## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACOB and JAMES JUNG, as Administrators of the Estate of LOUIS JUNG, JR, | : : : : | No. 2:24-cv-05618-TJS |
| Plaintiff, | : : | |
| v. | : : | **JURY TRIAL DEMANDED** |
| CITY OF PHILADELPHIA; YesCare Corp.; BLANCHE CARNEY, Former Commissioner of Philadelphia Dept. of Prisons; LALITHA TRIVIKRAM; MAUREEN GAY;  MARIESHA APOLLON; BLAIR CABELLOS; GENA FRASIER; WANDA BLOODSAW, | : : : : : : : : | |
| Defendants. | | |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Jacob and James Jung as Administrators of the Estate of Louis Jung, Jr. ("Mr. Jung"), by their counsel, hereby allege, as and for their Complaint against Defendant City of Philadelphia, YesCare Corp, Blanche Carney, Lalitha Trivikram, Maureen Gay, Mariesha Apollon, Blair Cabellos, Gena Frasier, Wanda Bloodsaw (together, "Defendants") as follows:

### INTRODUCTION

1.     Jacob and James Jung are sons of Louis Jung, Jr. Louis Jung, was a 50 year-old father, son, brother, and Philadelphia native. Louis Jung also suffered from Type 1 diabetes.

2.     While in the custody of the Philadelphia Department of Prisons, Mr. Jung died a preventable death caused by diabetic ketoacidosis. Together, James and Jacob are the administrators of his estate.

1

3.      Defendant City of Philadelphia is responsible for the health, safety, and the provision of medical care for individuals incarcerated at the Philadelphia Department of Prisons ("PDP").

4.      To date, there are well over 4,600 individuals housed within PDP that rely on defendants for the proper administration of their healthcare, both routine and urgent.

5.      All defendants were aware of their responsibility to provide adequate healthcare to all patients in their custody, but especially those with serious, chronic illnesses.

6.      The truth, however, is that PDP routinely fails to provide basic and necessary health care for individuals in their care such as Mr. Jung. PDP failed Mr. Jung in numerous, obvious ways that resulted in his death from a treatable illness. Among other faults, defendants:

- Failed to provide him with a diabetes care plan upon his intake to the jail;

- Failed to call for emergency care on October 28, 2023 when Mr. Jung's blood glucose levels were a dangerously high level of 542;

- Failed to place him in the infirmary where his precarious health condition could be properly monitored;

- Failed to take him to a hospital to stabilize his glucose levels and monitor him during his medical emergency;

- Failed to give him consistent access to glucose tests;

- Failed to give him any insulin in the last 6 days of his life;

- Failed to alert appropriate medical staff and seek necessary care while in his housing area;

- And delayed his emergency medical care for days until it was too late to save him.

7.      Despite having knowledge of Mr. Jung's history of diabetes, Defendants failed to properly treat him. Instead, they placed him in a cell on a housing unit where he could not access proper medical treatment, which resulted in his spending several days without insulin and eventually succumbing to diabetic ketoacidosis.

8.      Mr. Jung's sons cannot be silent about what their father endured. On behalf of him, and in the spirit of his memory, James and Jacob Jung seek justice for the callous, indifferent, and unlawful acts and omissions of defendants that resulted in the death of their father.

## JURSIDICTION AND VENUE

1.      This action is brought under 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("RA"). This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4). This Court has supplemental jurisdiction of the state law claims under 28 U.S.C. § 1367.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(b).

## PARTIES

3.      Jacob Jung is an adult individual residing in Pennsylvania, and James Jung is an adult individual residing in Delaware. Together they are the administrators of the Estate of Louis Jung, Jr., who was their father.

4.      Defendant, City of Philadelphia, a City of the First Class organized and existing under the laws of the Commonwealth of Pennsylvania was responsible for the creation and operation of the Philadelphia Department of Prisons including, but not limited to, the Curran-Fromhold Correctional Facility ("CFCF"). CFCF is located at 7901 State Road, Philadelphia, Pennsylvania.

5. Defendant Prison Commissioner Blanche Carney was at all relevant times for purposes of this lawsuit the Commissioner for the PDP of the City of Philadelphia. Defendant Blanche Carney is being sued in her individual capacity.

6. Defendant YesCare Corporation was at all relevant times for purposes of this lawsuit contracted with the City of Philadelphia to provide medical services, including care for patients with diabetes, to incarcerated people within the PDP.

7. Defendant Lalitha Trivikram was at all relevant times for purposes of this lawsuit the medical director employed by YesCare and responsible for the provision of medical services at CFCF. Defendant Trivikram is being sued in her individual capacity.

8. Defendant Maureen Gay was at all relevant times for purposes of this lawsuit a urse practitioner working in the PDP. Defendant Gay is sued in her individual capacity.

9. Defendant Mariesha Apollon was at all relevant times for purposes of this lawsuit a registered nurse (RN) working in the PDP. Defendant Apollon is sued in her individual capacity.

10. Defendant Blair Cabellos was at all relevant times for purposes of this lawsuit a licensed practical nurse (LPN) working in the PDP. Defendant Cabellos is sued in her individual capacity.

11. Defendant Gena Frasier was a correctional officer who worked in the housing unit where Mr. Jung died. She is sued in her individual capacity.

12. Defendant Wanda Bloodsaw was a correctional lieutenant who worked in the housing unit where Mr. Jung died. She is sued in her individual capacity.

# FACTS

## About Diabetes

13.     Approximately 38 million people in the United States have diabetes, comprising 11.6 percent of the population. Of those individuals, two million have Type 1 diabetes.[1]

14.     Diabetes is a chronic condition characterized by high levels of glucose in the blood due to the body's inability to produce or effectively use insulin. Insulin is a hormone that helps move glucose (blood sugar) into cells, thereby enabling energy production. Without insulin, blood glucose cannot enter cells and builds up in the bloodstream, leading to hyperglycemia.[2]

15.     If left untreated, hyperglycemia can then cause ketoacidosis and diabetic coma.[3]

16.     When the body cannot use glucose for fuel, it instead resorts to breaking down fats for energy, which produces a waste product called ketones. If the ketones cannot be sufficiently flushed out through urination, they build up in the bloodstream, poisoning the body and causing ketoacidosis. This is a serious, life-threatening condition that requires immediate medical care.[4]

17.     There are two main types of diabetes: Type 1 and Type 2. Although there are many similarities between Type 1 and Type 2 diabetes – both require ongoing medical management to prevent complications – the causes are very different, which is also reflected in each type's respective treatment.

---

[1] American Diabetes Association, Statistics About Diabetes, https://diabetes.org/about-diabetes/statistics/about-diabetes#:~:text=Overall%20numbers,of%20the%20population%2C%20had%20diabetes.&text=Diagnosed%20and%20undiagnosed%3A%20Of%20the,and%208.7%20million%20were%20undiagnosed. Accessed October 19, 2024.

[2] American Diabetes Association, Understanding Type 1 Diabetes, https://diabetes.org/about-diabetes/type-1. Accessed October 19, 2024.

[3] American Diabetes Association, Hyperglycemia (High Blood Glucose), https://diabetes.org/living-with-diabetes/treatment-care/hyperglycemia. Accessed October 19. 2024.

[4] American Diabetes Association, Diabetic Ketoacidosis – Signs & Symptoms, https://diabetes.org/about-diabetes/complications/ketoacidosis-dka/dka-ketoacidosis-ketones. Accessed October 19, 2024.

18.     Type 1 diabetes is an autoimmune condition: the body's immune system attacks insulin-producing cells in the pancreas, leading to little or no insulin production. It typically develops in childhood or adolescence, and people with Type 1 require daily insulin injections for management.[5]

19.     In contrast, in Type 2 diabetes, the body either becomes resistant to insulin or doesn't produce enough insulin. In contrast to Type 1, where the pancreas does not make insulin at all, people with Type 2 still produce insulin, but their bodies stop being able to use it.

20.     While Type 1 diabetes treatment focuses on lifelong insulin therapy and intensive blood glucose monitoring, Type 2 diabetes treatment often begins with lifestyle modifications and oral medications, potentially progressing to insulin therapy if necessary. Both types require education and support to manage the condition effectively.[6]

**Standards of Care for Management and Treatment of Diabetes in Jails**

21.     Each year, the American Diabetes Association (ADA) releases a national "Standards of Care in Diabetes." This report provides clinicians, policymakers, and researchers detailed information regarding diabetes care, general treatment goals, and tools to evaluate the quality of care.[7] For instance, the Federal Bureau of Prisons heavily cross-references the ADA in its 2017 Clinical Guidance for Management of Diabetes.[8]

22.     The ADA has also provided specific guidelines for the management of diabetes in correctional facilities, emphasizing that incarcerated persons should receive care that is of the same

---

[5] *Supra* n. 2.
[6] American Diabetes Association, Understanding Type 2 Diabetes, https://diabetes.org/about-diabetes/type-2. Accessed October 19, 2024
[7] American Diabetes Association, Introduction and Methodology: Standards of Care in Diabetes—2024 Diabetes Care 2024;47(Suppl. 1):S1–S4 | https://doi.org/10.2337/dc24-SINT. Accessed October 19, 2024.
[8] Federal Bureau of Prisons Clinical Guidance for Management of Diabetes, March 2017, https://www.bop.gov/resources/pdfs/diabetes_guidance_march_2017.pdf. Accessed October 19, 2024.

standards as that provided to the non-incarcerated population, while recognizing the unique challenges posed by detention. The ADA published a Position Statement on Diabetes Management in Detention Facilities in October 2021.[9]

23.    The Philadelphia Department of Prisons (PDP) has long recognized the ADA as the standard-setting organization for determining the proper standard of care for diabetes in jails.

24.    In 2021, PDP renewed its contract with Corizon Health (now known as YesCare Corp.) to provide medical care to PDP facilities.

25.    In the successful bid submitted in response to the Request For Proposals, Corizon represented that its "treatment guidelines are adapted from the nationally recognized correctional healthcare sources such as the National Commission on Correctional Health Care, and from clinical guidelines endorsed by recognized national organizations," which included the "American Diabetes Association" (ADA).

26.    Corizon's bid also represented that it regularly performed continuous quality improvement audits for its diabetes care and offered a chronic care clinic for diabetes care that adhered to "Evidenced-Based Care Guidelines."

- Diabetes Care was a "Core Corizon Health Audit Screen" issue incorporated into their Continuous Quality Improvement process.
- A diabetes "Chronic Care Clinic" was offered at PDP facilities.
- Corizon Health used "Evidence-Based Care Guidelines" for diabetes care.
- All medical and "appropriate correctional staff" were mandated to receive in-service training in diabetes.

27.    Corizon's successful bid contained a paragraph boasting of its improvements for those with poorly controlled or uncontrolled diabetes:

---

[9] American Diabetes Association, Diabetes Management in Detention Facilities, October 2021, https://diabetes.org/sites/default/files/2023-10/ADA-position-statement-diabetes-management-detention-settings-2021.pdf. Accessed October 19, 2024.

Diabetes Care has been significantly improved through the Pharmacist-Directed Diabetes Initiative. Patients are identified for enrollment in the clinical pharmacist clinic through physician referrals and inclusion in chronic care clinics. Physician referrals are most often generated by concerns of noncompliance and poly-pharmacy. In addition to the enrollment of patients referred by physicians, the clinical pharmacist identifies patients through utilization reports and medical chart reviews. This initiative specifically targets patients diagnosed with poorly controlled or uncontrolled diabetes, hypertension and hyperlipidemia.

28.     This recognition of the ADA as the standard-setting organization in care for diabetes was not a recent development within the City of Philadelphia's incarceration system either. In a settlement agreement approved in this federal district court in 2003, ADA representatives were permitted to observe training of police officers whose conduct was governed by the agreement, the ADA was to consult with the Philadelphia Police Department to design an educational poster, and the ADA agreed to co-produce a video with the Philadelphia Health Department on diabetes and the needs of people with diabetes in custody. See *Steven Rosen, et al. v. City of Philadelphia*, No. 2000-CV-764, Dkt. 39.

29.     The ADA identified key elements of the standard of care for diabetes management in jails and prisons in its October 2021 Position Statement. These include the following:

**Screening and Diagnosis**

30.     Upon entry into the facility, people should be screened for diabetes through medical history, physical examination, and appropriate laboratory tests. The ADA further notes that "It is critically important to determine if an individual has type 1 diabetes because *the omission of insulin for as little as 24 hours can result in severe metabolic decompensation, including diabetic ketoacidosis*. In addition, people with type 1 diabetes are at higher risk for severe hypoglycemia

due to the presence of hypoglycemia unawareness and therefore need more frequent glucose monitoring to detect impending severe hypoglycemia."[10]

31.    Medications and nutritional goals should be continued without interruption upon entry into the detention setting.

32.    A management plan to achieve normal or near normal glycemia with an A1C goal of < 7% should be developed at the time of initial medical evaluation.

33.    Goals should be individualized, documented in the patient's record and communicated to all persons involved in his/her care, including security staff.

**Glycemic Monitoring**

34.    Blood glucose monitoring should be available, with the frequency of monitoring tailored to the type of diabetes and the treatment regimen.

35.    For people with Type 1 diabetes, blood glucose levels should be checked 3 or more times daily (every 4-6 hours) because of risk for hypoglycemia. Glucose should be monitored prior to meals, at bedtime, prior to exercise, when low blood glucose is suspected, and after treating low blood glucose.

36.    Patients whose diabetes is poorly controlled or whose therapy is changing should have more frequent monitoring.

37.    Patients should be permitted to monitor their own glucose levels through a continuous glucose monitor or easy access to test strips and other necessary materials.

38.    A1C is a measure of long-term (two to three months) glycemic control and should be performed at least two times a year in patients who are meeting treatment goals (and who have

---

[10] *Id* (emphasis added).

stable glycemic control) and quarterly in patients whose therapy has changed or who are not meeting glycemic goals.

**Access to Medications**

39.    Medication administration should be consistent, timely, and supervised by medical personnel. Insulin administration should be coordinated with mealtimes, and facilities should ensure that insulin is stored properly and administered by trained personnel.

40.    The timing of rapid-acting insulin injections is critically important and should be immediately before or after (within 10 minutes) the meal. Long acting insulin should be administered at the same time each day.

41.    Insulin that is administered with the "sliding scale" method is when the insulin dose is based on blood sugar levels just before mealtime. The term "sliding scale" refers to the progressive increase in the pre-meal or nighttime insulin dose, based on pre-defined blood glucose ranges. Sliding scale insulin regimens approximate daily insulin requirements. Reliance on insulin "sliding scales" is ineffective, potentially dangerous, and is strongly discouraged.

**Hypoglycemia and Hyperglycemia Management**

42.    All patients must have access to prompt treatment for hypoglycemia (low blood glucose) and hyperglycemia (high blood glucose).

43.    Detention facilities should identify patients with type 1 diabetes who are at risk for diabetic ketoacidosis, particularly those with a prior history of frequent episodes of diabetic ketoacidosis.

44.    Facility staff should be educated on recognizing and responding to symptoms of both conditions, including by making appropriate referrals for care.

45. Staff should be required to notify a physician of all blood glucose results outside of a specified range, as determined by the treating physician (e.g., < 50 or > 350 mg/dL, < 2.8 or > 19.4 mmol/L).

46. Any patient with insulin-treated diabetes who becomes ill, runs a fever, complains of abdominal pain, nausea, vomiting or other unusual symptoms should be tested for ketonuria or ketonemia, regardless of the blood glucose level.

47. Urine ketones should be measured in patients with type 1 diabetes and persistent hyperglycemia (CBG > 300 for 24 hours). Presence of "moderate" or "large" urinary ketones requires urgent medical evaluation and treatment.

48. Despite the clarity of the preceding standards, and PDP's acknowledgment of the authority of the ADA, defendants systematically failed to adhere to these standards.

49. Defendant Carney failed to ensure that YesCare was complying with its contractual obligations in regard to providing ADA-compliant diabetes care despite being put on notice of deficiencies in care from deaths in custody and diabetes-related medical emergencies in PDP facilities, as discussed *infra*.

**Staff Education and Training**

50. The ADA recommends biannual trainings for lay and correctional staff to ensure they have the adequate knowledge and skills to provide for the health and safety of incarcerated persons. The ADA suggests that the curriculum should include the following:

- What diabetes is;

- Signs and symptoms of diabetes;

- Risk Factors;

- Signs and symptoms of, and emergency response to, hypo and hyperglycemia;

- Glucose monitoring;

- Medications;

- Exercise;

- Nutrition issues, including timing of meals and access to snacks;

- It is recommended to include diabetes in custodial/security staff education programs.

51.    Upon information and belief, PDP's staff education and training efforts on diabetes for correctional officers fell well short of this standard.

52.    Defendant Carney and Defendant Trivikram were responsible for ensuring staff under their supervision acquired this training, and despite their awareness that the training ranged from non-existent to grossly inadequate, they each failed to intervene and mandate the implementation of necessary, thorough, and effective training of correctional and medical care staff on providing for the needs of diabetic patients in PDP custody.

**Incarceration of Louis Jung, Jr.**

53.    Louis Jung, Jr. was born on April 16, 1973.

54.    Mr. Jung was diagnosed with Type 1 diabetes in adolescence. From that period on, Mr. Jung required daily treatment with insulin, frequent glucose checks, and appropriate dietary interventions to manage his glucose levels.

55.    Mr. Jung's diabetes required vigilance, daily care, and adherence to medical standards. Mr. Jung understood his condition and had more than 30 years of experience caring for himself in the community.

56.    Mr. Jung was the father of three children: Louis Jung III, Jacob Jung, and James Jung.

57.     Because of PDP's grossly inadequate policies and practices, Mr. Jung died from a preventable medical catastrophe that should have been avoided through adherence to basic medical standards of care for Type I diabetes.

58.     Louis Jung, Jr. was arrested and incarcerated in the PDP on December 16, 2021.

59.     Four days later, on December 20, 2021, he had to be hospitalized for diabetic ketoacidosis and hyperglycemia due to PDP's failure to treat his diabetes.

60.     From the start of his incarceration, PDP failed to develop a treatment plan, failed to provide necessary insulin, and failed to properly document Mr. Jung's glucose levels and insulin dosages.

61.     Mr. Jung was hospitalized between December 20, 2021 and January 5, 2022, and he was returned to Nazareth Hospital on January 5, 2022 and remained there through January 9, 2022 due to diabetic ketoacidosis and other medical conditions.

62.     Again, on April 7, 2022, he was admitted to Nazareth Hospital due to diabetic ketoacidosis because medical staff failed to ensure Mr. Jung was provided necessary medical care.

63.     Despite his high-intensity medical needs, PDP and YesCare officials and staff, including defendant Trivikram, did not confine Mr. Jung in a medical unit so as to ensure his diabetes was appropriately monitored and treated.

64.     Throughout his incarceration, PDP, YesCare, and defendant Trivikram routinely failed to provide or failed to ensure staff under their supervision provided prescribed doses of insulin, and failed to provide regular glucose checks.

65.     Medical staff also inexplicably did not document the dosages of insulin that he was provided pursuant to a prescription for an adjustable dose. This meant that medical providers had no record of the amount of insulin being provided to their patient from one dosage to the next.

66.    Additionally, medical staff failed to document Mr. Jung's glucose levels when they were checked. They were prescribed to be checked twice a day, yet this frequently did not happen. When it did, however, the actual glucose level was never documented unless Mr. Jung was in the infirmary.

67.    Defendant Trivikam was aware that medical staff did not properly document care for diabetic patients, but failed to intervene to ensure adherence to proper medical documentation protocol.

68.    Between his arrest and his death, Mr. Jung never was released from custody.

69.    During his incarceration, Mr. Jung was committed to Norristown Psychiatric Hospital pursuant to a court order so that his competency to stand trial could be evaluated and mental health treatment provided. He was at Norristown from March 23, 2023 through October 28, 2023.

70.    Mr. Jung was returned to PDP from Norristown on October 28, 2023. He would not leave PDP alive.

**Return to CFCF and Death of Louis Jung, Jr.**

71.    Louis Jung, Jr. returned to CFCF from Norristown State Psychiatric Hospital on October 28, 2023. Ten days later, he died from diabetic ketoacidosis after defendants failed to provide necessary treatment for his type 1 diabetes.

72.    Mr. Jung was in a state of medical emergency soon after he returned to CFCF, but no emergency care was provided.

73.    During a medical screening in the intake housing unit on October 28, 2023, which was conducted by defendant Apollon, Mr. Jung's glucose level was an alarming 542.

74.    Intake medical records show that Mr. Jung reported not having received insulin the prior three days.

75.    Defendant Apollon conducted this intake screening and communicated the findings of the screening to defendant Gay, and inexplicably both of them failed to provide proper care.

76.    A glucose level that high should have prompted immediate transfer to the infirmary or an outside hospital. Defendants Apollon and Gay did not take these obvious measures to protect Mr. Jung's health.

77.    A urine test was provided to test for the presence of ketones in the body, the accumulation of which causes diabetic ketoacidosis. Ketones were detected, providing further indication that Mr. Jung was facing a medical emergency that required urgent and continuous emergency medical care. Defendants Apollon and Gay did not enact such emergency care.

78.    Defendants Apollon and Gay recognized that Mr. Jung required chronic care follow-up, but this was not scheduled to occur for another 28 days. Mr. Jung would be dead before then from an untreated medical emergency.

79.    Defendant Apollon also entered erroneous information on Mr. Jung's medical intake form from October 28, 2023. She wrote "No" in response to questions asking if he was being returned from Norristown Hospital and if he was taking prescriptions for any medical conditions, including diabetes.

80.    Mr. Jung did not have any medical follow up between his intake screening on October 28 until his death on November 6.

81.    Defendants again prescribed Mr. Jung sliding scale insulin after his intake screening, despite this being contrary to American Diabetes Association standards for type 1 diabetes.

82.    Mr. Jung was again prescribed two types of insulin, and these were each to be provided twice daily.

83.    He was also to have his glucose checked twice daily.

84.    While in intake housing between October 28 and October 31, Mr. Jung was only provided 7 of 16 prescribed doses of insulin. No reason was documented by defendants for their failure to provide the other 9 doses.

85.    For those 7 instances when Mr. Jung was provided insulin, the actual dosage was not documented.

86.    Mr. Jung's glucose was only checked 5 of 8 prescribed times between October 28 and October 31. On those occasions when it was documented as having been checked, his glucose level was not documented.

87.    Between November 1 and November 6, the last days of Mr. Jung's life, there are no records that defendants provided him with any insulin or glucose checks whatsoever.

88.    Defendant Apollon, Gay and YesCare employees responsible for medical care for incarcerated people in the intake section of CFCF knew Mr. Jung was possibly suffering from diabetic ketoacidosis on October 28. They then failed to provide prescribed care for the remainder of October, not providing the majority of his prescribed insulin, not providing necessary ketone testing, not providing emergency care, not providing necessary medical monitoring of his condition, not checking his glucose with sufficient regularity, not documenting his glucose level when it was checked. This flagrant and knowing deviation from the standard of care for a patient with type 1 diabetes resulted in a worsening of Mr. Jung's medical emergency.

89.    And then, inexplicably and unconscionably, defendants Apollon, Gay and YesCare staff managed to do even less. They allowed Mr. Jung to slowly die from diabetic ketoacidosis

without any treatment whatsoever between November 1 and November 6 despite being aware of his serious medical needs for daily treatment for his diabetes and his need for emergency care to resolve his elevated glucose level.

90.     Mr. Jung's worsening medical condition was apparent and recognized by defendants Cabellos, Frasier, and Bloodsaw on November 5, the day before he died, but they all failed to render him any medical care.

91.     Defendant Cabellos, a licensed practical nurse who was aware that Mr. Jung was a diabetic, encountered Mr. Jung while he was prone on the ground in the doorway of his cell on November 5. She was told by Mr. Jung that he could not get up, but instead of providing any assistance or ensuring that other medical or correctional staff came to provide aid, defendant Cabellos walked off the unit without providing any medical care.

92.     Defendant Frasier, a correctional officer, was with defendant Cabellos on November 5, and also encountered Mr. Jung on the floor in the doorway of his cell and failed to provide him with medical care. They both left Mr. Jung lying on the floor outside of his cell for approximately nine minutes.

93.      Defendant Frasier also knew that Mr. Jung was a diabetic, and even entered into the housing log that Mr. Jung refused insulin. This entry was made despite Mr. Jung being medically incapable of moving off the floor, without him having signed a refusal form, and without defendant Frasier being able to explain how Mr. Jung refused when questioned about this incident.

94.     Mr. Jung, in fact, did not refuse insulin, but was in medical crisis and denied care by defendants Cabellos and Frasier.

95.     Defendant Bloodsaw, a correctional lieutenant, also encountered Mr. Jung on November 5 while he was on the floor in the doorway of his cell. Defendant Bloodsaw watched

as two incarcerated people dragged Mr. Jung back into his cell. Defendant Bloodsaw then exited the housing area.

96.     Defendants Cabellos, Frasier, and Bloodaw all encountered an unmistakable medical emergency on November 5 involving Mr. Jung. Defendants were aware that Mr. Jung was a diabetic, all were supposed to have been trained to recognize symptoms of medical distress, including diabetic ketoacidosis. Still, all of them failed to intervene and ensure Mr. Jung was provided emergency medical care as his condition deteriorated between November 5 and his death on November 6.

97.     Because defendants Cabellos, Frasier, and Bloodsaw failed to render medical care, Mr. Jung was left in his cell to die from diabetic ketoacidosis. By the time he was discovered by staff the morning of November 6, it was too late to save him. Mr. Jung's life could have been saved if he was provided proper medical care on November 5.

98.     Because of the failures of correctional staff, YesCare medical staff, YesCare, and the City of Philadelphia, Mr. Jung died a preventable death from a treatable illness that defendants knew had provoked a medical emergency in need of urgent care.

99.     Defendants' policies and practices enabled a culture where individual defendants willfully failed to provide patients like Mr. Jung with necessary care.

100.    But for the acts and omissions of defendants in this case, Mr. Jung would be alive today.

**Policies and Practices of the Philadelphia Department of Prisons Resulted in Mr. Jung's Death**

101.    Mr. Jung's death was caused by the customs and practices of the defendant City of Philadelphia, which PDP officials, including defendant Carney, knew of and failed to remedy, including:

a.  A custom of failing to timely respond to medical emergencies;

b.  A custom of ignoring the medical needs of incarcerated persons with physical and psychiatric disabilities;

c.  A custom of failing to provide care for individuals with diabetes that complied with the standards established by the American Diabetes Association;

d.  A custom of failing to provide timely rounds by corrections officers and their failure to respond to signs and symptoms of distress indicating a need for medical or psychiatric care;

e.  A custom of failing to appropriately train, discipline, and/or supervise its employees regarding the protection of persons admitted to the PDP with serious medical problems.

102.    For years, the PDP has displayed a consistent, callous, and systemic failure to maintain the order necessary to ensure adequate medical care.

103.    In the 12 months preceding Louis Jung's death, 12 people died at PDP. Additionally, in previous years, several incidents underscored the need for additional safeguards to protect the health of incarcerated persons. Several of these deaths resulted from PDP's failures to address the emergency medical needs of people at PDP:

a.  On September 20, 2018, while incarcerated at CFCF, Jonathan Gleaves, Jr., began experiencing noticeable, serious medical consequences relating to his substance abuse issues, including vomiting and diarrhea, as well as severe pain and discomfort, as evidenced by Mr. Gleaves' constant moaning. Eventually, Mr. Gleaves grew quiet and stopped making any sounds. His cellmate, T.T., pressed the alarm button in their cell, but corrections officers were either not alerted to the

emergency because they had turned off the alarm system, or they failed to respond because they customarily ignored requests for emergency assistance. These officers further failed to perform the duty of conducting regular tours of the unit housing Mr. Gleaves and T.T. Consequently, Mr. Gleaves was left in his cell suffering from a medical emergency, which ultimately caused his death—a death that could have been prevented had the officers adhered to their responsibilities.[11]

b.  On January 15, 2021, 60-year-old Dale Curbeam was found face down in his cell at CFCF. His death was ruled a homicide by blunt impact head trauma.[12]

c.  On April 12, 2021 Christopher Hinkle was beaten by his cellmate and died. Hours passed before he was discovered.[13]

d.  In February 2022, the family of Armani Faison sued the City of Philadelphia for placing him in a cell in CFCF with another incarcerated person who had recently assaulted a previous cellmate, then failing to intervene when he was attacked and murdered while in his cell and screaming for help for hours.[14]

e.  Norman Cooper reported that, while incarcerated at CFCF in 2020, an unknown person incarcerated on his cell block committed suicide. It was alleged that the victim was left hanging for several hours due to the failure of guards to check on

---

[11] McNamara v. City of Philadelphia, Complaint, Dkt. 1, 2:20-cv-4570, (E.D. Pa. Sept. 18, 2020).

[12] Samantha Melamed, "A man died after assault in Philly jail, where violence has surged under pandemic lockdown," Philadelphia Inquirer, January 20, 2021, https://www.inquirer.com/news/homicide-philadelphia-jails-violence-covid-pandemic-lockdowns-20210120.html. Accessed October 19, 2024.

[13] Mensah Dean, "In the absence of information about a jail beating death, a family will sue Philadelphia," Philadelphia Inquirer, February 28, 2022, https://www.inquirer.com/news/inmate-homicide-prisons-philadelphia-jail-lawsuit-christopher-hinkle-20220228.html. Accessed October 19, 2024.

[14] Mensah Dean, "Family of a man who was raped and killed in a Philly jail has sued, blaming the city for his death," Philadelphia Inquirer, February 3, 2022, https://www.inquirer.com/news/prison-homicide-inmate-death-federal-lawsuit-armani-faison-20220203.html. Accessed October 21, 2024.

his cell. According to Mr. Cooper, the victim's cellmate had banged on the walls of the cell to alert a correctional officer and call for help to no avail.[15]

    f.    According to a January 7, 2022 *Philadelphia Inquirer* report, there were – and had been – consistent reports of incarcerated people experiencing chest pain, seizures, diabetic shock, and panic attacks in their cells, while their urgent calls for medical attention went ignored. One man, a 49-year-old diabetic reported that "there's an emergency button in his cell but it doesn't work. 'I have had hypoglycemic events and anxiety attacks in my cell with no way to ask staff for help.'"[16]

104.    Defendant City of Philadelphia and Carney were aware of several other medical emergencies involving incarcerated patients with diabetes.

105.    On October 20, 2014, Frank SanLorenzo died of diabetic ketoacidosis at PDP at 32 years old.

106.    On April 16, 2021, Rahsaan Chambers, an incarcerated person housed at CFCF, died of medical complications caused by diabetic ketoacidosis at 22 years old.

107.    Prior to his death, Mr. Chambers experienced respiratory distress in his cell for over 24 hours before he received any medical attention.

108.    When he was finally examined by a prison medical staff member, his respiratory distress had become even more severe.

109.    Despite previous complaints to several correctional officers, and even defendant Carney, Mr. Chambers did not receive proper medical attention. As a result, Mr. Chambers fell into a vegetative state while hospitalized with ketoacidosis and died.

---

[15] Samantha Melamed, "Hunger, filth, constant danger: Prisoners' accounts of Philly jails paint a grim picture," Philadelphia Inquirer, November 16, 2021, https://www.inquirer.com/news/philadelphia-jail-conditions-cfcf-prisons-emergency-20211116.html. Accessed October 19, 2024.
[16] *Id.*

110.    In August 2021, Defendant Carney and Defendant Trivikram were made aware via letter from the Pennsylvania Institutional Law Project of an incarcerated man who was diagnosed with diabetes at CFCF in 2019. Defendants Carney and Trivikram were informed that "[t]he PDP has neglected to reliably provide [patient] with medication to treat his diabetes, with detrimental consequences … On some occasions, his doses have been skipped altogether. With recent staff shortages, these occasions have increased in frequency. Going without insulin is incredibly dangerous for insulin-dependent diabetics and can lead to diabetic ketoacidosis and even death."[17]Upon information and belief, at the time Mr. Jung did not receive care for his dangerously high glucose, PDP had a policy requiring treatment and management of patients with diabetes, including treatment for those experiencing a medical emergency at CFCF, and there existed a written policy requiring that medical care be immediately summoned for incarcerated individuals experiencing medical emergencies.

111.    However, PDP had a custom or de facto policy to allow egregious gaps in treatment to persist, of failing to provide ADA-compliant diabetic care, and to ignore medical emergencies resulting from such gaps, with deliberate indifference to the fact that ignoring such problems would risk death or grave physical harm for incarcerated patients.

112.    PDP had a custom of not creating individualized treatment plans for those with diabetes, which should have occurred each time a diabetic patient was processed through intake to the jail.

113.    PDP had a custom of failing to create a management plan to obtain appropriate A1C levels for diabetes patients.

---

[17] Pennsylvania Institutional Law Project, PILP Sends Letter to Philadelphia Department of Prisons Over Inadequate Diabetes Treatment, August 21, 2024, https://pilp.org/news/2021/8/30/pilp-sends-letter-to-pdp-over-diabetes-treatment. Accessed October 19, 2024.

114.    PDP had a custom of not documenting the dosage level of insulin provided to patients with diabetes on their medical charts who were confined at CFCF.

115.    PDP had a custom of not documenting the glucose level of diabetes patients at CFCF who were required to have daily glucose checks.

116.    PDP had a custom of routinely failing to administer prescribed insulin and glucose checks to diabetes patients at CFCF.

117.    Moreover, PDP had a custom of failing to properly investigate and address allegations contained within lawsuits against them.

118.    In April of 2020 ten incarcerated individuals within various facilities operated by the Philadelphia Department of Prisons filed a civil rights class action lawsuit against the City of Philadelphia and Prison Commissioner Blanche Carney over the conditions of the prisons and treatment of incarcerated people by staff. That lawsuit noted that its class members "are denied timely and adequate medical care" and that "Class member-Plaintiffs suffering from medical emergencies in their cells are not provided necessary medical care and treatment and have been forced to wait for prolonged periods for assistance from medical staff, exacerbating their condition and putting them at risk of illness, injury, and death."[18]

119.    On June 3, 2020, Defendant City of Philadelphia entered into a partial settlement agreement of the lawsuit. In that agreement, the City of Philadelphia agreed to "provide medically-necessary medical care for non-COVID-19 related medical and mental health needs based on protocols and directives in effect pre-COVID-19…"[19]

_____

[18] Remick v. City of Philadelphia, Amended Complaint, Dkt. 126-1, p. 8, 2:20-cv-01959, (E.D.Pa. January 7, 2022).
[19] Remick v. City of Philadelphia, Consent Decree, Dkt. 35, 2:20-cv-01959 (E.D. Pa. June 3, 2020).

120.    As part of the *Remick* litigation, Plaintiffs' counsel submitted public status reports regarding conditions at the Philadelphia Department of Prisons. The status report submitted on November 10, 2021 contained affidavits from incarcerated persons, including Joseph Rue, who was detained at CFCF. He wrote "staff shortages have also affected medical care. I have diabetes and since I have been on this unit, I have missed 4 or 5 blood sugar checks. It is very dangerous as a diabetic to go without monitoring my blood sugar levels."[20]

121.    On April 12, 2022, the parties in *Remick* agreed to a settlement with the City of Philadelphia designed to address and improve conditions at PDP.

122.    On July 27, 2024 following a contempt hearing, Judge McHugh found the City of Philadelphia in contempt of court for its failure to meet benchmarks and standards set forth in the April 2022 Settlement Agreement, including provisions related to timely and adequate medical care. The City had failed to come into compliance with the 2022 Consent Order during that period, including the time in which Louis Jung, Jr. was incarcerated and died within the PDP. Defendant Carney, as the former Commissioner of the Philadelphia Department of Prisons, as well as correctional defendants Frasier and Bloodsaw, were responsible for developing, promulgating, and enforcing proper policies and procedures to ensure that incarcerated persons like Mr. Jung are protected from the unlawful acts and omissions described in this Complaint.

123.    Defendant Carney was also responsible for supervising, training, and disciplining PDP staff to ensure adequate and timely responses to the emergency medical needs of incarcerated persons like Mr. Jung.

124.    At all times, Defendant Carney defendants failed to properly supervise and train staff, to ensure that incarcerated persons in need, like Mr. Jung, received appropriate care. This

---

[20] Remick v. City of Philadelphia, Plaintiffs' Status Report, Declaration of Joseph Rue, Dkt. 111-1, 2:20-cv-01959, (E.D.Pa. November 10, 2021).

supervisory deficiency involved, among other things, a failure to properly monitor staff compliance with this constitutional mandate, a failure to properly investigate breaches of this mandate, and a failure to properly discipline and retrain staff following such breaches.

125.    This supervisory failure resulted in the unlawful acts and omissions described in this complaint and was the factual cause of Mr. Jung's needless suffering and death.

126.    At all relevant times, all defendants were aware of Mr. Jung's serious medical needs and failed, with deliberate indifference, to ensure that Mr. Jung received needed evaluation and treatment.

127.    In particular, defendant City of Philadelphia, through its employees and agents, was aware of the factual basis for the claims raised here.

128.    Defendants City of Philadelphia, Carney, Frasier, and Bloodsaw failed to put in place an effective policy of ensuring adequate emergency medical care for those incarcerated at PDP. That failure resulted in Mr. Jung's death.

129.    As a direct and proximate cause of the conduct of all defendants, Mr. Jung experienced enormous physical and emotional pain and suffering.

130.    As a direct and proximate result of the conduct of all defendants, Mr. Jung was caused to lose the enjoyment of his life and was also caused to suffer complete loss of earnings and earning capacity.

**YesCare Corporation's Policies and Practices Resulted in Mr. Jung's Death**

131.    YesCare Corporation is a medical services company headquartered in Brentwood, Tennessee.

132.     YesCare was formed when its predecessor company, Corizon Health, Inc., divided itself into two corporations in a maneuver viewed by many as a fraudulent attempt to manipulate the bankruptcy system so as to shield its assets from jurisdictions and patients it has wronged.[21]

133.     YesCare is the medical contractor for the PDP. Its business model is to minimize costs so as to maximize profits.

134.     YesCare, through its predecessor Corizon, represented to PDP that it would provide diabetes care consistent with the standards set by the American Diabetes Association. This was untrue.

135.     Despite this representation, YesCare knowingly failed to provide care consistent with ADA standards.

136.     YesCare, through its predecessor Corizon, represented to PDP that it would provide training in recognizing the signs and symptoms of diabetes to all medical staff and appropriate correctional staff working in PDP facilities.

137.     Despite this representation, YesCare failed to provide meaningful, effective training to all necessary staff, including training on diabetes care and emergency medical care.

138.     YesCare had a custom at PDP of not documenting insulin dosages and glucose levels for patients who were not housed in the infirmary in contravention of ADA standards.

139.     YesCare had a custom at PDP of not providing individualized treatment plans for diabetes patients in contravention of ADA standards.

140.     YesCare had a custom at PDP of not developing individual treatment plans to keep patients' A1C levels within healthy limits in contravention of ADA standards.

---

[21] Nicole Einbinder and Dakin Campbell, "Hidden investors took over Corizon Health, a leading prison healthcare company. Then they deployed the Texas Two-Step," Business Insider, August 21, 2023, https://www.businessinsider.com/corizon-health-bankruptcy-yescare-texas-two-step-law-2023-8. Accessed October 19, 2024.

141.    YesCare had a custom at PDP of not providing regular insulin and glucose checks in contravention of ADA standards.

142.    YesCare staff routinely failed to provide prescribed insulin and glucose checks to diabetic patients at PDP, and the company failed to take remedial measures to rectify the problem.

143.    YesCare systematically engaged in under-staffing, failing to offer necessary incentive packages to ensure a medically adequate complement of staff to meet patient needs at PDP.

144.    YesCare had a custom of not providing medically appropriate housing to patients with Type 1 diabetes despite knowledge that housing these patients outside of a medical unit greatly increased the risk that their medical needs would not be met.

145.    YesCare failed to train its personnel on the requirements of the Americans with Disabilities Act as it pertains to diabetic patients, and how that law necessitated reasonable accommodations to ensure diabetic patients need for insulin, glucose monitoring, dietary modifications, and access to exercise opportunities.

146.    YesCare had a custom at PDP of not responding promptly to emergency needs. Despite frequent failures of YesCare personnel to provide urgent medical care the company failed to take remedial measures to ensure its staff were able to recognize and respond to medical emergencies.

147.    Because of the aforementioned policies, practices, and customs of YesCare Corporation, YesCare employees failed to provide necessary medical care and accommodations to Louis Jung, Jr., resulting in his death.

148.    Defendant Trivikram, as the medical director for YesCare at PDP, was aware of and responsible for remedying all of the policies, practices, and customs of deficient diabetes care described above, yet failed to take reasonable measures to do so.

**Americans With Disabilities Act Violations**

149.    Louis Jung was diagnosed with Type 1 diabetes, a condition that substantially limited the function of his endocrine system.

150.    Mr. Jung was a qualified individual with disabilities within the meaning of Title II of the Americans with Disabilities Act ("ADA").

151.    Defendant City of Philadelphia is a public entity within the meaning of 42 U.S.C. §12131.

152.    Defendant City of Philadelphia was aware that Mr. Jung was an individual with disabilities who is protected by the ADA.

153.    Despite this knowledge, Defendant City of Philadelphia failed to provide the necessary reasonable accommodations for Mr. Jung's disabilities.

154.    Such reasonable accommodations for Mr. Jung's disabilities include but are not limited to:

      a.   an initial treatment plan upon each admission to PDP;

      b.   an exercise plan to aid in diabetes care;

      c.   regular glucose level checks;

      d.   regular and prescribed insulin medication administration;

      e.   documentation of glucose levels and insulin doses;

      f.   a specialized diabetic diet;

g. medically appropriate housing, including placement in the infirmary to ensure necessary provision of care and medical attention;

h. training of staff on signs and symptoms of ketoacidosis and diabetes care, and

i. emergency attention and care.

155. Defendant City of Philadelphia acted with deliberate indifference to the risk of violating Mr. Jung's federally protected rights under the Americans with Disabilities Act by failing to provide Mr. Jung with an initial treatment plan at intake or anytime thereafter to manage his Type 1 diabetes, a care plan that would permit him to meaningfully benefit from the medical services administered at the prison.

156. Mr. Jung was denied meaningful access to the medical services provided by Defendants by being denied insulin administration and regular glucose level checks.

157. Mr. Jung was denied access to services and programs including but not limited to congregate activity in the dayroom, visitation, telephone calls, and participation in programming due to illness and hospitalization caused by defendants' failures to provide reasonable accommodations for his Type 1 diabetes.

158. Mr. Jung was also denied access to medically appropriate meals and a diet that was nutritionally appropriate for him, which is key in controlling glucose levels and managing diabetes.

159. Defendants discriminated against Mr. Jung by failing to provide him medication that he needed because of his diabetes. Defendants failed to administer regular glucose level checks and insulin administration as needed and failed to provide any care whatsoever in the 6 days preceding his untimely death.

160.    As a direct and proximate result of the aforementioned acts, including but not limited to Defendant City of Philadelphia's deliberate indifference to the violations of Mr. Jung's federally protected rights, Mr. Jung died a preventable death.

### Causes of Action

### COUNT I: Defendants' Deliberate Indifference and Objective Unreasonableness to Plaintiff's Serious Need for Medical Care Violates the Fourteenth Amendment to the U.S. Constitution – Against City of Philadelphia, YesCare Corp, and Against Defendants Carney, Trivikram, Gay, Apollon, Cabellos, Frasier, and Bloodsaw in their Individual Capacities

161.    All paragraphs herein are incorporated by reference.

162.    All Defendants failed to provide constitutionally required medical care for Mr. Jung. Defendants City of Philadelphia, YesCare Corp., Trivikram, Gay, and Apollon all were aware of Mr. Jung's Type 1 diabetes and each acted with deliberate indifference and objective unreasonableness in failing to provide care as required by the standards of the American Diabetes Association. These failures include but are not limited to not providing treatment plans, failing to provide insulin and glucose as necessary, not providing emergency care when Mr. Jung had the dangerously elevated glucose level of 542 and ketones in his system in October 2023, and ultimately letting him die from an untreated medical emergency.

163.    Defendants City of Philadelphia, Carney, YesCare Corp, and Trivikram further failed Mr. Jung by creating, enforcing, and/or adhering to the policies, practices, and customs alleged in this Complaint that resulted in under-staffing of correctional and medical staff, and systematically failing to adhere to proper standards for diabetes care.

164.    Defendants Cabellos, Frasier, and Bloodsaw all acted with deliberate indifference and objective unreasonableness to symptoms of Mr. Jung while he was dying from diabetic ketoacidosis on November 5, 2023. Despite the obvious nature of Mr. Jung's need for medical care

they failed to render medical care or initiate emergency treatment for Mr. Jung, resulting in his death.

**COUNT II: Medical Malpractice – Against Defendants YesCare, Trivikram, Gay, Apollon, Cabellos**

165.    All paragraphs herein are incorporated by reference.

166.    Defendants YesCare, Trivikram, Gay, Apollon, and Cabellos violated their duty of care to Mr. Jung under Pennsylvania state law by their negligent conduct in deviating from the proper standard of care required for Mr. Jung's Type 1 diabetes. These failures include but are not limited to not providing treatment plans, failing to provide insulin and glucose as necessary, not providing emergency care when Mr. Jung had the dangerously elevated glucose level of 542 in October 2023, and ultimately letting him die from an untreated medical emergency.

167.    Defendants YesCare, Trivikram, Gay, Apollon, and Cabellos further failed Mr. Jung by creating, enforcing, and/or adhering to the policies, practices, and customs that systematically failed to provide proper diabetes care, all of which deviated from the proper standard of care for Type 1 diabetes.

168.    Defendant Cabellos also violated their duty of care to Mr. Jung under Pennsylvania state law by negligently failed to provide medical care or initiate emergency medical assistance on November 5, 2023 when she found Mr. Jung prone on the floor and in medical distress.

**COUNT III Americans with Disabilities Act, 42 U.S.C. §12132 – Against Defendant City of Philadelphia**

169.    All paragraphs herein are incorporated by reference.

170.    Defendant City of Philadelphia is a public entity within the meaning of 42 U.S.C. §12131.

171.    Plaintiff is a qualified individual with disabilities within the meaning of Title II

of the Americans with Disabilities Act ("ADA").

172.    Defendant City of Philadelphia, and its employees, knew that Plaintiff was an individual with disabilities covered by the protections of the ADA.

173.    Despite this knowledge, the City of Philadelphia and its employees failed to provide Plaintiff with necessary reasonable accommodations for his disability.

174.    Such reasonable accommodations for Plaintiff's physical disabilities include but are not limited to:

   a.   an initial treatment plan upon admission to PDP;

   b.   regular glucose level checks;

   c.   regular and prescribed insulin medication administration;

   d.   documentation of glucose levels and insulin doses;

   e.   a specialized diabetic diet;

   f.   medically appropriate housing, including placement in the infirmary to ensure necessary provision of care;

   g.   training of staff on signs and symptoms of ketoacidosis and diabetes care, and

   h.   emergency attention and care.

175.    City of Philadelphia acted with deliberate indifference to the risk of violating Plaintiff's federally protected rights under the Americans With Disabilities Act by permitting, authorizing, acquiescing in, and otherwise enabling staff to fail to provide for the aforementioned reasonable accommodations for Mr. Jung's diabetes.

176.    As a direct and proximate result of the aforementioned acts, including but not limited to Defendant City of Philadelphia's deliberate indifference to the violations of Plaintiff's federally protected rights, Mr. Jung died a preventable death.

**COUNT IV: Rehabilitation Act, Section 504 – Against City of Philadelphia**

177.    All paragraphs herein are incorporated by reference.

178.    The City of Philadelphia receives federal financial assistance.

179.    For the reasons set forth in Count III, *supra*, the City of Philadelphia's conduct toward Mr. Jung was in violation of the Rehabilitation Act.

**COUNT V: Failure to Train or Supervise Staff to Provide Proper Medical Care or Discipline Staff who Failed to Provide Proper Medical Care in Violation of the Fourteenth Amendment – Against City of Philadelphia YesCare**

180.    All paragraphs herein are incorporated by reference.

181.    Defendant City of Philadelphia and YesCare failed to provide necessary training to staff to ensure proper medical care was provided to patients with Type 1 diabetes, as described in the Complaint, by:

a.    Failing to train and supervise staff in providing timely responses to medical emergencies;

b.    Failing to train and supervise staff on recognizing and responding to the medical needs of incarcerated persons with physical and psychiatric disabilities, including diabetes;

c.    Failing to train and supervise medical staff to provide care for individuals with diabetes that complied with the standards established by the American Diabetes Association;

d.    Failing to train and supervise correctional staff in making timely rounds and responding to signs and symptoms of distress indicating a need for medical or psychiatric care, including signs and symptoms associated with diabetes;

33

    e.    Failing to discipline correctional staff who failed in their responsibilities as they relate to medical emergencies.

**COUNT VI: Wrongful Death – Against Defendants City of Philadelphia, YesCare, Carney, Trivikram, Gay, Apollon, Cabellos, Frasier and Bloodsaw**

182.    All paragraphs herein are incorporated by reference.

183.    The following individuals are eligible to recover damages as a result of Louis Jung, Jr.'s death pursuant to 42 Pa.C.S.A. § 8301: Jacob Jung, James Jung, Louis Jung III.

184.    During his lifetime, Louis Jung, Jr. did not commence any action for the injuries that caused his death and no other action has been filed to recover damages for the wrongful death of decedent.

185.    At all relevant times, all Defendants committed acts of willful misconduct and acted with reckless indifference, carelessness, and negligence in regard to the rights of Louis Jung, Jr.

186.    As the direct and proximate result of the acts and omissions of all Defendants, Plaintiffs have suffered the following damages:

    a.    Expenses of administration related to Louis Jung, Jr.'s death; and

    b.    All other damages permissible in a wrongful death action.

187.    As a direct and proximate result of Defendants' acts and omissions described in this Complaint, Plaintiffs seek punitive damages.

188.    At all relevant times all defendants had a duty to provide Mr. Jung with reasonable medical care for his diabetes.

189.    Defendants failures to provide proper, necessary medical care resulted in his death.

**COUNT VII: Survival Action – Against Defendants City of Philadelphia, YesCare, Carney, Trivikram, Gay, Apollon, Cabellos, Frasier and Bloodsaw**

190.    All paragraphs herein are incorporated by reference.

191.     Plaintiffs bring this survival action pursuant to 20 Pa. C.S.A. § 3373 and 42

Pa.C.S. § 8302.

192.     As a direct and proximate result of Defendants' acts and omissions, all

Defendants are liable for the following damages:

    a.   Louis Jung, Jr.'s pain and suffering during his confinement in the PDP, including

       prior to and at the time of his death;

    b.   Louis Jung, Jr.'s total estimated future earning power;

    c.   Louis Jung, Jr.'s loss of retirement and Social Security income;

    d.   Louis Jung, Jr.'s other financial losses suffered as a result of his death;

    e.   Louis Jung, Jr.'s loss of the enjoyment of life.

## Prayer for Relief

WHEREFORE, Messrs. Jung, as Administrators of the Estate of Louis Jung, Jr.,

respectfully requests that judgment be entered in their favor and against Defendants as follows:

    (i)     Actual and special damages as to all Counts,

    (ii)    Compensatory damages as to all Counts,

    (iii)   Punitive damages as to all Counts,

    (iv)    Attorney's fees and costs, and

    (v)     All other relief as this Court deems just and proper.


Respectfully submitted,

*/s/ Bret Grote*
Bret Grote (PA 317273)
*/s/ Nia Holston*
Nia Holston (PA 327384)
*/s/ Rupalee Rashatwar\**
Rupalee Rashatwar (PA 331085)

*/s/ Margaret Hu*
Margaret Hu (PA 334438)
990 Spring Garden
Philadelphia, PA 19123
(412) 654-9070
bretgrote@abolitionistlawcenter.org
nia@alcenter.org
rupalee@alcenter.org
margo@alcenter.org

DATE: March 13, 2025