## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PA

| | |
|---|---|
| JACOB and JAMES JUNG as Administrators<br>for the Estate of LOUIS JUNG, JR.<br>            v.<br>CITY OF PHILADELPHIA; YESCARE CORP.,<br>BLANCHE CARNEY, LALITHA TRIVIKRAM,<br>MAUREEN GAY, MARIESHA APOLLON,<br>BLAIR CABELLOS, GENA FRASIER, and<br>WANDA BLOODSAW | :<br>:<br>:     CASE NO. 24-CV-05618<br>:<br>:<br>:<br>:<br>: |

## <u>ORDER</u>

**AND NOW** this _____ day of _____, 2025, upon consideration of

the Motion of Defendant YesCare Corporation to Join CareerStaffing Unlimited, LLC as a Third

Party Defendant in the above-captioned matter, and any response thereto, it is hereby **ORDERED**

and **DECREED** that the Defendants' Motion is **GRANTED**. YesCare Corporation is granted leave

to file its Third Party Complaint against CareerStaffing Unlimited, LLC, within twenty (20) days of

the date of this Order.

**BY THE COURT:**

_____

                                    J.

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PA

| | | |
|---|---|---|
| JACOB and JAMES JUNG as Administrators for the Estate of LOUIS JUNG, JR. | : | |
| | : | |
| | : | |
| v. | : | CASE NO. 24-CV-05618 |
| | : | |
| CITY OF PHILADELPHIA; YESCARE CORP., BLANCHE CARNEY, LALITHA TRIVIKRAM, MAUREEN GAY, MARIESHA APOLLON, BLAIR CABELLOS, GENA FRASIER, and WANDA BLOODSAW | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## MOTION OF DEFENDANT YESCARE CORPORATION
## TO JOIN ADDITIONAL DEFENDANT PURSUANT TO F.R.C.P. 14

Pursuant to Federal Rule of Civil Procedure 14, Defendant YesCare Corporation hereby

moves this Honorable Court for its Order permitting the Joinder of CareerStaffing Unlimited, LLC

as a Third Party Defendant in the above-captioned matter. The arguments and authorities in support

of this motion are set forth in the accompanying Brief.

Respectfully submitted,

**O'CONNOR KIMBALL LLP**

By: _____

Thomas J. Gregory, Esquire
Two Penn Center Plaza, Suite 1100
1500 John F. Kennedy Boulevard
Philadelphia, PA 19102
215-564-0400      Facsimile: 215-564-1973
Email: tgregory@okllp.com
*Attorney for Defendants, YesCare Corporation, Lalitha*
*Trivikram, M.D., Maureen Gay, N.P., and*
*Blair Cabellos, LPN*

Dated: 6/19/25

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PA

| | |
|---|---|
| JACOB and JAMES JUNG as Administrators for the Estate of LOUIS JUNG, JR.      : <br><br> : <br> : <br> v.      : <br> : <br> CITY OF PHILADELPHIA; YESCARE CORP., : <br> BLANCHE CARNEY, LALITHA TRIVIKRAM, : <br> MAUREEN GAY, MARIESHA APOLLON, : <br> BLAIR CABELLOS, GENA FRASIER, and : <br> WANDA BLOODSAW      : | CASE NO. 24-CV-05618 |

## MEMORANDUM OF LAW OF DEFENDANT YESCARE CORPORATION IN SUPPORT OF ITS
## MOTION TO JOIN THIRD PARTY DEFENDANT PURSUANT TO F.R.C.P. 14

**COMES NOW**, Defendant YesCare Corporation, by and through its counsel, O'Connor Kimball LLP, and as and for its Motion for Leave to Join CareerStaffing Unlimited, LLC as a third Party Defendant in the above-referenced matter, states as follows:

## I.  MATTER BEFORE THE COURT:

Motion for Leave to Join CareerStaffing Unlimited, LLC as a Third Party Defendant in the instant matter.

## II.  FACTUAL BACKGROUND:

This matter involves the claims of the Plaintiff for the wrongful death of the Plaintiffs' Decedent, Luis Jung. The Decedent, in 2023, was an inmate in the Philadelphia Department of Prisons located on State Road in Philadelphia, PA. The Moving Defendant, YesCare Corporation was, and is, the contracted-for provider of medical services to the inmate population of the Department of Prisons.

The Plaintiffs allege that the Decedent was deprived of appropriate medical care for his

diabetes mellitus which led to an incidence of diabetic ketoacidosis which culminated in the Decedent's death. In the Plaintiffs' original Complaint, the Plaintiffs named the City of Philadelphia, YesCare Corporation, former prison commissioner Blanche Carney, YesCare's physician Lalitha Trivikram and YesCare Nurse Practitioner Maureen Gay as original Defendants. The Complaint also named "John Does 1-10."

Among the specific factual allegations made by the Plaintiffs against the  medical providers are allegations that upon the Decedent's intake into the prison, the nursing staff who examined him failed to take the appropriate steps to address his elevated blood glucose levels. In the preliminary stages of discovery in this case, the Moving Defendant produced the complete medical records on the Decedent/Inmate, at which time, it was discovered that the intake nurse was Mariesha Apollon.

On or about March 14, 2025, the Plaintiffs filed their First Amended Complaint which specifically named Mariesha Apollon as a Defendant. On or about May 1, 2025, Nurse Apollon filed a Motion to Dismiss the claims against her pursuant to Rule 12(b)(6). Following the Plaintiffs' Response to the Dismissal Motion of Nurse Apollon, this Honorable Court denied the Motion by Order of May 22, 2025.

Recently, it has been learned that Mariesha Apollon was not an employee of YesCare Corporation, but was instead was a direct employee of CareerStaffing Unlimited, LLC ("CSU"), a contract provider of temporary medical personnel. Despite the Plaintiffs' affirmative steps to name Mariesha Apollon, no steps were taken to name or join her employer, CSU.

This Motion seeks to enable to Moving Defendant to accomplish the joinder of CSU.

## III.    QUESTION PRESENTED:

Should the Moving Defendant, YesCare Corporation be permitted to join CareerStaffing Limited, LLC as a Third Party Defendant on the claims of the Plaintiffs?

SUGGESTED ANSWER:    Yes

## IV.   LEGAL ARGUMENT:

Despite some confusion early in the case among the parties as to the oversight and management of the conduct of intake nurse Mariesha Apollon, it has recently been learned that Apollon was not a direct employee of medical provider YesCare Corporation, but was instead employed by the medical staffing company known as CareerStaffing Unlimited, LLC. There is a written contract, (with an assignment and amendment) which regulates the relationship between the Moving Defendant and the intended Third Party Defendant, true and correct copies of which are attached hereto as Exhibit "A." As is indicated in the "Managed Services Agreement," the Moving Defendant is entitled to be indemnified for claims arising from the negligent performance of the services rendered by CSU.

F.R.C.P. 14 regulates the filing of third party complaints and, specifically, the factors to be considered by the trial court in entertaining such a motion. In considering a defendant's motion to join third party defendants, the court must consider: (1) the timeliness of the motion; (2) the potential for complication of issues at trial; (3) the probability of trial delay; and (4) whether the plaintiff may be prejudiced by the addition of a party. <u>Atlantic Mutual Insurance Co. v. Champion Box, Inc.</u>, 2001 U.S. Dist. Lexis 1880 (E.D. Pa. 2001).

In the present case, the instant motion is being filed less than thirty (30) days after the Order of this Honorable Court denying the individual Defendant's motion to seek dismissal under Rule 12(b)(6). Accordingly, there is timeliness to the subject motion. There is no potential for the complication of issues at trial; the issue sought to be raised by the joinder is a very simple and strait forward one: the posture of the named individual defendant, Mariesha Apollon, being a direct employee of the joined third party defendant. There is no probability of trial delay, since the parties are just now embarking on pretrial discovery. Finally, there is no chance the Plaintiffs being

prejudiced by the addition of this party. It anything, the Plaintiffs benefit by the existence of an additional party to satisfy the Plaintiffs' claim for damages.

V.    **CONCLUSION:**

For all the reasons stated herein, it is respectfully requested that this Honorable Court grant this motion and allow Defendant YesCare Corporation to file its Third Party Complaint against CareerStaffing Unlimited, LLC.

Respectfully submitted,

**O'CONNOR KIMBALL LLP**

By: _____

Thomas J. Gregory, Esquire
Two Penn Center Plaza, Suite 1100
1500 John F. Kennedy Boulevard
Philadelphia, PA 19102
215-564-0400        Facsimile: 215-564-1973
Email: tgregory@okllp.com
*Attorney for Defendants, YesCare Corporation, Lalitha
Trivikram, M.D., Maureen Gay, N.P., and
Blair Cabellos, LPN*

Dated: 6/19/25

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PA**

| | |
|---|---|
| JACOB and JAMES JUNG as Administrators for the Estate of LOUIS JUNG, JR. | : : |
| v. | : CASE NO. 24-CV-05618 |
| YESCARE CORP., LALITHA TRIVIKRAM, MAUREEN GAY, and BLAIR CABELLOS, et al. | : : : |

## CERTIFICATE OF SERVICE

      I, Thomas J. Gregory, Esquire, hereby certify that I caused a true and correct copy of the foregoing Answer to Co-Defendants' Crossclaim to be electronically filed on this this *19th* day of June, 2025, and thereby served via the Court's Electronic ECF Filing System upon:

bretgrote@abolitionistlawcenter.org
nia@alcenter.org
rupalee@alcenter.org
margo@alcenter.org
Bret Grote, Esquire
Nia Holston, Esquire
Rupalee Rashatwar, Esquire
Margaret Hu, Esquire
Abolitionist Law Center
990 Spring Garden Street
Philadelphia, PA 19123
*Attorneys for Plaintiff*

jkaminsky@kiernantrebach.com
Jonathan Kaminsky, Esquire
Kiernan Trebach, LLP
10 Penn Center
1801 Market Street, Suite 770
Philadelphia, PA 19103
*Attorney for Defendant, Mariesha Apollon*

michael.pestrak@phila.gov
Michael Pestrak, Esquire
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
*Attorney for Defendants, City of Philadelphia and Blanche Carney*

          **O'CONNOR KIMBALL LLP**

      By: _____
          Thomas J. Gregory, Esquire
          Two Penn Center Plaza, Suite 1100
          1500 John F. Kennedy Boulevard
          Philadelphia, PA 19102
          215-564-0400     Facsimile: 215-564-1973
          Email: tgregory@okllp.com
          *Attorney for Defendants, YesCare Corporation, Lalitha Trivikram, M.D., Maureen Gay, N.P. and Blair Cabellos, LPN*

# EXHIBIT "A"

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



# MANAGED SERVICES AGREEMENT

This Managed Service Provider Agreement ("Agreement") made effective as of April 28, 2022 (the "Effective Date") by and between CareerStaff Unlimited LLC ("CSU") having its office at 1700 E. Golf Road, Suite 800 Schaumburg, IL 60173 and CHS Staffing, LLC (the "Client", and together with CSU, the "Parties" or a "Party").

## RECITALS

WHEREAS, CSU is engaged in the business of providing workforce solutions to healthcare organizations throughout the United States; and

WHEREAS, Client provides certain business and other services in support of its affiliated companies (the "Correctional Healthcare Entities") engaged in the delivery of correctional health care services in a variety of states to detainees and inmates in the care, custody, and control of certain prisons and jails;

WHEREAS, from time to time the Correctional Healthcare Entities require qualified Personnel, on a temporary and/or permanent basis ("Registry Personnel" defined as non-employed staff, either on full time, part time, or casual basis of client) for the correctional centers they service; and

WHEREAS, as part of its management services to the Correctional Healthcare Entities, Client shall arrange for and provide Registry Personnel for the Correctional Healthcare Entities;

WHEREAS, CSU and Client desire to enter into an exclusive agreement pursuant to which CSU will provide managed services (an "MSP") to manage the procurement and ancillary processes for the Registry Personnel needs of Client's Correctional Healthcare Entities, using web-based technology (the "VMS") to effectively and efficiently manage, distribute and request Registry Personnel staffing needs from the agencies, services, companies or providers providing such Registry Personnel ("Staffing Vendors"); and

WHEREAS, CSU shall manage a staffing vendor network of staffing agencies ("Staffing Vendors") to support the Registry Personnel requirements of Client's Correctional Healthcare Entities; and

NOW, THEREFORE, Client and CSU, in consideration of the mutual promises contained herein and other good and valuable consideration given and received, the Parties agree as follows:

1.  **Provision of Registry Personnel**

    1.1    Client hereby exclusively engages CSU to manage the process of procuring and supplying Registry Personnel to Client's Correctional Healthcare Entities and manage the performance of all Staffing Vendors providing such Registry Personnel. The commencement date of CSU's services as to the Correctional Healthcare Entities' particular locations shall occur in accordance with **Schedule 1.1**. For the avoidance of doubt, nothing in this Agreement shall prevent Client or its Correctional Healthcare

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



Entities from using their internal resources, including internal referrals, general advertising and other non-agency recruiting efforts to hire permanent, employed staff without having to pay a placement fee.  Further, upon execution of this Agreement, any staff from staffing agencies contracted directly with any Correctional Healthcare Agency shall be permitted to complete any contracted period which shall not be deemed a violation of this Agreement.  At the time of the contract period ending and an extension is offered on the assignment, the extension will at that time be managed through CSU.

1.2    Client's Correctional Healthcare Entities will submit all work orders for Registry Personnel ("Work Orders") through the VMS. Each Work Order shall identify:

    1.2.1    A defined period of time of engagement or a defined notice of termination period if the engagement is open-ended,

    1.2.2    The skills, experience, qualifications, capabilities and credentials required for the requested Registry Personnel,

    1.2.3    The location for the engagement,

    1.2.4    The preferred rates for such position, and

    1.2.5    Client's Correctional Healthcare Entities shall be responsible for promptly responding to Work Orders and CSU will provide to the Correctional Healthcare Entities Work Order progress through the VMS

1.3    Upon submission of a Work Order by Client's Correctional Health Care Entities, the Parties agree that CSU has up to seventy-two (72) hours to fulfill the Work Order using qualified CSU Registry Personnel acceptable to the Correctional Healthcare Entity.  If no such acceptable CSU Registry Personnel are available after seventy-two (72) hours after receiving a Work Order, CSU must allow other Staffing Vendors to submit candidates to fill the Work Order.

1.4    Notwithstanding anything contained in the Agreement to the contrary:

    1.4.1    Client agrees that it will not engage, utilize or otherwise fill a Work Order for Registry Personnel through any third party staffing agency other than a Staffing Vendor hereunder and the CareerStaff Managed Services Technology Platform except as set forth below or as otherwise agreed upon between the parties. Correctional Healthcare Entities may utilize any other third party placement services to fill a Work Order without any penalty hereunder if either (i) CSU is unable to fulfill a Work Order either through its own Registry Personnel or through its Staffing Vendors within twenty-four (24) hours of the commencement of the shift; or (ii) a Correctional Healthcare Entity is required to utilize a specific staffing agency as required by the correctional agency or as required to meet specific minority or other contracting requirements (I.e. W/MBE, veteran-owned, small business, etc.), but Client shall process such placement and fill such Work Order through the VMS; provided, however, that in the event Client utilizes a third party placement service because CSU is unable to fill the position, Client agrees that it will not pay a higher rate or provide any materially preferential terms to any third party engaged directly pursuant to this section 1.4.1(i) than the preferred rate or terms which was sought pursuant to the Work Order that was not filled by CSU.  Regarding staffing agencies utilized by Client's Correctional Healthcare Entities pursuant to the exception under section 1.4.1(ii), CSU agrees that in the event issues or concerns arise with a

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723

 **CareerStaff** Unlimited®

correctional client or state regulatory agency regarding the requirement that the staffing agency utilize CSU's VMS to fill Orders, that the requirement for that staffing agency to use the VMS will be waived.

1.4.2   Except as provided in Section 1.4.1 above, if, during the Term, Client seeks to engage, utilize or otherwise fill a Work Order through any staffing agency that is not a Staffing Vendor within CSU's network, then Client shall immediately notify CSU and CSU shall have two (2) weeks from the date of such notification to sign the agency into its network. If the third party agency is not willing to join CSU's network and sign a Staffing Vendor Agreement in substantially the form attached hereto as Schedule 1.11, then Client may not work with that third party agency; provided, however, that such agency must use the VMS to accept Work Orders and CSU shall not charge the full fee to such agency pursuant to Section 3.3.

1.4.3   In the event that either (i) Client has submitted a Work Order at least three (3) business days prior to the shift to be filled and CSU has failed to provide an acceptable candidate to Client twenty-four (24) hours prior to the start of the shift to be filled or (ii) Client first learns of the need to fill a shift within twenty-four (24) hours of the shift, Client may unilaterally fill such shift, without penalty, and within its sole discretion; provided, however, (a) Client may not pay a higher rate to any third party engaged directly pursuant to this Section 1.4.3 than the preferred rate which was sought pursuant to the Work Order that was not filled by CSU.

1.5   Staffing Vendors shall submit candidates for the Work Orders using the VMS.  Staffing Vendors may only submit Registry Personnel candidates to openings with the candidate's knowledge of the submission.  Submission of Registry Personnel candidates without the candidate's knowledge may be grounds for contract termination of the Staffing Vendor.

1.6   CSU shall verify that the Registry Personnel submitted for assignment consideration have the skills, experience and qualifications specified in the Work Order and have successfully completed the Pre-Assignment Credentialing and Screening set forth in **Schedule 1.6**, including, but not limited to verification of current licenses.  All documentation for Registry Personnel will be maintained in the VMS.  Any delay of this information being provided by Staffing Vendor can delay a start date at no cost or penalty to Client. Client will notify CSU within 48 hours of submission of Registry Personnel candidate if a candidate is known to a Correctional Healthcare Entity. If a Correctional Healthcare Entity has not contacted or has no activities with the Registry Personnel Candidate for a period of six months (6) the candidate will be considered a potential candidate to submit to work at a Correctional Healthcare Entity location.

1.7   Upon the Correctional Healthcare Entity's acceptance of a candidate, VMS shall provide to both Client and the applicable Staffing Vendor an electronic confirmation.  All billing services calculations will be based upon the information set forth in the confirmation, and all payment calculations will be based upon the information set forth in the CSU authorized and signed timecard.

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



1.8     Assigned Registry Personnel will report to the assigned Correctional Healthcare Entity location and supervisor specified on each Work Order and at the prescribed time indicated per the Work Order.  The Correctional Healthcare Entity will receive onsite delivery of services by such assigned Registry Personnel.  The Correctional Healthcare Entity may request the removal of any assigned Registry Personnel at any time in its commercially reasonable discretion, provided, however, that in no event will unlawful discrimination be considered commercially reasonable.  Upon such request for removal, , Staffing Vendor will remove any of its employees assigned as Registry Personnel to the Correctional Healthcare Entity, provided that this Agreement will not in any way affect the right of Staffing Vendor, in its sole discretion as employer, to hire, assign, reassign, discipline and/or terminate its own employees.

1.9     All communication by the Staffing Vendors related to the Registry Personnel positions shall be directed to CSU.  Client acknowledges that any attempt by Staffing Vendor to direct contact with Client of the Correctional Healthcare Entities for the Registry Personnel positions will be considered a breach of the Staffing Vendor's contract with CSU and may be grounds for termination of Staffing Vendor's contract.

1.10    In the event that a Registry Personnel candidate is submitted for the same position by multiple Staffing Vendors, the Work Order will default to the first Staffing Vendor submission received with the lowest bill rate unless otherwise directed by Client.

1.11    CSU shall enter into agreements with the Staffing Vendors in the form attached hereto as **Schedule 1.11**.  Pursuant to **Section 7** of such agreement (Cancellation of Request for Registry Personnel), Work Orders may be canceled by Client and/or a Correctional Healthcare Entity without penalty.

2.      **Independent Relationship; Non-Solicit**

2.1     In the performance of this Agreement, it is mutually understood and agreed that Staffing Vendors and Registry Personnel are contractors with, and not partners, agents or employees of, Client or its Correctional Healthcare Entities. Nothing in this Agreement shall be construed as creating a partnership, joint venture or joint employment arrangement amongst any of the parties hereto.

2.2     Neither Client nor its Correctional Healthcare Entities shall pay wages, overtime, sick leave, or vacation pay or make any promises regarding such to any Registry Personnel. Neither Client nor its Correctional Healthcare Entities shall pay, to or on behalf of, or withhold from any Registry Personnel, taxes, workers' compensation, disability or unemployment insurance premiums, Social Security or retirement benefits, nor any other amounts otherwise required by law to be paid or withheld by an employer, to or on behalf of, or from an employee.  Neither Client or its Correctional Healthcare Entities shall reimburse any Registry Personnel for any expenses incurred unless otherwise agreed in the Work Order.

2.3     During the term of this Agreement, Staffing Vendors and Client mutually agree not to knowingly and directly solicit or recruit each other's employees.  For purposes of this

4

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



Section 2.3, the term Client shall include the Correctional Healthcare Entities. Each Party acknowledges that each non-breaching party may have irreparable, material and adverse effects on the non-breaching party and damages arising from any such breach may be difficult to ascertain and the non-breaching party shall have the right to terminate this Agreement immediately. Nothing herein shall prohibit either party from conducting general advertising to which the other's employees may voluntarily respond to and each party may elect to hire.

2.4    Parties acknowledge and agree that Client or its Correctional Healthcare Entities may recruit or hire any Registry Personnel provided by Staffing Vendor or may utilize the VMS to procure permanent (i.e., employed) staff, in which case Client will pay a fee to Staffing Vendor as set forth in **Schedule 2.4.**

## 3.    Compensation, Billing and Payment

3.1    **Schedule 3.1** of this Agreement, which may be amended from time to time, contains the pricing, billing and fee schedule which will be used by all Staffing Vendors. These rates shall be applicable unless a written exception (which may be documented in an electronic communication) is agreed to between Client and/or the Correctional Healthcare Entity and Staffing Vendor prior to an assignment being accepted. Any exception to **Schedule 3.1** shall be applicable only to the terms of the written exception for that particular assignment.

3.2    As specified in **Schedule 3.1**, the Parties agree that Registry Personnel may be required to participate in orientation and training activities at the sole discretion of Client and/or the Correctional Healthcare Entity. The billing rate for training/orientation shall be 50% of the applicable standard bill rate.

3.3    CSU shall coordinate with Client to determine the number of hours worked for each Registry Personnel based on electronic time card data provided by Client to CSU weekly, and shall submit invoices to Client pursuant to such data. The Registry Personnel supplied to Client's Correctional Healthcare Entities hereunder shall track their time worked by using the electronic timekeeping tool utilized at the correctional facility. Invoiced billing to Client shall be in accordance with the confirmed Bill Rate in the Work Order and based upon electronic time card data provided by Client. Hours worked will be rounded to the nearest quarter hour. CSU invoices shall provide a breakdown by Registry Personnel by Facility and shall itemize the hours worked by that individual as well as a total for all hours worked by that individual as well as total dollars owed. Any additional reimbursement owed to CSU for shift differentials or bonuses shall be itemized on the invoice along with written documentation from Client or a Correctional Healthcare Entity authorizing or approving reimbursement. Client shall remit payment to CSU within thirty (30) days after the receipt of Invoice. In the event that Client remits payment to CSU via credit card, Client shall pay to CSU an additional 2.8% of the total otherwise payable. CSU will pay Staffing Vendor within fifteen (15) days of receipt of payment from Client. CSU may impose a finance charge on Client of up to eight (8)

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



percent per annum (not to exceed the maximum permitted by law) for any and all outstanding past due amounts.

3.4     Staffing Vendor will have access via VMS to time worked (per approved electric time card data) and approved by the Client in regards to Staffing Vendor's Registry Personnel by the close of business (Central Standard Time) on the Thursday for the prior week's record. The Staffing Vendor must use the CSU authorized and signed timecard; all other timecards will be rejected.

3.5     The Staffing Vendor agreement shall provide that Staffing Vendor agrees not to directly bill any patient, governmental agency or other third party payor for services rendered pursuant to this Agreement.  Staffing Vendor will not submit invoices to CSU, the Client or a Correctional Healthcare Entity. Staffing Vendor will notify CSU in writing within forty-five (45) calendar days from the date of payment advice date and provide a reasonably complete description of potential error or omission and, where appropriate, include supporting documentation.

3.6     Client understands, acknowledges and agrees that, pursuant to CSU's agreement with Staffing Vendors, CSU shall charge an administrative fee to the Staffing Vendor in the amount of five percent (5%) of the total value of services provided to Client.  CSU may deduct the fee from monies to be paid to Staffing Vendor based on services delivered to Client.

3.7     CSU will waive the onetime implementation fee of ten-thousand dollars ($10,000) for the customization and training of the CareerStaff Managed Services Technology Platform. There will be no charge to the Client.

3.8     Client's use of the CareerStaff Managed Services Technology Platform to fill Work Orders shall be free of charge; provided, however, that Client agrees that it shall use the CareerStaff Managed Services Technology Platform as its sole and exclusive source for posting and filling all of client's temporary staffing requirements for all nursing and ancillary clinical professionals subject to the exceptions set forth in Section 1.4.

3.9     Client and CSU acknowledge and agree that from time to time certain adjustments may be required on invoices due to communication delays, clerical errors and the like.  Each party agrees that it shall use commercially reasonable efforts to minimize the magnitude of such adjustments.

3.10    If a stated day under this Agreement is a nationally recognized holiday or a weekend day, such action to be taken hereunder shall be made on the next business day.  All references to specific times are acknowledged to be Central Standard Time.

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



**4.**    **Staffing Vendors' Performance**

4.1    CSU will meet with Client at Client's request to assess the MSP and Staffing Vendor performance.  Performance review information obtained from the Client will be shared confidentially with each Staffing Vendor as applicable.  The VMS will provide each Staffing Vendor with Client evaluation for each Registry Personnel who is assigned to Client's Correctional Healthcare Entities and where Client has completed said evaluation.  Additionally, each Staffing Vendor will be held accountable to the following key performance indicators:

4.1.1    Submissions per opening;

4.1.2    Offers per submission;

4.1.3    Acceptances per submission;

4.1.4    False starts;

4.1.5    Terminations;

4.1.6    Timely quality management and

4.1.7    Completeness of quality management documentation.

CSU will review these key performance indicators with Client and Staffing Vendors on a regular basis.

4.2    CSU will be responsible for the identification and qualification of any Staffing Vendors providing services under the MSP to Client.

4.2.1    Client, through its Correctional Healthcare Entities, in its sole and absolute discretion and without penalty, may accept, discontinue or reject any submission for assignment of any Registry Personnel candidate and shall so notify CSU.

4.2.2    Staffing Vendors will adhere to Client's compliance standards, including Work Order processing, providing credentials, and timekeeping.

4.3    Client will advise CSU if a Correctional Healthcare Entity is dissatisfied with any Registry Personnel and reserves the right to reject or discontinue use of any Registry Personnel. Client can discontinue services with or without notice at any time.

**5.**    **Staffing Vendor Responsibilities Regarding the Registry Personnel that it directly Supplies to Client**

5.1    The Staffing Vendor agreement will provide that Staffing Vendor guarantees and warrants to Client that all Registry Personnel it directly supplies to Client's Correctional Healthcare Entities:

5.1.1    Are employees of Staffing Vendor (e.g. all staff must be W-2 employees; 1099 or independent contractors are **not** permitted under this agreement);

5.1.2    Are covered by worker's compensation insurance in accordance with applicable state law;

5.1.3    Maintain appropriate credentials, licenses and/or certifications to practice their respective discipline in accordance with the applicable state practice act, in the state in which the Registry Personnel deliver Services on behalf of Client's Correctional Healthcare Entities;

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



5.1.4    Are lawfully residing and working in the United States;

5.1.5    Have been advised to comply with the pre-assignment screening as outlined in **Schedule 1.6;**

5.1.6    Has been advised to provide services to Client's Correctional Healthcare Entities in a manner acceptable under current professional standards and applicable state practices act;

5.1.7    Shall maintain the confidential nature of patient health information and Client's and its Correctional Health Entities' proprietary business information at all times; and

5.1.8    Has been advised to fully document services provided in accordance with the Correctional Healthcare Entities' policies and procedures, current applicable standards of healthcare practice and applicable laws, and incorporate care, treatment and billing documentation as soon as practicable in the Client or patient medical records.

5.2    All Staffing Vendors will recruit, interview, test, screen, select, hire, and ensure compliance with legally required pre-employment obligations as outlined in **Schedule 1.6** of this Agreement for all Registry Personnel to be assigned to Correctional Healthcare Entities' facilities prior to their assignment.  Staffing Vendor shall submit candidates for assignment consideration who, in CSU's judgment, are best qualified to perform the services requested by Client under this Agreement.


5.3    As the employer, Staffing Vendor shall:

5.3.1    Maintain all necessary personnel and payroll records for its employees;

5.3.2    Calculate their wages and withhold taxes and other government mandated charges, if any;

5.3.3    Remit such taxes and charges to the appropriate government entity;

5.3.4    Pay net wages and fringe benefits, if any, (e.g., vacation and holiday pay) directly to its employees;

5.3.5    Provide for liability insurance as specified in this Agreement,

5.3.6    Provide workers' compensation insurance coverage in amounts as required by law.

5.4    Staffing Vendor will maintain and make available to Client and its Correctional Healthcare Entities through the VMS, current copies of:  Registry Personnel's licenses, permits, certifications, and other pre-assignment screening as outlined in **Schedule 1.6**.

5.5    Staffing Vendor will be responsible to compensate their Registry Personnel for any wages and benefits and to Social Security, and all deductions required by law and to provide wages, withholdings taxes, worker's compensation insurance, professional liability insurance, general liability insurance and unemployment insurance, and any insurance required by law.

5.6    Staffing Vendor will specify in all applicable recruiting materials and activities that employees will be employees of Staffing Vendor.  Staffing Vendor will not use Client's or any of its Correctional Healthcare Entity's name or logo in any recruiting, advertising or

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



marketing activities or materials, without the prior written approval of Client or the Correctional Healthcare Entity.

5.7   Reports and Information:  While most reporting needs will be contained within the VMS, as reasonably requested by CSU, Staffing Vendor will provide CSU such reports and information as Client or CSU may require from time to time relating to Staffing Vendor's Registry Personnel's performance or other management matters under this Agreement. Upon the request of CSU, Staffing Vendor will reasonably cooperate with CSU and Client in the measurement of Client satisfaction and Staffing Vendor performance hereunder.

6.   **Confirmation of Request for Registry Personnel and Replacement**

6.1   Upon a Correctional Healthcare Entity's request for Registry Personnel and Staffing Vendor's submission of Registry Personnel for consideration, the Correctional Healthcare Entity shall confirm acceptance of the selected and assigned Registry Personnel through the VMS or shall reject the submitted candidate(s).  CSU and Staffing Vendor will be notified of this confirmation through the VMS.  This confirmation serves as CSU's and Staffing Vendor's authorization to supply Registry Personnel and be compensated for approved work performed.

6.2   If Staffing Vendor's assigned Registry Personnel fail to report for assignment or upon Client's or a Correctional healthcare entity's request for any reason, CSU, through its VMS, will reactivate the original, approved Work Order and restart the procurement process for a replacement Registry Personnel.  In the event that Registry Personnel fails to report for assignment, Client will not be charged a penalty. Additionally, at Client's request, CSU can block Registry Personnel that Client elects, in its sole discretion, to be barred from consideration for future placement within Correctional Healthcare Entity facilities. In making such an election, Client acknowledges that it shall not bar any Registry Personnel from being submitted through the MSP in accordance with the requirements of **Section 11**.

7.   **Cancellation of Request for Registry Personnel**

7.1   Cancellation of Per Diem Assignment by Client:
7.1.1   Staffing Vendor agrees that any request for non-travel placement of Registry Personnel may be canceled, without charge, if the cancelation occurs at least two (2) hours prior to the time at which such Registry Personnel is scheduled to begin providing services.  Staffing Vendor will be notified of cancelation electronically by the VMS.
7.1.2   If Client's Correctional Healthcare Entity cancels a request for non-travel Registry Personnel on less than two (2) hours' notice, Staffing Vendor may charge a late-cancellation fee of two (2) hours of service for each Registry Personnel who was cancelled late. CSU shall add the late-cancellation fee to the next invoice following the late cancellation and shall specify on the invoice, the date of the late cancellation, the Registry Personnel who were cancelled late and the amount of the late-cancellation fee.

9

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



7.1.3   If Client's Correctional Healthcare Entity cancels a request for non-travel Registry Personnel on less than two (2) hours' notice, and the Registry Personnel nevertheless arrives at the assignment location, Client's Correctional Healthcare Entity may utilize the services of such Registry Personnel for all or part of a shift and be invoiced for actual hours worked or send the Registry Personnel home and be invoiced for two (2) hours of service, whichever is greater.  If Registry Personnel is sent home, Staffing Vendor will be notified of cancellation electronically by the VMS.

7.2   Cancellation of Contract Assignment by Client:

7.2.1   In the event that Client's Correctional Healthcare Entity cancels an assignment with an expected duration, Client and/or the Correctional Healthcare Entity shall provide Staffing Vendor with a two (2) week advance notice.  Should the Correctional Healthcare Entity provide less than the required two (2) week notice, Client agrees to pay Staffing Vendor the total sum due for the entire temporary services period up to a maximum of two (2) weeks from the date on which Correctional Healthcare Entity notifies Staffing Vendor, plus any incurred expenses (i.e. unused rent, deposits, utilities, transportation, etc...).  Should a Correctional Healthcare Entity cancel a contract assignment for cause, Staffing Vendor will receive no compensation past the final hour worked by the Registry Personnel.

7.3   Cancellations due to acts of God, suspensions of admissions at a facility due to regulators or outright facility closings and clinical incompetence by Registry Personnel are not subject to cancellation penalties above.

7.4   Cancellation of Per Diem Assignment by Staffing Vendor

7.4.1   If Staffing Vendor cancels less than two (2) hours prior to the start of the shift the Staffing Vendor will be billed for two (2) hours of that shift.

7.4.2   If Staffing Vendor has an employee that is a no call/no show for a scheduled shift the Staffing Vendor will be billed for two (2) hours of that shift.

7.5   Cancellation of Travel Assignment by Staffing Vendor

7.5.1   In the event that Staffing Vendor cancels a contract assignment, Staffing Vendor agrees to provide Client with a two (2) week written notice to cancel the assignment.

7.5.2   Should Staffing Vendor provide less than the required two (2) week notice, Client reserves the right to charge Staffing Vendor a penalty equivalent to eighty (80) hours of time, based upon the agreed upon contract rate for said Registry Personnel.  CSU shall collect the fee from the Staffing Vendor and forward payment to Client.

8.   **Term and Termination**

8.1   This Agreement shall commence on the last date of its execution by both parties and shall continue for an initial term of one (1) year (the "Initial Term"). Thereafter, the Agreement shall be automatically renewed for successive terms of one (1) year each

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



unless notice is provided by either party to not renew the term at least thirty (30) days prior to the expiration of the then existing term.

8.2    If any Default (as defined below) shall occur with respect to either party, the other party may, in addition to exercising any other right or remedy available at law or in equity, forthwith terminate this Agreement by giving written notice of such termination, and this Agreement shall terminate thirty (30) days after the date of such termination notice subject to the requirements of any regulatory authorities.  Neither party shall have any further obligations whatsoever under this Agreement after such termination except for

8.2.1    Any liability arising out of any Default or any breach of this Agreement,

8.2.2    Any obligations arising prior to such termination and

8.2.3    As otherwise specifically set forth in this Agreement.

8.3    Each of the following shall constitute an event of "Default" under this Agreement, unless expressly waived by the non-defaulting party hereto:

8.3.1    Either party fails to make a payment to the other party, when due, which failure continues for a period of thirty (30) days after written notice thereof; provided however, that it will not constitute a Default if such failure to pay is the result of a good faith dispute over the amount of the payment;

8.3.2    Either party fails to keep, observe or perform any other covenant, agreement, term or provision of this Agreement required to be kept, observed or performed by it and such failure continues for a period of thirty (30) days after written notice thereof, or if such breach is not capable of cure within thirty (30) days, such cure is effected as soon as is reasonably practicable.

8.3.3    CSU fails to contract with critical third party staffing agencies identified by Client upon implementation of this Agreement and is unable to provide alternative staffing agencies satisfactory to Client.

8.4    Notwithstanding any other provisions of this Agreement, in the event the other party declares or becomes bankrupt or insolvent, dissolves or discontinues operations, either party may terminate this agreement upon forty-eight (48) hours written notice.

8.5    In the event Client fails to pay any amount owed when due, beyond applicable notice and cure periods, CSU, upon not less than five (5) days' written notice to Client, in addition to any other right or remedy, may: (i) declare all of Clients's outstanding invoices immediately due and payable in full; (ii) suspend all or part of CSU's services hereunder to Client; and (iii) require Client to pay on a cash on delivery (COD) basis for all services.

9.    **Indemnification and Disclaimer of Client Liability**

9.1    Each Party shall indemnify, defend and hold the other, its officers, directors, shareholders and employees harmless from any claim, demands and costs, including attorneys' fees, by any third party due to or arising out of:

9.1.1    Its breach of this Agreement

9.1.2    Its gross negligence or reckless or willful misconduct or

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



9.1.3    Any act or omission by a Party or its agents, servants, or employees pursuant to this Agreement which results in a claim for bodily injury or death or property loss or damage by whomsoever (including specifically, but without limitation, employees of the Parties and members of the general public).

Pursuant to this Paragraph, CSU specifically indemnifies Client and its Correctional Healthcare Entities for claims involving:

9.1.4    Workers compensation and unemployment compensation claims brought by Staffing Vendors assigned Registry Personnel;

9.1.5    Any state or federal law claims asserted by Staffing Vendors assigned Registry Personnel alleging wrongful discharge, constructive discharge, or discrimination by Staffing Vendor related to any of such assigned Registry Personnel's terms and conditions of employment with Staffing Vendor; and

9.1.6    Any claim that assigned Registry Personnel were entitled to participate in any benefit program maintained or offered by Client or a Correctional Healthcare Entity to its employees or that such assigned Registry Personnel are or should be treated as direct employees of Client or a Correctional Healthcare Entity and any resulting employment related wage and hour payments or expenses; provided that neither Client or a Correctional Healthcare Entity nor any employee, agent, or representative of Client or a Correctional healthcare Entity shall offer any such benefits to Registry Personnel.

9.2    The parties will promptly notify each other of the assertion of any claim for which a party seeks indemnification under this Agreement so as to permit the parties reasonable time within which to notify its insurers of such claim, and the tender of the defense thereof.

9.3    IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES OR EXPENSES OR LOST PROFITS (REGARDLESS OF HOW CHARACTERIZED AND EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES) UNDER OR IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION (WHETHER IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, STATUTORY LIABILITY, OR OTHERWISE).

9.4    In the event that a dispute arises between or among two or more Staffing Vendors, CSU hereby agrees to release, indemnify, defend and hold Client, its Correctional Healthcare Entities, their officers, directors, shareholders and employees harmless from all claims, demands, costs and damages of every kind and nature, known and unknown, suspected and unsuspected, disclosed and undisclosed, arising out of or in any way connected with such disputes.

9.5    The provisions of this section shall survive the expiration or termination of this Agreement.

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



**10.**   <u>**Insurance**</u>

10.1   At all times during the term of this Agreement, CSU shall be responsible to confirm and make certain that CSU and each Staffing Vendor shall maintain at its expense:

    10.1.1   Commercial general liability insurance and professional liability insurance with minimum limits of $1,000,000 per occurrence and $3,000,000 aggregate. Such coverage will include claims arising from the rendering of or failure to render professional services even if those claims are brought under 42 U.S.C. Section 1983 or under any other substantially similar federal and/or state statute; and

    10.1.2   Workers' compensation insurance as required by applicable state law; and

    10.1.3   Employer's liability coverage with policy limits not less than $1,000,000; and

    10.1.4   Unemployment insurance required by applicable law.

    10.1.5   For Staffing Vendor that only submit Registry Personnel for the opportunity to permanently place said Registry Personnel, such Vendor shall not be required to provide evidence of professional liability insurance.

10.2   CSU shall provide, and obtain from each Staffing Vendor, documentation of such insurance upon the execution of this Agreement and the Staffing Vendor Services Agreements, respectively, and shall make certain that such documentation names both Client (and its Correctional Healthcare Entities) and CSU as additional insureds under Staffing Vendor's general and professional liability policies.

10.3   CSU shall notify Client in writing at least thirty (30) days prior to any change in such coverage, including, but not limited to renewal and cancellation.

10.4   CSU agrees that coverage on a "claims made" coverage form is subject to tail coverage for a period of not less than six (6) years following the expiration of each and every policy and confirmation of such coverage shall be provided promptly to Client; alternately, evidence of coverage with retro dates to the inception of claims-made coverage will be provided.

10.5   Failure to maintain viable coverage pursuant to this **Section 10** shall be sufficient basis for Client, at its option, to immediately terminate this Agreement.

**11.**   <u>**EEO and Regulatory Compliance**</u>

11.1   CSU shall have Staffing Vendor certify that it is in compliance with laws and regulations regarding equal employment opportunity employer and is in full compliance with any and all applicable anti-discrimination laws, rules, and regulations. All Staffing Vendors shall agree not to harass, discriminate against, or retaliate against any employee of their own or of the other because of race, national origin, age, sex, religion, disability, marital status, or other category protected by law; nor shall either party cause or request the other party to engage in such discrimination, harassment, or retaliation. In the event of any complaint of unlawful discrimination, harassment, or retaliation by any assigned Registry Personnel's, CSU agrees to cooperate in the prompt investigation and resolution of any such complaint.

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



11.2   To the extent required by Section 1861(v)(l)(I) of the Social Security Act and its implementing regulations, CSU agrees that until the expiration of ten (10) years after the furnishing of the services provided under this Agreement, Staffing Vendor shall make available to the Secretary of the United States Department of Health and Human Services, the U.S. Comptroller General and any duly authorized representatives thereof, this Agreement and all books, documents, and records necessary to certify the nature and extent of the costs of Staffing Vendor's services.

11.3   CSU agrees to comply with those provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), set forth in Title XI, Part C of the Social Security Act (42 U.S.C. § 1320d-1329d-8) and the regulations thereunder (45 C.F.R. Parts 160, 162 and 164) as amended, the Health Information Technology for Economic and Clinical Health Act, included in Division A, Title XIII, Subtitle D of The American Recovery and Reinvestment Act of 2009, Public Law 111-5, 123 Stat. 115 (February 17, 2009) and any regulations or agency guidance issued pursuant thereto ("HITECH"); federal substance abuse confidentiality laws, and other applicable laws, or any successor at law, if and to the extent applicable, which set forth standards for electronic transactions and standards for security and privacy of individually identifiable health information.  All medical records and other individually identifiable health information disclosed to CSU and/or Staffing Vendor or assigned Registry Personnel, in any form, whether communicated electronically, on paper, or orally, shall be protected from unlawful disclosure in accordance with applicable federal and state law.

11.4   CSU shall require that Staffing Vendor agrees to maintain continuous compliance with all applicable provisions of federal, state and local laws, rules and regulations.

## 12.   Audit Rights

12.1   For a period of at least three years following the date services are provided by Staffing Vendor to Client under this Agreement, or for such longer period as may be required by applicable law, CSU agrees to maintain accounting and any other records necessary to verify the basis for all charges billed to Client hereunder.  In addition, Client shall have the right to review CSU's billing and other procedures relating to this Agreement.  Client shall have the right to audit such records during normal business hours upon at least seven (7) days prior written notice to CSU.  Each party will bear its own costs and expenses in connection with such audit, except that, should such audit reveal material errors by CSU, CSU shall reimburse Client for the costs of such audit.

12.2   Upon reasonable advanced written notice and no more frequently than annually, Client may (at its own cost and expense) inspect CSU's records solely related to services provided under this Agreement to verify CSU's compliance with this Agreement.

## 13.   Confidential Information

13.1   During the term of and following termination of this Agreement, each Party shall keep strictly confidential any proprietary information regarding the other Party.  All

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



information which the Parties have a reasonable basis to consider proprietary information, or which is reasonably treated by either Party as proprietary, shall be presumed to be proprietary.  Each Party shall take reasonable and necessary precautions to prevent unauthorized disclosure of proprietary information and shall require all of its officers, employees, and other personnel to whom it is necessary to disclose the same, or to whom the same has been disclosed, to keep such proprietary information confidential.

13.2     CSU shall require that Staffing Vendor agrees to maintain the confidentiality of all information and records relating to patients treated/served by Client's Correctional Healthcare Entities and agrees to assume responsibility for insuring that each Registry Personnel it supplies to Client's Correctional Healthcare Entities pursuant to this Agreement maintains such confidentiality.

**14.**    <u>**Miscellaneous**</u>

14.1     <u>Notices</u>. All notices, consents and other communications, which either Party is required to or may desire to give the other Party under this Agreement, shall be in writing and shall be given by or deposit, postage prepaid, in the United States mail, First Class, certified or registered return receipt requested addressed to the Parties at their respective addresses, facsimile or electronic mail as agreed upon to:

| **CSU:** | **Client:** |
|---|---|
| CareerStaff Managed Services | CHS Staffing, LLC |
| 1700 E. Golf Road Suite 800 | 351 Spook Rock Rd. |
| Schaumburg, IL 60173 | Suffern, NY 10901 |
| Attn:  Kristin Counts | Attn:  Robert Bunker |
| Telephone:      800.540.2306 | Telephone: 800-716-8478 |
| Facsimile:      505.468.9130 | email: |
|  | Rbunker@alphastaffing.com |

**With copy to:**
Genesis HealthCare LLC
101 East State St.
Kennett Square, PA 19348
Attn: Law Department
Facsimile: 484-813-6665
Email: lawdepartment@genesishcc.com

14.2     <u>Non-Assignability</u>. Neither Party may assign its rights or obligations hereunder without the prior written approval of the other Party; provided however, that such an assignment may be made to an entity which is related by virtue of a common parent corporation or which is directly or indirectly, wholly owned or controlled by the same entity as the assigning Party.

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



14.3    <u>No Waiver</u>. No waiver of a breach of any provision of this Agreement will be construed to be a waiver of any other breach of this Agreement, whether of a similar or dissimilar nature.

14.4    <u>Governing Law</u>. This Agreement and any modification of this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

14.5    <u>Headings</u>. The headings of this Agreement are inserted for convenience only and are not to be considered in the interpretation of this Agreement.

14.6    <u>Entire Agreement</u>. This Agreement constitutes the entire Agreement between the Parties with respect to the subject matter hereof and no change, modification, amendment or waiver will be effective except by written agreement signed by both Parties. This Agreement cancels and supersedes all previous agreements, if any, between the Parties relating to the subject matter covered by this Agreement. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid or unenforceable, such provision will be limited or eliminated to the minimum extent necessary so that this Agreement will otherwise remain in full force and effect.

14.7    <u>Amendments</u>. This Agreement may be amended or modified at any time by mutual agreement of both Parties, provided that before any amendment shall be operative or valid, it shall have been reduced to writing and signed by an authorized representative of both Parties.

14.8    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and when taken together shall constitute one and the same instrument.

14.9    <u>Not Construed Against Drafter</u>. No inference in favor of or against any Party to this Agreement shall be drawn from the fact that such Party has drafted any portion of this Agreement.

14.10    <u>Medical Records</u>. Staffing Vendor ensures that the Registry Personnel it supplies to Client's Correctional Healthcare Entities will safeguard all patient records. CSU agrees that patient records are the sole and exclusive property of the healthcare facility where Healthcare services were provided, and cannot be printed, copied or removed from the healthcare facility without permission.

14.12    <u>Failure to Enforce</u>. The failure of a party to enforce any provision of this Agreement shall not be construed as a waiver of any provision of this Agreement, or of the right of such party thereafter to enforce each and every provision of this Agreement.

**15.**    <u>**Mediation**</u>

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



If a dispute arises out of or relates to this Agreement or the breach thereof and if the dispute cannot be settled through negotiation, the Parties agree first to try in good faith to settle the dispute by non-binding mediation administered by a qualified mediator, prior to resorting to litigation.

16.    **Ownership**

All material, documentation and other work product, including but not limited to software programs (including source code, object code and enhancements and modifications) and software documentation or technical data, whether in final production or draft, which result from any services performed by Registry Personnel for Client and/or a Correctional Healthcare Entity hereunder, shall be deemed to be works made for hire and all rights title and interest shall belong exclusively to the applicable Correctional Healthcare Entity.  CSU agrees that all copyrights and other proprietary rights in computer programs, files, documentation, and related materials that are paid for by Client and/or a Correctional Healthcare Entity or developed by Registry Personnel in connection with this Agreement are owned by Client and/or the Correctional Healthcare Entity and CSU shall require Registry Personnel to assigns to Client and/or the Correctional Healthcare Entity all right, title and interest in such copyrights and other proprietary rights.

17.    **Civil Rights**

CSU shall comply with Title VI of the Civil Rights Act of 1964 and all requirements imposed under regulations of the United States Department of Health and Human Services 45 C.F.R. Part 80 issued pursuant to that Title, to the end that, no person in the United States shall, on the ground of age, sex, race, color, religion, disabled veteran status, or national origin, be excluded from participation in, be denied for benefits of, or be otherwise subjected to discrimination under any program or activity for which federal funds are used in support of CSU's activities.

18.    **Regulatory Requirements; Client's Policies**

All parties will perform the services contemplated by this Agreement at all times in compliance with federal, state, and local law, rules, and regulations, the policies, procedures, rules, and regulations of Client.

19.    **Medicare and Medicaid Fraud Representation**

CSU represents that it is a corporation of good standing in the state of its incorporation and not currently debarred or, to the best of its knowledge, under investigation by any state or federal governmental agency for Medicare or Medicaid fraud. Further, CSU represents that to the best of its reasonable knowledge its currently practicing staff (to include CSU its providers and staff, hereinafter collectively "Staff") are not under sanction by a state or federal governmental agency, that its Staff are not currently excluded from participating in the Medicare or Medicaid programs, and that no such proceeding is pending. In the event an investigation of a Party is initiated by any state or federal governmental agency, or it is discovered that the representations contained herein are false, the non-breaching Party reserves the right to immediately terminate this Agreement. It is understood and agreed to by the Parties that the

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723

 **CareerStaff** Unlimited®

ability to verify if any Staff are currently debarred is dependent upon the accuracy of the information contained on the OIG list of excluded persons and the representations of each individual Staff.

20. **Affirmative Action**

During the performance of the Agreement, each party agrees as follows:  each party will, in all solicitations or advertisements for employees placed by or on behalf of each party, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin, in accordance with Executive Order 11246, 41 CFR 60-1.4(a)(2), along with the affirmative action commitment for disabled veterans and veterans of the Vietnam era, set forth in 41 CFR 60-250.5(a), the affirmative action clause for disabled workers, set forth in 41 CFR 60-741.4(a) and all related federal regulations

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first written above.

CAREERSTAFF UNLIMITED LLC

Sign Name:  *Kristin Counts*

Print Name:  Kristin Counts

Title:  Vice President of Managed Services

Date:  04/28/2022

CHS Staffing, LLC

Sign Name:  *Robert Bunker*
DocuSigned by:
BE8BBE8F5BCD...

Print Name:  Robert Bunker

Title: CEO

Date:  4/28/2022

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



# Schedule 1.1

## COMMENCEMENT DATE OF CSU SERVICES

Date

30-60 days from contract being executed

Client's Operations

Implementation of travel, per diem, and permanent placement services for Correctional Healthcare Entities.

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



# Schedule 1.6

## PRE-ASSIGNMENT CREDENTIALING AND SCREENING

**PERMANENT PLACEMENT**

1. **RESUME:** Must meet minimum requirements for position

**CONTRACT & PER DIEM**

Each of the following must be completed and the applicable documents and verifications to be uploaded in the VMS prior to start date.  Requirements below are for Registry Personnel.

1. **Background Screening**: The Staffing Vendor will conduct background investigations for all Registry Personnel or re-hires with at least a 6 months gap in employment in accordance with state and federal requirements, but must include a 3-year review of the registry personnel's criminal history based on Social Security Number (SSN) name and address trace history, nurse aide registry check and national sex offender check. Additional state required searches, including, but not limited to, state specific criminal searches, fingerprinting searches, and abuse registry searches will be conducted as required.

2. **Drug Screen Results**: All Registry Personnel or re-hires with at least a 6 months gap in employment are required to have a 7-panel drug screen completed and negative results received prior to starting the first day of work. The 7-panel drug screen will include marijuana, opiates, amphetamines, PCP, cocaine, benzodiazepines and oxycodone.

3. **License/Certification**: All Registry Personnel will possess the appropriate license, certification or registration for the appropriate work state and services to be provided. A copy of each candidate's current license will be provided (front and back if applicable). License expiration dates will be re-verified prior to each new assignment. The client system will not allow for payment of services if licenses have expired mid-assignment.

4. **References**: Must have 2 references on file: minimum of one (1) supervisory professional clinical reference, and one (1) employment verification reference that is not the same as the supervisory reference.

5. **Resume or Profile**

6. **Basic Life Support/CPR**: A copy of the valid certification is required. All Registry Personnel are required to maintain current hands on CPR/BLS/ACLS certification obtained from a class which requires skills demonstration.

8. **TB Screen/PPD Chest X-Ray**: TB Skin Test (PPD) is required within 12 months prior to start. A Positive result will require: Proof of Positive Reading, Chest X-ray (radiology report) less than 5 years old and clear TB Questionnaire within 12 months prior to start.

9. **Hepatitis B Vaccination / Declination Information**

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



10. **HIPAA**: Registry Personnel shall be trained on the Health Insurance Portability and Accountability Act, or HIPAA, and their responsibility to protect confidential patient information.

11. **Physical:** As required per applicable state law.

12. **State Specific Requirements**: Such additional documents and verifications as may be requested by Client pursuant to any additional requirements required by the state or county.

13. **Flu Vaccine**: All registrants must be vaccinated by October 31st of each calendar year where required by the Correctional Healthcare Entity.

14. **Coronavirus Vaccination and Testing:** Registry Personnel must be vaccinated where required by the Correctional Healthcare Entity.  When required to be vaccinated, Registry Personnel will attest upon arrival to assignment that they are in compliance with testing requirements:

    15.1    Registry Personnel on contract assignments shall, upon request by the Correctional Healthcare Entity, make themselves available to complete regulatory COVID screenings that comply with CDC and state guidelines.  The cost of such tests shall be offset by the Client against any amounts owed to Staffing Vendor for services provided pursuant to this Agreement.

    15.2    Registry Personnel who are engaged on a per diem basis shall, upon request by the Correctional Healthcare Entity and prior to engagement, complete regulatory COVID screenings that comply with CDC and state guidelines and shall provide the test results to CSU upon request.  Staffing Vendor shall be responsible for the cost of such tests.

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



## Schedule 1.11

### STAFFING VENDOR SERVICES AGREEMENT

### [NOTE: DRAFT SENT IN SEPARATE ATTACHMENT]

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



## Schedule 2.4

## RECRUITMENT FEE UPON HIRE OF REGISTRY PERSONNEL

1.    **Permanent Placement of Travel Registry Personnel**

If Registry Personnel accept a permanent position with Client or a Correctional Healthcare Entity, and have completed less than a thirteen (13) week, full time (32 -40 hours per week) assignment, Client will pay a pro-rated recruitment fee in accordance with the following fee schedule:

RN -    $10,000
LPN -   $6,000
CNA -   $3,000

The placement fee will be pro-rated (reduced) by 1/13 of the fee for each full time (32 -40 hours) week completed.

Candidate referrals are valid for six (6) months from the Registry Personnel's last day of work in a Correctional Healthcare Entity facility and Client will honor the placement fee for valid referrals in accordance with the fee schedule as outlined above. If the Registry Personnel are hired by Client or a Correctional Healthcare Entity after six (6) months beyond their last day of work, Client will not be responsible for any placement fee.

If Client or a Correctional Healthcare Entity hires any Registry Personnel provided to Client's Correctional Healthcare Entities by Staffing Vendor, and pays any placement fee as outlined above, the fee paid by Client for said Registry Personnel shall be guaranteed for a period of ninety (90) days from the Registry Personnel's first day of employment at Client or the Correctional Healthcare Entity. If the candidate should terminate employment with Client and/or the Correctional Healthcare Entity with in the first thirty (30) days of the guarantee period, Client will void the Staffing Vendor invoice and the obligation to pay the invoice will be relieved. If the candidate should terminate employment within the thirty-one to ninety (31 -90) days of the guarantee period, Client will provide Staffing Vendor with a thirty(30) day grace period to replace the candidate. If Staffing Vendor cannot find a suitable candidate for Client or the Correctional Healthcare Entity to hire within a thirty (30) day period, Staffing Vendor agrees to refund 100% of the placement fee. If the candidate's employment with Client and/or the Correctional Healthcare Entity is terminated prior to Client paying the Staffing Vendor the fee, Client reserves the right to cancel the invoice and not make payment.

Permanent placement fees paid for per diem Personnel who convert to regular full time employment with Client and/or a Correctional Healthcare Entity will be paid within thirty (30) days of the Registry Personnel's start date of the employment with Client and/or the Correctional Healthcare Entity. Invoices for Permanent Placement will be processed through CSU's technology platform.

2.    **Direct Permanent Placement of PRN Registry Personnel**

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



If per diem Registry Personnel accept a permanent position with Client and/or a Correctional Healthcare Entity and have completed less than one thousand (1,000) hours of work, Client will pay a pro-rated recruitment fee in accordance with the following fee schedule:

| | |
|---|---|
| RN - | $10,000 |
| LPN - | $6,000 |
| CNA - | $3,000 |

The placement fee will be pro-rated (Reduced) by ten percent (10%) of the fee for each one hundred (100) hours completed.

Candidate referrals are valid for six (6) months from the Registry Personnel's last day of work in a Correctional Healthcare Entity facility and Client will honor the placement fee for valid referrals in accordance with the fee schedule as outlined above. If Registry Personnel are hired by Client and/or a Correctional Healthcare Entity after six (6) months beyond their last day of work, Client will not be responsible for any placement fee.

If Client and/or a Correctional Healthcare Entity hires any Registry Personnel provided to Client and/or a Correctional Healthcare Entity by Staffing Vendor, and pays any placement fee as outlined above, the fee paid by Client for said Registry Personnel shall be guaranteed for a period of ninety (90) days from the Registry Personnel's first day of employment at Client and/or Correctional Healthcare Entity. If the candidate should terminate employment with Client and/or Correctional Healthcare Entity within the first thirty (30) days of the guarantee period, Client will void the Staffing Vendor invoice and the obligation to pay the invoice will be relieved. If the candidate should terminate employment within the thirty-one to ninety (31 -90) day of the guarantee period, Client will provide Staffing Vendor with a thirty (30) day grace period to replace the candidate. If Staffing Vendor cannot find a suitable candidate for Client and/or the Correctional Healthcare Entity to hire within a thirty (30) day period, Staffing Vendor agrees to refund 100% of the placement fee. If the candidate's employment with Client and/or Correctional Healthcare Entity is terminated prior to Client paying the Staffing Vendor the fee, Client reserves the right to cancel the invoice and not make payment.

Permanent placement fees paid for per diem Registry Personnel who convert to regular full time employment with Client and/or Correctional Healthcare Entity will be paid within thirty (30) days of the Registry Personnel's start date of the employment with Client/Correctional Healthcare Entity. Invoices for Permanent Placement will be processed through CSU's technology platform.

**3.    Permanent Placement of Leadership Positions**

If Leadership Registry Personnel accept a permanent position with Client/Correctional Healthcare Entity, Client will pay a recruitment fee of: 15% of annualized salary.

Candidate referrals are valid for six (6) months from the Registry Personnel's last day of work in a Correctional Healthcare Entity facility and Client will honor the placement fee for valid referrals in accordance with the fee schedule as outlined above. If the Registry Personnel are hired by Client/Correctional Healthcare Entity after six (6) months beyond their last day of work, Client will not be responsible for any placement fee.

24

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



If Client and/or a Correctional Healthcare Entity hires any Leadership Registry Personnel provided to Client and/or a Correctional Healthcare Entity by Staffing Vendor, and pays any placement fee as outlined above, the fee paid by Client for said Registry Personnel shall be guaranteed for a period of ninety (90) days from the Leadership Registry Personnel's first day of employment at Client/Correctional Healthcare Entity. If the candidate should terminate employment with Client/Correctional Healthcare Entity within the first thirty (30) days of the guarantee period, Client will void the Staffing Vendor invoice and the obligation to pay the invoice will be relieved. If the candidate should terminate employment within the thirty-one to ninety (31 -90) days of the guarantee period, Client will provide Staffing Vendor with a thirty (30) day grace period to replace the candidate. If Staffing Vendor cannot find a suitable candidate for Client/Correctional Healthcare Entity to hire within a thirty (30) day period, Staffing Vendor agrees to refund 100% of the placement fee. If the candidate's employment with Client/Correctional Healthcare Entity is terminated prior to Client paying the Staffing Vendor the fee, Client reserves the right to cancel the invoice and not make payment.

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723

 **CareerStaff** Unlimited®

# Schedule 3.1
## PRICING, BILLING, and FEE SCHEDULE

1.  Rates will be determined by the submission and acceptance rates determined by the CSU MSP VMS and the corresponding confirmation page.

2.  Training/Orientation:  The bill rates for time spent by Registry Personnel in required training/orientation shall be at 50% of the agreed-upon rate up to a maximum of forty (40) hours.

3.  Overtime Hours/Holiday: In the event any Registry Personnel is approved in advance by Client to work an observed Holiday, the bill rates shall be increased by 1.5 times over the agreed-upon rate.

    2.1  Designated Holidays include: New Year's Day, Memorial Day, 4th of July, Labor Day, Thanksgiving Day and Christmas Day

    2.2  Per Diem and Travel: All overtime greater than forty (40) hours per week worked for Client and work on Client Holidays will be payable at a rate of the agreed upon all-inclusive rate. Client Program Manager or designee must approve all overtime and work on holidays in advance of Staffing Vendor Registry Personnel working that overtime/holiday.

4.  STAFFING VENDOR SHALL BE RESPONSIBLE FOR CONTROLLING OVERTIME HOURS IF ASSIGNING REGISTRY PERSONNEL TO MORE THAN ONE CLIENT AND THE PAYMENT OF OVERTIME TO THE REGISTRY PERSONNEL IN ACCORDANCE WITH APPLICABLE STATE LAW.

5.  Call Outs/Requested Time Off: Should Registry Personnel call out or request off, management will make an effort to provide weekend hours to fulfill their weekly hours. If there are not hours available on these weekend dates or Registry Personnel declines hours at the home site or nearby facility, weekly guarantees are not valid.

6.  Travel/Overnight Assignments:  Assignments that require travel or overnight accommodations as an added expense will not be authorized without the approval of the Client.

7.  Rate Modifications:

    7.1  Rates cannot change without prior written approval and agreement by both parties. In order to ensure rates remain competitive in each market while still attracting qualified talent to Client shall review hourly bill rates at least annually with CSU.

    7.2  No rate increase shall be approved after contracted employee begins assignment, unless otherwise agreed upon by Client. Completion of agreed assignment must be achieved as agreed.

8.  Payment terms are as outlined in **Section 3** of this Agreement.

9.  Preferred Bill Rates for Client are set forth below (as they may be updated from time to time to update rates and include additional regions or States)

    9.1  **Section 7** of the Agreement contains language that covers order cancellation billing events and time frames.

26

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



9.2    Shift differential billing is not covered in the Agreement Double time billing is not covered in the Agreement.

9.3    Per Diem and Traveler Bill Rates are all inclusive (for example, Bill Rates include all travel, housing, meals and other incidental costs.)

    9.1.1    Client approved Mileage Fees:  Mileage for services will only be paid with prior approval by Client and shall be reimbursed at the then current IRS Reimbursement rate.

9.4    In order to effectively establish the Billing Services hereunder, the following procedures will be implemented:

    9.4.1    The pay week for purposes of a Staffing Vendor and Registry Personnel will begin Sunday 12:00AM and end the following Saturday 11:59 PM.

    9.4.2    Client agrees that it shall make every effort to approve Registry Personnel worked time no later than 9:00 AM Central Standard Time (CST) of the following Tuesday after each Pay Week.

    9.4.3    After the end of a Pay Week, and on or before 9:00 AM CST on each Tuesday, CSU shall receive from the Staffing Vendor an excel spreadsheet via SFTP identifying each Registry Personnel that provided service to the Client during the Pay Week and the hours worked by each Registry Personnel as recorded in the Correctional Healthcare Client's electronic timekeeping system. CSU will submit an invoice to Client at Agency.Invoices@corizonhealth.com or such other inbox as Client so designates in writing by the following Thursday based upon the timekeeping data provided by Client. Such invoice shall be accompanied by an excel spreadsheet with such detail as request by Client. If Registry Personnel failed to utilize the electronic timekeeping system and electronic time card **data is not included for time worked in that work week,** , CSU will follow up with the Staffing Vendor to obtain required information to verify the hours worked and will reconcile on the next invoice.

9.5    Preferred hourly rates for services set forth below:

DocuSign Envelope ID: B71B6E9F-CEBA-482E-9727-AFE965060723



| State | Local LPN | Local RN | Travel LPN | Travel RN | C.N.A | MA | OT Rates after 40hrs |
|---|---|---|---|---|---|---|---|
| AL | $58 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| AR | $58 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| AZ | $60 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| C. CALI | $70 | $85 | $80 | $90 | $45 | $43 | 1.5x base rate |
| CO | $60 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| CT | $60 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| DE | $60 | $72 | $67 | $82 | $36 | $34 | 1.5x base rate |
| FL | $60 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| GA | $60 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| IA | $60 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| ID | $60 | $60 | $65 | $80 | $45 | $45 | 1.5x base rate |
| IL | $60 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| IN | $58 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| KS | $60 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| KY | $60 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| LA | $58 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| MA | $60 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| MD | $60 | $74 | $67 | $82 | $36 | $34 | 1.5x base rate |
| ME | $60 | $72 | $67 | $80 | $36 | $34 | 1.5x base rate |
| MI | $60 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| MN | $60 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| MO | $60 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| MS | $60 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| MT | $60 | $70 | $65 | $80 | $45 | $45 | 1.5x base rate |
| N. CALI | $70 | $85 | $80 | $90 | $45 | $45 | 1.5x base rate |
| NC | $60 | $73 | $65 | $80 | $36 | $34 | 1.5x base rate |
| ND | $60 | $73 | $65 | $80 | $45 | $45 | 1.5x base rate |
| NE | $60 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| NH | $60 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| NM | $60 | $72 | $65 | $85 | $45 | $45 | 1.5x base rate |
| NV | $58 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| NJ | $60 | $72 | $67 | $80 | $36 | $34 | 1.5x base rate |
| NY | $60 | $72 | $67 | $80 | $36 | $34 | 1.5x base rate |
| NYC area | $65 | $72 | $70 | $85 | $40 | $43 | 1.5x base rate |
| OH | $60 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| OK | $58 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| OR | $60 | $72 | $65 | $85 | $36 | $34 | 1.5x base rate |
| PA | $60 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| RI | $58 | $72 | $65 | $80 | $36 | $34 | 1.5x base rate |
| S. CALI | $70 | $85 | $80 | $90 | $45 | $43 | 1.5x base rate |
| SC | $60 | $72 | $67 | $80 | $36 | $34 | 1.5x base rate |
| SD | $60 | $73 | $65 | $80 | $36 | $34 | 1.5x base rate |
| TN | $58 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| TX | $58 | $72 | $67 | $80 | $36 | $34 | 1.5x base rate |
| UT | $60 | $73 | $65 | $80 | $45 | $45 | 1.5x base rate |
| VA | $60 | $75 | $67 | $82 | $36 | $34 | 1.5x base rate |
| VT | $60 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| WA | $60 | $73 | $65 | $85 | $36 | $34 | 1.5x base rate |
| WI | $60 | $72 | $67 | $80 | $36 | $34 | 1.5x base rate |
| WV | $60 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
| WY | $60 | $70 | $65 | $80 | $36 | $34 | 1.5x base rate |
|  | Local LPN | Local RN | Travel LPN | Travel RN | C.N.A. | MA |  |

| Orientation |
|---|
| 50% of bill rate |
| for up to 40hrs |

**Assignment and Amendment**
**to**
**CareerStaff Unlimited Managed Service Provider Master Agreement**

This Assignment and Amendment (the "Assignment and Amendment") effective as of the 2nd day of May, 2024 ("Effective Date") is by and between CareerStaff Unlimited, LLC ("CSU"),  CHS Staffing, LLC ("CHS") and YesCare Corp. on behalf of itself and its Correctional Healthcare Entities (collectively, "Client", and together with CSU and CHS, the "Parties" or a "Party").  All capitalized terms herein shall have the meanings as ascribed to such terms as set forth in the Agreement.

**WHEREAS**, CSU and CHS are Parties to the Managed Service Provider Agreement dated April 28, 2022, together with all exhibits and schedules thereto and all prior amendments (collectively the "Agreement") whereby CSU provides managed services (an "MSP") to manage the procurement and ancillary processes for the healthcare staffing needs of CHS' Correctional Healthcare Entities.

**WHEREAS**, CHS desires to assign the Agreement to Client and Client accepts such assignment and assumes all the performance obligations of CHS under the Agreement, all on the terms set forth herein;

**WHEREAS**, CSU consents to the assignment of the Agreement on the terms set forth herein; and

**WHEREAS**, the Parties also desire to amend the terms of the Agreement as set forth below.

**NOW THEREFORE,** with the intent to be legally bound, and in consideration of the covenants and promises hereinafter made, the parties hereto agree as follows:

1.      **Assignment and Assumption**.  Effective as of the Effective Date, and subject to the terms of this Assignment and Amendment, (a) CHS hereby assigns and transfers to Client all of its rights, title and interest in and to the Agreement, and (b) Client hereby accepts such assignment and agrees to perform each and every obligation of the "Client" (as defined in the Agreement) under the Agreement.

2.      **Provision of Registry Personnel**.  Sections 1.1, 1.4.3, and 1.12 of the Agreement are hereby amended and restated as follows:

1.1      Client hereby exclusively engages CSU to manage the process of procuring and supplying Registry Personnel to Client's Correctional Healthcare Entities and manage the performance of all Staffing Vendors providing such Registry Personnel. The commencement date of CSU's services as to the Correctional Healthcare Entities' particular locations shall occur in accordance with **Schedule 1.1**. For the avoidance of doubt, nothing in this Agreement shall prevent Client or its Correctional Healthcare Entities from using their internal resources, including internal referrals, general advertising and other non-agency recruiting efforts to hire temporary or permanent, staff employed by Client or its Correctional Healthcare Entities without having to pay a placement fee. Further, upon execution of this Agreement, any staff from staffing agencies contracted directly with any Correctional Healthcare Agency shall be permitted to complete any contracted period which shall not be deemed a violation of this Agreement. At the time of the contract period ending and an extension is offered on the assignment, the extension will at that time be managed through CSU.

1.4.3   Intentionally Omitted

1.12    Commencing on the Effective Date, CSU shall implement the following as it pertains to the provision of Registry Personnel:

1.12.1    CSU shall set up three separate regions in the VMS for Client and the following terms shall apply:

a.    <u>Maryland OUD Program (MD OUD)</u>.  This region is solely for recruiting and placement of Registry Personnel to fill positions in Maryland for the OUD Program. The Staffing Vendor is responsible for submitting Registry Personnel that are not listed as submitted, prospected, selected, or scheduled on any other YesCare order to their knowledge.  CSU may utilize any number of Staffing Vendors to fill these positions unless notified otherwise by Client.

b.    <u>Philadelphia (PA Only)</u>.  This region is solely for the recruiting and placement of Registry Personnel to fill positions associated with the contract with the Philadelphia Prison System.  CSU may utilize any number of Staffing Vendors to fill these positions unless notified otherwise by Client.

c.    <u>All Other YesCare Regions</u>.  This region includes all locations except for the two listed in a(i) and a(ii) above.  For these locations, CSU shall initially limit the Staffing Vendors that may bid on the openings to the Preferred Staffing Vendors List approved by Client, which may be amended at any time by Client upon 30-day notice to CSU:

i.    Maryland – Only the Preferred Staffing Vendors may bid on job postings for the Maryland region (excluding the OUD program) after CSU has up to seventy-two (72) hours to fulfill the Work Order, in accordance with **Section 1.3**. If an acceptable candidate is not identified within 90 days of order creation, then CSU may open up the posting to all other Staffing Vendors unless Client has requested to extend the 90-day delay or release it to all other Staffing Vendors prior to 90 days.

ii.    All Other YesCare Locations – Only the Preferred Staffing Vendors may bid on job postings for these locations after CSU has up to seventy-two (72) hours to fulfill the Work Order, in accordance with **Section 1.3**.  If an acceptable candidate is not identified within 90 days of order creation, then CSU may open up the posting to all other Staffing Vendors unless Client has requested to extend the 90-day delay or release it to all other Staffing Vendors prior to 90 days.

**3.**    <u>**Compensation, Billing, and Payment**</u>. Section 3.6 is amended and restated as follows:

3.6 Client understands, acknowledges, and agrees that, pursuant to each Staffing Vendor Agreement, CSU may charge an administrative fee to the Staffing Vendor based on a percentage of the total value of services invoiced to Client (with such percentage to be determined by CSU in its sole discretion). CSU may deduct the fee from monies to be paid to Staffing Vendor based on services delivered to Client.

**4.  Release.**  Notwithstanding anything herein to the contrary, CHS and Client shall remain jointly and severally responsible for all liabilities and obligations arising under the Agreement prior to the date hereof. CHS is released of responsibility for all liabilities and obligations of Client arising on or after the date hereof.

**5.   Notices.**  All notices, consents and other communications, which either Party is required  to or may desire to give the other Party under this Agreement, shall be in writing and shall be given by or deposit, postage prepaid, in the United States mail, First Class, certified or registered return receipt requested addressed to the Parties at their respective addresses, facsimile or electronic mail as agreed upon to: The Parties agree that all notices and invoices under the Agreement for "Client" after the Effective Date shall be sent to the following address (except as hereafter updated in accordance with the notice provision of the Agreement):

| CSU: | Client: |
|---|---|
| 1700 E. Golf Road | 205 Powell Place |
| Suite 800 | Suite 104 |
| Schaumburg, IL 60173 | Brentwood, TN 37027 |
| Attn: Kristin Counts | Agency.invoices@yescarecorp.com |
| Telephone: 800-540-2306 | Telephone: |
| Facsimile: 505-468-9130 | Facsimile: |

With copy to:
Genesis HealthCare LLC
101 East State St.
Kennett Square, PA 19348
Attn: Law Department
Email: lawdepartment@genesishcc.com

Other than as set forth above, all terms and conditions of the Agreement, as previously amended, shall remain the same.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Assignment and Amendment as of the day and year first written above.

**CareerStaff Unlimited, LLC**

By: _Kristin Counts_

Name: Kristin Counts

Title: VP of Managed Services

Date: 05-01-2024

**YesCare Corp.**

By: _James Sprouse_

Name: James Sprouse

Title: Chief Financial Officer

Date: 5/1/2024

**CONSENT TO ASSIGNMENT**

CHS Staffing, LLC

By: _Michael Hagney_

Name: Michael Hagney

Title: COO

Date: 5/1/2024

# Signature Certificate

Reference number: 5DQ4M-8WZXC-KMB9E-EXVRS

| Signer | Timestamp | Signature |
|--------|-----------|-----------|

**Kristin Counts**
Email: kristin.counts@careerstaff.com

| | |
|---|---|
| Sent: | 01 May 2024 22:07:40 UTC |
| Viewed: | 01 May 2024 22:07:55 UTC |
| Signed: | 01 May 2024 22:09:13 UTC |

*Kristin Counts*

**Recipient Verification:**

✓ Email verified                01 May 2024 22:07:55 UTC

IP address: 76.29.93.237
Location: Lake Zurich, United States

Document completed by all parties on:
01 May 2024 22:09:13 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 50,000+ companies worldwide.

