## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACOB and JAMES JUNG, as Administrators of the Estate of LOUIS JUNG, JR, | : : : : | No. 2:24-cv-05618-TJS |
| Plaintiff, | : : | |
| v. | : : | **JURY TRIAL DEMANDED** |
| CITY OF PHILADELPHIA; YesCare Corp.; BLANCHE CARNEY, Former Commissioner of Philadelphia Dept. of Prisons; LALITHA TRIVIKRAM; MAUREEN GAY;  MARIESHA APOLLON; BLAIR CABELLOS; GENA FRASIER; WANDA BLOODSAW, | : : : : : : : : | |
| Defendants, | : : | |
| v. | : : | |
| CAREERSTAFF UNLIMITED, LLC, | : : | |
| Third Party Defendant, | : : | |
| v. | : : | |
| TEKACCEL, INC., | : : | |
| Fourth Party Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS YESCARE AND CABELLOS**

/s/ Bret Grote
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
/s/ Rupalee Rashatwar
Staff Attorney
PA ID No. 331085
rupalee@alcenter.org
/s/ Margaret Hu
Staff Attorney
PA ID No. 334438
margo@alcenter.org

/s/ Lolo Salsbury Serrano
Legal Fellow
PA ID No. 338184
lolo@alcenter.org
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123

Counsel for Plaintiffs

**TABLE OF CONTENTS**

I.    PROCEDURAL HISTORY ................................................................................. 1

II.   STATEMENT OF FACTS .............................................................................. 2

III.  STATEMENT OF QUESTIONS INVOLVED .................................................. 9

IV.   LEGAL STANDARD ..................................................................................... 10

V.    ARGUMENT .................................................................................................. 10

    A.    YesCare is subject to vicarious liability for medical malpractice because its employees breached their duty to provide insulin to Mr. Jung, a Type 1 diabetic, causing his death from diabetic ketoacidosis. ..................................................................... 10

    B.    YesCare is subject to direct corporate liability for medical malpractice because it systematically failed to enforce policies or uphold the standard of care requiring administration of insulin to Type 1 diabetics. ....................................................... 14

    C.    Defendant Cabellos breached her duty of care to Mr. Jung, substantially contributing to his death. ............................................................................... 19

VI.   CONCLUSION ............................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...............................................10

*Brodowski v. Ryave*, 885 A.2d 1045 (Pa. Super. 2005)........................................ 15, 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 10

*Colon v. Correct Care Sols., LLC*, No. 834 C.D. 2018, 2019 WL 3729803 (Pa. Commw. Ct. Aug. 8, 2019) ...................................................................................................... 14

*Edwards v. Brandywine Hosp.*, 652 A.2d 1382 (Pa. Super. Ct. 1995) .................................. 16, 19

*Fox v. Horn*, No. CIV. A. 98-5279, 2000 WL 49374 (E.D. Pa. Jan. 21, 2000)...................... 14

*Garcia v. Howell*, No. 800 C.D. 2018, 2019 WL 3986331 (Pa. Commw. Ct. Aug. 23, 2019) .... 14

*Hightower-Warren v. Silk*, 698 A.2d 459 (Pa. 1997)............................................................ 11

*Jones v. Harrisburg Polyclinic Hosp.*, 437 A.2d 1134 (Pa. 1981) ................................ 11

*Jones v. Montefiore Hosp.*, 431 A.2d 920 (Pa. 1981) ................................................... 22

*Mitzelfelt v. Kamrin*, 584 A.2d 888 (Pa. 1990)......................................................... 11, 19, 22

*Navarro v. George*, 615 A.2d 890 (Pa. Cmwlth. 1992)........................................................ 20

*Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444 (M.D. Pa. 2017), *aff'd in part, punitive damages reinstated sub nom. Ponzini v. Monroe Cnty.*, 789 F. App'x 313 (3d Cir. 2019)10, 14, 20

*Prowel v. Wise Bus. Forms*, 579 F.3d 285 (3d Cir.2009) .................................................. 10

*Quinby v. Plumsteadville Fam. Prac., Inc.*, 907 A.2d 1061 (Pa. 2006) .................... 11, 12, 13, 19

*Rauch v. Mike-Mayer*, 783 A.2d 815 (Pa. Super. 2001)................................................. 16

*Scampone v. Highland Park Care Ctr., LLC*, 57 A.3d 582 (Pa. 2012) ........................... 14

*Sokolsky v. Eidelman*, 93 A.3d 858 (Pa. Super. 2014)................................................... 11

*Thompson v. Nason Hosp.*, 591 A.2d 703 (Pa. 1991).......................................... 10, 14, 15, 20

*Welsh v. Bulger*, 698 A.2d 581 (Pa. 1997)....................................................................... 14

*Whittington v. Episcopal Hosp.*, 768 A.2d 1144 (Pa. Super. Ct. 2001)................................ 15, 16

## RULES

Fed. R. Civ. P. 56(a) ................................................................................................ 10

# I.    PROCEDURAL HISTORY

Plaintiffs Jacob and James Jung brought this case as Administrators of the Estate of Louis Jung, Jr [hereafter "Mr. Jung"], their father, who died of diabetic ketoacidosis while incarcerated in the Curran-Fromhold Correctional Facility (CFCF) within the Philadelphia Department of Prisons. This lawsuit was initiated on October 23, 2024 by the filing of a civil rights action pursuant to 42 U.S.C. § 1983. Dkt. 1. Plaintiffs' claims were based on failures to provide proper medical care and disability accommodations to Mr. Jung.

Constitutional medical care claims were brought under the Fourteenth Amendment to the U.S. Constitution against the City of Philadelphia, YesCare Corporation [hereafter "YesCare"], and against defendants Carney, Trivikram, Gay, and John Does. Pennsylvania state law medical malpractice claims were brought against YesCare, Trivikram, and Gay. Americans with Disabilities Act and Rehabilitation Act claims were brought against the City of Philadelphia. Failure to train or supervise staff in providing medical care or discipline staff who failed to provide proper medical care were brought against the City of Philadelphia and YesCare. Wrongful Death and Survival Action claims were brought against all defendants. Dkt. 1 at ¶¶ 151-181.

The City of Philadelphia defendants filed a motion to dismiss on December 23, 2024. Dkt. 14. The motion was granted in so far as Plaintiffs complaint purported to bring medical malpractice claims against the City of Philadelphia and defendant Carney, but dismissed with prejudice in all other respects. Dkt. 17.

Following initial discovery, Plaintiffs filed a First Amended Complaint. Dkt. 25. The First Amended Complaint removed the Doe defendants and added four additional defendants: Mariesha Apollon, Blair Cabellos, Gena Frasier, and Wanda Bloodsaw. *Id*. at ¶¶ 9-12. All four defendants were sued for violations of the Fourteenth Amendment and under the Wrongful Death and Survival

1

Action counts. *Id*. at ¶¶ 161-164, 182-192. Pennsylvania state law medical malpractice claims were brought against defendants Apollon and Cabellos. *Id*. at ¶¶ 165-168.

Defendant Apollon filed a motion to dismiss on May 1, 2025. Dkt. 35. The Court denied that motion on May 22, 2025. Dkt. 42.

Plaintiffs now move for partial summary judgment on their Pennsylvania state law medical malpractice claims against YesCare and defendant Cabellos.

## II.    STATEMENT OF FACTS

Louis Jung, Jr. [Mr. Jung] was born on April 16, 1973 and had Type 1 diabetes since he was an adolescent. Statement of Undisputed Material Facts [hereafter "SUMF"] at ¶¶ 22-23. Type 1 diabetes is an autoimmune condition where an individual's pancreas is unable to produce insulin, resulting in absolute insulin deficiency that requires administration of insulin to treat it, often through multiple daily injections. *Id*. at ¶¶ 5-6. Type 1 diabetics cannot live without administered insulin. *Id*. at ¶ 7. Lack of insulin can cause diabetic ketoacidosis, a life-threatening condition. *Id*. at ¶¶ 8-9. Diabetic ketoacidosis occurs when the body does not have enough insulin to break down glucose properly, which causes the body to start breaking down fats as a fuel source. *Id*. at ¶10. This fat breakdown produces fatty acids and ketones, which acidify the blood, and acid build-up in the blood then disrupts normal body processes, ultimately causing multi-organ dysfunction and failure. *Id*. For a Type 1 diabetic, going without insulin for 24 hours may result in severe metabolic decompensation, including diabetic ketoacidosis. *Id*. at ¶ 11.

Mr. Jung was incarcerated within the Philadelphia Department of Prisons [PDP] on December 16, 2021. *Id*. at ¶ 24. At that time, Corizon, Inc. was contracted to provide health care for those in custody within PDP, a contract that eventually was assigned to YesCare in an agreement with the City of Philadelphia in February 2023. *Id*. at ¶ 12. In the contract entered into

2

between Corizon and the City of Philadelphia, which was assigned to YesCare, Corizon stated that its care for diabetic patients was based on the American Diabetes Association (ADA) guidelines. *Id*. at ¶ 12. The ADA states that all patients must have access to prompt treatment for hypoglycemia (low blood glucose) and hyperglycemia (high blood glucose), and further states that staff should be required to notify a physician of all blood glucose results outside of a specified range, as determined by the treating physician. *Id*. at ¶¶ 13-14.

YesCare recognized that prompt treatment for hyperglycemia and notification of a medical provider was required for diabetic patients with elevated glucose levels in its Clinical Pathway for diabetes care. *Id*. at ¶ 15. When a diabetic patient's glucose level equals or exceeds 400 in a Finger Stick Blood Glucose (FSBG) check, YesCare nursing staff were required to determine if ketones are present in the patient's urine; notify the facility or on-call practitioner for orders and document in the patient's chart; conduct a follow-up FSBG check in approximately two hours; place the patient on sick call to be seen by the provider for the next day that the provider is on-site. *Id*. at ¶ 16. When a diabetic patient's glucose level equaled or exceeded 300 in a FSBG check, YesCare nursing staff were required to determine if ketones are present in the patient's urine. *Id*. at ¶ 17. YesCare recognized insulin as a "critical medication" that required medical staff to follow-up with a patient any time a single dose was missed, and that missing a critical medication such as insulin requires nursing staff to implement the "Red Flag" policy, requiring nursing staff to schedule a patient encounter with a medical provider. *Id*. at ¶¶ 18-20. These encounters are documented in the patient's electronic health record. *Id*. If the patient agrees to accept insulin, it is to be provided; if the patient refuses, the patient is to be counseled on the risks of refusal of insulin, a refusal form is to be filled out, and the refusal is documented on the patient's Medication Administration Record, according to YesCare policy. *Id*. at ¶ 21.

3

Mr. Jung was hospitalized on the following dates for the following reasons while in PDP custody and under the medical care of YesCare: December 20, 2021 – January 5, 2022: diabetic ketoacidosis (DKA); April 7, 2022 – April 9, 2022: DKA; January 8, 2023 – January 12, 2023: DKA; January 23, 2023 – January 29, 2023: DKA; March 11, 2023 – March 14, 2023: DKA; March 19, 2023 – March 20, 2023 – Hyperglycemia. *Id*. at ¶ 25.

On June 2, 2023, Mr. Jung was transferred to Norristown State Psychiatric Hospital. *Id*. at ¶ 26. On October 27, 2023, Mr. Jung was transferred from Norristown State Psychiatric Hospital to PDP custody, arriving at Curran-Fromhold Correctional Facility (CFCF). *Id*. at ¶ 27.

Mr. Jung's medical intake screening occurred on October 28, 2023. *Id*. at ¶ 28. At intake, his glucose level was 542 and his urine tested positive for ketones. *Id.* at ¶¶ 29-30. The intake nurse, Mariesha Apollon, contacted the medical provider, Maureen Gay, a YesCare employee, on October 28, 2023 at around 10:02 AM regarding Mr. Jung. *Id*. at ¶¶ 31-32. Maureen Gay issued the following orders for Mr. Jung's Type 1 diabetes:

- NovoLIN N Suspension, 100 UNIT/ML, 10 units, Subcutaneous, TWICE DAILY, start date 10/28/2023;
- NOVOLIN R Solution, 100 UNIT/ML, 2-12 units, Injection, TWICE DAILY PRN, start date 10/28/2023, Notes: 151-200 give 4 units, 201-250 give 6 units, 251-300 give 8 units, 301-400 give 10 units, > or = 401 give 12 units;
- Accu Chek Reading, TWICE DAILY; start date 10/28/2023.

    *Id*. at ¶ 33.

There was not a documented medical order requiring nursing staff to check Mr. Jung's glucose within approximately two hours, nor was there a documented medical order requiring Mr. Jung to be seen by a medical provider the next day that a provider was on site. *Id*. at ¶¶ 34-35. Both of these measures were required by YesCare's Diabetes Mellitus Clinical Pathway. *Id*. Instead, Maureen Gay scheduled Mr. Jung to be seen by a provider for his diabetes care in 28 days. *Id*. at ¶ 36.

Mr. Jung was to be provided insulin twice per day, during an AM and PM administration. *Id*. at ¶ 37. During the PM glucose check and insulin administration for Mr. Jung on October 29, 2023, his glucose level was 585, and he was not seen by a medical provider in response. *Id*. at ¶¶ 38-39. According to YesCare's Patient Safety Event Report, there is a notation in "the EMAR" from October 29, 2023 that a provider was notified and a urine obtained, but there is no documentation of a provider notification or the result of this urine test, and accordingly no documentation as to whether Mr. Jung had ketones present in his urine on October 29, 2023. *Id*. at ¶¶ 40-41. There was no documentation of a PM administration of glucose check or insulin on October 30, 2023. *Id*. at ¶ 50(a).

During the PM glucose check and insulin administration for Mr. Jung on October 31, 2023, his glucose level was 500. *Id*. at ¶ 42. A medical provider was not notified by nursing staff and a medical provider did not see Mr. Jung in response to his elevated glucose level of 500 on October 31, 2023, and Mr. Jung was not checked for ketones at this time either. *Id*. at ¶¶ 43-44.

Mr. Jung did not receive insulin in the AM on November 1, 2023. *Id*. at ¶ 50(b). During the PM glucose check and insulin administration for Mr. Jung on November 1, 2023, his glucose level was 411. *Id*. at ¶ 45.  A medical provider was not notified by nursing staff and a medical provider did not see Mr. Jung in response to his elevated glucose level of 411 on November 1, 2023, and he was not checked for ketones on this date either. *Id*. at ¶¶ 46-47.

YesCare nursing staff did not document whether Mr. Jung had any symptoms associated with hyperglycemia and/or diabetic ketoacidosis when his blood glucose level was higher than 400 on October 29 and 31, 2023, and November 1, 2023. *Id*. at ¶ 48. YesCare nursing staff did not use the YesCare Hypoglycemia/Hyperglycemia Nursing Encounter Tool (NET) to document whether or not Mr. Jung was symptomatic; they did not document any symptoms in a progress note; they

did not even generate any progress note; nor did they produce any documentation in Mr. Jung's medical records whatsoever pertaining to the presence or absence of symptoms of hyperglycemia and/or diabetic ketoacidosis. *Id*.

Mr. Jung's medication administration record reflects the following missed or undocumented doses of insulin between October 28 and November 5:

- October 30, 2023, PM administration, reason given: Not Documented;
- November 1, 2023, AM administration, reason given: Refused (no refusal form);
- November 3, 2023, AM administration, reason given: No Show;
- November 4, 2023, PM administration, reason given: Not Documented;
- November 5, 2023, AM administration, reason given: No Show;
- November 5, 2023, PM administration, reason given: Refused (no form).

*Id*. at ¶ 50.

Each time Mr. Jung missed a dose of insulin, YesCare nursing staff was required to see the patient in person in order to provide the patient with an opportunity to receive insulin, and to generate a "Red Flag" appointment for him to be seen by a medical provider. *Id*. at ¶ 49. YesCare nursing staff did not schedule a Red Flag encounter with Mr. Jung after missed insulin doses on October 30, November 1, November 3, November 4, nor on the morning or evening of November 5. *Id.* at ¶ 50.

If a patient refuses insulin, YesCare nursing staff are required to follow the refusal policy, counsel the patient on the risks of not taking the medication and obtain a patient's signature on the refusal form. *Id*. at ¶ 51. If the patient refuses to sign, the nursing staff member is to sign the form and obtain the signature of a witness. *Id*. YesCare nursing staff failed to obtain refusal forms on November 1 and 5, 2023, when it was claimed that Mr. Jung refused his insulin. *Id*. at ¶ 52.

Defendant LPN Blair Cabellos was an employee of YesCare from August 2023 to May 2024, and on the morning of November 5, 2023, she was performing a medication pass at CFCF B1 Pod 3. *Id*. at ¶¶ 53-54. Defendant Cabellos was informed by a correctional officer that an

6

inmate, Mr. Jung, wanted to see a nurse. *Id*. at ¶ 55. In an interview with PDP investigator Shawn Jay, Defendant Cabellos stated that she saw an incarcerated person on the floor of the doorway of cell #21 and that the incarcerated person stated that he could not get up. *Id*. at ¶ 56. At her deposition, Defendant Cabellos testified that Mr. Jung was standing in the back of his cell when she arrived at the cell, and that he walked to the door and set himself on the floor. *Id*. at ¶ 57. At her deposition, Defendant Cabellos testified that Mr. Jung said his legs hurt. *Id*. at ¶ 58. At an earlier interview with PDP investigator Shawn Jay, Defendant Cabellos stated that she heard Mr. Jung say he needed help to get up. *Id*. at ¶ 58.  Defendant Cabellos did not evaluate Mr. Jung at all; she did not check his vitals; she did not check his blood glucose levels; she did not review his medical chart; she did not contact any other medical staff in regard to Mr. Jung; and she did not document her encounter with Mr. Jung. *Id*. at ¶¶ 62-65. Mr. Jung was dragged back into his cell by two incarcerated people after Defendant Cabellos had left. *Id*. at ¶ 67.

On November 6, 2023 at approximately 6:04 A.M., Mr. Jung was discovered in a state of medical emergency in his cell. *Id*. at ¶ 68. Mr. Jung was pronounced dead on PDP premises at CFCF at 6:47 A.M. on November 6, 2023. *Id*. at ¶ 69. The last documented instance that Mr. Jung had been administered insulin was during the AM sometime on November 4, 2023, approximately 48 hours before his death. *Id*. at ¶ 70. Mr. Jung did not receive any insulin at all on November 5, 2023. *Id*. at ¶ 71. The cause of Mr. Jung's death was diabetic ketoacidosis. *Id*. at ¶ 72.

YesCare conducted a review of Mr. Jung's death. *Id*. at ¶ 73. That review was the basis for a Patient Safety Event Report about Mr. Jung's death. *Id*. The Patient Safety Event identified, *inter alia*, the following problems with the care provided to Mr. Jung: "Nurse failed to utilize the Hyper/Hypoglycemia NET during the Intake screening or schedule a follow up (walk in appt)" and "will receive a write up for not completing a NET form for elevated Blood sugar upon

examination or scheduling a follow up visit"; "Nurse did not utilize CRIC for BS>400 nor notify the provider" and will "receive a write up for failure to administer sliding scale insulin coverage for a BS of 411"; "Nurses failed to obtain a signed refusal or schedule a red flag appointment" and will "receive a write up for not receiving a refusal"; "Nurses failed to utilize the Hyper/Hypoglycemia NET during med pass (BS >400)" and will "receive a write up for not completing a NET form for elevated Blood sugar upon examination"; "Nurses documented a NO SHOW for insulin" and would "receive a write up for not scheduling a red flag appointment"; "Nurses failed to document in the EMAR (Not Documented)" and will receive further education on documentation of medication administration; "Provider failed to follow up in real time regarding telephone call about patient with BS of 542 and positive ketones" and "was verbally educated by the SMD [Site Medical Director]. *Id*. at ¶ 74.

YesCare conducted no audits of insulin administration, its red flag policy, or its refusal policy as they pertained to diabetes care prior to November 2023. *Id*. at ¶¶ 75-77. Multiple prior hospitalizations for diabetic complications including hypoglycemia and hyperglycemia, both in Mr. Jung's own case and those of other patients, reflected problems similar to those identified in the Patient Safety Report on Mr. Jung. *Id.* at ¶ 78. These include undocumented blood sugar checks, a hyperglycemic episode without an NET, missing refusal forms for refusals in a MAR, and "no show" entries for insulin. *Id.*

YesCare's Patient Safety Event Report categorizes events that it reviews on scale of 1-4. *Id*. at ¶ 79. First, YesCare determines if there "was a deviation from generally accepted performance standards". *Id*. If the answer is yes, then YesCare asks "[d]id the deviation reach the patient?" *Id.* If the answer to this question is yes, then YesCare asks "[d]id the deviation lead to moderate to severe harm or death"? *Id*. If the answer to that question is yes, then YesCare

determines that the event is a Category 4 "Serious Safety Event," the most serious type in its Category Assignment. *Id*.

YesCare determined that there were deviations from generally accepted performance standards in regard to the care provided to Mr. Jung that was reviewed in its Patient Safety Report. *Id*. at ¶ 80. YesCare determined that these deviations reached the patient, Mr. Jung. *Id*. at ¶ 81. YesCare determined that these deviations led to moderate to severe harm or death in this case. *Id*. at ¶ 82. YesCare determined that the death of Mr. Jung was a Category 4 Serious Safety Event where the deviations in generally accepted performance standards reached Mr. Jung and caused his death. *Id*. at ¶ 83.

The Site Medical Director for CFCF, defendant Dr. Lalitha Trivikram, was designated as the 30(b)(6) deponent for YesCare. *Id*. at ¶ 84. Dr. Trivikram testified that the classification of Mr. Jung's death as a Category 4 event was accurate. *Id*. at ¶ 85. Dr. Trivikram testified that Mr. Jung's death was preventable. *Id*. at ¶86. Dr. Trivikram testified that the death of Mr. Jung could have been prevented if they had provided him with insulin. *Id*. at ¶ 87.

## III.    STATEMENT OF QUESTIONS INVOLVED

1. Whether Defendant YesCare Corporation is liable for medical malpractice under a theory of vicarious liability due to its employees' breaches in the duty of care owed to Mr. Jung that resulted in his death.

2. Whether Defendant YesCare Corporation is liable for medical malpractice under a theory of direct corporate negligence due to its deviation in the standard of care for Mr. Jung's Type 1 diabetes, of which they had constructive notice, and which resulted in Mr. Jung's death.

3. Whether Defendant Blair Cabellos is liable for medical malpractice due to her breach of her duty of care to Mr. Jung when she failed to provide any medical care to him on November 5, 2023, substantially contributing to his death.

## IV.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir.2009). To defeat summary judgment, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is only "genuine" for purposes of summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## V.    ARGUMENT

### A. YesCare is subject to vicarious liability for medical malpractice because its employees breached their duty to provide insulin to Mr. Jung, a Type 1 diabetic, causing his death from diabetic ketoacidosis.

Under Pennsylvania law, medical corporations are subject to vicarious liability for the medical malpractice of their employees under the theory of respondeat superior. *Thompson v. Nason Hosp.*, 591 A.2d 703, 707 (Pa. 1991); *see also Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 582 (M.D. Pa. 2017), *aff'd in part, punitive damages reinstated sub nom. Ponzini v. Monroe Cnty.*, 789 F. App'x 313 (3d Cir. 2019) (finding "the jury was instructed, without any objection and consistent with Pennsylvania law, that because all of the individual PrimeCare defendants were employees acting within the scope of their employment, if the jury found any of those defendants liable in negligence, then PrimeCare was also vicariously liable").

"Because medical malpractice is a form of negligence, to state a prima facie cause of action, a plaintiff must demonstrate the elements of negligence." *Quinby v. Plumsteadville Fam. Prac.,*

*Inc.*, 907 A.2d 1061, 1070 (Pa. 2006) (citations omitted). A "plaintiff must establish (1) a duty owed by the [medical provider] to the patient (2) a breach of duty from the [medical provider] to the patient (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and (4) damages suffered by the patient that were a direct result of that harm." *Mitzelfelt v. Kamrin*, 584 A.2d 888, 891 (Pa. 1990).

"With all but the most self-evident medical malpractice actions there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation." *Quinby*, 907 A.2d at 1070. Expert testimony is not required where "the matter is so simple or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even non-professional persons." *Hightower-Warren v. Silk*, 698 A.2d 459, 463 n.1 (Pa. 1997). "Expert medical testimony only becomes necessary when there is no fund of common knowledge from which laymen can reasonably draw the inference or conclusion of negligence." *Jones v. Harrisburg Polyclinic Hosp.*, 437 A.2d 1134, 1138 (Pa. 1981).

Vicarious liability in a medical malpractice action can be proven where staff are "named as a unit" or not otherwise laid out individually. *Sokolsky v. Eidelman*, 93 A.3d 858, 866 (Pa. Super. 2014) ("Simply because employees are unnamed within a complaint or referred to as a unit, *i.e.,* the staff, does not preclude one's claim against their employer under vicarious liability if the employees acted negligently during the course and within the scope of their employment").

**1.  YesCare employees had a duty to provide Mr. Jung, a Type 1 diabetic, with insulin.**

In this case, the duty owed by YesCare's employees was simple: to provide Mr. Jung, a Type I diabetic, with insulin. This is established by the reports of Plaintiffs' expert, Dr. Williams. SUMF ¶¶ 1-11; *Quinby*, 907 A.2d 1061. It is also self-evidently obvious from the deposition of

YesCare's 30(b)(6) representative, Dr. Lalitha Trivikram, who testified that Type I diabetics cannot live without insulin. SUMF ¶ 11.

**2. YesCare employees breached their duty to provide Mr. Jung with insulin.**

There were numerous breaches of the duty to provide Mr. Jung with insulin. These are established in the reports of Plaintiffs' expert. SUMF ¶¶ 50, 71. *Quinby*, 907 A.2d 1061. They are also clear from the face of YesCare's own Patient Safety Report. YesCare determined that there were "deviations from generally accepted performance standards" in Mr. Jung's Case. SUMF ¶ 80.

YesCare employees breached their duty to provide Mr. Jung with the twice-daily insulin he was prescribed. It is undisputed that Mr. Jung received no insulin on November 5, 2023, the day before he died. SUMF ¶ 71. His last documented insulin dose was on the morning of November 4, about 48 hours before his death. SUMF ¶ 70. It is also undisputed that Mr. Jung received no insulin on the morning of November 1 and the morning of November 3. SUMF ¶¶ 50. It is additionally undisputed that YesCare nurses failed to document insulin dosages on the evening of October 30 and the evening of November 4, in violation of YesCare policy. *Id.* YesCare determined that each of these missed or not-documented doses violated their policies for medication management. SUMF ¶ 74(c),(e)-(f).

YesCare employees further breached their duty to provide Mr. Jung with required insulin by violating policies designed to ensure follow-up care for hyperglycemia and missed insulin doses. YesCare staff failed to generate Nursing Encounter Tools when Mr. Jung's blood glucose levels were above 400, in violation of YesCare policy. SUMF ¶ 74(a), (b), (d). They failed to administer any corrective regular insulin for his blood sugar of 411 on November 1. SUMF ¶ 45. YesCare nursing staff failed to implement multiple safeguards that would have secured Mr. Jung

additional insulin necessary for his hyperglycemic episodes – immediate checks for ketones in urine, and a follow-up blood sugar check and further corrective insulin within two hours when his blood sugar was documented as over 400 on October 29, October 31, and November 1. SUMF ¶¶ 16, 39-48, 74(d). YesCare nursing staff failed to schedule follow-up "red flag" visits when Mr. Jung missed numerous insulin doses and failed to obtain signed refusal forms. SUMF ¶¶ 50, 74(c), 74(e). Proper "red flag" and refusal encounters would have ensured direct interaction between Mr. Jung and a medical provider for counseling on his insulin and the opportunity to receive his missed doses. SUMF ¶¶ 19-21.

### 3. YesCare employees' failure to provide Mr. Jung with insulin caused his death from diabetic ketoacidosis.

Causation in this matter is also simple. The cause of Mr. Jung's death was diabetic ketoacidosis. SUMF ¶ 72. Diabetic ketoacidosis occurs when diabetics are not provided insulin. SUMF ¶¶ 8, 11. This is established in the reports of Plaintiffs' expert. SUMF ¶¶ 72; *Quinby*, 907 A.2d 1061. Causation is also clearly laid out in YesCare's Patient Safety Report. SUMF ¶ 83. The Patient Safety Report reflects that deviations from generally accepted performance standards reached the patient, Mr. Jung, and led to moderate to severe harm or death. SUMF ¶ 74.

Dr. Trivikram, YesCare's 30(b)(6) deponent, testified that Mr. Jung's death was preventable, if YesCare had provided him with insulin. SUMF ¶¶ 84-87. Plaintiffs' expert, Dr. Williams, YesCare's 30(b)(6) deponent and Site Medical Director, and YesCare's own analysis are all in agreement: that deviations from the proper standard of care by YesCare employees led to Mr. Jung's death from diabetic ketoacidosis due to a lack of insulin. As these facts are not in dispute and establish every element for a medical malpractice claim against YesCare under a vicarious liability theory, Plaintiffs are entitled to summary judgment on this claim.

13

**B. YesCare is subject to direct corporate liability for medical malpractice because it systematically failed to enforce policies or uphold the standard of care requiring administration of insulin to Type 1 diabetics.**

YesCare is also liable under a theory of direct corporate responsibility for the death of Mr. Jung. Under Pennsylvania law, medical corporations may be subject to direct liability for medical malpractice on the basis of corporate negligence. *Thompson v. Nason Hosp.*, 591 A.2d 703, 707 (Pa. 1991). "[C]orporate negligence is based on the negligent acts of the institution. A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees." *Welsh v. Bulger*, 698 A.2d 581, 585 (Pa. 1997). Corporate negligence is a "theory of liability," not a separate claim from medical malpractice. *Thompson*, 527 Pa. at 338.

The *Thompson* corporate negligence liability analysis of medical malpractice is applicable to medical contractors for jails or prisons. Pennsylvania state and federal courts apply the corporate negligence analysis to such entities. See *Ponzini*, 269 F. Supp. 3d at 585-86; *Colon v. Correct Care Sols., LLC*, No. 834 C.D. 2018, 2019 WL 3729803 (Pa. Commw. Ct. Aug. 8, 2019); *Fox v. Horn*, No. CIV. A. 98-5279, 2000 WL 49374 (E.D. Pa. Jan. 21, 2000); *Garcia v. Howell*, No. 800 C.D. 2018, 2019 WL 3986331 (Pa. Commw. Ct. Aug. 23, 2019). For the Pennsylvania Supreme Court's articulation of the breadth of applicability of the corporate negligence theory of medical malpractice, see *Scampone v. Highland Park Care Ctr., LLC*, 57 A.3d 582, 600-604 (Pa. 2012) ("the *Thompson* majority did not purport to treat hospitals as *sui generis* corporate entities or to limit its decision to hospitals.")

*Thompson* recognizes four general areas of corporate medical duty, including "a duty to oversee all persons who practice medicine within its walls as to patient care" and "a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients."

14

*Thompson*, 591 A.2d at 707. Additionally, the court adopted more generally "as a theory of [corporate medical] liability the doctrine of corporate negligence or corporate liability under which the [corporation] is liable if it fails to uphold the proper standard of care owed its patient." *Id*. at 708. "These duties run directly from the [medical corporation] to the patient." *Brodowski v. Ryave*, 885 A.2d 1045, 1056 (Pa. Super. 2005).

Taking into account the *Thompson* duties, a case of corporate negligence consists of three elements:

"1. [the medical corporation] acted in deviation from the standard of care;

2. [the medical corporation] had actual or constructive notice of the defects or procedures which created the harm; and

3. that the conduct was a substantial factor in bringing about the harm."

*Whittington v. Episcopal Hosp.*, 768 A.2d 1144, 1149 (Pa. Super. Ct. 2001) (citing *Welsh*, 698 A.2d at 586).

Plaintiffs have already established the first and third element of a corporate negligence theory of liability. As argued, *supra*, YesCare deviated from its duty of care to Mr. Jung by failing to treat his Type 1 diabetes with insulin administration, resulting in diabetic ketoacidosis and death. The employees referenced *supra* in Section A were "employees of the [corporation] and were the agents through whose conduct [corporate] liability may attach" for corporate negligence. *Whittington*, 768 A.2d at 1150. The standard for determining a deviation from the standard of care is the same as already articulated in the preceding argument establishing YesCare's vicarious liability. A plaintiff must establish there was a duty to the patient, there was a breach of that duty, this breach was the proximate cause of or a substantial factor in the harm, and the damages were a direct result of the harm. *Mitzelfelt v. Kamrin*, 584 A.2d 888, 891 (Pa. 1990).

15

A corporate medical defendant "may properly be charged with constructive notice [when] it should have known of the decedent's condition." *Whittington*, 768 A.2d at 1154; *see also Edwards v. Brandywine Hosp.*, 652 A.2d 1382, 1386 (Pa. Super. Ct. 1995) (constructive notice "requires evidence that the [medical corporation] knew or should have known about the breach of duty that is harming its patient.")

"Further, constructive notice *must* be imposed when the failure to receive actual notice is caused by the absence of supervision." *Whittington*, 768 A.2d at 1154 (emphasis added). "For example, a hospital will be charged with constructive notice when its nurses should have known about a patient's adverse condition, but failed to act." *Brodowski*, 885 A.2d at 1057; *see also Whittington*, 768 A.2d 1154 ("Had [defendant corporation] undertaken adequate monitoring, it would have discovered that decedent had received and was continuing to receive medical treatment that was clearly deficient before and after her delivery. We are compelled to find constructive notice under these circumstances"); *Rauch v. Mike-Mayer*, 783 A.2d 815, 828 (Pa. Super. 2001) ("it is unclear whether there were no proper standards in place for medical clearance, or whether the physician defendants failed to conform with the clearance procedures established by the institutional defendant. In either event, the institutional defendant failed to enforce adequate rules and policies so as to ensure quality care for its patients. Thus, we conclude that the institutional defendant in this case must be deemed to have received constructive notice"); *Edwards*, 652 A.2d at 1387 (Pa. Super. 1995) (proposing hypothetical "systemic negligence" as establishing corporate negligence "where a hospital should realize that its patients are routinely getting infected because the nursing staff is leaving catheters in the same spot for too long, yet the hospital fails to formulate, adopt or enforce any rule about moving catheters.")

16

YesCare failed to supervise either routine or emergency administration of insulin, establishing both constructive notice and its breach of the *Thompson* duties to "oversee" and "enforce policies" regarding the provision of care. YesCare did not conduct any audits of insulin administration at PDP whatsoever prior to Mr. Jung's death. SUMF ¶ 75. YesCare also did not conduct audits of other policies that could have ensured administration of insulin at PDP: the "red flag" policy for missed "critical medications," including insulin, and the refusal policy designed to ensure proper documentation and interaction with patients who miss medications. SUMF ¶¶ 76,77.

The course of Mr. Jung's treatment from October 28 through November 5, 2023 is itself evidence of an utter vacuum of supervision or policy enforcement. YesCare's Patient Safety Report identified a violation of policy on nearly every single day in this period: multiple failures during the intake screening on 10/28; failure to complete a NET for a blood sugar for 585 on 10/29; failure to document an insulin dosage on 10/30; failure to complete a NET or document regular insulin for a blood sugar of 500 on 10/31; failure to obtain a refusal form or schedule a red flag for missed insulin on the morning of 11/1; failure to complete a NET or administer regular insulin for a blood sugar of 411 on the evening of 11/1; failure to schedule a red flag appointment for an insulin "no show" on 11/3; failure to document insulin on 11/4; failure to schedule a red flag appointment for an insulin "no show" on the morning of 11/4; and failure to obtain a signed refusal form or schedule a red flag appointment on the morning of 11/5. SUMF ¶¶ 74, 38-52.

YesCare was further put on notice of a lack of supervision or policy enforcement by multiple hospitalizations of other diabetic patients after weeks or months incarcerated at CFCF. A string of cases in the years prior to Mr. Jung's death, in his case and those of other patients, displayed strikingly similar systemic failures as those identified in the Patient Safety Report:

17

- Mr. Jung was hospitalized on January 23, 2023 for hyperglycemia. His medication administration record for the three days leading up to his hospitalization only show two documented administrations of insulin, on the mornings of 1/20 and 1/21; the rest of his MAR for blood sugar checks or insulin doses in these three days reflect refusals (with no refusal forms), "not documented," or "no show." SUMF ¶ 78(a).

- Mr. Jung was hospitalized for diabetic ketoacidosis on March 11, 2023. His medication administration record for insulin and blood sugar checks in the week leading up to this hospitalization reflects five "no shows", three "not documented", and five refusals. Only three refusal forms are present, none of them signed by Mr. Jung. SUMF ¶ 78(b).

- "Patient 1" was hospitalized three times for diabetic complications while under the care of YesCare/Corizon at CFCF. In the 11-day period leading up to his most recent hospitalization on August 24, 2022, his medication administration record for blood sugar check contained an entry of "not documented" for 19 of 44 checks. His medical records reflect a telephone call about his blood sugar level being at 508 ten days before this hospitalization, but contain no corresponding Nursing Encounter Tool for hyperglycemia. SUMF ¶ 78(c).

- "Patient 3" was hospitalized for diabetic complications on May 25, 2022 while under the care of YesCare/Corizon at CFCF. In the 11-day period leading up to this hospitalization, his medication administration record contains entries of "not documented" for 13 of 22 blood sugar checks. SUMF ¶ 78(d).

- "Patient 4" was hospitalized for diabetic complications on January 12, 2023 while under the care of YesCare/Corizon at CFCF. In the 11-day period leading up to this hospitalization, his medication administration record reflects an entry of "not documented" for 8 of 22 blood sugar checks. A week before this hospitalization, his medical records reflect a "stretcher call" for a hypoglycemic episode where the patient was unable to respond to questions. He was given a tube of glucose gel and two sugar packets. His medical records do not reflect any further encounters with medical providers between this episode and his hospitalization. SUMF ¶ 78(e).

No reasonable juror could find that this extensive course of conduct, in light of the undisputed absence of key oversight mechanisms, falls short of constructive notice. As in *Edwards*' hypothetical "systemic negligence," YesCare's patients were routinely hospitalized for diabetic complications from CFCF after patterns of deficient administration or documentation of insulin and blood sugar checks strikingly similar to the failures that caused Mr. Jung's diabetic ketoacidosis. In Mr. Jung's final days, multiple medical providers "should have known" of Mr. Jung's hyperglycemic episodes; they were left unaware because nurses failed to conduct a NET

18

that would have documented his condition in the electronic progress notes and triggered checks for ketones. *Brodowski*, 885 A.2d at 1057. Multiple nurses "should have known" of his impending diabetic ketoacidosis, especially with respect to the undocumented doses on November 4 and 5 immediately preceding his death. They were scheduled to provide him with insulin, and simply failed to do so – again and again. As in *Whittington*, had YesCare "undertaken adequate monitoring" of insulin administration, "it would have discovered" that Mr. Jung had not received documented insulin on nine separate occasions in the eight days leading up to his death – three of these occasions being in the 48 hours before he died – a "clearly deficient" course of care. 768 A.2d at 1154. In short, as in *Rauch*, "the institutional defendant failed to enforce adequate rules and policies so as to ensure quality care for its patients," and spare them a painful and preventable death. 783 A.2d at 828.

Undisputed facts establish that YesCare is also liable for medical malpractice under a corporate negligence theory of liability, providing another basis for granting summary judgment to Plaintiffs.

### C. Defendant Cabellos breached her duty of care to Mr. Jung, substantially contributing to his death.

Medical malpractice liability for an individual consists of the elements of negligence: duty, breach, causation, and damages. *Quinby*, 907 A.2d at 1070; *Mitzelfelt*, 584 A.2d at 891. Expert testimony is usually required to established duty, breach, and causation in a medical malpractice case. *Quinby*, 907 A.2d at 1070.

As stated above, medical corporations are vicariously liable for the malpractice of their employees. *Thompson*, 591 A.2d at 707; *Ponzini*, 269 F. Supp. 3d at 582. The medical malpractice of LPN Blair Cabellos provides another example of a negligent YesCare employee who failed to

provide basic, necessary medical care for Mr. Jung in deviation from the standard of care she owed to him. Defendant Blair Cabellos was an employee of Defendant YesCare on November 5, 2023. SUMF ¶ 53. Defendant Blair Cabellos was acting within the scope of her employment as a YesCare LPN on November 5, 2023. SUMF ¶ 53-54. Defendant Cabellos' negligence establishes liability for herself as an individual defendant, as well as vicarious liability for YesCare Corp.

A "nurse owes a duty of care to conduct himself/herself as a reasonably prudent nurse would act under the circumstances." *Navarro v. George*, 615 A.2d 890, 892 (Pa. Cmwlth. 1992). YesCare policy and the standard of care for reasonable nursing, as established in Plaintiff's expert report, required Defendant Cabellos to identify potential urgent/emergent health needs for patients; to use clinical knowledge and critical thinking skills to identify current or potential health issues that would require more immediate treatment; to identify patients that present with potential urgent or emergent health needs, provide emergency care if appropriate, or arrange for urgent care by contacting a provider; and to document encounters where patients such as Mr. Jung communicated their health needs. SUMF ¶¶ 59-61.

Defendant Cabellos was alerted to Mr. Jung by a correctional officer who told her he wanted to see a nurse because he did not feel good at approximately 10:00 AM on November 5, 2023. SUMF ¶ 55. When she arrived at Mr. Jung's cell, he told her that his leg hurt or that he needed help to get up. SUMF ¶ 58. Mr. Jung was laying on the floor prone during their interaction. SUMF ¶¶ 56-58. She did not check his vitals; check his blood sugar; review his medical chart; notify any other medical staff; or document their encounter. SUMF ¶¶ 62-65. He was declared dead from diabetic ketoacidosis at 6:47 AM on November 6.

Defendant Cabellos' significant breaches of reasonable nursing standards of care are established in the expert report of Lori Roscoe. SUMF ¶¶ 59-65. Defendant Cabellos failed to

evaluate a potential urgent or emergent health need by failing to conduct a basic physical examination of vital signs or blood sugar, or to seek the assistance of other nurses or providers who could have done the same. Defendant Cabellos then ensured that no other medical providers would learn of Mr. Jung's condition by failing to document their encounter in any way, or even to verbally alert a single member of medical staff to the situation. Even without the benefit of expert testimony, however, no reasonable jury could find that a reasonable nurse in LPN Cabellos' position would do *nothing at all* under these circumstances. A nurse was alerted to a patient asking to see a nurse; he complained of pain or inability to stand; at the end of their conversation, he was on the floor and he remained there. The nurse did not provide any medical care or attention. She left him on the floor, and he was dead in less than 24 hours. This is an obvious and flagrant breach of duty.

There are no material disputes in the Cabellos record, only slight variations in description of the encounter that do not alter Cabellos' duty or the fact that she did nothing in furtherance of that duty. If Mr. Jung "gently placed" himself on the floor or fell to the floor, he was still on the floor, and LPN Cabellos still did not provide any treatment. Any dispute as to how Mr. Jung ended up on the floor is immaterial to her duty to care for him. Further, regardless of whether or not LPN Cabellos told Officer Fraiser to call a stretcher or to wait to call a stretcher if he complained of pain, she still provided no care. No reasonable nurse could possibly think that telling correctional staff to call a stretcher was the only thing required of them under the circumstances. The purpose of a stretcher call is to alert medical staff and obtain urgent medical attention. LPN Cabellos was the only medical personnel on the scene; if she thought medical attention was required, she should have provided it. And she should have documented the encounter. Regardless of what she told a correctional officer on the scene, she still provided no care, breaching her duty.

21

Causation in a medical malpractice claim requires proof that a defendant's breaches of duty were the "proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient." *Mitzelfelt*, 584 A.2d at 891, A substantial factor "need not" be "the only factor, i.e., 'that cause which ... produces the result.'" *Jones v. Montefiore Hosp*., 431 A.2d 920, 923 (Pa. 1981).

Mr. Jung had not received his insulin earlier in the morning of November 5 and had no documented insulin administration on the evening of November 4. His next insulin dosage was not scheduled until the evening of November 5, which is a dose he also never received. Had Defendant Cabellos performed a minimal evaluation of Mr. Jung, inquired into his diabetes, checked his blood sugar, checked his records and seen no insulin documentation since November 4, or notified anyone with the wherewithal to do so, she would have discovered his missed insulin doses and secured the necessary insulin by alerting other medical staff.

If Defendant Cabellos performed a minimal evaluation she would have uncovered a diabetic patient with a clear history of hospitalizations for hyperglycemia and diabetic ketoacidosis, who had missed doses of his critical medication, who had an elevated glucose level indicating hyperglycemia and the need to notify a provider, test for ketones, provide insulin, check his glucose in approximately two hours, and possibly transport to the hospital. Doing so would have prevented the death of Mr. Jung. Defendant Cabellos' breach of her duty of care was a substantial contributing factor in the death of Mr. Jung, since adherence to her duty would have resulted in recognizing his need for insulin, the provision of that insulin, and subsequent treatments. Instead, Mr. Jung was not provided care, was dragged into his cell, and not seen by another member of the medical staff until the following morning when it was too late to save his life.

As the material facts regarding Defendant Cabellos' conduct on November 5, 2023 establish that she breached her duty of care to Mr. Jung, substantially contributing to his death, Plaintiffs are entitled to summary judgment against her on their medical malpractice claim.

## VI.    CONCLUSION

Defendants YesCare and Cabellos breached their duties to Mr. Jung, causing him suffering and a painful death. For the foregoing reasons, Plaintiffs asks this Court to grant them summary judgment against Defendants YesCare and Cabellos on liability for medical malpractice under Pennsylvania state law.

Respectfully submitted,

*/s/ Bret Grote*
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
*/s/ Rupalee Rashatwar*
Staff Attorney
PA ID No. 331085
*/s/ Margaret Hu*
PA ID No. 334438
*/s/ Lolo Salsbury Serrano*
PA ID No. 338184
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123


*Counsel for Plaintiffs*

23

**<u>CERTIFICATE OF SERVICE</u>**

      I, Bret Grote, Esq., hereby certify that I caused a true and correct copy of the foregoing Brief in Support of Plaintiffs' Motion for Partial Summary Judgment to be electronically filed on December 5, 2025, and thereby served upon all parties entered into the Court's ECF system.


                              /s/ *Bret Grote*
                              _____
                              Bret Grote