## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JACOB AND JAMES JUNG, ADMINISTRATORS OF ESTATE OF LOUIS JUNG, JR, | : : : : | CIVIL ACTION: |
| PLAINTIFFS, | : : | No. 24-cv-05618-TJS |
| v. | : : | |
| CITY OF PHILADELPHIA, ET AL. DEFENDANTS. | : : | |

### BRIEF IN SUPPORT OF MARIESHA APOLLON'S

### MOTION FOR SUMMARY JUDGMENT

### A. CONCISE STATEMENT OF THE ARGUMENT

The Court should grant Ms. Apollon's motion for summary judgment because plaintiffs cannot present a genuine dispute of material facts on either their Fourteenth Amendment claim or their medical malpractice claim.

First, the deliberate indifference standard is not met. Ms. Apollon's sole interaction with Mr. Jung occurred on October 28, 2023, during re-intake following his return from Norristown Hospital. During the re-intake Ms. Apollon treated Mr. Jung for diabetes in accordance with provider orders. Ms. Apollon had only begun working at PDP on August 1, 2023, and Mr. Jung had already been in custody for at least 455 days, excluding hospitalizations, before she ever even saw him. The attempt to impose constitutional liability on Ms. Apollon for a checked box on an

administrative form is, at most, an allegation of simple negligence, which cannot establish deliberate indifference under the Fourteenth Amendment.

Second, even with plaintiffs' late served expert reports, there is no competent opinion that Ms. Apollon's actions fell below the applicable standard of care or that anything she did or did not do caused Mr. Jung's death. Plaintiffs' reports contain criticism of Ms. Apollon's charting and of the form entry, but they stop short of stating that she breached the standard of care. Moreover, Plaintiffs' reports do not link Ms. Apollon's conduct to Mr. Jung's death on November 6, 2023. Without expert testimony on deviation and causation, Plaintiffs cannot sustain a medical malpractice claim against Ms. Apollon.

Third, Plaintiffs' expert reports are extraordinarily untimely and prejudicial. The operative case management order required Plaintiffs' expert reports or answers to expert interrogatories by October 24, 2025, defense reports by November 7, 2025, and completion of expert depositions by November 21, 2025, with motions for summary judgment due December 5, 2025. *See* a copy of the Operative Case Management Order attached at Exhibit F.

The Court later denied a joint motion to extend case deadlines and stated that the parties could only continue discovery by agreement so long as no other deadlines in the scheduling order were affected. *See* a copy of the Court's Order attached at Exhibit G. The parties' stipulation extending "fact discovery" to November 19, 2025 and "expert discovery" to December 3, 2025 could not rewrite the expert report deadlines or the summary judgment deadline. *See* a copy of Stipulation to Extend

13

Discovery attached at Exhibit H.  Plaintiffs' decision to serve initial expert reports on December 3, 2025 therefore violates the operative scheduling order and deprives the defense of the time contemplated for rebuttal and expert depositions.  The reports should be treated as untimely and excluded from consideration on summary judgment.

### B. PROCEDURAL BACKGROUND

Plaintiffs are the administrators of the Estate of Louis Jung.  Plaintiffs' Original Complaint is this matter was filed on or about October 23, 2024.  Ms. Apollon was not a named Defendant in the Original Complaint.

On or about March 13, 2025, Plaintiffs filed an Amended Complaint, which added new Defendants, including Ms. Apollon.  Plaintiffs' Amended Complaint alleges that Mr. Jung died on November 6, 2023 as a result of diabetic ketoacidosis (DKA) while at CFCF.

Plaintiffs' Amended Complaint contains seven (7) counts with claims as follows: (1) Deliberate Indifference and Objective Indifference to Serious Medical Need, (2) Medical Malpractice, (3) Americans with Disabilities Act, (4) Rehabilitation Act, (5) Failure to Train or Supervise Staff, (6) Wrongful Death Claim pursuant to Pa.C.S.A. §8301, (7) Survival Action pursuant to 20 Pa.C.S.A. §3373 and 42 Pa.C.S. §8302.

Counts 3 and 4 are brought against the City of Philadelphia alone.  Count 5 is brought against the City of Philadelphia and YesCare only. Only Counts 1, 2, 6 and 7 are brought against Ms. Apollon.

Third Party Complaints against CareerStaff Unlimited and Tekaccel have been filed since the Amended Complaint, but do not alter Plaintiffs' allegations against Ms. Apollon.

## C. PLAINTIFFS' COMPLAINT

Plaintiffs' First Amended Complaint focuses on general diabetes and prison healthcare issues, offering policy commentary and systemic critiques, but contains few factual allegations tied to Ms. Apollon. *See* ECF No. 27 ¶¶13-52.

Plaintiffs have named nine defendants: the City of Philadelphia, YesCare Corporation, and seven current or former PDP officials and medical staff sued in their individual capacities, including Blanche Carney, Lalitha Trivikram, Maureen Gay, Mariesha Apollon, Blair Cabellos, Gena Frasier, and Wanda Bloodsaw.

Plaintiffs' Complaint repeatedly references Ms. Apollon in paragraphs describing events on dates when she had no involvement, obscuring the fact that her only documented encounter with Mr. Jung occurred on October 28, 2023. *See Id.* ¶¶84-86.

Plaintiffs allege that on October 28, 2023, Ms. Apollon, a registered nurse, conducted Mr. Jung's intake screening, recorded a glucose level of 542, noted three days without insulin, and detected ketones but did not provide any further care. *See Id.* ¶¶73-77.

Plaintiffs then continue to allege that Ms. Apollon incorrectly documented that Mr. Jung was returning from Norristown Hospital and had no diabetes prescriptions. *See Id.* ¶79.

In their Complaint, Plaintiffs acknowledge that Ms. Apollon treated Mr. Jung by administering insulin and testing his ketones as ordered by co-defendant medical provider Gay during the October 28, 2023, intake encounter. *See Id*. ¶¶77, 84–86. Nevertheless, Plaintiffs allege that Ms. Apollon acted with deliberate indifference to Mr. Jung's serious medical needs by failing to provide adequate care, including insulin, glucose checks, and emergency treatment, which they contend contributed to his death. *See Id*. ¶¶ 162, 166.

## QUESTIONS PRESENTED

1. **Whether this Honorable Court should grant summary judgment in favor of Ms. Apollon on Plaintiffs' Fourteenth Amendment deliberate indifference claim, where it is undisputed that Ms. Apollon sought orders to address Mr. Jung's blood sugar, received orders regarding medication, and provided medication and instruction to Mr. Jung regarding his insulin and ketone levels?**

[*Suggested response in the affirmative.*]

2. **Whether this Honorable Court should grant summary judgment in favor of Ms. Apollon on Plaintiffs' medical malpractice claim, where Plaintiffs' expert reports contain no causation opinions against Ms. Apollon, thereby failing to meet one of the elements of negligence?**

[*Suggested response in the affirmative.*]

3. **Whether this Honorable Court should strike Plaintiffs' expert reports and grant summary judgment in favor of Ms. Apollon, where Plaintiffs' expert reports were untimely produced, produced on the deadline for the completion of all expert discovery, including depositions, and were produced for the first time within 48 hours of the Motion for Summary Judgment deadline?**

[*Suggested response in the affirmative.*]

16

D. **ARGUMENTS IN SUPPORT OF SUMMARY JUDGMENT**

     i.    **Legal Standard**

Summary judgment is proper when the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56.*

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

    1.  ***Ms. Apollon provided care and treatment to Mr. Jung, and her actions do not remotely constitute deliberate indifference to a serious medical need***

The Due Process Clause of the Fourteenth Amendment protects pretrial detainees. *Hubbard v. Taylor*, 399 F.3d 150, (3d Cir 2005). In the Third Circuit, claims of inadequate medical treatment for pretrial detainees are analyzed under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. However, the standard applied is the same as that used for convicted prisoners under the Eighth Amendment, as it would be "anomalous to afford a pretrial detainee less constitutional protection than one who has been convicted." *Inmates of Allegheny City Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).

Well-established Federal precedent dictates that, in order for a prisoner to maintain a 1983 action alleging violations of the Eighth Amendment, he or she must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97 (1976).

To substantiate a 'deliberate indifference' claim, a prison official must be shown to have 'known of and disregarded an excessive risk to inmate health or safety.'"  *Chadwick v. Court of Common Pleas*, 2006 U.S. Dist. LEXIS 40125 (EDPA 2006).  This involves action or inaction well in excess of that which would constitute medical negligence.  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle*, at 106.

As the above suggests, the prison must plead sufficient facts to establish 1) a serious medical need and 2) deliberate indifference to that need.  *Wall v. Buschman*, 2015 U.S. Dist. LEXIS 24266 (MDPA 2015).  "A medical need is serious if it 'has been diagnosed by a physician as requiring treatment or is…so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Id*., citing *Monmouth Cnty. Corr. Instr. Inmates v. Manzaro*, 834 F.2d 326, 347 (3rd Cir. 1987). Additionally, the medical need in question must rise to the level that "a failure to treat can be expected to lead to substantial and unnecessary suffering, injury or

death." *Chimenti v. Pa. Dep't of Corrections*, 2016 U.S. Dist. LEXIS 36682 (EDPA 2016).

"Deliberate indifference" occurs when a prison official "knows of and disregards an excessive risk to inmate health or safety." *Wall*, at 8. "Deliberate indifference" is "consistent with 'recklessness as the term is defined in criminal law.'" *Buoniconti*, at 435. "Given these prerequisites to a valid constitutional claim based on deliberate indifference, factual allegations suggesting only an 'ordinary lack of due care for the prisoner's interests or safety' will not suffice to meet the pleading requirements for deliberate indifference under the Eighth Amendment." *Chimenti*, at 15.

Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. *Clark v. Doe*, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 13, 2000) ("courts have consistently rejected Eight Amendment claims where an inmate has received some level of medical care"). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Soto-Muniz*, at 32, *citing*, *Fantone v. Herbik*, 528 Fed. App'x 123, 125 (3d Cir. 2013).

Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference. *See e.g., Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d. Cir. 1990) ('[A]'s long as a physician exercises professional judgment his behavior will not violate a

prisoner's constitutional rights.').*" *Gindraw v. Dendler*, 967 F.Supp. 833, 836 (E.D. Pa. Jun. 20, 1997). Applying this exact standard, courts have frequently rejected Eighth Amendment claims that are based on the level of professional care that an inmate received; *see, e.g., Ham v. Greer*, 269 F. App'x 149 (3d Cir. 2008); *James v. Dep't of Corrections*, 230 F. App'x 195 (3d. Cir. 2007); *Gillespie v. Hogan*, 182 F. App'x 103 (3d Cir. 2006), particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services.

In short, in the context of the Eighth Amendment (or here, the Fourteenth Amendment), any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional medical judgment. *Inmates of Allegheny County Jail v. Pierce*, 612 F. 2d 754, 762 (3d Cir. 1979) (*quoting Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)). Additionally, "[a] court may not substitute its own judgment for diagnosis and treatment decisions made by prison medical staff members." *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979); *Maynard v. New Jersey*, 719 F. Supp. 292, 295 (D.N.J., Jul. 28, 1989).

Here, plaintiffs cannot show that Ms. Apollon knew of and disregarded an excessive risk to Mr. Jung's health. Ms. Apollon's involvement in Mr. Jung's care was limited to a single encounter on October 28, 2023, during re-intake after his court ordered return from Norristown State Hospital.

During that encounter, Ms. Apollon recognized Mr. Jung's need to be treated for his diabetes, with insulin, and obtained orders from a qualified higher-level provider for the administration of the insulin. Her note documents that the insulin was in fact administered to Mr. Jung. Additionally, her note documents that she encouraged Mr. Jung with his fluid intake, in order to flush the ketones present in his urine from his system.

Indeed, the expert against Ms. Apollon, Lori Roscoe, whose report was produced on December 3, 2025, states:

> RN Apollon contacted a provider, who ordered 10 units of NPH and 12 units of regular insulin; these doses were administered, and Mr. Jung was provided a snack. A urine dip revealed the presence of ketones, and Mr. Jung was encouraged to drink fluids. RN Apollon initiated an urgent behavioral health referral as well as a behavioral health reentry referral. She completed a referral for practitioner evaluation and review of medication.

*See* a copy of Nurse Roscoe's Report attached at Exhibit L, page 3.

There is no evidence that Ms. Apollon refused to provide care, delayed care for non-medical reasons, or ignored any obvious sign of an emergent medical problem. Plaintiffs' complaints concern the adequacy and paperwork aspects of that visit, not any decision to withhold necessary treatment.

The deliberate indifference cases draw a clear line between negligence and a constitutional violation (though Ms. Apollon does not concede negligence). *Estelle* and its progeny make plain that even serious medical malpractice does not, without more, become deliberate indifference. Again, Plaintiffs focus on a checked box in an administrative portion of a form, while the substance of the encounter shows that Ms. Apollon actually provided necessary care.

Even assuming the box selection was mistaken or careless (which Ms. Apollon does not concede), that type of clerical error is, at most, if at all, an "ordinary lack of due care," not the criminal recklessness required for deliberate indifference. No matter how Plaintiffs try to twist and bend facts they cannot transform a treated condition into a constitutional violation.

Ms. Apollon was not responsible for Mr. Jung's care after October 28, 2023. There is no evidence whatsoever that she was involved with any of the subsequent blood sugar checks, insulin administrations, or involved in any capacity with Mr. Jung during the last days of his life in November 2023.

Plaintiffs simply believe more should have been done or documented differently. That is precisely the kind of disagreement with professional judgment that courts repeatedly hold is not actionable under § 1983. When an inmate receives treatment and the dispute is over its sufficiency, federal courts are "reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Soto-Muniz*, at 32. That same principle applies here. Plaintiffs' criticisms, even if accepted at face value, challenge the quality and documentation of care, not a conscious decision by Ms. Apollon to ignore a serious medical need.

The causation facts also reinforce the absence of deliberate indifference. The challenged box relates to the creation of a pathway to schedule a follow up appoint that would have occurred between 28 to 30 days after the re-intake appointment, long after the date of Mr. Jung's death. Other providers were responsible for Mr.

Jung's care in the period leading up to his death, and Plaintiffs identify no evidence that Ms. Apollon knew, on October 28, that he faced an imminent, excessive risk that required additional intervention that she then chose to disregard. Without proof that she subjectively *appreciated* and then ignored such a risk, plaintiffs cannot satisfy the deliberate indifference element.

As the record reflects, at most, a disagreement over the adequacy of a single, discrete encounter where care was provided and a possible paperwork error, and without a knowing disregard of a serious medical need, Plaintiffs' Fourteenth Amendment deliberate indifference claim against Ms. Apollon fails.

## 2. Plaintiffs' Expert Reports Do Not Articulate a Causation Opinion Against Ms. Apollon

In a medical malpractice action, a plaintiff must present expert testimony establishing three elements: (1) the applicable standard of care; (2) a deviation from that standard; and (3) that the deviation proximately caused the injury. *Nicholas v. Mynster*, 64 A.3d 536 (2013); *Gardner v. Pawliw*, 696 A.2d 599 (1997). Each element is necessary, and failure to prove any one through competent expert testimony defeats the claim.

Causation is ordinarily a question for the jury, but federal courts grant summary judgment when a party fails to raise a genuine issue of fact on causation. The Third Circuit has affirmed summary judgment where a plaintiff's expert testimony was insufficient, and district courts properly exclude expert opinions that

are essential to proving causation. *McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 869 F.3d 246 (3d Cir. 2017).

Expert opinions must rest on sufficient facts to support a jury verdict. An opinion that lacks factual support or is contradicted by indisputable record evidence cannot sustain a verdict. *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993). This principle is especially important in medical malpractice cases, where technical expertise is required to prove the claim.

Even setting aside Plaintiffs' failure to timely provide the expert reports, none of the reports satisfy the essential elements of medical malpractice as to Ms. Apollon. The primary expert against Ms. Apollon is that of Nurse Roscoe. *See* Exhibit L. In that report, she opines:

When RN Apollon conducted Mr. Jung's intake evaluation on October 28th, she encountered conflicting information regarding whether he was diabetic. She documented a blood glucose of 542 mg/dL which is a critically high level that placed Mr. Jung at immediate risk for diabetic ketoacidosis. Although she appropriately contacted the provider and checked for ketones, she did not complete the Hyper/Hypoglycemia Nursing Encounter Tool (NET) nor did she conduct the ongoing reassessment required for a patient in acute metabolic distress. After administering insulin, she did not recheck Mr. Jung's blood glucose or ketones, nor did she continue monitoring him until the level dropped to a safer range, but she should have. A glucose level exceeding 500 mg/dL accompanied by ketonuria represents a medical emergency requiring repeated reassessment, close monitoring, and continued communication with the provider. Often a blood glucose that high warrants transfer to an emergency department for a higher level of care than can be rendered in a correctional facility. RN Apollon's failure to carry out these essential nursing responsibilities deviated significantly from the standard of nursing care.

*See* Exhibit L.

While the opinions in the above paragraph do constitute standard of care opinions, they do not include an opinion as to causation. In other words, there is no opinion expressed that any of the alleged deviations by Nurse Apollon actually caused Mr. Jung's death. That is hardly surprising, considering Nurse Apollon's sole interaction with Mr. Jung was approximately ten (10) days prior to his death. The remainder of Nurse Roscoe's report is directed to the care rendered by others, and not Ms. Apollon.

The opinions expressed in the report of Dr. Williams, Plaintiffs' endocrinology expert, make it impossible for Plaintiffs to contend that they have offered a causation opinion against Ms. Apollon. Dr. Williams opines that diabetic ketoacidosis, although potentially fatal if untreated, is a condition that can be reversed with appropriate care such that a patient who is "near death" may return to normal health within a day or two. *See* a copy of Dr. Williams Report attached at Exhibit K. Thus, he opines that DKA is quickly reversible. See below:

- <u>After recognition of DKA, treatment is straightforward and extremely effective at preventing complications and death</u>. This includes; 1) volume resuscitation to correct dehydration and to expedite removal of ketone bodies, 2) correction of electrolytes, 3) reduction in glucose levels with insulin, and 4) identification and treatment of precipitating factors. All these maneuvers address cardiac susceptibility to fatal arrythmia that arises in DKA. Although DKA is fatal if not corrected, it is one of the rare life-threatening conditions wherein someone can be near death, yet discharged from the hospital to normal health in a day or two.

Having given that opinion, it would therefore be impossible to contend that any of the alleged departures from the standard of care by Nurse Apollon on October 28, actually caused Mr. Jung's death on November 6. This is particularly so given the allegations and opinions that doses of insulin were missed during that time frame.

25

While Dr. Williams opines that Mr. Jung's death was the result of DKA, he does not offer an opinion that Nurse Apollon's actions caused the death. Nor could he do so after previously opining that DKA can be corrected even when a patient is near death. There is absolutely no evidence or testimony in this matter to suggest that Mr. Jung was near death when seen by Nurse Apollon. His vital signs were normal, and he was able to communicate with her during the intake session.

Dr. Venters, the epidemiology expert describes systemic breakdowns in monitoring, documentation, and follow-up after October 28, and the absence of any provider reassessment of Mr. Jung's diabetes before his death on November 6. *See* a copy of Dr. Venters' Report attached at Exhibit J. None of these opinions tie Mr. Jung's DKA and death to anything Ms. Apollon did or did not do during re-intake. He therefore offers no causation opinion against Ms. Apollon.

The final report, that of Arthur Wallenstein, is directed at the Corrections Defendants. Mr. Wallenstein is not a physician or other health care provider, and is therefore not competent to offer an opinion against Ms. Apollon. Thus, not one of the four late reports offer a causation opinion linking Ms. Apollon's limited October 28 encounter to Mr. Jung's November 6 death. *See generally* Exhibits J, K, L, M.

Plaintiffs' malpractice claim against Ms. Apollon therefore fails. As briefed above, the final two counts against Ms. Apollon sound in Wrongful Death and Survival. Because, however, Plaintiffs' 14th amendment claim must fail, and because their medical malpractice claim must fail, the derivative claims in Wrongful Death and Survival must also fail.

### 3. Plaintiffs' Inexcusably Late Expert Reports Violate the Court's Deadlines, Create Severe Prejudice to Nurse Apollon, and Should be Stricken by this Honorable Court

Federal courts have broad discretion to enforce expert-discovery deadlines set in scheduling orders. Once the court establishes a deadline for completion of expert discovery, parties are obligated to serve any expert reports and identify their experts by that date. *See Fed. R. Civ. P. 16(b), 26(a)(2).* When a party serves expert reports only after that deadline has expired, the question is whether the failure to comply is "substantially justified or is harmless." *Fed. R. Civ. P. 37(c)(1).* If it is not, Rule 37(c)(1) provides that the default sanction is exclusion of the untimely expert evidence at trial.

In *Fulton v. Soh*, the court applied Rule 37(c)(1) and the familiar four-factor test from *Nicholas v. Pennsylvania State University* to determine whether late expert reports should be excluded. *See Fulton v. Soh*, slip op. at *6–8 (M.D. Pa.) (citing *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000); *Sabol v. Allstate Prop. & Cas. Ins. Co.*, 309 F.R.D. 282, 286 (M.D. Pa. 2015)).

Those factors are:

1. the prejudice or surprise to the party against whom the evidence would be offered;

2. the ability of that party to cure the prejudice;

3. the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case; and

4.  the bad faith or willfulness of the party failing to comply with the court's order or discovery obligation.

In *Fulton*, expert discovery had closed by court order, yet the plaintiff served two causation and damages expert reports only after the expert discovery deadline had passed.  The court found that admitting those reports would prejudice the defendant because he had been unable to prepare a defense to the opinions or meaningfully prepare to cross-examine the experts.  The deadlines for depositions had already passed, and reopening discovery to allow expert depositions so close to trial would disrupt the case schedule and delay resolution. *See Fulton* at \*8–9 (citing *Whitham v. Walmart Stores E., LP*, 2023 U.S. Dist. LEXIS 119485, 2023 WL 4494160, at \*2 (E.D. Pa. July 12, 2023); *Flickinger v. Toys R Us, Inc.*, 2011 U.S. Dist. LEXIS 85242, 2011 WL 3359646, at \*2 (M.D. Pa. Aug. 3, 2011)).

On the fourth factor, the court emphasized that counsel could offer "no meaningful explanation" for the delay in producing not just one, but two expert reports from treating physicians the party clearly knew about.  That lack of justification supported exclusion even in the absence of explicit bad faith.  *See Fulton* at \*9–10 (citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 299 (3d Cir. 2012); *Dandy v. Thicon Women's Health & Urology*, 579 F. Supp. 3d 625, 632 (D.N.J. 2022)).  As *Fulton* notes, sanctions under Rule 37 are appropriate where the failure to timely produce expert reports is neither substantially justified nor harmless, and a party's failure to offer a real justification for ignoring the scheduling order weighs heavily in

28

favor of exclusion.  *See Fulton* at *7–8 (citing *Sheetz v. Wal-Mart Stores E., L.P.*, 2017 U.S. Dist. LEXIS 193016 (M.D. Pa. Nov. 22, 2017)).

The *Fulton* court precluded the late expert reports and barred the treating physicians from testifying as experts, while allowing them to testify only as lay treating physicians and limiting the plaintiff to materials that had been timely produced during discovery. *See Fulton* at *10–11 (citing *Hamilton v. Dowson Holding Co.*, 2010 U.S. Dist. LEXIS 78010 (D.V.I. July 30, 2010)).

*Fulton* confirms that where expert reports are served well after court-ordered deadlines, on the eve of trial, without substantial justification, and in a manner that prejudices the opposing party and threatens to disrupt the schedule, exclusion of those late expert reports and related expert testimony is an appropriate and non-arbitrary exercise of the court's Rule 37(c)(1) authority.

Here, Plaintiffs' late expert reports must be excluded under Rule 37(c)(1) and *Fulton*.  The case management order required Plaintiffs to serve expert reports by October 24, 2025, and expert discovery (including depositions) to be completed by November 21. *See* Exhibit F.  Motions for Summary Judgment were to be filed by December 5, 2025.  *See* Exhibit F.

The Court denied a motion to extend these deadlines and made clear that discovery could continue only by agreement if other deadlines were not affected.  *See* Exhibit G.  Plaintiffs ignored that directive and waited until December 3 to serve their initial expert reports.  That violation stripped Ms. Apollon and co-defendants of the expert-discovery sequence the Court established.

Under the first *Nicholas* factor, the prejudice is obvious.  As in *Fulton*, Plaintiffs disclosed expert reports when expert discovery had closed and on the eve of the dispositive-motion deadline.  Because of this last-minute submission Ms. Apollon was forced to rewrite a pending summary judgment motion.  Now, Ms. Apollon is left without any chance to depose Plaintiffs' experts and without time for rebuttal reports. The scheduling order contemplated a clear sequence: Plaintiffs' reports, defense reports, depositions, then dispositive motions.  *See* Exhibit F.  Plaintiffs' delay destroyed that sequence and left Ms. Apollon and co-defendants unable to prepare a meaningful response or cross-examine the experts.

The second and third *Nicholas* factors also favor exclusion.  The prejudice cannot be cured without disrupting the schedule.  Expert depositions were required to be completed by November 21.  Even if the parties' stipulation extended "expert discovery" to December 3, that language did not create a new initial disclosure deadline.  *See* Exhibit H.  To cure the prejudice now, the Court would have to reopen expert discovery, permit rebuttal reports, and conduct depositions, all with trial set for January 27, 2026.  *Fulton* makes clear that forcing a party to scramble just before trial to address new expert opinions is exactly the disruption Rule 37(c)(1) is meant to prevent.

Furthermore, undersigned counsel for Ms. Apollon is attached for a date certain trial in another matter commencing on December 15, 2025, a date certain trial in another matter on January 12, 2026, and trial in this matter, on January 27, 2026. With the intervening holiday season, Plaintiffs' late production of nearly one hundred

(100) pages of expert materials has made any meaningful expert discovery impossible.

The fourth *Nicholas* factor also supports exclusion. This Honorable Court denied a motion to extend deadlines submitted earlier this fall. *See* Exhibit G. The Court further instructed that agreed discovery extension could not affect the rest of the scheduling order. *See* Exhibit H.

Plaintiffs nonetheless served their initial reports after the expert report deadline, after the deposition deadline, and only two days before dispositive motions were due. Plaintiffs never sought leave for an extension to serve the reports. There is no justification for waiting until December 3 to disclose expert opinions that should have been served by October 24. *Fulton* recognizes that even absent bad faith, failure to comply with a scheduling order without explanation weighs heavily in favor of exclusion.

Finally, the stipulation cannot rescue Plaintiffs' late disclosures. It extended fact discovery to November 19 and expert discovery to December 3, but it did not rewrite the expert report deadlines or the December 5 dispositive motion deadline. Reading the stipulation to create a new disclosure deadline would directly affect the schedule the Court refused to move. Plaintiffs' reports are untimely under the operative order and must be excluded.

Consistent with *Fulton*, the Court should preclude Plaintiffs from relying on these late served reports in opposing summary judgment.

**E. CONCLUSION**

For the foregoing reasons, Defendant, Mariesha Apollon, R.N. respectfully requests that this Honorable Court Grant her Motion for Summary Judgment and dismiss all claims against her, with prejudice.

Respectfully submitted,

**KIERNAN TREBACH, LLP**

Date: December 5, 2025

_____
Sarah M. Baker, Esq.
Attorneys for Mariesha Apollon

Respectfully submitted,

**KIERNAN TREBACH, LLP**

Date: December 5, 2025

_____
Jonathan M. Kaminsky, Esq.
Attorneys for Mariesha Apollon

## <u>VERIFICATION</u>

I, Jonathan M. Kaminsky, Esquire, verify that I am counsel for Defendant Apollon in this action, and, on behalf of such party, verify that the facts set forth in the attached are true and correct to the best of my knowledge, information, and belief.  The undersigned further certifies that this Verification is made subject to the provisions of 18 Pa.C.S. sec. 4904, relating to unsworn falsification to authorities.

       /s/Jonathan Kaminsky
JONATHAN M. KAMINSKY, ESQUIRE