# EXHIBIT "B"

```
 1        IN THE UNITED STATES DISTRICT COURT

 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                    -  -  -

 4  JACOB and JAMES JUNG, as        :
    Administrators of the Estate :
 5  of LOUIS JUNG, JR.,             :
              Plaintiff,            :
 6                                  :
    -vs.-                           :
 7                                  :
    CITY OF PHILADELPHIA, et al.,:
 8            Defendant(s).      :  2:24-cv-05618-TJS

 9                    -  -  -

10        Wednesday, November 5, 2025

11                    -  -  -

12            Videoconferenced deposition of

13  MARIESHA APOLLON, taken pursuant to notice, was

14  held virtually in the Commonwealth of

15  Pennsylvania, commencing at 10:04 a.m., on the

16  above date, before Jared Carey, a Professional

17  Reporter and Notary Public in and for the

18  Commonwealth of Pennsylvania.

19                    -  -  -

20

21

22

23  Everest Job No. 46484

24

25
```

1           APPEARANCES:

2     ABOLITIONIST LAW CENTER
      BY: BRET GROTE, ESQUIRE
3           MARGO HU, ESQUIRE
      631 N. 12th Street
4     Philadelphia, Pennsylvania 19123
      412.654.9070
5     Attorney for the Plaintiff
      (Appearing via Zoom)
6

7

8     KIERNAN TREBACH
      BY: SARAH BAKER, ESQUIRE
9           JONATHAN M. KAMINSKY, ESQUIRE
      1801 Market Street
10    Philadelphia, Pennsylvania 19103
      215.569.4433
11    Attorney for Defendant, Mariesha Apollon
      (Appearing via Zoom)

12

13    CITY OF PHILADELPHIA LAW DEPARTMENT
      BY: EMILY HOFF, ESQUIRE
14    1515 Arch Street, 15th floor
      Philadelphia, Pennsylvania 19103
15    215.683.5000
      Attorney for Defendant, City of Philadelphia,
16    Blanche Carney, Gene Frasier, Wanda Bloodsaw
      (Appearing via Zoom)

17

18

19    GORDON REES SCULLY MANSUKHANI
      BY: SUMMER C. THOMAS, ESQUIRE
20    1717 Arch Street, Suite 610
      Philadelphia, Pennsylvania 19103
21    215.561.2300
      Attorney for Defendant, Career Staffing
22    (Appearing via Zoom)

23

24

25

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 4 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1

2

3          APPEARANCES: Continued

4

5     O'CONNOR KIMBALL
      BY: RAYMOND WITTEKIND, ESQUIRE
6     15th Street and JFK Boulevard, Suite 100
      Philadelphia, Pennsylvania 19102
7     215.564.0400
      Attorney for Defendant, YesCare Corp.
8     (Appearing via Zoom)

9

10

11    ALSO PRESENT:

12    Corinne Austen

13    Lolo Serrano

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 5 of 63

Deposition of Mariesha Apollon    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1                    I   N   D   E   X
 2   WITNESS                                      PAGE
 3   MARIESHA APOLLON
 4   BY:  MR. GROTE                               6
 5        MR. WITTEKIND                           110
 6        MS. THOMAS                              117
 7        MS. BAKER                               117
 8                 E   X   H   I   B   I   T   S
 9   MARKED                DESCRIPTION            PAGE
10              (No exhibits were marked.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer

Page Line          Page Line              Page Line

None

Request for Production of Documents

Page Line          Page Line              Page Line

None

Stipulations

Page Line          Page Line              Page Line

None

Question Marked

Page Line          Page Line              Page Line

None

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 7 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 6

1          - - -
2          MARIESHA APOLLON, having been
3   duly sworn, was examined and testified as
4   follows:
5          - - -
6          EXAMINATION
7          - - -
8   BY MR. GROTE
9      Q.    Good morning, Ms. Apollon.  Can
10  you hear me fine?
11     A.    Yes.
12     Q.    My name is Bret Grote.  I am
13  counsel for the plaintiffs in the matter of Jung
14  versus City of Philadelphia.  You are here in
15  response to a Notice of Deposition.
16         Can you please state and spell
17  your name for the record.
18     A.    Mariesha Apollon.
19  M-A-R-I-E-S-H-A, A-P-O-L-L-O-N.
20     Q.    Have you ever given a deposition
21  before?
22     A.    Yes.
23     Q.    In what capacity -- or how many
24  times?
25     A.    One.

Page 7

1      Q.    And what was the nature of that
2   deposition for?
3      A.    I sued someone for firing me when
4   I was pregnant.
5      Q.    And about approximately how long
6   ago was that case?
7      A.    Four months ago.
8      Q.    That's when the deposition was?
9      A.    The deposition was in February.
10     Q.    So you've been through this
11  before.  But I will go over some ground rules
12  just so we are on the same page as to how the
13  deposition will be conducted.
14         We both have to speak out loud.
15  No head nods or mm-mmh type of answers because
16  we need the court reporter to take down
17  everything that is said so that the transcript
18  is clear.
19         We have to not talk over each
20  other.  So I will let you finish your answers
21  before I ask another question.  And I ask you to
22  let me finish my question before you give an
23  answer.
24         If you do not know or remember
25  something, please let me know if there is a

Page 8

1   document that might refresh your recollection.
2   And if you answer a question, I will assume that
3   you understood it.  Also, you can take breaks.
4   If you need a break, just let me know.
5          But the only thing I ask is that
6   if I have just asked a question, please answer
7   the question before we take a break.
8      A.    Okay.
9      Q.    Does all of that sound good to
10  you?
11     A.    Yes.
12     Q.    Are you prepared to give a
13  deposition today?
14     A.    Yes.
15     Q.    Did you do anything to prepare
16  for today's deposition?
17     A.    I spoke with my lawyers.  And I
18  reviewed the intake paperwork.
19     Q.    Without telling me anything about
20  the content of the conversation with your
21  attorneys, how many times did you meet with your
22  lawyers in preparation for this deposition?
23         MS. BAKER:  I will object.  Why
24  is that not subject to attorney/client
25  privilege?

Page 9

1          MR. GROTE:  It's a very standard
2   question to ask how many times someone has
3   met in order to engage the sense in which
4   they have been prepared to give testimony.
5   And --
6          MS. BAKER:  I don't think you are
7   entitled to know how many times she met
8   with us.  I think that's covered by
9   attorney/client privilege.  I'm sorry.
10         MR. GROTE:  Are you instructing
11  your client not to answer the question?
12         MS. BAKER:  I am instructing her
13  not to answer that question as it is
14  phrased.  Yes.
15         MR. GROTE:  Then we will certify
16  for the record that the client has been
17  instructed not to answer that question.
18  BY MR. GROTE
19     Q.    Did you -- you said you reviewed
20  the intake documents.  Was that correct,
21  Ms. Apollon?
22     A.    Yes.
23     Q.    Were those the documents dated
24  October 28, 2023, if you remember the date?
25     A.    Yes.

Page 10

Q.    Did you review any other documents in preparation for the deposition?
A.    No.
Q.    Where do you work currently?
A.    Robert Wood Johnson Hospital.
Q.    What do you do at the hospital?
A.    I'm a registered nurse.
Q.    Where is that hospital?
A.    Hamilton, New Jersey.
Q.    How long have you worked there?
A.    One month.
Q.    I will ask you some questions now about your educational and work history.
      Can you tell me all of the post high school education that you have received?
A.    I was a medical assistant, home health aide/medical assistant. And then I received my nursing degree.
Q.    Where were you -- where did you receive your nursing degree?
A.    Brooklyn, New York.
Q.    Any other degrees or post secondary education?
A.    Medical assistant degree.
Q.    And where did you receive that

Page 11

degree?
A.    Same place. Brooklyn, New York.
Q.    When did you get those degrees?
A.    Medical assistant is 2011 and nursing is 2016.
Q.    And when did you graduate high school?
A.    2008.
Q.    Are you currently in school for anything?
A.    I just graduated.
Q.    Where did you graduate from?
A.    Capella University.
Q.    What was the degree in?
A.    Bachelor's of science in nursing.
Q.    You said just graduated. Was that this year?
A.    Yes. Like a week ago.
Q.    And can you walk me through -- let's go -- can you tell me what your -- what was your first job in the medical field?
A.    As I stated, I was a home health aide. I would go to the hospital and watch patients. Right after that I was a medical assistant at a private doctor's office and then

Page 12

in the endoscopy center. And after that I started in the nursing home, the prison, and now the hospital.
Q.    As a home health aide, what training did you receive for that position?
A.    There is a home health aide certificate.
Q.    And what do you learn as part of receiving that certificate?
A.    How to take care of patients in their home, bathing, clothing, medications, exercises.
Q.    And how long were you a home health aide?
A.    Approximately seven years.
Q.    And what were those seven years? What was the beginning and what was the end?
A.    Approximately 2012 to 2019.
Q.    When did you become a medical assistant?
A.    When the pandemic broke out. So 2019.
Q.    Would that have been 2020 maybe?
A.    No. It was September -- around Septemberish of 2019.

Page 13

Q.    Where were you a medical assistant?
A.    I was at a private doctor's office. I do not recall the name. And then the pandemic broke out. Most people got laid off -- including me. And then I was hired at the Endoscopy Center of New York in New York City.
Q.    And as a medical assistant, what training did you receive for that position?
A.    I got my associate's degree. You are able to draw blood, do EKGs, assist the patient, those type of things, give orders.
Q.    Did you, as a medical assistant, ever receive any training on diabetes care?
A.    I don't believe that is within the practice. I don't believe that's something medical assistants learn.
Q.    So is it your -- are you saying that you did not receive specific training on diabetes care as part of that role?
A.    Yes, yes.
Q.    And as a medical assistant, you were in private practice, you said, before -- or you worked in an office that was in private practice before the Endoscopy Center of New

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 14

1  York.  Was that accurate?
2       A.    Yes.
3       Q.    And in that private practice can
4  you walk me through what did a basic day look
5  like --
6       A.    Shadow the doctor --
7            MS. BAKER:  Let him finish the
8       question before you start your answer.
9       Okay?
10           THE WITNESS:  Okay.
11           MS. BAKER:  Did you hear the
12      whole question?
13           THE WITNESS:  No.
14  BY MR. GROTE:
15      Q.    What did a typical day in your
16  job look like?  What were your responsibilities?
17      A.    I took orders from the doctor.  I
18  took urine samples, drew blood, EKG, those type
19  of things.
20      Q.    And at the Endoscopy Center of
21  New York, what were your typical
22  responsibilities?
23      A.    We mostly washed the beds, made
24  the beds so that the process -- it was an
25  outpatient endoscopy center.  So they needed to

Page 15

1  run the pace faster.  So I did not do any vital
2  signs or any blood work there.  We just mostly
3  provided a faster route for patients to get in
4  and out.
5       Q.    And after the Endoscopy Center of
6  New York, did you work at the Isabella
7  Rehabilitation Nursing Home?
8       A.    Yes.
9       Q.    And what were your job
10  responsibilities there?
11      A.    Taking orders from doctors, doing
12  wound care, passing medication, assessing
13  patients, determining if they need to go to the
14  hospital, EKG, IV, medications.
15      Q.    And were you also a medical
16  assistant or did you have a different role
17  there?
18      A.    No.  The only role that I carried
19  at Isabella was the nursing career.
20      Q.    As a medical assistant, is that a
21  position that requires a license?
22      A.    No.
23      Q.    When you were at Isabella
24  Rehabilitation Nursing Home, you were a nurse;
25  is that correct?

Page 16

1       A.    Yes.  You cannot work as a nurse
2  unless you pass the board license examination.
3       Q.    When did you pass the board
4  license examination?
5       A.    2021, November.
6       Q.    And at the Isabella
7  Rehabilitation Nursing Home, did you have
8  occasion to care for patients with diabetes?
9       A.    Yes.
10      Q.    And what type of care would you
11  provide to diabetic patients, generally
12  speaking?
13      A.    Insulin therapy, diet, make sure
14  they are on the right diet, follow-ups,
15  reassessments.
16      Q.    Did you review training in
17  diabetes care as part of your -- through the
18  rehabilitation nursing home?
19      A.    Can you re-ask that?
20      Q.    I think I can -- I think there is
21  another question I should ask first.
22            In receiving your nursing
23  license, prior to doing that or as part of
24  receiving that license, did you receive training
25  on diabetes care?

Page 17

1       A.    Yes.
2       Q.    Can you describe what that
3  training consisted of?
4       A.    At my school they taught us what
5  are the signs and symptoms of hypoglycemic,
6  hyperglycemic, the range, the normal blood
7  sugar.
8       Q.    And what --
9       A.    I was not done.  The type of
10  insulins, short-acting, long-acting, those type
11  of things.
12      Q.    And what are signs and symptoms
13  of hypoglycemia?
14      A.    Dysphagia, confusion,
15  dehydration.
16      Q.    Are there others?
17      A.    Sweating, blurred vision.
18      Q.    Any others that you can recall
19  right now?
20      A.    No.
21      Q.    And what are the signs and
22  symptoms of hyperglycemia?
23      A.    Excessive urination, dehydration,
24  blurred vision.
25      Q.    Are there any others that you

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 10 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 18

1  recall?
2      A.    No.
3      Q.    And you said you were trained on,
4  I believe, the normal range of glucose readings?
5  And correct me if that was not exactly what you
6  said.
7      A.    Yes.
8      Q.    What are normal ranges of glucose
9  readings?
10     A.    Between the range of 70 and 110.
11     Q.    Thank you.
12           Were you also trained on risks of
13  abnormal glucose levels?
14     A.    Yes.
15     Q.    What are those risks?
16     A.    As I stated before, the symptoms
17  any individual can have is confusion, blurred
18  vision, sweatiness, shakiness, frequent
19  urination, dehydration.
20     Q.    So as a nurse at Isabella
21  Rehabilitation Nursing Home, did you encounter
22  patients, diabetic patients, who at times had
23  these symptoms?
24     A.    Yes.
25     Q.    And as a nurse when you would

Page 19

1  encounter such symptomatic patients, what did
2  you do?
3      A.    We would check the blood glucose
4  levels first and then see if they have an order
5  for insulin, administer the insulin. And then
6  we do a reassessment. After the reassessment if
7  the patient remains the same or is more
8  declined, we have to call the doctor.
9      Q.    When did your job at Isabella
10  end?
11     A.    When I gave birth to my son in
12  January of 2023.
13     Q.    And is there any reason you did
14  not go back to Isabella after that?
15     A.    I moved to New Jersey.
16     Q.    After you moved to New Jersey,
17  where were you employed?
18     A.    August 2023 I got employed at the
19  prison.
20     Q.    And who was your employer when
21  you worked at the Philadelphia Department of
22  Prisons?
23     A.    I was hired through an agency
24  called Tekaccel.
25     Q.    Do you know where Tekaccel is

Page 20

1  based?
2      A.    Texas.
3      Q.    And are you familiar with an
4  entity called Career Staffing?
5      A.    No.
6      Q.    Did you have a supervisor at
7  Tekaccel?
8      A.    No. I had a recruiter.
9      Q.    Can you describe for me the
10  nature of the relationship with the recruiter,
11  how the employment came to be and how they
12  placed you at the Philadelphia Department of
13  Prisons?
14     A.    They reached out to me through
15  emails stating that they saw my résumé. They
16  would like to offer me a position at the prison.
17  They went through the application process and
18  offered me a rate and a shift. And I agreed to
19  those documentations.
20     Q.    What was the rate that was
21  offered?
22           MS. BAKER: Objection as to
23  relevance. Why is that relevant? Why is
24  her rate of pay relevant? We previously
25  produced, I believe, the agreement that she

Page 21

1  had.
2           MR. GROTE: Because it reveals
3  the compensation she was receiving for
4  performing.
5           MS. BAKER: But why is her rate
6  of compensation relevant to the questions
7  that are at issue in this case? We
8  produced the document which had that
9  redacted. I don't understand why you need
10  to know what the rate of pay was. I am
11  instructing her not to answer that question
12  unless you can provide --
13           MR. GROTE: What privilege are
14  you asserting? Are you asserting a
15  privilege?
16           MS. BAKER: I am not asserting --
17  well, I'm telling you that --
18           MR. GROTE: Your objection has
19  been stated for the record. Are you
20  asserting a privilege?
21           MS. BAKER: I have stated my
22  objection.
23           MR. GROTE: Correct. And unless
24  you are asserting a privilege, the witness
25  is to answer the question.

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 11 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 22

MS. BAKER: That's incorrect. That's incorrect. I don't understand why it has any relevance to this case what her rate of pay was. And you have not provided me the reason why it would be relevant.

MR. GROTE: Your objection has been stated for the record. I am asking is there a privilege that's being asserted?

MS. BAKER: I told you what the grounds for the objection are.

MR. GROTE: So you are not asserting a privilege?

MS. BAKER: You can ask your next question.

MR. GROTE: I want the record to reflect that you are not asserting a privilege and you are certifying that she is not to answer this question based on a relevance objection. Is that what you are instructing your client?

MS. BAKER: We can go around and around and around on this. Although discovery is broader than what is potentially admissible at the time of trial, I don't understand how her rate of

Page 23

pay has any bearing on any of the issues that we are exploring here in discovery. Unless you can provide me with the reason why it would be, then I think it's outside the scope of applicable discovery.

MR. GROTE: I understand what your objection is. You have stated it. It has a relevance for showing how YesCare was utilizing its overall staffing complement, including what compensation packages were for their staff, what their expectations were for staff who are making certain amounts of money based upon their training to perform their job responsibilities.

And it could have relevance for determining whether or not they were properly preparing their staff in order to provide the care that was required at the facility.

And I understand the nature of your objection. I want to make it clear on the record that if you are instructing your client not to answer the question, it is based on a relevance objection and not a privilege. That's all.

Page 24

MS. BAKER: I don't understand what you just articulated. Let's not hold the deposition up by continuing to argue over this. In order to keep things going, I will allow her answer the question as to what her rate was at the time she was hired. And I not will allow further inquiry into her pay.

Mariesha, you may answer the question as to what your rate of pay was at the time you were hired to work at the prison.

THE WITNESS: $64 an hour.

MR. GROTE: Thank you.

BY MR. GROTE

Q.    And did you have to obtain a license, a Pennsylvania license, prior to working at the prison?

A.    Yes.

Q.    And when did you obtain that license?

A.    Pennsylvania Board of Nursing. You just have to apply.

Q.    I am sorry. Maybe I didn't speak loud enough. I said, When did you obtain that

Page 25

license?

A.    Probably June 2023.

Q.    And you said that you agreed to a shift -- you were offered a shift I think was your language; is that correct?

A.    Yes. 3:00 p.m. to 11:00 p.m.

Q.    And what days of the week did you work 3:00 to 11:00 p.m.?

A.    Five days out of the week. I don't recall the specific days.

Q.    They are not always the same five days?

A.    They were not always the same five days.

Q.    A little more about diabetes. What is type 1 diabetes?

A.    We are told that type 1 is what you're born with.

Q.    Is there anything else that you know about type 1 diabetes?

A.    It needs to be managed with insulin.

Q.    Do you know what type 2 diabetes is?

A.    That is what you develop as you

Page 26

get older.

Q.    And do you know what distinguished type 1 from type 2 diabetes?

A.    Type 2 can be managed with oral medication.  Type 1 needs insulin.

Q.    So when you say insulin, do you mean injectable insulin?

A.    Yes.

Q.    Is the oral medication also insulin?  Or is that different?

A.    Yes.  It's not insulin.  But it lowers the blood sugar.

Q.    At Curran-Fromhold Correctional Facility -- excuse me.

When you worked at the Philadelphia Department of Prisons, were you stationed at any particular jail?

A.    I was stationed at CFCF Curran-Fromhold.

Q.    That was for the entirety of your employment there?

A.    Yes.  Only one day I was transferred to DC, which was a few feet from that prison.

Q.    DC is the Detention Center,

Page 27

correct?

A.    Yes.

Q.    And is that where the infirmary is in the prisons?

A.    No.  I didn't see that there.  I don't recall seeing that there when I was there.

Q.    Do you know where the infirmary was?

A.    No.

Q.    How long did you work at CFCF?

A.    26 weeks.

Q.    And is that approximately six months?

A.    Yes.

MS. BAKER:  She didn't know it was going to be a math test.

BY MR. GROTE

Q.    Why did your employment end at the end of that contract?

A.    Can you -- it was a contract as needed.  It started off as a 13-week and then extended for one more 13-week.

Q.    Did they offer to extend it beyond the 26 weeks?

A.    No.

Page 28

Q.    Where did you work next?

A.    Chapel Manor Nursing Home.

Q.    How long did you work there?

A.    Five months.

Q.    And when did that employment end?

A.    When I gave birth to my daughter in May 2024.

Q.    A little belated, but congratulations on that as well.

A.    Thank you.

Q.    When did you -- what was your next job after giving birth to your daughter?

A.    I stayed home 18 months.  And I started back to work October 6th.

Q.    Going back to Chapel Manor Nursing Home, what was your role at the nursing home?

A.    Charge nurse and supervisor.

Q.    How is being a charge nurse different from your role as CFCF?

A.    Being a charge nurse is you are in charge of the LPNs.  You are in charge of making decisions.  You are in charge of saying this patient needs to go to the hospital.  You are putting in orders.  You are taking orders

Page 29

from doctors.

Q.    And I am not sure if I asked this.  But what were your responsibilities at CFCF?

A.    I was assigned to medical triage, and I was also assigned to intake.

Q.    At intake, did you have to -- how do you screen for diabetes?

MS. BAKER:  At intake, you mean?  Or in general?

BY MR. GROTE

Q.    Let me back up.

Generally, if we talk about screening a patient, what does that term mean to you?

A.    Asking questions and physically looking at the patient to see if they have any symptoms.

Q.    So, in general, how does one screen for diabetes?

A.    You check their blood sugar.  And you can verbally ask them, Are you a diabetic?

Q.    Are there any other ways that you might have insight into whether or not they are a diabetic?

Page 30

MS. BAKER:  At that facility, you mean?  Or generally?

BY MR. GROTE

Q.    Actually just generally.

A.    Yes.  As I stated, you can look at someone's symptoms.  They are sweating.  They are confused.  Their vision is becoming more blurry.  There is signs and symptoms that you can look at to say someone may or may not be diabetic.

Q.    If you had their medical file, can you also review their medical record?

A.    Yes.

Q.    And what are ketones?

A.    That's something that is produced in the urine when the blood sugar is so high.  So we instruct the patient or the individual to drink a lot of water to flush out the ketones.

Q.    How do you test for ketones?

A.    You ask the individual to produce urine.  And then there is a urine test strip.  You take the test trip and you dip it in the urine.  And depending on the color, it tells you if the person has ketones.

Q.    And is there a color that

Page 31

indicates positive versus a color that indicates negative?

A.    Yes.

Q.    Are there any kind of gradations in that color scheme such that you can tell if there is a larger or a lighter presence of ketones?

A.    Yes.  The color doesn't -- it's not just two colors there.  It goes from light to dark.

Q.    So the darker it is, the heavier the presence of ketones.  Is that the case?

A.    Yes.  I would say yes.

Q.    In type 1 diabetes, you said that it's treated with insulin, correct?

A.    Yes.

Q.    Are there other ways in which type 1 diabetes can be treated or -- in addition to insulin, are there other ways that type 1 diabetes might be treated?

A.    In conjunction with the insulin, you have a diet modification and also you can exercise.

Q.    What about type 2 diabetes, are there other ways to treat in addition to the

Page 32

oral medication that you mentioned?

A.    Yes.  They are modifiable things that the patient can do:  Lose weight, change diet, less carbohydrates, those things, less sugary drinks, more water.

Q.    Anything else?

A.    No.

Q.    If I use the term "units of insulin," what does that mean?  What is a unit of insulin?

A.    The amount of insulin that the patient requires based off of their blood sugar level.

Q.    How do you determine how many units of insulin to give a patient?  Is it by reading the blood sugar level?

A.    We have something called a sliding scale.  Every institution has different ranges.  I don't remember the one for the prison.  But based on his sugar level it could have been 10 units, 12 units.

Q.    When you say based on his sugar level, are you referring to Mr. Jung?

A.    Yes.

Q.    Do you have any -- do you know

Page 33

why there is different ranges at different institutions?

A.    No.  I don't know.  I don't know.  Because even the job I am working at now there is different ranges.  They do not allow you to give the insulin unless the blood sugar is starting from 150.  So I don't know why each institution has different sliding scales.

Q.    Understood.

In the higher ranges, so if it's 400, can there also be different ranges depending upon the medical provider's guidelines?

MS. BAKER:  Objection to the form.  You may answer if you understand the question.

THE WITNESS:  I don't understand.  Can you repeat it?

BY MR. GROTE

Q.    What I'm wondering about is -- you just testified that where you are working now, unless it's 150, the glucose is 150, insulin will not be administered unless it's above that.

I am wondering if there is also

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 14 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 34

1 variation in prescribed insulin units as you get
2 higher up the scale. So if it's at 300, 350,
3 500, could there still be variation depending on
4 where you work now versus what PDP's scale was
5 or does it ever become the case that everywhere
6 you worked when it reaches a certain threshold
7 the number of units to be given are consistent?
8         MR. WITTEKIND: Objection to the
9 form.
10 BY MR. GROTE
11    Q.   Did that help?
12         MS. BAKER: You can answer the
13 question. That was just an objection to
14 form. You can answer the question if you
15 understand the question.
16         THE WITNESS: Every institution
17 is different. They provide different
18 guidelines on the sliding scale.
19 BY MR. GROTE
20    Q.   So if somebody's blood glucose is
21 over 400, would the amount of insulin that you
22 would provide as a nurse be dependent on what
23 the institution's sliding scale guidelines were?
24    A.   Yes.
25    Q.   And if somebody's glucose level

Page 35

1 is over -- in general if it's over 400, what are
2 you supposed to do as a nurse?
3         MS. BAKER: Objection to the
4 form. Are you asking her generally or are
5 you asking at that particular facility?
6         MR. WITTEKIND: I join.
7 BY MR. GROTE
8    Q.   I'm asking generally. But if
9 there is variations depending on the facility,
10 please indicate that.
11    A.   The right thing to do is call the
12 doctor for an order.
13    Q.   Why is that?
14    A.   That's not within my scope to put
15 an order in.
16    Q.   If the glucose level were, say,
17 at 200, would you still have to call the doctor
18 for an order then?
19    A.   Yes.
20    Q.   Is there any range in which you
21 would not have to call the doctor in order to
22 administer insulin?
23    A.   Yes. If it was in the normal
24 range. 70 to 110 you would not need to call the
25 doctor.

Page 36

1    Q.   Prior to working at CFCF, had you
2 ever worked in a correctional facility?
3    A.   No.
4    Q.   What was different about working
5 in a correctional facility than your prior jobs?
6         MR. WITTEKIND: Objection to the
7 form.
8         THE WITNESS: Prison is a little
9 bit more strict, I would say. It's
10 stricter guidelines in the prison.
11 BY MR. GROTE
12    Q.   And are those guidelines in
13 regard to patient care? In regard to security
14 issues? What do you mean by that?
15    A.   Security issues.
16    Q.   Thank you.
17         Were there any differences in
18 terms of any -- strike that.
19         In terms of providing patient
20 care, were there any differences beyond the
21 strict security protocols?
22    A.   Yes.
23    Q.   What were some of those?
24    A.   If you administer insulin there
25 was not -- sometimes you would not have

Page 37

1 access -- most of the time you do not have
2 access to do a reassessment on the patient.
3    Q.   Can you explain what you mean by
4 you wouldn't have access to do a reassessment?
5    A.   I am in intake. The intake
6 process may take 30 minutes. Within that
7 process I am administering the insulin. I am
8 advising the person to drink water within 30
9 minutes. The person is at another location of
10 the prison.
11    Q.   So as the intake nurse, would you
12 not then have any interaction with the patient
13 after the intake procedure?
14    A.   Can you rephrase the question?
15    Q.   Yes.
16         When you were intake nurse after
17 you went through an intake screening -- which I
18 think is what you're talking about; is that
19 right?
20    A.   Yes.
21    Q.   And the patient goes somewhere
22 else in the prison. Did you have any follow-up
23 with patients after that intake screening?
24    A.   No. But the patients were
25 informed that if they are symptomatic, they can

Page 38

1 come down to medical triage. And as I stated
2 before, I was also working in medical triage.
3 And then I would see them there as well.
4     Q.    If a patient was to be seen after
5 intake screening, whose responsibility was that?
6         MS. BAKER: Objection to the
7     form. Can you clarify what you're asking?
8 BY MR. GROTE
9     Q.    So you see somebody at intake
10 screening. And there needs to be a follow-up.
11 Right? And that follow-up I understand can be
12 different time periods which there is a
13 follow-up.
14         There can be a more immediate
15 follow-up. It can be the same day. There might
16 be a provider ordering it within a week, within
17 a month. I am wondering how continuity of care
18 worked from intake to what comes after intake?
19         MS. BAKER: Answer if you
20     understand the question. If you need
21     further clarification, please ask for it.
22         THE WITNESS: Okay. The
23     continuity of care would be the LPNs that
24     were there as well as the doctors and the
25     other nurses.

Page 39

1 BY MR. GROTE
2     Q.    Would they be scheduled to see --
3 and how would they be scheduled to see patients
4 after intake?
5     A.    Within the intake form you are
6 able to free write and state what is going on
7 with the patient. And then there will be
8 follow-ups.
9     Q.    And were you the one that
10 determined when there should be a follow-up or
11 was that another person's responsibility?
12     A.    I inform the doctor, the provider
13 at the time. And based on that, there would
14 have been follow-ups.
15     Q.    So is it accurate -- is what you
16 are saying is that it was the provider's
17 responsibility for determining when there should
18 be a follow-up?
19         MR. WITTEKIND: Objection to the
20     form.
21         MS. BAKER: I will -- the reason
22     I'm objecting -- let me give you the
23     grounds for my objection. I am sure you
24     and I can agree that this nurse should not
25     be testifying as to what the standard of

Page 40

1 care or requirements were for a provider
2 other than a nurse. That is the basis of
3 my objection.
4         I think I know what you're
5 asking. I am not going to prevent her from
6 answering the question. But I would ask
7 you to rephrase so it doesn't call for what
8 would amount to an expert opinion against a
9 higher level provider, please.
10         MR. WITTEKIND: I will join that
11 objection.
12         MR. GROTE: Okay. Ray, what did
13 you say?
14         MR. WITTEKIND: I said I would
15 join her objection.
16         MS. BAKER: It was such a good
17 objection. That's why.
18         MR. WITTEKIND: Yes. It was
19 wonderful.
20 BY MR. GROTE
21     Q.    So based on your experience as
22 the intake nurse, who was it within CFCF that
23 would decide when a patient would receive
24 follow-up care after intake?
25         MR. WITTEKIND: Object to the

Page 41

1 form.
2         THE WITNESS: I believe it's
3     within everyone's ability to follow up --
4     the nurses, the doctors.
5 BY MR. GROTE
6     Q.    And would that include yourself
7 as an intake nurse?
8     A.    Yes.
9     Q.    And I used the term "medical
10 providers" for the record. When I use that
11 term, what does medical provider mean to you in
12 the context of CFCF?
13     A.    The doctor, nurse practitioner,
14 someone who is above me who can give orders,
15 medication orders.
16     Q.    At CFCF you said you worked 3:00
17 to 11:00. Were you ever required to work
18 overtime shifts?
19     A.    I was not required to work
20 overtime shifts. I worked overtime. But it was
21 not a requirement.
22     Q.    Did that happen often? Not
23 often? Every once in a while? Any way you can
24 characterize it?
25     A.    Yes. I picked up at least two

Page 42

1  shifts additional to my five shifts a week.
2      Q.    And would those shifts also be
3  eight-hour shifts?
4      A.    Yes.
5      Q.    So was it typical for you to work
6  seven 8-hour shifts a week?
7      A.    The two shifts that I picked up
8  was on days that I was already scheduled to
9  work.  So two days out of the week I would work
10 16 hours.
11     Q.    Thank you.
12         Do you recall whether or not you
13 were working an overtime shift on
14 October 28, 2023?
15     A.    I don't remember.  But I worked
16 the morning shift.
17     Q.    And which shift is that?  Is that
18 8:00 to -- no math.  7:00 to 3:00?
19     A.    Yes.
20     Q.    Do you know if you worked the
21 3:00 to 11:00 shift that day?  Or is that what
22 you can't recall?
23     A.    I don't recall.
24     Q.    When you saw Mr. Jung, it was
25 during the morning shift?

Page 43

1      A.    Yes.
2      Q.    And do you begin working at
3  CFCF -- was that in August of 2023?
4      A.    Yes.
5      Q.    When you began working there,
6  were you provided training?
7      A.    Yes.
8      Q.    What did that consist of?
9      A.    You were put in a classroom.
10 They show you how the system runs, how to enter
11 things, how to go through questionnaires.  And
12 then the next day you are put with a preceptor
13 which would basically show you around and how
14 things are done and how the prison is run.
15     Q.    I think I get it.  But what is a
16 preceptor?  I never heard that term.
17     A.    Someone who has been at the job
18 longer than you who is able to show you how
19 things are run.
20     Q.    And do you remember the name of
21 your preceptor?
22     A.    I don't recall.
23     Q.    Do you remember what their
24 position was?
25     A.    Registered nurse.

Page 44

1      Q.    The training session you just
2  referenced, was that just the first day?
3          MS. BAKER:  Objection to form.  I
4  think that mischaracterizes what she said.
5  You can go ahead and answer.
6          THE WITNESS:  Yes.  As I said, it
7  was one day in class where they educate you
8  about certain things like how to enter
9  things.  And the next day you come in and
10 you follow a preceptor around.
11 BY MR. GROTE
12     Q.    How long would you work with a
13 preceptor?  Just that second day?
14     A.    Yes.
15     Q.    After those first two days, were
16 you provided any additional training?
17     A.    Yes.  You were -- I was provided
18 approximately, I don't recall, three days of
19 training and intake.
20     Q.    What did that consist of?
21     A.    Which forms to fill out, what
22 questions to specifically ask.  If they were
23 going through withdrawal, administer these
24 medications, those type of things.
25     Q.    Were you provided any policies to

Page 45

1  familiarize yourself with?
2      A.    Yes.
3      Q.    Do you recall which ones?
4      A.    I don't.
5      Q.    Were you also provided something
6  called clinical pathways for treating certain
7  conditions?
8      A.    I don't recall.
9      Q.    Were you provided any -- after
10 those three days of training and intake, were
11 you provided any additional training?
12     A.    No.
13     Q.    And in all of the training that
14 you just testified about, did you receive any
15 training on providing care for diabetic
16 patients?
17     A.    Not within the training.
18     Q.    You said not within the training.
19 Were you provided it in any other manner?
20     A.    Yes.  I was provided training at
21 Isabella and my education, schooling.
22     Q.    But you were not provided
23 anything specific at CFCF; is that correct?
24     A.    Yes.
25     Q.    Do you remember if you were

Page 46

provided any training on how to fill out a
nursing encounter tool or a NET for diabetic
patients?
     A.    I don't recall.
     Q.    Do you recall if you were
provided with a copy of YesCare's clinical
pathway for diabetes care?
          MR. WITTEKIND:  Objection to the
     form.
          MS. BAKER:  You may answer.
          THE WITNESS:  I was provided with
     paperwork from YesCare.  I don't recall
     what it entails completely.
BY MR. GROTE
     Q.    Bear with me one moment.  Do you
remember answering interrogatories as part of
this litigation?  Do you remember questions you
got as part of the discovery response that you
provided answers for?
     A.    Yes.
          MR. GROTE:  And one moment.  Bear
     with me.
          (Discussion held off the record.)
BY MR. GROTE
     Q.    So I will just share my screen,

Page 47

Ms. Apollon.  Can you see this document?
     A.    Yes.
     Q.    And where it says, Interrogatory
No. 4, it says, "Identify and describe the
process for referring a patient for placement in
the infirmary or to a hospital during intake
screening during Ms. Apollon's employment at PDP
as Ms. Apollon understood it."
          If you can take a moment to
review your answer and let me know when you have
done so.
     A.    Okay.  Can you enlarge it?  It's
small.
     Q.    Yes.  How is that?
     A.    Okay.  I want to confirm.  So you
did not receive any training or any protocol --
you were not trained on any protocol for
referring a patient to the infirmary or the
hospital; is that correct?
          MR. WITTEKIND:  Object to the
     form.
          THE WITNESS:  That's correct.
BY MR. GROTE
     Q.    The training that you spoke of
for your employment at CFCF, was that provided

Page 48

by YesCare employees, if you know?
     A.    Yes.
     Q.    Do you remember the names of any
of the people involved in the training?
     A.    No.
     Q.    And then I will go down to
Interrogatory No. 5.  "Identify and describe the
practice at PDP for providing a document in the
administration of insulin and glucose checks,
include specific details as to the type of
information to be documented, including
information on medication refusal and how such
document should be retained."
          If you can take a moment to
review that answer.  And let me know when you
need me to scroll the page to see the rest of
it.
     A.    Okay.
     Q.    Where it says that you would
follow a prompt on a computer screen with
pop-ups for where to enter the blood glucose
numbers, was that specific to the intake
screening?  Or was that something that had to be
utilized any time that glucose was being checked
within PDP, if you know?

Page 49

     A.    This is not referring to the
intake.  I was pulled a couple times to pass
medications.  And this is where this is coming
from.
     Q.    So whenever you were checking
glucose, there was a computer prompt and you had
to enter the number?
     A.    Yes.
     Q.    Do you know where that
information would be stored within the computer
system?
     A.    It would be stored underneath the
individual person's information.  So previous or
past people, people ahead of me, can look at it
and refer back to it.
     Q.    Was that part of the electronic
medical record?
     A.    Yes.
     Q.    Each patient would have those
numbers as part of their record?
     A.    Not necessarily.  It will pop up
if the person is diabetic.  Not everyone was
diabetic.
     Q.    Thank you for that clarification.
          Do you know what the document

Page 50

1 looked like in the electronic medical record
2 where this information would be stored?
3      A.   I don't recall.
4      Q.   Was there ever an instance that
5 you recall in which you, as a nurse, would not
6 document the glucose numbers?
7      A.   No.  I don't recall.
8      Q.   What was the process for
9 documenting insulin dosages provided?
10          MS. BAKER:  In which context?  In
11     intake?
12 BY MR. GROTE
13     Q.   We will start with non-intake.
14 If you were administering insulin, how would the
15 units of insulin, the dosage, be documented?
16     A.   You would first have to check the
17 blood glucose level.  And then check to see if
18 the person actually needs insulin.  And if they
19 do, we go to the sliding scale.  After that you
20 can enter the number.  The amount of units will
21 pop up in the system.  And you administer
22 insulin.
23     Q.   How would you document glucose
24 checks during the intake process?
25     A.   I was not assigned to document

Page 51

1 glucose checks in intake.  There was a medical
2 assistant that you would have to see before you
3 got to the nurse.
4      Q.   The medical assistant would --
5 would the medical assistant check glucose if the
6 patient was diabetic?
7      A.   Yes.
8      Q.   And would that medical assistant
9 be identified in the medical records for the
10 intake process?
11     A.   Yes.
12     Q.   Do you know where they might be
13 identified?  Would it be in a progress note or
14 some other document?
15     A.   Everyone at the prison has log-in
16 information.  Whatever you enter it's under your
17 name.  So it's ways to track it back.
18     Q.   So anything that is documented
19 will have some names associated with it in the
20 system?
21     A.   Yes.
22     Q.   Were there ever instances where
23 you did check somebody's glucose at intake?
24          MS. BAKER:  She personally you
25     mean?

Page 52

1          MR. GROTE:  Yes.
2          MS. BAKER:  Go ahead and answer.
3          THE WITNESS:  Like I said, a
4     medical assistant was provided.  So
5     specifically in intake, I did not have to
6     do it.
7 BY MR. GROTE
8      Q.   Were there instances where you
9 would ever administer insulin at intake?
10     A.   Yes.
11     Q.   Would that ever be done by a
12 medical assistant?
13     A.   No.
14     Q.   When you did administer insulin,
15 how would you document that in intake?
16     A.   There is an assessment part where
17 you can free type.  So you can type out
18 everything there in the assessment.
19     Q.   And is the assessment part of the
20 SOAP notes, objective, objective assessment
21 plan?  A progress note document?
22     A.   I would say assessment is based
23 off of my objectives, what I see, what I'm
24 experiencing with the patient.
25     Q.   I was trying to get to the form

Page 53

1 to make sure we are talking about the same
2 thing, the progress note that has -- assessment
3 is basically the third category.  Does that
4 sound accurate, if you recall?
5      A.   I don't recall.
6      Q.   Returning to your answer to
7 Interrogatory No. 5.  It says, "Answering
8 Defendants spoke to a supervisor named Smith
9 about wanting more training on insulin refusal
10 and proper ways to pass medication and proper
11 documenting in the PDP.  But Smith and the
12 people in the director or nursing office told
13 Answering Defendant that there was no additional
14 training and that as a registered nurse it was
15 expected of her to know how it works at the
16 PDP."
17          I am wondering do you recall when
18 you spoke to supervisor Smith about wanting more
19 training?
20     A.   I don't recall.  But I remember
21 speaking to her.  I don't remember which day,
22 which month.  But I recall speaking to her
23 because they did come to me and state that when
24 a prisoner refuses insulin, we have to notify
25 the endocrinologist so they can follow up with

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 19 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 54

1 them.

2     Q.    And do you have any recollection
3 of whether that was closer to the beginning of
4 your six-month contract?  The end?  The middle?

5     A.    I believe it was towards the
6 middle.

7     Q.    So the record is clear:  You
8 began August 1st.  And your contract ended at
9 the end of January 2024.  Does that sound
10 accurate?

11     A.    Approximately January, the middle
12 of January.

13     Q.    Would the middle then be August,
14 maybe like October and November potentially?

15     A.    Yes.

16     Q.    And what additional training did
17 you want?

18     A.    I spoke to them about -- I was
19 not trained on alerting the specialists if a
20 prisoner refuses the insulin.

21     Q.    Were you ever trained on
22 something called the Red Flag policy?

23     A.    I don't recall.

24     Q.    Were you ever trained on how to
25 utilize refusal of treatment forms at CFCF?

Page 55

1     A.    No.

2     Q.    Do you remember what Smith's role
3 was?  You said supervisor.  But do you know what
4 her position was?

5     A.    I'm not sure.  But she could have
6 been the administrator.

7     Q.    Would that be the health care
8 administrator?

9     A.    Yes.

10     Q.    When she told you that there was
11 no additional training required, how did you --
12 excuse me.

13         Your answer said that there was
14 no additional training and that as a registered
15 nurse you were expected to know how it works at
16 the PDP.  How did you respond to that?

17     A.    I continued to explain that I
18 would like more explanation on how things are
19 done.

20     Q.    How did she respond to that?

21     A.    Same answer.  Nothing was
22 resolved.

23     Q.    Is it accurate that what you were
24 seeking training on had to do with specific
25 policies and protocols for care within PDP?

Page 56

1         MR. WITTEKIND:  Objection to the
2 form.

3         MS. BAKER:  Sorry.  Can I have
4 that question read back again?

5         (The reporter read back the
6 record as requested.)

7         MS. BAKER:  Objection to the
8 form.  You may answer.

9         THE WITNESS:  I'm not clear on
10 the question.

11         MR. GROTE:  I can rephrase.

12 BY MR. GROTE

13     Q.    Is it true that you were not
14 seeking training on things that you had already
15 been trained on as a registered nurse?

16         MR. WITTEKIND:  Objection to the
17 form.

18         MS. BAKER:  I join in that
19 objection.  Go ahead and answer.

20         THE WITNESS:  I was not seeking
21 training based on things I already know.  I
22 was seeking training based off of the
23 prison guidelines.

24 BY MR. GROTE

25     Q.    You were seeking training based

Page 57

1 on what your employer's requirements and
2 policies were, right?

3         MS. BAKER:  Objection to the
4 form.

5         MR. WITTEKIND:  Object to the
6 form.

7         THE WITNESS:  Yes.

8         MS. BAKER:  Just note for my
9 objection the use of the term "employer."

10         Would now be an okay time for a
11 five-minute restroom break?

12         MR. GROTE:  Yes.

13         (Discussion held off the record.)

14 BY MR. GROTE

15     Q.    When you worked intake at CFCF,
16 can you walk me through what a typical day was
17 like?

18     A.    You received a patient/prisoner.
19 And then you asked them a whole bunch of
20 questions.

21     Q.    And then you just repeat that for
22 eight hours?  Is that the job?

23     A.    Yes.  There is about -- I can't
24 recall -- but maybe four forms, five forms that
25 you have to run through all the questions and

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 58

1 ask them based on their medical conditions, if
2 alcohol, been drinking, any surgeries, those
3 things.
4       Q.    How long did it take to process
5 an average person?  Or did it vary so much there
6 was not an average?
7       MS. BAKER:  At intake?
8       MR. GROTE:  Yes.
9       THE WITNESS:  It varies.  Every
10 individual is different.  Some may have
11 taken one hour and 30 minutes, some 30
12 minutes.
13 BY MR. GROTE
14      Q.    If you determined that there was
15 a higher level of care needed, that you needed
16 to call a medical provider, what was the process
17 there?
18      MS. BAKER:  Objection to the
19 form.  You can answer.
20      THE WITNESS:  If there is a
21 provider on site you can go to them
22 directly and tell me what the issue is.  If
23 there is no one on site, you have to pick
24 up the phone and call them and get an
25 order.

Page 59

1 BY MR. GROTE
2       Q.    And were providers usually on
3 site?
4       A.    I don't recall if there were
5 providers that were on site.
6       Q.    Were the providers more often
7 available remotely?
8       MR. WITTEKIND:  Object to the
9 form.
10      THE WITNESS:  Yes.  A few of them
11 was remotely.
12 BY MR. GROTE
13      Q.    I think this might have been
14 unclear in the record.  So I want to go back.
15 You said you do not recall providers that were
16 on site.  I wasn't sure if you were talking
17 about their specific identities.
18      But I was really kind of asking
19 was it usually the case that there was a
20 provider on site?
21      A.    No.  It's not usually the case
22 that the provider is on site.  There are some
23 that you have to call.
24      Q.    Did that present any challenges
25 to you as an intake nurse?

Page 60

1       A.    Yes.
2       MS. BAKER:  Object to the form.
3       THE WITNESS:  Yes.
4 BY MR. GROTE
5       Q.    What were those challenges?
6       A.    Sometimes you would have to call
7 two or three times.  There is no person
8 answering the phone.
9       Q.    Do you remember in the case of
10 Mr. Jung if you had to call more than once?
11      A.    I don't recall.
12      Q.    While you worked at PDP, did you
13 ever receive any disciplinary action against you
14 for anything?
15      A.    Yes.
16      Q.    What was that?
17      A.    I got a write-up because I put
18 the patient refused the insulin.  And I didn't
19 put the follow-up that he needs to consult a
20 specialist.
21      Q.    Do you remember who the patient
22 was?
23      A.    No.  I don't recall.
24      Q.    The follow-up was that he was
25 supposed to see a specialist?  Was this -- is

Page 61

1 that correct?
2       A.    Yes.
3       Q.    And was that the order from the
4 medical provider?
5       MR. WITTEKIND:  Object to the
6 form.  You can answer.
7       MS. BAKER:  I don't understand
8 the question.  Can you rephrase the
9 question, please?
10 BY MR. GROTE
11      Q.    What I am trying to get at is
12 that -- I think you -- was it your testimony
13 that you were given a write-up because you did
14 not document that a diabetic patient was
15 supposed to see a specialist?
16      A.    Yes.  They said that when someone
17 refuses insulin, you are supposed to alert the
18 specialist so they can follow up with the
19 patient.
20      Q.    And was this the situation that
21 led to the conversation with Smith that we
22 discussed earlier in which that issue was
23 brought to you and you asked for more training?
24      A.    Yes.
25      Q.    And in this instance, if you

Page 62

1 recall, who had made the decision that the
2 patient was supposed to see a specialist?
3       A.    Under my assumption, I just
4 assumed that that is just the prison's
5 guidelines/protocols.
6       Q.    So, I mean, was the write-up
7 based on the assessment that the prison
8 thought -- or that your supervisors thought that
9 you should have referred them to a specialist?
10          MR. WITTEKIND:  Object to the
11    form.
12          MS. BAKER:  Objection to what
13    somebody else thought.
14 BY MR. GROTE
15       Q.    What I am trying to get at -- and
16 maybe this will help clarify things.
17          Was there an order from a medical
18 provider that a patient should have seen a
19 specialist, this diabetic patient, and that you
20 didn't document that?  Or was it that you had
21 seen a patient and didn't refer them to a
22 specialist yourself and that was the issue you
23 got the write-up for?
24          MS. BAKER:  Objection to the
25    form.

Page 63

1          MR. WITTEKIND:  Objection.
2          THE WITNESS:  The write-up was
3    because I entered in the system the patient
4    refused his insulin.  The write-up was
5    because they told me that I was informed
6    that I am supposed to put an alert for a
7    specialist to see the patient.  And I
8    didn't know that.  I was not trained on
9    that.
10 BY MR. GROTE
11       Q.    I understand now.  Thank you.
12          When you say specialist, do you
13 know what type of medical professional was meant
14 by that, if you know?
15       A.    Endocrinologist.
16       Q.    And did this incident happen
17 prior to October 28, 2023, if you recall?
18       A.    That I don't recall.
19       Q.    And what was the consequence of
20 the write-up?
21       A.    They just had me sign a paper
22 that you were told this, this and this.  And
23 that was the only one.  I think you have up to
24 three chances.  But that was the only one.  They
25 had me sign a paper stating you understood what

Page 64

1 happened.
2       Q.    So would it be accurate to
3 characterize it as a written reprimand without
4 any additional penalty?
5          MS. BAKER:  Objection to the
6    form.  I think she's characterized it
7    already as a write-up.  You may answer.
8          THE WITNESS:  Yes, sir.
9 BY MR. GROTE
10       Q.    Are you familiar with the term
11 "nursing encounter tool"?
12          MR. WITTEKIND:  Object to the
13    form.
14          MS. BAKER:  If you have a
15    question, ask him.
16          THE WITNESS:  Are you asking in
17    reference to the prison?
18 BY MR. GROTE
19       Q.    Yes.  Well, generally, nursing
20 encounter tools, are these common in your
21 profession?
22       A.    Yes.
23       Q.    What are they?
24       A.    Strategies that you can use to
25 help you along the way.  It can be a book.  It

Page 65

1 can be a pamphlet.  It can be education.
2       Q.    Did you utilize nursing encounter
3 tools while you worked at CFCF?
4       A.    Yes.
5       Q.    Did you ever utilize -- if I say
6 NET, I mean nursing encounter tools -- for
7 hypoglycemia/hyperglycemia?
8       A.    I don't recall.
9       Q.    I will share my screen to see if
10 this document refreshes your recollection.
11       A.    Okay.
12       Q.    Can you see this document?
13       A.    Yes.
14       Q.    Is this familiar to you at all?
15       A.    No.  I can't say if I ever
16 received this document.  It doesn't look
17 familiar.
18       Q.    There is six pages.  Let me know
19 if you want me to pause if I am moving too fast
20 at any point.
21       A.    Okay.  I don't recall seeing this
22 document.
23          MS. BAKER:  Can you just please
24    identify it, Mr. Grote, for the record the
25    Bates numbers of the pages you just showed

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 66

her?

MR. GROTE: Yes. Thank you very much for that reminder. The Bates stamp is YesCare3438 through YesCare3443.

BY MR. GROTE

Q. And at CFCF if a patient has a blood glucose level over 500 at intake, what were you supposed to do?

A. Call the doctor.

Q. Anything else?

A. Administer insulin.

Q. And then what would happen after you called the doctor?

A. She would give me an order, specifically what insulins to give.

Q. Would you document the order that you were given?

A. Yes.

Q. And where would you document it?

A. I document it in my assessment part of intake.

Q. Did you document everything that you were told as part of that order?

A. Yes.

Q. Is there ever any situation that

Page 67

you can remember where you did not document any part of a medical order that you were given at CFCF?

A. No.

Q. Do you know at CFCF was there a difference between something called an emergent intervention and an urgent intervention?

A. I don't recall that at CFCF. But being a nurse you are taught those terms.

Q. So as a nurse, what do those terms mean? Start with "emergent intervention."

A. Emergent intervention is if someone stopped breathing, bleeding out uncontrollably, stab wound.

Q. Is the emergent indicated that there is an emergency?

A. Yes.

Q. And what is an "urgent intervention"?

A. Something that can be resolved within the facility like a cut, abrasion, blood sugar, hypertension.

Q. Where would diabetic ketoacidosis fall within the emergent versus urgent intervention spectrum?

Page 68

MS. BAKER: At the prison?

MR. GROTE: At the prison.

THE WITNESS: Based on the patient's vital signs, how he is looking, if he has any confusion going on, if his blood pressure is getting low, heart rate is dropping.

BY MR. GROTE

Q. And where would those vital signs be -- how you would document that at intake?

A. As I stated before, we were provided with a medical assistant who took the vital signs, blood sugar, HIV test, urine samples.

Q. Would you -- for diabetic patients, did you ever question them as to whether they were experiencing symptoms associated with hypoglycemia or hyperglycemia?

A. Yes.

Q. Did you have a standard set of questions you would ask in those circumstances?

A. Yes. The information that was provided in the intake questionnaire.

Q. So is the intake questionnaire, are those all questions that you would ask?

Page 69

A. Yes.

Q. Did you ever receive any -- are you familiar with Norristown State Psychiatric Hospital?

A. I am not familiar. But I did hear a few things about it.

Q. What did you hear about it?

A. That it's a hospital for psychiatric patients.

Q. Did you ever receive patients at PDP in intake who had returned from Norristown?

A. Yes. I believe so. Maybe two or three.

Q. How would you know they were coming from Norristown?

A. I don't recall. But I believe there was a paper that clicked off a box that said they were coming from there.

Q. Is that something that -- who would click that box or transmit that information, if you know?

A. Maybe the correctional officer who would encounter with them or someone -- I am not sure.

Q. I don't want you to guess.

Page 70

1  A.  I'm not sure.  I don't recall.
2  Q.  And going back to emergent
3 interventions, who would decide -- did you ever
4 decide if there was an emergent intervention
5 that was necessary for a patient when you worked
6 at intake in CFCF?
7  A.  Yes.
8  Q.  So in those situations, what
9 would you do?
10  A.  We still have to call the doctor.
11 And from that the doctor will tell us to call
12 911.
13  Q.  And when you were intake nurse at
14 CFCF, did you ever decide when there were urgent
15 interventions needed?
16  A.  Yes.  At intake.
17  Q.  And then what would be the
18 process there?
19  A.  Still call the doctor.
20  Q.  And, generally speaking, what is
21 the infirmary at CFCF -- not at CFCF.
22  Was there an infirmary within the
23 Philadelphia Department of Prisons?
24  A.  Yes.
25  Q.  And you testified earlier you do

Page 71

1 not know where that was located?
2  A.  Correct.
3  Q.  Did you have the authority to
4 refer someone to the infirmary?
5  A.  No.
6  Q.  And who did?
7  A.  The doctor.
8  Q.  Did you ever learn about whether
9 the infirmary was ever overcrowded during any of
10 time you worked at CFCF?
11  A.  I heard that it was overcrowded
12 amongst the other nursing coworkers.  There was
13 talk.
14  Q.  Do you remember when in your six
15 months that you might have heard that talk?
16  A.  I don't recall.
17  Q.  Was it something that you heard
18 frequently?
19  MR. WITTEKIND:  Objection to the
20  form.
21  THE WITNESS:  Yes.
22 BY MR. GROTE
23  Q.  Do you remember any of the other
24 staff who you had heard this from?  Any names?
25  A.  No.

Page 72

1  Q.  Did you ever play any role in
2 assessing who should go to the infirmary and who
3 should not?
4  A.  No.
5  Q.  Are you familiar with something
6 called 23-hour observation status at CFCF?
7  A.  No, I'm not.
8  Q.  Do you know what a sheltered
9 housing admission is at CFCF?
10  A.  No.
11  Q.  When you were an intake nurse,
12 were there instances in which diabetic patients
13 were positive for ketones?
14  A.  Yes.
15  Q.  What would you do when that was
16 the case?
17  A.  Call the doctor.  And most times
18 they would instruct us to provide water to flush
19 them out.
20  Q.  Do you ever recall an instance
21 where they sent somebody to the emergency room
22 when they had ketones?
23  A.  That I don't recall.
24  Q.  I was going to say at intake.  To
25 be clear, that is where I was talking about.

Page 73

1  Same answer?
2  A.  At intake?  No, no.
3  Q.  Do you recall any case where the
4 medical provider referred somebody to the
5 infirmary when they had ketones at intake?
6  A.  No.  Never encountered that.
7  Q.  Were you provided any guidance
8 aside from call the provider, in regard to a
9 diabetic patient with ketones as to what you
10 were supposed to do?
11  A.  As a nurse you are supposed to
12 provide them with the insulin, the water, and
13 reassess, follow up.
14  Q.  And when are you supposed to
15 follow up?
16  A.  Approximately 30 minutes to one
17 hour.
18  Q.  Would that follow up be
19 documented?
20  A.  Yes.  You have to document it.
21  MS. BAKER:  Just to be clear:
22  Are you talking about at the prison or are
23  you talking generally?  Because the
24  question didn't define it.

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 24 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 74

1  BY MR. GROTE
2      Q.    Yeah.  I meant specifically at
3  intake in CFCF.
4      A.    In intake there is no way to go
5  back and document reassessments.
6      Q.    Why is that?
7      A.    That's how it is built.  It's
8  just based off of the prisoners, background
9  conditions.  After you are done you cannot go
10  into it.  You have to go into another section of
11  the system and write that.  Not in intake.
12      Q.    So are you saying that the
13  assessment would still happen, but it would be
14  documented somewhere else?
15      A.    The reassessment --
16          MS. BAKER:  Object to the form.
17          MR. WITTEKIND:  Join.
18          THE WITNESS:  The reassessment
19      would be documented somewhere else.
20  BY MR. GROTE
21      Q.    And at intake when there was a
22  reassessment based on somebody having ketones,
23  who would carry out the reassessments?
24          MR. WITTEKIND:  Object to the
25      form.

Page 75

1          MS. BAKER:  I object as well.
2          MR. WITTEKIND:  I think you are
3      asking her if the reassessment happened in
4      intake.  And I believe the witness has
5      testified that it would not be in intake.
6  BY MR. GROTE
7      Q.    I can rephrase.
8          In a situation where somebody at
9  intake has ketones and they are to be reassessed
10  consistent with your testimony within 30 minutes
11  to an hour or shortly thereafter the intake
12  assessment, where does that reassessment occur?
13          MS. BAKER:  Do you mean where
14      physically?  Where is it documented?
15  BY MR. GROTE
16      Q.    Right now I mean where
17  physically.
18      A.    I am stationed at intake.  So
19  another nurse would have to take over for that,
20  reassess.
21      Q.    And how would that other nurse
22  have been notified of the need for reassessment?
23      A.    Based off of my assessment that I
24  typed in the intake process.
25      Q.    And that reassessment then, where

Page 76

1  would that other nurse document that
2  reassessment?
3      A.    It could be in the medication
4  section.  It could be on a new form that you can
5  create within the system.
6      Q.    And would that documentation then
7  go in the patient's electronic medical record
8  order?
9      A.    Yes.
10      Q.    Do you recall your encounter with
11  Louis Jung, Jr. on October 28, 2023?
12      A.    When you say recall, are you
13  talking about physically seeing him or
14  physically asking him questions?
15      Q.    I'm asking whether you have any
16  independent recollection of that encounter.  I
17  understand you reviewed documents.  But I am
18  wondering if you have a memory of your encounter
19  with Mr. Jung, anything he said, anything that
20  you said, anything that you observed.
21      A.    I recall only a couple things
22  that he said.
23      Q.    What are those?
24      A.    That he is not a diabetic.  He is
25  not abusing drugs.  He is not suicidal and he is

Page 77

1  not homicidal.  He has no other medical
2  conditions.
3      Q.    Did you have other information
4  that indicated that he was a diabetic?
5      A.    Nothing besides the 542 blood
6  sugar.
7      Q.    Did you review his electronic
8  medical record during the intake process?
9      A.    I don't have access to that.
10      Q.    You don't have access to
11  anybody's electronic medical record during the
12  intake process?
13      A.    No.  The intake screen is based
14  off of questions.  Anything outside of that, if
15  something was uploaded into his document, I
16  can't see that.
17      Q.    Did you ever have access to
18  patients' electronic medical records when you
19  were in intake?
20      A.    No.  Unless they physically
21  brought a physical paper to give to me.
22      Q.    Did you have any concerns about
23  that?
24          MS. BAKER:  Objection to the
25      form.  You can answer.

Page 78

1    THE WITNESS: Yes.
2  BY MR. GROTE
3    Q.    What was your concern?
4    A.    You want to properly help the
5  person. And if you do not have documentations
6  of the medical history, it can harm that patient.
7    Q.    Did you ever raise this issue
8  with the supervisor?
9    A.    No.
10   Q.    Why not?
11   A.    I just -- I didn't.
12   Q.    Does that mean you're not sure of
13 the reason?
14   MR. WITTEKIND: Object to the
15   form.
16   MS. BAKER: Object to the form.
17   She had given her answer.
18 BY MR. GROTE
19   Q.    Is it also the case that you
20 would not have medical records from, say,
21 another facility at intake?
22   A.    No.
23   Q.    That is, no, you would not have
24 access to those?
25   A.    Unless the prisoner gave me a

Page 79

1  physical paper I would not have access to
2  electronic information.
3    Q.    Is 542 a high glucose level in
4  your opinion?
5    A.    Yes.
6    Q.    And what are the possible medical
7  risks for -- 542, is that considered
8  hyperglycemia?
9    A.    That's considered hyperglycemia.
10   Q.    That's what I said. Maybe it was
11 not clear.
12   What are the medical risks
13 associated with hyperglycemia?
14   A.    As I stated, the symptoms,
15 someone can become confused, dehydrated, blurred
16 vision.
17   Q.    Questions about whether somebody
18 is confused, has high blood pressure, blurred
19 vision, any of the symptoms you said, are those
20 included in the intake questionnaire at CFCF, if
21 you remember?
22   MS. BAKER: Can she look at the
23   documentation if she needs to answer these
24   questions?
25   MR. GROTE: If she doesn't

Page 80

1  remember, then certainly we can do that to
2  refresh her recollection.
3    THE WITNESS: I don't recall.
4    MS. BAKER: Would you need to
5    look at the documentation?
6    THE WITNESS: Yes.
7  BY MR. GROTE
8    Q.    We will get to the intake form in
9  a little bit. In regard to having 542 glucose
10 level, what do you do?
11   A.    I called the provider.
12   Q.    Do you remember who the provider
13 was?
14   A.    Yes.
15   Q.    Who was that?
16   A.    Maureen Gay.
17   Q.    And was she working off site?
18   A.    Yes.
19   Q.    And I think I asked this but I
20 forgot. Do you recall how many times you had to
21 call her to get her on the phone?
22   MR. WITTEKIND: Object to the
23   form.
24   MS. BAKER: I think you did ask
25   already. But go ahead and answer.

Page 81

1    THE WITNESS: I don't recall.
2  BY MR. GROTE
3    Q.    Did you consult the -- let me ask
4  you this. I will bring up a document. Are you
5  familiar with the Clinical Pathways for Diabetes
6  Mellitus? That is YesCare's Clinical Pathway
7  for Diabetes Mellitus?
8    MS. BAKER: Asked and answered.
9    MR. WITTEKIND: Are you asking if
10   he has seen it or is familiar with it?
11   MR. GROTE: Yes. I think I did
12   ask it before. I think she said couldn't
13   recall specifically. And I was going to
14   share the document to see if it refreshed
15   her recollection. So I wanted to put it
16   all in one place in the record.
17   THE WITNESS: I don't recall.
18 BY MR. GROTE
19   Q.    Can you see this document,
20 Ms. Apollon?
21   A.    Yes.
22   Q.    Take a moment to look at this.
23 This is the first page of six. I am just asking
24 if this refreshes your recollection at all?
25   A.    I don't recall seeing this paper.

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 26 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 82

Q.    The Bates number is YesCare3432. That is the first page of the policy begins with YesCare3437.

Was it ever your practice in intake to reference a clinical pathway document in order to determine what course of treatment was to be provided?

A.    No.

Q.    Do you recall your conversation with Maureen Gay from October 28, 2023?

A.    Yes.

Q.    What do you recall about it?

A.    The amount of insulin, the type of insulin, and to check his urine for ketones.

Q.    And do you know if you checked for ketones before or after the call?

A.    I checked for ketones after the call.

Q.    Do you recall if ketones were present?

A.    Yes.

Q.    What did you do then?

A.    Based off of Maureen Gays, she instructed me to provide the prisoner with water, encourage him to drink plenty of water.

Page 83

Q.    Did you contact her -- how many times did you speak to Maureen Gay on October 28, 2023?

MS. BAKER:  At all?  Or with respect to Mr. Jung?

BY MR. GROTE

Q.    With respect to Mr. Jung.

A.    One time.

Q.    Did you ever speak to her after October 28, 2023 with respect to Mr. Jung?

A.    No.

Q.    Did you document what Maureen Gay instructed you to do in the medical record?

A.    In the assessment part of intake.

Q.    Did you document everything that she told you to do?

A.    Yes.

Q.    Did Maureen Gay order you to check on Mr. Jung in two hours?

A.    I don't recall.

Q.    If she did do that, would it have been your practice to write that down?

A.    Yes.  My routine would have been to do a reassessment.

Q.    If the provider ordered you to do

Page 84

the reassessment, would you have done that reassessment?

MS. BAKER:  Objection to the form.  You may answer.

THE WITNESS:  Yes.

MR. GROTE:  Off the record.

(Discussion held off the record.)

BY MR. GROTE

Q.    And if you would have done that assessment, would then it have been documented in the way you described earlier how reassessments were not documented as part of the intake but somewhere else in the medical record?

A.    Yes.

Q.    Did you encounter Mr. Jung at all after that intake assessment?

A.    No.

Q.    And that includes after October 28, 2023.  Any subsequent day you never saw Mr. Jung again?

A.    No.

Q.    Did Maureen Gay order you to fill out a nursing encounter tool for hyperglycemia?

A.    No.

Q.    If she ordered you to, would you

Page 85

have done it?

MR. WITTEKIND:  Objection to form.

THE WITNESS:  Yes.

BY MR. GROTE

Q.    And if she ordered you to do that, would you have documented it?

A.    Document it?  No.  Fill out, yes.

Q.    In the assessment where you wrote down her orders, you would have just said NET order to be filled out?  You just would have filled it out?  Is that your testimony?

MR. WITTEKIND:  Objection to the form.

THE WITNESS:  Yes.  I would have filled it out.  After the intake process you print everything.  You gather all the documents, and bring it to the back to the social worker to file it.

BY MR. GROTE

Q.    Did you work with Maureen Gay often?

A.    Yes.

Q.    And did you have any -- what was it like working with Maureen Gay?

Page 86

A.    She is a beautiful provider.  She is understanding.  She is clear on what she wants.  She is nice and respectful.  She cares about her job.  She is a caring person.

Q.    Does she work off site frequently?  Or was she on site oftentimes?  Did it depend --

A.    My --

Q.    That was my question --

MS. BAKER:  Let him finish.

MR. GROTE:  I was just going to comment if I wasn't clear I can rephrase.  But I think you know what I am getting at hopefully.

MR. WITTEKIND:  Objection.

THE WITNESS:  Do I answer?

MS. BAKER:  Yes.  If you remember.  We just have a lot of people talking over one another.

THE WITNESS:  Yes.  There was times she was physically at the prison.  And a majority of the time she was off site.

BY MR. GROTE

Q.    Do you recall in any situation

Page 87

where she was working on site but she then came to the prison because of a need to see a patient?

A.    I don't recall.

Q.    If Maureen Gay has stated that she ordered you to see Mr. Jung within two hours after intake, do you believe she was being truthful?

MR. WITTEKIND:  Object to the form.

MS. BAKER:  Objection.  And I am instructing her not to answer that question.  She is not the assessor of credibility in this case.  It's inappropriate to ask a witness to assess another witness's credibility.  Do not answer that question.

MR. GROTE:  I will rephrase.

BY MR. GROTE

Q.    Is it true that Maureen Gay ordered you to see Mr. Jung within two hours after the intake assessment?

MR. WITTEKIND:  Objection to form.

MS. BAKER:  I will object to the

Page 88

form of the question.  You may answer the question.  But you are not assessing the credibility of any other witness.

THE WITNESS:  You are asking me if Maureen Gay had ordered me to reassess the patient in two hours, would I have done it?

BY MR. GROTE

Q.    No.  I'm asking was that order given to you?

A.    I don't recall.

Q.    Is it possible it was given to you?

MS. BAKER:  Objection, calls for speculation.

MR. WITTEKIND:  Join.

MS. BAKER:  Do not speculate or guess.  But if you have an answer to that question you may answer.

THE WITNESS:  No.

BY MR. GROTE

Q.    Thank you.  That clarified a previous answer.

At intake how do you provide -- I guess the documentation you fill out as part of

Page 89

the intake screening, is that where any information will be for other medical care staff to know when the patient needs to be seen next?  Is that how continuity of care is established?

A.    Yes.

Q.    Did you ever, while working at intake, call 911 for a patient yourself?

A.    No.

Q.    And if 911 was to be called, that decision would be made by the medical provider?  Is that the case?

A.    Can you repeat the question?

Q.    Certainly.

If 911 was to be called, who would make the call to 911?

A.    I can physically make the call.  But I would still need an order from a provider.

Q.    And if you received order from a provider, would you be the one to make the call typically -- or you said you had not made a call.  So did you ever receive an order to call 911 from a provider?

A.    Not intake.

Q.    I was going to say "at intake."  Thank you.

Page 90

But if you received that order, would it have been -- would you have been the person who made the call to 911 or would somebody else make the actual call?

A.    Just the clarify, to go back, I said not at intake. I didn't make a 911 call. Not in intake. Somewhere else I made the call.

Q.    Right. I thought I understood. But thank you for making that clear.

A.    Okay.

Q.    When you made the 911 call that was not at intake, was that because the provider had given an order to make the 911 call?

A.    Yes.

Q.    Did you have the authority to make a 911 call without an order from a provider at intake?

A.    We would use our judgment. The provider was there at the time of an emergency. And we were given the order to call 911.

Q.    Was there ever instances at PDP when you worked there where a diabetic patient was sent to the emergency room with hyperglycemia that you recall?

A.    I don't recall.

Page 91

Q.    Was there a diabetes chronic care clinic at PDP?

A.    I don't recall.

MR. GROTE:  Let's take a quick break.

(Discussion held off the record.)

BY MR. GROTE

Q.    I will share my screen again. Do you see this document?

A.    Yes.

Q.    So right here, is this the progress note pertaining to Mr. Jung from 10/28/2023 that you reviewed prior to the deposition.

A.    Yes.

MS. BAKER:  In all fairness, what we are seeing is a portion of one of the pages of the intake.

MR. GROTE:  Yes. I will go through a number of them. But I will state the Bates stamp for the range at the outset here.

BY MR. GROTE

Q.    This is Bates number PDP18 a lot of zeroes and 18 through PDP 25. For the

Page 92

record, this document has been produced and reproduced from different parties. So it also appears in our discovery with different Bates numbers at times.

MS. BAKER:  Since my understanding is you are now about to ask a series of questions pertaining to this document, I have a hard copy of the document that I would put in front of the witness in case she is more comfortable using the hard copy.

So I will hand that to her at this time. It's not marked up in any way. It was simply printed. And the Bates numbers, which you just referenced, the Bates numbers of the hard copy that I am about to put in front of her are Jung City Production 000405 through 409 for the record.

MR. GROTE:  Yes. Thank you. I think the City has produced this twice.

BY MR. GROTE

Q.    If you look at the first page there, under General Examination it says, Intake orders requested. It has type 1 diabetes, blood

Page 93

sugar is 542. About the type 1 diabetes, do you recall who determined he had type 1 diabetes?

A.    I believe it was based off of his answers that I asked of him. How long had he had diabetes, those questions we determined that he had it at birth.

Q.    Would those questions be documented in this progress note?

A.    There may been a question. But I don't recall. I don't recall.

Q.    This progress note right here says, Provider, Maureen Gay, nurse practitioner. Who filled out this progress note? Did you filled it out? Did you do part of it? Ms. Gay did part of it? Can you explain that to me?

MR. WITTEKIND:  Objection to the form.

MS. BAKER:  It's a little bit compound. Can you break it down?

BY MR. GROTE

Q.    Under the Subjective part on this page, we are looking at the front page, who fill that part of the form out or the document out?

A.    The top portion seems like it could have been Maureen Gay that filled it out.

Page 94

Q.   You said "seems like." Do you know who filled that out?

A.   The only other person who had access is Maureen Gay.

MS. BAKER:  Hang on a second. Can you scroll to the end of this document that you are looking at and show us the signature?  Okay.

BY MR. GROTE

Q.   On page 2 it says, Electronically signed by Maureen Gay.  Does that mean that she completed these first two pages here with her signature on the bottom?

A.   Yes.  I don't have that in front of me.  So that is not my document.  I didn't sign that.

MS. BAKER:  I thought what you were about to get into was the intake documentation that nurse Apollon had created.  And we maybe had a misunderstanding as to what it was you were going to put up for her or ask her about.

BY MR. GROTE

Q.   I'm just not to that.  Yes.  I can scroll down to where I think is the

Page 95

telephone encounter.  The one that says, Electronically signed by Maureen Gay, that indicates that she was the one who generated these progress notes; is that correct?

A.   Yes.

MR. WITTEKIND:  Object to the form.

THE WITNESS:  Yes.

BY MR. GROTE

Q.   And do you have any independent recollection of how it was determined Mr. Jung has type 1 diabetes?

MS. BAKER:  By whom?

BY MR. GROTE

Q.   Yes.  Do you have any independent recollection of whether you knew Mr. Jung had type 1 diabetes?

A.   Based off what the intake questions were saying, the answers to the intake questions.

Q.   Now, at intake -- would the medical provider -- would Maureen have had access to patients' electronic medical records --

A.   Yes.

Page 96

Q.   -- when you would call her?

A.   Yes.

MS. BAKER:  You have to let him finish.  Wait until the question is asked. And make sure he is done.  And then provide your response.

Okay?

THE WITNESS:  Yes.

BY MR. GROTE

Q.   Would Maureen Gay have had access to Mr. Jung's electronic medical record?

MR. WITTEKIND:  When?

BY MR. GROTE

Q.   During intake when you had called her?

MR. WITTEKIND:  Objection to the form.

MS. BAKER:  You can answer.

THE WITNESS:  Yes.

BY MR. GROTE

Q.   Now, are you familiar with this page here, Ms. Apollon?

A.   No.

Q.   Have you ever seen a document similar to this around about a telephone

Page 97

encounter?

A.   No.

Q.   And it says, Provider, Maureen Gay.  Did you create this document?

A.   No.

Q.   Now, it says there is a telephone encounter at 10:02 a.m., October 28, 2023.  Does that seem to be consistent with your recollection of when you were working on October 28, 2023?

A.   Yes.

Q.   The next page I am showing is the progress note that begins with our Bates stamp PDP 2021.  Are you familiar with this document?

A.   Yes.

Q.   Is this the one that you filled out?

A.   Yes.

Q.   Now, at the bottom of this page it says, "Do you have diabetes?"  And the answer is, "No."

Do you recall why the answer is no?

A.   It's subjective information. It's information I received based off of what

Deposition of Mariesha Apollon

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 98

1  the prisoner told me.

2  Q.    If a prisoner provides -- if you

3  had information that contradicts what a prisoner

4  provides you, how are you supposed to address

5  that contradiction on the intake form?

6  A.    Can you rephrase the question?

7  Q.    If you actually knew that

8  Mr. Jung had diabetes, would you still write

9  "no" because he answered "no"?

10  MS. BAKER:  In the Subjective

11  section you mean would she write "no"?

12  MR. GROTE:  Yes.

13  MS. BAKER:  Would you write "no"

14  in a Subjective even if you knew the

15  patient had diabetes?

16  THE WITNESS:  No.

17  BY MR. GROTE

18  Q.    Would you write "yes" because he

19  had diabetes?

20  A.    Can you rephrase the question?

21  Q.    Yes.  In the Subjective section

22  if a patient tells you that they do not have

23  diabetes but you had other information

24  indicating they did have diabetes, what would

25  you answer on the form?

Page 99

1  A.    Other information referring to

2  what?  Like what?  What other information?  I

3  didn't have access to his records.

4  Q.    What about if the pre-intake

5  screening said that he had diabetes?

6  A.    I am not clear on the question.

7  Q.    If you knew that a patient was

8  giving you inaccurate information in response to

9  one of these questions, how would you address

10  that?

11  A.    You can simply ask again in a

12  different way.

13  Q.    So you would try to get the

14  patient to acknowledge the accurate information?

15  A.    Yes.

16  Q.    And you said you have a

17  recollection of Mr. Jung telling you he did not

18  have diabetes?

19  A.    Yes.

20  Q.    Did you have a recollection of

21  him answering any of the other questions about

22  his medical conditions?

23  MS. BAKER:  Objection, asked and

24  answered.  You may answer again.

25  THE WITNESS:  Can you ask the

Page 100

1  question again?

2  BY MR. GROTE

3  Q.    Do you have any independent

4  recollection of his answers to any questions

5  about other medical conditions?

6  A.    I don't.

7  Q.    Why do you remember his answer --

8  why do you think you remember his answer to the

9  question about diabetes?

10  A.    Because I had to call the

11  provider to administer insulin.

12  Q.    On the next page, so it's still

13  under the Subjective section.  The question, Are

14  you currently taking medications prescribed for

15  any medical condition, included those for

16  HIV/AIDS, diabetes, et cetera?  And the answer

17  is, No.

18  Do you recall asking Mr. Jung

19  this question?

20  A.    Yes.

21  Q.    Do you recall him answering "no"?

22  A.    Yes.

23  Q.    What is the difference between

24  the pre-intake screening and the intake

25  screening?

Page 101

1  A.    Just different questions.

2  Q.    When is the pre-intake screening

3  in relationship to the intake screening?  Is it

4  right before?

5  A.    Yes.

6  Q.    And do you review the answers to

7  the pre-intake screening before the intake

8  screening?

9  A.    Yes.

10  Q.    And did you do that in every

11  case?

12  A.    Yes.

13  Q.    So I will go down to -- this is

14  all still under Subjective.  And we are on to

15  the third page.  You see how it says, Pre-intake

16  screening up here?  And there is a number of

17  questions beneath.  And one of them is, "Is the

18  patient diabetic?"  And it says, "Yes."

19  Do you recall who took the

20  pre-intake screening of Mr. Jung?

21  A.    That's the medical system PAR.

22  Q.    So you did not take the

23  pre-intake screening, correct?

24  A.    No.  Medical assistant.

25  Q.    When it says, If yes, did you

Page 102

1 complete an Accu-Chek, it was the medical
2 assistant who completed the Accu-Chek?
3      A.    I don't have that in front of me.
4 But, yes, it was her that completed the
5 Accu-Chek.
6      Q.    Did you speak with the medical
7 assistant about Mr. Jung at all?
8      A.    She spoke to me.
9      Q.    Do you remember what she told
10 you?
11      A.    His blood sugar is 542.
12      Q.    Do you remember anything else?
13      A.    No.
14      Q.    After you spoke with Mr. Jung,
15 did you talk to the medical assistant again
16 about Mr. Jung?
17      A.    No.
18      Q.    Now, at the bottom of this page
19 it says, Mariesha -- am I pronouncing your name
20 correctly?  Is it Mariesha Apollon?
21      A.    Yes.
22      Q.    So that means you filled out the
23 whole progress note here?
24      A.    Yes.
25           MS. BAKER:  Object to the form.

Page 103

1 BY MR. GROTE
2      Q.    Then on the Assessment part here,
3 what is AAOX3.  What does that mean?
4      A.    Alert and oriented times 3.
5      Q.    It says, "States he has type 1
6 diabetes"?
7      A.    Yes.
8      Q.    Do you have any explanation for
9 why the assessment says what it says there,
10 states he has type 1 diabetes, and the answer on
11 the form that he said, no, he does not have
12 diabetes?
13           MS. BAKER:  Objection to the
14      form.  You can answer.
15           THE WITNESS:  After some time he
16      did start to reveal some stuff in the
17      intake process.
18 BY MR. GROTE
19      Q.    And did he reveal that he had
20 type 1 diabetes?
21      A.    Yes.
22      Q.    Why didn't you change the answer
23 to the question about whether or not he had
24 diabetes then?
25      A.    I don't believe I had access to

Page 104

1 it.  I don't believe I could have went back.
2 I'm not sure.  I don't recall.
3      Q.    It says, Blood sugar is 542.
4 States he had not got insulin in three days.
5           Did he tell you that he was
6 prescribed insulin?
7      A.    It says he had not gotten
8 insulin.  So, yes.
9      Q.    This is page 22 on mine.  I think
10 it's page 2 of the progress note that you have.
11 The question, Is the patient a transfer back
12 into custody from Norristown Hospital?  And it
13 says, No.
14           Would that have been based on
15 what Mr. Jung told you?
16      A.    Yes.
17      Q.    Did you have any way of verifying
18 where the inmates came from in intake?
19      A.    No.
20      Q.    Did anybody who was an employee
21 of the Philadelphia Department of Prisons ever
22 speak to you about Mr. Jung after his death?
23      A.    Yes.
24      Q.    Who was that?
25      A.    Marsha.

Page 105

1      Q.    Do you know Marsha's last name?
2      A.    No.
3      Q.    Do you know if she is a
4 Philadelphia Department of Prisons employee or a
5 YesCare employee?
6      A.    She was definitely a YesCare
7 employee.
8      Q.    And does the name Jeoboham
9 refresh your recollection?
10      A.    Yes.  That is the last name.
11      Q.    When did she speak to you about
12 Mr. Jung?
13      A.    The day that he had died.
14      Q.    What do you recall of your
15 conversation with Marsha?
16      A.    I got there at 3:30, 3:00 for my
17 shift.  And she said, Mr. Jung has died.  And I
18 said, What happened?  She said his blood sugar
19 was too high.  It's not your fault he was
20 noncompliant.
21      Q.    What was your response to that?
22      A.    I said, Okay.
23      Q.    Did she say anything else?
24      A.    No.
25      Q.    Did anybody else, a PDP employee

Page 106

or a YesCare employee, anybody else who you
worked with in the jails, ever speak to you
again about Mr. Jung's death?

A.    I recall calling Maureen Gay to
tell her about another prisoner.  And she said
that I didn't call her back to follow up with
Mr. Jung.

Q.    Do you remember when that call
was?

A.    I don't recall.

Q.    Was that when you still were
working within PDP because you were calling
about another prisoner?

A.    Can you rephrase that?

Q.    Yes.  That wasn't clear.
But that was when you were still
working at PDP when you spoke to Ms. Gay again?

A.    Yes, yes.

Q.    When she said that to you, how
did you respond?

A.    I just -- I was speechless
because I really didn't -- I don't recall her
asking me to call her back for that.

Q.    What did you say to her?

MS. BAKER:  She just said she was

Page 107

speechless.
BY MR. GROTE

Q.    Well, I assume at some point on
the call you recovered your powers of speech and
you didn't just hang up.  Maybe not.  But did
you ever recover your power of speech and
respond verbally to what she said?

A.    No.  I was really speechless.  I
was shocked that he had died.  I didn't have a
response.

Q.    Do you recall any other
conversations about Mr. Jung that you had after
his death in addition to the ones you just told
us about?

A.    No.

Q.    Were you ever part of a mortality
review?

A.    Can rephrase the question?

Q.    Were you ever a part of any
formal inquiry into Mr. Jung's death carried out
by YesCare?

A.    No.

Q.    Were you ever a part of any
formal inquiry into Mr. Jung's death carried out
by the Philadelphia Department of Prisons?

Page 108

A.    No.

Q.    Are you familiar with the term
intermetex?

A.    No.

Q.    So you're not sure what an
intermetex is?  I-N-T-E-R-M-E-T-E-X?  You are
not sure what that is?

A.    No.

Q.    Have you come to learn any
information about what happened to Mr. Jung
between intake and the date of his death?

MS. BAKER:  I will allow her to
answer this question with the caveat that
if the information that she has heard is
through counsel she is not to disclose.  So
the question should really be, Have you
learned from any source other than your
attorneys about anything that happened to
Mr. Jung between the time you saw him in
intake and his death?

MR. GROTE:  Yes.  Thank you.
BY MR. GROTE

Q.    So the question what your counsel
rephrased, have you learned anything other than
from your attorneys about what happened between

Page 109

intake and Mr. Jung's death to Mr. Jung?

A.    No.

Q.    Looking back, if you had to
conduct the intake of Mr. Jung again today,
would you have done anything differently?

MS. BAKER:  So I will instruct
her not answer to that question as phrased.
She is not expert in this case.  And asking
her to judge her conduct retrospectively I
don't think is appropriate.  I am certainly
willing to consider if you rephrase.
BY MR. GROTE

Q.    Do you think there is other steps
that you should have taken in Mr. Jung's intake
that were not taken?

MR. WITTEKIND:  Object to the
form.

MS. BAKER:  I will object to the
form of the question.  And -- I am sorry.
Is somebody else making --

MR. WITTEKIND:  I will join your
objection.

THE WITNESS:  So now I lost the
question.  Can you restate it, please?

Page 110

BY MR. GROTE
    Q.   Do you think there is anything
else that you should have done during Mr. Jung's
intake that was not done?
        MS. BAKER:  Objection to the form
    of the question.  You may answer that
    limited question only.
        THE WITNESS:  No.  I believe I
    did what I could have done within the
    prison, provided him with the insulin, the
    water, call the doctor.
        MR. GROTE:  If you can give me --
    I am probably going to be two minutes or
    less.
        (Discussion held off the record.)
        MR. GROTE:  I have no further
    questions.
                - - -
            EXAMINATION
                - - -
BY MR. WITTEKIND
    Q.   I have a couple.  Are you okay to
go on a few minutes, ma'am?
    A.   Yes.
    Q.   My name is Ray Wittekind.  I

Page 111

represent YesCare and a couple of the other
defendants in this lawsuit.  I have a couple
questions for you that will be brief.
    If I covered -- I will try to
avoid covering stuff that Bret asked you about.
But if I do, it's just because of the way things
go.
    A.   Okay.
    Q.   When we first started way back
this morning, you said you were recruited by a
company called Tekaccel?
    A.   Yes.
    Q.   And they were a recruiter?
    A.   Yes.  Recruiter agency.
    Q.   Did they tell you who they were
recruiting for relative to the job at PDP?
    A.   No.
    Q.   Have you ever heard -- before
they reached out to you, did you ever hear of
that company?
    A.   No.
    Q.   I will skip around a little bit.
I will try to be as efficient as I can.  I
believe you testified before that you don't have
a recollection one way or the other if Maureen

Page 112

Gay had asked you to do a two-hour reassessment
on Mr. Jung?
    A.   Yes.  I don't recall that.
    Q.   I don't have a document in front
of me.  But one of the documents that Attorney
Grote showed you, your intake notes, indicated
that Mr. Jung told you that he had not received
insulin for three days.
        Do you recall seeing that note a
few minutes ago?
    A.   Yes.
    Q.   Did he ever tell you why he had
not gotten insulin over the three-day period
before the intake session?
    A.   No.  He didn't tell me.
    Q.   Did he ever tell you that he had
a history of being noncompliant for his insulin
protocol?
    A.   No, he didn't tell me that.
    Q.   I will call her Megan.  You told
us she spoke to you on the date of his death,
correct?
        MS. BAKER:  I am sorry.  I don't
    think it was Megan.  I think she said
    Marsha.

Page 113

BY MR. WITTEKIND
    Q.   Marsha?
    A.   Yes.
    Q.   You told us before that she spoke
to you on the day Mr. Jung died?
    A.   Yes.
    Q.   And she told you that he was
noncompliant, correct?
    A.   Yes.
    Q.   What was your understanding as to
that?  Did you have an understanding as to what
he was noncompliant with?
        MR. GROTE:  Objection, calls for
    speculation of what Marsha meant by
    noncompliant.
        MS. BAKER:  Without speculating,
    if you have an understanding as a result of
    speaking with Marsha as to what she meant
    by noncompliant then you may testify to
    that.  But do not speculate or guess.
    Okay?
        THE WITNESS:  She was referring
    to him not being compliant with him taking
    his insulin.

Page 114

1  BY MR. WITTEKIND
2      Q.    Earlier or -- we looked at some
3  progress notes that Attorney Grote showed you.
4  And I wrote it down here.  It appears he was
5  diagnosed or was told to get 12 units of insulin
6  I believe -- hold on.
7          When you spoke to Marsha Gay on
8  the date of the intake session, was she the
9  person who would prescribe the insulin
10 medication for Mr. Jung or could you do that on
11 your own?
12     MS. BAKER:  Do you mean Maureen
13     Gay?
14 BY MR. WITTEKIND
15     Q.    Yes.  I am sorry.
16     A.    No.  I cannot just administer the
17 insulin.  I have to get a verbal order from the
18 provider.
19     Q.    And when you got that order from
20 Ms. Gay, did you give Mr. Jung the medication
21 that was ordered?
22     A.    Yes.
23     Q.    Did Mr. Jung take that willingly
24 to your knowledge?
25     A.    Yes.

Page 115

1      Q.    When you administered the
2  medication to Mr. Jung or gave him medication,
3  did you think that was the appropriate amount of
4  insulin to give him?
5      MS. BAKER:  Objection to the
6      form.  I will instruct her not to answer
7      that question.
8  BY MR. WITTEKIND
9      Q.    I will come back to that.
10 Earlier you said you had reached out to a
11 YesCare employee by the name of Smith regarding
12 training on the refusal of medication issue,
13 correct?  Do you recall that testimony?
14     A.    I think it was more towards the
15 refusal of medication and how to follow up after
16 that.
17     Q.    You indicated that you thought
18 she was a health care administrator.  Do you
19 know exactly what her title was at that time?
20     A.    Yes.  She was director of
21 administration.
22     Q.    Did you speak to anyone else at
23 YesCare about your concern over following up
24 with inmates who refused to take medication?
25     A.    No.

Page 116

1      Q.    After October 28th up until the
2  date of his death, did you have any discussions
3  with anyone from PDP such as correctional
4  officers or other people that worked for PDP
5  regarding Mr. Jung?
6      A.    No.
7      Q.    Again, same question, a little
8  different:  After October 28th and before
9  Mr. Jung died, and excluding calls you had with
10 Ms. Gay, did you have any discussions with
11 anyone affiliated with the YesCare regarding
12 Mr. Jung?
13     A.    Can you rephrase?
14     Q.    Yes.  Putting aside any
15 communications you had with Maureen Gay about
16 Mr. Jung, did you talk to anyone else at YesCare
17 about him from October 28th until the date of
18 his death?
19     A.    No.
20     MR. WITTEKIND:  I think that is
21     all I have.
22     MS. THOMAS:  I have a couple
23     questions.
24         - - -
25     EXAMINATION

Page 117

1          - - -
2  BY MS. THOMAS
3      Q.    Good afternoon.  My name is
4  Summer Thomas.  I am here on behalf of Career
5  Staff Unlimited.  Earlier you testified that you
6  never heard of Career Staffing.  Do you have any
7  familiarity with the company Career Staff
8  Unlimited?
9      A.    No.  I don't recall.
10     Q.    And the company Tekaccel, were
11 they listed on your 2023 tax returns?
12     A.    Yes.
13     MS. THOMAS:  Those are all the
14     questions from me.  Thank you.
15         - - -
16     EXAMINATION
17         - - -
18 BY MS. BAKER
19     Q.    Going back to the intake
20 paperwork that you completed on Mr. Jung in
21 October 28, 2023.  At the time you did his
22 intake evaluation, did you have vital signs
23 available to you?
24     A.    Yes.
25     Q.    Were those vital signs taken

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 35 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 118

1  while he was in the intake area?
2      A.    Yes.
3      Q.    Were they taken by the medical
4  assistant?
5      A.    Yes.
6      Q.    Did those vital signs include
7  blood pressure?
8      A.    Yes.
9      Q.    Body temperature?
10     A.    Yes.
11     Q.    Respiration rate?
12     A.    Yes.
13     Q.    Those types of -- the normal
14  types of vital signs you expect as a nurse to
15  have when you are evaluating a patient, correct?
16     A.    Yes.
17     Q.    Were any of the vital signs that
18  you had, such as his blood pressure, respiratory
19  rate or his oxygen saturation, outside of the
20  range of normal limits?
21     A.    No.
22     Q.    Do you recall -- or I will refer
23  you to the documentation.  What was his body
24  temperature documented as?
25     A.    97.0 Fahrenheit.

Page 119

1      Q.    Other than -- I believe it was
2  BMI and a body temperature of 97, were any of
3  the other vital signs indicated to be outside of
4  normal limits?
5      A.    No.
6      Q.    Mr. Grote asked you earlier in
7  the deposition what the AAOX3 abbreviation was.
8  And I think you said, Awake, alert and oriented
9  times 3.
10         Do you recall that testimony?
11     A.    Yes.
12     Q.    What does that indicate to you as
13  a nurse about the patient's mental status at the
14  time that you were evaluating him?
15         MR. GROTE:  Objection.  That
16     calls for testimony outside -- pertaining
17     to his mental health or psychiatric
18     conditions potentially.  And I want to make
19     sure that her testimony is not going to the
20     matters that she is not qualified to speak
21     on.
22         MS. BAKER:  That is actually not
23     what I'm asking her.  When I say "mental
24     status," I don't mean illness.  I don't
25     mean -- I am not asking her for a

Page 120

1  diagnosis.  That is why I phrased the
2  question the way I did in asking her as a
3  nurse what it means as far as mental status
4  is concerned.  Meaning is he compos mentis,
5  is he -- what does that awake, alert and
6  oriented times 3 mean.
7          So I'm not asking her for an
8  evaluation of his mental health -- if that
9  helps you in any way.
10  BY MS. BAKER
11     Q.    When a nurse, such as you,
12  documents, Awake, alert and oriented times 3,
13  what are they oriented to?
14     A.    The name, place, time, year,
15  month.
16     Q.    And does your note indicate that
17  he was oriented to those things?
18     A.    Yes.
19     Q.    Does the assessment note that you
20  wrote, or any other part of your note that you
21  wrote at intake, indicate that Mr. Jung had an
22  altered mental status at the time that you spoke
23  with him?
24     A.    No.
25     Q.    Or examined him?

Page 121

1      A.    No.
2      Q.    You gave some testimony earlier
3  in the deposition and were asked some follow-up
4  questions about that time where you asked for
5  additional training in response to the
6  disciplinary action that was taken.  I want to
7  ask you a couple questions about that.
8          Okay?
9      A.    Okay.
10     Q.    Is it accurate, based on the
11  testimony you've given today during this
12  deposition, that the inmate or patient that was
13  involved in that disciplinary action was not
14  Mr. Jung?
15     A.    Yes, it was not.
16     Q.    Was that patient even a patient
17  who you saw at intake?
18     A.    I don't recall.
19     Q.    Well, the disciplinary action was
20  for the Med Pass side of things as opposed to
21  your care in intake, correct?
22     A.    Yes.
23     Q.    Is it, therefore, accurate to say
24  that during the approximately six months that
25  you worked within the prison system, you

Page 122

1 received no disciplinary action whatsoever for
2 any of the care that you provided to any inmate
3 or patient at intake?
4     A.    Correct.
5     Q.    And this seems
6 self-explanatory -- and Mr. Wittekind touched on
7 this just a moment ago -- but back to your
8 assessment portion of your intake note.  Does
9 your intake note document that you administered
10 medication to Mr. Jung?
11     A.    Yes.
12     Q.    Does your intake note document
13 that Mr. Jung refused the medication that you
14 provided to him?
15     A.    No.
16     Q.    So, therefore, is it correct to
17 say that your interaction with Mr. Jung on
18 October 28, 2023 did not involve an inmate or
19 patient refusing the care you were attempting to
20 provide?
21     A.    Correct.
22     Q.    Give me one second here.
23         You were asked some questions
24 about doing reassessments on patients.  Let me
25 ask you, once a patient is removed from the

Page 123

1 intake area, either by corrections staff or
2 other staff at the prison, and you remain in
3 intake, do you, as the intake nurse, have the
4 opportunity to conduct a reassessment on that
5 patient?  Or does the reassessment have to be
6 done by another nurse in a different area?
7     A.    No.  It has be done by another
8 nurse in a different area.
9         MS. BAKER:  I think that's all
10 the questions that I have.  Thank you.
11 Jared, we are going to read and sign.
12         THE COURT REPORTER:  I just want
13 to get orders before we log off.  Summer?
14         MS. THOMAS:  Can I have an
15 electronic copy?  Can I get it sent to
16 someone else?
17         THE COURT REPORTER:  Yes.  The
18 same as last time?
19         MS. THOMAS:  Yes.
20         THE COURT REPORTER:  Alex?
21         MS. THOMAS:  Yes.
22         THE COURT REPORTER:  Emily?
23         MS. HOFF:  Digital mini is good
24 for us.  And if you want to send it to
25 Mike, if that is easier.

Page 124

1         THE COURT REPORTER:  Ray, copy?
2         MR. WITTEKIND:  Electronic mini
3 and full to me and Tom.
4         (Witness excused.)
5         (Deposition concluded at 1:08
6 p.m.)

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 37 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1

2                    C E R T I F I C A T I O N

3

4

5              I, JARED CAREY, Court Reporter,

6    certify that the foregoing is a true and

7    accurate transcript of the foregoing deposition,

8    that the witness was first sworn by me at the

9    time, place and on the date herein before set

10   forth.

11              I further certify that I am neither

12   attorney nor counsel for, not related to nor

13   employed by any of the parties to the action in

14   which this deposition was taken; further, that I

15   am not a relative or employee of any attorney or

16   counsel employed in this case, nor am I

17   financially interested in this action.

18

19

20

21   _____

     Jared Carey
22   Court Reporter
     and Notary Public
23   Date: November 18, 2025

24

25

1

2                    DEPOSITION ERRATA SHEET

3

4    JUNG

5       vs.

6    CITY OF PHILADELPHIA, et al.

7            DECLARATION UNDER PENALTY OF PERJURY

8       I declare under penalty of perjury

9       that I have read the entire transcript of

10      my Deposition taken in the captioned matter

11      or the same has been read to me, and

12      the same is true and accurate, save and

13      except for changes and/or corrections, if

14      any, as indicated by me on the DEPOSITION

15      ERRATA SHEET hereof, with the understanding

16      that I offer these changes as if still under

17      oath.

18            Signed on the _____ day of

19            _____, 20____.

20

21   _____

22                  MARIESHA APOLLON

23

24

25

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change To:_____

_____

Reason for Change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

1

2                    DEPOSITION ERRATA SHEET

3      Page No._____Line No._____Change To:_____

4      _____

5      Reason for Change:_____

6      Page No._____Line No._____Change to:_____

7      _____

8      Reason for change:_____

9      Page No._____Line No._____Change to:_____

10     _____

11     Reason for change:_____

12     Page No._____Line No._____Change to:_____

13     _____

14     Reason for change:_____

15     Page No._____Line No._____Change to:_____

16     _____

17     Reason for change:_____

18     Page No._____Line No._____Change to:_____

19     _____

20     Reason for change:_____

21     Page No._____Line No._____Change to:_____

22     _____

23     Reason for change:_____

24

25     SIGNATURE:_____DATE:_____

## WORD INDEX

**< $ >**
**$64**  24:*13*

**< 0 >**
**000405**  92:*18*

**< 1 >**
**1**  25:*16, 17, 20*  26:*3,*
*5*  31:*14, 18, 19*  92:*25*
*93:1, 2*  95:*12, 17*
*103:5, 10, 20*
**1:08**  124:*5*
**10**  32:*21*
**10/28/2023**  91:*13*
**10:02**  97:*7*
**10:04**  1:*15*
**100**  3:*6*
**11:00**  25:*6, 8*  41:*17*
*42:21*
**110**  4:*5*  18:*10*  35:*24*
**117**  4:*6, 7*
**12**  32:*21*  114:*5*
**12th**  2:*3*
**13-week**  27:*21, 22*
**150**  33:*7, 22*
**1515**  2:*14*
**15th**  2:*14*  3:*6*
**16**  42:*10*
**1717**  2:*19*
**18**  28:*13*  91:*25*
*125:23*
**1801**  2:*9*
**19102**  3:*6*
**19103**  2:*9, 14, 20*
**19123**  2:*4*
**1st**  54:*8*

**< 2 >**
**2**  25:*23*  26:*3, 4*
*31:24*  94:*10*  104:*10*
**2:24-cv-05618-TJS**
*1:8*
**20**  126:*19*
**200**  35:*17*
**2008**  11:*8*
**2011**  11:*4*
**2012**  12:*18*

**2016**  11:*5*
**2019**  12:*18, 22, 25*
**2020**  12:*23*
**2021**  16:*5*  97:*14*
**2023**  9:*24*  19:*12, 18*
*25:2*  42:*14*  43:*3*
*63:17*  76:*11*  82:*10*
*83:3, 10*  84:*19*  97:*7,*
*10*  117:*11, 21*  122:*18*
**2024**  28:*7*  54:*9*
**2025**  1:*10*  125:*23*
**215.561.2300**  2:*20*
**215.564.0400**  3:*7*
**215.569.4433**  2:*10*
**215.683.5000**  2:*15*
**22**  104:*9*
**23-hour**  72:*6*
**25**  91:*25*
**26**  27:*11, 24*
**28**  9:*24*  42:*14*  63:*17*
*76:11*  82:*10*  83:*3, 10*
*84:19*  97:*7, 10*
*117:21*  122:*18*
**28th**  116:*1, 8, 17*

**< 3 >**
**3**  103:*4*  119:*9*  120:*6,*
*12*
**3:00**  25:*6, 8*  41:*16*
*42:18, 21*  105:*16*
**3:30**  105:*16*
**30**  37:*6, 8*  58:*11*
*73:16*  75:*10*
**300**  34:*2*
**350**  34:*2*

**< 4 >**
**4**  47:*4*
**400**  33:*11*  34:*21*
*35:1*
**409**  92:*18*
**412.654.9070**  2:*4*
**46484**  1:*23*

**< 5 >**
**5**  1:*10*  48:*7*  53:*7*
**500**  34:*3*  66:*7*
**542**  77:*5*  79:*3, 7*
*80:9*  93:*1*  102:*11*

**104**:*3*

**< 6 >**
**6**  4:*4*
**610**  2:*19*
**631**  2:*3*
**6th**  28:*14*

**< 7 >**
**7:00**  42:*18*
**70**  18:*10*  35:*24*

**< 8 >**
**8:00**  42:*18*
**8-hour**  42:*6*

**< 9 >**
**911**  70:*12*  89:*7, 9, 14,*
*15, 22*  90:*3, 6, 11, 13,*
*16, 20*
**97**  119:*2*
**97.0**  118:*25*

**< A >**
**a.m**  1:*15*  97:*7*
**AAOX3**  103:*3*  119:*7*
**abbreviation**  119:*7*
**ability**  41:*3*
**able**  13:*11*  39:*6*
*43:18*
**abnormal**  18:*13*
**ABOLITIONIST**  2:*2*
**abrasion**  67:*21*
**abusing**  76:*25*
**access**  37:*1, 2, 4*  77:*9,*
*10, 17*  78:*24*  79:*1*
*94:4*  95:*23*  96:*10*
*99:3*  103:*25*
**Accu-Chek**  102:*1, 2, 5*
**accurate**  14:*1*  39:*15*
*53:4*  54:*10*  55:*23*
*64:2*  99:*14*  121:*10,*
*23*  125:*7*  126:*12*
**acknowledge**  99:*14*
**action**  60:*13*  121:*6,*
*13, 19*  122:*1*  125:*13,*
*17*
**actual**  90:*4*
**addition**  31:*18, 25*
*107:13*

**additional**  42:*1*
*44:16*  45:*11*  53:*13*
*54:16*  55:*11, 14*  64:*4*
*121:5*
**address**  98:*4*  99:*9*
**administer**  19:*5*
*35:22*  36:*24*  44:*23*
*50:21*  52:*9, 14*  66:*11*
*100:11*  114:*16*
**administered**  33:*23*
*115:1*  122:*9*
**administering**  37:*7*
*50:14*
**administration**  48:*9*
*115:21*
**administrator**  55:*6, 8*
*115:18*
**Administrators**  1:*4*
**admissible**  22:*24*
**admission**  72:*9*
**advising**  37:*8*
**affiliated**  116:*11*
**afternoon**  117:*3*
**agency**  19:*23*  111:*14*
**ago**  7:*6, 7*  11:*18*
*112:10*  122:*7*
**agree**  39:*24*
**agreed**  20:*18*  25:*3*
**agreement**  20:*25*
**ahead**  44:*5*  49:*14*
*52:2*  56:*19*  80:*25*
**aide**  11:*23*  12:*4, 6, 14*
**aide/medical**  10:*17*
**al**  1:*7*  126:*6*
**alcohol**  58:*2*
**alert**  61:*17*  63:*6*
*103:4*  119:*8*  120:*5,*
*12*
**alerting**  54:*19*
**Alex**  123:*20*
**allow**  24:*5, 7*  33:*5*
*108:12*
**altered**  120:*22*
**amount**  32:*11*  34:*21*
*40:8*  50:*20*  82:*13*
*115:3*
**amounts**  23:*13*
**and/or**  126:*13*
**Answer**  5:*5*  7:*23*
*8:2, 6*  9:*11, 13, 17*

14:8  21:11, 25  22:18
23:23  24:5, 9  33:15
34:12, 14  38:19  44:5
46:10  47:10  48:15
52:2  53:6  55:13, 21
56:8, 19  58:19  61:6
64:7  73:1  77:25
78:17  79:23  80:25
84:4  86:16  87:12, 17
88:1, 18, 19, 23  96:18
97:20, 22  98:25
99:24  100:7, 8, 16
103:10, 14, 22  108:13
109:7  110:6  115:6
**answered**  81:8  98:9
99:24
**answering**  40:6
46:16  53:7, 13  60:8
99:21  100:21
**answers**  7:15, 20
46:19  93:4  95:19
100:4  101:6
**anybody**  104:20
105:25  106:1
**anybody's**  77:11
**APOLLON**  1:13
2:10  4:3  6:2, 9, 18
9:21  47:1, 8  81:20
94:19  96:22  102:20
126:22
**A-P-O-L-L-O-N**  6:19
**Apollon's**  47:7
**APPEARANCES**  2:1
3:3
**Appearing**  2:5, 11, 16,
21  3:8
**appears**  92:3  114:4
**applicable**  23:5
**application**  20:17
**apply**  24:23
**appropriate**  109:10
115:3
**approximately**  7:5
12:15, 18  27:12
44:18  54:11  73:16
121:24
**Arch**  2:14, 19
**area**  118:1  123:1, 6,
8

**argue**  24:3
**articulated**  24:2
**aside**  73:8  116:14
**asked**  8:6  29:2
57:19  61:23  80:19
81:8  93:4  96:4
99:23  111:5  112:1
119:6  121:3, 4
122:23
**asking**  22:7  29:16
35:4, 5, 8  38:7  40:5
59:18  64:16  75:3
76:14, 15  81:9, 23
88:4, 9  100:18
106:23  109:8  119:23,
25  120:2, 7
**asserted**  22:8
**asserting**  21:14, 16,
20, 24  22:12, 16
**assess**  87:15
**assessing**  15:12  72:2
88:2
**assessment**  52:16, 18,
19, 20, 22  53:2  62:7
66:20  74:13  75:12,
23  83:14  84:10, 16
85:9  87:22  103:2, 9
120:19  122:8
**assessor**  87:13
**assigned**  29:5, 6
50:25
**assist**  13:11
**assistant**  10:16, 17,
24  11:4, 25  12:20
13:2, 8, 13, 22  15:16,
20  51:2, 4, 5, 8  52:4,
12  68:12  101:24
102:2, 7, 15  118:4
**assistants**  13:17
**associated**  51:19
68:18  79:13
**associate's**  13:10
**assume**  8:2  107:3
**assumed**  62:4
**assumption**  62:3
**attempting**  122:19
**Attorney**  2:5, 10, 15,
21  3:7  112:5  114:3
125:12, 15

**attorney/client**  8:24
9:9
**attorneys**  8:21
108:18, 25
**August**  19:18  43:3
54:8, 13
**Austen**  3:12
**authority**  71:3  90:15
**available**  59:7  117:23
**average**  58:5, 6
**avoid**  111:5
**Awake**  119:8  120:5,
12

**< B >**
**Bachelor's**  11:15
**back**  19:14  28:14, 15
29:12  49:15  51:17
56:4, 5  59:14  70:2
74:5  85:18  90:5
104:1, 11  106:6, 23
109:3  111:9  115:9
117:19  122:7
**background**  74:8
**BAKER**  2:8  4:7
8:23  9:6, 12  14:7, 11
20:22  21:5, 16, 21
22:1, 9, 13, 21  24:1
27:15  29:9  30:1
33:14  34:12  35:3
38:6, 19  39:2  40:16
44:3  46:10  50:10
51:24  52:2  56:3, 7,
18  57:3, 8  58:7, 18
60:2  61:7  62:12, 24
64:5, 14  65:23  68:1
73:21  74:16  75:1, 13
77:24  78:16  79:22
80:4, 24  81:8  83:4
84:3  86:10, 17  87:11,
25  88:14, 17  91:16
92:5  93:18  94:5, 17
95:13  96:3, 18  98:10,
13  99:23  102:25
103:13  106:25
108:12  109:6, 18
110:5  112:23  113:16
114:12  115:5  117:18
119:22  120:10  123:9

**based**  20:1  22:18
23:13, 24  32:12, 20,
22  39:13  40:21
52:22  56:21, 22, 25
58:1  62:7  68:3  74:8,
22  75:23  77:13
82:23  93:3  95:18
97:25  104:14  121:10
**basic**  14:4
**basically**  43:13  53:3
**basis**  40:2
**Bates**  65:25  66:3
82:1  91:21, 24  92:3,
14, 16  97:13
**bathing**  12:11
**Bear**  46:15, 21
**bearing**  23:1
**beautiful**  86:1
**becoming**  30:7
**beds**  14:23, 24
**began**  43:5  54:8
**beginning**  12:17  54:3
**begins**  82:2  97:13
**behalf**  117:4
**belated**  28:8
**believe**  13:15, 16
18:4  20:25  41:2
54:5  69:12, 16  75:4
87:7  93:3  103:25
104:1  110:8  111:24
114:6  119:1
**beneath**  101:17
**beyond**  27:24  36:20
**birth**  19:11  28:6, 12
93:6
**bit**  36:9  80:9  93:18
111:22
**Blanche**  2:16
**bleeding**  67:13
**blood**  13:11  14:18
15:2  17:6  19:3
26:12  29:21  30:16
32:12, 16  33:6  34:20
48:21  50:17  66:7
67:21  68:6, 13  77:5
79:18  92:25  102:11
104:3  105:18  118:7,
18
**Bloodsaw**  2:16

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 43 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

blurred  17:*17, 24*
  18:*17*  79:*15, 18*
blurry  30:*8*
BMI  119:2
board  16:*2, 3*  24:22
Body  118:*9, 23*  119:2
book  64:25
born  25:*18*
bottom  94:*13*  97:*19*
  102:*18*
Boulevard  3:*6*
box  69:*17, 20*
break  8:*4, 7*  57:*11*
  91:*5*  93:*19*
breaks  8:*3*
breathing  67:*13*
BRET  2:2  6:*12*
  111:*5*
brief  111:*3*
bring  81:*4*  85:*18*
broader  22:23
broke  12:*21*  13:*5*
Brooklyn  10:*21*  11:2
brought  61:*23*  77:*21*
built  74:7
bunch  57:*19*

< C >
call  19:*8*  35:*11, 17,
  21, 24*  40:7  58:*16, 24*
  59:*23*  60:*6, 10*  66:*9*
  70:*10, 11, 19*  72:*17*
  73:*8*  80:*21*  82:*16, 18*
  89:*7, 15, 16, 19, 21*
  90:*3, 4, 6, 7, 11, 13, 16,
  20*  96:*1*  100:*10*
  106:*6, 8, 23*  107:*4*
  110:*11*  112:*20*
called  19:*24*  20:*4*
  32:*17*  45:*6*  54:22
  66:*13*  67:*6*  72:*6*
  80:*11*  89:*9, 14*  96:*14*
  111:*11*
calling  106:*4, 12*
calls  88:*14*  113:*13*
  116:*9*  119:*16*
capacity  6:*23*
Capella  11:*13*
captioned  126:*10*
carbohydrates  32:*4*

care  12:*10*  13:*14, 20*
  15:*12*  16:*8, 10, 17, 25*
  23:*18*  36:*13, 20*
  38:*17, 23*  40:*1, 24*
  45:*15*  46:7  55:*7, 25*
  58:*15*  89:*2, 4*  91:*1*
  115:*18*  121:*21*  122:*2,
  19*
Career  2:*21*  15:*19*
  20:*4*  117:*4, 6, 7*
cares  86:*3*
Carey  1:*16*  125:*5, 17*
caring  86:*4*
Carney  2:*16*
carried  15:*18*  107:*20,
  24*
carry  74:*23*
case  7:6  21:7  22:*3*
  31:*12*  34:5  59:*19, 21*
  60:*9*  72:*16*  73:*3*
  78:*19*  87:*14*  89:*11*
  92:*10*  101:*11*  109:*8*
  125:*16*
category  53:*3*
caveat  108:*13*
CENTER  2:2  12:*1*
  13:*7, 25*  14:*20, 25*
  15:*5*  26:*25*
certain  23:*12*  34:6
  44:*8*  45:*6*
certainly  80:*1*  89:*13*
  109:*10*
certificate  12:*7, 9*
certify  9:*15*  125:*6, 11*
certifying  22:*17*
cetera  100:*16*
CFCF  26:*18*  27:*10*
  28:*20*  29:*4*  36:*1*
  40:22  41:*12, 16*  43:*3*
  45:*23*  47:*25*  54:*25*
  57:*15*  65:*3*  66:*6*
  67:*3, 5, 8*  70:*6, 14, 21*
  71:*10*  72:*6, 9*  74:*3*
  79:*20*
challenges  59:*24*
  60:*5*
chances  63:*24*
change  32:*3*  103:22
  127:*5, 8, 11, 14, 17, 20,

23*  128:*5, 8, 11, 14, 17,
  20, 23*
changes  126:*13, 16*
Chapel  28:*2, 15*
characterize  41:*24*
  64:*3*
characterized  64:6
Charge  28:*18, 19, 21,
  22, 23*
check  19:*3*  29:*21*
  50:*16, 17*  51:*5, 23*
  82:*14*  83:*19*
checked  48:24  82:*15,
  17*
checking  49:*5*
checks  48:*9*  50:24
  51:*1*
chronic  91:*1*
circumstances  68:*21*
CITY  1:7  2:*13, 15*
  6:*14*  13:7  92:*17, 21*
  126:6
clarification  38:*21*
  49:24
clarified  88:22
clarify  38:7  62:*16*
  90:*5*
class  44:7
classroom  43:9
clear  7:*18*  23:*21*
  54:7  56:*9*  72:25
  73:*21*  79:*11*  86:*2, 12*
  90:*9*  99:*6*  106:*15*
click  69:*20*
clicked  69:*17*
client  9:*11, 16*  22:*20*
  23:*23*
clinic  91:2
clinical  45:*6*  46:*6*
  81:*5, 6*  82:*5*
closer  54:*3*
clothing  12:*11*
color  30:*23, 25*  31:*1,
  5, 8*
colors  31:*9*
come  38:*1*  44:*9*
  53:*23*  108:*9*  115:*9*
comes  38:*18*
comfortable  92:*10*

coming  49:*3*  69:*15,
  18*
commencing  1:*15*
comment  86:*12*
common  64:*20*
Commonwealth  1:*14,
  18*
communications
  116:*15*
company  111:*11, 20*
  117:*7, 10*
compensation  21:*3, 6*
  23:*10*
complement  23:*9*
complete  102:*1*
completed  94:*12*
  102:2, *4*  117:*20*
completely  46:*13*
compliant  113:*23*
compos  120:*4*
compound  93:*19*
computer  48:*20*  49:*6,
  10*
concern  78:*3*  115:*23*
concerned  120:*4*
concerns  77:22
concluded  124:*5*
condition  100:*15*
conditions  45:7  58:*1*
  74:*9*  77:2  99:22
  100:*5*  119:*18*
conduct  109:*4, 9*
  123:*4*
conducted  7:*13*
confirm  47:*15*
confused  30:7  79:*15,
  18*
confusion  17:*14*
  18:*17*  68:*5*
congratulations  28:*9*
conjunction  31:*21*
consequence  63:*19*
consider  109:*11*
considered  79:7, *9*
consist  43:*8*  44:*20*
consisted  17:*3*
consistent  34:7
  75:*10*  97:*8*
consult  60:*19*  81:*3*

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 44 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

contact 83:*1*
content 8:*20*
context 41:*12* 50:*10*
Continued 3:*3* 55:*17*
continuing 24:*3*
continuity 38:*17, 23*
89:*4*
contract 27:*19, 20*
54:*4, 8*
contradiction 98:*5*
contradicts 98:*3*
conversation 8:*20*
61:*21* 82:9 105:*15*
conversations 107:*12*
copy 46:*6* 92:*8, 11,*
*16* 123:*15* 124:*1*
Corinne 3:*12*
Corp 3:*7*
correct 9:*20* 15:*25*
18:*5* 21:*23* 25:*5*
27:*1* 31:*15* 45:*23*
47:*19, 22* 61:*1* 71:*2*
95:*4* 101:*23* 112:*22*
113:*8* 115:*13* 118:*15*
121:*21* 122:*4, 16, 21*
Correctional 26:*13*
36:*2, 5* 69:*22* 116:*3*
corrections 123:*1*
126:*13*
correctly 102:*20*
counsel 6:*13* 108:*15,*
*23* 125:*12, 16*
couple 49:*2* 76:*21*
110:*22* 111:*1, 2*
116:*22* 121:*7*
course 82:*6*
COURT 1:*1* 7:*16*
123:*12, 17, 20, 22*
124:*1* 125:*5, 22*
covered 9:*8* 111:*4*
covering 111:*5*
coworkers 71:*12*
create 76:*5* 97:*4*
created 94:*20*
credibility 87:*14, 16*
88:*3*
Curran-Fromhold
26:*13, 19*
currently 10:*4* 11:*9*

100:*14*
custody 104:*12*
cut 67:*21*

< D >
dark 31:*10*
darker 31:*11*
date 1:*16* 9:*24*
108:*11* 112:*21* 114:*8*
116:*2, 17* 125:*9, 23*
dated 9:*23*
daughter 28:*6, 12*
day 14:*4, 15* 26:*22*
38:*15* 42:*21* 43:*12*
44:*2, 7, 9, 13* 53:*21*
57:*16* 84:*19* 105:*13*
113:*5* 126:*18*
days 25:*7, 9, 10, 12,*
*14* 42:*8, 9* 44:*15, 18*
45:*10* 104:*4* 112:*8*
DC 26:*23, 25*
death 104:*22* 106:*3*
107:*13, 20, 24* 108:*11,*
*20* 109:*1* 112:*21*
116:*2, 18*
decide 40:*23* 70:*3, 4,*
*14*
decision 62:*1* 89:*10*
decisions 28:*23*
DECLARATION
126:*7*
declare 126:*8*
declined 19:*8*
Defendant 2:*10, 15,*
*21* 3:*7* 53:*13*
Defendant(s 1:*8*
Defendants 53:*8*
111:*2*
define 73:*24*
definitely 105:*6*
degree 10:*18, 20, 24*
11:*1, 14* 13:*10*
degrees 10:*22* 11:*3*
dehydrated 79:*15*
dehydration 17:*15,*
*23* 18:*19*
DEPARTMENT 2:*13*
19:*21* 20:*12* 26:*16*
70:*23* 104:*21* 105:*4*

107:*25*
depend 86:*7*
dependent 34:*22*
depending 30:*23*
33:*12* 34:*3* 35:*9*
deposition 1:*12* 5:*3*
6:*15, 20* 7:*2, 8, 9, 13*
8:*13, 16, 22* 10:*2*
24:*3* 91:*14* 119:*7*
121:*3, 12* 124:*5*
125:*7, 14* 126:*2, 10,*
*14* 127:*2* 128:*2*
describe 17:*2* 20:*9*
47:*4* 48:*7*
described 84:*11*
DESCRIPTION 4:*9*
details 48:*10*
Detention 26:*25*
determine 32:*14* 82:*6*
determined 39:*10*
58:*14* 93:*2, 5* 95:*11*
determining 15:*13*
23:*16* 39:*17*
develop 25:*25*
diabetes 13:*14, 20*
16:*8, 17, 25* 25:*15, 16,*
*20, 23* 26:*3* 29:*8, 20*
31:*14, 18, 20, 24* 46:*7*
81:*5, 7* 91:*1* 92:*25*
93:*1, 2, 5* 95:*12, 17*
97:*20* 98:*8, 15, 19, 23,*
*24* 99:*5, 18* 100:*9, 16*
103:*6, 10, 12, 20, 24*
diabetic 16:*11* 18:*22*
29:*22, 25* 30:*10*
45:*15* 46:*2* 49:*22, 23*
51:*6* 61:*14* 62:*19*
67:*23* 68:*15* 72:*12*
73:*9* 76:*24* 77:*4*
90:*22* 101:*18*
diagnosed 114:*5*
diagnosis 120:*1*
died 105:*13, 17*
107:*9* 113:*5* 116:*9*
diet 16:*13, 14* 31:*22*
32:*4*
difference 67:*6*
100:*23*
differences 36:*17, 20*

different 15:*16*
26:*10* 28:*20* 32:*18*
33:*1, 5, 8, 11* 34:*17*
36:*4* 38:*12* 58:*10*
92:*2, 3* 99:*12* 101:*1*
116:*8* 123:*6, 8*
differently 109:*5*
Digital 123:*23*
dip 30:*22*
Direction 5:*5*
directly 58:*22*
director 53:*12*
115:*20*
disciplinary 60:*13*
121:*6, 13, 19* 122:*1*
disclose 108:*15*
discovery 22:*23* 23:*2,*
*5* 46:*18* 92:*3*
discussed 61:*22*
Discussion 46:*23*
57:*13* 84:*7* 91:*6*
110:*15*
discussions 116:*2, 10*
distinguished 26:*3*
DISTRICT 1:*1, 2*
doctor 14:*6, 17* 19:*8*
35:*12, 17, 21, 25*
39:*12* 41:*13* 66:*9, 13*
70:*10, 11, 19* 71:*7*
72:*17* 110:*11*
doctors 15:*11* 29:*1*
38:*24* 41:*4*
doctor's 11:*25* 13:*3*
document 8:*1* 21:*8*
47:*1* 48:*8, 13* 49:*25*
50:*6, 23, 25* 51:*14*
52:*15, 21* 61:*14*
62:*20* 65:*10, 12, 16,*
*22* 66:*16, 19, 20, 22*
67:*1* 68:*10* 73:*20*
74:*5* 76:*1* 77:*15*
81:*4, 14, 19* 82:*5*
83:*12, 15* 85:*8* 91:*9*
92:*1, 8, 9* 93:*23* 94:*6,*
*15* 96:*24* 97:*4, 14*
112:*4* 122:*9, 12*
documentation 76:*6*
79:*23* 80:*5* 88:*25*
94:*19* 118:*23*

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 45 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

documentations
20:*19*  78:5
documented  48:*11*
50:*15*  51:*18*  73:*19*
74:*14*, *19*  75:*14*
84:*10*, *12*  85:7  93:8
118:*24*
documenting  50:9
53:*11*
Documents  5:*10*
9:*20*, *23*  10:2  76:*17*
85:*18*  112:5  120:*12*
doing  15:*11*  16:*23*
122:*24*
dosage  50:*15*
dosages  50:9
draw  13:*11*
drew  14:*18*
drink  30:*18*  37:8
82:*25*
drinking  58:2
drinks  32:5
dropping  68:7
drugs  76:*25*
duly  6:3
Dysphagia  17:*14*

< E >
earlier  61:*22*  70:*25*
84:*11*  114:2  115:*10*
117:5  119:6  121:2
easier  123:*25*
EASTERN  1:2
educate  44:7
education  10:*15*, *23*
45:*21*  65:*1*
educational  10:*13*
efficient  111:*23*
eight  57:*22*
eight-hour  42:3
either  123:*1*
EKG  14:*18*  15:*14*
EKGs  13:*11*
electronic  49:*16*
50:*1*  76:7  77:7, *11*,
*18*  79:2  95:*23*  96:*11*
123:*15*  124:2
Electronically  94:*10*
95:2
emails  20:*15*

emergency  67:*16*
72:*21*  90:*19*, *23*
emergent  67:6, *11*, *12*,
*15*, *24*  70:2, *4*
EMILY  2:*13*  123:*22*
employed  19:*17*, *18*
125:*13*, *16*
employee  104:*20*
105:4, 5, 7, *25*  106:*1*
115:*11*  125:*15*
employees  48:*1*
employer  19:*20*  57:9
employer's  57:*1*
employment  20:*11*
26:*21*  27:*18*  28:5
47:7, *25*
encounter  18:*21*
19:*1*  46:2  64:*11*, *20*
65:2, 6  69:*23*  76:*10*,
*16*, *18*  84:*15*, *23*  95:*1*
97:*1*, 7
encountered  73:6
encourage  82:*25*
ended  54:8
endocrinologist  53:*25*
63:*15*
endoscopy  12:*1*  13:7,
*25*  14:*20*, *25*  15:5
engage  9:3
enlarge  47:*12*
entails  46:*13*
enter  43:*10*  44:8
48:*21*  49:7  50:*20*
51:*16*
entered  63:3
entire  126:9
entirety  26:*20*
entitled  9:7
entity  20:*4*
ERRATA  126:2, *15*
127:2  128:2
ESQUIRE  2:2, *3*, 8,
*13*, *19*  3:5
established  89:*4*
Estate  1:*4*
et  1:7  100:*16*  126:6
evaluating  118:*15*
119:*14*
evaluation  117:*22*

120:8
Everest  1:*23*
everyone's  41:3
exactly  18:5  115:*19*
EXAMINATION  6:6
16:2, 4  92:*24*  110:*19*
116:*25*  117:*16*
examined  6:3  120:*25*
Excessive  17:*23*
excluding  116:9
excuse  26:*14*  55:*12*
excused  124:*4*
exercise  31:*23*
exercises  12:*12*
exhibits  4:*10*
expect  118:*14*
expectations  23:*11*
expected  53:*15*  55:*15*
experience  40:*21*
experiencing  52:*24*
68:*17*
expert  40:8  109:8
explain  37:3  55:*17*
93:*15*
explanation  55:*18*
103:8
exploring  23:2
extend  27:*23*
extended  27:*22*

< F >
facility  23:*19*  26:*14*
30:*1*  35:5, *9*  36:2, *5*
67:*21*  78:*21*
Fahrenheit  118:*25*
fairness  91:*16*
fall  67:*24*
familiar  20:*3*  64:*10*
65:*14*, *17*  69:*3*, 5
72:5  81:5, *10*  96:*21*
97:*14*  108:2
familiarity  117:7
familiarize  45:*1*
far  120:*3*
fast  65:*19*
faster  15:*1*, *3*
fault  105:*19*
February  7:9
feet  26:*23*

field  11:*21*
file  30:*11*  85:*19*
fill  44:*21*  46:*1*
84:*22*  85:8  88:*25*
93:*22*
filled  85:*11*, *12*, *16*
93:*13*, *14*, *25*  94:2
97:*16*  102:*22*
financially  125:*17*
fine  6:*10*
finish  7:*20*, *22*  14:7
86:*10*  96:4
firing  7:3
first  11:*21*  16:*21*
19:*4*  44:2, *15*  50:*16*
81:*23*  82:2  92:*23*
94:*12*  111:9  125:8
Five  25:9, *11*, *14*
28:4  42:*1*  57:*24*
five-minute  57:*11*
Flag  54:*22*
floor  2:*14*
flush  30:*18*  72:*18*
follow  41:*3*  44:*10*
48:*20*  53:*25*  61:*18*
73:*13*, *15*, *18*  106:6
115:*15*
following  115:*23*
follows  6:4
follow-up  37:*22*
38:*10*, *11*, *13*, *15*
39:*10*, *18*  40:*24*
60:*19*, *24*  121:3
follow-ups  16:*14*
39:8, *14*
foregoing  125:6, 7
forgot  80:*20*
form  33:*15*  34:9, *14*
35:4  36:7  38:7  39:5,
*20*  41:*1*  44:3  46:9
47:*21*  52:*25*  56:2, 8,
*17*  57:4, 6  58:*19*
59:9  60:2  61:6
62:*11*, *25*  64:6, *13*
71:*20*  74:*16*, *25*  76:4
77:*25*  78:*15*, *16*  80:8,
*23*  84:4  85:3, *14*
87:*10*, *24*  88:*1*  93:*17*,
*23*  95:7  96:*17*  98:5,
*25*  102:*25*  103:*11*, *14*

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

109:*17*, *19*  110:*5*
115:*6*
**formal**  107:*20*, *24*
**forms**  44:*21*  54:*25*
57:*24*
**forth**  125:*10*
**Four**  7:*7*  57:*24*
**Frasier**  2:*16*
**free**  39:*6*  52:*17*
**frequent**  18:*18*
**frequently**  71:*18*
86:*6*
**front**  92:*9*, *17*  93:*22*
94:*14*  102:*3*  112:*4*
**full**  124:*3*
**further**  24:*7*  38:*21*
110:*16*  125:*11*, *14*

< G >
**gather**  85:*17*
**Gay**  80:*16*  82:*10*
83:*2*, *12*, *18*  84:*22*
85:*21*, *25*  87:*5*, *20*
88:*5*  93:*12*, *14*, *25*
94:*4*, *11*  95:*2*  96:*10*
97:*4*  106:*4*, *17*  112:*1*
114:*7*, *13*, *20*  116:*10*,
*15*
**Gays**  82:*23*
**Gene**  2:*16*
**general**  29:*10*, *19*
35:*1*  92:*24*
**generally**  16:*11*
29:*13*  30:*2*, *4*  35:*4*, *8*
64:*19*  70:*20*  73:*23*
**generated**  95:*3*
**getting**  68:*6*  86:*13*
**give**  7:*22*  8:*12*  9:*4*
13:*12*  32:*15*  33:*6*
39:*22*  41:*14*  66:*14*,
*15*  77:*21*  110:*12*
114:*20*  115:*4*  122:*22*
**given**  6:*20*  34:*7*
61:*13*  66:*17*  67:*2*
78:*17*  88:*10*, *12*
90:*13*, *20*  121:*11*
**giving**  28:*12*  99:*8*
**glucose**  18:*4*, *8*, *13*
19:*3*  33:*22*  34:*20*, *25*
35:*16*  48:*9*, *21*, *24*

49:*6*  50:*6*, *17*, *23*
51:*1*, *5*, *23*  66:*7*  79:*3*
80:*9*
**go**  7:*11*  11:*20*, *23*
15:*13*  19:*14*  22:*21*
28:*24*  43:*11*  44:*5*
48:*6*  50:*19*  52:*2*
56:*19*  58:*21*  59:*14*
72:*2*  74:*4*, *9*, *10*  76:*7*
80:*25*  90:*5*  91:*19*
101:*13*  110:*23*  111:*7*
**goes**  31:*9*  37:*21*
**going**  24:*4*  27:*16*
28:*15*  39:*6*  40:*5*
44:*23*  68:*5*  70:*2*
72:*24*  81:*13*  86:*11*
89:*24*  94:*22*  110:*13*
117:*19*  119:*19*
123:*11*
**Good**  6:*9*  8:*9*  40:*16*
117:*3*  123:*23*
**GORDON**  2:*16*
**gotten**  104:*7*  112:*13*
**gradations**  31:*4*
**graduate**  11:*6*, *12*
**graduated**  11:*11*, *16*
**GROTE**  2:*2*  4:*4*
6:*8*, *12*  9:*1*, *10*, *15*, *18*
14:*14*  21:*2*, *13*, *18*, *23*
22:*6*, *11*, *15*  23:*6*
24:*14*, *15*  27:*17*
29:*11*  30:*3*  33:*19*
34:*10*, *19*  35:*7*  36:*11*
38:*8*  39:*1*  40:*12*, *20*
41:*5*  44:*11*  46:*14*, *21*,
*24*  47:*23*  50:*12*  52:*1*,
*7*  56:*11*, *12*, *24*  57:*12*,
*14*  58:*8*, *13*  59:*1*, *12*
60:*4*  61:*10*  62:*14*
63:*10*  64:*9*, *18*  65:*24*
66:*2*, *5*  68:*2*, *8*  71:*22*
74:*1*, *20*  75:*6*, *15*
78:*2*, *18*  79:*25*  80:*7*
81:*2*, *11*, *18*  83:*6*
84:*6*, *8*  85:*5*, *20*
86:*11*, *24*  87:*18*, *19*
88:*8*, *21*  91:*4*, *7*, *19*,
*23*  92:*20*, *22*  93:*20*
94:*9*, *23*  95:*9*, *14*
96:*9*, *13*, *20*  98:*12*, *17*

100:*2*  103:*1*, *18*
107:*2*  108:*21*, *22*
109:*12*  110:*1*, *12*, *16*
112:*6*  113:*13*  114:*3*
119:*6*, *15*
**ground**  7:*11*
**grounds**  22:*10*  39:*23*
**guess**  69:*25*  88:*18*,
*25*  113:*20*
**guidance**  73:*7*
**guidelines**  33:*13*
34:*18*, *23*  36:*10*, *12*
56:*23*
**guidelines/protocols**
62:*5*

< H >
**Hamilton**  10:*9*
**hand**  92:*12*
**Hang**  94:*5*  107:*5*
**happen**  41:*22*  63:*16*
66:*12*  74:*13*
**happened**  64:*1*  75:*3*
105:*18*  108:*10*, *18*, *25*
**hard**  92:*8*, *11*, *16*
**harm**  78:*6*
**head**  7:*15*
**health**  10:*17*  11:*22*
12:*4*, *6*, *14*  55:*7*
115:*18*  119:*17*  120:*8*
**hear**  6:*10*  14:*11*
69:*6*, *7*  111:*19*
**heard**  43:*16*  71:*11*,
*15*, *17*, *24*  108:*14*
111:*18*  117:*6*
**heart**  68:*6*
**heavier**  31:*11*
**held**  1:*14*  46:*23*
57:*13*  84:*7*  91:*6*
110:*15*
**help**  34:*11*  62:*16*
64:*25*  78:*4*
**helps**  120:*9*
**hereof**  126:*15*
**high**  10:*15*  11:*6*
30:*16*  79:*3*, *18*
105:*19*
**higher**  33:*10*  34:*2*
40:*9*  58:*15*

**hired**  13:*6*  19:*23*
24:*7*, *11*
**history**  10:*13*  78:*6*
112:*17*
**HIV**  68:*13*
**HIV/AIDS**  100:*16*
**HOFF**  2:*13*  123:*23*
**hold**  24:*2*  114:*6*
**home**  10:*16*  11:*22*
12:*2*, *4*, *6*, *11*, *13*  15:*7*,
*24*  16:*7*, *18*  18:*21*
28:*2*, *13*, *16*, *17*
**homicidal**  77:*1*
**hopefully**  86:*14*
**Hospital**  10:*5*, *6*, *8*
11:*23*  12:*3*  15:*14*
28:*24*  47:*6*, *19*  69:*4*,
*8*  104:*12*
**hour**  24:*13*  58:*11*
73:*17*  75:*11*
**hours**  42:*10*  57:*22*
83:*19*  87:*6*, *21*  88:*6*
**housing**  72:*9*
**HU**  2:*3*
**hyperglycemia**  17:*22*
68:*18*  79:*8*, *9*, *13*
84:*23*  90:*24*
**hyperglycemic**  17:*6*
**hypertension**  67:*22*
**hypoglycemia**  17:*13*
68:*18*
**hypoglycemia/hypergl**
**ycemia**  65:*7*
**hypoglycemic**  17:*5*

< I >
**identified**  51:*9*, *13*
**Identify**  47:*4*  48:*7*
65:*24*
**identities**  59:*17*
**illness**  119:*24*
**immediate**  38:*14*
**inaccurate**  99:*8*
**inappropriate**  87:*15*
**incident**  63:*16*
**include**  41:*6*  48:*10*
118:*6*
**included**  79:*20*
100:*15*
**includes**  84:*18*

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 47 of 63

Deposition of Mariesha Apollon                                  Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**including** 13:6 23:10
48:11
**incorrect** 22:1, 2
**independent** 76:16
95:10, 15 100:3
**INDEX** 5:3
**indicate** 35:10
119:12 120:16, 21
**indicated** 67:15 77:4
112:6 115:17 119:3
126:14
**indicates** 31:1 95:3
**indicating** 98:24
**individual** 18:17
30:17, 20 49:13
58:10
**infirmary** 27:3, 7
47:6, 18 70:21, 24
71:4, 9 72:2 73:5
**inform** 39:12
**information** 48:11, 12
49:10, 13 50:2 51:16
68:22 69:21 77:3
79:2 89:2 97:24, 25
98:3, 23 99:1, 2, 8, 14
108:10, 14
**informed** 37:25 63:5
**injectable** 26:7
**inmate** 121:12 122:2,
18
**inmates** 104:18
115:24
**inquiry** 24:8 107:20,
24
**insight** 29:24
**instance** 50:4 61:25
72:20
**instances** 51:22 52:8
72:12 90:21
**institution** 32:18
33:8 34:16
**institutions** 33:2
**institution's** 34:23
**instruct** 30:17 72:18
109:6 115:6
**instructed** 9:17
82:24 83:13
**instructing** 9:10, 12
21:11 22:20 23:22
87:12

**Insulin** 16:13 19:5
25:22 26:5, 6, 7, 10,
11 31:15, 19, 21 32:9,
10, 11, 15 33:6, 23
34:1, 21 35:22 36:24
37:7 48:9 50:9, 14,
15, 18, 22 52:9, 14
53:9, 24 54:20 60:18
61:17 63:4 66:11
73:12 82:13, 14
100:11 104:4, 6, 8
110:10 112:8, 13, 17
113:24 114:5, 9, 17
115:4
**insulins** 17:10 66:15
**intake** 8:18 9:20
29:6, 7, 9 37:5, 11, 13,
16, 17, 23 38:5, 9, 18
39:4, 5 40:22, 24
41:7 44:19 45:10
47:6 48:22 49:2
50:11, 24 51:1, 10, 23
52:5, 9, 15 57:15
58:7 59:25 66:7, 21
68:10, 23, 24 69:11
70:6, 13, 16 72:11, 24
73:2, 5 74:3, 4, 11, 21
75:4, 5, 9, 11, 18, 24
77:8, 12, 13, 19 78:21
79:20 80:8 82:5
83:14 84:13, 16
85:16 87:7, 22 88:24
89:1, 7, 23, 24 90:6, 7,
12, 17 91:18 92:24
94:18 95:18, 19, 21
96:14 98:5 100:24
101:3, 7 103:17
104:18 108:11, 20
109:1, 4, 14 110:4
112:6, 14 114:8
117:19, 22 118:1
120:21 121:17, 21
122:3, 8, 9, 12 123:1,
3
**interaction** 37:12
122:17
**interested** 125:17
**intermetex** 108:3, 6
**I-N-T-E-R-M-E-T-E-**

**X** 108:6
**interrogatories** 46:16
**Interrogatory** 47:3
48:7 53:7
**intervention** 67:7, 11,
12, 19, 25 70:4
**interventions** 70:3, 15
**involve** 122:18
**involved** 48:4 121:13
**Isabella** 15:6, 19, 23
16:6 18:20 19:9, 14
45:21
**issue** 21:7 58:22
61:22 62:22 78:7
115:12
**issues** 23:1 36:14, 15
**its** 23:9
**IV** 15:14

**< J >**
**JACOB** 1:4
**jail** 26:17
**jails** 106:2
**JAMES** 1:4
**January** 19:12 54:9,
11, 12
**Jared** 1:16 123:11
125:5, 17
**Jeoboham** 105:8
**Jersey** 10:9 19:15, 16
**JFK** 3:6
**Job** 1:23 11:21
14:16 15:9 19:9
23:14 28:12 33:4
43:17 57:22 86:4
111:16
**jobs** 36:5
**Johnson** 10:5
**join** 35:6 40:10, 15
56:18 74:17 88:16
109:21
**JONATHAN** 2:8
**JR** 1:5 76:11
**judge** 109:9
**judgment** 90:18
**June** 25:2
**JUNG** 1:4, 5 6:13
32:23 42:24 60:10
76:11, 19 83:5, 7, 10,
19 84:15, 20 87:6, 21

91:12 92:17 95:11,
16 98:8 99:17
100:18 101:20 102:7,
14, 16 104:15, 22
105:12, 17 106:7
107:12 108:10, 19
109:1, 4 112:2, 7
113:5 114:10, 20, 23
115:2 116:5, 9, 12, 16
117:20 120:21
121:14 122:10, 13, 17
126:4
**Jung's** 96:11 106:3
107:20, 24 109:1, 14
110:3

**< K >**
**KAMINSKY** 2:8
**keep** 24:4
**ketoacidosis** 67:23
**ketones** 30:14, 18, 19,
24 31:7, 12 72:13, 22
73:5, 9 74:22 75:9
82:14, 16, 17, 19
**KIERNAN** 2:5
**KIMBALL** 3:5
**kind** 31:4 59:18
**knew** 95:16 98:7, 14
99:7
**know** 7:24, 25 8:4
9:7 19:25 21:10
25:20, 23 26:2 27:7,
15 32:25 33:3, 7
40:4 42:20 47:10
48:1, 15, 25 49:9, 25
51:12 53:15 55:3, 15
56:21 63:8, 13, 14
65:18 67:5 69:14, 21
71:1 72:8 82:15
86:13 89:3 94:2
105:1, 3 115:19
**knowledge** 114:24

**< L >**
**laid** 13:5
**language** 25:5
**larger** 31:6
**LAW** 2:2, 13
**lawsuit** 111:2
**lawyers** 8:17, 22

learn  12:*8*  13:*17*
71:*8*  108:*9*
learned  108:*17*, *24*
led  61:*21*
level  32:*13*, *16*, *20*, *23*
34:*25*  35:*16*  40:*9*
50:*17*  58:*15*  66:*7*
79:*3*  80:*10*
levels  18:*13*  19:*4*
license  15:*21*  16:*2*, *4*,
*23*, *24*  24:*17*, *21*  25:*1*
light  31:*9*
lighter  31:*6*
limited  110:*7*
limits  118:*20*  119:*4*
Line  5:*6*, *11*, *16*, *21*
listed  117:*11*
litigation  46:*17*
little  25:*15*  28:*8*
36:*8*  80:*9*  93:*18*
111:*22*  116:*7*
located  71:*1*
location  37:*9*
log  123:*13*
log-in  51:*15*
Lolo  3:*13*
long  7:*5*  10:*10*
12:*13*  27:*10*  28:*3*
44:*12*  58:*4*  93:*4*
long-acting  17:*10*
longer  43:*18*
look  14:*4*, *16*  30:*5*, *9*
49:*14*  65:*16*  79:*22*
80:*5*  81:*22*  92:*23*
looked  50:*1*  114:*2*
looking  29:*17*  68:*4*
93:*22*  94:*7*  109:*3*
Lose  32:*3*
lost  109:*23*
lot  30:*18*  86:*18*
91:*24*
loud  7:*14*  24:*25*
LOUIS  1:*5*  76:*11*
low  68:*6*
lowers  26:*12*
LPNs  28:*22*  38:*23*

< M >
ma'am  110:*23*
majority  86:*22*

making  23:*12*  28:*23*
90:*9*  109:*20*
managed  25:*21*  26:*4*
manner  45:*19*
Manor  28:*2*, *15*
MANSUKHANI  2:*16*
MARGO  2:*3*
MARIESHA  1:*13*
2:*10*  4:*3*  6:*2*, *18*
24:*9*  102:*19*, *20*
126:*22*

M-A-R-I-E-S-H-A
6:*19*
MARKED  4:*9*, *10*
5:*20*  92:*13*
Market  2:*9*
Marsha  104:*25*
105:*15*  112:*25*  113:*2*,
*14*, *18*  114:*7*
Marsha's  105:*1*
math  27:*16*  42:*18*
matter  6:*13*  126:*10*
matters  119:*20*
Maureen  80:*16*
82:*10*, *23*  83:*2*, *12*, *18*
84:*22*  85:*21*, *25*  87:*5*,
*20*  88:*5*  93:*12*, *25*
94:*4*, *11*  95:*2*, *22*
96:*10*  97:*3*  106:*4*
111:*25*  114:*12*
116:*15*
mean  26:*7*  29:*9*, *14*
30:*2*  32:*9*  36:*14*
37:*3*  41:*11*  51:*25*
62:*6*  65:*6*  67:*11*
75:*13*, *16*  78:*12*
94:*11*  98:*11*  103:*3*
114:*12*  119:*24*, *25*
120:*6*
Meaning  120:*4*
means  102:*22*  120:*3*
meant  63:*13*  74:*2*
113:*14*, *18*
Med  121:*20*
medical  10:*16*, *24*
11:*4*, *21*, *24*  12:*19*
13:*1*, *8*, *13*, *17*, *22*
15:*15*, *20*  29:*5*  30:*11*,
*12*  33:*12*  38:*1*, *2*
41:*9*, *11*  49:*17*  50:*1*

51:*1*, *4*, *5*, *8*, *9*  52:*4*,
*12*  58:*1*, *16*  61:*4*
62:*17*  63:*13*  67:*2*
68:*12*  73:*4*  76:*7*
77:*1*, *8*, *11*, *18*  78:*6*,
*20*  79:*6*, *12*  83:*13*
84:*13*  89:*2*, *10*  95:*22*,
*23*  96:*11*  99:*22*
100:*5*, *15*  101:*21*, *24*
102:*1*, *6*, *15*  118:*3*
medication  15:*12*
26:*5*, *9*  32:*1*  41:*15*
48:*12*  53:*10*  76:*3*
114:*10*, *20*  115:*2*, *12*,
*15*, *24*  122:*10*, *13*
medications  12:*11*
15:*14*  44:*24*  49:*3*
100:*14*
meet  8:*21*
Megan  112:*20*, *24*
Mellitus  81:*6*, *7*
memory  76:*18*
mental  119:*13*, *17*, *23*
120:*3*, *8*, *22*
mentioned  32:*1*
mentis  120:*4*
met  9:*3*, *7*
middle  54:*4*, *6*, *11*, *13*
Mike  123:*25*
mine  104:*9*
mini  123:*23*  124:*2*
minutes  37:*6*, *9*
58:*11*, *12*  73:*16*
75:*10*  110:*13*, *23*
112:*10*
mischaracterizes  44:*4*
misunderstanding
94:*21*
mm-mmh  7:*15*
modifiable  32:*2*
modification  31:*22*
moment  46:*15*, *21*
47:*9*  48:*14*  81:*22*
122:*7*
money  23:*13*
month  10:*11*  38:*17*
53:*22*  120:*15*
months  7:*7*  27:*13*
28:*4*, *13*  71:*15*
121:*24*

morning  6:*9*  42:*16*,
*25*  111:*10*
mortality  107:*16*
moved  19:*15*, *16*
moving  65:*19*

< N >
name  6:*12*, *17*  13:*4*
43:*20*  51:*17*  102:*19*
105:*1*, *8*, *10*  110:*25*
115:*11*  117:*3*  120:*14*
named  53:*8*
names  48:*3*  51:*19*
71:*24*
nature  7:*1*  20:*10*
23:*20*
necessarily  49:*21*
necessary  70:*5*
need  7:*16*  8:*4*  15:*13*
21:*9*  35:*24*  38:*20*
48:*16*  75:*22*  80:*4*
87:*2*  89:*17*
needed  14:*25*  27:*21*
58:*15*  70:*15*
needs  25:*21*  26:*5*
28:*24*  38:*10*  50:*18*
60:*19*  79:*23*  89:*3*
negative  31:*2*
neither  125:*11*
NET  46:*2*  65:*6*
85:*10*
never  43:*16*  73:*6*
84:*19*  117:*6*
New  10:*9*, *21*  11:*2*
13:*7*, *25*  14:*21*  15:*6*
19:*15*, *16*  76:*4*
nice  86:*3*
No.____Change
127:*3*, *6*, *9*, *12*, *15*, *18*,
*21*  128:*3*, *6*, *9*, *12*, *15*,
*18*, *21*
No.____Line  127:*6*,
*9*, *12*, *15*, *18*, *21*  128:*6*,
*9*, *12*, *15*, *18*, *21*
No.____Line  127:*3*
128:*3*
nods  7:*15*
noncompliant  105:*20*
112:*17*  113:*8*, *12*, *15*,

*19*

**non-intake** 50:*13*

**normal** 17:*6* 18:*4, 8*
35:23 118:*13, 20*
119:*4*

**Norristown** 69:*3, 11,
15* 104:*12*

**Notary** 1:*17* 125:22

**note** 51:*13* 52:*21*
53:*2* 57:*8* 91:*12*
93:*8, 11, 13* 97:*13*
102:*23* 104:*10* 112:*9*
120:*16, 19, 20* 122:*8,
9, 12*

**notes** 52:20 95:*4*
112:*6* 114:*3*

**notice** 1:*13* 6:*15*

**notified** 75:22

**notify** 53:*24*

**November** 1:*10* 16:*5*
54:*14* 125:*23*

**number** 34:*7* 49:*7*
50:*20* 82:*1* 91:*20, 24*
101:*16*

**numbers** 48:*22*
49:*20* 50:*6* 65:*25*
92:*4, 15, 16*

**nurse** 10:*7* 15:*24*
16:*1* 18:*20, 25* 28:*18,
19, 21* 34:*22* 35:*2*
37:*11, 16* 39:*24* 40:*2,
22* 41:*7, 13* 43:25
50:*5* 51:*3* 53:*14*
55:*15* 56:*15* 59:*25*
67:*9, 10* 70:*13* 72:*11*
73:*11* 75:*19, 21* 76:*1*
93:*12* 94:*19* 118:*14*
119:*13* 120:*3, 11*
123:*3, 6, 8*

**nurses** 38:25 41:*4*

**nursing** 10:*18, 20*
11:*5, 15* 12:*2* 15:*7,
19, 24* 16:*7, 18, 22*
18:*21* 24:*22* 28:*2, 16*
46:*2* 53:*12* 64:*11, 19*
65:*2, 6* 71:*12* 84:*23*

**< O >**

**oath** 126:*17*

**object** 8:*23* 40:25
47:*20* 57:*5* 59:*8*
60:*2* 61:*5* 62:*10*
64:*12* 74:*16, 24* 75:*1*
78:*14, 16* 80:22 87:*9,
25* 95:*6* 102:*25*
109:*16, 18*

**objecting** 39:*22*

**Objection** 20:22
21:*18, 22* 22:*6, 10, 19*
23:*7, 21, 24* 33:*14*
34:*8, 13* 35:*3* 36:*6*
38:*6* 39:*19, 23* 40:*3,
11, 15, 17* 44:*3* 46:*8*
56:*1, 7, 16, 19* 57:*3, 9*
58:*18* 62:*12, 24* 63:*1*
64:*5* 71:*19* 77:*24*
84:*3* 85:*2, 13* 86:*15*
87:*11, 23* 88:*14*
93:*16* 96:*16* 99:*23*
103:*13* 109:22 110:*5*
113:*13* 115:*5* 119:*15*

**objective** 52:*20*

**objectives** 52:*23*

**observation** 72:*6*

**observed** 76:*20*

**obtain** 24:*16, 20, 25*

**occasion** 16:*8*

**occur** 75:*12*

**O'CONNOR** 3:*5*

**October** 9:*24* 28:*14*
42:*14* 54:*14* 63:*17*
76:*11* 82:*10* 83:*3, 10*
84:*19* 97:*7, 10* 116:*1,
8, 17* 117:*21* 122:*18*

**offer** 20:*16* 27:*23*
126:*14*

**offered** 20:*18, 21*
25:*4*

**office** 11:*25* 13:*4, 24*
53:*12*

**officer** 69:*22*

**officers** 116:*4*

**oftentimes** 86:*6*

**Okay** 8:*8* 14:*9, 10*
38:22 40:*12* 47:*12,
15* 48:*18* 57:*10*
65:*11, 21* 90:*10* 94:*8*
96:*7* 105:22 110:22

111:*8* 113:*21* 121:*8,
9*

**older** 26:*1*

**once** 41:*23* 60:*10*
122:*25*

**ones** 45:*3* 107:*13*

**opinion** 40:*8* 79:*4*

**opportunity** 123:*4*

**opposed** 121:*20*

**oral** 26:*4, 9* 32:*1*

**order** 9:*3* 19:*4*
23:*17* 24:*4* 35:*12, 15,
18, 21* 58:25 61:*3*
62:*17* 66:*14, 16, 23*
67:*2* 76:*8* 82:*6*
83:*18* 84:22 85:*11*
88:*9* 89:*17, 18, 21*
90:*1, 13, 16, 20*
114:*17, 19*

**ordered** 83:25 84:25
85:*6* 87:*6, 21* 88:*5*
114:*21*

**ordering** 38:*16*

**orders** 13:*12* 14:*17*
15:*11* 28:25 41:*14,
15* 85:*10* 92:25
123:*13*

**oriented** 103:*4* 119:*8*
120:*6, 12, 13, 17*

**outpatient** 14:*25*

**outset** 91:*21*

**outside** 23:*4* 77:*14*
118:*19* 119:*3, 16*

**overall** 23:*9*

**overcrowded** 71:*9, 11*

**overtime** 41:*18, 20*
42:*13*

**oxygen** 118:*19*

**< P >**

**p.m** 25:*6, 8* 124:*6*

**pace** 15:*1*

**packages** 23:*10*

**PAGE** 4:*2, 9* 5:*6, 11,
16, 21* 7:*12* 48:*16*
81:*23* 82:*2* 92:*23*
93:22 94:*10* 96:22
97:*12, 19* 100:*12*
101:*15* 102:*18* 104:*9,
10* 127:*3, 6, 9, 12, 15,*

18, 21* 128:*3, 6, 9, 12,
15, 18, 21*

**pages** 65:*18, 25*
91:*18* 94:*12*

**pamphlet** 65:*1*

**pandemic** 12:*21* 13:*5*

**paper** 63:*21, 25*
69:*17* 77:*21* 79:*1*
81:*25*

**paperwork** 8:*18*
46:*12* 117:*20*

**PAR** 101:*21*

**part** 12:*8* 13:*20*
16:*17, 23* 46:*16, 18*
49:*16, 20* 52:*16, 19*
66:*21, 23* 67:*2* 83:*14*
84:*12* 88:25 93:*14,
15, 21, 23* 103:*2*
107:*16, 19, 23* 120:*20*

**particular** 26:*17* 35:*5*

**parties** 92:*2* 125:*13*

**pass** 16:*2, 3* 49:*2*
53:*10* 121:*20*

**passing** 15:*12*

**pathway** 46:*7* 81:*6*
82:*5*

**pathways** 45:*6* 81:*5*

**patient** 13:*12* 19:*7*
28:*24* 29:*14, 17*
30:*17* 32:*3, 12, 15*
36:*13, 19* 37:*2, 12, 21*
38:*4* 39:*7* 40:*23*
47:*5, 18* 49:*19* 51:*6*
52:*24* 60:*18, 21*
61:*14, 19* 62:*2, 18, 19,
21* 63:*3, 7* 66:*6* 70:*5*
73:*9* 78:*6* 87:*3* 88:*6*
89:*3, 7* 90:22 98:*15,
22* 99:*7, 14* 101:*18*
104:*11* 118:*15*
121:*12, 16* 122:*3, 19,
25* 123:*5*

**patient/prisoner**
57:*18*

**patients** 11:*24* 12:*10*
15:*3, 13* 16:*8, 11*
18:*22* 19:*1* 37:*23, 24*
39:*3* 45:*16* 46:*3*
68:*16* 69:*9, 10* 72:*12*
77:*18* 95:*23* 122:*24*

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 50 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

patient's 68:*4* 76:*7*
119:*13*
pause 65:*19*
pay 20:*24* 21:*10*
22:*4* 23:*1* 24:*8, 10*
PDP 47:*7* 48:*8, 25*
53:*11, 16* 55:*16, 25*
60:*12* 69:*11* 90:*21*
91:*2, 25* 97:*14*
105:*25* 106:*12, 17*
111:*16* 116:*3, 4*
PDP18 91:*24*
PDP's 34:*4*
penalty 64:*4* 126:*7, 8*
PENNSYLVANIA
1:*2, 15, 18* 2:*4, 9, 14,*
*20* 3:*6* 24:*17, 22*
people 13:*5* 48:*4*
49:*14* 53:*12* 86:*18*
116:*4*
perform 23:*14*
performing 21:*4*
period 112:*13*
periods 38:*12*
PERJURY 126:*7, 8*
person 30:*24* 37:*8, 9*
49:*22* 50:*18* 58:*5*
60:*7* 78:*5* 86:*4* 90:*3*
94:*3* 114:*9*
personally 51:*24*
person's 39:*11* 49:*13*
pertaining 91:*12*
92:*7* 119:*16*
PHILADELPHIA
1:*7* 2:*4, 9, 13, 14, 15,*
*20* 3:*6* 6:*14* 19:*21*
20:*12* 26:*16* 70:*23*
104:*21* 105:*4* 107:*25*
126:*6*
phone 58:*24* 60:*8*
80:*21*
phrased 9:*14* 109:*7*
120:*1*
physical 77:*21* 79:*1*
physically 29:*16*
75:*14, 17* 76:*13, 14*
77:*20* 86:*21* 89:*16*
pick 58:*23*
picked 41:*25* 42:*7*

place 11:*2* 81:*16*
120:*14* 125:*9*
placed 20:*12*
placement 47:*5*
Plaintiff 1:*5* 2:*5*
plaintiffs 6:*13*
plan 52:*21*
play 72:*1*
please 6:*16* 7:*25*
8:*6* 35:*10* 38:*21*
40:*9* 61:*9* 65:*23*
109:*24*
plenty 82:*25*
point 65:*20* 107:*3*
policies 44:*25* 55:*25*
57:*2*
policy 54:*22* 82:*2*
pop 49:*21* 50:*21*
pop-ups 48:*21*
portion 91:*17* 93:*24*
122:*8*
position 12:*5* 13:*9*
15:*21* 20:*16* 43:*24*
55:*4*
positive 31:*1* 72:*13*
possible 79:*6* 88:*12*
post 10:*14, 22*
potentially 22:*24*
54:*14* 119:*18*
power 107:*6*
powers 107:*4*
practice 13:*16, 23, 25*
14:*3* 48:*8* 82:*4*
83:*22*
practitioner 41:*13*
93:*12*
preceptor 43:*12, 16,*
*21* 44:*10, 13*
pregnant 7:*4*
pre-intake 99:*4*
100:*24* 101:*2, 7, 15,*
*20, 23*
preparation 8:*22*
10:*2*
prepare 8:*15*
prepared 8:*12* 9:*4*
preparing 23:*17*
prescribe 114:*9*
prescribed 34:*1*

100:*14* 104:*6*
presence 31:*6, 12*
PRESENT 3:*11*
59:*24* 82:*20*
pressure 68:*6* 79:*18*
118:*7, 18*
prevent 40:*5*
previous 49:*13* 88:*23*
previously 20:*24*
print 85:*17*
printed 92:*14*
prior 16:*23* 24:*17*
36:*1, 5* 63:*17* 91:*13*
prison 12:*2* 19:*19*
20:*16* 24:*12, 18*
26:*24* 32:*20* 36:*8, 10*
37:*10, 22* 43:*14*
51:*15* 56:*23* 62:*7*
64:*17* 68:*1, 2* 73:*22*
86:*21* 87:*2* 110:*10*
121:*25* 123:*2*
prisoner 53:*24*
54:*20* 78:*25* 82:*24*
98:*1, 2, 3* 106:*5, 13*
prisoners 74:*8*
Prisons 19:*22* 20:*13*
26:*16* 27:*4* 70:*23*
104:*21* 105:*4* 107:*25*
prison's 62:*4*
private 11:*25* 13:*3,*
*23, 24* 14:*3*
privilege 8:*25* 9:*9*
21:*13, 15, 20, 24* 22:*8,*
*12, 17* 23:*25*
Probably 25:*2*
110:*13*
procedure 37:*13*
process 14:*24* 20:*17*
37:*6, 7* 47:*5* 50:*8, 24*
51:*10* 58:*4, 16* 70:*18*
75:*24* 77:*8, 12* 85:*16*
103:*17*
produce 30:*20*
produced 20:*25* 21:*8*
30:*15* 92:*1, 21*
Production 5:*10*
92:*18*
profession 64:*21*
Professional 1:*16*
63:*13*

progress 51:*13*
52:*21* 53:*2* 91:*12*
93:*8, 11, 13* 95:*4*
97:*13* 102:*23* 104:*10*
114:*3*
prompt 48:*20* 49:*6*
pronouncing 102:*19*
proper 53:*10*
properly 23:*17* 78:*4*
protocol 47:*16, 17*
112:*18*
protocols 36:*21*
55:*25*
provide 16:*11* 21:*12*
23:*3, 18* 34:*17, 22*
72:*18* 73:*12* 82:*24*
88:*24* 96:*5* 122:*20*
provided 15:*3* 22:*4*
43:*6* 44:*16, 17, 25*
45:*5, 9, 11, 19, 20, 22*
46:*1, 6, 11, 19* 47:*25*
50:*9* 52:*4* 68:*12, 23*
73:*7* 82:*7* 110:*10*
122:*2, 14*
provider 38:*16*
39:*12* 40:*1, 9* 41:*11*
58:*16, 21* 59:*20, 22*
61:*4* 62:*18* 73:*4, 8*
80:*11, 12* 83:*25* 86:*1*
89:*10, 17, 19, 22*
90:*12, 16, 19* 93:*12*
95:*22* 97:*3* 100:*11*
114:*18*
providers 41:*10*
59:*2, 5, 6, 15*
provider's 33:*12*
39:*16*
provides 98:*2, 4*
providing 36:*19*
45:*15* 48:*8*
Psychiatric 69:*3, 9*
119:*17*
Public 1:*17* 125:*22*
pulled 49:*2*
pursuant 1:*13*
put 35:*14* 43:*9, 12*
60:*17, 19* 63:*6* 81:*15*
92:*9, 17* 94:*22*
putting 28:*25* 116:*14*

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 51 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

< Q >
**qualified** 119:*20*
**Question** 5:*20*  7:*21*,
*22*  8:*2, 6, 7*  9:*2, 11*,
*13, 17*  14:*8, 12*  16:*21*
21:*11, 25*  22:*14, 18*
23:*23*  24:*5, 10*  33:*16*
34:*13, 14, 15*  37:*14*
38:*20*  40:*6*  56:*4, 10*
61:*8, 9*  64:*15*  68:*16*
73:*24*  86:*9*  87:*13, 17*
88:*1, 2, 19*  89:*12*
93:*9*  96:*4*  98:*6, 20*
99:*6*  100:*1, 9, 13, 19*
103:*23*  104:*11*
107:*18*  108:*13, 16, 23*
109:*7, 19, 24*  110:*6, 7*
115:*7*  116:*7*  120:*2*
**questionnaire** 68:*23*,
*24*  79:*20*
**questionnaires** 43:*11*
**questions** 10:*12*  21:*6*
29:*16*  44:*22*  46:*17*
57:*20, 25*  68:*21, 25*
76:*14*  77:*14*  79:*17*,
*24*  92:*7*  93:*5, 7*
95:*19, 20*  99:*9, 21*
100:*4*  101:*1, 17*
110:*17*  111:*3*  116:*23*
117:*14*  121:*4, 7*
122:*23*  123:*10*
**quick** 91:*4*

< R >
**raise** 78:*7*
**range** 17:*6*  18:*4, 10*
35:*20, 24*  91:*21*
118:*20*
**ranges** 18:*8*  32:*19*
33:*1, 5, 10, 11*
**rate** 20:*18, 20, 24*
21:*5, 10*  22:*4, 25*
24:*6, 10*  68:*6*  118:*11*,
*19*
**Ray** 40:*12*  110:*25*
124:*1*
**RAYMOND** 3:*5*
**reached** 20:*14*

111:*19*  115:*10*
**reaches** 34:*6*
**read** 56:*4, 5*  123:*11*
126:*9, 11*
**reading** 32:*16*
**readings** 18:*4, 9*
**really** 59:*18*  106:*22*
107:*8*  108:*16*
**re-ask** 16:*19*
**reason** 19:*13*  22:*5*
23:*3*  39:*21*  78:*13*
127:*5, 8, 11, 14, 17, 20*,
*23*  128:*5, 8, 11, 14, 17*,
*20, 23*
**reassess** 73:*13*  75:*20*
88:*5*
**reassessed** 75:*9*
**reassessment** 19:*6*
37:*2, 4*  74:*15, 18, 22*
75:*3, 12, 22, 25*  76:*2*
83:*24*  84:*1, 2*  112:*1*
123:*4, 5*
**reassessments** 16:*15*
74:*5, 23*  84:*12*
122:*24*
**recall** 13:*4*  17:*18*
18:*1*  25:*10*  27:*6*
42:*12, 22, 23*  43:*22*
44:*18*  45:*3, 8*  46:*4, 5*,
*12*  50:*3, 5, 7*  53:*4, 5*,
*17, 20, 22*  54:*23*
57:*24*  59:*4, 15*  60:*11*,
*23*  62:*1*  63:*17, 18*
65:*8, 21*  67:*8*  69:*16*
70:*1*  71:*16*  72:*20, 23*
73:*3*  76:*10, 12, 21*
80:*3, 20*  81:*1, 13, 17*,
*25*  82:*9, 12, 19*  83:*20*
86:*25*  87:*4*  88:*11*
90:*24, 25*  91:*3*  93:*2*,
*10*  97:*22*  100:*18, 21*
101:*19*  104:*2*  105:*14*
106:*4, 10, 22*  107:*11*
112:*3, 9*  115:*13*
117:*9*  118:*22*  119:*10*
121:*18*
**receive** 10:*20, 25*
12:*5*  13:*9, 14, 19*
16:*24*  40:*23*  45:*14*

47:*16*  60:*13*  69:*2, 10*
89:*21*
**received** 10:*15, 18*
57:*18*  65:*16*  89:*18*
90:*1*  97:*25*  112:*7*
122:*1*
**receiving** 12:*9*  16:*22*,
*24*  21:*3*
**recollection** 8:*1*  54:*2*
65:*10*  76:*16*  80:*2*
81:*15, 24*  95:*11, 16*
97:*9*  99:*17, 20*  100:*4*
105:*9*  111:*25*
**record** 6:*17*  9:*16*
21:*19*  22:*7, 15*  23:*22*
30:*12*  41:*10*  46:*23*
49:*17, 20*  50:*1*  54:*7*
56:*6*  57:*13*  59:*14*
65:*24*  76:*7*  77:*8, 11*
81:*16*  83:*13*  84:*6, 7*,
*13*  91:*6*  92:*1, 19*
96:*11*  110:*15*
**records** 51:*9*  77:*18*
78:*20*  95:*24*  99:*3*
**recover** 107:*6*
**recovered** 107:*4*
**recruited** 111:*10*
**recruiter** 20:*8, 10*
111:*13, 14*
**recruiting** 111:*16*
**Red** 54:*22*
**redacted** 21:*9*
**REES** 2:*16*
**refer** 49:*15*  62:*21*
71:*4*  118:*22*
**reference** 64:*17*  82:*5*
**referenced** 44:*2*
92:*15*
**referred** 62:*9*  73:*4*
**referring** 32:*23*  47:*5*,
*18*  49:*1*  99:*1*  113:*22*
**reflect** 22:*16*
**refresh** 8:*1*  80:*2*
105:*9*
**refreshed** 81:*14*
**refreshes** 65:*10*
81:*24*
**refusal** 48:*12*  53:*9*
54:*25*  115:*12, 15*

**refused** 60:*18*  63:*4*
115:*24*  122:*13*
**refuses** 53:*24*  54:*20*
61:*17*
**refusing** 122:*19*
**regard** 36:*13*  73:*8*
80:*9*
**regarding** 115:*11*
116:*5, 11*
**registered** 10:*7*
43:*25*  53:*14*  55:*14*
56:*15*
**Rehabilitation** 15:*7*,
*24*  16:*7, 18*  18:*21*
**related** 125:*12*
**relationship** 20:*10*
101:*3*
**relative** 111:*16*
125:*15*
**relevance** 20:*23*  22:*3*,
*19*  23:*8, 15, 24*
**relevant** 20:*23, 24*
21:*6*  22:*5*
**remain** 123:*2*
**remains** 19:*7*
**remember** 7:*24*  9:*24*
32:*19*  42:*15*  43:*20*,
*23*  45:*25*  46:*16, 17*
48:*3*  53:*20, 21*  55:*2*
60:*9, 21*  67:*1*  71:*14*,
*23*  79:*21*  80:*1, 12*
86:*18*  100:*7, 8*  102:*9*,
*12*  106:*8*
**reminder** 66:*3*
**remotely** 59:*7, 11*
**removed** 122:*25*
**repeat** 33:*18*  57:*21*
89:*12*
**rephrase** 37:*14*  40:*7*
56:*11*  61:*8*  75:*7*
86:*12*  87:*18*  98:*6, 20*
106:*14*  107:*18*
109:*11*  116:*13*
**rephrased** 108:*24*
**Reporter** 1:*17*  7:*16*
56:*5*  123:*12, 17, 20*,
*22*  124:*1*  125:*5, 22*
**represent** 111:*1*
**reprimand** 64:*3*

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 52 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

reproduced 92:2
Request 5:10
requested 56:6 92:25
required 23:18
41:17, 19 55:11
requirement 41:21
requirements 40:1
57:1
requires 15:21 32:12
resolved 55:22 67:20
respect 83:5, 7, 10
respectful 86:3
Respiration 118:11
respiratory 118:18
respond 55:16, 20
106:20 107:7
response 6:15 46:18
96:6 99:8 105:21
107:10 121:5
responsibilities 14:16,
22 15:10 23:14 29:3
responsibility 38:5
39:11, 17
rest 48:16
restate 109:24
restroom 57:11
result 113:17
résumé 20:15
retained 48:13
retrospectively 109:9
returned 69:17
Returning 53:6
returns 117:11
reveal 103:16, 19
reveals 21:2
review 10:1 16:16
30:12 47:10 48:15
77:7 101:6 107:17
reviewed 8:18 9:19
76:17 91:13
Right 11:24 16:14
17:19 35:11 37:19
38:11 57:2 75:16
90:8 91:11 93:11
101:4
risks 18:12, 15 79:7,
12
Robert 10:5
role 13:20 15:16, 18

28:16, 20 55:2 72:1
room 72:21 90:23
route 15:3
routine 83:23
rules 7:11
run 15:1 43:14, 19
57:25
runs 43:10

< S >
samples 14:18 68:14
SARAH 2:8
saturation 118:19
save 126:12
saw 20:15 42:24
84:20 108:19 121:17
saying 13:18 28:23
39:16 74:12 95:19
says 47:3, 4 48:19
53:7 92:24 93:12
94:10 95:1 97:3, 6,
20 101:15, 18, 25
102:19 103:5, 9
104:3, 7, 13
scale 32:18 34:2, 4,
18, 23 50:19
scales 33:8
scheduled 39:2, 3
42:8
scheme 31:5
school 10:15 11:7, 9
17:4
schooling 45:21
science 11:15
scope 23:5 35:14
screen 29:8, 20
46:25 48:20 65:9
77:13 91:8
screening 29:14
37:17, 23 38:5, 10
47:7 48:23 89:1
99:5 100:24, 25
101:2, 3, 7, 8, 16, 20,
23
scroll 48:16 94:6, 25
SCULLY 2:16
second 44:13 94:5
122:22
secondary 10:23

section 74:10 76:4
98:11, 21 100:13
security 36:13, 15, 21
see 19:4 27:5 29:17
38:3, 9 39:2, 3 47:1
48:16 50:17 51:2
52:23 60:25 61:15
62:2 63:7 65:9, 12
77:16 81:14, 19 87:2,
6, 21 91:9 101:15
seeing 27:6 65:21
76:13 81:25 91:17
112:9
seeking 55:24 56:14,
20, 22, 25
seen 38:4 62:18, 21
81:10 89:3 96:24
self-explanatory 122:6
send 123:24
sense 9:3
sent 72:21 90:23
123:15
September 12:24
Septemberish 12:25
series 92:7
Serrano 3:13
session 44:1 112:14
114:8
set 68:20 125:9
seven 12:15, 16 42:6
Shadow 14:6
shakiness 18:18
share 46:25 65:9
81:14 91:8
SHEET 126:2, 15
127:2 128:2
sheltered 72:8
shift 20:18 25:4
42:13, 16, 17, 21, 25
105:17
shifts 41:18, 20 42:1,
2, 3, 6, 7
shocked 107:9
short-acting 17:10
shortly 75:11
show 43:10, 13, 18
94:7
showed 65:25 112:6
114:3

showing 23:8 97:12
side 121:20
sign 63:21, 25 94:16
123:11
signature 94:8, 13
SIGNATURE:_____
_____DA
TE 127:25 128:25
signed 94:11 95:2
126:18
signs 15:2 17:5, 12,
21 30:8 68:4, 9, 13
117:22, 25 118:6, 14,
17 119:3
similar 96:25
simply 92:14 99:11
sir 64:8
site 58:21, 23 59:3, 5,
16, 20, 22 80:17 86:5,
6, 23 87:1
situation 61:20
66:25 75:8 86:25
situations 70:8
six 27:12 65:18
71:14 81:23 121:24
six-month 54:4
skip 111:22
sliding 32:18 33:8
34:18, 23 50:19
small 47:13
Smith 53:8, 11, 18
61:21 115:11
Smith's 55:2
SOAP 52:20
social 85:19
somebody 38:9
62:13 72:21 73:4
74:22 75:8 79:17
90:4 109:20
somebody's 34:20, 25
51:23
someone's 30:6
son 19:11
sorry 9:9 24:24
56:3 109:19 112:23
114:15
sound 8:9 53:4 54:9
source 108:17
speak 7:14 24:24
83:2, 9 102:6 104:22

105:*11*  106:*2*  115:*22*
119:*20*

**speaking**  16:*12*
53:*21, 22*  70:*20*
113:*18*

**specialist**  60:*20, 25*
61:*15, 18*  62:*2, 9, 19,
22*  63:*7, 12*

**specialists**  54:*19*

**specific**  13:*19*  25:*10*
45:*23*  48:*10, 22*
55:*24*  59:*17*

**specifically**  44:*22*
52:*5*  66:*15*  74:*2*
81:*13*

**spectrum**  67:*25*

**speculate**  88:*17*
113:*20*

**speculating**  113:*16*

**speculation**  88:*15*
113:*14*

**speech**  107:*4, 6*

**speechless**  106:*21*
107:*1, 8*

**spell**  6:*16*

**spoke**  8:*17*  47:*24*
53:*8, 18*  54:*18*  102:*8,
14*  106:*17*  112:*21*
113:*4*  114:*7*  120:*22*

**stab**  67:*14*

**staff**  23:*11, 12, 17*
71:*24*  89:*2*  117:*5, 7*
123:*1, 2*

**Staffing**  2:*21*  20:*4*
23:*9*  117:*6*

**stamp**  66:*3*  91:*21*
97:*13*

**standard**  9:*1*  39:*25*
68:*20*

**start**  14:*8*  50:*13*
67:*11*  103:*16*

**started**  12:*2*  27:*21*
28:*14*  111:*9*

**starting**  33:*7*

**state**  6:*16*  39:*6*
53:*23*  69:*3*  91:*20*

**stated**  11:*22*  18:*16*
21:*19, 21*  22:*7*  23:*7*
30:*5*  38:*1*  68:*11*
79:*14*  87:*5*

**STATES**  1:*1*  103:*5,
10*  104:*4*

**stating**  20:*15*  63:*25*

**stationed**  26:*17, 18*
75:*18*

**status**  72:*6*  119:*13,
24*  120:*3, 22*

**stayed**  28:*13*

**steps**  109:*13*

**Stipulations**  5:*15*

**stopped**  67:*13*

**stored**  49:*10, 12*  50:*2*

**Strategies**  64:*24*

**Street**  2:*3, 9, 14, 19*
3:*6*

**strict**  36:*9, 21*

**stricter**  36:*10*

**strike**  36:*18*

**strip**  30:*21*

**stuff**  103:*16*  111:*5*

**subject**  8:*24*

**Subjective**  93:*21*
97:*24*  98:*10, 14, 21*
100:*13*  101:*14*

**subsequent**  84:*19*

**sued**  7:*3*

**sugar**  17:*7*  26:*12*
29:*21*  30:*16*  32:*12,
16, 20, 22*  33:*6*  67:*22*
68:*13*  77:*6*  93:*1*
102:*11*  104:*3*  105:*18*

**sugary**  32:*5*

**suicidal**  76:*25*

**Suite**  2:*19*  3:*6*

**SUMMER**  2:*19*
117:*4*  123:*13*

**supervisor**  20:*6*
28:*18*  53:*8, 18*  55:*3*
78:*8*

**supervisors**  62:*8*

**SUPPORT**  5:*3*

**supposed**  35:*2*  60:*25*
61:*15, 17*  62:*2*  63:*6*
66:*8*  73:*10, 11, 14*
98:*4*

**sure**  16:*13*  29:*2*
39:*23*  53:*1*  55:*5*
59:*16*  69:*24*  70:*1*
78:*12*  96:*5*  104:*2*

**108**:*5, 7*  119:*19*

**surgeries**  58:*2*

**sweatiness**  18:*18*

**Sweating**  17:*17*  30:*6*

**sworn**  6:*3*  125:*8*

**symptomatic**  19:*1*
37:*25*

**symptoms**  17:*5, 12,
22*  18:*16, 23*  29:*18*
30:*6, 8*  68:*17*  79:*14,
19*

**system**  43:*10*  49:*11*
50:*21*  51:*20*  63:*3*
74:*11*  76:*5*  101:*21*
121:*25*

**< T >**

**take**  7:*16*  8:*3, 7*
12:*10*  30:*22*  37:*6*
47:*9*  48:*14*  58:*4*
75:*19*  81:*22*  91:*4*
101:*22*  114:*23*
115:*24*

**taken**  1:*13*  58:*11*
109:*14, 15*  117:*25*
118:*3*  121:*6*  125:*14*
126:*10*

**talk**  7:*19*  29:*13*
71:*13, 15*  102:*15*
116:*16*

**talking**  37:*18*  53:*1*
59:*16*  72:*25*  73:*22,
23*  76:*13*  86:*19*

**taught**  17:*4*  67:*9*

**tax**  117:*11*

**Tekaccel**  19:*24, 25*
20:*7*  111:*11*  117:*10*

**telephone**  95:*1*
96:*25*  97:*6*

**tell**  10:*14*  11:*20*
31:*5*  58:*22*  70:*11*
104:*5*  106:*5*  111:*15*
112:*12, 15, 16, 19*

**telling**  8:*19*  21:*17*
99:*17*

**tells**  30:*23*  98:*22*

**temperature**  118:*9,
24*  119:*2*

**term**  29:*14*  32:*8*
41:*9, 11*  43:*16*  57:*9*
64:*10*  108:*2*

**terms**  36:*18, 19*  67:*9,
11*

**test**  27:*16*  30:*19, 21,
22*  68:*13*

**testified**  6:*3*  33:*21*
45:*14*  70:*25*  75:*5*
111:*24*  117:*5*

**testify**  113:*19*

**testifying**  39:*25*

**testimony**  9:*4*  61:*12*
75:*10*  85:*12*  115:*13*
119:*10, 16, 19*  121:*2,
11*

**Texas**  20:*2*

**Thank**  18:*11*  24:*14*
28:*10*  36:*16*  42:*11*
49:*24*  63:*11*  66:*2*
88:*22*  89:*25*  90:*9*
92:*20*  108:*21*  117:*14*
123:*10*

**therapy**  16:*13*

**thing**  8:*5*  35:*11*  53:*2*

**things**  13:*12*  14:*19*
17:*11*  24:*4*  32:*2, 4*
43:*11, 14, 19*  44:*8, 9,
24*  55:*18*  56:*14, 21*
58:*3*  62:*16*  69:*6*
76:*21*  111:*6*  120:*17*
121:*20*

**think**  9:*6, 8*  16:*20*
23:*4*  25:*4*  37:*18*
40:*4*  43:*15*  44:*4*
59:*13*  61:*12*  63:*23*
64:*6*  75:*2*  80:*19, 24*
81:*11, 12*  86:*13*
92:*21*  94:*25*  100:*8*
104:*9*  109:*10, 13*
110:*2*  112:*24*  115:*3,
14*  116:*20*  119:*8*
123:*9*

**third**  53:*3*  101:*15*

**THOMAS**  2:*19*  4:*6*
116:*22*  117:*2, 4, 13*
123:*14, 19, 21*

**thought**  62:*8, 13*
90:*8*  94:*17*  115:*17*

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**three** 44:*18* 45:*10*
60:7 63:*24* 69:*13*
104:*4* 112:8
**three-day** 112:*13*
**threshold** 34:*6*
**time** 22:*24* 24:*6, 11*
37:*1* 38:*12* 39:*13*
48:*24* 57:*10* 71:*10*
83:8 86:*22* 90:*19*
92:*13* 103:*15* 108:*19*
115:*19* 117:*21*
119:*14* 120:*14, 22*
121:*4* 123:*18* 125:9
**times** 6:*24* 8:*21* 9:*2,*
*7* 18:*22* 49:*2* 60:7
72:*17* 80:*20* 83:2
86:*21* 92:*4* 103:*4*
119:*9* 120:*6, 12*
**title** 115:*19*
**today** 8:*13* 109:*4*
121:*11*
**today's** 8:*16*
**told** 22:*9* 25:*17*
53:*12* 55:*10* 63:5, *22*
66:*23* 83:*16* 98:*1*
102:*9* 104:*15* 107:*13*
112:*7, 20* 113:*4, 7*
114:*5*
**Tom** 124:*3*
**tool** 46:2 64:*11*
84:*23*
**tools** 64:*20* 65:*3, 6*
**top** 93:*24*
**touched** 122:*6*
**track** 51:*17*
**trained** 18:*3, 12*
47:*17* 54:*19, 21, 24*
56:*15* 63:8
**training** 12:5 13:*9,*
*14, 19* 16:*16, 24* 17:*3*
23:*13* 43:6 44:*1, 16,*
*19* 45:*10, 11, 13, 15,*
*17, 18, 20* 46:1 47:*16,*
*24* 48:*4* 53:*9, 14, 19*
54:*16* 55:*11, 14, 24*
56:*14, 21, 22, 25*
61:*23* 115:*12* 121:5
**transcript** 7:*17*
125:7 126:*9*

**transfer** 104:*11*
**transferred** 26:*23*
**transmit** 69:*20*
**treat** 31:*25*
**treated** 31:*15, 18, 20*
**treating** 45:6
**treatment** 54:25 82:6
**TREBACH** 2:5
**triage** 29:5 38:*1, 2*
**trial** 22:*25*
**trip** 30:*22*
**true** 56:*13* 87:*20*
125:6 126:*12*
**truthful** 87:8
**try** 99:*13* 111:*4, 23*
**trying** 52:*25* 61:*11*
62:*15*
**twice** 92:*21*
**two** 31:9 41:*25* 42:7,
*9* 44:*15* 60:7 69:*12*
83:*19* 87:6, *21* 88:6
94:*12* 110:*13*
**two-hour** 112:*1*
**type** 7:*15* 13:*12*
14:*18* 16:*10* 17:*9, 10*
25:*16, 17, 20, 23* 26:*3,*
*4, 5* 31:*14, 18, 19, 24*
44:*24* 48:*10* 52:*17*
63:*13* 82:*13* 92:*25*
93:*1, 2* 95:*12, 17*
103:5, *10, 20*
**typed** 75:*24*
**types** 118:*13, 14*
**typical** 14:*15, 21*
42:5 57:*16*
**typically** 89:*20*

**< U >**
**unclear** 59:*14*
**uncontrollably** 67:*14*
**underneath** 49:*12*
**understand** 21:9
22:2, *25* 23:6, *20*
24:*1* 33:*15, 17* 34:*15*
38:*11, 20* 61:7 63:*11*
76:*17*
**understanding** 86:2
92:6 113:*10, 11, 17*
126:*15*

**understood** 8:*3* 33:*9*
47:8 63:*25* 90:8
**unit** 32:9
**UNITED** 1:*1*
**units** 32:8, *15, 21*
34:*1, 7* 50:*15, 20*
114:5
**University** 11:*13*
**Unlimited** 117:*5, 8*
**uploaded** 77:*15*
**urgent** 67:*7, 18, 24*
70:*14*
**urination** 17:*23*
18:*19*
**urine** 14:*18* 30:*16,*
*21, 23* 68:*13* 82:*14*
**use** 32:8 41:*10* 57:9
64:*24* 90:*18*
**usually** 59:2, *19, 21*
**utilize** 54:25 65:2, 5
**utilized** 48:*24*
**utilizing** 23:9

**< V >**
**variation** 34:*1, 3*
**variations** 35:9
**varies** 58:9
**vary** 58:5
**verbal** 114:*17*
**verbally** 29:22 107:7
**verifying** 104:*17*
**versus** 6:*14* 31:*1*
34:*4* 67:*24*
**Videoconferenced**
1:*12*
**virtually** 1:*14*
**vision** 17:*17, 24*
18:*18* 30:7 79:*16, 19*
**vital** 15:*1* 68:*4, 9, 13*
117:22, *25* 118:6, *14,*
*17* 119:*3*
**vs** 1:6 126:5

**< W >**
**Wait** 96:*4*
**walk** 11:*19* 14:*4*
57:*16*
**Wanda** 2:*16*
**want** 22:*15* 23:*21*
47:*15* 54:*17* 59:*14*

65:*19* 69:*25* 78:*4*
119:*18* 121:*6* 123:*12,*
*24*
**wanted** 81:*15*
**wanting** 53:*9, 18*
**wants** 86:*3*
**washed** 14:*23*
**watch** 11:*23*
**water** 30:*18* 32:5
37:8 72:*18* 73:*12*
82:*25* 110:*11*
**way** 41:*23* 64:*25*
74:*4* 84:*11* 92:*13*
99:*12* 104:*17* 111:*6,*
*9, 25* 120:2, *9*
**ways** 29:*23* 31:*17,*
*19, 25* 51:*17* 53:*10*
**Wednesday** 1:*10*
**week** 11:*18* 25:7, *9*
38:*16* 42:*1, 6, 9*
**weeks** 27:*11, 24*
**weight** 32:*3*
**well** 21:*17* 28:9
38:*3, 24* 64:*19* 75:*1*
107:*3* 121:*19*
**went** 20:*17* 37:*17*
104:*1*
**whatsoever** 122:*1*
**willing** 109:*11*
**willingly** 114:*23*
**withdrawal** 44:*23*
**WITNESS** 4:2 5:5
14:*10, 13* 21:*24*
24:*13* 33:*17* 34:*16*
36:8 38:*22* 41:2
44:6 46:*11* 47:*22*
52:*3* 56:9, *20* 57:7
58:9, *20* 59:*10* 60:*3*
63:2 64:*8, 16* 68:*3*
71:*21* 74:*18* 75:*4*
78:*1* 80:*3, 6* 81:*1, 17*
84:*5* 85:*4, 15* 86:*16,*
*20* 87:*15* 88:*3, 4, 20*
92:*10* 95:8 96:*8, 19*
98:*16* 99:*25* 103:*15*
109:*23* 110:8 113:22
124:*4* 125:8
**witness's** 87:*16*
**WITTEKIND** 3:5
4:5 34:8 35:6 36:6

39:19  40:10, 14, 18,
25  46:8  47:20  56:1,
16  57:5  59:8  61:5
62:10  63:1  64:12
71:19  74:17, 24  75:2
78:14  80:22  81:9
85:2, 13  86:15  87:9,
23  88:16  93:16  95:6
96:12, 16  109:16, 21
110:21, 25  113:1
114:1, 14  115:8
116:20  122:6  124:2
**wonderful**  40:19
**wondering**  33:20, 25
38:17  53:17  76:18
**Wood**  10:5
**work**  10:4, 13  15:2,
6  16:1  24:11  25:8
27:10  28:1, 3, 14
34:4  41:17, 19  42:5,
9  44:12  85:21  86:5
**worked**  10:10  13:24
19:21  26:15  34:6
36:2  38:18  41:16, 20
42:15, 20  57:15
60:12  65:3  70:5
71:10  90:22  106:2
116:4  121:25
**worker**  85:19
**working**  24:18  33:4,
21  36:1, 4  38:2
42:13  43:2, 5  80:17
85:25  87:1  89:6
97:9  106:12, 17
**works**  53:15  55:15
**wound**  15:12  67:14
**write**  39:6  74:11
83:22  98:8, 11, 13, 18
**write-up**  60:17
61:13  62:6, 23  63:2,
4, 20  64:7
**written**  64:3
**wrote**  85:9  114:4
120:20, 21

**< Y >**
**Yeah**  74:2
**year**  11:17  120:14
**years**  12:15, 16

**YesCare**  3:7  23:8
46:12  48:1  105:5, 6
106:1  107:21  111:1
115:11, 23  116:11, 16
**YesCare3432**  82:1
**YesCare3437**  82:3
**YesCare3438**  66:4
**YesCare3443**  66:4
**YesCare's**  46:6  81:6
**York**  10:21  11:2
13:7  14:1, 21  15:6

**< Z >**
**zeroes**  91:25
**Zoom**  2:5, 11, 16, 21
3:8

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 56 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

## WORD LIST

**< $ >**
$64  *(1)*

**< 0 >**
000405  *(1)*

**< 1 >**
1  *(16)*
1:08  *(1)*
10  *(1)*
10/28/2023  *(1)*
10:02  *(1)*
10:04  *(1)*
100  *(1)*
11:00  *(4)*
110  *(3)*
117  *(2)*
12  *(2)*
12th  *(1)*
13-week  *(2)*
150  *(3)*
1515  *(1)*
15th  *(2)*
16  *(1)*
1717  *(1)*
18  *(3)*
1801  *(1)*
19102  *(1)*
19103  *(3)*
19123  *(1)*
1st  *(1)*

**< 2 >**
2  *(6)*
2:24-cv-05618-TJS  *(1)*
20  *(1)*
200  *(1)*
2008  *(1)*
2011  *(1)*
2012  *(1)*
2016  *(1)*
2019  *(3)*
2020  *(1)*
2021  *(2)*
2023  *(17)*
2024  *(2)*
2025  *(2)*

215.561.2300  *(1)*
215.564.0400  *(1)*
215.569.4433  *(1)*
215.683.5000  *(1)*
22  *(1)*
23-hour  *(1)*
25  *(1)*
26  *(2)*
28  *(12)*
28th  *(3)*

**< 3 >**
3  *(4)*
3:00  *(6)*
3:30  *(1)*
30  *(6)*
300  *(1)*
350  *(1)*

**< 4 >**
4  *(1)*
400  *(3)*
409  *(1)*
412.654.9070  *(1)*
46484  *(1)*

**< 5 >**
5  *(3)*
500  *(2)*
542  *(7)*

**< 6 >**
6  *(1)*
610  *(1)*
631  *(1)*
6th  *(1)*

**< 7 >**
7:00  *(1)*
70  *(2)*

**< 8 >**
8:00  *(1)*
8-hour  *(1)*

**< 9 >**
911  *(12)*
97  *(1)*
97.0  *(1)*

**< A >**
a.m  *(2)*
AAOX3  *(2)*
abbreviation  *(1)*
ability  *(1)*
able  *(3)*
abnormal  *(1)*
ABOLITIONIST  *(1)*
abrasion  *(1)*
abusing  *(1)*
access  *(13)*
Accu-Chek  *(3)*
accurate  *(11)*
acknowledge  *(1)*
action  *(7)*
actual  *(1)*
addition  *(3)*
additional  *(9)*
address  *(2)*
administer  *(10)*
administered  *(3)*
administering  *(2)*
administration  *(2)*
administrator  *(3)*
Administrators  *(1)*
admissible  *(1)*
admission  *(1)*
advising  *(1)*
affiliated  *(1)*
afternoon  *(1)*
agency  *(2)*
ago  *(5)*
agree  *(1)*
agreed  *(2)*
agreement  *(1)*
ahead  *(5)*
aide  *(4)*
aide/medical  *(1)*
al  *(2)*
alcohol  *(1)*
alert  *(6)*
alerting  *(1)*
Alex  *(1)*
allow  *(4)*
altered  *(1)*
amount  *(6)*
amounts  *(1)*
and/or  *(1)*

**Answer**  *(59)*
answered  *(3)*
answering  *(7)*
answers  *(7)*
anybody  *(3)*
anybody's  *(1)*
APOLLON  *(14)*
A-P-O-L-L-O-N  *(1)*
Apollon's  *(1)*
APPEARANCES  *(2)*
Appearing  *(5)*
appears  *(2)*
applicable  *(1)*
application  *(1)*
apply  *(1)*
appropriate  *(2)*
approximately  *(8)*
Arch  *(2)*
area  *(4)*
argue  *(1)*
articulated  *(1)*
aside  *(2)*
asked  *(15)*
asking  *(23)*
asserted  *(1)*
asserting  *(7)*
assess  *(1)*
assessing  *(3)*
assessment  *(20)*
assessor  *(1)*
assigned  *(3)*
assist  *(1)*
assistant  *(24)*
assistants  *(1)*
associated  *(3)*
associate's  *(1)*
assume  *(2)*
assumed  *(1)*
assumption  *(2)*
attempting  *(1)*
Attorney  *(9)*
attorney/client  *(2)*
attorneys  *(3)*
August  *(4)*
Austen  *(1)*
authority  *(2)*
available  *(2)*
average  *(2)*
avoid  *(1)*

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 57 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Awake *(3)*

**< B >**
Bachelor's *(1)*
back *(22)*
background *(1)*
BAKER *(90)*
based *(26)*
basic *(1)*
basically *(2)*
basis *(1)*
Bates *(9)*
bathing *(1)*
Bear *(2)*
bearing *(1)*
beautiful *(1)*
becoming *(1)*
beds *(2)*
began *(2)*
beginning *(2)*
begins *(2)*
behalf *(1)*
belated *(1)*
believe *(17)*
beneath *(1)*
beyond *(2)*
birth *(4)*
bit *(4)*
Blanche *(1)*
bleeding *(1)*
blood *(26)*
Bloodsaw *(1)*
blurred *(5)*
blurry *(1)*
BMI *(1)*
board *(3)*
Body *(3)*
book *(1)*
born *(1)*
bottom *(3)*
Boulevard *(1)*
box *(2)*
break *(5)*
breaks *(1)*
breathing *(1)*
BRET *(3)*
brief *(1)*
bring *(2)*
broader *(1)*

broke *(2)*
Brooklyn *(2)*
brought *(2)*
built *(1)*
bunch *(1)*

**< C >**
call *(42)*
called *(13)*
calling *(2)*
calls *(4)*
capacity *(1)*
Capella *(1)*
captioned *(1)*
carbohydrates *(1)*
care *(27)*
Career *(6)*
cares *(2)*
Carey *(3)*
caring *(1)*
Carney *(1)*
carried *(3)*
carry *(1)*
case *(17)*
category *(1)*
caveat *(1)*
CENTER *(8)*
certain *(4)*
certainly *(3)*
certificate *(2)*
certify *(3)*
certifying *(1)*
cetera *(1)*
CFCF *(27)*
challenges *(2)*
chances *(1)*
change *(16)*
changes *(2)*
Chapel *(2)*
characterize *(2)*
characterized *(1)*
Charge *(6)*
check *(8)*
checked *(3)*
checking *(1)*
checks *(3)*
chronic *(1)*
circumstances *(1)*
CITY *(8)*

clarification *(2)*
clarified *(1)*
clarify *(3)*
class *(1)*
classroom *(1)*
clear *(12)*
click *(1)*
clicked *(1)*
client *(4)*
clinic *(1)*
clinical *(5)*
closer *(1)*
clothing *(1)*
color *(5)*
colors *(1)*
come *(5)*
comes *(1)*
comfortable *(1)*
coming *(3)*
commencing *(1)*
comment *(1)*
common *(1)*
Commonwealth *(2)*
communications *(1)*
company *(4)*
compensation *(3)*
complement *(1)*
complete *(1)*
completed *(4)*
completely *(1)*
compliant *(1)*
compos *(1)*
compound *(1)*
computer *(3)*
concern *(2)*
concerned *(1)*
concerns *(1)*
concluded *(1)*
condition *(1)*
conditions *(7)*
conduct *(3)*
conducted *(1)*
confirm *(1)*
confused *(1)*
confusion *(3)*
congratulations *(1)*
conjunction *(1)*
consequence *(1)*
consider *(1)*

considered *(2)*
consist *(2)*
consisted *(1)*
consistent *(3)*
consult *(2)*
contact *(1)*
content *(1)*
context *(2)*
Continued *(2)*
continuing *(1)*
continuity *(3)*
contract *(4)*
contradiction *(1)*
contradicts *(1)*
conversation *(4)*
conversations *(1)*
copy *(6)*
Corinne *(1)*
Corp *(1)*
correct *(22)*
Correctional *(5)*
corrections *(2)*
correctly *(1)*
counsel *(5)*
couple *(7)*
course *(1)*
COURT *(9)*
covered *(2)*
covering *(1)*
coworkers *(1)*
create *(2)*
created *(1)*
credibility *(3)*
Curran-Fromhold *(2)*
currently *(3)*
custody *(1)*
cut *(1)*

**< D >**
dark *(1)*
darker *(1)*
date *(9)*
dated *(1)*
daughter *(2)*
day *(16)*
days *(12)*
DC *(2)*
death *(11)*
decide *(4)*

decision *(2)*
decisions *(1)*
**DECLARATION** *(1)*
declare *(1)*
declined *(1)*
**Defendant** *(5)*
**Defendant(s** *(1)*
**Defendants** *(2)*
define *(1)*
definitely *(1)*
degree *(6)*
degrees *(2)*
dehydrated *(1)*
dehydration *(3)*
**DEPARTMENT** *(8)*
depend *(1)*
dependent *(1)*
depending *(4)*
deposition *(25)*
describe *(4)*
described *(1)*
**DESCRIPTION** *(1)*
details *(1)*
**Detention** *(1)*
determine *(2)*
determined *(5)*
determining *(3)*
develop *(1)*
diabetes *(41)*
diabetic *(20)*
diagnosed *(1)*
diagnosis *(1)*
died *(5)*
diet *(4)*
difference *(2)*
differences *(2)*
different *(21)*
differently *(1)*
**Digital** *(1)*
dip *(1)*
**Direction** *(1)*
directly *(1)*
director *(2)*
disciplinary *(5)*
disclose *(1)*
discovery *(5)*
discussed *(1)*
**Discussion** *(5)*
discussions *(2)*

distinguished *(1)*
**DISTRICT** *(2)*
doctor *(17)*
doctors *(4)*
doctor's *(2)*
document *(48)*
documentation *(6)*
documentations *(2)*
documented *(12)*
documenting *(2)*
**Documents** *(8)*
doing *(3)*
dosage *(1)*
dosages *(1)*
draw *(1)*
drew *(1)*
drink *(3)*
drinking *(1)*
drinks *(1)*
dropping *(1)*
drugs *(1)*
duly *(1)*
**Dysphagia** *(1)*

**< E >**
earlier *(8)*
easier *(1)*
**EASTERN** *(1)*
educate *(1)*
education *(4)*
educational *(1)*
efficient *(1)*
eight *(1)*
eight-hour *(1)*
either *(1)*
**EKG** *(2)*
**EKGs** *(1)*
electronic *(11)*
**Electronically** *(2)*
emails *(1)*
emergency *(4)*
emergent *(7)*
**EMILY** *(2)*
employed *(4)*
employee *(8)*
employees *(1)*
employer *(2)*
employer's *(1)*
employment *(6)*

encounter *(16)*
encountered *(1)*
encourage *(1)*
ended *(1)*
endocrinologist *(2)*
endoscopy *(6)*
engage *(1)*
enlarge *(1)*
entails *(1)*
enter *(6)*
entered *(1)*
entire *(1)*
entirety *(1)*
entitled *(1)*
entity *(1)*
**ERRATA** *(4)*
**ESQUIRE** *(7)*
**Established** *(1)*
**Estate** *(1)*
et *(3)*
evaluating *(2)*
evaluation *(2)*
**Everest** *(1)*
everyone's *(1)*
exactly *(2)*
**EXAMINATION** *(7)*
examined *(1)*
**Excessive** *(1)*
excluding *(1)*
excuse *(2)*
excused *(1)*
exercise *(1)*
exercises *(1)*
exhibits *(1)*
expect *(1)*
expectations *(1)*
expected *(2)*
experience *(1)*
experiencing *(2)*
expert *(2)*
explain *(3)*
explanation *(2)*
exploring *(1)*
extend *(1)*
extended *(1)*

**< F >**
facility *(9)*
**Fahrenheit** *(1)*

fairness *(1)*
fall *(1)*
familiar *(12)*
familiarity *(1)*
familiarize *(1)*
far *(1)*
fast *(1)*
faster *(2)*
fault *(1)*
**February** *(1)*
feet *(1)*
field *(1)*
file *(2)*
fill *(6)*
filled *(9)*
financially *(1)*
fine *(1)*
finish *(5)*
firing *(1)*
first *(12)*
**Five** *(6)*
five-minute *(1)*
**Flag** *(1)*
floor *(1)*
flush *(2)*
follow *(10)*
following *(1)*
follows *(1)*
follow-up *(11)*
follow-ups *(3)*
foregoing *(2)*
forgot *(1)*
form *(54)*
formal *(2)*
forms *(4)*
forth *(1)*
**Four** *(2)*
**Frasier** *(1)*
free *(2)*
frequent *(1)*
frequently *(2)*
front *(6)*
full *(1)*
further *(5)*

**< G >**
gather *(1)*
**Gay** *(27)*
**Gays** *(1)*

Gene *(1)*
general *(4)*
generally *(9)*
generated *(1)*
getting *(2)*
give *(15)*
given *(11)*
giving *(2)*
glucose *(21)*
go *(26)*
goes *(2)*
going *(17)*
Good *(5)*
GORDON *(1)*
gotten *(2)*
gradations *(1)*
graduate *(2)*
graduated *(2)*
GROTE *(114)*
ground *(1)*
grounds *(2)*
guess *(4)*
guidance *(1)*
guidelines *(6)*
guidelines/protocols *(1)*

< H >
Hamilton *(1)*
hand *(1)*
Hang *(2)*
happen *(4)*
happened *(6)*
hard *(3)*
harm *(1)*
head *(1)*
health *(9)*
hear *(5)*
heard *(8)*
heart *(1)*
heavier *(1)*
held *(6)*
help *(4)*
helps *(1)*
hereof *(1)*
high *(6)*
higher *(4)*
hired *(4)*
history *(3)*

HIV *(1)*
HIV/AIDS *(1)*
HOFF *(2)*
hold *(2)*
home *(16)*
homicidal *(1)*
hopefully *(1)*
Hospital *(12)*
hour *(4)*
hours *(6)*
housing *(1)*
HU *(1)*
hyperglycemia *(7)*
hyperglycemic *(1)*
hypertension *(1)*
hypoglycemia *(2)*
hypoglycemia/hypergl
ycemia *(1)*
hypoglycemic *(1)*

< I >
identified *(2)*
Identify *(3)*
identities *(1)*
illness *(1)*
immediate *(1)*
inaccurate *(1)*
inappropriate *(1)*
incident *(1)*
include *(3)*
included *(2)*
includes *(1)*
including *(3)*
incorrect *(2)*
independent *(4)*
INDEX *(1)*
indicate *(4)*
indicated *(6)*
indicates *(3)*
indicating *(1)*
individual *(5)*
infirmary *(10)*
inform *(1)*
information *(21)*
informed *(2)*
injectable *(1)*
inmate *(3)*
inmates *(2)*
inquiry *(3)*

insight *(1)*
instance *(3)*
instances *(4)*
institution *(3)*
institutions *(1)*
institution's *(1)*
instruct *(4)*
instructed *(3)*
instructing *(6)*
Insulin *(54)*
insulins *(2)*
intake *(118)*
interaction *(2)*
interested *(1)*
intermetex *(2)*
I-N-T-E-R-M-E-T-E-
X *(1)*
interrogatories *(1)*
Interrogatory *(3)*
intervention *(7)*
interventions *(2)*
involve *(1)*
involved *(2)*
Isabella *(8)*
issue *(6)*
issues *(3)*
its *(1)*
IV *(1)*

< J >
JACOB *(1)*
jail *(1)*
jails *(1)*
JAMES *(1)*
January *(4)*
Jared *(4)*
Jeoboham *(1)*
Jersey *(3)*
JFK *(1)*
Job *(12)*
jobs *(1)*
Johnson *(1)*
join *(7)*
JONATHAN *(1)*
JR *(2)*
judge *(1)*
judgment *(1)*
June *(1)*
JUNG *(55)*

Jung's *(7)*

< K >
KAMINSKY *(1)*
keep *(1)*
ketoacidosis *(1)*
ketones *(16)*
KIERNAN *(1)*
KIMBALL *(1)*
kind *(2)*
knew *(4)*
know *(44)*
knowledge *(1)*

< L >
laid *(1)*
language *(1)*
larger *(1)*
LAW *(2)*
lawsuit *(1)*
lawyers *(2)*
learn *(4)*
learned *(2)*
led *(1)*
level *(12)*
levels *(2)*
license *(9)*
light *(1)*
lighter *(1)*
limited *(1)*
limits *(2)*
Line *(12)*
listed *(1)*
litigation *(1)*
little *(7)*
located *(1)*
location *(1)*
log *(1)*
log-in *(1)*
Lolo *(1)*
long *(8)*
long-acting *(1)*
longer *(1)*
look *(10)*
looked *(2)*
looking *(5)*
Lose *(1)*
lost *(1)*
lot *(3)*

loud (2)
LOUIS (2)
low (1)
lowers (1)
LPNs (2)

< M >
ma'am (1)
majority (1)
making (4)
managed (2)
manner (1)
Manor (2)
MANSUKHANI (1)
MARGO (1)
MARIESHA (9)
M-A-R-I-E-S-H-A (1)
MARKED (4)
Market (1)
Marsha (7)
Marsha's (1)
math (2)
matter (2)
matters (1)
Maureen (24)
mean (22)
Meaning (1)
means (2)
meant (4)
Med (1)
medical (63)
medication (17)
medications (5)
meet (1)
Megan (2)
Mellitus (2)
memory (1)
mental (6)
mentioned (1)
mentis (1)
met (2)
middle (4)
Mike (1)
mine (1)
mini (1)
minutes (9)
mischaracterizes (1)
misunderstanding (1)
mm-mmh (1)

modifiable (1)
modification (1)
moment (6)
money (1)
month (4)
months (6)
morning (4)
mortality (1)
moved (2)
moving (1)

< N >
name (13)
named (1)
names (3)
nature (3)
necessarily (1)
necessary (1)
need (11)
needed (5)
needs (8)
negative (1)
neither (1)
NET (3)
never (4)
New (11)
nice (1)
No._____Change (14)
No._____Line (12)
No.____Line (2)
nods (1)
noncompliant (6)
non-intake (1)
normal (7)
Norristown (4)
Notary (2)
note (18)
notes (4)
notice (2)
notified (1)
notify (1)
November (4)
number (7)
numbers (7)
nurse (41)
nurses (2)
nursing (24)

< O >

oath (1)
object (21)
objecting (1)
Objection (52)
objective (2)
objectives (1)
observation (1)
observed (1)
obtain (3)
occasion (1)
occur (1)
O'CONNOR (1)
October (17)
offer (1)
offered (3)
office (4)
officer (1)
officers (1)
oftentimes (1)
Okay (20)
older (1)
once (3)
ones (2)
opinion (2)
opportunity (1)
opposed (1)
oral (3)
order (30)
ordered (7)
ordering (1)
orders (10)
oriented (6)
outpatient (1)
outset (1)
outside (5)
overall (1)
overcrowded (2)
overtime (4)
oxygen (1)

< P >
p.m (4)
pace (1)
packages (1)
PAGE (44)
pages (4)
pamphlet (1)
pandemic (2)
paper (6)

paperwork (3)
PAR (1)
part (25)
particular (2)
parties (2)
pass (5)
passing (1)
pathway (3)
pathways (2)
patient (55)
patient/prisoner (1)
patients (21)
patient's (3)
pause (1)
pay (6)
PDP (19)
PDP18 (1)
PDP's (1)
penalty (3)
PENNSYLVANIA
  (10)
people (7)
perform (1)
performing (1)
period (1)
periods (1)
PERJURY (2)
person (12)
personally (1)
person's (2)
pertaining (3)
PHILADELPHIA
  (17)
phone (3)
phrased (2)
physical (3)
physically (8)
pick (1)
picked (2)
place (4)
placed (1)
placement (1)
Plaintiff (2)
plaintiffs (1)
plan (1)
play (1)
please (9)
plenty (1)
point (2)

Case 2:24-cv-05618-TJS    Document 97-5    Filed 12/05/25    Page 61 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

policies *(3)*
policy *(2)*
pop *(2)*
pop-ups *(1)*
portion *(3)*
position *(6)*
positive *(2)*
possible *(2)*
post *(2)*
potentially *(3)*
power *(1)*
powers *(1)*
practice *(7)*
practitioner *(2)*
preceptor *(5)*
pregnant *(1)*
pre-intake *(7)*
preparation *(2)*
prepare *(1)*
prepared *(2)*
preparing *(1)*
prescribe *(1)*
prescribed *(3)*
presence *(2)*
PRESENT *(3)*
pressure *(4)*
prevent *(1)*
previous *(2)*
previously *(1)*
print *(1)*
printed *(1)*
prior *(6)*
prison *(24)*
prisoner *(9)*
prisoners *(1)*
Prisons *(8)*
prison's *(1)*
private *(5)*
privilege *(10)*
Probably *(2)*
procedure *(1)*
process *(16)*
produce *(1)*
produced *(5)*
Production *(2)*
profession *(1)*
Professional *(2)*
progress *(12)*
prompt *(2)*

pronouncing *(1)*
proper *(1)*
properly *(2)*
protocol *(3)*
protocols *(2)*
provide *(12)*
provided *(26)*
provider *(29)*
providers *(5)*
provider's *(2)*
provides *(2)*
providing *(3)*
Psychiatric *(3)*
Public *(2)*
pulled *(1)*
pursuant *(1)*
put *(10)*
putting *(2)*

< Q >
qualified *(1)*
Question *(64)*
questionnaire *(3)*
questionnaires *(1)*
questions *(31)*
quick *(1)*

< R >
raise *(1)*
range *(7)*
ranges *(6)*
rate *(12)*
Ray *(3)*
RAYMOND *(1)*
reached *(3)*
reaches *(1)*
read *(5)*
reading *(1)*
readings *(2)*
really *(4)*
re-ask *(1)*
reason *(19)*
reassess *(3)*
reassessed *(1)*
reassessment *(18)*
reassessments *(5)*
recall *(80)*
receive *(14)*
received *(9)*

receiving *(4)*
recollection *(15)*
record *(30)*
records *(5)*
recover *(1)*
recovered *(1)*
recruited *(1)*
recruiter *(4)*
recruiting *(1)*
Red *(1)*
redacted *(1)*
REES *(1)*
refer *(4)*
reference *(2)*
referenced *(2)*
referred *(2)*
referring *(6)*
reflect *(1)*
refresh *(3)*
refreshed *(1)*
refreshes *(2)*
refusal *(5)*
refused *(4)*
refuses *(3)*
refusing *(1)*
regard *(4)*
regarding *(3)*
registered *(5)*
Rehabilitation *(5)*
related *(1)*
relationship *(2)*
relative *(2)*
relevance *(6)*
relevant *(4)*
remain *(1)*
remains *(1)*
remember *(27)*
reminder *(1)*
remotely *(2)*
removed *(1)*
repeat *(3)*
rephrase *(13)*
rephrased *(1)*
Reporter *(10)*
represent *(1)*
reprimand *(1)*
reproduced *(1)*
Request *(1)*
requested *(2)*

required *(4)*
requirement *(1)*
requirements *(2)*
requires *(2)*
resolved *(2)*
respect *(3)*
respectful *(1)*
Respiration *(1)*
respiratory *(1)*
respond *(4)*
response *(7)*
responsibilities *(5)*
responsibility *(3)*
rest *(1)*
restate *(1)*
restroom *(1)*
result *(1)*
résumé *(1)*
retained *(1)*
retrospectively *(1)*
returned *(1)*
Returning *(1)*
returns *(1)*
reveal *(2)*
reveals *(1)*
review *(8)*
reviewed *(4)*
Right *(12)*
risks *(4)*
Robert *(1)*
role *(7)*
room *(2)*
route *(1)*
routine *(1)*
rules *(1)*
run *(1)*
runs *(1)*

< S >
samples *(2)*
SARAH *(1)*
saturation *(1)*
save *(1)*
saw *(5)*
saying *(5)*
says *(21)*
scale *(6)*
scales *(1)*
scheduled *(3)*

scheme *(1)*
school *(4)*
schooling *(1)*
science *(1)*
scope *(2)*
screen *(7)*
screening *(18)*
scroll *(3)*
SCULLY *(1)*
second *(3)*
secondary *(1)*
section *(5)*
security *(3)*
see *(26)*
seeing *(6)*
seeking *(5)*
seen *(6)*
self-explanatory *(1)*
send *(1)*
sense *(1)*
sent *(3)*
September *(1)*
Septemberish *(1)*
series *(1)*
Serrano *(1)*
session *(3)*
set *(2)*
seven *(3)*
Shadow *(1)*
shakiness *(1)*
share *(4)*
SHEET *(4)*
sheltered *(1)*
shift *(9)*
shifts *(8)*
shocked *(1)*
short-acting *(1)*
shortly *(1)*
show *(4)*
showed *(3)*
showing *(2)*
side *(1)*
sign *(4)*
signature *(2)*
SIGNATURE:_____
_____DA
TE *(2)*
signed *(3)*
signs *(14)*

similar *(1)*
simply *(2)*
sir *(1)*
site *(12)*
situation *(4)*
situations *(1)*
six *(5)*
six-month *(1)*
skip *(1)*
sliding *(5)*
small *(1)*
Smith *(5)*
Smith's *(1)*
SOAP *(1)*
social *(1)*
somebody *(9)*
somebody's *(3)*
someone's *(1)*
son *(1)*
sorry *(6)*
sound *(3)*
source *(1)*
speak *(10)*
speaking *(5)*
specialist *(10)*
specialists *(1)*
specific *(7)*
specifically *(5)*
spectrum *(1)*
speculate *(2)*
speculating *(1)*
speculation *(2)*
speech *(2)*
speechless *(3)*
spell *(1)*
spoke *(12)*
stab *(1)*
staff *(9)*
Staffing *(4)*
stamp *(1)*
standard *(3)*
start *(4)*
started *(4)*
starting *(1)*
state *(5)*
stated *(11)*
STATES *(4)*
stating *(2)*
stationed *(3)*

status *(5)*
stayed *(1)*
steps *(1)*
Stipulations *(1)*
stopped *(1)*
stored *(3)*
Strategies *(1)*
Street *(5)*
strict *(2)*
stricter *(1)*
strike *(1)*
strip *(1)*
stuff *(2)*
subject *(1)*
Subjective *(7)*
subsequent *(1)*
sued *(1)*
sugar *(16)*
sugary *(1)*
suicidal *(1)*
Suite *(2)*
SUMMER *(3)*
supervisor *(6)*
supervisors *(1)*
SUPPORT *(1)*
supposed *(11)*
sure *(14)*
surgeries *(1)*
sweatiness *(1)*
Sweating *(2)*
sworn *(2)*
symptomatic *(2)*
symptoms *(11)*
system *(9)*

< T >
take *(15)*
taken *(9)*
talk *(6)*
talking *(8)*
taught *(2)*
tax *(1)*
Tekaccel *(5)*
telephone *(3)*
tell *(12)*
telling *(3)*
tells *(2)*
temperature *(3)*
term *(8)*

terms *(4)*
test *(5)*
testified *(7)*
testify *(1)*
testifying *(1)*
testimony *(10)*
Texas *(1)*
Thank *(15)*
therapy *(1)*
thing *(3)*
things *(22)*
think *(34)*
third *(2)*
THOMAS *(9)*
thought *(6)*
three *(7)*
three-day *(1)*
threshold *(1)*
time *(23)*
times *(16)*
title *(1)*
today *(3)*
today's *(1)*
told *(17)*
Tom *(1)*
tool *(3)*
tools *(3)*
top *(1)*
touched *(1)*
track *(1)*
trained *(8)*
training *(37)*
transcript *(3)*
transfer *(1)*
transferred *(1)*
transmit *(1)*
treat *(1)*
treated *(3)*
treating *(1)*
treatment *(2)*
TREBACH *(1)*
triage *(3)*
trial *(1)*
trip *(1)*
true *(4)*
truthful *(1)*
try *(3)*
trying *(3)*
twice *(1)*

Deposition of Mariesha Apollon

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

two *(13)*
two-hour *(1)*
type *(32)*
typed *(1)*
types *(2)*
typical *(4)*
typically *(1)*

< U >
unclear *(1)*
uncontrollably *(1)*
underneath *(1)*
understand *(14)*
understanding *(6)*
understood *(5)*
unit *(1)*
UNITED *(1)*
units *(9)*
University *(1)*
Unlimited *(2)*
uploaded *(1)*
urgent *(4)*
urination *(2)*
urine *(7)*
use *(5)*
usually *(3)*
utilize *(3)*
utilized *(1)*
utilizing *(1)*

< V >
variation *(2)*
variations *(1)*
varies *(1)*
vary *(1)*
verbal *(1)*
verbally *(2)*
verifying *(1)*
versus *(4)*
Videoconferenced *(1)*
virtually *(1)*
vision *(6)*
vital *(10)*
vs *(2)*

< W >
Wait *(1)*
walk *(3)*
Wanda *(1)*

want *(12)*
wanted *(1)*
wanting *(2)*
wants *(1)*
washed *(1)*
watch *(1)*
water *(8)*
way *(12)*
ways *(6)*
Wednesday *(1)*
week *(7)*
weeks *(2)*
weight *(1)*
well *(8)*
went *(3)*
whatsoever *(1)*
willing *(1)*
willingly *(1)*
withdrawal *(1)*
WITNESS *(55)*
witness's *(1)*
WITTEKIND *(48)*
wonderful *(1)*
wondering *(5)*
Wood *(1)*
work *(20)*
worked *(20)*
worker *(1)*
working *(16)*
works *(2)*
wound *(2)*
write *(7)*
write-up *(8)*
written *(1)*
wrote *(4)*

< Y >
Yeah *(1)*
year *(2)*
years *(2)*
YesCare *(13)*
YesCare3432 *(1)*
YesCare3437 *(1)*
YesCare3438 *(1)*
YesCare3443 *(1)*
YesCare's *(2)*
York *(7)*

< Z >

zeroes *(1)*
Zoom *(5)*