# EXHIBIT "J"

**Review of Care for Louis Jung, Jr., Expert report of Dr. Homer Venters**

**Introduction and Qualifications**

I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, as well as testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care. I was subsequently promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer of the New York City jails. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, substance use treatment, quality improvement, re-entry and morbidity and mortality reviews, as well as all training and oversight of physicians, nursing, and pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices, including correctional officer responses to patients in distress, assessment after use of force injuries and medical observation and care for people in solitary confinement/segregation settings. My responsibilities during this time also included review and approval of all medical and mental health policies, including those relating to intake health assessments, chronic care and sick call, emergency responses, mental health and substance abuse care, infirmary care, and transfer of patients for higher levels of care.

During this time, I also worked closely with correctional leadership to provide training to correctional staff on the care of patients with serious mental illness, traumatic brain injuries and other common injuries that occur during use of force. I have also provided input on security policies and provided training for security staff relating to how correctional staff should recognize signs of illness and injury among incarcerated people.

In March 2017, I left Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges, and law enforcement staff on forensic evaluation and documentation, analysis of mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

1

Between December 2018 and April 2020, I served as the Senior Health Fellow and President of Community Oriented Correctional Health Services ("COCHS"), a nonprofit organization that promotes evidence-based improvements to correctional practices across the United States. I have also worked as a medical expert in cases involving correctional health since 2017.

During the COVID-19 pandemic, I worked on numerous COVID-19 responses in detention settings. During this time, I have conducted dozens of court-ordered inspections of detention facilities to assess the adequacy of their COVID-19 responses in ICE detention centers, county jails, and state and federal prisons. I was also named as an independent monitor for COVID-19 response for both the Connecticut State Prisons and the Hawaii Department of Corrections, and I was named as COVID-19 inspector by a Federal Court for the Bureau of Prisons facility in Lompoc, California.

I have also been named as Federal Court-appointed monitor for the health services in the Santa Barbara, California County Jail, the Fluvanna Prison for Women in the Virginia Department of Corrections and the Criminal Justice Complex in St. Thomas, United States Virgin Islands and the Cumberland County Jail. I have also been retained by the U.S. Department of Justice and several State Attorney General's offices in their investigations into the adequacy of health services in jail and prison settings.

I have published two books on correctional health, both published by Johns Hopkins University Press; *Life and Death in Rikers Island (2019*) and *Outbreak Behind Bars* (2025).

**Role and Methods**

I have been retained by counsel for the Estate of Mr. Louis Jung, who died while incarcerated in the Philadelphia Department of Prisons (PDP). This review includes an assessment of the adequacy of care that jail health staff provided for Mr. Jung leading up to his death from diabetic ketoacidosis (DKA) in November, 2023, and the adequacy of the oversight of YesCare provided by the Philadelphia Department of Prisons.

In order to formulate my opinions in this case, I have reviewed the following materials.

- Medical records of Mr. Jung in PDP
    - PDP 00000001-000000025
    - YesCare 1-2153
- Jung Corrective Action Plan
- Patient Safety Committee Report, 6/23/25
- Insulin Re-Audit September 2024
- PDP Death Reports (City-Jung-000001, CITY014194)
- **Deposition transcripts: Patricia Powers Gay,** Mariesha Apollon, Lalitha Trivikram
- YesCare Clinical Pathway: Diabetes Mellitus

- YesCare Audit Charts;
- Third-party medical records for patients 1-4[1]

Part of my role in this case is to determine whether errors or problems in the care provided to Mr. Jung represent systemic deficiencies. The Center for Disease Control (CDC) identifies systemic problems in health care as ones that involve the interplay between policies, procedures, infrastructure, spending decisions and human actions.[2] In jail and prison health systems, systemic barriers or problems in care can include a lack of staffing, ineffective or improper policies, inadequate physical plant and lack of adequate oversight or quality assurance of care. These types of systemic problems in correctional health services can cause harm or risk of harm to numerous patients across time and across multiple staff members. They also increase the likelihood that an individual error will result in harm to a patient.

Part of my approach in this case is to assess whether there is indication of systemic deficiencies indicated in the care provided to Mr. Jung. To address this issue, I have reviewed information beyond his own medical records including the deposition testimony of jail and County staff as well as the medical records of other people who were similarly hospitalized with complications of diabetes.

This is an approach I have utilized in detecting and addressing systemic problems in jail health services many times previously. For example, when leading the correctional health service in NYC, I relied on this methodological approach to review medical records, interview data and policies to identify systemic areas needing improvement in care for transgender patients, preventing assaults on staff and care for patients with traumatic brain injury.[3] In each of these examples, it was necessary to review multiple sources of data to determine how the health services were falling short and/or needed improvement.

This approach is different than the approach sometimes taken in research or academic projects, where the entire sample of patients, or a random sample, is selected to create a statistical model. I have utilized this approach as well, including creating regression models for the association between self-harm and multiple risk factors in a jail and measuring the efficacy of new tuberculosis screening tools in jail settings.[4] But these statistical models were developed after we determined that a systemic problem existed, and after we designed and implemented changes to our system of care.

For example, regarding self-harm, years before our analysis of approximately 250,000 jail admissions and creation of a regression model, we observed a sharp increase in acts of self-harm among our patients. I presented this relatively simple data to our oversight board to show that these increases were driven by the use of solitary confinement or segregation, and were mostly among people with mental illness. This information, along with reports from our patients

---

[1] Patients are anonymized to protect confidentiality. Plaintiffs' counsel have indicated that they will share the identity of each third-party patient with defendants' counsel.
[2] https://www.cdc.gov/polaris/php/thinking-in-systems/identifying-systems-problems.html?CDC_AAref_Val=https://www.cdc.gov/policy/polaris/tis/systems-problems/index.html.
[3] https://pubmed.ncbi.nlm.nih.gov/25913334/ , https://pubmed.ncbi.nlm.nih.gov/26745813/, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.nyc.gov/assets/boc/downloads/pdf/BOCMinutes%20(1.14.14).pdf
[4] https://pubmed.ncbi.nlm.nih.gov/24521238/, https://pubmed.ncbi.nlm.nih.gov/29633660/

themselves, and correctional staff who worked in these settings, led us to completely revamp out approach, and implement new more therapeutic units and care.[5] We has a similar experience with our tuberculosis screening, where we discovered that when utilizing a skin test for TB exposure, many jail patients left after we planted the TB inoculum but before we could read the result, 2-3 days later. In both cases, the statistical analyses were conducted after the systemic problems were identified. The approach I have utilized in this case is one that I have found to be extremely reliable throughout my career in correctional health.

**Diabetes Care in Carceral Facilities**

The treatment of patients with insulin-dependent diabetes is one of the most complicated and difficult missions for any correctional health service. First, patients with this medical problem can die or experience medical emergencies within a short period of time if they do not receive their insulin, and the complication of diabetic ketoacidosis as well as other potentially fatal consequences of extremely high or even low blood sugar can occur quickly, within days or even hours. While there are other medical problems that require regular administration of life-sustaining medications, insulin-dependent diabetes poses unique challenges for correctional health services because of the need for multiple contacts between health staff and the patient each day, as well as the need for coordination of three different tasks, insulin administration, blood glucose monitoring, and meals. When patients are stable in their glycemic control, these tasks can be achieved in a general population settings, but for patients who experience worsening glycemic control, manifested by elevated blood glucose levels, rising Hemoglobin A1C, or swings from elevated to low blood glucose levels, it is imperative that they be transferred to a higher level of care and medical monitoring. For medical emergencies, such as diabetic ketoacidosis (DKA), this must be treated in the hospital setting. But for patients who are not at the level of having a medical emergency but who do have poorly controlled diabetes, the jail infirmary or a dedicated diabetes housing area is the appropriate setting once it has become clear that their disease is not being controlled with the health resources of the general population settings. Jail health staff have numerous sources of information about patients who need a higher level of care, including patients with missed or refused insulin/blood glucose checks, patients with worsening Hemoglobin A1C levels, patients who require hospitalization for diabetic ketoacidosis or other complications of poorly controlled diabetes. The high prevalence of mental health and substance use disorders in jail patient populations means that jail health services routinely encounter patients with serious mental illness and diabetes, and then these patients are known to experience worsening or uncontrolled diabetes, it is essential to increase the level of care and monitoring they receive, most often through transfer to a medical infirmary or a dedicated diabetes housing area.

When a patient is known to experience complications of diabetes, including potentially fatal complications such as DKA, they must be housed in the jail infirmary until their diabetes is well controlled and they must be transferred back to the infirmary when and if their glycemic control worsens. Failing to do this for a patient who is known to be at a risk for DKA significantly increases the likelihood that they will again suffer DKA, require hospitalization, and potentially die. The need for an infirmary level of care for these patients is driven by information that the jail

---

[5] https://pubmed.ncbi.nlm.nih.gov/26848667/

health services already has at their disposal, that the patient's diabetes has not been controlled when housed in a general population setting. While this represents a minority of patients with insulin-dependent diabetes, it is essential to identify them and increase their level of care. The 2019 Position Statement of the American Diabetes Association on carceral care for patients with diabetes clearly identifies the need to identify incarcerated patients who are at elevated risk of DKA.[6] In an infirmary setting, patients can be closely monitored for any late or missed glucose checks or doses of insulin. The NCCHC Standards for Health Services in Jails from 2018 define infirmary level care as "Infirmary-level care is provided to patients with an illness or diagnosis that requires daily monitoring, medication and/or therapy, or assistance with activities of daily living at a level needing skilled nursing intervention."[7] For a patient with insulin dependent diabetes, poor glycemic control and a history of DKA, this level of care is essential. This step of transferring patients with poorly controlled diabetes to a jail infirmary is one that I first became familiar with in the NYC jail system, where this practice was routine.

Another basic requirement for patients with complex or poorly controlled chronic care problems is to have an individualized treatment plan that covers all aspects of the patient's care. The NCCHC has a specific and essential standard for patients with "Chronic Disease and other Special Needs" that details the absolute necessity of an individualized treatment plan for patients with complex medical problems.[8] This standard also identifies that the treatment plan must specify "a patient's course of therapy and the roles of qualified health care professionals in carrying it out." This is a key feature of diabetes care in jail settings because multiple nurses and providers may check the patient's glucose, administer insulin or assess the patient via physical examination or review key laboratory results in a single day. Because patients with diabetes can fall into serious illness and medical emergency very quickly, there must be a clear delineation of roles for the many health professionals who have contact with the diabetic patient so that key red flags are not ignored, such as missed doses of insulin or blood sugar checks, or abnormally high or low blood sugar, HbA1C or other test results. The NCCHC specifically mentions several health conditions which merit individualized treatment plans, including developmental disability, mental health problems and diabetes. One of the essential elements of each patient's treatment plan is for providers to clearly document at each contact whether their disease is well or poorly controlled and evidence of complications. This is essential for all of the health team caring for the patient because it makes clear that the patient is stable or when poorly controlled, more susceptible to disease complications and exacerbation.

**Timeline of Medical Events**

Mr. Jung was initially detained in the Philadelphia Department of Prisons (PDP) in December 2021. Between his admission to PDP and his death on November 6th, 2023, he had numerous documented instances of poorly controlled blood sugar and serious complications from untreated or poorly treated diabetes. In the period before Mr. Jung's return from Norristown State Hospital on 10/28/23, the following instances are present in his medical records.

---

[6] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://diabetes.org/sites/default/files/2023-10/ADA-position-statement-diabetes-management-detention-settings-2021.pdf.
[7] NCCHC Infirmary Level care, J-F-02 Standards for Health Services in Jails. 2018.
[8] NCCHC Patients with Chronic Disease and Other Special Needs., J-F-01 Standards for Health Services in Jails. 2018.

Hospital transfers (diabetic complications)

| Date | Problem | Records |
|---|---|---|
| 12/20/21-1/5/22 | DKA | Yescare0382 |
| 4/7/22-4/9/22 | DKA | Yescare0617 |
| 1/8/23-1/12/23 | DKA, | Yescare1374 |
| 1/23/23-1/29/23 | Hyoerglycemia, Pneumonia | Yescare1391 |
| 3/11/23-3/14/23 | DKA | Yescare1322 |
| 3/19/23-3/20/23 | Hyperglycemia | Yescare1339 |

I have reviewed the medication administration records (MAR) for Mr. Jung at PDP. These records appear to follow a convention of having nurses enter their initials when a medication or procedure is completed, and entering in various codes for instances when the medication or procedure is not completed.  The MAR sheets include definitions for these codes including the following:

Code   Definition

6       Not Documented

3       Refused

1       No Show

I reviewed the MAR sheets for Mr. Jung's blood sugar checks, which were ordered to occur twice daily. In the period from December 2021 through October 2023, I counted numerous instances when the codes for not documented (code 6), refused (code 3) and no show (code 1) were entered into Mr. Jungs records. The MAR document that I reviewed (PDP_MAR-00000000001-0000000000157) incudes 154 pages of MAR records for Mr. Jung from December 2021 through November 2023. These records show hundreds of entries for 'Not Documented', and dozens more for 'Refused' and 'No Show'.

During Mr. JUNG'S hospitalization for DKA on 1/8/23, the hospital physician documented that "he is a poor historian and does not provide reliable information about his glucose monitoring and compliance with insulin regimen". During this admission for DKA, the hospital physician also documented that despite being identified as having DKA, Mr. Jung "Feels thirsty, but has no other complaints and has been in his usual state of health." The discharge medications from this hospitalization include insulin glargine 42 units each night and insulin lispro 18 units three times per day with meals.

Mr. Jung was sent to the hospital on 1/23/23 and admitted with hyperglycemia and pneumonia. In the days prior to his hospital transfer, Mr. Jung's clinical notes and MAR records show the following. (pp 1632-1646)

1/20/23. PA Sarskaya documents that "Pt is not coming out for any medication or accu check . pt is complaining of pain and said that's why he isn't coming out ( per referral )." The assessment and plan for this note are blank.

1/21/23. No follow up or other provider note present.

6

1/22/23. At 8:30 am NP Henderson-Hamwright documents chief complaint of "elevated BG" and "Hyperglycemia with ketones". This note documents that Mr. Jung had glucose elevated to 466, had ketones in his urine and that he wanted to lay on the stretcher and that he was assessed as refusing care; "IP wanted a juice and to lay down on the stretcher…" This note also reports multiple episodes of nausea and vomiting by Mr. Jung. This note also contains two different accounts of how or why Mr. Jung refused intravenous fluids. One part of the note documents that "IV insertion attempted but was unsuccessful. Patient refused further attempts." Another part of this note documents "IP WANTED JUICE AND TO LAY ON STRETCHER INSTEAD OF GETTING AN IV." This note lacks any assessment or consideration of whether Mr. Jung might be in DKA and experiencing weakness from DKA. This note also documents that Mr. Jung "missed his semglee dose overnight due to being asleep.

There is no provider follow-up note or assessment of Mr. Jung after this 8:30 am encounter with the NP.

1/23/23. A nursing encounter at 10:24 am documents the following for Mr. Jung; "stretcher called to A2P3 at approximately 0910 am, arrived to IP cell IP noted laying in bed disoriented repeatedly screaming for water. IP BS checked reading HI. IP brought down to medical 12 units of Humulin R given SQ, pt continues to be disoriented unable to obtain urine sample, pt seen by triage provider n/o to send pt out VIA 911, for further eval , corrections aw are Dispatch #451 pt oof at 10:00 am awake alert with confusion"

The MAR records for 1/20/23-1/23/23 show insulin administered at 9 am on the 20th and 21st, two refusals on the 21st (both without a refusal form), and 9 instances of "Not Documented' or No Show'. (MAR 121-126)

Mr. Jung experienced two hospitalizations for diabetic ketoacidosis assessment/care in a single week in March 2023. In both of those instances, he had elevated blood glucose levels and positive urine ketone results.

The medical records for Mr. Jung's DKA hospitalization 3/11/23-3/14/23 give specific instructions in the discharge plan for the frequency of care he requires. The physician discharge plan (1326) includes the following assessment and directions;

"Insulin regimen in prison only provides regular insulin sliding scale twice a day in addition to basal insulin. As a result he has been severely hyperglycemic progressing into DKA."

"Patient's blood glucose needs to be monitored 4 times a day. He will need a base dose of mealtime insulin in addition to sliding scale coverage as well as basal insulin."

A physician note on 5/20/23 from Dr. Bradley includes the following; "Patient continues noncompliance. Current staffing does not allow for qid evaluations in the setting of this noncompliance. Insulin orders adjusted accordingly." This note also includes the order "Stop Accu Chek Reading, -, as directed TRT, FOUR TIMES DAILY". There is no documentation about why or how this physician came to the conclusion that Mr. Jung was continuing to be noncompliant.

This physician note also classifies Mr. Jung's diabetes in the following manner: "Diabetes mellitus without mention of complication, type II or unspecified type, uncontrolled".

Mr. Jung's MAR records are reviewed below but for the week before his hospitalization on 3/11/23, Mr. Jung's MAR during 3/4/23-3/10/22 shows 5 refusals, 5 no shows and 3 instances of simply not documented. When I reviewed the 5 instances when refusal was recorded in the MAR, I found that no refusal form was present in 2 of the instances (3/6/23, 4PM insulin and 3/6/23, 4PM accucheck), while the other 3 instances (3/6/23, 3/10/23) include forms but no signature from Mr. Jung and no documentation of his decisional capacity or understanding of the risks and benefits of his refusal.

Between January and March 2023, Mr. Jung had 2 hyperglycemia NETS on 2/9/23 and another telephone encounter for hyperglycemia on 2/10/22. Mr. Jung was seen for an elevated blood glucose of 307 on 2/13/23. The plan for this elevated blood glucose was to monitor Mr. Jung in the medical clinic after he received short acting insulin, but this did not occur. The nursing note documents "IP left triage area although he was informed to stay to be monitored. RN unable to recheck BS." No alternate plan is present for how Mr. Jung will be reassessed on this day.

Mr. Jung's Hemoglobin A1C was documented as 12.7 on 2/25/23. This lab report correlates blood glucose levels with A1C values from 6-12 but stops at 12 as the highest level. The American Diabetes Association's calculator for A1C/blood glucose identified this level (12.7) as representing long term blood glucose levels of 318, more than twice the recommended level of <130.[9]

Mr. Jung had several laboratory tests for Hemoglobin A1C at PDP showing that his values and overall glycemic control worsened dramatically over time.

| Date | Result (normal <6.5) | Blood Glucose Equivalent[10] |
|---|---|---|
| 1/25/22 | 9.3 | 220 |
| 3/14/22 | 11.2 | 275 |
| 2/25/23 | 12.7 | 318 |

No A1C tests are present from March-September 2022 or February-June 2023, times when he was in the care of PDP.

On 6/2/23, a transfer summary is present in Mr. Jung's medical records that indicates that Mr. Jung's insulin regimen includes 30 units of Humulin N in the mornings, 15 units in the evenings and sliding scale coverage with Humulin R with twice daily blood glucose checks.

On October 28, 2023, Mr. Jung was transferred from Norristown Psychiatric Hospital where he had been undergoing competency restoration back to PDP. Mr. Jung's medical records document that he was seen by Nurse Apollon in the morning for a screening encounter. Nurse Apollon contacted Nurse Practitioner Gay during his intake encounter.

A telephone encounter is present in Mr. Jung's medical records from Nurse Apollon to Nurse Practitioner Gay at 10:02 am with the message "Dr Gay Nurse Apollon Please order IP insulin

---

[9] https://professional.diabetes.org/glucose_calc
[10] https://professional.diabetes.org/glucose_calc

thanks". This message has a response time of 9:27 pm with the response "Please see intake orders written."

The receiving screening conducted by Nurse Apollon includes a question "Refer to midlevel practitioner or physician now," which is answered "No".

Nurse Apollon's note, signed at 10:03 AM, starts with "has type 1 diabetes BS is 542 states he hasn't gotten insulin for 3 days".

This encounter lists the chief complaint for Mr. Jung as "SMI SPI SUD," which are references to serious mental illness and substance use disorder, and also includes the following questions/responses:

> "Has inmate been previously diagnosed as SMI" No."

> "Do you have any other medical conditions? No." [occurs after infectious disease questions]

> "Have you been treated/hospitalized within the last year for any medical problems? No."

> "Are you on a diet prescribed by a doctor? No."

> "Have you ever been incarcerated before today? No"

> "Are you currently taking medications for any medical condition? (Including those for HIV/AIDS Diabetes, hypertension, Sickle Cell, Asthma, Epilepsy, hepatitis etc.) No."

This intake encounter also lists the following twice, "Patient's noncompliance with other medical treatment and regimen."

The past medical history in this note does not mention or document any review of Mr. Jung's recent hospitalizations for DKA or his history of recent DKA. This note does not include any documentation of review of Mr. Jung's insulin regimen as ordered after his DKA hospitalization or the regimen he was on prior to being transferred to Norristown for forensic restoration.

There is no review in this encounter of the insulin regimen Mr. Jung was receiving at Norristown or level of glucose control while at that hospital.

The assessment for Nurse Apollon's note includes "urine present for ketones encourage to drink plenty of water."

The assessment lists diabetes "without mention of complication, not stated as uncontrolled", orders Novolin N insulin 10 units twice per day, coverage with Novolin R insulin with a sliding scale, blood glucose checks twice daily and lists an ICD code of 250.01.[11] This encounter sets Mr. Jung's next provider appointment for chronic care (including his diabetes, cholesterol and thyroid issues) for 28 days later. This note also includes lab tests for 14 days later. This encounter note was signed at 9:48 pm.

---

[11] From https://www.aapc.com/codes/icd9-codes/250.01 . The code for type 1 diabetes with elevated blood sugar is E10.65 (used for encounter note 5/8/23) and the code for type 1 diabetes with ketoacidosis is E10.1 and the code for type 1 diabetes with unspecified complications is E10.8.

No re-assessment of Mr. Jung's ketonuria or elevated blood glucose is present later on October 28. No blood glucose result is present.

The intake form does not appear to have any field that documents yes or no for review of prior records. The intake form does not appear to include a list of current or prior health alerts.

On 10/30/28, a "Rule out TB" encounter is present from Medical Assistant Carrullo. This encounter includes a negative PPD reading. There is no documentation in this encounter of any re-assessment of Mr. Jung's ketonuria, elevated blood glucose or diabetes level of control.

A COVID-19 vaccine encounter is present with Nurse Ricks on 10/31/23 which documents Mr. Jung as refusing the vaccine. This encounter documents the medication orders continue for 10 units of Novolin N insulin and blood glucose checks twice per day and coverage with sliding scale Novolin R. There is no documentation in this encounter of any re-assessment of Mr. Jung's ketonuria, elevated blood glucose or diabetes level of control. The Yescare Patient Safety Review after Mr. Jung's death included a snapshot of the insulin and blood glucose checks he received in the time between 10/29/23 and 11/5/23. ((YesCare 3500)

|  | 10/29 | 10/30 | 10/31 | 11/1 | 11/2 | 11/3 | 11/4 | 11/5 |
|---|---|---|---|---|---|---|---|---|
| AM | BS 385 10 R 10 N | BS 268 8 R 10 N | BS 371 10 R 10 N | Refused (no form) | BS 290 8 R 10 N | No Show | BS 266 8 R 10 N | No Show |
| PM | BS 585 12 R 10 N | Not Doc | BS 500 No CRIC doc 10 N | BS 411 0 R 10 N | BS 245 6 R 10 N | BS 394 10 R 10 N | Not Doc | Refused (no form) |

A nursing encounter from Nurse Jeoboham is present in Mr. Jung's medical records dated 11/6/23 at 8:34 am. This encounter records that Mr. Jung was found unresponsive and that CPR was conducted by this nurse and two others but that Mr. Jung was declared dead by outside EMS.

Another encounter note from Nurse Practitioner Henderson-Hamwright describes the same emergency response, and documents that stretcher call was received at 6:04 am. This note states that Mr. Jung was unresponsive, breathing and that the blood sugar reading of the glucometer was "high". The note describes that Mr. Jung was noted to have stopped breathing while being transported to the clinic and that basic lifesaving efforts were initiated without effect. EMS was notified and their staff declared Mr. Jung dead at 6:47 am.

A physician note is also present from the time of Mr. Jung's death, written by Dr. Trivikram.

The discharge orders for medications present at the time of Mr. Jung's death included his cholesterol and thyroid medications and the following insulin regimens:

- Novolin N 10 units twice daily
- Novolin R 2-12 units twice daily

10

- Accu check twice daily

These records indicate that after his initial intake on 10/28/23, there was no subsequent assessment of Mr. Jung by a provider regarding his diabetes until he died on 11/6/23.

The MAR sheets for Mr. Jung's blood glucose checks after his return from Norristown show that the entry #6 (Not Documented) was recorded on the 28th, 30th or half of the 4 days recorded in October. The same code also appears for Mr. Jung's intermediate acting insulin (Novolin N) on these days. There are entries for the regular insulin (Novolin R) administration on October 29th and 30th but no values for the blood glucose reading or the number of units of insulin administered are present in the MAR sheets. There are no corresponding encounters in the medical records to reflect these aspects of care. The autopsy report for Mr. Jung identified his cause of death as diabetic ketoacidosis and the manner of his death as natural.

**Review of Additional Information**

I also requested to review medical records for patients like Mr. Jung, three of whom were sent to the hospital from CFCF, and one from another PDP facility, since 2022 for diabetes related complications at some point after their receiving screening/intake period.[12] I reviewed the medical records of 4 people who met these criteria. These patients exhibited several important similarities to Mr. Jung's case in their profiles of care and diabetes exacerbation.

These patients experienced numerous hospitalizations for worsening diabetes while in PDP.

- Patient 1 appears to have been transferred to the hospital with diabetes complications at least three times, including with hypoglycemia with seizures, hyperglycemia with ketonuria and hyperglycemia with vomiting (pp 240, 462, 516). 11/12/21 on p516, 12/13/21 on p462, 8/24/22 on p240
- Patient 2 appears to have been transferred to the hospital at least three times, including with hypoglycemia, DKA and fall with hypoglycemia (pp 129, 162, 214).2/2/22, 3/4/22
- Patient 3 appears to have been transferred to the hospital once with hyperglycemia and kidney failure (p 114).
- Patient 4 appears to have been transferred to the hospital at least two times past the initial receiving screening/intake period including with hyperglycemia with ketonuria and hypoglycemia (pp 302, 563).

Hospitalizations for Additional Records (after receiving screening/intake period)

| Name | Date/Page |
|---|---|
| Patient 1 | 11/12/21 (p516) |
| | 12/13/21 (p462) |
| | 8/24/22 (p240) |
| Patient 2 | 2/4/22 (p214) |
| | 2/22/22 (p129) |
| | 3/4/22 (p162) |
| Patient 3 | 5/25/22 (p114) |

---

[12] I reviewed four sets of records, reviewed above. There were three additional sets of records that fell outside these criteria, Riel, Bencito, Soler. In addition, among the four people I did review records for, I did not review hospital transfers that occurred in the receiving screening/intake period.

| Patient 4 | 7/6/22 (p563) |
|-----------|---------------|
|           | 1/12/23 (p302) |

I reviewed the MAR leading up to the most recent hospitalization for each of these four patients.

For Patient 1, his MAR shows the following. In the 11 day period before his third and most recent hospitalization with diabetes complications (8/13/22-8/23/22, p967), his accucheck was ordered for four times per day and was listed as 'not documented' 19 of 44 (43%) times it was ordered.

Patient 1's medical records also show that he had been diagnosed with seizure disorder as well as diabetes and had two prior hospitalizations with diabetes complications before August 2022. He had also been identified on 8/12/22 as being high risk based on his profile of insulin medications. (p248) There is a telephone encounter on 8/15/22 for elevated blood glucose to 508, answered by Eujudice Feverier. I did not find a NET encounter for hyperglycemia or actual clinical encounter on this date or any of the next seven days. There is a lab review without any apparent assessment of Patient 1 on 8/19/22, then the next actual progress note occurs on 8/23/22 with Dr. Wilbraham. (p242) It is unclear whether this provider spoke with Patient 1 because the only entry in the subjective section of the note is "BSs" and is it unclear whether the vital signs are new or not. The following day, an ER referral is present that reads "A 28 years old male was brought to medical triage via stretcher while having active seizures activities with hx of type1 diabetes. Blood sugar check 28, 1ml antivan given, glucose gel administered and 911 call initiated. Patient responsive to external stimuli and partially awake at this time. Patient was transported by 911 to Jefferson Torresdale ER" After his hospitalization, Patient 1 was returned to the PDP infirmary for 2 days before returning to a general population setting.

For Patient 3, his MAR shows the following. In the 11 day period before his most recent hospitalization with diabetes complications (5/14/22-5/24/22, p502), his accucheck was ordered for two times and shows that 13 of 22 accuchecks were listed as 'not documented' or 'no show' (59%) of times it was ordered. There is another set of similar appearing accucheck orders for the same time period with 9:00 and 21:00 time rows which is essentially blank across the 9:00 time and shows only 9 of 22 boxes with a staff initial entry, leaving 13 boxes with some other entry. These boxes with a staff initial entry in this second set of accuchecks do not appear to supplement the previous set because the boxes with staff initials in the second set are already marked with a set of initials in the initial set.

12

| | CFCF-B1POD1 | | | | Medication Administration Record   May 01, 2022 - May 31, 2022 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medications | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**CFCF-B1POD1**

CFCF-B1POD1

| Accu Chek - Reading   as directed | 09:00 | 6 | 6 | OO | 3 | OO | OO | DV | 1 | CF | 1 | 1 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 1 | 6 | 6 | 6 | 6 | | | | | | | | |
| | 21:00 | 6 | TP | AK | NA | AN | AK | KF | AK | AN | AK | AK | AN | AK | AK | 6 | 6 | AN | AK | KF | JO | NA | MH | AK | OT | | | | | | | |

TRT TWICE DAILY
for DX(Self-repor) U001.00
Rx S142714762   O/D:02/27/22   D/C:05/25/22
Prescriber: GEORGE      SIGY

| Accu Chek - Reading   as directed | 09:00 | BC | BC | OO | 3 | OO | OO | DV | 1 | CF | 1 | 1 | OO | OO | OO | 6 | 6 | OO | OO | OO | 1 | OO | OO | 6 | OO | NA | 6 | 1 | 6 | | | | |
| | 21:00 | 6 | TP | AK | AK | AN | AK | KF | AK | AN | AK | 7 | AN | AK | AK | 6 | 6 | AN | AK | 6 | JO | NA | 6 | LN | OT | 1 | 6 | 6 | 6 | | | | |

TRT TWICE DAILY
Rx S145800342   O/D:04/14/22   D/C:05/29/22

I also reviewed the hospital records for Patient 3 leading up to his May 2022 hospitalization. The day before his hospitalization, there is a lab review with multiple abnormal results from blood and urine tests indicating anemia, kidney failure or damage. His medical encounter on the day he was sent to the hospital indicates that he was called to the clinic because of a blood glucose reading over 600, but then the provider documents that he also reviewed the lab results at that time and noted the abnormalities. (p120) Review of his medical records shows one blood glucose value of 193 on 5/24/22 at a medical clearance encounter but neither his progress notes nor his MAR show the other blood glucose values that were obtained. I did not see any other accucheck readings in the vital signs summary at the start of his medical records (pp 1-12) or in the MAR sections.

For Patient 4, his MAR shows the following. In the 11 day period before his most recent hospitalization with diabetes complications (1/1/23-1/11/23, p2763), his accucheck was ordered for two times per day and was listed as 'not documented' 8 of 22 times (36%) it was ordered.

I also reviewed the medical records for Patient 4 leading up to his hospitalization on 1/12/23. He was seen for hypoglycemia by PA McKinney on 1/5/23, with a blood glucose of 35. That encounter includes the following;

> "IP known to this provider for frequent hypoglycemic episodes most notably in am (~8-10am); Per triage nurse: "Pt was a stretcher call at 9:20. Pt was awake but not responding to questions. Pt was given 2 sugar packets by LPNs on unit. BG at 9:28 was 30. BP 141/80, HR-79 and pox 97%. Pt was given tube of glucose gel at 9:30 and recheck of BG was 35-pt unable to respond to questions but awake."

There does not appear to be any clinical follow up the next day by a provider, or any of the following days until he is sent to the hospital with blood and ketones in his urine on 1/12/23, 7 days after this episode. I did not see any recording of daily blood glucose results in the vitals section of these medical records or in the MAR and during this period leading up to his hospitalization, I only observed a recorded results on the 5th and 12th of January.(pp 302, 312)

For Patient 2 her MAR shows the following. In the 7 day period before her most recent hospitalization with diabetes complications (2/25/22-3/3/22, pp 440, 465), her accucheck was ordered for two times per day and was listed as administered for all 14 of those times.

I also reviewed the medical records for Patient 2 leading up to her hospitalization. The encounter note on 3/4/22, the physician notes that nursing staff reports multiple recent episodes of hypoglycemia and also suggests that the patient was willfully manipulating her blood sugar;

> "I just got a call from MOD 3 nurse saying that this patient's BS was 34 and she was disoriented. She reports that the patent was spitting out the glucose gel they were giving her (intentional or related to her change in MS?) The nurse was frustrated reporting that she has had low BS a couple times in the morning lately." (p 129)

Her medical records include an encounter/NET for hypoglycemia on 3/3/22 but the most recent progress note or NET before that point is 2/24/22 (pp 145, 156). This is the date of this patient's previous transfer for DKA. I did not see any recording of daily blood glucose results in the vitals section of these medical records or in the MAR. This patient was sent to the infirmary upon hospital discharge

I have reviewed the 30 (b) (6) deposition transcript of Major Patricia Powers, one of the custodial leadership at PDP. Major Powers described how the medication administration process proceeds in PDP in general population and locked housing areas, including the officers announcing the presence of nursing staff for medication administration (p25) as well as the blood sugar checks for diabetic patients (p29). Major Powers testified that patients retain the right to not go when called for medications and that these instances trigger an entry by staff into the Red Flag Medication Policy; "So in general I announce medication and inmates choose not to go, they have that right to choose not to go. We do not force them to go. And then place into what we call the Red Flag Medication Policy. And then medical reviews those MARs, the medication administration records." (p31) Major Powers also testified that patients on this Red Flag list are given to security staff who then must bring the patients to medical staff for counseling and/or evaluation; "They place them on a Red Flag Medication Compliance List provided to the security staff. We then have to bring those inmates to medical staff, usually in the medical area where the inmate is counseled on missing, whether it be three straight doses of a life-sustaining or patterns or just refusing certain medications." (p32) Major Powers testified that there were no audits of the functioning of this Red Flag Medication policy and that this was a shared process between medical and security staff. (p34)

I have also reviewed the deposition transcript of Blanche Carney, the former Commissioner of PDP. Commissioner Carney described the Red Flag Medication policy and that when a patient refused three medication doses, refusal forms would be utilized for the refusals and the patient would be assessed by health staff. (p30) She also testified that refusal would be documented in the Lock and Track system, which medical staff had access to, but that a phone call would also be made to health staff about refusal. Commissioner Carney also testified that if a person did not come to the line for medications, but was on the list for medications, medical staff would be notified;

"Q. Did correctional staff have a responsibility to notify medical staff if an inmate was not going to med-line to receive their medication?

A. If they were on the list of individuals scheduled to receive, they would be required to notify that the individual is not coming to the med-line.

Q. And how would they make that notification?

14

A. That notification is usually made through a phone call, and then there's a documentation on the refusal form." (pp 31,32)

Commissioner Carney also testified that she did not recall specific responses put into place regarding an outside auditor's findings that chronic are refusals were not being documented. (p 42). When asked about how correctional staff respond to a patient not leaving their cell/coming to medication administration, Commissioner Carney responded "Depending on the duties or activities of the day, the officer is going to notify that the person is not showing. And then after they've done whatever duties there are presently completed they can then as part of their tour of the area, walk around, engage the individuals, and notify medical that the person did not report or wasn't sent." (p 46)

I have also reviewed the deposition transcript of Sandy Varghese, a nurse who works as the County Healthcare Coordinator, which she describes in the following manner; "But I oversee the health care contract for the City of Philadelphia." (p 13) She testified that she conducted some audits of care herself and also relied on the outside auditors for their twice per year reports as well as some comments from them in the wake of deaths among PDP patients. (p 21) She also testified that she did not conduct audits regarding diabetes care but that the vendor, YesCare, did some audits relating to diabetes and gave these reports to her although she could not recall the results or findings of these audits. (p 24) When Ms. Varghese was asked about the outside monitors assessing the need for emergency department transfer because of inadequate care in PDP, she responded as follows:

"Q. Did he ever look at whether or not somebody has to go to the emergency room because they are not getting the level of care they were supposed to while in PDP custody?

A. He has not looked at that specifically." (p28)

She also testified that she did recall improper handling of refusals as something that had been raised in quality improvement settings but could not recall the specific times this had occurred. (pp 28, 29)

I have reviewed the deposition transcript of Mariesha Apollon. Ms. Apollon worked in PDP as a nurse at the time Mr. Jung was incarcerated in 2023. Nurse Apollon reported working in both intake and medication administration roles in PDP. She also testified that she received no training on how to utilize the refusal forms at CFCF. (p54) She also testified that at some point, she had reached out to YesCare (a nursing supervisor named Smith) for direction on how to handle medication refusals and was told that there was no specific or additional training for her. (p53)

I have reviewed the deposition transcript of Dr. Lalitha Trivikram who worked at PDP for YesCare and was the site Medical Director at CFCF in late 2023. Dr. Trivikram testified that she reviewed paperwork for hospital returns when it was placed in her inbox but that it did not always occur that this paperwork was placed into her inbox. (p37) She also testified that she reviewed medical records several times for Mr. Jung in relation to hospital returns. (p122) When asked about infirmary placement for patients returning from hospital admissions, she testified as follows:

"When a patient returns from the emergency room after an inpatient stay, do they come back to CFCF if they left from CFCF; do they go to the Detention Center for the infirmary? Does it depend?

15

A. They usually end up in the infirmary, and they are in the infirmary until they're seen by the infirmary doctor. On rare occasions, if there is limited space in the infirmary and the patient is returning in very stable condition, they may get transferred back CFCF.

Q. But the normal practice is for the person to go to the infirmary after an inpatient stay?

A. Yes."

When asked about missing glucose measurements from MAR records, Dr. Trivikram testified that those glucose reading might be stored elsewhere besides the MAR part of the patient's records, but when asked whether each patient's electronic health record included their actual blood glucose results, she testified as follows:

"Q. When you pull up a patient's electronic health record, does it have glucose readings in it for a diabetic patient?

A. In ECW, unless it is checked at the time of an encounter, no."

When she was asked further about whether each blood glucose reading was somehow present in a patient's electronic medical record, she testified "I don't know if they pull the Accu-Cheks and put them in the Electronic Health Record. They pull this, the Medication Administration Record, and put that in. I do not know if the Accu-Cheks get put in there as well." (p176)

When asked about the documentation of insulin being "Not documented", she testified that this might mean that the medication was given, but it also might mean that is was not given:

"Q. Okay. If it was not documented, if it was not administered, or the Humulin was not administered, should that have triggered a red flag incident?

A. If it was not administered, then yes. But if it's not documented, that doesn't necessarily mean it was not administered."

When asked how or why insulin could be recorded as not documented in one part of the medical record but also be recorded as given in another view of the patient's medical, she testified "It's an imperfect system."

When asked about increasing or changing the frequency of blood glucose checks and insulin administration for a patient, Dr. Trivikram testified that this was "challenging" and when asked whether the infirmary was a place that this level of care could be accomplished, she testified that "The infirmary, yes, but the infirmary level of care is for patients who require a lot more than just a specific insulin time. They require wound care, they're paraplegic. They need to be turned, they need to be moved. It's for a much higher level of care."

When asked how Mr. Jung's level of care was increased or tailored after his progressive hospitalizations, Dr. Trivikram testified as follows:

"We continued the same things we always did. We continued to try to see him for chronic pain. We continued to try to get him his blood work. We continued to send him to off-site appointments. We continued to try to administer insulin. We continued to do everything we could, but we could not overcome his noncompliance and his persistence in noncompliance with diet, which we did not have any control over, or his walking out of visits with providers, which we could not control. So we provided the same standard of care that we would for every patient

16

every time Mr. Jung returned." (p180) When asked about seeking outside specialty care for Mr. Jung, she testified "We tried to send him out to an endocrinologist; we tried to get a specialist to help us out, but there was literally no one who could help us with the noncompliance." (p181)

When asked specifically about the hospital discharge plan for Mr. Jung in March 2023 that stated he needed an additional dose of mealtime basal insulin and blood sugar checks four times per day, Dr. Trivikram testified as follows;

"Q. It says here the patient's blood glucose needs to be monitored four times per day. He would need a base dose of mealtime insulin in addition to sliding scale, as well as basal insulin. Do you know if Mr. Jung was ever prescribed Accu-Cheks four times a day?

A. I don't think he was prescribed four times a day. We couldn't get him to comply with twice a day. So I don't know that it was specifically ordered for him four times a day." (p219)

She also stated that checking insulin four times per day would be possible at CFCF "With a compliant patient, we could try to make it work, yes." (p219)

When asked whether Mr. Jung's prior medical records should have been reviewed by the provider on 10/28/23 when he arrived from Norristown with a blood glucose level of 542 and ketones in the urine, Dr. Trivikram testified "Again, they could have looked into the history." (p227). When asked if anything further should have been done for Mr. Jung, Dr. Trivikram testified that a blood sugar check should have been repeated in an hour or two but did not mention any follow up for symptom check or need for further evaluation based on the positive ketones. In addition, she testified that a 14 day period for lab tests was "not unreasonable". (p239)

When asked about how a provider would see a red Flag notification for a patient, Dr. Trivikram testified that "It may have been something that nursing staff informed her of, that the patient had been missing doses of insulin." (p244)

I have reviewed the document "YesCare Clinical Pathways: Diabetes Mellitus". This document does not appear to be a site-specific policy relating to PDP but does include general guidelines for correctional diabetes diagnosis and management. This first element listed under evaluation and management is "Prior A1C and blood sugar results". This document also indicates that for any A1C over 8, the test should be rechecked every three months. The section on the insulin coverage protocol (Corrective Regular Insulin Coverage, CRIC) states that a provider order is required for this medication and that blood glucose logs must be reviewed "at least weekly to make necessary adjustments to basal regiments with the goal of eliminating the need for CRIC."

I have reviewed the PDP Special Investigations report for Mr. Jung. (City-Jung-0001), which found negligence in his death from both correctional and medical staff. This report identifies several problems in the care provided to Mr. Jung including correctional and medical staff not monitoring or rendering aid to Mr. Jung as required as well as failures to call for emergency response equipment and failure in how refusals of care/treatments were handled. This report also identifies numerous refusals of insulin and blood glucose checks that were never entered into the PDP Red Flag system.

17

I have reviewed the PDP Special Investigations reports on 58 deaths in the PDP. (CITY014194-CITY015338). These reports span approximately 900 pages and many of these cases included substantiated findings regarding failures to render care or aid to a person in distress or adequately monitor a person.

Many of these cases included findings that correctional staff failed to properly monitor or respond appropriately to a patient in medical distress outside the infirmary, including the following deaths:

1. SI-14-10-02 (2014)

2. SI-17-00235 (2017)

3. SI-18-00014 (2018)

4. SI-19-00088 (2019)

5. SI-19-00145 (2019)

6. SI-20-00045 (2020)

7. SI-20-00231 (2020)

8. SI-21-00225 (2021)

9. SI-21-00003 (2021)

10. SI-22-00105 (2022)

11. SI-21-00059 (2021)

12. SI-21-00234 (2021)

13. SI-21-00027 (2021)

14. SI-21-00009 (2021)

15. SI-21-00106 (2021)

16. SI-20-00149 (2020)

Several cases had findings that specifically related to medical staff not adequately responding to a patient in distress or correctional staff not taking required steps for patient refusals or making a health referral for a patient in the Lock and Track system. These included the following;

1. SI-18-00082 (2018)

2. SI-19-00145  (2019)

3. SI-19-00088 (2019)

4. SI-22-00105 (2022)

In addition to these records, I have reviewed the YesCare Patient Safety Event Committee Report from 6/23/25. (YesCare This document identifies several problems with the care for Mr. Jung, including the following;

- Nursing staff not properly document urine test
- Nurse filing to utilize Hyper/Hypoglycemia NET during intake screening or schedule a follow up
- Nursing staff failing to properly document hyperglycemia
- Nurses improperly documenting "No Show" for insulin including no CRIC documented
- Nurses failing to document in the EMAR
- Nurses filing to obtain signed refusals or schedule red flag appointments
- Provider failing to follow up after being notified of a patient with BS 542 and positive ketones

I have also reviewed a document titled "Chart 18 Jung Corrective Action Plan". This document includes 13 "opportunities for improvement" which correlate with the problems identified in the Patient Safety Event Committee Report. Twelve of the 13 items are addressed with a strategy that involves the retraining or signature of acknowledgement of an individual person. One other item was marked as pending at the time the document is written.

I have also reviewed YesCare diabetes audits or quality assurance reports leading up to Mr. Jung's death, from July 2022 through August 2023.(Charts 2,3,4,5,6) these audits do not appear to include two of the most basic and critical parts of diabetes care, whether the patients are having their blood sugar checked as needed, and whether they are receiving insulin as needed. The areas included in these audits relate to long term diabetes control, such as laboratory testing for HbA1C and vaccination status, but there is no review or audit of the areas relevant to every patient in jail with insulin dependent diabetes, blood sugar checks and insulin administration.

I have also reviewed a YesCare document titled "Insulin Re-Audit September 2024". This document presents several areas of needed improvement in diabetes care within the PDP.

**Findings:** Review of the information I have detailed above indicates the following failures in the care provided to Mr. Jung while in PDP.

1. Failure to provide basic care for diabetes.

The care provided to Mr. Jung in the care of PDP was deeply flawed. When Mr. Jung arrived in the facility 10/28/23, there was no review of his prior records or insulin regimen to understand that he had been recently hospitalized multiple times with DKA, a potentially fatal complication of diabetes. This is a failure by the nurse and the provider, since both had access to his prior records and should have reviewed them for warnings about potentially fatal or serious health problems, including recent hospitalizations for DKA. This also reflects a failure of the health service to have a process that makes this type of review mandatory.  Given the serious presentation of Mr. Jung, with markedly elevated blood sugar and ketones in his urine, it was also imperative that he be assessed by a provider at the time of his intake, not simply screened by a nurse, to make an assessment of whether he was again slipping back into DKA.

This failure was compounded by the lack of any adequate response to Mr. Jung's extremely elevated blood glucose level of 542 and the presence of ketones in his urine. This combination represents potential DKA and absolutely requires a higher level of assessment that includes measuring the anion gap determining the level of fluid shift/loss and initiating close monitoring of his electrolyte, blood sugar and hydration levels. This is the type of assessment, treatment and monitoring that requires hospital transfer.

Mr. Jung's case exhibits several other failures in his diabetes care before his return from Norristown Hospital on 10/28/23. One of the most glaring failures is the broken system for recording of actual blood glucose values in Mr. Jung's medical records. The testimony of the Site Medical Director, Dr. Trivikram, highlighted that blood glucose might or might not be present in the MAR or the patient's electronic health record. This is extremely damaging to the care of a patient like Mr. Jung because both nurses and providers need to see the blood glucose values alongside the insulin administrations when they are reviewing his health status.

It is also apparent that the Red Flag system and overall refusal practices were deeply flawed in Mr. Jung's case and more generally for PDP patients at this time. Major Powers testified that the Red Flag process that involved both custody and health staff whereby a patient who misses medications or care would be identified by medical staff via their MAR's and then placed on the Red Flag list so that security could take some action. Major Powers testified "They place them on a Red Flag Medication Compliance List provided to the security staff. We then have to bring those inmates to medical staff, usually in the medical area where the inmate is counseled on missing, whether it be three straight doses of a life-sustaining or patterns or just refusing certain medications". There is no evidence in Mr. Jung's medical records that this process was being followed with any consistency and the YesCare Patient Safety Committee meeting regarding Mr. Jung also documents failures in this area. The testimony by Major Powers that there were no audits of the Red Flag system helps to explain why it was not functioning for Mr. Jung. Any system that requires so many steps and multiple types of staff is prone to breakdowns or simply not being performed unless carefully overseen.

Dr. Trivikram testified about another area of ambiguity relating to whether a patient not receiving medication would trigger a Red Flag appointment. She testified that a patient's medical records might indicate their insulin or other medication was recorded as not documented but that "If it was not administered, then yes. But if it's not documented, that doesn't necessarily mean it was not administered." This confusing system appears to reflect the reality that some patients may have their medication recorded as not documented in one part of their medical records but that the medication might be documented elsewhere as administered. Based on my own experience overseeing medication administration, this type confusing system reduced the likelihood that staff will know with certainty that a medication was not given and thus, may simply not create Red Flag appointments or notifications.

My review of the available information indicates that these failures reflect systemic problems with how health care is delivered at PDP, not simply individual errors. The most alarming failure in Mr. Jung's case is that when he was seen with dangerously elevated blood glucose and ketones in his urine, he was not transferred for a higher level of assessment. The systemic nature of this exact problem was identified in an internal YesCare review many months after Mr. Jung's death.

The Insulin Adherence Re-Audit from September 2024, had the stated goal of "an audit was conducted to analyze insulin administration adherence in the Philadelphia Department of Prisons." This internal review included data from dozens of diabetic patients across PDP sites and reached the following conclusion; "**Areas In Need Of Improvement:** Treatment of patients with a high blood sugar has not improved."

Based on my review of Mr. Jung's records, there are multiple systemic contributors to these failures. The intake form utilized when Mr. Jung returned to PDP did not have a clear and required field to document review of prior records. This is an important element to include in the initial intake form so that the health staff seeing the patient entering the facility review prior diagnoses, hospitalizations and medication regimens. Mandating this type of review (along with quality assurance to ensure that it occurs) is essential to identification of high risk patients like Mr. Jung.

The failure to ensure that Mr. Jung was re-assessed in the hours after his intake for his diabetic control is a glaring error that also may reflect a systemic problem. Mr. Jung needed hospital evaluation for assessment of potential DKA, but even with that error made by the provider who saw him, it is stunning that there was no automatic encounter generated to be reassessed later on the 28th or early on the 29th when he was seen for a blood glucose over 500 and with a urine test showing ketones in his urine. This failure reflects a lack of adherence to the YesCare Diabetes Clinical Pathway. Based on that document, Mr. Jung's blood glucose should have been rechecked after 2 hours and he should have been seen by the provider the next day.

Another systemic failure is the lack of automatic recording of blood glucose values into the medical record of a patient. Any medical exam or test result obtained as part of a patient's care must be included in their medical records. These results are commonly included in flow sheets for vital signs and other basic diagnostic tests that can be reviewed in trends over time. I did not see any such records in Mr. Jung's medical records. The need for a medical record that includes a patient's diagnoses, diagnostic tests, flow sheets of significant findings and treatments and other basic elements is one of the essential standards of the National Commission on Correctional Health Care.[13] In the case of diabetes, tracking blood sugar values together with patient insulin regimen and HbA1C is critical for assessing glycemic control. Mr. Jung's last HbA1C value was an alarming 12.7 in February 2023. This represents a significant increase from an already elevated level and indicates a rapid worsening of his level of control over prior months. Increasing HbA1C is associated with numerous serious complications including increased risks for cardiovascular disease, kidney disease and death.[14] When he returned to PDP, there was no review or appreciation of that extremely elevated value, but equally problematic, there is no record of the few blood glucose checks that did occur between October 28th and November 6th. These checks are documented as occurring several times, and administration of regular insulin is also documented albeit without documentation in Mr. Jung's medical record of the dose given. Failure to document the blood glucose values and regular insulin administration dosages for Mr. Jung within his electronic health record contributed to the lack of clarity about his worsening level of glycemic control and these appear to reflect systemic problems with how the health

---

[13] NCCHC Standards for Health Services in Jails. 2018. Standard J-A-08, Health Records.
[14] https://pmc.ncbi.nlm.nih.gov/articles/PMC4395238/ and
https://pmc.ncbi.nlm.nih.gov/articles/PMC2766035/.

service operated. Based on review of this information, it is clear that YesCare failed to provide adequate diabetes care for Mr. Jung.


2.   Failure to house Mr. Jung in the Jail Infirmary prior to his death

By the time Mr. Jung returned from his inpatient psychiatric stay on 10/28/23, he had already been sent to the emergency department 6 times with DKA and hyperglycemia. His HbA1C has skyrocketed from 9.3 to 11.2 to 12.7. His medical records were full of over 1000 instances of medications (including insulin) and blood glucose checks being not documented, refused, or him being a 'no show'. He was clearly a patient with a serious illness that was not controlled and who had already become so ill as to need hospitalization numerous times. It is hard to conceive of a patient who needed an infirmary setting more than Mr. Jung and the failure to immediately house him in the PDP infirmary reflects a failure of the provider who saw him, but also a failure of YesCare and PDP because of the lack of effective alerts to trigger this automatic transfer.

The consistent opinion of YesCare clinical leaders that Mr. Jung did not need or deserve infirmary level care appears driven by two conflicting opinions, both of which are dangerous and wrong. The first erroneous opinion, reflected by both Dr. Bradley's actions and Dr. Trivikram's actual testimony, is that needing a regimen of insulin and glucose checks four times per day was not sufficient to warrant infirmary level of care. This is exactly what hospital physicians stated was necessary when Mr. Jung returned from his DKA admission in March 2023, his 5th hospital transfer for diabetes complications. His DKA was expressly attributed to the lack of this level of care was expressly called out by in his hospital discharge plan.

The second erroneous opinion expressed by Site Medical Director Dr. Trivikram is that Mr. Jung did not warrant or deserve infirmary level of care because of perceived refusals. When an incarcerated patient is perceived as not following a life-sustaining plan of care in general population, infirmary level assessment/care is exactly what they and the health service need. This is essential to understand the reasons behind their issues with compliance and come to grips with the potential contribution of their own poorly controlled disease, other medications or mental health issues as driving what is perceived as willful noncompliance. It is also essential to utilize the infirmary to maximize the care and monitoring for patients who are known to face serious or fatal outcomes if their disease is not better controlled. Mr. Jung was known to be such a patient after his numerous hospital transfers for DKA.

The note by Dr. Bradley on 3/20/23 marks a clear decision point by YesCare to ignore the direction of hospital physicians that the status quo was not working and that Mr. Jung's DKA was attributable to systemic flaws in their plan of care, not Mr. Jung's so called noncompliance. Dr. Bradley documented the rejection of hospital recommendation for four times daily blood glucose checks stating that this was not possible due to staffing shortages at PDP. This represents a conscious decision that refused a higher level of care for Mr. Jung despite clear communication that this higher level of care was needed to prevent potentially fatal DKA.

The testimony of Dr. Trivikram, who was a Site Medical Director at CFCF, also echoed the same overt decision that a patient who needed a higher level of care to receive insulin and glucose checks would not be an appropriate infirmary patient. She testified that this was "challenging" and when asked whether the infirmary was a place that this level of care could be accomplished,

22

she testified that "The infirmary, yes, but the infirmary level of care is for patients who require a lot more than just a specific insulin time. They require wound care, they're paraplegic. They need to be turned, they need to be moved. It's for a much higher level of care."

Despite the hospital physician clearly documenting that Mr. Jung had suffered a potentially fatal complication of diabetes, DKA, and that this complication was attributable to the insulin and blood glucose checks occurring only twice daily, Dr. Trivikram repeated the opinion that Mr. Jung's diabetes complications were the product of his own compliance not the lack of a higher level of care.

Even if Mr. Jung's worsening health was driven in part or whole by his noncompliance with medication and glucose checks in the general population setting, transfer to the infirmary was needed so that staff could work with him to understand the source of his issues with compliance and work to provide a higher level of care. My own experience as a physician, Medical Director and Chief Medical Officer of a jail system is that patients who require life-sustaining medications or treatments and who appear to have compliance issues in general population are exactly the type of patients we need to quickly transfer to the infirmary to understand the true issues with their care, maximize the monitoring and treatment we can provide and reduce their risk of death. Three groups of patients who fit this profile and for whom I directed infirmary transfer when there were apparent issues with compliance with life-sustaining care were patients with insulin dependent diabetes, epilepsy and hypertension.

There is well-established confusion and overlap between refusals of care and patients with uncontrolled diabetes exhibiting behaviors that are actually a product of their disease complications. A 2019 review of "High Risk Situations for Diabetes Patients" in CorrectCare (the NCCHC Journal) stated "Recognizing that the behaviors exhibited are related to the diabetes and not behavioral or noncompliance issues is essential and potentially lifesaving."[15]

Concrete examples of this issue are apparent in Mr. Jung's medical records. The series of events between 1/20/23 and 1/23/23 are one example. The medical records from this time show that staff were failing to conduct adequate clinical assessments, continuing to state that Mr. Jung was refusing care, and essentially ignoring his developing medical emergency as a potential contributor to his ability to even understand and engage in his care. During this time, the note by PA Sarskaya on 1/20/23 documents that "Pt is not coming out for any medication or accu check . pt is complaining of pain and said that's why he isn't coming out (per referral )." But this note has a blank assessment and plan and there is no follow up later that day or anytime subsequent about the type of pain causing Mr. Jung to not come out of his cell. He was ultimately diagnosed with DKA and pneumonia several days later and these failure represent extremely substandard care. The next provider encounter two days later by NP Henderson-Hamwright documents that Mr. Jung was experiencing hyperglycemia and ketones in his urine as well as nausea, vomiting and wanting to lay on the stretcher. But this encounter at 8:30 am does not include any assessment of potential DKA and also fails to trigger any follow up by a provider later in the day. These encounters clearly show Mr. Jung experiencing a serious worsening of his health and inability to engage in his own health care. But even on the day he was vomiting with elevated blood glucose and ketones in his urine, his desire to lay on a stretcher and thirst was interpreted as refusal of care. Even in this weakened and dire state, Mr. Jung was not seen again by a

---

[15] High Risk Situations for Patients With Diabetes. Correct Care. Vol. 33, Issue 1, 2019, p11.

provider that day or the following night. When he was finally seen the following morning, his health and mental status had deteriorated to the point that nursing staff documented "pt continues to be disoriented unable to obtain urine sample, pt seen by triage provider n/o to send pt out VIA 911, for further eval".

3.  Failure to conduct basic oversight of the adequacy of care leading up to Mr. Jung's Death

I have identified in the finding above that YesCare failed to provide adequate diabetes care for Mr. Jung . The information I have reviewed also reveals a glaring lack of clinical oversight by the County of the adequacy of care that YesCare was providing.

Testimony by the County's own contract manager, Nurse Varghese, indicates that the County did not conduct any independent audits concerning diabetes care and she could only recall generally that the vendor, YesCare, had performed some sort of audits relating to diabetes but could not recall the details or times they were conducted. She also indicated that the outside physician monitors employed by the County had never looked to see whether lapses in diabetes care led to preventable hospitalizations.

The YesCare diabetes audits leading up to Mr. Jung's death do not appear to include two of the most basic and critical parts of diabetes care, whether the patients are having their blood sugar checked as needed, and whether they are receiving insulin as needed. These are two critical tasks relevant to every patient in jail with insulin dependent diabetes, blood sugar checks and insulin administration. The failure of Yescare to review or audit these aspects of care should have prompted the County to undertake their own audits of these areas.

This failure to effectively monitor YesCare's diabetes care represents a serious deficiency by the County because complications of diabetes are a common source of morbidity and mortality in jail healthcare. In addition, PDP itself had experienced numerous patient hospitalizations for diabetes related illness in the years before Mr. Jung's death. There were more than 60 hospital transfers of patients with apparent diabetes complications among patients within PDP custody between 2020 and the time of Mr. Jung's death in 2023. In addition, review of the YesCare audits relating to diabetes care before Mr. Jung's death (Charts 2,3,4,5,6) showed there was no tracking of insulin administration or blood glucose monitoring for patients.

A central aspect of the Country's oversight failure leading up to Mr. Jung's death is the purported "Red Flag' system that was supposed to capture key refusals or missed care instances so that morbidity and mortality could be prevented. The PDP report on Mr. Jung's death identified numerous instances when Mr. Jung's refusals of insulin and blood glucose checks were never entered into the PDP Red Flag system. Deposition testimony of Major Powers indicates that there was no regular auditing done of this system.

The lack of effective oversight and guidance for how to handle refusals was also apparent in the testimony of Nurse Apollon. She testified that she sought but did not receive additional training on how to approach insulin refusals among diabetic patients.

The failures in the Red Flag system were made worse by the confusing and inoperable approach to recording blood glucose levels in the YesCare electronic medical records. Dr. Trivikram described a system that allowed for some people to have "Not Documented" entered into their

24

MAR when a task was actually completed while others might have entered "Not Documented" when the task was not done. Dr. Trivikram also testified that blood glucose results might or might not be pulled into the patient's MAR or medical records.

One of the mandated tasks in the YesCare Clinical Pathways document for diabetes was review of prior blood sugars and weekly review of blood glucose logs by a provider. This type of review was nearly impossible given the lack of clarity about whether these results were located and also given how prevalent the problem of accuchecks simply not occurring was. This is exactly the type of systemic problem that County oversight should have detected because it seems to reflect an interaction between how their vendor provided care, how the electronic medical record stored or recorded blood sugar results, and how workflows for nursing and medical staff intersected.

My review of the PDP Special Investigations reports for 58 deaths in the PDP. (CITY014194-CITY015338) also showed that there were multiple sustained findings when officers and/or medical staff failed to make rounds or render emergency care. This is relevant to the lead up to Mr. Jung's death because like the failures in the "Red Flag" system, these findings indicate an inability to keep patients safe or monitor their well-being. These types of documented failures should have prompted the County to implement auditing of nonfatal medical emergencies to track and improve routing monitoring and emergency responses. This knowledge should have also triggered auditing by the County of the infirmary referral process to ensure that patients who could suffer fatal outcomes when not properly cared for or monitored would be reliably sent for increased monitoring and care in the infirmary. This is very relevant to Mr. Jung's case because while two of the additional cases I reviewed did show that diabetic patients were sometimes sent to the infirmary for more monitoring and care, this was not done for Mr. Jung.

In addition, the County's outside physician auditors appear to have identified problems with how refusals were handled, without apparent corrective action plans. Taken together, the knowledge that patient deaths (in 16 instances) involved a failure to monitor or render aid, and that flaws existed in handling refusals should have prompted the County to ensure that any patients who were identified as high risk were cared for in an infirmary setting, especially when those patients required care beyond what was available in the general population setting. This knowledge also should have prompted auditing of refusal processing as well as tracking how lapses in diabetes care and other chronic health problems led to hospitalizations. Instead, Dr. Bradley seems to have documented very clearly on 3/20/23 that the systemic problem of not having a way to safely care for Mr. Jung in general population setting would simply result in a lower level of care than he needed.

The NCCHC essential standard on Continuous Quality Improvement clearly identifies that "One essential element of quality improvement is the monitoring of high-risk, high-volume, or problem prone aspects of health care provided to patients.[16] Three of the core areas of care to be monitored in this standard are chronic care, transfers to urgent/emergency care and infirmary care. Review of information in this case indicates that leading up to Mr. Jung's death, the County was simply not monitoring whether their patients with diabetes were receiving adequate blood glucose monitoring, insulin administration, the refusal and Red Flag process. Further, the

---

[16] NCCHC Standards for Health Services in Jails. 2018. Standard J-A-06, Continuous Quality Improvement.

information I have reviewed indicates that the Country was failing to monitor the very basic question of whether failures, lapses or deficiencies in diabetes care were contributing to diabetic complications and hospitalization.

The relevance for reviewing the additional cases of Patients 1-4 is to provide better understanding about whether the deficiencies in Mr. Jung care represented systemic problems with the health service. As I have detailed in my methodology section, a systemic problem is one that does not involve a single person's error in judgment or action but instead represents a feature of how the health service operates, with built in deficiencies in workflow, oversight, training or staffing. Systemic problems can occur across different patients and across time as the built-in deficiencies go unaddressed. Finding a systemic problem in health services is different than conducting a research study to determine the exact prevalence of that problem with fixed confidence intervals. I have taken both approaches numerous times in correctional health settings but the first step is to identify the presence of a systemic problem. In the case of Mr. Jung, his records show multiple gross deficiencies in the care he received leading up to his death and review of these additional four medical records also provides insight to how these problems were systemic, not just one off or unlucky outcomes.

These records show that prior to Mr. Jung's death, there were other patients experiencing life-threatening complications with diabetes who were not being re-checked after their blood sugar was found to be dangerously high or low. These records also show that many of the instances when blood sugar was ordered to occur, it was not done, either with of a 'not documented' code or some other reason. Finally, these records also show that lack of a clear tracking of blood sugar values in the medical records, something that was also present in Mr. Jung's case and which was also identified by the Site Medical Director in her testimony as "imperfect".

These problems reflected deficiencies in how the health system operated, not a failing of one single person. It was the County's responsibility to monitor this critical area of care but by their own admission, they conducted no independent audit of diabetes related care. They also failed to look retrospectively at diabetes-related hospitalizations to assess whether a lack of care contributes to the hospitalization, something that would quickly identify multiple problems with both the care being provided by the vendor, and their internal quality assurance efforts.

It is clear that the County had more than adequate knowledge about key failures in the YesCare approach to patient care before Mr. Jung died. The County's own physician auditors had identified problems with refusal processing for which there was no corrective action plan. The County had failed to conduct independent audits of the diabetes care or whether lapses in care contributed to emergency hospital transfers before Mr. Jung died, despite ample evidence that patients with diabetes (including Mr. Jung) experienced numerous hospitalizations for complications of diabetes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 3, 2025.

Homer Venters MD, MS

**Dr. Homer D. Venters**
hventers@gmail.com

**Health Administrator**          **Physician**                    **Epidemiologist**

*Professional Profile*
○ Award winning epidemiologist focused on the intersection of health, criminal justice and human rights.
○ Leader in provision and improvement of health services to patients with criminal justice involvement.
○ Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
○ Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

*Professional Experience*

**Medical/Forensic Expert**, 3/2016-present
○ Independent correctional health monitor
      ➢ Cumberland County Jail, NJ (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail.
      ➢ Fluvanna Women's Correctional Center, VA (ongoing). Serve as independent, court-appointed health services monitor in a women's prison.
      ➢ Santa Barbara County Jail, CA (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail Complex.
      ➢ VI Department of Corrections (ongoing). Serve as independent, court-appointed monitor of health services in St. Thomas detention facility.
      ➢ HI Department of Corrections (COVID-19 only 9/2021-3/2022).
      ➢ CT Corrections Department (COVID only, 2020).
○ U.S. Department of Justice, Civil Rights Investigations medical expert, 2019-present. Work with the USDOJ to investigate correctional health conditions and provide recommendations for addressing.
○ State Attorney's General, provide expert consultation and investigation regarding correctional Health (CA, NY, IL).
○ Other litigation, see testimony below.
○ Conduct analysis of health services and outcomes in detention settings.
○ Conduct site inspections and evaluations in detention settings.
○ Produce expert reports, testimony regarding detention settings.

**Member, Biden-Harris COVID-19 Health Equity Task Force,** 2/26/21-10/31/21
Work with Task Force members to provide President Biden with interim recommendations to address COVID-19 Health inequities.
      ➢ Work with Task Force and Federal partners to produce final report, recommendations and implementation plan for reducing inequities in COVID-19 and other pandemic responses.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.
○ Lead COCHS efforts to provide technical assistance, policy guidance.

- ○      Oversee operations and programmatic development of COCHS.
- ○      Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
- ○      Lead COCHS efforts to expand Health Services in Jails.
- ○      Develop strategy for non-profit models of jail diversion/health care.

**Director of Programs,** Physicians for Human Rights, 3/17-11/18.
- ○      Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- ○      Expand forensic documentation of mass killings and war crimes.
- ○      Develop and support sexual violence capacity development with physicians, nurses and judges.
- ○      Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.
- ○      Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
- ○      Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
- ○      Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
- ○      Reduced overall mortality in the nation's second largest jail system.
- ○      Increased operating budget from $140 million to $160 million.
- ○      Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.
- ○      Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.
- ○      Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.
- ○      Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
- ○      Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.
- ○      Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
- ○      Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
- ○      Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.

  o  Developed training program with Montefiore Social internal medicine residency program.
  o  Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

*Education and Training*
**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.
**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert    Einstein University7/2004-5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

*Academic Appointments, Licensure*
Adjunct Faculty, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.    New York (2007-present).

*Print articles and public testimony (last 15 years)*
Testimony: United States House of Representatives Subcommittee on Crime, Terrorism, and Homeland Security, Judiciary Committee 1/21/22.

Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction. NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.


*Peer Reviewed Publications (last 15 years)*

**Venters H.** Preventing Another Fifty Years of Mass Incarceration: How Bioethics Can Help. Hastings Center Report. 2023 April; 53(6).

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

K. Parmar, Jennifer Leigh, Ernest Thomas, Douglass Curry, **Homer Venters**, Andra Gilbert, Tamaryn Nelson, Ed Lester. Confl Health. 2019; 13: 41. Published online 2019 Sep 16.


Messner N, Woods A, Petty A, Parmar PK, Leigh J, Thomas E, Curry D, **Venters H**, Gilbert A, Nelson T, Lester E. Qualitative evidence of crimes against humanity: the August 2017 attacks on the Rohingya in northern Rakhine State, Myanmar. Confl Health. 2019 Sep 16;13:41.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated. *J Health Care Poor Underserved.* 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**. Feasibility of Treating Hepatitis C in a Transient Jail Population.

*Open Forum Infect Dis*. 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved*. In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet*. 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care*. 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep*. 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care*. 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health*. April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health*. 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, **Venters H.** Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health*. 2016 1/8/16.

Granski M, Keller A, **Venters H**. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health*. 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health*. 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health*. 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*. 2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved*. 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care*. 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:    Patient         safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights*. (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J*. (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

*Honors and Presentations (past 15 years)*

**Invited presentation,** Yale Law School/Liman Colloquium, Death investigation and models of carceral care. Yale Law School, New Haven, CT. 4/9/24.

**Invited presentation,** United Nations Office of Drugs and Crime, Presentation on Custodial Death

Investigation. Malina, Philippines (remote), 3/18/24.

**Invited presentation,** Jail and Prison Health and Human Rights, Oklahoma University School of Health Sciences, 2/13/22.

**Invited presentation,** COVID-19 and Carceral Health, Stanford University Schools of Engineering and Public Health, 2/23/22.

**Invited presentation,** Screening and treatment for sexually transmitted infections in justice. National Academy of Sciences Committee on Law and Justice, remote, September14th, 2020.

**Invited presentation,** Vaccination for COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, August 20th, 2020.

**Invited Presentation,** Documenting Deaths in Custody, National Association for Civilian Oversight of Law Enforcement (NACOLE), remote, August 3rd, 2020.

**Invited Presentation,** Decarceration and Health. Radcliffe Institute/Harvard University. Policy Series. Remote. 6/23/20.

**Invited presentation,** COVID-19 in correctional settings. Briefing for U.S. Senate Staff, sponsored by The Sentencing Project, remote, May 29, 2020

**Invited presentation,** COVID-19 in correctional settings. Briefing for Long Island Voluntary Organizations Active in Disaster , sponsored by The Health & Welfare Council of Long Island, remote, May 29, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, May 12, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Association of Counties, Justice and Public Safety Committee, remote, April 1, 2020.

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina, postponed.

**TedMed Presentation**, Correctional Health, Boston MA, March 15, 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable

care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

*Teaching & Other Health & Human Rights Activities*

**United Nations Office of the High Commissioner of Human Rights,** Istanbul Protocol, contributor to 2022 updated protocol.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-2020.

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University,

June 2015, June 2014, April 2019.

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Draconculiasis Eradication, Togo West Africa, June 1990- December 1991.

*Books*
**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.


*Chapters in Books*

**Venters H.** COVID-19 and the Struggle for Health Behind Bars. In *Excessive Punishment*. Columbia University Press, 2024.

**Venters H.** Asylum Evaluation in Detention Settings. In *Asylum Medicine: A Clinician's Guide*. Springer Publishing 2022.

**Venters H.** Mythbusting Solitary Confinement in Jail. In *Solitary Confinement Effects, Practices, and Pathways toward Reform*. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In *Decarceration*. Ernest Drucker, New Press, 2017.


*Prior Testimony and Deposition*

- Benjamin v. Horn, 75–cv–03073–LAP (S.D.N.Y.). Expert for Defendants 2015.
- Newbrough v. Piedmont Regional Jail Authority, 3:10CV867–HEH (E.D.V.A. 2011). Expert for Plaintiffs.
- Rodgers v. Martin, 2:16-cv-00216 (N.D.T.X.). Expert for Plaintiffs 10/19/2017
- Fikes v. Abernathy, 7:16-cv-00843-LSC (N.D.A.L.). Expert for Plaintiffs 10/30/20017
- Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.N.Y. 2017). Defendant in role as City Employee, 4/10/2018.
- Charleston v. Corizon Health Inc., 2:17-cv-03039-MAK (E.D. P.A.). Expert for Plaintiffs 4/20/2018.
- Atencio v. Board of Cnty. Comm. of Sante Fe Cnty., 1:17-CV-00617 WJ/KK (N.M.). Expert for Plaintiffs 7/23/2018.
- Hammonds v. Dekalb Cnty. , 4:16-cv-01558-KOB (M.D.A.L.). Expert for Plaintiffs 11/30/2018.
- Mathiasen v. Rio Arriba Cnty., 17-CV-1159 JHR/KBM (N.M.). Expert for Plaintiff 2/8/2019.
- Hutchinson v. Bates, 2:17-cv-00185-WKW-SMD (M.D.A.L.). Expert for Plaintiff 3/27/2019.

- Lewis v. East Baton Rouge Parish, 3:16-cv-00352-JWD-RLB (M.D.L.A.). Expert for Plaintiff 6/25/2019, 7/1/2019.
- Belcher v. Lopinto., 2:18-cv-07368-JTM-DPC (E.D.L.A.). Expert for Plaintiffs 12/5/2019.
- Zavala v. City of Baton Rouge, (NO. 3:17-656-JWD-EWD). Expert for Plaintiff. 3/6/2020.
- Imperati v. Semple, 3:18-cv-01847-RNC (C.T.) Expert for Plaintiffs 3/11/2020.
- Camera v. Semple, 3:18-cv-01595 (C.T.). Expert for Plaintiffs 9/23/2020.
- Staten v. Semple, 3:18-cv-01251 (VAB) (C.T.). Expert for Plaintiffs 2020.
- Woodward v. Lopinto, 2:18-cv-04236-MVL-KWR (E.D.L.A). Expert for Plaintiffs 12/1/2020.
- U.S. v. Pratt, 2:19-cr-00213-DWA (W.D.P.A.). Expert for Defendant 4/28/2020 (Video hearing).
- U.S. v. Nelson, 1:19-cr-00021-DSC (W.D.P.A.). Expert for Defendant 5/4/2020 (Video hearing).
- Chunn v. Edge, 1:20-CV-01590-RPK-RLM (E.D.N.Y.) Expert for Plaintiffs 4/30/2020 (Video deposition), 5/12/2020 (Video hearing).
- Martinez-Brooks v. Easter, 3:20-cv-569 (MPS) (C.T.). Expert for Plaintiffs 6/8/2020 (Video deposition), 6/11/2020 (Video hearing).
- Baxley v. Jividen et al. NO. 3:18-cv-01526, 7/1/21 Expert for Plaintiffs (Video Hearing).
- Busby v. Bonner, 2:20-cv-02359-SHL (W.D.T.N.). Expert for Plaintiffs 7/10/2020 (Video hearing).
- Braggs v. Dunn, 2:14-cv-601-MHT (M.D.L.A.). Expert for Plaintiffs 10/19/2020 (Audio testimony).
- Royston v. Christian, 6:19-cv-00274-RAW (E.D.O.K.). Expert for Plaintiffs 3/26/21 (Video deposition).
- Fraihat  v. U.S. Immigration and Customs Enforcement, 5:19-cv-01546-JGB-SHK (C.D.C.A.). Expert for Plaintiffs 2020.
- Torres v. Milusnic, CV 20-04450-CBM-PVC(x) (C.D.C.A). Court appointed expert 5/24/21 (Video deposition).
- Sanchez v. Brown, 20-cv-832-E (N.D.T.X.). Expert for Plaintiffs 5/25/21 (Video deposition).
- Barnett v. Tony, No 0:20-cv-61113-WPD 10/13/21 Expert for plaintiffs (Video hearing).
- Fenty, et al., v. Penzone, et al., No. 2:20-cv-01192. Expert for Plaintiffs 10/21/2021 (Video hearing).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 2/7/22 (Video testimony).
- Thomas Rainey v. County of San Diego, et al., No  CASE NO. No.: 19-cv-01650-H-AGS.. 3/21/22 Expert for Plaintiffs (Video Deposition).
- Frankie Greer v. County of San Diego, et al., No  CASE NO. 19-CV-0378-GPC-DEB. 4/27/22 Expert for Plaintiffs (Video Deposition).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 11/14/22 (Video testimony).
- Derrick Jones et al. v. City of St. Louis, Missouri et al., Case No. 4:21-cv-600. 3/17/23 Expert for Plaintiffs (Video deposition).
- Wilson v. San Diego, CA., Case No. 3:20-cv-0457-BAS-DEB. Expert for plaintiffs 5/8/23 (Video deposition).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 5/30/23 (Video testimony).
- Harris v. Georgia DOC, Case No. 5:18-CV-365-TES. Expert for plaintiffs 6/15/23.
- Serna v. San Diego, CA., Case No. 20-CV-2096-LAB-DDL. Expert for plaintiffs 10/27/23 (Video deposition).

- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 11/17/23 (Video testimony).
- Enyart v. San Bernardino 5:23-cv-00540. Expert for plaintiffs 5/8/23 (Video deposition).
- Carty v. Governor Bryan 3:94-cv-00078 Court appointed monitor. Hearing 4/30/24.

Rate of Compensation for Dr. Venters is $500 per hour, and $250 per hour for travel time plus expenses if needed.