# EXHIBIT "K"

December 1, 2025

Mr. Bret Grote, Esq.
Abolitionist Law Center
990 Spring Garden Street, Suite 306
Philadelphia, PA  19123

**Expert Report of Jonathan S. Williams, MD, MMSc.**

## Introduction

I, Jonathan S. Williams, MD, MMSc, have been asked to provide my expert opinion in the matter of Louis Jung, Jr's death during incarceration at Philadelphia Department of Prisons, Curran-Fromhold Correctional Facility on November 6, 2023.

As way of background, I am an active full-time board-certified practicing endocrinologist at Brigham and Women's Hospital, with an academic title of Associate Professor of Medicine at Harvard Medical School, in Boston, MA.  I completed my medical training in Internal Medicine and then in Endocrinology at these institutions.  I have an active endocrine research enterprise in hormonal dysfunction that focuses on adrenal gland dysfunction, blood pressure homeostasis, insulin resistance and diabetes that contributes to a wide variety of disease states in humans. I am or have been Principal Investigator on National Institutes of Health, foundation, and biopharmaceutical research awards with over 100 original peer-review publications.  Relevant to my interests in human research, I Direct the Cardiometabolic Endocrine Human Genetics Research Program, I am the Lead Medical Research Officer for the Center for Clinical Investigations at Brigham and Women's Hospital, Chair of the Institutional Review Board at Mass General Brigham, and standing member of the National Institutes of Health, National Institutes of Diabetes, and Digestive and Kidney Disease grant review study section that funds diabetes research nationally. I formerly sat on the National Board of the Association for Patient-Oriented Research and the Nominating Committee of the Association for Clinical and Translational Science and served as Associate Editor for the journal *Metabolism: Clinical and Experimental*.  I have an active leadership and educator role at Harvard Medical School where I was the past Co-director of the Masters Program in Clinical and Translational Investigations, The Clinical and Translational Research Academy, and current Director of the Brigham and Women's Research in Residency Clinical Investigations Pathway.  My clinical and educational expertise include my role as Attending Physician for the Endocrine Services at Brigham and Women's Hospital, Dana Farber Cancer Institute, and Boston VA Healthcare Systems where I train medical students, residents, and fellows from Harvard Medical School, Boston University School of Medicine, and the Massachusetts College of

Pharmacy and Health Sciences in clinical endocrine practice including management of diabetes and its complications such as diabetic ketoacidosis.

**Materials reviewed**

- Patient Safety Event Committee Report
- Jung Corrective Action Plan
- Medical Records of Louis Jung, Jr.
- FSBG reports
- Jung Red Flag/Potential Red Flag reports
- Jung First Amended Compliant
- Jung PDP Medical Administration Records
- PDP Report into Death of Louis Jung, Jr.
- Jung Refusal Records
- Selected YesCare Policies
- YesCare 1482-1483 Progress Notes of Dr. Bradley May 25, 2023
- Jung Laboratory reports
- Depositions (Mariesha Apollon, Lalitha Trivikram, MD, Gena Frasier, Maureen Gay-Johnson, Blair Cabellos, Shawn Jay, Wanda Bloodsaw)

**Principals of Diabetic Ketoacidosis**

- Diabetic ketoacidosis (DKA) is a condition that arises in the setting of relatively low insulin levels, or absolute zero insulin levels as in Type 1 Diabetes Mellitus (T1DM) in Mr. Jung's case. Insulin is required to convert glucose to energy for metabolic needs. When energy demands are high, yet insulin is deficient, then glucose can no longer meet demand and the body turns to second-line sources of energy, namely stored fat. A consequence of using fat to provide energy is generation of acid components (i.e. ketone bodies). Subsequent acid build-up in the blood impairs and ultimately halts normal physiologic activity leading to multi-organ dysfunction and failure. DKA is rapidly fatal if not reversed. Among the mortal risks are those from cardiac arrythmia due to acute electrolyte and acid-base disorders in the setting of hyperglycemia and DKA.

- <u>Patients with Type 1 DM will develop DKA if they do not receive insulin regularly.</u> Patients like Mr. Jung with Type 1 DM produce no insulin and are thus completely dependent on administration of insulin through external means. In short, if they do not have insulin products in their body, they will quickly develop ketones and then DKA within hours to days. Because they must have insulin in their body at all times to avoid developing DKA, the treatment consists of a continuous supply of insulin. This is given in the form of a long-acting insulin such as glargine or detemir insulin (which can last 18 to 24 hours) to provide a constant insulin level while a patient is fasting or sleeping, as well as short-acting insulin such as aspart, lispro or regular insulin (which can last 2-6 hours) that provides insulin to cover the carbohydrate intake of a meal. Often, patients with Type 1 DM use an insulin pump, which delivers a constant infusion of insulin day and night. *Importantly, if insulin is withheld from a patient with Type 1 DM for a length*

2

*of time (hours to a day or two) they will begin to generate ketones, typically with hyperglycemia, and rapidly progress to DKA and death*.

- <u>DKA is not a rare presentation</u> in the emergency setting and has been steadily increasing in prevalence. In 2006 a total of 136,510 cases of primary DKA were diagnosed. Most were in patients between the ages of 18 and 44 years (56%) and 45 and 65 years (24%). Patients with a history of DKA are more likely to have another episode of DKA.

- <u>Death caused by DKA is rare because it is avoidable</u>. Although DKA is the most common cause of death in children with Type 1 diabetes (T1DM), the overall mortality in adults is <1%. This is largely due to the development of rapid diagnosis and strictly protocolized treatment programs over the last 20 years.

- <u>Laboratory values provide diagnostic, severity and prognostic information to direct care.</u> Typically, an elevated blood glucose value will accompany a diagnosis of DKA. As such, elevated glucose values are important (*but not required*) in determining the need to explore a diagnosis of DKA. The degree of elevation along with symptoms may influence the decision to check for the presence of ketones towards discovering possible DKA. Accordingly, a <u>normal</u> glucose level in a patient with T1DM who displays signs and symptoms concerning for DKA should invoke testing for ketones. Similar, a markedly elevated glucose level (i.e. >400 mg/dL) in a T1DM without symptoms warrants investigation for DKA by ketone testing.

- <u>The clinical presentation of DKA is important to recognize given the high potential for rapid decompensation and death</u>. Usual early signs and symptoms may include frequent urination, thirst, elevated ketones in the urine, and elevated glucose. As DKA progresses to its later stages, additional signs and symptoms that may develop include fatigue/weakness, abdominal pain, vomiting, and ultimately respiratory and mental status changes (confusion, delirium, obtundation).

- <u>After recognition of DKA, treatment is straightforward and extremely effective at preventing complications and death</u>. This includes; 1) volume resuscitation to correct dehydration and to expedite removal of ketone bodies, 2) correction of electrolytes, 3) reduction in glucose levels with insulin, and 4) identification and treatment of precipitating factors. All these maneuvers address cardiac susceptibility to fatal arrythmia that arises in DKA. Although DKA is fatal if not corrected, it is one of the rare life-threatening conditions wherein someone can be near death, yet discharged from the hospital to normal health in a day or two.

**Case Review**

Mr. Jung was a 50-year-old male transferred from Norristown State Hospital back to Curran-Fromhold Correctional Facility on October 28, 2023. He had a long-standing history of T1DM, which was known to the facility due to prior episodes of DKA. While at Norristown State Hospital, the medical record documents consistent treatment with

insulin at least 3 times/day with reasonable glycemic control and very few missed insulin doses or Accu Check glucose readings.

On presentation to the facility intake station, the intake form indicated that he answered "no" to having diabetes, but testimony and the facility records documents that he was known to have T1DM since he was very young.  He stated that he had not had insulin 3 days, although the eMAR from Norristown State Hospital records 2 insulin injections on the morning of October 27, 2023 according to his schedule of NPH 30 units in the morning and 15 units in the afternoon along with regular insulin sliding scale three times/day with meals (ranging 3-15 units). No medical records from Norristown State Hospital were provided or reviewed at the time of intake.

The intake exam reports normal vital signs and appearance with an Accu Check glucose reading critically elevated at 542 mg/dL. Accordingly, the intake nurse Mariesha Apollon contacted the covering off-site provider Maureen Gay to notify her of the value and the presence of ketones on the urine dipstick, obtained per protocol.  Orders provided to the intake nurse were to give 10 units of NPH insulin and 12 units of regular insulin subcutaneously, encourage drinking plenty of fluids, and blood draws for 2 weeks later and a chronic care consult for 1 month later. No additional testing was ordered to determine efficacy of the insulin injection in the setting of critically elevated blood glucose and urine ketones, and Maureen Gay did not otherwise follow up with the patient following this administration of insulin.

Medication orders were placed for NPH 10 units twice per day and regular insulin twice per day on a sliding scale (2-12units), along with Accu Check glucose readings also twice per day.

A Progress Note entered by Maureen Gay on October 28, 2023 at 9:48PM describes the communication with the intake nurse including the diagnosis of T1DM, glucose reading of 542 mg/dL and urine ketones. It remarks on no distress and mucosa moist along with AAOx3. It further states "hasn't gotten insulin in 3 days". Assessment is Type 1 DM, not stated as uncontrolled. Labs are ordered for November 10, 2023, follow-up PRN, disposition-general population.  Three additional notes are recorded by Ms. Gay on October 30, 2023 documenting a rule-out TB results, on October 31, 2023 documenting a COVID-19 vaccination, and on November 6, 2023 that Mr. Jung was deceased.

From October 28 thru November 6, 2023 the medical record documents elevated glucose readings, multiple missed doses of insulin administration and failure to follow related procedures to prevent a critical care situation.

10/29/23:  AM glucose: 385 mg/dL; insulin administration 10 Regular/10 NPH (under-dosed for both Regular and NPH given prior history).

10/29/23:  PM glucose 585 mg/dL (evidence that morning dosing was too insufficient); administered 12 Regular and 10 NPH.  Annotation in eMAR "Provider notified; urine

4

obtained". No documentation of ketone result. No retest of glucose in 2 hours (failing YesCare policy).

10/30/23: AM glucose 268 mg/dL. Administered Regular 8 and 10 NPH (under dosed for both insulins).

10/30/23: PM glucose not recorded. PM insulin not recorded (YesCare policy would require escalation to provider to take action).

10/31/23: AM glucose 371 mg/dL (evidence that prior dosing was insufficient); administered Regular 10 and NPH 10 (insufficient dosing).

10/31/23: PM glucose 500 mg/dL (evidence that prior dosing was insufficient); administered 10 NPH. No documentation of Regular insulin dosing. No testing of ketones. No retesting of glucose in 2 hours.

11/1/23: AM glucose "refused". No documentation of insulin dosing. Nor Red Flag form generated. No notification to provider of missing/refusing critical medication (insulin).

11/1/23: PM glucose 411 mg/dL (evidence that prior dosing/missed dosing was insufficient). Administered 10 NPH. No Regular given. No ketones tested. No re-testing of glucose in 2 hours.

11/2/23: AM glucose 290 mg/dL (evidence that prior dosing was insufficient). Administered Regular 8 and NPH 10 (insufficient dosing).

11/2/23: PM glucose 245 gm/dL (evidence that prior dosing was insufficient). Administered Regular 6 and NPH 10.

11/3/23: AM glucose not obtained. No show for testing and insulin. No Red Flag generated.

11/3/23: PM glucose 394 mg/dL (evidence that prior dosing/missed dosing as insufficient). Administered Regular 10 and NPH 10.

11/4/23; AM glucose 266 mg/dL (evidence that prior dosing was insufficient). Administered Regular 8 and NPH 10.

11/4/23: PM glucose not obtained. Insulin not documented. No Red Flag generated.

11/5/23: AM glucose not obtained/no show. No insulin recorded. No Red Flag. generated.

11/5/23: PM glucose not obtained/refused. No insulin recorded. No Red Flag generated.

Consequently, despite reports that Mr. Jung was medically deteriorating by November 5, 2023 (including vomiting and urinating in his cell with a cell mate present) insufficient care was provided. Subsequently, Mr. Jung was found near dead on the morning of November 6, 2023 and expired within 45 minutes.

5

**Opinion**

<u>The cause of death is indisputable. Mr. Jung did not receive sufficient insulin, consequently developed DKA, which resulted in suffering and death. As an incarcerated person, he</u> was entirely dependent on attendants at the prison to provide his medical care. The intake record demonstrates that providers were aware of his diagnosis of T1DM and that he took both long-acting and short-acting insulin formulations. He was at high risk for DKA given prior episodes of DKA while in the same prison 3 times the year before.  As would be clearly indicated in this individual with T1DM and history of DKA, there were orders to check blood glucose levels and to administer insulin. His prior record at the same prison and also his record at Norristown State Hospital established that he required at least 60 units of insulin per day (Elizabeth Bradley, MD May 20, 2023 progress note and eMAR from Norristown State Hospital October 27, 2023). Mr. Jung had a long history of non-compliance. YesCare policy includes guardrails to manage non-administration of named critical medicines (including insulin), that requires immediate provider action. Clearly, this is meant to avoid known acute complications such as hyper- and hypoglycemia.  Unfortunately, the safeguards in place were not followed as outlined, leading to profound under-insulinization.

There is no question that he was developing DKA over this period as it would be entirely expected in the absence of insulin administration since the morning of October 27, 2023. The NPH insulin he received that morning would've been out of his system by the afternoon that day. From this time forward he would begin to develop DKA. The high suspicion of DKA was evident from intake. His incorrect answers at this time, including stating an initial "no" to history of diabetes and that he had not had "insulin for 3 days" are consistent with someone with impaired cognition in the setting of marked hyperglycemia or DKA. Yet, remarkably, no follow-up interventions were conducted to determine if the insulin provided at that time had corrected either his critically elevated glucose or ketones.  Regardless of his appearance at this time, the presence of these two components in an individual with T1DM requires very close follow-up, as indicated in YesCare's policy, which would include a glucose recheck within 2 hours. While increasing oral intake can help lower glucose and reduce ketones, it is a deviation from the standard of care to not order a follow up glucose reading and determine if ketones are starting to clear, as the absence of improvement indicates escalation of care is required.  Failing to follow up to check on Mr. Jung's blood glucose level was disregarding a known risk that he would develop DKA.

The testimony of those involved in his intake care along with the documented lax follow-up indicate a lack of fundamental understanding of T1DM management and the need for individuals to always have insulin in their system. Individuals with T1DM cannot be managed the same way those with T2DM are managed. They are at imminent risk for DKA within hours of insulin leaving the system.

Individuals experiencing DKA do not die silently.  Although the available record is scant on actual description of Mr. Jung's condition, his cell mate on November 5, 2023 remarked that he wanted to be transferred to a different cell because Mr. Jung was urinating and vomiting all over the cell. There is testimony from others that he was lifted from the floor to his bed that day. As described above, individuals dying from DKA experience excruciating abdominal pain, vomiting, mental status changes, all signs of acidic damage and multi-organ failure preceding death. Mental status changes would impair the ability to comprehend even basic instructions and stimuli. As such, it would be reasonable to assume that Mr. Jung may have missed several Accu Check and insulin administrations because of his declining medical condition. This would include an inability to respond to the verbal medication call-outs performed at the time of insulin administration. As his health declined rapidly on the last day, this would include the inability to call out for help.

Ultimately, Mr. Jung's death was entirely preventable. There were multiple opportunities for medical evaluation. These are outlined in several outcome documents generated by YesCare and the Philadelphia Department of Prisons from this case. Unfortunately, the policies and procedures created to prevent this outcome were not followed. The recognition of Mr. Jung's signs and symptoms of his progressively grave condition were not appreciated, and his death was entirely predictable in this setting.

These are my opinions based on my education, training, and experience as an internist and endocrinologist, and based on the information provided to me as of the date of this report.  I reserve the right to amend this report if new information is made available to me for review.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 1, 2025.

Respectfully,

*/ Williams*

Jonathan Williams, MD, MMSc
Associate Professor of Medicine
Harvard Medical School
Division of Endocrinology, Diabetes and Hypertension
Brigham and Women's Hospital
Boston, MA  02115

**Five-year Expert Medical Opinion Deposition and Trial History**

*Updated December 2, 2025*

Jonathan Williams, MD, MMSc
184 High Street
Ashland, MA  01721

**Depositions**:

1.     Case:  Tonya Forrest v. Richard Bruce Van Eldik, M.D and Endoscopy Center of Ocala (5th Judicial Circuit Marion County, FL)
   Attorney:  Olivia T. Kronenberg, Esq (855-292-2111)
   Firm:  Paul, Knopf, Bigger (Winter Park, FL)
   Deposition Date: April 5, 2021

2.     Case:  William Bawgus v. Downtown Baltimore Family Care, P.A., et al.  (Circuit Court for Baltimore, MD)
   Attorney:  Robert Joyce, Esq (443-562-2992)
   Firm:  Law Office of Barry R. Glazer, L.L.C.
   Deposition Date:  January 14, 2022

3.     Case:  Dai'Vontay Hudson v. Miami Valley Hospital, et al (Court of Common Pleas, Montgomery County, OH)
   Attorney:  Williams S. Jacobsen, Esq
   Firm:  Nurenberg Paris
   Deposition Date:  August 12, 2022

4.     Case:  Stacey Wolking v. Henry Linder, MD and Youngs Apothecary, Inc (United States District Court for the Middle District of Pennsylvania)
   Attorney:  Conor Lamb, Esq
   Firm:  Kline & Specter, P.C.
   Deposition Date:  June 11, 2024

5.     Case:  Johnson v Kennedy University Hospital, Inc. (New Jersey)
   Attorney:  Thomas M. Walsh, Esq
   Firm:  Parker McCay, P.A.
   Deposition Date: July 26, 2024

6.     Bond, Slusser, O'Leary, Corrar, et al. vs. Dupont, 3M, Solvay Specialty Polymers USA, LLC, et al (United States District Court, District of New Jersey)
   Attorney:  Stephen Phillips
   Firm:  Phillips and Paolicelli, LLP
   Deposition Date: July 1, 2025

## Legal Case Review Guidelines
(Updated March 1, 2023)

As an Endocrinologist, I am willing to assist attorneys with regard to legal issues involving liability cases, etc. The fee schedule and policy schedule of depositions is stated below. If, after careful review of the fee schedule and policy, you wish to arrange for a deposition or review, please notify me.

- **Scheduling:** I must maintain strict control of my time to allow for administrative, teaching, and clinical activities. I will attempt to schedule depositions in a timely fashion. Once a date is confirmed with me by the office of the attorney cancellation is possible as presented by the cancellation policy below, but please be mindful that scheduled time for activities (depositions/trial appearances/travel) often requires cancellation of clinic time, which cannot be readily rescheduled or reimbursed

- **Fee Schedule:**

| | |
|---|---|
| Review of records for purpose of assessing liability issues | $2,000 retainer fee with advance payment required to cover initial 4 hours of effort. $500 per hour for further review and discussion |
| Consultation | $500 per hour |
| Depositions | $3,000 minimum for initial 4 hours then $750/hr |
| Preparation for deposition | $500 per hour |
| Court/Panel testimony | $6,000 standing fee per day. All travel/lodging expenses paid/reimbursed |
| Travel | $2,000 standing fee per day of travel required beyond deposition/court appearance date if if requires leave before 5:00PM ET prior to appearance date or an additional night's stay after appearance |

- **Payment and cancellation policy for depositions:**
  A Deposition retainer of $3,000 must be received 12 working days from the scheduled deposition appointment, and is non-refundable within 12 days of the agreed deposition appointment.
- **Cancellation policy for court testimony:**
  A Court testimony retainer of $6,000 must be received 15 working days from the scheduled court appearance and is non-refundable within 15 working days of the agreed court appearance date.

  **<u>Your deposit indicates your complete and full understanding of our policy.</u>**

  **CHECKS SHOULD BE MADE PAYABLE TO Jonathan Williams, MD**
  **SSN: 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**