# EXHIBIT "M"

## EXPERT WITNESS REPORT -  ARTHUR WALLENSTEIN

My name is Arthur Wallenstein. My contact information is as follows: 17525 Princess Anne Drive, MD 20832. My telephone/cell phone number is (301) 412 – 7424 – email address: artwallenstein@gmail.com. I was retained by the law firm and public policy organization, Abolitionist Law Center (Pittsburg and Philadelphia, Pennsylvania) to serve as an expert witness in the case of Jung v. Philadelphia et. al. I was asked to review issues surrounding the death of inmate Louis Jung, Jr. while being held within the Philadelphia Department of Prisons and more specifically the Curran Fromhold Correctional Facility (CFCF).

I was asked to review the responsibility of correctional staff members for ensuring access to healthcare. This involved the responsibility of correctional staff to conduct routine and ongoing supervision of inmates and how staff members responded, and how these responses related to training they received or should have received regarding policies and procedures that should have guided their behavior based on best practices and elementary standards of care that were in place nationally at that time – in and around 2023.

My review was also to include the responsibility of the Philadelphia Department of Pisons to monitor diabetes care within its facilities that would specifically have included the Curran Fromhold Correctional Facility. By the time of this case, in and around 2023, it was essential to determine whether inmate Jung, whose healthcare situation was known to be that of a Chronic Care patient, was suffering from diabetes and whether correctional staff made certain that he was treated in accord with standards of the National Commission on Correctional Healthcare as well as the American Correctional Association Standards for Adult Local Detention Facilities as well as the standards of inmate supervision I was known to have practiced in the facilities I administered in over 38 consecutive years as a Warden and Agency Director.

My qualifications include over 43 consecutive years of working for governmental agencies with responsibility for inmates in county jails and county correctional facilities. Of this career long period, 38 years of consecutive service were as a Warden and Director of correctional agencies. I began my career as a volunteer, conducting classes in public affairs and current events at Eastern State Penitentiary, Philadelphia, Pennsylvania, while a graduate student at the University of Pennsylvania. During two summer periods, I worked as a paid employee at Eastern State Penitentiary filling in during staff vacations overseeing the prison library and conducting other administrative tasks. After deciding to change fields and seek a career in the field of corrections I worked for three years writing grant applications for the Philadelphia Prison System. Topic areas included drug treatment and mental health programs, staff training elements and workforce development.

Thanks to serious mentoring by Commissioner Louis Aytch and Deputy Commissioner Ed Lyons (1971-74) I returned to my home state, Illinois to seek broader training and dig into line operations. I served as Clinic Supervisor for the Minimum-Security Unit and then was promoted to Clinic Supervisor for the entire Stateville Prison Complex, Joliet, Illinois serving over 3000 inmates, most coming from inner city Chicago and its surrounding jurisdiction, Cook County, closely mirroring the city/county of Philadelphia. I then was promoted to Assistant Warden and studied and learned correctional administration in one of the largest and most challenging maximum-security prisons in the country.

I served as Warden and Director of the Department of Corrections, Bucks County, Pennsylvania from 1977 – 1990. I then served as Warden and Director of the Department of Adult Detention, King County, Washington (Seattle and its environs) from 1990 – 1999. I concluded my senior administrative career work as Director of the Department of Corrections and Rehabilitation, Montgomery County, Maryland (1999 – 2015). Each of the three systems that I administered received accreditation in healthcare from the National Commission on Correctional Healthcare. Further efforts to improve operations and healthcare came from accreditation by the American Correctional Association, Standards for Adult Local Detention Facilities Throughout this entire period. I also served as an adjunct professor and instructor at various university settings, conducting my classes in the evening or online after daily operations were largely concluded.

My own education included a bachelor's degree at Georgetown University, School of Foreign Service and Master's degree at the University of Pennsylvania, Department of International Relations with the additional graduate work at the University of Chicago, including doctoral level written and oral examinations (graded as distinguished) and served as a co-author (not research assistant), along with two senior Professors of a textbook on International Organizations and the United Nations.

I completed advanced specialized training from the years 1977 through 2015 that included at least 50 specialized training sessions on different elements of correctional operations at the local/county level. The training was highlighted by regular/yearly participation in a unique senior management group program known as the Large Jail Network (LJN) conducted by the US Department of Justice, National Institute of Corrections. I was an original charter member of this group and participated in twice yearly senior management session from the early 1990s through my retirement in 2015. The large jail network was limited to selected senior managers in charge of the 100 largest jails in the United States.

I was privileged to receive the lifetime achievement award from the American Jail Association for leadership in the field of corrections at the local level in 2015. On two occasions I was appointed by Attorneys General of the United States to serve on the advisory board of the National Institute of Corrections (served for 13 years – following appointment by Attorney General Janet Reno and Attorney General Eric Holder.).

## II. MATERIALS CONSIDERED AND SUMMARY OF OPINIONS

In formulating my opinions, I have been provided with and reviewed information specific to this case. I conducted analysis of core areas of correctional practice such as correctional healthcare, crisis intervention and related nationally selected standards that are linked directly to the matter at hand. I have also reviewed pertinent broad industry standards, policies, treatises, books and other materials when formulating my opinions. A list of materials considered and reviewed is found at the conclusion of this report. Nothing presented in the list of materials is presented as a library of resources – every item was read and reviewed as part of my work on this report.

Standards of correctional healthcare, crisis intervention and correctional management/administration are referenced from following key publications: Performance Based Standards for Adult Local Detention Facilities (fourth edition) 2004, American Correctional Association, 2004, and Standards for Health Services in Jails, National Commission on Correctional Health Care, 2014. I cite them specifically in the Introduction because they represent industry standards across a broad scope of operational elements in corrections at the county/local level that were in place at the time of this incident, October/November 2023.  This is essential information so that those reading and reviewing my work are certain that there were no further editions/revisions of the comprehensive work provided up to and including the time mentioned above, October/November 2023.

I was present at the creation so to speak of judicial intervention into correctional operations and the application of an entirely new constitutional standard. Judicial intervention and cases that sought to hold county corrections and jail facilities accountable for meeting constitutional standards began in earnest in the early 1970s, at a time that my career included senior-level correctional administration. Best practices and correctional standards in the core area of correctional healthcare were first brought online by a national program conducted by the American Medical Association. It then was morphed into the creation of the new organization, the National Commission on Correctional Health Care, that guided correctional healthcare practice from the 1970s right up through the present day. The American Correctional Association began its leadership practice of developing core best practice throughout the field of corrections and all of its individual organizational elements including local corrections – performance-based standards for adult local detention facilities and at the time of this incident, fully covered correctional operations and correctional healthcare.

My involvement and  responsibilities for correctional healthcare began with the decision of the US Supreme Court in Estelle v. Gamble (1976) and continued without deviation with the development of core standards by the National Commission on Correctional Healthcare also included the best practices and constitutional approved medications as well. It was my good fortune to serve as a Warden and Dir. Of corrections at the local level at the very same time that major landmark cases were handed down by the

Supreme Court that created constitutional responsibilities for correctional healthcare as well as broadly-based standards for virtually every element of correctional operations linked to judicial intervention in my field.

It is my opinion that correctional officer Gena Frasier and Lieutenant Wanda Bloodsaw failed as both a line correctional officer and as a senior supervisor to come to the aid of inmate Louis Jung in an appropriate manner to ensure his access to professional healthcare, knowing he suffered from a chronic illness, diabetes, that at all times defined his condition while under their care. All staff members had received training that was part of both the initial orientation for all correctional staff members and was reinforced during annual training that was part of the responsibility of PDP administration. Both of them should have provided interventions that could well have proven lifesaving to inmate Jung.

Senior administration at the very top of the organizational chart for PDP failed in numerous cases of in-custody death within the correctional system –overlooking or minimizing staff need to intervene and call for assistance and missed opportunities to help as part of the normal procedure of making rounds. These cases establish a pattern of correctional officers simply either forgetting to complete regular rounds of the housing units, going cell by cell to ensure the well-being of inmates or conducting rounds.

The advent of standards regarding correctional healthcare did not only focus on the clinical or medical side of the equation. Correctional staff – primarily line correctional officers working in direct contact with members of the inmate population were expected to provide a very clear range of services in support of their correctional health colleagues. This was a collaborative framework, working together to deliver health care to inmate populations. These duties received clear directions on how this assistance should take place on an ongoing and regular basis.

When I was the Warden and Dir. of the Department of adult detention in King County, Washington, there was a class action suit filed against the county, it had lost national healthcare accreditation, and numerous deaths marked problems with daily operations. We were charged by the county at its highest level to reverse this problem, reinstate accreditation and make certain that death diminished. It was the only time in my career that a county government brought myself and my counterpart in the health department together and basically ordered us to make things happen.

My counterpart at the Department of Health moved her entire operation, including her office, inside the detention facility in the middle of downtown Seattle. I in turn made certain that my office was in a centralized location giving credence to the availability, transparency and scope given to seeking to get that large county correctional system out of multiple class action lawsuits, the most challenging of which was correctional healthcare. My counterpart and I met every day. I made certain that I was seeing moving from my office area to the correctional health component and stopping to talk with staff members, both administrative and nursing staff who moved throughout the detention facility. I note this to highlight the importance of collaboration, working

5

together, coming together, following a crisis situation, and then having the determination to work through scores and scores of standards and the National Commission on Correctional Health Care.

After 1 ½ years we submitted our entire healthcare delivery system for on-site review by a team of three veteran, correctional healthcare of evaluators. It was singularly the most challenging and almost got wrenching experience in my career. National accreditation was received as was re-accreditation three years later. It was not just a plaque in the hallway. It was a process that began with a court decision from the nation's highest judicial element making it clear and certain that without any hesitation, regardless of size or past practice, the health of inmate populations throughout the country now rested upon nationally developed conduct of both healthcare professionals and correctional staff including correctional officers to deliver healthcare at a level meeting community-based standard. To this day, November, 2025. I look back all those years around 1994 when NCCHC on-site evaluators found that we had met all mandatory standards and in excess of 95% of all required standards in the system that had basically collapsed years earlier in providing health services to an inmate population. I cite this as an example or component of what remains as strong acceptance as any element in correctional practice where I found my boots embedded in a work assignment that challenged both my own skill set and most significant belief in what seamless collaboration meant to gain back or really to build a healthcare capacity that met constitutional standards for a large detention population.

The following summarizes my opinions:

☐☐Finding #1: Correctional Officer Gena Frasier failed to come to the assistance of inmate Jung a situation where it was apparent that some form of crisis was in progress finding the inmate slumped over and lying face down at the entrance to his cell. The absence of forthright intervention following clear operating procedures when finding an inmate in a nonroutine situation simply did not take place.

☐☐Finding #2: A reasonable officer would have made certain that any inmate who may have allegedly declined their medication or missed medication for any other reason, knowing that an inmate had a chronic condition, would be certain that healthcare staff was aware of same and would have been insistent in bringing this information to the attention of their colleagues in the healthcare component in what should have been a seamless, collaborative, and swift manner. The linkage between security officers and their professional healthcare counterparts should never break down given the physical presence of an officer on site and in the housing unit where inmates such as Mr. Jung could be observed and spoken to or and could have his situation easily documented.

☐☐Finding #3: A reasonable Correctional Supervisor such as Lt. Bloodsaw responding to a call from a correctional officer and finding an inmate such as Mr. Jung laying on the floor should never have determined without any formal clinical assistance and direction that an inmate did not have a medical issue, knowing full well that is beyond the scope of her knowledge. She knew or should have known that finding an inmate laying inert on

the floor required an emergency response known in the Curran Fromhold Correctional Facility as a "stretcher call" as opposed to turning away and then walking away, leaving the inmate to be dragged by other inmates back into a cell.

□□Finding #4: one of the most basic elements of conducting line supervision by correctional officer is making rounds. Making rounds relates to the movement of a correctional officer walking through inmate housing areas and checking each and every cell to ensure that everything exists in an acceptable manner and that inmates are not in distress or seeking assistance. Inmate rounds occur on an ongoing and regular basis, and constitutes one of the single most valuable tools and operating procedures to ensure both the overall security of the facility and the welfare of individual inmates. Making rounds is always a major priority and cannot be altered or minimized. Documentation must be clear and action taken of any behaviors or observations that warrant attention. This process appears deficient and I found it very surprising that much stronger action was not taken when it should have been due to failure to conduct rounds in an appropriate manner.

□□Finding #5: I reviewed investigations into 12 deaths that occurred in the Philadelphia Department of Prisons prior to the death of inmate Jung. A review of the cases presented several elements of concern regarding attention to the core elements of reviewing the inmate population, seeking out any inmates who expressed concern, and responding across the board on the part of correctional staff giving rise to my finding that appropriate measures were not taken as an ongoing and regularized response to issues pertaining to deaths in custody. Case materials covering all 12 of the death situations leave considerable description and documentation that, as in the matter of the death of inmate Jung, staff intervention was improperly delayed in circumstances resulting in loss of life.


## III. CASE SPECIFIC FACTS – VIDEO FOOTAGE

The video footage of the event begins at 9:52 AM covered by video and utilizing the video timer – the timer records the time of day (hour, seconds and portion of seconds) (Video from Discovery "b13 6a-3p 11/5/23) The video utilizes 4 separate camera coverage areas: they include the following:

    1) b-1-3 Console – main floor level including the officer's post or work space;
    2) b 1-3 Full Housing – covering area on the main floor;
    3) b 1-3 Left Mod Housing – this is upper tier including the cell where inmate Jung was housed as well a bar covering to prevent inmates jumping off the tier;
    4) b 1-3 Sallyport – covers the entrance and egress point and door in and out of the unit.

I utilized all 4 camera coverage units, each has an independent timer and some appear to be movement driven but all were effective in being able to cover what transpired regarding the timeframe and action under review. No areas not directly covered by the

cameras appear to show any emergency response team or individual staff members or any action related to what follows below. I was able to add definition of what took place from the formal investigation reports that followed the death of Inmate Jung.

9:52  - CO and Healthcare staff member walk up the stairs to the upper tier and walk across the tier to cell of inmate Jung. Cell door is opened – Inmate can be seen on the floor now at the entrance of the cell being both in the cell and lying across the entrance outside of the cell.

9:54  -  Both staff members are at the cell and remain at the cell of Inmate Jung on upper tier – no action in terms of responding to the inmate can be observed.

9:56 – cell door remains open; inmate Jung continues to be lying on the floor – no action can be observed regarding any assistance being offered to the inmate.

9:58  -  Correctional Officer and healthcare staff member  come down from the upper tier – the door of the cell remains open and Mr. Jung remains lying on the floor  - no "stretcher call" has been made as there is no observation of any healthcare emergency response.

9:59 AM  -  CO Frasier and Healthcare worker talk and consult on the main floor , they stop and then communicate again.

9:59 AM – healthcare worker leaves the unit. C/O Frasier is now the sole staff member in the unit with the cell door open and inmate Jung is still lying on the floor – there is no documentation of any emergency call ("stretcher call") being made – c/o on main floor with  door of cell remaining open.

10:00  - Inmate on floor – no action by CO Frasier

10:01  - Inmate on floor – no action by CO Frasier

10:02  - Inmate on floor – no action by CO Frasier

10:03  - Inmate on floor – no action by CO Frasier

10:04  - Inmate on floor – no action by CO Frasier

10:05  - Lt. Bloodsaw enters the unit.

10:05  - CO Frasier points to the Upper Tier which Lt. Bloodsaw can observe.

10:06 – Lt. Bloodsaw walks up the stairs to the upper tier with Inmate Jung remaining on the floor and CO Frasier standing on the main floor – did not accompany the Lt.

10:07  - CO Frasier gives what appears to be sanitary gloves to two inmates while standing on the main floor. The inmates then proceed to the upper tier and walk to the cell of Inmate Jung.

10:08  - Lt. Bloodsaw is standing right next to the cell and to inmate Jung who remains lying on the floor. The two inmates remain next to the cell and then drag inmate Jung back into the cell – no healthcare staff member is present, no stretcher is utilized to provide support for the movement of the inmate, only inmates are involved in moving Inmate Jung as no other staff members are observed moving to the upper tier. CO Frasier is not involved as she remains on the main floor.

10:10  -  Inmates seen leaving the cell door is closed by the Lt and inmates return down the stairs from the Upper Tier to the main floor.

10:10  -  Lt. Bloodsaw leaves the Upper Tier.

10:11 AM  -  Lt. Bloodsaw leaves the unit – no "stretcher call" or any medical support staff have responded.

Narrative associated with this video is contained in many pages of official reports submitted by the City of Philadelphia as part of discovery in this case. It was not my focus to accept any of the findings where I might have been in disagreement but rather to arrive at my own conclusions after reviewing all available materials and interposing my own beliefs and experiences to arrive at my conclusions regarding the outcomes that flowed from what took place.

## V. OPINIONS

☐☐**Finding #1**: Correctional Officer Gena Frasier failed to come to the assistance of inmate Jung a situation where it was apparent that some form of crisis was in progress finding the inmate slumped over and lying face down at the entrance to his cell. The absence of forthright intervention following clear operating procedures when finding an inmate in a nonroutine situation simply did not take place.

Discussion: Correctional Officer Gena Frasier was a line correctional officer assigned to duties in the housing unit where inmate Jung was out. On November 5, 2023, she came upon the inmate in obvious distress. She failed to provide emergency aid for which she was fully trained and should have been guided by the policies and procedures regarding a situation of this nature. She failed to render immediate assistance as shown in the video footage. The video footage revealed that the officer as well as licensed practical nurse Cabellos walked away from the inmate and left the inmate unattended, lying on the floor outside of his cell for approximately nine minutes. No medical emergency was called which in the parlance of the Philadelphia Department of prisons was designated a "stretcher call."

The PDP Policy 4.E.21 (PDP Staff Roles in Non-Routine and/or Medical Emergency Situations) make it abundantly clear that when coming upon such a situation line staff, and that would absolutely include correctional Officer Gena Frasier, are not to step aside, move elsewhere, fail to engage the situation, or in any other way diminish their involvement, because this could have life safety implications in a situation of this nature. During hearings that followed several months later correctional officer Frasier offered numerous explanations, none of which bear any relationship to the policies in existence at the time responsibilities inherent in the work of a correctional officer coming upon a situation of this nature.

This is one of those elements of providing a constitutional level of correctional healthcare. Correctional officers are part of the equation; they are trained in basic first aid and CPR which offer tools that can be utilized to impact life safety and demonstrate the importance of line correctional staff in helping to respond as professional medical help is notified and is assumed to be forthcoming. In this particular case, there was clearly no safety reason that prevented officer Frasier from intervening – she could and should have intervened. The failure to intervene cannot be explained in any element of the situation as described or reviewed in the video footage. She was there, she had a non-routine crisis situation right in front of her, there were no other inmate behaviors

from other inmates intruding or prohibiting her immediate action. Calling for medical emergency, known as a "stretcher call", would have taken a few seconds and then her attention to the inmate lying on the floor directly in front of her would have been her immediate response.

This is not a matter of my individual judgment that is reflected in agency policy and training that is provided to every staff member. Officer Frasier that she could not remember the training that she received, though there is no question that first day and CPR training was part of the training regime. Further training elements included the role of line staff – correctional officers in engaging any potential medical emergency, providing access to correctional healthcare by notifying healthcare staff, knowing that would also bring forth supervisory security staff that might have guided further action. While a Lieutenant did arrive on scene and further failed to meet their responsibility, that does not absolve correctional officer Frasier from what she should have done.

It seems almost inconceivable that correctional officer Frasier could turn her back on an inmate in crisis and walk away. Behavior of this nature is almost inconceivable. In matters of this nature. I find it useful to ask a counterpoint question – if this was a staff member found on the floor next to their post or a physician in a housing unit found in this condition would the officer have walked away, leaving the individual for others to engage? Nothing in any standard of performance or correctional standard in the National Commission on Correctional Health Care or the standards for adult local detention facilities authored by the American correctional Association offer any guideline that would relate to a response of the nature provided by this officer in this situation regarding her failure to come to the aid of inmate Jung, failing to provide any basic first aid or CPR assistance, or seeking the help of others and then walking away, leaving the inmate unattended after being hauled back into his cell, and inmates.

There is never an obligation to follow an illegal order, fully knowing that she should provide help to an inmate in distress she has seen with other staff members. There exists no possible means of explaining actions of this nature. Inmate Jung was found beyond any hope of assistance the following morning by a correctional officer who was supervising the delivery of food to the inmate population.

☐☐**Finding #2**: When a Correctional Officer is on duty in a Housing Unit and Medical Instructions are available for specific inmates to receive medical services it is the responsibility of the Officer on duty to both announce the presence of medical services and make certain that all inmates included are called, found, and any situation such as a refusal is documented. Entries in official records are to be based on face to face, observed behaviors. I found that was not the case regarding how Inmate Jung's situation was handled on November 5, 2023 by Correctional Officer Gena Frasier.

Discussion: following the episode that took place in the morning that involved finding an inmate lying on the floor, failing to call for emergency medical assistance, and utilizing inmates to return the inmate to his cell by dragging him, this failure to provide assistance to Mr. Jung continued into the afternoon. Correctional officer Frasier admits

to being on duty and to being present when an equally troubling situation took place regarding medication and a basic Accucheck was to occur regarding blood sugar levels and also the administration of insulin to Mr. Jung. Electric logbook documentation notes that at 4:34 PM a medication events was noted for "insulin Accu – check". Four inmates were to receive insulin and one of them was inmate Jung. At 4:49 PM correctional officer Frasier entered another logbook event acknowledging that inmate Jung had refused insulin and Accu check. Further investigation was conducted of the housing pod where this took place – video documentation indicates that inmate Jung was locked inside of his cell and at no time exited the cell. No time did correctional officer Frasier leave her post and go directly to the location where inmate Young was out to determine what the situation was and to ensure his notification and participation.

What I found most compelling was the testimony of correctional officer Frasier in both her disciplinary hearing and in her deposition that it was her process to yell out that insulin and Accu check or other medication had arrived. It was something that frankly I have never experienced as a Warden and agency director during my complete tenure engaged directly with line operations of this nature. Most housing units in Newark or even aging correctional institutions have systems that have long replaced yelling as a means of communication. Regardless of whether such a system was in place and operating or was out of commission yelling could never serve as a valid means of ensuring that inmates, especially those with chronic medical conditions should be accepted standard operating procedure to link the inmate who was specifically listed with the medication or healthcare service they were to receive. It is the responsibility and was the responsibility at that time for correctional officer Frasier to find that inmate, determine exactly what their situation was and document it following standard operating procedures that require the completion of a specific form to ensure solid evidence was provided. If an inmate, indeed, refused their medication.

In the electronic log it was noted in the post-event investigation that this inmate refused medication. What was equally clear from my review is that there was a very strong likelihood that the record was falsified – that refusal was substituted for any effort to seek out inmate and determine exactly what the situation was on November 5, 2023 at around 4:49 PM while correctional officer Frasier was on duty. During investigative review following the death of this inmate on November 6, 2023 it was clear that no hard information could be found to document that inmate Jung had indeed refused his medication. My review of this entire matter will always be a combination of hard evidence and documentation to which I have been provided access coupled with 38 years of experience working in a senior management position on matters of this kind, seeking out inmates for medication in the housing unit or seeking them out so they can be moved to a medical area to receive treatment. It is matter in any compelling situation of this type to find the inmate, to look at the inmate and if they do not respond upon initial notification, whether it be through yelling, use of an electronic notification system, staff must go directly to the cell and make certain that the inmate is not in some form of distress, and hence unable to respond as opposed to refusing the medication or the service at hand. In the Philadelphia Department of prisons, if an inmate refuses medication there is to be written documentation with a face-to-face engagement with the

prisoner, assigned form and then formal notification on official records, such as those accompanying a medical event.

This is something I simply do not recall ever coming across in my experience. I certainly have heard of some inmates who refuse medication, but at no times in the three correctional systems where I was the director and where we sought and received accreditation from the National Commission on Correctional Health Care would an officer falsify official records by indicating that an inmate had refused medication when no face-to-face indications were given and documented. Correctional officer Frasier seemed to infer in her testimony that it was good enough to yell – that was a word I simply do not ever recall hearing as the singular form of communication ensuring that inmates with chronic care needs, suffering from ailments such as diabetes would be held to, or that such would suffice as sufficient effort to notify them that insulin and an Accu Check were at hand.

Viewing the record, I find no report or indication of a serious event in progress, such as a disturbance that would have given credence that yelling was something brought about by some other situation at hand. Correctional officer Frasier gave no notice of a medical crisis at hand that diverted her attention from seeking out Mr. Jung. There was simply nothing of any significance that would have diminished the responsibility of the correctional officer to find out why he was not present and responding to receive insulin medication and an Accu check, which are ongoing elements in providing chronic care to someone with diabetes such as the situation involving inmate Jung. This has nothing to do with Correctional Officer Frasier having to make any clinical decisions or diagnose any condition. It involved reading a list of the names of inmates and being made aware that this was the appropriate date and time for inmate Jung to receive insulin and Accu check from appropriate healthcare authorities.

Such situations should not exist in a modern, urban and supposedly value and policy driven, correctional healthcare system with all of the alleged checks and balances that were deemed to exist to conduct such a basic service as linking an inmate with medication and in many chronic care situations, linking the inmate with lifesaving, or life safety focused evaluations regarding their condition. Correctional officer Frasier knew from the event in the morning that inmate Jung was found on the floor in the doorway of his cell. She also knew that at that time, he appeared to be unable to stand up and return to the housing unit without the assistance of others – in this case two inmates, which while contrary to appropriate practice was still the case at that time, several hours previous. Correctional officer Frasier knew from the service that was cited that the inmate was a diabetic and required insulin on a regular basis as well as critical monitoring to ensure both appropriate treatment and to respond to his condition. She never suggested that she was permitted, trained or in any other way capable of determining that the inmate did not require his medication – insulin which is well-known as a critical treatment element for those with diabetes. No member of the medical staff was present at that time and advised correctional officer Frasier that there was no need for the inmate to receive insulin medication and to be evaluated following an Accu check procedure. This was a unilateral determination made by correctional officer Frasier and

she had the unabated belief that in the absence of any personal checking that the failure of the inmate to respond to yelling as the sole call for treatment was sufficient to include in the official record the inmate had refused his medication.

This was outright misrepresentation and without any basis in any operating procedure that was part of the training of correctional officers. I went through every one of 385 pages of training materials provided by the City in response to discovery efforts. There was not a single reference directing correctional officers to add an inmate's failure or refusal to respond to a call for insulin and Accu check if the inmate did not present themselves directly to the officer so that communication could have taken place. There was no suggestion or inference that if the correctional officer was busy or their attention was diverted elsewhere that they could simply not follow procedure and ensure they had our documentation that an inmate had refuse their medication or call for medical service that was scheduled.

Separate from all other considerations, Correctional officer Frasier had been witness to this inmate lying on the floor earlier on her shift. She knew that no "stretcher call" had been made. She had more information than just the name of the inmate and the service that was to take place around for 4:49 PM that afternoon. Falsifying records and failing to personally seek out this prisoner to determine why he was unable to respond to the call for insulin and Accu check was certainly a matter of concern and something that was part of one failure after another. Ultimately, denying inmate Jung access to healthcare that was a core responsibility for all correctional staff and their part of the constitutional healthcare equation linking the important role that line staff brought to the table to assist their healthcare colleagues in providing to an inmate population.


**Finding #3**: Lieutenant Wanda Bloodsaw, arrived at the scene (the cell of inmate Jung) and clearly observed him lying on the floor outside of his cell. Lt. Bloodsaw, a long-term veteran and upper-level supervisor took no action to come to the aid of this inmate who at direct face observation appeared to be in significant need of assistance.

Discussion:   Lt. Bloodsaw should have responded in the same matter required of her colleague. Both correctional staff members should have rendered immediate aid, as previously noted above, under PDP Policy 4.E.21 (PDP Staff Roles in Non-Routine and/or Medical Emergency Situations).

It was suggested by Lt. Bloodsaw that an inmate lying on the floor was not actually in need of immediate medical attention. That was never a judgment that should have been made by Lt Bloodsaw. All healthcare decision-making rests with medical staff, and it immediately changes the nature of the intervention. Security staff can create turmoil in the decision-making process. Medical staff when it appears that they are taking over the situation when it is not their area of responsibility, and is beyond the scope of their authority, as was so evident in the case of this nature. Lt. Bloodsaw was called to the scene, observing Mr. Jung lying on the floor, and unable to effectively communicate, and she claims to have determined that there was nothing wrong with the inmate. That

was an inappropriate decision for correctional staff to make in that situation, as Mr. Jung's condition of lying immobile on the floor required medical intervention to assess him. The standards of both and NCCHC and the American Correctional Association prohibit such an intervention by non-medical staff. And NCCHC standard-A-03 notes – "clinical decisions and action regarding healthcare provided to inmates to meet their serious medical needs are solely the responsibility of qualified healthcare professional." Custody staff such as Lt. Bloodsaw are required to follow their standard operating procedures that include supporting "the implementation of clinical decisions."

In this situation a senior level correctional supervisor, Lt. Bloodsaw, was making a decision without any healthcare staff being involved, and then she turned around and left the inmate. In all of my 38 years as a Warden and Agency Director I never experienced any member of the correctional staff leaving an inmate lying on the floor.

I cannot understand a Lt. or any member of the correctional staff associated with public service walking away from any person lying on the floor without seeking care and then closing the door after inmates dragged the individual into the a cell. It is about as unconscionable an act as I can imagine. In the three county correctional systems over which I exercised responsibility in the period of leadership covering 38 years behavior of this sort upon reaching my desk would have been immediately forwarded to law enforcement authorities for criminal investigation. Negligent failure of this sort by Lt. Bloodsaw crossed the line, not just suggesting inappropriate behavior or the disciplinary action, but far more severe considerations, especially when the impact might have involved life safety considerations that should have brought forth attention to standard operating procedures and immediately seeking medical assessment and intervention.

Lt. Bloodsaw had no documentation or proof that the inmate was malingering or creating some false situation. Had malingering been a reality and had an inmate remained lying on the floor in the entrance to his cell, the Lt. would have proceeded to place the inmate in segregation status and prepare disciplinary charges for the behaviors that were alleged. None of that was forthcoming, there was no documentation to even suggest the possibility of malingering. Lt. Bloodsaw, operating under the same guidelines that were indeed consistent for all correctional staff, should have taken immediate action on the scene to render first-aid and related services for which all staff are trained. Nothing of the kind took place. In its worst-case, a member of the correctional staff, holding high supervisory rank with other staff members present walked away, again denying inmate Jung access to healthcare services.

☐☐**Finding #4:** Making of Rounds is a core basic element of staff supervision in any correctional situation. In this case, Correctional Officer Frasier did not follow up with Mr. Jung while making rounds on November 5, 2023 following the incident where he was found lying on the floor at the door of his cell.

Discussion: Correctional Officer Frasier was aware that inmate Jung had been found in distress beginning on or about 9:55 AM on her shift, February 5, 2023. She was aware that no medical emergency had been called, a supervisor had come to the unit and

observed the situation, and left without calling for any emergency medical services or assessment and had directed other inmates to drag inmate Jung back into his cell and closed the door. This entire matter was from my perspective about as challenging and counterintuitive as any I have experienced in my correctional career.

Officer Frasier knew there had been a problem and clearly would have no reason to have thought that the problem was resolved. The inmate in distress had not received any medical assessment or evaluation and a senior supervisor had felt that it was appropriate to have the inmate dragged back into his cell, close the door and then left the housing unit. Any correctional officer -- frankly any human being would have felt the need to check out on the individual inmate to see if there were any elements that would have required further intervention. It is almost as if correctional Officer Frasier simply defined this entire situation away as if it never happened. In my 40 something years in corrections I have never experienced nor have I ever reviewed such a situation.

Correctional Officer Frasier knew that Lt. Bloodsaw was not a member of the healthcare staff and any judgments by the Lt. that the inmate did not need help were just not medically validated. Correctional Officer Frasier was well aware that the inmate had not been cited for a disciplinary violation and or removed to a pre-disciplinary unit in light of any alleged infraction. There had to be an understanding on the part of this correctional officer that regular or even more attentive rounds should be made to check up on the situation involving inmate Jung. Was he still alive? Was there any indication that he needed assistance? Had she moved to the cell and made rounds ensuring that she stopped at the cell with some regularity to determine what the status of the inmate might be? In reviewing the video, I simply fail to see any attention on the part of this officer to respond what she had observed during this period from 9:55 AM through 10:11 AM, November 5, 2023. The Officer was clear that she had been on duty on that day and had been present during that timeframe, and said knowledge of exactly what had transpired in the housing unit that she was assigned to supervise.

Making rounds is a critical element in the scope of work for any correctional officer assigned to a housing unit. It becomes more significant when an incident has taken place and an inmate who was in distress remains on the unit after it had been necessary for other inmates to return him to his cell. As I reviewed the situation, it is bewildering how this staff member could have refrained from frequent visitation or movement to the second tier to the cell where inmate Jung was housed to seek to communicate with them and to seek out his situation. The bizarre nature of this entire situation was further expanded as noted above, but officer Frasier noted in an official record that the inmate had refused insulin and then Accu check test given the events that happened earlier that she was well aware of. Months later, during her disciplinary action hearing, officer Frasier noted she had been involved in numerous situations involving death of a prisoner or even homicide and she felt she had always done her job. Here is clear and definite example of negligent failure to stay on top of the situation involving that she knew to be an inmate with chronic healthcare concerns. That should surely have warranted close attention. It simply did not happen and regular rounds to check up on the inmate and to seek to communicate more directly with him did not take

place. Correctional Officer Frasier did not make proper rounds to check on Mr. Jung. She might have walked around but without any focus on checking on him, nor communicating with him, and thus the nature of those rounds were clearly deficient. It is hard to imagine how a trained correctional officer could essentially walk away from the situation and not make it part of regular rounds, an essential component of her scope of work on that shift.

☐☐**Finding #5:** Senior agency administration, up to and including the Commissioner appeared to have minimized the importance of responding to staff behaviors that appear to create a pattern or a culture that was all too frequently a part of how business was conducted within the agency. Any staff member could have made an occasional error, but it appears almost beyond understanding to explain how this many staff members could fail to conduct required rounds, staff could fail to contact medical staff members upon confronting an unresponsive inmate, and staff could neglect to respond to finding an inmate in need to provide first-aid or CPR or other elements for which they had been trained, amongst other considerations. I found an overarching culture of either looking elsewhere, perhaps at some point being too tired after working 12-hour shifts or simply leaving the caring that should include any work in our field. It is a very difficult outcome to explain. What cannot be overlooked is that inmates under the supervision of fully trained correctional staff members die while in custody and under correctional supervision. That remains an unacceptable outcome regardless of any other consideration.

Discussion: I reviewed over 900 pages of materials and then summary documentation of the death cases provided through Discovery. I called out selected notations from those materials that help me isolate a culture of negligent failure to conduct basic core operations that seem to defy in part, the understanding of the administration of the agency. This was made most apparent when I reviewed the deposition of Commissioner Carney. I was most surprised to come across testimony that did not reflect analysis or concern that so many of the cases where death was the outcome included so many elements that appear to have been part of behaviors that easily stood out when reviewing the materials at hand. I note the following as an exemplar, not a comprehensive list:

1. CO did not do 3 AM count or render first-aid – inmate found unresponsive in his cell (SI-21-00225)
2. CO failed to render first-aid for an Inmate found unresponsive and lying face down in cell (SI-20-00045)
3. Another CO did not check pulse and attempt CPR or render any first-aid – stood at entrance to cell but did not enter – CPR was only initiated by responding medical staff (SI-20-00045)
4. reluctance to take proper action by notifying medical staff that Inmate was unresponsive after he did not wake up for COWS assessment. (SI-19-00145)
5. Another staff member left cell without notifying any medical staff personnel that inmate was unresponsive. (SI-19-00145)

6. CO did not notify her immediate supervisor and did not call for medical assistance upon discovering inmate unresponsive in his cell. This CO did not check for a pulse, for she was the only CO in the unit was opened (SI-18-00014)
7. During the that time medical was called for an unresponsive inmate on the floor, neither staff member initiated aid or CPR; both had previously walked away from him, leaving him unattended (SI-22-00105)
8. Inmate found unresponsive inside cell – CO's failed to tour unit, both were at the officer station when notified of an inmate in trouble. (SI-20-00231)
9. inmate found unresponsive after being assaulted by cellmate – CO failed to as per policy that he remained behind the officer's desk in a reclined position for most of the shift (SI-21-00059)
10. A Sergeant gave permission for a CO to leave his pod unattended to go to his next post without sending anyone to conduct tours on the unit (SI-21-00059)
11. CO failed to tour unit and logged that they had 3x (times). This officer also did not conduct any tours of the unit, remained behind the officer's desk in a reclined position (SI-21-00106)
12. inmate found lying on the bathroom floor having been assaulted by another person Sgt. did not tour the dorm prior to the assault and failed to tour any assigned areas (SI-20-00149)
13. inmate found unresponsive in the cell by CO serving evening meal – multiple COs found not to have conducted tours of unit starting at 12 PM onwards. (SI-17-00235)

These are references drawn from other death cases. I did not seek out the most egregious references or specific cases where the mere sounding of the words would prove offensive. The examples contained herein are exemplars of a culture that suggests the conduct of the work according to appropriate training in core principles simply did not exist amongst staff. Correctional healthcare seems to have been an element of their work where many violations occurred that were unfortunately found in cases of inmate deaths. They do not provide any direct evidence regarding the allegations in the case at hand regarding the death of inmate Jung, but they are characteristic of a staff culture or certainly subculture that defines ongoing failure to follow the most basic elements of good correctional practice. These are practices that were also found in the current case of Mr. Jung and simply are used to isolate how over and over again in reviewing the reports of more than 50 death cases provided as part of discovery the same elements of negligent failure to respond were found in a repeated manner.

I was surprised to see the consistency between Mr. Jung's case and the other death investigations. In the case at hand, staff members did not call for medical assistance. Staff members walked away from situations when they should have looked more carefully or investigated more thoroughly. Staff members did not conduct their required rounds on an ongoing and regular basis. Upon finding someone unresponsive or lying on the floor staff did not take immediate action using the first-aid skills and CPR training that all staff members receive. Reviewing these death cases offered a background that from my past training suggested more of a culture – something that was part of the

ongoing conduct of correctional staff actions and was very hard to explain, other than to relate in part to a form of neglect that had become part of the way of doing business within the correctional environment in the Curran Fromhold Correctional Facility and in other parts of the system.

It is very hard for someone like myself to explain how all staff members who had been chosen following background investigations, who had completed orientation training, who had worked under the supervision of senior staff members could fail to conduct core elements of the work or could falsify official reporting materials. It is incomprehensible that staff members could neglect to record their tours of unit or that they would fail to make the tours or could leave inmates unattended or could not follow one of the basic and most rudimentary directives that upon coming in contact with an inmate who appeared unresponsive or appeared to require assistance that healthcare be contacted immediately. There is simply no way to explain such behaviors. Training and retraining and further yearly updates and further retraining do not seem to have made a difference as a relates to these certain core elements of conducting the work of a correctional officer or other line staff members. I cannot accept that there is any valid explanation of staff members making decisions on their own when training materials clearly point to ensuring those especially in the medical area are contacted who are capable of assessing and evaluating an inmate's condition and taking action thereafter.

## IV. CONCLUSION

Inmate Louis Jung, Jr. died while in custody under supervision by staff members of the Philadelphia Department of Prisons in the Curran Fromhold Correctional Facility. He arrived alive, ultimately was defined as having a chronic care condition, diabetes, that was well-known and well understood by healthcare professionals within the correctional system. Nonprofessional correctional staff were adequately trained in the rudimentary basics of supervising the inmate population. They knew what steps were necessary when any inmate was discovered in need of healthcare services or appeared to be in distress. They were trained to know that they were not independent decision-makers regarding any matters regarding the health status of an inmate. They had been trained under the guidelines inherent in the standards of the National Commission on Correctional Health Care and the American Correctional Association that healthcare decision-making, treatment issues, and any matters relating to healthcare assessment were the province of healthcare professionals and were not within the scope of employment of those working in line correctional operations – as in this case specifically correctional officers and those in supervisory positions. There is simply no way around these basic core operating practices that are to be found in every correctional institution in this country.

Nothing in my experience, especially that covering 38 consecutive years as a Warden and Agency Director, support outcomes linked to the five major findings that I presented in this report. I had the opportunity, as noted in the report. to review some 383 pages of training materials and none of them suggested any deviation or different interpretation from that which I used in presenting the findings included in this report. It must be my assumption that since those training materials were provided by the city of Philadelphia,

they represent the major elements, guidelines, standards and focus areas presented to staff members in both orientation training and yearly updates as required in Pennsylvania and in every other state in which I have visited County jail institutions or reviewed correctional materials. There is nothing complex about any of the issues surrounding the findings that I presented in this report – my conclusion is, as noted at the inception, that inmate Louis Jung, Jr. found himself in a situation where step after step could have been reversed at any time had someone sought help and assistance from healthcare professionals. Never should an inmate have been left lying on the floor for an extended period of time, nor should the door have been closed on the inmate after being dragged into a cell by other inmates, not correctional staff members, without a full healthcare assessment by healthcare professionals. He appeared in distress and absolutely needed the help of staff members.

My dismay is based on the merits – what I observed, what I read in hundreds of pages of documents, the failure of staff members to call for assistance and instead leave another human being, in their custody lying on the floor seeking help. My task was to assess the role of correctional staff and in this case it was wanting along the lines of the five findings contained in my report. I offer this report based on the materials made available to me in my own experience. I certainly would feel it appropriate to note that my findings will warrant further review if additional materials became known or were made available to me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 3, 2025.


**Arthur Wallenstein** _Art Wallenstein_          **Date:** 03/12/2025


## V. APPENDICES, MATERIALS CONSIDERED, PREVIOUS CASEWORK AND COMPENSATION
Materials Reviewed and Considered:

1. First Amended Complaint
2. Deposition of Shawn Jay, 98p.
3. Deposition of Blanche Carney, Commissioner, PDP, 173p.
4. Training Documents – City of Philadelphia, 383p.
5. Chart 18 Corrective Action Plan – Death of Louis Jung, Jr.PP 718327 excel spreadsheet
6. Chart 18 Jung Corrective Action Plan (2) excel spreadsheet
7. Defendant Gina Frasier, Responses to Plaintiffs First Set of Interrogatories (2) pdf. 5p.
8. Gena Frasier, Documents for PFD (1) pdf 204p.(includes hearing notes – Jung case)
9. Video b136a to 3p 11.5.23 exe
10. Blanche Carney Deposition, 173p.

11. Deposition of Maureen Gay – Johnson, 148p.
12. Deposition of Wanda Bloodsaw, 134p.
13. Deposition of Gena Frasier, 210p.
14. Deposition of Blair Cabellos, LPN, 149p.
15. Wanda Bloodsaw, Documents, 225p.(includes hearings of Jung case)
16. Jung PDP Medical Administration Records
17. PDP Policies and Procedures, 4.E.24.2 Red Flag Medication Compliance System
18. 4.E.21 PPS Staff Roles in Nonn Routine and/or Emergency Medical Situations, 12p.
19. 3.B.17 Medical Emergency Plan, 11p.
20. PDP Death Reports (3) pdf Re3ports of Investigations -Office of Special Investigations, 919p.
21. PDP Report Into the Death of Louis Jung (8) 902p.
22. 4.A.2 Procedures for Admitting Prisoners Into the Philadelphia Prison System, 11p.
23. 4.E.1 Administration of Health Care Services Delivery System
24. 4.E.14 Inmate Serious Illness or Death, 6p.
25. 4.E.13 Inmate Refusal of Health Care Services, 3p.
26. 4.E.12 Informed Consent, 3p.
27. 4.E.7 Access to Care
28. \4.E.5 Medical Services 12p
29. 4.E.3 Medical Assessment and Clearance of Inmates for Transfer From Intake Housing, 4pp..
30. Defendant's Wanda Bloodsaw Responses to Plaintiffs First Set of Request for Documents, 4p.
31. Patient Safety Events Committee Reports, 9p.
32. National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Jails, 2014 – in place at the time of the death of Louis Jung, Jr on February 6, 2023
33. American Correctional Association, Performance Based Standards for Adult Local Detention Facilities (4th edition), June, 2004 - in place at the time of the death of Louis Jung, Jr on February 6, 2023
34. William Collins, The Supreme Court and Corrections: The Landmark Cases That Have Shaped America's Prisons and Jails, Civil Research Institute, Kingston, New Jersey, 2019
35. Michael Mushlin, Rights of Prisoners, (4th edition), West, 2009 – this edition was in place at the time of the death of Louis Jung, Jr. on February 6, 2023.

**Previous Casework (last 5 years)**

1) Metcalf v. County of Erie, New York Supreme Court, No. 40 – 18-01696 (Trial Testimony7), 2024;

2) Estate of Durham v. Pierce County, State of Washington, No. 2019 -2024, Deposition – 2022;

3) Elizabeth Fiery v. Williamson County, US District Court, District of Texas, No. CV – 00836, Deposition, 2020.

.
**Compensation**- Hourly Rate of $350. My opinions and testimony do not depend on the outcome of this litigation.

.