## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JACOB and JAMES JUNG, as** | : | |
| **Administrators of the Estate of LOUIS** | : | |
| **JUNG, JR,** | : | |
| | : | |
| **Plaintiffs,** | : | **Civil Action** |
| | : | **No. 2:24-cv-05618** |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>ORDER</u>

**AND NOW**, this _____ day of _____, 2026, upon consideration of Defendants,
City of Philadelphia, Blanche Carney, Gena Fraiser, and Wanda Bloodshaw's (hereinafter
"Moving Defendants" or "Corrections Defendants"), Motion for Summary Judgment, it is hereby
**ORDERED** that the Moving Defendants' Motion is **GRANTED**, and **JUDGMENT IS
ENTERED** in favor of Moving Defendants, and against Plaintiff, as to all claims in Plaintiff's
Amended Complaint.


**BY THE COURT:**


_____
**TIMOTHY J. SAVAGE, J.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JACOB and JAMES JUNG, as Administrators of the Estate of LOUIS JUNG, JR,** | : | |
| | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | **Civil Action** |
| | : | **No. 2:24-cv-05618** |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANTS, CITY OF PHILADELPHIA, BLANCHE CARNEY, GENA FRAISER,
AND WANDA BLOODSHAW'S, MOTION FOR SUMMARY JUDGMENT**

Defendants, City of Philadelphia, Blanche Carney, Gena Fraiser, and Wanda Bloodshaw (hereinafter "Moving Defendants" or "Corrections Defendants"), by and through undersigned counsel, hereby file this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Moving Defendants incorporate by reference the attached Memorandum of Law. Defendants respectfully request that this Court grant summary judgment as to the claims asserted against them for the reasons set forth therein.

Date: December 5, 2025                    Respectfully submitted,

                                        */s/ Michael Pestrak*
                                        **Michael Pestrak**
                                        Senior Attorney
                                        Attorney I.D. No. 208611
                                        **Emily M. Hoff**
                                        Deputy City Solicitor
                                        Attorney I.D. No. 330859
                                        City of Philadelphia Law Department
                                        1515 Arch Street, 14th Floor
                                        Philadelphia, PA  19102
                                        *Attorneys for Defendants City of Philadelphia, Carney, Frasier, and Bloodsaw*

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JACOB and JAMES JUNG, as** | : | |
| **Administrators of the Estate of LOUIS** | : | |
| **JUNG, JR,** | : | |
| | : | |
| **Plaintiffs,** | : | **Civil Action** |
| | : | **No. 2:24-cv-05618** |
| v. | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS**
**CITY OF PHILADELPHIA, BLANCHE CARNEY, GENA FRASIER, AND**
**WANDA BLOODSAW'S MOTION FOR SUMMARY JUDGMENT**

In this civil rights action, Plaintiffs Jacob and James Jung (hereinafter "Plaintiffs"), bring claims under 42 U.S.C. § 1983 as Administrators of the Estate of Louis Jung, Jr. Plaintiffs allege that Defendants City of Philadelphia, Blanche Carney, Gena Frasier, and Wanda Bloodsaw (hereinafter "Moving Defendants").

There is no material issue of fact that would allow Plaintiffs to prevail against Moving Defendants. Plaintiffs have failed to adduce record evidence that Moving Defendants (1) were deliberately indifferent to Mr. Jung's serious medical need, (2) caused Mr. Jung's wrongful death in violation of 42 Pa.C.S.A. § 8301, and (3) are liable for survival actions pursuant to 20 Pa. C.S.A. § 3373 and 42 Pa.C.S. § 8302. Further, Plaintiffs have failed to adduce evidence that the City of Philadelphia (1) violated the Americans with Disabilities Act, (2) violated the Rehabilitation Act, § 504, and (3) failed to train, supervise, or discipline staff causing employees to fail to provide proper medical care. For these reasons, Moving Defendants move for summary judgment on all claims against them pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I.    <u>FACTUAL BACKGROUND</u>

Defendants incorporate by reference the attached Statement of Undisputed Material Facts ("SUMF") in support of this Motion for Summary Judgment. *See* ECF Doc. No. 100.

## II.    <u>STANDARD OF REVIEW</u>

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *See id.* All inferences must be drawn and all doubts resolved in favor of the non-moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).

On a motion for summary judgment, the moving party bears the initial burden of identifying these portions of the record that it believes demonstrates the absence of material fact disputes. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the moving party and may not rest on mere denials. *See id.* at 321, n.3; *First Natl. Bank of Pa. v. Lincoln Natl. Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir. 1987).

In a case where the non-moving party is the plaintiff and therefore bears the burden of proof, the non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Celotex*, 477 U.S. at 322-24. The non-moving party must adduce more than a mere scintilla of evidence in its favor to defeat the moving party's summary

judgment motion. *See Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989). Although all justifiable inferences must be drawn in favor of the non-moving party, the "moving party is entitled to summary judgment where no reasonable resolution of conflicting evidence and inferences therefrom could result in a judgment for the non-moving party." *Schwartz v. Hospital of Univ. of Pa.*, 1993 WL 153810 at *2 (E.D. Pa. May 7, 1993) (internal cite omitted). Furthermore, the "[p]laintiff cannot simply reassert factually unsupported allegations in its pleadings." *Poles v. St. Joseph's Univ.*, 1995 WL 542246 at *5 (E.D. Pa. Sept. 11, 1995) (citing *Celotex*, 477 U.S. at 325). Instead, the plaintiff "*must present affirmative evidence* in order to defeat [a] properly supported motion for [summary] judgment." *Id.* (emphasis added).

## III.  **ARGUMENT**

Plaintiffs bring seven counts in the operative complaint.[1] In relevant part, Count I alleges that the Corrections Defendants violated Section 1983 claim under the Fourteenth Amendment for failure to provide adequate medical treatment; Count III raises a claim under the Americans with Disabilities Act against the City of Philadelphia only; Count IV is a similar claim brought under the Rehabilitation Act; and Count V is another Section 1983 Claim under the Fourteenth Amendment on the basis of *Monell* liability. Finally, Count VI is a state law wrongful death claim and Count VII is a state law survival action against all defendants.

While it is unfortunate that Mr. Jung passed away pursuant to diabetic ketoacidosis while a pretrial inmate, Discovery has shown that Plaintiffs' claims are at most a medical negligence case, for which the City and its employees cannot be liable for as it is not a constitutional issue (as demonstrated by Plaintiffs' moving for partial summary judgment on this point. *See* ECF Docs.

---

[1] Count II, a medical malpractice claim against the YesCare Defendants, is not addressed herein. Additionally, the six claims are addressed out of order for clarity of each argument.

94 and 96). As discussed in more detail below, Plaintiffs' claims against the Moving Defendants fail upon review of the record. Summary Judgment is appropriate.

### A. Count I Fails Because Plaintiffs Cannot Establish the Corrections Defendants were Deliberately Indifferent to Mr. Jung's Serious Medical Need.

*Estelle v. Gamble* is the keystone case for a failure to provide adequate medical treatment claim in a corrections setting.[2] 429 U.S. 97 (1976). There, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05 (internal cites omitted); *see also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (holding that a plaintiff must demonstrate (1) he had a serious medical need, and (2) prison officials acted with deliberate indifference to that need to succeed on a failure to provide adequate medical treatment claim). Here, the record is void of any evidence that the Moving Defendants denied Plaintiff access to medical care.

#### 1. Defendants City of Philadelphia and Carney Cannot be Held Vicariously Liable for the Conduct Underlying Count I.

"[A] defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable." *Robinson v. Kirsch*, No. 19-CV-953, 2020 WL 247835, at *3 (E.D. Pa. Jan.

---

[2] *Estelle*'s review is an Eight Amendment analysis as the Plaintiff was a convicted inmate. However, the Third Circuit employs the same analysis when reviewing the Fourteenth Amendment. *See Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir. 1987) ("[W]e found the *Estelle v. Gamble* standard to be appropriate in evaluating claims that inadequate psychiatric care had been provided in the jail. A similar situation exists here. . . . The fact that this institution houses convicted prisoners as well as pretrial detainees would pose a practical administrative problem if different standards were to be applied to each group."); *see also Balas v. Stanish*, No. 20-CV-5386, 2021 WL 601095, at *2 (E.D. Pa. Feb. 16, 2021) (Robreno, J.) ("Courts generally apply the same standard to claims raised by pretrial detainees based on inadequate medical care." (citing *Brown v. Deparlos*, 492 F. App'x 211, 214 (3d Cir. 2012) (per curiam); *Duran v. Merline*, 923 F. Supp. 2d 702, 729 (D.N.J. 2013); *King v. Cty. of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008) ("assessment of detainee's claim based on denial of medical care 'involves an indirect application of the Eighth Amendment deliberate indifference standard'")).

15, 2020) (Pappert, J.) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("explaining that '[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'")). Here, Plaintiff cannot adduce any evidence that Defendant Carney was involved in a specific failure to provide Mr. Jung with medical treatment, either by way of "personal direction" or "actual knowledge and acquiescence." *Rode*, 845 F.2d at 1207. At most, the record indicates that Defendant Carney became aware of Mr. Jung's medical status after his death. *See* Exhibit G ("Carney Dep.") at 123:3-17; 132:8-135:19; 150:2-23 (SUMF ¶ 27). For this reason alone, summary judgment should be granted in Defendant Carney's favor, and she be dismissed from Count I.

As to the City, a municipality cannot be held liable under § 1983 for its employees' constitutional torts by way of respondeat superior. *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). While Plaintiff attempts to include language of *Monell* liability in Count I, Count V contains a *Monell* claim regarding the relevant theory of liability. *Compare* ECF Doc. No. 25-1 ("Amend. Compl."), at ¶ 162-63, *with id*. at ¶¶ 180-81e. As this is both a duplicative and improperly pled Count, summary judgment is appropriate. Defendant City of Philadelphia should be dismissed from Count I accordingly.[3]

### 2.    The Record is Void of Evidence That Defendants Bloodsaw and Frasier Were Deliberately Indifferent to Mr. Jung's Serious Medical Need.

As indicated above, to show a defendant's failure to provide adequate medical treatment, a Plaintiff must demonstrate that (1) he had a serious medical need, and (2) prison officials acted with deliberate indifference to that need. *Rouse*, 182 F.3d at 197. As to the first prong, a serious

---

[3] Plaintiffs' *Monell* claim fails on its merits too. *See infra.* at § III.D.

medical need exists when a "failure to treat can be expected to lead to substantial and unnecessary suffering." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991). For purposes of summary judgment, Moving Defendants do not contest that the record, viewed in the light most favorable to Plaintiffs, could lead a jury to determine Mr. Jung had a serious medical need, receiving insulin for his diabetes. However, having a serious medical need alone is insufficient to succeed on this claim.

Third Circuit precedent makes clear that deliberate indifference can occur in a multitude of ways in the incarceration setting. Examples of such deliberate indifference include if there is an improper dismissal of an "excessive risk to inmate health or safety;" or a delay of "necessary medical treatment [] for non-medical reasons;" or implementation of "arbitrary and burdensome procedures that result in interminable delays and outright denials of medical care to suffering inmates." *Sylvester v. City of Newark*, 120 F. App'x 419, 423–24 (3d Cir. 2005) (cleaned up) (internal quotes and citations omitted). However, the Third Circuit has also made clear "that 'a non-medical prison official' cannot 'be charge[d] with the Eighth Amendment scienter requirement of deliberate indifference' when the 'prisoner is under the care of medical experts' and the official does not have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 543 (3d Cir. 2017) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) ("holding that non-physicians cannot 'be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.'"). To this point, the District of Delaware indicated, "[w]e don't require prison guards to earn medical degrees and thus we don't hold them liable for their failure or inability to diagnose medical conditions that a

layperson would not recognize." *DeJesus v. Drace*, No. 15-1065, 2021 WL 3145191, at *4 (D. Del. July 26, 2021). By way of further example, "if someone were lying on the ground, gasping for air, and clutching their chest, we wouldn't require them to tell the prison official 'I am having a heart attack right now' before concluding that the prison official should have taken action." *Short v. Hartman*, 87 F.4th 593, 613–14 (4th Cir. 2023). Additionally, the Plaintiff's burden is even higher to establish that a non-medical prison official engaged in deliberate indifference when the Plaintiff was receiving medical treatment.

In *Spruill*, the Court explained that where there is current, active treatment by a medical practitioner, "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." 372 F.3d at 236. To hold "a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability." *Id*. Accordingly, the Third Circuit held that "dismissal of Spruill's claims against [the non-medical corrections defendant] after the point at which Spruill was first under medical care is appropriate because Spruill bears the burden of proving (and hence pleading) facts supporting the defendants' mental states, and he has failed to so plead with respect to [the non-medical corrections defendant]." *Id*. (emphasis in original) (citing *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n. 2 (3d Cir. 2001) (reviewing a motion to dismiss)). The analysis is further complicated when an inmate refuses treatment.

"Pretrial detainees have a qualified 'right to refuse unwanted medical treatment,' which controls unless the detainee has demonstrated that he is dangerous to himself or others." *King v.*

9

*Cnty. of Gloucester*, 302 F. App'x 92, 98, n. 4 (3d Cir. 2008) (quoting *White v. Napoleon,* 897 F.2d

103, 112, 113 (3d Cir.1990)). The Supreme Court, when reviewing this topic, indicated that

> we recognized that prisoners possess a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment. Still other cases support the recognition of a general liberty interest in refusing medical treatment.
>
> But determining that a person has a "liberty interest" under the Due Process Clause does not end the inquiry; whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests.
>
> Petitioners insist that under the general holdings of our cases, the forced administration of life-sustaining medical treatment, and even of artificially delivered food and water essential to life, would implicate a competent person's liberty interest. Although we think the logic of the cases discussed above would embrace such a liberty interest, the dramatic consequences involved in refusal of such treatment would inform the inquiry as to whether the deprivation of that interest is constitutionally permissible. But for purposes of this case, we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition.

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 278–79 (1990) (cleaned up).

The Plaintiffs have not created a record that indicates that Defendants Frasier and

Bloodsaw were deliberately indifferent to Mr. Jung's serious medical need. Plaintiffs plead that

Defendants Frasier and Bloodsaw "acted with deliberate indifference and objective

unreasonableness to symptoms of Mr. Jung while he was dying from diabetic ketoacidosis on

November 5, 2023. Despite the obvious nature of Mr. Jung's need for medical care they failed to

render medical care or initiate emergency treatment for Mr. Jung, resulting in his death." ECF Doc.

No. 25-1, at ¶ 164. However, the record belies such claims and, instead, shows the opposite.

The record is bereft of any indication that Defendants Frasier and Bloodsaw deliberately

disregarded or delayed treatment, or even had reason to believe treatment was needed, to Mr. Jung

on November 5, 2023. Rather, Defendant Frasier liaised immediate medical attention when she

told Nurse Cabellos that Mr. Jung was asking to see a medical provider while Nurse Cabellos was on the pod. Exhibit C ("Cabellos Dep."), at 76:2-77:9 (SUMF ¶ 9). Based upon that interaction, Nurse Cabellos did not determine that Mr. Jung's state required an immediate stretcher call or other immediate medical attention. *Id*. Corrections Officer Frasier would go on to rely on that medical determination. Exhibit D ("Frasier Dep.") at 125:15-126:1; *see also*, *id*. at 54:15-18 (SUMF ¶ 17). Further, it is reasonable to assume that Officer Frasier saw the conduct Nurse Cabellos' observed on November 5, 2023, because it was Officer Frasier's practice to accompany a nurse (or, in other words, a civilian employee) for the nurse's safety. *Id*. at 112:10-21 (SUMF ¶ 10). Nurse Cabellos testified that Decedent Jung complained of leg pain and indicated that he could not walk. Exhibit C, at 76:2-77:9 (SUMF ¶ 13). However, as this conversation was happening, Decedent Jung was standing up, then proceeded to walk towards Nurse Cabellos, before he sat himself on the ground and complained of falling. *Id*. (SUMF ¶ 14). Nurse Cabellos then left the pod. Exhibit E ("Bloodsaw Dep."), at 96:21-25 (SUMF ¶ 16). This is not the type of conduct that would prompt a non-medical official to believe that "prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *Pearson*, 850 F.3d at 543.

As to Defendant Bloodsaw, there is equally no evidence in the record that she disregarded or delayed treatment on November 5, 2023. Officer Frasier requested a supervisor to Cell 21, Mr. Jung's cell, because he was refusing to reenter his cell. Exhibit D at 118:21-119:24; *see also* Exhibit B, at BS30-31 (SUMF ¶ 18). Lt. Bloodsaw responded. Exhibit B at BS31 (SUMF ¶ 19). While Lt. Bloodsaw does not recall the incident, *see* Exhibit E at 51:8-52:24 (SUMF ¶ 20), she does know that it was not possible that someone told her to call a stretcher on November Fifth and she failed to do so. *Id*. at 69:12-70:18; 107:15-22; 107:23-108:10  (SUMF ¶ 21). Additionally, the mere fact that someone was refusing to go into their cell was not enough to raise concern for Lt.

11

Bloodsaw, because if an inmate is "[u]nable to get up, the inmate will tell me, 'I can't move,' 'I can't get up.' Refusing to get up is, usually, I would ask: 'Are you having an issue? Why aren't you getting up?' It could be, 'I'm not getting up' or 'I don't want to get up,' 'I don't want to go back in the cell.' So, basically, it comes from the inmate himself." *Id*. Further, if the inmate cannot communicate, which there is no reason to believe was the case here, then Lt. Bloodsaw would take the additional step of repeating her question before going to the correction officer to learn more information and, potentially, call for a stretcher. *Id*.

The record is bereft of any indication that Defendants Frasier or Bloodsaw had any actual knowledge that Mr. Jung was facing a medical emergency on November 5, 2023, and that his current medical treatment was inadequate. In summary, the record shows that on November 5, 2023, Mr. Jung requested to speak with medical when Officer Frasier was doing a round with Nurse Cabellos. Nurse Cabellos was brought to Mr. Jung and interacted with him almost immediately.[4] Nurse Cabellos did not believe Mr. Jung faced a medical emergency and told CO Fraiser to call for a stretcher if Mr. Jung continued to complain of pain. Nurse Cabellos based this

---

[4] Plaintiff may raise that Nurse Cabellos' interrogatory responses indicate that "[t]here was no 'encounter' as that term is used in a medical sense. At the time when [Nurse Cabellos] was nearby the cell of the decedent, and it was brought to her attention that the inmate may have needed medical care, [Nurse Cabellos] was prohibited from interacting with the inmate by the Corrections Officer at the scene; as a result, she instructed the Corrections Officer on site to initiate a stretcher call." Exhibit N ("Cabellos Interrogatory Resp.") at 5 (SUMF ¶ 12).

The Court need not rely upon this response as it was part of an unverified interrogatory response. *See Unzicker v. A.W. Chesterton Co.*, No. 11-CV-66288, 2012 WL 1966028, at *2 (E.D. Pa. May 31, 2012) (Strawbridge, M.J.) (collecting cases to this point); *see also Cabales v. United States*, 51 F.R.D. 498, 499 (S.D.N.Y. 1970), aff'd, 447 F.2d 1358 (2d Cir. 1971); *Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 831 (E.D. Va. 2017) ("When ruling on a motion for summary judgment, a district court may properly decline to consider a party's interrogatory responses when the responses 'were not properly attested.'" (internal cites omitted)).

However, should the Court consider this response, both statements can be true—RN Cabellos saw what she described in her deposition regarding Mr. Jung: he was alert, spoke with her, walked towards her and out of his cell, and placed himself on the ground outside all while she not was allowed to actually enter the cell. Both statements also include reference that she told CO Frasier to make a stretcher call; only the interrogatory response omits when she directed the CO to make the call, but the deposition provides the temporal context that the stretcher call needed to be made if Mr. Jung continued to complain of pain. These are not inherently contradictory statements. Further, even the observation outlined in her statement during the internal investigation, RN Cabellos indicated that Mr. Jung was alert and speaking. *See* Exhibit A, at BS5 (SUMF ¶ 13).

on her observations of Mr. Jung talking, walking, and that he placed himself on the ground. This is the only evidence of Mr. Jung's physical condition at this time. This was the condition noted by the only medically trained person. Since nothing in this description gives any indication that a lay person would need to overrule a medically trained opinion, there can be no deliberate indifference.

Mr. Jung stayed on the floor, where he had placed himself. Officer Frasier contacted a supervisor, Lieutenant Bloodsaw, and alerted her that Mr. Jung was refusing to return to his cell—not that he was having a medical emergency. Exhibit D at 118:21-119:24; *see also* Exhibit B, at BS30-31 (SUMF ¶ 18). There is no reason in the record for either corrections employee to have doubted Nurse Cabellos' assessment of the situation or to come to an independent conclusion that Mr. Jung was facing a medical emergency. As YesCare's Site Director of Corron-Fromhold Correctional Facility aptly notes, the Correctional Defendants appropriately relied on the medical evaluation of Nurse Cabellos as it should be a medical determination. Exhibit L ("Trivikram Dep."), at 103:12-24 (SUMF ¶ 37).

As *Estelle* stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." 429 U.S. at 106. Such is true here. Summary judgment on Count I is appropriate, and the Moving Defendants should be dismissed from the operative complaint accordingly.

### B.    The Record Contains No Evidence that the City of Philadelphia Violated the Americans with Disabilities Act.

The record contains no evidence that Mr. Jung was excluded from participation in or denied access to benefits because of his diabetes. Title II of the Americans with Disabilities Act ("ADA") prohibits discrimination in access to public services by requiring that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination

by any such entity." 42 U.S.C. § 12132. "Under this statute, a plaintiff can recover from a "public entity" if he establishes that (1) he is a qualified individual, (2) with a disability, (3) he was excluded from participation in, or denied the benefits of, the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity (4) by reason of his disability. *Wood v. City of Lancaster*, 2009 WL 80306, at \*21 (E.D. Pa. Jan. 13, 2009) (Dalzell, J.), aff'd, 352 F. App'x 641 (3d Cir. 2009) (citing *Bowers v. Nat'l Collegiate Athletics Ass'n*, 475 F.2d 524, 553 n. 32 (3d Cir. 2007)). In other words, Plaintiffs must demonstrate that Mr. Jung was "excluded from a program or service on account of or because of his disability as required." *Kokinda v. Pennsylvania Dep't of Corr.*, 779 F. App'x 944, 950 (3d Cir. 2019). Here, Plaintiffs have failed to establish that Mr. Jung was excluded from a facility's program or service because of his diabetes.

The record is void of any evidence as to prongs three and four. No reasonable fact finder would find that the City of Philadelphia excluded or denied Mr. Jung access to services, programs, or activities due to failing to accommodate his diabetic status. In fact, the City of Philadelphia had procedures in place for such disability accommodations. *See*, *e.g.*, Exhibit G at 88:9-90:10; *and see* Exhibit H ("Varghese Dep.") at 51:16-53:6 (SUMF ¶ 28). Additionally, the contracted for services that the City hired YesCare to perform were specifically required to comply with the ADA. Exhibit I, ("Medical Provider Contract") at BS1857-61 (SUMF ¶ 29-30). For this reason, summary judgement in favor of the City of Philadelphia is appropriate, and Count III should be dismissed against the City accordingly.

## C.    The Record Contains No Evidence that the City of Philadelphia Violated the Rehabilitation Act.

The Rehabilitation Act ("RA") and the ADA have the same standard for determination of liability. *MacFarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012); *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235 & n.10 (3d Cir. 2013) (same legal principles generally govern the ADA

and RA, except, for example, that the RA requires the defendant be federally funded and the RA requires that a disability be the sole cause of the discrimination). Count IV fails for the same reason as Plaintiffs' ADA claim fails. *See*, *supra*., § III.B. Thus, summary judgment should be granted and Count IV be dismissed from the claim accordingly.

### D.    Plaintiffs' *Monell* Claim (Count V) Must Fail, Because the Record Does Not Contain Any Evidence that the City Failed to Train, Supervise, or Discipline Staff Causing Employees to Fail to Provide Proper Medical Care.

Plaintiffs' *Monell* claim fails on multiple parts. First, for the reasons ascertained above, the record fails to establish an underlying constitutional violation for which the City of Philadelphia employees can be held liable. Thus, a corresponding *Monell* claim cannot be established. Second, there is no evidence in the record that the City of Philadelphia was deliberately indifferent to possible constitutional harm that would stem from the alleged failures in training, supervision, and discipline. Third, even if the record could support deliberate indifference, there is no causal nexus between the alleged harm and the City's alleged misconduct.

First and foremost, for the reasons asserted in each section above, Plaintiffs have not established an underlying constitutional violation that is attributable to the City of Philadelphia's employees. *See Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006) ("[I]n order for municipal liability to exist, there must still be a violation of the plaintiff's constitutional rights." (internal cites omitted)); *see also Page v. Mancuso*, 999 F. Supp. 2d 269, 281 (D.D.C. 2013) ("Allegations of municipal liability require a two-part inquiry: first, the plaintiff must establish an underlying constitutional violation; second, the plaintiff must show that there is a basis for municipal liability." (Internal citations omitted)). Even so, for the reasons discussed below, Plaintiffs' municipal liability claims fail as there is no record evidence to support their theories of municipal liability.

The Supreme Court established the standard for municipal liability under § 1983 when it decided *Monell*. 436 U.S. 658. There, the Supreme Court wrote that, while a municipality constitutes a person under § 1983, it cannot be liable under a theory of *respondeat superior*. *Id*. at 2018. As to the specific theories of liability, the Third Circuit has made clear that:

> a § 1983 claim against a municipality may proceed in two ways. A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice. The latter avenue arose in the failure-to-train context, but applies to other failures and inadequacies by municipalities, including those related to supervision and discipline of its [employees].

*Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (cleaned up) (internal citations omitted). While similar theories of liability, "the avenues remain distinct." *Id*. Here, Plaintiffs only plead a series of "failure to" theories of municipal liability. *See* Amend. Compl. at ¶ 181(a)-(e). Therefore, the Court need not review whether the City of Philadelphia had an unconstitutional policy, practice, or custom that led to Mr. Jung's injuries.[5]

When a Plaintiff is proceeding on the latter theory of municipal liability, as is the case here, a plaintiff has the "<u>demanding</u> requirement of demonstrating a failure or inadequacy amounting to deliberate indifference on the part of the municipality." *Id*. (internal citation omitted) (emphasis added). To demonstrate deliberate indifference, the Plaintiff must establish "that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999) (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2nd Cir. 1992)). Deliberate indifference is a high bar, as "it requires proof that a municipal actor disregarded a

---

[5] Though such an analysis would also result in summary judgment, as this theory is not supported by the current record.

known or obvious consequence of their action." *Thomas v. Cumberland County*, 749 F.3d 217, 223 (3rd Cir. 2014).

Before addressing Plaintiffs' specific theories, the record does not contain evidence of notice. As the Eastern District has previously said, "[t]he mere arbitrary assertion that the Defendants, at various times, 'failed to act' is not sufficient to survive summary judgment." *Cortlessa v. Cnty. of Chester*, 2006 WL 1490145, at *7 (E.D. Pa. May 24, 2006) (Baylson, J.). Further, for the reasons above and that follow, Plaintiffs have not established that any action of a City employee caused Constitutional harm in this instance. Without harm, Plaintiffs are unable to show notice that was disregarded with deliberate indifference.

        a.    *Plaintiff's Failure to Train Theories of Liability Are Unsupported by the Record.*

While the above caselaw provides the roadmap for this "failure to" claim, a failure to train claim occurs when "a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Canton v. Harris*, 489 U.S. 378, 389 (1989). This theory of municipal liability "is concerned with the substance of the training, not the particular instructional format[,]" as § 1983 does "not provide plaintiffs or courts carte blanch to micromanage local governments throughout the United States." *Connick v. Thompson*, 563 U.S. 51, 68 (2011); *see also Durham v. Philadelphia*, 2020 WL 6940021, *2 (E.D. Pa. Nov. 25, 2020). After all, if federal courts could engage "in an endless exercise of second-guessing municipal employee-training programs[,]" it would "implicate serious questions of federalism[.]" *Canton*, 489 U.S. at 392.

Plaintiffs assert four failure to train theories of municipal liability: the City failed to train its staff in 1) "providing timely responses to medical emergencies," 2) "recognizing and

responding to the medical needs of incarcerated persons with [] diabetes," 3) providing "care for individuals with diabetes that complied with the standards established by the American Diabetes Association," and 4) "making timely rounds and responding to signs and symptoms of distress indicating a need for medical or psychiatric care, including signs and symptoms associated with diabetes." Amend. Compl. at ¶ 181(a)-(d). These theories can be boiled down to two theories of liability: failure to train on responding to diabetic emergencies, and failure to train on making timely rounds. However, the record does not contain any evidence to support such theories. Again, the opposite is true.

As to general training, the City presents training at the training academy for newly hired corrections officers. Exhibit E at 16:6-18:19 (SUMF ¶ 45); Exhibit G at 14:14-15:6; 15:16-16:12, 69:12-71:24 (SUMF ¶ 32). The City also provides annual refresher training and training on updates of newly written or updated policies. Exhibit E at 27:13-20; 87:21-89:13; Exhibit G at 15:7-11 (SUMF ¶ 33). The corrections staff are trained in how to handle when an inmate refuses medical care. Exhibit E at 40:11-41:23 (SUMF ¶ 34). Finally, while certain, specific medical training for corrections staff is presented by YesCare employees during roll call, some topics are provided at the direction of PPD. Exhibit J ("Witkowski Dep.") at 17:2-18:18; Exhibit G at 50:18-51:10 (SUMF ¶ 35). As to training for diabetic medical emergencies, the City provides training at the training academy for general medical emergencies. Exhibit E at 16:6-19:4; Exhibit G at 14:14-15:6; 15:16-16:12, 69:12-71:24 (SUMF ¶ 32). Finally, the City employees also received a pamphlet at roll call with symptoms of diabetic emergencies. Exhibit E at 33:20-35:9; *see also* Exhibit K ("Diabetes Training PowerPoint") (SUMF ¶ 36). As to training for making timely rounds, all Corrections Officers receive training upon hiring at the training academy regarding how to make rounds. Exhibit E at 16:6-18:19 (SUMF ¶ 45).

Importantly, the City cannot be found deliberately indifferent to the potential concerns of inmates with diabetes, as the City <u>specifically contracted such requisite training to medical providers, which demonstrates a recognized need to provide such care</u>. *See* Exhibit G at 53:4-15; *see*, *e.g.*, Exhibit I at BS002331-34 (SUMF ¶ 31).[6] Per the agreed upon contract, the medical providers were to provide care consistent with "the certified medical recommendations from that body," here the American Diabetes Association. *Id*. What is most important, is that Plaintiffs' own expert decided that "correctional staff were adequately trained in the rudimentary basics of supervising the inmate population." Exhibit M ("Wallenstein Report") at 17 (SUMF ¶ 46).[7]

For these reasons, the record contains no evidence that would support Plaintiffs' theory of deliberate indifference. Summary judgment is appropriate on this basis.

> b. *Plaintiff's Failure to Supervise Theories of Liability Are Unsupported by the Record.*

To succeed, the record must support a theory that Philadelphia's alleged failure to supervise its officers amounted to deliberate indifference to the rights of those who the unsupervised officers would come into contact with. *See*, *e.g.*, *Forrest*, 930 F.3d at 108. As the Fourth Circuit succinctly stated, "[a] failure to supervise gives rise to municipal liability 'only in those situations in which there is a history of widespread abuse.'" *Washington v. Baltimore Police Dep't,* 457 F. Supp. 3d 520, 537 (D. Md. 2020) (quoting *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983)). Here, not only is there no evidence of such widespread abuse, but the presence of supervision is clear. As to supervising during diabetic medical emergencies, the City engages in audits on medical care

---

[6] The referenced contract contains approximately 1300 pages and can be produced to the Court upon request. However, only the pages referenced in the below citations have been attached as an exhibit to the instant motion.
[7] Reference to the expert report (a report and expert which Moving Defendants became aware for the first time at 4:30 p.m. Wednesday, December 3, 2025—a mere two-days prior to the instant filing deadline) does not intend to waive any arguments Moving Defendants will raise in *Daubert* motions contesting the admissibility of Plaintiffs' Prisons Practice Expert.

within the prison system, Exhibit H at 25:4-26:4 (SUMF ¶ 38); reviews corrective action plans for diabetes care, *id*. at 26:5-23 (SUMF ¶ 40); retains a doctor to come in to review medical care within the prison system twice a year, which occasionally includes review of diabetes care, *id*. at 32:2-22 (SUMF ¶ 39); supervises new medical providers in the corrections setting, Exhibit L at 39:5-40:7 (SUMF ¶ 41); and produces reports that review each death in the prison system and the discipline the stemmed from any corresponding policy failures by either corrections or medical staff. Exhibit G at 123-3-17; *and see*, *e.g.*, Exhibit A (SUMF ¶ 43). Further, YesCare employed multiple people to ensure that proper insulin administration was occurring. Exhibit L at 39:5-40:7 (SUMF ¶ 42). Finally, Dr. Trivikarm, a supervisory level YesCare employee, has a standing order to be alerted of when someone goes to the hospital for DKA. Exhibit L at 39:5-40:7 (SUMF ¶ 44). There is a clear showing that supervision was present concerning all inmates' medical needs and the responses to emergent needs. As to supervising for making timely rounds, the City employs members of correctional staff with the roles of sergeant and lieutenant, which are inherently supervisory roles. *See* Exhibit E at 10:23-11:18; 12:2-17 (SUMF ¶ 47). The analysis can stop there—Plaintiffs' theories toe a line between there was supervision within the prison system, as evidence by the mere fact that Lt. Bloodsaw is a named defendant, but also that there was no supervision within the system. Both cannot be true.

The record contains no evidence that would support Plaintiffs' theory of deliberate indifference. Summary judgment is appropriate on this basis.

   c. *Plaintiffs' Failure to Discipline Theory of Liability is Unsupported by the Record.*

To succeed, the record must support a theory that the City's alleged failure to discipline its officers amounted to deliberate indifference to the rights of those who the unsupervised officers would come into contact with. *See*, *e.g.*, *Forrest*, 930 F.3d at 108. However, the record is void of

any evidence to support this claim with regard to notice, deliberate indifference, and a causal nexus. Most importantly, there was a disciplinary action as it relates to Mr. Jung's death, *see*, *gen.*, Exhibit A, and each on-sight death results in a report and review, which includes any discipline that would stem from the actions that may have led to an inmate's death. Exhibit G at 123-3-17 (SUMF ¶ 51). Additionally, the contract between the Philadelphia Department of Prisons and the medical provider includes specific information regarding Performance Improvement Plans, which would be communicated on a quarterly basis. Exhibit G at 57:3-19; Exhibit I at BS002258 (SUMF ¶ 51). Unsurprisingly, even Plaintiffs' own expert does not opine on whether there was a failure to discipline within the Philadelphia Department of Prisons. *See*, *gen.*, Exhibit M (SUMF ¶ 46).[8] Again, there is no evidence within the record that supports such a theory of municipal liability.

### d.    The Record Demonstrates No Causal Nexus.

Finally, a Plaintiff must establish the causal nexus between the alleged municipal failures and the alleged constitutional violation. For a "failure to" theory of municipal liability "[t]he proper causation inquiry . . . focuses on 'whether the injury could have been avoided had the employee been trained [or supervised or disciplined] under a program that was not deficient in the identified respects.'" *Thomas v. City of Philadelphia*, 2019 WL 4039575, at *23 (E.D. Pa. Aug. 27, 2019) (Pratter, J.) (quoting *Cumberland Cnty*, 749 F.3d at 226 (citing *Canton,* 489 U.S. at 391)). Here, the record contains no evidence of such a causal nexus; rather the disciplinary history as demonstrated through Mr. Jung's death investigation shows—once more—the opposite is true. *See*, *e.g.*, Exhibit A. In fact, there was no Constitutional harm, so there can be no causal nexus.

---

[8] Once again, reference to the expert report does not intend to waive any arguments Moving Defendants intend to raise in *Daubert* motions contesting the admissibility of Plaintiffs' Prisons Practice Expert.

For these reasons, Plaintiffs theories of *Monell* cannot survive summary judgment's muster. The claim for municipal liability, as alleged against the City, must be dismissed accordingly.

**E.    Plaintiffs' Wrongful Death and Survival Actions are Derivative of the Other Claims and Fail on Summary Judgment because the Underlying Claims Cannot Survive Summary Judgment.**

Plaintiffs also bring Count VI, a wrongful death action under 42 Pa.C.S.A. § 8301, and Count VII, a survival action under 20 Pa. C.S.A. § 3373 and 42 Pa.C.S. § 8302. "Under Pennsylvania law, wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death." *Lansberry v. Altoona Area Sch. Dist.*, 356 F. Supp. 3d 486, 504 (W.D. Pa. 2018) (dismissing wrongful death and survival actions when *Monell* claim was not cognizably pled) (citations and quotations omitted). "Because wrongful death and survival actions are not independent claims, a plaintiff asserting these claims must assert some other independent, cognizable claim to survive a motion to dismiss the wrongful death and survival claims." *Id*. As shown in each other argument section, summary judgment is warranted for all of Plaintiffs' other claims against Moving Defendants, so summary judgement must be granted on the derivative survival and wrongful death claims.

IV.    <u>**CONCLUSION**</u>

For the foregoing reasons, Moving Defendants respectfully request that the Court grant this

Motion for Summary Judgment.


Date: December 5, 2025                    Respectfully submitted,

                                          */s/ Michael Pestrak*
                                          **Michael Pestrak**
                                          Senior Attorney
                                          Attorney I.D. No. 208611
                                          **Emily M. Hoff**
                                          Deputy City Solicitor
                                          Attorney I.D. No. 330859
                                          City of Philadelphia Law Department
                                          1515 Arch Street, 14th Floor
                                          Philadelphia, PA  19102
                                          *Attorneys for Defendants City of Philadelphia, Blanche Carney, Gena Fraiser, and Wanda Bloodshaw*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JACOB and JAMES JUNG, as** | : | |
| **Administrators of the Estate of LOUIS** | : | |
| **JUNG, JR,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Civil Action** |
| **v.** | : | **No. 2:24-cv-05618** |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, Defendants' Motion for Summary Judgment was filed via the Court's electronic filing system and is available for downloading.

Date: December 5, 2025                Respectfully submitted,

_/s/_____
**Michael Pestrak**
Senior Attorney
Attorney I.D. No. 208611
**Emily M. Hoff**
Deputy City Solicitor
Attorney I.D. No. 330859
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
_Attorneys for Defendants City of Philadelphia, Blanche Carney, Gena Fraiser, and Wanda Bloodshaw_