IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JACOB and JAMES JUNG, as Administrators of the Estate of LOUIS JUNG, JR, | : : : : : |
| Plaintiffs, | : : |
| v. | : : |
| CITY OF PHILADELPHIA, et al., | : : |
| Defendants. | : |

Civil Action
No. 2:24-cv-05618

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT ON BEHALF OF DEFENDANTS CITY OF PHILADELPHIA, CARNEY, FRAISER, AND BLOODSHAW**

Defendants, City of Philadelphia, Blanche Carney, Gena Fraiser, and Wanda Bloodshaw (hereinafter "Moving Defendants" or "Corrections Defendants"), by and through the undersigned counsel, moves for summary judgment as to all claims against them, and submits this statement of undisputed material facts in support of their motion:

*Facts Relating to Mr. Jung's Incarceration and Death:*

1. On October 27, 2023, Louis Jung Jr. was admitted to the Philadelphia Department of Prisons ("PDP"). Exhibit A ("Jung OCP Report"), at BS7.[1]

2. Mr. Jung had previously been incarcerated at PDP, as Plaintiffs note in their Complaint, from December 16, 2021, to September 27, 2022, and December 14, 2022, to June 2, 2023. *Id.*; *see also* ECF Doc. No. 25-1 ("Amend. Compl.").

---

[1] The bate stamped number has been adopted for all of the record citations. However, the language preceding the number has been omitted. For example, here, "City-Jung-000007" has been amened to "BS7."

1

3. From June 2, 2023, to October 27, 2023, Mr. Jung was admitted to Norristown State Hospital. Exhibit A at BS10.

4. Norristown State Hospital found Mr. Jung to be competent and malingering. *Id*.

5. On return from Norristown State Hospital, medical intake notes and orders highlighted that Mr. Jung had type 1 diabetes, arrived at intake with a blood sugar of 542, and a self-report that Mr. Jung had not received insulin for three days upon arrival. Exhibit F ("Jung Intake Medical Records") at BS402.

6. Between his return from Norristown State Hospital and his unfortunate death, Mr. Jung refused multiple doses of insulin. Exhibit A at BS10. There is documentation of one refusal for the morning dose on November 1st, and another on the afternoon of November 5th. *Id*.

7. Mr. Jung "no showed" for his morning insulin doses on both November 3rd and 5th. *Id*.

8. Mr. Jung's insulin status was not recorded in his medical records for the evening doses on October 30th or November 4th. *Id*.

9. On November 5, 2023, at approximately 10:57 a.m., Corrections Officer ("CO") Gena Frasier was escorting RN Blair Cabellos for a medical event on the pod that housed Mr. Jung. Exhibit B ("Lock and Track 11/5/23"), at BS30; *see* Exhibit C ("Cabellos Dep."), at 76:2-77:9.[2]

10. CO Frasier would accompany a nurse (or, in other words, a civilian employee) while they were on a pod for the nurse's safety. Exhibit D ("Frasier Dep."), at 112:10-21.

11. CO Frasier liaised medical attention when she told Nurse Cabellos that Mr. Jung was asking to see a medical provider while Nurse Cabellos was on the pod. Exhibit C at 76:2-77:9.

---

[2] Deposition cites are denotes as page:line-page:line. In the case of the citation being on the same page, page:line-line is used.

12. Nurse Cabellos made observations of Mr. Jung but did not constitute said interactions as rising to the level of a medical encounter. Exhibit N ("Cabellos Interrogatory Resp.") at 5.

13. Nurse Cabellos testified that Mr. Jung verbally complained of leg pain and indicated that he could not walk. Exhibit C, at 76:2-77:9; *see also* Exhibit A, at BS5.

14. However, as this conversation was happening, Mr. Jung was standing, then proceeded to walk towards Nurse Cabellos, before he sat himself on the ground and complained of falling. *Id*.

15. Nurse Cabellos did not determine that Mr. Jung's state required an immediate stretcher call or other immediate medical attention. Exhibit C at 76:2-77:9.

16. Nurse Cabellos then left the pod. Exhibit E ("Bloodsaw Dep."), at 96:21-25.

17. CO Frasier relied on Nurse Cabellos' medical determination that no medical treatment was needed. Exhibit D at 125:15-126:1; *see also id*. at 54:15-18.

18. As a result of this interaction, CO Frasier requested a supervisor to Cell 21, Mr. Jung's cell, because he was refusing to reenter his cell, not due to a medical emergency. Exhibit D at 118:21-119:24; *see also* Exhibit B, at BS30-31.

19. Lt. Bloodsaw, a supervisor, responded to Cell 21. Exhibit B at BS31.

20. Lt. Bloodsaw does not recall interacting with Mr. Jung. Exhibit E at 51:8-52:24.

21. Lt. Bloodsaw does know that it was not possible that someone told her to call a stretcher on November Fifth and she failed to do so, because her training would have prompted her to act differently than she did on November 5, 2023. *Id*. at 69:12-70:18; 107:15-22; 107:23-108:10.

22. On November 6, 2023, Mr. Jung was found at 6:05 AM breathing but not moving and medical personnel were called to his location. Exhibit A ("Jung OCP Report"), at BS12.

23. Emergency medical treatment was given to Mr. Jung, but he unfortunately passed away despite this treatment. *Id*.

24. On March 29, 2024, the Office of Special Investigations ("OSI") concluded an investigation reviewing the circumstances surrounding Mr. Jung's death and completed a report summarizing its findings. *See* Exhibit A.

25. These OSI reports are produced for each in custody death. Exhibit G ("Carney Dep.") at 123:3-17; *and see* Exhibit A.

26. These reports summarize the investigation that PDP performed as an audit on both corrections and medical staff's conduct as it relates to those circumstances and makes determinations regarding what these staff members could have, or should have, done differently. *Id*.

27. After completion of Mr. Jung's report, Commissioner Carney would review it. Exhibit G at 123:3-17; 132:8-135:19; 150:2-23.

*Innerworkings of the Prison System as it Relates to Inmate Care and Supervision*

28. The City of Philadelphia had procedures in place for disability accommodations. *See*, *e.g.*, Exhibit G, at 88:9-90:10; *and see* Exhibit H at 51:16-53:6.

29. The City contracted its prison medical services out to YesCare. Exhibit G at 19:24-20:14, 47:21-48:10; Exhibit I, ("Medical Provider Contract") at BS1857-61.[3]

30. The contracted-for services that the City hired YesCare to perform were specifically required to comply with the ADA. Exhibit I at BS3136-37.

---

[3] The referenced contract contains approximately 1300 pages and can be produced to the Court upon request. However, only the pages referenced in the below citations have been attached as an exhibit to the instant motion.

4

31. Per the agreed upon contract, the medical providers were to provide care consistent with "the certified medical recommendations from that body," here the American Diabetes Association. Exhibit G at 53:4-15; *see*, *e.g.*, Exhibit I at BS002331-34.

32. As to training corrections officers, the City presents training at the training academy for newly hired corrections officers, which includes how to respond to general medical emergencies. Exhibit E at 16:6-19:4; Exhibit G at 14:14-15:6; 15:16-16:12, 69:12-71:24.

33. The City also provides annual refresher training and training for newly written or updated policies. Exhibit E at 27:13-20, 87:21-89:13; Exhibit G at 15:7-11.

34. The corrections staff are trained in how to handle when an inmate refuses medical care. Exhibit E at 40:11-41:23.

35. While certain, specific medical training for corrections staff is presented by YesCare employees during roll call, some topics are provided at the direction of PPD. Exhibit J ("Witkowski Dep.") at 17:2-18:18; Exhibit G at 50:18-51:10.

36. Finally, the City employees also received a pamphlet at these roll call trainings with symptoms of diabetic emergencies. Exhibit E at 33:20-35:9; *see also* Exhibit K ("Diabetes Training PowerPoint").

37. As YesCare's Site Director of Corron-Fromhold Correctional Facility ("CFCF") aptly notes, the Correctional Defendants appropriately relied on the medical evaluation of Nurse Cabellos as it should be a medical determination. Exhibit L ("Trivikram Dep."), at 103:12-24.

38. Twice a year audits from outside Doctors are done on medical care within the prison system. Exhibit H at 25:4-26:4.

39. These audits can and have included reviews of diabetes care. *Id*. at 32:2-22.

40. The City is aware of corrective action plans for diabetes care. *Id*. at 26:5-23.

41. YesCare supervises new medical providers in the corrections setting. Exhibit L at 39:5-40:7.

42. YesCare employed multiple people to ensure that proper insulin administration was occurring. *Id*. at 104:6-16.

43. The City investigates and produces reports that review each death in the prison system and the discipline the stemmed from any corresponding policy failures by either corrections or medical staff. Exhibit G at 123-3-17; *and see*, *e.g.*, Exhibit A.

44. Dr. Trivikarm has a standing order to be alerted when someone goes to the hospital for DKA. Exhibit L at 109:5-17.

45. As to training for making timely rounds, all Corrections Officers receive training upon hiring at the training academy regarding how to make rounds. Exhibit E at 16:6-18:19.

46. Plaintiffs' expert determined that "correctional staff were adequately trained in the rudimentary basics of supervising the inmate population." Exhibit M ("Wallenstein Report") at 17.[4] However, Plaintiffs' expert does not opine on whether there was a failure to discipline within the Philadelphia Department of Prisons. *See id*.

47. Lieutenants and sergeants at PDP were additional layers of supervisors overseeing correctional staff. *See* Exhibit E at 10:23-11:18; 12:2-17.

48. Philadelphia Department of Prisons contract with YesCare includes specific information regarding Performance Improvement Plans, which would be communicated on a quarterly basis. Exhibit G at 57:3-19; Exhibit I at BS002258.

---

[4] Reference to the expert report (a report and expert which Moving Defendants became aware for the first time at 4:30 p.m. Wednesday, December 3, 2025—a mere two-days prior to the instant filing deadline) does not intend to waive any arguments Moving Defendants will raise in *Daubert* motions contesting the admissibility of Plaintiffs' Prisons Practice Expert.

49. OSI sustained policy violations against Lt. Bloodsaw, Officer Fraizer, and Nurse Cabellos. *See*, *e.g.*, Exhibit A.

50. After a disciplinary hearing, the allegations against Officer Frasier were found to be not sustained. *See* Exhibit O ("Fraiser disciplinary records").

51. In fact, each on-sight death results in a report and review, which includes any discipline that would stem from the actions that may have led to an inmate's death. Exhibit G at 123-3-17.

Date: December 5, 2025					Respectfully submitted,

/s/ *Michael Pestrak*
**Michael Pestrak**
Senior Attorney
Attorney I.D. No. 208611
**Emily M. Hoff**
Deputy City Solicitor
Attorney I.D. No. 330859
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA  19102
*Attorneys for Defendants City of Philadelphia, Blanche Carney, Gena Fraiser, and Wanda Bloodshaw*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JACOB and JAMES JUNG, as Administrators of the Estate of LOUIS JUNG, JR,** : <br> : <br> : <br> : <br> **Plaintiffs,** : <br> : <br> **v.** : <br> : <br> **CITY OF PHILADELPHIA, et al.,** : <br> : <br> **Defendants.** : <br> : | Civil Action <br> No. 2:24-cv-05618 |

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, Defendants' Statement of Undisputed Material Facts was filed via the Court's electronic filing system and is available for downloading.

Date: December 5, 2025                    Respectfully submitted,

/s/ Michael Pestrak
**Michael Pestrak**
Senior Attorney
Attorney I.D. No. 208611
**Emily M. Hoff**
Deputy City Solicitor
Attorney I.D. No. 330859
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA  19102
*Attorneys for Defendants City of Philadelphia, Blanche Carney, Gena Fraiser, and Wanda Bloodshaw*