# Exhibit C

1    IN THE UNITED STATES DISTRICT COURT

2  FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                - - -

JACOB and JAMES    : CIVIL ACTION

4  JUNG, as         :

Administrators of   :

5  the Estate of LOUIS :

JUNG, JR.,       :

6      Plaintiffs,  :

                   :

7      v.         :

                   :

8  CITY OF         :

PHILADELPHIA;     :

9  YESCARE CORP.;    :

BLANCHE CARNEY,    :

10  Former Commissioner :

of Philadelphia    :

11  Dept of Prisons;   :

LALITHA TRIVIKRAM;  :

12  MAUREEN GAY;      :

MARIESHA APOLLON;   :

13  BLAIR CABELLOS;    :

GENA FRASIER; WANDA :

14  BLOODSAW,      : NO.

      Defendants.  : 2:24-cv-05618-TJS

15

16              - - -

17        September 4, 2025

18              - - -

19        Videotaped deposition of

BLAIR CABELLOS, LPN, taken pursuant to

20  notice, was held at the offices of

Abolitionist Law Center, 990 Spring

21  Garden Street, Philadelphia, Pennsylvania

19123, beginning at 10:13 a.m., on the

22  above date, before Kristy L. Liedtka, a

Professional Court Reporter and Notary

23  Public in and for the Commonwealth of

Pennsylvania.

24

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 3 of 60

Deposition of Blair Cabellos, LPN                                Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1    APPEARANCES:

 2


 3        ABOLITIONIST LAW CENTER
          BY:  MARGARET HU, ESQUIRE
 4             BRET GROTE, ESQUIRE
               NIA HOLSTON, ESQUIRE
 5             RUPALEE RASHATWAR, ESQUIRE
          990 Spring Garden Street
 6        Suite 306
          Philadelphia, Pennsylvania 19123
 7        (412) 654-9070
          margo@alcenter.org
 8        bretgrote@abolitionistlawcenter.org
          nia@alcenter.org
 9        rupalee@alcenter.org
          Representing the Plaintiffs
10


11


          CITY OF PHILADELPHIA LAW DEPARTMENT
12        BY:  MICHAEL PESTRAK, ESQUIRE
          One Parkway, 14th Floor
13        1515 Arch Street
          Philadelphia, Pennsylvania 19102
14        (215) 683-5417
          michael.pestrak@phila.gov
15        Representing the Defendants, City of
          Philadelphia, former Commissioner
16        Blanche Carney, Gena Frasier and
          Wanda Bloodsaw
17


18


          KIERNAN TREBACH
19        BY:  JONATHAN M. KAMINSKY, ESQUIRE
          Ten Penn Center, Suite 770
20        1801 Market Street
          Philadelphia, Pennsylvania 19103
21        (215) 569-4433
          jkaminsky@kiernantrebach.com
22        Representing the Defendant, Mariesha
          Apollon
23


24
```

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1   APPEARANCES:   (Continued)

 2


 3        O'CONNOR KIMBALL, LLP
          BY:   THOMAS J. GREGORY, ESQUIRE
 4        Two Penn Center Plaza, Suite 1100
          15th Street and JFK Boulevard
 5        Philadelphia, Pennsylvania 19102
          (215) 564-0400
 6        tgregory@okllp.com
          Representing the Defendants,
 7        YesCare, Corp., Lalitha Trivikram,
          Maureen Gay, and Blair Cabellos

 8


 9


10        VIDEOTAPE TECHNICIAN:
             Andrew Whitner
11


12        ALSO PRESENT:
             Kyree Trotman
13


14        (Via Zoom Videoconference)
             Corinne Austen, Paralegal
15


16              -   -   -

17


18


19


20


21


22


23


24
```

```
 1                    -   -   -

 2                  I N D E X

 3                    -   -   -

 4

 5    Testimony of:  BLAIR CABELLOS, LPN

 6     By Attorney Hu                  7
       By Attorney Pestrak            116
 7     By Attorney Kaminsky           121

 8

 9                    -   -   -

                    E X H I B I T S
10
                      -   -   -
11

12     NO.               DESCRIPTION            PAGE

13      Cabellos-1    Philadelphia          85
                      Department of
14                    Prisons Interview
                      Record, Bates stamp
15                    Frasier-000026

16      Cabellos-2    Special               86
                      Investigations Unit
17                    Interview Record,
                      Bates stamp
18                    Fraiser-000024 and
                      000025
19
        Cabellos-3    Corizon Sentinel      90
20                    Event Corrective
                      Action Plan
21
        Cabellos-4    Intake forms, Bates 97
22                    stamp PDP-000000021
                      through 000000024
23

24
```

```
1                         -   -   -

2                DEPOSITION SUPPORT INDEX

3                         -   -   -

4

5    Direction to Witness Not to Answer

6    Page Line      Page Line      Page Line

7       42 19

8       44 12

9

10   Request for Production of Documents

11   Page Line      Page Line      Page Line

12   None

13

14

15   Stipulations

16   Page Line      Page Line      Page Line

17   None

18

19

20   Question Marked

21   Page Line      Page Line      Page Line

22   None

23

24
```

Page 6

1  THE VIDEOGRAPHER:  We are
2  now on the record.  Today's date
3  is September 4th, 2025 and the
4  time is 10:13 a.m. Eastern.  This
5  is a recorded video deposition of
6  Blair Cabellos being taken in the
7  matter of the Estate of Louis Jung
8  versus City of Philadelphia, et
9  al. in the United States District
10  Court for the Eastern District of
11  Pennsylvania, Case Number
12  2:24-cv-05618-TJS.
13  This deposition is being
14  held at 990 Spring Garden Street,
15  Suite 306, Philadelphia,
16  Pennsylvania.
17  My name is Andrew Whitner
18  from Everest Court Reporting and I
19  am the video specialist.  The
20  court reporter today is Kristy
21  Liedtka, also from Everest Court
22  Reporting.
23  Will counsel now please
24  state their appearances for the

Page 7

1  record.
2  ATTORNEY HU:  Margaret Hu
3  for plaintiffs' counsel.
4  ATTORNEY GREGORY:  Thomas
5  Gregory, I represent the witness.
6  ATTORNEY PESTRAK:  Michael
7  Pestrak representing the City,
8  Blanche Carney, Wanda Bloodsaw and
9  Gena Frasier.
10  ATTORNEY KAMINSKY:  Good
11  morning.  Jonathan Kaminsky and I
12  represent Mariesha Apollon.
13  THE VIDEOGRAPHER:  Now will
14  the court reporter please swear in
15  the witness.
16  - - -
17  BLAIR CABELLOS, LPN, after
18  having been duly sworn, was
19  examined and testified as follows:
20  - - -
21  EXAMINATION
22  - - -
23  BY ATTORNEY HU:
24  Q.  Okay.  Good morning.  Thank

Page 8

1  you for coming in.  We are here for the
2  deposition in the civil case of Jung
3  versus City of Philadelphia.  You are
4  here in response to a notice for a
5  deposition.
6  Could you please state and
7  spell your full name for the record.
8  A.  Blair Cabellos, B-L-A-I-R
9  C-A-B-E-L-L-O-S.
10  Q.  Okay.  My name is Margaret
11  Hu.  I'm counsel for plaintiffs and I'll
12  be asking you questions today.
13  Have you given a deposition
14  before?
15  A.  No.
16  Q.  Okay.  In which case, I'm
17  going to start by going over some basic
18  protocol.  Let me know if you have any
19  questions.
20  So you have to speak out
21  loud for today for the sake of our court
22  reporter.  That means when you are
23  responding to my questions, no head nods,
24  no mm-hmms.  You need to verbally respond

Page 9

1  "yes."  If you do not know or do not
2  remember something, let me know if
3  there's a document that might help
4  refresh your recollection?
5  If you answer a question,
6  I'll assume you understood the question
7  being asked.
8  And, finally, you can take a
9  break if you need one at any point today.
10  A.  Yes.
11  Q.  Do you understand all of
12  that?
13  A.  Yes.
14  Q.  Great.  Are you prepared to
15  give a deposition today?
16  A.  Yes.
17  Q.  Did you do anything to
18  prepare for today's deposition?
19  A.  No.
20  Q.  Without telling me any
21  conversations you had with your lawyer,
22  was there anything additionally you
23  reviewed, such as records, for today's
24  deposition?

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 8 of 60

Deposition of Blair Cabellos, LPN                                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 10

1    A.    No.
2    Q.    And who is in the room with
3 you today for support?
4    A.    That's my partner.
5    Q.    Okay.  Did you speak with
6 him at all --
7    A.    No.
8    Q.    -- about today's deposition.
9       Okay.  Just to note, please
10 let me finish the question that I'm
11 asking, again, for the sake of our court
12 reporter, before responding.
13       So, Ms. Cabellos, where do
14 you currently work?
15    A.    Girard College.
16    Q.    And how long have you worked
17 there?
18    A.    A year.
19    Q.    What is your role there?
20    A.    I'm a nurse.
21    Q.    Okay.  How long have you
22 worked as a nurse?
23    A.    Since September 2023.
24    Q.    Okay.  So about two years;

Page 11

1 is that correct?
2    A.    Yes.
3    Q.    And walk me through your
4 education and training up to date.
5    A.    I went to school for -- at
6 Delaware Skills Center for about 11
7 months.
8    Q.    Okay.  And what degree did
9 you receive there?
10    A.    I received a certification
11 of completion.
12    Q.    Okay.  And before that, any
13 college, any high school?
14    A.    I have college credits, but
15 it didn't apply to the training I had.
16    Q.    Okay.  When did you attend
17 college?
18    A.    From 2012 to 2022 on and
19 off.
20    Q.    And where did you attend?
21    A.    Hillsborough Community
22 College and then Delaware Skills -- or
23 Delaware Tech Community College.
24    Q.    And before then any high

Page 12

1 school?
2    A.    Yes.
3    Q.    Where did you go to high
4 school?
5    A.    Tampa Tech.
6    Q.    And when did you graduate?
7    A.    2012.
8    Q.    Do you hold any specific
9 licenses?
10    A.    Yes.
11    Q.    What licenses?
12    A.    Licensed practical nurse.
13    Q.    And what do you complete to
14 receive that license?  The aforementioned
15 Delaware Tech credits?
16    A.    It was a Delaware Skills --
17    Q.    Delaware Skills?
18    A.    -- completion.
19    Q.    Uh-huh.  Okay.
20       Okay.  Let's start by
21 walking through your employment history,
22 please.  So you mentioned you're
23 currently at Girard College and you've
24 been there for a year.  Where did you

Page 13

1 work before that?
2    A.    Before that I did -- I
3 worked at ChristianaCare as an emergency
4 care tech.  I was there nine-and-a-half
5 years and then before that I was at
6 YesCare.
7    Q.    Okay.  You said you were at
8 ChristianaCare for nine-and-a-half years?
9    A.    Yes.
10    Q.    So what year did you start?
11    A.    2014.
12    Q.    And can you repeat your role
13 there again?
14    A.    Emergency care tech.
15    Q.    Were you always an emergency
16 care tech during your time there?
17    A.    Yes.
18    Q.    Okay.  And before then you
19 say you worked at YesCare.
20    A.    Yes.
21    Q.    When did you start?
22    A.    September 2023.
23    Q.    Okay.
24       ATTORNEY GREGORY:  So I -- I

Deposition of Blair Cabellos, LPN                                   Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 14

1  don't think she meant to say that
2  before Christiana she worked at
3  YesCare.  She worked a Christiana
4  and then YesCare.  It was before
5  that she worked -- before she
6  worked at Girard College, she
7  worked at YesCare.
8       ATTORNEY HU:  Oh, okay.
9       THE WITNESS:  Right.
10 BY ATTORNEY HU:
11     Q.    So to clarify, you were at
12 ChristianaCare nine-and-a-half years ago
13 and then YesCare following?
14     A.    Yes.
15     Q.    And then your current
16 position at Girard.
17     A.    Correct.
18     Q.    Okay.  When did you stop
19 working at ChrisianaCare?
20     A.    When I graduated.
21     Q.    Okay.  And that would be in
22 2023?
23     A.    Yes.
24     Q.    Okay.

Page 15

1      A.    August.
2      Q.    And then you started working
3  at YesCare September of 2023?
4      A.    Yes.
5      Q.    Okay.  And where were you
6  placed while working at YesCare?
7      A.    CFCF.
8      Q.    Okay.  Were you at CFCF the
9  whole time you worked at YesCare?
10     A.    No.
11     Q.    Okay.  Where else did you
12 work?
13     A.    RCF.
14     Q.    Okay.  Any other facilities?
15     A.    No.
16     Q.    And how long were you
17 employed at YesCare?
18     A.    From August 2023 to
19 May 2024.
20     Q.    Okay.  And did you hold the
21 same role the whole time there?
22     A.    I went to -- when I went to
23 RCF in January 2024, I went there as a
24 MAT nurse.

Page 16

1      Q.    As a main nurse?
2      A.    MAT.
3      Q.    A match nurse.
4      A.    Medication assessment --
5  assistant -- assessment -- assessment and
6  treatment nurse.
7      Q.    Okay.  And was that the only
8  role you held at RCF?
9      A.    Yes.
10     Q.    Okay.  So could you repeat
11 for me again which roles you held while
12 working for YesCare?
13     A.    So a regular med pass nurse,
14 which is an LPN, and then when I went to
15 RCF, it was the MAT nurse.
16     Q.    Okay.  When you began
17 working for YesCare slash the
18 Philadelphia Department of Prisons, which
19 moving forward I'll refer to as PDP, what
20 training did you receive?
21     A.    Like as far as orientation?
22     Q.    Correct.
23     A.    Like a shadowing with the
24 nurse.

Page 17

1      Q.    Okay.  How long was that?
2      A.    I want to say maybe three,
3  maybe four weeks.
4      Q.    Okay.  And did you shadow
5  the same nurse that whole time?
6      A.    No.
7      Q.    Okay.  So did you shadow
8  multiple nurses then?
9      A.    Yes.
10     Q.    Did someone oversee that
11 training specifically?
12     A.    No.
13     Q.    Okay.  So who would tell you
14 which nurse to shadow?
15     A.    It would be written on a
16 sheet of paper, like the assignment
17 sheet --
18     Q.    Okay.
19     A.    -- that we look at every
20 day.
21     Q.    Uh-huh.  Following that
22 shadowing period, did you receive any
23 other trainings?
24     A.    No.

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 10 of 60

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 18

Q.   Okay.  So did you receive any written materials during this orientation period?

A.   I can't remember.

Q.   Did you receive any online modules?

A.   Yes.

Q.   What kinds?

A.   It was just what to do like in case of, I want to say, if an inmate like attacks you or how not to pursue a relationship with the inmate because it's a charge and PREA.

Q.   Okay.  Any other topics?

A.   I can't remember.

Q.   Okay.  How did these trainings compare to what you received in your previous employment?  For instance, at Christiana.

A.   Christiana was a lot more informative.

Q.   How so?

A.   The nurse managers are more -- were more engaged.  I'm trying to

Page 19

think how to say it.  They would do more like quarterly check-ins.  It was just different.

Q.   Uh-huh.  Did you have any follow-up check-ins similar to that at YesCare?

A.   I briefly spoke to my manager and -- yeah, I brief -- I briefly spoke to my manager about it.

Q.   Uh-huh.  When was that?

A.   I don't remember.

Q.   Was it after the shadowing period near the start of your employment or was it sometime after?

A.   It was sometime after.

Q.   Okay.  And did you raise it because you desired more training or did you have any concerns?

A.   Yes, it was because I wanted more training.

Q.   Okay.  What kind of training were you desiring?

A.   Just like more hands-on training.  The computer system was hard

Page 20

to navigate through.

Q.   So technical training it sounds like?

A.   Yes.

Q.   Was providing medical care in a jail setting different from your previous work?

A.   No.

Q.   What makes you say that?

A.   It was a lot like the ER.

Q.   How is it similar?

A.   Just emergencies.  You never know what you're walking into.

Q.   Were the emergencies you encounter in PDP similar to that in an emergency room?

A.   It was less acute.

Q.   You said less acute?

A.   Yes.

Q.   What do you mean by that?

A.   It wasn't as serious.

Q.   Okay.  Did safety and security concerns factor into the way you provided care at PDP?

Page 21

A.   Yes.

Q.   How so?

A.   There was never -- I felt like there was never enough correctional officers, how it should be.

Q.   Do you mean that in general or in terms of your personal safety?

A.   Just in general and personal safety.

Q.   Okay.  Did you have similar concerns in your prior positions?

A.   No.

Q.   You mentioned that you received some training on safety or, for instance, appropriate relationships with inmates or patients you were treating; is that correct?

A.   Yes.

Q.   Did you feel like those trainings addressed the safety and security concerns you had?

A.   No.

Q.   Okay.  Why not?

A.   Because it was just like --

Page 22

it was telling us not to engage in
relationships with inmates and that
wasn't a thing, like I was never going to
do that, so that didn't -- I don't feel
like that addressed anything.
     Q.    So you do not feel like your
safety and security concerns were
addressed in the trainings you received?
     A.    I don't know how to answer
that.
     Q.    You mentioned having safety
and security concerns.  Do you feel like
the trainings you received at YesCare
assuaged those concerns?
     A.    No.
     Q.    At PDP do correctional
officers escort nursing staff?
     A.    Yes.
     Q.    Okay.  When?
     A.    When you're going onto the
pod or when there's a stretcher call.
     Q.    Are there instances where
nurses have -- isn't escorted by
correctional officers?

Page 23

     A.    Yes.
     Q.    Okay.  When?
     A.    When they're short-staffed,
when the correctional officer can't --
you know, they're busy doing something
else or they can't go at that very
moment.
     Q.    Would it be correct to say
then correctional officers should always
be with nursing staff?
     A.    Yes.
     Q.    But there are instances
where they are not because of
short-staffing?
     A.    Correct.
     Q.    Okay.  Do medical staff
provide care on the housing units in PDP?
     A.    Yes.
     Q.    Okay.  When?
     A.    Stretcher calls.
     Q.    Okay.
     A.    When there's no correctional
officers on the unit, then a lieutenant
has to come and you have to give the

Page 24

medicines to the inmates.
     Q.    Would it be correct then to
say, based on what you just told me, that
it would not be normal or standard
procedure for medical staff to distribute
medication on the pod?
          ATTORNEY PESTRAK:  Objection
     to form.
          ATTORNEY GREGORY:  You can
     answer.
          THE WITNESS:  Can you repeat
     the question?
          ATTORNEY HU:  Sure.
BY ATTORNEY HU:
     Q.    So would it be normal for
medical staff to administer medications
on the pods?
     A.    Yes.
     Q.    Okay.
     A.    It -- it happens, but it
shouldn't because the safety of the
nurses.
     Q.    Okay.  Do PDP facilities
have any urgent care services?

Page 25

     A.    They have stretcher calls,
so yes.
     Q.    Okay.  And what does a
stretcher call entail?
     A.    It's when an emergency is
occurring the correctional officer will
call a number, I guess, and say that they
have a stretcher call and the nurses
would go up there and provide care to the
patient, to the inmate.
     Q.    Okay.  What kind of care
would be provided during a stretcher
call?
     A.    Anything.  CPR, if they need
Narcan, if they're having a seizure, if
there was a bad fight and there was
numerous inmates that were injured.
     Q.    What services could be
treated within the facility during the
stretcher calls?
     A.    I --
          ATTORNEY GREGORY:  I'm
     sorry.  I don't understand the
     question.  What do you mean,

Deposition of Blair Cabellos, LPN                     Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 26

1  within the facility?
2  BY ATTORNEY HU:
3      Q.    So, for instance, at what
4  point would someone need to be taken to a
5  hospital or an outside facility versus
6  treated within PDP?
7      A.    So the RNs would normally go
8  to those.  If I was able to, we would
9  attend -- we would go with them, but
10 anything that requires like, I would say,
11 lifesaving measures, then they would need
12 to be transported out.  If the facility
13 felt like it was -- the quality of care
14 needed to be escalated, then they would
15 go out.
16     Q.    What sort of lifesaving
17 measures, for example?
18     A.    I mean anything that just
19 requires like an emergency room visit.
20 Like I'm trying to think.  If they were
21 stabbed, they would have to go out.  It
22 just depends on the situation and what
23 the provider there feels.
24     Q.    Can patients receive

Page 27

1  critical care in PDP facilities?
2      A.    At CFCF, no.
3      Q.    As a nursing professional
4  and somebody who's worked in emergency
5  rooms, what is your definition of
6  "critical care"?
7      A.    Critical care is anything
8  that requires -- anything that requires
9  lifesaving measures, whether it's an IV,
10 whether it's blood, whether it's nursing
11 staff or doctors to lay eyes on them
12 consistently.
13     Q.    Okay.  Could patients
14 receive an IV or intravenous fluids
15 within PDP?
16     A.    Yes.
17     Q.    Okay.  When would that be
18 the case?
19     A.    If they were dehydrated.  I
20 mean it's -- it's -- it's a lot.  It's a
21 lot of cases where they could receive IV
22 fluids.
23     Q.    Uh-huh.  Who would make that
24 decision?

Page 28

1      A.    The doctor or the NP.
2      Q.    Could only the NP make that
3  decision?
4      A.    No.
5      Q.    Who else could?
6      A.    The nurse, depending on the
7  patient's symptoms.  She could put a call
8  out to the doctor.
9          ATTORNEY GREGORY:  When you
10     say "the nurse," you mean
11     registered nurse?
12         THE WITNESS:  The registered
13     nurse.
14 BY ATTORNEY HU:
15     Q.    And to clarify, a registered
16 nurse would be in contrast to the
17 position you held at PDP?
18     A.    Correct.  I was an LPN.
19     Q.    Okay.  Do PDP -- excuse me.
20 Do PDP facilities have any
21 i-STAT machines?
22         ATTORNEY PESTRAK:  I'm
23     sorry, I just didn't hear the
24     word.  I?

Page 29

1          ATTORNEY HU:  i-STAT.  I
2      dash S-T-A-T.
3          THE WITNESS:  I don't know.
4  BY ATTORNEY HU:
5      Q.    Do you know what an i-STAT
6  machine is?
7      A.    Yes.
8      Q.    Okay.  What is your
9  understanding of it?
10     A.    It checks your sugars.
11     Q.    Okay.  And you are unsure if
12 PDP has these capabilities?
13     A.    Correct.
14     Q.    Okay.  Did you ever see them
15 used during your time at YesCare?
16     A.    No.
17     Q.    Okay.  Were you ever
18 respond -- or excuse me.
19         Were you ever trained in
20 responding to emergencies at PDP/YesCare?
21     A.    No.
22     Q.    Were you ever trained to
23 recognize medical emergencies at
24 PDP/YesCare?

Page 30

1    A.    I can't remember.
2    Q.    Have you ever received
3  training in how to respond to medical
4  emergencies including at past employment?
5    A.    Yes.
6    Q.    Okay.  Walk me through that
7  training.  So how would you explain to
8  someone how to respond in a medical
9  emergency?
10   A.    Like at my former jobs?
11   Q.    Sure.
12   A.    When I was working in the
13 ER, they pretty much just told us what to
14 do in case of CPR and in case if a
15 patient needs CPR, they told us what to
16 do in case of a patient comes in with a
17 gunshot wound or a stabbing, they told us
18 what to do in case of like an arterial
19 bleed.  I'm trying to think.  That's all
20 I can remember at this time.
21   Q.    Was anything of that
22 background relevant or useful during your
23 time at PDP/YesCare?
24   A.    Not the gunshot wounds, but

Page 31

1  the other things, yes.
2    Q.    What are some signs and
3  symptoms of medical distress?
4    A.    When the patient feels like
5  his -- their breathing isn't correct,
6  like when they're having trouble
7  breathing, if they're not alert and
8  oriented, if they're not making sense, if
9  they don't -- I'm trying to think -- if
10 they're having a seizure.
11   Q.    Is verbally expressing pain
12 a sign of medical distress?
13   A.    No.
14   Q.    Why not?
15   A.    Because it depends where the
16 pain is located.
17   Q.    If someone expressed an
18 extreme level of pain verbally, would
19 that count as medical distress?
20   A.    It depends.
21   Q.    Depends on what?
22   A.    Because pain -- people's
23 pain tolerances are different.  So
24 something that hurt -- doesn't hurt you

Page 32

1  as much can hurt me a lot.  So it depends
2  where the pain is located.
3    Q.    Would it be correct to say
4  then it depends on other factors?
5    A.    Yes.
6    Q.    How about if someone is
7  nonresponsive, does that count as medical
8  distress?
9    A.    Yes.
10   Q.    How would you respond as an
11 LPN to that?
12   A.    I would check their pulse.
13 I would give them Narcan and then I would
14 check their sugar.
15   Q.    If someone was not moving or
16 unable to move, does that count as
17 medical distress?
18   A.    It depends.
19   Q.    Okay.  Depends on what?
20   A.    It depends if their --
21 what's their definition of not being able
22 to move.  Are they not moving because
23 they're in pain or are they not moving
24 because they're in so much pain that's --

Page 33

1  and that's why it's causing them not to
2  move.
3    Q.    Would you rely on their
4  subjective verbal response to assess
5  that?
6    A.    Yes.
7    Q.    What if someone was not
8  verbal at all, does that -- is that a
9  sign of medical distress?
10   A.    Yes.
11   Q.    How would you respond as an
12 LPN?
13   A.    Can you repeat the question?
14   Q.    So if someone was not -- not
15 verbal, unable to speak, how would you
16 respond to that sign of medical distress?
17   A.    The same way as if they
18 weren't arousable, check their pulse,
19 ask -- ask the people around them like do
20 they normally talk, and then check their
21 sugar and -- yeah.
22   Q.    What would you be looking
23 for when you check their sugar?
24   A.    Like the numbers or...

Deposition of Blair Cabellos, LPN                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 34

1      Q.    Yes.
2      A.    Anything past -- it depends
3  what they normally range.  Anything past,
4  I want to say, 200 is concerning.
5      Q.    When you started your
6  position at YesCare/PDP, were you ever
7  provided any training on how to handle a
8  situation if someone was refusing medical
9  care?
10     A.    Yes.
11     Q.    What was that training?
12     A.    They told us basically to
13 just if a -- an inmate has a right to
14 refuse medical care and in the event that
15 he does, you have to get a signature.
16     Q.    Okay.  And were you provided
17 this instruction verbally?
18     A.    I can't remember.
19     Q.    Was it in any sort of
20 written handbook or instruction?
21     A.    Possibly.  It was either
22 verbal or written.
23     Q.    And did you learn this
24 during your orientation period that you

Page 35

1  mentioned before?
2      A.    Yes, not the shadowing, but
3  the orientation, yes.
4      Q.    And was orientation before
5  the shadowing?
6      A.    Yes.
7      Q.    Okay.  And what did that
8  consist of again?
9      A.    The orientation was a week.
10 It was -- I want to say it was maybe --
11 no, I think it was -- I can't remember
12 how long the orientation was.
13     Q.    Do you remember, was it all
14 in person?
15     A.    No.
16     Q.    Okay.  How was it provided
17 then?
18     A.    I want to say one day was
19 virtual -- either one or two days were
20 virtual and then you had to complete
21 PowerPoints and that's where I think the
22 refusal was at.
23     Q.    What do you mean by
24 "complete PowerPoints"?

Page 36

1      A.    Read the PowerPoints.
2      Q.    Would someone confirm that
3  you completed that review?
4      A.    I'm not sure.
5      Q.    Did you have to sign
6  anything?
7      A.    I can't remember.
8      Q.    Okay.  Let's go back to the
9  question I asked about what to do if
10 someone refused medical care.  You
11 mentioned that a refusal form had to be
12 signed?
13     A.    Yes.
14     Q.    Okay.  What other protocol
15 would you have to go through if someone
16 was refusing medical care?
17     A.    You would let the doctor
18 know.
19     Q.    So let the doctor know and
20 sign a refusal form.  Was there any other
21 additional protocol?
22     A.    If the inmate refuses to
23 sign the paper, then you have to get the
24 correctional officer to witness it.

Page 37

1      Q.    Okay.
2      A.    But that was it.
3      Q.    And by "witness," do you
4  mean have them in the room while you
5  asked the person if they were refusing to
6  sign?
7      A.    Correct.
8      Q.    Okay.  Would you document
9  the refusal to sign at all?
10     A.    Yes.
11     Q.    How so?
12     A.    I never did it.
13     Q.    Okay.  Do you know if
14 correctional officers would have to do
15 so?
16     A.    I don't know.
17     Q.    Did you ever see them do it?
18     A.    No.
19     Q.    Are you familiar with what
20 diabetes is?
21     A.    Yes.
22     Q.    Please explain to me your
23 understanding.
24     A.    It's when your body is

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 15 of 60

Deposition of Blair Cabellos, LPN                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 38

1  unable to have a relatively safe sugar
2  because your pancreas doesn't -- it's not
3  working appropriately.
4      Q.   And how is diabetes treated?
5      A.   It depends what kind of --
6  if it's type 1 or type 2.
7      Q.   Explain to me how you treat
8  type 1 then.
9      A.   Type 1 is -- so to treat
10 it -- it depends what the doctor orders.
11 If some -- some diabetes, some people
12 it's treated by lifestyle and food
13 choices and other people it's insulin,
14 other patients can have like a monitor on
15 them.
16     Q.   Can you explain to me the
17 difference between type 1 and type 2
18 diabetes?
19     A.   Type 1 is I think when --
20 I'm not really sure, to be honest with
21 you.
22     Q.   Have you been close to
23 anyone who's ever had diabetes?
24     A.   Yes.

Page 39

1      Q.   Okay.  Who?
2      A.   My dad.
3      Q.   Do you know what type he
4  has?
5      A.   2.
6      Q.   And how long has he had it?
7      A.   A long time.
8      Q.   Have you witnessed him treat
9  himself for diabetes?
10     A.   Yes.
11     Q.   Okay.  And what -- how does
12 he treat his diabetes?
13     A.   Well, when he eats bad, he
14 has to use insulin, but he's made the
15 life choices to where he doesn't need
16 insulin anymore.
17     Q.   As part of your
18 aforementioned education, were you taught
19 about diabetes?
20     A.   Yes.
21     Q.   Okay.  When?
22     A.   At Delaware Skills Center.
23     Q.   Have you received any
24 training on diabetes since then?

Page 40

1      A.   No.
2      Q.   So not as part of your
3  employment at Christiana?
4           ATTORNEY GREGORY:  That was
5      before Delaware Skills Center.
6  BY ATTORNEY HU:
7      Q.   Did you work there
8  contemporaneously?
9      A.   Did I work there how?
10     Q.   So did you work at
11 Christiana while you were completing your
12 degree at Delaware Skills Center?
13     A.   Yes.
14     Q.   Okay.  And did you ever
15 learn anything about diabetes while at
16 Christiana?
17     A.   I can't remember.
18     Q.   Okay.  Did any of your other
19 workplaces train you on diabetes?
20     A.   No.
21     Q.   Were you ever trained on
22 identifying signs of high blood sugar?
23     A.   At that job?  At YesCare?
24     Q.   Ever.

Page 41

1      A.   I can't remember if YesCare
2  did it.
3      Q.   Okay.  Can you remember if
4  any of your other jobs did that?
5      A.   No.
6      Q.   Okay.  Were you ever trained
7  to recognize signs of emergency in a
8  diabetic patient?
9      A.   I can't remember.
10     Q.   Do you know how insulin is
11 administered?
12     A.   Yes.
13     Q.   How?
14     A.   Not from YesCare because I
15 didn't do insulins, but it's based off
16 the doctor's order.  You check their
17 sugar and then you look at the sliding
18 scale and then you give them the insulin
19 based off the sliding scale.
20     Q.   Do you know what the risks
21 of unstable glucose levels are?
22          ATTORNEY GREGORY:
23     Objection.  I've allowed you to
24     ask a lot of expert questions.

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 42

1  She's a fact witness.  You can ask
2  her about her interaction with --
3  with the decedent in the case, you
4  can ask her about what she did,
5  you're not going to ask her for
6  expert opinions and that's what
7  you're doing.
8        ATTORNEY HU:  I'm not asking
9  for an expert opinion from
10  Ms. Cabellos.  To be clear, I'm
11  asking for what her understanding
12  is as an LPN.
13        ATTORNEY GREGORY:  She's a
14  licensed practical nurse.  She's
15  not a physician.  That's a
16  question more appropriate for a
17  nurse practitioner, a physician's
18  assistant or a doctor.
19        So I'm going to tell her not
20  to answer that question.
21        ATTORNEY GROTE:  We're going
22  to have to get the court involved.
23        ATTORNEY HU:  Sir, this is
24  my deposition.  I'm going to ask

Page 43

1  the questions as I see fit.  If
2  you'd like the court involvement,
3  that is up to you.  If you'd like
4  to object, you're more than free
5  to do so.  If Ms. Cabellos does
6  not have the knowledge of these
7  questions in answering, she's more
8  than free to respond too.
9        ATTORNEY GREGORY:  I'm just
10  saying so far I've -- I've given
11  you a lot of leeway asking a lot
12  of hypothetical questions.
13  Hypothetical questions are for
14  expert witnesses not for fact
15  witnesses.
16        ATTORNEY HU:  Sir, this is
17  -- if you'd like to assert a
18  privilege, you can.  However --
19        ATTORNEY GREGORY:  A
20  privilege?
21        ATTORNEY HU:  -- I'm
22  conducting --
23        ATTORNEY GREGORY:  I haven't
24  asserted a privilege.

Page 44

1        ATTORNEY HU:  Correct.  So
2  I'm going to keep asking the
3  questions for this deposition and
4  keep conducting it and we'll go
5  from there.
6        ATTORNEY GREGORY:  All
7  right.  Sure.
8  BY ATTORNEY HU:
9    Q.   I'm going to repeat my last
10  question, Ms. Cabellos.  Do you know what
11  the risks of unstable glucose levels are?
12        ATTORNEY GREGORY:  I'm
13  telling you not to answer the
14  question.  It's not a question for
15  you.  Risks --
16        ATTORNEY HOLSTON:  Let's
17  take -- let's take -- let's take a
18  break.
19        THE VIDEOGRAPHER:  Going off
20  the record.  The time is
21  10:46 a.m.
22        (A recess occurred from
23  10:46 a.m. until 11:19 a.m.)
24        THE VIDEOGRAPHER:  Back on

Page 45

1  the record, 11:19 a.m.
2        ATTORNEY HU:  Federal Civil
3  Procedure --
4        ATTORNEY GREGORY:  Excuse
5  me, before we begin --
6        ATTORNEY HOLSTON:  Wait.
7  Hold on.  No.
8        ATTORNEY GREGORY:  Before we
9  begin --
10        ATTORNEY HOLSTON:  She's
11  talking.
12        ATTORNEY GREGORY:  Before we
13  begin --
14        ATTORNEY HOLSTON:  Excuse
15  me, she's talking before --
16  before --
17        ATTORNEY GREGORY:  Before we
18  begin --
19        ATTORNEY HOLSTON:  She's
20  putting something on the record
21  here.
22        ATTORNEY GREGORY:  I'm going
23  to put something on the record
24  first.

Page 46

1    ATTORNEY HOLSTON:  You
2  interrupted her and so she's going
3  to put that on the record.
4    ATTORNEY GREGORY:  I'm going
5  to put something on the record --
6    ATTORNEY HOLSTON:  Go
7  ahead --
8    ATTORNEY GREGORY:  -- first.
9    ATTORNEY HOLSTON:  -- finish
10  what you have to say.
11    ATTORNEY GREGORY:  I want
12  the record to reflect that --
13    ATTORNEY HOLSTON:  You --
14  you --
15    ATTORNEY GREGORY:  -- that
16  there are four --
17    ATTORNEY HOLSTON:  -- finish
18  what you have to say.
19    ATTORNEY GREGORY:  -- that
20  there are four attorneys
21  representing the plaintiffs, who
22  at 10:46 got up and left the room
23  and came back 33 minutes later to
24  the -- to the height of

Page 47

1  incivility, to the height of
2  rudeness, to the height of
3  inconvenience to all counsel.
4  I've never seen anything like this
5  before. I'm going to ask for
6  sanctions for this conduct.
7    We can go back on the record
8  and you can say whatever you want
9  to say. I'm going to object to
10  your last question, but allow her
11  to answer.
12    ATTORNEY HU:  Okay. Well,
13  then also for the record, Mr.
14  Gregory, Federal Civil Procedure
15  30(c)(2), as I started before,
16  says that for objections an
17  objection at the time of
18  examination, whether to evidence,
19  to a party's conduct, to the
20  officer's qualifications, to the
21  manner of taking the deposition,
22  or to any other aspect of the
23  deposition, must be noted on the
24  record, but the examination still

Page 48

1  proceeds; the testimony is taken
2  subject to any objection. An
3  objection must be stated concisely
4  in a nonargumentative and
5  nonsuggestive manner. A person
6  may instruct a deponent not to
7  answer only when necessary to
8  preserve a privilege, to enforce a
9  limitation ordered by the court,
10  or to present a motion under Rule
11  30(d)(3).
12    I will be moving forward
13  with this deposition. Moving
14  forward, if you ask the witness to
15  not answer, I'm going to ask you
16  to certify for the record that you
17  have instructed her not to answer
18  and we will take all certified
19  questions to the court.
20    Now, if we may proceed.
21  BY ATTORNEY HU:
22    Q.  Ms. Cabellos, did you talk
23  about any matters related to this current
24  deposition to anyone during the break?

Page 49

1    A.  No.
2    Q.  I resume my questioning from
3  before. Do you know what the risks of
4  unstable glucose levels are?
5    A.  Yes.
6    Q.  What are the risks?
7    A.  Organ failure, death.
8    Q.  Are you familiar with
9  diabetic ketoacidosis?
10    A.  DKA, yes.
11    Q.  What is it?
12    A.  That's when the sugar is so
13  high that -- it's when the sugar is so
14  high that it's -- it's an unhealthy
15  range.
16    Q.  What is an unhealthy range?
17    A.  To be DKA, I think it's
18  above -- I think it's above 600. Six or
19  seven hundred.
20    Q.  And what are the signs of
21  DKA?
22    A.  Excessive urinating, just
23  not feeling well, tired, hungry, really
24  hungry.

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 18 of 60

Deposition of Blair Cabellos, LPN                                     Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 50

Q.    How is DKA treated?

A.    The doctor would normally write orders for IV fluids, frequent monitoring.

Q.    Can DKA affect a person's mobility?

A.    Yes.

Q.    How so?

A.    I guess the pain.

Q.    And can DKA result in dehydration?

A.    Yes.

Q.    How does that affect the body?

A.    How does DKA affect the body?

Q.    How does dehydration from DKA affect the body?

A.    I don't know how to answer that question.

Q.    How does dehydration -- extreme dehydration affect someone's functioning?

A.    Severe dehydration can lead

Page 51

to organ failure.

Q.    Can DKA affect a person's cognitive abilities?

A.    Yes.

Q.    How so?

A.    I don't know the scientific way to put it to you, but their sugar is so high that they're not in their right mind.

Q.    Okay.  In your prior employment, did you ever care for patients with diabetes?

A.    While I was an ER tech, yes.

Q.    What kind of care did that entail?

A.    I was just a -- like a CNA, so it wasn't -- I never did like IVs or anything, but -- so I didn't really care for them.

Q.    But you would have patients that did have diabetes?

A.    Correct.

Q.    You just wouldn't treat their diabetes-specific issues; is that

Page 52

correct?

A.    I wasn't a nurse at that time.  So...

Q.    Understood.  Okay.  Did PDP provide you with any diabetes-specific training?

A.    I can't remember.

Q.    At PDP, did you ever provide care for patients who had diabetes?

A.    No.

Q.    Were you ever aware which inmates, which patients were diabetic?

A.    No.

Q.    Do you ever receive any directives or instructions from supervisors about the care of diabetic patients?

A.    No.

Q.    Do you know how insulin was administered at PDP?

A.    No.

Q.    Do you know where it would happen at PDP?

ATTORNEY GREGORY:  Where

Page 53

what happened?  The administration of insulin?

BY ATTORNEY HU:

Q.    Do you understand the question?

A.    No.

Q.    Do you know where insulin was administered at PDP?  Would it happen on the pod?  Would it happen at medical?

A.    I don't know.

Q.    Do you know what the protocol would be if a diabetic patient missed their insulin dosage?

A.    No.

Q.    Do you know what would happen if a diabetic patient missed a glucose check?

A.    No.

Q.    Do you know whose responsibility it was to track any missed insulin or glucose checks?

A.    No.

Q.    Okay.  Ms. Cabellos, do you have any experience with treating mental

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 54

1  or behavioral health issues?
2      A.    No.
3      Q.    Have you had any training
4  regarding mental or behavioral health
5  issues?
6          ATTORNEY PESTRAK:
7  Objection.
8          ATTORNEY GREGORY:
9      You can answer.
10         THE WITNESS:  No.
11 BY ATTORNEY HU:
12     Q.    Have you ever had patients
13 with mental health issues?
14     A.    Yes.
15     Q.    In what roles or what
16 previous employment?
17     A.    In the ER.
18     Q.    How about at PDP?
19     A.    There were.  Yes, there were
20 psych patients.
21     Q.    What trainings did you
22 receive at PDP regarding mental health?
23         ATTORNEY PESTRAK:
24     Objection.

Page 55

1          ATTORNEY GREGORY:  You can
2  answer.
3          THE WITNESS:  I think it was
4      a couple of slides, like
5      PowerPoints on it when we started
6      at orientation, but I can't
7      remember exactly what it said.
8  BY ATTORNEY HU:
9      Q.    Did you ever treat any
10 patients with mental health issues at
11 PDP?
12     A.    What do you mean by "treat"?
13     Q.    Did any of the patients you
14 saw have mental health issues?
15     A.    That was diagnosed with
16 mental health issues?
17     Q.    Sure.
18     A.    I wouldn't know if they had
19 a mental health issue unless I was like
20 opening their chart.
21     Q.    Just to clarify, you said
22 you wouldn't know?
23     A.    Correct.
24     Q.    Okay.  Unless you checked

Page 56

1  their chart?
2      A.    Correct.
3      Q.    Okay.  Did nurses at PDP
4  have any responsibilities related to
5  mental health?
6          ATTORNEY GREGORY:
7  Objection.
8      You can answer.
9          THE WITNESS:  When you say
10     "nurses," do you mean me or you
11     mean RNs?
12 BY ATTORNEY HU:
13     Q.    Start with you and then
14 describe RNs.  Tell me all of it.
15     A.    So me during med pass, if
16 there was an inmate that was causing a
17 scene, I could tell my manager about
18 that, but I wouldn't know -- during med
19 pass, I wouldn't know if they actually
20 had a mental illness unless I opened
21 their chart, which typically doesn't
22 happen when we're giving the meds.
23     Q.    Okay.  And explain to me,
24 what is med pass?

Page 57

1      A.    Med pass is when the inmates
2  come, they have orders by the physician
3  to receive medication.
4      Q.    And where does that happen?
5      A.    That happens -- that happens
6  in the med room.
7      Q.    And what was your role
8  during med pass?
9      A.    To give out the meds.
10     Q.    And how is it different from
11 an RN?
12     A.    So the RNs would -- the LPNs
13 would normally do the med pass.  The RNs
14 would normally be in triage to answer
15 like the stretcher calls.  In the event
16 that there's no LPNs, then an RN would
17 have to be pulled to do med pass.
18     Q.    And to your understanding,
19 what is an RNs responsibility related to
20 a patient's mental health?
21     A.    I don't know how to answer
22 that.
23     Q.    As an LPN, did you ever --
24 did your responsibilities ever include

Deposition of Blair Cabellos, LPN                                  Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 58

1  referrals to psychiatric providers?
2      A.    We could do that, but I
3  never had to do that.
4      Q.    Were you trained to
5  recognize any signs of mental health
6  decompensation?
7          ATTORNEY PESTRAK:
8      Objection.
9          ATTORNEY GREGORY:
10     You can answer.
11         THE WITNESS:  I can't
12     remember.
13 BY ATTORNEY HU:
14     Q.    If someone at PDP was
15 undergoing a mental health crisis, what
16 was your responsibility as medical staff
17 to respond?
18         ATTORNEY PESTRAK:
19     Objection.
20         ATTORNEY GREGORY:
21     You can answer.
22         THE WITNESS:  To make sure
23     they're safe, to escalate, to ask
24     them if they're suicidal or

Page 59

1  homicidal, to escalate that to the
2  doctor.
3  BY ATTORNEY HU:
4      Q.    Were you trained to
5  recognize any suicide attempts or
6  suicidality?
7      A.    Yes.
8      Q.    When?
9      A.    During the orientation, the
10 PowerPoints.
11     Q.    And what were you trained to
12 recognize?  What signs?
13     A.    It showed us how the inmates
14 can hurt themselves.  I'm trying to think
15 what else.  I can't really remember
16 anything else.
17     Q.    How were you trained to
18 respond in response to an inmate
19 expressing suicidality?
20         ATTORNEY PESTRAK:  Just note
21     for the record that I'm going to
22     have a running objection to all
23     the mental health and suicide
24     questions.  Thanks.

Page 60

1          THE WITNESS:  Can you repeat
2      the question?
3  BY ATTORNEY HU:
4      Q.    How were you trained to
5  respond to someone exhibiting signs of
6  suicide or suicidality?
7      A.    To just make sure the
8  patient is safe and then to escalate it
9  to the doctor.
10     Q.    How would you make sure
11 someone is safe?
12     A.    That he doesn't -- that he
13 actually takes his medication and doesn't
14 pocket them, that he hasn't -- that he
15 doesn't have anything sharp on him.  I
16 never had to deal with that, so I -- I
17 don't know specifically how to answer
18 that.
19     Q.    Ms. Cabellos, what is your
20 understanding of depression?
21     A.    Can -- can you go into
22 detail how you want me to answer that?
23     Q.    What is depression?
24     A.    It's a mental health illness

Page 61

1  that makes you sad.  It's a brain --
2  something in your brain is -- your levels
3  aren't all accurate, so that's why you
4  get sad.
5      Q.    What are some of the
6  diagnostic criteria for depression?
7      A.    I don't know.
8      Q.    What treatments are commonly
9  used for depression?
10     A.    Medications, therapy,
11 talking to a psychiatrist or a
12 psychologist, lifestyle changes.
13     Q.    And how is depression
14 relevant to a patient's general medical
15 care?
16     A.    How is it relevant to their
17 medical care?
18     Q.    How can it impact their
19 general medical care?
20     A.    I don't know how to answer
21 that.
22     Q.    What is your understanding
23 of anxiety?
24     A.    It's a condition where you,

Deposition of Blair Cabellos, LPN                           Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 62

I mean, I guess worry a lot.
    Q.    What are the diagnostic
criteria for anxiety?
    A.    I don't know.
    Q.    What treatments are commonly
used for anxiety?
    A.    Medications, lifestyle
changes.
    Q.    And what is your
understanding of bipolar disorder?
    A.    It's a mental health issue
where kind of like a roller coaster of
emotion.
    Q.    What are -- what are the
diagnostic criteria, excuse me, for
bipolar disorder?
    A.    I don't know.
    Q.    What treatments are commonly
used for bipolar disorder?
    A.    The same, the -- either
medication or the lifestyle changes or
both.
    Q.    During your nursing
education, were you taught about medical

Page 63

documentation?
    A.    Yes.
    Q.    What were you taught?
    A.    To document everything.
    Q.    What types of information
should be documented in a patient's
record?
    A.    The care that you gave.
    Q.    And how come?  Or what is
the importance of doing so?
    A.    To document the care that
you gave.
    Q.    What kinds of treatment
should be noted in such documents?
    A.    Any.
    Q.    So every time a nurse or
medical practitioner gives care to the
patient?
    A.    Yes.
    Q.    What kinds of patient
behavior should be noted?
    A.    All types.
    Q.    And what are the risks of
failing to document medical information

Page 64

or care?
    A.    I'm not sure.
    Q.    So when you were taught
about medical documentation, what is the
significance of doing so?
    A.    Can you repeat the question?
    Q.    So why is it important to
document all types of medical care?
    A.    Why is it important?
    Q.    Correct.
    A.    To document the care that
you gave.
    Q.    And if you didn't document
something, what could be at stake?
    A.    I'm not sure.
    Q.    Okay.  At your time at
Christiana, you -- what was your role
there again?
    A.    ER tech.
    Q.    Okay.  Did you ever do any
medical documentation in that role?
    A.    Yes.
    Q.    Okay.  What kinds?
    A.    If I checked the blood

Page 65

pressure, if I did the vital signs, if I
checked the sugar, anytime I was hands on
with the patient.
    Q.    So anytime you were hands
on, you would update their medical
documentation?
    A.    Yes.
    Q.    What was that system like?
Was it electronic?  Was it written?
    A.    It was electronic.
    Q.    Okay.  And at PDP what
training or directives were you given
about documentation practices?
    A.    I can't remember.
    Q.    How did you approach
documentation at PDP?
    A.    So for my role with the med
pass, we would sign off the medication as
we give them.
    Q.    Are there any other times
you'd update documentation?
    A.    No, because -- well, wound
care.  When I did wound care.
    Q.    And what would you note?

Deposition of Blair Cabellos, LPN                                   Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 66

1    A.    That the wound care was
2   performed.  I would write -- if like the
3   wound care had like an odor to it or if
4   it like -- I would describe the -- if it
5   had pus.
6    Q.    So the condition of the
7   wound you were treating?
8    A.    Correct.
9    Q.    Other than med pass or wound
10  care, are there other times you would
11  update medical documentation at PDP?
12   A.    No.
13   Q.    And you mentioned earlier
14  that sometimes you would check patient's
15  charts, correct?
16   A.    No.
17   Q.    Were there ever any times
18  you checked a patient's chart while
19  working at PDP?
20   A.    No.
21   Q.    Do you know what information
22  would be in a patient's chart at PDP?
23   A.    No.
24   Q.    Did you document all

Page 67

1   instances of care you provided at PDP?
2    A.    Yes.
3    Q.    Okay.  Were there ever times
4   where certain medical information was not
5   documented?
6    A.    I can't remember.
7    Q.    Did understaffing have any
8   effect on documentation practices?
9        ATTORNEY PESTRAK:
10      Objection.
11      THE WITNESS:  I don't know
12      how to answer that.
13  BY ATTORNEY HU:
14   Q.    Did high caseloads have any
15  effect on documentation practices at PDP?
16   A.    I don't know how to answer
17  that.
18   Q.    Okay.  I'm going to pivot
19  now to asking some questions about your
20  time working for YesCare at PDP.  Remind
21  me again, what roles did you serve during
22  your time working there?
23   A.    The morning med pass.
24   Q.    Okay.  So you were in charge

Page 68

1   of med pass.  Was that at CFCF?
2    A.    Yes.
3    Q.    And then I believe you
4   mentioned your role at RCF was a bit
5   different; is that correct?
6    A.    Yes.
7    Q.    What was it?
8    A.    I was a Suboxone nurse.
9    Q.    Okay.  Was that the only
10  treatment you were in charge of at RCF?
11   A.    Yes.  I wasn't in charge of
12  it, though.
13   Q.    Oh, I'm sorry.  Responsible
14  for?
15   A.    Uh-huh.  Yes.
16   Q.    Okay.  Thank you.  And could
17  you please remind me again what period
18  you worked at CFCF and what period you
19  worked at RCF?
20   A.    I worked at CFCF from
21  September of 2023 to December 2023.
22   Q.    Okay.  And at RCF from which
23  dates?
24   A.    January 2024 to May 2024.

Page 69

1    Q.    Let's talk about your shifts
2   at CFCF first.  So how long were your
3   shifts?
4    A.    Eight hours.
5    Q.    Okay.  And when would they
6   be?
7    A.    7 a.m. to 3 p.m.
8    Q.    Were you always on that
9   shift?
10   A.    Yes.
11   Q.    And how many days a week
12  would you work that 7 a.m. to 3 p.m.
13  shift?
14   A.    Five days.
15   Q.    Can you describe to me what
16  a typical shift was like for you?
17   A.    We would go in and look at
18  the assignment sheet and based off what
19  pod you're assigned to, you would print
20  out the med list and you would go
21  upstairs and give the medications.
22   Q.    Is that what you do for the
23  entire length of your shift?
24   A.    Yes.

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 70

1    Q.    Who would you typically
2  interact with?
3    A.    The inmates.
4    Q.    How about any other staff?
5    A.    Sometimes other nurses.
6    Q.    Would you interact with any
7  correctional officers?
8    A.    When I need to -- when I
9  need the inmates, yes.
10   Q.    And how about when you were
11 working at RCF as the Suboxone nurse,
12 what would those shifts look like?
13   A.    Like the out -- like what do
14 you mean?
15   Q.    So similar to how you
16 described your time at CFCF, when would
17 you get there?  Let's just start with that.
18   A.    I believe 8 o'clock.
19   Q.    And when would you usually
20 get off?
21   A.    4:00.
22   Q.    And what would you do during
23 those shifts?
24   A.    I would give the Suboxone

Page 71

1  out.
2    Q.    Any other responsibilities?
3    A.    No.
4    Q.    And would that generally
5  occur in the medical unit or were you
6  going around any housing units?
7    A.    We were going around the
8  housing units.
9    Q.    And who would you typically
10 interact with at RCF during those shifts?
11   A.    There was another Suboxone
12 nurse, so we would talk, and then the
13 correctional officers.
14   Q.    Okay.  So let's go back to
15 the CFCF duration.  Would you conduct
16 rounds as part of your job there?
17   A.    No.
18   Q.    Would you conduct rounds as
19 part of your job at RCF?
20   A.    No.
21   Q.    Do you know what conducting
22 rounds is?
23   A.    Yes.
24   Q.    Can you explain it to me?

Page 72

1    A.    It's when you go around the
2  pod to see the inmates.
3    Q.    And that was never part of
4  your responsibilities in general either
5  at CFCF or RCF.
6    A.    Correct.
7    Q.    Did you or other medical
8  staff ever provide care or medication on
9  the housing units?
10   A.    Yes.
11   Q.    When?
12   A.    When there wasn't enough
13 correctional staff.
14   Q.    So normally would
15 correctional staff be in charge of
16 distributing medication on housing units?
17       ATTORNEY PESTRAK:
18       Objection.
19       THE WITNESS:  They would
20   never distribute the medication.
21   They would just have to be there.
22 BY ATTORNEY HU:
23   Q.    So you said that if there
24 wasn't enough correctional officers,

Page 73

1  that's when medical staff would
2  distribute medication on the housing
3  units.
4    A.    Correct.
5    Q.    So what's the normal
6  practice then?
7    A.    Well, they changed it.  In
8  the beginning the inmates would come to
9  this one specific med room, but there
10 would have to be like two -- there would
11 have to be two to three additional
12 correctional officers there.  They ended
13 up changing it to each pod had a med
14 room.  So we would go there and then the
15 inmates would just have to come to us.
16   Q.    And would that be for all
17 medication?
18   A.    On my shift, yes.
19   Q.    And you said two to three
20 extra COs would be in the room just now,
21 correct?
22   A.    It wasn't a room.  It was
23 like a -- like an area like this, yes.
24   Q.    How many would be there

Page 74

already, since you mentioned those were
additional?

A.   In total probably like four.

Q.   And that would be for one
inmate?

A.   No, they would let them all
out at the same time.

Q.   Understood.  You mentioned
being in charge of med pass while at
CFCF, correct?

A.   I wasn't in charge of it.

ATTORNEY GREGORY:  She --
she --

BY ATTORNEY HU:

Q.   Oh, I'm sorry.  As part of
your responsibilities?

A.   Yes.

Q.   What kinds of medications
would you administer?

A.   Any medications that were
prescribed by the doctor.

Q.   Can you walk me through your
day on November 5th, 2023?

A.   I don't really remember the

Page 75

day.

Q.   Do you recall when you
arrived to work?

A.   When I what?

Q.   When did you arrive to work
on November 5th, 2023?

A.   Like what time?

Q.   Uh-huh.

A.   I'm assuming 7 a.m.

Q.   And what housing unit were
you assigned to that day?

A.   I know it was B Pod.

Q.   Does B Pod 3 sound familiar?

A.   Yes.

Q.   Do you recall other staff
you interacted with that day?

A.   No.

Q.   Do you recall Louis Jung?

A.   Now that this is going on I
remember the situation, yes.

Q.   What do you remember about
the situation?

A.   Do you want me to start it
from the beginning?

Page 76

Q.   Sure.

A.   So I had to give medications
on the pod because there wasn't enough
correctional officers to allow the
inmates to all come to me.  So I poured
the cups per inmate, poured their
medicine in a cup, wrote the -- their
room numbers to go onto the pod.  One of
the correctional officers, she said she
would go there with me.  As I'm
distributing the medications to, I can't
remember how many inmates, there wasn't a
lot, she told me that an inmate wanted to
see me.  So I went to the room and the
patient said -- he said he didn't feel
good.  So I asked him what was wrong.  He
told me -- I can't remember if he said
his legs or his leg hurt.  So I said, Did
you put in a sick call for that?  I can't
remember what he said.  And then he told
me he couldn't walk, but as he was saying
that, he was standing up.  So he told me,
look, I can't walk.  So then he proceeds
to walk to me.  And then I said, Okay.

Page 77

And then he proceeds to -- he's like,
look, I can't walk and then he proceeds
to gently place himself on the floor.
And then he tells me, see, look, I just
fell.  So I told the correctional officer
that if he continued to complain of pain,
she can call the stretcher call because
there was nothing I could do for him at
the time.

Q.   Okay.  I'm going to start
from the beginning and ask some follow-up
questions, if that's all right.

Do you remember the name of
the CO who escorted you that day?

A.   No.

Q.   Does the name Gena Frasier
sound familiar?

A.   No.

Q.   And when you say an inmate
was asking to see you, are you referring
to Louis Jung?

A.   Yes.

Q.   And when you first
approached his cell, you mentioned

Page 78

that -- I'll back up.

When you first approached his cell and saw him, where was he?

A.   He was in the cell.

Q.   Okay.  And where in the cell?  His bed?  The floor?

A.   He was standing up.  I can't exactly remember where he was at.

Q.   You mentioned just now that he tried to walk towards you.  Does that mean he was standing while you were having your initial conversation?

A.   He didn't try to walk.  He actually walked.

Q.   Uh-huh.

A.   He was standing up, yes.

Q.   Okay.  So he was standing when you approached him --

A.   Yes.

Q.   -- initially?

Okay.  How was -- he walked over to you.  How was his walk?

A.   It was an -- it was -- I can't remember.

Page 79

Q.   Did it look out of the ordinary to you?

A.   I can't remember.

Q.   And then you say he placed himself on the ground following.

A.   Correct.

Q.   Okay.  And could you please remind me again what he said about his legs to you?

A.   He told me they hurt.

Q.   Okay. Uh-huh.  And where was he lying down when he placed himself on the floor?

A.   I can't remember.  It was in the room.

Q.   Okay.  Had you encountered Louis Jung prior to this day --

A.   No.

Q.   -- November 5th.

Okay.  Did you know Mr. Jung was diabetic?

A.   No.

Q.   Did you ever check Mr. Jung's chart that day?

Page 80

A.   No.

Q.   Should you have?

A.   No.

Q.   Were you concerned when he said his legs hurt?

A.   No.

Q.   Why not?

A.   That was the only symptom he complained of.  He didn't look -- nothing that -- symptomatically nothing that he was showing or telling me was a concern, which is why I told the correctional officer to call the stretcher call if he continues to complain of pain.

Q.   Did you check Mr. Jung's vitals?

A.   No.  For leg pain, no.

Q.   And why not?

A.   You don't check vitals for leg pain.

Q.   Did you know about Mr. Jung's mental health conditions?

A.   No.

Q.   Did you know Mr. Jung had

Page 81

been in Norristown Hospital?

A.   No.

Q.   Did you make any inquiry into his mental health history that day?

A.   No.

Q.   Could a patient's mental health conditions affect how they interact with people?

A.   Yes.

Q.   Do you think that was perhaps the case here?

A.   No.

Q.   Why not?

A.   Mental health can sometimes make you yell, scream, throw stuff.  That wasn't the case in this situation.

Q.   And you mentioned that you came to his cell because someone told you he was asking for you, correct?

A.   Correct.

Q.   Do you remember who told you that?

A.   It was a correctional officer.

Case 2:24-cv-05618-TJS     Document 100-3     Filed 12/05/25     Page 26 of 60

Deposition of Blair Cabellos, LPN                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 82

Q.   Was it the one who was escorting you that day?

A.   Yes.

Q.   Did you go to his cell specifically because he had asked?

A.   Correct.

Q.   And not because of the medication rounds you were passing out?

A.   He didn't receive medication from me, no.

Q.   Okay.  Did you ever speak to Correctional Officer Gena Frasier about Mr. Jung?

A.   Prior -- prior to that day?

Q.   Yes.

A.   No.

Q.   How about on that day?

ATTORNEY GREGORY:  Other than what she's already said?

ATTORNEY HU:  (Indicating.)

ATTORNEY GREGORY:  Other than what you've already said.

THE WITNESS:  During that time, no.  Like that was the only

Page 83

interaction I had with him and her about -- about him.  She was right there.

BY ATTORNEY HU:

Q.   Okay.  Did you ever speak to her about Mr. Jung anytime after that day?

A.   No.

Q.   Okay.  Did you ever speak to a Lieutenant Wanda Bloodsaw about Mr. Jung?

A.   No.

Q.   Was Mr. Jung showing signs of potential medical distress?

A.   No.

Q.   How could you tell?

A.   He just complained of pain.

Q.   You mentioned that you told Correctional Officer Frasier to make a stretcher call if he continued to complain, correct?

A.   Correct.

Q.   Would that direction have been documented anywhere?

Page 84

A.   No.

Q.   Did you inform a supervisor that you made that request?

A.   No.

ATTORNEY HU:  I am distributing a document to you and other fellow counsel.

So you can mark it as Plaintiffs' Exhibit 1.

ATTORNEY GREGORY:  Has -- has P-1 not been marked previously?  This is the first exhibit in the case?

ATTORNEY RASHATWAR:  They're new numbers for each deposition.

ATTORNEY GREGORY:  I'm sorry?

ATTORNEY RASHATWAR:  They're new numbers for each deposition.

ATTORNEY GREGORY:  So how is P-1 here going to be different from P-1 then?

ATTORNEY GROTE:  It will be associated with the deposition

Page 85

transcript.  Exhibit 1 for the Cabellos deposition.

ATTORNEY GREGORY:  Well, why don't we call this Cabellos-1 then?

ATTORNEY GROTE:  Sure.

ATTORNEY GREGORY:  Because we could wind up -- off the record.

(A discussion off the record occurred.)

(Deposition Exhibit No. Cabellos-1, Philadelphia Department of Prisons Interview Record, Bates stamp Frasier-000026, was marked for identification.)

BY ATTORNEY HU:

Q.   Have you seen this document before?

A.   Yes.

Q.   So here in this interview at the bottom you state that you told someone to call for a stretcher.  Do you

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 86

1  stand by that today?
2      A.   Yes.
3      Q.   Okay.
4          ATTORNEY HU:  So I'm
5  distributing another document
6  marked as Plaintiffs' Exhibit 2 or
7  Cabellos-2.
8          (Deposition Exhibit No.
9  Cabellos-2, Special Investigations
10  Unit Interview Record, Bates stamp
11  Fraiser-000024 and 000025, was
12  marked for identification.)
13  BY ATTORNEY HU:
14      Q.   And I'll give you a few
15  moments to look that over.
16      A.   (Reviewing document.)
17  Oh, that's not mine.
18  (Indicating.)
19          (Reviewing document.)
20      Q.   So at the bottom of this
21  interview of Gena Frasier, who was the
22  correctional officer who escorted you on
23  November 5th, she says that the nurse
24  said that there was no stretcher needed

Page 87

1  and she is the one who makes medical
2  decisions.
3          What is your response to
4  that?
5          ATTORNEY PESTRAK:
6  Objection.
7          THE WITNESS:  I mean that's
8  not what happened.
9  BY ATTORNEY HU:
10      Q.   So do you stand by your
11  testimony that you did call for a
12  stretcher?
13          ATTORNEY PESTRAK:
14  Objection.  That's not her
15  testimony.
16          ATTORNEY GREGORY:  That's
17  not her testimony.
18  BY ATTORNEY HU:
19      Q.   Or excuse me.  Do you -- do
20  you confirm as in per your previous
21  interview that you did call for a
22  stretcher?
23          ATTORNEY PESTRAK:
24  Objection.

Page 88

1          ATTORNEY GREGORY:  No.
2          ATTORNEY PESTRAK:  That's
3  not her testimony.
4          ATTORNEY GREGORY:  That's
5  not her testimony.
6  BY ATTORNEY HU:
7      Q.   Did you call for a stretcher
8  on November 5th?
9      A.   No.
10      Q.   What is the response
11  required by policy if a correctional
12  staff encounters an inmate experiencing
13  potential medical distress?
14      A.   I'm not sure.
15      Q.   Okay.  What, if anything,
16  should you have done differently in
17  regards to Mr. Jung on November 5th,
18  2023?
19          ATTORNEY PESTRAK:
20  Objection.
21          ATTORNEY GREGORY:  You can
22  answer.
23          THE WITNESS:  Nothing.
24  BY ATTORNEY HU:

Page 89

1      Q.   Did you speak to any medical
2  staff about Mr. Jung?
3      A.   No.
4      Q.   Did you speak to any
5  correctional staff about Mr. Jung?
6      A.   No.
7      Q.   Did you interact with
8  Mr. Jung after this November 5th
9  incident?
10      A.   No.
11      Q.   Do you recall being
12  interviewed by PDP staff about this
13  matter?
14      A.   Briefly.  Shortly.
15      Q.   Who did you speak with?
16      A.   I don't remember his name.
17      Q.   What did you tell them?
18      A.   The same thing I just told
19  you.
20      Q.   Do you recall what the
21  findings of that PDP inquiry was?
22          ATTORNEY PESTRAK:
23  Objection.
24          THE WITNESS:  No.

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 28 of 60

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 90

BY ATTORNEY HU:
Q. Were you charged with violating policy?
A. Nobody told me anything. So...
Q. Did YesCare conduct a review of Louis Jung's death?
A. I'm not sure.
ATTORNEY HU: I'm distributing a document marked as Plaintiffs' Exhibit 3.
THE REPORTER: Cabellos Exhibit 3?
ATTORNEY HU: Cabellos-3, yes. Thank you.
(Deposition Exhibit No. Cabellos-3, Corizon Sentinel Event Corrective Action Plan, was marked for identification.)
THE WITNESS: (Reviewing document.)
BY ATTORNEY HU:
Q. Have you seen this document before?

Page 91

A. No.
Q. Have you seen any reports that look like this before?
A. No.
Q. Do you know what a sentinel event is?
A. Yes.
Q. What is it?
A. It's a serious issue or death.
Q. What kinds of serious issues?
A. Any type of serious issue.
Q. Can you think of any examples?
A. Maybe if like an employ was injured, an assault, something along that type of issue.
Q. Are YesCare staff informed of sentinel events?
A. I don't know. I never was informed of anything like prior to this.
Q. What is a nursing encounter tool or NET?

Page 92

A. I don't remember.
Q. Do you know what HCS stands for?
A. No.
Q. How about ECW documentation?
A. Yes.
Q. What is that?
A. It was a software that the staff would use.
Q. For what purposes?
A. To document medications. Well, I would use it for documenting medications.
Q. Do you know what ECW stands for?
A. No.
ATTORNEY GREGORY: Do you want to know? Do you want me to tell you?
ATTORNEY HU: Not right now.
ATTORNEY GREGORY: Okay.
ATTORNEY HU: Perhaps afterwards.
BY ATTORNEY HU:

Page 93

Q. What is YSSO-Documentation?
A. I'm not sure.
Q. What is CRIC stand for?
A. I'm not sure.
Q. Do you know what CRIC is?
A. No.
Q. What did you tell YesCare regarding this sentinel report into Mr. Jung?
A. I never spoke to YesCare about this.
Q. During your time working for YesCare, were there other deaths at PDP?
A. I can't remember.
Q. Did you hear of any reviews for any deaths?
ATTORNEY PESTRAK: Objection.
THE WITNESS: I can't remember.
BY ATTORNEY HU:
Q. Were you informed of any findings or reforms following deaths?
ATTORNEY PESTRAK:

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 29 of 60

Deposition of Blair Cabellos, LPN                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 94

Objection.
    THE WITNESS:  I can't
remember.
BY ATTORNEY HU:
    Q.    Following this incident with
Mr. Jung, did YesCare ever discipline
you?
    A.    No.
    Q.    Did any supervisor discuss
the incident with you?
    A.    No.
    Q.    Do you recall who your
supervisors were at the time?
    A.    Yes.
    Q.    Who?
    A.    Her last name was Smith.
    Q.    Okay.  And what was her
title?
    A.    She was the nurse manager.
    Q.    At CFCF, correct?
    A.    Yes.
    Q.    Was she your only supervisor
during your time at CFCF?
    A.    No.

Page 95

    Q.    Who else?
    A.    Lisa Fauntleroy.
    Q.    And what was her role?
    A.    She was the nurse manager at
RCF.
    Q.    Okay.  So was she your
manager while you were at RCF?
    A.    Yes.
    Q.    Not CFCF?
    A.    Lisa Fauntleroy was the
manager at RCF.
    Q.    Okay.
    A.    Smith was the manager at
CFCF.
    Q.    Any other managers during
your time at CFCF?  Or excuse me,
supervisors.
    A.    There was an assistant.
There was someone above Smith that worked
at CFCF.
    Q.    Do you recall their name?
    A.    No.
    Q.    Okay.  Did PDP do anything
to you in response to this accident with

Page 96

Mr. Jung?
    ATTORNEY PESTRAK:
Objection.
    ATTORNEY GREGORY:  You can
answer.
    THE WITNESS:  They pulled my
clearance.
BY ATTORNEY HU:
    Q.    When did that happen?
    A.    In May.
    Q.    Okay.  May 2024?
    A.    2024.
    Q.    Okay.  Did that effectively
end your employment at PDP?
    A.    Yes.
    Q.    Did you think that was fair?
    ATTORNEY PESTRAK:
Objection.
    ATTORNEY GREGORY:  You can
answer.
    THE WITNESS:  No.
BY ATTORNEY HU:
    Q.    Why not?
    ATTORNEY PESTRAK:  Same

Page 97

objection.
    ATTORNEY GREGORY:  You can
answer.
    THE WITNESS:  It wasn't --
it wasn't my fault.
    ATTORNEY HU:  I'm
distributing the final exhibit
today marked as Cabellos-4.
    (Deposition Exhibit No.
Cabellos-4, Intake forms, Bates
stamp PDP-000000021 through
000000024, was marked for
identification.)
BY ATTORNEY HU:
    Q.    And there are four total
pages, so feel free to take a glance at
them.
    A.    (Reviewing document.)
    ATTORNEY GREGORY:  Five.
Five pages.
    ATTORNEY HU:  True.
Correct.
    ATTORNEY GREGORY:  Yeah.
    ATTORNEY HU:  Uh-huh.  Just

Deposition of Blair Cabellos, LPN                              Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 98

1  a signature on the last page.
2         ATTORNEY GREGORY:  Yeah.
3         ATTORNEY HU:  Uh-huh.
4         THE WITNESS:  (Reviewing
5  document.)
6  BY ATTORNEY HU:
7     Q.    Have you seen these records
8  before?
9     A.    No.
10    Q.    Have you seen records like
11 this before?
12    A.    No.
13    Q.    Have you ever reviewed PDP
14 intake forms?
15    A.    No.
16    Q.    As a nurse, what information
17 in these records would you consider
18 important to medical decision-making?
19    A.    Decision-making as far as
20 what?
21    Q.    Decisions related to medical
22 care.
23         ATTORNEY GREGORY:  Objection
24 to the extent that you're asking

Page 99

1  her if she made medical decisions.
2         ATTORNEY HU:  That's not
3  what I'm asking.
4         ATTORNEY GREGORY:  Well,
5  you're asking what would be
6  important in terms of making
7  medical decisions.  She's not a
8  decisionmaker.  But that's my
9  objection.  It's on the record.
10        You can answer if you know.
11        THE WITNESS:  I don't know.
12 BY ATTORNEY HU:
13    Q.    Based on the information on
14 these records, should Mr. Jung have
15 received emergency care?
16    A.    Emergency care in what way?
17    Q.    Like you described before, a
18 stretcher call, critical care?
19    A.    I don't know how to answer
20 that.
21        ATTORNEY KAMINSKY:  I didn't
22 hear the answer.
23        ATTORNEY GREGORY:  She said
24 "I don't know how to answer that."

Page 100

1         ATTORNEY KAMINSKY:  Okay.
2  BY ATTORNEY HU:
3     Q.    Were you working on
4  November 6th, 2023?
5     A.    I can't remember.  Is that
6  the day that this happened?
7     Q.    That would be the day
8  following the incident we were just
9  discussing.
10    A.    I can't remember.
11    Q.    When did you learn Mr. Jung
12 had died?
13    A.    When -- when the -- the
14 gentleman from the -- in special
15 investigations contacted me.  Probably a
16 week before this meeting.  That's when I
17 learned about it.
18        ATTORNEY PESTRAK:
19 Indicating, for the record, the
20 document.  You're indicating P-1.
21 There's three documents in front
22 of you.  I just want to make
23 sure --
24        THE WITNESS:  Yes, yes.

Page 101

1         ATTORNEY PESTRAK:  Thank
2  you.
3  BY ATTORNEY HU:
4     Q.    So when you say the
5  "meeting," the interview you gave?
6     A.    Correct.
7     Q.    Okay.  So that would have
8  been in 2024, correct?
9     A.    Yes.
10    Q.    Okay.  Knowing what you know
11 now, would you have done anything
12 differently on November 5th, 2023?
13    A.    I don't know how to answer
14 that.
15    Q.    Are you aware of who the
16 other defendants are in this case?
17        ATTORNEY PESTRAK:
18 Objection.
19        THE WITNESS:  No.
20 BY ATTORNEY HU:
21    Q.    What is your relationship
22 with Correctional Officer Frasier?
23    A.    I never had a relationship
24 with her.  I don't -- I don't know her

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 31 of 60

Deposition of Blair Cabellos, LPN                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 102

that well. I don't know her at all.

Q. What is your relationship with Lieutenant Bloodsaw?

A. I don't know who that is.

Q. Did you have any conversations with other medical staff about Mr. Jung's death?

A. No.

Q. Did you ever discuss this incident with any other staff or supervisors?

A. No.

Q. Did you ever discuss this with Lalitha Trivikram?

A. No.

Q. How about a Maureen Gay?

A. No.

Q. How about a Mariesha Apollon?

A. No.

ATTORNEY HU: We're going to take a short break, see if there's any further questions for you and then we'll resume from there.

Page 103

ATTORNEY GREGORY: Okay.

THE VIDEOGRAPHER: Off the record, 12:09 p.m.

(A recess occurred from 12:09 p.m. until 12:31 p.m.)

THE VIDEOGRAPHER: Back on the record at 12:31 p.m.

ATTORNEY HU: Just a few more questions for you, Ms. Cabellos.

BY ATTORNEY HU:

Q. So in your experience at PDP, who has the authority to make stretcher calls?

A. Every -- every staff member.

Q. That includes every correctional staff member?

A. Yes.

Q. And every medical staff member?

A. They never went over how to call a stretcher call for us.

Q. If you wanted to could you -- would you be able to?

Page 104

A. I don't know.

Q. Did other medical staff make any rounds on the housing units?

A. I don't know.

Q. And can we go over the breakdown of medical staff at PDP? So, for instance, you're an LPN, can you go over for me who would be your direct supervisor and who's their supervisor, et cetera?

ATTORNEY GREGORY: You mean names of people or just rank?

ATTORNEY HU: I'm asking about roles.

THE WITNESS: So there's the nurse manager, which was Miss Smith, and then there was someone above her. I don't remember her name.

BY ATTORNEY HU:

Q. Do you know any other hierarchies above that?

A. No.

Q. Were you in charge of

Page 105

anyone?

A. No.

Q. Okay. Were you authorized to look at patient charts?

A. I don't know how to answer that question.

Q. Oh, what's confusing about it?

A. Authorize.

Q. Like could you pull up a patient chart as an LPN?

A. I believe so, yes.

Q. Did you ever?

A. No.

Q. Why not?

A. There was no need to.

Q. What would be a need to?

A. I don't know how to answer that question.

Q. Like when would it be called for, in your opinion?

A. I don't know how to answer the question.

Q. Would you pull up a

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 106

1 patient's chart if they were in medical
2 distress?
3       A.    I wouldn't be able to
4 because there's no computer in the pod.
5       Q.    Would you if you had a
6 computer in front of you during med pass?
7       A.    The location of the computer
8 isn't on a pod, so I wouldn't be able to
9 do that.
10      Q.    When would you have access
11 to the computer?
12      A.    In the other room that's not
13 even on -- located on the pod.
14      Q.    And when would you -- what
15 room was that?
16      A.    That the computer was
17 located in?
18      Q.    Yes.
19      A.    It was in the med room that
20 was like in the hallway outside of the
21 pod.
22      Q.    And when would you use the
23 computer during your daily
24 responsibilities?

Page 107

1       A.    To look at the medications
2 that needed to be given and to sign them
3 off.
4       Q.    Would you use it for
5 anything else?
6       A.    No.
7       Q.    You mentioned before that
8 sometimes there wouldn't be enough COs
9 and medical staff would have to make
10 rounds on the housing unit, correct?
11      A.    So to walk in the pod,
12 there's supposed to be a minimum of two
13 to three officers.
14      Q.    Uh-huh.
15      A.    So that day there was only
16 one officer.
17      Q.    Okay.  Uh-huh.  Did any lack
18 of staffing at PDP affect the treatment
19 you could give to patients?
20      A.    I don't know how to answer
21 that question.
22      Q.    If there was a lack of staff
23 at PDP, would that affect how you could
24 do your job?

Page 108

1       A.    It could.
2       Q.    How so?
3       A.    I don't know how to answer
4 that question.
5       Q.    Would the way you go about
6 giving treatment to patients differ if
7 there weren't enough staff at PDP?
8       A.    Yes.
9       Q.    How would it differ?
10      A.    There needs to be a minimum
11 of two to three COs to go inside a
12 patient's room if they need anything.  So
13 the safety I guess would be -- could be
14 impacted.
15      Q.    If there weren't enough,
16 what would you do?
17      A.    Not go in the room.
18      Q.    I want to bring your
19 attention back to the exhibit marked as
20 Cabellos-2 and that's the Gena Frasier
21 interview.
22            So you mentioned before when
23 I pointed out the part where she said the
24 nurse said no stretcher was needed that

Page 109

1 that was incorrect.
2       A.    Correct.
3       Q.    Is there anything else in
4 this interview that you think is
5 incorrect?
6            ATTORNEY PESTRAK:
7            Objection.
8 BY ATTORNEY HU:
9       Q.    And you can take your time
10 and look over it.
11      A.    (Reviewing document.)
12            On her -- on Gena Frasier's?
13      Q.    Yes.  And in regards to that
14 day on November 5th.
15      A.    (Reviewing document.)
16            So are you asking things
17 that I'm unaware of or things that --
18 what -- what would you like me to point
19 out?
20      Q.    Is there anything else that
21 you disagree with about that day?
22      A.    I mean that's not what
23 happened.
24      Q.    When you say "that's not

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 110

1  what happened," what are you referring
2  to?
3       A.   I do -- she said I do not
4  recall but if I walked away with the
5  nurse, he couldn't have been on the -- I
6  mean it's not -- that's not what I --
7  that's not what happened.  That's not
8  what I just told you.  So...
9       Q.   Specifically in regards to
10 him being on the floor?
11          To clarify, which part of
12 this interview do you think is wrong?
13      A.   When she said "due to a
14 nurse being on the unit," "I am guessing
15 that the nurse said that there was no
16 stretcher needed."
17      Q.   Okay.  Anything else?
18          And there are two pages.  I
19 just wanted to let you know?
20      A.   (Reviewing document.)
21          I don't know who Bloodsaw
22 is.  I don't know who that person is.
23          (Reviewing document.)
24          I'm not sure about the ins

Page 111

1  -- I didn't know this gentleman.  So I
2  don't know that he -- it says insulin.  I
3  don't know how -- refusal.  I don't know
4  anything about that.
5       Q.   So you never witnessed
6  Mr. Jung sign a refusal form?
7       A.   No, I never -- I didn't know
8  this man at all.  That was the only time
9  I interacted with him.
10      Q.   Was that time on
11 November 5th?
12      A.   Yes.
13      Q.   Okay.  You mentioned you
14 didn't talk to any other staff about
15 Mr. Jung.
16      A.   Correct.
17      Q.   Did you talk to any other
18 incarcerated people about Mr. Jung?
19      A.   No.
20      Q.   Did anyone tell you anything
21 about him?
22      A.   No.
23      Q.   Okay.  I'm going to ask some
24 clarifying questions about your

Page 112

1  employment history again, if that's all
2  right.
3          So you mentioned -- can you
4  remind me when you started at Girard
5  College?
6       A.   August 2024.
7       Q.   Okay.  So following your
8  employment at YesCare/PDP?
9       A.   Correct.
10      Q.   Okay.  And are you there
11 full-time?
12      A.   Yes.
13      Q.   Okay.  And then you also
14 mentioned being employed at
15 ChristianaCare.  Just to clarify, is that
16 a hospital?
17      A.   Yes.
18      Q.   Okay.  And were you
19 specifically in their emergency room
20 unit?
21      A.   Yes.
22      Q.   And was that where you
23 always were in terms of that --
24      A.   Yes.

Page 113

1       Q.   -- job?
2          Okay.  And then
3  fast-forwarding a bit.  You were at RCF
4  as a MAT treatment nurse?
5       A.   Yes.
6       Q.   Walk me through how that's
7  different from being a med pass nurse.
8       A.   The only medication I was
9  giving was the Suboxone as -- when I was
10 working at RCF as an MAT team nurse.
11      Q.   Why did you switch to RCF?
12      A.   I just wanted a change.
13      Q.   So it was your decision?
14      A.   Yes.
15      Q.   When did you request to be
16 switched?
17      A.   December 2023.
18      Q.   And did you also ask to
19 switch roles?
20      A.   Well, I saw the opening and
21 I -- I always wanted to work with
22 substance abuse.  So...
23      Q.   How come?
24      A.   It was just -- it was just a

Page 114

specialty I just wanted to get into.
Q.   You mentioned previously
that you wished you had received more
training at PDP.
A.   Yes.
Q.   On what specific topics?
ATTORNEY PESTRAK:
Objection.
THE WITNESS:  I guess all
topics.
BY ATTORNEY HU:
Q.   Can you give examples?
A.   No.
Q.   Related to medical care?
A.   I don't know how to answer
the question.
Q.   Did you wish for more
training related to medical care?
A.   I'm not sure.
Q.   Did the amount of training
you received at PDP affect patient care?
A.   No.
Q.   Why not?
ATTORNEY PESTRAK:

Page 115

Objection.
THE WITNESS:  It didn't
affect it.
BY ATTORNEY HU:
Q.   And did you ever receive any
training from correctional staff?
ATTORNEY PESTRAK:  Training
from correctional staff?  Is that
the question?
ATTORNEY HU:  Yes.  I said
training from correctional staff.
THE WITNESS:  No.
BY ATTORNEY HU:
Q.   So were your trainings and
orientations all by medical staff at PDP?
A.   So the question you just
asked, I don't remember.
Q.   In regards to who gave you
your trainings?
A.   No, to -- I don't remember
if we ever trained with the COs.
Q.   Okay.  Is there anything you
now remember about your testimony that
you didn't remember before?

Page 116

A.   No.
Q.   Have you understood all the
questions I've asked you today?
A.   Yes.
Q.   Is there anything you would
like to add or change about your
testimony today?
A.   No.
ATTORNEY HU:  No further
questions.
ATTORNEY GREGORY:  Counsel?
ATTORNEY PESTRAK:  I have a
couple.
- - -
EXAMINATION
- - -
BY ATTORNEY PESTRAK:
Q.   Good -- I think it's
afternoon.  My name is Mike Pestrak.  I
represent the City and two of the
corrections officers and former
Commissioner Blanche Carney.  I won't be
too long.  I'm just going to try to
clarify a couple of things that I might

Page 117

have missed.
When did you get your LPN
certification?
A.   June -- July of 2023.
Q.   And you've been asked a lot
of questions about insulin.  Are you
aware of how insulin was given at the
facilities, specifically CFCF?
A.   No.
Q.   Okay.  One of the answers
you gave was that critical care couldn't
be given at CFCF.  Was there a facility
on the grounds of Pennsylvania Department
of Prisons that could give critical care?
A.   Well, I don't really know if
it could have been given at CFCF.  I just
know I wasn't involved with it.  But
there was one jail that was -- that would
handle the more critical, unhealthy
patients.
Q.   Are you aware if a patient
needed that care, could they be
transferred to that building or that
area?

Page 118

A.   I assume so.

Q.   And we talked a lot about stretcher calls.  Would a stretcher call involve -- have the capability of giving an IV if needed?

A.   I'm not sure.

Q.   Would a stretcher call have the ability to at least start critical care if needed?

A.   I would assume so.

Q.   You were asked about i-STAT machines or i-STAT devices specifically. Was there a way to check glucose levels at -- during your rounds or interactions with patients?

A.   I'm not sure.

Q.   You talked -- you were shown P, I believe it's 4, which is an intake form.  And I'm just going to go to page 3 of this document.  And there's an underlined section near the top.  It says "Pre-Intake screening."  And one -- well, a little bit further down there's another section where it says "Pre-Intake

Page 119

Screening" and then one, two, three, four -- five lines down it says, "If yes, did you complete an Accu-Chek?"  And the answer is "yes."

Do you know what an Accu-Chek is?

A.   I know what an Accu-Chek is, yes.

Q.   What is an Accu-Chek?

A.   It's when you check their blood sugar.

Q.   You talked about the medical unit, where before the staffing shortages, inmates would come down to get their medication and you said there would be three or four additional officers there.  Was there officers stationed at the med unit on like a permanent basis in addition to those officers?

A.   The officers would only go there when we were -- when the nurses were there to give meds.

Q.   Gotcha.  So the nurses would go there to give meds and then the

Page 120

officers would come down with the inmates?

A.   Yes.

Q.   When that didn't happen and you would go to the unit, was that because there wasn't enough officers to bring the inmates down?

A.   And stay there with them, yes.

Q.   And when you went to the unit on November 5th, Officer Frasier -- or there was an officer there that we know as Officer Frasier when you arrived, correct?

A.   Yes.

Q.   And she escorted you through your rounds?

A.   Yes.

Q.   When you interacted with Mr. Jung and Officer Frasier all together at that time, when you walked away, was there a need for a stretcher call at that moment?

A.   No, not at that moment.

Page 121

ATTORNEY PESTRAK:  Okay.  I have nothing else.

ATTORNEY GREGORY:  John?

ATTORNEY KAMINSKY:  Yes.

- - -

EXAMINATION

- - -

BY ATTORNEY KAMINSKY:

Q.   Good afternoon.  I'm Jonathan Kaminsky and I represent Mariesha Apollon, who's an RN, and I just have a few questions.  And you might have answered some of these, but I just wanted to clarify.

So did you -- do you know Mariesha Apollon?

A.   Yes.

Q.   You do know her?

A.   Uh-huh.

Q.   And how do you know her?

A.   I knew her from the job.

Q.   Okay.  And did you -- so at the time that you were working at CFCF you both worked together?

Page 122

1    A.    She worked there.  I would
2 barely see her sometimes.
3    Q.    Okay.  So at the time that
4 you were at CFCF, did you ever work in
5 intake?
6    A.    No.
7    Q.    Never?
8    A.    Never.
9    Q.    Okay.
10    A.    That's only for RNs.
11    Q.    Okay.  So you're not
12 familiar with what intake looks like?
13    A.    No.
14    Q.    Okay.  So after Mr. Jung
15 had fall -- had -- had -- you said he had
16 placed himself on the floor?
17    A.    Yes.
18    Q.    Okay.  After he had placed
19 him on the floor, did you continue to
20 have conversation with him at that time?
21    A.    Well, he told me, see, look,
22 I'm -- I can't walk.  And I said, You're
23 walking now.  He placed himself on the
24 floor.  And then I said, You didn't fall.

Page 123

1 And then he said, No, I did.  And I --
2 that's when I told the correctional
3 officer to call a stretcher call if he
4 continues to complain of pain.
5    Q.    Okay.  And this incident
6 that you're referring to where -- earlier
7 you had testified that, and correct me if
8 I'm wrong, that he was on the floor still
9 inside of his cell or was he outside of
10 his cell?  Do you remember?
11    A.    When I was there with him?
12    Q.    Yeah.
13    A.    He was in -- inside his
14 cell.
15    Q.    Okay.  Have you watched the
16 surveillance video for this?
17    A.    I think -- they showed me it
18 during the questioning.
19    Q.    Okay.  As far as med pass
20 goes, which you had testified to earlier,
21 what types of med -- and I apologize if
22 you did already explain this, and you can
23 say, but what types of medications were
24 you bringing to the prisoners on

Page 124

1 November 5th, on that date?
2    A.    On that pod -- in that pod?
3    Q.    Yeah.
4    A.    Whatever medications they
5 were prescribed by the doctor.
6    Q.    So would that include
7 insulin?
8    A.    No.
9    Q.    Okay.  Why not?  Do you
10 know?
11    A.    The day shift nurse isn't
12 responsible for the insulin.  The evening
13 shift and the overnight nurse do that.
14    Q.    Okay.  And then would --
15 would nurses, RNs bring the insulin to
16 the pod to the -- to the prisoner or no?
17    A.    For the insulins, the
18 LPNs -- the inmates would have to go to
19 the LPN in the med room to get the
20 insulin.
21    Q.    Okay.  And would that -- how
22 would they know that -- how would the
23 prisoner know that it was time to -- or
24 that they could get insulin?  Sorry for

Page 125

1 that.
2    A.    I don't know because I never
3 did it, but I know that the -- either the
4 COs would let them know.  They would have
5 a -- like a list of like what inmate
6 needed it and they knock on their door
7 and bring them.
8    Q.    Okay.
9    ATTORNEY KAMINSKY:  I don't
10 have anything further.  Thank you.
11    ATTORNEY GREGORY:  Okay.
12 Thank you.
13    THE VIDEOGRAPHER:  Anything
14 else for the record?
15    ATTORNEY GREGORY:  No.
16    THE VIDEOGRAPHER:  This
17 concludes the video deposition of
18 Blair Cabellos.  We're going off
19 the record.  The time is
20 12:51 p.m.
21    (Off video record.)
22    (Witness excused.)
23    THE REPORTER:  Mr. Gregory,
24 would you like a copy?

Page 126

1    ATTORNEY GREGORY:  Ya.
2  Yeah, just mini please,
3  electronic.
4    ATTORNEY PESTRAK:  I'll take
5  a full and a mini electronic.
6    THE REPORTER:  And Mr.
7  Kaminsky?
8    ATTORNEY KAMINSKY:  Just
9  electronic, full and a mini.
10    (Deposition concluded at
11  approximately 12:51 p.m.)

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 38 of 60

Deposition of Blair Cabellos, LPN                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1                      CERTIFICATE

 2


 3

              I HEREBY CERTIFY that the
 4    witness was duly sworn by me and that the
      deposition is a true record of the
 5    testimony given by the witness.

 6            It was not requested before
      completion of the deposition that the
 7    witness, BLAIR CABELLOS, LPN, have the
      opportunity to read and sign the
 8    deposition transcript.

 9


10


11


12


13

              KRISTY L. LIEDTKA, a Court
14            Reporter and Notary Public
              Dated:  September 15, 2025
15


16


17


18            (The foregoing certification

19    of this transcript does not apply to any

20    reproduction of the same by any means,

21    unless under the direct control and/or

22    supervision of the certifying reporter.)

23


24
```

```
 1                         -  -  -

 2                  E R R A T A    S H E E T

 3                         -  -  -

 4

 5      PAGE        LINE       CHANGE

 6      _____     _____    _____

 7      _____     _____    _____

 8      _____     _____    _____

 9      _____     _____    _____

10      _____     _____    _____

11      _____     _____    _____

12      _____     _____    _____

13      _____     _____    _____

14      _____     _____    _____

15      _____     _____    _____

16      _____     _____    _____

17      _____     _____    _____

18      _____     _____    _____

19      _____     _____    _____

20      _____     _____    _____

21      _____     _____    _____

22      _____     _____    _____

23      _____     _____    _____

24      _____     _____    _____
```

1              ACKNOWLEDGMENT OF DEPONENT

2

3        I,                       , do hereby

4  certify that I have read the foregoing pages and

5  that the same is a correct transcription of the

6  answers given by me to the questions therein

7  propounded, except for the corrections or

8  changes in form or substance, if any, noted in

9  the attached Errata Sheet.

10

11

12

13

14

15  _____  _____
      Date             Signature

16

17

18

19

20

21

22

23

24

## WORD INDEX

**< 0 >**
**000000024**  4:*22*
97:*12*
**000025**  4:*18*  86:*11*

**< 1 >**
**1**  38:*6, 8, 9, 17, 19*
84:*9*  85:*1*
**10:13**  1:*21*  6:*4*
**10:46**  44:*21, 23*  46:*22*
**11**  11:*6*
**11:19**  44:*23*  45:*1*
**1100**  3:*4*
**116**  4:*6*
**12**  5:*8*
**12:09**  103:*3, 5*
**12:31**  103:*5, 7*
**12:51**  125:*20*  126:*11*
**121**  4:*7*
**14th**  2:*12*
**15**  127:*14*
**1515**  2:*13*
**15th**  3:*4*
**1801**  2:*20*
**19**  5:*7*
**19102**  2:*13*  3:*5*
**19103**  2:*20*
**19123**  1:*21*  2:*6*

**< 2 >**
**2**  38:*6, 17*  39:*5*  86:*6*
**2:24-cv-05618-TJS**
1:*14*  6:*12*
**200**  34:*4*
**2012**  11:*18*  12:*7*
**2014**  13:*11*
**2022**  11:*18*
**2023**  10:*23*  13:*22*
14:*22*  15:*3, 18*  68:*21*
74:*23*  75:*6*  88:*18*
100:*4*  101:*12*  113:*17*
117:*4*
**2024**  15:*19, 23*  68:*24*
96:*11, 12*  101:*8*
112:*6*
**2025**  1:*17*  6:*3*
127:*14*

**< 3 >**
**215**  2:*14, 21*  3:*5*

**< 3 >**
**3**  69:*7, 12*  75:*13*
90:*11, 13*  118:*19*
**30(c)(2**  47:*15*
**30(d)(3**  48:*11*
**306**  2:*6*  6:*15*
**33**  46:*23*

**< 4 >**
**4**  1:*17*  118:*18*
**4:00**  70:*21*
**412**  2:*7*
**42**  5:*7*
**44**  5:*8*
**4th**  6:*3*

**< 5 >**
**564-0400**  3:*5*
**569-4433**  2:*21*
**5th**  74:*23*  75:*6*
79:*19*  86:*23*  88:*8, 17*
89:*8*  101:*12*  109:*14*
111:*11*  120:*11*  124:*1*

**< 6 >**
**600**  49:*18*
**654-9070**  2:*7*
**683-5417**  2:*14*
**6th**  100:*4*

**< 7 >**
**7**  4:*6*  69:*7, 12*  75:*9*
**770**  2:*19*

**< 8 >**
**8**  70:*18*
**85**  4:*13*
**86**  4:*16*

**< 9 >**
**90**  4:*18*
**97**  4:*20*
**990**  1:*20*  2:*5*  6:*14*

**< A >**
**a.m**  1:*21*  6:*4*  44:*21,
23*  45:*1*  69:*7, 12*

75:*9*
**abilities**  51:*3*
**ability**  118:*8*
**able**  26:*8*  32:*21*
103:*24*  106:*3, 8*
**Abolitionist**  1:*20*  2:*3*
**abuse**  113:*22*
**access**  106:*10*
**accident**  95:*24*
**Accu-Chek**  119:*3, 6,
7, 9*
**accurate**  61:*3*
**ACKNOWLEDGMEN**
**T**  129:*1*
**ACTION**  1:*3*  4:*20*
90:*18*
**acute**  20:*17, 18*
**add**  116:*6*
**addition**  119:*19*
**additional**  36:*21*
73:*11*  74:*2*  119:*16*
**additionally**  9:*22*
**addressed**  21:*20*
22:*5, 8*
**administer**  24:*16*
74:*19*
**administered**  41:*11*
52:*20*  53:*8*
**administration**  53:*1*
**Administrators**  1:*4*
**affect**  50:*5, 13, 15, 18,
22*  51:*2*  81:*7*  107:*18,
23*  114:*21*  115:*3*
**aforementioned**
12:*14*  39:*18*
**afternoon**  116:*19*
121:*9*
**ago**  14:*12*
**ahead**  46:*7*
**al**  6:*9*
**alert**  31:*7*
**allow**  47:*10*  76:*4*
**allowed**  41:*23*
**amount**  114:*20*
**and/or**  127:*21*
**Andrew**  3:*10*  6:*17*
**Answer**  5:*5*  9:*5*
22:*9*  24:*10*  42:*20*
44:*13*  47:*11*  48:*7, 15,
17*  50:*19*  54:*9*  55:*2*

56:*8*  57:*14, 21*  58:*10,
21*  60:*17, 22*  61:*20*
67:*12, 16*  88:*22*  96:*5,
20*  97:*3*  99:*10, 19, 22,
24*  101:*13*  105:*5, 18,
22*  107:*20*  108:*3*
114:*15*  119:*4*
**answered**  121:*13*
**answering**  43:*7*
**answers**  117:*10*
129:*6*
**anxiety**  61:*23*  62:*3, 6*
**anymore**  39:*16*
**anytime**  65:*2, 4*  83:*6*
**APOLLON**  1:*12*
2:*22*  7:*12*  102:*19*
121:*11, 16*
**apologize**  123:*21*
**APPEARANCES**  2:*1*
3:*1*  6:*24*
**apply**  11:*15*  127:*19*
**approach**  65:*15*
**approached**  77:*24*
78:*2, 18*
**appropriate**  21:*15*
42:*16*
**appropriately**  38:*3*
**approximately**  126:*11*
**Arch**  2:*13*
**area**  73:*23*  117:*24*
**arousable**  33:*18*
**arrive**  75:*5*
**arrived**  75:*3*  120:*13*
**arterial**  30:*18*
**asked**  9:*7*  36:*9*  37:*5*
76:*16*  82:*5*  115:*17*
116:*3*  117:*5*  118:*11*
**asking**  8:*12*  10:*11*
42:*8, 11*  43:*11*  44:*2*
67:*19*  72:*10*  81:*19*
98:*24*  99:*3, 5*  104:*13*
109:*16*
**aspect**  47:*22*
**assault**  91:*17*
**assert**  43:*17*
**asserted**  43:*24*
**assess**  33:*4*
**assessment**  16:*4, 5*
**assigned**  69:*19*  75:*11*

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 42 of 60

Deposition of Blair Cabellos, LPN                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

assignment 17:*16*
*69:18*
assistant 16:*5* 42:*18*
*95:18*
associated 84:*24*
assuaged 22:*14*
assume 9:*6* 118:*1, 10*
assuming 75:*9*
attached 129:*9*
attacks 18:*11*
attempts 59:*5*
attend 11:*16, 20* 26:*9*
attention 108:*19*
Attorney 4:*6,* 7 7:*2,
4, 6, 10, 23* 13:*24*
14:*8, 10* 24:*7, 9, 13,
14* 25:*22* 26:*2* 28:*9,
14, 22* 29:*1, 4* 40:*4, 6*
41:*22* 42:*8, 13, 21, 23*
43:*9, 16, 19, 21, 23*
44:*1, 6, 8, 12, 16* 45:*2,
4, 6, 8, 10, 12, 14, 17,
19, 22* 46:*1, 4, 6, 8, 9,
11, 13, 15, 17, 19*
47:*12* 48:*21* 52:*24*
53:*3* 54:*6, 8, 11, 23*
55:*1, 8* 56:*6, 12* 58:*7,
9, 13, 18, 20* 59:*3, 20*
60:*3* 67:*9, 13* 72:*17,
22* 74:*12, 14* 82:*18,
20, 21* 83:*4* 84:*5, 10,
14, 16, 18, 20, 23* 85:*3,
6, 7, 18* 86:*4, 13* 87:*5,
9, 13, 16, 18, 23* 88:*1,
2, 4, 6, 19, 21, 24*
89:*22* 90:*1, 9, 14, 22*
92:*17, 20, 21, 22, 24*
93:*17, 21, 24* 94:*4*
96:*2, 4, 8, 17, 19, 22,
24* 97:*2, 6, 14, 19, 21,
23, 24* 98:*2, 3, 6, 23*
99:*2, 4, 12, 21, 23*
100:*1, 2, 18* 101:*1, 3,
17, 20* 102:*21* 103:*1,
8, 11* 104:*11, 13, 20*
109:*6, 8* 114:*7, 11, 24*
115:*4, 7, 10, 13* 116:*9,
11, 12, 17* 121:*1, 3, 4,
8* 125:*9, 11, 15* 126:*1,*

*4, 8*
attorneys 46:*20*
August 15:*1, 18*
112:*6*
Austen 3:*14*
authority 103:*13*
Authorize 105:*9*
authorized 105:*3*
aware 52:*11* 101:*15*
117:*7, 21*

< B >
back 36:*8* 44:*24*
46:*23* 47:*7* 71:*14*
78:*1* 103:*6* 108:*19*
background 30:*22*
bad 25:*16* 39:*13*
barely 122:*2*
based 24:*3* 41:*15, 19*
69:*18* 99:*13*
basic 8:*17*
basically 34:*12*
basis 119:*18*
Bates 4:*14, 17, 20*
85:*15* 86:*10* 97:*10*
bed 78:*6*
began 16:*16*
beginning 1:*21* 73:*8*
75:*24* 77:*11*
behavior 63:*21*
behavioral 54:*1, 4*
believe 68:*3* 70:*18*
105:*12* 118:*18*
bipolar 62:*10, 16, 19*
bit 68:*4* 113:*3*
118:*23*
BLAIR 1:*13, 19* 3:*7*
4:*5* 6:*6* 7:*17* 8:*8*
125:*18* 127:*7*
B-L-A-I-R 8:*8*
BLANCHE 1:*9* 2:*16*
7:*8* 116:*22*
bleed 30:*19*
blood 27:*10* 40:*22*
64:*24* 119:*11*
BLOODSAW 1:*14*
2:*16* 7:*8* 83:*10*
102:*3* 110:*21*
body 37:*24* 50:*14,*

*16, 18*
bottom 85:*23* 86:*20*
Boulevard 3:*4*
brain 61:*1, 2*
break 9:*9* 44:*18*
48:*24* 102:*22*
breakdown 104:*6*
breathing 31:*5, 7*
BRET 2:*4*
bretgrote@abolitionist
lawcenter.org 2:*8*
brief 19:*8*
briefly 19:*7, 8* 89:*14*
bring 108:*18* 120:*7*
124:*15* 125:*7*
bringing 123:*24*
building 117:*23*
busy 23:*5*

< C >
CABELLOS 1:*13, 19*
3:*7* 4:*5* 6:*6* 7:*17*
8:*8* 10:*13* 42:*10*
43:*5* 44:*10* 48:*22*
53:*23* 60:*19* 85:*2*
90:*12* 103:*10* 125:*18*
127:*7*
C-A-B-E-L-L-O-S 8:*9*
Cabellos-1 4:*13* 85:*4,
13*
Cabellos-2 4:*16* 86:*7,
9* 108:*20*
Cabellos-3 4:*18*
90:*14, 17*
Cabellos-4 4:*20* 97:*8,
10*
call 22:*21* 25:*4, 7, 8,
13* 28:*7* 76:*19* 77:*7*
80:*13* 83:*20* 85:*4, 24*
87:*11, 21* 88:*7* 99:*18*
103:*22* 118:*3, 7*
120:*22* 123:*3*
called 105:*20*
calls 23:*20* 25:*1, 20*
57:*15* 103:*14* 118:*3*
capabilities 29:*12*
capability 118:*4*
care 13:*4, 14, 16*
20:*5, 24* 23:*17* 24:*24*
25:*9, 11* 26:*13* 27:*1,*

*6, 7* 34:*9, 14* 36:*10,
16* 51:*11, 14, 18* 52:*9,
16* 61:*15, 17, 19* 63:*8,
11, 17* 64:*1, 8, 11*
65:*23* 66:*1, 3, 10*
67:*1* 72:*8* 98:*22*
99:*15, 16, 18* 114:*14,
18, 21* 117:*11, 14, 22*
118:*9*
CARNEY 1:*9* 2:*16*
7:*8* 116:*22*
Case 6:*11* 8:*2, 16*
18:*10* 27:*18* 30:*14,
16, 18* 42:*3* 81:*11, 16*
84:*13* 101:*16*
caseloads 67:*14*
cases 27:*21*
causing 33:*1* 56:*16*
cell 77:*24* 78:*3, 4, 6*
81:*18* 82:*4* 123:*9, 10,
14*
Center 1:*20* 2:*3, 19*
3:*4* 11:*6* 39:*22* 40:*5,
12*
certain 67:*4*
CERTIFICATE
127:*1*
certification 11:*10*
117:*3* 127:*18*
certified 48:*18*
certify 48:*16* 127:*1*
129:*4*
certifying 127:*22*
cetera 104:*10*
CFCF 15:*7, 8* 27:*2*
68:*1, 18, 20* 69:*2*
70:*16* 71:*15* 72:*5*
74:*10* 94:*20, 23* 95:*9,
14, 16, 20* 117:*8, 12,
16* 121:*23* 122:*4*
change 113:*12* 116:*6*
128:*5*
changed 73:*7*
changes 61:*12* 62:*8,
21* 129:*8*
changing 73:*13*
charge 18:*13* 67:*24*
68:*10, 11* 72:*15* 74:*9,
11* 104:*24*
charged 90:*2*

**chart** 55:20 56:1, 21
66:18, 22 79:24
105:11 106:1
**charts** 66:15 105:4
**check** 32:12, 14
33:18, 20, 23 41:16
53:17 66:14 79:23
80:15, 19 118:13
119:10
**checked** 55:24 64:24
65:2 66:18
**check-ins** 19:2, 5
**checks** 29:10 53:21
**choices** 38:13 39:15
**ChrisianaCare** 14:19
**Christiana** 14:2, 3
18:19, 20 40:3, 11, 16
64:17
**ChristianaCare** 13:3,
8 14:12 112:15
**CITY** 1:8 2:9, 15
6:8 7:7 8:3 116:20
**CIVIL** 1:3 8:2 45:2
47:14
**clarify** 14:11 28:15
55:21 110:11 112:15
116:24 121:14
**clarifying** 111:24
**clear** 42:10
**clearance** 96:7
**close** 38:22
**CNA** 51:16
**coaster** 62:12
**cognitive** 51:3
**College** 10:15 11:13,
14, 17, 22, 23 12:23
14:6 112:5
**come** 23:24 57:2
63:9 73:8, 15 76:5
113:23 119:14 120:1
**comes** 30:16
**coming** 8:1
**Commissioner** 1:10
2:15 116:22
**commonly** 61:8 62:5,
18
**Commonwealth** 1:23
**Community** 11:21, 23
**compare** 18:17

**complain** 77:6 80:14
83:21 123:4
**complained** 80:9
83:17
**complete** 12:13
35:20, 24 119:3
**completed** 36:3
**completing** 40:11
**completion** 11:11
12:18 127:6
**computer** 19:24
106:4, 6, 7, 11, 16, 23
**concern** 80:11
**concerned** 80:4
**concerning** 34:4
**concerns** 19:18
20:23 21:11, 21 22:7,
12, 14
**concisely** 48:3
**concluded** 126:10
**concludes** 125:17
**condition** 61:24 66:6
**conditions** 80:22
81:7
**conduct** 47:6, 19
71:15, 18 90:6
**conducting** 43:22
44:4 71:21
**confirm** 36:2 87:20
**confusing** 105:7
**consider** 98:17
**consist** 35:8
**consistently** 27:12
**contacted** 100:15
**contemporaneously**
40:8
**continue** 122:19
**Continued** 3:1 77:6
83:20
**continues** 80:14
123:4
**contrast** 28:16
**control** 127:21
**conversation** 78:12
122:20
**conversations** 9:21
102:6
**copy** 125:24
**Corinne** 3:14

**Corizon** 4:18 90:17
**CORP** 1:9 3:7
**correct** 11:1 14:17
16:22 21:17 23:8, 15
24:2 28:18 29:13
31:5 32:3 37:7 44:1
51:22 52:1 55:23
56:2 64:10 66:8, 15
68:5 72:6 73:4, 21
74:10 79:6 81:19, 20
82:6 83:21, 22 94:20
97:22 101:6, 8
107:10 109:2 111:16
112:9 120:14 123:7
129:5
**correctional** 21:4
22:16, 24 23:4, 9, 22
25:6 36:24 37:14
70:7 71:13 72:13, 15,
24 73:12 76:4, 9
77:5 80:12 81:23
82:12 83:19 86:22
88:11 89:5 101:22
103:17 115:6, 8, 11
123:2
**corrections** 116:21
129:7
**Corrective** 4:20
90:18
**COs** 73:20 107:8
108:11 115:21 125:4
**counsel** 6:23 7:3
8:11 47:3 84:7
116:11
**count** 31:19 32:7, 16
**couple** 55:4 116:13,
24
**COURT** 1:1, 22
6:10, 18, 20, 21 7:14
8:21 10:11 42:22
43:2 48:9, 19 127:8
**CPR** 25:14 30:14, 15
**credits** 11:14 12:15
**CRIC** 93:3, 5
**crisis** 58:15
**criteria** 61:6 62:3, 15
**critical** 27:1, 6, 7
99:18 117:11, 14, 19
118:8

**cup** 76:7
**cups** 76:6
**current** 14:15 48:23
**currently** 10:14
12:23

**< D >**
**dad** 39:2
**daily** 106:23
**dash** 29:2
**date** 1:22 6:2 11:4
124:1 129:15
**Dated** 127:14
**dates** 68:23
**day** 17:20 35:18
74:23 75:1, 11, 16
77:14 79:17, 24 81:4
82:2, 14, 17 83:7
100:6, 7 107:15
109:14, 21 124:11
**days** 35:19 69:11, 14
**deal** 60:16
**death** 49:7 90:7
91:10 102:7
**deaths** 93:13, 16, 23
**decedent** 42:3
**December** 68:21
113:17
**decision** 27:24 28:3
113:13
**decisionmaker** 99:8
**decision-making**
98:18, 19
**decisions** 87:2 98:21
99:1, 7
**decompensation** 58:6
**Defendant** 2:22
**Defendants** 1:14
2:15 3:6 101:16
**definition** 27:5 32:21
**degree** 11:8 40:12
**dehydrated** 27:19
**dehydration** 50:11,
17, 21, 22, 24
**Delaware** 11:6, 22, 23
12:15, 16, 17 39:22
40:5, 12
**DEPARTMENT** 2:9
4:13 16:18 85:14

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 44 of 60

Deposition of Blair Cabellos, LPN                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

117:*13*
**depending** 28:*6*
**depends** 26:22 31:*15*, *20, 21* 32:*1, 4, 18, 19, 20* 34:2 38:*5, 10*
**deponent** 48:6 129:*1*
**deposition** 1:*19* 5:2 6:*5, 13* 8:2, *5, 13* 9:*15, 18, 24* 10:8 42:*24* 44:*3* 47:*21, 23* 48:*13, 24* 84:*15, 19, 24* 85:*2, 12* 86:8 90:*16* 97:9 125:*17* 126:*10* 127:*4, 6, 8*
**depression** 60:*20, 23* 61:6, *9, 13*
**Dept** 1:*11*
**describe** 56:*14* 66:4 69:*15*
**described** 70:*16* 99:*17*
**DESCRIPTION** 4:*12*
**desired** 19:*17*
**desiring** 19:22
**detail** 60:22
**devices** 118:*12*
**diabetes** 37:20 38:*4, 11, 18, 23* 39:*9, 12, 19, 24* 40:*15, 19* 51:*12, 21* 52:9
**diabetes-specific** 51:*24* 52:5
**diabetic** 41:8 49:9 52:*12, 16* 53:*12, 16* 79:*21*
**diagnosed** 55:*15*
**diagnostic** 61:6 62:2, *15*
**died** 100:*12*
**differ** 108:6, *9*
**difference** 38:*17*
**different** 19:*3* 20:6 31:*23* 57:*10* 68:5 84:*21* 113:7
**differently** 88:*16* 101:*12*
**direct** 104:8 127:*21*
**Direction** 5:5 83:*23*
**directives** 52:*15*

65:*12*
**disagree** 109:*21*
**discipline** 94:6
**discuss** 94:9 102:9, *13*
**discussing** 100:9
**discussion** 85:*10*
**disorder** 62:*10, 16, 19*
**distress** 31:*3, 12, 19* 32:8, *17* 33:9, *16* 83:*14* 88:*13* 106:2
**distribute** 24:5 72:20 73:2
**distributing** 72:*16* 76:*11* 84:6 86:5 90:*10* 97:7
**DISTRICT** 1:*1, 2* 6:*9, 10*
**DKA** 49:*10, 17, 21* 50:*1, 5, 10, 15, 18* 51:2
**doctor** 28:*1, 8* 36:*17, 19* 38:*10* 42:*18* 50:2 59:2 60:9 74:*21* 124:5
**doctors** 27:*11*
**doctor's** 41:*16*
**document** 9:*3* 37:8 63:*4, 11, 24* 64:*8, 11, 13* 66:24 84:6 85:*19* 86:5, *16, 19* 90:*10, 21, 23* 92:*11* 97:*18* 98:5 100:*20* 109:*11, 15* 110:*20, 23* 118:*20*
**documentation** 63:*1* 64:*4, 21* 65:*6, 13, 16, 21* 66:*11* 67:8, *15* 92:5
**documented** 63:6 67:5 83:*24*
**documenting** 92:*12*
**Documents** 5:*10* 63:*14* 100:*21*
**doing** 23:5 42:7 63:*10* 64:5
**door** 125:6
**dosage** 53:*13*
**due** 110:*13*
**duly** 7:*18* 127:4

**duration** 71:*15*

**< E >**
**earlier** 66:*13* 123:6, *20*
**EASTERN** 1:2 6:*4, 10*
**eats** 39:*13*
**ECW** 92:5, *14*
**education** 11:4 39:*18* 62:24
**effect** 67:8, *15*
**effectively** 96:*13*
**Eight** 69:4
**either** 34:*21* 35:*19* 62:20 72:4 125:*3*
**electronic** 65:9, *10* 126:3, *5, 9*
**emergencies** 20:*12, 14* 29:20, *23* 30:4
**emergency** 13:*3, 14, 15* 20:*16* 25:5 26:*19* 27:4 30:9 41:7 99:*15, 16* 112:*19*
**emotion** 62:*13*
**employ** 91:*16*
**employed** 15:*17* 112:*14*
**employment** 12:*21* 18:*18* 19:*13* 30:4 40:*3* 51:*11* 54:*16* 96:*14* 112:*1, 8*
**encounter** 20:*15* 91:*23*
**encountered** 79:*16*
**encounters** 88:*12*
**ended** 73:*12*
**enforce** 48:8
**engage** 22:*1*
**engaged** 18:*24*
**entail** 25:*4* 51:*15*
**entire** 69:*23*
**ER** 20:*10* 30:*13* 51:*13* 54:*17* 64:*19*
**Errata** 129:9
**escalate** 58:*23* 59:*1* 60:8
**escalated** 26:*14*
**escort** 22:*17*

**escorted** 22:*23* 77:*14* 86:22 120:*16*
**escorting** 82:2
**ESQUIRE** 2:*3, 4, 5, 12, 19* 3:*3*
**Estate** 1:*5* 6:7
**et** 6:8 104:9
**evening** 124:*12*
**Event** 4:*20* 34:*14* 57:*15* 90:*17* 91:6
**events** 91:*20*
**Everest** 6:*18, 21*
**evidence** 47:*18*
**exactly** 55:7 78:8
**EXAMINATION** 7:*21* 47:*18, 24* 116:*15* 121:6
**examined** 7:*19*
**example** 26:*17*
**examples** 91:*15* 114:*12*
**Excessive** 49:22
**excuse** 28:*19* 29:*18* 45:*4, 14* 62:*15* 87:*19* 95:*16*
**excused** 125:22
**Exhibit** 84:9, *13* 85:*1, 12* 86:6, *8* 90:*11, 13, 16* 97:7, *9* 108:*19*
**exhibiting** 60:*5*
**experience** 53:*24* 103:*12*
**experiencing** 88:*12*
**expert** 41:*24* 42:6, *9* 43:*14*
**explain** 30:7 37:22 38:7, *16* 56:*23* 71:*24* 123:22
**expressed** 31:*17*
**expressing** 31:*11* 59:*19*
**extent** 98:*24*
**extra** 73:*20*
**extreme** 31:*18* 50:22
**eyes** 27:*11*

**< F >**
**facilities** 15:*14* 24:*23* 27:*1* 28:*20* 117:8

facility 25:*19* 26:*1, 5, 12* 117:*12*
fact 42:*1* 43:*14*
factor 20:*23*
factors 32:*4*
failing 63:*24*
failure 49:*7* 51:*1*
fair 96:*16*
fall 122:*15, 24*
familiar 37:*19* 49:*8* 75:*13* 77:*17* 122:*12*
far 16:*21* 43:*10* 98:*19* 123:*19*
fast-forwarding 113:*3*
fault 97:*5*
Fauntleroy 95:*2, 10*
Federal 45:*2* 47:*14*
feel 21:*19* 22:*4, 6, 12* 76:*15* 97:*16*
feeling 49:*23*
feels 26:*23* 31:*4*
fell 77:*5*
fellow 84:*7*
felt 21:*3* 26:*13*
fight 25:*16*
final 97:*7*
finally 9:*8*
findings 89:*21* 93:*23*
finish 10:*10* 46:*9, 17*
first 45:*24* 46:*8* 69:*2* 77:*23* 78:*2* 84:*12*
fit 43:*1*
Five 69:*14* 97:*19, 20* 119:*2*
Floor 2:*12* 77:*3* 78:*6* 79:*13* 110:*10* 122:*16, 19, 24* 123:*8*
fluids 27:*14, 22* 50:*3*
following 14:*13* 17:*21* 79:*5* 93:*23* 94:*5* 100:*8* 112:*7*
follows 7:*19*
follow-up 19:*5* 77:*11*
food 38:*12*
foregoing 127:*18* 129:*4*
form 24:*8* 36:*11, 20* 111:*6* 118:*19* 129:*8*

Former 1:*10* 2:*15* 30:*10* 116:*21*
forms 4:*20* 97:*10* 98:*14*
forward 16:*19* 48:*12, 14*
four 17:*3* 46:*16, 20* 74:*3* 97:*15* 119:*2, 16*
Fraiser-000024 4:*18* 86:*11*
FRASIER 1:*13* 2:*16* 7:*9* 77:*16* 82:*12* 83:*19* 86:*21* 101:*22* 108:*20* 120:*11, 13, 20*
Frasier-000026 4:*15* 85:*16*
Frasier's 109:*12*
free 43:*4, 8* 97:*16*
frequent 50:*3*
front 100:*21* 106:*6*
full 8:*7* 126:*5, 9*
full-time 112:*11*
functioning 50:*23*
further 102:*23* 116:*9* 118:*23* 125:*10*

< G >
Garden 1:*21* 2:*5* 6:*14*
GAY 1:*12* 3:*7* 102:*16*
GENA 1:*13* 2:*16* 7:*9* 77:*16* 82:*12* 86:*21* 108:*20* 109:*12*
general 21:*6, 8* 61:*14, 19* 72:*4*
generally 71:*4*
gentleman 100:*14* 111:*1*
gently 77:*3*
Girard 10:*15* 12:*23* 14:*6, 16* 112:*4*
give 9:*15* 23:*24* 32:*13* 41:*18* 57:*9* 65:*19* 69:*21* 70:*24* 76:*2* 86:*14* 107:*19* 114:*12* 117:*14* 119:*22, 24*

given 8:*13* 43:*10* 65:*12* 107:*2* 117:*7, 12, 16* 127:*5* 129:*6*
gives 63:*17*
giving 56:*22* 108:*6* 113:*9* 118:*4*
glance 97:*16*
glucose 41:*21* 44:*11* 49:*4* 53:*17, 21* 118:*13*
go 12:*3* 23:*6* 25:*9* 26:*7, 9, 15, 21* 36:*8, 15* 44:*4* 46:*6* 47:*7* 60:*21* 69:*17, 20* 71:*14* 72:*1* 73:*14* 76:*8, 10* 82:*4* 104:*5, 7* 108:*5, 11, 17* 118:*19* 119:*20, 24* 120:*5* 124:*18*
goes 123:*20*
going 8:*17* 22:*3, 20* 42:*5, 19, 21, 24* 44:*2, 9, 19* 45:*22* 46:*2, 4* 47:*5, 9* 48:*15* 59:*21* 67:*18* 71:*6, 7* 75:*19* 77:*10* 84:*21* 102:*21* 111:*23* 116:*23* 118:*19* 125:*18*
Good 7:*10, 24* 76:*16* 116:*18* 121:*9*
Gotcha 119:*23*
graduate 12:*6*
graduated 14:*20*
Great 9:*14*
GREGORY 3:*3* 7:*4, 5* 13:*24* 24:*9* 25:*22* 28:*9* 40:*4* 41:*22* 42:*13* 43:*9, 19, 23* 44:*6, 12* 45:*4, 8, 12, 17, 22* 46:*4, 8, 11, 15, 19* 47:*14* 52:*24* 54:*8* 55:*1* 56:*6* 58:*9, 20* 74:*12* 82:*18, 21* 84:*10, 16, 20* 85:*3, 7* 87:*16* 88:*1, 4, 21* 92:*17, 21* 96:*4, 19* 97:*2, 19, 23* 98:*2, 23* 99:*4, 23* 103:*1* 104:*11* 116:*11* 121:*3* 125:*11, 15, 23* 126:*1*

GROTE 2:*4* 42:*21* 84:*23* 85:*6*
ground 79:*5*
grounds 117:*13*
guess 25:*7* 50:*9* 62:*1* 108:*13* 114:*9*
guessing 110:*14*
gunshot 30:*17, 24*

< H >
hallway 106:*20*
handbook 34:*20*
handle 34:*7* 117:*19*
hands 65:*2, 4*
hands-on 19:*23*
happen 52:*23* 53:*8, 9, 16* 56:*22* 57:*4* 96:*9* 120:*4*
happened 53:*1* 87:*8* 100:*6* 109:*23* 110:*1, 7*
happens 24:*20* 57:*5*
hard 19:*24*
HCS 92:*2*
head 8:*23*
health 54:*1, 4, 13, 22* 55:*10, 14, 16, 19* 56:*5* 57:*20* 58:*5, 15* 59:*23* 60:*24* 62:*11* 80:*22* 81:*4, 7, 14*
hear 28:*23* 93:*15* 99:*22*
height 46:*24* 47:*1, 2*
held 1:*20* 6:*14* 16:*8, 11* 28:*17*
help 9:*3*
hierarchies 104:*22*
high 11:*13, 24* 12:*3* 40:*22* 49:*13, 14* 51:*8* 67:*14*
Hillsborough 11:*21*
history 12:*21* 81:*4* 112:*1*
hold 12:*8* 15:*20* 45:*7*
HOLSTON 2:*4* 44:*16* 45:*6, 10, 14, 19* 46:*1, 6, 9, 13, 17*
homicidal 59:*1*
honest 38:*20*

hospital  26:5  81:1
  112:16
hours  69:4
housing  23:17  71:6,
  8  72:9, 16  73:2
  75:10  104:3  107:10
HU  2:3  4:6  7:2, 23
  8:11  14:8, 10  24:13,
  14  26:2  28:14  29:1,
  4  40:6  42:8, 23
  43:16, 21  44:1, 8
  45:2  47:12  48:21
  53:3  54:11  55:8
  56:12  58:13  59:3
  60:3  67:13  72:22
  74:14  82:20  83:4
  84:5  85:18  86:4, 13
  87:9, 18  88:6, 24
  90:1, 9, 14, 22  92:20,
  22, 24  93:21  94:4
  96:8, 22  97:6, 14, 21,
  24  98:3, 6  99:2, 12
  100:2  101:3, 20
  102:21  103:8, 11
  104:13, 20  109:8
  114:11  115:4, 10, 13
  116:9
hundred  49:19
hungry  49:23, 24
hurt  31:24  32:1
  59:14  76:18  79:10
  80:5
hypothetical  43:12, 13

< I >
identification  85:17
  86:12  90:19  97:13
identifying  40:22
illness  56:20  60:24
impact  61:18
impacted  108:14
importance  63:10
important  64:7, 9
  98:18  99:6
incarcerated  111:18
incident  89:9  94:5,
  10  100:8  102:10
  123:5
incivility  47:1

include  57:24  124:6
includes  103:16
including  30:4
inconvenience  47:3
incorrect  109:1, 5
INDEX  5:2
Indicating  82:20
  86:18  100:19, 20
inform  84:2
information  63:5, 24
  66:21  67:4  98:16
  99:13
informative  18:21
informed  91:19, 22
  93:22
initial  78:12
initially  78:20
injured  25:17  91:17
inmate  18:10, 12
  25:10  34:13  36:22
  56:16  59:18  74:5
  76:6, 13  77:19  88:12
  125:5
inmates  21:16  22:2
  24:1  25:17  52:12
  57:1  59:13  70:3, 9
  72:2  73:8, 15  76:5,
  12  119:14  120:2, 7
  124:18
inquiry  81:3  89:21
ins  110:24
inside  108:11  123:9,
  13
instance  18:18  21:15
  26:3  104:7
instances  22:22
  23:12  67:1
instruct  48:6
instructed  48:17
instruction  34:17, 20
instructions  52:15
insulin  38:13  39:14,
  16  41:10, 18  52:19
  53:2, 7, 13, 21  111:2
  117:6, 7  124:7, 12, 15,
  20, 24
insulins  41:15  124:17
Intake  4:20  97:10
  98:14  118:18  122:5,
  12

interact  70:2, 6
  71:10  81:8  89:7
interacted  75:16
  111:9  120:19
interaction  42:2  83:1
interactions  118:14
interrupted  46:2
Interview  4:14, 17
  85:14, 22  86:10, 21
  87:21  101:5  108:21
  109:4  110:12
interviewed  89:12
intravenous  27:14
Investigations  4:16
  86:9  100:15
involve  118:4
involved  42:22
  117:17
involvement  43:2
issue  55:19  62:11
  91:9, 13, 18
issues  51:24  54:1, 5,
  13  55:10, 14, 16
  91:12
i-STAT  28:21  29:1,
  5  118:11, 12
IV  27:9, 14, 21  50:3
  118:5
IVs  51:17

< J >
JACOB  1:3
jail  20:6  117:18
JAMES  1:3
January  15:23  68:24
JFK  3:4
jkaminsky@kiernantr
ebach.com  2:21
job  40:23  71:16, 19
  107:24  113:1  121:21
jobs  30:10  41:4
John  121:3
JONATHAN  2:19
  7:11  121:10
JR  1:5
July  117:4
June  117:4
JUNG  1:4, 5  6:7
  8:2  75:18  77:21
  79:17, 20  80:24

82:13  83:6, 11, 13
  88:17  89:2, 5, 8  93:9
  94:6  96:1  99:14
  100:11  111:6, 15, 18
  120:20  122:14
Jung's  79:24  80:15,
  22  90:7  102:7

< K >
KAMINSKY  2:19
  4:7  7:10, 11  99:21
  100:1  121:4, 8, 10
  125:9  126:7, 8
keep  44:2, 4
ketoacidosis  49:9
KIERNAN  2:16
KIMBALL  3:3
kind  19:21  25:11
  38:5  51:14  62:12
kinds  18:8  63:13, 20
  64:23  74:18  91:11
knew  121:21
knock  125:6
know  8:18  9:1, 2
  20:13  22:9  23:5
  29:3, 5  36:18, 19
  37:13, 16  39:3  41:10,
  20  44:10  49:3  50:19
  51:6  52:19, 22  53:7,
  10, 11, 15, 19  55:18,
  22  56:18, 19  57:21
  60:17  61:7, 20  62:4,
  17  66:21  67:11, 16
  71:21  75:12  79:20
  80:21, 24  91:5, 21
  92:2, 14, 18  93:5
  99:10, 11, 19, 24
  101:10, 13, 24  102:1,
  4  104:1, 4, 21  105:5,
  18, 22  107:20  108:3
  110:19, 21, 22  111:1,
  2, 3, 7  114:15  117:15,
  17  119:5, 7  120:13
  121:15, 18, 20  124:10,
  22, 23  125:2, 3, 4
Knowing  101:10
knowledge  43:6
Kristy  1:22  6:20
  127:8

Kyree  3:*12*

**< L >**
lack  107:*17, 22*
LALITHA  1:*11*  3:*7*
  102:*14*
Law  1:*20*  2:*3, 9*
lawyer  9:*21*
lay  27:*11*
lead  50:*24*
learn  34:*23*  40:*15*
  100:*11*
learned  100:*17*
leeway  43:*11*
left  46:*22*
leg  76:*18*  80:*17, 20*
legs  76:*18*  79:*9*  80:*5*
length  69:*23*
level  31:*18*
levels  41:*21*  44:*11*
  49:*4*  61:*2*  118:*13*
license  12:*14*
Licensed  12:*12*  42:*14*
licenses  12:*9, 11*
Liedtka  1:*22*  6:*21*
  127:*8*
lieutenant  23:*23*
  83:*10*  102:*3*
life  39:*15*
lifesaving  26:*11, 16*
  27:*9*
lifestyle  38:*12*  61:*12*
  62:*7, 21*
limitation  48:*9*
Line  5:*6, 11, 16, 21*
  128:*5*
lines  119:*2*
Lisa  95:*2, 10*
list  69:*20*  125:*5*
little  118:*23*
LLP  3:*3*
located  31:*16*  32:*2*
  106:*13, 17*
location  106:*7*
long  10:*16, 21*  15:*16*
  17:*1*  35:*12*  39:*6, 7*
  69:*2*  116:*23*
look  17:*19*  41:*17*
  69:*17*  70:*12*  76:*23*
  77:*2, 4*  79:*1*  80:*9*

86:*15*  91:*3*  105:*4*
  107:*1*  109:*10*  122:*21*
looking  33:*22*
looks  122:*12*
lot  18:*20*  20:*10*
  27:*20, 21*  32:*1*  41:*24*
  43:*11*  62:*1*  76:*13*
  117:*5*  118:*2*
loud  8:*21*
LOUIS  1:*5*  6:*7*
  75:*18*  77:*21*  79:*17*
  90:*7*
LPN  1:*19*  4:*5*  7:*17*
  16:*14*  28:*18*  32:*11*
  33:*12*  42:*12*  57:*23*
  104:*7*  105:*11*  117:*2*
  124:*19*  127:*7*
LPNs  57:*12, 16*
  124:*18*
lying  79:*12*

**< M >**
machine  29:*6*
machines  28:*21*
  118:*12*
main  16:*1*
making  31:*8*  99:*6*
man  111:*8*
manager  19:*8, 9*
  56:*17*  94:*19*  95:*4, 7,
  11, 13*  104:*16*
managers  18:*23*
  95:*15*
manner  47:*21*  48:*5*
MARGARET  2:*3*
  7:*2*  8:*10*
margo@alcenter.org
  2:*7*
MARIESHA  1:*12*
  2:*22*  7:*12*  102:*18*
  121:*11, 16*
mark  84:*8*
Marked  5:*20*  84:*11*
  85:*16*  86:*6, 12*  90:*10,
  18*  97:*8, 12*  108:*19*
Market  2:*20*
MAT  15:*24*  16:*2, 15*
  113:*4, 10*
match  16:*3*

materials  18:*2*
matter  6:*7*  89:*13*
matters  48:*23*
MAUREEN  1:*12*
  3:*7*  102:*16*
mean  20:*20*  21:*6*
  25:*24*  26:*18*  27:*20*
  28:*10*  35:*23*  37:*4*
  55:*12*  56:*10, 11*  62:*1*
  70:*14*  78:*11*  87:*7*
  104:*11*  109:*22*  110:*6*
means  8:*22*  127:*20*
meant  14:*1*
measures  26:*11, 17*
  27:*9*
med  16:*13*  56:*15, 18,
  24*  57:*1, 6, 8, 13, 17*
  65:*17*  66:*9*  67:*23*
  68:*1*  69:*20*  73:*9, 13*
  74:*9*  106:*6, 19*  113:*7*
  119:*18*  123:*19, 21*
  124:*19*
medical  20:*5*  23:*16*
  24:*5, 16*  29:*23*  30:*3,
  8*  31:*3, 12, 19*  32:*7,
  17*  33:*9, 16*  34:*8, 14*
  36:*10, 16*  53:*9*  58:*16*
  61:*14, 17, 19*  62:*24*
  63:*17, 24*  64:*4, 8, 21*
  65:*5*  66:*11*  67:*4*
  71:*5*  72:*7*  73:*1*
  83:*14*  87:*1*  88:*13*
  89:*1*  98:*18, 21*  99:*1,
  7*  102:*6*  103:*19*
  104:*2, 6*  106:*1*  107:*9*
  114:*14, 18*  115:*15*
  119:*12*
Medication  16:*4*
  24:*6*  57:*3*  60:*13*
  62:*21*  65:*18*  72:*8, 16,
  20*  73:*2, 17*  82:*8, 9*
  113:*8*  119:*15*
medications  24:*16*
  61:*10*  62:*7*  69:*21*
  74:*18, 20*  76:*2, 11*
  92:*11, 13*  107:*1*
  123:*23*  124:*4*
medicine  76:*7*
medicines  24:*1*

meds  56:*22*  57:*9*
  119:*22, 24*
meeting  100:*16*
  101:*5*
member  103:*15, 17,
  20*
mental  53:*24*  54:*4,
  13, 22*  55:*10, 14, 16,
  19*  56:*5, 20*  57:*20*
  58:*5, 15*  59:*23*  60:*24*
  62:*11*  80:*22*  81:*4, 6,
  14*
mentioned  12:*22*
  21:*13*  22:*11*  35:*1*
  36:*11*  66:*13*  68:*4*
  74:*1, 8*  77:*24*  78:*9*
  81:*17*  83:*18*  107:*7*
  108:*22*  111:*13*  112:*3,
  14*  114:*2*
MICHAEL  2:*12*  7:*6*
michael.pestrak@phila
.gov  2:*14*
Mike  116:*19*
mind  51:*9*
mine  86:*17*
mini  126:*2, 5, 9*
minimum  107:*12*
  108:*10*
minutes  46:*23*
missed  53:*13, 16, 20*
  117:*1*
mm-hmms  8:*24*
mobility  50:*6*
modules  18:*6*
moment  23:*7*  120:*23,
  24*
moments  86:*15*
monitor  38:*14*
monitoring  50:*4*
months  11:*7*
morning  7:*11, 24*
  67:*23*
motion  48:*10*
move  32:*16, 22*  33:*2*
moving  16:*19*  32:*15,
  22, 23*  48:*12, 13*
multiple  17:*8*

**< N >**

name 6:17 8:7, 10
77:13, 16 89:16
94:16 95:21 104:19
116:19
names 104:12
Narcan 25:15 32:13
navigate 20:1
near 19:13 118:21
necessary 48:7
need 8:24 9:9 25:14
26:4, 11 39:15 70:8,
9 105:16, 17 108:12
120:22
needed 26:14 86:24
107:2 108:24 110:16
117:22 118:5, 9
125:6
needs 30:15 108:10
NET 91:24
never 20:12 21:3, 4
22:3 37:12 47:4
51:17 58:3 60:16
72:3, 20 91:21 93:10
101:23 103:21 111:5,
7 122:7, 8 125:2
new 84:15, 19
NIA 2:4
nia@alcenter.org 2:8
nine-and-a-half 13:4,
8 14:12
nods 8:23
nonargumentative
48:4
nonresponsive 32:7
nonsuggestive 48:5
normal 24:4, 15 73:5
normally 26:7 33:20
34:3 50:2 57:13, 14
72:14
Norristown 81:1
Notary 1:22 127:14
note 10:9 59:20
65:24
noted 47:23 63:14,
21 129:8
notice 1:20 8:4
November 74:23
75:6 79:19 86:23
88:8, 17 89:8 100:4

101:12 109:14
111:11 120:11 124:1
NP 28:1, 2
Number 6:11 25:7
numbers 33:24 76:8
84:15, 19
numerous 25:17
nurse 10:20, 22
12:12 15:24 16:1, 3,
6, 13, 15, 24 17:5, 14
18:23 28:6, 10, 11, 13,
16 42:14, 17 52:2
63:16 68:8 70:11
71:12 86:23 94:19
95:4 98:16 104:16
108:24 110:5, 14, 15
113:4, 7, 10 124:11,
13
nurses 17:8 22:23
24:22 25:8 56:3, 10
70:5 119:21, 23
124:15
nursing 22:17 23:10
27:3, 10 62:23 91:23

< O >
object 43:4 47:9
Objection 24:7
41:23 47:17 48:2, 3
54:7, 24 56:7 58:8,
19 59:22 67:10
72:18 87:6, 14, 24
88:20 89:23 93:18
94:1 96:3, 18 97:1
98:23 99:9 101:18
109:7 114:8 115:1
objections 47:16
occur 71:5
occurred 44:22
85:11 103:4
occurring 25:6
o'clock 70:18
O'CONNOR 3:3
odor 66:3
officer 23:4 25:6
36:24 77:5 80:13
81:24 82:12 83:19
86:22 101:22 107:16
120:11, 12, 13, 20
123:3

officers 21:5 22:17,
24 23:9, 23 37:14
70:7 71:13 72:24
73:12 76:4, 9 107:13
116:21 119:16, 17, 19,
20 120:1, 6
officer's 47:20
offices 1:20
Oh 14:8 68:13
74:15 86:17 105:7
Okay 7:24 8:10, 16
10:5, 9, 21, 24 11:8,
12, 16 12:19, 20 13:7,
18, 23 14:8, 18, 21, 24
15:5, 8, 11, 14, 20
16:7, 10, 16 17:1, 4, 7,
13, 18 18:1, 14, 16
19:16, 21 20:22
21:10, 23 22:19 23:2,
16, 19, 21 24:19, 23
25:3, 11 27:13, 17
28:19 29:8, 11, 14, 17
30:6 32:19 34:16
35:7, 16 36:8, 14
37:1, 8, 13 39:1, 11,
21 40:14, 18 41:3, 6
47:12 51:10 52:4
53:23 55:24 56:3, 23
64:16, 20, 23 65:11
67:3, 18, 24 68:9, 16,
22 69:5 71:14 76:24
77:10 78:5, 17, 21
79:7, 11, 16, 20 82:11
83:5, 9 86:3 88:15
92:21 94:17 95:6, 12,
23 96:11, 13 100:1
101:7, 10 103:1
105:3 107:17 110:17
111:13, 23 112:7, 10,
13, 18 113:2 115:22
117:10 121:1, 22
122:3, 9, 11, 14, 18
123:5, 15, 19 124:9,
14, 21 125:8, 11
online 18:5
opened 56:20
opening 55:20
113:20
opinion 42:9 105:21

opinions 42:6
opportunity 127:7
order 41:16
ordered 48:9
orders 38:10 50:3
57:2
ordinary 79:2
Organ 49:7 51:1
orientation 16:21
18:3 34:24 35:3, 4, 9,
12 55:6 59:9
orientations 115:15
oriented 31:8
outside 26:5 106:20
123:9
overnight 124:13
oversee 17:10

< P >
p.m 69:7, 12 103:3,
5, 7 125:20 126:11
P-1 84:11, 21, 22
100:20
PAGE 4:12 5:6, 11,
16, 21 98:1 118:19
128:5
pages 97:16, 20
110:18 129:4
pain 31:11, 16, 18, 22,
23 32:2, 23, 24 50:9
77:6 80:14, 17, 20
83:17 123:4
pancreas 38:2
paper 17:16 36:23
Paralegal 3:14
Parkway 2:12
part 39:17 40:2
71:16, 19 72:3 74:15
108:23 110:11
partner 10:4
party's 47:19
pass 16:13 56:15, 19,
24 57:1, 8, 13, 17
65:18 66:9 67:23
68:1 74:9 106:6
113:7 123:19
passing 82:8
patient 25:10 30:15,
16 31:4 41:8 53:12,
16 60:8 63:18, 20

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 49 of 60

Deposition of Blair Cabellos, LPN                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

65:3  76:15  105:4, 11
114:21  117:21
**patients**  21:16  26:24
27:13  38:14  51:12,
20  52:9, 12, 17  54:12,
20  55:10, 13  107:19
108:6  117:20  118:15
**patient's**  28:7  57:20
61:14  63:6  66:14, 18,
22  81:6  106:1
108:12
**PDP**  16:19  20:15, 24
22:16  23:17  24:23
26:6  27:1, 15  28:17,
19, 20  29:12  52:4, 8,
20, 23  53:8  54:18, 22
55:11  56:3  58:14
65:11, 16  66:11, 19,
22  67:1, 15, 20  89:12,
21  93:13  95:23
96:14  98:13  103:13
104:6  107:18, 23
108:7  114:4, 21
115:15
**PDP/YesCare**  29:20,
24  30:23
**PDP-000000021**  4:22
97:11
**Penn**  2:19  3:4
**PENNSYLVANIA**
1:2, 21, 23  2:6, 13, 20
3:5  6:11, 16  117:13
**people**  33:19  38:11,
13  81:8  104:12
111:18
**people's**  31:22
**performed**  66:2
**period**  17:22  18:3
19:13  34:24  68:17,
18
**permanent**  119:18
**person**  35:14  37:5
48:5  110:22
**personal**  21:7, 8
**person's**  50:5  51:2
**PESTRAK**  2:12  4:6
7:6, 7  24:7  28:22
54:6, 23  58:7, 18
59:20  67:9  72:17
87:5, 13, 23  88:2, 19

89:22  93:17, 24  96:2,
17, 24  100:18  101:1,
17  109:6  114:7, 24
115:7  116:12, 17, 19
121:1  126:4
**PHILADELPHIA**
1:8, 10, 21  2:6, 9, 13,
15, 20  3:5  4:13  6:8,
15  8:3  16:18  85:13
**physician**  42:15  57:2
**physician's**  42:17
**pivot**  67:18
**place**  77:3
**placed**  15:6  79:4, 12
122:16, 18, 23
**Plaintiffs**  1:6  2:9
7:3  8:11  46:21  84:9
86:6  90:11
**Plan**  4:20  90:18
**Plaza**  3:4
**please**  6:23  7:14
8:6  10:9  12:22
37:22  68:17  79:7
126:2
**pocket**  60:14
**pod**  22:21  24:6
53:9  69:19  72:2
73:13  75:12, 13  76:3,
8  106:4, 8, 13, 21
107:11  124:2, 16
**pods**  24:17
**point**  9:9  26:4
109:18
**pointed**  108:23
**policy**  88:11  90:3
**position**  14:16  28:17
34:6
**positions**  21:11
**Possibly**  34:21
**potential**  83:14  88:13
**poured**  76:5, 6
**PowerPoints**  35:21,
24  36:1  55:5  59:10
**practical**  12:12  42:14
**practice**  73:6
**practices**  65:13  67:8,
15
**practitioner**  42:17
63:17

**PREA**  18:13
**Pre-Intake**  118:22, 24
**prepare**  9:18
**prepared**  9:14
**prescribed**  74:21
124:5
**PRESENT**  3:12
48:10
**preserve**  48:8
**pressure**  65:1
**pretty**  30:13
**previous**  18:18  20:7
54:16  87:20
**previously**  84:12
114:2
**print**  69:19
**prior**  21:11  51:10
79:17  82:14  91:22
**prisoner**  124:16, 23
**prisoners**  123:24
**Prisons**  1:11  4:14
16:18  85:14  117:14
**privilege**  43:18, 20,
24  48:8
**probably**  74:3
100:15
**procedure**  24:5  45:3
47:14
**proceed**  48:20
**proceeds**  48:1  76:23
77:1, 2
**Production**  5:10
**Professional**  1:22
27:3
**propounded**  129:7
**protocol**  8:18  36:14,
21  53:12
**provide**  23:17  25:9
52:5, 8  72:8
**provided**  20:24
25:12  34:7, 16  35:16
67:1
**provider**  26:23
**providers**  58:1
**providing**  20:5
**psych**  54:20
**psychiatric**  58:1
**psychiatrist**  61:11
**psychologist**  61:12

**Public**  1:23  127:14
**pull**  105:10, 24
**pulled**  57:17  96:6
**pulse**  32:12  33:18
**purposes**  92:10
**pursuant**  1:19
**pursue**  18:11
**pus**  66:5
**put**  28:7  45:23  46:3,
5  51:7  76:19
**putting**  45:20


**< Q >**
**qualifications**  47:20
**quality**  26:13
**quarterly**  19:2
**Question**  5:20  9:5, 6
10:10  24:12  25:24
33:13  36:9  42:16, 20
44:10, 14  47:10
50:20  53:5  60:2
64:6  105:6, 19, 23
107:21  108:4  114:16
115:9, 16
**questioning**  49:2
123:18
**questions**  8:12, 19, 23
41:24  43:1, 7, 12, 13
44:3  48:19  59:24
67:19  77:12  102:23
103:9  111:24  116:3,
10  117:6  121:12
129:6


**< R >**
**raise**  19:16
**range**  34:3  49:15, 16
**rank**  104:12
**RASHATWAR**  2:5
84:14, 18
**RCF**  15:13, 23  16:8,
15  68:4, 10, 19, 22
70:11  71:10, 19  72:5
95:5, 7, 11  113:3, 10,
11
**Read**  36:1  127:7
129:4
**really**  38:20  49:23
51:18  59:15  74:24
117:15

**recall**  75:2, *15*, *18*
*89*:*11*, *20*  94:*12*
95:*21*  110:*4*
**receive**  11:9  12:*14*
16:*20*  17:22  18:*1*, *5*
26:*24*  27:*14*, *21*
52:*14*  54:22  57:*3*
82:9  115:*5*
**received**  11:*10*  18:*17*
21:*14*  22:8, *13*  30:2
39:*23*  99:*15*  114:*3*,
*21*
**recess**  44:22  103:*4*
**recognize**  29:*23*  41:7
58:*5*  59:*5*, *12*
**recollection**  9:*4*
**Record**  4:*14*, *17*  6:2
7:*1*  8:7  44:20  45:*1*,
*20*, *23*  46:*3*, *5*, *12*
47:7, *13*, *24*  48:*16*
59:*21*  63:7  85:9, *10*,
*15*  86:*10*  99:9
100:*19*  103:*3*, 7
125:*14*, *19*, *21*  127:*4*
**recorded**  6:*5*
**records**  9:*23*  98:*7*,
*10*, *17*  99:*14*
**refer**  16:*19*
**referrals**  58:*1*
**referring**  77:*20*
110:*1*  123:6
**reflect**  46:*12*
**reforms**  93:*23*
**refresh**  9:*4*
**refusal**  35:22  36:*11*,
*20*  37:9  111:*3*, 6
**refuse**  34:*14*
**refused**  36:*10*
**refuses**  36:22
**refusing**  34:8  36:*16*
37:*5*
**regarding**  54:*4*, *22*
93:8
**regards**  88:*17*
109:*13*  110:9  115:*18*
**registered**  28:*11*, *12*,
*15*
**regular**  16:*13*

**related**  48:*23*  56:*4*
57:*19*  98:*21*  114:*14*,
*18*
**relationship**  18:*12*
101:*21*, *23*  102:2
**relationships**  21:*15*
22:2
**relatively**  38:*1*
**relevant**  30:22  61:*14*,
*16*
**rely**  33:*3*
**remember**  9:2  18:*4*,
*15*  19:*11*  30:*1*, *20*
34:*18*  35:*11*, *13*  36:7
40:*17*  41:*1*, *3*, 9  52:7
55:7  58:*12*  59:*15*
65:*14*  67:6  74:24
75:*20*, *21*  76:*12*, *17*,
*20*  77:*13*  78:8, *24*
79:*3*, *14*  81:*21*  89:*16*
92:*1*  93:*14*, *20*  94:*3*
100:*5*, *10*  104:*18*
115:*17*, *20*, *23*, *24*
123:*10*
**Remind**  67:*20*  68:*17*
79:8  112:*4*
**repeat**  13:*12*  16:*10*
24:*11*  33:*13*  44:9
60:*1*  64:6
**report**  93:8
**Reporter**  1:22  6:*20*
7:*14*  8:22  10:*12*
90:*12*  125:*23*  126:6
127:*14*, 22
**Reporting**  6:*18*, 22
**reports**  91:2
**represent**  7:*5*, *12*
116:*20*  121:*10*
**Representing**  2:9, *15*,
22  3:6  7:7  46:*21*
**reproduction**  127:*20*
**Request**  5:*10*  84:*3*
113:*15*
**requested**  127:6
**required**  88:*11*
**requires**  26:*10*, *19*
27:8
**respond**  8:*24*  29:*18*
30:*3*, 8  32:*10*  33:*11*,

*16*  43:8  58:*17*  59:*18*
60:*5*
**responding**  8:*23*
10:*12*  29:*20*
**response**  8:*4*  33:*4*
59:*18*  87:*3*  88:*10*
95:*24*
**responsibilities**  56:*4*
57:*24*  71:2  72:*4*
74:*16*  106:*24*
**responsibility**  53:*20*
57:*19*  58:*16*
**Responsible**  68:*13*
124:*12*
**result**  50:*10*
**resume**  49:2  102:*24*
**review**  36:*3*  90:6
**reviewed**  9:*23*  98:*13*
**Reviewing**  86:*16*, *19*
90:*20*  97:*18*  98:*4*
109:*11*, *15*  110:*20*, *23*
**reviews**  93:*15*
**Right**  14:9  34:*13*
44:7  51:8  77:*12*
83:2  92:*20*  112:2
**risks**  41:*20*  44:*11*, *15*
49:*3*, 6  63:*23*
**RN**  57:*11*, *16*  121:*11*
**RNs**  26:7  56:*11*, *14*
57:*12*, *13*, *19*  122:*10*
124:*15*
**role**  10:*19*  13:*12*
15:*21*  16:8  57:7
64:*17*, *21*  65:*17*  68:*4*
95:*3*
**roles**  16:*11*  54:*15*
67:*21*  104:*14*  113:*19*
**roller**  62:*12*
**room**  10:2  20:*16*
26:*19*  37:*4*  46:22
57:6  73:9, *14*, *20*, *22*
76:8, *14*  79:*15*
106:*12*, *15*, *19*  108:*12*,
*17*  112:*19*  124:*19*
**rooms**  27:*5*
**rounds**  71:*16*, *18*, 22
82:8  104:*3*  107:*10*
118:*14*  120:*17*
**rudeness**  47:2

**Rule**  48:*10*
**running**  59:22
**RUPALEE**  2:*5*
**rupalee@alcenter.org**
2:*9*

**< S >**
**sad**  61:*1*, *4*
**safe**  38:*1*  58:*23*
60:8, *11*
**safety**  20:22  21:7, 9,
*14*, *20*  22:7, *11*  24:*21*
108:*13*
**sake**  8:*21*  10:*11*
**sanctions**  47:6
**saw**  55:*14*  78:*3*
113:*20*
**saying**  43:*10*  76:*21*
**says**  47:*16*  86:*23*
111:2  118:*21*, *24*
119:2
**scale**  41:*18*, *19*
**scene**  56:*17*
**school**  11:*5*, *13*  12:*1*,
*4*
**scientific**  51:6
**scream**  81:*15*
**screening**  118:22
119:*1*
**section**  118:*21*, *24*
**security**  20:*23*  21:*21*
22:7, *12*
**see**  29:*14*  37:*17*
43:*1*  72:2  76:*14*
77:*4*, *20*  102:22
122:2, *21*
**seen**  47:*4*  85:*19*
90:*23*  91:2  98:*7*, *10*
**seizure**  25:*15*  31:*10*
**sense**  31:8
**Sentinel**  4:*18*  90:*17*
91:*5*, *20*  93:8
**September**  1:*17*  6:*3*
10:*23*  13:22  15:*3*
68:*21*  127:*14*
**serious**  20:*21*  91:9,
*11*, *13*
**serve**  67:*21*
**services**  24:*24*  25:*18*

setting  20:6
seven  49:19
Severe  50:24
shadow  17:4, 7, 14
shadowing  16:23
  17:22  19:12  35:2, 5
sharp  60:15
sheet  17:16, 17
  69:18  129:9
shift  69:9, 13, 16, 23
  73:18  124:11, 13
shifts  69:1, 3  70:12,
  23  71:10
short  102:22
shortages  119:14
Shortly  89:14
short-staffed  23:3
short-staffing  23:14
showed  59:13  123:17
showing  80:11  83:13
shown  118:17
sick  76:19
sign  31:12  33:9, 16
  36:5, 20, 23  37:6, 9
  65:18  107:2  111:6
  127:7
signature  34:15  98:1
  129:15
signed  36:12
significance  64:5
signs  31:2  40:22
  41:7  49:20  58:5
  59:12  60:5  65:1
  83:13
similar  19:5  20:11,
  15  21:10  70:15
Sir  42:23  43:16
situation  26:22  34:8
  75:20, 22  81:16
Six  49:18
Skills  11:6, 22  12:16,
  17  39:22  40:5, 12
slash  16:17
slides  55:4
sliding  41:17, 19
Smith  94:16  95:13,
  19  104:17
software  92:8
somebody  27:4
someone's  50:22

sorry  25:23  28:23
  68:13  74:15  84:17
  124:24
sort  26:16  34:19
sound  75:13  77:17
sounds  20:3
speak  8:20  10:5
  33:15  82:11  83:5, 9
  89:1, 4, 15
Special  4:16  86:9
  100:14
specialist  6:19
specialty  114:1
specific  12:8  73:9
  114:6
specifically  17:11
  60:17  82:5  110:9
  112:19  117:8  118:12
spell  8:7
spoke  19:7, 9  93:10
Spring  1:20  2:5
  6:14
stabbed  26:21
stabbing  30:17
staff  22:17  23:10, 16
  24:5, 16  27:11  58:16
  70:4  72:8, 13, 15
  73:1  75:15  88:12
  89:2, 5, 12  91:19
  92:9  102:6, 10
  103:15, 17, 19  104:2,
  6  107:9, 22  108:7
  111:14  115:6, 8, 11,
  15
staffing  107:18
  119:13
stake  64:14
stamp  4:14, 17, 22
  85:15  86:10  97:11
stand  86:1  87:10
  93:3
standard  24:4
standing  76:22  78:7,
  11, 16, 17
stands  92:2, 14
start  8:17  12:20
  13:10, 21  19:13
  56:13  70:17  75:23
  77:10  118:8

started  15:2  34:5
  47:15  55:5  112:4
S-T-A-T  29:2
state  6:24  8:6  85:23
stated  48:3
STATES  1:1  6:9
stationed  119:17
stay  120:8
Stipulations  5:15
stop  14:18
Street  1:21  2:5, 13,
  20  3:4  6:14
stretcher  22:21
  23:20  25:1, 4, 8, 12,
  20  57:15  77:7  80:13
  83:20  85:24  86:24
  87:12, 22  88:7  99:18
  103:14, 22  108:24
  110:16  118:3, 7
  120:22  123:3
stuff  81:15
subject  48:2
subjective  33:4
Suboxone  68:8
  70:11, 24  71:11
  113:9
substance  113:22
  129:8
sugar  32:14  33:21,
  23  38:1  40:22  41:17
  49:12, 13  51:7  65:2
  119:11
sugars  29:10
suicidal  58:24
suicidality  59:6, 19
  60:6
suicide  59:5, 23  60:6
Suite  2:6, 19  3:4
  6:15
supervision  127:22
supervisor  84:2  94:9,
  22  104:9
supervisors  52:16
  94:13  95:17  102:11
SUPPORT  5:2  10:3
supposed  107:12
Sure  24:13  30:11
  36:4  38:20  44:7
  55:17  58:22  60:7, 10
  64:2, 15  76:1  85:6

88:14  90:8  93:2, 4
  100:23  110:24
  114:19  118:6, 16
surveillance  123:16
swear  7:14
switch  113:11, 19
switched  113:16
sworn  7:18  127:4
symptom  80:8
symptomatically
  80:10
symptoms  28:7  31:3
system  19:24  65:8

< T >
take  9:8  44:17
  48:18  97:16  102:22
  109:9  126:4
taken  1:19  6:6  26:4
  48:1
takes  60:13
talk  33:20  48:22
  69:1  71:12  111:14,
  17
talked  118:2, 17
  119:12
talking  45:11, 15
  61:11
Tampa  12:5
taught  39:18  62:24
  63:3  64:3
team  113:10
Tech  11:23  12:5, 15
  13:4, 14, 16  51:13
  64:19
technical  20:2
TECHNICIAN  3:10
tell  17:13  42:19
  56:14, 17  83:16
  89:17  92:19  93:7
  111:20
telling  9:20  22:1
  44:13  80:11
tells  77:4
Ten  2:19
terms  21:7  99:6
  112:23
testified  7:19  123:7,
  20

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 52 of 60

Deposition of Blair Cabellos, LPN                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**Testimony** 4:*5* 48:*1*
87:*11, 15, 17* 88:*3, 5*
115:*23* 116:7 127:*5*

**tgregory@okllp.com**
3:*6*

**Thank** 7:*24* 68:*16*
90:*15* 101:*1* 125:*10,*
*12*

**Thanks** 59:*24*

**therapy** 61:*10*

**thing** 22:*3* 89:*18*

**things** 31:*1* 109:*16,*
*17* 116:24

**think** 14:*1* 19:*1*
26:20 30:*19* 31:9
35:*11, 21* 38:*19*
49:*17, 18* 55:3 59:*14*
81:*10* 91:*14* 96:*16*
109:*4* 110:*12* 116:*18*
123:*17*

**THOMAS** 3:*3* 7:*4*

**three** 17:*2* 73:*11, 19*
100:*21* 107:*13*
108:*11* 119:*1, 16*

**throw** 81:*15*

**time** 6:*4* 13:*16* 15:*9,*
*21* 17:*5* 29:*15* 30:*20,*
*23* 39:7 44:*20* 47:*17*
52:*3* 63:*16* 64:*16*
67:20, *22* 70:*16* 74:7
75:*7* 77:*9* 82:*24*
93:*12* 94:*13, 23*
95:*16* 109:*9* 111:*8,*
*10* 120:*21* 121:*23*
122:*3, 20* 124:*23*
125:*19*

**times** 65:*20* 66:*10,*
*17* 67:*3*

**tired** 49:*23*

**title** 94:*18*

**today** 6:*20* 8:*12, 21*
9:*9, 15* 10:*3* 86:*1*
97:*8* 116:*3, 7*

**Today's** 6:*2* 9:*18, 23*
10:*8*

**told** 24:*3* 30:*13, 15,*
*17* 34:*12* 76:*13, 17,*
*20, 22* 77:*5* 79:*10*
80:*12* 81:*18, 21*
83:*18* 85:*23* 89:*18*

90:*4* 110:*8* 122:*21*
123:*2*

**tolerances** 31:*23*

**tool** 91:*24*

**top** 118:*21*

**topics** 18:*14* 114:*6,*
*10*

**total** 74:*3* 97:*15*

**track** 53:*20*

**train** 40:*19*

**trained** 29:*19, 22*
40:*21* 41:6 58:*4*
59:*4, 11, 17* 60:*4*
115:*21*

**training** 11:*4, 15*
16:*20* 17:*11* 19:*17,*
*20, 21, 24* 20:*2* 21:*14*
30:*3, 7* 34:*7, 11*
39:*24* 52:6 54:*3*
65:*12* 114:*4, 18, 20*
115:*6, 7, 11*

**trainings** 17:*23*
18:*17* 21:20 22:*8, 13*
54:*21* 115:*14, 19*

**transcript** 85:*1*
127:*8, 19*

**transcription** 129:*5*

**transferred** 117:*23*

**transported** 26:*12*

**treat** 38:*7, 9* 39:*8, 12*
51:*23* 55:*9, 12*

**treated** 25:*19* 26:6
38:*4, 12* 50:*1*

**treating** 21:*16* 53:*24*
66:*7*

**treatment** 16:*6*
63:*13* 68:*10* 107:*18*
108:*6* 113:*4*

**treatments** 61:*8* 62:*5,*
*18*

**TREBACH** 2:*16*

**triage** 57:*14*

**tried** 78:*10*

**TRIVIKRAM** 1:*11*
3:*7* 102:*14*

**Trotman** 3:*12*

**trouble** 31:*6*

**True** 97:*21* 127:*4*

**try** 78:*13* 116:*23*

**trying** 18:*24* 26:*20*
30:*19* 31:9 59:*14*

**Two** 3:*4* 10:*24*
35:*19* 73:*10, 11, 19*
107:*12* 108:*11*
110:*18* 116:*20* 119:*1*

**type** 38:*6, 8, 9, 17, 19*
39:*3* 91:*13, 18*

**types** 63:*5, 22* 64:*8*
123:*21, 23*

**typical** 69:*16*

**typically** 56:*21* 70:*1*
71:*9*

**< U >**

**Uh-huh** 12:*19* 17:*21*
19:*4, 10* 27:*23* 68:*15*
75:*8* 78:*15* 79:*11*
97:*24* 98:*3* 107:*14,*
*17* 121:*19*

**unable** 32:*16* 33:*15*
38:*1*

**unaware** 109:*17*

**undergoing** 58:*15*

**underlined** 118:*21*

**understaffing** 67:*7*

**understand** 9:*11*
25:*23* 53:*4*

**understanding** 29:*9*
37:*23* 42:*11* 57:*18*
60:*20* 61:*22* 62:*10*

**understood** 9:6 52:*4*
74:*8* 116:*2*

**unhealthy** 49:*14, 16*
117:*19*

**Unit** 4:*16* 23:*23*
71:*5* 75:*10* 86:*10*
107:*10* 110:*14*
112:*20* 119:*13, 18*
120:*5, 11*

**UNITED** 1:*1* 6:*9*

**units** 23:*17* 71:6, *8*
72:*9, 16* 73:*3* 104:*3*

**unstable** 41:*21*
44:*11* 49:*4*

**unsure** 29:*11*

**update** 65:*5, 21*
66:*11*

**upstairs** 69:*21*

**urgent** 24:*24*

**urinating** 49:*22*

**use** 39:*14* 92:9, *12*
106:*22* 107:*4*

**useful** 30:*22*

**usually** 70:*19*

**< V >**

**verbal** 33:*4, 8, 15*
34:*22*

**verbally** 8:*24* 31:*11,*
*18* 34:*17*

**versus** 6:*8* 8:*3* 26:*5*

**video** 6:*5, 19* 123:*16*
125:*17, 21*

**Videoconference** 3:*14*

**VIDEOGRAPHER**
6:*1* 7:*13* 44:*19, 24*
103:*2, 6* 125:*13, 16*

**VIDEOTAPE** 3:*10*

**Videotaped** 1:*19*

**violating** 90:*3*

**virtual** 35:*19, 20*

**visit** 26:*19*

**vital** 65:*1*

**vitals** 80:*16, 19*

**< W >**

**Wait** 45:*6*

**walk** 11:*3* 30:6
74:*22* 76:*21, 23, 24*
77:*2* 78:*10, 13, 22*
107:*11* 113:*6* 122:*22*

**walked** 78:*14, 21*
110:*4* 120:*21*

**walking** 12:*21* 20:*13*
122:*23*

**WANDA** 1:*13* 2:*16*
7:*8* 83:*10*

**want** 17:*2* 18:*10*
34:*4* 35:*10, 18* 46:*11*
47:*8* 60:*22* 75:*23*
92:*18* 100:*22* 108:*18*

**wanted** 19:*19* 76:*13*
103:*23* 110:*19*
113:*12, 21* 114:*1*
121:*13*

**watched** 123:*15*

**way** 20:*23* 33:*17*
51:*7* 99:*16* 108:*5*
118:*13*
**week** 35:*9* 69:*11*
100:*16*
**weeks** 17:*3*
**Well** 39:*13* 47:*12*
49:*23* 65:22 73:*7*
85:*3* 92:*12* 99:*4*
102:*1* 113:*20* 117:*15*
118:*22* 122:*21*
**went** 11:*5* 15:*22, 23*
16:*14* 76:*14* 103:*21*
120:*10*
**We're** 42:*21* 56:*22*
102:*21* 125:*18*
**Whitner** 3:*10* 6:*17*
**wind** 85:*8*
**wish** 114:*17*
**wished** 114:*3*
**Witness** 5:*5* 7:*5, 15*
14:*9* 24:*11* 28:*12*
29:*3* 36:*24* 37:*3*
42:*1* 48:*14* 54:*10*
55:*3* 56:*9* 58:*11, 22*
60:*1* 67:*11* 72:*19*
82:*23* 87:*7* 88:*23*
89:*24* 90:*20* 93:*19*
94:*2* 96:*6, 21* 97:*4*
98:*4* 99:*11* 100:*24*
101:*19* 104:*15* 114:*9*
115:*2, 12* 125:*22*
127:*4, 5, 7*
**witnessed** 39:*8* 111:*5*
**witnesses** 43:*14, 15*
**word** 28:*24*
**work** 10:*14* 13:*1*
15:*12* 20:*7* 40:*7, 9,*
*10* 69:*12* 75:*3, 5*
113:*21* 122:*4*
**worked** 10:*16, 22*
13:*3, 19* 14:*2, 3, 5, 6,*
*7* 15:*9* 27:*4* 68:*18,*
*19, 20* 95:*19* 121:*24*
122:*1*
**working** 14:*19* 15:*2,*
*6* 16:*12, 17* 30:*12*
38:*3* 66:*19* 67:*20, 22*
70:*11* 93:*12* 100:*3*

113:*10* 121:*23*
**workplaces** 40:*19*
**worry** 62:*1*
**wound** 30:*17* 65:22,
23  66:*1, 3, 7, 9*
**wounds** 30:*24*
**write** 50:*3* 66:2
**written** 17:*15* 18:2
34:*20, 22* 65:*9*
**wrong** 76:*16* 110:*12*
123:*8*
**wrote** 76:*7*

**< Y >**
**Ya** 126:*1*
**yeah** 19:*8* 33:*21*
97:*23* 98:2 123:*12*
124:*3* 126:2
**year** 10:*18* 12:*24*
13:*10*
**years** 10:*24* 13:*5, 8*
14:*12*
**yell** 81:*15*
**YESCARE** 1:*9* 3:*7*
13:*6, 19* 14:*3, 4, 7, 13*
15:*3, 6, 9, 17* 16:*12,*
*17* 19:*6* 22:*13* 29:*15*
40:*23* 41:*1, 14* 67:*20*
90:*6* 91:*19* 93:*7, 10,*
*13* 94:*6*
**YesCare/PDP** 34:*6*
112:*8*
**YSSO-Documentation**
93:*1*

**< Z >**
**Zoom** 3:*14*

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 54 of 60

Deposition of Blair Cabellos, LPN                           Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

## WORD LIST

**< 0 >**
**000000024** *(2)*
**000025** *(2)*

**< 1 >**
**1** *(7)*
**10:13** *(2)*
**10:46** *(3)*
**11** *(1)*
**11:19** *(2)*
**1100** *(1)*
**116** *(1)*
**12** *(1)*
**12:09** *(2)*
**12:31** *(2)*
**12:51** *(2)*
**121** *(1)*
**14th** *(1)*
**15** *(1)*
**1515** *(1)*
**15th** *(1)*
**1801** *(1)*
**19** *(1)*
**19102** *(2)*
**19103** *(1)*
**19123** *(2)*

**< 2 >**
**2** *(4)*
**2:24-cv-05618-TJS** *(2)*
**200** *(1)*
**2012** *(2)*
**2014** *(1)*
**2022** *(1)*
**2023** *(14)*
**2024** *(8)*
**2025** *(3)*
**215** *(3)*

**< 3 >**
**3** *(6)*
**30(c)(2** *(1)*
**30(d)(3** *(1)*
**306** *(2)*
**33** *(1)*

**< 4 >**

**4** *(2)*
**4:00** *(1)*
**412** *(1)*
**42** *(1)*
**44** *(1)*
**4th** *(1)*

**< 5 >**
**564-0400** *(1)*
**569-4433** *(1)*
**5th** *(12)*

**< 6 >**
**600** *(1)*
**654-9070** *(1)*
**683-5417** *(1)*
**6th** *(1)*

**< 7 >**
**7** *(4)*
**770** *(1)*

**< 8 >**
**8** *(1)*
**85** *(1)*
**86** *(1)*

**< 9 >**
**90** *(1)*
**97** *(1)*
**990** *(3)*

**< A >**
**a.m** *(9)*
**abilities** *(1)*
**ability** *(1)*
**able** *(5)*
**Abolitionist** *(2)*
**abuse** *(1)*
**access** *(1)*
**accident** *(1)*
**Accu-Chek** *(4)*
**accurate** *(1)*
**ACKNOWLEDGMEN T** *(1)*
**ACTION** *(3)*
**acute** *(2)*
**add** *(1)*
**addition** *(1)*

**additional** *(4)*
**additionally** *(1)*
**addressed** *(3)*
**administer** *(2)*
**administered** *(3)*
**administration** *(1)*
**Administrators** *(1)*
**affect** *(11)*
**aforementioned** *(2)*
**afternoon** *(2)*
**ago** *(1)*
**ahead** *(1)*
**al** *(1)*
**alert** *(1)*
**allow** *(2)*
**allowed** *(1)*
**amount** *(1)*
**and/or** *(1)*
**Andrew** *(2)*
**Answer** *(39)*
**answered** *(1)*
**answering** *(1)*
**answers** *(2)*
**anxiety** *(3)*
**anymore** *(1)*
**anytime** *(3)*
**APOLLON** *(6)*
**apologize** *(1)*
**APPEARANCES** *(3)*
**apply** *(2)*
**approach** *(1)*
**approached** *(3)*
**appropriate** *(2)*
**appropriately** *(1)*
**approximately** *(1)*
**Arch** *(1)*
**area** *(2)*
**arousable** *(1)*
**arrive** *(1)*
**arrived** *(2)*
**arterial** *(1)*
**asked** *(9)*
**asking** *(14)*
**aspect** *(1)*
**assault** *(1)*
**assert** *(1)*
**asserted** *(1)*
**assess** *(1)*
**assessment** *(3)*

**assigned** *(2)*
**assignment** *(2)*
**assistant** *(3)*
**associated** *(1)*
**assuaged** *(1)*
**assume** *(3)*
**assuming** *(3)*
**attached** *(1)*
**attacks** *(1)*
**attempts** *(1)*
**attend** *(3)*
**attention** *(1)*
**Attorney** *(189)*
**attorneys** *(1)*
**August** *(3)*
**Austen** *(1)*
**authority** *(1)*
**Authorize** *(1)*
**authorized** *(1)*
**aware** *(4)*

**< B >**
**back** *(8)*
**background** *(1)*
**bad** *(2)*
**barely** *(1)*
**based** *(5)*
**basic** *(1)*
**basically** *(1)*
**basis** *(1)*
**Bates** *(6)*
**bed** *(1)*
**began** *(1)*
**beginning** *(4)*
**behavior** *(1)*
**behavioral** *(2)*
**believe** *(4)*
**bipolar** *(3)*
**bit** *(3)*
**BLAIR** *(9)*
**B-L-A-I-R** *(1)*
**BLANCHE** *(4)*
**bleed** *(1)*
**blood** *(1)*
**BLOODSAW** *(6)*
**body** *(4)*
**bottom** *(2)*
**Boulevard** *(1)*
**brain** *(2)*

Case 2:24-cv-05618-TJS    Document 100-3    Filed 12/05/25    Page 55 of 60

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

break  (4)
breakdown  (1)
breathing  (2)
BRET  (1)
bretgrote@abolitionist
lawcenter.org  (1)
brief  (1)
briefly  (3)
bring  (4)
bringing  (1)
building  (1)
busy  (1)

< C >
CABELLOS  (19)
C-A-B-E-L-L-O-S  (1)
Cabellos-1  (3)
Cabellos-2  (4)
Cabellos-3  (3)
Cabellos-4  (3)
call  (25)
called  (1)
calls  (6)
capabilities  (1)
capability  (1)
care  (49)
CARNEY  (4)
Case  (14)
caseloads  (1)
cases  (1)
causing  (2)
cell  (9)
Center  (8)
certain  (1)
CERTIFICATE  (1)
certification  (3)
certified  (1)
certify  (3)
certifying  (1)
cetera  (1)
CFCF  (22)
change  (3)
changed  (1)
changes  (4)
changing  (1)
charge  (8)
charged  (1)
chart  (8)
charts  (2)

check  (13)
checked  (4)
check-ins  (2)
checks  (2)
choices  (2)
ChrisianaCare  (1)
Christiana  (8)
ChristianaCare  (4)
CITY  (7)
CIVIL  (4)
clarify  (7)
clarifying  (1)
clear  (1)
clearance  (1)
close  (1)
CNA  (1)
coaster  (1)
cognitive  (1)
College  (9)
come  (9)
comes  (1)
coming  (1)
Commissioner  (3)
commonly  (3)
Commonwealth  (1)
Community  (2)
compare  (1)
complain  (4)
complained  (2)
complete  (4)
completed  (1)
completing  (1)
completion  (3)
computer  (7)
concern  (1)
concerned  (1)
concerning  (1)
concerns  (7)
concisely  (1)
concluded  (1)
concludes  (1)
condition  (2)
conditions  (2)
conduct  (5)
conducting  (3)
confirm  (2)
confusing  (1)
consider  (1)
consist  (1)

consistently  (1)
contacted  (1)
contemporaneously  (1)
continue  (1)
Continued  (3)
continues  (2)
contrast  (1)
control  (1)
conversation  (2)
conversations  (2)
copy  (1)
Corinne  (1)
Corizon  (2)
CORP  (2)
correct  (42)
correctional  (31)
corrections  (2)
Corrective  (2)
COs  (5)
counsel  (6)
count  (3)
couple  (3)
COURT  (14)
CPR  (3)
credits  (2)
CRIC  (2)
crisis  (1)
criteria  (3)
critical  (8)
cup  (1)
cups  (1)
current  (2)
currently  (2)

< D >
dad  (1)
daily  (1)
dash  (1)
date  (5)
Dated  (1)
dates  (1)
day  (20)
days  (3)
deal  (1)
death  (4)
deaths  (3)
decedent  (1)
December  (2)

decision  (3)
decisionmaker  (1)
decision-making  (2)
decisions  (4)
decompensation  (1)
Defendant  (1)
Defendants  (4)
definition  (2)
degree  (2)
dehydrated  (1)
dehydration  (5)
Delaware  (9)
DEPARTMENT  (5)
depending  (1)
depends  (12)
deponent  (2)
deposition  (30)
depression  (5)
Dept  (1)
describe  (3)
described  (2)
DESCRIPTION  (1)
desired  (1)
desiring  (1)
detail  (1)
devices  (1)
diabetes  (14)
diabetes-specific  (2)
diabetic  (7)
diagnosed  (1)
diagnostic  (3)
died  (1)
differ  (2)
difference  (1)
different  (7)
differently  (1)
direct  (2)
Direction  (2)
directives  (2)
disagree  (1)
discipline  (1)
discuss  (3)
discussing  (1)
discussion  (1)
disorder  (3)
distress  (10)
distribute  (3)
distributing  (6)
DISTRICT  (4)

**DKA**  *(9)*
**doctor**  *(11)*
**doctors**  *(1)*
**doctor's**  *(1)*
**document**  *(26)*
**documentation**  *(11)*
**documented**  *(3)*
**documenting**  *(1)*
**Documents**  *(3)*
**doing**  *(4)*
**door**  *(1)*
**dosage**  *(1)*
**due**  *(1)*
**duly**  *(2)*
**duration**  *(1)*

**< E >**
**earlier**  *(3)*
**EASTERN**  *(3)*
**eats**  *(1)*
**ECW**  *(2)*
**education**  *(3)*
**effect**  *(2)*
**effectively**  *(1)*
**Eight**  *(1)*
**either**  *(5)*
**electronic**  *(5)*
**emergencies**  *(5)*
**emergency**  *(12)*
**emotion**  *(1)*
**employ**  *(1)*
**employed**  *(2)*
**employment**  *(10)*
**encounter**  *(2)*
**encountered**  *(1)*
**encounters**  *(1)*
**ended**  *(1)*
**enforce**  *(1)*
**engage**  *(1)*
**engaged**  *(1)*
**entail**  *(2)*
**entire**  *(1)*
**ER**  *(5)*
**Errata**  *(1)*
**escalate**  *(3)*
**escalated**  *(1)*
**escort**  *(1)*
**escorted**  *(4)*
**escorting**  *(1)*

**ESQUIRE**  *(7)*
**Estate**  *(2)*
**et**  *(2)*
**evening**  *(1)*
**Event**  *(5)*
**events**  *(1)*
**Everest**  *(2)*
**evidence**  *(1)*
**exactly**  *(2)*
**EXAMINATION**  *(5)*
**examined**  *(1)*
**example**  *(1)*
**examples**  *(2)*
**Excessive**  *(1)*
**excuse**  *(7)*
**excused**  *(1)*
**Exhibit**  *(12)*
**exhibiting**  *(1)*
**experience**  *(2)*
**experiencing**  *(1)*
**expert**  *(4)*
**explain**  *(7)*
**expressed**  *(1)*
**expressing**  *(2)*
**extent**  *(1)*
**extra**  *(1)*
**extreme**  *(2)*
**eyes**  *(1)*

**< F >**
**facilities**  *(5)*
**facility**  *(5)*
**fact**  *(2)*
**factor**  *(1)*
**factors**  *(1)*
**failing**  *(1)*
**failure**  *(2)*
**fair**  *(1)*
**fall**  *(2)*
**familiar**  *(5)*
**far**  *(4)*
**fast-forwarding**  *(1)*
**fault**  *(1)*
**Fauntleroy**  *(2)*
**Federal**  *(2)*
**feel**  *(6)*
**feeling**  *(1)*
**feels**  *(2)*
**fell**  *(1)*

**fellow**  *(1)*
**felt**  *(2)*
**fight**  *(1)*
**final**  *(1)*
**finally**  *(1)*
**findings**  *(2)*
**finish**  *(3)*
**first**  *(6)*
**fit**  *(1)*
**Five**  *(4)*
**Floor**  *(9)*
**fluids**  *(3)*
**following**  *(7)*
**follows**  *(1)*
**follow-up**  *(2)*
**food**  *(1)*
**foregoing**  *(2)*
**form**  *(6)*
**Former**  *(4)*
**forms**  *(3)*
**forward**  *(3)*
**four**  *(7)*
**Fraiser-000024**  *(2)*
**FRASIER**  *(12)*
**Frasier-000026**  *(2)*
**Frasier's**  *(1)*
**free**  *(3)*
**frequent**  *(1)*
**front**  *(2)*
**full**  *(3)*
**full-time**  *(1)*
**functioning**  *(1)*
**further**  *(4)*

**< G >**
**Garden**  *(3)*
**GAY**  *(3)*
**GENA**  *(8)*
**general**  *(5)*
**generally**  *(1)*
**gentleman**  *(2)*
**gently**  *(1)*
**Girard**  *(5)*
**give**  *(15)*
**given**  *(9)*
**gives**  *(1)*
**giving**  *(4)*
**glance**  *(1)*
**glucose**  *(6)*

**go**  *(31)*
**goes**  *(1)*
**going**  *(29)*
**Good**  *(5)*
**Gotcha**  *(1)*
**graduate**  *(1)*
**graduated**  *(1)*
**Great**  *(1)*
**GREGORY**  *(63)*
**GROTE**  *(4)*
**ground**  *(1)*
**grounds**  *(1)*
**guess**  *(5)*
**guessing**  *(1)*
**gunshot**  *(2)*

**< H >**
**hallway**  *(1)*
**handbook**  *(1)*
**handle**  *(2)*
**hands**  *(2)*
**hands-on**  *(1)*
**happen**  *(8)*
**happened**  *(6)*
**happens**  *(3)*
**hard**  *(1)*
**HCS**  *(1)*
**head**  *(1)*
**health**  *(19)*
**hear**  *(3)*
**height**  *(3)*
**held**  *(5)*
**help**  *(1)*
**hierarchies**  *(1)*
**high**  *(8)*
**Hillsborough**  *(1)*
**history**  *(3)*
**hold**  *(3)*
**HOLSTON**  *(11)*
**homicidal**  *(1)*
**honest**  *(1)*
**hospital**  *(3)*
**hours**  *(1)*
**housing**  *(9)*
**HU**  *(77)*
**hundred**  *(1)*
**hungry**  *(2)*
**hurt**  *(7)*
**hypothetical**  *(2)*

Case 2:24-cv-05618-TJS     Document 100-3     Filed 12/05/25     Page 57 of 60

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**< I >**
**identification** *(4)*
**identifying** *(1)*
**illness** *(2)*
**impact** *(1)*
**impacted** *(1)*
**importance** *(1)*
**important** *(4)*
**incarcerated** *(1)*
**incident** *(6)*
**incivility** *(1)*
**include** *(2)*
**includes** *(1)*
**including** *(1)*
**inconvenience** *(1)*
**incorrect** *(2)*
**INDEX** *(1)*
**Indicating** *(4)*
**inform** *(1)*
**information** *(6)*
**informative** *(1)*
**informed** *(3)*
**initial** *(1)*
**initially** *(1)*
**injured** *(2)*
**inmate** *(13)*
**inmates** *(18)*
**inquiry** *(2)*
**ins** *(1)*
**inside** *(3)*
**instance** *(4)*
**instances** *(3)*
**instruct** *(1)*
**instructed** *(1)*
**instruction** *(2)*
**instructions** *(1)*
**insulin** *(18)*
**insulins** *(2)*
**Intake** *(6)*
**interact** *(5)*
**interacted** *(3)*
**interaction** *(2)*
**interactions** *(1)*
**interrupted** *(1)*
**Interview** *(11)*
**interviewed** *(1)*
**intravenous** *(1)*
**Investigations** *(3)*

**involve** *(1)*
**involved** *(2)*
**involvement** *(1)*
**issue** *(5)*
**issues** *(8)*
**i-STAT** *(5)*
**IV** *(5)*
**IVs** *(1)*

**< J >**
**JACOB** *(1)*
**jail** *(2)*
**JAMES** *(1)*
**January** *(2)*
**JFK** *(1)*
**jkaminsky@kiernantr**
**ebach.com** *(1)*
**job** *(6)*
**jobs** *(2)*
**John** *(1)*
**JONATHAN** *(3)*
**JR** *(1)*
**July** *(1)*
**June** *(1)*
**JUNG** *(27)*
**Jung's** *(5)*

**< K >**
**KAMINSKY** *(12)*
**keep** *(2)*
**ketoacidosis** *(1)*
**KIERNAN** *(1)*
**KIMBALL** *(1)*
**kind** *(5)*
**kinds** *(6)*
**knew** *(1)*
**knock** *(1)*
**know** *(90)*
**Knowing** *(1)*
**knowledge** *(1)*
**Kristy** *(3)*
**Kyree** *(1)*

**< L >**
**lack** *(2)*
**LALITHA** *(3)*
**Law** *(3)*
**lawyer** *(1)*
**lay** *(1)*

**lead** *(1)*
**learn** *(3)*
**learned** *(1)*
**leeway** *(1)*
**left** *(1)*
**leg** *(3)*
**legs** *(3)*
**length** *(1)*
**level** *(1)*
**levels** *(5)*
**license** *(1)*
**Licensed** *(2)*
**licenses** *(2)*
**Liedtka** *(3)*
**lieutenant** *(3)*
**life** *(1)*
**lifesaving** *(3)*
**lifestyle** *(4)*
**limitation** *(1)*
**Line** *(13)*
**lines** *(1)*
**Lisa** *(2)*
**list** *(2)*
**little** *(1)*
**LLP** *(1)*
**located** *(4)*
**location** *(1)*
**long** *(9)*
**look** *(15)*
**looking** *(1)*
**looks** *(1)*
**lot** *(12)*
**loud** *(1)*
**LOUIS** *(6)*
**LPN** *(14)*
**LPNs** *(1)*
**lying** *(1)*

**< M >**
**machine** *(1)*
**machines** *(2)*
**main** *(1)*
**making** *(2)*
**man** *(1)*
**manager** *(9)*
**managers** *(2)*
**manner** *(2)*
**MARGARET** *(3)*
**margo@alcenter.org**

*(1)*
**MARIESHA** *(6)*
**mark** *(1)*
**Marked** *(10)*
**Market** *(1)*
**MAT** *(5)*
**match** *(1)*
**materials** *(1)*
**matter** *(2)*
**matters** *(1)*
**MAUREEN** *(3)*
**mean** *(18)*
**means** *(2)*
**meant** *(1)*
**measures** *(3)*
**med** *(24)*
**medical** *(53)*
**Medication** *(15)*
**medications** *(13)*
**medicine** *(1)*
**medicines** *(1)*
**meds** *(4)*
**meeting** *(2)*
**member** *(3)*
**mental** *(20)*
**mentioned** *(19)*
**MICHAEL** *(2)*
**michael.pestrak@phila**
**.gov** *(1)*
**Mike** *(1)*
**mind** *(1)*
**mine** *(1)*
**mini** *(3)*
**minimum** *(2)*
**minutes** *(1)*
**missed** *(4)*
**mm-hmms** *(1)*
**mobility** *(1)*
**modules** *(1)*
**moment** *(3)*
**moments** *(1)*
**monitor** *(1)*
**monitoring** *(1)*
**months** *(1)*
**morning** *(3)*
**motion** *(1)*
**move** *(3)*
**moving** *(6)*
**multiple** *(1)*

Deposition of Blair Cabellos, LPN                                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**< N >**
name  *(10)*
names  *(1)*
Narcan  *(2)*
navigate  *(1)*
near  *(2)*
necessary  *(1)*
need  *(12)*
needed  *(9)*
needs  *(2)*
NET  *(1)*
never  *(20)*
new  *(2)*
NIA  *(1)*
nia@alcenter.org  *(1)*
nine-and-a-half  *(3)*
nods  *(1)*
nonargumentative  *(1)*
nonresponsive  *(1)*
nonsuggestive  *(1)*
normal  *(3)*
normally  *(7)*
Norristown  *(1)*
Notary  *(2)*
note  *(3)*
noted  *(4)*
notice  *(2)*
November  *(13)*
NP  *(2)*
Number  *(2)*
numbers  *(4)*
numerous  *(1)*
nurse  *(39)*
nurses  *(10)*
nursing  *(6)*

**< O >**
object  *(2)*
Objection  *(29)*
objections  *(1)*
occur  *(1)*
occurred  *(3)*
occurring  *(1)*
o'clock  *(1)*
O'CONNOR  *(1)*
odor  *(1)*
officer  *(16)*
officers  *(20)*

officer's  *(1)*
offices  *(1)*
Oh  *(5)*
Okay  *(144)*
online  *(1)*
opened  *(1)*
opening  *(2)*
opinion  *(2)*
opinions  *(1)*
opportunity  *(1)*
order  *(1)*
ordered  *(1)*
orders  *(3)*
ordinary  *(1)*
Organ  *(2)*
orientation  *(9)*
orientations  *(1)*
oriented  *(1)*
outside  *(3)*
overnight  *(1)*
oversee  *(1)*

**< P >**
p.m  *(8)*
P-1  *(4)*
PAGE  *(16)*
pages  *(4)*
pain  *(15)*
pancreas  *(1)*
paper  *(2)*
Paralegal  *(1)*
Parkway  *(1)*
part  *(8)*
partner  *(1)*
party's  *(1)*
pass  *(16)*
passing  *(1)*
patient  *(16)*
patients  *(17)*
patient's  *(10)*
PDP  *(45)*
PDP/YesCare  *(3)*
PDP-000000021  *(2)*
Penn  *(2)*
PENNSYLVANIA
  *(10)*
people  *(6)*
people's  *(1)*
performed  *(1)*

period  *(6)*
permanent  *(1)*
person  *(4)*
personal  *(2)*
person's  *(2)*
PESTRAK  *(36)*
PHILADELPHIA
  *(15)*
physician  *(2)*
physician's  *(1)*
pivot  *(1)*
place  *(1)*
placed  *(6)*
Plaintiffs  *(8)*
Plan  *(2)*
Plaza  *(1)*
please  *(9)*
pocket  *(1)*
pod  *(18)*
pods  *(1)*
point  *(3)*
pointed  *(1)*
policy  *(2)*
position  *(3)*
positions  *(1)*
Possibly  *(1)*
potential  *(2)*
poured  *(2)*
PowerPoints  *(5)*
practical  *(2)*
practice  *(1)*
practices  *(3)*
practitioner  *(2)*
PREA  *(1)*
Pre-Intake  *(2)*
prepare  *(1)*
prepared  *(1)*
prescribed  *(2)*
PRESENT  *(2)*
preserve  *(1)*
pressure  *(1)*
pretty  *(1)*
previous  *(4)*
previously  *(2)*
print  *(1)*
prior  *(6)*
prisoner  *(2)*
prisoners  *(1)*
Prisons  *(5)*

privilege  *(4)*
probably  *(2)*
procedure  *(3)*
proceed  *(1)*
proceeds  *(4)*
Production  *(1)*
Professional  *(2)*
propounded  *(1)*
protocol  *(4)*
provide  *(5)*
provided  *(6)*
provider  *(1)*
providers  *(1)*
providing  *(1)*
psych  *(2)*
psychiatric  *(1)*
psychiatrist  *(1)*
psychologist  *(1)*
Public  *(2)*
pull  *(2)*
pulled  *(2)*
pulse  *(2)*
purposes  *(1)*
pursuant  *(1)*
pursue  *(1)*
pus  *(1)*
put  *(6)*
putting  *(1)*

**< Q >**
qualifications  *(1)*
quality  *(1)*
quarterly  *(1)*
Question  *(26)*
questioning  *(2)*
questions  *(21)*

**< R >**
raise  *(1)*
range  *(3)*
rank  *(1)*
RASHATWAR  *(3)*
RCF  *(18)*
Read  *(3)*
really  *(6)*
recall  *(8)*
receive  *(14)*
received  *(10)*
recess  *(2)*

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

recognize *(5)*
recollection *(1)*
Record *(30)*
recorded *(1)*
records *(5)*
refer *(1)*
referrals *(1)*
referring *(3)*
reflect *(1)*
reforms *(1)*
refresh *(1)*
refusal *(6)*
refuse *(1)*
refused *(1)*
refuses *(1)*
refusing *(3)*
regarding *(3)*
regards *(4)*
registered *(3)*
regular *(1)*
related *(6)*
relationship *(4)*
relationships *(2)*
relatively *(1)*
relevant *(3)*
rely *(1)*
remember *(45)*
Remind *(4)*
repeat *(7)*
report *(1)*
Reporter *(10)*
Reporting *(2)*
reports *(1)*
represent *(4)*
Representing *(6)*
reproduction *(1)*
Request *(3)*
requested *(1)*
required *(1)*
requires *(4)*
respond *(11)*
responding *(3)*
response *(6)*
responsibilities *(6)*
responsibility *(3)*
Responsible *(2)*
result *(1)*
resume *(2)*
review *(2)*

reviewed *(2)*
Reviewing *(9)*
reviews *(1)*
Right *(8)*
risks *(6)*
RN *(3)*
RNs *(8)*
role *(10)*
roles *(5)*
roller *(1)*
room *(20)*
rooms *(1)*
rounds *(8)*
rudeness *(1)*
Rule *(1)*
running *(1)*
RUPALEE *(1)*
rupalee@alcenter.org *(1)*

< S >
sad *(2)*
safe *(4)*
safety *(9)*
sake *(2)*
sanctions *(1)*
saw *(3)*
saying *(2)*
says *(6)*
scale *(2)*
scene *(1)*
school *(4)*
scientific *(1)*
scream *(1)*
screening *(2)*
section *(2)*
security *(4)*
see *(10)*
seen *(6)*
seizure *(2)*
sense *(1)*
Sentinel *(5)*
September *(7)*
serious *(4)*
serve *(1)*
services *(2)*
setting *(1)*
seven *(1)*
Severe *(1)*

shadow *(3)*
shadowing *(5)*
sharp *(1)*
sheet *(4)*
shift *(7)*
shifts *(5)*
short *(1)*
shortages *(1)*
Shortly *(1)*
short-staffed *(1)*
short-staffing *(1)*
showed *(2)*
showing *(2)*
shown *(1)*
sick *(1)*
sign *(12)*
signature *(3)*
signed *(1)*
significance *(1)*
signs *(9)*
similar *(5)*
Sir *(2)*
situation *(5)*
Six *(1)*
Skills *(7)*
slash *(1)*
slides *(1)*
sliding *(2)*
Smith *(4)*
software *(1)*
somebody *(1)*
someone's *(1)*
sorry *(6)*
sort *(2)*
sound *(2)*
sounds *(2)*
speak *(9)*
Special *(3)*
specialist *(1)*
specialty *(1)*
specific *(3)*
specifically *(7)*
spell *(1)*
spoke *(3)*
Spring *(3)*
stabbed *(1)*
stabbing *(1)*
staff *(34)*
staffing *(2)*

stake *(1)*
stamp *(6)*
stand *(3)*
standard *(1)*
standing *(5)*
stands *(2)*
start *(10)*
started *(5)*
S-T-A-T *(1)*
state *(3)*
stated *(1)*
STATES *(2)*
stationed *(1)*
stay *(1)*
Stipulations *(1)*
stop *(1)*
Street *(6)*
stretcher *(26)*
stuff *(1)*
subject *(1)*
subjective *(1)*
Suboxone *(5)*
substance *(2)*
sugar *(11)*
sugars *(1)*
suicidal *(1)*
suicidality *(3)*
suicide *(3)*
Suite *(4)*
supervision *(1)*
supervisor *(5)*
supervisors *(4)*
SUPPORT *(2)*
supposed *(1)*
Sure *(22)*
surveillance *(1)*
swear *(1)*
switch *(2)*
switched *(1)*
sworn *(2)*
symptom *(1)*
symptomatically *(1)*
symptoms *(2)*
system *(2)*

< T >
take *(9)*
taken *(4)*
takes *(1)*

Deposition of Blair Cabellos, LPN                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

talk  (6)
talked  (3)
talking  (3)
Tampa  (1)
taught  (4)
team  (1)
Tech  (8)
technical  (1)
TECHNICIAN  (1)
tell  (9)
telling  (4)
tells  (1)
Ten  (1)
terms  (3)
testified  (3)
Testimony  (10)
tgregory@okllp.com
  (1)
Thank  (6)
Thanks  (1)
therapy  (1)
thing  (2)
things  (4)
think  (19)
THOMAS  (2)
three  (8)
throw  (1)
time  (34)
times  (4)
tired  (1)
title  (1)
today  (10)
Today's  (4)
told  (21)
tolerances  (1)
tool  (1)
top  (1)
topics  (3)
total  (2)
track  (1)
train  (1)
trained  (10)
training  (24)
trainings  (8)
transcript  (3)
transcription  (1)
transferred  (1)
transported  (1)
treat  (7)

treated  (5)
treating  (3)
treatment  (6)
treatments  (3)
TREBACH  (1)
triage  (1)
tried  (1)
TRIVIKRAM  (3)
Trotman  (1)
trouble  (1)
True  (2)
try  (2)
trying  (5)
Two  (11)
type  (10)
types  (5)
typical  (1)
typically  (3)

< U >
Uh-huh  (14)
unable  (3)
unaware  (1)
undergoing  (1)
underlined  (1)
understaffing  (1)
understand  (3)
understanding  (7)
understood  (4)
unhealthy  (3)
Unit  (12)
UNITED  (2)
units  (7)
unstable  (3)
unsure  (1)
update  (3)
upstairs  (1)
urgent  (1)
urinating  (1)
use  (5)
useful  (1)
usually  (1)

< V >
verbal  (4)
verbally  (4)
versus  (3)
video  (5)
Videoconference  (1)

VIDEOGRAPHER
  (8)
VIDEOTAPE  (1)
Videotaped  (1)
violating  (1)
virtual  (2)
visit  (1)
vital  (1)
vitals  (2)

< W >
Wait  (1)
walk  (13)
walked  (4)
walking  (3)
WANDA  (4)
want  (13)
wanted  (8)
watched  (1)
way  (6)
week  (3)
weeks  (1)
Well  (13)
went  (8)
We're  (4)
Whitner  (2)
wind  (1)
wish  (1)
wished  (1)
Witness  (41)
witnessed  (2)
witnesses  (1)
word  (1)
work  (12)
worked  (17)
working  (15)
workplaces  (1)
worry  (1)
wound  (7)
wounds  (1)
write  (2)
written  (5)
wrong  (3)
wrote  (1)

< Y >
Ya  (1)
yeah  (7)
year  (3)

years  (4)
yell  (1)
YESCARE  (27)
YesCare/PDP  (2)
YSSO-Documentation
  (1)

< Z >
Zoom  (1)