# Exhibit D

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                         - - -

 4   JACOB and JAMES JUNG,   )  CIVIL DIVISION
     as Administrators of    )
 5   the Estate of LOUIS     )  Case No.:
     JUNG, JR.,              )  2:24-cv-05618-TJS
 6                           )
            Plaintiffs,      )  Deposition of:
 7                           )  GENA FRASIER
            vs.              )
 8                           )  Filed on Behalf of the
     CITY OF PHILADELPHIA;   )    Plaintiff
 9   YESCARE CORP.;          )
     BLANCHE CARNEY,         )  Counsel of Record for
10   Former Commissioner     )    This Party:
     of Philadelphia Dept.   )
11   of Prisons; LALITHA     )  Bret Grote, Esq.
     TRIVIKRAM; MAUREEN      )  Nia Holston, Esq.
12   GAY; MARIESHA           )  Rupalee Rashatwar, Esq.
     APOLLON; BLAIR          )  Margaret Hu, Esq.
13   CABELLOS; GENA          )  ABOLITIONIST LAW CENTER
     FRASIER; WANDA          )  990 Spring Garden St.
14   BLOODSAW,               )  Philadelphia, PA 19123
                             )
15          Defendants.      )

16

17                         - - -

18

19

20

21

22

23

24

25
```

```
 1              DEPOSITION OF GENA FRASIER,

 2      a Defendant herein, called by the Plaintiff for

 3      examination, taken pursuant to the Federal

 4      Rules of Civil Procedure, by and before

 5      Alexander Schaffer, a Court Reporter and Notary

 6      Public in and for the Commonwealth of

 7      Pennsylvania, at the offices of the

 8      Abolitionist Law Center, 990 Spring Garden

 9      Street, Philadelphia, Pennsylvania 19123, on

10      Monday, August 18, 2025, commencing at

11      1:14 p.m.

12      COUNSEL PRESENT:

13      On behalf of the Plaintiffs:
          BRET GROTE, ESQ.
14        NIA HOLSTON, ESQ.
          RUPALEE RASHATWAR, ESQ.
15        MARGARET HU, ESQ
                    Abolitionist Law Center
16                  990 Spring Garden Street, Suite 306
                    Philadelphia, Pennsylvania 19123
17                  Bretgrote@abolitionistlawcenter.org
                    Nia@alcenter.org
18                  Rupalee@alcenter.org
                    Margo@alcenter.org
19

20      On behalf of Defendants the City of
        Philadelphia, Wanda Bloodsaw, Gena Frasier, and
21      Blanche Carney:
          MICHAEL E. PESTRAK, ESQ.
22                  City of Philadelphia Law Department
                    1515 Arch Street
23                  14th Floor
                    Philadelphia, Pennsylvania 19102
24                  Michael.pestrak@phila.gov

25
```

```
 1    On behalf of Defendants YesCare and Blair
      Cabellos:
 2     RAYMOND R. WITTEKIND, JR., ESQ.
                 O'Connor Kimball LLP
 3               Two Penn Center Plaza
                 1500 John F. Kennedy Boulevard
 4               Suite 1100
                 Philadelphia, Pennsylvania 19102
 5               Rwittekind@okllp.com

 6    On behalf of Defendant Mariesha Apollon:
       JONATHAN KAMINSKY, ESQ.
 7               Kiernan Trebach
                 1801 Market Street
 8               Suite 770
                 Philadelphia, Pennsylvania 19103
 9               J.kaminsky@kiernantrebach.com

10                      -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 5 of 85

Deposition of Gena Frasier                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1                    I N D E X

2                  EXAMINATIONS

3     WITNESS:

4       GENA FRASIER

5       By ATTORNEY GROTE.........................    5
        By ATTORNEY WITTEKIND....................  153
6       By ATTORNEY KAMINSKY.....................  163
        By ATTORNEY PESTRAK......................  169
7       By ATTORNEY KAMINSKY.....................  171
        By ATTORNEY WITTEKIND....................  172
8       By ATTORNEY GROTE........................  172

9                  EXHIBITS MARKED

10    EXHIBIT NO.         DESCRIPTION              PAGE
      Plaintiff's    Corizon Health education       68
11    Exhibit 1      slides, diabetes
      Plaintiff's    Disciplinary documentation    113
12    Exhibit 2

13                        -  -  -

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

P R O C E E D I N G S

GENA FRASIER, a Defendant herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY ATTORNEY GROTE:

Q.   Good afternoon, Ms. Frasier.

A.   Good afternoon.

Q.   My name is Bret Grote, and I'm counsel for the Plaintiffs in this matter, Jacob and James Jung, the administrators of the estate of Louis Jung, Jr.  Can you please state your name for the record.

A.   Gena, G-E-N-A.  Frasier, F-R-A-S-I-E-R.

Q.   All right.  And thank you for that.

So I'm going to be asking you questions today.  Have you ever given a deposition before?

A.   I don't think I have.

Like, I was just going over with your attorney friend here --

Q.   Well, don't --

ATTORNEY PESTRAK:  It's okay. We were just talking right now.

Page 6

ATTORNEY GROTE:  You were just sharing at the table?

ATTORNEY PESTRAK:  Yeah.

THE WITNESS:  Yeah, yeah, it was just something in conversation.  But no, I don't think I have.

BY ATTORNEY GROTE:

Q.   Okay.  Have you ever been in a setting where you have been speaking and someone has been taking everything you say down into a transcript?

A.   You know, I served on a grand jury for a couple years, under Josh Shapiro, so -- I don't know if that counts.  I don't know.

Q.   No, that's not a deposition.

A.   Okay.  Sorry.  I didn't know.

Q.   That sounds interesting, but -- so I'm going to go over some ground rules so that we understand how things will proceed.

First is:  We have to let each other finish.  So when I'm asking a question, let me finish the question.  Sometimes you will know what the question is going to be before I finish, but you have to let me finish so that he (indicating) can get everything down.

Page 7

Vice-versa, I will let you finish any of your answers before I ask another question.

A.   Okay.

Q.   We both have to speak out loud, no head nods or "mm-hmm"s in response to a question.  I mean, you can nod your head, but that can't be your only answer; you need to answer verbally.

If you do not know or do not remember something, let me know if there is something that might refresh your memory, like a document.

If you answer a question, I will assume you understood it.  If you do not answer a question -- or, excuse me -- if you do not understand a question, then please let me know, and I will try to rephrase so that you understand.

Do you understand?

A.   I understand.

Q.   Also, you can take a break if you need one.  The only thing I ask is:  If I ask you a question, you answer the question before indicating that you need to take a break.

A.   I understand.

Page 8

Q.   Are you prepared to give a deposition today?

A.   Yes.

Q.   And I'm not asking for any information about conversations with legal counsel, but what have you done to prepare for today's deposition?

A.   Nothing.

Q.   Have you reviewed any documents?

A.   No.

Q.   And without asking about -- you know, I don't want you to tell me anything about the conversation.  But did you discuss the deposition with legal counsel prior to it?

A.   Yes.

Q.   Okay.  How many times?

A.   Maybe twice.

Q.   And where do you work, currently?

A.   Curran-Fromhold Correctional Facility.  7901 State Road, 19136.

ATTORNEY PESTRAK:  Do you need that spelled?

THE WITNESS:  I can spell it.

Curran, C-U-R-R-A-N.  Fromhold, F-R-O-M-H-O-L-D.  Correctional facility.

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 7 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 9

BY ATTORNEY GROTE:

Q. And how long have you worked there?

A. Ten years, and a little bit of change.

Q. And in what capacity are you employed that?

A. I'm a Correctional Officer.

Q. Has that been your title throughout that 10 years?

A. Yes.

Q. I'm going to ask, you know, about education and employment history. But we'll start with education. Can you let me know where you graduated high school, and then up through any education you've received after that?

A. High school, I graduated from Cardinal Dougherty in 1995.

College, I attended Peirce College. And Community College of Philadelphia, where I received my associate's degree in Criminal Justice. And I don't remember the year; I think it was, like, three years ago, the associate's in Criminal Justice.

Q. So, approximately, 2022?

Page 10

A. Yeah. Maybe.

Q. Sometime after 2020?

A. Yes. I want to say yes, tentatively.

Q. Was it after COVID?

A. Gosh -- I have a little brain syndrome today.

Q. It's okay. If you don't remember, you don't remember. I'm just --

A. After COVID? We were working, and I broke my ankle -- maybe right before COVID, maybe 2019.

Q. Okay.

A. That sounds a little bit more --

Q. COVID is how we keep track of time these days?

A. I think it was right before COVID, to be honest.

Q. All right. And can you -- if you've been at PDP 10 years, does that mean you began in 2015?

A. Yes. July of 2015, I was hired.

Q. And can you go -- tell me about your employment history prior to then, starting, I guess, as far back as after high school.

Page 11

A. Wow. No problem. Okay. So, after high school, I was working for McNeil Pharmaceutical as a temp, for maybe a year or two, and then met some people there, and they said, "Hey, listen, this is a temporary job. If you come over to McNeil Pharmaceutical Child Care Facility, you can be hired full time." So I jumped on that, of course. So I went to work for McNeil Pharmaceutical Child Care Facility for some time.

I believe, maybe, shortly after that, I worked for Carson Valley Residential Treatment Facility in Flourtown.

Q. And what did you do there?

A. I was a residential counselor for adolescent females with behavior problems.

From there -- trying to keep up now -- I believe I may have went to Horsham Clinic from there. For some time, I worked in their Children's Unit.

Q. What is Horsham clinic?

A. Horsham Clinic is a psychiatric facility in -- gosh, where's Horsham Clinic -- in Horsham, PA.

So I worked there, and I worked in

Page 12

their Child Care Unit maybe for a couple years. From there, I went to the Adolescents Unit for a couple years, then started to work with the adults who were in recovery, drug and alcohol recovery programs at Horsham Clinic.

Okay. Let's see. After Horsham Clinic, I went to Roxborough High School, and I was a teacher's aide at Roxborough High School. I think I was there for maybe a year or two.

Oh. I did skip one. Hold on.

Before -- so I don't know if Project Transition was before Roxborough or after. Well, anyway, let's just put it on the record: I worked for a company called Project Transition. They were located on County Line Road. There, I was a psychiatric rehabilitation counselor. There, I supervised adults in their apartments with severe mental illness.

So, basically, I would pour their medications weekly, meet with CBH monthly about the client's progress or decline.

Q. What is "CBH"?

A. County Behavioral Health System. They were the people, I believe -- now, this

Page 13

has been a while -- gave funding for those
individuals to live in those apartments at the
time.

    I would have to 302 people if, you
know, their decline was substantial enough
that, you know, they need to be hospitalized
for treatment.  So that was Project Transition.
I had to get that on there.

    Q.   I want to ask you a few more
questions about Project Transition.  How much
-- what kind of training did you receive for
that position?

    A.   Not very much.

    Again, I cannot recall.

    Q.   How long were you in that position,
approximately?

    A.   About four years.

    Q.   And you mentioned medication
administration.  Can you tell me what that was
like there?

    A.   Yeah.  So the clients would have,
obviously, prescription medication from the
psychiatric doctors who were available, on
call.  And when medications were called in for
the clients, it was my job, along with other

Page 14

counselors, to escort the clients to the
pharmacy in that area.

    We'd pick up the medication; we'd
bring it back.  We'd sit with the client in our
office, and we would go over, "Hey, you're on
Risperdal, 5mg, TID," you know, then we would
pour it for the week for them.

    And then we would go over the
Depakote medication for them, whatever
medication they may be on.  So we would pour it
in the sleeve for the week, make sure they had
their medications for the week.

    And when they would run out, it
would be my job to make sure that refills were
done for them, and so forth and so on.

    Q.   Thank you.  And you also talked
about situations where someone would have to be
302'd.  For the record, can you state what it
means to be "302'd"?

    A.   So a 302 is when a person has become
a danger to themselves or to others and they
are not capable of taking care of themselves.
At that time, it has become what we would call
a "crisis," so we do, like, crisis
intervention.

Page 15

    We would try to de-escalate the
person.  The psychiatrist would be called in to
see if they could help.  Sometimes we would
even call a family member in to come in and
say, "Hey, what's going on?  What triggered
this outburst?" or whatever the case may be.

    If none of those things worked,
then, obviously, at that time, we knew they
needed hospitalization for more intense
treatment.  So that was a 302.

    And I believe a 301 -- I can't
remember, exactly, because I don't do that
stuff no more.  But a 301, I think that's when
they signed themselves into the hospitals
willingly, the ones that were able to do that.

    So, yes.  That's -- I think that's
all I can remember about that.  It's been a
long time.

    Q.   How would you -- did you have any
medical training at that time?

    A.   No.

    Q.   Do you have any medical training
today?

    A.   No.

    Q.   How would you determine if somebody

Page 16

should be 302'd?  What would you look for?

    A.   So when we worked at Project
Transition, our clients lived independently, in
the apartments.  When we would go to the
apartment, let's say to do what we call a
"tour" or random checkup, if the apartment was
trashed, if things were all over the place,
neighbors would tell us -- because they lived
among other people, as well; it wasn't just
them.  They lived amongst a community in an
apartment complex, so neighbors would say,
"Hey, we heard banging, we heard kicking all
night.  They were running up and down the
hallway, yelling and screaming, ranting and
raving.  We didn't know what to do; police were
called."

    So sometimes, when police were
called, they would call us.  We were also on
call, as well; we had pagers back then.  So
then the police would contact the on-call
supervisor, and the supervisor would say, "Hey,
Gena, you're on call tonight.  Go out there,
see if you can see what's going on, see if you
can assess the situation, see what the police
think should be done as well."

Page 17

And we would take it from there. Then I would contact my supervisor and say, "Hey, listen. This is what I saw; this is what was said; this is what the police were given from the witnesses in the apartment complex. What do you want to do?"

"Well, this is what we're going to do." And we just took the proper steps that, you know, we were taught then.

Q. And around what time were you working at Project Transition, this four-year period?

A. Okay. I'm trying to get the years for you. Project Transition -- actually, I printed out a resume. I don't know if you wanted a resume.

Okay. I left -- okay. And I left out one more job too. I forgot all these jobs. I was a case manager assistant for Tabor Children's Services. So after Tabor Children's Services, that's when I went to Project Transition. So I left Tabor 2008, maybe.

I think I went to Project Transition maybe 2009. And then we got laid off -- we collected severance checks -- because they

Page 18

closed out Project Transition; it shut down. So we received a severance package; I do remember that. So I collected unemployment for a little bit.

It's coming back to me, slowly.

After Project Transition is when I went to Roxborough High School, because I needed a job. You know, you look for work after you get laid off, so you went to Roxborough High School. That was after Project Transition.

2013 to 2015 is when I applied to be a Correctional Officer. It took, like, two years. That's how I remember that timeframe.

So you -- I applied in 2013 to become a Correctional Officer and all that. But you're on a list; I didn't get called until 2015. That's what I know, because that's when I got called, in 2015.

Q. And then what happened after you got called? I mean, when did they hire you? And when did you begin?

A. So we began July of 2015. They were calling me maybe, you know, a month or so before that, saying, "Hey, we got your

Page 19

information. We'd like for you to come in."

You have to go through a series of tests, a drug test; they take a sample of your hair. You have to fill out something called a "PDQ book" the City has.

Q. What does "PDQ" stand for?

A. I could not tell you. But I just know it's called a "PDQ book," and it's a little blue book.

In that book, you have to answer questions about your -- just things like I'm sharing with you: My work; past history; family who've ever been in law enforcement; jobs. All that stuff, it's in the PDQ.

Like, I think that's how the City of Philadelphia verifies, you know, your credibility, in terms of what you used to do.

So I just know it's called a "PDQ book." Sorry. I don't know.

Q. And so, as a Corrections Officer, what are, at a pretty high level of generality, your job responsibilities?

A. So Corrections Officers, generally, supervise inmates on their housing areas. We make sure that they have the

Page 20

necessary things to get through their day. So an example of that would be make sure they get their medication when the nurses call around and say, "Hey, meds in progress."

If the officers in Official Visits or Regular Visits call me and say, "Hey, such-and-such inmate has a visit," my job is to try to get the inmate up and out of his cell, let them know that they have a visit, get them down to that area.

I feed them. Not personally. But when food comes onto the unit, my job is to have other inmates serve the meals. We do not feed them, personally, but we have inmates feed them meals.

I make sure they are getting rec time, if that was warranted for that day, if it's available, make sure we get them what we call their "out-of-cell time."

What else do we do?

If a social worker wants to meet with an inmate, the social worker will come onto the block and say, "Hey, Frasier, can I get three people to meet me in the back?" My job is to then find three inmates who are

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 21

willing to talk to the social worker, go to the
back for whatever reason the social worker
wants to ask them their questions.

I also transport inmates to various
appointments. And that could be anything: It
will range from a doctor; a dental; court. It
could be -- we transport inmates throughout the
city of Philadelphia.

Q.  Okay. Yeah. I was going to ask if
it's transport within the jail complex or
throughout the city, and you answered that.

A.  Yes. If that's the correct answer
that you're looking for, yes.

Q.  Okay. And in the time you've been
with the Philadelphia Department of Prisons,
have you had any disciplinary history?

A.  Yes.

Q.  And can you tell me about that?

A.  Okay. Let me think. We're going
back to, I guess, the very, very beginning. So
House of Corrections was my first jail I worked
at. That was 2015 to 2017.

While there, I had a visitor bring
her children to visit the inmate. My job was
to search the visitor and the children before

Page 22

they come into the visiting room. Now, being a
new officer, I believed I had done that
thoroughly; obviously, I didn't.

The baby, when I searched the baby
-- the baby was an infant, so it might have
been nine or ten months old -- the mother had
put Suboxone and marijuana in the pamper. I
missed that.

So our job, when we change -- the
parents have to bring a new pamper every time
they bring a child to visit, and they change it
in front of the officer, in front of us.

So the mother did change the pamper,
but -- I'm guessing she was smart, or she was
doing this long before I even started -- she
had already had the drugs in the pamper; I
didn't see the drugs in the cotton part of the
pamper. So --

Q.  The new pamper or the used pamper?

A.  The new pamper.

Q.  Okay.

A.  She must have -- so she brought a
pamper. You have to bring a pamper in. Like,
this bottle of water (indicating), this was the
pamper she brought into the room to change

Page 23

(indicating) --

Q.  Okay.

A.  -- to take off the old pamper. So,
again, I remember this because I got
disciplinary action for it.

So, after the visit was over, the
male inmate must have gotten the contraband out
of the pamper from holding his baby, and must
have taken it out (indicating).

The officer, the male officer in the
search area that searches the inmates before
they go back into the jail, found the
contraband on the inmate. So that's when they
go back to our records, and they say, "Well,
who searched this civilian?"

"Officer Frasier did that day, at
this time. She searched the girlfriend and the
two children."

So once all of that is, like,
thoroughly done, now they call me and say,
"Hey, this is what was found. Can you tell us
what happened? How did you miss it?"

And I'm like, "I didn't even know I
missed it. I searched the children; I searched
the infant. I didn't find contraband on them."

Page 24

And they're like, "Well, the
contraband was found on the baby."

So I got a disciplinary write-up for
that. I wasn't very happy about that, because
I was still new within 2015-2017, learning the
job. But that's the job.

Q.  How did they know the contraband
came from the baby --

A.  Because --

Q.  -- if it was found on the inmate?

A.  -- the dad wound up telling -- you
know, because he got in trouble too. He got
disciplinary action as well.

So our male inmate -- let me be
clear, I work with males. So when they get
ready to go to the hole, the place they go for
disciplinary action, based off of the time they
will get, some of them will start to be a
little forthcoming so they don't get as much
time. He was, I guess, forthcoming and said,
"Yeah, well, it was in my baby's pamper."

Q.  And what consequences did you face
for that?

A.  I got a disciplinary write-up.
Basically, they called it

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 11 of 85

Deposition of Gena Frasier                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 25

"counseling," where they say, you know, "In the future, going forward, your job responsibilities at the PDP are to make sure," you know, blah, blah, blah. "If you get another disciplinary action for this infraction, you know, you go a step higher."

So it was something that was in my jacket for that.

Q. Understood. Anything else?

A. Yeah. Ten years.

So -- excessive pepper spray. So I had an inmate who had refused to -- I can't even remember. He was in Charlie Building --

Q. "C Building"?

A. I'm sorry. C Building. We call it -- instead of saying "Charlie," we say "C." But yes, C Building.

He had refused something. I can't remember the particulars. And I remember pepper-spraying him for noncompliance. But when I -- after I pepper-sprayed him, I shut the door, and I called for my supervisor to come over because he was very aggressive.

My supervisor came over and asked me, you know, what happened, and I told him

Page 26

what had happened. Again, I can't remember the particulars, whether he was banging or kicking or yelling. I don't know the particulars, but I know that I had pepper-sprayed him.

My supervisor had another officer go to the door with me. We brought the inmate out of his cell. He was escorted to Medical to get decontaminated from the pepper spray. But, long story short, I believe they said that my pepper spray was excessive, that I shouldn't have sprayed him.

And I -- I can't remember the outcome of that, but it was another write-up, like, another counseling that --

Q. When did that happen?

A. I want to say before COVID, since I'm using -- kind of thinking of that timeline.

Q. That's fine.

A. Maybe 2019.

Q. And that got another counseling?

A. Yes.

Q. And was there -- have there been any since then?

A. I'm trying to think. Oh. Okay. So -- again, I don't know the year. I wish I

Page 27

had known; I could have pulled all this out of my jacket with the time and date for you.

I was working in B Building, which is Bravo, and a civilian stated that an inmate had touched her rear end when I walked away from the desk. So the Lieutenant, at the time, wrote me up for leaving my area while the civilian was on my block, with the inmates.

I remember going to my hearing, because I -- it was what we call it when we fight a write-up, when we know we didn't do anything wrong. You kind of go there to plead your case.

I asked the Union rep to pull the cameras that day. And I explained that I'd left that area because they'd called me for an emergency back in Unit Management.

So I ran off the block, which -- the camera showed me run off the block, to tend to the emergency in the back, and come back. The camera also showed that the inmate that, allegedly, touched the civilian's backside -- it never happened.

I was so thankful for cameras that day. It was just beyond my --

Page 28

Q. So you were -- that one was not sustained?

A. No, I was cleared from that one.

Q. Okay.

A. But it was -- I'm just giving you --

Q. Sure.

A. It was a write-up, but I was cleared from that one.

Q. All right. And what's the next one?

A. So I transported a prisoner, one day, on a medical trip. When I returned back to the jail with the prisoner, I was in Medical with my prisoner. You can't leave your prisoners in Medical when they come back from a trip; you have to take them back to their areas.

So my Sergeant, at the time, did not think I was back. I'm not sure -- I can't remember why; it was foggy -- but she did not think I was back. But I was back; I was in Medical with my inmate. She said she paged me, and she said I didn't respond, which was -- wound up being false, because I did respond.

Basically, I beat that write-up too.

Q. Okay.

Page 29

A.   She had tried to say that I wasn't where I was supposed to be.  But the cameras, again, said, "Hey, listen, this is her.  She was in Medical with the inmate; she's here.  You're arguing she wasn't here, but she was here."  So that was thrown out.  So that was another disciplinary infraction.

And then, of course, they wrote me up for this situation with Mr. -- I think it's Jung.

Q.   Jung, pronounced like a "Y."

A.   Jung.

Q.   I'll ask you more about that one.

A.   I believe that was another one.  And I beat that one, as well, meaning I was able -- it was able to be shown that I didn't do anything wrong.

I think that's all I can remember.

Q.   Was there a pepper-spray incident after that?

A.   I mean, there might have been.  I don't remember.  You know, it's very possible, because we do pepper-spray when needed.

Q.   2024?

A.   I'm not going to say it didn't

Page 30

happen.

I mean, I would have to see the name, the inmate, where I was when I pepper-sprayed.  2024?  So just last year --

Q.   Did you get a --

A.   No, go ahead.

Q.   I was just wondering:  Have you ever received anything more than informal counseling?

A.   Suspension.

I was suspended for five days.

Q.   Do you know when that was?

If you know.  If you don't know, that's fine.  We can get it from --

A.   Yeah.  I was suspended for five days.  And it might have been for the pepper-spray incident that you might be talking about.  But the incident didn't happen in 2024.  I don't believe it did.

The City of Philadelphia/Department of Prisons, a lot of things were put on hold because we were so short that we weren't being, maybe, disciplined at the time of the situation.  I think I know what you're talking about; I just can't remember the situation.

Page 31

But I did get a five-day suspension for that; definitely, I did get that.

Q.   The records will say when it happened.  But is it common -- usually, how long is it after a write-up before a hearing?

A.   That's just it:  I can't even give you a timeframe, because it doesn't even happen right away.

One of the incidents that -- I wish I had better clarity on it -- it happened, like, two years ago, and they had just given me the date, the suspension dates for it, from an incident that happened, like, two years ago, because we were so short, and I guess they felt like -- I'm just assuming -- the Department of Prisons, like, "Well, we need officers.  We really can't be suspending people for five days; we have to wait until we get more officers."  I'm just assuming.

But it didn't happen right away.

Q.   I think I understand what you mean, because you said you're just assuming --

A.   Yeah.

Q.   -- but to follow up, has anybody ever given you any explanation as to why

Page 32

sometimes there is a delay between a charge against an officer and then a hearing, that it can be months or years?

A.   No.

Q.   Going back to 2015, what sort of training did you receive when you became a Correctional Officer?  And you can just start at, just as general as possible, how long it was, where it was, what it consisted of, and then I can zero in on more specific questions.

A.   I do remember receiving a CPR training.  First Aid training.  Glock training.  Mental health training, we would go to some mental health trainings.

Q.   So I want to ask you about the -- what did you say after "CPR"?  Emergency aid?

A.   First Aid.

Q.   What does First Aid consist of?

A.   It's been so long.  Basically, teaching us how to wrap bandages around wounds properly, making sure that the wound is clean before we put a gauze pad on.

And then, basically, just being able to advise the inmate -- you know, if they had a cut, and they say, "Hey, C/O, I cut my hand on

Deposition of Gena Frasier                              Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 33

the gate over there," I'd look and say, "All
right.  Let me send you to Medical, let Medical
assess it" -- because, you know, I don't know
if it's infected; I'm not a doctor -- "I'm
going to write you a pass and let you go to
Medical because you showed me your hand."
        They would come back and say, "Oh,
Medical just cleaned it up and put a patch over
it."  Okay, fine, Medical did it; over and done
with.  But we don't, personally, clean their
wounds or anything.  You know, it's our job
just to say, "Let me write you a pass to
Medical and let Medical determine that."
    Q.    And you said you had some "mental
health training."  Do you have any -- was that
-- like, how long was that, do you think?
    A.    So when we would go over to the
Academy, if I remember, it was, like, a day
training.  They would hire -- "they," meaning
the City of Philadelphia, I'm guessing --
different contractors would come in and do
different group scenarios or trainings about
mental health, signs to look for in the
inmates.
    Q.    Do you recall what some of those

Page 34

signs are?
    A.    Well, if the inmate was isolating in
the cell, and I know that -- if that was my
block, and I've been on that block for, let's
say, a consistent amount of days, and "Hey,
such-and-such didn't come out now for, like,
the third day," that's something, now, I have
to look into and say, "Let me call Mental
Health, put in a referral."
        And my referral, it would ask me,
you know, Is the person depressed, suicidal,
Are they talking, isolating, Are they giving
away valuables, Are they interacting with you,
Are they interacting with their peers.  Like,
those kind of questions are in a mental health
assessment, so I would answer them to the best
of my ability, from my observation, and then it
would come up "urgent," "emergency" or
"routine."
    Q.    What's the difference between
"urgent" and "emergency"?
    A.    So "urgent," I believe they can be
seen within 24 hours; "emergency" means right
away.
        So an emergency situation would be

Page 35

-- so let's say the inmate I've been talking
about, that might have been in his cell for
three days, when I do my tour is now -- if
they're refusing to come out, they're refusing
to take medication, and they're -- let's say
they're walking around naked, banging their
head on the wall, that's going to be an
emergency because, now, we need to get that
person out of the cell.  You haven't come out
for a couple days, you're refusing medication,
and if you're -- well, for us, if I see you
walking around naked, that's a sign right
there:  That's not normal; you don't just walk
around naked, banging your head.  So that would
be an emergency for me, as the block officer.
        Now, I put it in as an emergency in
the system, in the Lock & Track.  Once I get a
rover or another officer or a supervisor to
come get that inmate, they cuff him, they put
some pants and a shirt on him, if they're
willing to put the pants and shirt on; that can
be a whole other situation.  If the person is
willing to put the pants and shirt on, we cuff
them, and then the person is escorted to Mental
Health, where they would meet with the Mental

Page 36

Health team.
        At that point, the Mental Health
team does their assessment and says, "Hey, this
person got down here and said that they were
walking around naked because they were hot.
They said they were banging their head because
that's what they do when they get a headache.
They're talking to us fine.  He's coherent;
he's compliant.  We're sending him back to the
unit."
        I say, "Okay."  That's Mental
Health.  My job is to send him back to the
cell; we don't do anything else after that.
    Q.    You said, "Glock training."
        Do you carry Glocks?
    A.    Yes.  9mm Glocks with 16 rounds.
    Q.    Do all C/Os have those?
        ATTORNEY GROTE:  Objection to
form.
        But you can answer.
        THE WITNESS:  Yes.
BY ATTORNEY GROTE:
    Q.    What other -- you mentioned mental
health training.  I think you were talking
about -- do you get trained on how to make

Page 37

rounds?

A.   So I'm going to say yes.

Obviously, I was -- as a rookie, when you first become a Correctional Officer, you are -- you're shadowing other Correctional Officers, and they're showing you how to do tours.

And my first jail, HOC, House of Corrections, was very different from CFCF.  HOC was what we call a "mass movement facility." The numbers on the blocks there were more than the numbers at CFCF.

So housing area at House of Corrections would have anywhere from 90 to 130 prisoners on a block.  It's called a "block" at House of Corrections.  There, you walk down a block -- it's a straight block; it's just straight -- and the inmates would move while you do your tour, check the cells.  You speak to the inmates, make sure everything was okay on the unit.  Your partner would stay at the top of the block and try to keep as best a visual of you as possible, but you do get lost in the crowd of inmates, because you walk amongst them, very close contact with them at

Page 38

House of Corrections.

So, by the time you get to the back, you have now toured a block with 130 prisoners. And if everything is okay, you come back up the block, and you come back to your desk, and you put in your log, "Tour completed.  Everything appears fine."  It -- "everything appears fine," we never really know 100 percent what's happening or how people are feeling; we always say "appears."

Q.   How does that compare with CFCF? When you make tours in CFCF, what are those like?

A.   So CFCF, we have pods.  They're called "Unit Management Areas."  So we go up the steps -- well, you can start either at the top or the bottom.  So we have a tier on the bottom, and you have a tier on the top, so you can either start at the bottom or top.

But you just walk around, you look in the cells, make sure that the cells are in compliance, that there's no clothing lines up, no debris all over the cell.  If there is, then the inmates are given warnings:  "Listen, you've got to get those clothing lines down,

Page 39

"You've got to get the debris up before you come out for rec time."  Either they comply or not; it's up to them.  We just inform them of the rules of the housing area.

So then you walk around.  Again, you do that on the bottom, and then you come up the steps, and you do the same thing on the top. That's a tour.

Q.   Okay.  Are tours documented?

A.   Yes.

Q.   How?

A.   In our Lock & Track system.

We're supposed to put them in there every -- excuse me -- every 30 to 40 minutes, you're supposed to tour the area.  I would say -- yeah, every 30 to 40 minutes.

Q.   And you might have touched on this already, but just generally, what's the purpose of making tours?

A.   Safety and security of the unit. And safety and security of the inmates, as well, just trying to make sure that they're safe, and if they are secure, that they're safely secured in their cells.

Q.   Were you trained on -- I mean, you

Page 40

spoke a little bit about First Aid.  But were you trained on responding to medical needs of inmates in any way?

A.   No.

Q.   What about -- did you ever have a role in assisting with the provision of medical care, like escorting nursing staff on housing units?

A.   Say that question one more time.

Q.   Would you ever escort -- do you ever escort medical staff in order to -- in order for them to be able to perform medical duties?

A.   Yes.

Q.   And in what circumstances would you do that?

A.   Quite often.  Civilians are not supposed to walk around the units without an escort, for safety reasons.

Q.   Does it happen, though?

ATTORNEY PESTRAK:  You can answer.

THE WITNESS:  Yes.

BY ATTORNEY GROTE:

Q.   And how does that happen?

Why does that happen?

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 15 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 41

A.    So, in order to get onto a unit, we have what we call a "booth officer" outside of the unit, who controls the doors to come on and off of the pods.

During COVID, we were really, really short-staffed, so it would be one officer on a unit.  If a nurse would come to the door, the booth officer will buzz them into the sally port area.  If there is no inmate in the sally port area, then the booth officer will sometimes buzz the civilian or nurse onto the unit while I may be on tour.  I might be walking somewhere; I might be talking to an inmate; or I might be doing anything.  But sometimes they would come onto my unit.

When I notice them, I would try to stop them and say, "Hey, wait a minute, I'll be with you shortly."

Some of them would say, "Oh, I've got it.  I'm just going to the door to ask them a question."  Sometimes, before I can even stop what I'm doing, sometimes they go to the cell door, ask the question they want to ask, and then they would go off the unit.

Is it supposed to happen?  No.  Does

Page 42

it happen?  Yes.

Q.    Understood.  Why are medical staff supposed to have a correctional escort?

A.    For safety, for their own safety.  They're civilians.

Q.    In case anything happens?

A.    Yes.

They're considered civilians.  And any civilian that comes onto the housing area, their safety is the priority of the officer.  At least it should be, anyway.

Q.    Where is medication administration provided in CFCF?

A.    Okay.  So medication is provided in the Unit Management area, and it can be provided on the actual unit.

Q.    Can you break down in what instances it's the Unit Management area and what instances it could be provided on the unit, as far as you know?

A.    I'm just trying to give you as clear examples as possible.

Again, when we're short-staffed, a nurse would come to our unit and say, "Hey, I'm here for medication."  We would, along with the

Page 43

supervisor, decide if it was safe to escort the nurse around to give the medication, because we're so short that the jail may have been down, but the inmates still need their medication.  It wasn't safe at one point, during COVID, for us to let them out, because we did not have the manpower at the time.  I'm just using COVID as a factual example.  It just was not safe, and it was not allowed.

So we would escort the nurse to every cell door.  We would crack the door -- myself and a supervisor, or myself and a rover -- and the nurse would give the individual their medication.

Q.    So if there is sufficient staff, is the normal, preferred procedure for medication to be administered in the Unit Management room?

A.    If is sufficient staff and rovers, medication is done on the unit, right next to the Correctional Officer's desk, behind a -- the nurses are behind, like, a Plexiglass, and they just put the -- slide the medication out underneath the glass.  It's, like, this much space (indicating), and they can just pass the medication underneath the glass on the

Page 44

unit.

The inmates might come from their cells.  We might do, maybe, five cells at a time.  We'll say, "Hey, Cells 1 through 5, medication.  We're coming around."  I would come around with my key; I would let those gentlemen out; I would shut those doors back; and the gentlemen would come up and get their medication.  Once they get their medication, they come back to the their cells.  I put them back in, and we do another five cells, and so on and so forth.  But it's done on the unit, and the nurse is behind Plexiglass.

Q.    And you used this term a couple times, but for the record, can you explain what a "rover" is?

A.    A rover is our officer that is not assigned to a pod; they're constantly watching our backs outside of the pods.  So a rover is, like, an escort officer.  Their job is to just watch our backs on the pod when we're by ourselves.

Q.    And we talked about medication administration.  Is that how insulin was administered or is there any difference there?

Page 45

A.   So insulin, typically, is called back in Unit Management.  I think -- again, I'm not medical -- but my times of doing insulin, the guys, we would call for them; they would tell us either "Yeah, I'm getting it," "No, I don't want it."

If they come out of their cell for insulin, they come off the block and go to Unit Management.  I think the insulin and stuff is kept in that area, in Unit Management, because maybe it was cool.  I mean, some insulin might have to be refrigerated.  I don't know.  I'm not Medical.  But typically, it was done in Unit Management, to answer the question.

Q.   And so those on the housing unit who needed insulin would be notified that it was time for the administration of insulin?

A.   Yes.

We kind of yell out on our unit.  And we yell for medication.  So when the nurses come into our areas, our booth officer says, "Hey, Frasier, medication in progress."

Now, I'm on the block.  I would say, "Hey, fellas, medication in progress.  Everybody that's getting meds, come on down."

Page 46

They'll start to come down, and I make sure that they've got their pants and their blue shirt on, and their armband.  And the booth officers buzzes them out, and they go right to the back to get their medication, and then they're supposed to come right back to the area.

Q.   Now, as a Correctional Officer -- is it "Correctional" or "Corrections"?

A.   Correctional Officer.

Q.   As a Correctional Officer, would you know who was diabetic or who needed insulin?

A.   No.

Q.   So the announcement would just go out to the housing unit?

A.   Generally, we yell it out, "Insulin in progress," "Medication in progress," "Special meds in progress," "The net program in progress."

We have little speakers on our desks, so you can use the speaker.  Or if you have a clear, loud mouth, like myself, you just kind of yell it out.  On the units, it's an echo, so the guys hear it.  And then the other guys would be yelling it, too, "Yo, insulin in

Page 47

progress," "Come on, get your meds."  So the guys, also, would yell it as well.

Q.   You, in an earlier answer, said, you know, some people might tell you that they're not going to insulin --

A.   Yes.

Q.   -- or that they're not -- I mean, would be people sometimes they're not going to seek medication as well?

A.   Yes.

Q.   What were you supposed to do if somebody informed you of that?

A.   We let the nurse know that such-and-such refused medication.  And at that point, it's up to the nurse, what they want to do.

Q.   And how do you let the nurse know?

A.   We just call them.  Or we'll go to the back and say, "Hey, such-and-such refused medication."  We give them their name and PP number, or they'll just ask for the PP number.

Q.   And would that be documented, when you did that?

A.   You can.  If you have the time to get to your computer and put in there, "Insulin

Page 48

in progress.  Such-and-such refused," if you have that time to put it in there, you can put it into your Lock & Track.  You can.  You can, absolutely.

Q.   Is that something you would do?

A.   I believe I have done that, yes.

To answer your question, yes.

Q.   And if it goes in Lock & Track would you also put in Lock & Track that you notified medical staff?

A.   You can do that.  I'm not sure.  Depending on what I have going on, at that moment, how busy I am.

Q.   And I'm kind of just asking if that's a regular -- if you have a regular practice there.

A.   I can't say, like, it's reg- -- like, I do it faithfully, every -- I can't say for sure, to be completely honest with you.

Q.   Were you ever provided any training on what to do if an inmate notifies you that they're refusing medication?

A.   No.

Q.   And can medical staff -- do they have access to Lock & Track?

Page 49

A.   You know what?  I'm going to say no.

Q.   Are you sure of that?

    Or are you guessing?

A.   Well, I don't know if they --

Q.   I don't want you to guess.

A.   Yeah, I don't know if medical staff has access to our Lock & Track.  I don't know.

Q.   I'll put it this way:  As far as you know, do they?

A.   As far as I know, I do not know.

Q.   Okay.  Are there instances where medical staff have contacted you to ask why an inmate has not shown up for their medication, or to inform you about some issue with them not coming to med line?

    ATTORNEY WITTEKIND:  Objection to form.

    ATTORNEY KAMINSKY:  Join.

    ATTORNEY PESTRAK:  You can answer.

    THE WITNESS:  I'm going to say yes.  The nurses have a list of the inmates that receive medication.

    So -- again, I can just use myself as an example -- if she gives me a list and

Page 50

says, "Hey, 'Frashe,' I've got 18 for medication," and my job is to get those 18 out of their cells to the window for medication, if I go to a cell and I say, "Hey, such-and-such, are you coming out," and they say, "No, I don't want it today," "Okay," then I put a red mark next to the name.

    When I get back to the window, I would let the nurse know that such-and-such refused.  That is the extent of what I have to do, as a Correctional Officer.

Q.   Do nurses ever -- have you ever been present when medical staff has had an inmate fill out a refusal form?

A.   Yes.

Q.   How often does that happen, you think?

A.   Not too often.

Q.   Is it done at the cell door?

A.   It would depend on the nurse and the circumstance.

Q.   If it was -- let's say somebody's on the housing unit, they don't go to medication, and the nurse contacts you and says, "I need to go get a medical treatment refusal form

Page 51

signed," would you or some other Correctional Officer have to escort that nurse?

A.   Yes.

Q.   Were you trained in -- and you spoke of responding to -- what are you supposed to do if you encounter a medical emergency?  How do you identify if there's a medical emergency, and what steps do you take if you determine that this might be a medical emergency?

A.   So if I notice an inmate having a seizure, or at least if I think he is having a seizure, I would get on my radio and call for a stretcher call.

    Medical will then come on my unit. I need to secure my area before they come onto the unit, meaning I need to secure the inmates. Sometimes one or two inmates will stay out with me, for safety reasons.  Because if the inmate is having a seizure, we don't want him to hit his head, like, too many times.  So sometimes they may have buddies to told the head still, and my job is to make sure nobody else comes around that inmate.  Meanwhile, everyone else is locked, and they know to step in their cells or go to the yard.

Page 52

    Then Medical will come on and say, "Hey, Frasier what's going on."

    "I think he's having a seizure.  I'm not sure."  Then Medical takes over and determines whether it was a seizure or whatever it was at that time.

    After everything was cleared, I would try to get to my computer as quickly as possible, if I can, and put in there, "Stretcher call was needed."  I would have the inmate's PP number; I would try to put that in the computer.  "Medical staff arrived on the unit."  I would try to remember the nurses' names; sometimes it's three or four of them that come when it's a stretcher call.

    Most times, a supervisor will try to respond, as well, just to make sure that everything is okay on the unit after a stretcher call.  That's not always the case, but most of the time, a supervisor will show up.  And if everything is good, and Medical is taken off the block, then I let my guys go back out, and we just go on with our day.

Q.   So that example was about a hypothetical seizure.

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 18 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 53

A.    A hypothetical seizure, yeah.

Q.    Is it the same procedure for any other medical emergency, something that would be determined to be an emergency?

A.    So, again, if I see an inmate maybe lying on the floor and appears to not be moving -- like, I may think he's not moving, so I would kick the door, or I would bang on the door, "Hey, hey, you good?  You okay?"

If they don't answer, I'll try again.  Then I'll open the door, and I'll say, "Hey, such-and-such are you okay?"  Either they'll say, "Yeah.  Get out of here.  Shut the door" -- okay, cool, he's okay; he's just laying on the floor -- or they may say, "I fell.  I need a stretcher call.  I need help."

Okay.  So then -- again, my walkie is already on me -- "Stretcher call needed to --" blah, blah, blah.  Again, I would do the same thing, secure the area, stand by at the door.  We do not go in the cell by ourselves, under no circumstances, because we can't take that risk of being held hostage in a cell; you don't know if the inmate is playing a trick to get you in the cell or if they are,

Page 54

legitimately, having a medical emergency.  So you stand outside the door, at that time, especially if you are by yourself on the unit.

Q.    If you can't tell whether or not it's a medical emergency -- you're speaking to the person, and you just can't tell one way or the other -- then what do you do?

A.    I would still call Medical.  If they're laying on the floor, and they're telling me, "Stretcher call needed," I would let Medical make that determination.

Medical will come.  They'll assess the inmate, "Frasier, he's good."

"Okay, thank you."  And that's that.

Q.    And you would rely on Medical's determination about whether there's any further need for medical care in that circumstance?

A.    Yes.

Q.    I want to get some clarity on something I was asking about a moment ago.

I think you said you wouldn't know who was on -- who's receiving insulin or who's certain medication, as a general matter; is that accurate?

A.    Again, we receive a list --

Page 55

Q.    You -- okay.

A.    -- from the nurse, with the names of the inmates that get medication.

Q.    So you -- would you not know what medication they're getting, but you would know that they're on the med list?

A.    Correct.

We don't know the meds they get.  It's just a printout that says the cell, the inmate's name, the intake number, the PP number.

I think that's it.  I could be missing something, but basically, that's what it looks like on a medication list.

Q.    And why would they give you the medication list?  So you know who was authorized to go to med line?

A.    Yes.  For me to call those individuals out.

So, on the housing area, you can have -- now the capacity is 64 on a housing area.  So let's say I have 20 that need medication, not all 64 need medication.  So Medical has a list of the 20 that need medication; I call those names or those cell

Page 56

numbers out.  If the gentlemen want to come out for medication, I go to the cell, I let them out, and we go get their medication.

Q.    So is that -- when people are being called for med line, are they being called individually, like you just described?

A.    Yes.

I would call by last name or, if my paperwork shows two in the same cell, I would say, "Cell 3, medication."

Q.    Right.  I get it.  So --

A.    And most of the time, they know that they have to get meds, if they want to take it.

Q.    Right.  That makes sense.  I didn't know, before, when you were talking about using the intercom or you project your voice, whether that was a sort of medication call for everybody at once.  But it's patient by patient or cell by cell is what you're saying?

A.    And we still make the announcement in general, regardless.

So the booth officer comes over the speaker, "Frasier, medication in progress."  Once the booth officer says it, then I say it, "Fellas, medication in progress.  Anybody

Page 57

getting meds, be on your door. If you're out, go get your meds."

Now, I have a list in front of me that I have received. So I'll know when they go off my block, Cell 3 went off my block. If this is your block, you kind of know your inmates; if it's your area, you'll know Cell 3 went off, Cell 8 went off, blah, blah, blah. If it's not my block, and I don't know the inmates, then definitely, I would call them by name because I need them to come off the block for their medication.

Q. And when you call them, would you do that from the booth?

A. It would depend if I'm at my desk -- no, no. I'm on the unit. I'm the officer on the unit, not the booth officer.

Q. The desk, not the booth. Sorry.

A. It's okay.

Q. So would you do it from your desk, or would you go to the cell door?

A. (No response.)

Q. Okay. So what I'm -- let's say there's two people in the cell that need medication and, from your position, you can't

Page 58

see into the cell. Would you just call them over the speaker, or make the announcement? Or would you go up to the cell and say, "Hey, medication"?

A. So, in that case, I would have to go to the cell to let them out of the cell.

So, generally, during a regular day, if we're operational, the guys are out, some of them are out. Half out, half in. Depends on the staffing. Or they could all be out; it would depend on the day. So, again, just using COVID, we were only running a tier at a time, because we were short-staffed, so -- meaning only half a tier was out.

So let's say Cell 17, both of those guys needed medication up top. Then I would have to go up there, and crack Cell 17, and get those guys out so they could go downstairs to get their meds.

Q. I get it. So if there is not day room or out-of-cell time happening, and somebody was in the cell, then you would go to the cell to --

A. Absolutely, to get them out, yes.

Q. Okay. Got it.

Page 59

ATTORNEY PESTRAK: I'm just going to remind you of the instruction to wait until he finishes the question before you answer it, for his sake (indicating).

THE WITNESS: Okay.

BY ATTORNEY GROTE:

Q. I'm going to ask questions about what other types of emergencies you have been trained to recognize and respond to.

So what about an inmate-on-inmate assault? How do you respond to that?

A. Okay. If I am notified by another inmate that "Cell 3 is fighting" -- you said "inmate-on-inmate"? Am I clear with your question?

Q. Yes.

A. Okay. I will go to the cell door, first, to see if they were play-fighting or they were really fighting. If I approach the cell door, and they are really fighting -- blood, and they're not stopping -- after I give them several verbal commands to cease all actions, "Stop fighting, stop fighting," and they don't listen to me, I call for a response on my radio. A response, basically, is asking

Page 60

for support from other Officers, and a supervisor will come on the block at that time.

Once the team arrives, the team will start to secure my area. I'm still at that door, with my radio, watching the inmates fight. Under no circumstances are we supposed to open that door, while two inmates are fighting, when you're by yourself. You need backup; you need help.

Once the backup arrives, and a supervisor has arrived, the supervisor will then say to the fellas, "Gentlemen, stop fighting. Cease all actions."

If they still continue to fight -- because they're fighting -- then the supervisor will give an order for an officer to spray, because we need them to stop fighting.

So one of us will open the door; another officer will spray. Hopefully, by then, they will separate. We'll handcuff them, and we'll get them both to Medical to be evaluated and decontaminated.

Q. Thank you for that answer.

How do you respond to somebody who's expressing an intent to harm themselves or

Page 61

commit suicide?

A.   If an inmate says to me, "Frasier, I'm about to kill myself," if he doesn't have a celly in the cell, and he's by himself, then I will call for my supervisor to come over, because, now, I need another set of eyes while I do my emergency referral.  So a supervisor or a rover -- it can be either, but I need another set of eyes to come over while I go to the computer and do what I explained earlier, an emergency referral.

I put in there what the inmate stated, as best as I could from what he has said.  Once the emergency referral is generated, again, if it comes up "emergency," then the supervisor or the rover or myself, whoever's available, will cuff them, if they're compliant, and we'll get them escorted down to Mental Health so Mental Health can take it from there.

Q.   And what if an inmate is just nonresponsive, and on the floor or on the bed or otherwise not engaging in any conversation, and you can't -- yeah, they're just not responsive.

Page 62

A.   So "nonresponsive," you mean verbally?  You don't mean --

Q.   Correct.

A.   -- health-wise "nonresponsive"?  I just want to make sure I'm understanding you.

Q.   Well --

A.   When you say "nonresponsive" --

Q.   "Nonresponsive," let's say they're not being verbal, but they're also not moving.

A.   Okay.  So if an inmate is completely nonresponsive -- not moving, not answering -- once I do yelling -- and I hate to say "yelling" -- but, you know, basically, we yell through the door before we open the door.  And we'll bang on the door, we'll kick the door, to try to get them to move, or to see if they're alive or they're passed out or whatever the case may be.

If I get no response, I will call for a stretcher call, and the supervisor will then come over.  They will respond, and they'll say, "Frasier, what's going on."

"The inmate is just laying here.  He's not moving, and he's not answering me.  I don't know what's going on."

Page 63

Then they'll -- the supervisor will, probably, do exactly the same thing I did -- not "probably"; they will -- they'll try to get their attention through the door first, to see if the person is going to wake up, if they're going to move.

By then, if Medical says, "Let's open the door.  Let's see what's going on," then we'll open the door and see what's going on.  And that's when it's up to Medical, at that point, because they will assess the situation.

Q.   All right.  In the case where there is any potential medical issue, is the protocol, generally, you call the medical staff, and they make an assessment of what needs to be done?

A.   Can you say that one more time?

Q.   If there's -- if you have any question as to whether an incarcerated person is having a medical issue requiring treatment, is the protocol to get medical staff to make the assessment as to what is to be done?

A.   Yes.

Q.   Okay.  And were you trained in

Page 64

recognizing any signs and symptoms of medical distress?

A.   No.

Q.   Do you -- what, in your experience, would you recognize as signs of medical distress?

A.   So, for me, if I see -- again, this is pretty common, unfortunately, in the prison system, seizures because of drug overdoses, or maybe just because they come in with seizures from medication or lack of seizure medication -- I'm not sure -- if I see, again, somebody laying on their side and foaming at the mouth, I think that's a medical emergency.

I would call for a stretcher and let Medical come and assess the situation.  That's what I would do if I see someone -- you know, they're foaming at the mouth or laying there having convulsions.  I would call Medical.

Q.   What would be some other signs of medical distress?

Well, let me ask:  What about somebody who expresses that they're in a lot of pain?

A.   Well, if an inmate says just that

Deposition of Gena Frasier

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 65

1  general statement, "C/O Frasier, I'm in pain,"
2  "Okay.  So you have to fill out a sick call."
3  And they have to -- Medical will call for them
4  to come down.
5        I can't assess the pain level that
6  the person is in.  If they're talking to me,
7  saying they're in pain, and that's all they are
8  saying, that they're in pain, they're not
9  saying anything else, like "I need to go to
10  Medical," "I'm in a lot of pain," "I can't
11  move," "I can't walk," if they're not giving me
12  details of how they're feeling, they're just
13  giving me a broad statement of "I'm in pain," I
14  have to do the proper protocol, which is fill
15  out a sick call.  You write how you feel on
16  your sick call, and Medical will evaluate you
17  as soon as they get the sick call.
18        Q.    If a statement like that -- pain,
19  not doing well -- were accompanied by something
20  more specific like "I cannot move" or, you
21  know, whether they have an injury, as well,
22  would that kind of change what happens there?
23        A.    Yes.  Then I would call for a
24  stretcher call.
25        Because if you're telling me,

Page 66

1  "Frasier, I can't move," "I fell, I hit my
2  head," that's a stretcher call.  I'm not
3  Medical; they're going to come and assess you,
4  help you, either take you out or, like, treat
5  you right there.
6        Q.    Understood.  Were you ever provided
7  training on any specific medical conditions you
8  might encounter?
9        A.    Now, I remember them showing us a
10  video, like, at the beginning of summertime, if
11  we think an inmate is overheated.  I think I
12  remember seeing a video like that.
13        Q.    Was it this summer?  Every summer?
14        A.    I can't say for sure it was this
15  summer, so I'm not going to say that.  But I do
16  recall seeing, like, a video about heat
17  exhaustion for the inmates, because it gets
18  really hot.
19        Q.    Is there air-conditioning?
20        A.    There is air-conditioning sometimes.
21        Q.    I know what that's like.
22        Are you familiar with what diabetes
23  is?
24        A.    Yes, I would say.
25        Q.    I'm not asking for an expert medical

Page 67

1  opinion, but what is your understanding of what
2  diabetes is?
3        A.    It's when your sugar is a problem.
4        Like, it can be too high or too low.
5        Q.    Has anybody -- and I'm not asking
6  for, you know, specific information, or names
7  or anything -- but anyone close to you or in
8  your family ever had diabetes?  Are you
9  familiar with it through that?
10        A.    Yes.
11        Q.    Okay.  And what is that like for
12  that person?  How is it treated?
13              ATTORNEY PESTRAK:  Objection
14  to form.
15        You can answer.
16              THE WITNESS:  So my mom is
17  diabetic, and she takes a pill.  I can't think
18  of the name; I would know the bottle if I see
19  it.  But she takes a pill.  Not Coumadin.
20  Glipizide, something like that.  But my mom
21  takes a pill for diabetes, to keep her sugar
22  under control.
23        Now, she has sisters that -- but
24  that's another story.  Yeah.  So it's a pill.
25  BY ATTORNEY GROTE:

Page 68

1        Q.    All right.  Other family members,
2  also, have diabetes?
3        A.    Yes.
4        Q.    All right.  Is it something you've
5  been familiar with for a long time?
6        A.    I would say I am aware of it.
7        I'm aware of it.
8        Q.    Were you aware of it before you
9  became a C/O?
10        A.    Yes.
11        Q.    I'm going to ask you -- we'll mark
12  this as Plaintiff's Exhibit "1" for this depo.
13        (Deposition Exhibit Plaintiff-1 was
14            marked for identification.)
15  (A brief discussion was held off the record.)
16  BY ATTORNEY GROTE:
17        Q.    Does this look familiar to you?
18              ATTORNEY PESTRAK:  You can
19  flip through the pages.
20              ATTORNEY GROTE:  Yeah, yeah.
21  (A brief discussion was held off the record.)
22  BY ATTORNEY GROTE:
23        Q.    Have you had a moment to look
24  through this?
25        A.    Yes.

Page 69

Q.   And do you recall ever seeing this
before?  If you recall.

A.   I don't recall.

Q.   Are you familiar with Corizon
Health?

A.   Yes.

Q.   Is that the company now known as
"YesCare," as far as you know?

ATTORNEY WITTEKIND:  Objection
to form.

ATTORNEY PESTRAK:  You can
answer.

THE WITNESS:  I believe so,
yes.

BY ATTORNEY GROTE:

Q.   And was Corizon the medical provider
in the Philadelphia Department of Prisons?

A.   I believe so.

Q.   Okay.  And I asked if you're
familiar with seeing this.  Are you -- do you
ever recall getting any training, consistent
with this information here, about diabetes and
its symptoms?

A.   No.

Q.   Do you receive -- we talked about

Page 70

some of the Training Academy trainings.  Do you
receive on-the-job trainings since you've been
a Corrections Officer?

And I -- well, "on-the-job training"
sometimes has a specific meaning.  I mean,
like, every year, do you receive ongoing,
additional training as part of your job?

A.   Yes.

Q.   In what form?  Like, when does that
happen?  And what type of training?

A.   So, every year, we have to get
Glock-certified to carry our weapons.  That's
every year.  That's really all I can think of.

Q.   Okay.  And so you were, as far as
you can recall, never trained in identifying
signs of high blood sugar?

A.   Not that I can recall.

Q.   And is that the same for low blood
sugar too?

A.   Not that I can recall.

Q.   And we talked about medical refusals
of treatment, previously.  Is it the case that
any refusal of treatment, the documentation of
that refusal was a matter for Medical to --
does Department of Corrections have any role in

Page 71

documenting refusals of care?

ATTORNEY WITTEKIND:  Objection
to form.

ATTORNEY PESTRAK:  You can
answer.

THE WITNESS:  No.

However, if the officer does have
the time -- like I stated earlier, if I'm at
the computer, and the inmate is saying, "Hey, I
don't want to take it," if I can remember at
that moment, I can put it in the computer,
"Such-and-such refused their medication," and
then I can let the nurse know this inmate
refused medication.  And I would try to let the
nurse know, at that moment, if I can get to the
phone, or if I can get to the back to let her
know or him know.

BY ATTORNEY GROTE:

Q.   And just so I understand this -- and
this is what you said before, I believe -- it
can be, time-permitting, entered into Lock &
Track?

A.   Yes.

Q.   And, also time-permitting, it can be
informally or orally told to medical staff?

Page 72

A.   Yes.

Q.   Okay.  Is there any written guidance
-- whether you call it a "policy," "procedure,"
or "protocol" -- that you, as a Correctional
Officer, have seen or can recall that addresses
a situation where you become aware that an
inmate is refusing medical treatment?

A.   Not that I'm aware of.

Q.   Were you ever provided any training
on how to complete your responsibilities when
the jail was short-staffed?

And what I mean is just that --
yeah.  Was there ever any training provided to
say, "Sometimes we don't have enough staff.
People aren't there at work.  There is
vacancies, etc.  In those circumstances, it's
important to do A, B, or C," or "X, Y, or Z,"
or "Here is how you prioritize things,"
anything of that sort?

A.   Yes.

Before the shift starts, at roll
call, if the supervisors are aware the jail is
short, they'll give us a heads-up, "Make sure
you guys are safe today.  Do not open doors
unless you have, you know, another officer with

Page 73

1  you." They'll say things like that, just to
2  keep everybody safe. So they will say things
3  in roll call, just to answer your question, on
4  hour our day might be.
5      Q.   Okay. So, like, they'll give you a
6  little heads-up?
7      A.   They'll -- if the information is
8  given to the supervisors prior to the shift,
9  and they already know that today is going to be
10 a rough day because we had, you know, 80
11 callouts, and everyone is at the shore, right,
12 they may say, "So today is one of those days
13 where -- be careful. Be a little bit more
14 vigilant. Do your tours more often."
15         So yes, that kind of information is
16 given to you in your roll call.
17     Q.   "Everyone is at the shore"? Does
18 that mean everybody went to the beach?
19             ATTORNEY PESTRAK: Objection
20 to form.
21         But you can answer.
22 BY ATTORNEY GROTE:
23     Q.   Does that happen a lot?
24     A.   No. It's just an example.
25     Q.   Okay. Whether it happened, I don't

Page 74

1  think that would be a good excuse.
2          Are you familiar with the term
3  "red-flagged"?
4      A.   I have heard nurses say that.
5      Q.   Do you know what it means?
6      A.   That -- if I recall, my
7  understanding is if an inmate is red-flagged,
8  they're not taking their medication. I believe
9  I've heard nurses say that, and I think --
10 that's what I think it means, that the inmate
11 has not taken medication. I think that's --
12     Q.   And do you know, to the best of your
13 understanding, who initiates a red flag, who
14 receives word of a red flag? Like, how's that
15 -- who's involved in that system?
16     A.   I couldn't tell you.
17     Q.   Were you ever provided training
18 in making accom- -- well, first, if I use the
19 term "disability," what does that term mean to
20 you?
21     A.   Someone is not able to perform,
22 maybe, normal activities.
23     Q.   Were you ever provided any training
24 in disability or on making accommodations for
25 inmates with disabilities?

Page 75

1      A.   So I'll answer your first part,
2  which is: Were we given any training on
3  inmates with disabilities?
4      Q.   Yes.
5      A.   No.
6              If an inmate does have a disability
7  -- my example would be crutches -- someone is
8  on crutches or in a wheelchair, then they are
9  placed on a unit that has a ramp so that they
10 don't have to go up and down steps with
11 crutches, which, obviously, is a danger. And
12 if they were in a wheelchair, they're going to
13 be on a unit with a ramp so that they can just
14 roll their wheelchair up and down the ramp.
15         So yes, we're given that
16 information.
17     Q.   Okay. Do you have -- in your
18 opinion, is diabetes a disability?
19             ATTORNEY PESTRAK: Objection
20 to form.
21         You can answer.
22             THE WITNESS: You know, I
23 don't know if I would view diabetes as a
24 disability. I don't know how it would be.
25 BY ATTORNEY GROTE:

Page 76

1      Q.   Do you know, were diabetics -- if
2  you know, were they housed in -- well, is the
3  infirmary called the "Infirmary" or the
4  "Medical Housing Unit"? What's it called in
5  PDP?
6      A.   So our infirmary is at DC, the
7  Detention Center. That's where our infirmary
8  is. It's on State Road. I don't know DC's
9  address -- it might be 8001 State Road -- but
10 that's where our infirmary is. It's at DC, the
11 Detention Center.
12     Q.   Have you ever worked in DC?
13     A.   I don't know how to answer that.
14             ATTORNEY PESTRAK: To the best
15 of your ability.
16             THE WITNESS: I want to say
17 yes. I wasn't an officer assigned to that
18 jail, but I do go over there and sit on
19 suicidal inmates, or I bring inmates over there
20 when I do transfers. So I have been in that
21 facility.
22 BY ATTORNEY GROTE:
23     Q.   So would it be fair to say that, as
24 part of your job responsibilities, you have
25 worked in that facility, but you have never

Page 77

been assigned as an officer to a housing unit
or a permanent station in that facility?

A.   Yes.

Q.   Okay.  Do you have any knowledge
whether diabetic patients were ever housed in
the infirmary?

A.   Not to my knowledge.

Q.   Were there times you worked -- I
guess, were there any times that you can recall
where insulin and glucose checks were not
happening as often has they should have?

ATTORNEY WITTEKIND:
Objection.  Form.

ATTORNEY PESTRAK:  Objection.
Form.

You can answer.

THE WITNESS:  Not that I can
recall.

(A brief discussion was held off the record.)

ATTORNEY GROTE:  We shall have
a quick break.

(Off the record at 2:37 p.m.)

(Back on the record at 2:44 p.m.)

BY ATTORNEY GROTE:

Q.   So what housing units have you

Page 78

worked on during your employment in the
Philadelphia Department of Prisons?  Or you can
start with -- let's start with what facilities
you've worked in.  House of Corrections, I
hear?

A.   House of Corrections, I worked all
the blocks there.  And they consist of Alpha,
Bravo, Charlie, Delta --

Q.   That's fine.

A.   So that's House of Corrections.
CFCF, all the blocks as well.

Q.   How long have you worked at CFCF?

A.   We -- okay.  2017 -- eight years.

Q.   And you still work at CFCF?

A.   Yes.

Q.   And is intake at CFCF?

A.   Yes.

Q.   And what does intake consist of?

A.   Intake is the area of the jail where
the inmates are first admitted.  They are
brought there by police or ambulance.

Q.   And what happens -- have you ever
been -- have you ever worked in the intake
section, like -- how does intake, when people
are first brought there, differ from the other

Page 79

housing units at CFCF?

A.   Intake is a little busier than the
actual housing areas because -- all right.
When inmates are first brought to the facility,
they go through a screening process based off
of what their needs are at the time.  So the
they are in quarantine for 7 to 14 days -- I
think 7 to 14 days.  I could be off by a day or
two, but generally, they are supposed to stay
in quarantine for 7 to 14 days.

During that time period, they see
the social workers, Medical for whatever
illnesses they may come into the jail with.
They have hearings, like a bench warrant
hearing or a probation hearing, because the
first 14 days, they're really trying to figure
out how long they're going to be at CFCF, or if
they're going to be there, if they can bail
out.  They're trying to get their cases
together.

So quarantine is pretty busy because
the social workers come around more frequently
-- let me say that, "more frequently" -- and
the public defenders or lawyers -- "paid
lawyers," we call them -- they come up a little

Page 80

more frequently, depending on the client's
needs.  Because -- well, individuals who are
incarcerated, obviously, they don't want to be
there --

Q.   I've heard.

A.   -- so if they have lawyers, they're
like, you know, "Get me out of here.  What do I
need to do?"  So the first 14 days is always a
little intense.

Q.   So what is the role of correctional
staff at intake?

A.   So you have two intake areas.
You have the receiving room, where
they first come in.  Those officers process the
belongings of the individuals coming in, i.e.:
money, credit cards, cell phones, things of
that nature.  They process all of that.

Once that part is done, then they
come around, and they go to medical intake,
which is in intake, where they have to give a
urine sample, and they get TB shots from the
medical staff, if they comply, and they do
blood work, if they comply, in that area, while
in intake.

If all goes well, and they're

Page 81

compliant with the urine, the TB shots, the
blood work, then they see a social worker while
they're in the receiving area in intake, just
so they can get a feel for why they're here,
"Do you have money to bail out?"  Sometimes
they can get released ROR.  It all depends on
what's going on.  If we get some of that
information in intake, they don't even make it
upstairs to the jail; they wind up leaving from
intake sometimes.

They get their showers in intake, in
the receiving room area.  Their clothes are
taken from them and inventoried.  They have to
wear orange jumpers, again, for -- while
they're in quarantine, for 7 to 14 days.
Generally, for 7 to 14 days, they wear these
orange jumpers.  They receive their blanket,
toothbrush, toothpaste, a cup, what we call a
"hygiene kit," with soap, shampoo, a little
thing of lotion.  And then, I think -- well,
don't quote me on that, but it's a little
hygiene kit you get.

    Q.   Well, we quote you on everything.

    A.   Oh, yeah.  Well, they get a hygiene
kit at intake.

Page 82

Also, they tell the officers in that
area -- they're allowed to make their phone
call.  Very, very important, when they come in:
Everyone is allowed to make a phone call.  So
they all make their first phone call in the
receiving area, in intake.

Also, we inform them of the phone
process, that the numbers that they dial, the
first five numbers that they dial when they get
to the unit will be the numbers on their phone
list.  Those will be the people that they can
call.  So we inform them of that.

So once they leave the receiving
room intake area, they then come to B Building,
which -- Bravo Building, which is the intake
area of the jail.  When they come to B Building
-- where I used to work; for a few years, I
worked in B Building -- we house them in their
cells.  If we have space, alone; if we don't
have space, they get a celly.

Again, when they come to our housing
area, we make sure that they have their
indigent kit, a hygiene kit.  That's the other,
alternative name for a hygiene kit, an
"indigent kit."  Then they would have a jumper,

Page 83

and we make sure they have skippies on their
feet and they have a blanket for their cell.

Depending on the time of day they
arrive in intake, we will allow them to get on
the phones, if it's rec time; if it's not, then
we let them know when the next rec period will
be, so they can get on the phone.  If they do
come early enough, during the day, if that
makes sense -- because, you know, we don't
close.  So they can come 9:00 at night; there
is no rec 9:00 at night.

So we let them know -- because the
first thing they say is "Hey, I need to call my
wife," or "my kids," or whatever -- "Well, sir,
it's 9:00 at night.  I'm sorry, there's no
phone calls, unfortunately.  But tomorrow
morning, starting at 8:05 a.m., the jail will
be open, and you can start your phone call
situation."

We inform them of the times of
events that transpire during the day, meaning
their rec time out, when we go down for head
count, when we eat.  We try our best to give
them that information when they first come in,
intake, because some of them know, and some of

Page 84

them don't know.  So we try our best to inform
them of that, because it can be a very
frustrating process when you come in, and no
one is talking to you, and you're just thrown
in a cell.  So we try our best, but we don't
always succeed.  We try our best.

    Q.   So intake housing on "B" unit, how
long do people, typically, stay -- if they're
going to be in the jail for weeks, months,
however -- you know, somebody that's not
getting out quickly, how long does somebody
remain on "B" block?

    A.   Typically, 7 to 14 days, they stay
in quarantine.  Typically, 7 to 14 days.  It
can be longer, if they're not compliant with
the intake process.

An example:  If an inmate says,
"Well, I'm not giving blood work."  Okay.
That's your right.  However, when you go up to
the unit, you're going to be what we call a
"med lock" until you comply with the
Philadelphia Department of Prisons policy,
which is -- this is what you have to do in
order to come out amongst your peers.

    Q.   Yeah.  So if somebody is "B" block,

Page 85

1  and then they get transferred -- what's the
2  difference between "B" block and other housing
3  units?
4      A.   Okay.  So B Building is quarantine.
5  B Building, top and bottom.
6      So we have B1, Bravo 1, which has
7  four pods.  And then you have B2, and you have
8  four pods upstairs as well.  So those pods are
9  quarantine pods.
10     There is an exception:  Bravo 1,
11 pod 1, is not a quarantine pod.  That is a pod
12 where we try to house our older gentlemen who
13 come in, like the gentlemen who are -- who have
14 a cane or wheelchair or crutches or something
15 like that.  We try to put those individuals on
16 Bravo 1, pod 1.  We try our best; we don't
17 always have the space, but that is something
18 that we try to do.
19     So once you leave B Building, you
20 then are housed on a regular housing unit,
21 based off of your custody level.  Custody
22 levels are "minimum," "medium," "close," and
23 the lowest is "community."
24     We really don't get too many
25 community levels at CFCF, because we are what

Page 86

1  we call a "close custody facility."  If we do
2  get a community or a minimum-level inmate, and
3  we are aware of it, we try our best to get them
4  over to DC, where those gentlemen are housed,
5  over there.
6      Q.   Back at intake -- there's medical
7  evaluations at intake?
8      A.   Yes.
9      Q.   Mental health evaluations?
10     A.   Yes.
11     Q.   And do you rely on medical staff to
12 let you know what somebody's medical needs are?
13          ATTORNEY WITTEKIND:  Objection
14 to form.
15          THE WITNESS:  They would let
16 us know.
17 BY ATTORNEY GROTE:
18     Q.   Okay.  What is an urgent behavioral
19 health referral?  I think we talked about this
20 earlier, but this is one that would be not
21 right away but within how many hours?
22     A.   I believe 24 hours, I believe.
23     Q.   In what circumstances is an urgent
24 behavioral health referral made?
25     A.   So, in my experience, an urgent

Page 87

1  behavioral referral would be made -- if an
2  inmate says, "I have a court date" -- for,
3  let's say, child support -- but he's locked up
4  for something else, but he knows he needed that
5  child support hearing, and he's anxious and
6  worried about it, if he shares that with the
7  officer, I can do a referral and let Mental
8  Health determine whether or not they want to
9  try to help this gentleman gauge how to handle
10 those emotions and that buildup of anxiety.
11     Because you're here for "A," but in
12 your mind, this "B" situation is, you know, a
13 problem.  So we would do a referral based on
14 what information they give us.  Sometimes they
15 give us a lot of information, and then
16 sometimes you get some guys who just won't tell
17 you enough, and you're like, "Okay.  Well, I
18 don't know how to help you, if you don't tell
19 me what's going on."
20     Q.   Are you familiar with Norristown
21 State Hospital?
22     A.   Yes.
23     Q.   And what is that?
24     A.   It's a psychiatric facility.  We
25 have had people go there, that I'm aware of.

Page 88

1      Q.   If somebody returns from Norristown
2  State Hospital to PDP, to the intake, are -- do
3  you know if they're supposed to receive a
4  behavioral health referral?
5      A.   I don't know.
6      Q.   What is -- so, in the time that's
7  relevant to this lawsuit, so the fall of 2023,
8  how long were the shifts you were working at
9  that time?
10     A.   We were on 12-hour shifts.
11     I had to think for a second.  Yes.
12 I believe we were already on our 12-hour shift
13 program.
14     Q.   Are you still on that program?
15     A.   Yes, we are.
16     Q.   And what does that consist of, in
17 terms of -- like, what's a normal period of how
18 many shifts you're on, how many you're off,
19 etc.?
20     A.   Okay.  So I am Squad 1.  So this
21 week, I am working two on -- Monday, Tuesday --
22 I'm off Wednesday, Thursday, and then I work
23 Friday, Saturday, Sunday.  So this week, I'm
24 doing 60 hours for week, and then I'm off the
25 two days.

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 27 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 89

Now, next week, I'll do just two days, and then I'm off five days.

Q.    And then it rotates?

A.    Yes.  It just keeps going.

Q.    And was that the case back in the fall of 2023?

A.    I believe so, yes.

I can't -- I don't know the exact year we started the 12-hour shift.  But I believe in 2023, we were on 12-hour shifts.

Q.    Do you like 12-hour shifts?

ATTORNEY PESTRAK:  Objection to form.

But you can answer.

THE WITNESS:  No.

BY ATTORNEY GROTE:

Q.    Why not?

ATTORNEY PESTRAK:  Objection to form.

You can still answer.

THE WITNESS:  Just long, longer days.

BY ATTORNEY GROTE:

Q.    How does that affect you on the job?

A.    Depending on where you're assigned

Page 90

in the jail, things can move a lot faster because you have to deal with a lot more people in a longer period of time.  And you can be by yourself, if we're not properly staffed.

So it's -- there are just long days, sometimes, by yourself on your unit, with "X" amount of inmates, and you are trying your best to attend to as many as possible within that long day.  So it's just -- for me, personally, they're just long days.

Q.    Can you take me through what a typical shift looked like for you -- I'm going to say in the fall of 2023, to the best of your recollection -- I don't know how much it varies or doesn't -- but what's a 12-hour shift like?

A.    To the best of my recollection, you come in at 7:00 -- well, 6:50 is roll call.  You enter the institution at about 7:00, 7:15.  You go to your designated area.

At that time, you tour your area, upon arrival.  You take the keys from the overnight officer.  They let you know if anything occurred, you know, throughout the night, that you need to know about, like an ER trip or a fight, anything that happens.  They

Page 91

just give you, basically, like, what we call a "report" of what happened overnight.

You sign on to your computer --

Q.    Let me stop you for a moment.  Those reports -- would you, also, leave a report for the staff that came after you?

A.    Yes, you should.

Q.    And what should be in those reports?

A.    Again, if someone goes to the ER; when your census changes; if a fight happened; if someone is problematic, or a very sick individual.

Things of that nature, you want to try to let the other officer know, kind of give them a heads-up because, you know, everybody works differently.  And sometimes, when we're short, you just get caught up in different things, and you forget.  So --

Q.    Is there ever any written guidance that you've received -- whether you call it a "policy," a "directive," a "memorandum," or it's something else -- as to what should be in those end-of-shift reports?

ATTORNEY PESTRAK:  Can I just get a quick clarification on that before you

Page 92

get to that?

ATTORNEY GROTE:  Yes.

ATTORNEY PESTRAK:  Are these end-of-shift reports written or verbal?

THE WITNESS:  They're verbal.

ATTORNEY PESTRAK:  Tell him.

THE WITNESS:  They're verbal; they're not written.

BY ATTORNEY GROTE:

Q.    Thank you.  That's very important.

Same question, though:  Were you ever provided any guidance on what should be those verbal reports, written guidance?

A.    No.

Q.    Okay.  How did you know what to put in it or what to share?  Just --

A.    Experience.

Q.    You picked it up over time?

A.    Yes.

Q.    All right.  So I interrupted your day.  You were going through the day-in-the-life, and I forget where we left off.  But you -- you're at the designated area, and then what happens?

A.    So you do your tour.  You get the

Deposition of Gena Frasier                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 93

keys from the overnight Officer.

Once your tour is complete, you let your workers out. Generally, we have one to two workers on a housing area that come out and clean the pod from the overnight, trash, meaning they take out the trash. They'll sweep the floors, kind of wipe stuff down so that when we open up at 8:00 for our day, the pod is clean.

And then, again, we open up -- from 8:05 to 11:05 a.m. is the rec time. We go down at 11:05 for lunch, so we'll secure the areas from 11:05 to 12:15. Then we do a head count for the entire jail. So, again, everything is already secured, so we make sure we count all our inmates.

Once head count is cleared, we open back up for rec at 1:05 p.m. to 4:05 p.m., then we go into head count again at 4:30 p.m. Again, the jail is secured at that time.

Once count clears, at 5:50 p.m., we open back up for another rec, and that rec is from 5:50 p.m. to, I believe, 8:45 p.m. Normally, I'm gone by then, but I believe it's until 8:45. I'm almost sure, yes.

Page 94

And then the jail goes down for the night at 8:45 p.m. We secure the jail for the night, and then we do it all again.

Q.   You've mentioned -- you were talking about staffing shortages. When did those begin, to the best of your recollection?

A.   COVID. The beginning of COVID.

Q.   And how have they impacted -- well, are there still staffing shortages?

A.   Yes.

Q.   How have they impacted your work?

ATTORNEY WITTEKIND:
Objection.

You can answer.

THE WITNESS: It can be very difficult working by yourself, with the population that we work with. Our population, they are very challenging individuals; they come in with a diverse need, and they expect those needs to be met, while incarcerated, by the one officer on the unit, when they want it.

So it can be difficult, challenging, time management-wise, with so many individuals when you're by yourself. Very stressful. Again, high pace, fast-moving sometimes.

Page 95

And then, unfortunately, during COVID -- because that's what we're talking about, when all of this started -- was extremely bad for -- I would say all of us, because the C/Os started quitting because they wanted to be home, and they did not want to get COVID in the jail.

For those of us who stayed and pushed through it, myself included, you were by yourself; you were just, you know, doing the best you can in dealing with -- death inside the prison was something I'd never dealt with.

And, again, I started in 2015. But I've never seen the things that I saw or the things that I experienced ever before, like, in my entire life. So it was very overwhelming and, psychologically and emotionally, and just physically, draining. You just felt drained during the COVID time, coming in for those 12-hour shifts and trying to just push through those days, and then having to stay.

We get hooked in the prison system, when we're really short. So when you think you're getting off at 7:00, if there is no officer to relieve you, you have to stay on

Page 96

that unit, and you can stay on that unit for up to 20 hours. So our days were really long during that time period.

And that's just the prison system. I mean, you can fight it all you want. But if there was nobody there, you couldn't leave until they found another officer.

Q.   Thank you for sharing that.

Does the -- how were things by the fall of 2023, if you recall? I mean, it sounded like -- you were talking about some of those stressful periods of COVID, which I think came to an end several times. But the fall of 2023, how were things within CFCF?

A.   Again, trying to recall 2023, I believe we were still struggling. I don't believe we were fully staffed.

Because I do recall still working by myself in certain areas, not having a partner -- when I say "by myself," I mean I didn't have a partner on the unit -- staying late. Instead of leaving at 7:00 p.m., sometimes, the supervisors -- who, really, were big advocates on our behalf -- they would say, "Hey, listen, can you at least stay until 9:30 to count the

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 29 of 85

Deposition of Gena Frasier                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 97

area, make sure the guys are fed before you go
home? And then -- I know you guys have been
working really hard. We won't have you stay
until," you know, "such-and-such hour. "We'll
have you leave by 10:00. You can just help us
out and make sure the pod is fed and that the
guys are locked down," and things like that.

So we started to get a little more
support from our supervisors because they were
starting to see, "Wow, these officers are
really not going home, and this is not good."
Because, you know, supervisors can leave; it
was officers -- we had to stay on our area.
You can't leave the area unattended; we weren't
supposed to.

Q.    Good to be a supervisor.

Did the staffing shortages affect
how frequently people would make rounds or
tours?

A.    Yes.

Q.    And how would that work?

A.    So, depending on the area you were
working that day, and how short we were in that
building -- "building" meaning Alpha, Bravo,
Charlie, or Delta; those are the four buildings

Page 98

-- if we did not have enough officers, you
would have to leave your area and go tour
another area because there was no officer at
all on another area. Like, completely empty.

So you would have to leave your
area, go tour another block, make sure those
guys are okay. If they're not, you know, try
to address whatever you can, safely, and then
come back to your area.

So you would miss a tour or two
because you're not on your area; you're going
to tour another area where there was no officer
at all for the day.

Q.    Would medication administration ever
be impacted by a shortage, by short staff?

A.    I'm going to say yes, because the
nurses have to be escorted around to be able to
give out the medication.

So, again, just reverting back to my
last statement: If I'm on Bravo 1-1, and
that's my area, and I can tour my area, my
medication is done, I'll get a call: "Frasier,
we have nobody on '2' pod. Can you go over to
'2' pod and medicate '2' pod?"

"Copy that." The nurse would be

Page 99

waiting for me to come to '2' pod, and I would
have to escort that nurse. Because the guys
are locked down and there's nobody on that pod,
I would escort that nurse around to give
medication to those individuals on that pod.

We would go door to door and make
sure that those individuals got their
medication. And then I would, obviously,
escort the nurse back off the unit.

So when I say "fast-paced," you
know, you try to do it as quickly and safely as
possible because you've got to get back to your
area. So, like, it was a lot.

Q.    So do you have any recollection of
Louis Jung, Jr.?

A.    Just from the incident that
occurred, I'm aware of him.

Again, hearing what happened, the
next day -- you know, obviously, what happened
with him. But I don't know him because that
was not my pod, so I didn't know him.

Q.    What was your pod?

A.    I did not have a pod; I was a rover
upstairs.

Q.    Oh. You were the rover?

Page 100

A.    I was B2 rover. So I believe, that
day, I was assigned to Bravo 1-3. I believe
that's the pod, 3 or 4. I was assigned there
because they didn't have an officer there.

Also, the role of a rover, if we're
really, really short, you have to, now, go work
a pod because we need an officer on the pod.
So that's what I had to do that day.

Q.    And do you recall that day at all?

A.    I recall some things about that day.

Q.    Tell me what you recall, please.

A.    Being assigned to the pod.

I believe we were down because we
were short. "Down," meaning I believe -- I
don't know if it was the jail or our building
-- I'm going to say my building might have been
down that day because we were short.

Q.    When you say "down," do you mean --

A.    Locked down. The inmates were
locked down.

Q.    And can you just -- I'm familiar
with a "lockdown," but for the record, what is
a lockdown?

A.    When the inmates cannot come out of
their cells because there's no staff.

Page 101

Q.   Got it.
A.   So, again, I was assigned to B1-3,
did my tours.  I know I had workers out that
day because we -- the workers make sure -- if
anyone needs us, they'll let us know.  We can't
be everywhere, but the workers tend to walk
around and check on other inmates.
        The nurse came on the unit for -- it
might have been for "COWS."  I'm not sure why
she came on the unit.  COWS, what's another
explanation for COWS?
Q.   How do you spell that?
A.   C-O-W-S.
Q.   Oh.
A.   It's when medical staff comes around
to check on inmates who may be sicker than
most, might be sicker than most.
        I think an example of that would be
ones that's going through withdrawal.  So they
tend to come around and make sure that the
vitals are stable.  They, typically, take
vitals to make sure that the guys are okay, I
think, something like that.
Q.   And do you -- you said you recall
the nurse was on the unit that day.  Do you

Page 102

recall which nurse?
A.   After reading through my
information, her name was Carabella (sic), but
I didn't recall who she was.
Q.   And I can refresh your recollection
in a moment, but could it have been Blair
Cabellos?
A.   That sounds --
        ATTORNEY WITTEKIND:  Objection
to form.
        ATTORNEY PESTRAK:  You can
answer.
        THE WITNESS:  That sounds
right.  I know it was a "C," but I couldn't
remember her name, like, prior.
BY ATTORNEY GROTE:
Q.   Have you ever worked with her
before?
A.   I'm sure I have.  We work with a lot
of the nurses throughout the facility.
Q.   Today, do you have any recollection
of her?
        ATTORNEY WITTEKIND:  Objection
to form.
        ATTORNEY PESTRAK:  You can

Page 103

answer.
        THE WITNESS:  No.
        I mean, I remember escorting her
that day, if that's -- am I -- I don't know --
should I not answer that?
        ATTORNEY PESTRAK:  No, you
can.  If that's the answer, that's the answer.
        THE WITNESS:  Yeah.  I
remember escorting her that day, going to the
different cells.
        I remember we went to Mr. Jung's
cell.  I do remember seeing us on the camera.
        I remember, you know, me standing
there and her -- I mean, she, probably, was
talking to him.  He was sitting on the floor,
and I believe we left his cell; we wound up
closing the door.  And she came down the steps;
I walked down the steps with her.  The camera
showed us talking; I don't recall what she and
I were talking about.
        But she walked off my unit, and I
came to my desk.  I don't remember what I put
in Lock & Track; I might have put something in
Lock & Track.
BY ATTORNEY GROTE:

Page 104

Q.   Now, what you just described, do you
remember that from that day or do you remember
that from watching the video from that day?
A.   So I remember that from watching the
video about a year and a half ago, when I had a
disciplinary hearing for this case.
        And I remember seeing the video and,
you know, she and I at the door.  They asked
me, you know, "Is this him sitting on the
floor?"  I said, "Yes."
        I remember them asking me, you know,
"Why was he sitting on the floor?"  I was like,
"I don't remember why he was sitting on the
floor.  He could have been sitting there
talking to her.  I don't know why he was
sitting on the floor."
        And, again, I remember seeing the
video of her coming down the steps.  She went
to the block; I went to the computer.
        I also remember, later on in that
day -- I don't know if it was morning or
afternoon -- his celly asked me can he come out
of that cell.  I do remember the celly moving
out of the cell, me getting the workers who I
had out.  I don't remember who they are, but

Page 105

the workers came to help move the celly out of
the cell, and we moved the celly to another
cell.

Q.   Do you know why he wanted to move?

A.   I can't remember.

Q.   How do you normally respond when
somebody requests to move a cell?  It's not --
you don't get to choose your own --

A.   No.

It can be something as simple as
either he just wants to -- he wanted -- a cell
could have been available where he could go
somewhere by himself, or he has a friend on the
block who he wants to move in with.  It could
be one of those two things.

Or it could be something on the
worse side, where they don't get along.  Not
all inmates -- they don't always get along.  So
it could be -- something like that could be the
third reason.

That's, really, pretty much it:
They want to move in with somebody; they don't
get along; or they're just trying to get into a
cell by themselves.

Q.   Were you -- as far as you know, do

Page 106

you have any -- were you aware that Mr. Jung
was a diabetic?

A.   No.

Q.   Okay.  And is there any way you
would have learned that he was a diabetic?

A.   That day, if I was given a list with
his name on it for insulin -- which is highly
possible -- I'm sure I would have called it
out, "Insulin in progress," and I would have
called out the inmates' names, just like with
medication, "Medication in progress."  And I
would call their names, you know, who wants to
come and get it.

Q.   And so if the jail was on lockdown
that day, how would insulin have been
administered?  How would glucose checks have
been done?

ATTORNEY PESTRAK:  I'm going
to just object to the "jail," because I think
it was just the pod that was talked about.

But you can answer.

ATTORNEY GROTE:  Fair enough.

BY ATTORNEY GROTE:

Q.   So if it was that pod that was
locked down --

Page 107

A.   Insulin was done in Unit Management.

Q.   Even with a lockdown?

A.   Yes.

Because the nurses -- I've never
escorted a nurse around with insulin, only
because some guys get needles, and they have to
-- when I do watch the nurse, I do see them --
they have to clean it with alcohol, depending
on if they get the needle in their stomach or
their arm.  I don't -- those are the places,
typically, I see it:  Stomach, arm.

So insulin, typically, is done in
Unit Management, to answer the question.

Q.   Who is Lieutenant Wanda Bloodsaw?

A.   She was my supervisor that day in
B Building.

Q.   Was she your supervisor other days
too?

A.   Good question.

I have worked under her, I believe,
before.  I'm going to say yes.  I mean, we get
different supervisors.

Q.   Have you had much interaction with
Lieutenant Bloodsaw over the years?

A.   Not much.

Page 108

She's new to our jail.  She came to
us maybe a year or two ago.  So she wasn't at
CFCF like the regular Lieutenants; she just got
promoted and was assigned to CFCF.

Q.   Okay.  Going back to insulin, if
the -- you testified earlier -- is this
accurate, that if an inmate is in his cell, and
the whole unit, you know, people are in their
cells, they're not out, you would go to the
cell door when you were announcing insulin,
that it was time for insulin?

A.   No.  I yell it out on the pod.

Q.   You yell it out on the pod --

A.   So, depending on if I'm, like,
behind my desk or where the speaker is, I can
say, "Insulin or Accu-Chek in progress."  Or I
can just yell it, "Insulin, Accu-Chek in
progress."  I'll have the list in front of me
of, I'm guessing, who's going to receive the
insulin.

At that time, inmates will start
telling me, "Frasier, Cell 17, insulin,"
"Cell 10, insulin," or they'll say "'Frashe,'
I'm not going."

"What cell is that?"

Page 109

1   "Cell 17."
2   "Okay."
3       It's just that simple.  Either they
4   get it or they don't; it's really their call.
5   Q.   So you would handle all of that from
6   the desk?
7   A.   I can handle that yelling from the
8   desk or, like, I would move closer to, like, a
9   middle section of the pod area, where I can
10  hear them a little better.  But I don't have to
11  go to every door on the block; I only -- I
12  would listen out for who's telling me they want
13  to get it and who wants to come out and get it.
14  Q.   What would you do if you didn't hear
15  from somebody who was on the list?
16  A.   I would go to the door and say,
17  "Hey, want your insulin?"
18  Q.   How many -- what's the range of
19  people that might need insulin, typically, on a
20  housing unit?  Does it -- yeah.
21      ATTORNEY PESTRAK:  Objection
22  to form.
23      You can answer.
24      THE WITNESS:  I guess it would
25  vary.  I mean, it could be one to maybe ten

Page 110

1   people, maybe.  Maybe one to ten people at a
2   time.  I don't know.
3   BY ATTORNEY GROTE:
4   Q.   Have you ever spoken with Lieutenant
5   Bloodsaw about this incident?
6   A.   We spoke about it -- I haven't seen
7   her in a long time.  But we spoke about it a
8   while ago, when I had my disciplinary hearing.
9   Q.   Okay.  What did that conversation
10  consist of?
11  A.   She didn't remember much.
12      I, pretty much, was telling her that
13  -- you know, I remember calling her over once I
14  saw the video, and I think I called her over
15  because Jung didn't want to -- did he not want
16  to get off -- I don't remember if he wanted to
17  move off of the floor, out of the floor area,
18  and his celly was trying to come out of the
19  cell.  I don't know if he was, like, sitting in
20  the doorway and wouldn't move.  But it was some
21  reason why I called her over to my area.
22      And she went up the steps -- because
23  she didn't come to me directly, when I saw the
24  video.  So something I must have said to her
25  over the phone, when I called her -- because

Page 111

1   sometimes you can call a supervisor over, like,
2   "Hey, L., can you come by," or "Hey, Sarge, can
3   you stop by?  Because such-and-such is refusing
4   to open the door" or "such-and-such is refusing
5   to close the door."  It can be something like
6   that.  And a supervisor will come over and say,
7   "Hey, what's going on?  Why won't you open the
8   door or close the door?"
9       So I do remember her coming to the
10  pod and the workers going up there with her,
11  and I think the guy, his celly, came out of the
12  cell.  And then she came -- L. came down the
13  steps and walked off the block.  I don't even
14  think we had -- I think because the situation
15  was remedied, I don't think there was no other
16  conversation needed.
17      ATTORNEY PESTRAK:  And just
18  for the record, when you're saying "L," you're
19  referring to "Lieutenant"?
20      THE WITNESS:  Yes.  I'm sorry.
21  BY ATTORNEY GROTE:
22  Q.   And do you recall why the nurse was
23  on the housing unit that day or not?
24  A.   Do I recall --
25  Q.   Do you recall -- was the nurse on

Page 112

1   the housing unit, at that time, with you?
2   A.   She was on the unit, but not with me
3   when the inmate moved out of the cell.  She did
4   come on the unit.
5   Q.   So when you say the inmate moved out
6   of the cell, do you mean when Mr. Walker moved
7   -- or, excuse me -- when his cellmate moved, or
8   when Mr. Jung was in the doorway?
9       What do you mean?
10  A.   Well, when we went to his door,
11  myself and the nurse, Mr. Jung was sitting on
12  the floor.  And I believe he came to the door
13  to talk to the nurse.
14      So, again, we don't encourage any
15  civilian or anyone to go into a cell.  So I'm
16  sure I had the nurse standing at the door with
17  me while she was talking to Inmate Jung at the
18  door.
19  Q.   And you saw that on the video, from
20  what you recall?
21  A.   Yes.
22      ATTORNEY GROTE:  We'll mark
23  this Plaintiff's "2."  It's Bates-stamped
24  Frasier-000005 through Frasier-000062.
25  (A brief discussion was held off the record.)

Page 113

(Deposition Exhibit Plaintiff-2 was
marked for identification.)
BY ATTORNEY GROTE:
Q.   And does this look like the
documentation from your disciplinary hearing
from this matter?
A.   Yes.
Q.   And you see on the first page, it
has a number of policies that you were charged
-- general orders or policies you were charged
with --
A.   Yes.
Q.   -- violating.  Were you found --
were you cleared of all wrongdoing in this
matter?
A.   Yes.
Q.   And can I direct your attention to
-- I want to go to the housing logs now, which
are somewhere -- bear with me -- looks like
000030 through 000034.
     And you see at the top of page
000030, it says, "Signon duty," "C/O Frasier."
     "Signon duty," is that what you
enter when you sign on duty?
A.   Yes.

Page 114

Q.   And then, at 9:33, it says, "SP meds
in progress."  What does "SP" mean?
A.   Special meds.
Q.   What are those, as far as you know?
A.   So special meds can be the net
program or the Suboxone program.
Q.   Got it.  And are those delivered at
the cell door, typically?
A.   Not typically.
Q.   So if there were meds on the unit,
does that mean they're being delivered at the
cell door or at the Unit Management area?
     Or can you not tell from this?
A.   Special meds, again, I -- we don't
do -- no, I can't say that.  If we're really
short, the Lieutenant or the Sergeant who's
escorting the special meds people around, they
will bring them to the area if we're really
short.
     I don't recall if, this day, they
went to the cell for this gentleman or if I
went to his cell and got him out and sent him
for special meds.  I don't recall.
Q.   Underneath that, there is a couple
entries.  It looks like "Nurse --"

Page 115

A.   I want to say "Weaner."
Q.   Weaner, Werner.  "-- in area for
COWS, and then, under that, "LT Crawford in
area for COWS."  Is this what you were
testifying about earlier?
A.   Yes.
Q.   What -- is C-O-W-S an acronym?
A.   Yes.
Q.   What exactly is it?
A.   I don't know, exactly, what it
stands for.  I apologize.  It's been a while.
Q.   If a nurse is involved, though, it's
a medical thing?
A.   Yes.
Q.   What does it entail?
A.   Vital signs.
Q.   The vital signs?
A.   And blood pressure.  Like, vital
signs and blood pressure.
Q.   And that's -- in what circumstances
is that done on the housing unit?
A.   So, again, COWS are done for -- and
this is quarantine, by the way -- in
quarantine, for a lot of your guys who first
come in who are going through withdrawal or who

Page 116

are just, you know, maybe really sick.  The
COWS are done to check their vitals and, like,
temperature and blood pressure to make sure
that they're stable while they're still in
quarantine at this time.
Q.   And is there any relationship
between COWS and lockdown?
A.   No.
Q.   Okay.  So they might do this whether
or not the pod is locked down?
A.   Yes.
Q.   If there was a lockdown, would that
be indicated somewhere in the housing log?
A.   It could be, if it was locked down.
     And, again, that's the officers
making sure they are trying to get everything
in Lock & Track that they possibly can, and
what they can remember throughout the day.
     And, again, this particular day, I
knew I was by myself.  So if -- was the jail or
the pod on lockdown?  I know the guys weren't
out, 100 percent, because when I saw the video,
the guys were not out.  Like, they weren't out
of their cells.  So I think the jail was down
or the pod was down that day because we were

Page 117

short.

Q.   Now, at 10:57, it says, "Medication event," "Meds in progress," "Nurse Cabellos escorted by C/O Frasier." So does that mean that you were escorting Nurse Cabellos as she was providing medications?

A.   Again, I don't recall, but I do remember seeing the video. She and I -- I was escorting her around.

Q.   And in what instance would you escort a nurse who's providing medication on the housing unit, I guess?

A.   One more time.

Q.   So if you're escorting her for something called a "medication event," does that indicate to you that she was providing people medications?

A.   It could be. Or it could be she was doing -- like, could be COWS.

As long as -- you try to remember why everybody is on the unit. So I know -- again, just reading through this little part, when I put "Nurse Weaner in area for COWS" -- so she might have been on the block for COWS. I don't remember if this nurse was

Page 118

on there for medication or because she had been doing COWS, too, and I just put it under "Medication," moving too fast. I don't remember.

Q.   Okay.

A.   But I know she was on the block. I know I escorted her, though.

Q.   And at 11:00, "Inmate moved within same unit Antoin Walker," from cell "#21 to #7." Do you know if Mr. Walker was the individual -- do you know if that was Mr. Jung's -- do you remember Mr. Walker?

A.   No, I don't remember.

Q.   You don't remember everybody who you've encountered in --

A.   No. But I do remember moving Mr. Jung's celly out; he did ask me, can he move out of that cell. So if I moved him, there must have been space available. I don't remember, you know --

Q.   And then, the top of the next page, which is Bates No. 000031, it says, "LT Bloodsaw needed to #21. I/P Jung refuses to get up." You entered that. Do you have any recollection of entering that?

Page 119

A.   Yes.

Q.   And what does it mean?

A.   So, sometimes, inmates refuse to get up off the floor; sometimes they refuse to get off the door. We try not to stir the pot, if you don't have to, so you always call for the supervisor to come in and try and put the fire out.

I don't remember why he didn't want to get up and move. But in quarantine, a lot of our inmates are, like I said earlier, more withdrawn; they're a little bit sicker than others, depending on what they're coming in with, what illnesses they're coming in with.

If I put that he refused to get up, I'm sure I gave him several verbal commands to get up. But, you know, I can't make him get up, so at that point, I probably called for the supervisor and the workers who I had out. If I remember that day, I do remember them going up with the supervisors to, probably, get him up off the floor. Sometimes it's as simple as picking them up and putting them in a chair. They just don't want to move sometimes.

Q.   But do you have any recollection of

Page 120

what was going on with Mr. Jung, what he communicated?

A.   No.

Q.   And when you encountered him at this -- at or around 11:00, do you know, was Nurse Cabellos with you?

A.   Oh. I don't remember.

Q.   Do you remember on the video?

A.   When he was laying on the --

Q.   Yeah.

A.   She was with me. I don't remember what time we were at his door.

Q.   Okay. If I can take you back to page 000026, and you see at the top, this says, "Interview of Blair Cabellos"?

ATTORNEY GROTE: Is it "Cabellos" or "Cabellos"? Do you know, Ray?

ATTORNEY WITTEKIND: Either way, it's "Cabellos." You can use either one for today.

BY ATTORNEY GROTE:

Q.   Take a moment to review that.

A.   Okay.

Q.   Now, you see about three-quarters of the way down, it says:

Page 121

1    "Q. At any time during you being on
2  B1, pod 3, did the incarcerated person on cell
3  #21 ask you for assistance? If so, what did he
4  say to you?
5    "A. He said that he needed help to
6  get up."
7    And then it asks, "Did you assist
8  him?" This is November 5, 2023. "If so, how?"
9    Answer: You did "not feel
10 comfortable due to him having a cellmate, and
11 we were instructed that we are not to go into
12 any cell unless there is more than one
13 Officer."
14   Now, did Mr. Jung have a cellmate at
15 that time?
16   A. I believe the gentleman that I see
17 here probably was his cellmate at the time,
18 unless I moved him out.
19   Q. So at -- I guess this is what I'm --
20 so back in the Lock & Track, it says on
21 page 000030 that Antoin walker moved "from #21
22 to #7" at 11:00.
23   It's at the bottom of page 000030.
24   ATTORNEY PESTRAK: This one.
25   THE WITNESS: Okay.

Page 122

1  BY ATTORNEY GROTE:
2    Q. So if you entered into the Lock &
3  Track at 11:00, "Inmate moved from 21 to 7,"
4  does that mean that he would have moved to No.
5  7 before you entered it into the Lock & Track?
6    A. That could be whenever I had the
7  opportunity to put the note in Lock & Track.
8  So it could have been at 11:00, or it could
9  have been after. I'm not sure what was going
10 on on the pod at that time.
11   Again, you try to enter things as
12 they occur, but you don't always get that
13 opportunity because you're by yourself and
14 you're busy.
15   Q. And so if it says, three minutes
16 later, on the top of page 000031, "LT Bloodsaw
17 needed to #21," cell 21, "Jung refuses to get
18 up," based on the Lock & Track, can you tell if
19 Mr. Walker was moved before or after the
20 encounter that you had with Nurse Cabellos and
21 Mr. Jung?
22   ATTORNEY WITTEKIND: Objection
23 to form.
24   ATTORNEY PESTRAK: You can
25 answer.

Page 123

1    THE WITNESS: I don't recall.
2  I don't remember.
3  BY ATTORNEY GROTE:
4    Q. Okay. Now, do you recall from the
5  video, was Mr. Jung inside his cell or was he
6  in the doorway?
7    A. I think he was sitting, like, in the
8  doorway. I think he was sitting, like, in the
9  doorway.
10   Q. If Nurse Cabellos wanted to provide
11 care but didn't feel comfortable with the
12 cellmate, what should have happened then?
13   ATTORNEY WITTEKIND: Objection
14 to form.
15 BY ATTORNEY GROTE:
16   Q. Do you recall her telling you that?
17   A. No, I don't recall that.
18   Q. If she would have told you that,
19 what would you have done?
20   ATTORNEY WITTEKIND: Objection
21 to form.
22   ATTORNEY PESTRAK: You can
23 answer.
24   THE WITNESS: Probably would
25 have called for my supervisor, like I did. But

Page 124

1  I don't recall her saying that, because I would
2  have called her supervisor or she would have
3  called her supervisor.
4  BY ATTORNEY GROTE:
5    Q. If medical staff need more
6  assistance, in your experience, what do they
7  do?
8    A. So when we -- so Medical will
9  determine if they need more assistance.
10 They'll either ask the officer to call for
11 additional medical staff via our walkie or
12 they'll say, "I'm going to go call for another
13 nurse to come up." That's their decision. If
14 they want additional medical staff, they'll
15 tell me, "Call for additional medical staff,"
16 and I'll call for additional medical staff.
17   Q. Now, back on page 000026, the
18 interview, at the bottom:
19   "Q. During the video, it appears
20 that you and the officer had a conversation
21 after walking away from cell #21 before you
22 exit the unit. What was the conversation
23 about?
24   "A. I told the officer to call a
25 stretcher due to the incarcerated person

Page 125

stating that he could not get up."
        So Nurse Cabellos said that she
"told the officer" she was with, which was you,
to get a stretcher.  Do you have any opinion as
to that statement by Nurse Cabellos, as
recorded in that interview?
        ATTORNEY WITTEKIND:  Objection
to form.
        ATTORNEY PESTRAK:  You can
answer.
        THE WITNESS:  That is not
true.
BY ATTORNEY GROTE:
    Q.   And why do you say that?
    A.   She did not ask me to call a
stretcher.
    Q.   And how do you know?
    A.   Because if she did, I would have
called it.
    Q.   Have you ever not called for a
stretcher when one of the nurses asked you to?
    A.   No.
        I mean, if they want a stretcher,
they -- that's their medical assessment.  They
determine that, not me.  So if she wants a

Page 126

stretcher, I call a stretcher.
    Q.   Do you know if Nurse Cabellos
received discipline for this incident?
    A.   They wouldn't discuss her situation
with me.  No one discussed it with me.  And I
didn't find this out until the day of my
hearing; I didn't even know she had said this
statement.
    Q.   And this is dated February 22, 2024.
And what date -- is the date on the cover here,
June 20, 2024, the date of the hearing, if you
know?
    A.   I don't remember the day of the
hearing.  No, that's the date of the -- I don't
remember the --
        ATTORNEY PESTRAK:  It's in the
first paragraph on the first page.
        THE WITNESS:  Oh, okay.
        ATTORNEY GROTE:  Oh, yeah,
you're right.  The first sentence.  That's
good.
        ATTORNEY PESTRAK:  Like, I
know I saw it.
BY ATTORNEY GROTE:
    Q.   Back to the housing logs.

Page 127

        If I can direct your attention to
page 000033 -- that's one you haven't looked at
yet -- the fourth entry says, "Other event:
Jung, Louis W.," "I/P Louis Jung," PP number,
"refused insulin," and you entered that.
        Do you have any recollection of why
you wrote that?
    A.   I'm sure I put it in because he
refused insulin.
    Q.   But do you recall that actual
refusal?
    A.   I don't recall.
        But I wouldn't just put anything in
Lock & Track that's -- I don't do that.
    Q.   Do you know how he -- I mean, do you
recall -- let's see -- did you notify Medical
that he refused insulin?
    A.   I would be certain that I did.
    Q.   And how would you have done that?
    A.   Called back the Unit Management, and
let the nurse know he refused his insulin.
    Q.   Would you have documented that call?
    A.   Again, if you have the time, you can
document it.  You should.  I don't -- here, it
looks like I didn't, but it's -- you know, I'm

Page 128

sure I was busy and doing the best I can,
working by myself.  And if I put that entry in,
that he refused it, then he told me he's
refusing insulin.
    Q.   So you're certain he would have told
you that?
    A.   Yes.
    Q.   Would you have gone to the cell door
to speak to him?
    A.   I wouldn't have to.
        If I'm on the unit, and I'm yelling,
"Insulin," and I'm like, "21 cell" or "17 cell,
are you coming out for insulin," if they say,
"No," then it's no.  I don't have to physically
go to the door and say, "Do you want your
insulin?"  If I can hear you through the door,
and you tell me "No," then the answer is "No."
    Q.   What would you have done if he just
didn't show up?
    A.   If he just didn't --
    Q.   Like, you called, "Insulin," and he
just doesn't come.
    A.   Well, then I would go to the door,
and I would say, "Hey, do you want your
insulin," and then they'd probably say "yes" or

Page 129

"no."  But if you're telling me "no," because
I'm yelling, "Insulin," or saying, "Insulin in
progress" -- that's a very common way that we
communicate on the areas; we will yell, if
we're by ourselves, ask the guys do they want
to come out or, you know --
    Q.    Right before that refusal, it says
"Medication event."  Was the medication event
-- that says, "Insulin in progress," and then
it says, "4."  Does that mean four people?
    A.    Yes.
    Q.    Okay.  A little bit below that, it
says, "Showers remain in progress."  Does that
-- if showers are in progress, does that --
would the unit would have been locked down or
not?
    A.    No.  We can run showers one or two
or three cells at a time.
    Q.    Even if there is a lockdown?
    A.    Yes.
    Q.    Okay.  Taking you back to page
000006, which is the second page of this, I'm
going to read this second full paragraph into
the record, and then I'll ask you some
questions about it.  It says:

Page 130

        "A review of the electronic logbook
(Lock & Track) revealed that you made a
Medication Event entry at 16:35 for insulin and
Accu-Chek, in which one of the four (4) I/Ps to
receive insulin was I/P Jung.  At 16:49, you
entered another logbook event acknowledging
that I/P Jung had refused his insulin and
Accu-Chek.  Further video review was conducted
of B1, Pod 3, for the relevant time periods
related to your logbook entries of the said
medication events.  The video shows that I/P
Jung was locked inside of cell #19 and at no
time exited the cell.  In addition, at no time
did you go to his cell to let him out for
insulin and Accu-Chek, nor did it appear that
you received any indication of his refusal, as
you were observed watching TV in the dayroom
(bottom tier area)."
        Does this refresh your recollection
of that medication event at all?
        ATTORNEY PESTRAK:  Objection
to form.
        But you can answer.
        THE WITNESS:  I mean, I
remember being, you know, out and about.  I'm

Page 131

sure I yelled, "Insulin in progress."
        That's -- I don't know.
BY ATTORNEY GROTE:
    Q.    How -- where is the officer's desk
in relationship to -- it says here "cell #19"?
    A.    In here (indicating), it says,
"#21."
    Q.    It does.
    A.    So was it 19 or 21?
    Q.    Good question.  It says "21"
elsewhere even throughout here.  But
regardless, where is the officer's desk in
relation to cell 19 or cell 21?
    A.    So cells 19 and 21 are on the top
tier, toward -- I mean, in the beginning of the
tier, right on the corner.  It's on the corner.
My desk is, obviously, on the bottom level
(indicating).  I can't really --
    Q.    Is it in the middle of the housing
unit?
    A.    No.  Our desk is --
    Q.    More towards one side?
    A.    Yes.
    Q.    And is that side closer to or
further from 19 and 21?

Page 132

    A.    Further.
    Q.    Okay.  And are the -- what are the
cell doors constructed of on that pod, bars or
steel?
    A.    Steel --
    Q.    Okay.  And --
    A.    -- I think.  I don't know what
they're made of.
    Q.    And when they are steel doors, are
there windows in the doors?
    A.    Yes, there are small windows.
    Q.    From your desk, can you see into all
the windows?
    A.    No.
    Q.    If somebody was at their window
upstairs, would you able to see them from the
desk?
    A.    Sometimes.
    Q.    Would that depend on what cell it
was?
    A.    Yes.
    Q.    What about cells that are farther
away from you?  Is it harder?
    A.    I haven't been on this particular
pod in a long time.  So I'm trying to visualize

Case 2:24-cv-05618-TJS   Document 100-4   Filed 12/05/25   Page 38 of 85

Deposition of Gena Frasier                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 133

1  Bravo 1, Pod 3. I believe that pod has, like,
2  bars up on their top tier, which kind of
3  obstructs a view a little bit.
4        I believe it's bars up there. I
5  can't remember. I think it is, though.
6        Is it possible to see somebody at a
7  cell window? It's possible, if you look hard
8  enough. And if the pod is not rambunctious or
9  loud, if someone -- if I ask someone, "Are you
10 coming out for medication?" in a loud tone, and
11 they say, "No," I can hear them.
12    Q.   And I was going to ask that: How
13 loud are the housing pods, usually? Or does it
14 vary?
15    A.   They can be pretty loud, if everyone
16 is out. But if they're in, and most of the
17 guys are sleeping, then it's kind of quiet.
18    Q.   And do you have any recollection of
19 what it was like that day?
20    A.   Again, I believe that that pod might
21 have been in restricted movement or down that
22 day. I don't remember them all being out that
23 day. I don't remember.
24    Q.   Okay. And just for my sake --
25 because I think you already said this, for the

Page 134

1  record -- but would it be the case that a pod
2  being on restricted movement would be entered
3  into Lock & Track?
4     A.   It should be.
5     Q.   If they were not on restricted
6  movement at 16:30 -- which is, I believe,
7  4:30 p.m. -- is that a time of day where
8  people, typically, are allowed out of their
9  cell?
10    A.   Typically, at 4:30, we would be in
11 head count. Typically.
12    Q.   And it does say that that was called
13 before then. Okay.
14        How long does head count last?
15    A.   It could last for a brief period.
16 Or it can last for a long time, if count
17 doesn't clear. So it all depends. If count
18 clears, it's fast; I would say 20, 30 minutes.
19 If we have a problem with the count, then
20 sometimes it's, like, an hour.
21    Q.   And so -- okay. Right before that,
22 on page 000032, it says, "Unit lockdown," "Jail
23 down for 3P H/C per C/C."
24        Can you decipher --
25        ATTORNEY PESTRAK:  What time

Page 135

1  is that, Bret?
2        ATTORNEY GROTE:  It's at the
3  very bottom, 16:02.
4  BY ATTORNEY GROTE:
5     Q.   What does that mean?
6     A.   So at 4:00 was -- they probably made
7  an announcement to secure all housing areas.
8        So, again, I'm just going to -- I
9  don't remember that day. But if -- let's say
10 another building was open; typically, we lock
11 the jail down -- the jail, probably, was open
12 from 1:05 p.m. to 4:05., if all the blocks had
13 officers and it was open. But around 4:00 or
14 4:05, the announcement is made to secure all
15 areas and prepare for head count. So that's
16 probably why I put that in.
17    Q.   Okay. And so "down for" -- "H/C"
18 there, that might be "head count"?
19    A.   Yes, "H/C" is "head count."
20    Q.   And then the census is called right
21 after that, and the census and head count is
22 count?
23    A.   Yes.
24    Q.   And would you -- when you do the
25 head count, do you enter this into the Lock &

Page 136

1  Track, and then do the count?
2     A.   No. I go around and count, and then
3  I enter it in Lock & Track.
4     Q.   So if this was entered at 6:03,
5  "Census" and "Head count" -- well, then there's
6  also one at 16:31 that says "Census" and "Head
7  count," that says "Head count" clearer.
8        So that's when that ended?
9     A.   So -- again, at 4:00, jail down,
10 3:00 p.m. head count --
11    Q.   Sorry. At the top of 000033 is
12 where it says --
13    A.   So I don't know why we went into a
14 3:00 p.m. head count. Again, it could be -- I
15 could give you a number of reasons why. I
16 don't know why. I'm not sure why that says
17 jail "down," for "3:00 p.m. head count."
18        Maybe we were doing head count at
19 this time, at 3:00 p.m. We've been through
20 some changes in the last few years, so I could
21 be off when I'm talking about a 4:30 head
22 count. Maybe that didn't start until -- I
23 don't know, maybe last year. I don't know.
24 But maybe we went down at 3:00 for count.
25    Q.   So what -- after count clears in the

Page 137

1  afternoon, are people allowed out of their
2  cells again?
3      A.   If we have staff, yes.
4      Q.   Okay.  Do you recall from the video
5  of the disciplinary hearing, that Lieutenant
6  Bloodsaw did come onto the unit and go to
7  Mr. Jung's cell?
8           ATTORNEY PESTRAK:  I just want
9  to clarify.  You said, "Video of the hearing."
10  Do you mean video of the event at the hearing?
11           ATTORNEY GROTE:  Yes, the
12  video of the event at the hearing.
13           THE WITNESS:  Yes.
14  BY ATTORNEY GROTE:
15      Q.   What happened, then, if you recall?
16      A.   When Lieutenant Bloodsaw came onto
17  the area?
18      Q.   Yes.
19      A.   I believe I shared this earlier, but
20  I believe I saw her walk on -- and I believe I
21  must have called her to come over, because she
22  went directly up to the steps to Jung's cell.
23           And -- again, I would have had to
24  see the video to refresh my memory -- I think
25  the workers were with her to help move -- I

Page 138

1  don't know if they moved the celly out or if
2  they just helped Jung up off the floor to put
3  him on his bed -- I don't remember -- but I do
4  remember, you know, Lieutenant Bloodsaw coming
5  on the area.
6           And then she left the area, and --
7  you know, she didn't say anything to me
8  pertaining to a problem, like, "We need to call
9  for a stretcher," or "I need you to call for
10  additional C/Os."  Like, it wasn't a crisis at
11  the time.
12      Q.   Was he -- is it normal for
13  incarcerated workers to physically move another
14  incarcerated person back into their cell?
15      A.   So moving back into -- you mean lift
16  them up off the --
17      Q.   Pick them up and drag them.
18      A.   That is very common.  They tend to
19  want to help each other, more so than us.
20           The reason for that is:  We are at
21  jeopardy of a statement being made, "Well, when
22  Frasier" -- just using me as an example --
23  "when she picked me up, she hurt my arm."
24           It's like, "I didn't hurt your arm.
25  I was picking you up."  But now a whole report

Page 139

1  has to be done, an incident report has to be
2  done.  He can say I hurt him, you know, I
3  grabbed his arm or I bruised his arm.
4           So we try not to do that, have that
5  contact, so their peers will help them.  They
6  feel better when their peers help them.  The
7  only time we really do hands-on if we really
8  have to, with an aggressive person who's
9  swinging or kicking or trying to spit,
10  something like that.  Then we will have to, you
11  know, use our hands to restrain the person.
12      Q.   So if there's a security concern, do
13  incarcerated workers have anything to do with
14  that?
15      A.   No.  None at all.
16      Q.   Do you recall if Mr. Jung was
17  showing any signs of what you thought might be
18  medical distress?
19      A.   No.
20      Q.   If you were with Nurse Cabellos,
21  would you have relied on the nurse for a
22  medical judgment?
23      A.   Absolutely.
24      Q.   Do people -- do you commonly
25  encounter incarcerated people lying on the --

Page 140

1  just lying down and refusing to get up?
2      A.   Yes.
3      Q.   And what are some of the reasons
4  that you typically encounter for that?
5      A.   So in quarantine -- generally, in
6  quarantine, our inmates feel safer sitting on
7  the floor, being closer to the floor.  They'll
8  put their mattresses on the floor; they don't
9  want them on the bed.  They could probably tell
10  you better than I could why they do that, but
11  it's a very common thing in quarantine:  They
12  feel safer on the floor.
13      Q.   Is that a quarantine-specific thing?
14      A.   Most of our guys that make it into
15  population, that are in blues, they won't
16  really lay on the floor.  You may run into a
17  few that may lay on the floor, and they'll make
18  little pallets out of blankets and their
19  mattress on the floor.  Their mattresses are
20  really thin, so they tend to make pallets,
21  having two or three blankets, and a lot of them
22  lay on the floor.  They just -- it's a very
23  common thing in the prison system.
24      Q.   Do you know the difference between
25  Type 1 or Type 2 diabetes?

Page 141

A.   No.

Q.   What, if anything, do you think you should have done differently in regard to Mr. Jung on November 5, 2023?

ATTORNEY PESTRAK:  Objection to form.

You can answer.

THE WITNESS:  I don't believe anything.

I didn't -- he was perfectly fine on my shift.  If he was in distress, and the nurse and I were at his door, the nurse would have said to call a stretcher, to me.  Though I have read on the record that she says she told me to call a stretcher, that is not true.

I have worked in quarantine for a very long time, and I call many a stretcher, many a day.  I have no problem with making that call:  It's as simple as hitting a button on my radio, and I say, "Hey, a stretcher is needed to Bravo 1, Pod 3."  It's very simple.

Also, if Nurse Cabellos is stating that she told me to call a stretcher and I refused, she is supposed to notify my supervisor and her supervisor that an officer

Page 142

refused to call a stretcher for an inmate.  She now has to take proper medical protocol and procedure if she feels as though an inmate is in need of medical attention.

So she or he should not just say, "Oh, well the officer refused to call the stretcher.  I'm going home for the rest of the day."  As a medical professional, if her statement says that I refused a stretcher, she now has to say, "Officer Frasier, I'm reporting you to your supervisor," one; two, "I'm going to my supervisor, because I have told you to call a stretcher, and you refused."

Then her supervisor would contact my supervisor.  It would have been a whole situation -- trust me when I tell you -- because you just can't walk away from something like that.  If she is stating on the record that she told me to call a stretcher and I just said, "No," I mean I -- that's kind of frustrating to even hear something like that, actually.  It's disturbing, because I've been in quarantine a long time, and I've never, ever, had one nurse say that "Officer Gena Frasier refused to call a stretcher."

Page 143

BY ATTORNEY GROTE:

Q.   When you call a stretcher, do you document that?

A.   We do, typically, document a stretcher call in progress, yes.  I'm going to say yes, absolutely.  You should.

Sometimes we forget.  Again, if we're really busy, you're by yourself, you're multitasking, you're dealing with the situation, you've got inmates out, you've got civilians on your unit.

You, definitely, should make the time to put that in your Lock & Track.

Q.   And who do you make that call to?

A.   The stretcher call?

Q.   Yes.

A.   It just comes over my radio to Medical.  So I would say to Medical, "A stretcher is needed to Bravo 1, Pod 3."

Q.   And then who has to come with the stretcher?

A.   So when Medical -- the officer from Medical will escort them, if they can leave the area.  If nothing is going on in Medical, that officer that sits in medical is to escort those

Page 144

nurses with the stretcher onto the unit.

Sometimes that doesn't happen because, again, we're short-staffed.  So that officer in Medical might be dealing with four other situations in Medical, that one officer, so he or she cannot leave that area.  But that stretcher, those nurses -- normally, it's two that would try to come on the stretcher call, -- if the unit is locked down, they'll come onto the unit, and I will have to escort them to wherever they have to go.

If the unit is out, they don't come onto the unit, because that's a risk.  They just -- they don't do that.  That's their policy, too:  Medical will not come onto the unit until the unit is secure.

Q.   In situations where a person is lying in the doorway of their cell, refusing to get up, do you, sometimes, handle that just by -- I mean, could you have handled that without calling Lieutenant Bloodsaw?

ATTORNEY PESTRAK:  Objection.

You can answer.

THE WITNESS:  (No response.)

BY ATTORNEY GROTE:

Page 145

Q.   Have you handled situations like that without calling your supervisor?

A.   I'm going to say yes.  I'm sure I, definitely, have in my past.

If I can get my workers -- and, again, it all depends on the rapport you have with the inmate.  I never met him before, so -- and, again, that wasn't my area; I work upstairs.  I'm not making excuses, but I'm just giving the facts:  I work up B2.  So I was, obviously, detailed to that unit because we don't have an officer.  I'm not familiar with those inmates on that area.

However, if the inmate workers who were out -- sometimes they have a rapport with each other, and they'll say, "Hey, man, get up off the floor," or "Sit on your mat," or "Hey, man, move out of the doorway."  Sometimes they can get each other to move, and it's just as simple as that.

Our inmates, sometimes, can be a little resistant to what we call "verbal commands" or "orders."  They just feel like, "I don't have to get up," "I don't have to move," "I don't feel good," "I'm not getting up."

Page 146

Okay.  I can't make you get up, but eventually, you're going to have to move.

That day, I think his celly wanted to come out.  Maybe he was frustrated.  I can't speak on what -- I don't remember the celly; I don't even remember what he looks like.  But if he asked me to come out of that cell, he probably was frustrated or -- I don't know.  I mean, I wish I could ask him, you know, why he wanted to come out of the cell that day.

I don't remember, honestly.

Q.   But do you have any insight into why you would have called Lieutenant Bloodsaw instead of handling it yourself?

A.   Why did I call her?

Q.   If you don't remember, I'm not asking you to guess.

A.   Yeah, no, I don't remember why I called her to put him back in his cell.

I'm not sure if it was maybe just something like he was obstructing the doorway and I needed him to move.  It could have been something like that, where I just needed him out of the doorway, and I didn't want to touch him, I didn't want to have a use of force on my

Page 147

hands.

So if a supervisor comes, they tend to, sometimes, listen to the supervisor, which he did, because he got out of the doorway.  So sometimes it's just that easy, just to call a supervisor.

Q.   Do you know how he got out of the doorway?

A.   I don't remember.

I know I was at the desk, and Lieutenant Bloodsaw and the -- I believe the inmate workers went up the steps to his cell.  They could have, you know, moved him.  She could have given him an order; maybe he listened to her.

I don't remember, you know, like how quickly or whatever happened.  But for the rest of my shift, I didn't have any problems, you know, with that cell or him.  You know, he was alive on my shift.  So I don't --

Q.   And if you thought that medical staff, like Nurse Cabellos, was not responding to a situation where you had a concern that there was a medical issue, what is your responsibility?

Page 148

A.   To contact my supervisor.  And my supervisor would then contact her supervisor.

We just don't jump chain of command, so I just can't say -- I mean, I can't just call the Chief of Medical on a nurse.  It's like, you know, "You need to let your supervisor tell us what's going on."

Q.   And --

A.   So I would have called Lieutenant Bloodsaw.

Q.   Right.  And I was going to say, your supervisor was Lieutenant Bloodsaw; right?

A.   Yes.

Q.   And did you learn that Mr. Jung passed away the following day, November 6?

A.   I don't know if it was that next day.  I don't know if I was working the next day, if I was off.  But when I returned to work, I did hear he had passed on his way to Medical on a stretcher.

Q.   Did you, at that time, connect that with what happened November 5?

A.   No, not at all.

Q.   Did you -- okay.  Do you know what the cause of his death was?

Page 149

A.   No.

Q.   Have you ever heard the term "diabetic ketoacidosis"?

A.   I believe it was mentioned in my hearing.  I think I heard it then, but that was the first time I ever heard those words.

Q.   Since this event, since Mr. Jung died, have you received any training on diabetes while on the job at PDP?

ATTORNEY PESTRAK:  Objection. You can answer.

THE WITNESS:  No.

BY ATTORNEY GROTE:

Q.   Do you think you should receive that training?

ATTORNEY PESTRAK:  Objection. You can answer.

THE WITNESS:  I want to say yes.  It would be good to have any type of additional training to enhance your career.

However, Correctional Officers should not make medical decisions, because they're Correctional Officers.  They are there for a specific purpose.  I think that's kind of risky, to impose Correctional Officers to be

Page 150

able to assess someone, if they're in a diabetic situation.  I think, then, you need to go to college and get some medical expertise, some real training, not just a --

BY ATTORNEY GROTE:

Q.   Well, you make behavioral health referrals, don't you?

ATTORNEY PESTRAK:  Objection. Argumentative.

But you can answer.

THE WITNESS:  Yes.

So the emergency referrals are kind of simple.  You just put in the information that is given to you.

I think something medical would be kind of, personally, out of my purview.  But --

BY ATTORNEY GROTE:

Q.   Do you think you could be trained not to make a diagnosis or a medical judgment but to recognize a physical symptom that suggests a need to call Medical?

A.   I would say yes.  Yeah.

Q.   Knowing what you know about everything involving Mr. Jung and his death, if you had the authority, what changes, if any,

Page 151

would you make about how PDP is run?  Would you make any changes in response to the situation?

ATTORNEY PESTRAK:  Objection. You can answer.

ATTORNEY WITTEKIND:  I'll join.

THE WITNESS:  I have nothing to say on how the Philadelphia Department of Prisons makes their decisions.

BY ATTORNEY GROTE:

Q.   Well, I was asking if there was something you think should be done differently, really, not so much how they make their decisions.

ATTORNEY PESTRAK:  Same objection.

You can answer.

THE WITNESS:  I have no comment on that.

BY ATTORNEY GROTE:

Q.   You have to answer the question. But if you don't have anything in response, that's a -- I just want to make sure it's clear or the record.

A.   So no.

Page 152

Q.   Have you spoken with any of the other Defendants in this case about this case?

ATTORNEY PESTRAK:  Since when? Because you already established that she talked to Lieutenant Bloodsaw a while ago.

BY ATTORNEY GROTE:

Q.   So aside from that, aside from talking to Lieutenant Bloodsaw sometime ago, around the disciplinary hearing, have you ever talked to any of the other Defendants?

A.   I was never aware of anyone else.

Q.   So "no"?

A.   No.

Q.   I would like to take a break to confer with my colleagues, to see how much longer the fun will last.

A.   Okay.

(Off the record at 4:16 p.m.)

(Back on the record at 4:31 p.m.)

BY ATTORNEY GROTE:

Q.   Ms. Frasier, I hope you enjoyed your break.  Have you understood all of my questions today?

A.   Yes.

Q.   Is there anything that you haven't

Page 153

1 shared that you think would be important, in
2 regard to this case, that you would like to add
3 now?
4         ATTORNEY PESTRAK:  Objection.
5 You can answer.
6         THE WITNESS:  No.
7 BY ATTORNEY GROTE:
8    Q.   Is there anything about the
9 testimony you've already given that you would
10 like to change?
11    A.   No.
12         ATTORNEY GROTE:  No further
13 questions.
14         ATTORNEY PESTRAK:  Do either
15 of you have questions?
16         ATTORNEY WITTEKIND:  I may
17 have a couple.
18         ATTORNEY PESTRAK:  Do you have
19 any?
20         ATTORNEY KAMINSKY:  I will,
21 but he can go first.
22         EXAMINATION
23 BY ATTORNEY WITTEKIND:
24    Q.   Officer Frasier, my name is Ray
25 Wittekind.  I represent a couple of the

Page 154

1 Defendants in this matter.
2         I'm going to have a couple questions
3 for you.  I'm going to try not to cover the
4 ground that Bret covered with you; if I do,
5 it's inadvertent, just the way that things go.
6         And the same rules apply to my
7 questions.  You know, the instructions that he
8 gave you earlier, they apply to me and to the
9 other attorneys as well.  All right?
10    A.   Yes.
11    Q.   We just don't want to have to repeat
12 those.
13         After the incident involving
14 Mr. Jung in the morning of November 5, were
15 there any other incidents that you recall that
16 involved him that day, during your shift?
17 That's a bad question, but if you understand
18 it, you can answer it.
19         Let me rephrase it.
20         We had an incident where Mr. Jung
21 was on the floor and didn't want to move in his
22 cell; correct?
23    A.   Well, I wouldn't say he "didn't want
24 to move."  He was just sitting on the floor and
25 refused to get up.

Page 155

1    Q.   Okay.  Then, eventually, he got
2 picked up, and he was moved back into his cell
3 by other inmates; correct?
4    A.   I believe so.
5    Q.   Okay.  During your shift that day,
6 were there any other incidents involving him
7 that required your attention or the attention
8 of the medical staff?
9    A.   Not that I can recall.
10    Q.   And I believe you told us earlier
11 that it's not unusual that an inmate would lie
12 down on the floor and refuse to get up;
13 correct?
14    A.   Correct.
15    Q.   Okay.  When you encountered Mr. Jung
16 that day, did you notice any manifestation of
17 any physical illness that he may have been
18 experiencing?
19    A.   No.
20    Q.   Okay.  Did he tell you that he was
21 experiencing any physical symptoms, pain, or
22 any signs of physical distress?
23    A.   No.
24    Q.   When you encountered Mr. Jung that
25 day, did he have a cellmate that was in the

Page 156

1 cell?
2    A.   I believe he did, yes.
3    Q.   Okay.  And I think you indicated
4 earlier that may have been Mr. Walker, the
5 inmate who moved out?
6    A.   If that is his name, I'm going to
7 say yes.  I'm not sure if that was his name,
8 but --
9    Q.   Okay.  But whatever his name was,
10 there was a cellmate?
11    A.   Yes, I believe he had a celly,
12 correct.
13    Q.   When you encountered Mr. Jung lying
14 on the floor and refusing to get up, were you
15 able to look inside the cell?
16    A.   My observation was he was sitting by
17 the door.
18    Q.   Okay.
19    A.   I don't recall what his cell looked
20 like.  I don't recall.
21    Q.   Do you recall seeing any vomit or
22 urine on the floor?
23    A.   I don't recall.
24    Q.   Do you recall if his roommate or his
25 cellmate mentioned any issues regarding vomit

Page 157

or urine on the cell floor that day?

A.   I don't recall.

Q.   Do you recall any of the discussions you had with Nurse Cabellos regarding Mr. Jung that day?

A.   No, I do not.

Q.   Was Mr. Jung lying on the floor before the nurse arrived on your pod?

A.   I don't recall his position when we arrived at his cell door.  I don't recall if he was sitting on his bed and came to the door, and sat on the floor to talk to her.

I don't recall.

Q.   Okay.  When he was talking to the nurse, were you able to overhear what their conversation was?

A.   I don't recall.  You can hear -- I mean, I was standing there, but I don't recall their conversation.

Q.   Now, earlier on, I know you told us that it's your recollection that Nurse Cabellos never told you to call for a stretcher; correct?

A.   That is correct.

Q.   Were you able to override that and

Page 158

call a stretcher on your own, regardless of what the nurse told you?

ATTORNEY PESTRAK:  I think you're asking if the nurse hadn't told her to call a stretcher.

ATTORNEY WITTEKIND:  Well, no. I mean, the officer said that the nurse did not tell her to call a stretcher.

ATTORNEY PESTRAK:  Got you.

BY ATTORNEY WITTEKIND:

Q.   My question to you, Officer, is: Assuming that the nurse did not tell you to call the stretcher, were you able to call a stretcher in any event, regardless of what the nurse told you or did not tell you?

A.   Yes, we can call a stretcher for an inmate.

Q.   Okay.

A.   If we see, obviously, you know, someone that's not responding, if someone appears unconscious, if they're telling us, "Look, I need a stretcher call," "I can't breathe," "I'm having chest pains," then yes, we do call a stretcher, if the inmates ask us to.  Yes.

Page 159

Q.   Okay.  Did Inmate Jung ever ask you to call a stretcher for him?

A.   No.

Q.   Okay.  I think with your Lock & Track -- and tell me if I recall your testimony correctly -- you enter the events when you have time to do so; correct?

A.   I try my best, yes.

Q.   Okay.  I just have a couple questions, just trying to clear some things up time-wise.

If you look at the second page of your hearing report -- I'll call it that -- that you were shown before, if you look on the page that's marked Frasier-000006, and you look at the first full paragraph -- and I'll paraphrase it -- it talks about you -- that you were observed opening up cell 21 at roughly 9:55, while escorting a nurse.  And then, a little bit later in that paragraph, it says the nurse then leaves the unit and I/P Jung is still observed on the unit, lying on the floor. And then, approximately 10:05 a.m., Lieutenant Wanda Bloodsaw arrives on the unit.

And that's, apparently, by the time

Page 160

on the video.  But if you look at your Lock & Track entries, -- particularly, if you look at the page that's marked as 000030 --

A.   Okay.

Q.   -- there is an entry there that -- I had it here a minute ago -- three or four lines up from the bottom, it says, you know, 11/5/2023, at 10:57, "Medication event," "Meds in progress.  Nurse Cabellos escorted by C/O Frasier."  Is that -- is it 10:57 when that actual event occurred?  Or does that 10:57 refer to when you entered it into the Lock & Track system?

A.   It might have been 10:57 when I had the opportunity to put it in Lock & Track.

Q.   Okay.

A.   Because, just reading this, it says I was -- per the camera, it says I was someplace else prior to 10:57.

So, again, it's the officer being able to -- I want to say multitask, to try to get -- to try to do whatever you were doing on the pod, and then try to get back to the computer to get your entries in, just so there is some record of what was going on on the pod.

Page 161

Q.   Okay.  And that's fair enough.  So the 10:57 entry, that's just you recording what happened, but the timing may not be quite accurate?

A.   Could -- I'm going to say yes.

Q.   Okay.  Have you ever talked to the cellmate of Mr. Jung for the reason why he wanted to move out?

A.   I don't recall.

Q.   Is there -- I know, earlier, you talked about, you know, escorting nurses and other civilians on the pod.  Is there a policy that would prohibit a nurse from entering the cell if an inmate's cellmate is also in there with them?

A.   I'm not sure if it's an actual policy that the Philadelphia Department of Prisons has in writing.

However, we were always trained that no civilian should enter any cell without security.  From my understanding, they're also taught that, for security reasons.  But I don't know if it's a policy.

Q.   Okay.  So it would not have been unusual for the nurse not to enter the cell

Page 162

that day?

ATTORNEY PESTRAK:  Objection.  You can answer.

THE WITNESS:  No.

BY ATTORNEY WITTEKIND:

Q.   Prior to that day -- "that day" being November 5 -- had you had any interactions with Inmate Jung?

A.   No.

Q.   Prior to that day -- again, November 5, 2023 -- had you had any interactions with Nurse Cabellos?

A.   I don't recall.

We escort nurses all the time, different units.  I possibly could have, but I don't remember.

Q.   When you got on duty that day, and you got your end-of-shift verbal report from your -- from the prior officer, did he mention any problems involving Inmate Jung during his shift?

A.   I don't recall speaking to an officer from the overnight shift.  I don't recall.

The -- just trying to refresh my own

Page 163

recollection, the Lock & Track says that I signed on at 8:58.  The shift ends at 7:00 a.m.  So it's highly probable that there was no officer on the unit until I got there, because I know we were short that day.

Q.   Okay.

A.   So I don't even know if I talked to someone when I got to the pod.  I don't remember.

Q.   Okay.  At any point in time before Mr. Jung died, did anyone ever tell you that he had a history of refusing to take insulin?

A.   Not that I can recall.

Q.   Did you have any communication with any of the medical staff in the intake unit about Mr. Jung after the events of November 5?

A.   Not that I recall.

Q.   I'm going to go through my notes.  That's all the questions I might have; I may have a couple more.  I'll turn you over to Attorney Kaminsky here.

EXAMINATION

BY ATTORNEY KAMINSKY:

Q.   Hello.

A.   Hi.

Page 164

Q.   I'm Jonathan Kaminsky, and I represent Mariesha Apollon.  Are you familiar with who Mariesha Apollon is?

A.   No.

Q.   Okay.  Can you -- I realize that we were discussing, earlier, lockdowns.  I was just curious, could you give me an understanding of the pod that Mr. Jung was in on November 5, what a typical lockdown should look like?

ATTORNEY PESTRAK:  Objection.  You can answer again.

THE WITNESS:  So Bravo 1, Pod 3, is a quarantine pod.  If, in fact, we were on lockdown -- which, again, I can't really remember; I just know that the pod was not open -- the inmates do not come out, because we're short-staffed.  If we are on a lockdown status, they don't come out because we're short-staffed.  So they stay in their cells until we get enough manpower to safely let everyone out.

So Bravo 1, Pod 3, is a quarantine pod.  That's the type of pod he was on.

BY ATTORNEY KAMINSKY:

Page 165

Q.   And so would that include prison staff -- inmates who are staff, would they also -- would they be walking around if there was a lockdown?

A.   If we were "open" for recreational activities, the inmates would be out of their cells, yes, walking around, watching TV, playing basketball in the yard.

But that day, they were not out like that, if I recall correctly; I think they were down that day. I don't remember -- I could be wrong, but I don't recall them being out that day.

Q.   Okay.  So, just to clarify, if it was lockdown, then inmate staff could not be walking around?  Or they could be walking around?

A.   When you say "inmate staff," what --

Q.   Well, like, inmates who are working inside the prison.

A.   Okay.  So our inmate workers are allowed out because they help their peers by giving them water underneath their doors.  They give what we call "water bags."

So they're able to come out of their

Page 166

cells, and they keep the pod clean.  They help us serve the meal.  And they do what we call "run the water" for the inmates so the inmates are able to have water while they're locked down.  And they also help control the TV on the pod.

So that's what the inmate workers do.  So even if we are locked down, with short staff, we will ask a supervisor, "Hey, LT can we have two workers out to run water and have them out when it's time to feed the guys?"  Because they have to eat, and we won't feed them; the inmate workers feed the inmates.

Q.   So the amount of inmate workers that would be out during a lockdown would be limited?

A.   Yes.  It would be maybe two to three.  And they would be the workers on the block.  Like, the block worker and a block rep, typically, are the ones we let out.

Q.   And typically, would it -- during a lockdown, would a cell door be open?

A.   It should not be open, but they have to be opened for medication purposes.

If another officer from another area

Page 167

calls me to get an inmate to come for an official visit, I have to open that door.  Or if another officer calls me to get an inmate for a regular visit, I have to open the cell door to get that inmate out.

If Medical calls me and says, "Hey, I need such-and-such sent to Medical for a DNA test," I have to open that door to get the inmate out, and write him a pass, and send him to those designated areas.

Q.   And we've talked about lockdown, and then you've also mentioned "shutdown."  Is there a -- is that different or is that the same thing, "shutdown" and "lockdown"?

A.   So -- I don't recall saying "shutdown."

Q.   Okay.

A.   But the jail can go on lockdown, if we are short-staffed.

Q.   Okay.

A.   Now, a term that we also use is "restricted movement."  That is when we allow very minimal inmate movement out because, again, we don't have enough staff to -- for them to move in their numbers, in mass numbers.

Page 168

Q.   Okay.  And really, really early on in this deposition, you had mentioned that you would get a list of people who needed medications; you would get a printout of the cell; you would get the inmate's number, the intake number, and then the PP number?

A.   Yes.  I believe that's what's on the medication list.

Q.   Okay.  So, with that in mind, for you to put in the Lock & Track that Mr. Jung had refused insulin, does that mean that your -- that that document, that printout, would have identified him as somebody who needed insulin?

A.   So it's two lists.  It's a medication list, and it's an insulin list.

So I remember in my Lock & Track, I put "Insulin, four inmates," which means -- if I can recall, I'm sure that it was an insulin list that had four inmate names.  Those names are not on my medication list; medication is different from insulin.

So if I put four inmates for insulin, I'm sure I received some kind of paper with those names for insulin.  I'm almost, you

Page 169

1  know, sure of that.
2      Q.   So my question is:  You had marked
3  in the Lock & Track that "I/P Louis Jung,
4  PP #718327, refused insulin."
5      A.   Okay.
6      Q.   So for you to put that in there,
7  would you have had a document showing that he
8  had required insulin?
9      A.   Yes.
10     Q.   Okay.
11         ATTORNEY KAMINSKY:  I have
12  nothing further.  Thank you.
13         ATTORNEY PESTRAK:  My turn.
14  It will be very quick.  I don't think I have a
15  ton.
16         EXAMINATION
17  BY ATTORNEY PESTRAK:
18     Q.   You were asked about disabilities
19  and accommodations.  Is it your job to
20  determine who qualifies for disability?
21     A.   No.
22     Q.   Is it your job to determine what
23  accommodations will be provided for anybody
24  with a disability?
25     A.   No.

Page 170

1      Q.   You were asked about, you know,
2  diabetes in general.  But if you saw an inmate
3  that was confused, had a fever and abdominal
4  pain, what would you do about that?
5      A.   If the inmate told me himself he's
6  having stomach pain, he's running a fever, he
7  doesn't feel well, I would say to him, "Sir, do
8  you need a stretcher?"  He would say, "No, I
9  can walk to Medical.  Can you write me a pass?"
10         If the inmate can walk to Medical on
11  his own, I write him a pass and send him to
12  Medical.  If he says he can't walk to Medical,
13  and he says, "Frasier, I need a stretcher," I
14  get on my radio, hit one button, and say,
15  "Stretcher call to Bravo 1-3."  It's just that
16  simple.
17     Q.   If you saw an inmate that appeared
18  to be dizzy, kept going in and out of
19  consciousness, and was sweating and breathing
20  fast, what would you do?
21     A.   In and out of consciousness?
22  Definitely, call a stretcher.  I would just
23  call a stretcher.
24     Q.   Would you need to know they were
25  symptoms or high or low blood sugar related to

Page 171

1  diabetes to do that?
2      A.   No.
3      Q.   If you saw an inmate that was
4  vomiting uncontrollably and having trouble
5  breathing, what would you do?
6      A.   Call a stretcher.
7      Q.   Would you need to know the
8  underlying cause of those symptoms to call the
9  stretcher?
10     A.   No.
11     Q.   I don't have any further questions
12  for you.
13         ATTORNEY KAMINSKY:  Does
14  anybody mind if I have --
15         ATTORNEY PESTRAK:  Go for it.
16         EXAMINATION
17  BY ATTORNEY KAMINSKY:
18     Q.   So if an inmate refuses insulin, can
19  you force them to take insulin?
20     A.   No.
21         I mean, I can't force, because I
22  don't give insulin.  Let me put that on the
23  record:  I am a Correctional Officer, so I
24  don't touch a needle; I don't touch anything
25  medical at all.

Page 172

1      Q.   Okay.
2          ATTORNEY KAMINSKY:  Do you
3  have anything else?
4          EXAMINATION
5  BY ATTORNEY WITTEKIND:
6      Q.   I have just one question to follow
7  up on what Attorney Kaminsky asked you.
8          Do you know whether the medical
9  staff could force the inmate to take insulin,
10  if he refused to take it voluntarily?
11     A.   No, I don't know if Medical can make
12  them take it.  I don't know that answer.
13         ATTORNEY PESTRAK:  I have
14  nothing based on that.
15         ATTORNEY GROTE:  One
16  follow-up.
17         EXAMINATION
18  BY ATTORNEY GROTE:
19     Q.   Do you know if medical staff can
20  send somebody to the hospital if they're having
21  serious medical symptoms from failure to take
22  medication?
23     A.   I believe they can.
24         ATTORNEY GROTE:  No further
25  questions.

Page 173

1     (A discussion was held off the record.)
2          THE REPORTER:  Copies of the
3  transcript?
4          ATTORNEY PESTRAK:  Yes.  Same
5  as last time.
6          ATTORNEY KAMINSKY:  Yes.  Just
7  PDF.
8          ATTORNEY WITTEKIND:  Yes.
9  Same here.
10     (The deposition concluded at 4:57 p.m.,
11       and signature was waived.)
12          - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1              C E R T I F I C A T E

 2    COMMONWEALTH OF PENNSYLVANIA      )
                                        )
 3    COUNTY OF PHILADELPHIA            )

 4      I, Alexander Schaffer, a Notary Public in and
      for the Commonwealth of Pennsylvania, do hereby
 5    certify that before me personally appeared GENA
      FRASIER, the witness herein; who then was by me
 6    first duly sworn to testify the truth, the
      whole truth, and nothing but the truth in the
 7    taking of a deposition in the cause aforesaid;
      that the testimony then given by GENA FRASIER
 8    as above set forth was reduced to stenotype by
      me, in the presence of said witness, and
 9    afterwards transcribed by computer-aided
      transcription under my direction.
10
        I do further certify that this deposition was
11    taken at the time and place specified in the
      foregoing caption, and signature was waived.
12
        I do further certify that I am not a relative
13    of or counsel or attorney for any party hereto,
      nor am I otherwise interested in the event of
14    this action.

15      IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my seal of office at
16    Philadelphia, Pennsylvania, on this 18th day of
      August 2025.
17
        The foregoing certification does not apply to
18    any reproduction of this transcript in any
      respect unless under the direct control and/or
19    direction of the certifying reporter.

20

21

22    _____
                        ALEXANDER SCHAFFER,
23                      Notary Public in and for the
                        Commonwealth of Pennsylvania
24                      Notary ID:  1440904

25                        My commission expires
```

1                               - - -

2                    E R R A T A    S H E E T

3                               - - -

4

5      PAGE          LINE          CHANGE

6      _____       _____       _____

7      _____       _____       _____

8      _____       _____       _____

9      _____       _____       _____

10     _____       _____       _____

11     _____       _____       _____

12     _____       _____       _____

13     _____       _____       _____

14     _____       _____       _____

15     _____       _____       _____

16     _____       _____       _____

17     _____       _____       _____

18     _____       _____       _____

19     _____       _____       _____

20     _____       _____       _____

21     _____       _____       _____

22     _____       _____       _____

23     _____       _____       _____

24     _____       _____       _____

25     _____       _____       _____

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1                    ACKNOWLEDGMENT OF DEPONENT

2

3           I,                            , do hereby

4    certify that I have read the foregoing pages and

5    that the same is a correct transcription of the

6    answers given by me to the questions therein

7    propounded, except for the corrections or

8    changes in form or substance, if any, noted in

9    the attached Errata Sheet.

10

11

12

13

14

15    _____        _____
      Date              Signature

16

17

18

19

20

21

22

23

24

25

## WORD INDEX

**< 0 >**
**000006**  129:22
**000026**  120:14
 124:17
**000030**  113:20, 22
 121:21, 23  160:3
**000031**  118:22
 122:16
**000032**  134:22
**000033**  127:2  136:11
**000034**  113:20

**< 1 >**
**1**  4:11  44:4  68:12
 85:6, 10, 11, 16  88:20
 133:1  140:25  141:21
 143:19  164:13, 23
**1:05**  93:18  135:12
**1:14**  2:11
**10**  9:9  10:20  108:23
**10:00**  97:5
**10:05**  159:23
**10:57**  117:2  160:8,
 10, 11, 14, 19  161:2
**100**  38:8  116:22
**1-1**  98:20
**11/5/2023**  160:8
**11:00**  118:8  120:5
 121:22  122:3, 8
**11:05**  93:11, 12, 13
**1100**  3:4
**113**  4:11
**12:15**  93:13
**12-hour**  88:10, 12
 89:9, 10, 11  90:15
 95:20
**1-3**  100:2  170:15
**130**  37:14  38:3
**14**  79:7, 8, 10, 16
 80:8  81:15, 16  84:13,
 14
**1440904**  174:24
**14th**  2:23
**1500**  3:3
**1515**  2:22
**153**  4:5
**16**  36:16

**16:02**  135:3
**16:30**  134:6
**16:31**  136:6
**16:35**  130:3
**16:49**  130:5
**163**  4:6
**169**  4:6
**17**  58:15, 17  108:22
 109:1  128:12
**171**  4:7
**172**  4:7, 8
**18**  2:10  50:1, 2
**1801**  3:7
**18th**  174:16
**19**  130:12  131:5, 9,
 13, 14, 25
**19102**  2:23  3:4
**19103**  3:8
**19123**  1:14  2:9, 16
**19136**  8:20
**1995**  9:18

**< 2 >**
**2**  4:12  98:23, 24
 99:1  112:23  140:25
**2:24-cv-05618-TJS**
 1:5
**2:37**  77:22
**2:44**  77:23
**20**  55:22, 24  96:2
 126:11  134:18
**2008**  17:22
**2009**  17:24
**2013**  18:12, 15
**2015**  10:21, 22  18:12,
 18, 19, 23  21:22  32:5
 95:13
**2015-2017**  24:5
**2017**  21:22  78:13
**2019**  10:12  26:19
**2020**  10:2
**2022**  9:25
**2023**  88:7  89:6, 10
 90:13  96:10, 14, 15
 121:8  141:4  162:11
**2024**  29:24  30:4, 18
 126:9, 11
**2025**  2:10  174:16
**21**  118:9, 23  121:3,
 21  122:3, 17  124:21

**128:12**  131:7, 9, 10,
 13, 14, 25  159:18
**22**  126:9
**24**  34:23  86:22

**< 3 >**
**3**  56:10  57:5, 7
 59:13  100:3  121:2
 130:9  133:1  141:21
 143:19  164:14, 23
**3:00**  136:10, 14, 17,
 19, 24
**30**  39:14, 16  134:18
**301**  15:11, 13
**302**  13:4  14:20
 15:10
**302'd**  14:18, 19  16:1
**306**  2:16
**3P**  134:23

**< 4 >**
**4**  100:3  129:10
 130:4
**4:00**  135:6, 13  136:9
**4:05**  93:18  135:12, 14
**4:16**  152:18
**4:30**  93:19  134:7, 10
 136:21
**4:31**  152:19
**4:57**  173:10
**40**  39:14, 16

**< 5 >**
**5**  4:5  44:4  121:8
 141:4  148:22  154:14
 162:7, 11  163:16
 164:9
**5:50**  93:21, 23
**5mg**  14:6

**< 6 >**
**6**  148:15
**6:03**  136:4
**6:50**  90:17
**60**  88:24
**64**  55:21, 23
**68**  4:10

**< 7 >**

**7**  79:7, 8, 10  81:15,
 16  84:13, 14  118:10
 121:22  122:3, 5
**7:00**  90:17, 18  95:24
 96:22  163:2
**7:15**  90:18
**718327**  169:4
**770**  3:8
**7901**  8:20

**< 8 >**
**8**  57:8
**8:00**  93:8
**8:05**  83:17  93:11
**8:45**  93:23, 25  94:2
**8:58**  163:2
**80**  73:10
**8001**  76:9

**< 9 >**
**9:00**  83:10, 11, 15
**9:30**  96:25
**9:33**  114:1
**9:55**  159:19
**90**  37:14
**990**  1:13  2:8, 16
**9mm**  36:16

**< A >**
**a.m**  83:17  93:11
 159:23  163:2
**abdominal**  170:3
**ability**  34:17  76:15
**able**  15:15  29:15, 16
 32:23  40:12  74:21
 98:17  132:16  150:1
 156:15  157:15, 25
 158:13  160:21
 165:25  166:4
**ABOLITIONIST**
 1:13  2:8, 15
**absolutely**  48:4
 58:24  139:23  143:6
**Academy**  33:18  70:1
**access**  48:25  49:7
**accom**  74:18
**accommodations**
 74:24  169:19, 23
**accompanied**  65:19

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 53 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**Accu-Chek** 108:*16*, *17* 130:*4, 8, 15*
**accurate** 54:*24* 108:*7* 161:*4*
**acknowledging** 130:*6*
**ACKNOWLEDGMENT** 176:*1*
**acronym** 115:*7*
**action** 23:*5* 24:*13*, *17* 25:*5* 174:*14*
**actions** 59:*23* 60:*13*
**activities** 74:*22* 165:*6*
**actual** 42:*16* 79:*3* 127:*10* 160:*11* 161:*16*
**add** 153:*2*
**addition** 130:*13*
**additional** 70:*7* 124:*11, 14, 15, 16* 138:*10* 149:*20*
**address** 76:*9* 98:*8*
**addresses** 72:*5*
**administered** 43:*17* 44:*25* 106:*16*
**administration** 13:*19* 42:*12* 44:*24* 45:*17* 98:*14*
**Administrators** 1:*4* 5:*11*
**admitted** 78:*20*
**adolescent** 11:*16*
**Adolescents** 12:*2*
**adults** 12:*4, 18*
**advise** 32:*24*
**advocates** 96:*23*
**affect** 89:*24* 97:*17*
**affixed** 174:*15*
**aforesaid** 174:*7*
**afternoon** 5:*7, 8* 104:*22* 137:*1*
**aggressive** 25:*23* 139:*8*
**ago** 9:*23* 31:*11, 13* 54:*20* 104:*5* 108:*2* 110:*8* 152:*5, 8* 160:*6*
**ahead** 30:*6*
**Aid** 32:*12, 16, 17, 18* 40:*1*
**aide** 12:*8*

**air-conditioning** 66:*19, 20*
**alcohol** 12:*4* 107:*8*
**Alexander** 2:*5* 174:*4, 22*
**alive** 62:*17* 147:*20*
**allegedly** 27:*22*
**allow** 83:*4* 167:*22*
**allowed** 43:*9* 82:*2, 4* 134:*8* 137:*1* 165:*22*
**Alpha** 78:*7* 97:*24*
**alternative** 82:*24*
**ambulance** 78:*21*
**amount** 34:*5* 90:*7* 166:*14*
**and/or** 174:*18*
**ankle** 10:*11*
**announcement** 46:*14* 56:*20* 58:*2* 135:*7, 14*
**announcing** 108:*10*
**answer** 7:*7, 8, 13, 14, 23* 19:*10* 21:*12* 34:*16* 36:*20* 40:*21* 45:*14* 47:*3* 48:*7* 49:*20* 53:*10* 59:*4* 60:*23* 67:*15* 69:*12* 71:*5* 73:*3, 21* 75:*1, 21* 76:*13* 77:*16* 89:*14, 20* 94:*14* 102:*12* 103:*1, 5, 7* 106:*21* 107:*13* 109:*23* 121:*9* 122:*25* 123:*23* 125:*10* 128:*17* 130:*23* 141:*7* 144:*23* 149:*11, 17* 150:*10* 151:*4, 17, 21* 153:*5* 154:*18* 162:*3* 164:*12* 172:*12*
**answered** 21:*11*
**answering** 62:*11, 24*
**answers** 7:*2* 176:*6*
**Antoin** 118:*9* 121:*21*
**anxiety** 87:*10*
**anxious** 87:*5*
**anybody** 31:*24* 56:*25* 67:*5* 169:*23* 171:*14*
**anyway** 12:*13* 42:*11*
**apartment** 16:*5, 6, 11* 17:*5*

**apartments** 12:*18* 13:*2* 16:*4*
**APOLLON** 1:*12* 3:*6* 164:*2, 3*
**apologize** 115:*11*
**apparently** 159:*25*
**appear** 130:*15*
**appeared** 170:*17* 174:*5*
**appears** 38:*7, 10* 53:*6* 124:*19* 158:*21*
**applied** 18:*12, 15*
**apply** 154:*6, 8* 174:*16*
**appointments** 21:*5*
**approach** 59:*19*
**approximately** 9:*25* 159:*23*
**Arch** 2:*22*
**area** 14:*2* 20:*10* 23:*11* 27:*7, 16* 37:*13* 39:*4, 15* 41:*9, 10* 42:*9, 15, 18* 45:*10* 46:*7* 51:*15* 53:*20* 55:*20, 22* 57:*7* 60:*4* 78:*19* 80:*23* 81:*3, 12* 82:*2, 6, 14, 16, 22* 90:*19, 20* 92:*23* 93:*4* 97:*1, 13, 14, 22* 98:*2, 3, 4, 6, 9, 11, 12, 21* 99:*13* 109:*9* 110:*17, 21* 114:*12, 18* 115:*2, 4* 117:*23* 130:*18* 137:*17* 138:*5, 6* 143:*24* 144:*6* 145:*8, 13* 166:*25*
**areas** 19:*24* 28:*16* 38:*15* 45:*21* 79:*3* 80:*12* 93:*12* 96:*19* 129:*4* 135:*7, 15* 167:*10*
**arguing** 29:*5*
**Argumentative** 150:*9*
**arm** 107:*10, 11* 138:*23, 24* 139:*3*
**armband** 46:*3*
**arrival** 90:*21*
**arrive** 83:*4*
**arrived** 52:*12* 60:*11* 157:*8, 10*

**arrives** 60:*3, 10* 159:*24*
**aside** 152:*7*
**asked** 25:*24* 27:*14* 69:*19* 104:*8, 22* 125:*21* 146:*7* 169:*18* 170:*1* 172:*7*
**asking** 5:*17* 6:*21* 8:*4, 11* 48:*14* 54:*20* 59:*25* 66:*25* 67:*5* 104:*11* 146:*17* 151:*11* 158:*4*
**asks** 121:*7*
**assault** 59:*11*
**assess** 16:*24* 33:*3* 54:*12* 63:*11* 64:*16* 65:*5* 66:*3* 150:*1*
**assessment** 34:*16* 36:*3* 63:*16, 23* 125:*24*
**assigned** 44:*18* 76:*17* 77:*1* 89:*25* 100:*2, 3, 12* 101:*2* 108:*4*
**assist** 121:*7*
**assistance** 121:*3* 124:*6, 9*
**assistant** 17:*19*
**assisting** 40:*6*
**associate's** 9:*21, 24*
**assume** 7:*14*
**assuming** 31:*15, 19, 22* 158:*12*
**attached** 176:*9*
**attend** 90:*8*
**attended** 9:*19*
**attention** 63:*4* 113:*17* 127:*1* 142:*4* 155:*7*
**ATTORNEY** 4:*5, 6, 7, 8* 5:*6, 22, 24* 6:*1, 3, 7* 8:*21* 9:*1* 36:*18, 22* 40:*20, 23* 49:*16, 18, 19* 59:*1, 6* 67:*13, 25* 68:*16, 18, 20, 22* 69:*9, 11, 15* 71:*2, 4, 18* 73:*19, 22* 75:*19, 25* 76:*14, 22* 77:*12, 14, 20, 24* 86:*13, 17* 89:*12, 16, 18, 23*

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

91:*24* 92:*2, 3, 6, 9*
94:*12* 102:*9, 11, 16,*
*23, 25* 103:*6, 25*
106:*18, 22, 23* 109:*21*
110:*3* 111:*17, 21*
112:*22* 113:*3* 120:*16,*
*18, 21* 121:*24* 122:*1,*
*22, 24* 123:*3, 13, 15,*
*20, 22* 124:*4* 125:*7, 9,*
*13* 126:*16, 19, 22, 24*
130:*21* 131:*3* 134:*25*
135:*2, 4* 137:*8, 11, 14*
141:*5* 143:*1* 144:*22,*
*25* 149:*10, 13, 16*
150:*5, 8, 17* 151:*3, 5,*
*10, 15, 20* 152:*3, 6, 20*
153:*4, 7, 12, 14, 16, 18,*
*20, 23* 158:*3, 6, 9, 10*
162:*2, 5* 163:*21, 23*
164:*11, 25* 169:*11, 13,*
*17* 171:*13, 15, 17*
172:*2, 5, 7, 13, 15, 18,*
*24* 173:*4, 6, 8* 174:*13*
**attorneys** 154:*9*
**August** 2:*10* 174:*16*
**authority** 150:*25*
**authorized** 55:*17*
**available** 13:*23*
20:*18* 61:*17* 105:*12*
118:*19*
**aware** 68:*6, 7, 8* 72:*6,*
*8, 22* 86:*3* 87:*25*
99:*17* 106:*1* 152:*11*

**< B >**
**B1** 85:*6* 121:*2* 130:*9*
**B1-3** 101:*2*
**B2** 85:*7* 100:*1*
145:*10*
**baby** 22:*4, 5* 23:*8*
24:*2, 8*
**baby's** 24:*21*
**back** 10:*25* 14:*4*
16:*19* 18:*5* 20:*24*
21:*2, 20* 23:*12, 14*
27:*17, 20* 28:*11, 14,*
*15, 18, 20* 32:*5* 33:*7*
36:*9, 12* 38:*2, 4, 5*
44:*7, 10, 11* 45:*2*
46:*5, 6* 47:*19* 50:*8*

52:*22* 71:*16* 77:*23*
86:*6* 89:*5* 93:*18, 22*
98:*9, 19* 99:*9, 12*
108:*5* 120:*13* 121:*20*
124:*17* 126:*25*
127:*20* 129:*21*
138:*14, 15* 146:*19*
152:*19* 155:*2* 160:*23*
**backs** 44:*19, 21*
**backside** 27:*22*
**backup** 60:*9, 10*
**bad** 95:*4* 154:*17*
**bags** 165:*24*
**bail** 79:*18* 81:*5*
**bandages** 32:*20*
**bang** 53:*8* 62:*15*
**banging** 16:*12* 26:*2*
35:*6, 14* 36:*6*
**bars** 132:*3* 133:*2, 4*
**based** 24:*17* 79:*5*
85:*21* 87:*13* 122:*18*
172:*14*
**basically** 12:*20*
24:*25* 28:*24* 32:*19,*
*23* 55:*13* 59:*25*
62:*13* 91:*1*
**basketball** 165:*8*
**Bates** 118:*22*
**Bates-stamped** 112:*23*
**beach** 73:*18*
**bear** 113:*19*
**beat** 28:*24* 29:*15*
**bed** 61:*22* 138:*3*
140:*9* 157:*11*
**began** 10:*20* 18:*23*
**beginning** 21:*20*
66:*10* 94:*7* 131:*15*
**Behalf** 1:*8* 2:*13, 20*
3:*1, 6* 96:*24*
**behavior** 11:*16*
**Behavioral** 12:*24*
86:*18, 24* 87:*1* 88:*4*
150:*6*
**believe** 11:*11, 18*
12:*25* 15:*11* 26:*9*
29:*14* 30:*19* 34:*22*
48:*6* 69:*13, 18* 71:*20*
74:*8* 86:*22* 88:*12*
89:*7, 10* 93:*23, 24*
96:*16, 17* 100:*1, 2, 13,*

*14* 103:*16* 107:*20*
112:*12* 121:*16* 133:*1,*
*4, 20* 134:*6* 137:*19,*
*20* 141:*8* 147:*11*
149:*4* 155:*4, 10*
156:*2, 11* 168:*7*
172:*23*
**believed** 22:*2*
**belongings** 80:*15*
**bench** 79:*14*
**best** 34:*16* 37:*22*
61:*13* 74:*12* 76:*14*
83:*23* 84:*1, 5, 6*
85:*16* 86:*3* 90:*7, 13,*
*16* 94:*6* 95:*11* 128:*1*
159:*8*
**better** 31:*10* 109:*10*
139:*6* 140:*10*
**beyond** 27:*25*
**big** 96:*23*
**bit** 9:*3* 10:*14* 18:*4*
40:*1* 73:*13* 119:*12*
129:*12* 133:*3* 159:*20*
**blah** 25:*4* 53:*19*
57:*8*
**BLAIR** 1:*12* 3:*1*
102:*6* 120:*15*
**BLANCHE** 1:*9* 2:*21*
**blanket** 81:*17* 83:*2*
**blankets** 140:*18, 21*
**block** 20:*23* 27:*8, 18,*
*19* 34:*4* 35:*15* 37:*15,*
*17, 22* 38:*3, 5* 45:*8,*
*23* 52:*22* 57:*5, 6, 9,*
*11* 60:*2* 84:*12, 25*
85:*2* 98:*6* 104:*19*
105:*14* 109:*11*
111:*13* 117:*24* 118:*6*
166:*19*
**blocks** 37:*11* 78:*7,*
*11* 135:*12*
**blood** 59:*21* 70:*16,*
*18* 80:*23* 81:*2* 84:*18*
115:*18, 19* 116:*3*
170:*25*
**BLOODSAW** 1:*14*
2:*20* 107:*14, 24*
110:*5* 118:*23* 122:*16*
137:*6, 16* 138:*4*
144:*21* 146:*13*

147:*11* 148:*10, 12*
152:*5, 8* 159:*24*
**blue** 19:*9* 46:*3*
**blues** 140:*15*
**book** 19:*5, 8, 9, 10, 19*
**booth** 41:*2, 8, 10*
45:*21* 46:*4* 56:*22, 24*
57:*14, 17, 18*
**bottle** 22:*24* 67:*18*
**bottom** 38:*17, 18, 19*
39:*6* 85:*5* 121:*23*
124:*18* 130:*18*
131:*17* 135:*3* 160:*7*
**Boulevard** 3:*3*
**brain** 10:*6*
**Bravo** 27:*4* 78:*8*
82:*15* 85:*6, 10, 16*
97:*24* 98:*20* 100:*2*
133:*1* 141:*21* 143:*19*
164:*13, 23* 170:*15*
**break** 7:*21, 24* 42:*17*
77:*21* 152:*14, 22*
**breathe** 158:*23*
**breathing** 170:*19*
171:*5*
**Bret** 1:*11* 2:*13* 5:*9*
135:*1* 154:*4*
**Bretgrote@abolitionist**
**lawcenter.org** 2:*17*
**brief** 68:*15, 21* 77:*19*
112:*25* 134:*15*
**bring** 14:*4* 21:*23*
22:*10, 11, 23* 76:*19*
114:*18*
**broad** 65:*13*
**broke** 10:*11*
**brought** 22:*22, 25*
26:*6* 78:*21, 25* 79:*4*
**bruised** 139:*3*
**buddies** 51:*21*
**Building** 25:*13, 14,*
*15, 17* 27:*3* 82:*14, 15,*
*16, 18* 85:*4, 5, 19*
97:*24* 100:*15, 16*
107:*16* 135:*10*
**buildings** 97:*25*
**buildup** 87:*10*
**busier** 79:*2*
**busy** 48:*13* 79:*21*

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 55 of 85

Deposition of Gena Frasier                                Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

122:*14* 128:*1* 143:*8*
**button** 141:*19* 170:*14*
**buzz** 41:*8, 11*
**buzzes** 46:*4*

**< C >**
**C/C** 134:*23*
**C/O** 32:*25* 65:*1*
68:*9* 113:*22* 117:*4*
160:*9*
**C/Os** 36:*17* 95:*5*
138:*10*
**CABELLOS** 1:*13*
3:*1* 102:*7* 117:*3, 5*
120:*6, 15, 17, 19*
122:*20* 123:*10* 125:*2,*
*5* 126:*2* 139:*20*
141:*22* 147:*22* 157:*4,*
*21* 160:*9* 162:*12*
**call** 13:*24* 14:*23*
15:*4* 16:*5, 18, 19, 22*
20:*3, 6, 19* 23:*20*
25:*15* 27:*10* 34:*8*
37:*10* 41:*2* 45:*4*
47:*18* 51:*12, 13*
52:*10, 15, 19* 53:*16,*
*18* 54:*8, 10* 55:*18, 25*
56:*8, 17* 57:*10, 13*
58:*1* 59:*24* 61:*5*
62:*19, 20* 63:*15*
64:*15, 19* 65:*2, 3, 15,*
*16, 17, 23, 24* 66:*2*
72:*3, 22* 73:*3, 16*
79:*25* 81:*18* 82:*3, 4,*
*5, 12* 83:*13, 18* 84:*20*
86:*1* 90:*17* 91:*1, 20*
98:*22* 106:*12* 109:*4*
111:*1* 119:*6* 124:*10,*
*12, 15, 16, 24* 125:*15*
126:*1* 127:*22* 138:*8,*
*9* 141:*13, 15, 17, 19,*
*23* 142:*1, 6, 13, 19, 25*
143:*2, 5, 14, 15* 144:*8*
145:*22* 146:*15* 147:*5*
148:*5* 150:*21* 157:*22*
158:*1, 5, 8, 13, 16, 22,*
*24* 159:*2, 13* 165:*24*
166:*2* 170:*15, 22, 23*
171:*6, 8*

**called** 2:*2* 12:*14*
13:*24* 15:*2* 16:*16, 18*
18:*17, 19, 21* 19:*4, 8,*
*18* 24:*25* 25:*22*
27:*16* 37:*15* 38:*15*
45:*1* 56:*5* 76:*3, 4*
106:*8, 10* 110:*14, 21,*
*25* 117:*15* 119:*18*
123:*25* 124:*2, 3*
125:*19, 20* 127:*20*
128:*21* 134:*12*
135:*20* 137:*21*
146:*13, 19* 148:*9*
**calling** 18:*24* 110:*13*
144:*21* 145:*2*
**callouts** 73:*11*
**calls** 83:*16* 167:*1, 3,*
*6*
**camera** 27:*19, 21*
103:*12, 18* 160:*18*
**cameras** 27:*15, 24*
29:*2*
**cane** 85:*14*
**capable** 14:*22*
**capacity** 9:*5* 55:*21*
**caption** 174:*11*
**Carabella** 102:*3*
**Cardinal** 9:*18*
**cards** 80:*16*
**Care** 11:*7, 9* 12:*1*
14:*22* 40:*7* 54:*17*
71:*1* 123:*11*
**career** 149:*20*
**careful** 73:*13*
**CARNEY** 1:*9* 2:*21*
**carry** 36:*15* 70:*12*
**Carson** 11:*12*
**Case** 1:*5* 15:*6* 17:*19*
27:*13* 42:*6* 52:*19*
58:*5* 62:*18* 63:*13*
70:*22* 89:*5* 104:*6*
134:*1* 152:*2* 153:*2*
**cases** 79:*19*
**caught** 91:*17*
**cause** 148:*25* 171:*8*
174:*7*
**CBH** 12:*21, 23*
**cease** 59:*22* 60:*13*
**cell** 20:*8* 26:*7* 34:*3*
35:*2, 9* 36:*13* 38:*23*

41:*22* 43:*11* 45:*7*
50:*4, 19* 53:*21, 23, 25*
55:*9, 25* 56:*2, 9, 10,*
*19* 57:*5, 7, 8, 21, 24*
58:*1, 3, 6, 15, 17, 22,*
*23* 59:*13, 17, 20* 61:*4*
80:*16* 83:*2* 84:*5*
103:*12, 16* 104:*23, 24*
105:*2, 3, 7, 11, 24*
108:*7, 10, 22, 23, 25*
109:*1* 110:*19* 111:*12*
112:*3, 6, 15* 114:*8, 12,*
*21, 22* 118:*9, 18*
121:*2, 12* 122:*17*
123:*5* 124:*21* 128:*8,*
*12* 130:*12, 13, 14*
131:*5, 13* 132:*3, 19*
133:*7* 134:*9* 137:*7,*
*22* 138:*14* 144:*18*
146:*7, 10, 19* 147:*12,*
*19* 154:*22* 155:*2*
156:*1, 15, 19* 157:*1,*
*10* 159:*18* 161:*14, 20,*
*25* 166:*22* 167:*4*
168:*5*
**cellmate** 112:*7*
121:*10, 14, 17* 123:*12*
155:*25* 156:*10, 25*
161:*7, 14*
**cells** 37:*19* 38:*21*
39:*24* 44:*3, 4, 10, 11*
50:*3* 51:*24* 82:*19*
100:*25* 103:*10* 108:*9*
116:*24* 129:*18*
131:*14* 132:*22* 137:*2*
164:*21* 165:*7* 166:*1*
**celly** 61:*4* 82:*20*
104:*22, 23* 105:*1, 2*
110:*18* 111:*11*
118:*17* 138:*1* 146:*3,*
*5* 156:*11*
**census** 91:*10* 135:*20,*
*21* 136:*5, 6*
**CENTER** 1:*13* 2:*8,*
*15* 3:*3* 76:*7, 11*
**certain** 54:*23* 96:*19*
127:*18* 128:*5*
**certification** 174:*16*
**certify** 174:*5, 9, 11*

176:*4*
**certifying** 174:*19*
**CFCF** 37:*9, 12*
38:*11, 12, 14* 42:*13*
78:*11, 12, 14, 16* 79:*1,*
*17* 85:*25* 96:*14*
108:*3, 4*
**chain** 148:*3*
**chair** 119:*23*
**challenging** 94:*18, 22*
**change** 9:*4* 22:*9, 11,*
*13, 25* 65:*22* 153:*10*
175:*5*
**changes** 91:*10*
136:*20* 150:*25* 151:*2*
176:*8*
**charge** 32:*1*
**charged** 113:*9, 10*
**Charlie** 25:*13, 16*
78:*8* 97:*25*
**check** 37:*19* 101:*7,*
*16* 116:*2*
**checks** 17:*25* 77:*10*
106:*16*
**checkup** 16:*6*
**chest** 158:*23*
**Chief** 148:*5*
**Child** 11:*6, 9* 12:*1*
22:*11* 87:*3, 5*
**children** 21:*24, 25*
23:*18, 24*
**Children's** 11:*20*
17:*20*
**choose** 105:*8*
**circumstance** 50:*21*
54:*17*
**circumstances** 40:*14*
53:*22* 60:*6* 72:*16*
86:*23* 115:*20*
**CITY** 1:*8* 2:*20, 22*
19:*5, 15* 21:*8, 11*
30:*20* 33:*20*
**CIVIL** 1:*4* 2:*4*
**civilian** 23:*15* 27:*4,*
*8* 41:*11* 42:*9* 112:*15*
161:*20*
**Civilians** 40:*16* 42:*5,*
*8* 143:*11* 161:*12*
**civilian's** 27:*22*

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 56 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

clarification  91:25
clarify  137:9  165:14
clarity  31:10  54:19
clean  32:21  33:10
  93:5, 9  107:8  166:1
cleaned  33:8
clear  24:15  42:21
  46:22  59:14  134:17
  151:23  159:10
cleared  28:3, 7  52:7
  93:17  113:14
clearer  136:7
clears  93:21  134:18
  136:25
client  14:4
clients  13:21, 25
  14:1  16:3
client's  12:22  80:1
Clinic  11:19, 21, 22,
  23  12:5, 7
close  37:25  67:7
  83:10  85:22  86:1
  111:5, 8
closed  18:1
closer  109:8  131:24
  140:7
closing  103:17
clothes  81:12
clothing  38:22, 25
coherent  36:8
colleagues  152:15
collected  17:25  18:3
College  9:19, 20
  150:3
come  11:6  15:4
  19:1  20:22  22:1
  25:23  27:20  28:14
  33:7, 21  34:6, 18
  35:4, 9, 19  38:4, 5
  39:2, 6  41:3, 7, 15
  42:24  44:2, 6, 8, 10
  45:7, 8, 21, 25  46:1, 6
  47:1  51:14, 15  52:1,
  15  54:12  56:17  57:11
  60:2  61:5, 9  62:21
  64:10, 16  65:4  66:3
  79:13, 22, 25  80:14,
  19  82:3, 14, 16, 21
  83:8, 10, 24  84:3, 24
  85:13  90:17  93:4

94:19  98:9  99:1
  100:24  101:20
  104:22  106:13
  109:13  110:18, 23
  111:2, 6  112:4
  115:25  119:7  124:13
  128:22  129:6  137:6,
  21  143:20  144:8, 9,
  12, 15  146:4, 7, 10
  164:17, 19  165:25
  167:1
comes  20:12  42:9
  51:22  56:22  61:15
  101:15  143:17  147:2
comfortable  121:10
  123:11
coming  18:5  44:5
  49:15  50:5  80:15
  95:19  104:18  111:9
  119:13, 14  128:13
  133:10  138:4
command  148:3
commands  59:22
  119:16  145:23
commencing  2:10
comment  151:19
commission  174:25
Commissioner  1:10
commit  61:1
common  31:4  64:8
  129:3  138:18  140:11,
  23
commonly  139:24
Commonwealth  2:6
  174:2, 4, 23
communicate  129:4
communicated  120:2
communication
  163:14
Community  9:20
  16:10  85:23, 25  86:2
company  12:14  69:7
compare  38:11
complete  72:10  93:2
completed  38:6
completely  48:19
  62:10  98:4
complex  16:11  17:5
  21:10
compliance  38:22

compliant  36:9
  61:18  81:1  84:15
comply  39:2  80:22,
  23  84:21
computer  47:25  52:8,
  12  61:10  71:9, 11
  91:3  104:19  160:24
computer-aided  174:9
concern  139:12
  147:23
concluded  173:10
conditions  66:7
conducted  130:8
confer  152:15
confused  170:3
connect  148:21
consciousness  170:19,
  21
consequences  24:22
considered  42:8
consist  32:18  78:7,
  18  88:16  110:10
consisted  32:9
consistent  34:5  69:21
constantly  44:18
constructed  132:3
contact  16:20  17:2
  37:25  139:5  142:14
  148:1, 2
contacted  49:12
contacts  50:24
continue  60:14
contraband  23:7, 13,
  25  24:2, 7
contractors  33:21
control  67:22  166:5
  174:18
controls  41:3
conversation  6:5
  8:13  61:23  110:9
  111:16  124:20, 22
  157:16, 19
conversations  8:5
convulsions  64:19
cool  45:11  53:14
Copies  173:2
Copy  98:25
Corizon  4:10  69:4,
  16

corner  131:16
CORP  1:9
correct  21:12  55:7
  62:3  154:22  155:3,
  13, 14  156:12  157:23,
  24  159:7  176:5
Correctional  8:19, 25
  9:7  18:13, 16  32:7
  37:4, 5  42:3  43:20
  46:8, 9, 10, 11  50:11
  51:1  72:4  80:10
  149:21, 23, 25  171:23
Corrections  19:20, 23
  21:21  37:9, 14, 16
  38:1  46:9  70:3, 25
  78:4, 6, 10  176:7
correctly  159:6
  165:10
cotton  22:17
Coumadin  67:19
Counsel  1:9  2:12
  5:10  8:6, 14  174:13
counseling  25:1
  26:14, 20  30:9
counselor  11:15
  12:17
counselors  14:1
count  83:23  93:13,
  15, 17, 19, 21  96:25
  134:11, 14, 16, 17, 19
  135:15, 18, 19, 21, 22,
  25  136:1, 2, 5, 7, 10,
  14, 17, 18, 22, 24, 25
counts  6:14
County  12:15, 24
  174:3
couple  6:13  12:1, 3
  35:10  44:14  114:24
  153:17, 25  154:2
  159:9  163:20
course  11:8  29:8
COURT  1:1  2:5
  21:6  87:2
cover  126:10  154:3
covered  154:4
COVID  10:5, 10, 11,
  15, 17  26:16  41:5
  43:6, 8  58:12  94:7
  95:2, 7, 19  96:12

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 57 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**COWS** 101:9, *10, 11*
115:*3, 4, 22* 116:2, *7*
117:*19, 23, 24* 118:2
**C-O-W-S** 101:*13*
115:*7*
**CPR** 32:11, *16*
**crack** 43:*11* 58:*17*
**Crawford** 115:*3*
**credibility** 19:*17*
**credit** 80:*16*
**Criminal** 9:21, *24*
**crisis** 14:2*4* 138:10
**crowd** 37:*24*
**crutches** 75:7, *8, 11*
85:*14*
**cuff** 35:19, *23* 61:17
**cup** 81:*18*
**curious** 164:7
**Curran** 8:2*4*
**C-U-R-R-A-N** 8:2*4*
**Curran-Fromhold**
8:*19*
**currently** 8:*18*
**custody** 85:21 86:1
**cut** 32:25

< D >
**dad** 24:*11*
**danger** 14:2*1* 75:*11*
**date** 27:2 31:*12*
87:2 126:*10, 11, 14*
176:*15*
**dated** 126:9
**dates** 31:*12*
**day** 20:*1, 17* 23:*16*
27:*15, 25* 28:*11*
33:*18* 34:7 52:*23*
58:7, *11, 20* 73:4, *10*
79:8 83:*3, 8, 21* 90:9
92:*21* 93:8 97:*23*
98:*13* 99:*19* 100:2, *8,
9, 10, 17* 101:4, *25*
103:*4, 9* 104:2, *3, 21*
106:*6, 15* 107:*15*
111:*23* 114:2*0*
116:*18, 19, 25* 119:2*0*
126:*6, 13* 133:*19, 22,
23* 134:7 135:9
141:*18* 142:*8* 146:*3,
10* 148:*15, 17, 18*

**154:*16* 155:5, *16, 25***
157:*1, 5* 162:*1, 6, 10,
17* 163:5 165:9, *11,
13* 174:*16*
**day-in-the-life** 92:*22*
**dayroom** 130:*17*
**days** 10:*16* 30:*11, 16*
31:*18* 34:5 35:*3, 10*
73:*12* 79:7, *8, 10, 16*
80:*8* 81:*15, 16* 84:*13,
14* 88:*25* 89:2, *22*
90:*5, 10* 95:*21* 96:2
107:*17*
**DC** 76:6, *10, 12* 86:4
**DC's** 76:*8*
**deal** 90:2
**dealing** 95:*11* 143:9
144:*4*
**dealt** 95:*12*
**death** 95:*11* 148:*25*
150:*24*
**debris** 38:*23* 39:*1*
**decide** 43:*1*
**decipher** 134:*24*
**decision** 124:*13*
**decisions** 149:*22*
151:9, *14*
**decline** 12:22 13:5
**decontaminated** 26:*8*
60:22
**de-escalate** 15:*1*
**Defendant** 2:2 3:6
5:2
**Defendants** 1:*15*
2:20 3:*1* 152:2, *10*
154:*1*
**defenders** 79:*24*
**definitely** 31:2 57:*10*
143:*12* 145:4 170:22
**degree** 9:2*1*
**delay** 32:*1*
**delivered** 114:7, *11*
**Delta** 78:8 97:*25*
**dental** 21:6
**Depakote** 14:9
**Department** 2:22
21:*15* 31:*15* 69:*17*
70:25 78:2 84:22
151:8 161:*17*

**depend** 50:2*0* 57:*15*
58:*11* 132:*19*
**Depending** 48:*12*
80:*1* 83:*3* 89:*25*
97:22 107:8 108:*14*
119:*13*
**Depends** 58:9 81:6
134:*17* 145:6
**depo** 68:*12*
**DEPONENT** 176:*1*
**Deposition** 1:6 2:*1*
5:*19* 6:*15* 8:2, *7, 14*
68:*13* 113:*1* 168:2
173:*10* 174:7, *9*
**depressed** 34:*11*
**Dept** 1:*10*
**described** 56:6 104:*1*
**DESCRIPTION** 4:*10*
**designated** 90:*19*
92:*23* 167:*10*
**desk** 27:6 38:5
43:2*0* 57:*15, 18, 20*
103:22 108:*15* 109:6,
*8* 131:*4, 12, 17, 21*
132:*12, 17* 147:*10*
**desks** 46:2*1*
**detailed** 145:*11*
**details** 65:*12*
**Detention** 76:7, *11*
**determination** 54:*11,
16*
**determine** 15:*25*
33:*13* 51:8 87:8
124:9 125:*25* 169:2*0,
22*
**determined** 53:*4*
**determines** 52:5
**diabetes** 4:*11* 66:22
67:2, *8, 21* 68:2
69:22 75:*18, 23*
140:25 149:9 170:2
171:*1*
**diabetic** 46:*12* 67:*17*
77:5 106:2, *5* 149:*3*
150:2
**diabetics** 76:*1*
**diagnosis** 150:*19*
**dial** 82:8, *9*
**died** 149:8 163:*11*
**differ** 78:25

**difference** 34:2*0*
44:25 85:2 140:2*4*
**different** 33:2*1, 22*
37:9 91:*17* 103:*10*
107:22 162:*15*
167:*13* 168:22
**differently** 91:*16*
141:*3* 151:*12*
**difficult** 94:*16, 22*
**direct** 113:*17* 127:*1*
174:*18*
**direction** 174:9, *19*
**directive** 91:2*1*
**directly** 110:2*3*
137:22
**disabilities** 74:2*5*
75:*3* 169:*18*
**disability** 74:*19, 24*
75:6, *18, 24* 169:2*0,
24*
**Disciplinary** 4:*11*
21:*16* 23:5 24:*3, 13,
17, 24* 25:5 29:7
104:6 110:8 113:5
137:5 152:9
**discipline** 126:*3*
**disciplined** 30:2*3*
**discuss** 8:*13* 126:4
**discussed** 126:5
**discussing** 164:6
**discussion** 68:*15, 21*
77:*19* 112:25 173:*1*
**discussions** 157:*3*
**distress** 64:2, *6, 21*
139:*18* 141:*11*
155:22
**DISTRICT** 1:*1, 2*
**disturbing** 142:22
**diverse** 94:*19*
**DIVISION** 1:*4*
**dizzy** 170:*18*
**DNA** 167:7
**doctor** 21:6 33:4
**doctors** 13:2*3*
**document** 7:*12*
127:2*4* 143:*3, 4*
168:*12* 169:7
**documentation** 4:*11*
70:2*3* 113:5

documented 39:9 47:22 127:22

documenting 71:1

documents 8:9

doing 22:15 41:14, 22 45:3 65:19 88:24 95:10 117:19 118:2 128:1 136:18 160:22

door 25:22 26:6 41:7, 20, 23 43:11 50:19 53:8, 9, 11, 14, 21 54:2 57:1, 21 59:17, 20 60:5, 7, 18 62:14, 15 63:4, 8, 9 99:6 103:17 104:8 108:10 109:11, 16 110:17 111:4, 5, 8 112:10, 12, 16, 18 114:8, 12 119:5 120:12 128:8, 15, 16, 23 141:12 156:17 157:10, 11 166:22 167:2, 5, 8

doors 41:3 44:7 72:24 132:3, 9, 10 165:23

doorway 110:20 112:8 123:6, 8, 9 144:18 145:18 146:21, 24 147:4, 8

Dougherty 9:18

downstairs 58:18

drag 138:17

drained 95:18

draining 95:18

drug 12:4 19:3 64:9

drugs 22:16, 17

due 121:10 124:25

duly 5:3 174:6

duties 40:12

duty 113:22, 23, 24 162:17

< E >

earlier 47:3 61:10 71:8 86:20 108:6 115:5 119:11 137:19 154:8 155:10 156:4 157:20 161:10 164:6

early 83:8 168:1

EASTERN 1:2

easy 147:5

eat 83:23 166:12

echo 46:24

education 4:10 9:12, 13, 15

eight 78:13

either 38:16, 19 39:2 45:5 53:12 61:8 66:4 105:11 109:3 120:18, 19 124:10 153:14

electronic 130:1

emergencies 59:8

emergency 27:17, 20 32:16 34:18, 21, 23, 25 35:8, 15, 16 51:6, 7, 9 53:3, 4 54:1, 5 61:7, 11, 14, 15 64:14 150:12

emotionally 95:17

emotions 87:10

employed 9:6

employment 9:12 10:24 78:1

empty 98:4

encounter 51:6 66:8 122:20 139:25 140:4

encountered 118:15 120:4 155:15, 24 156:13

encourage 112:14

ended 136:8

end-of-shift 91:23 92:4 162:18

ends 163:2

enforcement 19:13

engaging 61:23

enhance 149:20

enjoyed 152:21

entail 115:15

enter 90:18 113:24 122:11 135:25 136:3 159:6 161:20, 25

entered 71:21 118:24 122:2, 5 127:5 130:6 134:2 136:4 160:12

entering 118:25 161:13

entire 93:14 95:16

entries 114:25 130:10 160:2, 24

entry 127:3 128:2 130:3 160:5 161:2

ER 90:24 91:9

Errata 176:9

escort 14:1 40:10, 11, 18 42:3 43:1, 10 44:20 51:2 99:2, 4, 9 117:11 143:23, 25 144:10 162:14

escorted 26:7 35:24 61:18 98:17 107:5 117:4 118:7 160:9

escorting 40:7 103:3, 9 114:17 117:5, 9, 14 159:19 161:11

especially 54:3

Esq 1:11, 12 2:13, 14, 15, 21 3:2, 6

established 152:4

Estate 1:5 5:12

evaluate 65:16

evaluated 60:22

evaluations 86:7, 9

event 117:3, 15 127:3 129:8 130:3, 6, 20 137:10, 12 149:7 158:14 160:8, 11 174:13

events 83:21 130:11 159:6 163:16

eventually 146:1 155:1

Everybody 45:25 56:18 73:2, 18 91:15 117:21 118:14

exact 89:8

exactly 15:12 63:2 115:9, 10

examination 2:3 5:5 153:22 163:22 169:16 171:16 172:4, 17

EXAMINATIONS 4:2

examined 5:3

example 20:2 43:8 49:25 52:24 73:24 75:7 84:17 101:18 138:22

examples 42:22

exception 85:10

excessive 25:11 26:10

excuse 7:15 39:14 74:1 112:7

excuses 145:9

exhaustion 66:17

EXHIBIT 4:10, 11, 12 68:12, 13 113:1

EXHIBITS 4:9

exit 124:22

exited 130:13

expect 94:19

experience 64:4 86:25 92:17 124:6

experienced 95:15

experiencing 155:18, 21

expert 66:25

expertise 150:3

expires 174:25

explain 44:15

explained 27:15 61:10

explanation 31:25 101:11

expresses 64:23

expressing 60:25

extent 50:10

extremely 95:4

eyes 61:6, 9

< F >

face 24:22

facilities 78:3

Facility 8:20, 25 11:7, 9, 13, 23 37:10 76:21, 25 77:2 79:4 86:1 87:24 102:20

fact 164:14

facts 145:10

factual 43:8

failure 172:21

fair 76:23 106:22 161:1

faithfully 48:18

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 59 of 85

Deposition of Gena Frasier                                Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**fall** 88:7 89:6 90:13 96:10, 13
**false** 28:23
**familiar** 66:22 67:9 68:5, 17 69:4, 20 74:2 87:20 100:21 145:12 164:2
**family** 15:4 19:13 67:8 68:1
**far** 10:25 42:20 49:8, 10 69:8 70:14 105:25 114:4
**farther** 132:22
**fast** 118:3 134:18 170:20
**faster** 90:1
**fast-moving** 94:25
**fast-paced** 99:10
**February** 126:9
**fed** 97:1, 6
**Federal** 2:3
**feed** 20:11, 14 166:11, 12, 13
**feel** 65:15 81:4 121:9 123:11 139:6 140:6, 12 145:23, 25 170:7
**feeling** 38:9 65:12
**feels** 142:3
**feet** 83:2
**fell** 53:16 66:1
**fellas** 45:24 56:25 60:12
**felt** 31:14 95:18
**females** 11:16
**fever** 170:3, 6
**fight** 27:11 60:6, 14 90:25 91:10 96:5
**fighting** 59:13, 19, 20, 23 60:8, 13, 15, 17
**figure** 79:16
**Filed** 1:8
**fill** 19:4 50:14 65:2, 14
**find** 20:25 23:25 126:6
**fine** 26:18 30:14 33:9 36:8 38:7, 8 78:9 141:10

**finish** 6:21, 22, 24 7:1
**finishes** 59:3
**fire** 119:7
**first** 5:3 6:20 21:21 32:12, 17, 18 37:4, 8 40:1 59:18 63:4 74:18 75:1 78:20, 25 79:4, 16 80:8, 14 82:5, 9 83:13, 24 113:8 115:24 126:17, 20 149:6 153:21 159:16 174:6
**five** 30:11, 15 31:17 44:3, 11 82:9 89:2
**five-day** 31:1
**flag** 74:13, 14
**flip** 68:19
**Floor** 2:23 53:6, 15 54:9 61:22 103:15 104:10, 12, 14, 16 110:17 112:12 119:4, 22 138:2 140:7, 8, 12, 16, 17, 19, 22 145:17 154:21, 24 155:12 156:14, 22 157:1, 7, 12 159:22
**floors** 93:7
**Flourtown** 11:13
**foaming** 64:13, 18
**foggy** 28:19
**follow** 31:24 172:6
**following** 148:15
**follows** 5:4
**follow-up** 172:16
**food** 20:12
**force** 146:25 171:19, 21 172:9
**foregoing** 174:11, 16 176:4
**forget** 91:18 92:22 143:7
**forgot** 17:18
**form** 36:19 49:17 50:14, 25 67:14 69:10 70:9 71:3 73:20 75:20 77:13, 15 86:14 89:13, 19 102:10, 24 109:22 122:23 123:14, 21

125:8 130:22 141:6 176:8
**Former** 1:10
**forth** 14:15 44:12 174:8
**forthcoming** 24:19, 20
**forward** 25:2
**found** 23:12, 21 24:2, 10 96:7 113:13
**four** 13:17 52:14 85:7, 8 97:25 129:10 130:4 144:4 160:6 168:18, 20, 23
**fourth** 127:3
**four-year** 17:11
**Frashe** 50:1 108:23
**FRASIER** 1:7, 13 2:1, 20 4:4 5:2, 7, 14 20:23 23:16 45:22 52:2 54:13 56:23 61:2 62:22 65:1 66:1 98:22 108:22 113:22 117:4 138:22 142:10, 25 152:21 153:24 160:10 170:13 174:5, 7
**F-R-A-S-I-E-R** 5:15
**Frasier-000005** 112:24
**Frasier-000006** 159:15
**Frasier-000062** 112:24
**frequently** 79:22, 23 80:1 97:18
**Friday** 88:23
**friend** 5:22 105:13
**Fromhold** 8:24
**F-R-O-M-H-O-L-D** 8:25
**front** 22:12 57:3 108:18
**frustrated** 146:4, 8
**frustrating** 84:3 142:21
**full** 11:7 129:23 159:16
**fully** 96:17
**fun** 152:16
**funding** 13:1

**further** 54:16 130:8 131:25 132:1 153:12 169:12 171:11 172:24 174:9, 11
**future** 25:2

**< G >**
**Garden** 1:13 2:8, 16
**gate** 33:1
**gauge** 87:9
**gauze** 32:22
**GAY** 1:12
**GENA** 1:7, 13 2:1, 20 4:4 5:2, 14 16:22 142:24 174:5, 7
**G-E-N-A** 5:14
**general** 32:8 54:23 56:21 65:1 113:10 170:2
**generality** 19:21
**generally** 19:23 39:18 46:16 58:7 63:15 79:9 81:16 93:3 140:5
**generated** 61:15
**gentleman** 87:9 114:21 121:16
**gentlemen** 44:7, 8 56:1 60:12 85:12, 13 86:4
**getting** 20:16 45:5, 25 55:5 57:1 69:21 84:11 95:24 104:24 145:25
**girlfriend** 23:17
**give** 8:1 31:6 42:21 43:2, 13 47:20 55:15 59:21 60:16 72:23 73:5 80:20 83:23 87:14, 15 91:1, 14 98:18 99:4 136:15 164:7 165:24 171:22
**given** 5:18 17:4 31:11, 25 38:24 73:8, 16 75:2, 15 106:6 147:14 150:14 153:9 174:7 176:6
**gives** 49:25

Deposition of Gena Frasier

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**giving** 28:5  34:12  65:11, 13  84:18  145:10  165:23
**glass** 43:23, 25
**Glipizide** 67:20
**Glock** 32:12  36:14
**Glock-certified** 70:12
**Glocks** 36:15, 16
**glucose** 77:10  106:16
**go** 6:18  10:23  14:5, 8  16:4, 22  19:2  21:1  23:12, 14  24:16  25:6  26:5  27:12  30:6  32:13  33:5, 17  38:15  41:22, 24  45:8  46:4, 14  47:18  50:4, 23, 25  51:25  52:22, 23  53:21  55:17  56:2, 3  57:2, 5, 21  58:3, 5, 17, 18, 22  59:17  61:9  65:9  75:10  76:18  79:5  80:19  83:22  84:19  87:25  90:19  93:11, 19  97:1  98:2, 6, 23  99:6  100:6  105:12  108:9  109:11, 16  112:15  113:18  121:11  124:12  128:15, 23  130:14  136:2  137:6  144:11  150:3  153:21  154:5  163:18  167:18  171:15
**goes** 48:8  80:25  91:9  94:1
**going** 5:17, 21  6:18, 23  9:11  15:5  16:23  17:7  21:9, 19  25:2  27:9  29:25  32:5  33:5  35:7  37:2  41:20  47:5, 8  48:12  49:1, 21  52:2  59:2, 7  62:22, 25  63:5, 6, 8, 9  66:3, 15  68:11  73:9  75:12  79:17, 18  81:7  84:9, 20  87:19  89:4  90:12  92:21  97:11  98:11, 16  100:16  101:19  103:9  106:18  107:21  108:5, 19, 24

111:7, 10  115:25  119:20  120:1  122:9  124:12  129:23  133:12  135:8  142:7, 11  143:5, 24  145:3  146:2  148:7, 11  154:2, 3  156:6  160:25  161:5  163:18  170:18
**Good** 5:7, 8  52:21  53:9  54:13  74:1  97:11, 16  107:19  126:21  131:10  145:25  149:19
**Gosh** 10:6  11:23
**gotten** 23:7
**grabbed** 139:3
**graduated** 9:14, 17
**grand** 6:12
**Grote** 1:11  2:13  4:5, 8  5:6, 9  6:1, 7  9:1  36:18, 22  40:23  59:6  67:25  68:16, 20, 22  69:15  71:18  73:22  75:25  76:22  77:20, 24  86:17  89:16, 23  92:2, 9  102:16  103:25  106:22, 23  110:3  111:21  112:22  113:3  120:16, 21  122:1  123:3, 15  124:4  125:13  126:19, 24  131:3  135:2, 4  137:11, 14  143:1  144:25  149:13  150:5, 17  151:10, 20  152:6, 20  153:7, 12  172:15, 18, 24
**ground** 6:18  154:4
**group** 33:22
**guess** 10:25  21:20  24:20  31:14  49:5  77:9  109:24  117:12  121:19  146:17
**guessing** 22:14  33:20  49:3  108:19
**guidance** 72:2  91:19  92:12, 13
**guy** 111:11

**guys** 45:4  46:24, 25  47:2  52:22  58:8, 16, 18  72:24  87:16  97:1, 2, 7  98:7  99:2  101:22  107:6  115:24  116:21, 23  129:5  133:17  140:14  166:11

< H >
**H/C** 134:23  135:17, 19
**hair** 19:4
**Half** 58:9, 14  104:5
**hallway** 16:14
**hand** 32:25  33:6  174:15
**handcuff** 60:20
**handle** 87:9  109:5, 7  144:19
**handled** 144:20  145:1
**handling** 146:14
**hands** 139:11  147:1
**hands-on** 139:7
**happen** 26:15  30:1, 18  31:7, 20  40:19, 24, 25  41:25  42:1  50:16  70:10  73:23  144:2
**happened** 18:20  23:22  25:25  26:1  27:23  31:4, 10, 13  73:25  91:2, 10  99:18, 19  123:12  137:15  147:17  148:22  161:3
**happening** 38:9  58:21  77:11
**happens** 42:6  65:22  78:22  90:25  92:24
**happy** 24:4
**hard** 97:3  133:7
**harder** 132:23
**harm** 60:25
**hate** 62:12
**head** 7:5, 6  35:7, 14  36:6  51:20, 21  66:2  83:22  93:13, 17, 19  134:11, 14  135:15, 18, 19, 21, 25  136:5, 6, 7,

10, 14, 17, 18, 21
**headache** 36:7
**heads-up** 72:23  73:6  91:15
**Health** 4:10  12:24  32:13, 14  33:15, 23  34:9, 15  35:25  36:1, 2, 12, 24  61:19  69:5  86:9, 19, 24  87:8  88:4  150:6
**health-wise** 62:4
**hear** 46:24  78:5  109:10, 14  128:16  133:11  142:21  148:19  157:17
**heard** 16:12  74:4, 9  80:5  149:2, 5, 6
**hearing** 27:9  31:5  32:2  79:15  87:5  99:18  104:6  110:8  113:5  126:7, 11, 14  137:5, 9, 10, 12  149:5  152:9  159:13
**hearings** 79:14
**heat** 66:16
**held** 53:23  68:15, 21  77:19  112:25  173:1
**Hello** 163:24
**help** 15:3  53:16  60:9  66:4  87:9, 18  97:5  105:1  121:5  137:25  138:19  139:5, 6  165:22  166:1, 5
**helped** 138:2
**hereto** 174:13
**hereunto** 174:15
**Hey** 11:5  14:5  15:5  16:12, 21  17:3  18:25  20:4, 6, 23  23:21  29:3  32:25  34:5  36:3  41:17  42:24  44:4  45:22, 24  47:19  50:1, 4  52:2  53:9, 12  58:3  71:9  83:13  96:24  109:17  111:2, 7  128:24  141:20  145:16, 17  166:9  167:6
**Hi** 163:25

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 61 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**high**  9:*14, 17*  10:*25*
  11:2  12:7, *8*  18:7, *10*
  19:*21*  67:*4*  70:16
  94:25  170:25
**higher**  25:6
**highly**  106:7  163:*3*
**hire**  18:*21*  33:*19*
**hired**  10:22  11:7
**history**  9:*12*  10:24
  19:*12*  21:*16*  163:*12*
**hit**  51:*19*  66:*1*
  170:*14*
**hitting**  141:*19*
**HOC**  37:8, *9*
**Hold**  12:*10*  30:2*1*
**holding**  23:8
**hole**  24:*16*
**Holston**  1:*11*  2:*14*
**home**  95:6  97:2, *11*
  142:7
**honest**  10:*18*  48:*19*
**honestly**  146:*11*
**hooked**  95:22
**hope**  152:2*1*
**Hopefully**  60:*19*
**Horsham**  11:*18, 21,*
  *22, 23, 24*  12:5, *6*
**Hospital**  87:2*1*  88:2
  172:*20*
**hospitalization**  15:9
**hospitalized**  13:6
**hospitals**  15:*14*
**hostage**  53:*23*
**hot**  36:5  66:*18*
**hour**  73:4  97:4
  134:*20*
**hours**  34:*23*  86:2*1,*
  *22*  88:*24*  96:2
**House**  21:2*1*  37:8,
  *13, 16*  38:*1*  78:4, *6,*
  *10*  82:*18*  85:*12*
**housed**  76:2  77:5
  85:*20*  86:*4*
**housing**  19:*24*  37:*13*
  39:4  40:7  42:9
  45:*15*  46:*15*  50:*23*
  55:*20, 21*  76:4  77:*1,*
  *25*  79:*1, 3*  82:2*1*
  84:7  85:2, *20*  93:*4*
  109:*20*  111:*23*  112:*1*

113:*18*  115:2*1*
116:*13*  117:*12*
126:*25*  131:*19*
133:*13*  135:7
**how's**  74:*14*
**Hu**  1:*12*  2:*15*
**hurt**  138:*23, 24*
  139:2
**hygiene**  81:*19, 22, 24*
  82:*23, 24*
**hypothetical**  52:*25*
  53:*1*

**< I >**
**i.e**  80:*15*
**I/P**  118:*23*  127:*4*
  130:*5, 7, 11*  159:2*1*
  169:*3*
**I/Ps**  130:*4*
**ID**  174:*24*
**identification**  68:*14*
  113:2
**identified**  168:*13*
**identify**  51:7
**identifying**  70:*15*
**illness**  12:*19*  155:*17*
**illnesses**  79:*13*
  119:*14*
**impacted**  94:8, *11*
  98:*15*
**important**  72:*17*
  82:*3*  92:*10*  153:*1*
**impose**  149:*25*
**inadvertent**  154:*5*
**incarcerated**  63:*20*
  80:*3*  94:*20*  121:2
  124:*25*  138:*13, 14*
  139:*13, 25*
**incident**  29:*19*  30:*17,*
  *18*  31:*13*  99:*16*
  110:*5*  126:*3*  139:*1*
  154:*13, 20*
**incidents**  31:9
  154:*15*  155:6
**include**  165:*1*
**included**  95:9
**independently**  16:*3*
**indicate**  117:*16*
**indicated**  116:*13*
  156:*3*

**indicating**  6:*25*  7:*24*
  22:*24*  23:*1, 9*  43:*24*
  59:*4*  131:6, *18*
**indication**  130:*16*
**indigent**  82:*23, 25*
**individual**  43:*13*
  91:*12*  118:*11*
**individually**  56:6
**individuals**  13:2
  55:*19*  80:2, *15*  85:*15*
  94:*18, 23*  99:5, *7*
**infant**  22:5  23:*25*
**infected**  33:*4*
**infirmary**  76:*3, 6, 7,*
  *10*  77:6
**inform**  39:*3*  49:*14*
  82:7, *12*  83:*20*  84:*1*
**informal**  30:8
**informally**  71:*25*
**information**  8:*5*
  19:*1*  67:6  69:22
  73:*7, 15*  75:*16*  81:*8*
  83:*24*  87:*14, 15*
  102:*3*  150:*13*
**informed**  47:*12*
**infraction**  25:6  29:7
**initiates**  74:*13*
**injury**  65:2*1*
**inmate**  20:7, *8, 22*
  21:*24*  23:7, *13*  24:*10,*
  *14*  25:*12*  26:6  27:*4,*
  *21*  28:2*1*  29:*4*  30:*3*
  32:*24*  34:2  35:*1, 19*
  41:9, *14*  48:2*1*  49:*13*
  50:*13*  51:*10, 18, 23*
  53:5, *24*  54:*13*  59:*13*
  61:2, *12, 21*  62:*10, 23*
  64:*25*  66:*11*  71:9, *13*
  72:7  74:7, *10*  75:6
  84:*17*  86:2  87:2
  108:7  112:*3, 5, 17*
  118:8  122:*3*  142:*1, 3*
  145:7, *14*  147:*12*
  155:*11*  156:5  158:*17*
  159:*1*  162:8, *20*
  165:*15, 18, 21*  166:7,
  *13, 14*  167:*1, 3, 5, 9,*
  *23*  168:20  170:2, *5,*
  *10, 17*  171:*3, 18*
  172:9

**inmate-on-inmate**
  59:*10, 14*
**inmates**  19:*24*  20:*13,*
  *14, 25*  21:4, *7*  23:*11*
  27:8  33:*24*  37:*18, 20,*
  *24*  38:*24*  39:*21*  40:*3*
  43:*4*  44:2  49:*22*
  51:*16, 17*  55:*3*  57:*7,*
  *10*  60:5, *7*  66:*17*
  74:*25*  75:*3*  76:*19*
  78:*20*  79:*4*  90:*7*
  93:*16*  100:*19, 24*
  101:*7, 16*  105:*18*
  106:*10*  108:2*1*  119:*3,*
  *11*  140:6  143:*10*
  145:*13, 21*  155:*3*
  158:*24*  164:*17*  165:*2,*
  *6, 19*  166:*3, 13*
  168:*18, 23*
**inmate's**  52:*11*
  55:*10*  161:*14*  168:*5*
**inside**  95:*11*  123:*5*
  130:*12*  156:*15*
  165:*20*
**insight**  146:*12*
**instance**  117:*10*
**instances**  42:*17, 19*
  49:*11*
**institution**  90:*18*
**instructed**  121:*11*
**instruction**  59:2
**instructions**  154:7
**insulin**  44:2*4*  45:*1, 3,*
  *8, 9, 11, 16, 17*  46:*12,*
  *16, 25*  47:*5, 25*  54:22
  77:*10*  106:7, *9, 15*
  107:*1, 5, 12*  108:*5, 10,*
  *11, 16, 17, 20, 22, 23*
  109:*17, 19*  127:*5, 9,*
  *17, 21*  128:*4, 12, 13,*
  *16, 21, 25*  129:*2, 9*
  130:*3, 5, 7, 15*  131:*1*
  163:*12*  168:*11, 14, 16,*
  *18, 19, 22, 24, 25*
  169:*4, 8*  171:*18, 19,*
  *22*  172:*9*
**intake**  55:*10*  78:*16,*
  *18, 19, 23, 24*  79:2
  80:*11, 12, 19, 20, 24*
  81:*3, 8, 10, 11, 25*

*82*:6, *14*, *15*   83:*4*, *25*
84:*7*, *16*   86:6, *7*   88:2
163:*15*   168:6
**intense**   15:9   80:9
**intent**   60:*25*
**interacting**   34:*13*, *14*
**interaction**   107:*23*
**interactions**   162:8, *12*
**intercom**   56:*16*
**interested**   174:*13*
**interesting**   6:*17*
**interrupted**   92:*20*
**intervention**   14:*25*
**Interview**   120:*15*
 124:*18*   125:6
**inventoried**   81:*13*
**involved**   74:*15*
 115:*12*   154:*16*
**involving**   150:*24*
 154:*13*   155:6   162:*20*
**isolating**   34:2, *12*
**issue**   49:*14*   63:*14*, *21*
 147:*24*
**issues**   156:*25*
**its**   69:*23*

**< J >**
**J.kaminsky@kiernant**
**rebach.com**   3:9
**jacket**   25:8   27:2
**JACOB**   1:4   5:*11*
**jail**   21:*10*, *21*   23:*12*
 28:*12*   37:8   43:*3*
 72:11, *22*   76:*18*
 78:*19*   79:*13*   81:9
 82:*16*   83:*17*   84:9
 90:*1*   93:*14*, *20*   94:*1*,
 *2*   95:7   100:*15*
 106:*14*, *19*   108:*1*
 116:*20*, *24*   134:*22*
 135:*11*   136:9, *17*
 167:*18*
**JAMES**   1:4   5:*11*
**jeopardy**   138:*21*
**job**   11:5   13:*25*
 14:*14*   17:*18*   18:8
 19:*22*   20:7, *12*, *25*
 21:*24*   22:9   24:6
 25:2   33:*11*   36:*12*
 44:*20*   50:2   51:*22*

70:7   76:*24*   89:*24*
 149:9   169:*19*, *22*
**jobs**   17:*18*   19:*14*
**John**   3:*3*
**Join**   49:*18*   151:6
**JONATHAN**   3:6
 164:*1*
**Josh**   6:*13*
**JR**   1:*5*   3:2   5:*12*
 99:*15*
**judgment**   139:*22*
 150:*19*
**July**   10:22   18:*23*
**jump**   148:*3*
**jumped**   11:8
**jumper**   82:*25*
**jumpers**   81:*14*, *17*
**June**   126:*11*
**JUNG**   1:*4*, *5*   5:*11*,
 *12*   29:*10*, *11*, *12*
 99:*15*   106:*1*   110:*15*
 112:*8*, *11*, *17*   118:*23*
 120:*1*   121:*14*   122:*17*,
 *21*   123:5   127:*4*
 130:5, *7*, *12*   138:2
 139:*16*   141:*4*   148:*14*
 149:7   150:*24*   154:*14*,
 *20*   155:*15*, *24*   156:*13*
 157:5, *7*   159:*1*, *21*
 161:*7*   162:*8*, *20*
 163:*11*, *16*   164:8
 168:*10*   169:*3*
**Jung's**   103:*11*
 118:*12*, *17*   137:7, *22*
**jury**   6:*12*
**Justice**   9:*22*, *24*

**< K >**
**KAMINSKY**   3:6
 4:6, *7*   49:*18*   153:*20*
 163:*21*, *23*   164:*1*, *25*
 169:*11*   171:*13*, *17*
 172:2, *7*   173:6
**keep**   10:*15*   11:*17*
 37:22   67:*21*   73:2
 166:*1*
**keeps**   89:*4*
**Kennedy**   3:*3*
**kept**   45:*10*   170:*18*

**ketoacidosis**   149:*3*
**key**   44:*6*
**keys**   90:*21*   93:*1*
**kick**   53:8   62:*15*
**kicking**   16:*12*   26:2
 139:9
**kids**   83:*14*
**Kiernan**   3:*7*
**kill**   61:*3*
**Kimball**   3:2
**kind**   13:*11*   26:*17*
 27:*12*   34:*15*   45:*19*
 46:*23*   48:*14*   57:6
 65:22   73:*15*   91:*14*
 93:7   133:2, *17*
 142:*20*   149:*24*
 150:*12*, *16*   168:*24*
**kit**   81:*19*, 22, *25*
 82:23, *24*, *25*
**knew**   15:8   116:*20*
**know**   6:*12*, *14*, *16*, 22
 7:9, *10*, *16*   8:*12*   9:*11*,
 *13*   12:*11*   13:5, *6*
 14:6   16:*15*   17:9, *15*
 18:8, *18*, *24*   19:8, *16*,
 *18*, *19*   20:9   23:*23*
 24:7, *12*   25:*1*, *4*, 6, *25*
 26:*3*, *4*, *25*   27:*11*
 29:22   30:*12*, *13*, *24*
 32:*24*   33:*3*, *11*   34:*3*,
 *11*   38:8   42:20   45:*12*
 46:*12*   47:*4*, *13*, *17*
 49:*1*, *4*, *6*, *7*, *9*, *10*
 50:9   51:24   53:*24*
 54:*21*   55:*4*, *5*, *8*, *16*
 56:*12*, *15*   57:*4*, 6, *7*, 9
 62:*13*, *25*   64:*17*
 65:*21*   66:*21*   67:6, *18*
 69:*8*   71:*13*, *15*, *17*
 72:25   73:9, *10*   74:5,
 *12*   75:22, *23*, *24*   76:*1*,
 *2*, *8*, *13*   80:7   83:6, *9*,
 *12*, *25*   84:*1*, *10*   86:*12*,
 *16*   87:*12*, *18*   88:*3*, *5*
 89:8   90:*14*, 22, *23*, *24*
 91:*14*, *15*   92:*15*
 95:*10*   97:2, *4*, *12*
 98:7   99:*11*, *19*, *20*, *21*
 100:*15*   101:*3*, *5*
 102:*14*   103:*4*, *13*

104:*8*, *9*, *11*, *15*, *21*
 105:*4*, *25*   106:*12*
 108:8   110:2, *13*, *19*
 114:*4*   115:*10*   116:*1*,
 *21*   117:*21*   118:6, *7*,
 *10*, *11*, 20   119:*17*
 120:5, *17*   125:*17*
 126:2, *7*, *12*, 23
 127:*15*, *21*, *25*   129:6
 130:25   131:2   132:7
 136:*13*, *16*, *23*   138:*1*,
 *4*, *7*   139:2, *11*   140:24
 146:*8*, *9*   147:*7*, *10*, *13*,
 *16*, *19*   148:6, *16*, *17*,
 *24*   150:*23*   154:7
 157:*20*   158:*19*   160:7
 161:*10*, *11*, *23*   163:5,
 *7*   164:*16*   169:*1*
 170:*1*, *24*   171:7
 172:8, *11*, *12*, *19*
**Knowing**   150:*23*
**knowledge**   77:*4*, *7*
**known**   27:*1*   69:7
**knows**   87:*4*

**< L >**
**lack**   64:*11*
**laid**   17:*24*   18:9
**LALITHA**   1:*11*
**late**   96:*21*
**LAW**   1:*13*   2:*8*, *15*,
 22   19:*13*
**lawsuit**   88:7
**lawyers**   79:*24*, *25*
 80:6
**lay**   140:*16*, *17*, 22
**laying**   53:*15*   54:9
 62:23   64:*13*, *18*
 120:9
**learn**   148:*14*
**learned**   106:5
**learning**   24:5
**leave**   28:*13*   82:*13*
 85:*19*   91:5   96:6
 97:5, *12*, *14*   98:2, 5
 143:*23*   144:6
**leaves**   159:*21*
**leaving**   27:7   81:9
 96:22

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 63 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**left**  17:17, 22  27:16
92:22  103:16  138:6
**legal**  8:5, 14
**legitimately**  54:1
**level**  19:21  65:5
85:21  131:17
**levels**  85:22, 25
**lie**  155:11
**Lieutenant**  27:6
107:14, 24  110:4
111:19  114:16  137:5,
16  138:4  144:21
146:13  147:11  148:9,
12  152:5, 8  159:23
**Lieutenants**  108:3
**life**  95:16
**lift**  138:15
**limited**  166:16
**Line**  12:15  49:15
55:17  56:5  175:5
**lines**  38:22, 25  160:6
**list**  18:17  49:22, 25
54:25  55:6, 14, 16, 24
57:3  82:11  106:6
108:18  109:15  168:3,
8, 16, 20, 21
**listen**  11:5  17:3
29:3  38:24  59:24
96:24  109:12  147:3
**listened**  147:15
**lists**  168:15
**little**  9:3  10:6, 14
18:4  19:9  24:19
40:1  46:20  73:6, 13
79:2, 25  80:9  81:19,
21  97:8  109:10
117:22  119:12
129:12  133:3  140:18
145:22  159:20
**live**  13:2
**lived**  16:3, 8, 10
**LLP**  3:2
**located**  12:15
**Lock**  35:17  39:12
48:3, 8, 9, 25  49:7
71:21  84:21  103:23,
24  116:17  121:20
122:2, 5, 7, 18  127:14
130:2  134:3  135:10,
25  136:3  143:13

159:4  160:1, 12, 15
163:1  168:10, 17
169:3
**lockdown**  100:22, 23
106:14  107:2  116:7,
12, 21  129:19  134:22
164:9, 15, 19  165:4,
15  166:15, 22  167:11,
14, 18
**lockdowns**  164:6
**locked**  51:24  87:3
97:7  99:3  100:19, 20
106:25  116:10, 14
129:15  130:12  144:9
166:4, 8
**log**  38:6  116:13
**logbook**  130:1, 6, 10
**logs**  113:18  126:25
**long**  9:2  13:15
15:18  22:15  26:9
31:5  32:8, 19  33:16
68:5  78:12  79:17
84:8, 11  88:8  89:21
90:5, 9, 10  96:2
110:7  117:20  132:25
134:14, 16  141:17
142:23
**longer**  84:15  89:22
90:3  152:16
**look**  16:1  18:8  33:1,
23  34:8  38:20  68:17,
23  113:4  133:7
156:15  158:22
159:12, 14, 15  160:1,
2  164:10
**looked**  90:12  127:2
156:19
**looking**  21:13
**looks**  55:14  113:19
114:25  127:25  146:6
**lost**  37:23
**lot**  30:21  64:23
65:10  73:23  87:15
90:1, 2  99:13  102:19
115:24  119:10
140:21
**lotion**  81:20
**loud**  7:4  46:22
133:9, 10, 13, 15

**LOUIS**  1:5  5:12
99:15  127:4  169:3
**low**  67:4  70:18
170:25
**lowest**  85:23
**LT**  115:3  118:22
122:16  166:9
**lunch**  93:12
**lying**  53:6  139:25
140:1  144:18  156:13
157:7  159:22

**< M >**
**making**  32:21  39:19
74:18, 24  116:16
141:18  145:9
**male**  23:7, 10  24:14
**males**  24:15
**man**  145:16, 18
**Management**  27:17
38:15  42:15, 18
43:17  45:2, 9, 10, 14
107:1, 13  114:12
127:20
**management-wise**
94:23
**manager**  17:19
**manifestation**  155:16
**manpower**  43:7
164:21
**Margaret**  1:12  2:15
**Margo@alcenter.org**
2:18
**MARIESHA**  1:12
3:6  164:2, 3
**marijuana**  22:7
**mark**  50:6  68:11
112:22
**MARKED**  4:9  68:14
113:2  159:15  160:3
169:2
**Market**  3:7
**mass**  37:10  167:25
**mat**  145:17
**matter**  5:10  54:23
70:24  113:6, 15
154:1
**mattress**  140:19
**mattresses**  140:8, 19

**MAUREEN**  1:11
**McNeil**  11:2, 6, 9
**meal**  166:2
**meals**  20:13, 15
**mean**  7:6  10:20
18:21  29:21  30:2
31:21  39:25  45:11
47:7  62:1, 2  70:5
72:12  73:18  74:19
96:5, 10, 20  100:18
103:3, 14  107:21
109:25  112:6, 9
114:2, 11  117:4
119:2  122:4  125:23
127:15  129:10
130:24  131:15  135:5
137:10  138:15
142:20  144:20  146:9
148:4  157:18  158:7
168:11  171:21
**meaning**  29:15
33:19  51:16  58:13
70:5  83:21  93:6
97:24  100:14
**means**  14:19  34:23
74:5, 10  168:18
**med**  49:15  55:6, 17
56:5  84:21
**medical**  15:20, 22
26:7  28:11, 12, 14, 21
29:4  33:2, 6, 8, 9, 13
40:2, 6, 11, 12  42:2
45:3, 13  48:10, 24
49:6, 12  50:13, 25
51:6, 7, 9, 14  52:1, 4,
12, 21  53:3  54:1, 5, 8,
11, 12, 17  55:24
60:21  63:7, 10, 14, 15,
21, 22  64:1, 5, 14, 16,
19, 21  65:3, 10, 16
66:3, 7, 25  69:16
70:21, 24  71:25  72:7
76:4  79:12  80:19, 22
86:6, 11, 12  101:15
115:13  124:5, 8, 11,
14, 15, 16  125:24
127:16  139:18, 22
142:2, 4, 8  143:18, 22,
23, 24, 25  144:4, 5, 15
147:21, 24  148:5, 20

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 64 of 85

Deposition of Gena Frasier                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

149:22  150:*3*, *15*, *19*,
*21*  155:8  163:*15*
167:6, *7*  170:*9*, *10*, *12*
171:*25*  172:8, *11*, *19*,
*21*
**Medical's**  54:*15*
**medicate**  98:*24*
**medication**  13:*18*, *22*
14:*3*, *9*, *10*  20:*3*  35:5,
*10*  42:*12*, *14*, *25*  43:2,
*5*, *14*, *16*, *19*, *22*, *25*
44:5, *9*, *23*  45:20, *22*,
*24*  46:5, *17*  47:9, *14*,
*20*  48:22  49:*13*, *23*
50:2, *3*, *23*  54:*23*
55:*3*, *5*, *14*, *16*, *23*, *25*
56:2, *3*, *10*, *17*, *23*, *25*
57:*12*, *25*  58:*4*, *16*
64:*11*  71:*12*, *14*  74:8,
*11*  98:*14*, *18*, *22*  99:5,
*8*  106:*11*  117:2, *11*,
*15*  118:*1*, *3*  129:8
130:*3*, *11*, *20*  133:*10*
160:8  166:*24*  168:8,
*16*, *21*  172:22
**medications**  12:*21*
13:*24*  14:*12*  117:6,
*17*  168:*4*
**medium**  85:22
**meds**  20:*4*  45:25
46:*18*  47:*1*  55:8
56:*13*  57:1, *2*  58:*19*
114:*1*, *3*, *5*, *10*, *14*, *17*,
*23*  117:*3*  160:8
**meet**  12:*21*  20:*21*, *24*
35:25
**member**  15:*4*
**members**  68:*1*
**memorandum**  91:*21*
**memory**  7:*11*  137:*24*
**mental**  12:*18*  32:*13*,
*14*  33:*14*, *23*  34:8, *15*
35:*24*, *25*  36:2, *11*, *23*
61:*19*  86:9  87:7
**mention**  162:*19*
**mentioned**  13:*18*
36:*23*  94:4  149:*4*
156:*25*  167:*12*  168:2
**met**  11:*4*  94:*20*

145:7
**MICHAEL**  2:*21*
Michael.pestrak@phil
a.gov  2:*24*
**middle**  109:*9*  131:*19*
**mind**  87:*12*  168:*9*
171:*14*
**minimal**  167:*23*
**minimum**  85:22
**minimum-level**  86:2
**minute**  41:*17*  160:6
**minutes**  39:*14*, *16*
122:*15*  134:*18*
**missed**  22:8  23:*24*
**missing**  55:*13*
**mm-hmm''s**  7:5
**mom**  67:*16*, *20*
**moment**  48:*13*  54:*20*
68:*23*  71:*11*, *15*  91:*4*
102:6  120:22
**Monday**  2:*10*  88:*21*
**money**  80:*16*  81:5
**month**  18:*24*
**monthly**  12:*21*
**months**  22:6  32:*3*
84:*9*
**morning**  83:*17*
104:*21*  154:*14*
**mother**  22:6, *13*
**mouth**  46:22  64:*13*,
*18*
**move**  37:*18*  62:*16*
63:6  65:*11*, *20*  66:*1*
90:*1*  105:*1*, *4*, *7*, *14*,
*22*  109:8  110:*17*, *20*
118:*18*  119:*10*, *24*
137:25  138:*13*
145:*18*, *19*, *24*  146:2,
*22*  154:*21*, *24*  161:8
167:25
**moved**  105:2  112:*3*,
*5*, *6*, *7*  118:8, *18*
121:*18*, *21*  122:*3*, *4*,
*19*  138:*1*  147:*13*
155:2  156:5
**movement**  37:*10*
133:*21*  134:2, *6*
167:22, *23*

**moving**  53:6, *7*  62:9,
*11*, *24*  104:*23*  118:*3*,
*16*  138:*15*
**multitask**  160:*21*
**multitasking**  143:9

**< N >**
**naked**  35:6, *12*, *14*
36:5
**name**  5:9, *13*  30:*3*
47:20  50:7  55:*10*
56:8  57:*11*  67:*18*
82:24  102:*3*, *15*
106:7  153:24  156:6,
*7*, *9*
**names**  52:*14*  55:2,
*25*  67:6  106:*10*, *12*
168:20, *25*
**nature**  80:*17*  91:*13*
**necessary**  20:*1*
**need**  7:7, *22*, *24*  8:*21*
13:6  31:*16*  35:8
43:4  50:24  51:*15*, *16*
53:*16*  54:*17*  55:22,
*23*, *24*  57:*11*, *24*  60:8,
*9*, *17*  61:6, *8*  65:9
80:8  83:*13*  90:24
94:*19*  100:7  109:*19*
124:5, *9*  138:8, *9*
142:*4*  148:6  150:2,
*21*  158:22  167:7
170:8, *13*, *24*  171:7
**needed**  15:9  18:8
29:23  45:*16*  46:*12*
52:*10*  53:*18*  54:*10*
58:*16*  87:*4*  111:*16*
118:*23*  121:5  122:*17*
141:*20*  143:*19*
146:22, *23*  168:*3*, *13*
**needle**  107:9  171:24
**needles**  107:6
**needs**  40:2  63:*17*
79:6  80:2  86:*12*
94:*20*  101:5
**neighbors**  16:8, *11*
**net**  46:*18*  114:5
**never**  27:*23*  38:8
70:*15*  76:25  95:*12*,
*14*  107:*4*  142:*23*
145:7  152:*11*  157:22

**new**  22:2, *10*, *19*, *20*
24:5  108:*1*
**Nia**  1:*11*  2:*14*
Nia@alcenter.org
*2:17*
**night**  16:*13*  83:*10*,
*11*, *15*  90:24  94:2, *3*
**nine**  22:6
**nod**  7:6
**nods**  7:5
**noncompliance**  25:2*0*
**nonresponsive**  61:22
62:*1*, *4*, *7*, *8*, *11*
**normal**  35:*13*  43:*16*
74:22  88:*17*  138:*12*
**Normally**  93:*24*
105:6  144:7
**Norristown**  87:2*0*
88:*1*
**Notary**  2:5  174:4, *23*,
*24*
**note**  122:7
**noted**  176:8
**notes**  163:*18*
**notice**  41:*16*  51:*10*
155:*16*
**notified**  45:*16*  48:9
59:*12*
**notifies**  48:*21*
**notify**  127:*16*  141:24
**November**  121:8
141:*4*  148:*15*, *22*
154:*14*  162:7, *11*
163:*16*  164:9
**number**  47:*21*  52:*11*
55:*10*, *11*  113:9
127:*4*  136:*15*  168:5,
*6*
**numbers**  37:*11*, *12*
56:*1*  82:8, *9*, *10*
167:25
**nurse**  41:7, *11*  42:24
43:2, *10*, *13*  44:*13*
47:*13*, *15*, *17*  50:9, *20*,
*24*  51:2  55:2  71:*13*,
*15*  98:25  99:2, *4*, *9*
101:8, *25*  102:*1*
107:5, *7*  111:22, *25*
112:*11*, *13*, *16*  114:25
115:*12*  117:*3*, *5*, *11*,

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 65 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

23, 25  120:6  122:20
123:10  124:13  125:2,
5  126:2  127:21
139:20, 21  141:11, 12,
22  142:24  147:22
148:5  157:4, 8, 15, 21
158:2, 4, 7, 12, 15
159:19, 21  160:9
161:13, 25  162:12
nurses  20:3  43:21
45:20  49:22  50:12
52:13  74:4, 9  98:17
102:20  107:4  125:21
144:1, 7  161:11
162:14
nursing  40:7

< O >
object  106:19
Objection  36:18
49:16  67:13  69:9
71:2  73:19  75:19
77:13, 14  86:13
89:12, 18  94:13
102:9, 23  109:21
122:22  123:13, 20
125:7  130:21  141:5
144:22  149:10, 16
150:8  151:3, 16
153:4  162:2  164:11
observation  34:17
156:16
observed  130:17
159:18, 22
obstructing  146:21
obstructs  133:3
obviously  13:22  15:8
22:3  37:3  75:11
80:3  99:8, 19  131:17
145:11  158:19
occur  122:12
occurred  90:23
99:17  160:11
O'Connor  3:2
office  14:5  174:15
Officer  9:7  18:13, 16
19:20  22:2, 12  23:10,
16  26:5  32:2, 7
35:15, 18  37:4  41:2,
6, 8, 10  42:10  44:17,

20  45:21  46:8, 10, 11
50:11  51:2  56:22, 24
57:16, 17  60:16, 19
70:3  71:7  72:5, 25
76:17  77:1  87:7
90:22  91:14  93:1
94:21  95:25  96:7
98:3, 12  100:4, 7
121:13  124:10, 20, 24
125:3  141:25  142:6,
10, 24  143:22, 25
144:4, 5  145:12
153:24  158:7, 11
160:20  162:19, 23
163:4  166:25  167:3
171:23
Officers  19:23  20:5
31:16, 19  37:6  46:4
60:1  80:14  82:1
97:10, 13  98:1
116:15  135:13
149:21, 23, 25
Officer's  43:20
131:4, 12
offices  2:7
Official  20:5  167:2
Oh  12:10  26:24
33:7  41:19  81:24
99:25  101:14  120:7
126:18, 19  142:6
okay  5:24  6:8, 16
7:3  8:16  10:8, 13
11:1  12:6  17:13, 17
21:9, 14, 19  22:21
23:2  26:24  28:4, 25
33:9  36:11  37:20
38:4  39:9  42:14
49:11  50:6  52:18
53:9, 12, 14, 17  54:14
55:1  57:19, 23  58:25
59:5, 12, 17  62:10
63:25  65:2  67:11
69:19  70:14  72:2
73:5, 25  75:17  77:4
78:13  84:18  85:4
86:18  87:17  88:20
92:15  98:7  101:22
106:4  108:5  109:2
110:9  116:9  118:5
120:13, 23  121:25

123:4  126:18  129:12,
21  132:2, 6  133:24
134:13, 21  135:17
137:4  146:1  148:24
152:17  155:1, 5, 15,
20  156:3, 9, 18
157:14  158:18  159:1,
4, 9  160:4, 16  161:1,
6, 24  163:6, 10  164:5
165:14, 21  167:17, 20
168:1, 9  169:5, 10
172:1
old  22:6  23:3
older  85:12
on-call  16:20
once  23:19  35:17
44:9  56:18, 24  60:3,
10  61:14  62:12
80:18  82:13  85:19
93:2, 17, 21  110:13
ones  15:15  101:19
166:20
ongoing  70:6
on-the-job  70:2, 4
open  53:11  60:7, 18
62:14  63:8, 9  72:24
83:18  93:8, 10, 17, 22
111:4, 7  135:10, 11,
13  164:17  165:5
166:22, 23  167:2, 4, 8
opened  166:24
opening  159:18
operational  58:8
opinion  67:1  75:18
125:4
opportunity  122:7, 13
160:15
orally  71:25
orange  81:14, 17
order  40:11  41:1
60:16  84:24  147:14
orders  113:10  145:23
outburst  15:6
outcome  26:13
out-of-cell  20:19
58:21
outside  41:2  44:19
54:2
overdoses  64:9

overhear  157:15
overheated  66:11
overnight  90:22
91:2  93:1, 5  162:23
override  157:25
overwhelming  95:16

< P >
p.m  2:11  77:22, 23
93:18, 19, 21, 23  94:2
96:22  134:7  135:12
136:10, 14, 17, 19
152:18, 19  173:10
PA  1:14  11:24
pace  94:25
package  18:2
pad  32:22
PAGE  4:10  113:8,
21  118:21  120:14
121:21, 23  122:16
124:17  126:17  127:2
129:21, 22  134:22
159:12, 15  160:3
175:5
paged  28:21
pagers  16:19
pages  68:19  176:4
paid  79:24
pain  64:24  65:1, 5, 7,
8, 10, 13, 18  155:21
170:4, 6
pains  158:23
pallets  140:18, 20
pamper  22:7, 10, 13,
16, 18, 19, 20, 23, 25
23:3, 8  24:21
pants  35:20, 21, 23
46:2
paper  168:24
paperwork  56:9
paragraph  126:17
129:23  159:16, 20
paraphrase  159:17
parents  22:10
part  22:17  70:7
75:1  76:24  80:18
117:22
particular  116:19
132:24
particularly  160:2

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**particulars** 25:*19* 26:2, *3*
**partner** 37:*21* 96:*19*, *21*
**Party** 1:*10* 174:*13*
**pass** 33:5, *12* 43:*24* 167:*9* 170:9, *11*
**passed** 62:*17* 148:*15*, *19*
**patch** 33:*8*
**patient** 56:*18*
**patients** 77:5
**PDF** 173:7
**PDP** 10:*20* 25:*3* 76:5 88:2 149:*9* 151:*1*
**PDQ** 19:5, *6*, *8*, *14*, *18*
**peers** 34:*14* 84:*24* 139:5, *6* 165:22
**Peirce** 9:*19*
**Penn** 3:*3*
**PENNSYLVANIA** 1:2 2:7, 9, *16*, *23* 3:*4*, *8* 174:2, *4*, *16*, *23*
**people** 11:*4* 12:25 13:*4* 16:*9* 20:*24* 31:*17* 38:*9* 47:4, *8* 56:*4* 57:*24* 72:*15* 78:*24* 82:*11* 84:*8* 87:*25* 90:2 97:*18* 108:*8* 109:*19* 110:*1* 114:*17* 117:*17* 129:*10* 134:8 137:*1* 139:*24*, *25* 168:*3*
**pepper** 25:*11* 26:*8*, *10*
**pepper-spray** 29:*19*, *23* 30:*17*
**pepper-sprayed** 25:*21* 26:*4* 30:*4*
**pepper-spraying** 25:*20*
**percent** 38:*8* 116:22
**perfectly** 141:*10*
**perform** 40:*12* 74:*21*
**period** 17:*12* 79:*11* 83:6 88:*17* 90:*3* 96:*3* 134:*15*
**periods** 96:*12* 130:9
**permanent** 77:*2*

**person** 14:*20* 15:*2* 34:*11* 35:9, *22*, *24* 36:*4* 54:6 63:5, *20* 65:6 67:*12* 121:2 124:25 138:*14* 139:8, *11* 144:*17*
**personally** 20:*11*, *14* 33:*10* 90:9 150:*16* 174:5
**pertaining** 138:*8*
**PESTRAK** 2:2*1* 4:6 5:*24* 6:*3* 8:*21* 40:*20* 49:*19* 59:*1* 67:*13* 68:*18* 69:*11* 71:*4* 73:*19* 75:*19* 76:*14* 77:*14* 89:*12*, *18* 91:*24* 92:3, *6* 102:*11*, *25* 103:6 106:*18* 109:*21* 111:*17* 121:*24* 122:*24* 123:22 125:9 126:*16*, *22* 130:*21* 134:25 137:8 141:5 144:22 149:*10*, *16* 150:8 151:3, *15* 152:*3* 153:*4*, *14*, *18* 158:3, *9* 162:2 164:*11* 169:*13*, *17* 171:*15* 172:*13* 173:*4*
**Pharmaceutical** 11:*3*, 6, *9*
**pharmacy** 14:2
**PHILADELPHIA** 1:8, *10*, *14* 2:9, *16*, *20*, *22*, *23* 3:*4*, *8* 9:*20* 19:*16* 21:8, *15* 33:*20* 69:*17* 78:2 84:22 151:8 161:*17* 174:*3*, *16*
**Philadelphia/Departm ent** 30:*20*
**phone** 71:*16* 82:2, *4*, 5, 7, *10* 83:7, *16*, *18* 110:25
**phones** 80:*16* 83:5
**physical** 150:*20* 155:*17*, *21*, *22*
**physically** 95:*18* 128:*14* 138:*13*
**pick** 14:*3* 138:*17*

**picked** 92:*18* 138:*23* 155:2
**picking** 119:*23* 138:25
**pill** 67:*17*, *19*, *21*, *24*
**place** 16:7 24:*16* 174:*11*
**placed** 75:*9*
**places** 107:*10*
**Plaintiff** 1:*8* 2:2
**Plaintiff-1** 68:*13*
**Plaintiff-2** 113:*1*
**Plaintiffs** 1:6 2:*13* 5:*10*
**Plaintiff's** 4:*10*, *11* 68:*12* 112:*23*
**play-fighting** 59:*18*
**playing** 53:*24* 165:*8*
**Plaza** 3:*3*
**plead** 27:*12*
**please** 5:*12* 7:*16* 100:*11*
**Plexiglass** 43:2*1* 44:*13*
**pod** 44:*18*, *21* 85:*11*, *16* 93:5, *8* 97:6 98:*23*, *24* 99:*1*, *3*, *5*, *21*, *22*, *23* 100:*3*, *7*, *12* 106:*20*, *24* 108:*12*, *13* 109:9 111:*10* 116:*10*, *21*, *25* 121:2 122:*10* 130:9 132:*3*, *25* 133:*1*, *8*, *20* 134:*1* 141:2*1* 143:*19* 157:8 160:*23*, *25* 161:*12* 163:8 164:8, *14*, *16*, *23*, *24* 166:*1*, *6*
**pods** 38:*14* 41:*4* 44:*19* 85:7, *8*, *9* 133:*13*
**point** 36:2 43:5 47:*15* 63:*11* 119:*18* 163:*10*
**police** 16:*15*, *17*, *20*, *24* 17:*4* 78:2*1*
**policies** 113:9, *10*
**policy** 72:*3* 84:22 91:2*1* 144:*15* 161:*12*, *17*, *23*

**population** 94:*17* 140:*15*
**port** 41:9, *10*
**position** 13:*12*, *15* 57:25 157:*9*
**possible** 29:22 32:8 37:*23* 42:22 52:9 90:8 99:*12* 106:8 133:6, *7*
**possibly** 116:*17* 162:*15*
**pot** 119:5
**potential** 63:*14*
**pour** 12:*20* 14:7, *10*
**PP** 47:*20*, *21* 52:*11* 55:*10* 127:4 168:6 169:*4*
**practice** 48:*16*
**preferred** 43:*16*
**prepare** 8:6 135:*15*
**prepared** 8:*1*
**prescription** 13:22
**presence** 174:*8*
**PRESENT** 2:*12* 50:*13*
**pressure** 115:*18*, *19* 116:*3*
**pretty** 19:2*1* 64:8 79:2*1* 105:2*1* 110:*12* 133:*15*
**previously** 70:22
**printed** 17:*15*
**printout** 55:9 168:*4*, *12*
**prior** 8:*14* 10:*24* 73:8 102:*15* 160:*19* 162:6, *10*, *19*
**prioritize** 72:*18*
**priority** 42:*10*
**prison** 64:8 95:*12*, *22* 96:*4* 140:*23* 165:*1*, *20*
**prisoner** 28:*10*, *12*, *13*
**prisoners** 28:*14* 37:*15* 38:*3*
**Prisons** 1:*11* 21:*15* 30:2*1* 31:*16* 69:*17* 78:2 84:22 151:9 161:*18*
**probable** 163:*3*

**probably** 63:2, 3 103:14 119:18, 21 121:17 123:24 128:25 135:6, 11, 16 140:9 146:8
**probation** 79:15
**problem** 11:1 67:3 87:13 134:19 138:8 141:18
**problematic** 91:11
**problems** 11:16 147:18 162:20
**Procedure** 2:4 43:16 53:2 72:3 142:3
**proceed** 6:19
**process** 79:5 80:14, 17 82:8 84:3, 16
**professional** 142:8
**program** 46:18 88:13, 14 114:6
**programs** 12:5
**progress** 12:22 20:4 45:22, 24 46:17, 18, 19 47:1 48:1 56:23, 25 106:9, 11 108:16, 18 114:2 117:3 129:3, 9, 13, 14 131:1 143:5 160:9
**prohibit** 161:13
**Project** 12:11, 14 13:7, 10 16:2 17:11, 14, 21, 23 18:1, 6, 10 56:16
**promoted** 108:4
**pronounced** 29:11
**proper** 17:8 65:14 142:2
**properly** 32:21 90:4
**propounded** 176:7
**protocol** 63:15, 22 65:14 72:4 142:2
**provide** 123:10
**provided** 42:13, 14, 16, 19 48:20 66:6 72:9, 13 74:17, 23 92:12 169:23
**provider** 69:16
**providing** 117:6, 11, 16
**provision** 40:6

**psychiatric** 11:22 12:16 13:23 87:24
**psychiatrist** 15:2
**psychologically** 95:17
**Public** 2:6 79:24 174:4, 23
**pull** 27:14
**pulled** 27:1
**purpose** 39:18 149:24
**purposes** 166:24
**pursuant** 2:3
**purview** 150:16
**push** 95:20
**pushed** 95:9
**put** 12:13 22:7 30:21 32:22 33:8 34:9 35:16, 19, 21, 23 38:6 39:13 43:22 44:10 47:25 48:2, 9 49:8 50:6 52:9, 11 61:12 71:11 85:15 92:15 103:22, 23 117:23 118:2 119:7, 15 122:7 127:8, 13 128:2 135:16 138:2 140:8 143:13 146:19 150:13 160:15 168:10, 18, 23 169:6 171:22
**putting** 119:23

**< Q >**
**qualifies** 169:20
**quarantine** 79:7, 10, 21 81:15 84:14 85:4, 9, 11 115:23, 24 116:5 119:10 140:5, 6, 11 141:16 142:23 164:14, 23
**quarantine-specific** 140:13
**question** 6:21, 22, 23 7:2, 6, 13, 15, 16, 23 40:9 41:21, 23 45:14 48:7 59:3, 15 63:20 73:3 92:11 107:13, 19 131:10 151:21 154:17 158:11 169:2 172:6

**questions** 5:18 13:10 19:11 21:3 32:10 34:15 59:7 129:25 152:22 153:13, 15 154:2, 7 159:10 163:19 171:11 172:25 176:6
**quick** 77:21 91:25 169:14
**quickly** 52:8 84:11 99:11 147:17
**quiet** 133:17
**Quite** 40:16 161:3
**quitting** 95:5
**quote** 81:21, 23

**< R >**
**radio** 51:12 59:25 60:5 141:20 143:17 170:14
**rambunctious** 133:8
**ramp** 75:9, 13, 14
**ran** 27:18
**random** 16:6
**range** 21:6 109:18
**ranting** 16:14
**rapport** 145:6, 15
**Rashatwar** 1:12 2:14
**raving** 16:15
**Ray** 120:17 153:24
**RAYMOND** 3:2
**read** 129:23 141:14 176:4
**reading** 102:2 117:22 160:17
**ready** 24:16
**real** 150:4
**realize** 164:5
**really** 31:17 38:8 41:5 59:19, 20 66:18 70:13 79:16 85:24 95:23 96:2, 23 97:3, 11 100:6 105:21 109:4 114:15, 18 116:1 131:18 139:7 140:16, 20 143:8 151:13 164:16 168:1
**rear** 27:5
**reason** 21:2 105:20 110:21 138:20 161:7

**reasons** 40:18 51:18 136:15 140:3 161:22
**rec** 20:16 39:2 83:5, 6, 11, 22 93:11, 18, 22
**recall** 13:14 33:25 66:16 69:1, 2, 3, 21 70:15, 17, 20 72:5 74:6 77:9, 18 96:10, 15, 18 100:9, 10, 11 101:24 102:1, 4 103:19 111:22, 24, 25 112:20 114:20, 23 117:7 123:1, 4, 16, 17 124:1 127:10, 12, 16 137:4, 15 139:16 154:15 155:9 156:19, 20, 21, 23, 24 157:2, 3, 9, 10, 13, 17, 18 159:5 161:9 162:13, 22, 24 163:13, 17 165:10, 12 167:15 168:19
**receive** 13:11 32:6 49:23 54:25 69:25 70:2, 6 81:17 88:3 108:19 130:5 149:14
**received** 9:15, 21 18:2 30:8 57:4 91:20 126:3 130:16 149:8 168:24
**receives** 74:14
**receiving** 32:11 54:22 80:13 81:3, 12 82:6, 13
**recognize** 59:9 64:5 150:20
**recognizing** 64:1
**recollection** 90:14, 16 94:6 99:14 102:5, 21 118:25 119:25 127:6 130:19 133:18 157:21 163:1
**Record** 1:9 5:13 12:13 14:18 44:15 68:15, 21 77:19, 22, 23 100:22 111:18 112:25 129:24 134:1 141:14 142:18 151:24 152:18, 19 160:25 171:23 173:1

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 68 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

recorded  125:6
recording  161:2
records  23:14  31:3
recovery  12:4, 5
recreational  165:5
red  50:6  74:13, 14
red-flagged  74:3, 7
reduced  174:8
refer  160:12
referral  34:9, 10
  61:7, 11, 14  86:19, 24
  87:1, 7, 13  88:4
referrals  150:7, 12
referring  111:19
refills  14:14
refresh  7:11  102:5
  130:19  137:24
  162:25
refrigerated  45:12
refusal  50:14, 25
  70:23, 24  127:11
  129:7  130:16
refusals  70:21  71:1
refuse  119:3, 4
  155:12
refused  25:12, 18
  47:14, 19  48:1  50:10
  71:12, 14  119:15
  127:5, 9, 17, 21  128:3
  130:7  141:24  142:1,
  6, 9, 13, 25  154:25
  168:11  169:4  172:10
refuses  118:23
  122:17  171:18
refusing  35:4, 10
  48:22  72:7  111:3, 4
  128:4  140:1  144:18
  156:14  163:12
reg  48:17
regard  141:3  153:2
regarding  156:25
  157:4
regardless  56:21
  131:12  158:1, 14
Regular  20:6  48:15
  58:7  85:20  108:3
  167:4
rehabilitation  12:17
related  130:10

170:25
relation  131:13
relationship  116:6
  131:5
relative  174:11
released  81:6
relevant  88:7  130:9
relied  139:21
relieve  95:25
rely  54:15  86:11
remain  84:12  129:13
remedied  111:15
remember  7:10  9:22
  10:8, 9  15:12, 17
  18:3, 14  23:4  25:13,
  19  26:1, 12  27:9
  28:19  29:18, 22
  30:25  32:11  33:18
  52:13  66:9, 12  71:10
  102:15  103:3, 9, 11,
  12, 13, 22  104:2, 4, 7,
  11, 13, 17, 20, 23, 25
  105:5  110:11, 13, 16
  111:9  116:18  117:8,
  20, 25  118:4, 12, 13,
  14, 16, 20  119:9, 20
  120:7, 8, 11  123:2
  126:13, 15  130:25
  133:5, 22, 23  135:9
  138:3, 4  146:5, 6, 11,
  16, 18  147:9, 16
  162:16  163:9  164:16
  165:11  168:17
remind  59:2
rep  27:14  166:19
repeat  154:11
rephrase  7:17  154:19
report  91:2, 5
  138:25  139:1  159:13
  162:18
Reporter  2:5  173:2
  174:19
reporting  142:10
reports  91:5, 8, 23
  92:4, 13
represent  153:25
  164:2
reproduction  174:18
requests  105:7

required  155:7  169:8
requiring  63:21
Residential  11:12, 15
resistant  145:22
respect  174:18
respond  28:22, 23
  52:17  59:9, 11  60:24
  62:21  105:6
responding  40:2
  51:5  147:22  158:20
response  7:5  57:22
  59:24, 25  62:19
  144:24  151:2, 22
responsibilities  19:22
  25:3  72:10  76:24
responsibility  147:25
responsive  61:25
rest  142:7  147:17
restrain  139:11
restricted  133:21
  134:2, 5  167:22
resume  17:15, 16
returned  28:11
  148:18
returns  88:1
revealed  130:2
reverting  98:19
review  120:22  130:1,
  8
reviewed  8:9
right  5:16, 25  10:11,
  17, 19  28:9  31:8, 20
  33:2  34:23  35:12
  43:19  46:5, 6  56:11,
  14  63:13  66:5  68:1,
  4  73:11  79:3  84:19
  86:21  92:20  102:14
  126:20  129:7  131:16
  134:21  135:20
  148:11, 12  154:9
risk  53:23  144:13
risky  149:25
Risperdal  14:6
Road  8:20  12:16
  76:8, 9
role  40:6  70:25
  80:10  100:5
roll  72:21  73:3, 16
  75:14  90:17
rookie  37:3

room  22:1, 25  43:17
  58:21  80:13  81:12
  82:14
roommate  156:24
ROR  81:6
rotates  89:3
rough  73:10
roughly  159:18
rounds  36:16  37:1
  97:18
routine  34:19
rover  35:18  43:12
  44:16, 17, 19  61:8, 16
  99:23, 25  100:1, 5
rovers  43:19
Roxborough  12:7, 8,
  12  18:7, 9
Rules  2:4  6:18  39:4
  154:6
run  14:13  27:19
  129:17  140:16  151:1
  166:3, 10
running  16:13  58:12
  170:6
Rupalee  1:12  2:14
Rupalee@alcenter.org
  2:18

Rwittekind@okllp.com
  3:5

< S >
safe  39:23  43:1, 5, 9
  72:24  73:2
safely  39:24  98:8
  99:11  164:21
safer  140:6, 12
Safety  39:20, 21
  40:18  42:4, 10  51:18
sake  59:4  133:24
sally  41:8, 9
sample  19:3  80:21
Sarge  111:2
sat  157:12
Saturday  88:23
saw  17:3  95:14
  110:14, 23  112:19
  116:22  126:23
  137:20  170:2, 17
  171:3

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 69 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

saying 18:25 25:16
56:19 65:7, 8, 9 71:9
111:18 124:1 129:2
167:16

says 36:3 45:21
50:1, 24 55:9 56:24
61:2 63:7 64:25
84:17 87:2 113:22
114:1 117:2 118:22
120:14, 25 121:20
122:15 127:3 129:7,
9, 10, 13, 25 131:5, 6,
10 134:22 136:6, 7,
12, 16 141:14 142:9
159:20 160:7, 17, 18
163:1 167:6 170:12,
13

scenarios 33:22

Schaffer 2:5 174:4,
22

school 9:14, 17
10:25 11:2 12:7, 8
18:7, 10

screaming 16:14

screening 79:5

seal 174:15

search 21:25 23:11

searched 22:4 23:15,
17, 24

searches 23:11

second 88:11 129:22,
23 159:12

section 78:24 109:9

secure 39:23 51:15,
16 53:20 60:4 93:12
94:2 135:7, 14
144:16

secured 39:24 93:15,
20

security 39:20, 21
139:12 161:21, 22

see 12:6 15:3 16:23,
24 22:17 30:2 35:11
53:5 58:1 59:18
62:16 63:4, 8, 9 64:7,
12, 17 67:18 79:11
81:2 97:10 107:7, 11
113:8, 21 120:14, 24
121:16 127:16
132:12, 16 133:6

137:24 152:15
158:19

seeing 66:12, 16
69:1, 20 103:12
104:7, 17 117:8
156:21

seek 47:9

seen 34:23 72:5
95:14 110:6

seizure 51:11, 12, 19
52:3, 5, 25 53:1
64:11

seizures 64:9, 10

send 33:2 36:12
167:9 170:11 172:20

sending 36:9

sense 56:14 83:9

sent 114:22 167:7

sentence 126:20

separate 60:20

Sergeant 28:17
114:16

series 19:2

serious 172:21

serve 20:13 166:2

served 6:12

Services 17:20, 21

set 61:6, 9 174:8, 15

setting 6:9

severance 17:25 18:2

severe 12:18

shadowing 37:5

shampoo 81:19

Shapiro 6:13

share 92:16

shared 137:19 153:1

shares 87:6

sharing 6:2 19:12
96:8

Sheet 176:9

shift 72:21 73:8
88:12 89:9 90:12, 15
141:11 147:18, 20
154:16 155:5 162:21,
23 163:2

shifts 88:8, 10, 18
89:10, 11 95:20

shirt 35:20, 21, 23
46:3

shore 73:11, 17

short 26:9 30:22
31:14 43:3 72:23
91:17 95:23 97:23
98:15 100:6, 14, 17
114:16, 19 117:1
163:5 166:8

shortage 98:15

shortages 94:5, 9
97:17

shortly 11:11 41:18

short-staffed 41:6
42:23 58:13 72:11
144:3 164:18, 20
167:19

shots 80:21 81:1

show 52:20 128:19

showed 27:19, 21
33:6 103:19

showers 81:11
129:13, 14, 17

showing 37:6 66:9
139:17 169:7

shown 29:16 49:13
159:14

shows 56:9 130:11

shut 18:1 25:21
44:7 53:13

shutdown 167:12, 14,
16

sic 102:3

sick 65:2, 15, 16, 17
91:11 116:1

sicker 101:16, 17
119:12

side 64:13 105:17
131:22, 24

sign 35:12 91:3
113:24

signature 173:11
174:11 176:15

signed 15:14 51:1
163:2

Signon 113:22, 23

signs 33:23 34:1
64:1, 5, 20 70:16
115:16, 17, 19 139:17
155:22

simple 105:10 109:3
119:22 141:19, 21

145:20 150:13
170:16

sir 83:14 170:7

sisters 67:23

sit 14:4 76:18
145:17

sits 143:25

sitting 103:15 104:9,
12, 13, 14, 16 110:19
112:11 123:7, 8
140:6 154:24 156:16
157:11

situation 16:24 29:9
30:24, 25 34:25
35:22 63:12 64:16
72:6 83:19 87:12
111:14 126:4 142:16
143:10 147:23 150:2
151:2

situations 14:17
144:5, 17 145:1

skip 12:10

skippies 83:1

sleeping 133:17

sleeve 14:11

slide 43:22

slides 4:11

slowly 18:5

small 132:11

smart 22:14

soap 81:19

social 20:21, 22 21:1,
2 79:12, 22 81:2

somebody 15:25
47:12 58:22 60:24
64:12, 23 84:10, 11,
25 88:1 105:7, 22
109:15 132:15 133:6
168:13 172:20

somebody's 50:22
86:12

someplace 160:19

soon 65:17

Sorry 6:16 19:19
25:15 57:18 83:15
111:20 136:11

sort 32:5 56:17
72:19

sounded 96:11

sounds  6:*17*  10:*14*
102:*8, 13*
SP  114:*1, 2*
space  43:*24*  82:*19*,
*20*  85:*17*  118:*19*
speak  7:*4*  37:*19*
128:*9*  146:*5*
speaker  46:*21*  56:*23*
58:*2*  108:*15*
speakers  46:*20*
speaking  6:*9*  54:*5*
162:*22*
Special  46:*18*  114:*3*,
*5, 14, 17, 23*
specific  32:*10*  65:*20*
66:*7*  67:*6*  70:*5*
149:*24*
specified  174:*11*
spell  8:*23*  101:*12*
spelled  8:*22*
spit  139:*9*
spoke  40:*1*  51:*4*
110:*6, 7*
spoken  110:*4*  152:*1*
spray  25:*11*  26:*8, 10*
60:*16, 19*
sprayed  26:*11*
Spring  1:*13*  2:*8, 16*
Squad  88:*20*
St  1:*13*
stable  101:*21*  116:*4*
staff  40:*7, 11*  42:*2*
43:*15, 18*  48:*10, 24*
49:*6, 12*  50:*13*  52:*12*
63:*16, 22*  71:*25*
72:*14*  80:*11, 22*
86:*11*  91:*6*  98:*15*
100:*25*  101:*15*  124:*5*,
*11, 14, 15, 16*  137:*3*
147:*22*  155:*8*  163:*15*
165:*2, 15, 18*  166:*9*
167:*24*  172:*9, 19*
staffed  90:*4*  96:*17*
staffing  58:*10*  94:*5*,
*9*  97:*17*
stand  19:*6*  53:*20*
54:*2*
standing  103:*13*
112:*16*  157:*18*
stands  115:*11*

start  9:*13*  24:*18*
32:*7*  38:*16, 19*  46:*1*
60:*4*  78:*3*  83:*18*
108:*21*  136:*22*
started  12:*3*  22:*15*
89:*9*  95:*3, 5, 13*  97:*8*
starting  10:*24*  83:*17*
97:*10*
starts  72:*21*
state  5:*12*  8:*20*
14:*18*  76:*8, 9*  87:*21*
88:*2*
stated  27:*4*  61:*13*
71:*8*
statement  65:*1, 13*,
*18*  98:*20*  125:*5*
126:*8*  138:*21*  142:*9*
STATES  1:*1*
stating  125:*1*  141:*22*
142:*18*
station  77:*2*
status  164:*19*
stay  37:*21*  51:*17*
79:*9*  84:*8, 13*  95:*21*,
*25*  96:*1, 25*  97:*3, 13*
164:*20*
stayed  95:*8*
staying  96:*21*
steel  132:*4, 5, 9*
stenotype  174:*8*
step  25:*6*  51:*24*
steps  17:*8*  38:*16*
39:*7*  51:*8*  75:*10*
103:*17, 18*  104:*18*
110:*22*  111:*13*
137:*22*  147:*12*
stir  119:*5*
stomach  107:*9, 11*
170:*6*
stop  41:*17, 21*  59:*23*
60:*12, 17*  91:*4*  111:*3*
stopping  59:*21*
story  26:*9*  67:*24*
straight  37:*17, 18*
Street  2:*9, 16, 22*  3:*7*
stressful  94:*24*  96:*12*
stretcher  51:*13*
52:*10, 15, 19*  53:*16*,
*18*  54:*10*  62:*20*
64:*15*  65:*24*  66:*2*

124:*25*  125:*4, 16, 21*,
*23*  126:*1*  138:*9*
141:*13, 15, 17, 20, 23*
142:*1, 7, 9, 13, 19, 25*
143:*2, 5, 15, 19, 21*
144:*1, 7, 8*  148:*20*
157:*22*  158:*1, 5, 8, 13*,
*14, 16, 22, 24*  159:*2*
170:*8, 13, 15, 22, 23*
171:*6, 9*
struggling  96:*16*
stuff  15:*13*  19:*14*
45:*9*  93:*7*
Suboxone  22:*7*  114:*6*
substance  176:*8*
substantial  13:*5*
succeed  84:*6*
such-and-such  20:*7*
34:*6*  47:*14, 19*  48:*1*
50:*4, 9*  53:*12*  71:*12*
97:*4*  111:*3, 4*  167:*7*
sufficient  43:*15, 18*
sugar  67:*3, 21*  70:*16*,
*19*  170:*25*
suggests  150:*21*
suicidal  34:*11*  76:*19*
suicide  61:*1*
Suite  2:*16*  3:*4, 8*
summer  66:*13, 15*
summertime  66:*10*
Sunday  88:*23*
supervise  19:*24*
supervised  12:*17*
supervisor  16:*21*
17:*2*  25:*22, 24*  26:*5*
35:*18*  43:*1, 12*  52:*16*,
*20*  60:*2, 11, 15*  61:*5*,
*7, 16*  62:*20*  63:*1*
97:*16*  107:*15, 17*
111:*1, 6*  119:*7, 19*
123:*25*  124:*2, 3*
141:*25*  142:*11, 12, 14*,
*15*  145:*2*  147:*2, 3, 6*
148:*1, 2, 7, 12*  166:*9*
supervisors  72:*22*
73:*8*  96:*23*  97:*9, 12*
107:*22*  119:*21*
support  60:*1*  87:*3, 5*
97:*9*

supposed  29:*2*  39:*13*,
*15*  40:*17*  41:*25*  42:*3*
46:*6*  47:*11*  51:*5*
60:*6*  79:*9*  88:*3*
97:*15*  141:*24*
sure  14:*11, 14*  19:*25*
20:*2, 16, 18*  25:*3*
28:*6, 18*  32:*21*  37:*20*
38:*21*  39:*22*  46:*2*
48:*11, 19*  49:*2*  51:*22*
52:*4, 17*  62:*5*  64:*12*
66:*14*  72:*23*  82:*22*
83:*1*  93:*15, 25*  97:*1*,
*6*  98:*6*  99:*7*  101:*4, 9*,
*20, 22*  102:*19*  106:*8*
112:*16*  116:*3, 16*
119:*16*  122:*9*  127:*8*
128:*1*  131:*1*  136:*16*
145:*3*  146:*20*  151:*23*
156:*7*  161:*16*  168:*19*,
*24*  169:*1*
suspended  30:*11, 15*
suspending  31:*17*
Suspension  30:*10*
31:*1, 12*
sustained  28:*2*
sweating  170:*19*
sweep  93:*6*
swinging  139:*9*
sworn  5:*3*  174:*6*
symptom  150:*20*
symptoms  64:*1*
69:*23*  155:*21*  170:*25*
171:*8*  172:*21*
syndrome  10:*7*
System  12:*24*  35:*17*
39:*12*  64:*9*  74:*15*
95:*22*  96:*4*  140:*23*
160:*13*

< T >
table  6:*2*
Tabor  17:*19, 20, 22*
take  7:*21, 24*  17:*1*
19:*3*  23:*3*  28:*15*
35:*5*  51:*8*  53:*22*
56:*13*  61:*19*  66:*4*
71:*10*  90:*11, 21*  93:*6*
101:*21*  120:*13, 22*
142:*2*  152:*14*  163:*12*

Deposition of Gena Frasier                                            Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

171:*19*  172:*9, 10, 12, 21*

**taken**  2:*3*  23:*9*
52:*22*  74:*11*  81:*13*
174:*11*

**takes**  52:*4*  67:*17, 19, 21*

**talk**  21:*1*  112:*13*
157:*12*

**talked**  14:*16*  44:*23*
69:*25*  70:*21*  86:*19*
106:*20*  152:*4, 10*
161:*6, 11*  163:*7*
167:*11*

**talking**  5:*25*  30:*17, 24*  34:*12*  35:*1*  36:*8, 24*  41:*13*  56:*15*  65:*6*
84:*4*  94:*4*  95:*2*
96:*11*  103:*15, 19, 20*
104:*15*  112:*17*
136:*21*  152:*8*  157:*14*

**talks**  159:*17*

**taught**  17:*9*  161:*22*

**TB**  80:*21*  81:*1*

**teacher's**  12:*8*

**teaching**  32:*20*

**team**  36:*1, 3*  60:*3*

**tell**  8:*12*  10:*23*
13:*19*  16:*8*  19:*7*
21:*18*  23:*21*  45:*5*
47:*4*  54:*4, 6*  74:*16*
82:*1*  87:*16, 18*  92:*6*
100:*11*  114:*13*
122:*18*  124:*15*
128:*17*  140:*9*  142:*16*
148:*7*  155:*20*  158:*8, 12, 15*  159:*5*  163:*11*

**telling**  24:*11*  54:*10*
65:*25*  108:*22*  109:*12*
110:*12*  123:*16*  129:*1*
158:*21*

**temp**  11:*3*

**temperature**  116:*3*

**temporary**  11:*5*

**Ten**  9:*3*  22:*6*  25:*10*
109:*25*  110:*1*

**tend**  27:*19*  101:*6, 20*
138:*18*  140:*20*  147:*2*

**tentatively**  10:*4*

**term**  44:*14*  74:*2, 19*
149:*2*  167:*21*

**terms**  19:*17*  88:*17*

**test**  19:*3*  167:*8*

**testified**  5:*4*  108:*6*

**testify**  174:*6*

**testifying**  115:*5*

**testimony**  153:*9*
159:*5*  174:*7*

**tests**  19:*3*

**thank**  5:*16*  14:*16*
54:*14*  60:*23*  92:*10*
96:*8*  169:*12*

**thankful**  27:*24*

**thin**  140:*20*

**thing**  7:*22*  39:*7*
53:*20*  63:*2*  81:*20*
83:*13*  115:*13*  140:*11, 13, 23*  167:*14*

**things**  6:*19*  15:*7*
16:*7*  19:*11*  20:*1*
30:*21*  72:*18*  73:*1, 2*
80:*16*  90:*1*  91:*13, 18*
95:*14, 15*  96:*9, 14*
97:*7*  100:*10*  105:*15*
122:*11*  154:*5*  159:*10*

**think**  5:*20*  6:*6*  9:*23*
10:*17*  12:*9*  15:*13, 16*
16:*25*  17:*23*  19:*15*
21:*19*  26:*24*  28:*18, 20*  29:*9, 18*  30:*24*
31:*21*  33:*16*  36:*24*
45:*2, 9*  50:*17*  51:*11*
52:*3*  53:*7*  54:*21*
55:*12*  64:*14*  66:*11*
67:*17*  70:*13*  74:*1, 9, 10, 11*  79:*8*  81:*20*
86:*19*  88:*11*  95:*23*
96:*12*  101:*18, 23*
106:*19*  110:*14*
111:*11, 14, 15*  116:*24*
123:*7, 8*  132:*7*  133:*5, 25*  137:*24*  141:*2*
146:*3*  149:*5, 14, 24*
150:*2, 15, 18*  151:*12*
153:*1*  156:*3*  158:*3*
159:*4*  165:*10*  169:*14*

**thinking**  26:*17*

**third**  34:*7*  105:*20*

**thoroughly**  22:*3*
23:*20*

**thought**  139:*17*
147:*21*

**three**  9:*23*  20:*24, 25*
35:*3*  52:*14*  122:*15*
129:*18*  140:*21*  160:*6*
166:*18*

**three-quarters**  120:*24*

**thrown**  29:*6*  84:*4*

**Thursday**  88:*22*

**TID**  14:*6*

**tier**  38:*17, 18*  58:*12, 14*  130:*18*  131:*15, 16*
133:*2*

**time**  10:*15*  11:*7, 10, 19*  13:*3*  14:*23*  15:*8, 18, 20*  17:*10*  20:*17, 19*  21:*14*  22:*10*
23:*17*  24:*17, 20*  27:*2, 6*  28:*17*  30:*23*  38:*2*
39:*2*  40:*9*  43:*7*  44:*4*
45:*17*  47:*24*  48:*2*
52:*6, 20*  54:*2*  56:*12*
58:*12, 21*  60:*2*  63:*18*
68:*5*  71:*8*  79:*6, 11*
83:*3, 5, 22*  88:*6, 9*
90:*3, 20*  92:*18*  93:*11, 20*  94:*23*  95:*19*  96:*3*
108:*11, 21*  110:*2, 7*
112:*1*  116:*5*  117:*13*
120:*12*  121:*1, 15, 17*
122:*10*  127:*23*
129:*18*  130:*9, 13*
132:*25*  134:*7, 16, 25*
136:*19*  138:*11*  139:*7*
141:*17*  142:*23*
143:*13*  148:*21*  149:*6*
159:*7, 25*  162:*14*
163:*10*  166:*11*  173:*5*
174:*11*

**timeframe**  18:*14*
31:*7*

**timeline**  26:*17*

**time-permitting**
71:*21, 24*

**times**  8:*16*  44:*15*
45:*3*  51:*20*  52:*16*
77:*8, 9*  83:*20*  96:*13*

**time-wise**  159:*11*

**timing**  161:*3*

**title**  9:*8*

**today**  5:*18*  8:*2*  10:*7*
15:*23*  50:*6*  72:*24*
73:*9, 12*  102:*21*
120:*20*  152:*23*

**today's**  8:*7*

**told**  25:*25*  51:*21*
71:*25*  123:*18*  124:*24*
125:*3*  128:*3, 5*
141:*14, 23*  142:*12, 19*
155:*10*  157:*20, 22*
158:*2, 4, 15*  170:*5*

**tomorrow**  83:*16*

**ton**  169:*15*

**tone**  133:*10*

**tonight**  16:*22*

**toothbrush**  81:*18*

**toothpaste**  81:*18*

**top**  37:*22*  38:*17, 18, 19*  39:*7*  58:*16*  85:*5*
113:*21*  118:*21*
120:*14*  122:*16*
131:*14*  133:*2*  136:*11*

**touch**  146:*24*  171:*24*

**touched**  27:*5, 22*
39:*17*

**tour**  16:*6*  35:*3*
37:*19*  38:*6*  39:*8, 15*
41:*12*  90:*20*  92:*25*
93:*2*  98:*2, 6, 10, 12, 21*

**toured**  38:*3*

**tours**  37:*7*  38:*12*
39:*9, 19*  73:*14*  97:*19*
101:*3*

**track**  10:*15*  35:*17*
39:*12*  48:*3, 8, 9, 25*
49:*7*  71:*22*  103:*23, 24*  116:*17*  121:*20*
122:*3, 5, 7, 18*  127:*14*
130:*2*  134:*3*  136:*1, 3*
143:*13*  159:*5*  160:*2, 13, 15*  163:*1*  168:*10, 17*  169:*3*

**trained**  36:*25*  39:*25*
40:*2*  51:*4*  59:*9*
63:*25*  70:*15*  150:*18*
161:*19*

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

training 13:*11* 15:*20*, 22 32:6, *12*, *13* 33:*15*, *19* 36:*14*, *24* 48:*20* 66:7 69:*21* 70:*1*, *4*, *7*, *10* 72:*9*, *13* 74:*17*, *23* 75:2 149:8, *15*, *20* 150:*4*

trainings 32:*14* 33:22 70:*1*, *2*

transcribed 174:*9*

transcript 6:*11* 173:*3* 174:*18*

transcription 174:*9* 176:*5*

transferred 85:*1*

transfers 76:*20*

Transition 12:*12*, *15* 13:*7*, *10* 16:*3* 17:*11*, *14*, *22*, *23* 18:*1*, *6*, *11*

transpire 83:*21*

transport 21:*4*, *7*, *10*

transported 28:*10*

trash 93:5, *6*

trashed 16:7

treat 66:*4*

treated 67:*12*

Treatment 11:*13* 13:7 15:*10* 50:*25* 63:*21* 70:22, *23* 72:7

Trebach 3:7

trick 53:*24*

tried 29:*1*

triggered 15:5

trip 28:*11*, *15* 90:*25*

TRIVIKRAM 1:*11*

trouble 24:*12* 171:*4*

true 125:*12* 141:*15*

trust 142:*16*

truth 174:6

try 7:*17* 15:*1* 20:8 37:22 41:*16* 52:8, *11*, *13*, *16* 53:*10* 62:*16* 63:*3* 71:*14* 83:*23* 84:*1*, 5, *6* 85:*12*, *15*, *16*, *18* 86:*3* 87:*9* 91:*14* 98:7 99:*11* 117:*20* 119:5, *7* 122:*11* 139:*4* 144:8 154:*3* 159:8 160:*21*, *22*, *23*

trying 11:*17* 17:*13* 26:*24* 39:*22* 42:*21* 79:*16*, *19* 90:7 95:*20* 96:*15* 105:*23* 110:*18* 116:*16* 132:*25* 139:*9* 159:*10* 162:*25*

Tuesday 88:*21*

turn 163:*20* 169:*13*

TV 130:*17* 165:7 166:5

twice 8:*17*

Two 3:*3* 11:*4* 12:*9* 18:*13* 23:*18* 31:*11*, *13* 51:*17* 56:*9* 57:*24* 60:7 79:*9* 80:*12* 88:*21*, *25* 89:*1* 93:*4* 98:*10* 105:*15* 108:2 129:*17* 140:*21* 142:*11* 144:7 166:*10*, *17* 168:*15*

type 70:*10* 140:*25* 149:*19* 164:*24*

types 59:8

typical 90:*12* 164:*9*

typically 45:*1*, *13* 84:8, *13*, *14* 101:*21* 107:*11*, *12* 109:*19* 114:8, *9* 134:8, *10*, *11* 135:*10* 140:*4* 143:*4* 166:20, *21*

< U >

unattended 97:*14*

unconscious 158:*21*

uncontrollably 171:*4*

underlying 171:8

underneath 43:*23*, *25* 114:*24* 165:*23*

understand 6:*19* 7:*16*, *18*, *19*, *20*, *25* 31:*21* 71:*19* 154:*17*

understanding 62:5 67:*1* 74:*7*, *13* 161:*21* 164:8

understood 7:*14* 25:9 42:2 66:6 152:22

unemployment 18:*3*

unfortunately 64:8

83:*16* 95:*1*

Union 27:*14*

Unit 11:*20* 12:*1*, 2 20:*12* 27:*17* 36:*10* 37:*21* 38:*15* 39:*20* 41:*1*, *3*, 7, *12*, *15*, *24* 42:*15*, *16*, *18*, *19*, *24* 43:*17*, *19* 44:*1*, *12* 45:2, 8, *10*, *14*, *15*, *19* 46:*15* 50:*23* 51:*14*, *16* 52:*13*, *18* 54:*3* 57:*16*, *17* 75:*9*, *13* 76:*4* 77:*1* 82:*10* 84:7, *20* 85:*20* 90:6 94:*21* 96:*1*, *21* 99:*9* 101:8, *10*, *25* 103:*21* 107:*1*, *13* 108:8 109:*20* 111:*23* 112:*1*, *2*, *4* 114:*10*, *12* 115:*21* 117:*12*, *21* 118:*9* 124:*22* 127:*20* 128:*11* 129:*15* 131:*20* 134:*22* 137:*6* 143:*11* 144:*1*, *9*, *10*, *12*, *13*, *16* 145:*11* 159:*21*, *22*, *24* 163:*4*, *15*

UNITED 1:*1*

units 40:8, *17* 46:*23* 77:*25* 79:*1* 85:*3* 162:*15*

unusual 155:*11* 161:*25*

upstairs 81:*9* 85:8 99:*24* 132:*16* 145:*9*

urgent 34:*18*, *21*, *22* 86:*18*, *23*, *25*

urine 80:*21* 81:*1* 156:22 157:*1*

use 46:*21* 49:*24* 74:*18* 120:*19* 139:*11* 146:*25* 167:*21*

usually 31:*4* 133:*13*

< V >

vacancies 72:*16*

Valley 11:*12*

valuables 34:*13*

varies 90:*14*

various 21:*4*

vary 109:*25* 133:*14*

verbal 59:22 62:9 92:4, 5, 7, *13* 119:*16* 145:22 162:*18*

verbally 7:8 62:2

verifies 19:*16*

Vice-versa 7:*1*

video 66:*10*, *12*, *16* 104:*3*, 5, 7, *18* 110:*14*, *24* 112:*19* 116:22 117:8 120:8 123:5 124:*19* 130:8, *11* 137:*4*, *9*, *10*, *12*, *24* 160:*1*

view 75:*23* 133:*3*

vigilant 73:*14*

violating 113:*13*

visit 20:7, *9* 21:*24* 22:*11* 23:6 167:2, *4*

visiting 22:*1*

visitor 21:*23*, *25*

Visits 20:5, 6

visual 37:*23*

visualize 132:*25*

Vital 115:*16*, *17*, *18*

vitals 101:*21*, 22 116:2

voice 56:*16*

voluntarily 172:*10*

vomit 156:*21*, *25*

vomiting 171:*4*

vs 1:7

< W >

wait 31:*18* 41:*17* 59:2

waiting 99:*1*

waived 173:*11* 174:*11*

wake 63:5

walk 35:*13* 37:*16*, *24* 38:*20* 39:5 40:*17* 65:*11* 101:6 137:*20* 142:*17* 170:*9*, *10*, *12*

walked 27:5 103:*18*, *21* 111:*13*

Walker 112:6 118:*9*, *10*, *12* 121:*21* 122:*19*

156:4
walkie 53:17 124:11
walking 35:6, 12
36:5 41:13 124:21
165:3, 7, 16
wall 35:7
WANDA 1:13 2:20
107:14 159:24
want 8:12 10:3
13:9 17:6 26:16
32:15 41:23 45:6
47:15 49:5 50:6
51:19 54:19 56:1, 13
62:5 71:10 76:16
80:3 87:8 91:13
94:21 95:6 96:5
105:22 109:12, 17
110:15 113:18 115:1
119:9, 24 124:14
125:23 128:15, 24
129:5 137:8 138:19
140:9 146:24, 25
149:18 151:23
154:11, 21, 23 160:21
wanted 17:16 95:6
105:4, 11 110:16
123:10 146:3, 10
161:8
wants 20:21 21:3
105:11, 14 106:12
109:13 125:25
warnings 38:24
warrant 79:14
warranted 20:17
watch 44:21 107:7
watching 44:18 60:5
104:3, 4 130:17
165:7
water 22:24 165:23,
24 166:3, 4, 10
way 40:3 49:8 54:6
106:4 115:23 120:19,
25 129:3 148:19
154:5
Weaner 115:1, 2
117:23
weapons 70:12
wear 81:14, 16
Wednesday 88:22

week 14:7, 11, 12
88:21, 23, 24 89:1
weekly 12:21
weeks 84:9
Well 5:23 12:13
16:9, 19, 25 17:7
23:14 24:1, 13, 21
29:15 31:16 34:2
35:11 38:16 39:22
47:2, 9 49:4 52:17
62:6 64:22, 25 65:19,
21 70:4 74:18 76:2
78:11 80:2, 25 81:20,
23, 24 83:14 84:18
85:8 87:17 90:17
94:8 112:10 128:23
136:5 138:21 142:6
150:6 151:11 154:9,
23 158:6 165:19
170:7
went 11:8, 18 12:2, 7
17:21, 23 18:7, 9
57:5, 8 73:18 103:11
104:18, 19 110:22
112:10 114:21, 22
136:13, 24 137:22
147:12
we're 17:7 21:19
36:9 39:13 42:23
43:3 44:5, 21 58:8
75:15 90:4 91:16
95:2, 23 100:5
114:15, 18 129:5
143:8 144:3 164:18,
20
Werner 115:2
We've 136:19 167:11
wheelchair 75:8, 12,
14 85:14
WHEREOF 174:15
whoever's 61:17
who've 19:13
wife 83:14
willing 21:1 35:21,
23
willingly 15:15
wind 81:9
window 50:3, 8
132:15 133:7

windows 132:10, 11,
13
wipe 93:7
wish 26:25 31:9
146:9
withdrawal 101:19
115:25
withdrawn 119:12
WITNESS 4:3 6:4
8:23 36:21 40:22
49:21 59:5 67:16
69:13 71:6 75:22
76:16 77:17 86:15
89:15, 21 92:5, 7
94:15 102:13 103:2,
8 109:24 111:20
121:25 123:1, 24
125:11 126:18
130:24 137:13 141:8
144:24 149:12, 18
150:11 151:7, 18
153:6 162:4 164:13
174:5, 8, 15
witnesses 17:5
WITTEKIND 3:2
4:5, 7 49:16 69:9
71:2 77:12 86:13
94:12 102:9, 23
120:18 122:22
123:13, 20 125:7
151:5 153:16, 23, 25
158:6, 10 162:5
172:5 173:8
wondering 30:7
word 74:14
words 149:6
work 8:18 11:8
12:3 18:8 19:12
24:15 72:15 78:14
80:23 81:2 82:17
84:18 88:22 94:11,
17 97:21 100:6
102:19 145:8, 10
148:19
worked 9:2 11:12,
19, 25 12:14 15:7
16:2 21:21 76:12, 25
77:8 78:1, 4, 6, 12, 23
82:18 102:17 107:20
141:16

worker 20:21, 22
21:1, 2 81:2 166:19
workers 79:12, 22
93:3, 4 101:3, 4, 6
104:24 105:1 111:10
119:19 137:25
138:13 139:13 145:5,
14 147:12 165:21
166:7, 10, 13, 14, 18
working 10:10 11:2
17:11 27:3 88:8, 21
94:16 96:18 97:3, 23
128:2 148:17 165:19
works 91:16
worried 87:6
worse 105:17
wound 24:11 28:23
32:21 103:16
wounds 32:20 33:11
Wow 11:1 97:10
wrap 32:20
write 33:5, 12 65:15
167:9 170:9, 11
write-up 24:3, 24
26:13 27:11 28:7, 24
31:5
writing 161:18
written 72:2 91:19
92:4, 8, 13
wrong 27:12 29:17
165:12
wrongdoing 113:14
wrote 27:7 29:8
127:7

< Y >
yard 51:25 165:8
Yeah 6:3, 4 10:1
13:21 21:9 24:21
25:10 30:15 31:23
39:16 45:5 49:6
53:1, 13 61:24 67:24
68:20 72:13 81:24
84:25 103:8 109:20
120:10 126:19
146:18 150:22
year 9:22 11:3 12:9
26:25 30:4 70:6, 11,
13 89:9 104:5 108:2
136:23

**years**   6:*13*   9:*3, 9, 23*
   10:*20*   12:*1, 3*   13:*17*
   17:*13*   18:*14*   25:*10*
   31:*11, 13*   32:*3*   78:*13*
   82:*17*   107:*24*   136:*20*
**yell**   45:*19, 20*   46:*16,*
*23*   47:*2*   62:*13*
   108:*12, 13, 17*   129:*4*
**yelled**   131:*1*
**yelling**   16:*14*   26:*3*
   46:*25*   62:*12, 13*
   109:*7*   128:*11*   129:*2*
**YESCARE**   1:*9*   3:*1*
   69:*8*
**Yo**   46:*25*

**< Z >**
**zero**   32:*10*

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 75 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

## WORD LIST

**< 0 >**
**000006**  *(1)*
**000026**  *(2)*
**000030**  *(5)*
**000031**  *(2)*
**000032**  *(1)*
**000033**  *(2)*
**000034**  *(1)*

**< 1 >**
**1**  *(15)*
**1:05**  *(2)*
**1:14**  *(1)*
**10**  *(3)*
**10:00**  *(1)*
**10:05**  *(1)*
**10:57**  *(7)*
**100**  *(2)*
**1-1**  *(1)*
**11/5/2023**  *(1)*
**11:00**  *(5)*
**11:05**  *(3)*
**1100**  *(1)*
**113**  *(1)*
**12:15**  *(1)*
**12-hour**  *(7)*
**1-3**  *(2)*
**130**  *(2)*
**14**  *(9)*
**1440904**  *(1)*
**14th**  *(1)*
**1500**  *(1)*
**1515**  *(1)*
**153**  *(1)*
**16**  *(1)*
**16:02**  *(1)*
**16:30**  *(1)*
**16:31**  *(1)*
**16:35**  *(1)*
**16:49**  *(1)*
**163**  *(1)*
**169**  *(1)*
**17**  *(5)*
**171**  *(1)*
**172**  *(2)*
**18**  *(3)*
**1801**  *(1)*

**18th**  *(1)*
**19**  *(6)*
**19102**  *(2)*
**19103**  *(1)*
**19123**  *(3)*
**19136**  *(1)*
**1995**  *(1)*

**< 2 >**
**2**  *(7)*
**2:24-cv-05618-TJS**  *(1)*
**2:37**  *(1)*
**2:44**  *(1)*
**20**  *(5)*
**2008**  *(1)*
**2009**  *(1)*
**2013**  *(2)*
**2015**  *(9)*
**2015-2017**  *(1)*
**2017**  *(2)*
**2019**  *(2)*
**2020**  *(1)*
**2022**  *(1)*
**2023**  *(10)*
**2024**  *(5)*
**2025**  *(2)*
**21**  *(16)*
**22**  *(1)*
**24**  *(2)*

**< 3 >**
**3**  *(12)*
**3:00**  *(5)*
**30**  *(3)*
**301**  *(2)*
**302**  *(3)*
**302'd**  *(3)*
**306**  *(1)*
**3P**  *(1)*

**< 4 >**
**4**  *(3)*
**4:00**  *(3)*
**4:05**  *(3)*
**4:16**  *(1)*
**4:30**  *(4)*
**4:31**  *(1)*
**4:57**  *(1)*
**40**  *(2)*

**< 5 >**
**5**  *(10)*
**5:50**  *(2)*
**5mg**  *(1)*

**< 6 >**
**6**  *(1)*
**6:03**  *(1)*
**6:50**  *(1)*
**60**  *(1)*
**64**  *(2)*
**68**  *(1)*

**< 7 >**
**7**  *(11)*
**7:00**  *(5)*
**7:15**  *(1)*
**718327**  *(1)*
**770**  *(1)*
**7901**  *(1)*

**< 8 >**
**8**  *(1)*
**8:00**  *(1)*
**8:05**  *(2)*
**8:45**  *(3)*
**8:58**  *(1)*
**80**  *(1)*
**8001**  *(1)*

**< 9 >**
**9:00**  *(3)*
**9:30**  *(1)*
**9:33**  *(1)*
**9:55**  *(1)*
**90**  *(1)*
**990**  *(3)*
**9mm**  *(1)*

**< A >**
**a.m**  *(4)*
**abdominal**  *(1)*
**ability**  *(2)*
**able**  *(16)*
**ABOLITIONIST**  *(3)*
**absolutely**  *(4)*
**Academy**  *(2)*
**access**  *(2)*

**accom**  *(1)*
**accommodations**  *(3)*
**accompanied**  *(1)*
**Accu-Chek**  *(5)*
**accurate**  *(3)*
**acknowledging**  *(1)*
**ACKNOWLEDGMEN
T**  *(1)*
**acronym**  *(1)*
**action**  *(5)*
**actions**  *(2)*
**activities**  *(2)*
**actual**  *(5)*
**add**  *(1)*
**addition**  *(1)*
**additional**  *(7)*
**address**  *(2)*
**addresses**  *(1)*
**administered**  *(3)*
**administration**  *(5)*
**Administrators**  *(2)*
**admitted**  *(1)*
**adolescent**  *(1)*
**Adolescents**  *(1)*
**adults**  *(2)*
**advise**  *(1)*
**advocates**  *(1)*
**affect**  *(2)*
**affixed**  *(1)*
**aforesaid**  *(1)*
**afternoon**  *(4)*
**aggressive**  *(2)*
**ago**  *(10)*
**ahead**  *(1)*
**Aid**  *(5)*
**aide**  *(1)*
**air-conditioning**  *(2)*
**alcohol**  *(2)*
**Alexander**  *(3)*
**alive**  *(2)*
**allegedly**  *(1)*
**allow**  *(2)*
**allowed**  *(6)*
**Alpha**  *(2)*
**alternative**  *(1)*
**ambulance**  *(1)*
**amount**  *(3)*
**and/or**  *(1)*
**ankle**  *(1)*

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 76 of 85

Deposition of Gena Frasier                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

announcement  (5)
announcing  (1)
answer  (56)
answered  (1)
answering  (2)
answers  (2)
Antoin  (2)
anxiety  (1)
anxious  (1)
anybody  (5)
anyway  (2)
apartment  (4)
apartments  (3)
APOLLON  (4)
apologize  (1)
apparently  (1)
appear  (1)
appeared  (2)
appears  (6)
applied  (2)
apply  (3)
appointments  (1)
approach  (1)
approximately  (3)
Arch  (1)
area  (65)
areas  (12)
arguing  (1)
Argumentative  (1)
arm  (6)
armband  (1)
arrival  (1)
arrive  (1)
arrived  (4)
arrives  (3)
aside  (2)
asked  (10)
asking  (13)
asks  (1)
assault  (1)
assess  (8)
assessment  (5)
assigned  (9)
assist  (1)
assistance  (3)
assistant  (1)
assisting  (1)
associate's  (2)
assume  (1)

assuming  (4)
attached  (1)
attend  (1)
attended  (1)
attention  (6)
ATTORNEY  (155)
attorneys  (1)
August  (2)
authority  (1)
authorized  (1)
available  (5)
aware  (11)

< B >
B1  (3)
B1-3  (1)
B2  (3)
baby  (6)
baby's  (1)
back  (57)
backs  (2)
backside  (1)
backup  (2)
bad  (2)
bags  (1)
bail  (2)
bandages  (1)
bang  (2)
banging  (5)
bars  (3)
based  (6)
basically  (9)
basketball  (1)
Bates  (1)
Bates-stamped  (1)
beach  (1)
bear  (1)
beat  (2)
bed  (4)
began  (2)
beginning  (4)
Behalf  (6)
behavior  (1)
Behavioral  (6)
believe  (46)
believed  (1)
belongings  (1)
bench  (1)
best  (18)

better  (4)
beyond  (1)
big  (1)
bit  (9)
blah  (9)
BLAIR  (4)
BLANCHE  (2)
blanket  (2)
blankets  (2)
block  (36)
blocks  (4)
blood  (10)
BLOODSAW  (18)
blue  (2)
blues  (1)
book  (5)
booth  (10)
bottle  (2)
bottom  (11)
Boulevard  (1)
brain  (4)
Bravo  (15)
break  (6)
breathe  (1)
breathing  (2)
Bret  (5)
Bretgrote@abolitionist
lawcenter.org  (1)
brief  (5)
bring  (7)
broad  (1)
broke  (1)
brought  (6)
bruised  (1)
buddies  (1)
Building  (18)
buildings  (1)
buildup  (1)
busier  (1)
busy  (5)
button  (2)
buzz  (2)
buzzes  (1)

< C >
C/C  (1)
C/O  (6)
C/Os  (3)
CABELLOS  (22)

call  (119)
called  (42)
calling  (4)
callouts  (1)
calls  (4)
camera  (5)
cameras  (3)
cane  (1)
capable  (1)
capacity  (2)
caption  (1)
Carabella  (1)
Cardinal  (1)
cards  (1)
Care  (8)
career  (1)
careful  (1)
CARNEY  (2)
carry  (2)
Carson  (1)
Case  (16)
cases  (1)
caught  (1)
cause  (3)
CBH  (2)
cease  (2)
cell  (109)
cellmate  (10)
cells  (23)
celly  (13)
census  (5)
CENTER  (6)
certain  (4)
certification  (1)
certify  (4)
certifying  (1)
CFCF  (16)
chain  (1)
chair  (1)
challenging  (2)
change  (8)
changes  (5)
charge  (1)
charged  (2)
Charlie  (4)
check  (4)
checks  (3)
checkup  (1)
chest  (1)

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 77 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Chief *(1)*
Child *(6)*
children *(4)*
Children's *(3)*
choose *(1)*
circumstance *(2)*
circumstances *(6)*
CITY *(9)*
CIVIL *(2)*
civilian *(7)*
Civilians *(5)*
civilian's *(1)*
clarification *(1)*
clarify *(2)*
clarity *(2)*
clean *(6)*
cleaned *(1)*
clear *(7)*
cleared *(5)*
clearer *(1)*
clears *(3)*
client *(1)*
clients *(4)*
client's *(2)*
Clinic *(6)*
close *(7)*
closed *(1)*
closer *(3)*
closing *(1)*
clothes *(1)*
clothing *(2)*
coherent *(1)*
colleagues *(1)*
collected *(2)*
College *(4)*
come *(98)*
comes *(8)*
comfortable *(2)*
coming *(13)*
command *(1)*
commands *(3)*
commencing *(1)*
comment *(1)*
commission *(1)*
Commissioner *(1)*
commit *(1)*
common *(6)*
commonly *(1)*
Commonwealth *(4)*

communicate *(1)*
communicated *(1)*
communication *(1)*
Community *(5)*
company *(2)*
compare *(1)*
complete *(2)*
completed *(1)*
completely *(3)*
complex *(3)*
compliance *(1)*
compliant *(4)*
comply *(4)*
computer *(9)*
computer-aided *(1)*
concern *(2)*
concluded *(1)*
conditions *(1)*
conducted *(1)*
confer *(1)*
confused *(1)*
connect *(1)*
consciousness *(2)*
consequences *(1)*
considered *(1)*
consist *(5)*
consisted *(1)*
consistent *(2)*
constantly *(1)*
constructed *(1)*
contact *(7)*
contacted *(1)*
contacts *(1)*
continue *(1)*
contraband *(5)*
contractors *(1)*
control *(3)*
controls *(1)*
conversation *(9)*
conversations *(1)*
convulsions *(1)*
cool *(2)*
Copies *(1)*
Copy *(1)*
Corizon *(3)*
corner *(2)*
CORP *(1)*
correct *(12)*
Correctional *(22)*

Corrections *(14)*
correctly *(2)*
cotton *(1)*
Coumadin *(1)*
Counsel *(6)*
counseling *(4)*
counselor *(2)*
counselors *(1)*
count *(30)*
counts *(1)*
County *(3)*
couple *(11)*
course *(2)*
COURT *(4)*
cover *(2)*
covered *(1)*
COVID *(16)*
COWS *(12)*
C-O-W-S *(2)*
CPR *(2)*
crack *(1)*
Crawford *(1)*
credibility *(1)*
credit *(1)*
Criminal *(2)*
crisis *(3)*
crowd *(1)*
crutches *(4)*
cuff *(3)*
cup *(1)*
curious *(1)*
Curran *(1)*
C-U-R-R-A-N *(1)*
Curran-Fromhold *(1)*
currently *(1)*
custody *(3)*
cut *(2)*

< D >
dad *(1)*
danger *(2)*
date *(8)*
dated *(1)*
dates *(1)*
day *(75)*
day-in-the-life *(1)*
dayroom *(1)*
days *(26)*
DC *(4)*

DC's *(1)*
deal *(1)*
dealing *(3)*
dealt *(1)*
death *(3)*
debris *(2)*
decide *(1)*
decipher *(1)*
decision *(1)*
decisions *(3)*
decline *(2)*
decontaminated *(2)*
de-escalate *(1)*
Defendant *(3)*
Defendants *(6)*
defenders *(1)*
definitely *(5)*
degree *(1)*
delay *(1)*
delivered *(2)*
Delta *(2)*
dental *(1)*
Depakote *(1)*
Department *(9)*
depend *(4)*
Depending *(8)*
Depends *(4)*
depo *(1)*
DEPONENT *(1)*
Deposition *(13)*
depressed *(1)*
Dept *(1)*
described *(2)*
DESCRIPTION *(1)*
designated *(3)*
desk *(17)*
desks *(1)*
detailed *(1)*
details *(1)*
Detention *(2)*
determination *(1)*
determine *(8)*
determined *(1)*
determines *(1)*
diabetes *(13)*
diabetic *(7)*
diabetics *(1)*
diagnosis *(1)*
dial *(2)*

died *(2)*
differ *(1)*
difference *(4)*
different *(9)*
differently *(3)*
difficult *(2)*
direct *(3)*
direction *(2)*
directive *(1)*
directly *(2)*
disabilities *(3)*
disability *(7)*
Disciplinary *(14)*
discipline *(1)*
disciplined *(1)*
discuss *(2)*
discussed *(1)*
discussing *(1)*
discussion *(5)*
discussions *(1)*
distress *(6)*
DISTRICT *(2)*
disturbing *(1)*
diverse *(1)*
DIVISION *(1)*
dizzy *(1)*
DNA *(1)*
doctor *(2)*
doctors *(1)*
document *(6)*
documentation *(3)*
documented *(3)*
documenting *(1)*
documents *(1)*
doing *(12)*
door *(60)*
doors *(7)*
doorway *(11)*
Dougherty *(1)*
downstairs *(1)*
drag *(1)*
drained *(1)*
draining *(1)*
drug *(3)*
drugs *(2)*
due *(2)*
duly *(2)*
duties *(1)*
duty *(4)*

< E >
earlier *(14)*
early *(2)*
EASTERN *(1)*
easy *(1)*
eat *(2)*
echo *(1)*
education *(4)*
eight *(1)*
either *(13)*
electronic *(1)*
emergencies *(1)*
emergency *(23)*
emotionally *(1)*
emotions *(1)*
employed *(1)*
employment *(3)*
empty *(1)*
encounter *(5)*
encountered *(5)*
encourage *(1)*
ended *(1)*
end-of-shift *(3)*
ends *(1)*
enforcement *(1)*
engaging *(1)*
enhance *(1)*
enjoyed *(1)*
entail *(1)*
enter *(8)*
entered *(9)*
entering *(2)*
entire *(2)*
entries *(4)*
entry *(5)*
ER *(2)*
Errata *(1)*
escort *(17)*
escorted *(8)*
escorting *(9)*
especially *(1)*
Esq *(11)*
established *(1)*
Estate *(2)*
evaluate *(1)*
evaluated *(1)*
evaluations *(2)*
event *(15)*

events *(4)*
eventually *(2)*
Everybody *(7)*
exact *(1)*
exactly *(4)*
examination *(8)*
EXAMINATIONS *(1)*
examined *(1)*
example *(9)*
examples *(1)*
exception *(1)*
excessive *(2)*
excuse *(4)*
excuses *(1)*
exhaustion *(1)*
EXHIBIT *(6)*
EXHIBITS *(1)*
exit *(1)*
exited *(1)*
expect *(1)*
experience *(4)*
experienced *(1)*
experiencing *(2)*
expert *(1)*
expertise *(1)*
expires *(1)*
explain *(1)*
explained *(2)*
explanation *(2)*
expresses *(1)*
expressing *(1)*
extent *(1)*
extremely *(1)*
eyes *(2)*

< F >
face *(1)*
facilities *(1)*
Facility *(14)*
fact *(1)*
facts *(1)*
factual *(1)*
failure *(1)*
fair *(3)*
faithfully *(1)*
fall *(5)*
false *(1)*
familiar *(11)*
family *(4)*

far *(8)*
farther *(1)*
fast *(3)*
faster *(1)*
fast-moving *(1)*
fast-paced *(1)*
February *(1)*
fed *(2)*
Federal *(1)*
feed *(6)*
feel *(10)*
feeling *(2)*
feels *(1)*
feet *(1)*
fell *(2)*
fellas *(3)*
felt *(2)*
females *(1)*
fever *(2)*
fight *(6)*
fighting *(9)*
figure *(1)*
Filed *(1)*
fill *(4)*
find *(3)*
fine *(8)*
finish *(5)*
finishes *(1)*
fire *(1)*
first *(32)*
five *(7)*
five-day *(1)*
flag *(2)*
flip *(1)*
Floor *(33)*
floors *(1)*
Flourtown *(1)*
foaming *(2)*
foggy *(1)*
follow *(2)*
following *(1)*
follows *(1)*
follow-up *(1)*
food *(1)*
force *(4)*
foregoing *(3)*
forget *(3)*
forgot *(1)*
form *(25)*

Deposition of Gena Frasier

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Former *(1)*
forth *(3)*
forthcoming *(2)*
forward *(1)*
found *(6)*
four *(12)*
fourth *(1)*
four-year *(1)*
Frashe *(2)*
FRASIER *(31)*
F-R-A-S-I-E-R *(1)*
Frasier-000005 *(1)*
Frasier-000006 *(1)*
Frasier-000062 *(1)*
frequently *(4)*
Friday *(1)*
friend *(2)*
Fromhold *(1)*
F-R-O-M-H-O-L-D *(1)*
front *(4)*
frustrated *(2)*
frustrating *(2)*
full *(3)*
fully *(1)*
fun *(1)*
funding *(1)*
further *(10)*
future *(1)*

< G >
Garden *(3)*
gate *(1)*
gauge *(1)*
gauze *(1)*
GAY *(1)*
GENA *(11)*
G-E-N-A *(1)*
general *(6)*
generality *(1)*
generally *(9)*
generated *(1)*
gentleman *(3)*
gentlemen *(7)*
getting *(10)*
girlfriend *(1)*
give *(23)*
given *(15)*
gives *(1)*

giving *(7)*
glass *(2)*
Glipizide *(1)*
Glock *(2)*
Glock-certified *(1)*
Glocks *(2)*
glucose *(2)*
go *(83)*
goes *(4)*
going *(82)*
Good *(13)*
Gosh *(2)*
gotten *(1)*
grabbed *(1)*
graduated *(2)*
grand *(1)*
Grote *(65)*
ground *(2)*
group *(1)*
guess *(10)*
guessing *(4)*
guidance *(4)*
guy *(1)*
guys *(24)*

< H >
H/C *(3)*
hair *(1)*
Half *(4)*
hallway *(1)*
hand *(3)*
handcuff *(1)*
handle *(4)*
handled *(2)*
handling *(1)*
hands *(2)*
hands-on *(1)*
happen *(14)*
happened *(18)*
happening *(3)*
happens *(5)*
happy *(1)*
hard *(2)*
harder *(1)*
harm *(1)*
hate *(1)*
head *(27)*
headache *(1)*
heads-up *(3)*

Health *(22)*
health-wise *(1)*
hear *(9)*
heard *(8)*
hearing *(20)*
hearings *(1)*
heat *(1)*
held *(6)*
Hello *(1)*
help *(16)*
helped *(1)*
hereto *(1)*
hereunto *(1)*
Hey *(41)*
Hi *(1)*
high *(13)*
higher *(1)*
highly *(2)*
hire *(2)*
hired *(2)*
history *(5)*
hit *(3)*
hitting *(1)*
HOC *(2)*
Hold *(2)*
holding *(1)*
hole *(1)*
Holston *(2)*
home *(4)*
honest *(2)*
honestly *(1)*
hooked *(1)*
hope *(1)*
Hopefully *(1)*
Horsham *(1)*
Hospital *(3)*
hospitalization *(1)*
hospitalized *(1)*
hospitals *(1)*
hostage *(1)*
hot *(2)*
hour *(3)*
hours *(5)*
House *(10)*
housed *(4)*
housing *(31)*
how's *(1)*
Hu *(2)*
hurt *(3)*

hygiene *(5)*
hypothetical *(2)*

< I >
i.e *(1)*
I/P *(7)*
I/Ps *(1)*
ID *(1)*
identification *(2)*
identified *(1)*
identify *(1)*
identifying *(1)*
illness *(2)*
illnesses *(1)*
impacted *(3)*
important *(4)*
impose *(1)*
inadvertent *(1)*
incarcerated *(9)*
incident *(10)*
incidents *(3)*
include *(1)*
included *(1)*
independently *(1)*
indicate *(1)*
indicated *(2)*
indicating *(9)*
indication *(1)*
indigent *(2)*
individual *(3)*
individually *(1)*
individuals *(9)*
infant *(2)*
infected *(1)*
infirmary *(6)*
inform *(6)*
informal *(1)*
informally *(1)*
information *(13)*
informed *(1)*
infraction *(2)*
initiates *(1)*
injury *(1)*
inmate *(83)*
inmate-on-inmate *(2)*
inmates *(58)*
inmate's *(4)*
inside *(5)*
insight *(1)*

Deposition of Gena Frasier

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

instance *(1)*
instances *(3)*
institution *(1)*
instructed *(1)*
instruction *(1)*
instructions *(1)*
insulin *(64)*
intake *(29)*
intense *(2)*
intent *(1)*
interacting *(2)*
interaction *(1)*
interactions *(2)*
intercom *(1)*
interested *(1)*
interesting *(1)*
interrupted *(1)*
intervention *(1)*
Interview *(3)*
inventoried *(1)*
involved *(3)*
involving *(4)*
isolating *(2)*
issue *(4)*
issues *(1)*
its *(1)*

< J >
J.kaminsky@kiernan
rebach.com *(1)*
jacket *(2)*
JACOB *(2)*
jail *(33)*
JAMES *(2)*
jeopardy *(1)*
job *(25)*
jobs *(2)*
John *(1)*
Join *(2)*
JONATHAN *(2)*
Josh *(1)*
JR *(4)*
judgment *(2)*
July *(2)*
jump *(1)*
jumped *(1)*
jumper *(1)*
jumpers *(2)*
June *(1)*

JUNG *(47)*
Jung's *(5)*
jury *(1)*
Justice *(2)*

< K >
KAMINSKY *(15)*
keep *(6)*
keeps *(1)*
Kennedy *(1)*
kept *(2)*
ketoacidosis *(1)*
key *(1)*
keys *(2)*
kick *(2)*
kicking *(3)*
kids *(1)*
Kiernan *(1)*
kill *(1)*
Kimball *(1)*
kind *(19)*
kit *(7)*
knew *(2)*
know *(214)*
Knowing *(1)*
knowledge *(2)*
known *(2)*
knows *(1)*

< L >
lack *(1)*
laid *(2)*
LALITHA *(1)*
late *(1)*
LAW *(5)*
lawsuit *(1)*
lawyers *(3)*
lay *(3)*
laying *(6)*
learn *(1)*
learned *(1)*
learning *(1)*
leave *(12)*
leaves *(1)*
leaving *(3)*
left *(7)*
legal *(2)*
legitimately *(1)*
level *(4)*

levels *(2)*
lie *(1)*
Lieutenant *(17)*
Lieutenants *(1)*
life *(1)*
lift *(1)*
limited *(1)*
Line *(5)*
lines *(3)*
list *(19)*
listen *(8)*
listened *(1)*
lists *(1)*
little *(24)*
live *(1)*
lived *(3)*
LLP *(1)*
located *(1)*
Lock *(32)*
lockdown *(19)*
lockdowns *(1)*
locked *(14)*
log *(2)*
logbook *(3)*
logs *(2)*
long *(27)*
longer *(4)*
look *(18)*
looked *(3)*
looking *(1)*
looks *(5)*
lost *(1)*
lot *(12)*
lotion *(1)*
loud *(6)*
LOUIS *(6)*
low *(3)*
lowest *(1)*
LT *(4)*
lunch *(1)*
lying *(7)*

< M >
making *(7)*
male *(3)*
males *(1)*
man *(2)*
Management *(13)*
management-wise *(1)*

manager *(1)*
manifestation *(1)*
manpower *(2)*
Margaret *(2)*
Margo@alcenter.org
*(1)*
MARIESHA *(4)*
marijuana *(1)*
mark *(3)*
MARKED *(6)*
Market *(1)*
mass *(2)*
mat *(1)*
matter *(6)*
mattress *(1)*
mattresses *(2)*
MAUREEN *(1)*
McNeil *(3)*
meal *(1)*
meals *(2)*
mean *(46)*
meaning *(9)*
means *(5)*
med *(5)*
medical *(121)*
Medical's *(1)*
medicate *(1)*
medication *(85)*
medications *(6)*
medium *(1)*
meds *(18)*
meet *(4)*
member *(1)*
members *(1)*
memorandum *(1)*
memory *(2)*
mental *(16)*
mention *(1)*
mentioned *(7)*
met *(3)*
MICHAEL *(1)*
Michael.pestrak@phil
a.gov *(1)*
middle *(2)*
mind *(3)*
minimal *(1)*
minimum *(1)*
minimum-level *(1)*
minute *(2)*

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 81 of 85

Deposition of Gena Frasier    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

minutes *(4)*
missed *(2)*
missing *(1)*
mm-hmm''s *(1)*
mom *(2)*
moment *(8)*
Monday *(2)*
money *(2)*
month *(1)*
monthly *(1)*
months *(3)*
morning *(3)*
mother *(2)*
mouth *(3)*
move *(29)*
moved *(16)*
movement *(6)*
moving *(9)*
multitask *(1)*
multitasking *(1)*

< N >
naked *(4)*
name *(17)*
names *(9)*
nature *(2)*
necessary *(1)*
need *(45)*
needed *(20)*
needle *(2)*
needles *(1)*
needs *(7)*
neighbors *(2)*
net *(2)*
never *(11)*
new *(6)*
Nia *(2)*
Nia@alcenter.org *(1)*
night *(7)*
nine *(1)*
nod *(1)*
nods *(1)*
noncompliance *(1)*
nonresponsive *(6)*
normal *(5)*
Normally *(3)*
Norristown *(2)*
Notary *(4)*
note *(1)*

noted *(1)*
notes *(1)*
notice *(3)*
notified *(3)*
notifies *(1)*
notify *(2)*
November *(9)*
number *(11)*
numbers *(8)*
nurse *(69)*
nurses *(16)*
nursing *(1)*

< O >
object *(1)*
Objection *(31)*
observation *(2)*
observed *(3)*
obstructing *(1)*
obstructs *(1)*
obviously *(11)*
occur *(1)*
occurred *(3)*
O'Connor *(1)*
office *(2)*
Officer *(75)*
Officers *(17)*
Officer's *(3)*
offices *(1)*
Official *(2)*
Oh *(11)*
okay *(114)*
old *(2)*
older *(1)*
on-call *(1)*
once *(16)*
ones *(3)*
ongoing *(1)*
on-the-job *(2)*
open *(24)*
opened *(1)*
opening *(1)*
operational *(1)*
opinion *(3)*
opportunity *(3)*
orally *(1)*
orange *(2)*
order *(6)*
orders *(2)*

outburst *(1)*
outcome *(1)*
out-of-cell *(2)*
outside *(3)*
overdoses *(1)*
overhear *(1)*
overheated *(1)*
overnight *(5)*
override *(1)*
overwhelming *(1)*

< P >
p.m *(20)*
PA *(2)*
pace *(1)*
package *(1)*
pad *(1)*
PAGE *(18)*
paged *(1)*
pagers *(1)*
pages *(2)*
paid *(1)*
pain *(11)*
pains *(1)*
pallets *(2)*
pamper *(14)*
pants *(4)*
paper *(1)*
paperwork *(1)*
paragraph *(4)*
paraphrase *(1)*
parents *(1)*
part *(6)*
particular *(2)*
particularly *(1)*
particulars *(3)*
partner *(3)*
Party *(2)*
pass *(6)*
passed *(3)*
patch *(1)*
patient *(2)*
patients *(1)*
PDF *(1)*
PDP *(6)*
PDQ *(5)*
peers *(5)*
Peirce *(1)*
Penn *(1)*

PENNSYLVANIA *(11)*
people *(30)*
pepper *(3)*
pepper-spray *(3)*
pepper-sprayed *(3)*
pepper-spraying *(1)*
percent *(2)*
perfectly *(1)*
perform *(2)*
period *(7)*
periods *(2)*
permanent *(1)*
person *(18)*
personally *(6)*
pertaining *(1)*
PESTRAK *(56)*
Pharmaceutical *(3)*
pharmacy *(1)*
PHILADELPHIA *(22)*
Philadelphia/Departm ent *(1)*
phone *(10)*
phones *(2)*
physical *(4)*
physically *(3)*
pick *(2)*
picked *(3)*
picking *(2)*
pill *(4)*
place *(3)*
placed *(1)*
places *(1)*
Plaintiff *(2)*
Plaintiff-1 *(1)*
Plaintiff-2 *(1)*
Plaintiffs *(3)*
Plaintiff's *(4)*
play-fighting *(1)*
playing *(2)*
Plaza *(1)*
plead *(1)*
please *(3)*
Plexiglass *(1)*
pod *(57)*
pods *(8)*
point *(6)*
police *(6)*

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 82 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

policies *(2)*
policy *(7)*
population *(3)*
port *(2)*
position *(4)*
possible *(10)*
possibly *(2)*
pot *(1)*
potential *(1)*
pour *(3)*
PP *(7)*
practice *(1)*
preferred *(1)*
prepare *(2)*
prepared *(1)*
prescription *(1)*
presence *(1)*
PRESENT *(2)*
pressure *(3)*
pretty *(6)*
previously *(1)*
printed *(1)*
printout *(3)*
prior *(8)*
prioritize *(1)*
priority *(1)*
prison *(7)*
prisoner *(3)*
prisoners *(3)*
Prisons *(9)*
probable *(1)*
probably *(13)*
probation *(1)*
problem *(6)*
problematic *(1)*
problems *(3)*
Procedure *(5)*
proceed *(1)*
process *(6)*
professional *(1)*
program *(5)*
programs *(1)*
progress *(25)*
prohibit *(1)*
Project *(13)*
promoted *(1)*
pronounced *(1)*
proper *(3)*
properly *(2)*

propounded *(1)*
protocol *(5)*
provide *(1)*
provided *(12)*
provider *(1)*
providing *(3)*
provision *(1)*
psychiatric *(4)*
psychiatrist *(1)*
psychologically *(1)*
Public *(4)*
pull *(1)*
pulled *(1)*
purpose *(2)*
purposes *(1)*
pursuant *(1)*
purview *(1)*
push *(1)*
pushed *(1)*
put *(48)*
putting *(1)*

< Q >
qualifies *(1)*
quarantine *(19)*
quarantine-specific *(1)*
question *(28)*
questions *(18)*
quick *(3)*
quickly *(4)*
quiet *(1)*
Quite *(2)*
quitting *(1)*
quote *(2)*

< R >
radio *(6)*
rambunctious *(1)*
ramp *(3)*
ran *(1)*
random *(1)*
range *(2)*
ranting *(1)*
rapport *(1)*
Rashatwar *(2)*
raving *(1)*
Ray *(2)*
RAYMOND *(1)*

read *(3)*
reading *(3)*
ready *(1)*
real *(1)*
realize *(1)*
really *(32)*
rear *(1)*
reason *(5)*
reasons *(5)*
rec *(10)*
recall *(67)*
receive *(12)*
received *(10)*
receives *(1)*
receiving *(7)*
recognize *(3)*
recognizing *(1)*
recollection *(13)*
Record *(23)*
recorded *(1)*
recording *(1)*
records *(2)*
recovery *(2)*
recreational *(1)*
red *(3)*
red-flagged *(2)*
reduced *(1)*
refer *(1)*
referral *(11)*
referrals *(2)*
referring *(1)*
refills *(1)*
refresh *(5)*
refrigerated *(1)*
refusal *(7)*
refusals *(2)*
refuse *(3)*
refused *(25)*
refuses *(3)*
refusing *(12)*
reg *(1)*
regard *(2)*
regarding *(2)*
regardless *(4)*
Regular *(7)*
rehabilitation *(1)*
related *(2)*
relation *(1)*
relationship *(2)*

relative *(1)*
released *(1)*
relevant *(2)*
relied *(1)*
relieve *(1)*
rely *(2)*
remain *(2)*
remedied *(1)*
remember *(85)*
remind *(1)*
rep *(2)*
repeat *(1)*
rephrase *(2)*
report *(6)*
Reporter *(1)*
reporting *(1)*
reports *(5)*
represent *(2)*
reproduction *(1)*
requests *(1)*
required *(2)*
requiring *(1)*
Residential *(2)*
resistant *(1)*
respect *(1)*
respond *(8)*
responding *(4)*
response *(8)*
responsibilities *(4)*
responsibility *(1)*
responsive *(1)*
rest *(2)*
restrain *(1)*
restricted *(4)*
resume *(2)*
returned *(1)*
returns *(1)*
revealed *(1)*
reverting *(1)*
review *(3)*
reviewed *(1)*
right *(34)*
risk *(2)*
risky *(1)*
Risperdal *(1)*
Road *(4)*
role *(4)*
roll *(5)*
rookie *(1)*

room  (7)
roommate  (1)
ROR  (1)
rotates  (1)
rough  (1)
roughly  (1)
rounds  (3)
routine  (1)
rover  (11)
rovers  (1)
Roxborough  (5)
Rules  (4)
run  (7)
running  (3)
Rupalee  (2)
Rupalee@alcenter.org  (1)

Rwittekind@okllp.com  (1)

< S >
safe  (6)
safely  (4)
safer  (2)
Safety  (7)
sake  (2)
sally  (2)
sample  (2)
Sarge  (1)
sat  (1)
Saturday  (1)
saw  (11)
saying  (11)
says  (43)
scenarios  (1)
Schaffer  (3)
school  (8)
screaming  (1)
screening  (1)
seal  (1)
search  (2)
searched  (5)
searches  (1)
second  (4)
section  (2)
secure  (10)
secured  (3)
security  (5)

see  (37)
seeing  (9)
seek  (1)
seen  (4)
seizure  (8)
seizures  (2)
send  (5)
sending  (1)
sense  (2)
sent  (2)
sentence  (1)
separate  (1)
Sergeant  (2)
series  (1)
serious  (1)
serve  (2)
served  (1)
Services  (2)
set  (4)
setting  (1)
severance  (2)
severe  (1)
shadowing  (1)
shampoo  (1)
Shapiro  (1)
share  (1)
shared  (1)
shares  (1)
sharing  (3)
Sheet  (1)
shift  (14)
shifts  (6)
shirt  (4)
shore  (2)
short  (17)
shortage  (1)
shortages  (3)
shortly  (2)
short-staffed  (8)
shots  (2)
show  (2)
showed  (4)
showers  (4)
showing  (4)
shown  (3)
shows  (2)
shut  (4)
shutdown  (3)
sic  (1)

sick  (6)
sicker  (3)
side  (4)
sign  (3)
signature  (3)
signed  (3)
Signon  (2)
signs  (11)
simple  (8)
sir  (2)
sisters  (1)
sit  (3)
sits  (1)
sitting  (14)
situation  (18)
situations  (4)
skip  (1)
skippies  (1)
sleeping  (1)
sleeve  (1)
slide  (1)
slides  (1)
slowly  (1)
small  (1)
smart  (1)
soap  (1)
social  (7)
somebody  (17)
somebody's  (2)
someplace  (1)
soon  (1)
Sorry  (7)
sort  (3)
sounded  (1)
sounds  (4)
SP  (2)
space  (5)
speak  (4)
speaker  (4)
speakers  (1)
speaking  (3)
Special  (6)
specific  (6)
specified  (1)
spell  (1)
spelled  (1)
spit  (1)
spoke  (4)
spoken  (2)

spray  (5)
sprayed  (1)
Spring  (3)
Squad  (1)
St  (1)
stable  (1)
staff  (39)
staffed  (2)
staffing  (4)
stand  (2)
standing  (3)
stands  (1)
start  (12)
started  (7)
starting  (3)
starts  (1)
state  (7)
stated  (3)
statement  (8)
STATES  (1)
stating  (3)
station  (1)
status  (1)
stay  (12)
stayed  (1)
staying  (3)
steel  (3)
stenotype  (1)
step  (2)
steps  (12)
stir  (1)
stomach  (3)
stop  (8)
stopping  (1)
story  (2)
straight  (2)
Street  (4)
stressful  (2)
stretcher  (56)
struggling  (1)
stuff  (4)
Suboxone  (2)
substance  (1)
substantial  (1)
succeed  (1)
such-and-such  (13)
sufficient  (2)
sugar  (5)
suggests  (1)

Case 2:24-cv-05618-TJS    Document 100-4    Filed 12/05/25    Page 84 of 85

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

suicidal  (2)
suicide  (1)
Suite  (3)
summer  (3)
summertime  (1)
Sunday  (1)
supervise  (1)
supervised  (1)
supervisor  (46)
supervisors  (7)
support  (4)
supposed  (14)
sure  (55)
suspended  (2)
suspending  (1)
Suspension  (3)
sustained  (1)
sweating  (1)
sweep  (1)
swinging  (1)
sworn  (2)
symptom  (1)
symptoms  (6)
syndrome  (1)
System  (9)

< T >
table  (1)
Tabor  (3)
take  (27)
taken  (6)
takes  (4)
talk  (3)
talked  (12)
talking  (22)
talks  (1)
taught  (2)
TB  (2)
teacher's  (1)
teaching  (1)
team  (4)
tell  (30)
telling  (9)
temp  (1)
temperature  (1)
temporary  (1)
Ten  (5)
tend  (6)
tentatively  (1)

term  (6)
terms  (2)
test  (2)
testified  (2)
testify  (1)
testifying  (1)
testimony  (3)
tests  (1)
thank  (7)
thankful  (1)
thin  (1)
thing  (11)
things  (23)
think  (73)
thinking  (1)
third  (2)
thoroughly  (2)
thought  (2)
three  (10)
three-quarters  (1)
thrown  (2)
Thursday  (1)
TID  (1)
tier  (8)
time  (90)
timeframe  (2)
timeline  (1)
time-permitting  (2)
times  (9)
time-wise  (1)
timing  (1)
title  (1)
today  (11)
today's  (1)
told  (19)
tomorrow  (1)
ton  (1)
tone  (1)
tonight  (1)
toothbrush  (1)
toothpaste  (1)
top  (14)
touch  (3)
touched  (3)
tour  (15)
toured  (1)
tours  (7)
track  (31)
trained  (9)

training  (28)
trainings  (4)
transcribed  (1)
transcript  (3)
transcription  (2)
transferred  (1)
transfers  (1)
Transition  (12)
transpire  (1)
transport  (3)
transported  (1)
trash  (2)
trashed  (1)
treat  (1)
treated  (1)
Treatment  (8)
Trebach  (1)
trick  (1)
tried  (1)
triggered  (1)
trip  (3)
TRIVIKRAM  (1)
trouble  (2)
true  (2)
trust  (1)
truth  (3)
try  (37)
trying  (17)
Tuesday  (1)
turn  (2)
TV  (3)
twice  (1)
Two  (27)
type  (5)
types  (1)
typical  (2)
typically  (19)

< U >
unattended  (1)
unconscious  (1)
uncontrollably  (1)
underlying  (1)
underneath  (4)
understand  (9)
understanding  (6)
understood  (5)
unemployment  (1)
unfortunately  (3)

Union  (1)
Unit  (92)
UNITED  (1)
units  (7)
unusual  (2)
upstairs  (5)
urgent  (6)
urine  (4)
use  (7)
usually  (2)

< V >
vacancies  (1)
Valley  (1)
valuables  (1)
varies  (1)
various  (1)
vary  (2)
verbal  (9)
verbally  (2)
verifies  (1)
Vice-versa  (1)
video  (23)
view  (2)
vigilant  (1)
violating  (1)
visit  (7)
visiting  (1)
visitor  (2)
Visits  (2)
visual  (1)
visualize  (1)
Vital  (3)
vitals  (3)
voice  (1)
voluntarily  (1)
vomit  (2)
vomiting  (1)
vs  (1)

< W >
wait  (3)
waiting  (1)
waived  (2)
wake  (1)
walk  (13)
walked  (4)
Walker  (7)
walkie  (2)

walking  *(9)*
wall  *(1)*
**WANDA**  *(4)*
want  *(49)*
wanted  *(9)*
wants  *(7)*
warnings  *(1)*
warrant  *(1)*
warranted  *(1)*
watch  *(2)*
watching  *(6)*
water  *(6)*
way  *(10)*
Weaner  *(3)*
weapons  *(1)*
wear  *(2)*
Wednesday  *(1)*
week  *(7)*
weekly  *(1)*
weeks  *(1)*
Well  *(52)*
went  *(23)*
we're  *(22)*
Werner  *(1)*
We've  *(2)*
wheelchair  *(4)*
**WHEREOF**  *(1)*
whoever's  *(1)*
who've  *(1)*
wife  *(1)*
willing  *(3)*
willingly  *(1)*
wind  *(1)*
window  *(4)*
windows  *(3)*
wipe  *(1)*
wish  *(3)*
withdrawal  *(2)*
withdrawn  *(1)*
**WITNESS**  *(44)*
witnesses  *(1)*
**WITTEKIND**  *(25)*
wondering  *(1)*
word  *(1)*
words  *(1)*
work  *(21)*
worked  *(21)*
worker  *(6)*
workers  *(23)*

working  *(13)*
works  *(1)*
worried  *(1)*
worse  *(1)*
wound  *(4)*
wounds  *(2)*
Wow  *(2)*
wrap  *(1)*
write  *(6)*
write-up  *(7)*
writing  *(1)*
written  *(5)*
wrong  *(3)*
wrongdoing  *(1)*
wrote  *(3)*

**< Y >**
yard  *(2)*
Yeah  *(28)*
year  *(12)*
years  *(18)*
yell  *(10)*
yelled  *(1)*
yelling  *(8)*
**YESCARE**  *(3)*
Yo  *(1)*

**< Z >**
zero  *(1)*