# Exhibit E

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                          - - -

 4    JACOB and JAMES JUNG,      )   CIVIL DIVISION
      as Administrators of       )
 5    the Estate of LOUIS        )   Case No.:
      JUNG, JR.,                 )   2:24-cv-05618-TJS
 6                               )
              Plaintiffs,        )   Deposition of:
 7                               )   WANDA BLOODSAW
          vs.                    )
 8                               )   Filed on Behalf of the
      CITY OF PHILADELPHIA;      )     Plaintiffs
 9    YESCARE CORP.; BLANCHE     )
      CARNEY, Former             )   Counsel of Record for
10    Commissioner of           )     This Party:
      Philadelphia Department    )
11    of Prisons; LALITHA        )   Bret Grote, Esq.
      TRIVIKRAM; MAUREEN GAY;    )   Nia Holston, Esq.
12    MARIESHA APOLLON; BLAIR    )   Rupalee Rashatwar, Esq.
      CABELLOS; GENA FRASIER;    )   Margaret Hu, Esq.
13    WANDA BLOODSAW,            )   ABOLITIONIST LAW CENTER
                                 )   990 Spring Garden St
14            Defendants.        )   Philadelphia, PA 19123

15

16

17                          - - -

18

19

20

21

22

23    Everest Job No. 43833

24

25
```

```
 1              DEPOSITION OF WANDA BLOODSAW,

 2        a Defendant herein, called by the Plaintiffs

 3        for examination, taken pursuant to the Federal

 4        Rules of Civil Procedure, by and before

 5        Alexander Schaffer, a Court Reporter and Notary

 6        Public in and for the Commonwealth of

 7        Pennsylvania, at the offices of the

 8        Abolitionist Law Center, 990 Spring Garden

 9        Street, Philadelphia, Pennsylvania 19123, on

10        Tuesday, August 12, 2025, commencing at

11        10:04 a.m.

12        COUNSEL PRESENT:

13        On behalf of the Plaintiffs:
           BRET GROTE, ESQ.
14         NIA HOLSTON, ESQ.
           RUPALEE RASHATWAR, ESQ.
15         MARGARET HU, ESQ
                    Abolitionist Law Center
16                  990 Spring Garden Street
                    Philadelphia, Pennsylvania 19123
17                  Bretgrote@abolitionistlawcenter.org
                    Nia@alcenter.org
18                  Rupalee@alcenter.org
                    Margo@alcenter.org
19

20        On behalf of Defendants the City of
          Philadelphia, Wanda Bloodsaw, Gena Frasier, and
21        Blanche Carney:
           MICHAEL E. PESTRAK, ESQ.
22                  City of Philadelphia Law Department
                    1515 Arch Street
23                  17th Floor
                    Philadelphia, Pennsylvania 19102
24                  Michael.pestrak@phila.gov

25
```

```
 1        On behalf of Defendants YesCare and Blair
          Cabellos:
 2         RAYMOND R. WITTEKIND, JR., ESQ.
                      O'Connor Kimball LLP
 3                    Two Penn Center Plaza
                      1500 John F. Kennedy Boulevard
 4                    Suite 1100
                      Philadelphia, Pennsylvania 19102
 5                    Rwittekind@okllp.com

 6        On behalf of Defendant Mariesha Apollon:
           JONATHAN KAMINSKY, ESQ.
 7                    Kiernan Trebach
                      1801 Market Street
 8                    Suite 770
                      Philadelphia, Pennsylvania 19103
 9                    J.kaminsky@kiernantrebach.com

10                         -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                     I N D E X

2                   EXAMINATIONS

3     WITNESS:

4      WANDA BLOODSAW

5      By ATTORNEY GROTE..........................   5
       By ATTORNEY KAMINSKY.......................  92
6      By ATTORNEY WITTEKIND......................  95
       By ATTORNEY KAMINSKY.......................  97
7      By ATTORNEY PESTRAK........................  98
       By ATTORNEY GROTE.......................... 108

8

9                 EXHIBITS MARKED

10     EXHIBIT NO.        DESCRIPTION          PAGE
       Plaintiffs'    Corizon Health education   34
11     Exhibit 1      slides, diabetes
       plaintiffs'    Disciplinary documentation  52
12     Exhibit 2

13                     -  -  -

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

P R O C E E D I N G S

WANDA BLOODSAW, a Defendant herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY ATTORNEY GROTE:

Q.   Good morning, Ms. Bloodsaw.

A.   Good morning.

Q.   My name is Bret Grote.  I'm counsel for Plaintiffs in this case, which are Jacob and James Jung as the administrators of the estate of Louis Jung, Jr.

Can you please state your full name for the record.

A.   Wanda Bloodsaw.

Q.   And so I'm going to be asking you questions today.  Have you ever given a deposition before?

A.   I have.

Q.   And how many times?

A.   Just once.

Q.   And what was that in regard to?

A.   When I was assigned to the prison's Internal Affairs Department, I had taken a complaint from another correctional authority,

Page 6

and he brought up a complaint against the Deputy Commissioner.

Q.   So were you -- you weren't a party in that lawsuit?

A.   No.

Q.   Just a witness?

A.   Just a witness.

Q.   Okay.  So some of this might be a refresher.  I'm going go over some of the ground rules in the beginning.

We have to speak out loud, no head nods or "mm-mm," "mm-hmm" -- even though I just did that -- because the court reporter can't pick that up.

If you do not know or remember something, let me know if there is something that might refresh your recollection.  If you answer a question, I will assume that you've understood the question.

ATTORNEY PESTRAK:  I'm just going to chime in.

So that means if you don't understand, tell him so that he knows you don't before you answer.

BY ATTORNEY GROTE:

Page 7

Q.   Exactly.  And if your counsel objects, you can still answer the question, if you understand the question, unless your counsel instructs you not to answer the question.

A.   Okay.

Q.   Are you prepared to give a deposition today?

A.   Yes.

Q.   And did you do anything to prepare for today's deposition?

A.   No.  Just go over questions.

Q.   So, without telling me about any conversations you had with your attorney, did you review any records prior to coming in today?

A.   No.

Q.   Okay.  And where do you work, currently?

A.   I am currently assigned to Riverside Correctional Facility, Philadelphia Department of Prisons.

Q.   And are you a Lieutenant still?

A.   Yes.

Q.   And how long have you worked at

Page 8

Riverside?

A.   Since the 21st of July.

Q.   And can you -- when did you begin working in the Philadelphia Department of Prisons?

A.   December 2004.

Q.   Now, prior to that -- I'm going to ask you to just go through your educational history post-high school, or you can tell me where you graduated from high school and then your employment history up until December 2004, and then I'm going to ask you some history about your employment within Philadelphia Department of Prisons.

But, with that as an understanding, can you just start with your educational history, and just share it.

A.   I graduated from Parkway Program in 1987.  I have about a year of college, from Community.  That's it.

Q.   And what was Parkway Program?

A.   High school.

Q.   Okay.  Thank you.  Is that in Philadelphia?

A.   Yes.

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 7 of 57

Deposition of Wanda Bloodsaw                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 9

Q.   Prior to working at PDP -- and if I say "PDP," I'm referring to Philadelphia Department of Prisons -- what was your employment history?  What jobs did you have?  What did you do?

A.   I worked for SEPTA for 10 years.

Q.   What did you do there?

A.   I was a bus driver.

Q.   Anything else in your employment history?

A.   Prior to that, I worked in Provident National Bank as a teller, and promoted to a lead teller.  Citizens Bank as a teller, and then a lead teller.

A dental office as a receptionist, and promoted to, I guess, like, a supervisor receptionist.

Q.   And when you began with PDP, what was your initial role?

A.   I started as a Correctional Officer.

Q.   As a Correctional Officer, what sort of things were you, generally, responsible for?

ATTORNEY PESTRAK:  Objection to form.

You can answer.

Page 10

THE WITNESS:  As a Correctional Officer, I was in charge of inmates, securing -- and their safety.  I was assigned to the armory, in charge of handling weapons and assigning them to other correctional staff that may have to go out on hospital trips or take other inmates on clinic trips.

Key control.  I was also assigned to center control, which does movement when inmates are being moved from one housing area to another housing area or being discharged, making sure the census and head count is correct when someone is discharged or transferred to another facility.

Q.   And how long were you a Corrections Officer before you were -- what was your next promotion?  When was it?

A.   Sergeant.

Q.   And when did you --

A.   I became a Sergeant in September 2009.

Q.   And how was being a Sergeant different from being a Corrections Officer?

A.   Now I'm -- as a Sergeant, I am in

Page 11

charge of officers as well as inmates.

I conduct roll call, which is 10 minutes prior to our shift, which -- at that time, I was on the 3:00 p.m.-to-11:00 p.m. shift.  So we would conduct -- or I would conduct roll call at 2:50 p.m.; that's giving the Correctional Officers their assigned posts, filling in where needs to be, if I need to keep someone from the prior shift, making sure the count is correct, the census and the head count, where the Correctional Officers conduct the count on their assigned posts, calling in to the sergeant.  And then I make sure all the numbers are correct.

Just, basically, supervising.

Q.   Supervising the Corrections Officers?

A.   Yes.

Q.   And how long were you a Sergeant?  And what was your next role?

A.   I was a Sergeant for 14 years.  And then, recently, 2023, I was promoted to Lieutenant.

Q.   And was that around the end of October, if you remember?

Page 12

A.   Yes.

Q.   And how is a Lieutenant different from being a Sergeant?

A.   Well, now I am in charge of Correctional Sergeants, Correctional Officers, as well as inmates.

I have to conduct investigations for incidents that occur in the facility with Correctional Officers, with any Correctional Staff, as well as inmates.  Supervising, again, to make sure that the Sergeants and the correctional staff are doing their job.

With the staff being as short as it has been, I've been taking on roles of a Correctional Sergeant and Correctional Officer, as well as my own duties.

That's basically it.

Q.   Thank you.  Do you have any disciplinary history within the PDP?  And what I mean by that is:  Have you ever been found to have violated policy or rules by your employer?

A.   Prior to this incident?

Q.   Including this incident.

A.   Including this incident.  Prior to, no, no discipline.  Maybe a counseling, but no

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 8 of 57
Deposition of Wanda Bloodsaw
Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 13

major -- this incident was my first
disciplinary. And then I had another one after
this one.

Q. And what was the one after this one?

A. Another death. Where an inmate,
basically, beat another inmate to death.

Q. And what policy were you found to
have been in violation of in that incident?

A. Not taking proper action.

Q. And when was this death?

A. January 28, 2024.

Q. And do you remember the name of the
decedent?

A. I believe Mike Osbourne.

Q. And do you remember, in that matter,
how many policies you were found to have been
in violation of?

A. I don't remember.

Q. And was discipline imposed as a
consequence?

A. Yes.

Q. And what was that?

A. Thirty-day suspension.

Q. And for this incident -- I'll come
back to this later -- but was it a 15-day

Page 14

suspension?

A. For this incident, yes.

Q. I believe you said prior this
incident, you maybe received some counseling.
Is that referring to something that would not
be discipline but an informal counseling?

A. Correct.

Q. And did you have any specific
incident in mind that you were counseled on
when you said that?

A. During my duty in Internal Affairs,
a disciplinary write-up was not served to the
Deputy Warden, at that time, in a timely
manner, so I was counseled for that.

Q. And with the January 2024 incident,
involving -- you believed the name was
Mr. Osbourne -- what action did your superiors
believe you should have taken in that
situation?

A. In that situation, I was told that I
should have moved the inmate who did the
murder; I should have moved him off the housing
area, and I did not.

Q. And why did they say that he should
have been moved off the housing area?

Page 15

ATTORNEY PESTRAK: Objection
to form.

But you can answer.

THE WITNESS: Because he was
housed with Mr. Osbourne, and they were about
20 years apart. So I was told I should not
have housed the younger gentleman with
Mr. Osbourne.

BY ATTORNEY GROTE:

Q. As Lieutenant, are housing decisions
within the scope of your responsibilities?

A. They are.

Q. Do other people have
responsibilities around housing, as well,
assignments?

A. No, the officers don't have that
responsibility. If they feel they want to move
someone, they would either ask the Sergeant,
and then we would have to ask the movement
officer, which tell us where there is space for
somewhere else and if this person has
separation from someone else.

Q. And what rank is the movement
officer?

A. Correctional Officer.

Page 16

Q. But, movement, that's their specific
domain? They know about movement and
separations and things pertaining to that
classification?

A. Yes.

Q. Now, I want to go back to 2004
again, when you became a Correctional Officer,
if you could just give an overview of what you
remember of your training: Who provided it;
where it was provided; what subjects you
covered.

I know that can be a pretty big
question, so I'm happy to break it down. But I
thought I'd start and give you the opportunity
to just talk about what you remember of your
training.

A. Well, we -- I was in the Training
Academy for, I believe, 11 weeks.

We learned policies, how to use the
computer system that we were on at the time.
We had testing. We had physical training, how
to use a weapon, how to shoot the weapon.

Basically, it's like a classroom, so
we had testing on the policies that we learned.

Q. Where is the Training Academy?

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 9 of 57

Deposition of Wanda Bloodsaw                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 17

A.    It was on Torresdale Avenue at that time.

Q.    Okay.  And did you receive training in managing housing units?

A.    We did.  How to run your housing area as Correctional Officer, what you should or should not do.

Q.    What, in general, did that encompass?

A.    If you see an argument, try to de-escalate the situation before it escalates to physical.  How to do your head count.  How to do your census.  How to write passes for the inmates to go out to school or to medical or whenever they leave their -- housing area that they're assigned to.

Q.    What is a census?

Is that a synonym for "count"?

A.    The census is the overall count, yes.  It is the count, it's the overall count.

Q.    I thought that might be the case.

In terms of making rounds as a Corrections Officer, when I use that term, "making rounds," what does that refer to, to you?

Page 18

A.    That's the tours that the Correctional Officer does every half hour.

Q.    And that was one of my questions.

Every half hour?

A.    Yes.

Q.    And what is the -- what are you looking for when you're making rounds?

A.    To make sure there is no one -- make sure everybody is moving, make sure everyone is alive.

Q.    And would rounds be documented?

A.    Yes.

Q.    And that was all the way up through to the present?

A.    Yes.

Q.    How would they be documented?

A.    In the computer, you just put in "Correctional Officer Bloodsaw conducted a tour."

Q.    Were you trained on responding to the medical needs of inmates in any way?

A.    Yes.

Q.    And what did that consist of?

A.    If an inmate needed medical attention, I can't diagnose them, so I would

Page 19

call for a stretcher, which -- I would do it over the handheld radio, "Stretcher is needed to" whatever housing area, and Medical would respond.

Q.    Okay.  Would Corrections Officers ever escort nursing staff in certain situations?

A.    Yes.

Q.    In what situations?

A.    Whenever the nursing staff is on the housing area, the nursing staff -- no civilian is supposed to be left alone; they are supposed to be escorted with correctional staff.

Q.    Are all medical staff considered civilians?

A.    Yes.

Q.    And in what circumstances would medical staff come onto a housing unit?

A.    Back when I was an officer, they did not unless there was an emergency.

Q.    And you're now not an officer, so has that changed?

A.    As a Lieutenant, things have changed.  The medical staff come on to do sick call, where an inmate may put in something on a

Page 20

computer that maybe they are having some kind of issue, and then the nurse will come and see them or talk to them.

They have some other -- I'm not sure what it's called, where they come and maybe check -- like, a follow-up appointment, and they would come on the unit.

Q.    So they do some of that on the unit now?

A.    Yes.

Q.    Do you have an approximate idea of when that began to happen?

A.    I don't.

Q.    The date that's the focus of this case -- the dates, you know when Mr. Jung was there -- was that sometimes a practice?

A.    Yes.

Q.    What about medication administration?  How is that done?

A.    There is a window that -- it's called a "dispensary" or a "servery," where the nurse is behind the window, and the inmates who receive medication go to that window and receive their medication.

Q.    And is that for all housing units or

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 10 of 57

Deposition of Wanda Bloodsaw                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 21

1  does that vary in any particular housing units?
2      A.   All housing units.
3      Q.   Are any medications ever distributed
4  on the housing units?
5      A.   On the housing unit, no.
6      Q.   And do Corrections Officers ever
7  escort inmates to medical appointments?
8      A.   Yes.
9      Q.   Do they escort them to all medical
10 appointments?
11     A.   No.
12     Q.   Which ones would they --
13     A.   Well, not appointments.  They
14 will -- if an inmate is called down to Medical,
15 or if the inmate may be having an issue but
16 they can walk, then they are escorted down to
17 Medical.
18          But for their appointments, if
19 Medical call for them for an appointment,
20 they're just given a pass, and they are able to
21 walk to Medical on their own.
22     Q.   Have you ever heard the term
23 "universal" or "standard precautions"?
24     A.   No.
25     Q.   Were you trained in responding to

Page 22

1  medical emergencies?
2          ATTORNEY PESTRAK:  Objection
3  to form.
4          You can answer.
5          Technically, you asked that already.
6  BY ATTORNEY GROTE:
7      Q.   Just as a -- well, specifically, if
8  -- how are you instructed to deal with
9  recognizing and responding to potential medical
10 emergencies?
11         ATTORNEY PESTRAK:  Same
12 objection.
13         You can answer.
14         THE WITNESS:  I don't
15 recognize -- I wasn't trained to recognize what
16 the problem was.
17         If the inmate tells me, "I can't
18 breathe," that's something I would call for a
19 stretcher, "I'm dizzy" or -- it depends on if
20 the inmate cannot get to Medical on his own.
21 That's when I would call for Medical to come to
22 the housing area.
23 BY ATTORNEY GROTE:
24     Q.   So if somebody has a health
25 complaint, is it fair to say that your role is

Page 23

1  to contact medical?
2      A.   If they have a "health complaint"?
3      Q.   If they're complaining about
4  something that would sound like a symptom of a
5  physical issue or of a potential illness.
6      A.   If they tell me that they have a
7  particular illness, and maybe they haven't
8  taken their medication, I would have the
9  officer call Medical and ask if I could send
10 that particular person down because they didn't
11 get their medication.
12     Q.   In those circumstances, would you
13 document making that call?
14     A.   I would tell the officer to document
15 what the inmate said to me or what the inmate
16 may have said to the officer and what nurse or
17 what medical staff they spoke to and what the
18 medical staff may have told them.
19     Q.   So -- just so I'm clear now, because
20 I've asked you a lot of questions about, you
21 know, 20-plus years in PDP -- as a Lieutenant,
22 if you're supervising officers, and an inmate
23 requested medical attention, and a call was
24 made to Medical, who would document that that
25 call was made, you or the officer you're

Page 24

1  supervising that's involved?
2      A.   The Correctional Officer.
3      Q.   Okay.  Are there instances where
4  you, as the Lieutenant, would be the one who
5  would document making a call to Medical?
6      A.   No.
7      Q.   How long does it take to make the
8  rounds or do the tour of a housing unit?
9          ATTORNEY PESTRAK:  Objection.
10 Are you -- do you mind clarifying the facility?
11         ATTORNEY GROTE:  Yeah, let's
12 do that.
13 BY ATTORNEY GROTE:
14     Q.   Are all the housing units the same
15 size or not in PDP or does it vary?
16     A.   No, they're not.
17     Q.   CFCF, how much variety is there in
18 the size of housing units?
19     A.   CFCF, housing units are the same
20 size.  But there are four housing units per
21 floor, which is two floors.  Each housing unit
22 has 32 cells and four multipurpose rooms, so it
23 holds about 60 -- I'm sorry -- 80 inmates per
24 housing unit.
25     Q.   And so when an officer makes a tour,

Deposition of Wanda Bloodsaw                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 25

1 how many of these units are they responsible
2 for in a tour?
3      A.   Just that one.
4      Q.   Okay.  And how long, approximately,
5 does it take an officer to make a tour like
6 that?
7      A.   It varies.  If they are making the
8 correct tour -- I really can't answer how long.
9      Q.   When they're making the tour, what
10 are they looking for when they're looking into
11 the cells?
12           When individuals are inside the
13 cell, are they -- I guess what is the -- if
14 they're doing a wellness check or if they're
15 making sure there is not an issue, how do they
16 do that or what are they looking for?
17      A.   Well, they're looking for the inmate
18 to be breathing or moving, making sure there is
19 no sheets hanging from the ceiling to the
20 floor.  A lot of the inmates like to cover
21 their bed, so if you can't see the bed, then
22 that can prolong the tour.  Because if the
23 officer is the only officer on that housing
24 area, they have to get assistance so that they
25 can open that door or move the sheet, or tell

Page 26

1 the inmate to move the sheet.
2      Q.   What if somebody is asleep?  How
3 does the officer address that?  I mean, if they
4 can't exactly see if somebody is breathing, per
5 se, how can they make that call?
6      A.   They can call his name, knock on his
7 door.  As long as the inmate moves something,
8 that's how they know that they're breathing.
9      Q.   I'd like to show you, if I can --
10 this is not an exhibit yet.  Give me one
11 moment.
12           All right.  Now, do you see this
13 right here, just the type of document it is?
14      A.   Yes.
15      Q.   Now, is that what's known as -- is
16 that the lock-and-track system or the housing
17 log?
18      A.   That's the lock-and-track system,
19 which is the housing logbook.  So --
20      Q.   So they're --
21      A.   Yes.
22      Q.   -- one and the same?
23      A.   Yes.
24      Q.   And so when rounds are made, are
25 they entered into that system?

Page 27

1      A.   Yes.
2      Q.   And if there was an incident
3 involving a call made to Medical, it would be
4 in that system?
5      A.   Yes.
6      Q.   And who has access to that, both who
7 can enter information into it and who can read
8 that information?
9      A.   The Correctional Officers and
10 Sergeant and Lieutenant.
11      Q.   Who's above Lieutenant?  Major?
12      A.   Captain.
13      Q.   Now, what -- do you have refresher
14 trainings?  You had the Training Academy I
15 asked you about.  How often do you have to have
16 ongoing training as an employee of PDP?
17      A.   We have policy training once a year,
18 but we don't go into the Training Academy.
19 It's just a policy is handed to us; we go over
20 it, we sign that we received it and understand.
21      Q.   Is there -- what is considered an
22 emergency in the jail setting?
23      A.   Fighting with weapons.  Someone who
24 cannot breathe, can't move.  There are
25 different types of emergencies.  There are high

Page 28

1 emergencies, low emergencies.
2      Q.   Fair.  So I'll ask you about a few
3 situations, just how you would respond, in
4 general.  I know not all assaults are equal,
5 are the same.  But if there is an assault,
6 you're the Lieutenant, what is it you're
7 supposed to do to respond?
8           ATTORNEY PESTRAK:  Objection
9 to form.
10           You can answer.
11           THE WITNESS:  "If there is an
12 assault," meaning inmate on inmate?
13 BY ATTORNEY GROTE:
14      Q.   Let's start there.  Inmate on
15 inmate, yes.
16      A.   Okay.  So I wouldn't know, unless
17 the officer calls for -- what they would call
18 for is, like, a response, a local response, if
19 it's something that they can't handle.
20      Q.   And so what is the officer supposed
21 to do when there is an inmate-on-inmate
22 assault?
23      A.   They call for a local response,
24 which gives them assistance with other
25 officers.

Page 29

Q.   Okay.

A.   When that is called, that's usually when the Sergeant would respond.  If the Sergeant can't handle it, then the Sergeant will call for a secondary response.  Then the Lieutenant would respond.  Once the Lieutenant responds, if the Lieutenant can respond and de-escalate the problem, we separate the inmates from one another.

They go to Medical separately.  Even if there is no injuries that we could see, they would go to Medical separately, and let Medical say if there is an injury or no injury.  If there is injury, they go to punitive segregation; if there is no injuries, then they would, of course, receive disciplinary write-ups and be separated.  One may be moved from the housing area, or they may be both moved to separate housing areas.

Q.   Thank you.  What if -- what is the response from officers, and then up the chain, as appropriate, if there was a self-harm incident or suicide attempt?

ATTORNEY PESTRAK:  Objection to form.

Page 30

You can answer.

THE WITNESS:  If there is self-harm, that would be a high priority, so that would be medical staff first, local response.  Usually, we know when Medical is called first, it's something serious, so that's when all supervisors respond.

Medical staff will let us know if they need additional medical staff.  So we'll call for additional medical staff, and then that's when the Captain will respond to find out what's going on.

BY ATTORNEY GROTE:

Q.   And what if -- what is a Corrections Officer's response to be if they observe an inmate behaving in such a way that they think there might be a mental health issue?

And I can explain, a little bit, what I mean.  But if somebody is talking to themselves if no one else is around, if somebody's not able to engage kind of rationally with the Corrections Officer, or they engage in another behavior that seems abnormal, but there is not a self-harm incident, not an immediate threat to bodily

Page 31

safety, what then?

ATTORNEY PESTRAK:  Objection to form.

You can answer.

THE WITNESS:  The Correctional Officer would put in an electronic mental health referral.

The referral, according to the questions they answer, how it's answered, either it would come up as a routine or an emergency.  If it's an emergency, the supervisor is informed of the situation.  That inmate would have to be handcuffed and escorted to Mental Health right away.  If it's routine, that's something that Mental Health will make an appointment to see them.  If it's -- it's emergency, routine, or urgent.  Urgent would be they have 24 hours to see that person, but emergency is immediately.

BY ATTORNEY GROTE:

Q.   And -- similar question, but with medical issues -- let's say an inmate is not -- he's breathing or she's breathing, but they're not being responsive or mobile, they're not up and moving around.  What's the response, then,

Page 32

from Corrections?

ATTORNEY PESTRAK:  Objection to form.

You can answer.

THE WITNESS:  If the inmate is not moving around -- it depends.  If they're just staying in the cell and they're not coming out, of course, the officer should ask, you know, if there is a problem, especially if the person is usually out doing recreation.

Usually, the inmate, if he can talk, would let the officer know, "I'm not feeling well."  Then the officer should call Medical and let Medical know, "Okay.  He said he doesn't feel good," or whatever the case is, and it's up to Medical to say, "Send him down" or tell him to put him in sick call.  We would have to let them know exactly what's going on.

BY ATTORNEY GROTE:

Q.   And so if an inmate were verbally expressing that they were in pain, is that something that you would call Medical about?

ATTORNEY PESTRAK:  Objection. Form.

THE WITNESS:  Yes.

Case 2:24-cv-05618-TJS　　Document 100-5　　Filed 12/05/25　　Page 13 of 57

Deposition of Wanda Bloodsaw　　　　　　　　　Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 33

BY ATTORNEY GROTE:

Q. And if it appears that they're unable to move, would you also contact Medical in those instances?

ATTORNEY PESTRAK: Objection to form.

You can answer.

THE WITNESS: If he appears not to be able to move, yes, that would be something we call Medical for.

BY ATTORNEY GROTE:

Q. If he stated -- if it was a "he" -- that he was unable to move, then would you call Medical?

ATTORNEY PESTRAK: Objection. Form.

You can answer.

THE WITNESS: Yes.

BY ATTORNEY GROTE:

Q. Were you ever provided training on any specific medical conditions to look out for certain symptoms of?

A. No.

ATTORNEY GROTE: I'm going to -- we can mark this Plaintiffs' Exhibit "1."

Page 34

For the record, this is marked Jung - City Production 004398 through 004400.

(Plaintiffs' Exhibit 1 was marked for identification.)

BY ATTORNEY GROTE:

Q. Just look this over.

And have you ever seen this document, that you recall?

A. I believe so.

Q. And where do you believe you have seen it?

A. In training, before roll call.

Q. And can you break that down a little bit? What training happens before roll call?

A. Medical staff will come in. They may or may not show a video. And they'll pass out these pamphlets for us to read.

Q. And do you -- how many times do you think that you've seen this or something like this? Once, more than once? Is it a routine thing? If you recall.

A. I don't recall.

Q. Are you familiar with diabetes, whether through training or otherwise?

A. I'm familiar with it. I am familiar

Page 35

with diabetes.

Q. And I'm not asking for expert medical knowledge, but what's your understanding of diabetes?

A. I've seen people -- well, yeah, I've seen people that have diabetes, when they start to sweat profusely they -- somebody may give them orange juice. I've seen inmates take insulin shots.

That's basically it.

Q. And where is insulin administered in the jail? Is it in the med line -- excuse me -- in the dispensary?

A. It is not.

Insulin shots are given in the Unit Management area at CFCF, where the nurse is back near the supervisor's office, and there is a small triage room. The inmate comes in and pricks his finger, gives his numbers, and the nurse knows how much insulin to give him.

Q. Is that for all the housing units in CFCF?

A. Yes.

Q. When does an inmate go to receive insulin? Are there set times that they would

Page 36

go to receive insulin? Or would they be able to -- yeah, I guess, how would that work?

A. The nurse comes approximately the same time. Some inmates get it twice a day; some get it once a day. Sometimes the nurse will do it before she does the regular medication; some nurses will do it after they get the regular medication. So there is no time, "At 3:00 it's insulin and Accu-Chek"; it's around that approximate time.

Q. So this was in the triage room -- wait, excuse me -- the triage area of the unit management room? Did I get that correct?

A. Yes.

Q. Can you describe that area to me?

How big is it? How many people can fit in the room?

A. Unit Management is an office that holds about three offices in there: You have social workers; you have the Lieutenant's office; and you have a small triage area, where the nurse goes.

There's a room with a gurney, and there is another small room, I guess, where the nurses keep the medication away from the

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 14 of 57

Deposition of Wanda Bloodsaw                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 37

inmate.

There's two restrooms:  One for staff; one for inmates.  There is a laundry room.  So it's a pretty big area that holds other rooms in it.

Q.    When a nurse would be administering insulin, would they be doing that -- would Corrections Officers be present during that?

A.    Yes.

Q.    How many, usually?

A.    One.

Q.    And why was that?

A.    Why is it just one?

Q.    Just why is it one at all?  Is it --

A.    Safety issue.

Q.    Are there any other symptoms that you understand are associated with diabetes?

I say "other" because you mentioned one earlier -- I forgot what you said, exactly -- but are there other symptoms you understand to be related to diabetes?

A.    No.  Not unless I see it and someone tells me, "He or she has diabetes."  But no.

Q.    As a Corrections Officer, Lieutenant, or Sergeant -- and you can tell me

Page 38

the difference between the three in relation to this question -- would you know who had diabetes of those in custody?

A.    Not unless they tell us.

Q.    Would medical staff ever alert corrections if an inmate-patient missed a medical appointment, missed their medication, etc.?  Is that the sort of thing that would ever be brought to the attention of correctional staff?

A.    No.

Q.    Okay.  So, more specifically, if somebody missed their insulin, you would never get calls from Medical, saying, "Hey, we need to see so-and-so because they need to come get their insulin"?

A.    Yes.

Q.    You would get a call?

A.    Yes.  We would get a call if that person has missed it and -- something that they need to have right away, yes, we would get a call, and they'd say, "Send them to Medical."

Q.    Who would be responsible for initiating that?  Would it be Medical?

A.    Initiating --

Page 39

Q.    If somebody's missed their insulin, whose responsibility is it to identify that they missed their insulin?  Is that Medical?

A.    Yes.

Q.    And then if they needed to see the patient, they would contact whoever at Corrections was working in the housing units?

A.    Yes.

Q.    Do you -- if I use the term "red flag," do you know -- does that have a specific meaning within PDP?

A.    Yes.  I just learned that.

Q.    When did you learn it?

A.    After this situation.  Yes, I've heard the term "red flag."

Q.    And what does it mean?

A.    It's when an inmate does not report for his medication, is not taking his medication, then Medical will red-flag that particular inmate.

Q.    How do they red-flag?  Where does the red flag go?  Who sees the red flag?

A.    That I don't know.  That's all Medical.  I don't know how they determine who's the red flag.

Page 40

Q.    So the red flag mechanism is a medical intervention?

A.    Yes.

Q.    One thing I didn't tell you, way back at the beginning -- I apologize for that -- is that if you ever need a break while we're doing this, just let me know.  So long as it's not right after I ask a question, we can take a break.

A.    Okay.  Thank you.

Q.    Were you ever provided any training on how to handle a situation if an inmate was refusing medical care?

For example, you or a Corrections Officer were going to escort somebody to a medical appointment at the request of the infirmary, at the request of medical staff, and they say, "I'm not going.  I don't care what they say they want to see me for; I don't want treatment."  What happens in that situation?

A.    Usually, it's through the Corrections Officer.  If the inmate refuses to go to Medical, the Correctional Officer will call the Sergeant, let the Sergeant know Medical called for him, he's refusing to go.

Page 41

We would call Medical and let them
know that he's refusing. Sometimes Medical
would ask for the signature from the inmate,
which means that they would still have to go
down to sign a refusal. Or, as a Lieutenant,
I've gone to get the refusal form from Medical,
give it to the inmate to sign it, and then take
it back to Medical. So they would have to sign
a refusal if they refuse.

Q. And so you were familiar with the
refusal form process in 2023? Like, what you
just discussed, this was something you were
aware of in 2023?

A. Yes.

Q. And would you only provide a refusal
form to the inmate if Medical requested that?

A. Yes.

Q. If somebody refused to go receive
medical care, and the Correctional Officer was
aware of that, was involved, had heard that
refusal, would they document that or should
they document that in the housing log?

A. Yes, they should.

Q. What is the -- there are a lot of
things could be in the housing log. But what

Page 42

is supposed to be in the housing log?

Are certain things mandatory? Is it
anything that happens? What's the full range
of things that should be documented in the
housing log?

A. Anything out of the ordinary should
go in there. Your census and head count, your
tour. That's basically it, just things that
happen on the housing area.

Q. So, in PDP, which of the facilities
have you worked on in your history in PDP?

A. As a Correctional Officer, I was
assigned to Riverside Correctional Facility.
As a Sergeant, I was assigned to Alternative
Special Detention Unit. And then I went to
Office of Professional Compliance, which is
Internal Affairs. And then, as a Lieutenant, I
was assigned to CFCF.

Q. Before you were a Lieutenant, did
you ever work CFCF?

A. No.

Q. Is CFCF where intake is?

A. Yes.

Q. And which housing units are
considered intake?

Page 43

A. B Building.

I'm not sure of the intake units. I
did not work B Building very long.

Q. Is B -- so anything that's B1, B2,
B3, those housing units are intake?

ATTORNEY PESTRAK: Objection
to form.

You can answer.

THE WITNESS: Yes. There are,
I believe, one unit that has general population
I believe it's B2. I'm not quite sure of the
housing unit.

BY ATTORNEY GROTE:

Q. Was that the case as long as you've
worked as a Lieutenant at CFCF?

A. Yes.

Q. And can you describe what intake is
and what happens during an intake?

What are the procedures? What is
the jail trying to learn about people that are
coming into their custody?

A. I've never worked in intake.

However, the inmate is brought into
the receiving room. They are strip-searched to
make sure there are no weapons. Medical would

Page 44

go over their medical history -- I'm not quite
sure of everything that's entailed -- before
they are put into B Building.

Q. Is it your understanding that
medical evaluations are performed?

A. Yes.

Q. Mental health evaluation?

A. Yes.

Q. When they are put into B Building,
is that supposed to be -- when I mention intake
housing, how long are people supposed to be
within intake housing compared to general
population?

ATTORNEY PESTRAK: Objection
to form.

You can answer.

THE WITNESS: Intake can be
from two weeks -- I've seen people in there for
a month. I don't know what the criteria is as
to why this one gets out before this one. But
once they're out of intake, they're into
general population; that's where they either
are waiting for court, for their sentencing, or
they are serving whatever sentence they have.

BY ATTORNEY GROTE:

Page 45

Q.    What differences are there between the intake housing units and general population housing units?

A.    Intake is just temporary.  I believe, at that time, they're waiting for tuberculosis test results, different results that they may be waiting for before they can actually put them into general population.

Q.    Are the conditions any -- the conditions, I guess, the size of the cell, the amount of time people have out of their cell, the activities that are permissible or privileges, are there any differences there that you're aware of?

A.    No.

Q.    Back in 2023, when you first became a Lieutenant, how much out-of-cell time per day were people being permitted on the intake housing units?

ATTORNEY PESTRAK:  Objection. You can answer.

THE WITNESS:  At that time, we were extremely short.  So the day varied, according to the staff coverage.  They may have three hours out; they may have six hours out

Page 46

for recreation.

BY ATTORNEY GROTE:

Q.    And so when it comes to the staff issues -- you've mentioned staffing issues -- have there been problems with understaffing at PDP in recent years?

ATTORNEY PESTRAK:  Objection. You can answer.

THE WITNESS:  Yes.

BY ATTORNEY GROTE:

Q.    To the best of your recollection, when did those begin?

A.    I have not worked on the jail when the staffing issues started; I was assigned to Internal Affairs.  I believe it began around 2020, with the COVID outbreak.

Q.    And how has that impacted operations, generally speaking?

ATTORNEY PESTRAK:  Objection. You can answer to the extent that you know.

THE WITNESS:  From my experience, being back in the jail, it had a major impact on the jail running, the duties of the officers, the supervisors.

Page 47

As I said before, I had to take on the role of Lieutenant, Sergeant, and Correctional Officer on various days.

BY ATTORNEY GROTE:

Q.    Was that -- when you first became Lieutenant, was that the situation?

A.    Yes.

Q.    And how would that -- can you walk me through what a typical day would be like when you were Lieutenant but also had these additional responsibilities?

ATTORNEY PESTRAK:  Objection to form.

But you can answer.

THE WITNESS:  If there is an incident on the housing unit, I have to respond; I don't have a Sergeant to respond, to give me the information.

If an inmate had to be escorted to Medical or Mental Health, that was something that I would have to do because I couldn't pull an officer off the housing unit, because they have to watch the housing unit.  So I would have to escort the inmate to Medical or Mental Health.

Page 48

If there is discipline that had to be -- or the inmate had to be taken to punitive segregation, that would be something I would have to do.

I would have to monitor medication in the Unit Management area because I didn't have enough staff to come and pull.  Lunchtime, the officers would have to have their lunch break, so I would have to be the unit control officer, which is the person who sits in the center of the four units to open doors.  I would have to relieve that person to go to lunch.  I would have to kind of assign lunch, because sometimes you need at least four officers for the housing areas, and sometimes there were only two, so one officer would have to tour two housing units.  Sometimes I would help out with that.

BY ATTORNEY GROTE:

Q.    So it sounds like -- is it accurate that having fewer officers -- let me think of how I want to ask this.  Hold on.

You need officers to escort inmates; is that accurate?

A.    Yes.

Page 49

Q.   And to oversee movement between areas of the jail?

A.   Yes.

Q.   And were the staffing problems -- did they particularly impact escort and movement because of that?

A.   No.  The jail still ran the same.

Q.   By "impact," I guess I mean that there were fewer officers to do those tasks that they were needed for.

They had more to do.

A.   They had more to do.

Q.   Now, if a stretcher call is made, who would make that, Medical or Corrections?

A.   Corrections would make that.

Q.   And how many officers are needed for a stretcher call?

A.   Usually, the stretcher call is made from the officer that's assigned to that housing area.  When that happens, that's when maybe -- depending on what the staff is, one or two officers would respond, and supervisors would respond.

Q.   How many people would that end up being?

Page 50

A.   If we're fully staffed, that would be about two additional officers:  a Sergeant; and a Lieutenant.

Q.   What is an "urgent behavioral health referral"?  Is it just what it sounds like?

A.   That -- it depends on the way the officer answers the questions on the referral, it will come "urgent"; that's when the mental health staff has 24 hours to see that particular inmate.

Q.   Are you aware of what instances would generate an urgent behavioral health referral?

A.   I'm not quite sure.  Just answer the questions the way that they -- the behavior.

Q.   Did staffing shortage ever impact medication administration, that you're aware of?

A.   No.

Medical and mental health are priorities.  No matter what the staffing is, medication has to still be administered.

Q.   And were you aware of any issues with administration of insulin or glucose checks related to staffing?

Page 51

A.   No.

Q.   Were there -- in this period since, roughly, COVID until fall of 2023, were there, to your knowledge, any problems with staffing, not having enough staff in the Medical Department?

A.   That I'm not aware of.

Q.   Okay.  What do you remember about November 5, 2023?

A.   I don't remember anything about November 5.

Q.   Do you remember a disciplinary proceeding in regard to Mr. Jung?

A.   I remember the disciplinary.

Q.   And are you aware that that was focused on your actions from November 5, 2023, that date?

A.   I am aware of that.

Q.   Okay.  And do you recall Louis Jung at all?

A.   I don't.

Q.   Do you recall when you arrived to work that day?

A.   I do not.

Q.   Do you remember watching the video

Page 52

from that day?

A.   When I was called down to Office of Professional Compliance.  Yes.

Q.   And was that you on the video?

A.   Yes.

ATTORNEY GROTE:  I'm going to share another exhibit.  This is Bates-stamped Bloodsaw 000146 through 000195.

(Plaintiffs' Exhibit 2 was marked for identification.)

BY ATTORNEY GROTE:

Q.   And does this look like the cover page of the disciplinary packet from the incident involving Mr. Jung?

A.   This cover page?  I don't see this cover page; this isn't what they sent to me.

Q.   Okay.

A.   I don't get to see that.

ATTORNEY PESTRAK:  Give me a second.  I think there's something here that might help.

THE WITNESS:  That is what I see, the Employee Violation Report.

ATTORNEY PESTRAK:  00149.

ATTORNEY GROTE:  Okay.

Page 53

1  ATTORNEY WITTEKIND:  Bret, are
2  you marking this Exhibit "2"?
3  ATTORNEY GROTE:  Yes.
4  BY ATTORNEY GROTE:
5  Q.   So, looking at the Employee
6  Violation Report, does this refresh your
7  recollection at all about November 5, 2023?
8  A.   No.
9  Q.   And you see the charges here that
10  you had -- when it says "GO," what does "GO"
11  mean?
12  A.   General Orders.
13  Q.   And you were charged with violating
14  General Orders 1, 3, 5, 37, and 67, and two
15  part of the Employee Code of Conduct.  Do you
16  remember the disposition of those charges?
17  A.   Yes.
18  Q.   And what was that?
19  A.   I was found guilty for those general
20  orders.  I'm not sure if it was all the general
21  orders.
22  Q.   I can direct you to the back, so you
23  don't have to guess.  000193 and 000194.
24  ATTORNEY PESTRAK:  000192.
25  ATTORNEY GROTE:  Yeah, sorry.

Page 54

1  000192.
2  BY ATTORNEY GROTE:
3  Q.   Does it appear you were found -- if
4  you look at 000192 and 000193 -- and I think
5  those were the two voting members -- and 000192
6  said you were not guilty of No. 5, and 000193
7  crossed out No. 5.  So does it appear that you
8  were found guilty of the other four?
9  A.   Yes.
10  Q.   Now, how did you plead in this
11  matter?
12  A.   Not guilty.
13  Q.   And what did you base that plea on,
14  if you had no recollection of the day?
15  A.   Because I didn't have a
16  recollection, and I wasn't going to say I was
17  guilty.
18  Q.   After watching the video, does
19  that -- what was your -- did that change your
20  thinking about your actions that day?
21  ATTORNEY PESTRAK:  Objection
22  to form.
23  You can answer.
24  THE WITNESS:  No.
25  There was no sound to the video, so

Page 55

1  there was no -- there was nothing to say what
2  was said to me from Mr. Jung or what I said to
3  Mr. Jung.  So I still don't think that I was
4  guilty of any of those general orders.
5  BY ATTORNEY GROTE:
6  Q.   And Mr. Jung was taken back into his
7  cell by two other incarcerated people; correct,
8  if you recall?
9  A.   Yes.
10  Q.   Is that normal protocol?
11  A.   It's not normal protocol.  But I
12  would ask the inmate if he needed assistance.
13  And instead of having another officer do it, it
14  would be another inmate that they would feel
15  more comfortable with.
16  Q.   Didn't you testify earlier that if
17  somebody said they could not move, you would
18  call Medical?
19  A.   Yes.
20  Q.   If you called Medical, would that
21  have been documented?
22  A.   By the Correctional Officer, it
23  should be.
24  Q.   Was it in this case?
25  A.   No.

Page 56

1  Q.   Why not?
2  ATTORNEY PESTRAK:  Why was it
3  not documented or why was it not called in?
4  BY ATTORNEY GROTE:
5  Q.   Why was Medical not called?
6  A.   I don't know.
7  Q.   Do you recall anything that Mr. Jung
8  said to you?
9  A.   I do not.
10  Q.   Do you know if he was able to speak?
11  A.   I do not remember.
12  Q.   Do you know why you were on the
13  housing unit?  Would you normally make tours of
14  that housing unit?
15  A.   I would.
16  I don't remember anything about that
17  day.  But, looking at the video, I went
18  straight to that particular cell, so I'm
19  assuming that the officer called for me.
20  Q.   If I can direct your attention to
21  page 000157, at the very bottom, where -- I
22  think that's some highlight that looks dark
23  from the copying -- it says, "LT Bloodsaw
24  needed to #21.  I/P Jung refuses to get up."
25  And then it has the name "Frasier, G."

Deposition of Wanda Bloodsaw

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 57

How would you interpret that note?

A.   That Officer Frasier called for me to tell me that the inmate refuses to get up.

Q.   And was that at 11:01 that day?

A.   I don't remember.  But that's what the timestamp says.

Q.   Reading that, do you believe that's why you came on the unit to see Mr. Jung?

A.   I do.

Q.   Do you know if there was a nurse working that day?

A.   I learned that after this situation, yes.

Q.   And do you remember her name?

A.   I don't.

Q.   If I suggested it was Blair Cabellos --

ATTORNEY WITTEKIND:  Objection.  Form.

BY ATTORNEY GROTE:

Q.    -- does that refresh your recollection?

ATTORNEY PESTRAK:  You can answer.

THE WITNESS:  I don't know.

Page 58

BY ATTORNEY GROTE:

Q.   And Gena Frasier, do you know Gena Frasier?

A.   Yes.

Q.   How long have you known Gena Frasier?

A.   During this time?

Q.   Before this time or since.

A.   Just from this time, I just met her when I started working at CFCF.

Q.   Does she still work at CFCF?

A.   Yes.

Q.   And what's your relationship like with Correctional Officer Frasier?

A.   It was professional while I was at CFCF; now, it's no relationship at all.

Q.   Okay.  Do you have any opinion on Correctional Officer Frasier's reliability?

ATTORNEY PESTRAK:  Objection.  You can answer.

THE WITNESS:  I don't know her well enough to know her reliability.

BY ATTORNEY GROTE:

Q.   Have you ever known her to be dishonest?

Page 59

ATTORNEY PESTRAK:  Objection.  You can answer.

THE WITNESS:  I don't know.

BY ATTORNEY GROTE:

Q.   When you say you don't know -- I'm not asking whether, in her life, she's ever been dishonest.  But have you ever had an encounter with her or an interaction where she has said something that you thought was not true?

ATTORNEY PESTRAK:  Objection.  You can answer.

THE WITNESS:  No.

BY ATTORNEY GROTE:

Q.   If you could look at page 000158, please, just spend your time going through that.

Now, at the top, it seems to have a copy of the same note regarding Inmate Jung.  Do you agree with that, at the top of 000158?

A.   Yes.

Q.   That he "refuses to get up."  Do you see any other reference to Mr. Jung there?  Or do you agree that there is no other reference to Mr. Jung on the page?

Page 60

A.   I don't see anything else.

Q.   And if you want, you can go through 000159 and -- 000160 also has -- through 000161, actually, also has other instances from November 5, other entries.

ATTORNEY PESTRAK:  Next page?

ATTORNEY GROTE:  Yeah.  Which one are we at now?

ATTORNEY PESTRAK:  000160.

BY ATTORNEY GROTE:

Q.   All right.  Now, on 000160, the fourth entry or so, 16:49, it says, "I/P Louis Jung," "refused insulin," also entered by Frasier.  Does that refresh your recollection at all about Mr. Jung refusing insulin that day?

A.   No.

ATTORNEY PESTRAK:  Do you want her to look at the next page?

ATTORNEY GROTE:  I have a couple more questions about this page, then the next one.

BY ATTORNEY GROTE:

Q.   Do you -- would it be common for a Correctional Officer to enter an insulin

Case 2:24-cv-05618-TJS   Document 100-5   Filed 12/05/25   Page 20 of 57

Deposition of Wanda Bloodsaw                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 61

1  refusal in the housing log?
2      A.   Yes.
3      Q.   And why is that?
4      A.   To notate that this particular
5  inmate refused to take medication.  And then
6  the nurse should have been informed of the
7  incident as well.
8      Q.   Could the nurse see the housing
9  logs?
10     A.   No.
11     Q.   So when you say "the nurse should
12 have been informed," does that mean that, in
13 this case, Correctional Officer Frasier should
14 have told the nurse?
15     A.   Yes.
16     Q.   And if Correctional Officer Frasier
17 -- well, Correctional Officer Frasier did enter
18 this into the housing log.  Should they have
19 also taken a refusal form to Mr. Jung?
20     A.   Not all the time.
21        Because when insulin is being done,
22 the nurse is right there, and the nurse can
23 either say, "Okay.  I need the referral" -- I'm
24 sorry -- "the refusal," or not.  I don't know
25 what Medical -- what particular situation

Page 62

1  Medical needs the refusals for.
2      Q.   So using the form -- when the form
3  gets filled out, is that a medical decision,
4  when to use the form?
5      A.   Yes.
6      Q.   Okay.  And then you can skim through
7  000161 as well.  Now, in all these entries for
8  November 5, do you agree that there is not one
9  that references Mr. Jung being taken into his
10 cell by the incarcerated workers?
11     A.   I'm sorry.  Repeat that question.
12     Q.   So, if you recall from the video,
13 you were present when Mr. Jung was dragged back
14 into his cell by other incarcerated people;
15 right?
16        ATTORNEY PESTRAK:  Objection
17 to form.
18        You can answer.
19        THE WITNESS:  Yes.
20 BY ATTORNEY GROTE:
21     Q.   And do you agree that there is
22 nothing in the housing log that reflects that
23 encounter?
24     A.   Yes.
25     Q.   Should there have been?

Page 63

1      A.   It should have been that he was put
2  into a cell if it was said that he refused to
3  go in.
4      Q.   And it was said that he refused to
5  go in; right?
6      A.   Yes.
7      Q.   And whose responsibility would it
8  have been for ensuring that that was in the
9  housing log?
10     A.   That should have been Officer
11 Frasier's responsibility, to put it into the
12 housing log.
13     Q.   Would the normal procedure be that
14 Officer Frasier would have observed this and
15 put it in the housing log?  Or would you have
16 had to order Officer Frasier to put it in the
17 housing log?
18     A.   She should have observed it and put
19 it into the housing log.
20     Q.   What would your normal practice be,
21 as a Lieutenant in a circumstance like this?
22 Would you ever give an order to a Sergeant or a
23 Correctional Officer to make an entry in the
24 housing log?
25     A.   Yes.

Page 64

1      Q.   Why is that?
2      A.   To make sure everything is in there.
3  To cover the officer and the supervisor who's
4  there, to make sure everything is in there.  So
5  if it's in there that he refused, then yes, it
6  should have been notated that he was placed
7  into a cell.
8      Q.   And do you remember telling Officer
9  Frasier to put that in the housing log?
10     A.   No.
11     Q.   Is it possible that you did?
12        ATTORNEY PESTRAK:  Objection
13 to form.
14        You can answer.
15        THE WITNESS:  No.
16 BY ATTORNEY GROTE:
17     Q.   Why not?
18     A.   Possibly not.  Because I was
19 inexperienced; I was just learning my duties as
20 a Lieutenant.  So I was just four days, five
21 days on the job, so I was still learning my
22 duties as a Lieutenant.
23     Q.   Is it possible that you reported the
24 situation to Medical and it wasn't documented?
25        ATTORNEY PESTRAK:  Objection

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 21 of 57

Deposition of Wanda Bloodsaw                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 65

1  to form.
2        You can answer.
3        ATTORNEY WITTEKIND:  I'll
4  join.
5        THE WITNESS:  If I'd known
6  what the situation was, if I was told that he
7  refused to go into his cell, no, I would not
8  tell Medical.
9  BY ATTORNEY GROTE:
10     Q.   And why not?
11     A.   Because that's not a medical issue,
12  of an inmate refusing to go into a cell; that's
13  a security issue.
14     Q.   Was the fact -- how does the fact
15  that he was laying on the floor -- was he
16  laying on the floor, from what you recall in
17  the video?
18     A.   From the video, it appeared that he
19  was lying on the floor.
20     Q.   Did that seem like a security issue
21  to you?
22     A.   Yes.
23     Q.   Do you usually have incarcerated
24  workers deal with security issues?
25     A.   Depending on the situation.

Page 66

1        Again, if the inmate is refusing to
2  go in, from being a Lieutenant a little longer,
3  I would ask the particular inmate do he mind if
4  these inmates help him in because they are
5  workers; these are their fellow inmates.  Do
6  they mind, he or she mind, if the inmate helps
7  them into the cell or pick them up or whatever
8  the situation is.
9        I have had people who lie on the
10  floor to block the door from closing, and it's
11  not a medical issue; it's a refusal.
12     Q.   How do you determine if that's a
13  medical issue, though?
14     A.   If the inmate tells me, "I can't
15  move," or" I don't feel well," or if the
16  officer tells me that he said he's not getting
17  medication or -- it depends on what I'm told.
18     Q.   General Order 1 is called "Working
19  knowledge."  What does that one refer to?
20     A.   Meaning I should have knowledge of
21  my duties.
22     Q.   And you were found guilty of that.
23  Do you think that was a fair decision?
24        ATTORNEY PESTRAK:  Objection
25  to form.

Page 67

1        You can answer.
2        THE WITNESS:  I do not,
3  because I don't remember the situation.  And
4  there's no audio to the video to even know what
5  the conversation was from Officer Frasier to
6  myself or from Mr. Jung to me.
7  BY ATTORNEY GROTE:
8     Q.   And General Order 3 is "Efficient
9  performance."  What does that one entail?
10     A.   Again, basically, knowing what I'm
11  supposed to do in a situation.
12     Q.   Does it require you to be alert and
13  responsive to ensure the safety, security,
14  health, and welfare of inmates?
15        ATTORNEY PESTRAK:  Objection
16  to form.
17        You can answer.
18        THE WITNESS:  Yes.
19  BY ATTORNEY GROTE:
20     Q.   And do you also disagree with the
21  finding of guilt in that instance?
22        ATTORNEY PESTRAK:  Objection
23  to form.
24        You can answer.
25        THE WITNESS:  I do.

Page 68

1  BY ATTORNEY GROTE:
2     Q.   And the same with 37 and 67?  You
3  disagree with those findings of guilt as well?
4        ATTORNEY PESTRAK:  Objection
5  to form.
6        You can answer.
7        THE WITNESS:  I do.
8  BY ATTORNEY GROTE:
9     Q.   I guess I'm just having a hard time
10  understanding how you think that -- on what
11  basis do you think you were not guilty if you
12  don't have any recollection of what actually
13  was said or what happened?
14        ATTORNEY PESTRAK:  Objection.
15  Form.
16        You can answer again.
17        THE WITNESS:  Because I have
18  no way to defend myself if I don't remember the
19  situation, and I don't remember the
20  conversation between myself and Officer Frasier
21  or the conversation between myself and
22  Mr. Jung.
23  BY ATTORNEY GROTE:
24     Q.   So wouldn't it, then, be equally
25  possible that you were guilty as much as you

Page 69

weren't guilty if you can't remember what a
defense could be?
         ATTORNEY PESTRAK:  Objection.
    You can answer.
         THE WITNESS:  No, I don't.
BY ATTORNEY GROTE:
    Q.   So what is your defense, though, to
what happened that day?
         ATTORNEY PESTRAK:  Objection.
    You can answer.
         THE WITNESS:  My defense is:
Depending on what Officer Frasier called me to
tell me, I'm not on the housing area, so
basically, I have to go off the -- what the
officer is calling me for.
         So if I'm being told that an inmate
is refusing, that's what -- I'm going in there
thinking, that this person is refusing to go
into a cell.  If I was told that the inmate is
having a medical emergency, I know right off to
call for a stretcher.
BY ATTORNEY GROTE:
    Q.   Do you think it's possible somebody
told you to call for a stretcher, but you
didn't?

Page 70

         ATTORNEY PESTRAK:  Objection.
    to form.
         You can answer.
         THE WITNESS:  No, I don't
    think it's possible.
BY ATTORNEY GROTE:
    Q.   If somebody had called for a
stretcher, would you have called for a
stretcher?
    A.   I'm sorry?  Repeat that.
    Q.   Yes.  If medical staff said, "You
need to call a stretcher," would you have
called a stretcher?
    A.   Yes.
    Q.   Has there ever been an instance that
you can recall where there was a request to get
a stretcher and you said "No"?
    A.   No.
    Q.   Do you know if Officer Frasier was
accompanied by a nurse when she saw Mr. Jung?
    A.   I found out during the video, when I
was questioned by Internal Affairs.
    Q.   Do you think that you would have
known that from Officer Frasier on November 5?
    A.   Do I --

Page 71

         ATTORNEY PESTRAK:  Objection
to form.
         You can answer.
BY ATTORNEY GROTE:
    Q.   I, very much, understand that you
don't remember November 5 independently.
         Officer Frasier was with a nurse, as
you learned, made this entry in the housing
log, which says, "LT Bloodsaw needed --"
         If that was made in the housing log,
would you have just seen it in the housing log
and gone?  Or would the CO have contacted you?
    A.   The CO would have contacted me.
    Q.   Would it have been likely that the
CO would have said, "I was at Cell 21 with
Mr. Jung with a nurse"?  Is that information
that you think the CO would have shared with
you?
         ATTORNEY PESTRAK:  Objection
to form.
         You can answer.
         THE WITNESS:  In this
situation, I really can't answer that.  But if
an inmate is refusing, the only thing the
officer will say is, "Lieutenant, I need you

Page 72

over on this housing area.  Inmate in Cell
whatever is refusing to go in."
BY ATTORNEY GROTE:
    Q.   Do you know if -- at that time of
day, were people locked in their cells?  Or is
there a day room or something, or are people
allowed out?
    A.   At that time of day, they should
have been going in after recreation.
    Q.   Okay.  When is rec from?
    A.   It starts at 8:05, and it ends at
11:05.
    Q.   In a situation where somebody is up
and walking around, clearly able to walk, and
refuses to go into their cell, how is that
dealt with?
    A.   I would go over to the inmate, talk
to the inmate, ask, "What is the problem?"
Usually, they -- sometimes are calm and tell
me, "I'm tired of being in my cell," or
whatever the case is.  For the most part, I can
get them in their cell.
         If they're combative, then it turns
into a whole different situation.  I would have
to call for additional staff to help.  And,

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 23 of 57

Deposition of Wanda Bloodsaw                         Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 73

eventually, they would either go in or we would
have to use pepper spray.

Q. Wouldn't it suggest to you that if
somebody needed physical help to go into their
cell that they needed medical attention?

ATTORNEY PESTRAK: Objection
to form.

You can answer.

THE WITNESS: Not if I'm being
told he's refusing, no.

BY ATTORNEY GROTE:

Q. What if -- do you know if he said
that he was refusing?

A. I don't remember what he said.

If he told me that he needed medical
attention, then that's what I would have gotten
for him. I would have asked him if he could
walk down or did he need a stretcher.

Q. When did you learn that Mr. Jung had
died?

A. I was told about an inmate who
passed away, but I did not know who it was. I
didn't know that I was involved until I was
called down to Internal Affairs.

Q. And when was that, to the best of

Page 74

your recollection?

A. I believe when I came back from my
days off -- I think I had two or three days
off. And when I came back, it -- there was
just talk that an inmate passed away the other
day. But it didn't --

Q. I mean when were you called to
Internal Affairs?

A. Oh. Months later.

Q. I'm not going to ask you to guess.
Did you ever talk with Correctional Officer
Frasier about Mr. Jung's death?

A. I just asked her if she knew what
happened, if she remembered what she called me
for. I believe she said she didn't remember,
when she called me or what she called me for.

Q. Knowing what you know now, would you
have done something different?

ATTORNEY PESTRAK: Objection
to form.

You can answer.

THE WITNESS: Definitely.

BY ATTORNEY GROTE:

Q. What would you have done?

A. If I had known that he had a medical

Page 75

issue, I would, definitely, have called for a
stretcher. But if there was a nurse already
over there, and if the nurse was still there
when I got there, I would have asked the nurse
to look at him. But yeah, definitely, I would
have called for a stretcher.

Q. And is it -- do you rely on medical
staff to tell you when there are medical issues
that need responses?

ATTORNEY WITTEKIND:
Objection. Form.

ATTORNEY PESTRAK: You can
answer.

THE WITNESS: I don't rely on
Medical to tell me what needs medical because
Medical isn't always on the housing unit.

BY ATTORNEY GROTE:

Q. Sometimes you have to make a
decision to call Medical without waiting?

A. Exactly.

Q. If Medical were on the housing unit,
would you be relying on their opinion, asking
them, "Hey, do we need attention here?"

A. Yes.

Q. Knowing what you know about what

Page 76

happened with Mr. Jung, if you had the
authority, are there any changes you would make
to how -- in response to that?

ATTORNEY PESTRAK: Objection
to form.

You can answer.

BY ATTORNEY GROTE:

Q. To the policies, practices, anything
like that?

ATTORNEY PESTRAK: Same
objection.

You can answer.

THE WITNESS: I think, me
being a little more experienced as a
Lieutenant, to ask more questions from the
officer. Instead of maybe just "inmate
refusing to go in," I would find out more from
the officer so I know exactly what I'm supposed
to do to handle it.

I don't ever want anybody to go
through that again. I don't ever want to go
through that.

BY ATTORNEY GROTE:

Q. We spoke of Correctional Officer
Frasier. You're not familiar with Blair

Page 77

Cabellos; correct?

A.  No.

ATTORNEY PESTRAK:  "No," he's not correct?  Or "no," you're not familiar?

THE WITNESS:  No, I'm not familiar with him.

BY ATTORNEY GROTE:

Q.  Are you familiar with any of the other Defendants in this matter?

A.  Just Officer Frasier.

Q.  You don't know Maureen Gay?

Do you know Maureen Gay?

A.  No, I don't.

Q.  Mariesha Apollon?

A.  No.

Q.  Dr. Trivikram?

A.  No.

Q.  Blanche Carney?

A.  Yes.

Q.  Do you know of Ms. Carney?  Or do you actually know Ms. Carney, personally?

A.  I know of Ms. Carney.

Q.  Do you recall a person by the name of Anton Walker who was incarcerated in intake housing around the end of October, early

Page 78

November 2023?

ATTORNEY PESTRAK:  Objection. You can answer.

THE WITNESS:  No.

ATTORNEY GROTE:  We can go off the record for a moment, take a break.

(Off the record at 11:43 a.m.)

(Back on the record at 12:00 p.m.)

BY ATTORNEY GROTE:

Q.  All right.  Earlier, you mentioned that, prior to the incident involving Mr. Jung, you recalled some instances or an instance of receiving informal counseling about job performance issues, and I think you described one particular incident you had in mind.

I'm just wondering if there are other -- can you just tell me every instance you remember in which you received informal counseling for something on the job?

A.  One, calling someone a name that she called herself, an officer.

Q.  Do you recall the name?

A.  I believe Sanchez.

Another one, I was training a Sergeant to assign officers to clinic trips on

Page 79

the roster, and I believe I forgot to tell her to inform the officers that she'd assigned to the clinic trip.

That's it.

Q.  Okay.  Now, the incident involving when Mr. Osbourne died, were you working the day that he was killed?

A.  Yes.

Q.  Were you working on that housing unit?

A.  I wasn't working on the housing unit, but that was my area.

Q.  As a Lieutenant, how large is the area?  How many units does it hold?

A.  Eight units.  Two floors.

Q.  And what's your understanding of what happened?

ATTORNEY PESTRAK:  Objection. You can answer.

THE WITNESS:  I believe Mr. Miller, who was the person who killed Mr. Osbourne, had intentions to kill someone. And it happened to be Mr. Osbourne, unfortunately.

BY ATTORNEY GROTE:

Page 80

Q.  And what was the manner in which he killed Mr. Osbourne?

ATTORNEY PESTRAK:  Objection. You can answer again.

THE WITNESS:  He beat him to death.

BY ATTORNEY GROTE:

Q.  And you said you were found guilty for not -- was it -- I want to get this accurate -- what was it, exactly?  For not -- they should not have been celled together, basically?

A.  Basically, not taking proper action.

Q.  What are the factors that go into how housing is supposed to be handled?

What do you look at when you're deciding who goes in what cell, whether they have a cellmate, all of that?

A.  Now, learning -- again, I was out of the jail for 14 years, so now there is different inmates.  They're different from what I remember.

Q.  "Different" in what way?

A.  They're a lot younger.  They fight for everything.  An inmate looks at them the

Page 81

wrong way or they're from a different area --
it's a lot of gangs in the prison now -- from
what I was told after this situation, I should
not have housed a younger inmate with an older
inmate.

Q.   Were there any other factors that
were missed in this situation?

ATTORNEY PESTRAK:  Objection
to form.

You can answer.

THE WITNESS:  A mental health
issue.  I did send Mr. Miller to see Mental
Health.  They cleared him, so, the next day, he
was back on the same unit.

My inexperience, in not knowing the
authorities that I had as a Lieutenant, I could
have moved him off that particular unit.

BY ATTORNEY GROTE:

Q.   Like, as a precaution?

A.   Yes.  Because of his behavior the
day before.

Q.   And what was that behavior?

ATTORNEY PESTRAK:  Objection.

You can answer.

THE WITNESS:  He was erratic.

Page 82

He did say that he was going to kill someone.
That was the reason that I sent him to Mental
Health.

So, me believing that Mental Health
cleared him, this was just something that he
said.  Because inmates always say things that
they're not going to do, just to get their way.

BY ATTORNEY GROTE:

Q.   How much -- when you became a
Lieutenant, what sort of -- did you receive
additional training on how to be a Lieutenant?

A.   I did.

Q.   How extensive was that?

What did it entail?

A.   It was more on how to be a leader,
how to communicate with your subordinate staff,
how to communicate with inmates, and how to do
the paperwork that's required.

Q.   There is always paperwork in
promotions, isn't there?

A.   Yes.

Q.   Are there things you wish you'd had
more training on prior to becoming a
Lieutenant?

ATTORNEY PESTRAK:  Objection

Page 83

to form.

You can answer.

THE WITNESS:  Yes.

BY ATTORNEY GROTE:

Q.   And what are those?

A.   To prepare me with a staff shortage.

I did not understand how short the
jails were when I got back into the jail.
Given different scenarios of how to handle
things -- and things -- different things happen
every day, so more training on how to handle a
death situation or a mental health situation.

I did not know that, once a mental
health person is cleared, that I can actually
go to Mental Health and let them know that his
actions are this way, so I could be the one to
maybe 302 him; I didn't know that I could do
that as a Lieutenant.

Q.   What sort of training could have, in
your opinion, assisted with dealing with the
staffing issue?

ATTORNEY PESTRAK:  Objection
to form.

You can answer.

ATTORNEY GROTE:  Let me maybe

Page 84

put it another way.

BY ATTORNEY GROTE:

Q.   Do you feel like you needed training
on figuring out how to prioritize decisions
with limited resources?

ATTORNEY PESTRAK:  Same
objection.

You can still answer.

THE WITNESS:  Yes.

BY ATTORNEY GROTE:

Q.   How long was the kind of Lieutenant
training that you received?

A.   Two weeks, I believe.

Q.   And would that have been right
before you took that position?

A.   No, that's after I decided to take
the position.  And then they gave me the
training.

Q.   So if you began -- if your first day
as Lieutenant was October 30, 2023, would that
mean you would have been trained after?

A.   Yes.

Q.   Do you know when it began, how long
after?

A.   Maybe a month after actually being

Deposition of Wanda Bloodsaw                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 85

1  in the jail.
2      Q.   Was it after Mr. Jung had died?  He
3  died November 6.  If you remember.
4      A.   I don't remember.
5      Q.   Were you working 12-hour shifts at
6  that time?
7      A.   Yes.
8      Q.   How many days a week?
9      A.   It's called a "2-2-3."  So you have
10 two days on, two days off; three days on, two
11 days off; two days on, three days off.  So it
12 turns out to be every other weekend, every
13 other Friday, Saturday, Sunday.
14     Q.   Do you still have 12-hour shifts
15 like that?
16     A.   Yes.
17     Q.   Is that exhausting?
18         ATTORNEY PESTRAK:  Objection
19 to form.
20         You can answer.
21         THE WITNESS:  Very.
22 BY ATTORNEY GROTE:
23     Q.   How does that affect you at the
24 workplace?
25         ATTORNEY PESTRAK:  Objection

Page 86

1  to form.
2          You can answer.
3          THE WITNESS:  Very stressful.
4  Usually, I'm tired.  The job itself
5  is stressful; it can be frustrating.  But I try
6  not to get frustrated, so --
7  BY ATTORNEY GROTE:
8      Q.   When did the 12-hour shift -- has it
9  always been 12-hour shifts since you worked at
10 PDP, or did that change over time?
11     A.   It changed over time.
12     Q.   About when did it begin?
13     A.   I don't know.
14          I was still in Internal Affairs at
15 that time, and I was working eight hours.
16     Q.   Internal Affairs doesn't do 12
17 hours?
18     A.   They do now.
19     Q.   Oh.  Equity.  Why did you -- going
20 back to 2004 or whenever you made the decision,
21 why did you want to work at PDP and be a
22 Corrections Officer?
23          ATTORNEY PESTRAK:  Objection.
24          You can answer.
25          THE WITNESS:  Benefits.

Page 87

1  BY ATTORNEY GROTE:
2      Q.   So, like, what do those entail?
3          ATTORNEY PESTRAK:  Objection.
4  You can answer.
5          THE WITNESS:  At the time,
6  they were better than the benefits from SEPTA.
7  The money was better.
8          I really had no idea what the job
9  entailed.  But being on a bus was a little
10 dangerous.
11 BY ATTORNEY GROTE:
12     Q.   Is that because of people on the bus
13 or people on the roadway in the city?
14         ATTORNEY PESTRAK:  Objection.
15 You can answer.
16         ATTORNEY GROTE:  It's not
17 relevant.  Objection.  Irrelevant.
18 BY ATTORNEY GROTE:
19     Q.   Okay.  So benefits, salary?
20     A.   Yes.
21     Q.   In the annual policy training you
22 discussed, is any of that in person, like,
23 classroom-style?
24     A.   It hasn't been like that in a long
25 time.

Page 88

1      Q.   Is it all reviewing packets of
2  information or policies?  Or what does -- yeah.
3      A.   It's reviewing the policies that are
4  maybe updated at that moment.  They'll --
5  supervisors will let us know that we have
6  particular policy training; it may be one or
7  two policies at a time.
8          It used to be where a Sergeant would
9  do it in a classroom setting and then,
10 basically, read over the policy and answer any
11 questions.
12     Q.   So you said, "used to be"?
13     A.   Yeah.  There is not enough staff to
14 take the people away from their housing areas,
15 so now the Sergeant will go around and explain
16 the policy to you.  And you sign for it, and
17 you receive your policy.
18     Q.   And does that happen throughout the
19 year, at one time of the year?  Does it depend
20 on the policy?  I'm just kind of wondering,
21 like, about the flow of this.
22     A.   It depends on the -- I believe the
23 update of the policy.
24          You don't always start at Policy 1
25 and keep going through, and maybe this policy

Page 89

-- you may get the same policy twice in a year.
I guess it just depends on when they update the
policy.

Q.    And that would be because it got
updated twice that year?

A.    Yes.

Q.    What if -- if a policy has not been
updated for eight years, does that mean you
would not receive any refresher on it?

A.    No.

Q.    So you would -- I'm sorry.  You
would or wouldn't receive a refresher?

A.    You would receive a refresher.

Q.    Okay.  Did you receive any training
of any kind about responding to emergencies?

ATTORNEY PESTRAK:  Objection.
Form.

You can answer again.

THE WITNESS:  I'm quite sure I
have.

BY ATTORNEY GROTE:

Q.    Do you remember any?

A.    No.

Q.    What about refusals of care?  Did
you receive any training on that?

Page 90

A.    I'm quite sure I have.

Q.    Do you remember anything,
specifically?

A.    I don't.

Q.    Do you think the training that you
currently -- you and others receive at PDP,
that you have just been describing, about
reviewing policy, policy updates, do you think
it could be improved?

ATTORNEY PESTRAK:  Objection
to form.

You can answer.

THE WITNESS:  I'm quite sure
it could be improved.

BY ATTORNEY GROTE:

Q.    And how do you think it could be
improved?

ATTORNEY PESTRAK:  Objection.
You can answer.

THE WITNESS:  Some of the
wording.  I could take it one way; you could
take it another way.  Everybody learns
differently.  So I think the wording needs to
be exact, how things need to be.

BY ATTORNEY GROTE:

Page 91

Q.    Are there any other instances you
recall of somebody who was in the doorway of
their cell and refusing to get up that you were
involved in?

A.    Not that I can recall, no.

Q.    And is it a -- prior to seeking --
to contacting Medical in a situation, is it a
requirement that the person request medical
assistance?

A.    No, it's not a requirement for them
to request.

If I come on a scene and, to me, you
don't look like anything is wrong, I can't
determine if it is.  But if you tell me, "I
can't breathe," or "I can't move," or
something, then that would make me call if you
don't look like anything looks wrong to me.

Q.    Is the inverse true, as well, where
if it looked liked something was wrong but the
person didn't say, "I want to see Medical," or
didn't otherwise describe something that would
seem like a medical condition, would you or
might you call Medical in that situation?

A.    I would.

Q.    And why is that?

Page 92

A.    If the inmate is someone that I see
on a regular basis and they look a little
different, and they're lying on the floor and
maybe not talking at all, yeah, that would -- I
would ask them first.  But a lot of them
refuse, "Oh, I'm okay."  But if you don't look
well to me, then yes, I will call Medical.

ATTORNEY GROTE:  No further
questions.

ATTORNEY PESTRAK:  Do you have
any questions for the Witness before I go?

ATTORNEY KAMINSKY:  I do.  But
-- all right.  I could go.

EXAMINATION

BY ATTORNEY KAMINSKY:

Q.    Good afternoon.  I'm Jonathan
Kaminsky, and I represent Mariesha Apollon in
this matter.

So, as far as the roll call that you
had spoken about earlier, is that before every
shift?  Is that at the start of every shift,
the roll call?

A.    Yes.

Q.    Okay.  And who was at the roll call?

A.    It's Sergeants and Lieutenants and

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 28 of 57

Deposition of Wanda Bloodsaw                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 93

Correctional Officers.

Q.   Okay.  And then if Medical has anything to speak about, then they would come in to speak?  Or does Medical -- is there somebody from Medical there at every roll call?

A.   Not every roll call, no.

Q.   Okay.  And do you recall how many staff were on duty on the date of November 5?

A.   No, I don't.

Q.   You don't remember the roll call on that date?

A.   No.

Q.   Do you have doc- -- is there documentation that shows who would be at the roll call?

A.   Yes.

Q.   Has that --

ATTORNEY KAMINSKY:  Do we have that?  Just off the record.

(A brief discussion was held off the record.)

BY ATTORNEY KAMINSKY:

Q.   Earlier, you had testified about intake, and you had mentioned that you never worked in intake; that's true?

A.   Yes.

Page 94

Q.   Okay.  And so your only interaction with Mr. Jung, was that -- would that have been on November 5, from what you can recall?

A.   I don't remember.

Q.   You don't remember if you had any other interactions with Mr. Jung?

A.   No, I don't remember.

Q.   Is it fair to say that you had an interaction with Mr. Jung on November 5?

A.   Yes.

Q.   And that November 5 interaction, would you agree that that happened more than a week after his intake, which was on October 27 or around October 27?

A.   I don't know when he came in.

Q.   Well, if I represented to you that he --

ATTORNEY PESTRAK:  I'll stipulate that the time between the two is whatever the calendar says it is.

BY ATTORNEY KAMINSKY:

Q.   And so my point is:  You were not present for his intake; correct?

A.   Correct.

Q.   Okay.  And you had no involvement in

Page 95

completing or reviewing his intake medical forms; is that correct?

A.   Correct.

Q.   Is it usual for you to receive instructions from the intake nurse regarding medical care for a diabetic individual?

ATTORNEY PESTRAK:  Objection to form.

But you can answer.

THE WITNESS:  No.

ATTORNEY KAMINSKY:  Okay.  I don't have anything further.  Thank you.

ATTORNEY WITTEKIND:  I have a couple.

EXAMINATION

BY ATTORNEY WITTEKIND:

Q.   My name is Ray Wittekind.  I represent YesCare and Blair Cabellos.  I have just a couple questions for you.

Earlier, you told us you're not familiar with Blair Cabellos; correct?

A.   Correct.

Q.   Okay.  Is it fair to say you never had any discussions with her about Mr. Jung?

A.   I can't say.  I don't remember

Page 96

discussing Mr. Jung at all.

Q.   Okay.  When you talked to Officer Frasier about what happened that day, did she ever relay to you any communications that she had with Blair Cabellos about Mr. Jung?

ATTORNEY PESTRAK:  Objection to form.

You can answer.

THE WITNESS:  She did mention that there was a nurse on the housing area at that time.

BY ATTORNEY WITTEKIND:

Q.   Did Officer Frasier ever tell you what she and that nurse talked about?

ATTORNEY PESTRAK:  Objection to form.

You can answer.

THE WITNESS:  No, she didn't tell me what they talked about.

BY ATTORNEY WITTEKIND:

Q.   When you were at the cell that day, is it fair to say that the nurse was no longer there?

A.   Yeah, there was no nurse when I got over there.

Page 97

Q.   Is there any policy that would guide or direct when a nurse could enter an inmate's cell?  For example, if an inmate was having some type of problem and he had another inmate, another cellmate in that cell with him, was there a policy as to whether the nurse would enter that cell to provide any care?

A.   The nurse can enter the cell, but the cellmate has to come out for a safety issue for the nurse.

Q.   Okay.  On that date, was there another cellmate in Mr. Jung's cell, to your recollection?

A.   I don't remember.

ATTORNEY WITTEKIND:  That's all I have.  Thank you.

ATTORNEY KAMINSKY:  I have a quick follow-up.

EXAMINATION
BY ATTORNEY KAMINSKY:

Q.   Would you consider -- in light of the video that you watched, with your interaction, would you consider Mr. Jung to have been in or outside of the cell at that time, when you had approached him?

Page 98

A.   Looking at the video, the housing unit has bars, so you really can't see where Mr. Jung is lying.  You just see my body; you see me say something.  But I can't say where his body -- where he was lying on the floor.

ATTORNEY KAMINSKY:  Okay.  Nothing further.

ATTORNEY PESTRAK:  It's down to me.  There might be some after me, but hopefully, we're almost at the end.

EXAMINATION
BY ATTORNEY PESTRAK:

Q.   I'm going to be jumping around, so let me know if I start going too fast for you.  Okay?

A.   Okay.

Q.   Have you ever heard the term "overtime draft"?

A.   Yes.

Q.   What is that?

A.   That is when a person is drafted to work four hours after their shift.

So, in my case, I worked 7:00 a.m. to 7:00 p.m.  My captain would draft me for another four hours so I wouldn't get off until

Page 99

11:00 p.m.

Q.   In what circumstances would you need to be drafted for those next hours?

A.   To cover the next shift.

Q.   Was that implemented at the time that the staffing shortages started?

A.   That has been like that throughout my career.

Q.   So that was a tool that was available at the time of the staffing shortages?

A.   Yes.

Q.   Do you know the term "draft down"?

A.   "Draft down," I'm not quite sure.  But I believe if I'm drafted as a Sergeant -- me being a Lieutenant, I get drafted as a Sergeant to cover the next shift; they may be short Sergeants.

Q.   And that's the same as the overtime draft, you're just filling a different position?

A.   Yes.

Q.   Okay.  You talked about a change in the way Medical -- that the nurses would start coming to the floors for some of the

Page 100

appointments.

Do you remember when that started?

A.   No.

Q.   You talked about having calls that require responses.  Do you know the term "response team"?

A.   Yes.

Q.   What is a response team?

A.   A response team are the Correctional Officers.  You have a first wave and a second wave.

The first wave is the response team for something that may be a minor situation, but you need -- that Correctional Officer needs assistance.  Second wave response team is when it may be a little bigger or it may be an inmate on an officer, so you need as much staff as possible.

So the response teams are given at roll call.  Your name is called, you're on Response Team 1; next person may be Response Team 2.  So, basically, they know when to respond.

Q.   The person that's assigned or the officer that's assigned to Response Team 1 or

Page 101

1  Response Team 2, is that their only assignment
2  for that shift?
3      A.   No.
4      Q.   What other assignment would they
5  have for that safety?
6      A.   They are assigned to a housing unit
7  or wherever inmates are.
8      Q.   You were just asked about the
9  location of Mr. Jung, whether he was inside the
10 cell or outside the cell.  But earlier, you
11 talked about having inmate workers have to pick
12 him up and put him back in his cell.
13         Does that refresh your recollection
14 about your location at the time you were
15 interacting with him?
16     A.   No.
17     Q.   Would there have been any reason to
18 have the inmates put him in his cell if he was
19 already in his cell?
20     A.   Not if he was in his cell, no.
21     Q.   And I believe you said the reason
22 you were called there is because Mr. Jung was
23 refusing to go back into his cell?
24              ATTORNEY GROTE:  Objection.
25              ATTORNEY PESTRAK:  Okay.

Page 102

1  Well, I'll just read it off the document.
2              ATTORNEY GROTE:  Just the --
3              ATTORNEY PESTRAK:  No, I agree
4  with you.  I can get it --
5              ATTORNEY GROTE:  She didn't
6  recall, per se.
7              ATTORNEY PESTRAK:  Got you.
8  BY ATTORNEY PESTRAK:
9      Q.   What was shown to you as Exhibit P-2
10 was -- okay.  I apologize.  It does say
11 "refuses to get up."
12         If he was inside of his cell and
13 refusing to get up, would a supervisor be
14 needed to respond to the location?
15     A.   No.
16     Q.   One of the series of scenarios for
17 needing medical -- sorry.  Let me rephrase.
18         We went over a lot of different
19 scenarios for needing medical calls.  If you
20 observed a visible injury on an inmate, would
21 that require a medical call or a stretcher
22 call?
23     A.   Not a stretcher call, no.  He would
24 be escorted to medical.
25     Q.   I'm going to direct your attention

Page 103

1  to Plaintiffs' Exhibit 1, specifically pages
2  that were Bates-stamped City Production 004399
3  and 004400.  What is the title of those two
4  slides?
5      A.   "Diabetic Emergencies."
6      Q.   Do you know who made these slides?
7      A.   I'm assuming Medical.
8      Q.   And why are you assuming that?
9      A.   Because it's a medical situation.
10     Q.   Do you know who Corizon Health is?
11     A.   Medical.
12     Q.   And that's the Medical at the
13 Philadelphia prisons?
14     A.   Yes.
15     Q.   And on both of these slides, there's
16 -- well, the slide on 004399, there's signs and
17 symptoms of diabetic emergencies.  And you
18 actually mentioned one earlier, which was
19 sweating; right?
20     A.   Yes.
21     Q.   So you were made aware that if you
22 see these signs, then you should do a medical
23 call?
24     A.   Yes.  It wouldn't be a stretcher
25 call, all the time, but it would be a medical

Page 104

1  call.
2      Q.   And is that true for the symptoms
3  that are listed on slide 004400?
4      A.   Again, not a stretcher call; we
5  would call for Medical.
6      Q.   I'm going to put Plaintiffs-1 away
7  for now.
8         We talked a little bit about a nurse
9  and a CO being together on the floor.  If a
10 nurse observes the same thing a Correctional
11 Officer does, but doesn't render any aid --
12 well, let me rephrase.
13         If you and a nurse are together, and
14 you see the exact same incident, and the nurse
15 doesn't describe it as a medical incident, what
16 would you do?
17              ATTORNEY WITTEKIND:  Objection
18 to form.
19 BY ATTORNEY PESTRAK:
20     Q.   You can answer.
21     A.   I would take the advice of the
22 medical staff.  And if she or he tells me that
23 nothing needs to be done, then nothing gets
24 done.
25     Q.   If a nurse is on the floor and a

Page 105

1  medical event occurs, would the nurse be able
2  to render aid or assistance before any medical
3  or stretcher call is made?
4       A.    Yes.
5       Q.    Are you ever -- were you ever in a
6  situation where a nurse was on the floor, and a
7  medical situation happened, and the nurse
8  walked away and told you to call a stretcher?
9       A.    No.
10      Q.    Would there be any sense in a nurse
11  walking away from a medical situation and
12  telling you to call a stretcher?
13      A.    No.
14      Q.    Okay.  I just want to go back to
15  Exhibit Plaintiffs-2, and specifically, the log
16  again, which started on 000157.
17           I'm going to direct your attention
18  to the 10:42 event.  No.  I'm sorry.  The 10:57
19  event, can you read that for us out loud?
20      A.    "Medication event.  Meds in
21  progress.  Nurse Cabellos escorted by CO
22  Frasier."
23      Q.    And then the notification that you
24  were directed to earlier, that was at 11:01?
25      A.    Yes.

Page 106

1       Q.    So that's, approximately, four
2  minutes after Nurse Cabellos was doing the
3  medication event?
4       A.    Yes.
5       Q.    Okay.  And going to page 000160, at
6  16:49 -- I'm bad at military time -- but that's
7  approximately five-and-a-half hours after your
8  interaction with Mr. Jung; correct?
9       A.    Yes.
10      Q.    Okay.  Can you tell us --
11           ATTORNEY GROTE:  Isn't that --
12           ATTORNEY WITTEKIND:  Is it
13  more than five?
14           ATTORNEY GROTE:  Disregard me.
15  I'm worse at military time.
16           THE WITNESS:  That's -- that
17  would be 4:49, so yeah.
18           ATTORNEY PESTRAK:  Perfect.
19           ATTORNEY GROTE:  Disregard.
20  BY ATTORNEY PESTRAK:
21      Q.    It says, "Other event:  Louis Jung
22  refused insulin."  We talked about this one.
23           But prior to that, at 16:35, it
24  says, "Insulin in progress."  Who gives the
25  insulin?

Page 107

1       A.    The nurse.
2       Q.    And, in fact, at 17- -- well, we'll
3  skip that one.
4           At 16:49, Mr. Jung would have
5  interacted with the medical personnel?
6       A.    If he was to get insulin, yes.
7       Q.    And that, again, was four-and-a-half
8  hours after your interaction with him?
9       A.    Yes.
10      Q.    And we talked a lot about not being
11  able to get up and refusing to get up.  Are you
12  able to tell us the difference between the two?
13      A.    Yes.
14      Q.    Go ahead.
15      A.    Unable to get up, the inmate will
16  tell me, "I can't move," "I can't get up."
17           Refusing to get up is, usually, I
18  would ask:  "Are you having an issue?  Why
19  aren't you getting up?"  It could be, "I'm not
20  getting up" or "I don't want to get up," "I
21  don't want to go back in the cell."  So,
22  basically, it comes from the inmate himself.
23      Q.    If you asked the inmate if he's able
24  to get up and you get no response, what would
25  you do?

Page 108

1       A.    If I didn't get a response, I would
2  ask again.  And then I would ask the officer,
3  "What's going on with this inmate?"  Because,
4  again, I'm not on the housing unit like the
5  officer is.  So I would ask the officer, "What
6  is going on with the inmate," and either she
7  would tell me, "He's refusing" or "He can't get
8  up."  So then I would just call for a stretcher
9  if it seems like he's having some kind of
10  medical issue.
11      Q.    I don't have any more questions for
12  you, but there might be some follow-up.
13           ATTORNEY GROTE:  Brief
14  follow-up.
15           EXAMINATION
16  BY ATTORNEY GROTE:
17      Q.    In the housing logs, where it's
18  talking about "Medication event:  Louis Jung
19  refused insulin," above that, it says, "Insulin
20  in progress."  What is -- does that -- where is
21  the insulin being administered when there's a
22  note, "Insulin in progress"?  Is it in the area
23  you spoke of before, the triage room?
24      A.    Yes.
25      Q.    Or the triage area in the Unit

Page 109

1   Management room?
2       A.   Yes.
3           ATTORNEY GROTE:  Okay.  No
4   further questions.
5           ATTORNEY PESTRAK:  Anyone
6   else?
7       (A discussion was held off the record.)
8           THE REPORTER:  Mike?  Ray?
9   Jonathan?  Copies of the transcript?
10          ATTORNEY PESTRAK:  Full and
11  mini.
12          ATTORNEY WITTEKIND:  Yes.  No
13  hard copy.
14          ATTORNEY KAMINSKY:  Same here,
15  electronic only.
16      (The deposition concluded at 12:41 p.m.,
17          and signature was waived.)
18              - - -
19
20
21
22
23
24
25

```
1                              - - -

2              E R R A T A    S H E E T

3                              - - -

4

5    PAGE         LINE         CHANGE

6    _____      _____      _____

7    _____      _____      _____

8    _____      _____      _____

9    _____      _____      _____

10   _____      _____      _____

11   _____      _____      _____

12   _____      _____      _____

13   _____      _____      _____

14   _____      _____      _____

15   _____      _____      _____

16   _____      _____      _____

17   _____      _____      _____

18   _____      _____      _____

19   _____      _____      _____

20   _____      _____      _____

21   _____      _____      _____

22   _____      _____      _____

23   _____      _____      _____

24   _____      _____      _____

25   _____      _____      _____
```

1          ACKNOWLEDGMENT OF DEPONENT

2

3          I,                          , do hereby

4    certify that I have read the foregoing pages and

5    that the same is a correct transcription of the

6    answers given by me to the questions therein

7    propounded, except for the corrections or

8    changes in form or substance, if any, noted in

9    the attached Errata Sheet.

10

11

12

13

14

15    _____        _____
      Date              Signature

16

17

18

19

20

21

22

23

24

25

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 35 of 57

Deposition of Wanda Bloodsaw                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

C E R T I F I C A T E

COMMONWEALTH OF PENNSYLVANIA      )
                                 )
COUNTY OF PHILADELPHIA           )

  I, Alexander Schaffer, a Notary Public in and
for the Commonwealth of Pennsylvania, do hereby
certify that before me personally appeared
WANDA BLOODSAW, the witness herein; who then
was by me first duly sworn to testify the
truth, the whole truth, and nothing but the
truth in the taking of a deposition in the
cause aforesaid; that the testimony then given
by WANDA BLOODSAW as above set forth was
reduced to stenotype by me, in the presence of
said witness, and afterwards transcribed by
computer-aided transcription under my
direction.

  I do further certify that this deposition was
taken at the time and place specified in the
foregoing caption, and signature was waived.

  I do further certify that I am not a relative
of or counsel or attorney for any party hereto,
nor am I otherwise interested in the event of
this action.

  IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my seal of office at
Philadelphia, Pennsylvania, on this 12th day of
August 2025.

  The foregoing certification does not apply to
any reproduction of this transcript in any
respect unless under the direct control and/or
direction of the certifying reporter.


/s/ Alexander Schaffer
_____
                    ALEXANDER SCHAFFER,
                    Notary Public in and for the
                    Commonwealth of Pennsylvania
                    Notary ID:  1440904

                    My commission expires

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 36 of 57

Deposition of Wanda Bloodsaw                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

## WORD INDEX

**< 0 >**
**000146**  52:8
**000157**  56:21  105:16
**000158**  59:15, 20
**000159**  60:3
**000160**  60:3, 9, 11
  106:5
**000161**  60:4  62:7
**000192**  53:24  54:1, 4,
  5
**000193**  53:23  54:4, 6
**000194**  53:23
**000195**  52:8
**00149**  52:24
**004398**  34:2
**004399**  103:2, 16
**004400**  34:2  103:3
  104:3

**< 1 >**
**1**  4:11  33:25  34:3
  53:14  66:18  88:24
  100:21, 25  103:1
**10**  9:6  11:3
**10:04**  2:11
**10:42**  105:18
**10:57**  105:18
**108**  4:7
**11**  16:18
**11:00**  99:1
**11:01**  57:4  105:24
**11:05**  72:12
**11:43**  78:7
**1100**  3:4
**12**  2:10  86:16
**12:00**  78:8
**12:41**  109:16
**12-hour**  85:5, 14
  86:8, 9
**12th**  112:16
**14**  11:21  80:20
**1440904**  112:24
**1500**  3:3
**1515**  2:22
**15-day**  13:25
**16:35**  106:23
**16:49**  60:12  106:6

**107**:4
**17**  107:2
**17th**  2:23
**1801**  3:7
**19102**  2:23  3:4
**19103**  3:8
**19123**  1:14  2:9, 16
**1987**  8:19

**< 2 >**
**2**  4:12  52:9  53:2
  100:22  101:1
**2:24-cv-05618-TJS**
  1:5
**2:50**  11:6
**20**  15:6
**2004**  8:6, 11  16:6
  86:20
**2009**  10:22
**2020**  46:16
**2023**  11:22  41:11, 13
  45:16  51:3, 9, 16
  53:7  78:1  84:20
**2024**  13:11  14:15
**2025**  2:10  112:17
**20-plus**  23:21
**21**  56:24  71:15
**21st**  8:2
**2-2-3**  85:9
**24**  31:18  50:9
**27**  94:13, 14
**28**  13:11

**< 3 >**
**3**  53:14  67:8
**3:00**  11:4  36:9
**30**  84:20
**302**  83:17
**32**  24:22
**34**  4:10
**37**  53:14  68:2

**< 4 >**
**4:49**  106:17
**43833**  1:23

**< 5 >**
**5**  4:5  51:9, 11, 16
  53:7, 14  54:6, 7  60:5

**62**:8  70:24  71:6
  93:8  94:3, 9, 11
**52**  4:11

**< 6 >**
**6**  85:3
**60**  24:23
**67**  53:14  68:2

**< 7 >**
**7:00**  98:23, 24
**770**  3:8

**< 8 >**
**8:05**  72:11
**80**  24:23

**< 9 >**
**92**  4:5
**95**  4:6
**97**  4:6
**98**  4:7
**990**  1:13  2:8, 16

**< A >**
**a.m**  2:11  78:7  98:23
**able**  21:20  30:21
  33:9  36:1  56:10
  72:14  105:1  107:11,
  12, 23
**abnormal**  30:24
**ABOLITIONIST**
  1:13  2:8, 15
**Academy**  16:18, 25
  27:14, 18
**access**  27:6
**accompanied**  70:20
**Accu-Chek**  36:9
**accurate**  48:20, 24
  80:10
**ACKNOWLEDGMEN
T**  111:1
**action**  13:9  14:17
  80:13  112:14
**actions**  51:16  54:20
  83:16
**activities**  45:12
**additional**  30:9, 10
  47:11  50:2  72:25

**82**:11
**address**  26:3
**administered**  35:11
  50:22  108:21
**administering**  37:6
**administration**  20:19
  50:17, 24
**Administrators**  1:4
  5:11
**advice**  104:21
**Affairs**  5:24  14:11
  42:17  46:15  70:22
  73:24  74:8  86:14, 16
**affect**  85:23
**affixed**  112:16
**aforesaid**  112:7
**afternoon**  92:16
**agree**  59:20, 24  62:8,
  21  94:12  102:3
**ahead**  107:14
**aid**  104:11  105:2
**alert**  38:5  67:12
**Alexander**  2:5  112:4,
  19, 22
**alive**  18:10
**allowed**  72:7
**Alternative**  42:14
**amount**  45:11
**and/or**  112:19
**annual**  87:21
**answer**  6:18, 24  7:2,
  4  9:25  15:3  22:4, 13
  25:8  28:10  30:1
  31:4, 9  32:4  33:7, 17
  43:8  44:16  45:21
  46:8, 20  47:14  50:14
  54:23  57:24  58:20
  59:2, 12  62:18  64:14
  65:2  67:1, 17, 24
  68:6, 16  69:4, 10
  70:3  71:3, 21, 23
  73:8  74:21  75:13
  76:6, 12  78:3  79:19
  80:4  81:10, 24  83:2,
  24  84:8  85:20  86:2,
  24  87:4, 15  88:10
  89:18  90:12, 19  95:9
  96:8, 17  104:20
**answered**  31:9

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 37 of 57

Deposition of Wanda Bloodsaw                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

answers 50:7 111:6
Anton 77:24
anybody 76:20
apart 15:6
APOLLON 1:12 3:6
77:14 92:17
apologize 40:5
102:10
appear 54:3, 7
appeared 65:18
112:5
appears 33:2, 8
apply 112:18
appointment 20:6
21:19 31:16 38:7
40:16
appointments 21:7,
10, 13, 18 100:1
approached 97:25
appropriate 29:22
approximate 20:11
36:10
approximately 25:4
36:3 106:1, 7
Arch 2:22
area 10:11, 12 14:23,
25 17:6, 15 19:3, 11
22:22 25:24 29:18
35:16 36:12, 15, 21
37:4 42:9 48:6
49:20 69:13 72:1
79:12, 14 81:1 96:10
108:22, 25
areas 29:19 48:15
49:2 88:14
argument 17:10
armory 10:4
arrived 51:22
asked 22:5 23:20
27:15 73:17 74:13
75:4 101:8 107:23
asking 5:16 35:2
59:6 75:22
asleep 26:2
assault 28:5, 12, 22
assaults 28:4
assign 48:13 78:25
assigned 5:23 7:20
10:4, 9 11:7, 12
17:16 42:13, 14, 18

46:14 49:19 79:2
100:24, 25 101:6
assigning 10:5
assignment 101:1, 4
assignments 15:15
assistance 25:24
28:24 55:12 91:9
100:15 105:2
assisted 83:20
associated 37:17
assume 6:18
assuming 56:19
103:7, 8
attached 111:9
attempt 29:23
attention 18:25
23:23 38:9 56:20
73:5, 16 75:23
102:25 105:17
ATTORNEY 4:5, 6,
7 5:6 6:20, 25 7:14
9:23 15:1, 9 22:2, 6,
11, 23 24:9, 11, 13
28:8, 13 29:24 30:13
31:2, 20 32:2, 19, 23
33:1, 5, 11, 15, 19, 24
34:5 43:6, 13 44:14,
25 45:20 46:2, 7, 10,
19 47:4, 12 48:19
52:6, 11, 19, 24, 25
53:1, 3, 4, 24, 25 54:2,
21 55:5 56:2, 4
57:18, 20, 23 58:1, 19,
23 59:1, 4, 11, 14
60:6, 7, 9, 10, 18, 20,
23 62:16, 20 64:12,
16, 25 65:3, 9 66:24
67:7, 15, 19, 22 68:1,
4, 8, 14, 23 69:3, 6, 9,
22 70:1, 6 71:1, 4, 19
72:3 73:6, 11 74:19,
23 75:10, 12, 17 76:4,
7, 10, 23 77:3, 7 78:2,
5, 9 79:18, 25 80:3, 7
81:8, 18, 23 82:8, 25
83:4, 22, 25 84:2, 6,
10 85:18, 22, 25 86:7,
23 87:1, 3, 11, 14, 16,
18 89:16, 21 90:10,
15, 18, 25 92:8, 10, 12,

15 93:18, 21 94:18,
21 95:7, 11, 13, 16
96:6, 12, 15, 20 97:15,
17, 20 98:6, 8, 12
101:24, 25 102:2, 3, 5,
7, 8 104:17, 19
106:11, 12, 14, 18, 19,
20 108:13, 16 109:3,
5, 10, 12, 14 112:13
audio 67:4
August 2:10 112:17
authorities 81:16
authority 5:25 76:2
available 99:10
Avenue 17:1
aware 41:13, 20
45:14 50:11, 17, 23
51:7, 15, 18 103:21

< B >
B1 43:4
B2 43:4, 11
B3 43:5
back 13:25 16:6
19:19 35:17 40:5
41:8 45:16 46:23
53:22 55:6 62:13
74:2, 4 78:8 81:14
83:8 86:20 101:12,
23 105:14 107:21
bad 106:6
Bank 9:12, 13
bars 98:2
base 54:13
basically 11:15
12:17 13:6 16:23
35:10 42:8 67:10
69:14 80:12, 13
88:10 100:22 107:22
basis 68:11 92:2
Bates-stamped 52:7
103:2
beat 13:6 80:5
becoming 82:23
bed 25:21
began 9:18 20:12
46:15 84:19, 23
beginning 6:10 40:5
Behalf 1:8 2:13, 20

3:1, 6
behaving 30:16
behavior 30:23
50:15 81:20, 22
behavioral 50:4, 12
believe 13:14 14:3,
18 16:18 34:9, 10
43:10, 11 45:5 46:15
57:7 74:2, 15 78:23
79:1, 20 84:13 88:22
99:15 101:21
believed 14:16
believing 82:4
Benefits 86:25 87:6,
19
best 46:11 73:25
better 87:6, 7
big 16:12 36:16
37:4
bigger 100:16
bit 30:18 34:14
104:8
BLAIR 1:12 3:1
57:16 76:25 95:18,
21 96:5
BLANCHE 1:9 2:21
77:18
block 66:10
BLOODSAW 1:7, 13
2:1, 20 4:4 5:2, 7, 15
18:18 52:8 56:23
71:9 112:5, 8
bodily 30:25
body 98:3, 5
bottom 56:21
Boulevard 3:3
break 16:13 34:13
40:6, 9 48:9 78:6
breathe 22:18 27:24
91:15
breathing 25:18
26:4, 8 31:23
Bret 1:11 2:13 5:9
53:1
Bretgrote@abolitionist
lawcenter.org 2:17
brief 93:20 108:13
brought 6:1 38:9
43:23

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 38 of 57

Deposition of Wanda Bloodsaw                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**Building**  43:*1, 3*
44:*3, 9*
**bus**  9:8  87:9, *12*

**< C >**
**CABELLOS**  1:*12*
3:*1*  57:*17*  77:*1*
95:*18, 21*  96:5
105:*21*  106:2
**calendar**  94:*20*
**call**  11:2, *6*  19:*1, 25*
21:*19*  22:*18, 21*  23:9,
*13, 23, 25*  24:5  26:*5,
6*  27:*3*  28:*17, 23*
29:5  30:*10*  32:*13, 17,
22*  33:*10, 13*  34:*12,
14*  38:*18, 19, 22*
40:*24*  41:*1*  49:*13, 17,
18*  55:*18*  69:*21, 24*
70:*12*  72:*25*  75:*19*
91:*16, 23*  92:7, *19, 22,
24*  93:*5, 6, 10, 15*
100:*20*  102:*21, 22, 23*
103:*23, 25*  104:*1, 4, 5*
105:*3, 8, 12*  108:8
**called**  2:2  20:*5, 21*
21:*14*  29:*2*  30:6
40:*25*  52:2  55:*20*
56:*3, 5, 19*  57:2
66:*18*  69:*12*  70:7, *8,
13*  73:*24*  74:7, *14, 16*
75:*1, 6*  78:*21*  85:9
100:*20*  101:*22*
**calling**  11:*12*  69:*15*
78:*20*
**calls**  28:*17*  38:*14*
100:*4*  102:*19*
**calm**  72:*19*
**Captain**  27:*12*  30:*11*
98:*24*
**caption**  112:*12*
**care**  40:*13, 18*  41:*19*
89:*24*  95:6  97:7
**career**  99:8
**CARNEY**  1:9  2:*21*
77:*18, 20, 21, 22*
**Case**  1:5  5:*10*  17:*21*
20:*15*  32:*15*  43:*14*
55:*24*  61:*13*  72:*21*

98:*23*
**cause**  112:7
**ceiling**  25:*19*
**cell**  25:*13*  32:7
45:*10, 11*  55:7  56:*18*
62:*10, 14*  63:2  64:7
65:*7, 12*  66:7  69:*19*
71:*15*  72:*1, 15, 20, 22*
73:5  80:*17*  91:*3*
96:*21*  97:*3, 5, 7, 8, 12,
24*  101:*10, 12, 18, 19,
20, 23*  102:*12*  107:*21*
**celled**  80:*11*
**cellmate**  80:*18*  97:*5,
9, 12*
**cells**  24:*22*  25:*11*
72:5
**census**  10:*13*  11:*10*
17:*13, 17, 19*  42:7
**CENTER**  1:*13*  2:*8,
15*  3:3  10:*10*  48:*11*
**certain**  19:*6*  33:*22*
42:2
**certification**  112:*18*
**certify**  111:*4*  112:*5,
11, 13*
**certifying**  112:*19*
**CFCF**  24:*17, 19*
35:*16, 22*  42:*18, 20,
22*  43:*15*  58:*10, 11,
16*
**chain**  29:*21*
**change**  54:*19*  86:*10*
99:*23*  110:5
**changed**  19:*22, 24*
86:*11*
**changes**  76:2  111:8
**charge**  10:2, *4*  11:*1*
12:*4*
**charged**  53:*13*
**charges**  53:9, *16*
**check**  20:6  25:*14*
**checks**  50:*25*
**chime**  6:*21*
**circumstance**  63:*21*
**circumstances**  19:*17*
23:*12*  99:2
**Citizens**  9:*13*
**CITY**  1:8  2:*20, 22*

34:*1*  87:*13*  103:2
**CIVIL**  1:*4*  2:*4*
civilian  19:*11*
civilians  19:*15*
**clarifying**  24:*10*
**classification**  16:*4*
**classroom**  16:*23*  88:9
**classroom-style**  87:*23*
**clear**  23:*19*
**cleared**  81:*13*  82:5
83:*14*
**clearly**  72:*14*
**clinic**  10:7  78:*25*
79:*3*
**closing**  66:*10*
**Code**  53:*15*
**college**  8:*19*
**combative**  72:*23*
**come**  13:*24*  19:*18,
24*  20:2, *5, 7*  22:*21*
31:*10*  34:*15*  38:*15*
48:7  50:8  91:*12*
93:*3*  97:9
**comes**  35:*18*  36:3
46:*3*  107:*22*
**comfortable**  55:*15*
**coming**  7:*15*  32:7
43:*21*  99:*25*
**commencing**  2:*10*
**commission**  112:*25*
**Commissioner**  1:*10*
6:2
**common**  60:*24*
**Commonwealth**  2:6
112:*2, 4, 23*
**communicate**  82:*16,
17*
**communications**  96:*4*
**Community**  8:*20*
**compared**  44:*12*
**complaining**  23:*3*
**complaint**  5:*25*  6:*1*
22:*25*  23:2
**completing**  95:*1*
**Compliance**  42:*16*
52:*3*
**computer**  16:*20*
18:*17*  20:*1*
**computer-aided**  112:9

**concluded**  109:*16*
**condition**  91:*22*
**conditions**  33:*21*
45:*9, 10*
**conduct**  11:2, *5, 6, 11*
12:7  53:*15*
**conducted**  18:*18*
**consequence**  13:*20*
**consider**  97:*21, 23*
**considered**  19:*14*
27:*21*  42:*25*
**consist**  18:*23*
**contact**  23:*1*  33:*3*
39:*6*
**contacted**  71:*12, 13*
**contacting**  91:7
**control**  10:9, *10*  48:9
112:*19*
**conversation**  67:*5*
68:*20, 21*
**conversations**  7:*14*
**Copies**  109:*9*
**copy**  59:*19*  109:*13*
**copying**  56:*23*
**Corizon**  4:*10*  103:*10*
**CORP**  1:9
**correct**  10:*14*  11:*10,
14*  14:7  25:*8*  36:*13*
55:7  77:*1, 4*  94:*23,
24*  95:*2, 3, 21, 22*
106:*8*  111:5
**correctional**  5:*25*
7:*21*  9:*20, 21*  10:2, *6*
11:7, *11*  12:5, *9, 12,
15*  15:*25*  16:7  17:6
18:2, *18*  19:*13*  24:2
27:9  31:5  38:*10*
40:*23*  41:*19*  42:*12,
13*  47:3  55:*22*  58:*14,
18*  60:*25*  61:*13, 16,
17*  63:*23*  74:*11*
76:*24*  93:*1*  100:9, *14*
104:*10*
**Corrections**  10:*16, 24*
11:*16*  17:*23*  19:5
21:6  30:*14, 22*  32:*1*
37:8, *24*  38:6  39:7
40:*14, 22*  49:*14, 15*
86:*22*  111:7

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 39 of 57

Deposition of Wanda Bloodsaw                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Counsel 1:9 2:12
5:9 7:1, 4 112:13
counseled 14:9, 14
counseling 12:25
14:4, 6 78:13, 19
count 10:13 11:10,
11, 12 17:12, 18, 19,
20 42:7
COUNTY 112:3
couple 60:21 95:14,
19
course 29:16 32:8
COURT 1:1 2:5
6:13 44:23
cover 25:20 52:12,
15, 16 64:3 99:4, 17
coverage 45:24
covered 16:11
COVID 46:16 51:3
criteria 44:19
crossed 54:7
currently 7:19, 20
90:6
custody 38:3 43:21

< D >
dangerous 87:10
dark 56:22
date 20:14 51:17
93:8, 11 97:11
111:15
dates 20:15
day 36:4, 5 45:17, 23
47:9 51:23 52:1
54:14, 20 56:17 57:4,
11 60:16 69:8 72:5,
6, 8 74:6 79:7 81:13,
21 83:11 84:19 96:3,
21 112:16
days 47:3 64:20, 21
74:3 85:8, 10, 11
deal 22:8 65:24
dealing 83:20
dealt 72:16
death 13:5, 6, 10
74:12 80:6 83:12
decedent 13:13
December 8:6, 11
decided 84:16
deciding 80:17

decision 62:3 66:23
75:19 86:20
decisions 15:10 84:4
de-escalate 17:11
29:8
defend 68:18
Defendant 2:2 3:6
5:2
Defendants 1:14
2:20 3:1 77:9
defense 69:2, 7, 11
Definitely 74:22
75:1, 5
dental 9:15
Department 1:10
2:22 5:24 7:21 8:4,
14 9:3 51:6
depend 88:19
depending 49:21
65:25 69:12
depends 22:19 32:6
50:6 66:17 88:22
89:2
DEPONENT 111:1
Deposition 1:6 2:1
5:18 7:8, 11 109:16
112:7, 11
Deputy 6:2 14:13
describe 36:15 43:17
91:21 104:15
described 78:14
describing 90:7
DESCRIPTION 4:10
Detention 42:15
determine 39:24
66:12 91:14
diabetes 4:11 34:23
35:1, 4, 6 37:17, 21,
23 38:3
diabetic 95:6 103:5,
17
diagnose 18:25
died 73:20 79:6
85:2, 3
difference 38:1
107:12
differences 45:1, 13
different 10:24 12:2
27:25 45:6 72:24
74:18 80:21, 23 81:1

83:9, 10 92:3 99:20
102:18
differently 90:23
direct 53:22 56:20
97:2 102:25 105:17
112:19
directed 105:24
direction 112:10, 19
disagree 67:20 68:3
discharged 10:12, 14
Disciplinary 4:11
12:19 13:2 14:12
29:16 51:12, 14
52:13
discipline 12:25
13:19 14:6 48:1
discussed 41:12
87:22
discussing 96:1
discussion 93:20
109:7
discussions 95:24
dishonest 58:25 59:7
dispensary 20:21
35:13
disposition 53:16
Disregard 106:14, 19
distributed 21:3
DISTRICT 1:1, 2
DIVISION 1:4
dizzy 22:19
doc 93:13
document 23:13, 14,
24 24:5 26:13 34:8
41:21, 22 102:1
documentation 4:11
93:14
documented 18:11,
16 42:4 55:21 56:3
64:24
doing 12:12 25:14
32:10 37:7 40:7
106:2
domain 16:2
door 25:25 26:7
66:10
doors 48:11
doorway 91:2
Dr 77:16

draft 98:18, 24
99:13, 14, 20
drafted 98:21 99:3,
15, 16
dragged 62:13
driver 9:8
duly 5:3 112:6
duties 12:16 46:24
64:19, 22 66:21
duty 14:11 93:8

< E >
earlier 37:19 55:16
78:10 92:20 93:22
95:20 101:10 103:18
105:24
early 77:25
EASTERN 1:2
education 4:10
educational 8:8, 16
Efficient 67:8
Eight 79:15 86:15
89:8
either 15:18 31:10
44:22 61:23 73:1
108:6
electronic 31:6
109:15
emergencies 22:1, 10
27:25 28:1 89:15
103:5, 17
emergency 19:20
27:22 31:11, 17, 19
69:20
employee 27:16
52:23 53:5, 15
employer 12:21
employment 8:11, 13
9:4, 9
encompass 17:9
encounter 59:8 62:23
ends 72:11
engage 30:21, 23
ensure 67:13
ensuring 63:8
entail 67:9 82:14
87:2
entailed 44:2 87:9
enter 27:7 60:25

Case 2:24-cv-05618-TJS     Document 100-5     Filed 12/05/25     Page 40 of 57

Deposition of Wanda Bloodsaw                     Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

61:*17*  97:*2, 7, 8*
**entered**  26:*25*  60:*13*
**entries**  60:*5*  62:*7*
**entry**  60:*12*  63:*23*
71:*8*
**equal**  28:*4*
**equally**  68:*24*
**Equity**  86:*19*
**Errata**  111:*9*
**erratic**  81:*25*
**escalates**  17:*11*
**escort**  19:*6*  21:*7, 9*
40:*15*  47:*24*  48:*23*
49:*5*
**escorted**  19:*13*  21:*16*
31:*13*  47:*19*  102:*24*
105:*21*
**especially**  32:*9*
**Esq**  1:*11, 12*  2:*13,*
*14, 15, 21*  3:*2, 6*
**Estate**  1:*5*  5:*12*
**evaluation**  44:*7*
**evaluations**  44:*5*
**event**  105:*1, 18, 19,*
*20*  106:*3, 21*  108:*18*
112:*14*
**eventually**  73:*1*
**Everest**  1:*23*
**everybody**  18:*9*
90:*22*
**exact**  90:*24*  104:*14*
**Exactly**  7:*1*  26:*4*
32:*18*  37:*19*  75:*20*
76:*18*  80:*10*
**examination**  2:*3*  5:*5*
92:*14*  95:*15*  97:*19*
98:*11*  108:*15*
**EXAMINATIONS**
4:*2*
**examined**  5:*3*
**example**  40:*14*  97:*3*
**excuse**  35:*12*  36:*12*
**exhausting**  85:*17*
**EXHIBIT**  4:*10, 11,*
*12*  26:*10*  33:*25*  34:*3*
52:*7, 9*  53:*2*  102:*9*
103:*1*  105:*15*
**EXHIBITS**  4:*9*
**experience**  46:*23*

**experienced**  76:*14*
**expert**  35:*2*
**expires**  112:*25*
**explain**  30:*18*  88:*15*
**expressing**  32:*21*
**extensive**  82:*13*
**extent**  46:*20*
**extremely**  45:*23*

**< F >**
**facilities**  42:*10*
**Facility**  7:*21*  10:*15*
12:*8*  24:*10*  42:*13*
**fact**  65:*14*  107:*2*
**factors**  80:*14*  81:*6*
**fair**  22:*25*  28:*2*
66:*23*  94:*8*  95:*23*
96:*22*
**fall**  51:*3*
**familiar**  34:*23, 25*
41:*10*  76:*25*  77:*4, 6,*
*8*  95:*21*
**far**  92:*19*
**fast**  98:*14*
**Federal**  2:*3*
**feel**  15:*17*  32:*15*
55:*14*  66:*15*  84:*3*
**feeling**  32:*12*
**fellow**  66:*5*
**fewer**  48:*21*  49:*9*
**fight**  80:*24*
**Fighting**  27:*23*
**figuring**  84:*4*
**Filed**  1:*8*
**filled**  62:*3*
**filling**  11:*8*  99:*20*
**find**  30:*11*  76:*17*
**finding**  67:*21*
**findings**  68:*3*
**finger**  35:*19*
**first**  5:*3*  13:*1*  30:*4,*
*6*  45:*16*  47:*5*  84:*19*
92:*5*  100:*10, 12*
112:*6*
**fit**  36:*17*
**five**  64:*20*  106:*13*
**five-and-a-half**  106:*7*
**flag**  39:*10, 15, 22, 25*
40:*1*

**Floor**  2:*23*  24:*21*
25:*20*  65:*15, 16, 19*
66:*10*  92:*3*  98:*5*
104:*9, 25*  105:*6*
**floors**  24:*21*  79:*15*
99:*25*
**flow**  88:*21*
**focus**  20:*14*
**focused**  51:*16*
**follows**  5:*4*
**follow-up**  20:*6*  97:*18*
108:*12, 14*
**foregoing**  111:*4*
112:*12, 18*
**forgot**  37:*19*  79:*1*
**form**  9:*24*  15:*2*
22:*3*  28:*9*  29:*25*
31:*3*  32:*3, 24*  33:*6,*
*16*  41:*6, 11, 16*  43:*7*
44:*15*  47:*13*  54:*22*
57:*19*  61:*19*  62:*2, 4,*
*17*  64:*13*  65:*1*  66:*25*
67:*16, 23*  68:*5, 15*
70:*2*  71:*2, 20*  73:*7*
74:*20*  75:*11*  76:*5*
81:*9*  83:*1, 23*  85:*19*
86:*1*  89:*17*  90:*11*
95:*8*  96:*7, 16*  104:*18*
111:*8*
**Former**  1:*9*
**forms**  95:*2*
**forth**  112:*8*
**found**  12:*20*  13:*7, 16*
53:*19*  54:*3, 8*  66:*22*
70:*21*  80:*8*
**four**  24:*20, 22*  48:*11,*
*14*  54:*8*  64:*20*  98:*22,*
*25*  106:*1*
**four-and-a-half**  107:*7*
**fourth**  60:*12*
**FRASIER**  1:*12*  2:*20*
56:*25*  57:*2*  58:*2, 3, 6,*
*14*  60:*14*  61:*13, 16,*
*17*  63:*14, 16*  64:*9*
67:*5*  68:*20*  69:*12*
70:*19, 24*  71:*7*  74:*12*
76:*25*  77:*10*  96:*3, 13*
105:*22*
**Frasier's**  58:*18*  63:*11*

**Friday**  85:*13*
**frustrated**  86:*6*
**frustrating**  86:*5*
**full**  5:*13*  42:*3*
109:*10*
**fully**  50:*1*
**further**  92:*8*  95:*12*
98:*7*  109:*4*  112:*11,*
*13*

**< G >**
**gangs**  81:*2*
**Garden**  1:*13*  2:*8, 16*
**GAY**  1:*11*  77:*11, 12*
**GENA**  1:*12*  2:*20*
58:*2, 5*
**general**  17:*8*  28:*4*
43:*10*  44:*12, 22*  45:*2,*
*8*  53:*12, 14, 19, 20*
55:*4*  66:*18*  67:*8*
**generally**  9:*22*  46:*18*
**generate**  50:*12*
**gentleman**  15:*7*
**getting**  66:*16*  107:*19,*
*20*
**give**  7:*7*  16:*8, 14*
26:*10*  35:*7, 20*  41:*7*
47:*18*  52:*19*  63:*22*
**given**  5:*17*  21:*20*
35:*15*  83:*9*  100:*19*
111:*6*  112:*7*
**gives**  28:*24*  35:*19*
106:*24*
**giving**  11:*6*
**glucose**  50:*24*
**go**  6:*9*  7:*12*  8:*8*
10:*6*  16:*6*  17:*14*
20:*23*  27:*18, 19*
29:*10, 12, 14*  35:*24*
36:*1*  39:*22*  40:*23, 25*
41:*4, 18*  42:*7*  44:*1*
48:*12*  53:*10*  60:*2*
63:*3, 5*  65:*7, 12*  66:*2*
69:*14, 18*  72:*2, 15, 17*
73:*1, 4*  76:*17, 20, 21*
78:*5*  80:*14*  83:*15*
88:*15*  92:*11, 13*
101:*23*  105:*14*
107:*14, 21*
**goes**  36:*22*  80:*17*

going 5:16 6:9, 21
8:7, 12 30:12 32:18
33:24 40:15, 18 52:6
54:16 59:16 69:17
72:9 74:10 82:1, 7
86:19 88:25 98:13,
14 102:25 104:6
105:17 106:5 108:3,
6
Good 5:7, 8 32:15
92:16
gotten 73:16
graduated 8:10, 18
Grote 1:11 2:13 4:5,
7 5:6, 9 6:25 15:9
22:6, 23 24:11, 13
28:13 30:13 31:20
32:19 33:1, 11, 19, 24
34:5 43:13 44:25
46:2, 10 47:4 48:19
52:6, 11, 25 53:3, 4,
25 54:2 55:5 56:4
57:20 58:1, 23 59:4,
14 60:7, 10, 20, 23
62:20 64:16 65:9
67:7, 19 68:1, 8, 23
69:6, 22 70:6 71:4
72:3 73:11 74:23
75:17 76:7, 23 77:7
78:5, 9 79:25 80:7
81:18 82:8 83:4, 25
84:2, 10 85:22 86:7
87:1, 11, 16, 18 89:21
90:15, 25 92:8
101:24 102:2, 5
106:11, 14, 19 108:13,
16 109:3
ground 6:10
guess 9:16 25:13
36:2, 24 45:10 49:8
53:23 68:9 74:10
89:2
guide 97:1
guilt 67:21 68:3
guilty 53:19 54:6, 8,
12, 17 55:4 66:22
68:11, 25 69:1 80:8
gurney 36:23

< H >
half 18:2, 4
hand 112:16
handcuffed 31:13
handed 27:19
handheld 19:2
handle 28:19 29:4
40:12 76:19 83:9, 11
handled 80:15
handling 10:4
hanging 25:19
happen 20:12 42:9
83:10 88:18
happened 68:13
69:8 74:14 76:1
79:17, 23 94:12 96:3
105:7
happens 34:14 40:20
42:3 43:18 49:20
happy 16:13
hard 68:9 109:13
head 6:11 10:13
11:10 17:12 42:7
Health 4:10 22:24
23:2 30:17 31:7, 14,
15 44:7 47:20, 25
50:4, 9, 12, 20 67:14
81:11, 13 82:3, 4
83:12, 14, 15 103:10
heard 21:22 39:15
41:20 98:17
held 93:20 109:7
help 48:18 52:21
66:4 72:25 73:4
helps 66:6
hereto 112:13
hereunto 112:14
Hey 38:14 75:23
high 8:10, 22 27:25
30:3
highlight 56:22
history 8:9, 11, 12, 17
9:4, 10 12:19 42:11
44:1
Hold 48:22 79:14
holds 24:23 36:19
37:4
Holston 1:11 2:14
hopefully 98:10

hospital 10:7
hour 18:2, 4
hours 31:18 45:25
50:9 86:15, 17 98:22,
25 99:3 106:7 107:8
housed 15:5, 7 81:4
housing 10:11, 12
14:22, 25 15:10, 14
17:4, 5, 15 19:3, 11,
18 20:25 21:1, 2, 4, 5
22:22 24:8, 14, 18, 19,
20, 21, 24 25:23
26:16, 19 29:18, 19
35:21 39:7 41:22, 25
42:1, 5, 9, 24 43:5, 12
44:11, 12 45:2, 3, 19
47:16, 22, 23 48:15,
17 49:20 56:13, 14
61:1, 8, 18 62:22
63:9, 12, 15, 17, 19, 24
64:9 69:13 71:8, 10,
11 72:1 75:16, 21
77:25 79:9, 11 80:15
88:14 96:10 98:1
101:6 108:4, 17
Hu 1:12 2:15

< I >
I/P 56:24 60:12
ID 112:24
idea 20:11 87:8
identification 34:4
52:10
identify 39:2
illness 23:5, 7
immediate 30:25
immediately 31:19
impact 46:24 49:5, 8
50:16
impacted 46:17
implemented 99:5
imposed 13:19
improved 90:9, 14, 17
incarcerated 55:7
62:10, 14 65:23
77:24
incident 12:22, 23, 24
13:1, 8, 24 14:2, 4, 9,
15 27:2 29:23 30:25
47:16 52:14 61:7

78:11, 15 79:5
104:14, 15
incidents 12:8
Including 12:23, 24
independently 71:6
individual 95:6
individuals 25:12
inexperience 81:15
inexperienced 64:19
infirmary 40:17
inform 79:2
informal 14:6 78:13,
18
information 27:7, 8
47:18 71:16 88:2
informed 31:12 61:6,
12
initial 9:19
initiating 38:24, 25
injuries 29:11, 15
injury 29:13, 14
102:20
inmate 13:5, 6 14:21
18:24 19:25 21:14,
15 22:17, 20 23:15,
22 25:17 26:1, 7
28:12, 14, 15 30:16
31:13, 22 32:5, 11, 20
35:18, 24 37:1 39:17,
20 40:12, 22 41:3, 7,
16 43:23 47:19, 24
48:2 50:10 55:12, 14
57:3 59:19 61:5
65:12 66:1, 3, 6, 14
69:16, 19 71:24 72:1,
17, 18 73:21 74:5
76:16 80:25 81:4, 5
92:1 97:3, 4 100:17
101:11 102:20
107:15, 22, 23 108:3,
6
inmate-on-inmate
28:21
inmate-patient 38:6
inmates 10:3, 7, 11
11:1 12:6, 10 17:14
18:21 20:22 21:7
24:23 25:20 29:9
35:8 36:4 37:3
48:23 66:4, 5 67:14

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 42 of 57

Deposition of Wanda Bloodsaw                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

80:*21*  82:6, *17*  101:7, *18*
**inmate's**  97:2
**inside**  25:*12*  101:9  102:*12*
**instance**  67:*21*  70:*15*  78:*12, 17*
**instances**  24:3  33:4  50:*11*  60:4  78:*12*  91:*1*
**instructed**  22:8
**instructions**  95:5
**instructs**  7:4
**insulin**  35:9, *11*, *15*, *20*, *25*  36:*1, 9*  37:7  38:*13, 16*  39:*1, 3*  50:*24*  60:*13, 15, 25*  61:*21*  106:*22, 24, 25*  107:6  108:*19, 21, 22*
**intake**  42:*22, 25*  43:2, *5*, *17*, *18*, *22*  44:*10, 12, 17, 21*  45:2, *4*, *18*  77:*24*  93:*23, 24*  94:*13, 23*  95:*1, 5*
**intentions**  79:22
**interacted**  107:5
**interacting**  101:*15*
**interaction**  59:8  94:*1, 9, 11*  97:*23*  106:8  107:8
**interactions**  94:6
**interested**  112:*14*
**Internal**  5:*24*  14:*11*  42:*17*  46:*15*  70:22  73:*24*  74:8  86:*14, 16*
**interpret**  57:*1*
**intervention**  40:2
**inverse**  91:*18*
**investigations**  12:7
**involved**  24:*1*  41:*20*  73:*23*  91:4
**involvement**  94:*25*
**involving**  14:*16*  27:3  52:*14*  78:*11*  79:5
**Irrelevant**  87:*17*
**issue**  20:2  21:*15*  23:5  25:*15*  30:*17*  37:*15*  65:*11, 13, 20*  66:*11, 13*  75:1  81:*12*

83:*21*  97:9  107:*18*  108:*10*
**issues**  31:22  46:*4, 14*  50:*23*  65:*24*  75:8  78:*14*

**< J >**
**J.kaminsky@kiernant  rebach.com**  3:9
**JACOB**  1:*4*  5:*10*
**jail**  27:22  35:*12*  43:*20*  46:*13, 23, 24*  49:*2, 7*  80:*20*  83:8  85:*1*
**jails**  83:8
**JAMES**  1:*4*  5:*11*
**January**  13:*11*  14:*15*
**Job**  1:*23*  12:*12*  64:*21*  78:*13, 19*  86:4  87:8
**jobs**  9:4
**John**  3:3
**join**  65:4
**JONATHAN**  3:6  92:*16*  109:9
**JR**  1:*5*  3:2  5:*12*
**juice**  35:8
**July**  8:2
**jumping**  98:*13*
**JUNG**  1:*4, 5*  5:*11*, *12*  20:*15*  34:*1*  51:*13*, *19*  52:*14*  55:2, *3, 6*  56:*7, 24*  57:8  59:*19*, *23, 25*  60:*13, 15*  61:*19*  62:*9, 13*  67:6  68:22  70:20  71:*16*  73:*19*  76:*1*  78:*11*  85:2  94:2, *6, 9*  95:*24*  96:*1, 5*  97:*23*  98:3  101:*9, 22*  106:*8, 21*  107:*4*  108:*18*
**Jung's**  74:*12*  97:*12*

**< K >**
**KAMINSKY**  3:6  4:*5, 6*  92:*12, 15, 17*  93:*18, 21*  94:*21*  95:*11*  97:*17, 20*  98:6  109:*14*

**keep**  11:*8*  36:*25*  88:*25*
**Kennedy**  3:3
**Key**  10:9
**Kiernan**  3:7
**kill**  79:22  82:*1*
**killed**  79:*7, 21*  80:2
**Kimball**  3:2
**kind**  20:*1*  30:*21*  48:*13*  84:*11*  88:*20*  89:*15*  108:9
**knew**  74:*13*
**knock**  26:6
**know**  6:*15*, *16*  16:2, *12*  20:*15*  23:*21*  26:8  28:*4, 16*  30:*5, 8*  32:9, *12, 14, 18*  38:2  39:*10*, *23, 24*  40:7, *24*  41:2  44:*19*  46:*21*  56:6, *10*, *12*  57:*10, 25*  58:2, *21*, *22*  59:*3, 5*  61:*24*  67:4  69:20  70:*19*  72:4  73:*12, 22, 23*  74:*17*  75:25  76:*18*  77:*11, 12, 20, 21, 22*  83:*13, 15, 17*  84:23  86:*13*  88:5  94:*15*  98:*14*  99:*13*  100:*5, 22*  103:6, *10*
**knowing**  67:*10*  74:*17*  75:25  81:*15*
**knowledge**  35:3  51:4  66:*19, 20*
**known**  26:*15*  58:5, *24*  65:5  70:*24*  74:25
**knows**  6:*23*  35:20

**< L >**
**LALITHA**  1:*11*
**large**  79:*13*
**laundry**  37:3
**LAW**  1:*13*  2:8, *15*, *22*
**lawsuit**  6:4
**laying**  65:*15, 16*
**lead**  9:*13, 14*
**leader**  82:*15*
**learn**  39:*13*  43:20  73:*19*

**learned**  16:*19, 24*  39:*12*  57:*12*  71:8
**learning**  64:*19, 21*  80:*19*
**learns**  90:22
**leave**  17:*15*
**left**  19:*12*
**lie**  66:9
**Lieutenant**  7:*23*  11:*23*  12:2  15:*10*  19:*23*  23:*21*  24:4  27:*10, 11*  28:6  29:6, *7*  37:25  41:5  42:*17*, *19*  43:*15*  45:*17*  47:2, *6, 10*  50:3  63:*21*  64:20, *22*  66:2  71:25  76:*15*  79:*13*  81:*16*  82:*10, 11, 24*  83:*18*  84:*11, 20*  99:*16*
**Lieutenants**  92:25
**Lieutenant's**  36:*20*
**life**  59:6
**light**  97:*21*
**liked**  91:*19*
**limited**  84:5
**line**  35:*12*  110:5
**listed**  104:3
**little**  30:*18*  34:*13*  66:2  76:*14*  87:9  92:2  100:*16*  104:8
**LLP**  3:2
**local**  28:*18, 23*  30:4
**location**  101:9, *14*  102:*14*
**lock-and-track**  26:*16, 18*
**locked**  72:5
**log**  26:*17*  41:22, *25*  42:*1, 5*  61:*1, 18*  62:22  63:9, *12, 15, 17*, *19, 24*  64:9  71:9, *10*, *11*  105:*15*
**logbook**  26:*19*
**logs**  61:9  108:*17*
**long**  7:25  10:*16*  11:*19*  24:7  25:4, *8*  26:7  40:7  43:3, *14*  44:*11*  58:5  84:*11, 23*  87:*24*
**longer**  66:2  96:22

look 33:21 34:6
52:12 54:4 59:15
60:19 75:5 80:16
91:13, 17 92:2, 6
looked 91:19
looking 18:7 25:10,
16, 17 53:5 56:17
98:1
looks 56:22 80:25
91:17
lot 23:20 25:20
41:24 80:24 81:2
92:5 102:18 107:10
loud 6:11 105:19
LOUIS 1:5 5:12
51:19 60:12 106:21
108:18
low 28:1
LT 56:23 71:9
lunch 48:8, 13
Lunchtime 48:7
lying 65:19 92:3
98:3, 5

< M >
major 13:1 27:11
46:24
making 10:13 11:9
17:22, 24 18:7 23:13
24:5 25:7, 9, 15, 18
Management 35:16
36:13, 18 48:6 109:1
managing 17:4
mandatory 42:2
manner 14:14 80:1
Margaret 1:12 2:15
Margo@alcenter.org
2:18
MARIESHA 1:12
3:6 77:14 92:17
mark 33:25
MARKED 4:9 34:1,
3 52:9
Market 3:7
marking 53:2
matter 13:15 50:21
54:11 77:9 92:18
MAUREEN 1:11
77:11, 12

mean 12:20 26:3
30:19 39:16 49:8
53:11 61:12 74:7
84:21 89:8
meaning 28:12
39:11 66:20
means 6:22 41:4
mechanism 40:1
med 35:12
medical 17:14 18:21,
24 19:3, 14, 18, 24
21:7, 9, 14, 17, 19, 21
22:1, 9, 20, 21 23:1, 9,
17, 18, 23, 24 24:5
27:3 29:10, 12 30:4,
5, 8, 9, 10 31:22
32:13, 14, 16, 22 33:3,
10, 14, 21 34:15 35:3
38:5, 7, 14, 22, 24
39:3, 19, 24 40:2, 13,
16, 17, 23, 25 41:1, 2,
6, 8, 16, 19 43:25
44:1, 5 47:20, 24
49:14 50:20 51:5
55:18, 20 56:5 61:25
62:1, 3 64:24 65:8,
11 66:11, 13 69:20
70:11 73:5, 15 74:25
75:7, 8, 15, 16, 19, 21
91:7, 8, 20, 22, 23
92:7 93:2, 4, 5 95:1,
6 99:24 102:17, 19,
21, 24 103:7, 9, 11, 12,
22, 25 104:5, 15, 22
105:1, 2, 7, 11 107:5
108:10
medication 20:18, 23,
24 23:8, 11 36:7, 8,
25 38:7 39:18, 19
48:5 50:17, 22 61:5
66:17 105:20 106:3
108:18
medications 21:3
Meds 105:20
members 54:5
mental 30:17 31:6,
14, 15 44:7 47:20, 24
50:8, 20 81:11, 12
82:2, 4 83:12, 13, 15
mention 44:10 96:9

mentioned 37:18
46:4 78:10 93:23
103:18
met 58:9
MICHAEL 2:21
Michael.pestrak@phil
a.gov 2:24
Mike 13:14 109:8
military 106:6, 15
Miller 79:21 81:12
mind 14:9 24:10
66:3, 6 78:15
mini 109:11
minor 100:13
minutes 11:3 106:2
missed 38:6, 7, 13, 20
39:1, 3 81:7
mm-hmm 6:12
mm-mm 6:12
mobile 31:24
moment 26:11 78:6
88:4
money 87:7
monitor 48:5
month 44:19 84:25
Months 74:9
morning 5:7, 8
move 15:17 25:25
26:1 27:24 33:3, 9,
13 55:17 66:15
91:15 107:16
moved 10:11 14:21,
22, 25 29:17, 19
81:17
movement 10:10
15:19, 23 16:1, 2
49:1, 6
moves 26:7
moving 18:9 25:18
31:25 32:6
multipurpose 24:22
murder 14:22

< N >
name 5:9, 13 13:12
14:16 26:6 56:25
57:14 77:23 78:20,
22 95:17 100:20
National 9:12
near 35:17

need 11:8 30:9
38:14, 15, 21 40:6
48:14, 23 61:23
70:12 71:25 73:18
75:9, 23 90:24 99:2
100:14, 17
needed 18:24 19:2
39:5 49:10, 16 55:12
56:24 71:9 73:4, 5,
15 84:3 102:14
needing 102:17, 19
needs 11:8 18:21
62:1 75:15 90:23
100:14 104:23
never 38:13 43:22
93:23 95:23
Nia 1:11 2:14
Nia@alcenter.org
2:17
nods 6:12
normal 55:10, 11
63:13, 20
normally 56:13
Notary 2:5 112:4, 23,
24
notate 61:4
notated 64:6
note 57:1 59:19
108:22
noted 111:8
notification 105:23
November 51:9, 11,
16 53:7 60:5 62:8
70:24 71:6 78:1
85:3 93:8 94:3, 9, 11
numbers 11:14 35:19
nurse 20:2, 22 23:16
35:16, 20 36:3, 5, 22
37:6 57:10 61:6, 8,
11, 14, 22 70:20 71:7,
16 75:2, 3, 4 95:5
96:10, 14, 22, 24 97:2,
6, 8, 10 104:8, 10, 13,
14, 25 105:1, 6, 7, 10,
21 106:2 107:1
nurses 36:7, 25 99:24
nursing 19:6, 10, 11

< O >

**Objection** 9:*23* 15:*1*
22:2, *12* 24:9 28:8
29:*24* 31:2 32:2, *23*
33:5, *15* 43:6 44:*14*
45:20 46:7, *19* 47:*12*
54:*21* 57:*19* 58:*19*
59:*1, 11* 62:16 64:*12,
25* 66:24 67:*15, 22*
68:*4, 14* 69:*3, 9* 70:*1*
71:*1, 19* 73:6 74:*19*
75:*11* 76:4, *11* 78:2
79:*18* 80:*3* 81:8, *23*
82:*25* 83:22 84:7
85:*18, 25* 86:*23* 87:*3,
14, 17* 89:*16* 90:*10,
18* 95:7 96:6, *15*
101:*24* 104:*17*
**objects** 7:2
**observe** 30:*15*
**observed** 63:*14, 18*
102:*20*
**observes** 104:*10*
**occur** 12:8
**occurs** 105:*1*
**O'Connor** 3:2
**October** 11:*25* 77:*25*
84:*20* 94:*13, 14*
**office** 9:*15* 35:*17*
36:*18, 21* 42:*16* 52:2
112:*16*
**Officer** 9:*20, 21* 10:2,
*17, 24* 12:*15* 15:*20,
24, 25* 16:7 17:6, *23*
18:2, *18* 19:*19, 21*
23:9, *14, 16, 25* 24:2,
*25* 25:5, *23* 26:3
28:*17, 20* 30:22 31:6
32:8, *12, 13* 37:*24*
40:*15, 22, 23* 41:*19*
42:*12* 47:*3, 22* 48:*10,
16* 49:*19* 50:7 55:*13,
22* 56:*19* 57:2 58:*14,
18* 60:*25* 61:*13, 16,
17* 63:*10, 14, 16, 23*
64:*3, 8* 66:*16* 67:5
68:*20* 69:*12, 15*
70:*19, 24* 71:7, *25*
74:*11* 76:*16, 18, 24*
77:*10* 78:*21* 86:22

96:2, *13* 100:*14, 17,
25* 104:*11* 108:2, *5*
**officers** 11:*1, 7, 11,
17* 12:5, *9* 15:*16*
19:5 21:6 23:22
27:9 28:25 29:*21*
37:8 46:*25* 48:8, *15,
21, 23* 49:9, *16, 22*
50:2 78:*25* 79:2
93:*1* 100:*10*
**Officer's** 30:*15*
**offices** 2:7 36:*19*
**Oh** 74:9 86:*19* 92:6
**Okay** 6:8 7:6, *18*
8:*23* 17:3 19:5 24:*3*
25:*4* 28:*16* 29:*1*
32:*14* 38:*12* 40:*10*
51:8, *19* 52:*17, 25*
58:*17* 61:*23* 62:6
72:*10* 79:5 87:*19*
89:*14* 92:6, *24* 93:2,
7 94:*1, 25* 95:*11, 23*
96:2 97:*11* 98:6, *15,
16* 99:23 101:*25*
102:*10* 105:*14* 106:5,
*10* 109:*3*
**older** 81:*4*
**once** 5:*21* 27:*17*
29:6 34:*20* 36:5
44:*21* 83:*13*
**ones** 21:*12*
**ongoing** 27:*16*
**open** 25:*25* 48:*11*
**operations** 46:*18*
**opinion** 58:*17* 75:22
83:*20*
**opportunity** 16:*14*
**orange** 35:8
**order** 63:*16, 22*
66:*18* 67:8
**Orders** 53:*12, 14, 20,
21* 55:4
**ordinary** 42:6
**Osbourne** 13:*14*
14:*17* 15:5, 8 79:6,
*22, 23* 80:2
**outbreak** 46:*16*
**out-of-cell** 45:*17*
**outside** 97:*24* 101:*10*

**overall** 17:*19, 20*
**oversee** 49:*1*
**overtime** 98:*18* 99:*19*
**overview** 16:8

**< P >**
**p.m** 11:*4, 6* 78:8
98:*24* 99:*1* 109:*16*
**p.m.-to-11:00** 11:*4*
**P-2** 102:*9*
**PA** 1:*14*
**packet** 52:*13*
**packets** 88:*1*
**PAGE** 4:*10* 52:*13,
15, 16* 56:*21* 59:*15,
25* 60:6, *19, 21* 106:*5*
110:*5*
**pages** 103:*1* 111:*4*
**pain** 32:*21*
**pamphlets** 34:*17*
**paperwork** 82:*18, 19*
**Parkway** 81:*18, 21*
**part** 53:*15* 72:*21*
**particular** 21:*1* 23:7,
*10* 39:20 50:*10*
56:*18* 61:*4, 25* 66:*3*
78:*15* 81:*17* 88:6
**particularly** 49:5
**Party** 1:*10* 6:*3*
112:*13*
**pass** 21:20 34:*16*
**passed** 73:22 74:5
**passes** 17:*13*
**patient** 39:6
**PDP** 9:*1, 2, 18* 12:19
23:*21* 24:*15* 27:*16*
39:*11* 42:*10, 11* 46:6
86:*10, 21* 90:6
**Penn** 3:*3*
**PENNSYLVANIA**
1:2 2:7, *9, 16, 23* 3:*4,
8* 112:2, *4, 16, 23*
**people** 15:*13* 35:5, *6*
36:*16* 43:20 44:*11,
18* 45:*11, 18* 49:*24*
55:7 62:*14* 66:9
72:5, *6* 87:*12, 13*
88:*14*
**pepper** 73:2
**Perfect** 106:*18*

**performance** 67:9
78:*14*
**performed** 44:*5*
**period** 51:2
**permissible** 45:*12*
**permitted** 45:*18*
**person** 15:*21* 23:*10*
31:*18* 32:*10* 38:20
48:*10, 12* 69:*18*
77:23 79:*21* 83:*14*
87:22 91:8, *20* 98:*21*
100:*21, 24*
**personally** 77:*21*
112:*5*
**personnel** 107:*5*
**pertaining** 16:*3*
**PESTRAK** 2:*21* 4:7
6:*20* 9:23 15:*1* 22:2,
*11* 24:9 28:8 29:*24*
31:2 32:2, *23* 33:5,
*15* 43:6 44:*14* 45:20
46:7, *19* 47:*12* 52:*19,
24* 53:*24* 54:*21* 56:2
57:*23* 58:*19* 59:*1, 11*
60:6, *9, 18* 62:16
64:*12, 25* 66:24
67:*15, 22* 68:*4, 14*
69:*3, 9* 70:*1* 71:*1, 19*
73:6 74:*19* 75:*12*
76:4, *10* 77:*3* 78:2
79:*18* 80:*3* 81:8, *23*
82:*25* 83:22 84:6
85:*18, 25* 86:*23* 87:*3,
14* 89:*16* 90:*10, 18*
92:*10* 94:*18* 95:7
96:6, *15* 98:8, *12*
101:*25* 102:*3, 7, 8*
104:*19* 106:*18, 20*
109:*5, 10*
**PHILADELPHIA**
1:8, *10, 14* 2:*9, 16, 20,
22, 23* 3:*4, 8* 7:*21*
8:*4, 13, 24* 9:2
103:*13* 112:*3, 16*
**physical** 16:*21* 17:*12*
23:5 73:*4*
**pick** 6:*14* 66:7
101:*11*
**place** 112:*11*
**placed** 64:6

**Plaintiffs** 1:6, 8  2:2, 13  4:10, 11  5:10  33:25  34:3  52:9  103:1
**Plaintiffs-1** 104:6
**Plaintiffs-2** 105:15
**Plaza** 3:3
**plea** 54:13
**plead** 54:10
**please** 5:13  59:16
**point** 94:22
**policies** 13:16  16:19, 24  76:8  88:2, 3, 7
**policy** 12:21  13:7  27:17, 19  87:21  88:6, 10, 16, 17, 20, 23, 24, 25  89:1, 3, 7  90:8  97:1, 6
**population** 43:10  44:13, 22  45:2, 8
**position** 84:15, 17  99:21
**possible** 64:11, 23  68:25  69:23  70:5  100:18
**Possibly** 64:18
**post-high** 8:9
**posts** 11:7, 12
**potential** 22:9  23:5
**practice** 20:16  63:20
**practices** 76:8
**precaution** 81:19
**precautions** 21:23
**prepare** 7:10  83:6
**prepared** 7:7
**presence** 112:8
**PRESENT** 2:12  18:14  37:8  62:13  94:23
**pretty** 16:12  37:4
**pricks** 35:19
**prior** 7:15  8:7  9:1, 11  11:3, 9  12:22, 24  14:3  78:11  82:23  91:6  106:23
**priorities** 50:21
**prioritize** 84:4
**priority** 30:3
**prison** 81:2

**Prisons** 1:11  7:22  8:5, 14  9:3  103:13
**prison's** 5:23
**privileges** 45:13
**problem** 22:16  29:8  32:9  72:18  97:4
**problems** 46:5  49:4  51:4
**Procedure** 2:4  63:13
**procedures** 43:19
**proceeding** 51:13
**process** 41:11
**Production** 34:2  103:2
**Professional** 42:16  52:3  58:15
**profusely** 35:7
**Program** 8:18, 21
**progress** 105:21  106:24  108:20, 22
**prolong** 25:22
**promoted** 9:12, 16  11:22
**promotion** 10:18
**promotions** 82:20
**proper** 13:9  80:13
**propounded** 111:7
**protocol** 55:10, 11
**provide** 41:15  97:7
**provided** 16:9, 10  33:20  40:11
**Provident** 9:11
**Public** 2:6  112:4, 23
**pull** 47:21  48:7
**punitive** 29:14  48:2
**pursuant** 2:3
**put** 18:17  19:25  31:6  32:17  44:3, 9  45:8  63:1, 11, 15, 16, 18  64:9  84:1  101:12, 18  104:6

**< Q >**
**question** 6:18, 19  7:2, 3, 5  16:13  31:21  38:2  40:8  62:11
**questioned** 70:22
**questions** 5:17  7:12  18:3  23:20  31:9  50:7, 15  60:21  76:15

**88:**11  92:9, 11  95:19  108:11  109:4  111:6
**quick** 97:18
**quite** 43:11  44:1  50:14  89:19  90:1, 13  99:14

**< R >**
**radio** 19:2
**ran** 49:7
**range** 42:3
**rank** 15:23
**Rashatwar** 1:12  2:14
**rationally** 30:22
**Ray** 95:17  109:8
**RAYMOND** 3:2
**read** 27:7  34:17  88:10  102:1  105:19  111:4
**Reading** 57:7
**really** 25:8  71:23  87:8  98:2
**reason** 82:2  101:17, 21
**rec** 72:10
**recall** 34:8, 21, 22  51:19, 22  55:8  56:7  62:12  65:16  70:16  77:23  78:22  91:2, 5  93:7  94:3  102:6
**recalled** 78:12
**receive** 17:3  20:23, 24  29:16  35:24  36:1  41:18  82:10  88:17  89:9, 12, 13, 14, 25  90:6  95:4
**received** 14:4  27:20  78:18  84:12
**receiving** 43:24  78:13
**receptionist** 9:15, 17
**recognize** 22:15
**recognizing** 22:9
**recollection** 6:17  46:11  53:7  54:14, 16  57:22  60:14  68:12  74:1  97:13  101:13
**Record** 1:9  5:14  34:1  78:6, 7, 8  93:19,

**20** 109:7
**records** 7:15
**recreation** 32:10  46:1  72:9
**red** 39:9, 15, 22, 25  40:1
**red-flag** 39:19, 21
**reduced** 112:8
**refer** 17:24  66:19
**reference** 59:23, 24
**references** 62:9
**referral** 31:7, 8  50:5, 7, 13  61:23
**referring** 9:2  14:5
**reflects** 62:22
**refresh** 6:17  53:6  57:21  60:14  101:13
**refresher** 6:9  27:13  89:9, 12, 13
**refusal** 41:5, 6, 9, 11, 15, 21  61:1, 19, 24  66:11
**refusals** 62:1  89:24
**refuse** 41:9  92:6
**refused** 41:18  60:13  61:5  63:2, 4  64:5  65:7  106:22  108:19
**refuses** 40:22  56:24  57:3  59:22  72:15  102:11
**refusing** 40:13, 25  41:2  60:15  65:12  66:1  69:17, 18  71:24  72:2  73:10, 13  76:17  91:3  101:23  102:13  107:11, 17  108:7
**regard** 5:22  51:13
**regarding** 59:19  95:5
**regular** 36:6, 8  92:2
**related** 37:21  50:25
**relation** 38:1
**relationship** 58:13, 16
**relative** 112:13
**relay** 96:4
**relevant** 87:17
**reliability** 58:18, 22
**relieve** 48:12
**rely** 75:7, 14
**relying** 75:22

remember 6:*15*
11:*25* 13:*12, 15, 18*
16:*9, 15* 51:*8, 10, 12,*
*14, 25* 53:*16* 56:*11,*
*16* 57:*5, 14* 64:*8*
67:*3* 68:*18, 19* 69:*1*
71:*6* 73:*14* 74:*15*
78:*18* 80:*22* 85:*3, 4*
89:*22* 90:*2* 93:*10*
94:*4, 5, 7* 95:*25*
97:*14* 100:*2*
**remembered** 74:*14*
**render** 104:*11* 105:*2*
**Repeat** 62:*11* 70:*10*
**rephrase** 102:*17*
104:*12*
**report** 39:*17* 52:*23*
53:*6*
**reported** 64:*23*
**Reporter** 2:*5* 6:*13*
109:*8* 112:*19*
**represent** 92:*17*
95:*18*
**represented** 94:*16*
**reproduction** 112:*18*
**request** 40:*16, 17*
70:*16* 91:*8, 11*
**requested** 23:*23*
41:*16*
**require** 67:*12* 100:*5*
102:*21*
**required** 82:*18*
**requirement** 91:*8, 10*
**resources** 84:*5*
**respect** 112:*19*
**respond** 19:*4* 28:*3, 7*
29:*3, 6, 7* 30:*7, 11*
47:*17* 49:*22, 23*
100:*23* 102:*14*
**responding** 18:*20*
21:*25* 22:*9* 89:*15*
**responds** 29:*7*
**response** 28:*18, 23*
29:*5, 21* 30:*5, 15*
31:*25* 76:*3* 100:*6, 8,*
*9, 12, 15, 19, 21, 25*
101:*1* 107:*24* 108:*1*
**responses** 75:*9* 100:*5*
**responsibilities** 15:*11,*
*14* 47:*11*

**responsibility** 15:*17*
39:*2* 63:*7, 11*
**responsible** 9:*22*
25:*1* 38:*23*
**responsive** 31:*24*
67:*13*
**restrooms** 37:*2*
**results** 45:*6*
**review** 7:*15*
**reviewing** 88:*1, 3*
90:*8* 95:*1*
**right** 26:*12, 13*
31:*14* 38:*21* 40:*8*
60:*11* 61:*22* 62:*15*
63:*5* 69:*20* 78:*10*
84:*14* 92:*13* 103:*19*
**Riverside** 7:*20* 8:*1*
42:*13*
**roadway** 87:*13*
**role** 9:*19* 11:*20*
22:*25* 47:*2*
**roles** 12:*14*
**roll** 11:*2, 6* 34:*12, 14*
92:*19, 22, 24* 93:*5, 6,*
*10, 15* 100:*20*
**room** 35:*18* 36:*11,*
*13, 17, 23, 24* 37:*4*
43:*24* 72:*6* 108:*23*
109:*1*
**rooms** 24:*22* 37:*5*
**roster** 79:*1*
**roughly** 51:*3*
**rounds** 17:*22, 24*
18:*7, 11* 24:*8* 26:*24*
**routine** 31:*10, 14, 17*
34:*20*
**Rules** 2:*4* 6:*10*
12:*21*
**run** 17:*5*
**running** 46:*24*
**Rupalee** 1:*12* 2:*14*
**Rupalee@alcenter.org**
2:*18*

**Rwittekind@okllp.com**
3:*5*

**< S >**

**safety** 10:*3* 31:*1*
37:*15* 67:*13* 97:*9*
101:*5*
**salary** 87:*19*
**Sanchez** 78:*23*
**Saturday** 85:*13*
**saw** 70:*20*
**saying** 38:*14*
**says** 53:*10* 56:*23*
57:*6* 60:*12* 71:*9*
94:*20* 106:*21, 24*
108:*19*
**scenarios** 83:*9*
102:*16, 19*
**scene** 91:*12*
**Schaffer** 2:*5* 112:*4,*
*19, 22*
**school** 8:*9, 10, 22*
17:*14*
**scope** 15:*11*
**se** 26:*5* 102:*6*
**seal** 112:*16*
**second** 52:*20* 100:*10,*
*15*
**secondary** 29:*5*
**securing** 10:*3*
**security** 65:*13, 20, 24*
67:*13*
**see** 17:*10* 20:*2*
25:*21* 26:*4, 12* 29:*11*
31:*16, 18* 37:*22*
38:*15* 39:*5* 40:*19*
50:*9* 52:*15, 18, 23*
53:*9* 57:*8* 59:*23*
60:*1* 61:*8* 81:*12*
91:*20* 92:*1* 98:*2, 3, 4*
103:*22* 104:*14*
**seeking** 91:*6*
**seen** 34:*7, 11, 19*
35:*5, 6, 8* 44:*18*
71:*11*
**sees** 39:*22*
**segregation** 29:*15*
48:*3*
**self-harm** 29:*22* 30:*3,*
*24*
**send** 23:*9* 32:*16*
38:*22* 81:*12*
**sense** 105:*10*

**sent** 52:*16* 82:*2*
**sentence** 44:*24*
**sentencing** 44:*23*
**separate** 29:*8, 19*
**separated** 29:*17*
**separately** 29:*10, 12*
**separation** 15:*22*
**separations** 16:*3*
**SEPTA** 9:*6* 87:*6*
**September** 10:*22*
**Sergeant** 10:*19, 21,*
*23, 25* 11:*13, 19, 21*
12:*3, 15* 15:*18* 27:*10*
29:*3, 4* 37:*25* 40:*24*
42:*14* 47:*2, 17* 50:*2*
63:*22* 78:*25* 88:*8, 15*
99:*15, 17*
**Sergeants** 12:*5, 11*
92:*25* 99:*18*
**series** 102:*16*
**serious** 30:*6*
**served** 14:*12*
**servery** 20:*21*
**serving** 44:*24*
**set** 35:*25* 112:*8, 14*
**setting** 27:*22* 88:*9*
**share** 8:*17* 52:*7*
**shared** 71:*17*
**she'd** 79:*2*
**sheet** 25:*25* 26:*1*
111:*9*
**sheets** 25:*19*
**shift** 11:*3, 5, 9* 86:*8*
92:*21* 98:*22* 99:*4, 17*
101:*2*
**shifts** 85:*5, 14* 86:*9*
**shoot** 16:*22*
**short** 12:*13* 45:*23*
83:*7* 99:*18*
**shortage** 50:*16* 83:*6*
**shortages** 99:*6, 11*
**shots** 35:*9, 15*
**show** 26:*9* 34:*16*
**shown** 102:*9*
**shows** 93:*14*
**sick** 19:*24* 32:*17*
**sign** 27:*20* 41:*5, 7, 8*
88:*16*

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 47 of 57

Deposition of Wanda Bloodsaw                                     Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**signature** 41:*3* 109:*17* 111:*15* 112:*12*
**signs** 103:*16*, 22
**similar** 31:*21*
**sits** 48:*10*
**situation** 14:*19*, 20 17:*11* 31:*12* 39:*14* 40:*12*, 20 47:6 57:*12* 61:*25* 64:*24* 65:6, 25 66:8 67:*3*, 11 68:*19* 71:*23* 72:*13*, 24 81:*3*, 7 83:*12* 91:*7*, 23 100:*13* 103:9 105:6, 7, 11
**situations** 19:*7*, 9 28:*3*
**six** 45:*25*
**size** 24:*15*, 18, 20 45:*10*
**skim** 62:6
**skip** 107:*3*
**slide** 103:*16* 104:*3*
**slides** 4:*11* 103:*4*, 6, 15
**small** 35:*18* 36:*21*, 24
**so-and-so** 38:*15*
**social** 36:*20*
**somebody** 22:*24* 26:2, 4 30:*19* 35:7 38:*13* 40:*15* 41:*18* 55:*17* 69:*23* 70:7 72:*13* 73:4 91:2 93:5
**somebody's** 30:*21* 39:*1*
**sorry** 24:*23* 53:*25* 61:*24* 62:*11* 70:*10* 89:*11* 102:*17* 105:*18*
**sort** 9:*21* 38:8 82:*10* 83:*19*
**sound** 23:4 54:*25*
**sounds** 48:*20* 50:5
**space** 15:*20*
**speak** 6:*11* 56:*10* 93:*3*, 4
**speaking** 46:*18*
**Special** 42:*15*
**specific** 14:8 16:*1* 33:*21* 39:*10*

**specifically** 22:7 38:*12* 90:*3* 103:*1* 105:*15*
**specified** 112:*11*
**spend** 59:*16*
**spoke** 23:*17* 76:*24* 108:*23*
**spoken** 92:*20*
**spray** 73:*2*
**Spring** 1:*13* 2:8, 16
**St** 1:*13*
**staff** 10:6 12:*10*, 12, 13 19:6, 10, 11, 13, 14, 18, 24 23:*17*, 18 30:*4*, 8, 9, 10 34:*15* 37:*3* 38:*5*, 10 40:*17* 45:*24* 46:*3* 48:*7* 49:*21* 50:9 51:5 70:*11* 72:*25* 75:8 82:*16* 83:6 88:*13* 93:8 100:*17* 104:*22*
**staffed** 50:*1*
**staffing** 46:*4*, 14 49:*4* 50:*16*, 21, 25 51:*4* 83:*21* 99:6, 10
**standard** 21:*23*
**start** 8:*16* 16:*14* 28:*14* 35:6 88:*24* 92:*21* 98:*14* 99:*24*
**started** 9:*20* 46:*14* 58:*10* 99:6 100:2 105:*16*
**starts** 72:*11*
**state** 5:*13*
**stated** 33:*12*
**STATES** 1:*1*
**staying** 32:*7*
**stenotype** 112:*8*
**stipulate** 94:*19*
**straight** 56:*18*
**Street** 2:*9*, 16, 22 3:7
**stressful** 86:*3*, 5
**stretcher** 19:*1*, 2 22:*19* 49:*13*, 17, 18 69:*21*, 24 70:8, 9, 12, 13, 17 73:*18* 75:2, 6 102:*21*, 23 103:*24* 104:*4* 105:*3*, 8, 12 108:*8*

**strip-searched** 43:*24*
**subjects** 16:*10*
**subordinate** 82:*16*
**substance** 111:*8*
**suggest** 73:*3*
**suggested** 57:*16*
**suicide** 29:*23*
**Suite** 3:*4*, 8
**Sunday** 85:*13*
**superiors** 14:*17*
**supervising** 11:*15*, 16 12:*10* 23:*22* 24:*1*
**supervisor** 9:*16* 31:*12* 64:*3* 102:*13*
**supervisors** 30:*7* 46:*25* 49:*22* 88:*5*
**supervisor's** 35:*17*
**supposed** 19:*12* 28:*7*, 20 42:*1* 44:*10*, 11 67:*11* 76:*18* 80:*15*
**sure** 10:*13* 11:*9*, 13 12:*11* 18:*8*, 9 20:*4* 25:*15*, 18 43:*2*, 11, 25 44:*2* 50:*14* 53:*20* 64:2, 4 89:*19* 90:*1*, 13 99:*14*
**suspension** 13:*23* 14:*1*
**sweat** 35:*7*
**sweating** 103:*19*
**sworn** 5:*3* 112:6
**symptom** 23:*4*
**symptoms** 33:*22* 37:*16*, 20 103:*17* 104:*2*
**synonym** 17:*18*
**system** 16:*20* 26:*16*, 18, 25 27:*4*

**< T >**
**take** 10:7 24:7 25:5 35:8 40:8 41:7 47:*1* 61:5 78:6 84:*16* 88:*14* 90:*21*, 22 104:*21*
**taken** 2:*3* 5:*24* 14:*18* 23:8 48:2 55:6 61:*19* 62:9 112:*11*

**talk** 16:*15* 20:*3* 32:*11* 72:*17* 74:5, 11
**talked** 96:2, *14*, 19 99:*23* 100:*4* 101:*11* 104:8 106:*22* 107:*10*
**talking** 30:*19* 92:*4* 108:*18*
**tasks** 49:*9*
**team** 100:*6*, 8, 9, 12, 15, 21, 22, 25 101:*1*
**teams** 100:*19*
**Technically** 22:*5*
**tell** 6:*23* 8:9 15:*20* 23:6, 14 25:*25* 32:*17* 37:*25* 38:4 40:*4* 57:*3* 65:8 69:*13* 72:*19* 75:8, *15* 78:*17* 79:*1* 91:*14* 96:*13*, 19 106:*10* 107:*12*, 16 108:7
**teller** 9:*12*, 13, 14
**telling** 7:*13* 64:8 105:*12*
**tells** 22:*17* 37:*23* 66:*14*, 16 104:*22*
**temporary** 45:*4*
**term** 17:*21* 21:*22* 39:*9*, 15 98:*17* 99:*13* 100:*5*
**terms** 17:*22*
**test** 45:6
**testified** 5:*4* 93:*22*
**testify** 55:*16* 112:6
**testimony** 112:*7*
**testing** 16:*21*, 24
**Thank** 8:*23* 12:*18* 29:*20* 40:*10* 95:*12* 97:*16*
**thing** 34:*21* 38:8 40:*4* 71:*24* 104:*10*
**things** 9:*22* 16:*3* 19:*23* 41:*25* 42:2, 4, 8 82:6, 22 83:*10* 90:*24*
**think** 30:*16* 34:*19* 48:*21* 52:*20* 54:4 55:*3* 56:*22* 66:*23* 68:*10*, 11 69:*23* 70:5, 23 71:*17* 74:*3* 76:*13*

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 48 of 57

Deposition of Wanda Bloodsaw                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

78:*14*  90:*5, 8, 16, 23*
**thinking**  54:*20*  69:*18*
**Thirty-day**  13:*23*
**thought**  16:*14*  17:*21*
59:*9*
**threat**  30:*25*
**three**  36:*19*  38:*1*
45:*25*  74:*3*  85:*10, 11*
**time**  11:*4*  14:*13*
16:*20*  17:*2*  36:*4, 9,*
*10*  45:*5, 11, 17, 22*
58:*7, 8, 9*  59:*16*
61:*20*  68:*9*  72:*4, 8*
85:*6*  86:*10, 11, 15*
87:*5, 25*  88:*7, 19*
94:*19*  96:*11*  97:*25*
99:*5, 10*  101:*14*
103:*25*  106:*6, 15*
112:*11*
**timely**  14:*13*
**times**  5:*20*  34:*18*
35:*25*
**timestamp**  57:*6*
**tired**  72:*20*  86:*4*
**title**  103:*3*
**today**  5:*17*  7:*8, 16*
**today's**  7:*11*
**told**  14:*20*  15:*6*
23:*18*  61:*14*  65:*6*
66:*17*  69:*16, 19, 24*
73:*10, 15, 21*  81:*3*
95:*20*  105:*8*
**tool**  99:*9*
**top**  59:*18, 20*
**Torresdale**  17:*1*
**tour**  18:*19*  24:*8, 25*
25:*2, 5, 8, 9, 22*  42:*8*
48:*17*
**tours**  18:*1*  56:*13*
**trained**  18:*20*  21:*25*
22:*15*  84:*21*
**training**  16:*9, 16, 17,*
*21, 25*  17:*3*  27:*14, 16,*
*17, 18*  33:*20*  34:*12,*
*14, 24*  40:*11*  78:*24*
82:*11, 23*  83:*11, 19*
84:*3, 12, 18*  87:*21*
88:*6*  89:*14, 25*  90:*5*
**trainings**  27:*14*
**transcribed**  112:*9*

**transcript**  109:*9*
112:*18*
**transcription**  111:*5*
112:*9*
**transferred**  10:*15*
**treatment**  40:*20*
**Trebach**  3:*7*
**triage**  35:*18*  36:*11,*
*12, 21*  108:*23, 25*
**trip**  79:*3*
**trips**  10:*7, 8*  78:*25*
**TRIVIKRAM**  1:*11*
77:*16*
**true**  59:*10*  91:*18*
93:*24*  104:*2*
**truth**  112:*6, 7*
**try**  17:*10*  86:*5*
**trying**  43:*20*
**tuberculosis**  45:*6*
**Tuesday**  2:*10*
**turns**  72:*23*  85:*12*
**twice**  36:*4*  89:*1, 5*
**Two**  3:*3*  24:*21*  37:*2*
44:*18*  48:*16, 17*
49:*22*  50:*2*  53:*14*
54:*5*  55:*7*  74:*3*
79:*15*  84:*13*  85:*10,*
*11*  88:*7*  94:*19*  103:*3*
107:*12*
**type**  26:*13*  97:*4*
**types**  27:*25*
**typical**  47:*9*

**< U >**
**unable**  33:*3, 13*
107:*15*
**understaffing**  46:*5*
**understand**  6:*23*  7:*3*
27:*20*  37:*17, 20*  71:*5*
83:*7*
**understanding**  8:*15*
35:*4*  44:*4*  68:*10*
79:*16*
**understood**  6:*19*
**unfortunately**  79:*24*
**unit**  19:*18*  20:*7, 8*
21:*5*  24:*8, 21, 24*
35:*15*  36:*12, 18*
42:*15*  43:*10, 12*
47:*16, 22, 23*  48:*6, 9*

56:*13, 14*  57:*8*  75:*16,*
*21*  79:*10, 12*  81:*14,*
*17*  98:*2*  101:*6*  108:*4,*
*25*
**UNITED**  1:*1*
**units**  17:*4*  20:*25*
21:*1, 2, 4*  24:*14, 18,*
*19, 20*  25:*1*  35:*21*
39:*7*  42:*24*  43:*2, 5*
45:*2, 3, 19*  48:*11, 17*
79:*14, 15*
**universal**  21:*23*
**update**  88:*23*  89:*2*
**updated**  88:*4*  89:*5, 8*
**updates**  90:*8*
**urgent**  31:*17*  50:*4, 8,*
*12*
**use**  16:*19, 22*  17:*23*
39:*9*  62:*4*  73:*2*
**usual**  95:*4*
**usually**  29:*2*  30:*5*
32:*10, 11*  37:*10*
40:*21*  49:*18*  65:*23*
72:*19*  86:*4*  107:*17*

**< V >**
**varied**  45:*23*
**varies**  25:*7*
**variety**  24:*17*
**various**  47:*3*
**vary**  21:*1*  24:*15*
**verbally**  32:*20*
**video**  34:*16*  51:*25*
52:*4*  54:*18, 25*  56:*17*
62:*12*  65:*17, 18*  67:*4*
70:*21*  97:*22*  98:*1*
**violated**  12:*21*
**violating**  53:*13*
**violation**  13:*8, 17*
52:*23*  53:*6*
**visible**  102:*20*
**voting**  54:*5*
**vs**  1:*7*

**< W >**
**wait**  36:*12*
**waiting**  44:*23*  45:*5,*
*7*  75:*19*
**waived**  109:*17*
112:*12*

**walk**  21:*16, 21*  47:*8*
72:*14*  73:*18*
**walked**  105:*8*
**Walker**  77:*24*
**walking**  72:*14*
105:*11*
**WANDA**  1:*7, 13*  2:*1,*
*20*  4:*4*  5:*2, 15*  112:*5,*
*8*
**want**  15:*17*  16:*6*
40:*19*  48:*22*  60:*2, 18*
76:*20, 21*  80:*9*  86:*21*
91:*20*  105:*14*  107:*20,*
*21*
**Warden**  14:*13*
**watch**  47:*23*
**watched**  97:*22*
**watching**  51:*25*
54:*18*
**wave**  100:*10, 11, 12,*
*15*
**way**  18:*13, 21*  30:*16*
40:*4*  50:*6, 15*  68:*18*
80:*23*  81:*1*  82:*7*
83:*16*  84:*1*  90:*21, 22*
99:*24*
**weapon**  16:*22*
**weapons**  10:*5*  27:*23*
43:*25*
**week**  85:*8*  94:*13*
**weekend**  85:*12*
**weeks**  16:*18*  44:*18*
84:*13*
**welfare**  67:*14*
**well**  11:*1*  12:*4, 6, 10,*
*16*  15:*14*  16:*17*
21:*13*  22:*7*  25:*17*
32:*13*  35:*5*  58:*22*
61:*7, 17*  62:*7*  66:*15*
68:*3*  91:*18*  92:*7*
94:*16*  102:*1*  103:*16*
104:*12*  107:*2*
**wellness**  25:*14*
**went**  42:*15*  56:*17*
102:*18*
**we're**  40:*6*  50:*1*
98:*10*
**WHEREOF**  112:*14*
**window**  20:*20, 22, 23*
**wish**  82:*22*

Case 2:24-cv-05618-TJS     Document 100-5     Filed 12/05/25     Page 49 of 57

Deposition of Wanda Bloodsaw                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**WITNESS**  4:*3*  6:*6, 7*
10:*1*  15:*4*  22:*14*
28:*11*  30:2  31:*5*
32:*5, 25*  33:*8, 18*
43:*9*  44:*17*  45:*22*
46:*9, 22*  47:*15*  52:*22*
54:*24*  57:*25*  58:*21*
59:*3, 13*  62:*19*  64:*15*
65:*5*  67:2, *18, 25*
68:*7, 17*  69:*5, 11*
70:*4*  71:22  73:*9*
74:22  75:*14*  76:*13*
77:*5*  78:*4*  79:*20*
80:*5*  81:*11, 25*  83:*3*
84:*9*  85:*21*  86:*3, 25*
87:*5*  89:*19*  90:*13, 20*
92:*11*  95:*10*  96:*9, 18*
106:*16*  112:*5, 9, 14*
**WITTEKIND**  3:2
4:*6*  53:*1*  57:*18*  65:*3*
75:*10*  95:*13, 16, 17*
96:*12, 20*  97:*15*
104:*17*  106:*12*
109:*12*
**wondering**  78:*16*
88:*20*
**wording**  90:*21, 23*
**work**  7:*18*  36:2
42:*20*  43:*3*  51:*23*
58:*11*  86:*21*  98:22
**worked**  7:*25*  9:*6, 11*
42:*11*  43:*15, 22*
46:*13*  86:*9*  93:*24*
98:*23*
**workers**  36:*20*  62:*10*
65:*24*  66:*5*  101:*11*
**working**  8:*4*  9:*1*
39:7  57:*11*  58:*10*
66:*18*  79:*6, 9, 11*
85:*5*  86:*15*
**workplace**  85:*24*
**worse**  106:*15*
**write**  17:*13*
**write-up**  14:*12*
**write-ups**  29:*17*
**wrong**  81:*1*  91:*13,*
*17, 19*

**< Y >**

**Yeah**  24:*11*  35:*5*
36:2  53:*25*  60:*7*
75:*5*  88:*2, 13*  92:*4*
96:*24*  106:*17*
**year**  8:*19*  27:*17*
88:*19*  89:*1, 5*
**years**  9:*6*  11:*21*
15:*6*  23:*21*  46:*6*
80:*20*  89:*8*
**YESCARE**  1:*9*  3:*1*
95:*18*
**younger**  15:*7*  80:*24*
81:*4*

Case 2:24-cv-05618-TJS    Document 100-5    Filed 12/05/25    Page 50 of 57

Deposition of Wanda Bloodsaw                                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

## **WORD LIST**

**< 0 >**
**000146**  *(1)*
**000157**  *(2)*
**000158**  *(2)*
**000159**  *(1)*
**000160**  *(4)*
**000161**  *(2)*
**000192**  *(4)*
**000193**  *(3)*
**000194**  *(1)*
**000195**  *(1)*
**00149**  *(1)*
**004398**  *(1)*
**004399**  *(2)*
**004400**  *(3)*

**< 1 >**
**1**  *(9)*
**10**  *(2)*
**10:04**  *(1)*
**10:42**  *(1)*
**10:57**  *(1)*
**108**  *(1)*
**11**  *(1)*
**11:00**  *(1)*
**11:01**  *(2)*
**11:05**  *(1)*
**11:43**  *(1)*
**1100**  *(1)*
**12**  *(2)*
**12:00**  *(1)*
**12:41**  *(1)*
**12-hour**  *(4)*
**12th**  *(1)*
**14**  *(2)*
**1440904**  *(1)*
**1500**  *(1)*
**1515**  *(1)*
**15-day**  *(1)*
**16:35**  *(1)*
**16:49**  *(3)*
**17**  *(1)*
**17th**  *(1)*
**1801**  *(1)*
**19102**  *(2)*
**19103**  *(1)*
**19123**  *(3)*

**1987**  *(1)*

**< 2 >**
**2**  *(5)*
**2:24-cv-05618-TJS**  *(1)*
**2:50**  *(1)*
**20**  *(1)*
**2004**  *(4)*
**2009**  *(1)*
**2020**  *(1)*
**2023**  *(10)*
**2024**  *(2)*
**2025**  *(2)*
**20-plus**  *(1)*
**21**  *(2)*
**21st**  *(1)*
**2-2-3**  *(1)*
**24**  *(2)*
**27**  *(2)*
**28**  *(1)*

**< 3 >**
**3**  *(2)*
**3:00**  *(2)*
**30**  *(1)*
**302**  *(1)*
**32**  *(1)*
**34**  *(1)*
**37**  *(2)*

**< 4 >**
**4:49**  *(1)*
**43833**  *(1)*

**< 5 >**
**5**  *(16)*
**52**  *(1)*

**< 6 >**
**6**  *(1)*
**60**  *(1)*
**67**  *(2)*

**< 7 >**
**7:00**  *(2)*
**770**  *(1)*

**< 8 >**
**8:05**  *(1)*

**80**  *(1)*

**< 9 >**
**92**  *(1)*
**95**  *(1)*
**97**  *(1)*
**98**  *(1)*
**990**  *(3)*

**< A >**
**a.m**  *(3)*
**able**  *(10)*
**abnormal**  *(1)*
**ABOLITIONIST**  *(3)*
**Academy**  *(4)*
**access**  *(1)*
**accompanied**  *(1)*
**Accu-Chek**  *(1)*
**accurate**  *(3)*
**ACKNOWLEDGMEN
T**  *(1)*
**action**  *(4)*
**actions**  *(3)*
**activities**  *(1)*
**additional**  *(6)*
**address**  *(1)*
**administered**  *(3)*
**administering**  *(1)*
**administration**  *(3)*
**Administrators**  *(2)*
**advice**  *(1)*
**Affairs**  *(9)*
**affect**  *(1)*
**affixed**  *(1)*
**aforesaid**  *(1)*
**afternoon**  *(1)*
**agree**  *(6)*
**ahead**  *(1)*
**aid**  *(2)*
**alert**  *(2)*
**Alexander**  *(4)*
**alive**  *(1)*
**allowed**  *(1)*
**Alternative**  *(1)*
**amount**  *(1)*
**and/or**  *(1)*
**annual**  *(1)*
**answer**  *(68)*
**answered**  *(1)*

**answers**  *(2)*
**Anton**  *(1)*
**anybody**  *(1)*
**apart**  *(1)*
**APOLLON**  *(4)*
**apologize**  *(2)*
**appear**  *(2)*
**appeared**  *(2)*
**appears**  *(2)*
**apply**  *(1)*
**appointment**  *(5)*
**appointments**  *(5)*
**approached**  *(1)*
**appropriate**  *(1)*
**approximate**  *(2)*
**approximately**  *(4)*
**Arch**  *(1)*
**area**  *(27)*
**areas**  *(1)*
**argument**  *(1)*
**armory**  *(1)*
**arrived**  *(1)*
**asked**  *(8)*
**asking**  *(4)*
**asleep**  *(1)*
**assault**  *(3)*
**assaults**  *(1)*
**assign**  *(2)*
**assigned**  *(16)*
**assigning**  *(1)*
**assignment**  *(2)*
**assignments**  *(1)*
**assistance**  *(6)*
**assisted**  *(1)*
**associated**  *(1)*
**assume**  *(1)*
**assuming**  *(3)*
**attached**  *(1)*
**attempt**  *(1)*
**attention**  *(9)*
**ATTORNEY**  *(200)*
**audio**  *(1)*
**August**  *(2)*
**authorities**  *(1)*
**authority**  *(2)*
**available**  *(1)*
**Avenue**  *(1)*
**aware**  *(10)*

**< B >**
**B1** *(1)*
**B2** *(2)*
**B3** *(1)*
**back** *(21)*
**bad** *(1)*
**Bank** *(2)*
**bars** *(1)*
**base** *(1)*
**basically** *(13)*
**basis** *(2)*
**Bates-stamped** *(2)*
**beat** *(2)*
**becoming** *(1)*
**bed** *(2)*
**began** *(5)*
**beginning** *(2)*
**Behalf** *(5)*
**behaving** *(1)*
**behavior** *(4)*
**behavioral** *(2)*
**believe** *(20)*
**believed** *(1)*
**believing** *(1)*
**Benefits** *(3)*
**best** *(2)*
**better** *(2)*
**big** *(3)*
**bigger** *(1)*
**bit** *(3)*
**BLAIR** *(7)*
**BLANCHE** *(3)*
**block** *(1)*
**BLOODSAW** *(14)*
**bodily** *(1)*
**body** *(2)*
**bottom** *(1)*
**Boulevard** *(1)*
**break** *(6)*
**breathe** *(3)*
**breathing** *(5)*
**Bret** *(4)*
**Bretgrote@abolitionist**
**lawcenter.org** *(1)*
**brief** *(1)*
**brought** *(3)*
**Building** *(4)*
**bus** *(3)*

**< C >**
**CABELLOS** *(9)*
**calendar** *(1)*
**call** *(63)*
**called** *(29)*
**calling** *(3)*
**calls** *(4)*
**calm** *(1)*
**Captain** *(3)*
**caption** *(1)*
**care** *(6)*
**career** *(1)*
**CARNEY** *(6)*
**Case** *(10)*
**cause** *(1)*
**ceiling** *(1)*
**cell** *(38)*
**celled** *(1)*
**cellmate** *(4)*
**cells** *(3)*
**census** *(6)*
**CENTER** *(6)*
**certain** *(3)*
**certification** *(1)*
**certify** *(4)*
**certifying** *(1)*
**CFCF** *(11)*
**chain** *(1)*
**change** *(4)*
**changed** *(3)*
**changes** *(2)*
**charge** *(4)*
**charged** *(1)*
**charges** *(2)*
**check** *(2)*
**checks** *(1)*
**chime** *(1)*
**circumstance** *(1)*
**circumstances** *(3)*
**Citizens** *(1)*
**CITY** *(6)*
**CIVIL** *(2)*
**civilian** *(1)*
**civilians** *(1)*
**clarifying** *(1)*
**classification** *(1)*
**classroom** *(2)*
**classroom-style** *(1)*
**clear** *(1)*

**cleared** *(3)*
**clearly** *(1)*
**clinic** *(3)*
**closing** *(1)*
**Code** *(1)*
**college** *(1)*
**combative** *(1)*
**come** *(15)*
**comes** *(4)*
**comfortable** *(1)*
**coming** *(4)*
**commencing** *(1)*
**commission** *(1)*
**Commissioner** *(2)*
**common** *(1)*
**Commonwealth** *(4)*
**communicate** *(2)*
**communications** *(1)*
**Community** *(5)*
**compared** *(1)*
**complaining** *(1)*
**complaint** *(4)*
**completing** *(1)*
**Compliance** *(2)*
**computer** *(3)*
**computer-aided** *(1)*
**concluded** *(1)*
**condition** *(1)*
**conditions** *(3)*
**conduct** *(6)*
**conducted** *(5)*
**consequence** *(1)*
**consider** *(2)*
**considered** *(3)*
**consist** *(1)*
**contact** *(3)*
**contacted** *(2)*
**contacting** *(1)*
**control** *(4)*
**conversation** *(3)*
**conversations** *(1)*
**Copies** *(1)*
**copy** *(2)*
**copying** *(1)*
**Corizon** *(2)*
**CORP** *(1)*
**correct** *(17)*
**correctional** *(44)*
**Corrections** *(19)*

**Counsel** *(6)*
**counseled** *(2)*
**counseling** *(5)*
**count** *(10)*
**COUNTY** *(1)*
**couple** *(2)*
**course** *(2)*
**COURT** *(4)*
**cover** *(7)*
**coverage** *(2)*
**covered** *(1)*
**COVID** *(2)*
**criteria** *(1)*
**crossed** *(1)*
**currently** *(2)*
**custody** *(2)*

**< D >**
**dangerous** *(1)*
**dark** *(1)*
**date** *(6)*
**dates** *(1)*
**day** *(26)*
**days** *(12)*
**deal** *(2)*
**dealing** *(1)*
**dealt** *(1)*
**death** *(6)*
**decedent** *(1)*
**December** *(2)*
**decided** *(1)*
**deciding** *(1)*
**decision** *(1)*
**decisions** *(2)*
**de-escalate** *(2)*
**defend** *(1)*
**Defendant** *(3)*
**Defendants** *(4)*
**defense** *(3)*
**Definitely** *(1)*
**dental** *(1)*
**Department** *(8)*
**depend** *(1)*
**depending** *(3)*
**depends** *(6)*
**DEPONENT** *(1)*
**Deposition** *(8)*
**Deputy** *(2)*
**describe** *(4)*

Deposition of Wanda Bloodsaw                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

described  *(1)*
describing  *(1)*
**DESCRIPTION**  *(1)*
Detention  *(1)*
determine  *(3)*
diabetes  *(9)*
diabetic  *(3)*
diagnose  *(1)*
died  *(4)*
difference  *(2)*
differences  *(2)*
different  *(15)*
differently  *(1)*
direct  *(6)*
directed  *(1)*
direction  *(2)*
disagree  *(2)*
discharged  *(2)*
**Disciplinary**  *(8)*
discipline  *(4)*
discussed  *(2)*
discussing  *(1)*
discussion  *(2)*
discussions  *(1)*
dishonest  *(2)*
dispensary  *(2)*
disposition  *(1)*
**Disregard**  *(2)*
distributed  *(1)*
**DISTRICT**  *(2)*
**DIVISION**  *(1)*
dizzy  *(1)*
doc  *(1)*
document  *(9)*
documentation  *(2)*
documented  *(6)*
doing  *(6)*
domain  *(1)*
door  *(3)*
doors  *(1)*
doorway  *(1)*
**Dr**  *(1)*
draft  *(5)*
drafted  *(4)*
dragged  *(1)*
driver  *(1)*
duly  *(2)*
duties  *(5)*
duty  *(2)*

**< E >**
earlier  *(9)*
early  *(1)*
**EASTERN**  *(1)*
education  *(1)*
educational  *(2)*
**Efficient**  *(1)*
**Eight**  *(3)*
either  *(6)*
electronic  *(2)*
emergencies  *(8)*
emergency  *(7)*
employee  *(4)*
employer  *(1)*
employment  *(4)*
encompass  *(1)*
encounter  *(2)*
ends  *(1)*
engage  *(2)*
ensure  *(1)*
ensuring  *(1)*
entail  *(3)*
entailed  *(2)*
enter  *(6)*
entered  *(2)*
entries  *(2)*
entry  *(3)*
equal  *(1)*
equally  *(1)*
**Equity**  *(1)*
**Errata**  *(1)*
erratic  *(1)*
escalates  *(1)*
escort  *(7)*
escorted  *(6)*
especially  *(1)*
**Esq**  *(11)*
**Estate**  *(2)*
evaluation  *(1)*
evaluations  *(1)*
event  *(8)*
eventually  *(1)*
**Everest**  *(1)*
everybody  *(2)*
exact  *(2)*
**Exactly**  *(7)*
examination  *(7)*
**EXAMINATIONS**  *(1)*

examined  *(1)*
example  *(2)*
excuse  *(2)*
exhausting  *(1)*
**EXHIBIT**  *(12)*
**EXHIBITS**  *(1)*
experience  *(1)*
experienced  *(1)*
expert  *(1)*
expires  *(1)*
explain  *(2)*
expressing  *(1)*
extensive  *(1)*
extent  *(1)*
extremely  *(1)*

**< F >**
facilities  *(1)*
**Facility**  *(5)*
fact  *(3)*
factors  *(2)*
fair  *(6)*
fall  *(1)*
familiar  *(9)*
far  *(1)*
fast  *(1)*
**Federal**  *(1)*
feel  *(5)*
feeling  *(1)*
fellow  *(1)*
fewer  *(2)*
fight  *(1)*
**Fighting**  *(1)*
figuring  *(1)*
**Filed**  *(1)*
filled  *(1)*
filling  *(2)*
find  *(2)*
finding  *(1)*
findings  *(1)*
finger  *(1)*
first  *(11)*
fit  *(1)*
five  *(2)*
five-and-a-half  *(1)*
flag  *(6)*
**Floor**  *(12)*
floors  *(3)*
flow  *(1)*

focus  *(1)*
focused  *(1)*
follows  *(1)*
follow-up  *(4)*
foregoing  *(3)*
forgot  *(2)*
form  *(49)*
**Former**  *(1)*
forms  *(1)*
forth  *(1)*
found  *(9)*
four  *(9)*
four-and-a-half  *(1)*
fourth  *(1)*
**FRASIER**  *(27)*
**Frasier's**  *(2)*
**Friday**  *(1)*
frustrated  *(1)*
frustrating  *(1)*
full  *(3)*
fully  *(1)*
further  *(6)*

**< G >**
gangs  *(1)*
**Garden**  *(3)*
**GAY**  *(3)*
**GENA**  *(5)*
general  *(14)*
generally  *(2)*
generate  *(1)*
gentleman  *(1)*
getting  *(3)*
give  *(10)*
given  *(7)*
gives  *(3)*
giving  *(1)*
glucose  *(1)*
go  *(50)*
goes  *(2)*
going  *(28)*
**Good**  *(4)*
gotten  *(1)*
graduated  *(2)*
**Grote**  *(93)*
ground  *(1)*
guess  *(10)*
guide  *(1)*
guilt  *(2)*

guilty *(11)*
gurney *(1)*

**< H >**
half *(2)*
hand *(1)*
handcuffed *(1)*
handed *(1)*
handheld *(1)*
handle *(6)*
handled *(1)*
handling *(1)*
hanging *(1)*
happen *(4)*
happened *(9)*
happens *(5)*
happy *(1)*
hard *(2)*
head *(5)*
Health *(23)*
heard *(4)*
held *(2)*
help *(5)*
helps *(1)*
hereto *(1)*
hereunto *(1)*
Hey *(2)*
high *(4)*
highlight *(1)*
history *(9)*
Hold *(2)*
holds *(3)*
Holston *(2)*
hopefully *(1)*
hospital *(1)*
hour *(2)*
hours *(11)*
housed *(3)*
housing *(81)*
Hu *(2)*

**< I >**
I/P *(2)*
ID *(1)*
idea *(2)*
identification *(2)*
identify *(1)*
illness *(2)*
immediate *(1)*

immediately *(1)*
impact *(4)*
impacted *(1)*
implemented *(1)*
imposed *(1)*
improved *(3)*
incarcerated *(5)*
incident *(21)*
incidents *(1)*
Including *(2)*
independently *(1)*
individual *(1)*
individuals *(1)*
inexperience *(1)*
inexperienced *(1)*
infirmary *(1)*
inform *(1)*
informal *(3)*
information *(5)*
informed *(3)*
initial *(1)*
initiating *(2)*
injuries *(2)*
injury *(4)*
inmate *(73)*
inmate-on-inmate *(1)*
inmate-patient *(1)*
inmates *(25)*
inmate's *(1)*
inside *(3)*
instance *(4)*
instances *(6)*
instructed *(1)*
instructions *(1)*
instructs *(1)*
insulin *(25)*
intake *(21)*
intentions *(1)*
interacted *(1)*
interacting *(1)*
interaction *(7)*
interactions *(1)*
interested *(1)*
Internal *(9)*
interpret *(1)*
intervention *(1)*
inverse *(1)*
investigations *(1)*
involved *(4)*

involvement *(1)*
involving *(5)*
Irrelevant *(1)*
issue *(17)*
issues *(8)*

**< J >**
J.kaminsky@kiernan
rebach.com *(1)*
JACOB *(2)*
jail *(11)*
jails *(1)*
JAMES *(2)*
January *(2)*
Job *(7)*
jobs *(1)*
John *(1)*
join *(1)*
JONATHAN *(3)*
JR *(3)*
juice *(1)*
July *(1)*
jumping *(1)*
JUNG *(45)*
Jung's *(2)*

**< K >**
KAMINSKY *(14)*
keep *(3)*
Kennedy *(1)*
Key *(1)*
Kiernan *(1)*
kill *(2)*
killed *(3)*
Kimball *(1)*
kind *(7)*
knew *(1)*
knock *(1)*
know *(63)*
knowing *(4)*
knowledge *(4)*
known *(6)*
knows *(2)*

**< L >**
LALITHA *(1)*
large *(1)*
laundry *(1)*
LAW *(4)*

lawsuit *(1)*
laying *(2)*
lead *(2)*
leader *(1)*
learn *(3)*
learned *(5)*
learning *(3)*
learns *(1)*
leave *(1)*
left *(3)*
lie *(1)*
Lieutenant *(38)*
Lieutenants *(1)*
Lieutenant's *(1)*
life *(1)*
light *(1)*
liked *(1)*
limited *(1)*
line *(2)*
listed *(1)*
little *(8)*
LLP *(1)*
local *(3)*
location *(3)*
lock-and-track *(2)*
locked *(1)*
log *(19)*
logbook *(1)*
logs *(2)*
long *(15)*
longer *(2)*
look *(12)*
looked *(1)*
looking *(8)*
looks *(3)*
lot *(8)*
loud *(2)*
LOUIS *(6)*
low *(2)*
LT *(2)*
lunch *(3)*
Lunchtime *(1)*
lying *(4)*

**< M >**
major *(3)*
making *(11)*
Management *(5)*
managing *(1)*

Case 2:24-cv-05618-TJS   Document 100-5   Filed 12/05/25   Page 54 of 57
Deposition of Wanda Bloodsaw
Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

mandatory *(1)*
manner *(2)*
Margaret *(2)*
Margo@alcenter.org *(1)*
MARIESHA *(4)*
mark *(1)*
MARKED *(4)*
Market *(1)*
marking *(1)*
matter *(5)*
MAUREEN *(3)*
mean *(10)*
meaning *(3)*
means *(2)*
mechanism *(1)*
med *(1)*
medical *(126)*
medication *(19)*
medications *(1)*
Meds *(1)*
members *(1)*
mental *(16)*
mention *(2)*
mentioned *(5)*
met *(1)*
MICHAEL *(1)*
Michael.pestrak@phil a.gov *(1)*
Mike *(2)*
military *(1)*
Miller *(2)*
mind *(6)*
mini *(1)*
minor *(1)*
minutes *(2)*
missed *(7)*
mm-hmm *(1)*
mm-mm *(1)*
mobile *(1)*
moment *(3)*
money *(1)*
monitor *(1)*
month *(2)*
Months *(1)*
morning *(2)*
move *(11)*
moved *(7)*
movement *(7)*

moves *(1)*
moving *(4)*
multipurpose *(1)*
murder *(1)*

< N >
name *(12)*
National *(1)*
near *(1)*
need *(18)*
needed *(13)*
needing *(2)*
needs *(7)*
never *(4)*
Nia *(2)*
Nia@alcenter.org *(1)*
nods *(1)*
normal *(4)*
normally *(1)*
Notary *(4)*
notate *(1)*
notated *(1)*
note *(3)*
noted *(1)*
notification *(1)*
November *(14)*
numbers *(2)*
nurse *(43)*
nurses *(3)*
nursing *(3)*

< O >
Objection *(63)*
objects *(1)*
observe *(1)*
observed *(3)*
observes *(1)*
occur *(1)*
occurs *(1)*
O'Connor *(1)*
October *(5)*
office *(7)*
Officer *(86)*
officers *(27)*
Officer's *(1)*
offices *(2)*
Oh *(3)*
Okay *(44)*
older *(1)*

once *(8)*
ones *(1)*
ongoing *(1)*
open *(2)*
operations *(1)*
opinion *(3)*
opportunity *(1)*
orange *(1)*
order *(4)*
Orders *(5)*
ordinary *(1)*
Osbourne *(8)*
outbreak *(1)*
out-of-cell *(1)*
outside *(1)*
overall *(2)*
oversee *(1)*
overtime *(2)*
overview *(1)*

< P >
p.m *(6)*
p.m.-to-11:00 *(1)*
P-2 *(1)*
PA *(1)*
packet *(1)*
packets *(1)*
PAGE *(12)*
pages *(2)*
pain *(1)*
pamphlets *(1)*
paperwork *(2)*
Parkway *(2)*
part *(2)*
particular *(12)*
particularly *(1)*
Party *(3)*
pass *(2)*
passed *(2)*
passes *(1)*
patient *(1)*
PDP *(14)*
Penn *(1)*
PENNSYLVANIA *(11)*
people *(18)*
pepper *(1)*
Perfect *(1)*
performance *(2)*

performed *(1)*
period *(1)*
permissible *(1)*
permitted *(1)*
person *(17)*
personally *(2)*
personnel *(1)*
pertaining *(1)*
PESTRAK *(84)*
PHILADELPHIA *(18)*
physical *(4)*
pick *(3)*
place *(1)*
placed *(1)*
Plaintiffs *(11)*
Plaintiffs-1 *(1)*
Plaintiffs-2 *(1)*
Plaza *(1)*
plea *(1)*
plead *(1)*
please *(2)*
point *(1)*
policies *(7)*
policy *(20)*
population *(5)*
position *(3)*
possible *(6)*
Possibly *(1)*
post-high *(1)*
posts *(2)*
potential *(1)*
practice *(2)*
practices *(1)*
precaution *(1)*
precautions *(1)*
prepare *(2)*
prepared *(1)*
presence *(1)*
PRESENT *(5)*
pretty *(2)*
pricks *(1)*
prior *(13)*
priorities *(1)*
prioritize *(1)*
priority *(1)*
prison *(1)*
Prisons *(6)*
prison's *(1)*

privileges  *(1)*
problem  *(5)*
problems  *(3)*
Procedure  *(2)*
procedures  *(1)*
proceeding  *(1)*
process  *(1)*
Production  *(2)*
Professional  *(3)*
profusely  *(1)*
Program  *(2)*
progress  *(4)*
prolong  *(1)*
promoted  *(3)*
promotion  *(1)*
promotions  *(1)*
proper  *(2)*
propounded  *(1)*
protocol  *(2)*
provide  *(2)*
provided  *(4)*
Provident  *(1)*
Public  *(2)*
pull  *(2)*
punitive  *(2)*
pursuant  *(1)*
put  *(17)*

< Q >
question  *(10)*
questioned  *(1)*
questions  *(16)*
quick  *(1)*
quite  *(7)*

< R >
radio  *(1)*
ran  *(1)*
range  *(1)*
rank  *(1)*
Rashatwar  *(2)*
rationally  *(1)*
Ray  *(2)*
RAYMOND  *(1)*
read  *(6)*
Reading  *(1)*
really  *(4)*
reason  *(3)*
rec  *(1)*

recall  *(17)*
recalled  *(1)*
receive  *(16)*
received  *(4)*
receiving  *(2)*
receptionist  *(2)*
recognize  *(2)*
recognizing  *(1)*
recollection  *(11)*
Record  *(9)*
records  *(1)*
recreation  *(3)*
red  *(6)*
red-flag  *(2)*
reduced  *(1)*
refer  *(2)*
reference  *(2)*
references  *(1)*
referral  *(6)*
referring  *(2)*
reflects  *(1)*
refresh  *(5)*
refresher  *(5)*
refusal  *(10)*
refusals  *(2)*
refuse  *(2)*
refused  *(9)*
refuses  *(6)*
refusing  *(19)*
regard  *(2)*
regarding  *(2)*
regular  *(3)*
related  *(2)*
relation  *(1)*
relationship  *(2)*
relative  *(1)*
relay  *(1)*
relevant  *(1)*
reliability  *(2)*
relieve  *(1)*
rely  *(2)*
relying  *(1)*
remember  *(38)*
remembered  *(1)*
render  *(2)*
Repeat  *(2)*
rephrase  *(2)*
report  *(3)*
reported  *(1)*

Reporter  *(4)*
represent  *(2)*
represented  *(1)*
reproduction  *(1)*
request  *(5)*
requested  *(1)*
require  *(3)*
required  *(1)*
requirement  *(2)*
resources  *(1)*
respect  *(1)*
respond  *(14)*
responding  *(4)*
responds  *(1)*
response  *(21)*
responses  *(2)*
responsibilities  *(3)*
responsibility  *(4)*
responsible  *(3)*
responsive  *(2)*
restrooms  *(1)*
results  *(2)*
review  *(1)*
reviewing  *(4)*
right  *(14)*
Riverside  *(3)*
roadway  *(1)*
role  *(4)*
roles  *(1)*
roll  *(12)*
room  *(11)*
rooms  *(2)*
roster  *(2)*
roughly  *(1)*
rounds  *(6)*
routine  *(2)*
Rules  *(3)*
run  *(1)*
running  *(1)*
Rupalee  *(2)*
Rupalee@alcenter.org
  *(1)*

Rwittekind@okllp.com
  *(1)*

< S >
safety  *(6)*
salary  *(1)*

Sanchez  *(1)*
Saturday  *(1)*
saw  *(1)*
saying  *(1)*
says  *(9)*
scenarios  *(3)*
scene  *(1)*
Schaffer  *(4)*
school  *(4)*
scope  *(1)*
se  *(2)*
seal  *(1)*
second  *(3)*
secondary  *(1)*
securing  *(1)*
security  *(4)*
see  *(29)*
seeking  *(1)*
seen  *(8)*
sees  *(1)*
segregation  *(2)*
self-harm  *(3)*
send  *(4)*
sense  *(2)*
sent  *(2)*
sentence  *(1)*
sentencing  *(1)*
separate  *(2)*
separated  *(1)*
separately  *(2)*
separation  *(1)*
separations  *(1)*
SEPTA  *(2)*
September  *(1)*
Sergeant  *(27)*
Sergeants  *(4)*
series  *(1)*
serious  *(1)*
served  *(1)*
servery  *(1)*
serving  *(1)*
set  *(3)*
setting  *(2)*
share  *(2)*
shared  *(1)*
she'd  *(1)*
sheet  *(3)*
sheets  *(1)*
shift  *(10)*

Deposition of Wanda Bloodsaw                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

| | | | |
|---|---|---|---|
| shifts *(3)* | start *(8)* | teller *(4)* | try *(2)* |
| shoot *(1)* | started *(6)* | telling *(3)* | trying *(1)* |
| short *(4)* | starts *(1)* | tells *(5)* | tuberculosis *(1)* |
| shortage *(2)* | state *(1)* | temporary *(1)* | Tuesday *(1)* |
| shortages *(2)* | stated *(1)* | term *(7)* | turns *(2)* |
| shots *(2)* | STATES *(1)* | terms *(1)* | twice *(3)* |
| show *(2)* | staying *(1)* | test *(1)* | Two *(22)* |
| shown *(1)* | stenotype *(1)* | testified *(2)* | type *(2)* |
| shows *(1)* | stipulate *(1)* | testify *(2)* | types *(1)* |
| sick *(2)* | straight *(1)* | testimony *(1)* | typical *(1)* |
| sign *(5)* | Street *(4)* | testing *(2)* | |
| signature *(4)* | stressful *(2)* | Thank *(6)* | < U > |
| signs *(2)* | stretcher *(24)* | thing *(5)* | unable *(3)* |
| similar *(1)* | strip-searched *(1)* | things *(13)* | understaffing *(1)* |
| sits *(1)* | subjects *(1)* | think *(21)* | understand *(7)* |
| situation *(31)* | subordinate *(1)* | thinking *(2)* | understanding *(5)* |
| situations *(3)* | substance *(1)* | Thirty-day *(1)* | understood *(1)* |
| six *(1)* | suggest *(1)* | thought *(3)* | unfortunately *(1)* |
| size *(4)* | suggested *(1)* | threat *(1)* | unit *(31)* |
| skim *(1)* | suicide *(1)* | three *(6)* | UNITED *(1)* |
| skip *(1)* | Suite *(2)* | time *(37)* | units *(22)* |
| slide *(2)* | Sunday *(1)* | timely *(1)* | universal *(1)* |
| slides *(4)* | superiors *(1)* | times *(2)* | update *(2)* |
| small *(3)* | supervising *(5)* | timestamp *(1)* | updated *(3)* |
| so-and-so *(1)* | supervisor *(4)* | tired *(2)* | updates *(1)* |
| social *(1)* | supervisors *(4)* | title *(1)* | urgent *(5)* |
| somebody *(15)* | supervisor's *(1)* | today *(3)* | use *(6)* |
| somebody's *(2)* | supposed *(10)* | today's *(1)* | usual *(1)* |
| sorry *(8)* | sure *(22)* | told *(15)* | usually *(11)* |
| sort *(4)* | suspension *(2)* | tool *(1)* | |
| sound *(2)* | sweat *(1)* | top *(2)* | < V > |
| sounds *(2)* | sweating *(1)* | Torresdale *(1)* | varied *(1)* |
| space *(1)* | sworn *(2)* | tour *(10)* | varies *(1)* |
| speak *(4)* | symptom *(1)* | tours *(2)* | variety *(1)* |
| speaking *(1)* | symptoms *(5)* | trained *(4)* | various *(1)* |
| Special *(1)* | synonym *(1)* | training *(28)* | vary *(2)* |
| specific *(4)* | system *(5)* | trainings *(1)* | verbally *(1)* |
| specifically *(5)* | | transcribed *(1)* | video *(13)* |
| specified *(1)* | < T > | transcript *(2)* | violated *(2)* |
| spend *(1)* | take *(14)* | transcription *(2)* | violating *(1)* |
| spoke *(3)* | taken *(9)* | transferred *(1)* | violation *(4)* |
| spoken *(1)* | talk *(6)* | treatment *(1)* | visible *(1)* |
| spray *(1)* | talked *(9)* | Trebach *(1)* | voting *(1)* |
| Spring *(3)* | talking *(3)* | triage *(6)* | vs *(1)* |
| St *(1)* | tasks *(1)* | trip *(1)* | |
| staff *(37)* | team *(9)* | trips *(3)* | < W > |
| staffed *(1)* | teams *(1)* | TRIVIKRAM *(2)* | wait *(1)* |
| staffing *(10)* | Technically *(1)* | true *(4)* | waiting *(4)* |
| standard *(1)* | tell *(25)* | truth *(3)* | waived *(2)* |

**walk**  *(5)*
**walked**  *(1)*
**Walker**  *(1)*
**walking**  *(2)*
**WANDA**  *(9)*
**want**  *(15)*
**Warden**  *(1)*
**watch**  *(1)*
**watched**  *(1)*
**watching**  *(2)*
**wave**  *(4)*
**way**  *(15)*
**weapon**  *(2)*
**weapons**  *(3)*
**week**  *(2)*
**weekend**  *(1)*
**weeks**  *(3)*
**welfare**  *(1)*
**well**  *(25)*
**wellness**  *(1)*
**went**  *(3)*
**we're**  *(3)*
**WHEREOF**  *(1)*
**window**  *(3)*
**wish**  *(1)*
**WITNESS**  *(64)*
**WITTEKIND**  *(15)*
**wondering**  *(2)*
**wording**  *(2)*
**work**  *(8)*
**worked**  *(10)*
**workers**  *(5)*
**working**  *(11)*
**workplace**  *(1)*
**worse**  *(1)*
**write**  *(1)*
**write-up**  *(1)*
**write-ups**  *(1)*
**wrong**  *(4)*

**< Y >**
**Yeah**  *(11)*
**year**  *(6)*
**years**  *(7)*
**YESCARE**  *(3)*
**younger**  *(3)*