# Exhibit G

1

2      IN THE UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3

4
    ------------------------------------------
5   JACOB & JAMES JUNG, as Administrators of
    the Estates of LOUIS JUNG, JR.,
6

7        Plaintiffs,

8   -vs-

9   CITY OF PHILADELPHIA, YESCARE CORP;
    BLANCHE CARNEY, FORMER COMMISSIONER OF
10  PHILADELPHIA DEPARTMENT OF PRISONS; LALITHA
    TRIVIKRAM; MAUREEN GAY; MARIESHA APOLLON;
11  BLAIR CABELLOS; GENA FRASIER; WANDA BLOODSAW,

12       Defendants.

13  ------------------------------------------

14             -------
            THURSDAY, OCTOBER 23, 2025
15             -------

16

17      Videotaped Virtual Oral deposition of

18  BLANCH CARNEY, was taken on behalf of

19  Plaintiffs, commencing at 10:05 a.m., on

20  the above date, before Lisa J. Brill, a

21  Court Reporter and Notary Public, there

22  being present:

23

24

```
 1    A P P E A R A N C E S

 2


 3    BY: BRET GROTE, ESQUIRE
      ABOLITIONIST LAW CENTER
 4    990 SPRING GARDEN STREET, SUITE 306
      PHILADELPHIA, PENNSYLVANIA 19123
 5    BRETGROTE@ABOLITIONISTLAWCENTER.ORG
      ATTORNEY FOR THE PLAINTIFFS
 6


 7


 8
      BY:  MICHAEL PESTRAK, ESQUIRE
 9    CITY OF PHILADELPHIA LAW DEPARTMENT
      1515 ARCH STREET, 15TH FLOOR
10    MICHAEL.PESTRAK@PHILA.GOV
      PHILADELPHIA, PENNSYLVANIA 19102
11    ATTORNEY FOR THE DEFENDANTS, BLANCHE
      CARNEY, COMMISSIONER OF THE PHILADELPHIA
12    DEPARTMENT OF PRISONS, CITY OF PHILADELPHIA

13


14


15


16    BY:  JONATHAN KAMINSKY, ESQUIRE
      KIERNAN, TREBACH,LLP
17    TEN PENN CENTER, SUITE 770
      1801 MARKET STREET
18    PHILADELPHIA, PA 19103
      JKAMINSKY@KEIRNANTRABACH.COM
19    ATTORNEY FOR THE DEFENDANT, LALITHA
      MARIESHA APOLLON
20


21


22


23


24
```

1

A P P E A R A N C E S

2

3

4

5

6  BY: RAY WITTEKIND, ESQUIRE
   O'CONNOR KIMBALL, LLP
7  1500 JOHN F. KENNEDY BOULEVARD, SUITE 110,
   PHILADELPHIA, PA 19102
   WITTEKIND@OKLLP.COM
8  TGREGORY@OKLLP.COM
   ATTORNEY FOR THE DEFENDANTS, YESCARE CORP.
9  DR. TRIVIKIM, NURSE GAY, AND BLAIR CABELLOS

10

11

12

13  BY:  SUMMER THOMAS, ESQUIRE
    GORDON, REES, SCULLY, MANSUKHANI
14  THREE LOGAN SQUARE
    1717 ARCH STREET, SUITE 610
15  PHILADELPHIA, PA 19103
    ADOSSINO@GRSM.COM
16  ATTORNEY FOR THE DEFENDANTS, GENA FRASIER,
    WANDA BLOODSAW

17

18

19

20

21

22

23

24

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1                      I N D E X

 2   WITNESS:

 3   BLANCHE CARNEY

 4

 5   EXAMINATION              PAGE

 6   MR. GROTE:                  6

 7   MR. KAMINSKY:            146

 8   MR. WITTEKIND:          149

 9

10                   E X H I B I T S

11   NO.        Description                    Page

12   Exhibit-1 Provider Agreement               7
13             January 4th, 2022, between
              Philadelphia and
14             Corizon Health

15

16

17

18

19

20

21

22

23

24
```

```
 1              - - -
          DEPOSITION SUPPORT INDEX
 2              - - -

 3  Direction to Witness Not To Answer
    Page Line
 4
    None
 5

 6

 7  Request for Production of Documents
    Page  Line
 8
    None
 9

10

11

12  Stipulations
    Page  Line
13
    7       1
14

15

16

17  Questions Marked
    Page Line
18
    None
19

20

21

22

23

24
```

Page 6

---
P R O C E E D I N G S
---

THE COURT REPORTER:  Let me start at the top of my screen.  Mr. Pestrak, are you going to need the transcript from today?

MR. PESTRAK:  Electronic only.  Mini, full.

THE COURT REPORTER:  Ms. Thomas, are you going to need the transcript?

MS. THOMAS:  Yes.  Just an electronic copy.

THE COURT REPORTER:  Mr. Kaminsky?

MR. KAMINSKY:  Yeah, same as everybody as far as electronic copy, full and mini.

THE COURT REPORTER:  Mr. Wittekind?

MR. WITTEKIND:  Yeah, check off electronic full and mini.  It will be to two of us.

Page 7

---
(It is hereby stipulated and agreed by and between counsel that reading, signing, sealing, filing and certification are hereby waived; and that all objections, except as to the form of the questions, be reserved until the time of trial.)
---

BLANCHE CARNEY, after having been first duly sworn, was examined and testified as follows:

---
EXAMINATION
---
BY MR. GROTE:

Q.  All right.  Good morning, Ms. Carney.  My name is Bret Grote.  I'm counsel for the plaintiffs in this matter.  The estate of Lewis Jung, Jr. versus the City of Philadelphia.  Can you please state and spell your name for the record?

A.  Blanche Carney, B-L-A-N-C-H-E C-A-R-N-E-Y.

Page 8

Q.  And have you ever given a deposition before?

A.  Yes.

Q.  How many times, if you remember?

A.  About six or seven.

Q.  And were those in your role with the Philadelphia Department of Prisons or related to that role?

A.  Yes.

Q.  So you're going to be familiar with the deposition process, I'm going to go over some basic ground rules, just so we're both on the same page.  You have to speak out loud as I do, so that there's no head nods or no mm-hmms, because the court reporter can't take that down.  We won't talk over each other, so I will let you finish your answers, and if you let me finish your questions, even if you know where the question is going to go and you know the answer, that would just allow the court reporter to get everything down.  If you don't know or remember something, please let me know if there's a document

Page 9

that might refresh your recollection.  And if you answer a question, I'm going to assume that you understood the question.  And you can take a break.  If you need a break, just let me know.  With the only caveat being, if I ask a question, please answer the question before we would take a break.  Does all of that sound good to you?

A.  Yeah.

Q.  Are you prepared to give a deposition today?

A.  Yes.

Q.  And did you do anything to prepare for today's deposition?

A.  No.

Q.  And without telling me about any conversations that you've had with your lawyer, have you reviewed any records prior to coming in today?

A.  No.

Q.  Okay.  And are you currently employed in the field of corrections?

A.  Yes.

Page 10

Q. And what is that employment?
    MR. PESTRAK: Objection. And
Blanche, if you want to give your
title, I think you can answer it
that way. But you don't have to say
where you are currently employed.
And if we need to make that an
issue, Bret, we can do so. But as I
said yesterday, I'm going to
instruct not to answer where she is
currently employed, but if she wants
to give her a title, I'll let her do
that.
    MR. GROTE: Understood. We'll
certify for the record that you're
instructing her not to answer that
question. I was phrasing it in the
way I did in order to determine if
it was relevant to past experience.
BY MR. GROTE:
Q. So with all of that said, what is
your current title, Ms. Carney?
A. Associate Director.
Q. And how long have you been in that

Page 11

position?
    MR. PESTRAK: Same objection. You
can answer if you're comfortable
with it, Blanche.
    THE WITNESS: Approximately year
and a half.
BY MR. GROTE:
Q. And prior to that position, where
were you employed?
A. The City of Philadelphia
Department of Prisons.
Q. And what was your role there?
A. Commissioner.
Q. And how long were you the
Commissioner?
A. Eight years.
Q. Before going through the
employment history, I'm going to go ask
you about your educational history. Can
you let me know any post-high-school
education that you have received?
A. A Bachelor's of Science and a
Master's of Social Services.
Q. And where did you receive those

Page 12

from?
A. Lincoln University and Bryn Mawr
Graduate School of Social Work and Social
Research.
Q. And what years?
A. 1992 and 1997.
Q. And can you walk me from your
employment history up -- well, when did
you become Commissioner of PDP?
A. If I'm remembering correctly, I
believe it was 2016.
Q. And can you walk me through your
employment history within the
Philadelphia -- well, first, before --
when did you start working with the
Philadelphia Department of Prisons?
A. 1995.
Q. And prior to that, were you ever
in any correctional job?
A. No.
Q. Any law enforcement?
A. No.
Q. And can you walk me through your
employment from 1995 up to 2016, the

Page 13

positions you held, general
responsibilities at PDP?
A. Social Work Service Manager,
Social Work Supervisor, Human Service
Program Administrator, Deputy Commissioner
for Restorative and Transitional Services,
all of which involved I worked closely
with correctional sworn staff and
providing direct services to the
incarcerated population.
Q. Okay. And when you became
Commissioner, what were your
responsibilities as Commissioner?
A. The overall site responsibility
for the facilities that make up the
Department of Prisons.
Q. And can you elaborate on that a
little bit? I understand that it's quite
a comprehensive role, but how many
facilities are there, and how would you
provide that oversight generally?
A. Well, at the time in which I was
Commissioner, we had five major facilities
of which there is a rank structure, so I

Page 14

have overall site responsibilities. And
those duties are carried out through
Deputy Commissioners, which then are
carried out through the wardens of each
facility. The wardens of the facilities
then have their rank structure, which are
deputy wardens. You have captains,
lieutenants, sergeants, down to
correctional officers, as well as civilian
personnel and contract staff.
   Q.   Thank you. And did you have
any -- I think this can be an extensive
question, so let me know if it'd be easier
to break it down. But I'm just wondering
what trainings you received throughout
your history within PDP prior to becoming
Commissioner. What training did they
provide you for your various roles?
   A.   There's a training academy that
provides training to both sworn and
civilian that staff are required to
participate and attend throughout their
careers at the Department of Prisons. And
that encompasses a range of topics and

Page 15

services that are provided in a
correctional setting.
   Q.   And so is it accurate that when
you began with PDP, you went through the
training academy?
   A.   Yes.
   Q.   And how frequently would you have
to receive training throughout your
employment after that initial time in the
academy?
   A.   It's ongoing, annual training.
   Q.   Did you receive specific training
around the provision of medical care in
the jail settings?
   A.   No.
   Q.   What about emergency care, you
know, responding to emergencies?
   A.   Staff receive training in the
policies, but do not necessarily
effectuate the delivery of such
medications or emergent care. So there
are policies that are universal for which
staff are responsible to have knowledge of
how to notify, and then the respective

Page 16

parties that are licensed to deliver care
or treatment through the contracted
services then deliver the services to the
incarcerated population.
   Q.   And so I'm understanding
correctly, if there is an emergency and
correctional staff, as opposed to medical
staff, encounter that, the policy provides
guidance for them to seek some in the
assistance of appropriate medical staff.
Is that accurate?
   A.   That's accurate.
   Q.   Did you ever receive any training
on any specific medical conditions as a
correctional officer, any signs and
symptoms to look out for with regard to a
specific medical condition?
       MR. PESTRAK: I'm just going to
       object, Bret, because I don't think
       she was ever a correctional officer.
       MR. GROTE: That's a good point.
BY MR. GROTE:
   Q.   Within your employment at PDP, did
you ever receive training on any specific

Page 17

medical conditions?
   A.   No.
   Q.   When you became -- what was your
position right before you became
commissioner again?
   A.   Deputy Commissioner.
   Q.   So as -- how long were you Deputy
Commissioner?
   A.   If I remember correctly, about a
year and some months.
   Q.   How many Deputy Commissioners are
there?
   A.   When I was the Commissioner, there
were three.
   Q.   Do you remember, when you were
Deputy Commissioner, how many there were?
   A.   There were three.
   Q.   And I know you touched on this
before, but as Deputy Commissioner, what
were your responsibilities?
   A.   Overall site responsibility for
major division within the Department of
Prisons, and through the rank structure
the program services and activities were

Page 18

then carried out through subordinate human service program administrators, wardens, and down through the chain of command to correctional officers, civilian staff, and contracted staff.

Q.  Okay, thank you.

As Deputy Commissioner, were there certain facilities you were in charge of that were distinct from the other two Deputy Commissioners?  How were the responsibilities distributed between the deputies?

A.  Well, the divisions, the site responsibility was assigned to the Deputy Commissioners, but divisions were located at each of the facilities.

Q.  Can you explain to me what you mean by "division"?

A.  You can have a division of Restorative and Transitional Services, which is the Social Service Program Division that provides direct service to the population.  You also had a Deputy Commissioner for operations, responsible

Page 19

for overall site operations.  And then there was the Deputy Commissioner of court administration, who handled administrative aspects of the Department of Prisons.

Q.  And what were the divisions you were responsible for?

A.  I was responsible for Restorative and Transitional Services as Deputy.

Q.  When you became Commissioner, were you provided any -- did they provide you training or guidance?  What happens when you become Commissioner to prepare you for that job?

A.  You're really calling together your experience in the field of corrections.  You bring all of your experience to the position, understanding that you have -- overall have site responsibility for the department.  So all the years that you've gained experience in the department, or in the field of corrections, you bring that to the position.

Q.  And as Commissioner, what was your

Page 20

relationship to the medical provider?  Did you provide oversight?  Were you in collaboration with them?  What did that look like?

A.  As a contracted provider for the Department of Prisons the oversight of that particular contract was through the Chief Medical Officer, and the Chief Medical Officer and I would converse and have ongoing engagement regarding services.  But the overall site responsibility for that contracted provider was through the Chief Medical Officer.

Q.  And through 2016 to 2024, who was the Chief Medical Officer, or if there was more than one, who were they?

A.  Dr. Bruce Herdman.

Q.  The entire time it was Dr. Herdman?

A.  Yes.

Q.  And do you know what Dr. Herdman's background is professionally?  What is he a doctor in?

Page 21

A.  He has a, I believe, an MBA if I recall correctly.

Q.  Master's of Business Administration, would that be --

A.  Correct.

Q.  Do you know what his methods were for providing oversight of the medical contractor?

A.  He would hold weekly or daily meetings and have daily engagements with licensed clinical and medical providers.  It could be case-related, it could be an overall initiative.  But he maintained contact with the licensed medical provider, direct reports at the facilities, and they also had a rank structure as well.

Q.  And would he report to you about his reports from meetings with the provider?

A.  On occasion, yes.

Q.  And what form would those reports take?  Would they be oral; would they be written?

Page 22

A. Oral.

Q. And were those part of a regular series of meetings you would have, or would it be as a need arose?

A. It would be both. It depended on the scenario or the case being reviewed. But overall, he maintained and managed site responsibility for the clinical medical services for the Department.

Q. And in the time you were Commissioner of the Philadelphia Department of Prisons, do you know how diabetes care was administered in the prisons?

A. Yes.

Q. And how was that?

A. Well, there would be a clinical assessment by a licensed practitioner. The licensed practitioner would meet with the individual, engage them in a series of questions to obtain information. At that point based on the clinician's diagnosis medication would be ordered and the individual would receive the medication,

Page 23

and that was the normal course of duty for rendering medications.

Q. And if a patient were diabetic, and they -- and they were to receive glucose measurements, where would that happen or how would that happen?

A. They could happen in the medical area or infirmary area, or it could happen in another area designated by the facility to render care. It depended on the facility's location and where they were going to render confidential services and administer medications.

Q. And would that vary depending on which facility somebody was in perhaps?

A. Yes.

Q. Thank you. In terms of where it was.

MR. PESTRAK: Did you want her to answer that, Bret, or is that just finishing your question?

BY MR. GROTE:

Q. I think, just so we understand and so that we're clear, your answer was that,

Page 24

yeah, depending on if they're in CFCF, the Detention Center, PICC, and other factors, whether the medication was administered in one location or the medical services that would vary. That was not very artful, but do you understand what I mean?

A. Yes.

Q. Were the readings of glucose documented or supposed to be documented?

A. Supposed to be documented in the electronic medical record.

Q. And do you know what was supposed to be documented when they do a glucose check?

A. I don't want to speak or assume so. I know there's a documentation. I don't know specifically what.

Q. So you don't know if they're supposed to document the glucose level itself or not?

MR. PESTRAK: Objection. You can answer again.

THE WITNESS: There is a level or a reading that I am aware of. I do

Page 25

not know the specific medical terminology for that, but that would be from the licensed provider.

BY MR. GROTE:

Q. The -- what would be from the provider? The -- using the correct terminology or?

A. The actual medical provision of services, whether that's inclusive of an assessment terminology to enter into the medical electronic record.

Q. So is it the provider who determines what's supposed to be documented in the medical record?

A. Yes. By a licensed professional, yes.

Q. Understood. And this is a similar question, it may get a similar answer: How is insulin administered to diabetic patients?

A. There are two forms of -- I know there's a pill, and then there's one with the syringe.

Q. And would those be provided by the

Page 26

1  medical provider?
2      A.  Yes.
3      Q.  And would that be, as you
4  testified before, in an appropriate,
5  confidential medical setting?
6      A.  Yes.
7      Q.  And do you know if that was
8  supposed to be documented as well?
9      A.  I'm not certain of the -- if the
10 location is documented in the electronic
11 medical record.
12     Q.  Do you know if the -- was the fact
13 that it was or was not administered
14 supposed to be documented?
15     A.  Yes.
16     Q.  While you were Commissioner at
17 PDP, was there a process for ensuring that
18 medication administration was occurring as
19 it was supposed to be occurring?
20     A.  Yes.
21     Q.  And what was that process?
22     A.  The process is through the Chief
23 Medical Officer quality-assurance checks
24 to make sure that scheduled medications

Page 27

1  occur as scheduled.  And if an individual
2  refuses medication, there's a process to
3  document their refusal.
4      Q.  So, the quality-assurance checks:
5  Can you tell me a little bit more about
6  that process?  How would it be carried
7  out?  How frequently?  What would they
8  look at?
9      A.  Dr. Herdman would be best to
10 respond to that question, but based on my
11 knowledge, if there were any missed
12 medication periods for the day, Medical
13 would notify Dr. Herdman, and he would
14 engage to determine what the issue or
15 challenge was.
16     Q.  So that would be a daily process
17 in response to a notification from the
18 medical provider?
19     A.  Yes.
20     Q.  Were there any processes that
21 were, in addition to that, say, were there
22 monthly reviews, every three months, some
23 type of audit of medication
24 administration, Dr. Herdman would carry

Page 28

1  out?
2      A.  Yes.  He would do the quality
3  assurance analysis, but I would have to
4  defer to him for the specifics on the
5  frequency and how he arrived at that for
6  those ongoing audits.
7      Q.  Is it fair to say that that was a
8  responsibility that as commissioner you
9  delegated to him to carry out?
10     A.  It wasn't delegated.  That was one
11 of his assigned duties, and he was
12 responsible for that.  Of course, he would
13 report up, but that was one of his
14 assigned duties.  That was not delegated
15 from my assigned duties to monitor on a
16 daily basis those activities.
17     Q.  Thank you for that clarification.
18 I understand.  Was -- I mean, was PDP able
19 to identify if there were ever chronic
20 failures in administering insulin within
21 PDP facilities while you were
22 commissioner?
23     A.  No.
24     Q.  And just so I'm understanding my

Page 29

1  own question better, let me rephrase that.
2  Are you -- is your answer meaning that you
3  never found that there were chronic
4  failures in administering insulin while
5  you were commissioner?
6      A.  I never had any report of any
7  chronic failures.
8      Q.  Did you have any reports of
9  non-chronic or episodic failures, we can
10 say -- call them?
11     A.  No.
12     Q.  Would such reports make it to you
13 or would those be directed to Dr. Herdman?
14     A.  They would be directed to Dr.
15 Herdman and those reports would then if a
16 person refused medications, there's what
17 we have, a red-flag protocol, then that
18 brings into a different response from
19 medical to engage the individual, to
20 provide education, the importance of
21 taking the medication as prescribed, and
22 trying to engage them so that they can
23 become medication-compliant.  And those
24 were not brought to my attention.  Those

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 13 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 30

1  were routine care engagements unless
2  something was life-threatening and it
3  required that the person you needed a
4  court order to medicate.  So those are
5  things that wouldn't be brought to my
6  attention on a daily basis.
7     Q.   You mentioned there's a process if
8  a person refuses medication.  Can you walk
9  me through what that process was?
10    A.   The process if they have three
11 missed doses and they're refusing medical
12 will engage the patient.  And as I just
13 testified, there's an engagement by a
14 licensed provider educating the individual
15 or the importance of maintaining
16 medication compliance.
17    Q.   And is there a form to document
18 refusals?
19    A.   Yes.
20    Q.   Who was supposed to fill that out;
21 what was the process for that documented
22 refusal?
23    A.   I would have to see the form it's
24 been some time.  I believe the

Page 31

1  correctional officer would notify medical.
2  Medical would then be responsible for
3  getting -- obtaining the signature for
4  refusal and documenting it in the
5  electronic medical record.
6     Q.   Do you know if there was a process
7  in place if a patient refused to sign the
8  refusal form?
9     A.   If that person refused to sign, it
10 still would have been required to be
11 documented, their refusal to sign.
12    Q.   And do you know who would have
13 signed off that they witnessed that
14 refusal, what staff?
15    A.   It could be the correctional
16 officer or the medical provider.
17    Q.   Did correctional staff have a
18 responsibility to notify medical staff if
19 an inmate was not going to med-line to
20 receive their medication?
21    A.   If they were on the list of
22 individuals scheduled to receive, they
23 would be required to notify that the
24 individual is not coming to the med-line.

Page 32

1     Q.   And how would they make that
2  notification?
3     A.   That notification is usually made
4  through a phone call, and then there's a
5  documentation on the refusal form.
6     Q.   Would the phone call to medical be
7  documented in any way?
8     A.   I don't believe it's exclusive to
9  the phone call.  It's the paperwork that
10 should accompany as well.  So I'm not 100%
11 certain.
12    Q.   Understood.  You're familiar with
13 the Lock and Track system, I assume?
14    A.   Yes.
15    Q.   Did medical staff have access to
16 the Lock and Track system?
17    A.   Yes.
18    Q.   Okay.  If something was entered
19 into the Lock and Track system, would it
20 still be expected that -- so let's say, if
21 correctional staff entered into the Lock
22 and Track system that somebody refused
23 medication, they would still be expected
24 to notify medical staff through a phone

Page 33

1  call like you just discussed?
2     A.   Yes.
3     Q.   Do medical staff necessarily
4  review the Lock and Track, you know, on a
5  daily basis?
6        MR. PESTRAK:  Objection.  You can
7     answer if you know.
8  BY MR. GROTE:
9     Q.   If you know.
10    A.   I'm not sure if it's on a daily
11 basis.  They do have read-only rights for
12 portions of Lock and Track.
13    Q.   Okay.  How -- Can you describe for
14 the record what Lock and Track is and how
15 it is used within PDP?
16       MR. PESTRAK:  How broadly do you
17    want that question, Bret?
18 BY MR. GROTE:
19    Q.   What I'm wondering is kind of
20 generally what would be documented there
21 and how frequently staff are reviewing it.
22 Is it a place to document notes so there's
23 a record, or is it something that staff
24 are expected to be reviewing as it's

Page 34

related to, say, the housing unit they're working on as part of their daily job responsibilities?

A.    So Lock and Track is the platform which captures incarcerated individuals' admissions, participation in programs, treatments, any case notes, read-only rights, legal paperwork.  The individuals that have access to Lock and Track are only able to have a read-only access to certain portions of it.  Depending on their work for the day, they may or may not go into Lock and Track.  Their duties and information can be entered for individuals to review if they're going through the case file.  And that information is the overall platform for a person's incarceration history.  The electronic medical record is separate, and only the clinical staff have access to it to enter clinical notes to ensure privacy and protection of medical information.  Need-to-know folks.  There are some read-only rights for individuals just to

Page 35

take a look at certain aspects of the electronic medical record.  That does not give people medical history of an individual.

Q.    Thank you.  When it comes to the refusal forms, was -- every time a patient refused medication, was there supposed to be documented -- documentation of that refusal?

A.    Yes.

Q.    And why is that?

A.    You're tracking to see the individual's compliance.  If it's a one-time occasion you want to engage, the red-flag goes into medications, and that's -- then your -- medical is approaching the individual to educate, engage, see what the challenges are and reason for refusal.

Q.    And you've mentioned the red-flag system a couple times, so can you walk me through that?  And specifically, who determines when a red flag is supposed to be raised?  I don't know what the right term is.  And who's responsible, I guess,

Page 36

for administering the red-flag system?

A.    The red-flag system is triggered when there are three missed doses of medication.  Medical is then looking at we have three missed doses for this individual.  And this is where the engagement starts.  The officer is notifying, as well, daily on those occasions that the person is missing the medications.  Medical is aware and tracking to see, and three missed doses that activates the red flag.  And then you start with the engagement, and trying to gain compliance and obtain the reason for refusal.

Q.    Could a red-flag be initiated if there were less than three missed doses, depending on the medication?

A.    That would be clinically, but the process is set up for three missed doses, to my recollection.

Q.    Thank you.

A.    But certainly, if there's a missed dose, Medical could engage the individual

Page 37

as well.

Q.    Bear with me.  I'm going to use a document here.  And when did you leave PDP again?  It was 2024, correct?

A.    Correct.

MR. GROTE:  I am going to share my screen.  All right, can everybody see this document?

BY MR. GROTE:

Q.    Do you see this document, Ms. Carney, that says Western Correctional Consultants, LLC at the top?

A.    Yes.

MR. GROTE:  And for the record, this is Jung City Production002649.  And this is directed to Ms. Anne Taylor.

BY MR. GROTE:

Q.    You recognize that name, I assume?

A.    Yes.

Q.    And I'm going to give you a moment to review this first page, just so you're familiar with what this document is.  And I'm going to ask some questions about a

Page 38

later passage.  Just let me know when
you've reviewed?
    A.  Okay.  I can't see the last
paragraph because you're -- Okay.
    Q.  This better?
    A.  A little more, please.
    Q.  Good?
    A.  Yes.  Okay.
    Q.  And do you -- where's the name?
And this was signed by -- see at the
bottom here?  Michael T. Puerini.  Do you
remember meeting with Dr. Puerini?
    A.  Yes.
    Q.  And what was Dr. Puerini -- what
was the nature of what they were -- were
they assisting PDP?
    A.  They were auditing PDP.  They were
two contracted, licensed individuals, and
Dr. Puerini is a medical doctor, and he
would come and assess and make
observations and recommendations regarding
the delivery of care at the Department of
Prisons.  And that was done twice a year.
    Q.  Okay, so this is from 2023.  Did

Page 39

he do that twice every year?
    A.  I don't recall if it was twice
every year or if it was annually.
    Q.  Okay.  How -- you might not
remember the exact number of years, but
did he do that for what years when you
were Commissioner?  Every year that you
remember, once or twice?  Some years?
    A.  Some years, but I do not recall
the exact years.
    Q.  Okay, thank you.  And did you
review this report that Dr. Puerini
submitted that we're looking at now?
    A.  Yes.
    Q.  And I want to go down to:
Findings.  You see where it says:
Findings for specific patients?
    A.  Yes.
    Q.  And it says:  Of the 12 patients I
reviewed, three were significantly
non-compliant with the plan of care, two
of which had poorly controlled diabetes.
Some things are in the parentheses.  Then
it says:  Refusals were not found in the

Page 40

chart for all missed chronic care visits.
And then I want to go down to where it
says:  Suggestions.  And one of them is
generally refusals of potentially
life-saving treatment such as diabetes
care should be witnessed by a medical
provider in a medical setting.  This
infrequently happens.  Many refusals for
chronic care visits are not documented in
writing at all.  Do you remember this part
of the report of Dr. Puerini?
    A.  No, not -- until reading it here.
I do not.
    Q.  Understood.  Do you know if that
suggestion was followed up on?
        MR. WITTEKIND:  Objection to the
    form.  You can answer.
        THE WITNESS:  I don't recall.  I'm
    just looking at what he wrote here.
    I'm not recalling it.  But then he's
    saying, further down, something
    totally different so...
BY MR. GROTE:
    Q.  And would you like to say what

Page 41

that is, that you think is totally
different?
    A.  Yeah.  Kudos for managing to see
diabetics regularly on a reasonable
schedule despite the backlogs.  So I don't
know what -- I would have to read this
again in its entirety.
    Q.  Right.  But seeing diabetics on a
regular schedule, wouldn't you -- isn't
that different from documenting refusals?
    A.  Based on the 12 patients that he
pulled from the population, that was what
he found.  That's all I can base it on.
It's based on the 12 that he pulled from
the population size.
    Q.  So whenever Dr. Puerini would
issue a report like this, did you and Dr.
Herdman have a general way of reviewing
and addressing issues in the report?
    A.  Yes, how to address the issues,
how to deliver the care, and he would
implement.  So when we would receive this,
we would be open to suggestions and then
discuss how that the delivery of services

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 16 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 42

would then get to the population.

Q. And would responses to this report, like you just discussed, be documented in any way?

A. We had oral conversations. It was easier to go through as we're conversing about how to deliver it. And then Dr. Herdman would put his plan in place. And that would also encompass working with the facility wardens, for the wardens to work through their direct reports to get the care to the population.

Q. And so in regard to this top suggestion about where it says many refusals for chronic care visits are not documented in writing at all, and it also talks about -- yeah, when it says that. You don't recall if Dr. Herdman responded to that in any way?

A. I can't say specifically how he responded, but he was responsive to working with the medical providers with any suggestions. But I can't speak specifically to what he said, how he said

Page 43

it, and what plan he actually put in place to deliver it.

Q. Did you have a process for following up with Dr. Herdman after these oral conversations to check on the progress of any response to these reports?

A. Yes, we would have meetings where we would discuss suggestions, implementations, delivery of care. They were ongoing, and we would converse about it, and he would report that he had spoken with the medical providers, how they were going to deliver care and how they were going to discuss the issues.

Q. And that process, was this always the case when you were Commissioner, what you're describing when you were getting reports from Dr. Puerini, is that the general process you followed?

A. Yes.

Q. And when you were Commissioner in 2016, was Corizon the medical provider?

A. Yes.

Q. And were they the medical provider

Page 44

until YesCare became the medical provider?

A. Yes.

Q. Do you remember when YesCare became the medical provider?

A. I don't want to guess, but there was a change. I can't recall the year.

Q. And was Corizon, and then YesCare, were they both responsible for the provision of diabetes care?

A. Yes.

Q. And what role did correctional staff play in administering diabetes care? And by that, I mean I understand that they didn't engage in clinical medical work, but what role would they have played in ensuring patients were notified it was time to go to medication, escorted to medication, or anything else that facilitated access to medical care for diabetes patients?

A. There is generally an announcement made for medication, and then the correctional officer calls out the names of those individuals, and then those

Page 45

individuals are either escorted or given a pass to report to medical or the area to receive treatment.

Q. I'm going to stop sharing my screen now. So when they call out for medication, is that just something they do verbally on the housing unit?

A. They can call out over the intercom system, and then individuals begin to line up. They all have to call in, and they're going to either be issued a pass or escorted to the area.

Q. And if somebody does not leave their cell when it's time for their medication, was there a protocol the correctional officer was supposed to follow in those circumstances?

A. Depending on the duties or activities of the day, the officer is going to notify that the person is not showing. And then after they've done whatever duties there are presently completed they can then as part of their tour of the area, walk around, engage the

Page 46

1  individuals, and notify medical that the
2  person did not report or wasn't sent.
3      Q.   So when you say after their kind
4  of current duties, does that mean if
5  they're in the middle of something,
6  that's --
7      A.   If they're in the middle of
8  something, yes, they're going to finish
9  that out and then through the course of
10 their tour, they will address the
11 individuals.
12     Q.   And while you were Commissioner,
13 do you know if correctional staff were
14 trained in recognizing signs and symptoms
15 of diabetes?
16     A.   I'm not 100% recalling the signs.
17 I would have to review the policy for that
18 specific language; I would need to see the
19 policy.
20     Q.   Understood.  Were there are a lot
21 of policies at PDP?
22     A.   Yes.
23     Q.   You didn't memorize them all?
24     A.   No.

Page 47

1      Q.   Bear with me one moment.  All
2  right.  And what I'm going to share now is
3  -- I'm going to share the first page and
4  then ask you a few questions on what is
5  a -- oh, hold on a moment.  All right.
6  And can you see this document?  I'm sorry,
7  I didn't catch that.
8      A.   Yes.
9          MR. GROTE:  Okay.  And this is for
10         counsel.  This has not been
11         produced.  This was obtained through
12         a Right-to-Know request.  I'm going
13         to enter this as an exhibit, and
14         then we can Bates-stamp it and get
15         it to everybody.
16                    - - -
17         (Whereupon, Exhibit-1 was marked
18         for identification.)
19                    - - -
20 BY MR. GROTE:
21     Q.   And, just reviewing the first
22 page, does this look to you as it is the
23 Provider Agreement executed on January
24 4th, 2022, between Philadelphia and

Page 48

1  Corizon Health?
2      A.   Yes.
3      Q.   And if you recall, when the
4  contract transfer from Corizon to YesCare
5  was it that YesCare became the new entity
6  that had the contract assigned to it, so
7  it was still carrying out the provision of
8  medical services consistent with the terms
9  that Corizon had agreed to?
10     A.   Yes.
11     Q.   And on this page here, is that
12 your signature?
13         MR. GROTE:  And I think you said
14         yes, but I don't know if it's
15         cutting out for others as well.
16         Occasionally a word is missed.
17         THE COURT REPORTER:  Yeah, a
18         couple -- I don't mean to interrupt,
19         but a couple of times I did see you
20         answering.  I just -- I don't know
21         if it's not coming through because
22         you're on an iPhone, or if there's
23         interference on your iPhone.
24         Sometimes that's happening.

Page 49

1          THE WITNESS:  Yes.  Yeah, my
2  answer was yes.
3          MR. KAMINSKY:  I noticed that too.
4  It did seem like a couple of times
5  there might have been a few more
6  words that were not caught.
7          MR. GROTE:  Just saying thanks.
8  Yeah, it's like 98% of it's coming
9  through.
10                    - - -
11         (Whereupon, a discussion was held
12         off the record.)
13                    - - -
14 BY MR. GROTE:
15     Q.   You see on this page right here,
16 do you agree this is the Request for
17 Proposals?
18     A.   Yes.
19     Q.   And what is a Request for Proposal
20 for the record?
21     A.   That is a formal announcement that
22 is posted on the city's website for
23 solicitation for services.
24     Q.   Thank you.  And I'm going to fast

Page 50

1 forward to this page and the Request for
2 Proposal.  And down here, you see the part
3 I highlighted?
4    A.  Yes.
5    Q.  Now, you agree this says all
6 medical staff and appropriate correctional
7 staff must receive in-service training in
8 at least the following areas.  And do you
9 agree that, right here, it lists diabetes?
10    A.  Yes.
11    Q.  And is it accurate to say that in
12 the Request for Proposal, the city wanted
13 a medical provider who would provide
14 medical staff and appropriate correctional
15 staff with in-service training on
16 diabetes?
17    A.  Yes.
18    Q.  And what is in-service training?
19    A.  In-service training is training
20 that is provided to sworn and civilian
21 staff.  Medical normally provides a
22 training module that is then given to
23 sworn and civilian staff and giving them
24 information about the various conditions

Page 51

1 that are highlighted here.
2    Q.  Thank you.  And was this training
3 to be provided by the medical provider?
4    A.  Yes, it can be provided by the
5 medical provider through roll-call
6 training with the correctional staff, and
7 given to the administrators for sworn
8 staff -- excuse me, for civilian staff, to
9 ensure that the training is delivered to
10 their respective direct reports.
11    Q.  And would medical contract
12 employees of Corizon also be civilian
13 staff?
14    A.  They are civilian,
15 civilian-contracted employees.
16    Q.  Right.  And the distinction here
17 is between civilian and those who are
18 correctional staff; is that accurate?
19    A.  Yes.
20    Q.  And what is roll call training?
21    A.  Roll call training is for sworn
22 staff that receive a number of directives,
23 information for the incoming shift to be
24 aware of any training.  Any information

Page 52

1 that is to be conveyed is done during the
2 roll call training.
3    Q.  And back to this document, where
4 it says:  Appropriate correctional staff,
5 Do you know what the word "appropriate"
6 does in this sentence?  Who are
7 appropriate correctional staff that should
8 receive this type of training?
9    A.  Appropriate correctional staff --
10 all staff should receive that training.
11 But definitely, when you're doing and
12 providing direct service on a post and
13 doing direct engagement with the
14 population.
15    Q.  Does PDP use the term contact
16 staff?
17    A.  No, not during my tenure.
18    Q.  Maybe it's a DOC thing.  But what
19 you just described as those who are
20 providing services, or, I think maybe you
21 said on the housing unit, would officers
22 who interact with the incarcerated
23 population as part of their job
24 responsibilities be included in those

Page 53

1 staff who should be receiving this
2 training?
3    A.  Yes.
4    Q.  Go down to page 43 -- actually, do
5 you know if the medical provider was
6 supposed to provide care consistent with
7 the American Diabetes Association
8 standards?
9       MR. WITTEKIND:  Objection to form.
10       MR. PESTRAK:  You can answer,
11    Blanche.
12       THE WITNESS:  Based on the
13    certified medical recommendations
14    from that body, they should have
15    complied.
16 BY MR. GROTE:
17    Q.  Thank you.  All right, so on this
18 page here, you see the section:  Quality
19 Assurance and Quality Improvement?
20    A.  Yes.
21    Q.  And was that what you were
22 describing before in regard to Dr.
23 Herdman's process for providing oversight
24 of diabetes care?

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 19 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 54

MR. PESTRAK: I heard you a little
bit there, Blanche, but if you could
just repeat the answer, I'm not sure
it came all the way through.
THE WITNESS: Yes.
BY MR. GROTE:
Q. And so it says here: The QA Plan
must include clinical guidelines for
chronic diseases at a minimum, and then it
includes diabetes. So the provider would
provide the clinical guidelines for
diabetes care; is that accurate?
A. Yes.
Q. Okay. And PIP, which is
Performance Improvement Plan, what is the
Performance Improvement Plan?
A. The Performance Improvement Plan
are areas that require an improvement in
the delivery of services.
Q. And so this sentence here, the PIP
must provide for monitoring if all
significant aspects of health care,
including at least the access to care,
timeliness of care, timeliness of

Page 55

medication management, appropriateness of
care, nursing services, physician
services, access to specialty care, access
to behavioral health services, pharmacy
services, dental services, environmental
services, infection control procedures,
health care records, sick call services,
intake screening and evaluations, chronic
disease services, infirmary care,
diagnostic services, and adverse patient
occurrences, including all deaths. So is
that consistent with your understanding of
what was to be part of the Performance
Improvement Plans?
A. Yes.
Q. Who was responsible for the
Performance Improvement Plans?
A. Dr. Herdman, as the Chief Medical
Officer, would create the plans, and that
would be discussed and expectations set
with the medical provider.
Q. And would these be written plans?
A. They could be oral and written
plans, yes.

Page 56

Q. What would determine if one was
oral or one was written? Was there a
method for that?
A. Oral could be to convey
information rather quickly --
Q. You just cut out for a bit after
that information, very quickly.
A. Yeah, yeah. I'm not sure. I'm
trying not to move even with this
question. So the oral could be to convey
information rather quickly, but the
written performance plan would spell out
the area that would be addressed, how it
would be delivered, and how it would be
monitored. So the PIP plan should
formalize in writing --
MR. PESTRAK: We lost you in the
middle there, Blanche. The PIP plan
was to be in writing, and then keep
going.
THE WITNESS: It's to formalize in
writing the area that's going to be
addressed, what's going to be
delivered, and how it will be

Page 57

monitored.
BY MR. GROTE:
Q. So would a PIP plan be kind of
issue-specific, or would it be something
that could incorporate a range of the
things that were identified here?
A. It could be both. If it entails
that it requires encompassing multiple,
but it could be specific to one area.
Q. And do you know if Dr. Herdman had
a schedule for how frequently he would be
creating a PIP plan? You know, would they
be calendared every three months on these
issues? Every six months? We do this
annually, or was that the case?
A. Based on my recollection, I
believe they were quarterly. That's based
on my recollection with the meetings he
would have with medical.
Q. Understood. Thank you. Would you
review PIP plans when they were written?
A. Not necessarily. Dr. Herdman
would converse with me, as I stated
before. We would talk about what he's

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 20 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 58

1  working on, what he's monitoring or
2  managing, and he would provide updates to
3  me.
4      Q.   Thank you.  And did you have a
5  regular list of issues you would discuss
6  with him on updates or would you rely on
7  him to bring relevant things to your
8  attention?
9      A.   Well, standard of care were one of
10 our standing --
11     MR. PESTRAK:  Standard of Care
12 would be a regular --
13     THE WITNESS:  Was one of my
14 regular topics -- they're standing
15 topics that just remain.
16     MR. PESTRAK:  We lost you again,
17 Blanche.
18     THE WITNESS:  Oh, I'm not sure
19 what's happening.
20     MR. PESTRAK:  Do you have a
21 landline you can call into?  We can
22 use it.  You're on the phone, and I
23 think there was a number in the link
24 that I forwarded that you could call

Page 59

1  into for the audio.
2      KAMINSKY:  Can we just take a
3  few-minute break?  Would that be
4  okay while we're working on this
5  anyway.
6      MR. PESTRAK:  Sure.
7          - - -
8      (Whereupon, a brief recess was
9  taken.)
10         - - -
11 BY MR. GROTE:
12     Q.   Were there specific issues that
13 you regularly reviewed with Dr. Herdman?
14     A.   There were no specific issues
15 regularly reviewed, but medical services
16 would be a standing agenda item, and that
17 would encompass how services are going,
18 are there any issues?  And that would be
19 our engagement.  So no specific pointing
20 to any specific conditions.  Nothing of
21 that nature.
22     Q.   So you didn't have, like, a set of
23 subtopics, like medication administration,
24 access to care, nursing services, etc.?

Page 60

1  Would it just be this general testimony
2  you just gave?
3      A.   So they would be overarching.  It
4  encompasses all of the areas that you just
5  laid out, and it's giving an update, but
6  not pointing out any one particular issue.
7      Q.   I guess I'm just wondering were
8  you getting an update necessarily on each
9  of those topics, or would you get an
10 update as Dr. Herdman felt there was
11 something to update you about in regard to
12 one of those areas?
13     A.   Yes.  It would be an update from
14 Dr. Herdman regarding one of those areas,
15 yes.
16     Q.   Thank you.  I'm going to go back
17 to the screen share for a couple more
18 questions.  Do you see this document that
19 has Corizon Health at the top?
20     A.   Yes.
21     Q.   And see at the bottom, it says:
22 Tab 5:  Proposed Scope of Work.  Does this
23 look to you like part of Corizon Health's
24 proposal in response to the request for

Page 61

1  proposal?
2      MR. WITTEKIND:  I'm unable to
3  scroll that down.  What page are you
4  on this?  I cannot scroll on my
5  screen.
6      MR. GROTE:  Okay.  Can you see
7  now?  It says Page 5.76 at the
8  bottom?
9      MR. WITTEKIND:  Okay.  All right.
10     MR. GROTE:  Yeah.  For the record,
11 Page 5.76.
12     MR. WITTEKIND:  It was not showing
13 up before.
14     THE WITNESS:  Can you repeat your
15 question, please?
16 BY MR. GROTE:
17     Q.   Certainly.  Looking at the bottom,
18 Tab 5, Proposed Scope of Work, does this
19 appear to you to be a page from Corizon's
20 proposal in response to the City's Request
21 for Proposal we were looking at earlier?
22     A.   Yes.
23     Q.   And the last paragraph here begins
24 with:  Our chronic care program, and it

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 21 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 62

says: Our treatment guidelines are
adapted from nationally recognized
correctional healthcare sources, such as
the National Commission on Correctional
Health Care.
    Can you tell us what is the
National Commission on Correctional Health
Care?
    A.   That's a national body that
establishes guidelines, recommendations
for delivery of healthcare in correctional
settings.
    Q.   And is that a national -- is that
an organization that you would look to as
commissioner to follow the standards that
they establish?
    A.   Yes.
    Q.   Bear with me one second.  All
right, so the last sentence here:  These
guidelines are the foundation for
developing the individualized treatment
plan based upon the disease and degree of
control for each patient.  And then when
you go onto the next page, it says:

Page 63

American Diabetes Association.  So is it
your understanding that Corizon, in this
proposal, was telling the City of
Philadelphia we are going to provide care
consistent with the standards set out by
the National Commission on Correctional
Health Care and the American Diabetes
Association?
        MR. WITTEKIND:  Objection to form.
    To the extent you're
    mischaracterizing the letter, it
    states guidelines, not standards.
BY MR. GROTE:
    Q.   Okay.  Guidelines they were
supposed to adhere to for the American
Diabetes Association?
    A.   Yes.
    Q.   Thank you.  And again, would it be
Dr. Herdman who is responsible on the side
of the City for ensuring the contractor
was living up to its obligations under the
contract?
    A.   Yes.
        MR. GROTE:  And now I'm going

Page 64

to -- this is page 562 in the PDF,
but page 5.162 at the bottom here,
just for the record, so you can
correlate that with Bates stamps
when we serve these on the other
counsel.
BY MR. GROTE:
    Q.   You see this paragraph here on
diabetes care?
    A.   Can you enlarge the screen
slightly, please?
    Q.   Probably.  How's that?
    A.   Much better.  Okay.
    Q.   And then, can you see the whole --
I can't exactly see what you see.  Can you
see that --
    A.   I can see the whole paragraph,
yes.
    Q.   Okay.  And it begins:  Diabetes
care has been significantly improved
through the Pharmacist-Directed Diabetes
Initiative.  Do you know what the
Pharmacist-Directed Diabetes Initiative
is?

Page 65

    A.   It is a system whereby medical
providers can go into a portal or system
to see a history of insulin-filled -- no,
not insulin-filled; excuse me,
prescriptions filled by various
pharmacies.  That's my recollection of
what it is.
    Q.   Okay.  Was that initiative used at
PDP while you were commissioner?
    A.   I believe medical could go into
the portal and review a patient's filled
prescription.  I don't know what other
information they were able to ascertain
from access.
    Q.   Okay.  So when you say review
prescription, would that be reviewing
anything about medication compliance or
medication administration, or is it just
looking at what the prescriptions were for
patients?
    A.   Based on my recollection, it was
just based on the prescriptions that were
filled, and giving the provider some
information that the person receives the

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 22 of 75

Deposition of Blanche Carney                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 66

medication at some point. But I don't know about the other question -- areas you just asked about. I'm not sure if that was provided in that portal.

Q. Do you know who would know about that?

A. I would have to defer to Dr. Herdman to see what additional information can be garnered from this initiative.

Q. Thank you. In page 5.183. And this also, you know, Corizon Health at the top. And similar to the Request for Proposal from the City, Corizon here. Do you agree that Corizon is saying all medical staff and appropriate correctional staff must receive in-service training in at least the following areas, and it includes diabetes?

A. Yes.

Q. And how would the City ensure that that training was happening?

A. The City, the Department of Prisons, has a compliance unit that deals with training, the frequencies of

Page 67

training. Any training provided and delivered by medical, would be in concert with particular unit, and they would track staff who received the training.

Q. Did the City have any way of determining if the training was effective?

MR. PESTRAK: Objection to the form, but you can answer.

THE WITNESS: The City -- we would do the annual training. I don't believe the City then came in and said, let's assess that training that you're receiving from your medical provider. No.

BY MR. GROTE:

Q. Were you ever involved in reviewing YesCare's provision of diabetes care?

A. I reviewed how they would give or assess, overall the medication. When I say assess the medication, I mean based on the clinical certified practitioner. Any individual who was determined to be diabetic would receive insulin. That's my

Page 68

extent.

Q. And when you say you would review, how would you do that review? I mean -- yeah, how would you do that?

A. It wouldn't be a review of any formal reports or individual clients; it was the overall delivery of care. So if someone was diabetic, they would receive insulin based on the clinical provider's assessment.

Q. So would there be any documents that you would review in conducting your own review of this?

A. No.

Q. Would it be reports from Dr. Herdman, oral reports?

A. Oral reports if they were brought to my attention. I can't recall reviewing or discussing individuals who were diabetics.

Q. Okay, thank you. So I know there'd be a lot of variation to this question depending on the specific circumstances, but generally what happens,

Page 69

or what's supposed to happen, if an incarcerated person is experiencing a medical emergency?

A. If an individual is experiencing a medical emergency, the officer or the staff member while the emergency is happening is starting the process of notification request, notifying other staff to report to the area. Medical is being notified; they're reporting to the area to render care to the individual.

Q. Are correction's staff trained in recognizing medical emergencies?

A. Yes, to the extent they're not assessing. But if they are calling out, giving clear commands to the individual, and the individual doesn't appear to respond in a way that indicates they're acknowledging they're being called or engaged, then the officer starts the notification process.

Q. Are there other circumstances that might -- so you talked about it -- you're just talking about if an incarcerated

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 70

1  person is nonresponsive. Are there other
2  circumstances where a correctional officer
3  is trained to call Medical?
4      A.  If the individual is either
5  nonverbal, non-movement, they're going to
6  notify because they're giving the
7  individual commands and the person isn't
8  either responding verbally, or their body
9  language may be giving something that
10 there's something wrong.
11     Q.  And so if they're non-responsive
12 to commands, how do correction officers
13 determine if this is perhaps a question of
14 somebody being disobedient and not obeying
15 orders versus a potential medical issue?
16     A.  They're not making the distinction
17 for assessment. It's based on a
18 case-by-case basis. And if the person
19 is -- it's based on how individuals are
20 responding -- so if they're looking, based
21 on the correctional officer's
22 interpretation, they're then making the
23 call to say this person may be having or
24 experiencing a medical emergency or I need

Page 71

1  security staff for assistance because the
2  person is not following commands.
3      Q.  So if somebody's not following
4  commands, they would call security staff
5  to address that?
6      A.  It's a case-by-case basis. And
7  let me clarify: If the officer needs
8  assistance, they're going to call for
9  assistance. If the person is, you know,
10 -- they're not giving off any medical
11 signs, and again, correctional officers
12 are not certified medical practitioners.
13 But they're looking for visual cues, body
14 cues, and it's dependent on the officer's
15 perception. At the time they make the
16 call for assistance, they're going to
17 clarify. I need assistance, medical
18 emergency, or whatever they're observing
19 at the time. But that's a correctional
20 officer who has a firsthand account of it.
21 So I don't want to put it into a box to
22 say if it's this or that. I'm just trying
23 to clarify the scenarios.
24     Q.  Right.

Page 72

1      A.  But that help is being called.
2      Q.  In a situation where an
3  incarcerated person is refusing to move
4  into their cell and is lying on the floor,
5  would it be appropriate to have inmate
6  workers move that person into their cell?
7          MR. PESTRAK:  Objection. You can
8      answer.
9          THE WITNESS:  No.
10 BY MR. GROTE:
11     Q.  Why not?
12         MR. PESTRAK:  Same objection.
13         THE WITNESS:  The officer is
14     responsible for any engagement with
15     an incarcerated individual.
16 BY MR. GROTE:
17     Q.  And why is that?
18     A.  They are employees of the
19 Department of Prisons.
20     Q.  And indeed incarcerated people are
21 not?
22     A.  Yes, correct.
23     Q.  And is it ultimately the
24 responsibility of the Department of

Page 73

1  Prisons to handle security and safety
2  issues within the Department of Prisons?
3      A.  Yes.
4      Q.  Are corrections staff trained to
5  provide life-saving aid like CPR?
6      A.  Yes.
7      Q.  Is that provided in the training
8  academy?
9      A.  Yes.
10     Q.  And are there, you know, refresher
11 trainings on that or how does that work?
12 If somebody gets trained in CPR, do they
13 have to have an annual refresher every two
14 years? How's that work?
15     A.  It's an annual refresher depending
16 on, I don't recall, if it's two or three
17 years. But there is a refresher training.
18 Yes.
19     Q.  Is there any other training that
20 they receive in regard to providing any
21 emergency care?
22     A.  Not to my recollection, outside of
23 CPR.
24     Q.  When should staff provide CPR to

Page 74

1  somebody?
2     MR. PESTRAK:  Objection.  To the
3  extent she's not a medical
4  personnel, she can answer within her
5  knowledge.
6  BY MR. GROTE:
7     Q.  If they're trained to -- I can
8  rephrase.  If corrections staff are
9  trained to provide CPR, what guidance are
10 they given as to when CPR might be
11 appropriate?
12    A.  They will have to first call for
13 assistance.  And there, I believe, if I
14 remember correctly, it's checking for a
15 pulse.  But the first thing is to call for
16 assistance.  You don't initiate CPR
17 independent of anyone being notified.  So,
18 at the time, the officer -- if the person
19 they can't get a pulse, they may start it,
20 and then medical arrives to take over.
21    Q.  And are the procedures that are in
22 place that are supposed to enable
23 correctional staff to identify potential
24 medical emergencies?  And I can get more

Page 75

1  specific if that would be helpful.  But
2  staffing on the housing units, how many
3  officers are supposed to be there, and is
4  that important for identifying medical
5  emergencies?  I know that's a compound
6  question, so I'll break it down.  How many
7  staff are supposed to be on a regular
8  general population housing unit?
9     A.  It's dependent on the number of
10 individuals incarcerated on that housing
11 unit, which would be one to 64
12 individuals.
13    Q.  And if it were 64 individuals,
14 what would be the complement of staff?
15    A.  One correctional officer.
16    Q.  And is that correctional officer
17 -- one of that correctional officer's
18 responsible for identifying possible
19 medical emergencies that may be occurring
20 with an individual on that unit?
21    MR. PESTRAK:  Objection to form.
22 You can answer.
23    THE WITNESS:  In the course of
24 their duties, they conduct rounds

Page 76

1  and tours on the housing unit, and
2  that is how they are engaging the
3  population or determining if someone
4  needs assistance.
5  BY MR. GROTE:
6     Q.  So, when making rounds, does that
7  involve going around the housing unit and
8  checking on people in their cells?
9     A.  Yes.
10    Q.  And are making rounds important
11 for identifying possible medical
12 emergencies?
13    A.  Not necessarily.  It's the routine
14 duties that they're responsible to
15 perform.  Should they come upon someone
16 who is experiencing a medical emergency,
17 then the activation of notification
18 begins, and then the officer is making
19 whatever observations and calling in
20 medical for assistance.
21    Q.  Right.  Maybe I can rephrase,
22 because I think that could be helpful.
23 Would it be -- so this part of their
24 regular duties to make rounds, they're not

Page 77

1  making rounds simply to identify medical
2  emergencies, but as part of their duties
3  in making rounds, that might be something
4  that they encounter; is that fair?
5     A.  Yes.
6     Q.  And is that one of many reasons
7  why officers are supposed to make regular
8  rounds to identify if there's something
9  they would not observe otherwise?
10    A.  Can you repeat your question?
11    Q.  Certainly.  Why do they -- why do
12 officers make rounds?
13    A.  The officers make rounds for a
14 number of reasons, and that's to make sure
15 that the individuals who are assigned to
16 that unit are -- the number of individuals
17 assigned are counted for and to address
18 any issues that may be presented on the
19 housing unit.
20    Q.  And those could be security
21 issues?
22    A.  Yes.
23    Q.  And they could be health issues?
24    A.  Yes.

Page 78

Q.   Are there other ways that correctional staff can learn of medical emergencies?

A.   Yes.  If the officer has completed their rounds, everything appears in order.  A fellow incarcerated individual could alert the officer that there is something happening.  It may not be called an emergency, but it could be a check on such and such.  But another incarcerated individual can do just that.

Q.   So officers can observe individuals acting in such a way that they might think there's a medical issue, and they can receive information from other individuals that could alert them to a potential medical issue; is that fair?

A.   That's fair.

Q.   What if an incarcerated person is refusing to leave their cell, is there guidance that correctional staff have for addressing that situation?

A.   Yes.

Q.   And what are they supposed to do?

Page 79

A.   They can go to the cell.  They can engage the individual.  The individual will state what the issue is, or maybe not state what the issue is.  The officer is documenting in their logbook.  And they can also call for a supervisor to come over to assist.

Q.   And if they're refusing to come out for medications, is it the process we talked of earlier, they're supposed to notify medical staff?

A.   Well, they're notifying medical staff -- based on the list that Medical provides to the housing unit, that's where it generates from.  Not the officer generating it to Medical.  Medical is providing a list of individuals, and then the officer is notifying Medical that the person is refusing.

Q.   Understood.  Thank you.  Does a corrections officer have the authority to call for a stretcher?

A.   Yes, they can.  They are notifying, and part of that notification

Page 80

can be, if that's their assessment.  Again, it's a case-by-case basis.  And we would have to see what the officer's seeing that would say:  I need assistance, I need medical, I need a stretcher call.  They're going to provide as much information based on their firsthand observation for the response and assistance.

Q.   And if a nurse is on the scene and does not call the stretcher, does a correctional officer still have the authority to call a stretcher if they think there might be a medical emergency?

A.   We're relying on Medical to make the assessment.  The correctional officer isn't a trained clinician.  The Medical provider is there and determining and assessing what additional services are needed.

Q.   I guess what I'm wondering, though, is if there's a situation where the medical provider doesn't call for a stretcher.  If it's a nurse, but the

Page 81

correctional officer is still concerned that the incarcerated person is not doing well, are they empowered to take any further steps?

A.   Based on what they're presenting, they could make the call, but it depends on what they're observing.  And then they would have to explain the reason for that additional call above the medical-certified practitioner.

Q.   Thank you.  When an incarcerated person was sent to the hospital when you were Commissioner, would you be notified?

A.   Can you clarify hospital?

Q.   Yeah.  So, I guess, because there's emergent and non-emergency care at the hospital.  Let's say if somebody is sent out to the emergency room at the hospital for an emergency situation, would you be notified as the Commissioner about that?

A.   Not necessarily.  Because you have a warden of each facility that is notified, and based on their assessment,

Page 82

1  if it escalates and above and it's beyond
2  and becomes a regular or a routine
3  transport, then I'm notified, but I'm not
4  notified of every single transport to the
5  hospital. You have your wardens in place.
6  They're assessing and monitoring the
7  situation based on the reports that
8  they're receiving.
9      Q. When would it be escalated to you?
10 What types of situations would you get
11 notified about in regard to somebody being
12 sent to the emergency room?
13     A. If there is someone without a
14 pulse or severe visible injury.
15     Q. When you were Commissioner, were
16 hospitalizations from PDP, or say
17 emergency room trips, were those tracked
18 in any way by the City of Philadelphia?
19     A. They were tracked by us. I don't
20 know the mechanism that the City used to
21 track, but we tracked all transports.
22     Q. I mean the Philadelphia Department
23 of Prisons. So, when you said track them,
24 I should be more specific. Were you ever

Page 83

1  -- so you were documenting all of these,
2  obviously, right?
3      A. There is documentation of every
4  trip that goes off campus.
5      Q. And were you ever assessing
6  emergency room trips to see if there were
7  issues that kept occurring?
8      MR. PESTRAK: Actually, in the
9      form, you can answer.
10     THE WITNESS: No. It's based on
11     the clinical assessment of the
12     individual and the need to treat
13     above what we could provide on
14     campus.
15 BY MR. GROTE:
16     Q. In your time as Commissioner, did
17 you ever notice any patterns in regard to
18 emergency room trips? And by patterns, I
19 mean types of medical conditions, types of
20 injuries, other scenarios that occurred,
21 you know, more than once?
22     MR. PESTRAK: Objection. You can
23     answer.
24 BY MR. GROTE:

Page 84

1      Q. And what were some of those
2  patterns?
3      MR. PESTRAK: Same objection. You
4      can answer.
5      THE WITNESS: If someone's going
6      out because of chest pains; if
7      someone was in a fight and they were
8      assaulted. Those were the two
9      primary.
10 BY MR. GROTE:
11     Q. Do you know if there are any
12 protocols in place for the medical
13 provider to assess a patient's care who is
14 sent to the emergency room? Would they
15 review that patient's care to see if there
16 had been any deficiencies?
17     MR. PESTRAK: Brad, I'm just going
18     to ask for clarification on medical
19     provider. Do you mean the receiving
20     facility, or if you mean YesCare?
21     MR. GROTE: I mean YesCare. I can
22     try that again.
23 BY MR. GROTE:
24     Q. So, if in a scenario where a

Page 85

1  patient is sent to the emergency room from
2  the Philadelphia Department of Prisons, do
3  you know if YesCare took any measures to
4  review the quality of care, the
5  appropriateness of care they were
6  providing to that patient who was sent to
7  the emergency room?
8      MR. WITTEKIND: Objection to form.
9      MR. PESTRAK: You can answer,
10     Blanche.
11     THE WITNESS: Yes. Dr. Herdman
12     would converse with the provider and
13     reviewed the files, or the case --
14     excuse me, the case. I don't know
15     how often that would occur, but yes,
16     I do have knowledge he would discuss
17     that with YesCare.
18 BY MR. GROTE:
19     Q. And when you say you don't know
20 how often that would occur, does that mean
21 you're not sure if it happened with every
22 ER trip? Is that what you mean?
23     A. I'm not sure if it happened with
24 every ER trip. I would have to defer to

Page 86

Dr. Herdman.

Q. Understood. And do you know, was there anybody at YesCare that Dr. Herdman liaised with or communicated with more frequently than, you know, others, if you know?

A. I do not recall the title, but there is a hierarchy and rank structure of YesCare. But I don't recall the actual title, but it was the highest-ranking individual for YesCare. I do not recall the name or the title.

Q. Was it the medical director? Does that refresh your recollection?

MR. WITTEKIND: Objection to form.

MR. PESTRAK: You can answer.

THE WITNESS: I can't say for certain. I would have to defer to Dr. Herman or look at their org chart.

BY MR. GROTE:

Q. Okay. Does the name Dr. Trivikram (ph) sound familiar?

MR. WITTEKIND: Objection to form.

Page 87

MR. PESTRAK: You can answer.

THE WITNESS: Yes.

BY MR. GROTE:

Q. Was that the individual who was the highest-ranking at YesCare?

MR. WITTEKIND: Objection.

MR. PESTRAK: You can answer.

THE WITNESS: I do not recall, but have to see documents to support if I'm going to answer that.

BY MR. GROTE:

Q. Understood. Who decides if an incarcerated person was supposed to be placed in the Prison Health Services wing?

A. That is the medical provider.

Q. Does Corrections play any role in those decisions?

A. There are joint decisions and discussions. Medical makes the medical determination, and the security staff makes sure the security housing is appropriate for that individual as they're receiving care in the medical wing.

Q. Okay. When you were Commissioner,

Page 88

were there times when there was no vacancy in the Prison Health Services wing? You know, getting at how often was it completely filled if you recall?

A. My recollection is I don't believe there was ever a capacity where we didn't have an opportunity to place someone there, based on my recollection.

Q. Does PDP have a policy on disability accommodations?

A. Can you clarify that question?

Q. Yes. I have some more specific questions, but the first kind of general one: When you were Commissioner, did PDP have a policy so that inmates with disabilities were provided accommodations for those disabilities?

A. Yes.

Q. And in general, how were accommodations to be provided? How were disabilities to be assessed? Who made those decisions?

A. As part of the intake screening process, disabilities can either be

Page 89

presented by the individual and confirmed by the provider. Any visual or physical, or communicative disabilities are recorded. An alert is placed in Lock and Track and a card is issued to the individual so that if a person is hearing-impaired, sight impaired, or has a disability, then the officer they can raise the card. If the person is hearing-impaired and not responding, the officer is alerted in Lock and Track where they can show the card if they're face-to-face with correctional staff.

Q. Thank you.

A. And any other disabilities are determined by medical, such as bunk status, top or bottom, and that's assessed by the medical provider.

Q. You anticipated my next question. So lower tier and lower bunk status are medical decisions, right?

A. Correct.

Q. And do you know if anybody was ever placed -- Could somebody be placed in

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 28 of 75

Deposition of Blanche Carney                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 90

1 the prison health services wing as part of
2 the disability accommodation policy?
3 Could that be a possible housing
4 accommodation for somebody?
5    A.   Yes.
6    Q.   Do you know the circumstances in
7 which that would be appropriate?
8    A.   Where we have no other facility to
9 accommodate the individual in the existing
10 structure.
11    Q.   When you were commissioner, from
12 COVID until the time that you left, were
13 there challenges with having enough
14 correctional staff during those years?
15       MR. PESTRAK:  Objection.  You can
16    answer.
17       THE WITNESS:  Yes.
18 BY MR. GROTE:
19    Q.   And just broadly speaking, how
20 would you describe those challenges?
21    A.   We were short-staffed, just like
22 the world, who lost a portion of its
23 workforce due to COVID or COVID-related
24 concerns.

Page 91

1    Q.   And did you put in place any
2 policies to ensure that individuals with
3 more serious medical needs would have
4 access to care at times when you were
5 short-staffed with corrections officers at
6 PDP?
7       MR. PESTRAK:  You said "yes," but
8    I don't think it came through.
9    Sorry, Bret.  Just repeat your
10    answer, Blanche.
11       THE WITNESS:  Yes.
12 BY MR. GROTE:
13    Q.   And what were those policies?
14    A.   When we were short-staffed and
15 unable to escort those individuals -- not
16 every individual, but those individuals
17 where we could not provide an escort -- we
18 provided a designated area for medical to
19 come to the area and assess in a
20 confidential manner and provide services.
21    Q.   So, the policy was, if I'm
22 understanding right, to make it easier for
23 medical staff to come to the -- where the
24 patients were, to ensure that the services

Page 92

1 were provided.  Is that accurate?
2    A.   It was to ensure that the services
3 were delivered.  I don't want to put a
4 clarifier of easier on it.  I'm just
5 saying that we were then saying, because
6 we do not have a person to escort, we'll
7 deliver the services in a designated,
8 confidential area.  Medical would report
9 there and render care.
10    Q.   Were there ever challenges with
11 having enough medical staff during those
12 years, 2020, 2024?
13       MR. PESTRAK:  Objection to form.
14    You can answer.
15       THE WITNESS:  I don't believe it
16    was as challenging.  There were some
17    challenges, but not as challenging.
18 BY MR. GROTE:
19    Q.   When you were commissioner between
20 2020 and 2024, did PDP ever seek to admit
21 certain patients who needed more care, you
22 know, a higher level of care, or a higher
23 frequency of care, to the Prison Health
24 Services Wing because of challenges in

Page 93

1 providing that care on the housing units?
2       MR. PESTRAK:  I'm just going to
3    object to form, but you can answer
4    if you understood the question.
5       THE WITNESS:  Repeat that question
6    for me, please.
7 BY MR. GROTE:
8    Q.   Sure.  Due to staffing challenges,
9 did PDP ever consider placing patients
10 with greater needs for medical care in the
11 Prison Health Services Wing to ensure
12 delivery of that care?
13    A.   No.
14    Q.   And why not?
15    A.   Because the infirmary is based on
16 the level of care determined by the
17 medical provider.  Those beds are
18 specifically designated for higher-acute
19 patients care that cannot be provided or
20 rendered in the other facilities.  So
21 simply trying to place someone there to
22 get the basic care, that was not done;
23 that care was delivered at the facilities.
24 Now, if Medical determined this person has

Deposition of Blanche Carney                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 94

a higher need, they're an acute or chronic, then that person is transferred into the infirmary.

Q.  Okay.  And so it was just always Medical's decision about who went to the infirmary, right?

A.  It was in collaboration.  Medical would have to present, make the request, and then security would come alongside, making sure for housing purposes, and then the person was transferred over.

Q.  So when you -- so security would have to also approve then; is that true?

A.  Approve in terms of making sure that the housing placement there was not where you're putting two individuals that should be separated.  So Medical takes the lead on a clinical necessity for someone to go over, but definitely more security staff for assessing to make sure that it's a smooth transition and not a security matter.

Q.  Right.  So PDP and security staff won't interfere with the Medical

Page 95

determination, though, right?

A.  That is correct, based on their Medical determination and what's presented.

Q.  And is intake at CFCF?

A.  Repeat your question, please.

Q.  The intake to the jail, when somebody's first arriving, is that at CFCF?

A.  CFCF for male prisoners.

Q.  Yes, for male.  Thank you.  What information do correctional staff in the intake area have access to?  Or let me be more specific.  I think you touched on this in a different question.  So this should be pretty straightforward.  But do they have access to any medical information?

A.  If it's available, they would have to maybe confirm with outside sources.  They're relying on self-reports from the person they're interviewing or any visual assessments that they make.

Q.  They don't have access to the

Page 96

patient's medical record, though, do they?

A.  They do not.

Q.  And is that because of HIPAA?

A.  Because of HIPAA.  And they're doing their initial assessments of the individual.

Q.  If correction staff thinks somebody might need a higher level of care, emergency care, do they then follow the process you discussed earlier where they notifying medical to make that assessment?

A.  Yes.

Q.  With the Lock and Track system, is there certain types of information that correctional staff are required to put into Lock and Track?  How do they determine what goes in Lock and Track; What can be omitted from Lock and Track?

MR. PESTRAK:  Again, I'm just going to object to the broadness of the question, but you can answer.

THE WITNESS:  The platform is designed with preloaded information

Page 97

or questions that have to be responded to.  So as the officer is processing a person in the intake, they're answering a series of questions and entering in that information.

BY MR. GROTE:

Q.  Okay.  You're talking about intake specifically?

A.  Yes, based on the question.

Q.  Understood.  More generally speaking, you know, when officers make rounds, are they supposed to note that in Lock and Track?

A.  Note what specifically?

Q.  Just that they made a round?

A.  Yes.

Q.  What about when they do head counts?

A.  Yes.

Q.  When they call for medication distribution?

A.  I believe they can make that in the log, but I'm not sure if it's a

Page 98

1  mandatory entry based on my recollection.
2      Q.   What about if there's a refusal
3  for somebody to receive medical care?  Is
4  that supposed to be documented in Lock and
5  Track?
6      A.   I believe, based on my
7  recollection, they do enter it in, if.
8  But if the form is -- notes indicating the
9  refusal, is the driver of it.
10     Q.   Understood.  Is there, if you
11 recall, a specific policy document that
12 lays out how officers are supposed to use
13 Lock and Track?
14     A.   I believe there -- if I'm
15 recalling correctly, there is a policy on
16 what is entered there.  I do not recall
17 with certainty, however, but I believe
18 there is some instruction.
19     Q.   Thank you.  When you were
20 commissioner, was there ever any process
21 of auditing Lock and Track to see if
22 officers were entering information as they
23 were supposed to?
24         MR. PESTRAK:  Objection.  You can

Page 99

1  answer.
2          THE WITNESS:  The facility could
3      request the audits to see if staff
4      were entering in.  You had sergeants
5      and lieutenants who would tour the
6      areas, and they, on a daily or
7      weekly basis, would go around.  They
8      would have to be entered into the
9      system, and they could look to
10     determine if individuals were using
11     Lock and Track.
12 BY MR. GROTE:
13     Q.   Okay.  Now, are there policies
14 pertaining to reviewing deaths that happen
15 within PDP custody?
16     A.   There is a death review process.
17 It's a mortality review that's conducted
18 by medical staff, in addition to any
19 investigation that the prison would
20 initiate based on the death in custody.
21     Q.   Okay.  So let's start with the
22 mortality reviews.  When I say mortality
23 review, is that the medical review that
24 you were referring to?

Page 100

1      A.   Yes.
2      Q.   And who conducts those reviews?
3      A.   Dr. Herdman has overall
4  responsibility where he's bringing in and
5  manages the Medical Executive Team, and
6  they're reviewing each individual case.
7      Q.   And what do those reviews consist
8  of?
9      A.   They consist of a series of
10 medical reviews, the treatment provided,
11 and then any issues surrounding the death
12 of an incarcerated individual.
13     Q.   And do these generate written
14 reports?
15     A.   Yes.  The mortality reviews are
16 written reports.
17     Q.   If you recall, what format were
18 those reports in?
19     A.   When you say "format?  Can you
20 specify?
21     Q.   I can give an example.  Well, are
22 you familiar with something called
23 Sentinel Reports?
24     A.   Yes.

Page 101

1      Q.   Are these different from Mortality
2  Reviews?
3      A.   I would have to compare those two.
4  It's been a while.
5      Q.   Okay.  Is the Mortality Review in
6  a spreadsheet format?
7      A.   No.
8      Q.   Okay.  And would you, as
9  Commissioner, review the Mortality
10 Reviews?
11     A.   I would.  As part of the
12 investigations, it's part of the packet,
13 yes.
14     Q.   And for the mortality reviews, who
15 would determine kind of the scope of
16 what's relevant to look at in regard to a
17 particular death?  Would that be Dr.
18 Herdman?  Yeah.  Would that be Dr.
19 Herdman?
20     A.   That would be Dr. Herdman and the
21 medical team.  Yes.
22     Q.   Do you know, you know, for --
23 would there be a specific time frame they
24 would look at in regard to the death?

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 102

1  Like how far back might they go to assess
2  a patient's care or history in PDP?
3      A.  Based on my recollection, it would
4  be based on the current incarceration
5  period.
6      Q.  What would they be trying to look
7  at in these mortality reviews?  What type
8  of information would they be trying to
9  evaluate?
10     MR. PESTRAK:  Objection.  You can
11     answer if you know.
12     THE WITNESS:  I would have to see
13     the report.  The report lays out
14     what they need to address or answer.
15     I would have to review the mortality
16     report or defer to Dr. Herdman
17     specifically to answer that question
18     for the specifics.
19 BY MR. GROTE:
20     Q.  As Commissioner, were there
21  certain things that you always wanted to
22  look into when there was a death in
23  custody?
24     A.  Yes.

Page 103

1      Q.  And what were those?
2      A.  I would look into tours, last
3  engagement with the individual, and any
4  medical or mental health information, and
5  any security-related information that may
6  have played a part in the incarcerated
7  person's demise.
8      Q.  And why would you look at tours?
9      A.  To see the last time that the
10  correctional officer engaged or toured the
11  area where they were housed.
12     Q.  Would you be looking to see if any
13  policies were violated?
14     A.  Yes.
15     Q.  Would you at times look to see if
16  -- how do I put this -- would you ever
17  look to assess if any of the policies you
18  had in place needed to be changed in light
19  of something that led to a death in
20  custody?
21     A.  Yes.
22     Q.  In what circumstances would you,
23  you know, kind of look to see, does this
24  policy need to be changed, does this need

Page 104

1  to be tweaked?  Was it all the time, or
2  would it be only whenever there was some
3  particular set of facts that would make
4  you take that look?
5      MR. PESTRAK:  Objection.  You can
6      answer.
7      THE WITNESS:  It would be a
8      series.  It's not a one occurrence
9      and then you change an entire
10     policy.  So you're looking for
11     themes and you're looking for an
12     engagement.  So it's not automatic
13     that someone, you know, passes in
14     custody and you just change a policy
15     based on an occurrence.  You're
16     looking for a theme and a pattern.
17 BY MR. GROTE:
18     Q.  And how would you determine if
19  there is a theme or a pattern?
20     A.  In reviewing the investigations,
21  you can glean information, and you're
22  looking to see if there are additional
23  occurrences, or that requires a review for
24  a possible revision.

Page 105

1      Q.  Was there a process at PDP for
2  kind of looking at multiple deaths in
3  custody, in the aggregate, to try to
4  identify patterns?
5      MR. PESTRAK:  Objection.  You can
6      answer.
7      THE WITNESS:  Yes, that's the same
8      process I'm explaining.  So you're
9      looking at the aggregate, but there
10     are differences in every case.  And
11     then you're determining does the
12     policy needs to be changed, or
13     whether this is an isolated incident
14     or an individual case.
15 BY MR. GROTE:
16     Q.  So, when you say looking at the
17  aggregate, what I'm trying to understand
18  is:  Did you have a specific process for
19  doing that, or is it just part of the
20  individual mortality reviews?
21     A.  It's part of the mortality --
22  whatever medical -- if we're gleaning
23  information, we're looking at the totality
24  of the investigation to see, in fact,

Page 106

whether there is a pattern here. Because
each individual being treated by medical
is different. So we're not just looking
at that; we're looking at the overall
circumstance surrounding the death of the
individual.

Q. Can you recall any patterns that
emerged during your time as Commissioner
in regard to in-custody deaths?

A. No.

Q. And are you, just so the record's
clear, are you saying no, you don't
recall, or no, you don't think that there
were any patterns?

A. I don't recall there being any
patterns that I reviewed.

Q. Okay. So do mortality reviews
involve -- or could -- I mean, I know it
would depend case-by-case. But could they
involve discussions or interviews with
medical staff who were involved with
patient care for the decedent?

A. They could have, but I don't
believe that the staff involved were at

Page 107

the mortality review, based on my
recollection.

Q. And you said the medical file
would be reviewed, though, right?

A. Yes.

Q. Would they review if the decedent
had not shown for medical appointments
during their time in PDP custody?

A. Yes, that could have been reviewed
if it's in the file.

Q. Would mortality reviews assess the
reasons for the no-shows?

A. I don't recall that it would
assess that. I'm not sure. I cannot
answer that with certainty.

Q. Do you ever recall if a mortality
review would look into systemic issues in
regards to somebody missing medical
appointments?

MR. PESTRAK: Objection. You can
answer.

THE WITNESS: Again, I don't
recall that.

BY MR. GROTE:

Page 108

Q. And this might be similar to the
last question, or to the last couple
questions. So would mortality reviews
track missed medical appointments as part
of their process, or was that dependent on
the particular case?

A. I would have to defer that to Dr.
Herdman to see how he tracked that.

Q. Would mortality reviews ever
involve speaking with other incarcerated
people?

A. No, that would be part of the
investigation, not the mortality review.

Q. In addition to yourself and Dr.
Herdman, who else would review mortality
reviews?

A. The Deputy Commissioners would
review mortality reviews. Our Director of
the Office of Professional Compliance
would review as part of the investigation,
and we would then solicit a review from
our Policy and Audit Division regarding
policy and procedure, which makes up the
investigation process for the department.

Page 109

Q. Who was the Director of the Office
of Professional Compliance when you were
Commissioner?

A. Ivan Marshall.

Q. What are quarterly mortality
reviews, actually? Strike that. I'll
come back to that in a moment. Mortality
reviews, do those reports ever make
recommendations?

A. I would have to review the form to
see if it does make those recommendations.

Q. Okay. Now, quarterly mortality
reviews -- were these something that PDP
engaged in?

A. Yes.

Q. And what were the quarterly
mortality reviews?

A. The quarterly mortality reviews
were cases that would be identified by Dr.
Herdman. We would schedule with myself,
deputy commissioners, wardens, and any
other designees identified by Dr. Herdman
from the medical side and the warden,
based on their executive staff side. And

Page 110

we would meet to discuss the cases and to glean and share information regarding the individual. And if there's anything, again, as I testified, assessing, are there any issues where we're assessing; are we seeing any patterns, or what led to the individual's demise.

Q. And so with the quarterly reviews, you would be -- would you review deaths in custody that happened within that three-month period?

A. Not necessarily. It could be from a previous quarter or it could be the current quarter, depending on the time of death.

Q. So it'd be some group of deaths in custody, but it wouldn't necessarily be only within the three months prior to the review. Is that fair?

A. That's fair.

Q. Was the REMIC monitor ever involved in quarterly mortality reviews in any way?

MR. PESTRAK: Objection. You can

Page 111

answer.

THE WITNESS: No, they were not involved in quarterly mortality reviews.

BY MR. GROTE:

Q. Did they offer any suggestions on your mortality review process during the monitoring of the REMIC case?

MR. PESTRAK: Objection. You can answer.

MR. WITTEKIND: I'll join.

THE WITNESS: With any death that occurred during that period, they would be involved in the after-action review, and we would discuss -- the REMIC monitors would be present, and they would provide whatever recommendations in the written report.

BY MR. GROTE:

Q. Okay. What is the after-action review?

A. That is when an in-custody death has occurred, and it's scheduled. And

Page 112

you're bringing anyone that may have had involvement into the meeting to discuss the individual and any issues or information that may have led up to the person's death.

Q. And after there's a death in custody, would there always be one of these after-action reviews?

A. Yes.

Q. And bear with me a moment. Is an after-action review the same type of review as a critical incident review?

A. Yes.

Q. And who would be at those meetings?

A. Medical, Behavioral Health, Dr. Herdman, deputy commissioners, wardens, and any staff intimately involved with the incident.

Q. And when you were commissioner, was that something that was initiated, the critical incident reviews?

A. No, it predates me.

Q. Okay. Was it always in place,

Page 113

then, when you were commissioner?

A. Yes.

Q. As commissioner, you were aware of every death that happened in PDP custody, is that correct?

A. Correct.

Q. And you would review every mortality review?

A. As part of the investigation, yes.

Q. And you would participate in every after-action review?

A. Based on my recollection, I don't believe I missed any, but if I did, I don't recall.

Q. There -- now you -- I want to go to a document. I'm going to share the screen again.

A. All right.

Q. And this is the REMIC Monitors Report filed with the court March 29th, 2024. You can see from the top the case number, Document 204 filed 3/09/24. And there it says: Mortality Information. Do you see that, Ms. Carney?

Page 114

A. Yes.

Q. And I'm not going to read the whole paragraph, but if you could read this second paragraph, beginning with September 2022. And then when you get to the bottom, let me know. I'm going to ask you a question or two.

A. I'm finished.

Q. Okay. Did PDP develop a process for ensuring that all corrective action was implemented and tracked?

A. Yes. Prior to this, we still had our reports and our reviews, but based on this we started tracking it formally.

Q. Okay. And so how did you do that?

A. So this information, I believe, Excel or some type of platform was identified, and our Policy and Audit Division was tasked with monitoring any recommendations and adding it to that form. I don't know if it was a form or just an Excel document.

Q. Some documents --

A. Where you could track the

Page 115

information. Yeah, and it says to formalize the reviews. So we were doing that. We were meeting. We were reviewing the information, and they recommended we formally do that, and we assigned that to our Policy and Audit Division.

Q. And so prior to that, you had the individual reviews from each case. You already had those in place, right?

A. Yes.

Q. But you didn't have a kind of spreadsheet or some similar type of document tracking like you just described?

A. Correct.

Q. And it also said at the end there, including any disciplinary action taken against individual personnel. So prior to this, were you tracking disciplinary action outside of the individual instances of which was imposed in any way?

A. Yes, that's always been tracked through the disciplinary hearings, and that has a record. And we've been tracking that as far back as I can

Page 116

remember. The staff who were disciplined, the dispositions. So that information was readily available. And I don't know if they wanted this in a different format, but that's always been tracked.

Q. Would that be tracked in a way that would allow you -- Well, would you review that information as Commissioner to try to identify any patterns of staff policy violations?

MR. PESTRAK: Objection. You can answer.

THE WITNESS: Through that platform where we track all disciplinary issues. The reason is there and you are tracking across. And it comes down to an individual basis. People are individuals, they're not robots. So you may still have staff that are not in compliance with a particular policy, but they may not be following different parts of the policy. So it doesn't say it's the policy. It

Page 117

may come down to the individual, but we've been tracking that information and it was tracked up until my retirement.

BY MR. GROTE:

Q. So how would you -- was it ever -- How would you determine if there was an issue with the policy as opposed to the individual if you understand the question?

MR. PESTRAK: Objection. You can answer.

THE WITNESS: Is it the policy -- Yes. Thank you. Is it the policy that needed to be tweaked because it wasn't consistent. So if you had staff just not calling and making the initial call for help, let's assess, is it the individual or the policy?

So there are different things you're looking for to see. Is it the policy. But an incident does not require the policy to be changed. Is it the error of the

Page 118

staff person?  But if the policy is
consistent, and more often than not
a majority of the staff are
following the policy, then you're
looking at the Individual.
BY MR. GROTE:
    Q.  Were there ever occasions, as
Commissioner, in which you thought a lot
of staff members were not following
certain policies?
        MR. PESTRAK:  Objection.  You can
answer.
        THE WITNESS:  Not in particular.
    It's just staff, not policies.  But
    no one policy is jumping out at me.
BY MR. GROTE:
    Q.  Right.  And I guess what I'm --
I'm just wondering -- how to phrase this.
Did you ever encounter situations where
you thought the policy was fine, but one
staff member, then another staff member,
then another staff member, right, and so
on, are not doing what they're supposed to
be doing, in those circumstances, would

Page 119

you just seek to treat each instance
through the individual disciplinary
proceeding, or were there other measures
you would take to try to identify why many
staff members were not following a policy
that was sound and should have been
followed?
        MR. PESTRAK:  Objection.  You can
answer.
        THE WITNESS:  We would deal with
    that through the disciplinary
    process.
BY MR. GROTE:
    Q.  Now, what are facility
investigations into deaths in custody?
    A.  Those are investigations conducted
by the facility.  That's the warden for
his designee that have to conduct an
investigation on what occurred in their
facility.
    Q.  And how are they different from
mortality reviews?
    A.  They're doing the overall
investigation with every facet:  Security,

Page 120

any person that may have engaged the
individual, program, services, activities.
The mortality review is focusing primarily
on the medical or behavioral health
treatment of the individual.
    Q.  And what is the scope of the
facility investigation?  What are they all
looking at in the facility investigation?
    A.  They're looking for services,
program engagement, any services provided,
any policies violated, the staff who were
involved.  If there are any safety or
security issues that need to be addressed.
    Q.  Did those facility investigations
ever assess if any policies should be
changed?
    A.  If there is, it is presented and a
recommendation or suggestion is made, I
don't recall any, but that's an
opportunity for the facility to assess and
make a recommendation.
    Q.  And how is a facility
investigation -- is it different from an
Office of Professional Compliance

Page 121

investigation?
    A.  It's different, but it becomes
part of the Office of Professional
Compliance investigation.  So they're
providing and assessing what occurred
inside the facility.  The Office of
Professional Compliance is also
determining and assessing what happened
inside and any external impact that may
have resulted.  And so they're
encompassing every scenario that's
presented.  They're not creating it and
assessing.  And that becomes part of the
investigation.  They're also investigating
the staff of the facility that conducted
the investigation or who were involved in
the incident.
    Q.  Does OPC look into every death in
custody or not?
    A.  Yes, they look into every death in
custody.
    Q.  Okay.  And who carries out OPC
investigations?
    A.  That is the Director of the Office

Deposition of Blanche Carney
Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 122

1  of Professional Compliance, who was then
2  Ivan Marshall.
3      Q.  Okay.  And would he then designate
4  somebody who would carry out the
5  investigation, whom he supervises?
6      A.  It depended on the number of
7  cases, but primarily he was the lead
8  individual responsible.
9      Q.  Okay.  The Office of Professional
10  Compliance, they're looking to see if
11  staff violated policy, correct?
12      A.  Correct.
13          MR. PESTRAK:  Objection to form.
14  BY MR. GROTE:
15      Q.  Does OPC ever assess whether or
16  not certain policies should be changed?
17      A.  Based on my recollection, I don't
18  believe I received any.  But they do look
19  at policy as part of the investigation
20  process to determine whether or not there
21  was a violation.
22      Q.  Understood.  Do you have any
23  recollection of OPC ever recommending that
24  there needs to be more training to staff

Page 123

1  because of their findings?
2      A.  No.  Based on my recollection, no.
3      Q.  Now, OPC reports -- would you read
4  all of those reports as Commissioner?
5      A.  Yes.
6      Q.  And that would include reports
7  where there were sustained findings of
8  misconduct and reports where there were
9  not sustained findings of misconduct?
10      A.  Yes.
11      Q.  And so, when OPC sustains a
12  finding of misconduct, that just means
13  that it's bringing charges against an
14  officer, right?  It doesn't mean that
15  they're fully found to have violated
16  policy yet?
17      A.  Correct.
18      Q.  And can you walk me through the
19  disciplinary process from when charges
20  would be brought through an OPC finding to
21  the end, in a situation where discipline
22  would be imposed?
23      A.  So, at the completion of the
24  investigation by the Office of

Page 124

1  Professional Compliance, the report is
2  then scheduled for a Full Board hearing.
3  The Full Board hearing is chaired by a
4  non-voting Deputy Commissioner, and your
5  panel would be part of the individuals who
6  are present the case would be heard by
7  either a warden or a deputy warden not
8  assigned to the facility being heard.  A
9  security officer is identified, and the
10  hearing is held.  The Office of
11  Professional Compliance presents its case
12  to sustain the charges.  The board hears
13  that, renders a decision, determines which
14  charges are upheld and which are
15  dismissed.  Then There is a range of
16  penalties based on a disciplinary matrix
17  that is rendered; that submission is
18  submitted to the Commissioner as a
19  recommendation.  Upon receiving the
20  report, I review it in its totality.  I
21  can either accept the recommendation,
22  reject the recommendation, or modify the
23  recommendation for discipline.
24      Q.  So as Commissioner, were you the

Page 125

1  only one who was authorized to impose
2  discipline?
3      A.  Yes, unless it was a designee.
4  Now, it depends, for the Office of
5  Professional Compliance, that's that
6  level.  Any investigation conducted at the
7  facility that did not rise to the level of
8  referral for a Full Board hearing would be
9  heard by the warden or the deputy warden
10  designated, would hear the case and render
11  discipline at the facility level.
12      Q.  I'm going to share my screen
13  again.  So I'm going to ask you about some
14  specific reports here.  Can you see this?
15  I can make it bigger?
16      A.  Please enlarge it.  Thank you.
17      Q.  Is that large enough?
18      A.  A little more, please.  Okay.
19      Q.  Okay.  And do you agree that --
20  this is marked Jung City Production004786,
21  and does this look like the COVID page of
22  the Office of Special Investigations'
23  review of the death of Angel Torres
24  Rosado?

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 37 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 126

1  A.  Yes.
2  Q.  Do you recall this case at all?
3  A.  I don't recall the specifics of
4  the case.
5  Q.  Okay.  Do you recall --
6  A.  I would have to review the report.
7  Q.  Understood.  And bear with me
8  while I -- can you take a moment to review
9  the conclusion here and let me know when
10 you're finished.
11 A.  Okay, I'm finished.
12 Q.  Okay.  And just for the record, do
13 you agree that a Corrections Officer was
14 found to have not performed head count and
15 to not have rendered first aid, and there
16 was a sustained finding of staff
17 misconduct?
18 A.  Yes.
19 Q.  And then, in the other paragraph,
20 another staff member was found to have
21 failed to render aid, and another one was
22 found to have not toured the POD as
23 required.  Do you agree it also sustained
24 misconduct findings there?

Page 127

1  A.  Yes.
2  Q.  Does this refresh your
3  recollection about this case at all?
4  A.  No, it does not.
5  Q.  Okay, so you don't recall if
6  discipline was ever imposed against these
7  officers?
8  A.  Based on this report that I'm
9  reading, it is sustaining it.  So I know
10 there was some discipline that was
11 sustained.
12 Q.  But just so we're clear for the
13 record, this report means that charges
14 were brought because it was sustained,
15 right?
16 A.  Correct.
17 Q.  So there would still be a hearing
18 process where they could defend
19 themselves, right?
20 A.  Correct.
21 Q.  Okay.  And so, where it says
22 failing to make a tour for one of the
23 officers, do you agree that that's a
24 serious breach of policy?

Page 128

1  MR. PESTRAK:  Objection.  You can
2  answer.
3  THE WITNESS:  Yes.
4  BY MR. GROTE:
5  Q.  And why is that?
6  A.  Because the tours are to be
7  unpredictable and routine, and assess to
8  make sure, as I testified previously,
9  accountability of the individuals,
10 ensuring those individuals are assigned,
11 and for the office to assess any issues
12 that would require the assistance of
13 additional security, safety security, or
14 medical personnel.
15 Q.  And same with failing to render
16 aid.  Is that also a serious breach of
17 policy?
18 MR. PESTRAK:  Objection.  You can
19 answer.
20 THE WITNESS:  Yes.
21 BY MR. GROTE:
22 Q.  And why is that?
23 A.  Because staff received the
24 training to do just both of those in the

Page 129

1  performance of their duties.
2  Q.  While you were Commissioner, does
3  this refresh your recollection whether
4  there was a pattern of staff failing to
5  make housing tours that was revealed
6  through investigations into deaths in
7  custody?
8  MR. PESTRAK:  Objection.  You can
9  answer.
10 THE WITNESS:  Based on my
11 recollection, there were some cases
12 where staff did not make the
13 required rounds.  Yes.
14 BY MR. GROTE:
15 Q.  Did you ever engage in any more
16 systemic review into why that was
17 happening more than once, or did you deal
18 with these just kind of individual,
19 case-by-case circumstances?
20 MR. PESTRAK:  Objection.  You can
21 answer.
22 THE WITNESS:  Case-by-case,
23 because the majority of the staff
24 were doing their rounds as they were

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 38 of 75

Deposition of Blanche Carney                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 130

required in the performance of their duties. And those staff who simply failed to perform the rounds, we dealt with them on a case-by-case basis.

BY MR. GROTE:

Q. Was there -- would there ever be a threshold where you would say to yourself or you did say to yourself, was there ever a period that maybe we need to do more? The case-by-case approach isn't preventing this from recurring?

MR. PESTRAK: Objection. You can answer.

THE WITNESS: I did just that. As technology became readily available, and we're looking at that. We didn't just turn a deaf ear and a blind eye. I procured a contract with Guardian. That is a GPS system whereby correctional staff physically go around and there are modules are placed strategically throughout housing areas. Where

Page 131

that GPS, you have to hit the scanner to that GPS, and that tells you that the individual got up from the desk, walked around, and completed their tours. We also put that in place to account for a number of other services provided that wasn't readily available at the time, but when it became available, I procured Guardian. And that GPS system allows us to track, account for, and record cloud-based accounts of engagement and certain work-performance duties to be performed by the correctional officers on the housing unit.

BY MR. GROTE:

Q. When did you procure that service through Guardian?

A. I believe I started engaging -- I signed the contract, based on my recollection, in late 2023, early 2024. But I would need to see the contract to see exactly when that happened.

Page 132

Q. Fair enough. Was it implemented prior to your leaving PDP?

A. I don't believe it was implemented. I believe we were at the stage in which the infrastructure was being installed, based on my recollection.

Q. Thank you. I'll stop sharing now.

Do you remember the case of Lewis Jung, his death?

A. I recollect that this individual was in a housing unit at the Detention Center and he became ill, that an officer called for assistance. A lieutenant reported and a medical provider reported. That's my recollection without seeing the full or reviewing the report again.

Q. So I'm going to share the screen now. This is the Report of Investigation: Office of Special Investigations, Death of Lewis Jung, City Jung000001, and you agree it says his death was caused by diabetic ketoacidosis?

A. Based on what I'm reading, yes.

Q. And I'm going to scroll down to

Page 133

the conclusion and give you a chance to review that. Let me know when you've reviewed it.

A. I'm finished.

Q. Does this refresh your recollection at all?

A. Yes.

Q. And towards the bottom it says: Correctional Lt. Wanda Bloodsaw arrived at the cell and appeared to be trying to communicate with incarcerated person Jung before two incarcerated people come to the cell and drag incarcerated person Jung into the cell as Lt. Bloodsaw monitors the situation. The incarcerated people then exit the cell, which is then secured by Lt. Bloodsaw, who exit the housing area. Does that describe proper protocol?

A. No, it does not.

Q. And what is not proper about that?

A. The arriving to the cell, medical isn't performing any duties. You have two other incarcerated individuals involved, and a stretcher call was not initiated.

Deposition of Blanche Carney

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 134

Q. And when you say the two other incarcerated individuals were involved, should they have not been involved in the way described here?

A. That is correct.

Q. And that's for reasons we discussed earlier, right? They're not PDP employees?

A. Correct.

Q. Do you recall the after-incident review for Mr. Jung's death?

A. Not off the top of my head, I don't.

Q. And so you see, this was from November 5th. If I go back to the first page, it's not on the first page; it's on the second page. On November 6th, he died. You were still Commissioner at this time, correct?

A. Yes.

Q. And the report was dated March 29th, 2024. Were you still Commissioner when the OPC investigation concluded?

A. Yes.

Page 135

Q. When was your last day, if you remember?

A. April 4th, 2024.

Q. Okay. Do you recall having any conversations about Mr. Jung's case with others at PDP?

A. I believe I recall not the specifics, but with any death case, I confer and converse with my executive team, so I recall doing that. That was consistent. I don't know exactly when, but when any in-death custody occurs, I'm meeting with the executive team and any persons involved with the case.

Q. Do you recall if there were any instances in Mr. Jung's medical care at PDP where the Red Flag Policy was not followed?

A. I don't recall.

MR. WITTEKIND: Objection to form.

BY MR. GROTE:

Q. Are there ever any notes for the after-incident reviews?

A. We were not maintaining notes,

Page 136

unless individuals maintained notes. We brought individuals together, and we would discuss, and people would report. But we don't have any notes or minutes.

Q. Why were notes not taken? Is there a reason for not taking notes?

A. We wanted to be for staff to articulate their recollection. The Office of Professional Compliance was already going to get statements obtained and speak to these individuals, and in no way was inferring or implying if someone saying something then you hand that over as part of it. Everything is independent, and we wanted to give people an opportunity to decompress, express what occurred, and if there were any issues or areas we would address and discuss them.

MR. GROTE: I'll take a break and confer with colleagues and see how much more I have left.

MR. PESTRAK: How long do you want to take, Bret?

MR. GROTE: Five minutes. It

Page 137

might take more. Probably not ten.

MR. PESTRAK: Do you want to come back at 1:00 then.

- - -

(Whereupon, a recess was taken.)

- - -

BY MR. GROTE:

Q. All set. Okay, so I'm going to share my screen again. This is -- wait -- Jung City Production005109, and it refers to an inmate, Jermaine Samicheilli (ph), discovered unresponsive in his cell, and he was pronounced dead on December 17th, 2017. Do you remember this incident, Commissioner Carney? Do you remember Mr. Samichielli?

A. No. I'm reading it, though.

Q. Let me know when you have. I'm going to then take you to another page to see if it refreshes your recollection.

A. Okay, you can go to the other page.

Q. Okay. Here's the conclusion. And let me know after you've read it, or if

Page 138

you need me to scroll down because it
finishes on the next page.

A.  Okay, you can go to the next page.

Q.  And it says on Jung City
Production005130 the allegation of staff
misconduct against PDP staff, Staff
Sergeant C. Hill, Sergeant Gordon, C/O
Soell, C/O L. Murphy, C/O H. Rosa, C/O A.
Woods, C/O K. Morris, C/O C. Durham, C/O
M. Robinson, C/O J. Mathis is sustained.
And do you agree that this was sustained
because these staff members did not make
tours of the housing unit, as they were
required to?

A.  Yes.  Based on the narrative.

Q.  Yes.  And it says disciplinary
action was taken by the Facilities
Administration by the order of
Commissioner Blanche Carney.  Does this
refresh your recollection about this
instance?

A.  No, it does not.  I would have to
see the actual investigation.  I'd have to
have the full opportunity to review and

Page 139

see what discipline was rendered.

Q.  Okay.  Is there anything unusual
about that many staff members not making
housing tours in a particular incident?

A.  Without me reviewing it -- there's
nothing unusual other than individuals not
following the policy.  But I would need
time to review this entire investigation
to determine why.

Q.  Understood.  When you were
Commissioner, were you ever concerned that
there was a culture amongst corrections
staff at PDP of not following protocol?

MR. PESTRAK:  Objection.  You can
answer.

THE WITNESS:  I don't believe it
was a culture.  I believe it was
individuals simply opting not to
follow policy and procedure.  For
the most part, this contains several
staff members, but it doesn't speak
for the totality of the other
departmental staff that did their
tours and performed their duties.

Page 140

BY MR. GROTE;

Q.  How would you determine if there
was kind of a culture of not following
policy?

MR. PESTRAK:  Objection.  You can
answer.

THE WITNESS:  That you would have,
more often than not, a majority of
your staff simply not doing tours.
Based on this incident they've
identified the individuals.  But for
me to assess, it would have to give
me significant indications or
incidents where people just simply
were flat-out not doing any tours.
And I don't want to paint the broad
brush with this incident or to
minimize it, but that's what I would
be looking for.

BY MR. GROTE:

Q.  If you did think there was an
issue among staff culture, right, if they
were not following policy, what measures
would you have taken to address a more

Page 141

widespread issue?

MR. PESTRAK:  Objection.  You can
answer.

THE WITNESS:  Well, I've done just
that with the Guardian, with putting
additional infrastructure in place,
procuring different resources,
increasing staffing numbers.  I did
a number of things to put measures
in place to enhance and increase,
and that's how I would handle it.
It's not just sitting idly by, but
if there are a few bad actors, they
certainly don't represent the entire
department.  And there were staff on
duty throughout my tenure that did
their job and performed as per
policy.

BY MR. GROTE:

Q.  You said -- you mentioned the
guardian, and we've talked about that.
And then you said putting infrastructure
in place.  Was there specific
infrastructure you had in place?

Deposition of Blanche Carney

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 142

A.  Well, you have additional security measures.  You have scanners that can work to assess and decrease any flow of contraband.  You have your K-9 unit where we procured additional K-9s to aid our security.  So those are the type of measures I'm talking about.

Q.  Are there any measures, though, that you can think of that would specifically go to addressing a staff culture of non-compliance with rules, if you thought that needed to be addressed.  I understand your testimony, but how would you address that?

MR. PESTRAK:  Objection.  You can answer.

THE WITNESS:  You do refresher trainings and during roll calls, you're sharing information with staff, you're reiterating the expectations, and you're providing any additional training.  I know during my tenure I implemented crisis intervention de-escalation

Page 143

training.  So any training that we thought would enhance and supplement, we put that in place and I did just that.

BY MR. GROTE:

Q.  So if there -- if you were -- if you made an assessment that there's been a pattern that I want to address.  I want to make sure staff are really on top of this, we're going to do some refresher trainings and we're going to get this out to everybody.  That's how you would address it?

MR. PESTRAK:  Objection.  You can answer.

THE WITNESS:  That's how I'd address it, with the leadership of the facilities as well.  So it's not just dependent upon me, but it's making sure that they carry out my expectations through training, through refresher trainings, and that there are increased tours by the leadership of those facilities

Page 144

as well.

BY MR. GROTE:

Q.  Did you ever, in your time as Commissioner order refresher trainings for rendering emergency aid?

MR. PESTRAK:  Objection.  You can answer.

THE WITNESS:  Not to my recollection.

BY MR. GROTE:

Q.  Was there ever a time while you were Commissioner that you ordered refresher training on making housing tours?

MR. PESTRAK:  Objection.  You can answer.

THE WITNESS:  Yes, I believe I did several.  And when I say several, through roll call trainings and unit management trainings for the supervisors and the line staff.  And I believe that occurred throughout my tenure.

BY MR. GROTE:

Page 145

Q.  And why did you do that?

MR. PESTRAK:  Objection.  You can answer.

THE WITNESS:  The refresher, we had a significant turnover in staff.  So you're either -- it's a refresher for some, or new to others.  And that was just to reiterate the expectations.  So during that period of time, I had staff, as I testified, with a loss of staff.  You have a loss of those staff that are retired and have departed.  So that was making sure that the message was consistently getting to as a refresher or to our newly-hired individuals.  And that's just routine corrections.  It's not a one-and-done.

BY MR. GROTE:

Q.  Understood.  The refreshers on housing tours -- were you ever ordering them in response to a critical incident in the facility?

Page 146

A.  Not that I can recall right off the top of my head.

MR. GROTE:  No further questions.

MR. PESTRAK:  John, do you have any questions?

MR. KAMINSKY:  I do, not many.

- - -

EXAMINATION

- - -

BY MR. KAMINSKY:

Q.  Good afternoon, Ms. Carney.  I'm Mr. Jonathan Kaminsky and I represent Mariesha Apollon in this matter.  And thank you for your time this afternoon and this morning.

Earlier today, much earlier today, you had -- a discussion was provided from you about medical providers and medical clinicians.  Do you consider -- is there a difference between medical clinicians to you and a medical provider?

A.  No, I use that term interchangeably.

Q.  Earlier also, you were discussing

Page 147

-- while the discussion was about mortality reports -- you had mentioned a current incarceration period.  What is a current incarceration period to you?

A.  So the police identification number does not change.  Once you're issued that, it is with you.

The intake number is what changes.  So every time you are admitted to custody, you're assigned a unique intake number.  And when you're released, then that intake number closes out.  If you're readmitted, that's a current incarceration, and we're using that intake number.

Q.  Okay, and so readmitted, meaning that if you were transferred -- if an inmate was transferred out to a mental health facility and then readmitted into the Philadelphia -- into PDP, that's a new number.  Is that what you're saying?

A.  No, that's not a new number.  And that's the nuance.  You have to physically leave custody under judicial order, which would end that intake number.  If you were

Page 148

transferred to a mental health hospital, that intake number remains active until you are released under judicial order.

Q.  Released under judicial order from the --

A.  By the court.

Q.  No, no, I understand.  But from the mental health facility or from the PDP?

A.  From the PDP.

Q.  Okay.  And so, as far as the current incarceration period -- I know we were talking about it as far as mortality reports, is that current incarceration period the same as -- does that apply also for correctional staff's participation in an intake?

A.  Yes.

MR. PESTRAK:  Can you rephrase that?  I'm sorry, I just don't know if I understood.  Can you just rephrase that a little bit?

MR. KAMINSKY:  Yeah, the current -- I mean, the witness did

Page 149

answer "yes."

MR. PESTRAK:  Okay.  If you're okay with the answer, then that's fine.  Okay.

MR. KAMINSKY:  I have nothing further.  Thank you.  Thank you again for your time today.

MR. PESTRAK:  I have Ms. Thomas next on my screen.  Do you have any questions?

MS. THOMAS:  I have no questions. Thank you.

MR. PESTRAK:  And that just leaves you, Ray.

MR. WITTEKIND:  Well, I -- I just have a couple.

- - -

EXAMINATION

- - -

BY MR. WITTEKIND:

Q.  Commissioner Carney, my name is Ray Wittekind.  I represent YesCare, Dr. Trivikim, Nurse Gay, and Blair Cabellos. I'm not going to -- I'm going to try not

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 43 of 75

Deposition of Blanche Carney                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 150

1  to be repetitive of what Bret asked you
2  earlier.  Is it fair to say that, as
3  between you and Dr. Herdman, he was the
4  liaison between the PDP, Corizon, and
5  YesCare?
6      A.  Yes.
7      Q.  Do you recall having any direct
8  communications with anyone at YesCare or
9  Corizon relative to the treatment or the
10 medical care provided to Mr. Jung?
11     A.  Not to my recollection.
12     Q.  And that would include Dr.
13 Trivicam, Nurse Gay, and Blair Gabellos.
14 So you don't recall any discussions with
15 them about what happened to the Plaintiff?
16     A.  If they were present at the
17 meeting, they would have presented
18 whatever was asked of them, or their
19 recollection, and that would have been the
20 extent, but it wouldn't have been calling
21 them directly and soliciting information.
22 But if they were at the meeting, they
23 definitely participated.
24     Q.  During your time as a

Page 151

1  commissioner, did you ever get any -- or
2  strike that -- do you recall any
3  discussions or communications with Dr.
4  Herdman in which he stated that he was
5  concerned over the quality of care that
6  was being provided by Corizon or YesCare?
7      MR. PESTRAK:  Objection.  But you
8  can answer.
9      THE WITNESS:  No, not specifically
10 other than just rendering care, but
11 no specifics.
12     MR. WITTEKIND:  I think that's all
13 I have.
14     MR. PESTRAK:  Bret, I don't have
15 any.  So unless you follow up.
16     MR. GROTE:  I do not.  We are
17 through.  Thank you for your time,
18 Ms. Carney.
19     MR. PESTRAK:  You're free to go.
20 Thank you very much.
21          - - -
22     (Whereupon, a deposition of Blanche
23 Carney was concluded at 1:25 p.m.)
24          - - -

```
 1                           -  -  -

 2                   E R R A T A    S H E E T

 3                           -  -  -

 4

 5        PAGE        LINE        CHANGE

 6        _____     _____     _____

 7        _____     _____     _____

 8        _____     _____     _____

 9        _____     _____     _____

10        _____     _____     _____

11        _____     _____     _____

12        _____     _____     _____

13        _____     _____     _____

14        _____     _____     _____

15        _____     _____     _____

16        _____     _____     _____

17        _____     _____     _____

18        _____     _____     _____

19        _____     _____     _____

20        _____     _____     _____

21        _____     _____     _____

22        _____     _____     _____

23        _____     _____     _____

24        _____     _____     _____

25        _____     _____     _____
```

Deposition of Blanche Carney

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1          ACKNOWLEDGMENT OF DEPONENT

2

3          I,                        , do hereby

4     certify that I have read the foregoing pages and

5     that the same is a correct transcription of the

6     answers given by me to the questions therein

7     propounded, except for the corrections or

8     changes in form or substance, if any, noted in

9     the attached Errata Sheet.

10

11

12

13

14

15     _____    _____
       Date            Signature

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3           I, Lisa J. Brill, a Court and Notary
      Public in and for the Commonwealth of
4     Pennsylvania, do hereby certify the
      foregoing to be a true and accurate
5     transcript of my original stenographic
      notes taken at the time and place
6     hereinbefore set forth.

7

8

9     _____

      Lisa J. Brill, Court Reporter-Notary Public
10    in and for the Commonwealth of Pennsylvania

11    DATED:_____

12

13

14

15           (The foregoing certification of
      this transcript does not apply to any
16    reproduction of the same by any means,
      unless under the direct control and/or
17    supervision of the certifying shorthand
      reporter.)

18

19

20

21

22

23

24

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 47 of 75

Deposition of Blanche Carney                                      Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**WORD INDEX**

**< 1 >**
**1**  5:12
**1:00**  137:3
**1:25**  151:23
**10:05**  1:19
**100**  32:10  46:16
**110**  3:6
**12**  39:19  41:11, 14
**146**  4:7
**149**  4:8
**1500**  3:6
**1515**  2:9
**15TH**  2:9
**1717**  3:14
**17th**  137:13
**1801**  2:17
**19102**  2:10  3:7
**19103**  2:18  3:15
**19123**  2:4
**1992**  12:6
**1995**  12:17, 24
**1997**  12:6

**< 2 >**
**2016**  12:11, 24  20:15
  43:22
**2017**  137:14
**2020**  92:12, 20
**2022**  4:13  47:24
  114:5
**2023**  38:24  131:22
**2024**  20:15  37:4
  92:12, 20  113:21
  131:22  134:22  135:3
**2025**  1:14
**204**  113:22
**23**  1:14
**29th**  113:20  134:22

**< 3 >**
**3/09/24**  113:22
**306**  2:4

**< 4 >**
**43**  53:4
**4th**  4:13  47:24
  135:3

**< 5 >**
**5**  60:22  61:18
**5.162**  64:2
**5.183**  66:10
**5.76**  61:7, 11
**562**  64:1
**5th**  134:15

**< 6 >**
**6**  4:6
**610**  3:14
**64**  75:11, 13
**6th**  134:17

**< 7 >**
**7**  4:8  5:12
**770**  2:17

**< 9 >**
**98**  49:8
**990**  2:4

**< A >**
**a.m**  1:19
**able**  28:18  34:10
  65:13
**ABOLITIONIST**  2:3
**academy**  14:19  15:5,
  10  73:8
**accept**  124:21
**access**  32:15  34:9, 10,
  20  44:19  54:23  55:3
  59:24  65:14  91:4
  95:13, 17, 24
**accommodate**  90:9
**accommodation**  90:2,
  4
**accommodations**
  88:10, 16, 20
**accompany**  32:10
**account**  71:20  131:6,
  11
**accountability**  128:9
**accounts**  131:12
**accurate**  15:3  16:11,
  12  50:11  51:18
  54:12  92:1  154:4
**acknowledging**  69:19

**ACKNOWLEDGMEN**
**T**  153:1
**acting**  78:13
**action**  114:10
  115:16, 19  138:17
**activates**  36:12
**activation**  76:17
**active**  148:2
**activities**  17:24
  28:16  45:19  120:2
**actors**  141:13
**actual**  25:8  86:9
  138:23
**acute**  94:1
**adapted**  62:2
**adding**  114:20
**addition**  27:21  99:18
  108:14
**additional**  66:8
  80:19  81:9  104:22
  128:13  141:6  142:1,
  5, 22
**address**  41:20  46:10
  71:5  77:17  102:14
  136:18  140:24
  142:14  143:8, 12, 17
**addressed**  56:13, 23
  120:13  142:12
**addressing**  41:19
  78:22  142:10
**adhere**  63:15
**administer**  23:13
**administered**  22:13
  24:3  25:19  26:13
**administering**  28:20
  29:4  36:1  44:12
**administration**  19:3
  21:4  26:18  27:24
  59:23  65:18  138:18
**administrative**  19:3
**Administrator**  13:5
**Administrators**  1:5
  18:2  51:7
**admissions**  34:6
**admit**  92:20
**admitted**  147:9
**ADOSSINO@GRSM.**
**COM**  3:15
**adverse**  55:10

**after-action**  111:15,
  21  112:8, 11  113:11
**after-incident**  134:10
  135:23
**afternoon**  146:11, 14
**agenda**  59:16
**aggregate**  105:3, 9, 17
**agree**  49:16  50:5, 9
  66:14  125:19  126:13,
  23  127:23  132:20
  138:11
**agreed**  7:3  48:9
**Agreement**  4:8  47:23
**aid**  73:5  126:15, 21
  128:16  142:5  144:5
**alert**  78:7, 16  89:4
**alerted**  89:11
**allegation**  138:5
**allow**  8:21  116:7
**allows**  131:11
**alongside**  94:9
**American**  53:7  63:1,
  7, 15
**analysis**  28:3
**and/or**  154:16
**Angel**  125:23
**Anne**  37:16
**announcement**  44:21
  49:21
**annual**  15:11  67:10
  73:13, 15
**annually**  39:3  57:15
**Answer**  5:3  8:21
  9:2, 7  10:4, 10, 16
  11:3  23:20, 24  24:22
  25:18  29:2  33:7
  40:17  49:2  53:10
  54:3  67:8  72:8  74:4
  75:22  83:9, 23  84:4
  85:9  86:16  87:1, 7,
  10  90:16  91:10
  92:14  93:3  96:22
  99:1  102:11, 14, 17
  104:6  105:6  107:15,
  21  111:1, 10  116:12
  117:11  118:12  119:9
  128:2, 19  129:9, 21
  130:14  139:15  140:6
  141:3  142:16  143:15

144:7, *16*  145:*3*
149:*1, 3*  151:8
**answering**  48:*20*
97:4
**answers**  8:*18*  153:6
**anticipated**  89:*19*
**anybody**  86:*3*  89:*23*
**anyway**  59:5
**APOLLON**  1:*10*
2:*19*  146:*13*
**appear**  61:*19*  69:*17*
**appeared**  133:*10*
**appears**  78:5
**apply**  148:*15*  154:*15*
**appointments**  107:7,
*19*  108:*4*
**approach**  130:*11*
**approaching**  35:*16*
**appropriate**  16:*10*
26:*4*  50:6, *14*  52:*4, 5,
7, 9*  66:*15*  72:5
74:*11*  87:22  90:7
**appropriateness**  55:*1*
85:5
**approve**  94:*13, 14*
**Approximately**  11:5
**April**  135:*3*
**ARCH**  2:*9*  3:*14*
**area**  23:8, *9*  45:2, *12,
24*  56:*13, 22*  57:9
69:*9, 11*  91:*18, 19*
92:8  95:*13*  103:*11*
133:*17*
**areas**  50:8  54:*18*
60:*4, 12, 14*  66:2, *17*
99:6  130:*24*  136:*17*
**arose**  22:*4*
**arrived**  28:5  133:9
**arrives**  74:*20*
**arriving**  95:8  133:*21*
**artful**  24:5
**articulate**  136:8
**ascertain**  65:*13*
**asked**  66:*3*  150:*1, 18*
**aspects**  19:*4*  35:*1*
54:22
**assaulted**  84:8
**assess**  38:*20*  67:*12,
20, 21*  84:*13*  91:*19*
102:*1*  103:*17*  107:*11,*

*14*  117:*18*  120:*15, 20*
122:*15*  128:7, *11*
140:*12*  142:*3*
**assessed**  88:*21*  89:*17*
**assessing**  69:*15*
80:*19*  82:6  83:5
94:*20*  110:*4, 5*  121:*5,
8, 13*
**assessment**  22:*18*
25:*10*  68:*10*  70:*17*
80:*1, 16*  81:*24*  83:*11*
96:*12*  143:7
**assessments**  95:*23*
96:5
**assigned**  18:*14*
28:*11, 14, 15*  48:6
77:*15, 17*  115:5
124:8  128:*10*  147:*10*
**assist**  79:7
**assistance**  16:*10*
71:*1, 8, 9, 16, 17*
74:*13, 16*  76:*4, 20*
80:*4, 9*  128:*12*
132:*13*
**assisting**  38:*16*
**Associate**  10:*23*
**Association**  53:7
63:*1, 8, 16*
**assume**  9:*3*  24:*15*
32:*13*  37:*19*
**assurance**  28:*3*  53:*19*
**attached**  153:9
**attend**  14:22
**attention**  29:*24*  30:6
58:8  68:*18*
**ATTORNEY**  2:*5, 11,
19*  3:8, *16*
**audio**  59:*1*
**audit**  27:*23*  108:22
114:*18*  115:6
**auditing**  38:*17*  98:*21*
**audits**  28:6  99:*3*
**authority**  79:*21*
80:*13*
**authorized**  125:*1*
**automatic**  104:*12*
**available**  95:*19*
116:*3*  130:*16*  131:8,
9

**aware**  24:*24*  36:*10*
51:*24*  113:*3*

**< B >**
**Bachelor's**  11:22
**back**  52:*3*  60:*16*
102:*1*  109:7  115:*24*
134:*15*  137:*3*
**background**  20:*23*
**backlogs**  41:5
**bad**  141:*13*
**base**  41:*13*
**based**  22:22  27:*10*
41:*11, 14*  53:*12*
57:*16, 17*  62:22
65:*21, 22*  67:*21*  68:9
70:*17, 19, 20*  79:*13*
80:7  81:5, *24*  82:7
83:*10*  88:8  93:*15*
95:2  97:*10*  98:*1, 6*
99:*20*  102:*3, 4*
104:*15*  107:*1*  109:*24*
113:*12*  114:*13*
122:*17*  123:2  124:*16*
127:8  129:*10*  131:*21*
132:6, *23*  138:*15*
140:*10*
**basic**  8:*12*  93:22
**basis**  28:*16*  30:6
33:5, *11*  70:*18*  71:6
80:2  99:7  116:*18*
130:5
**Bates**  64:*4*
**Bates-stamp**  47:*14*
**Bear**  37:2  47:*1*
62:*18*  112:*10*  126:7
**becoming**  14:*16*
**beds**  93:*17*
**began**  15:*4*
**beginning**  114:*4*
**begins**  61:*23*  64:*19*
76:*18*
**behalf**  1:*18*
**behavioral**  55:*4*
112:*16*  120:*4*
**believe**  12:*11*  21:*1*
30:*24*  32:8  57:*17*
65:*10*  67:*11*  74:*13*
88:5  92:*15*  97:23
98:6, *14, 17*  106:*24*

113:*13*  114:*16*
122:*18*  131:*20*  132:*3,
4*  135:7  139:*16, 17*
144:*17, 22*
**best**  27:9
**better**  29:*1*  38:5
64:*13*
**beyond**  82:*1*
**bigger**  125:*15*
**bit**  13:*18*  27:5  54:2
56:6  148:22
**BLAIR**  1:*11*  3:9
149:*23*  150:*13*
**BLANCH**  1:*18*
**BLANCHE**  1:*9*  2:*11*
4:*3*  7:*10, 23*  10:*3*
11:*4*  53:*11*  54:2
56:*18*  58:*17*  85:*10*
91:*10*  138:*19*  151:22
**B-L-A-N-C-H-E**  7:*23*
**blind**  130:*19*
**BLOODSAW**  1:*11*
3:*16*  133:9, *14, 17*
**Board**  124:2, *3, 12*
125:8
**body**  53:*14*  62:9
70:8  71:*13*
**bottom**  38:*11*  60:*21*
61:8, *17*  64:2  89:*17*
114:6  133:8
**BOULEVARD**  3:*6*
**box**  71:*21*
**Brad**  84:*17*
**breach**  127:*24*
128:*16*
**break**  9:*4, 5, 8*  14:*14*
59:*3*  75:6  136:*19*
**BRET**  2:*3*  7:*18*
10:8  16:*19*  23:*20*
33:*17*  91:9  136:*23*
150:*1*  151:*14*
**BRETGROTE@ABO
LITIONISTLAWCEN
TER.ORG**  2:5
**brief**  59:8
**Brill**  1:*20*  154:*3, 6*
**bring**  19:*16, 22*  58:7
**bringing**  100:*4*
112:*1*  123:*13*

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 49 of 75

Deposition of Blanche Carney                                 Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**brings** 29:*18*
**broad** 140:*16*
**broadly** 33:*16* 90:*19*
**broadness** 96:*21*
**brought** 29:*24* 30:*5*
68:*17* 123:*20* 127:*14*
136:*2*
**Bruce** 20:*18*
**brush** 140:*17*
**Bryn** 12:*2*
**bunk** 89:*16, 20*
**Business** 21:*3*

**< C >**
**C/O** 138:*7, 8, 9, 10*
**CABELLOS** 1:*11*
3:*9* 149:*23*
**calendared** 57:*13*
**call** 29:*10* 32:*4, 6, 9*
33:*1* 45:*5, 8, 10*
51:*20, 21* 52:*2* 55:*7*
58:*21, 24* 70:*3, 23*
71:*4, 8, 16* 74:*12, 15*
79:*6, 22* 80:*5, 11, 13,*
*23* 81:*6, 9* 97:*21*
117:*17* 133:*24*
144:*19*
**called** 69:*19* 72:*1*
78:*8* 100:*22* 132:*13*
**calling** 19:*14* 69:*15*
76:*19* 117:*16* 150:*20*
**calls** 44:*23* 142:*18*
**campus** 83:*4, 14*
**capacity** 88:*6*
**captains** 14:*7*
**captures** 34:*5*
**card** 89:*5, 9, 12*
**care** 15:*13, 16, 21*
16:*1* 22:*13* 23:*10*
30:*1* 38:*22* 39:*21*
40:*1, 6, 9* 41:*21*
42:*12, 15* 43:*9, 13*
44:*9, 12, 19* 53:*6, 24*
54:*12, 22, 23, 24* 55:*2,*
*3, 7, 9* 58:*9, 11* 59:*24*
61:*24* 62:*5, 8* 63:*4, 7*
64:*9, 20* 67:*18* 68:*7*
69:*11* 73:*21* 81:*16*
84:*13, 15* 85:*4, 5*
87:*23* 91:*4* 92:*9, 21,*

*22, 23* 93:*1, 10, 12, 16,*
*19, 22, 23* 96:*9* 98:*3*
102:*2* 106:*22* 135:*16*
150:*10* 151:*5, 10*
**careers** 14:*23*
**CARNEY** 1:*9, 18*
2:*11* 4:*3* 7:*10, 18, 23*
10:*22* 37:*11* 113:*24*
137:*15* 138:*19*
146:*11* 149:*21*
151:*18, 23*
**C-A-R-N-E-Y** 7:*24*
**carried** 14:*2, 4* 18:*1*
27:*6*
**carries** 121:*22*
**carry** 27:*24* 28:*9*
122:*4* 143:*20*
**carrying** 48:*7*
**case** 22:*6* 34:*7, 16*
43:*16* 57:*15* 85:*13,*
*14* 100:*6* 105:*10, 14*
108:*6* 111:*8* 113:*21*
115:*8* 124:*6, 11*
125:*10* 126:*2, 4*
127:*3* 132:*8* 135:*5, 8,*
*14*
**case-by-case** 70:*18*
71:*6* 80:*2* 106:*19*
129:*19, 22* 130:*4, 11*
**case-related** 21:*12*
**cases** 109:*19* 110:*1*
122:*7* 129:*11*
**catch** 47:*7*
**caught** 49:*6*
**caused** 132:*21*
**caveat** 9:*6*
**cell** 45:*14* 72:*4, 6*
78:*20* 79:*1* 133:*10,*
*13, 14, 16, 21* 137:*12*
**cells** 76:*8*
**CENTER** 2:*3, 17*
24:*2* 132:*12*
**certain** 18:*8* 26:*9*
32:*11* 34:*11* 35:*1*
86:*18* 92:*21* 96:*15*
102:*21* 118:*10*
122:*16* 131:*13*
**certainly** 36:*23*
61:*17* 77:*11* 141:*14*

**certainty** 98:*17*
107:*15*
**certification** 7:*5*
154:*15*
**certified** 53:*13* 67:*22*
71:*12*
**certify** 10:*15* 153:*4*
154:*4*
**certifying** 154:*17*
**CFCF** 24:*1* 95:*5, 9,*
*10*
**chain** 18:*3*
**chaired** 124:*3*
**challenge** 27:*15*
**challenges** 35:*18*
90:*13, 20* 92:*10, 17,*
*24* 93:*8*
**challenging** 92:*16, 17*
**chance** 133:*1*
**change** 44:*6* 104:*9,*
*14* 147:*6* 152:*5*
**changed** 103:*18, 24*
105:*12* 117:*24*
120:*16* 122:*16*
**changes** 147:*8* 153:*8*
**charge** 18:*8*
**charges** 123:*13, 19*
124:*12, 14* 127:*13*
**chart** 40:*1* 86:*20*
**check** 6:*22* 24:*14*
43:*5* 78:*9*
**checking** 74:*14* 76:*8*
**checks** 26:*23* 27:*4*
**chest** 84:*6*
**Chief** 20:*8, 13, 16*
26:*22* 55:*18*
**chronic** 28:*19* 29:*3,*
*7* 40:*1, 9* 42:*15* 54:*9*
55:*8* 61:*24* 94:*2*
**circumstance** 106:*5*
**circumstances** 45:*17*
68:*24* 69:*22* 70:*2*
90:*6* 103:*22* 118:*24*
129:*19*
**CITY** 1:*9* 2:*9, 12*
7:*21* 11:*10* 37:*15*
50:*12* 63:*3, 20* 66:*13,*
*20, 22* 67:*5, 9, 11*
82:*18, 20* 125:*20*

132:*20* 137:*10* 138:*4*
**city's** 49:*22* 61:*20*
**civilian** 14:*9, 21*
18:*4* 50:*20, 23* 51:*8,*
*12, 14, 17*
**civilian-contracted**
51:*15*
**clarification** 28:*17*
84:*18*
**clarifier** 92:*4*
**clarify** 71:*7, 17, 23*
81:*14* 88:*11*
**clear** 23:*24* 69:*16*
106:*12* 127:*12*
**clients** 68:*6*
**clinical** 21:*11* 22:*8,*
*17* 34:*20, 21* 44:*14*
54:*8, 11* 67:*22* 68:*9*
83:*11* 94:*18*
**clinically** 36:*19*
**clinician** 80:*17*
**clinicians** 146:*19, 20*
**clinician's** 22:*22*
**closely** 13:*7*
**closes** 147:*12*
**cloud-based** 131:*12*
**collaboration** 20:*3*
94:*7*
**colleagues** 136:*20*
**come** 38:*20* 76:*15*
79:*6, 8* 91:*19, 23*
94:*9* 109:*7* 117:*1*
133:*12* 137:*2*
**comes** 35:*5* 116:*17*
**comfortable** 11:*3*
**coming** 9:*20* 31:*24*
48:*21* 49:*8*
**command** 18:*3*
**commands** 69:*16*
70:*7, 12* 71:*2, 4*
**commencing** 1:*19*
**Commission** 62:*4, 7*
63:*6*
**COMMISSIONER**
1:*9* 2:*11* 11:*13, 15*
12:*9* 13:*5, 12, 13, 23*
14:*17* 17:*5, 6, 8, 13,*
*16, 19* 18:*7, 24* 19:*2,*
*9, 12, 24* 22:*11* 26:*16*
28:*8, 22* 29:*5* 39:*7*

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 50 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

43:*16*, *21*  46:*12*
62:*15*  65:*9*  81:*13*, *20*
82:*15*  83:*16*  87:*24*
88:*14*  90:*11*  92:*19*
98:*20*  101:*9*  102:*20*
106:*8*  109:*3*  112:*20*
113:*1*, *3*  116:*8*  118:*8*
123:*4*  124:*4*, *18*, *24*
129:*2*  134:*18*, *22*
137:*15*  138:*19*
139:*11*  144:*4*, *12*
149:*21*  151:*1*
**Commissioners**  14:*3*
17:*11*  18:*10*, *15*
108:*17*  109:*21*
112:*17*
**Commonwealth**
154:*3*, *10*
**communicate**  133:*11*
**communicated**  86:*4*
**communications**
150:*8*  151:*3*
**communicative**  89:*3*
**compare**  101:*3*
**complement**  75:*14*
**completed**  45:*23*
78:*4*  131:*5*
**completely**  88:*4*
**completion**  123:*23*
**compliance**  30:*16*
35:*13*  36:*14*  65:*17*
66:*23*  108:*19*  109:*2*
116:*21*  120:*24*  121:*4*,
*7*  122:*1*, *10*  124:*1*, *11*
125:*5*  136:*9*
**complied**  53:*15*
**compound**  75:*5*
**comprehensive**  13:*19*
**concerned**  81:*1*
139:*11*  151:*5*
**concerns**  90:*24*
**concert**  67:*2*
**concluded**  134:*23*
151:*23*
**conclusion**  126:*9*
133:*1*  137:*23*
**condition**  16:*17*
**conditions**  16:*14*
17:*1*  50:*24*  59:*20*
83:*19*

**conduct**  75:*24*
119:*18*
**conducted**  99:*17*
119:*16*  121:*15*  125:*6*
**conducting**  68:*12*
**conducts**  100:*2*
**confer**  135:*9*  136:*20*
**confidential**  23:*12*
26:*5*  91:*20*  92:*8*
**confirm**  95:*20*
**confirmed**  89:*1*
**consider**  93:*9*  146:*19*
**consist**  100:*7*, *9*
**consistent**  48:*8*  53:*6*
55:*12*  63:*5*  117:*15*
118:*2*  135:*11*
**consistently**  145:*15*
**Consultants**  37:*12*
**contact**  21:*14*  52:*15*
**contains**  139:*20*
**contraband**  142:*4*
**contract**  14:*10*  20:*7*
48:*4*, *6*  51:*11*  63:*22*
130:*19*  131:*21*, *23*
**contracted**  16:*2*  18:*5*
20:*5*, *12*  38:*18*
**contractor**  21:*8*
63:*20*
**control**  55:*6*  62:*23*
154:*16*
**controlled**  39:*22*
**conversations**  9:*18*
42:*5*  43:*5*  135:*5*
**converse**  20:*9*  43:*10*
57:*23*  85:*12*  135:*9*
**conversing**  42:*6*
**convey**  56:*4*, *10*
**conveyed**  52:*1*
**copy**  6:*14*, *18*
**Corizon**  4:*14*  43:*22*
44:*7*  48:*1*, *4*, *9*  51:*12*
60:*19*, *23*  63:*2*  66:*11*,
*13*, *14*  150:*4*, *9*  151:*6*
**Corizon's**  61:*19*
**CORP**  1:*9*  3:*8*
**Correct**  21:*5*  25:*6*
37:*4*, *5*  72:*22*  89:*22*
95:*2*  113:*5*, *6*  115:*14*
122:*11*, *12*  123:*17*

127:*16*, *20*  134:*5*, *9*,
*19*  153:*5*
**correction**  70:*12*
96:*7*
**correctional**  12:*19*
13:*8*  14:*9*  15:*2*  16:*7*,
*15*, *20*  18:*4*  31:*1*, *15*,
*17*  32:*21*  37:*11*
44:*11*, *23*  45:*16*
46:*13*  50:*6*, *14*  51:*6*,
*18*  52:*4*, *7*, *9*  62:*3*, *4*,
*7*, *11*  63:*6*  66:*15*
70:*2*, *21*  71:*11*, *19*
74:*23*  75:*15*, *16*, *17*
78:*2*, *21*  80:*12*, *16*
81:*1*  89:*13*  90:*14*
95:*12*  96:*16*  103:*10*
130:*21*  131:*15*  133:*9*
148:*16*
**corrections**  9:*23*
19:*16*, *22*  73:*4*  74:*8*
79:*21*  87:*16*  91:*5*
126:*13*  139:*12*
145:*18*  153:*7*
**correction's**  69:*12*
**corrective**  114:*10*
**correctly**  12:*10*  16:*6*
17:*9*  21:*2*  74:*14*
98:*15*
**correlate**  64:*4*
**counsel**  7:*3*, *19*
47:*10*  64:*6*
**count**  126:*14*
**counted**  77:*17*
**counts**  97:*19*
**couple**  35:*20*  48:*18*,
*19*  49:*4*  60:*17*  108:*2*
149:*16*
**course**  23:*1*  28:*12*
46:*9*  75:*23*
**COURT**  1:*2*, *21*  6:*4*,
*10*, *15*, *20*  8:*15*, *22*
19:*2*  30:*4*  48:*17*
113:*20*  148:*6*  154:*3*,
*6*
**COVID**  90:*12*, *23*
125:*21*
**COVID-related**  90:*23*
**CPR**  73:*5*, *12*, *23*, *24*

74:*9*, *10*, *16*
**create**  55:*19*
**creating**  57:*12*
121:*12*
**crisis**  142:*24*
**critical**  112:*12*, *22*
145:*23*
**cues**  71:*13*, *14*
**culture**  139:*12*, *17*
140:*3*, *22*  142:*11*
**current**  10:*22*  46:*4*
102:*4*  110:*14*  147:*3*,
*4*, *13*  148:*12*, *14*, *24*
**currently**  9:*22*  10:*6*,
*11*
**custody**  99:*15*, *20*
102:*23*  103:*20*
104:*14*  105:*3*  107:*8*
110:*10*, *17*  112:*7*
113:*4*  119:*15*  121:*19*,
*21*  129:*7*  135:*12*
147:*9*, *23*
**cut**  56:*6*
**cutting**  48:*15*

**< D >**
**daily**  21:*9*, *10*  27:*16*
28:*16*  30:*6*  33:*5*, *10*
34:*2*  36:*8*  99:*6*
**date**  1:*20*  153:*15*
**dated**  134:*21*  154:*11*
**day**  27:*12*  34:*12*
45:*19*  135:*1*
**dead**  137:*13*
**deaf**  130:*18*
**deal**  119:*10*  129:*17*
**deals**  66:*23*
**dealt**  130:*4*
**death**  99:*16*, *20*
100:*11*  101:*17*, *24*
102:*22*  103:*19*  106:*5*
110:*15*  111:*12*, *23*
112:*5*, *6*  113:*4*
121:*18*, *20*  125:*23*
132:*9*, *19*, *21*  134:*11*
135:*8*
**deaths**  55:*11*  99:*14*
105:*2*  106:*9*  110:*9*,
*16*  119:*15*  129:*6*

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 51 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

decedent  106:22
107:6
December  137:13
decides  87:12
decision  94:5  124:13
decisions  87:17, 18
88:22  89:21
decompress  136:16
decrease  142:3
de-escalation  142:24
defend  127:18
DEFENDANT  2:19
Defendants  1:12
2:11  3:8, 16
defer  28:4  66:7
85:24  86:18  102:16
108:7
deficiencies  84:16
definitely  52:11
94:19  150:23
degree  62:22
delegated  28:9, 10, 14
deliver  16:1, 3  41:21
42:7  43:2, 13  92:7
delivered  51:9  56:14,
24  67:2  92:3  93:23
delivery  15:20  38:22
41:24  43:9  54:19
62:11  68:7  93:12
demise  103:7  110:7
dental  55:5
departed  145:13
DEPARTMENT  1:10
2:9, 12  8:7  11:11
12:16  13:16  14:23
17:22  19:4, 19, 21
20:6  22:9, 12  38:22
66:22  72:19, 24  73:2
82:22  85:2  108:24
141:15
departmental  139:23
depend  106:19
depended  22:5
23:10  122:6
dependent  71:14
75:9  108:5  143:19
depending  23:14
24:1  34:11  36:18
45:18  68:23  73:15

110:14
depends  81:6  125:4
DEPONENT  153:1
deposition  1:17  5:1
8:2, 11  9:12, 15
151:22
deputies  18:12
Deputy  13:5  14:3, 7
17:6, 7, 11, 16, 19
18:7, 10, 14, 23  19:2,
8  108:17  109:21
112:17  124:4, 7
125:9
describe  33:13  90:20
133:18
described  52:19
115:13  134:4
describing  43:17
53:22
Description  4:8
designate  122:3
designated  23:9
91:18  92:7  93:18
125:10
designed  96:24
designee  119:18
125:3
designees  109:22
desk  131:4
despite  41:5
Detention  24:2
132:11
determination  87:20
95:1, 3
determine  10:18
27:14  56:1  70:13
96:18  99:10  101:15
104:18  117:7  122:20
139:9  140:2
determined  67:23
89:16  93:16, 24
determines  25:13
35:22  124:13
determining  67:6
76:3  80:18  105:11
121:8
develop  114:9
developing  62:21
diabetes  22:13  39:22
40:5  44:9, 12, 20

46:15  50:9, 16  53:7,
24  54:10, 12  63:1, 7,
16  64:9, 19, 21, 23
66:18  67:17
diabetic  23:3  25:19
67:24  68:8  132:21
diabetics  41:4, 8
68:20
diagnosis  22:22
diagnostic  55:10
died  134:18
difference  146:20
differences  105:10
different  29:18
40:22  41:2, 10  95:15
101:1  106:3  116:4,
23  117:20  119:21
120:23  121:2  141:7
direct  13:9  18:22
21:15  42:11  51:10
52:12, 13  150:7
154:16
directed  29:13, 14
37:16
Direction  5:3
directives  51:22
directly  150:21
Director  10:23  86:13
108:18  109:1  121:24
disabilities  88:16, 17,
21, 24  89:3, 15
disability  88:10  89:8
90:2
disciplinary  115:16,
18, 22  116:15  119:2,
11  123:19  124:16
138:16
discipline  123:21
124:23  125:2, 11
127:6, 10  139:17
disciplined  116:1
discovered  137:12
discuss  41:24  43:8,
14  58:5  85:16  110:1
111:16  112:2  136:3,
18
discussed  33:1  42:3
55:20  96:10  134:7
discussing  68:19
146:24

discussion  49:11
146:17  147:1
discussions  87:19
106:20  150:14  151:3
disease  55:9  62:22
diseases  54:9
dismissed  124:15
disobedient  70:14
dispositions  116:2
distinct  18:9
distinction  51:16
70:16
distributed  18:11
distribution  97:22
DISTRICT  1:2
division  17:22  18:18,
19, 22  108:22  114:19
115:6
divisions  18:13, 15
19:5
DOC  52:18
doctor  20:24  38:19
document  8:24
24:19  27:3  30:17
33:22  37:3, 8, 10, 23
47:6  52:3  60:18
98:11  113:16, 22
114:22  115:13
documentation  24:16
32:5  35:8  83:3
documented  24:9, 10,
13  25:14  26:8, 10, 14
30:21  31:11  32:7
33:20  35:8  40:9
42:4, 16  98:4
documenting  31:4
41:10  79:5  83:1
Documents  5:7
68:11  87:9  114:23
doing  52:11, 13  81:2
96:5  105:19  115:2
118:23, 24  119:23
129:24  135:10  140:9,
15
dose  36:24
doses  30:11  36:3, 5,
11, 17, 20
DR  3:9  20:18, 19, 22
27:9, 13, 24  29:13, 14
38:12, 14, 19  39:12

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 52 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

40:*11*  41:*16, 17*  42:*7, 18*  43:*4, 18*  53:*22*  55:*18*  57:*10, 22*  59:*13*  60:*10, 14*  63:*19*  66:*7*  68:*15*  85:*11*  86:*1, 3, 19, 22*  100:*3*  101:*17, 18, 20*  102:*16*  108:*7, 14*  109:*19, 22*  112:*16*  149:*22*  150:*3, 12*  151:*3*

**drag**  133:*13*
**driver**  98:*9*
**due**  90:*23*  93:*8*
**duly**  7:*11*
**Durham**  138:*9*
**duties**  14:2  28:*11, 14, 15*  34:*13*  45:*18, 22*  46:*4*  75:*24*  76:*14, 24*  77:2  129:*1*  130:2  131:*14*  133:*22*  139:*24*
**duty**  23:*1*  141:*16*

**< E >**
**ear**  130:*18*
**earlier**  61:*21*  79:*10*  96:*10*  134:*7*  146:*16, 24*  150:2
**early**  131:*22*
**easier**  14:*13*  42:*6*  91:*22*  92:*4*
**EASTERN**  1:2
**educate**  35:*17*
**educating**  30:*14*
**education**  11:*21*  29:*20*
**educational**  11:*19*
**effective**  67:*6*
**effectuate**  15:*20*
**Eight**  11:*16*
**either**  45:*1, 11*  70:*4, 8*  88:*24*  124:*7, 21*  145:*6*
**elaborate**  13:*17*
**Electronic**  6:*8, 14, 18, 23*  24:*11*  25:*11*  26:*10*  31:*5*  34:*19*  35:2
**emerged**  106:*8*

**emergencies**  15:*17*  69:*13*  74:*24*  75:*5, 19*  76:*12*  77:2  78:*3*
**emergency**  15:*16*  16:*6*  69:*3, 5, 6*  70:*24*  71:*18*  73:*21*  76:*16*  78:*9*  80:*14*  81:*18, 19*  82:*12, 17*  83:*6, 18*  84:*14*  85:*1, 7*  96:*9*  144:*5*
**emergent**  15:*21*  81:*16*
**employed**  9:*23*  10:*6, 11*  11:*9*
**employees**  51:*12, 15*  72:*18*  134:*8*
**employment**  10:*1*  11:*18*  12:*8, 13, 24*  15:*9*  16:*23*
**empowered**  81:*3*
**enable**  74:*22*
**encompass**  42:*9*  59:*17*
**encompasses**  14:*24*  60:*4*
**encompassing**  57:*8*  121:*11*
**encounter**  16:*8*  77:*4*  118:*19*
**enforcement**  12:*21*
**engage**  22:*20*  27:*14*  29:*19, 22*  30:*12*  35:*14, 17*  36:*24*  44:*14*  45:*24*  79:2  129:*15*
**engaged**  69:*20*  103:*10*  109:*14*  120:*1*
**engagement**  20:*10*  30:*13*  36:*7, 13*  52:*13*  59:*19*  72:*14*  103:*3*  104:*12*  120:*10*  131:*13*
**engagements**  21:*10*  30:*1*
**engaging**  76:2  131:*20*
**enhance**  141:*10*  143:2
**enlarge**  64:*10*  125:*16*

**ensure**  34:*21*  51:*9*  66:*20*  91:*2, 24*  92:2  93:*11*
**ensuring**  26:*17*  44:*16*  63:*20*  114:*10*  128:*10*
**entails**  57:*7*
**enter**  25:*10*  34:*21*  47:*13*  98:*7*
**entered**  32:*18, 21*  34:*14*  98:*16*  99:*8*
**entering**  97:*5*  98:*22*  99:*4*
**entire**  20:*19*  104:*9*  139:*8*  141:*14*
**entirety**  41:*7*
**entity**  48:*5*
**entry**  98:*1*
**environmental**  55:*5*
**episodic**  29:*9*
**ER**  85:*22, 24*
**Errata**  153:*9*
**error**  117:*24*
**escalated**  82:*9*
**escalates**  82:*1*
**escort**  91:*15, 17*  92:*6*
**escorted**  44:*17*  45:*1, 12*
**ESQUIRE**  2:*3, 5, 16*  3:*1, 13*
**establish**  62:*16*
**establishes**  62:*10*
**estate**  7:*20*
**Estates**  1:*5*
**evaluate**  102:*9*
**evaluations**  55:*8*
**everybody**  6:*18*  37:*7*  47:*15*  143:*12*
**exact**  39:*5, 10*
**exactly**  64:*15*  131:*24*  135:*11*
**EXAMINATION**  4:*5*  7:*14*  146:*8*  149:*18*
**examined**  7:*11*
**example**  100:*21*
**Excel**  114:*17, 22*
**exclusive**  32:*8*
**excuse**  51:*8*  65:*4*  85:*14*
**executed**  47:*23*

**Executive**  100:*5*  109:*24*  135:*9, 13*
**exhibit**  47:*13*
**Exhibit-1**  4:*8*  47:*17*
**existing**  90:*9*
**exit**  133:*16, 17*
**expectations**  55:*20*  142:*21*  143:*21*  145:*9*
**expected**  32:*20, 23*  33:*24*
**experience**  10:*19*  19:*15, 17, 20*
**experiencing**  69:*2, 4*  70:*24*  76:*16*
**explain**  18:*17*  81:*8*
**explaining**  105:*8*
**express**  136:*16*
**extensive**  14:*12*
**extent**  63:*10*  68:*1*  69:*14*  74:*3*  150:*20*
**external**  121:*9*
**eye**  130:*19*

**< F >**
**facet**  119:*24*
**face-to-face**  89:*13*
**facilitated**  44:*19*
**facilities**  13:*15, 20, 23*  14:*5*  18:*8, 16*  21:*16*  28:*21*  93:*20, 23*  138:*17*  143:*18, 24*
**facility**  14:*5*  23:*9, 15*  42:*10*  81:*23*  84:*20*  90:*8*  99:2  119:*14, 17, 20*  120:*7, 8, 14, 20, 22*  121:*6, 15*  124:*8*  125:*7, 11*  145:*24*  147:*18*  148:*8*
**facility's**  23:*11*
**fact**  26:*12*  105:*24*
**factors**  24:2
**facts**  104:*3*
**failed**  126:*21*  130:*3*
**failing**  127:*22*  128:*15*  129:*4*
**failures**  28:*20*  29:*4, 7, 9*
**fair**  28:*7*  77:*4*  78:*17, 18*  110:*19, 20*  132:*1*  150:2

familiar 8:*10* 32:*12*
37:*23* 86:*23* 100:*22*
far 6:*18* 102:*1*
115:*24* 148:*11*, *13*
fast 49:*24*
fellow 78:*6*
felt 60:*10*
few-minute 59:*3*
field 9:*23* 19:*15*, *21*
fight 84:*7*
file 34:*16* 107:*3*, *10*
filed 113:*20*, *22*
files 85:*13*
filing 7:*4*
fill 30:*20*
filled 65:*5*, *11*, *23*
88:*4*
finding 123:*12*, *20*
126:*16*
Findings 39:*16*, *17*
123:*1*, *7*, *9* 126:*24*
fine 118:*20* 149:*4*
finish 8:*18*, *19* 46:*8*
finished 114:*8*
126:*10*, *11* 133:*4*
finishes 138:*2*
finishing 23:*21*
first 7:*11* 12:*14*
37:*22* 47:*3*, *21* 74:*12*,
*15* 88:*13* 95:*8*
126:*15* 134:*15*, *16*
firsthand 71:*20* 80:*7*
five 13:*23* 136:*24*
flag 35:*22* 36:*12*
135:*17*
flat-out 140:*15*
FLOOR 2:*9* 72:*4*
flow 142:*3*
focusing 120:*3*
folks 34:*23*
follow 45:*17* 62:*15*
96:*9* 139:*19* 151:*15*
followed 40:*15*
43:*19* 119:*7* 135:*18*
following 43:*4* 50:*8*
66:*17* 71:*2*, *3* 116:*22*
118:*4*, *9* 119:*5* 139:*7*,
*13* 140:*3*, *23*
follows 7:*12*

foregoing 153:*4*
154:*4*, *15*
form 7:*7* 21:*22*
30:*17*, *23* 31:*8* 32:*5*
40:*17* 53:*9* 63:*9*
67:*8* 75:*21* 83:*9*
85:*8* 86:*15*, *24* 92:*13*
93:*3* 98:*8* 109:*10*
114:*21* 122:*13*
135:*20* 153:*8*
formal 49:*21* 68:*6*
formalize 56:*16*, *21*
115:*2*
formally 114:*14*
115:*5*
format 100:*17*, *19*
101:*6* 116:*4*
FORMER 1:*9*
forms 25:*21* 35:*6*
forth 154:*6*
forward 50:*1*
forwarded 58:*24*
found 29:*3* 39:*24*
41:*13* 123:*15* 126:*14*,
*20*, *22*
foundation 62:*20*
frame 101:*23*
FRASIER 1:*11* 3:*16*
free 151:*19*
frequencies 66:*24*
frequency 25:*5* 92:*23*
frequently 15:*7* 27:*7*
33:*21* 57:*11* 86:*5*
full 6:*9*, *19*, *23* 124:*2*,
*3* 125:*8* 132:*16*
138:*24*
fully 123:*15*
further 40:*21* 81:*4*
146:*3* 149:*6*

**< G >**
Gabellos 150:*13*
gain 36:*14*
gained 19:*20*
GARDEN 2:*4*
garnered 66:*9*
GAY 1:*10* 3:*9*
149:*23* 150:*13*
GENA 1:*11* 3:*16*

general 13:*1* 41:*18*
43:*19* 60:*1* 75:*8*
88:*13*, *19*
generally 13:*21*
33:*20* 40:*4* 44:*21*
68:*24* 97:*11*
generate 100:*13*
generates 79:*15*
generating 79:*16*
getting 31:*3* 43:*17*
60:*8* 88:*3* 145:*15*
give 9:*11* 10:*3*, *12*
35:*3* 37:*21* 67:*19*
100:*21* 133:*1* 136:*15*
140:*12*
given 8:*1* 45:*1*
50:*22* 51:*7* 74:*10*
153:*6*
giving 50:*23* 60:*5*
65:*23* 69:*16* 70:*6*, *9*
71:*10*
glean 104:*21* 110:*2*
gleaning 105:*22*
glucose 23:*5* 24:*8*,
*13*, *19*
go 8:*12*, *20* 11:*18*
34:*13* 39:*15* 40:*2*
42:*6* 44:*17* 53:*4*
60:*16* 62:*24* 65:*2*, *10*
79:*1* 94:*19* 99:*7*
102:*1* 113:*15* 130:*22*
134:*15* 137:*21* 138:*3*
142:*10* 151:*19*
goes 35:*15* 83:*4*
96:*18*
going 6:*6*, *11* 8:*10*,
*11*, *20* 9:*2* 10:*9*
11:*17*, *18* 16:*18*
23:*12* 31:*19* 34:*15*
37:*2*, *6*, *21*, *24* 43:*13*,
*14* 45:*4*, *11*, *20* 46:*8*
47:*2*, *3*, *12* 49:*24*
56:*20*, *22*, *23* 59:*17*
60:*16* 63:*4*, *24* 70:*5*
71:*8*, *16* 76:*7* 80:*6*
84:*5*, *17* 87:*10* 93:*2*
96:*21* 113:*16* 114:*2*,
*6* 125:*12*, *13* 132:*17*,
*24* 136:*10* 137:*8*, *19*
143:*10*, *11* 149:*24*

Good 7:*17* 9:*8*
16:*21* 38:*7* 146:*11*
GORDON 3:*13*
138:*7*
GPS 130:*20* 131:*1*, *2*,
*10*
Graduate 12:*3*
greater 93:*10*
GROTE 2:*3* 4:*6*
7:*16*, *18* 10:*14*, *20*
11:*7* 16:*21*, *22* 23:*22*
25:*4* 33:*8*, *18* 37:*6*, *9*,
*14*, *18* 40:*23* 47:*9*, *20*
48:*13* 49:*7*, *14* 53:*16*
54:*6* 57:*2* 59:*11*
61:*6*, *10*, *16* 63:*13*, *24*
64:*7* 67:*15* 72:*10*, *16*
74:*6* 76:*5* 83:*15*, *24*
84:*10*, *21*, *23* 85:*18*
86:*21* 87:*3*, *11* 90:*18*
91:*12* 92:*18* 93:*7*
97:*7* 99:*12* 102:*19*
104:*17* 105:*15*
107:*24* 111:*5*, *20*
117:*5* 118:*6*, *16*
119:*13* 122:*14* 128:*4*,
*21* 129:*14* 130:*6*
131:*17* 135:*21*
136:*19*, *24* 137:*7*
140:*1*, *20* 141:*19*
143:*5* 144:*2*, *10*, *24*
145:*20* 146:*3* 151:*16*
ground 8:*12*
group 110:*16*
Guardian 130:*20*
131:*10*, *19* 141:*5*, *21*
guess 35:*24* 44:*5*
60:*7* 80:*21* 81:*15*
118:*17*
guidance 16:*9* 19:*11*
74:*9* 78:*21*
guidelines 54:*8*, *11*
62:*1*, *10*, *20* 63:*12*, *14*

**< H >**
half 11:*6*
hand 136:*13*
handle 73:*1* 141:*11*
handled 19:*3*

Deposition of Blanche Carney

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

happen 23:6, 7, 8
69:1 99:14
happened 85:21, 23
110:10 113:4 121:8
131:24 150:15
happening 48:24
58:19 66:21 69:7
78:8 129:17
happens 19:11 40:8
68:24
head 8:15 97:18
126:14 134:12 146:2
Health 4:14 48:1
54:22 55:4, 7 60:19
62:5, 7 63:7 66:11
77:23 87:14 88:2
90:1 92:23 93:11
103:4 112:16 120:4
147:18 148:1, 8
healthcare 62:3, 11
Health's 60:23
hear 125:10
heard 54:1 124:6, 8
125:9
hearing 124:2, 3, 10
125:8 127:17
hearing-impaired
89:7, 10
hearings 115:22
hears 124:12
held 13:1 49:11
124:10
help 72:1 117:17
helpful 75:1 76:22
Herdman 20:18, 20
27:9, 13, 24 29:13, 15
41:18 42:8, 18 43:4
55:18 57:10, 22
59:13 60:10, 14
63:19 66:8 68:16
85:11 86:1, 3 100:3
101:18, 19, 20 102:16
108:8, 15 109:20, 22
112:17 150:3 151:4
Herdman's 20:22
53:23
hereinbefore 154:6
Herman 86:19
hierarchy 86:8

higher 92:22 94:1
96:8
higher-acute 93:18
highest-ranking
86:10 87:5
highlighted 50:3 51:1
Hill 138:7
HIPAA 96:3, 4
history 11:18, 19
12:8, 13 14:16 34:18
35:3 65:3 102:2
hit 131:1
hold 21:9 47:5
hospital 81:12, 14, 17,
19 82:5 148:1
hospitalizations 82:16
housed 103:11
housing 34:1 45:7
52:21 75:2, 8, 10
76:1, 7 77:19 79:14
87:21 90:3 93:1
94:10, 15 129:5
130:24 131:16
132:11 133:17
138:13 139:4 144:13
145:22
How's 64:12 73:14
Human 13:4 18:1

< I >
identification 47:18
147:5
identified 57:6
109:19, 22 114:18
124:9 140:11
identify 28:19 74:23
77:1, 8 105:4 116:9
119:4
identifying 75:4, 18
76:11
idly 141:12
ill 132:12
impact 121:9
impaired 89:7
implement 41:22
implementations 43:9
implemented 114:11
132:1, 4 142:23
implying 136:12

importance 29:20
30:15
important 75:4 76:10
impose 125:1
imposed 115:20
123:22 127:6
improved 64:20
Improvement 53:19
54:15, 16, 17, 18
55:14, 17
incarcerated 13:10
16:4 34:5 52:22
69:2, 24 72:3, 15, 20
75:10 78:6, 10, 19
81:2, 11 87:13
100:12 103:6 108:10
133:11, 12, 13, 15, 23
134:2
incarceration 34:18
102:4 147:3, 4, 13
148:12, 14
incident 105:13
112:12, 19, 22 117:22
121:17 137:14 139:4
140:10, 17 145:23
incidents 140:14
include 54:8 123:6
150:12
included 52:24
includes 54:10 66:18
including 54:23
55:11 115:16
inclusive 25:9
incoming 51:23
incorporate 57:5
increase 141:10
increased 143:23
increasing 141:8
in-custody 106:9
111:23
in-death 135:12
independent 74:17
136:14
INDEX 5:1
indicates 69:18
indicating 98:8
indications 140:13
individual 22:20, 24
27:1 29:19 30:14
31:24 35:4, 17 36:6,

24 67:23 68:6 69:4,
11, 16, 17 70:4, 7
72:15 75:20 78:6, 11
79:2 83:12 86:11
87:4, 22 89:1, 6 90:9
91:16 96:6 100:6, 12
103:3 105:14, 20
106:2, 6 110:3 112:3
115:8, 17, 19 116:17
117:1, 9, 18 118:5
119:2 120:2, 5 122:8
129:18 131:3 132:10
individualized 62:21
individuals 31:22
34:5, 8, 15, 24 38:18
44:24 45:1, 9 46:1,
11 68:19 70:19
75:10, 12, 13 77:15,
16 78:13, 16 79:17
91:2, 15, 16 94:16
99:10 116:18 124:5
128:9, 10 133:23
134:2 136:1, 2, 11
139:6, 18 140:11
145:17
individual's 35:13
110:7
infection 55:6
inferring 136:12
infirmary 23:8 55:9
93:15 94:3, 6
information 22:21
34:14, 17, 22 50:24
51:23, 24 56:5, 7, 11
65:13, 24 66:8 78:15
80:7 95:12, 18 96:15,
24 97:6 98:22 102:8
103:4, 5 104:21
105:23 110:2 112:4
113:23 114:16 115:1,
4 116:2, 8 117:2
142:19 150:21
infrastructure 132:5
141:6, 22, 24
infrequently 40:8
initial 15:9 96:5
117:17
initiate 74:16 99:20
initiated 36:16
112:21 133:24

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**initiative** 21:*13* 64:22, *23* 65:8 66:9

**injuries** 83:*20*

**injury** 82:*14*

**inmate** 31:*19* 72:5 137:*11* 147:*17*

**inmates** 88:*15*

**in-service** 50:7, *15, 18, 19* 66:*16*

**inside** 121:6, *9*

**installed** 132:6

**instance** 119:*1* 138:*21*

**instances** 115:*19* 135:*16*

**instruct** 10:*10*

**instructing** 10:*16*

**instruction** 98:*18*

**insulin** 25:*19* 28:*20* 29:*4* 67:*24* 68:*9*

**insulin-filled** 65:*3, 4*

**intake** 55:*8* 88:*23* 95:5, *7, 13* 97:*3, 8* 147:*8, 10, 11, 14, 24* 148:2, *17*

**interact** 52:*22*

**interchangeably** 146:*23*

**intercom** 45:*9*

**interfere** 94:*24*

**interference** 48:*23*

**interpretation** 70:*22*

**interrupt** 48:*18*

**intervention** 142:*24*

**interviewing** 95:*22*

**interviews** 106:*20*

**intimately** 112:*18*

**investigating** 121:*14*

**investigation** 99:*19* 105:*24* 108:*13, 20, 24* 113:*9* 119:*19, 24* 120:7, *8, 23* 121:*1, 4, 14, 16* 122:5, *19* 123:*24* 125:6 132:*18* 134:*23* 138:*23* 139:8

**investigations** 101:*12* 104:*20* 119:*15, 16* 120:*14* 121:*23* 125:22 129:*6* 132:*19*

**involve** 76:7 106:*18, 20* 108:*10*

**involved** 13:7 67:*16* 106:*21, 24* 110:*22* 111:*3, 14* 112:*18* 120:*12* 121:*16* 133:*23* 134:2, *3* 135:*14*

**involvement** 112:*2*

**iPhone** 48:*22, 23*

**isolated** 105:*13*

**issue** 10:*8* 27:*14* 41:*17* 60:*6* 70:*15* 78:*14, 17* 79:*3, 4* 117:*8* 140:*22* 141:*1*

**issued** 45:*11* 89:*5* 147:*7*

**issues** 41:*19, 20* 43:*14* 57:*14* 58:*5* 59:*12, 14, 18* 73:*2* 77:*18, 21, 23* 83:*7* 100:*11* 107:*17* 110:*5* 112:*3* 116:*15* 120:*13* 128:*11* 136:*17*

**issue-specific** 57:*4*

**it'd** 14:*13* 110:*16*

**item** 59:*16*

**its** 41:*7* 63:*21* 90:*22* 124:*11, 20*

**Ivan** 109:*4* 122:*2*

**< J >**

**JACOB** 1:*5*

**jail** 15:*14* 95:7

**JAMES** 1:*5*

**January** 4:*13* 47:*23*

**Jermaine** 137:*11*

**JKAMINSKY@KEIR NANTRABACH.COM** 2:*18*

**job** 12:*19* 19:*13* 34:2 52:*23* 141:*17*

**JOHN** 3:*6* 146:*4*

**join** 111:*11*

**joint** 87:*18*

**JONATHAN** 2:*16* 146:*12*

**JR** 1:*5* 7:*20*

**judicial** 147:*23* 148:*3, 4*

**jumping** 118:*15*

**JUNG** 1:*5* 7:*20* 37:*15* 125:*20* 132:9, *20* 133:*11, 13* 137:*10* 138:*4* 150:*10*

**Jung000001** 132:*20*

**Jung's** 134:*11* 135:*5, 16*

**< K >**

**K-9** 142:*4*

**K-9s** 142:*5*

**KAMINSKY** 2:*16* 4:*7* 6:*16, 17* 49:*3* 59:2 146:6, *10, 12* 148:*23* 149:*5*

**keep** 56:*19*

**KENNEDY** 3:*6*

**kept** 83:*7*

**ketoacidosis** 132:*22*

**KIERNAN** 2:*16*

**KIMBALL** 3:*6*

**kind** 33:*19* 46:*3* 57:*3* 88:*13* 101:*15* 103:*23* 105:2 115:*11* 129:*18* 140:*3*

**know** 8:*19, 21, 23, 24* 9:*5* 11:*20* 14:*13* 15:*17* 17:*18* 20:22 21:6 22:*12* 24:*12, 16, 17, 18* 25:*1, 21* 26:*7, 12* 31:6, *12* 33:*4, 7, 9* 35:*23* 38:*1* 40:*14* 41:6 46:*13* 48:*14, 20* 52:5 53:5 57:*10, 12* 64:22 65:*12* 66:2, *5, 11* 68:*21* 71:9 73:*10* 75:5 82:20 83:*21* 84:*11* 85:*3, 14, 19* 86:2, *5, 6* 88:*3* 89:*23* 90:6 92:*22* 97:*12* 101:*22* 102:*11* 103:*23* 104:*13* 106:*18* 114:6, *21* 116:*3* 126:9 127:9 133:2 135:*11* 137:*18, 24* 142:*22* 148:*12, 20*

**knowledge** 15:*23* 27:*11* 74:5 85:*16*

**Kudos** 41:*3*

**< L >**

**laid** 60:*5*

**LALITHA** 1:*10* 2:*19*

**landline** 58:*21*

**language** 46:*18* 70:9

**large** 125:*17*

**late** 131:*22*

**LAW** 2:*3, 9* 12:*21*

**lawyer** 9:*19*

**lays** 98:*12* 102:*13*

**lead** 94:*18* 122:7

**leadership** 143:*17, 24*

**learn** 78:*2*

**leave** 37:*3* 45:*13* 78:*20* 147:*23*

**leaves** 149:*13*

**leaving** 132:*2*

**led** 103:*19* 110:6 112:*4*

**left** 90:*12* 136:*21*

**legal** 34:*8*

**letter** 63:*11*

**level** 24:*19, 23* 92:*22* 93:*16* 96:*8* 125:6, *7, 11*

**Lewis** 7:*20* 132:8, *20*

**liaised** 150:*4*

**liaison** 150:*4*

**licensed** 16:*1* 21:*11, 14* 22:*18, 19* 25:*3, 15* 30:*14* 38:*18*

**lieutenant** 132:*13*

**lieutenants** 14:*8* 99:*5*

**life-saving** 40:*5* 73:*5*

**life-threatening** 30:*2*

**light** 103:*18*

**Lincoln** 12:*2*

**Line** 5:*3, 7, 12, 17* 45:*10* 144:*21* 152:*5*

**link** 58:*23*

**Lisa** 1:*20* 154:*3, 6*

**list** 31:*21* 58:*5* 79:*13, 17*

**lists** 50:*9*

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 56 of 75

Deposition of Blanche Carney                                        Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**little** 13:*18* 27:*5* 38:6 54:*1* 125:*18* 148:22

**living** 63:*21*

**LLC** 37:*12*

**LLP** 3:*6*

**located** 18:*15*

**location** 23:*11* 24:*4* 26:*10*

**Lock** 32:*13*, *16*, *19*, *21* 33:*4*, *12*, *14* 34:*4*, *9*, *13* 89:*4*, *11* 96:*14*, *17*, *18*, *19* 97:*14* 98:*4*, *13*, *21* 99:*11*

**log** 97:*24*

**LOGAN** 3:*14*

**logbook** 79:*5*

**long** 10:*24* 11:*14* 17:*7* 136:22

**look** 16:*16* 20:*4* 27:*8* 35:*1* 47:22 60:*23* 62:*14* 86:*19* 99:*9* 101:*16*, *24* 102:*6*, *22* 103:*2*, *8*, *15*, *17*, *23* 104:*4* 107:*17* 121:*18*, *20* 122:*18* 125:*21*

**looking** 36:*4* 39:*13* 40:*19* 61:*17*, *21* 65:*19* 70:*20* 71:*13* 103:*12* 104:*10*, *11*, *16*, *22* 105:*2*, *9*, *16*, *23* 106:*3*, *4* 117:*21* 118:*5* 120:*8*, *9* 122:*10* 130:*17* 140:*19*

**loss** 145:*11*, *12*

**lost** 56:*17* 58:*16* 90:22

**lot** 46:*20* 68:22 118:*8*

**loud** 8:*14*

**LOUIS** 1:*5*

**lower** 89:*20*

**Lt** 133:*9*, *14*, *17*

**lying** 72:*4*


< M >

**maintained** 21:*13* 22:*7* 136:*1*

**maintaining** 30:*15* 135:24

**major** 13:*23* 17:22

**majority** 118:*3* 129:*23* 140:*8*

**making** 70:*16*, *22* 76:*6*, *10*, *18* 77:*1*, *3* 94:*10*, *14* 117:*16* 139:*3* 143:*20* 144:*13* 145:*14*

**male** 95:*10*, *11*

**managed** 22:*7*

**management** 55:*1* 144:*20*

**Manager** 13:*3*

**manages** 100:*5*

**managing** 41:*3* 58:*2*

**mandatory** 98:*1*

**manner** 91:*20*

**MANSUKHANI** 3:*13*

**March** 113:*20* 134:*21*

**MARIESHA** 1:*10* 2:*19* 146:*13*

**Marked** 5:*12* 47:*17* 125:*20*

**MARKET** 2:*17*

**Marshall** 109:*4* 122:*2*

**Master's** 11:*23* 21:*3*

**Mathis** 138:*10*

**matrix** 124:*16*

**matter** 7:*19* 94:22 146:*13*

**MAUREEN** 1:*10*

**Mawr** 12:*2*

**MBA** 21:*1*

**mean** 18:*18* 24:*6* 28:*18* 44:*13* 46:*4* 48:*18* 67:*21* 68:*3* 82:22 83:*19* 84:*19*, *20*, *21* 85:*20*, *22* 106:*18* 123:*14* 148:24

**meaning** 29:*2* 147:*15*

**means** 123:*12* 127:*13* 154:*16*

**measurements** 23:*5*

**measures** 85:*3* 119:*3* 140:*23* 141:*9* 142:*2*, *7*, 8

**mechanism** 82:*20*

**medical** 15:*13* 16:*7*, *10*, *14*, *17* 17:*1* 20:*1*, *8*, *9*, *13*, *16* 21:*7*, *11*, *14* 22:*9* 23:*7* 24:*4*, *11* 25:*1*, *8*, *11*, *14* 26:*1*, *5*, *11*, *23* 27:*12*, *18* 29:*19* 30:*11* 31:*1*, *2*, *5*, *16*, *18* 32:*6*, *15*, *24* 33:*3* 34:*19*, *22* 35:*2*, *3*, *16* 36:*4*, *10*, *24* 38:*19* 40:*6*, 7 42:22 43:*12*, *22*, *24* 44:*1*, *4*, *14*, *19* 45:*2* 46:*1* 48:*8* 50:*6*, *13*, *14*, *21* 51:*3*, *5*, *11* 53:*5*, *13* 55:*18*, *21* 57:*19* 59:*15* 65:*1*, *10* 66:*15* 67:*2*, *14* 69:*3*, *5*, *9*, *13* 70:*3*, *15*, *24* 71:*10*, *12*, *17* 74:*3*, *20*, *24* 75:*4*, *19* 76:*11*, *16*, *20* 77:*1* 78:*2*, *14*, *17* 79:*11*, *12*, *13*, *16*, *18* 80:*5*, *14*, *15*, *17*, *23* 83:*19* 84:*12*, *18* 86:*13* 87:*15*, *19*, *23* 89:*16*, *18*, *21* 91:*3*, *18*, *23* 92:*8*, *11* 93:*10*, *17*, *24* 94:*7*, *17*, *24* 95:*3*, *17* 96:*1*, *11* 98:*3* 99:*18*, *23* 100:*5*, *10* 101:*21* 103:*4* 105:22 106:*2*, *21* 107:*3*, *7*, *18* 108:*4* 109:*23* 112:*16* 120:*4* 128:*14* 132:*14* 133:*21* 135:*16* 146:*18*, *20*, *21* 150:*10*

**medical-certified** 81:*10*

**Medical's** 94:*5*

**medicate** 30:*4*

**medication** 22:*23*, *24* 24:*3* 26:*18* 27:*2*, *12*, *23* 29:*21* 30:*8*, *16* 31:*20* 32:*23* 35:*7* 36:*4*, *18* 44:*17*, *18*, *22*

45:*6*, *15* 55:*1* 59:*23* 65:*17*, *18* 66:*1* 67:*20*, *21* 97:*21*

**medication-compliant** 29:*23*

**medications** 15:*21* 23:*2*, *13* 26:*24* 29:*16* 35:*15* 36:*10* 79:*9*

**med-line** 31:*19*, *24*

**meet** 22:*19* 110:*1*

**meeting** 38:*12* 112:*2* 115:*3* 135:*13* 150:*17*, *22*

**meetings** 21:*10*, *19* 22:*3* 43:*7* 57:*18* 112:*15*

**member** 69:*6* 118:*21*, *22* 126:*20*

**members** 118:*9* 119:*5* 138:*12* 139:*3*, *21*

**memorize** 46:*23*

**mental** 103:*4* 147:*17* 148:*1*, 8

**mentioned** 30:*7* 35:*19* 141:*20* 147:*2*

**message** 145:*15*

**method** 56:*3*

**methods** 21:*6*

**MICHAEL** 2:*5* 38:*11*

**MICHAEL.PESTRAK @PHILA.GOV** 2:*10*

**middle** 46:*5*, *7* 56:*18*

**Mini** 6:*9*, *19*, *23*

**minimize** 140:*18*

**minimum** 54:*9*

**minutes** 136:*4*, *24*

**mischaracterizing** 63:*11*

**misconduct** 123:*8*, *9*, *12* 126:*17*, *24* 138:*6*

**missed** 27:*11* 30:*11* 36:*3*, *5*, *11*, *17*, *20*, *23* 40:*1* 48:*16* 108:*4* 113:*13*

**missing** 36:*9* 107:*18*

**mm-hmms** 8:*15*

**modify** 124:*22*

module 50:22
modules 130:23
moment 37:21 47:1,
5 109:7 112:10
126:8
monitor 28:15
110:21
monitored 56:15
57:1
monitoring 54:21
58:1 82:6 111:8
114:19
monitors 111:16
113:19 133:14
monthly 27:22
months 17:10 27:22
57:13, 14 110:18
morning 7:17 146:15
Morris 138:9
mortality 99:17, 22
100:15 101:1, 5, 9, 14
102:7, 15 105:20, 21
106:17 107:1, 11, 16
108:3, 9, 13, 15, 18
109:5, 7, 12, 17, 18
110:22 111:3, 7
113:8, 23 119:22
120:3 147:2 148:13
move 56:9 72:3, 6
multiple 57:8 105:2
Murphy 138:8

< N >
name 7:18, 22 37:19
38:9 86:12, 22
149:21
names 44:23
narrative 138:15
National 62:4, 7, 9,
13 63:6
nationally 62:2
nature 38:15 59:21
necessarily 15:19
33:3 57:22 60:8
76:13 81:22 110:12,
17
necessity 94:18
need 6:6, 11 9:4
10:7 22:4 46:18
70:24 71:17 80:4, 5

83:12 94:1 96:8
102:14 103:24
120:13 130:10
131:23 138:1 139:7
needed 30:3 80:20
92:21 103:18 117:14
142:12
needs 71:7 76:4
91:3 93:10 105:12
122:24
Need-to-know 34:23
never 29:3, 6
new 48:5 145:7
147:19, 21
newly-hired 145:16
nods 8:15
non-chronic 29:9
non-compliance
142:11
non-compliant 39:21
non-emergency 81:16
non-movement 70:5
nonresponsive 70:11
non-responsive 70:11
nonverbal 70:5
non-voting 124:4
normal 23:1
normally 50:21
no-shows 107:12
Notary 1:21 154:3
note 97:13, 15
noted 153:8
notes 33:22 34:7, 21
98:8 135:22, 24
136:1, 4, 5, 6 154:5
notice 83:17
noticed 49:3
notification 27:17
32:2, 3 69:8, 21
76:17 79:24
notified 44:16 69:10
74:17 81:13, 20, 24
82:3, 4, 11
notify 15:24 27:13
31:1, 18, 23 32:24
45:20 46:1 70:6
79:11
notifying 36:8 69:8
79:12, 18, 24 96:11

November 134:15, 17
nuance 147:22
number 39:5 51:22
58:23 75:9 77:14, 16
113:22 122:6 131:7
141:9 147:6, 8, 10, 12,
14, 20, 21, 24 148:2
numbers 141:8
NURSE 3:9 80:10,
24 149:23 150:13
nursing 55:2 59:24

< O >
obeying 70:14
object 16:19 93:3
96:21
Objection 10:2 11:2
24:21 33:6 40:16
53:9 63:9 67:7 72:7,
12 74:2 75:21 83:22
84:3 85:8 86:15, 24
87:6 90:15 92:13
98:24 102:10 104:5
105:5 107:20 110:24
111:9 116:11 117:10
118:11 119:8 122:13
128:1, 18 129:8, 20
130:13 135:20
139:14 140:5 141:2
142:15 143:14 144:6,
15 145:2 151:7
objections 7:6
obligations 63:21
observation 80:8
observations 38:21
76:19
observe 77:9 78:12
observing 71:18 81:7
obtain 22:21 36:14
obtained 47:11
136:10
obtaining 31:3
obviously 83:2
occasion 21:21 35:14
Occasionally 48:16
occasions 36:9 118:7
occur 27:1 85:15, 20
occurred 83:20
111:13, 24 119:19

121:5 136:16 144:22
occurrence 104:8, 15
occurrences 55:11
104:23
occurring 26:18, 19
75:19 83:7
occurs 135:12
O'CONNOR 3:6
OCTOBER 1:14
offer 111:6
Office 108:19 109:1
120:24 121:3, 6, 24
122:9 123:24 124:10
125:4, 22 128:11
132:19 136:8
officer 16:15, 20
20:8, 9, 14, 16 26:23
31:1, 16 36:7 44:23
45:16, 19 55:19 69:5,
20 70:2 71:7, 20
72:13 74:18 75:15,
16 76:18 78:4, 7
79:4, 15, 18, 21 80:12,
16 81:1 89:8, 11
97:2 103:10 123:14
124:9 126:13 132:12
officers 14:9 18:4
52:21 70:12 71:11
75:3 77:7, 12, 13
78:12 91:5 97:12
98:12, 22 127:7, 23
131:16
officer's 70:21 71:14
75:17 80:3
oh 47:5 58:18
Okay 9:22 13:11
18:6 32:18 33:13
38:3, 4, 8, 24 39:4, 11
47:9 54:14 59:4
61:6, 9 63:14 64:13,
19 65:8, 15 68:21
86:22 87:24 94:4
97:8 99:13, 21 101:5,
8 106:17 109:12
111:21 112:24 114:9,
15 121:22 122:3, 9
125:18, 19 126:5, 11,
12 127:5, 21 135:4
137:8, 21, 23 138:3

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

139:2  147:15  148:11
149:2, 3, 4
**omitted**  96:19
**once**  39:8  83:21
129:17  147:6
**one-and-done**  145:19
**one-time**  35:14
**ongoing**  15:11  20:10
28:6  43:10
**OPC**  121:18, 22
122:15, 23  123:3, 11,
20  134:23
**open**  41:23
**operations**  18:24
19:1
**opportunity**  88:7
120:20  136:15
138:24
**opposed**  16:7  117:8
**opting**  139:18
**Oral**  1:17  21:23
22:1  42:5  43:5
55:23  56:2, 4, 10
68:16, 17
**order**  10:18  30:4
78:5  138:18  144:4
147:23  148:3, 4
**ordered**  22:23
144:12
**ordering**  145:22
**orders**  70:15
**org**  86:19
**organization**  62:14
**original**  154:5
**outside**  73:22  95:20
115:19
**overall**  13:14  14:1
17:21  19:1, 18  20:11
21:13  22:7  34:17
67:20  68:7  100:3
106:4  119:23
**overarching**  60:3
**oversight**  13:21  20:2,
6  21:7  53:23

**< P >**
**p.m**  151:23
**PA**  2:18  3:7, 15
**packet**  101:12

**PAGE**  4:5, 8  5:3, 7,
12, 17  8:13  37:22
47:3, 22  48:11  49:15
50:1  53:4, 18  61:3, 7,
11, 19  62:24  64:1, 2
66:10  125:21  134:16,
17  137:19, 22  138:2,
3  152:5
**pages**  153:4
**pains**  84:6
**paint**  140:16
**panel**  124:5
**paperwork**  32:9  34:8
**paragraph**  38:4
61:23  64:8, 17  114:3,
4  126:19
**parentheses**  39:23
**part**  22:2  34:2
40:10  45:23  50:2
52:23  55:13  60:23
76:23  77:2  79:24
88:23  90:1  101:11,
12  103:6  105:19, 21
108:4, 12, 20  113:9
121:3, 13  122:19
124:5  136:13  139:20
**participate**  14:22
113:10
**participated**  150:23
**participation**  34:6
148:16
**particular**  20:7  60:6
67:3  101:17  104:3
108:6  116:21  118:13
139:4
**parties**  16:1
**parts**  116:23
**pass**  45:2, 12
**passage**  38:1
**passes**  104:13
**patient**  23:3  30:12
31:7  35:6  55:10
62:23  85:1, 6  106:22
**patients**  25:20  39:17,
19  41:11  44:16, 20
65:20  91:24  92:21
93:9, 19
**patient's**  65:11
84:13, 15  96:1  102:2

**pattern**  104:16, 19
106:1  129:4  143:8
**patterns**  83:17, 18
84:2  105:4  106:7, 14,
16  110:6  116:9
**PDF**  64:1
**PDP**  12:9  13:2
14:16  15:4  16:23
26:17  28:18, 21
33:15  37:3  38:16, 17
46:21  52:15  65:9
82:16  88:9, 14  91:6
92:20  93:9  94:23
99:15  102:2  105:1
107:8  109:13  113:4
114:9  132:2  134:7
135:6, 17  138:6
139:13  147:19  148:9,
10  150:4
**penalties**  124:16
**PENN**  2:17
**PENNSYLVANIA**
1:2  2:4, 10  154:4, 10
**people**  35:3  72:20
76:8  108:11  116:18
133:12, 15  136:3, 15
140:14
**perception**  71:15
**perform**  76:15  130:3
**Performance**  54:15,
16, 17  55:13, 17
56:12  129:1  130:1
**performed**  126:14
131:15  139:24
141:17
**performing**  133:22
**period**  102:5  110:11
111:13  130:10  145:9
147:3, 4  148:12, 15
**periods**  27:12
**person**  29:16  30:3, 8
31:9  36:9  45:20
46:2  65:24  69:2
70:1, 7, 18, 23  71:2, 9
72:3, 6  74:18  78:19
79:19  81:2, 12  87:13
89:6, 9  92:6  93:24
94:2, 11  95:22  97:3
118:1  120:1  133:11,
13

**personnel**  14:10
74:4  115:17  128:14
**persons**  135:14
**person's**  34:18  103:7
112:5
**pertaining**  99:14
**PESTRAK**  2:5  6:6,
8  10:2  11:2  16:18
23:19  24:21  33:6, 16
53:10  54:1  56:17
58:11, 16, 20  59:6
67:7  72:7, 12  74:2
75:21  83:8, 22  84:3,
17  85:9  86:16  87:1,
7  90:15  91:7  92:13
93:2  96:20  98:24
102:10  104:5  105:5
107:20  110:24  111:9
116:11  117:10
118:11  119:8  122:13
128:1, 18  129:8, 20
130:13  136:22  137:2
139:14  140:5  141:2
142:15  143:14  144:6,
15  145:2  146:4
148:19  149:2, 8, 13
151:7, 14, 19
**ph**  86:23  137:11
**pharmacies**  65:6
**Pharmacist-Directed**
64:21, 23
**pharmacy**  55:4
**PHILADELPHIA**
1:9, 10  2:4, 9, 10, 11,
12, 18  3:7, 15  4:13
7:21  8:7  11:10
12:14, 16  22:11
47:24  63:4  82:18, 22
85:2  147:19
**phone**  32:4, 6, 9, 24
58:22
**phrase**  118:18
**phrasing**  10:17
**physical**  89:2
**physically**  130:22
147:22
**physician**  55:2
**PICC**  24:2
**pill**  25:22

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 59 of 75

Deposition of Blanche Carney                                Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**PIP** 54:*14, 20* 56:*15,*
*18* 57:*3, 12, 21*
**place** 31:*7* 33:*22*
42:*8* 43:*1* 74:*22*
82:*5* 84:*12* 88:*7*
91:*1* 93:*21* 103:*18*
112:*24* 115:*9* 131:*6*
141:*6, 10, 23, 24*
143:*3* 154:*5*
**placed** 87:*14* 89:*4,*
*24* 130:*23*
**placement** 94:*15*
**placing** 93:*9*
**Plaintiff** 150:*15*
**Plaintiffs** 1:*7, 19* 2:*5*
7:*19*
**plan** 39:*21* 42:*8*
43:*1* 54:*7, 15, 16, 17*
56:*12, 15, 18* 57:*3, 12*
62:*22*
**Plans** 55:*14, 17, 19,*
*22, 24* 57:*21*
**platform** 34:*4, 17*
96:*23* 114:*17* 116:*14*
**play** 44:*12* 87:*16*
**played** 44:*15* 103:*6*
**please** 7:*21* 8:*24*
9:*6* 38:*6* 61:*15*
64:*11* 93:*6* 95:*6*
125:*16, 18*
**POD** 126:*22*
**point** 16:*21* 22:*22*
66:*1*
**pointing** 59:*19* 60:*6*
**police** 147:*5*
**policies** 15:*19, 22*
46:*21* 91:*2, 13* 99:*13*
103:*13, 17* 118:*10, 14*
120:*11, 15* 122:*16*
**policy** 16:*8* 46:*17, 19*
88:*9, 15* 90:*2* 91:*21*
98:*11, 15* 103:*24*
104:*10, 14* 105:*12*
108:*22, 23* 114:*18*
115:*6* 116:*10, 21, 23,*
*24* 117:*8, 12, 13, 19,*
*22, 23* 118:*1, 4, 15, 20*
119:*5* 122:*11, 19*
123:*16* 127:*24*

128:*17* 135:*17* 139:*7,*
*19* 140:*4, 23* 141:*18*
**poorly** 39:*22*
**population** 13:*10*
16:*4* 18:*23* 41:*12, 15*
42:*1, 12* 52:*14, 23*
75:*8* 76:*3*
**portal** 65:*2, 11* 66:*4*
**portion** 90:*22*
**portions** 33:*12* 34:*11*
**position** 11:*1, 8* 17:*4*
19:*17, 23*
**positions** 13:*1*
**possible** 75:*18* 76:*11*
90:*3* 104:*24*
**post** 52:*12*
**posted** 49:*22*
**post-high-school**
11:*20*
**potential** 70:*15*
74:*23* 78:*17*
**potentially** 40:*4*
**practitioner** 22:*18, 19*
67:*22* 81:*10*
**practitioners** 71:*12*
**predates** 112:*23*
**preloaded** 96:*24*
**prepare** 9:*14* 19:*12*
**prepared** 9:*11*
**prescribed** 29:*21*
**prescription** 65:*12, 16*
**prescriptions** 65:*5, 19,*
*22*
**present** 1:*22* 94:*8*
111:*17* 124:*6* 150:*16*
**presented** 77:*18*
89:*1* 95:*4* 120:*17*
121:*12* 150:*17*
**presenting** 81:*5*
**presently** 45:*22*
**presents** 124:*11*
**pretty** 95:*16*
**preventing** 130:*11*
**previous** 110:*13*
**previously** 128:*8*
**primarily** 120:*3*
122:*7*
**primary** 84:*9*
**prior** 9:*20* 11:*8*
12:*18* 14:*16* 110:*18*

114:*12* 115:*7, 17*
132:*2*
**Prison** 87:*14* 88:*2*
90:*1* 92:*23* 93:*11*
99:*19*
**prisoners** 95:*10*
**PRISONS** 1:*10* 2:*12*
8:*7* 11:*11* 12:*16*
13:*16* 14:*23* 17:*23*
19:*4* 20:*6* 22:*12, 14*
38:*23* 66:*23* 72:*19*
73:*1, 2* 82:*23* 85:*2*
**privacy** 34:*21*
**Probably** 64:*12*
137:*1*
**procedure** 108:*23*
139:*19*
**procedures** 55:*6*
74:*21*
**proceeding** 119:*3*
**process** 8:*11* 26:*17,*
*21, 22* 27:*2, 6, 16*
30:*7, 9, 10, 21* 31:*6*
36:*20* 43:*3, 15, 19*
53:*23* 69:*7, 21* 79:*9*
88:*24* 96:*10* 98:*20*
99:*16* 105:*1, 8, 18*
108:*5, 24* 111:*7*
114:*9* 119:*12* 122:*20*
123:*19* 127:*18*
**processes** 27:*20*
**processing** 97:*3*
**procure** 131:*18*
**procured** 130:*19*
131:*10* 142:*5*
**procuring** 141:*7*
**produced** 47:*11*
**Production** 5:*7*
**Production002649**
37:*15*
**Production004786**
125:*20*
**Production005109**
137:*10*
**Production005130**
138:*5*
**professional** 25:*15*
108:*19* 109:*2* 120:*24*
121:*3, 7* 122:*1, 9*

124:*1, 11* 125:*5*
136:*9*
**professionally** 20:*23*
**Program** 13:*5* 17:*24*
18:*2, 21* 61:*24* 120:*2,*
*10*
**programs** 34:*6*
**progress** 43:*6*
**pronounced** 137:*13*
**proper** 133:*18, 20*
**Proposal** 49:*19* 50:*2,*
*12* 60:*24* 61:*1, 20, 21*
63:*3* 66:*13*
**Proposals** 49:*17*
**Proposed** 60:*22*
61:*18*
**propounded** 153:*7*
**protection** 34:*22*
**protocol** 29:*17* 45:*15*
133:*18* 139:*13*
**protocols** 84:*12*
**provide** 13:*21* 14:*18*
19:*10* 20:*2* 29:*20*
50:*13* 53:*6* 54:*11, 21*
58:*2* 63:*4* 73:*5, 24*
74:*9* 80:*6* 83:*13*
91:*17, 20* 111:*17*
**provided** 15:*1* 19:*10*
25:*24* 50:*20* 51:*3, 4*
66:*4* 67:*1* 73:*7*
88:*16, 20* 91:*18* 92:*1*
93:*19* 100:*10* 120:*10*
131:*7* 146:*17* 150:*10*
151:*6*
**Provider** 4:*8* 20:*1, 5,*
*13* 21:*15, 20* 25:*3, 6,*
*12* 26:*1* 27:*18* 30:*14*
31:*16* 40:*7* 43:*22, 24*
44:*1, 4* 47:*23* 50:*13*
51:*3, 5* 53:*5* 54:*10*
55:*21* 65:*23* 67:*14*
80:*18, 23* 84:*13, 19*
85:*12* 87:*15* 89:*2, 18*
93:*17* 132:*14* 146:*21*
**providers** 21:*11*
42:*22* 43:*12* 65:*2*
146:*18*
**provider's** 68:*9*
**provides** 14:*20* 16:*8*
18:*22* 50:*21* 79:*14*

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 60 of 75

Deposition of Blanche Carney                                                Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

providing 13:9 21:7
52:12, 20 53:23
73:20 79:17 85:6
93:1 121:5 142:21

provision 15:13 25:8
44:9 48:7 67:17

Public 1:21 154:3, 6

Puerini 38:11, 12, 14,
19 39:12 40:11
41:16 43:18

pulled 41:12, 14

pulse 74:15, 19 82:14

purposes 94:10

put 42:8 43:1 71:21
91:1 92:3 96:16
103:16 131:5 141:9
143:3

putting 94:16 141:5,
22

< Q >
QA 54:7

quality 28:2 53:18,
19 85:4 151:5

quality-assurance
26:23 27:4

quarter 110:13, 14

quarterly 57:17
109:5, 12, 16, 18
110:8, 22 111:3

question 8:20 9:2, 3,
6, 7 10:17 14:13
23:21 25:18 27:10
29:1 33:17 56:10
61:15 66:2 68:23
70:13 75:6 77:10
88:11 89:19 93:4, 5
95:6, 15 96:22 97:10
102:17 108:2 114:7
117:9

Questions 5:12 7:7
8:19 22:21 37:24
47:4 60:18 88:13
97:1, 5 108:3 146:3,
5 149:10, 11 153:6

quickly 56:5, 7, 11

quite 13:18

< R >

raise 89:9

raised 35:23

range 14:24 57:5
124:15

rank 13:24 14:6
17:23 21:16 86:8

RAY 3:1 149:14, 22

read 41:6 114:2, 3
123:3 137:24 153:4

readily 116:3 130:16
131:8

reading 7:4 24:24
40:12 127:9 132:23
137:17

readings 24:8

readmitted 147:12,
15, 18

read-only 33:11
34:7, 10, 24

really 19:14 143:9

reason 35:18 36:14
81:8 116:15 136:6

reasonable 41:4

reasons 77:6, 14
107:12 134:6

recall 21:2 39:2, 9
40:18 42:18 44:6
48:3 68:18 73:16
86:7, 9, 11 87:8 88:4
98:11, 16 100:17
106:7, 13, 15 107:13,
16, 23 113:14 120:19
126:2, 3, 5 127:5
134:10 135:4, 7, 10,
15, 19 146:1 150:7,
14 151:2

recalling 40:20
46:16 98:15

receive 11:24 15:8,
12, 18 16:13, 24
22:24 23:4 31:20, 22
41:22 45:3 50:7
51:22 52:8, 10 66:16
67:24 68:8 73:20
78:15 98:3

received 11:21 14:15
67:4 122:18 128:23

receives 65:24

receiving 53:1 67:13
82:8 84:19 87:23
124:19

recess 59:8 137:5

recognize 37:19

recognized 62:2

recognizing 46:14
69:13

recollect 132:10

recollection 9:1
36:21 57:16, 18 65:6,
21 73:22 86:14 88:5,
8 98:1, 7 102:3
107:2 113:12 122:17,
23 123:2 127:3
129:3, 11 131:22
132:6, 15 133:6
136:8 137:20 138:20
144:9 150:11, 19

recommendation
120:18, 21 124:19, 21,
22, 23

recommendations
38:21 53:13 62:10
109:9, 11 111:18
114:20

recommended 115:4

recommending 122:23

record 7:22 10:15
24:11 25:11, 14
26:11 31:5 33:14, 23
34:19 35:2 37:14
49:12, 20 61:10 64:3
96:1 115:23 126:12
127:13 131:12

recorded 89:4

records 9:19 55:7

record's 106:11

recurring 130:12

red 35:22 36:12
135:17

red-flag 29:17 35:15,
19 36:1, 2, 16

REES 3:13

referral 125:8

referring 99:24

refers 137:10

refresh 9:1 86:14
127:2 129:3 133:5
138:20

refresher 73:10, 13,
15, 17 142:17 143:10,
22 144:4, 13 145:4, 6,
16

refreshers 145:21

refreshes 137:20

refusal 27:3 30:22
31:4, 8, 11, 14 32:5
35:6, 9, 18 36:15
98:2, 9

refusals 30:18 39:24
40:4, 8 41:10 42:15

refused 29:16 31:7,
9 32:22 35:7

refuses 27:2 30:8

refusing 30:11 72:3
78:20 79:8, 19

regard 16:16 42:13
53:22 60:11 73:20
82:11 83:17 101:16,
24 106:9

regarding 20:10
38:21 60:14 108:22
110:2

regards 107:18

regular 22:2 41:9
58:5, 12, 14 75:7
76:24 77:7 82:2

regularly 41:4 59:13,
15

reiterate 145:8

reiterating 142:20

reject 124:22

related 8:8 34:1

relationship 20:1

relative 150:9

released 147:11
148:3, 4

relevant 10:19 58:7
101:16

rely 58:6

relying 80:15 95:21

remain 58:15

remains 148:2

remember 8:4, 23
17:9, 15 38:12 39:5,
8 40:10 44:3 74:14
116:1 132:8 135:2
137:14, 15

remembering 12:10

**REMIC** 110:*21*
111:*8, 16* 113:*19*
**render** 23:*10, 12*
69:*11* 92:9 125:*10*
126:*21* 128:*15*
**rendered** 93:*20*
124:*17* 126:*15* 139:*1*
**rendering** 23:*2*
144:*5* 151:*10*
**renders** 124:*13*
**repeat** 54:*3* 61:*14*
77:*10* 91:9 93:5
95:6
**repetitive** 150:*1*
**rephrase** 29:*1* 74:8
76:*21* 148:*19, 22*
**report** 21:*18* 28:*13*
29:6 39:*12* 40:*11*
41:*17, 19* 42:*3* 43:*11*
45:2 46:2 69:9 92:8
102:*13, 16* 111:*19*
113:*20* 124:*1, 20*
126:6 127:*8, 13*
132:*16, 18* 134:*21*
136:*3*
**reported** 132:*14*
**Reporter** 1:*21* 6:*4,
10, 15, 20* 8:*16, 22*
48:*17* 154:*17*
**Reporter-Notary**
154:*6*
**reporting** 69:*10*
**reports** 21:*15, 19, 22*
29:*8, 12, 15* 42:*11*
43:*6, 18* 51:*10* 68:*6,
15, 16, 17* 82:*7*
100:*14, 16, 18, 23*
109:*8* 114:*13* 123:*3,
4, 6, 8* 125:*14* 147:2
148:*14*
**represent** 141:*14*
146:*12* 149:*22*
**reproduction** 154:*16*
**Request** 5:*7* 47:*12*
49:*16, 19* 50:*1, 12*
60:*24* 61:*20* 66:*12*
69:8 94:8 99:*3*
**require** 54:*18*
117:*23* 128:*12*

**required** 14:*21* 30:*3*
31:*10, 23* 96:*16*
126:*23* 129:*13* 130:*1*
138:*14*
**requires** 57:*8* 104:*23*
**Research** 12:*4*
**reserved** 7:*8*
**resources** 141:*7*
**respective** 15:*24*
51:*10*
**respond** 27:*10* 69:*18*
**responded** 42:*18, 21*
97:*2*
**responding** 15:*17*
70:*8, 20* 89:*10*
**response** 27:*17*
29:*18* 43:6 60:*24*
61:*20* 80:8 145:*23*
**responses** 42:*2*
**responsibilities** 13:*2,
13* 14:*1* 17:*20* 18:*11*
34:*3* 52:*24*
**responsibility** 13:*14*
17:*21* 18:*14* 19:*19*
20:*12* 22:*8* 28:*8*
31:*18* 72:*24* 100:*4*
**responsible** 15:*23*
18:*24* 19:*6, 7* 28:*12*
31:*2* 35:*24* 44:*8*
55:*16* 63:*19* 72:*14*
75:*18* 76:*14* 122:*8*
**responsive** 42:*21*
**Restorative** 13:*6*
18:*20* 19:*7*
**resulted** 121:*10*
**retired** 145:*13*
**retirement** 117:*4*
**revealed** 129:*5*
**review** 33:*4* 34:*15*
37:*22* 39:*12* 46:*17*
57:*21* 65:*11, 15* 68:*2,
3, 5, 12, 13* 84:*15*
85:*4* 99:*16, 17, 23*
101:*5, 9* 102:*15*
104:*23* 107:*1, 6, 17*
108:*13, 15, 18, 20, 21*
109:*10* 110:*9, 19*
111:*7, 15, 22* 112:*11,
12* 113:*7, 8, 11* 116:*8*
120:*3* 124:*20* 125:*23*

126:*6, 8* 129:*16*
133:2 134:*11* 138:*24*
139:*8*
**reviewed** 9:*19* 22:6
38:2 39:*20* 59:*13, 15*
67:*19* 85:*13* 106:*16*
107:*4, 9* 133:*3*
**reviewing** 33:*21, 24*
41:*18* 47:*21* 65:*16*
67:*17* 68:*18* 99:*14*
100:6 104:*20* 115:*3*
132:*16* 139:*5*
**reviews** 27:*22* 99:*22*
100:*2, 7, 10, 15* 101:*2,
10, 14* 102:*7* 105:*20*
106:*17* 107:*11* 108:*3,
9, 16, 18* 109:*6, 8, 13,
17, 18* 110:*8, 22*
111:*4* 112:*8, 22*
114:*13* 115:*2, 8*
119:*22* 135:*23*
**revision** 104:*24*
**right** 7:*17* 17:*4*
35:*23* 37:7 41:*8*
47:*2, 5* 49:*15* 50:*9*
51:*16* 53:*17* 61:*9*
62:*19* 71:*24* 76:*21*
83:2 89:*21* 91:*22*
94:*6, 23* 95:*1* 107:*4*
113:*18* 115:*9* 118:*17,
22* 123:*14* 127:*15, 19*
134:*7* 140:*22* 146:*1*
**rights** 33:*11* 34:*8, 24*
**Right-to-Know** 47:*12*
**rise** 125:*7*
**Robinson** 138:*10*
**robots** 116:*19*
**role** 8:*6, 8* 11:*12*
13:*19* 44:*11, 15*
87:*16*
**roles** 14:*18*
**roll** 51:*20, 21* 52:2
142:*18* 144:*19*
**roll-call** 51:*5*
**room** 81:*18* 82:*12,
17* 83:*6, 18* 84:*14*
85:*1, 7*
**Rosa** 138:*8*
**Rosado** 125:*24*
**round** 97:*16*

**rounds** 75:*24* 76:*6,
10, 24* 77:*1, 3, 8, 12,
13* 78:*5* 97:*13*
129:*13, 24* 130:*3*
**routine** 30:*1* 76:*13*
82:2 128:*7* 145:*18*
**rules** 8:*12* 142:*11*

**< S >**
**safety** 73:*1* 120:*12*
128:*13*
**Samicheilli** 137:*11*
**Samichielli** 137:*16*
**saying** 40:*21* 49:*7*
66:*14* 92:5 106:*12*
136:*12* 147:*20*
**says** 37:*11* 39:*16, 19,
24* 40:*3* 42:*14, 17*
50:*5* 52:*4* 54:*7*
60:*21* 61:*7* 62:*1, 24*
113:*23* 115:*1* 127:*21*
132:*21* 133:*8* 138:*4,
16*
**scanner** 131:*2*
**scanners** 142:*2*
**scenario** 22:6 84:*24*
121:*11*
**scenarios** 71:*23*
83:*20*
**scene** 80:*10*
**schedule** 41:*5, 9*
57:*11* 109:*20*
**scheduled** 26:*24*
27:*1* 31:*22* 111:*24*
124:*2*
**School** 12:*3*
**Science** 11:*22*
**Scope** 60:*22* 61:*18*
101:*15* 120:*6*
**screen** 6:*5* 37:*7*
45:*5* 60:*17* 61:*5*
64:*10* 113:*17* 125:*12*
132:*17* 137:*9* 149:*9*
**screening** 55:*8* 88:*23*
**scroll** 61:*3, 4* 132:*24*
138:*1*
**SCULLY** 3:*13*
**sealing** 7:*4*
**second** 62:*18* 114:*4*

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 62 of 75

Deposition of Blanche Carney                                              Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

134:*17*

**section** 53:*18*

**secured** 133:*16*

**security** 71:*1, 4* 73:*1*
77:*20* 87:*20, 21* 94:*9,*
*12, 19, 21, 23* 119:*24*
120:*13* 124:*9* 128:*13*
142:*1, 6*

**security-related** 103:*5*

**see** 30:*23* 35:*12, 17*
36:*11* 37:*8, 10* 38:*3,*
*10* 39:*16* 41:*3* 46:*18*
47:*6* 48:*19* 49:*15*
50:*2* 53:*18* 60:*18, 21*
61:*6* 64:*8, 14, 15, 16,*
*17* 65:*3* 66:*8* 80:*3*
83:*6* 84:*15* 87:*9*
98:*21* 99:*3* 102:*12*
103:*9, 12, 15, 23*
104:*22* 105:*24* 108:*8*
109:*11* 113:*21, 24*
117:*21* 122:*10*
125:*14* 131:*23, 24*
134:*14* 136:*20*
137:*20* 138:*23* 139:*1*

**seeing** 41:*8* 80:*4*
110:*6* 132:*15*

**seek** 16:*9* 92:*20*
119:*1*

**self-reports** 95:*21*

**sent** 46:*2* 81:*12, 18*
82:*12* 84:*14* 85:*1, 6*

**sentence** 52:*6* 54:*20*
62:*19*

**Sentinel** 100:*23*

**separate** 34:*19*

**separated** 94:*17*

**September** 114:*5*

**Sergeant** 138:*7*

**sergeants** 14:*8* 99:*4*

**series** 22:*3, 20* 97:*4*
100:*9* 104:*8*

**serious** 91:*3* 127:*24*
128:*16*

**serve** 64:*5*

**Service** 13:*3, 4* 18:*2,*
*21, 22* 52:*12* 131:*18*

**Services** 11:*23* 13:*6,*
*9* 15:*1* 16:*3* 17:*24*
18:*20* 19:*8* 20:*11*

22:*9* 23:*12* 24:*4*
25:*9* 41:*24* 48:*8*
49:*23* 52:*20* 54:*19*
55:*2, 3, 4, 5, 6, 7, 9, 10*
59:*15, 17, 24* 80:*19*
87:*14* 88:*2* 90:*1*
91:*20, 24* 92:*2, 7, 24*
93:*11* 120:*2, 9, 10*
131:*7*

**set** 36:*20* 55:*20*
59:*22* 63:*5* 104:*3*
137:*8* 154:*6*

**setting** 15:*2* 26:*5*
40:*7*

**settings** 15:*14* 62:*12*

**seven** 8:*5*

**severe** 82:*14*

**share** 37:*6* 47:*2, 3*
60:*17* 110:*2* 113:*16*
125:*12* 132:*17* 137:*9*

**sharing** 45:*4* 132:*7*
142:*19*

**Sheet** 153:*9*

**shift** 51:*23*

**shorthand** 154:*17*

**short-staffed** 90:*21*
91:*5, 14*

**show** 89:*12*

**showing** 45:*21* 61:*12*

**shown** 107:*7*

**sick** 55:*7*

**side** 63:*19* 109:*23, 24*

**sight** 89:*7*

**sign** 31:*7, 9, 11*

**signature** 31:*3* 48:*12*
153:*15*

**signed** 31:*13* 38:*10*
131:*21*

**significant** 54:*22*
140:*13* 145:*5*

**significantly** 39:*20*
64:*20*

**signing** 7:*4*

**signs** 16:*15* 46:*14,*
*16* 71:*11*

**similar** 25:*17, 18*
66:*12* 108:*1* 115:*12*

**simply** 77:*1* 93:*21*
130:*2* 139:*18* 140:*9,*

*14*

**single** 82:*4*

**site** 13:*14* 14:*1*
17:*21* 18:*13* 19:*1, 18*
20:*11* 22:*8*

**sitting** 141:*12*

**situation** 72:*2* 78:*22*
80:*22* 81:*19* 82:*7*
123:*21* 133:*15*

**situations** 82:*10*
118:*19*

**six** 8:*5* 57:*14*

**size** 41:*15*

**slightly** 64:*11*

**smooth** 94:*21*

**Social** 11:*23* 12:*3*
13:*3, 4* 18:*21*

**Soell** 138:*8*

**solicit** 108:*21*

**solicitation** 49:*23*

**soliciting** 150:*21*

**somebody** 23:*15*
32:*22* 45:*13* 70:*14*
73:*12* 74:*1* 81:*17*
82:*11* 89:*24* 90:*4*
96:*8* 98:*3* 107:*18*
122:*4*

**somebody's** 71:*3*
95:*8*

**someone's** 84:*5*

**sorry** 47:*6* 91:*9*
148:*20*

**sound** 9:*8* 86:*23*
119:*6*

**sources** 62:*3* 95:*20*

**speak** 8:*14* 24:*15*
42:*23* 136:*10* 139:*21*

**speaking** 90:*19*
97:*12* 108:*10*

**Special** 125:*22*
132:*19*

**specialty** 55:*3*

**specific** 15:*12* 16:*14,*
*17, 24* 25:*1* 39:*17*
46:*18* 57:*9* 59:*12, 14,*
*19, 20* 68:*23* 75:*1*
82:*24* 88:*12* 95:*14*
98:*11* 101:*23* 105:*18*
125:*14* 141:*23*

**specifically** 24:*17*
35:*21* 42:*20, 24*
93:*18* 97:*9, 15*
102:*17* 142:*10* 151:*9*

**specifics** 28:*4* 102:*18*
126:*3* 135:*8* 151:*11*

**specify** 100:*20*

**spell** 7:*22* 56:*12*

**spoken** 43:*11*

**spreadsheet** 101:*6*
115:*12*

**SPRING** 2:*4*

**SQUARE** 3:*14*

**staff** 13:*8* 14:*10, 21*
15:*18, 23* 16:*7, 8, 10*
18:*4, 5* 31:*14, 17, 18*
32:*15, 21, 24* 33:*3, 21,*
*23* 34:*20* 44:*12*
46:*13* 50:*6, 7, 14, 15,*
*21, 23* 51:*6, 8, 13, 18,*
*22* 52:*4, 7, 9, 10, 16*
53:*1* 66:*15, 16* 67:*4*
69:*6, 9, 12* 71:*1, 4*
73:*4, 24* 74:*8, 23*
75:*7, 14* 78:*2, 21*
79:*11, 13* 87:*20*
89:*13* 90:*14* 91:*23*
92:*11* 94:*20, 23*
95:*12* 96:*7, 16* 99:*3,*
*18* 106:*21, 24* 109:*24*
112:*18* 116:*1, 9, 20*
117:*16* 118:*1, 3, 9, 14,*
*21, 22* 119:*5* 120:*11*
121:*15* 122:*11, 24*
126:*16, 20* 128:*23*
129:*4, 12, 23* 130:*2,*
*21* 136:*7* 138:*5, 6, 12*
139:*3, 13, 21, 23*
140:*9, 22* 141:*15*
142:*10, 20* 143:*9*
144:*21* 145:*5, 10, 11,*
*12*

**staffing** 75:*2* 93:*8*
141:*8*

**staff's** 148:*16*

**stage** 132:*5*

**stamps** 64:*4*

**standard** 58:*9, 11*

**standards** 53:*8*
62:*15* 63:*5, 12*

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 63 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

standing 58:*10*, *14*
59:*16*
start 6:*4* 12:*15*
36:*13* 74:*19* 99:*21*
started 114:*14*
131:*20*
starting 69:7
starts 36:7 69:*20*
state 7:*22* 79:*3*, *4*
stated 57:*23* 151:*4*
statements 136:*10*
STATES 1:*2* 63:*12*
status 89:*17*, *20*
stenographic 154:*5*
steps 81:*4*
stipulated 7:*2*
Stipulations 5:*12*
stop 45:*4* 132:7
straightforward 95:*16*
strategically 130:*23*
STREET 2:*4*, *9*, *17*
3:*14*
stretcher 79:*22* 80:*5*,
*11*, *13*, *24* 133:*24*
Strike 109:*6* 151:*2*
structure 13:*24* 14:*6*
17:*23* 21:*17* 86:*8*
90:*10*
submission 124:*17*
submitted 39:*13*
124:*18*
subordinate 18:*1*
substance 153:*8*
subtopics 59:*23*
suggestion 40:*15*
42:*14* 120:*18*
Suggestions 40:*3*
41:*23* 42:*23* 43:*8*
111:*6*
SUITE 2:*4*, *17* 3:*6*,
*14*
SUMMER 3:*13*
supervises 122:*5*
supervision 154:*17*
Supervisor 13:*4* 79:*6*
supervisors 144:*21*
supplement 143:*3*
SUPPORT 5:*1* 87:*9*
supposed 24:*9*, *10*, *12*,
*19* 25:*13* 26:*8*, *14*, *19*

30:*20* 35:*7*, *22* 45:*16*
53:*6* 63:*15* 69:*1*
74:*22* 75:*3*, *7* 77:*7*
78:*24* 79:*10* 87:*13*
97:*13* 98:*4*, *12*, *23*
118:*23*
sure 26:*24* 33:*10*
54:*3* 56:*8* 58:*18*
59:*6* 66:*3* 77:*14*
85:*21*, *23* 87:*21* 93:*8*
94:*10*, *14*, *20* 97:*24*
107:*14* 128:*8* 143:*9*,
*20* 145:*14*
surrounding 100:*11*
106:*5*
sustain 124:*12*
sustained 123:7, *9*
126:*16*, *23* 127:*11*, *14*
138:*10*, *11*
sustaining 127:*9*
sustains 123:*11*
sworn 7:*11* 13:*8*
14:*20* 50:*20*, *23* 51:*7*,
*21*
symptoms 16:*16*
46:*14*
syringe 25:*23*
system 32:*13*, *16*, *19*,
*22* 35:*20* 36:*1*, *2*
45:*9* 65:*1*, *2* 96:*14*
99:*9* 130:*20* 131:*11*
systemic 107:*17*
129:*16*

< T >
Tab 60:*22* 61:*18*
take 8:*16* 9:*4*, *7*
21:*23* 35:*1* 59:*2*
74:*20* 81:*3* 104:*4*
119:*4* 126:*8* 136:*19*,
*23* 137:*1*, *19*
taken 1:*18* 59:*9*
115:*16* 136:*5* 137:*5*
138:*17* 140:*24* 154:*5*
takes 94:*17*
talk 8:*17* 57:*24*
talked 69:*23* 79:*10*
141:*21*
talking 69:*24* 97:*8*

142:*7* 148:*13*
talks 42:*17*
tasked 114:*19*
Taylor 37:*17*
Team 100:*5* 101:*21*
135:*10*, *13*
technology 130:*16*
tell 27:*5* 62:*6*
telling 9:*17* 63:*3*
tells 131:*2*
TEN 2:*17* 137:*1*
tenure 52:*17* 141:*16*
142:*23* 144:*23*
term 35:*24* 52:*15*
146:*22*
terminology 25:*2*, *7*,
*10*
terms 23:*17* 48:*8*
94:*14*
testified 7:*12* 26:*4*
30:*13* 110:*4* 128:*8*
145:*11*
testimony 60:*1*
142:*13*
TGREGORY@OKLL
P.COM 3:*8*
Thank 14:*11* 18:*6*
23:*17* 28:*17* 35:*5*
36:*22* 39:*11* 49:*24*
51:*2* 53:*17* 57:*20*
58:*4* 60:*16* 63:*18*
66:*10* 68:*21* 79:*20*
81:*11* 89:*14* 95:*11*
98:*19* 117:*13* 125:*16*
132:*7* 146:*14* 149:*6*,
*12* 151:*17*, *20*
thanks 49:*7*
theme 104:*16*, *19*
themes 104:*11*
thing 52:*18* 74:*15*
things 30:*5* 39:*23*
57:*6* 58:*7* 102:*21*
117:*20* 141:*9*
think 10:*4* 14:*12*
16:*19* 23:*23* 41:*1*
48:*13* 52:*20* 58:*23*
76:*22* 78:*14* 80:*14*
91:*8* 95:*14* 106:*13*
140:*21* 142:*9* 151:*12*
thinks 96:*7*

THOMAS 3:*13* 6:*10*,
*13* 149:*8*, *11*
thought 118:*8*, *20*
142:*12* 143:*2*
THREE 3:*14* 17:*14*,
*17* 27:*22* 30:*10* 36:*3*,
*5*, *11*, *17*, *20* 39:*20*
57:*13* 73:*16* 110:*18*
three-month 110:*11*
threshold 130:*8*
THURSDAY 1:*14*
tier 89:*20*
time 7:*8* 13:*22* 15:*9*
20:*19* 22:*10* 30:*24*
35:*6* 44:*17* 45:*14*
71:*15*, *19* 74:*18*
83:*16* 90:*12* 101:*23*
103:*9* 104:*1* 106:*8*
107:*8* 110:*14* 131:*9*
134:*19* 139:*8* 144:*3*,
*11* 145:*10* 146:*14*
147:*9* 149:*7* 150:*24*
151:*17* 154:*5*
timeliness 54:*24*
times 8:*4* 35:*20*
48:*19* 49:*4* 88:*1*
91:*4* 103:*15*
title 10:*4*, *12*, *22*
86:*7*, *10*, *12*
today 6:*7* 9:*12*, *20*
146:*16* 149:*7*
today's 9:*15*
top 6:*5* 37:*12* 42:*13*
60:*19* 66:*12* 89:*17*
113:*21* 134:*12* 143:*9*
146:*2*
topics 14:*24* 58:*14*,
*15* 60:*9*
Torres 125:*23*
totality 105:*23*
124:*20* 139:*22*
totally 40:*22* 41:*1*
touched 17:*18* 95:*14*
tour 45:*24* 46:*10*
99:*5* 127:*22*
toured 103:*10* 126:*22*
tours 76:*1* 103:*2*, *8*
128:*6* 129:*5* 131:*5*
138:*13* 139:*4*, *24*

140:9, 15   143:23
  144:14   145:22
**Track**   32:13, 16, 19,
  22   33:4, 12, 14   34:4,
  9, 13   67:3   82:21, 23
  89:5, 11   96:14, 17, 18,
  19   97:14   98:5, 13, 21
  99:11   108:4   114:24
  116:14   131:11
**tracked**   82:17, 19, 21
  108:8   114:11   115:21
  116:5, 6   117:3
**tracking**   35:12
  36:11   114:14   115:13,
  18, 24   116:16   117:2
**trained**   46:14   69:12
  70:3   73:4, 12   74:7, 9
  80:17
**training**   14:17, 19, 20
  15:5, 8, 11, 12, 18
  16:13, 24   19:11   50:7,
  15, 18, 19, 22   51:2, 6,
  9, 20, 21, 24   52:2, 8,
  10   53:2   66:16, 21, 24
  67:1, 4, 6, 10, 12   73:7,
  17, 19   122:24   128:24
  142:22   143:1, 21
  144:13
**trainings**   14:15
  73:11   142:18   143:10,
  22   144:4, 19, 20
**transcript**   6:7, 12
  154:5, 15
**transcription**   153:5
**transfer**   48:4
**transferred**   94:2, 11
  147:16, 17   148:1
**transition**   94:21
**Transitional**   13:6
  18:20   19:8
**transport**   82:3, 4
**transports**   82:21
**treat**   83:12   119:1
**treated**   106:2
**treatment**   16:2   40:5
  45:3   62:1, 21   100:10
  120:5   150:9
**treatments**   34:7
**TREBACH,LLP**   2:16

**trial**   7:8
**triggered**   36:2
**trip**   83:4   85:22, 24
**trips**   82:17   83:6, 18
**Trivicam**   150:13
**TRIVIKIM**   3:9
  149:23
**TRIVIKRAM**   1:10
  86:22
**true**   94:13   154:4
**try**   84:22   105:3
  116:9   119:4   149:24
**trying**   29:22   36:13
  56:9   71:22   93:21
  102:6, 8   105:17
  133:10
**turn**   130:18
**turnover**   145:5
**tweaked**   104:1
  117:14
**twice**   38:23   39:1, 2, 8
**two**   6:24   18:9   25:21
  38:18   39:21   73:13,
  16   84:8   94:16   101:3
  114:7   133:12, 22
  134:1
**type**   27:23   52:8
  102:7   112:11   114:17
  115:12   142:6
**types**   82:10   83:19
  96:15

**< U >**
**ultimately**   72:23
**unable**   61:2   91:15
**understand**   13:18
  23:23   24:6   28:18
  44:13   105:17   117:9
  142:13   148:7
**understanding**   16:5
  19:17   28:24   55:12
  63:2   91:22
**understood**   9:3
  10:14   25:17   32:12
  40:14   46:20   57:20
  79:20   86:2   87:12
  93:4   97:11   98:10
  122:22   126:7   139:10
  145:21   148:21
**unique**   147:10

**unit**   34:1   45:7
  52:21   66:23   67:3
  75:8, 11, 20   76:1, 7
  77:16, 19   79:14
  131:16   132:11
  138:13   142:4   144:19
**UNITED**   1:2
**units**   75:2   93:1
**universal**   15:22
**University**   12:2
**unpredictable**   128:7
**unresponsive**   137:12
**unusual**   139:2, 6
**update**   60:5, 8, 10, 11,
  13
**updates**   58:2, 6
**upheld**   124:14
**use**   37:2   52:15
  58:22   98:12   146:22
**usually**   32:3

**< V >**
**vacancy**   88:1
**variation**   68:22
**various**   14:18   50:24
  65:5
**vary**   23:14   24:5
**verbally**   45:7   70:8
**versus**   7:20   70:15
**Videotaped**   1:17
**violated**   103:13
  120:11   122:11
  123:15
**violation**   122:21
**violations**   116:10
**Virtual**   1:17
**visible**   82:14
**visits**   40:1, 9   42:15
**visual**   71:13   89:2
  95:22
**vs**   1:8

**< W >**
**wait**   137:9
**waived**   7:5
**walk**   12:7, 12, 23
  30:8   35:20   45:24
  123:18
**walked**   131:4

**WANDA**   1:11   3:16
  133:9
**want**   10:3   23:19
  24:15   33:17   35:14
  39:15   40:2   44:5
  71:21   92:3   113:15
  136:22   137:2   140:16
  143:8
**wanted**   50:12
  102:21   116:4   136:7,
  15
**wants**   10:11
**warden**   81:23
  109:23   119:17   124:7
  125:9
**wardens**   14:4, 5, 7
  18:2   42:10   82:5
  109:21   112:17
**way**   10:5, 18   32:7
  41:18   42:4, 19   54:4
  67:5   69:18   78:13
  82:18   110:23   115:20
  116:6   134:4   136:11
**ways**   78:1
**website**   49:22
**weekly**   21:9   99:7
**well**   12:8, 14   13:22
  14:9   18:13   21:17
  22:17   26:8   32:10
  36:8   37:1   48:15
  58:9   79:12   81:3
  100:21   116:7   141:4
  142:1   143:18   144:1
  149:15
**went**   15:4   94:5
**we're**   8:13   23:24
  39:13   42:6   59:4
  80:15   105:22, 23
  106:3, 4   110:5
  127:12   130:17
  143:10, 11   147:13
**Western**   37:11
**we've**   115:23   117:2
  141:21
**widespread**   141:1
**wing**   87:14, 23   88:2
  90:1   92:24   93:11
**WITNESS**   4:2   5:3
  11:5   24:23   40:18
  49:1   53:12   54:5

56:*21*  58:*13, 18*
61:*14*  67:*9*  72:*9, 13*
75:*23*  83:*10*  84:*5*
85:*11*  86:*17*  87:*2, 8*
90:*17*  91:*11*  92:*15*
93:*5*  96:*23*  99:*2*
102:*12*  104:*7*  105:*7*
107:*22*  111:*2, 12*
116:*13*  117:*12*
118:*13*  119:*10*  128:*3,*
*20*  129:*10, 22*  130:*15*
139:*16*  140:*7*  141:*4*
142:*17*  143:*16*  144:*8,*
*17*  145:*4*  148:*24*
151:*9*
**witnessed**  31:*13*  40:*6*
**WITTEKIND**  3:*1*
4:*8*  6:*21, 22*  40:*16*
53:*9*  61:*2, 9, 12*  63:*9*
85:*8*  86:*15, 24*  87:*6*
111:*11*  135:*20*
149:*15, 20, 22*  151:*12*
**WITTEKIND@OKLL**
**P.COM**  3:*7*
**wondering**  14:*14*
33:*19*  60:*7*  80:*21*
118:*18*
**Woods**  138:*9*
**word**  48:*16*  52:*5*
**words**  49:*6*
**Work**  12:*3*  13:*3, 4*
34:*12*  42:*10*  44:*14*
60:*22*  61:*18*  73:*11,*
*14*  142:*2*
**worked**  13:*7*
**workers**  72:*6*
**workforce**  90:*23*
**working**  12:*15*  34:*2*
42:*9, 22*  58:*1*  59:*4*
**work-performance**
131:*14*
**world**  90:*22*
**writing**  40:*10*  42:*16*
56:*16, 19, 22*
**written**  21:*24*  55:*22,*
*23*  56:*2, 12*  57:*21*
100:*13, 16*  111:*19*
**wrong**  70:*10*
**wrote**  40:*19*

**< Y >**
**Yeah**  6:*17, 22*  9:*10*
24:*1*  41:*3*  42:*17*
48:*17*  49:*1, 8*  56:*8*
61:*10*  68:*4*  81:*15*
101:*18*  115:*1*  148:*23*
**year**  11:*5*  17:*10*
38:*23*  39:*1, 3, 7*  44:*6*
**years**  11:*16*  12:*5*
19:*20*  39:*5, 6, 8, 9, 10*
73:*14, 17*  90:*14*
92:*12*
**YESCARE**  1:*9*  3:*8*
44:*1, 3, 7*  48:*4, 5*
84:*20, 21*  85:*3, 17*
86:*3, 9, 11*  87:*5*
149:*22*  150:*5, 8*
151:*6*
**YesCare's**  67:*17*
**yesterday**  10:*9*

## **WORD LIST**

**< 1 >**
**1** *(1)*
**1:00** *(1)*
**1:25** *(1)*
**10:05** *(1)*
**100** *(2)*
**110** *(1)*
**12** *(3)*
**146** *(1)*
**149** *(1)*
**1500** *(1)*
**1515** *(1)*
**15TH** *(1)*
**1717** *(1)*
**17th** *(1)*
**1801** *(1)*
**19102** *(2)*
**19103** *(2)*
**19123** *(1)*
**1992** *(1)*
**1995** *(1)*
**1997** *(1)*

**< 2 >**
**2016** *(4)*
**2017** *(1)*
**2020** *(2)*
**2022** *(3)*
**2023** *(2)*
**2024** *(8)*
**2025** *(1)*
**204** *(1)*
**23** *(1)*
**29th** *(2)*

**< 3 >**
**3/09/24** *(1)*
**306** *(1)*

**< 4 >**
**43** *(1)*
**4th** *(3)*

**< 5 >**
**5** *(2)*
**5.162** *(1)*
**5.183** *(1)*

**5.76** *(2)*
**562** *(1)*
**5th** *(1)*

**< 6 >**
**6** *(1)*
**610** *(1)*
**64** *(2)*
**6th** *(1)*

**< 7 >**
**7** *(2)*
**770** *(1)*

**< 9 >**
**98** *(1)*
**990** *(1)*

**< A >**
**a.m** *(1)*
**able** *(3)*
**ABOLITIONIST** *(1)*
**academy** *(4)*
**accept** *(1)*
**access** *(14)*
**accommodate** *(1)*
**accommodation** *(2)*
**accommodations** *(3)*
**accompany** *(1)*
**account** *(3)*
**accountability** *(1)*
**accounts** *(1)*
**accurate** *(8)*
**acknowledging** *(1)*
**ACKNOWLEDGMENT** *(1)*
**acting** *(1)*
**action** *(4)*
**activates** *(1)*
**activation** *(1)*
**active** *(1)*
**activities** *(4)*
**actors** *(1)*
**actual** *(3)*
**acute** *(1)*
**adapted** *(1)*
**adding** *(1)*
**addition** *(3)*
**additional** *(9)*

**address** *(11)*
**addressed** *(4)*
**addressing** *(3)*
**adhere** *(1)*
**administer** *(1)*
**administered** *(4)*
**administering** *(4)*
**administration** *(7)*
**administrative** *(1)*
**Administrator** *(1)*
**Administrators** *(3)*
**admissions** *(1)*
**admit** *(1)*
**admitted** *(1)*
**ADOSSINO@GRSM. COM** *(1)*
**adverse** *(1)*
**after-action** *(5)*
**after-incident** *(2)*
**afternoon** *(2)*
**agenda** *(1)*
**aggregate** *(3)*
**agree** *(10)*
**agreed** *(2)*
**Agreement** *(2)*
**aid** *(6)*
**alert** *(3)*
**alerted** *(1)*
**allegation** *(1)*
**allow** *(2)*
**allows** *(1)*
**alongside** *(1)*
**American** *(4)*
**analysis** *(1)*
**and/or** *(1)*
**Angel** *(1)*
**Anne** *(1)*
**announcement** *(2)*
**annual** *(4)*
**annually** *(2)*
**Answer** *(65)*
**answering** *(2)*
**answers** *(2)*
**anticipated** *(1)*
**anybody** *(2)*
**anyway** *(1)*
**APOLLON** *(3)*
**appear** *(2)*
**appeared** *(1)*

**appears** *(1)*
**apply** *(2)*
**appointments** *(3)*
**approach** *(1)*
**approaching** *(1)*
**appropriate** *(13)*
**appropriateness** *(2)*
**approve** *(2)*
**Approximately** *(1)*
**April** *(1)*
**ARCH** *(2)*
**area** *(17)*
**areas** *(10)*
**arose** *(1)*
**arrived** *(2)*
**arrives** *(1)*
**arriving** *(2)*
**artful** *(1)*
**articulate** *(1)*
**ascertain** *(1)*
**asked** *(3)*
**aspects** *(3)*
**assaulted** *(1)*
**assess** *(18)*
**assessed** *(2)*
**assessing** *(10)*
**assessment** *(10)*
**assessments** *(2)*
**assigned** *(11)*
**assist** *(1)*
**assistance** *(14)*
**assisting** *(1)*
**Associate** *(1)*
**Association** *(4)*
**assume** *(4)*
**assurance** *(2)*
**attached** *(1)*
**attend** *(1)*
**attention** *(4)*
**ATTORNEY** *(5)*
**audio** *(1)*
**audit** *(4)*
**auditing** *(2)*
**audits** *(2)*
**authority** *(2)*
**authorized** *(1)*
**automatic** *(1)*
**available** *(5)*
**aware** *(4)*

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 67 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**< B >**
**Bachelor's** *(1)*
**back** *(7)*
**background** *(1)*
**backlogs** *(1)*
**bad** *(1)*
**base** *(1)*
**based** *(45)*
**basic** *(2)*
**basis** *(10)*
**Bates** *(1)*
**Bates-stamp** *(1)*
**Bear** *(1)*
**becoming** *(1)*
**beds** *(1)*
**began** *(1)*
**beginning** *(1)*
**begins** *(3)*
**behalf** *(1)*
**behavioral** *(3)*
**believe** *(26)*
**best** *(1)*
**better** *(3)*
**beyond** *(1)*
**bigger** *(1)*
**bit** *(5)*
**BLAIR** *(4)*
**BLANCH** *(1)*
**BLANCHE** *(15)*
**B-L-A-N-C-H-E** *(1)*
**blind** *(1)*
**BLOODSAW** *(5)*
**Board** *(4)*
**body** *(4)*
**bottom** *(8)*
**BOULEVARD** *(1)*
**box** *(1)*
**Brad** *(1)*
**breach** *(2)*
**break** *(7)*
**BRET** *(10)*
**BRETGROTE@ABO**
**LITIONISTLAWCEN**
**TER.ORG** *(1)*
**brief** *(1)*
**Brill** *(3)*
**bring** *(3)*
**bringing** *(3)*

**brings** *(1)*
**broad** *(1)*
**broadly** *(2)*
**broadness** *(1)*
**brought** *(6)*
**Bruce** *(1)*
**brush** *(1)*
**Bryn** *(1)*
**bunk** *(2)*
**Business** *(1)*

**< C >**
**C/O** *(8)*
**CABELLOS** *(3)*
**calendared** *(1)*
**call** *(33)*
**called** *(5)*
**calling** *(5)*
**calls** *(2)*
**campus** *(2)*
**capacity** *(1)*
**captains** *(1)*
**captures** *(1)*
**card** *(3)*
**care** *(71)*
**careers** *(1)*
**CARNEY** *(16)*
**C-A-R-N-E-Y** *(1)*
**carried** *(4)*
**carries** *(1)*
**carry** *(4)*
**carrying** *(1)*
**case** *(24)*
**case-by-case** *(8)*
**case-related** *(1)*
**cases** *(4)*
**catch** *(1)*
**caught** *(1)*
**caused** *(1)*
**caveat** *(1)*
**cell** *(11)*
**cells** *(1)*
**CENTER** *(4)*
**certain** *(12)*
**certainly** *(4)*
**certainty** *(2)*
**certification** *(2)*
**certified** *(3)*
**certify** *(3)*

**certifying** *(1)*
**CFCF** *(4)*
**chain** *(1)*
**chaired** *(1)*
**challenge** *(1)*
**challenges** *(7)*
**challenging** *(2)*
**chance** *(1)*
**change** *(5)*
**changed** *(6)*
**changes** *(2)*
**charge** *(1)*
**charges** *(5)*
**chart** *(2)*
**check** *(4)*
**checking** *(2)*
**checks** *(2)*
**chest** *(1)*
**Chief** *(6)*
**chronic** *(10)*
**circumstance** *(1)*
**circumstances** *(8)*
**CITY** *(21)*
**city's** *(2)*
**civilian** *(9)*
**civilian-contracted** *(1)*
**clarification** *(2)*
**clarifier** *(1)*
**clarify** *(5)*
**clear** *(4)*
**clients** *(1)*
**clinical** *(12)*
**clinically** *(1)*
**clinician** *(1)*
**clinicians** *(2)*
**clinician's** *(1)*
**closely** *(1)*
**closes** *(1)*
**cloud-based** *(1)*
**collaboration** *(1)*
**colleagues** *(1)*
**come** *(11)*
**comes** *(2)*
**comfortable** *(1)*
**coming** *(4)*
**command** *(1)*
**commands** *(5)*
**commencing** *(1)*
**Commission** *(3)*

**COMMISSIONER**
 *(65)*
**Commissioners** *(7)*
**Commonwealth** *(2)*
**communicate** *(1)*
**communicated** *(1)*
**communications** *(2)*
**communicative** *(1)*
**compare** *(1)*
**complement** *(1)*
**completed** *(3)*
**completely** *(1)*
**completion** *(1)*
**compliance** *(17)*
**complied** *(1)*
**compound** *(1)*
**comprehensive** *(1)*
**concerned** *(3)*
**concerns** *(1)*
**concert** *(1)*
**concluded** *(2)*
**conclusion** *(3)*
**condition** *(1)*
**conditions** *(5)*
**conduct** *(2)*
**conducted** *(4)*
**conducting** *(1)*
**conducts** *(1)*
**confer** *(2)*
**confidential** *(4)*
**confirm** *(1)*
**confirmed** *(1)*
**consider** *(2)*
**consist** *(2)*
**consistent** *(7)*
**consistently** *(1)*
**Consultants** *(1)*
**contact** *(1)*
**contains** *(1)*
**contraband** *(1)*
**contract** *(9)*
**contracted** *(5)*
**contractor** *(2)*
**control** *(3)*
**controlled** *(1)*
**conversations** *(4)*
**converse** *(5)*
**conversing** *(1)*
**convey** *(2)*

conveyed  (1)
copy  (2)
Corizon  (16)
Corizon's  (1)
CORP  (2)
Correct  (19)
correction  (2)
correctional  (52)
corrections  (12)
correction's  (1)
corrective  (1)
correctly  (6)
correlate  (1)
counsel  (4)
count  (1)
counted  (1)
counts  (1)
couple  (7)
course  (4)
COURT  (15)
COVID  (3)
COVID-related  (1)
CPR  (7)
create  (1)
creating  (2)
crisis  (1)
critical  (3)
cues  (2)
culture  (5)
current  (10)
currently  (3)
custody  (18)
cut  (1)
cutting  (1)

< D >
daily  (10)
date  (2)
dated  (2)
day  (4)
dead  (1)
deaf  (1)
deal  (2)
deals  (1)
dealt  (1)
death  (22)
deaths  (8)
decedent  (2)
December  (1)

decides  (1)
decision  (2)
decisions  (4)
decompress  (1)
decrease  (1)
de-escalation  (1)
defend  (1)
DEFENDANT  (1)
Defendants  (4)
defer  (6)
deficiencies  (1)
definitely  (3)
degree  (1)
delegated  (3)
deliver  (7)
delivered  (6)
delivery  (8)
demise  (2)
dental  (1)
departed  (1)
DEPARTMENT  (24)
departmental  (1)
depend  (1)
depended  (3)
dependent  (4)
depending  (8)
depends  (2)
DEPONENT  (1)
deposition  (7)
deputies  (1)
Deputy  (20)
describe  (3)
described  (3)
describing  (2)
Description  (1)
designate  (1)
designated  (5)
designed  (1)
designee  (2)
designees  (1)
desk  (1)
despite  (1)
Detention  (2)
determination  (3)
determine  (12)
determined  (4)
determines  (3)
determining  (5)
develop  (1)

developing  (1)
diabetes  (22)
diabetic  (5)
diabetics  (3)
diagnosis  (1)
diagnostic  (1)
died  (1)
difference  (1)
differences  (1)
different  (14)
direct  (9)
directed  (3)
Direction  (1)
directives  (1)
directly  (1)
Director  (5)
disabilities  (6)
disability  (3)
disciplinary  (9)
discipline  (7)
disciplined  (1)
discovered  (1)
discuss  (10)
discussed  (5)
discussing  (2)
discussion  (3)
discussions  (4)
disease  (1)
diseases  (1)
dismissed  (1)
disobedient  (1)
dispositions  (1)
distinct  (1)
distinction  (2)
distributed  (1)
distribution  (1)
DISTRICT  (2)
division  (7)
divisions  (3)
DOC  (1)
doctor  (2)
document  (17)
documentation  (4)
documented  (17)
documenting  (4)
Documents  (4)
doing  (13)
dose  (1)
doses  (6)

DR  (49)
drag  (1)
driver  (1)
due  (2)
duly  (7)
Durham  (1)
duties  (17)
duty  (2)

< E >
ear  (1)
earlier  (8)
early  (1)
easier  (4)
EASTERN  (1)
educate  (1)
educating  (1)
education  (2)
educational  (1)
effective  (1)
effectuate  (1)
Eight  (1)
either  (8)
elaborate  (1)
Electronic  (10)
emerged  (1)
emergencies  (8)
emergency  (22)
emergent  (2)
employed  (4)
employees  (4)
employment  (7)
empowered  (1)
enable  (1)
encompass  (2)
encompasses  (2)
encompassing  (2)
encounter  (3)
enforcement  (1)
engage  (12)
engaged  (4)
engagement  (11)
engagements  (2)
engaging  (2)
enhance  (2)
enlarge  (2)
ensure  (7)
ensuring  (5)
entails  (1)

Case 2:24-cv-05618-TJS    Document 100-7    Filed 12/05/25    Page 69 of 75

Deposition of Blanche Carney                                     Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

enter  *(4)*
entered  *(5)*
entering  *(3)*
entire  *(4)*
entirety  *(1)*
entity  *(1)*
entry  *(1)*
environmental  *(1)*
episodic  *(1)*
ER  *(2)*
Errata  *(1)*
error  *(1)*
escalated  *(1)*
escalates  *(1)*
escort  *(3)*
escorted  *(3)*
ESQUIRE  *(5)*
establish  *(1)*
establishes  *(1)*
estate  *(1)*
Estates  *(1)*
evaluate  *(1)*
evaluations  *(1)*
everybody  *(4)*
exact  *(2)*
exactly  *(3)*
EXAMINATION  *(4)*
examined  *(1)*
example  *(1)*
Excel  *(2)*
exclusive  *(1)*
excuse  *(3)*
executed  *(1)*
Executive  *(4)*
exhibit  *(1)*
Exhibit-1  *(2)*
existing  *(1)*
exit  *(2)*
expectations  *(4)*
expected  *(3)*
experience  *(4)*
experiencing  *(4)*
explain  *(2)*
explaining  *(1)*
express  *(1)*
extensive  *(1)*
extent  *(5)*
external  *(1)*
eye  *(1)*

< F >
facet  *(1)*
face-to-face  *(1)*
facilitated  *(1)*
facilities  *(13)*
facility  *(24)*
facility's  *(1)*
fact  *(2)*
factors  *(1)*
facts  *(1)*
failed  *(2)*
failing  *(3)*
failures  *(4)*
fair  *(8)*
familiar  *(5)*
far  *(5)*
fast  *(1)*
fellow  *(1)*
felt  *(1)*
few-minute  *(1)*
field  *(3)*
fight  *(1)*
file  *(3)*
filed  *(2)*
files  *(1)*
filing  *(1)*
fill  *(1)*
filled  *(4)*
finding  *(3)*
Findings  *(6)*
fine  *(2)*
finish  *(3)*
finished  *(4)*
finishes  *(1)*
finishing  *(1)*
first  *(12)*
firsthand  *(2)*
five  *(2)*
flag  *(3)*
flat-out  *(1)*
FLOOR  *(2)*
flow  *(1)*
focusing  *(1)*
folks  *(1)*
follow  *(5)*
followed  *(4)*
following  *(13)*
follows  *(1)*

foregoing  *(3)*
form  *(24)*
formal  *(2)*
formalize  *(3)*
formally  *(2)*
format  *(4)*
FORMER  *(1)*
forms  *(2)*
forth  *(1)*
forward  *(1)*
forwarded  *(1)*
found  *(7)*
foundation  *(1)*
frame  *(1)*
FRASIER  *(2)*
free  *(1)*
frequencies  *(1)*
frequency  *(2)*
frequently  *(5)*
full  *(8)*
fully  *(1)*
further  *(4)*

< G >
Gabellos  *(1)*
gain  *(1)*
gained  *(1)*
GARDEN  *(1)*
garnered  *(1)*
GAY  *(4)*
GENA  *(2)*
general  *(7)*
generally  *(6)*
generate  *(1)*
generates  *(1)*
generating  *(1)*
getting  *(5)*
give  *(10)*
given  *(6)*
giving  *(7)*
glean  *(2)*
gleaning  *(1)*
glucose  *(4)*
go  *(24)*
goes  *(3)*
going  *(58)*
Good  *(5)*
GORDON  *(2)*
GPS  *(4)*

Graduate  *(1)*
greater  *(1)*
GROTE  *(83)*
ground  *(1)*
group  *(1)*
Guardian  *(5)*
guess  *(6)*
guidance  *(4)*
guidelines  *(7)*

< H >
half  *(1)*
hand  *(1)*
handle  *(2)*
handled  *(1)*
happen  *(6)*
happened  *(7)*
happening  *(6)*
happens  *(3)*
head  *(5)*
Health  *(22)*
healthcare  *(2)*
Health's  *(1)*
hear  *(1)*
heard  *(4)*
hearing  *(5)*
hearing-impaired  *(2)*
hearings  *(1)*
hears  *(1)*
held  *(3)*
help  *(2)*
helpful  *(2)*
Herdman  *(35)*
Herdman's  *(2)*
hereinbefore  *(1)*
Herman  *(1)*
hierarchy  *(1)*
higher  *(4)*
higher-acute  *(1)*
highest-ranking  *(2)*
highlighted  *(1)*
Hill  *(1)*
HIPAA  *(2)*
history  *(9)*
hit  *(1)*
hold  *(2)*
hospital  *(6)*
hospitalizations  *(1)*
housed  *(1)*

housing  (24)
How's  (2)
Human  (2)

< I >
identification  (2)
identified  (6)
identify  (7)
identifying  (3)
idly  (1)
ill  (1)
impact  (1)
impaired  (1)
implement  (1)
implementations  (1)
implemented  (4)
implying  (1)
importance  (2)
important  (2)
impose  (1)
imposed  (3)
improved  (1)
Improvement  (7)
incarcerated  (25)
incarceration  (7)
incident  (11)
incidents  (1)
include  (3)
included  (1)
includes  (2)
including  (3)
inclusive  (1)
incoming  (1)
incorporate  (1)
increase  (1)
increased  (1)
increasing  (1)
in-custody  (2)
in-death  (1)
independent  (2)
INDEX  (1)
indicates  (1)
indicating  (1)
indications  (1)
individual  (57)
individualized  (1)
individuals  (39)
individual's  (2)
infection  (1)

inferring  (1)
infirmary  (5)
information  (37)
infrastructure  (4)
infrequently  (1)
initial  (3)
initiate  (2)
initiated  (3)
initiative  (5)
injuries  (1)
injury  (1)
inmate  (4)
inmates  (1)
in-service  (5)
inside  (1)
installed  (1)
instance  (2)
instances  (2)
instruct  (1)
instructing  (1)
instruction  (1)
insulin  (5)
insulin-filled  (2)
intake  (14)
interact  (1)
interchangeably  (1)
intercom  (1)
interfere  (1)
interference  (1)
interpretation  (1)
interrupt  (1)
intervention  (1)
interviewing  (1)
interviews  (1)
intimately  (1)
investigating  (1)
investigation  (23)
investigations  (9)
involve  (4)
involved  (14)
involvement  (1)
iPhone  (2)
isolated  (1)
issue  (12)
issued  (3)
issues  (21)
issue-specific  (1)
it'd  (2)
item  (1)

its  (5)
Ivan  (2)

< J >
JACOB  (1)
jail  (2)
JAMES  (1)
January  (2)
Jermaine  (1)
JKAMINSKY@KEIR

NANTRABACH.COM
  (1)
job  (5)
JOHN  (2)
join  (1)
joint  (1)
JONATHAN  (2)
JR  (2)
judicial  (3)
jumping  (1)
JUNG  (12)
Jung000001  (1)
Jung's  (3)

< K >
K-9  (1)
K-9s  (1)
KAMINSKY  (11)
keep  (1)
KENNEDY  (1)
kept  (1)
ketoacidosis  (1)
KIERNAN  (1)
KIMBALL  (1)
kind  (10)
know  (78)
knowledge  (4)
Kudos  (1)

< L >
laid  (1)
LALITHA  (2)
landline  (1)
language  (2)
large  (1)
late  (1)
LAW  (3)
lawyer  (1)

lays  (2)
lead  (2)
leadership  (2)
learn  (1)
leave  (4)
leaves  (1)
leaving  (1)
led  (3)
left  (2)
legal  (1)
letter  (1)
level  (8)
Lewis  (3)
liaised  (1)
liaison  (1)
licensed  (9)
lieutenant  (1)
lieutenants  (2)
life-saving  (2)
life-threatening  (1)
light  (1)
Lincoln  (1)
Line  (7)
link  (1)
Lisa  (3)
list  (4)
lists  (2)
little  (6)
living  (1)
LLC  (1)
LLP  (1)
located  (1)
location  (3)
Lock  (21)
log  (1)
LOGAN  (1)
logbook  (1)
long  (4)
look  (24)
looking  (26)
loss  (2)
lost  (3)
lot  (3)
loud  (1)
LOUIS  (1)
lower  (2)
Lt  (3)
lying  (1)

Deposition of Blanche Carney                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**< M >**
maintained  *(3)*
maintaining  *(2)*
major  *(2)*
majority  *(3)*
making  *(14)*
male  *(2)*
managed  *(1)*
management  *(2)*
Manager  *(1)*
manages  *(1)*
managing  *(2)*
mandatory  *(1)*
manner  *(1)*
MANSUKHANI  *(1)*
March  *(2)*
MARIESHA  *(3)*
Marked  *(3)*
MARKET  *(1)*
Marshall  *(2)*
Master's  *(2)*
Mathis  *(1)*
matrix  *(1)*
matter  *(3)*
MAUREEN  *(1)*
Mawr  *(1)*
MBA  *(1)*
mean  *(18)*
meaning  *(2)*
means  *(3)*
measurements  *(1)*
measures  *(7)*
mechanism  *(1)*
medical  *(164)*
medical-certified  *(1)*
Medical's  *(1)*
medicate  *(1)*
medication  *(28)*
medication-compliant
  *(1)*
medications  *(8)*
med-line  *(2)*
meet  *(2)*
meeting  *(6)*
meetings  *(6)*
member  *(5)*
members  *(5)*
memorize  *(1)*
mental  *(4)*

mentioned  *(4)*
message  *(1)*
method  *(1)*
methods  *(1)*
MICHAEL  *(2)*
MICHAEL.PESTRAK
@PHILA.GOV  *(1)*
middle  *(3)*
Mini  *(3)*
minimize  *(1)*
minimum  *(1)*
minutes  *(2)*
mischaracterizing  *(1)*
misconduct  *(6)*
missed  *(12)*
missing  *(2)*
mm-hmms  *(1)*
modify  *(1)*
module  *(1)*
modules  *(1)*
moment  *(6)*
monitor  *(2)*
monitored  *(2)*
monitoring  *(5)*
monitors  *(3)*
monthly  *(1)*
months  *(5)*
morning  *(1)*
Morris  *(1)*
mortality  *(35)*
move  *(1)*
multiple  *(2)*
Murphy  *(1)*

**< N >**
name  *(7)*
names  *(1)*
narrative  *(1)*
National  *(5)*
nationally  *(1)*
nature  *(2)*
necessarily  *(8)*
necessity  *(1)*
need  *(22)*
needed  *(6)*
needs  *(6)*
Need-to-know  *(1)*
never  *(2)*
new  *(4)*

newly-hired  *(1)*
nods  *(1)*
non-chronic  *(1)*
non-compliance  *(1)*
non-compliant  *(1)*
non-emergency  *(1)*
non-movement  *(1)*
nonresponsive  *(1)*
non-responsive  *(1)*
nonverbal  *(1)*
non-voting  *(1)*
normal  *(1)*
normally  *(1)*
no-shows  *(1)*
Notary  *(1)*
note  *(2)*
noted  *(1)*
notes  *(11)*
notice  *(1)*
noticed  *(1)*
notification  *(7)*
notified  *(9)*
notify  *(10)*
notifying  *(6)*
November  *(2)*
nuance  *(1)*
number  *(19)*
numbers  *(1)*
NURSE  *(5)*
nursing  *(2)*

**< O >**
obeying  *(1)*
object  *(3)*
Objection  *(47)*
objections  *(1)*
obligations  *(1)*
observation  *(1)*
observations  *(2)*
observe  *(1)*
observing  *(2)*
obtain  *(2)*
obtained  *(2)*
obtaining  *(1)*
obviously  *(1)*
occasion  *(2)*
Occasionally  *(1)*
occasions  *(2)*
occur  *(3)*

occurred  *(7)*
occurrence  *(2)*
occurrences  *(2)*
occurring  *(4)*
occurs  *(1)*
O'CONNOR  *(1)*
OCTOBER  *(1)*
offer  *(1)*
Office  *(14)*
officer  *(41)*
officers  *(17)*
officer's  *(4)*
oh  *(2)*
Okay  *(57)*
omitted  *(1)*
once  *(4)*
one-and-done  *(1)*
one-time  *(1)*
ongoing  *(4)*
OPC  *(8)*
open  *(1)*
operations  *(2)*
opportunity  *(4)*
opposed  *(2)*
opting  *(1)*
Oral  *(11)*
order  *(8)*
ordered  *(2)*
ordering  *(1)*
orders  *(1)*
org  *(1)*
organization  *(1)*
original  *(1)*
outside  *(3)*
overall  *(14)*
overarching  *(1)*
oversight  *(5)*

**< P >**
p.m  *(1)*
PA  *(3)*
packet  *(1)*
PAGE  *(32)*
pages  *(1)*
pains  *(1)*
paint  *(1)*
panel  *(1)*
paperwork  *(2)*
paragraph  *(7)*

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

parentheses *(1)*
part *(28)*
participate *(2)*
participated *(1)*
participation *(2)*
particular *(9)*
parties *(1)*
parts *(1)*
pass *(2)*
passage *(1)*
passes *(1)*
patient *(9)*
patients *(11)*
patient's *(5)*
pattern *(5)*
patterns *(9)*
PDF *(1)*
PDP *(39)*
penalties *(1)*
PENN *(1)*
PENNSYLVANIA *(5)*
people *(10)*
perception *(1)*
perform *(2)*
Performance *(8)*
performed *(4)*
performing *(1)*
period *(9)*
periods *(1)*
person *(35)*
personnel *(4)*
persons *(1)*
person's *(3)*
pertaining *(1)*
PESTRAK *(70)*
ph *(2)*
pharmacies *(1)*
Pharmacist-Directed *(2)*
pharmacy *(1)*
PHILADELPHIA *(23)*
phone *(5)*
phrase *(1)*
phrasing *(1)*
physical *(1)*
physically *(2)*
physician *(1)*
PICC *(1)*

pill *(1)*
PIP *(7)*
place *(20)*
placed *(5)*
placement *(1)*
placing *(1)*
Plaintiff *(1)*
Plaintiffs *(4)*
plan *(13)*
Plans *(6)*
platform *(5)*
play *(2)*
played *(2)*
please *(10)*
POD *(1)*
point *(3)*
pointing *(2)*
police *(1)*
policies *(13)*
policy *(43)*
poorly *(1)*
population *(11)*
portal *(3)*
portion *(1)*
portions *(2)*
position *(5)*
positions *(1)*
possible *(4)*
post *(1)*
posted *(1)*
post-high-school *(1)*
potential *(3)*
potentially *(1)*
practitioner *(4)*
practitioners *(1)*
predates *(1)*
preloaded *(1)*
prepare *(2)*
prepared *(1)*
prescribed *(1)*
prescription *(2)*
prescriptions *(3)*
present *(5)*
presented *(6)*
presenting *(1)*
presently *(1)*
presents *(1)*
pretty *(1)*
preventing *(1)*

previous *(1)*
previously *(1)*
primarily *(2)*
primary *(1)*
prior *(9)*
Prison *(6)*
prisoners *(1)*
PRISONS *(19)*
privacy *(1)*
Probably *(6)*
procedure *(2)*
procedures *(2)*
proceeding *(1)*
process *(35)*
processes *(1)*
processing *(1)*
procure *(1)*
procured *(5)*
procuring *(1)*
produced *(5)*
Production *(1)*
Production002649 *(1)*
Production004786 *(1)*
Production005109 *(1)*
Production005130 *(1)*
professional *(12)*
professionally *(1)*
Program *(7)*
programs *(1)*
progress *(1)*
pronounced *(1)*
proper *(2)*
Proposal *(9)*
Proposals *(1)*
Proposed *(2)*
propounded *(1)*
protection *(1)*
protocol *(4)*
protocols *(1)*
provide *(19)*
provided *(20)*
Provider *(38)*
providers *(5)*
provider's *(1)*
provides *(5)*
providing *(11)*
provision *(5)*
Public *(3)*
Puerini *(8)*

pulled *(2)*
pulse *(3)*
purposes *(1)*
put *(10)*
putting *(3)*

< Q >
QA *(1)*
quality *(5)*
quality-assurance *(2)*
quarter *(2)*
quarterly *(8)*
question *(31)*
Questions *(16)*
quickly *(1)*
quite *(1)*

< R >
raise *(1)*
raised *(1)*
range *(3)*
rank *(5)*
RAY *(1)*
read *(6)*
readily *(3)*
reading *(6)*
readings *(1)*
readmitted *(3)*
read-only *(4)*
really *(2)*
reason *(5)*
reasonable *(1)*
reasons *(4)*
recall *(39)*
recalling *(3)*
receive *(22)*
received *(5)*
receives *(1)*
receiving *(6)*
recess *(2)*
recognize *(1)*
recognized *(1)*
recognizing *(2)*
recollect *(1)*
recollection *(31)*
recommendation *(6)*
recommendations *(7)*
recommended *(1)*
recommending *(1)*

record  *(21)*
recorded  *(1)*
records  *(2)*
record's  *(1)*
recurring  *(1)*
red  *(3)*
red-flag  *(6)*
REES  *(1)*
referral  *(1)*
referring  *(1)*
refers  *(1)*
refresh  *(6)*
refresher  *(12)*
refreshers  *(1)*
refreshes  *(1)*
refusal  *(13)*
refusals  *(6)*
refused  *(5)*
refuses  *(2)*
refusing  *(5)*
regard  *(10)*
regarding  *(5)*
regards  *(1)*
regular  *(9)*
regularly  *(3)*
reiterate  *(1)*
reiterating  *(1)*
reject  *(1)*
related  *(2)*
relationship  *(1)*
relative  *(1)*
released  *(3)*
relevant  *(3)*
rely  *(1)*
relying  *(2)*
remain  *(1)*
remains  *(1)*
remember  *(15)*
remembering  *(1)*
REMIC  *(4)*
render  *(7)*
rendered  *(4)*
rendering  *(3)*
renders  *(1)*
repeat  *(6)*
repetitive  *(1)*
rephrase  *(5)*
report  *(27)*
reported  *(2)*

Reporter  *(9)*
Reporter-Notary  *(1)*
reporting  *(1)*
reports  *(28)*
represent  *(3)*
reproduction  *(1)*
Request  *(12)*
require  *(3)*
required  *(9)*
requires  *(2)*
Research  *(1)*
reserved  *(1)*
resources  *(1)*
respective  *(2)*
respond  *(2)*
responded  *(3)*
responding  *(4)*
response  *(7)*
responses  *(1)*
responsibilities  *(7)*
responsibility  *(10)*
responsible  *(14)*
responsive  *(1)*
Restorative  *(3)*
resulted  *(1)*
retired  *(1)*
retirement  *(1)*
revealed  *(1)*
review  *(54)*
reviewed  *(12)*
reviewing  *(13)*
reviews  *(32)*
revision  *(1)*
right  *(32)*
rights  *(3)*
Right-to-Know  *(1)*
rise  *(1)*
Robinson  *(1)*
robots  *(1)*
role  *(7)*
roles  *(1)*
roll  *(5)*
roll-call  *(1)*
room  *(8)*
Rosa  *(1)*
Rosado  *(1)*
round  *(1)*
rounds  *(14)*
routine  *(5)*

rules  *(2)*

< S >
safety  *(3)*
Samicheilli  *(1)*
Samichielli  *(1)*
saying  *(8)*
says  *(21)*
scanner  *(1)*
scanners  *(1)*
scenario  *(3)*
scenarios  *(2)*
scene  *(1)*
schedule  *(4)*
scheduled  *(5)*
School  *(1)*
Science  *(1)*
Scope  *(4)*
screen  *(11)*
screening  *(2)*
scroll  *(4)*
SCULLY  *(1)*
sealing  *(1)*
second  *(3)*
section  *(1)*
secured  *(1)*
security  *(18)*
security-related  *(1)*
see  *(54)*
seeing  *(4)*
seek  *(3)*
self-reports  *(1)*
sent  *(7)*
sentence  *(3)*
Sentinel  *(1)*
separate  *(1)*
separated  *(1)*
September  *(1)*
Sergeant  *(2)*
sergeants  *(2)*
series  *(5)*
serious  *(3)*
serve  *(1)*
Service  *(7)*
Services  *(45)*
set  *(7)*
setting  *(3)*
settings  *(2)*
seven  *(1)*

severe  *(1)*
share  *(9)*
sharing  *(3)*
Sheet  *(1)*
shift  *(1)*
shorthand  *(1)*
short-staffed  *(3)*
show  *(1)*
showing  *(2)*
shown  *(1)*
sick  *(1)*
side  *(3)*
sight  *(1)*
sign  *(3)*
signature  *(3)*
signed  *(3)*
significant  *(3)*
significantly  *(2)*
signing  *(1)*
signs  *(4)*
similar  *(5)*
simply  *(6)*
single  *(1)*
site  *(8)*
sitting  *(1)*
situation  *(7)*
situations  *(2)*
six  *(2)*
size  *(1)*
slightly  *(1)*
smooth  *(1)*
Social  *(6)*
Soell  *(1)*
solicit  *(1)*
solicitation  *(1)*
soliciting  *(1)*
somebody  *(14)*
somebody's  *(2)*
someone's  *(1)*
sorry  *(3)*
sound  *(3)*
sources  *(2)*
speak  *(5)*
speaking  *(3)*
Special  *(2)*
specialty  *(1)*
specific  *(22)*
specifically  *(10)*
specifics  *(5)*

Deposition of Blanche Carney                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

specify *(1)*
spell *(2)*
spoken *(1)*
spreadsheet *(2)*
SPRING *(1)*
SQUARE *(1)*
staff *(118)*
staffing *(3)*
staff's *(1)*
stage *(1)*
stamps *(1)*
standard *(2)*
standards *(4)*
standing *(3)*
start *(5)*
started *(2)*
starting *(1)*
starts *(2)*
state *(3)*
stated *(2)*
statements *(1)*
STATES *(2)*
status *(2)*
stenographic *(1)*
steps *(1)*
stipulated *(1)*
Stipulations *(1)*
stop *(2)*
straightforward *(1)*
strategically *(1)*
STREET *(4)*
stretcher *(6)*
Strike *(2)*
structure *(6)*
submission *(1)*
submitted *(2)*
subordinate *(1)*
substance *(1)*
subtopics *(1)*
suggestion *(3)*
Suggestions *(5)*
SUITE *(4)*
SUMMER *(1)*
supervises *(1)*
supervision *(1)*
Supervisor *(2)*
supervisors *(1)*
supplement *(1)*
SUPPORT *(2)*

supposed *(27)*
sure *(21)*
surrounding *(2)*
sustain *(1)*
sustained *(8)*
sustaining *(1)*
sustains *(1)*
sworn *(7)*
symptoms *(2)*
syringe *(1)*
system *(14)*
systemic *(2)*

< T >
Tab *(2)*
take *(15)*
taken *(8)*
takes *(1)*
talk *(2)*
talked *(3)*
talking *(4)*
talks *(1)*
tasked *(1)*
Taylor *(1)*
Team *(4)*
technology *(1)*
tell *(2)*
telling *(2)*
tells *(1)*
TEN *(2)*
tenure *(4)*
term *(3)*
terminology *(3)*
terms *(3)*
testified *(6)*
testimony *(2)*
TGREGORY@OKLL
P.COM *(1)*
Thank *(30)*
thanks *(1)*
theme *(2)*
themes *(1)*
thing *(2)*
things *(7)*
think *(17)*
thinks *(1)*
THOMAS *(5)*
thought *(4)*
THREE *(14)*

three-month *(1)*
threshold *(1)*
THURSDAY *(1)*
tier *(1)*
time *(32)*
timeliness *(2)*
times *(7)*
title *(6)*
today *(6)*
today's *(1)*
top *(10)*
topics *(4)*
Torres *(1)*
totality *(3)*
totally *(2)*
touched *(2)*
tour *(4)*
toured *(2)*
tours *(14)*
Track *(28)*
tracked *(9)*
tracking *(8)*
trained *(8)*
training *(46)*
trainings *(8)*
transcript *(4)*
transcription *(1)*
transfer *(1)*
transferred *(5)*
transition *(1)*
Transitional *(3)*
transport *(2)*
transports *(1)*
treat *(2)*
treated *(6)*
treatment *(8)*
treatments *(1)*
TREBACH,LLP *(1)*
trial *(1)*
triggered *(1)*
trip *(3)*
trips *(3)*
Trivicam *(1)*
TRIVIKIM *(2)*
TRIVIKRAM *(2)*
true *(2)*
try *(5)*
trying *(9)*
turn *(1)*

turnover *(1)*
tweaked *(2)*
twice *(4)*
two *(14)*
type *(7)*
types *(4)*

< U >
ultimately *(1)*
unable *(1)*
understand *(9)*
understanding *(6)*
understood *(18)*
unique *(1)*
unit *(18)*
UNITED *(1)*
units *(2)*
universal *(1)*
University *(1)*
unpredictable *(1)*
unresponsive *(1)*
unusual *(2)*
update *(5)*
updates *(2)*
upheld *(1)*
use *(5)*
usually *(1)*

< V >
vacancy *(1)*
variation *(1)*
various *(3)*
vary *(2)*
verbally *(2)*
versus *(2)*
Videotaped *(1)*
violated *(4)*
violation *(1)*
violations *(1)*
Virtual *(1)*
visible *(1)*
visits *(3)*
visual *(3)*
vs *(1)*

< W >
wait *(1)*
waived *(1)*
walk *(7)*

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

walked  *(1)*
**WANDA**  *(3)*
**want**  *(16)*
**wanted**  *(5)*
**wants**  *(1)*
**warden**  *(7)*
**wardens**  *(9)*
**way**  *(16)*
**ways**  *(1)*
**website**  *(1)*
**weekly**  *(2)*
**well**  *(22)*
**went**  *(2)*
**we're**  *(16)*
**Western**  *(1)*
**we've**  *(3)*
**widespread**  *(1)*
**wing**  *(6)*
**WITNESS**  *(53)*
**witnessed**  *(2)*
**WITTEKIND**  *(20)*
**WITTEKIND@OKLL**
**P.COM**  *(1)*
**wondering**  *(5)*
**Woods**  *(1)*
**word**  *(2)*
**words**  *(1)*
**Work**  *(11)*
**worked**  *(1)*
**workers**  *(1)*
**workforce**  *(1)*
**working**  *(6)*
**work-performance**
 *(1)*
**world**  *(1)*
**writing**  *(5)*
**written**  *(9)*
**wrong**  *(1)*
**wrote**  *(1)*

**< Y >**
**Yeah**  *(17)*
**year**  *(7)*
**years**  *(12)*
**YESCARE**  *(19)*
**YesCare's**  *(1)*
**yesterday**  *(1)*