# Exhibit H

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 2 of 52

Deposition of Sandy Varghese                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                      -   -   -

4   JACOB and JAMES JUNG, as      :
    Administrators of the Estate :
5   of LOUIS JUNG, JR.,           :
              Plaintiff,          :
6                                 :
    -vs.-                         :
7                                 :
    CITY OF PHILADELPHIA, et al.,:
8             Defendant(s).       : 2:24-cv-05618-TJS

9                      -   -   -

10              Friday, October 24, 2025

11                      -   -   -

12              Videoconferenced deposition of

13   SANDY VARGHESE, taken pursuant to notice, was

14   held virtually in the Commonwealth of

15   Pennsylvania, commencing at 9:02 a.m., on the

16   above date, before Jared Carey, a Professional

17   Reporter and Notary Public in and for the

18   Commonwealth of Pennsylvania.

19                      -   -   -

20

21

22          EVEREST COURT REPORTING LLC
                100 N. 18th Street
23                  Suite 2001
            Philadelphia, Pennsylvania 19103
24              (215) 341-3616

25

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 3 of 52

Deposition of Sandy Varghese                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1            APPEARANCES:

2    ABOLITIONIST LAW CENTER
     BY: BRET GROTE, ESQUIRE
3        MARGO HU, ESQUIRE
     990 Spring Garden Street, Suite 306
4    Philadelphia, Pennsylvania 19123
     412.654.9070
5    Attorney for the Plaintiff
     (Appearing via Zoom)

6

7    KIERNAN TREBACH
     BY: JONATHAN M. KAMINSKY, ESQUIRE
8    1801 Market Street, Suite 770
     Philadelphia, Pennsylvania 19103
9    215.569.4433
     Attorney for Defendant, Mariesha Apollon
10   (Appearing via Zoom)

11

12   CITY OF PHILADELPHIA LAW DEPARTMENT
     BY: MIKE PESTRAK, ESQUIRE
13   1515 Arch Street, 14th floor
     Philadelphia, Pennsylvania 19103
14   215.683.5000
     Attorney for Defendant, City of Philadelphia,
     Blanche Carney, Gene Frasier, Wanda Bloodsaw
15   (Appearing via Zoom)

16

17   GORDON REES SCULLY MANSUKHANI
     BY: SUMMER C. THOMAS, ESQUIRE
18   1717 Arch Street, Suite 610
     Philadelphia, Pennsylvania 19103
19   215.561.2300
     Attorney for Defendant, Career Staffing
     (Appearing via Zoom)

20

21

22

23

24

25

```
 1          APPEARANCES: Continued

 2

 3     O'CONNOR KIMBALL
       BY: RAYMOND WITTEKIND, ESQUIRE
 4     15th Street and JFK Boulevard, Suite 1100
       Philadelphia, Pennsylvania 19102
 5     215.564.0400
       Attorney for Defendant, YesCare Corp.
 6     (Appearing via Zoom)

 7

 8

 9     ALSO PRESENT:

10     Corinne Austen

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I  N  D  E  X

 2   WITNESS                                    PAGE

 3   SANDY VARGHESE

 4   BY:  MR. GROTE                             6, 89

 5        MR. KAMINSKY                          66, 82

 6        MR. WITTEKIND                         75, 88

 7        MR. PESTRAK                           87

 8              E  X  H  I  B  I  T  S

 9   MARKED              DESCRIPTION            PAGE

10            (No exhibits were marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2

 3                  DEPOSITION SUPPORT INDEX

 4

 5   Direction to Witness Not to Answer

 6   Page Line           Page Line           Page Line

 7   None

 8

 9

10   Request for Production of Documents

11   Page Line           Page Line           Page Line

12   None

13

14

15   Stipulations

16   Page Line           Page Line           Page Line

17   None

18

19

20   Question Marked

21   Page Line           Page Line           Page Line

22   None

23

24

25
```

Page 6

- - -

SANDY VARGHESE, having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. GROTE

Q.    Good morning, Ms. Varghese.

A.    Good morning.

Q.    I am having a little bit of trouble hearing you.  If that continues I will let you know.

A.    Okay.

Q.    My name is Bret Grote.  I am counsel for plaintiffs in the matter Jung versus City of Philadelphia.  And you are here in response for a notice of a deposition.  Can you please state and spell your name for the record.

A.    Sandy Varghese.  S-A-N-D-Y, V-A-R-G-H-E-S-E.

Q.    Thank you.  I will be asking you questions today.  Have you ever given a deposition before?

A.    No.

Q.    That's a no?

Page 7

A.    No.  Can you hear me?

Q.    It's a little muddled.

MR. PESTRAK:  It doesn't seem to pick you up as soon as you start talking.

(Discussion held off the record.)

BY MR. GROTE

Q.    So do you know what a 30(b)(6) deposition is?  Has that been explained to you?

A.    I believe Mike did explain it to me.

Q.    I am not going to ask you to share anything your lawyers shared.  But this was a deposition not noticed to you as an individual, but to the Defendant City of Philadelphia asking for them to designate somebody to speak on particular topics.

Is that your understanding?

A.    Yes.

Q.    I will go over some of the basic ground rules for the deposition so it can go smoothly.  We have to speak.  We can't answer through nods or body language or um-hmms because the court reporter cannot get that.

Okay?

A.    Okay.

Page 8

Q.    And the purpose of a deposition is for the court reporter to get down all of the testimony.

A.    Okay.

Q.    We have to not talk over each other.  So I will let you finish your answers.  And if you can let me finish my questions.  Oftentimes in regular conversation we anticipate where a question is going and we can get there before it's finished.

But for the court reporter's sake, let's let each other finish.  If you do not know or remember something, let me know if there is a document that might refresh your recollection.  If you answer a question, I will assume you understood it.

And if you want to take a break, just let us know and we can take breaks.  But if I have asked you a question, you can't take a break to get more time to think about the question or anything of that nature.  You have answer the question.  And then we can take a break.

Does all of that make sense to you?

Page 9

A.    Yes, it does.

Q.    Are you prepared to give a deposition today?

A.    Yes.

Q.    You understand that you've been designated by the City of Philadelphia to testify to specific topics?

A.    Yes.

Q.    I know you just said yes.  But it didn't come through very well.

A.    Yes.

Q.    So I will review the topics you've been designated to testify to and just ask if you are prepared to testify to each of those topics.

A.    Okay.

Q.    I believe they are the first six on the deposition notice.  Topic 1, any audits, reviews, evaluations, investigations or trainings related to medical care, including but not limited to care for persons with diabetes or persons exhibiting symptoms of diabetic ketoacidosis conducted by PDP officials or by outside auditors, monitors, experts, evaluators or inspectors within PDP facilities between

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 8 of 52

Deposition of Sandy Varghese                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 10

January 1, 2018 and December 31, 2023.
Are you prepared to testify to
that?

A.    Yes.

Q.    Topic 2, Policies and practices
for the provision of diabetes treatment within
PDP facilities, including but not limited to the
role of correctional staff and officials in
ensuring the provision of diabetes care.

Before I ask are you prepared to
testify to that, I want to go back and make
clear for the record you've been designated to
speak by PDP as it pertains to the role of PDP
employed medical staff to the topics; is that
accurate?

A.    Yes.

Q.    So for No. 2 about diabetes
treatment, are you prepared to testify to that
from that perspective?

A.    Yes.

Q.    No. 3, Policies and practices of
medication administration and documentation
within PDP facilities, including the role of
correctional staff and officials in ensuring
proper medication administration and

Page 11

documentation.
Are you prepared to testify to
that?

A.    Yes.

MR. PESTRAK:  Just for the record
for 3, 4, 5 and 6, she is designated for
the medical parts of those questions, not
the correctional parts of those questions.

As you know, we had Major Powers.
I wanted to make sure that was on the
record.

MR. GROTE:  Yes.  For 3, 4, 5 and
6 it all has this including -- and the role
of correctional staff.

MR. PESTRAK:  That's all I wanted
was to make sure it was on the record.

MR. GROTE:  We are on the same
page.  Thank you.

BY MR. GROTE

Q.    No. 4, Policies and practices of
providing emergency medical care within PDP
facilities?

A.    Yes.

Q.    No. 5, Policies and practices
pertaining to placement of incarcerated

Page 12

individuals in an infirmary or other medical
housing unit within PDP facilities?

A.    Yes.

Q.    And No. 6, Policies and practices
pertaining to referral or transfer of
incarcerated individuals within PDP facilities
to an outside medical facility, including but
not limited to a hospital?

A.    Yes.

Q.    Thank you.

Did you do anything to prepare
for today's deposition?

A.    Yes, I did.

Q.    What was that without telling me
about any contents of conversations you had with
legal counsel?

A.    I just refreshed myself with the
policies and procedures.

Q.    Were there any specific policy
documents you looked at?

A.    I looked at the PDP policies that
I provided to the legal counsel.

Q.    You provided documents to your
counsel?

A.    Yes.

Page 13

Q.    And do you recall what the names
of some of those policies were?

A.    It's been a few weeks.  I think
it was intake procedures.  It could have been
Access to Care policy, emergency transfer
policies.  I don't remember all the names of
them.

Q.    Okay.  And you can only testify
to what you remember, too, of course.

Where do you work currently?

A.    Philadelphia Department of
Prisons.

Q.    And what is your role there?

A.    So my city title is the
healthcare coordinator.  But I oversee the
health care contract for the City of
Philadelphia.

Q.    How long have you been in that
role?

A.    About 22 years now.

Q.    In that same position?

A.    Yes.  Well, the title -- to
clarify, for this title it's been two years.
But even though the title has changed, the
position has pretty much been the same.

Page 14

Q.    I will go back to the employment history in a moment.  But before that, if you can let me know, what education did you receive?  Do you have any -- high school I don't need to know about.  But anything after high school degrees?

A.    So I went to nursing school.  I'm an RN.  I have my bachelor's degree in nursing.  And then I did go to graduate school.  I have an MBA in health administration.

Q.    Where did you get that MBA?

A.    Eastern University.

Q.    And when did you get it?

A.    I graduated in 2006.

Q.    So you were working at PDP at the time already?

A.    Yes.

Q.    When did you begin with PDP?  I am asking the hard questions.

A.    I believe it was June of 2001.  Should I clarify?

Q.    Sure.

A.    Prior to working in this position with PDP, my actual -- my first nursing position was with Prison Health Services, PHS.  So I did

Page 15

work at Curran-Fromhold as a staff nurse for a period of time.  And then I resigned from that position and took on a couple other nursing duties before I returned and became a city employee.

Q.    When you returned into the position that is -- I think the position you have now with a different title, what was that position?  And what were your responsibilities?

A.    The Curran-Fromhold position?

Q.    Yes.

A.    So I'm pretty much the healthcare contract monitor.  So the city contracts with YesCare to provide medical services.  I oversee what they do by conducting chart audits.  I attend some of their QI -- I do attend their QI meetings.  I have conversations with them if I need to investigate something that's going on and I need further information.

Q.    Thank you.  I have more specific questions about that.

Did you receive any specific training as part of taking on this role of contract supervisor?

A.    On-the-job training.

Page 16

Q.    Who provided that?

A.    When I began my position here there was actually three other nurses in the office.  So there was actually two supervisors and then somebody that was on the same level as me.  All three of them in combination showed me various aspects of the job.

Q.    You mentioned the office.  What office is this?

A.    It's currently called the Office of Medical Operations.

Q.    How many others are in the office with you now?

A.    So now I'm the only nurse.  And I work with Dr. Bruce Herdman who is the chief of medical operations.

Q.    Thank you.  Do you know what Dr. Herdman is a doctor of by chance?

A.    PhD in economics.

Q.    When you started, the contractor was Prison Health Services, you said?

A.    Yes.

Q.    And did Prison Health Services change their name to Corizon at some point?

A.    Yes.

Page 17

Q.    Did Corizon then change to YesCare?

A.    Yes.

Q.    Do you remember when YesCare became the contractor?

A.    I believe 2021.

Q.    But you are not sure, though, are you?

A.    No.  It's been the same company.  Just a name change.

Q.    Right.  I know time is hard to keep track of after COVID.

A.    Yes.

Q.    How did PDP -- how do you provide oversight of the contract for YesCare?  Walk me through what that looks like.

A.    So my duties change from day-to-day.  But overall I can pick a topic that I would like the look at.  And then I will pull a sample from our medical record and conduct chart audits that way.

Other things I do is I receive emails throughout the day, a lot from the public defenders with inquiries about somebody's healthcare.  So I look into that to see if the

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 10 of 52

Deposition of Sandy Varghese                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 18

1 person is receiving the care they should be
2 getting and respond back to the public
3 defenders. I attend their monthly QI meetings,
4 their monthly pharmacy meetings, infection
5 control meetings. I pick up the phone and call
6 their administrative staff at any point because
7 we have four different facilities. So if
8 something is going on at a certain jail, I will
9 call that administrator and speak to them.
10      From time to time I might take a
11 tour of medical areas just to see what is going
12 on. I participate in our yearly mass disaster
13 drills with the healthcare staff.
14      Q.    So thank you for that. It seems
15 like a lot of responsibilities.
16      You mentioned chart audits. What
17 is the process for doing chart audits? Do you
18 do them on a regular basis? Is it as a
19 situation arises? How do you determine when to
20 do those?
21      A.    I try my best to do them on a
22 regular basis. But some of them happen as a
23 need arises or if I'm reviewing a report to see
24 where something is not meeting the standard as
25 we would like it to be, so I might decide, okay,

Page 19

1 let me take a closer look at this and audit it
2 to see what is going on.
3      Q.    What does an audit consist of
4 when you do a chart audit?
5      A.    Normally I will go into our EHR
6 and pull a sample of -- let's say, for example,
7 I wanted to look at people that were getting
8 their chronic care medications. So I might pull
9 a list of people that are on those medications
10 and then just randomize the sample and then go
11 into the chart. I can review to see when was
12 the medication ordered, when did they start
13 receiving it, are they compliant with it.
14 Depending on the situation, I will think of
15 parameters to review.
16      Q.    And does that generate a report?
17 Do you document this audit? What is your -- how
18 does that work?
19      A.    I write up the report. And then
20 I give it to Dr. Herdman for review. And then
21 we discuss it at our joint QI meeting which is
22 with the YesCare staff.
23      Q.    Those are monthly QI meetings,
24 you said?
25      A.    So the joint QI, that's

Page 20

1 bimonthly. So there is -- I am sorry. There is
2 two QI meetings. So there is the YesCare QI
3 meeting which is monthly. And that is run by
4 the YesCare staff. Then we have a joint QI
5 meeting which Dr. Herdman chairs. And that is
6 attended by YesCare and me and Dr. Herdman and
7 our legal monitors.
8      Q.    Are the legal monitors -- is that
9 your legal counsel? Or is that the monitor from
10 the Remick case?
11      A.    No. Dr. Puerini and Dr. Johnson.
12 So they come twice a year to review our medical
13 behavioral health services.
14      Q.    When you said bimonthly, does
15 that mean every other month?
16      A.    Yes.
17      Q.    I can never tell if it's twice a
18 month or every other -- the biweekly thing.
19      Is there a standard agenda at
20 either of these QI meetings?
21      A.    Yes.
22      Q.    What are those agendas?
23      A.    At the joint QI meeting we give
24 an overview of any changes that might have
25 happened within the past two months of the prior

Page 21

1 meeting. We will go over my audits. We'll
2 review the YesCare audits. They will present
3 and review their audits. Any corrective action
4 plans that they put into place, they will also
5 review that.
6      If we have had any mortalities,
7 we will do a little mortality review. And then
8 we give Dr. Puerini and Dr. Johnson time to ask
9 any questions or make any comments. That is
10 pretty much the agenda for the joint QI.
11      The YesCare QI meeting is run by
12 the YesCare staff. So they will talk about,
13 again, any audits that they have completed,
14 corrective action plans. They will talk about
15 grievances. What else? The infection control
16 nurse will do a portion of the meeting and talk
17 about any infection control issues. I think
18 that's it for their meeting.
19      Q.    And when you mentioned corrective
20 action plans, what are those?
21      A.    So, for instance, if I do an
22 audit, even if they do an audit and it doesn't
23 meet the standard -- let's say, it has to be at
24 90 percent that they are below. Then we ask
25 them to do a corrective action plan which will

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 11 of 52

Deposition of Sandy Varghese                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 22

1  then show us what they are going to do to be
2  able to meet that standard.
3          So it can be anything from them
4  educating the staff and then going back like a
5  month later to review and see whatever, did the
6  education work.  Or it can be a process change.
7  Sometimes you can realize you are not doing
8  things the right way or it might be more
9  efficient way to do it and then they make that
10  change and a couple months later they go back
11  and see was that effective, do we need to relook
12  at it, those things.
13          Q.    And you also mentioned mortality
14  reviews.  What are those?
15          A.    That is if we had an incarcerated
16  person pass away, we have to do a mortality
17  review.  We usually have the medical director
18  will do a chart summary and present that to the
19  group then discuss if we thought things went
20  well, if there were any deficiencies, if there
21  was something we could have done a little bit
22  better.  And it was an open forum for people to
23  discuss and make their thoughts known about the
24  case.
25          Q.    At either of these QI meetings,

Page 23

1  are notes taken?
2          A.    Yes.
3          Q.    And are they retained?
4          A.    Yes.
5          Q.    Do you know where they are
6  retained or who is the one that retains them?
7          A.    YesCare retains their minutes.
8  And Dr. Herdman's Office of Medical Operations
9  retained the minutes for the joint QI.
10          Q.    You mentioned monthly pharmacy
11  meetings.  What are those?
12          A.    Those happen on the same day as
13  the QI meeting.  So it follows directly after
14  that.  So YesCare has a contractor that provides
15  pharmacy services, which means they provide our
16  medications.  So they do two pharmacies
17  actually.
18          Both of them are on this meeting.
19  And they present what we spent for the month,
20  what are the top medications that are ordered,
21  if there is any drug shortages they will notify
22  us and will talk about it at the meeting.  That
23  is discussed at the meeting.
24          Q.    You've been in this position for
25  a little bit.  So I have a narrower timeframe

Page 24

1  here.  But within the last, we will say, four
2  years or maybe from 2020 to the end of 2023, was
3  diabetes care ever a topic in either of these
4  types of QI meetings that you recall?
5          A.    I personally did not do any
6  audits on diabetes.  But the YesCare staff did
7  conduct some audits.
8          Q.    And can you tell me what you know
9  about those audits conducted by YesCare staff
10  for diabetes care?
11          A.    I don't recall the results of
12  them.
13          Q.    Do you know were they shared with
14  you?
15          A.    I don't remember exactly.
16          Q.    Do you know if they were shared
17  with Dr. Herdman?
18          A.    I don't know.
19          Q.    Do you know what they looked into
20  in regard to diabetes care?
21          A.    For those specific audits I don't
22  have the specific questions.  I can tell you
23  overall normally what they would look at.
24          Q.    When you say normally overall,
25  you mean for --

Page 25

1          A.    If they are doing a diabetic
2  audit.
3          Q.    Just let me finish the question.
4          Do you mean overall for the types
5  of audits that go into specific aspects of
6  medical care or for overall diabetes care in
7  general?
8          A.    Overall for diabetes care.
9          Q.    What is your understanding that
10  these audits would generally look at?
11          A.    So they look at lab work, if lab
12  work was completed as ordered, did the person
13  have their chronic care appointment which are
14  typically every 90 days or more frequently if
15  needed.  Is the person getting their blood sugar
16  checks as ordered; are they receiving their
17  medication as ordered; did they have a yearly
18  eye exam; did they have a foot exam during the
19  time of their appointment and the level of
20  control.
21          Q.    What do you mean by "level of
22  control"?
23          A.    So when any doctor does a chronic
24  care visit they usually document the person is
25  in good control, poor control.  Meaning, you

Page 26

know, they might not be compliant with their
medications or their labs are not within the
parameters they should be.  It's based on
physician review of the overall process.
    Q.    Do you recall any corrective
action plans within the 2020s pertaining to
diabetes care?
    A.    I don't recall the specifics of
it.  But I do recall that we had corrective
action plans.
    Q.    Do you remember how many?
    A.    No.
    Q.    Do you know if any of them were
prior to the end of 2023?
    A.    Yes, they were.
    Q.    Did you ever become aware that
there were issues with ensuring that diabetic
patients were receiving insulin as prescribed
within this time period?
        MR. WITTEKIND:  Objection to
    form.
        THE WITNESS:  I am not aware of
    any issues.
BY MR. GROTE
    Q.    Are you aware of any of the

Page 27

specific issues pertaining to diabetes care that
did lead to corrective action plans that you
just discussed?
        MR. WITTEKIND:  Objection.
        THE WITNESS:  No, I'm not.
BY MR. GROTE
    Q.    I want to understand your role in
providing oversight but also not being as
familiar with it.  It is you just do not
remember this?
    A.    Yes.  I don't remember.
    Q.    Would these matters have been
discussed in the QI meetings?
    A.    Yes.
    Q.    Would they have been discussed in
any other setting, aside from ad hoc discussions
here and there, but any other setting that is
part of your regular job responsibilities?
    A.    It would have been discussed also
in the YesCare QI meetings.
    Q.    In terms of the QI meetings,
whether it's PDP or YesCare, the QI meetings,
were trips to the emergency ever part of the
subjects when you review how many people went to
the emergency room, what they were going for,

Page 28

and try to identify potential issues?
    A.    If we discussed them, we would
have discussed them at the PDP QI meeting.
    Q.    And why is that?
    A.    So when Dr. Puerini, the medical
consultant, when he does his reviews prior to
him coming to my office we will give him some
recommendations on things we would like him to
look at.  And emergency room trips is something
that we typically have him review just to get a
physician perspective on how we are doing with
emergency trips.
    Q.    Do you know what his review of
emergency room trips entails?
    A.    So we have him look at if
somebody was sent to the emergency room, was it
appropriate.  Like did they really need to go
out to the emergency room or is it something we
could have handled here on site?  And from my
recollection on any of the reviews he has done
he has always found them to be appropriate.
    Q.    Did he ever look at whether or
not somebody has to go to the emergency room
because they are not getting the level of care
they were supposed to while in PDP custody?

Page 29

    A.    He has not looked at that
specifically.
    Q.    In between January 1, 2020
through the end of 2023, in the QI meetings was
there ever a discussion of issues pertaining to
the proper documentation of refusals of medical
care by patients?
    A.    I don't recall for that specific
time period.  But refusals is something that we
discuss from time to time.
    Q.    And specifically the issue of
whether they are properly documented, is that
something that has been discussed at QI
meetings?
    A.    Yes.
    Q.    Do you recall it ever being
raised as a concern that refusals of medical
care are not being properly documented?
    A.    Can you ask that again?
    Q.    Do you recall an instance where
the subject of conversations at a QI meeting,
PDP meeting, YesCare meeting, was that refusals
of medical care were not being properly
documented?
    A.    Yes.

Deposition of Sandy Varghese                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 30

Q.    Did that happen more than once?

A.    Yes.

Q.    And I know you were not sure of the timeframe.  But was that within the last five years, you think?

A.    Yes.

Q.    What about before that?

A.    Yes.

Q.    Is it something that has come up on occasion throughout your time at PDP?

A.    Yes, it has.

Q.    Was medical treatment refusal documentation was ever the subject of a corrective action plan?

A.    I don't recall.

Q.    So the two consultants you spoke of, Dr. Perini and -- what the other one?

A.    Dr. Johnson.

Q.    Did these consultants provide what you consider -- do they provide audits of the medical care at PDP?

A.    They provide a detailed report once their visit is completed.

Q.    And how often do they do that?

A.    They come here twice a year.

Page 31

Q.    Is there a report each time?

A.    Yes.

Q.    And who keeps -- do you have copies of those reports?

A.    I have copies of them.  They are submitted to the law department.

Q.    What do those reports look at?

A.    So Dr. Puerini's report is pretty much an overview of medical services.  So it varies from time to time.  But it will be whatever he looked at during that visit.

So normally he will pick a chronic care disease that he wants to review.  We have a dialysis trailer.  So typically we will look at dialysis.  And then it can be any topic.  When he is here he goes around and he will speak to our physicians and will speak to the medical staff.  And he can look at anything that we ask him to look at or anything he wants to look at.

But I'm typically with him when he is doing his review, whereas Dr. Johnson does behavioral health.  And because their visits coincide with each other, I'm not able to be with her.  So I am not really with her during

Page 32

her visit.

Q.    Does Dr. Perini ever talk to incarcerated people during those visits?

A.    He has but typically not.

Q.    Do his reports address diabetes care all of the time?  Sometimes?  How would you answer that?

A.    Sometimes.

Q.    Do they address medication administration issues?

A.    Yes.

Q.    All the time?  Sometimes?

A.    Sometimes.

Q.    Is there anything it addresses all the time?

A.    No.  Because when he comes we can have a certain topic and we might want him to look at.  And he might look at that for two or three visits.  And if he sees improvement then he moves on to another topic.  So there is not anything that he does a hundred percent of the time.

Q.    Do you recall if any of his assessments ever address deaths in PDP custody?

A.    Yes.  He reviews every death that

Page 33

we've had in custody.

Q.    Everyone.  Okay.

Do you know what he reviews those deaths for?  What is he looking for there?

A.    So, like I said, part of our joint QI meeting is where we discuss mortality.  But when -- I guess I will backtrack.  With mortalities, when somebody dies in custody YesCare has to do a mortality review within 30 days of a person's death.  So that is something that we do internally.

And Dr. Puerini is not a part of that meeting.  That's our on-site physicians that were involved in that case and other staff.  Then for the joint QI meeting, that's where Dr. Puerini and Dr. Johnson will be a part of that.  And then when they do their on-site visit, which is twice a year, we have a mortality meeting at that time also which is attended by the commissioner, deputy wardens, the warden, security, healthcare staff.

And at all of these meetings what happens is one of the physicians will present a summary of the medical record.  And then people are given the opportunity to ask questions about

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 14 of 52

Deposition of Sandy Varghese                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 34

1  it.  If we have the cause of death available at
2  that time we, of course, will share that with
3  everybody.
4        It's an opportunity for people to
5  ask questions and to provide feedback on how
6  they think things occurred at that time.
7     Q.   Do those meetings also have
8  minutes?
9     A.   There is brief minutes pretty
10  much just saying that we discussed the case.
11  But the actual discussion is not recorded.
12     Q.   Do those discussions into deaths
13  in custody ever address policy issues like
14  whether there is a certain policy that maybe
15  should be changed or that was not adequate for a
16  particular situation?
17     A.   Yes.
18     Q.   Do they ever discuss -- let me
19  back up.
20        At the QI meetings, has providing
21  emergency medical care ever been a subject --
22  and to be more specific -- ensuring staff are
23  doing what they are supposed to do when there is
24  a medical emergency is what I meant by that.
25        MR. PESTRAK:  Are you asking

Page 35

1  about all QI meetings or specific YesCare
2  or PDP?
3  BY MR. GROTE
4     Q.   Either of them.
5     A.   More specifically the PDP
6  meeting.  But I do recall a time where it was
7  discussed at YesCare meetings, too.
8     Q.   And was it discussed more
9  frequently at PDP meetings?
10     A.   Yes.
11     Q.   And why is that?
12     A.   Just because we had noticed an
13  increase in people going out for
14  violence-related issues.  So that is why we were
15  really looking at a lot of the ER trips to see
16  what was going on and why people were being sent
17  out.
18     Q.   Do you recall if there was an
19  issue with staff not providing the emergency
20  care in the way they were supposed to?
21     A.   No.
22     Q.   These QI meetings for PDP, did
23  they just focus on -- did they ever talk about
24  the role of correction officers in regard to the
25  provision of medical care?

Page 36

1     A.   I'm not sure what that means.
2     Q.   Maybe I will give you a scenario
3  and see if this is the sort of thing that would
4  be covered.
5        If there were medical emergencies
6  resulting in trips to the emergency room and
7  they were discovered by staff but after -- maybe
8  staff had not been making rounds like they were
9  supposed to so it's not sure how long the person
10  was in need of medical assistance -- would these
11  QI meetings, the PDP QI meetings, discuss the
12  issue of corrections staff not making rounds due
13  to its impact on the delivery of medical care?
14     A.   It would be brought up.  But we
15  do not have corrections at that meeting.  So we
16  cannot really address that situation during
17  those meetings.
18     Q.   Was there a forum, a meeting, for
19  the medical and the corrections sides to speak
20  together to address joint issues?
21     A.   For the mortality reviews, that
22  is attended by -- the internal mortality review
23  is attended by our Internal Affairs Division or
24  Office of Professional Compliance.  They attend
25  the autopsy and the mortality review meetings.

Page 37

1  And that is an opportunity where medical staff
2  can discuss their issues with them.
3     Q.   Are there any other opportunities
4  where corrections and medical staff can talk
5  about issues pertaining to the delivery of
6  medical care outside of mortality reviews?
7     A.   Yes.  I just remembered the HSAs,
8  the health service administrators for YesCare.
9  And the warden's office, they have -- I don't
10  know if they are weekly or biweekly.  I'm not
11  sure.
12        But they do have regular meetings
13  with the security and the medical administration
14  for each jail.  So that is an opportunity for
15  security to address something that they might
16  not like with medical or medical to address
17  something that they need assistance with from
18  security.
19     Q.   It's the HSAs that have those
20  meetings?
21     A.   Yes.  They are -- I believe they
22  are chaired by the warden.  But they are
23  attended by the HSAs.
24     Q.   And the HSAs are YesCare
25  employees?

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 15 of 52

Deposition of Sandy Varghese                                Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 38

1    A.    Yes.
2    Q.    You talked about the QI meetings,
3  QI processes for PDP and for YesCare.  You
4  talked about the consultants, Doctors Puerini
5  and Johnson.
6          Are there any other regular
7  audits or reviews of the delivery of medical
8  services by YesCare performed by PDP?
9    A.    The only other thing is the
10 Remick case.
11   Q.    Describe how that works.
12   A.    So the Court monitors -- I guess
13 I can focus more on my role with them.
14   Q.    Sure.
15   A.    So I provide -- well, YesCare
16 provides me with weekly backlog reports, for
17 example.  So those reports I turn around and
18 share it with the court monitors.  And we have
19 database that it's uploaded to.
20         And we provide them with backlog
21 numbers.  Again, if there is a mortality, we
22 provide them -- I provide them with the autopsy
23 reports.  We give them the grievance logs, the
24 staffing information, health education topics
25 that are covered.  That's provided to them.

Page 39

1  That's it.  And then the court monitors are here
2  every few months to review services.  But I'm
3  not involved in all of their meetings when they
4  are here.
5    Q.    And the monitor issues regular
6  reports, correct?
7    A.    Yes.
8    Q.    Do you know if the monitors ever
9  looked at diabetes care?
10   A.    Not specifically.
11   Q.    Are there any other review
12 processes, oversight processes, that I have not
13 asked you about?
14   A.    I don't believe so.
15   Q.    Can you walk us through how
16 diabetes care is administered in PDP facilities?
17   A.    So when a person is arrested who
18 has diabetes, they are supposed to be taken to
19 the police administration building where YesCare
20 has one nurse that is assigned there 24 hours a
21 day.  So the nurse can check the blood sugar.
22 Then if the person needs orders for insulin or
23 medication, whatever the case is, they will call
24 our on-call provider.  Typically it's CFCF --
25 and obtain a verbal order for that.

Page 40

1          Once they arrive at either CFCF,
2  or if they are female they arrive at PICC, so
3  they come off the bus.  The nurse goes out to
4  the loading dock and reviews everybody and makes
5  sure they are okay to be admitted into the
6  facility.
7          If the person has a medical
8  condition, and typically it's made known at that
9  time, they will get bumped up to medical.  So
10 they will -- security has to do some brief
11 screening.  I'm not sure exactly what it is they
12 do.  Once that's completed they bring the person
13 over and have them ready to see medical for
14 their intake screening.
15         Do you need to know what the
16 intake screening consists of?
17   Q.    Yes, please.
18   A.    So the first thing they do before
19 they see medical staff is they give them a cup
20 for them to put urine in which tests for STDs,
21 gonorrhea, chlamydia.  And then they will go
22 into the room and see the medical assistant who
23 will ask a series of medical questions.
24         And one of them will be, Are you
25 a diabetic?  Because there is certain labs that

Page 41

1  need to be done based on any chronic conditions
2  that somebody might have.
3          They also do the STD testing, HIV
4  screening.  Then they will go over and see the
5  registered nurse who then asks like a
6  questionnaire, like 150 questions.  But it's all
7  medical, behavioral health related questions.
8  So if you are diabetic, they will have to make
9  sure the blood sugar is done at that time.
10         If a person needs medication like
11 then and there, there is a doctor at CFCF 24/7.
12 And will call the doctor and obtain the order
13 for the medication.  A person can get it right
14 at that time.  And then the doctor, of course,
15 will order their regular medication order for
16 their incarceration.  Then the person is
17 scheduled to be seen in chronic care clinic
18 within 30 days of admission.
19   Q.    Thank you.
20         For diabetic patients are there
21 instances where they should be seen sooner than
22 that that 30-day period for chronic care?
23   A.    Yes.  And if they need to be seen
24 sooner we do make that happen.
25   Q.    Who makes that decision?

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 16 of 52

Deposition of Sandy Varghese                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 42

A.    Normally for a diabetic -- let's say the person went through intake.  And now they are housed on their regular housing unit.  So typically blood sugars are done twice a day.  So if the blood sugars run high, which can be over 250 or more, and if the medication doesn't seem to be helping, then, you know -- well, my understanding is if it's over 250 they have to notify the physician to see if we need additional medications to be ordered or a higher dose of medication.

So at that time the physician can review it.  If they feel like they need to see the patient physically then they will see them in the medical unit.  So it's on a case-to-case basis.

Q.    Understood.  If you know, if somebody's glucose is really high, how do they determine what the next steps are?

A.    That's based on the discussion with the physician.

Q.    When you say physician, is that synonymous with medical provider in this context?

A.    Yes.  And I should say -- because

Page 43

we do not have just physicians.  We also have nurse practitioners, too.

Q.    A nurse practitioner or a doctor?

A.    Yes.

Q.    Anybody else?

A.    We do have a few physician's assistants.

Q.    Does YesCare have a policy for how to administer diabetes care?

MR. PESTRAK:  I think it's beyond the scope for what she is designated for.  But I will let her answer.

THE WITNESS:  They don't have a policy.  But YesCare has protocols for certain things.

BY MR. GROTE:

Q.    Do they call them clinical pathways?

A.    I believe so.

Q.    How are glucose checks administered and how is insulin administered to patients in PDP?

A.    The nurses pull a list of who is due for a medication.  And they go up to the -- well, for instance, at CFCF they will go up to

Page 44

the medication area and let the officer know who needs to come out to have their blood sugar checked or receive medication.  And the person comes out one by one.  And they will do the blood sugar check and administer their medication at that time.

Q.    Where do they do this?

A.    It's not just CFCF.  But every facility has a medication area.  So they are just called different names depending on which facility.  But there is a designated medication area where the nurses will administer medications.  For insulin you have to have a sharps container.  So it has to be in a medical area so they can dispose of the sharps properly.

Q.    At CFCF, do you know where intake housing is?

A.    Yes.

Q.    Where is that?

A.    B building.

Q.    Are the medication administration areas within B building?

A.    Yes.

Q.    So is it part of the -- on the housing unit or just off the housing unit?

Page 45

A.    Just off the housing unit.

Q.    So it takes seconds to walk there?

A.    Yes.

Q.    Do you know what the process is if a patient misses an insulin dose?

A.    We have the red flag policy.  Insulin is considered a critical medication.  So if somebody misses a dose, the nurse is supposed to red flag them, which means an attempt needs to be made to call them down to medical and find out the reason why the person didn't come out for their medication.

Q.    And has insulin always been a critical medication within PDP?

A.    That's a very broad question.

Q.    Do you recall a time when it was not a considered a critical medication within PDP?

A.    I am trying to figure how best to answer.  Insulin has always been a critical medication.  But I don't recall when exactly that was changed in the policy.  The way the red flag policy was written is if you missed three days of medication or there is a pattern of

Case 2:24-cv-05618-TJS     Document 100-8     Filed 12/05/25     Page 17 of 52

Deposition of Sandy Varghese                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 46

1 missed doses.
2          So an example would be somebody
3 comes for the medication every evening but they
4 do not come out in the morning.  So that might
5 be a pattern.  Or come every other day, that's a
6 pattern.  But at some point, and I'm not sure
7 exactly when, they developed a list of critical
8 medications which insulin is definitely one of
9 them.  Because if you miss one dose of
10 medication you can be in trouble.
11      Q.    So is there a list of these
12 critical medications?
13      A.    I know that YesCare has a list.
14 I don't recall if the actual medications are in
15 the policy.  I don't remember.
16      Q.    Do you have access to that list?
17      A.    I can ask for it.
18      Q.    Understood.
19          So the red flag system, if
20 somebody is to be red flagged for missing
21 medication, what staff are responsible for
22 issuing the red flag or whatever the term is?
23      A.    The nurse is the one that is
24 responsible because they are the ones that know
25 who came out with their medications and who

Page 47

1 didn't.  The process is they are supposed to
2 make an appointment in the electronic health
3 record for a red flag encounter.  Then they are
4 supposed go in and document that they went and
5 spoke to the person, counseled them about the
6 medication, that the person just refused
7 medication and doesn't want to be there.  Of
8 course, at that time you want to see that the
9 refusal was filled out and signed and documented
10 appropriately.
11          So for some people one counseling
12 is enough.  And they will resume and get their
13 medications.  Others just do not want to come
14 out and end up with more than one red flag.  And
15 at that point if the person just says, hey, I
16 don't like getting my medication I don't want to
17 be up in the morning to do this, at that point
18 they are referred to the provider to then be
19 counseled and if the medication change is able
20 to be done at that time they can do that.
21      Q.    How are refusals supposed to be
22 documented?  What is the process there?
23      A.    Supposed to be done face-to-face
24 where you explain to the person the risks of
25 refusing whatever it is they are refusing.  And

Page 48

1 then the patient, the nurse, and a witness are
2 supposed to sign the paper.
3      Q.    Who can the witness be or must it
4 be?
5      A.    It can be security or it can be
6 somebody else in healthcare.
7      Q.    It cannot be an incarcerated
8 person, though, can it?
9      A.    No.
10      Q.    When you say somebody in
11 healthcare, does that mean it can be a YesCare
12 employee as well?
13      A.    Yes.  If another nurse is there
14 or a medical assistant, yes, somebody else.
15      Q.    Are there any policies,
16 protocols, anything in place -- let me ask a
17 different way.
18          Is the process you described for
19 insulin administration ever altered due to
20 having staff shortages that day?
21      A.    What do you mean by "altered"?
22      Q.    That you don't enough staff,
23 whether it's correctional staff or medical
24 staff.  Are there ever ways that the process has
25 to be changed to accommodate that scenario to

Page 49

1 ensure people get their care?
2          MR. WITTEKIND:  Objection to the
3   form.
4          THE WITNESS:  No matter what is
5   going on the insulin has to be
6   administered.  So let's say there is a
7   shortage and we can't do it on the
8   medication area.  Especially during COVID,
9   there were times where we allowed the
10   nurses to go on the unit, itself.
11          And, of course, with an officer
12   and they can do it cell by cell.  So every
13   effort is made to administer medications
14   because that is something you cannot miss.
15 BY MR. GROTE
16      Q.    Is the process for checking
17 somebody's glucose level part and parcel of
18 insulin administration?  Does it happen at the
19 same time?  Same place?
20      A.    Usually you check the glucose
21 level first.  And then you administer the
22 insulin.  Some people are on a regular dose of
23 insulin and others receive what is called a
24 sliding scale.  So they receive their dosage
25 based on what their blood sugar level is.

Page 50

Q.    And how is this all to be documented?  Insulin doses and glucose checks?

A.    So we document it on the medication administration record.

Q.    Are the glucose levels themselves documented somewhere?

A.    At one point I believe in that timeframe it was documented in the eMAR which is the electronic system.  But right now there was an upgrade.  And I think the eMAR is not talking to our ECW system or something.  We did an upgrade and something is not working right.  But it is documented on a flow sheet.  So it has to be documented somewhere.

Q.    Is a flow sheet -- what is that?  Is that a written document?

A.    It's a written document where they go in and have the date and time and what the blood sugar level was.

Q.    And who retains possession of the flow sheets?  YesCare or PDP or both?

A.    So it becomes a part of the medical record.  So at the end of the month it's scanned into ECW.  So at the end of the day PDP owns the medical record.

Page 51

Q.    Do you know who -- and this might be a little granular -- but do you know who scans it into the record?

A.    A medical records clerk.

Q.    Is that a YesCare employee?

A.    Yes.

Q.    Is there any -- this system of diabetes care we've been talking about, who is ultimately responsible for that?

A.    I am trying to get --

MR. WITTEKIND:  Bret, can you repeat that question?  I didn't catch the last part.

BY MR. GROTE

Q.    I will rephrase it.

Is it PDP or YesCare that is responsible for establishing the diabetes delivery care system?

MR. WITTEKIND:  Object to the form.

THE WITNESS:  So YesCare establishes the guidelines.  But they are based on national standards.

BY MR. GROTE

Q.    What are those standards?

Page 52

A.    It's based on the American Diabetes Association.  And we also -- PDP is accredited by the NCCHC, The National Commission on Correctional Health Care.  So they do not have standards specifically to diabetes.  But they have standards specific to chronic diseases and how we do certain things.

So our policies and standards are based on those guidelines.  YesCare has their corporate which puts out guidelines for them to follow.  But their own coordination with the Diabetes Association, NCCHC.

Q.    So it is the case that PDP requires its contractor to adhere to NCCHC standards and American Diabetes Association guidelines?

A.    Yes.

Q.    I think you touched on this but I want to make sure it's clear on the record.  The system of diabetes care you've been describing, how does PDP provide oversight to ensure that it's functioning as it should?

A.    I guess I should mention with Dr. Puerini being our medical consultant, he is also somebody that will review their guidelines

Page 53

and ensure that YesCare is following nationally accepted guidances, that same type of care you would expect to see in the community is what we should be providing here to the patients.  So the way we ensure that is by doing chart reviews, chart audits.

Q.    What is the process for responding to a medical emergency in PDP?  What is supposed to happen?

A.    I will give an example if somebody is having a seizure.  So if they are having a seizure, security will do an overhead page and say "stretcher call" to C building, let's say.  So then medical staff has a minimum of two people, but during the day we have more people on site.  So whoever is available will report to the unit.

So they take the stretcher with them, the backboard, the AED machine, oxygen, emergency drug box, all of our emergency equipment.  And they will respond to the unit.  Once they are allowed to proceed onto the unit they will go and assess the patient.  If the patient is able to be put on the stretcher and brought back to medical, they can do that.

Page 54

If the person is too sick and cannot put them on the stretcher and we feel like 911 has to be called, then 911 will be called. And emergency services will be activated.

Q. Who has the authority to call for a stretcher?

A. Normally security is the one that calls because they are the ones that found the person or, you know, the majority of it happens on the housing unit.

Q. Normally it's security. They obviously have the authority to call the stretcher, right?

A. Yes.

Q. Does medical also have that authority if they come across a situation in which they think one is needed?

A. They can. But I believe what will happen is they tell the officer to call for a stretcher. Because it has to be an overhead page, which means they have to call -- somebody has to call Center Control. Then the officer in Center Control is who does the overhead.

Q. So those are just typically

Page 55

correctional-to-correctional staff communications?

A. Yes.

Q. How do you provide oversight -- is emergency care something else you provided oversight of to ensure it's being provided when necessary?

A. Yes.

Q. Is it through the same processes we discuss earlier?

A. Yes.

Q. In reviewing an incident, multiple incidents, if you determine that a non PDP employee, a YesCare medical worker, was not doing what they are supposed to be doing, how is that addressed?

A. So if I review one of their charts?

Q. Yes. Let's say a nurse is not properly documenting refusals or an emergency care. They do not call for a stretcher when you think they should have or whatever the issue is. But it's not a PDP employee.

What is your role as providing oversight? How would you address that?

Page 56

MR. PESTRAK: Objection to the form.

MR. WITTEKIND: Object to the form.

THE WITNESS: So, for instance, I receive multiple requests from the Public Defenders throughout the days. And if I see that somebody didn't do something. I typically address it. It's a case-by-case basis. Typically I will address it through an email to the administrator of that facility and ask for a response in writing as to how they are doing to address that situation.

BY MR. GROTE

Q. How would it be addressed if it's, say, part of a mortality review? If it's a mortality review and a YesCare staff person is found to have violated policy, how does PDP address that? Or does PDP address that?

MR. WITTEKIND: Object to the form.

THE WITNESS: So when there is a mortality, with me being the nurse that works for the city, I do my own chart

Page 57

review. And if I see something that should have been done and wasn't done, I will question it. So then it does become part of the mortality review discussion. So typically when I do my reviews I might put questions as to that I reviewed this and I didn't see the refusal form.

And then we will discuss it at the mortality review. And the HSA is part of that. We typically at that point will answer the question as to what happened, why the refusal form was not there or whatever the situation was.

BY MR. GROTE

Q. Can you tell me one of the topics here is policies and practices pertaining to placement of incarcerated individuals in an infirmary or medical housing unit within PDP facilities. Can you walk me through how that works? How is somebody placed in the infirmary? Who makes the decision? Anything else about the process?

A. If we feel somebody needs an infirmary level of care, that is determined by the provider. And then the physician or the

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 20 of 52

Deposition of Sandy Varghese                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 58

1  nurse practitioner -- let's just say somebody
2  came in through intake at CFCF and we noticed
3  they are sick but not sick enough to have to be
4  in the hospital but would benefit from being in
5  the infirmary. The physician would review them.
6  They think, yes, they need to go to the
7  infirmary. They will make that notification to
8  DC and have them admitted into the infirmary.
9  But it's done by the physician.
10     Q.    In the quality improvement and
11  the oversight of YesCare processes you were
12  describing previously, have you ever looked at
13  admissions to the infirmary to see any issues
14  that might be involved there?
15     A.    I have in the past.
16     Q.    Do you recall how far in the
17  past?
18     A.    Not recently. But I do know it's
19  something that I have Dr. Perini look at.
20     Q.    Do you recall what exactly he was
21  looking at in regard to infirmary placements?
22     A.    Were they proper admissions, like
23  somebody that needed to be there. And also he
24  was looking at when they are discharged from the
25  infirmary, how the follow-up is once they return

Page 59

1  back to their regular unit.
2     Q.    Do you know if he has ever looked
3  at whether or not certain patients should be in
4  the infirmary but are not being placed in the
5  infirmary?
6     A.    He has not specifically.
7     Q.    Is that an issue that has ever
8  been brought to your attention?
9     A.    I would say -- it might come up
10  from time to time. But if there is a situation
11  that arises, YesCare -- they will handle it
12  internally. Because they are the ones that are
13  on the front lines. So they know about somebody
14  before I will.
15        There is probably times where the
16  Public Defender might bring somebody to our
17  attention. And if that happens, I will have the
18  doctor take a look at the person. And based on
19  their judgment, if they feel the person needs to
20  go to the hospital or the infirmary, they will
21  make that decision.
22     Q.    And do you know how many beds
23  there are in the infirmary?
24     A.    All together -- because we have
25  the infirmary and the behavioral health

Page 60

1  hospital -- all together that's 64 beds. I want
2  to say the infirmary is 22, 24.
3     Q.    Do you recall a time when the
4  infirmary was full with no vacancy?
5     A.    Yes. That was pre-COVID.
6     Q.    Can you tell me what the staffing
7  levels are like on the infirmary? What staff
8  work there? How often are they present? What
9  level of care can they provide? Basically what
10  makes it an infirmary?
11     A.    There is a physician there on day
12  shift seven days a week. There is a complement
13  of RNs, LPNs and CNAs. And nursing staff is
14  there seven days a week on all three shifts.
15     Q.    How many nursing staff typically?
16     A.    I would be guessing if I told
17  you.
18     Q.    No guessing.
19        If someone is be placed on a
20  lower tier housing status, is that also a
21  medical decision?
22     A.    So let's say the person has a
23  cast or crutches. So somebody that needs to be
24  on a lower tier, medical will make the
25  recommendation. But that's -- security is the

Page 61

1  one that houses them.
2     Q.    Would that be -- so for placement
3  in medical housing, does medical staff make the
4  recommendation and security still has to approve
5  based on nonclinical factors?
6     A.    The infirmary -- over there it's
7  single cells, single beds. So there was no
8  lower or upper tier in the infirmary.
9     Q.    But I guess I am wondering does
10  medical have exclusive authority to place
11  someone into the infirmary?
12     A.    Medical is the only one that
13  gives the order to put them in the infirmary.
14  And I have never seen security not take somebody
15  over.
16     Q.    Were there any -- and I asked
17  this before in relation to medical
18  administration. So it's a similar question.
19        In instances where there has been
20  chronic staff shortages, are you aware if PDP
21  has ever placed certain patients in the
22  infirmary to ensure they would be able to access
23  health care without being impacted by staff
24  shortages that might impede or interfere with
25  delivery of that care?

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 21 of 52

Deposition of Sandy Varghese                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 62

1    A.    No.
2    Q.    And can you walk me through the
3  process for referring or transferring an
4  incarcerated person to an outside medical
5  facility?
6    A.    So they need to go to the
7  emergency room?
8    Q.    Yes.  People can also be
9  transferred for appointments that are not
10  emergency in nature.  But let's start with the
11  emergency room.
12    A.    If they need to go to the
13  emergency room, depending on the severity of the
14  issue, we will send them out either with 911 or
15  prison transportation.  It depends on how
16  critical the need is.
17         Those, again, are done based on
18  discussion with the provider.  So CFCF is the
19  only place where we have a provider 24 hours a
20  day.  So if the emergency occurs in one of our
21  other facilities, they will call over to CFCF
22  and consult with that provider.
23         And based on that discussion the
24  provider will say, Send them out 911 or send
25  them out with prison transportation.  And then

Page 63

1  the patient is escorted with two officers to go
2  to the emergency room.
3         In the meantime one of the nurses
4  will call the emergency room to let them know
5  that somebody is on their way and kind of give
6  them a little history of what is going on.  But
7  we also send them with an emergency referral
8  form that gives some basic information as to why
9  the person is being sent.
10    Q.    So to send somebody out to the
11  ER, would that be a clinical decision by a
12  medical provider?
13    A.    Yes.
14    Q.    When a person comes back from --
15  hold on.
16         I will refer to a policy.  And I
17  can bring it up.  But I will read an excerpt
18  from it and I will let everyone know where it is
19  on the Bates number and ask a question about it.
20         So this is the Access to Care
21  policy, which the Bates number is Jung City
22  Production 000207.  And it says, Inmate access
23  to care must be free of unreasonable barriers.
24  Specific considerations to ensure this include
25  QHCP, so qualified health care provider, will

Page 64

1  not accept a no-show as a refusal of care.
2  No-show visits will be reported to the shift
3  commander and rescheduled in the next available
4  encounter time and documented as such in the
5  medical record.
6         Are you familiar with that policy
7  provision?
8    A.    Yes.
9    Q.    And what is a no-show in this
10  context?
11    A.    So, for instance, it can be
12  somebody that was scheduled for a chronic care
13  visit.  And medical staff called for them to
14  come to the appointment and they did not appear.
15    Q.    So in this policy that's then
16  supposed to be reported to the shift commander?
17    A.    Yes.
18    Q.    When it says, Rescheduled in the
19  next available encounter, who does that
20  rescheduling?  The shift commander?
21    A.    No.  The YesCare staff.
22    Q.    And then communicated to shift
23  commanders so they know the person is to report
24  to medical?
25    A.    Yes.

Page 65

1    Q.    Is that different from the
2  medication refusals?
3    A.    Yes.  Because chronic care is
4  considered a clinic where medications -- it's a
5  bit of a different process.
6    Q.    Is that the red flag process is
7  the other one?
8    A.    Red flag is related to the
9  medication process.
10    Q.    I guess both of these processes
11  are trying to get at the same thing.  If
12  somebody is missing medical care, then that
13  should require follow-up to -- that these
14  processes are in place to address that, right?
15    A.    Yes.
16         MR. GROTE:  Let's go off the
17    record.
18         (Discussion held off the record.)
19         MR. GROTE:  Ms. Varghese, I have
20    no further questions for you.
21                 -  -  -
22             EXAMINATION
23                 -  -  -
24  BY MR. KAMINSKY
25    Q.    Good morning, Ms. Varghese.  I am

Page 66

1  Jonathan Kaminsky.  I represent Mariesha Apollon
2  in this lawsuit.  I have a couple of questions
3  for you.  Give me a second.
4          Earlier today you had testified
5  about the intake process.  And you began with
6  the inmate gets arrested and then goes to the
7  police admin building.
8          Can you take us through an intake
9  when an inmate is returning from a facility such
10 as Norristown Hospital?
11     A.   So when somebody comes back from
12 Norristown Hospital, they are still treated as a
13 new inmate.  So they receive the whole STD
14 screening, that entire intake medical
15 questionnaire is asked of them again.  The only
16 difference is once it is noted that the person
17 is a Norristown return they are referred to
18 behavioral health with an emergency behavioral
19 health referral.  That way behavioral health
20 staff can see them and review their medications
21 and ensure that we have that continuity of care.
22     Q.   As far as an inmate's prior
23 medical history, his prior medical history is
24 still known to the prison?  To the medical
25 staff?

Page 67

1      A.   Do you mean with their intake
2  screening?  So even though they are a Norristown
3  return, the person is considered as a new
4  admission to the PDP.  So the person will go
5  through the same exact screening as somebody who
6  is just being arrested and coming off the
7  street.
8      Q.   But this is still a human being,
9  right?
10     A.   Yes.
11     Q.   And so this human being has
12 medical history, correct?
13     A.   Yes.
14     Q.   And so does medical staff have
15 access to this inmate's medical history?
16     A.   So when they do the intake
17 screening we have access to review their online
18 medication history.  So if they have medications
19 that were ordered from a big pharmacy like CVS
20 or Walgreens or something like that, then the
21 prescription history will populate on this so we
22 can see any recent prescription refills that the
23 person may have had.
24          If they were here with us at a
25 previous timeframe we can certainly look at

Page 68

1  their previous medical record.  But if it's the
2  person's first full-time incarcerated with us,
3  we do not have access to anything until they
4  tell us what their history is.  And if it's
5  something that warrants further treatment we can
6  request medical records from their community
7  providers.
8      Q.   I'm not asking about anybody who
9  is just a new inmate, just a new arrival.  I'm
10 asking specifically about somebody who has had
11 prior -- has been in custody prior to the return
12 to the prison.
13          MR. PESTRAK:  I think she
14     answered that part of it, too.  But I will
15     let her answer it again.
16 BY MR. KAMINSKY
17     Q.   If you want to change your answer
18 under that information, please do.
19     A.   The same answer.  We do have
20 access.  If they were here with us in the past,
21 their medical records are still available.
22 Everyone is electronic.  So you can go back and
23 see whatever their history was during their
24 prior incarceration.
25

Page 69

1      Q.   I want to share my screen for a
2  second.  Are you able to see my screen?  It
3  should say "Analysis" at the top.
4      A.   Yes.
5      Q.   And do you know what this is?  Do
6  you need me to scroll?  Are you able to identify
7  what this is?
8      A.   That's my review of his medical
9  record.
10     Q.   So are you the author of what is
11 below the Analysis?
12     A.   Yes.
13          MR. PESTRAK:  Jonathan, I will
14     let her keep answering.  But I think this
15     is going beyond her designation as a
16     30(b)(6) witness today.  This is more
17     factual for what she did.
18          I will let you ask the questions.
19     I just want to put that on the record that
20     that's how she will be answering questions
21     related to this document in her personal
22     capacity, not as 30(b)(6) designee.
23          MR. KAMINSKY:  I don't see how
24     it's not part of the 30(b)(6) testimony.
25     But I understand and we will handle that

Page 70

1    later.
2  BY MR. KAMINSKY
3       Q.    Ms. Varghese, do you see the
4  paragraph where it starts with 10/28/23?
5       A.    Yes.
6       Q.    Can you take a second and read
7  this paragraph and let me know when you are
8  finished?
9       A.    Yes.  Okay.
10      Q.    So after reading that, would you
11 agree that at the time of this intake that is
12 being referred to in this paragraph on 10/28
13 that there was insulin administered?
14      A.    Yes.
15      Q.    And also that a test was
16 performed to check for ketones?
17      A.    Yes.
18      Q.    Then do you see these dates?
19      A.    Yes.
20      Q.    And what would these dates -- can
21 you tell me what these dates are?
22      A.    They are every admission he has
23 had here at the PDP.  For instance, 7/12/12 is
24 when he was admitted.  7/13/12 is when he was
25 discharged.

Page 71

1       Q.    Then there is more dates as it
2  goes on?
3       A.    Yes.
4       Q.    So these dates show the times
5  that the inmate was in custody at the PDP?
6       A.    Yes.
7       Q.    I want to bring one more thing.
8  So do you see where it says 11/6/23 NP
9  Henderson?
10      A.    Yes.
11      Q.    Since it's on double pages, can
12 you see that?  Can you read what is there?
13      A.    Yes.
14      Q.    Read it.  And let me know if you
15 need me to scroll down to continue with the
16 Analysis on there.
17      A.    Done.
18      Q.    As far as NP Henderson, what does
19 NP mean?
20      A.    Nurse practitioner.
21      Q.    Is that considered more of an
22 advanced, as you were discussing today,
23 provider?
24      A.    Yes.  So it's a nurse with an
25 advanced degree.  A nurse practitioner can

Page 72

1  prescribe medications.
2       Q.    Then if I scroll down, there is
3  this part here where it says, "Upon closer
4  inspection I recognize the patient as Louis
5  Jung.  When I realized who was there I asked for
6  blood glucose reading because I knew him to be a
7  brittle diabetic."
8            How would NP Henderson know that
9  Louis Jung was a brittle diabetic?
10           MR. WITTEKIND:  Objection to the
11 form?
12           MR. PESTRAK:  Objection to the
13 form.  You can answer if you know.
14           THE WITNESS:  I don't
15 specifically know how she knew him.  But I
16 can just tell you based on my experience
17 even from working as a staff nurse at a
18 certain time you get to know your patients.
19 Somebody with diabetes is somebody that you
20 see once or twice a day every day that you
21 work with.  You get to know who your
22 patients are.
23 BY MR. KAMINSKY
24      Q.    So as we had originally talked
25 about an inmate returning to the prison, and

Page 73

1  obviously these dates that we're looking at --
2  so I will highlight it goes 12/16/21 to 9/27/22.
3            And then there is a period of
4  time in between that and it goes from 12/14/22
5  to 6/12/23.  And then there is another break in
6  between 6/2/23 and a return again 10/27/23 to
7  11/6/2023.  Correct?  Did I read that right?
8       A.    Yes.
9       Q.    So with Mr. Jung, would there
10 have been any possibility that any of the
11 medical staff was not aware of his diabetic
12 status?
13           MR. WITTEKIND:  Object to the
14 form.
15           MR. PESTRAK:  Same objection.
16 You can answer if you know.
17           THE WITNESS:  I am not sure what
18 you're asking.
19 BY MR. KAMINSKY
20      Q.    Would it have been clear to the
21 medical staff that Mr. Jung was diabetic?
22           MR. WITTEKIND:  Objection to the
23 form.
24           MR. PESTRAK:  Same objection.
25           THE WITNESS:  I would say through

Page 74

intake it would be -- when they are doing
the intake screening, if he identified or
reported that he was diabetic.  That is the
first line on how we know that somebody had
a disease.
BY MR. KAMINSKY
    Q.    So you said that he reported it.
So it's up to him to report it?
          MR. PESTRAK:  Objection.  You can
answer again.
          THE WITNESS:  Yes.  When somebody
comes through intake we ask a series of
health related questions.  It's up to the
patient to say if they have high blood
pressure, diabetes, whatever the disease
process is.  We do not always know -- we
don't always know what somebody is
diagnosed with.
          So with that timeframe, I don't
know when he was first diagnosed with
diabetes.  So I'm not sure during any of
these incarcerations when the diabetes was
diagnosed.
BY MR. KAMINSKY
    Q.    What if I were to represent to

Page 75

you that the record that the prison has from
7/12/2012 to 7/13/2012, that record in and of
itself has recognized that Mr. Jung has Type 1
diabetes.
          Does that help your response or
change your response?
    A.    Then, yes.  Based on medical
record review, the nurse would be able to see
that they had that diagnosis.
    Q.    So there would be no doubt that
Mr. Jung has diabetes, correct?
    A.    Correct.
          MR. KAMINSKY:  I have nothing
    further.
              - - -
            EXAMINATION
              - - -
BY MR. WITTEKIND
    Q.    Ms. Varghese, I am Ray Wittekind.
I represent the YesCare defendants who are
Dr. Trivikram, Blair Cabellos and Maureen Gay.
Just a couple questions for you.  And I will try
not to be too repetitive.
    A.    Okay.
    Q.    But if I am, I apologize for

Page 76

that.  In that document that Jonathan Kaminsky
just showed you, he asked you about the opinion
that Mr. Jung was a brittle diabetic.
          What is your understanding of a
brittle diabetic?
    A.    So what was in that portion that
said "brittle diabetic," that is exactly what
the nurse practitioner had documented in the
clinical work.  So that is her wording.
    Q.    Have you ever used that term
"brittle diabetic"?
    A.    In my practice I have in the
past, yes.
    Q.    When you would describe someone
as brittle diabetic, what did you use that term
to mean?
    A.    I would use it to mean somebody
whose blood sugar is unpredictable.  It runs
routinely high or somebody who -- it runs high.
You can give them their medication, and then the
blood sugar drops.  So somebody that you need to
monitor closely.
    Q.    Earlier on attorney Grote asked
you about the YesCare quality assurance
meetings.  And I believe you said you would

Page 77

attend them pretty regularly?
    A.    Yes.
    Q.    And, generally, not for any
particular meeting, but generally who from
YesCare would be there?
    A.    At the YesCare meetings?
    Q.    Yes.
    A.    They are run by the QI
department.  And Dr. Trivikram attends.  I think
during that timeframe she would have been our
medical director at CFCF.  Dr. Kalu would have
been our regional director at that point.  So
it's all the site medical directors, the HSAs,
the assistant HSAs.  The pharmacy
representatives are there.  Was anybody else?
And people from the regional team, like the
regional vice presidents and regional director.
          MR. PESTRAK:  Ray, real quick,
    Sandy, if you can spell Dr. Kalu's name for
    the record for us?
          THE WITNESS:  K-A-L-U.
BY MR. WITTEKIND
    Q.    Were you the only one who
attended the meeting on behalf of the PDP?
    A.    Yes.

Page 78

Q.    I don't want to be too
repetitive.  But about the PDP review meetings,
who, if anyone, from the YesCare team, if you
understand my phrase, would go to that meeting?
        A.    The PDP -- the joint QI meeting?
        Q.    Yes.
        A.    So that's chaired by Dr. Herdman.
And so I attend.  Again, the region medical
directors during that timeframe would have been,
again, Dr. Kalu.  Our regional behavioral health
director.  Who else?  Dr. Puerini, Dr. Johnson,
the YesCare QI team.
            And we normally review a site
specific process study.  So it can be one of the
HSAs from whichever facility we were reviewing
that month.  So that rotates.  And I am sorry.
I forgot what your -- your previous question
with the YesCare meetings?
        Q.    Right.
        A.    Regional behavioral health staff
also attended that.
        Q.    Thank you.
            Earlier today you were asked
about -- you told us that YesCare would do their
own audit of the diabetes care at the various

Page 79

facilities?
        A.    Yes.
        Q.    And I believe, and tell me if I'm
wrong, I think you said that the result of that
audit was not shared with the PDP?
        A.    I don't recall it being shared at
that time.  I can't speculate when it was
shared.
        Q.    When you say "at that time," what
time period is that?
        A.    Whenever they did the audits.
        Q.    Is it being shared currently or
it's still the same situation?
        A.    So when they do audits currently
they share them at the YesCare QI and, again, at
our joint QI meetings.
        Q.    So they get disclosed eventually?
        A.    Yes.  And to be clear:  If I ask
them for any of their audits, if I want to
review anything, they do share them.
        Q.    That's my next question.
            Was there any time that you made
a request for an audit and YesCare refused to
give what you were looking for?
        A.    No.

Page 80

Q.    When these diabetes audits were
being disclosed either to you at your request or
at one of the QI meetings, were there concerns
as to what the audits were showing or finding?
        A.    I don't remember the exact
results of the audits.
        Q.    Do you know whether Dr. Puerini
ever raised any issues or concerns over the
diabetes care during any of the site inspections
or monitoring reports?
        A.    So to my recollection, and I
don't remember exactly which year, but I
remember us looking at diabetes.  And I remember
him making a recommendation to make sure that
the providers are documenting they had done the
foot exams.
            YesCare did go back and make a
change in their smart form, which is a form they
fill out during the chronic care visits.  And
just to make sure that that notation was on
there and they can put a yes or no answer to
that question.
        Q.    To your knowledge, was there ever
a time when YesCare did not agree to implement a
recommendation from Dr. Puerini or from any

Page 81

other person providing oversight of medical
care?
        A.    Not that I can recall.
        Q.    Just going back to just more
questions relative to Mr. Jung.  Did you have
any direct communications with anyone at YesCare
as to what occurred as to the events leading up
to his death?
            MR. PESTRAK:  Objection.  This is
        beyond what she is designated for.  But I
        will let her answer.
BY MR. WITTEKIND
        Q.    Do you recall having any direct
communications with anyone from YesCare
regarding Mr. Jung's death?
        A.    I don't recall the specifics of
it.  But when I do my chart reviews I will -- if
I have questions about something I will contact
someone from QI to discuss something.  Sometimes
being a nurse something might look -- it doesn't
sit well with me or not sure about.  So at times
I will call them to discuss it to make sure that
I'm looking at something correctly.  And I don't
want to be quick to judgment about something.

Page 82

MR. WITTEKIND:  I think that's all I have.

- - -

FURTHER EXAMINATION

- - -

BY MR. KAMINSKY

Q.    Mr. Varghese, is there a specific training for an RN to be able to perform intake?

A.    So when YesCare hires their staff they go through CHIO training, which I am not sure what that stands for.

Q.    Can you spell that?

A.    CHIO.  I don't know what it stands for.  But they do an overall training regarding what is expected of them working here at the PDP.  So it's something related to what they are going to be doing regarding health care responsibilities.  But it's an overall training. It's all levels, all disciplines attend this training.

They also do ECW training, which ECW is e-clinical works, our medical record.  At that time our EHR clinical person does a class with them.  And I don't attend that training. So I'm just going to tell you what I know of it.

Page 83

I believe they are assigned their roles.  So an RN will have certain roles within the EHR of what they will do.  Let's say someone is assigned for CFCF -- an RN who is working at CFCF who is responsible to do intake so they can be assigned to work intake.

So during the EHR training at that point they will be given access to that intake consult and be able to practice on how to ask the questions and answer the questions and see what appointments positive answers will trigger.

And then there is also training that they get once they are hired and working on site.  They will shadow a nurse.  I don't know for how many days.  But they do shadow somebody.

Q.    So when you said somebody who is hired from YesCare, do you distinguish any difference between somebody directly hired under YesCare compared to somebody who is hired by a staffing agency?

A.    Well, YesCare does have agency staff.  But they have to go through the same training process that the YesCare staff go through.

Page 84

Q.    Do you know if there is any kind of period of time that an RN would have to wait before they can do intake?  Is there any kind of guidance about that?

A.    I'm not familiar with that timeframe.

Q.    So as long as they were provided the training, the ECW and the CHIO and the EHR, then they are qualified to do the intake?  Is what you are saying?  Along with shadowing?

MR. PESTRAK:  Objection, misstates her previous answer.  I think she said she was not aware if there was a time period.  I don't think she said there was -- she said that was the training they received from YesCare and that was not aware of a time period.  As to when they are qualified I think is not a question she would know the answer to.  But I will let her answer to the best of her knowledge.

MR. KAMINSKY:  We can strike that.

BY MR. KAMINSKY

Q.    So if a nurse is starting today and she's shadowed people and she has taken part

Page 85

of CHIO and taken part of ECW and then EHR, as of today because she did that stuff, could she perform intake?

MR. PESTRAK:  Objection.  You can answer.

THE WITNESS:  Yes, she can. Because part of the shadowing process is that they are not just watching somebody. They also are given the opportunity to perform a screening while the senior nurse is observing them to assist them.

BY MR. KAMINSKY

Q.    So you are familiar with B1 Pod 3. Am I correct?

A.    Yes.

Q.    And B1 Pod 3, that's where the inmates are housed?

A.    Yes.  That's one of the pods.

Q.    So earlier you had testified that it would take seconds to walk from the -- I think you said from the medical area to the pod; am I correct?

A.    From the pod to the medication area.

Q.    Medication area.  Okay.

Page 86

So is the medical area where the nurses and doctors where they are situated, is that further than the medicine area?

A. Yes.

Q. How far is the medical area from the pod? I am just asking for an estimate walking.

A. Probably not even a 2-minute walk.

Q. And I think that you had answered -- so I have this down as a question. But I feel like this was an answer you had given. I'm not sure, though.

If an inmate needs an infirmary, it's the physicians who will make the decision about whether or not they need to go to the infirmary?

A. Yes.

MR. KAMINSKY: I think that's all that I have.

- - -

EXAMINATION

- - -

BY MR. PESTRAK

Q. If medical reviews through any of

Page 87

the process and notices a situation where a corrections is impacting negatively medical treatment or administration, is there a process or procedure for medical to notify the corrections side of that potential issue?

A. So they have meetings with the -- the HSAs and the wardens have meetings. I don't know if it's weekly or twice a month. I'm not sure. But they do have meetings with the wardens. And they can address at those meetings.

I do know that the HSAs have direct access to the wardens at any time that they -- outside of these meetings they can certainly call them at any time and address things. If it's something that needs to be addressed at a higher level, it can certainly be brought to the attention of Dr. Herdman. And he -- his title is chief of medical operations. But he is at a deputy commissioner level for the prisons. And he can bring it up at one of his administrative meetings with security. So there is various ways to address things.

MR. PESTRAK: I don't have any more questions for you, Sandy.

Page 88

- - -

FURTHER EXAMINATION

- - -

BY MR. WITTEKIND

Q. One or two brief questions. You told us earlier about the red flag process when an inmate refuses to take medication.

A. Yes.

Q. Do you recall that?

A. Yes.

Q. Is it fair to say that if an inmate refused to take his medication and the red flag process works its way through that, the PDP or the medical staff cannot force him to take the medication?

A. That's correct.

Q. Ultimately, that is his or her own decision as to what he wants to do for whatever reason?

A. Yes.

MR. WITTEKIND: Thank you.

- - -

FURTHER EXAMINATION

- - -

Page 89

BY MR. GROTE

Q. Are you aware of certain indications where medication can be administered involuntarily if there is an appropriate clinical determination that that is required?

A. The only place we can do involuntary medication is if the person is admitted to PHSW which is our inpatient behavioral health hospital.

Q. So there are instances where that could be an option if there is a clinical determination that it is necessary for patient health?

A. Yes. But that's typically with psychotropic medication.

MR. GROTE: I think we are done.

THE COURT REPORTER: Real quick before we go off the record, I want to get orders. Michael, copy?

MR. PESTRAK: A full and a mini, email only.

THE COURT REPORTER: Okay. Ray?

MR. WITTEKIND: Electronic mini and full.

THE COURT REPORTER: Summer?

Deposition of Sandy Varghese

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 90

1   MS. THOMAS:  I will take an
2   electronic mini and full.
3   THE COURT REPORTER:  And then
4   Jonathan?
5   MR. KAMINSKY:  I will do what Ray
6   was asking for.
7   (Witness excused.)
8   (Deposition concluded at 11:27
9   a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T I O N

        I, JARED CAREY, Court Reporter,
certify that the foregoing is a true and
accurate transcript of the foregoing deposition,
that the witness was first sworn by me at the
time, place and on the date herein before set
forth.

        I further certify that I am neither
attorney nor counsel for, not related to nor
employed by any of the parties to the action in
which this deposition was taken; further, that I
am not a relative or employee of any attorney or
counsel employed in this case, nor am I
financially interested in this action.

_____
Jared Carey
Court Reporter
and Notary Public
Date: November 5, 2025

```
 1                        -  -  -

 2              E R R A T A   S H E E T

 3                        -  -  -

 4

 5    PAGE        LINE        CHANGE

 6    _____      _____      _____

 7    _____      _____      _____

 8    _____      _____      _____

 9    _____      _____      _____

10    _____      _____      _____

11    _____      _____      _____

12    _____      _____      _____

13    _____      _____      _____

14    _____      _____      _____

15    _____      _____      _____

16    _____      _____      _____

17    _____      _____      _____

18    _____      _____      _____

19    _____      _____      _____

20    _____      _____      _____

21    _____      _____      _____

22    _____      _____      _____

23    _____      _____      _____

24    _____      _____      _____

25    _____      _____      _____
```

1               ACKNOWLEDGMENT OF DEPONENT

2

3        I,                        , do hereby

4   certify that I have read the foregoing pages and

5   that the same is a correct transcription of the

6   answers given by me to the questions therein

7   propounded, except for the corrections or

8   changes in form or substance, if any, noted in

9   the attached Errata Sheet.

10

11

12

13

14

15   _____      _____
     Date             Signature

16

17

18

19

20

21

22

23

24

25

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 32 of 52

Deposition of Sandy Varghese                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

## WORD INDEX

**< 0 >**
**000207**  63:*22*

**< 1 >**
**1**  9:*18*  10:*1*  29:*3*
  75:*3*
**10/27/23**  73:6
**10/28**  70:*12*
**10/28/23**  70:4
**100**  1:*22*
**11/6/2023**  73:7
**11/6/23**  71:*8*
**11:27**  90:*8*
**1100**  3:*4*
**12/14/22**  73:4
**12/16/21**  73:2
**14th**  2:*12*
**150**  41:*6*
**1515**  2:*12*
**15th**  3:*4*
**1717**  2:*17*
**1801**  2:*8*
**18th**  1:*22*
**19102**  3:*4*
**19103**  1:*23*  2:*8, 13,*
  *18*
**19123**  2:*4*

**< 2 >**
**2**  10:*5, 17*
**2:24-cv-05618-TJS**
  1:*8*
**2001**  1:*23*  14:*20*
**2006**  14:*14*
**2018**  10:*1*
**2020**  24:2  29:*3*
**2020s**  26:*6*
**2021**  17:*6*
**2023**  10:*1*  24:2
  26:*14*  29:*4*
**2025**  1:*10*  91:*22*
**215**  1:*24*
**215.561.2300**  2:*18*
**215.564.0400**  3:*5*
**215.569.4433**  2:*9*
**215.683.5000**  2:*13*
**22**  13:*20*  60:2

**24**  1:*10*  39:*20*  60:2
  62:*19*
**24/7**  41:*11*
**250**  42:*6, 8*
**2-minute**  86:*8*

**< 3 >**
**3**  10:*21*  11:*6, 12*
  85:*14, 16*
**30**  33:*9*  41:*18*
**30(b)(6**  7:7  69:*16, 22,*
  *24*
**306**  2:*3*
**30-day**  41:*22*
**31**  10:*1*
**341-3616**  1:*24*

**< 4 >**
**4**  11:*6, 12, 20*
**412.654.9070**  2:*4*

**< 5 >**
**5**  11:*6, 12, 24*  91:*22*

**< 6 >**
**6**  4:*4*  11:*6, 13*  12:*4*
**6/12/23**  73:*5*
**6/2/23**  73:*6*
**610**  2:*17*
**64**  60:*1*
**66**  4:*5*

**< 7 >**
**7/12/12**  70:*23*
**7/12/2012**  75:2
**7/13/12**  70:*24*
**7/13/2012**  75:2
**75**  4:*6*
**770**  2:*8*

**< 8 >**
**82**  4:*5*
**87**  4:*7*
**88**  4:*6*
**89**  4:*4*

**< 9 >**
**9/27/22**  73:2
**9:02**  1:*15*

**90**  21:*24*  25:*14*
**911**  54:*3*  62:*14, 24*
**990**  2:*3*

**< A >**
**a.m**  1:*15*  90:*9*
**able**  22:2  31:*24*
  47:*19*  53:24  61:*22*
  69:*2, 6*  75:*8*  82:*8*
  83:*9*
**ABOLITIONIST**  2:2
**accept**  64:*1*
**accepted**  53:2
**Access**  13:5  46:*16*
  61:*22*  63:*20, 22*
  67:*15, 17*  68:*3, 20*
  83:8  87:*13*
**accommodate**  48:*25*
**accredited**  52:*3*
**accurate**  10:*15*  91:*6*
**ACKNOWLEDGMEN
T**  93:*1*
**action**  21:*3, 14, 20, 25*
  26:*6, 10*  27:2  30:*14*
  91:*12, 16*
**activated**  54:*5*
**actual**  14:*24*  34:*11*
  46:*14*
**ad**  27:*16*
**additional**  42:*10*
**address**  32:5, *9, 24*
  34:*13*  36:*16, 20*
  37:*15, 16*  55:25  56:*9,*
  *10, 13, 20*  65:*14*
  87:*10, 15, 23*
**addressed**  55:*16*
  56:*16*  87:*17*
**addresses**  32:*14*
**adequate**  34:*15*
**adhere**  52:*14*
**admin**  66:*7*
**administer**  43:*9*
  44:*5, 12*  49:*13, 21*
**administered**  39:*16*
  43:*21*  49:*6*  70:*13*
  89:*3*
**administration**  10:*22,*
  *25*  14:*10*  32:*10*
  37:*13*  39:*19*  44:*21*

**48:*19*  49:*18*  50:4**
  61:*18*  87:*3*
**administrative**  18:*6*
  87:*22*
**administrator**  18:*9*
  56:*11*
**Administrators**  1:*4*
  37:*8*
**admission**  41:*18*
  67:*4*  70:*22*
**admissions**  58:*13, 22*
**admitted**  40:*5*  58:*8*
  70:24  89:*8*
**advanced**  71:*22, 25*
**AED**  53:*19*
**Affairs**  36:*23*
**agency**  83:*21, 22*
**agenda**  20:*19*  21:*10*
**agendas**  20:*22*
**agree**  70:*11*  80:*24*
**al**  1:*7*
**allowed**  49:*9*  53:*22*
**altered**  48:*19, 21*
**American**  52:*1, 15*
**Analysis**  69:*3, 11*
  71:*16*
**Answer**  5:5  7:*21*
  8:*15, 22*  32:7  43:*12*
  45:*21*  57:*11*  68:*15,*
  *17, 19*  72:*13*  73:*16*
  74:*10*  80:*21*  81:*11*
  83:*10*  84:*12, 19, 20*
  85:*5*  86:*12*
**answered**  68:*14*
  86:*11*
**answering**  69:*14, 20*
**answers**  8:*6*  83:*11*
  93:*6*
**anticipate**  8:*8*
**Anybody**  43:*5*  68:*8*
  77:*15*
**Apollon**  2:*9*  66:*1*
**apologize**  75:*25*
**appear**  64:*14*
**APPEARANCES**  2:*1*
  3:*1*
**Appearing**  2:*5, 10, 15,*
  *19*  3:*6*
**appointment**  25:*13,*
  *19*  47:2  64:*14*

appointments  62:9
83:11
appropriate  28:17, 21
89:4
appropriately  47:10
approve  61:4
Arch  2:12, 17
area  44:1, 9, 12, 15
49:8  85:21, 24, 25
86:1, 3, 5
areas  18:11  44:22
arises  18:19, 23
59:11
arrested  39:17  66:6
67:6
arrival  68:9
arrive  40:1, 2
aside  27:16
asked  8:19  39:13
61:16  66:15  72:5
76:2, 23  78:23
asking  6:21  7:15
14:19  34:25  68:8, 10
73:18  86:6  90:6
asks  41:5
aspects  16:7  25:5
assess  53:23
assessments  32:24
assigned  39:20  83:1,
4, 6
assist  85:11
assistance  36:10
37:17
assistant  40:22
48:14  77:14
assistants  43:7
Association  52:2, 12,
15
assume  8:16
assurance  76:24
attached  93:9
attempt  45:10
attend  15:16  18:3
36:24  77:1  78:8
82:19, 24
attended  20:6  33:20
36:22, 23  37:23
77:24  78:21
attends  77:9

attention  59:8, 17
87:18
Attorney  2:5, 9, 14,
19  3:5  76:23  91:11,
14
audit  19:1, 3, 4, 17
21:22  25:2  78:25
79:5, 23
auditors  9:24
audits  9:18  15:15
17:21  18:16, 17  21:1,
2, 3, 13  24:6, 7, 9, 21
25:5, 10  30:20  38:7
53:6  79:11, 14, 19
80:1, 4, 6
Austen  3:10
author  69:10
authority  54:6, 13, 17
61:10
autopsy  36:25  38:22
available  34:1  53:16
64:3, 19  68:21
aware  26:16, 22, 25
61:20  73:11  84:13,
17  89:2

< B >
B1  85:13, 16
bachelor's  14:8
back  10:11  14:1
18:2  22:4, 10  34:19
53:25  59:1  63:14
66:11  68:22  80:17
81:4
backboard  53:19
backlog  38:16, 20
backtrack  33:7
barriers  63:23
based  26:3  41:1
42:20  49:25  51:23
52:1, 9  59:18  61:5
62:17, 23  72:16  75:7
basic  7:19  63:8
Basically  60:9
basis  18:18, 22
42:16  56:10
Bates  63:19, 21
beds  59:22  60:1
61:7

began  16:2  66:5
behalf  77:24
behavioral  20:13
31:23  41:7  59:25
66:18, 19  78:10, 20
89:9
believe  7:9  9:17
14:20  17:6  37:21
39:14  43:19  50:7
54:19  76:25  79:3
83:1
benefit  58:4
best  18:21  45:20
84:20
better  22:22
beyond  43:10  69:15
81:10
big  67:19
bimonthly  20:1, 14
bit  6:10  22:21
23:25  65:5
biweekly  20:18  37:10
Blair  75:21
Blanche  2:14
blood  25:15  39:21
41:9  42:4, 5  44:2, 5
49:25  50:19  72:6
74:14  76:18, 21
Bloodsaw  2:14
body  7:22
Boulevard  3:4
box  53:20
break  8:17, 20, 23
73:5
breaks  8:18
BRET  2:2  6:14
51:11
brief  34:9  40:10
88:5
bring  40:12  59:16
63:17  71:7  87:21
brittle  72:7, 9  76:3,
5, 7, 11, 15
broad  45:16
brought  36:14  53:25
59:8  87:18
Bruce  16:15
building  39:19  44:20,
22  53:13  66:7

bumped  40:9
bus  40:3

< C >
Cabellos  75:21
call  18:5, 9  39:23
41:12  43:17  45:11
53:13  54:6, 13, 20, 22,
23  55:21  62:21  63:4
81:22  87:15
called  16:10  44:10
49:23  54:3, 4  64:13
calls  54:9
capacity  69:22
care  9:20, 21  10:9
11:21  13:5, 16  18:1
19:8  24:3, 10, 20
25:6, 8, 13, 24  26:7
27:1  28:24  29:7, 18,
23  30:21  31:13  32:6
34:21  35:20, 25
36:13  37:6  39:9, 16
41:17, 22  43:9  49:1
51:8, 18  52:4, 20
53:2  55:5, 21  57:24
60:9  61:23, 25  63:20,
23, 25  64:1, 12  65:3,
12  66:21  78:25  80:9,
19  81:2  82:17
Career  2:19
Carey  1:16  91:4, 16
Carney  2:14
case  20:10  22:24
33:14  34:10  38:10
39:23  52:13  91:15
case-by-case  56:9
case-to-case  42:15
cast  60:23
catch  51:12
cause  34:1
cell  49:12
cells  61:7
CENTER  2:2  54:23,
24
certain  18:8  32:17
34:14  40:25  43:15
52:7  59:3  61:21
72:18  83:2  89:2
certainly  67:25

87:15, 17
**certify** 91:5, 10  93:4
**CFCF** 39:24  40:1
  41:11  43:25  44:8, 16
  58:2  62:18, 21  77:11
  83:4, 5
**chaired** 37:22  78:7
**chairs** 20:5
**chance** 16:18
**change** 16:24  17:1,
  10, 17  22:6, 10  47:19
  68:17  75:6  80:18
  92:5
**changed** 13:24  34:15
  45:23  48:25
**changes** 20:24  93:8
**chart** 15:15  17:21
  18:16, 17  19:4, 11
  22:18  53:5, 6  56:25
  81:17
**charts** 55:18
**check** 39:21  44:5
  49:20  70:16
**checked** 44:3
**checking** 49:16
**checks** 25:16  43:20
  50:2
**chief** 16:15  87:19
**CHIO** 82:10, 13
  84:8  85:1
**chlamydia** 40:21
**chronic** 19:8  25:13,
  23  31:13  41:1, 17, 22
  52:6  61:20  64:12
  65:3  80:19
**CITY** 1:7  2:10, 14
  6:16  7:14  9:6  13:14,
  16  15:4, 13  56:25
  63:21
**clarify** 13:23  14:21
**class** 82:23
**clear** 10:12  52:19
  73:20  79:18
**clerk** 51:4
**clinic** 41:17  65:4
**clinical** 43:17  63:11
  76:9  82:23  89:5, 11
**closely** 76:22
**closer** 19:1  72:3

**CNAs** 60:13
**coincide** 31:24
**combination** 16:6
**come** 9:10  20:12
  30:9, 25  40:3  44:2
  45:12  46:4, 5  47:13
  54:17  59:9  64:14
**comes** 32:16  44:4
  46:3  63:14  66:11
  74:12
**coming** 28:7  67:6
**commander** 64:3, 16,
  20
**commanders** 64:23
**commencing** 1:15
**comments** 21:9
**Commission** 52:3
**commissioner** 33:20
  87:20
**Commonwealth** 1:14,
  18
**communicated** 64:22
**communications** 55:2
  81:6, 14
**community** 53:3  68:6
**company** 17:9
**compared** 83:20
**complement** 60:12
**completed** 21:13
  25:12  30:23  40:12
**Compliance** 36:24
**compliant** 19:13  26:1
**concern** 29:17
**concerns** 80:3, 8
**concluded** 90:8
**condition** 40:8
**conditions** 41:1
**conduct** 17:20  24:7
**conducted** 9:23  24:9
**conducting** 15:15
**consider** 30:20
**considerations** 63:24
**considered** 45:8, 18
  65:4  67:3  71:21
**consist** 19:3
**consists** 40:16
**consult** 62:22  83:9
**consultant** 28:6
  52:24

**consultants** 30:16, 19
  38:4
**contact** 81:18
**container** 44:14
**contents** 12:15
**context** 42:24  64:10
**continue** 71:15
**Continued** 3:1
**continues** 6:11
**continuity** 66:21
**contract** 13:16  15:13,
  24  17:15
**contractor** 16:20
  17:5  23:14  52:14
**contracts** 15:13
**control** 18:5  21:15,
  17  25:20, 22, 25
  54:23, 24
**conversation** 8:8
**conversations** 12:15
  15:17  29:21
**coordination** 52:11
**coordinator** 13:15
**copies** 31:4, 5
**copy** 89:19
**Corinne** 3:10
**Corizon** 16:24  17:1
**Corp** 3:5
**corporate** 52:10
**correct** 39:6  67:12
  73:7  75:11, 12  85:14,
  22  88:16  93:5
**correction** 35:24
**correctional** 10:8, 24
  11:8, 14  48:23  52:4
**correctional-to-
correctional** 55:1
**corrections** 36:12, 15,
  19  37:4  87:2, 5  93:7
**corrective** 21:3, 14,
  19, 25  26:5, 9  27:2
  30:14
**correctly** 81:23
**counsel** 6:15  12:16,
  22, 24  20:9  91:11, 15
**counseled** 47:5, 19
**counseling** 47:11
**couple** 15:3  22:10
  66:2  75:22

**course** 13:9  34:2
  41:14  47:8  49:11
**COURT** 1:1, 22
  7:23  8:2, 11  38:12,
  18  39:1  89:17, 22, 25
  90:3  91:4, 21
**covered** 36:4  38:25
**COVID** 17:12  49:8
**critical** 45:8, 15, 18,
  21  46:7, 12  62:16
**crutches** 60:23
**cup** 40:19
**Curran-Fromhold**
  15:1, 10
**currently** 13:10
  16:10  79:12, 14
**custody** 28:25  32:24
  33:1, 8  34:13  68:11
  71:5
**CVS** 67:19

**< D >**
**database** 38:19
**date** 1:16  50:18
  91:8, 22  93:15
**dates** 70:18, 20, 21
  71:1, 4  73:1
**day** 17:23  23:12
  39:21  42:4  46:5
  48:20  50:24  53:15
  60:11  62:20  72:20
**days** 25:14  33:10
  41:18  45:25  56:7
  60:12, 14  83:16
**day-to-day** 17:18
**DC** 58:8
**death** 32:25  33:10
  34:1  81:8, 15
**deaths** 32:24  33:4
  34:12
**December** 10:1
**decide** 18:25
**decision** 41:25  57:21
  59:21  60:21  63:11
  86:15  88:18
**Defendant** 2:9, 14, 19
  3:5  7:14
**Defendant(s** 1:8
**defendants** 75:20
**Defender** 59:16

defenders 17:*24*
  18:*3* 56:*7*
deficiencies 22:*20*
definitely 46:*8*
degree 14:*8* 71:*25*
degrees 14:*6*
delivery 36:*13* 37:*5*
  38:*7* 51:*18* 61:*25*
DEPARTMENT 2:*10*
  13:*11* 31:*6* 77:*9*
Depending 19:*14*
  44:*10* 62:*13*
depends 62:*15*
DEPONENT 93:*1*
deposition 1:*12* 5:*3*
  6:*17, 23* 7:*8, 13, 20*
  8:*1* 9:*3, 18* 12:*12*
  90:*8* 91:*6, 13*
deputy 33:*20* 87:*20*
Describe 38:*11* 76:*14*
described 48:*18*
describing 52:*20*
  58:*12*
DESCRIPTION 4:*9*
designate 7:*15*
designated 9:*6, 13*
  10:*12* 11:*6* 43:*11*
  44:*11* 81:*10*
designation 69:*15*
designee 69:*22*
detailed 30:*22*
determination 89:*5,*
*12*
determine 18:*19*
  42:*19* 55:*13*
determined 57:*24*
developed 46:*7*
diabetes 9:*21* 10:*6, 9,*
*17* 24:*3, 6, 10, 20*
  25:*6, 8* 26:*7* 27:*1*
  32:*5* 39:*9, 16, 18*
  43:*9* 51:*8, 17* 52:*2, 5,*
*12, 15, 20* 72:*19*
  74:*15, 21, 22* 75:*4, 11*
  78:*25* 80:*1, 9, 13*
diabetic 9:*22* 25:*1*
  26:*17* 40:*25* 41:*8, 20*
  42:*1* 72:*7, 9* 73:*11,*
*21* 74:*3* 76:*3, 5, 7, 11,*
*15*

diagnosed 74:*18, 20,*
*23*
diagnosis 75:*9*
dialysis 31:*14, 15*
dies 33:*8*
difference 66:*16*
  83:*19*
different 15:*8* 18:*7*
  44:*10* 48:*17* 65:*1, 5*
direct 81:*6, 13* 87:*13*
Direction 5:*5*
directly 23:*13* 83:*19*
director 22:*17* 77:*11,*
*12, 17* 78:*11*
directors 77:*13* 78:*9*
disaster 18:*12*
discharged 58:*24*
  70:*25*
disciplines 82:*19*
disclosed 79:*17* 80:*2*
discovered 36:*7*
discuss 19:*21* 22:*19,*
*23* 29:*10* 33:*6* 34:*18*
  36:*11* 37:*2* 55:*10*
  57:*8* 81:*19, 22*
discussed 23:*23* 27:*3,*
*13, 15, 19* 28:*2, 3*
  29:*13* 34:*10* 35:*7, 8*
discussing 71:*22*
Discussion 7:*5* 29:*5*
  34:*11* 42:*20* 57:*4*
  62:*18, 23* 65:*18*
discussions 27:*16*
  34:*12*
disease 31:*13* 74:*5,*
*15*
diseases 52:*6*
dispose 44:*15*
distinguish 83:*18*
DISTRICT 1:*1, 2*
Division 36:*23*
dock 40:*4*
doctor 16:*18* 25:*23*
  41:*11, 12, 14* 43:*3*
  59:*18*
Doctors 38:*4* 86:*2*
document 8:*14*
  19:*17* 25:*24* 47:*4*
  50:*3, 16, 17* 69:*21*
  76:*1*

documentation 10:*22*
  11:*1* 29:*6* 30:*13*
documented 29:*12,*
*18, 24* 47:*9, 22* 50:*2,*
*6, 8, 13, 14* 64:*4* 76:*8*
documenting 55:*20*
  80:*15*
Documents 5:*10*
  12:*20, 23*
doing 18:*17* 22:*7*
  25:*1* 28:*11* 31:*22*
  34:*23* 53:*5* 55:*15*
  56:*13* 74:*1* 82:*17*
dosage 49:*24*
dose 42:*11* 45:*6, 9*
  46:*9* 49:*22*
doses 46:*1* 50:*2*
double 71:*11*
doubt 75:*10*
Dr 16:*15, 18* 19:*20*
  20:*5, 6, 11* 21:*8* 23:*8*
  24:*17* 28:*5* 30:*17, 18*
  31:*8, 22* 32:*2* 33:*12,*
*16* 52:*24* 58:*19*
  75:*21* 77:*9, 11, 19*
  78:*7, 10, 11* 80:*7, 25*
  87:*18*
drills 18:*13*
drops 76:*21*
drug 23:*21* 53:*20*
due 36:*12* 43:*24*
  48:*19*
duly 6:*2*
duties 15:*4* 17:*17*

< E >
earlier 55:*10* 66:*4*
  76:*23* 78:*23* 85:*19*
  88:*6*
EASTERN 1:*2* 14:*12*
e-clinical 82:*22*
economics 16:*19*
ECW 50:*11, 24*
  82:*21, 22* 84:*8* 85:*1*
educating 22:*4*
education 14:*3* 22:*6*
  38:*24*
effective 22:*11*
efficient 22:*9*
effort 49:*13*

documentation 10:*22*
EHR 19:*5* 82:*23*
  83:*3, 7* 84:*8* 85:*1*
either 20:*20* 22:*25*
  24:*3* 35:*4* 40:*1*
  62:*14* 80:*2*
electronic 47:*2* 50:*9*
  68:*22* 89:*23* 90:*2*
email 56:*11* 89:*21*
emails 17:*23*
eMAR 50:*8, 10*
emergencies 36:*5*
emergency 11:*21*
  13:*5* 27:*23, 25* 28:*9,*
*12, 14, 16, 18, 23*
  34:*21, 24* 35:*19* 36:*6*
  53:*8, 20* 54:*4* 55:*5,*
*20* 62:*7, 10, 11, 13, 20*
  63:*2, 4, 7* 66:*18*
employed 10:*14*
  91:*12, 15*
employee 15:*5* 48:*12*
  51:*5* 55:*14, 23* 91:*14*
employees 37:*25*
employment 14:*1*
encounter 47:*3* 64:*4,*
*19*
ensure 49:*1* 52:*21*
  53:*1, 5* 55:*6* 61:*22*
  63:*24* 66:*21*
ensuring 10:*9, 24*
  26:*17* 34:*22*
entails 28:*14*
entire 66:*14*
equipment 53:*21*
ER 35:*15* 63:*11*
Errata 93:*9*
escorted 63:*1*
Especially 49:*8*
ESQUIRE 2:*2, 3, 7,*
*12, 17* 3:*3*
establishes 51:*22*
establishing 51:*17*
Estate 1:*4*
estimate 86:*6*
et 1:*7*
evaluations 9:*19*
evaluators 9:*24*
evening 46:*3*
events 81:*7*

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 36 of 52

Deposition of Sandy Varghese                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

eventually  79:*17*
**EVEREST**  1:*22*
everybody  34:*3*  40:*4*
exact  67:*5*  80:*5*
exactly  24:*15*  40:*11*
  45:22  46:7  58:*20*
  76:7  80:*12*
exam  25:*18*
**EXAMINATION**  6:*5*
  65:22  75:*16*  82:*4*
  86:22  88:2, *23*
examined  6:*3*
example  19:*6*  38:*17*
  46:2  53:*10*
exams  80:*16*
excerpt  63:*17*
exclusive  61:*10*
excused  90:*7*
exhibiting  9:*22*
exhibits  4:*10*
expect  53:*3*
expected  82:*15*
experience  72:*16*
experts  9:*24*
explain  7:*9*  47:*24*
explained  7:*8*
eye  25:*18*

**< F >**
face-to-face  47:*23*
facilities  9:*25*  10:*7,*
  *23*  11:22  12:2, *6*
  18:7  39:*16*  57:*19*
  62:*21*  79:*1*
facility  12:7  40:*6*
  44:*9, 11*  56:*12*  62:*5*
  66:*9*  78:*15*
factors  61:*5*
factual  69:*17*
fair  88:*11*
familiar  27:*9*  64:*6*
  84:*5*  85:*13*
far  58:*16*  66:22
  71:*18*  86:*5*
feedback  34:*5*
feel  42:*13*  54:2
  57:*23*  59:*19*  86:*12*
female  40:2
figure  45:*20*

fill  80:*19*
filled  47:*9*
financially  91:*16*
find  45:*11*
finding  80:*4*
finish  8:6, *7, 12*  25:*3*
finished  8:*10*  70:*8*
first  9:*17*  14:*24*
  40:*18*  49:*21*  68:2
  74:*4, 20*  91:*7*
five  30:*5*
flag  45:*7, 10, 24*
  46:*19, 22*  47:*3, 14*
  65:*6, 8*  88:*6, 13*
flagged  46:*20*
floor  2:*12*
flow  50:*13, 15, 21*
focus  35:*23*  38:*13*
follow  52:*11*
following  53:*1*
follows  6:*3*  23:*13*
follow-up  58:*25*
  65:*13*
foot  25:*18*  80:*16*
force  88:*14*
foregoing  91:*5, 6*
  93:*4*
forgot  78:*17*
form  26:*21*  49:*3*
  51:*20*  56:2, *4, 22*
  57:*7, 12*  63:*8*  72:*11,*
  *13*  73:*14, 23*  80:*18*
  93:*8*
forth  91:*9*
forum  22:22  36:*18*
found  28:*21*  54:*9*
  56:*19*
four  18:7  24:*1*
Frasier  2:*14*
free  63:*23*
frequently  25:*14*
  35:*9*
Friday  1:*10*
front  59:*13*
full  60:*4*  89:*20, 24*
  90:*2*
full-time  68:2
functioning  52:22
further  15:*19*  65:*20*
  68:*5*  75:*14*  82:*4*

86:*3*  88:2, *23*  91:*10,*
*13*

**< G >**
Garden  2:*3*
Gay  75:*21*
Gene  2:*14*
general  25:7
generally  25:*10*  77:*3,*
*4*
generate  19:*16*
getting  18:2  19:7
  25:*15*  28:*24*  47:*16*
give  9:2  19:*20*
  20:*23*  21:8  28:7
  36:2  38:*23*  40:*19*
  53:*10*  63:*5*  66:*3*
  76:*20*  79:*24*
given  6:22  33:*25*
  83:8  85:*9*  86:*13*
  93:*6*
gives  61:*13*  63:*8*
glucose  42:*18*  43:*20*
  49:*17, 20*  50:2, *5*
  72:*6*
go  7:*19, 20*  10:*11*
  14:*1, 9*  19:*5, 10*  21:*1*
  22:*10*  25:*5*  28:*17, 23*
  40:*21*  41:*4*  43:*24, 25*
  47:*4*  49:*10*  50:*18*
  53:*23*  58:*6*  59:*20*
  62:*6, 12*  63:*1*  65:*16*
  67:*4*  68:22  78:*4*
  80:*17*  82:*10*  83:*23,*
  *24*  86:*16*  89:*18*
goes  31:*16*  40:*3*
  66:*6*  71:2  73:2, *4*
going  7:*11*  8:*9*
  15:*18*  18:*8, 11*  19:2
  22:*1, 4*  27:25  35:*13,*
  *16*  49:*5*  63:*6*  69:*15*
  81:*4*  82:*17, 25*
gonorrhea  40:*21*
Good  6:*8, 9*  25:25
  65:25
**GORDON**  2:*15*
graduate  14:*9*
graduated  14:*14*
granular  51:2

grievance  38:*23*
grievances  21:*15*
**GROTE**  2:2  4:*4*
  6:*7, 14*  7:*6*  11:*12, 17,*
  *19*  26:24  27:6  35:*3*
  43:*16*  49:*15*  51:*14,*
  *24*  56:*15*  57:*14*
  65:*16, 19*  76:*23*  89:*1,*
  *16*
ground  7:*20*
group  22:*19*
guess  33:7  38:*12*
  52:23  61:*9*  65:*10*
guessing  60:*16, 18*
guidance  84:*4*
guidances  53:2
guidelines  51:22
  52:*9, 10, 16, 25*

**< H >**
handle  59:*11*  69:*25*
handled  28:*19*
happen  18:22  23:*12*
  30:*1*  41:*24*  49:*18*
  53:*9*  54:*20*
happened  20:25
  57:*11*
happens  33:*23*  54:*10*
  59:*17*
hard  14:*19*  17:*11*
health  13:*16*  14:*10,*
  *25*  16:*21, 23*  20:*13*
  31:*23*  37:8  38:*24*
  41:7  47:2  52:*4*
  59:*25*  61:*23*  63:*25*
  66:*18, 19*  74:*13*
  78:*10, 20*  82:*17*  89:*9,*
  *13*
healthcare  13:*15*
  15:*12*  17:25  18:*13*
  33:*21*  48:*6, 11*
hear  7:*1*
hearing  6:*11*
held  1:*14*  7:*5*  65:*18*
help  75:*5*
helping  42:*7*
Henderson  71:*9, 18*
  72:8

**Herdman** 16:*15, 18*
*19*:20  20:5, 6  24:*17*
78:7  87:*18*
**Herdman's** 23:8
**hey** 47:*15*
**high** 14:4, 5  42:5, *18*
74:*14*  76:*19*
**higher** 42:*10*  87:*17*
**highlight** 73:2
**hired** 83:*14, 18, 19, 20*
**hires** 82:9
**history** 14:2  63:6
66:*23*  67:*12, 15, 18,*
*21*  68:4, *23*
**HIV** 41:*3*
**hoc** 27:*16*
**hold** 63:*15*
**hospital** 12:8  58:*4*
59:*20*  60:*1*  66:*10, 12*
89:9
**hours** 39:*20*  62:*19*
**housed** 42:*3*  85:*17*
**houses** 61:*1*
**housing** 12:2  42:*3*
44:*17, 25*  45:*1*  54:*11*
57:*18*  60:*20*  61:*3*
**HSA** 57:9
**HSAs** 37:7, *19, 23, 24*
77:*13, 14*  78:*15*  87:7,
*12*
**HU** 2:*3*
**human** 67:8, *11*
**hundred** 32:*21*

**< I >**
**identified** 74:2
**identify** 28:*1*  69:6
**impact** 36:*13*
**impacted** 61:*23*
**impacting** 87:2
**impede** 61:*24*
**implement** 80:*24*
**improvement** 32:*19*
58:*10*
**incarcerated** 11:*25*
12:6  22:*15*  32:*3*
48:7  57:*17*  62:4
68:2
**incarceration** 41:*16*

68:*24*
**incarcerations** 74:*22*
**incident** 55:*12*
**incidents** 55:*13*
**include** 63:*24*
**including** 9:*20*  10:7,
*23*  11:*13*  12:7
**increase** 35:*13*
**INDEX** 5:*3*
**indications** 89:*3*
**individual** 7:*14*
**individuals** 12:*1, 6*
57:*17*
**infection** 18:*4*  21:*15,*
*17*
**infirmary** 12:*1*
57:*18, 20, 24*  58:5, 7,
8, *13, 21, 25*  59:4, 5,
*20, 23, 25*  60:2, 4, 7,
*10*  61:6, 8, *11, 13, 22*
86:*14, 17*
**information** 15:*19*
38:*24*  63:8  68:*18*
**Inmate** 63:*22*  66:6, 9,
*13*  68:9  71:5  72:*25*
86:*14*  88:7, *12*
**inmates** 85:*17*
**inmate's** 66:*22*  67:*15*
**inpatient** 89:8
**inquiries** 17:*24*
**inspection** 72:4
**inspections** 80:9
**inspectors** 9:*25*
**instance** 21:*21*  29:*20*
43:*25*  56:5  64:*11*
70:*23*
**instances** 41:*21*
61:*19*  89:*10*
**insulin** 26:*18*  39:*22*
43:*21*  44:*13*  45:6, 8,
*14, 21*  46:8  48:*19*
49:*5, 18, 22, 23*  50:2
70:*13*
**intake** 13:*4*  40:*14,*
*16*  42:2  44:*16*  58:2
66:*5, 8, 14*  67:*1, 16*
70:*11*  74:*1, 2, 12*
82:*8*  83:5, *6, 9*  84:*3,*
*9*  85:*3*

**interested** 91:*16*
**interfere** 61:*24*
**internal** 36:*22, 23*
**internally** 33:*11*
59:*12*
**investigate** 15:*18*
**investigations** 9:*19*
**involuntarily** 89:*4*
**involuntary** 89:*7*
**involved** 33:*14*  39:*3*
58:*14*
**issue** 29:*11*  35:*19*
36:*12*  55:*22*  59:*7*
62:*14*  87:5
**issues** 21:*17*  26:*17,*
*23*  27:*1*  28:*1*  29:5
32:*10*  34:*13*  35:*14*
36:*20*  37:2, *5*  39:5
58:*13*  80:8
**issuing** 46:*22*
**its** 36:*13*  52:*14*
88:*13*

**< J >**
**JACOB** 1:*4*
**jail** 18:8  37:*14*
**JAMES** 1:*4*
**January** 10:*1*  29:*3*
**Jared** 1:*16*  91:4, *16*
**JFK** 3:*4*
**job** 16:7  27:*18*
**Johnson** 20:*11*  21:8
30:*18*  31:22  33:*16*
38:*5*  78:*11*
**joint** 19:*21, 25*  20:*4,*
*23*  21:*10*  23:9  33:6,
*15*  36:*20*  78:5  79:*16*
**JONATHAN** 2:*7*
66:*1*  69:*13*  76:*1*
90:*4*
**JR** 1:*5*
**judgment** 59:*19*
81:*24*
**June** 14:*20*
**JUNG** 1:*4, 5*  6:*15*
63:*21*  72:5, *9*  73:*9,*
*21*  75:*3, 11*  76:*3*
81:*5*
**Jung's** 81:*15*

**< K >**
**Kalu** 77:*11*  78:*10*
**K-A-L-U** 77:*21*
**Kalu's** 77:*19*
**KAMINSKY** 2:*7*
4:*5*  65:*24*  66:*1*
68:*16*  69:*23*  70:2
72:*23*  73:*19*  74:6, *24*
75:*13*  76:*1*  82:6
84:*21, 23*  85:*12*
86:*19*  90:*5*
**keep** 17:*12*  69:*14*
**keeps** 31:*3*
**ketoacidosis** 9:*23*
**ketones** 70:*16*
**KIERNAN** 2:*7*
**KIMBALL** 3:*3*
**kind** 63:*5*  84:*1, 3*
**knew** 72:6, *15*
**know** 6:*12*  7:7  8:*13,*
*18*  9:9  11:9  14:*3, 5*
16:*17*  17:*11*  23:5
24:*8, 13, 16, 18, 19*
26:*1, 13*  28:*13*  30:*3*
33:*3*  37:*10*  39:8
40:*15*  42:7, *17*  44:*1,*
*16*  45:5  46:*13, 24*
51:*1, 2*  54:*10*  58:*18*
59:2, *13, 22*  63:*4, 18*
64:*23*  69:5  70:7
71:*14*  72:8, *13, 15, 18,*
*21*  73:*16*  74:*4, 16, 17,*
*20*  80:7  82:*13, 25*
83:*15*  84:*1, 19*  87:8,
*12*
**knowledge** 80:*23*
84:*20*
**known** 22:*23*  40:8
66:*24*

**< L >**
**lab** 25:*11*
**labs** 26:*2*  40:*25*
**language** 7:*22*
**LAW** 2:*2, 10*  31:6
**lawsuit** 66:2
**lawyers** 7:*12*
**lead** 27:2
**leading** 81:7

**legal**   12:*16*, 22   20:7, *8*, *9*
**level**   16:*5*   25:*19*, *21*   28:*24*   49:*17*, *21*, *25*   50:*19*   57:*24*   60:*9*   87:*17*, *20*
**levels**   50:*5*   60:7   82:*19*
**limited**   9:*21*   10:7   12:*8*
**Line**   5:*6*, *11*, *16*, *21*   74:*4*   92:*5*
**lines**   59:*13*
**list**   19:*9*   43:*23*   46:*7*, *11*, *13*, *16*
**little**   6:*10*   7:*2*   21:7   22:*21*   23:*25*   51:*2*   63:*6*
**LLC**   1:*22*
**loading**   40:*4*
**logs**   38:*23*
**long**   13:*18*   36:*9*   84:*7*
**look**   17:*19*, *25*   19:*1*, *7*   24:*23*   25:*10*, *11*   28:*9*, *15*, 22   31:*7*, *15*, *18*, *19*, *20*   32:*18*   58:*19*   59:*18*   67:*25*   81:*20*
**looked**   12:*20*, *21*   24:*19*   29:*1*   31:*11*   39:*9*   58:*12*   59:*2*
**looking**   33:*4*   35:*15*   58:*21*, *24*   73:*1*   79:*24*   80:*13*   81:*23*
**looks**   17:*16*
**lot**   17:*23*   18:*15*   35:*15*
**LOUIS**   1:*5*   72:*4*, *9*
**lower**   60:*20*, *24*   61:*8*
**LPNs**   60:*13*

**< M >**
**machine**   53:*19*
**Major**   11:*9*
**majority**   54:*10*
**making**   36:*8*, *12*   80:*14*
**MANSUKHANI**   2:*15*

**MARGO**   2:*3*
**Mariesha**   2:*9*   66:*1*
**MARKED**   4:*9*, *10*   5:*20*
**Market**   2:*8*
**mass**   18:*12*
**matter**   6:*15*   49:*4*
**matters**   27:*12*
**Maureen**   75:*21*
**MBA**   14:*10*, *11*
**mean**   20:*15*   24:*25*   25:*4*, *21*   48:*11*, *21*   67:*1*   71:*19*   76:*16*, 17
**Meaning**   25:*25*
**means**   23:*15*   36:*1*   45:*10*   54:*22*
**meant**   34:*24*
**medical**   9:*20*   10:*14*   11:*7*, *21*   12:*1*, *7*   15:*14*   16:*11*, *16*   17:*20*   18:*11*   20:*12*   22:*17*   23:*8*   25:*6*   28:*5*   29:*6*, *17*, *23*   30:*12*, *21*   31:*9*, *18*   33:*24*   34:*21*, *24*   35:*25*   36:*5*, *10*, *13*, *19*   37:*1*, *4*, *6*, *13*, *16*   38:*7*   40:*7*, *9*, *13*, *19*, 22, *23*   41:*7*   42:*15*, *23*   44:*14*   45:*11*   48:*14*, *23*   50:*23*, *25*   51:*4*   52:*24*   53:*8*, *14*, *25*   54:*16*   55:*14*   57:*18*   60:*21*, *24*   61:*3*, *10*, *12*, *17*   62:*4*   63:*12*   64:*5*, *13*, *24*   65:*12*   66:*14*, *23*, *24*   67:*12*, *14*, *15*   68:*1*, *6*, *21*   69:*8*   73:*11*, *21*   75:*7*   77:*11*, *13*   78:*8*   81:*1*   82:*22*   85:*21*   86:*1*, *5*, *25*   87:*2*, *4*, *19*   88:*14*
**medication**   10:*22*, *25*   19:*12*   25:*17*   32:*9*   39:*23*   41:*10*, *13*, *15*   42:*6*, *11*   43:*24*   44:*1*, *3*, *6*, *9*, *11*, *21*   45:*8*, *13*, *15*, *18*, 22, *25*   46:*3*, *10*, *21*   47:*6*, *7*, *16*, *19*   49:*8*   50:*4*   65:*2*, *9*

**67:*18*   76:*20*   85:*23*, *25*   88:*7*, *12*, *15*   89:*3*, *7*, *15*
**medications**   19:*8*, *9*   23:*16*, *20*   26:*2*   42:*10*   44:*13*   46:*8*, *12*, *14*, *25*   47:*13*   49:*13*   65:*4*   66:*20*   67:*18*   72:*1*
**medicine**   86:*3*
**meet**   21:*23*   22:*2*
**meeting**   18:*24*   19:*21*   20:*3*, *5*, *23*   21:*1*, *11*, *16*, *18*   23:*13*, *18*, 22, *23*   28:*3*   29:*21*, 22   33:*6*, *13*, *15*, *19*   35:*6*   36:*15*, *18*   77:*4*, *24*   78:*4*, *5*
**meetings**   15:*17*   18:*3*, *4*, *5*   19:*23*   20:*2*, *20*   22:*25*   23:*11*   24:*4*   27:*13*, *20*, *21*, *22*   29:*4*, *14*   33:*22*   34:*7*, *20*   35:*1*, *7*, *9*, 22   36:*11*, *17*, *25*   37:*12*, *20*   38:*2*   39:*3*   76:*25*   77:*6*   78:*2*, *18*   79:*16*   80:*3*   87:*6*, *7*, *9*, *11*, *14*, *22*
**mention**   52:*23*
**mentioned**   16:*8*   18:*16*   21:*19*   22:*13*   23:*10*
**Michael**   89:*19*
**MIKE**   2:*12*   7:*9*
**mini**   89:*20*, *23*   90:*2*
**minimum**   53:*14*
**minutes**   23:*7*, *9*   34:*8*, *9*
**missed**   45:*24*   46:*1*
**misses**   45:*6*, *9*
**missing**   46:*20*   65:*12*
**misstates**   84:*12*
**moment**   14:*2*
**monitor**   15:*13*   20:*9*   39:*5*   76:*22*
**monitoring**   80:*10*
**monitors**   9:*24*   20:*7*, *8*   38:*12*, *18*   39:*1*, *8*
**month**   20:*15*, *18*   22:*5*   23:*19*   50:*23*   78:*16*   87:*8*

**monthly**   18:*3*, *4*   19:*23*   20:*3*   23:*10*
**months**   20:*25*   22:*10*   39:*2*
**morning**   6:*8*, *9*   46:*4*   47:*17*   65:*25*
**mortalities**   21:*6*   33:*8*
**mortality**   21:*7*   22:*13*, *16*   33:*6*, *9*, *19*   36:*21*, *22*, *25*   37:*6*   38:*21*   56:*17*, *18*, *24*   57:*4*, *9*
**moves**   32:*20*
**muddled**   7:*2*
**multiple**   55:*13*   56:*6*

**< N >**
**name**   6:*14*, *18*   16:*24*   17:*10*   77:*19*
**names**   13:*1*, *6*   44:*10*
**narrower**   23:*25*
**national**   51:*23*   52:*3*
**nationally**   53:*1*
**nature**   8:*21*   62:*10*
**NCCHC**   52:*3*, *12*, *14*
**necessary**   55:*7*   89:*12*
**need**   14:*4*   15:*18*, *19*   18:*23*   22:*11*   28:*17*   36:*10*   37:*17*   40:*15*   41:*1*, *23*   42:*9*, *13*   58:*6*   62:*6*, *12*, *16*   69:*6*   71:*15*   76:*21*   86:*16*
**needed**   25:*15*   54:*18*   58:*23*
**needs**   39:*22*   41:*10*   44:*2*   45:*10*   57:*23*   59:*19*   60:*23*   86:*14*   87:*16*
**negatively**   87:*2*
**neither**   91:*10*
**never**   20:*17*   61:*14*
**new**   66:*13*   67:*3*   68:*9*
**nods**   7:*22*
**non**   55:*13*
**nonclinical**   61:*5*
**Normally**   19:*5*   24:*23*, *24*   31:*12*   42:*1*   54:*8*, *12*   78:*13*
**Norristown**   66:*10*, *12*,

17  67:*2*
**no-show**  64:*1, 2, 9*
**Notary**  1:*17*  91:*21*
**notation**  80:*20*
**noted**  66:*16*  93:8
**notes**  23:*1*
**notice**  1:*13*  6:*17*
  9:*18*
**noticed**  7:*13*  35:*12*
  58:*2*
**notices**  87:*1*
**notification**  58:7
**notify**  23:*21*  42:9
  87:*4*
**November**  91:*22*
**NP**  71:*8, 18, 19*  72:8
**number**  63:*19, 21*
**numbers**  38:*21*
**nurse**  15:*1*  16:*14*
  21:*16*  39:20, 21  40:*3*
  41:5  43:2, 3  45:9
  46:*23*  48:*1, 13*  55:*19*
  56:*24*  58:*1*  71:*20, 24,*
  *25*  72:*17*  75:8  76:8
  81:*20*  83:*15*  84:*24*
  85:*10*
**nurses**  16:*3*  43:*23*
  44:*12*  49:*10*  63:*3*
  86:*2*
**nursing**  14:7, *8, 24*
  15:*3*  60:*13, 15*

**< O >**
**Object**  51:*19*  56:*3,*
  *21*  73:*13*
**Objection**  26:*20*
  27:*4*  49:*2*  56:*1*
  72:*10, 12*  73:*15, 22,*
  *24*  74:9  81:9  84:*11*
  85:*4*
**observing**  85:*11*
**obtain**  39:*25*  41:*12*
**obviously**  54:*13*  73:*1*
**occasion**  30:*10*
**occurred**  34:6  81:7
**occurs**  62:*20*
**O'CONNOR**  3:*3*
**October**  1:*10*

**office**  16:*4, 8, 9, 10,*
  *12*  23:8  28:7  36:*24*
  37:*9*
**officer**  44:*1*  49:*11*
  54:*20, 23*
**officers**  35:*24*  63:*1*
**officials**  9:*23*  10:8, *24*
**Oftentimes**  8:8
**Okay**  6:*13*  7:*24, 25*
  8:*4*  9:*16*  13:8  18:*25*
  33:*2*  40:5  70:9
  75:*24*  85:*25*  89:*22*
**on-call**  39:*24*
**once**  30:*1, 23*  40:*1,*
  *12*  53:*22*  58:*25*
  66:*16*  72:*20*  83:*14*
**ones**  46:*24*  54:9
  59:*12*
**online**  67:*17*
**on-site**  33:*13, 17*
**On-the-job**  15:*25*
**open**  22:*22*
**Operations**  16:*11, 16*
  23:8  87:*19*
**opinion**  76:*2*
**opportunities**  37:*3*
**opportunity**  33:*25*
  34:*4*  37:*1, 14*  85:9
**option**  89:*11*
**order**  39:*25*  41:*12,*
  *15*  61:*13*
**ordered**  19:*12*  23:*20*
  25:*12, 16, 17*  42:*10*
  67:*19*
**orders**  39:*22*  89:*19*
**originally**  72:*24*
**outside**  9:*24*  12:7
  37:6  62:*4*  87:*14*
**overall**  17:*18*  24:*23,*
  *24*  25:*4, 6, 8*  26:*4*
  82:*14, 18*
**overhead**  53:*12*
  54:*21, 24*
**oversee**  13:*15*  15:*14*
**oversight**  17:*15*  27:8
  39:*12*  52:*21*  55:*4, 6,*
  *25*  58:*11*  81:*1*
**overview**  20:*24*  31:9
**owns**  50:*25*

**oxygen**  53:*19*

**< P >**
**PAGE**  4:*2, 9*  5:*6, 11,*
  *16, 21*  11:*18*  53:*13*
  54:*22*  92:5
**pages**  71:*11*  93:4
**paper**  48:*2*
**paragraph**  70:*4, 7, 12*
**parameters**  19:*15*
  26:*3*
**parcel**  49:*17*
**part**  15:*23*  27:*18, 23*
  33:5, *12, 16*  44:*24*
  49:*17*  50:*22*  51:*13*
  56:*17*  57:*3, 9*  68:*14*
  69:*24*  72:*3*  84:*25*
  85:*1, 7*
**participate**  18:*12*
**particular**  7:*16*
  34:*16*  77:*4*
**parties**  91:*12*
**parts**  11:7, *8*
**pass**  22:*16*
**pathways**  43:*18*
**patient**  42:*14*  45:6
  48:*1*  53:*23, 24*  63:*1*
  72:*4*  74:*14*  89:*12*
**patients**  26:*18*  29:7
  41:*20*  43:*22*  53:*4*
  59:*3*  61:*21*  72:*18, 22*
**pattern**  45:*25*  46:5, *6*
**PDP**  9:*23, 25*  10:7,
  *13, 23*  11:*21*  12:2, *6,*
  *21*  14:*15, 18, 24*
  17:*14*  27:*22*  28:*3, 25*
  29:*22*  30:*10, 21*
  32:*24*  35:2, *5, 9, 22*
  36:*11*  38:*3, 8*  39:*16*
  43:*22*  45:*15, 19*
  50:*21, 24*  51:*16*  52:*2,*
  *13, 21*  53:8  55:*14, 23*
  56:*19, 20*  57:*18*
  61:*20*  67:*4*  70:*23*
  71:5  77:*24*  78:2, *5*
  79:5  82:*16*  88:*14*
**PENNSYLVANIA**
  1:*2, 15, 18, 23*  2:*4, 8,*
  *13, 18*  3:*4*

**people**  19:7, *9*  22:*22*
  27:*24*  32:*3*  33:*24*
  34:*4*  35:*13, 16*  47:*11*
  49:*1, 22*  53:*15, 16*
  62:8  77:*16*  84:*25*
**percent**  21:*24*  32:*21*
**perform**  82:*8*  85:*3,*
  *10*
**performed**  38:8
  70:*16*
**Perini**  30:*17*  32:2
  58:*19*
**period**  15:2  26:*19*
  29:9  41:*22*  73:*3*
  79:*10*  84:2, *14, 17*
**person**  18:*1*  22:*16*
  25:*12, 15, 24*  36:9
  39:*17, 22*  40:7, *12*
  41:*10, 13, 16*  42:2
  44:*3*  45:*12*  47:5, *6,*
  *15, 24*  48:8  54:*1, 10*
  56:*18*  59:*18, 19*
  60:*22*  62:*4*  63:9, *14*
  64:*23*  66:*16*  67:*3, 4,*
  *23*  81:*1*  82:*23*  89:7
**personal**  69:*21*
**personally**  24:5
**persons**  9:*21, 22*
**person's**  33:*10*  68:2
**perspective**  10:*19*
  28:*11*
**pertaining**  11:*25*
  12:5  26:6  27:*1*  29:5
  37:5  57:*16*
**pertains**  10:*13*
**PESTRAK**  2:*12*  4:7
  7:*3*  11:5, *15*  34:*25*
  43:*10*  56:*1*  68:*13*
  69:*13*  72:*12*  73:*15,*
  *24*  74:9  77:*18*  81:9
  84:*11*  85:*4*  86:*24*
  87:*24*  89:*20*
**pharmacies**  23:*16*
**pharmacy**  18:*4*
  23:*10, 15*  67:*19*
  77:*14*
**PhD**  16:*19*
**PHILADELPHIA**
  1:7, *23*  2:*4, 8, 10, 13,*

**14**, *18* 3:*4* 6:*16* 7:*15*
9:*6* 13:*11*, *17*
**phone** 18:*5*
**phrase** 78:*4*
**PHS** 14:*25*
**PHSW** 89:*8*
**physically** 42:*14*
**physician** 26:*4* 28:*11*
42:*9*, *12*, *21*, *22* 57:*25*
58:*5*, *9* 60:*11*
**physicians** 31:*17*
33:*13*, *23* 43:*1* 86:*15*
**physician's** 43:*6*
**PICC** 40:*2*
**pick** 7:*4* 17:*18* 18:*5*
31:*12*
**place** 21:*4* 48:*16*
49:*19* 61:*10* 62:*19*
65:*14* 89:*6* 91:*8*
**placed** 57:*20* 59:*4*
60:*19* 61:*21*
**placement** 11:*25*
57:*17* 61:*2*
**placements** 58:*21*
**Plaintiff** 1:*5* 2:*5*
**plaintiffs** 6:*15*
**plan** 21:*25* 30:*14*
**plans** 21:*4*, *14*, *20*
26:*6*, *10* 27:*2*
**please** 6:*18* 40:*17*
68:*18*
**Pod** 85:*13*, *16*, *21*, *23*
86:*6*
**pods** 85:*18*
**point** 16:*24* 18:*6*
46:*6* 47:*15*, *17* 50:*7*
57:*10* 77:*12* 83:*8*
**police** 39:*19* 66:*7*
**Policies** 10:*5*, *21*
11:*20*, *24* 12:*4*, *18*, *21*
13:*2*, *6* 48:*15* 52:*8*
57:*16*
**policy** 12:*19* 13:*5*
34:*13*, *14* 43:*8*, *14*
45:*7*, *23*, *24* 46:*15*
56:*19* 63:*16*, *21* 64:*6*,
*15*
**poor** 25:*25*
**populate** 67:*21*
**portion** 21:*16* 76:*6*

**position** 13:*21*, *25*
14:*23*, *24* 15:*3*, *7*, *9*,
*10* 16:*2* 23:*24*
**positive** 83:*11*
**possession** 50:*20*
**possibility** 73:*10*
**potential** 28:*1* 87:*5*
**Powers** 11:*9*
**practice** 76:*12* 83:*9*
**practices** 10:*5*, *21*
11:*20*, *24* 12:*4* 57:*16*
**practitioner** 43:*3*
58:*1* 71:*20*, *25* 76:*8*
**practitioners** 43:*2*
**pre-COVID** 60:*5*
**prepare** 12:*11*
**prepared** 9:*2*, *14*
10:*2*, *10*, *18* 11:*2*
**prescribe** 72:*1*
**prescribed** 26:*18*
**prescription** 67:*21*, *22*
**PRESENT** 3:*9* 21:*2*
22:*18* 23:*19* 33:*23*
60:*8*
**presidents** 77:*17*
**pressure** 74:*15*
**pretty** 13:*25* 15:*12*
21:*10* 31:*8* 34:*9*
77:*1*
**previous** 67:*25* 68:*1*
78:*17* 84:*12*
**previously** 58:*12*
**Prior** 14:*23* 20:*25*
26:*14* 28:*6* 66:*22*, *23*
68:*11*, *24*
**Prison** 14:*25* 16:*21*,
*23* 62:*15*, *25* 66:*24*
68:*12* 72:*25* 75:*1*
**Prisons** 13:*12* 87:*21*
**probably** 59:*15* 86:*8*
**procedure** 87:*4*
**procedures** 12:*18*
13:*4*
**proceed** 53:*22*
**process** 18:*17* 22:*6*
26:*4* 45:*5* 47:*1*, *22*
48:*18*, *24* 49:*16* 53:*7*
57:*22* 62:*3* 65:*5*, *6*, *9*
66:*5* 74:*16* 78:*14*

83:*24* 85:*7* 87:*1*, *3*
88:*6*, *13*
**processes** 38:*3* 39:*12*
55:*9* 58:*11* 65:*10*, *14*
**Production** 5:*10*
63:*22*
**Professional** 1:*16*
36:*24*
**proper** 10:*25* 29:*6*
58:*22*
**properly** 29:*12*, *18*,
*23* 44:*15* 55:*20*
**propounded** 93:*7*
**protocols** 43:*14*
48:*16*
**provide** 15:*14* 17:*14*
23:*15* 30:*19*, *20*, *22*
34:*5* 38:*15*, *20*, *22*
52:*21* 55:*4* 60:*9*
**provided** 12:*22*, *23*
16:*1* 38:*25* 55:*5*, *6*
84:*7*
**provider** 39:*24*
42:*23* 47:*18* 57:*25*
62:*18*, *19*, *22*, *24*
63:*12*, *25* 71:*23*
**providers** 68:*7* 80:*15*
**provides** 23:*14* 38:*16*
**providing** 11:*21*
27:*8* 34:*20* 35:*19*
53:*4* 55:*24* 81:*1*
**provision** 10:*6*, *9*
35:*25* 64:*7*
**psychotropic** 89:*15*
**Public** 1:*17* 17:*23*
18:*2* 56:*6* 59:*16*
91:*21*
**Puerini** 20:*11* 21:*8*
28:*5* 33:*12*, *16* 38:*4*
52:*24* 78:*11* 80:*7*, *25*
**Puerini's** 31:*8*
**pull** 17:*19* 19:*6*, *8*
43:*23*
**purpose** 8:*1*
**pursuant** 1:*13*
**put** 21:*4* 40:*20*
53:*24* 54:*2* 57:*5*
61:*13* 69:*19* 80:*21*
**puts** 52:*10*

**< Q >**
**QHCP** 63:*25*
**QI** 15:*16* 18:*3*
19:*21*, *23*, *25* 20:*2*, *4*,
*20*, *23* 21:*10*, *11*
22:*25* 23:*9*, *13* 24:*4*
27:*13*, *20*, *21*, *22* 28:*3*
29:*4*, *13*, *21* 33:*6*, *15*
34:*20* 35:*1*, *22* 36:*11*
38:*2*, *3* 77:*8* 78:*5*, *12*
79:*15*, *16* 80:*3* 81:*19*
**qualified** 63:*25* 84:*9*,
*18*
**quality** 58:*10* 76:*24*
**Question** 5:*20* 8:*9*,
*15*, *19*, *21*, *22* 25:*3*
45:*16* 51:*12* 57:*3*, *11*
61:*18* 63:*19* 78:*17*
79:*21* 80:*22* 84:*18*
86:*11*
**questionnaire** 41:*6*
66:*15*
**questions** 6:*22* 8:*7*
11:*7*, *8* 14:*19* 15:*21*
21:*9* 24:*22* 33:*25*
34:*5* 40:*23* 41:*6*, *7*
57:*6* 65:*20* 66:*2*
69:*18*, *20* 74:*13*
75:*22* 81:*5*, *18* 83:*10*
87:*25* 88:*5* 93:*6*
**quick** 77:*18* 81:*24*
89:*17*

**< R >**
**raised** 29:*17* 80:*8*
**randomize** 19:*10*
**Ray** 75:*19* 77:*18*
89:*22* 90:*5*
**RAYMOND** 3:*3*
**read** 63:*17* 70:*6*
71:*12*, *14* 73:*7* 93:*4*
**reading** 70:*10* 72:*6*
**ready** 40:*13*
**real** 77:*18* 89:*17*
**realize** 22:*7*
**realized** 72:*5*
**really** 28:*17* 31:*25*
35:*15* 36:*16* 42:*18*
**reason** 45:*12* 88:*19*

Deposition of Sandy Varghese                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**recall** 13:*1* 24:*4*, *11* 26:5, 8, 9 29:8, *16*, *20* 30:*15* 32:*23* 35:6, *18* 45:*17*, *22* 46:*14* 58:*16*, *20* 60:*3* 79:6 81:*3*, *13*, *16* 88:9
**receive** 14:*3* 15:22 17:*22* 44:*3* 49:*23*, *24* 56:6 66:*13*
**received** 84:*16*
**receiving** 18:*1* 19:*13* 25:*16* 26:*18*
**recognize** 72:*4*
**recognized** 75:*3*
**recollection** 8:*15* 28:*20* 80:*11*
**recommendation** 60:*25* 61:*4* 80:*14*, *25*
**recommendations** 28:*8*
**record** 6:*18* 7:*5* 10:*12* 11:*5*, *11*, *16* 17:*20* 33:*24* 47:*3* 50:*4*, *23*, *25* 51:*3* 52:*19* 64:*5* 65:*17*, *18* 68:*1* 69:*9*, *19* 75:*1*, *2*, *8* 77:*20* 82:*22* 89:*18*
**recorded** 34:*11*
**records** 51:*4* 68:*6*, *21*
**red** 45:*7*, *10*, *23* 46:*19*, *20*, *22* 47:*3*, *14* 65:*6*, *8* 88:*6*, *13*
**REES** 2:*15*
**refer** 63:*16*
**referral** 12:*5* 63:*7* 66:*19*
**referred** 47:*18* 66:*17* 70:*12*
**referring** 62:*3*
**refills** 67:*22*
**refresh** 8:*14*
**refreshed** 12:*17*
**refusal** 30:*12* 47:*9* 57:*7*, *12* 64:*1*
**refusals** 29:*6*, *9*, *17*, *22* 47:*21* 55:*20* 65:*2*
**refused** 47:*6* 79:*23* 88:*12*
**refuses** 88:*7*
**refusing** 47:*25*

**regard** 24:*20* 35:*24* 58:*21*
**regarding** 81:*15* 82:*15*, *17*
**region** 78:*8*
**regional** 77:*12*, *16*, *17* 78:*10*, *20*
**registered** 41:*5*
**regular** 8:*8* 18:*18*, *22* 27:*18* 37:*12* 38:6 39:*5* 41:*15* 42:*3* 49:*22* 59:*1*
**regularly** 77:*1*
**related** 9:*20* 41:*7* 65:*8* 69:*21* 74:*13* 82:*16* 91:*11*
**relation** 61:*17*
**relative** 81:*5* 91:*14*
**relook** 22:*11*
**remember** 8:*13* 13:6, *9* 17:*4* 24:*15* 26:*11* 27:*10*, *11* 46:*15* 80:*5*, *12*, *13*
**remembered** 37:*7*
**Remick** 20:*10* 38:*10*
**repeat** 51:*12*
**repetitive** 75:*23* 78:*2*
**rephrase** 51:*15*
**report** 18:*23* 19:*16*, *19* 30:*22* 31:*1*, *8* 53:*17* 64:*23* 74:*8*
**reported** 64:*2*, *16* 74:*3*, *7*
**Reporter** 1:*17* 7:*23* 8:*2* 89:*17*, *22*, *25* 90:*3* 91:*4*, *21*
**reporter's** 8:*11*
**REPORTING** 1:*22*
**reports** 31:*4*, *7* 32:*5* 38:*16*, *17*, *23* 39:*6* 80:*10*
**represent** 66:*1* 74:*25* 75:*20*
**representatives** 77:*15*
**Request** 5:*10* 68:*6* 79:*23* 80:*2*
**requests** 56:*6*
**require** 65:*13*
**required** 89:*5*

**requires** 52:*14*
**rescheduled** 64:*3*, *18*
**rescheduling** 64:*20*
**resigned** 15:*2*
**respond** 18:*2* 53:*21*
**responding** 53:*8*
**response** 6:*17* 56:*12* 75:*5*, *6*
**responsibilities** 15:*9* 18:*15* 27:*18* 82:*18*
**responsible** 46:*21*, *24* 51:*9*, *17* 83:*5*
**result** 79:*4*
**resulting** 36:*6*
**results** 24:*11* 80:*6*
**resume** 47:*12*
**retained** 23:*3*, *6*, *9*
**retains** 23:6, *7* 50:*20*
**return** 58:*25* 66:*17* 67:*3* 68:*11* 73:*6*
**returned** 15:*4*, *6*
**returning** 66:*9* 72:*25*
**review** 9:*12* 19:*11*, *15*, *20* 20:*12* 21:*2*, *3*, *5*, *7* 22:*5*, *17* 26:*4* 27:*24* 28:*10*, *13* 31:*13*, *22* 33:*9* 36:*22*, *25* 39:*2*, *11* 42:*13* 52:*25* 55:*17* 56:*17*, *18* 57:*1*, *4*, *9* 58:*5* 66:*20* 67:*17* 69:*8* 75:*8* 78:*2*, *13* 79:*20*
**reviewed** 57:*6*
**reviewing** 18:*23* 55:*12* 78:*15*
**reviews** 9:*19* 22:*14* 28:*6*, *20* 32:*25* 33:*3* 36:*21* 37:*6* 38:*7* 40:*4* 53:*6* 57:*5* 81:*17* 86:*25*
**Right** 17:*11* 22:*8* 41:*13* 50:*9*, *12* 54:*14* 65:*14* 67:*9* 73:*7* 78:*19*
**risks** 47:*24*
**RN** 14:*8* 82:*8* 83:*2*, *4* 84:*2*
**RNs** 60:*13*
**role** 10:*8*, *13*, *23* 11:*13* 13:*13*, *19*

15:*23* 27:*7* 35:*24* 38:*13* 55:*24*
**roles** 83:*2*
**room** 27:*25* 28:*9*, *14*, *16*, *18*, *23* 36:6 40:22 62:*7*, *11*, *13* 63:*2*, *4*
**rotates** 78:*16*
**rounds** 36:*8*, *12*
**routinely** 76:*19*
**rules** 7:*20*
**run** 20:*3* 21:*11* 42:*5* 77:*8*
**runs** 76:*18*, *19*

**< S >**
**sake** 8:*12*
**sample** 17:*20* 19:*6*, *10*
**SANDY** 1:*13* 4:*3* 6:*2*, *19* 77:*19* 87:*25*
**S-A-N-D-Y** 6:*19*
**saying** 34:*10* 84:*10*
**says** 47:*15* 63:*22* 64:*18* 71:*8* 72:*3*
**scale** 49:*24*
**scanned** 50:*24*
**scans** 51:*3*
**scenario** 36:*2* 48:*25*
**scheduled** 41:*17* 64:*12*
**school** 14:*4*, *5*, *7*, *9*
**scope** 43:*11*
**screen** 69:*1*, *2*
**screening** 40:*11*, *14*, *16* 41:*4* 66:*14* 67:*2*, *5*, *17* 74:*2* 85:*10*
**scroll** 69:*6* 71:*15* 72:*2*
**SCULLY** 2:*15*
**second** 66:*3* 69:*2* 70:*6*
**seconds** 45:*2* 85:*20*
**security** 33:*21* 37:*13*, *15*, *18* 40:*10* 48:*5* 53:*12* 54:*8*, *12* 60:*25* 61:*4*, *14* 87:*22*
**see** 17:*25* 18:*11*, *23* 19:*2*, *11* 22:*5*, *11* 35:*15* 36:*3* 40:*13*, *19*, *22* 41:*4* 42:*9*, *13*, *14*

Deposition of Sandy Varghese                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

47:8  53:3  56:8  57:1,
7  58:13  66:20  67:22
68:23  69:2, 23  70:3,
18  71:8, 12  72:20
75:8  83:11
**seen**  41:17, 21, 23
61:14
**sees**  32:19
**seizure**  53:11, 12
**send**  62:14, 24  63:7,
10
**senior**  85:10
**sense**  8:24
**sent**  28:16  35:16
63:9
**series**  40:23  74:12
**service**  37:8
**Services**  14:25  15:14
16:21, 23  20:13
23:15  31:9  38:8
39:2  54:4
**set**  91:8
**setting**  27:16, 17
**seven**  60:12, 14
**severity**  62:13
**shadow**  83:15, 16
**shadowed**  84:25
**shadowing**  84:10
85:7
**share**  7:12  34:2
38:18  69:1  79:15, 20
**shared**  7:12  24:13,
16  79:5, 6, 8, 12
**sharps**  44:14, 15
**sheet**  50:13, 15  93:9
**sheets**  50:21
**shift**  60:12  64:2, 16,
20, 22
**shifts**  60:14
**shortage**  49:7
**shortages**  23:21
48:20  61:20, 24
**show**  22:1  71:4
**showed**  16:6  76:2
**showing**  80:4
**sick**  54:1  58:3
**side**  87:5
**sides**  36:19
**sign**  48:2

**Signature**  93:15
**signed**  47:9
**similar**  61:18
**single**  61:7
**sit**  81:21
**site**  28:19  53:16
77:13  78:13  80:9
83:15
**situated**  86:2
**situation**  18:19
19:14  34:16  36:16
54:17  56:14  57:13
59:10  79:13  87:1
**six**  9:17
**sliding**  49:24
**smart**  80:18
**smoothly**  7:21
**somebody**  7:16  16:5
28:16, 23  33:8  41:2
45:9  46:2, 20  48:6,
10, 14  52:25  53:11
54:22  56:8  57:20, 23
58:1, 23  59:13, 16
60:23  61:14  63:5, 10
64:12  65:12  66:11
67:5  68:10  72:19
74:4, 11, 17  76:17, 19,
21  83:16, 17, 19, 20
85:8
**somebody's**  17:24
42:18  49:17
**soon**  7:4
**sooner**  41:21, 24
**sorry**  20:1  78:16
**sort**  36:3
**speak**  7:16, 21  10:13
18:9  31:17  36:19
**specific**  9:7  12:19
15:20, 22  24:21, 22
25:5  27:1  29:8
34:22  35:1  52:6
63:24  78:14  82:7
**specifically**  29:2, 11
35:5  39:10  52:5
59:6  68:10  72:15
**specifics**  26:8  81:16
**speculate**  79:7
**spell**  6:18  77:19
82:12

**spent**  23:19
**spoke**  30:16  47:5
**Spring**  2:3
**staff**  10:8, 14, 24
11:14  15:1  18:6, 13
19:22  20:4  21:12
22:4  24:6, 9  31:18
33:14, 21  34:22
35:19  36:7, 8, 12
37:1, 4  40:19  46:21
48:20, 22, 23, 24
53:14  55:1  56:18
60:7, 13, 15  61:3, 20,
23  64:13, 21  66:20,
25  67:14  72:17
73:11, 21  78:20  82:9
83:23, 24  88:14
**Staffing**  2:19  38:24
60:6  83:21
**standard**  18:24
20:19  21:23  22:2
**standards**  51:23, 25
52:5, 6, 8, 15
**stands**  82:11, 14
**start**  7:4  19:12
62:10
**started**  16:20
**starting**  84:24
**starts**  70:4
**state**  6:18
**STATES**  1:1
**status**  60:20  73:12
**STD**  41:3  66:13
**STDs**  40:20
**steps**  42:19
**Stipulations**  5:15
**Street**  1:22  2:3, 8, 12,
17  3:4  67:7
**stretcher**  53:13, 18,
24  54:2, 7, 14, 21
55:21
**strike**  84:21
**study**  78:14
**stuff**  85:2
**subject**  29:21  30:13
34:21
**subjects**  27:24
**submitted**  31:6
**substance**  93:8

**sugar**  25:15  39:21
41:9  44:2, 5  49:25
50:19  76:18, 21
**sugars**  42:4, 5
**Suite**  1:23  2:3, 8, 17
3:4
**summary**  22:18
33:24
**SUMMER**  2:17
89:25
**supervisor**  15:24
**supervisors**  16:4
**SUPPORT**  5:3
**supposed**  28:25
34:23  35:20  36:9
39:18  45:9  47:1, 4,
21, 23  48:2  53:9
55:15  64:16
**sure**  11:10, 16  14:22
17:7  30:3  36:1, 9
37:11  38:14  40:5, 11
41:9  46:6  52:19
73:17  74:21  80:14,
20  81:21, 22  82:11
86:13  87:9
**sworn**  6:3  91:7
**symptoms**  9:22
**synonymous**  42:23
**system**  46:19  50:9,
11  51:7, 18  52:20

**< T >**
**take**  8:17, 18, 19, 22
18:10  19:1  53:18
59:18  61:14  66:8
70:6  85:20  88:7, 12,
15  90:1
**taken**  1:13  23:1
39:18  84:25  85:1
91:13
**takes**  45:2
**talk**  8:5  21:12, 14,
16  23:22  32:2  35:23
37:4
**talked**  38:2, 4  72:24
**talking**  7:4  50:10
51:8
**team**  77:16  78:3, 12
**tell**  20:17  24:8, 22
54:20  57:15  60:6

68:4  70:21  72:16
79:3  82:25
telling  12:14
term  46:22  76:10, 15
terms  27:21
test  70:15
testified  6:3  66:4
85:19
testify  9:7, 13, 14
10:2, 11, 18  11:2
13:8
testimony  8:3  69:24
testing  41:3
tests  40:20
Thank  6:21  11:18
12:10  15:20  16:17
18:14  41:19  78:22
88:21
thing  20:18  36:3
38:9  40:18  65:11
71:7
things  17:22  22:8,
12, 19  28:8  34:6
43:15  52:7  87:16, 23
think  8:20  13:3
15:7  19:14  21:17
30:5  34:6  43:10
50:10  52:18  54:18
55:22  58:6  68:13
69:14  77:9  79:4
82:1  84:12, 14, 18
85:21  86:10, 19
89:16
THOMAS  2:17  90:1
thought  22:19
thoughts  22:23
three  16:3, 6  32:19
45:24  60:14
tier  60:20, 24  61:8
time  8:20  14:16
15:2  17:11  18:10
21:8  25:19  26:19
29:9, 10  30:10  31:1,
10  32:6, 12, 15, 22
33:19  34:2, 6  35:6
40:9  41:9, 14  42:12
44:6  45:17  47:8, 20
49:19  50:18  59:10
60:3  64:4  70:11
72:18  73:4  79:7, 9,

10, 22  80:24  82:23
84:2, 13, 17  87:13, 15
91:8
timeframe  23:25
30:4  50:8  67:25
74:19  77:10  78:9
84:6
times  49:9  59:15
71:4  81:21
title  13:14, 22, 23, 24
15:8  87:19
today  6:22  9:3  66:4
69:16  71:22  78:23
84:24  85:2
today's  12:12
told  60:16  78:24
88:6
top  23:20  69:3
Topic  9:18  10:5
17:18  24:3  31:16
32:17, 20
topics  7:16  9:7, 12,
15  10:14  38:24
57:15
touched  52:18
tour  18:11
track  17:12
trailer  31:14
training  15:23, 25
82:8, 10, 14, 18, 20, 21,
24  83:7, 13, 24  84:8,
15
trainings  9:20
transcript  91:6
transcription  93:5
transfer  12:5  13:5
transferred  62:9
transferring  62:3
transportation  62:15,
25
treated  66:12
treatment  10:6, 18
30:12  68:5  87:3
TREBACH  2:7
trigger  83:12
trips  27:23  28:9, 12,
14  35:15  36:6
Trivikram  75:21
77:9

trouble  6:11  46:10
true  91:5
try  18:21  28:1  75:22
trying  45:20  51:10
65:11
turn  38:17
twice  20:12, 17
30:25  33:18  42:4
72:20  87:8
two  13:23  16:4  20:2,
25  23:16  30:16
32:18  53:15  63:1
88:5
type  53:2  75:3
types  24:4  25:4
typically  25:14
28:10  31:14, 21  32:4
39:24  40:8  42:4
54:25  56:9, 10  57:5,
10  60:15  89:14

< U >
ultimately  51:9  88:17
um-hmms  7:22
understand  9:5  27:7
69:25  78:4
understanding  7:17
25:9  42:8  76:4
understood  8:16
42:17  46:18
unit  12:2  42:3, 15
44:25  45:1  49:10
53:17, 21, 22  54:11
57:18  59:1
UNITED  1:1
University  14:12
unpredictable  76:18
unreasonable  63:23
upgrade  50:10, 12
uploaded  38:19
upper  61:8
urine  40:20
use  76:15, 17
usually  22:17  25:24
49:20

< V >
vacancy  60:4

VARGHESE  1:13
4:3  6:2, 8, 19  65:19,
25  70:3  75:19  82:7
V-A-R-G-H-E-S-E
6:20
varies  31:10
various  16:7  78:25
87:23
verbal  39:25
versus  6:15
vice  77:17
Videoconferenced
1:12
violated  56:19
violence-related  35:14
virtually  1:14
visit  25:24  30:23
31:11  32:1  33:18
64:13
visits  31:23  32:3, 19
64:2  80:19
vs  1:6

< W >
wait  84:2
Walgreens  67:20
Walk  17:15  39:15
45:2  57:19  62:2
85:20  86:9
walking  86:7
Wanda  2:14
want  8:17  10:11
27:7  32:17  47:7, 8,
13, 16  52:19  60:1
68:17  69:1, 19  71:7
78:1  79:19  81:24
89:18
wanted  11:10, 15
19:7
wants  31:13, 19
88:18
warden  33:21  37:22
wardens  33:20  87:7,
10, 13
warden's  37:9
warrants  68:5
watching  85:8
way  17:21  22:8, 9
35:20  45:23  48:17

53:5  63:5  66:19
88:13
**ways**  48:24  87:23
**week**  60:12, 14
**weekly**  37:10  38:16
87:8
**weeks**  13:3
**well**  9:10  13:22
22:20  38:15  42:7
43:25  48:12  81:21
83:22
**went**  14:7  22:19
27:24  42:2  47:4
**we're**  73:1
**we've**  33:1  51:8
**whichever**  78:15
**WITNESS**  4:2  5:5
26:22  27:5  43:13
48:1, 3  49:4  51:21
56:5, 23  69:16  72:14
73:17, 25  74:11
77:21  85:6  90:7
91:7
**WITTEKIND**  3:3
4:6  26:20  27:4  49:2
51:11, 19  56:3, 21
72:10  73:13, 22
75:18, 19  77:22
81:12  82:1  88:4, 21
89:23
**wondering**  61:9
**wording**  76:9
**work**  13:10  15:1
16:15  19:18  22:6
25:11, 12  60:8  72:21
76:9  83:6
**worker**  55:14
**working**  14:15, 23
50:12  72:17  82:15
83:4, 14
**works**  38:11  56:25
57:20  82:22  88:13
**write**  19:19
**writing**  56:12
**written**  45:24  50:16,
17
**wrong**  79:4


**< Y >**

**year**  20:12  30:25
33:18  80:12
**yearly**  18:12  25:17
**years**  13:20, 23  24:2
30:5
**YesCare**  3:5  15:14
17:2, 4, 15  19:22
20:2, 4, 6  21:2, 11, 12
23:7, 14  24:6, 9
27:20, 22  29:22  33:9
35:1, 7  37:8, 24  38:3,
8, 15  39:19  43:8, 14
46:13  48:11  50:21
51:5, 16, 21  52:9
53:1  55:14  56:18
58:11  59:11  64:21
75:20  76:24  77:5, 6
78:3, 12, 18, 24  79:15,
23  80:17, 24  81:6, 14
82:9  83:18, 20, 22, 24
84:16


**< Z >**
**Zoom**  2:5, 10, 15, 19
3:6

## WORD LIST

**< 0 >**
**000207**  *(1)*

**< 1 >**
**1**  *(4)*
**10/27/23**  *(1)*
**10/28**  *(1)*
**10/28/23**  *(1)*
**100**  *(1)*
**11/6/2023**  *(1)*
**11/6/23**  *(1)*
**11:27**  *(1)*
**1100**  *(1)*
**12/14/22**  *(1)*
**12/16/21**  *(1)*
**14th**  *(1)*
**150**  *(1)*
**1515**  *(1)*
**15th**  *(1)*
**1717**  *(1)*
**1801**  *(1)*
**18th**  *(1)*
**19102**  *(1)*
**19103**  *(4)*
**19123**  *(1)*

**< 2 >**
**2**  *(2)*
**2:24-cv-05618-TJS**  *(1)*
**2001**  *(2)*
**2006**  *(1)*
**2018**  *(1)*
**2020**  *(2)*
**2020s**  *(1)*
**2021**  *(1)*
**2023**  *(4)*
**2025**  *(2)*
**215**  *(1)*
**215.561.2300**  *(1)*
**215.564.0400**  *(1)*
**215.569.4433**  *(1)*
**215.683.5000**  *(1)*
**22**  *(2)*
**24**  *(4)*
**24/7**  *(1)*
**250**  *(2)*
**2-minute**  *(1)*

**< 3 >**
**3**  *(5)*
**30**  *(2)*
**30(b)(6**  *(4)*
**306**  *(1)*
**30-day**  *(1)*
**31**  *(1)*
**341-3616**  *(1)*

**< 4 >**
**4**  *(3)*
**412.654.9070**  *(1)*

**< 5 >**
**5**  *(4)*

**< 6 >**
**6**  *(4)*
**6/12/23**  *(1)*
**6/2/23**  *(1)*
**610**  *(1)*
**64**  *(1)*
**66**  *(1)*

**< 7 >**
**7/12/12**  *(1)*
**7/12/2012**  *(1)*
**7/13/12**  *(1)*
**7/13/2012**  *(1)*
**75**  *(1)*
**770**  *(1)*

**< 8 >**
**82**  *(1)*
**87**  *(1)*
**88**  *(1)*
**89**  *(1)*

**< 9 >**
**9/27/22**  *(1)*
**9:02**  *(1)*
**90**  *(2)*
**911**  *(4)*
**990**  *(1)*

**< A >**
**a.m**  *(2)*
**able**  *(10)*
**ABOLITIONIST**  *(1)*
**accept**  *(1)*
**accepted**  *(1)*
**Access**  *(11)*
**accommodate**  *(1)*
**accredited**  *(1)*
**accurate**  *(2)*
**ACKNOWLEDGMENT**  *(1)*
**action**  *(10)*
**activated**  *(1)*
**actual**  *(3)*
**ad**  *(1)*
**additional**  *(1)*
**address**  *(18)*
**addressed**  *(3)*
**addresses**  *(1)*
**adequate**  *(1)*
**adhere**  *(1)*
**admin**  *(1)*
**administer**  *(5)*
**administered**  *(6)*
**administration**  *(12)*
**administrative**  *(2)*
**administrator**  *(2)*
**Administrators**  *(2)*
**admission**  *(3)*
**admissions**  *(2)*
**admitted**  *(4)*
**advanced**  *(2)*
**AED**  *(1)*
**Affairs**  *(1)*
**agency**  *(2)*
**agenda**  *(2)*
**agendas**  *(1)*
**agree**  *(2)*
**al**  *(1)*
**allowed**  *(2)*
**altered**  *(2)*
**American**  *(2)*
**Analysis**  *(3)*
**Answer**  *(22)*
**answered**  *(2)*
**answering**  *(2)*
**answers**  *(3)*
**anticipate**  *(1)*
**Anybody**  *(3)*
**Apollon**  *(2)*
**apologize**  *(1)*

**appear**  *(1)*
**APPEARANCES**  *(2)*
**Appearing**  *(5)*
**appointment**  *(4)*
**appointments**  *(2)*
**appropriate**  *(3)*
**appropriately**  *(1)*
**approve**  *(1)*
**Arch**  *(2)*
**area**  *(11)*
**areas**  *(2)*
**arises**  *(3)*
**arrested**  *(3)*
**arrival**  *(1)*
**arrive**  *(2)*
**aside**  *(1)*
**asked**  *(8)*
**asking**  *(9)*
**asks**  *(1)*
**aspects**  *(2)*
**assess**  *(1)*
**assessments**  *(1)*
**assigned**  *(4)*
**assist**  *(1)*
**assistance**  *(2)*
**assistant**  *(3)*
**assistants**  *(1)*
**Association**  *(3)*
**assume**  *(1)*
**assurance**  *(1)*
**attached**  *(1)*
**attempt**  *(1)*
**attend**  *(8)*
**attended**  *(7)*
**attends**  *(1)*
**attention**  *(3)*
**Attorney**  *(8)*
**audit**  *(10)*
**auditors**  *(1)*
**audits**  *(24)*
**Austen**  *(1)*
**author**  *(1)*
**authority**  *(4)*
**autopsy**  *(1)*
**available**  *(5)*
**aware**  *(8)*

**< B >**
**B1**  *(2)*

Deposition of Sandy Varghese                                  Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

bachelor's *(1)*
back *(13)*
backboard *(1)*
backlog *(2)*
backtrack *(1)*
barriers *(1)*
based *(13)*
basic *(2)*
Basically *(1)*
basis *(4)*
Bates *(2)*
beds *(3)*
began *(2)*
behalf *(1)*
behavioral *(10)*
believe *(12)*
benefit *(1)*
best *(3)*
better *(1)*
beyond *(3)*
big *(1)*
bimonthly *(2)*
bit *(4)*
biweekly *(2)*
Blair *(1)*
Blanche *(1)*
blood *(13)*
Bloodsaw *(1)*
body *(1)*
Boulevard *(1)*
box *(1)*
break *(4)*
breaks *(1)*
BRET *(3)*
brief *(3)*
bring *(5)*
brittle *(7)*
broad *(1)*
brought *(4)*
Bruce *(1)*
building *(5)*
bumped *(1)*
bus *(1)*

< C >
Cabellos *(1)*
call *(17)*
called *(6)*
calls *(1)*

capacity *(1)*
care *(60)*
Career *(1)*
Carey *(3)*
Carney *(1)*
case *(8)*
case-by-case *(1)*
case-to-case *(1)*
cast *(1)*
catch *(1)*
cause *(1)*
cell *(2)*
cells *(1)*
CENTER *(3)*
certain *(11)*
certainly *(3)*
certify *(3)*
CFCF *(12)*
chaired *(2)*
chairs *(1)*
chance *(1)*
change *(11)*
changed *(4)*
changes *(2)*
chart *(11)*
charts *(1)*
check *(4)*
checked *(1)*
checking *(1)*
checks *(3)*
chief *(2)*
CHIO *(4)*
chlamydia *(1)*
chronic *(12)*
CITY *(12)*
clarify *(2)*
class *(1)*
clear *(4)*
clerk *(1)*
clinic *(2)*
clinical *(6)*
closely *(1)*
closer *(2)*
CNAs *(1)*
coincide *(1)*
combination *(1)*
come *(13)*
comes *(6)*
coming *(2)*

commander *(3)*
commanders *(1)*
commencing *(1)*
comments *(1)*
Commission *(1)*
commissioner *(2)*
Commonwealth *(2)*
communicated *(1)*
communications *(3)*
community *(1)*
company *(1)*
compared *(1)*
complement *(1)*
completed *(4)*
Compliance *(1)*
compliant *(2)*
concern *(1)*
concerns *(2)*
concluded *(1)*
condition *(1)*
conditions *(1)*
conduct *(2)*
conducted *(2)*
conducting *(1)*
consider *(1)*
considerations *(1)*
considered *(5)*
consist *(1)*
consists *(1)*
consult *(2)*
consultant *(2)*
consultants *(3)*
contact *(1)*
container *(1)*
contents *(1)*
context *(2)*
continue *(1)*
Continued *(1)*
continues *(1)*
continuity *(1)*
contract *(4)*
contractor *(4)*
contracts *(1)*
control *(9)*
conversation *(1)*
conversations *(3)*
coordination *(1)*
coordinator *(1)*
copies *(2)*

copy *(1)*
Corinne *(1)*
Corizon *(2)*
Corp *(1)*
corporate *(1)*
correct *(9)*
correction *(1)*
correctional *(6)*
correctional-to-
correctional *(1)*
corrections *(7)*
corrective *(8)*
correctly *(1)*
counsel *(7)*
counseled *(1)*
counseling *(1)*
couple *(4)*
course *(5)*
COURT *(14)*
covered *(2)*
COVID *(2)*
critical *(7)*
crutches *(1)*
cup *(1)*
Curran-Fromhold *(2)*
currently *(4)*
custody *(7)*
CVS *(1)*

< D >
database *(1)*
date *(5)*
dates *(6)*
day *(12)*
days *(8)*
day-to-day *(1)*
DC *(1)*
death *(5)*
deaths *(3)*
December *(1)*
decide *(1)*
decision *(7)*
Defendant *(5)*
Defendant(s *(1)*
defendants *(1)*
Defender *(1)*
defenders *(3)*
deficiencies *(1)*
definitely *(1)*

degree (2)
degrees (1)
delivery (5)
DEPARTMENT (4)
Depending (3)
depends (1)
DEPONENT (1)
deposition (14)
deputy (2)
Describe (2)
described (1)
describing (2)
DESCRIPTION (1)
designate (1)
designated (7)
designation (1)
designee (1)
detailed (1)
determination (2)
determine (3)
determined (1)
developed (1)
diabetes (34)
diabetic (17)
diagnosed (3)
diagnosis (1)
dialysis (2)
dies (1)
difference (2)
different (6)
direct (3)
Direction (1)
directly (2)
director (5)
directors (2)
disaster (1)
discharged (2)
disciplines (1)
disclosed (2)
discovered (1)
discuss (12)
discussed (11)
discussing (1)
Discussion (8)
discussions (2)
disease (3)
diseases (1)
dispose (1)
distinguish (1)

DISTRICT (2)
Division (1)
dock (1)
doctor (7)
Doctors (2)
document (9)
documentation (4)
documented (12)
documenting (2)
Documents (3)
doing (12)
dosage (1)
dose (5)
doses (2)
double (1)
doubt (1)
Dr (33)
drills (1)
drops (1)
drug (2)
due (3)
duly (1)
duties (2)

< E >
earlier (6)
EASTERN (2)
e-clinical (1)
economics (1)
ECW (6)
educating (1)
education (3)
effective (1)
efficient (1)
effort (1)
EHR (6)
either (7)
electronic (5)
email (2)
emails (1)
eMAR (2)
emergencies (1)
emergency (29)
employed (3)
employee (6)
employees (1)
employment (1)
encounter (3)
ensure (8)

ensuring (4)
entails (1)
entire (1)
equipment (1)
ER (2)
Errata (1)
escorted (1)
Especially (1)
ESQUIRE (6)
establishes (1)
establishing (1)
Estate (1)
estimate (1)
et (1)
evaluations (1)
evaluators (1)
evening (1)
events (1)
eventually (1)
EVEREST (1)
everybody (2)
exact (2)
exactly (7)
exam (2)
EXAMINATION (7)
examined (1)
example (4)
exams (1)
excerpt (1)
exclusive (1)
excused (1)
exhibiting (1)
exhibits (1)
expect (1)
expected (1)
experience (1)
experts (1)
explain (2)
explained (1)
eye (1)

< F >
face-to-face (1)
facilities (11)
facility (8)
factors (1)
factual (1)
fair (1)
familiar (4)

far (4)
feedback (1)
feel (5)
female (1)
figure (1)
fill (1)
filled (1)
financially (1)
find (1)
finding (1)
finish (4)
finished (2)
first (8)
five (1)
flag (11)
flagged (1)
floor (1)
flow (3)
focus (2)
follow (1)
following (1)
follows (2)
follow-up (2)
foot (1)
force (1)
foregoing (3)
forgot (1)
form (16)
forth (1)
forum (2)
found (3)
four (2)
Frasier (1)
free (1)
frequently (2)
Friday (1)
front (1)
full (4)
full-time (1)
functioning (1)
further (10)

< G >
Garden (1)
Gay (1)
Gene (1)
general (1)
generally (3)
generate (1)

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 48 of 52

Deposition of Sandy Varghese                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

getting  (5)
give  (13)
given  (6)
gives  (2)
glucose  (7)
go  (35)
goes  (6)
going  (17)
gonorrhea  (1)
Good  (4)
GORDON  (1)
graduate  (1)
graduated  (1)
granular  (1)
grievance  (1)
grievances  (1)
GROTE  (22)
ground  (1)
group  (1)
guess  (5)
guessing  (2)
guidance  (1)
guidances  (1)
guidelines  (5)

< H >
handle  (2)
handled  (1)
happen  (7)
happened  (2)
happens  (3)
hard  (2)
health  (24)
healthcare  (7)
hear  (1)
hearing  (1)
held  (3)
help  (1)
helping  (1)
Henderson  (3)
Herdman  (8)
Herdman's  (1)
hey  (1)
high  (7)
higher  (2)
highlight  (1)
hired  (4)
hires  (1)
history  (10)

HIV  (1)
hoc  (1)
hold  (1)
hospital  (7)
hours  (2)
housed  (2)
houses  (1)
housing  (10)
HSA  (1)
HSAs  (9)
HU  (1)
human  (2)
hundred  (1)

< I >
identified  (1)
identify  (2)
impact  (1)
impacted  (1)
impacting  (1)
impede  (1)
implement  (1)
improvement  (2)
incarcerated  (8)
incarceration  (2)
incarcerations  (1)
incident  (1)
incidents  (1)
include  (1)
including  (5)
increase  (1)
INDEX  (1)
indications  (1)
individual  (1)
individuals  (3)
infection  (3)
infirmary  (26)
information  (4)
Inmate  (10)
inmates  (1)
inmate's  (2)
inpatient  (1)
inquiries  (1)
inspection  (1)
inspections  (1)
inspectors  (1)
instance  (6)
instances  (3)
insulin  (16)

intake  (22)
interested  (1)
interfere  (1)
internal  (2)
internally  (2)
investigate  (1)
investigations  (1)
involuntarily  (1)
involuntary  (1)
involved  (3)
issue  (7)
issues  (15)
issuing  (1)
its  (3)

< J >
JACOB  (1)
jail  (2)
JAMES  (1)
January  (2)
Jared  (3)
JFK  (1)
job  (2)
Johnson  (7)
joint  (11)
JONATHAN  (5)
JR  (1)
judgment  (2)
June  (1)
JUNG  (12)
Jung's  (1)

< K >
Kalu  (2)
K-A-L-U  (1)
Kalu's  (1)
KAMINSKY  (19)
keep  (2)
keeps  (1)
ketoacidosis  (1)
ketones  (1)
KIERNAN  (1)
KIMBALL  (1)
kind  (1)
knew  (2)
know  (63)
knowledge  (2)
known  (3)

< L >
lab  (2)
labs  (2)
language  (1)
LAW  (3)
lawsuit  (1)
lawyers  (1)
lead  (1)
leading  (1)
legal  (5)
level  (12)
levels  (3)
limited  (3)
Line  (14)
lines  (1)
list  (6)
little  (7)
LLC  (1)
loading  (1)
logs  (1)
long  (3)
look  (21)
looked  (8)
looking  (8)
looks  (1)
lot  (3)
LOUIS  (3)
lower  (3)
LPNs  (1)

< M >
machine  (1)
Major  (1)
majority  (1)
making  (3)
MANSUKHANI  (1)
MARGO  (1)
Mariesha  (2)
MARKED  (3)
Market  (1)
mass  (1)
matter  (2)
matters  (1)
Maureen  (2)
MBA  (2)
mean  (10)
Meaning  (1)
means  (4)
meant  (1)

Case 2:24-cv-05618-TJS    Document 100-8    Filed 12/05/25    Page 49 of 52

Deposition of Sandy Varghese                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

medical (101)
medication (45)
medications (17)
medicine (1)
meet (2)
meeting (28)
meetings (43)
mention (1)
mentioned (5)
Michael (1)
MIKE (2)
mini (3)
minimum (1)
minutes (4)
missed (2)
misses (2)
missing (2)
misstates (1)
moment (1)
monitor (4)
monitoring (1)
monitors (7)
month (7)
monthly (5)
months (3)
morning (5)
mortalities (2)
mortality (16)
moves (1)
muddled (1)
multiple (2)

< N >
name (5)
names (3)
narrower (1)
national (2)
nationally (1)
nature (2)
NCCHC (3)
necessary (2)
need (21)
needed (3)
needs (9)
negatively (1)
neither (1)
never (2)
new (4)
nods (1)

non (1)
nonclinical (1)
Normally (8)
Norristown (4)
no-show (3)
Notary (1)
notation (1)
noted (2)
notes (1)
notice (3)
noticed (3)
notices (1)
notification (1)
notify (3)
November (1)
NP (4)
number (2)
numbers (1)
nurse (26)
nurses (6)
nursing (6)

< O >
Object (4)
Objection (13)
observing (1)
obtain (2)
obviously (2)
occasion (1)
occurred (2)
occurs (1)
O'CONNOR (1)
October (1)
office (9)
officer (4)
officers (2)
officials (3)
Oftentimes (1)
Okay (13)
on-call (1)
once (9)
ones (3)
online (1)
on-site (2)
On-the-job (1)
open (1)
Operations (4)
opinion (1)
opportunities (1)

opportunity (5)
option (1)
order (5)
ordered (7)
orders (2)
originally (1)
outside (5)
overall (9)
overhead (3)
oversee (1)
oversight (9)
overview (2)
owns (1)
oxygen (1)

< P >
PAGE (18)
pages (2)
paper (1)
paragraph (3)
parameters (2)
parcel (1)
part (19)
participate (1)
particular (3)
parties (1)
parts (2)
pass (1)
pathways (1)
patient (9)
patients (9)
pattern (3)
PDP (54)
PENNSYLVANIA (9)
people (17)
percent (3)
perform (1)
performed (2)
Perini (3)
period (9)
person (38)
personal (1)
personally (1)
persons (2)
person's (2)
perspective (2)
pertaining (7)
pertains (1)
PESTRAK (21)

pharmacies (1)
pharmacy (5)
PhD (1)
PHILADELPHIA (14)
phone (1)
phrase (1)
PHS (1)
PHSW (1)
physically (1)
physician (10)
physicians (5)
physician's (1)
PICC (1)
pick (4)
place (8)
placed (4)
placement (3)
placements (1)
Plaintiff (2)
plaintiffs (1)
plan (2)
plans (6)
please (3)
Pod (5)
pods (1)
point (9)
police (1)
Policies (12)
policy (15)
poor (1)
populate (1)
portion (2)
position (11)
positive (1)
possession (1)
possibility (1)
potential (2)
Powers (1)
practice (2)
practices (6)
practitioner (5)
practitioners (1)
pre-COVID (1)
prepare (1)
prepared (6)
prescribe (1)
prescribed (1)
prescription (2)

**PRESENT** *(6)*
**presidents** *(1)*
**pressure** *(1)*
**pretty** *(6)*
**previous** *(4)*
**previously** *(1)*
**Prior** *(9)*
**Prison** *(9)*
**Prisons** *(2)*
**probably** *(2)*
**procedure** *(1)*
**procedures** *(2)*
**proceed** *(1)*
**process** *(24)*
**processes** *(7)*
**Production** *(2)*
**Professional** *(2)*
**proper** *(3)*
**properly** *(5)*
**propounded** *(1)*
**protocols** *(2)*
**provide** *(14)*
**provided** *(7)*
**provider** *(11)*
**providers** *(2)*
**provides** *(2)*
**providing** *(7)*
**provision** *(4)*
**psychotropic** *(1)*
**Public** *(6)*
**Puerini** *(10)*
**Puerini's** *(1)*
**pull** *(4)*
**purpose** *(1)*
**pursuant** *(1)*
**put** *(8)*
**puts** *(1)*

**< Q >**
**QHCP** *(1)*
**QI** *(41)*
**qualified** *(3)*
**quality** *(2)*
**Question** *(18)*
**questionnaire** *(2)*
**questions** *(27)*
**quick** *(3)*

**< R >**

**raised** *(2)*
**randomize** *(1)*
**Ray** *(4)*
**RAYMOND** *(1)*
**read** *(6)*
**reading** *(2)*
**ready** *(1)*
**real** *(2)*
**realize** *(1)*
**realized** *(1)*
**really** *(5)*
**reason** *(2)*
**recall** *(24)*
**receive** *(8)*
**received** *(1)*
**receiving** *(4)*
**recognize** *(1)*
**recognized** *(1)*
**recollection** *(3)*
**recommendation** *(4)*
**recommendations** *(1)*
**record** *(26)*
**recorded** *(1)*
**records** *(3)*
**red** *(12)*
**REES** *(1)*
**refer** *(1)*
**referral** *(3)*
**referred** *(3)*
**referring** *(1)*
**refills** *(1)*
**refresh** *(1)*
**refreshed** *(1)*
**refusal** *(5)*
**refusals** *(7)*
**refused** *(3)*
**refuses** *(1)*
**refusing** *(2)*
**regard** *(3)*
**regarding** *(3)*
**region** *(1)*
**regional** *(6)*
**registered** *(1)*
**regular** *(11)*
**regularly** *(1)*
**related** *(7)*
**relation** *(1)*
**relative** *(2)*
**relook** *(1)*

**remember** *(13)*
**remembered** *(1)*
**Remick** *(2)*
**repeat** *(1)*
**repetitive** *(2)*
**rephrase** *(1)*
**report** *(9)*
**reported** *(4)*
**Reporter** *(9)*
**reporter's** *(1)*
**REPORTING** *(1)*
**reports** *(8)*
**represent** *(3)*
**representatives** *(1)*
**Request** *(4)*
**requests** *(1)*
**require** *(1)*
**required** *(1)*
**requires** *(1)*
**rescheduled** *(2)*
**rescheduling** *(1)*
**resigned** *(1)*
**respond** *(2)*
**responding** *(1)*
**response** *(4)*
**responsibilities** *(4)*
**responsible** *(5)*
**result** *(1)*
**resulting** *(1)*
**results** *(2)*
**resume** *(1)*
**retained** *(3)*
**retains** *(3)*
**return** *(5)*
**returned** *(2)*
**returning** *(1)*
**review** *(38)*
**reviewed** *(1)*
**reviewing** *(3)*
**reviews** *(14)*
**Right** *(10)*
**risks** *(1)*
**RN** *(5)*
**RNs** *(1)*
**role** *(11)*
**roles** *(2)*
**room** *(13)*
**rotates** *(1)*
**rounds** *(2)*

**routinely** *(1)*
**rules** *(1)*
**run** *(4)*
**runs** *(2)*

**< S >**
**sake** *(1)*
**sample** *(3)*
**SANDY** *(6)*
**S-A-N-D-Y** *(1)*
**saying** *(2)*
**says** *(5)*
**scale** *(1)*
**scanned** *(1)*
**scans** *(1)*
**scenario** *(2)*
**scheduled** *(2)*
**school** *(4)*
**scope** *(1)*
**screen** *(2)*
**screening** *(10)*
**scroll** *(3)*
**SCULLY** *(1)*
**second** *(3)*
**seconds** *(2)*
**security** *(13)*
**see** *(34)*
**seen** *(4)*
**sees** *(1)*
**seizure** *(2)*
**send** *(5)*
**senior** *(2)*
**sense** *(1)*
**sent** *(3)*
**series** *(2)*
**service** *(1)*
**Services** *(10)*
**set** *(1)*
**setting** *(2)*
**seven** *(2)*
**severity** *(1)*
**shadow** *(2)*
**shadowed** *(1)*
**shadowing** *(2)*
**share** *(6)*
**shared** *(7)*
**sharps** *(2)*
**sheet** *(3)*
**sheets** *(1)*

Deposition of Sandy Varghese

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**shift** *(5)*
**shifts** *(1)*
**shortage** *(1)*
**shortages** *(4)*
**show** *(2)*
**showed** *(2)*
**showing** *(1)*
**sick** *(3)*
**side** *(1)*
**sides** *(1)*
**sign** *(1)*
**Signature** *(1)*
**signed** *(1)*
**similar** *(1)*
**single** *(2)*
**sit** *(1)*
**site** *(6)*
**situated** *(1)*
**situation** *(10)*
**six** *(1)*
**sliding** *(1)*
**smart** *(1)*
**smoothly** *(1)*
**somebody** *(44)*
**somebody's** *(3)*
**soon** *(1)*
**sooner** *(2)*
**sorry** *(2)*
**sort** *(1)*
**speak** *(7)*
**specific** *(15)*
**specifically** *(8)*
**specifics** *(2)*
**speculate** *(1)*
**spell** *(3)*
**spent** *(1)*
**spoke** *(2)*
**Spring** *(1)*
**staff** *(51)*
**Staffing** *(4)*
**standard** *(4)*
**standards** *(6)*
**stands** *(2)*
**start** *(3)*
**started** *(1)*
**starting** *(1)*
**starts** *(1)*
**state** *(1)*
**STATES** *(1)*

**status** *(2)*
**STD** *(2)*
**STDs** *(1)*
**steps** *(1)*
**Stipulations** *(1)*
**Street** *(7)*
**stretcher** *(8)*
**strike** *(1)*
**study** *(1)*
**stuff** *(1)*
**subject** *(3)*
**subjects** *(1)*
**submitted** *(1)*
**substance** *(1)*
**sugar** *(9)*
**sugars** *(2)*
**Suite** *(5)*
**summary** *(2)*
**SUMMER** *(2)*
**supervisor** *(1)*
**supervisors** *(1)*
**SUPPORT** *(1)*
**supposed** *(14)*
**sure** *(23)*
**sworn** *(2)*
**symptoms** *(1)*
**synonymous** *(1)*
**system** *(6)*

**< T >**
**take** *(16)*
**taken** *(6)*
**takes** *(1)*
**talk** *(8)*
**talked** *(3)*
**talking** *(3)*
**team** *(3)*
**tell** *(11)*
**telling** *(1)*
**term** *(3)*
**terms** *(1)*
**test** *(1)*
**testified** *(3)*
**testify** *(8)*
**testimony** *(2)*
**testing** *(1)*
**tests** *(1)*
**Thank** *(9)*
**thing** *(6)*

**things** *(10)*
**think** *(25)*
**THOMAS** *(2)*
**thought** *(1)*
**thoughts** *(1)*
**three** *(5)*
**tier** *(3)*
**time** *(53)*
**timeframe** *(8)*
**times** *(4)*
**title** *(6)*
**today** *(8)*
**today's** *(1)*
**told** *(3)*
**top** *(2)*
**Topic** *(7)*
**topics** *(7)*
**touched** *(1)*
**tour** *(1)*
**track** *(1)*
**trailer** *(1)*
**training** *(14)*
**trainings** *(1)*
**transcript** *(1)*
**transcription** *(1)*
**transfer** *(2)*
**transferred** *(1)*
**transferring** *(1)*
**transportation** *(2)*
**treated** *(1)*
**treatment** *(5)*
**TREBACH** *(1)*
**trigger** *(1)*
**trips** *(6)*
**Trivikram** *(2)*
**trouble** *(2)*
**true** *(1)*
**try** *(3)*
**trying** *(3)*
**turn** *(1)*
**twice** *(7)*
**two** *(10)*
**type** *(2)*
**types** *(2)*
**typically** *(15)*

**< U >**
**ultimately** *(2)*
**um-hmms** *(1)*

**understand** *(4)*
**understanding** *(4)*
**understood** *(3)*
**unit** *(13)*
**UNITED** *(1)*
**University** *(1)*
**unpredictable** *(1)*
**unreasonable** *(1)*
**upgrade** *(2)*
**uploaded** *(1)*
**upper** *(1)*
**urine** *(1)*
**use** *(2)*
**usually** *(3)*

**< V >**
**vacancy** *(1)*
**VARGHESE** *(10)*
**V-A-R-G-H-E-S-E** *(1)*
**varies** *(1)*
**various** *(3)*
**verbal** *(1)*
**versus** *(1)*
**vice** *(1)*
**Videoconferenced** *(1)*
**violated** *(1)*
**violence-related** *(1)*
**virtually** *(1)*
**visit** *(6)*
**visits** *(5)*
**vs** *(1)*

**< W >**
**wait** *(1)*
**Walgreens** *(1)*
**Walk** *(7)*
**walking** *(1)*
**Wanda** *(1)*
**want** *(18)*
**wanted** *(3)*
**wants** *(3)*
**warden** *(2)*
**wardens** *(4)*
**warden's** *(1)*
**warrants** *(1)*
**watching** *(1)*
**way** *(10)*
**ways** *(2)*
**week** *(2)*

**weekly**  *(3)*
**weeks**  *(1)*
**well**  *(9)*
**went**  *(5)*
**we're**  *(1)*
**we've**  *(2)*
**whichever**  *(1)*
**WITNESS**  *(20)*
**WITTEKIND**  *(20)*
**wondering**  *(1)*
**wording**  *(1)*
**work**  *(11)*
**worker**  *(1)*
**working**  *(7)*
**works**  *(5)*
**write**  *(1)*
**writing**  *(1)*
**written**  *(3)*
**wrong**  *(1)*

**< Y >**
**year**  *(4)*
**yearly**  *(2)*
**years**  *(4)*
**YesCare**  *(63)*

**< Z >**
**Zoom**  *(5)*