# Exhibit J

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 2 of 76

Deposition of Lynda Witkowski                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                     -   -   -
   JACOB and JAMES JUNG,     : CIVIL ACTION
4  as administrators for     :
   the estate of LOUIS       :
5  JUNG, JR.,                 :
        Plaintiffs,           :
6                             :
7       v.                    :
                              :
   YESCARE CORP., LALITHA     :
8  TRIVIKRAM, MAUREEN GAY,    :
   BLAIR CABELLOS, et al.,    :
9       Defendants,           :
                              :
10      v.                    :
                              :
11 CAREERSTAFF UNLIMITED,     :
   LLC,                       :
12      Third-Party           :
        Defendant,            :
13                            :
14      v.                    :
                              :
   TEKACCEL, INC.,            :
15      Fourth-Party          :
        Defendant.            : NO. 2:24-cv-05618-TJS
16
                     -   -   -
17              November 12, 2025
                     -   -   -
18
              Remote oral deposition of LYNDA
19 WITKOWSKI, taken pursuant to notice, was held
   at the location of the witness in Philadelphia,
20 Pennsylvania, beginning at 10:03 a.m., on the
   above date, before Kristy L. Liedtka, a
21 Professional Court Reporter and Notary Public
   in and for the Commonwealth of Pennsylvania.

22

23

24 Everest Job No. 47127

```
 1    APPEARANCES:

 2


 3        ABOLITIONIST LAW CENTER
          BY:   RUPALEE RASHATWAR, ESQUIRE
 4              MARGARET HU, ESQUIRE
                BRET GROTE, ESQUIRE
 5        990 Spring Garden Street
          Suite 306
 6        Philadelphia, Pennsylvania 19123
          (412) 654-9070
 7        rupalee@alcenter.org
          margo@alcenter.org
 8        bretgrote@abolitionistlawcenter.org
          Representing the Plaintiffs
 9


10        CITY OF PHILADELPHIA LAW DEPARTMENT
11        BY:   MICHAEL PESTRAK, ESQUIRE
          One Parkway, 14th Floor
12        1515 Arch Street
          Philadelphia, Pennsylvania 19102
13        (215) 683-5417
          michael.pestrak@phila.gov
14        Representing the Defendants, City of
          Philadelphia, former Commissioner
15        Blanche Carney, Gena Frasier and
          Wanda Bloodsaw
16


17        KIERNAN TREBACH
18        BY:   JONATHAN M. KAMINSKY, ESQUIRE
          Ten Penn Center, Suite 770
19        1801 Market Street
          Philadelphia, Pennsylvania 19103
20        (215) 569-4433
          jkaminsky@kiernantrebach.com
21        Representing the Defendant, Mariesha
          Apollon
22


23


24
```

```
 1   APPEARANCES:   (Continued)

 2


 3        O'CONNOR KIMBALL, LLP
          BY:   THOMAS J. GREGORY, ESQUIRE
 4        Two Penn Center Plaza, Suite 1100
          15th Street and JFK Boulevard
 5        Philadelphia, Pennsylvania 19102
          (215) 564-0400
 6        tgregory@okllp.com
          Representing the Defendants,
 7        YesCare, Corp., Lalitha Trivikram,
          Maureen Gay, and Blair Cabellos
 8

 9

10        GORDON REES SCULLY MANSUKHANI, LLP
          BY:   SUMMER C. THOMAS, ESQUIRE
11        Three Logan Square
          1717 Arch Street, Suite 610
12        Philadelphia, Pennsylvania 19103
          (215) 561-2300
13        scthomas@grsm.com
          Representing the Third-Party
14        Defendant, CareerStaff Unlimited,
          LLC
15

16

17

18        ALSO PRESENT:
             Corinne Austen, Paralegal
19

20

21                    -   -   -

22

23

24
```

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 5 of 76

Deposition of Lynda Witkowski                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1                          –   –   –

 2                       I N D E X

 3                          –   –   –

 4


 5      Testimony of:   LYNDA WITKOWSKI

 6         BY ATTORNEY RASHATWAR              6, 155
           BY ATTORNEY KAMINSKY              141
 7


 8                          –   –   –

 9                    E X H I B I T S

10                          –   –   –

11


12        NO.                  DESCRIPTION              PAGE

13     Witkowski-1     Chart 18, Jung             66
                       Corrective Action Plan
14
       Witkowski-2     YesCare Patient Safety      105
15                     Event Committee
                       PowerPoint presentation
16                     slide deck

17

18

19

20

21

22

23

24
```

```
 1                        -   -   -

 2                 DEPOSITION SUPPORT INDEX

 3                        -   -   -

 4

 5     Direction to Witness Not to Answer

 6     Page Line          Page Line          Page Line

 7     123  17

 8

 9     Request for Production of Documents

10     Page Line          Page Line          Page Line

11     None

12

13

14     Stipulations

15     Page Line          Page Line          Page Line

16     None

17

18

19     Question Marked

20     Page Line          Page Line          Page Line

21     None

22

23

24
```

Deposition of Lynda Witkowski                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 6

1         - - -

2         LYNDA WITKOWSKI, after having been

3    duly remotely sworn, was examined and

4    testified as follows:

5         - - -

6         EXAMINATION

7         - - -

8    BY ATTORNEY RASHATWAR:

9    Q.    Good morning.  My name is Rupalee

10   and I'm going to be taking your deposition

11   today.  We're here in a deposition in a civil

12   case, Jung v. City of Philadelphia and I'm

13   counsel for the plaintiffs.

14        Have you ever given a deposition

15   before?

16   A.    Yes, I have.

17   Q.    In what capacity?

18   A.    As a witness.

19   Q.    Okay.

20   A.    Okay.

21   Q.    And how many cases?

22   A.    I'd say about five maybe.

23   Q.    And were they all related to the

24   role that you're serving in now?

Page 7

1    A.    One was many years ago when I worked

2    at a hospital.

3    Q.    And were the other four related to

4    the position that you're currently in?

5    A.    That is correct.

6    Q.    Okay.  So since you've done this

7    many times before, I won't speak at length

8    about, sort of, how this process works, but,

9    obviously, we're taking this deposition and

10   it's being transcribed by a court reporter

11   who's also on the line, so it's just important

12   that any time you give a response to any of my

13   questions, that the response be verbal and it

14   not be a nod or an mm-hmm, which won't be

15   clearly recorded in the record.  And I ask that

16   you try to let me answer -- or finish my entire

17   question before you answer, just so that we're

18   not speaking at the same time for the record.

19        And if you do not know or do not

20   remember something, I just ask that you let me

21   know and I'll sometimes ask if there might be

22   something that would refresh your memory about

23   what that is?

24        If you answer a question that I ask,

Page 8

1    I'm going to assume that you understood it.  So

2    if there's any point at which don't understand

3    my question or you would like me to rephrase,

4    please let me know that.  Okay?

5    A.    Yes.

6    Q.    And we, I imagine, will take a few

7    breaks, but if you need a break at any point,

8    just let me know.  Okay?

9    A.    Yes.

10   Q.    And where are you giving this

11   deposition from this morning?

12   A.    I am in my office at -- on the

13   Philadelphia Prison grounds.

14   Q.    Okay.  Is there anyone else in your

15   office with you?

16   A.    No, the door is closed.

17   Q.    Okay.  Great.  Are you prepared to

18   give a deposition today?

19   A.    Yes.

20   Q.    Did you do anything to prepare for

21   today's deposition?

22   A.    No.

23   Q.    Did you review any records or

24   documents prior to coming in today?

Page 9

1    A.    No.

2    Q.    Okay.  So where do you currently

3    work?

4    A.    I work at the Philadelphia

5    Department of Prisons.

6    Q.    And how long have you worked there?

7    A.    Just shy of 15 years.

8    Q.    And what's your current position or

9    title?

10   A.    Senior director of clinical

11   services.

12   Q.    Can you tell me about any education

13   that you have received after high school?

14   A.    After high school, okay.  That

15   shortens it a little bit.  I have -- I started

16   with my associate's degree in nursing and I

17   currently have my Bachelor of Science in

18   Nursing from Jacksonville University.

19   Q.    And do you have any specific

20   licenses?

21   A.    Besides my RN, I also have a

22   certification in CCHP-RN.

23   Q.    What is that?

24   A.    Certified Correctional Health

Page 10

Professional with a specialized in Registered
Nurse, and that's Specialty II correctional
nursing.

Q.    And what is the process for getting
that certification?

A.    You just take a test for
certification in correctional -- it's just for
NCCHC Nursing -- or NCCHC knowing the -- the
credentials for NCCHC and then you get your
CCHP and then you go and take a second test
specific to RN clinical duties specific to
correctional nursing.

Q.    So when did you receive -- CCHP; is
that right?

A.    Yes.

Q.    When did you receive that
certification?

A.    Oh, I don't know because that's just
my yearly.  CCHP maybe about eight years ago,
I'm guessing, and then my CCHP-RN maybe about
four years ago.  I'm just guessing.

Q.    Okay.  Are you -- and just to be
clear, when did you obtain your nursing
license?

Page 11

A.    1996.

Q.    Are you a part of any professional
associations?

A.    No.

Q.    Do you do -- or have you received
any other training or specific training with
respect to the NCCHC?

A.    (Indicating.)

Q.    Did you say no?

A.    No.  I did do training for Lean Six
Sigma.  So I'm a green belt and that has to do
with like auditing and just basically like
auditing and ensuring compliance with auditing
when you -- basically auditing.

Q.    Can you explain what that
certification or -- can you explain what that
is called and what the process for obtaining
it?

A.    It's a -- it's a long testing
process.  It's an online -- online -- it's an
extensive online testing process.  It's
including tests as you go along the -- the
online -- it's like online training with
testing in between.  Just a way to accurately

Page 12

audit different areas -- not different areas,
just areas of clinical section -- not sections.
Just a way of correctly auditing areas, I
guess.  It's...

Q.    Is it --

A.    Just a more streamlined.  It's not
specific to anything really, but it's just a
way to accurately audit and streamline, a way
to audit processes.

Q.    Okay.  Is it like a special
engagement quality improvement?  Is that part
of it?

A.    Yes.

Q.    And it's not specific to
correctional work?

A.    Not at all.

Q.    And when did you receive that?

A.    Just about four years ago.  It was
about 2021.  Maybe.  Maybe 2023.  I'll have to
look it up.

Q.    That's okay if that's an
approximation.

A.    Yes, absolutely.

Q.    And the NCCHP that you obtained, was

Page 13

that required as part of your job duties?

A.    It was not required.  It was just
recommended.  The CCHP was recommended.  The
CCHP-RN, I obtained that on my own.

Q.    And who was the -- who was that
recommended by?

A.    It was just recommended by my
current company.

Q.    And what's your current company?

A.    Current company is YesCare.  The
prior company was Corizon Health.

Q.    So you mentioned that for the past
15 years, you've been working at PDP; is that
right?

A.    At the PDP through our -- through
the medical company Corizon Health/YesCare.

Q.    So for the past 15 years, you've
been working for Corizon and then now YesCare,
right?

A.    That is correct.

Q.    So what are your -- can you just
walk me through the different positions that
you have held at Corizon, which is now known as
YesCare?

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 9 of 76

Deposition of Lynda Witkowski                                      Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 14

A. When I started in 2011, I was the director of nursing for the infirmary, 2014 I got promoted to quality improvement department and my title like slightly changed, but I was still working in quality improvement, then about 2019 or maybe 2020, I -- I had many different titles, but I basically did the same thing. But I went to like regional -- I had a big -- I had a big long title. But I started overseeing quality improvement, the utilization management department, which they're the people that schedule the offsite services, oversee onsite services, track the patients that are in the emergency room and just, you know, track those reports and stuff, and then oversee the infectious disease nurse. So I -- regional safety and security -- I had this big long title. Then my last title was what I am now without the "senior."

Q. And can you repeat that?

A. Regional -- I'm not even sure what it is now. I had so many different titles and they were so long. Senior -- I can't even think what my title is right now. I'm trying

Page 15

to look for a business card. I'm not even sure. I can't even think of it. I'm blacking out.

Q. Okay.

ATTORNEY GREGORY: At the beginning of your deposition, you said senior director of clinical services.

THE WITNESS: Thank you. So I was director of clinical services and then my last promotion, I'm now senior director of clinical services, which that also includes assisting with education for staff, eduction for officers, and I also provide education for the IPs here.

BY ATTORNEY RASHATWAR:

Q. And, for the record, to be clear, IP, is incarcerated person?

A. That is correct.

Q. I'm going to apologize that I lost my audio for a moment, but you can hear me now, right?

A. That is correct.

Q. Okay. So I might ask you at some points to repeat a bit of what you just said,

Page 16

but in your current role right now, which is at the senior level, do you also conduct any training?

A. I do conduct some trainings, yes.

Q. And who do you train?

A. I send trainings to clinical staff, I do trainings -- I do video trainings to officers, they're called the monthly roll calls, I do trainings -- I do video -- we call them -- I call them PSAs, public service announcements, to the IPs.

Q. What are PSAs?

A. We call -- we call it public service announcements. So we'll do -- I'll do like video snippets and they will go on the -- the TVs in the IPs' -- in their general -- their general areas in the blocks on their TVs.

Q. And what are those usually about?

A. Basically anything that the client -- that the PDP client requests. It might be on -- what are some of them I've done? Right now they have -- the PDP TVs are broken, so I haven't had a chance to do any lately, but it might be on general healthcare, any like job

Page 17

preventative use, I did one on like tranq, general healthcare and stuff like that. During COVID I was doing them on COVID, on social distancing and stuff like that. Influenza, vaccines, pneumonia vaccines and stuff like that. Sick call, why not to refuse an offsite visit and stuff like that.

Q. Got it. So it sounds like you liaise closely with PDP in conducting all of your duties?

A. Correct.

Q. And is quality -- in your title, I saw that it said QI, and does that stand for quality improvement?

A. That's correct.

Q. Is that part of your title and responsibilities?

A. Right now I just oversee them on a clinical basis, but that's not my -- I don't directly oversee them.

Q. Okay. What does that mean, when you say you're responsible for overseeing them on a clinical basis?

A. We now have another supervisor that

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 10 of 76

Deposition of Lynda Witkowski                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 18

directly oversees the quality improvement
department.

Q.    What was that person's name?

A.    Reed Domer-Shank.

Q.    And were you previously responsible
for quality improvement --

A.    Yes.

Q.    -- with respect to YesCare?

A.    Yes.

Q.    And when did you stop being
responsible for that?

A.    Maybe 2023.  2022, 2023.

Q.    That's an approximation?

A.    That's an approximation.  That is
correct.

Q.    And what was the scope of your
responsibilities with respect to quality
improvement at YesCare?

A.    Back when I started?

Q.    When you were responsible for
quality improvement in your prior role as some
kind of regional director.  Tell me if I got
the title wrong.

A.    When I was overseeing just we would

Page 19

do like monthly -- monthly performance
improvement data audits, we did independent
audits, we collected our monthly data from the
sites to do your PI reports, our performance
improvement reports that were required monthly
to the client, completing the grievance data
collection, any special data that the client
requested.  It was just about a lot of data
reporting and specialized data that was just --
we -- if there was anything that we felt was --
needed a special look at.  Then, of course, the
sentinel events, that we collected the data on
the sentinel events.

Q.    What's a sentinel event?

A.    A sentinel event is any -- anything
from a medication error that can cause harm to
a patient, any suicide attempt that causes a
hospitalization, any completed suicide, any
mortality, any diabetic ketoacidosis that
causes a hospital -- a hospital event, in
hospital -- I'm sorry, in-house birth or any
other event that is out of the norm, which we
usually don't have anything that's out of the
norm.  Something that we deem reportable.

Page 20

Q.    Who determines if something arises
to a sentinel event?

A.    Well, anything in that category is
automatically a sentinel event.  And that's
determined from our corporate and it's just
standard.

Q.    And so when you say "our corporate,"
you mean corporate YesCare?

A.    That's correct.

Q.    Did you also review IP grievances as
well in that role?

A.    That's correct.

Q.    Was there certain grievances that
you reviewed as part of your process or were
you given all grievances?

A.    All grievances.  We had a grievance
log.  Every single grievance.

Q.    Even ones that didn't pertain to
medical care?

A.    No, just -- just medical care.
Medical and behavioral health and dental, they
came to us.

Q.    Okay.  And I apologize if I missed
this at the moment my audio went out, but did

Page 21

you end up stating your current title right
now?

A.    That is the senior director of
clinical services.

Q.    Okay.  Thank you.
So I'm going to just backtrack for a
moment from prior to when you started working
at Corizon about 15 years ago.  Can you tell me
about your employment history before then,
after high school?

A.    After I graduated from nursing
school, I -- once I graduated from nursing
school, I worked about six months at a nursing
home.  From there, I started at Camden County
jail as the charge nurse for two-and-a-half
years.  From there, I left the Camden County
jail and I worked at -- back then it was
Kennedy Hospital in New Jersey.  I did 12 years
between Stratford campus and Washington
Township campus for 12 years and then from
there I returned to jail and came to
Philadelphia.

Q.    And so what was your role at the
nursing home where you first worked?

Page 22

A.   Just a staff nurse.
Q.   And how long were you working there?
A.   Just about six months.
Q.   And when you were a charge nurse at the Camden County jail, can you tell me what your job was at that facility?  Like what does that exactly mean?
A.   I was just the charge nurse.  I oversaw the LPNs, I basically worked in the medical department, saw inmates.  Basically, kind of ran sick call.  When they would put in their slips, I would triage their slips, bring them down to see them.  I took care of insulin administration, I took care of STD treatments, I reviewed charts, I oversaw the intake charts and took care of any emergencies that arose up on the blocks.
Q.   And how long were you in that role?
A.   That was two-and-a-half years.
Q.   And what were -- what was your title when you were working at Kennedy Hospital?
A.   I was basically a staff nurse sometimes.  I did charge nurse, but I -- I went anywhere from staff nurse, I worked PRN.

Page 23

Between the 12 years, I -- like I said, I went from PRN to staff nurse, back to PRN to staff nurse and I just floated around.  I did everything from med/surg to PCU.  I floated in the -- I went in the ER, I did some mother/baby.  So I was really everywhere between that 12 years, but if I could pinpoint where I spent most of my time, that was in the progressive care unit back in the.
         Step-down ICU.
Q.   The PCU.  Is that right?
A.   Yes, progressive care unit.
Q.   And what kind of patients were generally treated there?
A.   They were high care telemetry patients and the step-down ICU were basically patients that were stable enough to come out of the ICU, but they were still -- they might have been some stable ventilated patients.  It was like a one-to-three patient/nurse ratio.  So they were still pretty sick, but stable enough to come out of the ICU.
Q.   Okay.  So I just want to go back to your time at Corizon/YesCare when you first

Page 24

started at PDP.
         When you first started at PDP, did you receive any training from YesCare?
A.   Yes.
Q.   What did that entail?
A.   The standard YesCare new employee orientation.
Q.   And what is included in the new employee orientation?
A.   It's everything from they go over the intake process -- every -- they basically go over everything that has to do with not clinical, but just like HR -- everything that Human Resources would go over and then a few days of clinical processes.  Everything from like intake, chronic care -- intake, chronic care, sick call, every single process that any -- anyone clinical would have to put their hands on.  And then orientation, I was primarily in the infirmary, so I went over to the infirmary and had orientation with an infirmary nurse to learn the infirmary process, because that's a whole different process than just a regular staff nurse in any of the other facilities.

Page 25

facilities.
Q.   And after that training, did you receive any other additional like ongoing training from YesCare?
A.   Well, that basically covered everything that I needed and I was able to go -- my administrator at that time was a clinical nurse, so I was able to refer to her if I had any questions.
         ATTORNEY GREGORY:  Just to be clear, you're using YesCare and Corizon interchangeably, right?  Because where you're asking her --
         ATTORNEY RASHATWAR:  Yes.
         ATTORNEY GREGORY:  -- if she received training from YesCare back in the beginning, YesCare didn't even exist then.
         ATTORNEY RASHATWAR:  Yes, for the purposes of my question, when I was referring to YesCare, I was referring to Corizon as well because --
         ATTORNEY GREGORY:  All right.
         ATTORNEY RASHATWAR:  -- Corizon turned into YesCare.  I'm using those

Deposition of Lynda Witkowski                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 26

interchangeably.
      ATTORNEY GREGORY:  That's all I
wanted to make clear.
      ATTORNEY RASHATWAR:  Thank you.
      THE WITNESS:  Actually -- actually,
back when I was hired, it may have even
been Prison Health Services.
      ATTORNEY GREGORY:  Prison Health
Services, yes.
      THE WITNESS:  Yeah.  Yeah.
BY ATTORNEY RASHATWAR:
   Q.   So for the record, so it's clear,
I'm using all three of those interchangeably
because my understanding is that you were
employed for that same company for the duration
of those 15 years, correct?
   A.   (Inaudible.)
   Q.   You said "yes," right?
   A.   I didn't.  I said correct.
   Q.   Okay.  Thanks.  Just sometimes I can
and can't hear.
      So then just to follow up, was there
any additional training that was required after
the orientation by YesCare?

Page 27

   A.   No, because I received the original
general clinical nurse orientation and then
when I transitioned from my orientation over to
the infirmary, I received a specialized
infirmary orientation.
   Q.   And were you ever responsible for
intake at PDP?
   A.   Yes.
   Q.   In what role were you responsible
for intake?
   A.   If -- if any inmates -- this is a
little story here.  If any inmates got arrested
and got injured prior to -- during their arrest
and had to go to the hospital before they got
intaked, so if you can imagine they get -- they
get injured, get arrested, go to the hospital,
and once they get discharged from the hospital,
they're still injured enough that they can't go
into general population, so they go right from
the hospital straight to the infirmary.  I need
to do their intake at the infirmary bedside.
So that's called a bedside booking.  So I would
do their intake a/k/a a bedside booking.  So
that's when I would do their intake.  It didn't

Page 28

happen that often, but I would have to do their
intake as a bedside booking plus their
infirmary intake, so, yes, there are times that
I completed an intake.  Again, this was a long
time ago and it was totally paper at that time.
   Q.   What does "totally paper" mean?
   A.   We didn't have the electronic health
record.
   Q.   Got it.
   A.   That was 14 years ago.
   Q.   And besides the bedside booking, did
you -- were you otherwise responsible for
intake in any of your prior positions?
   A.   No, because I went straight from the
infirmary into the quality improvement role.
   Q.   Okay.  So in your current role, you
conduct training, right?
   A.   That's correct.
   Q.   So what trainings are you -- I guess
are you familiar with all the training that the
nursing staff receives?
   A.   Yes.
   Q.   What is the training program at
YesCare?

Page 29

   A.   They're set trainings that corporate
requires.  They are specific -- they're
generalized trainings that they receive on
our -- on our corporate website.  It's called
YesCare University.  So it just basically goes
over what's required like during intake, what's
required during chronic care and stuff.  It's
not specific to the Philadelphia Prisons.
   Q.   Is there additional training that's
offered that's specific to the Philadelphia
Prisons?
   A.   That would be their on -- our OJT,
on-the-job training.
   Q.   And what's the OJT?
   A.   That's when they actually get --
they match up with a nurse on the -- at their
current -- at their -- the jail that they're
working.
   Q.   And is there any training that's
offered by the jail or PDP?
   A.   That would probably be the security
training.
   Q.   And what's the security training?
   A.   Just orients the new prospect into

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 13 of 76

Deposition of Lynda Witkowski                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 30

1  how it is working in the jail. You know, don't
2  talk to the inmates, don't tell them any -- any
3  personal information, you know, always -- don't
4  walk with your back to the inmate and just
5  general security information.
6      Q.  In terms of the training that is
7  offered by YesCare, does that training include
8  training in the clinical pathways documents?
9      A.  Clinical pathways is more for
10 providers.
11     Q.  So are nursing staff trained in
12 clinical pathways?
13     A.  I would say not nurses because
14 clinical pathways are, again, more for
15 providers with orders for medications. So the
16 nurses really aren't familiar with the clinical
17 pathways.
18     Q.  Are nursing staff trained in the
19 NET? And do you know what the NET is?
20     A.  Yes, they're the nursing encounter
21 tools.
22     Q.  Yeah. Are nursing staff trained in
23 them?
24     A.  Absolutely.

Page 31

1      Q.  And how do those operate? How do
2  the -- how do the NETs work?
3      A.  The nursing encounter tools? They
4  are trained at orientation on nursing encounter
5  tools and they are -- they are trained that
6  anytime an inmate has a clinical complaint,
7  that they should use a nursing encounter tool.
8      Q.  And is the YesCare training that's
9  administered, is it provided to nursing staff
10 that are contracted to work at YesCare?
11     A.  Yes.
12     Q.  Do you understand my question?
13     A.  Yes. Contracted, meaning -- okay.
14 Can you rephrase that then?
15     Q.  Sure. My understanding is that
16 sometimes YesCare will hire contracted staff
17 who are not full-time staff employed at
18 YesCare. For the purposes of those individuals
19 who are contracted staff, are they offered the
20 same training by YesCare?
21     A.  You mean like agency nurses --
22     Q.  Correct.
23     A.  -- by contracted?
24         Yes, they go through the same

Page 32

1  orientation and onboarding that our hired staff
2  will go through.
3      Q.  So is there any difference between
4  the training that a contracted staff would
5  receive compared to someone who is a full-time
6  YesCare staff?
7      A.  They go through the same training.
8      Q.  I have the same question with
9  respect to medical pass nurses. Do med pass
10 nurses receive the same training as all other
11 YesCare staff?
12     A.  That is correct.
13     Q.  Does YesCare, in its generalized
14 training, offer training on caring for patients
15 with diabetes?
16     A.  That is correct.
17     Q.  And do they also train nursing staff
18 on emergency response?
19     A.  That is correct.
20     Q.  How does intake at PDP work?
21     A.  The intake? Once an inmate comes
22 into -- using CFCF as an example because CFCF
23 is our largest facility. Once an inmate comes
24 into receiving, in a nutshell, the officers do

Page 33

1  their portion, you know, the collection of all
2  the stuff and everything. Once they're ready
3  from medical, they have their little cup of
4  urine, they come into the medical screening
5  area, the inmate goes into the one room where
6  the MA is, the MA takes their -- takes their
7  blood, asks them the prescreening questions
8  that the MA is able to complete and then when
9  the MA is done, they come out and they go into
10 the room with the RN and the RN completes
11 their -- their assessment and their intake
12 portion, which is very, very long. It can be a
13 hundred and -- a hundred-plus questions and
14 they complete their portion.
15     Q.  And that's the intake screening
16 questionnaire you're referring to?
17     A.  That is the intake screening
18 questionnaire. There's an MA prescreening
19 section and then the rest of it must be
20 complete by the RN.
21     Q.  Do you know how insulin is
22 administered at PDP?
23     A.  You need to specify that.
24     Q.  Do you know what the process is for

Page 34

IPs receiving insulin at PDP on a day-to-day basis?

A.   It can be -- it can be administered on average daily or twice a day, depending on how it's ordered.

Q.   Sure.  And for patients who have insulin that's ordered, for instance, say twice a day, how exactly is it administered on the blocks?  So my question is sort of specific to how it's administered at the facility.

A.   I am really not sure how it's administered.  I don't really spend a lot of time in the buildings.  So anything I would say would be more speculation than anything.

Q.   Do you know how insulin administration is documented?

A.   It -- it can be -- it can be documented in the electronic health record and at one point we did have paper documents for our -- for our CRIC, in other words our sliding scale.  So -- go ahead, I'm sorry.

Q.   Can you explain what CRIC and sliding scale are for the record?

A.   Sliding scale is when you check a

Page 35

blood sugar, when you check a fingerstick, depending on what the patient's result is, you might -- there's a sliding scale.  So if their blood sugar is this, they'll get this much insulin.  If it's higher, they might get more.  So it's basically a scale, depending on what their result is, they might get a certain amount of usually it's Humulin R, which is the fast-acting, in addition to -- well, it might not be in addition to, but they'll be ordering a sliding scale.

Q.   Have you cared for patients in the past who have diabetes?

A.   I have back in the day.

Q.   Sounds like you're pretty familiar with the administration of diabetes care.  Is that fair to say?

A.   I think that would be fair to say.

Q.   Have you cared for any patients at PDP who had -- who were managing their diabetes?

A.   I cared for patients when I worked in the infirmary, yes.

Q.   And so you mentioned that the

Page 36

documentation, it could happen in the electronic health records.  When did PDP shift to using an electronic health documentation system?

A.   Probably around 2014 as I left the infirmary and came into this position.

Q.   So as electronic records are currently documented, is the electronic health system the exclusive way for insulin administration to be documented?

A.   I'm sorry, what was that?

Q.   Sure.  In the -- basically, I'm asking in 2023, what are all the ways in which insulin can be documented -- the administration of insulin can be documented?

A.   Well, I know we had the electronic health record.  I am unsure if it was 100 percent in the electronic health record or if we were still using -- in addition to the electronic health record, if we were still using that paper documentation.

Q.   Is paper documentation still used now?

A.   I believe we are 100 percent

Page 37

electronic.

Q.   And do you know when that happened?

A.   I don't know.  I can't answer that accurately.

Q.   Okay.  How are refusals of insulin documented?

A.   Well, of course, in the electronic health record, they would document a refusal plus we have a refusal form that the nurse would fill out and document patient refused, what medication they refused, the reason for the refusal, and then on the second page, or hopefully they did it two-sided, the inmate should sign it with the nurse, officer, and if the inmate refused, there's a little check box that says "inmate refused," and that should be scanned into the patient's electronic health record.

Q.   And why are those used?

A.   So we get proof that the inmate actually refused and not -- and not that like an officer said they refused when they really didn't or, you know, just -- just for legal documentation.

Page 38

Q.    And do you know how no-shows for medication administration are documented?

A.    The same thing.  In the electronic health record, they can document just a no-show.

Q.    How is that documented in the medical -- in the electronic health record?

A.    The nurse can -- I don't want to speculate really 'cause I -- I'm not familiar with electronic documentation, but I've seen it.  So...

Q.    You're not responsible for using the electronic health system right now in your current role, are you?

A.    Correct.

Q.    So do you review those kinds of documents when you're doing your work?

A.    I haven't lately.

Q.    Okay.  Do nursing staff provide care on PDP housing units?

A.    They do now.  Can I clarify?  What care are you talking about?  If I can back up.

Q.    Well, that was going to be my next question was what kind of care is provided on

Page 39

housing units?

A.    Not specifically on housing units.  What facility -- it depends on what facility you're talking about.  We have four facilities here.

Q.    Sure.  At CFCF, do nursing staff provide any care on housing units?

A.    Okay.  At CFCF, in each block, in each like A, B, C and D there is a room called the -- the unit management area where there is a medication room and there's like a little -- like a little treatment room that the -- the IPs can go into, so they're not actually in the housing area.  The IP would come into that secure area where the nurse has their medication in a secure room and then an area where there's like a treatment table and some -- and some treatment equipment that they can -- that they can use to take care of the patient, for example, like wound care and stuff.

So if you're considering that as a housing area, then yes, the nurses can go in the housing area and treat the patient.

Page 40

Q.    Do PDP facilities have any urgent care services or critical care services?

Would you like me to rephrase?

A.    Yes.

Q.    Does PDP offer critical care services at any of the facilities?

A.    Medical -- medical-wise?

Q.    Yeah.

A.    It depends on the situation.  I mean, if -- if an urgent event arises and we -- it is outside the scope of our care, we will send the patient out.

Q.    And you mean out to a hospital, right?

A.    Out to a hospital.  That is correct.

Q.    Okay.  Are nurses authorized to send an IP to a specialized unit within PDP to receive critical care?

A.    Depends on the situation.  We do have the infirmary.  Of course, we -- the nurse has to consult with a provider prior to doing anything to send a patient to the infirmary or to the hospital.

Q.    So could a nurse acting alone refer

Page 41

an individual to the infirmary?

A.    No, that would have to get a provider authorization.

Q.    Are nurses authorized to call a stretcher?

A.    Are nurses authorized to call a stretcher?  If they're up on the block?

Q.    Yes.

A.    Yes.

Q.    Are you familiar with the red flag system with respect to patient care at PDP?

A.    Yeah.

Q.    What is it?

A.    Red flag is a notification to providers that the -- if an IP refuses one dose of a critical medication or three doses of a regular medication -- three -- three consecutive doses or a trend of three doses of a medication.

Q.    And what's a critical medication?

A.    A critical medication could be something like cancer -- a cancer drug, like an HIV drug, insulin, Coumadin.  There's a list for critical medications.  That's just an

Page 42

example of a few.

Q.    Where is a red flag indicator supposed to be documented?

A.    That would be -- they would make a new encounter in the patient's chart for a provider to see the patient.

Q.    Is a new encounter, the same as a NET?

A.    No, no.

Q.    What's the difference?

A.    A NET is the nursing smart form that they would document an assessment of the patient basically.  A red flag is an encounter for a provider.  It's just an encounter.  So when the provider -- it's like a chronic care encounter.  So the provider would come in in the morning and they would pull -- literally pull up red flags to see how many patients they have to see for a red flag and they specifically know what a red flag encounter is for.

Q.    So who is responsible for documenting a red flag?

A.    For ordering a red flag?  I don't

Page 43

understand.

Q.    Sure.  Is a red flag a referral?

A.    You could say it's kind of a referral, but it's not -- it's just -- it's just a -- it's -- it's not a referral.  It's just an encounter.

Q.    So who's responsible for entering a red flag into the system?

A.    For making the appointment?

Q.    Yes.

A.    The nurse.

Q.    And so once they make the appointment, does that mean that every red flag automatically generates an appointment with the provider?

A.    It needs to be manually entered by the nurse.

Q.    And then just -- so my question was does every red flag automatically generate an appointment with a provider.

A.    If the patient doesn't show up for the medication, the nurse needs to go into the patient's chart and manually create the appointment, the red flag appointment for a provider.

Page 44

Q.    Understood.  So are there -- just to be clear, are there multiple steps in the process of entering a red flag, that the nurse enters the encounter and then also manually schedules an appointment?

A.    It's just one -- it's just one encounter.  Making the appointment is the encounter.

Q.    And in terms of -- and where is it exactly entered?  Where is the red flag exactly entered?  Is it in the patient's electronic health record?

A.    That's correct.

Q.    Can refusal of a medication trigger a red flag?

A.    Yes, it can.

Q.    Yeah.  And does failure to show up for a critical medication also trigger a red flag?

A.    I depends if the patient doesn't -- if they find out the patient doesn't show up because they were at court or an official visit or something, but if the patient -- I mean, if the patient is a no-show, they should find out

Page 45

where the patient is.  Like the patient is a no-show and they're like they just don't want to come out, then, yeah, that would trigger, to me that would trigger a red flag.

Q.    So the reason for someone's failure to appear will determine whether or not it would trigger a red flag?

A.    That is correct.

Q.    How is medication administered if someone does go out for court?

A.    When they come back, they would come get -- they would go track them down and give them medication.

Q.    And how would that person be sort of tracked or logged to make sure that they received their medication later that day?

A.    I don't know how the sites track that.

Q.    How is it determined whether or not a provider follows up on a red flag?

A.    The provider would come in in the morning and run a list of red flags that were scheduled, she would call the patients down and counsel.

Page 46

Q.    And you said "counsel"?

A.    Yes.

Q.    What does that mean?

A.    Just find out why they didn't want to take their medications and counsel them like -- and do -- complete education on them.

Q.    And so was there any tracking of whether or not red flags were followed up on?

A.    Yeah, she would write in -- she would document in the note.

Q.    Sure.  Was there any systemic auditing at PDP done of the red flag system to determine whether or not it's being -- whether or not the policy is being used?

A.    I would have to go back and look at our -- our audit list and see if we reviewed red flags.  It's been quite a few years.  And I don't -- I don't follow the QI anymore on 100 percent of audits.

Q.    What -- what was on the audit list?

A.    I -- they do so many audits now.  And that the -- that gentleman I mentioned earlier, Reed, he follows the audits, so I don't follow the audits.  I follow the other

Page 47

clinical stuff.

Q.    And when you say "the other clinical stuff," what do you mean?

A.    Just anything clinical that comes up.  Like the sentinel events, I just look it over, make sure that's done, I look at the grievances to make sure the grievance is there, the information is there clinically correct.

Q.    Okay.  So when was YesCare's quality improvement -- and when I say "YesCare," I mean YesCare or Corizon Workers' and Health Services, when was -- when was their quality health improvement program first started?

A.    They've always had a quality improvement department.

Q.    And has what it actually monitors changed over time in your experience?

A.    I believe it's just gotten better.

Q.    How so?

A.    When I started in 2014, it was just myself.  Now we have four quality improvement employees.

Q.    And what are the different -- in 2023, who was part of the quality improvement

Page 48

team?

A.    I think there was -- I'm not sure if there was two or three of them.  I think Reed was overseeing them at that time and I'm not sure if it was three or four of them at the time.  I'm not sure when -- when they all got hired.

Q.    And what were -- what -- like to the best of your recollection, what were they all responsible for?

A.    They're basically responsible for all the same -- all the same duties.  They just split it up at times, but it's -- they have the same duties and responsibilities, the auditing, making sure the PIs are done, and just covering everything, the grievances and everything.  So it's the same duties.  They just do it on a larger scale at this time.

Q.    And so the record is clear, what's a PI?

A.    The performance indicators.

Q.    And then did you -- were you in the same role as everyone else or did you have a different position?

Page 49

A.    I had a different position at that time.

Q.    Were you their supervisor?

A.    I was like the clinical oversight, as I mentioned earlier.

Q.    So you were not their supervisor?

A.    That is correct.

Q.    Okay.  In 2023, did you monitor adverse clinical events or near miss clinical incidents?

A.    I was just like an oversight for them at the time.

Q.    So were the -- did the other individuals on that team monitor adverse clinical events or near miss clinical incidents?

A.    That would be correct.

Q.    Did the quality improvement team, do they now ever conduct a forensic analysis of all the mortality reviews that take place?

A.    They complete all the mortality reviews that take place, that's correct.

Q.    Do they ever do an analysis of all the mortality reviews to look for patterns?

Page 50

A.    I'm sure we do, yes.  I'm sure they do.

Q.    And do you know what -- any kind of reports that they have generated or any kind of conclusions they've come to from those reviews?

A.    No.

Q.    Do you know who would be responsible for generating those?

A.    Probably the quality improvement team in addition with the regional medical director.

Q.    Who is the regional medical director?

A.    Lalitha Trivikram.

Q.    In 2023, were you a part of the team that performed any auditing of clinical services?

A.    I don't believe I was auditing at that time.

Q.    Do you know who was auditing at that time?

A.    Name-wise?

Q.    Yeah.

A.    It was probably Lisa Debow, Danielle

Page 51

McGettigan, and I think just the two of them at that time.

Q.    And are you familiar with what they were auditing in 2023?

A.    Probably the same stuff I was auditing when I started the position.

Q.    Do you know if they were auditing patient charts to ensure that vitals were taken as ordered?

A.    There's a multitude of stuff that we audit.

Q.    Do you know if part of the audit included whether or not patient charts included or reviewed that vitals were taken as ordered?

A.    Not specifically.

Q.    And do you know if the audit included an audit of patient charts to ensure that medical orders were carried out as ordered?

A.    Not specifically.

Q.    Okay.  And do you know whether or not an audit of patient charts included any review of whether or not insulin was being administered as ordered?

Page 52

A.    Not specifically.

Q.    Okay.  Are you familiar with patient safety reports?

A.    Please clarify.

Q.    Well, let me start and just backtrack for a second.  You mentioned you're familiar with mortality reviews.  What's a mortality review?

A.    A mortality review is a review of any mortality that occurs in our facility.

Q.    And is there a difference between mortality reviews that are conducted by YesCare and those conducted by PDP?

A.    By just PDP?

Q.    Yeah.  Let me rephrase my question.

Are you familiar with YesCare's mortality reviews?

A.    YesCare or -- yes, YesCare has mortality reviews.

Q.    And does PDP have any mortality reviews that are distinct from YesCare's?

A.    Normally right after any mortality, the PDP will have a mortality review.  I think it's within like -- like 72 hours after the

Page 53

event and it's held in the facility that it occurred.

Q.    And how is that distinct from the mortality review that YesCare conducts?

A.    YesCare will request a mortality review, not with every mortality, but they'll request a mortality review sometimes if there's areas that would like to be discussed or like areas of possible improvement.

Q.    How are some cases decided on being reviewed by YesCare with a mortality review?

A.    That's determined by corporate.

Q.    How does corporate determine which cases are ultimately going to get a mortality review?

A.    I don't know.

Q.    Have you ever personally referred any cases and suggested that they be reviewed by -- have you personally, have you referred any cases to YesCare corporate?

A.    No.

Q.    Are you familiar with anyone who has personally recommended that a case be reviewed by YesCare corporate?

Page 54

A.   No.
Q.   What exactly is included in a mortality review?
A.   The whole case is presented.
Q.   What exactly does a mortality review entail?
A.   The whole case -- the whole case is reviewed and other people throughout corporate -- throughout any of the YesCare contracts are invited to attend and they just make any comments or suggestions and it's discussed.  They ask questions and make comments, concerns, recommendations.
Q.   So who's actually included in this review committee?  You mentioned people are invited.
A.   Uh-huh.
Q.   So who is included?
A.   Corporate staff, providers from other contracts.
Q.   And when you say "providers from other contracts," what do you mean?
A.   Doctors from other contracts, from YesCare contracts.

Page 55

Q.   Are people included who have a direct relationship to the actual mortality that happened?
A.   Yes.  Yeah, the regional medical director, the site medical directors and other regional and/or site medical directors from YesCare contracts.
Q.   Are there people who are involved in the review who are always there?
A.   Yeah.
Q.   Who?
A.   I can't think of their names off the top of my head, but there's just some -- some providers that are just -- always like to put their recommendations in that are just -- you know, that just always are on the meetings.
Q.   And just to be clear, are there any people who attend the mortality reviews whose attendance is not voluntary?
A.   Oh, they are voluntary.  The attendance is voluntary.
Q.   So everyone is -- okay.  So everyone is just choosing to attend them?
A.   Yes.  Uh-huh.  But just a lot of

Page 56

people just always attend.
Q.   And so what documents are generated from a mortality review?
A.   There's a slide stack of the presentation and I don't know any other documents that are -- that are generated as a result of it.
Q.   And besides the slide stack of the presentation, is there any document called a "mortality review"?
A.   Not that I'm aware of.
Q.   So what's the process of actually generating any kind of a presentation?  How does that happen?
A.   The presentation is generated from the chart review.
Q.   And so what's your role with respect to conducting mortality reviews?
A.   My role is reviewing the chart and documenting the facts from the chart and, you know, making a timeline of what occurred, the history of the patient until the time of his death.
Q.   And what is the chart review -- what

Page 57

does that mean?
A.   A review of the patient chart.
Q.   Uh-huh.  Does it include any witness interviews as well?
A.   No.
Q.   Did you say no?
A.   No.
Q.   What are corrective action plans?
A.   Corrective action plans are any education to any staff, any education or areas that we find we can improve, ways to improve with a start date and an end date, might include education, might include site audits, might include areas of improvement in the site, meaning like, you know, documentation, anything like that.
Q.   Who's responsible for creating corrective action plans?
A.   Normally it's the administrators of the site.  It might be some assistance with the quality improvement department, might be assistance of the regional staff, but normally we like the administrators to do the -- the corrective action plan.

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 20 of 76

Deposition of Lynda Witkowski                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 58

Q.   And when you say "administrators,"
you're referring to PDP staff?

A.   No, no, this is the YesCare/Corizon
staff.  This is not the PDP.

Q.   Okay.  And so the corrective action
plans are generated by YesCare administrators?

A.   That's correct.

Q.   And are they used or consulted in
creating mortality reviews?

A.   Is who used?

Q.   Are corrective action plans -- are
corrective action plans reviewed when
conducting mortality reviews?

A.   Yes.

Q.   What -- what else is used, if
anything else, besides electronic health
records and corrective action plan in
conducting a mortality review?

A.   Off the top of my head I think that
would be everything.

Q.   So have you personally conducted
mortality reviews?

A.   Yes.

Q.   Okay.  And how often are they

Page 59

conducted?

A.   The YesCare mortality reviews?

Q.   Yes.

A.   The patient sentinel event or the
patient sentinel mortality -- I forget what
they're called, they are conducted with YesCare
every -- I don't know if it's every two months,
but corporate likes to pull maybe two or three
events and present them.

Q.   And what's your role in those
presentations that happen?

A.   When I was in QI, I would do -- I
would complete the presentation.

Q.   And so when you were in QI, would
you be presenting all of the reports that were
requested to be pulled by corporate?

A.   Only if it was a Philadelphia event.

Q.   Were there events from other
jurisdictions also presented in those meetings?

A.   Oh, absolutely.

Q.   Oh, okay.  So when you said two or
three were pulled -- when you said there were
two or three mortality reviews at every
meeting, is this like a regional meeting that

Page 60

would take place?

A.   Correct.  It might not have been a
mortality.  One might have been a mortality and
one might have been a suicide attempt, one
might have been just a medication.  If
corporate saw like one little thing, it -- they
might say, you know what, let's present this,
this is just a good case to -- a good little,
you know, educational piece to present to, you
know, all -- all of the -- all of the region.
So it dose -- it didn't always to have to be a
mortality.  It was just a learn -- it's just a
learning experience for everyone.  That that's
what it was.  It could have been just a simple
little medication error, but they found one
little thing that they thought this is a good
education.  So it might have been one
Philadelphia and one from like Wyoming, one
from Alabama, but you'll have three cases being
presented during this meeting.

Q.   And so at this -- like what was the
exact meeting that you're referring to?  Is it
like a regional meeting of YesCare staff?  Like
what was the meeting?

Page 61

A.   It was the patient safety event and
they have it like every -- I don't know, like
every two months.

Q.   So who -- so yeah, who's involved in
the patient safety event that happens every two
months?  Are there specific -- are there
specific YesCare staff involved in that?

A.   Again, it's anyone.  The site
medical directors, regional medical directors
get the invite and it's a voluntary invite.

Q.   And for every patient safety event,
is a slide deck created?

A.   The slide deck is created by the
site that had the event.

Q.   And the slide -- is a slide deck
created for every event?

A.   A slide deck is created for every
event.

Q.   Is the process for conducting a
patient safety report the same every time?

A.   With the slide deck?

Q.   Yes.

A.   Yes.  It's the determination of the
site to make the slide deck.

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 21 of 76

Deposition of Lynda Witkowski                           Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 62

Q.   So you can probably just speak to PDP's site, the ones that you are responsible for, right?

A.   Correct.  And it was YesCare.  It wasn't PDP.  PDP has nothing to do with these events.

Q.   Sure.

A.   With these -- with these meetings.

Q.   So when you were -- okay.  How long after a patient event were these presentations typically conducted?

A.   It varies.

Q.   Was there generally a pattern that it would happen soon after the event, like a month after the event?

A.   I can't answer that.  It -- it varies.

Q.   Would you say it's common for the presentation to take place a year after the event?

A.   I -- again, it varies.  I never kept track of when the event versus when we were asked to present anything.

Q.   How many patient safety events would

Page 63

you say you've been involved in presenting on?

A.   Ballpark maybe five.

Q.   And you mentioned that PDP had nothing to do with the patient safety event presentations that happened.  Were any PDP staff ever present for the patient safety committee presentations?

A.   Absolutely not.

Q.   Okay.  Why do you say "absolutely not"?

A.   Because these were only secure for YesCare employees.

Q.   I see we have been going for like about an hour and 15 minutes.  Would you like to take a five-minute break or just keep going?

A.   I'm fine.  I have my -- my water.

Q.   Okay.

ATTORNEY THOMAS:  If could we take a five-minute break or a ten-minute break, that would be great.  I lost Wi-Fi at one point, so I'm going to try to figure that out.

ATTORNEY RASHATWAR:  Yeah.  Why don't we take five.  If anyone needs to go

Page 64

to the bathroom, we can, and then regroup. So it's 11:17.  Why don't we come back at 11 --

ATTORNEY THOMAS:  Can we do 11:30?

ATTORNEY RASHATWAR:  If that's okay with everyone else, it works for me.

ATTORNEY SUMMERS:  Okay.

ATTORNEY GREGORY:  11:30 is fine.

ATTORNEY THOMAS:  Thank you.

(A recess occurred from 11:17 a.m. until 11:31 a.m.)

ATTORNEY RASHATWAR:  Back on the record.

BY ATTORNEY RASHATWAR:

Q.   So do you have any recollection of doing the mortality review in the death of Louis Jung?

A.   Vaguely.

Q.   Sure.  Did you have any role in his corrective action plan that was drafted?

A.   I'd say vaguely.

Q.   So would you have a better idea if I showed you a copy of that document?

A.   Maybe.

Page 65

Q.   All right.

ATTORNEY GREGORY:  Well, your question presumes that there was a corrective action plan that was drafted as a result of the mortality review conducted by YesCare.  That's not the case.

ATTORNEY RASHATWAR:  Okay.  I'm going to ask questions about the corrective action plan that was given to us in discovery and I'm going to see if we can figure out what her role is in it and lay a foundation.

ATTORNEY GREGORY:  You're talking about the corrective action plan that is --

ATTORNEY RASHATWAR:  I'm talking about Chart 18, the Jung corrective action plan.

ATTORNEY GREGORY:  Okay.

ATTORNEY RASHATWAR:  So I'm just going to go ahead and share my screen. Okay?

ATTORNEY GREGORY:  Sure.

ATTORNEY RASHATWAR:  All right.

BY ATTORNEY RASHATWAR:

Page 66

Q.   All right.  So, Ms. Witkowski, are you able to see this Excel chart?

A.   Yes, I am.

Q.   Okay.  So what I'm showing you is something that was marked in discovery as Chart 18, Jung Corrective Action Plan.  It doesn't have a Bates stamp number for the record.

Do you recognize this document?

A.   Yes.

Q.   Okay.  What is this?

A.   That is a corrective action plan as a result --

Q.   And --

A.   As a result of information found that needed -- as a result of items identified from the chart review.

ATTORNEY RASHATWAR:  Okay.  And so I'm going to enter this Chart 18 into the record as Witkowski-1 as an exhibit.

(Deposition Exhibit No. Witkowski-1, Chart 18, Jung Corrective Action Plan, was marked for identification.)

BY ATTORNEY RASHATWAR:

Q.   So did you have a role in creating

Page 67

this document?

A.   Yes, I guess.

Q.   Yeah.  What was your role in putting this document together?

A.   Probably assisted with -- I probably assisted with entering it into our corporate -- our corporate reporting system.

Q.   What's your corporate reporting system?

A.   It's called Risk Connect.  So all -- all documents goes into the corporate reporting system.

ATTORNEY GREGORY:  Is there a way to show this entire document on the screen because it's missing the -- it's missing the final column, which is the date that it was created?

ATTORNEY RASHATWAR:  Does that show up?  I just expanded my screen.  Does that show up for you or not?

ATTORNEY GREGORY:  No.

ATTORNEY RASHATWAR:  Okay.  If you just give me a moment, I'm going to minimize and that might help.

Page 68

Are you able to see more now?

ATTORNEY GREGORY:  More, but not all.  The completed -- the column that's cut off -- oh, there it is.  Completed action plan date 12/1/23.

Okay.  That's -- that's better.  I guess you'll probably have to shift it back and forth.

BY ATTORNEY RASHATWAR:

Q.   Okay.  So I'll shift it back and forth, but for the purposes of how it exists now, are you able to see it, Ms. Witkowski?

A.   Yes.

Q.   Okay.

A.   I see it up to completed action date.

Q.   Okay.  So you entered the information in here into your internal risk database; is that right?

A.   Yes.

Q.   Did you also actually write this text about opportunities for improvement or strategies to improve?

A.   I probably assisted with this, yes.

Page 69

Q.   Who did you assist?  What was the process in creating this?

A.   I probably assisted CF administration with this.

Q.   Is this a document -- who created this document?

A.   The actual spreadsheet is a corporate document.

Q.   And is this a -- would you say this is a YesCare document or a PDP document?

A.   This is a YesCare document.

Q.   Okay.  And so how was CFCF administration -- how did they collaborate in drafting this document?

A.   It is a collaboration.

Q.   So who did you work with at CFCF in putting this together?

A.   CFCF administration.

Q.   Do you remember who specifically?

A.   I don't remember who was the administration at that time.

Q.   Okay.  And is there a -- typically, a role or -- a role at CFCF administration with whom you collaborate on these?

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 23 of 76

Deposition of Lynda Witkowski                              Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 70

1    A.    It would be the administrators.
2    Q.    And who are the administrators?
3    A.    Back then, I can't -- I don't have
4  the recollection, but it would be the health
5  service administrator, the assistant health
6  service administrator, and back at that time if
7  there was a DON.
8    Q.    Okay.
9    A.    There was a time when there was a
10 director of nursing, but I don't know if there
11 was one at the time or not.
12   Q.    And do you know when the sentinel
13 event corrective action plan was drafted?
14   A.    Probably soon after the event.
15   Q.    Is that typically how it works?
16   A.    Yes.
17   Q.    How soon after an event is the
18 sentinel event corrective action plan typically
19 created?
20   A.    Well, it says in that top left "due
21 30 days from start date." So usually --
22 usually we try to have it within 30 days of the
23 sentinel event date.
24   Q.    And so when it says "start date" in

Page 71

1  column A1, does that refer to the event date of
2  whatever incident happened?
3    A.    Usually, yes.
4    Q.    Okay. So what is your role in --
5  how would you characterize your role in
6  drafting this document?
7    A.    Once there's -- once there is a
8  sentinel event, no matter what it is, the site
9  medical director normally does the chart review
10 and as QI, although, as I said, I wasn't
11 directly in QI, I was overseeing it, QI
12 normally does their own chart review and we
13 look for any deviations in care so when we
14 receive the site medical director's chart
15 review, we can ensure that everything was
16 noted. So we're able to ensure that everything
17 was noted and we can start seeing if there were
18 any deviations. So we saw the deviations and
19 we ask administration to start their corrective
20 action plan and that's where this comes from.
21   Q.    So is this corrective action plan
22 based both on your chart review in addition to
23 the site medical director's chart review?
24   A.    Correct.

Page 72

1    Q.    Okay. And so would it be fair to
2  say that the opportunities for improvement were
3  suggested by both of you?
4    A.    That is correct.
5    Q.    Okay. And who determines who the
6  responsible party is in column C?
7    A.    That would be anywhere from
8  administration to the regional medical
9  director, site medical directors and I think I
10 said regional.
11   Q.    Sure. And who determines which
12 party is going to be responsible?
13   A.    A collaboration of everyone I just
14 said.
15   Q.    Okay. And what does the action plan
16 start date mean?
17   A.    That's basically when we
18 determine -- basically, it's kind of like when
19 this is completed, then we can say, okay, this
20 is when you start ensuring that this is
21 going -- that every opportunity -- every
22 measurable strategy can begin.
23   Q.    What does audit dates mean?
24   A.    Sometimes the measurable strategy to

Page 73

1  improve may be that the administrators are
2  maybe auditing charts or something like that.
3    Q.    Okay. And so do you know why the
4  audit dates column is all N/A in here?
5    A.    Because most of them are completing
6  education.
7    Q.    And so when would an audit be
8  appropriate?
9    A.    If the measurable strategy was for
10 administration to complete like weekly audits
11 and submit them to the QI department.
12   Q.    Have you ever seen that an audit was
13 part of a corrective action plan?
14   A.    Yes.
15   Q.    What types of things would get
16 audited by the administration in situations
17 you've observed personally?
18   A.    Reviewing like ten charts to ensure
19 like the DNR/DNI was completed on on -- on a
20 bedside booking or stuff like that.
21   Q.    Why would an audit be warranted in
22 situations like that?
23   A.    If a patient -- if a -- if a nurse
24 didn't complete the DNR form on an intake.

Deposition of Lynda Witkowski
Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 74

That's only specific to an infirmary admission.

Q.   Is an audit called for when there's a systemic problem?

A.   Yeah, if like -- that would be specific if QI did an independent audit and we found something there.  So...

Q.   And when you say "QI did an independent audit," what are you referring to? Something specific to a sentinel event or are you talking about --

A.   No.

Q.   -- a generalized audit?

A.   QI does what we call independent audits and they'll audit like all the sites and they might see that like the infirmary has a low number for -- for example, like I just said we do code status forms on our intakes in the infirmary.  So if they have low -- a low percentage for the DNR/DNI forms, they might have to do an audit for the next ten intakes to ensure that the DNR/DNI forms are completed.

Q.   Are sentinel events analyzed as a part of the QI audits to determine trends or systemic issues?

Page 75

A.   No, because we don't -- we really don't have that many sentinel events here at the PDP.

Q.   How often would you say you had sentinel events?

A.   Mortalities?  Not many at all. Knock some wood on that.

Q.   Sentinel events include more than just a death in custody, right?

A.   Yes, that's correct.  Please don't jinx us.

Q.   I don't wish that on anyone.

And so do you know how this process was generated for there to be a sentinel event corrective action plan in this particular case?

A.   Can you repeat that?

Q.   Sure.  How was it determined in the death in Mr. Jung's case that there was going be to a sentinel event correction -- corrective action plan.

A.   Well, upon review of the chart, we found some deviations.

Q.   And so were you requested to do a chart review or is that an automatic part of

Page 76

the process that YesCare has?

A.   It's an automatic process.

Q.   And so --

ATTORNEY KAMINSKY:  I'm sorry, can we go off the record for one second?

(A discussion off the record occurred.)

(A recess occurred from 11:46 a.m. until 11:49 a.m.)

ATTORNEY RASHATWAR:  I'm going to share my screen.  We'll go back on the record.  And is everyone able to see the whole Excel chart?

THE WITNESS:  Yes.

ATTORNEY RASHATWAR:  I've tried to move columns around so it's visible now.

BY ATTORNEY RASHATWAR:

Q.   Okay.  So what qualifies as a sentinel event?

A.   A sentinel event is a medication error that can cause hospital -- that can cause a potential harm to the patient, suicide attempt with a hospital admission, completed suicide, mortality, a DKA with a hospital

Page 77

admission, a birth -- in-facility birth, loss of limb or any other major event that we feel is reportable to corporate.

Q.   And so are all sentinel events reported to corporate?

A.   Yes.

Q.   Okay.  In the -- in terms of the process of drafting this corrective action plan, besides reviewing electronic health records, were any interviews conducted of any staff?

A.   I don't recall.

Q.   Okay.

A.   But that wouldn't be by me.  That would be by the administration.

Q.   And when you say "the administration," are you referring to PDP administrators?

A.   YesCare administrators.

Q.   Okay.  Is it typical for interviews to be conducted when creating these corrective action plans?

A.   Can you repeat that?

Q.   Sure.  Is it typical for interviews

Page 78

to be conducted when drafting these corrective action plans?

A.   It wouldn't be specific to be creating the corrective action plan.

Q.   I'll just maybe rephrase my question.

This document is based on the review of electronic health records.  Is it typical that there's additional information that's used when coming to these conclusions?

A.   The administrators may interview the staff as a result of what happened during the event.

Q.   And do you know if that information is memorialized in any way?

A.   That I am unsure of.

Q.   When you work with the administrators and also with the site medical director in putting together this document, what's your process?

A.   The information here comes straight out of the chart.

Q.   Okay.  We'll go through specifics if I have any questions.

Page 79

So I'm just looking at A5 in this chart.  It says that -- I'll just give you an opportunity to read it.  It says that patient was a state hospital return.  No paperwork was received to identify the transfer.  An emergency behavioral health referral was not generated.

Here where it says that there's a measurable strategy to improve, it says "pending," do you know whether or not this corrective action was taken?

A.   I believe that was.

Q.   And how do you know?

A.   Because there was a process identified with that.

Q.   And what was the process or change, if you're familiar with it?

A.   I am actually not familiar with it because I'm not exactly familiar with the behavioral health process.  So I don't want to -- I don't want to tell you something that I'm not actually familiar with.

Q.   Sure.  And in column F5 where it says the completed action plan date is pending,

Page 80

do you know who is responsible for updating this chart to determine whether or not an action plan was completed or not?

A.   Probably someone from QI.  So it probably still -- it probably still says pending because even though the meeting was scheduled, the plan wasn't complete and nobody went in and updated that from pending.

Q.   So is it possible that this document was just submitted prior to the meeting date of 11/21?

A.   Well, what I'm assuming is the meeting was completed on 11/21, but the plan, how it says to develop a plan, the plan was developed, but the process wasn't completed as of 11/21.

Q.   Sure.  And so --

A.   From what I can vaguely remember is there was updates to put in our electronic health record for stuff to occur if there were -- they were through the electronic health record and it took longer just having that meeting for it -- for it to occur.

Q.   And so you mentioned that it would

Page 81

be someone from QI that would track whether or not an action plan was completed.  Other than you, who else would be responsible from the QI team for tracking that?

A.   That was the QI girls, the Danielle McGettigan and Lisa Debow.

Q.   And do you recall if all of you were working on this case, Mr. Jung's case, at the time that the sentinel event happened?

A.   Yes.

Q.   And so to be clear then, was it you three who were part of the QI team who were working on this document?

A.   Yes.  Again, I was overseeing it, but because this was a large document, that's why I was assisting with it.

Q.   Okay.  And when you say "large document," what do you mean?

A.   There was a lot of -- there was many opportunities for improvement in this case.

Q.   Would you say that this is sort of an unusual sentinel event in terms of how many corrective action plan items are on -- on here?

A.   Yes.

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 26 of 76

Deposition of Lynda Witkowski                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 82

Q.   How many do you think are typically spotted in a case?

A.   Sometimes maybe one to three and there are -- sometimes there are no areas of improvement.

Q.   So in -- I have a question about 7. I'll give you just an opportunity to read what's in A7.

A.   Yes.

Q.   So can you just explain to me what that means and then also what "no ECW documentation" means?

A.   HCS is our electronic medication administration record. So in the electronic medication record, the EMAR, it appears that the nurse wrote when the blood sugar was 585, they documented that the provider was notified and a urine sample was obtained, which is to check for ketones in the urine, but if you -- if you notify a provider, you should document in their electronic health record, basically their electronic chart, but what -- we identified that there was no documentation in the patient chart. Our electronic health

Page 83

record and our electronic medication record are two separate -- two separate electronic like applications. So that's what we were -- that's what we noted there.

Q.   Okay. And so one electronic system -- is it safe to say that one electronic system is just dedicated to medication administration?

A.   That is correct.

Q.   And one electronic documentation system includes everything including referrals and red flags and notes about progress and things like that?

A.   That is correct.

Q.   And so -- I'm sorry. You told me what HCS stood for, but can you just tell us the difference between -- yeah, what is HCS?

A.   I don't know what HCS stands for, but it's our electronic medication administration record.

Q.   Okay. And so is it common for there to be discrepancies between the HCS and then the ECW system?

A.   Medication-wise?

Page 84

Q.   No. Yeah. So I'm asking is it common for there to be discrepancies between medication orders that are in HCS and then what's in the system, in the ECW system.

A.   Unfortunately, yes, there could be some discrepancies.

Q.   And in drafting this report, you reviewed both the HCS system in addition to the ECW system, right?

A.   Yes.

Q.   Okay. So I'm just moving on now to 8A. And in this column -- in this entry it says that PM insulin was not documented. What does that mean?

A.   That means that the nurse did not document if the medication was given, not given, like you mentioned earlier, no-show, refused. It just -- the 10 p.m. insulin space was -- remained blank for that shift.

Q.   So how is it determined whether or not insulin is either not administered or not documented or if, for instance, there would be something like a no-show?

A.   Well, if it's not documented, after

Page 85

a certain amount of hours, the HCS automatically puts a -- I believe it's an "ND" in that box.

Q.   So to be clear then, when it says "not documented," are you making that determination based on the nurse writing "ND" into the electronic health chart?

A.   No. It means that the nurse did not put anything in that -- in that slot.

Q.   So when you are doing a review of an electronic health chart and there is blanks or, for instance, it's unclear what happened, how do you determine whether or not insulin was -- for instance, in this case insulin was either not documented or not administered or if there was a no-show?

A.   We're unsure what occurred during that -- that insulin time slot because nothing was documented. The nurse could have given it and not documented it. We -- we don't know. It was just not documented.

Q.   So when is -- so, basically, you don't know whether or not it was administered on that date?

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 27 of 76

Deposition of Lynda Witkowski                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 86

A.   That is correct.

Q.   Okay.  And -- okay.  I'm going to move on to A10 here.  A10 states that insulin was refused, but there was no refusal, no red flag.

So when it says "no refusal," what does that mean?

A.   It was no refusal documentation located in the patient's chart.

Q.   So how is it determined that insulin was refused without refusal documentation in the chart?

A.   Well, from what I can surmise from cell A10, the nurse -- I'm assuming the nurse wrote in the HCS that patient refused and upon looking for a refusal form, there was no refusal found in the patient's ECW documentation chart and there was no red flag encounter generated for that time frame.

Q.   Other than a nurse writing into the system that an IP refused, would you have any other basis to conclude that insulin was refused?

A.   No.

Page 87

Q.   Other than obviously a refusal form.

A.   No.  I mean, the nurse could have documented "patient refused."  So once they refuse, the next thing we do is automatically look for a refusal form.

Q.   Sure.  And just other than a nurse writing that, there's no other way for you to come to that conclusion.  Would that be fair to say?

A.   That's fair to say.

Q.   Okay.  And so is there any distinction between making a statement that insulin was not documented and not administered?

A.   Correct.

Q.   And then I'm just looking here at A11.  It states that zero units of CRIC are documented.

And so what does that mean?

A.   That is the sliding scale I spoke of earlier, depending on what the patient's fingerstick was.  So depending on what their fingerstick was, they might get some of the Humulin R, depending on the -- the result of

Page 88

their fingerstick.

Q.   And is that usually warranted with a blood sugar of 411?

A.   That is correct.

Q.   And what blood sugar typically triggers a NET encounter, if you know?

A.   Yeah, that recently changed.  I believe 411 would warrant a NET or at least -- at least that would warrant a call to a provider.

Q.   Do you know what that change was recently that you referred to earlier?

A.   Oh, it just changed.  Literally we had a call about it the other day.

Q.   Do you know what the change was to?

A.   300.

Q.   Oh, okay.

A.   Actually, the intervention would actually be to get a urine sample.  That's what the intervention would be for that.

Q.   And are you talking about for a blood sugar of 411 or 300?

A.   For 411.

Q.   Okay.  And why is a urine sample

Page 89

ordered at that stage?

A.   To check for ketones.

Q.   And so just to be clear, what is the appropriate response it has to be when someone's blood sugar is either 411 or, as in 9A, 500?

A.   You should check for -- get a urine sample and check for ketones.

Q.   And is there also supposed to be a NET encounter?

A.   Not necessarily.  If they have ketones, you can send them down to triage and have them -- have triage -- have triage check them.

Q.   And so what would -- what would require a NET encounter?

A.   Hyperglycemia.  But the LPN would really send them down to triage and the triage nurse would do the NET encounter.

Q.   And why would that be handled by the triage nurse?

A.   Because the LPN has about 300 inmates to -- to medicate.  So they can give them a card and have the officer send them down

Page 90

1 to triage.
2 Q. So they could get more
3 individualized urgent attention?
4 A. Yes, a more -- a more thorough
5 assessment.
6 Q. And is there anything additional
7 that the triage nurse can assess for that a
8 nurse -- that another nurse would not be able
9 to?
10 A. Not not be able to, just the triage
11 has more time to do a more thorough assessment,
12 call the provider, as the LPN is up there, you
13 know, medicating, as I said, doing the
14 medications. And back at this time, they
15 weren't actually using that utilization -- that
16 unit management area as effectively.
17 Q. How so? And the unit management
18 area, you're referring to the one that's like
19 on the block, right?
20 A. That's correct, yeah.
21 Q. And so how so when you say it could
22 have been used more effectively?
23 A. There was a -- there was a time when
24 we weren't using it -- the LPNs weren't up

Page 91

1 there. There was a time that we did the change
2 that they weren't up there doing everything on
3 that area at that time. It was just a process
4 change that we did and I believe it was -- the
5 process change was after this event.
6 Q. And so what -- what was the actual
7 change in terms of what was handled in that --
8 in that unit as compared to in other areas?
9 A. It wasn't other areas. It was just
10 a PDP process change to get more care to the --
11 to the IPs at the time.
12 Q. And so is the -- was the process
13 change that more individuals were referred to
14 the triage unit?
15 A. Can you repeat that? I'm sorry.
16 Q. Sure. I'll just phrase it
17 differently. What exactly was the process
18 change?
19 A. Just for the nurses to spend more
20 time up there instead of inmates coming down to
21 triage all the time for generalized --
22 generalized care. There was just too much
23 activity going on down in triage. So it was
24 just an overall process change of the LPN

Page 92

1 staying upstairs more so the inmates can get
2 minimal care taken upstairs instead of coming
3 down to triage.
4 Q. And for inmates to go down to
5 triage, they have to be escorted, I imagine,
6 right?
7 A. Not necessarily. General population
8 could come downstairs, but it was just -- there
9 was just too many inmates in triage and it
10 was -- it was a lot -- a lot going on down
11 there. So it was just a generalized process
12 change that was a collaboration between medical
13 and corrections.
14 Q. Got it.
15 A. More like an increased access to
16 care kind of thing.
17 Q. Got it. And then generally just in
18 terms of members, about like how many -- how
19 many patients is a nurse responsible for on the
20 unit in the -- in their unit manager room as
21 compared to triage?
22 A. There's like maybe 200 upstairs and
23 200 downstairs.
24 Q. Oh, so you'd say it's about the same

Page 93

1 number of patients in triage as compared to on
2 the unit?
3 A. I'm saying in the blocks. Upstairs
4 there's about 200, downstairs is 200. So if an
5 inmate just says like, hey, I need -- I need
6 some Band-Aids, the nurse that's in that unit
7 management area can give them the Band-Aids
8 instead of that inmate having to go down to
9 triage. So that's why they determined that the
10 LPNs can stay upstairs and take care of that
11 instead of, you know, five guys needing
12 Band-Aids going down to triage. And that's
13 decreasing the amount of traffic going down to
14 triage and blocking up triage.
15 Q. Sure. I'm just asking about the
16 number of patients that are generally in triage
17 as compared to the number of people who are
18 getting served by the nurses or the LPNs on
19 that unit. Are you able to estimate how many
20 patients are cared for at each location?
21 A. Triage? Triage can be crazy. The
22 amount of people that go to triage, I mean
23 it's -- it's -- there's a lot. There's a lot.
24 Triage is like an urgent care at all times. So

Page 94

to decrease the amount of patients that go down
to triage will help immensely because triage
you have -- you have lab going on down there,
you have chronic care, you have infectious
disease, you have wound care, you have patients
just coming in, you have patients coming back
from off-site services. There's a lot going on
in triage. So any amount of patients you can
decrease coming down there for minimal services
such as like I'm saying for Band-Aids, for any
kind of those minimal nonemergent events
decreases the traffic going on down there.

Q.   Got it. Thank you.

A.   But in an event like this, this
patient would need a more in-depth assessment.
This patient I would recommend be sent down to
triage for that -- for that more specialized
assessment.

Q.   Got it. And so I'm going to -- like
I'm asking you now about A12 and A13. These
two cells where it says no-show, no further
documentation and insulin not documented.

Was there any difference between the
way both of those -- -- what both of those

Page 95

mean?

A.   Well, for A12, it appears that this
was documented. This patient did -- was a
no-show. And for A13 there was no
documentation, which is similar to A8.

Q.   And so when you say "no-show," that
would mean, like you mentioned, that a nurse
could put in the system NS at a later point in
time. Is that right?

A.   I don't know what you mean by "a
later point in time."

Q.   Oh. I --

A.   The nurse appeared to have
documented no-show.

Q.   Sure. I just meant after -- after
that round. So, yeah, my question is basically
just in order for you to determine that a
patient was a no-show, there has to have been
some kind of a notation in the system --

A.   Yes.

Q.   -- indicating as such, right?

A.   Yes, there appears that there was
documentation in the electronic health record.
In the EMAR. I'm sorry.

Page 96

Q.   Okay. And so just looking at an
example like A11 there's a corrective action
that's suggested involving some reeducation.
So where it notes that the responsible party is
CFCF administration, what is that exactly --
what are they responsible for?

A.   They are responsible to ensure that
the staff member completes those -- those
trainings.

Q.   And is that referring to a PDP staff
or YesCare staff?

A.   YesCare staff.

Q.   Okay. And were any suggestions made
as a part of this corrective action plan for
any systemic changes to be made to PDP
processes?

A.   Not that I'm aware of.

Q.   Are you aware of whether any -- any
staff who are involved in the care here were
interviewed by administrators to form the basis
of this report?

A.   I stated that I wasn't aware of any
interviews performed.

Q.   And do you -- did you create this

Page 97

report?

A.   I assisted with CF administration in
completing this corrective action plan.

Q.   I'm sorry. I was just in the middle
of my question.

Did you -- did you create this
report like in a meeting together? Did you
collaborate like by exchanging different
versions of this via e-mail? Like how did you
actually collaborate with them?

A.   I don't recall how we collaborated
it.

Q.   Do you have like a standard process
for how you do it?

A.   There is no standard process.
Really -- it's really specific to the event.

Q.   And how many corrective action plans
would you say you've been a part of creating?

A.   Probably too many to count.

Q.   Like more than ten?

A.   Yes, yes.

Q.   More than 20?

A.   Probably.

Q.   More than 30?

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 30 of 76

Deposition of Lynda Witkowski                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 98

1    A.    Maybe.
2    Q.    More than a hundred?
3    A.    No.
4    Q.    Okay.  So I'm going -- were you
5  involved in the June 2025 presentation of
6  Mr. Jung's patient safety report?
7    A.    Is that the slide stack you're
8  talking about?
9    Q.    Yes, the slide -- the slide deck.
10   A.    Yes.
11   Q.    What was your involvement in that
12  presentation?
13   A.    I created the slides.
14   Q.    And who asked you to perform this
15  review?
16   A.    Corporate requested the slides.
17   Q.    Who in corporate?
18   A.    The patient safety -- the person
19  that's in charge of it, Tonya Mooningham.
20   Q.    And when did she ask you to perform
21  this review?
22   A.    I don't recall.
23   Q.    Was it this year, in 2025?
24   A.    I don't think it was 2025.

Page 99

1    Q.    How long does it usually take for
2  you to prepare a slide deck and put on a
3  presentation?
4    A.    Well, they send an e-mail and say we
5  would like you to present and tell us when the
6  meeting is and we just set the slides.  I don't
7  think it was 2025.
8    Q.    How much notice do you usually get
9  before having to give a presentation?
10   A.    Maybe a couple of weeks.  I mean we
11  can always say that we need more time to set
12  the slides.  I don't know if that was the case
13  then, but...
14   Q.    Sure.  After the corrective action
15  plan that we just reviewed, that Excel
16  document, were there any other meetings that
17  took place -- that took place from YesCare with
18  respect to Mr. Jung's mortality review?
19   A.    I don't recall.
20   Q.    Are there typically -- besides this
21  corrective action plan, are there typically any
22  other events that get generated in the sentinel
23  event?
24   A.    There might have been, but I don't

Page 100

1  recall.
2    Q.    What other documents generally are a
3  part of the mortality review?
4         (A cell phone interruption
5    occurred.)
6    A.    I'm turning that off.  They left a
7  voicemail.
8    Q.    Yeah.  What other documents are
9  generally part of the mortality review besides
10  the sentinel event document that we just went
11  over?
12   A.    What other documents?  Any documents
13  that result from that corrective action plan
14  that are in that column.  If there were any
15  audits.  There could be something from that --
16  that one that said "pending."  Nothing else
17  that I can recall.  I mean the site medical
18  director's report.  Just the standard reports.
19  The site medical director's report, the
20  psychiatric director's report, the autopsies,
21  PDP's report.  I'm trying to think of what we
22  have to upload.  The two autopsies, the pending
23  and the final.  I think that's all.
24   Q.    What's the difference between the

Page 101

1  pending and the final autopsy?
2    A.    I'm sorry?
3    Q.    What's the difference between the
4  pending and the final autopsy?
5    A.    Well, once the autopsy is completed,
6  we get a pending autopsy report and then the
7  final once it -- once the autopsy is read and
8  completed.  The final usually comes out like --
9  in Philadelphia, the final is usually like
10  four, five, six months later.
11   Q.    And what's the site medical
12  director's report?
13   A.    It's a full chart review.
14   Q.    What does a full chart review look
15  like?
16   A.    Well, it's from the time the patient
17  was intaked, the date of intake until the date
18  of the death.
19   Q.    Is it like a chronological review of
20  everything that happened with that patient?
21   A.    That is correct.
22   Q.    And you mentioned there's also a
23  behavioral health report.  What was that?
24   A.    Yeah, behavioral health does a chart

Page 102

1  review. I don't know if we get a copy of it,
2  but behavioral health usually has a copy of it.
3  I don't think I actually get it.
4      Q.   And what does their review entail?
5      A.   Just any -- any psychological -- any
6  behavioral health events that happened. They
7  do a full behavioral health review. Like a --
8  they call it a psychological autopsy.
9      Q.   And once all those documents are
10 reviewed, are there ever -- are there any
11 meetings that take place with respect to doing
12 like a root cause analysis of the mortality?
13     A.   There is a mortality review that is
14 completed with the PDP.
15     Q.   And that's distinct and separate
16 from the process we just talked about with
17 respect to YesCare, right?
18     A.   Yes, that is correct.
19     Q.   Are you involved at all in PDP's
20 mortality review that they do?
21     A.   Yes.
22     Q.   How are you involved in that?
23     A.   It's just a generalized meeting
24 together to go over any areas. Just a review

Page 103

1  of the case.
2      Q.   And what do you mean it's -- I mean,
3  what's your role with respect to that process.
4  Are you consulted or do you just -- are you
5  just present when they make any findings known
6  to you?
7      A.   There's usually -- there's usually
8  no new findings because it is already
9  collaborated ahead of time, but it's just like
10 Internal Affairs is there, PDP is there,
11 Medical is there, the Psych Department is there
12 and we just collaboratively review the event.
13 Excuse me. We collaboratively review the event
14 and discuss any findings and if anyone has any
15 questions for each department, we just ask the
16 questions and answer them and when everyone is
17 satisfied with the -- with the results, the
18 meeting is over.
19     Q.   And how is PDP's mortality review
20 process different from YesCare's mortality
21 review process?
22     A.   Well, everyone is involved. With
23 YesCare --
24     Q.   And just to be --

Page 104

1      A.   With YesCare, the one that we were
2  just discussing, it's only YesCare. This one
3  is a collaborative of all three departments.
4      Q.   And when you say all three
5  departments, besides YesCare, who are you
6  referring to?
7      A.   I'm sorry. Well, it's two
8  departments. It's YesCare, Physical and
9  Behavioral Health.
10     Q.   Okay.
11     A.   Because we're one company, so it's
12 two departments. It's YesCare and PDP.
13     Q.   Okay. I'm going to share my screen
14 so we can go through the slide deck. Okay?
15     A.   Okay.
16     Q.   Can you see this PowerPoint deck?
17     A.   Yes.
18     Q.   Okay. Great. So do you recognize
19 this document?
20     A.   Yes.
21     Q.   And what do you know it to be?
22     A.   This is the slide -- the page 1 of
23 the slide deck for the Patient Safety Event
24 Committee.

Page 105

1      Q.   Okay.
2      A.   I don't know why that says 6/23/25
3  because that was not -- this was not presented
4  in June.
5      Q.   Okay. So I'm just going to do two
6  things. I'm just scrolling to page 3, which is
7  Bates stamped YesCare 3498.
8          You were the presenter of the
9  document, right?
10     A.   That is correct.
11         ATTORNEY RASHATWAR: Okay. I'm
12     going to enter this exhibit, YesCare 3496,
13     the Patient Safety Event Committee, into
14     evidence as Witkowski-2.
15         (Deposition Exhibit No. Witkowski-2,
16     YesCare Patient Safety Event Committee
17     PowerPoint presentation slide deck, was
18     marked for identification.)
19 BY ATTORNEY RASHATWAR:
20     Q.   And why don't we start with the
21 date. When was this slide deck presentation
22 effective?
23     A.   That I don't know. But I'm assuming
24 that 6/23/25 was the date -- is this a PDF.

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 32 of 76

Deposition of Lynda Witkowski                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 106

1    Q.    Yes.  Would it be helpful if I just
2  scroll through all the pages at first so you
3  kind of can see what we're looking at?
4    A.    Well, I'm assuming the 6/23/25 --
5  what I always did is I made that to be like the
6  current date when it was a PowerPoint.  So it
7  automatically reflected the current date.  So
8  that's why I'm assuming it was 6/23/25.
9    Q.    Okay.  So what makes you think that?
10  When do you think that this presentation was
11  given?
12    A.    I don't know.
13    Q.    Is it typical for these
14  presentations to happen close in time to a
15  patient event or sentinel event?
16    A.    When was this sentinel event?
17    Q.    Oh, is -- is it typical for these
18  presentations to take place close in time to
19  the sentinel event?
20    A.    When was his event?  I'm sorry.
21    Q.    It was in 2023, in November.
22    A.    I would say it was -- I would guess
23  in my -- maybe like four months after.
24    Q.    Is it typical for a review like that

Page 107

1  to happen four months after the fact?
2    A.    I can only guess.
3    Q.    Yeah.  I guess let me ask you a
4  question.  Why do you think it happened -- why
5  do you think this presentation happened four
6  months after his death?
7    A.    Well, once the sentinel event
8  committee receives all the paperwork, they just
9  review it and they can just pick out any ones
10  they want and when they end up having a
11  meeting, they can just send the information to
12  the corresponding site and say, hey, we would
13  like you to present this.
14    Q.    So did corporate e-mail you and ask
15  you to do this presentation?
16    A.    That is how it happens.
17    Q.    And so would an e-mail be able to
18  confirm when you did this presentation?
19    A.    Probably an e-mail or the last time
20  this -- these slide stacks were last altered.
21  I could figure it out.
22    Q.    Yeah.  How would you know that?
23    A.    To go under my PowerPoint and look
24  at the last time it was altered.

Page 108

1    Q.    Would you have any other record of
2  when you presented on this patient safety
3  event?
4    A.    Probably not.
5    Q.    Okay.
6    A.    I don't -- I don't have any
7  documentation on it, no.
8    Q.    Yeah.  When did -- yeah, who asked
9  you to perform the mortality review -- sorry.
10         Who asked you to perform this
11  Patient Safety Event Committee report for
12  Mr. Jung's death?
13    A.    The Patient Safety Committee, Tonya
14  Mooningham.
15    Q.    Uh-huh.  And when did she ask you?
16    A.    That I can't answer.  I don't know.
17    Q.    Okay.  And did she ask you via
18  e-mail?
19    A.    Yes.
20    Q.    And would you still have a copy of
21  your e-mails to know when she asked you?
22    A.    I may somewhere in my history.
23    Q.    Okay.  Who was on the Patient Safety
24  Event Committee in this case?

Page 109

1    A.    Again, it's sent out to multiple
2  people in YesCare, site medical directors,
3  regional medical directors, administrators, and
4  it's a voluntary process to join the meeting.
5    Q.    And with respect to Mr. Jung's case
6  and this particular presentation, do you know
7  who was present?
8    A.    I do not recall.
9    Q.    Do you know if that would have been
10  memorialized anywhere?
11    A.    Maybe Tonya Mooningham has it.  I'm
12  not sure.
13    Q.    Okay.  And what was your role in the
14  drafting of this PDF?
15    A.    Chart review.
16    Q.    And beyond the chart review, did you
17  also actually put together the content of
18  what's in this PDF?
19    A.    Yes, I did.
20    Q.    Okay.  And did anyone else help you
21  with that?
22    A.    Yes.
23    Q.    Who is that?
24    A.    Our old regional medical director.

Page 110

Q.   Okay.  And who is that?

A.   Eke Kalu.

Q.   Can you spell that?

A.   E-K-E K-A-L-U.

Q.   And so I am just going to scroll to page 3 here and I see that you're the presenter.

What does it mean to be the presenter?

A.   I just read the -- I give the facts, basically.

Q.   Do you also answer questions?

A.   Yes.  Uh-huh.

Q.   And did you also come to any conclusions with respect to the substance of what's in this presentation?

A.   Not any conclusions.  If there's any recommendations, any questions, I would answer the questions, with the assistance of Dr. Kalu if there was anything more pressing and more clinical, outside of my scope.

Q.   So what was Dr. Kalu's role with respect to this patient safety event presentation?

Page 111

A.   He was the regional medical director of YesCare at the time.

Q.   And just what was his role with respect to this presentation?

A.   He was just an additional clinical oversight.  Again, if there was any extra questions that were outside of my scope as -- as an RN.

Q.   And so what does it mean for an event to be a Category 4 incident?

A.   I believe there is a slide in there that explains the different categories.

Right there.

Q.   Sure.  For the record, looking at YesCare 3503.  Yeah, what does it mean to be a Category 4 incident?

A.   So the first level, you start at that top one was there a deviation from any generally accepted performance standards.  If it's yes, did the deviation reach the patient, which we determined it did, and then did the deviation lead to, in this case, severe harm or death, yes, and that makes it a serious Category 4 event.  And in this case, during

Page 112

this review we get to the slide -- and sometimes if we make it -- if we determine it's a Category 3, in the presentation we will ask everyone that's in the meeting if they agree with a three.  Sometimes everyone that's in the meeting can say no, we think it's a four and it will get moved to a four, but in this case we already predetermined it was a four, but that's basically what this meeting is for everyone to -- you present your case, you present the event and everyone has the discussion and they might agree that it is a four, it might be a two, but in this case we already predetermined that this was a Category 4.

Q.   Okay.  So it sounds like the purpose of this meeting is to present and it's also to come sometimes to a collaborative finding about different aspects where there might have been a deviation; is that right?

A.   That is correct.

Q.   Were there any other purposes to the presentation beyond like, I guess, the collaborative nature of categorizing the event?  Is there any more opportunity for collaboration

Page 113

there?

A.   Just education.  I mean there might be something that other sites might learn, things that we do here in Philadelphia that might benefit other other -- other facilities throughout the country or something that another -- another contract might be doing that might help us.  So it is a collaborative learning experience.

Q.   And so in terms of the -- when you say that the Category 4 finding was an internal finding, who came to that conclusion?

A.   Everyone here in Philadelphia. YesCare.

Q.   Were you the person who was responsible for determining that it was a Category 4?

A.   No, it was collaborative.

Q.   And so it was -- when you said everyone at YesCare, I mean, who -- who's part of that?

A.   Well, if you look at the category assignment decision tree here in front of us, it -- it -- you just follow the yeses and we

Page 114

can tell that it is a Category 4 safety event.

Q.    Would you sort of -- would you say that there wasn't a lot of subjective input into it?  It was sort of objectively a Category 4 incident?

A.    Yes, it was.

Q.    I'm going to move on to page 4, which is YesCare 3499.  In the Narrative Timeline Review, where did you get the information that this is based on?

A.    This came directly out of the patient's chart.

Q.    So you performed a chart review in this case to get this information?

A.    That is correct.

Q.    Okay.  Did you perform any -- did you perform any interviews of any individuals involved in the patient care in this case beyond, yeah, doing a chart review?

A.    No, this is all factual information directly out of the patient's chart.

Q.    Okay.  Just moving on to page 5, Medication Administration.

So, again, I want to confirm how did

Page 115

you get all of the information about -- yeah, how did you get all this information that's in here?  What -- what records did you consult?

A.    This was either from the electronic health record, that ECW or from the HCS, which I earlier mentioned was the electronic medication administration record.

Q.    And is HCS the same thing as EMAR?

A.    Yes, that is correct.  I mentioned that earlier.

Q.    Yeah, I just wanted to clarify while we're looking at the page.

A.    Okay.

Q.    Thanks.

And so when there was a no-show that was documented, for instance, on 11/3 or 11/5, what -- specifically what records would that have been included in?

A.    That would have been the EMAR, the electronic medication administration record.

Q.    Okay.  And when conclusions are made that there was not documentation, for instance, on 10/30 or, for instance, on 11/4, for those instances, how was that -- what specifically

Page 116

was consulted to determine that it was not documented?

A.    The EMAR.

Q.    And was the electronic health record also consulted in those cases?

A.    No, it wouldn't show in the electronic health record.  It would be in the electronic MAR.

Q.    And is there any presumption that can be made about whether or not care was administered when it's not documented?

A.    No.

Q.    Okay.  And where it states that no CRIC or sliding scale insulin was administered, for instance, on 10/31, how is that -- how is that conclusion determined?  What -- what documents are considered in making that conclusion?

A.    The EMAR.

Q.    And is it only the EMAR?

A.    That's correct.

Q.    And with respect to the refusals that are in here, there is a refusal on 11/1 and on 11/5.  How is -- how is it determined

Page 117

that those were refusals?

A.    They docu -- they would have documented in the EMAR that the patient refused, but there was no forms scanned into their electronic health record, ECW.

Q.    All right.  I'm moving on to page 6, which is YesCare 3501.  What are taxonomy codes and what does "QIP" stand for?

A.    Quality improvement performance plan.

Q.    Uh-huh.

A.    And taxonomy -- taxonomy code is just code numbers that YesCare gave.  It's just a section of codes where -- I'm not really sure what that is, but it's a list of areas where you can say -- I have the paper right over there, but I know I can't get it.  But it's like --

Q.    You could -- you could tell me like what document would refresh your recollection.  Like what would you need to look at to tell you what those are?

A.    It's even covered by another paper.  But it's an area where it's like P is like --

Page 118

1  different areas where like -- I'm trying to
2  figure out what it is.  Like failure to
3  treat -- there's different areas where it's
4  like actions or one section might be like --
5  like equipment failure versus provider failure
6  or like awareness.  So there's different areas
7  that you can find these codes.
8      So that's what the P1 or PD or CT or
9  CM or CY is.  It's just different areas of
10 where you can find these taxonomy codes.  Like
11 NET/Usage is forms that you should have -- that
12 you should have used and it's just areas that
13 you can find -- locate these codes.
14     Q.   Got it.  So it's like an internal
15 system where you're logging what the
16 different --
17     A.   Right.
18     Q.   -- areas are?
19     A.   It's just a -- it's just a corporate
20 document where you can find these taxonomy
21 codes where they're all grouped together.
22     Q.   What was the -- yeah, how are the
23 conclusions reached in these cases?  Like, for
24 instance, even just the first one, like Omitted

Page 119

1  Actions, the nurse failed to answer intake
2  questions accurately.  How were these
3  conclusions reached and solutions offered?
4      ATTORNEY KAMINSKY:  I'm just going
5  to object to form for characterization of
6  those.
7      But you can answer.
8  BY ATTORNEY RASHATWAR:
9      Q.   Yeah, you can still answer.  And
10 I'll just rephrase that.
11     My question is:  Under each of
12 these, like even in, for instance, the first
13 one there's a problem and there's a solution,
14 how were the problems and the solutions
15 reached?
16     A.   That was, again, collaborated as a
17 result of the correction -- corrective action
18 plan collaboratively between the administrators
19 and QI.
20     Q.   So, you know, here there's two pages
21 of these different things.  One, two, three,
22 four, five -- I'm counting seven different
23 categories.  How -- how did you determine if
24 there were any differences between what was on

Page 120

1  the corrective action plan and then what was in
2  here, what you were going to present on?
3      A.   Well, we tried to make them
4  collaborative.  We tried to make them mirror
5  each other.
6      Q.   Okay.  And so what was your process
7  for putting together all of these problems and
8  solutions on this page?
9      A.   What was my awareness?
10     Q.   What was your process.
11     A.   The process was just reviewing the
12 corrective action plan and matching up the
13 corrective action plan with the accurate
14 taxonomy code.
15     Q.   And was there any other
16 collaboration with others either at YesCare or
17 otherwise in putting together this
18 presentation?
19     A.   No, just with YesCare.
20     Q.   And what was that collaboration?
21     A.   Just to choose the most accurate
22 taxonomy code that collaborated with the
23 corrective action plan that was identified on
24 that prior form.

Page 121

1      Q.   Were any problems determined to be
2  more serious than others?
3      And you let me know if you'd like an
4  opportunity to just read through both of these
5  pages.
6      A.   I think they were all
7  collaboratively -- collectively not good.
8      Q.   Yeah.  Was there any comparative
9  analysis done with respect to different
10 problems and whether or not they had more of
11 a -- more of an influence on the ultimate
12 outcome in this case?
13     A.   I mean, again, I think they're all
14 collaboratively not good.  I mean, we're
15 talking about insulin in a diabetic here.
16     Q.   Yeah.  So, I mean, as a part of this
17 presentation, was there -- was there any
18 conclusion or was there any inquiry with
19 respect to which failures were responsible for
20 Mr. Jung's death?
21     A.   Are you asking for my subjective
22 answer?
23     Q.   I'm asking for your opinion based on
24 what this report ultimately concluded.

Case 2:24-cv-05618-TJS     Document 100-10     Filed 12/05/25     Page 36 of 76

Deposition of Lynda Witkowski                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 122

ATTORNEY GREGORY:  No, she's not
giving her opinion.

BY ATTORNEY RASHATWAR:

Q.  I'm not -- sorry, just to be clear,
I was not asking for your subjective opinion.
I'm asking with respect to the report that you
created, if this report made any indication
with respect to which failures were responsible
for Mr. Jung's death.

ATTORNEY GREGORY:  The report says
what it says.  It's in --

ATTORNEY RASHATWAR:  Yeah.

ATTORNEY GREGORY:  It's in writing
and she's not going to interpret the
report.

ATTORNEY RASHATWAR:  And I'm -- I'm
asking for -- I mean, your objection is
noted for the record.  So I'm just going to
repeat my question.  You know, I'm not
asking about anything that's privileged.

BY ATTORNEY RASHATWAR:

Q.  And my understanding is that as
quality improvement at YesCare, you know,
you're -- you're responsible for performing

Page 123

this review.  So my question is whether this
report or presentation made any indication with
respect to which failures were responsible for
Mr. Jung's death.

ATTORNEY GREGORY:  And I'm telling
you, you're asking her for her opinion
because if it's in the report, it's in the
report.  If it's not in the report, it's
not in the report.  This entire report is
privileged.  I've given you a lot -- a lot
of leeway here asking her these questions
and you're not going to ask her for her
opinion as to which action or failure to
act was more seriously impactful on the
decedent.  You're asking her for her
opinion, whether you characterize it that
way or not, and she's not going to answer
that question.

ATTORNEY RASHATWAR:  Okay.

ATTORNEY KAMINSKY:  I'm going to
join in that objection, to the extent that
an objection to form on that question.

ATTORNEY RASHATWAR:  Yeah.  This
report is not subject to attorney-client

Page 124

privilege.  I mean, unless you're asserting
that it is subject to that privilege, which
would be the first hearing of it.

ATTORNEY GREGORY:  Who said
attorney-client privilege?

ATTORNEY RASHATWAR:  What -- so
what --

ATTORNEY GREGORY:  No one said that.

ATTORNEY RASHATWAR:  Okay.

ATTORNEY GREGORY:  It's privileged
under the PSQIA.  That's what it says on
page 2 in the report.

ATTORNEY RASHATWAR:  Yeah.

ATTORNEY GREGORY:  Or in the
first -- beginning of the report.

Now, the court has told us that we
have to produce the report and we did.  The
court did not say we have to discuss the
session that was held to create this
report, and that's what you're getting into
and we're not going to go there.

ATTORNEY RASHATWAR:  Okay.  And
so -- so the record is clear, I mean, this
report is highly relevant about any

Page 125

mortality review that was conducted.  It
goes to the heart of all of them.  So it's
clearly relevant.  I'd just like to know --

ATTORNEY GREGORY:  I didn't say it
wasn't relevant.  And that's not the
argument I'm making.  But you're asking her
now to give testimony outside the scope of
this report.  You're asking her to give
her -- you're asking her to give you her
opinion as to which of these alleged
deficiencies was the more serious.

ATTORNEY RASHATWAR:  No.

ATTORNEY GREGORY:  And she's not
going to do that.

ATTORNEY RASHATWAR:  Okay.  And so
the record is clear, I asked whether the
report made any indication as to which
failures were responsible for his death.
And so the record is clear, that was my
question.  It wasn't opining.  I wasn't
asking her to opine as an expert witness.

And I just want the record to also
be clear that there's even -- you know,
that no privilege has been asserted which

Page 126

1  would mean that this couldn't be admitted
2  at trial.  And so if you're going to assert
3  one later then, you know, that's fine, but
4  if you're going to certify that this
5  witness not answer this question, let the
6  record just be clear about what my question
7  was.
8       ATTORNEY GREGORY:  Well, you're
9  asking what the report -- you're asking her
10  if there's something in the report that
11  quantifies one dereliction over another.
12  The report speaks for itself.  There's
13  nothing in the report that says that.  And
14  so if you're asking her if there's
15  something in this report that's more
16  serious than something else, you're asking
17  her for her opinion.
18       ATTORNEY RASHATWAR:  My
19  understanding is that this was a
20  collaborative process where there were
21  other people involved.  So I'm asking
22  about -- I'm asking about the report and
23  any conversations about those derelictions
24  are absolutely within in the scope of this

Page 127

1  report and presentation.
2       ATTORNEY GREGORY:  Well, then ask
3  her if there were any conversations about
4  which of these issues was the most serious.
5  I think she's already told you that three,
6  maybe four times, that there were not, but
7  you can ask her again.
8       ATTORNEY RASHATWAR:  I don't believe
9  so, but just so the record is clear, I had
10  asked --
11       ATTORNEY GREGORY:  You know what --
12       ATTORNEY RASHATWAR:  Yeah.
13       ATTORNEY GREGORY:  -- let's move --
14  let's move on.  Let's move on.  Ask another
15  question.
16       ATTORNEY RASHATWAR:  Okay.  This is
17  my deposition.  So I just want the record
18  to be clear that my question was whether
19  the report indicated which failures were
20  responsible for Mr. Jung's death and
21  Mr. Gregory has instructed his witness not
22  to answer that question.
23       ATTORNEY GREGORY:  No.  No, that's a
24  different question.  She can answer that

Page 128

1  question.
2       Lynda, does the report indicate that
3  any of these issues were more serious than
4  any other issue?
5       THE WITNESS:  No, that's not what
6  this report states.
7       ATTORNEY GREGORY:  Thank you.
8  BY ATTORNEY RASHATWAR:
9    Q.  Okay.  Now, with respect to
10  conversations that took place during the
11  presentation, do you have any recollection
12  of questions that were asked in this case?
13    A.  I do not have any recollection.
14    Q.  Do you recall any of the discussion
15  that took place during the presentation of this
16  report?
17    A.  I do not have any recollection.
18  This was probably almost -- like almost two
19  years ago probably.
20    Q.  And was there any conversation about
21  whether there were some actions that have more
22  influence on Mr. Jung's death than others?
23       ATTORNEY GREGORY:  Objection.
24  That's --

Page 129

1       ATTORNEY RASHATWAR:  If you
2  remember.
3       ATTORNEY GREGORY:  That's the
4  question you just asked her.  You asked
5  her --
6       ATTORNEY RASHATWAR:  I just --
7       ATTORNEY GREGORY:  You asked her
8  about what conversations she remembers and
9  she says she doesn't remember
10  conversations.  Now you're asking her about
11  conversations that she's already testified
12  she doesn't remember.
13       ATTORNEY RASHATWAR:  No, I think
14  maybe my question -- maybe my question
15  wasn't clear.
16  BY ATTORNEY RASHATWAR:
17    Q.  I was simply asking about the
18  conversations that took place during the
19  presentation and you said you didn't recall
20  them.  I mean, do you recall any conversations
21  about any particular derelictions being more
22  significant than others?  And if you don't
23  remember, then you don't remember, but that's
24  just my question to be clear.

Page 130

1    ATTORNEY KAMINSKY: I'm objecting to
2  form, to that characterization.
3    ATTORNEY GREGORY: You can answer,
4  Lynda.
5    THE WITNESS: No, I don't recall any
6  conversations during this presentation.
7  BY ATTORNEY RASHATWAR:
8    Q.   Okay. And so with respect to these
9  conclusion -- sorry.
10    With respect to the problems and the
11  solutions -- I'm sorry, I'm getting a little
12  bit of feedback.
13    Okay. With respect to the problems
14  and the solutions that are in here, are
15  these -- are these pulled directly from the
16  corrective action plan?
17    A.   Yes, they are.
18    Q.   Okay. And are you using any of your
19  subjective opinions, you know, when -- when you
20  were drafting this presentation or is this all
21  based on objective information from the
22  corrective action plan?
23    A.   These are literally copy and pasted
24  from the corrective action plan.

Page 131

1    Q.   And so would it be safe to say it's
2  not based on your subjective opinion?
3    A.   The only thing that was based off of
4  a separate review were the taxonomy codes. The
5  problem and solutions were from the corrective
6  action plan.
7    Q.   Okay. And do the -- what purpose
8  did the taxonomy codes serve for you
9  internally?
10    A.   They're just required.
11    Q.   Do they serve any particular
12  purpose?
13    A.   They're required for our -- the
14  reporting system for our corporate. We need to
15  enter taxonomy codes.
16    Q.   And do you know like why they're
17  used by corporate or what function they serve?
18  If it has anything to do with care and how it's
19  provided.
20    A.   I'm not sure how the -- what
21  function they serve.
22    Q.   Okay. How long was the provider --
23  how long was the patient safety event
24  presentation?

Page 132

1    A.   I don't recall. As I said, it might
2  have been two or three cases.
3    Q.   And so how long are -- typically are
4  these presentations where there's a patient
5  safety event presentation?
6    A.   It depends on the cases.
7    Q.   Do you recall how long Mr. Jung's
8  was?
9    A.   I don't recall.
10    Q.   Do you recall if providers who were
11  specifically involved in his care were present?
12    A.   I'm sorry, what was that?
13    Q.   Do you recall whether providers
14  specifically involved in Mr. Jung's care were
15  present at his provider presentation?
16    A.   They usually are. They usually are.
17    Q.   Why are they usually present?
18    A.   Just in case any questions are asked
19  that they're able to directly respond.
20    Q.   And are nursing staff typically
21  included or is it generally the higher provider
22  level?
23    A.   Provider level.
24    Q.   Okay. Do you recall if Dr. Gay was

Page 133

1  present for Mr. Jung's meeting?
2    ATTORNEY GREGORY: Who?
3  BY ATTORNEY RASHATWAR:
4    Q.   Do you recall if Dr. Maureen Gay was
5  present for this patient's safety event
6  committee presentation for Mr. Jung?
7    ATTORNEY GREGORY: Maureen Gay is
8  not a doctor.
9    ATTORNEY RASHATWAR: Sure.
10  BY ATTORNEY RASHATWAR:
11    Q.   Do you recall if Nurse Practitioner
12  Gay was present for Mr. Jung's presentation?
13    A.   I doubt she was. She usually
14  doesn't present. She usually doesn't -- nurse
15  practitioners normally aren't there. So it
16  would be safe to say that she was not present.
17    Q.   Do you recall if Dr. Trivikram was
18  there?
19    A.   It would be safe to say that
20  Dr. Trivikram was present.
21    Q.   Okay. In the fall of 2023, were
22  there staffing issues among medical staff at
23  PDP?
24    A.   I believe there might have been.

Page 134

For PDP or for medical?
Q.   For medical staff.
A.   I can't accurately answer that because I wasn't involved -- 100 percent involved in staffing.  I know we might have -- I'm not answering that accurately.  So if I can strike that.
Q.   Sure.  You can strike that.
Did your role in QI ever involve reviewing staffing levels among medical staff?
A.   No, it did not.
Q.   Was that someone else's role at PD -- was that someone else's role who was in the quality improvement program?
A.   It was not -- quality improvement was not involved in staffing.
Q.   Did staffing levels of medical staff ever impact the care that was provided?
A.   It was more so during COVID.
Q.   And when would --
A.   I don't -- I don't know how staffing levels were at that time.
Q.   And when would you say sort of the staffing issues from COVID ended?

Page 135

A.   I don't recall.  I know we were utilizing agency.  So...
Q.   And what did the agency do, when you say you utilized an agency?
A.   It increased our staffing levels.
Q.   And do you know when YesCare started using an agency?
A.   I don't know.  As I stated, I don't know how our staffing was managed.
Q.   Do you have any independent recollection of interacting with Mr. Jung personally?
A.   No, I do not have any recollection -- I do not -- I did not have any interaction with Mr. Jung.
Q.   That -- that you recall.  I mean, would it surprise you if there was a medical record with your name on it and his name on it?
A.   I guess it wouldn't, but I do not have any recollection of his -- of being with -- any interaction with him.
Q.   Did you ever provide any individual care to people at PDP once you got involved in the quality improvement aspect of YesCare?

Page 136

A.   There were times that I worked in the facilities.
Q.   And what kind of things would you do in the facilities?
A.   Triage, sick call, some medication administration.
Q.   And why would you do that?
A.   When we had short staffing, especially during COVID, when we had like abundance of backlog or sick call.  When there was, you know, quick staffing, level drop, call out, I would run over and assist.
Q.   And did that happen frequently during COVID?
A.   During COVID, absolutely, yes.
Q.   And when would you say that ended, that you -- like being called to sort of fill in some of those other roles at the facilities?  Are you still doing that?
A.   No.  No, no, no.  No, we're pretty good right now.  I don't know.  Maybe like 2021.  What, COVID was March 2020.  Maybe like 2021.
Q.   Okay.  And did -- from your role

Page 137

doing quality improvement, did staffing levels ever impact timing of care?
A.   Yeah, there were times.
Q.   Did it impact documentation of care?
A.   I could assume so.
Q.   And did it document whether care was administered?
ATTORNEY GREGORY:  Did it document?
THE WITNESS:  Can you repeat that?
BY ATTORNEY RASHATWAR:
Q.   Sure.  Did staffing levels ever impact whether care was administered?
A.   I would assume so.  Can you -- I...
ATTORNEY RASHATWAR:  Okay.  I'm just going to ask if we can take five and then we'll wrap up and I'll pass it over to others if they have any questions.  Is that okay?
ATTORNEY KAMINSKY:  How about if we take ten?  Would that be okay for everybody?
ATTORNEY THOMAS:  Yeah, I would prefer ten as well, if that's okay.
ATTORNEY GREGORY:  Yeah.

Page 138

1    ATTORNEY RASHATWAR:  Fine by me.
2    ATTORNEY THOMAS:  All right.  1:20.
3    ATTORNEY KAMINSKY:  Thank you.
4    (A recess occurred from 1:09 p.m.
5    until 1:22 p.m.)
6    ATTORNEY RASHATWAR:  We can go back
7    on the record.  It looks like most folks
8    are back.
9  BY ATTORNEY RASHATWAR:
10    Q.    So I just want to loop back and ask
11  you about documentation.
12    So where are glucose levels
13  documented when nursing staff take those
14  readings?
15    A.    In the electronic medication
16  administration record.
17    Q.    Are they also documented in the
18  patient's electronic health record?
19    A.    No.
20    Q.    And where are insulin levels
21  documented?
22    A.    They're ordered in the electronic --
23  the patient chart, the EMAR -- I mean, I'm
24  sorry, in the patient chart is where they're

Page 139

1  ordered.
2    Q.    And so that would be the electronic
3  health record, right?
4    A.    Yes.
5    Q.    Okay.  And so you said that's where
6  insulin levels are ordered.  When an insulin
7  level is --
8    A.    Insulin orders are ordered.
9    Q.    Okay.  So the record is clear, so
10  insulin orders are in the electronic health
11  record of the patient, right?
12    A.    That's what -- that's where they're
13  ordered, yes.
14    Q.    And when there's a reading done of
15  an individual's -- okay.  Thank you.
16    And do you know how a no-show
17  designation is made in the electronic
18  medical -- medication administration record,
19  the EMAR?
20    A.    It should show up as an NS.
21    Q.    Okay.  All right.  Did you
22  understand all of my questions today?
23    A.    Yes, I did.
24    Q.    Okay.  Did I give you an opportunity

Page 140

1  to fully answer all of my questions?
2    A.    Yes.
3    Q.    Is there anything that you would
4  like to add or change about the testimony you
5  gave today because you remembered something you
6  didn't previously remember or realized that you
7  said something incorrectly?
8    A.    No.
9    Q.    Okay.  Do you have any other
10  recollection in the presentation that you gave
11  or your involvement in Mr. Jung's mortality
12  review that you didn't previously mention that
13  you now remembered?
14    A.    No.
15    ATTORNEY RASHATWAR:  Okay.  Do my
16    co-counsel have any questions for
17    Mrs. Witkowski?  And by "co-counsel" I mean
18    opposing counsel.
19    ATTORNEY KAMINSKY:  I do, but if
20    anybody else wants to go first.
21    ATTORNEY THOMAS:  I have none.
22    ATTORNEY GREGORY:  Sure.  It's all
23    you, Jon.
24    ATTORNEY KAMINSKY:  I'm sorry, Ms.

Page 141

1  Thomas, I didn't hear what you said.
2    ATTORNEY THOMAS:  Sorry.  I just
3    said I have none.
4    ATTORNEY KAMINSKY:  Okay.  All
5    right.
6    - - -
7    EXAMINATION
8    - - -
9  BY ATTORNEY KAMINSKY:
10    Q.    Good afternoon, Ms. Witkowski.  My
11  name is Jonathan Kaminsky and in this matter I
12  represent the interest of Mariesha Apollon.
13  Thank you for your time today.
14    So I have a few questions and I'm
15  going to share my screen.
16    Are you able to see my screen?
17    A.    Yes, I am.
18    Q.    Okay.  And so this was a document
19  that we were looking through earlier.  I think
20  that it's called -- it was introduced as
21  Witkowski-2.
22    A.    Uh-huh.
23    Q.    And this is a PowerPoint and, I'm
24  sorry, you created this PowerPoint?

Page 142

A.   Yes, I did.

Q.   Okay.  There were questions earlier about taxonomy codes.

A.   Yes.

Q.   And so are these codes, are they internal or are they universal, as far as in the medical community?

A.   I am unsure.

Q.   Okay.  Have you used these codes in the past?

A.   Yes.

Q.   And so you inserted these codes into this PowerPoint?

A.   Yes.

Q.   Okay.  And, I'm sorry, so were you able to tell us what P1 is?

A.   Omitted actions.

Q.   I'm sorry, can you -- omitted actions, you said?

A.   That's correct.

Q.   Okay.  PD2?

A.   NET/Usage.

Q.   Okay.  So these are just the -- oh, okay, okay.  I didn't catch that earlier.  So

Page 143

these are just pretty much the acronyms, in a way, for what's to the left.  So P1 is omitted and then CT1 would be situational awareness.  Is that what you're saying?

A.   Yes, that is correct.

Q.   Oh, okay.  If you did say that earlier, I didn't catch that.  I apologize.

As far as the medication administration, do you see this -- this page?

A.   Yes.

Q.   YesCare 3500.

And you create -- you created this document?

A.   Yes, I did.

Q.   Okay.  Is there a reason that you left out October 28th on this?

A.   Can you go back one slide?

Q.   Sure.

A.   'Cause he was admitted 10/28 at 10:03.  I don't recall why I omitted October 28th.  Admitted to the facility on 10/28 at 10:03.  I don't recall why I omitted 10/28.  Received an order for 10 units of NPH and 12 units of R.

Page 144

I -- I could assume, but I'm not going to answer that because I don't know why I omitted 10/28.

Q.   Okay.

A.   If I had paperwork to review, I would be able to answer that.

Q.   Okay.  And then as far as if we could just focus back on medication administration again.

A.   Uh-huh.

Q.   Is it accurate for me to say that what is shown on the screen right now as far as the a.m. and the p.m. and then it shows BS, which is for blood sugar, and then it shows numbers next to that, right?

A.   Yes.

Q.   And these are the blood sugar testing results from Mr. Jung.  Am I correct?

A.   That is correct.

Q.   All right.  So is it fair to say that on each of these dates Mr. Jung's blood sugar was tested?

A.   That is correct.

Q.   Okay.  And are all inmates' blood

Page 145

sugar tested at PDP?

A.   As long as it's ordered.

Q.   Okay.  Why would it be ordered?

A.   If the provider orders it.

Q.   Why would a provider order a blood sugar test?

A.   Well, if they're ordered the sliding scale, you need to know how much insulin to give them.

Q.   Is it fair to say that looking at a result, as on this document that we're looking at, that it was clear that Mr. Jung had diabetes?

A.   Well, he reported type 1 diabetes.  So it was clear to determine he had diabetes because he reported it.

Q.   Okay.  What other reasons would a provider request a blood sugar reading outside of diabetes?

A.   Well, some patients come in and they're on a -- just a -- like Lantus, which is a long-acting, and they just take Lantus without a sliding scale.  So sometimes patients come in and they don't get the blood sugar

Page 146

checks every day. So not every patient
requires blood sugars checked twice a day.

So to answer your question prior,
not every diabetic receives blood sugar checks
on a daily basis.

Q. Okay. But if you -- if there are
checks on a daily basis, what is the reason for
those checks?

A. Because he was ordered a CRIC
sliding scale twice a day.

Q. Okay. And who ordered the CRIC
sliding scale twice a day?

A. A provider.

Q. And when you say "provider," who are
you referring to as -- what do you define as
providers?

A. Physician's assistant, a nurse
practitioner or a doctor.

Q. Okay. And is that -- any time that
you had said "provider" today was that who you
were referring to?

A. That is correct.

Q. Okay. You had also -- during the
deposition, you had commented that -- that you

Page 147

had taken -- that you had directly copy and
pasted from the correction -- the corrective
action plan into the -- into this document,
into the PowerPoint, correct?

A. Correct.

Q. Okay. Just give me one second. I
just want to pull up another document.

And you're able to see. So this is
the corrective action plan that we were talking
about earlier.

A. Uh-huh.

Q. And are you able to see this
document?

A. Yes, I can.

Q. Okay. And then in line is it 3, is
that the one that starts with "during intake"?

A. Yes.

Q. Okay. And so this says, "During
intake, the questions regarding the patient's
DM history were answered 'No'." And then it
looks like there's a quotation, and it says,
"('Do you have DM' and 'Are you currently
taking medications prescribed for any medical
condition')." And then it says, "By answering

Page 148

Yes would have generated an intake appointment
for the provider to order medication timely."
And then in the next window it says, "Staff
member will complete the YesCare
Intake/Receiving Screening module in YesCare
University."

If the inmate during intake reports
that either a "no" or whatever answer that they
report -- all right. Strike that. I don't
know where I'm going with that.

Can you confirm that RNs at intake
are not authorized to independently manage
diabetes?

A. That is correct.

Q. Okay. And so who assumes the
responsibility for monitoring diabetes after
intake is completed?

A. Can you rephrase that?

Q. I could just repeat it.

So who -- yeah, I can rephrase it.
Who takes on the responsibility to
monitor an inmate's diabetes once intake is
completed?

A. It's a collaborative effort between

Page 149

RNs, LPNs and providers.

Q. Okay. And so would you agree that
an intake nurse has no authority to monitor or
intervene once the inmate is transferred out
from intake?

A. Define "intervene."

Q. Well, just the ordinary definition
of "intervene."

ATTORNEY RASHATWAR: Objection with
respect to form. The question is not
clear.

BY ATTORNEY KAMINSKY:

Q. Okay. Would you agree that -- I'll
restate it.

Would you agree that an intake nurse
has no authority to monitor an inmate's
diabetes once the inmate is transferred out of
intake?

A. It's the intake RN's responsibility
to do an initial assessment of a diabetic at
intake as long as he admits to having diabetes.

ATTORNEY KAMINSKY: I'm going to
object to that answer. I don't think that
you answered my question.

Page 150

BY ATTORNEY KAMINSKY:

Q.   The sentinel event corrective action plan document that we were referring to, is that -- would you consider the actual document that we have been looking at today, was that a complete document?

A.   It was final except for the rows that stated "pending."

Q.   Okay.  And did you have any challenges in gathering all the necessary information contained in it?

A.   There were challenges compiling the document because it was -- just because it was so large.

Q.   What was so large?

A.   The quantity of correction action plans.

Q.   I don't understand that.  What do you mean?

A.   Can you share the corrective action plan that we're talking about?

Q.   Absolutely, yeah.  I apologize.

A.   Okay.

Q.   Do you want me to -- I know --

Page 151

A.   No, that's fine.  With the quantity of areas of improvement identified, it was just a task to compile it once we identified all the areas of improvement.  So if you wanted to rephrase your question.

Q.   No, that's okay.  Just give me a minute.

I'm just looking over my notes.

So earlier we were talking about red flags.

A.   Uh-huh.  Yes.

Q.   And I just wanted a clarification.  So as far as a red flag, what generates a red flag?

A.   A red flag is generated as a result of one missed dose of a critical medication or three missed doses of a regular medication, three consecutive missed doses of a regular medication or a pattern of missed doses of a regular medication.  For example, if a medication is ordered to be given like twice a day, three a.m. doses are missed or three p.m. doses are missed.

Q.   Okay.  Is there any other way that a

Page 152

red flag can be generated outside of what you just explained to me?

A.   Generally, that's -- that's what we train our nurses about.

Q.   Okay.  You also discussed earlier that as far as the -- you mentioned about that there's in the housing unit and in the prison -- or in the physical building I thought you were talking about, there was like A, B, C and D units, I think.

A.   Yes, A, B, C and D blocks.

Q.   Okay.  And so is there -- so is there just one nursing unit and one medical facility in that building that handles all of those units or are there -- is there a medical unit for each of those A, B, C, D?  Does that make sense?

A.   Well, let's see.  On A block you have upstairs and downstairs.  So it's A1 and A2.

Q.   Okay.

A.   And that's the same in A, B, C and D.  And A1 as a unit management, B1 has a unit management.  B1 has a unit management, B2 has a

Page 153

unit management.  So that's consecutive through each -- each block.

Q.   And so would the unit management go into A, B, C -- so let's just say on one particular date, let's say today, and I'm speaking totally hypothetical of as regards to this situation, but --

A.   Okay.

Q.   -- as far as would a -- would a medical staff, would they -- would they go to B1 and then A1 or those -- there's individual staff that's assigned on a particular date?

A.   Normally a nurse is assigned to medication nurse for A block, a medication nurse for B block, medication nurse for C and a nurse for D.

Q.   Okay.

A.   There might be a good day where there's a medication nurse for A1, a medication nurse for A2, and that's called splitting buildings, but it doesn't always happen when you have a building split, quote, unquote.

Q.   Okay.  But as far as the staff go, are they all housed or grouped in the same area

Page 154

when they're not in the housing area?

A.   Each block, A1 has four pods.  So A1
has four pods, B1 has four pods, A2 has four
pods, B2 has four pods.

Q.   Okay.  I'm getting lost in the weeds
with this.  I apologize.  I'm just trying to
understand how that is set up, but I don't
think that that's really important.

ATTORNEY KAMINSKY:  I don't think I
have any more questions.  I might have a
follow-up if that's okay with everybody,
but if anybody else has any questions.

ATTORNEY GREGORY:  Anybody else?
Mike?

ATTORNEY PESTRAK:  No, I'm good.
Thank you.

ATTORNEY KAMINSKY:  All right.
Well, then, if that is the case --

ATTORNEY RASHATWAR:  Very -- very
brief follow-up.  Just a very brief
follow-up based on what you were asking,
Jon.  Okay?

Page 155

- - -

EXAMINATION

- - -

BY ATTORNEY RASHATWAR:

Q.   Does an intake nurse play a role in
patient care at PDP?

Does an intake nurse play a role in
patient care at PDP?

A.   Only -- if something is urgent -- I
mean, play a role in patient care at PDP.

Q.   Yeah.  Does the intake nurse do
anything to assist with patient care?

A.   If there's something urgent that
comes up at intake, if the patient has a wound
and she like cleaned a wound and wrapped it at
that immediate time, yes.

Q.   And intake nurses, do they also play
a role in designating care that might be needed
for chronic care patients or diabetic patients?

A.   If a patient comes in and says
they're a diabetic, when she documents it and
locks that note, that note automatically
schedules a bunch of things pertaining to
diabetes or hypertension or asthma or seizures.

Page 156

Q.   And can an intake nurse provide a
follow-up glucose check on a patient with
elevated glucose levels?

A.   She can schedule an appointment or
let triage know.

ATTORNEY RASHATWAR:  Okay.  That's
it for me.

ATTORNEY GREGORY:  Okay.  Thank you
everyone.

THE REPORTER:  Can I ask counsel to
state whether you would like a copy of the
transcript?

ATTORNEY RASHATWAR:  Yes, please.
I'll take a mini and a full.

ATTORNEY PESTRAK:  I'll take the
same.  Electronic only, please.

ATTORNEY GREGORY:  Same for me.

ATTORNEY KAMINSKY:  Same here,
electronic only.

ATTORNEY THOMAS:  I'll just take a
full electronic.

THE REPORTER:  Thank you.

(Witness excused.)

(Deposition concluded at

Page 157

approximately 1:48 p.m.)

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 45 of 76

Deposition of Lynda Witkowski                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1                                    – – –

2                        E R R A T A    S H E E T

3                                    – – –

4

5    PAGE        LINE        CHANGE

6    _____      _____      _____

7    _____      _____      _____

8    _____      _____      _____

9    _____      _____      _____

10   _____      _____      _____

11   _____      _____      _____

12   _____      _____      _____

13   _____      _____      _____

14   _____      _____      _____

15   _____      _____      _____

16   _____      _____      _____

17   _____      _____      _____

18   _____      _____      _____

19   _____      _____      _____

20   _____      _____      _____

21   _____      _____      _____

22   _____      _____      _____

23   _____      _____      _____

24   _____      _____      _____

1                    ACKNOWLEDGMENT OF DEPONENT

2

3              I,                          , do hereby

4      certify that I have read the foregoing pages and

5      that the same is a correct transcription of the

6      answers given by me to the questions therein

7      propounded, except for the corrections or

8      changes in form or substance, if any, noted in

9      the attached Errata Sheet.

10

11

12

13

14

15      _____    _____
        Date          Signature

16

17

18

19

20

21

22

23

24

1                        CERTIFICATE

2

3

4              I HEREBY CERTIFY that the
    witness was duly remotely sworn by me and
    that the deposition is a true record of
5   the testimony given by the witness.

6              It was not requested before
    completion of the deposition that the
7   witness, LYNDA WITKOWSKI, have the
    opportunity to read and sign the
8   deposition transcript.

9

10

11

12

13

            KRISTY L. LIEDTKA, a Court
14          Reporter and Notary Public
            Dated:  November 26, 2025
15

16

17

18              (The foregoing certification

19   of this transcript does not apply to any

20   reproduction of the same by any means,

21   unless under the direct control and/or

22   supervision of the certifying reporter.)

23

24

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 48 of 76

Deposition of Lynda Witkowski                                  Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

## WORD INDEX

**< 1 >**
**1** 104:22  145:14
**1:09** 138:4
**1:20** 138:2
**1:22** 138:5
**1:48** 157:1
**10** 84:18  143:23
**10/28** 143:19, 22, 23
144:3
**10/30** 115:23
**10/31** 116:15
**10:03** 1:20  143:20, 22
**100** 36:17, 24  46:19
134:4
**105** 4:13
**11** 64:3
**11/1** 116:23
**11/21** 80:11, 13, 16
**11/3** 115:16
**11/4** 115:23
**11/5** 115:16  116:24
**11:17** 64:2, 10
**11:30** 64:4, 8
**11:31** 64:11
**11:46** 76:8
**11:49** 76:9
**1100** 3:4
**12** 1:17  21:18, 20
23:1, 7  143:24
**12/1/23** 68:5
**123** 5:7
**14** 28:10
**141** 4:6
**14th** 2:11
**15** 9:7  13:13, 17
21:8  26:16  63:14
**1515** 2:12
**155** 4:6
**15th** 3:4
**17** 5:7
**1717** 3:11
**18** 4:13  65:16  66:6,
18, 21
**1801** 2:19
**19102** 2:12  3:5
**19103** 2:19  3:12
**19123** 2:6

**1996** 11:1

**< 2 >**
**2** 124:12
**2:24-cv-05618-TJS**
1:15
**20** 97:22
**200** 92:22, 23  93:4
**2011** 14:1
**2014** 14:2  36:5
47:20
**2019** 14:6
**2020** 14:6  136:22
**2021** 12:19  136:22,
23
**2022** 18:12
**2023** 12:19  18:12
36:13  47:24  49:8
50:15  51:4  106:21
133:21
**2025** 1:17  98:5, 23,
24  99:7  160:14
**215** 2:13, 20  3:5, 12
**26** 160:14
**28th** 143:16, 21

**< 3 >**
**3** 105:6  110:6  112:3
147:15
**30** 70:21, 22  97:24
**300** 88:16, 22  89:22
**306** 2:5
**3496** 105:12
**3498** 105:7
**3499** 114:8
**3500** 143:11
**3501** 117:7
**3503** 111:15

**< 4 >**
**4** 111:10, 16, 24
112:14  113:11, 17
114:1, 5, 7
**411** 88:3, 8, 22, 23
89:5
**412** 2:6
**47127** 1:24

**< 5 >**

**5** 114:22
**500** 89:6
**561-2300** 3:12
**564-0400** 3:5
**569-4433** 2:20
**585** 82:16

**< 6 >**
**6** 4:6  117:6
**6/23/25** 105:2, 24
106:4, 8
**610** 3:11
**654-9070** 2:6
**66** 4:13
**683-5417** 2:13

**< 7 >**
**7** 82:6
**72** 52:24
**770** 2:18

**< 8 >**
**8A** 84:12

**< 9 >**
**990** 2:5
**9A** 89:6

**< A >**
**a.m** 1:20  64:10, 11
76:8, 9  144:13
151:22
**a/k/a** 27:23
**A1** 71:1  152:19, 23
153:11, 19  154:2
**A10** 86:3, 14
**A11** 87:17  96:2
**A12** 94:20  95:2
**A13** 94:20  95:4
**A2** 152:20  153:20
154:3
**A5** 79:1
**A7** 82:8
**A8** 95:5
**able** 25:6, 8  33:8
66:2  68:1, 12  71:16
76:12  90:8, 10  93:19
107:17  132:19
141:16  142:16  144:6

**147:8, 12**
**ABOLITIONIST** 2:3
**absolutely** 12:23
30:24  59:20  63:8, 9
126:24  136:15
150:22
**abundance** 136:10
**accepted** 111:19
**access** 92:15
**accurate** 120:13, 21
144:11
**accurately** 11:24
12:8  37:4  119:2
134:3, 6
**ACKNOWLEDGMEN
T** 159:1
**acronyms** 143:1
**act** 123:14
**acting** 40:24
**ACTION** 1:3  4:13
57:8, 9, 18, 24  58:5,
11, 12, 17  64:20  65:4,
9, 14, 16  66:6, 11, 21
68:5, 15  70:13, 18
71:20, 21  72:15
73:13  75:15, 20  77:8,
22  78:2, 4  79:11, 24
80:3  81:2, 23  96:2,
14  97:3, 17  99:14, 21
100:13  119:17  120:1,
12, 13, 23  123:13
130:16, 22, 24  131:6
147:3, 9  150:2, 16, 20
**actions** 118:4  119:1
128:21  142:17, 19
**activity** 91:23
**actual** 55:2  69:7
91:6  150:4
**add** 140:4
**addition** 35:9, 10
36:19  50:10  71:22
84:8
**additional** 25:3
26:23  29:9  78:9
90:6  111:5
**administered** 31:9
33:22  34:3, 8, 10, 12
45:9  51:24  84:21
85:15, 23  87:14
116:11, 14  137:7, 12

**administration** 22:*14*
34:*16* 35:*16* 36:*10,
14* 38:2 69:*4, 13, 18,
21, 23* 71:*19* 72:8
73:*10, 16* 77:*15, 17*
82:*14* 83:*8, 20* 96:5
97:2 114:*23* 115:*7,
20* 136:6 138:*16*
139:*18* 143:9 144:9
**administrator** 25:*7*
70:*5, 6*
**administrators** 1:*4*
57:*19, 23* 58:*1, 6*
70:*1, 2* 73:*1* 77:*18,
19* 78:*11, 18* 96:*20*
109:*3* 119:*18*
**admission** 74:*1*
76:*23* 77:*1*
**admits** 149:*21*
**admitted** 126:*1*
143:*19, 21*
**adverse** 49:*9, 14*
**Affairs** 103:*10*
**afternoon** 141:*10*
**agency** 31:*21* 135:*2,
3, 4, 7*
**ago** 7:*1* 10:*19, 21*
12:*18* 21:8 28:*5, 10*
128:*19*
**agree** 112:*4, 12*
149:2, *13, 15*
**ahead** 34:*21* 65:*20*
103:9
**al** 1:8
**Alabama** 60:*19*
**alleged** 125:*10*
**altered** 107:*20, 24*
**amount** 35:8 85:*1*
93:*13, 22* 94:*1, 8*
**analysis** 49:*19, 23*
102:*12* 121:9
**analyzed** 74:22
**and/or** 55:6 160:*21*
**announcements**
16:*11, 14*
**Answer** 5:5 7:*16, 17,
24* 37:3 62:16
103:*16* 108:16
110:*12, 18* 119:*1, 7, 9*
121:22 123:*17* 126:5

127:22, *24* 130:*3*
134:*3* 140:*1* 144:2, *6*
146:*3* 148:8 149:*23*
**answered** 147:*20*
149:*24*
**answering** 134:6
147:*24*
**answers** 159:6
**anybody** 140:*20*
154:*12, 13*
**anymore** 46:*18*
**anytime** 31:6
**Apollon** 2:*21* 141:*12*
**apologize** 15:*19*
20:*23* 143:7 150:22
154:6
**appear** 45:6
**APPEARANCES** 2:*1*
3:*1*
**appeared** 95:*13*
**appears** 82:*15* 95:2,
22
**applications** 83:*3*
**apply** 160:*19*
**appointment** 43:*8, 12,
13, 19, 23* 44:*5, 7*
148:*1* 156:*4*
**appropriate** 73:8
89:*4*
**approximately** 157:*1*
**approximation** 12:22
18:*13, 14*
**Arch** 2:*12* 3:*11*
**area** 33:*5* 39:*10, 14,
15, 16, 23, 24* 90:*16,
18* 91:*3* 93:*7* 117:*24*
153:*24* 154:*1*
**areas** 12:*1, 2, 3*
16:*17* 53:*8, 9* 57:*10,
14* 82:*4* 91:*8, 9*
102:*24* 117:*15* 118:*1,
3, 6, 9, 12, 18* 151:2, *4*
**argument** 125:6
**arises** 20:*1* 40:*10*
**arose** 22:*16*
**arrest** 27:*13*
**arrested** 27:*12, 16*
**asked** 62:*23* 98:*14*
108:8, *10, 21* 125:*16*

127:*10* 128:*12* 129:*4,
7* 132:*18*
**asking** 25:*13* 36:*13*
84:*1* 93:*15* 94:*20*
121:*21, 23* 122:5, *6,
17, 20* 123:*6, 11, 15*
125:*6, 8, 9, 21* 126:*9,
14, 16, 21, 22* 129:*10,
17* 154:*21*
**asks** 33:*7*
**aspect** 135:*24*
**aspects** 112:*18*
**assert** 126:*2*
**asserted** 125:*24*
**asserting** 124:*1*
**assess** 90:*7*
**assessment** 33:*11*
42:*12* 90:*5, 11* 94:*15,
18* 149:*20*
**assigned** 153:*12, 13*
**assignment** 113:*23*
**assist** 69:*1* 136:*12*
155:*12*
**assistance** 57:*20, 22*
110:*19*
**assistant** 70:*5* 146:*17*
**assisted** 67:*5, 6*
68:*24* 69:*3* 97:2
**assisting** 15:*12* 81:*16*
**associate's** 9:*16*
**associations** 11:*3*
**assume** 8:*1* 137:*5,
13* 144:*1*
**assumes** 148:*15*
**assuming** 80:*12*
86:*14* 105:*23* 106:*4,
8*
**asthma** 155:*24*
**attached** 159:*9*
**attempt** 19:*17* 60:*4*
76:*23*
**attend** 54:*10* 55:*18,
23* 56:*1*
**attendance** 55:*19, 21*
**attention** 90:*3*
**ATTORNEY** 4:*6*
6:*8* 15:*5, 15* 25:*10,
14, 15, 18, 22, 23* 26:*2,
4, 8, 11* 63:*18, 23*
64:*4, 5, 7, 8, 9, 12, 14*

65:*2, 7, 13, 15, 18, 19,
22, 23, 24* 66:*17, 23*
67:*13, 18, 21, 22* 68:*2,
9* 76:*4, 10, 15, 17*
105:*11, 19* 119:*4, 8*
122:*1, 3, 10, 12, 13, 16,
21* 123:*5, 19, 20, 23*
124:*4, 6, 8, 9, 10, 13,
14, 22* 125:*4, 12, 13,
15* 126:*8, 18* 127:*2, 8,
11, 12, 13, 16, 23*
128:*7, 8, 23* 129:*1, 3,
6, 7, 13, 16* 130:*1, 3, 7*
133:*2, 3, 7, 9, 10*
137:*8, 10, 14, 19, 22,
24* 138:*1, 2, 3, 6, 9*
140:*15, 19, 21, 22, 24*
141:*2, 4, 9* 149:*9, 12,
22* 150:*1* 154:*9, 13,
15, 17, 19* 155:*4*
156:*6, 8, 13, 15, 17, 18,
20*
**attorney-client**
123:*24* 124:*5*
**audio** 15:*20* 20:*24*
**audit** 12:*1, 8, 9*
46:*16, 20* 51:*11, 12,
16, 17, 22* 72:*23* 73:*4,
7, 12, 21* 74:*2, 5, 8, 12,
14, 20*
**audited** 73:*16*
**auditing** 11:*12, 13, 14*
12:*3* 46:*12* 48:*14*
50:*16, 18, 20* 51:*4, 6,
7* 73:2
**audits** 19:*2, 3* 46:*19,
21, 23, 24* 57:*13*
73:*10* 74:*14, 23*
100:*15*
**Austen** 3:*18*
**authority** 149:*3, 16*
**authorization** 41:*3*
**authorized** 40:*16*
41:*4, 6* 148:*12*
**automatic** 75:*24* 76:2
**automatically** 20:*4*
43:*13, 18* 85:2 87:*4*
106:7 155:22
**autopsies** 100:*20, 22*

**autopsy** 101:*1, 4, 5, 6, 7* 102:*8*
**average** 34:*4*
**aware** 56:*11* 96:*17, 18, 22*
**awareness** 118:*6* 120:*9* 143:*3*

**< B >**
**B1** 152:*23, 24* 153:*11* 154:*3*
**B2** 152:*24* 154:*4*
**Bachelor** 9:*17*
**Back** 18:*19* 21:*17* 23:2, *9, 23* 25:*16* 26:*6* 30:*4* 35:*14* 38:*22* 45:*11* 46:*15* 64:*2, 12* 68:*7, 10* 70:*3, 6* 76:*11* 90:*14* 94:*6* 138:*6, 8, 10* 143:*17* 144:*8*
**backlog** 136:*10*
**backtrack** 21:*6* 52:*6*
**Ballpark** 63:*2*
**Band-Aids** 93:*6, 7, 12* 94:*10*
**based** 71:*22* 78:*7* 85:*6* 114:*10* 121:*23* 130:*21* 131:2, *3* 154:*21*
**basically** 11:*12, 14* 14:*7* 16:*19* 22:*9, 10, 22* 23:*16* 24:*11* 25:*5* 29:*5* 35:*6* 36:*12* 42:*13* 48:*11* 72:*17, 18* 82:*21* 85:*22* 95:*16* 110:*11* 112:*9*
**basis** 17:*19, 23* 34:*2* 86:*22* 96:*20* 146:5, *7*
**Bates** 66:*7* 105:*7*
**bathroom** 64:*1*
**bedside** 27:*21, 22, 23* 28:2, *11* 73:*20*
**beginning** 1:*20* 15:*5* 25:*17* 124:*15*
**behavioral** 20:*21* 79:*6, 20* 101:*23, 24* 102:*2, 6, 7* 104:*9*
**believe** 36:*24* 47:*18* 50:*18* 79:*12* 85:*2*

88:*8* 91:*4* 111:*11* 127:*8* 133:*24*
**belt** 11:*11*
**benefit** 113:*5*
**best** 48:*9*
**better** 47:*18* 64:*22* 68:*6*
**beyond** 109:*16* 112:*22* 114:*19*
**big** 14:*9, 17*
**birth** 19:*21* 77:*1*
**bit** 9:*15* 15:*24* 130:*12*
**blacking** 15:*2*
**BLAIR** 1:*8* 3:*7*
**Blanche** 2:*15*
**blank** 84:*19*
**blanks** 85:*11*
**block** 39:*8* 41:*7* 90:*19* 152:*18* 153:2, *14, 15* 154:*2*
**blocking** 93:*14*
**blocks** 16:*17* 22:*17* 34:*9* 93:*3* 152:*11*
**blood** 33:*7* 35:*1, 4* 82:*16* 88:*3, 5, 22* 89:*5* 144:*14, 17, 21, 24* 145:*5, 18, 24* 146:2, *4*
**Bloodsaw** 2:*15*
**booking** 27:*22, 23* 28:2, *11* 73:*20*
**Boulevard** 3:*4*
**box** 37:*15* 85:*3*
**break** 8:*7* 63:*15, 19*
**breaks** 8:*7*
**BRET** 2:*4*
**bretgrote@abolitionist lawcenter.org** 2:*8*
**brief** 154:*20*
**bring** 22:*12*
**broken** 16:*22*
**BS** 144:*13*
**building** 152:*8, 14* 153:*22*
**buildings** 34:*13* 153:*21*
**bunch** 155:*23*
**business** 15:*1*

**< C >**
**CABELLOS** 1:*8* 3:*7*
**call** 16:*9, 10, 13* 17:*6* 22:*11* 24:*17* 41:*4, 6* 45:*23* 74:*13* 88:*9, 14* 90:*12* 102:*8* 136:*5, 10, 11*
**called** 11:*17* 16:*8* 27:*22* 29:*4* 39:*9* 56:*9* 59:*6* 67:*10* 74:*2* 136:*17* 141:*20* 153:*20*
**calls** 16:*9*
**Camden** 21:*14, 16* 22:*5*
**campus** 21:*19, 20*
**cancer** 41:*22*
**capacity** 6:*17*
**card** 15:*1* 89:*24*
**care** 20:*19, 20* 22:*13, 14, 16* 23:*9, 12, 15* 24:*16, 17* 29:*7* 35:*16* 38:*19, 22, 24* 39:*7, 19, 20* 40:*2, 5, 11, 18* 41:*11* 42:*15* 71:*13* 91:*10, 22* 92:*2, 16* 93:*10, 24* 94:*4, 5* 96:*19* 114:*18* 116:*10* 131:*18* 132:*11, 14* 134:*18* 135:*23* 137:*2, 4, 6, 12* 155:*6, 8, 10, 12, 18, 19*
**cared** 35:*12, 19, 22* 93:*20*
**CAREERSTAFF** 1:*11* 3:*14*
**caring** 32:*14*
**Carney** 2:*15*
**carried** 51:*18*
**case** 6:*12* 53:*23* 54:*4, 7* 60:*8* 65:*6* 75:*15, 18* 81:*8, 20* 82:*2* 85:*14* 99:*12* 103:*1* 108:*24* 109:*5* 111:*22, 24* 112:*7, 10, 13* 114:*14, 18* 121:*12* 128:*12* 132:*18* 154:*18*

**cases** 6:*21* 53:*10, 14, 18, 20* 60:*19* 116:*5* 118:*23* 132:*2, 6*
**catch** 142:*24* 143:*7*
**categories** 111:*12* 119:*23*
**categorizing** 112:*23*
**category** 20:*3* 111:*10, 16, 24* 112:*3, 14* 113:*11, 17, 22* 114:*1, 5*
**cause** 19:*16* 38:*9* 76:*21* 102:*12* 143:*19*
**causes** 19:*17, 20*
**CCHP** 10:*10, 13, 19* 13:*3*
**CCHP-RN** 9:*22* 10:*20* 13:*4*
**cell** 86:*14* 100:*4*
**cells** 94:*21*
**CENTER** 2:*3, 18* 3:*4*
**certain** 20:*13* 35:*7* 85:*1*
**CERTIFICATE** 160:*1*
**certification** 9:*22* 10:*5, 7, 17* 11:*16* 160:*18*
**Certified** 9:*24*
**certify** 126:*4* 159:*4* 160:*1*
**certifying** 160:*22*
**CF** 69:*3* 97:*2*
**CFCF** 32:*22* 39:*6, 8* 69:*12, 16, 18, 23* 96:*5*
**challenges** 150:*10, 12*
**chance** 16:*23*
**change** 79:*16* 88:*11, 15* 91:*1, 4, 5, 7, 10, 13, 18, 24* 92:*12* 140:*4* 158:*5*
**changed** 14:*4* 47:*17* 88:*7, 13*
**changes** 96:*15* 159:*8*
**characterization** 119:*5* 130:*2*
**characterize** 71:*5* 123:*16*
**charge** 21:*15* 22:*4, 8, 23* 98:*19*

**Chart** 4:*13* 42:*5* 43:22 56:*16, 19, 20, 24* 57:2 65:*16* 66:2, *5, 16, 18, 21* 71:*9, 12, 14, 22, 23* 75:*21, 24* 76:*13* 78:22 79:2 80:2 82:22, *24* 85:7, *11* 86:*9, 12, 18* 101:*13, 14, 24* 109:*15, 16* 114:*12, 13, 19, 21* 138:*23, 24*

**charts** 22:*15* 51:8, *13, 17, 22* 73:2, *18*

**check** 34:*24* 35:*1* 37:*15* 82:*19* 89:2, 7, 8, 13 156:2

**checked** 146:2

**checks** 146:*1, 4, 7, 8*

**choose** 120:*21*

**choosing** 55:*23*

**chronic** 24:*16* 29:7 42:*15* 94:4 155:*19*

**chronological** 101:*19*

**CITY** 2:8, *14* 6:*12*

**CIVIL** 1:*3* 6:*11*

**clarification** 151:*12*

**clarify** 38:*21* 52:4 115:*11*

**cleaned** 155:*15*

**clear** 10:*23* 15:*16* 25:*10* 26:*3, 12* 44:2 48:*19* 55:*17* 81:*11* 85:4 89:*3* 122:4 124:*23* 125:*16, 19, 23* 126:*6* 127:*9, 18* 129:*15, 24* 139:*9* 145:*12, 15* 149:*11*

**clearly** 7:*15* 125:*3*

**client** 16:*20* 19:*6, 7*

**clinical** 9:*10* 10:*11* 12:2 15:*7, 9, 11* 16:6 17:*19, 23* 21:4 24:*13, 15, 18* 25:8 27:2 30:8, *9, 12, 14, 16* 31:6 47:*1, 2, 4* 49:4, *9, 15* 50:*16* 110:*21* 111:5

**clinically** 47:8

**close** 106:*14, 18*

**closed** 8:*16*

**closely** 17:9

**CM** 118:9

**co-counsel** 140:*16, 17*

**code** 74:*17* 117:*12, 13* 120:*14, 22*

**codes** 117:7, *14* 118:7, *10, 13, 21* 131:4, 8, *15* 142:*3, 5, 9, 12*

**collaborate** 69:*13, 24* 97:8, *10*

**collaborated** 97:*11* 103:9 119:*16* 120:22

**collaboration** 69:*15* 72:13 92:*12* 112:*24* 120:*16, 20*

**collaborative** 104:*3* 112:*17, 21* 113:8, *18* 120:4 126:*20* 148:*24*

**collaboratively** 103:*12, 13* 119:*18* 121:7, *14*

**collected** 19:*3, 12*

**collection** 19:7 33:*1*

**collectively** 121:7

**column** 67:*16* 68:*3* 71:*1* 72:6 73:4 79:*23* 84:*12* 100:*14*

**columns** 76:*16*

**come** 23:*17, 22* 33:*4, 9* 39:*14* 42:*16* 45:*3, 11, 21* 50:5 64:2 87:8 92:8 110:*14* 112:*17* 145:*20, 24*

**comes** 32:*21, 23* 47:4 71:*20* 78:*21* 101:8 155:*14, 20*

**coming** 8:*24* 78:*10* 91:*20* 92:2 94:6, *9*

**commented** 146:*24*

**comments** 54:*11, 13*

**Commissioner** 2:*14*

**Committee** 4:*15* 54:*15* 63:7 104:*24* 105:*13, 16* 107:8 108:*11, 13, 24* 133:6

**common** 62:*18* 83:*21* 84:2

**Commonwealth** 1:*21*

**community** 142:7

**company** 13:8, *9, 10, 11, 16* 26:*15* 104:*11*

**comparative** 121:8

**compared** 32:5 91:8 92:*21* 93:*1, 17*

**compile** 151:*3*

**compiling** 150:*12*

**complaint** 31:6

**complete** 33:8, *14, 20* 46:6 49:*21* 59:*13* 73:*10, 24* 80:7 148:4 150:6

**completed** 19:*18* 28:4 68:*3, 4, 15* 72:*19* 73:*19* 74:*21* 76:*23* 79:*24* 80:*3, 13, 15* 81:2 101:5, *8* 102:*14* 148:*17, 23*

**completes** 33:*10* 96:8

**completing** 19:6 73:5 97:*3*

**completion** 160:6

**compliance** 11:*13*

**concerns** 54:*13*

**conclude** 86:22

**concluded** 121:*24* 156:*24*

**conclusion** 87:8 113:*12* 116:*16, 18* 121:*18* 130:9

**conclusions** 50:*5* 78:*10* 110:*15, 17* 115:*21* 118:*23* 119:*3*

**condition** 147:*24*

**conduct** 16:2, *4* 28:*17* 49:*19*

**conducted** 52:*12, 13* 58:*21* 59:*1, 6* 62:*11* 65:5 77:*10, 21* 78:*1* 125:*1*

**conducting** 17:9 56:*18* 58:*13, 18* 61:*19*

**conducts** 53:*4*

**confirm** 107:*18* 114:*24* 148:*11*

**Connect** 67:*10*

**consecutive** 41:*18* 151:*18* 153:*1*

**consider** 150:*4*

**considered** 116:*17*

**considering** 39:22

**consult** 40:*21* 115:*3*

**consulted** 58:8 103:*4* 116:*1, 5*

**contained** 150:*11*

**content** 109:*17*

**Continued** 3:*1*

**contract** 113:7

**contracted** 31:*10, 13, 16, 19, 23* 32:4

**contracts** 54:*10, 20, 22, 23, 24* 55:7

**control** 160:*21*

**conversation** 128:*20*

**conversations** 126:*23* 127:*3* 128:*10* 129:8, *10, 11, 18, 20* 130:6

**copy** 64:*23* 102:*1, 2* 108:*20* 130:*23* 147:*1* 156:*11*

**Corinne** 3:*18*

**Corizon** 13:*11, 16, 18, 23* 21:8 25:*11, 21, 23* 47:*11*

**Corizon/YesCare** 23:*24*

**CORP** 1:*7* 3:*7*

**corporate** 20:*5, 7, 8* 29:*1, 4* 53:*12, 13, 20, 24* 54:*9, 19* 59:*8, 16* 60:*6* 67:*6, 7, 8, 11* 69:*8* 77:*3, 5* 98:*16, 17* 107:*14* 118:*19* 131:*14, 17*

**correct** 7:*5* 13:*20* 15:*18, 22* 17:*11, 15* 18:*15* 20:*9, 12* 26:*16, 19* 28:*18* 31:22 32:*12, 16, 19* 38:*15* 40:*15* 44:*13* 45:8 47:8 49:*7, 17, 22* 58:7 60:2 62:4 71:*24* 72:4 75:*10* 83:*9, 14* 86:*1* 87:*15* 88:4 90:*20* 101:*21* 102:*18* 105:*10*

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 52 of 76
Deposition of Lynda Witkowski
Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

112:*20*  114:*15*  115:9
116:*21*  142:*20*  143:5
144:*18, 19, 23*  146:22
147:4, 5  148:*14*
159:5
**correction**  75:*19*
119:*17*  147:2  150:*16*
**Correctional**  9:*24*
10:2, 7, 12  12:*15*
**corrections**  92:*13*
159:7
**Corrective**  4:*13*  57:8,
9, *18, 24*  58:5, *11, 12,
17*  64:20  65:4, 8, *14,
16*  66:6, *11, 21*  70:*13,
18*  71:*19, 21*  73:*13*
75:*15, 19*  77:8, *21*
78:*1, 4*  79:*11*  81:*23*
96:2, *14*  97:3, *17*
99:*14, 21*  100:*13*
119:*17*  120:*1, 12, 13,
23*  130:*16, 22, 24*
131:5  147:2, 9  150:2,
20
**correctly**  12:*3*
**corresponding**  107:*12*
**Coumadin**  41:*23*
**counsel**  6:*13*  45:24
46:*1, 5*  140:*18*
156:*10*
**count**  97:*19*
**counting**  119:22
**country**  113:6
**County**  21:*14, 16*
22:5
**couple**  99:*10*
**course**  19:*11*  37:7
40:*20*
**COURT**  1:*1, 21*
7:*10*  44:22  45:*10*
124:*16, 18*  160:8
**covered**  25:5  117:*23*
**covering**  48:*15*
**COVID**  17:*3*  134:*19,
24*  136:9, *14, 15, 22*
**crazy**  93:*21*
**create**  43:22  96:24
97:6  124:*19*  143:*12*
**created**  61:*12, 13, 16,
17*  67:17  69:5  70:*19*

98:*13*  122:7  141:*24*
143:*12*
**creating**  57:*17*  58:9
66:24  69:2  77:*21*
78:4  97:*18*
**credentials**  10:9
**CRIC**  34:20, *22*
87:*17*  116:*14*  146:9,
*11*
**critical**  40:2, *5, 18*
41:*16, 20, 21, 24*
44:*18*  151:*16*
**CT**  118:8
**CT1**  143:*3*
**cup**  33:*3*
**current**  9:8  13:8, 9,
10  16:*1*  21:*1*  28:*16*
29:*17*  38:*14*  106:6, 7
**currently**  7:4  9:2, *17*
36:8  147:22
**custody**  75:9
**cut**  68:4
**CY**  118:9

< D >
**daily**  34:4  146:5, 7
**Danielle**  50:*24*  81:5
**data**  19:2, 3, 6, 7, 8, 9,
12
**database**  68:*19*
**date**  1:*20*  57:*12*
67:*16*  68:5, *16*  70:*21,
23, 24*  71:*1*  72:*16*
79:24  80:*10*  85:24
101:*17*  105:*21, 24*
106:6, 7  153:5, *12*
159:*15*
**Dated**  160:*14*
**dates**  72:*23*  73:4
144:*21*
**day**  34:4, 8  35:*14*
45:*16*  88:*14*  146:*1, 2,
10, 12*  151:22  153:*18*
**days**  24:*15*  70:*21, 22*
**day-to-day**  34:*1*
**death**  56:*23*  64:*16*
75:9, *18*  101:*18*
107:6  108:*12*  111:*23*
121:*20*  122:9  123:4

125:*18*  127:*20*
128:22
**Debow**  50:*24*  81:6
**decedent**  123:*15*
**decided**  53:*10*
**decision**  113:*23*
**deck**  4:*16*  61:*12, 13,
15, 17, 21, 24*  98:9
99:2  104:*14, 16, 23*
105:*17, 21*
**decrease**  94:*1, 9*
**decreases**  94:*12*
**decreasing**  93:*13*
**dedicated**  83:7
**deem**  19:*24*
**Defendant**  1:*12, 15*
2:*21*  3:*14*
**Defendants**  1:9  2:*14*
3:6
**deficiencies**  125:*11*
**define**  146:*15*  149:6
**definition**  149:7
**degree**  9:*16*
**dental**  20:*21*
**DEPARTMENT**  2:8
9:5  14:3, *11*  18:2
22:*10*  47:*15*  57:*21*
73:*11*  103:*11, 15*
**departments**  104:3, 5,
8, 12
**depending**  34:4  35:2,
6  87:*21, 22, 24*
**depends**  39:3  40:9,
19  44:20  132:6
**DEPONENT**  159:*1*
**deposition**  1:*17*  5:2
6:*10, 11, 14*  7:9  8:*11,
18, 21*  15:6  66:20
105:*15*  127:*17*
146:24  156:*24*  160:*4,
6, 8*
**dereliction**  126:*11*
**derelictions**  126:*23*
129:*21*
**DESCRIPTION**  4:*12*
**designating**  155:*18*
**designation**  139:*17*
**determination**  61:*23*
85:6

**determine**  45:6
46:*13*  53:*13*  72:*18*
74:*23*  80:2  85:*13*
95:*17*  112:2  116:*1*
119:*23*  145:*15*
**determined**  20:5
45:*19*  53:*12*  75:*17*
84:*20*  86:*10*  93:9
111:*21*  116:*16, 24*
121:*1*
**determines**  20:*1*
72:5, *11*
**determining**  113:*16*
**develop**  80:*14*
**developed**  80:*15*
**deviation**  111:*18, 20,
22*  112:*19*
**deviations**  71:*13, 18*
75:22
**diabetes**  32:*15*  35:*13,
16, 21*  145:*13, 14, 15,
19*  148:*13, 16, 22*
149:*17, 21*  155:*24*
**diabetic**  19:*19*
121:*15*  146:4  149:*20*
155:*19, 21*
**difference**  32:*3*
42:*10*  52:*11*  83:*17*
94:*23*  100:*24*  101:*3*
**differences**  119:*24*
**different**  11:2  13:22
14:7, *22*  24:*23*  47:*23*
48:*24*  49:*1*  97:8
103:*20*  111:*12*
112:*18*  118:*1, 3, 6, 9,
16*  119:*21, 22*  121:9
127:*24*
**differently**  91:*17*
**direct**  55:2  160:*21*
**Direction**  5:5
**directly**  17:*20*  18:*1*
71:*11*  114:*11, 21*
130:*15*  132:*19*  147:*1*
**director**  9:*10*  14:2
15:7, 9, *10*  18:22
21:*3*  50:*11, 13*  55:5
70:*10*  71:9  72:9
78:*19*  109:*24*  111:*1*
**directors**  55:5, 6
61:9  72:9  109:2, 3

director's  71:*14, 23*
100:*18, 19, 20*  101:*12*
discharged  27:*17*
discovery  65:*10*  66:*5*
discrepancies  83:*22*
84:*2, 6*
discuss  103:*14*
124:*18*
discussed  53:*8*  54:*12*
152:*5*
discussing  104:*2*
discussion  76:*6*
112:*11*  128:*14*
disease  14:*16*  94:*5*
distancing  17:*4*
distinct  52:*21*  53:*3*
102:*15*
distinction  87:*12*
DISTRICT  1:*1, 2*
DKA  76:*24*
DM  147:*20, 22*
DNR  73:*24*
DNR/DNI  73:*19*
74:*19, 21*
doctor  133:*8*  146:*18*
Doctors  54:*23*
docu  117:*2*
document  37:*8, 10*
38:*4*  42:*12*  46:*10*
56:*9*  64:*23*  66:*8*
67:*1, 4, 14*  69:*5, 6, 8,*
*10, 11, 14*  71:*6*  78:*7,*
*19*  80:*9*  81:*13, 15, 18*
82:*20*  84:*16*  99:*16*
100:*10*  104:*19*  105:*9*
117:*20*  118:*20*  137:*6,*
*8*  141:*18*  143:*13*
145:*11*  147:*3, 7, 13*
150:*3, 4, 6, 13*
documentation  36:*1,*
*3, 21, 22*  37:*24*  38:*10*
57:*15*  82:*12, 23*
83:*10*  86:*8, 11, 18*
94:*22*  95:*5, 23*  108:*7*
115:*22*  137:*4*  138:*11*
documented  34:*16,*
*18*  36:*8, 10, 14, 15*
37:*6*  38:*2, 6*  42:*3*
82:*17*  84:*13, 22, 24*
85:*5, 15, 19, 20, 21*

87:*3, 13, 18*  94:*22*
95:*3, 14*  115:*16*
116:*2, 11*  117:*3*
138:*13, 17, 21*
documenting  42:*23*
56:*20*
Documents  5:*9*  8:*24*
30:*8*  34:*19*  38:*17*
56:*2, 6*  67:*11*  100:*2,*
*8, 12*  102:*9*  116:*17*
155:*21*
doing  17:*3*  38:*17*
40:*21*  64:*16*  85:*10*
90:*13*  91:*2*  102:*11*
113:*7*  114:*19*  136:*19*
137:*1*
Domer-Shank  18:*4*
DON  70:*7*
door  8:*16*
dose  41:*15*  60:*11*
151:*16*
doses  41:*16, 18*
151:*17, 18, 19, 22, 23*
doubt  133:*13*
downstairs  92:*8, 23*
93:*4*  152:*19*
Dr  110:*19, 22*
132:*24*  133:*4, 17, 20*
drafted  64:*20*  65:*4*
70:*13*
drafting  69:*14*  71:*6*
77:*8*  78:*1*  84:*7*
109:*14*  130:*20*
drop  136:*11*
drug  41:*22, 23*
due  70:*20*
duly  6:*3*  160:*4*
duration  26:*15*
duties  10:*11*  13:*1*
17:*10*  48:*12, 14, 17*

< E >
earlier  46:*23*  49:*5*
84:*17*  87:*21*  88:*12*
115:*6, 10*  141:*19*
142:*2, 24*  143:*7*
147:*10*  151:*9*  152:*5*
EASTERN  1:*2*

ECW  82:*11*  83:*23*
84:*4, 9*  86:*17*  115:*5*
117:*5*
education  9:*12*
15:*12, 14*  46:*6*  57:*10,*
*13*  60:*17*  73:*6*  113:*2*
educational  60:*9*
eduction  15:*13*
effective  105:*22*
effectively  90:*16, 22*
effort  148:*24*
eight  10:*19*
either  84:*21*  85:*14*
89:*5*  115:*4*  120:*16*
148:*8*
Eke  110:*2*
E-K-E  110:*4*
electronic  28:*7*
34:*18*  36:*2, 3, 7, 8, 16,*
*18, 20*  37:*1, 7, 17*
38:*3, 7, 10, 13*  44:*11*
58:*16*  77:*9*  78:*8*
80:*19, 21*  82:*13, 14,*
*21, 22, 24*  83:*1, 2, 5, 6,*
*10, 19*  85:*7, 11*  95:*23*
115:*4, 6, 20*  116:*4, 7,*
*8*  117:*5*  138:*15, 18,*
*22*  139:*2, 10, 17*
156:*16, 19, 21*
elevated  156:*3*
else's  134:*12, 13*
e-mail  97:*9*  99:*4*
107:*14, 17, 19*  108:*18*
e-mails  108:*21*
EMAR  82:*15*  95:*24*
115:*8, 19*  116:*3, 19,*
*20*  117:*3*  138:*23*
139:*19*
emergencies  22:*16*
emergency  14:*14*
32:*18*  79:*6*
employed  26:*15*
31:*17*
employee  24:*6, 9*
employees  47:*22*
63:*12*
employment  21:*9*
encounter  30:*20*
31:*3, 4, 7*  42:*5, 7, 13,*
*14, 16, 20*  43:*5*  44:*4,*

7, 8  86:*19*  88:*6*
89:*10, 16, 19*
ended  134:*24*  136:*16*
engagement  12:*11*
ensure  51:*8, 17*
71:*15, 16*  73:*18*
74:*21*  96:*7*
ensuring  11:*13*  72:*20*
entail  24:*5*  54:*6*
102:*4*
enter  66:*18*  105:*12*
131:*15*
entered  43:*15*  44:*10,*
*11*  68:*17*
entering  43:*6*  44:*3*
67:*6*
enters  44:*4*
entire  7:*16*  67:*14*
123:*9*
entry  84:*12*
equipment  39:*18*
118:*5*
ER  23:*5*
Errata  159:*9*
error  19:*16*  60:*15*
76:*21*
escorted  92:*5*
especially  136:*9*
ESQUIRE  2:*3, 4, 11,*
*18*  3:*3, 10*
estate  1:*4*
estimate  93:*19*
et  1:*8*
Event  4:*15*  19:*14, 15,*
*20, 22*  20:*2, 4*  40:*10*
53:*1*  59:*4, 17*  61:*1, 5,*
*11, 14, 16, 18*  62:*10,*
*14, 15, 20, 22*  63:*4*
70:*13, 14, 17, 18, 23*
71:*1, 8*  74:*9*  75:*14,*
*19*  76:*19, 20*  77:*2*
78:*13*  81:*9, 22*  91:*5*
94:*14*  97:*16*  99:*23*
100:*10*  103:*12, 13*
104:*23*  105:*13, 16*
106:*15, 16, 19, 20*
107:*7*  108:*3, 11, 24*
110:*23*  111:*10, 24*
112:*11, 23*  114:*1*

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 54 of 76

Deposition of Lynda Witkowski                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

131:*23*  132:*5*  133:*5*
150:*2*
**events**  19:*12, 13*
47:*5*  49:*9, 15*  59:*9,
18*  62:*6, 24*  74:*22*
75:*2, 5, 8*  77:*4*  94:*11*
99:*22*  102:*6*
**Everest**  1:*24*
**everybody**  137:*21*
154:*11*
**evidence**  105:*14*
**exact**  60:*22*
**exactly**  22:*7*  34:*8*
44:*10*  54:*2, 5*  79:*19*
91:*17*  96:*5*
**EXAMINATION**  6:*6*
141:*7*  155:*2*
**examined**  6:*3*
**example**  32:*22*  39:*20*
42:*1*  74:*16*  96:*2*
151:*20*
**Excel**  66:*2*  76:*13*
99:*15*
**exchanging**  97:*8*
**exclusive**  36:*9*
**Excuse**  103:*13*
**excused**  156:*23*
**exhibit**  66:*19, 20*
105:*12, 15*
**exist**  25:*17*
**exists**  68:*11*
**expanded**  67:*19*
**experience**  47:*17*
60:*13*  113:*9*
**expert**  125:*21*
**explain**  11:*15, 16*
34:*22*  82:*10*
**explained**  152:*2*
**explains**  111:*12*
**extensive**  11:*21*
**extent**  123:*21*
**extra**  111:*6*

< F >
**F5**  79:*23*
**facilities**  25:*1*  39:*4*
40:*1, 6*  113:*5*  136:*2,
4, 18*

**facility**  22:*6*  32:*23*
34:*10*  39:*3*  52:*10*
53:*1*  143:*21*  152:*14*
**fact**  107:*1*
**facts**  56:*20*  110:*10*
**factual**  114:*20*
**failed**  119:*1*
**failure**  44:*17*  45:*5*
118:*2, 5*  123:*13*
**failures**  121:*19*
122:*8*  123:*3*  125:*18*
127:*19*
**fair**  35:*17, 18*  72:*1*
87:*8, 10*  144:*20*
145:*10*
**fall**  133:*21*
**familiar**  28:*20*  30:*16*
35:*15*  38:*9*  41:*10*
51:*3*  52:*2, 7, 16*
53:*22*  79:*17, 18, 19,
22*
**far**  142:*6*  143:*8*
144:*7, 12*  151:*13*
152:*6*  153:*9, 23*
**fast-acting**  35:*9*
**feedback**  130:*12*
**feel**  77:*2*
**felt**  19:*10*
**figure**  63:*21*  65:*11*
107:*21*  118:*2*
**fill**  37:*10*  136:*17*
**final**  67:*16*  100:*23*
101:*1, 4, 7, 8, 9*  150:*7*
**find**  44:*21, 24*  46:*4*
57:*11*  118:*7, 10, 13,
20*
**finding**  112:*17*
113:*11, 12*
**findings**  103:*5, 8, 14*
**fine**  63:*16*  64:*8*
126:*3*  138:*1*  151:*1*
**fingerstick**  35:*1*
87:*22, 23*  88:*1*
**finish**  7:*16*
**first**  21:*24*  23:*24*
24:*2*  47:*13*  106:*2*
111:*17*  118:*24*
119:*12*  124:*3, 15*
140:*20*

**five**  6:*22*  63:*2, 24*
93:*11*  101:*10*  119:*22*
137:*15*
**five-minute**  63:*15, 19*
**flag**  41:*10, 14*  42:*2,
13, 19, 20, 23, 24*  43:*2,
7, 12, 18, 23*  44:*3, 10,
15, 19*  45:*4, 7, 20*
46:*12*  86:*5, 18*
151:*13, 14, 15*  152:*1*
**flags**  42:*18*  45:*22*
46:*8, 17*  83:*12*
151:*10*
**floated**  23:*3, 4*
**Floor**  2:*11*
**focus**  144:*8*
**folks**  138:*7*
**follow**  26:*22*  46:*18,
24*  113:*24*
**followed**  46:*8*
**follows**  6:*4*  45:*20*
46:*23*
**follow-up**  154:*11, 20,
21*  156:*2*
**foregoing**  159:*4*
160:*18*
**forensic**  49:*19*
**forget**  59:*5*
**form**  37:*9*  42:*11*
73:*24*  86:*16*  87:*1, 5*
96:*20*  119:*5*  120:*24*
123:*22*  130:*2*  149:*10*
159:*8*
**former**  2:*14*
**forms**  74:*17, 19, 21*
117:*4*  118:*11*
**forth**  68:*8, 11*
**found**  60:*15*  66:*14*
74:*6*  75:*22*  86:*17*
**foundation**  65:*12*
**four**  7:*3*  10:*21*
12:*18*  39:*4*  47:*21*
48:*5*  101:*10*  106:*23*
107:*1, 5*  112:*6, 7, 8,
12*  119:*22*  127:*6*
154:*2, 3, 4*
**Fourth-Party**  1:*15*
**frame**  86:*19*
**Frasier**  2:*15*

**frequently**  136:*13*
**front**  113:*23*
**full**  101:*13, 14*  102:*7*
156:*14, 21*
**full-time**  31:*17*  32:*5*
**fully**  140:*1*
**function**  131:*17, 21*
**further**  94:*21*

< G >
**Garden**  2:*5*
**gathering**  150:*10*
**GAY**  1:*8*  3:*7*
132:*24*  133:*4, 7, 12*
**Gena**  2:*15*
**general**  16:*16, 17, 24*
17:*2*  27:*2, 19*  30:*5*
92:*7*
**generalized**  29:*3*
32:*13*  74:*12*  91:*21,
22*  92:*11*  102:*23*
**generally**  23:*14*
62:*13*  92:*17*  93:*16*
100:*2, 9*  111:*19*
132:*21*  152:*3*
**generate**  43:*18*
**generated**  50:*4*  56:*2,
6, 15*  58:*6*  75:*14*
79:*7*  86:*19*  99:*22*
148:*1*  151:*15*  152:*1*
**generates**  43:*13*
151:*13*
**generating**  50:*8*
56:*13*
**gentleman**  46:*22*
**getting**  10:*4*  93:*18*
124:*20*  130:*11*  154:*5*
**girls**  81:*5*
**give**  7:*12*  8:*18*
45:*12*  67:*23*  79:*2*
82:*7*  89:*23*  93:*7*
99:*9*  110:*10*  125:*7, 8,
9*  139:*24*  145:*9*
147:*6*  151:*6*
**given**  6:*14*  20:*15*
65:*9*  84:*16, 17*  85:*19*
106:*11*  123:*10*
151:*21*  159:*6*  160:*5*
**giving**  8:*10*  122:*2*

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 55 of 76

Deposition of Lynda Witkowski                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

glucose 138:12
156:2, 3
go 10:10 11:22
16:15 23:23 24:10,
12, 14 25:7 27:14, 16,
18, 19 31:24 32:2, 7
33:9 34:21 39:13, 23
43:21 45:10, 12
46:15 63:24 65:20
76:5, 11 78:23 92:4
93:8, 22 94:1 102:24
104:14 107:23
124:21 138:6 140:20
143:17 153:3, 10, 23
goes 29:5 33:5
67:11 125:2
going 6:10 8:1
15:19 21:6 38:23
53:14 63:13, 15, 21
65:8, 10, 20 66:18
67:23 72:12, 21
75:18 76:10 86:2
91:23 92:10 93:12,
13 94:3, 7, 12, 19
98:4 104:13 105:5,
12 110:5 114:7
119:4 120:2 122:14,
18 123:12, 17, 20
124:21 125:14 126:2,
4 137:15 141:15
144:2 148:10 149:22
Good 6:9 60:8, 16
121:7, 14 136:21
141:10 153:18
154:15
GORDON 3:10
gotten 47:18
graduated 21:11, 12
Great 8:17 63:20
104:18
green 11:11
GREGORY 3:3
15:5 25:10, 15, 22
26:2, 8 64:8 65:2, 13,
18, 22 67:13, 21 68:2
122:1, 10, 13 123:5
124:4, 8, 10, 14 125:4,
13 126:8 127:2, 11,
13, 21, 23 128:7, 23
129:3, 7 130:3 133:2,

7 137:8, 24 140:22
154:13 156:8, 17
grievance 19:6 20:16,
17 47:7
grievances 20:10, 13,
15, 16 47:7 48:16
GROTE 2:4
grounds 8:13
grouped 118:21
153:24
guess 12:4 28:19
67:2 68:7 106:22
107:2, 3 112:22
135:19
guessing 10:20, 21
guys 93:11

< H >
handled 89:20 91:7
handles 152:14
hands 24:19
happen 28:1 36:1
56:14 59:11 62:14
106:14 107:1 136:13
153:21
happened 37:2 55:3
63:5 71:2 78:12
81:9 85:12 101:20
102:6 107:4, 5
happens 61:5 107:16
harm 19:16 76:22
111:22
HCS 82:13 83:16, 17,
18, 22 84:3, 8 85:1
86:15 115:5, 8
head 55:13 58:19
Health 9:24 13:11
20:21 26:7, 8 28:7
34:18 36:2, 3, 8, 17,
18, 20 37:8, 17 38:4,
7, 13 44:12 47:11, 13
58:16 70:4, 5 77:9
78:8 79:6, 20 80:20,
21 82:21, 24 85:7, 11
95:23 101:23, 24
102:2, 6, 7 104:9
115:5 116:4, 7 117:5
138:18 139:3, 10
Health/YesCare 13:16

healthcare 16:24
17:2
hear 15:20 26:21
141:1
hearing 124:3
heart 125:2
held 1:19 13:23
53:1 124:19
help 67:24 94:2
109:20 113:8
helpful 106:1
hey 93:5 107:12
high 9:13, 14 21:10
23:15
higher 35:5 132:21
highly 124:24
hire 31:16
hired 26:6 32:1 48:7
history 21:9 56:22
108:22 147:20
HIV 41:23
home 21:14, 24
hopefully 37:13
hospital 7:2 19:20,
21 21:18 22:21
27:14, 16, 17, 20
40:13, 15, 23 76:21,
23, 24 79:4
hospitalization 19:18
hour 63:14
hours 52:24 85:1
housed 153:24
housing 38:20 39:1,
2, 7, 14, 23, 24 152:7
154:1
HR 24:13
HU 2:4
Human 24:14
Humulin 35:8 87:24
hundred 33:13 98:2
hundred-plus 33:13
Hyperglycemia 89:17
hypertension 155:24
hypothetical 153:6

< I >
ICU 23:10, 16, 18, 22
idea 64:22
identification 66:22
105:18

identified 66:15
79:15 82:23 120:23
151:2, 3
identify 79:5
II 10:2
imagine 8:6 27:15
92:5
immediate 155:16
immensely 94:2
impact 134:18 137:2,
4, 12
impactful 123:14
important 7:11 154:8
improve 57:11 68:23
73:1 79:9
improvement 12:11
14:3, 5, 10 17:14
18:1, 6, 18, 21 19:2, 5
28:15 47:10, 13, 15,
21, 24 49:18 50:9
53:9 57:14, 21 68:22
72:2 81:20 82:5
117:9 122:23 134:14,
15 135:24 137:1
151:2, 4
Inaudible 26:17
incarcerated 15:17
incident 71:2 111:10,
16 114:5
incidents 49:10, 16
include 30:7 57:3,
13, 14 75:8
included 24:8 51:13,
17, 22 54:2, 14, 18
55:1 115:18 132:21
includes 15:11 83:11
including 11:22
83:11
incorrectly 140:7
increased 92:15
135:5
independent 19:2
74:5, 8, 13 135:10
independently 148:12
in-depth 94:15
INDEX 5:2
indicate 128:2
indicated 127:19
Indicating 11:8
95:21

**indication** 122:7
123:2 125:17
**indicator** 42:2
**indicators** 48:21
**individual** 41:1
135:22 153:11
**individualized** 90:3
**individuals** 31:18
49:14 91:13 114:17
**individual's** 139:15
**in-facility** 77:1
**infectious** 14:16 94:4
**infirmary** 14:2
24:20, 21, 22 27:4, 5,
20, 21 28:3, 15 35:23
36:6 40:20, 22 41:1
74:1, 15, 18
**influence** 121:11
128:22
**Influenza** 17:4
**information** 30:3, 5
47:8 66:14 68:18
78:9, 14, 21 107:11
114:10, 14, 20 115:1,
2 130:21 150:11
**in-house** 19:21
**initial** 149:20
**injured** 27:13, 16, 18
**inmate** 30:4 31:6
32:21, 23 33:5 37:13,
15, 16, 20 93:5, 8
148:7 149:4, 17
**inmates** 22:10 27:11,
12 30:2 89:23 91:20
92:1, 4, 9 144:24
**inmate's** 148:22
149:16
**input** 114:3
**inquiry** 121:18
**inserted** 142:12
**instance** 34:7 84:22
85:12, 14 115:16, 22,
23 116:15 118:24
119:12
**instances** 115:24
**instructed** 127:21
**insulin** 22:13 33:21
34:1, 7, 15 35:5 36:9,
14, 15 37:5 41:23
51:23 84:13, 18, 21

85:13, 14, 18 86:3, 10,
22 87:13 94:22
116:14 121:15
138:20 139:6, 8, 10
145:8
**intake** 22:15 24:11,
16 27:7, 10, 21, 23, 24
28:2, 3, 4, 13 29:6
32:20, 21 33:11, 15,
17 73:24 101:17
119:1 147:16, 19
148:1, 7, 11, 17, 22
149:3, 5, 15, 18, 19, 21
155:5, 7, 11, 14, 17
156:1
**Intake/Receiving**
148:5
**intaked** 27:15 101:17
**intakes** 74:17, 20
**interacting** 135:11
**interaction** 135:14, 21
**interchangeably**
25:12 26:1, 13
**interest** 141:12
**internal** 68:18
103:10 113:11
118:14 142:6
**internally** 131:9
**interpret** 122:14
**interruption** 100:4
**intervene** 149:4, 6, 8
**intervention** 88:18, 20
**interview** 78:11
**interviewed** 96:20
**interviews** 57:4
77:10, 20, 24 96:23
114:17
**introduced** 141:20
**invite** 61:10
**invited** 54:10, 16
**involve** 134:9
**involved** 55:8 61:4,
7 63:1 96:19 98:5
102:19, 22 103:22
114:18 126:21
132:11, 14 134:4, 5,
16 135:23
**involvement** 98:11
140:11
**involving** 96:3

**IP** 15:17 20:10
39:14 40:17 41:15
86:21
**IPs** 15:14 16:11, 16
34:1 39:13 91:11
**issue** 128:4
**issues** 74:24 127:4
128:3 133:22 134:24
**items** 66:15 81:23
**its** 32:13

**< J >**
**Jacksonville** 9:18
**JACOB** 1:3
**jail** 21:15, 17, 21
22:5 29:17, 20 30:1
**JAMES** 1:3
**Jersey** 21:18
**JFK** 3:4
**jinx** 75:11
**jkaminsky@kiernantr**
**ebach.com** 2:20
**Job** 1:24 13:1 16:24
22:6
**join** 109:4 123:21
**Jon** 140:23 154:22
**JONATHAN** 2:18
141:11
**JR** 1:5
**June** 98:5 105:4
**JUNG** 1:3, 5 4:13
6:12 64:17 65:16
66:6, 21 133:6
135:11, 15 144:18
145:12
**Jung's** 75:18 81:8
98:6 99:18 108:12
109:5 121:20 122:9
123:4 127:20 128:22
132:7, 14 133:1, 12
140:11 144:21
**jurisdictions** 59:19

**< K >**
**Kalu** 110:2, 19
**K-A-L-U** 110:4
**Kalu's** 110:22
**KAMINSKY** 2:18
4:6 76:4 119:4
123:20 130:1 137:19

138:3 140:19, 24
141:4, 9, 11 149:12,
22 150:1 154:9, 17
156:18
**keep** 63:15
**Kennedy** 21:18 22:21
**kept** 62:21
**ketoacidosis** 19:19
**ketones** 82:19 89:2,
8, 12
**KIERNAN** 2:15
**KIMBALL** 3:3
**kind** 18:22 22:11
23:13 38:24 43:3
50:3, 4 56:13 72:18
92:16 94:11 95:19
106:3 136:3
**kinds** 38:16
**Knock** 75:7
**know** 7:19, 21 8:4, 8
10:18 14:14 30:1, 3,
19 33:1, 21, 24 34:15
36:16 37:2, 3, 23
38:1 42:20 45:17
50:3, 7, 20 51:7, 12,
16, 21 53:16 55:16
56:5, 21 57:15 59:7
60:7, 9, 10 61:2
70:10, 12 73:3 75:13
78:14 79:10, 13 80:1
83:18 85:20, 23 88:6,
11, 15 90:13 93:11
95:10 99:12 102:1
104:21 105:2, 23
106:12 107:22
108:16, 21 109:6, 9
117:17 119:20 121:3
122:19, 23 125:3, 23
126:3 127:11 130:19
131:16 134:5, 21
135:1, 6, 8, 9 136:11,
21 139:16 144:2
145:8 148:10 150:24
156:5
**knowing** 10:8
**known** 13:23 103:5
**Kristy** 1:20 160:8

**< L >**
**lab** 94:3

**LALITHA** 1:7 3:7
50:14
**Lantus** 145:21, 22
**large** 81:15, 17
150:14, 15
**larger** 48:18
**largest** 32:23
**lately** 16:23 38:18
**LAW** 2:3, 8
**lay** 65:11
**lead** 111:22
**Lean** 11:10
**learn** 24:22 60:12
113:3
**learning** 60:13 113:9
**leeway** 123:11
**left** 21:16 36:5
70:20 100:6 143:2,
16
**legal** 37:23
**length** 7:7
**level** 16:2 111:17
132:22, 23 136:11
139:7
**levels** 134:10, 17, 22
135:5 137:1, 11
138:12, 20 139:6
156:3
**liaise** 17:9
**license** 10:24
**licenses** 9:20
**Liedtka** 1:20 160:8
**likes** 59:8
**limb** 77:2
**Line** 5:6, 10, 15, 20
7:11 147:15 158:5
**Lisa** 50:24 81:6
**list** 41:23 45:22
46:16, 20 117:15
**literally** 42:17 88:13
130:23
**little** 9:15 27:12
33:3 37:15 39:11, 12
60:6, 8, 15, 16 130:11
**LLC** 1:11 3:14
**LLP** 3:3, 10
**locate** 118:13
**located** 86:9
**location** 1:19 93:20

**locks** 155:22
**log** 20:17
**Logan** 3:11
**logged** 45:15
**logging** 118:15
**long** 9:6 11:19 14:9,
17, 23 22:2, 18 28:4
33:12 62:9 99:1
131:22, 23 132:3, 7
145:2 149:21
**long-acting** 145:22
**longer** 80:22
**look** 12:20 15:1
19:11 46:15 47:5, 6
49:24 71:13 87:5
101:14 107:23
113:22 117:21
**looking** 79:1 86:16
87:16 96:1 106:3
111:14 115:12
141:19 145:10, 11
150:5 151:8
**looks** 138:7 147:21
**loop** 138:10
**loss** 77:1
**lost** 15:19 63:20
154:5
**lot** 19:8 34:12
55:24 81:19 92:10
93:23 94:7 114:3
123:10
**LOUIS** 1:4 64:17
**low** 74:16, 18
**LPN** 89:17, 22 90:12
91:24
**LPNs** 22:9 90:24
93:10, 18 149:1
**LYNDA** 1:17 4:5
6:2 128:2 130:4
160:7

**< M >**
**MA** 33:6, 8, 9, 18
**major** 77:2
**making** 43:8 44:7
48:15 56:21 85:5
87:12 116:17 125:6
**manage** 148:12
**managed** 135:9

**management** 14:11
39:10 90:16, 17 93:7
152:23, 24 153:1, 3
**manager** 92:20
**managing** 35:20
**MANSUKHANI** 3:10
**manually** 43:15, 22
44:4
**MAR** 116:8
**March** 136:22
**MARGARET** 2:4
**margo@alcenter.org**
2:7
**Mariesha** 2:21
141:12
**Marked** 5:19 66:5,
22 105:18
**Market** 2:19
**match** 29:16
**matching** 120:12
**matter** 71:8 141:11
**MAUREEN** 1:8 3:7
133:4, 7
**McGettigan** 51:1
81:6
**mean** 17:21 20:8
22:7 28:6 31:21
40:10, 13 43:12
44:23 46:3 47:3, 10
54:22 57:1 72:16, 23
81:18 84:14 86:7
87:2, 19 93:22 95:1,
7, 10 99:10 100:17
103:2 110:8 111:9,
15 113:2, 20 121:13,
14, 16 122:17 124:1,
23 126:1 129:20
135:16 138:23
140:17 150:19
155:10
**meaning** 31:13 57:15
**means** 82:11, 12
84:15 85:8 160:20
**meant** 95:15
**measurable** 72:22, 24
73:9 79:9
**med** 32:9
**med/surg** 23:4
**medical** 13:16 20:19,
20, 21 22:10 32:9

33:3, 4 38:7 40:7
50:10, 12 51:18 55:4,
5, 6 61:9 71:9, 14, 23
72:8, 9 78:18 92:12
100:17, 19 101:11
103:11 109:2, 3, 24
111:1 133:22 134:1,
2, 10, 17 135:17
139:18 142:7 147:23
152:13, 15 153:10
**medical-wise** 40:7
**medicate** 89:23
**medicating** 90:13
**medication** 19:16
37:11 38:2 39:11, 16
41:16, 17, 19, 20, 21
43:21 44:14, 18 45:9,
13, 16 60:5, 15 76:20
82:13, 15 83:1, 7, 19
84:3, 16 114:23
115:7, 20 136:5
138:15 139:18 143:8
144:8 148:2 151:16,
17, 19, 20, 21 153:14,
15, 19
**medications** 30:15
41:24 46:5 90:14
147:23
**Medication-wise**
83:24
**meeting** 59:24 60:20,
22, 23, 24 80:6, 10, 13,
23 97:7 99:6 102:23
103:18 107:11 109:4
112:4, 6, 9, 16 133:1
**meetings** 55:16
59:19 62:8 99:16
102:11
**member** 96:8 148:4
**members** 92:18
**memorialized** 78:15
109:10
**memory** 7:22
**mention** 140:12
**mentioned** 13:12
35:24 46:22 49:5
52:6 54:15 63:3
80:24 84:17 95:7
101:22 115:6, 9

152:6
**MICHAEL** 2:11
**michael.pestrak@phila**
**.gov** 2:13
**middle** 97:4
**Mike** 154:14
**mini** 156:14
**minimal** 92:2 94:9, 11
**minimize** 67:24
**minute** 151:7
**minutes** 63:14
**mirror** 120:4
**missed** 20:23 151:16, 17, 18, 19, 22, 23
**missing** 67:15
**mm-hmm** 7:14
**module** 148:5
**moment** 15:20 20:24 21:7 67:23
**monitor** 49:8, 14 148:22 149:3, 16
**monitoring** 148:16
**monitors** 47:16
**month** 62:15
**monthly** 16:8 19:1, 3, 5
**months** 21:13 22:3 59:7 61:3, 6 101:10 106:23 107:1, 6
**Mooningham** 98:19 108:14 109:11
**morning** 6:9 8:11 42:17 45:22
**Mortalities** 75:6
**mortality** 19:19 49:20, 21, 24 52:7, 8, 9, 10, 12, 17, 19, 20, 22, 23 53:4, 5, 6, 7, 11, 14 54:3, 5 55:2, 18 56:3, 10, 18 58:9, 13, 18, 22 59:2, 5, 23 60:3, 12 64:16 65:5 76:24 99:18 100:3, 9 102:12, 13, 20 103:19, 20 108:9 125:1 140:11
**mother/baby** 23:6
**move** 76:16 86:3

114:7 127:13, 14
**moved** 112:7
**moving** 84:11 114:22 117:6
**multiple** 44:2 109:1
**multitude** 51:10

**< N >**

**N/A** 73:4
**name** 6:9 18:3 135:18 141:11
**names** 55:12
**Name-wise** 50:22
**Narrative** 114:8
**nature** 112:23
**NCCHC** 10:8, 9 11:7
**NCCHP** 12:24
**ND** 85:2, 6
**near** 49:9, 15
**necessarily** 89:11 92:7
**necessary** 150:10
**need** 8:7 27:20 33:23 93:5 94:15 99:11 117:21 131:14 145:8
**needed** 19:11 25:6 66:15 155:18
**needing** 93:11
**needs** 43:15, 21 63:24
**NET** 30:19 42:8, 11 88:6, 8 89:10, 16, 19
**NET/Usage** 118:11 142:22
**NETs** 31:2
**never** 62:21
**New** 21:18 24:6, 8 29:24 42:5, 7 103:8
**nod** 7:14
**nonemergent** 94:11
**norm** 19:22, 24
**Normally** 52:22 57:19, 22 71:9, 12 133:15 153:13
**no-show** 38:5 44:24 45:2 84:17, 23 85:16 94:21 95:4, 6, 14, 18 115:15 139:16

**no-shows** 38:1
**Notary** 1:21 160:14
**notation** 95:19
**note** 46:10 155:22
**noted** 71:16, 17 83:4 122:18 159:8
**notes** 83:12 96:4 151:8
**notice** 1:19 99:8
**notification** 41:14
**notified** 82:17
**notify** 82:20
**November** 1:17 106:21 160:14
**NPH** 143:23
**NS** 95:8 139:20
**number** 66:7 74:16 93:1, 16, 17
**numbers** 117:13 144:15
**Nurse** 10:2 14:16 21:15 22:1, 4, 8, 22, 23, 24 23:2, 3 24:22, 24 25:8 27:2 29:16 37:9, 14 38:8 39:15 40:20, 24 43:10, 16, 21 44:3 73:23 82:16 84:15 85:6, 8, 19 86:14, 20 87:2, 6 89:19, 21 90:7, 8 92:19 93:6 95:7, 13 119:1 133:11, 14 146:17 149:3, 15 153:13, 14, 15, 16, 19, 20 155:5, 7, 11 156:1
**nurses** 30:13, 16 31:21 32:9, 10 39:23 40:16 41:4, 6 91:19 93:18 152:4 155:17
**nursing** 9:16, 18 10:3, 8, 12, 23 14:2 21:11, 12, 13, 24 28:21 30:11, 18, 20, 22 31:3, 4, 7, 9 32:17 38:19 39:6 42:11 70:10 132:20 138:13 152:13
**nutshell** 32:24

**< O >**

**object** 119:5 149:23
**objecting** 130:1
**objection** 122:17 123:21, 22 128:23 149:9
**objective** 130:21
**objectively** 114:4
**observed** 73:17
**obtain** 10:23
**obtained** 12:24 13:4 82:18
**obtaining** 11:17
**obviously** 7:9 87:1
**occur** 80:20, 23
**occurred** 53:2 56:21 64:10 76:7, 8 85:17 100:5 138:4
**occurs** 52:10
**O'CONNOR** 3:3
**October** 143:16, 21
**offer** 32:14 40:5
**offered** 29:10, 20 30:7 31:19 119:3
**office** 8:12, 15
**officer** 37:14, 22 89:24
**officers** 15:13 16:8 32:24
**official** 44:22
**offsite** 14:12 17:6
**off-site** 94:7
**Oh** 10:18 55:20 59:20, 21 68:4 88:13, 17 92:24 95:12 106:17 142:23 143:6
**OJT** 29:12, 14
**Okay** 6:19, 20 7:6 8:4, 8, 14, 17 9:2, 14 10:22 12:10, 21 15:4, 23 17:21 20:23 21:5 23:23 26:20 28:16 31:13 37:5 38:19 39:8 40:16 47:9 49:8 51:21 52:2 55:22 58:5, 24 59:21 62:9 63:9, 17 64:5, 7 65:7, 18, 21 66:4, 10, 17 67:22 68:6, 10, 14, 17 69:12, 22 70:8

71:4  72:1, 5, 15, 19
73:3  76:18  77:7, 13,
20  78:23  81:17  83:5,
21  84:11  86:2  87:11
88:17, 24  96:1, 13
98:4  104:10, 13, 14,
15, 18  105:1, 5, 11
106:9  108:5, 17, 23
109:13, 20  110:1
112:15  114:16, 22
115:13, 21  116:13
120:6  123:19  124:9,
22  125:15  127:16
128:9  130:8, 13, 18
131:7, 22  132:24
133:21  136:24
137:14, 18, 20, 23
139:5, 9, 15, 21, 24
140:9, 15  141:4, 18
142:2, 9, 15, 21, 23, 24
143:6, 15  144:4, 7, 24
145:3, 17  146:6, 11,
19, 23  147:6, 15, 18
148:15  149:2, 13
150:9, 23  151:6, 24
152:5, 12, 21  153:8,
17, 23  154:5, 11, 22
156:6, 8
**old**  109:24
**Omitted**  118:24
142:17, 18  143:2, 20,
22  144:3
**onboarding**  32:1
**once**  21:12  27:17
32:21, 23  33:2  43:11
71:7  87:3  101:5, 7
102:9  107:7  135:23
148:22  149:4, 17
151:3
**ones**  20:18  62:2
107:9
**one-to-three**  23:20
**ongoing**  25:3
**online**  11:20, 21, 23
**onsite**  14:13
**on-the-job**  29:13
**operate**  31:1
**opine**  125:21
**opining**  125:20

**opinion**  121:23
122:2, 5  123:6, 13, 16
125:10  126:17  131:2
**opinions**  130:19
**opportunities**  68:22
72:2  81:20
**opportunity**  72:21
79:3  82:7  112:24
121:4  139:24  160:7
**opposing**  140:18
**oral**  1:17
**order**  95:17  143:23
145:5  148:2
**ordered**  34:5, 7  51:9,
14, 19, 24  89:1
138:22  139:1, 6, 8, 13
145:2, 3, 7  146:9, 11
151:21
**ordering**  35:10  42:24
**orders**  30:15  51:18
84:3  139:8, 10  145:4
**ordinary**  149:7
**orientation**  24:7, 9,
19, 21  26:24  27:2, 3,
5  31:4  32:1
**orients**  29:24
**original**  27:1
**outcome**  121:12
**outside**  40:11  110:21
111:7  125:7  145:18
152:1
**overall**  91:24
**oversaw**  22:9, 15
**oversee**  14:12, 15
17:18, 20
**overseeing**  14:10
17:22  18:24  48:4
71:11  81:14
**oversees**  18:1
**oversight**  49:4, 11
111:6

**< P >**
**p.m**  84:18  138:4, 5
144:13  151:22  157:1
**P1**  118:8  142:16
143:2
**PAGE**  4:12  5:6, 10,
15, 20  37:12  104:22
105:6  110:6  114:7,

22  115:12  117:6
120:8  124:12  143:9
158:5
**pages**  106:2  119:20
121:5  159:4
**paper**  28:5, 6  34:19
36:21, 22  117:16, 23
**paperwork**  79:4
107:8  144:5
**Paralegal**  3:18
**Parkway**  2:11
**part**  11:2  12:11
13:1  17:16  20:14
47:24  50:15  51:12
73:13  74:23  75:24
81:12  96:14  97:18
100:3, 9  113:20
121:16
**particular**  75:15
109:6  129:21  131:11
153:5, 12
**party**  72:6, 12  96:4
**pass**  32:9  137:16
**pasted**  130:23  147:2
**pathways**  30:8, 9, 12,
14, 17
**Patient**  4:13  19:17
37:10  39:20, 24
40:12, 22  41:11  42:6,
13  43:20  44:20, 21,
23, 24  45:1  51:8, 13,
17, 22  52:2  56:22
57:2  59:4, 5  61:1, 5,
11, 20  62:10, 24  63:4,
6  73:23  76:22  79:3
82:24  86:15  87:3
94:15, 16  95:3, 18
98:6, 18  101:16, 20
104:23  105:13, 16
106:15  108:2, 11, 13,
23  110:23  111:20
114:18  117:3  131:23
132:4  138:23, 24
139:11  146:1  155:6,
8, 10, 12, 14, 20  156:2
**patient/nurse**  23:20
**patients**  14:13  23:13,
16, 17, 19  32:14  34:6
35:12, 19, 22  42:18
45:23  92:19  93:1, 16,

20  94:1, 5, 6, 8
145:20, 23  155:19
**patient's**  35:2  37:17
42:5  43:22  44:11
86:9, 17  87:21
114:12, 21  133:5
138:18  147:19
**pattern**  62:13  151:19
**patterns**  49:24
**PCU**  23:4, 11
**PD**  118:8  134:12
**PD2**  142:21
**PDF**  105:24  109:14,
18
**PDP**  13:13, 15  16:20,
22  17:9  24:1, 2  27:7
29:20  32:20  33:22
34:1  35:20  36:2
38:20  40:1, 5, 17
41:11  46:12  52:13,
14, 20, 23  58:2, 4
62:5  63:3, 5  69:10
75:3  77:17  91:10
96:10, 15  102:14
103:10  104:12
133:23  134:1  135:23
145:1  155:6, 8, 10
**PDP's**  62:2  100:21
102:19  103:19
**pending**  79:10, 24
80:6, 8  100:16, 22
101:1, 4, 6  150:8
**Penn**  2:18  3:4
**PENNSYLVANIA**
1:2, 20, 21  2:6, 12, 19
3:5, 12
**people**  14:11  54:8,
15  55:1, 8, 18  56:1
93:17, 22  109:2
126:21  135:23
**percent**  36:18, 24
46:19  134:4
**percentage**  74:19
**perform**  98:14, 20
108:9, 10  114:16, 17
**performance**  19:1, 4
48:21  111:19  117:9
**performed**  50:16
96:23  114:13
**performing**  122:24

**person** 15:*17* 45:*14*
98:*18* 113:*15*
**personal** 30:*3*
**personally** 53:*17, 19,*
*23* 58:*21* 73:*17*
135:*12*
**person's** 18:*3*
**pertain** 20:*18*
**pertaining** 155:*23*
**PESTRAK** 2:*11*
154:*15* 156:*15*
**Philadelphia** 1:*19*
2:*6, 8, 12, 14, 19* 3:*5,*
*12* 6:*12* 8:*13* 9:*4*
21:*22* 29:*8, 10* 59:*17*
60:*18* 101:*9* 113:*4,*
*13*
**phone** 100:*4*
**phrase** 91:*16*
**Physical** 104:*8* 152:*8*
**Physician's** 146:*17*
**PI** 19:*4* 48:*20*
**pick** 107:*9*
**piece** 60:*9*
**pinpoint** 23:*7*
**PIs** 48:*15*
**place** 49:*20, 22* 60:*1*
62:*19* 99:*17* 102:*11*
106:*18* 128:*10, 15*
129:*18*
**Plaintiffs** 1:*5* 2:*8*
6:*13*
**Plan** 4:*13* 57:*24*
58:*17* 64:*20* 65:*4, 9,*
*14, 17* 66:*6, 11, 21*
68:*5* 70:*13, 18* 71:*20,*
*21* 72:*15* 73:*13*
75:*15, 20* 77:*9* 78:*4*
79:*24* 80:*3, 7, 13, 14*
81:*2, 23* 96:*14* 97:*3*
99:*15, 21* 100:*13*
117:*10* 119:*18* 120:*1,*
*12, 13, 23* 130:*16, 22,*
*24* 131:*6* 147:*3, 9*
150:*3, 21*
**plans** 57:*8, 9, 18*
58:*6, 11, 12* 77:*22*
78:*2* 97:*17* 150:*17*
**play** 155:*5, 7, 10, 17*
**Plaza** 3:*4*

**please** 8:*4* 52:*4*
75:*10* 156:*13, 16*
**plus** 28:*2* 37:*9*
**PM** 84:*13*
**pneumonia** 17:*5*
**pods** 154:*2, 3, 4*
**point** 8:*2, 7* 34:*19*
63:*21* 95:*8, 11*
**points** 15:*24*
**policy** 46:*14*
**population** 27:*19*
92:*7*
**portion** 33:*1, 12, 14*
**position** 7:*4* 9:*8*
36:*6* 48:*24* 49:*1*
51:*6*
**positions** 13:*22* 28:*13*
**possible** 53:*9* 80:*9*
**potential** 76:*22*
**PowerPoint** 4:*15*
104:*16* 105:*17* 106:*6*
107:*23* 141:*23, 24*
142:*13* 147:*4*
**Practitioner** 133:*11*
146:*18*
**practitioners** 133:*15*
**predetermined** 112:*8,*
*13*
**prefer** 137:*23*
**prepare** 8:*20* 99:*2*
**prepared** 8:*17*
**prescreening** 33:*7, 18*
**prescribed** 147:*23*
**PRESENT** 3:*18*
59:*9* 60:*7, 9* 62:*23*
63:*6* 99:*5* 103:*5*
107:*13* 109:*7* 112:*10,*
*16* 120:*2* 132:*11, 15,*
*17* 133:*1, 5, 12, 14, 16,*
*20*
**presentation** 4:*15*
56:*5, 9, 13, 15* 59:*13*
62:*19* 98:*5, 12* 99:*3,*
*9* 105:*17, 21* 106:*10*
107:*5, 15, 18* 109:*6*
110:*16, 24* 111:*4*
112:*3, 22* 120:*18*
121:*17* 123:*2* 127:*1*
128:*11, 15* 129:*19*
130:*6, 20* 131:*24*

132:*5, 15* 133:*6, 12*
140:*10*
**presentations** 59:*11*
62:*10* 63:*5, 7* 106:*14,*
*18* 132:*4*
**presented** 54:*4*
59:*19* 60:*20* 105:*3*
108:*2*
**presenter** 105:*8*
110:*7, 9*
**presenting** 59:*15*
63:*1*
**pressing** 110:*20*
**presumes** 65:*3*
**presumption** 116:*9*
**pretty** 23:*21* 35:*15*
136:*20* 143:*1*
**preventative** 17:*1*
**previously** 18:*5*
140:*6, 12*
**primarily** 24:*20*
**prior** 8:*24* 13:*11*
18:*21* 21:*7* 27:*13*
28:*13* 40:*21* 80:*10*
120:*24* 146:*3*
**Prison** 8:*13* 26:*7, 8*
152:*8*
**Prisons** 9:*5* 29:*8, 11*
**privilege** 124:*1, 2, 5*
125:*24*
**privileged** 122:*20*
123:*10* 124:*10*
**PRN** 22:*24* 23:*2*
**probably** 29:*21* 36:*5*
50:*9, 24* 51:*5* 62:*1*
67:*5* 68:*7, 24* 69:*3*
70:*14* 80:*4, 5* 97:*19,*
*23* 107:*19* 108:*4*
128:*18, 19*
**problem** 74:*3*
119:*13* 131:*5*
**problems** 119:*14*
120:*7* 121:*1, 10*
130:*10, 13*
**process** 7:*8* 10:*4*
11:*17, 20, 21* 20:*14*
24:*11, 17, 22, 23*
33:*24* 44:*3* 56:*12*
61:*19* 69:*2* 75:*13*
76:*1, 2* 77:*8* 78:*20*

79:*14, 16, 20* 80:*15*
91:*3, 5, 10, 12, 17, 24*
92:*11* 97:*13, 15*
102:*16* 103:*3, 20, 21*
109:*4* 120:*6, 10, 11*
126:*20*
**processes** 12:*9* 24:*15*
96:*16*
**produce** 124:*17*
**Production** 5:*9*
**Professional** 1:*21*
10:*1* 11:*2*
**program** 28:*23*
47:*13* 134:*14*
**progress** 83:*12*
**progressive** 23:*9, 12*
**promoted** 14:*3*
**promotion** 15:*10*
**proof** 37:*20*
**propounded** 159:*7*
**prospect** 29:*24*
**provide** 15:*13* 38:*19*
39:*7* 135:*22* 156:*1*
**provided** 31:*9* 38:*24*
131:*19* 134:*18*
**provider** 40:*21* 41:*3*
42:*6, 14, 15, 16* 43:*14,*
*19, 24* 45:*20, 21*
82:*17, 20* 88:*10*
90:*12* 118:*5* 131:*22*
132:*15, 21, 23* 145:*4,*
*5, 18* 146:*13, 14, 20*
148:*2*
**providers** 30:*10, 15*
41:*15* 54:*19, 21*
55:*14* 132:*10, 13*
146:*16* 149:*1*
**PSAs** 16:*10, 12*
**PSQIA** 124:*11*
**Psych** 103:*11*
**psychiatric** 100:*20*
**psychological** 102:*5, 8*
**Public** 1:*21* 16:*10,*
*13* 160:*14*
**pull** 42:*17, 18* 59:*8*
147:*7*
**pulled** 59:*16, 22*
130:*15*
**purpose** 112:*15*
131:*7, 12*

purposes 25:*19*
31:*18* 68:*11* 112:*21*
pursuant 1:*19*
put 22:*11* 24:*18*
55:*14* 80:*19* 85:*9*
95:*8* 99:*2* 109:*17*
puts 85:*2*
putting 67:*3* 69:*17*
78:*19* 120:*7, 17*

**< Q >**
QI 17:*13* 46:*18*
59:*12, 14* 71:*10, 11*
73:*11* 74:*5, 7, 13, 23*
80:*4* 81:*1, 3, 5, 12*
119:*19* 134:*9*
QIP 117:*8*
qualifies 76:*18*
quality 12:*11* 14:*3, 5,*
*10* 17:*12, 14* 18:*1, 6,*
*17, 21* 28:*15* 47:*9, 12,*
*14, 21, 24* 49:*18* 50:*9*
57:*21* 117:*9* 122:*23*
134:*14, 15* 135:*24*
137:*1*
quantifies 126:*11*
quantity 150:*16*
151:*1*
Question 5:*19* 7:*17,*
*24* 8:*3* 25:*19* 31:*12*
32:*8* 34:*9* 38:*24*
43:*17* 52:*15* 65:*3*
78:*6* 82:*6* 95:*16*
97:*5* 107:*4* 119:*11*
122:*19* 123:*1, 18, 22*
125:*20* 126:*5, 6*
127:*15, 18, 22, 24*
128:*1* 129:*4, 14, 24*
146:*3* 149:*10, 24*
151:*5*
questionnaire 33:*16,*
*18*
questions 7:*13* 25:*9*
33:*7, 13* 54:*12* 65:*8*
78:*24* 103:*15, 16*
110:*12, 18, 19* 111:*7*
119:*2* 123:*11* 128:*12*
132:*18* 137:*17*
139:*22* 140:*1, 16*

141:*14* 142:*2* 147:*19*
154:*10, 12* 159:*6*
quick 136:*11*
quite 46:*17*
quotation 147:*21*
quote 153:*22*

**< R >**
ran 22:*11*
RASHATWAR 2:*3*
4:*6* 6:*8* 15:*15* 25:*14,*
*18, 23* 26:*4, 11* 63:*23*
64:*5, 12, 14* 65:*7, 15,*
*19, 23, 24* 66:*17, 23*
67:*18, 22* 68:*9* 76:*10,*
*15, 17* 105:*11, 19*
119:*8* 122:*3, 12, 16,*
*21* 123:*19, 23* 124:*6,*
*9, 13, 22* 125:*12, 15*
126:*18* 127:*8, 12, 16*
128:*8* 129:*1, 6, 13, 16*
130:*7* 133:*3, 9, 10*
137:*10, 14* 138:*1, 6, 9*
140:*15* 149:*9* 154:*19*
155:*4* 156:*6, 13*
ratio 23:*20*
reach 111:*20*
reached 118:*23*
119:*3, 15*
read 79:*3* 82:*7*
101:*7* 110:*10* 121:*4*
159:*4* 160:*7*
reading 139:*14*
145:*18*
readings 138:*14*
ready 33:*2*
realized 140:*6*
really 12:*7* 23:*6*
30:*16* 34:*11, 12*
37:*22* 38:*9* 75:*1*
89:*18* 97:*16* 117:*14*
154:*8*
reason 37:*11* 45:*5*
143:*15* 146:*7*
reasons 145:*17*
recall 77:*12* 81:*7*
97:*11* 98:*22* 99:*19*
100:*1, 17* 109:*8*
128:*14* 129:*19, 20*
130:*5* 132:*1, 7, 9, 10,*

*13, 24* 133:*4, 11, 17*
135:*1, 16* 143:*20, 22*
receive 10:*13, 16*
12:*17* 24:*3* 25:*3*
29:*3* 32:*5, 10* 40:*18*
71:*14*
received 9:*13* 11:*5*
25:*16* 27:*1, 4* 45:*16*
79:*5* 143:*23*
receives 28:*21* 107:*8*
146:*4*
receiving 32:*24* 34:*1*
recess 64:*10* 76:*8*
138:*4*
recognize 66:*8*
104:*18*
recollection 48:*9*
64:*15* 70:*4* 117:*20*
128:*11, 13, 17* 135:*11,*
*13, 20* 140:*10*
recommend 94:*16*
recommendations
54:*13* 55:*15* 110:*18*
recommended 13:*3, 6,*
*7* 53:*23*
record 7:*15, 18*
15:*16* 26:*12* 28:*8*
34:*18, 23* 36:*17, 18,*
*20* 37:*8, 18* 38:*4, 7*
44:*12* 48:*19* 64:*13*
66:*7, 19* 76:*5, 6, 12*
80:*20, 22* 82:*14, 15,*
*21* 83:*1, 20* 95:*23*
108:*1* 111:*14* 115:*5,*
*7, 20* 116:*4, 7* 117:*5*
122:*18* 124:*23*
125:*16, 19, 22* 126:*6*
127:*9, 17* 135:*18*
138:*7, 16, 18* 139:*3, 9,*
*11, 18* 160:*4*
recorded 7:*15*
records 8:*23* 36:*2, 7*
58:*17* 77:*10* 78:*8*
115:*3, 17*
red 41:*10, 14* 42:*2,*
*13, 18, 19, 20, 23, 24*
43:*2, 7, 12, 18, 23*
44:*3, 10, 15, 18* 45:*4,*
*7, 20, 22* 46:*8, 12, 17*

83:*12* 86:*4, 18* 151:*9,*
*13, 15* 152:*1*
Reed 18:*4* 46:*23*
48:*3*
reeducation 96:*3*
REES 3:*10*
refer 25:*8* 40:*24*
71:*1*
referral 43:*2, 4* 79:*6*
referrals 83:*11*
referred 53:*17, 19*
88:*12* 91:*13*
referring 25:*20*
33:*16* 58:*2* 60:*22*
74:*8* 77:*17* 90:*18*
96:*10* 104:*6* 146:*15,*
*21* 150:*3*
reflected 106:*7*
refresh 7:*22* 117:*20*
refusal 37:*8, 9, 12*
44:*14* 86:*4, 6, 8, 11,*
*16, 17* 87:*1, 5* 116:*23*
refusals 37:*5* 116:*22*
117:*1*
refuse 17:*6* 87:*4*
refused 37:*10, 11, 15,*
*16, 21, 22* 84:*18* 86:*4,*
*11, 15, 21, 23* 87:*3*
117:*4*
refuses 41:*15*
regarding 147:*19*
regards 153:*6*
region 60:*10*
regional 14:*8, 16, 21*
18:*22* 50:*10, 12* 55:*4,*
*6* 57:*22* 59:*24* 60:*23*
61:*9* 72:*8, 10* 109:*3,*
*24* 111:*1*
Registered 10:*1*
regroup 64:*1*
regular 24:*24* 41:*17*
151:*17, 18, 20*
related 6:*23* 7:*3*
relationship 55:*2*
relevant 124:*24*
125:*3, 5*
remained 84:*19*
remember 7:*20*
69:*19, 20* 80:*18*
129:*2, 9, 12, 23* 140:*6*

**remembered** 140:5, 13

**remembers** 129:8

**Remote** 1:17

**remotely** 6:3 160:4

**repeat** 14:20 15:24 75:16 77:23 91:15 122:19 137:9 148:19

**rephrase** 8:3 31:14 40:3 52:15 78:5 119:10 148:18, 20 151:5

**report** 61:20 84:7 96:21 97:1, 7 98:6 100:18, 19, 20, 21 101:6, 12, 23 108:11 121:24 122:6, 7, 10, 15 123:2, 7, 8, 9, 24 124:12, 15, 17, 20, 24 125:8, 17 126:9, 10, 12, 13, 15, 22 127:1, 19 128:2, 6, 16 148:9

**reportable** 19:24 77:3

**reported** 77:5 145:14, 16

**Reporter** 1:21 7:10 156:10, 22 160:14, 22

**reporting** 19:9 67:7, 8, 11 131:14

**reports** 14:15 19:4, 5 50:4 52:3 59:15 100:18 148:7

**represent** 141:12

**Representing** 2:8, 14, 21 3:6, 13

**reproduction** 160:20

**Request** 5:9 53:5, 7 145:18

**requested** 19:8 59:16 75:23 98:16 160:6

**requests** 16:20

**require** 89:16

**required** 13:1, 2 19:5 26:23 29:6, 7 131:10, 13

**requires** 29:2 146:2

**Resources** 24:14

**respect** 11:7 18:8, 17 32:9 41:11 56:17 99:18 102:11, 17 103:3 109:5 110:15, 23 111:4 116:22 121:9, 19 122:6, 8 123:3 128:9 130:8, 10, 13 149:10

**respond** 132:19

**response** 7:12, 13 32:18 89:4

**responsibilities** 17:17 18:17 48:14

**responsibility** 148:16, 21 149:19

**responsible** 17:22 18:5, 11, 20 27:6, 9 28:12 38:12 42:22 43:6 48:10, 11 50:7 57:17 62:2 72:6, 12 80:1 81:3 92:19 96:4, 6, 7 113:16 121:19 122:8, 24 123:3 125:18 127:20

**rest** 33:19

**restate** 149:14

**result** 35:2, 7 56:7 65:5 66:12, 14, 15 78:12 87:24 100:13 119:17 145:11 151:15

**results** 103:17 144:18

**return** 79:4

**returned** 21:21

**review** 8:23 20:10 38:16 51:23 52:8, 9, 23 53:4, 6, 7, 11, 15 54:3, 5, 15 55:9 56:3, 10, 16, 24 57:2 58:18 64:16 65:5 66:16 71:9, 12, 15, 22, 23 75:21, 24 78:7 85:10 98:15, 21 99:18 100:3, 9 101:13, 14, 19 102:1, 4, 7, 13, 20, 24 103:12, 13, 19, 21 106:24 107:9 108:9 109:15, 16 112:1 114:9, 13, 19 123:1

**reviewed** 20:14 22:15 46:16 51:14 53:11, 18, 23 54:8 58:12 84:8 99:15 102:10

**reviewing** 56:19 73:18 77:9 120:11 134:10

**reviews** 49:20, 22, 24 50:5 52:7, 12, 17, 19, 21 55:18 56:18 58:9, 13, 22 59:2, 23

**right** 10:14 13:14, 19 14:24 15:21 16:1, 22 17:18 21:1 23:11 25:12, 22 26:18 27:19 28:17 38:13 40:14 52:22 62:3 65:1, 23 66:1 68:19 75:9 84:9 90:19 92:6 95:9, 21 102:17 105:9 111:13 112:19 117:6, 16 118:17 136:21 138:2 139:3, 11, 21 141:5 144:12, 15, 20 148:9 154:17

**Risk** 67:10 68:18

**RN** 9:21 10:11 33:10, 20 111:8

**RNs** 148:11 149:1

**RN's** 149:19

**role** 6:24 16:1 18:21 20:11 21:23 22:18 27:9 28:15, 16 38:14 48:23 56:17, 19 59:10 64:19 65:11 66:24 67:3 69:23 71:4, 5 103:3 109:13 110:22 111:3 134:9, 12, 13 136:24 155:5, 7, 10, 18

**roles** 136:18

**roll** 16:8

**room** 14:14 33:5, 10 39:9, 11, 12, 16 92:20

**root** 102:12

**round** 95:16

**rows** 150:7

**run** 45:22 136:12

**RUPALEE** 2:3 6:9

**rupalee@alcenter.org** 2:7

**< S >**

**safe** 83:6 131:1 133:16, 19

**Safety** 4:13 14:17 52:3 61:1, 5, 11, 20 62:24 63:4, 6 98:6, 18 104:23 105:13, 16 108:2, 11, 13, 23 110:23 114:1 131:23 132:5 133:5

**sample** 82:18 88:19, 24 89:8

**satisfied** 103:17

**saw** 17:13 22:10 60:6 71:18

**saying** 93:3 94:10 143:4

**says** 37:16 70:20, 24 79:2, 3, 8, 9, 24 80:5, 14 84:13 85:4 86:6 93:5 94:21 105:2 122:10, 11 124:11 126:13 129:9 147:18, 21, 24 148:3 155:20

**scale** 34:21, 23, 24 35:3, 6, 11 48:18 87:20 116:14 145:8, 23 146:10, 12

**scanned** 37:17 117:4

**schedule** 14:12 156:4

**scheduled** 45:23 80:7

**schedules** 44:5 155:23

**school** 9:13, 14 21:10, 12, 13

**Science** 9:17

**scope** 18:16 40:11 110:21 111:7 125:7 126:24

**screen** 65:20 67:14, 19 76:11 104:13 141:15, 16 144:12

**screening** 33:4, 15, 17

148:*5*

scroll 106:*2* 110:*5*

scrolling 105:*6*

scthomas@grsm.com
3:*13*

SCULLY 3:*10*

second 10:*10* 37:*12*
52:*6* 76:*5* 147:*6*

section 12:*2* 33:*19*
117:*14* 118:*4*

sections 12:*2*

secure 39:*15, 16*
63:*11*

security 14:*17* 29:*21,
23* 30:*5*

see 22:*13* 42:*6, 18,
19* 46:*16* 63:*13*
65:*10* 66:*2* 68:*1, 12,
15* 74:*15* 76:*12*
104:*16* 106:*3* 110:*6*
141:*16* 143:*9* 147:*8,
12* 152:*18*

seeing 71:*17*

seen 38:*10* 73:*12*

seizures 155:*24*

send 16:*6* 40:*12, 16,
22* 89:*12, 18, 24* 99:*4*
107:*11*

Senior 9:*10* 14:*19,
23* 15:*6, 10* 16:*2*
21:*3*

sense 152:*17*

sent 94:*16* 109:*1*

sentinel 19:*12, 13, 14,
15* 20:*2, 4* 47:*5* 59:*4,
5* 70:*12, 18, 23* 71:*8*
74:*9, 22* 75:*2, 5, 8, 14,
19* 76:*19, 20* 77:*4*
81:*9, 22* 99:*22*
100:*10* 106:*15, 16, 19*
107:*7* 150:*2*

separate 83:*2* 102:*15*
131:*4*

serious 111:*23* 121:*2*
125:*11* 126:*16* 127:*4*
128:*3*

seriously 123:*14*

serve 131:*8, 11, 17, 21*

served 93:*18*

service 16:*10, 13*
70:*5, 6*

services 9:*11* 14:*12,
13* 15:*7, 9, 11* 21:*4*
26:*7, 9* 40:*2, 6* 47:*12*
50:*17* 94:*7, 9*

serving 6:*24*

session 124:*19*

set 29:*1* 99:*6, 11*
154:*7*

seven 119:*22*

severe 111:*22*

share 65:*20* 76:*11*
104:*13* 141:*15*
150:*20*

Sheet 159:*9*

shift 36:*2* 68:*7, 10*
84:*19*

short 136:*8*

shortens 9:*15*

show 43:*20* 44:*17,
21* 67:*14, 18, 20*
116:*6* 139:*20*

showed 64:*23*

showing 66:*4*

shown 144:*12*

shows 144:*13, 14*

shy 9:*7*

Sick 17:*6* 22:*11*
23:*21* 24:*17* 136:*5,
10*

Sigma 11:*11*

sign 37:*14* 160:*7*

Signature 159:*15*

significant 129:*22*

similar 95:*5*

simple 60:*14*

simply 129:*17*

single 20:*17* 24:*17*

site 55:*5, 6* 57:*13, 14,
20* 61:*8, 14, 24* 62:*2*
71:*8, 14, 23* 72:*9*
78:*18* 100:*17, 19*
101:*11* 107:*12* 109:*2*

sites 19:*4* 45:*17*
74:*14* 113:*3*

situation 40:*9, 19*
153:*7*

situational 143:*3*

situations 73:*16, 22*

Six 11:*10* 21:*13*
22:*3* 101:*10*

slide 4:*16* 56:*4, 8*
61:*12, 13, 15, 17, 21,
24* 98:*7, 9* 99:*2*
104:*14, 22, 23* 105:*17,
21* 107:*20* 111:*11*
112:*1* 143:*17*

slides 98:*13, 16* 99:*6,
12*

sliding 34:*20, 23, 24*
35:*3, 11* 87:*20*
116:*14* 145:*7, 23*
146:*10, 12*

slightly 14:*4*

slips 22:*12*

slot 85:*9, 18*

smart 42:*11*

snippets 16:*15*

social 17:*3*

solution 119:*13*

solutions 119:*3, 14*
120:*8* 130:*11, 14*
131:*5*

someone's 45:*5* 89:*5*

soon 62:*14* 70:*14, 17*

sorry 19:*21* 34:*21*
36:*11* 76:*4* 83:*15*
91:*15* 95:*24* 97:*4*
101:*2* 104:*7* 106:*20*
108:*9* 122:*4* 130:*9,
11* 132:*12* 138:*24*
140:*24* 141:*2, 24*
142:*15, 18*

sort 7:*8* 34:*9* 45:*14*
81:*21* 114:*2, 4*
134:*23* 136:*17*

sounds 17:*8* 35:*15*
112:*15*

space 84:*18*

speak 7:*7* 62:*1*

speaking 7:*18* 153:*6*

speaks 126:*12*

special 12:*10* 19:*7,
11*

specialized 10:*1*
19:*9* 27:*4* 40:*17*
94:*17*

Specialty 10:*2*

specific 9:*19* 10:*11*
11:*6* 12:*7, 14* 29:*2, 8,
10* 34:*9* 61:*6, 7* 74:*1,
5, 9* 78:*3* 97:*16*

specifically 39:*2*
42:*20* 51:*15, 20* 52:*1*
69:*19* 115:*17, 24*
132:*11, 14*

specifics 78:*23*

specify 33:*23*

speculate 38:*9*

speculation 34:*14*

spell 110:*3*

spend 34:*12* 91:*19*

spent 23:*8*

split 48:*13* 153:*22*

splitting 153:*20*

spoke 87:*20*

spotted 82:*2*

spreadsheet 69:*7*

Spring 2:*5*

Square 3:*11*

stable 23:*17, 19, 21*

stack 56:*4, 8* 98:*7*

stacks 107:*20*

staff 15:*12* 16:*6*
22:*1, 22, 24* 23:*2*
24:*24* 28:*21* 30:*11,
18, 22* 31:*9, 16, 17, 19*
32:*1, 4, 6, 11, 17*
38:*19* 39:*6* 54:*19*
57:*10, 22* 58:*2, 4*
60:*23* 61:*7* 63:*6*
77:*11* 78:*12* 96:*8, 10,
11, 12, 19* 132:*20*
133:*22* 134:*2, 10, 17*
138:*13* 148:*3* 153:*10,
12, 23*

staffing 133:*22*
134:*5, 10, 16, 17, 21,
24* 135:*5, 9* 136:*8, 11*
137:*1, 11*

stage 89:*1*

stamp 66:*7*

stamped 105:*7*

stand 17:*13* 117:*8*

standard 20:*6* 24:*6*
97:*13, 15* 100:*18*

standards 111:*19*

stands 83:*18*

start 52:5 57:12 70:21, 24 71:17, 19 72:16, 20 105:20 111:17

started 9:15 14:1, 9 18:19 21:7, 14 24:1, 2 47:13, 20 51:6 135:6

starts 147:16

state 79:4 156:11

stated 96:22 135:8 150:8

statement 87:12

STATES 1:1 86:3 87:17 116:13 128:6

stating 21:1

status 74:17

stay 93:10

staying 92:1

STD 22:14

Step-down 23:10, 16

steps 44:2

Stipulations 5:14

stood 83:16

stop 18:10

story 27:12

straight 27:20 28:14 78:21

strategies 68:23

strategy 72:22, 24 73:9 79:9

Stratford 21:19

streamline 12:8

streamlined 12:6

Street 2:5, 12, 19 3:4, 11

stretcher 41:5, 7

strike 134:7, 8 148:9

stuff 14:15 17:2, 4, 5, 7 29:7 33:2 39:21 47:1, 3 51:5, 10 73:20 80:20

subject 123:24 124:2

subjective 114:3 121:21 122:5 130:19 131:2

submit 73:11

submitted 80:10

substance 110:15 159:8

sugar 35:1, 4 82:16 88:3, 5, 22 89:5 144:14, 17, 22 145:1, 6, 18, 24 146:4

sugars 146:2

suggested 53:18 72:3 96:3

suggestions 54:11 96:13

suicide 19:17, 18 60:4 76:22, 24

Suite 2:5, 18 3:4, 11

SUMMER 3:10

SUMMERS 64:7

supervision 160:22

supervisor 17:24 49:3, 6

SUPPORT 5:2

supposed 42:3 89:9

sure 14:21 15:2 31:15 34:6, 11 36:12 39:6 43:2 45:15 46:11 47:6, 7 48:2, 5, 6, 15 50:1 62:7 64:19 65:22 72:11 75:17 77:24 79:23 80:17 87:6 91:16 93:15 95:15 99:14 109:12 111:14 117:14 131:20 133:9 134:8 137:11 140:22 143:18

surmise 86:13

surprise 135:17

sworn 6:3 160:4

system 36:4, 9 38:13 41:11 43:7 46:12 67:7, 9, 12 83:6, 7, 11, 23 84:4, 8, 9 86:21 95:8, 19 118:15 131:14

systemic 46:11 74:3, 24 96:15


< T >

table 39:17

take 8:6 10:6, 10 39:19 46:5 49:20, 22 60:1 62:19 63:15, 18, 24 93:10 99:1

102:11 106:18 137:15, 20 138:13 145:22 156:14, 15, 20

taken 1:19 51:8, 14 79:11 92:2 147:1

takes 33:6 148:21

talk 30:2

talked 102:16

talking 38:22 39:4 65:13, 15 74:10 88:21 98:8 121:15 147:9 150:21 151:9 152:9

task 151:3

taxonomy 117:7, 12 118:10, 20 120:14, 22 131:4, 8, 15 142:3

team 48:1 49:14, 18 50:10, 15 81:4, 12

TEKACCEL 1:14

telemetry 23:15

tell 9:12 18:22 21:8 22:5 30:2 79:21 83:16 99:5 114:1 117:19, 21 142:16

telling 123:5

Ten 2:18 73:18 74:20 97:20 137:20, 23

ten-minute 63:19

terms 30:6 44:9 77:7 81:22 91:7 92:18 113:10

test 10:6, 10 145:6

tested 144:22 145:1

testified 6:4 129:11

Testimony 4:5 125:7 140:4 160:5

testing 11:19, 21, 24 144:18

tests 11:22

text 68:22

tgregory@okllp.com 3:6

Thank 15:8 21:5 26:4 64:9 94:13 128:7 138:3 139:15 141:13 154:16 156:8, 22

Thanks 26:20 115:14

thing 14:8 38:3 60:6, 16 87:4 92:16 115:8 131:3

things 73:15 83:13 105:6 113:4 119:21 136:3 155:23

think 14:24 15:2 35:18 48:2, 3 51:1 52:23 55:12 58:19 72:9 82:1 98:24 99:7 100:21, 23 102:3 106:9, 10 107:4, 5 112:6 121:6, 13 127:5 129:13 141:19 149:23 152:10 154:8, 9

Third-Party 1:12 3:13

THOMAS 3:3, 10 63:18 64:4, 9 137:22 138:2 140:21 141:1, 2 156:20

thorough 90:4, 11

thought 60:16 152:8

Three 3:11 26:13 41:16, 17, 18 48:3, 5 59:8, 22, 23 60:19 81:12 82:3 104:3, 4 112:5 119:21 127:5 132:2 151:17, 18, 22

time 7:12, 18 23:8, 24 25:7 28:5 34:13 47:17 48:4, 6, 18 49:2, 12 50:19, 21 51:2 56:22 61:20 69:21 70:6, 9, 11 81:9 85:18 86:19 90:11, 14, 23 91:1, 3, 11, 20, 21 95:9, 11 99:11 101:16 103:9 106:14, 18 107:19, 24 111:2 134:22 141:13 146:19 155:16

timeline 56:21 114:9

timely 148:2

times 7:7 28:3 48:13 93:24 127:6 136:1 137:3

timing 137:2

**title** 9:9 14:4, 9, 18,
24 17:12, 16 18:23
21:1 22:20
**titles** 14:7, 22
**today** 6:11 8:18, 24
139:22 140:5 141:13
146:20 150:5 153:5
**today's** 8:21
**told** 83:15 124:16
127:5
**Tonya** 98:19 108:13
109:11
**tool** 31:7
**tools** 30:21 31:3, 5
**top** 55:13 58:19
70:20 111:18
**totally** 28:5, 6 153:6
**Township** 21:20
**track** 14:13, 14
45:12, 17 62:22 81:1
**tracked** 45:15
**tracking** 46:7 81:4
**traffic** 93:13 94:12
**train** 16:5 32:17
152:4
**trained** 30:11, 18, 22
31:4, 5
**training** 11:6, 10, 23
16:3 24:3 25:2, 4, 16
26:23 28:17, 20, 23
29:9, 13, 19, 22, 23
30:6, 7, 8 31:8, 20
32:4, 7, 10, 14
**trainings** 16:4, 6, 7, 9
28:19 29:1, 3 96:9
**tranq** 17:1
**transcribed** 7:10
**transcript** 156:12
160:8, 19
**transcription** 159:5
**transfer** 79:5
**transferred** 149:4, 17
**transitioned** 27:3
**treat** 39:24 118:3
**treated** 23:14
**treatment** 39:12, 17,
18
**treatments** 22:14
**TREBACH** 2:15

**tree** 113:23
**trend** 41:18
**trends** 74:23
**triage** 22:12 89:12,
13, 18, 21 90:1, 7, 10
91:14, 21, 23 92:3, 5,
9, 21 93:1, 9, 12, 14,
16, 21, 22, 24 94:2, 8,
17 136:5 156:5
**trial** 126:2
**tried** 76:15 120:3, 4
**trigger** 44:14, 18
45:3, 4, 7
**triggers** 88:6
**TRIVIKRAM** 1:8
3:7 50:14 133:17, 20
**true** 160:4
**try** 7:16 63:21 70:22
**trying** 14:24 100:21
118:1 154:6
**turned** 25:24
**turning** 100:6
**TVs** 16:16, 17, 22
**twice** 34:4, 7 146:2,
10, 12 151:21
**Two** 3:4 48:3 51:1
59:7, 8, 21, 23 61:3, 5
83:2 94:21 100:22
104:7, 12 105:5
112:13 119:20, 21
128:18 132:2
**two-and-a-half** 21:15
22:19
**two-sided** 37:13
**type** 145:14
**types** 73:15
**typical** 77:20, 24
78:8 106:13, 17, 24
**typically** 62:11
69:22 70:15, 18 82:1
88:5 99:20, 21 132:3,
20

**< U >**
**Uh-huh** 54:17 55:24
57:3 108:15 110:13
117:11 141:22
144:10 147:11
151:11
**ultimate** 121:11

**ultimately** 53:14
121:24
**unclear** 85:12
**understand** 8:2
31:12 43:1 139:22
150:18 154:7
**understanding** 26:14
31:15 122:22 126:19
**understood** 8:1 44:1
**Unfortunately** 84:5
**unit** 23:9, 12 39:10
40:17 90:16, 17 91:8,
14 92:20 93:2, 6, 19
152:7, 13, 16, 23, 24
153:1, 3
**UNITED** 1:1
**units** 38:20 39:1, 2,
7 87:17 143:23, 24
152:10, 15
**universal** 142:6
**University** 9:18 29:5
148:6
**UNLIMITED** 1:11
3:14
**unquote** 153:22
**unsure** 36:17 78:16
85:17 142:8
**unusual** 81:22
**updated** 80:8
**updates** 80:19
**updating** 80:1
**upload** 100:22
**upstairs** 92:1, 2, 22
93:3, 10 152:19
**urgent** 40:1, 10 90:3
93:24 155:9, 13
**urine** 33:4 82:18, 19
88:19, 24 89:7
**use** 17:1 31:7 39:19
**usually** 16:18 19:23
35:8 70:21, 22 71:3
88:2 99:1, 8 101:8, 9
102:2 103:7 132:16,
17 133:13, 14
**utilization** 14:10
90:15
**utilized** 135:4
**utilizing** 135:2

**ultimately** 53:14

**< V >**
**vaccines** 17:5
**Vaguely** 64:18, 21
80:18
**varies** 62:12, 17, 21
**ventilated** 23:19
**verbal** 7:13
**versions** 97:9
**versus** 62:22 118:5
**video** 16:7, 9, 15
**visible** 76:16
**visit** 17:7 44:22
**vitals** 51:8, 14
**voicemail** 100:7
**voluntary** 55:19, 20,
21 61:10 109:4

**< W >**
**walk** 13:22 30:4
**Wanda** 2:15
**want** 23:23 38:8
45:2 46:4 79:20, 21
107:10 114:24
125:22 127:17
138:10 147:7 150:24
**wanted** 26:3 115:11
151:4, 12
**wants** 140:20
**warrant** 88:8, 9
**warranted** 73:21
88:2
**Washington** 21:19
**water** 63:16
**way** 11:24 12:3, 8
36:9 67:13 78:15
87:7 94:24 123:17
143:2 151:24
**ways** 36:13 57:11
**website** 29:4
**weeds** 154:5
**weekly** 73:10
**weeks** 99:10
**Well** 20:3, 11 25:5,
21 35:9 36:16 37:7
38:23 52:5 57:4
65:2 70:20 75:21
80:12 84:24 86:13
95:2 99:4 101:5, 16
103:22 104:7 106:4
107:7 113:22 120:3

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 66 of 76

Deposition of Lynda Witkowski                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

126:8  127:2  137:23
145:7, 14, 20  149:7
152:18  154:18
**went**  14:8  20:24
22:23  23:1, 5  24:20
28:14  80:8  100:10
**We're**  6:11  7:9, 17
71:16  85:17  104:11
106:3  115:12  121:14
124:21  136:20
145:11  150:21
**Wi-Fi**  63:20
**window**  148:3
**wish**  75:12
**WITKOWSKI**  1:19
4:5  6:2  66:1  68:12
140:17  141:10  160:7
**Witkowski-1**  4:13
66:19, 20
**Witkowski-2**  4:13
105:14, 15  141:21
**witness**  1:19  5:5
6:18  15:8  26:5, 10
57:3  76:14  125:21
126:5  127:21  128:5
130:5  137:9  156:23
160:4, 5, 7
**wood**  75:7
**words**  34:20
**work**  9:3, 4  12:15
31:2, 10  32:20  38:17
69:16  78:17
**worked**  7:1  9:6
21:13, 17, 24  22:9, 24
35:22  136:1
**Workers**  47:11
**working**  13:13, 18
14:5  21:7  22:2, 21
29:18  30:1  81:8, 13
**works**  7:8  64:6
70:15
**wound**  39:20  94:5
155:14, 15
**wrap**  137:16
**wrapped**  155:15
**write**  46:9  68:21
**writing**  85:6  86:20
87:7  122:13
**wrong**  18:23

**wrote**  82:16  86:15
**Wyoming**  60:18

**< Y >**
**Yeah**  26:10  30:22
40:8  41:12  44:17
45:3  46:9  50:23
52:15  55:4, 10  61:4
63:23  67:3  74:4
83:17  84:1  88:7
90:20  95:16  100:8
101:24  107:3, 22
108:8  111:15  114:19
115:1, 11  118:22
119:9  121:8, 16
122:12  123:23
124:13  127:12  137:3,
22, 24  148:20  150:22
155:11
**year**  62:19  98:23
**yearly**  10:19
**years**  7:1  9:7  10:19,
21  12:18  13:13, 17
21:8, 16, 18, 20  22:19
23:1, 7  26:16  28:10
46:17  128:19
**YESCARE**  1:7  3:7
4:13  13:10, 18, 24
18:8, 18  20:8  24:3, 6
25:4, 11, 16, 17, 20, 24
26:24  28:24  29:5
30:7  31:8, 10, 16, 18,
20  32:6, 11, 13  47:10,
11  52:12, 18  53:4, 5,
11, 20, 24  54:9, 24
55:7  58:6  59:2, 6
60:23  61:7  62:4
63:12  65:6  69:10, 11
76:1  77:19  96:11, 12
99:17  102:17  103:23
104:1, 2, 5, 8, 12
105:7, 12, 16  109:2
111:2, 15  113:14, 20
114:8  117:7, 13
120:16, 19  122:23
135:6, 24  143:11
148:4, 5
**YesCare/Corizon**  58:3
**YesCare's**  47:9

52:16, 21  103:20
**yeses**  113:24

**< Z >**
**zero**  87:17

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 67 of 76

Deposition of Lynda Witkowski                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

## WORD LIST

**< 1 >**
**1** *(2)*
**1:09** *(1)*
**1:20** *(1)*
**1:22** *(1)*
**1:48** *(1)*
**10** *(2)*
**10/28** *(4)*
**10/30** *(1)*
**10/31** *(1)*
**10:03** *(3)*
**100** *(4)*
**105** *(1)*
**11** *(1)*
**11/1** *(1)*
**11/21** *(3)*
**11/3** *(1)*
**11/4** *(1)*
**11/5** *(2)*
**11:17** *(2)*
**11:30** *(2)*
**11:31** *(1)*
**11:46** *(1)*
**11:49** *(1)*
**1100** *(1)*
**12** *(6)*
**12/1/23** *(1)*
**123** *(1)*
**14** *(1)*
**141** *(1)*
**14th** *(1)*
**15** *(6)*
**1515** *(1)*
**155** *(1)*
**15th** *(1)*
**17** *(1)*
**1717** *(1)*
**18** *(5)*
**1801** *(1)*
**19102** *(2)*
**19103** *(2)*
**19123** *(1)*
**1996** *(1)*

**< 2 >**
**2** *(1)*
**2:24-cv-05618-TJS** *(1)*

**20** *(1)*
**200** *(4)*
**2011** *(1)*
**2014** *(3)*
**2019** *(1)*
**2020** *(2)*
**2021** *(3)*
**2022** *(1)*
**2023** *(10)*
**2025** *(6)*
**215** *(4)*
**26** *(1)*
**28th** *(2)*

**< 3 >**
**3** *(4)*
**30** *(3)*
**300** *(3)*
**306** *(1)*
**3496** *(1)*
**3498** *(1)*
**3499** *(1)*
**3500** *(1)*
**3501** *(1)*
**3503** *(1)*

**< 4 >**
**4** *(9)*
**411** *(5)*
**412** *(1)*
**47127** *(1)*

**< 5 >**
**5** *(1)*
**500** *(1)*
**561-2300** *(1)*
**564-0400** *(1)*
**569-4433** *(1)*
**585** *(1)*

**< 6 >**
**6** *(2)*
**6/23/25** *(4)*
**610** *(1)*
**654-9070** *(1)*
**66** *(1)*
**683-5417** *(1)*

**< 7 >**

**7** *(1)*
**72** *(1)*
**770** *(1)*

**< 8 >**
**8A** *(1)*

**< 9 >**
**990** *(1)*
**9A** *(1)*

**< A >**
**a.m** *(7)*
**a/k/a** *(1)*
**A1** *(7)*
**A10** *(3)*
**A11** *(2)*
**A12** *(2)*
**A13** *(2)*
**A2** *(3)*
**A5** *(1)*
**A7** *(1)*
**A8** *(1)*
**able** *(18)*
**ABOLITIONIST** *(1)*
**absolutely** *(8)*
**abundance** *(1)*
**accepted** *(1)*
**access** *(1)*
**accurate** *(3)*
**accurately** *(6)*
**ACKNOWLEDGMEN T** *(1)*
**acronyms** *(1)*
**act** *(1)*
**acting** *(1)*
**ACTION** *(59)*
**actions** *(5)*
**activity** *(1)*
**actual** *(4)*
**add** *(1)*
**addition** *(6)*
**additional** *(6)*
**administered** *(16)*
**administration** *(30)*
**administrator** *(3)*
**administrators** *(15)*
**admission** *(3)*
**admits** *(1)*

**admitted** *(3)*
**adverse** *(2)*
**Affairs** *(1)*
**afternoon** *(1)*
**agency** *(5)*
**ago** *(8)*
**agree** *(5)*
**ahead** *(3)*
**al** *(1)*
**Alabama** *(1)*
**alleged** *(1)*
**altered** *(2)*
**amount** *(6)*
**analysis** *(4)*
**analyzed** *(1)*
**and/or** *(2)*
**announcements** *(2)*
**Answer** *(26)*
**answered** *(2)*
**answering** *(2)*
**answers** *(1)*
**anybody** *(3)*
**anymore** *(1)*
**anytime** *(1)*
**Apollon** *(2)*
**apologize** *(5)*
**appear** *(1)*
**APPEARANCES** *(2)*
**appeared** *(1)*
**appears** *(3)*
**applications** *(1)*
**apply** *(1)*
**appointment** *(10)*
**appropriate** *(2)*
**approximately** *(1)*
**approximation** *(3)*
**Arch** *(2)*
**area** *(14)*
**areas** *(22)*
**argument** *(1)*
**arises** *(2)*
**arose** *(1)*
**arrest** *(1)*
**arrested** *(2)*
**asked** *(12)*
**asking** *(27)*
**asks** *(1)*
**aspect** *(1)*
**aspects** *(1)*

assert *(1)*
asserted *(1)*
asserting *(1)*
assess *(1)*
assessment *(7)*
assigned *(1)*
assignment *(1)*
assist *(3)*
assistance *(3)*
assistant *(2)*
assisted *(5)*
assisting *(2)*
associate's *(1)*
associations *(1)*
assume *(4)*
assumes *(1)*
assuming *(5)*
asthma *(1)*
attached *(1)*
attempt *(3)*
attend *(4)*
attendance *(2)*
attention *(1)*
ATTORNEY *(134)*
attorney-client *(2)*
audio *(2)*
audit *(21)*
audited *(1)*
auditing *(14)*
audits *(11)*
Austen *(1)*
authority *(2)*
authorization *(1)*
authorized *(4)*
automatic *(2)*
automatically *(7)*
autopsies *(2)*
autopsy *(6)*
average *(1)*
aware *(4)*
awareness *(3)*

< B >
B1 *(4)*
B2 *(2)*
Bachelor *(1)*
Back *(26)*
backlog *(1)*
backtrack *(2)*

Ballpark *(1)*
Band-Aids *(4)*
based *(9)*
basically *(22)*
basis *(1)*
Bates *(2)*
bathroom *(1)*
bedside *(6)*
beginning *(4)*
behavioral *(9)*
believe *(10)*
belt *(1)*
benefit *(1)*
best *(3)*
better *(1)*
beyond *(3)*
big *(3)*
birth *(3)*
bit *(3)*
blacking *(1)*
BLAIR *(2)*
Blanche *(1)*
blank *(1)*
blanks *(1)*
block *(8)*
blocking *(1)*
blocks *(5)*
blood *(17)*
Bloodsaw *(1)*
booking *(5)*
Boulevard *(1)*
box *(2)*
break *(4)*
breaks *(1)*
BRET *(1)*
bretgrote@abolitionist
lawcenter.org *(1)*
brief *(2)*
bring *(1)*
broken *(1)*
BS *(1)*
building *(3)*
buildings *(2)*
bunch *(1)*
business *(1)*

< C >
CABELLOS *(2)*
call *(18)*

called *(12)*
calls *(1)*
Camden *(3)*
campus *(2)*
cancer *(2)*
capacity *(1)*
card *(2)*
care *(52)*
cared *(4)*
CAREERSTAFF *(2)*
caring *(1)*
Carney *(1)*
carried *(1)*
case *(29)*
cases *(10)*
catch *(2)*
categories *(2)*
categorizing *(1)*
category *(11)*
cause *(6)*
causes *(2)*
CCHP *(4)*
CCHP-RN *(3)*
cell *(2)*
cells *(1)*
CENTER *(3)*
certain *(3)*
CERTIFICATE *(1)*
certification *(6)*
Certified *(1)*
certify *(3)*
certifying *(1)*
CF *(2)*
CFCF *(9)*
challenges *(2)*
chance *(1)*
change *(14)*
changed *(4)*
changes *(2)*
characterization *(2)*
characterize *(2)*
charge *(5)*
Chart *(43)*
charts *(8)*
check *(9)*
checked *(1)*
checks *(4)*
choose *(1)*
choosing *(1)*

chronic *(6)*
chronological *(1)*
CITY *(3)*
CIVIL *(2)*
clarification *(1)*
clarify *(3)*
cleaned *(1)*
clear *(25)*
clearly *(2)*
client *(4)*
clinical *(32)*
clinically *(1)*
close *(2)*
closed *(1)*
closely *(1)*
CM *(1)*
co-counsel *(2)*
code *(5)*
codes *(13)*
collaborate *(4)*
collaborated *(4)*
collaboration *(6)*
collaborative *(8)*
collaboratively *(5)*
collected *(2)*
collection *(2)*
collectively *(1)*
column *(8)*
columns *(1)*
come *(18)*
comes *(8)*
coming *(7)*
commented *(1)*
comments *(2)*
Commissioner *(1)*
Committee *(11)*
common *(3)*
Commonwealth *(1)*
community *(1)*
company *(7)*
comparative *(1)*
compared *(5)*
compile *(1)*
compiling *(1)*
complaint *(1)*
complete *(11)*
completed *(19)*
completes *(2)*
completing *(3)*

completion *(1)*
compliance *(1)*
concerns *(1)*
conclude *(1)*
concluded *(2)*
conclusion *(6)*
conclusions *(7)*
condition *(1)*
conduct *(4)*
conducted *(11)*
conducting *(5)*
conducts *(1)*
confirm *(3)*
Connect *(1)*
consecutive *(3)*
consider *(1)*
considered *(1)*
considering *(1)*
consult *(2)*
consulted *(4)*
contained *(1)*
content *(14)*
Continued *(1)*
contract *(1)*
contracted *(6)*
contracts *(6)*
control *(1)*
conversation *(1)*
conversations *(9)*
copy *(7)*
Corinne *(1)*
Corizon *(9)*
Corizon/YesCare *(1)*
CORP *(2)*
corporate *(27)*
correct *(53)*
correction *(4)*
Correctional *(5)*
corrections *(2)*
Corrective *(50)*
correctly *(1)*
corresponding *(1)*
Coumadin *(1)*
counsel *(6)*
count *(1)*
counting *(1)*
country *(1)*
County *(3)*
couple *(1)*

course *(3)*
COURT *(8)*
covered *(2)*
covering *(1)*
COVID *(8)*
crazy *(1)*
create *(5)*
created *(11)*
creating *(7)*
credentials *(1)*
CRIC *(6)*
critical *(9)*
CT *(1)*
CT1 *(1)*
cup *(1)*
current *(11)*
currently *(5)*
custody *(1)*
cut *(1)*
CY *(1)*

< D >
daily *(3)*
Danielle *(2)*
data *(7)*
database *(1)*
date *(23)*
Dated *(1)*
dates *(3)*
day *(11)*
days *(3)*
day-to-day *(1)*
death *(14)*
Debow *(2)*
decedent *(1)*
decided *(1)*
decision *(1)*
deck *(14)*
decrease *(2)*
decreases *(1)*
decreasing *(1)*
dedicated *(1)*
deem *(1)*
Defendant *(4)*
Defendants *(3)*
deficiencies *(1)*
define *(2)*
definition *(1)*
degree *(1)*

dental *(1)*
DEPARTMENT *(11)*
departments *(4)*
depending *(6)*
depends *(5)*
DEPONENT *(1)*
deposition *(18)*
dereliction *(1)*
derelictions *(2)*
DESCRIPTION *(1)*
designating *(1)*
designation *(1)*
determination *(2)*
determine *(12)*
determined *(11)*
determines *(3)*
determining *(1)*
develop *(1)*
developed *(1)*
deviation *(4)*
deviations *(4)*
diabetes *(1)*
diabetic *(6)*
difference *(7)*
differences *(1)*
different *(22)*
differently *(1)*
direct *(2)*
Direction *(1)*
directly *(8)*
director *(16)*
directors *(7)*
director's *(6)*
discharged *(1)*
discovery *(2)*
discrepancies *(3)*
discuss *(2)*
discussed *(3)*
discussing *(1)*
discussion *(3)*
disease *(2)*
distancing *(1)*
distinct *(3)*
distinction *(1)*
DISTRICT *(2)*
DKA *(1)*
DM *(2)*
DNR *(1)*
DNR/DNI *(3)*

doctor *(2)*
Doctors *(1)*
docu *(1)*
document *(45)*
documentation *(20)*
documented *(32)*
documenting *(2)*
Documents *(15)*
doing *(12)*
Domer-Shank *(1)*
DON *(1)*
door *(1)*
dose *(3)*
doses *(8)*
doubt *(1)*
downstairs *(4)*
Dr *(6)*
drafted *(3)*
drafting *(7)*
drop *(1)*
drug *(2)*
due *(1)*
duly *(1)*
duration *(1)*
duties *(6)*

< E >
earlier *(14)*
EASTERN *(1)*
ECW *(7)*
education *(10)*
educational *(1)*
eduction *(1)*
effective *(1)*
effectively *(2)*
effort *(1)*
eight *(1)*
either *(6)*
Eke *(1)*
E-K-E *(1)*
electronic *(52)*
elevated *(1)*
else's *(2)*
e-mail *(6)*
e-mails *(1)*
EMAR *(10)*
emergencies *(1)*
emergency *(3)*
employed *(2)*

employee  (2)
employees  (2)
employment  (1)
encounter  (19)
ended  (2)
engagement  (1)
ensure  (7)
ensuring  (2)
entail  (3)
enter  (3)
entered  (4)
entering  (3)
enters  (1)
entire  (3)
entry  (1)
equipment  (2)
ER  (1)
Errata  (1)
error  (3)
escorted  (1)
especially  (1)
ESQUIRE  (7)
estate  (1)
estimate  (1)
et  (1)
Event  (68)
events  (17)
Everest  (1)
everybody  (2)
evidence  (1)
exact  (1)
exactly  (9)
EXAMINATION  (3)
examined  (1)
example  (6)
Excel  (3)
exchanging  (1)
exclusive  (1)
Excuse  (1)
excused  (1)
exhibit  (4)
exist  (1)
exists  (1)
expanded  (1)
experience  (3)
expert  (1)
explain  (4)
explained  (1)
explains  (1)

extensive  (1)
extent  (1)
extra  (1)

< F >
F5  (1)
facilities  (8)
facility  (9)
fact  (1)
facts  (2)
factual  (1)
failed  (1)
failure  (6)
failures  (5)
fair  (7)
fall  (1)
familiar  (14)
far  (1)
fast-acting  (1)
feedback  (1)
feel  (1)
felt  (1)
figure  (4)
fill  (2)
final  (8)
find  (8)
finding  (3)
findings  (3)
fine  (5)
fingerstick  (4)
finish  (1)
first  (11)
five  (7)
five-minute  (2)
flag  (27)
flags  (6)
floated  (2)
Floor  (1)
focus  (1)
folks  (1)
follow  (5)
followed  (1)
follows  (3)
follow-up  (4)
foregoing  (2)
forensic  (1)
forget  (1)
form  (13)
former  (1)

forms  (5)
forth  (2)
found  (5)
foundation  (1)
four  (21)
Fourth-Party  (1)
frame  (1)
Frasier  (1)
frequently  (1)
front  (1)
full  (5)
full-time  (2)
fully  (1)
function  (2)
further  (1)

< G >
Garden  (1)
gathering  (1)
GAY  (6)
Gena  (1)
general  (8)
generalized  (7)
generally  (9)
generate  (1)
generated  (12)
generates  (2)
generating  (2)
gentleman  (1)
getting  (5)
girls  (1)
give  (17)
given  (11)
giving  (2)
glucose  (3)
go  (42)
goes  (4)
going  (49)
Good  (10)
GORDON  (1)
gotten  (1)
graduated  (2)
Great  (3)
green  (1)
GREGORY  (44)
grievance  (4)
grievances  (6)
GROTE  (1)
grounds  (1)

grouped  (2)
guess  (9)
guessing  (2)
guys  (1)

< H >
handled  (2)
handles  (1)
hands  (1)
happen  (9)
happened  (11)
happens  (2)
harm  (3)
HCS  (11)
head  (1)
Health  (48)
Health/YesCare  (1)
healthcare  (2)
hear  (3)
hearing  (1)
heart  (1)
held  (4)
help  (4)
helpful  (1)
hey  (2)
high  (4)
higher  (2)
highly  (1)
hire  (1)
hired  (3)
history  (4)
HIV  (1)
home  (2)
hopefully  (1)
hospital  (17)
hospitalization  (1)
hour  (1)
hours  (2)
housed  (1)
housing  (9)
HR  (1)
HU  (1)
Human  (1)
Humulin  (2)
hundred  (2)
hundred-plus  (1)
Hyperglycemia  (1)
hypertension  (1)
hypothetical  (1)

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 71 of 76

Deposition of Lynda Witkowski                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**< I >**
**ICU** (4)
**idea** (1)
**identification** (2)
**identified** (6)
**identify** (1)
**II** (1)
**imagine** (3)
**immediate** (1)
**immensely** (1)
**impact** (4)
**impactful** (1)
**important** (2)
**improve** (5)
**improvement** (34)
**Inaudible** (1)
**incarcerated** (1)
**incident** (4)
**incidents** (2)
**include** (6)
**included** (11)
**includes** (2)
**including** (2)
**incorrectly** (1)
**increased** (2)
**independent** (5)
**independently** (1)
**in-depth** (1)
**INDEX** (1)
**indicate** (1)
**indicated** (1)
**Indicating** (2)
**indication** (3)
**indicator** (1)
**indicators** (1)
**individual** (3)
**individualized** (1)
**individuals** (4)
**individual's** (1)
**in-facility** (1)
**infectious** (2)
**infirmary** (19)
**influence** (2)
**Influenza** (1)
**information** (16)
**in-house** (1)
**initial** (1)
**injured** (3)

**inmate** (14)
**inmates** (10)
**inmate's** (2)
**input** (1)
**inquiry** (1)
**inserted** (1)
**instance** (10)
**instances** (1)
**instructed** (1)
**insulin** (31)
**intake** (41)
**Intake/Receiving** (1)
**intaked** (2)
**intakes** (2)
**interacting** (1)
**interaction** (2)
**interchangeably** (3)
**interest** (1)
**internal** (5)
**internally** (1)
**interpret** (1)
**interruption** (1)
**intervene** (3)
**intervention** (2)
**interview** (1)
**interviewed** (1)
**interviews** (6)
**introduced** (1)
**invite** (2)
**invited** (2)
**involve** (1)
**involved** (17)
**involvement** (2)
**involving** (1)
**IP** (6)
**IPs** (6)
**issue** (1)
**issues** (5)
**items** (2)
**its** (1)

**< J >**
**Jacksonville** (1)
**JACOB** (1)
**jail** (7)
**JAMES** (1)
**Jersey** (1)
**JFK** (1)
**jinx** (1)

**jkaminsky@kiernantr**
**ebach.com** (1)
**Job** (4)
**join** (2)
**Jon** (2)
**JONATHAN** (2)
**JR** (1)
**June** (2)
**JUNG** (13)
**Jung's** (17)
**jurisdictions** (1)

**< K >**
**Kalu** (2)
**K-A-L-U** (1)
**Kalu's** (1)
**KAMINSKY** (19)
**keep** (1)
**Kennedy** (2)
**kept** (1)
**ketoacidosis** (1)
**ketones** (4)
**KIERNAN** (1)
**KIMBALL** (1)
**kind** (14)
**kinds** (1)
**Knock** (1)
**know** (90)
**knowing** (1)
**known** (2)
**Kristy** (2)

**< L >**
**lab** (1)
**LALITHA** (3)
**Lantus** (2)
**large** (4)
**larger** (1)
**largest** (1)
**lately** (2)
**LAW** (2)
**lay** (1)
**lead** (1)
**Lean** (1)
**learn** (3)
**learning** (2)
**leeway** (1)
**left** (6)
**legal** (1)

**length** (1)
**level** (6)
**levels** (10)
**liaise** (1)
**license** (1)
**licenses** (1)
**Liedtka** (2)
**likes** (1)
**limb** (1)
**Line** (15)
**Lisa** (2)
**list** (5)
**literally** (3)
**little** (11)
**LLC** (2)
**LLP** (2)
**locate** (1)
**located** (1)
**location** (1)
**locks** (1)
**log** (1)
**Logan** (1)
**logged** (1)
**logging** (1)
**long** (17)
**long-acting** (1)
**longer** (1)
**look** (13)
**looking** (12)
**looks** (2)
**loop** (1)
**loss** (1)
**lost** (3)
**lot** (12)
**LOUIS** (2)
**low** (3)
**LPN** (4)
**LPNs** (5)
**LYNDA** (6)

**< M >**
**MA** (5)
**major** (1)
**making** (8)
**manage** (1)
**managed** (1)
**management** (10)
**manager** (1)
**managing** (1)

Case 2:24-cv-05618-TJS    Document 100-10    Filed 12/05/25    Page 72 of 76

Deposition of Lynda Witkowski                                        Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**MANSUKHANI** *(1)*
**manually** *(3)*
**MAR** *(1)*
**March** *(1)*
**MARGARET** *(1)*
**margo@alcenter.org** *(1)*
**Mariesha** *(2)*
**Marked** *(4)*
**Market** *(1)*
**match** *(1)*
**matching** *(1)*
**matter** *(2)*
**MAUREEN** *(4)*
**McGettigan** *(2)*
**mean** *(47)*
**meaning** *(2)*
**means** *(5)*
**meant** *(1)*
**measurable** *(4)*
**med** *(1)*
**med/surg** *(1)*
**medical** *(45)*
**medical-wise** *(1)*
**medicate** *(1)*
**medicating** *(1)*
**medication** *(45)*
**medications** *(5)*
**Medication-wise** *(1)*
**meeting** *(21)*
**meetings** *(5)*
**member** *(2)*
**members** *(1)*
**memorialized** *(2)*
**memory** *(1)*
**mention** *(1)*
**mentioned** *(14)*
**MICHAEL** *(1)*
**michael.pestrak@phila.gov** *(1)*
**middle** *(1)*
**Mike** *(1)*
**mini** *(1)*
**minimal** *(3)*
**minimize** *(1)*
**minute** *(1)*
**minutes** *(1)*
**mirror** *(1)*
**missed** *(7)*

**missing** *(2)*
**mm-hmm** *(1)*
**module** *(1)*
**moment** *(4)*
**monitor** *(1)*
**monitoring** *(1)*
**monitors** *(1)*
**month** *(1)*
**monthly** *(5)*
**months** *(9)*
**Mooningham** *(3)*
**morning** *(4)*
**Mortalities** *(1)*
**mortality** *(51)*
**mother/baby** *(1)*
**move** *(6)*
**moved** *(1)*
**moving** *(3)*
**multiple** *(2)*
**multitude** *(1)*

**< N >**
**N/A** *(1)*
**name** *(5)*
**names** *(1)*
**Name-wise** *(1)*
**Narrative** *(1)*
**nature** *(1)*
**NCCHC** *(4)*
**NCCHP** *(1)*
**ND** *(2)*
**near** *(2)*
**necessarily** *(2)*
**necessary** *(1)*
**need** *(10)*
**needed** *(4)*
**needing** *(1)*
**needs** *(3)*
**NET** *(9)*
**NET/Usage** *(2)*
**NETs** *(1)*
**never** *(1)*
**New** *(7)*
**nod** *(1)*
**nonemergent** *(1)*
**norm** *(2)*
**Normally** *(7)*
**no-show** *(13)*
**no-shows** *(1)*

**Notary** *(2)*
**notation** *(1)*
**note** *(3)*
**noted** *(5)*
**notes** *(3)*
**notice** *(2)*
**notification** *(1)*
**notified** *(1)*
**notify** *(1)*
**November** *(3)*
**NPH** *(1)*
**NS** *(2)*
**number** *(5)*
**numbers** *(2)*
**Nurse** *(63)*
**nurses** *(13)*
**nursing** *(28)*
**nutshell** *(1)*

**< O >**
**object** *(2)*
**objecting** *(1)*
**objection** *(5)*
**objective** *(1)*
**objectively** *(1)*
**observed** *(1)*
**obtain** *(1)*
**obtained** *(3)*
**obtaining** *(1)*
**obviously** *(2)*
**occur** *(2)*
**occurred** *(8)*
**occurs** *(1)*
**O'CONNOR** *(1)*
**October** *(2)*
**offer** *(1)*
**offered** *(5)*
**office** *(2)*
**officer** *(3)*
**officers** *(3)*
**official** *(1)*
**offsite** *(2)*
**off-site** *(1)*
**Oh** *(12)*
**OJT** *(2)*
**Okay** *(163)*
**old** *(1)*
**Omitted** *(7)*
**onboarding** *(1)*

**once** *(19)*
**ones** *(3)*
**one-to-three** *(1)*
**ongoing** *(1)*
**online** *(5)*
**onsite** *(1)*
**on-the-job** *(1)*
**operate** *(1)*
**opine** *(1)*
**opining** *(1)*
**opinion** *(9)*
**opinions** *(1)*
**opportunities** *(3)*
**opportunity** *(7)*
**opposing** *(1)*
**oral** *(1)*
**order** *(4)*
**ordered** *(18)*
**ordering** *(2)*
**orders** *(6)*
**ordinary** *(1)*
**orientation** *(10)*
**orients** *(1)*
**original** *(1)*
**outcome** *(1)*
**outside** *(6)*
**overall** *(1)*
**oversaw** *(4)*
**oversee** *(4)*
**overseeing** *(6)*
**oversees** *(1)*
**oversight** *(3)*

**< P >**
**p.m** *(6)*
**P1** *(1)*
**PAGE** *(25)*
**pages** *(4)*
**paper** *(7)*
**paperwork** *(3)*
**Paralegal** *(1)*
**Parkway** *(1)*
**part** *(18)*
**particular** *(6)*
**party** *(3)*
**pass** *(3)*
**pasted** *(2)*
**pathways** *(5)*
**Patient** *(73)*

patient/nurse *(1)*
patients *(24)*
patient's *(13)*
pattern *(2)*
patterns *(1)*
PCU *(2)*
PD *(2)*
PD2 *(1)*
PDF *(3)*
PDP *(46)*
PDP's *(4)*
pending *(10)*
Penn *(2)*
PENNSYLVANIA *(8)*
people *(12)*
percent *(4)*
percentage *(1)*
perform *(6)*
performance *(5)*
performed *(3)*
performing *(1)*
person *(4)*
personal *(1)*
personally *(6)*
person's *(1)*
pertain *(1)*
pertaining *(1)*
PESTRAK *(3)*
Philadelphia *(19)*
phone *(1)*
phrase *(1)*
Physical *(2)*
Physician's *(1)*
PI *(2)*
pick *(1)*
piece *(1)*
pinpoint *(1)*
PIs *(1)*
place *(11)*
Plaintiffs *(3)*
Plan *(49)*
plans *(10)*
play *(4)*
Plaza *(1)*
please *(5)*
plus *(2)*
PM *(1)*
pneumonia *(1)*
pods *(5)*

point *(6)*
points *(1)*
policy *(1)*
population *(2)*
portion *(3)*
position *(6)*
positions *(3)*
possible *(2)*
potential *(1)*
PowerPoint *(9)*
Practitioner *(2)*
practitioners *(1)*
predetermined *(2)*
prefer *(1)*
prepare *(2)*
prepared *(1)*
prescreening *(2)*
prescribed *(1)*
PRESENT *(23)*
presentation *(38)*
presentations *(7)*
presented *(5)*
presenter *(3)*
presenting *(2)*
pressing *(1)*
presumes *(1)*
presumption *(1)*
pretty *(4)*
preventative *(1)*
previously *(3)*
primarily *(1)*
prior *(10)*
Prison *(4)*
Prisons *(3)*
privilege *(4)*
privileged *(3)*
PRN *(3)*
probably *(21)*
problem *(3)*
problems *(6)*
process *(42)*
processes *(3)*
produce *(1)*
Production *(1)*
Professional *(3)*
program *(3)*
progress *(1)*
progressive *(2)*
promoted *(1)*

promotion *(1)*
proof *(1)*
propounded *(1)*
prospect *(1)*
provide *(5)*
provided *(4)*
provider *(27)*
providers *(10)*
PSAs *(2)*
PSQIA *(1)*
Psych *(1)*
psychiatric *(1)*
psychological *(2)*
Public *(4)*
pull *(4)*
pulled *(3)*
purpose *(3)*
purposes *(4)*
pursuant *(1)*
put *(8)*
puts *(1)*
putting *(5)*

< Q >
QI *(19)*
QIP *(1)*
qualifies *(1)*
quality *(25)*
quantifies *(1)*
quantity *(2)*
Question *(38)*
questionnaire *(2)*
questions *(27)*
quick *(1)*
quite *(1)*
quotation *(1)*
quote *(1)*

< R >
ran *(1)*
RASHATWAR *(65)*
ratio *(1)*
reach *(1)*
reached *(1)*
read *(7)*
reading *(2)*
readings *(1)*
ready *(1)*
realized *(1)*

really *(13)*
reason *(4)*
reasons *(1)*
recall *(25)*
receive *(10)*
received *(8)*
receives *(3)*
receiving *(2)*
recess *(3)*
recognize *(2)*
recollection *(11)*
recommend *(1)*
recommendations *(3)*
recommended *(5)*
record *(56)*
recorded *(1)*
records *(8)*
red *(33)*
Reed *(3)*
reeducation *(1)*
REES *(1)*
refer *(3)*
referral *(3)*
referrals *(1)*
referred *(4)*
referring *(13)*
reflected *(1)*
refresh *(2)*
refusal *(13)*
refusals *(3)*
refuse *(2)*
refused *(14)*
refuses *(1)*
regarding *(1)*
regards *(1)*
region *(1)*
regional *(17)*
Registered *(1)*
regroup *(1)*
regular *(5)*
related *(2)*
relationship *(1)*
relevant *(3)*
remained *(1)*
remember *(10)*
remembered *(2)*
remembers *(1)*
Remote *(1)*
remotely *(2)*

repeat  (8)
rephrase  (9)
report  (45)
reportable  (2)
reported  (3)
Reporter  (6)
reporting  (5)
reports  (8)
represent  (1)
Representing  (5)
reproduction  (1)
Request  (4)
requested  (5)
requests  (1)
require  (1)
required  (8)
requires  (2)
Resources  (1)
respect  (25)
respond  (1)
response  (4)
responsibilities  (3)
responsibility  (3)
responsible  (30)
rest  (1)
restate  (1)
result  (13)
results  (2)
return  (1)
returned  (1)
review  (67)
reviewed  (12)
reviewing  (5)
reviews  (16)
right  (47)
Risk  (2)
RN  (6)
RNs  (2)
RN's  (1)
role  (34)
roles  (1)
roll  (1)
room  (8)
root  (1)
round  (1)
rows  (1)
run  (2)
RUPALEE  (2)
rupalee@alcenter.org

(1)

< S >
safe  (4)
Safety  (24)
sample  (4)
satisfied  (1)
saw  (4)
saying  (3)
says  (26)
scale  (13)
scanned  (2)
schedule  (2)
scheduled  (2)
schedules  (2)
school  (5)
Science  (1)
scope  (6)
screen  (8)
screening  (4)
scroll  (2)
scrolling  (1)
scthomas@grsm.com
(1)
SCULLY  (1)
second  (5)
section  (4)
sections  (1)
secure  (3)
security  (4)
see  (21)
seeing  (1)
seen  (2)
seizures  (1)
send  (9)
Senior  (7)
sense  (1)
sent  (2)
sentinel  (32)
separate  (4)
serious  (6)
seriously  (1)
serve  (4)
served  (1)
service  (4)
services  (16)
serving  (1)
session  (1)
set  (4)

seven  (1)
severe  (1)
share  (5)
Sheet  (1)
shift  (4)
short  (1)
shortens  (1)
show  (8)
showed  (1)
showing  (1)
shown  (1)
shows  (2)
shy  (1)
Sick  (6)
Sigma  (1)
sign  (2)
Signature  (1)
significant  (1)
similar  (1)
simple  (1)
simply  (1)
single  (2)
site  (19)
sites  (4)
situation  (3)
situational  (1)
situations  (2)
Six  (4)
slide  (23)
slides  (4)
sliding  (11)
slightly  (1)
slips  (2)
slot  (2)
smart  (1)
snippets  (1)
social  (1)
solution  (1)
solutions  (6)
someone's  (2)
soon  (3)
sorry  (22)
sort  (8)
sounds  (3)
space  (1)
speak  (2)
speaking  (2)
speaks  (1)
special  (3)

specialized  (5)
Specialty  (1)
specific  (17)
specifically  (10)
specifics  (1)
specify  (1)
speculate  (1)
speculation  (1)
spell  (1)
spend  (2)
spent  (1)
split  (2)
splitting  (1)
spoke  (1)
spotted  (1)
spreadsheet  (1)
Spring  (1)
Square  (1)
stable  (3)
stack  (3)
stacks  (1)
staff  (48)
staffing  (13)
stage  (1)
stamp  (1)
stamped  (1)
stand  (2)
standard  (5)
standards  (1)
stands  (1)
start  (10)
started  (12)
starts  (1)
state  (2)
stated  (3)
statement  (1)
STATES  (5)
stating  (1)
status  (1)
stay  (1)
staying  (1)
STD  (1)
Step-down  (2)
steps  (1)
Stipulations  (1)
stood  (1)
stop  (1)
story  (1)
straight  (3)

strategies *(1)*
strategy *(4)*
Stratford *(1)*
streamline *(1)*
streamlined *(1)*
Street *(5)*
stretcher *(2)*
strike *(3)*
stuff *(14)*
subject *(2)*
subjective *(5)*
submit *(1)*
submitted *(1)*
substance *(2)*
sugar *(15)*
sugars *(1)*
suggested *(3)*
suggestions *(2)*
suicide *(5)*
Suite *(4)*
SUMMER *(1)*
SUMMERS *(1)*
supervision *(1)*
supervisor *(3)*
SUPPORT *(1)*
supposed *(2)*
sure *(40)*
surmise *(1)*
surprise *(1)*
sworn *(2)*
system *(22)*
systemic *(4)*

< T >
table *(1)*
take *(23)*
taken *(6)*
takes *(3)*
talk *(1)*
talked *(1)*
talking *(12)*
task *(1)*
taxonomy *(11)*
team *(7)*
TEKACCEL *(1)*
telemetry *(1)*
tell *(12)*
telling *(1)*
Ten *(6)*

ten-minute *(1)*
terms *(7)*
test *(3)*
tested *(2)*
testified *(1)*
Testimony *(4)*
testing *(4)*
tests *(1)*
text *(1)*
tgregory@okllp.com *(1)*
Thank *(12)*
Thanks *(2)*
thing *(8)*
things *(7)*
think *(30)*
Third-Party *(2)*
THOMAS *(11)*
thorough *(1)*
thought *(2)*
Three *(24)*
time *(48)*
timeline *(2)*
timely *(1)*
times *(7)*
timing *(1)*
title *(11)*
titles *(2)*
today *(9)*
today's *(1)*
told *(3)*
Tonya *(3)*
tool *(1)*
tools *(3)*
top *(4)*
totally *(3)*
Township *(1)*
track *(6)*
tracked *(1)*
tracking *(2)*
traffic *(2)*
train *(3)*
trained *(5)*
training *(28)*
trainings *(9)*
tranq *(1)*
transcribed *(1)*
transcript *(3)*
transcription *(1)*

transfer *(1)*
transferred *(2)*
transitioned *(1)*
treat *(2)*
treated *(1)*
treatment *(3)*
treatments *(1)*
TREBACH *(1)*
tree *(1)*
trend *(1)*
trends *(1)*
triage *(33)*
trial *(1)*
tried *(3)*
trigger *(5)*
triggers *(1)*
TRIVIKRAM *(5)*
true *(1)*
try *(3)*
trying *(4)*
turned *(1)*
turning *(1)*
TVs *(3)*
twice *(6)*
Two *(21)*
two-and-a-half *(2)*
two-sided *(1)*
type *(1)*
types *(1)*
typical *(6)*
typically *(10)*

< U >
Uh-huh *(10)*
ultimate *(1)*
ultimately *(2)*
unclear *(1)*
understand *(6)*
understanding *(4)*
understood *(2)*
Unfortunately *(1)*
unit *(21)*
UNITED *(1)*
units *(9)*
universal *(1)*
University *(3)*
UNLIMITED *(2)*
unquote *(1)*
unsure *(4)*

unusual *(1)*
updated *(1)*
updates *(1)*
updating *(1)*
upload *(1)*
upstairs *(6)*
urgent *(6)*
urine *(6)*
use *(3)*
usually *(19)*
utilization *(2)*
utilized *(1)*
utilizing *(1)*

< V >
vaccines *(2)*
Vaguely *(3)*
varies *(3)*
ventilated *(1)*
verbal *(1)*
versions *(1)*
versus *(2)*
video *(3)*
visible *(1)*
visit *(2)*
vitals *(2)*
voicemail *(1)*
voluntary *(5)*

< W >
walk *(2)*
Wanda *(1)*
want *(13)*
wanted *(4)*
wants *(1)*
warrant *(2)*
warranted *(2)*
Washington *(1)*
water *(1)*
way *(12)*
ways *(2)*
website *(1)*
weeds *(1)*
weekly *(1)*
weeks *(1)*
Well *(35)*
went *(9)*
We're *(13)*
Wi-Fi *(1)*

**window**  (1)
**wish**  (1)
**WITKOWSKI**  (8)
**Witkowski-1**  (3)
**Witkowski-2**  (4)
**witness**  (18)
**wood**  (1)
**words**  (1)
**work**  (9)
**worked**  (9)
**Workers**  (1)
**working**  (10)
**works**  (3)
**wound**  (4)
**wrap**  (1)
**wrapped**  (1)
**write**  (2)
**writing**  (4)
**wrong**  (1)
**wrote**  (2)
**Wyoming**  (1)

**< Y >**
**Yeah**  (45)
**year**  (2)
**yearly**  (1)
**years**  (18)
**YESCARE**  (83)
**YesCare/Corizon**  (1)
**YesCare's**  (4)
**yeses**  (1)

**< Z >**
**zero**  (1)