# Exhibit L

1        IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
     No. 2:24-cv-05618-TJS
3
     ------------------------------------------
4    JACOB & JAMES JUNG, as Administrators of
     the Estates of LOUIS JUNG, JR.,
5
6          Plaintiffs,
7    -vs-
8    CITY OF PHILADELPHIA, YESCARE CORP;
     BLANCHE CARNEY, FORMER COMMISSIONER OF THE
9    PHILADELPHIA DEPARTMENT OF PRISONS; LALITHA
     TRIVIKRAM; MAUREEN GAY; MARIESHA APOLLON;
10   BLAIR CABELLOS; GENA FRASIER; WANDA BLOODSAW,
11         Defendants.
12   ------------------------------------------
13                        -------
                 MONDAY, NOVEMBER 17, 2025
14                        -------
15

16      Videotaped Virtual Oral deposition of

17   DR. LALITHA TRIVIKRAM, was taken on behalf

18   of Plaintiffs, commencing at 10:00 a.m., on

19   the above date, before Lisa J. Brill, a

20   Court Reporter and Notary Public, there

21   being present:

22

23   Job #47414

24

```
 1    A P P E A R A N C E S

 2


 3

      BY: BRET GROTE, ESQUIRE
 4    BY:  LOLO SERRANO, ESQUIRE
      ABOLITIONIST LAW CENTER
 5    990 SPRING GARDEN STREET, SUITE 306
      PHILADELPHIA, PENNSYLVANIA 19123
 6    ATTORNEY FOR THE PLAINTIFFS

 7


 8

 9

      BY:  MICHAEL PESTRAK, ESQUIRE
10    CITY OF PHILADELPHIA LAW DEPARTMENT
      1515 ARCH STREET, 15TH FLOOR
11    MICHAEL.PESTRAK@PHILA.GOV
      PHILADELPHIA, PENNSYLVANIA 19102
12    ATTORNEY FOR THE DEFENDANTS, BLANCHE
      CARNEY, COMMISSIONER OF THE PHILADELPHIA
13    DEPARTMENT OF PRISONS, CITY OF PHILADELPHIA

14

15

16

17    BY:  JONATHAN KAMINSKY, ESQUIRE
      KIERNAN, TREBACH,LLP
18    TEN PENN CENTER, SUITE 770
      1801 MARKET STREET
19    PHILADELPHIA, PA 19103
      JKAMINSKY@KEIRNANTRABACH.COM
20    ATTORNEY FOR THE DEFENDANT, LALITHA
      MARIESHA APOLLON
21

22

23

24
```

1
      A P P E A R A N C E S
2

3

4

5     BY: THOMAS GREGORY, ESQUIRE
      LAW OFFICES OF O'CONNOR & KIMBLE
6     1500 JOHN F. KENNEDY BOULEVARD, SUITE 1100,
      PHILADELPHIA, PA 19102
7     WITTEKIND@OKLLP.COM
      TGREGORY@OKLLP.COM
8     ATTORNEY FOR THE DEFENDANTS, YESCARE CORP.
      DR. TRIVIKIM, NURSE GAY, AND BLAIR CABELLOS
9

10

11

12    BY:  SUMMER THOMAS, ESQUIRE
      GORDON, REES, SCULLY, MANSUKHANI
13    THREE LOGAN SQUARE
      1717 ARCH STREET, SUITE 610
14    PHILADELPHIA, PA 19103
      SCTHOMAS@GRSM.COM
15    ATTORNEY FOR THE DEFENDANTS, CAREER STAFF

16

17    ALSO PRESENT:  MARGO HU

18

19

20

21

22

23

24

```
 1                    I N D E X

 2   WITNESS:

 3   DR. LALITHA TRIVIKRAM

 4

 5   EXAMINATION                PAGE

 6   MR. GROTE:                   7

 7

 8

 9                  E X H I B I T S

10   NO.      Description                  Page

11   None were marked.

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                 – – –
              DEPOSITION SUPPORT INDEX
2                 – – –

3  Direction to Witness Not To Answer
   Page Line
4
   None
5

6

7  Request for Production of Documents
   Page  Line
8
   None
9

10

11

12  Stipulations
    Page  Line
13
    7      1
14

15

16

17  Questions Marked
    Page Line
18
    None
19

20

21

22

23

24
```

Case 2:24-cv-05618-TJS     Document 100-12     Filed 12/05/25     Page 7 of 114

Deposition of Dr. Lalitha Trivikram                     Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 6

- - -

P R O C E E D I N G S

- - -

THE COURT REPORTER:  Just really quick before we get started, is everybody going to need the same order as I think it was Friday?

MS. THOMAS:  Yes, yes.

THE COURT REPORTER:  Yes?  Is that Ms. Thomas?

MS. THOMAS:  Yes, all right.  I can't see anyone.  Jonathan Kaminsky and then Mr. Pestrak?

MR. PESTRAK:  Same way.  Thank you.

MR. KAMINSKY:  Yes.  Yes.  To Jonathan Kaminsky.  Yep.  Same order.  Thank you.

THE COURT REPORTER:  And then I was also informed that this is expedited.

MR. GROTE:  That is for plaintiffs.  Yes.

- - -

Page 7

(It is hereby stipulated and agreed by and between counsel that reading, signing, sealing, filing and certification are hereby waived; and that all objections, except as to the form of the questions, be reserved until the time of trial.)

- - -

DR. LALITHA TRIVIKRAM, after having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. GROTE:

Q.  Good morning.

A.  Good morning.

Q.  Dr. Lalitha Trivikram.  Am I pronouncing your name correctly?

A.  That is correct.

Q.  Thank you.  My name is Bret Grote.  I'm plaintiff's counsel.  You're here for a deposition in the civil case of Jung v. City of Philadelphia.  Can you please

Page 8

state and spell your name for the record?

A.  Lalitha Trivikram, L-A-L-I-T-H-A T-R-I-V-I-K-R-A-M.

Q.  Thank you.  I'm going to be asking you questions today.  Have you given a deposition before?

A.  I have.

Q.  And how many times have you given a deposition?

A.  Twice, I believe.

Q.  And what was the nature of those cases?

A.  It was a case where a patient of mine had a bad outcome after surgery.  And another one was related to a case after I started working at the prison, an opioid-overdose case.

Q.  And was the first case from before your time at the prison?

A.  Yes, it was.

Q.  And what was the outcome of that case?

A.  I was removed from the case.

Q.  Okay, so you were no longer a

Page 9

defendant after being removed?

A.  Correct.

Q.  All right.  So you've been through depositions before.  I'm going to go over some ground rules.  These will probably be familiar to you.  We have to speak out loud.  No head nods or uh-hmms, that way the court reporter can get everything down in the transcript.  I will let you finish your answers before asking my next question.  And I ask that you let me finish my question before you give your answer, so we don't talk over each other.  If you do not know or remember something, please let me know if there is a document that might refresh your recollection.  And if you answer a question, I'll assume you understood it.  If you don't understand the question, please ask me to clarify.  And you can take breaks if you need one; just let me know.  The only thing I ask is if I've just asked you a question, please answer the question prior to us taking a break.  Does that all sound good to you?

Page 10

1    A.   Yes.
2    Q.   And are you prepared to give a
3 deposition today?
4    A.   Yes.
5    Q.   And do you understand that you're
6 being deposed in both your individual
7 capacity as a defendant in this case and
8 because you've been designated by YesCare
9 to testify to specific topics on behalf of
10 YesCare?
11    A.   Yes.
12    Q.   And the topics you have been
13 designated to testify about on behalf of
14 YesCare were identified in a notice sent
15 by Plaintiffs' counsel.  Have you seen
16 that deposition notice identifying those
17 topics you are asked to testify to?
18    A.   I believe I have.
19    Q.   I'm going to review the topics and
20 make sure that you're prepared to testify
21 to all of those.  So I'm not going to be,
22 you know, testing if you've memorized the
23 notice, but I'll go through those now.
24 Topic 1:  Any audits, reviews,

Page 11

1 evaluations, investigations, or trainings
2 related to medical care, including, but
3 not limited to, care for persons with
4 diabetes or persons exhibiting symptoms of
5 diabetic ketoacidosis conducted by
6 YesCare, PDP or by outside auditors,
7 evaluators, monitors, experts, or
8 inspectors within PDP facilities between
9 January 1st, 2018 and December 31st, 2023.
10 Are you prepared to testify to that topic?
11    A.   Yes.
12    Q.   Okay, that one was a mouthful.
13 The others are shorter.  Topic 2:
14 Policies and practices for the provision
15 of diabetes treatment within PDP
16 facilities.  You prepare to testify to
17 that?
18    A.   Yes.
19    Q.   Topic 3:  Policies and practices
20 of medication administration,
21 documentation of medication administration
22 and medical records, and documentation and
23 maintenance within PDP facilities?
24    A.   Yes.

Page 12

1    Q.   Topic 4:  Policies and practices
2 of providing emergency medical care within
3 PDP facilities?
4    A.   Yes.
5    Q.   Topic 5:  Policies and practices
6 pertaining to placement of incarcerated
7 individuals in an infirmary or other
8 medical housing unit within PDP
9 facilities?
10    A.   Yes.
11    Q.   Topic 6:  Policies and practices
12 pertaining to referral or transfer of
13 incarcerated individuals within PDP
14 facilities to an outside medical facility?
15    A.   Yes.
16    Q.   And Topic 7:  Policies and
17 practices pertaining to conducting
18 investigations, reviews, and any type of
19 assessment of the facts and circumstances
20 when an incarcerated person dies while in
21 PDP custody.
22    A.   Yes.
23    Q.   Topic 8:  Policies and practices
24 for imposing disciplinary measures on

Page 13

1 staff for failures to provide proper care,
2 render aid, or otherwise appropriately
3 respond to situations where incarcerated
4 people are in need of medical care?
5    A.   Yes.
6    Q.   And did you do anything to prepare
7 for today's deposition?
8    A.   I did.
9    Q.   And what was that?  Without
10 telling me about any conversations you had
11 with counsel?
12    A.   I reviewed the chart.
13    Q.   And that would be the chart of Mr.
14 Jung?
15    A.   Yes.
16    Q.   And did you review the entire
17 chart?
18    A.   I did.
19    Q.   Did you do anything else?
20    A.   I reviewed the audits that we did
21 to review the case.
22    Q.   When you say the audits you did to
23 review the case, would those be reviews of
24 Mr. Jung's case in particular?

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 14

1    A.  Yes.  Particularly his case.
2    Q.  Was one of those the Corrective
3  Action Plan?
4    A.  Yes.
5    Q.  And was another the Patient Safety
6  Event Committee Report?
7    A.  Yes.
8    Q.  Were there any others?
9    A.  No.
10    Q.  And did you do anything further to
11  prepare?
12    A.  No.
13    Q.  Okay.  And where do you work
14  currently?
15    A.  I currently work at the
16  Curran-Fromhold Correctional Facility, or
17  in Mod 2.
18    Q.  Or in where?
19    A.  Mod 2, which is the specific
20  building on the campus where I work.
21    Q.  Okay.  Got it.  And how long have
22  you worked there?
23    A.  I have been with YesCare, Corizon
24  since 2018, February.

Page 15

1    Q.  And in 2018 YesCare was Corizon?
2    A.  That's correct.
3    Q.  And in what capacity are you
4  currently employed?
5    A.  Currently, I'm the Regional
6  Medical Director.
7    Q.  And when did you become Regional
8  Medical Director?
9    A.  It was October of 2024.
10    Q.  And what are your responsibilities
11  as Regional Medical Director?
12    A.  I oversee the care for the
13  patients who are incarcerated with the
14  Philadelphia Department of Prisons.
15    Q.  And who was in that role prior to
16  you?
17    A.  Dr. E.K. Kalu (ph).
18    Q.  And prior to that role, or maybe
19  you can just start in 2018 when you became
20  employed by Corizon, can you walk me up
21  till the change -- until you became
22  Regional Medical Director in 2024, what
23  was your role and responsibility?
24    A.  So when I started in 2018, I was

Page 16

1  the site Medical Director at the jail
2  known as Curran-Fromhold Correctional
3  Facility.  And in that capacity, I was
4  responsible for overseeing the care of the
5  patients who are in that particular
6  facility.  I was also responsible for
7  overseeing the practitioners, advanced
8  practitioners, and physicians who were
9  working at CFCF.
10    Q.  And was that the only role you
11  held in Corizon and YesCare prior to
12  becoming Regional Site Director?
13    A.  Yes.
14    Q.  Okay.  I'm asking you about your
15  previous employment and educational
16  history, but maybe to be most efficient,
17  can you walk me through your
18  post-high-school education and employment
19  history?  Where you went to school, what
20  degrees you got, where you were employed,
21  and what you did there, please?
22    A.  Sure.  So, post-high-school, you
23  said, right?
24    Q.  Yes.  You can --

Page 17

1    A.  No, that's quite all right.  I
2  went to the State University of Buffalo
3  for my undergraduate.  I graduated in '94
4  with a dual degree in biochemistry and
5  English literature.  I went to the Penn
6  State College of Medicine in '94 to '98,
7  and subsequent to that I started my
8  internal medicine residency at the
9  University of Michigan.  I did two years
10  there, the first two years there, I
11  transferred to Cornell New York Hospital
12  when my husband got a change in job.  That
13  was the reason for the transfer, and I
14  completed my residency there in New York.
15    After finishing my residency, I
16  went to a multispecialty practice called
17  Crystal Run.  I think I was there for
18  about three years, from 2001 to about
19  2004, I believe.  Subsequent to that, I
20  went to another multispecialty practice
21  called Access Medical Group in White
22  Plains, New York.
23    I should just take a step back in
24  both of those roles, I was an internist.

Page 18

I did outpatient care. I did inpatient hospital rounds. I admitted patients to the hospital. I did nursing home work. Pretty much a standard attending, an internal medicine, in an outpatient setting, outpatient and inpatient setting.

Subsequent to Access, I left Access Medical Care because the practice was having financial difficulties. So I preemptively left and I started working at a nursing home called -- Oh, my goodness. Blanking on the name of the nursing home, but it's in the Bronx. I was there for about three years and there I was responsible for the care of the patients who were both in acute and long-term care, including dementia-level care.

We moved to Pennsylvania in 2010, and I took a couple years off, three years off to get my family settled. And once I returned to work, I started at Christine Meyer, M.D. Associates, and I spent four years there. And again, that was primarily outpatient internal medicine

Page 19

care. And then in 2018 is when I started with the Philadelphia Department of Prisons and Corizon.

Q. Thank you. In those, you listed a number of places where you were employed. Did any of those jobs involve treatment of patients with diabetes?

A. Yes.

Q. And was that -- How would you characterize the frequency with which you treated diabetic patients?

A. Well, the usual frequency that an internist would treat diabetes in an outpatient setting.

Q. What is the usual frequency?

A. It depends on what the patient presents with. If they come in with diabetes, I took care of them. I don't know that I could quantitate how many patients I saw going back, you know, to 2001.

Q. Maybe I can just ask it this way, was it a common enough occurrence that you were treating patients with diabetes?

Page 20

That's a vague question. Let me rephrase.

Did you regularly provide care for patients with diabetes over the course of your prior employments?

A. If they presented with diabetes, yes, I did.

Q. You didn't treat people for diabetes if they didn't have it.

A. Correct.

Q. Understood. So, as the Site Director at CFCF, can you give me an overview of your responsibilities?

A. So generally speaking, I would oversee the care of patients. What that involved is for example, patients who go out for off-site visits. I would review the paperwork coming back with the patient. I would implement treatment if it was necessary. If I had questions about the treatment, I would call the provider or the consultant and discuss the case with them. I did that routinely, even in situations where a patient might

Page 21

be having situations in our environment. If I needed to get some expert help with patients, understanding a patient's history, we would obtain medical records for patients who stated that they had medical history prior to coming to us. I would review those records and determine if there was anything that needed to be done for those patients. While they were in our custody, I would try to facilitate follow-up afterwards. If a patient was transferred upstate and they were actively going through treatment for various conditions, I would communicate with providers upstate to let them know that these are the things that the patient needs to follow up on. I was a resource for the mid-levels and the advanced practitioners if they had any questions about patient care, how to manage a difficult case or challenging case. I collaborated with the other site medical directors since our patients transferred between facilities to ensure again

Page 22

1  continuity as much as possible.
2      If there were issues with -- if
3  problems were identified, I would look
4  into seeing what was the issue and try to
5  work with my administrators to see how we
6  could better address those issues.
7      Q.  Thank you.  Thank you for that.
8  Did you play any role in formulating
9  policies for YesCare at CFCF?
10     A.  Not as the Site Medical Director.
11     Q.  Okay, who did?  Who was
12  responsible for that?
13     A.  The regional team would be
14  responsible, and the corporate as well.
15     Q.  Okay.  Who is the regional team?
16  Is that the Regional Director?  And who
17  else?
18     A.  The Regional Medical Director is
19  the clinical lead for policies.  You know,
20  specifically clinical policies.  They
21  would work in conjunction with, say, the
22  Chief Medical Officer and corporate.  You
23  know, where most of those policies are
24  coming from.  So the regional team also

Page 23

1  includes a Regional Vice President of
2  Operations, but that's the operations side
3  of things.
4      Q.  And operations as distinct from
5  clinical.  Is that the distinction you're
6  making?
7      A.  Correct.
8      Q.  Okay.  Did you have any role in
9  providing feedback to the regional team as
10 to the policies that were in place at
11 CFCF?
12     A.  The policies weren't something
13 that I would give feedback for.  I would
14 give feedback if there were issues with
15 implementing a policy that was specific to
16 CFCF.
17     Q.  Okay.  Did you have any role in
18 who facilitated or who created the nursing
19 engagement tools, or nursing encounter
20 tools, is that what NET stands for?
21     A.  Correct.  That is corporate.
22     Q.  Corporate as well.  Then, would
23 you role then be the same as with
24 policies:  If there were issues with

Page 24

1  implementing any aspect of a NET, how the
2  NETs were used, you could share that, or
3  you would share that, but not actually
4  provide feedback on the content of the
5  NET?
6      A.  Correct.
7      Q.  And the clinical pathways that are
8  used by YesCare, is those also coming from
9  corporate?
10     A.  Yes.
11     Q.  Did you have any role within CFCF
12 in formulating any policies that were kind
13 of locally implemented or protocols?
14     A.  No.
15     Q.  Can you tell me when it comes to
16 YesCare policies that were to be
17 implemented by the medical staff, are all
18 YesCare staff required to be familiar with
19 those policies?
20     A.  What do you mean?
21     Q.  What I want to know is do YesCare
22 medical staff all have a standard set of
23 policies they are to be familiar with, or
24 were certain policies maybe -- only to be

Page 25

1  known by certain types of staff?  Were
2  there different policies the nursing staff
3  had to be aware of, as opposed to the site
4  director, as opposed to nurse
5  practitioners or were there a common set
6  of policies everybody was to be familiar
7  with and to follow?
8      A.  It would be a common set of
9  policies.
10     Q.  And can you tell me how the
11 medical department is organized for PDP as
12 a whole?  What I'm interested in is just
13 who are the staff that are employed there,
14 what does the organizational chart look
15 like, and who supervises whom?
16     A.  For the medical team?
17     Q.  Correct.
18     A.  So at the site level?
19     Q.  Yes.  Well, I guess at the first
20 level, there's multiple facilities at PDP,
21 if you could maybe just go through the
22 four of those, and it seems like they each
23 have a site director, but how that works,
24 who they report to, and how they work

Page 26

1  together?
2      A.   So there is Curran-Fromhold
3  correctional facility.  There's the
4  Riverside Correctional Facility.  There's
5  the Detention Center, and there's the
6  Philadelphia Industrial Correctional
7  Complex.  Those are the four jails.  There
8  is a smaller jail called Mod 3, where
9  juveniles who are adjudicated as adults
10 are housed on State Road.  There is a
11 separate West Philly location for our
12 juvenile detention center called JJSC.  So
13 JJSC, PICC, DC, CFCF, and RCF all have a
14 Site Medical Director.  The Site Medical
15 Director, the individual jails have
16 different numbers of advanced
17 practitioners based on their size and the
18 amount of services that need to be
19 provided.  So, for instance, at JJSC, Dr.
20 Kate is the only one who is there.  At the
21 Detention Center, there's a mid-level who
22 works with the Site Medical Director.  At
23 PICC, there are anywhere from two to three
24 mid-levels who work with the Site Medical

Page 27

1  Director.  At RCF, there's one mid-level
2  who works with the provider, and since
3  CFCF has a 24-hour, seven-days-a-week
4  operation, they have the most mid-levels
5  working there.
6      So all the mid-levels report up to
7  their Site Medical Director; the Site
8  Medical Director reports up to the
9  Regional Medical Director, and there's
10 definitely collaboration between Site
11 Medical Directors, as I had mentioned
12 before, because patients do transfer
13 between facilities.
14     Q.   Thank you.  When you say -- well,
15 how many mid-levels are there in CFCF?
16     A.   So there are two 12-hour shifts on
17 the weekends.  Then there is a triage
18 provider for the three shifts during the
19 week.  There's two chronic care providers,
20 and then there is a sick-call provider and
21 then there's a handful of PRN providers.
22     Q.   I think I counted six, and then
23 you said a handful.  So are we talking
24 about 10, give or take a couple,

Page 28

1  depending?
2      A.   Yes, correct.
3      Q.   And when you say mid-level, what
4  type of license falls within the
5  mid-level?
6      A.   They are nurse practitioners or
7  physician's assistants.
8      Q.   And can you just describe for the
9  record what's a nurse practitioner?  What
10 can they do?  What type of care can they
11 provide under their license?  What can
12 they not do?
13     A.   So nurse practitioners are
14 providers who have a degree in nursing and
15 then do further training so that they can
16 work as a provider, a clinical provider.
17 Their scope of practice they are able to
18 see most things, diagnose most things, and
19 treat most things.  They are able to do
20 simple procedures that may be included in
21 their scope of practice.  It all depends
22 on the specifics of that scope of
23 practice.  Similarly, physician's
24 assistant do not have a nursing background

Page 29

1  typically.  They go to school to become
2  physician assistants.  Similarly, they
3  have a scope of practice in which they can
4  see patients, diagnose conditions, treat
5  conditions, and perform minor procedures.
6      Q.   Are there any other -- physician's
7  assistants, and what was the other one
8  again?
9      A.   Nurse practitioners.
10     Q.   Nurse practitioners.  Are there
11 any other types of mid-levels?
12     A.   As like physician extenders?  No.
13 There are nurse practitioners and
14 physician's assistants.
15     Q.   Thank you.  Now, in terms of
16 nursing staff, can you walk me through the
17 types of nursing staff?  You know,
18 licensed practical nurses and registered
19 nurse, and how many there are.  We'll
20 start with CFCF.  You know, what is CFC
21 complement of nursing staff?
22     A.   I could not speak to the number of
23 nursing staff at any of the buildings, but
24 I can speak to the distinction between an

Page 30

RN and an LPN. An LPN is a licensed practical nurse. They are able to do such things as medication passes, administer medication. What they are not specifically trained to do is assess patients, perform patient assessments. So they would require more input from a physician or a mid-level provider in terms of assessing a patient. A registered nurse has the ability to perform a full assessment and present that assessment to a provider. If further treatment guidelines or a further evaluation are needed, they can defer to a provider.

Q. And when you say provider, does that refer to mid-level or higher?

A. Correct.

Q. Okay. I want to know how oversight is provided for medical staff at PDP. How do you supervise staff? But maybe I'll just give you an idea of some of what I'm looking for, and you can then kind of respond as makes the most sense. But, you know, who supervises? How does

Page 31

supervision happen? Are there employee evaluations? Are there performance audits? That's the sort of thing I'm interested in. How is supervision handled within the medical department?

A. So supervision occurs informally. As a site medical director, if you're reviewing a chart and you identify questions, then, you know, you would address it with the practitioners involved. It happens if the mid-level or advanced care practitioner comes with specific questions about how to manage a certain case. Then you offer supervision in that setting as well. There are annual reviews that are done where charts are taken and audited, and areas of strength are identified. Areas for improvement are discussed. So that's our general process, you know, with the practitioners.

Similarly, I believe there are reviews done with the nursing staff. Actually, I'm not 100% sure what that process is with the nursing staff.

Page 32

Q. And who supervises the nursing staff?

A. So there are clinical administrators who do supervise. At CFCF, there is a position for Director of Nursing, who would be responsible for supervising nursing staff. Ultimately, there is a Regional Vice President for Clinical who oversees the nursing staff.

Q. And you said, going back earlier, that the charts are audited. Would that be for the mid-levels that you supervise?

A. Yes.

Q. And how are those charts selected?

A. Those are selected randomly.

Q. Approximately how many charts would typically be reviewed in a random annual review?

A. Maybe about 10 to 15 charts.

Q. And what is -- Did you have any role in supervising nursing staff? What's the role between -- Yeah, Can you describe the relationship between the medical providers and nursing staff?

Page 33

A. I do not provide supervision. As the Site Medical Director, I do not provide supervision for nursing staff. If there is an issue that is brought to my attention, then I address it with the administrators.

Q. And as the Site Director, you might have already answered this, but who did you report to?

A. As the Site Director, I reported to Dr. Kalu.

Q. That's the Regional Medical Director. Is that the right name?

A. Yes.

Q. Did you report to anybody else?

A. No.

Q. And when you were Site Director, can you walk me through what a typical day might look like? I understand there might have been a lot of atypicality in your work, but in general, when did you get to work, and what did the workflow look like?

A. I would start my day pretty early, usually at 5:30, 6:00 a.m. I came in in

Page 34

the morning because it tends to be quieter
and I am able to go through paperwork and
see, depending on what was placed in my
bin, the box outside my office door.
Basically, anything and everything may
have been placed in there. So I start by
looking through those papers. Some of
them may be hospital returns. So I'll
review the cases to see what did the
patient go out for, what was done in the
hospital for them. Check the chart to
make sure that whatever orders are needed
were taken care of. If there's any issues
that I need to be aware of or carry
forward, then I would do that as well.
And actually, before I did that, I would
touch base with the night-shift provider,
which was one of the reasons I like to
come in early so that I could provide some
continuity for the night-shift provider
and just let them know that they're
supported. So I usually would stop by,
talk to them. Find out what happened
overnight. Is there anything I need to

Page 35

know. What do we need to follow up on?
And that conversation would be followed by
me going back to my office, looking at my
paperwork, talking to the nurses. I would
also touch base with the nurses to find
out if there was anything that happened
that they wanted me to know about, if
there was any issues. Shortly after that,
when shift change happens, then I would
start just touching base with the
day-shift to either communicate anything
that the night-shift provider had told me
if they had not had the opportunity to
tell day shift themselves, or if there
were any other issues or concerns that I
had that I needed them to look into, then
I would ask them to take care of that.
And then, you know, the rest of the day is
pretty much checking e-mails. Addressing
concerns that come from the client,
meaning the Philadelphia Department of
Prisons, Dr. Herdman, or from Sandy,
addressing any issues that other people
might bring. There might be issues with

Page 36

X-rays, there might be issues with labs.
So it was just a variety of looking into
and investigating and answering questions
that people may have or supplying
information. It may be clinical and maybe
more administrative, but it covered the
gamut of things.
    Q.   So you said you would review
hospital returns. Did you review all
hospital returns for patients. Well,
which hospital returns would you review?
    A.   The hospital -- the returns that
may have been placed in my box, all of
them did not come to my box. If a
provider had some concerns, then they
might place it in my box so that I would
be aware of those concerns. But that
doesn't necessarily mean everybody who
returns.
    Q.   Okay. And when we say returns,
we're talking about people who were
returning to CFCF specifically?
    A.   Yes.
    Q.   And would that be somebody -- What

Page 37

if somebody was transferred to the
hospital from CFCF and came back and was
placed in the infirmary and the Detention
Center, would that still be considered a
CFCF return?
    A.   No, that would be a Detention
Center return.
    Q.   Would you only be provided -- Were
there any types of hospital returns that
always made it to your inbox, or was it
dependent on a provider putting it there?
    A.   It would depend on somebody
putting it there.
    Q.   And if somebody were coming from
the Detention Center, from the infirmary,
would you back -- or to CFCF, would you
learn about that each time or not?
    A.   Not necessarily, because the site
medical director at the Detention Center
would address those issues.
    Q.   And so, in what instances would
that be brought to your attention?
    A.   It wouldn't necessarily be brought
to my attention. If it is someone I was

Page 38

1  aware had gone out, then I may look in the
2  chart to see what happened.  And then I
3  might find out that they returned to the
4  Detention Center.  If I had questions, I
5  would reach out to my colleague.
6      Q.   Thank you.  As Site Director, were
7  you involved in patient care yourself?
8      A.   Sometimes.
9      Q.   When would you be involved in
10 patient care?
11     A.   If a provider came to me with
12 concerns, if they weren't sure what was
13 going on with the patient, if they weren't
14 sure what they were seeing, then I would
15 step in and evaluate the patient myself.
16 Similarly, if a nurse had a concern about
17 a patient and perhaps one of the other
18 providers wasn't available, then I would
19 step in and evaluate the patient.  In
20 cases where a patient might be a little
21 bit more difficult, I might evaluate the
22 patient just to help create a treatment
23 plan for the patient.
24     Q.   Now, as Site Director, do you

Page 39

1  consider it important that medical staff
2  are trained properly to do their job?
3      A.   I'm not sure what that question is
4  really asking.
5      Q.   I mean, how important is it that
6  medical staff are trained to provide care
7  within PDP facilities?
8      A.   Quite important.
9      Q.   And why is that?
10     A.   Because we are taking care of
11 people.
12     Q.   What kind of training -- So, as
13 site director, did you have any oversight
14 of employee training for medical
15 employees?
16     A.   Yes.
17     Q.   And can you describe what that
18 responsibility consisted of?
19     A.   So if we had a new provider
20 starting at CFCF, I would direct their
21 onboarding once they cleared all the
22 requisite trainings, as far as what they
23 needed to do when they came into my jail
24 and what that would look like.

Page 40

1      Q.   And what are the requisite
2  trainings?
3      A.   It would be the training from PDP
4  for security purposes.  It's the corporate
5  trainings that they need to do.  It's the
6  computer EHR training that they need to
7  do.
8      Q.   And that was for the medical
9  providers you were just describing, was
10 there -- what was the training like for
11 nursing staff?
12     A.   I can't speak to specifically the
13 training staff, the training for the
14 nursing staff, because I did not supervise
15 that.
16     Q.   Do you know who did?
17     A.   The Regional Vice President and
18 the administrators would oversee the
19 training of the nursing staff.
20     Q.   You're now the Regional Director,
21 correct?
22     A.   Yes.  Yes.
23     Q.   Do you have responsibilities for
24 training in nursing staff in that role?

Page 41

1      A.   No.
2      Q.   And you touched on what some of
3  the requisite trainings are.  I'm going to
4  ask you about some other matters as to
5  what medical providers were trained in.
6  So, were they trained in intake screening,
7  or would that be something nurses were
8  trained in?
9      A.   They are not trained in intake
10 screening, but they are asked to provide
11 orders for patients who come through
12 intake.  So, in terms of intake, their
13 responsibility is to place bridge orders
14 for medications that patients require.
15     Q.   What is a bridge order?  I think I
16 get the term, but describe it?
17     A.   Yes.  So, if somebody is taking
18 blood pressure medication prior to
19 incarceration, they will be ordered their
20 blood pressure medication upon intake.
21 And that is to go until they are seen by
22 the chronic care provider, who will then
23 determine if this is appropriate, if any
24 adjustments need to be made, and then

Page 42

1  continue their medication moving forward.
2      Q.  And were medical providers trained
3  on when they were supposed to refer
4  somebody to a chronic care provider?
5      A.  Yes.
6      Q.  And how were they trained?  Were
7  they provided policies?  Was there an
8  in-class module?
9      A.  So part of it is that our EMR has
10  what we call a clinical rule engine.  So a
11  patient reports that they have a chronic
12  medical condition.  Then a chronic care
13  appointment will be generated for the
14  patient.
15      Q.  And medical providers, were they
16  given any training and medication
17  administration?
18      A.  The providers?
19      Q.  Yes.
20      A.  In what way?
21      Q.  How medication was supposed to be
22  administered within PDP?
23      A.  That's not some -- go ahead.
24      Q.  It's a compound question, so I'll

Page 43

1  let you answer that one and get to the
2  next one.  Go ahead.
3      A.  The providers don't need to
4  necessarily know the specifics of
5  medication administration.  That would be
6  done by the LPN.
7      Q.  Okay.  And then you say done by
8  the LPN.  That means it's the licensed
9  practical nurses who would administer the
10  medication or who would train nursing
11  staff on that?
12      A.  They would be the ones to
13  administer the medications.
14      Q.  Was that only LPNs who would
15  administer medications?
16      A.  If needed, I suppose an RN could
17  step in to administer medications if there
18  were not enough LPNs, but it would either
19  be an LPN or an RN.
20      Q.  Were medical providers trained at
21  all in supervision of medication
22  administration?  And what I mean by that
23  is less like supervision of nursing staff,
24  which I know was not their role, but

Page 44

1  ensuring that their orders were being
2  carried out.  How are they monitoring
3  that?
4      A.  They would give the order, and it
5  would be the nurse's responsibility to
6  give it.  There isn't supervision where
7  the provider would supervise the nurse
8  giving the medication that was ordered.
9      Q.  And why is that, if you know?
10      A.  Should I say -- I mean, that is
11  how it is typically done in medicine in
12  general.  A physician gives an order, a
13  mid-level gives an order, and a nurse
14  practitioner gives an order.  It's the
15  nurse's responsibility to carry out that
16  order or to ask questions if they need
17  clarification.
18      Q.  Thank you.  Were medical providers
19  trained in the Red Flag Policy?
20      A.  They are aware of the Red Flag
21  Policy, since they may be addressing red
22  flags.
23      Q.  And so how would they be -- would
24  they be made aware of that during their

Page 45

1  onboarding?
2      A.  Yes, they would.
3      Q.  And we'll get into more of the Red
4  Flag Policy later.  But when you say -- is
5  it the nursing staff that would kind of
6  trigger the Red Flag Policy, which could
7  then involve the Medical Provider?
8      A.  Yes.
9      Q.  You mentioned EHR.  Is that
10  Electronic Health Record?
11      A.  Yes.
12      Q.  And are medical providers trained
13  in how to utilize the Electronic Health
14  Record within PDP facilities?
15      A.  Yes.
16      Q.  And what did that consist of, that
17  training?
18      A.  So their training consists of a
19  session with the EHR professionals who
20  will introduce them to the processes and
21  within the EHR and how to order
22  medication, how to document in a note what
23  the different encounter types are.  Then
24  there used to be a manual, now it's

Page 46

electronic YouTube videos, that will take
a provider step by step through the work
flows.  So they know how to order a
medication, how to discontinue medication.
To arrive at an appointment, document an
appointment, what to do once you finish
your appointment.  And then they sit with
providers to practice, so to speak, where
they will see a patient.  And if they have
questions, then they speak to their
colleague about what do I do in this
situation.
    Q.   Are medical provider's given
training on just generally what the
policies were that they were to abide by?
    A.   I'm not sure what is being
encompassed in "policy".  Medical
providers deliver medical care.  That's
something they get from their training as
a nurse practitioner, as a PA, or as an
MD.  That is universal, no matter where
you are.  So there's no training that
tells a provider this is how you take care
of a patient.  The training comes in, how

Page 47

do you do it, you know, within this
environment, which is where they learn how
to use our EHR.  So I don't know if that
answers your question.
    Q.   Let me try asking a different
question.  Are there policies of the
Philadelphia Department of Prisons that
pertain to the provision of medical care?
For example, the Access to Care policy and
the Emergency Room Hospitalization policy.
The Red Flag policy is a PDP policy.
Those are the ones I'm kind of getting at.
Are there PDP policies pertaining to the
provision of medical care?
    A.   The PDP really doesn't tell us how
to be as providers.
    Q.   Well, my question was, are there
such policies, though, that do address
medical care within PDP facilities?
    A.   There are some policies, I guess,
yes.
    Q.   And are our medical providers
employed by YesCare given notice about
these policies?  Do they know they exist?

Page 48

Are those policies provided to them so
they can become familiar with them?
    A.   Specifically, I don't think
they're given the PDP policies.
    Q.   Okay.  Are they notified that
there are such policies?
    A.   They are.  If it comes up, yes.
    Q.   Is it part of the onboarding?
    A.   To discuss PDP policies?  No.
    Q.   Clinical pathways, When I use that
term in the context of YesCare, what does
that mean?
    A.   Clinical pathways are guidance on
how to manage chronic medical conditions.
    Q.   And what are some -- I don't know
how many clinical pathways there might be
for YesCare, so I'm not looking for an
exhaustive list.  But what are some
examples of clinical pathways that YesCare
has for specific conditions?
    A.   For anticoagulation, for
hypertension, for example, chronic
conditions like that.
    Q.   Is diabetes one as well?

Page 49

    A.   Yes.
    Q.   And are your medical providers
given these clinical pathways as part of
their onboarding?
    A.   I do not know for sure if it is
addressed during the corporate trainings.
    Q.   Do you know if it is addressed
elsewhere?
    A.   No.
    Q.   Do you know if the medical
providers used, supervised, or utilized
these clinical pathways?
    A.   For the most part.  If you are
practicing medicine the way you should be
taught to practice medicine, then you are
following those clinical pathways.
They're a guide, and every patient is a
little different, so you might adjust
things accordingly to what is best for the
patient who is sitting in front of you.
    Q.   So were medical providers
instructed to follow YesCare's clinical
pathways as guides?
    A.   Not specifically.

Page 50

1    Q.   And when you say not specifically,
2  what does that mean?
3    A.   It means that medicine is not a
4  cookbook recipe; there are guidelines that
5  you can use, but they are not exhaustive,
6  they are not prescriptive, and they are
7  not the only way to address a medical
8  issue.
9    Q.   If a medical provider employed at
10 CFC wanted to reference these clinical
11 pathways of YesCare, how would they do
12 that?
13   A.   We would make it accessible to
14 them.
15   Q.   Would they have to request it?
16   A.   It depends.  If it's somebody who
17 doesn't know how to manage something, then
18 it would be given to them as part of their
19 supervision.  But if it's something they
20 want to look into, then it would be given
21 to them.
22   Q.   And as Site Director would you --
23 you would provide that clinical pathway if
24 one of your staff you supervise, one of

Page 51

1  the medical providers, had requested it,
2  or you thought that they could benefit
3  from it.  Is that fair?
4    A.   Yes.
5    Q.   Were medical providers trained in
6  when to admit somebody to the infirmary?
7    A.   Again, it's a clinical judgment.
8  There is no hard yes or no to any of those
9  types of questions.
10   Q.   Was there any training on how to
11 go about exercising clinical judgment to
12 admit somebody to the infirmary?
13   A.   So clinical judgment is something
14 that people are trained to do in their
15 education, and we will give them criteria
16 to consider for a patient who might
17 benefit from being in the infirmary.
18   Q.   And how did you give them those
19 criteria to consider?  Was that part of
20 the onboarding?  Is it part of a written
21 document?  How is that -- is it part of
22 the onboarding?
23   A.   Because they spend time with the
24 colleagues who have been in our system for

Page 52

1  a while, those colleagues will explain, if
2  a situation arises, that this is a patient
3  we're kind of, sort of sending to the
4  infirmary.  And this is how we go about
5  getting the patient sent to the infirmary.
6    Q.   Okay.  Same question for emergency
7  room referrals, are medical providers
8  given guidance on when to make emergency
9  room referrals?
10   A.   Again, it's a clinical judgment.
11 No one is going to tell someone that they
12 must or must not, or that they should or
13 should not.  It's based on your evaluation
14 at the time the patient presents.
15   Q.   Are there any general criteria
16 that were used to guide those clinical
17 judgments?
18   A.   It's the same criteria that would
19 be used if you were in an outpatient
20 setting, if you were in a nursing home, or
21 if you were in urgent care.
22   Q.   I'm just asking, were there
23 criteria or guidance that was provided to
24 medical providers by YesCare as part of

Page 53

1  their training for admitting somebody to
2  the hospital?
3    A.   If somebody has gone through
4  training and has a license to practice as
5  a provider, those are things that they
6  would understand.
7    Q.   And so, based on that response or
8  what you say -- are you saying that they
9  were not provided any additional training
10 beyond what they would have received with
11 their education and training to obtain the
12 license they had?
13   A.   There is no specific training for
14 that.  I think this is where I'm
15 struggling a little bit.  I cannot tell
16 someone that they must send a patient for
17 this, that, and the other thing.  That is
18 something where you evaluate the patient,
19 and you make a decision.  Now, if somebody
20 needs assistance or they're not sure what
21 to do, then yes, I would talk them through
22 the case.  We would discuss it; we may
23 make a decision.  That is not something
24 that I'm specifically training them to do.

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 19 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 54

Q.   Okay, so there were no documents that you gave medical providers to guide them for somebody to the ER?

A.   No.

Q.   Okay.  Do you know if PDP has any policy on provision of emergency care?

A.   They do.

Q.   Was that provided to medical providers as part of their training?

A.   No.

Q.   And were medical providers given training in diabetes care?

A.   Again, whatever training they had that led to them getting a license, that was their training for diabetes management.

Q.   Was there any aspect of the onboarding that discussed diabetes care within PDP facilities?

A.   As part of their clinical work, when they're working with a colleague, then yes, that is where the nuances of treating diabetes in this environment would have been discussed.

Page 55

Q.   And so, clinical work -- working with a colleague.  I think I get what you mean there, but can you just describe what that looks like in practice?

A.   So it means that they start out by shadowing a provider to see how things are done.  Then they will gradually be asked to see patients alongside this provider, and eventually they'll see patients on their own and consult only as needed with their colleague, to the point where we feel like we're well versed enough to be able to function in our environment, see patients, and have enough of an understanding of how to make things happen and get things done so that they can continue on their own.

Q.   Thank you.  Are there sometimes contract staff?  And by that I mean non-YesCare employees?  I guess YesCare employees have contracts too, right?  But medical professionals who are employed within PDP facilities who are not YesCare employees, is that sometimes the case?

Page 56

A.   Yes.

Q.   And what does that actually -- what type of medical professionals might fit into that category?  Is it only nursing staff?  Could it be medical providers?  What's the range there?

A.   It could be nursing staff, or it could be medical providers.

Q.   And when somebody, a non-YesCare, contract employee, begins work at a PDP facility, will their onboarding be the same as what you've just been describing, or will it be different?

A.   So, speaking from the provider perspective, I believe their onboarding, at least when they get to the site, is the same.  It is the same.  Not pretty much -- it is the same.  I would onboard a provider the same way regardless of whether they were agency staff or a YesCare employee.

Q.   And do you know if that was the case for nursing staff?

A.   I can't speak to the training for

Page 57

the nursing staff.

Q.   Okay, thank you.  How long is the onboarding process for medical providers?

A.   It depends on the provider.

Q.   Can you give me a range?

A.   Some providers become very adept within two weeks.  Some providers need a little bit more time.

Q.   Thank you.  How do you determine if somebody needs more time?

A.   Just based on their comfort level with the EHR.  Based on their comfort level with corrections and with nursing staff and all the players that are required to collaborate to take care of patients in this environment.

Q.   And so, who makes that assessment as to whether or not somebody is sufficiently comfortable?

A.   It's collaborative.  As the Site Medical Director, you know, I will be overseeing and speaking to the provider, speaking to the colleagues, working with the provider and making that assessment.

Page 58

1  Our medical provider is required to
2  complete ongoing training during the
3  course of their employment.  There are
4  trainings that we are asked to do.
5  They're not clinical per se.  They're more
6  infectious disease control or safety in
7  the workplace.  Those types of trainings.
8      Q.   And are those the type of things
9  that -- like, they have to happen
10  annually, every couple of years?  How do
11  they come up?
12      A.   I believe they're annual.
13      Q.   Okay.  When it comes to clinical
14  care, are there any ongoing annual
15  trainings pertaining to clinical care?
16      A.   Back to clinical care.  No.
17      Q.   When I use the term intake, can
18  you tell me what intake is?
19      A.   Intake is the process that we go
20  through when a newly incarcerated person
21  presents to medical.
22      Q.   Okay.  And what is the role of
23  medical at intake?  At the door?
24      A.   Our role is to determine if a

Page 59

1  patient is fit for confinement.  If
2  they're not fit for confinement, then we
3  don't accept them into the facility.  Once
4  they're determined to be fit for
5  confinement and they go through the basic
6  security searches and everything else,
7  then they're brought to medical for us to
8  assess what their medical conditions,
9  chronic or acute, may be.
10      Q.   And what does it mean if
11  somebody's unfit for confinement?
12      A.   If they're not able to stand, hold
13  themselves up, answer questions, or their
14  vital signs are somehow unstable, those
15  would render a patient unfit for
16  confinement.
17      Q.   With 'unfit for confinement' in
18  this context, does that mean somebody's
19  going to an outside medical facility for
20  some type of urgent care?
21      A.   Yes, they should be taken to the
22  hospital.
23      Q.   Okay.  Can you walk me through the
24  intake procedures?  From prescreening to

Page 60

1  screening.  Let's start with prescreening
2  and then screening.
3      A.   So the patient will first sit with
4  the medical assistant who will obtain --
5  will place a PPD for TB screening, obtain
6  a urine sample for STD screening, will get
7  a blood sample to screen for HIV and
8  hepatitis C, obtain their vital signs, and
9  make sure that there isn't anything that
10  would be concerning that should be brought
11  to the nurse's attention sooner than
12  later.
13      Subsequent to that, the nurse then
14  interviews the patient.  There's an
15  exhaustive list of questions that the
16  nurse goes through to assess the patient's
17  medical history, behavioral health
18  history, and substance abuse history,
19  identifying any medical conditions that we
20  need to be monitoring for or addressing.
21  They do a physical exam to identify any
22  issues with wounds or any other injuries,
23  and then they summarize their assessment.
24  And they will then -- when they lock her

Page 61

1  note, they run the clinical rule engine,
2  and anything that will be triggered by the
3  answers that they've given.  So, for
4  example, if somebody reports using
5  opiates, they will be scheduled for
6  withdrawal assessments.  If somebody
7  reports a history of hypertension, they'll
8  be scheduled for a chronic care
9  appointment.  Included in that is an
10  intake order appointment, so anyone,
11  again, with hypertension who might need
12  bridge medication for their hypertension
13  will have a separate encounter generated
14  for the provider called the intake order
15  encounter, and that would be scheduled
16  when the nurse locks her note at the
17  completion of the intake.
18      Q.   Thank you for that.  You mentioned
19  something called the clinical rule engine.
20  Was that -- did I hear that correctly?
21      A.   Yes.
22      Q.   What is that?
23      A.   That is the system that will
24  automatically generate appointments based

Page 62

1  on how the nurse answers questions in the
2  intake.
3    Q.  Okay.  Can you maybe illustrate
4  that with an example what might generate
5  an automatic appointment?
6    A.  Like I said, if somebody says they
7  have a history of hypertension, that
8  would, you know -- the yes answer to, you
9  know, do you have hypertension, will
10 trigger a chronic care appointment to be
11 scheduled when the clinical rule engine is
12 run.
13   Q.  Okay.  And so, and there's other
14 conditions that would then automatically
15 do the same?
16   A.  Yes.
17   Q.  Is diabetes one of these?
18   A.  Yes.
19   Q.  What about hypothyroidism?
20   A.  Hypothyroidism isn't specifically
21 asked, but if they say they have any other
22 chronic conditions, or if they say that
23 they are taking medication, then it will
24 trigger an intake order.

Page 63

1    Q.  If somebody's taking psychotropic
2  medications, will that also trigger a
3  chronic care follow-up?
4    A.  Yes, and it would also trigger a
5  behavioral health evaluation.
6    Q.  And just so the record's clear,
7  when you say behavioral health, this is
8  synonymous with mental health care?
9    A.  Yes.
10   Q.  Who conducts the pre-screening
11 interview, what type of staff?
12   A.  I believe that's the medical
13 assistant.
14   Q.  Okay.  And a medical assistant is
15 not a nurse, correct?
16   A.  Correct.
17   Q.  Does that person have a license?
18   A.  They do need to be licensed, I
19 believe.
20   Q.  And who conducts the screening?
21   A.  The screening?
22   Q.  After the prescreening?
23   A.  You mean the intake screening?
24   Q.  Yes, sorry.

Page 64

1    A.  The registered nurse.  An RN.
2    Q.  Does the registered nurse have
3  access if it's somebody who's been to PDP
4  before, and there is an electronic health
5  record for that patient, does the
6  registered nurse have access to that
7  patient's records at the intake screening?
8    A.  Yes.
9    Q.  And are they supposed to review
10 that chart?
11   A.  Yes.
12     MR. KAMINSKY:  I'm going to object
13   to that, but continue.
14 BY MR. GROTE:
15   Q.  And why is that?
16   A.  I'm sorry?
17   Q.  And why are they supposed to
18 review the chart?
19   A.  To see if there were any medical
20 conditions that were treated during a
21 prior incarceration.
22   Q.  And I think I know the answer.
23 But I just want this to be clear for the
24 record.  Based on what you testified

Page 65

1  earlier, do you know if the registered
2  nurses are trained to review people's
3  electronic medical records at intake?
4    A.  I do not know if they're trained.
5    Q.  In what instances will an intake
6  nurse contact a medical provider about a
7  patient going through the intake
8  screening?
9    A.  If there are any concerning
10 findings, for example, vital signs that
11 are out of the normal range, if the
12 patient is not cooperative, if they're
13 lethargic, if there's a wound that will
14 need specific orders, if there are any
15 injuries that are of concern, anything
16 identified as out of the norm could be
17 brought to a provider's attention.
18   Q.  And is there always a provider on
19 site to take calls or to -- it may or may
20 not be a call.  So, is there always a
21 provider on site to contact as part of the
22 intake screening?
23   A.  There is always a provider
24 available.  On rare occasions, they may

Page 66

not be on site.

Q.  Thank you.  Does a provider have to be contacted to issue medical orders?

A.  Yes.

Q.  And does the provider have access to the patient's Electronic Health Record if it's a patient who already has an Electronic Health Record within PDP?

A.  They do.

Q.  And are they supposed to look at that as well?

A.  They should.

Q.  Does intake medical staff have access to records indicating where the person being screened is coming from?  And by coming from, I mean:  Are they coming from an arrest in the community, a state prison, Norristown, or some other facility?

A.  Not consistently.

Q.  And can you elaborate on what you mean by not consistently?  When might they have it, and when might they not have it?

A.  If the transferring facility

Page 67

provides the paperwork and it gets to us and doesn't get lost along the way, then it's available to us.  But they don't always send information.

Q.  And when you say send information, that would be sent with the person while they are en route to PDP?

A.  Yes.

Q.  Another way of, say, getting at that is:  Is it fair to say that you only have the information that the person shows up with?

A.  That would be fair, yes.

Q.  Do you know if intake medical staff have access to YesCare Clinical Pathways?

A.  I do not know.

Q.  Do intake medical staff have access to Nursing Encounter Tools?

A.  When you say intake staff, do you mean the nurses or the providers?

Q.  Let's break it down.  So, first, the nurses.  Do nurses have access to the Nursing Encounter Tools?

Page 68

A.  They do.

Q.  And when are they supposed to use those?

A.  Depending on the clinical situation.

Q.  Is there -- if I just say NET, we know that I'm talking about Nursing Encounter Tool?

A.  Yes.

Q.  Is there a NET for hypoglycemia and hyperglycemia?

A.  Yes.

Q.  If somebody has a glucose in excess of 400, should a NET be used?

A.  Yes.

Q.  Does the medical provider have access to the NETs?  Well, actually, let me ask a more foundational question.  Do medical providers fill out the NETs, since those are nursing encounter tools, or are those nursing tools?

A.  They're nursing tools.

Q.  Did the medical providers utilize the information on the NETs in order to

Page 69

provide care?

A.  Yes.

Q.  And you touched on this a little bit with the chronic care.  But for patients who need follow-up care after intake, how is that scheduled?  How does that work?

A.  With the clinical rule engine, it would be automatically generated at the time the intake note is locked.

Q.  So then it just goes into a system and it's on the calendar.  Is that fair?

A.  Yes.  Yes.

Q.  How soon may a chronic care appointment -- I mean, this will depend. I'm assuming a chronic care appointment might be something that should happen within a short period of time, or months, or even longer, perhaps.  How is that determined?

A.  It's scheduled for within a month of the intake.

Q.  Okay.  What if somebody is determined to need more to be seen sooner

Page 70

than that within 2 hours or 24 hours. How is that scheduled?

A. If the patient needs to be seen in the short term, it can be scheduled as a walk-in so that the patient is called to medical triage and evaluated. It wouldn't necessarily have to be at the chronic care visit alone.

Q. Okay, so that would be different than the Clinical Rule Engine system?

A. Yes.

Q. So, If the medical provider says they wanted somebody to be checked on within a couple of hours, how would they issue that order? How would it go into the system?

A. So they could schedule a walk-in appointment. For, say, the next shift. Communicate with staff that this patient needs to be seen in this time interval. And that would be probably the easiest way to facilitate that evaluation.

Q. So, it would be a medical order that would be documented and communicated

Page 71

to the appropriate staff?

A. Yes.

Q. All right, so can you describe for me the process of medication administration within CFCF, we'll start with, how does that work?

A. Oh, where do you want me to begin with medication administration?

Q. Let's think about it from the perspective of the housing unit, right? You have incarcerated people in the housing unit. How do they know that it's time to get their medication. How are they notified? Where do they go? What's the process?

A. So I don't know that I can speak to security's process about getting the patients to the medication line.

Q. Understood, but yeah, and you're just kind of designated from the YesCare perspective on medication administration, so not asking you to testify to anything within the ambit of PDP's knowledge, right? So, with that understanding, how

Page 72

is medication administered to patients in general population? Actually, let's start with: Can you describe for me at CFCF -- is that where intake housing is?

A. Yes.

Q. And what is --

A. For the men.

Q. Thank you. How is it different from, or similar to, general population housing at CFCF?

A. How is it different? They are held on a particular unit for the first five days of their incarceration, until they're cleared as far as their TB screen is concerned. That's how it's different.

Q. Is there any difference in how medication is administered from intake housing for intake housing as opposed to general population housing at CFCF?

A. I don't think there's any difference.

Q. Okay. So how is medication administered for these housing units at CFCF?

Page 73

A. So the nurse would go to the unit, she would have her medication cart available to her, she would have a computer available to her. From her computer, from the pharmacy system, she should be able to pull up a list of administrations that are due. And that list of people who should come out for medications, I believe, is then given to corrections, and patients are brought to her. She'll check that the patient is who they say they are, and then administer the medications that are due based on the Electronic Medication Administration Record, or the eMAR.

Q. Okay. And where are the medications administered?

A. It's usually on Unit Management. It can be through the servery on the unit. It depends on the location and what may be going on at that time.

Q. What is the servery?

A. That is a space on the unit. It's a protected space, so to speak, on the

Page 74

1  unit, through which the nurse could
2  administer medications.
3      Q.  Okay, thank you.  And you
4  mentioned the MAR -- I think you just
5  mentioned the Medication Administration
6  Record.  But I'm also wondering, how is it
7  documented when medication is
8  administered?
9      A.  So it should be documented on the
10 eMAR.
11     Q.  The eMAR, the Electronic
12 Medication Administration Record?
13     A.  Correct.
14     Q.  And is the eMAR part of the
15 electronic health record?
16     A.  It is eventually part of the
17 medical record.  At the end of the month,
18 it is put into the medical record.
19     Q.  Thank you.  And I was asking, for
20 medication administration, the same
21 questions for insulin, which I understand
22 is a medication:  Is insulin administered
23 in the same manner, or are there
24 differences?

Page 75

1      A.  Administered in the same manner
2  meaning?
3      Q.  How is insulin administered?  Are
4  they called at the same time as other
5  medications?  Are they called at different
6  times?  Is it administered in the same
7  place on the housing units?
8      A.  So I believe insulin med pass is a
9  separate med pass where it's actually
10 done.  I think it's in the same place, but
11 again, I'm not 100% sure.
12     Q.  Okay.  I'll come back to the
13 insulin questions.
14         Does YesCare consider certain
15 medications to be critical medications?
16     A.  Yes.
17     Q.  This might be a very long list, so
18 you don't have to be exhausted.  But just
19 what are critical medications?  What does
20 that mean?  And what are some specific
21 examples?
22     A.  Psychotropic medications, insulin,
23 and anticoagulants.  These would be
24 considered critical medications.

Page 76

1      Q.  What does the term critical mean
2  in this context?
3      A.  It means that if a patient misses
4  one dose, then somebody or a provider
5  should be notified that the patient has
6  missed that dose.
7      Q.  And how are refusals of any
8  medication supposed to be handled within
9  let's say CFCF, but I think it's the same
10 for all of the facilities, so within PDP?
11     A.  If a medication is refused at the
12 time of refusal, the nurse should give
13 some education or counseling to the
14 patient so that they understand why they
15 need to take the medication, what the
16 purpose of the medication is, and what the
17 consequence of not taking the medication
18 is.  If the patient still, after being
19 informed of this, wants to refuse the
20 medication, the patient should sign a
21 refusal form.  However, many patients, if
22 they're willing to refuse their
23 medication, are also willing to refuse to
24 sign the refusal form.  And so, in that

Page 77

1  circumstance.
2      Q.  What should the refusal form look
3  like?  Who signs it?
4      A.  So if that's the case, then the
5  nurse can sign the refusal form, and she
6  can get a witness to sign the refusal
7  form.
8      Q.  And who could be a witness?  Other
9  medical staff or the correctional staff?
10 Another inmate?  Some of those, not all of
11 those?
12     A.  It should not be another inmate.
13 Preferably it is another nurse, another
14 medical colleague, or an officer who was
15 present to hear the counseling and to hear
16 the patient refuse.
17     Q.  Thank you.  And what is the Red
18 Flag policy?
19     A.  So the Red Flag is our way of
20 identifying patients who have been
21 noncompliant, who are not showing up, or
22 who are refusing their medication.
23     Q.  Okay.  And how does it work?
24     A.  So the nurse, after encountering a

Page 78

patient who refuses the medication.
Sorry.  My animals are acting up, too.
    Q.  They do that.
    A.  Yes.  When a patient refuses the
medication.  If it's a critical
medication, after one missed dose the
nurse is to schedule a Red Flag encounter
for a provider to speak to the patient and
counsel them about their refusal or their
noncompliance.  If it's a noncritical
medication, the Red Flag is created after
three missed doses, and our medical staff
are made aware of that.
    Q.  How are medical staff made aware
that missing one dose of a critical
medication should trigger a Red Flag?
    A.  So, that is something that's
explained to them during their onboarding,
because they will be shown that there is a
Red Flag encounter.  They'll be told this
is what a Red Flag encounter is, and then
they will be instructed on how to address
a Red Flag encounter.
    Q.  If the Red Flag encounters are

Page 79

initiated, is this supposed to be
documented somewhere?
    A.  Yes.  It would be an encounter
that is scheduled in the patient's chart.
    Q.  So would that be like a
progress -- like within a progress note
there -- well, actually break it down for
me.  Where would it be scheduled and what
would it look like?  What form, and then
the follow-up after it happens, how would
that be documented?
    A.  The nurse would schedule an
encounter.  And the way our EHR is,
there's past, present, and future
encounters.  You'll be able to see all of
those.  So she would come in and schedule
the Red Flag encounter, which we have a
provider who is assigned to address the
Red Flags pretty much on a daily basis.
So that provider, when they come in for
the day, will pull up all the scheduled
Red Flags, and that's how they will know
who needs to be spoken to about medication
on compliance.

Page 80

    Q.  And was this what you just
described, was that in place between 2021
and 2023?
    A.  Yes.
    Q.  And would the Red Flag encounter
for a patient then be in that patient's
EHR?
    A.  Yes.
    Q.  And then after they're seen by the
provider, would the provider document that
as well?
    A.  They would document in that Red
Flag encounter.
    Q.  Okay, so would it then become part
of the same?
    A.  No.
    Q.  This was scheduled and it
happened, and here's what happens?
    A.  Correct.
    Q.  Okay.  Is there anywhere outside
of the Electronic Health Record that a Red
Flag encounter would be documented?
    A.  There might be situation where the
refusal was obtained, and that would be

Page 81

scanned into the patient documents.  But
maybe the Red Flag appointment was not
generated, and then it would not be in the
record.  But that would be a way of
knowing that somebody refused a medication
without seeing the Red Flag encounter
scheduled.
    Q.  Okay, so I just wanna make sure I
understood what you just said.  Under this
hypothetical, the Red Flag didn't make it
into the system, but there was a follow-up
and a refusal form was obtained.  Is it
your testimony that that would be another
type of documentation that would indicate
the patient was seen when they missed
their medication?
    A.  It would be an indication that
they were seen by whoever signed that
refusal form, which most likely would be
the nurse.
    Q.  Right.  Thank you.  In our medical
-- do you know how?  What sort of training
is there on the Red Flag?  Well, I just
asked this earlier, but does everybody

Page 82

1  know that they're supposed to document the
2  Red Flags whenever they're triggered?
3  Everybody in medical staff -- should
4  everybody know that, I should say?
5     A.  So the medical providers will know
6  what to do with the Red Flag.  Again, I
7  don't know what the nurses are
8  specifically trained or how they're
9  trained.
10    Q.  Got it.
11       MS. THOMAS:  Brett, I'm sorry to
12    interrupt you, but could we take a
13    five-to-ten-minute break?
14       MR. GROTE:  We certainly can.
15       MS. THOMAS:  Thank you.
16          - - -
17       (Whereupon, a brief recess was
18    taken.
19          - - -
20 BY MR. GROTE:
21    Q.  What sort of training is there on
22 the Red Flag -- well, I just asked this
23 earlier.  But does everybody know that
24 they're supposed to document the Red Flags

Page 83

1  whenever they're triggered, everybody in
2  medical staff?  Should everybody know that
3  I should say?
4     A.  So the medical providers will know
5  what to do with the Red Flag.
6     Q.  So I was asking you some questions
7  about insulin administration earlier.
8  What is insulin?
9     A.  It is a hormone used to regulate
10 glucose levels in the body.
11    Q.  And what is diabetes?
12    A.  Diabetes is a condition where
13 there is either resistance to the effects
14 of insulin or a deficiency of insulin
15 production by the body that leads to
16 impaired glucose metabolism.
17    Q.  And what are the possible health
18 consequences of impaired glucose
19 metabolism?
20    A.  Over the long term, impaired
21 glucose metabolism can lead to
22 atherosclerosis, or hardening of the
23 arteries.  It can lead to coronary artery
24 disease, visual loss, peripheral nerve

Page 84

1  damage, and damage to the motility of the
2  gastrointestinal tract, just to name a
3  few.
4     Q.  And what is Type 1 diabetes?
5     A.  Type 1 diabetes is where the
6  pancreas is not able to make enough
7  insulin, and that leads to impaired
8  glucose metabolism.
9     Q.  And what is Type 2 diabetes?
10    A.  Type 2 diabetes, also known as
11 insulin resistance, is when the body is
12 still able to produce insulin, but the
13 insulin does not work efficiently and
14 effectively.
15    Q.  Between Type 1 and Type 2
16 diabetes, is one generally considered to
17 be more serious or to require a heightened
18 level of monitoring?
19    A.  They're both serious.
20    Q.  Does one involve any greater
21 medical risk than the other?
22    A.  No.  They both can lead to
23 dangerous situations.
24    Q.  How is care for them?  How do you

Page 85

1  -- let me back up.  You testified earlier
2  that insulin is a critical medication.
3  It's considered a critical medication
4  within PDP by YesCare.  Is that accurate?
5     A.  Yes.
6     Q.  And has that been the case since
7  you began working there back in 2018?
8     A.  Yes.
9     Q.  And what is the role of insulin in
10 treating Type 1 diabetes?
11    A.  Since patients are not able to
12 produce insulin, the exogenous
13 administration of insulin is how we
14 address the deficiency.
15    Q.  And what happens if a Type 1
16 diabetic is not provided exogenous
17 insulin?
18    A.  Then their blood sugar is going to
19 remain high.
20    Q.  Can a Type 1 diabetic live without
21 insulin?
22    A.  They cannot.
23    Q.  And how important is insulin?
24 Well, do all Type 2 diabetics receive

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 86

1  insulin as part of their treatment?
2      A.   Not necessarily.
3      Q.   Can you explain when they will,
4  and when they won't?
5      A.   So, Type 2 diabetics start out
6  with resistance to insulin.  Their bodies
7  still produce insulin, but their tissues
8  don't respond to insulin as well, so you
9  might require higher levels of insulin,
10 which eventually taxes the pancreas.  At
11 some point, the pancreas may lose its
12 ability to generate enough insulin.  When
13 they're in the insulin-resistant phase,
14 they can be treated with oral medications.
15 When the pancreas loses the ability to
16 produce enough insulin, we may need to
17 supplement them with insulin.
18     Q.   Thank you.  So the pancreas
19 produces insulin.  What exactly does the
20 pancreas do?
21     A.   In terms of its function in the
22 body.
23     Q.   Its function in the body?
24     A.   It has many functions, but one is

Page 87

1  the production of insulin.
2      Q.   Okay.  Anything else related to
3  that?
4      A.   I'm not sure what that question
5  is.
6      Q.   I just wonder what some of its
7  other functions are.
8      A.   It has other exocrine functions
9  that help with digestion.
10     Q.   Now, on the housing units, where
11 is insulin administered when is it
12 administered?
13     A.   On the housing units?
14     Q.   If it is on the housing units, it
15 might not be.
16     A.   I cannot speak to exactly where
17 the nurses might be running their insulin
18 med pass.
19     Q.   Do you know how incarcerated
20 diabetic patients are notified when it's
21 time for a glucose check in insulin?
22     A.   That would be security.  They
23 would need to get the patients to the
24 nurse.

Page 88

1      Q.   Are there certain times of day
2  that insulin is administered?
3      A.   There are two types of insulin
4  medications.  At least some patients do
5  need insulin before bedtime.
6      Q.   And currently in CFCF, if there
7  are -- what times are insulin med pass?
8      A.   I can't speak to specifically what
9  CFCF med pass times are at this point.
10     Q.   In the past, can you speak to any
11 specifics about when those med times were
12 for insulin?
13     A.   It was roughly around 5:00 a.m.
14 in the morning and then around 4:00 p.m.
15 in the afternoon.
16     Q.   And do you know why those were the
17 times?
18     A.   I do not specifically know.  But a
19 lot of what we do depends on what is
20 happening with corrections and with
21 airflow, and so we find ourselves having
22 to adapt sometimes to that.
23     Q.   Is there a relationship between
24 when somebody's given insulin and when

Page 89

1  they've last eaten?  Should they get
2  insulin prior to a meal?  After a meal?
3  Does it depend?  If so, what does it
4  depend on?  That's a wildly compound
5  question, but hopefully you know what I'm
6  getting at.
7      A.   So it's a complex question because
8  it all depends on the patient.  It depends
9  on their situation.  It depends on their
10 treatment regimen.  It's not a
11 one-size-fits-all.  So in some cases,
12 there may be some patients who take
13 insulin right before they eat.  And in
14 other cases, they might be getting a
15 longer-acting insulin that is meant to
16 kind of cover them throughout the day a
17 little bit more uniformly.  So it varies.
18     Q.   Is the treatment supposed to be
19 individualized based on a patient's
20 condition?
21     A.   As much as possible.  But in the
22 setting that we practice, it is not always
23 possible to be completely individualized.
24     Q.   Can you explain why that might be?

Page 90

A. It's just that we are medical providers in a jail. We're not a medical facility. And so we don't have the complete say in what we need to do. And we work with Corrections to do the best we can to get the patients the care they need.

Q. If a patient, if a diabetic patient needs more frequent glucose checks, what are you able to do as the medical provider in a correctional facility to ensure that?

A. So we would schedule them to come down to medical at times outside of the insulin med pass, if that was necessary.

Q. And when glucose checks happen, how is that supposed to be documented?

A. It should be documented on the eMAR.

Q. Is it documented anywhere else?

A. It used to be that we had a flow sheet where the Accu-Cheks would be documented.

Q. And would that flow sheet include

Page 91

the glucose level on it?

A. Yes.

Q. And you said used to be. When did you move away from the flow sheets?

A. When we moved to the electronic system, then everything was to be placed in the electronic system.

Q. And when did you move to the electronic system?

A. I don't remember exactly when that was.

Q. Was it while you were still site director?

A. Yes.

Q. Was it before COVID?

A. I can't remember, honestly.

Q. Do you know if it was in 2023?

A. I don't remember. I cannot pinpoint when it happened.

Q. Understood. When you moved to the electronic system, Doctor, are the glucose levels still documented?

A. They are documented. Yes.

Q. And where?

Page 92

A. In the electronic system. So if they were documented in the eMAR.

Q. On the electronic medical record, there would be documentation that a glucose check happened and what the glucose level was?

A. Yes.

Q. And same question for insulin administration was that also documented in the eMAR?

A. Yes.

Q. And did the -- what is sliding-scale insulin?

A. Sliding-scale insulin is to be administered. The dose is determined based on what an AccuCheck is.

Q. And since the dose can vary, would the dosage level be documented somewhere too?

A. Yes.

Q. And would that be in the eMAR?

A. Yes.

Q. And prior to that, was it on a flow sheet?

Page 93

A. Yes.

Q. Would the flow sheet become part of a patient's Electronic Health Record?

A. It would.

Q. And when would that occur? Would it be like you mentioned earlier, with the eMAR, Like at the end of a month, it would be uploaded. How would that work?

A. Similarly, at the end of the month.

Q. Where insulin refusals to be handled in the same manner that you just discussed other medication refusals?

A. Yes.

Q. And for insulin, I think you testified, so sorry if this is redundant. You already testified to this, but one missed dose of insulin was to trigger the Red Flag policy, is that correct?

A. Yes.

Q. And was that the case since 2018?

A. Yes.

Q. Have you ever encountered a situation in your time at PDP where a Type

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 94

1 diabetic was refusing insulin?
A. Yes.
Q. And what was the -- is it one time that stands out? Many times? Is it hard to quantify?
A. Our patient population can be challenging, and they don't always make the best decisions for themselves. So it's not infrequent that patients might refuse insulin or other medications for that matter, or any treatment.
Q. And have you ever personally had to address those issues with patients?
A. I have.
Q. And what has been your approach in those situations?
A. So I -- usually by the time they get to me, they've been counseled by several staff, nursing staff as well as medical staff. So usually when I'm getting to them, it's not a question of simply educating them. I will then try to delve into what might be the reasons behind their noncompliance, and that could

Page 95

be anything. It could be that they don't want to take the medication and they don't have a specific reason. It could be that they don't think that's what they need, and even if we try to explain it to them, they don't hear what we're trying to tell them. It might be that the timing is difficult for them. So if that's the case, try to adjust their medical regimen so that it does work for them in any way that we can. And as much control as we have over that, then we will try to work with them. It might be switching them to a different medication. It could be because of a side effect.
So that's the in-depth type of conversation that I would have if a patient is consistently refusing treatment of any sort.
Q. And if somebody's -- after that, have you ever had a situation where, even after that sort of in-depth encounter, somebody has just said, I'm refusing to take insulin, has that ever happened?

Page 96

A. Absolutely.
Q. And what do you do in those circumstances?
A. Well, at that point, we just keep trying to discuss it with them. You know, we may involve behavioral health if we have concerns about the patient's ability to make those decisions. If there is serious medical illness involved, then that might impair their ability to make those types of decisions. I have involved the city psychologist to speak to patients because there might be underlying issues that aren't apparent to me or that the patient is not speaking to me about that influences their ability or their intention to comply with medical treatment.
A lot of our patients come from traumatic backgrounds, and these are intangible things that we -- that affect what we can do and how we can do it for them, and that is not always apparent or communicated to us. So there's untold

Page 97

factors sometimes that impact a patient's ability to comply.
Q. And just now you said -- you used the term serious "medical illness," did you mean serious mental illness?
A. Yes. Yes. Thank you.
Q. So the record's clear. Have you ever had to send anybody to the emergency room because they just would not take insulin?
A. Not specifically for refusal.
Q. Okay. So what other factor would have to be present?
A. There would have to be some illness associated with their refusal.
Q. So if it was a Type 2 diabetic whose glucose levels were under control, but they weren't taking prescribed insulin, that hypothetical situation wouldn't automatically trigger an ER trip, right?
A. That's correct.
Q. But if it was a Type 1 diabetic who needed insulin and without it, their

Page 98

1  glucose was elevated, tat could trigger an
2  ER trip?
3     A.  Unless they were ill in some way.
4  If they're otherwise stable, then the ER
5  isn't necessarily going to do anything
6  differently than we are doing.
7     Q.  Okay.  But if they were -- if they
8  had hyperglycemia and were just not taking
9  or complying with medical orders to take
10 insulin, what would you do then?
11    A.  You would continue to try and work
12 with them to get them to take their
13 insulin.  Noncompliance wouldn't be a
14 reason to send someone to the emergency
15 room.
16    Q.  Okay.  If somebody was
17 noncompliant but medically decompensating,
18 is that a different situation?
19    A.  Yes.
20    Q.  And I had -- are you familiar with
21 the American Diabetes Association?
22    A.  Yes.
23    Q.  And if I were to share with you
24 that they state it's critically important

Page 99

1  to determine if an individual has Type 1
2  diabetes, because the omission of insulin
3  for as little as 24 hours can result in
4  severe metabolic decompensation, including
5  diabetic ketoacidosis.  Do you agree with
6  that statement?
7     A.  Potentially, yes.
8     Q.  And what does the term metabolic
9  decompensation mean?
10    A.  Basically, that they get ill.
11    Q.  Thank you.  For people with Type 1
12 diabetes, should blood glucose levels be
13 checked three or more times per day?
14    A.  It depends on the patient.
15    Q.  Is there a minimum amount of times
16 per day glucose should be checked for Type
17 1 diabetics?
18    A.  Not necessarily.  Again, it's
19 individual to the patient.
20    Q.  And what is an A1C level?
21    A.  A hemoglobin A1C is the average
22 blood glucose, or average percent of
23 glucose over a three-month period.
24    Q.  And is it important to track the

Page 100

1  A1C level of a diabetic patient?
2     A.  Yes.
3     Q.  And why is that?
4     A.  It's just an indication of how
5  well they are being controlled.
6     Q.  What are the ranges for A1C
7  levels?  You know, what's a level that's
8  under control, what's not that well
9  controlled, and that's uncontrolled?
10    A.  So the goal for diabetics is to
11 get their A1C below 7.0.  Closer to 6.5
12 would be ideal.  Anyone in the range of,
13 like, 7, 8, or 9 is moderately well
14 controlled but has room for improvement.
15 A1Cs above 10 are not well controlled.
16    Q.  And how does one get -- what are
17 the treatment options if an A1C level
18 shows uncontrolled or poorly controlled
19 glucose levels?
20    A.  It depends on what they're already
21 doing.
22    Q.  Can you explain that a little bit,
23 please?
24    A.  So, if they are a Type 2 diabetic

Page 101

1  on oral medication, it might require an
2  increase in dose; it might be a change in
3  medication.  If it's a Type 1 or a Type 2
4  diabetic who requires insulin, then it's
5  adjusting their insulin doses to provide
6  better coverage.  It might involve
7  adjusting the timing of the insulin,
8  depending on when their levels seem to run
9  high.  And that's similar with Type 1
10 diabetics.  Since they're mostly treated
11 with insulin, it would be adjusting the
12 dose and timing of the dose.
13    Q.  So should there be a management
14 plan to try to stabilize somebody's A1C
15 level if it is elevated?
16    A.  I'm not sure what you mean by a
17 management plan.
18    Q.  A treatment plan?
19    A.  By virtue of the fact that they're
20 on medication, that's their treatment
21 plan.
22    Q.  Okay.  Should there be anything --
23 So should the treatment plan then be --
24 how should the treatment plan be -- I

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 102

1   guess it is -- I'm trying to get what your
2   testimony was.  If somebody has a
3   treatment plan and their A1C is elevated,
4   what should happen to the treatment plan?
5       A.  So, as I mentioned, you would
6   adjust the medication.  You would talk to
7   them about how to monitor the effects of
8   the adjustments.  You may meet with them
9   sooner to see what the effects of your
10  treatment were.  Was it beneficial?  Were
11  there side effects?  And then have further
12  discussion.  All of that depends on a
13  patient's compliance level, however, and
14  with a noncompliant patient, it doesn't
15  matter what kind of treatment plan you
16  come up with.  If they don't follow it,
17  then it's impossible to try and get them
18  under control.
19      Q.  For Type 1 diabetics, are there
20  any other aspects of treatment besides
21  insulin?
22      A.  There are dietary considerations
23  as well.
24      Q.  Okay.  And, within the

Page 103

1   correctional setting, should the treatment
2   goals for a diabetic patient be
3   communicated to all people involved in
4   that patient's care?
5       A.  It's communicated as far as
6   documentation and a chart, yes.  The goals
7   are the same for patients, whether they're
8   incarcerated or in the community.  We
9   still strive to get them under the control
10  we would if the patient was in our
11  outpatient practice.
12      Q.  Okay.  Do you know if YesCare
13  provided any training to correctional
14  staff for recognizing potential signs and
15  symptoms of diabetes in the incarcerated
16  population?
17      A.  I do not know.
18      Q.  Do you think that would be
19  important for correctional staff to be
20  aware of?
21      A.  Not necessarily.
22      Q.  Why not?
23      A.  Because that is really a medical
24  determination.  I mean, Corrections can

Page 104

1   let us know if they have concerns about
2   someone, or if someone looks unwell, but
3   it's for us to then figure out what's
4   going on for them.  They're not trained to
5   figure that out.
6       Q.  And who within CFCF would have
7   been responsible for ensuring that medical
8   staff, I guess this would be nursing
9   staff, were properly administering insulin
10  and performing glucose checks?
11      A.  I guess overall it would probably
12  be the regional vice president, but she
13  also has the director of nursing.  That
14  was at CFCF.  That position is at CFCF.
15  You have the administrators, who would
16  also be overseeing the nursing staff.
17      Q.  And did you have any role as Site
18  Director in ensuring the nursing staff
19  were properly administering glucose checks
20  and insulin?
21      A.  If it was brought to my attention
22  that something was not happening, then,
23  yes, I would pursue it with the
24  appropriate people.

Page 105

1       Q.  So if you're aware of a problem,
2   you had a responsibility to address it.
3   Is that what you're saying?
4       A.  Yes.
5       Q.  Okay.  And if you didn't know
6   about it, then you couldn't have addressed
7   it?
8       A.  Correct.
9       Q.  Okay.  What is considered
10  emergency medical care?
11      A.  It's kind of a broad question.  I
12  think if a patient is in any way unstable,
13  that would probably warrant emergency
14  medical care.
15      Q.  And what are some signs of
16  instability?
17      A.  It could be instability with vital
18  signs:  Either a blood pressure that's
19  very low or very high; oxygen levels that
20  are below normal; a pulse rate that is
21  either very low or very high; or a
22  respiration rate that is too low.  It
23  could be the patient's level of mentation
24  -- are they awake, alert, and responding?

Page 106

It could be that there are neurologic deficits that are obvious and new. Those are just some examples.

Q.   And if somebody needs emergency medical care, your PDP facility is equipped to provide emergency medical care, and if so, what type?

A.   They are equipped to do basic life-support measures. So we have a defibrillator that we take when we are asked to respond, or we are called to respond to emergency situations, we initiate CPR. We can place a patient on oxygen. We can support some respiratory status by bag ventilation. And we can place IVs. There are certain medications that we can give in emergency situations that do not require a patient to be on a monitor when they are administered.

Q.   And what type of emergency care would require sending somebody out to a hospital?

A.   Usually, if it's falling under the category of emergency, they probably

Page 107

should be going to the hospital.

Q.   Okay, so the other types of care that you just listed might be things that need to be done to respond to the immediate situation, but the person could still be going to the hospital. Is that accurate?

A.   That's correct.

Q.   Who determines or who has the authority to send somebody to the hospital within a PDP facility?

A.   The medical provider would be the one to make that determination.

Q.   Okay. And if other staff, if nursing staff, thought someone needed to go to the hospital, would their step be to contact the provider for that decision?

A.   Yes.

Q.   Is it the same with correctional staff?

A.   In terms of?

Q.   If correctional staff come across somebody who is seriously injured and think that person needs to go to the

Page 108

hospital, do they also contact medical, and does it make its way to the provider?

A.   Correct. They would call medical, who would arrive, assess the patient, and make the determination.

Q.   As Site Director, would you get notified when somebody went to the hospital from CFCF?

A.   Not necessarily.

Q.   In what circumstances would you be notified?

A.   Sometimes you might be present when it's happening. Sometimes maybe a provider would come to you and say that somebody was sent out. It's not automatically communicated every time a patient goes to the emergency room.

Q.   Did you ever tell medical providers that you wanted to be notified when somebody goes to the hospital in certain circumstances?

A.   In general, yes.

Q.   Maybe I can be more specific. If, during the height of the COVID pandemic,

Page 109

somebody was going out for COVID, did you let people know that you wanted to be notified of that?

A.   Yes.

Q.   Are there any other medical conditions that you let your staff know about? If somebody goes to the hospital for this, tell me about it, please?

A.   So, in cases of overdose, I want to know. In cases of DKA, I want to know. If it's a cardiac arrest, I'd want to know. So, pretty much, if there is some resuscitative measure involved, then I should know about it.

Q.   And does DKA mean diabetic ketoacidosis?

A.   Yes.

Q.   And when you say resuscitative measure, what does that mean?

A.   So, mostly CPR. The defibrillator was discharged. Those types of situations.

Q.   As far as you know, if somebody was sent to the hospital for diabetic

Page 110

ketoacidosis (DKA) -- well, let me ask
this: Did staff tell you, as a routine
matter, when somebody was sent to the
hospital for DKA?
    A.  I don't know that they
consistently told me, but I don't think
it's because they were trying to keep me
in the dark.  You know, it's busy.  It's
busy.  So things happen and it happens
quickly.
    Q.  Understood.  Do you have any sense
of how often you were not told when
somebody was sent to the hospital for DKA?
    A.  I don't think I could quantify
that.
    Q.  Did you track ER trips in any way?
    A.  I did.  Generally, yes.
    Q.  And how did you do that?
    A.  So I can see when patients return,
there is an encounter that's created, so I
can look for those encounters.  We have a
report when patients get admitted to the
hospital, so I'm aware of patients who are
ending up in the hospital, which would

Page 111

have started as an ER visit.
    Q.  Okay.  So is there a log that
shows hospital admissions that you have
access to?
    A.  Yes.
    Q.  And was that in place since 2018?
    A.  Yes.
    Q.  Okay.  And did you review that
periodically?
    A.  Yes.
    Q.  Would there ever be any entry in
that log that you would not have put eyes
on at some point?
    A.  Not sure what you're asking.  If
I'm reviewing the log, I'm looking at the
log.
    Q.  Yeah.  Okay.  I think -- I think
that does get what I'm asking.  You know,
sometimes in my job, you know, we get a
lot of records, and some of them, we scan
all of them and look at every entry.  Some
of them, you're looking for certain
things, but I think you just got what I
was getting at.  How is hyperglycemia

Page 112

treated by YesCare within PDP facilities?
    A.  So it depends on the level of
blood sugar.  If their sugar is elevated,
they might just get an extra dose of
insulin.  If their sugar is above a
certain level, then we would be checking
the urine for ketones, because the concern
is that they may be en route to developing
diabetic ketoacidosis, and so they will be
monitored that way.
    Q.  And what are ketones?
    A.  Ketones are the breakdown
byproduct of fatty acids -- fatty acid
metabolism.
    Q.  And when ketones are present, is
that a good thing or a bad thing?
    A.  It depends.  If they're in a high
enough concentration, then it acidifies
the environment to which our internal
cellular structures are exposed, and that
can be disruptive to their function.
    Q.  And how does one test for the
presence of ketones?
    A.  A very simplistic way is checking

Page 113

the urine for ketones.
    Q.  In the urine, do urine tests tell
you anything about the concentration of
ketones?
    A.  Yes, in the urine, but that does
not necessarily indicate the concentration
in the body.
    Q.  So how does a test show that it's
more concentrated in the urine?  What
would that look like in the test?
    A.  So the way the urine is tested is
with a dipstick.  Depending on the
colorimetric assay, and depending on how
deep the color is, you would quantitate it
that way.
    Q.  So a darker color indicates more
ketones?
    A.  Yes.
    Q.  But you said this might not
correlate to the rest of the body, so how
so?  If it was -- let's say it wasn't that
deep of a color, but ketones were present,
would that tell you anything about how
present they may be elsewhere in the body?

Page 114

1   A.   No.
2   Q.   And why not?
3   A.   Because it's not just the presence
4 of ketones; it's how acidic the blood is.
5 The urine does not test for the acidity;
6 it just tests for the presence of ketones.
7   Q.   How do you test for the acidity?
8   A.   That would be a blood test.
9 Either a venous sample or an arterial
10 sample.
11   Q.   And when would a blood test be
12 taken for a patient who has ketones?
13   A.   So at PDP, it wouldn't necessarily
14 be done if the patient has ketones.  But
15 they are relatively stable.  They look
16 fine.  Then you can administer insulin and
17 monitor.  If they look unwell and it looks
18 like we need further laboratory testing
19 urgently to figure out what's going on,
20 then they would go to the hospital.
21   Q.   And if a patient has ketones in a
22 situation like that, would a Nursing
23 Encounter Tool for hyperglycemia be filled
24 out?

Page 115

1   A.   Yes.
2   Q.   And if somebody has ketones but
3 was otherwise stable, when should they be
4 checked on next?
5   A.   That depends on the situation.
6 That can be determined at the time of the
7 patients being evaluated.  Whether they
8 need to be seen in an hour, two hours,
9 depends.
10   Q.   Okay, so it could be an hour,
11 could be two hours.  Could it -- Would it
12 be relative -- if they have ketones, would
13 it be sometime within 24 hours?
14   A.   Potentially, yes.
15   Q.   How can you tell if ketones were
16 present, how do you tell if they've been
17 cleared from the system?  Is cleared even
18 the right word?  I'm not sure.
19   A.   You could probably repeat a urine
20 sample, but the presence of ketones, like
21 I said, isn't just the only factor in
22 determining if somebody needs an extra
23 level of care.  It's the clinical picture
24 they present with.

Page 116

1   Q.   Okay, what are the other factors
2 that would be relevant?
3   A.   So if the patient is febrile, if
4 the patient has vital sign instability, if
5 they're nauseous and vomiting and unable
6 to keep anything orally, if they are
7 obtunded or lethargic and not responding
8 as they would normally, so their mentation
9 is affected.  These would be some of the
10 clinical signs that something else is
11 going on.
12   Q.   And what does febrile mean?
13   A.   They have a fever.
14   Q.   And obtunded?
15   A.   Just a reduced level of
16 consciousness.
17   Q.   And would it be important also to
18 look at somebody's medical history?
19   A.   In terms of?
20   Q.   To determine if there's other --
21 would it be relevant if somebody has a
22 history of unstable, poorly controlled
23 glucose for determining whether they need
24 a higher level of care?

Page 117

1      MR. KAMINSKY:  Objection to the
2   form.
3 BY MR. GROTE;
4   Q.   You can answer.  His objections
5 have been stated for the record.
6   A.   I see.  So no.  If a patient is in
7 distress, the history is irrelevant.  They
8 need to be seen in the hospital; they need
9 to be sent to the hospital.
10   Q.   What if a patient has elevated
11 glucose and ketones but is not visibly in
12 distress, would their history be relevant,
13 and if so, how?
14   A.   I mean, for a patient to have
15 ketones, either they're a patient who
16 doesn't have diabetes and they've been
17 fasting for days, so they're breaking down
18 fats as a fuel source.  So ketones by
19 themselves are not concerning.  If they're
20 diabetic and they have ketones and they're
21 weak and alert and not feeling sick, you
22 manage it with treatment.  If the
23 treatment is insulin, you give them a
24 little more insulin.  So again, it depends

Page 118

1  on the clinical presentation of the
2  patient.
3     Q.  Okay.  Are hyperglycemic patients
4  ever sent to the infirmary within PDP for
5  higher levels of care?
6     A.  Not typically.  If they're stable,
7  they stay in general population.  If
8  they're ill or unstable, they go to the
9  hospital.
10    Q.  You said not typically.  Are there
11 any instances where you can recall a
12 diabetic patient being placed in the
13 infirmary for any reason -- for a reason
14 pertaining to their diabetes?
15    A.  I could envision a scenario where,
16 if there is a patient where we're
17 struggling to figure out what is happening
18 with their sugars, maybe they'd go to the
19 infirmary for that observation.  But
20 otherwise, just uncontrolled diabetes.
21 No.  And, like I said, if they're ill
22 enough, they would go to the hospital.
23    Q.  And so, you'd say you can envision
24 a situation like the one you just

Page 119

1  described.  Can you recall any such
2  situation?
3     A.  No.
4     Q.  Is there any standard protocol --
5  And by protocol, I understand there's
6  clinical judgment, there can be variation,
7  right?  But certain measures that should
8  be taken if somebody's glucose is higher
9  than 400 within a PDP facility?
10    A.  So I mentioned that's when a
11 ketone check is done.  And, you know, you
12 might start IV fluids, depending on how
13 sick the patient is, to try and stabilize
14 them to reduce their sugar levels.  And if
15 not, if you can't stabilize them, or if
16 they're sicker than you would want them to
17 be, then you'd send them to the hospital.
18    Q.  And who would be responsible for
19 everything you just laid out, the medical
20 provider?
21    A.  Yes.
22    Q.  And would they reference a Nursing
23 Encounter Tool to assist them?
24    A.  They could.

Page 120

1     Q.  One moment.  You talked earlier
2  about -- we talked earlier about reviewing
3  information logs about who was sent to the
4  emergency room.  Did you ever review those
5  and look to identify whether or not there
6  are any patterns or repeated conditions,
7  or, you know, more systemic issues that
8  you wanted to be aware of?
9     A.  I have.
10    Q.  And what issues were you looking
11 for when you did that?
12    A.  Like you said, patterns.  So, if
13 somebody is going to the hospital
14 repeatedly, then it would be something I
15 would be looking into a little bit more.
16    Q.  And did you find any?  Were you
17 doing that from 2018, as long as you were
18 site director?
19    A.  Yes.
20    Q.  And in that time period, did you
21 ever identify any patterns?
22    A.  I have.
23    Q.  What were they?
24    A.  Specific examples of patterns?

Page 121

1     Q.  Yes.
2     A.  I mean, it really is, you know, if
3  somebody is going out for repeated
4  infections, if they are going out with
5  repeated episodes of chest pain, it could
6  be any clinical presentation that seems to
7  continue.  They could have exacerbations
8  of heart failure.  They could be patients
9  going out for repeated paracenteses to
10 have removal of ascitic fluid.  It could
11 be anything.
12    Q.  It sounds like what you were just
13 describing was looking for kind of
14 patterns that would apply to a specific
15 patient.  Did you ever look for patterns
16 that would apply to multiple patients,
17 right?  If there's a certain medical
18 condition, we'll say, maybe, diabetes,
19 whether or not a lot of people were going
20 out for DKA, were those things you were
21 also looking for?
22    A.  I would look into each individual
23 case before determining that there's a
24 pattern that's a problem.

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 36 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 122

Q.  Did you ever find any patterns pertaining to diabetes care resulting in hospitalization?

A.  A pattern?  Not necessarily.  Each case was individual.

Q.  Would you review patient medical charts when -- Okay, so you said you would look through the ER logs.  In what instances would you actually look at somebody's medical chart when they were sent to the emergency room?

A.  If I had additional questions about what was surrounding the ER visit.

Q.  Do you recall ever doing that for Mr. Jung?

A.  Yes.

Q.  Once, more than once?

A.  Probably several times with Mr. Jung.

Q.  Why is that?

A.  Because he was going to the hospital with DKA.

Q.  And so, during those reviews, you would review his chart?

Page 123

A.  Yes.

Q.  Okay.  And when reviewing the chart, what were you looking for?

A.  Just trying to determine the circumstances.

Q.  When a patient returns from the emergency room after an inpatient stay, do they come back to CFCF if they left from CFCF; do they go to the Detention Center for the infirmary?  Does it depend?

A.  They usually end up in the infirmary, and they are in the infirmary until they're seen by the infirmary doctor.  On rare occasions, if there is limited space in the infirmary and the patient is returning in very stable condition, they may get transferred back to CFCF.

Q.  But the normal practice is for the person to go to the infirmary after an inpatient stay?

A.  Yes.

Q.  And why is that?

A.  Just so that they are monitored a

Page 124

little bit more closely, you know, post-hospitalization.

Q.  And the infirmary is at the Detention Center, correct?

A.  That's correct.

Q.  And is Dr. Bradley the site director for the infirmary or the Detention Center?

A.  Not right now.  She was the Medical Director at the infirmary.

Q.  Okay.  During 2021-2023, was she the infirmary Medical Director?

A.  I believe she was, yes.

Q.  Is she the one who was responsible for discharging somebody from the infirmary?

A.  Yes.

Q.  Would that be in all instances?  As the Medical Director of the Detention Center, she would be the one who had to make that call?

A.  Yes.

Q.  And when somebody was discharged and returned to CFCF, how would that be

Page 125

communicated to medical staff at CFCF?

A.  So the patient is supposed to be brought from DC to medical, and the nurses are supposed to document that the patient's returned as a transfer from the Detention Center.  And the -- then if there's any need then the provider might be involved.  If there's any concern about the patient's condition, then the provider might be involved.

Q.  Okay.  I guess the other way to -- who would decide -- if somebody within CFCF, an incarcerated person, do any of the medical providers have the authority to refer that person to the infirmary?

A.  They do.

Q.  Would they have to run that by you?

A.  They would discuss it with the infirmary Medical Director.

Q.  Okay.  Would that only be brought to your attention if one of the staff you supervise, one of the providers, saw a reason to discuss the matter with you?

Page 126

A.   Yes.

Q.   When somebody dies within a PDP
facility, what does YesCare do, as a
protocol, to respond to that?

A.   So there will be a review done by
the Site Medical Director, a kind of
summary of the case to look for areas of
opportunity, to understand -- well, to
understand the circumstances and to see if
there were opportunities for us to have
done something differently, with the eye
to prevent future outcomes.

Q.   Right.  And so when somebody dies
who -- if somebody dies at CFCF, when you
were Site Director, were you notified as a
matter of course every time?

A.   Yes.

Q.   If somebody died at one of the
other facilities, would you still be
notified?

A.   As the Site Medical Director, no.

Q.   Who all is notified within the
medical staff at CFCF when a patient dies
or an incarcerated person dies?

Page 127

A.   So the administrators would be
aware, the Site Medical Director would be
aware, and then the Regional Team would be
made aware.

Q.   So there are some terms I want to
run by you.  I just want to make sure I
understand what's what.  We earlier
mentioned the Corrective Action Plan.  The
Patient Safety Report.  Is there -- What
is a Mortality Review, though?

A.   A Mortality Review is
multidisciplinary -- Well, there are two
types of Mortality Reviews.  There's a
multidisciplinary one that happens at the
Philly regional level, which includes
YesCare staff, YesCare behavioral health
staff, and corrections as well.  And then
there is a Mortality Review that happens
at a corporate level, which is just
YesCare employees.

Q.   Does the Mortality Review generate
a report of any sort?

A.   I don't know that there's a
specific report.  I mean, I suppose there

Page 128

is analysis as to what happened, and if
there are areas of improvement identified,
then there's discussion around that.

Q.   Maybe I can simplify this.  I've
seen the Corrective Action Plan for Mr.
Jung, the Patient Safety Event Report.
I'm just wondering, are you aware of any
other documents that involve -- does the
Mortality Review, did it result in any
other documents in that case?

A.   No.

Q.   Would it typically result in any
other documents in other cases?

A.   No.

Q.   Helping me harmonize the terms
with the documents that are there.  What
is your role in a Mortality Review?  What
was your role as Site Director?

A.   It would be to summarize the
details of the case.

Q.   Okay.  And how would you do that?

A.   By reviewing the chart.

Q.   Would you do anything else?

A.   If I had questions, I would speak

Page 129

with staff.

Q.   So that was -- was it -- is it
case-by-case basis as to whether you would
speak to staff?

A.   Correct.

Q.   Would you ever talk to
correctional staff?

A.   I have spoken to correctional
staff at times, yes.

Q.   What about other incarcerated
people?

A.   Typically do not speak with other
incarcerated patients.

Q.   And why not?

A.   If it was relevant, then I would,
but I'm thinking of situations that it
wasn't relevant to the case.  If the
patient had a cellmate who could give me
some information, then perhaps I might
speak with them, but that hasn't happened.

Q.   Okay, so you don't recall one
instance where it happened?

A.   I cannot recall an instance.

Q.   Okay.  What's the time frame in

Page 130

which you gather the facts for the summary?

A. We try to do it within 48 hours.

Q. And why do you do it so quickly?

A. Because it's important to do it quickly, to understand what happened.

Q. Who within the medical -- so after you make a summary, who do you share that with and what happens with it?

A. Share it with the QI team, and at that point, I shared it with Dr. Kalu as well.

Q. Who's on the QI -- I mean, Quality Improvement?

A. Yes.

Q. And who's on the QI team?

A. Currently, it's Danielle McGettigan specifically, and Lisa Duvall (ph) for physical health.

Q. Are those YesCare employees?

A. They are.

Q. Were they in those roles back in 2023?

A. I don't think they were. I cannot

Page 131

recall when they transitioned into those roles.

Q. Do you remember who was there before then?

A. Maybe Linda.

Q. Well, you don't have to guess.

A. I don't -- I cannot recall.

Q. And then, after you share that with the QI Team and the Regional Director, then what happens?

A. Then it would be discussed by the Regional Team. And if there were areas for improvement, there would be discussion on what that improvement would look like or what we needed to do to try and understand why things happen the way they did. I'll find a root cause analysis.

Q. Would there be a meeting to discuss this?

A. I suppose there would be a meeting.

Q. Would that be in every case? Or, you know, would it be periodically in your review if there's more than one case?

Page 132

Just curious how that was when you'd come together to talk about these things.

A. It would be as needed for as the case arose.

Q. And would these lead to a corrective action plan?

A. If there were areas of improvement that were identified.

Q. Are there other cases that would not lead to a Corrective Action Plan?

A. Yes.

Q. And that would be when there were not areas identified in need of improvement?

A. Correct.

Q. And who participates in developing the Corrective Action Plan?

A. The regional team, the Quality Assurance team. The site may be involved if it's needed, if it's something that's specific to a site.

Q. Are there any guidelines for what a Corrective Action Plan should look at?

A. No.

Page 133

Q. Is it just based on whatever the case presents?

A. Pretty much, yes.

Q. And do these corrective action plans make recommendations?

A. Again, I mean, they're looking for areas for improvement, and then, yes, I suppose in terms of what to do to improve them, then, yes, I guess they are called recommendations.

Q. And are those recommendations communicated to YesCare staff at the facility?

A. It depends on the nature of the recommendations.

Q. What recommendations would be shared with what staff?

A. If there were individual staff that needed to be counseled, then that would be shared with the administrators, and the administrators would have those discussions. If it's something that is more of a process issue, then we would be looking more at the process -- why it

Page 134

1  didn't work or where it didn't work. Or
2  is that site specific. Is that campus
3  specific. And then make changes that are
4  needed.
5     Q.  Who's responsible for ensuring the
6  corrective action plan is implemented?
7     A.  It would be the regional team in
8  conjunction with the site or sites.
9     Q.  And how do those involved with
10 implementing it ensure that it is
11 implemented?
12    A.  There may be audits. If it is
13 something that is auditable, it might be
14 an improvement plan. If it's a specific
15 staff member that needs further assistance
16 or supervision.
17    Q.  So there would be follow-ups
18 scheduled, depending on what certain
19 component of the plan was, to ensure that
20 it was done?
21    A.  Yes.
22    Q.  What is a Patient Safety Report?
23    A.  Patient Safety Report, I'm not
24 sure I know that term.

Page 135

1     Q.  Have you ever heard of the Patient
2  Safety Event Committee?
3     A.  Other than the corporate, I don't
4  know if you're referring to the corporate
5  process to investigate.
6     Q.  Well, I got it from a document,
7  which I'll be sharing with you later. So
8  right now I'm just asking what you're
9  familiar with. Are you familiar with what
10 the corporate process is called or is that
11 term similar to Patient Safety Event?
12    A.  Yes, that is a meeting that is
13 held with YesCare staff to address issues
14 of various contracts.
15    Q.  Understood. And as the site
16 director at CFCF, were you ever involved
17 in Patient Safety Event meetings?
18    A.  Not typically, no.
19    Q.  It wasn't typical. Did it ever
20 happen?
21    A.  It had happened in the case of Mr.
22 Jung.
23    Q.  Do you remember when that was?
24    A.  I do not recall the date.

Page 136

1     Q.  Was it earlier this year?
2     A.  I honestly -- no, I don't think
3  so. I don't remember when. Dates are not
4  my forte, clearly.
5     Q.  I can't ask you to guess, and
6  we'll get into that specific document
7  later.
8        Do you have any role in developing
9  a Patient Safety Event Report?
10    A.  In my capacity now as Regional
11 Medical Director, yes, with reference to
12 Mr. Jung, I did have input. In that case,
13 I don't, again, typically have that as a
14 Site Medical Director.
15    Q.  What's the purpose of the Patient
16 Safety Event meetings?
17    A.  It is to look for ways to improve
18 what we do for our patient population.
19    Q.  Do those meetings ever generate
20 recommendations?
21    A.  They do.
22    Q.  And are those communicated to
23 staff similarly to the corrective action
24 plan? You know, depending on the

Page 137

1  recommendation, it will go to appropriate
2  staff?
3     A.  Yes.
4     Q.  Bear with me one moment. When it
5  comes to the NET for hypoglycemia or
6  hyperglycemia -- and I'm saying hypo- and
7  hyperglycemia -- the NET is just one
8  Nursing Encounter Tool for both
9  conditions. Is that correct?
10    A.  I think so.
11    Q.  Okay, well, what is its purpose?
12    A.  The purpose of the NET is to
13 provide some guidance to the nursing staff
14 about how to evaluate a patient who
15 presents with a specific concern or
16 symptom.
17    Q.  Okay. I'm going to share my
18 screen real quickly, just so you're not
19 guessing with some of these. All right.
20 Can you see that document?
21    A.  Not yet.
22    Q.  Okay.
23    A.  That's kind of small.
24    Q.  How's that?

Page 138

A.   Okay.  That's a little better.
Q.   Is that the NET that's used within CFCF?
A.   It should be.
Q.   And you agree it says: Hypoglycemia and hyperglycemia?
A.   Yes.
Q.   That was all I wanted to show you that.  And YesCare is a clinical pathway for diabetes care, correct?  I think you testified to that already?
A.   Yes.
Q.   And that was, in effect, since, as -- do you recall it ever being different from 2018 on?  Has it gone through any changes while you've been there?
A.   I'm not sure.
Q.   One moment.  Can you see this document?
A.   Yes.
Q.   Is this the clinical pathway for diabetes mellitus, YesCare clinical pathway?
A.   Yes.

Page 139

Q.   And I'll scroll down.  You see number three right here where it says: A1C greater than or equal to 10-12%, not symptomatic?
A.   Yes.
Q.   Initiate triple oral medication therapy with Metformin.  First-line glycemic control, and then A1C greater than 10-12%.  Regardless, Metformin and insulin therapy, for us lay folk, can you tell me what that means?  What's Metformin, what's being recommended, and why?
A.   Metformin is an oral agent used to manage diabetes, typically Type 2 diabetes, because it sensitizes tissues to the effect of insulin.  These recommendations are for patients who have Type 2 diabetes, as patients with Type 1 diabetes typically aren't managed with oral therapy.  The point they're making in this case is that a Type 2 diabetic at some point may need insulin therapy, and this is guidance as to when that insulin

Page 140

therapy might be initiated.
Q.   I get it.  Treatment, Type 2 diabetes, it says right there.  Thank you.  And what is corrective regular insulin coverage or CRIC?
A.   That was the sliding scale that you were referring to earlier.
Q.   Okay.  And so is this section and this chart providing some guidance on how to administer the CRIC?
A.   Correct.  It's giving the dose of insulin that should be administered based on the blood glucose level.
Q.   Okay.  And then, here it says FSBG -- that's finger-stick blood glucose greater than 400?
A.   Correct.
Q.   And where says on the next page:  Follow-up FSBG post insulin at approximately 2 hours.  Testing at less than 90 minutes with repeating insulin can lead to insulin stacking and hypoglycemia.  Can you explain why there should be follow-up in two hours, and what this

Page 141

insulin stacking is?
A.   So the follow-up in two hours is just a guideline as to when you want to recheck the finger stick to again assess if your treatment was effective.  The idea of insulin stacking is you don't want to be giving too much insulin too quickly, and so that's where you're giving enough time to get a sense of it, because if you do, you may run the risk of dropping someone's sugar to below-normal levels.
Q.   Got it.  So, basically, too much medicine too fast?
A.   Correct.
Q.   And you touched on this a little bit, but can you describe what the chronic care clinics are at PDP?
A.   So the chronic care clinic is essentially like a primary care appointment.  So the same types of issues, in the same way as outpatient internal medicine or family practice appointments, would be conducted.  That is the purpose of the chronic care clinic.

Page 142

Q.   In the clinic, it's not like a separate physical structure?

A.   No.

Q.   Is there a diabetes chronic care clinic?

A.   No.  The patient's scheduled for chronic care, whatever their medical issues are, would be reviewed at that time.

Q.   Okay, so chronic care catches everybody that requires chronic care, regardless of the condition.  It's not a different clinic for that condition?

A.   Correct.

Q.   Okay.  And I understand there's going to be variation in this answer, but how frequently are diabetic patients within PDP supposed to be seen by a medical provider?

A.   Routinely every three months.

Q.   And when might it be more frequent?

A.   If you are instituting a change in therapy, you have a patient who is

Page 143

compliant, and you want to monitor the effects of that therapy, then you may bring them down a little bit sooner than three months to reevaluate.

Q.   What about an instance when a patient is noncompliant?

A.   You can try to, but they have the right to refuse their chronic care clinic as well.

Q.   Would you try to see them more frequently if their care was not being provided consistent with the orders?

A.   You can try to, but it doesn't mean that they will comply with that recommendation.

Q.   How do you determine if somebody is being noncompliant versus not being provided treatment for some other reason?  We're going to get to this a little bit later, but just so you're not guessing at what I mean, because some of it's in the medication administration record.  Sometimes there's a note that something's refused.  Sometimes it says something's

Page 144

not documented or not administered, right.  How do you make the assessment as to whether this is a compliance issue or some other factors at play?

A.   So there is a space where the nurse can put in details.  So if the patient did not show up for whatever reason, there's a place where they can put that.  If it is that they didn't show up and the nurse can confirm that the patient was called, then it could be a situation where the nurse would generate a red flag as a way of communicating that this patient is not coming for their medication.

Q.   Okay.  At a chronic care appointment for a diabetes patient, what happens?

A.   So you would review the patient's medical history to understand what are the issues that you would need to address at that appointment.  You would review the patient's labs.  You would review the patient's medication list.  Is it accurate?  Are they taking their

Page 145

medications?  You might confirm that they are noncompliant by reviewing the MAR.  For diabetics, you'd be looking to see whether, you know, do we have acute checks to review.  You'd be looking to see what health maintenance the patient needs, what immunizations they need, you know, based on age and medical conditions, and any kind of maintenance that they might require, such as visual exams for patients with hypertension, things like that.

Q.   Okay.  I know we've talked about this, but I don't know if I specifically asked this question.  What is hyperglycemia?

A.   It's a blood glucose level that is out of the normal range.

Q.   And is it out of the normal range in that it's elevated?

A.   Yes.

Q.   And what is considered hyperglycemic?  What level?

A.   So a fasting blood glucose levels

Page 146

1  should be around 100.  And for patients
2  who don't have a history of diabetes, a
3  random blood glucose greater than 200 is
4  something that should trigger an
5  evaluation for diabetes.
6      Q.  And when you say fasting, does
7  that mean it's distinguished from when
8  somebody has just eaten?
9      A.  Fasting distinguishes it from a
10 random test where you don't know when
11 somebody ate or did not eat.  You're just
12 checking a blood glucose level versus
13 somebody who you know has not eaten for,
14 say, eight hours.
15     Q.  In that latter instance, not eaten
16 for eight hours that would be fasting?
17     A.  Correct.
18     Q.  And does eating tend to elevate
19 blood sugar because food does that?
20     A.  Yes.
21     Q.  And are there medical risks
22 associated with hyperglycemia?
23     A.  I think we talked about the
24 chronic risk of hyperglycemia.

Page 147

1      Q.  Yeah, we did.  We did.  Thank you.
2  Don't need to go over that ground again.
3          What is diabetic ketoacidosis?
4      A.  So diabetic ketoacidosis is a
5  situation in which the body does not have
6  enough insulin to break down glucose
7  properly.  As a result, the body starts
8  breaking down fats as a fuel source.
9  Byproduct of the breakdown of fats are
10 fatty acids and ketones.  Ketones acidify
11 the blood, acidify the internal
12 environment of the body, and that's where
13 the acidosis part comes in.
14     Q.  And how do you determine if a
15 patient's condition has developed such
16 that DKA is the correct diagnosis?
17     A.  So there's the clinical
18 presentation of hyperglycemia, along with
19 nausea, vomiting, decreased mental status,
20 feeling ill in general.  But then there is
21 also the laboratory testing that I
22 mentioned earlier, where you get blood
23 either from a venous or arterial supply.
24 And you determine acidosis based on that.

Page 148

1      Q.  What would be present in the blood
2  test that would signify acidosis?
3      A.  So the pH level of the blood would
4  be in the acidic range.
5      Q.  And what range is that?
6      A.  So now you're asking me to go back
7  to hospital medicine, which I have not
8  done in a very long time, but it would be
9  probably less than seven.
10     Q.  That's fair.  I feel like that's
11 how I'd respond if somebody asked me to go
12 back to the Bar.  Have you personally sent
13 patients to the ER within CFCF who were at
14 CFCF for hyperglycemia?
15     A.  I believe I responded once to Mr.
16 Jung and sent him out for DKA.  Other than
17 him, I don't think I have personally been
18 involved in sending a patient out.
19     Q.  And if you recall, was that
20 hospitalization in December 2021?
21     A.  I don't remember what the date
22 was.
23     Q.  I have documents to show later, so
24 don't guess.

Page 149

1          Does YesCare perform audits of its
2  care within PDP facilities?
3      A.  Yes.
4      Q.  And how does it do it -- I guess,
5  at the most general level, how does it do
6  it and what are these audits referred to
7  as?  You know, I've heard different terms
8  like Quality Assurance and Performance
9  Improvement Plan.  So if you could just
10 kind of break down the overview of how
11 care is audited, that would be a great
12 starting point?
13     A.  So the QI team are the ones who
14 perform the routine audits.  They audit
15 disease types, so they'll do an asthma
16 audit, they'll do a diabetes audit.  There
17 are certain things that they're looking
18 for when they audit the charts to
19 determine how comprehensive the care is
20 for our diabetic patients.  And they will
21 look through a sample of, say, 30 charts,
22 40 charts, 50 charts.  I can't speak to
23 the exact number, but they look through
24 several charts for each of the jails and

Page 150

compile the information in terms of how each site is doing. In that process, if there are areas where, or a particular site where the care might not be as regimented, then we might look to see if there's a specific provider and that specific provider needs a little bit more assistance with their clinical judgment or decision making, then that's when the Clinical Improvement Plan may be put into place.

Q. Thank you. Who performs the audits?

A. QI.

Q. And you mentioned earlier two people that are on the QI team. Has that generally been the case, there's a couple people that handle QI?

A. Yes.

Q. Do you have any role in the audits?

A. Not as the Site Medical Director, other than if there was a specific provider or specific area where we were

Page 151

not doing what we needed to do, then that would be addressed.

Q. And you said they look at chart review. Are there other documents that are looked at?

A. They may look at the Accu-Chek and insulin administration as well.

Q. Okay. I was speaking generally about audit, so I was going to ask some specific questions, though, about different provisions of care. So are intake practices audited?

A. They can be.

Q. Okay. Is it something that are regularly done, or would something have to trigger a focus on intake practices?

A. I'm thinking. I don't know if it's routinely done.

Q. Okay, to back up a little bit when some documents can be looked at, does the QI team ever talk with staff as part of their medical staff auditing process?

A. Not during the auditing process unless there's a specific question.

Page 152

Q. So is the auditing practice -- would it be accurate to say that the auditing process is document-based unless there's a need to clarify something with questions, and then, based on what that reveals, they will talk to staff as indicated by their findings?

A. Yes.

Q. Are medication administration practices audited on a regular basis?

A. Yes.

Q. And same with insulin administration: Is it audited on a regular basis currently?

A. Yes.

Q. Was it in 2021-2023?

A. I am not sure.

Q. Okay. Same insulin administration. Same for glucose checks. Those are currently audited?

A. That's part of the insulin administration audit.

Q. Understood. I have a question here about medical records documentation.

Page 153

Is that just kind of -- whenever there's an audit in the reviewing of charts, are the auditors necessarily looking to see if medical charts are properly filled out?

A. I'm sorry. Could you repeat that question, please?

Q. Yeah, well, let me start it from the other direction. I was going to ask first, but, you know, sometimes I anticipate the answer and change. Is medical records documentation a subject for auditing itself?

A. As far as?

Q. Is medical care being properly documented?

A. Yes, that is part of the audit.

Q. Is this just like part and parcel of reviewing medical charts? They're going to see if things are properly documented?

A. Yes.

Q. Is there anything about emergency room transfers that is subject to auditing?

Page 154

A.  No.
Q.  Mortality reviews?
A.  Well, the mortality review is an audit.
Q.  Okay.  Has there ever been an audit of the mortality review itself, saying, should we assess whether or not these reviews are being conducted as they should be?
A.  No.
Q.  And just to give everybody else a heads up, I'm going to go over a few more documents pertaining to this subject, and then I think time for a break.  Bear with me while I get the documents up.  I want to ask you some questions about -- one moment.  This one's in a different folder, but I know where it is.  Can you -- when you put your glasses on, can you see this one?
A.  Yes.
Q.  Okay.  Do you recognize this document?
A.  Not specifically.

Page 155

Q.  I'm sure you look at a lot of documents in your job.  This appears to be an insulin-adherence re-audit from September 2024.
A.  That's what the title suggests.
Q.  Do you know who Danielle McGettigan Tischler is?
A.  I do.
Q.  And who is she?
A.  She is an LPN who is on the QI Committee.
Q.  Okay.  I'll give you a moment to read through what's on the page now, and let me know when you've done so.
A.  Okay.
Q.  Okay.  Scroll through the rest of it, because there are only three pages.  Let me know when you want me to move on.
A.  I can't see the graph that's at the top or the title.
Q.  Okay.  There are numbers in the chart at the very bottom.  I don't think there's too much there, but let me know if you want to look at it.  Let me go back to

Page 156

the first page.  I've got some questions for you on this.  Do you recall receiving this document now?
A.  September 2024 was before I became Regional Medical Director, so I wouldn't have had this document at that time.
Q.  So, this was not shared with you as the Site Director?
A.  I don't recall it being specifically shared with me.
Q.  You don't recall?  Do you know if an audit like this was ever conducted in 2023 or earlier?
A.  I do not know.
Q.  So, here it says Clinical Solutions to send an Administration Compliance Report daily.  Do you know what an Administration Compliance Report is?
A.  I do not know.
Q.  Okay.  When did you become Regional Director?
A.  In October of 2024.
Q.  So, when you were Site Director, what is Clinical Solutions?

Page 157

A.  That is the pharmacy vendor that we use.
Q.  But as Site Director, do you ever recall receiving anything that was an Administration Compliance Report from Clinical Solutions?
A.  I did not.
Q.  On page -- this is the right picture, right here.  It says a blood sugar of greater than 400 requires nursing staff to perform a urine dipstick to check for ketones.  Nursing Encounter Tool to be completed in the patient's chart, and a provider is to be notified.  Is it your understanding that that was what was supposed to happen?  I guess, was that -- does this sentence identify what you understood to be an existing policy, or does that reflect a change of any sort?
A.  This was the existing policy.
Q.  And was that the existing policy between 2021 and 2023?
A.  Yes.
Q.  Share another document now.  Let

Page 158

1  me -- can you see this one?
2      A.  I can.
3      Q.  And at the top, the spreadsheet is
4  labeled Accu-Chek and Insulin Corrective
5  Action Plan.  Are you familiar with this?
6  Take a moment.
7      A.  I don't know that I've seen the
8  specific document.
9      Q.  And so the date here is February
10  22nd, 2024.  Does this refresh your
11  recollection as to whether or not there
12  was an Accu-Chek Insulin Corrective Action
13  Plan that was implemented during this time
14  period?
15      A.  It must have been.
16      Q.  Did you receive this Corrective
17  Action Plan as Site Director at CFCF?
18      A.  No, this would have gone to the
19  administrators.
20      Q.  Who would have been responsible
21  for implementing this Corrective Action
22  Plan?
23      A.  The administrators.
24      Q.  And who are the administrators?

Page 159

1      A.  So that is the HSA, Assistant HSA,
2  and Don at the sites.
3      Q.  Would you be made aware, as the
4  Site Director, when there was a Corrective
5  Action Plan?
6      A.  I might know that it is there.
7      Q.  Okay.  You say might.  How might
8  you know?
9      A.  So I might be aware that there's a
10  Corrective Action Plan, but it wouldn't
11  have been my responsibility to implement
12  it.
13      Q.  And is that because -- why is
14  that?  Yeah, why is that?
15      A.  Because the administrators are the
16  ones who are supervising the nursing
17  staff.
18      Q.  Okay.  Is that because the
19  corrective action plan recommendations
20  applying to nursing staff?
21      A.  Yes.
22      Q.  All right.  For the record, I
23  should know that the document I just
24  shared didn't have a Bates stamp because

Page 160

1  it was a spreadsheet.  But it was in the
2  production from YesCare from July 8th.  I
3  believe it was labeled Chart 1.  This one
4  here is Chart 5, so the record's clear on
5  that.  Diabetes Report Card Audit --
6  December 2022 to March 2023.  Can you see
7  this document?
8      A.  Pretty much, yes.
9      Q.  Okay.  There's a lot going on in
10  this document.  I know.  Are you familiar
11  with this document?
12      A.  I have not seen the specific
13  document, no.
14      Q.  Would these sorts of audits ever
15  be shared with you as the site
16  administrator, CFCF?
17      A.  It might have been in a different
18  format, but I have not seen the specific
19  chart that you were showing me.
20      Q.  Okay.  It's a couple questions if
21  you maybe would be able to assist with.
22  So here I can't exactly highlight, you
23  know, the thing on the angle here, but
24  this one, I don't know if you see the

Page 161

1  cursor.  It was a microalbumin.
2  Completed, if -- no.  Next question:  What
3  is microalbumin?
4      A.  It's a measure of protein in the
5  urine as an indicator of early stages of
6  diabetic renal disease.
7      Q.  Got it.  What is an ACE inhibitor?
8      A.  ACE inhibitor is a class of blood
9  pressure medication that is used to treat
10  hypertension, but also to slow down or
11  prevent diabetic renal disease.
12      Q.  And what is a Framingham Risk
13  Score?
14      A.  It's an assessment of
15  cardiovascular risk.
16      Q.  And then it says, is there
17  documented level of diabetic control.
18  What does that refer to?
19      A.  It just means a quantification.
20  If somebody's well controlled, somebody is
21  poorly controlled, someone's control is
22  improving.
23      Q.  And so is that something that's
24  supposed to be documented for diabetic

Page 162

1  patients in their medical chart?
2     A.  It's something that we ask
3  providers to document.
4     Q.  And what would be an indicator of
5  poorly controlled diabetes?
6     A.  As we mentioned before, the
7  Hemoglobin A1C is used as an indication.
8  The Accu-Chek can be used as an
9  indication.
10    Q.  What A1C level would result in
11  poorly controlled being the designation?
12    A.  As I had said earlier, usually
13  A1Cs above 10 would be poorly controlled.
14  If it's in the 7 to 10 range, it's
15  moderate control, but definitely could be
16  improved.  And less than 7 would be well
17  controlled.
18    Q.  Thank you.  All right, this is
19  Chart 13.  Hold on, let me try to make
20  this a little larger.  Can you see this
21  one?
22    A.  Kind of, yes.
23    Q.  Chart 13.  It says:  HCS and
24  Insulin Cap Audit Template CFCF.  You'll

Page 163

1  notice some of the dates refer to 2024-25.
2  Do you recognize this document?
3     A.  Not the specific document, no.
4     Q.  Is this specific document similar
5  to other documents you recognize?
6     A.  No.  This document is not
7  something that I have seen before.
8     Q.  Okay.  Do you know what HCS stands
9  for in the title?
10    A.  Yes, that is our eMAR system.
11    Q.  Okay.  What is HCS?
12    A.  I don't remember what it stands
13  for, but it's our eMAR.
14    Q.  Got it.  Do you know what CAP
15  stands for?
16    A.  Corrective Action Plan.
17    Q.  Okay.  And so, were you ever
18  provided a document like this when you
19  were Site Director?
20    A.  Not the specific document, no.
21    Q.  Okay.  We haven't provided
22  anything containing similar information.
23  You said not the specific document, but
24  anything of a similar nature when you were

Page 164

1  a Site Director?
2     A.  So, this is again going back to
3  insulin administration and medication
4  administration, that is a nursing
5  function.  I do not supervise nursing
6  staff.  So, this is not something that
7  would necessarily be brought to my
8  attention.
9     Q.  So, you don't know if this was
10  being done 2021-2023 at CFCF?
11    A.  I do not, no.
12       MR. GROTE:  All right, so I think
13    now is a good time to take a break.
14    And when I get back, I have a number
15    of questions and documents
16    pertaining to Mr. Jung, so I could
17    still take a bit of time.  What if
18    we take a break?  I want to eat a
19    little and have a little lunch.  Is
20    that acceptable to others?  A half
21    hour would work.
22       MR. GREGORY:  Sure.  Works for me.
23              - - -
24    (Whereupon, a recess was taken.)

Page 165

1              - - -
2  BY MR. GROTE:
3     Q.  All right, back on the record.  I
4  can share my screen again.  Can you see
5  this document, Dr. Trivikram?
6     A.  I can.
7     Q.  On the record, this is 0074
8  through 0078.  Can you take a moment to
9  read through this page, and then I'll
10  scroll down.  Let me know when.  Please
11  scroll down.
12    A.  You can scroll down, please.
13    Q.  Next page?
14    A.  Okay.
15    Q.  And you see this note?  It was
16  signed on December 30th, 2021.  If you go
17  down to the next page, see here?  It says:
18  The patient was known to critical care and
19  was in the ICU from December 20th to
20  December 22nd, 2021 for DKA, septic shock.
21  Does this document refresh your
22  recollection of Mr. Jung going to the
23  hospital and being admitted to the
24  intensive care unit in December 2021 for

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 47 of 114

Deposition of Dr. Lalitha Trivikram                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 166

1  diabetic ketoacidosis?
2      A.  Yes.
3      Q.  Was this the incident where you
4  had sent him to the hospital, if you
5  recall?
6      A.  I don't recall which time I saw
7  him, because he went to the hospital.
8      Q.  What is septic shock?
9      A.  Septic shock is a condition in
10 which, usually for infectious reasons, the
11 normal regulatory systems that help us
12 maintain our blood pressure and heart rate
13 get dysregulated, and the patient becomes
14 hypotensive.  Usually, tachycardia
15 increases the heart rate, drops the blood
16 pressure, and the patient becomes
17 unstable.
18     Q.  Is septic shock linked in any way
19 to DKA?
20     A.  It can be the trigger for DKA.
21     Q.  How does that work?
22     A.  So, in patients like Mr. Jung, who
23 have missed several doses of insulin over
24 very long periods of time, their bodies

Page 167

1  are used to being in a hyperglycemic
2  state.  You can see that there are
3  episodes when he was with us where he had
4  hyperglycemia that did not lead to, or was
5  not, DKA; that was managed on site.  The
6  times that he presented with DKA, there
7  was usually something that probably
8  triggered him to go into DKA, which can be
9  an infection.  Infection is a stress on
10 the body, and as a result it increases the
11 release of adrenaline and cortisol.  Both
12 of these hormones then lead to an
13 increased insulin requirement.  So,
14 someone who may live in a hyperglycemic
15 state and can function in a hyperglycemic
16 state, when you add the insults of
17 infection or ischemia of the heart or
18 something else, can be triggered to go
19 into DKA.
20     Q.  Thank you.  Did you see in these
21 records where it also noted a pulmonary
22 embolism?
23     A.  Yes.
24     Q.  What is a pulmonary embolism?

Page 168

1      A.  It is a blood clot that usually
2  originates in a peripheral vein, typically
3  the leg, but doesn't have to be the leg,
4  and then it breaks off and migrates into
5  the lung.
6      Q.  Okay, and is there any potential
7  link between a pulmonary embolism and DKA?
8      A.  Pulmonary embolism on its own
9  could be a stressor that pushes someone
10 into DKA.  It is also something that was
11 related to COVID-19 or was seen with
12 COVID-19.
13     Q.  Mr. Jung tested positive for
14 COVID-19 as indicated at this time during
15 this hospital trip.  Is that true?
16     A.  That's correct.
17     Q.  What is acute hypoxia?
18     A.  That means that his oxygen levels
19 in his blood were low, below normal.
20     Q.  And it says here, underlying
21 psychiatric disorder, Bipolar I.  Do you
22 recall Mr. Jung as being diagnosed with
23 bipolar disorder?
24     A.  I can't speak to what his mental

Page 169

1  health history was.
2      Q.  When you reviewed his records
3  prior to this deposition, did you see any
4  other references to bipolar disorder?
5      A.  I thought that he was seen by
6  Behavioral Health.  I know he did go to
7  Norristown State Hospital for competency
8  evaluation, but I did not specifically pay
9  attention to what his diagnoses were.
10 Psychiatric diagnoses, that is.
11     Q.  Are there instances where it's
12 important to you, as a medical provider,
13 to be familiar with the patient's
14 psychiatric diagnoses?
15     A.  I believe I mentioned earlier
16 that, in evaluating patients who are
17 noncompliant, we take a comprehensive
18 approach, and you have to consider that
19 there might be a psychiatric reason for
20 their refusal or their noncompliance.  So
21 is the specific diagnosis important?  Not
22 necessarily.  Is it important to consider
23 it as we evaluate a patient for
24 noncompliance?  Yes, I think it should be

Page 170

part of that evaluation.

Q.   Do you recall if Mr. Jung was ever evaluated by mental health providers in relation to issues of noncompliance?

A.   I do not specifically recall.

Q.   Okay.  And so does that mean you also don't recall whether or not you ever -- well, if you thought that was an appropriate course of action -- do you refer patients to Behavioral Health?  How does that work?

A.   We can refer them to Behavioral Health.  He was already seeing Behavioral Health.  You know, they can also evaluate and see, with his medications, if he was being compliant.  So they could have addressed compliance in general that way as well.

Q.   Have there ever been instances where somebody's already been seen by Behavioral Health, but you contacted the Behavioral Health provider to say, can you talk to this patient about medication compliance because they're not compliant

Page 171

with what we're prescribing?

A.   I have done that in cases where patients were not on the Behavioral Health caseload.  And so there's a question if there is something going on.  So I have done that in that situation.

Q.   Have you ever done that when a patient was already on the Behavioral Health caseload?

A.   I can't specifically recall, but it can be an informal conversation that you have between providers, to say, hey, when you see this patient next, could you please take a look and see what's going on with this?  It was a pervasive issue with Mr. Jung.

Q.   Did you ever talk to the behavioral-health provider about Mr. Jung?

A.   I do not recall if I specifically did.

Q.   Can you see this document?

A.   Yes.

Q.   And does this appear to be a Medication Administration Record, December

Page 172

1st, 2021 to December 31st, 2021?  It's for Mr. Jung.  Where's his name?  Oh, it's at the top here.  Patient name.

A.   That's what it seems to be.  Yes.

Q.   And you recall the dates of the hospital records we just saw were the latter part of December 2021, correct?

A.   Correct.

Q.   And do you recall that he was admitted to the ICU on December 20th?

A.   I believe so, yes.

Q.   Okay.  Now an Accu-Chek reading. Is it the case that this is when Mr. Jung's blood glucose was to be measured via Accu-Chek?

A.   Correct.

Q.   What does 6 signify?

A.   I believe 6 is not documented.

Q.   Just so we're not guessing, it's down here, too.  So not documented?

A.   Yes.

Q.   And 'E.F.' is somebody's initials, presumably?

A.   Presumably, yes.

Page 173

Q.   And so, if Mr. Jung was admitted to the hospital on December 20th, at some point in the days preceding that.  Only listed four days preceding that, out of eight Accu-Chek checks, am I reading this correctly, that only one was documented?

A.   Only one has initials.  But what this doesn't say is if the Accu-Chek was documented in a separate area and the nurse did not sign her initials to have done the Accu-Chek.

Q.   So where else would an Accu-Chek be documented?

A.   So there is a parameter, which I can't recall in HCS, that you can use to pull up the Accu-Chek readings using that parameter.  It wasn't documented physically as far as a number on this eMAR.

Q.   Can you explain to me exactly what you mean?  I'm not sure what you mean.  I just don't know what you mean by they could be pulled up; there's a parameter?

A.   Sure.  So when you do the

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 49 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 174

Accu-Chek, there's the nurse who does it, and there's the actual value of the Accu-Chek. The value of the Accu-Chek would not be documented on this document. What I was saying is there is a different function within the eMAR where the Accu-Chek readings were listed, and then you would, as the provider or as a nurse, go and pull up a list of those Accu-Chek values that would be documented. Here is an administration, so the initials on the 18th would signify that the nurse did the Accu-Chek check that day. But it doesn't necessarily mean that no Accu-Chek was done on the other days; the nurse just may not have put their initials there.

Q. Where would it be documented, then? I mean, you're talking about this other place where a glucose level could be entered. Where is that? Where does it live?

A. Again, because I don't have HCS in front of me, I can't tell you what the parameters are. I could, like, go through

Page 175

the steps and find it, but I can't tell you where it is. Describe the steps to take to get there.

Q. So it's part of a computer system?

A. It's part of the HCS, the eMAR.

Q. Okay, so if it was entered through the HCS as part of the eMAR, does it become part of the patient's electronic health record?

A. I do not know if that is separately pulled and put into the chart.

Q. When you pull up a patient's electronic health record, does it have glucose readings in it for a diabetic patient?

A. In ECW, unless it is checked at the time of an encounter, no.

Q. And what is ECW?

A. That is our EHR, Electronic Health Record.

Q. Okay, so is there another place where the glucose records are documented and stored that's not the Electronic Health Record?

Page 176

A. It should be an HCS.

Q. Is HCS different from the Electronic Health Record?

A. HCS is the eMAR.

Q. And the eMAR is the Electronic Medication Administration Record, correct?

A. Correct.

Q. Is this document we're looking at right now, is this part of the eMAR?

A. Yes.

Q. Okay, so if the eMAR becomes a part of the Electronic Health Record, would that be all of the eMAR should become part of the Electronic Health Record?

A. I don't know if they pull the Accu-Cheks and put them in the Electronic Health Record. They pull this, the Medication Administration Record, and put that in. I do not know if the Accu-Cheks get put in there as well.

Q. Okay. What is 6 supposed to -- I mean, it says not documented. When is somebody supposed to enter 6?

Page 177

A. I believe 6 is a default. So if somebody doesn't put their initials in there, the 6 shows up.

Q. Okay. And what are the initials supposed to signify that it was administered?

A. That is supposed to be the nurse's initials.

Q. And they're supposed to initial when they do the administration. Is that generally how it works?

A. Yes.

Q. Okay. What is Humulin? I don't know -- I don't know how to pronounce that. What is that?

A. Humulin is a long-acting insulin.

Q. All right, so with all these 6s, what does that mean to you as a provider?

A. Well, I'd have to go back and look at the individual dates because sometimes the initials don't register and we have to go back to the individual dates and see if it was administered.

Q. And how would you do that?

Page 178

A.  I'd have to get into the system, the HCS system, and this is one representation of the data, and there is a day-to-day representation of this data, and I'd have to go into that mode to see it.

Q.  Okay.  If it was not documented, if it was not administered, or the Humulin was not administered, should that have triggered a red flag incident?

A.  If it was not administered, then yes.  But if it's not documented, that doesn't necessarily mean it was not administered.

Q.  So how would you know if it's administered if it's not documented?

A.  So I would have to go to the day-to-day representation of the data.  So if the Humulin was supposed to be given at 6:00 a.m., I would have to go to that 6:00 a.m. slot and see if the medication was given.

Q.  Okay.  I'm just having a hard time understanding why that would be indicated

Page 179

in one place, but in another place it would appear to be not documented.  Do you have any testimony that could help me understand that?

A.  It's an imperfect system.

Q.  Now, when somebody returns from the ER, Mr. Jung went out to the ER.  If he goes back to the infirmary, or if he goes back to CFCF, is there any sort of protocol for a return from the ER?  Right.  Are there any certain steps that are automatically done?

A.  The patient will be seen.  The hospital paperwork will be reviewed.  Any orders that need to be entered would be entered.  Any follow-ups that are necessary would be submitted as a referral.  And that would be the process.

Q.  Okay, so the patient's chart would be reviewed.  The hospital paperwork would be your vehicle.  The hospital paperwork would be reviewed.  Would their chart from prior to going into the hospital also be reviewed for any relevant information?

Page 180

A.  I suppose, if there are questions.  But typically it's the hospital paperwork that's reviewed, and that too may not be very complete.  We sometimes only get an after-visit summary.  So the amount of information that we have sometimes varies, and it might require us to request records to get the full chart and the full details of what happened during the hospitalization.

Q.  Okay.  Do you have any record or independent recollection of the many times he went to the hospital?  What measures were put in place when Mr. Jung would return from the hospital to provide care for his diabetes?

A.  We continued the same things we always did.  We continued to try to see him for chronic pain.  We continued to try to get him his blood work.  We continued to send him to off-site appointments.  We continued to try to administer insulin.  We continued to do everything we could, but we could not overcome his

Page 181

noncompliance and his persistence in noncompliance with diet, which we did not have any control over, or his walking out of visits with providers, which we could not control.  So we provided the same standard of care that we would for every patient every time Mr. Jung returned.

Q.  Do you ever remember any variation about trying something different to try to address these issues?

A.  We tried to send him out to an endocrinologist; we tried to get a specialist to help us out, but there was literally no one who could help us with the noncompliance.  If we did what we were trying to do, it may have been a different outcome.

Q.  If -- I'm sorry.  If you did what you were trying to do?

A.  In terms of get him his insulin, to try and get him to his appointments, to try and get him his lab, so we could follow and see what was going on.  All the typical measures we set up for every

Page 182

1  patient we did for Mr. Jung.
2    Q.  When there was a refusal of
3  insulin, was that supposed to be
4  documented?
5    A.  Yes.
6    Q.  And was it documented?
7    A.  It was not always documented.
8    Q.  Okay, then how do you know it was
9  a refusal?
10    A.  Because there are other episodes
11  and examples of refusals that have been
12  documented in his chart, provider notes,
13  and refusal forms in various ways.
14    Q.  Did he ever sign any refusal forms
15  for anything?
16    A.  I do not recall if he did, but I
17  would not be surprised if he did not.
18    Q.  Can you see this document?
19    A.  Yes.
20    Q.  There's a progress note with your
21  name on it from December 20th, 2021?
22    A.  Yes.
23    Q.  If you could take a moment to
24  review and let me know when you want me to

Page 183

1  scroll.  It just finishes on the next
2  page.
3    A.  Okay.  Yes.
4    Q.  And now, does this refresh your
5  memory as to whether you sent him to the
6  hospital December 20th, 2021?
7    A.  I did say that I did send him to
8  hospital.  I could not recall the date.
9    Q.  Oh, right, right.  I know.  Does
10  it refresh your memory that it was this
11  date?
12    A.  Yes.
13    Q.  Did you get in touch with the ICU
14  attending physician when Mr. Jung went to
15  the ER?
16    A.  After he was admitted, I did.
17    Q.  Okay.  Is that your standard
18  practice when somebody goes to the ER?
19    A.  Yes.  I like to know what happens
20  to my patients, so I often reach out to
21  the hospital team.
22    Q.  And it says down under:
23  Assessment unclear from history and chart
24  of patients, Type 1 or Type 2

Page 184

1  insulin-dependent diabetic.  How do you
2  determine if one is Type 1 or Type 2?
3    A.  It's a difficult distinction.
4  Sometimes you can do blood work that will
5  look at genetically in their insulin
6  levels and things like that, which I
7  cannot speak to, as I am not an
8  endocrinologist.  But the typical
9  presentation is a Type 1 diabetic, they're
10  usually very young when they're diagnosed,
11  and it is not related to body habitus,
12  obesity and things like that.
13    Type 2 diabetes tends to present
14  later in life, is more associated with
15  being overweight or heavy.  And so in his
16  case, if both diagnoses were listed in his
17  chart, that's where I said I was not clear
18  if he was a Type 1 or Type 2.  But that
19  was a moot point because the issue at hand
20  was that he had hyperglycemia.  And DKA is
21  the condition in Type 1 diabetics that can
22  be life threatening and hyperosmolar
23  hyperglycemic nonketotic syndrome is the
24  equivalent of that in Type 2 diabetics.

Page 185

1    Q.  Okay.  Outside of the
2  hyperglycemia episode, is it important to
3  distinguish between Type 1 and Type 2
4  diabetes?
5    A.  Not only in the management of a
6  patient, but if you are with this
7  gentleman, he was being treated with
8  insulin.  So whether he was a Type 2 who
9  needed insulin or Type 1 who needed
10  insulin, we would still treat him the same
11  way in terms of trying to get his
12  hyperglycemia under control.
13    Q.  Okay, but was there any value to
14  understanding whether, as a medical
15  provider, whether it was Type 1 or Type 2?
16    A.  Again, I think I said the
17  management.  If a patient who has diabetes
18  is on insulin, the goals are the same.
19    Q.  But the question I asked was
20  whether or not there's any type of value,
21  whether there's any information that is
22  helpful to you as a provider in knowing if
23  it's Type 1 or Type 2?
24    A.  Again.  I think I would manage the

Page 186

1  patient the same way. You know, you would
2  be -- like I mentioned in my notes, the
3  differential is a little different. The
4  treatment of what happens would be
5  different when they go to the hospital.
6  But for the patient in front of me, I'm
7  just trying to get their sugars under
8  control, their hemoglobin A1C under
9  control, and get their risk factors for
10 heart disease and the chronic sequelae of
11 diabetes under control.
12     Q.  I understand that it was just a
13 yes or no question. You're saying that,
14 no, it doesn't matter to you if you know
15 whether they're Type 1 or Type 2 diabetic?
16     A.  I'm saying it is important, but it
17 doesn't change my management.
18     Q.  Okay. The management's different.
19 I just want to know if it was important.
20 Thank you. And do you see this document
21 with Nazareth Hospital at the top?
22     A.  Yes.
23     Q.  Patient name, Louis Jung. I'm
24 gonna scroll rather quickly and just kind

Page 187

1  of cut to the chase with some of this, but
2  if, you know, I'm asking you questions and
3  you think you need to look at the rest of
4  the document or something else, please let
5  me know. Not trying to -- not trying
6  to -- just trying to move this along and
7  not, you know, trying to keep anything
8  from you. So this one is YesCare 1947-48.
9  The prior one, I should note, sorry, for
10 the record, was YesCare 1947-48. This one
11 is YesCare 0608-60018. And here, do you
12 see that, Mr. Jung was admitted late
13 evening April 7th for diabetic
14 ketoacidosis? Do you agree with that?
15     A.  Yes.
16     Q.  And then the next page, it says
17 A1C was 12.5. That is high, correct?
18     A.  Yes.
19     Q.  And I think we already touched on
20 this. And, to talk about diabetes
21 generally, how is that to be managed when
22 you have a high A1C level?
23     A.  As I mentioned before, you try to
24 work with the patient, adjust their

Page 188

1  medication, get them to comply with their
2  medication, get them to comply with
3  dietary restrictions, and you monitor.
4     Q.  Do you remember this
5  hospitalization specifically?
6     A.  No, I do not specifically remember
7  this hospitalization.
8     Q.  When Mr. Jung would go to the
9  hospital, would you review his medication
10 administration records to determine how
11 frequently he was or was not getting
12 glucose checks or receiving insulin?
13     A.  I would take a look at that. Yes.
14     Q.  Did you ever talk with nursing
15 staff in regard to the administration of
16 glucose checks and insulin of Mr. Jung?
17     A.  As I mentioned, I don't supervise
18 the nurses. If there were concerns, I
19 would bring it to the administrators.
20     Q.  And who were the administrators in
21 this time period?
22     A.  I don't remember who the
23 administrators were in April 22nd.
24     Q.  Did you, did you ever bring any

Page 189

1  concern to the administrators in regard to
2  nursing staff's administration of his
3  glucose checks or insulin?
4     A.  I probably did, yes.
5     Q.  You probably did. Do you actually
6  recall doing that?
7     A.  I don't have documentation of
8  doing it, but clearly it's concerning that
9  he's missing insulin doses. It is not
10 something I would overlook, and I would
11 address it.
12     Q.  Right. But I'm just wondering if
13 you have any specific recollection of
14 having done that?
15     A.  This was three years ago. Two
16 years ago -- three years ago. I do not
17 have a specific recollection.
18     Q.  Okay. As a general practice, when
19 you speak to an administrator about an
20 issue of nursing care, do you document
21 that conversation with the administrator?
22     A.  I may. I may not. It's not
23 routine that I would.
24     Q.  Okay, why not?

Page 190

1    A.   Because it is a discussion that
2  I'm having, and I don't have a specific
3  reason as to why I wouldn't document it.
4    Q.   Do you have any recollection of
5  ever speaking with -- let me back up a
6  little bit.  So it's CFCF.  There are
7  different mid-level medical providers that
8  you supervised, right?  It could be
9  somewhere from like 8 to more than 10,
10 give or take.  Is that the testimony you
11 gave earlier?
12    A.   Yes.
13    Q.   Do you have any specific
14 recollection of talking to any medical
15 providers at CFCF about Mr. Jung's glucose
16 checks and insulin administration?
17    A.   I have.  I don't specifically
18 recall if I talked to anyone.  I do
19 specifically recall speaking with Ms. Gay,
20 Dr. Gay, when this incident occurred.
21    Q.   And when the incident occurred.
22 Are you referring to Mr. Jung's death?
23    A.   Yes.
24    Q.   And when did you speak with Ms.

Page 191

1  Gay?  I'm not saying Dr. Gay, not out of
2  disrespect, but I don't think she was --
3  she's a medical doctor?
4    A.   So I spoke to her shortly after
5  the incident to understand what may have
6  happened.
7    Q.   And what did she tell you?
8    A.   She explained that she was given
9  certain information, that she made a
10 certain decision because of that, and
11 that's what she told me.
12    Q.   Do you remember what information
13 she was given?
14    A.   I don't specifically recall what
15 she told me.
16    Q.   And do you remember anything about
17 the decision she said she made?
18    A.   No.  She ordered the insulin.  And
19 that's what she had said she had done.
20    Q.   And was that during -- as part of
21 his intake screening, if you recall?
22    A.   Yes.
23    Q.   One moment.  Okay.  And this is
24 YesCare 724 to YesCare 730.  And this is

Page 192

1  big enough.  Can you see this?
2    A.   Yes.
3    Q.   Okay.  And this is Medication
4  Administration Record, Louis Jung.  April
5  1st to April 30th, 2022.  At the top it
6  says Abilify.  Do you know what Abilify
7  is?
8    A.   It's a psychiatric medication.
9    Q.   And it says for ADF, bipolar
10 disorder.  Is that bipolar disorder?
11    A.   Yes.
12    Q.   And do you know if Abilify has any
13 side effects?
14    A.   I don't specifically.  I don't
15 work with Abilify, and I do not recall
16 specifically what the side effects are of
17 Abilify.
18    Q.   Okay, so you don't know if
19 drowsiness is a potential side effect?
20    A.   It can be with any medication.
21    Q.   And if I can direct your attention
22 to Abilify.  You see, under 8, it says NA.
23 And then down here, under the 7th, we see
24 some NA as well.  What does NA mean?

Page 193

1    A.   I do not know if that is a nurse's
2  initials.  There is usually a key at the
3  back of the --
4    Q.   Is this the key?
5    A.   Yes.
6    Q.   Okay.  I don't see any last names
7  with NA.
8    A.   Correct.  I don't either.
9    Q.   Okay, so you're not sure what the
10 NA means here?
11    A.   Not entirely sure what that means.
12    Q.   Okay.  And 3, that's a refusal,
13 correct?
14    A.   Yes.
15    Q.   Okay.  And so, for every time
16 there is a 3, should there be a refusal
17 form generated?
18    A.   There should be.
19    Q.   And that will either be signed by
20 the patient or, if the patient doesn't
21 sign, signed by a nurse and a witness?
22    A.   Yes.
23    Q.   And now, one is a no-show.  So
24 here, for the Accu-Chek readings, I know

Page 194

it's hard to maybe see from the cursor,
but the 5th through the 7th, we have
no-shows or no-show. Three refusals not
documented and an NA. I was going to ask:
Can you tell from this document whether he
received any Accu-Cheks on those days?
    A.  Not entirely, no.
    Q.  And is that because of what we
went over earlier about the HCS
potentially having other information?
    A.  Okay.
    Q.  Okay. And down here it says,
diabetes with diagnosis with ketoacidosis.
Type 2, or unspecified type, uncontrolled.
Is that indicating -- is that uncontrolled
referring to him basically having poorly
controlled glucose?
    A.  Yes.
    Q.  And this is YesCare 972 to 977.
You take a moment, but does this appear to
be Jefferson Endocrinology, a cover letter
from an endocrinology appointment for Mr.
Jung?
    A.  Yes. It's a letter from the

Page 195

endocrinologist. Yes.
    Q.  And take a moment to look at that
real quick. I have some questions about
the next page. Okay, so the page says
Type 1 DM, diabetes mellitus, diagnosed at
age 14 years. Do you see that?
    A.  Yes.
    Q.  And let me know when you've read
the rest of this page, and I'll go down.
    A.  Okay.
    Q.  Okay. And I'm gonna fast forward
a little bit. Under Assessment Plan, it
says Type 1 diabetes mellitus with
hyperglycemia, long-standing, poor control
of diabetes mellitus. Currently on NPH
and R. Do you know what those stand for?
    A.  Yes. NPH is the Humulin N, which
is the long-acting insulin we referred to
before. And R is regular insulin. It's a
shorter, quicker-acting insulin, often
used for sliding scales.
    Q.  And then it says he reports he
gets this at 4 to 5 a.m. and then 4 to 5
p.m. Is that when insulin was

Page 196

administered? This is from July 2022.
Are those the times when insulin was
administered, if you know?
    A.  That is likely the insulin
administration times.
    Q.  The times are on the Medication
Administration Records, right?
    A.  Yes.
    Q.  One moment. Oh, right. Here it
is. Number one on the next page says --
then, let's go up above. It says, if
available, prefer insulin change to
Glargine, Lispro, or Aspart. What does
that mean?
    A.  Those are very long-acting
insulins. So whereas NPH peaks between
six to eight hours, glargine is an insulin
that is a steady-state, consistent level
for a 24-hour period. So what we call a
basal insulin.
    Q.  Okay. Are those types of insulin
available within PDP?
    A.  Yes, they are.
    Q.  Okay. It says: If these are not

Page 197

available, then suggest NPH 30 units,
administered around 9:00 a.m. and 9:00
p.m. Do you know if changing the
timing -- Do you know -- Do you recall --
Did you speak with the endocrinologist who
saw Mr. Jung, if you remember?
    A.  At the time that he saw this
endocrinologist, it looks like he was at a
different jail, not at CFCF.
    Q.  Okay. Do you recall at any point
whether or not you looked into changing
the timing during which Mr. Jung was
administered insulin?
    A.  I do not specifically recall, but
changing the timing of insulin
administration is challenging in the
environment in which we work in. It is
not the same as dealing with a patient in
an outpatient practice where we can tell
them to take their meds at a certain time.
    Q.  And I think I understand why. But
if you can just explained why?
    A.  It's just the way Corrections
operates and what they need to do. And

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 198

what they need to do to keep people safe.
All of those things matter in terms of it
affects how we deliver care.
    Q.   Are there housing units that allow
for more frequent access to medical care?
    A.   Not specifically, no.
    Q.   What about the infirmary?
    A.   The infirmary, yes, but the
infirmary level of care is for patients
who require a lot more than just a
specific insulin time.  They require wound
care, they're paraplegic.  They need to be
turned, they need to be moved.  It's for a
much higher level of care.
    Q.   Do you know how many staff are
present within the infirmary or how it is
staffed?
    A.   I do not specifically know the
nursing staff there know.
    Q.   Is it your understanding that
nursing staff are always present in the
infirmary?
    A.   Yes.
    Q.   Is that the same on the housing

Page 199

units, or are nursing staff always
present?
    A.   No, not on the housing units.
    Q.   In the housing units, do they make
rounds as required by their job
responsibilities?
    A.   Yes.
    Q.   Are outside specialists'
recommendations always followed, sometimes
followed?  How does that work?  Who makes
that decision?
    A.   So the provider who reviews the
recommendations can consider what needs to
be done.  At times it is followed exactly
as the consultant recommends.  Other
times, if there are reasons why it
wouldn't work, or there's information the
consultant may not have had, that's when
we'd pick up the phone and speak with the
consultant.
    Q.   So, with somebody like Mr. Jung --
I'm sure this applies to plenty of other
PDP, but Mr. Jung was incarcerated in
December 2021 until his death in November

Page 200

2023.  Sometimes he was in one facility,
like CFCF; sometimes in the Detention
Center, I believe; sometimes he was in
PICC.  Sometimes he was in Norristown.
How do you determine who the provider will
be in any given situation?  Is it just
whoever happens to be on duty when he has
an appointment?
    A.   Do you mean off-site provider or
on-site provider?
    Q.   On-site provider.
    A.   Yes.  It would be whichever
facility he's in.  Pretty much the
provider staffing is consistent, you know,
from day to day at a particular jail.  So,
if he is coming to chronic care and Nurse
Practitioner 1 is doing chronic care, then
he would see Nurse Practitioner 1.
    Q.   In what instances would providers
discuss a patient?  I mean, more
specifically, did providers ever discuss
Mr. Jung in order to deal with the more
complicated issues in his care?
    A.   Informally?  If you're asking me,

Page 201

yes.  We had conversations about Mr. Jung
because he was known to be noncompliant,
and so we did have discussions about what
we could do differently if there were
things we could do differently.
    Q.   Okay.  And do you remember who you
had those conversations with?
    A.   Again, it was informally.  You can
talk to, you know, your colleagues about
-- and talk about patients and discuss
their care.  So I cannot recall specific
conversations or specific dates of
conversations.
    Q.   I understand that.  Do you recall
the names of anybody who you spoke to
about?
    A.   I do not.
    Q.   One moment.  And are you aware
that Mr. Jung was sent out to Norristown
State Hospital for competency restoration?
Were you aware of that?
    A.   At the time?  Probably not.  We
don't always know when patients are
transferred out to Norristown.

Page 202

Q.   Okay.  Do you have any idea why that's the case you wouldn't know that or -- yeah?

A.   We are not always privy to when Corrections are moving patients from place to place.

Q.   Okay.  Is there any training that medical providers received in regard to treating patients with mental illness, treating them for their medical conditions?  You know, but they also have mental illness.  Is there anything specific to give them guidance in that?

A.   No.

Q.   And is that in the category of things that they're supposed to have been trained on as part of their basic education in the profession?

A.   Generally speaking, but it's not the focus of their discipline.  If they're trained in family practice, they may have done a short rotation in psychiatry, but that doesn't make them at the level of somebody who's been trained as a

Page 203

psychiatrist or as a mental health nurse practitioner.  It's not the same.

Q.   And do you see this document?

A.   Yes.

Q.   YesCare 1634-1639.  This provider, CMO.  Do you know what that means?

A.   It's a generic term.  It's not that itself it doesn't denote anyone specific.

Q.   Okay.  Do you know why it might be used as opposed to a name?

A.   Sometimes, when nurses do their documentation, they use that as their provider.  Other than that, I don't have a specific reason as to why it would be used.

Q.   Okay.  And this is a progress note from Mr. Jung.  You see, the date is -- I've blocked the date: 1/23/23.  And it says: He refused to come to medical transfer recheck, Accu-Chek was high.  Refused to sign refusal form.  And then it says there was a stretcher call for elevated blood sugar and change in mental

Page 204

status.  I'll scroll down.  Oh, wait one moment.  I'm sorry.  I'm working off the wrong document.  I got a little out of order in my outline.  I apologize.  Okay, here we go.  This is from a larger document, but I'm just going to be using the SKR 1660-1662.  This is also a Progress Note that says:  CMO.  This is from January 8th, 2023.  Chief complaint: Hyperglycemia with high ketones in urine.  Scroll through this quickly.  So at the top where it says:  HPI, what does HPI mean?

A.   History of present illness.

Q.   Okay, does NET 21, does that indicate that this information that follows is from the hypoglycemia, hyperglycemia Nursing Encounter Tool?

A.   Yes.

Q.   And this says he had high ketones in the urine.  So ketones in the urine wouldn't -- if, you know, would a nurse be expected to use the NET before testing for ketones or after?

Page 205

A.   It's usually they use the NET, which will direct them to check ketones in the urine.

Q.   Okay.  And they would do an Accu-Chek before even using the NET?

A.   They may or may not.  Yes.

Q.   Okay.  That depends on how the patient is presenting?

A.   How the patient's presenting.  If they know the patient from before, and they know the patient has a history of diabetes, they might check it right away.

Q.   This was signed by Ingrazia Costello.  Are you familiar with Ms. Costello?

A.   I am.

Q.   Okay.  And what was her role at YesCare?

A.   She is a Registered Nurse, often working in the triage area.

Q.   Okay, so as a Registered Nurse, she couldn't send somebody to the hospital, could she?

A.   She spoke to a provider and sent

Page 206

1  the patient to the hospital.
2      Q.   Right.  And it say:  Patient was
3  sent to Jefferson Torresdale at EDS per
4  provider on duty.  Where would it say who
5  the provider was?
6      A.   She didn't delineate who the
7  provider was.
8      Q.   Would that be contained anywhere
9  else in the medical record?
10     A.   If the provider entered a note,
11 then it might be, but it might not.
12     Q.   And it says here the fingerstick
13 result was 396, and there were high
14 ketones in the urine.  Is that information
15 significant for considering whether to
16 send somebody to the hospital?
17     A.   It is.
18     Q.   And why is that?
19     A.   The presence of ketones can be
20 concerning.  It depends on whether the
21 patient had other symptoms; if he wasn't
22 feeling well, and so it was probably a
23 decision based on his cumulative
24 subjective findings and objective findings

Page 207

1  that led to the decision to send them to
2  the hospital.  Okay.  And in fact, his
3  blood pressure was low, so that's probably
4  what the key factor was.
5      Q.   Another factor.  Okay.  It also
6  says here he was dizzy, lightheaded,
7  drowsy, weak.  Is the purpose of the NE to
8  gather information on all of these
9  questions so as to determine what type of
10 care is appropriate?
11     A.   Yes.  They should be completing on
12 that form, completely.
13     Q.   Okay.  And then 1659 -- Oh, let me
14 go back down to 62, where her name was.
15 You see, that's a 12:19 p.m?
16     A.   Yes.
17     Q.   On January 8th.  Now, this is a
18 progress note with your name on it from
19 January 8th, same day; it's signed at
20 5:23.  This appears to be about a COVID
21 test?
22     A.   Yes.
23     Q.   Was that a standard practice, when
24 somebody's going to the hospital, they

Page 208

1  would receive a COVID test?
2      A.   Yes, they would.
3      Q.   And what is your role on this
4  progress note?  Why were you feeling this
5  one out?  Is it because you were the
6  provider or no?
7      A.   As I said before, sometimes the
8  nurse will use a generic provider name.
9  Sometimes they use my name as the SMD.
10     Q.   Okay.  Do you have any
11 recollection of Mr. Jung going to the
12 hospital in January 2023 or your
13 involvement in that decision?
14     A.   I was not involved in that
15 decision.
16     Q.   Okay.  And you know that because
17 -- Is that because Ms. Booker signed this
18 and Ms. Costello is on the other notes?
19     A.   Ms. Costello typically worked the
20 evening shift.  I don't typically work the
21 evening shift, so I don't recall telling
22 her to send this patient.  I don't recall
23 this being discussed with me.  But again,
24 yeah.

Page 209

1      Q.   Would the fact that she signed the
2  note at 12:19 p.m., indicate what shift
3  she was on?
4      A.   That would be a day shift?
5  Typically, yes.  So she must have done --
6  it's unusual, but she must have worked a
7  day shift that day.  I think.
8      Q.   Do you sometimes have to work
9  unusual hours at PDP?
10     A.   Oh, absolutely.
11     Q.   And when somebody would return
12 from the hospital, I think you went over
13 this, but under for an inpatient stay,
14 what were the circumstances in which
15 somebody would, say, be sent back to CFCF
16 instead of the infirmary?
17     A.   Depends on what they were in the
18 hospital for, how long they were in the
19 hospital for, and what
20 post-hospitalization care they might need.
21 And if there's availability in the
22 infirmary.  It's a limited resource, and
23 so we tried to keep it for the patients
24 who had the highest acuity needs.  So if

Page 210

someone returns with, I don't know,
something simple, say they had a urinary
tract infection, they had to be
hospitalized.  They come back, they've
completed their antibiotics, they don't
have any other skilled nursing needs, and
there is limited availability in the
infirmary.  We might choose and triage to
send the patient back to CFCF to keep the
availability for somebody who is of higher
acuity and has higher infirmary-level
needs.
    Q.   Got it.  Thank you.  Let me just
bring this document up.  Do you know what
-- I don't know if I can pronounce that,
Levothyroxine sodium.
    A.   Uh-huh.
    Q.   Sounds like you are familiar with
that?
    A.   I am.
    Q.   So long as one of us are and it's
you, that works.  All right.  Medication
Administration Record, Mr. Jung, January
1st, 2023 to January 31st, 2023.  What is

Page 211

this, levothyroxine sodium?
    A.   It is a supplement for people who
have low thyroid hormone levels.
    Q.   If somebody has low thyroid, is
that hypothyroidism?
    A.   That is hypothyroidism.
    Q.   And what does that mean?  If your
levels are low, how does that affect you?
    A.   It depends to the degree to which
it's low.  And if you are on treatment or
you're not on treatment, So a very mild
case, a patient may be completely
asymptomatic.  A very severe case, the
patient could be hospitalized.
    Q.   Okay.  Now here we have a bunch of
no-shows and not documented.  Is there
anywhere else in the HCS system that might
have different information as to whether
or not he received levothyroxine sodium?
    A.   This seems like he was a no-show,
so it likely was not administered to him.
Now, with the 6s, with the not documented,
that is not clear if he was given the
medication, even though it says not

Page 212

documented.
    Q.   Okay.  Because earlier we talked
about how there is another part of the HCS
system where there may be information
around glucose levels, insulin dosages.
Does that -- are there other parts?  Is
there other medications that could be
documented somewhere else in the HCS
system that would have different or
additional information for other
medications?
    A.   So where it says: No-show, then
there wouldn't be.  But where it says 6
and not documented.  If we go to the daily
presentation of the administrations, we
might find that the medication was
actually given.  It's just not showing up
as being administered on this particular
format.
    Q.   Okay, so for any medication, if it
says 6, that actually means go check the
HCS to see if that's the case?
    A.   Yes.
    Q.   Okay, now I do want to share 1634

Page 213

to 1639, progress note with CMO.  We've
already discussed that.  That doesn't tell
us who that is.  This was the nurse.  Hold
on, one moment.  And the next note:  Karen
McKinney, Physician's Assistant.  Are you
familiar with PA McKinney?
    A.   I am.
    Q.   And she was a Physician's
Assistant at CFC at this time?
    A.   Yes.
    Q.   And you'll see it says elevated
BG, blood glucose, change in mental
status.  There's a stretcher call.  Take a
moment to read this, but it says known to
be non-compliant with insulin, able to
shake head no and asked about pain.
Nodded yes when asked about NV.  What is
NV?
    A.   Nausea and vomiting.
    Q.   Asked about missed insulin and why
he did not take it, able to say sleep
otherwise.  Moaning incoherently.  Do you
ever recall this?  What does that note
mean to you?

Page 214

1    A.   It means that the patient is not
2  doing well.
3    Q.   Okay.  Do you recall whether or
4  not Mr. Jung tended to have any issues
5  with sleeping through calls for medication
6  or calls for insulin?
7    A.   I do not recall.
8    Q.   Did you ever talk with him about
9  that, if you recall?
10    A.   I do not recall.
11    Q.   Do you recall conversations with
12  Mr. Jung that you had?
13    A.   I do not think I had conversations
14  with Mr. Jung.  I did not have specific
15  care responsibilities with him.
16    Q.   That earlier note from December
17  2021.  It sounds like you evaluated him
18  then?
19    A.   Correct.  That was an acute
20  situation when he was uptunded, not able
21  to respond to me, and I was dealing with
22  an emergency situation.
23    Q.   So in all the times that he was
24  there, going to the hospital, coming back,

Page 215

1  you never made it a point to go see him
2  yourself?
3    A.   Not necessarily, no.  I had
4  providers who were seeing him that were
5  following up with him or attempting to see
6  him and follow up with him.  It's not my
7  primary responsibility to see all
8  patients.  So I have staff who do see the
9  patients and try to provide the care that
10  we continually try to provide to Mr. Jung.
11    Q.   Can hypothyroidism cause
12  drowsiness?
13    A.   If you know, yes, it could.
14    Q.   And you see this date, January
15  23rd, 2023.  Do you agree this is more
16  information taken from an NET?
17    A.   Yes.
18    Q.   And Chief Complaint:
19  Hyperglycemia, I'm trying to see if it
20  says he has ketones.  That was under
21  Associated Factors.  Do you agree, the
22  only one listed here is disorientation?
23    A.   Yes.
24    Q.   And now, I'm looking for his blood

Page 216

1  glucose level, so if you find that before
2  me, let me know.  I don't see it on this
3  page.
4    A.   It might be lower down in the
5  assessment.  It says it was high.
6    Q.   Yeah.  What is -- I've seen that
7  before in the notes, where it's just like
8  an H and I.  What does it mean in terms of
9  numbers?
10    A.   It means that the glucometer can't
11  even register what the number is.
12    Q.   How high can the glucometer
13  register?
14    A.   I don't specifically know, but
15  it's probably above 550, 600.
16    Q.   Okay.  It says disposition:
17  Transport to the hospital.  Here it says
18  he's awake, alert, but with confusion.
19  So, with a over 500, we can estimate
20  glucose and disorientation.  He was sent
21  to the hospital.  Do you think that was
22  the appropriate thing to do in that case?
23    A.   Yes, it was.
24    Q.   Simone Houston was the registered

Page 217

1  nurse.  Are you familiar with Ms. Houston?
2    A.   I am.
3    Q.   This one is YesCare 1322 to 1337.
4  After-visit summary discharge
5  instructions.  The primary care provider
6  now is that Dr. Kalu, the Regional
7  Director at this time period, which was --
8  which we'll get to, but which was earlier
9  than now?
10    A.   Yes.
11    Q.   Yeah.  And it looks like printed
12  on March 14th.  That looks like it might
13  also be March 14th.  Handwritten: 2023.
14  Scrolling down.  Now, this says: Louis
15  Jung, you were in the hospital for DKA,
16  which is probably related to dosing
17  schedule of insulin in the prison.  Have
18  you ever seen this document?
19    A.   Specifically, I don't recall.
20    Q.   Do you have any recollection of an
21  outside provider stating that the dosing
22  schedule in the prison was related to Mr.
23  Jung not receiving his insulin as
24  prescribed?

Page 218

A.   So lots of hospitals can say that, but they don't necessarily know what's happening in the jail.  And as the endocrinologist's note had said to change the timing.  And as I mentioned at that time, it's not always a simple matter to change the timing of a medication pass.  So this comment, I understand where it's coming from, but they don't understand what it is like practicing in the jail setting.

Q.   Okay.  And let me see if I can find the provider name here, Samantha Milanase (ph).  Are you familiar with -- what's DO mean?

A.   That's a Doctor of Osteopathic Medicine.  And I do not know Dr. Milanase.

Q.   It says here the patient's blood glucose needs to be monitored four times per day.  He would need a base dose of mealtime insulin in addition to sliding scale, as well as basal insulin.  Do you know if Mr. Jung was ever prescribed Accu-Cheks four times a day?

Page 219

A.   I don't think he was prescribed four times a day.  We couldn't get him to comply with twice a day.  So I don't know that it was specifically ordered for him four times a day.

Q.   Do you recall any time that a patient in your care at CFCF who was a diabetic was prescribed to have their glucose monitored four times a day?

A.   I do not specifically remember that.  No.

Q.   Is that something that could be accommodated in CFCF or not?

A.   With a compliant patient, we could try to make it work, yes.

Q.   Okay, what would have to be done that would be different than an instance where somebody got two checks?

A.   So the two checks are ordered or timed to coincide with the insulin medication pass.  When the nurse is on the unit, and able to perform the Accu-Chek at that time.  If we have a patient who is compliant and we discuss, we want to check

Page 220

your finger sticks or your Accu-Cheks a little more frequently and they agree to it, then we would set them up to come down to triage and have it checked at triage, as opposed to on the unit.

Q.   And how is the Accu-Chek done exactly?  Is it the finger stick method?  Can you just describe that for me?

A.   Yeah.  So there's like a small lancet that's used to prick the tip of the finger.  A small drop of blood is elicited.  It's placed on a strip.  That strip is in the glucometer machine, and then the machine will calculate or will detect what the glucose level is.

Q.   Are patients ever permitted to monitor their own glucose levels within PDP?

A.   No.

Q.   Do you know why that is?

A.   It can -- the lancets have a small, sharp protrusion, a needle, so to speak, and we typically do not give anything that could be used as a weapon to

Page 221

our patient population.

Q.   Now, can you see this document?

A.   I can.

Q.   This is the facility named Detention Center.  Fingerstick Blood Glucose Record, Jung, Louis.  Where's the date?  We can see it's February on the side there and going down to the next page.  I can't really see the year.  Can you?

A.   I did not see it when you scrolled down before.

Q.   Yeah, me neither.  Sometime in February, but are you familiar with this form?

A.   Yes.

Q.   And it says:  Corizon Health.  Did YesCare also use this form?

A.   It probably was used, depending on when we switched to the eMAR, and I can't recall if that was under Corizon or under YesCare.

Q.   Okay.  Was this used prior to switching to the eMAR?  The HCS system

Page 222

where you'd enter -- strike that. Let me ask this more coherently. What is this document? What is this document?

A. It is a log of Accu-Cheks that were recorded for the date indicated on the log.

Q. Does FSBG refer to the fingerstick blood glucose level?

A. Yes.

Q. And CRIC units given, that would be the insulin dosage given?

A. Correct.

Q. Initials would be the staff who administered it?

A. Correct.

Q. And you know the time her it says a.m. on the one column, and then over where it says p.m., it has an actual time. But that's supposed to identify when it happened, right?

A. Correct.

Q. And were these the forms you testified about earlier that were to be uploaded to become part of a patient's EHR

Page 223

at the end of every month prior to this becoming electronic?

A. Yes.

Q. Okay. And this says Facility Name Detention Center. Were these forms available at CFCF as well when you were site director?

A. Yes.

Q. And are they still in use today?

A. They may be still in use today. And that's based on the fact that we have a glitch in the system with documenting the finger-sticks. So they may be resorting to paper to document their finger-sticks right now.

Q. And you say "right now" you mean, like, right this very moment --

A. Currently. Yes. That we're trying to work through.

Q. Was this something that has just been discovered, or is this a new glitch? Is this something that has been around?

A. It's a new glitch related to updates in our EHR that happened within

Page 224

the past -- less than a year, or a year. Yeah.

Q. Okay.

A. Just about a year.

Q. And what you were describing in terms of the HCS system, where, you know, you testified how the 6 might mean it was not documented. That could mean nothing was given, but it could mean something was given. And you have to go check this HCS system. Is that where there could be information about the FSBG and the CRIC units given currently, glitch aside?

A. I'm sorry, you lost me with that question.

Q. That's fair. It was meandering. Leaving aside the glitch, the information that's tracked on this form -- is this the same information you testified earlier can be entered into the HCS system?

A. Yes.

Q. And you just -- you do not recall when that HCS system eMAR entries pertaining to glucose and insulin was

Page 225

implemented.

A. That's correct. I do not recall when we transitioned.

Q. Do you know who would know or how we could learn that?

A. I'm sure I could find out. I'm not sure who specifically to ask, but probably the EHR team would know specifically when we transitioned to the electronic MARs.

Q. Do you know who's on the EHR team?

A. Yes. Rob McCauley would have been here. I think Chris, Diana may have been here. I can't remember if he came after the transition or not.

Q. Okay, thank you. And I think you got to this with another question, so I'm probably not going to bring up this other document. But are there instances where you would be listed as the provider, but a nurse would fill out a form without you being involved?

A. Yes.

Q. Okay. YesCare 1464-1471. This is

Page 226

a progress note from October 28th, 2023.
Provider was Maureen Gay. I'll give you a
chance to summarize.
    A.   Okay.
    Q.   Scrolling down, do you agree this
Mr. Jung had a glucose level of 542 at
this day?
    A.   Yes.
    Q.   And did you see a reference to
ketones here?
    A.   No.
    Q.   Okay, I think -- One moment.
Okay.  Later on, this is part of the
intake.  I'm just scrolling.  So you see,
right?  This is still Maurine Gay.  A few
pages down.  History Confidential
Questionnaire.  I'm going fast, and I can
stop just to get the next question, but
does this look familiar to you?  Like the
questions that are asked during intake
screening?
    A.   Yes.
    Q.   And down here it says urine
present for ketones.  What does it say --

Page 227

Yeah, urine present for ketones,
encouraged to drink plenty of water.  So
is it your understanding that that means
ketones were present in the urine?
    A.   Yes.
    Q.   So with ketones present in the
urine in a glucose level of 542, should an
NET have been used for hyperglycemia?
    A.   Yes.
    Q.   And should the medical -- well,
should the intake nurse have looked into
Mr. Jung's medical history in PDP when
doing this intake screening?
    A.   At this point, just with his
hyperglycemia, adequate treatment could be
delivered by the information that we have
at this time.
    Q.   Should the medical provider have
looked at his history at all?
    A.   Again, they could have looked into
the history.  But what he needed was his
insulin.  The insulin was ordered, and
that was appropriate.
    Q.   Should anything further have been

Page 228

done?
    A.   It would been reasonable to
recheck the Accu-Chek and see that it had
responded to the insulin that was
administered.
    Q.   And when should that recheck have
been?
    A.   Could have been an hour or two.
    Q.   Okay.  Do you know if that did
happen?
    A.   I do not, no.
    Q.   Is that right?  You see here an
assessment where it says diabetes mellitus
without mention of complication, Type 1,
juvenile type.  Not stated as
uncontrolled.  What does the phrase:  "Not
stated as uncontrolled" mean?
    A.   I don't really know what that's
supposed to mean.  That is wording that
insurance companies ask us to use when,
you know, we tried to code visits in our
setting.  It's really not relevant, and
I'm not really sure why that particular
code was chosen for this case.

Page 229

    Q.   Is this different?  We talked
earlier about whether somebody's glucose
was well controlled, moderately
controlled, or poorly controlled.  Is this
similar to that?
    A.   It's the nurse -- I believe this
is still the nurse's note.  Correct.
Let's see.  Well, this is Maureen Gay,
Nurse Practitioner.  Okay.  Yes,
theoretically it is --
    MR. GREGORY:  Wait a second.
Let's look at the bottom of the
note, please.  Thank you.
    MR. GROTE:  I know, because
there's some confusion with some of
the other records.
    MR. GREGORY:  I just wanted to
make sure.
    MR. GROTE:  Fair.
    MR. GREGORY:  Thank you.
    THE WITNESS:  So, yes, it could
have been used to indicate that the
diabetes is not controlled.  It's
hard to make a judgment of control

Page 230

1    just based on one finger stick.
2        Again, I'm not sure why this
3    specific diagnosis code was used as
4    not stated as uncontrolled.
5  BY MR. GROTE:
6        Q.    Right.  And not uncontrolled, I
7    mean, if you know, is that synonymous with
8    controlled or not?  It's a double
9    negative.  It's throwing me.
10       A.    Yeah, it's throwing me as an
11   English major, too.  I'm not particularly
12   fond of it.
13       Q.    I started as an English major, but
14   switched.  Okay.  Would you with the A1C
15   level be relevant for assessing control?
16       A.    That would be a better indication
17   of overall control, yes.
18       Q.    And it says here, what is the
19   appointment time frame needed for lab
20   appointments it says 14 days.  Would that
21   be to take blood work?
22       A.    Yes.
23       Q.    Okay.  Any reason it would be 14
24   days and not sooner?

Page 231

1        A.    Fourteen days is not unreasonable.
2    The patient is coming with a situation.
3    We don't know what they're walking in off
4    at the know we're continuing their
5    medication.  We're not making a change
6    based on anything.  So it's reasonable to
7    check it in 14 days.
8        Q.    Okay.  Were you made aware of
9    anything about Mr. Jung?  Okay, so Mr.
10   Young Jung still keep doing that?  Mr.
11   Jung came back to CFCF, has his intake
12   screen in October 28th, 2023.  He died on
13   November 6th, 2023.  Between November
14   28th, 2023 -- excuse me, October 20th,
15   2023 and November 6th, 2023, did you have
16   any knowledge that Mr. Jung was back at
17   CFCF?
18       A.    I did not.
19       Q.    And now I'm going to be bringing
20   up the Corrective Action Plan for Mr.
21   Jung, which is Chart 18.  There's no Bates
22   number on the spreadsheets.  And take a
23   moment to review this and let me know.
24   Well, first, are you familiar with this

Page 232

1    document?
2        A.    As a Corrective Action Plan, yes.
3        Q.    And take a moment to review.
4        A.    Okay.
5        Q.    Were you involved in creating this
6    document?
7        A.    At this point, I would have
8    reviewed the chart, but I wouldn't have
9    been involved with the Corrective Action
10   Plan since that comes from the regional
11   level.
12       Q.    Do you agree with the corrective
13   action plan?
14       A.    In terms of.
15       Q.    Where the -- what it identified as
16   opportunities for improvement.  We'll just
17   stick to that column for now.
18       A.    Yes.
19       Q.    Okay.  On row 4 here, it says an
20   Intermedix review was not complete to
21   identify any recent prescriptions or
22   medications and/or dosages.  What is an
23   Intermedix review?
24       A.    It's a database that we can access

Page 233

1    that compiles information from local
2    pharmacies about any new or recent
3    prescription fills that the patient would
4    have done prior to incarceration.
5        Q.    Below that it says patient was a
6    state hospital return, no PPW was received
7    to identify the transfer or PPW paperwork.
8        A.    Yeah.
9        Q.    And an emergency behavioral health
10   referral was not generated.  Do you think
11   that would have been important to do?
12       A.    Yes, and we worked with Norristown
13   Hospital subsequent to this to get more
14   consistent records when patients transfer
15   from their facility to our facility and to
16   receive it in a timely manner not weeks
17   later.
18       Q.    And why is it important to get
19   that information in a timely manner?
20       A.    For continuity of care.
21       Q.    And we talked about this a lot.
22   It says:  No NET intake was completed with
23   a blood sugar of 542.  A NET should have
24   been completed, correct?

Page 234

A.   Yes.

Q.   It says no follow-up scheduled, walk-in appointment.  Does that refer to there being no immediate follow-up to check his glucose, but instead he was told that he can contact medical as a walk-in?  Is that what that means?

A.   That's how I take it, yes.

Q.   So this says October 29th, his blood sugar was 585.  Provider notified, in urine sample obtained per HCS.  That is referring to the system we've been talking about, right, the HCS system that had his blood sugar at 585 for that day?

A.   Yes.

Q.   What is ECW documentation?

A.   That is our EHR, and it's probably referring to the fact that a NET form wasn't done when the elevated Accu-Chek was found.

Q.   And when it says provider notified -- I mean, you don't have the records in front of you.  Do you know if a provider saw him after that?

Page 235

A.   I do not know.

Q.   How are providers notified?  Is it just contact the provider on duty?  Does it go into some system where, you know, there's a stack of notifications to the provider?  How does that work?

A.   It should be a phone call to the provider.  So, if the nurse is on the unit when she obtains the Accu-Chek, she can call triage and ask to speak to the provider on duty.  Alternatively, she could come down to medical and speak to the provider and let them know that this is what she found.  So, there are different ways to notify the provider.

Q.   Okay.  And going down a couple: October 31st, p.m., blood sugar 500.  No -- CRIC administered, no intervention.  So that indicates blood sugar is 500.  Wasn't given Insulin, and then there was no intervention; nothing further was done?

A.   That's what it seems to indicate, yes.

Q.   I think the rest of these speak

Page 236

for themselves.  November 5th, did you ever come to learn of an investigation by PDP into the circumstances surrounding Mr. Jung's death?

A.   I did not.  I was not aware of that.

Q.   You know, there's other defendants in this case, including ones named Wanda Bloodsaw and Gena Frazier.  Are you familiar with the allegations against them in this matter?

A.   I am not.

Q.   And same question for Blair Cabellos, are you familiar with allegations regarding her?

A.   I am.

Q.   And what are you -- not telling me any conversations you've had with counsel, but what do you understand about those?

A.   I understand that she may have seen the patient before he expired.

Q.   And know anything more specific than that?

A.   I do not.

Page 237

Q.   And this is a Patient Safety Event Committee.  And you'll see on the next page, this, or down here, deals with Louis Jung.  But going back to the top page, have you ever seen this document?

A.   Yes, I have.

Q.   And we've had some confusion around the date.  It says:  June 23rd, 2025.  Does that seem like the day when this meeting was this summer, or was this earlier in time?

A.   I think it was earlier.  I don't remember it being the summer.

Q.   Okay.  Yeah.  And what is a patient safety event -- these are the meetings that happen at Regional, is that correct?

A.   No, this is the meeting that happens at the corporate level.

Q.   The corporate level.  Okay.  So were you present at this meeting?

A.   Yes.

Q.   And who else was present that you remember?

Page 238

A.   I believe Linda was there.
Q.   Wakowski (ph), The presenter?
A.   Yes, yes.  And other than that, I don't recall who was there.
Q.   Okay.  And did you have any role in preparing this report?
A.   Other than the review that I did as the Site Medical Director, but not specifically.
Q.   So, did you review the report before the meeting with corporate?
A.   I do not recall if I reviewed it before meeting with corporate.
Q.   Okay, and you see this as Cat, for Category 4?  Do you know what that means?
A.   It's the level to which the omissions in care impacted the patient.
Q.   So, I'll go down to the end.  This is the decision tree of the categories?
A.   Yes.
Q.   In this one, it's indicating, yes, this was a serious safety event that led to moderate-to-severe harm or death?

Page 239

A.   Yes.
Q.   And just take a moment to review that page.
A.   Okay.
Q.   Do you agree that the information on this page is accurate?
A.   I believe so, yes.
Q.   Now it says the timeline begins 10/28/2023, do you know how it's determined when to review the timeline?  So, for instance, we've been talking as far back as December 2021 about Mr. Jung being in PDP.  And there have been other medical incidents in the intervening time period.  Do you know why any of those past instances were not part of this timeline?
A.   It was focused on the event and the circumstances leading up to that event.
Q.   Is that just how it's done customarily, you focus on the death and the immediate circumstances precipitating it?
A.   In terms of the narrative

Page 240

timeline, yes.
Q.   Are there ever instances where the review will look back further into the record to try to identify areas for potential improvement?
A.   Yes, it can be part of that review.
Q.   Do you know if that was done in Mr. Jung's case?
A.   I believe so.
Q.   And do you know how that was done?
A.   I do not know specifically.  I'm not sure what you mean by how it was done.
Q.   Was it through a chart review where people interviewed, just that sort of thing?
A.   Well, for his prior incarcerations, it would be a chart review.
Q.   Would this page here, would this information be from the HCS?
A.   Yes.
Q.   And whenever there were alleged refusals, there should have been a form,

Page 241

correct?
A.   Yes.
Q.   And so this says:  Not doc, that means even in the HCS, there was no documentation?
A.   I don't know.  I don't know if that's the case.
Q.   Okay.  When you were Site Director, did you have standard days that you worked?
A.   Yes.
Q.   What were they, Monday to Friday?
A.   Yes.
Q.   And what were your standard hours?
A.   That varied depending on the day.
Q.   Okay.  You said this earlier:  Your normal time of coming in -- was that like 6:00?
A.   Typically around 6:00.
Q.   What was an average time for you to leave?
A.   Three, four o'clock.
Q.   So October 29th, it said:  Provider noted urine obtained.  Was there

Page 242

a typical provider on a Sunday?  Did that person always work Sundays, or did it shift?

A.  We have a bailer position on the weekend, so typically it's the same providers, but I do not recall if that particular day it was the bailer, or if it was somebody who was covering for the Baylor.

Q.  The bailer, what does that mean?

A.  It's just a position that we have where the provider works two 12-hour shifts on Saturday and Sunday, but their compensation is based on a full-time schedule or something like that.

Q.  Okay.  Now, QIP taxonomy codes.  Do you know what QIP means, Quality Improvement Plan?

A.  I don't know what QIP specifically refers to, but the taxonomy codes are just our way of identifying what were the areas of improvement.

Q.  So, in the parentheses here, it's P1, PD2, CT1.  Do those codes have any

Page 243

kind of qualitative or definitional content, or are they just a kind of internal categorization system?

A.  As far as I know, it's an internal categorization system.

Q.  If you can just take a moment to review these?

A.  Okay.

Q.  Do you agree with the assessment on this page?

A.  So I agree that the areas of improvement or the areas that we are deficient were identified, and I agree that each one was addressed according to what the issue was.

Q.  Thank you.  Now, page 2, and then I'm going to ask the same question.  And do you agree with the assessment on this page as well?

A.  I agree that there were areas of opportunity that were identified, and they were addressed.  Each one was addressed with a plan to improve it.

Q.  And you agree this was a Category

Page 244

4 event?

A.  Yes.

MR. GROTE:  We're almost there, John, but not yet.

MR. KAMINSKY:  Off the record.

- - -

(Whereupon, a discussion was held off the record.)

- - -

BY MR. GROTE:

Q.  You see this document here, Progress Note?

A.  Yes.

Q.  From Nurse Practitioner Henderson Hamright, and I'm going to go through a few of these Progress Notes, just really with some quick questions.  This is YesCare 1642.  If you look in the assessments, it says:  Has multiple Red Flags for missing medications.  Where would a provider see these Red Flags?

A.  It may have been something that nursing staff informed her of, that the patient had been missing doses of insulin.

Page 245

Q.  Okay.  So she put this in her assessment.  Is this what a Red Flag note looks like?  Like we were talking earlier.  If somebody were to go through the Red Flag system, they would trigger, they would schedule an encounter.  I mean, they would.  They would talk to the patient and document that, and if the patient still did not comply with the medication as ordered, a provider would be scheduled to call, and this would all be documented.  Is that a fair summary of what you testified to earlier?

A.  Yes.

Q.  Would that documentation look like a note like this or would it be something different?

A.  This is not reading like a Red Flag encounter.  It's reading more like a patient.  The patient had an elevated blood glucose and came to triage or was brought to triage and then the triage provider is assessing the situation.

Q.  Okay, thank you for clarifying

Page 246

1 that. Now, I'm gonna scroll down to 1568
2 provider is Physician's Assistant,
3 McKinney. See where I highlight here, he
4 also has an RF visit pending. Does RF, I
5 mean, as far as you know, does that mean
6 Red Flag?
7   A.  Yes.
8   Q.  In is RF a common abbreviation
9 within your note system for a Red Flag?
10   A.  I think it can be used. I don't
11 know if I would call it common.
12   Q.  Okay. It depends on whoever's
13 making the note, I guess?
14   A.  Correct.
15   Q.  Okay. All right. March 6th,
16 2023, Progress Note: This is YesCare
17 1549. This also notes Red Flag for missed
18 Eliquis p.m., et cetera. Is this what a
19 Red Flag note looks like?
20   A.  The one previously also looked
21 like a Red Flag. And it looks like Mr.
22 Jung did not stay for the counseling in
23 that case, but yes. PA McKinney does
24 typically do our Red Flag assessments.

Page 247

1 And yes, both notes look like -- actually,
2 let me just step back. The first one
3 looked like a Red Flag. This one looks
4 like he was refusing to go to cardiology,
5 and so she counseled him, with reference
6 to that refusal.
7   Q.  Yeah, and it looks like there's a
8 few forms signed/witnessed. So the form
9 will say which one it was, or both. So
10 this looks like a Red Flag about -- or no,
11 this is a refusal for cardiology note, and
12 then also the Red Flag is noted?
13   A.  Yes.
14   Q.  Okay, and when you said the
15 previous one, is that the one I blew by
16 here?
17   A.  Yes.
18   Q.  Okay, so let's check that out,
19 then. Also PA McKinney?
20   A.  I don't think it was this one.
21 The other one we had looked at.
22   Q.  Oh, the one I just stopped on?
23   A.  Yes, the one you were just on
24 before.

Page 248

1   Q.  Henderson Hamwright?
2   A.  No, the first one for PA McKinney
3 that we looked at. This looks it was a
4 Red Flag encounter.
5   Q.  Okay. Missed a.m. insulin,
6 glucose, noncompliance. So this is what a
7 red-flag will look like?
8   A.  Yes.
9   Q.  Okay. So it's a progress note.
10 And the reason is because of the missed
11 medication?
12   A.  Yes.
13   Q.  Okay. You mentioned a
14 conversation with Maureen Gay. Have you
15 ever talked with Blair Cabellos about this
16 case or about Mr. Jung?
17   A.  No.
18   Q.  Have you talked with Blanche
19 Carney about it?
20   A.  No.
21   Q.  Linda Wakowski. Anybody? Have
22 you talked with anybody about Mr. Jung
23 that you haven't told me about already?
24   A.  I would have spoken to Linda.

Page 249

1 Yes. I can't recall exactly who I would
2 have spoken to about Mr. Jung's case.
3   Q.  Do you recall your conversation --
4 any conversation, with Linda?
5   A.  It was probably in the context of
6 this mortality review that we had to
7 prepare for.
8   Q.  In your opinion, was Mr. Jung's
9 death preventable?
10   A.  Yes, I do think it was
11 preventable.
12   Q.  And how do you think it could have
13 been prevented?
14   A.  It could have been prevented if we
15 were able to identify him and get him his
16 insulin. I think there were several
17 challenges to doing that and getting his
18 insulin. But I do think that would have
19 prevented it.
20     MR. GROTE: If you all will give
21 me one moment so I can have a phone
22 call with my colleagues to see if I
23 have anything further. It will be a
24 quick one.

Page 250

- - -

(Whereupon, a brief recess was taken.)

- - -

BY MR. GROTE:

Q. Just briefly. Is there housing for behavioral health patients anywhere within the PDP facilities, like a specific behavioral health unit?

A. There are.

Q. And where are they located?

A. They are currently located at the Riverside Correctional Facility.

Q. Where were they located in 2021-2023?

A. Either PICC, or they might have already moved to RCF.

Q. Okay. You don't remember when they moved?

A. I do not, no.

Q. Okay. And who would determine if somebody should be housed there? Would that be a Behavioral Health decision?

A. Yes.

Page 251

Q. Would there ever be a circumstance where medical would refer somebody to Behavioral Health housing?

A. No.

Q. You might refer somebody to the Behavioral Health treatment, but then the housing would be from Behavioral Health professionals?

A. This patient was on the Behavioral Health caseload, and as such, if they felt he needed that supportive environment, they would have sent him there.

Q. Okay. Thank you, Dr. Trivikram. No further questions.

MR. GREGORY: Thank you. That's all for today. You can sign off, Doctor.

THE COURT REPORTER: I got an e-mail that this was expedited for Friday.

MR. GROTE: Yes. Yes.

THE COURT REPORTER: All right. Does anyone else need an expedited for Friday as well?

Page 252

MR. GREGORY: No.

THE COURT REPORTER: And then Mr. Pestrak?

MR. PESTRAK: Thank you. No expedited?

THE COURT REPORTER: Ms. Thomas?

MS. THOMAS: Thank you. No. All right.

THE COURT REPORTER: I think that's all I needed then. Thank you.

- - -

(Whereupon, the deposition of Dr. Lalitha Trivikram was concluded at 4:05 p.m.)

- - -

1              C E R T I F I C A T I O N

2

3         I, Lisa J. Brill, a Court and Notary
   Public in and for the Commonwealth of
4  Pennsylvania, do hereby certify the
   foregoing to be a true and accurate
5  transcript of my original stenographic
   notes taken at the time and place
6  hereinbefore set forth.

7

8

9  _____

   Lisa J. Brill, Court Reporter-Notary Public
10 in and for the Commonwealth of Pennsylvania

11 DATED:_____

12

13

14

15        (The foregoing certification of
   this transcript does not apply to any
16 reproduction of the same by any means,
   unless under the direct control and/or
17 supervision of the certifying shorthand
   reporter.)

18

19

20

21

22

23

24

```
1                                  - - -

2                      E R R A T A    S H E E T

3                                  - - -

4

5        PAGE          LINE          CHANGE

6        _____       _____       _____

7        _____       _____       _____

8        _____       _____       _____

9        _____       _____       _____

10       _____       _____       _____

11       _____       _____       _____

12       _____       _____       _____

13       _____       _____       _____

14       _____       _____       _____

15       _____       _____       _____

16       _____       _____       _____

17       _____       _____       _____

18       _____       _____       _____

19       _____       _____       _____

20       _____       _____       _____

21       _____       _____       _____

22       _____       _____       _____

23       _____       _____       _____

24       _____       _____       _____
```

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
1              ACKNOWLEDGMENT OF DEPONENT

2

3         I,                    , do hereby

4   certify that I have read the foregoing pages and

5   that the same is a correct transcription of the

6   answers given by me to the questions therein

7   propounded, except for the corrections or

8   changes in form or substance, if any, noted in

9   the attached Errata Sheet.

10

11

12

13

14

15    _____      _____
      Date            Signature

16

17

18

19

20

21

22

23

24
```

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 72 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

## WORD INDEX

**< 0 >**
**0074**  165:7
**0078**  165:8
**0608-60018**  187:11

**< 1 >**
**1**  5:12  10:24  84:4, 5,
15  85:10, 15, 20  94:1
97:23  99:1, 11, 17
101:3, 9  102:19
139:19  160:3  183:24
184:2, 9, 18, 21  185:3,
9, 15, 23  186:15
195:5, 13  200:17, 18
228:14
**1/23/23**  203:19
**10**  27:24  32:19
100:15  162:13, 14
190:9
**10/28/2023**  239:9
**10:00**  1:18
**100**  31:23  75:11
146:1
**10-12**  139:3, 9
**1100**  3:6
**12.5**  187:17
**12:19**  207:15  209:2
**12-hour**  27:16
242:12
**13**  162:19, 23
**1322**  217:3
**1337**  217:3
**14**  195:6  230:20, 23
231:7
**1464-1471**  225:24
**14th**  217:12, 13
**15**  32:19
**1500**  3:6
**1515**  2:10
**1549**  246:17
**1568**  246:1
**15TH**  2:10
**1634**  212:24
**1634-1639**  203:5
**1639**  213:1
**1642**  244:18
**1659**  207:13

**1660-1662**  204:7
**17**  1:13
**1717**  3:13
**18**  231:21
**1801**  2:18
**18th**  174:12
**19102**  2:11  3:6
**19103**  2:19  3:14
**19123**  2:5
**1947-48**  187:8, 10
**1st**  11:9  172:1
192:5  210:24

**< 2 >**
**2**  11:13  14:17, 19
70:1  84:9, 10, 15
85:24  86:5  97:16
100:24  101:3  139:15,
19, 22  140:2, 20
183:24  184:2, 13, 18,
24  185:3, 8, 15, 23
186:15  194:14
243:16
**2:24-cv-05618-TJS**
1:1
**200**  146:3
**2001**  17:18  19:21
**2004**  17:19
**2010**  18:18
**2018**  11:9  14:24
15:1, 19, 24  19:1
85:7  93:21  111:6
120:17  138:15
**2021**  80:2  148:20
157:22  165:16, 20, 24
172:1, 7  182:21
183:6  199:24  214:17
239:12
**2021-2023**  124:11
152:16  164:10
250:15
**2022**  160:6  192:5
196:1
**2023**  11:9  80:3
91:17  130:23  156:13
157:22  160:6  200:1
204:9  208:12  210:24
215:15  217:13  226:1
231:12, 13, 14, 15
246:16

**2024**  15:9, 22  155:4
156:4, 22  158:10
**2024-25**  163:1
**2025**  1:13  237:9
**20th**  165:19  172:10
173:2  182:21  183:6
231:14
**21**  204:15
**22nd**  158:10  165:20
188:23
**23rd**  215:15  237:8
**24**  70:1  99:3  115:13
**24-hour**  27:3  196:19
**28th**  226:1  231:12,
14
**29th**  234:9  241:23

**< 3 >**
**3**  11:19  26:8  193:12,
16
**30**  149:21  197:1
**306**  2:5
**30th**  165:16  192:5
**31st**  11:9  172:1
210:24  235:17
**396**  206:13

**< 4 >**
**4**  12:1  195:23
232:19  238:15  244:1
**4:00**  88:14
**4:05**  252:15
**40**  149:22
**400**  68:14  119:9
140:16  157:10
**47414**  1:23
**48**  130:3

**< 5 >**
**5**  12:5  160:4  195:23
**5:00**  88:13
**5:23**  207:20
**5:30**  33:24
**50**  149:22
**500**  216:19  235:17,
19
**542**  226:6  227:7
233:23
**550**  216:15

**585**  234:10, 14
**5th**  194:2  236:1

**< 6 >**
**6**  12:11  172:17, 18
176:22, 24  177:1, 3
212:13, 21  224:7
**6.5**  100:11
**6:00**  33:24  178:20
241:18, 19
**600**  216:15
**610**  3:13
**62**  207:14
**6s**  177:17  211:22
**6th**  231:13, 15
246:15

**< 7 >**
**7**  4:6  5:12  12:16
100:13  162:14, 16
**7.0**  100:11
**724**  191:24
**730**  191:24
**770**  2:18
**7th**  187:13  192:23
194:2

**< 8 >**
**8**  12:23  100:13
190:9  192:22
**8th**  160:2  204:9
207:17, 19

**< 9 >**
**9**  100:13
**9:00**  197:2
**90**  140:21
**94**  17:3, 6
**972**  194:19
**977**  194:19
**98**  17:6
**990**  2:5

**< A >**
**a.m**  1:18  33:24
88:13  178:20, 21
195:23  197:2  222:17
248:5
**A1C**  99:20, 21  100:1,
6, 11, 17  101:14

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 73 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

102:*3* 139:*3, 8* 162:*7,*
*10* 186:*8* 187:*17, 22*
230:*14*
**A1Cs** 100:*15* 162:*13*
**abbreviation** 246:*8*
**abide** 46:*15*
**Abilify** 192:*6, 12, 15,*
*17, 22*
**ability** 30:*10* 86:*12,*
*15* 96:*7, 10, 16* 97:*2*
**able** 28:*17, 19* 30:*2*
34:*2* 55:*13* 59:*12*
73:*6* 79:*15* 84:*6, 12*
85:*11* 90:*10* 160:*21*
213:*15, 21* 214:*20*
219:*22* 249:*15*
**ABOLITIONIST** 2:*4*
**Absolutely** 96:*1*
209:*10*
**abuse** 60:*18*
**accept** 59:*3*
**acceptable** 164:*20*
**Access** 17:*21* 18:*7, 8*
47:*9* 64:*3, 6* 66:*5, 14*
67:*15, 19, 23* 68:*17*
111:*4* 198:*5* 232:*24*
**accessible** 50:*13*
**accommodated**
219:*13*
**AccuCheck** 92:*16*
**Accu-Chek** 151:*6*
158:*4, 12* 162:*8*
172:*12, 15* 173:*5, 8,*
*11, 12, 16* 174:*1, 3, 7,*
*9, 13, 14* 193:*24*
203:*21* 205:*5* 219:*22*
220:*6* 228:*3* 234:*19*
235:*9*
**Accu-Cheks** 90:*22*
176:*17, 20* 194:*6*
218:*24* 220:*1* 222:*4*
**accurate** 85:*4* 107:*7*
145:*1* 152:*2* 239:*6*
253:*4*
**ACE** 161:*7, 8*
**acid** 112:*13*
**acidic** 114:*4* 148:*4*
**acidifies** 112:*18*
**acidify** 147:*10, 11*
**acidity** 114:*5, 7*

**acidosis** 147:*13, 24*
148:*2*
**acids** 112:*13* 147:*10*
**ACKNOWLEDGMEN
T** 255:*1*
**acting** 78:*2*
**Action** 14:*3* 127:*8*
128:*5* 132:*6, 10, 17,*
*23* 133:*4* 134:*6*
136:*23* 158:*5, 12, 17,*
*21* 159:*5, 10, 19*
163:*16* 170:*9* 231:*20*
232:*2, 9, 13*
**actively** 21:*12*
**actual** 174:*2* 222:*18*
**acuity** 209:*24* 210:*11*
**acute** 18:*16* 59:*9*
145:*5* 168:*17* 214:*19*
**adapt** 88:*22*
**add** 167:*16*
**addition** 218:*21*
**additional** 53:*9*
122:*12* 212:*10*
**address** 22:*6* 31:*10*
33:*5* 37:*20* 47:*18*
50:*7* 78:*22* 79:*18*
85:*14* 94:*13* 105:*2*
135:*13* 144:*21*
181:*10* 189:*11*
**addressed** 49:*6, 7*
105:*6* 151:*2* 170:*17*
243:*14, 22*
**Addressing** 35:*19, 23*
44:*21* 60:*20*
**adept** 57:*6*
**adequate** 227:*15*
**ADF** 192:*9*
**adjudicated** 26:*9*
**adjust** 49:*18* 95:*9*
102:*6* 187:*24*
**adjusting** 101:*5, 7, 11*
**adjustments** 41:*24*
102:*8*
**administer** 30:*3*
43:*9, 13, 15, 17* 73:*12*
74:*2* 114:*16* 140:*10*
180:*22*
**administered** 42:*22*
72:*1, 17, 23* 73:*17*
74:*8, 22* 75:*1, 3, 6*

87:*11, 12* 88:*2* 92:*15*
106:*19* 140:*12* 144:*1*
177:*6, 23* 178:*8, 9, 11,*
*14, 16* 196:*1, 3* 197:*2,*
*13* 211:*21* 212:*18*
222:*14* 228:*5* 235:*18*
**administering** 104:*9,*
*19*
**administration** 11:*20,*
*21* 42:*17* 43:*5, 22*
71:*5, 8, 21* 73:*14*
74:*5, 12, 20* 83:*7*
85:*13* 92:*9* 143:*22*
151:*7* 152:*9, 13, 19,*
*22* 156:*16, 18* 157:*5*
164:*3, 4* 171:*24*
174:*11* 176:*6, 19*
177:*10* 188:*10, 15*
189:*2* 190:*16* 192:*4*
196:*5, 7* 197:*16*
210:*23*
**administrations** 73:*7*
212:*15*
**administrative** 36:*6*
**administrator** 160:*16*
189:*19, 21*
**Administrators** 1:*4*
22:*5* 32:*4* 33:*6*
40:*18* 104:*15* 127:*1*
133:*20, 21* 158:*19, 23,*
*24* 159:*15* 188:*19, 20,*
*23* 189:*1*
**admissions** 111:*3*
**admit** 51:*6, 12*
**admitted** 18:*2*
110:*22* 165:*23*
172:*10* 173:*1* 183:*16*
187:*12*
**admitting** 53:*1*
**adrenaline** 167:*11*
**adults** 26:*9*
**advanced** 16:*7* 21:*18*
26:*16* 31:*12*
**affect** 96:*21* 211:*8*
**afternoon** 88:*15*
**after-visit** 180:*5*
217:*4*
**age** 145:*9* 195:*6*
**agency** 56:*20*

**agent** 139:*14*
**ago** 189:*15, 16*
**agree** 99:*5* 138:*5*
187:*14* 215:*15, 21*
220:*2* 226:*5* 232:*12*
239:*5* 243:*9, 11, 13,*
*18, 20, 24*
**agreed** 7:*2*
**ahead** 42:*23* 43:*2*
**aid** 13:*2*
**airflow** 88:*21*
**alert** 105:*24* 117:*21*
216:*18*
**allegations** 236:*10, 15*
**alleged** 240:*23*
**allow** 198:*4*
**alongside** 55:*8*
**Alternatively** 235:*11*
**ambit** 71:*23*
**American** 98:*21*
**amount** 26:*18* 99:*15*
180:*5*
**analysis** 128:*1*
131:*17*
**and/or** 232:*22* 253:*16*
**angle** 160:*23*
**animals** 78:*2*
**annual** 31:*15* 32:*18*
58:*12, 14*
**annually** 58:*10*
**Answer** 5:*3* 9:*13, 17,*
*23* 43:*1* 59:*13* 62:*8*
64:*22* 117:*4* 142:*16*
153:*10*
**answered** 33:*8*
**answering** 36:*3*
**answers** 9:*10* 47:*4*
61:*3* 62:*1* 255:*6*
**antibiotics** 210:*5*
**anticipate** 153:*10*
**anticoagulants** 75:*23*
**anticoagulation** 48:*21*
**anybody** 33:*15* 97:*8*
201:*15* 248:*21, 22*
**APOLLON** 1:*9* 2:*20*
**apologize** 204:*4*
**apparent** 96:*14, 23*
**appear** 171:*23* 179:*2*
194:*20*

appears 155:2
207:20
applies 199:22
apply 121:14, 16
253:15
applying 159:20
appointment 42:13
46:5, 6, 7 61:9, 10
62:5, 10 69:15, 16
70:18 81:2 141:20
144:17, 22 194:22
200:8 230:19 234:3
appointments 61:24
141:22 180:21
181:21 230:20
approach 94:15
169:18
appropriate 41:23
71:1 104:24 137:1
170:9 207:10 216:22
227:23
appropriately 13:2
Approximately 32:16
140:20
April 187:13 188:23
192:4, 5
ARCH 2:10 3:13
area 150:24 173:9
205:20
areas 31:17, 18
126:7 128:2 131:12
132:7, 13 133:7
150:3 240:4 242:21
243:11, 12, 20
arises 52:2
arose 132:4
arrest 66:17 109:11
arrive 46:5 108:4
arterial 114:9 147:23
arteries 83:23
artery 83:23
ascitic 121:10
aside 224:13, 17
asked 9:22 10:17
41:10 55:7 58:4
62:21 81:24 82:22
106:11 145:15
148:11 185:19
213:16, 17, 20 226:20

asking 8:4 9:10
16:14 39:4 47:5
52:22 71:22 74:19
83:6 111:14, 18
135:8 148:6 187:2
200:24
Aspart 196:13
aspect 24:1 54:17
aspects 102:20
assay 113:13
assess 30:5 59:8
60:16 108:4 141:4
154:7
assessing 30:9
230:15 245:23
assessment 12:19
30:11 57:17, 24
60:23 144:2 161:14
183:23 195:12 216:5
228:13 243:9, 18
245:2
assessments 30:6
61:6 244:19 246:24
assigned 79:18
assist 119:23 160:21
assistance 53:20
134:15 150:8
assistant 28:24 60:4
63:13, 14 159:1
213:5, 9 246:2
assistants 28:7 29:2,
7, 14
associated 97:15
146:22 184:14
215:21
Associates 18:22
Association 98:21
assume 9:17
assuming 69:16
Assurance 132:19
149:8
asthma 149:15
asymptomatic 211:13
ate 146:11
atherosclerosis 83:22
attached 255:9
attempting 215:5
attending 18:4
183:14

attention 33:5 37:22,
24 60:11 65:17
104:21 125:22 164:8
169:9 192:21
ATTORNEY 2:6, 12,
20 3:8, 15
atypicality 33:20
audit 149:14, 16, 18
151:9 152:22 153:2,
16 154:4, 6 156:12
160:5 162:24
auditable 134:13
audited 31:17 32:11
149:11 151:12
152:10, 13, 20
auditing 151:22, 23
152:1, 3 153:12, 24
auditors 11:6 153:3
audits 10:24 13:20,
22 31:3 134:12
149:1, 6, 14 150:13,
21 160:14
authority 107:10
125:14
automatic 62:5
automatically 61:24
62:14 69:9 97:20
108:16 179:12
availability 209:21
210:7, 10
available 38:18
65:24 67:3 73:3, 4
196:12, 22 197:1
223:6
average 99:21, 22
241:20
awake 105:24 216:18
aware 25:3 34:14
36:17 38:1 44:20, 24
78:13, 14 103:20
105:1 110:23 120:8
127:2, 3, 4 128:7
159:3, 9 201:18, 21
231:8 236:5

< B >
back 17:23 19:20
20:18 32:10 35:3
37:2, 16 58:16 75:12
85:1, 7 123:8, 17

130:22 148:6, 12
151:19 155:24 164:2,
14 165:3 177:19, 22
179:8, 9 190:5 193:3
207:14 209:15 210:4,
9 214:24 231:11, 16
237:4 239:12 240:3
247:2
background 28:24
backgrounds 96:20
bad 8:14 112:16
bag 106:15
bailer 242:4, 7, 10
Bar 148:12
basal 196:20 218:22
base 34:17 35:5, 10
218:20
based 26:17 52:13
53:7 57:11, 12 61:24
64:24 73:13 89:19
92:16 133:1 140:12
145:8 147:24 152:5
206:23 223:11 230:1
231:6 242:14
basic 59:5 106:8
202:17
Basically 34:5 99:10
141:12 194:16
basis 79:19 129:3
152:10, 14
Bates 159:24 231:21
Baylor 242:9
Bear 137:4 154:14
becoming 16:12
223:2
bedtime 88:5
began 85:7
begins 56:10 239:8
behalf 1:17 10:9, 13
behavioral 60:17
63:5, 7 96:6 127:16
169:6 170:10, 12, 13,
21, 22 171:3, 8 233:9
250:7, 9, 23 251:3, 6,
7, 9
behavioral-health
171:18
believe 8:10 10:18
17:19 31:21 56:15
58:12 63:12, 19 73:9

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 75 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

75:8 124:13 148:15
160:3 169:15 172:11,
18 177:1 200:3
229:6 238:1 239:7
240:10
**below-normal** 141:11
**beneficial** 102:10
**benefit** 51:2, 17
**best** 49:19 90:5 94:8
**better** 22:6 101:6
138:1 230:16
**beyond** 53:10
**BG** 213:12
**big** 192:1
**bin** 34:4
**biochemistry** 17:4
**Bipolar** 168:21, 23
169:4 192:9, 10
**bit** 38:21 53:15
57:8 69:4 89:17
100:22 120:15 124:1
141:16 143:3, 19
150:7 151:19 164:17
190:6 195:12
**BLAIR** 1:10 3:8
236:13 248:15
**BLANCHE** 1:8 2:12
248:18
**Blanking** 18:12
**blew** 247:15
**blocked** 203:19
**blood** 41:18, 20 60:7
85:18 99:12, 22
105:18 112:3 114:4,
8, 11 140:13, 15
145:17, 24 146:3, 12,
19 147:11, 22 148:1,
3 157:9 161:8
166:12, 15 168:1, 19
172:14 180:20 184:4
203:24 207:3 213:12
215:24 218:18
220:11 221:5 222:8
230:21 233:23
234:10, 14 235:17, 19
245:21
**BLOODSAW** 1:10
236:9
**bodies** 86:6 166:24

**body** 83:10, 15
84:11 86:22, 23
113:7, 20, 24 147:5, 7,
12 167:10 184:11
**Booker** 208:17
**bottom** 155:22
229:12
**BOULEVARD** 3:6
**box** 34:4 36:13, 14,
16
**Bradley** 124:6
**break** 9:24 67:22
79:7 82:13 147:6
149:10 154:14
164:13, 18
**breakdown** 112:12
147:9
**breaking** 117:17
147:8
**breaks** 9:20 168:4
**BRET** 2:1 7:21
**Brett** 82:11
**bridge** 41:13, 15
61:12
**brief** 82:17 250:2
**briefly** 250:6
**Brill** 1:19 253:3, 6
**bring** 35:24 143:3
188:19, 24 210:14
225:18
**bringing** 231:19
**broad** 105:11
**Bronx** 18:13
**brought** 33:4 37:22,
23 59:7 60:10 65:17
73:10 104:21 125:3,
21 164:7 245:22
**Buffalo** 17:2
**building** 14:20
**buildings** 29:23
**bunch** 211:15
**busy** 110:8, 9
**byproduct** 112:13
147:9

**< C >**
**CABELLOS** 1:10
3:8 236:14 248:15
**calculate** 220:14
**calendar** 69:12

**call** 20:21 42:10
65:20 108:3 124:21
196:19 203:23
213:13 235:7, 10
245:11 246:11
249:22
**called** 17:16, 21
18:11 26:8, 12 61:14,
19 70:5 75:4, 5
106:11 133:9 135:10
144:11
**calls** 65:19 214:5, 6
**campus** 14:20 134:2
**Cap** 162:24 163:14
**capacity** 10:7 15:3
16:3 136:10
**Card** 160:5
**cardiac** 109:11
**cardiology** 247:4, 11
**cardiovascular** 161:15
**care** 11:2, 3 12:2
13:1, 4 15:12 16:4
18:1, 8, 15, 16, 17
19:1, 18 20:3, 15
21:20 27:19 28:10
31:12 34:13 35:17
38:7, 10 39:6, 10
41:22 42:4, 12 46:18,
23 47:8, 9, 14, 19
52:21 54:6, 12, 18
57:15 58:14, 15, 16
59:20 61:8 62:10
63:3, 8 69:1, 4, 5, 14,
16 70:7 84:24 90:6
103:4 105:10, 14
106:5, 7, 20 107:2
115:23 116:24 118:5
122:2 138:10 141:17,
18, 19, 24 142:4, 7, 10,
11 143:8, 11 144:16
149:2, 11, 19 150:4
151:11 153:14
165:18, 24 180:15
181:6 189:20 198:3,
5, 9, 12, 14 200:16, 17,
23 201:11 207:10
209:20 214:15 215:9
217:5 219:7 233:20
238:18
**CAREER** 3:15

**CARNEY** 1:8 2:12
248:19
**carried** 44:2
**carry** 34:14 44:15
**cart** 73:2
**case** 7:23 8:13, 15,
17, 18, 22, 23 10:7
13:21, 23, 24 14:1
20:23 21:21 31:14
53:22 55:24 56:23
77:4 85:6 93:21
95:9 121:23 122:5
126:7 128:10, 20
129:17 131:22, 24
132:4 133:2 135:21
136:12 139:22
150:17 172:13
184:16 202:2 211:12,
13 212:22 216:22
228:24 236:8 240:9
241:7 246:23 248:16
249:2
**case-by-case** 129:3
**caseload** 171:4, 9
251:10
**cases** 8:12 34:9
38:20 89:11, 14
109:9, 10 128:13
132:9 171:2
**Cat** 238:14
**catches** 142:10
**categories** 238:20
**categorization** 243:3,
5
**category** 56:4
106:24 202:15
238:15 243:24
**cause** 131:17 215:11
**cellmate** 129:18
**cellular** 112:20
**CENTER** 2:4, 18
26:5, 12, 21 37:4, 7,
15, 19 38:4 123:9
124:4, 8, 20 125:6
200:3 221:5 223:5
**certain** 24:24 25:1
31:14 75:14 88:1
106:16 108:21
111:22 112:6 119:7
121:17 134:18

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 76 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

149:*17*  179:*11*  191:*9*,
*10*  197:*20*
**certainly**  82:*14*
**certification**  7:*4*
253:*15*
**certify**  253:*4*  255:*4*
**certifying**  253:*17*
**cetera**  246:*18*
**CFC**  29:*20*  50:*10*
213:*9*
**CFCF**  16:*9*  20:*12*
22:*9*  23:*11*, *16*  24:*11*
26:*13*  27:*3*, *15*  29:*20*
32:*4*  36:*22*  37:*2*, *5*,
*16*  39:*20*  71:*5*  72:*3*,
*10*, *19*, *24*  76:*9*  88:*6*,
*9*  104:*6*, *14*  108:*8*
123:*8*, *9*, *18*  124:*24*
125:*1*, *13*  126:*14*, *23*
135:*16*  138:*3*  148:*13*,
*14*  158:*17*  160:*16*
162:*24*  164:*10*  179:*9*
190:*6*, *15*  197:*9*
200:*2*  209:*15*  210:*9*
219:*7*, *13*  223:*6*
231:*11*, *17*
**challenges**  249:*17*
**challenging**  21:*21*
94:*7*  197:*16*
**chance**  226:*3*
**change**  15:*21*  17:*12*
35:*9*  101:*2*  142:*23*
153:*10*  157:*19*
186:*17*  196:*12*
203:*24*  213:*12*  218:*4*,
*7*  231:*5*  254:*5*
**changes**  134:*3*
138:*16*  255:*8*
**changing**  197:*3*, *11*,
*15*
**characterize**  19:*10*
**chart**  13:*12*, *13*, *17*
25:*14*  31:*8*  34:*11*
38:*2*  64:*10*, *18*  79:*4*
103:*6*  122:*10*, *24*
123:*3*  128:*22*  140:*9*
151:*3*  155:*22*  157:*13*
160:*3*, *4*, *19*  162:*1*, *19*,
*23*  175:*11*  179:*19*, *22*
180:*8*  182:*12*  183:*23*

184:*17*  231:*21*  232:*8*
240:*14*, *18*
**charts**  31:*16*  32:*11*,
*14*, *16*, *19*  122:*7*
149:*18*, *21*, *22*, *24*
153:*2*, *4*, *18*
**chase**  187:*1*
**Check**  34:*11*  73:*11*
87:*21*  92:*5*  119:*11*
157:*11*  174:*13*  205:*2*,
*12*  212:*21*  219:*24*
224:*10*  231:*7*  234:*5*
247:*18*
**checked**  70:*13*  99:*13*,
*16*  115:*4*  175:*16*
220:*4*
**checking**  35:*19*
112:*6*, *24*  146:*12*
**checks**  90:*10*, *16*
104:*10*, *19*  145:*5*
152:*19*  173:*5*  188:*12*,
*16*  189:*3*  190:*16*
219:*18*, *19*
**chest**  121:*5*
**Chief**  22:*22*  204:*9*
215:*18*
**choose**  210:*8*
**chosen**  228:*24*
**Chris**  225:*13*
**Christine**  18:*21*
**chronic**  27:*19*  41:*22*
42:*4*, *11*, *12*  48:*14*, *22*
59:*9*  61:*8*  62:*10*, *22*
63:*3*  69:*4*, *14*, *16*
70:*7*  141:*16*, *18*, *24*
142:*4*, *7*, *10*, *11*  143:*8*
144:*16*  146:*24*
180:*19*  186:*10*
200:*16*, *17*
**circumstance**  77:*1*
251:*1*
**circumstances**  12:*19*
96:*3*  108:*10*, *21*
123:*5*  126:*9*  209:*14*
236:*3*  239:*18*, *22*
**CITY**  1:*8*  2:*10*, *13*
7:*24*  96:*12*
**civil**  7:*23*
**clarification**  44:*17*

**clarify**  9:*19*  152:*4*
**clarifying**  245:*24*
**class**  161:*8*
**clear**  63:*6*  64:*23*
97:*7*  160:*4*  184:*17*
211:*23*
**cleared**  39:*21*  72:*14*
115:*17*
**clearly**  136:*4*  189:*8*
**client**  35:*20*
**clinic**  141:*18*, *24*
142:*1*, *5*, *13*  143:*8*
**clinical**  22:*19*, *20*
23:*5*  24:*7*  28:*16*
32:*3*, *9*  36:*5*  42:*10*
48:*10*, *13*, *16*, *19*  49:*3*,
*12*, *16*, *22*  50:*10*, *23*
51:*7*, *11*, *13*  52:*10*, *16*
54:*20*  55:*1*  58:*5*, *13*,
*15*, *16*  61:*1*, *19*  62:*11*
67:*15*  68:*4*  69:*8*
70:*10*  115:*23*  116:*10*
118:*1*  119:*6*  121:*6*
138:*9*, *21*, *22*  147:*17*
150:*8*, *10*  156:*15*, *24*
157:*6*
**clinics**  141:*17*
**closely**  124:*1*
**Closer**  100:*11*
**clot**  168:*1*
**CMO**  203:*6*  204:*8*
213:*1*
**code**  228:*21*, *24*
230:*3*
**codes**  242:*16*, *20*, *24*
**coherently**  222:*2*
**coincide**  219:*20*
**collaborate**  57:*15*
**collaborated**  21:*22*
**collaboration**  27:*10*
**collaborative**  57:*20*
**colleague**  38:*5*  46:*11*
54:*21*  55:*2*, *11*  77:*14*
**colleagues**  51:*24*
52:*1*  57:*23*  201:*9*
249:*22*
**College**  17:*6*
**color**  113:*14*, *16*, *22*
**colorimetric**  113:*13*

**column**  222:*17*
232:*17*
**come**  19:*17*  34:*19*
35:*20*  36:*14*  41:*11*
58:*11*  73:*8*  75:*12*
79:*16*, *20*  90:*13*
96:*19*  102:*16*  107:*22*
108:*14*  123:*8*  132:*1*
203:*20*  210:*4*  220:*3*
235:*12*  236:*2*
**comes**  24:*15*  31:*12*
46:*24*  48:*7*  58:*13*
137:*5*  147:*13*  232:*10*
**comfort**  57:*11*, *12*
**comfortable**  57:*19*
**coming**  20:*18*  21:*6*
22:*24*  24:*8*  37:*14*
66:*15*, *16*  144:*14*
200:*16*  214:*24*  218:*9*
231:*2*  241:*17*
**commencing**  1:*18*
**comment**  218:*8*
**COMMISSIONER**
1:*8*  2:*12*
**Committee**  14:*6*
135:*2*  155:*11*  237:*2*
**common**  19:*23*  25:*5*,
*8*  246:*8*, *11*
**Commonwealth**
253:*3*, *10*
**communicate**  21:*14*
35:*11*  70:*19*
**communicated**  70:*24*
96:*24*  103:*3*, *5*
108:*16*  125:*1*  133:*12*
136:*22*
**communicating**
144:*13*
**community**  66:*17*
103:*8*
**companies**  228:*20*
**compensation**  242:*14*
**competency**  169:*7*
201:*20*
**compile**  150:*1*
**compiles**  233:*1*
**complaint**  204:*9*
215:*18*
**complement**  29:*21*

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 77 of 114
Deposition of Dr. Lalitha Trivikram
Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**complete** 58:2 90:4 180:4 232:20
**completed** 17:14 157:13 161:2 210:5 233:22, 24
**completely** 89:23 207:12 211:12
**completing** 207:11
**completion** 61:17
**Complex** 26:7 89:7
**compliance** 79:24 102:13 144:3 156:17, 18 157:5 170:17, 24
**compliant** 143:1 170:16, 24 219:14, 24
**complicated** 200:23
**complication** 228:14
**comply** 96:17 97:2 143:14 188:1, 2 219:3 245:9
**complying** 98:9
**component** 134:19
**compound** 42:24 89:4
**comprehensive** 149:19 169:17
**computer** 40:6 73:4, 5 175:4
**concentrated** 113:9
**concentration** 112:18 113:3, 6
**concern** 38:16 65:15 112:7 125:8 137:15 189:1
**concerned** 72:15
**concerning** 60:10 65:9 117:19 189:8 206:20
**concerns** 35:15, 20 36:15, 17 38:12 96:7 104:1 188:18
**concluded** 252:14
**condition** 42:12 83:12 89:20 121:18 123:17 125:9 142:12, 13 147:15 166:9 184:21
**conditions** 21:14 29:4, 5 48:14, 20, 23 59:8 60:19 62:14, 22

**conducted** 11:5 141:23 154:8 156:12
**conducting** 12:17
**conducts** 63:10, 20
**Confidential** 226:16
**confinement** 59:1, 2, 5, 11, 16, 17
**confirm** 144:10 145:2
**confusion** 216:18 229:15 237:7
**conjunction** 22:21 134:8
**consciousness** 116:16
**consequence** 76:17
**consequences** 83:18
**consider** 39:1 51:16, 19 75:14 169:18, 22 199:13
**considerations** 102:22
**considered** 37:4 75:24 84:16 85:3 105:9 145:22
**considering** 206:15
**consist** 45:16
**consisted** 39:18
**consistent** 143:12 196:18 200:14 233:14
**consistently** 66:20, 22 95:18 110:6
**consists** 45:18
**consult** 55:10
**consultant** 20:22 199:15, 18, 20
**contact** 65:6, 21 107:17 108:1 234:6 235:3
**contacted** 66:3 170:21
**contained** 206:8
**containing** 163:22
**content** 24:4 243:2
**context** 48:11 59:18 76:2 249:5
**continually** 215:10
**continue** 42:1 55:17 64:13 98:11 121:7

64:20 109:6 120:6 137:9 145:9 202:11

**continued** 180:17, 18, 19, 20, 22, 23
**continuing** 231:4
**continuity** 22:1 34:20 233:20
**contract** 55:19 56:10
**contracts** 55:21 135:14
**control** 58:6 95:11 97:17 100:8 102:18 103:9 139:8 161:17, 21 162:15 181:3, 5 185:12 186:8, 9, 11 195:14 229:24 230:15, 17 253:16
**controlled** 100:5, 9, 14, 15, 18 116:22 161:20, 21 162:5, 11, 13, 17 194:17 229:3, 4, 23 230:8
**conversation** 35:2 95:17 171:11 189:21 248:14 249:3, 4
**conversations** 13:10 201:1, 7, 12, 13 214:11, 13 236:18
**cookbook** 50:4
**cooperative** 65:12
**Corizon** 14:23 15:1, 20 16:11 19:3 221:17, 21
**Cornell** 17:11
**coronary** 83:23
**CORP** 1:8 3:8
**corporate** 22:14, 22 23:21, 22 24:9 40:4 49:6 127:19 135:3, 4, 10 237:19, 20 238:11, 13
**correct** 7:20 9:2 15:2 20:10 23:7, 21 24:6 25:17 28:2 30:17 40:21 63:15, 16 74:13 80:19 93:19 97:22 105:8 107:8 108:3 124:4, 5 129:5 132:15 137:9 138:10 140:11, 17 141:14 142:14 146:17 147:16

168:16 172:7, 8, 16 176:6, 7 187:17 193:8, 13 214:19 222:12, 15, 21 225:2 229:7 233:24 237:17 241:1 246:14 255:5
**Correctional** 14:16 16:2 26:3, 4, 6 77:9 90:11 103:1, 13, 19 107:19, 22 129:7, 8 250:13
**corrections** 57:13 73:10 88:20 90:5 103:24 127:17 197:23 202:5 255:7
**Corrective** 14:2 127:8 128:5 132:6, 10, 17, 23 133:4 134:6 136:23 140:4 158:4, 12, 16, 21 159:4, 10, 19 163:16 231:20 232:2, 9, 12
**correctly** 7:19 61:20 173:6
**correlate** 113:20
**cortisol** 167:11
**Costello** 205:14, 15 208:18, 19
**counsel** 7:2, 22 10:15 13:11 78:9 236:18
**counseled** 94:18 133:19 247:5
**counseling** 76:13 77:15 246:22
**counted** 27:22
**couple** 18:19 27:24 58:10 70:14 150:17 160:20 235:16
**course** 20:4 58:3 126:16 170:9
**COURT** 1:1, 20 6:4, 9, 19 9:8 251:18, 22 252:2, 6, 9 253:3, 6
**cover** 89:16 194:21
**coverage** 101:6 140:5
**covered** 36:6
**covering** 242:8

**COVID** 91:*15*
108:*24* 109:*1* 207:*20*
208:*1*
**COVID-19** 168:*11*,
*12*, *14*
**CPR** 106:*13* 109:*20*
**create** 38:22
**created** 23:*18* 78:*11*
110:*20*
**creating** 232:*5*
**CRIC** 140:*5*, *10*
222:*10* 224:*12*
235:*18*
**criteria** 51:*15*, *19*
52:*15*, *18*, *23*
**critical** 75:*15*, *19*, *24*
76:*1* 78:*5*, *15* 85:*2*, *3*
165:*18*
**critically** 98:*24*
**Crystal** 17:*17*
**CT1** 242:*24*
**cumulative** 206:*23*
**curious** 132:*1*
**Curran-Fromhold**
14:*16* 16:2 26:2
**currently** 14:*14*, *15*
15:*4*, *5* 88:*6* 130:*17*
152:*14*, *20* 195:*15*
223:*18* 224:*13*
250:*12*
**cursor** 161:*1* 194:*1*
**custody** 12:2*1* 21:*10*
**customarily** 239:*21*
**cut** 187:*1*

**< D >**
**daily** 79:*19* 156:*17*
212:*14*
**damage** 84:*1*
**dangerous** 84:2*3*
**Danielle** 130:*17*
155:*6*
**dark** 110:8
**darker** 113:*16*
**data** 178:*3*, *4*, *18*
**database** 232:24
**date** 1:*19* 135:24
148:2*1* 158:9 183:*8*,
*11* 203:*18*, *19* 215:*14*

221:7 222:*5* 237:*8*
255:*15*
**DATED** 253:*11*
**Dates** 136:*3* 163:*1*
172:*5* 177:*20*, 22
201:*12*
**day** 33:*18*, *23* 35:*14*,
*18* 79:*21* 88:*1* 89:*16*
99:*13*, *16* 174:*13*
200:*15* 207:*19* 209:*4*,
7 218:*20*, *24* 219:*2*, *3*,
*5*, *9* 226:7 234:*14*
237:9 241:*15* 242:7
**days** 72:*13* 117:*17*
173:*3*, *4* 174:*15*
194:6 230:*20*, *24*
231:*1*, 7 241:9
**day-shift** 35:*11*
**day-to-day** 178:*4*, *18*
**DC** 26:*13* 125:*3*
**deal** 200:22
**dealing** 197:*18*
214:2*1*
**deals** 237:*3*
**death** 190:22 199:24
236:*4* 238:24 239:*21*
249:9
**December** 11:9
148:*20* 160:6 165:*16*,
*19*, *20*, *24* 171:24
172:*1*, 7, *10* 173:2
182:2*1* 183:6 199:24
214:*16* 239:*12*
**decide** 125:*12*
**decision** 53:*19*, *23*
107:*17* 150:9 191:*10*,
*17* 199:*11* 206:*23*
207:*1* 208:*13*, *15*
238:*20* 250:*23*
**decisions** 94:8 96:*8*,
*11*
**decompensating**
98:*17*
**decompensation** 99:*4*,
*9*
**decreased** 147:*19*
**deep** 113:*14*, 22
**default** 177:*1*
**DEFENDANT** 2:*20*
9:*1* 10:7

**Defendants** 1:*11*
2:*12* 3:*8*, *15* 236:7
**defer** 30:*14*
**defibrillator** 106:*10*
109:*20*
**deficiency** 83:*14*
85:*14*
**deficient** 243:*13*
**deficits** 106:2
**definitely** 27:*10*
162:*15*
**definitional** 243:*1*
**degree** 17:*4* 28:*14*
211:9
**degrees** 16:*20*
**delineate** 206:6
**deliver** 46:*18* 198:*3*
**delivered** 227:*16*
**delve** 94:*23*
**dementia-level** 18:*17*
**denote** 203:*8*
**DEPARTMENT** 1:9
2:*10*, *13* 15:*14* 19:2
25:*11* 31:*5* 35:2*1*
47:7
**depend** 37:*12* 69:*15*
89:*3*, *4* 123:*10*
**dependent** 37:*11*
**depending** 28:*1* 34:*3*
68:*4* 101:*8* 113:*12*,
*13* 119:*12* 134:*18*
136:2*4* 221:*19*
241:*15*
**depends** 19:*16* 28:2*1*
50:*16* 57:*4* 73:*20*
88:*19* 89:*8*, *9* 99:*14*
100:*20* 102:*12* 112:*2*,
*17* 115:*5*, *9* 117:*24*
133:*14* 205:7 206:*20*
209:*17* 211:9 246:*12*
**DEPONENT** 255:*1*
**deposed** 10:6
**deposition** 1:*16* 5:*1*
7:2*3* 8:6, 9 10:*3*, *16*
13:7 169:*3* 252:*13*
**depositions** 9:*4*
**describe** 28:*8* 32:22
39:*17* 41:*16* 55:*3*
71:*3* 72:*3* 141:*16*

175:2 220:*8*
**described** 80:2 119:*1*
**describing** 40:9
56:*12* 121:*13* 224:*5*
**Description** 4:*6*
**designated** 10:*8*, *13*
71:*20*
**designation** 162:*11*
**details** 128:*20* 144:*6*
180:*8*
**detect** 220:*15*
**Detention** 26:*5*, *12*,
*21* 37:*3*, 6, *15*, *19*
38:*4* 123:9 124:*4*, *8*,
*19* 125:*6* 200:2
221:*5* 223:*5*
**determination** 103:*24*
107:*13* 108:*5*
**determine** 21:7
41:*23* 57:9 58:2*4*
99:*1* 116:*20* 123:*4*
143:*16* 147:*14*, *24*
149:*19* 184:2 188:*10*
200:*5* 207:9 250:2*1*
**determined** 59:*4*
69:*20*, *24* 92:*15*
115:6 239:*10*
**determines** 107:9
**determining** 115:22
116:2*3* 121:2*3*
**developed** 147:*15*
**developing** 112:*8*
132:*16* 136:*8*
**diabetes** 11:*4*, *15*
19:*7*, *13*, *18*, 24 20:*4*,
6, 9 48:24 54:*12*, *15*,
*18*, *23* 62:*17* 83:*11*,
*12* 84:*4*, *5*, 9, *10*, *16*
85:*10* 98:2*1* 99:*2*, *12*
103:*15* 117:*16*
118:*14*, *20* 121:*18*
122:2 138:*10*, 22
139:*15*, *16*, *19*, *20*
140:*3* 142:*4* 144:*17*
146:2, *5* 149:*16*
160:*5* 162:*5* 180:*16*
184:*13* 185:*4*, *17*
186:*11* 187:*20*
194:*13* 195:*5*, *13*, *15*

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 79 of 114

Deposition of Dr. Lalitha Trivikram                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

205:12  228:13
229:23

**diabetic**  11:5  19:11
85:16, 20  87:20  90:8
94:1  97:16, 23  99:5
100:1, 24  101:4
103:2  109:15, 24
112:9  117:20  118:12
139:22  142:17  147:3,
4  149:20  161:6, 11,
17, 24  166:1  175:14
184:1, 9  186:15
187:13  219:8

**diabetics**  85:24  86:5
99:17  100:10  101:10
102:19  145:4  184:21,
24

**diagnose**  28:18  29:4

**diagnosed**  168:22
184:10  195:5

**diagnoses**  169:9, 10,
14  184:16

**diagnosis**  147:16
169:21  194:13  230:3

**Diana**  225:13

**died**  126:18  231:12

**dies**  12:20  126:2, 13,
14, 23, 24

**diet**  181:2

**dietary**  102:22  188:3

**difference**  72:16, 21

**differences**  74:24

**different**  25:2  26:16
45:23  47:5  49:18
56:13  70:9  72:8, 11,
15  75:5  95:14  98:18
138:14  142:13  149:7
151:11  154:17
160:17  174:5  176:2
181:9, 16  186:3, 5, 18
190:7  197:9  211:18
212:9  219:17  229:1
235:15  245:17

**differential**  186:3

**differently**  98:6
126:11  201:4, 5

**difficult**  21:21  38:21
95:8  184:3

**difficulties**  18:9

**digestion**  87:9

**dipstick**  113:12
157:11

**direct**  39:20  192:21
205:2  253:16

**Direction**  5:3  153:8

**Director**  15:6, 8, 11,
22  16:1, 12  20:12
22:10, 16, 18  25:4, 23
26:14, 15, 22  27:1, 7,
8, 9  31:7  32:5  33:2,
7, 10, 13, 17  37:19
38:6, 24  39:13  40:20
50:22  57:21  91:13
104:13, 18  108:6
120:18  124:7, 10, 12,
19  125:20  126:6, 15,
21  127:2  128:18
131:10  135:16
136:11, 14  150:22
156:5, 8, 21, 23  157:3
158:17  159:4  163:19
164:1  217:7  223:7
238:8  241:9

**directors**  21:23  27:11

**discharge**  217:4

**discharged**  109:21
124:23

**discharging**  124:15

**disciplinary**  12:24

**discipline**  202:20

**discontinue**  46:4

**discovered**  223:21

**discuss**  20:22  48:9
53:22  96:5  125:19,
24  131:19  200:20, 21
201:10  219:24

**discussed**  31:19
54:18, 24  93:13
131:11  208:23  213:2

**discussion**  102:12
128:3  131:13  190:1
244:7

**discussions**  133:22
201:3

**disease**  58:6  83:24
149:15  161:6, 11
186:10

**disorder**  168:21, 23
169:4  192:10

**disorientation**  215:22
216:20

**disposition**  216:16

**disrespect**  191:2

**disruptive**  112:21

**distinct**  23:4

**distinction**  23:5
29:24  184:3

**distinguish**  185:3

**distinguished**  146:7

**distinguishes**  146:9

**distress**  117:7, 12

**DISTRICT**  1:1

**dizzy**  207:6

**DKA**  109:10, 15
110:1, 4, 13  121:20
122:22  147:16
148:16  165:20
166:19, 20  167:5, 6, 8,
19  168:7, 10  184:20
217:15

**DM**  195:5

**doc**  241:3

**Doctor**  91:21  123:14
191:3  218:16  251:17

**document**  9:15
45:22  46:5  51:21
80:10, 12  82:1, 24
125:4  135:6  136:6
137:20  138:19
154:23  156:3, 6
157:24  158:8  159:23
160:7, 10, 11, 13
162:3  163:2, 3, 4, 6,
18, 20, 23  165:5, 21
171:21  174:4  176:8
182:18  186:20  187:4
189:20  190:3  194:5
203:3  204:3, 6
210:14  217:18  221:2
222:3  223:14  225:19
232:1, 6  237:5
244:11  245:8

**documentation**  11:21,
22  81:14  92:4  103:6
152:24  153:11  189:7
203:13  234:16  241:5
245:15

**document-based**
152:3

**documented**  70:24
74:7, 9  79:2, 11
80:22  90:17, 18, 20,
23  91:22, 23  92:2, 9,
18  144:1  153:15, 20
161:17, 24  172:18, 20
173:6, 9, 13, 17  174:4,
10, 17  175:22  176:23
178:7, 12, 16  179:2
182:4, 6, 7, 12  194:4
211:16, 22  212:1, 8,
14  224:8  245:11

**documenting**  223:12

**Documents**  5:7  54:1
81:1  128:8, 10, 13, 16
148:23  151:4, 20
154:13, 15  155:2
163:5  164:15

**doing**  98:6  100:21
120:17  122:14  150:2
151:1  189:6, 8
200:17  214:2  227:13
231:10  249:17

**Don**  159:2

**door**  34:4  58:23

**dosage**  92:18  222:11

**dosages**  212:5  232:22

**dose**  76:4, 6  78:6, 15
92:15, 17  93:18
101:2, 12  112:4
140:11  218:20

**doses**  78:12  101:5
166:23  189:9  244:24

**dosing**  217:16, 21

**double**  230:8

**DR**  1:17  3:8  4:3
7:9, 18  15:17  26:19
33:11  35:22  124:6
130:11  165:5  190:20
191:1  217:6  218:17
251:13  252:13

**drink**  227:2

**drop**  220:11

**dropping**  141:10

**drops**  166:15

**drowsiness**  192:19
215:12

**drowsy**  207:7

**dual**  17:4

due  73:7, *13*
duly  7:*10*
duty  200:7  206:4
235:*3, 11*
Duvall  130:*18*
dysregulated  166:*13*

< E >
E.F  172:22
E.K  15:*17*
earlier  32:*10*  65:*1*
81:*24*  82:23  83:7
85:*1*  93:6  120:*1*
127:7  136:*1*  140:7
147:22  150:*15*
156:*13*  162:*12*
169:*15*  190:*11*  194:9
212:2  214:*16*  217:8
222:23  224:*19*  229:2
237:*11, 12*  241:*16*
245:*3, 13*
early  33:23  34:*19*
161:*5*
easiest  70:*21*
EASTERN  1:*1*
eat  89:*13*  146:*11*
164:*18*
eaten  89:*1*  146:8, *13,*
*15*
eating  146:*18*
ECW  175:*16, 18*
234:*16*
EDS  206:*3*
educating  94:22
education  16:*18*
51:*15*  53:*11*  76:*13*
202:*18*
educational  16:*15*
effect  95:*15*  138:*13*
139:*17*  192:*19*
effective  141:*5*
effectively  84:*14*
effects  83:*13*  102:7,
*9, 11*  143:2  192:*13,*
*16*
efficient  16:*16*
efficiently  84:*13*
EHR  40:6  45:*9, 19,*
*21*  47:*3*  57:*12*  79:*13*
80:7  175:*19*  222:24

223:24  225:8, *11*
234:*17*
eight  146:*14, 16*
173:*5*  196:*17*
either  35:*11*  43:*18*
83:*13*  105:*18, 21*
114:9  117:*15*  147:23
193:8, *19*  250:*16*
elaborate  66:*21*
Electronic  45:*10, 13*
46:*1*  64:4  65:*3*  66:6,
*8*  73:*14*  74:*11, 15*
80:*21*  91:*5, 7, 9, 21*
92:*1, 3*  93:*3*  175:*8,*
*13, 19, 23*  176:*3, 5, 12,*
*14, 17*  223:2  225:*10*
elevate  146:*18*
elevated  98:*1*  101:*15*
102:*3*  112:*3*  117:*10*
145:*20*  203:*24*
213:*11*  234:*19*
245:*20*
elicited  220:*12*
Eliquis  246:*18*
e-mail  251:*19*
e-mails  35:*19*
eMAR  73:*15*  74:*10,*
*11, 14*  90:*19*  92:2, *10,*
*21*  93:7  163:*10, 13*
173:*19*  174:6  175:*5,*
*7*  176:*4, 5, 9, 11, 13*
221:*20, 24*  224:23
embolism  167:22, *24*
168:7, *8*
emergency  12:2
47:*10*  52:6, *8*  54:6
97:*8*  98:*14*  105:*10,*
*13*  106:*4, 6, 12, 17, 20,*
*24*  108:*17*  120:4
122:*11*  123:7  153:22
214:22  233:9
employed  15:*4, 20*
16:*20*  19:*5*  25:*13*
47:23  50:9  55:22
employee  31:*1*  39:*14*
56:*10, 21*
employees  39:*15*
55:*20, 21, 24*  127:*20*
130:*20*

employment  16:*15,*
*18*  58:3
employments  20:*5*
EMR  42:9
en  67:7  112:8
encompassed  46:*17*
encounter  23:*19*
45:23  61:*13, 15*
67:*19, 24*  68:*8, 20*
78:7, *20, 21, 23*  79:*3,*
*13, 17*  80:5, *13, 22*
81:6  95:22  110:*20*
114:23  119:23  137:8
157:*12*  175:*17*
204:*18*  245:6, *19*
248:*4*
encountered  93:23
encountering  77:*24*
encounters  78:*24*
79:*15*  110:*21*
encouraged  227:2
endocrinologist
181:*12*  184:8  195:*1*
197:*5, 8*
endocrinologist's
218:*4*
Endocrinology
194:*21, 22*
engagement  23:*19*
engine  42:*10*  61:*1,*
*19*  62:*11*  69:8  70:*10*
English  17:*5*  230:*11,*
*13*
ensure  21:*24*  90:*12*
134:*10, 19*
ensuring  44:*1*  104:7,
*18*  134:*5*
enter  176:*24*  222:*1*
entered  174:*20*
175:6  179:*15, 16*
206:*10*  224:*20*
entire  13:*16*
entirely  193:*11*  194:7
entries  224:23
entry  111:*11, 21*
environment  21:*1*
47:2  54:23  55:*13*
57:*16*  112:*19*  147:*12*
197:*17*  251:*11*

envision  118:*15, 23*
episode  185:2
episodes  121:*5*  167:*3*
182:*10*
equal  139:*3*
equipped  106:6, *8*
equivalent  184:*24*
ER  54:*3*  97:*20*  98:2,
*4*  110:*16*  111:*1*
122:*8, 13*  148:*13*
179:7, *10*  183:*15, 18*
Errata  255:9
ESQUIRE  2:*1, 4, 6,*
*17*  3:5, *12*
essentially  141:*19*
Estates  1:*4*
estimate  216:*19*
et  246:*18*
evaluate  38:*15, 19, 21*
53:*18*  137:*14*  169:23
170:*14*
evaluated  70:6
115:7  170:*3*  214:*17*
evaluating  169:*16*
evaluation  30:*13*
52:*13*  63:5  70:22
146:5  169:8  170:*1*
evaluations  11:*1*  31:2
evaluators  11:7
evening  187:*13*
208:*20, 21*
Event  14:6  128:6
135:2, *11, 17*  136:*9,*
*16*  237:*1, 15*  238:23
239:*17, 19*  244:*1*
eventually  55:9
74:*16*  86:*10*
everybody  6:6  25:6
36:*18*  81:*24*  82:*3, 4,*
*23*  83:*1, 2*  142:*11*
154:*11*
exacerbations  121:7
exact  149:23
exactly  86:*19*  87:*16*
91:*10*  160:22  173:*20*
199:*14*  220:7  249:*1*
exam  60:*21*
EXAMINATION  4:*5*
7:*13*
examined  7:*11*

**example** 20:*16* 47:*9*
48:*22* 61:*4* 62:*4*
65:*10*
**examples** 48:*19*
75:*21* 106:*3* 120:*24*
182:*11*
**exams** 145:*11*
**excess** 68:*14*
**excuse** 231:*14*
**exercising** 51:*11*
**exhausted** 75:*18*
**exhaustive** 48:*18*
50:*5* 60:*15*
**exhibiting** 11:*4*
**exist** 47:*24*
**existing** 157:*18, 20, 21*
**exocrine** 87:*8*
**exogenous** 85:*12, 16*
**expected** 204:*23*
**expedited** 6:*21*
251:*19, 23* 252:*5*
**expert** 21:*2*
**experts** 11:*7*
**expired** 236:*21*
**explain** 52:*1* 86:*3*
89:*24* 95:*5* 100:*22*
140:*23* 173:*20*
**explained** 78:*18*
191:*8* 197:*22*
**exposed** 112:*20*
**extenders** 29:*12*
**extra** 112:*4* 115:*22*
**eye** 126:*11*
**eyes** 111:*12*

< F >
**facilitate** 21:*10* 70:*22*
**facilitated** 23:*18*
**facilities** 11:8, *16, 23*
12:*3, 9, 14* 21:*24*
25:*20* 27:*13* 39:*7*
45:*14* 47:*19* 54:*19*
55:*23* 76:*10* 112:*1*
126:*19* 149:*2* 250:*8*
**facility** 12:*14* 14:*16*
16:*3, 6* 26:*3, 4* 56:*11*
59:*3, 19* 66:*19, 24*
90:*3, 12* 106:*5*
107:*11* 119:*9* 126:*3*
133:*13* 200:*1, 13*

**fill** 68:*19* 225:*21*
**filled** 114:*23* 153:*4*
**fills** 233:*3*
**financial** 18:*9*
**Find** 34:*23* 35:*5*
38:*3* 88:*21* 120:*16*
122:*1* 131:*17* 175:*1*
212:*16* 216:*1* 218:*13*
225:*6*
**findings** 65:*10* 152:*7*
206:*24*
**fine** 114:*16*
**finger** 141:*4* 220:*1, 7,*
*11* 230:*1*
**fingerstick** 206:*12*
221:*5* 222:*7*
**finger-stick** 140:*15*
**finger-sticks** 223:*13,*
*15*
**finish** 9:*9, 12* 46:*6*
**finishes** 183:*1*
**finishing** 17:*15*
**first** 7:*10* 8:*18*
17:*10* 25:*19* 60:*3*
67:*22* 72:*12* 153:*9*
156:*1* 231:*24* 247:*2*
248:*2*
**First-line** 139:*7*
**fit** 56:*4* 59:*1, 2, 4*
**five** 72:*13*
**five-to-ten-minute**
82:*13*
**Flag** 44:*19, 20* 45:*4,*
*6* 47:*11* 77:*18, 19*
78:*7, 11, 16, 20, 21, 23,*
*24* 79:*17* 80:*5, 13, 22*
81:*2, 6, 10, 23* 82:*6,*
*22* 83:*5* 93:*19*
144:*12* 178:*10* 245:*2,*
*5, 19* 246:*6, 9, 17, 19,*
*21, 24* 247:*3, 10, 12*
248:*4*
**flags** 44:*22* 79:*19, 22*
82:*2, 24* 244:*20, 21*
**FLOOR** 2:*10*
**flow** 90:*21, 24* 91:*4*
92:*24* 93:*2*
**flows** 46:*3*
**fluid** 121:*10*
**fluids** 119:*12*

**focus** 151:*16* 202:*20*
239:*21*
**focused** 239:*17*
**folder** 154:*17*
**folk** 139:*10*
**follow** 21:*17* 25:*7*
35:*1* 49:*22* 102:*16*
181:*23* 215:*6*
**followed** 35:*2* 199:*9,*
*10, 14*
**following** 49:*16*
215:*5*
**follows** 7:*11* 204:*17*
**follow-up** 21:*11* 63:*3*
69:*5* 79:*10* 81:*11*
140:*19, 24* 141:*2*
234:2, *4*
**follow-ups** 134:*17*
179:*16*
**fond** 230:*12*
**food** 146:*19*
**foregoing** 253:*4, 15*
255:*4*
**form** 7:*6* 76:*21, 24*
77:2, *5, 7* 79:*9* 81:*12,*
*19* 117:*2* 193:*17*
203:*22* 207:*12*
221:*15, 18* 224:*18*
225:*21* 234:*18*
240:*24* 247:*8* 255:*8*
**format** 160:*18*
212:*19*
**FORMER** 1:*8*
**forms** 182:*13, 14*
222:*22* 223:*5* 247:*8*
**formulating** 22:*8*
24:*12*
**forte** 136:*4*
**forth** 253:*6*
**forward** 34:*15* 42:*1*
195:*11*
**found** 234:*20* 235:*14*
**foundational** 68:*18*
**four** 18:*22* 25:*22*
26:*7* 173:*4* 218:*19,*
*24* 219:*2, 5, 9* 241:*22*
**Fourteen** 231:*1*
**frame** 129:*24* 230:*19*
**Framingham** 161:*12*

**fact** 101:*19* 207:*2*
209:*1* 223:*11* 234:*18*
**factor** 97:*12* 115:*21*
207:*4, 5*
**factors** 97:*1* 116:*1*
144:*4* 186:*9* 215:*21*
**facts** 12:*19* 130:*1*
**failure** 121:*8*
**failures** 13:*1*
**fair** 51:*3* 67:*10, 13*
69:*12* 148:*10* 224:*16*
229:*19* 245:*12*
**falling** 106:*23*
**falls** 28:*4*
**familiar** 9:*6* 24:*18,*
*23* 25:*6* 48:*2* 98:*20*
135:*9* 158:*5* 160:*10*
169:*13* 205:*14*
210:*18* 213:*6* 217:*1*
218:*14* 221:*14*
226:*19* 231:*24*
236:*10, 14*
**family** 18:*20* 141:*22*
202:*21*
**far** 39:*22* 72:*14*
103:*5* 109:*23* 153:*13*
173:*18* 239:*12* 243:*4*
246:*5*
**fast** 141:*13* 195:*11*
226:*17*
**fasting** 117:*17*
145:*24* 146:*6, 9, 16*
**fats** 117:*18* 147:*8, 9*
**fatty** 112:*13* 147:*10*
**febrile** 116:*3, 12*
**February** 14:*24*
158:*9* 221:*7, 14*
**feedback** 23:*9, 13, 14*
24:*4*
**feel** 55:*12* 148:*10*
**feeling** 117:*21*
147:*20* 206:*22* 208:*4*
**felt** 251:*10*
**fever** 116:*13*
**figure** 104:*3, 5*
114:*19* 118:*17*
**filing** 7:*3*

221:*4* 223:*4* 233:*15*
250:*13*

**FRASIER** 1:*10*
**Frazier** 236:*9*
**frequency** 19:*10, 12, 15*
**frequent** 90:*9*
142:22 198:*5*
**frequently** 142:*17*
143:*11* 188:*11* 220:2
**Friday** 6:*7* 241:*12*
251:*20, 24*
**front** 49:*20* 174:*23*
186:6 234:*23*
**FSBG** 140:*14, 19*
222:*7* 224:*12*
**fuel** 117:*18* 147:8
**full** 30:*10* 180:8
**full-time** 242:*14*
**function** 55:*13* 86:*21, 23* 112:*21* 164:*5*
167:*15* 174:6
**functions** 86:*24* 87:*7, 8*
**further** 14:*10* 28:*15*
30:*12, 13* 102:*11*
114:*18* 134:*15*
227:*24* 235:*21* 240:*3*
249:*23* 251:*14*
**future** 79:*14* 126:*12*

**< G >**
**gamut** 36:*7*
**GARDEN** 2:*5*
**gastrointestinal** 84:2
**gather** 130:*1* 207:8
**GAY** 1:*9* 3:*8*
190:*19, 20* 191:*1*
226:2, *15* 229:8
248:*14*
**GENA** 1:*10* 236:*9*
**general** 31:*19* 33:*21*
44:*12* 52:*15* 72:2, *9, 19* 108:*22* 118:*7*
147:*20* 149:*5* 170:*17*
189:*18*
**generally** 20:*14*
46:*14* 84:*16* 110:*17*
150:*17* 151:8 177:*11*
187:*21* 202:*19*

**generate** 61:*24* 62:*4*
86:*12* 127:*21* 136:*19*
144:*12*
**generated** 42:*13*
61:*13* 69:*9* 81:*3*
193:*17* 233:*10*
**generic** 203:7 208:8
**genetically** 184:*5*
**gentleman** 185:*7*
**getting** 47:*12* 52:*5*
54:*14* 67:*9* 71:*17*
89:6, *14* 94:*21*
111:*24* 188:*11*
249:*17*
**give** 9:*12* 10:2
20:*12* 23:*13, 14*
27:*24* 30:*21* 44:*4, 6*
51:*15, 18* 57:*5* 76:*12*
106:*17* 117:*23*
129:*18* 154:*11*
155:*12* 190:*10*
202:*13* 220:*23* 226:2
249:*20*
**given** 8:*5, 8* 42:*16*
46:*13* 47:*23* 48:*4*
49:*3* 50:*18, 20* 52:*8*
54:*11* 61:*3* 73:*9*
88:*24* 178:*19, 22*
191:8, *13* 200:6
211:*23* 212:*17*
222:*10, 11* 224:*9, 10, 13* 235:*20* 255:6
**gives** 44:*12, 13, 14*
**giving** 44:8 140:*11*
141:7, 8
**Glargine** 196:*13, 17*
**glasses** 154:*19*
**glitch** 223:*12, 21, 23*
224:*13, 17*
**glucometer** 216:*10, 12* 220:*13*
**glucose** 68:*13* 83:*10, 16, 18, 21* 84:8 87:*21*
90:9, *16* 91:*1, 21*
92:5, 6 97:*17* 98:*1*
99:*12, 16, 22, 23*
100:*19* 104:*10, 19*
116:*23* 117:*11* 119:8
140:*13, 15* 145:*17, 24*
146:*3, 12* 147:6

152:*19* 172:*14*
174:*19* 175:*14, 22*
188:*12, 16* 189:*3*
190:*15* 194:*17* 212:*5*
213:*12* 216:*1, 20*
218:*19* 219:*9* 220:*15, 17* 221:6 222:8
224:*24* 226:6 227:7
229:2 234:*5* 245:*21*
248:6
**glycemic** 139:8
**go** 9:*4* 10:*23* 20:*16*
25:*21* 29:*1* 34:2, *10*
41:*21* 42:*23* 43:2
51:*11* 52:*4* 58:*19*
59:*5* 70:*15* 71:*14*
73:*1* 107:*16, 24*
114:*20* 118:8, *18, 22*
123:*9, 20* 137:*1*
147:2 148:6, *11*
154:*12* 155:*24*
165:*16* 167:8, *18*
169:6 174:*9, 24*
177:*19, 22* 178:*5, 17, 20* 186:*5* 188:8
195:9 196:*11* 204:*5*
207:*14* 212:*14, 21*
215:*1* 224:*10* 235:*4*
238:*19* 244:*15* 245:*4*
247:*4*
**goal** 100:*10*
**goals** 103:2, 6 185:*18*
**goes** 60:*16* 69:*11*
108:*17, 20* 109:7
179:8, 9 183:*18*
**going** 6:6 8:*4* 9:*4*
10:*19, 21* 19:*20*
21:*13* 32:*10* 35:*3*
38:*13* 41:*3* 52:*11*
59:*19* 64:*12* 65:7
73:*21* 85:*18* 98:*5*
104:4 107:*1, 6* 109:*1*
114:*19* 116:*11*
120:*13* 121:*3, 4, 9, 19*
122:*21* 137:*17*
142:*16* 143:*19* 151:*9*
153:8, *19* 154:*12*
160:*9* 164:2 165:*22*
171:*5, 14* 179:*23*
181:*23* 194:*4* 204:6

207:*24* 208:*11*
214:*24* 221:8 225:*18*
226:*17* 231:*19*
235:*16* 237:*4* 243:*17*
244:*15*
**gonna** 186:*24*
195:*11* 246:*1*
**Good** 7:*16, 17* 9:*24*
112:*16* 164:*13*
**goodness** 18:*11*
**GORDON** 3:*12*
**gradually** 55:7
**graduated** 17:*3*
**graph** 155:*19*
**great** 149:*11*
**greater** 84:*20* 139:*3, 8* 140:*16* 146:*3*
157:*10*
**GREGORY** 3:*5*
164:22 229:*11, 17, 20*
251:*15* 252:*1*
**GROTE** 2:*1* 4:6
6:22 7:*15, 21* 64:*14*
82:*14, 20* 117:*3*
164:*12* 165:2 229:*14, 19* 230:*5* 244:*3, 10*
249:*20* 250:*5* 251:*21*
**ground** 9:*5* 147:2
**Group** 17:*21*
**guess** 25:*19* 47:*20*
55:*20* 102:*1* 104:*8, 11* 125:*11* 131:6
133:9 136:*5* 148:*24*
149:*4* 157:*16* 246:*13*
**guessing** 137:*19*
143:*20* 172:*19*
**guidance** 48:*13* 52:8, *23* 137:*13* 139:*24*
140:9 202:*13*
**guide** 49:*17* 52:*16*
54:2
**guideline** 141:*3*
**guidelines** 30:*13*
50:*4* 132:22
**guides** 49:*23*

**< H >**
**habitus** 184:*11*
**half** 164:*20*

**Hamright**  244:*15*
**Hamwright**  248:*1*
**hand**  184:*19*
**handful**  27:*21, 23*
**handle**  150:*18*
**handled**  31:*4*  76:*8*
  93:*12*
**Handwritten**  217:*13*
**happen**  31:*1*  55:*15*
  58:*9*  69:*17*  90:*16*
  102:*4*  110:*9*  131:*16*
  135:*20*  157:*16*
  228:*10*  237:*16*
**happened**  34:*23*
  35:*6*  38:*2*  80:*18*
  91:*19*  92:*5*  95:*24*
  128:*1*  129:*20, 22*
  130:*6*  135:*21*  180:*9*
  191:*6*  222:*20*  223:*24*
**happening**  88:*20*
  104:*22*  108:*13*
  118:*17*  218:*3*
**happens**  31:*11*  35:*9*
  79:*10*  80:*18*  85:*15*
  110:*9*  127:*14, 18*
  130:*9*  131:*10*  144:*18*
  183:*19*  186:*4*  200:*7*
  237:*19*
**hard**  51:*8*  94:*4*
  178:*23*  194:*1*  229:*24*
**hardening**  83:*22*
**harm**  238:*24*
**harmonize**  128:*15*
**HCS**  162:*23*  163:*8,
  11*  173:*15*  174:*22*
  175:*5, 7*  176:*1, 2, 4*
  178:*2*  194:*9*  211:*17*
  212:*3, 8, 22*  221:*24*
  224:*6, 10, 20, 23*
  234:*11, 13*  240:*21*
  241:*4*
**head**  9:*7*  213:*16*
**heads**  154:*12*
**Health**  45:*10, 13*
  60:*17*  63:*5, 7, 8*  64:*4*
  66:*6, 8*  74:*15*  80:*21*
  83:*17*  93:*3*  96:*6*
  127:*16*  130:*19*  145:*7*
  169:*1, 6*  170:*3, 10, 13,
  14, 21, 22*  171:*3, 9*

175:*9, 13, 19, 24*
176:*3, 12, 14, 18*
203:*1*  221:*17*  233:*9*
250:*7, 9, 23*  251:*3, 6,
7, 10*
**hear**  61:*20*  77:*15*
  95:*6*
**heard**  135:*1*  149:*7*
**heart**  121:*8*  166:*12,
  15*  167:*17*  186:*10*
**heavy**  184:*15*
**height**  108:*24*
**heightened**  84:*17*
**held**  16:*11*  72:*12*
  135:*13*  244:*7*
**help**  21:*2*  38:*22*
  87:*9*  166:*11*  179:*3*
  181:*13, 14*
**helpful**  185:*22*
**Helping**  128:*15*
**hemoglobin**  99:*21*
  162:*7*  186:*8*
**Henderson**  244:*14*
  248:*1*
**hepatitis**  60:*8*
**Herdman**  35:*22*
**hereinbefore**  253:*6*
**hey**  171:*12*
**high**  85:*19*  101:*9*
  105:*19, 21*  112:*17*
  187:*17, 22*  203:*21*
  204:*10, 20*  206:*13*
  216:*5, 12*
**higher**  30:*16*  86:*9*
  116:*24*  118:*5*  119:*8*
  198:*14*  210:*10, 11*
**highest**  209:*24*
**highlight**  160:*22*
  246:*3*
**history**  16:*16, 19*
  21:*4, 6*  60:*17, 18*
  61:*7*  62:*7*  116:*18, 22*
  117:*7, 12*  144:*20*
  146:*2*  169:*1*  183:*23*
  204:*14*  205:*11*
  226:*16*  227:*12, 19, 21*
**HIV**  60:*7*
**hold**  59:*12*  162:*19*
  213:*3*

**home**  18:*3, 11, 12*
  52:*20*
**honestly**  91:*16*  136:*2*
**hopefully**  89:*5*
**hormone**  83:*9*  211:*3*
**hormones**  167:*12*
**Hospital**  17:*11*  18:*2,
  3*  34:*8, 11*  36:*9, 10,
  11, 12*  37:*2, 9*  53:*2*
  59:*22*  106:*22*  107:*1,
  6, 10, 16*  108:*1, 8, 20*
  109:*7, 24*  110:*4, 13,
  23, 24*  111:*3*  114:*20*
  117:*8, 9*  118:*9, 22*
  119:*17*  120:*13*
  122:*22*  148:*7*  165:*23*
  166:*4, 7*  168:*15*
  169:*7*  172:*6*  173:*2*
  179:*14, 20, 21, 23*
  180:*2, 13, 15*  183:*6, 8,
  21*  186:*5, 21*  188:*9*
  201:*20*  205:*23*  206:*1,
  16*  207:*2, 24*  208:*12*
  209:*12, 18, 19*  214:*24*
  216:*17, 21*  217:*15*
  233:*6, 13*
**Hospitalization**  47:*10*
  122:*3*  148:*20*  180:*10*
  188:*5, 7*
**hospitalized**  210:*4*
  211:*14*
**hospitals**  218:*1*
**hour**  115:*8, 10*
  164:*21*  228:*8*
**hours**  70:*1, 14*  99:*3*
  115:*8, 11, 13*  130:*3*
  140:*20, 24*  141:*2*
  146:*14, 16*  196:*17*
  209:*9*  241:*14*
**housed**  26:*10*  250:*22*
**housing**  12:*8*  71:*10,
  12*  72:*4, 10, 18, 19, 23*
  75:*7*  87:*10, 13, 14*
  198:*4, 24*  199:*3, 4*
  250:*6*  251:*3, 7*
**Houston**  216:*24*
  217:*1*
**How's**  137:*24*
**HPI**  204:*12*

**HSA**  159:*1*
**HU**  3:*17*
**Humulin**  177:*13, 16*
  178:*8, 19*  195:*17*
**husband**  17:*12*
**hyperglycemia**  68:*11*
  98:*8*  111:*24*  114:*23*
  137:*6, 7*  138:*6*
  145:*16*  146:*22, 24*
  147:*18*  148:*14*  167:*4*
  184:*20*  185:*2, 12*
  195:*14*  204:*10, 18*
  215:*19*  227:*8, 15*
**hyperglycemic**  118:*3*
  145:*23*  167:*1, 14, 15*
  184:*23*
**hyperosmolar**  184:*22*
**hypertension**  48:*22*
  61:*7, 11, 12*  62:*7, 9*
  145:*12*  161:*10*
**hypo**  137:*6*
**hypoglycemia**  68:*10*
  137:*5*  138:*6*  140:*22*
  204:*17*
**hypotensive**  166:*14*
**hypothetical**  81:*10*
  97:*19*
**hypothyroidism**
  62:*19, 20*  211:*5, 6*
  215:*11*
**hypoxia**  168:*17*

**< I >**
**ICU**  165:*19*  172:*10*
  183:*13*
**idea**  30:*21*  141:*5*
  202:*1*
**ideal**  100:*12*
**identified**  10:*14*  22:*3*
  31:*18*  65:*16*  128:*2*
  132:*8, 13*  232:*15*
  243:*13, 21*
**identify**  31:*8*  60:*21*
  120:*5, 21*  157:*17*
  222:*19*  232:*21*  233:*7*
  240:*4*  249:*15*
**identifying**  10:*16*
  60:*19*  77:*20*  242:*21*
**ill**  98:*3*  99:*10*  118:*8,
  21*  147:*20*

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 84 of 114

Deposition of Dr. Lalitha Trivikram                     Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**illness** 96:9 97:4, 5, 15 202:9, 12 204:14

**illustrate** 62:3

**immediate** 107:5 234:4 239:22

**immunizations** 145:8

**impact** 97:1

**impacted** 238:18

**impair** 96:10

**impaired** 83:16, 18, 20 84:7

**imperfect** 179:5

**implement** 20:19 159:11

**implemented** 24:13, 17 134:6, 11 158:13 225:1

**implementing** 23:15 24:1 134:10 158:21

**important** 39:1, 5, 8 85:23 98:24 99:24 103:19 116:17 130:5 169:12, 21, 22 185:2 186:16, 19 233:11, 18

**imposing** 12:24

**impossible** 102:17

**improve** 133:8 136:17 243:23

**improved** 162:16

**improvement** 31:18 100:14 128:2 130:14 131:13, 14 132:7, 14 133:7 134:14 149:9 150:10 232:16 240:5 242:18, 22 243:12

**improving** 161:22

**inbox** 37:10

**incarcerated** 12:6, 13, 20 13:3 15:13 58:20 71:11 87:19 103:8, 15 125:13 126:24 129:10, 13 199:23

**incarceration** 41:19 64:21 72:13 233:4

**incarcerations** 240:18

**incident** 166:3 178:10 190:20, 21 191:5

**incidents** 239:14

**in-class** 42:8

**include** 90:24

**included** 28:20 61:9

**includes** 23:1 127:15

**including** 11:2 18:17 99:4 236:8

**incoherently** 213:22

**increase** 101:2

**increased** 167:13

**increases** 166:15 167:10

**independent** 180:12

**in-depth** 95:16, 22

**INDEX** 5:1

**indicate** 81:14 113:6 204:16 209:2 229:22 235:22

**indicated** 152:7 168:14 178:24 222:5

**indicates** 113:16 235:19

**indicating** 66:14 194:15 238:22

**indication** 81:17 100:4 162:7, 9 230:16

**indicator** 161:5 162:4

**individual** 10:6 26:15 99:1, 19 121:22 122:5 133:18 177:20, 22

**individualized** 89:19, 23

**individuals** 12:7, 13

**Industrial** 26:6

**infection** 167:9, 17 210:3

**infections** 121:4

**infectious** 58:6 166:10

**infirmary** 12:7 37:3, 15 51:6, 12, 17 52:4, 5 118:4, 13, 19 123:10, 12, 13, 15, 20 124:3, 7, 10, 12, 16 125:15, 20 179:8 198:7, 8, 9, 16, 22 209:16, 22 210:8

**infirmary-level** 210:11

**influences** 96:16

**informal** 171:11

**informally** 31:6 200:24 201:8

**information** 36:5 67:4, 5, 11 68:24 120:3 129:19 150:1 163:22 179:24 180:6 185:21 191:9, 12 194:10 199:17 204:16 206:14 207:8 211:18 212:4, 10 215:16 224:12, 17, 19 227:16 233:1, 19 239:5 240:21

**informed** 6:20 76:19 244:23

**infrequent** 94:9

**Ingrazia** 205:13

**inhibitor** 161:7, 8

**initial** 177:9

**initials** 172:22 173:7, 10 174:11, 16 177:2, 4, 8, 21 193:2 222:13

**initiate** 106:13 139:6

**initiated** 79:1 140:1

**injured** 107:23

**injuries** 60:22 65:15

**inmate** 77:10, 12

**inpatient** 18:1, 6 123:7, 21 209:13

**input** 30:7 136:12

**inspectors** 11:8

**instability** 105:16, 17 116:4

**instance** 26:19 129:22, 23 143:5 146:15 219:17 239:11

**instances** 37:21 65:5 118:11 122:9 124:18 169:11 170:19 200:19 225:19 239:16 240:2

**instituting** 142:23

**instructed** 49:22 78:22

**instructions** 217:5

**insulin** 74:21, 22 75:3, 8, 13, 22 83:7, 8, 14 84:7, 11, 12, 13 85:2, 9, 12, 13, 17, 21, 23 86:1, 6, 7, 8, 9, 12, 16, 17, 19 87:1, 11, 17, 21 88:2, 3, 5, 7, 12, 24 89:2, 13, 15 90:15 92:8, 13, 14 93:11, 15, 18 94:1, 10 95:24 97:10, 19, 24 98:10, 13 99:2 101:4, 5, 7, 11 102:21 104:9, 20 112:5 114:16 117:23, 24 139:10, 17, 23, 24 140:4, 12, 19, 21, 22 141:1, 6, 7 147:6 151:7 152:12, 18, 21 158:4, 12 162:24 164:3 166:23 167:13 177:16 180:22 181:20 182:3 184:5 185:8, 9, 10, 18 188:12, 16 189:3, 9 190:16 191:18 195:18, 19, 20, 24 196:2, 4, 12, 17, 20, 21 197:13, 15 198:11 212:5 213:15, 20 214:6 217:17, 23 218:21, 22 219:20 222:11 224:24 227:22 228:4 235:20 244:24 248:5 249:16, 18

**insulin-adherence** 155:3

**insulin-dependent** 184:1

**insulin-resistant** 86:13

**insulins** 196:16

**insults** 167:16

**insurance** 228:20

**intake** 41:6, 9, 12, 20 58:17, 18, 19, 23 59:24 61:10, 14, 17 62:2, 24 63:23 64:7 65:3, 5, 7, 22 66:13 67:14, 18, 20 69:6, 10,

22   72:4, 17, 18
151:12, 16   191:21
226:14, 20   227:11, 13
231:11   233:22
**intangible**   96:21
**intensive**   165:24
**intention**   96:17
**interested**   25:12   31:4
**Intermedix**   232:20, 23
**internal**   17:8   18:5,
24   112:19   141:21
147:11   243:3, 4
**internist**   17:24   19:13
**interrupt**   82:12
**interval**   70:20
**intervening**   239:14
**intervention**   235:18,
21
**interview**   63:11
**interviewed**   240:15
**interviews**   60:14
**introduce**   45:20
**investigate**   135:5
**investigating**   36:3
**investigation**   236:2
**investigations**   11:1
12:18
**involve**   19:6   45:7
84:20   96:6   101:6
128:8
**involved**   20:16
31:11   38:7, 9   96:9,
11   103:3   109:13
125:8, 10   132:19
134:9   135:16   148:18
208:14   225:22   232:5,
9
**involvement**   208:13
**irrelevant**   117:7
**ischemia**   167:17
**issue**   22:4   33:4   50:8
66:3   70:15   133:23
144:3   171:15   184:19
189:20   243:15
**issues**   22:2, 6   23:14,
24   34:13   35:8, 15, 23,
24   36:1   37:20   60:22
94:13   96:13   120:7,
10   135:13   141:20

142:8   144:21   170:4
181:10   200:23   214:4
**its**   86:11, 21, 23   87:6
108:2   137:11   149:1
168:8
**IV**   119:12
**IVs**   106:16

**< J >**
**JACOB**   1:4
**jail**   16:1   26:8   39:23
90:2   197:9   200:15
218:3, 10
**jails**   26:7, 15   149:24
**JAMES**   1:4
**January**   11:9   204:9
207:17, 19   208:12
210:23, 24   215:14
**Jefferson**   194:21
206:3
**JJSC**   26:12, 13, 19
**JKAMINSKY@KEIR**

**NANTRABACH.COM**
2:19
**Job**   1:23   17:12   39:2
111:19   155:2   199:5
**jobs**   19:6
**JOHN**   3:6   244:4
**JONATHAN**   2:17
6:12, 17
**JR**   1:4
**judgment**   51:7, 11, 13
52:10   119:6   150:8
229:24
**judgments**   52:17
**July**   160:2   196:1
**June**   237:8
**JUNG**   1:4   7:23
13:14   122:15, 19
128:6   135:22   136:12
148:16   164:16
165:22   166:22
168:13, 22   170:2
171:16, 18   172:2
173:1   179:7   180:14
181:7   182:1   183:14
186:23   187:12   188:8,
16   192:4   194:23
197:6, 12   199:21, 23

200:22   201:1, 19
203:18   208:11
210:23   214:4, 12, 14
215:10   217:15, 23
218:23   221:6   226:6
231:9, 10, 11, 16, 21
237:4   239:12   246:22
248:16, 22
**Jung's**   13:24   172:14
190:15, 22   227:12
236:4   240:9   249:2, 8
**juvenile**   26:12
228:15
**juveniles**   26:9

**< K >**
**Kalu**   15:17   33:11
130:11   217:6
**KAMINSKY**   2:17
6:12, 16, 17   64:12
117:1   244:5
**Karen**   213:4
**Kate**   26:20
**keep**   96:4   110:7
116:6   187:7   198:1
209:23   210:9   231:10
**KENNEDY**   3:6
**ketoacidosis**   11:5
99:5   109:16   110:1
112:9   147:3, 4   166:1
187:14   194:13
**ketone**   119:11
**ketones**   112:7, 11, 12,
15, 23   113:1, 4, 17, 22
114:4, 6, 12, 14, 21
115:2, 12, 15, 20
117:11, 15, 18, 20
147:10   157:12
204:10, 20, 21, 24
205:2   206:14, 19
215:20   226:10, 24
227:1, 4, 6
**key**   193:2, 4   207:4
**KIERNAN**   2:17
**KIMBLE**   3:5
**kind**   24:12   30:23
39:12   45:5   47:12
52:3   71:20   89:16
102:15   105:11
121:13   126:6   137:23

145:10   149:10   153:1
162:22   186:24   243:1,
2
**know**   9:14, 15, 21
10:22   19:19, 20
21:15   22:19, 23
24:21   29:17, 20
30:18, 24   31:9, 20
34:21   35:1, 7, 18
40:16   43:4, 24   44:9
46:3   47:1, 3, 24
48:15   49:5, 7, 10
50:17   54:5   56:22
57:21   62:8, 9   64:22
65:1, 4   67:14, 17
68:7   71:12, 16   79:22
81:22   82:1, 4, 5, 7, 23
83:2, 4   87:19   88:16,
18   89:5   91:17   96:5
100:7   103:12, 17
104:1   105:5   109:2, 6,
10, 12, 14, 23   110:5, 8
111:18, 19   119:11
120:7   121:2   124:1
127:23   131:23
134:24   135:4   136:24
145:5, 8, 13, 14
146:10, 13   149:7
151:17   153:9   154:18
155:6, 14, 18, 23
156:11, 14, 17, 19
158:7   159:6, 8, 23
160:10, 23, 24   163:8,
14   164:9   165:10
169:6   170:14   173:22
175:10   176:16, 20
177:14   178:15   182:8,
24   183:9, 19   186:1,
14, 19   187:2, 5, 7
192:6, 12, 18   193:1,
24   195:8, 16   196:3
197:3, 4   198:15, 18,
19   200:14   201:9, 23
202:2, 11   203:6, 10
204:22   205:10, 11
208:16   210:1, 14, 15
215:13   216:2, 14
218:2, 17, 23   219:3
220:20   222:16   224:6
225:4, 8, 11   228:9, 18,

21 229:14 230:7
231:3, 4, 23 234:23
235:1, 4, 13 236:7, 22
238:15 239:9, 15
240:8, 11, 12 241:6
242:17, 19 243:4
246:5, 11
knowing 81:5 185:22
knowledge 71:23
231:16
known 16:2 25:1
84:10 165:18 201:2
213:14

< L >
lab 181:22 230:19
labeled 158:4 160:3
laboratory 114:18
147:21
labs 36:1 144:23
laid 119:19
LALITHA 1:9, 17
2:20 4:3 7:9, 18 8:2
252:14
L-A-L-I-T-H-A 8:2
lancet 220:10
lancets 220:21
larger 162:20 204:5
late 187:12
LAW 2:4, 10 3:5
lay 139:10
lead 22:19 83:21, 23
84:22 132:5, 10
140:22 167:4, 12
leading 239:18
leads 83:15 84:7
learn 37:17 47:2
225:5 236:2
leave 241:21
Leaving 224:17
led 54:14 207:1
238:23
left 18:7, 10 123:8
leg 168:3
lethargic 65:13 116:7
letter 194:21, 24
level 25:18, 20 57:11,
13 84:18 91:1 92:6,
18 99:20 100:1, 7, 17
101:15 102:13

105:23 112:2, 6
115:23 116:15, 24
127:15, 19 140:13
145:17, 23 146:12
148:3 149:5 161:17
162:10 174:19
187:22 196:18 198:9,
14 202:23 216:1
220:15 222:8 226:6
227:7 230:15 232:11
237:19, 20 238:17
levels 83:10 86:9
91:22 97:17 99:12
100:7, 19 101:8
105:19 118:5 119:14
141:11 145:24
168:18 184:6 211:3,
8 212:5 220:17
Levothyroxine
210:16 211:1, 19
license 28:4, 11 53:4,
12 54:14 63:17
licensed 29:18 30:1
43:8 63:18
life 184:14, 22
life-support 106:9
lightheaded 207:6
limited 11:3 123:15
209:22 210:7
Linda 131:5 238:1
248:21, 24 249:4
Line 5:3, 7, 12, 17
71:18 254:5
link 168:7
linked 166:18
Lisa 1:19 130:18
253:3, 6
Lispro 196:13
list 48:18 60:15
73:6, 8 75:17 144:24
174:9
listed 19:4 107:3
173:4 174:7 184:16
215:22 225:20
literally 181:14
literature 17:5
little 38:20 49:18
53:15 57:8 69:3
89:17 99:3 100:22
117:24 120:15 124:1

138:1 141:15 143:3,
19 150:7 151:19
162:20 164:19 186:3
190:6 195:12 204:3
220:2
live 85:20 167:14
174:21
local 233:1
locally 24:13
located 250:11, 12, 14
location 26:11 73:20
lock 60:24
locked 69:10
locks 61:16
log 111:2, 12, 15, 16
222:4, 6
LOGAN 3:13
logs 120:3 122:8
LOLO 2:4
long 14:21 57:2
75:17 83:20 120:17
148:8 166:24 209:18
210:21
long-acting 177:16
195:18 196:15
longer 8:24 69:19
longer-acting 89:15
long-standing 195:14
long-term 18:16
look 22:3 25:14
33:19, 22 35:16 38:1
39:24 50:20 66:10
77:2 79:9 110:21
111:21 113:10
114:15, 17 116:18
120:5 121:15, 22
122:8, 9 126:7
131:14 132:23
136:17 149:21, 23
150:5 151:3, 6 155:1,
24 171:14 177:19
184:5 187:3 188:13
195:2 226:19 229:12
240:3 244:18 245:15
247:1 248:7
looked 151:5, 20
197:11 227:11, 19, 20
246:20 247:3, 21
248:3

looking 30:22 34:7
35:3 36:2 48:17
111:15, 22 120:10, 15
121:13, 21 123:3
133:6, 24 145:4, 6
149:17 153:3 176:8
215:24
looks 55:4 104:2
114:17 197:8 217:11,
12 245:3 246:19, 21
247:3, 7, 10 248:3
lose 86:11
loses 86:15
loss 83:24
lost 67:2 224:14
lot 33:20 88:19
96:19 111:20 121:19
155:1 160:9 198:10
233:21
lots 218:1
loud 9:7
LOUIS 1:4 186:23
192:4 217:14 221:6
237:3
low 105:19, 21, 22
168:19 207:3 211:3,
4, 8, 10
lower 216:4
LPN 30:1 43:6, 8, 19
155:10
LPNs 43:14, 18
lunch 164:19
lung 168:5

< M >
M.D 18:22
machine 220:13, 14
maintain 166:12
maintenance 11:23
145:7, 10
major 230:11, 13
making 23:6 57:24
139:21 150:9 231:5
246:13
manage 21:20 31:13
48:14 50:17 117:22
139:15 185:24
managed 139:20
167:5 187:21

**management** 54:*16*
73:*18* 101:*13, 17*
185:*5, 17* 186:*17*
**management's** 186:*18*
**manner** 74:*23* 75:*1*
93:*12* 233:*16, 19*
**MANSUKHANI** 3:*12*
**manual** 45:*24*
**MAR** 74:*4* 145:*3*
**March** 160:*6* 217:*12,
13* 246:*15*
**MARGO** 3:*17*
**MARIESHA** 1:*9*
2:*20*
**marked** 4:*6* 5:*12*
**MARKET** 2:*18*
**MARs** 225:*10*
**matter** 46:*21* 94:*11*
102:*15* 110:*3* 125:*24*
126:*16* 186:*14* 198:*2*
218:*6* 236:*11*
**matters** 41:*4*
**MAUREEN** 1:*9*
226:*2* 229:*8* 248:*14*
**Maurine** 226:*15*
**McCauley** 225:*12*
**McGettigan** 130:*18*
155:*7*
**McKinney** 213:*5, 6*
246:*3, 23* 247:*19*
248:*2*
**MD** 46:*21*
**meal** 89:*2*
**mealtime** 218:*21*
**mean** 24:*20* 36:*18*
39:*5* 43:*22* 44:*10*
48:*12* 50:*2* 55:*3, 19*
59:*10, 18* 63:*23*
66:*16, 22* 67:*21*
69:*15* 75:*20* 76:*1*
97:*5* 99:*9* 101:*16*
103:*24* 109:*15, 19*
116:*12* 117:*14* 121:*2*
127:*24* 130:*13* 133:*6*
143:*14, 21* 146:*7*
170:*6* 173:*21, 22*
174:*14, 18* 176:*23*
177:*18* 178:*13*
192:*24* 196:*14* 200:*9,
20* 204:*13* 211:*7*

213:*24* 216:*8* 218:*15*
223:*16* 224:*7, 8, 9*
228:*17, 19* 230:*7*
234:*22* 240:*13*
242:*10* 245:*6* 246:*5*
**meandering** 224:*16*
**meaning** 35:*21* 75:*2*
**means** 43:*8* 50:*3*
55:*5* 76:*3* 139:*11*
161:*19* 168:*18*
193:*10, 11* 203:*6*
212:*21* 214:*1* 216:*10*
227:*3* 234:*7* 238:*16*
241:*4* 242:*17* 253:*16*
**meant** 89:*15*
**measure** 109:*13, 19*
161:*4*
**measured** 172:*14*
**measures** 12:*24*
106:*9* 119:*7* 180:*13*
181:*24*
**med** 75:*8, 9* 87:*18*
88:*7, 9, 11* 90:*15*
**medical** 11:*2, 22*
12:*2, 8, 14* 13:*4* 15:*6,
8, 11, 22* 16:*1* 17:*21*
18:*8* 21:*4, 6, 22*
22:*10, 18, 22* 24:*17,
22* 25:*11, 16* 26:*14,
22, 24* 27:*7, 8, 9, 11*
30:*19* 31:*5, 7* 32:*23*
33:*2, 12* 37:*19* 39:*1,
6, 14* 40:*8* 41:*5* 42:*2,
12, 15* 43:*20* 44:*18*
45:*7, 12* 46:*13, 17, 18*
47:*8, 14, 19, 22* 48:*14*
49:*2, 10, 21* 50:*7, 9*
51:*1, 5* 52:*7, 24* 54:*2,
8, 11* 55:*22* 56:*3, 5, 8*
57:*3, 21* 58:*1, 21, 23*
59:*7, 8, 19* 60:*4, 17,
19* 63:*12, 14* 64:*19*
65:*3, 6* 66:*3, 13*
67:*14, 18* 68:*16, 19,
23* 70:*6, 12, 23* 74:*17,
18* 77:*9, 14* 78:*12, 14*
81:*21* 82:*3, 5* 83:*2, 4*
84:*21* 90:*1, 2, 11, 14*
92:*3* 94:*20* 95:*9*
96:*9, 17* 97:*4* 98:*9*

103:*23* 104:*7* 105:*10,
14* 106:*5, 6* 107:*12*
108:*1, 3, 18* 109:*5*
116:*18* 119:*19*
121:*17* 122:*6, 10*
124:*10, 12, 19* 125:*1,
3, 14, 20* 126:*6, 21, 23*
127:*2* 130:*7* 136:*11,
14* 142:*7, 19* 144:*20*
145:*9* 146:*21* 150:*22*
151:*22* 152:*24* 153:*4,
11, 14, 18* 156:*5*
162:*1* 169:*12* 185:*14*
190:*7, 14* 191:*3*
198:*5* 202:*8, 10*
203:*20* 206:*9* 227:*10,
12, 18* 234:*6* 235:*12*
238:*8* 239:*14* 251:*2*
**medically** 98:*17*
**medication** 11:*20, 21*
30:*3, 4* 41:*18, 20*
42:*1, 16, 21* 43:*5, 10,
21* 44:*8* 45:*22* 46:*4*
61:*12* 62:*23* 71:*4, 8,
13, 18, 21* 72:*1, 17, 22*
73:*2, 14* 74:*5, 7, 12,
20, 22* 76:*8, 11, 15, 16,
17, 20, 23* 77:*22* 78:*1,
5, 6, 11, 16* 79:*23*
81:*5, 16* 85:*2, 3*
93:*13* 95:*2, 14* 101:*1,
3, 20* 102:*6* 139:*6*
143:*22* 144:*15, 24*
152:*9* 161:*9* 164:*3*
170:*23* 171:*24* 176:*6,
19* 178:*21* 188:*1, 2, 9*
192:*3, 8, 20* 196:*6*
210:*22* 211:*24*
212:*16, 20* 214:*5*
218:*7* 219:*21* 231:*5*
245:*9* 248:*11*
**medications** 41:*14*
43:*13, 15, 17* 63:*2*
73:*9, 13, 17* 74:*2*
75:*5, 15, 19, 22, 24*
86:*14* 88:*4* 94:*10*
106:*16* 145:*2* 170:*15*
212:*7, 11* 232:*22*
244:*20*

**Medicine** 17:*6, 8*
18:*5, 24* 44:*11* 49:*14,
15* 50:*3* 141:*13, 22*
148:*7* 218:*17*
**meds** 197:*20*
**meet** 102:*8*
**meeting** 131:*18, 21*
135:*12* 237:*10, 18, 21*
238:*11, 13*
**meetings** 135:*17*
136:*16, 19* 237:*16*
**mellitus** 138:*22*
195:*5, 13, 15* 228:*13*
**member** 134:*15*
**memorized** 10:*22*
**memory** 183:*5, 10*
**men** 72:*7*
**mental** 63:*8* 97:*5*
147:*19* 168:*24* 170:*3*
202:*9, 12* 203:*1, 24*
213:*12*
**mentation** 105:*23*
116:*8*
**mention** 228:*14*
**mentioned** 27:*11*
45:*9* 61:*18* 74:*4, 5*
93:*6* 102:*5* 119:*10*
127:*8* 147:*22* 150:*15*
162:*6* 169:*15* 186:*2*
187:*23* 188:*17* 218:*5*
248:*13*
**metabolic** 99:*4, 8*
**metabolism** 83:*16, 19,
21* 84:*8* 112:*14*
**Metformin** 139:*7, 9,
12, 14*
**method** 220:*7*
**Meyer** 18:*22*
**MICHAEL** 2:*6*
**MICHAEL.PESTRAK
@PHILA.GOV** 2:*11*
**Michigan** 17:*9*
**microalbumin** 161:*1,
3*
**mid-level** 26:*21* 27:*1*
28:*3, 5* 30:*8, 16*
31:*11* 44:*13* 190:*7*
**mid-levels** 21:*18*
26:*24* 27:*4, 6, 15*

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 88 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

29:*11*  32:*12*
migrates  168:*4*
Milanase  218:*14, 17*
mild  211:*11*
mine  8:*14*
minimum  99:*15*
minor  29:*5*
minutes  140:*21*
missed  76:*6*  78:*6, 12*
81:*15*  93:*18*  166:*23*
213:*20*  246:*17*  248:*5,
10*
misses  76:*3*
missing  78:*15*  189:*9*
244:*20, 24*
Moaning  213:*22*
Mod  14:*17, 19*  26:*8*
mode  178:*5*
moderate  162:*15*
moderately  100:*13*
229:*3*
moderate-to-severe
238:*24*
module  42:*8*
moment  120:*1*  137:*4*
138:*18*  154:*17*
155:*12*  158:*6*  165:*8*
182:*23*  191:*23*
194:*20*  195:*2*  196:*9*
201:*18*  204:*2*  213:*4,
14*  223:*17*  226:*12*
231:*23*  232:*3*  239:*2*
243:*6*  249:*21*
MONDAY  1:*13*
241:*12*
monitor  102:*7*
106:*19*  114:*17*  143:*1*
188:*3*  220:*17*
monitored  112:*10*
123:*24*  218:*19*  219:*9*
monitoring  44:*2*
60:*20*  84:*18*
monitors  11:*7*
month  69:*21*  74:*17*
93:*7, 10*  223:*1*
months  69:*18*
142:*20*  143:*4*
moot  184:*19*
morning  7:*16, 17*
34:*1*  88:*14*

Mortality  127:*10, 11,
13, 18, 21*  128:*9, 17*
154:*2, 3, 6*  249:*6*
motility  84:*1*
mouthful  11:*12*
move  91:*4, 8*  155:*18*
187:*6*
moved  18:*18*  91:*5,
20*  198:*13*  250:*17, 19*
moving  42:*1*  202:*5*
multidisciplinary
127:*12, 14*
multiple  25:*20*
121:*16*  244:*19*
multispecialty  17:*16,
20*

< N >
name  7:*19, 21*  8:*1*
18:*12*  33:*13*  84:*2*
172:*2, 3*  182:*21*
186:*23*  203:*11*
207:*14, 18*  208:*8, 9*
218:*13*  223:*4*
named  221:*4*  236:*8*
names  193:*6*  201:*15*
narrative  239:*24*
nature  8:*11*  133:*14*
163:*24*
nausea  147:*19*
213:*19*
nauseous  116:*5*
Nazareth  186:*21*
NE  207:*7*
necessarily  36:*18*
37:*18, 23*  43:*4*  70:*7*
86:*2*  98:*5*  99:*18*
103:*21*  108:*9*  113:*6*
114:*13*  122:*4*  153:*3*
164:*7*  169:*22*  174:*14*
178:*13*  215:*3*  218:*2*
necessary  20:*20*
90:*15*  179:*17*
need  6:*6*  9:*20*  13:*4*
26:*18*  34:*14, 24*  35:*1*
40:*5, 6*  41:*24*  43:*3*
44:*16*  57:*7*  60:*20*
61:*11*  63:*18*  65:*14*
69:*5, 24*  76:*15*  86:*16*
87:*23*  88:*5*  90:*4, 7*

95:*4*  107:*4*  114:*18*
115:*8*  116:*23*  117:*8*
125:*7*  132:*13*  139:*23*
144:*21*  145:*8*  147:*2*
152:*4*  179:*15*  187:*3*
197:*24*  198:*1, 12, 13*
209:*20*  218:*20*
251:*23*
needed  21:*2, 8*  30:*14*
34:*12*  35:*16*  39:*23*
43:*16*  55:*10*  97:*24*
107:*15*  131:*15*  132:*3,
20*  133:*19*  134:*4*
151:*1*  185:*9*  227:*21*
230:*19*  251:*11*
252:*10*
needle  220:*22*
needs  21:*17*  53:*20*
57:*10*  70:*3, 20*  79:*23*
90:*9*  106:*4*  107:*24*
115:*22*  134:*15*  145:*7*
150:*7*  199:*13*  209:*24*
210:*6, 12*  218:*19*
negative  230:*9*
neither  221:*13*
nerve  83:*24*
NET  23:*20*  24:*1, 5*
68:*6, 10, 14*  137:*5, 7,
12*  138:*2*  204:*15, 23*
205:*1, 5*  215:*16*
227:*8*  233:*22, 23*
234:*18*
NETs  24:*2*  68:*17, 19,
24*
neurologic  106:*1*
never  215:*1*
New  17:*11, 14, 22*
39:*19*  106:*2*  223:*21,
23*  233:*2*
newly  58:*20*
night-shift  34:*17, 20*
35:*12*
Nodded  213:*17*
nods  9:*7*
noncompliance  78:*10*
94:*24*  98:*13*  169:*20,
24*  170:*4*  181:*1, 2, 15*
248:*6*
noncompliant  77:*21*
98:*17*  102:*14*  143:*6,

17*  145:*3*  169:*17*
201:*2*
non-compliant  213:*15*
noncritical  78:*10*
nonketotic  184:*23*
non-YesCare  55:*20*
56:*9*
norm  65:*16*
normal  65:*11*
105:*20*  123:*19*
145:*18, 19*  166:*11*
168:*19*  241:*17*
normally  116:*8*
Norristown  66:*18*
169:*7*  200:*4*  201:*19,
24*  233:*12*
no-show  193:*23*
194:*3*  211:*20*  212:*12*
no-shows  194:*3*
211:*16*
Notary  1:*20*  253:*3*
note  45:*22*  61:*1, 16*
69:*10*  79:*6*  143:*23*
165:*15*  182:*20*  187:*9*
203:*17*  204:*8*  206:*10*
207:*18*  208:*4*  209:*2*
213:*1, 4, 23*  214:*16*
218:*4*  226:*1*  229:*7,
13*  244:*12*  245:*2, 16*
246:*9, 13, 16, 19*
247:*11*  248:*9*
noted  167:*21*  241:*24*
247:*12*  255:*8*
notes  182:*12*  186:*2*
208:*18*  216:*7*  244:*16*
246:*17*  247:*1*  253:*5*
notice  10:*14, 16, 23*
47:*23*  163:*1*
notifications  235:*5*
notified  48:*5*  71:*14*
76:*5*  87:*20*  108:*7, 11,
19*  109:*3*  126:*15, 20,
22*  157:*14*  234:*10, 22*
235:*2*
notify  235:*15*
NOVEMBER  1:*13*
199:*24*  231:*13, 15*
236:*1*
NPH  195:*15, 17*

196:*16*  197:*1*
**nuances**  54:*22*
**number**  19:*5*  29:*22*
  139:2  149:*23*  164:*14*
  173:*18*  196:*10*
  216:*11*  231:22
**numbers**  26:*16*
  155:*21*  216:9
**NURSE**  3:8  25:*4*
  28:6, *9*, *13*  29:*9*, *10*,
  *13*, *19*  30:2, *10*  38:*16*
  44:7, *13*  46:20  60:*13*,
  *16*  61:*16*  62:*1*  63:*15*
  64:*1*, *2*, *6*  65:6  73:*1*
  74:*1*  76:12  77:5, *13*,
  *24*  78:7  79:*12*  81:*20*
  87:24  144:6, *10*, *12*
  173:*10*  174:*1*, *8*, *12*,
  *15*  193:*21*  200:*16*, *18*
  203:*1*  204:22  205:*19*,
  *21*  208:8  213:*3*
  217:*1*  219:*21*  225:*21*
  227:*11*  229:6, *9*
  235:8  244:*14*
**nurses**  29:*18*  35:*4*, *5*
  41:7  43:9  65:2
  67:*21*, *23*  82:7  87:*17*
  125:*3*  188:*18*  203:*12*
**nurse's**  44:5, *15*
  60:*11*  177:7  193:*1*
  229:7
**nursing**  18:*3*, *11*, *12*
  23:*18*, *19*  25:2  28:*14*,
  *24*  29:*16*, *17*, *21*, *23*
  31:22, *24*  32:*1*, *6*, *7*, *9*,
  *21*, *24*  33:3  40:*11*, *14*,
  *19*, *24*  43:*10*, *23*  45:5
  52:20  56:5, *7*, *23*
  57:*1*, *13*  67:*19*, *24*
  68:7, *20*, *21*, *22*  94:*19*
  104:8, *13*, *16*, *18*
  107:*15*  114:22
  119:22  137:8, *13*
  157:*10*, *12*  159:*16*, *20*
  164:*4*, *5*  188:*14*
  189:2, *20*  198:*19*, *21*
  199:*1*  204:*18*  210:6
  244:*23*
**NV**  213:*17*, *18*

**< O >**
**obesity**  184:*12*
**object**  64:*12*
**Objection**  117:*1*
**objections**  7:5  117:*4*
**objective**  206:*24*
**observation**  118:*19*
**obtain**  21:*4*  53:*11*
  60:*4*, *5*, *8*
**obtained**  80:*24*
  81:*12*  234:*11*  241:*24*
**obtains**  235:9
**obtunded**  116:7, *14*
**obvious**  106:2
**occasions**  65:*24*
  123:*14*
**occur**  93:5
**occurred**  190:20, *21*
**occurrence**  19:*23*
**occurs**  31:6
**o'clock**  241:22
**O'CONNOR**  3:5
**October**  15:9  156:22
  226:*1*  231:*12*, *14*
  234:9  235:*17*  241:*23*
**offer**  31:*14*
**office**  34:*4*  35:*3*
**Officer**  22:22  77:*14*
**OFFICES**  3:5
**off-site**  20:*17*  180:*21*
  200:9
**Oh**  18:*11*  71:7
  172:2  183:9  196:9
  204:*1*  207:*13*  209:*10*
  247:22
**Okay**  8:*24*  11:*12*
  14:*13*, *21*  16:*14*
  22:*11*, *15*  23:8, *17*
  30:*18*  36:20  43:7
  48:5  52:6  54:*1*, *5*
  57:2  58:*13*, 22  59:*23*
  62:3, *13*  63:*14*  69:*23*
  70:9  72:22  73:*16*
  74:3  75:*12*  77:*23*
  80:*14*, *20*  81:8  87:2
  97:*12*  98:7, *16*
  101:22  102:*24*
  103:*12*  105:5, *9*
  107:2, *14*  111:2, *8*, *17*

115:*10*  116:*1*  118:*3*
  122:7  123:2  124:*11*
  125:*11*, *21*  128:*21*
  129:*21*, *24*  137:*11*, *17*,
  *22*  138:*1*  140:8, *14*
  142:*10*, *15*  144:*16*
  145:*13*  151:8, *14*, *19*
  152:*18*  154:5, *22*
  155:*12*, *15*, *16*, *21*
  156:20  159:7, *18*
  160:9, *20*  163:8, *11*,
  *17*, *21*  165:*14*  168:6
  170:6  172:*12*  175:6,
  *21*  176:*11*, *22*  177:*4*,
  *13*  178:7, *23*  179:*19*
  180:*11*  182:8  183:*3*,
  *17*  185:*1*, *13*  186:*18*
  189:*18*, *24*  191:*23*
  192:*3*, *18*  193:6, *9*, *12*,
  *15*  194:*12*  195:*4*, *10*,
  *11*  196:*21*, *24*  197:*10*
  201:6  202:*1*, *7*
  203:*10*, *17*  204:*4*, *15*
  205:*4*, *7*, *17*, *21*  207:*2*,
  *5*, *13*  208:*10*, *16*
  211:*15*  212:2, *20*, *24*
  214:*3*  216:*16*  218:*12*
  219:*16*  221:*23*  223:*4*
  224:*3*  225:*16*, *24*
  226:*4*, *12*, *13*  228:9
  229:9  230:*14*, *23*
  231:8, *9*  232:*4*, *19*
  235:*16*  237:*14*, *20*
  238:5, *14*  239:*4*
  241:8, *16*  242:*16*
  243:8  245:*1*, *24*
  246:*12*, *15*  247:*14*, *18*
  248:5, *9*, *13*  250:*18*,
  *21*  251:*13*
**omission**  99:2
**omissions**  238:*18*
**onboard**  56:*18*
**onboarding**  39:*21*
  45:*1*  48:8  49:*4*
  51:20, *22*  54:*18*
  56:*11*, *15*  57:*3*  78:*18*
**once**  18:*20*  39:*21*
  46:6  59:*3*  122:*17*
  148:*15*

**ones**  43:*12*  47:*12*
  149:*13*  159:*16*  236:8
**one's**  154:*17*
**one-size-fits-all**  89:*11*
**ongoing**  58:2, *14*
**on-site**  200:*10*, *11*
**operates**  197:24
**operation**  27:4
**Operations**  23:2, *4*
**opiates**  61:5
**opinion**  249:8
**opioid-overdose**  8:*17*
**opportunities**  126:*10*
  232:*16*
**opportunity**  35:*13*
  126:8  243:*21*
**opposed**  25:3, *4*
  72:*18*  203:*11*  220:5
**options**  100:*17*
**Oral**  1:*16*  86:*14*
  101:*1*  139:6, *14*, *21*
**orally**  116:6
**order**  6:7, *18*  41:*15*
  44:*4*, *12*, *13*, *14*, *16*
  45:*21*  46:*3*  61:*10*, *14*
  62:*24*  68:*24*  70:*15*,
  *23*  200:22  204:*4*
**ordered**  41:*19*  44:8
  191:*18*  219:*4*, *19*
  227:22  245:*10*
**orders**  34:*12*  41:*11*,
  *13*  44:*1*  65:*14*  66:*3*
  98:9  143:*12*  179:*15*
**organizational**  25:*14*
**organized**  25:*11*
**original**  253:5
**originates**  168:2
**Osteopathic**  218:*16*
**outcome**  8:*14*, *21*
  181:*17*
**outcomes**  126:*12*
**outline**  204:*4*
**outpatient**  18:*1*, *5*, *6*,
  *24*  19:*14*  52:*19*
  103:*11*  141:*21*
  197:*19*
**outside**  11:6  12:*14*
  34:*4*  59:*19*  80:*20*
  90:*14*  185:*1*  199:8
  217:*21*

overall  104:*11*
*230:17*
overcome  180:*24*
overdose  109:*9*
overlook  189:*10*
overnight  34:*24*
oversee  15:*12*  20:*15*
*40:18*
overseeing  16:*4, 7*
*57:22*  104:*16*
oversees  32:*9*
oversight  30:*19*
*39:13*
overview  20:*13*
*149:10*
overweight  184:*15*
oxygen  105:*19*
*106:14*  168:*18*

< P >
p.m  88:*14*  195:*24*
*197:3*  207:*15*  209:2
*222:18*  235:*17*
*246:18*  252:*15*
P1  242:*24*
PA  2:*19*  3:*6, 14*
*46:20*  213:*6*  246:*23*
*247:19*  248:2
PAGE  4:*5, 6*  5:*3, 7,*
*12, 17*  140:*19*  155:*13*
*156:1*  157:*8*  165:*9,*
*13, 17*  183:2  187:*16*
*195:4, 9*  196:*10*
*216:3*  221:*9*  237:*3, 4*
*239:3, 6*  240:*20*
*243:10, 16, 19*  254:*5*
pages  155:*17*  226:*16*
*255:4*
pain  121:*5*  180:*19*
*213:16*
pancreas  84:*6*  86:*10,*
*11, 15, 18, 20*
pandemic  108:*24*
paper  223:*14*
papers  34:*7*
paperwork  20:*18*
*34:2*  35:*4*  67:*1*
*179:14, 20, 21*  180:2
*233:7*
paracenteses  121:*9*

parameter  173:*14, 17,*
*23*
parameters  174:*24*
paraplegic  198:*12*
parcel  153:*17*
parentheses  242:*23*
part  42:*9*  48:*8*  49:*3,*
*13*  50:*18*  51:*19, 20,*
*21*  52:*24*  54:*9, 20*
*65:21*  74:*14, 16*
*80:14*  86:*1*  93:2
*147:13*  151:*21*
*152:21*  153:*16, 17*
*170:1*  172:*7*  175:*4, 5,*
*7, 8*  176:*9, 12, 14*
*191:20*  202:*17*  212:*3*
*222:24*  226:*13*
*239:16*  240:*6*
participates  132:*16*
particular  13:*24*
*16:5*  72:*12*  150:*3*
*200:15*  212:*18*
*228:23*  242:*7*
Particularly  14:*1*
*230:11*
parts  212:*6*
pass  75:*8, 9*  87:*18*
*88:7, 9*  90:*15*  218:*7*
*219:21*
passes  30:*3*
pathway  50:*23*
*138:9, 21, 23*
pathways  24:*7*  48:*10,*
*13, 16, 19*  49:*3, 12, 16,*
*23*  50:*11*  67:*16*
patient  8:*13*  14:*5*
*19:16*  20:*19, 24*
*21:11, 16, 20*  30:*6, 9*
*34:10*  38:*7, 10, 13, 15,*
*17, 19, 20, 22, 23*
*42:11, 14*  46:*9, 24*
*49:17, 20*  51:*16*  52:*2,*
*5, 14*  53:*16, 18*  59:*1,*
*15*  60:*3, 14*  64:*5*
*65:7, 12*  66:*7*  70:*3, 5,*
*19*  73:*11*  76:*3, 5, 14,*
*18, 20*  77:*16*  78:*1, 4,*
*8*  80:*6*  81:*1, 15*  89:*8*
*90:8, 9*  94:*6*  95:*18*
*96:15*  99:*14, 19*

100:*1*  102:*14*  103:*2,*
*10*  105:*12*  106:*13, 18*
*108:4, 17*  114:*12, 14,*
*21*  116:*3, 4*  117:*6, 10,*
*14, 15*  118:*2, 12, 16*
*119:13*  121:*15*  122:*6*
*123:6, 16*  125:2
*126:23*  127:*9*  128:*6*
*129:18*  134:*22, 23*
*135:1, 11, 17*  136:*9,*
*15, 18*  137:*14*  142:*24*
*143:6*  144:*7, 10, 14,*
*17*  145:*7*  148:*18*
*165:18*  166:*13, 16*
*169:23*  170:*23*  171:*8,*
*13*  172:*3*  175:*15*
*179:13*  181:*7*  182:*1*
*185:6, 17*  186:*1, 6, 23*
*187:24*  193:*20*
*197:18*  200:*20*  205:*8,*
*10, 11*  206:*1, 2, 21*
*208:22*  210:*9*  211:*12,*
*14*  214:*1*  219:*7, 14,*
*23*  221:*1*  231:2
*233:3, 5*  236:*21*
*237:1, 15*  238:*18*
*244:24*  245:*7, 8, 20*
*251:9*
patients  15:*13*  16:*5*
*18:2, 15*  19:*7, 11, 20,*
*24*  20:*4, 15, 16*  21:*3,*
*5, 9, 23*  27:*12*  29:*4*
*30:6*  36:*10*  41:*11, 14*
*55:8, 9, 14*  57:*16*
*69:5*  71:*18*  72:*1*
*73:10*  76:*21*  77:*20*
*85:11*  87:*20, 23*  88:*4*
*89:12*  90:*6*  94:*9, 13*
*96:12, 19*  103:*7*
*110:19, 22, 23*  115:*7*
*118:3*  121:*8, 16*
*129:13*  139:*18, 19*
*142:17*  145:*11*  146:*1*
*148:13*  149:*20*  162:*1*
*166:22*  169:*16*
*170:10*  171:*3*  183:*20,*
*24*  198:*9*  201:*10, 23*
*202:5, 9*  209:*23*
*215:8, 9*  220:*16*
*233:14*  250:*7*

patient's  21:*3*  60:*16*
*64:7*  66:*6*  79:*4*  80:*6*
*89:19*  93:*3*  96:*7*
*97:1*  102:*13*  103:*4*
*105:23*  125:*5, 9*
*142:6*  144:*19, 23, 24*
*147:15*  157:*13*
*169:13*  175:*8, 12*
*179:19*  205:*9*  218:*18*
*222:24*
pattern  121:*24*  122:*4*
patterns  120:*6, 12, 21,*
*24*  121:*14, 15*  122:*1*
pay  169:*8*
PD2  242:*24*
PDP  11:*6, 8, 15, 23*
*12:3, 8, 13, 21*  25:*11,*
*20*  30:*20*  39:*7*  40:*3*
*42:22*  45:*14*  47:*11,*
*13, 15, 19*  48:*4, 9*
*54:5, 19*  55:*23*  56:*10*
*64:3*  66:*8*  67:*7*
*76:10*  85:*4*  93:*24*
*106:5*  107:*11*  112:*1*
*114:13*  118:*4*  119:*9*
*126:2*  141:*17*  142:*18*
*149:2*  196:*22*  199:*23*
*209:9*  220:*18*  227:*12*
*236:3*  239:*13*  250:*8*
PDP's  71:*23*
peaks  196:*16*
pending  246:*4*
PENN  2:*18*  17:*5*
PENNSYLVANIA
*1:1*  2:*5, 11*  18:*18*
*253:4, 10*
people  13:*4*  20:*8*
*35:23*  36:*4, 21*  39:*11*
*51:14*  71:*11*  73:*8*
*99:11*  103:*3*  104:*24*
*109:2*  121:*19*  129:*11*
*150:16, 18*  198:*1*
*211:2*  240:*15*
people's  65:*2*
percent  99:*22*
perform  29:*5*  30:*6,*
*10*  149:*1, 14*  157:*11*
*219:22*
performance  31:*2*

149:8

**performing** 104:10
**performs** 150:12
**period** 69:18 99:23
120:20 158:14
188:21 196:19 217:7
239:15
**periodically** 111:9
131:23
**periods** 166:24
**peripheral** 83:24
168:2
**permitted** 220:16
**persistence** 186:1
**person** 12:20 58:20
63:17 66:15 67:6, 11
107:5, 24 123:20
125:13, 15 126:24
242:2
**personally** 94:12
148:12, 17
**persons** 11:3, 4
**perspective** 56:15
71:10, 21
**pertain** 47:8
**pertaining** 12:6, 12,
17 47:13 58:15
118:14 122:2 154:13
164:16 224:24
**pervasive** 171:15
**PESTRAK** 2:6 6:13,
14 252:3, 4
**ph** 15:17 130:19
148:3 218:14 238:2
**pharmacies** 233:2
**pharmacy** 73:5 157:1
**phase** 86:13
**PHILADELPHIA**
1:8, 9 2:5, 10, 11, 12,
13, 19 3:6, 14 7:24
15:14 19:2 26:6
35:21 47:7
**Philly** 26:11 127:15
**phone** 199:19 235:7
249:21
**phrase** 228:16
**physical** 60:21
130:19 142:2
**physically** 173:18

**physician** 29:2, 12
30:8 44:12 183:14
**physicians** 16:8
**physician's** 28:7, 23
29:6, 14 213:5, 8
246:2
**PICC** 26:13, 23
200:4 250:16
**pick** 199:19
**picture** 115:23 157:9
**pinpoint** 91:19
**place** 23:10 36:16
41:13 60:5 75:7, 10
80:2 106:13, 16
111:6 144:8 150:11
174:19 175:21 179:1
180:14 202:5, 6
253:5
**placed** 34:3, 6 36:13
37:3 91:6 118:12
220:12
**placement** 12:6
**places** 19:5
**Plains** 17:22
**Plaintiffs** 1:6, 18 2:6
6:23 10:15
**plaintiff's** 7:22
**Plan** 14:3 38:23
101:14, 17, 18, 21, 23,
24 102:3, 4, 15 127:8
128:5 132:6, 10, 17,
23 134:6, 14, 19
136:24 149:9 150:10
158:5, 13, 17, 22
159:5, 10, 19 163:16
195:12 231:20 232:2,
10, 13 242:18 243:23
**plans** 133:5
**play** 22:8 144:4
**players** 57:14
**please** 7:24 9:15, 19,
22 16:21 100:23
109:8 153:6 165:10,
12 171:14 187:4
229:13
**plenty** 199:22 227:2
**point** 55:11 86:11
88:9 96:4 111:13
130:11 139:21, 23
149:12 173:3 184:19

197:10 215:1 227:14
232:7
**Policies** 11:14, 19
12:1, 5, 11, 16, 23
22:9, 19, 20, 23 23:10,
12, 24 24:12, 16, 19,
23, 24 25:2, 6, 9 42:7
46:15 47:6, 13, 18, 20,
24 48:1, 4, 6, 9
**policy** 23:15 44:19,
21 45:4, 6 46:17
47:9, 10, 11 54:6
77:18 93:19 157:18,
20, 21
**poor** 195:14
**poorly** 100:18
116:22 161:21 162:5,
11, 13 194:16 229:4
**population** 72:2, 9, 19
94:6 103:16 118:7
136:18 221:1
**position** 32:5 104:14
242:4, 11
**positive** 168:13
**possible** 22:1 83:17
89:21, 23
**post** 140:19
**post-high-school**
16:18, 22
**post-hospitalization**
124:2 209:20
**potential** 103:14
168:6 192:19 240:5
**Potentially** 99:7
115:14 194:10
**PPD** 60:5
**PPW** 233:6, 7
**practical** 29:18 30:2
43:9
**practice** 17:16, 20
18:8 28:17, 21, 23
29:3 46:8 49:15
53:4 55:4 89:22
103:11 123:19
141:22 152:1 183:18
189:18 197:19
202:21 207:23
**practices** 11:14, 19
12:1, 5, 11, 17, 23
151:12, 16 152:10

**practicing** 49:14
218:10
**practitioner** 28:9
31:12 44:14 46:20
200:17, 18 203:2
229:9 244:14
**practitioners** 16:7, 8
21:19 25:5 26:17
28:6, 13 29:9, 10, 13
31:10, 20
**preceding** 173:3, 4
**precipitating** 239:22
**preemptively** 18:10
**prefer** 196:12
**Preferably** 77:13
**prepare** 11:16 13:6
14:11 249:7
**prepared** 10:2, 20
11:10
**preparing** 238:6
**prescreening** 59:24
60:1 63:22
**pre-screening** 63:10
**prescribed** 97:18
217:24 218:23 219:1,
8
**prescribing** 171:1
**prescription** 233:3
**prescriptions** 232:21
**prescriptive** 50:6
**presence** 112:23
114:3, 6 115:20
206:19
**present** 1:21 3:17
30:11 77:15 79:14
97:13 108:12 112:15
113:22, 24 115:16, 24
148:1 184:13 198:16,
21 199:2 204:14
226:24 227:1, 4, 6
237:21, 23
**presentation** 118:1
121:6 147:18 184:9
212:15
**presented** 20:6 167:6
**presenter** 238:2
**presenting** 205:8, 9
**presents** 19:17 52:14
58:21 133:2 137:15

**President** 23:*1* 32:8
40:*17* 104:*12*
**pressure** 41:*18, 20*
105:*18* 161:9 166:*12,
16* 207:*3*
**presumably** 172:*23,
24*
**Pretty** 18:*4* 33:*23*
35:*19* 56:*17* 79:*19*
109:*12* 133:*3* 160:8
200:*13*
**prevent** 126:*12*
161:*11*
**preventable** 249:9, *11*
**prevented** 249:*13, 14,
19*
**previous** 16:*15*
247:*15*
**previously** 246:*20*
**prick** 220:*10*
**primarily** 18:*24*
**primary** 141:*19*
215:*7* 217:*5*
**printed** 217:*11*
**prior** 9:*23* 15:*15, 18*
16:*11* 20:5 21:6
41:*18* 64:*21* 89:2
92:*23* 169:*3* 179:*23*
187:9 221:*23* 223:*1*
233:*4* 240:*17*
**prison** 8:*16, 19*
66:*18* 217:*17, 22*
**PRISONS** 1:9 2:*13*
15:*14* 19:*3* 35:22
47:*7*
**privy** 202:*4*
**PRN** 27:*21*
**probably** 9:*5* 70:*21*
104:*11* 105:*13*
106:*24* 115:*19*
122:*18* 148:9 167:*7*
189:*4, 5* 201:22
206:22 207:*3* 216:*15*
217:*16* 221:*19* 225:8,
*18* 234:*17* 249:*5*
**problem** 105:*1*
121:*24*
**problems** 22:*3*
**procedures** 28:*20*
29:5 59:*24*

**process** 31:*19, 24*
57:*3* 58:*19* 71:*4, 15,
17* 133:*23, 24* 135:*5,
10* 150:2 151:*22, 23*
152:*3* 179:*18*
**processes** 45:*20*
**produce** 84:*12* 85:*12*
86:*7, 16*
**produces** 86:*19*
**Production** 5:*7*
83:*15* 87:*1* 160:2
**profession** 202:*18*
**professionals** 45:*19*
55:22 56:*3* 251:8
**progress** 79:6
182:*20* 203:*17* 204:8
207:*18* 208:*4* 213:*1*
226:*1* 244:*12, 16*
246:*16* 248:9
**pronounce** 177:*14*
210:*15*
**pronouncing** 7:*19*
**proper** 13:*1*
**properly** 39:2 104:9,
*19* 147:*7* 153:*4, 14,
19*
**propounded** 255:*7*
**protected** 73:*24*
**protein** 161:*4*
**protocol** 119:*4, 5*
126:*4* 179:*10*
**protocols** 24:*13*
**protrusion** 220:*22*
**provide** 13:*1* 20:*3*
24:*4* 28:*11* 33:*1, 3*
34:*19* 39:6 41:*10*
50:*23* 69:*1* 101:*5*
106:6 137:*13* 180:*15*
215:9, *10*
**provided** 26:*19*
30:*19* 37:8 42:*7*
48:*1* 52:*23* 53:9
54:8 85:*16* 103:*13*
143:*12, 18* 163:*18, 21*
181:*5*
**provider** 20:22 27:2,
*18, 20* 28:*16* 30:8, *12,
14, 15* 34:*17, 20*
35:*12* 36:*15* 37:*11*
38:*11* 39:*19* 41:22

42:*4* 44:*7* 45:*7* 46:2,
*23* 50:9 53:5 55:6, 8
56:*14, 19* 57:*4, 22, 24*
58:*1* 61:*14* 65:6, *18,
21, 23* 66:2, 5 68:*16*
70:*12* 76:4 78:8
79:*18, 20* 80:*10*
90:*11* 107:*12, 17*
108:2, *14* 119:*20*
125:*7, 9* 142:*19*
150:6, *7, 24* 157:*14*
169:*12* 170:22
171:*18* 174:8 177:*18*
182:*12* 185:*15, 22*
199:*12* 200:5, *9, 10,
11, 14* 203:5, *14*
205:24 206:*4, 5, 7, 10*
208:6, 8 217:5, *21*
218:*13* 225:*20* 226:2
227:*18* 234:*10, 21, 24*
235:*3, 6, 8, 11, 13, 15*
241:*24* 242:*1, 12*
244:*21* 245:*10, 23*
246:2
**providers** 21:*15*
27:*19, 21* 28:*14*
32:*24* 38:*18* 40:9
41:*5* 42:2, *15, 18*
43:*3, 20* 44:*18* 45:*12*
46:8, *18* 47:*16, 22*
49:2, *11, 21* 51:*1, 5*
52:*7, 24* 54:2, *9, 11*
56:6, 8 57:*3, 6, 7*
67:*21* 68:*19, 23* 82:5
83:*4* 90:*12* 108:*19*
125:*14, 23* 162:*3*
170:*3* 171:*12* 181:*4*
190:*7, 15* 200:*19, 21*
202:8 215:*4* 235:2
242:6
**provider's** 46:*13*
65:*17*
**provides** 67:*1*
**providing** 12:2 23:9
140:9
**provision** 11:*14* 47:*8,
14* 54:6
**provisions** 151:*11*
**psychiatric** 168:*21*

169:*10, 14, 19* 192:8
**psychiatrist** 203:*1*
**psychiatry** 202:22
**psychologist** 96:*12*
**psychotropic** 63:*1*
75:22
**Public** 1:*20* 253:*3, 6*
**pull** 73:6 79:*21*
173:*16* 174:9 175:*12*
176:*16, 18*
**pulled** 173:*23* 175:*11*
**pulmonary** 167:*21,
24* 168:*7, 8*
**pulse** 105:*20*
**purpose** 76:*16*
136:*15* 137:*11, 12*
141:*23* 207:*7*
**purposes** 40:*4*
**pursue** 104:*23*
**pushes** 168:9
**put** 74:*18* 111:*12*
144:6, 8 150:*10*
154:*19* 174:*16*
175:*11* 176:*17, 19, 21*
177:2 180:*14* 245:*1*
**putting** 37:*11, 13*

**< Q >**
**QI** 130:*10, 13, 16*
131:9 149:*13* 150:*14,
16, 18* 151:*21* 155:*10*
**QIP** 242:*16, 17, 19*
**qualitative** 243:*1*
**Quality** 130:*13*
132:*18* 149:8 242:*17*
**quantification** 161:*19*
**quantify** 94:5 110:*14*
**quantitate** 19:*19*
113:*14*
**question** 9:*11, 12, 17,
19, 22, 23* 20:*1* 39:*3*
42:*24* 47:*4, 6, 17*
52:6 68:*18* 87:*4*
89:*5, 7* 92:8 94:*21*
105:*11* 145:*15*
151:*24* 152:*23* 153:6
161:2 171:*4* 185:*19*
186:*13* 224:*15*
225:*17* 226:*18*

236:*13*  243:*17*
**Questionnaire**  226:*17*
**Questions**  5:*12*  7:6
8:*5*  20:*20*  21:*19*
31:*9*, *13*  36:*3*  38:*4*
44:*16*  46:*10*  51:*9*
59:*13*  60:*15*  62:*1*
74:*21*  75:*13*  83:6
122:*12*  128:*24*
151:*10*  152:*5*  154:*16*
156:*1*  160:*20*  164:*15*
180:*1*  187:*2*  195:*3*
207:*9*  226:*20*  244:*17*
251:*14*  255:6
**quick**  6:*5*  195:*3*
244:*17*  249:*24*
**quicker-acting**  195:*20*
**quickly**  110:*10*
130:*4*, *6*  137:*18*
141:*7*  186:*24*  204:*11*
**quieter**  34:*1*
**quite**  17:*1*  39:8

**< R >**
**random**  32:*17*  146:*3*,
*10*
**randomly**  32:*15*
**range**  56:*6*  57:*5*
65:*11*  100:*12*  145:*18*,
*19*  148:*4*, *5*  162:*14*
**ranges**  100:6
**rare**  65:*24*  123:*14*
**rate**  105:*20*, *22*
166:*12*, *15*
**RCF**  26:*13*  27:*1*
250:*17*
**reach**  38:*5*  183:*20*
**read**  155:*13*  165:*9*
195:8  213:*14*  255:*4*
**reading**  7:*3*  172:*12*
173:*5*  245:*18*, *19*
**readings**  173:*16*
174:*7*  175:*14*  193:*24*
**real**  137:*18*  195:*3*
**really**  6:*4*  39:*4*
47:*15*  103:*23*  121:*2*
221:*9*  228:*18*, *22*, *23*
244:*16*
**reason**  17:*13*  95:*3*
98:*14*  118:*13*  125:*24*

143:*18*  144:8  169:*19*
190:*3*  203:*15*  230:*23*
248:*10*
**reasonable**  228:*2*
231:6
**reasons**  34:*18*  94:*23*
166:*10*  199:*16*
**re-audit**  155:*3*
**recall**  118:*11*  119:*1*
122:*14*  129:*21*, *23*
131:*1*, *7*  135:*24*
138:*14*  148:*19*  156:*2*,
*9*, *11*  157:*4*  166:*5*, *6*
168:*22*  170:*2*, *5*, *7*
171:*10*, *19*  172:*5*, *9*
173:*15*  182:*16*  183:8
189:*6*  190:*18*, *19*
191:*14*, *21*  192:*15*
197:*4*, *10*, *14*  201:*11*,
*14*  208:*21*, *22*  213:*23*
214:*3*, *7*, *9*, *10*, *11*
217:*19*  219:*6*  221:*21*
224:*22*  225:*2*  238:*4*,
*12*  242:*6*  249:*1*, *3*
**receive**  85:*24*  158:*16*
208:*1*  233:*16*
**received**  53:*10*  194:6
202:8  211:*19*  233:6
**receiving**  156:*2*
157:*4*  188:*12*  217:*23*
**recess**  82:*17*  164:*24*
250:*2*
**recheck**  141:*4*
203:*21*  228:*3*, *6*
**recipe**  50:*4*
**recognize**  154:*22*
163:*2*, *5*
**recognizing**  103:*14*
**recollection**  9:*16*
158:*11*  165:*22*
180:*12*  189:*13*, *17*
190:*4*, *14*  208:*11*
217:*20*
**recommendation**
137:*1*  143:*15*
**recommendations**
133:*5*, *10*, *11*, *15*, *16*
136:*20*  139:*18*
159:*19*  199:*9*, *13*

**recommended**  139:*12*
**recommends**  199:*15*
**record**  8:*1*  28:*9*
45:*10*, *14*  64:*5*, *24*
66:*6*, 8  73:*15*  74:*6*,
*12*, *15*, *17*, *18*  80:*21*
81:*4*  92:*3*  93:*3*
117:*5*  143:*22*  159:*22*
165:*3*, *7*  171:*24*
175:*9*, *13*, *20*, *24*
176:*3*, *6*, *12*, *15*, *18*, *19*
180:*11*  187:*10*  192:*4*
206:*9*  210:*23*  221:*6*
240:*4*  244:*5*, 8
**recorded**  222:*5*
**records**  11:*22*  21:*4*,
*7*  64:*7*  65:*3*  66:*14*
111:*20*  152:*24*
153:*11*  167:*21*  169:*2*
172:*6*  175:*22*  180:*7*
188:*10*  196:*7*  229:*16*
233:*14*  234:*23*
**record's**  63:*6*  97:*7*
160:*4*
**Red**  44:*19*, *20*, *21*
45:*3*, *6*  47:*11*  77:*17*,
*19*  78:*7*, *11*, *16*, *20*, *21*,
*23*, *24*  79:*17*, *19*, *22*
80:*5*, *12*, *21*  81:*2*, *6*,
*10*, *23*  82:*2*, *6*, *22*, *24*
83:*5*  93:*19*  144:*12*
178:*10*  244:*19*, *21*
245:*2*, *4*, *18*  246:*6*, *9*,
*17*, *19*, *21*, *24*  247:*3*,
*10*, *12*  248:*4*
**red-flag**  248:*7*
**reduce**  119:*14*
**reduced**  116:*15*
**redundant**  93:*16*
**REES**  3:*12*
**reevaluate**  143:*4*
**refer**  30:*16*  42:*3*
125:*15*  161:*18*  163:*1*
170:*10*, *12*  222:*7*
234:*3*  251:*2*, *5*
**reference**  50:*10*
119:*22*  136:*11*  226:*9*
247:*5*
**references**  169:*4*

**referral**  12:*12*
179:*18*  233:*10*
**referrals**  52:*7*, *9*
**referred**  149:*6*
195:*18*
**referring**  135:*4*
140:*7*  190:*22*  194:*16*
234:*12*, *18*
**refers**  242:*20*
**reflect**  157:*19*
**refresh**  9:*16*  158:*10*
165:*21*  183:*4*, *10*
**refusal**  76:*12*, *21*, *24*
77:*2*, *5*, *6*  78:*9*  80:*24*
81:*12*, *19*  97:*11*, *15*
169:*20*  182:*2*, *9*, *13*,
*14*  193:*12*, *16*  203:*22*
247:*6*, *11*
**refusals**  76:*7*  93:*11*,
*13*  182:*11*  194:*3*
240:*24*
**refuse**  76:*19*, *22*, *23*
77:*16*  94:*10*  143:8
**refused**  76:*11*  81:*5*
143:*24*  203:*20*, *22*
**refuses**  78:*1*, *4*
**refusing**  77:*22*  94:*1*
95:*18*, *23*  247:*4*
**regard**  188:*15*  189:*1*
202:8
**regarding**  236:*15*
**regardless**  56:*19*
139:*9*  142:*12*
**regimen**  89:*10*  95:*9*
**regimented**  150:*5*
**Regional**  15:*5*, *7*, *11*,
*22*  16:*12*  22:*13*, *15*,
*16*, *18*, *24*  23:*1*, *9*
27:*9*  32:8  33:*12*
40:*17*, *20*  104:*12*
127:*3*, *15*  131:*9*, *12*
132:*18*  134:*7*  136:*10*
156:*5*, *21*  217:*6*
232:*10*  237:*16*
**register**  177:*21*
216:*11*, *13*
**registered**  29:*18*
30:*9*  64:*1*, *2*, *6*  65:*1*
205:*19*, *21*  216:*24*

regular 140:4
152:10, 14 195:19
regularly 20:3
151:15
regulate 83:9
regulatory 166:11
related 8:15 11:2
87:2 168:11 184:11
217:16, 22 223:23
relation 170:4
relationship 32:23
88:23
relative 115:12
relatively 114:15
release 167:11
relevant 116:2, 21
117:12 129:15, 17
179:24 228:22
230:15
remain 85:19
remember 9:14
91:10, 16, 18 131:3
135:23 136:3 148:21
163:12 181:8 188:4,
6, 22 191:12, 16
197:6 201:6 219:10
225:14 237:13, 24
250:18
removal 121:10
removed 8:23 9:1
renal 161:6, 11
render 13:2 59:15
repeat 115:19 153:5
repeated 120:6
121:3, 5, 9
repeatedly 120:14
repeating 140:21
rephrase 20:2
Report 14:6 25:24
27:6 33:9, 15 110:22
127:9, 22, 24 128:6
134:22, 23 136:9
156:17, 18 157:5
160:5 238:6, 10
reported 33:10
Reporter 1:20 6:4, 9,
19 9:8 251:18, 22
252:2, 6, 9 253:17
Reporter-Notary
253:6

reports 27:8 42:11
61:4, 7 195:22
representation 178:3,
4, 18
reproduction 253:16
Request 5:7 50:15
180:7
requested 51:1
require 30:7 41:14
84:17 86:9 101:1
106:18, 21 145:11
180:7 198:10, 11
required 24:18
57:15 58:1 199:5
requirement 167:13
requires 101:4
142:11 157:10
requisite 39:22 40:1
41:3
reserved 7:7
residency 17:8, 14, 15
resistance 83:13
84:11 86:6
resorting 223:14
resource 21:17
209:22
respiration 105:22
respiratory 106:14
respond 13:3 30:23
86:8 106:11, 12
107:4 126:4 148:11
214:21
responded 148:15
228:4
responding 105:24
116:7
response 53:7
responsibilities 15:10
20:13 40:23 199:6
214:15
responsibility 15:23
39:18 41:13 44:5, 15
105:2 159:11 215:7
responsible 16:4, 6
18:15 22:12, 14 32:6
104:7 119:18 124:14
134:5 158:20
rest 35:18 113:20
155:16 187:3 195:9

235:24
restoration 201:20
restrictions 188:3
result 99:3 128:9, 12
147:7 162:10 167:10
206:13
resulting 122:2
resuscitative 109:13,
18
return 37:5, 7
110:19 179:10
180:15 209:11 233:6
returned 18:21 38:3
124:24 125:5 181:7
returning 36:22
123:16
returns 34:8 36:9,
10, 11, 12, 19, 20 37:9
123:6 179:6 210:1
reveals 152:6
review 10:19 13:16,
21, 23 20:17 21:7
32:18 34:9 36:8, 9,
11 64:9, 18 65:2
111:8 120:4 122:6,
24 126:5 127:10, 11,
18, 21 128:9, 17
131:24 144:19, 22, 23
145:6 151:4 154:3, 6
182:24 188:9 231:23
232:3, 20, 23 238:7,
10 239:2, 10 240:3, 7,
14, 19 243:7 249:6
reviewed 13:12, 20
32:17 142:8 169:2
179:14, 20, 22, 24
180:3 232:8 238:12
reviewing 31:8
111:15 120:2 123:2
128:22 145:3 153:2,
18
reviews 10:24 12:18
13:23 31:16, 22
122:23 127:13 154:2,
8 199:12
RF 246:4, 8
right 6:11 9:3
16:23 17:1 33:13
55:21 71:3, 10, 24
81:21 89:13 97:21

115:18 119:7 121:17
124:9 126:13 135:8
137:19 139:2 140:3
143:8 144:1 157:8, 9
159:22 162:18
164:12 165:3 176:9
177:17 179:10 183:9
189:12 190:8 196:7,
9 205:12 206:2
210:22 222:20
223:15, 16, 17 226:15
228:12 230:6 234:13
246:15 251:22 252:8
risk 84:21 141:10
146:24 161:12, 15
186:9
risks 146:21
Riverside 26:4
250:13
RN 30:1 43:16, 19
64:1
Road 26:10
Rob 225:12
role 15:15, 18, 23
16:10 22:8 23:8, 17,
23 24:11 32:21, 22
40:24 43:24 58:22,
24 85:9 104:17
128:17, 18 136:8
150:20 205:17 208:3
238:5
roles 17:24 130:22
131:2
Room 47:10 52:7, 9
97:9 98:15 100:14
108:17 120:4 122:11
123:7 153:23
root 131:17
rotation 202:22
roughly 88:13
rounds 18:2 199:5
route 67:7 112:8
routine 110:2
149:14 189:23
routinely 20:23
142:20 151:18
row 232:19
rule 42:10 61:1, 19
62:11 69:8 70:10
rules 9:5

**Run** 17:*17* 61:*1*
62:*12* 101:*8* 125:*17*
127:*6* 141:*10*
**running** 87:*17*

**< S >**
**safe** 198:*1*
**Safety** 14:*5* 58:*6*
127:*9* 128:*6* 134:*22*,
*23* 135:*2*, *11*, *17*
136:*9*, *16* 237:*1*, *15*
238:*23*
**Samantha** 218:*13*
**sample** 60:*6*, *7* 114:*9*,
*10* 115:*20* 149:*21*
234:*11*
**Sandy** 35:*22*
**Saturday** 242:*13*
**saw** 19:*20* 125:*23*
166:*6* 172:*6* 197:*6*, *7*
234:*24*
**saying** 53:*8* 105:*3*
137:*6* 154:*7* 174:*5*
186:*13*, *16* 191:*1*
**says** 62:*6* 70:*12*
138:*5* 139:*2* 140:*3*,
*14*, *18* 143:*24* 156:*15*
157:*9* 161:*16* 162:*23*
165:*17* 168:*20*
176:*23* 183:*22*
187:*16* 192:*6*, *9*, *22*
194:*12* 195:*4*, *13*, *22*
196:*10*, *11*, *24* 203:*20*,
*23* 204:*8*, *12*, *20*
206:*12* 207:*6* 211:*24*
212:*12*, *13*, *21* 213:*11*,
*14* 215:*20* 216:*5*, *16*,
*17* 217:*14* 218:*18*
221:*17* 222:*16*, *18*
223:*4* 226:*23* 228:*13*
230:*18*, *20* 232:*19*
233:*5*, *22* 234:*2*, *9*, *21*
237:*8* 239:*8* 241:*3*
244:*19*
**scale** 140:*6* 218:*22*
**scales** 195:*21*
**scan** 111:*20*
**scanned** 81:*1*
**scenario** 118:*15*

**schedule** 70:*17* 78:*7*
79:*12*, *16* 90:*13*
217:*17*, *22* 242:*15*
245:*6*
**scheduled** 61:*5*, *8*, *15*
62:*11* 69:*6*, *21* 70:*2*,
*4* 79:*4*, *8*, *21* 80:*17*
81:*7* 134:*18* 142:*6*
234:*2* 245:*10*
**school** 16:*19* 29:*1*
**scope** 28:*17*, *21*, *22*
29:*3*
**Score** 161:*13*
**screen** 60:*7* 72:*14*
137:*18* 165:*4* 231:*12*
**screened** 66:*15*
**screening** 41:*6*, *10*
60:*1*, *2*, *5*, *6* 63:*20*, *21*,
*23* 64:*7* 65:*8*, *22*
191:*21* 226:*21*
227:*13*
**scroll** 139:*1* 155:*16*
165:*10*, *11*, *12* 183:*1*
186:*24* 204:*1*, *11*
246:*1*
**scrolled** 221:*11*
**Scrolling** 217:*14*
226:*5*, *14*
**SCTHOMAS@GRSM.
COM** 3:*14*
**SCULLY** 3:*12*
**se** 58:*5*
**sealing** 7:*3*
**searches** 59:*6*
**second** 229:*11*
**section** 140:*8*
**security** 40:*4* 59:*6*
87:*22*
**security's** 71:*17*
**see** 6:*12* 22:*5* 28:*18*
29:*4* 34:*3*, *9* 38:*2*
46:*9* 55:*6*, *8*, *9*, *13*
64:*19* 79:*15* 102:*9*
110:*19* 117:*6* 126:*9*
137:*20* 138:*18* 139:*1*
143:*10* 145:*4*, *6*
150:*5* 153:*3*, *19*
154:*19* 155:*19* 158:*1*
160:*6*, *24* 162:*20*
165:*4*, *15*, *17* 167:*2*,

*20* 169:*3* 170:*15*
171:*13*, *14*, *21* 177:*22*
178:*5*, *21* 180:*18*
181:*23* 182:*18*
186:*20* 187:*12* 192:*1*,
*22*, *23* 193:*6* 194:*1*
195:*6* 200:*18* 203:*3*,
*18* 207:*15* 212:*22*
213:*11* 215:*1*, *5*, *7*, *8*,
*14*, *19* 216:*2* 218:*12*
221:*2*, *7*, *9*, *11* 226:*9*,
*14* 228:*3*, *12* 229:*8*
237:*2* 238:*14* 244:*11*,
*21* 246:*3* 249:*22*
**seeing** 22:*4* 38:*14*
81:*6* 170:*13* 215:*4*
**seen** 10:*15* 41:*21*
69:*24* 70:*3*, *20* 80:*9*
81:*15*, *18* 115:*8*
117:*8* 123:*13* 128:*5*
142:*18* 158:*7* 160:*12*,
*18* 163:*7* 168:*11*
169:*5* 170:*20* 179:*13*
216:*6* 217:*18* 236:*21*
237:*5*
**selected** 32:*14*, *15*
**send** 53:*16* 67:*4*, *5*
97:*8* 98:*14* 107:*10*
119:*17* 156:*16*
180:*21* 181:*11* 183:*7*
205:*22* 206:*16* 207:*1*
208:*22* 210:*9*
**sending** 52:*3* 106:*21*
148:*18*
**sense** 30:*23* 110:*11*
141:*9*
**sensitizes** 139:*16*
**sent** 10:*14* 52:*5*
67:*6* 108:*15* 109:*24*
110:*3*, *13* 117:*9*
118:*4* 120:*3* 122:*11*
148:*12*, *16* 166:*4*
183:*5* 201:*19* 205:*24*
206:*3* 209:*15* 216:*20*
251:*12*
**sentence** 157:*17*
**separate** 26:*11* 61:*13*
75:*9* 142:*2* 173:*9*
**separately** 175:*11*

**September** 155:*4*
156:*4*
**septic** 165:*20* 166:*8*,
*9*, *18*
**sequelae** 186:*10*
**serious** 84:*17*, *19*
96:*9* 97:*4*, *5* 238:*23*
**seriously** 107:*23*
**SERRANO** 2:*4*
**servery** 73:*19*, *22*
**services** 26:*18*
**session** 45:*19*
**set** 24:*22* 25:*5*, *8*
181:*24* 220:*3* 253:*6*
**setting** 18:*6* 19:*14*
31:*15* 52:*20* 89:*22*
103:*1* 218:*11* 228:*22*
**settled** 18:*20*
**seven** 148:*9*
**seven-days-a-week**
27:*3*
**severe** 99:*4* 211:*13*
**shadowing** 55:*6*
**shake** 213:*16*
**share** 24:*2*, *3* 98:*23*
130:*8*, *10* 131:*8*
137:*17* 157:*24* 165:*4*
212:*24*
**shared** 130:*11*
133:*17*, *20* 156:*7*, *10*
159:*24* 160:*15*
**sharing** 135:*7*
**sharp** 220:*22*
**sheet** 90:*22*, *24*
92:*24* 93:*2* 255:*9*
**sheets** 91:*4*
**She'll** 73:*11*
**shift** 35:*9*, *14* 70:*18*
208:*20*, *21* 209:*2*, *4*, *7*
242:*3*
**shifts** 27:*16*, *18*
242:*13*
**shock** 165:*20* 166:*8*,
*9*, *18*
**short** 69:*18* 70:*4*
202:*22*
**shorter** 11:*13* 195:*20*
**shorthand** 253:*17*
**Shortly** 35:*8* 191:*4*

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 96 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**show** 113:8 138:8
144:7, 9 148:23
**showing** 77:21
160:19 212:17
**shown** 78:19
**shows** 67:11 100:18
111:3 177:3
**sick** 117:21 119:13
**sick-call** 27:20
**sicker** 119:16
**side** 23:2 95:15
102:11 192:13, 16, 19
221:8
**sign** 76:20, 24 77:5,
6 116:4 173:10
182:14 193:21
203:22 251:16
**Signature** 255:15
**signed** 81:18 165:16
193:19, 21 205:13
207:19 208:17 209:1
**signed/witnessed**
247:8
**significant** 206:15
**signify** 148:2 172:17
174:12 177:5
**signing** 7:3
**signs** 59:14 60:8
65:10 77:3 103:14
105:15, 18 116:10
**similar** 72:9 101:9
135:11 163:4, 22, 24
229:5
**Similarly** 28:23 29:2
31:21 38:16 93:9
136:23
**Simone** 216:24
**simple** 28:20 210:2
218:6
**simplify** 128:4
**simplistic** 112:24
**simply** 94:22
**sit** 46:7 60:3
**site** 16:1, 12 20:11
21:22 22:10 25:3, 18,
23 26:14, 22, 24 27:7,
10 31:7 33:2, 7, 10,
17 37:18 38:6, 24
39:13 50:22 56:16
57:20 65:19, 21 66:1

**91**:12 104:17 108:6
120:18 124:6 126:6,
15, 21 127:2 128:18
132:19, 21 134:2, 8
135:15 136:14 150:2,
4, 22 156:8, 23 157:3
158:17 159:4 160:15
163:19 164:1 167:5
223:7 238:8 241:8
**sites** 134:8 159:2
**sitting** 49:20
**situation** 46:12 52:2
68:5 80:23 89:9
93:24 95:21 97:19
98:18 107:5 114:22
115:5 118:24 119:2
144:11 147:5 171:6
200:6 214:20, 22
231:22 245:23
**situations** 13:3
20:24 21:1 84:23
94:16 106:12, 17
109:22 129:16
**six** 27:22 196:17
**size** 26:17
**skilled** 210:6
**SKR** 204:7
**sleep** 213:21
**sleeping** 214:5
**sliding** 140:6 195:21
218:21
**sliding-scale** 92:13, 14
**slot** 178:21
**slow** 161:10
**small** 137:23 220:9,
11, 22
**smaller** 26:8
**SMD** 208:9
**sodium** 210:16
211:1, 19
**Solutions** 156:16, 24
157:6
**somebody** 36:24
37:1, 12, 14 41:17
42:4 50:16 51:6, 12
53:1, 3, 19 54:3 56:9
57:10, 18 61:4, 6
62:6 64:3 68:13
69:23 70:13 76:4
81:5 95:23 98:16

**102**:2 106:4, 21
107:10, 23 108:7, 15,
20 109:1, 7, 23 110:3,
13 115:2, 22 116:21
120:13 121:3 124:15,
23 125:12 126:2, 13,
14, 18 143:16 146:8,
11, 13 148:11 161:20
176:24 177:2 179:6
183:18 199:21
202:24 205:22
206:16 209:11, 15
210:10 211:4 219:18
242:8 245:4 250:22
251:2, 5
**somebody's** 59:11, 18
63:1 88:24 95:20
101:14 116:18 119:8
122:10 161:20
170:20 172:22
207:24 229:2
**someone's** 141:11
161:21
**something's** 143:23,
24
**soon** 69:14
**sooner** 60:11 69:24
102:9 143:3 230:24
**sorry** 63:24 64:16
78:2 82:11 93:16
153:5 181:18 187:9
204:2 224:14
**sort** 31:3 52:3
81:22 82:21 95:19,
22 127:22 157:19
179:9 240:15
**sorts** 160:14
**sound** 9:24
**sounds** 121:12
210:18 214:17
**source** 117:18 147:8
**space** 73:23, 24
123:15 144:5
**speak** 9:6 29:22, 24
40:12 46:8, 10 56:24
71:16 73:24 78:8
87:16 88:8, 10 96:12
128:24 129:4, 12, 20
149:22 168:24 184:7
189:19 190:24 197:5

**199**:19 220:23
235:10, 12, 24
**speaking** 20:14
56:14 57:22, 23
96:15 151:8 190:5,
19 202:19
**specialist** 181:13
**specialists** 199:8
**specific** 10:9 14:19
23:15 31:13 48:20
53:13 65:14 75:20
95:3 108:23 120:24
121:14 127:24
132:21 134:2, 3, 14
136:6 137:15 150:6,
7, 23, 24 151:10, 24
158:8 160:12, 18
163:3, 4, 20, 23
169:21 189:13, 17
190:2, 13 198:11
201:11, 12 202:13
203:9, 15 214:14
230:3 236:22 250:8
**specifically** 22:20
30:5 36:22 40:12
48:3 49:24 50:1
53:24 62:20 82:8
88:8, 18 97:11
130:18 145:14
154:24 156:10 169:8
170:5 171:10, 19
188:5, 6 190:17, 19
191:14 192:14, 16
197:14 198:6, 18
200:21 216:14
217:19 219:4, 10
225:7, 9 238:9
240:12 242:19
**specifics** 28:22 43:4
88:11
**spell** 8:1
**spend** 51:23
**spent** 18:22
**spoke** 191:4 201:15
205:24
**spoken** 79:23 129:8
248:24 249:2
**spreadsheet** 158:3
160:1

spreadsheets 231:*22*
**SPRING** 2:*5*
**SQUARE** 3:*13*
stabilize 101:*14*
119:*13, 15*
stable 98:*4* 114:*15*
115:*3* 118:*6* 123:*16*
stack 235:*5*
stacking 140:22
141:*1, 6*
**STAFF** 3:*15* 13:*1*
24:*17, 18, 22* 25:*1, 2,*
*13* 29:*16, 17, 21, 23*
30:*19, 20* 31:*22, 24*
32:2, *7, 9, 21, 24* 33:*3*
39:*1, 6* 40:*11, 13, 14,*
*19, 24* 43:*11, 23* 45:*5*
50:*24* 55:*19* 56:*5, 7,*
*20, 23* 57:*1, 14* 63:*11*
66:*13* 67:*15, 18, 20*
70:*19* 71:*1* 77:*9*
78:*12, 14* 82:*3* 83:*2*
94:*19, 20* 103:*14, 19*
104:*8, 9, 16, 18*
107:*14, 15, 20, 22*
109:*6* 110:*2* 125:*1,*
*22* 126:*23* 127:*16, 17*
129:*1, 4, 7, 9* 133:*12,*
*17, 18* 134:*15* 135:*13*
136:*23* 137:2, *13*
151:*21, 22* 152:*6*
157:*11* 159:*17, 20*
164:*6* 188:*15* 198:*15,*
*19, 21* 199:*1* 215:*8*
222:*13* 244:*23*
staffed 198:*17*
staffing 200:*14*
staff's 189:2
stages 161:*5*
stamp 159:*24*
stand 59:*12* 195:*16*
standard 18:*4* 24:22
119:*4* 181:*6* 183:*17*
207:*23* 241:*9, 14*
stands 23:*20* 94:*4*
163:*8, 12, 15*
start 15:*19* 29:*20*
33:*23* 34:*6* 35:*10*
55:*5* 60:*1* 71:*5* 72:2
86:*5* 119:*12* 153:*7*

started 6:*5* 8:*16*
15:*24* 17:*7* 18:*10, 21*
19:*1* 111:*1* 230:*13*
starting 39:*20* 149:*12*
starts 147:*7*
state 8:*1* 17:2, *6*
26:*10* 66:*17* 98:*24*
167:2, *15, 16* 169:*7*
201:*20* 233:*6*
stated 21:*5* 117:*5*
228:*15, 17* 230:*4*
statement 99:*6*
**STATES** 1:*1*
stating 217:*21*
status 106:*15* 147:*19*
204:*1* 213:*13*
stay 118:*7* 123:*7, 21*
209:*13* 246:22
**STD** 60:*6*
steady-state 196:*18*
stenographic 253:*5*
step 17:*23* 38:*15, 19*
43:*17* 46:2 107:*16*
247:2
steps 175:*1, 2* 179:*11*
stick 141:*4* 220:*7*
230:*1* 232:*17*
sticks 220:*1*
stipulated 7:*1*
**Stipulations** 5:*12*
stop 34:22 226:*18*
stopped 247:22
stored 175:*23*
**STREET** 2:*5, 10, 18*
3:*13*
strength 31:*17*
stress 167:*9*
stressor 168:*9*
stretcher 203:*23*
213:*13*
strike 222:*1*
strip 220:*12, 13*
strive 103:*9*
structure 142:2
structures 112:*20*
struggling 53:*15*
118:*17*
subject 153:*11, 23*
154:*13*

subjective 206:*24*
submitted 179:*17*
subsequent 17:*7, 19*
18:*7* 60:*13* 233:*13*
substance 60:*18*
255:*8*
sufficiently 57:*19*
sugar 85:*18* 112:*3, 5*
119:*14* 141:*11*
146:*19* 157:*10*
203:*24* 233:*23*
234:*10, 14* 235:*17, 19*
sugars 118:*18* 186:*7*
suggest 197:*1*
suggests 155:*5*
**SUITE** 2:*5, 18* 3:*6,*
*13*
summarize 60:*23*
128:*19* 226:*3*
summary 126:*7*
130:2, *8* 180:*5* 217:*4*
245:*12*
**SUMMER** 3:*12*
237:*10, 13*
**Sunday** 242:*1, 13*
**Sundays** 242:2
supervise 30:*20* 32:*4,*
*12* 40:*14* 44:*7* 50:*24*
125:*23* 164:*5* 188:*17*
supervised 49:*11*
190:*8*
supervises 25:*15*
30:*24* 32:*1*
supervising 32:*7, 21*
159:*16*
supervision 31:*1, 4, 6,*
*14* 33:*1, 3* 43:*21, 23*
44:*6* 50:*19* 134:*16*
253:*17*
supplement 86:*17*
211:2
supply 147:*23*
supplying 36:*4*
**SUPPORT** 5:*1*
106:*14*
supported 34:22
supportive 251:*11*
suppose 43:*16*
127:*24* 131:*20* 133:*8*
180:*1*

supposed 42:*3, 21*
64:*9, 17* 66:*10* 68:2
76:*8* 79:*1* 82:*1, 24*
89:*18* 90:*17* 125:2, *4*
142:*18* 157:*16*
161:*24* 176:22, *24*
177:*5, 7, 9* 178:*19*
182:*3* 202:*16* 222:*19*
228:*19*
sure 10:*20* 16:22
31:*23* 34:*12* 38:*12,*
*14* 39:*3* 46:*16* 49:*5*
53:*20* 60:*9* 75:*11*
81:*8* 87:*4* 101:*16*
111:*14* 115:*18* 127:*6*
134:*24* 138:*17*
152:*17* 155:*1* 164:22
173:*21, 24* 193:*9, 11*
199:22 225:*6, 7*
228:*23* 229:*18* 230:2
240:*13*
surgery 8:*14*
surprised 182:*17*
surrounding 122:*13*
236:*3*
switched 221:*20*
230:*14*
switching 95:*13*
221:*24*
sworn 7:*10*
symptom 137:*16*
symptomatic 139:*4*
symptoms 11:*4*
103:*15* 206:*21*
syndrome 184:*23*
synonymous 63:*8*
230:*7*
system 51:*24* 61:*23*
69:*11* 70:*10, 16* 73:*5*
81:*11* 91:*6, 7, 9, 21*
92:*1* 115:*17* 163:*10*
175:*4* 178:*1, 2* 179:*5*
211:*17* 212:*4, 9*
221:*24* 222:*12* 224:*6,*
*11, 20, 23* 234:*12, 13*
235:*4* 243:*3, 5* 245:*5*
246:*9*
systemic 120:*7*
systems 166:*11*

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 98 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

< T >

**tachycardia** 166:*14*
**take** 9:*20* 17:*23*
27:*24* 35:*17* 46:*1, 23*
57:*15* 65:*19* 76:*15*
82:*12* 89:*12* 95:2, *24*
97:*9* 98:*9, 12* 106:*10*
158:*6* 164:*13, 17, 18*
165:*8* 169:*17* 171:*14*
175:*3* 182:*23* 188:*13*
190:*10* 194:*20* 195:2
197:*20* 213:*13, 21*
230:*21* 231:*22* 232:*3*
234:*8* 239:2 243:*6*
**taken** 1:*17* 31:*17*
34:*13* 59:*21* 82:*18*
114:*12* 119:*8* 164:*24*
215:*16* 250:*3* 253:*5*
**talk** 9:*13* 34:*23*
53:*21* 102:*6* 129:*6*
132:2 151:*21* 152:*6*
170:*23* 171:*17*
187:*20* 188:*14* 201:*9,
10* 214:*8* 245:*7*
**talked** 120:*1, 2*
145:*13* 146:*23*
190:*18* 212:2 229:*1*
233:*21* 248:*15, 18, 22*
**talking** 27:*23* 35:*4*
36:*21* 68:*7* 174:*18*
190:*14* 234:*12*
239:*11* 245:*3*
**tat** 98:*1*
**taught** 49:*15*
**taxes** 86:*10*
**taxonomy** 242:*16, 20*
**TB** 60:*5* 72:*14*
**team** 22:*13, 15, 24*
23:*9* 25:*16* 127:*3*
130:*10, 16* 131:*9, 12*
132:*18, 19* 134:*7*
149:*13* 150:*16*
151:*21* 183:*21* 225:*8,
11*
**tell** 24:*15* 25:*10*
35:*14* 47:*15* 52:*11*
53:*15* 58:*18* 95:*6*
108:*18* 109:*8* 110:2
113:2, *23* 115:*15, 16*

139:*11* 174:*23* 175:*1*
191:*7* 194:*5* 197:*19*
213:2
**telling** 13:*10* 208:*21*
236:*17*
**tells** 46:*23*
**Template** 162:*24*
**TEN** 2:*18*
**tend** 146:*18*
**tended** 214:*4*
**tends** 34:*1* 184:*13*
**term** 41:*16* 48:*11*
58:*17* 70:*4* 76:*1*
83:*20* 97:*4* 99:*8*
134:*24* 135:*11* 203:*7*
**terms** 29:*15* 30:*8*
41:*12* 86:*21* 107:*21*
116:*19* 127:*5* 128:*15*
133:*8* 149:*7* 150:*1*
181:*20* 185:*11* 198:2
216:*8* 224:*6* 232:*14*
239:*24*
**test** 112:*22* 113:*8, 10*
114:*5, 7, 8, 11* 146:*10*
148:2 207:*21* 208:*1*
**tested** 113:*11* 168:*13*
**testified** 7:*11* 64:*24*
85:*1* 93:*16, 17*
138:*11* 222:*23* 224:*7,
19* 245:*13*
**testify** 10:*9, 13, 17, 20*
11:*10, 16* 71:*22*
**testimony** 81:*13*
102:2 179:*3* 190:*10*
**testing** 10:*22* 114:*18*
140:*20* 147:*21*
204:*23*
**tests** 113:2 114:*6*
**TGREGORY@OKLL**
**P.COM** 3:*7*
**Thank** 6:*14, 18* 7:*21*
8:*4* 19:*4* 22:*7* 27:*14*
29:*15* 38:*6* 44:*18*
55:*18* 57:2, *9* 61:*18*
66:2 72:*8* 74:*3, 19*
77:*17* 81:*21* 82:*15*
86:*18* 97:*6* 99:*11*
140:*3* 147:*1* 150:*12*
162:*18* 167:*20*
186:*20* 210:*13*

225:*16* 229:*13, 20*
243:*16* 245:*24*
251:*13, 15* 252:*4, 7,
10*
**theoretically** 229:*10*
**therapy** 139:*7, 10, 21,
23* 140:*1* 142:*24*
143:2
**thing** 9:*21* 31:*3*
53:*17* 112:*16* 160:*23*
216:*22* 240:*16*
**things** 21:*16* 23:*3*
28:*18, 19* 30:*3* 36:*7*
49:*19* 53:*5* 55:*6, 15,
16* 58:*8* 96:*21* 107:*3*
110:*9* 111:*23* 121:*20*
131:*16* 132:2 145:*12*
149:*17* 153:*19*
180:*17* 184:*6, 12*
198:2 201:*5* 202:*16*
**think** 6:*7* 17:*17*
27:*22* 41:*15* 48:*3*
53:*14* 55:2 64:*22*
71:*9* 72:*20* 74:*4*
75:*10* 76:*9* 93:*15*
95:*4* 103:*18* 105:*12*
107:*24* 110:*6, 14*
111:*17, 23* 130:*24*
136:2 137:*10* 138:*10*
146:*23* 148:*17*
154:*14* 155:*22*
164:*12* 169:*24*
185:*16, 24* 187:*3, 19*
191:2 197:*21* 209:*7,
12* 214:*13* 216:*21*
219:*1* 225:*13, 16*
226:*12* 233:*10*
235:*24* 237:*12*
246:*10* 247:*20*
249:*10, 12, 16, 18*
252:*9*
**thinking** 129:*16*
151:*17*
**THOMAS** 3:*5, 12*
6:*8, 10, 11* 82:*11, 15*
252:*6, 7*
**thought** 51:2 107:*15*
169:*5* 170:*8*
**threatening** 184:*22*

**THREE** 3:*13* 17:*18*
18:*14, 19* 26:*23*
27:*18* 78:*12* 99:*13*
139:2 142:*20* 143:*4*
155:*17* 189:*15, 16*
194:*3* 241:*22*
**three-month** 99:*23*
**throwing** 230:*9, 10*
**thyroid** 211:*3, 4*
**till** 15:*21*
**time** 7:*7* 8:*19* 37:*17*
51:*23* 52:*14* 57:*8, 10*
69:*10, 18* 70:*20*
71:*13* 73:*21* 75:*4*
76:*12* 87:*21* 93:*24*
94:*3, 17* 108:*16*
115:*6* 120:*20* 126:*16*
129:*24* 141:*9* 142:*9*
148:*8* 154:*14* 156:*6*
158:*13* 164:*13, 17*
166:*6, 24* 168:*14*
175:*17* 178:*23* 181:*7*
188:*21* 193:*15* 197:*7,
20* 198:*11* 201:*22*
213:*9* 217:*7* 218:*6*
219:*6, 23* 222:*16, 18*
227:*17* 230:*19*
237:*11* 239:*14*
241:*17, 20* 253:*5*
**timed** 219:*20*
**timeline** 239:*8, 10, 16*
240:*1*
**timely** 233:*16, 19*
**times** 8:*8* 75:*6* 88:*1,
7, 9, 11, 17* 90:*14*
94:*4* 99:*13, 15*
122:*18* 129:*9* 167:*6*
180:*12* 196:*2, 5, 6*
199:*14, 16* 214:*23*
218:*19, 24* 219:*2, 5, 9*
**timing** 95:*7* 101:*7,
12* 197:*4, 12, 15*
218:*5, 7*
**tip** 220:*10*
**Tischler** 155:*7*
**tissues** 86:*7* 139:*16*
**title** 155:*5, 20* 163:*9*
**today** 8:*5* 10:*3*
223:*9, 10* 251:*16*
**today's** 13:*7*

Case 2:24-cv-05618-TJS   Document 100-12   Filed 12/05/25   Page 99 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**told** 35:*12* 78:*20*
110:*6, 12* 191:*11, 15*
234:5 248:*23*
**Tool** 68:*8* 114:*23*
119:*23* 137:*8* 157:*12*
204:*18*
**tools** 23:*19, 20* 67:*19,
24* 68:*20, 21, 22*
**top** 155:*20* 158:*3*
172:*3* 186:*21* 192:*5*
204:*12* 237:*4*
**Topic** 10:*24* 11:*10,
13, 19* 12:*1, 5, 11, 16,
23*
**topics** 10:*9, 12, 17, 19*
**Torresdale** 206:*3*
**touch** 34:*17* 35:*5*
183:*13*
**touched** 41:2 69:*3*
141:*15* 187:*19*
**touching** 35:*10*
**track** 99:*24* 110:*16*
**tracked** 224:*18*
**tract** 84:2 210:*3*
**train** 43:*10*
**trained** 30:*5* 39:2, 6
41:*5, 6, 8, 9* 42:2, 6
43:20 44:*19* 45:*12*
51:5, *14* 65:2, *4* 82:*8,
9* 104:*4* 202:*17, 21,
24*
**training** 28:*15* 39:*12,
14* 40:*3, 6, 10, 13, 19,
24* 42:*16* 45:*17, 18*
46:*14, 19, 22, 24*
51:*10* 53:*1, 4, 9, 11,
13, 24* 54:*9, 12, 13, 15*
56:*24* 58:2 81:*22*
82:*21* 103:*13* 202:7
**trainings** 11:*1* 39:*22*
40:2, *5* 41:*3* 49:*6*
58:*4, 7, 15*
**transcript** 9:*9* 253:*5,
15*
**transcription** 255:*5*
**transfer** 12:*12* 17:*13*
27:*12* 125:*5* 203:*21*
233:*7, 14*

**transferred** 17:*11*
21:*12, 23* 37:*1*
123:*17* 201:*24*
**transferring** 66:*24*
**transfers** 153:*23*
**transition** 225:*15*
**transitioned** 131:*1*
225:*3, 9*
**Transport** 216:*17*
**traumatic** 96:*20*
**treat** 19:*13* 20:*8*
28:*19* 29:*4* 161:*9*
185:*10*
**treated** 19:*11* 64:*20*
86:*14* 101:*10* 112:*1*
185:7
**treating** 19:*24* 54:*23*
85:*10* 202:*9, 10*
**treatment** 11:*15*
19:*6* 20:*19, 21* 21:*13*
30:*12* 38:22 86:*1*
89:*10, 18* 94:*11*
95:*18* 96:*18* 100:*17*
101:*18, 20, 23, 24*
102:*3, 4, 10, 15, 20*
103:*1* 117:*22, 23*
140:*2* 141:5 143:*18*
186:*4* 211:*10, 11*
227:*15* 251:6
**TREBACH,LLP** 2:*17*
**tree** 238:*20*
**triage** 27:*17* 70:6
205:*20* 210:8 220:*4*
235:*10* 245:*21, 22*
**trial** 7:7
**tried** 181:*11, 12*
209:*23* 228:*21*
**trigger** 45:6 62:*10,
24* 63:2, *4* 78:*16*
93:*18* 97:*20* 98:*1*
146:*4* 151:*16* 166:*20*
245:*5*
**triggered** 61:2 82:2
83:*1* 167:8, *18*
178:*10*
**trip** 97:*20* 98:2
168:*15*
**triple** 139:*6*
**trips** 110:*16*
**TRIVIKIM** 3:*8*

**TRIVIKRAM** 1:*9, 17*
4:*3* 7:*9, 18* 8:2
165:5 251:*13* 252:*14*
**T-R-I-V-I-K-R-A-M**
8:*3*
**true** 168:*15* 253:*4*
**try** 21:*10* 22:*4* 47:5
94:22 95:*5, 9, 12*
98:*11* 101:*14* 102:*17*
119:*13* 130:*3* 131:*15*
143:*7, 10, 13* 162:*19*
180:*18, 19, 22* 181:*9,
21, 22* 187:*23* 215:*9,
10* 219:*15* 240:*4*
**trying** 95:6 96:*5*
102:*1* 110:*7* 123:*4*
181:*9, 16, 19* 185:*11*
186:*7* 187:*5, 6, 7*
215:*19* 223:*19*
**turned** 198:*13*
**Twice** 8:*10* 219:*3*
**two** 17:*9, 10* 26:*23*
27:*16, 19* 57:*7* 88:*3*
115:*8, 11* 127:*12*
140:*24* 141:2 150:*15*
189:*15* 219:*18, 19*
228:*8* 242:*12*
**type** 12:*18* 28:*4, 10*
56:*3* 58:*8* 59:*20*
63:*11* 81:*14* 84:*4, 5,
9, 10, 15* 85:*10, 15, 20,
24* 86:*5* 93:24 95:*16*
97:*16, 23* 99:*1, 11, 16*
100:*24* 101:*3, 9*
102:*19* 106:*7, 20*
139:*15, 19, 22* 140:*2*
183:*24* 184:*2, 9, 13,
18, 21, 24* 185:*3, 8, 9,
15, 20, 23* 186:*15*
194:*14* 195:*5, 13*
207:*9* 228:*14, 15*
**types** 25:*1* 29:*11, 17*
37:*9* 45:*23* 51:*9*
58:*7* 88:*3* 96:*11*
107:*2* 109:*21* 127:*13*
141:*20* 149:*15*
196:*21*
**typical** 33:*18* 135:*19*
181:*24* 184:*8* 242:*1*

**typically** 29:*1* 32:*17*
44:*11* 118:*6, 10*
128:*12* 129:*12*
135:*18* 136:*13*
139:*15, 20* 168:2
180:2 208:*19, 20*
209:5 220:*23* 241:*19*
242:5 246:*24*

**< U >**
**uh-hmms** 9:*7*
**Uh-huh** 210:*17*
**Ultimately** 32:7
**unable** 116:*5*
**unclear** 183:*23*
**uncontrolled** 100:*9,
18* 118:*20* 194:*14, 15*
228:*16, 17* 230:*4, 6*
**undergraduate** 17:*3*
**underlying** 96:*13*
168:*20*
**understand** 9:*18*
10:*5* 33:*19* 53:*6*
74:*21* 76:*14* 119:*5*
126:*8, 9* 127:*7* 130:*6*
131:*16* 142:*15*
144:*20* 179:*4* 186:*12*
191:*5* 197:*21* 201:*14*
218:*8, 9* 236:*19, 20*
**understanding** 21:*3*
55:*15* 71:*24* 157:*15*
178:*24* 185:*14*
198:*20* 227:*3*
**understood** 9:*18*
20:*11* 71:*19* 81:*9*
91:*20* 110:*11* 135:*15*
152:*23* 157:*18*
**unfit** 59:*11, 15, 17*
**uniformly** 89:*17*
**unit** 12:*8* 71:*10, 12*
72:*12* 73:*1, 18, 19, 23*
74:*1* 165:*24* 219:*22*
220:5 235:*8* 250:*9*
**UNITED** 1:*1*
**units** 72:*23* 75:7
87:*10, 13, 14* 197:*1*
198:*4* 199:*1, 3, 4*
222:*10* 224:*13*
**universal** 46:*21*

**University** 17:2, 9
**unreasonable** 231:1
**unspecified** 194:14
**unstable** 59:14
105:12 116:22 118:8
166:17
**untold** 96:24
**unusual** 209:6, 9
**unwell** 104:2 114:17
**updates** 223:24
**uploaded** 93:8
222:24
**upstate** 21:12, 15
**uptunded** 214:20
**urgent** 52:21 59:20
**urgently** 114:19
**urinary** 210:2
**urine** 60:6 112:7
113:1, 2, 5, 9, 11
114:5 115:19 157:11
161:5 204:10, 21
205:3 206:14 226:23
227:1, 4, 7 234:11
241:24
**use** 47:3 48:10 50:5
58:17 68:2 157:2
173:15 203:13
204:23 205:1 208:8,
9 221:18 223:9, 10
228:20
**usual** 19:12, 15
**usually** 33:24 34:22
73:18 94:17, 20
106:23 123:11
162:12 166:10, 14
167:7 168:1 184:10
193:2 205:1
**utilize** 45:13 68:23
**utilized** 49:11

**< V >**
**vague** 20:1
**value** 174:2, 3
185:13, 20
**values** 174:10
**variation** 119:6
142:16 181:8
**varied** 241:15
**varies** 89:17 180:6
**variety** 36:2

**various** 21:13
135:14 182:13
**vary** 92:17
**vehicle** 179:21
**vein** 168:2
**vendor** 157:1
**venous** 114:9 147:23
**ventilation** 106:15
**versed** 55:12
**versus** 143:17 146:12
**Vice** 23:1 32:8
40:17 104:12
**videos** 46:1
**Videotaped** 1:16
**Virtual** 1:16
**virtue** 101:19
**visibly** 117:11
**visit** 70:8 111:1
122:13 246:4
**visits** 20:17 181:4
228:21
**visual** 83:24 145:11
**vital** 59:14 60:8
65:10 105:17 116:4
**vomiting** 116:5
147:19 213:19
**vs** 1:7

**< W >**
**wait** 204:1 229:11
**waived** 7:4
**Wakowski** 238:2
248:21
**walk** 15:20 16:17
29:16 33:18 59:23
**walk-in** 70:5, 17
234:3, 6
**walking** 181:3 231:3
**WANDA** 1:10 236:8
**wanna** 81:8
**want** 24:21 30:18
50:20 64:23 71:7
95:2 109:9, 10, 11
119:16 127:5, 6
141:3, 6 143:1
154:15 155:18, 24
164:18 182:24
186:19 212:24
219:24

**wanted** 35:7 50:10
70:13 108:19 109:2
120:8 138:8 229:17
**wants** 76:19
**warrant** 105:13
**water** 227:2
**way** 6:14 9:7 19:22
42:20 49:14 50:7
56:19 67:2, 9 70:21
77:19 79:13 81:4
95:10 98:3 105:12
108:2 110:16 112:10,
24 113:11, 15 125:11
131:16 141:21
144:13 166:18
170:17 185:11 186:1
197:23 242:21
**ways** 136:17 182:13
235:15
**weak** 117:21 207:7
**weapon** 220:24
**week** 27:19
**weekend** 242:5
**weekends** 27:17
**weeks** 57:7 233:16
**Well** 19:12 22:14
23:22 25:19 27:14
31:15 34:15 36:10
47:17 48:24 55:12
66:11 68:17 79:7
80:11 81:23 82:22
85:24 86:8 94:19
96:4 100:5, 8, 13, 15
102:23 110:1 126:8
127:12, 17 130:12
131:6 135:6 137:11
143:9 151:7 153:7
154:3 161:20 162:16
170:8, 18 176:21
177:19 192:24
206:22 214:2 218:22
223:6 227:10 229:3,
8 231:24 240:17
243:19 251:24
**went** 16:19 17:2, 5,
16, 20 108:7 166:7
179:7 180:13 183:14
194:9 209:12
**we're** 36:21 52:3
55:12 90:2 95:6

118:16 143:19 171:1
172:19 176:8 223:18
231:4, 5 244:3
**West** 26:11
**we've** 145:13 213:1
234:12 237:7 239:11
**whichever** 200:12
**White** 17:21
**whoever's** 246:12
**wildly** 89:4
**willing** 76:22, 23
**withdrawal** 61:6
**WITNESS** 4:2 5:3
77:6, 8 193:21
229:21
**WITTEKIND@OKLL
P.COM** 3:7
**wonder** 87:6
**wondering** 74:6
128:7 189:12
**word** 115:18
**wording** 228:19
**work** 14:13, 15, 20
18:3, 21 22:5, 21
25:24 26:24 28:16
33:21, 22 46:2 54:20
55:1 56:10 69:7
71:6 77:23 84:13
90:5 93:8 95:10, 12
98:11 134:1 164:21
166:21 170:11
180:20 184:4 187:24
192:15 197:17
199:10, 17 208:20
209:8 219:15 223:19
230:21 235:6 242:2
**worked** 14:22
208:19 209:6 233:12
241:10
**workflow** 33:22
**working** 8:16 16:9
18:10 27:5 54:21
55:1 57:23 85:7
204:2 205:20
**workplace** 58:7
**works** 25:23 26:22
27:2 164:22 177:11
210:22 242:12
**wound** 65:13 198:11

**wounds**  60:*22*
**written**  51:*20*
**wrong**  204:*3*

**< X >**
**X-rays**  36:*1*

**< Y >**
**Yeah**  32:*22*  71:*19*
  111:*17*  147:*1*  153:*7*
  159:*14*  202:*3*  208:*24*
  216:*6*  217:*11*  220:*9*
  221:*13*  224:2  227:*1*
  230:*10*  233:*8*  237:*14*
  247:*7*
**year**  136:*1*  221:*9*
  224:*1, 4*
**years**  17:*9, 10, 18*
  18:*14, 19, 23*  58:*10*
  189:*15, 16*  195:*6*
**Yep**  6:*17*
**YESCARE**  1:*8*  3:*8*
  10:*8, 10, 14*  11:*6*
  14:*23*  15:*1*  16:*11*
  22:*9*  24:*8, 16, 18, 21*
  47:*23*  48:*11, 17, 19*
  50:*11*  52:*24*  55:*20,*
  *23*  56:*21*  67:*15*
  71:*20*  75:*14*  85:*4*
  103:*12*  112:*1*  126:*3*
  127:*16, 20*  130:*20*
  133:*12*  135:*13*  138:*9,*
  *22*  149:*1*  160:*2*
  187:*8, 10, 11*  191:*24*
  194:*19*  203:*5*  205:*18*
  217:*3*  221:*18, 22*
  225:*24*  244:*18*
  246:*16*
**YesCare's**  49:*22*
**York**  17:*11, 14, 22*
**young**  184:*10*  231:*10*
**YouTube**  46:*1*

## WORD LIST

< 0 >
0074  *(1)*
0078  *(1)*
0608-60018  *(1)*

< 1 >
1  *(33)*
1/23/23  *(1)*
10  *(6)*
10/28/2023  *(1)*
10:00  *(1)*
100  *(3)*
10-12  *(2)*
1100  *(1)*
12.5  *(1)*
12:19  *(2)*
12-hour  *(2)*
13  *(2)*
1322  *(1)*
1337  *(1)*
14  *(4)*
1464-1471  *(1)*
14th  *(2)*
15  *(1)*
1500  *(1)*
1515  *(1)*
1549  *(1)*
1568  *(1)*
15TH  *(1)*
1634  *(1)*
1634-1639  *(1)*
1639  *(1)*
1642  *(1)*
1659  *(1)*
1660-1662  *(1)*
17  *(1)*
1717  *(1)*
18  *(1)*
1801  *(1)*
18th  *(1)*
19102  *(2)*
19103  *(2)*
19123  *(1)*
1947-48  *(2)*
1st  *(4)*

< 2 >

2  *(29)*
2:24-cv-05618-TJS  *(1)*
200  *(1)*
2001  *(2)*
2004  *(1)*
2010  *(1)*
2018  *(11)*
2021  *(14)*
2021-2023  *(4)*
2022  *(3)*
2023  *(21)*
2024  *(6)*
2024-25  *(1)*
2025  *(2)*
20th  *(6)*
21  *(1)*
22nd  *(3)*
23rd  *(2)*
24  *(3)*
24-hour  *(2)*
28th  *(3)*
29th  *(2)*

< 3 >
3  *(4)*
30  *(2)*
306  *(1)*
30th  *(2)*
31st  *(4)*
396  *(1)*

< 4 >
4  *(6)*
4:00  *(1)*
4:05  *(1)*
40  *(1)*
400  *(4)*
47414  *(1)*
48  *(1)*

< 5 >
5  *(4)*
5:00  *(1)*
5:23  *(1)*
5:30  *(1)*
50  *(1)*
500  *(3)*
542  *(3)*
550  *(1)*

585  *(2)*
5th  *(2)*

< 6 >
6  *(10)*
6.5  *(1)*
6:00  *(5)*
600  *(1)*
610  *(1)*
62  *(1)*
6s  *(2)*
6th  *(3)*

< 7 >
7  *(6)*
7.0  *(1)*
724  *(1)*
730  *(1)*
770  *(1)*
7th  *(3)*

< 8 >
8  *(4)*
8th  *(4)*

< 9 >
9  *(1)*
9:00  *(2)*
90  *(1)*
94  *(2)*
972  *(1)*
977  *(1)*
98  *(1)*
990  *(1)*

< A >
a.m  *(9)*
A1C  *(16)*
A1Cs  *(2)*
abbreviation  *(1)*
abide  *(1)*
Abilify  *(6)*
ability  *(7)*
able  *(18)*
ABOLITIONIST  *(1)*
Absolutely  *(2)*
abuse  *(1)*
accept  *(1)*
acceptable  *(1)*

Access  *(15)*
accessible  *(1)*
accommodated  *(1)*
AccuCheck  *(1)*
Accu-Chek  *(26)*
Accu-Cheks  *(7)*
accurate  *(6)*
ACE  *(2)*
acid  *(1)*
acidic  *(2)*
acidifies  *(1)*
acidify  *(2)*
acidity  *(2)*
acidosis  *(3)*
acids  *(2)*
ACKNOWLEDGMEN
T  *(1)*
acting  *(1)*
Action  *(23)*
actively  *(1)*
actual  *(2)*
acuity  *(2)*
acute  *(5)*
adapt  *(1)*
add  *(1)*
addition  *(1)*
additional  *(3)*
address  *(15)*
addressed  *(8)*
Addressing  *(4)*
adept  *(1)*
adequate  *(1)*
ADF  *(1)*
adjudicated  *(1)*
adjust  *(4)*
adjusting  *(3)*
adjustments  *(2)*
administer  *(10)*
administered  *(33)*
administering  *(2)*
administration  *(40)*
administrations  *(2)*
administrative  *(1)*
administrator  *(3)*
Administrators  *(17)*
admissions  *(1)*
admit  *(2)*
admitted  *(7)*
admitting  *(1)*

Deposition of Dr. Lalitha Trivikram

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

adrenaline *(1)*
adults *(1)*
advanced *(4)*
affect *(2)*
afternoon *(1)*
after-visit *(2)*
age *(2)*
agency *(1)*
agent *(1)*
ago *(3)*
agree *(15)*
agreed *(1)*
ahead *(2)*
aid *(1)*
airflow *(1)*
alert *(3)*
allegations *(2)*
alleged *(1)*
allow *(1)*
alongside *(1)*
Alternatively *(1)*
ambit *(1)*
American *(1)*
amount *(3)*
analysis *(2)*
and/or *(2)*
angle *(1)*
animals *(1)*
annual *(4)*
annually *(1)*
Answer *(11)*
answered *(1)*
answering *(1)*
answers *(5)*
antibiotics *(1)*
anticipate *(1)*
anticoagulants *(1)*
anticoagulation *(1)*
anybody *(5)*
APOLLON *(2)*
apologize *(1)*
apparent *(2)*
appear *(3)*
appears *(2)*
applies *(1)*
apply *(3)*
applying *(1)*
appointment *(19)*
appointments *(5)*

approach *(2)*
appropriate *(8)*
appropriately *(1)*
Approximately *(2)*
April *(4)*
ARCH *(2)*
area *(3)*
areas *(14)*
arises *(1)*
arose *(1)*
arrest *(2)*
arrive *(2)*
arterial *(2)*
arteries *(1)*
artery *(1)*
ascitic *(1)*
aside *(2)*
asked *(16)*
asking *(15)*
Aspart *(1)*
aspect *(2)*
aspects *(1)*
assay *(1)*
assess *(6)*
assessing *(3)*
assessment *(15)*
assessments *(4)*
assigned *(1)*
assist *(2)*
assistance *(3)*
assistant *(8)*
assistants *(4)*
associated *(4)*
Associates *(1)*
Association *(1)*
assume *(1)*
assuming *(1)*
Assurance *(2)*
asthma *(1)*
asymptomatic *(1)*
ate *(1)*
atherosclerosis *(1)*
attached *(1)*
attempting *(1)*
attending *(2)*
attention *(10)*
ATTORNEY *(5)*
atypicality *(1)*
audit *(13)*

auditable *(1)*
audited *(7)*
auditing *(6)*
auditors *(2)*
audits *(11)*
authority *(2)*
automatic *(1)*
automatically *(6)*
availability *(3)*
available *(9)*
average *(3)*
awake *(2)*
aware *(22)*

< B >
back *(38)*
background *(1)*
backgrounds *(1)*
bad *(2)*
bag *(1)*
bailer *(3)*
Bar *(1)*
basal *(2)*
base *(4)*
based *(20)*
basic *(3)*
Basically *(4)*
basis *(4)*
Bates *(2)*
Baylor *(1)*
Bear *(2)*
becoming *(2)*
bedtime *(1)*
began *(1)*
begins *(2)*
behalf *(3)*
behavioral *(21)*
behavioral-health *(1)*
believe *(22)*
below-normal *(1)*
beneficial *(1)*
benefit *(2)*
best *(3)*
better *(4)*
beyond *(2)*
BG *(1)*
big *(1)*
bin *(1)*
biochemistry *(1)*

Bipolar *(5)*
bit *(16)*
BLAIR *(4)*
BLANCHE *(3)*
Blanking *(1)*
blew *(1)*
blocked *(1)*
blood *(46)*
BLOODSAW *(2)*
bodies *(2)*
body *(13)*
Booker *(1)*
bottom *(2)*
BOULEVARD *(1)*
box *(4)*
Bradley *(1)*
break *(9)*
breakdown *(2)*
breaking *(2)*
breaks *(2)*
BRET *(2)*
Brett *(1)*
bridge *(3)*
brief *(2)*
briefly *(1)*
Brill *(3)*
bring *(6)*
bringing *(1)*
broad *(1)*
Bronx *(1)*
brought *(12)*
Buffalo *(1)*
building *(1)*
buildings *(1)*
bunch *(1)*
busy *(2)*
byproduct *(2)*

< C >
CABELLOS *(4)*
calculate *(1)*
calendar *(1)*
call *(13)*
called *(14)*
calls *(3)*
campus *(2)*
Cap *(2)*
capacity *(4)*
Card *(1)*

Case 2:24-cv-05618-TJS     Document 100-12     Filed 12/05/25     Page 104 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

cardiac *(1)*
cardiology *(2)*
cardiovascular *(1)*
care *(107)*
CAREER *(1)*
CARNEY *(3)*
carried *(1)*
carry *(2)*
cart *(1)*
case *(51)*
case-by-case *(1)*
caseload *(3)*
cases *(10)*
Cat *(1)*
catches *(1)*
categories *(1)*
categorization *(2)*
category *(5)*
cause *(2)*
cellmate *(1)*
cellular *(1)*
CENTER *(18)*
certain *(17)*
certainly *(1)*
certification *(2)*
certify *(2)*
certifying *(1)*
cetera *(1)*
CFC *(3)*
CFCF *(56)*
challenges *(1)*
challenging *(3)*
chance *(1)*
change *(15)*
changes *(3)*
changing *(3)*
characterize *(1)*
chart *(36)*
charts *(14)*
chase *(1)*
Check *(15)*
checked *(6)*
checking *(4)*
checks *(13)*
chest *(1)*
Chief *(3)*
choose *(1)*
chosen *(1)*
Chris *(1)*

Christine *(1)*
chronic *(30)*
circumstance *(2)*
circumstances *(10)*
CITY *(5)*
civil *(1)*
clarification *(1)*
clarify *(2)*
clarifying *(1)*
class *(1)*
clear *(6)*
cleared *(4)*
clearly *(2)*
client *(1)*
clinic *(6)*
clinical *(51)*
clinics *(1)*
closely *(1)*
Closer *(1)*
clot *(1)*
CMO *(3)*
code *(3)*
codes *(3)*
coherently *(1)*
coincide *(1)*
collaborate *(1)*
collaborated *(1)*
collaboration *(1)*
collaborative *(1)*
colleague *(6)*
colleagues *(5)*
College *(1)*
color *(3)*
colorimetric *(1)*
column *(2)*
come *(22)*
comes *(8)*
comfort *(2)*
comfortable *(1)*
coming *(14)*
commencing *(1)*
comment *(1)*
COMMISSIONER *(2)*
Committee *(4)*
common *(5)*
Commonwealth *(2)*
communicate *(3)*
communicated *(8)*

communicating *(1)*
community *(2)*
companies *(1)*
compensation *(1)*
competency *(2)*
compile *(1)*
compiles *(1)*
complaint *(2)*
complement *(1)*
complete *(4)*
completed *(6)*
completely *(3)*
completing *(1)*
completion *(1)*
Complex *(2)*
compliance *(8)*
compliant *(5)*
complicated *(1)*
complication *(1)*
comply *(7)*
complying *(1)*
component *(1)*
compound *(2)*
comprehensive *(2)*
computer *(4)*
concentrated *(1)*
concentration *(3)*
concern *(6)*
concerned *(1)*
concerning *(5)*
concerns *(8)*
concluded *(1)*
condition *(11)*
conditions *(16)*
conducted *(4)*
conducting *(2)*
conducts *(2)*
Confidential *(1)*
confinement *(6)*
confirm *(2)*
confusion *(3)*
conjunction *(2)*
consciousness *(1)*
consequence *(1)*
consequences *(1)*
consider *(7)*
considerations *(1)*
considered *(6)*
considering *(1)*

consist *(1)*
consisted *(1)*
consistent *(4)*
consistently *(4)*
consists *(1)*
consult *(1)*
consultant *(4)*
contact *(6)*
contacted *(2)*
contained *(1)*
containing *(1)*
content *(2)*
context *(4)*
continually *(1)*
continue *(5)*
continued *(6)*
continuing *(1)*
continuity *(3)*
contract *(2)*
contracts *(2)*
control *(21)*
controlled *(18)*
conversation *(7)*
conversations *(8)*
cookbook *(1)*
cooperative *(1)*
Corizon *(7)*
Cornell *(1)*
coronary *(1)*
CORP *(2)*
corporate *(15)*
correct *(52)*
Correctional *(15)*
corrections *(9)*
Corrective *(23)*
correctly *(1)*
correlate *(1)*
cortisol *(1)*
Costello *(4)*
counsel *(6)*
counseled *(3)*
counseling *(3)*
counted *(1)*
couple *(7)*
course *(6)*
COURT *(13)*
cover *(2)*
coverage *(2)*
covered *(1)*

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 105 of 114

Deposition of Dr. Lalitha Trivikram                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

covering *(1)*
COVID *(5)*
COVID-19 *(3)*
CPR *(2)*
create *(1)*
created *(3)*
creating *(1)*
CRIC *(5)*
criteria *(5)*
critical *(9)*
critically *(1)*
Crystal *(1)*
CT1 *(1)*
cumulative *(1)*
curious *(1)*
Curran-Fromhold *(3)*
currently *(12)*
cursor *(2)*
custody *(2)*
customarily *(1)*
cut *(1)*

< D >
daily *(3)*
damage *(2)*
dangerous *(1)*
Danielle *(2)*
dark *(1)*
darker *(1)*
data *(3)*
database *(1)*
date *(13)*
DATED *(1)*
Dates *(6)*
day *(27)*
days *(11)*
day-shift *(1)*
day-to-day *(2)*
DC *(2)*
deal *(1)*
dealing *(2)*
deals *(1)*
death *(6)*
December *(17)*
decide *(1)*
decision *(13)*
decisions *(3)*
decompensating *(1)*
decompensation *(2)*

decreased *(1)*
deep *(2)*
default *(1)*
DEFENDANT *(3)*
Defendants *(5)*
defer *(1)*
defibrillator *(2)*
deficiency *(2)*
deficient *(1)*
deficits *(1)*
definitely *(1)*
definitional *(1)*
degree *(3)*
degrees *(1)*
delineate *(1)*
deliver *(2)*
delivered *(1)*
delve *(1)*
dementia-level *(1)*
denote *(1)*
DEPARTMENT *(9)*
depend *(5)*
dependent *(1)*
depending *(11)*
depends *(23)*
DEPONENT *(1)*
deposed *(1)*
deposition *(10)*
depositions *(1)*
describe *(10)*
described *(2)*
describing *(4)*
Description *(1)*
designated *(3)*
designation *(1)*
details *(3)*
detect *(1)*
Detention *(16)*
determination *(3)*
determine *(16)*
determined *(6)*
determines *(1)*
determining *(3)*
developed *(1)*
developing *(3)*
diabetes *(59)*
diabetic *(35)*
diabetics *(9)*
diagnose *(2)*

diagnosed *(3)*
diagnoses *(4)*
diagnosis *(4)*
Diana *(1)*
died *(2)*
dies *(6)*
diet *(1)*
dietary *(2)*
difference *(2)*
differences *(1)*
different *(34)*
differential *(1)*
differently *(4)*
difficult *(1)*
difficulties *(1)*
digestion *(1)*
dipstick *(2)*
direct *(4)*
Direction *(2)*
Director *(66)*
directors *(2)*
discharge *(1)*
discharged *(1)*
discharging *(1)*
disciplinary *(1)*
discipline *(1)*
discontinue *(1)*
discovered *(1)*
discuss *(11)*
discussed *(7)*
discussion *(5)*
discussions *(2)*
disease *(6)*
disorder *(5)*
disorientation *(2)*
disposition *(1)*
disrespect *(1)*
disruptive *(1)*
distinct *(1)*
distinction *(3)*
distinguish *(1)*
distinguished *(1)*
distinguishes *(1)*
distress *(2)*
DISTRICT *(2)*
dizzy *(1)*
DKA *(20)*
DM *(1)*
doc *(1)*

Doctor *(5)*
document *(57)*
documentation *(12)*
document-based *(1)*
documented *(47)*
documenting *(1)*
Documents *(15)*
doing *(13)*
Don *(1)*
door *(2)*
dosage *(2)*
dosages *(2)*
dose *(13)*
doses *(5)*
dosing *(2)*
double *(1)*
DR *(18)*
drink *(1)*
drop *(1)*
dropping *(1)*
drops *(1)*
drowsiness *(2)*
drowsy *(1)*
dual *(1)*
due *(2)*
duly *(1)*
duty *(4)*
Duvall *(1)*
dysregulated *(1)*

< E >
E.F *(1)*
E.K *(1)*
earlier *(29)*
early *(3)*
easiest *(1)*
EASTERN *(1)*
eat *(3)*
eaten *(4)*
eating *(1)*
ECW *(3)*
EDS *(1)*
educating *(1)*
education *(5)*
educational *(1)*
effect *(4)*
effective *(1)*
effectively *(1)*
effects *(7)*

efficient *(1)*
efficiently *(1)*
EHR *(14)*
eight *(4)*
either *(11)*
elaborate *(1)*
Electronic *(29)*
elevate *(1)*
elevated *(10)*
elicited *(1)*
Eliquis *(1)*
e-mail *(1)*
e-mails *(1)*
eMAR *(23)*
embolism *(4)*
emergency *(22)*
employed *(8)*
employee *(4)*
employees *(6)*
employment *(3)*
employments *(1)*
EMR *(1)*
en *(2)*
encompassed *(1)*
encounter *(30)*
encountered *(1)*
encountering *(1)*
encounters *(3)*
encouraged *(1)*
endocrinologist *(5)*
endocrinologist's *(1)*
Endocrinology *(2)*
engagement *(1)*
engine *(6)*
English *(3)*
ensure *(4)*
ensuring *(4)*
enter *(2)*
entered *(6)*
entire *(1)*
entirely *(2)*
entries *(1)*
entry *(2)*
environment *(9)*
envision *(2)*
episode *(1)*
episodes *(3)*
equal *(1)*
equipped *(2)*

equivalent *(1)*
ER *(14)*
Errata *(1)*
ESQUIRE *(6)*
essentially *(1)*
Estates *(1)*
estimate *(1)*
et *(1)*
evaluate *(7)*
evaluated *(4)*
evaluating *(1)*
evaluation *(7)*
evaluations *(2)*
evaluators *(1)*
evening *(3)*
Event *(13)*
eventually *(3)*
everybody *(11)*
exacerbations *(1)*
exact *(1)*
exactly *(8)*
exam *(1)*
EXAMINATION *(2)*
examined *(1)*
example *(6)*
examples *(5)*
exams *(1)*
excess *(1)*
excuse *(1)*
exercising *(1)*
exhausted *(1)*
exhaustive *(3)*
exhibiting *(1)*
exist *(1)*
existing *(3)*
exocrine *(1)*
exogenous *(2)*
expected *(1)*
expedited *(4)*
expert *(1)*
experts *(1)*
expired *(1)*
explain *(7)*
explained *(3)*
exposed *(1)*
extenders *(1)*
extra *(2)*
eye *(1)*
eyes *(1)*

< F >
facilitate *(2)*
facilitated *(1)*
facilities *(19)*
facility *(25)*
fact *(5)*
factor *(4)*
factors *(5)*
facts *(2)*
failure *(1)*
failures *(1)*
fair *(8)*
falling *(1)*
falls *(1)*
familiar *(21)*
family *(3)*
far *(9)*
fast *(3)*
fasting *(5)*
fats *(3)*
fatty *(3)*
febrile *(1)*
February *(4)*
feedback *(4)*
feel *(2)*
feeling *(4)*
felt *(1)*
fever *(1)*
figure *(4)*
filing *(1)*
fill *(2)*
filled *(2)*
fills *(1)*
financial *(1)*
Find *(12)*
findings *(4)*
fine *(1)*
finger *(5)*
fingerstick *(3)*
finger-stick *(1)*
finger-sticks *(2)*
finish *(3)*
finishes *(1)*
finishing *(1)*
first *(12)*
First-line *(1)*
fit *(4)*
five *(1)*

five-to-ten-minute *(1)*
Flag *(41)*
flags *(7)*
FLOOR *(1)*
flow *(5)*
flows *(2)*
fluid *(1)*
fluids *(1)*
focus *(3)*
focused *(1)*
folder *(1)*
folk *(1)*
follow *(7)*
followed *(4)*
following *(2)*
follows *(2)*
follow-up *(10)*
follow-ups *(2)*
fond *(1)*
food *(1)*
foregoing *(3)*
form *(21)*
format *(2)*
FORMER *(1)*
forms *(5)*
formulating *(2)*
forte *(1)*
forth *(1)*
forward *(3)*
found *(2)*
foundational *(1)*
four *(10)*
Fourteen *(1)*
frame *(2)*
Framingham *(1)*
FRASIER *(1)*
Frazier *(1)*
frequency *(3)*
frequent *(3)*
frequently *(4)*
Friday *(1)*
front *(4)*
FSBG *(4)*
fuel *(2)*
full *(3)*
full-time *(1)*
function *(7)*
functions *(3)*
further *(12)*

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

future *(2)*

< G >
gamut *(1)*
GARDEN *(1)*
gastrointestinal *(1)*
gather *(2)*
GAY *(10)*
GENA *(2)*
general *(13)*
generally *(9)*
generate *(6)*
generated *(6)*
generic *(2)*
genetically *(1)*
gentleman *(1)*
getting *(11)*
give *(23)*
given *(28)*
gives *(3)*
giving *(4)*
Glargine *(2)*
glasses *(1)*
glitch *(5)*
glucometer *(3)*
glucose *(59)*
glycemic *(1)*
go *(57)*
goal *(1)*
goals *(3)*
goes *(8)*
going *(57)*
gonna *(3)*
Good *(5)*
goodness *(1)*
GORDON *(1)*
gradually *(1)*
graduated *(1)*
graph *(1)*
great *(1)*
greater *(6)*
GREGORY *(7)*
GROTE *(19)*
ground *(2)*
Group *(1)*
guess *(14)*
guessing *(3)*
guidance *(7)*
guide *(3)*

guideline *(1)*
guidelines *(3)*
guides *(1)*

< H >
habitus *(1)*
half *(1)*
Hamright *(1)*
Hamwright *(1)*
hand *(1)*
handful *(2)*
handle *(1)*
handled *(3)*
Handwritten *(1)*
happen *(12)*
happened *(16)*
happening *(5)*
happens *(15)*
hard *(5)*
hardening *(1)*
harm *(1)*
harmonize *(1)*
HCS *(25)*
head *(2)*
heads *(1)*
Health *(45)*
hear *(4)*
heard *(3)*
heart *(5)*
heavy *(1)*
height *(1)*
heightened *(1)*
held *(4)*
help *(7)*
helpful *(1)*
Helping *(1)*
hemoglobin *(3)*
Henderson *(2)*
hepatitis *(1)*
Herdman *(1)*
hereinbefore *(1)*
hey *(1)*
high *(13)*
higher *(8)*
highest *(1)*
highlight *(2)*
history *(23)*
HIV *(1)*
hold *(3)*

home *(4)*
honestly *(2)*
hopefully *(1)*
hormone *(2)*
hormones *(1)*
Hospital *(73)*
Hospitalization *(6)*
hospitalized *(2)*
hospitals *(1)*
hour *(4)*
hours *(16)*
housed *(2)*
housing *(20)*
Houston *(2)*
How's *(1)*
HPI *(2)*
HSA *(2)*
HU *(1)*
Humulin *(5)*
husband *(1)*
hyperglycemia *(22)*
hyperglycemic *(6)*
hyperosmolar *(1)*
hypertension *(8)*
hypo *(1)*
hypoglycemia *(5)*
hypotensive *(1)*
hypothetical *(2)*
hypothyroidism *(5)*
hypoxia *(1)*

< I >
ICU *(3)*
idea *(3)*
ideal *(1)*
identified *(10)*
identify *(10)*
identifying *(4)*
ill *(5)*
illness *(7)*
illustrate *(1)*
immediate *(3)*
immunizations *(1)*
impact *(1)*
impacted *(1)*
impair *(1)*
impaired *(4)*
imperfect *(1)*
implement *(2)*

implemented *(6)*
implementing *(4)*
important *(17)*
imposing *(1)*
impossible *(1)*
improve *(3)*
improved *(1)*
improvement *(17)*
improving *(1)*
inbox *(1)*
incarcerated *(15)*
incarceration *(4)*
incarcerations *(1)*
incident *(5)*
incidents *(1)*
in-class *(1)*
include *(1)*
included *(2)*
includes *(2)*
including *(4)*
incoherently *(1)*
increase *(1)*
increased *(2)*
increases *(2)*
independent *(1)*
in-depth *(2)*
INDEX *(1)*
indicate *(6)*
indicated *(4)*
indicates *(2)*
indicating *(3)*
indication *(5)*
indicator *(2)*
individual *(9)*
individualized *(2)*
individuals *(2)*
Industrial *(1)*
infection *(4)*
infections *(1)*
infectious *(2)*
infirmary *(33)*
infirmary-level *(1)*
influences *(1)*
informal *(1)*
informally *(3)*
information *(31)*
informed *(3)*
infrequent *(1)*
Ingrazia *(1)*

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

inhibitor  (2)
initial  (1)
initials  (11)
initiate  (2)
initiated  (2)
injured  (1)
injuries  (2)
inmate  (2)
inpatient  (5)
input  (2)
inspectors  (1)
instability  (3)
instance  (7)
instances  (11)
instituting  (1)
instructed  (2)
instructions  (1)
insulin  (140)
insulin-adherence  (1)
insulin-dependent  (1)
insulin-resistant  (1)
insulins  (1)
insults  (1)
insurance  (1)
intake  (40)
intangible  (1)
intensive  (1)
intention  (1)
interested  (2)
Intermedix  (2)
internal  (8)
internist  (2)
interrupt  (1)
interval  (1)
intervening  (1)
intervention  (2)
interview  (1)
interviewed  (1)
interviews  (1)
introduce  (1)
investigate  (1)
investigating  (1)
investigation  (1)
investigations  (2)
involve  (6)
involved  (18)
involvement  (1)
irrelevant  (1)
ischemia  (1)

issue  (11)
issues  (24)
its  (8)
IV  (1)
IVs  (1)

< J >
JACOB  (1)
jail  (8)
jails  (3)
JAMES  (1)
January  (8)
Jefferson  (2)
JJSC  (3)
JKAMINSKY@KEIR
NANTRABACH.COM
(1)
Job  (6)
jobs  (1)
JOHN  (2)
JONATHAN  (3)
JR  (1)
judgment  (7)
judgments  (1)
July  (2)
June  (1)
JUNG  (60)
Jung's  (9)
juvenile  (2)
juveniles  (1)

< K >
Kalu  (4)
KAMINSKY  (7)
Karen  (1)
Kate  (1)
keep  (8)
KENNEDY  (1)
ketoacidosis  (10)
ketone  (1)
ketones  (38)
key  (3)
KIERNAN  (1)
KIMBLE  (1)
kind  (20)
know  (202)
knowing  (2)
knowledge  (2)

known  (6)

< L >
lab  (2)
labeled  (2)
laboratory  (2)
labs  (2)
laid  (1)
LALITHA  (8)
L-A-L-I-T-H-A  (1)
lancet  (1)
lancets  (1)
larger  (2)
late  (1)
LAW  (3)
lay  (1)
lead  (9)
leading  (1)
leads  (2)
learn  (4)
leave  (1)
Leaving  (1)
led  (3)
left  (3)
leg  (2)
lethargic  (2)
letter  (2)
level  (46)
levels  (19)
Levothyroxine  (3)
license  (6)
licensed  (4)
life  (2)
life-support  (1)
lightheaded  (1)
limited  (4)
Linda  (5)
Line  (6)
link  (1)
linked  (1)
Lisa  (4)
Lispro  (1)
list  (7)
listed  (7)
literally  (1)
literature  (1)
little  (25)
live  (3)
local  (1)

locally  (1)
located  (3)
location  (2)
lock  (1)
locked  (1)
locks  (1)
log  (6)
LOGAN  (1)
logs  (2)
LOLO  (1)
long  (9)
long-acting  (3)
longer  (2)
longer-acting  (1)
long-standing  (1)
long-term  (1)
look  (46)
looked  (10)
looking  (20)
looks  (13)
lose  (1)
loses  (1)
loss  (1)
lost  (2)
lot  (9)
lots  (1)
loud  (1)
LOUIS  (6)
low  (9)
lower  (1)
LPN  (6)
LPNs  (2)
lunch  (1)
lung  (1)

< M >
M.D  (1)
machine  (2)
maintain  (1)
maintenance  (3)
major  (2)
making  (6)
manage  (7)
managed  (3)
management  (7)
management's  (1)
manner  (5)
MANSUKHANI  (1)
manual  (1)

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**MAR** *(2)*
**March** *(4)*
**MARGO** *(1)*
**MARIESHA** *(2)*
**marked** *(2)*
**MARKET** *(1)*
**MARs** *(1)*
**matter** *(10)*
**matters** *(1)*
**MAUREEN** *(4)*
**Maurine** *(1)*
**McCauley** *(1)*
**McGettigan** *(2)*
**McKinney** *(6)*
**MD** *(1)*
**meal** *(2)*
**mealtime** *(1)*
**mean** *(64)*
**meandering** *(1)*
**meaning** *(2)*
**means** *(19)*
**meant** *(1)*
**measure** *(3)*
**measured** *(1)*
**measures** *(5)*
**med** *(7)*
**medical** *(185)*
**medically** *(1)*
**medication** *(87)*
**medications** *(25)*
**Medicine** *(12)*
**meds** *(1)*
**meet** *(1)*
**meeting** *(8)*
**meetings** *(4)*
**mellitus** *(5)*
**member** *(1)*
**memorized** *(1)*
**memory** *(2)*
**men** *(1)*
**mental** *(10)*
**mentation** *(2)*
**mention** *(1)*
**mentioned** *(18)*
**metabolic** *(2)*
**metabolism** *(5)*
**Metformin** *(4)*
**method** *(1)*
**Meyer** *(1)*
**MICHAEL** *(1)*

**MICHAEL.PESTRAK**
**@PHILA.GOV** *(1)*
**Michigan** *(1)*
**microalbumin** *(2)*
**mid-level** *(9)*
**mid-levels** *(7)*
**migrates** *(1)*
**Milanase** *(2)*
**mild** *(1)*
**mine** *(1)*
**minimum** *(1)*
**minor** *(1)*
**minutes** *(1)*
**missed** *(10)*
**misses** *(1)*
**missing** *(4)*
**Moaning** *(1)*
**Mod** *(3)*
**mode** *(1)*
**moderate** *(1)*
**moderately** *(2)*
**moderate-to-severe**
  *(1)*
**module** *(1)*
**moment** *(23)*
**MONDAY** *(2)*
**monitor** *(6)*
**monitored** *(4)*
**monitoring** *(3)*
**monitors** *(1)*
**month** *(5)*
**months** *(3)*
**moot** *(1)*
**morning** *(4)*
**Mortality** *(11)*
**motility** *(1)*
**mouthful** *(1)*
**move** *(4)*
**moved** *(6)*
**moving** *(2)*
**multidisciplinary** *(2)*
**multiple** *(3)*
**multispecialty** *(2)*

**< N >**
**name** *(17)*
**named** *(2)*
**names** *(2)*
**narrative** *(1)*

**nature** *(3)*
**nausea** *(2)*
**nauseous** *(1)*
**Nazareth** *(1)*
**NE** *(1)*
**necessarily** *(20)*
**necessary** *(3)*
**need** *(48)*
**needed** *(22)*
**needle** *(1)*
**needs** *(18)*
**negative** *(1)*
**neither** *(1)*
**nerve** *(1)*
**NET** *(19)*
**NETs** *(4)*
**neurologic** *(1)*
**never** *(1)*
**New** *(8)*
**newly** *(1)*
**night-shift** *(3)*
**Nodded** *(1)*
**nods** *(1)*
**noncompliance** *(10)*
**noncompliant** *(8)*
**non-compliant** *(1)*
**noncritical** *(1)*
**nonketotic** *(1)*
**non-YesCare** *(2)*
**norm** *(1)*
**normal** *(8)*
**normally** *(1)*
**Norristown** *(6)*
**no-show** *(4)*
**no-shows** *(2)*
**Notary** *(2)*
**note** *(32)*
**noted** *(4)*
**notes** *(8)*
**notice** *(5)*
**notifications** *(1)*
**notified** *(15)*
**notify** *(1)*
**NOVEMBER** *(6)*
**NPH** *(4)*
**nuances** *(1)*
**number** *(9)*
**numbers** *(3)*
**NURSE** *(59)*

**nurses** *(14)*
**nurse's** *(6)*
**nursing** *(65)*
**NV** *(2)*

**< O >**
**obesity** *(1)*
**object** *(1)*
**Objection** *(1)*
**objections** *(2)*
**objective** *(1)*
**observation** *(1)*
**obtain** *(5)*
**obtained** *(4)*
**obtains** *(1)*
**obtunded** *(2)*
**obvious** *(1)*
**occasions** *(2)*
**occur** *(1)*
**occurred** *(2)*
**occurrence** *(1)*
**occurs** *(1)*
**o'clock** *(1)*
**O'CONNOR** *(1)*
**October** *(8)*
**offer** *(1)*
**office** *(2)*
**Officer** *(2)*
**OFFICES** *(1)*
**off-site** *(3)*
**Oh** *(9)*
**Okay** *(185)*
**omission** *(1)*
**omissions** *(1)*
**onboard** *(1)*
**onboarding** *(11)*
**once** *(7)*
**ones** *(5)*
**one's** *(1)*
**one-size-fits-all** *(1)*
**ongoing** *(2)*
**on-site** *(2)*
**operates** *(1)*
**operation** *(1)*
**Operations** *(3)*
**opiates** *(1)*
**opinion** *(1)*
**opioid-overdose** *(1)*
**opportunities** *(2)*

opportunity *(3)*
opposed *(5)*
options *(1)*
Oral *(6)*
orally *(1)*
order *(18)*
ordered *(7)*
orders *(9)*
organizational *(1)*
organized *(1)*
original *(1)*
originates *(1)*
Osteopathic *(1)*
outcome *(3)*
outcomes *(1)*
outline *(1)*
outpatient *(9)*
outside *(9)*
overall *(2)*
overcome *(1)*
overdose *(1)*
overlook *(1)*
overnight *(1)*
oversee *(3)*
overseeing *(4)*
oversees *(1)*
oversight *(2)*
overview *(2)*
overweight *(1)*
oxygen *(3)*

< P >
p.m *(9)*
P1 *(1)*
PA *(8)*
PAGE *(30)*
pages *(3)*
pain *(3)*
pancreas *(6)*
pandemic *(1)*
paper *(1)*
papers *(1)*
paperwork *(9)*
paracenteses *(1)*
parameter *(3)*
parameters *(1)*
paraplegic *(1)*
parcel *(1)*
parentheses *(1)*

part *(38)*
participates *(1)*
particular *(8)*
Particularly *(2)*
parts *(1)*
pass *(8)*
passes *(1)*
pathway *(4)*
pathways *(11)*
patient *(162)*
patients *(75)*
patient's *(28)*
pattern *(2)*
patterns *(7)*
pay *(1)*
PD2 *(1)*
PDP *(49)*
PDP's *(1)*
peaks *(1)*
pending *(1)*
PENN *(2)*
PENNSYLVANIA *(6)*
people *(20)*
people's *(1)*
percent *(1)*
perform *(7)*
performance *(2)*
performing *(1)*
performs *(1)*
period *(8)*
periodically *(2)*
periods *(1)*
peripheral *(2)*
permitted *(1)*
persistence *(1)*
person *(13)*
personally *(3)*
persons *(2)*
perspective *(3)*
pertain *(1)*
pertaining *(10)*
pervasive *(1)*
PESTRAK *(5)*
ph *(5)*
pharmacies *(1)*
pharmacy *(2)*
phase *(1)*
PHILADELPHIA
  *(16)*

Philly *(2)*
phone *(3)*
phrase *(1)*
physical *(3)*
physically *(1)*
physician *(5)*
physicians *(1)*
physician's *(7)*
PICC *(4)*
pick *(1)*
picture *(2)*
pinpoint *(1)*
place *(20)*
placed *(7)*
placement *(1)*
places *(1)*
Plains *(1)*
Plaintiffs *(5)*
plaintiff's *(1)*
Plan *(38)*
plans *(1)*
play *(2)*
players *(1)*
please *(13)*
plenty *(2)*
point *(15)*
Policies *(33)*
policy *(16)*
poor *(1)*
poorly *(8)*
population *(8)*
position *(4)*
positive *(1)*
possible *(4)*
post *(1)*
post-high-school *(2)*
post-hospitalization
  *(2)*
potential *(4)*
Potentially *(3)*
PPD *(1)*
PPW *(2)*
practical *(3)*
practice *(21)*
practices *(10)*
practicing *(2)*
practitioner *(9)*
practitioners *(12)*
preceding *(2)*

precipitating *(1)*
preemptively *(1)*
prefer *(1)*
Preferably *(1)*
prepare *(4)*
prepared *(3)*
preparing *(1)*
prescreening *(3)*
pre-screening *(1)*
prescribed *(5)*
prescribing *(1)*
prescription *(1)*
prescriptions *(1)*
prescriptive *(1)*
presence *(5)*
present *(24)*
presentation *(5)*
presented *(2)*
presenter *(1)*
presenting *(2)*
presents *(5)*
President *(4)*
pressure *(7)*
presumably *(2)*
Pretty *(9)*
prevent *(2)*
preventable *(2)*
prevented *(3)*
previous *(2)*
previously *(1)*
prick *(1)*
primarily *(1)*
primary *(3)*
printed *(1)*
prior *(17)*
prison *(5)*
PRISONS *(6)*
privy *(1)*
PRN *(1)*
probably *(21)*
problem *(2)*
problems *(1)*
procedures *(3)*
process *(16)*
processes *(1)*
produce *(4)*
produces *(1)*
Production *(4)*
profession *(1)*

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 111 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

professionals  (4)
progress  (13)
pronounce  (2)
pronouncing  (1)
proper  (1)
properly  (7)
propounded  (1)
protected  (1)
protein  (1)
protocol  (4)
protocols  (1)
protrusion  (1)
provide  (17)
provided  (15)
provider  (106)
providers  (55)
provider's  (2)
provides  (1)
providing  (3)
provision  (4)
provisions  (1)
psychiatric  (5)
psychiatrist  (1)
psychiatry  (1)
psychologist  (1)
psychotropic  (2)
Public  (3)
pull  (7)
pulled  (2)
pulmonary  (4)
pulse  (1)
purpose  (6)
purposes  (1)
pursue  (1)
pushes  (1)
put  (14)
putting  (2)

< Q >
QI  (10)
QIP  (3)
qualitative  (1)
Quality  (4)
quantification  (1)
quantify  (2)
quantitate  (2)
question  (33)
Questionnaire  (1)
Questions  (34)

quick  (4)
quicker-acting  (1)
quickly  (7)
quieter  (1)
quite  (2)

< R >
random  (3)
randomly  (1)
range  (9)
ranges  (1)
rare  (2)
rate  (4)
RCF  (3)
reach  (2)
read  (5)
reading  (5)
readings  (4)
real  (2)
really  (10)
reason  (13)
reasonable  (2)
reasons  (4)
re-audit  (1)
recall  (56)
receive  (4)
received  (5)
receiving  (1)
recess  (3)
recheck  (4)
recipe  (1)
recognize  (3)
recognizing  (1)
recollection  (10)
recommendation  (2)
recommendations
 (10)
recommended  (1)
recommends  (1)
record  (43)
recorded  (1)
records  (19)
record's  (3)
Red  (48)
red-flag  (1)
reduce  (1)
reduced  (1)
redundant  (1)
REES  (1)

reevaluate  (1)
refer  (11)
reference  (5)
references  (1)
referral  (3)
referrals  (2)
referred  (2)
referring  (6)
refers  (1)
reflect  (1)
refresh  (5)
refusal  (22)
refusals  (6)
refuse  (6)
refused  (5)
refuses  (2)
refusing  (5)
regard  (3)
regarding  (1)
regardless  (3)
regimen  (2)
regimented  (1)
Regional  (30)
register  (3)
registered  (9)
regular  (4)
regularly  (2)
regulate  (1)
regulatory  (1)
related  (8)
relation  (1)
relationship  (2)
relative  (1)
relatively  (1)
release  (1)
relevant  (8)
remain  (1)
remember  (22)
removal  (1)
removed  (2)
renal  (2)
render  (2)
repeat  (2)
repeated  (4)
repeatedly  (1)
repeating  (1)
rephrase  (1)
Report  (19)
reported  (1)

Reporter  (11)
Reporter-Notary  (1)
reports  (5)
representation  (3)
reproduction  (1)
Request  (3)
requested  (3)
require  (11)
required  (4)
requirement  (1)
requires  (1)
requisite  (3)
reserved  (1)
residency  (3)
resistance  (3)
resorting  (1)
resource  (2)
respiration  (1)
respiratory  (1)
respond  (9)
responded  (2)
responding  (2)
response  (1)
responsibilities  (5)
responsibility  (8)
responsible  (11)
rest  (6)
restoration  (1)
restrictions  (1)
result  (7)
resulting  (1)
resuscitative  (2)
return  (7)
returned  (5)
returning  (2)
returns  (11)
reveals  (1)
review  (49)
reviewed  (12)
reviewing  (8)
reviews  (10)
RF  (3)
right  (52)
risk  (6)
risks  (1)
Riverside  (2)
RN  (4)
Road  (1)
Rob  (1)

role *(24)*
roles *(3)*
Room *(11)*
root *(1)*
rotation *(1)*
roughly *(1)*
rounds *(2)*
route *(2)*
routine *(3)*
routinely *(3)*
row *(1)*
rule *(6)*
rules *(1)*
Run *(7)*
running *(1)*

< S >
safe *(1)*
Safety *(14)*
Samantha *(1)*
sample *(7)*
Sandy *(1)*
Saturday *(1)*
saw *(7)*
saying *(8)*
says *(64)*
scale *(2)*
scales *(1)*
scan *(1)*
scanned *(1)*
scenario *(1)*
schedule *(9)*
scheduled *(17)*
school *(2)*
scope *(4)*
Score *(1)*
screen *(5)*
screened *(1)*
screening *(15)*
scroll *(10)*
scrolled *(1)*
Scrolling *(3)*
SCTHOMAS@GRSM.
COM *(1)*
SCULLY *(1)*
se *(1)*
sealing *(1)*
searches *(1)*
second *(1)*

section *(1)*
security *(3)*
security's *(1)*
see *(86)*
seeing *(5)*
seen *(25)*
selected *(2)*
send *(16)*
sending *(3)*
sense *(3)*
sensitizes *(1)*
sent *(21)*
sentence *(1)*
separate *(5)*
separately *(1)*
September *(2)*
septic *(4)*
sequelae *(1)*
serious *(6)*
seriously *(1)*
SERRANO *(1)*
servery *(2)*
services *(1)*
session *(1)*
set *(6)*
setting *(9)*
settled *(1)*
seven *(1)*
seven-days-a-week *(1)*
severe *(2)*
shadowing *(1)*
shake *(1)*
share *(10)*
shared *(7)*
sharing *(1)*
sharp *(1)*
sheet *(5)*
sheets *(1)*
She'll *(1)*
shift *(9)*
shifts *(3)*
shock *(4)*
short *(3)*
shorter *(2)*
shorthand *(1)*
Shortly *(2)*
show *(5)*
showing *(3)*
shown *(1)*

shows *(4)*
sick *(2)*
sick-call *(1)*
sicker *(1)*
side *(7)*
sign *(10)*
Signature *(1)*
signed *(8)*
signed/witnessed *(1)*
significant *(1)*
signify *(4)*
signing *(1)*
signs *(8)*
similar *(7)*
Similarly *(6)*
Simone *(1)*
simple *(3)*
simplify *(1)*
simplistic *(1)*
simply *(1)*
sit *(2)*
site *(61)*
sites *(2)*
sitting *(1)*
situation *(22)*
situations *(9)*
six *(2)*
size *(1)*
skilled *(1)*
SKR *(1)*
sleep *(1)*
sleeping *(1)*
sliding *(3)*
sliding-scale *(2)*
slot *(1)*
slow *(1)*
small *(4)*
smaller *(1)*
SMD *(1)*
sodium *(3)*
Solutions *(3)*
somebody *(76)*
somebody's *(14)*
someone's *(2)*
something's *(2)*
soon *(1)*
sooner *(5)*
sorry *(10)*
sort *(10)*

sorts *(1)*
sound *(1)*
sounds *(3)*
source *(2)*
space *(4)*
speak *(29)*
speaking *(9)*
specialist *(1)*
specialists *(1)*
specific *(47)*
specifically *(41)*
specifics *(3)*
spell *(1)*
spend *(1)*
spent *(1)*
spoke *(3)*
spoken *(4)*
spreadsheet *(2)*
spreadsheets *(1)*
SPRING *(1)*
SQUARE *(1)*
stabilize *(3)*
stable *(5)*
stack *(1)*
stacking *(3)*
STAFF *(100)*
staffed *(1)*
staffing *(1)*
staff's *(1)*
stages *(1)*
stamp *(1)*
stand *(2)*
standard *(8)*
stands *(5)*
start *(12)*
started *(9)*
starting *(2)*
starts *(1)*
state *(12)*
stated *(5)*
statement *(1)*
STATES *(1)*
stating *(1)*
status *(4)*
stay *(1)*
STD *(1)*
steady-state *(1)*
stenographic *(1)*
step *(8)*

steps  (3)
stick  (4)
sticks  (1)
stipulated  (1)
Stipulations  (1)
stop  (2)
stopped  (1)
stored  (1)
STREET  (4)
strength  (1)
stress  (1)
stressor  (1)
stretcher  (2)
strike  (1)
strip  (2)
strive  (1)
structure  (1)
structures  (1)
struggling  (2)
subject  (3)
subjective  (1)
submitted  (1)
subsequent  (5)
substance  (2)
sufficiently  (1)
sugar  (14)
sugars  (2)
suggest  (1)
suggests  (1)
SUITE  (4)
summarize  (3)
summary  (6)
SUMMER  (3)
Sunday  (2)
Sundays  (1)
supervise  (9)
supervised  (2)
supervises  (3)
supervising  (3)
supervision  (12)
supplement  (2)
supply  (1)
supplying  (1)
SUPPORT  (2)
supported  (1)
supportive  (1)
suppose  (5)
supposed  (27)
sure  (34)

surgery  (1)
surprised  (1)
surrounding  (2)
switched  (2)
switching  (2)
sworn  (1)
symptom  (2)
symptomatic  (1)
symptoms  (3)
syndrome  (1)
synonymous  (2)
system  (34)
systemic  (1)
systems  (1)

< T >
tachycardia  (1)
take  (39)
taken  (11)
talk  (16)
talked  (11)
talking  (9)
tat  (1)
taught  (1)
taxes  (1)
taxonomy  (2)
TB  (2)
team  (19)
tell  (22)
telling  (3)
tells  (1)
Template  (1)
TEN  (1)
tend  (1)
tended  (1)
tends  (2)
term  (11)
terms  (18)
test  (11)
tested  (2)
testified  (10)
testify  (7)
testimony  (4)
testing  (5)
tests  (2)
TGREGORY@OKLL
P.COM  (1)
Thank  (42)
theoretically  (1)

therapy  (7)
thing  (8)
things  (29)
think  (57)
thinking  (2)
THOMAS  (9)
thought  (4)
threatening  (1)
THREE  (16)
three-month  (1)
throwing  (2)
thyroid  (2)
till  (1)
time  (57)
timed  (1)
timeline  (4)
timely  (2)
times  (26)
timing  (8)
tip  (1)
Tischler  (1)
tissues  (2)
title  (3)
today  (5)
today's  (1)
told  (8)
Tool  (6)
tools  (7)
top  (7)
Topic  (9)
topics  (4)
Torresdale  (1)
touch  (3)
touched  (4)
touching  (1)
track  (2)
tracked  (1)
tract  (2)
train  (1)
trained  (22)
training  (34)
trainings  (9)
transcript  (3)
transcription  (1)
transfer  (7)
transferred  (6)
transferring  (1)
transfers  (1)
transition  (1)

transitioned  (3)
Transport  (1)
traumatic  (1)
treat  (6)
treated  (6)
treating  (5)
treatment  (34)
TREBACH,LLP  (1)
tree  (1)
triage  (10)
trial  (1)
tried  (4)
trigger  (13)
triggered  (6)
trip  (3)
triple  (1)
trips  (1)
TRIVIKIM  (1)
TRIVIKRAM  (9)
T-R-I-V-I-K-R-A-M
  (1)
true  (2)
try  (28)
trying  (16)
turned  (1)
Twice  (2)
two  (18)
type  (66)
types  (15)
typical  (5)
typically  (20)

< U >
uh-hmms  (1)
Uh-huh  (1)
Ultimately  (1)
unable  (1)
unclear  (1)
uncontrolled  (9)
undergraduate  (1)
underlying  (2)
understand  (23)
understanding  (8)
understood  (9)
unfit  (3)
uniformly  (1)
unit  (14)
UNITED  (1)
units  (12)

Case 2:24-cv-05618-TJS    Document 100-12    Filed 12/05/25    Page 114 of 114

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**universal** *(1)*
**University** *(2)*
**unreasonable** *(1)*
**unspecified** *(1)*
**unstable** *(5)*
**untold** *(1)*
**unusual** *(2)*
**unwell** *(2)*
**updates** *(1)*
**uploaded** *(2)*
**upstate** *(2)*
**uptunded** *(1)*
**urgent** *(2)*
**urgently** *(1)*
**urinary** *(1)*
**urine** *(23)*
**use** *(16)*
**usual** *(2)*
**usually** *(15)*
**utilize** *(2)*
**utilized** *(1)*

**< V >**
**vague** *(1)*
**value** *(4)*
**values** *(1)*
**variation** *(3)*
**varied** *(1)*
**varies** *(2)*
**variety** *(1)*
**various** *(3)*
**vary** *(1)*
**vehicle** *(1)*
**vein** *(1)*
**vendor** *(1)*
**venous** *(2)*
**ventilation** *(1)*
**versed** *(1)*
**versus** *(2)*
**Vice** *(4)*
**videos** *(1)*
**Videotaped** *(1)*
**Virtual** *(1)*
**virtue** *(1)*
**visibly** *(1)*
**visit** *(4)*
**visits** *(3)*
**visual** *(2)*
**vital** *(5)*

**vomiting** *(3)*
**vs** *(1)*

**< W >**
**wait** *(2)*
**waived** *(1)*
**Wakowski** *(2)*
**walk** *(5)*
**walk-in** *(4)*
**walking** *(2)*
**WANDA** *(1)*
**wanna** *(1)*
**want** *(23)*
**wanted** *(8)*
**wants** *(1)*
**warrant** *(1)*
**water** *(1)*
**way** *(32)*
**ways** *(3)*
**weak** *(2)*
**weapon** *(1)*
**week** *(1)*
**weekend** *(1)*
**weekends** *(1)*
**weeks** *(2)*
**Well** *(56)*
**went** *(12)*
**we're** *(14)*
**West** *(1)*
**we've** *(5)*
**whichever** *(1)*
**White** *(1)*
**whoever's** *(1)*
**wildly** *(1)*
**willing** *(2)*
**withdrawal** *(1)*
**WITNESS** *(6)*
**WITTEKIND@OKLL P.COM** *(1)*
**wonder** *(1)*
**wondering** *(3)*
**word** *(1)*
**wording** *(1)*
**work** *(44)*
**worked** *(5)*
**workflow** *(1)*
**working** *(10)*
**workplace** *(1)*
**works** *(7)*

**wound** *(2)*
**wounds** *(1)*
**written** *(1)*
**wrong** *(1)*

**< X >**
**X-rays** *(1)*

**< Y >**
**Yeah** *(18)*
**year** *(5)*
**years** *(12)*
**Yep** *(1)*
**YESCARE** *(54)*
**YesCare's** *(1)*
**York** *(3)*
**young** *(2)*
**YouTube** *(1)*