# EXHIBIT D

 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                        -   -   -

 4   JACOB and JAMES JUNG, as      :
     Administrators of the Estate :
 5   of LOUIS JUNG, JR.,           :
                 Plaintiff,        :
 6                                 :
     -vs.-                         :
 7                                 :
     CITY OF PHILADELPHIA, et al.,:
 8            Defendant(s).        :  2:24-cv-05618-TJS

 9                        -   -   -

10            Wednesday, November 5, 2025

11                        -   -   -

12              Videoconferenced deposition of

13   MARIESHA APOLLON, taken pursuant to notice, was

14   held virtually in the Commonwealth of

15   Pennsylvania, commencing at 10:04 a.m., on the

16   above date, before Jared Carey, a Professional

17   Reporter and Notary Public in and for the

18   Commonwealth of Pennsylvania.

19                        -   -   -

20

21

22

23   Everest Job No. 46484

24

25

1          APPEARANCES:

2    ABOLITIONIST LAW CENTER
     BY: BRET GROTE, ESQUIRE
3        MARGO HU, ESQUIRE
     631 N. 12th Street
4    Philadelphia, Pennsylvania 19123
     412.654.9070
5    Attorney for the Plaintiff
     (Appearing via Zoom)
6

7

8    KIERNAN TREBACH
     BY: SARAH BAKER, ESQUIRE
9        JONATHAN M. KAMINSKY, ESQUIRE
     1801 Market Street
10   Philadelphia, Pennsylvania 19103
     215.569.4433
11   Attorney for Defendant, Mariesha Apollon
     (Appearing via Zoom)

12

13   CITY OF PHILADELPHIA LAW DEPARTMENT
     BY: EMILY HOFF, ESQUIRE
14   1515 Arch Street, 15th floor
     Philadelphia, Pennsylvania 19103
15   215.683.5000
     Attorney for Defendant, City of Philadelphia,
16   Blanche Carney, Gene Frasier, Wanda Bloodsaw
     (Appearing via Zoom)
17

18

19   GORDON REES SCULLY MANSUKHANI
     BY: SUMMER C. THOMAS, ESQUIRE
20   1717 Arch Street, Suite 610
     Philadelphia, Pennsylvania 19103
21   215.561.2300
     Attorney for Defendant, Career Staffing
22   (Appearing via Zoom)

23

24

25

1

2

3          APPEARANCES: Continued

4

5   O'CONNOR KIMBALL
    BY: RAYMOND WITTEKIND, ESQUIRE
6   15th Street and JFK Boulevard, Suite 100
    Philadelphia, Pennsylvania 19102
7   215.564.0400
    Attorney for Defendant, YesCare Corp.
8   (Appearing via Zoom)

9

10

11  ALSO PRESENT:

12  Corinne Austen

13  Lolo Serrano

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I   N   D   E   X
 2   WITNESS                                   PAGE
 3   MARIESHA APOLLON
 4   BY:  MR. GROTE                            6
 5        MR. WITTEKIND                        110
 6        MS. THOMAS                           117
 7        MS. BAKER                            117
 8                E   X   H   I   B   I   T   S
 9   MARKED              DESCRIPTION           PAGE
10            (No exhibits were marked.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer

Page Line            Page Line            Page Line

None

Request for Production of Documents

Page Line            Page Line            Page Line

None

Stipulations

Page Line            Page Line            Page Line

None

Question Marked

Page Line            Page Line            Page Line

None

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 7 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 6

1         - - -

2         MARIESHA APOLLON, having been

3  duly sworn, was examined and testified as

4  follows:

5         - - -

6         EXAMINATION

7         - - -

8  BY MR. GROTE

9      Q.    Good morning, Ms. Apollon.  Can

10  you hear me fine?

11     A.    Yes.

12     Q.    My name is Bret Grote.  I am

13  counsel for the plaintiffs in the matter of Jung

14  versus City of Philadelphia.  You are here in

15  response to a Notice of Deposition.

16         Can you please state and spell

17  your name for the record.

18     A.    Mariesha Apollon.

19  M-A-R-I-E-S-H-A, A-P-O-L-L-O-N.

20     Q.    Have you ever given a deposition

21  before?

22     A.    Yes.

23     Q.    In what capacity -- or how many

24  times?

25     A.    One.

Page 7

1      Q.    And what was the nature of that

2  deposition for?

3      A.    I sued someone for firing me when

4  I was pregnant.

5      Q.    And about approximately how long

6  ago was that case?

7      A.    Four months ago.

8      Q.    That's when the deposition was?

9      A.    The deposition was in February.

10     Q.    So you've been through this

11  before.  But I will go over some ground rules

12  just so we are on the same page as to how the

13  deposition will be conducted.

14         We both have to speak out loud.

15  No head nods or mm-mmh type of answers because

16  we need the court reporter to take down

17  everything that is said so that the transcript

18  is clear.

19         We have to not talk over each

20  other.  So I will let you finish your answers

21  before I ask another question.  And I ask you to

22  let me finish my question before you give an

23  answer.

24         If you do not know or remember

25  something, please let me know if there is a

Page 8

1  document that might refresh your recollection.

2  And if you answer a question, I will assume that

3  you understood it.  Also, you can take breaks.

4  If you need a break, just let me know.

5         But the only thing I ask is that

6  if I have just asked a question, please answer

7  the question before we take a break.

8      A.    Okay.

9      Q.    Does all of that sound good to

10  you?

11     A.    Yes.

12     Q.    Are you prepared to give a

13  deposition today?

14     A.    Yes.

15     Q.    Did you do anything to prepare

16  for today's deposition?

17     A.    I spoke with my lawyers.  And I

18  reviewed the intake paperwork.

19     Q.    Without telling me anything about

20  the content of the conversation with your

21  attorneys, how many times did you meet with your

22  lawyers in preparation for this deposition?

23         MS. BAKER:  I will object.  Why

24  is that not subject to attorney/client

25  privilege?

Page 9

1         MR. GROTE:  It's a very standard

2  question to ask how many times someone has

3  met in order to engage the sense in which

4  they have been prepared to give testimony.

5  And --

6         MS. BAKER:  I don't think you are

7  entitled to know how many times she met

8  with us.  I think that's covered by

9  attorney/client privilege.  I'm sorry.

10         MR. GROTE:  Are you instructing

11  your client not to answer the question?

12         MS. BAKER:  I am instructing her

13  not to answer that question as it is

14  phrased.  Yes.

15         MR. GROTE:  Then we will certify

16  for the record that the client has been

17  instructed not to answer that question.

18  BY MR. GROTE

19     Q.    Did you -- you said you reviewed

20  the intake documents.  Was that correct,

21  Ms. Apollon?

22     A.    Yes.

23     Q.    Were those the documents dated

24  October 28, 2023, if you remember the date?

25     A.    Yes.

Page 10

1  Q.   Did you review any other
2  documents in preparation for the deposition?
3       A.   No.
4       Q.   Where do you work currently?
5       A.   Robert Wood Johnson Hospital.
6       Q.   What do you do at the hospital?
7       A.   I'm a registered nurse.
8       Q.   Where is that hospital?
9       A.   Hamilton, New Jersey.
10      Q.   How long have you worked there?
11      A.   One month.
12      Q.   I will ask you some questions now
13 about your educational and work history.
14          Can you tell me all of the post
15 high school education that you have received?
16      A.   I was a medical assistant, home
17 health aide/medical assistant.  And then I
18 received my nursing degree.
19      Q.   Where were you -- where did you
20 receive your nursing degree?
21      A.   Brooklyn, New York.
22      Q.   Any other degrees or post
23 secondary education?
24      A.   Medical assistant degree.
25      Q.   And where did you receive that

Page 11

1  degree?
2       A.   Same place.  Brooklyn, New York.
3       Q.   When did you get those degrees?
4       A.   Medical assistant is 2011 and
5  nursing is 2016.
6       Q.   And when did you graduate high
7  school?
8       A.   2008.
9       Q.   Are you currently in school for
10 anything?
11      A.   I just graduated.
12      Q.   Where did you graduate from?
13      A.   Capella University.
14      Q.   What was the degree in?
15      A.   Bachelor's of science in nursing.
16      Q.   You said just graduated.  Was
17 that this year?
18      A.   Yes.  Like a week ago.
19      Q.   And can you walk me through --
20 let's go -- can you tell me what your -- what
21 was your first job in the medical field?
22      A.   As I stated, I was a home health
23 aide.  I would go to the hospital and watch
24 patients.  Right after that I was a medical
25 assistant at a private doctor's office and then

Page 12

1  in the endoscopy center.  And after that I
2  started in the nursing home, the prison, and now
3  the hospital.
4       Q.   As a home health aide, what
5  training did you receive for that position?
6       A.   There is a home health aide
7  certificate.
8       Q.   And what do you learn as part of
9  receiving that certificate?
10      A.   How to take care of patients in
11 their home, bathing, clothing, medications,
12 exercises.
13      Q.   And how long were you a home
14 health aide?
15      A.   Approximately seven years.
16      Q.   And what were those seven years?
17 What was the beginning and what was the end?
18      A.   Approximately 2012 to 2019.
19      Q.   When did you become a medical
20 assistant?
21      A.   When the pandemic broke out.  So
22 2019.
23      Q.   Would that have been 2020 maybe?
24      A.   No.  It was September -- around
25 Septemberish of 2019.

Page 13

1       Q.   Where were you a medical
2  assistant?
3       A.   I was at a private doctor's
4  office.  I do not recall the name.  And then the
5  pandemic broke out.  Most people got laid off --
6  including me.  And then I was hired at the
7  Endoscopy Center of New York in New York City.
8       Q.   And as a medical assistant, what
9  training did you receive for that position?
10      A.   I got my associate's degree.  You
11 are able to draw blood, do EKGs, assist the
12 patient, those type of things, give orders.
13      Q.   Did you, as a medical assistant,
14 ever receive any training on diabetes care?
15      A.   I don't believe that is within
16 the practice.  I don't believe that's something
17 medical assistants learn.
18      Q.   So is it your -- are you saying
19 that you did not receive specific training on
20 diabetes care as part of that role?
21      A.   Yes, yes.
22      Q.   And as a medical assistant, you
23 were in private practice, you said, before -- or
24 you worked in an office that was in private
25 practice before the Endoscopy Center of New

Page 14

1  York. Was that accurate?
2       A.    Yes.
3       Q.    And in that private practice can
4  you walk me through what did a basic day look
5  like --
6       A.    Shadow the doctor --
7            MS. BAKER: Let him finish the
8       question before you start your answer.
9       Okay?
10           THE WITNESS: Okay.
11           MS. BAKER: Did you hear the
12      whole question?
13           THE WITNESS: No.
14  BY MR. GROTE
15      Q.    What did a typical day in your
16  job look like? What were your responsibilities?
17      A.    I took orders from the doctor. I
18  took urine samples, drew blood, EKG, those type
19  of things.
20      Q.    And at the Endoscopy Center of
21  New York, what were your typical
22  responsibilities?
23      A.    We mostly washed the beds, made
24  the beds so that the process -- it was an
25  outpatient endoscopy center. So they needed to

Page 15

1  run the pace faster. So I did not do any vital
2  signs or any blood work there. We just mostly
3  provided a faster route for patients to get in
4  and out.
5       Q.    And after the Endoscopy Center of
6  New York, did you work at the Isabella
7  Rehabilitation Nursing Home?
8       A.    Yes.
9       Q.    And what were your job
10  responsibilities there?
11      A.    Taking orders from doctors, doing
12  wound care, passing medication, assessing
13  patients, determining if they need to go to the
14  hospital, EKG, IV, medications.
15      Q.    And were you also a medical
16  assistant or did you have a different role
17  there?
18      A.    No. The only role that I carried
19  at Isabella was the nursing career.
20      Q.    As a medical assistant, is that a
21  position that requires a license?
22      A.    No.
23      Q.    When you were at Isabella
24  Rehabilitation Nursing Home, you were a nurse;
25  is that correct?

Page 16

1       A.    Yes. You cannot work as a nurse
2  unless you pass the board license examination.
3       Q.    When did you pass the board
4  license examination?
5       A.    2021, November.
6       Q.    And at the Isabella
7  Rehabilitation Nursing Home, did you have
8  occasion to care for patients with diabetes?
9       A.    Yes.
10      Q.    And what type of care would you
11  provide to diabetic patients, generally
12  speaking?
13      A.    Insulin therapy, diet, make sure
14  they are on the right diet, follow-ups,
15  reassessments.
16      Q.    Did you review training in
17  diabetes care as part of your -- through the
18  rehabilitation nursing home?
19      A.    Can you re-ask that?
20      Q.    I think I can -- I think there is
21  another question I should ask first.
22           In receiving your nursing
23  license, prior to doing that or as part of
24  receiving that license, did you receive training
25  on diabetes care?

Page 17

1       A.    Yes.
2       Q.    Can you describe what that
3  training consisted of?
4       A.    At my school they taught us what
5  are the signs and symptoms of hypoglycemic,
6  hyperglycemic, the range, the normal blood
7  sugar.
8       Q.    And what --
9       A.    I was not done. The type of
10  insulins, short-acting, long-acting, those type
11  of things.
12      Q.    And what are signs and symptoms
13  of hypoglycemia?
14      A.    Dysphagia, confusion,
15  dehydration.
16      Q.    Are there others?
17      A.    Sweating, blurred vision.
18      Q.    Any others that you can recall
19  right now?
20      A.    No.
21      Q.    And what are the signs and
22  symptoms of hyperglycemia?
23      A.    Excessive urination, dehydration,
24  blurred vision.
25      Q.    Are there any others that you

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 18

recall?

A.    No.

Q.    And you said you were trained on, I believe, the normal range of glucose readings? And correct me if that was not exactly what you said.

A.    Yes.

Q.    What are normal ranges of glucose readings?

A.    Between the range of 70 and 110.

Q.    Thank you.

Were you also trained on risks of abnormal glucose levels?

A.    Yes.

Q.    What are those risks?

A.    As I stated before, the symptoms any individual can have is confusion, blurred vision, sweatiness, shakiness, frequent urination, dehydration.

Q.    So as a nurse at Isabella Rehabilitation Nursing Home, did you encounter patients, diabetic patients, who at times had these symptoms?

A.    Yes.

Q.    And as a nurse when you would

Page 19

encounter such symptomatic patients, what did you do?

A.    We would check the blood glucose levels first and then see if they have an order for insulin, administer the insulin. And then we do a reassessment. After the reassessment if the patient remains the same or is more declined, we have to call the doctor.

Q.    When did your job at Isabella end?

A.    When I gave birth to my son in January of 2023.

Q.    And is there any reason you did not go back to Isabella after that?

A.    I moved to New Jersey.

Q.    After you moved to New Jersey, where were you employed?

A.    August 2023 I got employed at the prison.

Q.    And who was your employer when you worked at the Philadelphia Department of Prisons?

A.    I was hired through an agency called Tekaccel.

Q.    Do you know where Tekaccel is

Page 20

based?

A.    Texas.

Q.    And are you familiar with an entity called Career Staffing?

A.    No.

Q.    Did you have a supervisor at Tekaccel?

A.    No. I had a recruiter.

Q.    Can you describe for me the nature of the relationship with the recruiter, how the employment came to be and how they placed you at the Philadelphia Department of Prisons?

A.    They reached out to me through emails stating that they saw my résumé. They would like to offer me a position at the prison. They went through the application process and offered me a rate and a shift. And I agreed to those documentations.

Q.    What was the rate that was offered?

MS. BAKER:  Objection as to relevance. Why is that relevant? Why is her rate of pay relevant? We previously produced, I believe, the agreement that she

Page 21

had.

MR. GROTE:  Because it reveals the compensation she was receiving for performing.

MS. BAKER:  But why is her rate of compensation relevant to the questions that are at issue in this case? We produced the document which had that redacted. I don't understand why you need to know what the rate of pay was. I am instructing her not to answer that question unless you can provide --

MR. GROTE:  What privilege are you asserting? Are you asserting a privilege?

MS. BAKER:  I am not asserting -- well, I'm telling you that --

MR. GROTE:  Your objection has been stated for the record. Are you asserting a privilege?

MS. BAKER:  I have stated my objection.

MR. GROTE:  Correct. And unless you are asserting a privilege, the witness is to answer the question.

Page 22

MS. BAKER: That's incorrect. That's incorrect. I don't understand why it has any relevance to this case what her rate of pay was. And you have not provided me the reason why it would be relevant.

MR. GROTE: Your objection has been stated for the record. I am asking is there a privilege that's being asserted?

MS. BAKER: I told you what the grounds for the objection are.

MR. GROTE: So you are not asserting a privilege?

MS. BAKER: You can ask your next question.

MR. GROTE: I want the record to reflect that you are not asserting a privilege and you are certifying that she is not to answer this question based on a relevance objection. Is that what you are instructing your client?

MS. BAKER: We can go around and around and around on this. Although discovery is broader than what is potentially admissible at the time of trial, I don't understand how her rate of

Page 23

pay has any bearing on any of the issues that we are exploring here in discovery. Unless you can provide me with the reason why it would be, then I think it's outside the scope of applicable discovery.

MR. GROTE: I understand what your objection is. You have stated it. It has a relevance for showing how YesCare was utilizing its overall staffing complement, including what compensation packages were for their staff, what their expectations were for staff who are making certain amounts of money based upon their training to perform their job responsibilities.

And it could have relevance for determining whether or not they were properly preparing their staff in order to provide the care that was required at the facility.

And I understand the nature of your objection. I want to make it clear on the record that if you are instructing your client not to answer the question, it is based on a relevance objection and not a privilege. That's all.

Page 24

MS. BAKER: I don't understand what you just articulated. Let's not hold the deposition up by continuing to argue over this. In order to keep things going, I will allow her answer the question as to what her rate was at the time she was hired. And I not will allow further inquiry into her pay.

Mariesha, you may answer the question as to what your rate of pay was at the time you were hired to work at the prison.

THE WITNESS: $64 an hour.

MR. GROTE: Thank you.

BY MR. GROTE

Q. And did you have to obtain a license, a Pennsylvania license, prior to working at the prison?

A. Yes.

Q. And when did you obtain that license?

A. Pennsylvania Board of Nursing. You just have to apply.

Q. I am sorry. Maybe I didn't speak loud enough. I said, When did you obtain that

Page 25

license?

A. Probably June 2023.

Q. And you said that you agreed to a shift -- you were offered a shift I think was your language; is that correct?

A. Yes. 3:00 p.m. to 11:00 p.m.

Q. And what days of the week did you work 3:00 to 11:00 p.m.?

A. Five days out of the week. I don't recall the specific days.

Q. They are not always the same five days?

A. They were not always the same five days.

Q. A little more about diabetes. What is type 1 diabetes?

A. We are told that type 1 is what you're born with.

Q. Is there anything else that you know about type 1 diabetes?

A. It needs to be managed with insulin.

Q. Do you know what type 2 diabetes is?

A. That is what you develop as you

Deposition of Mariesha Apollon

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 26

1 get older.

2     Q.    And do you know what

3 distinguished type 1 from type 2 diabetes?

4     A.    Type 2 can be managed with oral

5 medication.  Type 1 needs insulin.

6     Q.    So when you say insulin, do you

7 mean injectable insulin?

8     A.    Yes.

9     Q.    Is the oral medication also

10 insulin?  Or is that different?

11     A.    Yes.  It's not insulin.  But it

12 lowers the blood sugar.

13     Q.    At Curran-Fromhold Correctional

14 Facility -- excuse me.

15         When you worked at the

16 Philadelphia Department of Prisons, were you

17 stationed at any particular jail?

18     A.    I was stationed at CFCF

19 Curran-Fromhold.

20     Q.    That was for the entirety of your

21 employment there?

22     A.    Yes.  Only one day I was

23 transferred to DC, which was a few feet from

24 that prison.

25     Q.    DC is the Detention Center,

Page 27

1 correct?

2     A.    Yes.

3     Q.    And is that where the infirmary

4 is in the prisons?

5     A.    No.  I didn't see that there.  I

6 don't recall seeing that there when I was there.

7     Q.    Do you know where the infirmary

8 was?

9     A.    No.

10     Q.    How long did you work at CFCF?

11     A.    26 weeks.

12     Q.    And is that approximately six

13 months?

14     A.    Yes.

15         MS. BAKER:  She didn't know it

16     was going to be a math test.

17 BY MR. GROTE

18     Q.    Why did your employment end at

19 the end of that contract?

20     A.    Can you -- it was a contract as

21 needed.  It started off as a 13-week and then

22 extended for one more 13-week.

23     Q.    Did they offer to extend it

24 beyond the 26 weeks?

25     A.    No.

Page 28

1     Q.    Where did you work next?

2     A.    Chapel Manor Nursing Home.

3     Q.    How long did you work there?

4     A.    Five months.

5     Q.    And when did that employment end?

6     A.    When I gave birth to my daughter

7 in May 2024.

8     Q.    A little belated, but

9 congratulations on that as well.

10     A.    Thank you.

11     Q.    When did you -- what was your

12 next job after giving birth to your daughter?

13     A.    I stayed home 18 months.  And I

14 started back to work October 6th.

15     Q.    Going back to Chapel Manor

16 Nursing Home, what was your role at the nursing

17 home?

18     A.    Charge nurse and supervisor.

19     Q.    How is being a charge nurse

20 different from your role as CFCF?

21     A.    Being a charge nurse is you are

22 in charge of the LPNs.  You are in charge of

23 making decisions.  You are in charge of saying

24 this patient needs to go to the hospital.  You

25 are putting in orders.  You are taking orders

Page 29

1 from doctors.

2     Q.    And I am not sure if I asked

3 this.  But what were your responsibilities at

4 CFCF?

5     A.    I was assigned to medical triage,

6 and I was also assigned to intake.

7     Q.    At intake, did you have to -- how

8 do you screen for diabetes?

9         MS. BAKER:  At intake, you mean?

10     Or in general?

11 BY MR. GROTE

12     Q.    Let me back up.

13         Generally, if we talk about

14 screening a patient, what does that term mean to

15 you?

16     A.    Asking questions and physically

17 looking at the patient to see if they have any

18 symptoms.

19     Q.    So, in general, how does one

20 screen for diabetes?

21     A.    You check their blood sugar.  And

22 you can verbally ask them, Are you a diabetic?

23     Q.    Are there any other ways that you

24 might have insight into whether or not they are

25 a diabetic?

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 13 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 30

1       MS. BAKER:  At that facility, you
2   mean?  Or generally?
3   BY MR. GROTE
4       Q.    Actually just generally.
5       A.    Yes.  As I stated, you can look
6   at someone's symptoms.  They are sweating.  They
7   are confused.  Their vision is becoming more
8   blurry.  There is signs and symptoms that you
9   can look at to say someone may or may not be
10  diabetic.
11      Q.    If you had their medical file,
12  can you also review their medical record?
13      A.    Yes.
14      Q.    And what are ketones?
15      A.    That's something that is produced
16  in the urine when the blood sugar is so high.
17  So we instruct the patient or the individual to
18  drink a lot of water to flush out the ketones.
19      Q.    How do you test for ketones?
20      A.    You ask the individual to produce
21  urine.  And then there is a urine test strip.
22  You take the test trip and you dip it in the
23  urine.  And depending on the color, it tells you
24  if the person has ketones.
25      Q.    And is there a color that

Page 31

1   indicates positive versus a color that indicates
2   negative?
3       A.    Yes.
4       Q.    Are there any kind of gradations
5   in that color scheme such that you can tell if
6   there is a larger or a lighter presence of
7   ketones?
8       A.    Yes.  The color doesn't -- it's
9   not just two colors there.  It goes from light
10  to dark.
11      Q.    So the darker it is, the heavier
12  the presence of ketones.  Is that the case?
13      A.    Yes.  I would say yes.
14      Q.    In type 1 diabetes, you said that
15  it's treated with insulin, correct?
16      A.    Yes.
17      Q.    Are there other ways in which
18  type 1 diabetes can be treated or -- in addition
19  to insulin, are there other ways that type 1
20  diabetes might be treated?
21      A.    In conjunction with the insulin,
22  you have a diet modification and also you can
23  exercise.
24      Q.    What about type 2 diabetes, are
25  there other ways to treat in addition to the

Page 32

1   oral medication that you mentioned?
2       A.    Yes.  They are modifiable things
3   that the patient can do:  Lose weight, change
4   diet, less carbohydrates, those things, less
5   sugary drinks, more water.
6       Q.    Anything else?
7       A.    No.
8       Q.    If I use the term "units of
9   insulin," what does that mean?  What is a unit
10  of insulin?
11      A.    The amount of insulin that the
12  patient requires based off of their blood sugar
13  level.
14      Q.    How do you determine how many
15  units of insulin to give a patient?  Is it by
16  reading the blood sugar level?
17      A.    We have something called a
18  sliding scale.  Every institution has different
19  ranges.  I don't remember the one for the
20  prison.  But based on his sugar level it could
21  have been 10 units, 12 units.
22      Q.    When you say based on his sugar
23  level, are you referring to Mr. Jung?
24      A.    Yes.
25      Q.    Do you have any -- do you know

Page 33

1   why there is different ranges at different
2   institutions?
3       A.    No.  I don't know.  I don't know.
4   Because even the job I am working at now there
5   is different ranges.  They do not allow you to
6   give the insulin unless the blood sugar is
7   starting from 150.  So I don't know why each
8   institution has different sliding scales.
9       Q.    Understood.
10          In the higher ranges, so if it's
11  400, can there also be different ranges
12  depending upon the medical provider's
13  guidelines?
14          MS. BAKER:  Objection to the
15      form.  You may answer if you understand the
16      question.
17          THE WITNESS:  I don't understand.
18      Can you repeat it?
19  BY MR. GROTE
20      Q.    What I'm wondering about is --
21  you just testified that where you are working
22  now, unless it's 150, the glucose is 150,
23  insulin will not be administered unless it's
24  above that.
25          I am wondering if there is also

Deposition of Mariesha Apollon

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 34

1 variation in prescribed insulin units as you get
2 higher up the scale. So if it's at 300, 350,
3 500, could there still be variation depending on
4 where you work now versus what PDP's scale was
5 or does it ever become the case that everywhere
6 you worked when it reaches a certain threshold
7 the number of units to be given are consistent?
8        MR. WITTEKIND: Objection to the
9    form.
10 BY MR. GROTE
11     Q.   Did that help?
12       MS. BAKER: You can answer the
13    question. That was just an objection to
14    form. You can answer the question if you
15    understand the question.
16       THE WITNESS: Every institution
17    is different. They provide different
18    guidelines on the sliding scale.
19 BY MR. GROTE
20     Q.   So if somebody's blood glucose is
21 over 400, would the amount of insulin that you
22 would provide as a nurse be dependent on what
23 the institution's sliding scale guidelines were?
24     A.   Yes.
25     Q.   And if somebody's glucose level

Page 35

1 is over -- in general if it's over 400, what are
2 you supposed to do as a nurse?
3       MS. BAKER: Objection to the
4    form. Are you asking her generally or are
5    you asking at that particular facility?
6       MR. WITTEKIND: I join.
7 BY MR. GROTE
8     Q.   I'm asking generally. But if
9 there is variations depending on the facility,
10 please indicate that.
11     A.   The right thing to do is call the
12 doctor for an order.
13     Q.   Why is that?
14     A.   That's not within my scope to put
15 an order in.
16     Q.   If the glucose level were, say,
17 at 200, would you still have to call the doctor
18 for an order then?
19     A.   Yes.
20     Q.   Is there any range in which you
21 would not have to call the doctor in order to
22 administer insulin?
23     A.   Yes. If it was in the normal
24 range. 70 to 110 you would not need to call the
25 doctor.

Page 36

1       Q.   Prior to working at CFCF, had you
2 ever worked in a correctional facility?
3     A.   No.
4     Q.   What was different about working
5 in a correctional facility than your prior jobs?
6       MR. WITTEKIND: Objection to the
7    form.
8       THE WITNESS: Prison is a little
9    bit more strict, I would say. It's
10    stricter guidelines in the prison.
11 BY MR. GROTE
12     Q.   And are those guidelines in
13 regard to patient care? In regard to security
14 issues? What do you mean by that?
15     A.   Security issues.
16     Q.   Thank you.
17       Were there any differences in
18 terms of any -- strike that.
19       In terms of providing patient
20 care, were there any differences beyond the
21 strict security protocols?
22     A.   Yes.
23     Q.   What were some of those?
24     A.   If you administer insulin there
25 was not -- sometimes you would not have

Page 37

1 access -- most of the time you do not have
2 access to do a reassessment on the patient.
3     Q.   Can you explain what you mean by
4 you wouldn't have access to do a reassessment?
5     A.   I am in intake. The intake
6 process may take 30 minutes. Within that
7 process I am administering the insulin. I am
8 advising the person to drink water within 30
9 minutes. The person is at another location of
10 the prison.
11     Q.   So as the intake nurse, would you
12 not then have any interaction with the patient
13 after the intake procedure?
14     A.   Can you rephrase the question?
15     Q.   Yes.
16       When you were intake nurse after
17 you went through an intake screening -- which I
18 think is what you're talking about; is that
19 right?
20     A.   Yes.
21     Q.   And the patient goes somewhere
22 else in the prison. Did you have any follow-up
23 with patients after that intake screening?
24     A.   No. But the patients were
25 informed that if they are symptomatic, they can

Page 38

1  come down to medical triage. And as I stated
2  before, I was also working in medical triage.
3  And then I would see them there as well.
4      Q.    If a patient was to be seen after
5  intake screening, whose responsibility was that?
6      MS. BAKER: Objection to the
7      form. Can you clarify what you're asking?
8  BY MR. GROTE
9      Q.    So you see somebody at intake
10 screening. And there needs to be a follow-up.
11 Right? And that follow-up I understand can be
12 different time periods which there is a
13 follow-up.
14      There can be a more immediate
15 follow-up. It can be the same day. There might
16 be a provider ordering it within a week, within
17 a month. I am wondering how continuity of care
18 worked from intake to what comes after intake?
19      MS. BAKER: Answer if you
20      understand the question. If you need
21      further clarification, please ask for it.
22      THE WITNESS: Okay. The
23      continuity of care would be the LPNs that
24      were there as well as the doctors and the
25      other nurses.

Page 39

1  BY MR. GROTE
2      Q.    Would they be scheduled to see --
3  and how would they be scheduled to see patients
4  after intake?
5      A.    Within the intake form you are
6  able to free write and state what is going on
7  with the patient. And then there will be
8  follow-ups.
9      Q.    And were you the one that
10 determined when there should be a follow-up or
11 was that another person's responsibility?
12      A.    I inform the doctor, the provider
13 at the time. And based on that, there would
14 have been follow-ups.
15      Q.    So is it accurate -- is what you
16 are saying is that it was the provider's
17 responsibility for determining when there should
18 be a follow-up?
19      MR. WITTEKIND: Objection to the
20      form.
21      MS. BAKER: I will -- the reason
22      I'm objecting -- let me give you the
23      grounds for my objection. I am sure you
24      and I can agree that this nurse should not
25      be testifying as to what the standard of

Page 40

1  care or requirements were for a provider
2  other than a nurse. That is the basis of
3  my objection.
4      I think I know what you're
5  asking. I am not going to prevent her from
6  answering the question. But I would ask
7  you to rephrase so it doesn't call for what
8  would amount to an expert opinion against a
9  higher level provider, please.
10      MR. WITTEKIND: I will join that
11      objection.
12      MR. GROTE: Okay. Ray, what did
13      you say?
14      MR. WITTEKIND: I said I would
15      join her objection.
16      MS. BAKER: It was such a good
17      objection. That's why.
18      MR. WITTEKIND: Yes. It was
19      wonderful.
20 BY MR. GROTE
21      Q.    So based on your experience as
22 the intake nurse, who was it within CFCF that
23 would decide when a patient would receive
24 follow-up care after intake?
25      MR. WITTEKIND: Object to the

Page 41

1  form.
2      THE WITNESS: I believe it's
3      within everyone's ability to follow up --
4      the nurses, the doctors.
5  BY MR. GROTE
6      Q.    And would that include yourself
7  as an intake nurse?
8      A.    Yes.
9      Q.    And I used the term "medical
10 providers" for the record. When I use that
11 term, what does medical provider mean to you in
12 the context of CFCF?
13      A.    The doctor, nurse practitioner,
14 someone who is above me who can give orders,
15 medication orders.
16      Q.    At CFCF you said you worked 3:00
17 to 11:00. Were you ever required to work
18 overtime shifts?
19      A.    I was not required to work
20 overtime shifts. I worked overtime. But it was
21 not a requirement.
22      Q.    Did that happen often? Not
23 often? Every once in a while? Any way you can
24 characterize it?
25      A.    Yes. I picked up at least two

Page 42

1  shifts additional to my five shifts a week.
2      Q.    And would those shifts also be
3  eight-hour shifts?
4      A.    Yes.
5      Q.    So was it typical for you to work
6  seven 8-hour shifts a week?
7      A.    The two shifts that I picked up
8  was on days that I was already scheduled to
9  work.  So two days out of the week I would work
10 16 hours.
11     Q.    Thank you.
12           Do you recall whether or not you
13 were working an overtime shift on
14 October 28, 2023?
15     A.    I don't remember.  But I worked
16 the morning shift.
17     Q.    And which shift is that?  Is that
18 8:00 to -- no math.  7:00 to 3:00?
19     A.    Yes.
20     Q.    Do you know if you worked the
21 3:00 to 11:00 shift that day?  Or is that what
22 you can't recall?
23     A.    I don't recall.
24     Q.    When you saw Mr. Jung, it was
25 during the morning shift?

Page 43

1      A.    Yes.
2      Q.    And do you begin working at
3  CFCF -- was that in August of 2023?
4      A.    Yes.
5      Q.    When you began working there,
6  were you provided training?
7      A.    Yes.
8      Q.    What did that consist of?
9      A.    You were put in a classroom.
10 They show you how the system runs, how to enter
11 things, how to go through questionnaires.  And
12 then the next day you are put with a preceptor
13 which would basically show you around and how
14 things are done and how the prison is run.
15     Q.    I think I get it.  But what is a
16 preceptor?  I never heard that term.
17     A.    Someone who has been at the job
18 longer than you who is able to show you how
19 things are run.
20     Q.    And do you remember the name of
21 your preceptor?
22     A.    I don't recall.
23     Q.    Do you remember what their
24 position was?
25     A.    Registered nurse.

Page 44

1      Q.    The training session you just
2  referenced, was that just the first day?
3           MS. BAKER:  Objection to form.  I
4      think that mischaracterizes what she said.
5      You can go ahead and answer.
6           THE WITNESS:  Yes.  As I said, it
7      was one day in class where they educate you
8      about certain things like how to enter
9      things.  And the next day you come in and
10     you follow a preceptor around.
11 BY MR. GROTE
12     Q.    How long would you work with a
13 preceptor?  Just that second day?
14     A.    Yes.
15     Q.    After those first two days, were
16 you provided any additional training?
17     A.    Yes.  You were -- I was provided
18 approximately, I don't recall, three days of
19 training and intake.
20     Q.    What did that consist of?
21     A.    Which forms to fill out, what
22 questions to specifically ask.  If they were
23 going through withdrawal, administer these
24 medications, those type of things.
25     Q.    Were you provided any policies to

Page 45

1  familiarize yourself with?
2      A.    Yes.
3      Q.    Do you recall which ones?
4      A.    I don't.
5      Q.    Were you also provided something
6  called clinical pathways for treating certain
7  conditions?
8      A.    I don't recall.
9      Q.    Were you provided any -- after
10 those three days of training and intake, were
11 you provided any additional training?
12     A.    No.
13     Q.    And in all of the training that
14 you just testified about, did you receive any
15 training on providing care for diabetic
16 patients?
17     A.    Not within the training.
18     Q.    You said not within the training.
19 Were you provided it in any other manner?
20     A.    Yes.  I was provided training at
21 Isabella and my education, schooling.
22     Q.    But you were not provided
23 anything specific at CFCF; is that correct?
24     A.    Yes.
25     Q.    Do you remember if you were

Page 46

provided any training on how to fill out a
nursing encounter tool or a NET for diabetic
patients?

A.    I don't recall.

Q.    Do you recall if you were
provided with a copy of YesCare's clinical
pathway for diabetes care?

MR. WITTEKIND:  Objection to the
form.

MS. BAKER:  You may answer.

THE WITNESS:  I was provided with
paperwork from YesCare.  I don't recall
what it entails completely.

BY MR. GROTE

Q.    Bear with me one moment.  Do you
remember answering interrogatories as part of
this litigation?  Do you remember questions you
got as part of the discovery response that you
provided answers for?

A.    Yes.

MR. GROTE:  And one moment.  Bear
with me.

(Discussion held off the record.)

BY MR. GROTE

Q.    So I will just share my screen,

Page 47

Ms. Apollon.  Can you see this document?

A.    Yes.

Q.    And where it says, Interrogatory
No. 4, it says, "Identify and describe the
process for referring a patient for placement in
the infirmary or to a hospital during intake
screening during Ms. Apollon's employment at PDP
as Ms. Apollon understood it."

If you can take a moment to
review your answer and let me know when you have
done so.

A.    Okay.  Can you enlarge it?  It's
small.

Q.    Yes.  How is that?

A.    Okay.  I want to confirm.  So you
did not receive any training or any protocol --
you were not trained on any protocol for
referring a patient to the infirmary or the
hospital; is that correct?

MR. WITTEKIND:  Object to the
form.

THE WITNESS:  That's correct.

BY MR. GROTE

Q.    The training that you spoke of
for your employment at CFCF, was that provided

Page 48

by YesCare employees, if you know?

A.    Yes.

Q.    Do you remember the names of any
of the people involved in the training?

A.    No.

Q.    And then I will go down to
Interrogatory No. 5.  "Identify and describe the
practice at PDP for providing a document in the
administration of insulin and glucose checks,
include specific details as to the type of
information to be documented, including
information on medication refusal and how such
document should be retained."

If you can take a moment to
review that answer.  And let me know when you
need me to scroll the page to see the rest of
it.

A.    Okay.

Q.    Where it says that you would
follow a prompt on a computer screen with
pop-ups for where to enter the blood glucose
numbers, was that specific to the intake
screening?  Or was that something that had to be
utilized any time that glucose was being checked
within PDP, if you know?

Page 49

A.    This is not referring to the
intake.  I was pulled a couple times to pass
medications.  And this is where this is coming
from.

Q.    So whenever you were checking
glucose, there was a computer prompt and you had
to enter the number?

A.    Yes.

Q.    Do you know where that
information would be stored within the computer
system?

A.    It would be stored underneath the
individual person's information.  So previous or
past people, people ahead of me, can look at it
and refer back to it.

Q.    Was that part of the electronic
medical record?

A.    Yes.

Q.    Each patient would have those
numbers as part of their record?

A.    Not necessarily.  It will pop up
if the person is diabetic.  Not everyone was
diabetic.

Q.    Thank you for that clarification.
Do you know what the document

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 18 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 50

1 looked like in the electronic medical record
2 where this information would be stored?
3      A.   I don't recall.
4      Q.   Was there ever an instance that
5 you recall in which you, as a nurse, would not
6 document the glucose numbers?
7      A.   No.  I don't recall.
8      Q.   What was the process for
9 documenting insulin dosages provided?
10      MS. BAKER:  In which context?  In
11 intake?
12 BY MR. GROTE
13      Q.   We will start with non-intake.
14 If you were administering insulin, how would the
15 units of insulin, the dosage, be documented?
16      A.   You would first have to check the
17 blood glucose level.  And then check to see if
18 the person actually needs insulin.  And if they
19 do, we go to the sliding scale.  After that you
20 can enter the number.  The amount of units will
21 pop up in the system.  And you administer
22 insulin.
23      Q.   How would you document glucose
24 checks during the intake process?
25      A.   I was not assigned to document

Page 51

1 glucose checks in intake.  There was a medical
2 assistant that you would have to see before you
3 got to the nurse.
4      Q.   The medical assistant would --
5 would the medical assistant check glucose if the
6 patient was diabetic?
7      A.   Yes.
8      Q.   And would that medical assistant
9 be identified in the medical records for the
10 intake process?
11      A.   Yes.
12      Q.   Do you know where they might be
13 identified?  Would it be in a progress note or
14 some other document?
15      A.   Everyone at the prison has log-in
16 information.  Whatever you enter it's under your
17 name.  So it's ways to track it back.
18      Q.   So anything that is documented
19 will have some names associated with it in the
20 system?
21      A.   Yes.
22      Q.   Were there ever instances where
23 you did check somebody's glucose at intake?
24      MS. BAKER:  She personally you
25 mean?

Page 52

1      MR. GROTE:  Yes.
2      MS. BAKER:  Go ahead and answer.
3      THE WITNESS:  Like I said, a
4 medical assistant was provided.  So
5 specifically in intake, I did not have to
6 do it.
7 BY MR. GROTE
8      Q.   Were there instances where you
9 would ever administer insulin at intake?
10      A.   Yes.
11      Q.   Would that ever be done by a
12 medical assistant?
13      A.   No.
14      Q.   When you did administer insulin,
15 how would you document that in intake?
16      A.   There is an assessment part where
17 you can free type.  So you can type out
18 everything there in the assessment.
19      Q.   And is the assessment part of the
20 SOAP notes, objective, objective assessment
21 plan?  A progress note document?
22      A.   I would say assessment is based
23 off of my objectives, what I see, what I'm
24 experiencing with the patient.
25      Q.   I was trying to get to the form

Page 53

1 to make sure we are talking about the same
2 thing, the progress note that has -- assessment
3 is basically the third category.  Does that
4 sound accurate, if you recall?
5      A.   I don't recall.
6      Q.   Returning to your answer to
7 Interrogatory No. 5.  It says, "Answering
8 Defendants spoke to a supervisor named Smith
9 about wanting more training on insulin refusal
10 and proper ways to pass medication and proper
11 documenting in the PDP.  But Smith and the
12 people in the director or nursing office told
13 Answering Defendant that there was no additional
14 training and that as a registered nurse it was
15 expected of her to know how it works at the
16 PDP."
17      I am wondering do you recall when
18 you spoke to supervisor Smith about wanting more
19 training?
20      A.   I don't recall.  But I remember
21 speaking to her.  I don't remember which day,
22 which month.  But I recall speaking to her
23 because they did come to me and state that when
24 a prisoner refuses insulin, we have to notify
25 the endocrinologist so they can follow up with

Page 54

1  them.
2      Q.    And do you have any recollection
3  of whether that was closer to the beginning of
4  your six-month contract?  The end?  The middle?
5      A.    I believe it was towards the
6  middle.
7      Q.    So the record is clear:  You
8  began August 1st.  And your contract ended at
9  the end of January 2024.  Does that sound
10  accurate?
11     A.    Approximately January, the middle
12  of January.
13     Q.    Would the middle then be August,
14  maybe like October and November potentially?
15     A.    Yes.
16     Q.    And what additional training did
17  you want?
18     A.    I spoke to them about -- I was
19  not trained on alerting the specialists if a
20  prisoner refuses the insulin.
21     Q.    Were you ever trained on
22  something called the Red Flag policy?
23     A.    I don't recall.
24     Q.    Were you ever trained on how to
25  utilize refusal of treatment forms at CFCF?

Page 55

1      A.    No.
2      Q.    Do you remember what Smith's role
3  was?  You said supervisor.  But do you know what
4  her position was?
5      A.    I'm not sure.  But she could have
6  been the administrator.
7      Q.    Would that be the health care
8  administrator?
9      A.    Yes.
10     Q.    When she told you that there was
11  no additional training required, how did you --
12  excuse me.
13          Your answer said that there was
14  no additional training and that as a registered
15  nurse you were expected to know how it works at
16  the PDP.  How did you respond to that?
17     A.    I continued to explain that I
18  would like more explanation on how things are
19  done.
20     Q.    How did she respond to that?
21     A.    Same answer.  Nothing was
22  resolved.
23     Q.    Is it accurate that what you were
24  seeking training on had to do with specific
25  policies and protocols for care within PDP?

Page 56

1          MR. WITTEKIND:  Objection to the
2  form.
3          MS. BAKER:  Sorry.  Can I have
4  that question read back again?
5          (The reporter read back the
6  record as requested.)
7          MS. BAKER:  Objection to the
8  form.  You may answer.
9          THE WITNESS:  I'm not clear on
10  the question.
11         MR. GROTE:  I can rephrase.
12  BY MR. GROTE
13     Q.    Is it true that you were not
14  seeking training on things that you had already
15  been trained on as a registered nurse?
16         MR. WITTEKIND:  Objection to the
17  form.
18         MS. BAKER:  I join in that
19  objection.  Go ahead and answer.
20         THE WITNESS:  I was not seeking
21  training based on things I already know.  I
22  was seeking training based off of the
23  prison guidelines.
24  BY MR. GROTE
25     Q.    You were seeking training based

Page 57

1  on what your employer's requirements and
2  policies were, right?
3          MS. BAKER:  Objection to the
4  form.
5          MR. WITTEKIND:  Object to the
6  form.
7          THE WITNESS:  Yes.
8          MS. BAKER:  Just note for my
9  objection the use of the term "employer."
10         Would now be an okay time for a
11  five-minute restroom break?
12         MR. GROTE:  Yes.
13         (Discussion held off the record.)
14  BY MR. GROTE
15     Q.    When you worked intake at CFCF,
16  can you walk me through what a typical day was
17  like?
18     A.    You received a patient/prisoner.
19  And then you asked them a whole bunch of
20  questions.
21     Q.    And then you just repeat that for
22  eight hours?  Is that the job?
23     A.    Yes.  There is about -- I can't
24  recall -- but maybe four forms, five forms that
25  you have to run through all the questions and

Page 58

1  ask them based on their medical conditions, if
2  alcohol, been drinking, any surgeries, those
3  things.
4       Q.    How long did it take to process
5  an average person?  Or did it vary so much there
6  was not an average?
7            MS. BAKER:  At intake?
8            MR. GROTE:  Yes.
9            THE WITNESS:  It varies.  Every
10      individual is different.  Some may have
11      taken one hour and 30 minutes, some 30
12      minutes.
13 BY MR. GROTE
14      Q.    If you determined that there was
15 a higher level of care needed, that you needed
16 to call a medical provider, what was the process
17 there?
18           MS. BAKER:  Objection to the
19      form.  You can answer.
20           THE WITNESS:  If there is a
21      provider on site you can go to them
22      directly and tell me what the issue is.  If
23      there is no one on site, you have to pick
24      up the phone and call them and get an
25      order.

Page 59

1  BY MR. GROTE
2       Q.    And were providers usually on
3  site?
4       A.    I don't recall if there were
5  providers that were on site.
6       Q.    Were the providers more often
7  available remotely?
8            MR. WITTEKIND:  Object to the
9       form.
10           THE WITNESS:  Yes.  A few of them
11      was remotely.
12 BY MR. GROTE
13      Q.    I think this might have been
14 unclear in the record.  So I want to go back.
15 You said you do not recall providers that were
16 on site.  I wasn't sure if you were talking
17 about their specific identities.
18           But I was really kind of asking
19 was it usually the case that there was a
20 provider on site?
21      A.    No.  It's not usually the case
22 that the provider is on site.  There are some
23 that you have to call.
24      Q.    Did that present any challenges
25 to you as an intake nurse?

Page 60

1       A.    Yes.
2            MS. BAKER:  Object to the form.
3            THE WITNESS:  Yes.
4  BY MR. GROTE
5       Q.    What were those challenges?
6       A.    Sometimes you would have to call
7  two or three times.  There is no person
8  answering the phone.
9       Q.    Do you remember in the case of
10 Mr. Jung if you had to call more than once?
11      A.    I don't recall.
12      Q.    While you worked at PDP, did you
13 ever receive any disciplinary action against you
14 for anything?
15      A.    Yes.
16      Q.    What was that?
17      A.    I got a write-up because I put
18 the patient refused the insulin.  And I didn't
19 put the follow-up that he needs to consult a
20 specialist.
21      Q.    Do you remember who the patient
22 was?
23      A.    No.  I don't recall.
24      Q.    The follow-up was that he was
25 supposed to see a specialist?  Was this -- is

Page 61

1  that correct?
2       A.    Yes.
3       Q.    And was that the order from the
4  medical provider?
5            MR. WITTEKIND:  Object to the
6       form.  You can answer.
7            MS. BAKER:  I don't understand
8       the question.  Can you rephrase the
9       question, please?
10 BY MR. GROTE
11      Q.    What I am trying to get at is
12 that -- I think you -- was it your testimony
13 that you were given a write-up because you did
14 not document that a diabetic patient was
15 supposed to see a specialist?
16      A.    Yes.  They said that when someone
17 refuses insulin, you are supposed to alert the
18 specialist so they can follow up with the
19 patient.
20      Q.    And was this the situation that
21 led to the conversation with Smith that we
22 discussed earlier in which that issue was
23 brought to you and you asked for more training?
24      A.    Yes.
25      Q.    And in this instance, if you

Page 62

recall, who had made the decision that the
patient was supposed to see a specialist?
    A.    Under my assumption, I just
assumed that that is just the prison's
guidelines/protocols.
    Q.    So, I mean, was the write-up
based on the assessment that the prison
thought -- or that your supervisors thought that
you should have referred them to a specialist?
    MR. WITTEKIND:  Object to the
    form.
    MS. BAKER:  Objection to what
    somebody else thought.
BY MR. GROTE
    Q.    What I am trying to get at -- and
maybe this will help clarify things.
        Was there an order from a medical
provider that a patient should have seen a
specialist, this diabetic patient, and that you
didn't document that?  Or was it that you had
seen a patient and didn't refer them to a
specialist yourself and that was the issue you
got the write-up for?
    MS. BAKER:  Objection to the
    form.

Page 63

    MR. WITTEKIND:  Objection.
    THE WITNESS:  The write-up was
    because I entered in the system the patient
    refused his insulin.  The write-up was
    because they told me that I was informed
    that I am supposed to put an alert for a
    specialist to see the patient.  And I
    didn't know that.  I was not trained on
    that.
BY MR. GROTE
    Q.    I understand now.  Thank you.
        When you say specialist, do you
know what type of medical professional was meant
by that, if you know?
    A.    Endocrinologist.
    Q.    And did this incident happen
prior to October 28, 2023, if you recall?
    A.    That I don't recall.
    Q.    And what was the consequence of
the write-up?
    A.    They just had me sign a paper
that you were told this, this and this.  And
that was the only one.  I think you have up to
three chances.  But that was the only one.  They
had me sign a paper stating you understood what

Page 64

happened.
    Q.    So would it be accurate to
characterize it as a written reprimand without
any additional penalty?
    MS. BAKER:  Objection to the
    form.  I think she's characterized it
    already as a write-up.  You may answer.
    THE WITNESS:  Yes, sir.
BY MR. GROTE
    Q.    Are you familiar with the term
"nursing encounter tool"?
    MR. WITTEKIND:  Object to the
    form.
    MS. BAKER:  If you have a
    question, ask him.
    THE WITNESS:  Are you asking in
    reference to the prison?
BY MR. GROTE
    Q.    Yes.  Well, generally, nursing
encounter tools, are these common in your
profession?
    A.    Yes.
    Q.    What are they?
    A.    Strategies that you can use to
help you along the way.  It can be a book.  It

Page 65

can be a pamphlet.  It can be education.
    Q.    Did you utilize nursing encounter
tools while you worked at CFCF?
    A.    Yes.
    Q.    Did you ever utilize -- if I say
NET, I mean nursing encounter tools -- for
hypoglycemia/hyperglycemia?
    A.    I don't recall.
    Q.    I will share my screen to see if
this document refreshes your recollection.
    A.    Okay.
    Q.    Can you see this document?
    A.    Yes.
    Q.    Is this familiar to you at all?
    A.    No.  I can't say if I ever
received this document.  It doesn't look
familiar.
    Q.    There is six pages.  Let me know
if you want me to pause if I am moving too fast
at any point.
    A.    Okay.  I don't recall seeing this
document.
    MS. BAKER:  Can you just please
    identify it, Mr. Grote, for the record the
    Bates numbers of the pages you just showed

Page 66

her?

MR. GROTE: Yes. Thank you very much for that reminder. The Bates stamp is YesCare3438 through YesCare3443.

BY MR. GROTE

Q. And at CFCF if a patient has a blood glucose level over 500 at intake, what were you supposed to do?

A. Call the doctor.

Q. Anything else?

A. Administer insulin.

Q. And then what would happen after you called the doctor?

A. She would give me an order, specifically what insulins to give.

Q. Would you document the order that you were given?

A. Yes.

Q. And where would you document it?

A. I document it in my assessment part of intake.

Q. Did you document everything that you were told as part of that order?

A. Yes.

Q. Is there ever any situation that

Page 67

you can remember where you did not document any part of a medical order that you were given at CFCF?

A. No.

Q. Do you know at CFCF was there a difference between something called an emergent intervention and an urgent intervention?

A. I don't recall that at CFCF. But being a nurse you are taught those terms.

Q. So as a nurse, what do those terms mean? Start with "emergent intervention."

A. Emergent intervention is if someone stopped breathing, bleeding out uncontrollably, stab wound.

Q. Is the emergent indicated that there is an emergency?

A. Yes.

Q. And what is an "urgent intervention"?

A. Something that can be resolved within the facility like a cut, abrasion, blood sugar, hypertension.

Q. Where would diabetic ketoacidosis fall within the emergent versus urgent intervention spectrum?

Page 68

MS. BAKER: At the prison?

MR. GROTE: At the prison.

THE WITNESS: Based on the patient's vital signs, how he is looking, if he has any confusion going on, if his blood pressure is getting low, heart rate is dropping.

BY MR. GROTE

Q. And where would those vital signs be -- how you would document that at intake?

A. As I stated before, we were provided with a medical assistant who took the vital signs, blood sugar, HIV test, urine samples.

Q. Would you -- for diabetic patients, did you ever question them as to whether they were experiencing symptoms associated with hypoglycemia or hyperglycemia?

A. Yes.

Q. Did you have a standard set of questions you would ask in those circumstances?

A. Yes. The information that was provided in the intake questionnaire.

Q. So is the intake questionnaire, are those all questions that you would ask?

Page 69

A. Yes.

Q. Did you ever receive any -- are you familiar with Norristown State Psychiatric Hospital?

A. I am not familiar. But I did hear a few things about it.

Q. What did you hear about it?

A. That it's a hospital for psychiatric patients.

Q. Did you ever receive patients at PDP in intake who had returned from Norristown?

A. Yes. I believe so. Maybe two or three.

Q. How would you know they were coming from Norristown?

A. I don't recall. But I believe there was a paper that clicked off a box that said they were coming from there.

Q. Is that something that -- who would click that box or transmit that information, if you know?

A. Maybe the correctional officer who would encounter with them or someone -- I am not sure.

Q. I don't want you to guess.

Page 70

1    A.    I'm not sure.  I don't recall.
2    Q.    And going back to emergent
3  interventions, who would decide -- did you ever
4  decide if there was an emergent intervention
5  that was necessary for a patient when you worked
6  at intake in CFCF?
7    A.    Yes.
8    Q.    So in those situations, what
9  would you do?
10    A.    We still have to call the doctor.
11  And from that the doctor will tell us to call
12  911.
13    Q.    And when you were intake nurse at
14  CFCF, did you ever decide when there were urgent
15  interventions needed?
16    A.    Yes.  At intake.
17    Q.    And then what would be the
18  process there?
19    A.    Still call the doctor.
20    Q.    And, generally speaking, what is
21  the infirmary at CFCF -- not at CFCF.
22          Was there an infirmary within the
23  Philadelphia Department of Prisons?
24    A.    Yes.
25    Q.    And you testified earlier you do

Page 71

1  not know where that was located?
2    A.    Correct.
3    Q.    Did you have the authority to
4  refer someone to the infirmary?
5    A.    No.
6    Q.    And who did?
7    A.    The doctor.
8    Q.    Did you ever learn about whether
9  the infirmary was ever overcrowded during any of
10  time you worked at CFCF?
11    A.    I heard that it was overcrowded
12  amongst the other nursing coworkers.  There was
13  talk.
14    Q.    Do you remember when in your six
15  months that you might have heard that talk?
16    A.    I don't recall.
17    Q.    Was it something that you heard
18  frequently?
19          MR. WITTEKIND:  Objection to the
20    form.
21          THE WITNESS:  Yes.
22  BY MR. GROTE
23    Q.    Do you remember any of the other
24  staff who you had heard this from?  Any names?
25    A.    No.

Page 72

1    Q.    Did you ever play any role in
2  assessing who should go to the infirmary and who
3  should not?
4    A.    No.
5    Q.    Are you familiar with something
6  called 23-hour observation status at CFCF?
7    A.    No, I'm not.
8    Q.    Do you know what a sheltered
9  housing admission is at CFCF?
10    A.    No.
11    Q.    When you were an intake nurse,
12  were there instances in which diabetic patients
13  were positive for ketones?
14    A.    Yes.
15    Q.    What would you do when that was
16  the case?
17    A.    Call the doctor.  And most times
18  they would instruct us to provide water to flush
19  them out.
20    Q.    Do you ever recall an instance
21  where they sent somebody to the emergency room
22  when they had ketones?
23    A.    That I don't recall.
24    Q.    I was going to say at intake.  To
25  be clear, that is where I was talking about.

Page 73

1          Same answer?
2    A.    At intake?  No, no.
3    Q.    Do you recall any case where the
4  medical provider referred somebody to the
5  infirmary when they had ketones at intake?
6    A.    No.  Never encountered that.
7    Q.    Were you provided any guidance
8  aside from call the provider, in regard to a
9  diabetic patient with ketones as to what you
10  were supposed to do?
11    A.    As a nurse you are supposed to
12  provide them with the insulin, the water, and
13  reassess, follow up.
14    Q.    And when are you supposed to
15  follow up?
16    A.    Approximately 30 minutes to one
17  hour.
18    Q.    Would that follow up be
19  documented?
20    A.    Yes.  You have to document it.
21          MS. BAKER:  Just to be clear:
22    Are you talking about at the prison or are
23    you talking generally?  Because the
24    question didn't define it.

Page 74

BY MR. GROTE

Q.    Yeah.  I meant specifically at intake in CFCF.

A.    In intake there is no way to go back and document reassessments.

Q.    Why is that?

A.    That's how it is built.  It's just based off of the prisoners, background conditions.  After you are done you cannot go into it.  You have to go into another section of the system and write that.  Not in intake.

Q.    So are you saying that the assessment would still happen, but it would be documented somewhere else?

A.    The reassessment --

MS. BAKER:  Object to the form.

MR. WITTEKIND:  Join.

THE WITNESS:  The reassessment would be documented somewhere else.

BY MR. GROTE

Q.    And at intake when there was a reassessment based on somebody having ketones, who would carry out the reassessments?

MR. WITTEKIND:  Object to the form.

Page 75

MS. BAKER:  I object as well.

MR. WITTEKIND:  I think you are asking her if the reassessment happened in intake.  And I believe the witness has testified that it would not be in intake.

BY MR. GROTE

Q.    I can rephrase.

In a situation where somebody at intake has ketones and they are to be reassessed consistent with your testimony within 30 minutes to an hour or shortly thereafter the intake assessment, where does that reassessment occur?

MS. BAKER:  Do you mean where physically?  Where is it documented?

BY MR. GROTE

Q.    Right now I mean where physically.

A.    I am stationed at intake.  So another nurse would have to take over for that, reassess.

Q.    And how would that other nurse have been notified of the need for reassessment?

A.    Based off of my assessment that I typed in the intake process.

Q.    And that reassessment then, where

Page 76

would that other nurse document that reassessment?

A.    It could be in the medication section.  It could be on a new form that you can create within the system.

Q.    And would that documentation then go in the patient's electronic medical record order?

A.    Yes.

Q.    Do you recall your encounter with Louis Jung, Jr. on October 28, 2023?

A.    When you say recall, are you talking about physically seeing him or physically asking him questions?

Q.    I'm asking whether you have any independent recollection of that encounter.  I understand you reviewed documents.  But I am wondering if you have a memory of your encounter with Mr. Jung, anything he said, anything that you said, anything that you observed.

A.    I recall only a couple things that he said.

Q.    What are those?

A.    That he is not a diabetic.  He is not abusing drugs.  He is not suicidal and he is

Page 77

not homicidal.  He has no other medical conditions.

Q.    Did you have other information that indicated that he was a diabetic?

A.    Nothing besides the 542 blood sugar.

Q.    Did you review his electronic medical record during the intake process?

A.    I don't have access to that.

Q.    You don't have access to anybody's electronic medical record during the intake process?

A.    No.  The intake screen is based off of questions.  Anything outside of that, if something was uploaded into his document, I can't see that.

Q.    Did you ever have access to patients' electronic medical records when you were in intake?

A.    No.  Unless they physically brought a physical paper to give to me.

Q.    Did you have any concerns about that?

MS. BAKER:  Objection to the form.  You can answer.

Page 78

THE WITNESS:  Yes.

BY MR. GROTE

Q.    What was your concern?

A.    You want to properly help the person.  And if you do not have documentations of the medical history, it can harm the patient.

Q.    Did you ever raise this issue with the supervisor?

A.    No.

Q.    Why not?

A.    I just -- I didn't.

Q.    Does that mean you're not sure of the reason?

MR. WITTEKIND:  Object to the form.

MS. BAKER:  Object to the form. She had given her answer.

BY MR. GROTE

Q.    Is it also the case that you would not have medical records from, say, another facility at intake?

A.    No.

Q.    That is, no, you would not have access to those?

A.    Unless the prisoner gave me a

Page 79

physical paper I would not have access to electronic information.

Q.    Is 542 a high glucose level in your opinion?

A.    Yes.

Q.    And what are the possible medical risks for -- 542, is that considered hyperglycemia?

A.    That's considered hyperglycemia.

Q.    That's what I said.  Maybe it was not clear.

What are the medical risks associated with hyperglycemia?

A.    As I stated, the symptoms, someone can become confused, dehydrated, blurred vision.

Q.    Questions about whether somebody is confused, has high blood pressure, blurred vision, any of the symptoms you said, are those included in the intake questionnaire at CFCF, if you remember?

MS. BAKER:  Can she look at the documentation if she needs to answer these questions?

MR. GROTE:  If she doesn't

Page 80

remember, then certainly we can do that to refresh her recollection.

THE WITNESS:  I don't recall.

MS. BAKER:  Would you need to look at the documentation?

THE WITNESS:  Yes.

BY MR. GROTE

Q.    We will get to the intake form in a little bit.  In regard to having 542 glucose level, what do you do?

A.    I called the provider.

Q.    Do you remember who the provider was?

A.    Yes.

Q.    Who was that?

A.    Maureen Gay.

Q.    And was she working off site?

A.    Yes.

Q.    And I think I asked this but I forgot.  Do you recall how many times you had to call her to get her on the phone?

MR. WITTEKIND:  Object to the form.

MS. BAKER:  I think you did ask already.  But go ahead and answer.

Page 81

THE WITNESS:  I don't recall.

BY MR. GROTE

Q.    Did you consult the -- let me ask you this.  I will bring up a document.  Are you familiar with the Clinical Pathways for Diabetes Mellitus?  That is YesCare's Clinical Pathway for Diabetes Mellitus?

MS. BAKER:  Asked and answered.

MR. WITTEKIND:  Are you asking if he has seen it or is familiar with it?

MR. GROTE:  Yes.  I think I did ask it before.  I think she said couldn't recall specifically.  And I was going to share the document to see if it refreshed her recollection.  So I wanted to put it all in one place in the record.

THE WITNESS:  I don't recall.

BY MR. GROTE

Q.    Can you see this document, Ms. Apollon?

A.    Yes.

Q.    Take a moment to look at this. This is the first page of six.  I am just asking if this refreshes your recollection at all?

A.    I don't recall seeing this paper.

Page 82

Q.    The Bates number is YesCare3432.
That is the first page of the policy begins with
YesCare3437.
       Was it ever your practice in
intake to reference a clinical pathway document
in order to determine what course of treatment
was to be provided?
       A.    No.
       Q.    Do you recall your conversation
with Maureen Gay from October 28, 2023?
       A.    Yes.
       Q.    What do you recall about it?
       A.    The amount of insulin, the type
of insulin, and to check his urine for ketones.
       Q.    And do you know if you checked
for ketones before or after the call?
       A.    I checked for ketones after the
call.
       Q.    Do you recall if ketones were
present?
       A.    Yes.
       Q.    What did you do then?
       A.    Based off of Maureen Gays, she
instructed me to provide the prisoner with
water, encourage him to drink plenty of water.

Page 83

       Q.    Did you contact her -- how many
times did you speak to Maureen Gay on
October 28, 2023?
       MS. BAKER:    At all?  Or with
   respect to Mr. Jung?
BY MR. GROTE
       Q.    With respect to Mr. Jung.
       A.    One time.
       Q.    Did you ever speak to her after
October 28, 2023 with respect to Mr. Jung?
       A.    No.
       Q.    Did you document what Maureen Gay
instructed you to do in the medical record?
       A.    In the assessment part of intake.
       Q.    Did you document everything that
she told you to do?
       A.    Yes.
       Q.    Did Maureen Gay order you to
check on Mr. Jung in two hours?
       A.    I don't recall.
       Q.    If she did do that, would it have
been your practice to write that down?
       A.    Yes.  My routine would have been
to do a reassessment.
       Q.    If the provider ordered you to do

Page 84

the reassessment, would you have done that
reassessment?
       MS. BAKER:    Objection to the
   form.  You may answer.
       THE WITNESS:    Yes.
       MR. GROTE:    Off the record.
       (Discussion held off the record.)
BY MR. GROTE
       Q.    And if you would have done that
assessment, would then it have been documented
in the way you described earlier how
reassessments were not documented as part of the
intake but somewhere else in the medical record?
       A.    Yes.
       Q.    Did you encounter Mr. Jung at all
after that intake assessment?
       A.    No.
       Q.    And that includes after
October 28, 2023.  Any subsequent day you never
saw Mr. Jung again?
       A.    No.
       Q.    Did Maureen Gay order you to fill
out a nursing encounter tool for hyperglycemia?
       A.    No.
       Q.    If she ordered you to, would you

Page 85

have done it?
       MR. WITTEKIND:    Objection to
   form.
       THE WITNESS:    Yes.
BY MR. GROTE
       Q.    And if she ordered you to do
that, would you have documented it?
       A.    Document it?  No.  Fill out, yes.
       Q.    In the assessment where you wrote
down her orders, you would have just said NET
order to be filled out?  You just would have
filled it out?  Is that your testimony?
       MR. WITTEKIND:    Objection to the
   form.
       THE WITNESS:    Yes.  I would have
   filled it out.  After the intake process
   you print everything.  You gather all the
   documents, and bring it to the back to the
   social worker to file it.
BY MR. GROTE
       Q.    Did you work with Maureen Gay
often?
       A.    Yes.
       Q.    And did you have any -- what was
it like working with Maureen Gay?

Deposition of Mariesha Apollon                              Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 86

A.    She is a beautiful provider. She
is understanding. She is clear on what she
wants. She is nice and respectful. She cares
about her job. She is a caring person.
Q.    Does she work off site
frequently? Or was she on site oftentimes? Did
it depend --
A.    My --
Q.    That was my question --
MS. BAKER: Let him finish.
MR. GROTE: I was just going to
comment if I wasn't clear I can rephrase.
But I think you know what I am getting at
hopefully.
MR. WITTEKIND: Objection.
THE WITNESS: Do I answer?
MS. BAKER: Yes. If you
remember. We just have a lot of people
talking over one another.
THE WITNESS: Yes. There was
times she was physically at the prison.
And a majority of the time she was off
site.
BY MR. GROTE
Q.    Do you recall in any situation

Page 87

where she was working on site but she then came
to the prison because of a need to see a
patient?
A.    I don't recall.
Q.    If Maureen Gay has stated that
she ordered you to see Mr. Jung within two hours
after intake, do you believe she was being
truthful?
MR. WITTEKIND: Object to the
form.
MS. BAKER: Objection. And I am
instructing her not to answer that
question. She is not the assessor of
credibility in this case. It's
inappropriate to ask a witness to assess
another witness's credibility. Do not
answer that question.
MR. GROTE: I will rephrase.
BY MR. GROTE
Q.    Is it true that Maureen Gay
ordered you to see Mr. Jung within two hours
after the intake assessment?
MR. WITTEKIND: Objection to
form.
MS. BAKER: I will object to the

Page 88

form of the question. You may answer the
question. But you are not assessing the
credibility of any other witness.
THE WITNESS: You are asking me
if Maureen Gay had ordered me to reassess
the patient in two hours, would I have done
it?
BY MR. GROTE
Q.    No. I'm asking was that order
given to you?
A.    I don't recall.
Q.    Is it possible it was given to
you?
MS. BAKER: Objection, calls for
speculation.
MR. WITTEKIND: Join.
MS. BAKER: Do not speculate or
guess. But if you have an answer to that
question you may answer.
THE WITNESS: No.
BY MR. GROTE
Q.    Thank you. That clarified a
previous answer.
At intake how do you provide -- I
guess the documentation you fill out as part of

Page 89

the intake screening, is that where any
information will be for other medical care staff
to know when the patient needs to be seen next?
Is that how continuity of care is established?
A.    Yes.
Q.    Did you ever, while working at
intake, call 911 for a patient yourself?
A.    No.
Q.    And if 911 was to be called, that
decision would be made by the medical provider?
Is that the case?
A.    Can you repeat the question?
Q.    Certainly.
If 911 was to be called, who
would make the call to 911?
A.    I can physically make the call.
But I would still need an order from a provider.
Q.    And if you received order from a
provider, would you be the one to make the call
typically -- or you said you had not made a
call. So did you ever receive an order to call
911 from a provider?
A.    Not intake.
Q.    I was going to say "at intake."
Thank you.

Page 90

But if you received that order,
would it have been -- would you have been the
person who made the call to 911 or would
somebody else make the actual call?

A.    Just the clarify, to go back, I
said not at intake.  I didn't make a 911 call.
Not in intake.  Somewhere else I made the call.

Q.    Right.  I thought I understood.
But thank you for making that clear.

A.    Okay.

Q.    When you made the 911 call that
was not at intake, was that because the provider
had given an order to make the 911 call?

A.    Yes.

Q.    Did you have the authority to
make a 911 call without an order from a provider
at intake?

A.    We would use our judgment.  The
provider was there at the time of an emergency.
And we were given the order to call 911.

Q.    Was there ever instances at PDP
when you worked there where a diabetic patient
was sent to the emergency room with
hyperglycemia that you recall?

A.    I don't recall.

Page 91

Q.    Was there a diabetes chronic care
clinic at PDP?

A.    I don't recall.

MR. GROTE:  Let's take a quick
break.

(Discussion held off the record.)

BY MR. GROTE

Q.    I will share my screen again.  Do
you see this document?

A.    Yes.

Q.    So right here, is this the
progress note pertaining to Mr. Jung from
10/28/2023 that you reviewed prior to the
deposition?

A.    Yes.

MS. BAKER:  In all fairness, what
we are seeing is a portion of one of the
pages of the intake.

MR. GROTE:  Yes.  I will go
through a number of them.  But I will state
the Bates stamp for the range at the outset
here.

BY MR. GROTE

Q.    This is Bates number PDP18 a lot
of zeroes and 18 through PDP 25.  For the

Page 92

record, this document has been produced and
reproduced from different parties.  So it also
appears in our discovery with different Bates
numbers at times.

MS. BAKER:  Since my
understanding is you are now about to ask a
series of questions pertaining to this
document, I have a hard copy of the
document that I would put in front of the
witness in case she is more comfortable
using the hard copy.

So I will hand that to her at
this time.  It's not marked up in any way.
It was simply printed.  And the Bates
numbers, which you just referenced, the
Bates numbers of the hard copy that I am
about to put in front of her are Jung City
Production 000405 through 409 for the
record.

MR. GROTE:  Yes.  Thank you.  I
think the City has produced this twice.

BY MR. GROTE

Q.    If you look at the first page
there, under General Examination it says, Intake
orders requested.  It has type 1 diabetes, blood

Page 93

sugar is 542.  About the type 1 diabetes, do you
recall who determined he had type 1 diabetes?

A.    I believe it was based off of his
answers that I asked of him.  How long had he
had diabetes, those questions we determined that
he had it at birth.

Q.    Would those questions be
documented in this progress note?

A.    There may been a question.  But I
don't recall.  I don't recall.

Q.    This progress note right here
says, Provider, Maureen Gay, nurse practitioner.
Who filled out this progress note?  Did you
filled it out?  Did you do part of it?  Ms. Gay
did part of it?  Can you explain that to me?

MR. WITTEKIND:  Objection to the
form.

MS. BAKER:  It's a little bit
compound.  Can you break it down?

BY MR. GROTE

Q.    Under the Subjective part on this
page, we are looking at the front page, who fill
that part of the form out or the document out?

A.    The top portion seems like it
could have been Maureen Gay that filled it out.

Page 94

Q.    You said "seems like." Do you
know who filled that out?

A.    The only other person who had
access is Maureen Gay.

MS. BAKER:  Hang on a second.
Can you scroll to the end of this document
that you are looking at and show us the
signature?  Okay.

BY MR. GROTE

Q.    On page 2 it says, Electronically
signed by Maureen Gay.  Does that mean that she
completed these first two pages here with her
signature on the bottom?

A.    Yes.  I don't have that in front
of me.  So that is not my document.  I didn't
sign that.

MS. BAKER:  I thought what you
were about to get into was the intake
documentation that nurse Apollon had
created.  And we maybe had a
misunderstanding as to what it was you were
going to put up for her or ask her about.

BY MR. GROTE

Q.    I'm just not to that.  Yes.  I
can scroll down to where I think is the

Page 95

telephone encounter.  The one that says,
Electronically signed by Maureen Gay, that
indicates that she was the one who generated
these progress notes; is that correct?

A.    Yes.

MR. WITTEKIND:  Object to the
form.

THE WITNESS:  Yes.

BY MR. GROTE

Q.    And do you have any independent
recollection of how it was determined Mr. Jung
has type 1 diabetes?

MS. BAKER:  By whom?

BY MR. GROTE

Q.    Yes.  Do you have any independent
recollection of whether you knew Mr. Jung had
type 1 diabetes?

A.    Based off what the intake
questions were saying, the answers to the intake
questions.

Q.    Now, at intake -- would the
medical provider -- would Maureen have had
access to patients' electronic medical
records --

A.    Yes.

Page 96

Q.    -- when you would call her?

A.    Yes.

MS. BAKER:  You have to let him
finish.  Wait until the question is asked.
And make sure he is done.  And then provide
your response.
Okay?

THE WITNESS:  Yes.

BY MR. GROTE

Q.    Would Maureen Gay have had access
to Mr. Jung's electronic medical record?

MR. WITTEKIND:  When?

BY MR. GROTE

Q.    During intake when you had called
her?

MR. WITTEKIND:  Objection to the
form.

MS. BAKER:  You can answer.

THE WITNESS:  Yes.

BY MR. GROTE

Q.    Now, are you familiar with this
page here, Ms. Apollon?

A.    No.

Q.    Have you ever seen a document
similar to this around about a telephone

Page 97

encounter?

A.    No.

Q.    And it says, Provider, Maureen
Gay.  Did you create this document?

A.    No.

Q.    Now, it says there is a telephone
encounter at 10:02 a.m., October 28, 2023.  Does
that seem to be consistent with your
recollection of when you were working on
October 28, 2023?

A.    Yes.

Q.    The next page I am showing is the
progress note that begins with our Bates stamp
PDP 2021.  Are you familiar with this document?

A.    Yes.

Q.    Is this the one that you filled
out?

A.    Yes.

Q.    Now, at the bottom of this page
it says, "Do you have diabetes?"  And the answer
is, "No."

Do you recall why the answer is
no?

A.    It's subjective information.
It's information I received based off of what

Page 98

1  the prisoner told me.
2       Q.    If a prisoner provides -- if you
3  had information that contradicts what a prisoner
4  provides you, how are you supposed to address
5  that contradiction on the intake form?
6       A.    Can you rephrase the question?
7       Q.    If you actually knew that
8  Mr. Jung had diabetes, would you still write
9  "no" because he answered "no"?
10      MS. BAKER:  In the Subjective
11   section you mean would she write "no"?
12      MR. GROTE:  Yes.
13      MS. BAKER:  Would you write "no"
14   in a Subjective even if you knew the
15   patient had diabetes?
16      THE WITNESS:  No.
17  BY MR. GROTE
18      Q.    Would you write "yes" because he
19  had diabetes?
20      A.    Can you rephrase the question?
21      Q.    Yes.  In the Subjective section
22  if a patient tells you that they do not have
23  diabetes but you had other information
24  indicating they did have diabetes, what would
25  you answer on the form?

Page 99

1       A.    Other information referring to
2  what?  Like what?  What other information?  I
3  didn't have access to his records.
4       Q.    What about if the pre-intake
5  screening said that he had diabetes?
6       A.    I am not clear on the question.
7       Q.    If you knew that a patient was
8  giving you inaccurate information in response to
9  one of these questions, how would you address
10  that?
11      A.    You can simply ask again in a
12  different way.
13      Q.    So you would try to get the
14  patient to acknowledge the accurate information?
15      A.    Yes.
16      Q.    And you said you have a
17  recollection of Mr. Jung telling you he did not
18  have diabetes?
19      A.    Yes.
20      Q.    Did you have a recollection of
21  him answering any of the other questions about
22  his medical conditions?
23      MS. BAKER:  Objection, asked and
24   answered.  You may answer again.
25      THE WITNESS:  Can you ask the

Page 100

1  question again?
2  BY MR. GROTE
3       Q.    Do you have any independent
4  recollection of his answers to any questions
5  about other medical conditions?
6       A.    I don't.
7       Q.    Why do you remember his answer --
8  why do you think you remember his answer to the
9  question about diabetes?
10      A.    Because I had to call the
11  provider to administer insulin.
12      Q.    On the next page, so it's still
13  under the Subjective section.  The question, Are
14  you currently taking medications prescribed for
15  any medical condition, included those for
16  HIV/AIDS, diabetes, et cetera?  And the answer
17  is, No.
18           Do you recall asking Mr. Jung
19  this question?
20      A.    Yes.
21      Q.    Do you recall him answering "no"?
22      A.    Yes.
23      Q.    What is the difference between
24  the pre-intake screening and the intake
25  screening?

Page 101

1       A.    Just different questions.
2       Q.    When is the pre-intake screening
3  in relationship to the intake screening?  Is it
4  right before?
5       A.    Yes.
6       Q.    And do you review the answers to
7  the pre-intake screening before the intake
8  screening?
9       A.    Yes.
10      Q.    And did you do that in every
11  case?
12      A.    Yes.
13      Q.    So I will go down to -- this is
14  all still under Subjective.  And we are on to
15  the third page.  You see how it says, Pre-intake
16  screening up here?  And there is a number of
17  questions beneath.  And one of them is, "Is the
18  patient diabetic?"  And it says, "Yes."
19           Do you recall who took the
20  pre-intake screening of Mr. Jung?
21      A.    That's the medical system PAR.
22      Q.    So you did not take the
23  pre-intake screening, correct?
24      A.    No.  Medical assistant.
25      Q.    When it says, If yes, did you

Page 102

1 complete an Accu-Chek, it was the medical
2 assistant who completed the Accu-Chek?
3     A.    I don't have that in front of me.
4 But, yes, it was her that completed the
5 Accu-Chek.
6     Q.    Did you speak with the medical
7 assistant about Mr. Jung at all?
8     A.    She spoke to me.
9     Q.    Do you remember what she told
10 you?
11     A.    His blood sugar is 542.
12     Q.    Do you remember anything else?
13     A.    No.
14     Q.    After you spoke with Mr. Jung,
15 did you talk to the medical assistant again
16 about Mr. Jung?
17     A.    No.
18     Q.    Now, at the bottom of this page
19 it says, Mariesha -- am I pronouncing your name
20 correctly?  Is it Mariesha Apollon?
21     A.    Yes.
22     Q.    So that means you filled out the
23 whole progress note here?
24     A.    Yes.
25     MS. BAKER:  Object to the form.

Page 103

1 BY MR. GROTE
2     Q.    Then on the Assessment part here,
3 what is AAOX3.  What does that mean?
4     A.    Alert and oriented times 3.
5     Q.    It says, "States he has type 1
6 diabetes"?
7     A.    Yes.
8     Q.    Do you have any explanation for
9 why the assessment says what it says there,
10 states he has type 1 diabetes, and the answer on
11 the form that he said, no, he does not have
12 diabetes?
13     MS. BAKER:  Objection to the
14 form.  You can answer.
15     THE WITNESS:  After some time he
16 did start to reveal some stuff in the
17 intake process.
18 BY MR. GROTE
19     Q.    And did he reveal that he had
20 type 1 diabetes?
21     A.    Yes.
22     Q.    Why didn't you change the answer
23 to the question about whether or not he had
24 diabetes then?
25     A.    I don't believe I had access to

Page 104

1 it.  I don't believe I could have went back.
2 I'm not sure.  I don't recall.
3     Q.    It says, Blood sugar is 542.
4 States he had not got insulin in three days.
5     Did he tell you that he was
6 prescribed insulin?
7     A.    It says he had not gotten
8 insulin.  So, yes.
9     Q.    This is page 22 on mine.  I think
10 it's page 2 of the progress note that you have.
11 The question, Is the patient a transfer back
12 into custody from Norristown Hospital?  And it
13 says, No.
14     Would that have been based on
15 what Mr. Jung told you?
16     A.    Yes.
17     Q.    Did you have any way of verifying
18 where the inmates came from in intake?
19     A.    No.
20     Q.    Did anybody who was an employee
21 of the Philadelphia Department of Prisons ever
22 speak to you about Mr. Jung after his death?
23     A.    Yes.
24     Q.    Who was that?
25     A.    Marsha.

Page 105

1     Q.    Do you know Marsha's last name?
2     A.    No.
3     Q.    Do you know if she is a
4 Philadelphia Department of Prisons employee or a
5 YesCare employee?
6     A.    She was definitely a YesCare
7 employee.
8     Q.    And does the name Jeoboham
9 refresh your recollection?
10     A.    Yes.  That is the last name.
11     Q.    When did she speak to you about
12 Mr. Jung?
13     A.    The day that he had died.
14     Q.    What do you recall of your
15 conversation with Marsha?
16     A.    I got there at 3:30, 3:00 for my
17 shift.  And she said, Mr. Jung has died.  And I
18 said, What happened?  She said his blood sugar
19 was too high.  It's not your fault he was
20 noncompliant.
21     Q.    What was your response to that?
22     A.    I said, Okay.
23     Q.    Did she say anything else?
24     A.    No.
25     Q.    Did anybody else, a PDP employee

Page 106

or a YesCare employee, anybody else who you
worked with in the jails, ever speak to you
again about Mr. Jung's death?

A.    I recall calling Maureen Gay to
tell her about another prisoner.  And she said
that I didn't call her back to follow up with
Mr. Jung.

Q.    Do you remember when that call
was?

A.    I don't recall.

Q.    Was that when you still were
working within PDP because you were calling
about another prisoner?

A.    Can you rephrase that?

Q.    Yes.  That wasn't clear.

But that was when you were still
working at PDP when you spoke to Ms. Gay again?

A.    Yes, yes.

Q.    When she said that to you, how
did you respond?

A.    I just -- I was speechless
because I really didn't -- I don't recall her
asking me to call her back for that.

Q.    What did you say to her?

MS. BAKER:  She just said she was

Page 107

speechless.
BY MR. GROTE

Q.    Well, I assume at some point on
the call you recovered your powers of speech and
you didn't just hang up.  Maybe not.  But did
you ever recover your power of speech and
respond verbally to what she said?

A.    No.  I was really speechless.  I
was shocked that he had died.  I didn't have a
response.

Q.    Do you recall any other
conversations about Mr. Jung that you had after
his death in addition to the ones you just told
us about?

A.    No.

Q.    Were you ever part of a mortality
review?

A.    Can rephrase the question?

Q.    Were you ever a part of any
formal inquiry into Mr. Jung's death carried out
by YesCare?

A.    No.

Q.    Were you ever a part of any
formal inquiry into Mr. Jung's death carried out
by the Philadelphia Department of Prisons?

Page 108

A.    No.

Q.    Are you familiar with the term
intermetex?

A.    No.

Q.    So you're not sure what an
intermetex is?  I-N-T-E-R-M-E-T-E-X?  You are
not sure what that is?

A.    No.

Q.    Have you come to learn any
information about what happened to Mr. Jung
between intake and the date of his death?

MS. BAKER:  I will allow her to
answer this question with the caveat that
if the information that she has heard is
through counsel she is not to disclose.  So
the question should really be, Have you
learned from any source other than your
attorneys about anything that happened to
Mr. Jung between the time you saw him in
intake and his death?

MR. GROTE:  Yes.  Thank you.
BY MR. GROTE

Q.    So the question what your counsel
rephrased, have you learned anything other than
from your attorneys about what happened between

Page 109

intake and Mr. Jung's death to Mr. Jung?

A.    No.

Q.    Looking back, if you had to
conduct the intake of Mr. Jung again today,
would you have done anything differently?

MS. BAKER:  So I will instruct
her not answer to that question as phrased.
She is not expert in this case.  And asking
her to judge her conduct retrospectively I
don't think is appropriate.  I am certainly
willing to consider if you rephrase.
BY MR. GROTE

Q.    Do you think there is other steps
that you should have taken in Mr. Jung's intake
that were not taken?

MR. WITTEKIND:  Object to the
form.

MS. BAKER:  I will object to the
form of the question.  And -- I am sorry.
Is somebody else making --

MR. WITTEKIND:  I will join your
objection.

THE WITNESS:  So now I lost the
question.  Can you restate it, please?

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 33 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 110

BY MR. GROTE

Q.    Do you think there is anything
else that you should have done during Mr. Jung's
intake that was not done?

MS. BAKER:  Objection to the form
of the question.  You may answer that
limited question only.

THE WITNESS:  No.  I believe I
did what I could have done within the
prison, provided him with the insulin, the
water, call the doctor.

MR. GROTE:  If you can give me --
I am probably going to be two minutes or
less.

(Discussion held off the record.)

MR. GROTE:  I have no further
questions.

- - -

EXAMINATION

- - -

BY MR. WITTEKIND

Q.    I have a couple.  Are you okay to
go on a few minutes, ma'am?

A.    Yes.

Q.    My name is Ray Wittekind.  I

Page 111

represent YesCare and a couple of the other
defendants in this lawsuit.  I have a couple
questions for you that will be brief.

If I covered -- I will try to
avoid covering stuff that Bret asked you about.
But if I do, it's just because of the way things
go.

A.    Okay.

Q.    When we first started way back
this morning, you said you were recruited by a
company called Tekaccel?

A.    Yes.

Q.    And they were a recruiter?

A.    Yes.  Recruiter agency.

Q.    Did they tell you who they were
recruiting for relative to the job at PDP?

A.    No.

Q.    Have you ever heard -- before
they reached out to you, did you ever hear of
that company?

A.    No.

Q.    I will skip around a little bit.
I will try to be as efficient as I can.  I
believe you testified before that you don't have
a recollection one way or the other if Maureen

Page 112

Gay had asked you to do a two-hour reassessment
on Mr. Jung?

A.    Yes.  I don't recall that.

Q.    I don't have a document in front
of me.  But one of the documents that Attorney
Grote showed you, your intake notes, indicated
that Mr. Jung told you that he had not received
insulin for three days.

Do you recall seeing that note a
few minutes ago?

A.    Yes.

Q.    Did he ever tell you why he had
not gotten insulin over the three-day period
before the intake session?

A.    No.  He didn't tell me.

Q.    Did he ever tell you that he had
a history of being noncompliant for his insulin
protocol?

A.    No, he didn't tell me that.

Q.    I will call her Megan.  You told
us she spoke to you on the date of his death,
correct?

MS. BAKER:  I am sorry.  I don't
think it was Megan.  I think she said
Marsha.

Page 113

BY MR. WITTEKIND

Q.    Marsha?

A.    Yes.

Q.    You told us before that she spoke
to you on the day Mr. Jung died?

A.    Yes.

Q.    And she told you that he was
noncompliant, correct?

A.    Yes.

Q.    What was your understanding as to
that?  Did you have an understanding as to what
he was noncompliant with?

MR. GROTE:  Objection, calls for
speculation of what Marsha meant by
noncompliant.

MS. BAKER:  Without speculating,
if you have an understanding as a result of
speaking with Marsha as to what she meant
by noncompliant then you may testify to
that.  But do not speculate or guess.
Okay?

THE WITNESS:  She was referring
to him not being compliant with him taking
his insulin.

Page 114

BY MR. WITTEKIND
Q.    Earlier or -- we looked at some progress notes that Attorney Grote showed you. And I wrote it down here.  It appears he was diagnosed or was told to get 12 units of insulin I believe -- hold on.
Q.    When you spoke to Marsha Gay on the date of the intake session, was she the person who would prescribe the insulin medication for Mr. Jung or could you do that on your own?
MS. BAKER:  Do you mean Maureen Gay?
BY MR. WITTEKIND
Q.    Yes.  I am sorry.
A.    No.  I cannot just administer the insulin.  I have to get a verbal order from the provider.
Q.    And when you got that order from Ms. Gay, did you give Mr. Jung the medication that was ordered?
A.    Yes.
Q.    Did Mr. Jung take that willingly to your knowledge?
A.    Yes.

Page 115

Q.    When you administered the medication to Mr. Jung or gave him medication, did you think that was the appropriate amount of insulin to give him?
MS. BAKER:  Objection to the form.  I will instruct her not to answer that question.
BY MR. WITTEKIND
Q.    I will come back to that. Earlier you said you had reached out to a YesCare employee by the name of Smith regarding training on the refusal of medication issue, correct?  Do you recall that testimony?
A.    I think it was more towards the refusal of medication and how to follow up after that.
Q.    You indicated that you thought she was a health care administrator.  Do you know exactly what her title was at that time?
A.    Yes.  She was director of administration.
Q.    Did you speak to anyone else at YesCare about your concern over following up with inmates who refused to take medication?
A.    No.

Page 116

Q.    After October 28th up until the date of his death, did you have any discussions with anyone from PDP such as correctional officers or other people that worked for PDP regarding Mr. Jung?
A.    No.
Q.    Again, same question, a little different:  After October 28th and before Mr. Jung died, and excluding calls you had with Ms. Gay, did you have any discussions with anyone affiliated with the YesCare regarding Mr. Jung?
A.    Can you rephrase?
Q.    Yes.  Putting aside any communications you had with Maureen Gay about Mr. Jung, did you talk to anyone else at YesCare about him from October 28th until the date of his death?
A.    No.
MR. WITTEKIND:  I think that is all I have.
MS. THOMAS:  I have a couple questions.
- - -
EXAMINATION

Page 117

- - -
BY MS. THOMAS
Q.    Good afternoon.  My name is Summer Thomas.  I am here on behalf of Career Staff Unlimited.  Earlier you testified that you never heard of Career Staffing.  Do you have any familiarity with the company Career Staff Unlimited?
A.    No.  I don't recall.
Q.    And the company Tekaccel, were they listed on your 2023 tax returns?
A.    Yes.
MS. THOMAS:  Those are all the questions from me.  Thank you.
- - -
EXAMINATION
- - -
BY MS. BAKER
Q.    Going back to the intake paperwork that you completed on Mr. Jung in October 28, 2023.  At the time you did his intake evaluation, did you have vital signs available to you?
A.    Yes.
Q.    Were those vital signs taken

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 35 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 118

1  while he was in the intake area?
2      A.    Yes.
3      Q.    Were they taken by the medical
4  assistant?
5      A.    Yes.
6      Q.    Did those vital signs include
7  blood pressure?
8      A.    Yes.
9      Q.    Body temperature?
10     A.    Yes.
11     Q.    Respiration rate?
12     A.    Yes.
13     Q.    Those types of -- the normal
14 types of vital signs you expect as a nurse to
15 have when you are evaluating a patient, correct?
16     A.    Yes.
17     Q.    Were any of the vital signs that
18 you had, such as his blood pressure, respiratory
19 rate or his oxygen saturation, outside of the
20 range of normal limits?
21     A.    No.
22     Q.    Do you recall -- or I will refer
23 you to the documentation.  What was his body
24 temperature documented as?
25     A.    97.0 Fahrenheit.

Page 119

1      Q.    Other than -- I believe it was
2  BMI and a body temperature of 97, were any of
3  the other vital signs indicated to be outside of
4  normal limits?
5      A.    No.
6      Q.    Mr. Grote asked you earlier in
7  the deposition what the AAOX3 abbreviation was.
8  And I think you said, Awake, alert and oriented
9  times 3.
10         Do you recall that testimony?
11     A.    Yes.
12     Q.    What does that indicate to you as
13 a nurse about the patient's mental status at the
14 time that you were evaluating him?
15         MR. GROTE:  Objection.  That
16     calls for testimony outside -- pertaining
17     to his mental health or psychiatric
18     conditions potentially.  And I want to make
19     sure that her testimony is not going to the
20     matters that she is not qualified to speak
21     on.
22         MS. BAKER:  That is actually not
23     what I'm asking her.  When I say "mental
24     status," I don't mean illness.  I don't
25     mean -- I am not asking her for a

Page 120

1  diagnosis.  That is why I phrased the
2  question the way I did in asking her as a
3  nurse what it means as far as mental status
4  is concerned.  Meaning is he compos mentis,
5  is he -- what does that awake, alert and
6  oriented times 3 mean.
7         So I'm not asking her for an
8  evaluation of his mental health -- if that
9  helps you in any way.
10 BY MS. BAKER:
11     Q.    When a nurse, such as you,
12 documents, Awake, alert and oriented times 3,
13 what are they oriented to?
14     A.    The name, place, time, year,
15 month.
16     Q.    And does your note indicate that
17 he was oriented to those things?
18     A.    Yes.
19     Q.    Does the assessment note that you
20 wrote, or any other part of your note that you
21 wrote at intake, indicate that Mr. Jung had an
22 altered mental status at the time that you spoke
23 with him?
24     A.    No.
25     Q.    Or examined him?

Page 121

1      A.    No.
2      Q.    You gave some testimony earlier
3  in the deposition and were asked some follow-up
4  questions about that time where you asked for
5  additional training in response to the
6  disciplinary action that was taken.  I want to
7  ask you a couple questions about that.
8         Okay?
9      A.    Okay.
10     Q.    Is it accurate, based on the
11 testimony you've given today during this
12 deposition, that the inmate or patient that was
13 involved in that disciplinary action was not
14 Mr. Jung?
15     A.    Yes, it was not.
16     Q.    Was that patient even a patient
17 who you saw at intake?
18     A.    I don't recall.
19     Q.    Well, the disciplinary action was
20 for the Med Pass side of things as opposed to
21 your care in intake, correct?
22     A.    Yes.
23     Q.    Is it, therefore, accurate to say
24 that during the approximately six months that
25 you worked within the prison system, you

Page 122

received no disciplinary action whatsoever for
any of the care that you provided to any inmate
or patient at intake?

A.    Correct.

Q.    And this seems
self-explanatory -- and Mr. Wittekind touched on
this just a moment ago -- but back to your
assessment portion of your intake note.  Does
your intake note document that you administered
medication to Mr. Jung?

A.    Yes.

Q.    Does your intake note document
that Mr. Jung refused the medication that you
provided to him?

A.    No.

Q.    So, therefore, is it correct to
say that your interaction with Mr. Jung on
October 28, 2023 did not involve an inmate or
patient refusing the care you were attempting to
provide?

A.    Correct.

Q.    Give me one second here.

You were asked some questions
about doing reassessments on patients.  Let me
ask you, once a patient is removed from the

Page 123

intake area, either by corrections staff or
other staff at the prison, and you remain in
intake, do you, as the intake nurse, have the
opportunity to conduct a reassessment on that
patient?  Or does the reassessment have to be
done by another nurse in a different area?

A.    No.  It has be done by another
nurse in a different area.

MS. BAKER:  I think that's all
the questions that I have.  Thank you.
Jared, we are going to read and sign.

THE COURT REPORTER:  I just want
to get orders before we log off.  Summer?

MS. THOMAS:  Can I have an
electronic copy?  Can I get it sent to
someone else?

THE COURT REPORTER:  Yes.  The
same as last time?

MS. THOMAS:  Yes.

THE COURT REPORTER:  Alex?

MS. THOMAS:  Yes.

THE COURT REPORTER:  Emily?

MS. HOFF:  Digital mini is good
for us.  And if you want to send it to
Mike, if that is easier.

Page 124

THE COURT REPORTER:  Ray, copy?

MR. WITTEKIND:  Electronic mini
and full to me and Tom.

(Witness excused.)

(Deposition concluded at 1:08
p.m.)

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1

2                    C E R T I F I C A T I O N

3

4

5            I, JARED CAREY, Court Reporter,

6   certify that the foregoing is a true and

7   accurate transcript of the foregoing deposition,

8   that the witness was first sworn by me at the

9   time, place and on the date herein before set

10  forth.

11            I further certify that I am neither

12  attorney nor counsel for, not related to nor

13  employed by any of the parties to the action in

14  which this deposition was taken; further, that I

15  am not a relative or employee of any attorney or

16  counsel employed in this case, nor am I

17  financially interested in this action.

18

19

20

21  _____

    Jared Carey
22  Court Reporter
    and Notary Public
23  Date: November 18, 2025

24

25

1

2                    DEPOSITION ERRATA SHEET

3

4    JUNG

5      vs.

6    CITY OF PHILADELPHIA, et al.

7              DECLARATION UNDER PENALTY OF PERJURY

8        I declare under penalty of perjury

9        that I have read the entire transcript of

10       my Deposition taken in the captioned matter

11       or the same has been read to me, and

12       the same is true and accurate, save and

13       except for changes and/or corrections, if

14       any, as indicated by me on the DEPOSITION

15       ERRATA SHEET hereof, with the understanding

16       that I offer these changes as if still under

17       oath.

18             Signed on the _____ day of

19             _____, 20____.

20

21    _____

22                    MARIESHA APOLLON

23

24

25

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change To:_____

_____

Reason for Change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1

2                  DEPOSITION ERRATA SHEET

3    Page No._____Line No._____Change To:_____

4    _____

5    Reason for Change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

25   SIGNATURE:_____DATE:_____

## WORD INDEX

**< $ >**
**$64** 24:*13*

**< 0 >**
**000405** 92:*18*

**< 1 >**
**1** 25:*16, 17, 20* 26:*3,
5* 31:*14, 18, 19* 92:*25*
93:*1, 2* 95:*12, 17*
103:*5, 10, 20*
**1:08** 124:*5*
**10** 32:*21*
**10/28/2023** 91:*13*
**10:02** 97:*7*
**10:04** 1:*15*
**100** 3:*6*
**11:00** 25:*6, 8* 41:*17*
42:*21*
**110** 4:*5* 18:*10* 35:*24*
**117** 4:*6, 7*
**12** 32:*21* 114:*5*
**12th** 2:*3*
**13-week** 27:*21, 22*
**150** 33:*7, 22*
**1515** 2:*14*
**15th** 2:*14* 3:*6*
**16** 42:*10*
**1717** 2:*19*
**18** 28:*13* 91:*25*
125:*23*
**1801** 2:*9*
**19102** 3:*6*
**19103** 2:*9, 14, 20*
**19123** 2:*4*
**1st** 54:*8*

**< 2 >**
**2** 25:*23* 26:*3, 4*
31:*24* 94:*10* 104:*10*
**2:24-cv-05618-TJS**
1:*8*
**20** 126:*19*
**200** 35:*17*
**2008** 11:*8*
**2011** 11:*4*
**2012** 12:*18*

**2016** 11:*5*
**2019** 12:*18, 22, 25*
**2020** 12:*23*
**2021** 16:*5* 97:*14*
**2023** 9:*24* 19:*12, 18*
25:*2* 42:*14* 43:*3*
63:*17* 76:*11* 82:*10*
83:*3, 10* 84:*19* 97:*7,
10* 117:*11, 21* 122:*18*
**2024** 28:*7* 54:*9*
**2025** 1:*10* 125:*23*
**215.561.2300** 2:*20*
**215.564.0400** 3:*7*
**215.569.4433** 2:*10*
**215.683.5000** 2:*15*
**22** 104:*9*
**23-hour** 72:*6*
**25** 91:*25*
**26** 27:*11, 24*
**28** 9:*24* 42:*14* 63:*17*
76:*11* 82:*10* 83:*3, 10*
84:*19* 97:*7, 10*
117:*21* 122:*18*
**28th** 116:*1, 8, 17*

**< 3 >**
**3** 103:*4* 119:*9* 120:*6,
12*
**3:00** 25:*6, 8* 41:*16*
42:*18, 21* 105:*16*
**3:30** 105:*16*
**30** 37:*6, 8* 58:*11*
73:*16* 75:*10*
**300** 34:*2*
**350** 34:*2*

**< 4 >**
**4** 47:*4*
**400** 33:*11* 34:*21*
35:*1*
**409** 92:*18*
**412.654.9070** 2:*4*
**46484** 1:*23*

**< 5 >**
**5** 1:*10* 48:*7* 53:*7*
**500** 34:*3* 66:*7*
**542** 77:*5* 79:*3, 7*
80:*9* 93:*1* 102:*11*

104:*3*

**< 6 >**
**6** 4:*4*
**610** 2:*19*
**631** 2:*3*
**6th** 28:*14*

**< 7 >**
**7:00** 42:*18*
**70** 18:*10* 35:*24*

**< 8 >**
**8:00** 42:*18*
**8-hour** 42:*6*

**< 9 >**
**911** 70:*12* 89:*7, 9, 14,
15, 22* 90:*3, 6, 11, 13,
16, 20*
**97** 119:*2*
**97.0** 118:*25*

**< A >**
**a.m** 1:*15* 97:*7*
**AAOX3** 103:*3* 119:*7*
**abbreviation** 119:*7*
**ability** 41:*3*
**able** 13:*11* 39:*6*
43:*18*
**abnormal** 18:*13*
**ABOLITIONIST** 2:*2*
**abrasion** 67:*21*
**abusing** 76:*25*
**access** 37:*1, 2, 4* 77:*9,
10, 17* 78:*24* 79:*1*
94:*4* 95:*23* 96:*10*
99:*3* 103:*25*
**Accu-Chek** 102:*1, 2, 5*
**accurate** 14:*1* 39:*15*
53:*4* 54:*10* 55:*23*
64:*2* 99:*14* 121:*10,
23* 125:*7* 126:*12*
**acknowledge** 99:*14*
**action** 60:*13* 121:*6,
13, 19* 122:*1* 125:*13,
17*
**actual** 90:*4*
**addition** 31:*18, 25*
107:*13*

**additional** 42:*1*
44:*16* 45:*11* 53:*13*
54:*16* 55:*11, 14* 64:*4*
121:*5*
**address** 98:*4* 99:*9*
**administer** 19:*5*
35:*22* 36:*24* 44:*23*
50:*21* 52:*9, 14* 66:*11*
100:*11* 114:*16*
**administered** 33:*23*
115:*1* 122:*9*
**administering** 37:*7*
50:*14*
**administration** 48:*9*
115:*21*
**administrator** 55:*6, 8*
115:*18*
**Administrators** 1:*4*
**admissible** 22:*24*
**admission** 72:*9*
**advising** 37:*8*
**affiliated** 116:*11*
**afternoon** 117:*3*
**agency** 19:*23* 111:*14*
**ago** 7:*6, 7* 11:*18*
112:*10* 122:*7*
**agree** 39:*24*
**agreed** 20:*18* 25:*3*
**agreement** 20:*25*
**ahead** 44:*5* 49:*14*
52:*2* 56:*19* 80:*25*
**aide** 11:*23* 12:*4, 6, 14*
**aide/medical** 10:*17*
**al** 1:*7* 126:*6*
**alcohol** 58:*2*
**alert** 61:*17* 63:*6*
103:*4* 119:*8* 120:*5,
12*
**alerting** 54:*19*
**Alex** 123:*20*
**allow** 24:*5, 7* 33:*5*
108:*12*
**altered** 120:*22*
**amount** 32:*11* 34:*21*
40:*8* 50:*20* 82:*13*
115:*3*
**amounts** 23:*13*
**and/or** 126:*13*
**Answer** 5:*5* 7:*23*
8:*2, 6* 9:*11, 13, 17*

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 42 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

14:8  21:11, 25  22:18
23:23  24:5, 9  33:15
34:12, 14  38:19  44:5
46:10  47:10  48:15
52:2  53:6  55:13, 21
56:8, 19  58:19  61:6
64:7  73:1  77:25
78:17  79:23  80:25
84:4  86:16  87:12, 17
88:1, 18, 19, 23  96:18
97:20, 22  98:25
99:24  100:7, 8, 16
103:10, 14, 22  108:13
109:7  110:6  115:6

**answered**  81:8  98:9
99:24

**answering**  40:6
46:16  53:7, 13  60:8
99:21  100:21

**answers**  7:15, 20
46:19  93:4  95:19
100:4  101:6

**anybody**  104:20
105:25  106:1

**anybody's**  77:11

**APOLLON**  1:13
2:10  4:3  6:2, 9, 18
9:21  47:1, 8  81:20
94:19  96:22  102:20
126:22

**A-P-O-L-L-O-N**  6:19

**Apollon's**  47:7

**APPEARANCES**  2:1
3:3

**Appearing**  2:5, 11, 16,
21  3:8

**appears**  92:3  114:4

**applicable**  23:5

**application**  20:17

**apply**  24:23

**appropriate**  109:10
115:3

**approximately**  7:5
12:15, 18  27:12
44:18  54:11  73:16
121:24

**Arch**  2:14, 19

**area**  118:1  123:1, 6,
8

**argue**  24:3

**articulated**  24:2

**aside**  73:8  116:14

**asked**  8:6  29:2
57:19  61:23  80:19
81:8  93:4  96:4
99:23  111:5  112:1
119:6  121:3, 4
122:23

**asking**  22:7  29:16
35:4, 5, 8  38:7  40:5
59:18  64:16  75:3
76:14, 15  81:9, 23
88:4, 9  100:18
106:23  109:8  119:23,
25  120:2, 7

**asserted**  22:8

**asserting**  21:14, 16,
20, 24  22:12, 16

**assess**  87:15

**assessing**  15:12  72:2
88:2

**assessment**  52:16, 18,
19, 20, 22  53:2  62:7
66:20  74:13  75:12,
23  83:14  84:10, 16
85:9  87:22  103:2, 9
120:19  122:8

**assessor**  87:13

**assigned**  29:5, 6
50:25

**assist**  13:11

**assistant**  10:16, 17,
24  11:4, 25  12:20
13:2, 8, 13, 22  15:16,
20  51:2, 4, 5, 8  52:4,
12  68:12  101:24
102:2, 7, 15  118:4

**assistants**  13:17

**associated**  51:19
68:18  79:13

**associate's**  13:10

**assume**  8:2  107:3

**assumed**  62:4

**assumption**  62:3

**attempting**  122:19

**Attorney**  2:5, 10, 15,
21  3:7  112:5  114:3
125:12, 15

**attorney/client**  8:24
9:9

**attorneys**  8:21
108:18, 25

**August**  19:18  43:3
54:8, 13

**Austen**  3:12

**authority**  71:3  90:15

**available**  59:7  117:23

**average**  58:5, 6

**avoid**  111:5

**Awake**  119:8  120:5,
12

**< B >**

**Bachelor's**  11:15

**back**  19:14  28:14, 15
29:12  49:15  51:17
56:4, 5  59:14  70:2
74:5  85:18  90:5
104:1, 11  106:6, 23
109:3  111:9  115:9
117:19  122:7

**background**  74:8

**BAKER**  2:8  4:7
8:23  9:6, 12  14:7, 11
20:22  21:5, 16, 21
22:1, 9, 13, 21  24:1
27:15  29:9  30:1
33:14  34:12  35:3
38:6, 19  39:21  40:16
44:3  46:10  50:10
51:24  52:2  56:3, 7,
18  57:3, 8  58:7, 18
60:2  61:7  62:12, 24
64:5, 14  65:23  68:1
73:21  74:16  75:1, 13
77:24  78:16  79:22
80:4, 24  81:8  83:4
84:3  86:10, 17  87:11,
25  88:14, 17  91:16
92:5  93:18  94:5, 17
95:13  96:3, 18  98:10,
13  99:23  102:25
103:13  106:25
108:12  109:6, 18
110:5  112:23  113:16
114:12  115:5  117:18
119:22  120:10  123:9

**based**  20:1  22:18
23:13, 24  32:12, 20,
22  39:13  40:21
52:22  56:21, 22, 25
58:1  62:7  68:3  74:8,
22  75:23  77:13
82:23  93:3  95:18
97:25  104:14  121:10

**basic**  14:4

**basically**  43:13  53:3

**basis**  40:2

**Bates**  65:25  66:3
82:1  91:21, 24  92:3,
14, 16  97:13

**bathing**  12:11

**Bear**  46:15, 21

**bearing**  23:1

**beautiful**  86:1

**becoming**  30:7

**beds**  14:23, 24

**began**  43:5  54:8

**beginning**  12:17  54:3

**begins**  82:2  97:13

**behalf**  117:4

**belated**  28:8

**believe**  13:15, 16
18:4  20:25  41:2
54:5  69:12, 16  75:4
87:7  93:3  103:25
104:1  110:8  111:24
114:6  119:1

**beneath**  101:17

**beyond**  27:24  36:20

**birth**  19:11  28:6, 12
93:6

**bit**  36:9  80:9  93:18
111:22

**Blanche**  2:16

**bleeding**  67:13

**blood**  13:11  14:18
15:2  17:6  19:3
26:12  29:21  30:16
32:12, 16  33:6  34:20
48:21  50:17  66:7
67:21  68:6, 13  77:5
79:18  92:25  102:11
104:3  105:18  118:7,
18

**Bloodsaw**  2:16

blurred 17:*17, 24*
18:*17* 79:*15, 18*
blurry 30:*8*
BMI 119:*2*
board 16:*2, 3* 24:*22*
Body 118:*9, 23* 119:*2*
book 64:*25*
born 25:*18*
bottom 94:*13* 97:*19*
102:*18*
Boulevard 3:*6*
box 69:*17, 20*
break 8:*4, 7* 57:*11*
91:*5* 93:*19*
breaks 8:*3*
breathing 67:*13*
BRET 2:*2* 6:*12*
111:*5*
brief 111:*3*
bring 81:*4* 85:*18*
broader 22:*23*
broke 12:*21* 13:*5*
Brooklyn 10:*21* 11:*2*
brought 61:*23* 77:*21*
built 74:*7*
bunch 57:*19*

< C >
call 19:*8* 35:*11, 17,*
*21, 24* 40:*7* 58:*16, 24*
59:*23* 60:*6, 10* 66:*9*
70:*10, 11, 19* 72:*17*
73:*8* 80:*21* 82:*16, 18*
89:*7, 15, 16, 19, 21*
90:*3, 4, 6, 7, 11, 13, 16,*
*20* 96:*1* 100:*10*
106:*6, 8, 23* 107:*4*
110:*11* 112:*20*
called 19:*24* 20:*4*
32:*17* 45:*6* 54:*22*
66:*13* 67:*6* 72:*6*
80:*11* 89:*9, 14* 96:*14*
111:*11*
calling 106:*4, 12*
calls 88:*14* 113:*13*
116:*9* 119:*16*
capacity 6:*23*
Capella 11:*13*
captioned 126:*10*
carbohydrates 32:*4*

care 12:*10* 13:*14, 20*
15:*12* 16:*8, 10, 17, 25*
23:*18* 36:*13, 20*
38:*17, 23* 40:*1, 24*
45:*15* 46:*7* 55:*7, 25*
58:*15* 89:*2, 4* 91:*1*
115:*18* 121:*21* 122:*2,*
*19*
Career 2:*21* 15:*19*
20:*4* 117:*4, 6, 7*
cares 86:*3*
Carey 1:*16* 125:*5, 17*
caring 86:*4*
Carney 2:*16*
carried 15:*18* 107:*20,*
*24*
carry 74:*23*
case 7:*6* 21:*7* 22:*3*
31:*12* 34:*5* 59:*19, 21*
60:*9* 72:*16* 73:*3*
78:*19* 87:*14* 89:*11*
92:*10* 101:*11* 109:*8*
125:*16*
category 53:*3*
caveat 108:*13*
CENTER 2:*2* 12:*1*
13:*7, 25* 14:*20, 25*
15:*5* 26:*25*
certain 23:*12* 34:*6*
44:*8* 45:*6*
certainly 80:*1* 89:*13*
109:*10*
certificate 12:*7, 9*
certify 9:*15* 125:*6, 11*
certifying 22:*17*
cetera 100:*16*
CFCF 26:*18* 27:*10*
28:*20* 29:*4* 36:*1*
40:*22* 41:*12, 16* 43:*3*
45:*23* 47:*25* 54:*25*
57:*15* 65:*3* 66:*6*
67:*3, 5, 8* 70:*6, 14, 21*
71:*10* 72:*6, 9* 74:*3*
79:*20*
challenges 59:*24*
60:*5*
chances 63:*24*
change 32:*3* 103:*22*
127:*5, 8, 11, 14, 17, 20,*

*23* 128:*5, 8, 11, 14, 17,*
*20, 23*
changes 126:*13, 16*
Chapel 28:*2, 15*
characterize 41:*24*
64:*3*
characterized 64:*6*
Charge 28:*18, 19, 21,*
*22, 23*
check 19:*3* 29:*21*
50:*16, 17* 51:*5, 23*
82:*14* 83:*19*
checked 48:*24* 82:*15,*
*17*
checking 49:*5*
checks 48:*9* 50:*24*
51:*1*
chronic 91:*1*
circumstances 68:*21*
CITY 1:*7* 2:*13, 15*
6:*14* 13:*7* 92:*17, 21*
126:*6*
clarification 38:*21*
49:*24*
clarified 88:*22*
clarify 38:*7* 62:*16*
90:*5*
class 44:*7*
classroom 43:*9*
clear 7:*18* 23:*21*
54:*7* 56:*9* 72:*25*
73:*21* 79:*11* 86:*2, 12*
90:*9* 99:*6* 106:*15*
click 69:*20*
clicked 69:*17*
client 9:*11, 16* 22:*20*
23:*23*
clinic 91:*2*
clinical 45:*6* 46:*6*
81:*5, 6* 82:*5*
closer 54:*3*
clothing 12:*11*
color 30:*23, 25* 31:*1,*
*5, 8*
colors 31:*9*
come 38:*1* 44:*9*
53:*23* 108:*9* 115:*9*
comes 38:*18*
comfortable 92:*10*

coming 49:*3* 69:*15,*
*18*
commencing 1:*15*
comment 86:*12*
common 64:*20*
Commonwealth 1:*14,*
*18*
communications
116:*15*
company 111:*11, 20*
117:*7, 10*
compensation 21:*3, 6*
23:*10*
complement 23:*9*
complete 102:*1*
completed 94:*12*
102:*2, 4* 117:*20*
completely 46:*13*
compliant 113:*23*
compos 120:*4*
compound 93:*19*
computer 48:*20* 49:*6,*
*10*
concern 78:*3* 115:*23*
concerned 120:*4*
concerns 77:*22*
concluded 124:*5*
condition 100:*15*
conditions 45:*7* 58:*1*
74:*9* 77:*2* 99:*22*
100:*5* 119:*18*
conduct 109:*4, 9*
123:*4*
conducted 7:*13*
confirm 47:*15*
confused 30:*7* 79:*15,*
*18*
confusion 17:*14*
18:*17* 68:*5*
congratulations 28:*9*
conjunction 31:*21*
consequence 63:*19*
consider 109:*11*
considered 79:*7, 9*
consist 43:*8* 44:*20*
consisted 17:*3*
consistent 34:*7*
75:*10* 97:*8*
consult 60:*19* 81:*3*

contact 83:*1*
content 8:*20*
context 41:*12* 50:*10*
Continued 3:*3* 55:*17*
continuing 24:*3*
continuity 38:*17, 23*
89:*4*
contract 27:*19, 20*
54:*4, 8*
contradiction 98:*5*
contradicts 98:*3*
conversation 8:*20*
61:*21* 82:*9* 105:*15*
conversations 107:*12*
copy 46:*6* 92:*8, 11,*
*16* 123:*15* 124:*1*
Corinne 3:*12*
Corp 3:*7*
correct 9:*20* 15:*25*
18:*5* 21:*23* 25:*5*
27:*1* 31:*15* 45:*23*
47:*19, 22* 61:*1* 71:*2*
95:*4* 101:*23* 112:*22*
113:*8* 115:*13* 118:*15*
121:*21* 122:*4, 16, 21*
Correctional 26:*13*
36:*2, 5* 69:*22* 116:*3*
corrections 123:*1*
126:*13*
correctly 102:*20*
counsel 6:*13* 108:*15,*
*23* 125:*12, 16*
couple 49:*2* 76:*21*
110:*22* 111:*1, 2*
116:*22* 121:*7*
course 82:*6*
COURT 1:*1* 7:*16*
123:*12, 17, 20, 22*
124:*1* 125:*5, 22*
covered 9:*8* 111:*4*
covering 111:*5*
coworkers 71:*12*
create 76:*5* 97:*4*
created 94:*20*
credibility 87:*14, 16*
88:*3*
Curran-Fromhold
26:*13, 19*
currently 10:*4* 11:*9*

100:*14*
custody 104:*12*
cut 67:*21*

< D >
dark 31:*10*
darker 31:*11*
date 1:*16* 9:*24*
108:*11* 112:*21* 114:*8*
116:*2, 17* 125:*9, 23*
dated 9:*23*
daughter 28:*6, 12*
day 14:*4, 15* 26:*22*
38:*15* 42:*21* 43:*12*
44:*2, 7, 9, 13* 53:*21*
57:*16* 84:*19* 105:*13*
113:*5* 126:*18*
days 25:*7, 9, 10, 12,*
*14* 42:*8, 9* 44:*15, 18*
45:*10* 104:*4* 112:*8*
DC 26:*23, 25*
death 104:*22* 106:*3*
107:*13, 20, 24* 108:*11,*
*20* 109:*1* 112:*21*
116:*2, 18*
decide 40:*23* 70:*3, 4,*
*14*
decision 62:*1* 89:*10*
decisions 28:*23*
DECLARATION
126:*7*
declare 126:*8*
declined 19:*8*
Defendant 2:*10, 15,*
*21* 3:*7* 53:*13*
Defendant(s 1:*8*
Defendants 53:*8*
111:*2*
define 73:*24*
definitely 105:*6*
degree 10:*18, 20, 24*
11:*1, 14* 13:*10*
degrees 10:*22* 11:*3*
dehydrated 79:*15*
dehydration 17:*15,*
*23* 18:*19*
DEPARTMENT 2:*13*
19:*21* 20:*12* 26:*16*
70:*23* 104:*21* 105:*4*

107:*25*
depend 86:*7*
dependent 34:*22*
depending 30:*23*
33:*12* 34:*3* 35:*9*
deposition 1:*12* 5:*3*
6:*15, 20* 7:*2, 8, 9, 13*
8:*13, 16, 22* 10:*2*
24:*3* 91:*14* 119:*7*
121:*3, 12* 124:*5*
125:*7, 14* 126:*2, 10,*
*14* 127:*2* 128:*2*
describe 17:*2* 20:*9*
47:*4* 48:*7*
described 84:*11*
DESCRIPTION 4:*9*
details 48:*10*
Detention 26:*25*
determine 32:*14* 82:*6*
determined 39:*10*
58:*14* 93:*2, 5* 95:*11*
determining 15:*13*
23:*16* 39:*17*
develop 25:*25*
diabetes 13:*14, 20*
16:*8, 17, 25* 25:*15, 16,*
*20, 23* 26:*3* 29:*8, 20*
31:*14, 18, 20, 24* 46:*7*
81:*5, 7* 91:*1* 92:*25*
93:*1, 2, 5* 95:*12, 17*
97:*20* 98:*8, 15, 19, 23,*
*24* 99:*5, 18* 100:*9, 16*
103:*6, 10, 12, 20, 24*
diabetic 16:*11* 18:*22*
29:*22, 25* 30:*10*
45:*15* 46:*2* 49:*22, 23*
51:*6* 61:*14* 62:*19*
67:*23* 68:*15* 72:*12*
73:*9* 76:*24* 77:*4*
90:*22* 101:*18*
diagnosed 114:*5*
diagnosis 120:*1*
died 105:*13, 17*
107:*9* 113:*5* 116:*9*
diet 16:*13, 14* 31:*22*
32:*4*
difference 67:*6*
100:*23*
differences 36:*17, 20*

different 15:*16*
26:*10* 28:*20* 32:*18*
33:*1, 5, 8, 11* 34:*17*
36:*4* 38:*12* 58:*10*
92:*2, 3* 99:*2, 12* 101:*1*
116:*8* 123:*6, 8*
differently 109:*5*
Digital 123:*23*
dip 30:*22*
Direction 5:*5*
directly 58:*22*
director 53:*12*
115:*20*
disciplinary 60:*13*
121:*6, 13, 19* 122:*1*
disclose 108:*15*
discovery 22:*23* 23:*2,*
*5* 46:*18* 92:*3*
discussed 61:*22*
Discussion 46:*23*
57:*13* 84:*7* 91:*6*
110:*15*
discussions 116:*2, 10*
distinguished 26:*3*
DISTRICT 1:*1, 2*
doctor 14:*6, 17* 19:*8*
35:*12, 17, 21, 25*
39:*12* 41:*13* 66:*9, 13*
70:*10, 11, 19* 71:*7*
72:*17* 110:*11*
doctors 15:*11* 29:*1*
38:*24* 41:*4*
doctor's 11:*25* 13:*3*
document 8:*1* 21:*8*
47:*1* 48:*8, 13* 49:*25*
50:*6, 23, 25* 51:*14*
52:*15, 21* 61:*14*
62:*20* 65:*10, 12, 16,*
*22* 66:*16, 19, 20, 22*
67:*1* 68:*10* 73:*20*
74:*5* 76:*1* 77:*15*
81:*4, 14, 19* 82:*5*
83:*12, 15* 85:*8* 91:*9*
92:*1, 8, 9* 93:*23* 94:*6,*
*15* 96:*24* 97:*4, 14*
112:*4* 122:*9, 12*
documentation 76:*6*
79:*23* 80:*5* 88:*25*
94:*19* 118:*23*

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 45 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

documentations
20:*19*  78:5
documented  48:*11*
50:*15*  51:*18*  73:*19*
74:*14*, *19*  75:*14*
84:*10*, *12*  85:7  93:8
118:*24*
documenting  50:9
53:*11*
Documents  5:*10*
9:*20*, *23*  10:2  76:*17*
85:*18*  112:5  120:*12*
doing  15:*11*  16:*23*
122:*24*
dosage  50:*15*
dosages  50:9
draw  13:*11*
drew  14:*18*
drink  30:*18*  37:8
82:*25*
drinking  58:2
drinks  32:5
dropping  68:7
drugs  76:*25*
duly  6:3
Dysphagia  17:*14*

< E >
earlier  61:*22*  70:*25*
84:*11*  114:2  115:*10*
117:5  119:6  121:2
easier  123:*25*
EASTERN  1:2
educate  44:7
education  10:*15*, *23*
45:*21*  65:*1*
educational  10:*13*
efficient  111:*23*
eight  57:*22*
eight-hour  42:3
either  123:*1*
EKG  14:*18*  15:*14*
EKGs  13:*11*
electronic  49:*16*
50:*1*  76:7  77:7, *11*,
*18*  79:2  95:*23*  96:*11*
123:*15*  124:2
Electronically  94:*10*
95:2
emails  20:*15*

emergency  67:*16*
72:*21*  90:*19*, *23*
emergent  67:6, *11*, *12*,
*15*, *24*  70:2, 4
EMILY  2:*13*  123:*22*
employed  19:*17*, *18*
125:*13*, *16*
employee  104:*20*
105:4, 5, 7, *25*  106:*1*
115:*11*  125:*15*
employees  48:*1*
employer  19:*20*  57:9
employer's  57:*1*
employment  20:*11*
26:*21*  27:*18*  28:5
47:7, *25*
encounter  18:*21*
19:*1*  46:2  64:*11*, *20*
65:2, 6  69:*23*  76:*10*,
*16*, *18*  84:*15*, *23*  95:*1*
97:*1*, 7
encountered  73:6
encourage  82:*25*
ended  54:8
endocrinologist  53:*25*
63:*15*
endoscopy  12:*1*  13:7,
*25*  14:*20*, *25*  15:5
engage  9:3
enlarge  47:*12*
entails  46:*13*
enter  43:*10*  44:8
48:*21*  49:7  50:*20*
51:*16*
entered  63:3
entire  126:9
entirety  26:*20*
entitled  9:7
entity  20:4
ERRATA  126:2, *15*
127:2  128:2
ESQUIRE  2:2, 3, 8,
*13*, *19*  3:5
established  89:4
Estate  1:4
et  1:7  100:*16*  126:6
evaluating  118:*15*
119:*14*
evaluation  117:*22*

120:8
Everest  1:*23*
everyone's  41:3
exactly  18:5  115:*19*
EXAMINATION  6:6
16:2, 4  92:*24*  110:*19*
116:*25*  117:*16*
examined  6:3  120:*25*
Excessive  17:*23*
excluding  116:9
excuse  26:*14*  55:*12*
excused  124:4
exercise  31:*23*
exercises  12:*12*
exhibits  4:*10*
expect  118:*14*
expectations  23:*11*
expected  53:*15*  55:*15*
experience  40:*21*
experiencing  52:*24*
68:*17*
expert  40:8  109:8
explain  37:3  55:*17*
93:*15*
explanation  55:*18*
103:8
exploring  23:2
extend  27:*23*
extended  27:*22*

< F >
facility  23:*19*  26:*14*
30:*1*  35:5, 9  36:2, 5
67:*21*  78:*21*
Fahrenheit  118:*25*
fairness  91:*16*
fall  67:*24*
familiar  20:3  64:*10*
65:*14*, *17*  69:3, 5
72:5  81:5, *10*  96:*21*
97:*14*  108:2
familiarity  117:7
familiarize  45:*1*
far  120:3
fast  65:*19*
faster  15:*1*, 3
fault  105:*19*
February  7:9
feet  26:*23*

field  11:*21*
file  30:*11*  85:*19*
fill  44:*21*  46:*1*
84:*22*  85:8  88:*25*
93:*22*
filled  85:*11*, *12*, *16*
93:*13*, *14*, *25*  94:2
97:*16*  102:*22*
financially  125:*17*
fine  6:*10*
finish  7:*20*, *22*  14:7
86:*10*  96:4
firing  7:3
first  11:*21*  16:*21*
19:4  44:2, *15*  50:*16*
81:*23*  82:2  92:*23*
94:*12*  111:9  125:8
Five  25:9, *11*, *14*
28:4  42:*1*  57:*24*
five-minute  57:*11*
Flag  54:*22*
floor  2:*14*
flush  30:*18*  72:*18*
follow  41:3  44:*10*
48:*20*  53:*25*  61:*18*
73:*13*, *15*, *18*  106:6
115:*15*
following  115:*23*
follows  6:4
follow-up  37:*22*
38:*10*, *11*, *13*, *15*
39:*10*, *18*  40:*24*
60:*19*, *24*  121:3
follow-ups  16:*14*
39:8, *14*
foregoing  125:6, 7
forgot  80:*20*
form  33:*15*  34:9, *14*
35:4  36:7  38:7  39:5,
*20*  41:*1*  44:3  46:9
47:*21*  52:*25*  56:2, 8,
*17*  57:4, 6  58:*19*
59:9  60:2  61:6
62:*11*, *25*  64:6, *13*
71:*20*  74:*16*, *25*  76:4
77:*25*  78:*15*, *16*  80:8,
*23*  84:4  85:3, *14*
87:*10*, *24*  88:*1*  93:*17*,
*23*  95:7  96:*17*  98:5,
*25*  102:*25*  103:*11*, *14*

109:*17, 19*  110:*5*
115:*6*
**formal**  107:*20, 24*
**forms**  44:*21*  54:*25*
57:*24*
**forth**  125:*10*
**Four**  7:*7*  57:*24*
**Frasier**  2:*16*
**free**  39:*6*  52:*17*
**frequent**  18:*18*
**frequently**  71:*18*
86:*6*
**front**  92:*9, 17*  93:*22*
94:*14*  102:*3*  112:*4*
**full**  124:*3*
**further**  24:*7*  38:*21*
110:*16*  125:*11, 14*

**< G >**
**gather**  85:*17*
**Gay**  80:*16*  82:*10*
83:*2, 12, 18*  84:*22*
85:*21, 25*  87:*5, 20*
88:*5*  93:*12, 14, 25*
94:*4, 11*  95:*2*  96:*10*
97:*4*  106:*4, 17*  112:*1*
114:*7, 13, 20*  116:*10,
15*
**Gays**  82:*23*
**Gene**  2:*16*
**general**  29:*10, 19*
35:*1*  92:*24*
**generally**  16:*11*
29:*13*  30:*2, 4*  35:*4, 8*
64:*19*  70:*20*  73:*23*
**generated**  95:*3*
**getting**  68:*6*  86:*13*
**give**  7:*22*  8:*12*  9:*4*
13:*12*  32:*15*  33:*6*
39:*22*  41:*14*  66:*14,
15*  77:*21*  110:*12*
114:*20*  115:*4*  122:*22*
**given**  6:*20*  34:*7*
61:*13*  66:*17*  67:*2*
78:*17*  88:*10, 12*
90:*13, 20*  121:*11*
**giving**  28:*12*  99:*8*
**glucose**  18:*4, 8, 13*
19:*3*  33:*22*  34:*20, 25*
35:*16*  48:*9, 21, 24*

49:*6*  50:*6, 17, 23*
51:*1, 5, 23*  66:*7*  79:*3*
80:*9*
**go**  7:*11*  11:*20, 23*
15:*13*  19:*14*  22:*21*
28:*24*  43:*11*  44:*5*
48:*6*  50:*19*  52:*2*
56:*19*  58:*21*  59:*14*
72:*2*  74:*4, 9, 10*  76:*7*
80:*25*  90:*5*  91:*19*
101:*13*  110:*23*  111:*7*
**goes**  31:*9*  37:*21*
**going**  24:*4*  27:*16*
28:*15*  39:*6*  40:*5*
44:*23*  68:*5*  70:*2*
72:*24*  81:*13*  86:*11*
89:*24*  94:*22*  110:*13*
117:*19*  119:*19*
123:*11*
**Good**  6:*9*  8:*9*  40:*16*
117:*3*  123:*23*
**GORDON**  2:*16*
**gotten**  104:*7*  112:*13*
**gradations**  31:*4*
**graduate**  11:*6, 12*
**graduated**  11:*11, 16*
**GROTE**  2:*2*  4:*4*
6:*8, 12*  9:*1, 10, 15, 18*
14:*14*  21:*2, 13, 18, 23*
22:*6, 11, 15*  23:*6*
24:*14, 15*  27:*17*
29:*11*  30:*3*  33:*19*
34:*10, 19*  35:*7*  36:*11*
38:*8*  39:*1*  40:*12, 20*
41:*5*  44:*11*  46:*14, 21,
24*  47:*23*  50:*12*  52:*1,
7*  56:*11, 12, 24*  57:*12,
14*  58:*8, 13*  59:*1, 12*
60:*4*  61:*10*  62:*14*
63:*10*  64:*9, 18*  65:*24*
66:*2, 5*  68:*2, 8*  71:*22*
74:*1, 20*  75:*6, 15*
78:*2, 18*  79:*25*  80:*7*
81:*2, 11, 18*  83:*6*
84:*6, 8*  85:*5, 20*
86:*11, 24*  87:*18, 19*
88:*8, 21*  91:*4, 7, 19,
23*  92:*20, 22*  93:*20*
94:*9, 23*  95:*9, 14*
96:*9, 13, 20*  98:*12, 17*

100:*2*  103:*1, 18*
107:*2*  108:*21, 22*
109:*12*  110:*1, 12, 16*
112:*6*  113:*13*  114:*3*
119:*6, 15*
**ground**  7:*11*
**grounds**  22:*10*  39:*23*
**guess**  69:*25*  88:*18,
25*  113:*20*
**guidance**  73:*7*
**guidelines**  33:*13*
34:*18, 23*  36:*10, 12*
56:*23*
**guidelines/protocols**
62:*5*

**< H >**
**Hamilton**  10:*9*
**hand**  92:*12*
**Hang**  94:*5*  107:*5*
**happen**  41:*22*  63:*16*
66:*12*  74:*13*
**happened**  64:*1*  75:*3*
105:*18*  108:*10, 18, 25*
**hard**  92:*8, 11, 16*
**harm**  78:*6*
**head**  7:*15*
**health**  10:*17*  11:*22*
12:*4, 6, 14*  55:*7*
115:*18*  119:*17*  120:*8*
**hear**  6:*10*  14:*11*
69:*6, 7*  111:*19*
**heard**  43:*16*  71:*11,
15, 17, 24*  108:*14*
111:*18*  117:*6*
**heart**  68:*6*
**heavier**  31:*11*
**held**  1:*14*  46:*23*
57:*13*  84:*7*  91:*6*
110:*15*
**help**  34:*11*  62:*16*
64:*25*  78:*4*
**helps**  120:*9*
**hereof**  126:*15*
**high**  10:*15*  11:*6*
30:*16*  79:*3, 18*
105:*19*
**higher**  33:*10*  34:*2*
40:*9*  58:*15*

**hired**  13:*6*  19:*23*
24:*7, 11*
**history**  10:*13*  78:*6*
112:*17*
**HIV**  68:*13*
**HIV/AIDS**  100:*16*
**HOFF**  2:*13*  123:*23*
**hold**  24:*2*  114:*6*
**home**  10:*16*  11:*22*
12:*2, 4, 6, 11, 13*  15:*7,
24*  16:*7, 18*  18:*21*
28:*2, 13, 16, 17*
**homicidal**  77:*1*
**hopefully**  86:*14*
**Hospital**  10:*5, 6, 8*
11:*23*  12:*3*  15:*14*
28:*24*  47:*6, 19*  69:*4,
8*  104:*12*
**hour**  24:*13*  58:*11*
73:*17*  75:*11*
**hours**  42:*10*  57:*22*
83:*19*  87:*6, 21*  88:*6*
**housing**  72:*9*
**HU**  2:*3*
**hyperglycemia**  17:*22*
68:*18*  79:*8, 9, 13*
84:*23*  90:*24*
**hyperglycemic**  17:*6*
**hypertension**  67:*22*
**hypoglycemia**  17:*13*
68:*18*
**hypoglycemia/hypergl
ycemia**  65:*7*
**hypoglycemic**  17:*5*

**< I >**
**identified**  51:*9, 13*
**Identify**  47:*4*  48:*7*
65:*24*
**identities**  59:*17*
**illness**  119:*24*
**immediate**  38:*14*
**inaccurate**  99:*8*
**inappropriate**  87:*15*
**incident**  63:*16*
**include**  41:*6*  48:*10*
118:*6*
**included**  79:*20*
100:*15*
**includes**  84:*18*

**including** 13:6 23:10
48:11
**incorrect** 22:1, 2
**independent** 76:16
95:10, 15 100:3
**INDEX** 5:3
**indicate** 35:10
119:12 120:16, 21
**indicated** 67:15 77:4
112:6 115:17 119:3
126:14
**indicates** 31:1 95:3
**indicating** 98:24
**individual** 18:17
30:17, 20 49:13
58:10
**infirmary** 27:3, 7
47:6, 18 70:21, 22
71:4, 9 72:2 73:5
**inform** 39:12
**information** 48:11, 12
49:10, 13 50:2 51:16
68:22 69:21 77:3
79:2 89:2 97:24, 25
98:3, 23 99:1, 2, 8, 14
108:10, 14
**informed** 37:25 63:5
**injectable** 26:7
**inmate** 121:12 122:2,
18
**inmates** 104:18
115:24
**inquiry** 24:8 107:20,
24
**insight** 29:24
**instance** 50:4 61:25
72:20
**instances** 51:22 52:8
72:12 90:21
**institution** 32:18
33:8 34:16
**institutions** 33:2
**institution's** 34:23
**instruct** 30:17 72:18
109:6 115:6
**instructed** 9:17
82:24 83:13
**instructing** 9:10, 12
21:11 22:20 23:22
87:12

**Insulin** 16:13 19:5
25:22 26:5, 6, 7, 10,
11 31:15, 19, 21 32:9,
10, 11, 15 33:6, 23
34:1, 21 35:22 36:24
37:7 48:9 50:9, 14,
15, 18, 22 52:9, 14
53:9, 24 54:20 60:18
61:17 63:4 66:11
73:12 82:13, 14
100:11 104:4, 6, 8
110:10 112:8, 13, 17
113:24 114:5, 9, 17
115:4
**insulins** 17:10 66:15
**intake** 8:18 9:20
29:6, 7, 9 37:5, 11, 13,
16, 17, 23 38:5, 9, 18
39:4, 5 40:22, 24
41:7 44:19 45:10
47:6 48:22 49:2
50:11, 24 51:1, 10, 23
52:5, 9, 15 57:15
58:7 59:25 66:7, 21
68:10, 23, 24 69:11
70:6, 13, 16 72:11, 24
73:2, 5 74:3, 4, 11, 21
75:4, 5, 9, 11, 18, 24
77:8, 12, 13, 19 78:21
79:20 80:8 82:5
83:14 84:13, 16
85:16 87:7, 22 88:24
89:1, 7, 23, 24 90:6, 7,
12, 17 91:18 92:24
94:18 95:18, 19, 21
96:14 98:5 100:24
101:3, 7 103:17
104:18 108:11, 20
109:1, 4, 14 110:4
112:6, 14 114:8
117:19, 22 118:1
120:21 121:17, 21
122:3, 8, 9, 12 123:1,
3
**interaction** 37:12
122:17
**interested** 125:17
**intermetex** 108:3, 6
**I-N-T-E-R-M-E-T-E-**

**X** 108:6
**interrogatories** 46:16
**Interrogatory** 47:3
48:7 53:7
**intervention** 67:7, 11,
12, 19, 25 70:4
**interventions** 70:3, 15
**involve** 122:18
**involved** 48:4 121:13
**Isabella** 15:6, 19, 23
16:6 18:20 19:9, 14
45:21
**issue** 21:7 58:22
61:22 62:22 78:7
115:12
**issues** 23:1 36:14, 15
**its** 23:9
**IV** 15:14

**< J >**
**JACOB** 1:4
**jail** 26:17
**jails** 106:2
**JAMES** 1:4
**January** 19:12 54:9,
11, 12
**Jared** 1:16 123:11
125:5, 17
**Jeoboham** 105:8
**Jersey** 10:9 19:15, 16
**JFK** 3:6
**Job** 1:23 11:21
14:16 15:9 19:9
23:14 28:12 33:4
43:17 57:22 86:4
111:16
**jobs** 36:5
**Johnson** 10:5
**join** 35:6 40:10, 15
56:18 74:17 88:16
109:21
**JONATHAN** 2:8
**JR** 1:5 76:11
**judge** 109:9
**judgment** 90:18
**June** 25:2
**JUNG** 1:4, 5 6:13
32:23 42:24 60:10
76:11, 19 83:5, 7, 10,
19 84:15, 20 87:6, 21

91:12 92:17 95:11,
16 98:8 99:17
100:18 101:20 102:7,
14, 16 104:15, 22
105:12, 17 106:7
107:12 108:10, 19
109:1, 4 112:2, 7
113:5 114:10, 20, 23
115:2 116:5, 9, 12, 16
117:20 120:21
121:14 122:10, 13, 17
126:4
**Jung's** 96:11 106:3
107:20, 24 109:1, 14
110:3

**< K >**
**KAMINSKY** 2:8
**keep** 24:4
**ketoacidosis** 67:23
**ketones** 30:14, 18, 19,
24 31:7, 12 72:13, 22
73:5, 9 74:22 75:9
82:14, 16, 17, 19
**KIERNAN** 2:5
**KIMBALL** 3:5
**kind** 31:4 59:18
**knew** 95:16 98:7, 14
99:7
**know** 7:24, 25 8:4
9:7 19:25 21:10
25:20, 23 26:2 27:7,
15 32:25 33:3, 7
40:4 42:20 47:10
48:1, 15, 25 49:9, 25
51:12 53:15 55:3, 15
56:21 63:8, 13, 14
65:18 67:5 69:14, 21
71:1 72:8 82:15
86:13 89:3 94:2
105:1, 3 115:19
**knowledge** 114:24

**< L >**
**laid** 13:5
**language** 25:5
**larger** 31:6
**LAW** 2:2, 13
**lawsuit** 111:2
**lawyers** 8:17, 22

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 48 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**learn** 12:*8* 13:*17* 71:*8* 108:*9*

**learned** 108:*17, 24*

**led** 61:*21*

**level** 32:*13, 16, 20, 23* 34:*25* 35:*16* 40:*9* 50:*17* 58:*15* 66:*7* 79:*3* 80:*10*

**levels** 18:*13* 19:*4*

**license** 15:*21* 16:*2, 4, 23, 24* 24:*17, 21* 25:*1*

**light** 31:*9*

**lighter** 31:*6*

**limited** 110:*7*

**limits** 118:*20* 119:*4*

**Line** 5:*6, 11, 16, 21*

**listed** 117:*11*

**litigation** 46:*17*

**little** 25:*15* 28:*8* 36:*8* 80:*9* 93:*18* 111:*22* 116:*7*

**located** 71:*1*

**location** 37:*9*

**log** 123:*13*

**log-in** 51:*15*

**Lolo** 3:*13*

**long** 7:*5* 10:*10* 12:*13* 27:*10* 28:*3* 44:*12* 58:*4* 93:*4*

**long-acting** 17:*10*

**longer** 43:*18*

**look** 14:*4, 16* 30:*5, 9* 49:*14* 65:*16* 79:*22* 80:*5* 81:*22* 92:*23*

**looked** 50:*1* 114:*2*

**looking** 29:*17* 68:*4* 93:*22* 94:*7* 109:*3*

**Lose** 32:*3*

**lost** 109:*23*

**lot** 30:*18* 86:*18* 91:*24*

**loud** 7:*14* 24:*25*

**LOUIS** 1:*5* 76:*11*

**low** 68:*6*

**lowers** 26:*12*

**LPNs** 28:*22* 38:*23*

**< M >**

**ma'am** 110:*23*

**majority** 86:*22*

**making** 23:*12* 28:*23* 90:*9* 109:*20*

**managed** 25:*21* 26:*4*

**manner** 45:*19*

**Manor** 28:*2, 15*

**MANSUKHANI** 2:*16*

**MARGO** 2:*3*

**MARIESHA** 1:*13* 2:*10* 4:*3* 6:*2, 18* 24:*9* 102:*19, 20* 126:*22*

**M-A-R-I-E-S-H-A** 6:*19*

**MARKED** 4:*9, 10* 5:*20* 92:*13*

**Market** 2:*9*

**Marsha** 104:*25* 105:*15* 112:*25* 113:*2, 14, 18* 114:*7*

**Marsha's** 105:*1*

**math** 27:*16* 42:*18*

**matter** 6:*13* 126:*10*

**matters** 119:*20*

**Maureen** 80:*16* 82:*10, 23* 83:*2, 12, 18* 84:*22* 85:*21, 25* 87:*5, 20* 88:*5* 93:*12, 25* 94:*4, 11* 95:*2, 22* 96:*10* 97:*3* 106:*4* 111:*25* 114:*12* 116:*15*

**mean** 26:*7* 29:*9, 14* 30:*2* 32:*9* 36:*14* 37:*3* 41:*11* 51:*25* 62:*6* 65:*6* 67:*11* 75:*13, 16* 78:*12* 94:*11* 98:*11* 103:*3* 114:*12* 119:*24, 25* 120:*6*

**Meaning** 120:*4*

**means** 102:*22* 120:*3*

**meant** 63:*13* 74:*2* 113:*14, 18*

**Med** 121:*20*

**medical** 10:*16, 24* 11:*4, 21, 24* 12:*19* 13:*1, 8, 13, 17, 22* 15:*15, 20* 29:*5* 30:*11, 12* 33:*12* 38:*1, 2* 41:*9, 11* 49:*17* 50:*1*

**51:***1, 4, 5, 8, 9* 52:*4, 12* 58:*1, 16* 61:*4* 62:*17* 63:*13* 67:*2* 68:*12* 73:*4* 76:*7* 77:*1, 8, 11, 18* 78:*6, 20* 79:*6, 12* 83:*13* 84:*13* 89:*2, 10* 95:*22, 23* 96:*11* 99:*22* 100:*5, 15* 101:*21, 24* 102:*1, 6, 15* 118:*3*

**medication** 15:*12* 26:*5, 9* 32:*1* 41:*15* 48:*12* 53:*10* 76:*3* 114:*10, 20* 115:*2, 12, 15, 24* 122:*10, 13*

**medications** 12:*11* 15:*14* 44:*24* 49:*3* 100:*14*

**meet** 8:*21*

**Megan** 112:*20, 24*

**Mellitus** 81:*6, 7*

**memory** 76:*18*

**mental** 119:*13, 17, 23* 120:*3, 8, 22*

**mentioned** 32:*1*

**mentis** 120:*4*

**met** 9:*3, 7*

**middle** 54:*4, 6, 11, 13*

**Mike** 123:*25*

**mine** 104:*9*

**mini** 123:*23* 124:*2*

**minutes** 37:*6, 9* 58:*11, 12* 73:*16* 75:*10* 110:*13, 23* 112:*10*

**mischaracterizes** 44:*4*

**misunderstanding** 94:*21*

**mm-mmh** 7:*15*

**modifiable** 32:*2*

**modification** 31:*22*

**moment** 46:*15, 21* 47:*9* 48:*14* 81:*22* 122:*7*

**money** 23:*13*

**month** 10:*11* 38:*17* 53:*22* 120:*15*

**months** 7:*7* 27:*13* 28:*4, 13* 71:*15* 121:*24*

**morning** 6:*9* 42:*16, 25* 111:*10*

**mortality** 107:*16*

**moved** 19:*15, 16*

**moving** 65:*19*

**< N >**

**name** 6:*12, 17* 13:*4* 43:*20* 51:*17* 102:*19* 105:*1, 8, 10* 110:*25* 115:*11* 117:*3* 120:*14*

**named** 53:*8*

**names** 48:*3* 51:*19* 71:*24*

**nature** 7:*1* 20:*10* 23:*20*

**necessarily** 49:*21*

**necessary** 70:*5*

**need** 7:*16* 8:*4* 15:*13* 21:*9* 35:*24* 38:*20* 48:*16* 75:*22* 80:*4* 87:*2* 89:*17*

**needed** 14:*25* 27:*21* 58:*15* 70:*15*

**needs** 25:*21* 26:*5* 28:*24* 38:*10* 50:*18* 60:*19* 79:*23* 89:*3*

**negative** 31:*2*

**neither** 125:*11*

**NET** 46:*2* 65:*6* 85:*10*

**never** 43:*16* 73:*6* 84:*19* 117:*6*

**New** 10:*9, 21* 11:*2* 13:*7, 25* 14:*21* 15:*6* 19:*15, 16* 76:*4*

**nice** 86:*3*

**No.____Change** 127:*3, 6, 9, 12, 15, 18, 21* 128:*3, 6, 9, 12, 15, 18, 21*

**No.____Line** 127:*6, 9, 12, 15, 18, 21* 128:*6, 9, 12, 15, 18, 21*

**No.____Line** 127:*3* 128:*3*

**nods** 7:*15*

**noncompliant** 105:*20* 112:*17* 113:*8, 12, 15,*

*19*

**non-intake** 50:*13*

**normal** 17:*6* 18:*4, 8*
35:23 118:*13*, 20
119:*4*

**Norristown** 69:*3, 11,
15* 104:*12*

**Notary** 1:*17* 125:22

**note** 51:*13* 52:*21*
53:2 57:8 91:*12*
93:8, *11, 13* 97:*13*
102:*23* 104:*10* 112:9
120:*16, 19, 20* 122:8,
*9, 12*

**notes** 52:20 95:4
112:6 114:*3*

**notice** 1:*13* 6:*15*

**notified** 75:22

**notify** 53:24

**November** 1:*10* 16:5
54:*14* 125:23

**number** 34:7 49:*7*
50:20 82:1 91:20, *24*
101:*16*

**numbers** 48:22
49:20 50:6 65:25
92:4, *15, 16*

**nurse** 10:7 15:24
16:*1* 18:20, *25* 28:*18,
19, 21* 34:22 35:2
37:*11*, 16 39:24 40:2,
22 41:7, *13* 43:25
50:5 51:*3* 53:*14*
55:15 56:15 59:25
67:9, *10* 70:*13* 72:*11*
73:*11* 75:*19, 21* 76:1
93:*12* 94:*19* 118:*14*
119:*13* 120:*3, 11*
123:*3, 6, 8*

**nurses** 38:25 41:*4*

**nursing** 10:*18, 20*
11:*5, 15* 12:2 15:7,
*19, 24* 16:7, *18, 22*
18:*21* 24:22 28:2, *16*
46:2 53:*12* 64:*11, 19*
65:2, *6* 71:*12* 84:23

**< O >**

**oath** 126:*17*

**object** 8:*23* 40:25
47:*20* 57:5 59:8
60:2 61:*5* 62:*10*
64:*12* 74:*16, 24* 75:*1*
78:*14, 16* 80:22 87:9,
*25* 95:6 102:*25*
109:*16, 18*

**objecting** 39:22

**Objection** 20:22
21:*18*, 22 22:6, *10, 19*
23:7, *21, 24* 33:*14*
34:8, *13* 35:*3* 36:6
38:6 39:*19, 23* 40:*3,
11, 15, 17* 44:*3* 46:8
56:*1, 7, 16, 19* 57:*3, 9*
58:*18* 62:*12, 24* 63:*1*
64:*5* 71:*19* 77:24
84:*3* 85:*2, 13* 86:*15*
87:*11, 23* 88:*14*
93:*16* 96:*16* 99:*23*
103:*13* 109:22 110:*5*
113:*13* 115:*5* 119:*15*

**objective** 52:*20*

**objectives** 52:*23*

**observation** 72:6

**observed** 76:*20*

**obtain** 24:*16, 20, 25*

**occasion** 16:*8*

**occur** 75:*12*

**O'CONNOR** 3:*5*

**October** 9:*24* 28:*14*
42:*14* 54:*14* 63:*17*
76:*11* 82:*10* 83:*3, 10*
84:*19* 97:7, *10* 116:*1,
8, 17* 117:*21* 122:*18*

**offer** 20:*16* 27:*23*
126:*16*

**offered** 20:*18*, 21
25:*4*

**office** 11:*25* 13:*4, 24*
53:*12*

**officer** 69:22

**officers** 116:*4*

**oftentimes** 86:6

**Okay** 8:8 14:9, *10*
38:22 40:*12* 47:*12,
15* 48:*18* 57:*10*
65:*11, 21* 90:*10* 94:8
96:7 105:22 110:22

**111**:8 113:*21* 121:8,
9

**older** 26:*1*

**once** 41:*23* 60:*10*
122:25

**ones** 45:*3* 107:*13*

**opinion** 40:8 79:4

**opportunity** 123:*4*

**opposed** 121:*20*

**oral** 26:*4, 9* 32:*1*

**order** 9:*3* 19:*4*
23:*17* 24:*4* 35:*12, 15,
18, 21* 58:25 61:*3*
62:*17* 66:*14*, 16, 23
67:2 76:8 82:6
83:*18* 84:22 85:*11*
88:9 89:*17, 18, 21*
90:*1, 13, 16, 20*
114:*17, 19*

**ordered** 83:25 84:25
85:6 87:6, *21* 88:5
114:*21*

**ordering** 38:*16*

**orders** 13:*12* 14:*17*
15:*11* 28:25 41:*14,
15* 85:*10* 92:25
123:*13*

**oriented** 103:*4* 119:8
120:6, *12, 13, 17*

**outpatient** 14:*25*

**outset** 91:*21*

**outside** 23:*4* 77:*14*
118:*19* 119:*3, 16*

**overall** 23:9

**overcrowded** 71:9, *11*

**overtime** 41:*18, 20*
42:*13*

**oxygen** 118:*19*

**< P >**

**p.m** 25:6, 8 124:6

**pace** 15:*1*

**packages** 23:*10*

**PAGE** 4:2, 9 5:6, *11,
16, 21* 7:*12* 48:*16*
81:23 82:2 92:23
93:22 94:*10* 96:22
97:*12, 19* 100:*12*
101:*15* 102:*18* 104:9,
*10* 127:*3, 6, 9, 12, 15,*

*18, 21* 128:*3, 6, 9, 12,
15, 18, 21*

**pages** 65:*18, 25*
91:*18* 94:*12*

**pamphlet** 65:*1*

**pandemic** 12:*21* 13:5

**paper** 63:*21, 25*
69:*17* 77:*21* 79:*1*
81:25

**paperwork** 8:*18*
46:*12* 117:*20*

**PAR** 101:*21*

**part** 12:8 13:*20*
16:*17, 23* 46:*16, 18*
49:*16, 20* 52:*16, 19*
66:*21, 23* 67:2 83:*14*
84:*12* 88:25 93:*14,
15, 21, 23* 103:2
107:*16, 19, 23* 120:*20*

**particular** 26:*17* 35:5

**parties** 92:2 125:*13*

**pass** 16:2, *3* 49:2
53:*10* 121:20

**passing** 15:*12*

**pathway** 46:7 81:6
82:5

**pathways** 45:6 81:5

**patient** 13:*12* 19:7
28:24 29:*14, 17*
30:*17* 32:3, *12, 15*
36:*13, 19* 37:2, *12, 21*
38:4 39:7 40:23
47:5, *18* 49:*19* 51:6
52:24 60:*18, 21*
61:*14, 19* 62:2, *18, 19,
21* 63:*3, 7* 66:6 70:5
73:9 78:6 87:*3* 88:6
89:*3, 7* 90:22 98:*15,
22* 99:7, *14* 101:*18*
104:*11* 118:*15*
121:*12, 16* 122:*3, 19,
25* 123:5

**patient/prisoner**
57:*18*

**patients** 11:*24* 12:*10*
15:*3, 13* 16:8, *11*
18:22 19:*1* 37:23, *24*
39:*3* 45:*16* 46:*3*
68:*16* 69:9, *10* 72:*12*
77:*18* 95:23 122:*24*

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 50 of 63

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

patient's 68:*4* 76:*7*
119:*13*
pause 65:*19*
pay 20:*24* 21:*10*
22:*4* 23:*1* 24:*8, 10*
PDP 47:*7* 48:*8, 25*
53:*11, 16* 55:*16, 25*
60:*12* 69:*11* 90:*21*
91:*2, 25* 97:*14*
105:*25* 106:*12, 17*
111:*16* 116:*3, 4*
PDP18 91:*24*
PDP's 34:*4*
penalty 64:*4* 126:*7, 8*
PENNSYLVANIA
1:*2, 15, 18* 2:*4, 9, 14,*
*20* 3:*6* 24:*17, 22*
people 13:*5* 48:*4*
49:*14* 53:*12* 86:*18*
116:*4*
perform 23:*14*
performing 21:*4*
period 112:*13*
periods 38:*12*
PERJURY 126:*7, 8*
person 30:*24* 37:*8, 9*
49:*22* 50:*18* 58:*5*
60:*7* 78:*5* 86:*4* 90:*3*
94:*3* 114:*9*
personally 51:*24*
person's 39:*11* 49:*13*
pertaining 91:*12*
92:*7* 119:*16*
PHILADELPHIA
1:*7* 2:*4, 9, 13, 14, 15,*
*20* 3:*6* 6:*14* 19:*21*
20:*12* 26:*16* 70:*23*
104:*21* 105:*4* 107:*25*
126:*6*
phone 58:*24* 60:*8*
80:*21*
phrased 9:*14* 109:*7*
120:*1*
physical 77:*21* 79:*1*
physically 29:*16*
75:*14, 17* 76:*13, 14*
77:*20* 86:*21* 89:*16*
pick 58:*23*
picked 41:*25* 42:*7*

place 11:*2* 81:*16*
120:*14* 125:*9*
placed 20:*12*
placement 47:*5*
Plaintiff 1:*5* 2:*5*
plaintiffs 6:*13*
plan 52:*21*
play 72:*1*
please 6:*16* 7:*25*
8:*6* 35:*10* 38:*21*
40:*9* 61:*9* 65:*23*
109:*24*
plenty 82:*25*
point 65:*20* 107:*3*
policies 44:*25* 55:*25*
57:*2*
policy 54:*22* 82:*2*
pop 49:*21* 50:*21*
pop-ups 48:*21*
portion 91:*17* 93:*24*
122:*8*
position 12:*5* 13:*9*
15:*21* 20:*16* 43:*24*
55:*4*
positive 31:*1* 72:*13*
possible 79:*6* 88:*12*
post 10:*14, 22*
potentially 22:*24*
54:*14* 119:*18*
power 107:*6*
powers 107:*4*
practice 13:*16, 23, 25*
14:*3* 48:*8* 82:*4*
83:*22*
practitioner 41:*13*
93:*12*
preceptor 43:*12, 16,*
*21* 44:*10, 13*
pregnant 7:*4*
pre-intake 99:*4*
100:*24* 101:*2, 7, 15,*
*20, 23*
preparation 8:*22*
10:*2*
prepare 8:*15*
prepared 8:*12* 9:*4*
preparing 23:*17*
prescribe 114:*9*
prescribed 34:*1*

100:*14* 104:*6*
presence 31:*6, 12*
PRESENT 3:*11*
59:*24* 82:*20*
pressure 68:*6* 79:*18*
118:*7, 18*
prevent 40:*5*
previous 49:*13* 88:*23*
previously 20:*24*
print 85:*17*
printed 92:*14*
prior 16:*23* 24:*17*
36:*1, 5* 63:*17* 91:*13*
prison 12:*2* 19:*19*
20:*16* 24:*12, 18*
26:*24* 32:*20* 36:*8, 10*
37:*10, 22* 43:*14*
51:*15* 56:*23* 62:*7*
64:*17* 68:*1, 2* 73:*22*
86:*21* 87:*2* 110:*10*
121:*25* 123:*2*
prisoner 53:*24*
54:*20* 78:*25* 82:*24*
98:*1, 2, 3* 106:*5, 13*
prisoners 74:*8*
Prisons 19:*22* 20:*13*
26:*16* 27:*4* 70:*23*
104:*21* 105:*4* 107:*25*
prison's 62:*4*
private 11:*25* 13:*3,*
*23, 24* 14:*3*
privilege 8:*25* 9:*9*
21:*13, 15, 20, 24* 22:*8,*
*12, 17* 23:*25*
Probably 25:*2*
110:*13*
procedure 37:*13*
process 14:*24* 20:*17*
37:*6, 7* 47:*5* 50:*8, 24*
51:*10* 58:*4, 16* 70:*18*
75:*24* 77:*8, 12* 85:*16*
103:*17*
produce 30:*20*
produced 20:*25* 21:*8*
30:*15* 92:*1, 21*
Production 5:*10*
92:*18*
profession 64:*21*
Professional 1:*16*
63:*13*

progress 51:*13*
52:*21* 53:*2* 91:*12*
93:*8, 11, 13* 95:*4*
97:*13* 102:*23* 104:*10*
114:*3*
prompt 48:*20* 49:*6*
pronouncing 102:*19*
proper 53:*10*
properly 23:*17* 78:*4*
protocol 47:*16, 17*
112:*18*
protocols 36:*21*
55:*25*
provide 16:*11* 21:*12*
23:*3, 18* 34:*17, 22*
72:*18* 73:*12* 82:*24*
88:*24* 96:*5* 122:*20*
provided 15:*3* 22:*4*
43:*6* 44:*16, 17, 25*
45:*5, 9, 11, 19, 20, 22*
46:*1, 6, 11, 19* 47:*25*
50:*9* 52:*4* 68:*12, 23*
73:*7* 82:*7* 110:*10*
122:*2, 14*
provider 38:*16*
39:*12* 40:*1, 9* 41:*11*
58:*16, 21* 59:*20, 22*
61:*4* 62:*18* 73:*4, 8*
80:*11, 12* 83:*25* 86:*1*
89:*10, 17, 19, 22*
90:*12, 16, 19* 93:*12*
95:*22* 97:*3* 100:*11*
114:*18*
providers 41:*10*
59:*2, 5, 6, 15*
provider's 33:*12*
39:*16*
provides 98:*2, 4*
providing 36:*19*
45:*15* 48:*8*
Psychiatric 69:*3, 9*
119:*17*
Public 1:*17* 125:*22*
pulled 49:*2*
pursuant 1:*13*
put 35:*14* 43:*9, 12*
60:*17, 19* 63:*6* 81:*15*
92:*9, 17* 94:*22*
putting 28:*25* 116:*14*

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 51 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

< Q >
qualified 119:20
Question 5:20 7:21,
22 8:2, 6, 7 9:2, 11,
13, 17 14:8, 12 16:21
21:11, 25 22:14, 18
23:23 24:5, 10 33:16
34:13, 14, 15 37:14
38:20 40:6 56:4, 10
61:8, 9 64:15 68:16
73:24 86:9 87:13, 17
88:1, 2, 19 89:12
93:9 96:4 98:6, 20
99:6 100:1, 9, 13, 19
103:23 104:11
107:18 108:13, 16, 23
109:7, 19, 24 110:6, 7
115:7 116:7 120:2
questionnaire 68:23,
24 79:20
questionnaires 43:11
questions 10:12 21:6
29:16 44:22 46:17
57:20, 25 68:21, 25
76:14 77:14 79:17,
24 92:7 93:5, 7
95:19, 20 99:9, 21
100:4 101:1, 17
110:17 111:3 116:23
117:14 121:4, 7
122:23 123:10
quick 91:4

< R >
raise 78:7
range 17:6 18:4, 10
35:20, 24 91:21
118:20
ranges 18:8 32:19
33:1, 5, 10, 11
rate 20:18, 20, 24
21:5, 10 22:4, 25
24:6, 10 68:6 118:11,
19
Ray 40:12 110:25
124:1
RAYMOND 3:5
reached 20:14

111:19 115:10
reaches 34:6
read 56:4, 5 123:11
126:9, 11
reading 32:16
readings 18:4, 9
really 59:18 106:22
107:8 108:16
re-ask 16:19
reason 19:13 22:5
23:3 39:21 78:13
127:5, 8, 11, 14, 17, 20,
23 128:5, 8, 11, 14, 17,
20, 23
reassess 73:13 75:20
88:5
reassessed 75:9
reassessment 19:6
37:2, 4 74:15, 18, 22
75:3, 12, 22, 25 76:2
83:24 84:1, 2 112:1
123:4, 5
reassessments 16:15
74:5, 23 84:12
122:24
recall 13:4 17:18
18:1 25:10 27:6
42:12, 22, 23 43:22
44:18 45:3, 8 46:4, 5,
12 50:3, 5, 7 53:4, 5,
17, 20, 22 54:23
57:24 59:4, 15 60:11,
23 62:1 63:17, 18
65:8, 21 67:8 69:16
70:1 71:16 72:20, 23
73:3 76:10, 12, 21
80:3, 20 81:1, 13, 17,
25 82:9, 12, 19 83:20
86:25 87:4 88:11
90:24, 25 91:3 93:2,
10 97:22 100:18, 21
101:19 104:2 105:14
106:4, 10, 22 107:11
112:3, 9 115:13
117:9 118:22 119:10
121:18
receive 10:20, 25
12:5 13:9, 14, 19
16:24 40:23 45:14

47:16 60:13 69:2, 10
89:21
received 10:15, 18
57:18 65:16 89:18
90:1 97:25 112:7
122:1
receiving 12:9 16:22,
24 21:3
recollection 8:1 54:2
65:10 76:16 80:2
81:15, 24 95:11, 16
97:9 99:17, 20 100:4
105:9 111:25
record 6:17 9:16
21:19 22:7, 15 23:22
30:12 41:10 46:23
49:17, 20 50:1 54:7
56:6 57:13 59:14
65:24 76:7 77:8, 11
81:16 83:13 84:6, 7,
13 91:6 92:1, 19
96:11 110:15
records 51:9 77:18
78:20 95:24 99:3
recover 107:6
recovered 107:4
recruited 111:10
recruiter 20:8, 10
111:13, 14
recruiting 111:16
Red 54:22
redacted 21:9
REES 2:16
refer 49:15 62:21
71:4 118:22
reference 64:17 82:5
referenced 44:2
92:15
referred 62:9 73:4
referring 32:23 47:5,
18 49:1 99:1 113:22
reflect 22:16
refresh 8:1 80:2
105:9
refreshed 81:14
refreshes 65:10
81:24
refusal 48:12 53:9
54:25 115:12, 15

refused 60:18 63:4
115:24 122:13
refuses 53:24 54:20
61:17
refusing 122:19
regard 36:13 73:8
80:9
regarding 115:11
116:5, 11
registered 10:7
43:25 53:14 55:14
56:15
Rehabilitation 15:7,
24 16:7, 18 18:21
related 125:12
relationship 20:10
101:3
relative 111:16
125:15
relevance 20:23 22:3,
19 23:8, 15, 24
relevant 20:23, 24
21:6 22:5
remain 123:2
remains 19:7
remember 7:24 9:24
32:19 42:15 43:20,
23 45:25 46:16, 17
48:3 53:20, 21 55:2
60:9, 21 67:1 71:14,
23 79:21 80:1, 12
86:18 100:7, 8 102:9,
12 106:8
reminder 66:3
remotely 59:7, 11
removed 122:25
repeat 33:18 57:21
89:12
rephrase 37:14 40:7
56:11 61:8 75:7
86:12 87:18 98:6, 20
106:14 107:18
109:11 116:13
rephrased 108:24
Reporter 1:17 7:16
56:5 123:12, 17, 20,
22 124:1 125:5, 22
represent 111:1
reprimand 64:3

Deposition of Mariesha Apollon                                      Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

reproduced 92:2
**Request** 5:10
requested 56:6 92:25
required 23:18
41:17, 19 55:11
requirement 41:21
requirements 40:1
57:1
requires 15:21 32:12
resolved 55:22 67:20
respect 83:5, 7, 10
respectful 86:3
**Respiration** 118:11
respiratory 118:18
respond 55:16, 20
106:20 107:7
response 6:15 46:18
96:6 99:8 105:21
107:10 121:5
responsibilities 14:16,
22 15:10 23:14 29:3
responsibility 38:5
39:11, 17
rest 48:16
restate 109:24
restroom 57:11
result 113:17
résumé 20:15
retained 48:13
retrospectively 109:9
returned 69:11
**Returning** 53:6
returns 117:11
reveal 103:16, 19
reveals 21:2
review 10:1 16:16
30:12 47:10 48:15
77:7 101:6 107:17
reviewed 8:18 9:19
76:17 91:13
**Right** 11:24 16:14
17:19 35:11 37:19
38:11 57:2 75:16
90:8 91:11 93:11
101:4
risks 18:12, 15 79:7,
12
**Robert** 10:5
role 13:20 15:16, 18

28:16, 20 55:2 72:1
**room** 72:21 90:23
route 15:3
routine 83:23
rules 7:11
run 15:1 43:14, 19
57:25
runs 43:10

< S >
samples 14:18 68:14
**SARAH** 2:8
saturation 118:19
save 126:12
saw 20:15 42:24
84:20 108:19 121:17
saying 13:18 28:23
39:16 74:12 95:19
says 47:3, 4 48:19
53:7 92:24 93:12
94:10 95:1 97:3, 6,
20 101:15, 18, 25
102:19 103:5, 9
104:3, 7, 13
scale 32:18 34:2, 4,
18, 23 50:19
scales 33:8
scheduled 39:2, 3
42:8
scheme 31:5
school 10:15 11:7, 9
17:4
schooling 45:21
science 11:15
scope 23:5 35:14
screen 29:8, 20
46:25 48:20 65:9
77:13 91:8
screening 29:14
37:17, 23 38:5, 10
47:7 48:23 89:1
99:5 100:24, 25
101:2, 3, 7, 8, 16, 20,
23
scroll 48:16 94:6, 25
**SCULLY** 2:16
second 44:13 94:5
122:22
secondary 10:23

section 74:10 76:4
98:11, 21 100:13
security 36:13, 15, 21
see 19:4 27:5 29:17
38:3, 9 39:2, 3 47:1
48:16 50:17 51:2
52:23 60:25 61:15
62:2 63:7 65:9, 12
77:16 81:14, 19 87:2,
6, 21 91:9 101:15
seeing 27:6 65:21
76:13 81:25 91:17
112:9
seeking 55:24 56:14,
20, 22, 25
seen 38:4 62:18, 21
81:10 89:3 96:24
self-explanatory 122:6
send 123:24
sense 9:3
sent 72:21 90:23
123:15
**September** 12:24
**Septemberish** 12:25
series 92:7
**Serrano** 3:13
session 44:1 112:14
114:8
set 68:20 125:9
seven 12:15, 16 42:6
**Shadow** 14:6
shakiness 18:18
share 46:25 65:9
81:14 91:8
**SHEET** 126:2, 15
127:2 128:2
sheltered 72:8
shift 20:18 25:4
42:13, 16, 17, 21, 25
105:17
shifts 41:18, 20 42:1,
2, 3, 6, 7
shocked 107:9
short-acting 17:10
shortly 75:11
show 43:10, 13, 18
94:7
showed 65:25 112:6
114:3

showing 23:8 97:12
side 121:20
sign 63:21, 25 94:16
123:11
signature 94:8, 13
**SIGNATURE:**_____
_____**DA**
**TE** 127:25 128:25
signed 94:11 95:2
126:18
signs 15:2 17:5, 12,
21 30:8 68:4, 9, 13
117:22, 25 118:6, 14,
17 119:3
similar 96:25
simply 92:14 99:11
sir 64:8
site 58:21, 23 59:3, 5,
16, 20, 22 80:17 86:5,
6, 23 87:1
situation 61:20
66:25 75:8 86:25
situations 70:8
six 27:12 65:18
71:14 81:23 121:24
six-month 54:4
skip 111:22
sliding 32:18 33:8
34:18, 23 50:19
small 47:13
**Smith** 53:8, 11, 18
61:21 115:11
**Smith's** 55:2
**SOAP** 52:20
social 85:19
somebody 38:9
62:13 72:21 73:4
74:22 75:8 79:17
90:4 109:20
somebody's 34:20, 25
51:23
someone's 30:6
son 19:11
sorry 9:9 24:24
56:3 109:19 112:23
114:15
sound 8:9 53:4 54:9
source 108:17
speak 7:14 24:24
83:2, 9 102:6 104:22

105:*11*  106:*2*  115:*22*
119:*20*

**speaking**  16:*12*
53:*21, 22*  70:*20*
113:*18*

**specialist**  60:*20, 25*
61:*15, 18*  62:*2, 9, 19,*
*22*  63:*7, 12*

**specialists**  54:*19*

**specific**  13:*19*  25:*10*
45:*23*  48:*10, 22*
55:*24*  59:*17*

**specifically**  44:*22*
52:*5*  66:*15*  74:*2*
81:*13*

**spectrum**  67:*25*

**speculate**  88:*17*
113:*20*

**speculating**  113:*16*

**speculation**  88:*15*
113:*14*

**speech**  107:*4, 6*

**speechless**  106:*21*
107:*1, 8*

**spell**  6:*16*

**spoke**  8:*17*  47:*24*
53:*8, 18*  54:*18*  102:*8,*
*14*  106:*17*  112:*21*
113:*4*  114:*7*  120:*22*

**stab**  67:*14*

**staff**  23:*11, 12, 17*
71:*24*  89:*2*  117:*5, 7*
123:*1, 2*

**Staffing**  2:*21*  20:*4*
23:*9*  117:*6*

**stamp**  66:*3*  91:*21*
97:*13*

**standard**  9:*1*  39:*25*
68:*20*

**start**  14:*8*  50:*13*
67:*11*  103:*16*

**started**  12:*2*  27:*21*
28:*14*  111:*9*

**starting**  33:*7*

**state**  6:*16*  39:*6*
53:*23*  69:*3*  91:*20*

**stated**  11:*22*  18:*16*
21:*19, 21*  22:*7*  23:*7*
30:*5*  38:*1*  68:*11*
79:*14*  87:*5*

**STATES**  1:*1*  103:*5,*
*10*  104:*4*

**stating**  20:*15*  63:*25*

**stationed**  26:*17, 18*
75:*18*

**status**  72:*6*  119:*13,*
*24*  120:*3, 22*

**stayed**  28:*13*

**steps**  109:*13*

**Stipulations**  5:*15*

**stopped**  67:*13*

**stored**  49:*10, 12*  50:*2*

**Strategies**  64:*24*

**Street**  2:*3, 9, 14, 19*
3:*6*

**strict**  36:*9, 21*

**stricter**  36:*10*

**strike**  36:*18*

**strip**  30:*21*

**stuff**  103:*16*  111:*5*

**subject**  8:*24*

**Subjective**  93:*21*
97:*24*  98:*10, 14, 21*
100:*13*  101:*14*

**subsequent**  84:*19*

**sued**  7:*3*

**sugar**  17:*7*  26:*12*
29:*21*  30:*16*  32:*12,*
*16, 20, 22*  33:*6*  67:*22*
68:*13*  77:*6*  93:*1*
102:*11*  104:*3*  105:*18*

**sugary**  32:*5*

**suicidal**  76:*25*

**Suite**  2:*19*  3:*6*

**SUMMER**  2:*19*
117:*4*  123:*13*

**supervisor**  20:*6*
28:*18*  53:*8, 18*  55:*3*
78:*8*

**supervisors**  62:*8*

**SUPPORT**  5:*3*

**supposed**  35:*2*  60:*25*
61:*15, 17*  62:*2*  63:*6*
66:*8*  73:*10, 11, 14*
98:*4*

**sure**  16:*13*  29:*2*
39:*23*  53:*1*  55:*5*
59:*16*  69:*24*  70:*1*
78:*12*  96:*5*  104:*2*

108:*5, 7*  119:*19*

**surgeries**  58:*2*

**sweatiness**  18:*18*

**Sweating**  17:*17*  30:*6*

**sworn**  6:*3*  125:*8*

**symptomatic**  19:*1*
37:*25*

**symptoms**  17:*5, 12,*
*22*  18:*16, 23*  29:*18*
30:*6, 8*  68:*17*  79:*14,*
*19*

**system**  43:*10*  49:*11*
50:*21*  51:*20*  63:*3*
74:*11*  76:*5*  101:*21*
121:*25*

**< T >**

**take**  7:*16*  8:*3, 7*
12:*10*  30:*22*  37:*6*
47:*9*  48:*14*  58:*4*
75:*19*  81:*22*  91:*4*
101:*22*  114:*23*
115:*24*

**taken**  1:*13*  58:*11*
109:*14, 15*  117:*25*
118:*3*  121:*6*  125:*14*
126:*10*

**talk**  7:*19*  29:*13*
71:*13, 15*  102:*15*
116:*16*

**talking**  37:*18*  53:*1*
59:*16*  72:*25*  73:*22,*
*23*  76:*13*  86:*19*

**taught**  17:*4*  67:*9*

**tax**  117:*11*

**Tekaccel**  19:*24, 25*
20:*7*  111:*11*  117:*10*

**telephone**  95:*1*
96:*25*  97:*6*

**tell**  10:*14*  11:*20*
31:*5*  58:*22*  70:*11*
104:*5*  106:*5*  111:*15*
112:*12, 15, 16, 19*

**telling**  8:*19*  21:*17*
99:*17*

**tells**  30:*23*  98:*22*

**temperature**  118:*9,*
*24*  119:*2*

**term**  29:*14*  32:*8*
41:*9, 11*  43:*16*  57:*9*
64:*10*  108:*2*

**terms**  36:*18, 19*  67:*9,*
*11*

**test**  27:*16*  30:*19, 21,*
*22*  68:*13*

**testified**  6:*3*  33:*21*
45:*14*  70:*25*  75:*5*
111:*24*  117:*5*

**testify**  113:*19*

**testifying**  39:*25*

**testimony**  9:*4*  61:*12*
75:*10*  85:*12*  115:*13*
119:*10, 16, 19*  121:*2,*
*11*

**Texas**  20:*2*

**Thank**  18:*11*  24:*14*
28:*10*  36:*16*  42:*11*
49:*24*  63:*11*  66:*2*
88:*22*  89:*25*  90:*9*
92:*20*  108:*21*  117:*14*
123:*10*

**therapy**  16:*13*

**thing**  8:*5*  35:*11*  53:*2*

**things**  13:*12*  14:*19*
17:*11*  24:*4*  32:*2, 4*
43:*11, 14, 19*  44:*8, 9,*
*24*  55:*18*  56:*14, 21*
58:*3*  62:*16*  69:*6*
76:*21*  111:*6*  120:*17*
121:*20*

**think**  9:*6, 8*  16:*20*
23:*4*  25:*4*  37:*18*
40:*4*  43:*15*  44:*4*
59:*13*  61:*12*  63:*23*
64:*6*  75:*2*  80:*19, 24*
81:*11, 12*  86:*13*
92:*21*  94:*25*  100:*8*
104:*9*  109:*10, 13*
110:*2*  112:*24*  115:*3,*
*14*  116:*20*  119:*8*
123:*9*

**third**  53:*3*  101:*15*

**THOMAS**  2:*19*  4:*6*
116:*22*  117:*2, 4, 13*
123:*14, 19, 21*

**thought**  62:*8, 13*
90:*8*  94:*17*  115:*17*

three 44:*18* 45:*10*
60:*7* 63:*24* 69:*13*
104:*4* 112:*8*
three-day 112:*13*
threshold 34:*6*
time 22:*24* 24:*6, 11*
37:*1* 38:*12* 39:*13*
48:*24* 57:*10* 71:*10*
83:*8* 86:*22* 90:*19*
92:*13* 103:*15* 108:*19*
115:*19* 117:*21*
119:*14* 120:*14, 22*
121:*4* 123:*18* 125:*9*
times 6:*24* 8:*21* 9:*2,*
*7* 18:*22* 49:*2* 60:*7*
72:*17* 80:*20* 83:*2*
86:*21* 92:*4* 103:*4*
119:*9* 120:*6, 12*
title 115:*19*
today 8:*13* 109:*4*
121:*11*
today's 8:*16*
told 22:*9* 25:*17*
53:*12* 55:*10* 63:*5, 22*
66:*23* 83:*16* 98:*1*
102:*9* 104:*15* 107:*13*
112:*7, 20* 113:*4, 7*
114:*5*
Tom 124:*3*
tool 46:*2* 64:*11*
84:*23*
tools 64:*20* 65:*3, 6*
top 93:*24*
touched 122:*6*
track 51:*17*
trained 18:*3, 12*
47:*17* 54:*19, 21, 24*
56:*15* 63:*8*
training 12:*5* 13:*9,*
*14, 19* 16:*16, 24* 17:*3*
23:*13* 43:*6* 44:*1, 16,*
*19* 45:*10, 11, 13, 15,*
*17, 18, 20* 46:*1* 47:*16,*
*24* 48:*4* 53:*9, 14, 19*
54:*16* 55:*11, 14, 24*
56:*14, 21, 22, 25*
61:*23* 115:*12* 121:*5*
transcript 7:*17*
125:*7* 126:*9*

transfer 104:*11*
transferred 26:*23*
transmit 69:*20*
treat 31:*25*
treated 31:*15, 18, 20*
treating 45:*6*
treatment 54:*25* 82:*6*
TREBACH 2:*5*
triage 29:*5* 38:*1, 2*
trial 22:*25*
trip 30:*22*
true 56:*13* 87:*20*
125:*6* 126:*12*
truthful 87:*8*
try 99:*13* 111:*4, 23*
trying 52:*25* 61:*11*
62:*15*
twice 92:*21*
two 31:*9* 41:*25* 42:*7,*
*9* 44:*15* 60:*7* 69:*12*
83:*19* 87:*6, 21* 88:*6*
94:*12* 110:*13*
two-hour 112:*1*
type 7:*15* 13:*12*
14:*18* 16:*10* 17:*9, 10*
25:*16, 17, 20, 23* 26:*3,*
*4, 5* 31:*14, 18, 19, 24*
44:*24* 48:*10* 52:*17*
63:*13* 82:*13* 92:*25*
93:*1, 2* 95:*12, 17*
103:*5, 10, 20*
typed 75:*24*
types 118:*13, 14*
typical 14:*15, 21*
42:*5* 57:*16*
typically 89:*20*

< U >
unclear 59:*14*
uncontrollably 67:*14*
underneath 49:*12*
understand 21:*9*
22:*2, 25* 23:*6, 20*
24:*1* 33:*15, 17* 34:*15*
38:*11, 20* 61:*7* 63:*11*
76:*17*
understanding 86:*2*
92:*6* 113:*10, 11, 17*
126:*15*

understood 8:*3* 33:*9*
47:*8* 63:*25* 90:*8*
unit 32:*9*
UNITED 1:*1*
units 32:*8, 15, 21*
34:*1, 7* 50:*15, 20*
114:*5*
University 11:*13*
Unlimited 117:*5, 8*
uploaded 77:*15*
urgent 67:*7, 18, 24*
70:*14*
urination 17:*23*
18:*19*
urine 14:*18* 30:*16,*
*21, 23* 68:*13* 82:*14*
use 32:*8* 41:*10* 57:*9*
64:*24* 90:*18*
usually 59:*2, 19, 21*
utilize 54:*25* 65:*2, 5*
utilized 48:*24*
utilizing 23:*9*

< V >
variation 34:*1, 3*
variations 35:*9*
varies 58:*9*
vary 58:*5*
verbal 114:*17*
verbally 29:*22* 107:*7*
verifying 104:*17*
versus 6:*14* 31:*1*
34:*4* 67:*24*
Videoconferenced
1:*12*
virtually 1:*14*
vision 17:*17, 24*
18:*18* 30:*7* 79:*16, 19*
vital 15:*1* 68:*4, 9, 13*
117:*22, 25* 118:*6, 14,*
*17* 119:*3*
vs 1:*6* 126:*5*

< W >
Wait 96:*4*
walk 11:*19* 14:*4*
57:*16*
Wanda 2:*16*
want 22:*15* 23:*21*
47:*15* 54:*17* 59:*14*

65:*19* 69:*25* 78:*4*
119:*18* 121:*6* 123:*12,*
*24*
wanted 81:*15*
wanting 53:*9, 18*
wants 86:*3*
washed 14:*23*
watch 11:*23*
water 30:*18* 32:*5*
37:*8* 72:*18* 73:*12*
82:*25* 110:*11*
way 41:*23* 64:*25*
74:*4* 84:*11* 92:*13*
99:*12* 104:*17* 111:*6,*
*9, 25* 120:*2, 9*
ways 29:*23* 31:*17,*
*19, 25* 51:*17* 53:*10*
Wednesday 1:*10*
week 11:*18* 25:*7, 9*
38:*16* 42:*1, 6, 9*
weeks 27:*11, 24*
weight 32:*3*
well 21:*17* 28:*9*
38:*3, 24* 64:*19* 75:*1*
107:*3* 121:*19*
went 20:*17* 37:*17*
104:*1*
whatsoever 122:*1*
willing 109:*11*
willingly 114:*23*
withdrawal 44:*23*
WITNESS 4:*2* 5:*5*
14:*10, 13* 21:*24*
24:*13* 33:*17* 34:*16*
36:*8* 38:*22* 41:*2*
44:*6* 46:*11* 47:*22*
52:*3* 56:*9, 20* 57:*7*
58:*9, 20* 59:*10* 60:*3*
63:*2* 64:*8, 16* 68:*3*
71:*21* 74:*18* 75:*4*
78:*1* 80:*3, 6* 81:*1, 17*
84:*5* 85:*4, 15* 86:*16,*
*20* 87:*15* 88:*3, 4, 20*
92:*10* 95:*8* 96:*8, 19*
98:*16* 99:*25* 103:*15*
109:*23* 110:*8* 113:*22*
124:*4* 125:*8*
witness's 87:*16*
WITTEKIND 3:*5*
4:*5* 34:*8* 35:*6* 36:*6*

39:*19*  40:*10, 14, 18,*
*25*  46:*8*  47:*20*  56:*1,*
*16*  57:*5*  59:*8*  61:*5*
62:*10*  63:*1*  64:*12*
71:*19*  74:*17, 24*  75:*2*
78:*14*  80:*22*  81:*9*
85:*2, 13*  86:*15*  87:*9,*
*23*  88:*16*  93:*16*  95:*6*
96:*12, 16*  109:*16, 21*
110:*21, 25*  113:*1*
114:*1, 14*  115:*8*
116:*20*  122:*6*  124:*2*
**wonderful**  40:*19*
**wondering**  33:*20, 25*
38:*17*  53:*17*  76:*18*
**Wood**  10:*5*
**work**  10:*4, 13*  15:*2,*
*6*  16:*1*  24:*11*  25:*8*
27:*10*  28:*1, 3, 14*
34:*4*  41:*17, 19*  42:*5,*
*9*  44:*12*  85:*21*  86:*5*
**worked**  10:*10*  13:*24*
19:*21*  26:*15*  34:*6*
36:*2*  38:*18*  41:*16, 20*
42:*15, 20*  57:*15*
60:*12*  65:*3*  70:*5*
71:*10*  90:*22*  106:*2*
116:*4*  121:*25*
**worker**  85:*19*
**working**  24:*18*  33:*4,*
*21*  36:*1, 4*  38:*2*
42:*13*  43:*2, 5*  80:*17*
85:*25*  87:*1*  89:*6*
97:*9*  106:*12, 17*
**works**  53:*15*  55:*15*
**wound**  15:*12*  67:*14*
**write**  39:*6*  74:*11*
83:*22*  98:*8, 11, 13, 18*
**write-up**  60:*17*
61:*13*  62:*6, 23*  63:*2,*
*4, 20*  64:*7*
**written**  64:*3*
**wrote**  85:*9*  114:*4*
120:*20, 21*

**< Y >**
**Yeah**  74:*2*
**year**  11:*17*  120:*14*
**years**  12:*15, 16*

**YesCare**  3:*7*  23:*8*
46:*12*  48:*1*  105:*5, 6*
106:*1*  107:*21*  111:*1*
115:*11, 23*  116:*11, 16*
**YesCare3432**  82:*1*
**YesCare3437**  82:*3*
**YesCare3438**  66:*4*
**YesCare3443**  66:*4*
**YesCare's**  46:*6*  81:*6*
**York**  10:*21*  11:*2*
13:*7*  14:*1, 21*  15:*6*

**< Z >**
**zeroes**  91:*25*
**Zoom**  2:*5, 11, 16, 21*
3:*8*

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 56 of 63

Deposition of Mariesha Apollon
Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

## WORD LIST

**< $ >**
$64  *(1)*

**< 0 >**
000405  *(1)*

**< 1 >**
1  *(16)*
1:08  *(1)*
10  *(1)*
10/28/2023  *(1)*
10:02  *(1)*
10:04  *(1)*
100  *(1)*
11:00  *(4)*
110  *(3)*
117  *(2)*
12  *(2)*
12th  *(1)*
13-week  *(2)*
150  *(3)*
1515  *(1)*
15th  *(2)*
16  *(1)*
1717  *(1)*
18  *(3)*
1801  *(1)*
19102  *(1)*
19103  *(3)*
19123  *(1)*
1st  *(1)*

**< 2 >**
2  *(6)*
2:24-cv-05618-TJS  *(1)*
20  *(1)*
200  *(1)*
2008  *(1)*
2011  *(1)*
2012  *(1)*
2016  *(1)*
2019  *(3)*
2020  *(1)*
2021  *(2)*
2023  *(17)*
2024  *(2)*
2025  *(2)*

215.561.2300  *(1)*
215.564.0400  *(1)*
215.569.4433  *(1)*
215.683.5000  *(1)*
22  *(1)*
23-hour  *(1)*
25  *(1)*
26  *(2)*
28  *(12)*
28th  *(3)*

**< 3 >**
3  *(4)*
3:00  *(6)*
3:30  *(1)*
30  *(6)*
300  *(1)*
350  *(1)*

**< 4 >**
4  *(1)*
400  *(3)*
409  *(1)*
412.654.9070  *(1)*
46484  *(1)*

**< 5 >**
5  *(3)*
500  *(2)*
542  *(7)*

**< 6 >**
6  *(1)*
610  *(1)*
631  *(1)*
6th  *(1)*

**< 7 >**
7:00  *(1)*
70  *(2)*

**< 8 >**
8:00  *(1)*
8-hour  *(1)*

**< 9 >**
911  *(12)*
97  *(1)*
97.0  *(1)*

**< A >**
a.m  *(2)*
AAOX3  *(2)*
abbreviation  *(1)*
ability  *(1)*
able  *(3)*
abnormal  *(1)*
ABOLITIONIST  *(1)*
abrasion  *(1)*
abusing  *(1)*
access  *(13)*
Accu-Chek  *(3)*
accurate  *(11)*
acknowledge  *(1)*
action  *(7)*
actual  *(1)*
addition  *(3)*
additional  *(9)*
address  *(2)*
administer  *(10)*
administered  *(3)*
administering  *(2)*
administration  *(2)*
administrator  *(3)*
Administrators  *(1)*
admissible  *(1)*
admission  *(1)*
advising  *(1)*
affiliated  *(1)*
afternoon  *(1)*
agency  *(2)*
ago  *(5)*
agree  *(1)*
agreed  *(2)*
agreement  *(1)*
ahead  *(5)*
aide  *(4)*
aide/medical  *(1)*
al  *(2)*
alcohol  *(1)*
alert  *(6)*
alerting  *(1)*
Alex  *(1)*
allow  *(4)*
altered  *(1)*
amount  *(6)*
amounts  *(1)*
and/or  *(1)*

**Answer**  *(59)*
**answered**  *(3)*
**answering**  *(7)*
**answers**  *(7)*
**anybody**  *(3)*
**anybody's**  *(1)*
**APOLLON**  *(14)*
**A-P-O-L-L-O-N**  *(1)*
**Apollon's**  *(1)*
**APPEARANCES**  *(2)*
**Appearing**  *(5)*
**appears**  *(2)*
**applicable**  *(1)*
**application**  *(1)*
**apply**  *(1)*
**appropriate**  *(2)*
**approximately**  *(8)*
**Arch**  *(2)*
**area**  *(4)*
**argue**  *(1)*
**articulated**  *(1)*
**aside**  *(2)*
**asked**  *(15)*
**asking**  *(23)*
**asserted**  *(1)*
**asserting**  *(7)*
**assess**  *(1)*
**assessing**  *(3)*
**assessment**  *(20)*
**assessor**  *(1)*
**assigned**  *(3)*
**assist**  *(1)*
**assistant**  *(24)*
**assistants**  *(1)*
**associated**  *(3)*
**associate's**  *(1)*
**assume**  *(2)*
**assumed**  *(1)*
**assumption**  *(2)*
**attempting**  *(1)*
**Attorney**  *(9)*
**attorney/client**  *(2)*
**attorneys**  *(3)*
**August**  *(4)*
**Austen**  *(1)*
**authority**  *(2)*
**available**  *(2)*
**average**  *(2)*
**avoid**  *(1)*

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 57 of 63

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Awake  (3)

< B >
Bachelor's  (1)
back  (22)
background  (1)
BAKER  (90)
based  (26)
basic  (1)
basically  (2)
basis  (1)
Bates  (9)
bathing  (1)
Bear  (2)
bearing  (1)
beautiful  (1)
becoming  (1)
beds  (2)
began  (2)
beginning  (2)
begins  (2)
behalf  (1)
belated  (1)
believe  (17)
beneath  (1)
beyond  (2)
birth  (4)
bit  (4)
Blanche  (1)
bleeding  (1)
blood  (26)
Bloodsaw  (1)
blurred  (5)
blurry  (1)
BMI  (1)
board  (3)
Body  (3)
book  (1)
born  (1)
bottom  (3)
Boulevard  (1)
box  (2)
break  (5)
breaks  (1)
breathing  (1)
BRET  (3)
brief  (1)
bring  (2)
broader  (1)

broke  (2)
Brooklyn  (2)
brought  (2)
built  (1)
bunch  (1)

< C >
call  (42)
called  (13)
calling  (2)
calls  (4)
capacity  (1)
Capella  (1)
captioned  (1)
carbohydrates  (1)
care  (27)
Career  (6)
cares  (1)
Carey  (3)
caring  (1)
Carney  (1)
carried  (3)
carry  (1)
case  (17)
category  (1)
caveat  (1)
CENTER  (8)
certain  (4)
certainly  (3)
certificate  (2)
certify  (3)
certifying  (1)
cetera  (1)
CFCF  (27)
challenges  (2)
chances  (1)
change  (16)
changes  (2)
Chapel  (2)
characterize  (2)
characterized  (1)
Charge  (6)
check  (8)
checked  (3)
checking  (1)
checks  (3)
chronic  (1)
circumstances  (1)
CITY  (8)

clarification  (2)
clarified  (1)
clarify  (3)
class  (1)
classroom  (1)
clear  (12)
click  (1)
clicked  (1)
client  (4)
clinic  (1)
clinical  (5)
closer  (1)
clothing  (1)
color  (5)
colors  (1)
come  (5)
comes  (1)
comfortable  (1)
coming  (3)
commencing  (1)
comment  (1)
common  (1)
Commonwealth  (2)
communications  (1)
company  (4)
compensation  (3)
complement  (1)
complete  (1)
completed  (4)
completely  (1)
compliant  (1)
compos  (1)
compound  (1)
computer  (3)
concern  (2)
concerned  (1)
concerns  (1)
concluded  (1)
condition  (1)
conditions  (7)
conduct  (3)
conducted  (1)
confirm  (1)
confused  (1)
confusion  (3)
congratulations  (1)
conjunction  (1)
consequence  (1)
consider  (1)

considered  (2)
consist  (2)
consisted  (1)
consistent  (3)
consult  (1)
contact  (1)
content  (1)
context  (2)
Continued  (2)
continuing  (1)
continuity  (3)
contract  (4)
contradiction  (1)
contradicts  (1)
conversation  (4)
conversations  (1)
copy  (6)
Corinne  (1)
Corp  (1)
correct  (22)
Correctional  (5)
corrections  (2)
correctly  (1)
counsel  (5)
couple  (7)
course  (1)
COURT  (9)
covered  (2)
covering  (1)
coworkers  (1)
create  (2)
created  (1)
credibility  (3)
Curran-Fromhold  (2)
currently  (3)
custody  (1)
cut  (1)

< D >
dark  (1)
darker  (1)
date  (9)
dated  (1)
daughter  (2)
day  (16)
days  (12)
DC  (2)
death  (11)
decide  (4)

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

| | | | |
|---|---|---|---|
| decision  *(2)* | distinguished  *(1)* | encounter  *(16)* | fairness  *(1)* |
| decisions  *(1)* | DISTRICT  *(2)* | encountered  *(1)* | fall  *(1)* |
| DECLARATION  *(1)* | doctor  *(17)* | encourage  *(1)* | familiar  *(12)* |
| declare  *(1)* | doctors  *(4)* | ended  *(1)* | familiarity  *(1)* |
| declined  *(1)* | doctor's  *(2)* | endocrinologist  *(2)* | familiarize  *(1)* |
| Defendant  *(5)* | document  *(48)* | endoscopy  *(6)* | far  *(1)* |
| Defendant(s  *(1)* | documentation  *(6)* | engage  *(1)* | fast  *(1)* |
| Defendants  *(2)* | documentations  *(2)* | enlarge  *(1)* | faster  *(2)* |
| define  *(1)* | documented  *(12)* | entails  *(1)* | fault  *(1)* |
| definitely  *(1)* | documenting  *(2)* | enter  *(6)* | February  *(1)* |
| degree  *(6)* | Documents  *(8)* | entered  *(1)* | feet  *(1)* |
| degrees  *(2)* | doing  *(3)* | entire  *(1)* | field  *(1)* |
| dehydrated  *(1)* | dosage  *(1)* | entirety  *(1)* | file  *(2)* |
| dehydration  *(3)* | dosages  *(1)* | entitled  *(1)* | fill  *(6)* |
| DEPARTMENT  *(8)* | draw  *(1)* | entity  *(1)* | filled  *(9)* |
| depend  *(1)* | drew  *(1)* | ERRATA  *(4)* | financially  *(1)* |
| dependent  *(1)* | drink  *(3)* | ESQUIRE  *(7)* | fine  *(1)* |
| depending  *(4)* | drinking  *(1)* | established  *(1)* | finish  *(5)* |
| deposition  *(25)* | drinks  *(1)* | Estate  *(1)* | firing  *(1)* |
| describe  *(4)* | dropping  *(1)* | et  *(3)* | first  *(12)* |
| described  *(1)* | drugs  *(1)* | evaluating  *(2)* | Five  *(6)* |
| DESCRIPTION  *(1)* | duly  *(1)* | evaluation  *(2)* | five-minute  *(1)* |
| details  *(1)* | Dysphagia  *(1)* | Everest  *(1)* | Flag  *(1)* |
| Detention  *(1)* | | everyone's  *(1)* | floor  *(1)* |
| determine  *(2)* | < E > | exactly  *(2)* | flush  *(2)* |
| determined  *(5)* | earlier  *(8)* | EXAMINATION  *(7)* | follow  *(10)* |
| determining  *(3)* | easier  *(1)* | examined  *(1)* | following  *(1)* |
| develop  *(1)* | EASTERN  *(1)* | Excessive  *(1)* | follows  *(1)* |
| diabetes  *(41)* | educate  *(1)* | excluding  *(1)* | follow-up  *(11)* |
| diabetic  *(20)* | education  *(4)* | excuse  *(2)* | follow-ups  *(3)* |
| diagnosed  *(1)* | educational  *(1)* | excused  *(1)* | foregoing  *(2)* |
| diagnosis  *(1)* | efficient  *(1)* | exercise  *(1)* | forgot  *(1)* |
| died  *(5)* | eight  *(1)* | exercises  *(1)* | form  *(54)* |
| diet  *(4)* | eight-hour  *(1)* | exhibits  *(1)* | formal  *(2)* |
| difference  *(2)* | either  *(1)* | expect  *(1)* | forms  *(4)* |
| differences  *(2)* | EKG  *(2)* | expectations  *(1)* | forth  *(1)* |
| different  *(21)* | EKGs  *(1)* | expected  *(2)* | Four  *(2)* |
| differently  *(1)* | electronic  *(11)* | experience  *(1)* | Frasier  *(1)* |
| Digital  *(1)* | Electronically  *(2)* | experiencing  *(2)* | free  *(2)* |
| dip  *(1)* | emails  *(1)* | expert  *(2)* | frequent  *(1)* |
| Direction  *(1)* | emergency  *(4)* | explain  *(3)* | frequently  *(2)* |
| directly  *(1)* | emergent  *(7)* | explanation  *(2)* | front  *(6)* |
| director  *(2)* | EMILY  *(2)* | exploring  *(1)* | full  *(1)* |
| disciplinary  *(5)* | employed  *(4)* | extend  *(1)* | further  *(5)* |
| disclose  *(1)* | employee  *(8)* | extended  *(1)* | |
| discovery  *(5)* | employees  *(1)* | | < G > |
| discussed  *(1)* | employer  *(2)* | < F > | gather  *(1)* |
| Discussion  *(5)* | employer's  *(1)* | facility  *(9)* | Gay  *(27)* |
| discussions  *(2)* | employment  *(6)* | Fahrenheit  *(1)* | Gays  *(1)* |

Gene (1)
general (4)
generally (9)
generated (1)
getting (2)
give (15)
given (11)
giving (2)
glucose (21)
go (26)
goes (2)
going (17)
Good (5)
GORDON (1)
gotten (2)
gradations (1)
graduate (2)
graduated (2)
GROTE (114)
ground (1)
grounds (2)
guess (4)
guidance (1)
guidelines (6)
guidelines/protocols (1)

< H >
Hamilton (1)
hand (1)
Hang (2)
happen (4)
happened (6)
hard (3)
harm (1)
head (1)
health (9)
hear (5)
heard (8)
heart (1)
heavier (1)
held (6)
help (4)
helps (1)
hereof (1)
high (6)
higher (4)
hired (4)
history (3)

HIV (1)
HIV/AIDS (1)
HOFF (2)
hold (2)
home (16)
homicidal (1)
hopefully (1)
Hospital (12)
hour (4)
hours (6)
housing (1)
HU (1)
hyperglycemia (7)
hyperglycemic (1)
hypertension (1)
hypoglycemia (2)
hypoglycemia/hypergl
ycemia (1)
hypoglycemic (1)

< I >
identified (2)
Identify (3)
identities (1)
illness (1)
immediate (1)
inaccurate (1)
inappropriate (1)
incident (1)
include (3)
included (2)
includes (1)
including (3)
incorrect (2)
independent (4)
INDEX (1)
indicate (4)
indicated (6)
indicates (3)
indicating (1)
individual (5)
infirmary (10)
inform (1)
information (21)
informed (2)
injectable (1)
inmate (3)
inmates (2)
inquiry (3)

insight (1)
instance (3)
instances (4)
institution (3)
institutions (1)
institution's (1)
instruct (4)
instructed (3)
instructing (6)
Insulin (54)
insulins (2)
intake (118)
interaction (2)
interested (1)
intermetex (2)
I-N-T-E-R-M-E-T-E-
X (1)
interrogatories (1)
Interrogatory (3)
intervention (7)
interventions (2)
involve (1)
involved (2)
Isabella (8)
issue (6)
issues (3)
its (1)
IV (1)

< J >
JACOB (2)
jail (1)
jails (1)
JAMES (1)
January (4)
Jared (4)
Jeoboham (1)
Jersey (3)
JFK (1)
Job (12)
jobs (1)
Johnson (1)
join (7)
JONATHAN (1)
JR (2)
judge (1)
judgment (1)
June (1)
JUNG (55)

Jung's (7)

< K >
KAMINSKY (1)
keep (1)
ketoacidosis (1)
ketones (16)
KIERNAN (1)
KIMBALL (1)
kind (2)
knew (4)
know (44)
knowledge (1)

< L >
laid (1)
language (1)
larger (1)
LAW (2)
lawsuit (1)
lawyers (2)
learn (4)
learned (2)
led (1)
level (12)
levels (2)
license (9)
light (1)
lighter (1)
limited (1)
limits (2)
Line (12)
listed (1)
litigation (1)
little (7)
located (1)
location (1)
log (1)
log-in (1)
Lolo (1)
long (8)
long-acting (1)
longer (1)
look (10)
looked (2)
looking (5)
Lose (1)
lost (1)
lot (3)

Case 2:24-cv-05618-TJS    Document 106    Filed 12/08/25    Page 60 of 63

Deposition of Mariesha Apollon    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

loud  (2)
LOUIS  (2)
low  (1)
lowers  (1)
LPNs  (2)

< M >
ma'am  (1)
majority  (1)
making  (4)
managed  (2)
manner  (1)
Manor  (2)
MANSUKHANI  (1)
MARGO  (1)
MARIESHA  (9)
M-A-R-I-E-S-H-A  (1)
MARKED  (4)
Market  (1)
Marsha  (7)
Marsha's  (1)
math  (2)
matter  (2)
matters  (1)
Maureen  (24)
mean  (22)
Meaning  (1)
means  (2)
meant  (4)
Med  (1)
medical  (63)
medication  (17)
medications  (5)
meet  (1)
Megan  (2)
Mellitus  (2)
memory  (1)
mental  (6)
mentioned  (1)
mentis  (1)
met  (2)
middle  (4)
Mike  (1)
mine  (1)
mini  (1)
minutes  (9)
mischaracterizes  (1)
misunderstanding  (1)
mm-mmh  (1)

modifiable  (1)
modification  (1)
moment  (6)
money  (1)
month  (4)
months  (6)
morning  (4)
mortality  (1)
moved  (2)
moving  (1)

< N >
name  (13)
named  (1)
names  (3)
nature  (3)
necessarily  (1)
necessary  (1)
need  (11)
needed  (5)
needs  (8)
negative  (1)
neither  (1)
NET  (3)
never  (4)
New  (11)
nice  (1)
No._____Change  (14)
No._____Line  (12)
No.____Line  (2)
nods  (1)
noncompliant  (6)
non-intake  (1)
normal  (7)
Norristown  (4)
Notary  (2)
note  (18)
notes  (4)
notice  (2)
notified  (1)
notify  (1)
November  (4)
number  (7)
numbers  (7)
nurse  (41)
nurses  (2)
nursing  (24)

< O >

oath  (1)
object  (21)
objecting  (1)
Objection  (52)
objective  (2)
objectives  (1)
observation  (1)
observed  (1)
obtain  (3)
occasion  (1)
occur  (1)
O'CONNOR  (1)
October  (17)
offer  (1)
offered  (3)
office  (4)
officer  (1)
officers  (1)
oftentimes  (1)
Okay  (20)
older  (1)
once  (3)
ones  (2)
opinion  (2)
opportunity  (1)
opposed  (1)
oral  (3)
order  (30)
ordered  (7)
ordering  (1)
orders  (10)
oriented  (6)
outpatient  (1)
outset  (1)
outside  (5)
overall  (1)
overcrowded  (2)
overtime  (4)
oxygen  (1)

< P >
p.m  (4)
pace  (1)
packages  (1)
PAGE  (44)
pages  (4)
pamphlet  (1)
pandemic  (2)
paper  (6)

paperwork  (3)
PAR  (1)
part  (25)
particular  (2)
parties  (2)
pass  (5)
passing  (1)
pathway  (3)
pathways  (2)
patient  (55)
patient/prisoner  (1)
patients  (21)
patient's  (3)
pause  (1)
pay  (6)
PDP  (19)
PDP18  (1)
PDP's  (1)
penalty  (3)
PENNSYLVANIA
  (10)
people  (7)
perform  (1)
performing  (1)
period  (1)
periods  (1)
PERJURY  (2)
person  (12)
personally  (1)
person's  (2)
pertaining  (3)
PHILADELPHIA
  (17)
phone  (3)
phrased  (3)
physical  (2)
physically  (8)
pick  (1)
picked  (2)
place  (4)
placed  (1)
placement  (1)
Plaintiff  (2)
plaintiffs  (1)
plan  (1)
play  (1)
please  (9)
plenty  (1)
point  (2)

Deposition of Mariesha Apollon                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

policies *(3)*
policy *(2)*
pop *(2)*
pop-ups *(1)*
portion *(3)*
position *(6)*
positive *(2)*
possible *(2)*
post *(2)*
potentially *(3)*
power *(1)*
powers *(1)*
practice *(7)*
practitioner *(2)*
preceptor *(5)*
pregnant *(1)*
pre-intake *(7)*
preparation *(2)*
prepare *(1)*
prepared *(2)*
preparing *(1)*
prescribe *(1)*
prescribed *(3)*
presence *(2)*
PRESENT *(3)*
pressure *(4)*
prevent *(1)*
previous *(2)*
previously *(1)*
print *(1)*
printed *(1)*
prior *(6)*
prison *(24)*
prisoner *(9)*
prisoners *(1)*
Prisons *(8)*
prison's *(1)*
private *(5)*
privilege *(10)*
Probably *(2)*
procedure *(1)*
process *(16)*
produce *(1)*
produced *(5)*
Production *(2)*
profession *(1)*
Professional *(2)*
progress *(12)*
prompt *(2)*

pronouncing *(1)*
proper *(2)*
properly *(2)*
protocol *(3)*
protocols *(2)*
provide *(12)*
provided *(26)*
provider *(29)*
providers *(5)*
provider's *(2)*
provides *(2)*
providing *(3)*
Psychiatric *(3)*
Public *(2)*
pulled *(1)*
pursuant *(1)*
put *(10)*
putting *(2)*

< Q >
qualified *(1)*
Question *(64)*
questionnaire *(3)*
questionnaires *(1)*
questions *(31)*
quick *(1)*

< R >
raise *(1)*
range *(7)*
ranges *(6)*
rate *(12)*
Ray *(3)*
RAYMOND *(1)*
reached *(3)*
reaches *(1)*
read *(5)*
reading *(1)*
readings *(2)*
really *(4)*
re-ask *(1)*
reason *(19)*
reassess *(3)*
reassessed *(1)*
reassessment *(18)*
reassessments *(5)*
recall *(80)*
receive *(14)*
received *(9)*

receiving *(4)*
recollection *(15)*
record *(30)*
records *(5)*
recover *(1)*
recovered *(1)*
recruited *(1)*
recruiter *(4)*
recruiting *(1)*
Red *(1)*
redacted *(1)*
REES *(1)*
refer *(4)*
reference *(2)*
referenced *(2)*
referred *(2)*
referring *(6)*
reflect *(1)*
refresh *(3)*
refreshed *(1)*
refreshes *(2)*
refusal *(5)*
refused *(4)*
refuses *(3)*
refusing *(1)*
regard *(4)*
regarding *(3)*
registered *(5)*
Rehabilitation *(5)*
related *(1)*
relationship *(2)*
relative *(2)*
relevance *(6)*
relevant *(4)*
remain *(1)*
remains *(1)*
remember *(27)*
reminder *(1)*
remotely *(2)*
removed *(1)*
repeat *(3)*
rephrase *(13)*
rephrased *(1)*
Reporter *(10)*
represent *(1)*
reprimand *(1)*
reproduced *(1)*
Request *(1)*
requested *(2)*

required *(4)*
requirement *(1)*
requirements *(2)*
requires *(2)*
resolved *(2)*
respect *(3)*
respectful *(1)*
Respiration *(1)*
respiratory *(1)*
respond *(4)*
response *(7)*
responsibilities *(5)*
responsibility *(3)*
rest *(1)*
restate *(1)*
restroom *(1)*
result *(1)*
résumé *(1)*
retained *(1)*
retrospectively *(1)*
returned *(1)*
Returning *(1)*
returns *(1)*
reveal *(2)*
reveals *(1)*
review *(8)*
reviewed *(4)*
Right *(12)*
risks *(4)*
Robert *(1)*
role *(7)*
room *(2)*
route *(1)*
routine *(1)*
rules *(1)*
run *(4)*
runs *(1)*

< S >
samples *(2)*
SARAH *(1)*
saturation *(1)*
save *(1)*
saw *(5)*
saying *(5)*
says *(21)*
scale *(6)*
scales *(1)*
scheduled *(3)*

Deposition of Mariesha Apollon

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

scheme  *(1)*
school  *(4)*
schooling  *(1)*
science  *(1)*
scope  *(2)*
screen  *(7)*
screening  *(18)*
scroll  *(3)*
SCULLY  *(1)*
second  *(3)*
secondary  *(1)*
section  *(5)*
security  *(3)*
see  *(26)*
seeing  *(6)*
seeking  *(5)*
seen  *(6)*
self-explanatory  *(1)*
send  *(1)*
sense  *(1)*
sent  *(3)*
September  *(1)*
Septemberish  *(1)*
series  *(1)*
Serrano  *(1)*
session  *(3)*
set  *(2)*
seven  *(3)*
Shadow  *(1)*
shakiness  *(1)*
share  *(4)*
SHEET  *(4)*
sheltered  *(1)*
shift  *(9)*
shifts  *(8)*
shocked  *(1)*
short-acting  *(1)*
shortly  *(1)*
show  *(4)*
showed  *(3)*
showing  *(2)*
side  *(1)*
sign  *(4)*
signature  *(2)*
SIGNATURE:_____
_____DA
TE  *(2)*
signed  *(3)*
signs  *(14)*

similar  *(1)*
simply  *(2)*
sir  *(1)*
site  *(12)*
situation  *(4)*
situations  *(1)*
six  *(5)*
six-month  *(1)*
skip  *(1)*
sliding  *(5)*
small  *(1)*
Smith  *(5)*
Smith's  *(1)*
SOAP  *(1)*
social  *(1)*
somebody  *(9)*
somebody's  *(3)*
someone's  *(1)*
son  *(1)*
sorry  *(6)*
sound  *(3)*
source  *(1)*
speak  *(10)*
speaking  *(5)*
specialist  *(10)*
specialists  *(1)*
specific  *(7)*
specifically  *(5)*
spectrum  *(1)*
speculate  *(2)*
speculating  *(1)*
speculation  *(2)*
speech  *(2)*
speechless  *(3)*
spell  *(1)*
spoke  *(12)*
stab  *(1)*
staff  *(9)*
Staffing  *(4)*
stamp  *(3)*
standard  *(3)*
start  *(4)*
started  *(4)*
starting  *(1)*
state  *(5)*
stated  *(11)*
STATES  *(4)*
stating  *(2)*
stationed  *(3)*

status  *(5)*
stayed  *(1)*
steps  *(1)*
Stipulations  *(1)*
stopped  *(1)*
stored  *(3)*
Strategies  *(1)*
Street  *(5)*
strict  *(2)*
stricter  *(1)*
strike  *(1)*
strip  *(1)*
stuff  *(2)*
subject  *(1)*
Subjective  *(7)*
subsequent  *(1)*
sued  *(1)*
sugar  *(16)*
sugary  *(1)*
suicidal  *(1)*
Suite  *(2)*
SUMMER  *(3)*
supervisor  *(6)*
supervisors  *(1)*
SUPPORT  *(1)*
supposed  *(11)*
sure  *(14)*
surgeries  *(1)*
sweatiness  *(1)*
Sweating  *(2)*
sworn  *(2)*
symptomatic  *(2)*
symptoms  *(11)*
system  *(9)*

< T >
take  *(15)*
taken  *(9)*
talk  *(6)*
talking  *(8)*
taught  *(2)*
tax  *(1)*
Tekaccel  *(5)*
telephone  *(3)*
tell  *(12)*
telling  *(3)*
tells  *(2)*
temperature  *(3)*
term  *(8)*

terms  *(4)*
test  *(5)*
testified  *(7)*
testify  *(1)*
testifying  *(1)*
testimony  *(10)*
Texas  *(1)*
Thank  *(15)*
therapy  *(1)*
thing  *(3)*
things  *(22)*
think  *(34)*
third  *(2)*
THOMAS  *(9)*
thought  *(6)*
three  *(7)*
three-day  *(1)*
threshold  *(1)*
time  *(23)*
times  *(16)*
title  *(1)*
today  *(3)*
today's  *(1)*
told  *(17)*
Tom  *(1)*
tool  *(3)*
tools  *(3)*
top  *(1)*
touched  *(1)*
track  *(1)*
trained  *(8)*
training  *(37)*
transcript  *(3)*
transfer  *(1)*
transferred  *(1)*
transmit  *(1)*
treat  *(1)*
treated  *(3)*
treating  *(1)*
treatment  *(2)*
TREBACH  *(1)*
triage  *(3)*
trial  *(1)*
trip  *(1)*
true  *(4)*
truthful  *(1)*
try  *(3)*
trying  *(3)*
twice  *(1)*

two  *(13)*
two-hour  *(1)*
type  *(32)*
typed  *(1)*
types  *(2)*
typical  *(4)*
typically  *(1)*

**< U >**
unclear  *(1)*
uncontrollably  *(1)*
underneath  *(1)*
understand  *(14)*
understanding  *(6)*
understood  *(5)*
unit  *(1)*
UNITED  *(1)*
units  *(9)*
University  *(1)*
Unlimited  *(2)*
uploaded  *(1)*
urgent  *(4)*
urination  *(2)*
urine  *(7)*
use  *(5)*
usually  *(3)*
utilize  *(3)*
utilized  *(1)*
utilizing  *(1)*

**< V >**
variation  *(2)*
variations  *(1)*
varies  *(1)*
vary  *(1)*
verbal  *(1)*
verbally  *(2)*
verifying  *(1)*
versus  *(4)*
Videoconferenced  *(1)*
virtually  *(1)*
vision  *(6)*
vital  *(10)*
vs  *(2)*

**< W >**
Wait  *(1)*
walk  *(3)*
Wanda  *(1)*

want  *(12)*
wanted  *(1)*
wanting  *(2)*
wants  *(1)*
washed  *(1)*
watch  *(1)*
water  *(8)*
way  *(12)*
ways  *(6)*
Wednesday  *(1)*
week  *(7)*
weeks  *(2)*
weight  *(1)*
well  *(8)*
went  *(3)*
whatsoever  *(1)*
willing  *(1)*
willingly  *(1)*
withdrawal  *(1)*
WITNESS  *(55)*
witness's  *(1)*
WITTEKIND  *(48)*
wonderful  *(1)*
wondering  *(5)*
Wood  *(1)*
work  *(20)*
worked  *(20)*
worker  *(1)*
working  *(16)*
works  *(2)*
wound  *(2)*
write  *(7)*
write-up  *(8)*
written  *(1)*
wrote  *(4)*

**< Y >**
Yeah  *(1)*
year  *(2)*
years  *(2)*
YesCare  *(13)*
YesCare3432  *(1)*
YesCare3437  *(1)*
YesCare3438  *(1)*
YesCare3443  *(1)*
YesCare's  *(2)*
York  *(7)*

**< Z >**

zeroes  *(1)*
Zoom  *(5)*