IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACOB AND JAMES JUNG, ADMINISTRATORS OF ESTATE OF LOUIS JUNG, JR, PLAINTIFFS, | : : : : : : : : : : : | CIVIL ACTION: No. 24-cv-05618-TJS |
| v. | | |
| CITY OF PHILADELPHIA, ET AL. DEFENDANTS. | | |

**BRIEF IN SUPPORT OF MARIESHA APOLLON'S
MOTION TO PRECLUDE PLAINTIFFS' MEDICAL EXPERT OPINIONS
PURSUANT TO *DAUBERT***

## I.    MATTER BEFORE THE COURT

Defendant, Nurse Apollon, moves pursuant to Federal Rule of Evidence 702 and *Daubert* to preclude Plaintiffs from offering any expert causation opinion against her.  Plaintiffs have disclosed three medical experts: Lori E. Roscoe ("Nurse Roscoe"), Dr. Jonathan Williams ("Dr. Williams"), and Dr. Homer D. Venters ("Dr. Venters").  None of Plaintiffs' experts actually articulates a causation opinion linking Nurse Apollon's care to the death of Mr. Jung.  Any causation theory that Plaintiffs attempt to derive from their reports is conjecture and does not satisfy Rule 702's reliability and fit requirements.

Nurse Apollon's involvement with Mr. Jung was brief and limited to a re-intake encounter following his court-ordered return to Curran Fromhold Correctional

Facility ("CFCF") from Norristown Hospital.  On October 28, 2023, Nurse Apollon

saw Mr. Jung once during that re-intake, she documented his condition, contacted

the provider, and administered insulin for his Type-1 diabetes.  Nurse Apollon had

no further involvement in his care.  During the nine days that followed, Mr. Jung

remained in a correctional facility under continuous supervision by multiple medical

and correctional staff, with repeated opportunities for assessment and intervention,

yet he died on November 6, 2023.

## II.    QUESTIONS PRESENTED

**1. Whether Plaintiffs' medical experts may offer causation testimony against Nurse Apollon where their reports do not actually articulate a causation opinion as to her?**

[*Suggested response in the affirmative.*]

**2. Whether any causation theory Plaintiffs attempt to derive from the reports of Nurse Roscoe, Dr. Williams, or Dr. Venters is inadmissible under Rule 702 and *Daubert* because it is speculative, conclusory, and not the product of a reliable, case-specific medical analysis?**

[*Suggested response in the affirmative.*]

## III.    RELEVANT FACTUAL BACKGOUND

On October 28, 2023, pursuant to court order, Mr. Jung returned to the

Philadelphia Department of Prison's ("PDP") CFCF.  ECF No. 27 ¶ 70.  Nurse

Apollon, assigned to medical intake that day, conducted Mr. Jung's return screening

following transfer back from Norristown Hospital. Exhibit A, Apollon Dep. 29:5–6,

92:23–25, 93:1–6.

As part of the intake screening, Nurse Apollon obtained Mr. Jung's vital signs and reviewed his blood sugar, which was 542.  Exhibit A, Apollon Dep. 102:6–11. After receiving this result, she contacted the on-duty provider, co-Defendant Maureen Gay, CRNP, and reported Mr. Jung's blood sugar and vital signs.  *See generally* ECF No. 27 ¶¶ 73, 77.  Since Nurse Apollon could not herself order insulin as a registered nurse, she received orders from CRNP Gay for medication to reduce Mr. Jung's blood sugar.  Exhibit A, Apollon Dep. 114:2–22.  After CRNP Gay issued orders for the insulin, Nurse Apollon documented the administration of insulin. Nurse Apollon further advised Mr. Jung to drink water in response to the urine ketone and blood sugar results.  *See* Exhibit B, Apollon Verified Answers to Interrogatories.

In her verified interrogatory answers, Nurse Apollon also explained that she requested additional training on how to handle insulin refusals among diabetic patients but did not receive it.  *Id*.  After completing the October 28 re-intake screening, Nurse Apollon had no further interaction with Mr. Jung. Exhibit A, Apollon Dep. 84:15–17.

From October 29 through November 5, 2023, Mr. Jung's subsequent blood sugars and insulin administrations were documented by other medical staff:



**Medication Administration**

**Insulin order:**
Novolin N 10 units SQ BID
Novolin R CRIC SQ BID
151-200 = 4 units, 201-250 = 6 units, 251-300 = 8 units, 301-400 = 10 units, > 400 = 12 units

| | 10/29 | 10/30 | 10/31 | 11/1 | 11/2 | 11/3 | 11/4 | 11/5 |
|---|---|---|---|---|---|---|---|---|
| AM | BS 385 10 R 10 N | BS 268 8 R 10 N | BS 371 10 R 10 N | Refused (no form) | BS 290 8 R 10 N | No Show | BS 266 8 R 10 N | No Show |
| PM | BS 585 12 R 10 N | Not Doc | BS 500 No CRIC doc 10 N | BS 411 0 R 10 N | BS 245 6 R 10 N | BS 394 10 R 10 N | Not Doc | Refused (no form) |

10/29 PM BS included a note in the EMAR: "Provider notified; urine obtained." No other documentation or lab located.

11/6 AM Patient did not show up for his AM insulin. The nurse was on his way to obtain a refusal form when the stretcher call was announced at 0604. All resuscitative efforts were attempted, and the patient was pronounced at 0647 after Fire Rescue arrived.

Nurse Apollon was not involved in obtaining those blood sugars or administering any of the insulin recorded during that period. Exhibit A, Apollon Dep. 84:15-17. Mr. Jung died on November 6, 2023, nine days after his single re-intake encounter with Nurse Apollon. ECF No. 27 ¶ 97.

On December 3, 2025, in violation of the operative Court's Case Management Order Plaintiffs served three medical expert reports whose opinions they rely on in support of their claims: (1) Nurse Roscoe who is a registered nurse who offers opinions on nursing standards of care and criticizes aspects of Nurse Apollon's re-intake screening performed on October 28.  *See* Exhibit C, Nurse Roscoe's Report; (2) Dr. Williams who is an endocrinologist who opines that Mr. Jung died from diabetic ketoacidosis and describes DKA as a condition that can be rapidly reversed with appropriate treatment, even in patients who are near death.  *See* Exhibit D, Dr. Williams' Report; and (3) Dr. Venters who is a physician and epidemiologist who provides opinions about systemic deficiencies in the delivery of diabetes care at the

Philadelphia Department of Prisons, including policies, documentation practices, and the handling of refusals.  *See* Exhibit E, Dr. Venters' Report.

### IV.    LEGAL STANDARD

Federal Rule of Evidence 702 establishes the framework for admitting expert testimony in federal court. Under the Daubert standard, "district courts perform a gatekeeping function to ensure that expert testimony meets the requirements of Federal Rule of Evidence 702." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017). This gatekeeping "function extends not only to scientific testimony, but also to other forms of technical or specialized knowledge." *Id*.

"Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Id*.  A witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent shows the court that the expert's specialized knowledge will, more likely than not, assist the trier of fact in understanding the evidence or determining a fact in issue.  *See USCS Fed Rules Evid R 702*.

The Third Circuit has determined that Rule 702 has three basic requirements: (1) qualification, (2) reliability, and (3) fit.  *In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994); *see also Calhoun v. Yamaha Motor Corp*. U.S.A., 350 F.3d 316, 321 (3d Cir.2003).

The reliability prong requires expert testimony to be "based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Karlo v. Pittsburgh Glass Works, LLC,* 849 F.3d 61, 81 (3d Cir. 2017) (quoting *In re TMI Litig.*, 193 F.3d 613, 703-07 (3d Cir. 1999), amended, 199 F.3d 158 (3d Cir. 2000). Courts therefore exclude opinions that are "connected to existing data only by the ipse dixit of the expert," because testimony that is conjecture is not the product of a reliable method. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Courts look for scientific rigor, not mere "haphazard, intuitive inquiry." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000). Thus, "the court looks to whether the expert's testimony is supported by 'good grounds.'" *Karlo*, 849 F.3d at 81; see also Oddi, 234 F.3d at 145 (citing *In re Paoli*, 35 F.3d at 742 n. 8) (identifying the nonexclusive list of factors for the court to consider). "It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002).

The fit requirement ensures that the evidence or testimony helps the trier of fact to understand the evidence or to determine a fact in issue, and this condition goes primarily to relevance. *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61 (3d Cir. 2017). Rule 702 requires that the expert testimony must fit the issues in the case, meaning the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. *Schneider v. Fried*, 320 F.3d 396 (3d Cir. 2003). Rule 702's helpfulness standard requires a valid scientific connection to the

pertinent inquiry as a precondition to admissibility.  *Schneider v. Fried*, 320 F.3d
396 (3d Cir. 2003).  The Third Circuit stated in *Walker v. Gordon*, 46 Fed.Appx. 691,
694 (3d Cir. 2002) that in accordance with *Daubert*, trial courts are required to
apply a reliability analysis to an expert's opinion; that opinion is "reliable" if it is
based on the "methods and procedures of science" rather than on "subjective belief
or unsupported speculation."  *In re Paoli R .R. Yard PCB Litig.*, 35 F.3d 717, 742
(1994) (quoting *Daubert*, 509 U.S. at 590).

## V.    ARGUMENT

### 1. Plaintiffs' Medical Experts Do Not Provide Any Admissible Causation Opinion Against Nurse Apollon

Plaintiffs must offer admissible expert testimony that Nurse Apollon's limited
October 28 single nursing encounter caused or contributed to Mr. Jung's death 9 days
later on November 6.  However, Plaintiffs have not done so.  Of all three medical
experts, neither Nurse Roscoe, Dr. Williams nor Dr. Venters have shown a causation
opinion specific to Ms. Apollon.  To the extent that Plaintiffs suggest otherwise, any
claimed causation is purely conjecture and fails Rule 702's reliability and fit
requirements.

### a. Nurse Roscoe: Standard of Care Criticism Only, No Causation as to Nurse Apollon

Nurse Roscoe only articulates a standard of care criticism against Nurse
Apollon and did not put forth any causation opinion.

Expert testimony must actually address the issue in dispute. In this matter, whether Nurse Apollon's care caused Mr. Jung's death.

In Nurse Roscoe's report she opines:

When RN Apollon conducted Mr. Jung's intake evaluation on October 28th, she encountered conflicting information regarding whether he was diabetic. She documented a blood glucose of 542 mg/dL which is a critically high level that placed Mr. Jung at immediate risk for diabetic ketoacidosis. Although she appropriately contacted the provider and checked for ketones, she did not complete the Hyper/Hypoglycemia Nursing Encounter Tool (NET) nor did she conduct the ongoing reassessment required for a patient in acute metabolic distress. After administering insulin, she did not recheck Mr. Jung's blood glucose or ketones, nor did she continue monitoring him until the level dropped to a safer range, but she should have. A glucose level exceeding 500 mg/dL accompanied by ketonuria represents a medical emergency requiring repeated reassessment, close monitoring, and continued communication with the provider. Often a blood glucose that high warrants transfer to an emergency department for a higher level of care than can be rendered in a correctional facility. RN Apollon's failure to carry out these essential nursing responsibilities deviated significantly from the standard of nursing care.

*See* Exhibit C.

In the above paragraph Nurse Roscoe discusses forms, reassessments, and deviations. While her opinions in the above paragraph do constitute standard of care opinions, they do not include an opinion as to causation. In other words, there is no opinion expressed that any of the alleged deviations by Nurse Apollon actually caused Mr. Jung's death. That is hardly surprising, considering Nurse Apollon's sole interaction with Mr. Jung was approximately nine (9) days prior to his death. The remainder of Nurse Roscoe's report is directed to the care rendered by others, and not Nurse Apollon.

Since Nurse Roscoe never gives a causal conclusion or causal chain, her opinions have not articulated causation against Nurse Apollon. Under Rule 702, Nurse Roscoe should be precluded from offering any causation testimony as to Nurse Apollon at trial.

### b. **Dr. Williams: DKA is Quickly Reversible; No Causation Opinion Against Nurse Apollon**

Dr. Williams opines on Diabetic Ketoacidosis ("DKA") generally as he also attributes Mr. Jung's death to DKA, however, Dr. Williams does not opine that Nurse Apollon's re-intake encounter caused Mr. Jung's death.

Rule 702 requires reliable, case specific application of medical principles to the question whether a defendant's conduct caused the outcome.

The opinions expressed in the report of Dr. Williams, Plaintiffs' endocrinology expert, make it impossible for Plaintiffs to contend that they have offered a causation opinion against Nurse Apollon. This is because Dr. Williams opines that DKA, although potentially fatal if untreated, is a condition that can be reversed with appropriate care such that a patient who is "near death" may return to normal health within a day or two. *See* Exhibit D. Thus, Dr. Williams opines that DKA is quickly reversible. See below:

- <u>After recognition of DKA, treatment is straightforward and extremely effective at preventing complications and death</u>. This includes; 1) volume resuscitation to correct dehydration and to expedite removal of ketone bodies, 2) correction of electrolytes, 3) reduction in glucose levels with insulin, and 4) identification and treatment of precipitating factors. All these maneuvers address cardiac susceptibility to fatal arrythmia that arises in DKA. Although DKA is fatal if not corrected, it is one of the rare life-threatening conditions wherein someone can be near death, yet discharged from the hospital to normal health in a day or two.

Having given that opinion, it would therefore be impossible to contend that any of the alleged departures from the standard of care by Nurse Apollon on October 28, actually caused Mr. Jung's death on November 6.  This is particularly so given the allegations and opinions that doses of insulin were missed during that time frame.

While Dr. Williams opines that Mr. Jung's death was the result of DKA, he does not offer an opinion that Nurse Apollon's actions caused the death.  Nor could he do so after previously opining that DKA can be corrected even when a patient is near death.  In other words, if DKA is reversible with prompt care, blaming a single re-intake visit nine days earlier without analysis is conjecture.  There is absolutely no evidence or testimony in this matter to suggest that Mr. Jung was near death when seen by Nurse Apollon.  His vital signs were normal, and he was able to communicate with Nurse Apollon during the intake session.

Thus, to the extent Plaintiffs argue Williams provides causation against Nurse Apollon, that theory is unsupported by Dr. Williams report and is therefore inadmissible under Rule 702.

c. **Dr. Venters: Systemic Critique That Does Not "Fit" Individual Causation Against Nurse Apollon**

D r. Venters' report critiques systems and co-defendants the City and YesCare; it does not provide an individualized causation analysis as to Nurse Apollon.

Expert testimony must "fit" the issue in dispute.  System-level opinions do not answer whether Nurse Apollon's specific conduct caused Mr. Jung's death.

Dr. Venters, Plaintiffs' epidemiology expert, describes systemic breakdowns in monitoring, documentation, and follow-up after October 28, and the absence of any provider reassessment of Mr. Jung's diabetes before his death on November 6. *See* Exhibit E, Dr. Venters' Report. None of Dr. Venters' opinions ties Mr. Jung's DKA and death to anything Nurse Apollon did or did not do during re-intake.

Dr. Venters mentions Nurse Apollon only in the context of inadequate training, noting her testimony that she requested additional training on how to handle insulin refusals among diabetic patients but did not receive it. *See Id.* Dr. Venters cites this as evidence of broader failures in oversight and education, not as a basis for any opinion that Nurse Apollon's actions or omissions caused Mr. Jung's death. *See Id.* Dr. Venters therefore offers no causation opinion against Nurse Apollon.

Since Dr. Venters never applies a patient specific causal chain to Nurse Apollon's care, any attempt to treat his report as a causation opinion against her would be speculative which fails Rule 702's reliability and fit requirements.

## VI.    CONCLUSION

For the foregoing reasons, Defendant, Mariesha Apollon, R.N. respectfully requests that this Honorable Court Grant her *Daubert* Motion and preclude Plaintiffs' medical experts, including Nurse Roscoe, Dr. Williams, and Dr. Venters, from offering any opinion that Nurse Apollon's October 2023 nursing care caused or contributed to the death of Mr. Louis Jung Jr.

14

Respectfully submitted,

**KIERNAN TREBACH, LLP**

_____
Sarah M. Baker, Esq.
Attorneys for Mariesha Apollon


**KIERNAN TREBACH, LLP**

_____
Jonathan M. Kaminsky, Esq.
Attorneys for Mariesha Apollon

Date: December 12, 2025

## <u>VERIFICATION</u>

I, Jonathan M. Kaminsky, Esquire, verify that I am counsel for Defendant Apollon in this action, and, on behalf of such party, verify that the facts set forth in the attached are true and correct to the best of my knowledge, information, and belief.  The undersigned further certifies that this Verification is made subject to the provisions of 18 Pa.C.S. sec. 4904, relating to unsworn falsification to authorities.

_____

JONATHAN M. KAMINSKY, ESQUIRE