# EXHIBIT "A"

1      IN THE UNITED STATES DISTRICT COURT

2     FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                    -  -  -

4  JACOB and JAMES JUNG, as          :
   Administrators of the Estate     :
5  of LOUIS JUNG, JR.,               :
              Plaintiff,             :
6                                    :
                                     :
7  -vs.-                             :
                                     :
8  CITY OF PHILADELPHIA, et al.,:
              Defendant(s).          :  2:24-cv-05618-TJS

9                    -  -  -

10          Wednesday, November 5, 2025

11                   -  -  -

12          Videoconferenced deposition of

13  MARIESHA APOLLON, taken pursuant to notice, was

14  held virtually in the Commonwealth of

15  Pennsylvania, commencing at 10:04 a.m., on the

16  above date, before Jared Carey, a Professional

17  Reporter and Notary Public in and for the

18  Commonwealth of Pennsylvania.

19                   -  -  -

20

21

22

23  Everest Job No. 46484

24

25

         APPEARANCES:

ABOLITIONIST LAW CENTER
BY: BRET GROTE, ESQUIRE
     MARGO HU, ESQUIRE
631 N. 12th Street
Philadelphia, Pennsylvania 19123
412.654.9070
Attorney for the Plaintiff
(Appearing via Zoom)


KIERNAN TREBACH
BY: SARAH BAKER, ESQUIRE
     JONATHAN M. KAMINSKY, ESQUIRE
1801 Market Street
Philadelphia, Pennsylvania 19103
215.569.4433
Attorney for Defendant, Mariesha Apollon
(Appearing via Zoom)


CITY OF PHILADELPHIA LAW DEPARTMENT
BY: EMILY HOFF, ESQUIRE
1515 Arch Street, 15th floor
Philadelphia, Pennsylvania 19103
215.683.5000
Attorney for Defendant, City of Philadelphia,
Blanche Carney, Gene Frasier, Wanda Bloodsaw
(Appearing via Zoom)


GORDON REES SCULLY MANSUKHANI
BY: SUMMER C. THOMAS, ESQUIRE
1717 Arch Street, Suite 610
Philadelphia, Pennsylvania 19103
215.561.2300
Attorney for Defendant, Career Staffing
(Appearing via Zoom)

1

2

3          APPEARANCES: Continued

4

5   O'CONNOR KIMBALL
    BY: RAYMOND WITTEKIND, ESQUIRE
6   15th Street and JFK Boulevard, Suite 100
    Philadelphia, Pennsylvania 19102
7   215.564.0400
    Attorney for Defendant, YesCare Corp.
8   (Appearing via Zoom)

9

10

11  ALSO PRESENT:

12  Corinne Austen

13  Lolo Serrano

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I   N   D   E   X

2    WITNESS                                    PAGE

3    MARIESHA APOLLON

4    BY:  MR. GROTE                             6

5         MR. WITTEKIND                         110

6         MS. THOMAS                            117

7         MS. BAKER                             117

8              E   X   H   I   B   I   T   S

9    MARKED              DESCRIPTION            PAGE

10            (No exhibits were marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1
 2
 3                  DEPOSITION SUPPORT INDEX
 4
 5   Direction to Witness Not to Answer
 6   Page Line             Page Line            Page Line
 7   None
 8
 9
10   Request for Production of Documents
11   Page Line             Page Line            Page Line
12   None
13
14
15   Stipulations
16   Page Line             Page Line            Page Line
17   None
18
19
20   Question Marked
21   Page Line             Page Line            Page Line
22   None
23
24
25
```

Case 2:24-cv-05618-TJS     Document 110-4     Filed 12/12/25     Page 7 of 152

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1                            -   -   -

2                    MARIESHA APOLLON, having been

3       duly sworn, was examined and testified as

4       follows:

5                            -   -   -

6                        EXAMINATION

7                            -   -   -

8       BY MR. GROTE

9           Q.     Good morning, Ms. Apollon.  Can

10      you hear me fine?

11          A.     Yes.

12          Q.     My name is Bret Grote.  I am

13      counsel for the plaintiffs in the matter of Jung

14      versus City of Philadelphia.  You are here in

15      response to a Notice of Deposition.

16                 Can you please state and spell

17      your name for the record.

18          A.     Mariesha Apollon.

19      M-A-R-I-E-S-H-A, A-P-O-L-L-O-N.

20          Q.     Have you ever given a deposition

21      before?

22          A.     Yes.

23          Q.     In what capacity -- or how many

24      times?

25          A.     One.

1    Q.    And what was the nature of that

2    deposition for?

3    A.    I sued someone for firing me when

4    I was pregnant.

5    Q.    And about approximately how long

6    ago was that case?

7    A.    Four months ago.

8    Q.    That's when the deposition was?

9    A.    The deposition was in February.

10    Q.    So you've been through this

11    before.  But I will go over some ground rules

12    just so we are on the same page as to how the

13    deposition will be conducted.

14        We both have to speak out loud.

15    No head nods or mm-mmh type of answers because

16    we need the court reporter to take down

17    everything that is said so that the transcript

18    is clear.

19        We have to not talk over each

20    other.  So I will let you finish your answers

21    before I ask another question.  And I ask you to

22    let me finish my question before you give an

23    answer.

24        If you do not know or remember

25    something, please let me know if there is a

1  document that might refresh your recollection.

2  And if you answer a question, I will assume that

3  you understood it.  Also, you can take breaks.

4  If you need a break, just let me know.

5           But the only thing I ask is that

6  if I have just asked a question, please answer

7  the question before we take a break.

8       A.    Okay.

9       Q.    Does all of that sound good to

10  you?

11      A.    Yes.

12      Q.    Are you prepared to give a

13  deposition today?

14      A.    Yes.

15      Q.    Did you do anything to prepare

16  for today's deposition?

17      A.    I spoke with my lawyers.  And I

18  reviewed the intake paperwork.

19      Q.    Without telling me anything about

20  the content of the conversation with your

21  attorneys, how many times did you meet with your

22  lawyers in preparation for this deposition?

23           MS. BAKER:  I will object.  Why

24      is that not subject to attorney/client

25      privilege?

1          MR. GROTE:  It's a very standard

2     question to ask how many times someone has

3     met in order to engage the sense in which

4     they have been prepared to give testimony.

5     And --

6          MS. BAKER:  I don't think you are

7     entitled to know how many times she met

8     with us.  I think that's covered by

9     attorney/client privilege.  I'm sorry.

10          MR. GROTE:  Are you instructing

11     your client not to answer the question?

12          MS. BAKER:  I am instructing her

13     not to answer that question as it is

14     phrased.  Yes.

15          MR. GROTE:  Then we will certify

16     for the record that the client has been

17     instructed not to answer that question.

18  BY MR. GROTE

19     Q.     Did you -- you said you reviewed

20  the intake documents.  Was that correct,

21  Ms. Apollon?

22     A.     Yes.

23     Q.     Were those the documents dated

24  October 28, 2023, if you remember the date?

25     A.     Yes.

1    Q.    Did you review any other

2    documents in preparation for the deposition?

3    A.    No.

4    Q.    Where do you work currently?

5    A.    Robert Wood Johnson Hospital.

6    Q.    What do you do at the hospital?

7    A.    I'm a registered nurse.

8    Q.    Where is that hospital?

9    A.    Hamilton, New Jersey.

10    Q.    How long have you worked there?

11    A.    One month.

12    Q.    I will ask you some questions now

13    about your educational and work history.

14    Can you tell me all of the post

15    high school education that you have received?

16    A.    I was a medical assistant, home

17    health aide/medical assistant.  And then I

18    received my nursing degree.

19    Q.    Where were you -- where did you

20    receive your nursing degree?

21    A.    Brooklyn, New York.

22    Q.    Any other degrees or post

23    secondary education?

24    A.    Medical assistant degree.

25    Q.    And where did you receive that

Case 2:24-cv-05618-TJS    Document 110-4    Filed 12/12/25    Page 12 of 152

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1  degree?

2          A.      Same place.  Brooklyn, New York.

3          Q.      When did you get those degrees?

4          A.      Medical assistant is 2011 and

5  nursing is 2016.

6          Q.      And when did you graduate high

7  school?

8          A.      2008.

9          Q.      Are you currently in school for

10  anything?

11          A.      I just graduated.

12          Q.      Where did you graduate from?

13          A.      Capella University.

14          Q.      What was the degree in?

15          A.      Bachelor's of science in nursing.

16          Q.      You said just graduated.  Was

17  that this year?

18          A.      Yes.  Like a week ago.

19          Q.      And can you walk me through --

20  let's go -- can you tell me what your -- what

21  was your first job in the medical field?

22          A.      As I stated, I was a home health

23  aide.  I would go to the hospital and watch

24  patients.  Right after that I was a medical

25  assistant at a private doctor's office and then

1  in the endoscopy center.  And after that I

2  started in the nursing home, the prison, and now

3  the hospital.

4          Q.     As a home health aide, what

5  training did you receive for that position?

6          A.     There is a home health aide

7  certificate.

8          Q.     And what do you learn as part of

9  receiving that certificate?

10          A.     How to take care of patients in

11  their home, bathing, clothing, medications,

12  exercises.

13          Q.     And how long were you a home

14  health aide?

15          A.     Approximately seven years.

16          Q.     And what were those seven years?

17  What was the beginning and what was the end?

18          A.     Approximately 2012 to 2019.

19          Q.     When did you become a medical

20  assistant?

21          A.     When the pandemic broke out.  So

22  2019.

23          Q.     Would that have been 2020 maybe?

24          A.     No.  It was September -- around

25  Septemberish of 2019.

1    Q.        Where were you a medical

2  assistant?

3         A.        I was at a private doctor's

4  office.  I do not recall the name.  And then the

5  pandemic broke out.  Most people got laid off --

6  including me.  And then I was hired at the

7  Endoscopy Center of New York in New York City.

8         Q.        And as a medical assistant, what

9  training did you receive for that position?

10        A.        I got my associate's degree.  You

11 are able to draw blood, do EKGs, assist the

12 patient, those type of things, give orders.

13        Q.        Did you, as a medical assistant,

14 ever receive any training on diabetes care?

15        A.        I don't believe that is within

16 the practice.  I don't believe that's something

17 medical assistants learn.

18        Q.        So is it your -- are you saying

19 that you did not receive specific training on

20 diabetes care as part of that role?

21        A.        Yes, yes.

22        Q.        And as a medical assistant, you

23 were in private practice, you said, before -- or

24 you worked in an office that was in private

25 practice before the Endoscopy Center of New

Deposition of Mariesha Apollon                                  Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1   York.   Was that accurate?
 2           A.      Yes.
 3           Q.      And in that private practice can
 4   you walk me through what did a basic day look
 5   like --
 6           A.      Shadow the doctor --
 7                   MS. BAKER:  Let him finish the
 8       question before you start your answer.
 9                   Okay?
10                   THE WITNESS:  Okay.
11                   MS. BAKER:  Did you hear the
12       whole question?
13                   THE WITNESS:  No.
14   BY MR. GROTE
15           Q.      What did a typical day in your
16   job look like?  What were your responsibilities?
17           A.      I took orders from the doctor.  I
18   took urine samples, drew blood, EKG, those type
19   of things.
20           Q.      And at the Endoscopy Center of
21   New York, what were your typical
22   responsibilities?
23           A.      We mostly washed the beds, made
24   the beds so that the process -- it was an
25   outpatient endoscopy center.  So they needed to
```

1    run the pace faster.  So I did not do any vital

2    signs or any blood work there.  We just mostly

3    provided a faster route for patients to get in

4    and out.

5         Q.      And after the Endoscopy Center of

6    New York, did you work at the Isabella

7    Rehabilitation Nursing Home?

8         A.      Yes.

9         Q.      And what were your job

10   responsibilities there?

11        A.      Taking orders from doctors, doing

12   wound care, passing medication, assessing

13   patients, determining if they need to go to the

14   hospital, EKG, IV, medications.

15        Q.      And were you also a medical

16   assistant or did you have a different role

17   there?

18        A.      No.  The only role that I carried

19   at Isabella was the nursing career.

20        Q.      As a medical assistant, is that a

21   position that requires a license?

22        A.      No.

23        Q.      When you were at Isabella

24   Rehabilitation Nursing Home, you were a nurse;

25   is that correct?

1    A.    Yes.  You cannot work as a nurse

2  unless you pass the board license examination.

3    Q.    When did you pass the board

4  license examination?

5    A.    2021, November.

6    Q.    And at the Isabella

7  Rehabilitation Nursing Home, did you have

8  occasion to care for patients with diabetes?

9    A.    Yes.

10    Q.    And what type of care would you

11  provide to diabetic patients, generally

12  speaking?

13    A.    Insulin therapy, diet, make sure

14  they are on the right diet, follow-ups,

15  reassessments.

16    Q.    Did you review training in

17  diabetes care as part of your -- through the

18  rehabilitation nursing home?

19    A.    Can you re-ask that?

20    Q.    I think I can -- I think there is

21  another question I should ask first.

22        In receiving your nursing

23  license, prior to doing that or as part of

24  receiving that license, did you receive training

25  on diabetes care?

1      A.      Yes.

2      Q.      Can you describe what that

3  training consisted of?

4      A.      At my school they taught us what

5  are the signs and symptoms of hypoglycemic,

6  hyperglycemic, the range, the normal blood

7  sugar.

8      Q.      And what --

9      A.      I was not done.  The type of

10  insulins, short-acting, long-acting, those type

11  of things.

12      Q.      And what are signs and symptoms

13  of hypoglycemia?

14      A.      Dysphagia, confusion,

15  dehydration.

16      Q.      Are there others?

17      A.      Sweating, blurred vision.

18      Q.      Any others that you can recall

19  right now?

20      A.      No.

21      Q.      And what are the signs and

22  symptoms of hyperglycemia?

23      A.      Excessive urination, dehydration,

24  blurred vision.

25      Q.      Are there any others that you

1    recall?

2          A.      No.

3          Q.      And you said you were trained on,

4    I believe, the normal range of glucose readings?

5    And correct me if that was not exactly what you

6    said.

7          A.      Yes.

8          Q.      What are normal ranges of glucose

9    readings?

10         A.      Between the range of 70 and 110.

11         Q.      Thank you.

12                 Were you also trained on risks of

13   abnormal glucose levels?

14         A.      Yes.

15         Q.      What are those risks?

16         A.      As I stated before, the symptoms

17   any individual can have is confusion, blurred

18   vision, sweatiness, shakiness, frequent

19   urination, dehydration.

20         Q.      So as a nurse at Isabella

21   Rehabilitation Nursing Home, did you encounter

22   patients, diabetic patients, who at times had

23   these symptoms?

24         A.      Yes.

25         Q.      And as a nurse when you would

1  encounter such symptomatic patients, what did

2  you do?

3          A.     We would check the blood glucose

4  levels first and then see if they have an order

5  for insulin, administer the insulin.  And then

6  we do a reassessment.  After the reassessment if

7  the patient remains the same or is more

8  declined, we have to call the doctor.

9          Q.     When did your job at Isabella

10 end?

11         A.     When I gave birth to my son in

12 January of 2023.

13         Q.     And is there any reason you did

14 not go back to Isabella after that?

15         A.     I moved to New Jersey.

16         Q.     After you moved to New Jersey,

17 where were you employed?

18         A.     August 2023 I got employed at the

19 prison.

20         Q.     And who was your employer when

21 you worked at the Philadelphia Department of

22 Prisons?

23         A.     I was hired through an agency

24 called Tekaccel.

25         Q.     Do you know where Tekaccel is

1  based?

2          A.       Texas.

3          Q.       And are you familiar with an

4  entity called Career Staffing?

5          A.       No.

6          Q.       Did you have a supervisor at

7  Tekaccel?

8          A.       No.  I had a recruiter.

9          Q.       Can you describe for me the

10 nature of the relationship with the recruiter,

11 how the employment came to be and how they

12 placed you at the Philadelphia Department of

13 Prisons?

14         A.       They reached out to me through

15 emails stating that they saw my résumé.  They

16 would like to offer me a position at the prison.

17 They went through the application process and

18 offered me a rate and a shift.  And I agreed to

19 those documentations.

20         Q.       What was the rate that was

21 offered?

22                  MS. BAKER:  Objection as to

23     relevance.  Why is that relevant?  Why is

24     her rate of pay relevant?  We previously

25     produced, I believe, the agreement that she

Case 2:24-cv-05618-TJS    Document 110-4    Filed 12/12/25    Page 22 of 152

Deposition of Mariesha Apollon                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    had.

2              MR. GROTE:  Because it reveals

3    the compensation she was receiving for

4    performing.

5              MS. BAKER:  But why is her rate

6    of compensation relevant to the questions

7    that are at issue in this case?  We

8    produced the document which had that

9    redacted.  I don't understand why you need

10   to know what the rate of pay was.  I am

11   instructing her not to answer that question

12   unless you can provide --

13             MR. GROTE:  What privilege are

14   you asserting?  Are you asserting a

15   privilege?

16             MS. BAKER:  I am not asserting --

17   well, I'm telling you that --

18             MR. GROTE:  Your objection has

19   been stated for the record.  Are you

20   asserting a privilege?

21             MS. BAKER:  I have stated my

22   objection.

23             MR. GROTE:  Correct.  And unless

24   you are asserting a privilege, the witness

25   is to answer the question.

1           MS. BAKER:  That's incorrect.

2   That's incorrect.  I don't understand why

3   it has any relevance to this case what her

4   rate of pay was.  And you have not provided

5   me the reason why it would be relevant.

6           MR. GROTE:  Your objection has

7   been stated for the record.  I am asking is

8   there a privilege that's being asserted?

9           MS. BAKER:  I told you what the

10   grounds for the objection are.

11           MR. GROTE:  So you are not

12   asserting a privilege?

13           MS. BAKER:  You can ask your next

14   question.

15           MR. GROTE:  I want the record to

16   reflect that you are not asserting a

17   privilege and you are certifying that she

18   is not to answer this question based on a

19   relevance objection.  Is that what you are

20   instructing your client?

21           MS. BAKER:  We can go around and

22   around and around on this.  Although

23   discovery is broader than what is

24   potentially admissible at the time of

25   trial, I don't understand how her rate of

1    pay has any bearing on any of the issues

2    that we are exploring here in discovery.

3    Unless you can provide me with the reason

4    why it would be, then I think it's outside

5    the scope of applicable discovery.

6              MR. GROTE:  I understand what

7    your objection is.  You have stated it.  It

8    has a relevance for showing how YesCare was

9    utilizing its overall staffing complement,

10   including what compensation packages were

11   for their staff, what their expectations

12   were for staff who are making certain

13   amounts of money based upon their training

14   to perform their job responsibilities.

15             And it could have relevance for

16   determining whether or not they were

17   properly preparing their staff in order to

18   provide the care that was required at the

19   facility.

20             And I understand the nature of

21   your objection.  I want to make it clear on

22   the record that if you are instructing your

23   client not to answer the question, it is

24   based on a relevance objection and not a

25   privilege.  That's all.

1    MS. BAKER:  I don't understand

2    what you just articulated.  Let's not hold

3    the deposition up by continuing to argue

4    over this.  In order to keep things going,

5    I will allow her answer the question as to

6    what her rate was at the time she was

7    hired.  And I not will allow further

8    inquiry into her pay.

9    Mariesha, you may answer the

10   question as to what your rate of pay was at

11   the time you were hired to work at the

12   prison.

13   THE WITNESS:  $64 an hour.

14   MR. GROTE:  Thank you.

15   BY MR. GROTE

16       Q.    And did you have to obtain a

17   license, a Pennsylvania license, prior to

18   working at the prison?

19       A.    Yes.

20       Q.    And when did you obtain that

21   license?

22       A.    Pennsylvania Board of Nursing.

23   You just have to apply.

24       Q.    I am sorry.  Maybe I didn't speak

25   loud enough.  I said, When did you obtain that

1    license?

2          A.        Probably June 2023.

3          Q.        And you said that you agreed to a

4    shift -- you were offered a shift I think was

5    your language; is that correct?

6          A.        Yes.  3:00 p.m. to 11:00 p.m.

7          Q.        And what days of the week did you

8    work 3:00 to 11:00 p.m.?

9          A.        Five days out of the week.  I

10   don't recall the specific days.

11         Q.        They are not always the same five

12   days?

13         A.        They were not always the same

14   five days.

15         Q.        A little more about diabetes.

16   What is type 1 diabetes?

17         A.        We are told that type 1 is what

18   you're born with.

19         Q.        Is there anything else that you

20   know about type 1 diabetes?

21         A.        It needs to be managed with

22   insulin.

23         Q.        Do you know what type 2 diabetes

24   is?

25         A.        That is what you develop as you

1    get older.

2         Q.     And do you know what

3    distinguished type 1 from type 2 diabetes?

4         A.     Type 2 can be managed with oral

5    medication.  Type 1 needs insulin.

6         Q.     So when you say insulin, do you

7    mean injectable insulin?

8         A.     Yes.

9         Q.     Is the oral medication also

10   insulin?  Or is that different?

11        A.     Yes.  It's not insulin.  But it

12   lowers the blood sugar.

13        Q.     At Curran-Fromhold Correctional

14   Facility -- excuse me.

15               When you worked at the

16   Philadelphia Department of Prisons, were you

17   stationed at any particular jail?

18        A.     I was stationed at CFCF

19   Curran-Fromhold.

20        Q.     That was for the entirety of your

21   employment there?

22        A.     Yes.  Only one day I was

23   transferred to DC, which was a few feet from

24   that prison.

25        Q.     DC is the Detention Center,

1    correct?

2              A.      Yes.

3              Q.      And is that where the infirmary

4    is in the prisons?

5              A.      No.  I didn't see that there.  I

6    don't recall seeing that there when I was there.

7              Q.      Do you know where the infirmary

8    was?

9              A.      No.

10             Q.      How long did you work at CFCF?

11             A.      26 weeks.

12             Q.      And is that approximately six

13   months?

14             A.      Yes.

15             MS. BAKER:  She didn't know it

16       was going to be a math test.

17   BY MR. GROTE

18             Q.      Why did your employment end at

19   the end of that contract?

20             A.      Can you -- it was a contract as

21   needed.  It started off as a 13-week and then

22   extended for one more 13-week.

23             Q.      Did they offer to extend it

24   beyond the 26 weeks?

25             A.      No.

1    Q.      Where did you work next?

2    A.      Chapel Manor Nursing Home.

3    Q.      How long did you work there?

4    A.      Five months.

5    Q.      And when did that employment end?

6    A.      When I gave birth to my daughter

7    in May 2024.

8    Q.      A little belated, but

9    congratulations on that as well.

10   A.      Thank you.

11   Q.      When did you -- what was your

12   next job after giving birth to your daughter?

13   A.      I stayed home 18 months.  And I

14   started back to work October 6th.

15   Q.      Going back to Chapel Manor

16   Nursing Home, what was your role at the nursing

17   home?

18   A.      Charge nurse and supervisor.

19   Q.      How is being a charge nurse

20   different from your role as CFCF?

21   A.      Being a charge nurse is you are

22   in charge of the LPNs.  You are in charge of

23   making decisions.  You are in charge of saying

24   this patient needs to go to the hospital.  You

25   are putting in orders.  You are taking orders

1  from doctors.

2          Q.    And I am not sure if I asked

3  this.  But what were your responsibilities at

4  CFCF?

5          A.    I was assigned to medical triage,

6  and I was also assigned to intake.

7          Q.    At intake, did you have to -- how

8  do you screen for diabetes?

9                MS. BAKER:  At intake, you mean?

10    Or in general?

11 BY MR. GROTE

12          Q.    Let me back up.

13                Generally, if we talk about

14 screening a patient, what does that term mean to

15 you?

16          A.    Asking questions and physically

17 looking at the patient to see if they have any

18 symptoms.

19          Q.    So, in general, how does one

20 screen for diabetes?

21          A.    You check their blood sugar.  And

22 you can verbally ask them, Are you a diabetic?

23          Q.    Are there any other ways that you

24 might have insight into whether or not they are

25 a diabetic?

Case 2:24-cv-05618-TJS    Document 110-4    Filed 12/12/25    Page 31 of 152

Deposition of Mariesha Apollon                                Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1                    MS. BAKER:  At that facility, you

2          mean?  Or generally?

3    BY MR. GROTE

4             Q.        Actually just generally.

5             A.        Yes.  As I stated, you can look

6    at someone's symptoms.  They are sweating.  They

7    are confused.  Their vision is becoming more

8    blurry.  There is signs and symptoms that you

9    can look at to say someone may or may not be

10   diabetic.

11            Q.        If you had their medical file,

12   can you also review their medical record?

13            A.        Yes.

14            Q.        And what are ketones?

15            A.        That's something that is produced

16   in the urine when the blood sugar is so high.

17   So we instruct the patient or the individual to

18   drink a lot of water to flush out the ketones.

19            Q.        How do you test for ketones?

20            A.        You ask the individual to produce

21   urine.  And then there is a urine test strip.

22   You take the test trip and you dip it in the

23   urine.  And depending on the color, it tells you

24   if the person has ketones.

25            Q.        And is there a color that

1  indicates positive versus a color that indicates

2  negative?

3         A.    Yes.

4         Q.    Are there any kind of gradations

5  in that color scheme such that you can tell if

6  there is a larger or a lighter presence of

7  ketones?

8         A.    Yes.  The color doesn't -- it's

9  not just two colors there.  It goes from light

10 to dark.

11        Q.    So the darker it is, the heavier

12 the presence of ketones.  Is that the case?

13        A.    Yes.  I would say yes.

14        Q.    In type 1 diabetes, you said that

15 it's treated with insulin, correct?

16        A.    Yes.

17        Q.    Are there other ways in which

18 type 1 diabetes can be treated or -- in addition

19 to insulin, are there other ways that type 1

20 diabetes might be treated?

21        A.    In conjunction with the insulin,

22 you have a diet modification and also you can

23 exercise.

24        Q.    What about type 2 diabetes, are

25 there other ways to treat in addition to the

1  oral medication that you mentioned?

2          A.      Yes.   They are modifiable things

3  that the patient can do:  Lose weight, change

4  diet, less carbohydrates, those things, less

5  sugary drinks, more water.

6          Q.      Anything else?

7          A.      No.

8          Q.      If I use the term "units of

9  insulin," what does that mean?  What is a unit

10  of insulin?

11          A.      The amount of insulin that the

12  patient requires based off of their blood sugar

13  level.

14          Q.      How do you determine how many

15  units of insulin to give a patient?  Is it by

16  reading the blood sugar level?

17          A.      We have something called a

18  sliding scale.  Every institution has different

19  ranges.  I don't remember the one for the

20  prison.  But based on his sugar level it could

21  have been 10 units, 12 units.

22          Q.      When you say based on his sugar

23  level, are you referring to Mr. Jung?

24          A.      Yes.

25          Q.      Do you have any -- do you know

1  why there is different ranges at different

2  institutions?

3        A.      No.  I don't know.  I don't know.

4  Because even the job I am working at now there

5  is different ranges.  They do not allow you to

6  give the insulin unless the blood sugar is

7  starting from 150.  So I don't know why each

8  institution has different sliding scales.

9        Q.      Understood.

10             In the higher ranges, so if it's

11  400, can there also be different ranges

12  depending upon the medical provider's

13  guidelines?

14             MS. BAKER:  Objection to the

15       form.  You may answer if you understand the

16       question.

17             THE WITNESS:  I don't understand.

18       Can you repeat it?

19  BY MR. GROTE:

20        Q.      What I'm wondering about is --

21  you just testified that where you are working

22  now, unless it's 150, the glucose is 150,

23  insulin will not be administered unless it's

24  above that.

25             I am wondering if there is also

1  variation in prescribed insulin units as you get

2  higher up the scale.  So if it's at 300, 350,

3  500, could there still be variation depending on

4  where you work now versus what PDP's scale was

5  or does it ever become the case that everywhere

6  you worked when it reaches a certain threshold

7  the number of units to be given are consistent?

8              MR. WITTEKIND:  Objection to the

9      form.

10 BY MR. GROTE

11         Q.     Did that help?

12             MS. BAKER:  You can answer the

13     question.  That was just an objection to

14     form.  You can answer the question if you

15     understand the question.

16             THE WITNESS:  Every institution

17     is different.  They provide different

18     guidelines on the sliding scale.

19 BY MR. GROTE

20         Q.     So if somebody's blood glucose is

21 over 400, would the amount of insulin that you

22 would provide as a nurse be dependent on what

23 the institution's sliding scale guidelines were?

24         A.     Yes.

25         Q.     And if somebody's glucose level

1　is over -- in general if it's over 400, what are

2　you supposed to do as a nurse?

3　　　　　　　　MS. BAKER:  Objection to the

4　　　　form.  Are you asking her generally or are

5　　　　you asking at that particular facility?

6　　　　　　　　MR. WITTEKIND:  I join.

7　BY MR. GROTE

8　　　　　Q.　　I'm asking generally.  But if

9　there is variations depending on the facility,

10　please indicate that.

11　　　　　A.　　The right thing to do is call the

12　doctor for an order.

13　　　　　Q.　　Why is that?

14　　　　　A.　　That's not within my scope to put

15　an order in.

16　　　　　Q.　　If the glucose level were, say,

17　at 200, would you still have to call the doctor

18　for an order then?

19　　　　　A.　　Yes.

20　　　　　Q.　　Is there any range in which you

21　would not have to call the doctor in order to

22　administer insulin?

23　　　　　A.　　Yes.  If it was in the normal

24　range.  70 to 110 you would not need to call the

25　doctor.

1      Q.      Prior to working at CFCF, had you

2  ever worked in a correctional facility?

3      A.      No.

4      Q.      What was different about working

5  in a correctional facility than your prior jobs?

6              MR. WITTEKIND:  Objection to the

7      form.

8              THE WITNESS:  Prison is a little

9      bit more strict, I would say.  It's

10     stricter guidelines in the prison.

11 BY MR. GROTE

12     Q.      And are those guidelines in

13 regard to patient care?  In regard to security

14 issues?  What do you mean by that?

15     A.      Security issues.

16     Q.      Thank you.

17             Were there any differences in

18 terms of any -- strike that.

19             In terms of providing patient

20 care, were there any differences beyond the

21 strict security protocols?

22     A.      Yes.

23     Q.      What were some of those?

24     A.      If you administer insulin there

25 was not -- sometimes you would not have

1   access -- most of the time you do not have

2   access to do a reassessment on the patient.

3            Q.      Can you explain what you mean by

4   you wouldn't have access to do a reassessment?

5            A.      I am in intake.  The intake

6   process may take 30 minutes.  Within that

7   process I am administering the insulin.  I am

8   advising the person to drink water within 30

9   minutes.  The person is at another location of

10  the prison.

11           Q.      So as the intake nurse, would you

12  not then have any interaction with the patient

13  after the intake procedure?

14           A.      Can you rephrase the question?

15           Q.      Yes.

16                   When you were intake nurse after

17  you went through an intake screening -- which I

18  think is what you're talking about; is that

19  right?

20           A.      Yes.

21           Q.      And the patient goes somewhere

22  else in the prison.  Did you have any follow-up

23  with patients after that intake screening?

24           A.      No.  But the patients were

25  informed that if they are symptomatic, they can

1  come down to medical triage.  And as I stated

2  before, I was also working in medical triage.

3  And then I would see them there as well.

4         Q.    If a patient was to be seen after

5  intake screening, whose responsibility was that?

6              MS. BAKER:  Objection to the

7      form.  Can you clarify what you're asking?

8  BY MR. GROTE

9         Q.    So you see somebody at intake

10 screening.  And there needs to be a follow-up.

11 Right?  And that follow-up I understand can be

12 different time periods which there is a

13 follow-up.

14             There can be a more immediate

15 follow-up.  It can be the same day.  There might

16 be a provider ordering it within a week, within

17 a month.  I am wondering how continuity of care

18 worked from intake to what comes after intake?

19             MS. BAKER:  Answer if you

20     understand the question.  If you need

21     further clarification, please ask for it.

22             THE WITNESS:  Okay.  The

23     continuity of care would be the LPNs that

24     were there as well as the doctors and the

25     other nurses.

Case 2:24-cv-05618-TJS    Document 110-4    Filed 12/12/25    Page 40 of 152

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1  BY MR. GROTE

2        Q.      Would they be scheduled to see --

3  and how would they be scheduled to see patients

4  after intake?

5        A.      Within the intake form you are

6  able to free write and state what is going on

7  with the patient.  And then there will be

8  follow-ups.

9        Q.      And were you the one that

10 determined when there should be a follow-up or

11 was that another person's responsibility?

12       A.      I inform the doctor, the provider

13 at the time.  And based on that, there would

14 have been follow-ups.

15       Q.      So is it accurate -- is what you

16 are saying is that it was the provider's

17 responsibility for determining when there should

18 be a follow-up?

19              MR. WITTEKIND:  Objection to the

20       form.

21              MS. BAKER:  I will -- the reason

22       I'm objecting -- let me give you the

23       grounds for my objection.  I am sure you

24       and I can agree that this nurse should not

25       be testifying as to what the standard of

1    care or requirements were for a provider

2    other than a nurse.  That is the basis of

3    my objection.

4                I think I know what you're

5    asking.  I am not going to prevent her from

6    answering the question.  But I would ask

7    you to rephrase so it doesn't call for what

8    would amount to an expert opinion against a

9    higher level provider, please.

10                MR. WITTEKIND:  I will join that

11    objection.

12                MR. GROTE:  Okay.  Ray, what did

13    you say?

14                MR. WITTEKIND:  I said I would

15    join her objection.

16                MS. BAKER:  It was such a good

17    objection.  That's why.

18                MR. WITTEKIND:  Yes.  It was

19    wonderful.

20    BY MR. GROTE

21        Q.    So based on your experience as

22    the intake nurse, who was it within CFCF that

23    would decide when a patient would receive

24    follow-up care after intake?

25                MR. WITTEKIND:  Object to the

Case 2:24-cv-05618-TJS   Document 110-4   Filed 12/12/25   Page 42 of 152

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1          form.
2                    THE WITNESS:  I believe it's
3          within everyone's ability to follow up --
4          the nurses, the doctors.
5    BY MR. GROTE
6          Q.      And would that include yourself
7    as an intake nurse?
8          A.      Yes.
9          Q.      And I used the term "medical
10   providers" for the record.  When I use that
11   term, what does medical provider mean to you in
12   the context of CFCF?
13         A.      The doctor, nurse practitioner,
14   someone who is above me who can give orders,
15   medication orders.
16         Q.      At CFCF you said you worked 3:00
17   to 11:00.  Were you ever required to work
18   overtime shifts?
19         A.      I was not required to work
20   overtime shifts.  I worked overtime.  But it was
21   not a requirement.
22         Q.      Did that happen often?  Not
23   often?  Every once in a while?  Any way you can
24   characterize it?
25         A.      Yes.  I picked up at least two

1  shifts additional to my five shifts a week.

2         Q.     And would those shifts also be

3  eight-hour shifts?

4         A.     Yes.

5         Q.     So was it typical for you to work

6  seven 8-hour shifts a week?

7         A.     The two shifts that I picked up

8  was on days that I was already scheduled to

9  work.  So two days out of the week I would work

10  16 hours.

11         Q.     Thank you.

12              Do you recall whether or not you

13  were working an overtime shift on

14  October 28, 2023?

15         A.     I don't remember.  But I worked

16  the morning shift.

17         Q.     And which shift is that?  Is that

18  8:00 to -- no math.  7:00 to 3:00?

19         A.     Yes.

20         Q.     Do you know if you worked the

21  3:00 to 11:00 shift that day?  Or is that what

22  you can't recall?

23         A.     I don't recall.

24         Q.     When you saw Mr. Jung, it was

25  during the morning shift?

1        A.      Yes.

2        Q.      And do you begin working at

3  CFCF -- was that in August of 2023?

4        A.      Yes.

5        Q.      When you began working there,

6  were you provided training?

7        A.      Yes.

8        Q.      What did that consist of?

9        A.      You were put in a classroom.

10  They show you how the system runs, how to enter

11  things, how to go through questionnaires.  And

12  then the next day you are put with a preceptor

13  which would basically show you around and how

14  things are done and how the prison is run.

15        Q.      I think I get it.  But what is a

16  preceptor?  I never heard that term.

17        A.      Someone who has been at the job

18  longer than you who is able to show you how

19  things are run.

20        Q.      And do you remember the name of

21  your preceptor?

22        A.      I don't recall.

23        Q.      Do you remember what their

24  position was?

25        A.      Registered nurse.

Case 2:24-cv-05618-TJS    Document 110-4    Filed 12/12/25    Page 45 of 152

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    Q.      The training session you just

2  referenced, was that just the first day?

3              MS. BAKER:  Objection to form.  I

4        think that mischaracterizes what she said.

5        You can go ahead and answer.

6              THE WITNESS:  Yes.  As I said, it

7        was one day in class where they educate you

8        about certain things like how to enter

9        things.  And the next day you come in and

10       you follow a preceptor around.

11  BY MR. GROTE

12    Q.      How long would you work with a

13  preceptor?  Just that second day?

14    A.      Yes.

15    Q.      After those first two days, were

16  you provided any additional training?

17    A.      Yes.  You were -- I was provided

18  approximately, I don't recall, three days of

19  training and intake.

20    Q.      What did that consist of?

21    A.      Which forms to fill out, what

22  questions to specifically ask.  If they were

23  going through withdrawal, administer these

24  medications, those type of things.

25    Q.      Were you provided any policies to

1  familiarize yourself with?

2          A.      Yes.

3          Q.      Do you recall which ones?

4          A.      I don't.

5          Q.      Were you also provided something

6  called clinical pathways for treating certain

7  conditions?

8          A.      I don't recall.

9          Q.      Were you provided any -- after

10 those three days of training and intake, were

11 you provided any additional training?

12         A.      No.

13         Q.      And in all of the training that

14 you just testified about, did you receive any

15 training on providing care for diabetic

16 patients?

17         A.      Not within the training.

18         Q.      You said not within the training.

19 Were you provided it in any other manner?

20         A.      Yes.  I was provided training at

21 Isabella and my education, schooling.

22         Q.      But you were not provided

23 anything specific at CFCF; is that correct?

24         A.      Yes.

25         Q.      Do you remember if you were

1  provided any training on how to fill out a

2  nursing encounter tool or a NET for diabetic

3  patients?

4          A.      I don't recall.

5          Q.      Do you recall if you were

6  provided with a copy of YesCare's clinical

7  pathway for diabetes care?

8                  MR. WITTEKIND:  Objection to the

9      form.

10                 MS. BAKER:  You may answer.

11                 THE WITNESS:  I was provided with

12     paperwork from YesCare.  I don't recall

13     what it entails completely.

14  BY MR. GROTE

15          Q.      Bear with me one moment.  Do you

16  remember answering interrogatories as part of

17  this litigation?  Do you remember questions you

18  got as part of the discovery response that you

19  provided answers for?

20          A.      Yes.

21                 MR. GROTE:  And one moment.  Bear

22     with me.

23                 (Discussion held off the record.)

24  BY MR. GROTE

25          Q.      So I will just share my screen,

1   Ms. Apollon.  Can you see this document?

2        A.      Yes.

3        Q.      And where it says, Interrogatory

4   No. 4, it says, "Identify and describe the

5   process for referring a patient for placement in

6   the infirmary or to a hospital during intake

7   screening during Ms. Apollon's employment at PDP

8   as Ms. Apollon understood it."

9            If you can take a moment to

10  review your answer and let me know when you have

11  done so.

12       A.      Okay.  Can you enlarge it?  It's

13  small.

14       Q.      Yes.  How is that?

15       A.      Okay.  I want to confirm.  So you

16  did not receive any training or any protocol --

17  you were not trained on any protocol for

18  referring a patient to the infirmary or the

19  hospital; is that correct?

20           MR. WITTEKIND:  Object to the

21      form.

22           THE WITNESS:  That's correct.

23  BY MR. GROTE:

24       Q.      The training that you spoke of

25  for your employment at CFCF, was that provided

1    by YesCare employees, if you know?

2              A.      Yes.

3              Q.      Do you remember the names of any

4    of the people involved in the training?

5              A.      No.

6              Q.      And then I will go down to

7    Interrogatory No. 5.  "Identify and describe the

8    practice at PDP for providing a document in the

9    administration of insulin and glucose checks,

10   include specific details as to the type of

11   information to be documented, including

12   information on medication refusal and how such

13   document should be retained."

14              If you can take a moment to

15   review that answer.  And let me know when you

16   need me to scroll the page to see the rest of

17   it.

18              A.      Okay.

19              Q.      Where it says that you would

20   follow a prompt on a computer screen with

21   pop-ups for where to enter the blood glucose

22   numbers, was that specific to the intake

23   screening?  Or was that something that had to be

24   utilized any time that glucose was being checked

25   within PDP, if you know?

1          A.      This is not referring to the

2     intake.  I was pulled a couple times to pass

3     medications.  And this is where this is coming

4     from.

5          Q.      So whenever you were checking

6     glucose, there was a computer prompt and you had

7     to enter the number?

8          A.      Yes.

9          Q.      Do you know where that

10    information would be stored within the computer

11    system?

12         A.      It would be stored underneath the

13    individual person's information.  So previous or

14    past people, people ahead of me, can look at it

15    and refer back to it.

16         Q.      Was that part of the electronic

17    medical record?

18         A.      Yes.

19         Q.      Each patient would have those

20    numbers as part of their record?

21         A.      Not necessarily.  It will pop up

22    if the person is diabetic.  Not everyone was

23    diabetic.

24         Q.      Thank you for that clarification.

25              Do you know what the document

1  looked like in the electronic medical record

2  where this information would be stored?

3          A.      I don't recall.

4          Q.      Was there ever an instance that

5  you recall in which you, as a nurse, would not

6  document the glucose numbers?

7          A.      No.  I don't recall.

8          Q.      What was the process for

9  documenting insulin dosages provided?

10              MS. BAKER:  In which context?  In

11      intake?

12  BY MR. GROTE

13          Q.      We will start with non-intake.

14  If you were administering insulin, how would the

15  units of insulin, the dosage, be documented?

16          A.      You would first have to check the

17  blood glucose level.  And then check to see if

18  the person actually needs insulin.  And if they

19  do, we go to the sliding scale.  After that you

20  can enter the number.  The amount of units will

21  pop up in the system.  And you administer

22  insulin.

23          Q.      How would you document glucose

24  checks during the intake process?

25          A.      I was not assigned to document

1  glucose checks in intake.  There was a medical

2  assistant that you would have to see before you

3  got to the nurse.

4        Q.     The medical assistant would --

5  would the medical assistant check glucose if the

6  patient was diabetic?

7        A.     Yes.

8        Q.     And would that medical assistant

9  be identified in the medical records for the

10  intake process?

11        A.     Yes.

12        Q.     Do you know where they might be

13  identified?  Would it be in a progress note or

14  some other document?

15        A.     Everyone at the prison has log-in

16  information.  Whatever you enter it's under your

17  name.  So it's ways to track it back.

18        Q.     So anything that is documented

19  will have some names associated with it in the

20  system?

21        A.     Yes.

22        Q.     Were there ever instances where

23  you did check somebody's glucose at intake?

24              MS. BAKER:  She personally you

25      mean?

1           MR. GROTE:  Yes.

2           MS. BAKER:  Go ahead and answer.

3           THE WITNESS:  Like I said, a

4     medical assistant was provided.  So

5     specifically in intake, I did not have to

6     do it.

7  BY MR. GROTE

8       Q.      Were there instances where you

9  would ever administer insulin at intake?

10      A.      Yes.

11      Q.      Would that ever be done by a

12  medical assistant?

13      A.      No.

14      Q.      When you did administer insulin,

15  how would you document that in intake?

16      A.      There is an assessment part where

17  you can free type.  So you can type out

18  everything there in the assessment.

19      Q.      And is the assessment part of the

20  SOAP notes, objective, objective assessment

21  plan?  A progress note document?

22      A.      I would say assessment is based

23  off of my objectives, what I see, what I'm

24  experiencing with the patient.

25      Q.      I was trying to get to the form

1    to make sure we are talking about the same

2    thing, the progress note that has -- assessment

3    is basically the third category.  Does that

4    sound accurate, if you recall?

5          A.    I don't recall.

6          Q.    Returning to your answer to

7    Interrogatory No. 5.  It says, "Answering

8    Defendants spoke to a supervisor named Smith

9    about wanting more training on insulin refusal

10   and proper ways to pass medication and proper

11   documenting in the PDP.  But Smith and the

12   people in the director or nursing office told

13   Answering Defendant that there was no additional

14   training and that as a registered nurse it was

15   expected of her to know how it works at the

16   PDP."

17          I am wondering do you recall when

18   you spoke to supervisor Smith about wanting more

19   training?

20          A.    I don't recall.  But I remember

21   speaking to her.  I don't remember which day,

22   which month.  But I recall speaking to her

23   because they did come to me and state that when

24   a prisoner refuses insulin, we have to notify

25   the endocrinologist so they can follow up with

1    them.

2         Q.    And do you have any recollection

3    of whether that was closer to the beginning of

4    your six-month contract?  The end?  The middle?

5         A.    I believe it was towards the

6    middle.

7         Q.    So the record is clear:  You

8    began August 1st.  And your contract ended at

9    the end of January 2024.  Does that sound

10   accurate?

11        A.    Approximately January, the middle

12   of January.

13        Q.    Would the middle then be August,

14   maybe like October and November potentially?

15        A.    Yes.

16        Q.    And what additional training did

17   you want?

18        A.    I spoke to them about -- I was

19   not trained on alerting the specialists if a

20   prisoner refuses the insulin.

21        Q.    Were you ever trained on

22   something called the Red Flag policy?

23        A.    I don't recall.

24        Q.    Were you ever trained on how to

25   utilize refusal of treatment forms at CFCF?

1      A.      No.

2      Q.      Do you remember what Smith's role

3  was?  You said supervisor.  But do you know what

4  her position was?

5      A.      I'm not sure.  But she could have

6  been the administrator.

7      Q.      Would that be the health care

8  administrator?

9      A.      Yes.

10     Q.      When she told you that there was

11 no additional training required, how did you --

12 excuse me.

13            Your answer said that there was

14 no additional training and that as a registered

15 nurse you were expected to know how it works at

16 the PDP.  How did you respond to that?

17     A.      I continued to explain that I

18 would like more explanation on how things are

19 done.

20     Q.      How did she respond to that?

21     A.      Same answer.  Nothing was

22 resolved.

23     Q.      Is it accurate that what you were

24 seeking training on had to do with specific

25 policies and protocols for care within PDP?

Case 2:24-cv-05618-TJS    Document 110-4    Filed 12/12/25    Page 57 of 152

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

 1                    MR. WITTEKIND:  Objection to the

 2          form.

 3                    MS. BAKER:  Sorry.  Can I have

 4          that question read back again?

 5                    (The reporter read back the

 6          record as requested.)

 7                    MS. BAKER:  Objection to the

 8          form.  You may answer.

 9                    THE WITNESS:  I'm not clear on

10          the question.

11                    MR. GROTE:  I can rephrase.

12     BY MR. GROTE

13          Q.    Is it true that you were not

14     seeking training on things that you had already

15     been trained on as a registered nurse?

16                    MR. WITTEKIND:  Objection to the

17          form.

18                    MS. BAKER:  I join in that

19          objection.  Go ahead and answer.

20                    THE WITNESS:  I was not seeking

21          training based on things I already know.  I

22          was seeking training based off of the

23          prison guidelines.

24     BY MR. GROTE

25          Q.    You were seeking training based

1  on what your employer's requirements and

2  policies were, right?

3                    MS. BAKER:  Objection to the

4      form.

5                    MR. WITTEKIND:  Object to the

6      form.

7                    THE WITNESS:  Yes.

8                    MS. BAKER:  Just note for my

9      objection the use of the term "employer."

10                    Would now be an okay time for a

11      five-minute restroom break?

12                    MR. GROTE:  Yes.

13                    (Discussion held off the record.)

14  BY MR. GROTE

15          Q.      When you worked intake at CFCF,

16  can you walk me through what a typical day was

17  like?

18          A.      You received a patient/prisoner.

19  And then you asked them a whole bunch of

20  questions.

21          Q.      And then you just repeat that for

22  eight hours?  Is that the job?

23          A.      Yes.  There is about -- I can't

24  recall -- but maybe four forms, five forms that

25  you have to run through all the questions and

1  ask them based on their medical conditions, if

2  alcohol, been drinking, any surgeries, those

3  things.

4         Q.    How long did it take to process

5  an average person?  Or did it vary so much there

6  was not an average?

7              MS. BAKER:  At intake?

8              MR. GROTE:  Yes.

9              THE WITNESS:  It varies.  Every

10       individual is different.  Some may have

11       taken one hour and 30 minutes, some 30

12       minutes.

13  BY MR. GROTE

14         Q.    If you determined that there was

15  a higher level of care needed, that you needed

16  to call a medical provider, what was the process

17  there?

18              MS. BAKER:  Objection to the

19       form.  You can answer.

20              THE WITNESS:  If there is a

21       provider on site you can go to them

22       directly and tell me what the issue is.  If

23       there is no one on site, you have to pick

24       up the phone and call them and get an

25       order.

```
 1   BY MR. GROTE
 2          Q.      And were providers usually on
 3   site?
 4          A.      I don't recall if there were
 5   providers that were on site.
 6          Q.      Were the providers more often
 7   available remotely?
 8                  MR. WITTEKIND:  Object to the
 9       form.
10                  THE WITNESS:  Yes.  A few of them
11       was remotely.
12   BY MR. GROTE
13          Q.      I think this might have been
14   unclear in the record.  So I want to go back.
15   You said you do not recall providers that were
16   on site.  I wasn't sure if you were talking
17   about their specific identities.
18                  But I was really kind of asking
19   was it usually the case that there was a
20   provider on site?
21          A.      No.  It's not usually the case
22   that the provider is on site.  There are some
23   that you have to call.
24          Q.      Did that present any challenges
25   to you as an intake nurse?
```

```
1              A.      Yes.
2                      MS. BAKER:  Object to the form.
3                      THE WITNESS:  Yes.
4    BY MR. GROTE
5              Q.      What were those challenges?
6              A.      Sometimes you would have to call
7    two or three times.  There is no person
8    answering the phone.
9              Q.      Do you remember in the case of
10   Mr. Jung if you had to call more than once?
11             A.      I don't recall.
12             Q.      While you worked at PDP, did you
13   ever receive any disciplinary action against you
14   for anything?
15             A.      Yes.
16             Q.      What was that?
17             A.      I got a write-up because I put
18   the patient refused the insulin.  And I didn't
19   put the follow-up that he needs to consult a
20   specialist.
21             Q.      Do you remember who the patient
22   was?
23             A.      No.  I don't recall.
24             Q.      The follow-up was that he was
25   supposed to see a specialist?  Was this -- is
```

1    that correct?

2             A.      Yes.

3             Q.      And was that the order from the

4    medical provider?

5                     MR. WITTEKIND:  Object to the

6         form.  You can answer.

7                     MS. BAKER:  I don't understand

8         the question.  Can you rephrase the

9         question, please?

10   BY MR. GROTE

11            Q.      What I am trying to get at is

12   that -- I think you -- was it your testimony

13   that you were given a write-up because you did

14   not document that a diabetic patient was

15   supposed to see a specialist?

16            A.      Yes.  They said that when someone

17   refuses insulin, you are supposed to alert the

18   specialist so they can follow up with the

19   patient.

20            Q.      And was this the situation that

21   led to the conversation with Smith that we

22   discussed earlier in which that issue was

23   brought to you and you asked for more training?

24            A.      Yes.

25            Q.      And in this instance, if you

1    recall, who had made the decision that the

2    patient was supposed to see a specialist?

3            A.      Under my assumption, I just

4    assumed that that is just the prison's

5    guidelines/protocols.

6            Q.      So, I mean, was the write-up

7    based on the assessment that the prison

8    thought -- or that your supervisors thought that

9    you should have referred them to a specialist?

10                  MR. WITTEKIND:  Object to the

11        form.

12                  MS. BAKER:  Objection to what

13        somebody else thought.

14   BY MR. GROTE

15           Q.      What I am trying to get at -- and

16   maybe this will help clarify things.

17                  Was there an order from a medical

18   provider that a patient should have seen a

19   specialist, this diabetic patient, and that you

20   didn't document that?  Or was it that you had

21   seen a patient and didn't refer them to a

22   specialist yourself and that was the issue you

23   got the write-up for?

24                  MS. BAKER:  Objection to the

25        form.

Case 2:24-cv-05618-TJS    Document 110-4    Filed 12/12/25    Page 64 of 152

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

 1              MR. WITTEKIND:  Objection.

 2              THE WITNESS:  The write-up was

 3        because I entered in the system the patient

 4        refused his insulin.  The write-up was

 5        because they told me that I was informed

 6        that I am supposed to put an alert for a

 7        specialist to see the patient.  And I

 8        didn't know that.  I was not trained on

 9        that.

10   BY MR. GROTE

11        Q.     I understand now.  Thank you.

12              When you say specialist, do you

13   know what type of medical professional was meant

14   by that, if you know?

15        A.     Endocrinologist.

16        Q.     And did this incident happen

17   prior to October 28, 2023, if you recall?

18        A.     That I don't recall.

19        Q.     And what was the consequence of

20   the write-up?

21        A.     They just had me sign a paper

22   that you were told this, this and this.  And

23   that was the only one.  I think you have up to

24   three chances.  But that was the only one.  They

25   had me sign a paper stating you understood what

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    happened.

2         Q.    So would it be accurate to

3    characterize it as a written reprimand without

4    any additional penalty?

5              MS. BAKER:  Objection to the

6         form.  I think she's characterized it

7         already as a write-up.  You may answer.

8              THE WITNESS:  Yes, sir.

9    BY MR. GROTE

10        Q.    Are you familiar with the term

11   "nursing encounter tool"?

12             MR. WITTEKIND:  Object to the

13        form.

14             MS. BAKER:  If you have a

15        question, ask him.

16             THE WITNESS:  Are you asking in

17        reference to the prison?

18   BY MR. GROTE

19        Q.    Yes.  Well, generally, nursing

20   encounter tools, are these common in your

21   profession?

22        A.    Yes.

23        Q.    What are they?

24        A.    Strategies that you can use to

25   help you along the way.  It can be a book.  It

1    can be a pamphlet.  It can be education.

2             Q.      Did you utilize nursing encounter

3    tools while you worked at CFCF?

4             A.      Yes.

5             Q.      Did you ever utilize -- if I say

6    NET, I mean nursing encounter tools -- for

7    hypoglycemia/hyperglycemia?

8             A.      I don't recall.

9             Q.      I will share my screen to see if

10   this document refreshes your recollection.

11            A.      Okay.

12            Q.      Can you see this document?

13            A.      Yes.

14            Q.      Is this familiar to you at all?

15            A.      No.  I can't say if I ever

16   received this document.  It doesn't look

17   familiar.

18            Q.      There is six pages.  Let me know

19   if you want me to pause if I am moving too fast

20   at any point.

21            A.      Okay.  I don't recall seeing this

22   document.

23                    MS. BAKER:  Can you just please

24        identify it, Mr. Grote, for the record the

25        Bates numbers of the pages you just showed

1          her?

2                    MR. GROTE:  Yes.  Thank you very

3          much for that reminder.  The Bates stamp is

4          YesCare3438 through YesCare3443.

5    BY MR. GROTE

6          Q.      And at CFCF if a patient has a

7    blood glucose level over 500 at intake, what

8    were you supposed to do?

9          A.      Call the doctor.

10         Q.      Anything else?

11         A.      Administer insulin.

12         Q.      And then what would happen after

13   you called the doctor?

14         A.      She would give me an order,

15   specifically what insulins to give.

16         Q.      Would you document the order that

17   you were given?

18         A.      Yes.

19         Q.      And where would you document it?

20         A.      I document it in my assessment

21   part of intake.

22         Q.      Did you document everything that

23   you were told as part of that order?

24         A.      Yes.

25         Q.      Is there ever any situation that

1  you can remember where you did not document any

2  part of a medical order that you were given at

3  CFCF?

4        A.     No.

5        Q.     Do you know at CFCF was there a

6  difference between something called an emergent

7  intervention and an urgent intervention?

8        A.     I don't recall that at CFCF.  But

9  being a nurse you are taught those terms.

10       Q.     So as a nurse, what do those

11 terms mean?  Start with "emergent intervention."

12       A.     Emergent intervention is if

13 someone stopped breathing, bleeding out

14 uncontrollably, stab wound.

15       Q.     Is the emergent indicated that

16 there is an emergency?

17       A.     Yes.

18       Q.     And what is an "urgent

19 intervention"?

20       A.     Something that can be resolved

21 within the facility like a cut, abrasion, blood

22 sugar, hypertension.

23       Q.     Where would diabetic ketoacidosis

24 fall within the emergent versus urgent

25 intervention spectrum?

1          MS. BAKER:  At the prison?

2          MR. GROTE:  At the prison.

3          THE WITNESS:  Based on the

4     patient's vital signs, how he is looking,

5     if he has any confusion going on, if his

6     blood pressure is getting low, heart rate

7     is dropping.

8  BY MR. GROTE

9          Q.     And where would those vital signs

10 be -- how you would document that at intake?

11         A.     As I stated before, we were

12 provided with a medical assistant who took the

13 vital signs, blood sugar, HIV test, urine

14 samples.

15         Q.     Would you -- for diabetic

16 patients, did you ever question them as to

17 whether they were experiencing symptoms

18 associated with hypoglycemia or hyperglycemia?

19         A.     Yes.

20         Q.     Did you have a standard set of

21 questions you would ask in those circumstances?

22         A.     Yes.  The information that was

23 provided in the intake questionnaire.

24         Q.     So is the intake questionnaire,

25 are those all questions that you would ask?

1          A.      Yes.

2          Q.      Did you ever receive any -- are

3    you familiar with Norristown State Psychiatric

4    Hospital?

5          A.      I am not familiar.  But I did

6    hear a few things about it.

7          Q.      What did you hear about it?

8          A.      That it's a hospital for

9    psychiatric patients.

10          Q.      Did you ever receive patients at

11    PDP in intake who had returned from Norristown?

12          A.      Yes.  I believe so.  Maybe two or

13    three.

14          Q.      How would you know they were

15    coming from Norristown?

16          A.      I don't recall.  But I believe

17    there was a paper that clicked off a box that

18    said they were coming from there.

19          Q.      Is that something that -- who

20    would click that box or transmit that

21    information, if you know?

22          A.      Maybe the correctional officer

23    who would encounter with them or someone -- I am

24    not sure.

25          Q.      I don't want you to guess.

```
 1            A.     I'm not sure.  I don't recall.
 2            Q.     And going back to emergent
 3     interventions, who would decide -- did you ever
 4     decide if there was an emergent intervention
 5     that was necessary for a patient when you worked
 6     at intake in CFCF?
 7            A.     Yes.
 8            Q.     So in those situations, what
 9     would you do?
10            A.     We still have to call the doctor.
11     And from that the doctor will tell us to call
12     911.
13            Q.     And when you were intake nurse at
14     CFCF, did you ever decide when there were urgent
15     interventions needed?
16            A.     Yes.  At intake.
17            Q.     And then what would be the
18     process there?
19            A.     Still call the doctor.
20            Q.     And, generally speaking, what is
21     the infirmary at CFCF -- not at CFCF.
22                   Was there an infirmary within the
23     Philadelphia Department of Prisons?
24            A.     Yes.
25            Q.     And you testified earlier you do
```

1   not know where that was located?

2        A.    Correct.

3        Q.    Did you have the authority to

4   refer someone to the infirmary?

5        A.    No.

6        Q.    And who did?

7        A.    The doctor.

8        Q.    Did you ever learn about whether

9   the infirmary was ever overcrowded during any of

10  time you worked at CFCF?

11       A.    I heard that it was overcrowded

12  amongst the other nursing coworkers.  There was

13  talk.

14       Q.    Do you remember when in your six

15  months that you might have heard that talk?

16       A.    I don't recall.

17       Q.    Was it something that you heard

18  frequently?

19            MR. WITTEKIND:  Objection to the

20      form.

21            THE WITNESS:  Yes.

22  BY MR. GROTE

23       Q.    Do you remember any of the other

24  staff who you had heard this from?  Any names?

25       A.    No.

1    Q.      Did you ever play any role in

2    assessing who should go to the infirmary and who

3    should not?

4         A.      No.

5         Q.      Are you familiar with something

6    called 23-hour observation status at CFCF?

7         A.      No, I'm not.

8         Q.      Do you know what a sheltered

9    housing admission is at CFCF?

10        A.      No.

11        Q.      When you were an intake nurse,

12   were there instances in which diabetic patients

13   were positive for ketones?

14        A.      Yes.

15        Q.      What would you do when that was

16   the case?

17        A.      Call the doctor.  And most times

18   they would instruct us to provide water to flush

19   them out.

20        Q.      Do you ever recall an instance

21   where they sent somebody to the emergency room

22   when they had ketones?

23        A.      That I don't recall.

24        Q.      I was going to say at intake.  To

25   be clear, that is where I was talking about.

1          Same answer?

2     A.      At intake?  No, no.

3     Q.      Do you recall any case where the

4  medical provider referred somebody to the

5  infirmary when they had ketones at intake?

6     A.      No.  Never encountered that.

7     Q.      Were you provided any guidance

8  aside from call the provider, in regard to a

9  diabetic patient with ketones as to what you

10 were supposed to do?

11    A.      As a nurse you are supposed to

12 provide them with the insulin, the water, and

13 reassess, follow up.

14    Q.      And when are you supposed to

15 follow up?

16    A.      Approximately 30 minutes to one

17 hour.

18    Q.      Would that follow up be

19 documented?

20    A.      Yes.  You have to document it.

21            MS. BAKER:  Just to be clear:

22       Are you talking about at the prison or are

23       you talking generally?  Because the

24       question didn't define it.

25

1  BY MR. GROTE
2      Q.      Yeah.  I meant specifically at
3  intake in CFCF.
4      A.      In intake there is no way to go
5  back and document reassessments.
6      Q.      Why is that?
7      A.      That's how it is built.  It's
8  just based off of the prisoners, background
9  conditions.  After you are done you cannot go
10 into it.  You have to go into another section of
11 the system and write that.  Not in intake.
12     Q.      So are you saying that the
13 assessment would still happen, but it would be
14 documented somewhere else?
15     A.      The reassessment --
16             MS. BAKER:  Object to the form.
17             MR. WITTEKIND:  Join.
18             THE WITNESS:  The reassessment
19    would be documented somewhere else.
20 BY MR. GROTE
21     Q.      And at intake when there was a
22 reassessment based on somebody having ketones,
23 who would carry out the reassessments?
24             MR. WITTEKIND:  Object to the
25    form.

1          MS. BAKER:  I object as well.

2          MR. WITTEKIND:  I think you are

3     asking her if the reassessment happened in

4     intake.  And I believe the witness has

5     testified that it would not be in intake.

6  BY MR. GROTE

7          Q.      I can rephrase.

8          In a situation where somebody at

9  intake has ketones and they are to be reassessed

10 consistent with your testimony within 30 minutes

11 to an hour or shortly thereafter the intake

12 assessment, where does that reassessment occur?

13          MS. BAKER:  Do you mean where

14     physically?  Where is it documented?

15 BY MR. GROTE

16          Q.      Right now I mean where

17 physically.

18          A.      I am stationed at intake.  So

19 another nurse would have to take over for that,

20 reassess.

21          Q.      And how would that other nurse

22 have been notified of the need for reassessment?

23          A.      Based off of my assessment that I

24 typed in the intake process.

25          Q.      And that reassessment then, where

1  would that other nurse document that

2  reassessment?

3         A.     It could be in the medication

4  section.  It could be on a new form that you can

5  create within the system.

6         Q.     And would that documentation then

7  go in the patient's electronic medical record

8  order?

9         A.     Yes.

10         Q.     Do you recall your encounter with

11  Louis Jung, Jr. on October 28, 2023?

12         A.     When you say recall, are you

13  talking about physically seeing him or

14  physically asking him questions?

15         Q.     I'm asking whether you have any

16  independent recollection of that encounter.  I

17  understand you reviewed documents.  But I am

18  wondering if you have a memory of your encounter

19  with Mr. Jung, anything he said, anything that

20  you said, anything that you observed.

21         A.     I recall only a couple things

22  that he said.

23         Q.     What are those?

24         A.     That he is not a diabetic.  He is

25  not abusing drugs.  He is not suicidal and he is

1  not homicidal.  He has no other medical

2  conditions.

3        Q.     Did you have other information

4  that indicated that he was a diabetic?

5        A.     Nothing besides the 542 blood

6  sugar.

7        Q.     Did you review his electronic

8  medical record during the intake process?

9        A.     I don't have access to that.

10       Q.     You don't have access to

11 anybody's electronic medical record during the

12 intake process?

13       A.     No.  The intake screen is based

14 off of questions.  Anything outside of that, if

15 something was uploaded into his document, I

16 can't see that.

17       Q.     Did you ever have access to

18 patients' electronic medical records when you

19 were in intake?

20       A.     No.  Unless they physically

21 brought a physical paper to give to me.

22       Q.     Did you have any concerns about

23 that?

24             MS. BAKER:  Objection to the

25      form.  You can answer.

1       THE WITNESS:  Yes.

2    BY MR. GROTE

3       Q.    What was your concern?

4       A.    You want to properly help the

5    person.  And if you do not have documentations

6    of the medical history, it can harm the patient.

7       Q.    Did you ever raise this issue

8    with the supervisor?

9       A.    No.

10      Q.    Why not?

11      A.    I just -- I didn't.

12      Q.    Does that mean you're not sure of

13   the reason?

14          MR. WITTEKIND:  Object to the

15       form.

16          MS. BAKER:  Object to the form.

17       She had given her answer.

18   BY MR. GROTE

19      Q.    Is it also the case that you

20   would not have medical records from, say,

21   another facility at intake?

22      A.    No.

23      Q.    That is, no, you would not have

24   access to those?

25      A.    Unless the prisoner gave me a

1  physical paper I would not have access to

2  electronic information.

3          Q.      Is 542 a high glucose level in

4  your opinion?

5          A.      Yes.

6          Q.      And what are the possible medical

7  risks for -- 542, is that considered

8  hyperglycemia?

9          A.      That's considered hyperglycemia.

10         Q.      That's what I said.  Maybe it was

11 not clear.

12                 What are the medical risks

13 associated with hyperglycemia?

14         A.      As I stated, the symptoms,

15 someone can become confused, dehydrated, blurred

16 vision.

17         Q.      Questions about whether somebody

18 is confused, has high blood pressure, blurred

19 vision, any of the symptoms you said, are those

20 included in the intake questionnaire at CFCF, if

21 you remember?

22                 MS. BAKER:  Can she look at the

23     documentation if she needs to answer these

24     questions?

25                 MR. GROTE:  If she doesn't

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    remember, then certainly we can do that to

2    refresh her recollection.

3                    THE WITNESS:  I don't recall.

4                    MS. BAKER:  Would you need to

5         look at the documentation?

6                    THE WITNESS:  Yes.

7    BY MR. GROTE

8         Q.    We will get to the intake form in

9    a little bit.  In regard to having 542 glucose

10   level, what do you do?

11        A.    I called the provider.

12        Q.    Do you remember who the provider

13   was?

14        A.    Yes.

15        Q.    Who was that?

16        A.    Maureen Gay.

17        Q.    And was she working off site?

18        A.    Yes.

19        Q.    And I think I asked this but I

20   forgot.  Do you recall how many times you had to

21   call her to get her on the phone?

22                    MR. WITTEKIND:  Object to the

23        form.

24                    MS. BAKER:  I think you did ask

25        already.  But go ahead and answer.

1           THE WITNESS:  I don't recall.

2    BY MR. GROTE

3           Q.      Did you consult the -- let me ask

4    you this.  I will bring up a document.  Are you

5    familiar with the Clinical Pathways for Diabetes

6    Mellitus?  That is YesCare's Clinical Pathway

7    for Diabetes Mellitus?

8                   MS. BAKER:  Asked and answered.

9                   MR. WITTEKIND:  Are you asking if

10        he has seen it or is familiar with it?

11                  MR. GROTE:  Yes.  I think I did

12        ask it before.  I think she said couldn't

13        recall specifically.  And I was going to

14        share the document to see if it refreshed

15        her recollection.  So I wanted to put it

16        all in one place in the record.

17                  THE WITNESS:  I don't recall.

18    BY MR. GROTE

19           Q.      Can you see this document,

20    Ms. Apollon?

21           A.      Yes.

22           Q.      Take a moment to look at this.

23    This is the first page of six.  I am just asking

24    if this refreshes your recollection at all?

25           A.      I don't recall seeing this paper.

1    Q.    The Bates number is YesCare3432.

2  That is the first page of the policy begins with

3  YesCare3437.

4            Was it ever your practice in

5  intake to reference a clinical pathway document

6  in order to determine what course of treatment

7  was to be provided?

8    A.    No.

9    Q.    Do you recall your conversation

10  with Maureen Gay from October 28, 2023?

11    A.    Yes.

12    Q.    What do you recall about it?

13    A.    The amount of insulin, the type

14  of insulin, and to check his urine for ketones.

15    Q.    And do you know if you checked

16  for ketones before or after the call?

17    A.    I checked for ketones after the

18  call.

19    Q.    Do you recall if ketones were

20  present?

21    A.    Yes.

22    Q.    What did you do then?

23    A.    Based off of Maureen Gays, she

24  instructed me to provide the prisoner with

25  water, encourage him to drink plenty of water.

Case 2:24-cv-05618-TJS    Document 110-4    Filed 12/12/25    Page 84 of 152

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    Q.    Did you contact her -- how many

2    times did you speak to Maureen Gay on

3    October 28, 2023?

4              MS. BAKER:  At all?  Or with

5         respect to Mr. Jung?

6    BY MR. GROTE

7         Q.    With respect to Mr. Jung.

8         A.    One time.

9         Q.    Did you ever speak to her after

10    October 28, 2023 with respect to Mr. Jung?

11        A.    No.

12        Q.    Did you document what Maureen Gay

13    instructed you to do in the medical record?

14        A.    In the assessment part of intake.

15        Q.    Did you document everything that

16    she told you to do?

17        A.    Yes.

18        Q.    Did Maureen Gay order you to

19    check on Mr. Jung in two hours?

20        A.    I don't recall.

21        Q.    If she did do that, would it have

22    been your practice to write that down?

23        A.    Yes.  My routine would have been

24    to do a reassessment.

25        Q.    If the provider ordered you to do

1  the reassessment, would you have done that

2  reassessment?

3              MS. BAKER:  Objection to the

4     form.  You may answer.

5              THE WITNESS:  Yes.

6              MR. GROTE:  Off the record.

7              (Discussion held off the record.)

8  BY MR. GROTE

9      Q.     And if you would have done that

10 assessment, would then it have been documented

11 in the way you described earlier how

12 reassessments were not documented as part of the

13 intake but somewhere else in the medical record?

14     A.     Yes.

15     Q.     Did you encounter Mr. Jung at all

16 after that intake assessment?

17     A.     No.

18     Q.     And that includes after

19 October 28, 2023.  Any subsequent day you never

20 saw Mr. Jung again?

21     A.     No.

22     Q.     Did Maureen Gay order you to fill

23 out a nursing encounter tool for hyperglycemia?

24     A.     No.

25     Q.     If she ordered you to, would you

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1   have done it?
 2                   MR. WITTEKIND:  Objection to
 3        form.
 4                   THE WITNESS:  Yes.
 5   BY MR. GROTE
 6        Q.     And if she ordered you to do
 7   that, would you have documented it?
 8        A.     Document it?  No.  Fill out, yes.
 9        Q.     In the assessment where you wrote
10   down her orders, you would have just said NET
11   order to be filled out?  You just would have
12   filled it out?  Is that your testimony?
13                   MR. WITTEKIND:  Objection to the
14        form.
15                   THE WITNESS:  Yes.  I would have
16        filled it out.  After the intake process
17        you print everything.  You gather all the
18        documents, and bring it to the back to the
19        social worker to file it.
20   BY MR. GROTE
21        Q.     Did you work with Maureen Gay
22   often?
23        A.     Yes.
24        Q.     And did you have any -- what was
25   it like working with Maureen Gay?
```

1    A.    She is a beautiful provider.  She

2  is understanding.  She is clear on what she

3  wants.  She is nice and respectful.  She cares

4  about her job.  She is a caring person.

5    Q.    Does she work off site

6  frequently?  Or was she on site oftentimes?  Did

7  it depend --

8    A.    My --

9    Q.    That was my question --

10    MS. BAKER:  Let him finish.

11    MR. GROTE:  I was just going to

12    comment if I wasn't clear I can rephrase.

13    But I think you know what I am getting at

14    hopefully.

15    MR. WITTEKIND:  Objection.

16    THE WITNESS:  Do I answer?

17    MS. BAKER:  Yes.  If you

18    remember.  We just have a lot of people

19    talking over one another.

20    THE WITNESS:  Yes.  There was

21    times she was physically at the prison.

22    And a majority of the time she was off

23    site.

24  BY MR. GROTE

25    Q.    Do you recall in any situation

1  where she was working on site but she then came

2  to the prison because of a need to see a

3  patient?

4          A.      I don't recall.

5          Q.      If Maureen Gay has stated that

6  she ordered you to see Mr. Jung within two hours

7  after intake, do you believe she was being

8  truthful?

9                  MR. WITTEKIND:  Object to the

10      form.

11                 MS. BAKER:  Objection.  And I am

12      instructing her not to answer that

13      question.  She is not the assessor of

14      credibility in this case.  It's

15      inappropriate to ask a witness to assess

16      another witness's credibility.  Do not

17      answer that question.

18                 MR. GROTE:  I will rephrase.

19  BY MR. GROTE

20          Q.      Is it true that Maureen Gay

21  ordered you to see Mr. Jung within two hours

22  after the intake assessment?

23                 MR. WITTEKIND:  Objection to

24      form.

25                 MS. BAKER:  I will object to the

```
 1              form of the question.  You may answer the

 2              question.  But you are not assessing the

 3              credibility of any other witness.

 4                        THE WITNESS:  You are asking me

 5              if Maureen Gay had ordered me to reassess

 6              the patient in two hours, would I have done

 7              it?

 8   BY MR. GROTE

 9         Q.    No.  I'm asking was that order

10   given to you?

11         A.    I don't recall.

12         Q.    Is it possible it was given to

13   you?

14                   MS. BAKER:  Objection, calls for

15         speculation.

16                   MR. WITTEKIND:  Join.

17                   MS. BAKER:  Do not speculate or

18         guess.  But if you have an answer to that

19         question you may answer.

20                   THE WITNESS:  No.

21   BY MR. GROTE

22         Q.    Thank you.  That clarified a

23   previous answer.

24                   At intake how do you provide -- I

25   guess the documentation you fill out as part of
```

1  the intake screening, is that where any

2  information will be for other medical care staff

3  to know when the patient needs to be seen next?

4  Is that how continuity of care is established?

5          A.     Yes.

6          Q.     Did you ever, while working at

7  intake, call 911 for a patient yourself?

8          A.     No.

9          Q.     And if 911 was to be called, that

10  decision would be made by the medical provider?

11  Is that the case?

12          A.     Can you repeat the question?

13          Q.     Certainly.

14                 If 911 was to be called, who

15  would make the call to 911?

16          A.     I can physically make the call.

17  But I would still need an order from a provider.

18          Q.     And if you received order from a

19  provider, would you be the one to make the call

20  typically -- or you said you had not made a

21  call.  So did you ever receive an order to call

22  911 from a provider?

23          A.     Not intake.

24          Q.     I was going to say "at intake."

25  Thank you.

1            But if you received that order,

2    would it have been -- would you have been the

3    person who made the call to 911 or would

4    somebody else make the actual call?

5            A.      Just the clarify, to go back, I

6    said not at intake.  I didn't make a 911 call.

7    Not in intake.  Somewhere else I made the call.

8            Q.      Right.  I thought I understood.

9    But thank you for making that clear.

10           A.      Okay.

11           Q.      When you made the 911 call that

12   was not at intake, was that because the provider

13   had given an order to make the 911 call?

14           A.      Yes.

15           Q.      Did you have the authority to

16   make a 911 call without an order from a provider

17   at intake?

18           A.      We would use our judgment.  The

19   provider was there at the time of an emergency.

20   And we were given the order to call 911.

21           Q.      Was there ever instances at PDP

22   when you worked there where a diabetic patient

23   was sent to the emergency room with

24   hyperglycemia that you recall?

25           A.      I don't recall.

1    Q.    Was there a diabetes chronic care

2  clinic at PDP?

3        A.    I don't recall.

4              MR. GROTE:  Let's take a quick

5      break.

6              (Discussion held off the record.)

7  BY MR. GROTE

8        Q.    I will share my screen again.  Do

9  you see this document?

10       A.    Yes.

11       Q.    So right here, is this the

12  progress note pertaining to Mr. Jung from

13  10/28/2023 that you reviewed prior to the

14  deposition.

15       A.    Yes.

16              MS. BAKER:  In all fairness, what

17      we are seeing is a portion of one of the

18      pages of the intake.

19              MR. GROTE:  Yes.  I will go

20      through a number of them.  But I will state

21      the Bates stamp for the range at the outset

22      here.

23  BY MR. GROTE

24       Q.    This is Bates number PDP18 a lot

25  of zeroes and 18 through PDP 25.  For the

1  record, this document has been produced and

2  reproduced from different parties.  So it also

3  appears in our discovery with different Bates

4  numbers at times.

5            MS. BAKER:  Since my

6       understanding is you are now about to ask a

7       series of questions pertaining to this

8       document, I have a hard copy of the

9       document that I would put in front of the

10      witness in case she is more comfortable

11      using the hard copy.

12            So I will hand that to her at

13      this time.  It's not marked up in any way.

14      It was simply printed.  And the Bates

15      numbers, which you just referenced, the

16      Bates numbers of the hard copy that I am

17      about to put in front of her are Jung City

18      Production 000405 through 409 for the

19      record.

20            MR. GROTE:  Yes.  Thank you.  I

21      think the City has produced this twice.

22  BY MR. GROTE

23       Q.    If you look at the first page

24  there, under General Examination it says, Intake

25  orders requested.  It has type 1 diabetes, blood

1  sugar is 542.  About the type 1 diabetes, do you

2  recall who determined he had type 1 diabetes?

3        A.    I believe it was based off of his

4  answers that I asked of him.  How long had he

5  had diabetes, those questions we determined that

6  he had it at birth.

7        Q.    Would those questions be

8  documented in this progress note?

9        A.    There may been a question.  But I

10  don't recall.  I don't recall.

11        Q.    This progress note right here

12  says, Provider, Maureen Gay, nurse practitioner.

13  Who filled out this progress note?  Did you

14  filled it out?  Did you do part of it?  Ms. Gay

15  did part of it?  Can you explain that to me?

16              MR. WITTEKIND:  Objection to the

17        form.

18              MS. BAKER:  It's a little bit

19        compound.  Can you break it down?

20  BY MR. GROTE

21        Q.    Under the Subjective part on this

22  page, we are looking at the front page, who fill

23  that part of the form out or the document out?

24        A.    The top portion seems like it

25  could have been Maureen Gay that filled it out.

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    Q.    You said "seems like."  Do you
2  know who filled that out?
3    A.    The only other person who had
4  access is Maureen Gay.
5    MS. BAKER:  Hang on a second.
6    Can you scroll to the end of this document
7    that you are looking at and show us the
8    signature?  Okay.
9  BY MR. GROTE
10    Q.    On page 2 it says, Electronically
11  signed by Maureen Gay.  Does that mean that she
12  completed these first two pages here with her
13  signature on the bottom?
14    A.    Yes.  I don't have that in front
15  of me.  So that is not my document.  I didn't
16  sign that.
17    MS. BAKER:  I thought what you
18    were about to get into was the intake
19    documentation that nurse Apollon had
20    created.  And we maybe had a
21    misunderstanding as to what it was you were
22    going to put up for her or ask her about.
23  BY MR. GROTE
24    Q.    I'm just not to that.  Yes.  I
25  can scroll down to where I think is the

1  telephone encounter.  The one that says,

2  Electronically signed by Maureen Gay, that

3  indicates that she was the one who generated

4  these progress notes; is that correct?

5          A.     Yes.

6                 MR. WITTEKIND:  Object to the

7     form.

8                 THE WITNESS:  Yes.

9  BY MR. GROTE

10         Q.     And do you have any independent

11 recollection of how it was determined Mr. Jung

12 has type 1 diabetes?

13                MS. BAKER:  By whom?

14 BY MR. GROTE

15         Q.     Yes.  Do you have any independent

16 recollection of whether you knew Mr. Jung had

17 type 1 diabetes?

18         A.     Based off what the intake

19 questions were saying, the answers to the intake

20 questions.

21         Q.     Now, at intake -- would the

22 medical provider -- would Maureen have had

23 access to patients' electronic medical

24 records --

25         A.     Yes.

```
 1            Q.      -- when you would call her?
 2            A.      Yes.
 3            MS. BAKER:  You have to let him
 4       finish.  Wait until the question is asked.
 5       And make sure he is done.  And then provide
 6       your response.
 7            Okay?
 8            THE WITNESS:  Yes.
 9   BY MR. GROTE
10            Q.      Would Maureen Gay have had access
11   to Mr. Jung's electronic medical record?
12            MR. WITTEKIND:  When?
13   BY MR. GROTE
14            Q.      During intake when you had called
15   her?
16            MR. WITTEKIND:  Objection to the
17       form.
18            MS. BAKER:  You can answer.
19            THE WITNESS:  Yes.
20   BY MR. GROTE
21            Q.      Now, are you familiar with this
22   page here, Ms. Apollon?
23            A.      No.
24            Q.      Have you ever seen a document
25   similar to this around about a telephone
```

1    encounter?

2          A.     No.

3          Q.     And it says, Provider, Maureen

4    Gay.  Did you create this document?

5          A.     No.

6          Q.     Now, it says there is a telephone

7    encounter at 10:02 a.m., October 28, 2023.  Does

8    that seem to be consistent with your

9    recollection of when you were working on

10   October 28, 2023?

11         A.     Yes.

12         Q.     The next page I am showing is the

13   progress note that begins with our Bates stamp

14   PDP 2021.  Are you familiar with this document?

15         A.     Yes.

16         Q.     Is this the one that you filled

17   out?

18         A.     Yes.

19         Q.     Now, at the bottom of this page

20   it says, "Do you have diabetes?"  And the answer

21   is, "No."

22               Do you recall why the answer is

23   no?

24         A.     It's subjective information.

25   It's information I received based off of what

1   the prisoner told me.

2           Q.      If a prisoner provides -- if you

3   had information that contradicts what a prisoner

4   provides you, how are you supposed to address

5   that contradiction on the intake form?

6           A.      Can you rephrase the question?

7           Q.      If you actually knew that

8   Mr. Jung had diabetes, would you still write

9   "no" because he answered "no"?

10          MS. BAKER:  In the Subjective

11      section you mean would she write "no"?

12          MR. GROTE:  Yes.

13          MS. BAKER:  Would you write "no"

14      in a Subjective even if you knew the

15      patient had diabetes?

16          THE WITNESS:  No.

17  BY MR. GROTE

18          Q.      Would you write "yes" because he

19  had diabetes?

20          A.      Can you rephrase the question?

21          Q.      Yes.  In the Subjective section

22  if a patient tells you that they do not have

23  diabetes but you had other information

24  indicating they did have diabetes, what would

25  you answer on the form?

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    A.    Other information referring to
2  what?  Like what?  What other information?  I
3  didn't have access to his records.
4    Q.    What about if the pre-intake
5  screening said that he had diabetes?
6    A.    I am not clear on the question.
7    Q.    If you knew that a patient was
8  giving you inaccurate information in response to
9  one of these questions, how would you address
10  that?
11    A.    You can simply ask again in a
12  different way.
13    Q.    So you would try to get the
14  patient to acknowledge the accurate information?
15    A.    Yes.
16    Q.    And you said you have a
17  recollection of Mr. Jung telling you he did not
18  have diabetes?
19    A.    Yes.
20    Q.    Did you have a recollection of
21  him answering any of the other questions about
22  his medical conditions?
23    MS. BAKER:  Objection, asked and
24    answered.  You may answer again.
25    THE WITNESS:  Can you ask the

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    question again?

2  BY MR. GROTE

3        Q.      Do you have any independent

4  recollection of his answers to any questions

5  about other medical conditions?

6        A.      I don't.

7        Q.      Why do you remember his answer --

8  why do you think you remember his answer to the

9  question about diabetes?

10        A.      Because I had to call the

11  provider to administer insulin.

12        Q.      On the next page, so it's still

13  under the Subjective section.  The question, Are

14  you currently taking medications prescribed for

15  any medical condition, included those for

16  HIV/AIDS, diabetes, et cetera?  And the answer

17  is, No.

18               Do you recall asking Mr. Jung

19  this question?

20        A.      Yes.

21        Q.      Do you recall him answering "no"?

22        A.      Yes.

23        Q.      What is the difference between

24  the pre-intake screening and the intake

25  screening?

```
 1            A.      Just different questions.

 2            Q.      When is the pre-intake screening

 3   in relationship to the intake screening?  Is it

 4   right before?

 5            A.      Yes.

 6            Q.      And do you review the answers to

 7   the pre-intake screening before the intake

 8   screening?

 9            A.      Yes.

10            Q.      And did you do that in every

11   case?

12            A.      Yes.

13            Q.      So I will go down to -- this is

14   all still under Subjective.  And we are on to

15   the third page.  You see how it says, Pre-intake

16   screening up here?  And there is a number of

17   questions beneath.  And one of them is, "Is the

18   patient diabetic?"  And it says, "Yes."

19                    Do you recall who took the

20   pre-intake screening of Mr. Jung?

21            A.      That's the medical system PAR.

22            Q.      So you did not take the

23   pre-intake screening, correct?

24            A.      No.  Medical assistant.

25            Q.      When it says, If yes, did you
```

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
1    complete an Accu-Chek, it was the medical
2    assistant who completed the Accu-Chek?
3            A.      I don't have that in front of me.
4    But, yes, it was her that completed the
5    Accu-Chek.
6            Q.      Did you speak with the medical
7    assistant about Mr. Jung at all?
8            A.      She spoke to me.
9            Q.      Do you remember what she told
10   you?
11           A.      His blood sugar is 542.
12           Q.      Do you remember anything else?
13           A.      No.
14           Q.      After you spoke with Mr. Jung,
15   did you talk to the medical assistant again
16   about Mr. Jung?
17           A.      No.
18           Q.      Now, at the bottom of this page
19   it says, Mariesha -- am I pronouncing your name
20   correctly?  Is it Mariesha Apollon?
21           A.      Yes.
22           Q.      So that means you filled out the
23   whole progress note here?
24           A.      Yes.
25                   MS. BAKER:  Object to the form.
```

1  BY MR. GROTE

2        Q.      Then on the Assessment part here,

3  what is AAOX3.  What does that mean?

4        A.      Alert and oriented times 3.

5        Q.      It says, "States he has type 1

6  diabetes"?

7        A.      Yes.

8        Q.      Do you have any explanation for

9  why the assessment says what it says there,

10 states he has type 1 diabetes, and the answer on

11 the form that he said, no, he does not have

12 diabetes?

13              MS. BAKER:  Objection to the

14      form.  You can answer.

15              THE WITNESS:  After some time he

16      did start to reveal some stuff in the

17      intake process.

18 BY MR. GROTE

19        Q.      And did he reveal that he had

20 type 1 diabetes?

21        A.      Yes.

22        Q.      Why didn't you change the answer

23 to the question about whether or not he had

24 diabetes then?

25        A.      I don't believe I had access to

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

 1  it.  I don't believe I could have went back.

 2  I'm not sure.  I don't recall.

 3          Q.      It says, Blood sugar is 542.

 4  States he had not got insulin in three days.

 5          Did he tell you that he was

 6  prescribed insulin?

 7          A.      It says he had not gotten

 8  insulin.  So, yes.

 9          Q.      This is page 22 on mine.  I think

10  it's page 2 of the progress note that you have.

11  The question, Is the patient a transfer back

12  into custody from Norristown Hospital?  And it

13  says, No.

14          Would that have been based on

15  what Mr. Jung told you?

16          A.      Yes.

17          Q.      Did you have any way of verifying

18  where the inmates came from in intake?

19          A.      No.

20          Q.      Did anybody who was an employee

21  of the Philadelphia Department of Prisons ever

22  speak to you about Mr. Jung after his death?

23          A.      Yes.

24          Q.      Who was that?

25          A.      Marsha.

1    Q.    Do you know Marsha's last name?

2    A.    No.

3    Q.    Do you know if she is a

4    Philadelphia Department of Prisons employee or a

5    YesCare employee?

6    A.    She was definitely a YesCare

7    employee.

8    Q.    And does the name Jeoboham

9    refresh your recollection?

10    A.    Yes.  That is the last name.

11    Q.    When did she speak to you about

12    Mr. Jung?

13    A.    The day that he had died.

14    Q.    What do you recall of your

15    conversation with Marsha?

16    A.    I got there at 3:30, 3:00 for my

17    shift.  And she said, Mr. Jung has died.  And I

18    said, What happened?  She said his blood sugar

19    was too high.  It's not your fault he was

20    noncompliant.

21    Q.    What was your response to that?

22    A.    I said, Okay.

23    Q.    Did she say anything else?

24    A.    No.

25    Q.    Did anybody else, a PDP employee

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    or a YesCare employee, anybody else who you

2    worked with in the jails, ever speak to you

3    again about Mr. Jung's death?

4         A.    I recall calling Maureen Gay to

5    tell her about another prisoner.  And she said

6    that I didn't call her back to follow up with

7    Mr. Jung.

8         Q.    Do you remember when that call

9    was?

10        A.    I don't recall.

11        Q.    Was that when you still were

12   working within PDP because you were calling

13   about another prisoner?

14        A.    Can you rephrase that?

15        Q.    Yes.  That wasn't clear.

16              But that was when you were still

17   working at PDP when you spoke to Ms. Gay again?

18        A.    Yes, yes.

19        Q.    When she said that to you, how

20   did you respond?

21        A.    I just -- I was speechless

22   because I really didn't -- I don't recall her

23   asking me to call her back for that.

24        Q.    What did you say to her?

25              MS. BAKER:  She just said she was

1    speechless.

2  BY MR. GROTE

3        Q.    Well, I assume at some point on

4  the call you recovered your powers of speech and

5  you didn't just hang up.  Maybe not.  But did

6  you ever recover your power of speech and

7  respond verbally to what she said?

8        A.    No.  I was really speechless.  I

9  was shocked that he had died.  I didn't have a

10  response.

11        Q.    Do you recall any other

12  conversations about Mr. Jung that you had after

13  his death in addition to the ones you just told

14  us about?

15        A.    No.

16        Q.    Were you ever part of a mortality

17  review?

18        A.    Can rephrase the question?

19        Q.    Were you ever a part of any

20  formal inquiry into Mr. Jung's death carried out

21  by YesCare?

22        A.    No.

23        Q.    Were you ever a part of any

24  formal inquiry into Mr. Jung's death carried out

25  by the Philadelphia Department of Prisons?

1    A.      No.

2    Q.      Are you familiar with the term

3  intermetex?

4    A.      No.

5    Q.      So you're not sure what an

6  intermetex is?  I-N-T-E-R-M-E-T-E-X?  You are

7  not sure what that is?

8    A.      No.

9    Q.      Have you come to learn any

10 information about what happened to Mr. Jung

11 between intake and the date of his death?

12           MS. BAKER:  I will allow her to

13      answer this question with the caveat that

14      if the information that she has heard is

15      through counsel she is not to disclose.  So

16      the question should really be, Have you

17      learned from any source other than your

18      attorneys about anything that happened to

19      Mr. Jung between the time you saw him in

20      intake and his death?

21           MR. GROTE:  Yes.  Thank you.

22 BY MR. GROTE

23    Q.      So the question what your counsel

24 rephrased, have you learned anything other than

25 from your attorneys about what happened between

intake and Mr. Jung's death to Mr. Jung?

A.      No.

Q.      Looking back, if you had to conduct the intake of Mr. Jung again today, would you have done anything differently?

MS. BAKER:  So I will instruct her not answer to that question as phrased. She is not expert in this case.  And asking her to judge her conduct retrospectively I don't think is appropriate.  I am certainly willing to consider if you rephrase.

BY MR. GROTE

Q.      Do you think there is other steps that you should have taken in Mr. Jung's intake that were not taken?

MR. WITTEKIND:  Object to the form.

MS. BAKER:  I will object to the form of the question.  And -- I am sorry. Is somebody else making --

MR. WITTEKIND:  I will join your objection.

THE WITNESS:  So now I lost the question.  Can you restate it, please?

1  BY MR. GROTE

2        Q.    Do you think there is anything

3  else that you should have done during Mr. Jung's

4  intake that was not done?

5            MS. BAKER:  Objection to the form

6       of the question.  You may answer that

7       limited question only.

8            THE WITNESS:  No.  I believe I

9       did what I could have done within the

10      prison, provided him with the insulin, the

11      water, call the doctor.

12           MR. GROTE:  If you can give me --

13      I am probably going to be two minutes or

14      less.

15           (Discussion held off the record.)

16           MR. GROTE:  I have no further

17      questions.

18                  -   -   -

19                EXAMINATION

20                  -   -   -

21  BY MR. WITTEKIND

22        Q.    I have a couple.  Are you okay to

23  go on a few minutes, ma'am?

24        A.    Yes.

25        Q.    My name is Ray Wittekind.  I

1  represent YesCare and a couple of the other

2  defendants in this lawsuit.  I have a couple

3  questions for you that will be brief.

4                  If I covered -- I will try to

5  avoid covering stuff that Bret asked you about.

6  But if I do, it's just because of the way things

7  go.

8          A.      Okay.

9          Q.      When we first started way back

10 this morning, you said you were recruited by a

11 company called Tekaccel?

12         A.      Yes.

13         Q.      And they were a recruiter?

14         A.      Yes.  Recruiter agency.

15         Q.      Did they tell you who they were

16 recruiting for relative to the job at PDP?

17         A.      No.

18         Q.      Have you ever heard -- before

19 they reached out to you, did you ever hear of

20 that company?

21         A.      No.

22         Q.      I will skip around a little bit.

23 I will try to be as efficient as I can.  I

24 believe you testified before that you don't have

25 a recollection one way or the other if Maureen

1  Gay had asked you to do a two-hour reassessment

2  on Mr. Jung?

3          A.      Yes.  I don't recall that.

4          Q.      I don't have a document in front

5  of me.  But one of the documents that Attorney

6  Grote showed you, your intake notes, indicated

7  that Mr. Jung told you that he had not received

8  insulin for three days.

9                  Do you recall seeing that note a

10 few minutes ago?

11         A.      Yes.

12         Q.      Did he ever tell you why he had

13 not gotten insulin over the three-day period

14 before the intake session?

15         A.      No.  He didn't tell me.

16         Q.      Did he ever tell you that he had

17 a history of being noncompliant for his insulin

18 protocol?

19         A.      No, he didn't tell me that.

20         Q.      I will call her Megan.  You told

21 us she spoke to you on the date of his death,

22 correct?

23                 MS. BAKER:  I am sorry.  I don't

24     think it was Megan.  I think she said

25     Marsha.

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
1    BY MR. WITTEKIND
2            Q.      Marsha?
3            A.      Yes.
4            Q.      You told us before that she spoke
5    to you on the day Mr. Jung died?
6            A.      Yes.
7            Q.      And she told you that he was
8    noncompliant, correct?
9            A.      Yes.
10           Q.      What was your understanding as to
11   that?  Did you have an understanding as to what
12   he was noncompliant with?
13               MR. GROTE:  Objection, calls for
14       speculation of what Marsha meant by
15       noncompliant.
16               MS. BAKER:  Without speculating,
17       if you have an understanding as a result of
18       speaking with Marsha as to what she meant
19       by noncompliant then you may testify to
20       that.  But do not speculate or guess.
21               Okay?
22               THE WITNESS:  She was referring
23       to him not being compliant with him taking
24       his insulin.
25
```

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1   BY MR. WITTEKIND
 2          Q.     Earlier or -- we looked at some
 3   progress notes that Attorney Grote showed you.
 4   And I wrote it down here.  It appears he was
 5   diagnosed or was told to get 12 units of insulin
 6   I believe -- hold on.
 7                 When you spoke to Marsha Gay on
 8   the date of the intake session, was she the
 9   person who would prescribe the insulin
10   medication for Mr. Jung or could you do that on
11   your own?
12                 MS. BAKER:  Do you mean Maureen
13      Gay?
14   BY MR. WITTEKIND
15          Q.     Yes.  I am sorry.
16          A.     No.  I cannot just administer the
17   insulin.  I have to get a verbal order from the
18   provider.
19          Q.     And when you got that order from
20   Ms. Gay, did you give Mr. Jung the medication
21   that was ordered?
22          A.     Yes.
23          Q.     Did Mr. Jung take that willingly
24   to your knowledge?
25          A.     Yes.
```

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    Q.    When you administered the
2    medication to Mr. Jung or gave him medication,
3    did you think that was the appropriate amount of
4    insulin to give him?
5         MS. BAKER:  Objection to the
6    form.  I will instruct her not to answer
7    that question.
8    BY MR. WITTEKIND
9    Q.    I will come back to that.
10   Earlier you said you had reached out to a
11   YesCare employee by the name of Smith regarding
12   training on the refusal of medication issue,
13   correct?  Do you recall that testimony?
14   A.    I think it was more towards the
15   refusal of medication and how to follow up after
16   that.
17   Q.    You indicated that you thought
18   she was a health care administrator.  Do you
19   know exactly what her title was at that time?
20   A.    Yes.  She was director of
21   administration.
22   Q.    Did you speak to anyone else at
23   YesCare about your concern over following up
24   with inmates who refused to take medication?
25   A.    No.

1    Q.    After October 28th up until the

2    date of his death, did you have any discussions

3    with anyone from PDP such as correctional

4    officers or other people that worked for PDP

5    regarding Mr. Jung?

6    A.    No.

7    Q.    Again, same question, a little

8    different:  After October 28th and before

9    Mr. Jung died, and excluding calls you had with

10   Ms. Gay, did you have any discussions with

11   anyone affiliated with the YesCare regarding

12   Mr. Jung?

13   A.    Can you rephrase?

14   Q.    Yes.  Putting aside any

15   communications you had with Maureen Gay about

16   Mr. Jung, did you talk to anyone else at YesCare

17   about him from October 28th until the date of

18   his death?

19   A.    No.

20   MR. WITTEKIND:  I think that is

21   all I have.

22   MS. THOMAS:  I have a couple

23   questions.

24   -  -  -

25   EXAMINATION

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
1                        -   -   -
2    BY MS. THOMAS
3           Q.      Good afternoon.  My name is
4    Summer Thomas.  I am here on behalf of Career
5    Staff Unlimited.  Earlier you testified that you
6    never heard of Career Staffing.  Do you have any
7    familiarity with the company Career Staff
8    Unlimited?
9           A.      No.  I don't recall.
10          Q.      And the company Tekaccel, were
11   they listed on your 2023 tax returns?
12          A.      Yes.
13                  MS. THOMAS:  Those are all the
14      questions from me.  Thank you.
15                        -   -   -
16                  EXAMINATION
17                        -   -   -
18   BY MS. BAKER
19          Q.      Going back to the intake
20   paperwork that you completed on Mr. Jung in
21   October 28, 2023.  At the time you did his
22   intake evaluation, did you have vital signs
23   available to you?
24          A.      Yes.
25          Q.      Were those vital signs taken
```

1  while he was in the intake area?

2          A.      Yes.

3          Q.      Were they taken by the medical

4  assistant?

5          A.      Yes.

6          Q.      Did those vital signs include

7  blood pressure?

8          A.      Yes.

9          Q.      Body temperature?

10         A.      Yes.

11         Q.      Respiration rate?

12         A.      Yes.

13         Q.      Those types of -- the normal

14  types of vital signs you expect as a nurse to

15  have when you are evaluating a patient, correct?

16         A.      Yes.

17         Q.      Were any of the vital signs that

18  you had, such as his blood pressure, respiratory

19  rate or his oxygen saturation, outside of the

20  range of normal limits?

21         A.      No.

22         Q.      Do you recall -- or I will refer

23  you to the documentation.  What was his body

24  temperature documented as?

25         A.      97.0 Fahrenheit.

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    Q.    Other than -- I believe it was

2    BMI and a body temperature of 97, were any of

3    the other vital signs indicated to be outside of

4    normal limits?

5    A.    No.

6    Q.    Mr. Grote asked you earlier in

7    the deposition what the AAOX3 abbreviation was.

8    And I think you said, Awake, alert and oriented

9    times 3.

10    Do you recall that testimony?

11    A.    Yes.

12    Q.    What does that indicate to you as

13    a nurse about the patient's mental status at the

14    time that you were evaluating him?

15    MR. GROTE:  Objection.  That

16    calls for testimony outside -- pertaining

17    to his mental health or psychiatric

18    conditions potentially.  And I want to make

19    sure that her testimony is not going to the

20    matters that she is not qualified to speak

21    on.

22    MS. BAKER:  That is actually not

23    what I'm asking her.  When I say "mental

24    status," I don't mean illness.  I don't

25    mean -- I am not asking her for a

1      diagnosis.  That is why I phrased the

2      question the way I did in asking her as a

3      nurse what it means as far as mental status

4      is concerned.  Meaning is he compos mentis,

5      is he -- what does that awake, alert and

6      oriented times 3 mean.

7              So I'm not asking her for an

8      evaluation of his mental health -- if that

9      helps you in any way.

10 BY MS. BAKER

11         Q.     When a nurse, such as you,

12 documents, Awake, alert and oriented times 3,

13 what are they oriented to?

14         A.     The name, place, time, year,

15 month.

16         Q.     And does your note indicate that

17 he was oriented to those things?

18         A.     Yes.

19         Q.     Does the assessment note that you

20 wrote, or any other part of your note that you

21 wrote at intake, indicate that Mr. Jung had an

22 altered mental status at the time that you spoke

23 with him?

24         A.     No.

25         Q.     Or examined him?

```
1              A.      No.

2              Q.      You gave some testimony earlier

3    in the deposition and were asked some follow-up

4    questions about that time where you asked for

5    additional training in response to the

6    disciplinary action that was taken.  I want to

7    ask you a couple questions about that.

8                      Okay?

9              A.      Okay.

10             Q.      Is it accurate, based on the

11   testimony you've given today during this

12   deposition, that the inmate or patient that was

13   involved in that disciplinary action was not

14   Mr. Jung?

15             A.      Yes, it was not.

16             Q.      Was that patient even a patient

17   who you saw at intake?

18             A.      I don't recall.

19             Q.      Well, the disciplinary action was

20   for the Med Pass side of things as opposed to

21   your care in intake, correct?

22             A.      Yes.

23             Q.      Is it, therefore, accurate to say

24   that during the approximately six months that

25   you worked within the prison system, you
```

1  received no disciplinary action whatsoever for

2  any of the care that you provided to any inmate

3  or patient at intake?

4          A.      Correct.

5          Q.      And this seems

6  self-explanatory -- and Mr. Wittekind touched on

7  this just a moment ago -- but back to your

8  assessment portion of your intake note.  Does

9  your intake note document that you administered

10  medication to Mr. Jung?

11          A.      Yes.

12          Q.      Does your intake note document

13  that Mr. Jung refused the medication that you

14  provided to him?

15          A.      No.

16          Q.      So, therefore, is it correct to

17  say that your interaction with Mr. Jung on

18  October 28, 2023 did not involve an inmate or

19  patient refusing the care you were attempting to

20  provide?

21          A.      Correct.

22          Q.      Give me one second here.

23          You were asked some questions

24  about doing reassessments on patients.  Let me

25  ask you, once a patient is removed from the

1  intake area, either by corrections staff or

2  other staff at the prison, and you remain in

3  intake, do you, as the intake nurse, have the

4  opportunity to conduct a reassessment on that

5  patient?  Or does the reassessment have to be

6  done by another nurse in a different area?

7          A.     No.  It has be done by another

8  nurse in a different area.

9                  MS. BAKER:  I think that's all

10      the questions that I have.  Thank you.

11      Jared, we are going to read and sign.

12                  THE COURT REPORTER:  I just want

13      to get orders before we log off.  Summer?

14                  MS. THOMAS:  Can I have an

15      electronic copy?  Can I get it sent to

16      someone else?

17                  THE COURT REPORTER:  Yes.  The

18      same as last time?

19                  MS. THOMAS:  Yes.

20                  THE COURT REPORTER:  Alex?

21                  MS. THOMAS:  Yes.

22                  THE COURT REPORTER:  Emily?

23                  MS. HOFF:  Digital mini is good

24      for us.  And if you want to send it to

25      Mike, if that is easier.

1              THE COURT REPORTER:  Ray, copy?

2              MR. WITTEKIND:  Electronic mini

3     and full to me and Tom.

4                   (Witness excused.)

5                   (Deposition concluded at 1:08

6     p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N


          I, JARED CAREY, Court Reporter,
certify that the foregoing is a true and
accurate transcript of the foregoing deposition,
that the witness was first sworn by me at the
time, place and on the date herein before set
forth.

          I further certify that I am neither
attorney nor counsel for, not related to nor
employed by any of the parties to the action in
which this deposition was taken; further, that I
am not a relative or employee of any attorney or
counsel employed in this case, nor am I
financially interested in this action.


*Jared Carey*
Jared Carey
Court Reporter
and Notary Public

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
1

2                    DEPOSITION ERRATA SHEET

3

4    JUNG

5       vs.

6    CITY OF PHILADELPHIA, et al.

7            DECLARATION UNDER PENALTY OF PERJURY

8       I declare under penalty of perjury

9       that I have read the entire transcript of

10      my Deposition taken in the captioned matter

11      or the same has been read to me, and

12      the same is true and accurate, save and

13      except for changes and/or corrections, if

14      any, as indicated by me on the DEPOSITION

15      ERRATA SHEET hereof, with the understanding

16      that I offer these changes as if still under

17      oath.

18            Signed on the _____ day of

19            _____, 20___.

20

21
     _____
22                 MARIESHA APOLLON

23

24

25
```

Deposition of Mariesha Apollon                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1

2                      DEPOSITION ERRATA SHEET

3    Page No._____Line No._____Change To:_____

4    _____

5    Reason for Change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

25   SIGNATURE:_____DATE:_____

Deposition of Mariesha Apollon                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change To:_____

_____

Reason for Change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

## WORD INDEX

**< $ >**
**$64** 24:*13*

**< 0 >**
**000405** 92:*18*

**< 1 >**
**1** 25:*16, 17, 20* 26:*3,*
*5* 31:*14, 18, 19* 92:*25*
93:*1, 2* 95:*12, 17*
*103:5, 10, 20*
**1:08** 124:*5*
**10** 32:*21*
**10/28/2023** 91:*13*
**10:02** 97:*7*
**10:04** 1:*15*
**100** 3:*6*
**11:00** 25:*6, 8* 41:*17*
*42:21*
**110** 4:*5* 18:*10* 35:*24*
**117** 4:*6, 7*
**12** 32:*21* 114:*5*
**12th** 2:*3*
**13-week** 27:*21, 22*
**150** 33:*7, 22*
**1515** 2:*14*
**15th** 2:*14* 3:*6*
**16** 42:*10*
**1717** 2:*19*
**18** 28:*13* 91:*25*
*125:23*
**1801** 2:*9*
**19102** 3:*6*
**19103** 2:*9, 14, 20*
**19123** 2:*4*
**1st** 54:*8*

**< 2 >**
**2** 25:*23* 26:*3, 4*
31:*24* 94:*10* 104:*10*
**2:24-cv-05618-TJS**
1:*8*
**20** 126:*19*
**200** 35:*17*
**2008** 11:*8*
**2011** 11:*4*
**2012** 12:*18*

**2016** 11:*5*
**2019** 12:*18, 22, 25*
**2020** 12:*23*
**2021** 16:*5* 97:*14*
**2023** 9:*24* 19:*12, 18*
25:*2* 42:*14* 43:*3*
63:*17* 76:*11* 82:*10*
83:*3, 10* 84:*19* 97:*7,*
*10* 117:*11, 21* 122:*18*
**2024** 28:*7* 54:*9*
**2025** 1:*10* 125:*23*
**215.561.2300** 2:*20*
**215.564.0400** 3:*7*
**215.569.4433** 2:*10*
**215.683.5000** 2:*15*
**22** 104:*9*
**23-hour** 72:*6*
**25** 91:*25*
**26** 27:*11, 24*
**28** 9:*24* 42:*14* 63:*17*
76:*11* 82:*10* 83:*3, 10*
84:*19* 97:*7, 10*
117:*21* 122:*18*
**28th** 116:*1, 8, 17*

**< 3 >**
**3** 103:*4* 119:*9* 120:*6,*
*12*
**3:00** 25:*6, 8* 41:*16*
42:*18, 21* 105:*16*
**3:30** 105:*16*
**30** 37:*6, 8* 58:*11*
73:*16* 75:*10*
**300** 34:*2*
**350** 34:*2*

**< 4 >**
**4** 47:*4*
**400** 33:*11* 34:*21*
35:*1*
**409** 92:*18*
**412.654.9070** 2:*4*
**46484** 1:*23*

**< 5 >**
**5** 1:*10* 48:*7* 53:*7*
**500** 34:*3* 66:*7*
**542** 77:*5* 79:*3, 7*
80:*9* 93:*1* 102:*11*

104:*3*

**< 6 >**
**6** 4:*4*
**610** 2:*19*
**631** 2:*3*
**6th** 28:*14*

**< 7 >**
**7:00** 42:*18*
**70** 18:*10* 35:*24*

**< 8 >**
**8:00** 42:*18*
**8-hour** 42:*6*

**< 9 >**
**911** 70:*12* 89:*7, 9, 14,*
*15, 22* 90:*3, 6, 11, 13,*
*16, 20*
**97** 119:*2*
**97.0** 118:*25*

**< A >**
**a.m** 1:*15* 97:*7*
**AAOX3** 103:*3* 119:*7*
**abbreviation** 119:*7*
**ability** 41:*3*
**able** 13:*11* 39:*6*
43:*18*
**abnormal** 18:*13*
**ABOLITIONIST** 2:*2*
**abrasion** 67:*21*
**abusing** 76:*25*
**access** 37:*1, 2, 4* 77:*9,*
*10, 17* 78:*24* 79:*1*
94:*4* 95:*23* 96:*10*
99:*3* 103:*25*
**Accu-Chek** 102:*1, 2, 5*
**accurate** 14:*1* 39:*15*
53:*4* 54:*10* 55:*23*
64:*2* 99:*14* 121:*10,*
*23* 125:*7* 126:*12*
**acknowledge** 99:*14*
**action** 60:*13* 121:*6,*
*13, 19* 122:*1* 125:*13,*
*17*
**actual** 90:*4*
**addition** 31:*18, 25*
107:*13*

**additional** 42:*1*
44:*16* 45:*11* 53:*13*
54:*16* 55:*11, 14* 64:*4*
121:*5*
**address** 98:*4* 99:*9*
**administer** 19:*5*
35:*22* 36:*24* 44:*23*
50:*21* 52:*9, 14* 66:*11*
100:*11* 114:*16*
**administered** 33:*23*
115:*1* 122:*9*
**administering** 37:*7*
50:*14*
**administration** 48:*9*
115:*21*
**administrator** 55:*6, 8*
115:*18*
**Administrators** 1:*4*
**admissible** 22:*24*
**admission** 72:*9*
**advising** 37:*8*
**affiliated** 116:*11*
**afternoon** 117:*3*
**agency** 19:*23* 111:*14*
**ago** 7:*6, 7* 11:*18*
112:*10* 122:*7*
**agree** 39:*24*
**agreed** 20:*18* 25:*3*
**agreement** 20:*25*
**ahead** 44:*5* 49:*14*
52:*2* 56:*19* 80:*25*
**aide** 11:*23* 12:*4, 6, 14*
**aide/medical** 10:*17*
**al** 1:*7* 126:*6*
**alcohol** 58:*2*
**alert** 61:*17* 63:*6*
103:*4* 119:*8* 120:*5,*
*12*
**alerting** 54:*19*
**Alex** 123:*20*
**allow** 24:*5, 7* 33:*5*
108:*12*
**altered** 120:*22*
**amount** 32:*11* 34:*21*
40:*8* 50:*20* 82:*13*
115:*3*
**amounts** 23:*13*
**and/or** 126:*13*
**Answer** 5:*5* 7:*23*
8:*2, 6* 9:*11, 13, 17*

Deposition of Mariesha Apollon                                        Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

14:8  21:11, 25  22:18
23:23  24:5, 9  33:15
34:12, 14  38:19  44:5
46:10  47:10  48:15
52:2  53:6  55:13, 21
56:8, 19  58:19  61:6
64:7  73:1  77:25
78:17  79:23  80:25
84:4  86:16  87:12, 17
88:1, 18, 19, 23  96:18
97:20, 22  98:25
99:24  100:7, 8, 16
103:10, 14, 22  108:13
109:7  110:6  115:6
**answered** 81:8  98:9
99:24
**answering** 40:6
46:16  53:7, 13  60:8
99:21  100:21
**answers** 7:15, 20
46:19  93:4  95:19
100:4  101:6
**anybody** 104:20
105:25  106:1
**anybody's** 77:11
**APOLLON** 1:13
2:10  4:3  6:2, 9, 18
9:21  47:1, 8  81:20
94:19  96:22  102:20
126:22
**A-P-O-L-L-O-N** 6:19
**Apollon's** 47:7
**APPEARANCES** 2:1
3:3
**Appearing** 2:5, 11, 16,
21  3:8
**appears** 92:3  114:4
**applicable** 23:5
**application** 20:17
**apply** 24:23
**appropriate** 109:10
115:3
**approximately** 7:5
12:15, 18  27:12
44:18  54:11  73:16
121:24
**Arch** 2:14, 19
**area** 118:1  123:1, 6,
8

**argue** 24:3
**articulated** 24:2
**aside** 73:8  116:14
**asked** 8:6  29:2
57:19  61:23  80:19
81:8  93:4  96:4
99:23  111:5  112:1
119:6  121:3, 4
122:23
**asking** 22:7  29:16
35:4, 5, 8  38:7  40:5
59:18  64:16  75:3
76:14, 15  81:9, 23
88:4, 9  100:18
106:23  109:8  119:23,
25  120:2, 7
**asserted** 22:8
**asserting** 21:14, 16,
20, 24  22:12, 16
**assess** 87:15
**assessing** 15:12  72:2
88:2
**assessment** 52:16, 18,
19, 20, 22  53:2  62:7
66:20  74:13  75:12,
23  83:14  84:10, 16
85:9  87:22  103:2, 9
120:19  122:8
**assessor** 87:13
**assigned** 29:5, 6
50:25
**assist** 13:11
**assistant** 10:16, 17,
24  11:4, 25  12:20
13:2, 8, 13, 22  15:16,
20  51:2, 4, 5, 8  52:4,
12  68:12  101:24
102:2, 7, 15  118:4
**assistants** 13:17
**associated** 51:19
68:18  79:13
**associate's** 13:10
**assume** 8:2  107:3
**assumed** 62:4
**assumption** 62:3
**attempting** 122:19
**Attorney** 2:5, 10, 15,
21  3:7  112:5  114:3
125:12, 15

**attorney/client** 8:24
9:9
**attorneys** 8:21
108:18, 25
**August** 19:18  43:3
54:8, 13
**Austen** 3:12
**authority** 71:3  90:15
**available** 59:7  117:23
**average** 58:5, 6
**avoid** 111:5
**Awake** 119:8  120:5,
12

**< B >**
**Bachelor's** 11:15
**back** 19:14  28:14, 15
29:12  49:15  51:17
56:4, 5  59:14  70:2
74:5  85:18  90:5
104:1, 11  106:6, 23
109:3  111:9  115:9
117:19  122:7
**background** 74:8
**BAKER** 2:8  4:7
8:23  9:6, 12  14:7, 11
20:22  21:5, 16, 21
22:1, 9, 13, 21  24:1
27:15  29:9  30:1
33:14  34:12  35:3
38:6, 19  39:21  40:16
44:3  46:10  50:10
51:24  52:2  56:3, 7,
18  57:3, 8  58:7, 18
60:2  61:7  62:12, 24
64:5, 14  65:23  68:1
73:21  74:16  75:1, 13
77:24  78:16  79:22
80:4, 24  81:8  83:4
84:3  86:10, 17  87:11,
25  88:14, 17  91:16
92:5  93:18  94:5, 17
95:13  96:3, 18  98:10,
13  99:23  102:25
103:13  106:25
108:12  109:6, 18
110:5  112:23  113:16
114:12  115:5  117:18
119:22  120:10  123:9

**based** 20:1  22:18
23:13, 24  32:12, 20,
22  39:13  40:21
52:22  56:21, 22, 25
58:1  62:7  68:3  74:8,
22  75:23  77:13
82:23  93:3  95:18
97:25  104:14  121:10
**basic** 14:4
**basically** 43:13  53:3
**basis** 40:2
**Bates** 65:25  66:3
82:1  91:21, 24  92:3,
14, 16  97:13
**bathing** 12:11
**Bear** 46:15, 21
**bearing** 23:1
**beautiful** 86:1
**becoming** 30:7
**beds** 14:23, 24
**began** 43:5  54:8
**beginning** 12:17  54:3
**begins** 82:2  97:13
**behalf** 117:4
**belated** 28:8
**believe** 13:15, 16
18:4  20:25  41:2
54:5  69:12, 16  75:4
87:7  93:3  103:25
104:1  110:8  111:24
114:6  119:1
**beneath** 101:17
**beyond** 27:24  36:20
**birth** 19:11  28:6, 12
93:6
**bit** 36:9  80:9  93:18
111:22
**Blanche** 2:16
**bleeding** 67:13
**blood** 13:11  14:18
15:2  17:6  19:3
26:12  29:21  30:16
32:12, 16  33:6  34:20
48:21  50:17  66:7
67:21  68:6, 13  77:5
79:18  92:25  102:11
104:3  105:18  118:7,
18
**Bloodsaw** 2:16

Case 2:24-cv-05618-TJS    Document 110-4    Filed 12/12/25    Page 132 of 152

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

blurred 17:17, 24
18:17 79:15, 18
blurry 30:8
BMI 119:2
board 16:2, 3 24:22
Body 118:9, 23 119:2
book 64:25
born 25:18
bottom 94:13 97:19
102:18
Boulevard 3:6
box 69:17, 20
break 8:4, 7 57:11
91:5 93:19
breaks 8:3
breathing 67:13
BRET 2:2 6:12
111:5
brief 111:3
bring 81:4 85:18
broader 22:23
broke 12:21 13:5
Brooklyn 10:21 11:2
brought 61:23 77:21
built 74:7
bunch 57:19

< C >
call 19:8 35:11, 17,
21, 24 40:7 58:16, 24
59:23 60:6, 10 66:9
70:10, 11, 19 72:17
73:8 80:21 82:16, 18
89:7, 15, 16, 19, 21
90:3, 4, 6, 7, 11, 13, 16,
20 96:1 100:10
106:6, 8, 23 107:4
110:11 112:20
called 19:24 20:4
32:17 45:6 54:22
66:13 67:6 72:6
80:11 89:9, 14 96:14
111:11
calling 106:4, 12
calls 88:14 113:13
116:9 119:16
capacity 6:23
Capella 11:13
captioned 126:10
carbohydrates 32:4

care 12:10 13:14, 20
15:12 16:8, 10, 17, 25
23:18 36:13, 20
38:17, 23 40:1, 24
45:15 46:7 55:7, 25
58:15 89:2, 4 91:1
115:18 121:21 122:2,
19
Career 2:21 15:19
20:4 117:4, 6, 7
cares 86:3
Carey 1:16 125:5, 17
caring 86:4
Carney 2:16
carried 15:18 107:20,
24
carry 74:23
case 7:6 21:7 22:3
31:12 34:5 59:19, 21
60:9 72:16 73:3
78:19 87:14 89:11
92:10 101:11 109:8
125:16
category 53:3
caveat 108:13
CENTER 2:2 12:1
13:7, 25 14:20, 25
15:5 26:25
certain 23:12 34:6
44:8 45:6
certainly 80:1 89:13
109:10
certificate 12:7, 9
certify 9:15 125:6, 11
certifying 22:17
cetera 100:16
CFCF 26:18 27:10
28:20 29:4 36:1
40:22 41:12, 16 43:3
45:23 47:25 54:25
57:15 65:3 66:6
67:3, 5, 8 70:6, 14, 21
71:10 72:6, 9 74:3
79:20
challenges 59:24
60:5
chances 63:24
change 32:3 103:22
127:5, 8, 11, 14, 17, 20,

23 128:5, 8, 11, 14, 17,
20, 23
changes 126:13, 16
Chapel 28:2, 15
characterize 41:24
64:3
characterized 64:6
Charge 28:18, 19, 21,
22, 23
check 19:3 29:21
50:16, 17 51:5, 23
82:14 83:19
checked 48:24 82:15,
17
checking 49:5
checks 48:9 50:24
51:1
chronic 91:1
circumstances 68:21
CITY 1:7 2:13, 15
6:14 13:7 92:17, 21
126:6
clarification 38:21
49:24
clarified 88:22
clarify 38:7 62:16
90:5
class 44:7
classroom 43:9
clear 7:18 23:21
54:7 56:9 72:25
73:21 79:11 86:2, 12
90:9 99:6 106:15
click 69:20
clicked 69:17
client 9:11, 16 22:20
23:23
clinic 91:2
clinical 45:6 46:6
81:5, 6 82:5
closer 54:3
clothing 12:11
color 30:23, 25 31:1,
5, 8
colors 31:9
come 38:1 44:9
53:23 108:9 115:9
comes 38:18
comfortable 92:10

coming 49:3 69:15,
18
commencing 1:15
comment 86:12
common 64:20
Commonwealth 1:14,
18
communications
116:15
company 111:11, 20
117:7, 10
compensation 21:3, 6
23:10
complement 23:9
complete 102:1
completed 94:12
102:2, 4 117:20
completely 46:13
compliant 113:23
compos 120:4
compound 93:19
computer 48:20 49:6,
10
concern 78:3 115:23
concerned 120:4
concerns 77:22
concluded 124:5
condition 100:15
conditions 45:7 58:1
74:9 77:2 99:22
100:5 119:18
conduct 109:4, 9
123:4
conducted 7:13
confirm 47:15
confused 30:7 79:15,
18
confusion 17:14
18:17 68:5
congratulations 28:9
conjunction 31:21
consequence 63:19
consider 109:11
considered 79:7, 9
consist 43:8 44:20
consisted 17:3
consistent 34:7
75:10 97:8
consult 60:19 81:3

contact 83:*1*
content 8:*20*
context 41:*12* 50:*10*
Continued 3:*3* 55:*17*
continuing 24:*3*
continuity 38:*17, 23*
89:*4*
contract 27:*19, 20*
54:*4, 8*
contradiction 98:*5*
contradicts 98:*3*
conversation 8:*20*
61:*21* 82:*9* 105:*15*
conversations 107:*12*
copy 46:*6* 92:*8, 11,*
*16* 123:*15* 124:*1*
Corinne 3:*12*
Corp 3:*7*
correct 9:*20* 15:*25*
18:*5* 21:*23* 25:*5*
27:*1* 31:*15* 45:*23*
47:*19, 22* 61:*1* 71:*2*
95:*4* 101:*23* 112:*22*
113:*8* 115:*13* 118:*15*
121:*21* 122:*4, 16, 21*
Correctional 26:*13*
36:*2, 5* 69:*22* 116:*3*
corrections 123:*1*
126:*13*
correctly 102:*20*
counsel 6:*13* 108:*15,*
*23* 125:*12, 16*
couple 49:*2* 76:*21*
110:*22* 111:*1, 2*
116:*22* 121:*7*
course 82:*6*
COURT 1:*1* 7:*16*
123:*12, 17, 20, 22*
124:*1* 125:*5, 22*
covered 9:*8* 111:*4*
covering 111:*5*
coworkers 71:*12*
create 76:*5* 97:*4*
created 94:*20*
credibility 87:*14, 16*
88:*3*
Curran-Fromhold
26:*13, 19*
currently 10:*4* 11:*9*

100:*14*
custody 104:*12*
cut 67:*21*

< D >
dark 31:*10*
darker 31:*11*
date 1:*16* 9:*24*
108:*11* 112:*21* 114:*8*
116:*2, 17* 125:*9, 23*
dated 9:*23*
daughter 28:*6, 12*
day 14:*4, 15* 26:*22*
38:*15* 42:*21* 43:*12*
44:*2, 7, 9, 13* 53:*21*
57:*16* 84:*19* 105:*13*
113:*5* 126:*18*
days 25:*7, 9, 10, 12,*
*14* 42:*8, 9* 44:*15, 18*
45:*10* 104:*4* 112:*8*
DC 26:*23, 25*
death 104:*22* 106:*3*
107:*13, 20, 24* 108:*11,*
*20* 109:*1* 112:*21*
116:*2, 18*
decide 40:*23* 70:*3, 4,*
*14*
decision 62:*1* 89:*10*
decisions 28:*23*
DECLARATION
126:*7*
declare 126:*8*
declined 19:*8*
Defendant 2:*10, 15,*
*21* 3:*7* 53:*13*
Defendant(s 1:*8*
Defendants 53:*8*
111:*2*
define 73:*24*
definitely 105:*6*
degree 10:*18, 20, 24*
11:*1, 14* 13:*10*
degrees 10:*22* 11:*3*
dehydrated 79:*15*
dehydration 17:*15,*
*23* 18:*19*
DEPARTMENT 2:*13*
19:*21* 20:*12* 26:*16*
70:*23* 104:*21* 105:*4*

107:*25*
depend 86:*7*
dependent 34:*22*
depending 30:*23*
33:*12* 34:*3* 35:*9*
deposition 1:*12* 5:*3*
6:*15, 20* 7:*2, 8, 9, 13*
8:*13, 16, 22* 10:*2*
24:*3* 91:*14* 119:*7*
121:*3, 12* 124:*5*
125:*7, 14* 126:*2, 10,*
*14* 127:*2* 128:*2*
describe 17:*2* 20:*9*
47:*4* 48:*7*
described 84:*11*
DESCRIPTION 4:*9*
details 48:*10*
Detention 26:*25*
determine 32:*14* 82:*6*
determined 39:*10*
58:*14* 93:*2, 5* 95:*11*
determining 15:*13*
23:*16* 39:*17*
develop 25:*25*
diabetes 13:*14, 20*
16:*8, 17, 25* 25:*15, 16,*
*20, 23* 26:*3* 29:*8, 20*
31:*14, 18, 20, 24* 46:*7*
81:*5, 7* 91:*1* 92:*25*
93:*1, 2, 5* 95:*12, 17*
97:*20* 98:*8, 15, 19, 23,*
*24* 99:*5, 18* 100:*9, 16*
103:*6, 10, 12, 20, 24*
diabetic 16:*11* 18:*22*
29:*22, 25* 30:*10*
45:*15* 46:*2* 49:*22, 23*
51:*6* 61:*14* 62:*19*
67:*23* 68:*15* 72:*12*
73:*9* 76:*24* 77:*4*
90:*22* 101:*18*
diagnosed 114:*5*
diagnosis 120:*1*
died 105:*13, 17*
107:*9* 113:*5* 116:*9*
diet 16:*13, 14* 31:*22*
32:*4*
difference 67:*6*
100:*23*
differences 36:*17, 20*

different 15:*16*
26:*10* 28:*20* 32:*18*
33:*1, 5, 8, 11* 34:*17*
36:*4* 38:*12* 58:*10*
92:*2, 3* 99:*12* 101:*1*
116:*8* 123:*6, 8*
differently 109:*5*
Digital 123:*23*
dip 30:*22*
Direction 5:*5*
directly 58:*22*
director 53:*12*
115:*20*
disciplinary 60:*13*
121:*6, 13, 19* 122:*1*
disclose 108:*15*
discovery 22:*23* 23:*2,*
*5* 46:*18* 92:*3*
discussed 61:*22*
Discussion 46:*23*
57:*13* 84:*7* 91:*6*
110:*15*
discussions 116:*2, 10*
distinguished 26:*3*
DISTRICT 1:*1, 2*
doctor 14:*6, 17* 19:*8*
35:*12, 17, 21, 25*
39:*12* 41:*13* 66:*9, 13*
70:*10, 11, 19* 71:*7*
72:*17* 110:*11*
doctors 15:*11* 29:*1*
38:*24* 41:*4*
doctor's 11:*25* 13:*3*
document 8:*1* 21:*8*
47:*1* 48:*8, 13* 49:*25*
50:*6, 23, 25* 51:*14*
52:*15, 21* 61:*14*
62:*20* 65:*10, 12, 16,*
*22* 66:*16, 19, 20, 22*
67:*1* 68:*10* 73:*20*
74:*5* 76:*1* 77:*15*
81:*4, 14, 19* 82:*5*
83:*12, 15* 85:*8* 91:*9*
92:*1, 8, 9* 93:*23* 94:*6,*
*15* 96:*24* 97:*4, 14*
112:*4* 122:*9, 12*
documentation 76:*6*
79:*23* 80:*5* 88:*25*
94:*19* 118:*23*

Case 2:24-cv-05618-TJS    Document 110-4    Filed 12/12/25    Page 134 of 152
Deposition of Mariesha Apollon
Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**documentations** 20:*19* 78:*5*
**documented** 48:*11* 50:*15* 51:*18* 73:*19* 74:*14*, *19* 75:*14* 84:*10*, *12* 85:*7* 93:*8* 118:*24*
**documenting** 50:*9* 53:*11*
**Documents** 5:*10* 9:*20*, *23* 10:*2* 76:*17* 85:*18* 112:*5* 120:*12*
**doing** 15:*11* 16:*23* 122:*24*
**dosage** 50:*15*
**dosages** 50:*9*
**draw** 13:*11*
**drew** 14:*18*
**drink** 30:*18* 37:*8* 82:*25*
**drinking** 58:*2*
**drinks** 32:*5*
**dropping** 68:*7*
**drugs** 76:*25*
**duly** 6:*3*
**Dysphagia** 17:*14*

**< E >**
**earlier** 61:*22* 70:*25* 84:*11* 114:*2* 115:*10* 117:*5* 119:*6* 121:*2*
**easier** 123:*25*
**EASTERN** 1:*2*
**educate** 44:*7*
**education** 10:*15*, *23* 45:*21* 65:*1*
**educational** 10:*13*
**efficient** 111:*23*
**eight** 57:*22*
**eight-hour** 42:*3*
**either** 123:*1*
**EKG** 14:*18* 15:*14*
**EKGs** 13:*11*
**electronic** 49:*16* 50:*1* 76:*7* 77:*7*, *11*, *18* 79:*2* 95:*23* 96:*11* 123:*15* 124:*2*
**Electronically** 94:*10* 95:*2*
**emails** 20:*15*

**emergency** 67:*16* 72:*21* 90:*19*, *23*
**emergent** 67:*6*, *11*, *12*, *15*, *24* 70:*2*, *4*
**EMILY** 2:*13* 123:*22*
**employed** 19:*17*, *18* 125:*13*, *16*
**employee** 104:*20* 105:*4*, *5*, *7*, *25* 106:*1* 115:*11* 125:*15*
**employees** 48:*1*
**employer** 19:*20* 57:*9*
**employer's** 57:*1*
**employment** 20:*11* 26:*21* 27:*18* 28:*5* 47:*7*, *25*
**encounter** 18:*21* 19:*1* 46:*2* 64:*11*, *20* 65:*2*, *6* 69:*23* 76:*10*, *16*, *18* 84:*15*, *23* 95:*1* 97:*1*, *7*
**encountered** 73:*6*
**encourage** 82:*25*
**ended** 54:*8*
**endocrinologist** 53:*25* 63:*15*
**endoscopy** 12:*1* 13:*7*, *25* 14:*20*, *25* 15:*5*
**engage** 9:*3*
**enlarge** 47:*12*
**entails** 46:*13*
**enter** 43:*10* 44:*8* 48:*21* 49:*7* 50:*20* 51:*16*
**entered** 63:*3*
**entire** 126:*9*
**entirety** 26:*20*
**entitled** 9:*7*
**entity** 20:*4*
**ERRATA** 126:*2*, *15* 127:*2* 128:*2*
**ESQUIRE** 2:*2*, *3*, *8*, *13*, *19* 3:*5*
**established** 89:*4*
**Estate** 1:*4*
**et** 1:*7* 100:*16* 126:*6*
**evaluating** 118:*15* 119:*14*
**evaluation** 117:*22*

120:*8*
**Everest** 1:*23*
**everyone's** 41:*3*
**exactly** 18:*5* 115:*19*
**EXAMINATION** 6:*6* 16:*2*, *4* 92:*24* 110:*19* 116:*25* 117:*16*
**examined** 6:*3* 120:*25*
**Excessive** 17:*23*
**excluding** 116:*9*
**excuse** 26:*14* 55:*12*
**excused** 124:*4*
**exercise** 31:*23*
**exercises** 12:*12*
**exhibits** 4:*10*
**expect** 118:*14*
**expectations** 23:*11*
**expected** 53:*15* 55:*15*
**experience** 40:*21*
**experiencing** 52:*24* 68:*17*
**expert** 40:*8* 109:*8*
**explain** 37:*3* 55:*17* 93:*15*
**explanation** 55:*18* 103:*8*
**exploring** 23:*2*
**extend** 27:*23*
**extended** 27:*22*

**< F >**
**facility** 23:*19* 26:*14* 30:*1* 35:*5*, *9* 36:*2*, *5* 67:*21* 78:*21*
**Fahrenheit** 118:*25*
**fairness** 91:*16*
**fall** 67:*24*
**familiar** 20:*3* 64:*10* 65:*14*, *17* 69:*3*, *5* 72:*5* 81:*5*, *10* 96:*21* 97:*14* 108:*2*
**familiarity** 117:*7*
**familiarize** 45:*1*
**far** 120:*3*
**fast** 65:*19*
**faster** 15:*1*, *3*
**fault** 105:*19*
**February** 7:*9*
**feet** 26:*23*

**field** 11:*21*
**file** 30:*11* 85:*19*
**fill** 44:*21* 46:*1* 84:*22* 85:*8* 88:*25* 93:*22*
**filled** 85:*11*, *12*, *16* 93:*13*, *14*, *25* 94:*2* 97:*16* 102:*22*
**financially** 125:*17*
**fine** 6:*10*
**finish** 7:*20*, *22* 14:*7* 86:*10* 96:*4*
**firing** 7:*3*
**first** 11:*21* 16:*21* 19:*4* 44:*2*, *15* 50:*16* 81:*23* 82:*2* 92:*23* 94:*12* 111:*9* 125:*8*
**Five** 25:*9*, *11*, *14* 28:*4* 42:*1* 57:*24*
**five-minute** 57:*11*
**Flag** 54:*22*
**floor** 2:*14*
**flush** 30:*18* 72:*18*
**follow** 41:*3* 44:*10* 48:*20* 53:*25* 61:*18* 73:*13*, *15*, *18* 106:*6* 115:*15*
**following** 115:*23*
**follows** 6:*4*
**follow-up** 37:*22* 38:*10*, *11*, *13*, *15* 39:*10*, *18* 40:*24* 60:*19*, *24* 121:*3*
**follow-ups** 16:*14* 39:*8*, *14*
**foregoing** 125:*6*, *7*
**forgot** 80:*20*
**form** 33:*15* 34:*9*, *14* 35:*4* 36:*7* 38:*7* 39:*5*, *20* 41:*1* 44:*3* 46:*9* 47:*21* 52:*25* 56:*2*, *8*, *17* 57:*4*, *6* 58:*19* 59:*9* 60:*2* 61:*6* 62:*11*, *25* 64:*6*, *13* 71:*20* 74:*16*, *25* 76:*4* 77:*25* 78:*15*, *16* 80:*8*, *23* 84:*4* 85:*3*, *14* 87:*10*, *24* 88:*1* 93:*17*, *23* 95:*7* 96:*17* 98:*5*, *25* 102:*25* 103:*11*, *14*

109:*17, 19*  110:*5*
115:*6*
**formal**  107:*20, 24*
**forms**  44:*21*  54:*25*
57:*24*
**forth**  125:*10*
**Four**  7:*7*  57:*24*
**Frasier**  2:*16*
**free**  39:*6*  52:*17*
**frequent**  18:*18*
**frequently**  71:*18*
86:*6*
**front**  92:*9, 17*  93:*22*
94:*14*  102:*3*  112:*4*
**full**  124:*3*
**further**  24:*7*  38:*21*
110:*16*  125:*11, 14*

< G >
**gather**  85:*17*
**Gay**  80:*16*  82:*10*
83:*2, 12, 18*  84:*22*
85:*21, 25*  87:*5, 20*
88:*5*  93:*12, 14, 25*
94:*4, 11*  95:*2*  96:*10*
97:*4*  106:*4, 17*  112:*1*
114:*7, 13, 20*  116:*10,*
*15*
**Gays**  82:*23*
**Gene**  2:*16*
**general**  29:*10, 19*
35:*1*  92:*24*
**generally**  16:*11*
29:*13*  30:*2, 4*  35:*4, 8*
64:*19*  70:*20*  73:*23*
**generated**  95:*3*
**getting**  68:*6*  86:*13*
**give**  7:*22*  8:*12*  9:*4*
13:*12*  32:*15*  33:*6*
39:*22*  41:*14*  66:*14,*
*15*  77:*21*  110:*12*
114:*20*  115:*4*  122:*22*
**given**  6:*20*  34:*7*
61:*13*  66:*17*  67:*2*
78:*17*  88:*10, 12*
90:*13, 20*  121:*11*
**giving**  28:*12*  99:*8*
**glucose**  18:*4, 8, 13*
19:*3*  33:*22*  34:*20, 25*
35:*16*  48:*9, 21, 24*

49:*6*  50:*6, 17, 23*
51:*1, 5, 23*  66:*7*  79:*3*
80:*9*
**go**  7:*11*  11:*20, 23*
15:*13*  19:*14*  22:*21*
28:*24*  43:*11*  44:*5*
48:*6*  50:*19*  52:*2*
56:*19*  58:*21*  59:*14*
72:*2*  74:*4, 9, 10*  76:*7*
80:*25*  90:*5*  91:*19*
101:*13*  110:*23*  111:*7*
**goes**  31:*9*  37:*21*
**going**  24:*4*  27:*16*
28:*15*  39:*6*  40:*5*
44:*23*  68:*5*  70:*2*
72:*24*  81:*13*  86:*11*
89:*24*  94:*22*  110:*13*
117:*19*  119:*19*
123:*11*
**Good**  6:*9*  8:*9*  40:*16*
117:*3*  123:*23*
**GORDON**  2:*16*
**gotten**  104:*7*  112:*13*
**gradations**  31:*4*
**graduate**  11:*6, 12*
**graduated**  11:*11, 16*
**GROTE**  2:*2*  4:*4*
6:*8, 12*  9:*1, 10, 15, 18*
14:*14*  21:*2, 13, 18, 23*
22:*6, 11, 15*  23:*6*
24:*14, 15*  27:*17*
29:*11*  30:*3*  33:*19*
34:*10, 19*  35:*7*  36:*11*
38:*8*  39:*1*  40:*12, 20*
41:*5*  44:*11*  46:*14, 21,*
*24*  47:*23*  50:*12*  52:*1,*
*7*  56:*11, 12, 24*  57:*12,*
*14*  58:*8, 13*  59:*1, 12*
60:*4*  61:*10*  62:*14*
63:*10*  64:*9, 18*  65:*24*
66:*2, 5*  68:*2, 8*  71:*22*
74:*1, 20*  75:*6, 15*
78:*2, 18*  79:*25*  80:*7*
81:*2, 11, 18*  83:*6*
84:*6, 8*  85:*5, 20*
86:*11, 24*  87:*18, 19*
88:*8, 21*  91:*4, 7, 19,*
*23*  92:*20, 22*  93:*20*
94:*9, 23*  95:*9, 14*
96:*9, 13, 20*  98:*12, 17*

100:*2*  103:*1, 18*
107:*2*  108:*21, 22*
109:*12*  110:*1, 12, 16*
112:*6*  113:*13*  114:*3*
119:*6, 15*
**ground**  7:*11*
**grounds**  22:*10*  39:*23*
**guess**  69:*25*  88:*18,*
*25*  113:*20*
**guidance**  73:*7*
**guidelines**  33:*13*
34:*18, 23*  36:*10, 12*
56:*23*
**guidelines/protocols**
62:*5*

< H >
**Hamilton**  10:*9*
**hand**  92:*12*
**Hang**  94:*5*  107:*5*
**happen**  41:*22*  63:*16*
66:*12*  74:*13*
**happened**  64:*1*  75:*3*
105:*18*  108:*10, 18, 25*
**hard**  92:*8, 11, 16*
**harm**  78:*6*
**head**  7:*15*
**health**  10:*17*  11:*22*
12:*4, 6, 14*  55:*7*
115:*18*  119:*17*  120:*8*
**hear**  6:*10*  14:*11*
69:*6, 7*  111:*19*
**heard**  43:*16*  71:*11,*
*15, 17, 24*  108:*14*
111:*18*  117:*6*
**heart**  68:*6*
**heavier**  31:*11*
**held**  1:*14*  46:*23*
57:*13*  84:*7*  91:*6*
110:*15*
**help**  34:*11*  62:*16*
64:*25*  78:*4*
**helps**  120:*9*
**hereof**  126:*15*
**high**  10:*15*  11:*6*
30:*16*  79:*3, 18*
105:*19*
**higher**  33:*10*  34:*2*
40:*9*  58:*15*

**hired**  13:*6*  19:*23*
24:*7, 11*
**history**  10:*13*  78:*6*
112:*17*
**HIV**  68:*13*
**HIV/AIDS**  100:*16*
**HOFF**  2:*13*  123:*23*
**hold**  24:*2*  114:*6*
**home**  10:*16*  11:*22*
12:*2, 4, 6, 11, 13*  15:*7,*
*24*  16:*7, 18*  18:*21*
28:*2, 13, 16, 17*
**homicidal**  77:*1*
**hopefully**  86:*14*
**Hospital**  10:*5, 6, 8*
11:*23*  12:*3*  15:*14*
28:*24*  47:*6, 19*  69:*4,*
*8*  104:*12*
**hour**  24:*13*  58:*11*
73:*17*  75:*11*
**hours**  42:*10*  57:*22*
83:*19*  87:*6, 21*  88:*6*
**housing**  72:*9*
**HU**  2:*3*
**hyperglycemia**  17:*22*
68:*18*  79:*8, 9, 13*
84:*23*  90:*24*
**hyperglycemic**  17:*6*
**hypertension**  67:*22*
**hypoglycemia**  17:*13*
68:*18*
**hypoglycemia/hypergl**
**ycemia**  65:*7*
**hypoglycemic**  17:*5*

< I >
**identified**  51:*9, 13*
**Identify**  47:*4*  48:*7*
65:*24*
**identities**  59:*17*
**illness**  119:*24*
**immediate**  38:*14*
**inaccurate**  99:*8*
**inappropriate**  87:*15*
**incident**  63:*16*
**include**  41:*6*  48:*10*
118:*6*
**included**  79:*20*
100:*15*
**includes**  84:*18*

Deposition of Mariesha Apollon

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**including** 13:6 23:10
48:11
**incorrect** 22:1, 2
**independent** 76:16
95:10, 15 100:3
**INDEX** 5:3
**indicate** 35:10
119:12 120:16, 21
**indicated** 67:15 77:4
112:6 115:17 119:3
126:14
**indicates** 31:1 95:3
**indicating** 98:24
**individual** 18:17
30:17, 20 49:13
58:10
**infirmary** 27:3, 7
47:6, 18 70:21, 22
71:4, 9 72:2 73:5
**inform** 39:12
**information** 48:11, 12
49:10, 13 50:2 51:16
68:22 69:21 77:3
79:2 89:2 97:24, 25
98:3, 23 99:1, 2, 8, 14
108:10, 14
**informed** 37:25 63:5
**injectable** 26:7
**inmate** 121:12 122:2,
18
**inmates** 104:18
115:24
**inquiry** 24:8 107:20,
24
**insight** 29:24
**instance** 50:4 61:25
72:20
**instances** 51:22 52:8
72:12 90:21
**institution** 32:18
33:8 34:16
**institutions** 33:2
**institution's** 34:23
**instruct** 30:17 72:18
109:6 115:6
**instructed** 9:17
82:24 83:13
**instructing** 9:10, 12
21:11 22:20 23:22
87:12

**Insulin** 16:13 19:5
25:22 26:5, 6, 7, 10,
11 31:15, 19, 21 32:9,
10, 11, 15 33:6, 23
34:1, 21 35:22 36:24
37:7 48:9 50:9, 14,
15, 18, 22 52:9, 14
53:9, 24 54:20 60:18
61:17 63:4 66:11
73:12 82:13, 14
100:11 104:4, 6, 8
110:10 112:8, 13, 17
113:24 114:5, 9, 17
115:4
**insulins** 17:10 66:15
**intake** 8:18 9:20
29:6, 7, 9 37:5, 11, 13,
16, 17, 23 38:5, 9, 18
39:4, 5 40:22, 24
41:7 44:19 45:10
47:6 48:22 49:2
50:11, 24 51:1, 10, 23
52:5, 9, 15 57:15
58:7 59:25 66:7, 21
68:10, 23, 24 69:11
70:6, 13, 16 72:11, 24
73:2, 5 74:3, 4, 11, 21
75:4, 5, 9, 11, 18, 24
77:8, 12, 13, 19 78:21
79:20 80:8 82:5
83:14 84:13, 16
85:16 87:7, 22 88:24
89:1, 7, 23, 24 90:6, 7,
12, 17 91:18 92:24
94:18 95:18, 19, 21
96:14 98:5 100:24
101:3, 7 103:17
104:18 108:11, 20
109:1, 4, 14 110:4
112:6, 14 114:8
117:19, 22 118:1
120:21 121:17, 21
122:3, 8, 9, 12 123:1,
3
**interaction** 37:12
122:17
**interested** 125:17
**intermetex** 108:3, 6
**I-N-T-E-R-M-E-T-E-**

**X** 108:6
**interrogatories** 46:16
**Interrogatory** 47:3
48:7 53:7
**intervention** 67:7, 11,
12, 19, 25 70:4
**interventions** 70:3, 15
**involve** 122:18
**involved** 48:4 121:13
**Isabella** 15:6, 19, 23
16:6 18:20 19:9, 14
45:21
**issue** 21:7 58:22
61:22 62:22 78:7
115:12
**issues** 23:1 36:14, 15
**its** 23:9
**IV** 15:14

**< J >**
**JACOB** 1:4
**jail** 26:17
**jails** 106:2
**JAMES** 1:4
**January** 19:12 54:9,
11, 12
**Jared** 1:16 123:11
125:5, 17
**Jeoboham** 105:8
**Jersey** 10:9 19:15, 16
**JFK** 3:6
**Job** 1:23 11:21
14:16 15:9 19:9
23:14 28:12 33:4
43:17 57:22 86:4
111:16
**jobs** 36:5
**Johnson** 10:5
**join** 35:6 40:10, 15
56:18 74:17 88:16
109:21
**JONATHAN** 2:8
**JR** 1:5 76:11
**judge** 109:9
**judgment** 90:18
**June** 25:2
**JUNG** 1:4, 5 6:13
32:23 42:24 60:10
76:11, 19 83:5, 7, 10,
19 84:15, 20 87:6, 21

91:12 92:17 95:11,
16 98:8 99:17
100:18 101:20 102:7,
14, 16 104:15, 22
105:12, 17 106:7
107:12 108:10, 19
109:1, 4 112:2, 7
113:5 114:10, 20, 23
115:2 116:5, 9, 12, 16
117:20 120:21
121:14 122:10, 13, 17
126:4
**Jung's** 96:11 106:3
107:20, 24 109:1, 14
110:3

**< K >**
**KAMINSKY** 2:8
**keep** 24:4
**ketoacidosis** 67:23
**ketones** 30:14, 18, 19,
24 31:7, 12 72:13, 22
73:5, 9 74:22 75:9
82:14, 16, 17, 19
**KIERNAN** 2:5
**KIMBALL** 3:5
**kind** 31:4 59:18
**knew** 95:16 98:7, 14
99:7
**know** 7:24, 25 8:4
9:7 19:25 21:10
25:20, 23 26:2 27:7,
15 32:25 33:3, 7
40:4 42:20 47:10
48:1, 15, 25 49:9, 25
51:12 53:15 55:3, 15
56:21 63:8, 13, 14
65:18 67:5 69:14, 21
71:1 72:8 82:15
86:13 89:3 94:2
105:1, 3 115:19
**knowledge** 114:24

**< L >**
**laid** 13:5
**language** 25:5
**larger** 31:6
**LAW** 2:2, 13
**lawsuit** 111:2
**lawyers** 8:17, 22

Deposition of Mariesha Apollon     Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**learn** 12:*8* 13:*17* 71:*8* 108:*9*

**learned** 108:*17, 24*

**led** 61:*21*

**level** 32:*13, 16, 20, 23* 34:*25* 35:*16* 40:*9* 50:*17* 58:*15* 66:*7* 79:*3* 80:*10*

**levels** 18:*13* 19:*4*

**license** 15:*21* 16:*2, 4, 23, 24* 24:*17, 21* 25:*1*

**light** 31:*9*

**lighter** 31:*6*

**limited** 110:*7*

**limits** 118:*20* 119:*4*

**Line** 5:*6, 11, 16, 21*

**listed** 117:*11*

**litigation** 46:*17*

**little** 25:*15* 28:*8* 36:*8* 80:*9* 93:*18* 111:*22* 116:*7*

**located** 71:*1*

**location** 37:*9*

**log** 123:*13*

**log-in** 51:*15*

**Lolo** 3:*13*

**long** 7:*5* 10:*10* 12:*13* 27:*10* 28:*3* 44:*12* 58:*4* 93:*4*

**long-acting** 17:*10*

**longer** 43:*18*

**look** 14:*4, 16* 30:*5, 9* 49:*14* 65:*16* 79:*22* 80:*5* 81:*22* 92:*23*

**looked** 50:*1* 114:*2*

**looking** 29:*17* 68:*4* 93:*22* 94:*7* 109:*3*

**Lose** 32:*3*

**lost** 109:*23*

**lot** 30:*18* 86:*18* 91:*24*

**loud** 7:*14* 24:*25*

**LOUIS** 1:*5* 76:*11*

**low** 68:*6*

**lowers** 26:*12*

**LPNs** 28:*22* 38:*23*

**< M >**

**ma'am** 110:*23*

**majority** 86:*22*

**making** 23:*12* 28:*23* 90:*9* 109:*20*

**managed** 25:*21* 26:*4*

**manner** 45:*19*

**Manor** 28:*2, 15*

**MANSUKHANI** 2:*16*

**MARGO** 2:*3*

**MARIESHA** 1:*13* 2:*10* 4:*3* 6:*2, 18* 24:*9* 102:*19, 20* 126:*22*

**M-A-R-I-E-S-H-A** 6:*19*

**MARKED** 4:*9, 10* 5:*20* 92:*13*

**Market** 2:*9*

**Marsha** 104:*25* 105:*15* 112:*25* 113:*2, 14, 18* 114:*7*

**Marsha's** 105:*1*

**math** 27:*16* 42:*18*

**matter** 6:*13* 126:*10*

**matters** 119:*20*

**Maureen** 80:*16* 82:*10, 23* 83:*2, 12, 18* 84:*22* 85:*21, 25* 87:*5, 20* 88:*5* 93:*12, 25* 94:*4, 11* 95:*2, 22* 96:*10* 97:*3* 106:*4* 111:*25* 114:*12* 116:*15*

**mean** 26:*7* 29:*9, 14* 30:*2* 32:*9* 36:*14* 37:*3* 41:*11* 51:*25* 62:*6* 65:*6* 67:*11* 75:*13, 16* 78:*12* 94:*11* 98:*11* 103:*3* 114:*12* 119:*24, 25* 120:*6*

**Meaning** 120:*4*

**means** 102:*22* 120:*3*

**meant** 63:*13* 74:*2* 113:*14, 18*

**Med** 121:*20*

**medical** 10:*16, 24* 11:*4, 21, 24* 12:*19* 13:*1, 8, 13, 17, 22* 15:*15, 20* 29:*5* 30:*11, 12* 33:*12* 38:*1, 2* 41:*9, 11* 49:*17* 50:*1*

**51**:*1, 4, 5, 8, 9* **52**:*4, 12* 58:*1, 16* 61:*4* 62:*17* 63:*13* 67:*2* 68:*12* 73:*4* 76:*7* 77:*1, 8, 11, 18* 78:*6, 20* 79:*6, 12* 83:*13* 84:*13* 89:*2, 10* 95:*22, 23* 96:*11* 99:*22* 100:*5, 15* 101:*21, 24* 102:*1, 6, 15* 118:*3*

**medication** 15:*12* 26:*5, 9* 32:*1* 41:*15* 48:*12* 53:*10* 76:*3* 114:*10, 20* 115:*2, 12, 15, 24* 122:*10, 13*

**medications** 12:*11* 15:*14* 44:*24* 49:*3* 100:*14*

**meet** 8:*21*

**Megan** 112:*20, 24*

**Mellitus** 81:*6, 7*

**memory** 76:*18*

**mental** 119:*13, 17, 23* 120:*3, 8, 22*

**mentioned** 32:*1*

**mentis** 120:*4*

**met** 9:*3, 7*

**middle** 54:*4, 6, 11, 13*

**Mike** 123:*25*

**mine** 104:*9*

**mini** 123:*23* 124:*2*

**minutes** 37:*6, 9* 58:*11, 12* 73:*16* 75:*10* 110:*13, 23* 112:*10*

**mischaracterizes** 44:*4*

**misunderstanding** 94:*21*

**mm-mmh** 7:*15*

**modifiable** 32:*2*

**modification** 31:*22*

**moment** 46:*15, 21* 47:*9* 48:*14* 81:*22* 122:*7*

**money** 23:*13*

**month** 10:*11* 38:*17* 53:*22* 120:*15*

**months** 7:*7* 27:*13* 28:*4, 13* 71:*15* 121:*24*

**morning** 6:*9* 42:*16, 25* 111:*10*

**mortality** 107:*16*

**moved** 19:*15, 16*

**moving** 65:*19*

**< N >**

**name** 6:*12, 17* 13:*4* 43:*20* 51:*17* 102:*19* 105:*1, 8, 10* 110:*25* 115:*11* 117:*3* 120:*14*

**named** 53:*8*

**names** 48:*3* 51:*19* 71:*24*

**nature** 7:*1* 20:*10* 23:*20*

**necessarily** 49:*21*

**necessary** 70:*5*

**need** 7:*16* 8:*4* 15:*13* 21:*9* 35:*24* 38:*20* 48:*16* 75:*22* 80:*4* 87:*2* 89:*17*

**needed** 14:*25* 27:*21* 58:*15* 70:*15*

**needs** 25:*21* 26:*5* 28:*24* 38:*10* 50:*18* 60:*19* 79:*23* 89:*3*

**negative** 31:*2*

**neither** 125:*11*

**NET** 46:*2* 65:*6* 85:*10*

**never** 43:*16* 73:*6* 84:*19* 117:*6*

**New** 10:*9, 21* 11:*2* 13:*7, 25* 14:*21* 15:*6* 19:*15, 16* 76:*4*

**nice** 86:*3*

**No.\_\_\_\_Change** 127:*3, 6, 9, 12, 15, 18, 21* 128:*3, 6, 9, 12, 15, 18, 21*

**No.\_\_\_\_\_Line** 127:*6, 9, 12, 15, 18, 21* 128:*6, 9, 12, 15, 18, 21*

**No.\_\_\_\_Line** 127:*3* 128:*3*

**nods** 7:*15*

**noncompliant** 105:*20* 112:*17* 113:*8, 12, 15,*

Deposition of Mariesha Apollon

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

*19*

**non-intake** 50:*13*

**normal** 17:*6* 18:*4, 8* 35:*23* 118:*13, 20* 119:*4*

**Norristown** 69:*3, 11, 15* 104:*12*

**Notary** 1:*17* 125:*22*

**note** 51:*13* 52:*21* 53:*2* 57:*8* 91:*12* 93:*8, 11, 13* 97:*13* 102:*23* 104:*10* 112:*9* 120:*16, 19, 20* 122:*8, 9, 12*

**notes** 52:*20* 95:*4* 112:*6* 114:*3*

**notice** 1:*13* 6:*15*

**notified** 75:*22*

**notify** 53:*24*

**November** 1:*10* 16:*5* 54:*14* 125:*23*

**number** 34:*7* 49:*7* 50:*20* 82:*1* 91:*20, 24* 101:*16*

**numbers** 48:*22* 49:*20* 50:*6* 65:*25* 92:*4, 15, 16*

**nurse** 10:*7* 15:*24* 16:*1* 18:*20, 25* 28:*18, 19, 21* 34:*22* 35:*2* 37:*11, 16* 39:*24* 40:*2, 22* 41:*7, 13* 43:*25* 50:*5* 51:*3* 53:*14* 55:*15* 56:*15* 59:*25* 67:*9, 10* 70:*13* 72:*11* 73:*11* 75:*19, 21* 76:*1* 93:*12* 94:*19* 118:*14* 119:*13* 120:*3, 11* 123:*3, 6, 8*

**nurses** 38:*25* 41:*4*

**nursing** 10:*18, 20* 11:*5, 15* 12:*2* 15:*7, 19, 24* 16:*7, 18, 22* 18:*21* 24:*22* 28:*2, 16* 46:*2* 53:*12* 64:*11, 19* 65:*2, 6* 71:*12* 84:*23*

**< O >**

**oath** 126:*17*

**object** 8:*23* 40:*25* 47:*20* 57:*5* 59:*8* 60:*2* 61:*5* 62:*10* 64:*12* 74:*16, 24* 75:*1* 78:*14, 16* 80:*22* 87:*9, 25* 95:*6* 102:*25* 109:*16, 18*

**objecting** 39:*22*

**Objection** 20:*22* 21:*18, 22* 22:*6, 10, 19* 23:*7, 21, 24* 33:*14* 34:*8, 13* 35:*3* 36:*6* 38:*6* 39:*19, 23* 40:*3, 11, 15, 17* 44:*3* 46:*8* 56:*1, 7, 16, 19* 57:*3, 9* 58:*18* 62:*12, 24* 63:*1* 64:*5* 71:*19* 77:*24* 84:*3* 85:*2, 13* 86:*15* 87:*11, 23* 88:*14* 93:*16* 96:*16* 99:*23* 103:*13* 109:*22* 110:*5* 113:*13* 115:*5* 119:*15*

**objective** 52:*20*

**objectives** 52:*23*

**observation** 72:*6*

**observed** 76:*20*

**obtain** 24:*16, 20, 25*

**occasion** 16:*8*

**occur** 75:*12*

**O'CONNOR** 3:*5*

**October** 9:*24* 28:*14* 42:*14* 54:*14* 63:*17* 76:*11* 82:*10* 83:*3, 10* 84:*19* 97:*7, 10* 116:*1, 8, 17* 117:*21* 122:*18*

**offer** 20:*16* 27:*23* 126:*16*

**offered** 20:*18, 21* 25:*4*

**office** 11:*25* 13:*4, 24* 53:*12*

**officer** 69:*22*

**officers** 116:*4*

**oftentimes** 86:*6*

**Okay** 8:*8* 14:*9, 10* 38:*22* 40:*12* 47:*12, 15* 48:*18* 57:*10* 65:*11, 21* 90:*10* 94:*8* 96:*7* 105:*22* 110:*22*

111:*8* 113:*21* 121:*8, 9*

**older** 26:*1*

**once** 41:*23* 60:*10* 122:*25*

**ones** 45:*3* 107:*13*

**opinion** 40:*8* 79:*4*

**opportunity** 123:*4*

**opposed** 121:*20*

**oral** 26:*4, 9* 32:*1*

**order** 9:*3* 19:*4* 23:*17* 24:*4* 35:*12, 15, 18, 21* 58:*25* 61:*3* 62:*17* 66:*14, 16, 23* 67:*2* 76:*8* 82:*6* 83:*18* 84:*22* 85:*11* 88:*9* 89:*17, 18, 21* 90:*1, 13, 16, 20* 114:*17, 19*

**ordered** 83:*25* 84:*25* 85:*6* 87:*6, 21* 88:*5* 114:*21*

**ordering** 38:*16*

**orders** 13:*12* 14:*17* 15:*11* 28:*25* 41:*14, 15* 85:*10* 92:*25* 123:*13*

**oriented** 103:*4* 119:*8* 120:*6, 12, 13, 17*

**outpatient** 14:*25*

**outset** 91:*21*

**outside** 23:*4* 77:*14* 118:*19* 119:*3, 16*

**overall** 23:*9*

**overcrowded** 71:*9, 11*

**overtime** 41:*18, 20* 42:*13*

**oxygen** 118:*19*

**< P >**

**p.m** 25:*6, 8* 124:*6*

**pace** 15:*1*

**packages** 23:*10*

**PAGE** 4:*2, 9* 5:*6, 11, 16, 21* 7:*12* 48:*16* 81:*23* 82:*2* 92:*23* 93:*22* 94:*10* 96:*22* 97:*12, 19* 100:*12* 101:*15* 102:*18* 104:*9, 10* 127:*3, 6, 9, 12, 15,*

*18, 21* 128:*3, 6, 9, 12, 15, 18, 21*

**pages** 65:*18, 25* 91:*18* 94:*12*

**pamphlet** 65:*1*

**pandemic** 12:*21* 13:*5*

**paper** 63:*21, 25* 69:*17* 77:*21* 79:*1* 81:*25*

**paperwork** 8:*18* 46:*12* 117:*20*

**PAR** 101:*21*

**part** 12:*8* 13:*20* 16:*17, 23* 46:*16, 18* 49:*16, 20* 52:*16, 19* 66:*21, 23* 67:*2* 83:*14* 84:*12* 88:*25* 93:*14, 15, 21, 23* 103:*2* 107:*16, 19, 23* 120:*20*

**particular** 26:*17* 35:*5*

**parties** 92:*2* 125:*13*

**pass** 16:*2, 3* 49:*2* 53:*10* 121:*20*

**passing** 15:*12*

**pathway** 46:*7* 81:*6* 82:*5*

**pathways** 45:*6* 81:*5*

**patient** 13:*12* 19:*7* 28:*24* 29:*14, 17* 30:*17* 32:*3, 12, 15* 36:*13, 19* 37:*2, 12, 21* 38:*4* 39:*7* 40:*23* 47:*5, 18* 49:*19* 51:*6* 52:*24* 60:*18, 21* 61:*14, 19* 62:*2, 18, 19, 21* 63:*3, 7* 66:*6* 70:*5* 73:*9* 78:*6* 87:*3* 88:*6* 89:*3, 7* 90:*22* 98:*15, 22* 99:*7, 14* 101:*18* 104:*11* 118:*15* 121:*12, 16* 122:*3, 19, 25* 123:*5*

**patient/prisoner** 57:*18*

**patients** 11:*24* 12:*10* 15:*3, 13* 16:*8, 11* 18:*22* 19:*1* 37:*23, 24* 39:*3* 45:*16* 46:*3* 68:*16* 69:*9, 10* 72:*12* 77:*18* 95:*23* 122:*24*

Case 2:24-cv-05618-TJS    Document 110-4    Filed 12/12/25    Page 139 of 152
Deposition of Mariesha Apollon
Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

patient's 68:*4* 76:7
119:*13*
pause 65:*19*
pay 20:*24* 21:*10*
22:*4* 23:*1* 24:8, *10*
PDP 47:7 48:*8, 25*
53:*11, 16* 55:16, *25*
60:*12* 69:*11* 90:21
91:*2, 25* 97:*14*
105:*25* 106:*12, 17*
111:*16* 116:3, *4*
PDP18 91:*24*
PDP's 34:*4*
penalty 64:*4* 126:7, 8
PENNSYLVANIA
1:*2, 15, 18* 2:4, *9, 14,*
*20* 3:*6* 24:*17, 22*
people 13:5 48:*4*
49:*14* 53:*12* 86:*18*
116:*4*
perform 23:*14*
performing 21:*4*
period 112:*13*
periods 38:*12*
PERJURY 126:7, 8
person 30:*24* 37:8, *9*
49:*22* 50:*18* 58:5
60:7 78:5 86:*4* 90:3
94:*3* 114:*9*
personally 51:*24*
person's 39:*11* 49:*13*
pertaining 91:*12*
92:7 119:*16*
PHILADELPHIA
1:*7* 2:*4, 9, 13, 14, 15,*
*20* 3:*6* 6:*14* 19:*21*
20:*12* 26:*16* 70:*23*
104:*21* 105:*4* 107:*25*
126:*6*
phone 58:*24* 60:*8*
80:*21*
phrased 9:*14* 109:7
120:*1*
physical 77:*21* 79:*1*
physically 29:*16*
75:*14, 17* 76:*13, 14*
77:*20* 86:*21* 89:*16*
pick 58:*23*
picked 41:*25* 42:7

place 11:*2* 81:*16*
120:*14* 125:*9*
placed 20:*12*
placement 47:5
Plaintiff 1:5 2:5
plaintiffs 6:*13*
plan 52:*21*
play 72:*1*
please 6:*16* 7:*25*
8:*6* 35:*10* 38:*21*
40:*9* 61:*9* 65:*23*
109:*24*
plenty 82:*25*
point 65:*20* 107:*3*
policies 44:*25* 55:*25*
57:*2*
policy 54:*22* 82:*2*
pop 49:*21* 50:*21*
pop-ups 48:*21*
portion 91:*17* 93:*24*
122:*8*
position 12:5 13:*9*
15:*21* 20:*16* 43:*24*
55:*4*
positive 31:*1* 72:*13*
possible 79:6 88:*12*
post 10:*14, 22*
potentially 22:*24*
54:*14* 119:*18*
power 107:*6*
powers 107:*4*
practice 13:*16, 23, 25*
14:*3* 48:*8* 82:*4*
83:*22*
practitioner 41:*13*
93:*12*
preceptor 43:*12, 16,*
*21* 44:*10, 13*
pregnant 7:*4*
pre-intake 99:*4*
100:*24* 101:*2, 7, 15,*
*20, 23*
preparation 8:*22*
10:*2*
prepare 8:*15*
prepared 8:*12* 9:*4*
preparing 23:*17*
prescribe 114:*9*
prescribed 34:*1*

100:*14* 104:*6*
presence 31:*6, 12*
PRESENT 3:*11*
59:*24* 82:*20*
pressure 68:*6* 79:*18*
118:*7, 18*
prevent 40:*5*
previous 49:*13* 88:*23*
previously 20:*24*
print 85:*17*
printed 92:*14*
prior 16:*23* 24:*17*
36:*1, 5* 63:*17* 91:*13*
prison 12:*2* 19:*19*
20:*16* 24:*12, 18*
26:*24* 32:*20* 36:8, *10*
37:*10, 22* 43:*14*
51:*15* 56:*23* 62:7
64:*17* 68:*1, 2* 73:*22*
86:*21* 87:*2* 110:*10*
121:*25* 123:*2*
prisoner 53:*24*
54:*20* 78:*25* 82:*24*
98:*1, 2, 3* 106:5, *13*
prisoners 74:*8*
Prisons 19:*22* 20:*13*
26:*16* 27:*4* 70:*23*
104:*21* 105:*4* 107:*25*
prison's 62:*4*
private 11:*25* 13:*3,*
*23, 24* 14:*3*
privilege 8:*25* 9:*9*
21:*13, 15, 20, 24* 22:8,
*12, 17* 23:*25*
Probably 25:*2*
110:*13*
procedure 37:*13*
process 14:*24* 20:*17*
37:*6, 7* 47:5 50:8, *24*
51:*10* 58:4, *16* 70:*18*
75:*24* 77:*8, 12* 85:*16*
103:*17*
produce 30:*20*
produced 20:*25* 21:8
30:*15* 92:*1, 21*
Production 5:*10*
92:*18*
profession 64:*21*
Professional 1:*16*
63:*13*

progress 51:*13*
52:*21* 53:*2* 91:*12*
93:8, *11, 13* 95:*4*
97:*13* 102:*23* 104:*10*
114:*3*
prompt 48:*20* 49:*6*
pronouncing 102:*19*
proper 53:*10*
properly 23:*17* 78:*4*
protocol 47:*16, 17*
112:*18*
protocols 36:*21*
55:*25*
provide 16:*11* 21:*12*
23:3, *18* 34:*17, 22*
72:*18* 73:*12* 82:*24*
88:*24* 96:*5* 122:*20*
provided 15:*3* 22:*4*
43:*6* 44:*16, 17, 25*
45:5, *9, 11, 19, 20, 22*
46:*1, 6, 11, 19* 47:*25*
50:*9* 52:*4* 68:*12, 23*
73:*7* 82:*7* 110:*10*
122:*2, 14*
provider 38:*16*
39:*12* 40:*1, 9* 41:*11*
58:*16, 21* 59:*20, 22*
61:*4* 62:*18* 73:4, *8*
80:*11, 12* 83:*25* 86:*1*
89:*10, 17, 19, 22*
90:*12, 16, 19* 93:*12*
95:*22* 97:*3* 100:*11*
114:*18*
providers 41:*10*
59:*2, 5, 6, 15*
provider's 33:*12*
39:*16*
provides 98:*2, 4*
providing 36:*19*
45:*15* 48:*8*
Psychiatric 69:*3, 9*
119:*17*
Public 1:*17* 125:*22*
pulled 49:*2*
pursuant 1:*13*
put 35:*14* 43:9, *12*
60:*17, 19* 63:*6* 81:*15*
92:*9, 17* 94:*22*
putting 28:*25* 116:*14*

< Q >
**qualified** 119:*20*
**Question** 5:*20* 7:*21*,
*22* 8:*2*, *6*, *7* 9:*2*, *11*,
*13*, *17* 14:*8*, *12* 16:*21*
21:*11*, *25* 22:*14*, *18*
23:*23* 24:*5*, *10* 33:*16*
34:*13*, *14*, *15* 37:*14*
38:*20* 40:*6* 56:*4*, *10*
61:*8*, *9* 64:*15* 68:*16*
73:*24* 86:*9* 87:*13*, *17*
88:*1*, *2*, *19* 89:*12*
93:*9* 96:*4* 98:*6*, *20*
99:*6* 100:*1*, *9*, *13*, *19*
103:*23* 104:*11*
107:*18* 108:*13*, *16*, *23*
109:*7*, *19*, *24* 110:*6*, *7*
115:*7* 116:*7* 120:*2*
**questionnaire** 68:*23*,
*24* 79:*20*
**questionnaires** 43:*11*
**questions** 10:*12* 21:6
29:*16* 44:*22* 46:*17*
57:*20*, *25* 68:*21*, *25*
76:*14* 77:*14* 79:*17*,
*24* 92:*7* 93:*5*, *7*
95:*19*, *20* 99:*9*, *21*
100:*4* 101:*1*, *17*
110:*17* 111:*3* 116:*23*
117:*14* 121:*4*, *7*
122:*23* 123:*10*
**quick** 91:*4*

< R >
**raise** 78:*7*
**range** 17:*6* 18:*4*, *10*
35:*20*, *24* 91:*21*
118:*20*
**ranges** 18:*8* 32:*19*
33:*1*, *5*, *10*, *11*
**rate** 20:*18*, *20*, *24*
21:*5*, *10* 22:*4*, *25*
24:*6*, *10* 68:*6* 118:*11*,
*19*
**Ray** 40:*12* 110:*25*
124:*1*
**RAYMOND** 3:*5*
**reached** 20:*14*

111:*19* 115:*10*
**reaches** 34:*6*
**read** 56:*4*, *5* 123:*11*
126:*9*, *11*
**reading** 32:*16*
**readings** 18:*4*, *9*
**really** 59:*18* 106:*22*
107:*8* 108:*16*
**re-ask** 16:*19*
**reason** 19:*13* 22:5
23:*3* 39:*21* 78:*13*
127:*5*, *8*, *11*, *14*, *17*, *20*,
*23* 128:*5*, *8*, *11*, *14*, *17*,
*20*, *23*
**reassess** 73:*13* 75:*20*
88:*5*
**reassessed** 75:*9*
**reassessment** 19:*6*
37:*2*, *4* 74:*15*, *18*, *22*
75:*3*, *12*, *22*, *25* 76:*2*
83:*24* 84:*1*, *2* 112:*1*
123:*4*, *5*
**reassessments** 16:*15*
74:*5*, *23* 84:*12*
122:*24*
**recall** 13:*4* 17:*18*
18:*1* 25:*10* 27:6
42:*12*, *22*, *23* 43:*22*
44:*18* 45:*3*, *8* 46:*4*, *5*,
*12* 50:*3*, *5*, *7* 53:*4*, *5*,
*17*, *20*, *22* 54:*23*
57:*24* 59:*4*, *15* 60:*11*,
*23* 62:*1* 63:*17*, *18*
65:*8*, *21* 67:*8* 69:*16*
70:*1* 71:*16* 72:*20*, *23*
73:*3* 76:*10*, *12*, *21*
80:*3*, *20* 81:*1*, *13*, *17*,
*25* 82:*9*, *12*, *19* 83:*20*
86:*25* 87:*4* 88:*11*
90:*24*, *25* 91:*3* 93:*2*,
*10* 97:*22* 100:*18*, *21*
101:*19* 104:*2* 105:*14*
106:*4*, *10*, *22* 107:*11*
112:*3*, *9* 115:*13*
117:*9* 118:*22* 119:*10*
121:*18*
**receive** 10:*20*, *25*
12:*5* 13:*9*, *14*, *19*
16:*24* 40:*23* 45:*14*

47:*16* 60:*13* 69:*2*, *10*
89:*21*
**received** 10:*15*, *18*
57:*18* 65:*16* 89:*18*
90:*1* 97:*25* 112:*7*
122:*1*
**receiving** 12:*9* 16:*22*,
*24* 21:*3*
**recollection** 8:*1* 54:*2*
65:*10* 76:*16* 80:*2*
81:*15*, *24* 95:*11*, *16*
97:*9* 99:*17*, *20* 100:*4*
105:*9* 111:*25*
**record** 6:*17* 9:*16*
21:*19* 22:*7*, *15* 23:*22*
30:*12* 41:*10* 46:*23*
49:*17*, *20* 50:*1* 54:*7*
56:*6* 57:*13* 59:*14*
65:*24* 76:*7* 77:*8*, *11*
81:*16* 83:*13* 84:*6*, *7*,
*13* 91:*6* 92:*1*, *19*
96:*11* 110:*15*
**records** 51:*9* 77:*18*
78:*20* 95:*24* 99:*3*
**recover** 107:*6*
**recovered** 107:*4*
**recruited** 111:*10*
**recruiter** 20:*8*, *10*
111:*13*, *14*
**recruiting** 111:*16*
**Red** 54:*22*
**redacted** 21:*9*
**REES** 2:*16*
**refer** 49:*15* 62:*21*
71:*4* 118:*22*
**reference** 64:*17* 82:*5*
**referenced** 44:*2*
92:*15*
**referred** 62:*9* 73:*4*
**referring** 32:*23* 47:*5*,
*18* 49:*1* 99:*1* 113:*22*
**reflect** 22:*16*
**refresh** 8:*1* 80:*2*
105:*9*
**refreshed** 81:*14*
**refreshes** 65:*10*
81:*24*
**refusal** 48:*12* 53:*9*
54:*25* 115:*12*, *15*

**refused** 60:*18* 63:*4*
115:*24* 122:*13*
**refuses** 53:*24* 54:*20*
61:*17*
**refusing** 122:*19*
**regard** 36:*13* 73:*8*
80:*9*
**regarding** 115:*11*
116:*5*, *11*
**registered** 10:*7*
43:*25* 53:*14* 55:*14*
56:*15*
**Rehabilitation** 15:*7*,
*24* 16:*7*, *18* 18:*21*
**related** 125:*12*
**relationship** 20:*10*
101:*3*
**relative** 111:*16*
125:*15*
**relevance** 20:*23* 22:*3*,
*19* 23:*8*, *15*, *24*
**relevant** 20:*23*, *24*
21:6 22:5
**remain** 123:*2*
**remains** 19:*7*
**remember** 7:*24* 9:*24*
32:*19* 42:*15* 43:*20*,
*23* 45:*25* 46:*16*, *17*
48:*3* 53:*20*, *21* 55:*2*
60:*9*, *21* 67:*1* 71:*14*,
*23* 79:*21* 80:*1*, *12*
86:*18* 100:*7*, *8* 102:*9*,
*12* 106:*8*
**reminder** 66:*3*
**remotely** 59:*7*, *11*
**removed** 122:*25*
**repeat** 33:*18* 57:*21*
89:*12*
**rephrase** 37:*14* 40:*7*
56:*11* 61:*8* 75:*7*
86:*12* 87:*18* 98:*6*, *20*
106:*14* 107:*18*
109:*11* 116:*13*
**rephrased** 108:*24*
**Reporter** 1:*17* 7:*16*
56:*5* 123:*12*, *17*, *20*,
*22* 124:*1* 125:*5*, *22*
**represent** 111:*1*
**reprimand** 64:*3*

reproduced 92:2
Request 5:10
requested 56:6 92:25
required 23:18
41:17, 19 55:11
requirement 41:21
requirements 40:1
57:1
requires 15:21 32:12
resolved 55:22 67:20
respect 83:5, 7, 10
respectful 86:3
Respiration 118:11
respiratory 118:18
respond 55:16, 20
106:20 107:7
response 6:15 46:18
96:6 99:8 105:21
107:10 121:5
responsibilities 14:16,
22 15:10 23:14 29:3
responsibility 38:5
39:11, 17
rest 48:16
restate 109:24
restroom 57:11
result 113:17
résumé 20:15
retained 48:13
retrospectively 109:9
returned 69:11
Returning 53:6
returns 117:11
reveal 103:16, 19
reveals 21:2
review 10:1 16:16
30:12 47:10 48:15
77:7 101:6 107:17
reviewed 8:18 9:19
76:17 91:13
Right 11:24 16:14
17:19 35:11 37:19
38:11 57:2 75:16
90:8 91:11 93:11
101:4
risks 18:12, 15 79:7,
12
Robert 10:5
role 13:20 15:16, 18

28:16, 20 55:2 72:1
room 72:21 90:23
route 15:3
routine 83:23
rules 7:11
run 15:1 43:14, 19
57:25
runs 43:10

< S >
samples 14:18 68:14
SARAH 2:8
saturation 118:19
save 126:12
saw 20:15 42:24
84:20 108:19 121:17
saying 13:18 28:23
39:16 74:12 95:19
says 47:3, 4 48:19
53:7 92:24 93:12
94:10 95:1 97:3, 6,
20 101:15, 18, 25
102:19 103:5, 9
104:3, 7, 13
scale 32:18 34:2, 4,
18, 23 50:19
scales 33:8
scheduled 39:2, 3
42:8
scheme 31:5
school 10:15 11:7, 9
17:4
schooling 45:21
science 11:15
scope 23:5 35:14
screen 29:8, 20
46:25 48:20 65:9
77:13 91:8
screening 29:14
37:17, 23 38:5, 10
47:7 48:23 89:1
99:5 100:24, 25
101:2, 3, 7, 8, 16, 20,
23
scroll 48:16 94:6, 25
SCULLY 2:16
second 44:13 94:5
122:22
secondary 10:23

section 74:10 76:4
98:11, 21 100:13
security 36:13, 15, 21
see 19:4 27:5 29:17
38:3, 9 39:2, 3 47:1
48:16 50:17 51:2
52:23 60:25 61:15
62:2 63:7 65:9, 12
77:16 81:14, 19 87:2,
6, 21 91:9 101:15
seeing 27:6 65:21
76:13 81:25 91:17
112:9
seeking 55:24 56:14,
20, 22, 25
seen 38:4 62:18, 21
81:10 89:3 96:24
self-explanatory 122:6
send 123:24
sense 9:3
sent 72:21 90:23
123:15
September 12:24
Septemberish 12:25
series 92:7
Serrano 3:13
session 44:1 112:14
114:8
set 68:20 125:9
seven 12:15, 16 42:6
Shadow 14:6
shakiness 18:18
share 46:25 65:9
81:14 91:8
SHEET 126:2, 15
127:2 128:2
sheltered 72:8
shift 20:18 25:4
42:13, 16, 17, 21, 25
105:17
shifts 41:18, 20 42:1,
2, 3, 6, 7
shocked 107:9
short-acting 17:10
shortly 75:11
show 43:10, 13, 18
94:7
showed 65:25 112:6
114:3

showing 23:8 97:12
side 121:20
sign 63:21, 25 94:16
123:11
signature 94:8, 13
SIGNATURE:_____
_____DA
TE 127:25 128:25
signed 94:11 95:2
126:18
signs 15:2 17:5, 12,
21 30:8 68:4, 9, 13
117:22, 25 118:6, 14,
17 119:3
similar 96:25
simply 92:14 99:11
sir 64:8
site 58:21, 23 59:3, 5,
16, 20, 22 80:17 86:5,
6, 23 87:1
situation 61:20
66:25 75:8 86:25
situations 70:8
six 27:12 65:18
71:14 81:23 121:24
six-month 54:4
skip 111:22
sliding 32:18 33:8
34:18, 23 50:19
small 47:13
Smith 53:8, 11, 18
61:21 115:11
Smith's 55:2
SOAP 52:20
social 85:19
somebody 38:9
62:13 72:21 73:4
74:22 75:8 79:17
90:4 109:20
somebody's 34:20, 25
51:23
someone's 30:6
son 19:11
sorry 9:9 24:24
56:3 109:19 112:23
114:15
sound 8:9 53:4 54:9
source 108:17
speak 7:14 24:24
83:2, 9 102:6 104:22

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

105:*11*  106:*2*  115:*22*
119:*20*
**speaking**  16:*12*
53:*21, 22*  70:*20*
113:*18*
**specialist**  60:*20, 25*
61:*15, 18*  62:*2, 9, 19,*
*22*  63:*7, 12*
**specialists**  54:*19*
**specific**  13:*19*  25:*10*
45:*23*  48:*10, 22*
55:*24*  59:*17*
**specifically**  44:*22*
52:*5*  66:*15*  74:*2*
81:*13*
**spectrum**  67:*25*
**speculate**  88:*17*
113:*20*
**speculating**  113:*16*
**speculation**  88:*15*
113:*14*
**speech**  107:*4, 6*
**speechless**  106:*21*
107:*1, 8*
**spell**  6:*16*
**spoke**  8:*17*  47:*24*
53:*8, 18*  54:*18*  102:*8,*
*14*  106:*17*  112:*21*
113:*4*  114:*7*  120:*22*
**stab**  67:*14*
**staff**  23:*11, 12, 17*
71:*24*  89:*2*  117:*5, 7*
123:*1, 2*
**Staffing**  2:*21*  20:*4*
23:*9*  117:*6*
**stamp**  66:*3*  91:*21*
97:*13*
**standard**  9:*1*  39:*25*
68:*20*
**start**  14:*8*  50:*13*
67:*11*  103:*16*
**started**  12:*2*  27:*21*
28:*14*  111:*9*
**starting**  33:*7*
**state**  6:*16*  39:*6*
53:*23*  69:*3*  91:*20*
**stated**  11:*22*  18:*16*
21:*19, 21*  22:*7*  23:*7*
30:*5*  38:*1*  68:*11*
79:*14*  87:*5*

**STATES**  1:*1*  103:*5,*
*10*  104:*4*
**stating**  20:*15*  63:*25*
**stationed**  26:*17, 18*
75:*18*
**status**  72:*6*  119:*13,*
*24*  120:*3, 22*
**stayed**  28:*13*
**steps**  109:*13*
**Stipulations**  5:*15*
**stopped**  67:*13*
**stored**  49:*10, 12*  50:*2*
**Strategies**  64:*24*
**Street**  2:*3, 9, 14, 19*
3:*6*
**strict**  36:*9, 21*
**stricter**  36:*10*
**strike**  36:*18*
**strip**  30:*21*
**stuff**  103:*16*  111:*5*
**subject**  8:*24*
**Subjective**  93:*21*
97:*24*  98:*10, 14, 21*
100:*13*  101:*14*
**subsequent**  84:*19*
**sued**  7:*3*
**sugar**  17:*7*  26:*12*
29:*21*  30:*16*  32:*12,*
*16, 20, 22*  33:*6*  67:*22*
68:*13*  77:*6*  93:*1*
102:*11*  104:*3*  105:*18*
**sugary**  32:*5*
**suicidal**  76:*25*
**Suite**  2:*19*  3:*6*
**SUMMER**  2:*19*
117:*4*  123:*13*
**supervisor**  20:*6*
28:*18*  53:*8, 18*  55:*3*
78:*8*
**supervisors**  62:*8*
**SUPPORT**  5:*3*
**supposed**  35:*2*  60:*25*
61:*15, 17*  62:*2*  63:*6*
66:*8*  73:*10, 11, 14*
98:*4*
**sure**  16:*13*  29:*2*
39:*23*  53:*1*  55:*5*
59:*16*  69:*24*  70:*1*
78:*12*  96:*5*  104:*2*

108:*5, 7*  119:*19*
**surgeries**  58:*2*
**sweatiness**  18:*18*
**Sweating**  17:*17*  30:*6*
**sworn**  6:*3*  125:*8*
**symptomatic**  19:*1*
37:*25*
**symptoms**  17:*5, 12,*
*22*  18:*16, 23*  29:*18*
30:*6, 8*  68:*17*  79:*14,*
*19*
**system**  43:*10*  49:*11*
50:*21*  51:*20*  63:*3*
74:*11*  76:*5*  101:*21*
121:*25*

**< T >**
**take**  7:*16*  8:*3, 7*
12:*10*  30:*22*  37:*6*
47:*9*  48:*14*  58:*4*
75:*19*  81:*22*  91:*4*
101:*22*  114:*23*
115:*24*
**taken**  1:*13*  58:*11*
109:*14, 15*  117:*25*
118:*3*  121:*6*  125:*14*
126:*10*
**talk**  7:*19*  29:*13*
71:*13, 15*  102:*15*
116:*16*
**talking**  37:*18*  53:*1*
59:*16*  72:*25*  73:*22,*
*23*  76:*13*  86:*19*
**taught**  17:*4*  67:*9*
**tax**  117:*11*
**Tekaccel**  19:*24, 25*
20:*7*  111:*11*  117:*10*
**telephone**  95:*1*
96:*25*  97:*6*
**tell**  10:*14*  11:*20*
31:*5*  58:*22*  70:*11*
104:*5*  106:*5*  111:*15*
112:*12, 15, 16, 19*
**telling**  8:*19*  21:*17*
99:*17*
**tells**  30:*23*  98:*22*
**temperature**  118:*9,*
*24*  119:*2*

**term**  29:*14*  32:*8*
41:*9, 11*  43:*16*  57:*9*
64:*10*  108:*2*
**terms**  36:*18, 19*  67:*9,*
*11*
**test**  27:*16*  30:*19, 21,*
*22*  68:*13*
**testified**  6:*3*  33:*21*
45:*14*  70:*25*  75:*5*
111:*24*  117:*5*
**testify**  113:*19*
**testifying**  39:*25*
**testimony**  9:*4*  61:*12*
75:*10*  85:*12*  115:*13*
119:*10, 16, 19*  121:*2,*
*11*
**Texas**  20:*2*
**Thank**  18:*11*  24:*14*
28:*10*  36:*16*  42:*11*
49:*24*  63:*11*  66:*2*
88:*22*  89:*25*  90:*9*
92:*20*  108:*21*  117:*14*
123:*10*
**therapy**  16:*13*
**thing**  8:*5*  35:*11*  53:*2*
**things**  13:*12*  14:*19*
17:*11*  24:*4*  32:*2, 4*
43:*11, 14, 19*  44:*8, 9,*
*24*  55:*18*  56:*14, 21*
58:*3*  62:*16*  69:*6*
76:*21*  111:*6*  120:*17*
121:*20*
**think**  9:*6, 8*  16:*20*
23:*4*  25:*4*  37:*18*
40:*4*  43:*15*  44:*4*
59:*13*  61:*12*  63:*23*
64:*6*  75:*2*  80:*19, 24*
81:*11, 12*  86:*13*
92:*21*  94:*25*  100:*8*
104:*9*  109:*10, 13*
110:*2*  112:*24*  115:*3,*
*14*  116:*20*  119:*8*
123:*9*
**third**  53:*3*  101:*15*
**THOMAS**  2:*19*  4:*6*
116:*22*  117:*2, 4, 13*
123:*14, 19, 21*
**thought**  62:*8, 13*
90:*8*  94:*17*  115:*17*

**three** 44:*18* 45:*10*
60:*7* 63:*24* 69:*13*
104:*4* 112:*8*
**three-day** 112:*13*
**threshold** 34:*6*
**time** 22:*24* 24:*6, 11*
37:*1* 38:*12* 39:*13*
48:*24* 57:*10* 71:*10*
83:*8* 86:*22* 90:*19*
92:*13* 103:*15* 108:*19*
115:*19* 117:*21*
119:*14* 120:*14, 22*
121:*4* 123:*18* 125:*9*
**times** 6:*24* 8:*21* 9:*2,
7* 18:*22* 49:*2* 60:*7*
72:*17* 80:*20* 83:*2*
86:*21* 92:*4* 103:*4*
119:*9* 120:*6, 12*
**title** 115:*19*
**today** 8:*13* 109:*4*
121:*11*
**today's** 8:*16*
**told** 22:*9* 25:*17*
53:*12* 55:*10* 63:*5, 22*
66:*23* 83:*16* 98:*1*
102:*9* 104:*15* 107:*13*
112:*7, 20* 113:*4, 7*
114:*5*
**Tom** 124:*3*
**tool** 46:*2* 64:*11*
84:*23*
**tools** 64:*20* 65:*3, 6*
**top** 93:*24*
**touched** 122:*6*
**track** 51:*17*
**trained** 18:*3, 12*
47:*17* 54:*19, 21, 24*
56:*15* 63:*8*
**training** 12:*5* 13:*9,
14, 19* 16:*16, 24* 17:*3*
23:*13* 43:*6* 44:*1, 16,
19* 45:*10, 11, 13, 15,
17, 18, 20* 46:*1* 47:*16,
24* 48:*4* 53:*9, 14, 19*
54:*16* 55:*11, 14, 24*
56:*14, 21, 22, 25*
61:*23* 115:*12* 121:*5*
**transcript** 7:*17*
125:*7* 126:*9*

**transfer** 104:*11*
**transferred** 26:*23*
**transmit** 69:*20*
**treat** 31:*25*
**treated** 31:*15, 18, 20*
**treating** 45:*6*
**treatment** 54:*25* 82:*6*
**TREBACH** 2:*5*
**triage** 29:*5* 38:*1, 2*
**trial** 22:*25*
**trip** 30:*22*
**true** 56:*13* 87:*20*
125:*6* 126:*12*
**truthful** 87:*8*
**try** 99:*13* 111:*4, 23*
**trying** 52:*25* 61:*11*
62:*15*
**twice** 92:*21*
**two** 31:*9* 41:*25* 42:*7,
9* 44:*15* 60:*7* 69:*12*
83:*19* 87:*6, 21* 88:*6*
94:*12* 110:*13*
**two-hour** 112:*1*
**type** 7:*15* 13:*12*
14:*18* 16:*10* 17:*9, 10*
25:*16, 17, 20, 23* 26:*3,
4, 5* 31:*14, 18, 19, 24*
44:*24* 48:*10* 52:*17*
63:*13* 82:*13* 92:*25*
93:*1, 2* 95:*12, 17*
103:*5, 10, 20*
**typed** 75:*24*
**types** 118:*13, 14*
**typical** 14:*15, 21*
42:*5* 57:*16*
**typically** 89:*20*

**< U >**
**unclear** 59:*14*
**uncontrollably** 67:*14*
**underneath** 49:*12*
**understand** 21:*9*
22:*2, 25* 23:*6, 20*
24:*1* 33:*15, 17* 34:*15*
38:*11, 20* 61:*7* 63:*11*
76:*17*
**understanding** 86:*2*
92:*6* 113:*10, 11, 17*
126:*15*

**understood** 8:*3* 33:*9*
47:*8* 63:*25* 90:*8*
**unit** 32:*9*
**UNITED** 1:*1*
**units** 32:*8, 15, 21*
34:*1, 7* 50:*15, 20*
114:*5*
**University** 11:*13*
**Unlimited** 117:*5, 8*
**uploaded** 77:*15*
**urgent** 67:*7, 18, 24*
70:*14*
**urination** 17:*23*
18:*19*
**urine** 14:*18* 30:*16,
21, 23* 68:*13* 82:*14*
**use** 32:*8* 41:*10* 57:*9*
64:*24* 90:*18*
**usually** 59:*2, 19, 21*
**utilize** 54:*25* 65:*2, 5*
**utilized** 48:*24*
**utilizing** 23:*9*

**< V >**
**variation** 34:*1, 3*
**variations** 35:*9*
**varies** 58:*9*
**vary** 58:*5*
**verbal** 114:*17*
**verbally** 29:*22* 107:*7*
**verifying** 104:*17*
**versus** 6:*14* 31:*1*
34:*4* 67:*24*
**Videoconferenced**
1:*12*
**virtually** 1:*14*
**vision** 17:*17, 24*
18:*18* 30:*7* 79:*16, 19*
**vital** 15:*1* 68:*4, 9, 13*
117:*22, 25* 118:*6, 14,
17* 119:*3*
**vs** 1:*6* 126:*5*

**< W >**
**Wait** 96:*4*
**walk** 11:*19* 14:*4*
57:*16*
**Wanda** 2:*16*
**want** 22:*15* 23:*21*
47:*15* 54:*17* 59:*14*

65:*19* 69:*25* 78:*4*
119:*18* 121:*6* 123:*12,
24*
**wanted** 81:*15*
**wanting** 53:*9, 18*
**wants** 86:*3*
**washed** 14:*23*
**watch** 11:*23*
**water** 30:*18* 32:*5*
37:*8* 72:*18* 73:*12*
82:*25* 110:*11*
**way** 41:*23* 64:*25*
74:*4* 84:*11* 92:*13*
99:*12* 104:*17* 111:*6,
9, 25* 120:*2, 9*
**ways** 29:*23* 31:*17,
19, 25* 51:*17* 53:*10*
**Wednesday** 1:*10*
**week** 11:*18* 25:*7, 9*
38:*16* 42:*1, 6, 9*
**weeks** 27:*11, 24*
**weight** 32:*3*
**well** 21:*17* 28:*9*
38:*3, 24* 64:*19* 75:*1*
107:*3* 121:*19*
**went** 20:*17* 37:*17*
104:*1*
**whatsoever** 122:*1*
**willing** 109:*11*
**willingly** 114:*23*
**withdrawal** 44:*23*
**WITNESS** 4:*2* 5:*5*
14:*10, 13* 21:*24*
24:*13* 33:*17* 34:*16*
36:*8* 38:*22* 41:*2*
44:*6* 46:*11* 47:*22*
52:*3* 56:*9, 20* 57:*7*
58:*9, 20* 59:*10* 60:*3*
63:*2* 64:*8, 16* 68:*3*
71:*21* 74:*18* 75:*4*
78:*1* 80:*3, 6* 81:*1, 17*
84:*5* 85:*4, 15* 86:*16,
20* 87:*15* 88:*3, 4, 20*
92:*10* 95:*8* 96:*8, 19*
98:*16* 99:*25* 103:*15*
109:*23* 110:*8* 113:*22*
124:*4* 125:*8*
**witness's** 87:*16*
**WITTEKIND** 3:*5*
4:*5* 34:*8* 35:*6* 36:*6*

39:*19*  40:*10, 14, 18,*
25  46:*8*  47:*20*  56:*1,*
*16*  57:*5*  59:*8*  61:*5*
62:*10*  63:*1*  64:*12*
71:*19*  74:*17, 24*  75:*2*
78:*14*  80:*22*  81:*9*
85:*2, 13*  86:*15*  87:*9,*
*23*  88:*16*  93:*16*  95:*6*
96:*12, 16*  109:*16, 21*
110:*21, 25*  113:*1*
114:*1, 14*  115:*8*
116:*20*  122:*6*  124:*2*
**wonderful**  40:*19*
**wondering**  33:*20, 25*
38:*17*  53:*17*  76:*18*
**Wood**  10:*5*
**work**  10:*4, 13*  15:*2,*
*6*  16:*1*  24:*11*  25:*8*
27:*10*  28:*1, 3, 14*
34:*4*  41:*17, 19*  42:*5,*
*9*  44:*12*  85:*21*  86:*5*
**worked**  10:*10*  13:*24*
19:*21*  26:*15*  34:*6*
36:*2*  38:*18*  41:*16, 20*
42:*15, 20*  57:*15*
60:*12*  65:*3*  70:*5*
71:*10*  90:*22*  106:*2*
116:*4*  121:*25*
**worker**  85:*19*
**working**  24:*18*  33:*4,*
*21*  36:*1, 4*  38:*2*
42:*13*  43:*2, 5*  80:*17*
85:*25*  87:*1*  89:*6*
97:*9*  106:*12, 17*
**works**  53:*15*  55:*15*
**wound**  15:*12*  67:*14*
**write**  39:*6*  74:*11*
83:*22*  98:*8, 11, 13, 18*
**write-up**  60:*17*
61:*13*  62:*6, 23*  63:*2,*
*4, 20*  64:*7*
**written**  64:*3*
**wrote**  85:*9*  114:*4*
120:*20, 21*


**< Y >**
**Yeah**  74:*2*
**year**  11:*17*  120:*14*
**years**  12:*15, 16*

**YesCare**  3:*7*  23:*8*
46:*12*  48:*1*  105:*5, 6*
106:*1*  107:*21*  111:*1*
115:*11, 23*  116:*11, 16*
**YesCare3432**  82:*1*
**YesCare3437**  82:*3*
**YesCare3438**  66:*4*
**YesCare3443**  66:*4*
**YesCare's**  46:*6*  81:*6*
**York**  10:*21*  11:*2*
13:*7*  14:*1, 21*  15:*6*


**< Z >**
**zeroes**  91:*25*
**Zoom**  2:*5, 11, 16, 21*
3:*8*

Deposition of Mariesha Apollon

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

## WORD LIST

**< $ >**
**$64** *(1)*

**< 0 >**
**000405** *(1)*

**< 1 >**
**1** *(16)*
**1:08** *(1)*
**10** *(1)*
**10/28/2023** *(1)*
**10:02** *(1)*
**10:04** *(1)*
**100** *(1)*
**11:00** *(4)*
**110** *(3)*
**117** *(2)*
**12** *(2)*
**12th** *(1)*
**13-week** *(2)*
**150** *(3)*
**1515** *(1)*
**15th** *(2)*
**16** *(1)*
**1717** *(1)*
**18** *(3)*
**1801** *(1)*
**19102** *(1)*
**19103** *(3)*
**19123** *(1)*
**1st** *(1)*

**< 2 >**
**2** *(6)*
**2:24-cv-05618-TJS** *(1)*
**20** *(1)*
**200** *(1)*
**2008** *(1)*
**2011** *(1)*
**2012** *(1)*
**2016** *(1)*
**2019** *(3)*
**2020** *(1)*
**2021** *(2)*
**2023** *(17)*
**2024** *(2)*
**2025** *(2)*

**215.561.2300** *(1)*
**215.564.0400** *(1)*
**215.569.4433** *(1)*
**215.683.5000** *(1)*
**22** *(1)*
**23-hour** *(1)*
**25** *(1)*
**26** *(2)*
**28** *(12)*
**28th** *(3)*

**< 3 >**
**3** *(4)*
**3:00** *(6)*
**3:30** *(1)*
**30** *(6)*
**300** *(1)*
**350** *(1)*

**< 4 >**
**4** *(1)*
**400** *(3)*
**409** *(1)*
**412.654.9070** *(1)*
**46484** *(1)*

**< 5 >**
**5** *(3)*
**500** *(2)*
**542** *(7)*

**< 6 >**
**6** *(1)*
**610** *(1)*
**631** *(1)*
**6th** *(1)*

**< 7 >**
**7:00** *(1)*
**70** *(2)*

**< 8 >**
**8:00** *(1)*
**8-hour** *(1)*

**< 9 >**
**911** *(12)*
**97** *(1)*
**97.0** *(1)*

**< A >**
**a.m** *(2)*
**AAOX3** *(2)*
**abbreviation** *(1)*
**ability** *(1)*
**able** *(3)*
**abnormal** *(1)*
**ABOLITIONIST** *(1)*
**abrasion** *(1)*
**abusing** *(1)*
**access** *(13)*
**Accu-Chek** *(3)*
**accurate** *(11)*
**acknowledge** *(1)*
**action** *(7)*
**actual** *(1)*
**addition** *(3)*
**additional** *(9)*
**address** *(2)*
**administer** *(10)*
**administered** *(3)*
**administering** *(2)*
**administration** *(2)*
**administrator** *(3)*
**Administrators** *(1)*
**admissible** *(1)*
**admission** *(1)*
**advising** *(1)*
**affiliated** *(1)*
**afternoon** *(1)*
**agency** *(2)*
**ago** *(5)*
**agree** *(1)*
**agreed** *(2)*
**agreement** *(1)*
**ahead** *(5)*
**aide** *(4)*
**aide/medical** *(1)*
**al** *(2)*
**alcohol** *(1)*
**alert** *(6)*
**alerting** *(1)*
**Alex** *(1)*
**allow** *(4)*
**altered** *(1)*
**amount** *(6)*
**amounts** *(1)*
**and/or** *(1)*

**Answer** *(59)*
**answered** *(3)*
**answering** *(7)*
**answers** *(7)*
**anybody** *(3)*
**anybody's** *(1)*
**APOLLON** *(14)*
**A-P-O-L-L-O-N** *(1)*
**Apollon's** *(1)*
**APPEARANCES** *(2)*
**Appearing** *(5)*
**appears** *(2)*
**applicable** *(1)*
**application** *(1)*
**apply** *(1)*
**appropriate** *(2)*
**approximately** *(8)*
**Arch** *(2)*
**area** *(4)*
**argue** *(1)*
**articulated** *(1)*
**aside** *(2)*
**asked** *(15)*
**asking** *(23)*
**asserted** *(1)*
**asserting** *(7)*
**assess** *(1)*
**assessing** *(3)*
**assessment** *(20)*
**assessor** *(1)*
**assigned** *(3)*
**assist** *(1)*
**assistant** *(24)*
**assistants** *(1)*
**associated** *(3)*
**associate's** *(1)*
**assume** *(2)*
**assumed** *(1)*
**assumption** *(1)*
**attempting** *(1)*
**Attorney** *(9)*
**attorney/client** *(2)*
**attorneys** *(3)*
**August** *(4)*
**Austen** *(1)*
**authority** *(2)*
**available** *(2)*
**average** *(2)*
**avoid** *(1)*

Deposition of Mariesha Apollon     Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Awake  *(3)*

**< B >**
Bachelor's  *(1)*
back  *(22)*
background  *(1)*
BAKER  *(90)*
based  *(26)*
basic  *(1)*
basically  *(2)*
basis  *(1)*
Bates  *(9)*
bathing  *(1)*
Bear  *(2)*
bearing  *(1)*
beautiful  *(1)*
becoming  *(1)*
beds  *(2)*
began  *(2)*
beginning  *(2)*
begins  *(2)*
behalf  *(1)*
belated  *(1)*
believe  *(17)*
beneath  *(1)*
beyond  *(2)*
birth  *(4)*
bit  *(4)*
Blanche  *(1)*
bleeding  *(1)*
blood  *(26)*
Bloodsaw  *(1)*
blurred  *(5)*
blurry  *(1)*
BMI  *(1)*
board  *(3)*
Body  *(3)*
book  *(1)*
born  *(1)*
bottom  *(3)*
Boulevard  *(1)*
box  *(2)*
break  *(5)*
breaks  *(1)*
breathing  *(1)*
BRET  *(3)*
brief  *(1)*
bring  *(2)*
broader  *(1)*

broke  *(2)*
Brooklyn  *(2)*
brought  *(2)*
built  *(1)*
bunch  *(1)*

**< C >**
call  *(42)*
called  *(13)*
calling  *(2)*
calls  *(4)*
capacity  *(1)*
Capella  *(1)*
captioned  *(1)*
carbohydrates  *(1)*
care  *(27)*
Career  *(6)*
cares  *(1)*
Carey  *(3)*
caring  *(1)*
Carney  *(1)*
carried  *(3)*
carry  *(1)*
case  *(17)*
category  *(1)*
caveat  *(1)*
CENTER  *(8)*
certain  *(4)*
certainly  *(3)*
certificate  *(2)*
certify  *(3)*
certifying  *(1)*
cetera  *(1)*
CFCF  *(27)*
challenges  *(2)*
chances  *(1)*
change  *(16)*
changes  *(2)*
Chapel  *(2)*
characterize  *(2)*
characterized  *(1)*
Charge  *(6)*
check  *(8)*
checked  *(3)*
checking  *(1)*
checks  *(3)*
chronic  *(1)*
circumstances  *(1)*
CITY  *(8)*

clarification  *(2)*
clarified  *(1)*
clarify  *(3)*
class  *(1)*
classroom  *(1)*
clear  *(12)*
click  *(1)*
clicked  *(1)*
client  *(4)*
clinic  *(1)*
clinical  *(5)*
closer  *(1)*
clothing  *(1)*
color  *(5)*
colors  *(1)*
come  *(5)*
comes  *(1)*
comfortable  *(1)*
coming  *(3)*
commencing  *(1)*
comment  *(1)*
common  *(1)*
Commonwealth  *(2)*
communications  *(1)*
company  *(4)*
compensation  *(3)*
complement  *(1)*
complete  *(1)*
completed  *(4)*
completely  *(1)*
compliant  *(1)*
compos  *(1)*
compound  *(1)*
computer  *(3)*
concern  *(2)*
concerned  *(1)*
concerns  *(1)*
concluded  *(1)*
condition  *(1)*
conditions  *(7)*
conduct  *(3)*
conducted  *(1)*
confirm  *(1)*
confused  *(1)*
confusion  *(3)*
congratulations  *(1)*
conjunction  *(1)*
consequence  *(1)*
consider  *(1)*

considered  *(2)*
consist  *(2)*
consisted  *(1)*
consistent  *(3)*
consult  *(2)*
contact  *(1)*
content  *(1)*
context  *(2)*
Continued  *(2)*
continuing  *(1)*
continuity  *(3)*
contract  *(4)*
contradiction  *(1)*
contradicts  *(1)*
conversation  *(4)*
conversations  *(1)*
copy  *(6)*
Corinne  *(1)*
Corp  *(1)*
correct  *(22)*
Correctional  *(5)*
corrections  *(2)*
correctly  *(1)*
counsel  *(5)*
couple  *(7)*
course  *(1)*
COURT  *(9)*
covered  *(2)*
covering  *(1)*
coworkers  *(1)*
create  *(2)*
created  *(1)*
credibility  *(3)*
Curran-Fromhold  *(2)*
currently  *(3)*
custody  *(1)*
cut  *(1)*

**< D >**
dark  *(1)*
darker  *(1)*
date  *(9)*
dated  *(1)*
daughter  *(2)*
day  *(16)*
days  *(12)*
DC  *(2)*
death  *(11)*
decide  *(4)*

Deposition of Mariesha Apollon                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

decision  (2)
decisions  (1)
**DECLARATION**  (1)
declare  (1)
declined  (1)
**Defendant**  (5)
**Defendant(s**  (1)
**Defendants**  (2)
define  (1)
definitely  (1)
degree  (6)
degrees  (2)
dehydrated  (1)
dehydration  (3)
**DEPARTMENT**  (8)
depend  (1)
dependent  (1)
depending  (4)
deposition  (25)
describe  (4)
described  (1)
**DESCRIPTION**  (1)
details  (1)
**Detention**  (1)
determine  (2)
determined  (5)
determining  (3)
develop  (1)
diabetes  (41)
diabetic  (20)
diagnosed  (1)
diagnosis  (1)
died  (5)
diet  (4)
difference  (2)
differences  (2)
different  (21)
differently  (1)
**Digital**  (1)
dip  (1)
**Direction**  (1)
directly  (1)
director  (2)
disciplinary  (5)
disclose  (1)
discovery  (5)
discussed  (1)
**Discussion**  (5)
discussions  (2)

distinguished  (1)
**DISTRICT**  (2)
doctor  (17)
doctors  (4)
doctor's  (1)
document  (48)
documentation  (6)
documentations  (2)
documented  (12)
documenting  (2)
**Documents**  (8)
doing  (3)
dosage  (1)
dosages  (1)
draw  (1)
drew  (1)
drink  (3)
drinking  (1)
drinks  (1)
dropping  (1)
drugs  (1)
duly  (1)
**Dysphagia**  (1)

< E >
earlier  (8)
easier  (1)
**EASTERN**  (1)
educate  (1)
education  (4)
educational  (1)
efficient  (1)
eight  (1)
eight-hour  (1)
either  (1)
**EKG**  (2)
**EKGs**  (1)
electronic  (11)
**Electronically**  (2)
emails  (1)
emergency  (4)
emergent  (7)
**EMILY**  (2)
employed  (4)
employee  (8)
employees  (1)
employer  (2)
employer's  (1)
employment  (6)

encounter  (16)
encountered  (1)
encourage  (1)
ended  (1)
endocrinologist  (2)
endoscopy  (6)
engage  (1)
enlarge  (1)
entails  (1)
enter  (6)
entered  (1)
entire  (1)
entirety  (1)
entitled  (1)
entity  (1)
**ERRATA**  (4)
**ESQUIRE**  (7)
**Established**  (1)
**Estate**  (1)
et  (3)
evaluating  (2)
evaluation  (2)
**Everest**  (1)
everyone's  (1)
exactly  (2)
**EXAMINATION**  (7)
examined  (1)
**Excessive**  (1)
excluding  (1)
excuse  (2)
excused  (1)
exercise  (1)
exercises  (1)
exhibits  (1)
expect  (1)
expectations  (1)
expected  (2)
experience  (1)
experiencing  (2)
expert  (2)
explain  (3)
explanation  (2)
exploring  (1)
extend  (1)
extended  (1)

< F >
facility  (9)
**Fahrenheit**  (1)

fairness  (1)
fall  (1)
familiar  (12)
familiarity  (1)
familiarize  (1)
far  (1)
fast  (1)
faster  (2)
fault  (1)
**February**  (1)
feet  (1)
field  (1)
file  (2)
fill  (6)
filled  (9)
financially  (1)
fine  (1)
finish  (5)
firing  (1)
first  (12)
**Five**  (6)
five-minute  (1)
**Flag**  (1)
floor  (1)
flush  (2)
follow  (10)
following  (1)
follows  (1)
follow-up  (11)
follow-ups  (3)
foregoing  (2)
forgot  (1)
form  (54)
formal  (2)
forms  (4)
forth  (1)
**Four**  (2)
**Frasier**  (1)
free  (2)
frequent  (1)
frequently  (2)
front  (6)
full  (1)
further  (5)

< G >
gather  (1)
**Gay**  (27)
**Gays**  (1)

Deposition of Mariesha Apollon       Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

| | | | |
|---|---|---|---|
| Gene *(1)* | HIV *(1)* | insight *(1)* | Jung's *(7)* |
| general *(4)* | HIV/AIDS *(1)* | instance *(3)* | |
| generally *(9)* | HOFF *(2)* | instances *(4)* | **< K >** |
| generated *(1)* | hold *(2)* | institution *(3)* | KAMINSKY *(1)* |
| getting *(2)* | home *(16)* | institutions *(1)* | keep *(1)* |
| give *(15)* | homicidal *(1)* | institution's *(1)* | ketoacidosis *(1)* |
| given *(11)* | hopefully *(1)* | instruct *(4)* | ketones *(16)* |
| giving *(2)* | Hospital *(12)* | instructed *(3)* | KIERNAN *(1)* |
| glucose *(21)* | hour *(4)* | instructing *(6)* | KIMBALL *(1)* |
| go *(26)* | hours *(6)* | Insulin *(54)* | kind *(2)* |
| goes *(2)* | housing *(2)* | insulins *(2)* | knew *(4)* |
| going *(17)* | HU *(1)* | intake *(118)* | know *(44)* |
| Good *(5)* | hyperglycemia *(7)* | interaction *(2)* | knowledge *(1)* |
| GORDON *(1)* | hyperglycemic *(1)* | interested *(1)* | |
| gotten *(2)* | hypertension *(1)* | intermetex *(2)* | **< L >** |
| gradations *(1)* | hypoglycemia *(2)* | I-N-T-E-R-M-E-T-E- | laid *(1)* |
| graduate *(2)* | hypoglycemia/hypergl | X *(1)* | language *(1)* |
| graduated *(2)* | ycemia *(1)* | interrogatories *(1)* | larger *(1)* |
| GROTE *(114)* | hypoglycemic *(1)* | Interrogatory *(3)* | LAW *(2)* |
| ground *(1)* | | intervention *(7)* | lawsuit *(1)* |
| grounds *(2)* | **< I >** | interventions *(2)* | lawyers *(2)* |
| guess *(4)* | identified *(2)* | involve *(1)* | learn *(4)* |
| guidance *(1)* | Identify *(3)* | involved *(2)* | learned *(7)* |
| guidelines *(6)* | identities *(1)* | Isabella *(8)* | led *(1)* |
| guidelines/protocols | illness *(1)* | issue *(6)* | level *(12)* |
| *(1)* | immediate *(1)* | issues *(3)* | levels *(2)* |
| | inaccurate *(1)* | its *(1)* | license *(9)* |
| **< H >** | inappropriate *(1)* | IV *(1)* | light *(1)* |
| Hamilton *(1)* | incident *(1)* | | lighter *(1)* |
| hand *(1)* | include *(3)* | **< J >** | limited *(1)* |
| Hang *(2)* | included *(2)* | JACOB *(1)* | limits *(2)* |
| happen *(4)* | includes *(1)* | jail *(1)* | Line *(12)* |
| happened *(6)* | including *(3)* | jails *(1)* | listed *(1)* |
| hard *(3)* | incorrect *(2)* | JAMES *(1)* | litigation *(1)* |
| harm *(1)* | independent *(4)* | January *(4)* | little *(7)* |
| head *(1)* | INDEX *(1)* | Jared *(4)* | located *(1)* |
| health *(9)* | indicate *(4)* | Jeoboham *(1)* | location *(1)* |
| hear *(5)* | indicated *(6)* | Jersey *(3)* | log *(1)* |
| heard *(8)* | indicates *(3)* | JFK *(1)* | log-in *(1)* |
| heart *(1)* | indicating *(1)* | Job *(12)* | Lolo *(1)* |
| heavier *(1)* | individual *(5)* | jobs *(1)* | long *(8)* |
| held *(6)* | infirmary *(10)* | Johnson *(1)* | long-acting *(1)* |
| help *(4)* | inform *(1)* | join *(7)* | longer *(1)* |
| helps *(1)* | information *(21)* | JONATHAN *(1)* | look *(10)* |
| hereof *(1)* | informed *(2)* | JR *(2)* | looked *(2)* |
| high *(6)* | injectable *(1)* | judge *(1)* | looking *(5)* |
| higher *(4)* | inmate *(3)* | judgment *(1)* | Lose *(1)* |
| hired *(4)* | inmates *(2)* | June *(1)* | lost *(1)* |
| history *(3)* | inquiry *(3)* | JUNG *(55)* | lot *(3)* |

loud  *(2)*
LOUIS  *(2)*
low  *(1)*
lowers  *(1)*
LPNs  *(2)*

**< M >**
ma'am  *(1)*
majority  *(1)*
making  *(4)*
managed  *(2)*
manner  *(1)*
Manor  *(2)*
MANSUKHANI  *(1)*
MARGO  *(1)*
MARIESHA  *(9)*
M-A-R-I-E-S-H-A  *(1)*
MARKED  *(4)*
Market  *(1)*
Marsha  *(7)*
Marsha's  *(1)*
math  *(2)*
matter  *(2)*
matters  *(1)*
Maureen  *(24)*
mean  *(22)*
Meaning  *(1)*
means  *(2)*
meant  *(4)*
Med  *(1)*
medical  *(63)*
medication  *(17)*
medications  *(5)*
meet  *(1)*
Megan  *(2)*
Mellitus  *(2)*
memory  *(1)*
mental  *(6)*
mentioned  *(1)*
mentis  *(1)*
met  *(2)*
middle  *(4)*
Mike  *(1)*
mine  *(1)*
mini  *(2)*
minutes  *(9)*
mischaracterizes  *(1)*
misunderstanding  *(1)*
mm-mmh  *(1)*

modifiable  *(1)*
modification  *(1)*
moment  *(6)*
money  *(1)*
month  *(4)*
months  *(6)*
morning  *(4)*
mortality  *(1)*
moved  *(2)*
moving  *(1)*

**< N >**
name  *(13)*
named  *(1)*
names  *(3)*
nature  *(3)*
necessarily  *(1)*
necessary  *(1)*
need  *(11)*
needed  *(5)*
needs  *(8)*
negative  *(1)*
neither  *(1)*
NET  *(3)*
never  *(4)*
New  *(11)*
nice  *(1)*
No.____Change  *(14)*
No.____Line  *(12)*
No.____Line  *(2)*
nods  *(1)*
noncompliant  *(6)*
non-intake  *(1)*
normal  *(7)*
Norristown  *(4)*
Notary  *(2)*
note  *(18)*
notes  *(4)*
notice  *(2)*
notified  *(1)*
notify  *(1)*
November  *(4)*
number  *(7)*
numbers  *(7)*
nurse  *(41)*
nurses  *(2)*
nursing  *(24)*

**< O >**

oath  *(1)*
object  *(21)*
objecting  *(1)*
Objection  *(52)*
objective  *(2)*
objectives  *(1)*
observation  *(1)*
observed  *(1)*
obtain  *(3)*
occasion  *(1)*
occur  *(1)*
O'CONNOR  *(1)*
October  *(17)*
offer  *(3)*
offered  *(3)*
office  *(4)*
officer  *(1)*
officers  *(1)*
oftentimes  *(1)*
Okay  *(20)*
older  *(1)*
once  *(3)*
ones  *(1)*
opinion  *(2)*
opportunity  *(1)*
opposed  *(1)*
oral  *(3)*
order  *(30)*
ordered  *(7)*
ordering  *(1)*
orders  *(10)*
oriented  *(6)*
outpatient  *(1)*
outset  *(1)*
outside  *(5)*
overall  *(1)*
overcrowded  *(2)*
overtime  *(4)*
oxygen  *(1)*

**< P >**
p.m  *(4)*
pace  *(1)*
packages  *(1)*
PAGE  *(44)*
pages  *(4)*
pamphlet  *(1)*
pandemic  *(2)*
paper  *(6)*

paperwork  *(3)*
PAR  *(1)*
part  *(25)*
particular  *(2)*
parties  *(2)*
pass  *(5)*
passing  *(1)*
pathway  *(3)*
pathways  *(2)*
patient  *(55)*
patient/prisoner  *(1)*
patients  *(21)*
patient's  *(3)*
pause  *(1)*
pay  *(6)*
PDP  *(19)*
PDP18  *(1)*
PDP's  *(1)*
penalty  *(3)*
PENNSYLVANIA
  *(10)*
people  *(7)*
perform  *(1)*
performing  *(1)*
period  *(1)*
periods  *(1)*
PERJURY  *(2)*
person  *(12)*
personally  *(1)*
person's  *(2)*
pertaining  *(3)*
PHILADELPHIA
  *(17)*
phone  *(3)*
phrased  *(3)*
physical  *(2)*
physically  *(8)*
pick  *(1)*
picked  *(2)*
place  *(4)*
placed  *(1)*
placement  *(1)*
Plaintiff  *(2)*
plaintiffs  *(1)*
plan  *(1)*
play  *(1)*
please  *(9)*
plenty  *(1)*
point  *(2)*

policies  *(3)*
policy  *(2)*
pop  *(2)*
pop-ups  *(1)*
portion  *(3)*
position  *(6)*
positive  *(2)*
possible  *(2)*
post  *(2)*
potentially  *(3)*
power  *(1)*
powers  *(1)*
practice  *(7)*
practitioner  *(2)*
preceptor  *(5)*
pregnant  *(1)*
pre-intake  *(7)*
preparation  *(2)*
prepare  *(1)*
prepared  *(2)*
preparing  *(1)*
prescribe  *(1)*
prescribed  *(3)*
presence  *(2)*
PRESENT  *(3)*
pressure  *(4)*
prevent  *(1)*
previous  *(2)*
previously  *(1)*
print  *(1)*
printed  *(1)*
prior  *(6)*
prison  *(24)*
prisoner  *(9)*
prisoners  *(1)*
Prisons  *(8)*
prison's  *(1)*
private  *(5)*
privilege  *(10)*
Probably  *(2)*
procedure  *(1)*
process  *(16)*
produce  *(1)*
produced  *(5)*
Production  *(2)*
profession  *(1)*
Professional  *(2)*
progress  *(12)*
prompt  *(2)*

pronouncing  *(1)*
proper  *(2)*
properly  *(2)*
protocol  *(3)*
protocols  *(2)*
provide  *(12)*
provided  *(26)*
provider  *(29)*
providers  *(5)*
provider's  *(2)*
provides  *(2)*
providing  *(3)*
Psychiatric  *(3)*
Public  *(2)*
pulled  *(1)*
pursuant  *(1)*
put  *(10)*
putting  *(2)*

< Q >
qualified  *(1)*
Question  *(64)*
questionnaire  *(3)*
questionnaires  *(1)*
questions  *(31)*
quick  *(1)*

< R >
raise  *(1)*
range  *(7)*
ranges  *(6)*
rate  *(12)*
Ray  *(3)*
RAYMOND  *(1)*
reached  *(3)*
reaches  *(1)*
read  *(5)*
reading  *(1)*
readings  *(2)*
really  *(4)*
re-ask  *(1)*
reason  *(19)*
reassess  *(3)*
reassessed  *(1)*
reassessment  *(18)*
reassessments  *(5)*
recall  *(80)*
receive  *(14)*
received  *(9)*

receiving  *(4)*
recollection  *(15)*
record  *(30)*
records  *(5)*
recover  *(1)*
recovered  *(1)*
recruited  *(1)*
recruiter  *(4)*
recruiting  *(1)*
Red  *(1)*
redacted  *(1)*
REES  *(1)*
refer  *(4)*
reference  *(2)*
referenced  *(1)*
referred  *(2)*
referring  *(6)*
reflect  *(1)*
refresh  *(3)*
refreshed  *(1)*
refreshes  *(2)*
refusal  *(5)*
refused  *(4)*
refuses  *(3)*
refusing  *(1)*
regard  *(4)*
regarding  *(3)*
registered  *(5)*
Rehabilitation  *(5)*
related  *(1)*
relationship  *(2)*
relative  *(2)*
relevance  *(6)*
relevant  *(4)*
remain  *(1)*
remains  *(1)*
remember  *(27)*
reminder  *(1)*
remotely  *(2)*
removed  *(1)*
repeat  *(3)*
rephrase  *(13)*
rephrased  *(1)*
Reporter  *(10)*
represent  *(1)*
reprimand  *(1)*
reproduced  *(1)*
Request  *(1)*
requested  *(2)*

required  *(4)*
requirement  *(1)*
requirements  *(2)*
requires  *(2)*
resolved  *(2)*
respect  *(3)*
respectful  *(1)*
Respiration  *(1)*
respiratory  *(1)*
respond  *(4)*
response  *(7)*
responsibilities  *(5)*
responsibility  *(3)*
rest  *(1)*
restate  *(1)*
restroom  *(1)*
result  *(1)*
résumé  *(1)*
retained  *(1)*
retrospectively  *(1)*
returned  *(1)*
Returning  *(1)*
returns  *(1)*
reveal  *(2)*
reveals  *(1)*
review  *(8)*
reviewed  *(4)*
Right  *(12)*
risks  *(4)*
Robert  *(1)*
role  *(7)*
room  *(2)*
route  *(1)*
routine  *(1)*
rules  *(1)*
run  *(4)*
runs  *(1)*

< S >
samples  *(2)*
SARAH  *(1)*
saturation  *(1)*
save  *(1)*
saw  *(5)*
saying  *(5)*
says  *(21)*
scale  *(6)*
scales  *(1)*
scheduled  *(3)*

Deposition of Mariesha Apollon                                     Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

scheme *(1)*
school *(4)*
schooling *(1)*
science *(1)*
scope *(2)*
screen *(7)*
screening *(18)*
scroll *(3)*
SCULLY *(1)*
second *(3)*
secondary *(1)*
section *(5)*
security *(3)*
see *(26)*
seeing *(6)*
seeking *(5)*
seen *(6)*
self-explanatory *(1)*
send *(1)*
sense *(1)*
sent *(3)*
September *(1)*
Septemberish *(1)*
series *(1)*
Serrano *(1)*
session *(3)*
set *(2)*
seven *(3)*
Shadow *(1)*
shakiness *(1)*
share *(4)*
SHEET *(4)*
sheltered *(1)*
shift *(9)*
shifts *(8)*
shocked *(1)*
short-acting *(1)*
shortly *(1)*
show *(4)*
showed *(3)*
showing *(2)*
side *(1)*
sign *(4)*
signature *(2)*
SIGNATURE:_____
_____DA
TE *(2)*
signed *(3)*
signs *(14)*

similar *(1)*
simply *(2)*
sir *(1)*
site *(12)*
situation *(4)*
situations *(1)*
six *(5)*
six-month *(1)*
skip *(1)*
sliding *(5)*
small *(1)*
Smith *(5)*
Smith's *(1)*
SOAP *(1)*
social *(1)*
somebody *(9)*
somebody's *(3)*
someone's *(1)*
son *(1)*
sorry *(6)*
sound *(3)*
source *(1)*
speak *(10)*
speaking *(5)*
specialist *(10)*
specialists *(1)*
specific *(7)*
specifically *(5)*
spectrum *(1)*
speculate *(2)*
speculating *(1)*
speculation *(2)*
speech *(2)*
speechless *(3)*
spell *(1)*
spoke *(12)*
stab *(1)*
staff *(9)*
Staffing *(4)*
stamp *(3)*
standard *(3)*
start *(4)*
started *(4)*
starting *(1)*
state *(5)*
stated *(11)*
STATES *(4)*
stating *(2)*
stationed *(3)*

status *(5)*
stayed *(1)*
steps *(1)*
Stipulations *(1)*
stopped *(1)*
stored *(3)*
Strategies *(1)*
Street *(5)*
strict *(2)*
stricter *(1)*
strike *(1)*
strip *(1)*
stuff *(2)*
subject *(1)*
Subjective *(7)*
subsequent *(1)*
sued *(1)*
sugar *(16)*
sugary *(1)*
suicidal *(1)*
Suite *(2)*
SUMMER *(3)*
supervisor *(6)*
supervisors *(1)*
SUPPORT *(1)*
supposed *(11)*
sure *(14)*
surgeries *(1)*
sweatiness *(1)*
Sweating *(2)*
sworn *(2)*
symptomatic *(2)*
symptoms *(11)*
system *(9)*

< T >
take *(15)*
taken *(9)*
talk *(6)*
talking *(8)*
taught *(2)*
tax *(1)*
Tekaccel *(5)*
telephone *(3)*
tell *(12)*
telling *(3)*
tells *(2)*
temperature *(3)*
term *(8)*

terms *(4)*
test *(5)*
testified *(7)*
testify *(1)*
testifying *(1)*
testimony *(10)*
Texas *(1)*
Thank *(15)*
therapy *(1)*
thing *(3)*
things *(22)*
think *(34)*
third *(2)*
THOMAS *(9)*
thought *(6)*
three *(7)*
three-day *(1)*
threshold *(1)*
time *(23)*
times *(16)*
title *(1)*
today *(3)*
today's *(1)*
told *(17)*
Tom *(1)*
tool *(3)*
tools *(3)*
top *(1)*
touched *(1)*
track *(1)*
trained *(8)*
training *(37)*
transcript *(3)*
transfer *(1)*
transferred *(1)*
transmit *(1)*
treat *(1)*
treated *(3)*
treating *(1)*
treatment *(2)*
TREBACH *(1)*
triage *(3)*
trial *(1)*
trip *(1)*
true *(4)*
truthful *(1)*
try *(3)*
trying *(3)*
twice *(1)*

Deposition of Mariesha Apollon

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

two *(13)*
two-hour *(1)*
type *(32)*
typed *(1)*
types *(2)*
typical *(4)*
typically *(1)*

**< U >**
unclear *(1)*
uncontrollably *(1)*
underneath *(1)*
understand *(14)*
understanding *(6)*
understood *(5)*
unit *(1)*
UNITED *(1)*
units *(9)*
University *(1)*
Unlimited *(2)*
uploaded *(1)*
urgent *(4)*
urination *(2)*
urine *(7)*
use *(5)*
usually *(3)*
utilize *(3)*
utilized *(1)*
utilizing *(1)*

**< V >**
variation *(2)*
variations *(1)*
varies *(1)*
vary *(1)*
verbal *(1)*
verbally *(2)*
verifying *(1)*
versus *(4)*
Videoconferenced *(1)*
virtually *(1)*
vision *(6)*
vital *(10)*
vs *(2)*

**< W >**
Wait *(1)*
walk *(3)*
Wanda *(1)*

want *(12)*
wanted *(1)*
wanting *(2)*
wants *(1)*
washed *(1)*
watch *(1)*
water *(8)*
way *(12)*
ways *(6)*
Wednesday *(1)*
week *(7)*
weeks *(2)*
weight *(1)*
well *(8)*
went *(3)*
whatsoever *(1)*
willing *(1)*
willingly *(1)*
withdrawal *(1)*
WITNESS *(55)*
witness's *(1)*
WITTEKIND *(48)*
wonderful *(1)*
wondering *(5)*
Wood *(1)*
work *(20)*
worked *(20)*
worker *(1)*
working *(16)*
works *(2)*
wound *(2)*
write *(7)*
write-up *(8)*
written *(1)*
wrote *(4)*

**< Y >**
Yeah *(1)*
year *(2)*
years *(2)*
YesCare *(13)*
YesCare3432 *(1)*
YesCare3437 *(1)*
YesCare3438 *(1)*
YesCare3443 *(1)*
YesCare's *(2)*
York *(7)*

**< Z >**

zeroes *(1)*
Zoom *(5)*