# EXHIBIT "C"



EXPERT WITNESS REPORT OF LORI E. ROSCOE, DNP, PhD, APRN, ANP-C, CCHP-RN
REGARDING Louis Jung

I have been retained to render opinions regarding the care and treatment of Mr. Louis Jung while detained at the Philadelphia Department of Prisons. My opinions are based on my knowledge, education, training and experience, and the records, videos, and reports I reviewed regarding this matter.

EXPERIENCE AND QUALIFICATIONS:

I am an Advanced Practice Registered Nurse, certified as an Adult Nurse Practitioner. I have a Bachelor's Degree in Education, a Bachelor's Degree in Nursing, a Master's Degree in Public Administration with a healthcare concentration, a Master's Degree in Nursing, a Doctorate Degree in Healthcare Administration, and a Doctor of Nursing Practice degree. I am certified by the National Commission on Correctional Healthcare (NCCHC) as a Correctional Health Professional and a Correctional Health Professional – Registered Nurse. I am currently the principal of Correctional HealthCare Consultants LLC. I began in correctional healthcare in 1995, and have worked in various correctional healthcare roles, including as a correctional facility Health Services Administrator, a Regional Administrator, an Associate Program Director, an Executive Director of Clinical Services, a nurse practitioner, and a registered nurse. I have active registered nurse licensure in California, Kentucky, Florida, Washington, Virginia, and Georgia. In addition, I am licensed as an Autonomous Advanced Practice Registered Nurse (nurse practitioner) in Florida and an Advanced Practice Registered Nurse (nurse practitioner) in California, Kentucky, Virginia, and Georgia.

I have worked for private contractors, such as Correct Care Solutions and CorrectHealth, LLC, and state subcontractors, such as the Medical College of Georgia. In my administrative roles, I was

responsible for policy and procedure development; staff supervision, including RNs, LPNs and ancillary staff; staff education, including RNs, LPNs, ancillary staff, providers and custody staff; Continuous Quality Improvement Programs; and fiscal management. I continue to provide these services, as well as healthcare program transitional, evaluative and consultation services to correctional health programs through Correctional HealthCare Consultants LLC.

I am a member of the American Nurses Association's national expert workgroup that reviewed and revised the *Correctional Nursing: Scope and Standards of Practice,* most recently published in 2021 (third edition).  Under the auspices of the American Correctional Nurses Association, I am currently working on the fourth edition, expected to be published in 2026.

I am a member of the National Commission on Correctional Health Care (NCCHC) Multidisciplinary Education Committee, and a member of the American Correctional Association's Nursing Committee and Healthcare Committee.  I am a peer reviewer for the Journal of Correctional Health Care. I was an invited expert on the 2024-2025 NCCHC Standards Advisory Task Force that reviewed/edited the 2026 *Standards for Health Services in Jails* and the *Standards for Health Services in Prisons,* published in August 2025.

I am a founding member and President-Elect of the American Correctional Nurses Association.  A complete listing of my education, training, and experience is set forth in my Curriculum Vitae, a copy of which is attached to this report as Exhibit A.

COMPENSATION AND PRIOR TESTIMONY:

I have attached to this report as Exhibit B a list of all cases in which I have testified by deposition or at trial in the last four years.  I currently receive compensation of $400 per hour for case review and expert report production, with an initial retainer of $5000 for up to 10 hours of work.  I receive $650 per hour compensation for deposition and court testimony, with a four-hour daily minimum, and travel time reimbursed at $275 per hour as applicable. Travel expenses are charged per actual cost.

DOCUMENTATION REVIEWED:

Please see Exhibit C attached to this report.


SUMMARY

On October 27, 2023, Mr. Jung was discharged from Norristown Hospital and remanded to the Philadelphia Department of Prisons (PDP). On October 28, 2023, Medical Assistant (MA) Carullo completed a pre-intake screening and documented that Mr. Jung was a diabetic. His blood glucose was measured at 542 mg/dL. However, on the Confidential Intake Questionnaire completed that same day, it was documented that Mr. Jung was *not* a diabetic. On the Physical Health Follow-Up form, he was referred for a 28-day chronic care appointment for diabetes management.

Later on October 28, 2023, Registered Nurse (RN) Mariesha Apollon completed Mr. Jung's intake evaluation. She documented that he was not currently taking medication for diabetes, although elsewhere on the form it was indicated that he *was* a diabetic per the pre-intake screening.  A history of non-compliance with other medical treatments was also noted. Vital signs were recorded as: blood pressure 110/82 mmHg, pulse 92 beats per minute, respirations 18 breaths per minute, oxygen saturation 97%, temperature 97.0°F, and blood glucose 542 mg/dL. Mr. Jung reported that he had not received insulin for three days.

RN Apollon contacted a provider, who ordered 10 units of NPH and 12 units of regular insulin; these doses were administered, and Mr. Jung was provided a snack. A urine dip revealed the presence of ketones, and Mr. Jung was encouraged to drink fluids. RN Apollon initiated an urgent behavioral health referral as well as a behavioral health reentry referral. She completed a referral for practitioner evaluation and review of medication.

At approximately 2148 hours on October 28, 2023, Nurse Practitioner (NP) Gay reviewed Mr. Jung's intake screening. She wrote he had previously been admitted to the PDP in June 2023, and she renewed his previously ordered medications (levothyroxine and atorvastatin). She documented his medical history as including diabetes, hypercholesterolemia, COVID-19, MRSA, and a history of

non-compliance with medical treatment. NP Gay reiterated that Mr. Jung's blood glucose was 542 mg/dL upon entry; that he had not received insulin for three days; and that he was administered 10 units of NPH and 12 units of regular insulin earlier that day.

NP Gay's assessment included mixed hyperlipidemia, hypothyroidism, and diabetes mellitus without complications. She ordered Novolin N (NPH) 10 units twice daily for 90 days and Novolin R (regular insulin) on a sliding-scale, to be administered twice daily beginning October 28, 2023. NP Gay's disposition included admission to general population with medications ordered, laboratory tests and diagnostics ordered, and chronic care follow-up scheduled.

This facility uses the term CRIC to refer to *Corrective Regular Insulin Coverage*, which is regular insulin administered to address hyperglycemia identified through blood glucose checks. CRIC is usually ordered on a sliding scale, which means there is a range of dosages ordered, and nursing staff must administer the dose corresponding to the actual blood glucose as measured by a glucometer. Also at this time, Policy and Procedure stated that when an incarcerated person refused their insulin, a refusal form is completed, signed and entered into their health record. In addition, an appointment to speak to a provider (red flag appointment) should be created every time an incarcerated person does not receive their prescribed insulin. This appointment should occur the next day per the Nursing Encounter Tool (NET) for Hyper/Hypoglycemia.

On October 29, 2023, Mr. Jung's morning blood glucose was 385 mg/dL, and he received 10 units of CRIC and 10 units of NPH. His afternoon blood glucose was 585 mg/dL, and he received 12 units of CRIC and 10 units of NPH. There is no indication that a provider was notified or that a urine ketone test was performed. The Nursing Encounter Tool (NET) for Hyper/Hypoglycemia was not used.

On October 30, 2023, Mr. Jung's morning blood glucose was 268 mg/dL, and he was administered 8 units of CRIC and 10 units of NPH. The evening dose section was blank, with no documentation present. No red flag appointment was made. Also on October 30, 2023, Mr. Jung's PPD (Purified Protein Derivative - test for exposure to tuberculosis) was read as 0 mm induration (negative).

On October 31, 2023, Licensed Practical Nurse (LPN) Ricks documented that Mr. Jung was offered a COVID-19 Moderna bivalent booster, which he refused. There is no corresponding signed refusal form in the health record. That morning, Mr. Jung's blood glucose was 371 mg/dL, and he received 10 units of CRIC and 10 units of NPH. His evening blood glucose was 500 mg/dL. No CRIC insulin was administered, although 10 units of NPH is documented as given. There is no corresponding note in the health record explaining why the ordered CRIC was not administered. No Hyper/Hypoglycemia NET was completed; and no provider was notified of Mr. Jung's extremely high blood glucose.

*Because the November 2023 medication administration record (MAR) for Mr. Jung was not part of his health record, the following chronology regarding blood glucose readings and nursing actions are based on the Patient Safety Event Committee presentation by Lynda Witkowski, completed after his death, regarding Mr. Jung's care while detained at the Curran-Fromhold Correctional Facility (CFCF) until his death on November 6, 2023.*

On November 1, 2023, Mr. Jung's morning insulin was refused. There was no signed refusal form in the health record and no red-flag follow-up appointment made. His evening blood glucose was 411 mg/dL, and no CRIC insulin was administered; no urine testing for ketones was conducted; no Hyper/Hypoglycemic NET was initiated, and no provider was notified.

On November 2, 2023, Mr. Jung's morning blood glucose was 290 mg/dL, and he received 8 units of CRIC and 10 units of NPH. His evening blood glucose was 245 mg/dL, and he received 6 units of CRIC and 10 units of NPH.

On November 3, 2023, Mr. Jung was documented as a no-show for the morning blood glucose check and insulin administration. No provider was contacted and no red flag appointment was made. There is no indication that anyone checked on Mr. Jung to ensure his safety. His evening blood glucose was 394 mg/dL, and he received 10 units of CRIC and 10 units of NPH.

On November 4, 2023, Mr. Jung's morning blood glucose was 266 mg/dL, and he received 8 units of regular insulin and 10 units of NPH. It is unknown if Mr. Jung was offered his evening blood glucose test and insulin because his evening blood glucose and insulin administration fields were blank, and there is no documentation in the health record of any nursing interventions at that time.

On November 5, 2023, Mr. Jung was noted to be a no-show for the morning blood glucose check and insulin administration, and again no one checked on Mr. Jung's well-being. No provider was notified and no red flag appointment was made. That evening, Mr. Jung was documented as refusing insulin. There is no signed refusal form, no red flag appointment made and no provider notification.

Video footage from November 5, 2023, at approximately 0955 hours, shows Custody Officer (CO) Gena Frasier and LPN Blair Cabellos in the unit. Per their depositions, CO Frasier informed LPN Cabellos that Mr. Jung wanted to speak with her. When Mr. Jung's cell door was opened, he was visible lying on the floor at/in the doorway. CO Frasier and LPN Cabellos briefly conversed outside the cell, and the nurse left the unit. Mr. Jung remained on the floor in the cell doorway. At approximately 1005 hours, Lieutenant Bloodsaw arrived. Two incarcerated persons were given gloves, went to Mr. Jung's cell, and pulled him further inside the cell. Lt. Bloodsaw closed the door and left the unit. CO Frasier testified in her deposition she believed the nurse did not identify a need for a medical emergency response and she would not override the nurse's medical judgment. LPN Cabellos did not document this encounter in Mr. Jung's health record, but she testified that Mr. Jung asked to see her because of leg pain. She stated that when she went to the cell, he was standing; stated he couldn't walk but did; and then gently went to the floor. She told Mr. Jung to submit a sick call request. She instructed CO Frasier to make a stretcher call if Mr. Jung continued to complain. CO Frasier testified that she was never told to do that. LPN Cabellos stated that she usually did not interact with Mr. Jung because she did not have medications to administer to him, but according to the MAR, Mr. Jung was prescribed levothyroxine as a morning medication, which

is the medication administration she was doing. Per the October MAR, Mr. Jung did receive the levothyroxine during some of the morning medication passes.

On November 6, 2023, Mr. Jung was again a no-show for blood glucose measurement and insulin administration. No refusal form was signed, no red flag appointment was made and no provider was notified. No one checked on Mr. Jung to ensure his well-being. The nurse later stated she had intended to return to obtain a signed refusal when the emergency call was made. This refusal represented the fourth time in two days that Mr. Jung, for whatever reason, did not receive his ordered insulin. Thus, his last dose of insulin was on November 4, 2023 in the morning.

At approximately 0604 hours on November 6, 2023, Custody Officer Aaron Hester discovered Mr. Jung unresponsive on the floor during morning meal pass. A medical emergency was initiated. Medical staff, including NP Henderson-Hamright, Dr. Trivikram, and LPN Jeoboham, arrived around 0610 hours. Mr. Jung was breathing but was minimally responsive and staring upward. Because he was known to be a "brittle diabetic," NP Henderson-Hamright requested an immediate blood glucose measurement, which read "HI" on the glucometer, indicating severe hyperglycemia beyond the meter's limit.

She noted that Mr. Jung was cold, clammy, and minimally responsive even to ammonia inhalants. He was placed on a stretcher at approximately 0619 hours for transport to medical for insulin administration and further assessment. En route, he stopped breathing, and CPR was initiated. Naloxone was administered twice with no effect. Fourteen units of insulin were given, and EMS was notified. An AED and ambu-bag ventilation device were applied. Mr. Jung was moved to the floor for more effective compressions. EMS arrived at approximately 0646 hours, and Mr. Jung was pronounced deceased at 0647 hours. The autopsy report indicated that Mr. Jung died from ketoacidosis.

After Mr. Jung's death, the YesCare Patient Safety Event Committee reviewed the death and identified several concerning issues. It noted the discrepancies at intake with identifying Mr. Jung

as a diabetic and specifically stating he was not a transfer back from Norristown Hospital as a failure to answer intake questions appropriately.  It identified that nurses were not using the NET for Hyper/Hypoglycemia during the Intake screening, and at other times when Mr. Jung's blood sugar was equal to or greater than 400 mg/dL, or per policy, equal to or greater than 300 mg/dL if symptomatic.  It noted that nurses did not use the CRIC for blood glucose levels greater than 400mg/dL, nor did they contact a provider. Nurses failed to obtain a signed refusal and schedule patients to be seen by a provider through a red flag appointment. It identified that nurses were leaving the medication administration record blank.  Nurses also documented that a patient prescribed insulin was a "no show" but did nothing to verify the patient was okay.  It also noted that the provider contacted by the intake nurse failed to follow-up in real time regarding a patient with a blood sugar of 542 mg/dL and positive ketones.  Healthcare staff also were not testing their patients with a blood sugar over 400 mg/dL for ketones.  Finally, the Patient Safety Event Committee used the decision tree to assign Mr. Jung's death as a category 4, Serious Safety Event.

At this time, YesCare had a policy for refusals, *J-G-05.1 Refusal of Medication or Clinical Encounter*, that stated, in part, that refusals should be documented on an appropriate form - Refusal of Service - with the signature of the patient and the health staff, or if the patient refused to sign, the signature of health staff and a witness.  It included that a provider must be notified if the patient refused or missed one dose of a critical medication, including insulin. Also in effect were two processes regarding making red flag urgent appointments:  *YesCare Core Process Program 214 C SOP Medication Administration*, which stated that a provider must be notified for any patient missing a single dose of a critical medication.  The *Philadelphia Department of Prisons Red Flag Medication Compliance System 4.E.24.2* in part, mandated a weekly report of "Red Flag" patients who were non-compliant with their medications.  This included a required summary of all persons who were counseled about their non-compliance.  There is no evidence that nursing staff made any red flag appointments for Mr. Jung during his October – November 2023 incarceration, or that he was seen and counseled for his insulin refusals.

To address these deficiencies, YesCare's action plan included retraining the individual nurses who were not practicing according to policy and procedures. Subsequent audits of insulin administration continued to show staff failed to adhere to its policies and procedures and protocols, including notifying a provider when a critical medication was not administered; initiating the Hyper/Hypoglycemia NET for patients with equal to or greater than 400mg/dL blood glucose readings to include urine testing for ketones and notification of a provider. The YesCare audits in January 2024 and August 2024 confirmed that the treatment of patients with high blood sugar greater than or equal to 400mg/dL per the policies, procedures and protocols had not improved. In fact, a repeat audit conducted November 18, 2024 also indicated no improvement in performing a ketone check, notifying a provider and completing the NET when the blood sugar was greater than or equal to 400mg/dL. The Quality Improvement Team's plan was to send the health service administrators the names of nursing staff not performing these interventions and to re-audit in two months.

Review of the records of Mr. Jung's incarceration before he was sent to Norristown Hospital in June of 2023 identifies similar lapses in care and adherence to the policies and procedures; the Clinical Pathway for Diabetes; and the Hyper/Hypoglycemia Nurse Encounter Tool.  Elevated blood glucose levels were not appropriately managed; providers were not always notified per the NET and Clinical Pathway requirements; and red flag appointments and next day appointments were not routinely scheduled when Mr. Jung did not receive his insulin dose.

There is also evidence that nursing staff documented refusals of blood glucose checks and insulin based on the report by the custody officer, rather than having an interaction with their patient. This is unacceptable, as every patient refusing care or medications must be counseled face-to-face and given the ramifications of not accepting the nursing intervention or medication. This is also an opportunity to ensure the patient is alright.

In addition, there were many more refusals documented on the MARs than refusal forms completed and filed in the health record. Informed refusals were not always provided to Mr. Jung, and most

refusals were not signed by him acknowledging an understanding of the risks. In correctional healthcare, obtaining an informed refusal is essential because it preserves the patient's autonomy while ensuring they truly understand the treatment/medication, its purpose, the risks of refusing, and any available alternatives. It allows the nurse the opportunity to assess whether the refusal reflects misunderstanding, fear, impaired judgment, or a clinically significant change that requires further evaluation, and it creates a clear record of the education, assessment, and follow-up plan developed by the nurse. When a patient refuses to sign the refusal document, the nurse must still complete the refusal process with documentation of the patient education given to the patient and the patient's response, and then the date and time the patient refused to sign must be documented on the form. In addition, the nurse must obtain the signature of someone who witnessed the patient education given and subsequent refusal to sign the form. This can be either another healthcare staff member or custody staff but must be someone who was there when the patient was educated and refused to acknowledge it through his/her/their signature on the refusal form.

I also noted that Dr. Bradley documented on May 20, 2023 that she was discontinuing the order for glucose checks and CRIC four times a day, and reduced it to twice a day, even though Mr. Jung's diabetes continued uncontrolled. Her justification for this punitive action was "current staffing does not allow for QID evaluations in the setting of non-compliance," and she adjusted his insulin orders accordingly. The actions of Dr. Bradley in this situation are contrary to adequate diabetes care and correctional health care. The American Diabetes Association[1] recommends frequent blood glucose monitoring for Type 1 Diabetics (6-10 per day), and step-down orders should only be given when the patient is improved. Basic correctional healthcare cannot be withheld based on current staffing levels, and the treatment plan should always be based upon the needs and condition of the patient. NCCHC correctional healthcare standards for an adequate healthcare program require that patients are allowed to refuse care and the care decisions made by a provider reflect the patient's medical condition and needs, rather than their refusal behavior. The care provided in the facility must be reflective of the care a patient can receive in the community.

---

[1] https://diabetesjournals.org/care/article/48/Supplement_1/S146/157557/7-Diabetes-Technology-Standards-of-Care-in

Fundamental medical knowledge includes that reducing monitoring frequency in brittle diabetes increases the likelihood of unrecognized hyperglycemia, hypoglycemia, and delayed detection of DKA. Thus, reducing the frequency of blood glucose monitoring to twice daily in a brittle diabetic, based solely on refusals and staffing levels, would fall below accepted standards and pose significant clinical risk.

DISCUSSION

The care provided to Mr. Jung from his arrival at the Philadelphia Department of Prisons on October 27, 2023, until his death on November 6, 2023, reflects a series of significant and repeated deviations from accepted nursing practice and standards of care, diabetes management standards, and facility policies. These failures occurred at every stage of his incarceration, beginning with his intake evaluation, continuing throughout his daily nursing encounters, and culminating in the inadequate response to his visible clinical deterioration shortly before his death.

When RN Apollon conducted Mr. Jung's intake evaluation on October 28th, she encountered conflicting information regarding whether he was diabetic. She documented a blood glucose of 542 mg/dL which is a critically high level that placed Mr. Jung at immediate risk for diabetic ketoacidosis. Although she appropriately contacted the provider and checked for ketones, she did not complete the Hyper/Hypoglycemia Nursing Encounter Tool (NET) nor did she conduct the ongoing reassessment required for a patient in acute metabolic distress. After administering insulin, she did not recheck Mr. Jung's blood glucose or ketones, nor did she continue monitoring him until the level dropped to a safer range, but she should have. A glucose level exceeding 500 mg/dL accompanied by ketonuria represents a medical emergency requiring repeated reassessment, close monitoring, and continued communication with the provider. Often a blood glucose that high warrants transfer to an emergency department for a higher level of care than can be rendered in a correctional facility. RN Apollon's failure to carry out these essential nursing responsibilities deviated significantly from the standard of nursing care.

The provider, NP Gay, appropriately ordered regular and NPH insulin at intake, but she likewise did not order any follow-up blood glucose checks or reassessments. Established practice for managing severe hyperglycemia includes checking the blood glucose approximately one-two hours after insulin administration, again at four hours, and then continuing monitoring based on clinical response. YesCare's own Hyper/Hypoglycemia NET reflects these requirements. In addition, NP Gay should have explicitly ordered follow-up glucose checks for Mr. Jung to ensure her treatment plan was efficacious. Without any provider orders directing follow-up assessment, nursing staff lacked clear guidance for monitoring a patient at high risk of rapid decompensation. The failure of NP Gay to ensure that Mr. Jung, her patient with severe hyperglycemia, who was positive for ketones and who reportedly had not had insulin in three days, was properly monitored by nursing staff significantly deviated from the applicable standard of care.

Throughout his incarceration, Mr. Jung repeatedly demonstrated dangerously high blood glucose levels, including readings 500 mg/dL and greater, and ultimately a "HI" reading on the glucometer, indicating extreme hyperglycemia well beyond the meter's measurable range. A glucose level above 300 mg/dL is considered hyperglycemia and necessitates increased monitoring, while levels above 400 mg/dL require immediate action, including provider notification and assessment for diabetic ketoacidosis. However, nursing staff responsible for Mr. Jung's care continued to administer insulin without notifying a provider of his hyperglycemic blood glucose, failed to perform additional ketone testing, and did not use the Hyper/Hypoglycemia NET to guide their clinical actions and decisions. They did not escalate care despite blood glucose levels that clearly indicated a medical emergency, and they failed to make a red flag appointment so Mr. Jung would be evaluated and counseled by a provider the next day. These omissions reflect a clear failure to recognize and respond to life-threatening hyperglycemia and represent a significant deviation from the standard of nursing care.

Mr. Jung's ongoing risk of DKA was further compounded by the lack of monitoring for dehydration, mental status changes, and vital sign abnormalities by the nurses responsible for his glucose checks and medication administration. These signs could be indicative of developing metabolic

crisis. Mr. Jung had already demonstrated ketonuria at intake, and his persistent hyperglycemia placed him at high risk for worsening metabolic acidosis. Nevertheless, there were times, particularly during evening shifts, when no nursing encounter, or even attempt, was documented, and the MAR was blank. The failure of the nurses responsible for Mr. Jung's medication administration and care to monitor their patient and document their nursing interventions deviated significantly from the standard of nursing care.

The nursing response to Mr. Jung's missed or refused insulin doses reflected a systemic disregard for critical medication management. Between October 28, 2023 and November 6, 2023, Mr. Jung missed or refused multiple insulin doses, yet no nurse documented a follow-up assessment, no signed refusals were obtained, and no provider was notified. Facility policy required a provider be informed after even one missed dose of a critical medication such as insulin, and reasonable nursing care requires a "no-show" for essential medication administration must prompt immediate assessment to determine whether the patient is deteriorating clinically. In Mr. Jung's case, these missed doses were particularly dangerous given his already elevated blood glucose levels, yet no red-flag appointments were created, and no efforts were made to evaluate him. These failures deviated significantly from the standards of nursing care and directly increased his risk of developing DKA.

The events of November 5th further demonstrate a concerning lack of clinical judgment and follow-through. According to the testimony of LPN Cabellos, Mr. Jung was not on the floor when she arrived, and he complained of leg pain and inability to walk. She stated he took a few steps before "gently" lowering himself to the floor. Regardless how he reached the floor, once a patient is found lying or seated on the floor and not getting up, an immediate clinical assessment is required to evaluate for possible physical trauma, syncope, dehydration, neurologic compromise, altered mental status, or metabolic instability. Video evidence confirms that Mr. Jung remained on the floor in the cell doorway during and after this interaction.

A reasonable nurse in this situation would have conducted a physical exam and determined whether Mr. Jung needed to be transported to the medical unit for further evaluation and care; or,

if he/she/they were responsible for medication administration and could not interrupt their duties, would have called another nurse to evaluate Mr. Jung as soon as possible. At that time, depending on the nurse's findings, a stretcher call would have been made. Finally, a reasonable nurse would document the encounter and outcome in Mr. Jung's health record. However, despite Mr. Jung's presentation, LPN Cabellos conducted only a minimal encounter, did not perform a nursing evaluation, and left the unit without arranging for transport to medical or ensuring that another nurse evaluated Mr. Jung. She also did not document the encounter in Mr. Jung's health record.

There is conflicting testimony regarding LPN Cabellos' instruction to CO Frasier to call a stretcher call if Mr. Jung continued to complain, but as stated above, it was her responsibility to ensure Mr. Jung was monitored by healthcare staff. Mr. Jung ultimately remained on the floor until two incarcerated persons dragged him back inside the cell and the door closed. This represented a serious failure to recognize a potentially emergent medical condition and a missed opportunity to intervene in what was, in retrospect, early clinical deterioration associated with untreated hyperglycemia and impending DKA. The failure of LPN Cabellos to conduct a proper evaluation, escalate care, arrange for timely transport or reassessment by another nurse, and document the encounter in the health record significantly deviated from the standard of nursing care.

On November 6, 2023, the morning nurse did not follow up after yet another missed insulin dose and Mr. Jung was discovered unresponsive by custody staff during meal pass. Although an emergency response was initiated, by that time Mr. Jung had gone more than forty-eight hours without insulin, was showing clear signs of functional decline, and had likely progressed into severe Diabetic Ketoacidosis (DKA). Insulin administered during cardiopulmonary arrest is not a corrective treatment for DKA.

The YesCare Patient Safety Event Committee later identified many of these same failures, including lack of NET completion, insufficient use of CRIC insulin, incomplete documentation, lack of provider notification, and failure to address refusals and no-shows. Importantly, the Committee noted that even after initiating corrective actions, subsequent audits throughout 2024 showed continued non-compliance with critical aspects of diabetic care. This demonstrates that the

deficiencies in Mr. Jung's care were not isolated or attributable to a single nurse; they reflected systemic failures across the nursing service. A targeted retraining approach for individuals was insufficient given the scope of the problem. A facility-wide retraining initiative would have been necessary to address the global breakdown in safe diabetic practice.

My opinions and findings are made to a reasonable degree of nursing, provider and administrative certainty and are based upon my knowledge, education, training and experience, and the records, videos, and reports I reviewed regarding this matter. I hereby reserve the right to amend, supplement, or withdraw my opinion based upon future discovery and depositions of the relative parties that may be provided to me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully Submitted on December 2, 2025.

*Lori E Roscoe*
_____

Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

15

# Curriculum Vitae

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

404-805-9502

---

### PROFILE

---

An innovative Healthcare Manager, certified as an Advanced Practice Registered Nurse, a Correctional Health Professional, and a Correctional Registered Nurse, with 30 years of experience in Correctional Health Care and 36 years of Registered Nursing experience. An expert on National Commission on Correctional Health Care and American Correctional Association standards, and policy and procedure development and compliance. An educator of both nurses and correctional officers. A seasoned Continuous Quality Improvement professional. An experienced correctional health expert legal witness, including case review, expert report authoring, and deposition/trial testimony.

---

### EDUCATION

---

**Doctor of Nursing Practice**
University of Alabama, 2017

**Master of Science in Nursing, Adult Nurse Practitioner**
South University, 2014

**Doctor of Health Care Administration**
Madison University, 2006

**Master of Public Administration, Health Care concentration**
University of Hartford, 1994

**Bachelor of Science in Nursing**
University of Connecticut, 1989

**Bachelor of Science in Education, Secondary Education and Sociology majors**
Southern Connecticut State University, 1978

---

### AWARDS

---

DAISY Team and Correctional Nurse Leadership Award – November 2025

Margaret Collatt Service Award - 2023 – Academy of Correctional Health Professionals

High Honors - South University - 2014

Award for Academic Excellence – University of Hartford 1994

Woodruff Fellow 1992 – 1994 – University of Hartford

## EXPERIENCE

**Correctional HealthCare Consultants LLC**

    January 2007 – present – Managing Member

      **American Correctional Nurses Association** – (2020 – present), Co-Founder and Member of the Correctional Nursing workgroup currently reviewing and editing the *Correctional Nursing*: *Scope and Standards of Practice, 4th edition,* to be published 2026.  President-Elect 2025-2026.

      **National Commission on Correctional Health Care Jail and Prison Expert Advisory Task Force for the 2026 Standards** – 2024 – present.

      **Independent Content Expert Reviewer** for Doctoral Nursing Student thesis regarding medication administration and Continuity of Care in a Jail setting - Aspen College – 2023-present

      **Phoebe Putney Health System – Dougherty County Jail - Georgia** – (2023 – 2024) Healthcare program consultant

      **Marion County, KY – Jailer J. Barry Brady** – (2018-present) Healthcare program transitional and ongoing consultation services

      **Boone County, KY – Jailer Jason Maydak** – (2018-present) Healthcare program development, transition services and consultation services

      **Laurel County, KY – Jailer Jamie Mosley –** (2017-2024; 2025-present) Healthcare Program Evaluation, ongoing program development, and consultation services

      **Preceptor for MSN Nurse Practitioner students from Georgia State University – (**2016 – 2017) Semester of Nurse Practitioner experience in a correctional setting

      **CorHealth Solutions, LLC – Dr. D. Brent Cherry** – (2016) - Correctional Health Program Development and contract initiation consultation- Somerset, KY

      **National Commission on Correctional Health Care Multi-Disciplinary Education Committee** (2019 – present)

      **Journal of Correctional Health Care,** peer reviewer (2019 – present)

      **University of Connecticut School of Nursing** (2014 - 2016) – Expert Nurse panelist for a research study regarding the Correctional nurse and stress being conducted by Dr. Denise Panosky.

      **American Nurses Association –** Member of the Correctional Nursing workgroup responsible for reviewing and editing the *Correctional Nursing*: *Scope and Standards of Practice* – latest version published November 2020.

      **The Correctional Nurse Educator** (2010-present) – Developed and maintain an online educational site where nurses can earn continuing education credits in topics specifically related to correctional nursing. Accredited as a Provider by the California, Florida, Georgia, South Carolina and other Boards of Nursing.

      **Medical Association of Georgia** (2007-2017) – Accreditation auditor for the Corrections Division.

      **Legal casework** (2007-present) - Multiple cases for both Defendants and Plaintiffs.

      **American Correctional Health Services Association –** Executive Director – 2011-2012

      **Correct Health, LLC –** DeKalb County Jail (2008-2009) - Operational review, Management staff mentoring, CQI Program expansion and Annual Review, Procedures and Post Order development, nursing staff mentoring and education.

**Comprehensive Nursing Care, Inc.** (2007 - 2009) **–** Development of successful bid proposal for Medical Nursing Services at Hall County Jail – continued association to develop and execute a complete Nursing orientation program, written procedures for staff, Nursing Assessment Protocols, corresponding Nursing Treatment Notes and Blood Borne Pathogen Exposure Plan, CQI Program and ongoing Staff and Management mentoring.

## The Community Health Center, West Palm Beach, FL

July 2018 – 2023 – Nurse Practitioner

Nurse Practitioner volunteer provider at this Free Clinic – evaluate, diagnose and treat patients presenting to the clinic with a wide range of illnesses and injuries, including chronic illnesses such as diabetes, hypertension, seizure disorder and hyperthyroidism; women's health issues; mental illness; and acute conditions like infections; sprains and minor injuries. Preceptor for Nurse Practitioner, Physician Assistant, Medical and RN students.

## Correct Care Solutions, Nashville, TN

September 2014 – January 2018 – Nurse Practitioner, Georgia

In collaboration with the Medical Director, provision of the full range of medical services for the patients at the facility, including sick call, urgent/emergent and chronic care.  Interpretation of lab results and diagnostic studies ordered through the facility.

## CorrectHealth LLC, Atlanta, Georgia

January 2013 – June 2013 – Director of Clinical Support

Responsible for Clinical Services Education, Infection Control, Continuous Quality Improvement, and Accreditation.  Daily clinical practice and staff contact. Exclusively responsible for the clinical education of staff at 33 sites, which included working side-by-side with staff, conducting needs assessments and evaluations, and the research of evidence based practices and guidelines to ensure staff were adhering to nationally approved standards of care.

January 2012- January 2013 – Executive Director of Clinical Services

Responsible for all aspects of Clinical Services, including Education, Infection Control, Continuous Quality Improvement, Health Information and Accreditation.  Policy and Procedure review and development.  Responsible for nursing and ancillary staff.  Visited sites and interacted with clients on a regular basis.

July 2009 – December 2011 – Director of Special Projects

Participated in projects with the Georgia Department of Corrections; Project Coordinator and Lead Surveyor for an audit of all healthcare services for the Maricopa County Jail, Phoenix, Arizona; Developed projects and procured funding for the CorrectHealth Community Development Center (non-profit); Project Manager for a Special Study for the Wyoming Department of Corrections regarding healthcare access, medical cost and potential efficiencies; internal operations auditing and staff development.  Within CorrectHealth, major responsibility for the clinical education of staff, including nurses, providers and ancillary staff. This included working side-by-side with staff, conducting needs assessments and evaluations, and evidence-based practices and guidelines research to ensure staff adherence to nationally approved standards of care.

**Georgia Correctional Health Care, Georgia Department of Corrections**

    2006 - 2007 – Staff Nurse/PRN - Georgia Diagnostic and Classification Prison

**Correctional Medical Services, St. Louis, Missouri**

    2004 - 2006 - Health Service Administrator - DeKalb County Jail (GA)

    2004 - Utilization Management Nurse (interim) - New Jersey Department of Corrections contract

    2000 - 2002 - Associate Program Director – New Jersey Department of Corrections contract

    1996 - 1998 - Associate Program Director – Massachusetts Department of Corrections contract

    1995 - 1996 - Health Services Administrator - Framingham Women's Prison (MA)

**New Britain Technical Institute, New Britain, CT** 1998 - 1999 – Instructor, LPN program

---

PRESENTATIONS/LECTURES/PUBLICATIONS

---

**The Art of Saying No:  Real Strategies for Real Situations.** Presented at the Fall 2025 NCCHC Conference, Baltimore, MD.  November 4, 2025.

**American Correctional Nurses Association** webinar **Advanced Wound Care Therapy for the Correctional Environment, Moderator**  presented July 29, 2025.

**"How to Achieve Success as a Correctional Nurse Manager"** a series of 5 webinars held February 5th, 12th, 19th, and March 5th and 12th, 2025 for the National Commission on Correctional Healthcare - Lead Nurse Planner and presenter week 3, *Clinical Processes* and week 5, *Capstone presentation*.

**American Correctional Nurses Association** webinar "**Are You Ready to Advance Your Career? Principles of Correctional Nursing Leadership**" a panel discussion held February 6, 2025.

**American College of Correctional Physicians, Case Histories in Correctional Medicine, Webinar Moderator** presented August 21, 2024 .

**A Comprehensive Look at Correctional Healthcare Documentation: The Critical Importance of Medical and Behavioral Healthcare Documentation.** Academy of Correctional Health Professionals, webinar presented August 6, 2024.

**Case Studies in Correctional Nursing:  Practice, Standards and Leadership** presented at the National Commission on Correctional Health Care Spring 2024 Conference April 27-30, 2024 in St. Louis, MO.

**APRN  Challenges: Staying Current on Treatment Guidelines** presented at the National Commission on Correctional Health Care Spring 2024 Conference April 27-30, 2024 in St. Louis, MO.

**American Correctional Nurses Association webinar presenter, "What Do the Correctional Nursing: Scope and Standards of Practice Mean to Me?"** Presented February 1, 2024.

**American College of Correctional Physicians, Webinar Moderator, "Compassion and Care--War Stories from the Trenches--Case Histories in Correctional Medicine"** presented November 16, 2023.

"**Bringing High Quality Healthcare to the Incarcerated – Lessons from a Nurse Educator**"  presented at The Western American Correctional Health Services Association conference October 25-27, 2023 in Sacramento, CA.

Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN                November 2025

**The American Correctional Nurses Association, OPEN FORUM: All Things Intake** conducted June 20th, 2023; **Scope of Practice for Correctional Nurses** conducted July 20th, 2023; **Withdrawal** conducted October 19, 2023; **Systemic Racism**, December 2023; **Recruitment and Retention** January 2024; February 2024; March 2024; April 2024; … March 2025; and ongoing.  ** This is a monthly ACNA activity**

**"Components of a Correctional Healthcare Program"** presented to the Kentucky Jailer's Association during its Educational Conference June 8, 2023, in Covington, Kentucky.

**"The Lived Experiences of Advanced Practice Registered Nurses in Correctional Settings"** presented at the National Commission on Correctional Health Care Spring 2023 Conference in New Orleans, Louisiana.

**"Components of a Correctional Healthcare Program"** presented to the newly elected Jailers at the Kentucky Jailers Association Conference December 9, 2022, in Lexington, Kentucky.

**"APRN Transformational Leadership"** presented at the National Commission on Correctional Health Care Spring 2022 Conference in Atlanta, Georgia.

**"How to Achieve Success as a Correctional Nurse Manager"** a series of 4 webinars for the National Commission on Correctional Healthcare by the Nurse Advisory Council – Lead Nurse Planner and presenter week 3, Clinical Processes, held August 3rd, 10th, 17th and 24th 2021.
Also Presented April 10, 2022, as a Pre-Conference half day session to the Spring National Conference of the National Commission on Correctional Health Care in Atlanta, Georgia.

**"Professional Practice in Our Post-COVID World: A Correctional Nurse Conversation"** presented at the Virginia Department of Correction Nursing Conference Keynote speaker July 13, 2021.

**"Honoring Our Practice in a Post-COVID World: A Correctional Nursing Conversation"** presented at the Wisconsin Department of Correction Health Services Administrators' meeting June 17, 2021.

**"How APRNs Can Add Value to Your Correctional Healthcare Operation"** presented at the National Commission on Correctional Health Care Spring 2021 Virtual Conference.

**"Patient Advocacy for the Correctional Nurse"** and **"Skin Assessment for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in Ft. Lauderdale, FL.  October 2019.

**"Clinical Decision Making in Correctional Nursing"; "Advanced Practice Registered Nurses in Corrections:  Roundtable"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN.  April 2019.

**"Clinical Judgment for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in Las Vegas, NV, October 2018 and in Atlanta, GA, May 2017.

**"A Seizure Disorder Primer for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN, April 2016.

**"A Hypertension Primer for the Correctional Nurse"** and **"The Nurse's Role in Chronic Care Management"** presented at the National Conference of the National Commission on Correctional Health Care in Dallas, TX, October 2015.

**"A Diabetic Primer for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in New Orleans, LA, April 2015.

Guest Expert Panelist, American Association of Legal Nurse Consultants webinar **"Civil Rights Litigation"** held nation-wide on October 30, 2014.

**"The Nurse's Role in Chronic Care Management"** presented at the National Conference of the National Commission on Correctional Health Care in Atlanta, GA, April 2014.

Guest Expert panelist, Omnisure webinar **"The Unscheduled Encounter: Reducing Liability and Risk",** held nation-wide on December 4, 2013**.**

**"The New ANA Scope and Standards of Practice for Correctional Nurses: Implementation Standard", "The New ANA Scope and Standards of Practice for Correctional Nurses: Communication Standard"** and **"The Essentials of Nursing Leadership: Capstone Presentation"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN, October 2013.

**"Unscheduled Encounters:  Managing the Nursing Curbside Consult"** and **"The New ANA Scope and Standards of Practice for Correctional Nurses: Implementation Standard"** presented at the National Conference of the National Commission on Correctional Health Care in Denver, CO, April 2013.

**"Unscheduled Encounters:   Managing the Nursing Curbside Consult"** presented at the National Conference of the National Commission on Correctional Health Care in Las Vegas, NV, October 2012.

**"Children and Prescription Drug Abuse" –** CHAMPS Instructor School, Georgia Sheriff's Association, June 2012.

**"Con Games: Inmate Manipulation"** presented at the Nursing Forum, American Correctional Health Services Association's National Conference in San Antonio, TX, April 2012.

**"HIV Awareness", "Universal Precautions"** and **"Inmate Medical Services"** at the DeKalb County Sheriff's Office 111th Jail Academy, February 2011 through the 124th Jail Academy, August 2014.

**"Crisis Intervention Training"** co-presenter at the American Correctional Health Services Association Georgia Conference, Savannah, Georgia, November 2009.

**"Nursing Forum: Legal Parameters and Best Practice"** at the American Correctional Health Services Association National Conference, Orlando, Florida, March 2009.

**"Dilemmas in Correctional Nursing"** at the American Correctional Health Services Association National Conference, Reno, NV, June 2007.

---

## PUBLICATIONS

---

Zucker, D., Reagan, L., Clifton, J., Abdulhamed, A., Roscoe, L., Wright, R., Penix, D., Shelton, D., and Loeb, S. (2022).  **NPs caring for people who are incarcerated and negatively impacted by social determinants of health**. *The Nurse Practitioner (47)* 6, 38 - 46.  Wolters Kluwer Health, INC, DOI-10.1097/01.NPR.0000829804.16627.7b

Roscoe, L., Smith, S., and Shelton, D.  (2023). **Translating the Essentials for correctional nursing practice and professional development.** *The Journal of Continuing Education in Nursing, 54(9)*. Doi: 10.3928/00220124-20230816-14.

Shelton, D., Roscoe, L., Kaptanovic, T., and Smith, S. (2025). **The correctional nursing workforce crisis:  An innovative solution to meet the challenge**. *Journal of Correctional Health Care,* Doi: 10.1089/jchc.24.09.0079.

LICENSES AND CERTIFICATIONS

Advanced Practice Registered Nurse/Nurse Practitioner – Florida (Autonomous Practice APRN9485060), California (NP95006810), Georgia (RN179490), Kentucky (3012955) and Virginia (0024178346).

Certified Adult Nurse Practitioner – American Academy of Nurse Practitioners National Certification Board (A0614010 – expiration June 2029)

Registered Nurse licensure - Florida, Washington, California, Kentucky, Virginia, and Georgia

Certified Correctional Health Professional – Certified Correctional Registered Nurse – National Commission on Correctional Health Care

Certified Provider of Continuing Education – California Board of Registered Nursing and others

Certified Guest Instructor - Georgia Peace Officer Standards and Training Council

BLS Healthcare Provider

MEMBERSHIPS

American Correctional Nurses Association - Founding Member and President-Elect 2025-2026

American Association of Nurse Practitioners - member

American College of Correctional Physicians – member, Virtual Education Committee

American Correctional Association – member, Health Care Committee and Correctional Nursing Committee

American Jail Association - member

Western American Correctional Health Services Association (WACHSA) - member

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
**2021 - 2025**

**Jason Hicks, Chris Hammons**, Laird, Hammons, Laird, PLLC
**Oklahoma City, OK**

> Kizzie Simms, individually and as Special Administrator of the Estate of Gregory Neil Davis, Plaintiff, vs. Board Of County Commissioners For Oklahoma County; Board Of Trustees For The Oklahoma County Criminal Justice Authority; Greg Williams, individually,  Turn Key Health Clinics, LLc, et al.
> *Plaintiff* - **ongoing litigation**

**Sarah Mansfield, Wesley Clark and Frank Brazil**, Brazil Clark PLLC
**Nashville, TN**

> Jason Michael Clark, ex rel Conservator Richard Gary Clark, Plaintiff v Fentress County, Sheriff Michael Reagon, Candy Norman (aka Candy Price), Fast Access Healthcare, Anthony Baird, Nerissa Owens, Defendants
> *Plaintiff* - **settled 2025**

**Marko Duric,** Sandberg Phoenix
**St. Louis, MO**
**Shauna Reitz, Loizzi Law Offices, LLC**
**Chicago, IL**

> Amy Hernandez, as Administrator of the Estate of Alex Alvarez, deceased, Plaintiff, v. Vippin Shah, MD, Deena Seed, Amy Frey, Amy Thurman, Pamela Ward and Wexford Health Sources, Inc Defendants.
> *Plaintiff* - **ongoing litigation**

**Paul K. Croley II,** Law Offices of Croley & Foley
**Lexington, KY**

> Tammy Webb, as Administratrix of the Estate of Terri Beth Mays, deceased v. Whitley County, KY, Brian Lawson, et al.
> *Plaintiff* - **ongoing litigation**

**Anika Ades**, MacDonald Hoague & Bayless
**Seattle, WA**

> Ryan Kelty, Plaintiff, v. Walla Walla County, Rebecca Groom, Nadean Pulfer, et al.
> *Plaintiff* - **settled 2025**

**Derek Franseen**, Walsh & Franseen
**Edmond, OK**

> Blake Williams, Plaintiff, v. Heather Hasenmyer, individual
> *Plaintiff* - **ongoing litigation**

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
### 2021 - 2025

**F. Davis Poisson III and Noah Abrams,** Poisson and Bower
**Raleigh, NC**
> Kahleel Truesdale, Plaintiff v. Quality Mobile X-Ray, Wellpath LLC, et al Defendant
> *Plaintiff* - **ongoing litigation**

**Paul K. Croley II,** Law Offices of Croley & Foley
**Lexington, KY**
> Keri Burnette, as Administratrix of the Estate of Aaron K Burnette, deceased v.
> Whitley County
> *Plaintiff* - **ongoing litigation**

**Aurora Randolph,** ALR Civil Rights LLC
**Denver, CO**
> Kisha Birts, Plaintiff, vs. Colorado Department of Corrections, Rita Winn, NP, et al.
> Defendants.
> *Plaintiff* - **ongoing litigation**

**Brian Tanner,** Griffin, Turner, Tanner & Clarkson
**Savannah, GA**
> Patsy Ann Amaro, as mother of Johnny Warren Conley;
> Jake Calvin Conley, as father of Johnny Warren Conley; et al v. Dr. Myra Pope, et al
> *Plaintiff* - **ongoing litigation**

**Anna Holland Edwards,** Holland, Holland Edwards & Grossman, LLC
**Denver, CO**
> Estate of Cristo Jesus Canett, by and through its personal representative Elizabeth
> Naranjo v. Wellpath LLC, Board of County Commissioners of the County of El Paso,
> CO; Sheriff Joseph Roybal, Anthony Lupo, individually; et al.
> *Plaintiff* - **ongoing litigation**

**Anna Holland Edwards,** Holland, Holland Edwards & Grossman, LLC
**Denver, CO**
> Estate of Amy Lynn Cross v. Turn Key Health Clinics LLC, Board of County
> Commissioners, Weld County, et al
> *Plaintiff* - **ongoing litigation**

**Thomas Day,** Eagan Flanagan and Cohen
**Springfield, MA**
> MAURA O'NEILL, as administrator of the Estate of Madelyn E. Linsenmeir, Plaintiff,
> v. CITY OF SPRINGFIELD, et al. Defendants
> *Defendant Hampton County Sheriff's Office* - Defendant - **settled 2025**

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
**2021 - 2025**

**Jason Hicks, Chris Hammons**, Laird, Hammons, Laird, PLLC
**Oklahoma City, OK**
> Ashley Meyers, et al v.  Board of County Commissioners of Rogers County, et al
> *Plaintiff* **- ongoing litigation**

**William Murray, Jaden Rhea**, Bailey & Wyant, PLLC
**Charleston, WV**
> Joyce Horner as Administratrix of Estate of Noah Morris v. PrimeCare Medical of WV,
> INC and the WV Division of Corrections and Rehabilitation (DCR).
> *Defendant DCR* - **ongoing litigation**

**Todd Schroeder**, McKeen and Associates
**Detroit, MI**
> Timothy Griswold as the personal representative of the estate of John E.  Griswold of
> v. Trinity Health; County of Livingston; et al
> *Plaintiff* - **ongoing litigation**

**Anna Holland Edwards, Erica Grossman**, Holland, Holland Edwards & Grossman, LLC
**Denver, CO**
> Estate of Kelroy Newman, Plantiffs v Board of County Commissioners of the County
> of Montezuma, CO; Sheriff Steven Nowlin; et al
> *Plaintiff* - **ongoing litigation**

**Frederick J. Schlosser**, Gates, Wise, Schlosser and Goebel
**Springfield, IL**
> Smith v. County of Macon, et al.
> *Plaintiff* - ***settled 2025***

**Rachel Fuerst**, Henson Fuerst, PA
**Raleigh, NC**
> Estate of Caveness v. Gray, et al.
> *Plaintiff* - ***settled 2023***

**Mark Krudys,** The Krudys Law Firm, PLC
**Richmond, VA**
> Boley v. Armor Correctional Health Services, Inc., et al.
> *Plaintiff* - ***Trial December 2022***

**John Coletti,** Paulson Coletti Trial Attorneys PC
**Portland, OR**
> Thomsen v. NaphCare, Inc,  et al
> *Plaintiff* - ***settled 2024***

# Legal Cases-Depositions/Trial

Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
**2021 - 2025**

**<u>Carolyn Trier,</u> Trier Law Office, LLC**
**Fort Wayne, IN**
> Rittenhouse v. Wells County et al
> *Plaintiff - **settled 2024***

**<u>Michael Crow,</u>  Beasley, Allen, Crow**
**Montgomery, AL**
> Robert Edward Taylor, v. Eric Starr et al
> *Plaintiff - **settled 2024***

**<u>Erik Heipt,</u>  Budge & Heipt, PLLC**
**Seattle,  WA**
> Mary Margaret Mathis v. Southwestern Correctional LLC et al
> *Plaintiff - **settled 2023***

**<u>Amy Miller,</u> Miller Olsen, PLLCC**
**Seattle,  WA**
> Michael Eugene Searles, v. Washington State Department of Corrections
> *Plaintiff - **settled 2023***

**<u>Kevin Young,</u>  Peterson & Associates, P.C.**
**Kansas City, MO**
> Gary Burke, et al. Plaintiffs vs. Butler County, et al. Defendants
> *Plaintiff - **settled 2023***

**<u>Paul Dworak & Jeffery Storms,</u> Newmark Storms Dworak Law Office;  and**
**<u>Jeffrey Montpetit,</u> Sieben Carey**
**Minneapolis, MN**
> Janessa Novak, Special Administrator vs. Michael McIlvain, Douglas County, MEnD et al
> *Plaintiff - **settled 2023***

**<u>Samuel Daheim,</u> Connolly Law Offices, PLLC**
**Tacoma, WA**
> Daniel Bailey, as Personal Representative of the Estate of Michael Joseph Bailey,
> deceased vs. the City of Kent, Defendant
> *Plaintiff - **settled 2022***

**<u>Mark Krudys,</u> The Krudys Law Firm, PLC**
**Richmond, VA**
> Lucy Mae Hill, Administrator, of the Estate of Lashawn Andrea Hill, deceased vs
> Hallmark Youthcare-Richmond, et al
> *Plaintiff - **settled 2022***

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
**2021 - 2025**

**<u>Joane Hallinan and Kirstin Eidenbach,</u>**  **Hallinan & Killpack Law Firm**
**Tucson, AZ**

> Armando Banuelos, Margarita Banuelos and Uriel Banuelos vs Corizon Healthcare LLC, Centurion of Arizona LLC, et al, vs Corizon Healthcare LLC, Centurion of Arizona LLC, et al
> *Plaintiff - **ongoing litigation***

**<u>Joane Hallinan and Kirstin Eidenbach,</u>**  **Hallinan & Killpack Law Firm**
**Tucson, AZ**

> Paul Harlan Lupe vs Corizon Healthcare LLC, Centurion of Arizona LLC, Kimberly Branum, et al
> *Plaintiff - **ongoing litigation***

**<u>Dennis Wallin</u>, Spence Law Firm NM, LLC**
**Albuquerque, NM**

> Lee Hunt, as the Wrongful Death Personal Representative for the Estate of Gary Sugamosto, deceased, Plaintiff v. The GEO Group, INC; et al
> *Plaintiff - **settled 2022***

**<u>Edwin Budge and Hank Balson,</u> Budge & Heipt, PLLC**
**Seattle, WA**

> The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, Individually, Plaintiff v. NaphCare, Inc.; Hannah Gubitz, Individually; and Spokane County, a political subdivision of the State of Washington, Defendants
> *Plaintiff - **trial July 2022***

Exhibit C: Index of Documents Reviewed

YesCare 3251-3495.pdf [Core Process Papers];
Select YesCare Policies.pdf;
Gena Frasier documents for RPD.pdf;
Jung – City RPD.pdf;
3508 PICC MAY Audit.pdf;
3505-3507 Insulin Re-Audit – Sept 2024.pdf;
Chart 1 Accu-Check and Insulin Corrective Action Plan.xlsx;
Chart 4 Diabetes Report Card Audit Rolling July 2022 to October 2022 revised.xlsx;
Chart 3 Diabetes Report Card Audit Rolling 03.2022.xlsx;
Chart 5 Diabetes Report Card Audit Rolling Dec 2022 to March 2023.xlsx;
Chart 7 DM December 2023.xlsx;
Chart 6 DM August 2023.xlsx;
Chart 8 DM April 2024.xlsx;
Chart 9 DM 4.1.24–7.31.24.xlsx;
Chart 10 DM December 2024.xlsx;
Chart 11 DM 12.04.24 03.31.25.xlsx;
Chart 13 HCS and Insulin CAP audit template CFCF.xlsx;
Chart 12 HCS and Insulin CAP audit DC.xlsx;
Chart 15 HCS and Insulin CAP audit template RCF.xlsx;
Chart 14 HCS and Insulin CAP audit template PICC.xlsx;
Chart 16 Lisa DM working audit July 2022 to October 2022.xlsx;
Chart 18 Jung Corrective Action Plan.xlsx;
Chart 17 Lisa DM working audit March 2022 to June 2022.xlsx;
3511-3513 Working Audit March – June 2022 (Redacted).pdf;
3510 DM Aug–Nov 2023 (Redacted).pdf;
23 – YesCare Amended Sup Response to Plntf RPOD 07-30-25.pdf;
3683-3689 CHART 17 – Redacted.pdf;
3514-3515 DM Working Audit July–Oct 2022 (Redacted).pdf;
3516-3682 Diabetes Report Card Dec 2022 – March 2023 (Redacted).pdf;
3699 DM Working Audit Jan–April 2021.pdf;
3692-3696 DM Working Audit Sept.2018–Nov.2020.pdf;
3690-3691 Diabetes Report Card OLD.pdf;
3701-3785 ER & Inpatient Log – 2020.pdf;
3700 DM Working Audit May–July.2023.pdf;
3786-3909 ER & Inpatient Log – 2021.pdf;
3991-4118 ER & Inpatient Log – 2022.pdf;
4119-4346 ER & Inpatient Log – 2023.pdf;
Jung – Fraiser First RPD Responses.pdf;

Exhibit C: Index of Documents Reviewed

Jung – City First RPD Responses (1)A.pdf;

Jung – City First Rogs Responses (1).pdf;

Jung – City First RPD Responses (1).pdf;

Jung – City 1stSuppRPD.pdf;

Jung – Supp RPD Responses.pdf;

Jung – Bloodsaw First RPD Responses.pdf;

Wanda Bloodsaw documents for RPD.pdf;

Jung – Apollon Response to Plaintiff Request for Production of Documents.pdf;

Jung – Apollon Documents Produced 7-31-25.pdf;

Diabetes Clinical Pathway.pdf;

YesCare 1-3250.pdf;

NEW Condensed Complete City Requests for Production of Documents – Discovery – Jung City Production00001-05610.pdf;

City Additional Production – PDP Policies Only – 000003-000028.pdf;

Grote Jung initial retainer;

Grote Jung initial retainer (duplicate entry preserved);

PDP Report into Death of Louis Jung Jr..pdf;

Chart 18 Jung Corrective Action Plan.xlsx (duplicate listing from separate folder section);

3496-3504 A Patient Safety Event Committee Report.pdf;

Select Policies City of Philadelphia;

2025.02.14 – Jung, Louis – PCP, Nazareth, Norristown Records Bates Stamped.pdf;

04-24-25 YesCare Defs Resp to Plntf Rogs.pdf;

Jung – Fraiser First ROGs Responses.pdf;

Jung – City First Rogs Responses (1).pdf (duplicate entry preserved);

Jung – Supp Rogs Responses.pdf;

Jung – Bloodsaw First Rogs Responses.pdf;

Jung – Apollon Interrogatories to Plaintiff 72225.pdf;

3509 Norristown return process changes.pdf;

Chart 2 DC diabetic audit July 2022 to October 2022.xlsx;

3496-3504 Patient Safety Event Committee Report.pdf (duplicate – different screenshot);

Jung First Amended Complaint.pdf;

Video November 5, 2023 labeled: b13 6a to 3 p 11 5 23;

Video November 6, 2023 labeled: b13 640a to 710a 11 6 23;

List of FSBG and refusals;

Jung insulin and glucose MAR entries,

All red flag and potential red flag;

PDP med admin records; and

Depositions of Gay, Cabellos, Frasier, Bloodsaw, Apollon, Trivikram and Jay.