# Exhibit C

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
    JACOB and JAMES JUNG, as  :
 3  Administrators of the     : NO.: 2:24-cv-05618
    Estate of LOUIS JUNG, JR.,:
 4                            :
             Plaintiffs,      :
 5                            :
    v.                        :
 6                            :
    CITY OF PHILADELPHIA,     :
 7  ET AL.,                   :
                             :
 8           Defendants.      :

 9                  ------

10         Wednesday, December 10, 2025

11                  ------

12            Oral deposition of ARTHUR

13  WALLENSTEIN held remotely at 10:02 a.m., on the

14  above date, before Rodney Hill, Digital Reporter.

15                  ------

16

17

18

19

20

21

22

23

24  Job No.:  1030777
```

Arthur Wallenstein
12/10/2025

Page 2

```
 1                    APPEARANCES
 2
    ABOLITIONIST LAW CENTER
 3  BY:  BRET GROTE, ESQ.
    990 Spring Garden
 4  Philadelphia, Pennsylvania 19123
    ph:  412.654.9070
 5  bretgrote@abolitionistlawcenter.org
    Counsel for Plaintiffs
 6  (Via Zoom)
 7  CITY OF PHILADELPHIA, LAW DEPARTMENT
    CIVIL RIGHTS UNIT
 8  BY:  MICHAEL PESTRAK, ESQ.
    1515 Arch Street
 9  14th Floor
    Philadelphia, Pennsylvania 19102
10  ph:  215.683.5387
    michael.pestrak@phila.gov
11  Counsel for Defendants, City of Philadelphia,
    Blanche Carney, Gena Frasier, and Wanda
12  Bloodsaw
    (Via Zoom)
13
    O'CONNOR KIMBALL LLP
14  BY:  RAYMOND R. WITTEKIND, ESQ.
    1500 John F. Kennedy Boulevard
15  Suite 1100
    Philadelphia, Pennsylvania 19102
16  ph:  215.564.0400
    rwittekind@okllp.com
17  Counsel for Defendants, Yescare, Dr. Lalitha
    Trivikram, Maureen Gay, and Blair Cabellos
18  (Via Zoom)
19  GORDON REES SCULLY MANSUKHANI, LLP
    BY:  ALEXANDER POSSINO, ESQ.
20  707 Grant Street
    Suite 3800
21  Pittsburgh, Pennsylvania 15222
    ph:  724.766.9108
22  apossino@grsm.com
    Counsel for Defendant, CareerStaff Unlimited,
23  LLC
    (Via Zoom)
24
```

Page 3

```
 1  APPEARANCES, cont'd.
 2       KIERNAN TREBACH LLP
         BY:  JONATHAN KAMINSKY, ESQ.
 3       1801 Market Street
         Suite 770
 4       Philadelphia, Pennsylvania 19103
         ph:  215.576.4502
 5       jkaminsky@kiernantrebach.com
         Counsel for Defendant, Mariesha Apollon
 6       (Via Zoom)
 7
 8  Also Present:
 9       Janine Dempster, Notary Public
10                    ------
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1                      INDEX
 2  WITNESS:  ARTHUR WALLENSTEIN
 3                   EXAMINATION
 4                                           PAGE
 5  By MR. PESTRAK                             7
 6  By MR. WITTEKIND                          94
 7              ------
 8                   EXHIBITS
 9  (None marked.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1              -  -  -
 2            PROCEEDINGS
 3              -  -  -
 4            THE REPORTER:  We are going on a
 5  record.  Today's date is December 10th, 2025,
 6  and the time is 10:02 a.m. eastern time.
 7  Good morning.  My name is Rod Hill, and I am
 8  the Georgia notary and reporter assigned by
 9  Lexitas.  I request all parties stipulate and
10  agree that by videoconference technology,
11  this will be the remote deposition of Arthur
12  Wallenstein in the case of Jacob and James
13  Jung as the administrators of the Estate of
14  Louis Jung v. the City of Philadelphia, et
15  al.
16            Counsel, will you please state your
17  appearance for the record, your firm and who
18  you represent, and that you agree to
19  stipulate that I may report this proceeding
20  remotely.
21            MR. PESTRAK:  Good morning.
22  Michael Pestrak on behalf of the City of
23  Philadelphia, Blanche Carney, Gena Frasier,
24  and Wanda Bloodsaw.  And I do so stipulate.
```

Page 6

1        MR. GROTE:  Good morning.  Bret
2   Grote on behalf of plaintiffs.  And I also
3   stipulate to the recording of this
4   deposition.
5        MR. WITTEKIND:  Ray Wittekind with
6   O'Connor Kimball for defendant Yescare, Dr.
7   Trivikram, Marsha Gay, and Blair Cabellos
8   (phonetic).  And I stipulate to the
9   recording.
10       MR. KAMINSKY:  Good morning.
11   Jonathan Kaminsky with Kiernan Trebach.  I
12   represent Mariesha Apollon.  We stipulate to
13   the recording, and additionally, I note for
14   the record that we object to these
15   proceedings and we object to Plaintiffs' late
16   submission of all the expert reports.  Thank
17   you.
18       MR. POSSINO:  Good morning.  This
19   is Alex Possino from Gordon Rees Scully
20   Mansukhani, on behalf of CareerStaff
21   Unlimited, LLC.  And we also stipulate to the
22   recording.
23       THE REPORTER:  Ms. Dempster, you
24   can continue from here, swear in the witness.

Page 7

1        THE NOTARY PUBLIC:  Thank you.
2   Good morning, everyone.  My name is Janine
3   Dempster.  I am the Pennsylvania notary
4   assigned to swear the witness in by Lexitas.
5   Mr. Arthur Wallenstein, can you please raise
6   your right hand?  Thank you.  Do you swear
7   and affirm to tell the truth, the whole
8   truth, and nothing but the truth during this
9   testimony?
10       THE WITNESS:  I do.
11       ARTHUR WALLENSTEIN, after having
12   been first duly sworn, was examined and
13   testified as follows:
14       THE NOTARY PUBLIC:  Thank you.  You
15   can put your hands down.  You may all
16   proceed.
17       THE REPORTER:  Counsel, you may
18   begin when you're ready.
19       MR. PESTRAK:  Thank you.
20            - - -
21       EXAMINATION
22            - - -
23   BY MR. PESTRAK:
24       Q.  And good morning again, Mr. Wallenstein.

Page 8

1   How are you?
2       A.  Fine, sir.
3       Q.  I read your report, so I'm going to try
4   not to go over everything you've told us in the
5   report.  But I do have some questions on the
6   report and just want to get a little bit of
7   clarification on some of the things that are in
8   there.  You've worked for 43 years in governmental
9   agencies with responsibility for inmates and
10   county jails and county correctional facilities.
11   Am I correct that you never worked as a
12   correctional officer?
13       A.  Never.
14       Q.  You started off, I believe, as a clinic
15   supervisor.
16       A.  Actually, I started off as a volunteer
17   and as a summer replacement aide in Eastern State
18   Penitentiary.
19       Q.  And as a summer volunteer at Eastern
20   State Penitentiary, what are your
21   responsibilities?
22       A.  My responsibilities were to actually
23   operate the library -- the prison library,
24   substituting for individuals who were on vacation.

Page 9

1   And they asked me to do so after they sort of got
2   a look at me when I was doing volunteer teaching
3   while I was in graduate school.
4       Q.  And how long did you perform this work
5   for?
6       A.  I'm sorry, I didn't hear you.
7       Q.  How long did you perform this work?  I
8   know you say two summer periods, but I don't
9   understand -- well, I don't have a frame of
10   reference what that means in terms of time.
11       A.  All right.  My volunteer teaching work
12   was done over three years while I was in graduate
13   school at University of Pennsylvania.  And then
14   the specific -- pardon me -- the paid work in the
15   library was two summers.  So let's say three
16   months times two.
17       Q.  And then I move to your first job after
18   you graduated.  It would then be as a clinic
19   supervisor at the minimum security unit.
20       A.  Actually, no.  I -- after I finished
21   graduate school, or actually, before I finished
22   graduate school, I had to go -- had to go on
23   active duty with the US Army.  And I did work as a
24   volunteer in the stockade or the brig at Fort

Arthur Wallenstein
12/10/2025

1  Benning, Georgia.  So the beginning of my work,
2  actually, was that volunteer work in the evenings
3  at Fort Benning.  And when I came out and made the
4  decision to change careers and go into
5  corrections, my first "paid job of substance"
6  would have been with the Philadelphia Prisons.
7      Q.   And what was your role with the
8  Philadelphia Prisons?
9      A.   All right.  May I step back a half a
10 beat?  My first paid job was with the Pennsylvania
11 Prison Society.  Pennsylvania Prison Society
12 apparently had a contract with the Philadelphia
13 Prisons -- and that's what it was called then, so
14 please pardon me if I make any nomenclature errors
15 -- that the prison society would come on-site and
16 train staff in what was going to be a forthcoming
17 quantum change in how disciplinary hearings were
18 conducted.  All right.  And that followed a
19 decision in a case called Wolf v. McDonnell, but
20 I'm not making any legal judgments.
21          There were specific elements that were
22 going to change that had never been part of prison
23 disciplinary hearings before.  And so my job,
24 number 1, was to go into the institutions at all

1  hours, day shift, afternoon shift, night shift,
2  and conduct basic core training in the procedures
3  that were going to go into effect.  I was also
4  asked by the superintendent of prisons -- pardon
5  me -- the deputy superintendent to go to the
6  hospital unit that was then in operation -- and
7  the name of the hospital escapes me.  At the time,
8  it was a major public hospital in Philadelphia --
9  and do a review of how I thought it was operating.
10     Q.   There was a lot there.  The disciplinary
11 process that you're referring to, is this for
12 inmates or for staff?
13     A.   Oh, I'm sorry.  I should have said that.
14 Inmate disciplinary hearings as a function of
15 changes in legal process.
16     Q.   Thank you.  And I guess it'll be easiest
17 for me to say, what was your next position?
18     A.   Okay.  I don't have my resume in front
19 of me.  And it's not that I have lost my memory.
20 I need to sort of walk my way through that.  So
21 the Pennsylvania Prison Society was number 1.
22 Number 2 was the Philadelphia Prisons.  All right.
23 I then left Philadelphia and returned to my home
24 state of Illinois, and I went to work for the

1  Illinois Department of Corrections.
2      Q.   So at the Philadelphia Prisons, which
3  you're saying is a different position from the one
4  that you just mentioned about the disciplinary
5  hearings, what was your responsibilities in this
6  other position with the Philadelphia Prisons?
7      A.   Okay.  Fair enough.  The Philadelphia
8  Prisons, the superintendent and the deputy
9  superintendent -- and again, I apologize that the
10 -- it may have been -- commissioner may have been
11 the title -- asked me to come on board, all right,
12 if I could qualify, and write grants to become a
13 grant writer.  This was the period when the Law
14 Enforcement Assistance Administration was
15 providing significant funding to correctional
16 institutions, correctional systems, prisons and
17 jails.  So that was my job, to write grant
18 applications, which I did.
19     Q.   And then at the Illinois Department of
20 Corrections, I'm looking at the list of jobs that
21 you held, and I'm just going to go through them
22 and tell me if I missed any.  Clinical services
23 supervisor, assistant warden, program services,
24 and director, adult reception and classification.

1  Did I miss any?
2      A.   Very close.  My first assignment was to
3  the minimum security unit, the farm, as they
4  called it, clinic supervisor.  I was then given a
5  lateral change to come inside of the enormous
6  Stateville Penitentiary in Joliett as their clinic
7  supervisor.  I was then promoted to the position
8  of assistant warden.  And if I use the word
9  deputy, I apologize, it was a matter of
10 nomenclature and trying to remember.  And so I
11 became the assistant warden at the Stateville
12 Penitentiary.
13     Q.   So let's do those hopefully one by one.
14 The clinical --
15     A.   Okay.
16     Q.   -- services supervisor, what were your
17 responsibilities for that?  And you can tell us
18 the differences between inside and outside, if
19 there were any differences.
20     A.   Okay.  My job was to be available for
21 any counseling, not therapy.  Let's just say
22 issues of the day, concerns, someone to talk to
23 outside of the security staff.  I was also in
24 charge of all the programs at the minimum security

Page 14

1 unit. And that would be education, adult basic
2 education, GED. There were some religious
3 engagements, okay, faith community programs, Bible
4 study, etc. And it was my responsibility to
5 supervise those.
6        And also to report any classification
7 concerns. And that would be simply to report in,
8 if I had any concerns that an inmate who was
9 assigned to the minimum security unit, which had
10 no walls, was out on the public or was on the
11 complex. And Stateville had a very large
12 footprint, several hundred acres, that I could
13 recommend or express concern if I felt somebody
14 was misclassified and shouldn't be out there. Oh,
15 and I also walked the halls of the dormitories
16 where the inmates were housed.
17        Q.   How did your duties or responsibilities
18 change when you became assistant warden?
19        A.   Okay. Well, I became the assistant
20 warden after being promoted from the clinic
21 supervisor position inside the walls at the
22 Stateville institution. I became an assistant
23 warden, and there were two of us. The average
24 daily population, and that's ADP, average daily

Page 15

1 population was over 3,000 inmates at the time.
2 And my job was to provide overall supervision for,
3 I think, some -- 20 some caseworkers, counselors
4 who were out and about inside of the institution
5 periodically.
6        They also had no manual for the conduct
7 of clinical services, so the warden directed me to
8 write a manual, which I did over the course of
9 about a year. I also was a member of the
10 classification committee that made classification
11 decisions regarding high risk offenders. I also
12 sat on disciplinary hearings as it related to loss
13 of good time or earned time. And I also served as
14 the acting warden in the absence of the warden at
15 the Stateville Penitentiary. And there were times
16 that I was indeed responsible for the entire
17 operation of the facility.
18        Q.   And then when you became director, how
19 does your responsibilities change, if at all?
20        A.   And there will be -- are you talking --
21 pardon me. I'm getting tongue tied. Will you
22 tell me, director of what?
23        Q.   You have director of Adult Reception and
24 Classification Center on your curriculum vitae.

Page 16

1        A.   Okay. I'm sorry. Now I understand.
2 Before I went to Stateville Penitentiary, my last
3 assignment before then was serving as the director
4 of the reception unit. And the Joliett
5 Penitentiary and the Stateville Penitentiary were
6 both part of the same complex. Every Friday, a
7 bus would appear and it would bring all newly
8 sentenced offenders who'd been sentenced in Cook
9 County. All right. Chicago, by and large. And
10 it was my job to see that they were promptly
11 classified.
12        That means reviewed by intake
13 classification experts who would assess their
14 security concerns, any program concerns, any
15 health care concerns, and then select the
16 appropriate institution in the State of Illinois
17 where they should be assigned to serve their
18 sentences, which were often very lengthy. I then
19 reviewed, approved, or rejected all of those
20 recommendations. And I believe within two weeks
21 the buses were running in another direction,
22 taking the newly arrived inmates out to where they
23 were going to serve their sentences. That was the
24 job that I held when you use the term director.

Page 17

1        Q.   And then it looks from your CV that you
2 then became director/warden of Bucks County
3 Department of Corrections in Doylestown,
4 Pennsylvania. Is that correct or is there
5 anything in between those positions that we might
6 have missed?
7        A.   I was offered the position of warden at
8 the Joliett prison complex and declined it and
9 also decided this was a good time for me to leave
10 Illinois. Not get out of town, but leave the
11 Illinois Department of Corrections. And there was
12 a vacancy for warden and director of corrections
13 in Bucks County, Pennsylvania -- and that's B-U-C-
14 K-S, Bucks County, Pennsylvania -- right outside
15 of Philadelphia. And I jumped at the opportunity,
16 and that was really the big shift, big
17 opportunity, and big change in my corrections
18 career for I applied and was a -- was selected for
19 a jail, all right, pretrial detention and short-
20 term facilities, my first warden's position and my
21 first opportunity to be the overall director of a
22 good-sized county correctional system.
23        Q.   I'm going to ask you a follow-up
24 question now, but I just want to see if maybe

Arthur Wallenstein
12/10/2025

Page 18

1 there's a way we can streamline this.  You have
2 director, warden after Bucks County at King County
3 Department of Adult Detention in Seattle,
4 Washington, and then after that, until you
5 retired, director, warden Montgomery County
6 Department of Correction Rehabilitation.  Are
7 those the extent of your positions, from Bucks
8 County warden to King County warden to Montgomery
9 County warden?
10     A.   Okay.  The, the video stopped for a half
11 of the second, but my institutional paid
12 positions, Bucks County, King County, Washington,
13 Montgomery County, Maryland, but simultaneously
14 Temple University, then University of Washington,
15 then University of Maryland, adjunct instructor,
16 then adjunct associate professor.
17     Q.   So this next question is going to be
18 related to your times as your -- excuse me -- your
19 role as warden in those three facilities that you
20 just mentioned.  And I know there's going to be
21 different specifics for each facility, but my
22 question is, generally, what was your roles and
23 responsibility as a warden inclusive of all three
24 of those locations?

Page 19

1     A.   All right.  In each of the three
2 environments, I -- my appointment was dual in
3 nature.  It was warden and also director of the
4 agency.  In Montgomery County, Maryland, in my
5 last position, I served as warden and director.
6 And then, thank goodness, I recommended they hire
7 a warden when the new institution opened and I
8 moved over to solely being director.  So my job
9 was to be in charge.  I was the -- I think you
10 would call it chief administrative officer.
11 Right.
12        None of these were sheriff's
13 departments.  These were all line county operating
14 departments like the police department or the
15 personnel department or the finance department.  I
16 was interviewed and competed for the director
17 position for operating the adult correctional
18 system.  No juvenile system was involved.  That
19 most likely is a decent beginning to your
20 question.
21     Q.   And the topics that you taught as a
22 professor, if you could just give us the thumbnail
23 version of those topics, what would they be it?
24     A.   I taught two major courses.  One,

Page 20

1 Introduction to Criminal Justice when necessary.
2 My main thrust and what -- why I was hired right
3 from the beginning was to teach introduction to
4 corrections within criminal justice programs.  And
5 those, those programs were at Temple University,
6 the University of Washington, then Montgomery
7 County Community College, and then the University
8 of Maryland.
9     Q.   Thank you, Mr. Wallenstein.
10     A.   I do that -- I'm sorry.  And I do that
11 until today.  Start again January the 3rd.
12     Q.   Now, turning to the case that you are
13 hired in, you have a list of the materials that
14 you reviewed.  You have them listed 1 through 35.
15 And the first question I have, are these in the
16 order in which you reviewed them or are they just
17 listed in generic order as you wrote them down?
18     A.   Fair enough.  They are not in any
19 chronological order.  All right.  They are me
20 going through my notes, all right, and also
21 through materials received to make sure that I had
22 given you as many as I could recall.
23     Q.   Thank you.  And one of the items that
24 you reviewed was a video.  I think you only

Page 21

1 reviewed one video, so I'm not going to worry
2 about naming it, but it's a video that we're all
3 fairly familiar with here.  But how did you review
4 that video?  What was the process for that?
5     A.   Well, the video was B6-3, November 5,
6 2023.  All right?  That was the specific citation
7 for the video.  And I know that because I reviewed
8 it so many times.  What I did was, once I was able
9 to open it, I watched it, and I watched it, I
10 guess, five or six times so I could get used to
11 the visual pictures that were in front of me and
12 also gain an understanding of how that housing
13 unit looked and operated.
14     Q.   Did you review any of the reports of the
15 video before watching the video?
16     A.   Yes, I did.
17     Q.   Which reports did you review before
18 watching the video?
19     A.   I reviewed the disciplinary reports, or
20 we'll call them disciplinary process.  And that
21 may not be the language that was used in PDP, but
22 I'm sure it's understood.  And in all of those
23 reports, there was mention of the video.  They
24 were -- the video was also mentioned in the

Arthur Wallenstein
12/10/2025

Page 22

1  depositions of Ms. -- I'll use their correct title
2  -- Lieutenant Bloodsaw and Correctional Officer
3  Frasier.
4      Q.   So you reviewed both of Lieutenant
5  Bloodsaw and Officer Frasier's depositions before
6  viewing the video?
7      A.   I certainly reviewed Officer Frasier and
8  -- yes, yes, I can be specific.  I did review
9  both.
10     Q.   You said the first time that you watched
11 the video -- well, the first time you reviewed the
12 video, you watched about five to six times.  Did
13 you conduct a second or additional review of the
14 video after that?
15     A.   Yes, I did.  I went through almost three
16 reviews.  When I say that, that doesn't mean
17 watching it three times.  I may have watched it 10
18 or 15 times, but I stopped, came back to it, and
19 then came back to it again.
20     Q.   Is 15 times the total number of times
21 that you watch the video, or is there a different
22 number for that?
23     A.   Now, that's a fair question.  I didn't
24 keep a list.  I just watched it repeatedly.  And I

Page 23

1  watched sections of the video over and over and
2  over again.  Now, that's not a number and that's
3  not specific, but 15 would be a very fair picture
4  of how many times I went over certain elements in
5  the video.
6      Q.   In your Materials Considered section,
7  you talk about two publications, Performance-Based
8  Standards for Adult Local Detention Facilities by
9  the American Correctional Association and
10 Standards for Health Services and Jails by the
11 National Commission on Correctional Health Care.
12 You say that you cite them specifically in the
13 introduction because they represent industry
14 standards across a broad scope of operational
15 elements and corrections at the county local level
16 that were in place at the time of this incident.
17         Now, my question on those two documents
18 is that you don't cite to them anywhere in your
19 opinions.  So I would want to ask you about --
20 let's do it one at a time.  The Performance-Based
21 Standards for Adult Location Detention Facilities,
22 what in that publication did you use, if anything,
23 to form any of your opinions in this case?
24     A.   Fair enough.  The ACA standards included

Page 24

1  -- well, initially included operational issues,
2  the nature of the environment, security
3  procedures.  We'll call it operations and program
4  elements.  And then later, health care was added
5  to it.  All right.  It was the driving statement
6  by the American Correctional Association, adult
7  local detention facilities, translated into
8  English, jails, county correctional systems, all
9  right, that there were definitely
10 responsibilities, all right, that were incumbent
11 upon correctional staff in the conduct of their
12 business.
13         It created for me, all right, a
14 construct, a background, an environment, the way
15 of conducting business.  And as it related to
16 health care, it was all formulated following the
17 1976 decision of the Supreme Court -- and I don't
18 want to make any legal judgments -- of the
19 operational elements that we studied and were
20 trained about in terms of how correctional staff
21 should conduct their business.
22     Q.   And the same question for the Standards
23 of Health Services in Jails.  What did you use
24 that publication for to help you form an opinion

Page 25

1  on?
2      A.   The group you're referring to is NCCHC.
3  And they -- their clarity, which was very intense,
4  was that health care decision making was the sole
5  responsibility of medical staff, right, and that
6  was incumbent throughout the entire report.  And
7  we were trained -- pardon me.  I was trained as a
8  result of a very special training environment that
9  fortunately was available during my tenure as a
10 warden through the National Institute of
11 Corrections.  But NCCHC and ACA were the -- I
12 don't want to say the Bible.  We'll simply call
13 them holy writ on how to conduct good practices,
14 best practices, meet constitutional standards as
15 it related to the conduct of daily operations.
16 It's a long answer, but I hope it was clear.
17     Q.   It was.  Thank you.  Now, in case you
18 have your report in front of you, I'm just going
19 to direct you to where I'm reading from.  It's
20 page 4 of your report.  You have a paragraph, and
21 it starts off with -- the first paragraph is, "It
22 is my opinion that Correction Officer --" and then
23 it goes on.  And I'll get back to you.  But you
24 have five findings in addition to this opinion.

Arthur Wallenstein
12/10/2025

Page 26

1  So my question at this point in time is, are those
2  findings independent of this opinion or are they
3  combined within that opinion?
4       A.   Okay.  My counsel told me that I could
5  have one document in front of me and that would be
6  a copy of my report.  So I do.  It has no notes,
7  and on the front it says, "Signed report."  So
8  that was just so I would have the right document.
9  Okay.  Please don't be upset.  May I ask, would
10 you repeat the question?
11      Q.   Not a problem at all.  And I have no
12 problem with you referring to your report.  It's
13 not an issue for me today.  So, on page 4, you
14 have a paragraph that starts, "It is my opinion"
15 and then a very long opinion that follows from
16 that.  But in the report you also have, well, five
17 what appear to be independent findings.  So my
18 question to you is your opinion in total those
19 five findings plus this opinion, or is this
20 opinion that's on page 4 your opinion of those
21 five findings that we're using to support that
22 opinion?
23      A.   When I write an expert report, and let
24 me force myself to be brief, I begin with who

Page 27

1  hired me and why, qualifications, a general
2  overall opinion.  Then I move into a citation of
3  the findings from my review.  That would be the
4  findings that gave me the guts of the material to
5  make that comment that you referred to at the
6  beginning on page 4.  I hope that's clear.
7       Q.   Your answer is clear.  But what I need
8  to now clear up is that your opinion starts with
9  that paragraph, but I'm not entirely sure where on
10 page 4 into page 5, before you get into your
11 findings, where your opinion concludes, because
12 you start getting into some --
13      A.   Okay.
14      Q.   -- anecdotes.  So I'm just trying to
15 figure out if you could tell us what your opinion
16 is in this case.
17      A.   If you're asking me, I'm going to have
18 to go into the report, look at the language so
19 that I can be responsive to the question.  All
20 right?  I just can't recite it off the top of my
21 head.  I would be glad to go into the report.
22 There was the overall considerations up front,
23 starting on page 4.  Then there were the findings,
24 which really are the construct of the opinion.

Page 28

1  And then there's a conclusion at the end.  All
2  right?  All three are relevant, but the guts of
3  what I found are listed in finding 1, 2, 3, 4, and
4  5.
5       Q.   So I have no problem with you going
6  through the report, and if you could direct me to
7  what your opinion is.  If it is just findings 1,
8  2, 3 and 4 and 5, that's fine as well.  But I'm
9  just trying to figure it out because it wasn't
10 clear to me from my reading of your report.  So I
11 would --
12      A.   Okay.
13      Q.   -- have no problem if you take as long
14 as you need to go through report.  Let me know --
15           MR. GROTE:  I would just -- oh,
16      sorry.  I don't want to interrupt.
17           MR. PESTRAK:  Go ahead.
18           MR. GROTE:  I would just like to
19      place an objection on the record just to the
20      form of the question, because I'm not sure
21      what you're not sure about in the report
22      itself and in the opinions, but -- I just
23      want to get that on the record.  That's all.
24           MR. PESTRAK:  So I guess I'm just

Page 29

1  asking Mr. Wallenstein, if he needs to go
2  through his report, to put his opinion on the
3  record today.
4           THE WITNESS:  All right.  I
5      certainly don't want to read my entire report
6      to you, but there is a conclusion.  But I
7      want to -- what is my opinion?  My opinion is
8      I found five major areas that were of concern
9      to me, and those are what I am presenting,
10     right, in my report to my contractor, right,
11     Abolition Legal Services, and to you today.
12           Finding number 1, conclusion
13     regarding the work of Gena Frasier.  And
14     that's cited, so I'm not going to read that
15     into the record.  It's there for your review,
16     if that's all right.  The same for number 2,
17     that -- my findings regarding inmates who
18     allegedly decline medication.  That was a key
19     element of what I found, helped formulate my
20     opinion.  Number 3 was the -- my review of
21     the behavior actions of Lieutenant Bloodsaw.
22           Number 4 was how rounds were made.
23     And again, these are all my opinions.  All
24     right.  And then 5 was -- and there's a typo

Page 30

1   here.  All right.  And I'm glad to have the
2   chance to give it to you.  I reviewed
3   investigations into 12 deaths.  12 was not
4   the right answer, but it was a relevant
5   number to another part of the report that I
6   was working on.
7          And here I was concerned -- a
8   review of the cases -- these are my findings
9   -- reviewing the inmate population, seeking
10  out any inmates who express concern and
11  responding across the board on the part of
12  correctional staff giving rise to my finding
13  that appropriate measures were not taken as
14  an ongoing and regularized response to issues
15  pertaining to deaths in custody and case
16  materials covering 12 -- it was much more
17  than 12.  I used the wrong number, right, and
18  I didn't catch this -- situations leave
19  considerable description and documentation
20  that, as a matter of death, the Jung staff
21  intervention was improperly delayed in
22  circumstances resulting in loss of life.  And
23  it was also a finding of mine that there was
24  insufficient review from the top of the

Page 31

1          organization, all right, and that would be
2   during the tenure of Commissioner Carney.
3   That would be it.
4   BY MR. PESTRAK:
5      Q.  And just to close this line of
6   questioning, you mentioned the conclusion was also
7   part of your opinion.  And I'm just trying to flip
8   to that part.  Here it is.  In your conclusion,
9   you have, "Non-professional correctional staff
10  were adequately trained in the rudimentary basics
11  of supervising the inmate population."  So the
12  first question I have there is, by non-
13  professional, do you mean non-medical
14  professional?
15     A.  Yes.  I was trying to use terminology
16  that I had picked up in the report.  Medical would
17  have been professional, licensed medical.  And I
18  was referring to correctional staff as I found its
19  use in the -- in the materials.
20     Q.  You continue a few sentences later,
21  "They --" I'm assuming this still referring to the
22  non-medical professional correctional staff "--
23  had been trained under the guidelines inherent in
24  the standards of the National Commission on

Page 32

1   Correctional Health Care and the American
2   Correctional Association that health care
3   decision-making, treatment issues, and any matters
4   relating to health care assessment were the
5   province of health care professionals and were not
6   within the scope of employment of those working in
7   line correctional operations as, in this case,
8   specifically correctional officers and those in
9   supervisory positions."
10         So I just want to make sure that I
11  understand your conclusion there, is that the
12  correctional staff at PDP was appropriately
13  trained under the standards as related to the two
14  publications that you mentioned earlier in your
15  review.
16     A.  Okay.  Fair, fair enough.  Let me
17  explain.  The -- in response to the discovery, the
18  City Philadelphia provided 385 pages of training
19  material.  The training materials were on point to
20  basic core training of what correctional officers,
21  correctional supervisors, and that would cover
22  both Frasier and Bloodsaw by definition, knew or
23  should have known.
24         What was not provided was the

Page 33

1   documentation on whether they learned it, whether
2   they attended -- whether they paid attention
3   because both said in their depositions they
4   weren't trained, all right, that they didn't know
5   many of the issues that were discussed in the
6   training.  So I drew my inference that training
7   was provided from the 385 pages that were given to
8   Counsel in discovery.  I hope that's responsive to
9   the question.
10     Q.  I think so.  I'm just going to clarify
11  that you are saying in your opinion that they had
12  been trained under the guidelines inherent in the
13  standards of the National Commission on
14  Correctional Health Care and the American
15  Correctional Association.
16     A.  Yes.  I drew that inference because when
17  I -- and I reviewed every single page of the 385,
18  maybe it was 383, pages.  And those pages covered
19  elements that were -- contained generic practices
20  and information materials that were part of the
21  health care standards, management standards of
22  both the American Correctional Association -- and
23  from time to time, I'll say ACA, if I may -- and
24  NCCHC.  The answer to your question is yes.

Arthur Wallenstein
12/10/2025

Page 34

1    Q.   Thank you, Mr. Wallenstein.  In the
2  materials that we provided to you and that you
3  reviewed were a number of policies.  And the two
4  that I'm going to ask you about now are the PDP
5  policies and procedures 4E242, red flag medication
6  compliance system, and 4E21, PPS staff roles in
7  non-routine and/or emergency medical situations.
8  You reviewed both of those policies.  Correct?
9    A.   Yes.
10    Q.   Was there anything in your opinion that
11  was deficient in those policies?
12    A.   I'm hesitating because I want to give
13  you a fair and truthful answer.  The basic
14  mechanics were on point to what should have been
15  done and what correctional staff knew or should
16  have known.  What was not included was the nature
17  of the review process that would take place if
18  data showed there were deficiencies.  So it's a
19  dual -- it's two things.
20         One, "What should we do?"  Properly
21  covered.  In fact, they cite into the actual
22  standards of both NCCHC and to ACA up at the top
23  in the upper right-hand corner of the policies.
24  And then secondly, the nature of the review,

Page 35

1  quality, coordination, etc., that was -- I didn't
2  feel was included.  And maybe it wasn't intended
3  to be included.
4    Q.   I believe I understood your answer, so
5  thank you again.  I'm going to now turn to your
6  specific findings.  And just so you know what I'm
7  looking at, I'm starting on page 8.  I know you
8  make them earlier than page 8, but you seem to go
9  into a little bit more detail starting at page 8.
10  And I'll start with finding number 1.  And I'm
11  going to go right down to the discussion.
12         You say, "Correctional Officer Gena
13  Frasier was a line correctional officer assigned
14  to duties in the housing unit where Inmate Jung
15  was out."  I think we all agree with that.  You
16  then say, "On November 5th, 2023, she came upon
17  the inmate obvious distressed."  And I just want
18  to know what you base your conclusion that Mr.
19  Jung was in obvious distress upon.
20    A.   Oh, I'm sorry, I didn't hear the last
21  couple of words.  Did you ask me I drew that
22  conclusion based on what?
23    Q.   What did you use to draw the conclusion
24  that Mr. Jung was in obvious distress?

Page 36

1    A.   Yes, he was lying on the floor.
2    Q.   Is that the sum and substance of all the
3  facts that you used to come to that conclusion?
4    A.   Any inmate who was lying on the floor
5  was, was certainly a major element.  And then that
6  was given further elaboration when she asked a
7  member of the medical staff to stop passing out
8  meds or doing whatever they were doing and come up
9  to the cell and take a look at him.  Yes.
10    Q.   You also reviewed Nurse Cabellos's
11  deposition testimony and review for this case as
12  well, did you not?
13    A.   Yes, I did.
14    Q.   And Nurse Cabellos actually describes
15  her interaction with Mr. Jung on November 5th of
16  2023.  Doesn't she?
17    A.   Yes.
18    Q.   And other than laying down, she's really
19  the only eyewitness we have to Mr. Jung's
20  condition on November 5th, 2023, isn't she?
21    A.   No.  There were multiple eyewitnesses.
22    Q.   Who are the other eyewitnesses that give
23  descriptions of his condition?
24    A.   Frasier.  All right.  Oh, I'm sorry.

Page 37

1  You want people who gave descriptions.  All right.
2  So we have Frasier.  We have Lieutenant Bloodsaw.
3  We don't have the testimony of the inmates who
4  were called up to the cell to move him back in.
5  So that wouldn't be included in your -- in your
6  question.  I'm trying to think if there was anyone
7  else.  Direct participants, eyewitnesses.  Right?
8  Not reviewers or anything of that nature.
9    Q.   Correct.
10    A.   Yes.
11    Q.   And that would be?
12    A.   No, I'm sorry, I was saying to you you
13  didn't want me to cite to you any folks who, after
14  the fact, did analysis and review?
15    Q.   So you're saying that that's the sum and
16  substance of -- well, let me rephrase that.
17  That's the world in which we would have for
18  eyewitnesses as Mr. Jung's condition at the time.
19  You agree with me is Lieutenant Bloodsaw, Officer
20  Frasier, Nurse Cabellos, and any inmates that are
21  present.
22    A.   Yes, pardon me, with one hesitation.  I
23  don't know if the camera or video lead was
24  connected to the officer outside the unit who

Arthur Wallenstein
12/10/2025

1  controlled the doors moving into the unit.  That
2  would only -- that would add one additional
3  person, possibly McKay.
4       Q.    Even without possibility, we don't have
5  any record evidence of what that person, if they
6  did observe anything, observed.  Correct?
7       A.    Fair enough.  Yes.
8       Q.    We don't have any record evidence of
9  what the inmates at the time observed.  Correct?
10      A.    Correct.
11      Q.    So we have Lieutenant Bloodsaw's
12  recollection, of which she admits is very limited.
13  And she's unable to remember what she specifically
14  conversed with Mr. Jung about.  You agree with
15  that representation of her deposition testimony
16  about what she would have observed to Mr. Jung
17  that day?
18      A.    No, I don't agree.  And again, I'm not
19  being argumentative with you.  You know, we're
20  doing fine so far.  It was much more intense than
21  that.  She said she knew nothing, could remember
22  nothing.  All right?  It was largely -- and she
23  didn't use the word blank, but largely, she could
24  not state anything about what transpired that day

1  in that --
2       Q.    Good news is that --
3       A.    -- situation.
4       Q.    The good news is I think we're saying
5  the same thing.  We're just choosing how to phrase
6  it differently.
7       A.    Okay.
8       Q.    Officer Frasier gives a limited
9  description of her interaction with Mr. Jung on
10  November 5th, specifically at the time you say
11  that he was in obvious distress because he was
12  laying down.  Would you agree with that
13  categorization of her testimony?
14      A.    Right now, I'll apologize because I feel
15  I'm really understanding your questions.  Could
16  you repeat that question to me?
17      Q.    Sure.  Officer Frasier gave a deposition
18  testimony in this case in which he described her
19  interaction with Mr. Jung at the time in which you
20  say he was in obvious distress.  Let me just ask
21  it this way.  How would you categorize her
22  description of Mr. Jung at that point in time?
23      A.    Limited.  It's extraordinary that in a
24  situation of this nature, these two staff members

1  should have -- I'm sorry.  Cancel that.  You were
2  -- you just asked me about Frasier.  I already
3  talked about Bloodsaw -- that their recollections
4  should be so limited.  All right.  It, it passing
5  almost in nature.  It was not descriptive in any
6  significant manner.  And then, of course, there
7  were large areas that were not even included
8  because Frasier noted she didn't go up to the cell
9  and accompany the lieutenant.  She waited down on
10  the main floor, I believe it's called.
11      Q.    And then lastly, we have Nurse Cabellos.
12  And she's the one, in her deposition testimony at
13  least -- and I'm going to use the word here, and
14  you can feel free to disagree or not, and tell me
15  why.  She gives the most full description of Mr.
16  Jung at the time of her and Officer Frasier's
17  interaction with him that you say he was in
18  obvious distress.  Does she not?
19           MR. GROTE:  I would just object to
20       form.
21           THE WITNESS:  He provides-- and I'm
22       assuming objections to form I can go ahead
23       and answer the question unless I'm so
24       instructed not to.  All right.  Her report is

1       the most detailed, the fullest description,
2       whether accurate or not, whether truthful or
3       not.  It is -- it has the longest narrative
4       of what she "observed".
5  BY MR. PESTRAK:
6       Q.    And she is the only health care
7  professional that interacts with Mr. Jung at the
8  time you say he's in obvious distress on November
9  5th of 2023?
10      A.    At that time, yes.
11      Q.    And I know you're not a medical
12  personnel, you're not a medical doctor, but her
13  description is not one of someone in obvious
14  distress.  Is it?
15      A.    Yes.  It does have not yes, not in
16  distress.  Her, her commentary -- this was brought
17  out most clearly in her deposition -- is she knew
18  the inmate was in pain.  All right?  She indeed
19  knew that if the pain continued, that if she was
20  truthful, that she told Frasier to make a
21  stretcher call.  Now, of course, Frasier said she
22  was a liar.  But you asked me a question, if there
23  was no finding of distress.  Yes, I found a
24  finding.  She told Frasier, stretcher call.  And

Arthur Wallenstein
12/10/2025

Page 42

1 that's about as significant a response as might be
2 possible in terms of, "Something's wrong. Get
3 help."
4      Q.   Now, we can agree that her sign of
5 distress was not the one that you cited to in your
6 conclusion.
7      A.   Of pain.  Right.
8      Q.   We can also agree that she observed him
9 talking, walking, and seeming in no physical
10 impediment to his ability to do either one of
11 those.  Correct?
12            MR. GROTE:  I would object to form
13      there, right, if you're -- I think you're
14      asking what she testified to as opposed to
15      what -- but I think the phrasing of the
16      question was that she observed this.  So I'm
17      not sure if you're asking him to pass on her
18      credibility as to what she observed or as to
19      what she testified to in her deposition
20      itself.
21 BY MR. PESTRAK:
22      Q.   She testified that she observed him
23 walking and talking and in no physical impairments
24 based on any complaints of pain.  Correct?

Page 43

1      A.   No, that, I don't know.  I will agree
2 with you, number 1, that he was verbal, all right,
3 according to her report.  Number 2, that he was
4 mobile, at least in the short distances that were
5 -- she could observe in the cell.  Those would be
6 correct.  I do not know about the nature of what
7 he was feeling, all right, pain or weakness or
8 what have you.  That, I have to infer or just
9 leave out.
10      Q.   Well, I'm not asking you to judge what
11 he was feeling.  I'm asking you if you remember
12 Nurse Cabellos's testimony about what he said to
13 her that he was feeling and, more specifically,
14 what she testified to as to her opinion on his
15 complaint of pain.
16            MR. GROTE:  I just want to object
17      to form because when you say testify, there's
18      also a signed interview statement by Nurse
19      Cabellos that we believe is of a testimonial
20      nature.  And this is not --
21            MR. PESTRAK:  But you know an
22      interview is not testimony.  I'm sorry, Bret.
23      I'll let you get the objection, but you know
24      as well as I do that an interview is not

Page 44

1 testimony.  It might be testimonial for a
2 criminal trial, but it is not testimony.  So
3 I think my question was clear.
4 BY MR. PESTRAK:
5      Q.   Her testimony at her deposition is the
6 only time that she gives a description of her
7 interaction with Mr. Jung.  Correct, Mr.
8 Wallenstein?
9            MR. GROTE:  Objection to
10      characterization.  The only time when?  In
11      the deposition or in the record?
12            MR. PESTRAK:  Both.
13            THE WITNESS:  The question is
14      understood.  I'm trying to remember whether
15      she was called as part of any one of the
16      investigations, all right, to -- by Internal
17      Affairs, which is another name for the Office
18      of Professional Responsibility, and I just
19      can't remember that right now.
20 BY MR. PESTRAK:
21      Q.   I'm going to share my screen in just a
22 minute.  I just wanted to get the page before I
23 got there.  So let's go ahead and just pull this
24 up.  Now, I have open -- and I'll go to the top so

Page 45

1 you can see it.  It's the notes of testimony from
2 the September 4th videotape deposition of Blair
3 Cabellos.  This, just so the record's clear, is
4 document number 14 on your Materials Considered.
5 And I'm going to go down to page 76 of the notes.
6 And this is where -- actually I'm going to go up
7 to 75.
8            She's asked, "When did you arrive --"
9 This is line 5 through -- I think that's supposed
10 to be 7.  "When did you arrive to work on November
11 5th, 2023?"  On page 9, "I'm assuming 7:00 a.m."
12 So we know what day she's talking about.  "Do you
13 recall Louis Jung --"  Her answer, "Now that this
14 is going on, I remember the situation, yes."
15 "What do you remember about the situation?  Do you
16 want me to start it from the beginning?"  Back up
17 to the top, page 76, "Sure."  Just bear with me
18 because I'm going to read it so we're all on the
19 same page.
20      A.   No problem.
21      Q.   Her answer is, "So I had to give
22 medications on the pod because there wasn't enough
23 correctional officers to allow the inmates to all
24 come to me.  So I poured the cups for inmate,

Arthur Wallenstein
12/10/2025

Page 46

1 poured their medicine in a cup, wrote their room
2 numbers to go onto the pod. One of the
3 correctional officers, she said she would go there
4 with me. As I'm distributing the medications to -
5 - I can't remember how many inmates. There wasn't
6 a lot. She told me that an inmate wanted to see
7 me.
8         So I went to the room and the patient,
9 he said he didn't feel good. So I asked him what
10 was wrong. He told me. I can't remember if he
11 said his legs or his leg hurt. So I said, "Did
12 you put in a sick call for that?" I can't
13 remember what he said. And then he told me he
14 couldn't walk. But as he was saying that, he was
15 standing up. So he told me, "Look, I can't walk."
16 So then he proceeds to walk to me. And then I
17 said, "Okay."
18         And then he proceeds to -- he's like,
19 "Look, I can't walk," and then he proceeds to
20 gently place himself on the floor. And then he
21 tells me, "See, look, I just fell." So I told the
22 correctional officer that if he continued to
23 complain of pain that she can call the stretcher
24 because there was nothing I could do for him at

Page 47

1 the time." That's her testimony. Right?
2     A.   That's the testimony, yes.
3     Q.   And if there's nothing that a medical
4 personnel could do for him at the time, you have
5 to agree that he's not on obvious distress.
6 Correct?
7     A.   No.
8     Q.   No? How's he on obvious distress there?
9     A.   Not what you asked me. Can -- "So I
10 told the correctional officer that if he continued
11 to complain of pain, she can call the stretcher
12 call because there was nothing I could do for him
13 at the time." At the time, she was passing out
14 meds. All right? And I'm not making a medical
15 assessment here. I'm going by the plain meaning
16 of the language of access to care. She could have
17 said, "Make a stretcher call now," or find a
18 correctional officer and see how far he can walk,
19 if he can walk to the medical unit.
20         So he may well have been in distress.
21 He had to gently place himself on the floor. He
22 didn't plop down like he was ready to play a game
23 or something like that. This was a medical
24 situation. I'm not assessing anything about it.

Page 48

1 I'm going on what I heard, what I read, and what I
2 observed. So I cannot, under any way, shape, or
3 form, say that he was not in distress. I'm sorry.
4     Q.   You're going against the licensed
5 medical providers who reviewed the situation then,
6 you disagreeing with.
7     A.   No, I'm not going against their
8 assessment. That may have been her assessment at
9 time and place and environment. She's got a load
10 of medications in her hand. All right?
11     Q.   I'm --
12     A.   She has --
13     Q.   -- sorry, can you show me in the record
14 where she says how many medications are in her
15 hand?
16     A.   I'm sorry. I stand corrected. She said
17 she was passing out medications. I believe that's
18 why she was on the unit. She had no opportunity,
19 for whatever reason, not to conduct a physical
20 examination of the inmate. They were talking
21 through a steel door. That's not an exam. That
22 does not call upon me to make any assessment. I'm
23 evaluating the environment. All right? So she
24 says -- pardon me. Let's see if the -- this --

Page 49

1 that's all -- "There was nothing I could do for
2 him at the time." Yes, there was.
3     Q.   Can you show me in the record where she
4 says they're talking through a steel door?
5     A.   Oh, the door of the cell was steel. He
6 was lying on the -- well, he was standing at the
7 beginning, lying on the floor. So you're correct.
8 I stand corrected. The door must have been open.
9 We just logically assumed that. All right. "But
10 there was nothing I could do for him at the time."
11 She, for whatever reason, okay, did not do a
12 physical examination, did not ask him significant
13 number of medical questions. And I'm not putting
14 myself in her place. I don't know what her
15 protocol was for doing an examination, but there
16 he was. Jung -- I'm pronouncing the name as I was
17 told to pronounce it -- is there standing then in
18 the -- a prone or lying down position, and, and --
19 I'll be direct here -- she does nothing.
20     Q.   Which she are you talking about?
21     A.   I'm sorry?
22     Q.   Which she are you talking about?
23     A.   Oh, I'm sorry. Nurse Cabellos is -- I'm
24 sorry. When you said she, I'm, I'm just assuming

Arthur Wallenstein
12/10/2025

Page 50

1  -- and today you, you don't assume all these
2  things with names -- that Nurse Cabellos was a
3  female.  If she was a male, then I apologize to
4  you.
5       Q.  No, I was only asking because there's
6  multiple women that we're discussing --
7            THE WITNESS:  Women on the floor.
8  Yeah, I'm sorry, I just talked over you.  I'm
9  sorry.  Let me be quiet.  Mr. Pestrak?
10           MR. PESTRAK:  Yes.
11           THE WITNESS:  Michael, is there a
12  way I can take a two-minute break?  I need to
13  go get some ice and water.
14           MR. PESTRAK:  Go for it.  We'll
15  take a --
16           THE WITNESS:  I'll be right back.
17           MR. PESTRAK:  Look.  Let's take a
18  five-minute break at this time so that
19  everybody knows what time to come back.
20           THE WITNESS:  All right.  Thank you
21  very much.
22           THE REPORTER:  With no objection,
23  we're off the record at 11:06 a.m.
24           (Off the record.)

Page 51

1            THE REPORTER:  Back on record at
2  11:16 a.m.
3  BY MR. PESTRAK:
4       Q.  And are you ready to continue, Mr.
5  Wallenstein?
6       A.  I am.
7       Q.  I'm just going to continue on to page 80
8  of Ms. Cabellos's deposition.  Starting on line 4,
9  the question to her was, "Were you concerned when
10  he said his legs hurt?"  Her answer is, "No."  She
11  then was asked, "Why not?"  Her answer was, "That
12  was the only symptom he complained of.  He didn't
13  look -- nothing that -- symptomatically, nothing
14  that he was showing or telling me was a concern,
15  which is why I told the correctional officer to
16  call the stretcher call if he continues to
17  complain of pain."
18           Now, that's the only medical personnel
19  that interacted with him on the morning of
20  November -- well, the only medical personnel that
21  interact with him on November 5th, 2023.  And she
22  had no concern about his condition.  Do you agree
23  that that's an accurate reading of her deposition
24  transcript?

Page 52

1       A.  I agree that it's an accurate reading of
2  the words that were spoken, right?
3       Q.  And you have obviously given prior
4  opinions before.  And I'm going to ask if you
5  remember giving an opinion in the case of the
6  Estate of Andrew James Wessling.  I don't know who
7  they sued, but he died in custody at Nisqually
8  Jail in Olympia, Washington on April 12th, 2016.
9  And for Mr. Hill, that is N-I-S-Q-U-A-L-L-Y.  Do
10 you remember giving a report and an opinion in
11 that case?
12      A.  Yes.
13      Q.  And I have a copy of that opinion, and
14 I'm just going to -- I guess I'll show you the
15 first page to start with.  And this says, "Report
16 of Arthur --"  Let me make sure it's showing
17 first.  "Report of Arthur," excuse me, "M.
18 Wallenstein and curriculum vitae and --"
19      A.  I can see that perfectly.
20      Q.  "-- and preliminary report on the death
21 of Andrew Wessling," just so that we're on the
22 same page.  And I'm going to drop down to -- I
23 believe it's page 7.  Yes.  And paragraph 3 here -
24 - and I'll read the whole thing for completeness

Page 53

1  and so that I'm not leaving anything out.
2  Hopefully I pronounce the officer's name right.
3  "Officer Althauser, A-L-T-H-A-U-S-E-R, completed
4  his shift and left the facility.  Wessling was now
5  in holding cell number 3 under the purported
6  visual supervision of Correctional Officer Michael
7  Pino.  Pino also was at the end of his shift but
8  remained to receive Wessling in his new
9  designation holding cell number 3, medical
10 observation.
11           Officer Pino was not a professional
12 health care provider.  He claims to have felt or
13 understood that anxiety from Wessling's earlier
14 call with a judge was the reason for being placed
15 under medical supervision, but Officer Pino was in
16 no position to make any medical determination
17 about any element of Wessling's condition.  As a
18 non-medical staff member, it was completely
19 improper for him to suggest he understood why
20 Wessling was experiencing the symptoms of which he
21 complained.
22           Then you have this bold and underlined,
23 "Non-medical staff do not make health care
24 decisions.  Only professional health care provider

Arthur Wallenstein
12/10/2025

1 could determine if heart cardiac matters are
2 present and how they should be addressed, but no
3 one with medical expertise was called, contacted,
4 or sought out to assist.  One staff member after
5 another arrived false conclusions because they
6 never called upon their health care colleagues or
7 community-based service provider to assist."  Do
8 you still hold that opinion?
9     A.   Of that case, I do.
10     Q.   Do you still hold the opinion that it's
11 completely improper for a non-medical corrections
12 officer to suggest he understood why Wessling was
13 experiencing the symptoms of which he complained?
14     A.   Absolutely.
15     Q.   Do you still continue to opine that non-
16 medical staff do not make health care decisions?
17     A.   Correct.
18     Q.   Now, this situation is actually
19 different than our situation because in Mr. Jung's
20 case, a medical professional was not only gotten
21 by Officer Frasier, not only brought over to Mr.
22 Jung by Officer Frasier, but she came to a medical
23 conclusion with which she shared with Officer
24 Frasier, did she not?

1     A.   She shared -- she shared thoughts with
2 Officer Frasier without doing certain things.  But
3 the answer to your question is yes, she shared her
4 thoughts with Officer Frasier.
5     Q.   I'm going to go down a little bit
6 further in the same report to paragraph 21.  And
7 your opinion in the Wessling case was, in
8 paragraph 21, "It was a gross deviation of how the
9 jail should be operated, how to operate without
10 any figment of concern for professional medical
11 practices.  No staff member asked any questions of
12 any medical provider, contact physician or any
13 other health care professional.  They operated
14 outside any understanding of core constitutional
15 practices that since 1976," and cite to Estelle v.
16 Gamble, "have been the guiding focus of
17 correctional health services.
18          Every prisoner, every human being in the
19 Nisqually jail has a right to medical services.
20 They must have access to medical services as a
21 undiluted constitutional mandate.  Correctional
22 non-medical staff own the access linkage.  Once
23 access is provided, decisions and outcomes rest
24 with medical professionals."  Do you still agree

1 with that opinion?
2     A.   As it relates to the Wessling case?
3 Yes, I do.
4     Q.   And would you also still continue to
5 opine that once access is provided, decisions and
6 outcomes rest with medical professionals?  And
7 that would apply to the Jung case as well.  Right?
8     A.   Yes.  But I, I, I don't know that the
9 language that I used is fully responsive to your
10 question.  All right?  It is as far as it goes.
11 All right?  The question would be, could there
12 have been any errors?  Were there other
13 situations?  Was there a reason that there was no
14 physical examination done?  Again, these are for
15 health care people, not for Arthur Wallenstein to
16 opine about.
17          Was there a reason that before leaving
18 that cell, all right, before turning around and
19 heading downstairs, no effort was made to review
20 the medical record by calling back to the health
21 care central office.  So those are elements that
22 hit me immediately.  All right?  Yes if, if I ask
23 a question and the response is yes or A, B, C, D,
24 but what about E, F, G, and H?  All right?  And I

1 didn't see that in the -- excuse me.  I apologize.
2 Didn't see that in the context of the Jung case
3 where Cabellos was up on that housing unit.  All
4 right.
5          Now, I did qualify myself or limit
6 myself and say I don't know what her protocol was,
7 all right, but to me, it left a different
8 environment because it still left -- and this is
9 clear.  It still left -- after she does an about-
10 face, it left Gena Frasier stuck with an inmate
11 lying on the floor complaining of pain, right, and
12 not knowing what his general health care condition
13 was.  There's just no way around that for me.  I'm
14 done with the -- my answer.
15     Q.   You agree that she brought the nurse to
16 Mr. Jung to provide medical access?
17     A.   Yes.
18     Q.   She being Officer Frasier.  I apologize.
19 I just committed --
20     A.   No --
21     Q.   -- my own error.
22     A.   -- I understood.  The --
23     Q.   I'm --
24     A.   -- answer is yes.

Page 58

1    Q.    -- sorry, I missed your answer.
2    A.    The answer is yes.
3    Q.    Whether you agree that more should have
4  been done by Nurse Cabellos, you agree that Nurse
5  Cabellos came to a conclusion of some sort?
6          MR. GROTE:  Objection to form.  You
7  can answer.
8          THE WITNESS:  I don't think it was
9      a conclusion.  I think she decided that she
10     was done.
11 BY MR. PESTRAK:
12   Q.    So whether it was a medical decision or
13 whether it was a decision that she just didn't
14 want to be there anymore, the medical personnel
15 walked away from Mr. Jung and told the corrections
16 officer that if he continued to complain of pain
17 to call a stretcher because there was nothing that
18 she was concerned by?
19   A.    That is what she alleges took place.
20 Yes.
21   Q.    So that would be Officer Frasier
22 providing access to medical professionals and not
23 making a medical decision on her own as you opined
24 that she should not be doing.  Correct?

Page 59

1    A.    Hey, hold for a second.  Let me just
2  work that through.  At this point, yes.
3    Q.    Now I lost my page.  Give me a second.
4  Page 8.  That's where I was.  I think we've beaten
5  that one to death.  So let's move on to finding
6  number 2.
7    A.    May I go to number 2 on my report?
8    Q.    Sure.  It's page 9, second to --
9    A.    Thank you.
10   Q.    -- last paragraph.
11   A.    I have it.
12   Q.    Now, your finding number 2, just to make
13 sure I have it complete, I'll just read the whole
14 thing.  "When a correction officer is on duty in a
15 housing unit and medical instructions are
16 available for specific inmates to receive medical
17 services, it is the responsibility of the officer
18 on duty to both announce the presence of medical
19 services and make certain that all inmates
20 included are called, found, and any situation,
21 such as a refusal, is documented.
22          Entries and official records are to be
23 based on face-to-face observed behaviors.  I found
24 this was not the case regarding how Inmate Jung's

Page 60

1  situation was handled on November 5th, 2023 by
2  Correctional Officer Gena Frasier."  And then
3  there's multiple paragraphs of discussion.  So I
4  guess my first question for you is, "Entries and
5  official records are to be based on face-to-face
6  observed behaviors," what are you using to come to
7  that conclusion?
8    A.    I'm using the facts of this particular
9  encounter.  The names of four prisoners were
10 provided who were to receive insulin and Accu-
11 Chek.  It appears from all of the different
12 materials that three of them appeared and that
13 Jung did not, and that Officer Frasier infers that
14 he refused, declined, didn't appear, didn't want
15 the medication.  It also is clear that she wrote
16 down in her official documentary log that he
17 declined.  So this wasn't a maybe or a perhaps.
18 Yet there was no documentation that she actually
19 did this.
20          There was no documentation that upon
21 realizing that she was short, that one of the
22 inmates, Jung, clearly with diabetes because she's
23 -- she knew what insulin and Accu-Chek was all
24 about, had not appeared and she did not go to his

Page 61

1  cell.  She goes into a long exhortation in -- I
2  believe it's in her deposition she yelled out
3  his name, that somehow that was an appropriate way
4  of making contact with inmates.  She didn't have
5  to go to his cell.  Later on, she says he did --
6  she did.
7          There were questions about, "Well, did
8  you see him through the door?", etc.  And she said
9  she felt it was sufficient for the inmate to, I
10 guess, yell back, "I don't want the medication."
11 This entire episode was contrary to appropriate
12 practice from the perspective of this expert
13 witness.  Right?  This was a person with a chronic
14 medical illness.  And there was no -- just no --
15 pardon me.  There was no documentation that she
16 called medical to get out there and see what was
17 going on.  And so that's the -- that entire maybe
18 too long discussion was why I even had a finding
19 number 2.  It hit me right from the beginning.
20 I'm done.  I'm sorry.
21   Q.    I'm trying to parse -- so your basis of
22 it not meeting the standards is because you don't
23 believe that she said what she did or because of
24 some other reason?

Arthur Wallenstein
12/10/2025

1      A.  No, they were required.  There was a
2  requirement where medication was being declined,
3  refused, whatever the word is that we want to
4  select.  There then had to be written
5  documentation.  There was none that could be
6  found.  I'm sorry, I shouldn't raise my voice.
7  Let, let me just slow down.  There was no written
8  documentation that I could find that the inmate
9  had signed off, that the officer had made an
10 effort to see whether the inmate was really
11 refusing.  And those, those were key elements in
12 helping me arrive at a, a finding on this matter.
13     Q.  Let me just unpack that a little bit.
14 So you're saying there's no documentation of the
15 refusal as in a refusal form specifically or some
16 other kind of documentation?
17     A.  No, I'm talking about the hard-core
18 documentation, piece of paper, a medical entry,
19 all right, a signature on the part of the inmate.
20 And of course, later on, there was tape evidence
21 that Officer Frasier didn't leave her location and
22 that she was watching television, all right, after
23 this took place.  And also, there was no
24 documentation at all that Officer Frasier was

1  detained or couldn't do it because there was a
2  disturbance, there was something else going on
3  within the unit.  You know, the, the unit was
4  quiet for all intents and purposes, sort of best-
5  state situation that rarely happens in a
6  correctional setting.  And she didn't go up and
7  see what was going on.
8      Q.  You did review the logbook in this case
9  where Officer Frasier documented in her log that
10 Mr. Jung refused the insulin in the afternoon of
11 November 5th.  Did you not?
12     A.  I did.
13     Q.  You also reviewed the Office of
14 Professional Compliance investigation, which
15 included a review of the MAR medical record that
16 showed that Mr. Jung refused morning insulin on
17 11/1/23 and afternoon insulin on 11/5/23.  Did you
18 not?
19     A.  I did.
20     Q.  So that's two hard-core forms of
21 documentation, to use your terms, of Officer
22 Frasier documenting Mr. Jung's refusal.  Correct?
23          MR. GROTE:  I just object --
24          THE WITNESS:  No.

1          MR. GROTE:  -- to the
2  characterization --
3          THE WITNESS:  I'm sorry.
4          MR. GROTE:  I'm sorry.  Objection
5  as to form.  I think that mischaracterizes
6  his testimony as what he referred to as hard-
7  core documentation does not track what it was
8  that you were just comparing that to.
9  BY MR. PESTRAK:
10     Q.  Mr. Wallenstein, your answer?
11     A.  You cited two other times when it was
12 indicated that the inmate declined his medication.
13 And this came from the Office of Professional
14 Standards.  There was an entry made.  All right?
15 But there was an entry made also at a time that we
16 know he didn't decline or they don't know whether
17 he declined his medication because no contact was
18 made.  I didn't know the context in which the
19 other two were made, all right, so I didn't refer
20 to them.  They don't help me.  And I'll be direct
21 about this.
22          Remember, my judgments are not by
23 reading what someone else told me.  In this case,
24 I had to arrive at my best judgments as an expert

1  on what I could infer from the situation.  So I
2  did not find that the two other references in some
3  way swayed my opinion or, or what have you.  It
4  stands alone on the merits of 4:00 p.m. or 4:35
5  p.m., to use normal time, not the 24-hour clock,
6  16-something.  And so it was what it was.  I
7  wasn't asked to judge whether those two dates and
8  medical engagements were accurate.  That wasn't
9  part of my responsibility.
10     Q.  You weren't asked to review whether Mr.
11 Jung refused diabetic care on 11/5/2023 based on
12 either the correctional officer staff -- excuse me
13 -- correctional staff actions?
14     A.  No, I'm -- that's what I was doing.  I
15 wasn't offering comment on the other two that you
16 mentioned to me.
17     Q.  Well, I mentioned two to you, but one
18 was another and one was 11/5.  So I'll go over
19 them again.
20     A.  Okay.
21     Q.  On 11/5/2023, Officer Frasier has in her
22 -- in her log to document her actions that in the
23 afternoon Mr. Jung refused his insulin.  You
24 reviewed that documentation.  Did you not?

Arthur Wallenstein
12/10/2025

Page 66

1    A.    Yes.

2    Q.    You also reviewed the documentation or

3  the review of the medical records included in the

4  OPC report, where it says review of the MAR, which

5  is the medical records, showed --

6    A.    I'm sorry, you, you went blank.  Your --

7  I'm going to ask you if you could begin at the

8  beginning.  I'm not trying to cause a problem.  I

9  couldn't hear you -- part of what -- while your

10  question was being asked.

11    Q.    Not a problem.  And I'll try to face the

12  computer as I talk, so hopefully that doesn't

13  happen again.  The OPC report, which you reviewed

14  in this case, included a review of the medical

15  records.  And in those medical records, it showed

16  that he refused -- and there's one that's --

17    A.    I'm sorry --

18    Q.    -- a different date.

19    A.    -- it stopped again.

20    Q.    Let me try moving --

21    A.    It says your --

22    Q.    -- closer.

23    A.    My, my computer says my -- the Internet

24  connection is unstable, so it may not be your

Page 67

1  problem, it may be mine.  I'll try to listen very

2  carefully.

3    Q.    So the OPC report included a review of

4  the medical records, and it notes there was two

5  refusals.  One was on 11/1, which I agree we're

6  not worried about for the purposes of this

7  deposition.  And the other was the p.m. insulin on

8  11/5/2023, the exact time that we're discussing

9  right now.  So it's also documented in the medical

10  records that he refused the insulin.

11    A.    Okay.

12    Q.    So what I am asking is, why are you

13  diminishing those two documentations of his

14  refusal?

15    A.    One of the -- I was hired to review

16  11/5/23, all right, specifically the behavior --

17    Q.    Mr. Wallenstein, I'm not trying to be

18  rude by interrupting you, but we are discussing

19  11/5/23 currently.  That was the substance of my

20  question to you.  There is documentation --

21    A.    Oh, okay.

22    Q.    -- in his medical records that he

23  refused insulin in the afternoon on 11/5/23.

24  There is documentation in Officer Frasier's log

Page 68

1  that she entered that Mr. Jung refused insulin on

2  the afternoon of 11/5/23.  You said that your

3  opinion is based on there being no hard

4  documentation of refusal.  I've now just presented

5  you with two documents from two different sources,

6  and I'm still trying to figure out if your opinion

7  is the same.

8        MR. GROTE:  I would just object and

9    ask that he actually be showed the documents

10    you're referring to because I think that this

11    is providing confusion.

12        MR. PESTRAK:  Sure.  He reviewed

13    these documents, but I'll gladly show them

14    again.

15        THE WITNESS:  Thank you.

16  BY MR. PESTRAK:

17    Q.    So we're going to work backwards on this

18  one, Commissioner's Office of Special

19  Investigations, case number 2300188, death of

20  incarcerated person Louis Jung.  Analysis

21  continued.  And let me highlight it.  Review of

22  the MAR.  Do you disagree that that's the medical

23  records?

24    A.    I agree.

Page 69

1    Q.    That he refused a.m. insulin on 11/1/23,

2  I'm not asking you about that.  I don't care about

3  that for the purposes of this deposition.  And it

4  continues, and p.m. insulin 11/5/2023.

5    A.    Yes, I see it.

6    Q.    So that's the medical record showing the

7  refusal in the afternoon of 11/5/23.

8    A.    Yes.

9    Q.    Let me stop sharing so I can find the

10  logs.  Okay.  I'm going to share my screen again.

11  Here we go.  We have facility CFCF, post B1 Pod 3,

12  date 11/5/23, time 8:58 a.m., sign-on entered by

13  Gena Frasier.  Is this the logs that you reviewed

14  as part of your materials?

15    A.    Yes.

16    Q.    Let me scroll down to the afternoon.  We

17  have 11/5 16:49, which you translated for us.  I'm

18  not super concerned about the specific times.  It

19  says, "Entered by Gena Frasier.  Other event, PP

20  number, Jung, Louis W.  Comment is incarcerated

21  person, I/P, Louis Jung, PP number again, refused

22  insulin."  You agree that's documentation in her

23  logs?

24    A.    That's the material that's written in

Arthur Wallenstein
12/10/2025

Page 70

1  the medical record, yes.
2      Q.   Well, this is a documentation in the
3  officer logbook log.
4      A.   That's not documentation.  That is
5  narrative.
6      Q.   Which is documented.
7      A.   You and I are disagreeing about the word
8  documented.  I am saying -- I'm saying it's
9  written and you're saying it's documented.
10      Q.   Define documented for me so that we're
11  on the same page.
12      A.   Documented would mean there is some
13  element of hard information that was used to
14  arrive at the words that Frasier wrote in the
15  medical record or in the computer system that
16  translated it into the MAR.
17      Q.   What is not hard about a computer entry?
18      A.   Could be false.
19      Q.   So you think Officer Frasier was lying
20  when she put this in her record?
21      A.   I don't know what she was doing.
22      Q.   So you have to assume that she's telling
23  the truth here.  Correct?
24              MR. GROTE:  Objection.

Page 71

1              THE WITNESS:  No.
2  BY MR. PESTRAK:
3      Q.   No?
4      A.   No.
5      Q.   So then you're assuming she's --
6      A.   Because I have the --
7      Q.   -- lying?
8      A.   I'm sorry, we're talking over each
9  other.  Let me -- let me stop and let you get your
10  question now.
11      Q.   If you're saying that you don't believe
12  the documentation that you've just been shown
13  because Officer Frasier entered it herself, then
14  you are, one way or the other, making a
15  credibility determination of Officer Frasier at
16  the time that she made this documentation.
17              MR. GROTE:  Objection.
18  BY MR. PESTRAK:
19      Q.   Correct?
20              MR. GROTE:  That mischaracterizes
21      his testimony and the finding.
22              MR. PESTRAK:  Are you instructing
23      him not to answer?
24  BY MR. PESTRAK:

Page 72

1      Q.   And you can answer.
2      A.   Okay.  This is not a one-dimensional
3  case.  In other words -- sorry, my phone was
4  speaking.  I had available to me other source
5  material.  I wasn't relying on the medical record.
6  It existed, therefore, it was part of the record.
7  I also had the findings of the Internal Affairs
8  Unit, Office of Professional, and then the
9  disciplinary hearing regarding the officer.  All
10  right.
11              So already, I'm up to three or four -- I
12  don't want to say ancillary records and findings
13  that she didn't put correct information into the
14  system or she failed to do what she knew or should
15  have known, should be done to be certain what was
16  actually the situation.  And follow this, this
17  last note.  You showed me the medical record where
18  she wrote that he declined, refused his
19  medication.  Nowhere did I see the words, "And I
20  reported it to medical."  Done.
21      Q.   So you're saying that you're basing your
22  opinion that she falsified documents -- and before
23  I even ask that question, I'm going to direct you
24  to page 10, last paragraph.

Page 73

1      A.   In the electronic log, is it that --
2      Q.   Yes.
3      A.   -- paragraph you're talking about?
4  Okay.
5      Q.   It was noted in the post-event
6  investigation that this inmate refused medication.
7  Now, what you say, "What was equally clear from my
8  review, there was a very strong likelihood that
9  the record was falsified."
10      A.   Is that your -- I'm sorry, is there a
11  question?
12      Q.   That's what it says in this paper.
13  Right?  That's your opinion that it's a very
14  strong likelihood that the record was falsified?
15      A.   That's my absolute written opinion up
16  until that point.
17      Q.   So your opinion is that Officer Frasier
18  falsified the documentation?
19              MR. GROTE:  Objection.  The opinion
20      speaks for itself and that mischaracterize it
21      by omitting the qualifier.
22  BY MR. PESTRAK:
23      Q.   There's a very strong likelihood that
24  she falsified the paperwork.

Arthur Wallenstein
12/10/2025

Page 74

1    A.    Those are my words.

2    Q.    So you're discounting the paperwork
3  because you believe it was falsified?

4    A.    It's not what I believe.  It was a fair
5  question.  I believed it because A, B, C, and D.
6  And that's also part of my answer, all right, that
7  we've gone over.

8    Q.    Your answer, A, B, C, and D, is that she
9  was disciplined for falsifying a record?

10    A.    No, that she was seen sitting at her
11  desk, right, that she didn't -- upon learning that
12  the inmate didn't appear, that he should have
13  responded when she yelled out insulin and Accu-
14  Chek, that he -- that she didn't go to the cell.
15  She didn't talk to the inmate.  She had no way,
16  from my perspective, of knowing what his situation
17  is.  And if indeed he said no way, she made no
18  effort to find out why knowing that he had a
19  chronic condition.

20    Q.    I appreciate your answer, Mr.
21  Wallenstein, but that wasn't my question.  You
22  indicated that you believe she falsified -- that
23  there's a strong likelihood that she falsified the
24  record.  And you indicated there's something in

Page 75

1  the record that gives you that very strong
2  likelihood.  So let me ask it this way.  What in
3  the record specifically leads you to believe, not
4  based on your judgment of her actions, but in the
5  record says that she has any evidence that she
6  falsified any documentation?

7    A.    Well, let's be --

8         MR. GROTE:  Objection to this has
9    been asked and answered.  I'll let him answer
10    this, but I think this has been asked at
11    least three times now.  And I think he has
12    spoken at multiple points of things in the
13    record, including the PDP investigation that
14    speaks of this incident.

15         MR. PESTRAK:  Maybe I should ask
16    you.  You're saying there's a PDP
17    investigation at Officer Frasier for
18    falsifying record?

19         MR. GROTE:  I didn't say falsifying
20    records.  I said of this incident, Mr. Jay's
21    findings, when he brought the charges, spoke
22    of her calling out for insulin and remaining
23    seated at her desk and not going to the cell
24    door to verify anything.

Page 76

1         MR. PESTRAK:  And what about that
2    finding by Officer -- well, excuse me -- that
3    lay opinion by Officer Jay goes to
4    falsification of records?  And I'll ask Mr.
5    Wallenstein that.

6  BY MR. PESTRAK:

7    Q.    Mr. Wallenstein, are you basing your
8  likelihood of her falsifying based on Lieutenant
9  Jay's deposition testimony and --

10    A.    I'm basing on this -- I'm sorry, I, I
11  talked over you.  What were the last couple of --

12    Q.    No, it's fine.  I was just going to
13  clarify, and also the charging documentation for
14  her disciplinary hearing.

15    A.    Okay.  Remember, I'm arriving at my own
16  conclusions.  All right?  I'm not -- it was not my
17  responsibility to, to write an overview as part of
18  my report on whether Office of Professional
19  Responsibility did it's job properly or what have
20  you, or what their outcomes were.  They were a
21  guide.  So was the fact that she did not speak
22  directly to the inmate.

23         She was asked, "Can it be noisy?"  "Yes,
24  it can be noisy."  I don't know how she arrived at

Page 77

1  the conclusion.  Maybe he was lying down in his
2  cell, and when she yelled out, that's a whole
3  thing in and of itself.  Insulin and Accu-Chek --
4  this isn't the old cell block at Holmesburg
5  Prison, you know, that's 25 yards long.  This was
6  a housing unit with a small number of cells and an
7  electronic communication system.  All right?

8         If indeed he doesn't show, how does she
9  know that he's not lying down incapable of walking
10  again.  She didn't go to his cell.  There's no
11  documentation in the video record that she did so.
12  Yet she's capable of saying he declined his
13  medication.  No way is that appropriate practice.
14  She needed to be out of that chair, off that
15  floor, up the stairs and engaging him, all right,
16  as a chronically -- as someone's suffering from a
17  chronic illness, "Are you ready for your
18  medication?  Aren't you ready?"

19         And then, of course, further
20  documentation helping me arrive at my finding,
21  there's no physical record of him signing off on,
22  "I refuse."  What we have is the officer saying he
23  refused.  You can find that I was wrong, right, or
24  that I didn't properly conduct my own review of

Arthur Wallenstein
12/10/2025

1 the situation, but the totality of what I've just
2 subjected you to listening to is how I arrived at
3 the finding and why I made it a finding.
4     Q.   Mr. Wallenstein, you said that you don't
5 believe her actions met the standards appropriate
6 because she didn't get a face-to-face reaction and
7 you don't know if she could or could not hear him
8 on the day in which she says she called out and he
9 heard -- she spoke to her and said that he was not
10 going.  I forget the exact words that he used to.
11 That's my understanding of the answer you just
12 gave.  Is that correct?
13     A.   In part.  And I don't want to go over
14 all of it again.  The investigations --
15     Q.   I'm focusing just on that part.  You
16 don't believe that Officer Frasier heard him say
17 that he was refusing?
18     A.   No, I don't know that.
19     Q.   He says it.
20     A.   I would have known something more if I
21 had documentation that she went to the cell and
22 talked to him.
23     Q.   That's a different thing than you're
24 saying.  You're saying that you don't believe --

1 you're saying there's a strong likelihood that the
2 record was falsified.  And when I ask you why you
3 believe that, you say because you don't have
4 documentation that she went and talked to him, but
5 you have documentation that he refused, and you
6 don't seem to accept that documentation.
7          MR. GROTE:  Objection.  This is
8     argumentative.  Then you've asked --
9          MR. PESTRAK:  It is argumentative
10    because --
11         MR. GROTE:  -- these questions --
12         MR. PESTRAK:  -- I want him to put
13    an answer on the question.
14         MR. GROTE:  He has answered --
15 BY MR. PESTRAK:
16    Q.   Why do you not accept the documentation
17 in this case?  There is nothing contradicting that
18 documentation, is there?
19         MR. GROTE:  Objection, asked and
20    answered.
21         MR. PESTRAK:  No, there's not been
22    answered.  I've not asked that question.  I
23    asked him what he believed made it falsified.
24         MR. GROTE:  You're asking the same

1 question using different words.
2          MR. PESTRAK:  I am not, Bret, but
3     thank you.  Your objection is noted.
4 BY MR. PESTRAK:
5     Q.   Mr. Wallenstein, what evidence that she
6 falsified this -- all right.  Let's take a step
7 back.  You're saying that because she was charged
8 by Lieutenant Jay.  She was found not guilty of
9 those charges, was she not?
10    A.   Wait a minute.  You didn't ask me if the
11 charge was what I relied upon.  I'm sorry.  You
12 didn't ask me --
13    Q.   Well, that's what your attorney
14 referenced when I asked him, because he said it
15 was asked and answered.  So did you --
16         MR. GROTE:  So I would --
17         MR. PESTRAK:  I'm asking him, Bret.
18 BY MR. PESTRAK:
19    Q.   Did you rely on the charging
20 documentation to come to your conclusion that
21 there's a very strong likelihood Officer Frasier
22 falsified documents?
23    A.   No.
24    Q.   So we can just kick that out then.

1 Thank you.  I thought you didn't.
2          MR. GROTE:  I would just want to
3     raise --
4          THE WITNESS:  It wasn't my answer.
5          MR. GROTE:  -- another objection
6     right here because I believe that your
7     response to his answer right now shows that
8     it's being mischaracterized and confused.
9     And he has already answered this question
10    about the various sources that he used to
11    come to his opinion.
12 BY MR. PESTRAK:
13    Q.   The red flag policy that you said you
14 reviewed, it indicates whose responsibility it is
15 to get the refusal signature from the inmate on a
16 refusal.  Does it not?
17    A.   Yes.
18    Q.   And it is medical staff's responsibility
19 to get that signature.  Is it not?
20    A.   Yes.  I have a question, and I'm not
21 trying to impede your questioning.  If I have some
22 -- I can't remember all the materials that I read,
23 and I haven't really said that to you.  I haven't
24 used that as an excuse during this deposition.  I

Arthur Wallenstein
12/10/2025

1 really feel I need to see the red flag policy
2 again to refresh my memory.  So I'm not guessing.
3      Q.   You would agree that the red flag policy
4 initiates the protocol for who and how the refusal
5 documents are to be signed by the inmates?
6      A.   I want to see it again.
7      Q.   Do you have any quibble with the red
8 flag policy itself, any disagreements?  You said
9 it was sufficient earlier, but I just want to ask
10 again.  Do you find any deficiencies?
11      A.   No.  The red flag policy as a
12 representation to help staff track individuals who
13 are refusing medication is a valid methodology,
14 from my perspective as a non-medical expert.
15      Q.   Let's move to finding 3 on page 12.  I
16 promise I'll be a lot quicker on this one.  Your
17 conclusion is, "Should have responded in the same
18 manner --"  Sorry.  Your finding in first sentence
19 of your discussion, "Lieutenant Bloodsaw should
20 have responded in the same manner required of her
21 colleague.  Both correctional staff members should
22 have rendered immediate aid as previously noted
23 above under PDP Policy 4E21."
24           So my question to you is that, since

1 you're saying it was the same respondent in the
2 same matter quiet of her colleague, is everything
3 that you said about why you believe Mr. Jung
4 needed medical aid based at the time Lieutenant
5 Bloodsaw interacted with him the same as why you
6 believed Officer Frasier should have responded in
7 the same manner?
8      A.   Okay.  Let me just get myself up to
9 date.  We're back to my report, finding number 3.
10 Are we talking about beginning on page 12?
11      Q.   Yes.  And I'm specifically asking about
12 the discussion.
13      A.   Right.
14      Q.   Is there anything different -- here, let
15 me rephrase the question.
16           Is there anything different in your
17 opinion that Lieutenant Bloodsaw should have
18 responded than based on what you already described
19 for Officer Frasier?
20      A.   Each engagement was a different
21 situation.  All right.  But your question is
22 clear.  There were no new elements.  There was
23 still inmate on floor in this case without a
24 health care person being present.  All right?

1 That's a difference in the situation.  So it's --
2 we're still talking about Jung.  We're still
3 talking about the morning.  We're still talking
4 about him laying on the floor allegedly being
5 unable to move.  Okay.  So that remains the same.
6 Yes.
7      Q.   Thank you.  For finding number 4 --
8      A.   Page number?  I'm sorry.
9      Q.   It starts on page 13, but I'm going to
10 ask you about page 14.
11      A.   Okay.  I apologize.  I shouldn't have
12 interrupted you.
13      Q.   No, you're fine.  I have no problem you
14 asking for clarification.  I'm trying to figure
15 out where I should start you at.  It's the fourth
16 sentence from the bottom of the page.
17      A.   On page number?
18      Q.   14.
19      A.   Okay.
20      Q.   Now, you have a lot of discussion here,
21 but I believe you sum up your opinion with, "Here
22 is clear and -- here is clear and definite example
23 of negligent failure to stay on top of the
24 situation involving that she knew to be an inmate

1 with chronic health care concerns."  Is that your
2 opinion for finding number 4?
3      A.   Yeah.  There's one -- there's one typo
4 on my part.  The word negligent might carry with
5 it, in your, your world, a legal conclusion.  I
6 just assumed it wasn't there, and it would be the
7 same failure to stay on top of the situation.
8      Q.   Well, you use the word negligent, and I
9 know you're not making a legal conclusion, but
10 what are you saying was negligent?
11      A.   The failure to stay on top of the
12 situation involving what she knew to be an inmate
13 in chronic health care -- having chronic health
14 care concerns.
15      Q.   I'm going to go to finding 5, and again,
16 this should be much quicker as well.  Finding 5
17 is, just to summarize it very briefly, and I'm not
18 trying to hold you to the summary, about what's
19 the senior agency administration information they
20 had.  And you list 13 cases.  And in just to show
21 you why I'm asking the question, in your materials
22 considered, you list PDP death reports, and you
23 have a parenthetical 3.  So I guess I'm just
24 trying to figure out, do you know the total number

1  of PDP death reports that you reviewed?

2      A.  Fair question.  From the document that I

3  reviewed, all right, I did not record the number

4  of deaths.  All right.  So the answer is no, that

5  -- yes, I -- no, I did not record the number of

6  deaths.

7      Q.  So back on page 15, when you list the

8  reports that you're using as exemplars and you say

9  it is not a comprehensive list, do you know the

10  totality of investigative reports that you

11  reviewed that showed what you're now just citing

12  as exemplars?

13      A.  I page through every single page.

14  Right.  If I don't, I can't say that that was a

15  document that I relied upon or was part of my

16  review, just like the 383 pages of, of training

17  issues.  I didn't count.  I knew that the number

18  was many.  All right?  Many.  Several was not good

19  enough.  Many.  So I guess the answer to your

20  question is yes, I did.

21      Q.  So I guess more my question is, at

22  trial, if these exemplars are shown to you, is

23  there any other additional cases you would be

24  using as exemplars, or would you be limited to

1  testifying on just these 13?

2              MR. GROTE:  Objection.  I think

3      that's a legal question.

4              MR. PESTRAK:  I'm not asking him

5      for evidentiary.  I'm asking if he's asked to

6      give his opinion, are you going to testify

7      beyond more than these exemplars?  Because

8      then I have a right to look at those

9      documents.

10              MR. GROTE:  If I may, just to

11      clarify the objection, earlier on, he did say

12      that in the finding, he reviewed over 900

13      pages of materials.  I do agree that you are

14      entitled to fair notice of exhibits,

15      witnesses, and summaries of what the

16      witnesses will testify to.  So I'm noting

17      this question for that purpose for the

18      future.  Now, with that, you can ask him the

19      question.

20  BY MR. PESTRAK:

21      Q.  So Mr. Wallenstein, are you aware of any

22  other reports that you would testify to to support

23  the conclusion that you make in finding number 5?

24      A.  Not -- the answer to your question is no

1  unless -- I'm not being an attorney -- unless as

2  part of trial preparation, Counsel advises me that

3  we would go further.  All right.  And that would

4  only be on legal advice.  So the answer to your

5  question is at this point, that would be the limit

6  of the cases.

7      Q.  Give me one quick second.  I'm sorry.

8  There it is.  Okay.  And turning to page 20 of

9  your report, you have previous casework in the

10  last five years?

11      A.  Okay.  Would you give me a second?

12  Okay.

13      Q.  Absolutely.

14      A.  I just want to get to page 20.

15      Q.  That makes sense.  I'm --

16      A.  I'm there.

17      Q.  -- going to take this moment to take a

18  drink in fact.

19      A.  Okay.  I've been drinking water all

20  along.  I hope I didn't need to ask permission to

21  do so.

22      Q.  No, you're fine.

23      A.  Okay.  I'm on page 20.

24      Q.  And you have previous casework for the

1  last five years, and there's three cases listed

2  there, Metcalf v. County of Erie, Estate of Durham

3  v. Pierce County, Elizabeth Fiery v. Williamson

4  County.  Is there any other cases that you can

5  think of within the last five years that you may

6  have omitted from this list?

7      A.  Oh, yes.  This list I was -- I took from

8  a previous -- a previous vita, and it was only to

9  be cases where I testified, not cases that I did.

10  So the casework here listed in Metcalf trial,

11  Durham v. Pierce deposition, Fiery v. Williamson

12  County deposition, all right, it's only where I

13  was called to testify under oath, not a list of

14  all of the cases that I had done in the last five

15  years.  So let me -- I hope that responds to your

16  question.

17      Q.  It does.  Was one of those cases that

18  you've also worked on in the last five years but

19  perhaps were not deposed in or testified for the

20  case of Brandon Motton, M-O-T-T-O-N, v. Corey

21  Ruark, R-U-A-R-K?

22      A.  It's a work in progress.  I was

23  scheduled to testify at trial on the 8th of

24  January.  Counsel notified me that they had some

Page 90

1  points that were being argued, but the judge
2  canceled or -- it may not be the right word --
3  said stop.  The trial date will be changed to
4  sometime in February.  All right.  So work in
5  progress.
6      Q.  Are you aware of the judge in that case
7  issuing an order related to your ability to
8  testify that was filed on November 20th of 2025?
9      A.  Counsel told me that there was a
10 proposal, a legal process from the defense and
11 that the judge -- they, they were seeking to, to -
12 - that I was not qualified to testify.  Not my
13 personal qualifications, but there was some legal
14 argument based on elements in the case.  Yes, I am
15 aware of that.
16     Q.  And I'll share my screen so that we can
17 all see what I'm talking about, because I'm not
18 trying to hide anything here.  I just want to get
19 down to the -- so this is the Brandon Motton v.
20 Corey Ruark case under 4:21-cv-04093 by or at
21 11/20/2025 in the United States District Court for
22 the Central District of Illinois.  Do you see
23 that?
24     A.  Yeah.  Yes.  I'm sorry.

Page 91

1      Q.  And there's a Westlaw cite for the
2  record of 2025, Westlaw 3241214, and it's a slip
3  copy 2025.  And there's a bunch of motions in
4  limine here, but I'm going to scroll down to
5  number 10.  And as you said, Defendant in that
6  case was seeking an order barring testimony from
7  Plaintiff jail practice expert.  Plaintiff
8  retained Arthur Wallenstein as an expert in this
9  case.  And you make five findings in that report,
10 too, and I'll just show them to you.  I'm not
11 going to read them for the record.  There's
12 finding 1, finding 2, finding 3, finding 4, and
13 finding 5.
14     Just so that we're all on the same page,
15 Defendant argues that Mr. Wallenstein's findings
16 are improper legal conclusions that will not
17 assist the jury to understand the evidence or
18 resolve any issues of fact.  The court gives a
19 summary of the rules of evidence as well as the
20 case law that applies.  There's a lot of more
21 discussion of the case law.
22     And here I'll get into what the judge
23 says.  And this is, I think, what you were saying.
24 "The level of factual complexity in the case may

Page 92

1  also bear on the relevance of expert testimony
2  about police practices or protocols.  In many
3  cases, evaluating an officer's conduct will draw
4  primarily on the jury's collective common sense.
5  The everyday experience of lay jurors fully equips
6  them to answer the reasonableness questions when a
7  case involves facts that people of common
8  understanding can easily comprehend.  The jury's
9  common experience will suffice, for example, when
10 police use their bare hands in making arrest, the
11 most primitive form of force."
12     So the judge gives a few more examples
13 of those types of facts then opines that this case
14 does not involve police procedures or protocols,
15 but holdings in case law are sufficiently -- for
16 the court to find them controlling.  And then
17 there's an agreement of the information, and the
18 judge says expert testimony is not required for
19 jurors to appreciate the fact that detainees may
20 sometimes need to be housed separately from
21 others, and the jail has dedicated an area for
22 that purpose.
23     It goes on and on and on and then --
24 well, not on and on.  Just continues going on.

Page 93

1  Oh, sorry.  Let me go back and reread one last
2  thing.  I think I just scrolled past it.  No.
3  "Two of Mr. Wallenstein's findings directly
4  contradict the law in the circuit.  Compare
5  finding 3 and finding 5 with a cite.  Failure to
6  escort inmate back to cell did not cross the line
7  from negligently enabling the attack to recklessly
8  condoning it and decision to wait for backup once
9  by sight, it was not unreasonable.  The court
10 finds that Mr. Wallenstein's expected testimony is
11 not likely to assist the jurors in resolving any
12 issue of fact and that presentation of his
13 testimony unnecessary risks that the jury will
14 decide the case on an improper basis.  Defendant's
15 request is granted."  So you are precluded from
16 testifying in this case.  Correct?
17     A.  At this point, sir.
18     Q.  Have you ever been precluded from
19 testifying in any other cases?
20     A.  Never.
21     Q.  Have you ever been disqualified as an
22 expert in any other cases?
23     A.  Never.
24     MR. PESTRAK:  I don't have any more

Arthur Wallenstein
12/10/2025

Page 94

1  questions for you.  I don't know if anybody
2  else will have, but now is their opportunity.
3  And I'm going to stop sharing my screen.
4              THE WITNESS:  Thank you.
5         MR. WITTEKIND:  I guess I'll go.
6  I'm --
7              THE WITNESS:  Sir, could you remind
8  me --
9         MR. WITTEKIND:  Yeah, hold on.
10             THE WITNESS:  -- whom you're
11 representing?
12        MR. WITTEKIND:  Sure.  I'm Ray
13 Wittekind with O'Connor Kimball.  I represent
14 Yescare, Dr. Trivikram, Blair Cabellos, and
15 Marsha Gay.
16                    -  -  -
17             EXAMINATION
18                    -  -  -
19 BY MR. WITTEKIND:
20   Q.   I just have a couple of questions for
21 you, and I'll try to be very brief.  You have no
22 medical education.  Correct?
23   A.   No medical education?
24   Q.   Correct.

Page 95

1   A.   No, I do not.
2   Q.   It's not redundant question, but you
3  have no education or training as a nurse.
4  Correct?
5   A.   No.
6   Q.   And I think earlier on you had told us
7  either anecdotally or as part of your testimony
8  that you're a non-medical expert.  Correct?  Early
9  on you mentioned that you're a non-medical expert?
10   A.   Let me answer the question and then
11 you'll decide whether it -- whether I'm doing it
12 to your satisfaction.  I am not testifying on
13 clinical medical issues.  I am talking about the
14 application of operating elements following the
15 court's ruling in Estelle v. Gamble but then
16 translated into how business is to be conducted.
17 And that is a linkage -- a direct linkage with
18 medical staff.  Now, you understand -- you, you
19 understand what I said, and whether that discounts
20 the fact that I can make any inference on
21 something that has a link to medical, that, I
22 leave to you.
23   Q.   But you're not retained to offer any
24 opinions as to whether correctional medical staff

Page 96

1  met their reasonable standard of care.  Correct?
2   A.   Correct, in the circumstances in this
3  case regarding inmate Jung.
4   Q.   You're not qualified to offer an opinion
5  as to whether a medical correctional employee met
6  a standard of care.  Correct?
7   A.   Clinical care, you are -- I am -- yes.
8  The answer is yes.  I'm sorry.
9   Q.   You're not qualified to offer such an
10 opinion?
11   A.   I don't find that I am qualified to make
12 clinical decisions.
13   Q.   Do you think you're qualified to offer
14 any other types of opinions as to what a medical
15 employee did or did not do?
16   A.   I can infer elements that relate to the
17 linkage between corrections and health care.  And
18 you got to understand this from my perspective.
19 You go back to pages 99 and 100 in the training
20 materials and you come across key elements about
21 the linkage between correctional staff and medical
22 staff, the eyes and the ears.
23        So I can decide -- all right.  I can
24 decide from my experience whether or not there was

Page 97

1  a proper linkage.  Did they do their due
2  diligence?  Did they make contact?  Did they
3  communicate?  Did they work together?  None of
4  those are clinical in nature, but they relate to
5  the training.  This was not two separate worlds.
6  You got corrections on one side and health care on
7  the other.  No way -- that's not the way this is
8  done in good correctional practice.
9        So we're back to that same issue.  Non-
10 clinical, yes, I agree, but in terms of the
11 linkage working together, not separately, with
12 that, of course, I believe I am fully qualified to
13 offer an opinion.
14   Q.   In terms of how you believe they should
15 have worked together.  Correct?
16   A.   Correct.
17   Q.   Earlier on, when you were being asked
18 about Nurse Cabellos's testimony and so forth, you
19 said that she did not perform a physical
20 examination or ask any questions.  Would that not
21 be part of her duty of care?  And you're not
22 qualified to offer an opinion as to any medical
23 professional's duty of care.  Correct?
24   A.   Duty of care is, from my perspective,

Arthur Wallenstein
12/10/2025

Page 98

1  part of licensure.  You know, you must follow the
2  duty of care, which explains what her
3  responsibilities would be.  That's my
4  interpretation of your use of the duty of care.  I
5  would be able to comment on linkage, on working
6  together with correctional officers to do those
7  things that -- I'm sorry -- that might facilitate
8  the clinical judgments that would be made.
9          And I -- and I know this may be hard to,
10 to understand because -- just let me get it out,
11 okay -- that you've got several attorneys
12 representing different people and different
13 groups.  I am used to a one-dimensional picture
14 where in best practices, corrections and the
15 health care component of the correctional system,
16 PDP, which in this case was Horizon and then
17 YesCare, work together as a seamless entity.  And
18 that's my starting point.  Did they?
19     Q.   And I understand your earlier testimony.
20 Let me just cut to the chase.  You're not
21 qualified to offer -- you're not qualified to
22 offer an opinion as to whether Nurse Cabellos or
23 any other YesCare employee employed at the jail
24 met their reasonable standard of care as a medical

Page 99

1  professional.  Are you?
2     A.   No.  Now you're talking about licensure
3  and, and elements.  And I would consider that I am
4  not qualified unless I was called as a witness for
5  someone who was qualified to ask, "What about A,
6  B, C, and D?"
7          MR. WITTEKIND:  I think that's all
8  I have.  Thank you, Mr. Wallenstein.
9          THE WITNESS:  You're welcome.
10         MR. PESTRAK:  I'm not hearing
11 anyone else.  So is it safe to assume there
12 are no other questions?
13         MR. GROTE:  I was giving you, the
14 defense counsel, a chance, but there's
15 nothing from Plaintiffs.
16         THE WITNESS:  May I get in a quick
17 word before you go off the record?  It's not
18 about the substance.  I have a telephone
19 breath that may or may, may not be working.
20 I will give it a try when we're off the
21 record and done.
22         MR. GROTE:  You could have said
23 that off the record.  That would have been
24 the place to do it.

Page 100

1          THE WITNESS:  I'm sorry -- I'm
2  sorry.
3          THE REPORTER:  Let me go ahead and
4  -- let me go ahead and confirm transcripts
5  and then we'll go off record.  Counsel
6  Pestrak, will you be purchasing the original
7  copy of the transcript?
8          MR. PESTRAK:  I would like a
9  electronic only full, mini, and expedited for
10 tomorrow delivery, please.
11         THE REPORTER:  Counsel Grote, will
12 you be purchasing a copy?
13         MR. GROTE:  Yes.  And can we do it
14 tomorrow as well?  My client wants to read
15 and sign.  Mike, I know that you're going to
16 want to be likely using this in the filing,
17 so we're not going to hold that up, of
18 course, at all.  That's just in case there's
19 some glaring thing that contradicts what we
20 believe he said.  We're preserving that
21 ability to --
22         THE REPORTER:  Understood.  Counsel
23 Wittekind, will you be needing a copy?
24         MR. WITTEKIND:  No transcript now,

Page 101

1  no.
2          THE REPORTER:  Counsel Kaminsky,
3  will you need a copy?
4          MR. KAMINSKY:  Yeah, we'll take a
5  copy, but it doesn't have to be expedited.  I
6  just need a full digital.
7          MR. GROTE:  And I don't know if I
8  said that, but yeah, just digital.  Full
9  digital.  And --
10         THE REPORTER:  Digital.
11         MR. GROTE:  -- mini is good too.
12         THE REPORTER:  And then finally,
13 Counselor Possino, will you be needing a
14 copy, sir?
15         MR. POSSINO:  I'll take a full
16 digital copy, and that's it.  And not
17 expedited.
18         THE REPORTER:  Not expedited.
19 Right?  Okay.  All right.  Today's date is
20 December 10th, 2025.  The time is 12:25 p.m.
21 eastern time.  We are now off the record.
22     (Proceedings concluded at 12:25 p.m.)
23
24

Arthur Wallenstein
12/10/2025

Page 102

1          CERTIFICATE OF DIGITAL REPORTER

2

3       I, RODNEY HILL, a Digital Reporter for the

4    State of Pennsylvania, do hereby certify:

5

6       That the foregoing proceeding hereinbefore

7    set forth was accurately captured with annotations

8    by me during the proceeding.

9

10      I further certify that I am not related to

11   any of the parties to this action by blood or

12   marriage, and that I am in no way interested in

13   the outcome of this matter.

14

15      IN WITNESS THEREOF, I have hereunto set my

16   hand this 10th day of December, 2025.

17

18

19   _____

20          Rodney Hill
            Digital Reporter
21          CER-3616

22

23

24

Page 103

1    CERTIFICATE OF TRANSCRIPTIONIST

2

3       I, AALIYAH PRINCE, do hereby certify:

4

5       That said audio transcription is a true

6    record as reported by me, a disinterested

7    person.

8

9       I further certify that I am not

10   interested in the outcome of said action, nor

11   connected with, nor related to any of the

12   parties in said action, nor to their

13   respective counsel.

14

15      IN WITNESS THEREOF, I have hereunto set

16   my hand this 11th day of December, 2025.

17

18

19   _____

            Aaliyah Prince

20

21

22

23

24



Arthur Wallenstein
12/10/2025

---

**1**

**1**
10:24
11:21
20:14
28:3,7
29:12
35:10
43:2
91:12

**10**
22:17
72:24
91:5

**100**
96:19

**10:02**
5:6

**10th**
5:5
101:20

**11/1**
67:5

**11/1/23**
63:17
69:1

**11/20/**
**2025**
90:21

**11/5**
65:18
69:17

**11/5/**
**2023**
65:11,21
67:8
69:4

**11/5/23**
63:17
67:16,

19,23
68:2
69:7,12

**11:06**
50:23

**11:16**
51:2

**12**
30:3,16,
17 82:15
83:10

**12:25**
101:20,
22

**12th**
52:8

**13**
84:9
85:20
87:1

**14**
45:4
84:10,18

**15**
22:18,20
23:3
86:7

**16-**
**somethin**
**g**
65:6

**16:49**
69:17

**1976**
24:17
55:15

---

**2**

**2**
11:22

28:3,8
29:16
43:3
59:6,7,
12 61:19
91:12

**20**
15:3
88:8,14,
23

**2016**
52:8

**2023**
21:6
35:16
36:16,20
41:9
45:11
51:21
60:1

**2025**
5:5 90:8
91:2,3
101:20

**20th**
90:8

**21**
55:6,8

**2300188**
68:19

**24-hour**
65:5

**25**
77:5

---

**3**

**3**
28:3,8
29:20
52:23
53:5,9

69:11
82:15
83:9
85:23
91:12
93:5

**3,000**
15:1

**3241214**
91:2

**35**
20:14

**383**
33:18
86:16

**385**
32:18
33:7,17

**3rd**
20:11

---

**4**

**4**
25:20
26:13,20
27:6,10,
23 28:3,
8 29:22
51:8
84:7
85:2
91:12

**43**
8:8

**4:00**
65:4

**4:21-cv-**
**04093**
90:20

**4:35**
65:4

**4E21**
34:6
82:23

**4E242**
34:5

**4th**
45:2

---

**5**

**5**
21:5
27:10
28:4,8
29:24
45:9
85:15,16
87:23
91:13
93:5

**5th**
35:16
36:15,20
39:10
41:9
45:11
51:21
60:1
63:11

---

**7**

**7**
45:10
52:23

**75**
45:7

**76**
45:5,17

**7:00**
45:11

---

**8**

**8**
35:7,8,9
59:4

**80**
51:7

**8:58**
69:12

**8th**
89:23

---

**9**

**9**
45:11
59:8

**900**
87:12

**99**
96:19

---

**A**

**A-L-T-H-**
**A-U-S-E-**
**R**
53:3

**a.m.**
5:6
45:11
50:23
51:2
69:1,12

**ability**
42:10
90:7
100:21

**Abolitio**
**n**
29:11

about-
57:9

absence
15:14

absolute
73:15

Absolutely
54:14
88:13

ACA
23:24
25:11
33:23
34:22

accept
79:6,16

access
47:16
55:20,
22,23
56:5
57:16
58:22

accompany
40:9

Accu-
60:10
74:13

Accu-chek
60:23
77:3

accurate
41:2
51:23
52:1
65:8

acres
14:12

acting
15:14

actions
29:21
65:13,22
75:4
78:5

active
9:23

actual
34:21

add
38:2

added
24:4

addition
25:24

additional
22:13
38:2
86:23

additionally
6:13

addressed
54:2

adequately
31:10

adjunct
18:15,16

administration
12:14
85:19

administrative
19:10

administrators
5:13

admits
38:12

ADP
14:24

adult
12:24
14:1
15:23
18:3
19:17
23:8,21
24:6

advice
88:4

advises
88:2

Affairs
44:17
72:7

affirm
7:7

afternoon
11:1
63:10,17
65:23
67:23
68:2
69:7,16

agencies
8:9

agency
19:4
85:19

agree
5:10,18
35:15
37:19

38:14,18
39:12
42:4,8
43:1
47:5
51:22
52:1
55:24
57:15
58:3,4
67:5
68:24
69:22
82:3
87:13
97:10

agreement
92:17

ahead
28:17
40:22
44:23
100:3,4

aid
82:22
83:4

aide
8:17

Alex
6:19

allegedly
29:18
84:4

alleges
58:19

Althauser
53:3

American

23:9
24:6
32:1
33:14,22

analysis
37:14
68:20

ancillary
72:12

and/or
34:7

Andrew
52:6,21

anecdotally
95:7

anecdotes
27:14

announce
59:18

anxiety
53:13

anymore
58:14

Apollon
6:12

apologize
12:9
13:9
39:14
50:3
57:1,18
84:11

apparently
10:12

appearance
5:17

appeared
60:12,24

appears
60:11

application
95:14

applications
12:18

applied
17:18

applies
91:20

apply
56:7

appointment
19:2

appropriately
32:12

approved
16:19

April
52:8

area
92:21

areas
29:8
40:7

argued
90:1

argues
91:15

argument

Arthur Wallenstein
12/10/2025

3

90:14

**argumentative**

38:19

79:8,9

**Army**

9:23

**arrest**

92:10

**arrive**

45:8,10

62:12

64:24

70:14

77:20

**arrived**

16:22

54:5

76:24

78:2

**arriving**

76:15

**Arthur**

5:11

7:5,11

52:16,17

56:15

91:8

**assess**

16:13

**assessing**

47:24

**assessment**

32:4

47:15

48:8,22

**assigned**

5:8 7:4

14:9

16:17

35:13

**assignment**

13:2

16:3

**assist**

54:4,7

91:17

93:11

**Assistance**

12:14

**assistant**

12:23

13:8,11

14:18,

19,22

**associate**

18:16

**Association**

23:9

24:6

32:2

33:15,22

**assume**

50:1

70:22

99:11

**assumed**

49:9

85:6

**assuming**

31:21

40:22

45:11

49:24

71:5

**attack**

93:7

**attended**

33:2

**attention**

33:2

**attorney**

80:13

88:1

**attorneys**

98:11

**average**

14:23,24

**aware**

87:21

90:6,15

———————

**B**

**B-U-C-**

17:13

**B1**

69:11

**B6-3**

21:5

**back**

10:9

22:18,19

25:23

37:4

45:16

50:16,19

51:1

56:20

61:10

80:7

83:9

86:7

93:1,6

96:19

97:9

**background**

24:14

**backup**

93:8

**backwards**

68:17

**bare**

92:10

**barring**

91:6

**base**

35:18

**based**

35:22

42:24

59:23

60:5

65:11

68:3

75:4

76:8

83:4,18

90:14

**basic**

11:2

14:1

32:20

34:13

**basics**

31:10

**basing**

72:21

76:7,10

**basis**

61:21

93:14

**bear**

45:17

92:1

**beat**

10:10

**beaten**

59:4

**begin**

7:18

26:24

66:7

**beginning**

10:1

19:19

20:3

27:6

45:16

49:7

61:19

66:8

83:10

**behalf**

5:22

6:2,20

**behavior**

29:21

67:16

**behaviors**

59:23

60:6

**believed**

74:5

79:23

83:6

**Benning**

10:1,3

**best-**

63:4

**Bible**

14:3

25:12

**big**

17:16,17

**bit**

8:6 35:9

55:5

62:13

**Blair**

6:7 45:2

94:14

**Blanche**

5:23

**blank**

38:23

66:6

**block**

77:4

**Bloodsaw**

5:24

22:2,5

29:21

32:22

37:2,19

40:3

82:19

83:5,17

**Bloodsaw's**

38:11

**board**

12:11

30:11

**bold**

53:22

**bottom**

84:16

**Brandon**

89:20

90:19

**break**

50:12,18

**breath**
99:19
**Bret**
6:1
43:22
80:2,17
**briefly**
85:17
**brig**
9:24
**bring**
16:7
**broad**
23:14
**brought**
41:16
54:21
57:15
75:21
**Bucks**
17:2,13,
14 18:2,
7,12
**bunch**
91:3
**bus**
16:7
**buses**
16:21
**business**
24:12,
15,21
95:16

———
C

**Cabellos**
6:7
36:14
37:20
40:11

43:19
45:3
49:23
50:2
57:3
58:4,5
94:14
98:22
**Cabellos's**
36:10
43:12
51:8
97:18
**call**
19:10
21:20
24:3
25:12
41:21,24
46:12,23
47:11,
12,17
48:22
51:16
53:14
58:17
**called**
10:13,19
13:4
37:4
40:10
44:15
54:3,6
59:20
61:16
78:8
89:13
99:4
**calling**
56:20
75:22

**camera**
37:23
**Cancel**
40:1
**canceled**
90:2
**capable**
77:12
**cardiac**
54:1
**care**
16:15
23:11
24:4,16
25:4
32:1,2,
4,5
33:14,21
41:6
47:16
53:12,
23,24
54:6,16
55:13
56:15,21
57:12
65:11
69:2
83:24
85:1,13,
14 96:1,
6,7,17
97:6,21,
23,24
98:2,4,
15,24
**career**
17:18
**careers**
10:4

**Careerstaff**
6:20
**carefully**
67:2
**Carney**
5:23
31:2
**carry**
85:4
**case**
5:12
10:19
20:12
23:23
25:17
27:16
30:15
32:7
36:11
39:18
52:5,11
54:9,20
55:7
56:2,7
57:2
59:24
63:8
64:23
66:14
68:19
72:3
79:17
83:23
89:20
90:6,14,
20 91:6,
9,20,21,
24 92:7,
13,15
93:14,16
96:3

98:16
100:18
**cases**
30:8
85:20
86:23
88:6
89:1,4,
9,14,17
92:3
93:19,22
**casework**
88:9,24
89:10
**caseworkers**
15:3
**catch**
30:18
**categorization**
39:13
**categorize**
39:21
**cell**
36:9
37:4
40:8
43:5
49:5
53:5,9
56:18
61:1,5
74:14
75:23
77:2,4,
10 78:21
93:6
**cells**
77:6

**Center**
15:24
**central**
56:21
90:22
**CFCF**
69:11
**chair**
77:14
**chance**
30:2
99:14
**change**
10:4,17,
22 13:5
14:18
15:19
17:17
**changed**
90:3
**characterization**
44:10
64:2
**charge**
13:24
19:9
80:11
**charged**
80:7
**charges**
75:21
80:9
**charging**
76:13
80:19
**chase**
98:20
**Chek**
60:11

74:14
Chicago
16:9
chief
19:10
choosing
39:5
chronic
61:13
74:19
77:17
85:1,13
chronically
77:16
chronological
20:19
circuit
93:4
circumstances
30:22
96:2
citation
21:6
27:2
cite
23:12,18
34:21
37:13
55:15
91:1
93:5
cited
29:14
42:5
64:11
citing
86:11

City
5:14,22
32:18
claims
53:12
clarification
8:7
84:14
clarify
33:10
76:13
87:11
clarity
25:3
classification
12:24
14:6
15:10,24
16:13
classified
16:11
clear
25:16
27:6,7,8
28:10
44:3
45:3
57:9
60:15
73:7
83:22
84:22
client
100:14
clinic
8:14
9:18
13:4,6

14:20
clinical
12:22
13:14
15:7
95:13
96:7,12
97:4,10
98:8
clock
65:5
close
13:2
31:5
closer
66:22
colleague
82:21
83:2
colleagues
54:6
collective
92:4
College
20:7
combined
26:3
comment
27:5
65:15
69:20
98:5
commentary
41:16
Commission

23:11
31:24
33:13
commissioner
12:10
31:2
Commissioner's
68:18
committed
57:19
committee
15:10
common
92:4,7,9
communicate
97:3
communication
77:7
community
14:3
20:7
community-based
54:7
Compare
93:4
comparing
64:8
competed
19:16
complain
46:23

47:11
51:17
58:16
complained
51:12
53:21
54:13
complaining
57:11
complaint
43:15
complaints
42:24
complete
59:13
completed
53:3
completely
53:18
54:11
completeness
52:24
complex
14:11
16:6
17:8
complexity
91:24
compliance
34:6
63:14

component
98:15
comprehend
92:8
comprehensive
86:9
computer
66:12,23
70:15,17
concern
14:13
29:8
30:10
51:14,22
55:10
concerned
30:7
51:9
58:18
69:18
concerns
13:22
14:7,8
16:14,15
85:1,14
conclude
101:22
concludes
27:11
conclusion
28:1
29:6,12
31:6,8
32:11

35:18,
22,23
36:3
42:6
54:23
58:5,9
60:7
77:1
80:20
82:17
85:5,9
87:23

**conclusions**
54:5
76:16
91:16

**condition**
36:20,23
37:18
51:22
53:17
57:12
74:19

**condoning**
93:8

**conduct**
11:2
15:6
22:13
24:11,21
25:13,15
48:19
77:24
92:3

**conducted**
10:18
95:16

**conducting**
24:15

**confirm**
100:4

**confused**
81:8

**confusion**
68:11

**connected**
37:24

**connection**
66:24

**considerable**
30:19

**considerations**
27:22

**considered**
23:6
45:4
85:22

**constitutional**
25:14
55:14,21

**construct**
24:14
27:24

**contact**
55:12
61:4
64:17
97:2

**contacted**
54:3

**contained**
33:19

**context**
57:2
64:18

**continue**
6:24
31:20
51:4,7
54:15
56:4

**continued**
41:19
46:22
47:10
58:16
68:21

**continues**
51:16
69:4
92:24

**contract**
10:12

**contractor**
29:10

**contradict**
93:4

**contradicting**
79:17

**contradicts**
100:19

**contrary**
61:11

**controlled**
38:1

**controlling**
92:16

**conversed**
38:14

**Cook**
16:8

**coordination**
35:1

**copy**
26:6
52:13
91:3
100:7,
12,23
101:3,5,
14,16

**core**
11:2
32:20
55:14
64:7

**Corey**
89:20
90:20

**corner**
34:23

**correct**
8:11
17:4
22:1
34:8
37:9
38:6,9,

10
42:11,24
43:6
44:7
47:6
49:7
54:17
58:24
63:22
70:23
71:19
72:13
78:12
93:16
94:22,24
95:4,8
96:1,2,6
97:15,
16,23

**corrected**
48:16
49:8

**correction**
18:6
25:22
59:14

**correctional**
8:10,12
12:15,16
17:22
19:17
22:2
23:9,11
24:6,8,
11,20
30:12
31:9,18,
22 32:1,
2,7,8,
12,20,21

33:14,
15,22
34:15
35:12,13
45:23
46:3,22
47:10,18
51:15
53:6
55:17,21
60:2
63:6
65:12,13
82:21
95:24
96:5,21
97:8
98:6,15

**corrections**
10:5
12:1,20
17:3,11,
12,17
20:4
23:15
25:11
54:11
58:15
96:17
97:6
98:14

**counsel**
5:16
7:17
26:4
33:8
88:2
89:24
90:9
99:14
100:5,
11,22

101:2

**counseling**
13:21

**Counselor**
101:13

**counselors**
15:3

**count**
86:17

**county**
8:10
16:9
17:2,13,
14,22
18:2,5,
8,9,12,
13 19:4,
13 20:7
23:15
24:8
89:2,3,
4,12

**couple**
35:21
76:11
94:20

**courses**
19:24

**court**
24:17
90:21
91:18
92:16
93:9

**court's**
95:15

**cover**
32:21

**covered**
33:18
34:21

**covering**
30:16

**created**
24:13

**credibility**
42:18
71:15

**criminal**
20:1,4
44:2

**cross**
93:6

**cup**
46:1

**cups**
45:24

**curriculum**
15:24
52:18

**custody**
30:15
52:7

**cut**
98:20

**CV**
17:1

——————

**D**

**daily**
14:24
25:15

**data**
34:18

**date**
5:5

66:18
69:12
83:9
90:3
101:19

**dates**
65:7

**day**
11:1
13:22
38:17,24
45:12
78:8

**death**
30:20
52:20
59:5
68:19
85:22
86:1

**deaths**
30:3,15
86:4,6

**December**
5:5
101:20

**decent**
19:19

**decide**
93:14
95:11
96:23,24

**decided**
17:9
58:9

**decision**
10:4,19
24:17
25:4
58:12,
13,23
93:8

**decision-making**
32:3

**decisions**
15:11
53:24
54:16
55:23
56:5
96:12

**decline**
29:18
64:16

**declined**
17:8
60:14,17
62:2
64:12,17
72:18
77:12

**dedicated**
92:21

**defendant**
6:6
91:5,15

**Defendant's**
93:14

**defense**
90:10
99:14

**deficiencies**
34:18
82:10

**deficient**
34:11

**Define**
70:10

**definite**
84:22

**definition**
32:22

**delayed**
30:21

**delivery**
100:10

**Dempster**
6:23 7:3

**department**
12:1,19
17:3,11
18:3,6
19:14,15

**departments**
19:13,14

**deposed**
89:19

**deposition**
5:11 6:4
36:11
38:15
39:17
40:12
41:17
42:19
44:5,11
45:2
51:8,23
61:2
67:7
69:3
76:9
81:24

89:11,12

**depositions**
22:1,5
33:3

**deputy**
11:5
12:8
13:9

**describes**
36:14

**description**
30:19
39:9,22
40:15
41:1,13
44:6

**descriptions**
36:23
37:1

**descriptive**
40:5

**designation**
53:9

**desk**
74:11
75:23

**detail**
35:9

**detailed**
41:1

**detained**
63:1

**detainees**

92:19

**detention**

17:19

18:3

23:8,21

24:7

**determination**

53:16

71:15

**determine**

54:1

**deviation**

55:8

**diabetes**

60:22

**diabetic**

65:11

**died**

52:7

**difference**

84:1

**differences**

13:18,19

**differently**

39:6

**digital**

101:6,8,

9,10,16

**diligence**

97:2

**diminishing**

67:13

**direct**

25:19

28:6

37:7

49:19

64:20

72:23

95:17

**directed**

15:7

**direction**

16:21

**directly**

76:22

93:3

**director**

12:24

15:18,

22,23

16:3,24

17:12,21

18:2,5

19:3,5,

8,16

**director/warden**

17:2

**disagree**

40:14

68:22

**disagreeing**

48:6

70:7

**disagreements**

82:8

**disciplinary**

10:17,23

11:10,14

12:4

15:12

21:19,20

72:9

76:14

**disciplined**

74:9

**discounting**

74:2

**discounts**

95:19

**discovery**

32:17

33:8

**discussed**

33:5

**discussing**

50:6

67:8,18

**discussion**

35:11

60:3

61:18

82:19

83:12

84:20

91:21

**disqualified**

93:21

**distances**

43:4

**distress**

35:19,24

39:11,20

40:18

41:8,14,

16,23

42:5

47:5,8,

20 48:3

**distressed**

35:17

**distributing**

46:4

**District**

90:21,22

**disturbance**

63:2

**doctor**

41:12

**document**

26:5,8

45:4

65:22

86:2,15

**documentary**

60:16

**documentation**

30:19

33:1

60:18,20

61:15

62:5,8,

14,16,

18,24

63:21

64:7

65:24

66:2

67:20,24

68:4

69:22

70:2,4

71:12,16

73:18

75:6

76:13

77:11,20

78:21

79:4,5,

6,16,18

80:20

**documentations**

67:13

**documented**

59:21

63:9

67:9

70:6,8,

9,10,12

**documenting**

63:22

**documents**

23:17

68:5,9,

13 72:22

80:22

82:5

87:9

**door**

48:21

49:4,5,8

61:8

75:24

**doors**

38:1

**dormitories**

14:15

**downstairs**

56:19

**Doylestown**

17:3

**draw**

35:23

92:3

**drew**

33:6,16

35:21

**drink**

88:18

**drinking**

88:19

**driving**

24:5

**drop**

52:22

**dual**

19:2

34:19

**due**

97:1

**duly**

7:12

**Durham**

89:2,11

**duties**

14:17

35:14

duty
9:23
59:14,18
97:21,
23,24
98:2,4

---

**E**

earlier
32:14
35:8
53:13
82:9
87:11
95:6
97:17
98:19

Early
95:8

earned
15:13

ears
96:22

easiest
11:16

easily
92:8

eastern
5:6
8:17,19
101:21

education
14:1,2
94:22,23
95:3

effect
11:3

effort
56:19
62:10

74:18

elaborat
ion
36:6

electronic
73:1
77:7
100:9

element
29:19
36:5
53:17
70:13

elements
10:21
23:4,15
24:4,19
33:19
56:21
62:11
83:22
90:14
95:14
96:16,20
99:3

Elizabeth
89:3

emergency
34:7

employed
98:23

employee
96:5,15
98:23

employment
32:6

enabling
93:7

encounter
60:9

end
28:1
53:7

Enforcement
12:14

engagement
83:20

engagements
14:3
65:8

engaging
77:15

English
24:8

enormous
13:5

entered
68:1
69:12,19
71:13

entire
15:16
25:6
29:5
61:11,17

entitled
87:14

entity
98:17

Entries
59:22
60:4

entry
62:18
64:14,15
70:17

environment
24:2,14
25:8
48:9,23
57:8

environments
19:2

episode
61:11

equally
73:7

equips
92:5

Erie
89:2

error
57:21

errors
10:14
56:12

escapes
11:7

escort
93:6

Estate
5:13
52:6
89:2

Estelle
55:15
95:15

evaluating
48:23

92:3

evenings
10:2

event
69:19

everyday
92:5

evidence
38:5,8
62:20
75:5
80:5
91:17,19

evidentiary
87:5

exact
67:8
78:10

exam
48:21

examination
7:21
48:20
49:12,15
56:14
94:17
97:20

examined
7:12

examples
92:12

excuse
18:18
52:17
57:1
65:12
76:2
81:24

exemplars
86:8,12,
22,24
87:7

exhibits
87:14

exhortation
61:1

existed
72:6

expected
93:10

expedited
100:9
101:5,
17,18

experience
92:5,9
96:24

experiencing
53:20
54:13

expert
6:16
26:23
61:12
64:24
82:14
91:7,8
92:1,18
93:22
95:8,9

expertise
54:3

experts
  16:13
explain
  32:17
explains
  98:2
express
  14:13
  30:10
extent
  18:7
extraord
inary
  39:23
eyes
  96:22
eyewitnes
ss
  36:19
eyewitne
sses
  36:21,22
  37:7,18

—————
    F
face
  57:10
  66:11
face-to-
face
  59:23
  60:5
  78:6
facilita
te
  98:7
faciliti
es
  8:10
  17:20

18:19
23:8,21
24:7
facility
  15:17
  18:21
  53:4
  69:11
fact
  34:21
  37:14
  76:21
  88:18
  91:18
  92:19
  93:12
  95:20
facts
  36:3
  60:8
  92:7,13
factual
  91:24
failed
  72:14
failure
  84:23
  85:7,11
  93:5
fair
  12:7
  20:18
  22:23
  23:3,24
  32:16
  34:13
  38:7
  74:4
  86:2
  87:14
fairly
  21:3

faith
  14:3
false
  54:5
  70:18
falsific
ation
  76:4
falsifie
d
  72:22
  73:9,14,
  18,24
  74:3,22,
  23  75:6
  79:2,23
  80:6,22
falsifyi
ng
  74:9
  75:18,19
  76:8
familiar
  21:3
farm
  13:3
February
  90:4
feel
  35:2
  39:14
  40:14
  46:9
  82:1
feeling
  43:7,11,
  13
fell
  46:21
felt
  14:13

53:12
61:9
female
  50:3
Fiery
  89:3,11
figment
  55:10
figure
  27:15
  28:9
  68:6
  84:14
  85:24
filed
  90:8
filing
  100:16
finally
  101:12
finance
  19:15
find
  47:17
  62:8
  65:2
  69:9
  74:18
  77:23
  82:10
  92:16
  96:11
finding
  28:3
  29:12
  30:12,23
  35:10
  41:23,24
  59:5,12
  61:18
  62:12

71:21
76:2
77:20
78:3
82:15,18
83:9
84:7
85:2,15,
16
87:12,23
91:12,13
93:5
findings
  25:24
  26:2,17,
  19,21
  27:3,4,
  11,23
  28:7
  29:17
  30:8
  35:6
  72:7,12
  75:21
  91:9,15
  93:3
finds
  93:10
fine
  8:2 28:8
  38:20
  76:12
  84:13
  88:22
finished
  9:20,21
firm
  5:17
five-
minute
  50:18

flag
  34:5
  81:13
  82:1,3,
  8,11
flip
  31:7
floor
  36:1,4
  40:10
  46:20
  47:21
  49:7
  50:7
  57:11
  77:15
  83:23
  84:4
focus
  55:16
focusing
  78:15
folks
  37:13
follow
  72:16
  98:1
follow-
up
  17:23
footprin
t
  14:12
force
  26:24
  92:11
forget
  78:10
form
  23:23
  24:24

28:20
40:20,22
42:12
43:17
48:3
58:6
62:15
64:5
92:11

**forms**
63:20

**formulate**
29:19

**formulated**
24:16

**Fort**
9:24
10:3

**forthcoming**
10:16

**fortunately**
25:9

**found**
28:3
29:8,19
31:18
41:23
59:20,23
62:6
80:8

**fourth**
84:15

**frame**
9:9

**Frasier**
5:23
22:3,7

29:13
32:22
35:13
36:24
37:2,20
39:8,17
40:2,8
41:20,
21,24
54:21,
22,24
55:2,4
57:10,18
58:21
60:2,13
62:21,24
63:9,22
65:21
69:13,19
70:14,19
71:13,15
73:17
75:17
78:16
80:21
83:6,19

**Frasier's**
22:5
40:16
67:24

**free**
40:14

**Friday**
16:6

**front**
11:18
21:11
25:18
26:5,7
27:22

**full**

40:15
100:9
101:6,8,
15

**fullest**
41:1

**fully**
56:9
92:5
97:12

**function**
11:14

**funding**
12:15

**future**
87:18

———————

**G**

**gain**
21:12

**Gamble**
55:16
95:15

**game**
47:22

**gave**
27:4
37:1
39:17
78:12

**Gay**
6:7
94:15

**GED**
14:2

**Gena**
5:23
29:13
35:12
57:10

60:2
69:13,19

**general**
27:1
57:12

**generally**
18:22

**generic**
20:17
33:19

**gently**
46:20
47:21

**Georgia**
5:8  10:1

**give**
19:22
30:2
34:12
36:22
45:21
59:3
87:6
88:7,11
99:20

**giving**
30:12
52:5,10
99:13

**glad**
27:21
30:1

**gladly**
68:13

**glaring**
100:19

**good**
5:7,21
6:1,10,
18  7:2,

24  15:13
17:9
25:13
39:2,4
46:9
86:18
97:8
101:11

**good-sized**
17:22

**goodness**
19:6

**Gordon**
6:19

**governmental**
8:8

**graduate**
9:3,12,
21,22

**graduated**
9:18

**grant**
12:13,17

**granted**
93:15

**grants**
12:12

**gross**
55:8

**Grote**
6:1,2
28:15,18
40:19
42:12
43:16
44:9
58:6
63:23

64:1,4
68:8
70:24
71:17,20
73:19
75:8,19
79:7,11,
14,19,24
80:16
81:2,5
87:2,10
99:13,22
100:11,
13
101:7,11

**group**
25:2

**groups**
98:13

**guess**
11:16
21:10
28:24
52:14
60:4
61:10
85:23
86:19,21
94:5

**guessing**
82:2

**guide**
76:21

**guidelines**
31:23
33:12

**guiding**
55:16

**guilty**
80:8

guts
27:4
28:2

———————

**H**
half
10:9
18:10
halls
14:15
hand
7:6
48:10,15
handled
60:1
hands
7:15
92:10
happen
66:13
hard
68:3
70:13,17
98:9
hard-
64:6
hard-
core
62:17
63:20
head
27:21
heading
56:19
health
16:15
23:10,11
24:4,16,
23 25:4
32:1,2,

4,5
33:14,21
41:6
53:12,
23,24
54:6,16
55:13,17
56:15,20
57:12
83:24
85:1,13
96:17
97:6
98:15

hear
9:6
35:20
66:9
78:7
heard
48:1
78:9,16
hearing
72:9
76:14
99:10
hearings
10:17,23
11:14
12:5
15:12
heart
54:1
held
12:21
16:24
helped
29:19
helping
62:12
77:20

hesitati
ng
34:12
hesitati
on
37:22
Hey
59:1
hide
90:18
high
15:11
highligh
t
68:21
Hill
5:7 52:9
hire
19:6
hired
20:2,13
27:1
67:15
hit
56:22
61:19
hold
54:8,10
59:1
85:18
94:9
100:17
holding
53:5,9
holdings
92:15
Holmesbur
g
77:4

holy
25:13
home
11:23
hope
25:16
27:6
33:8
88:20
89:15
Horizon
98:16
hospital
11:6,7,8
hours
11:1
housed
14:16
92:20
housing
21:12
35:14
57:3
59:15
77:6
How's
47:8
human
55:18
hundred
14:12
hurt
46:11
51:10

———————

**I**
I/p
69:21
ice
50:13

Illinois
11:24
12:1,19
16:16
17:10,11
90:22
illness
61:14
77:17
immediat
ely
56:22
impairme
nts
42:23
impede
81:21
impedime
nt
42:10
improper
53:19
54:11
91:16
93:14
imprope
rly
30:21
incapabl
e
77:9
incarcer
ated
68:20
69:20
incident
23:16
75:14,20
included
23:24
24:1

34:16
35:2,3
37:5
40:7
59:20
63:15
66:3,14
67:3
includin
g
75:13
inclusiv
e
18:23
incumben
t
24:10
25:6
independ
ent
26:2,17
individu
als
8:24
82:12
industry
23:13
infer
43:8
65:1
96:16
inference
e
33:6,16
95:20
infers
60:13
informat
ion
33:20
70:13

72:13
85:19
92:17

**inherent**
31:23
33:12

**initially**
24:1

**initiates**
82:4

**inmate**
11:14
14:8
30:9
31:11
35:14,17
36:4
41:18
45:24
46:6
48:20
57:10
59:24
61:9
62:8,10,
19 64:12
73:6
74:12,15
76:22
81:15
83:23
84:24
85:12
93:6
96:3

**inmates**
8:9
11:12
14:16
15:1

16:22
29:17
30:10
37:3,20
38:9
45:23
46:5
59:16,19
60:22
61:4
82:5

**inside**
13:5,18
14:21
15:4

**Institute**
25:10

**institution**
14:22
15:4
16:16
19:7

**institutional**
18:11

**institutions**
10:24
12:16

**instructed**
40:24

**instructing**
71:22

**instructions**
59:15

**instructor**
18:15

**insufficient**
30:24

**insulin**
60:10,23
63:10,
16,17
65:23
67:7,10,
23 68:1
69:1,4,
22 74:13
75:22
77:3

**intake**
16:12

**intended**
35:2

**intense**
25:3
38:20

**intents**
63:4

**interact**
51:21

**interacted**
51:19
83:5

**interaction**
36:15
39:9,19
40:17
44:7

**interacts**
41:7

**Internal**
44:16
72:7

**Internet**
66:23

**interpretation**
98:4

**interrupt**
28:16

**interrupted**
84:12

**interrupting**
67:18

**intervention**
30:21

**interview**
43:18,
22,24

**interviewed**
19:16

**introduction**
20:1,3
23:13

**investigation**
63:14
73:6
75:13,17

**investigations**
30:3
44:16

68:19
78:14

**investigative**
86:10

**involve**
92:14

**involved**
19:18

**involves**
92:7

**involving**
84:24
85:12

**issue**
26:13
93:12
97:9

**issues**
13:22
24:1
30:14
32:3
33:5
86:17
91:18
95:13

**issuing**
90:7

**items**
20:23

_____

**J**

**Jacob**
5:12

**jail**
17:19
52:8
55:9,19
91:7

92:21
98:23

**jails**
8:10
12:17
23:10
24:8,23

**James**
5:12
52:6

**Janine**
7:2

**January**
20:11
89:24

**Jay**
76:3
80:8

**Jay's**
75:20
76:9

**job**
9:17
10:5,10,
23 12:17
13:20
15:2
16:10,24
19:8
76:19

**jobs**
12:20

**Joliett**
13:6
16:4
17:8

**Jonathan**
6:11

**judge**
43:10
53:14

65:7
90:1,6,
11 91:22
92:12,18

**judgment**
75:4

**judgments**
10:20
24:18
64:22,24
98:8

**jumped**
17:15

**Jung**
5:13,14
30:20
35:14,
19,24
36:15
38:14,16
39:9,19,
22 40:16
41:7
44:7
45:13
49:16
54:22
56:7
57:2,16
58:15
60:13,22
63:10,16
65:11,23
68:1,20
69:20,21
83:3
84:2
96:3

**Jung's**
36:19
37:18

54:19
59:24
63:22

**jurors**
92:5,19
93:11

**jury**
91:17
93:13

**jury's**
92:4,8

**justice**
20:1,4

**juvenile**
19:18

_____

**K**

**K-S**
17:14

**Kaminsky**
6:10,11
101:2,4

**key**
29:18
62:11
96:20

**kick**
80:24

**Kiernan**
6:11

**Kimball**
6:6
94:13

**kind**
62:16

**King**
18:2,8,
12

**knew**
32:22

34:15
38:21
41:17,19
60:23
72:14
84:24
85:12
86:17

**knowing**
57:12
74:16,18

_____

**L**

**language**
21:21
27:18
47:16
56:9

**large**
14:11
16:9
40:7

**largely**
38:22,23

**lastly**
40:11

**late**
6:15

**lateral**
13:5

**law**
12:13
91:20,21
92:15
93:4

**lay**
76:3
92:5

**laying**
36:18
39:12

84:4

**lead**
37:23

**leads**
75:3

**learned**
33:1

**learning**
74:11

**leave**
17:9,10
30:18
43:9
62:21
95:22

**leaving**
53:1
56:17

**left**
11:23
53:4
57:7,8,
9,10

**leg**
46:11

**legal**
10:20
11:15
24:18
29:11
85:5,9
87:3
88:4
90:10,13
91:16

**legs**
46:11
51:10

**lengthy**
16:18

**level**
23:15
91:24

**Lexitas**
5:9 7:4

**liar**
41:22

**library**
8:23
9:15

**licensed**
31:17
48:4

**licensure**
98:1
99:2

**lieutenant**
22:2,4
29:21
37:2,19
38:11
40:9
76:8
80:8
82:19
83:4,17

**life**
30:22

**likelihood**
73:8,14,
23 74:23
75:2
76:8
79:1
80:21

**limine**
91:4

**level**

**limit**
57:5
88:5

**limited**
38:12
39:8,23
40:4
86:24

**link**
95:21

**linkage**
55:22
95:17
96:17,21
97:1,11
98:5

**list**
12:20
20:13
22:24
85:20,22
86:7,9
89:6,7,
13

**listed**
20:14,17
28:3
89:1,10

**listen**
67:1

**listening**
78:2

**LLC**
6:21

**load**
48:9

**local**
23:8,15
24:7

location
  23:21
  62:21
locations
  18:24
log
  60:16
  63:9
  65:22
  67:24
  70:3
  73:1
logbook
  63:8
  70:3
logically
  49:9
logs
  69:10,
  13,23
long
  9:4,7
  25:16
  26:15
  28:13
  61:1,18
  77:5
longest
  41:3
looked
  21:13
loss
  15:12
  30:22
lost
  11:19
  59:3
lot
  11:10

46:6
82:16
84:20
91:20
Louis
  5:14
  45:13
  68:20
  69:20,21
lying
  36:1,4
  49:6,7,
  18 57:11
  70:19
  71:7
  77:1,9

―――――――
        M

M-O-T-T-
O-N
  89:20
made
  10:3
  15:10
  29:22
  56:19
  62:9
  64:14,
  15,18,19
  71:16
  74:17
  78:3
  79:23
  98:8
main
  20:2
  40:10
major
  11:8
  19:24
  29:8
  36:5

make
  10:14
  20:21
  24:18
  27:5
  32:10
  35:8
  41:20
  47:17
  48:22
  52:16
  53:16,23
  54:16
  59:12,19
  87:23
  91:9
  95:20
  96:11
  97:2
makes
  88:15
making
  10:20
  25:4
  47:14
  58:23
  61:4
  71:14
  85:9
  92:10
male
  50:3
management
  33:21
mandate
  55:21
manner
  40:6
  82:18,20
  83:7

Mansukha
ni
  6:20
manual
  15:6,8
MAR
  63:15
  66:4
  68:22
  70:16
Mariesha
  6:12
Marsha
  6:7
  94:15
Maryland
  18:13,15
  19:4
  20:8
material
  27:4
  32:19
  69:24
  72:5
materials
  20:13,21
  23:6
  30:16
  31:19
  32:19
  33:20
  34:2
  45:4
  60:12
  69:14
  81:22
  85:21
  87:13
  96:20
matter
  13:9

30:20
62:12
83:2
matters
  32:3
  54:1
Mcdonnell
  10:19
Mckay
  38:3
meaning
  47:15
means
  9:10
  16:12
measures
  30:13
mechanics
  34:14
medical
  25:5
  31:16,17
  34:7
  36:7
  41:11,12
  47:3,14,
  19,23
  48:5
  49:13
  51:18,20
  53:9,15,
  16 54:3,
  16,20,22
  55:10,
  12,19,
  20,24
  56:6,20
  57:16
  58:12,
  14,22,23

59:15,
16,18
61:14,16
62:18
63:15
65:8
66:3,5,
14,15
67:4,9,
22 68:22
69:6
70:1,15
72:5,17,
20 81:18
83:4
94:22,23
95:13,
18,21,24
96:5,14,
21 97:22
98:24
medication
  29:18
  34:5
  60:15
  61:10
  62:2
  64:12,17
  72:19
  73:6
  77:13,18
  82:13
medications
  45:22
  46:4
  48:10,
  14,17
medicine
  46:1
meds
  36:8

47:14

**meet**

25:14

**meeting**

61:22

**member**

15:9

36:7

53:18

54:4

55:11

**members**

39:24

82:21

**memory**

11:19

82:2

**mention**

21:23

**mentioned**

12:4

18:20

21:24

31:6

32:14

65:16,17

95:9

**merits**

65:4

**met**

78:5

96:1,5

98:24

**Metcalf**

89:2,10

**methodology**

82:13

**Michael**

5:22

50:11

53:6

**Mike**

100:15

**mine**

30:23

67:1

**mini**

100:9

101:11

**minimum**

9:19

13:3,24

14:9

**minute**

44:22

80:10

**mischaracterize**

73:20

**mischaracterized**

81:8

**mischaracterizes**

64:5

71:20

**misclassified**

14:14

**missed**

12:22

17:6

58:1

**mobile**

43:4

**moment**

88:17

**Montgomery**

18:5,8,

13 19:4

20:6

**months**

9:16

**morning**

5:7,21

6:1,10,

18 7:2,

24 51:19

63:16

84:3

**motions**

91:3

**Motton**

89:20

90:19

**move**

9:17

27:2

37:4

59:5

82:15

84:5

**moved**

19:8

**moving**

38:1

66:20

**multiple**

36:21

50:6

60:3

75:12

---

**N**

**N-I-S-Q-U-A-L-L-Y**

52:9

**names**

50:2

60:9

**naming**

21:2

**narrative**

41:3

70:5

**National**

23:11

25:10

31:24

33:13

**nature**

19:3

24:2

34:16,24

37:8

39:24

40:5

43:6,20

97:4

**NCCHC**

25:2,11

33:24

34:22

**needed**

77:14

83:4

**needing**

100:23

101:13

**negligent**

84:23

85:4,8,

10

**negligently**

93:7

**newly**

16:7,22

**news**

39:2,4

**night**

11:1

**Nisqually**

52:7

55:19

**noisy**

76:23,24

**nomenclature**

10:14

13:10

**non-**

31:12

54:15

97:9

**non-medical**

31:13,22

53:18,23

54:11

55:22

82:14

95:8,9

**Non-professional**

31:9

**non-routine**

34:7

**normal**

65:5

**notary**

5:8 7:1,

3,14

**note**

6:13

72:17

**noted**

40:8

73:5

80:3

82:22

**notes**

20:20

26:6

45:1,5

67:4

**notice**

87:14

**notified**

89:24

**noting**

87:16

**November**

21:5

35:16

36:15,20

39:10

41:8

45:10

51:20,21

60:1

63:11

90:8

**number**

10:24

11:21,22

22:20,22

23:2

29:12,

16,20,22

30:5,17

34:3

35:10

43:2,3

45:4

| | | | | | |
|---|---|---|---|---|---|
| 49:13 | **objectio** | 15:11 | 24 63:9, | OPC | **opinion** |
| 53:5,9 | **n** | 16:8 | 21 | 66:4,13 | 24:24 |
| 59:6,7, | 28:19 | **offer** | 65:12,21 | 67:3 | 25:22,24 |
| 12 61:19 | 43:23 | 95:23 | 67:24 | **open** | 26:2,3, |
| 68:19 | 44:9 | 96:4,9, | 70:3,19 | 21:9 | 14,15, |
| 69:20,21 | 50:22 | 13 | 71:13,15 | 44:24 | 18,19, |
| 77:6 | 58:6 | 97:13,22 | 72:9 | 49:8 | 20,22 |
| 83:9 | 64:4 | 98:21,22 | 73:17 | **opened** | 27:2,8, |
| 84:7,8, | 70:24 | **offered** | 75:17 | 19:7 | 11,15,24 |
| 17 85:2, | 71:17 | 17:7 | 76:2,3 | **operate** | 28:7 |
| 24 86:3, | 73:19 | **offering** | 77:22 | 8:23 | 29:2,7, |
| 5,17 | 75:8 | 65:15 | 78:16 | 55:9 | 20 31:7 |
| 87:23 | 79:7,19 | **office** | 80:21 | **operated** | 33:11 |
| 91:5 | 80:3 | 44:17 | 83:6,19 | 21:13 | 34:10 |
| **numbers** | 81:5 | 56:21 | **officer'** | 55:9,13 | 43:14 |
| 46:2 | 87:2,11 | 63:13 | **s** | **operating** | 52:5,10, |
| **nurse** | **objectio** | 64:13 | 53:2 | 11:9 | 13 54:8, |
| 36:10,14 | **ns** | 68:18 | 92:3 | 19:13,17 | 10 55:7 |
| 37:20 | 40:22 | 72:8 | **officers** | 95:14 | 56:1 |
| 40:11 | **observat** | 76:18 | 32:8,20 | **operation** | 65:3 |
| 43:12,18 | **ion** | **officer** | 45:23 | 11:6 | 68:3,6 |
| 49:23 | 53:10 | 8:12 | 46:3 | 15:17 | 72:22 |
| 50:2 | **observe** | 19:10 | 98:6 | **operational** | 73:13, |
| 57:15 | 38:6 | 22:2,5,7 | **official** | 23:14 | 15,17,19 |
| 58:4 | 43:5 | 25:22 | 59:22 | 24:1,19 | 76:3 |
| 95:3 | **observed** | 35:12,13 | 60:5,16 | **operations** | 81:11 |
| 97:18 | 38:6,9, | 37:19,24 | **Olympia** | 24:3 | 83:17 |
| 98:22 | 16 41:4 | 39:8,17 | 52:8 | 25:15 | 84:21 |
| | 42:8,16, | 40:16 | **omitted** | 32:7 | 85:2 |
| ──────── | 18,22 | 46:22 | 89:6 | **opine** | 87:6 |
| O | 48:2 | 47:10,18 | **omitting** | 54:15 | 96:4,10 |
| **O'CONNOR** | 59:23 | 51:15 | 73:21 | 56:5,16 | 97:13,22 |
| 6:6 | 60:6 | 53:3,6, | **on-site** | **opined** | 98:22 |
| 94:13 | **obvious** | 11,15 | 10:15 | 58:23 | **opinions** |
| **oath** | 35:17, | 54:12, | **one-** | **opines** | 23:19,23 |
| 89:13 | 19,24 | 21,22,23 | **dimensio** | 92:13 | 28:22 |
| **object** | 39:11,20 | 55:2,4 | **nal** | | 29:23 |
| 6:14,15 | 40:18 | 57:18 | 72:2 | | 52:4 |
| 40:19 | 41:8,13 | 58:16,21 | 98:13 | | 95:24 |
| 42:12 | 47:5,8 | 59:14,17 | **ongoing** | | 96:14 |
| 43:16 | **offenders** | 60:2,13 | 30:14 | | **opportunity** |
| 63:23 | **s** | 62:9,21, | | | 17:15, |
| 68:8 | | | | | |

17,21
48:18
94:2
**opposed**
42:14
**order**
20:16,
17,19
90:7
91:6
**organiza
tion**
31:1
**original**
100:6
**outcomes**
55:23
56:6
76:20
**overview**
76:17

**P**
**p.m.**
65:4,5
67:7
69:4
101:20,
22
**pages**
32:18
33:7,18
86:16
87:13
96:19
**paid**
9:14
10:5,10
18:11
33:2

**pain**
41:18,19
42:7,24
43:7,15
46:23
47:11
51:17
57:11
58:16
**paper**
62:18
73:12
**paperwor
k**
73:24
74:2
**paragrap
h**
25:20,21
26:14
27:9
52:23
55:6,8
59:10
72:24
73:3
**paragraph
hs**
60:3
**pardon**
9:14
10:14
11:4
15:21
25:7
37:22
48:24
61:15
**parenthe
tical**
85:23

**parse**
61:21
**part**
10:22
16:6
30:5,11
31:7,8
33:20
44:15
62:19
65:9
66:9
69:14
72:6
74:6
76:17
78:13,15
85:4
86:15
88:2
95:7
97:21
98:1
**particip
ants**
37:7
**parties**
5:9
**pass**
42:17
**passing**
36:7
40:4
47:13
48:17
**past**
93:2
**patient**
46:8
**PDP**
21:21
32:12

34:4
75:13,16
82:23
85:22
86:1
98:16
**Penitent
iary**
8:18,20
13:6,12
15:15
16:2,5
**Pennsylv
ania**
7:3 9:13
10:10,11
11:21
17:4,13,
14
**people**
37:1
56:15
92:7
98:12
**perfectl
y**
52:19
**perform**
9:4,7
97:19
**Performa
nce-
based**
23:7,20
**period**
12:13
**periodic
ally**
15:5
**periods**
9:8

**permissi
on**
88:20
**person**
38:3,5
61:13
68:20
69:21
83:24
**personal**
90:13
**personne
l**
19:15
41:12
47:4
51:18,20
58:14
**perspect
ive**
61:12
74:16
82:14
96:18
97:24
**pertaini
ng**
30:15
**Pestrak**
5:21,22
7:19,23
28:17,24
31:4
41:5
42:21
43:21
44:4,12,
20 50:9,
10,14,17
51:3
58:11
64:9

68:12,16
71:2,18,
22,24
73:22
75:15
76:1,6
79:9,12,
15,21
80:2,4,
17,18
81:12
87:4,20
93:24
99:10
100:6,8
**Philadel
phia**
5:14,23
10:6,8,
12 11:8,
22,23
12:2,6,7
17:15
32:18
**phone**
72:3
**phonetic**
6:8
**phrase**
39:5
**phrasing**
42:15
**physical**
42:9,23
48:19
49:12
56:14
77:21
97:19
**physicia
n**
55:12

| | | | | | |
|---|---|---|---|---|---|
| picked | pod | 53:16 | preclude | primitiv | proceedi |
| 31:16 | 45:22 | positions | d | e | ngs |
| picture | 46:2 | | 93:15,18 | 92:11 | 5:2 6:15 |
| 23:3 | 69:11 | 17:5 | prelimin | prior | 101:22 |
| 98:13 | point | 18:7,12 | ary | 52:3 | proceeds |
| pictures | 26:1 | 32:9 | 52:20 | prison | 46:16, |
| 21:11 | 32:19 | possibil | preparat | 8:23 | 18,19 |
| piece | 34:14 | ity | ion | 10:11, | process |
| 62:18 | 39:22 | 38:4 | 88:2 | 15,22 | 11:11,15 |
| Pierce | 59:2 | possibly | presence | 11:21 | 21:4,20 |
| 89:3,11 | 73:16 | 38:3 | 59:18 | 17:8 | 34:17 |
| Pino | 88:5 | Possino | present | 77:5 | 90:10 |
| 53:7,11, | 93:17 | 6:18,19 | 37:21 | prisoner | professi |
| 15 | 98:18 | 101:13, | 54:2 | 55:18 | onal |
| place | points | 15 | 83:24 | prisoner | 31:13, |
| 23:16 | 75:12 | post | presenta | s | 14,17,22 |
| 28:19 | 90:1 | 69:11 | tion | 60:9 | 41:7 |
| 34:17 | police | post- | 93:12 | prisons | 44:18 |
| 46:20 | 19:14 | event | presente | 10:6,8, | 53:11,24 |
| 47:21 | 92:2,10, | 73:5 | d | 13 11:4, | 54:20 |
| 48:9 | 14 | poured | 68:4 | 22 12:2, | 55:10,13 |
| 49:14 | policies | 45:24 | presenti | 6,8,16 | 63:14 |
| 58:19 | 34:3,5, | 46:1 | ng | problem | 64:13 |
| 62:23 | 8,11,23 | PP | 29:9 | 26:11,12 | 72:8 |
| 99:24 | policy | 69:19,21 | preservi | 28:5,13 | 76:18 |
| plain | 81:13 | PPS | ng | 45:20 | 99:1 |
| 47:15 | 82:1,3, | 34:6 | 100:20 | 66:8,11 | professi |
| Plaintif | 8,11,23 | practice | pretrial | 67:1 | onal's |
| f | populati | 61:12 | 17:19 | 84:13 | 97:23 |
| 91:7 | on | 77:13 | previous | procedur | professi |
| plaintif | 14:24 | 91:7 | 88:9,24 | es | onals |
| fs | 15:1 | 97:8 | 89:8 | 11:2 | 32:5 |
| 6:2 | 30:9 | practice | previous | 24:3 | 55:24 |
| 99:15 | 31:11 | s | ly | 34:5 | 56:6 |
| Plaintif | position | 25:13,14 | 82:22 | 92:14 | 58:22 |
| fs' | 11:17 | 33:19 | primaril | proceed | professo |
| 6:15 | 12:3,6 | 55:11,15 | y | 7:16 | r |
| play | 13:7 | 92:2 | 92:4 | proceedi | 18:16 |
| 47:22 | 14:21 | 98:14 | | ng | 19:22 |
| plop | 17:7,20 | | | 5:19 | program |
| 47:22 | 19:5,17 | | | | 12:23 |
| | 49:18 | | | | 16:14 |

24:3

**programs**
13:24
14:3
20:4,5

**progress**
89:22
90:5

**promise**
82:16

**promoted**
13:7
14:20

**promptly**
16:10

**prone**
49:18

**pronounce**
49:17
53:2

**pronouncing**
49:16

**proper**
97:1

**properly**
34:20
76:19
77:24

**proposal**
90:10

**protocol**
49:15
57:6
82:4

**protocols**
92:2,14

**provide**
15:2
57:16

**provided**
32:18,24
33:7
34:2
55:23
56:5
60:10

**provider**
53:12,24
54:7
55:12

**providers**
48:5

**provides --**
40:21

**providing**
12:15
58:22
68:11

**province**
32:5

**public**
7:1,14
11:8
14:10

**publication**
23:22
24:24

**publications**
23:7
32:14

**pull**
44:23

**purchasing**
100:6,12

**purported**
53:5

**purpose**
87:17
92:22

**purposes**
63:4
67:6
69:3

**put**
7:15
29:2
46:12
70:20
72:13
79:12

**putting**
49:13

———————

**Q**

**qualifications**
27:1
90:13

**qualified**
90:12
96:4,9,11,13
97:12,22
98:21
99:4,5

**qualifier**
73:21

**qualify**
12:12

57:5

**quality**
35:1

**quantum**
10:17

**question**
17:24
18:17,22
19:20
20:15
22:23
23:17
24:22
26:1,10,18 27:19
28:20
31:12
33:9,24
37:6
39:16
40:23
41:22
42:16
44:3,13
51:9
55:3
56:10,11,23
60:4
66:10
67:20
71:10
72:23
73:11
74:5,21
79:13,22
80:1
81:9,20
82:24
83:15,21
85:21
86:2,20,21 87:3,

17,19,24
88:5
89:16
95:2,10

**questioning**
31:6
81:21

**questions**
8:5
39:15
49:13
55:11
61:7
79:11
92:6
94:1,20
97:20
99:12

**quibble**
82:7

**quick**
88:7
99:16

**quicker**
82:16
85:16

**quiet**
50:9
63:4
83:2

———————

**R**

**R-U-A-R-K**
89:21

**raise**
7:5  62:6
81:3

**rarely**
63:5

**Ray**
6:5
94:12

**reaction**
78:6

**read**
8:3
29:5,14
45:18
48:1
52:24
59:13
81:22
91:11
100:14

**reading**
25:19
28:10
51:23
52:1
64:23

**ready**
7:18
47:22
51:4
77:17,18

**realizing**
60:21

**reason**
48:19
49:11
53:14
56:13,17
61:24

**reasonable**
96:1
98:24

**reasonab
leness**
  92:6
**recall**
  20:22
  45:13
**receive**
  53:8
  59:16
  60:10
**received**
  20:21
**receptio
n**
  12:24
  15:23
  16:4
**recite**
  27:20
**reckless
ly**
  93:7
**recollec
tion**
  38:12
**recollec
tions**
  40:3
**recommen
d**
  14:13
**recommen
dations**
  16:20
**recommen
ded**
  19:6
**record**
  5:5,17
  6:14

28:19,23
29:3,15
38:5,8
44:11
48:13
49:3
50:23,24
51:1
56:20
63:15
69:6
70:1,15,
20 72:5,
6,17
73:9,14
74:9,24
75:1,3,
5,13,18
77:11,21
79:2
86:3,5
91:2,11
99:17,
21,23
100:5
101:21
**record's**
  45:3
**recordin
g**
  6:3,9,
  13,22
**records**
  59:22
  60:5
  66:3,5,
  15 67:4,
  10,22
  68:23
  72:12
  75:20
  76:4

**red**
  34:5
  81:13
  82:1,3,
  7,11
**redundan
t**
  95:2
**Rees**
  6:19
**refer**
  64:19
**referenc
e**
  9:10
**referenc
ed**
  80:14
**referenc
es**
  65:2
**referred**
  27:5
  64:6
**referrin
g**
  11:11
  25:2
  26:12
  31:18,21
  68:10
**refresh**
  82:2
**refusal**
  59:21
  62:15
  63:22
  67:14
  68:4
  69:7
  81:15,16

82:4
**refusals**
  67:5
**refuse**
  77:22
**refused**
  60:14
  62:3
  63:10,16
  65:11,23
  66:16
  67:10,23
  68:1
  69:1,21
  72:18
  73:6
  77:23
  79:5
**refusing**
  62:11
  78:17
  82:13
**regulari
zed**
  30:14
**Rehabili
tation**
  18:6
**rejected**
  16:19
**relate**
  96:16
  97:4
**related**
  15:12
  18:18
  24:15
  25:15
  32:13
  90:7

**relates**
  56:2
**relating**
  32:4
**relevanc
e**
  92:1
**relevant**
  28:2
  30:4
**relied**
  80:11
  86:15
**religiou
s**
  14:2
**rely**
  80:19
**relying**
  72:5
**remained**
  53:8
**remainin
g**
  75:22
**remains**
  84:5
**remember**
  13:10
  38:13,21
  43:11
  44:14,19
  45:14,15
  46:5,10,
  13 52:5,
  10 64:22
  76:15
  81:22
**remind**
  94:7

**remote**
  5:11
**remotely**
  5:20
**rendered**
  82:22
**repeat**
  26:10
  39:16
**repeated
ly**
  22:24
**rephrase**
  37:16
  83:15
**replacem
ent**
  8:17
**report**
  5:19
  8:3,5,6
  14:6,7
  25:6,18,
  20 26:6,
  7,12,16,
  23
  27:18,21
  28:6,10,
  14,21
  29:2,5,
  10 30:5
  31:16
  40:24
  43:3
  52:10,
  15,17,20
  55:6
  59:7
  66:4,13
  67:3
  76:18
  83:9

88:9
91:9
**reported**
72:20
**reporter**
5:4,8
6:23
7:17
50:22
51:1
100:3,
11,22
101:2,
10,12,18
**reports**
6:16
21:14,
17,19,23
85:22
86:1,8,
10 87:22
**represent**
5:18
6:12
23:13
94:13
**representation**
38:15
82:12
**representing**
94:11
98:12
**request**
5:9
93:15
**required**
62:1
82:20
92:18

**requirement**
62:2
**reread**
93:1
**resolve**
91:18
**resolving**
93:11
**responded**
74:13
82:17,20
83:6,18
**respondent**
83:1
**responding**
30:11
**responds**
89:15
**response**
30:14
32:17
42:1
56:23
81:7
**responsibilities**
8:21,22
12:5
13:17
14:17
15:19
24:10
98:3
**responsibility**
8:9 14:4

18:23
25:5
44:18
59:17
65:9
76:17,19
81:14,18
**responsible**
15:16
**responsive**
27:19
33:8
56:9
**rest**
55:23
56:6
**result**
25:8
**resulting**
30:22
**resume**
11:18
**retained**
91:8
95:23
**retired**
18:5
**returned**
11:23
**review**
11:9
21:3,14,
17 22:8,
13 27:3
29:15,20
30:8,24
32:15
34:17,24

36:11
37:14
56:19
63:8,15
65:10
66:3,4,
14 67:3,
15 68:21
73:8
77:24
86:16
**reviewed**
16:12,19
20:14,
16,24
21:1,7,
19 22:4,
7,11
30:2
33:17
34:3,8
36:10
48:5
63:13
65:24
66:2,13
68:12
69:13
81:14
86:1,3,
11 87:12
**reviewers**
37:8
**reviewing**
30:9
**reviews**
22:16
**right-hand**
34:23

**rise**
30:12
**risk**
15:11
**risks**
93:13
**Rod**
5:7
**role**
10:7
18:19
**roles**
18:22
34:6
**room**
46:1,8
**rounds**
29:22
**Ruark**
89:21
90:20
**rude**
67:18
**rudimentary**
31:10
**rules**
91:19
**ruling**
95:15
**running**
16:21

———
**S**
**safe**
99:11
**sat**
15:12

**satisfaction**
95:12
**scheduled**
89:23
**school**
9:3,13,
21,22
**scope**
23:14
32:6
**screen**
44:21
69:10
90:16
94:3
**scroll**
69:16
91:4
**scrolled**
93:2
**Scully**
6:19
**seamless**
98:17
**seated**
75:23
**Seattle**
18:3
**section**
23:6
**sections**
23:1
**security**
9:19
13:3,23,
24 14:9
16:14
24:2

**seeking**
  30:9
  90:11
  91:6
**select**
  16:15
  62:4
**selected**
  17:18
**senior**
  85:19
**sense**
  88:15
  92:4
**sentence**
  82:18
  84:16
**sentenced**
  16:8
**sentences**
  16:18,23
  31:20
**separate**
  97:5
**separately**
  92:20
  97:11
**September**
  45:2
**serve**
  16:17,23
**served**
  15:13
  19:5
**service**
  54:7

**services**
  12:22,23
  13:16
  15:7
  23:10
  24:23
  29:11
  55:17,
  19,20
  59:17,19
**serving**
  16:3
**setting**
  63:6
**shape**
  48:2
**share**
  44:21
  69:10
  90:16
**shared**
  54:23
  55:1,3
**sharing**
  69:9
  94:3
**sheriff's**
  19:12
**shift**
  11:1
  17:16
  53:4,7
**short**
  43:4
  60:21
**short-**
  17:19
**show**
  48:13
  49:3

  52:14
  68:13
  77:8
  85:20
  91:10
**showed**
  34:18
  63:16
  66:5,15
  68:9
  72:17
  86:11
**showing**
  51:14
  52:16
  69:6
**shown**
  71:12
  86:22
**shows**
  81:7
**sick**
  46:12
**side**
  97:6
**sight**
  93:9
**sign**
  42:4
  100:15
**sign-on**
  69:12
**signature**
  62:19
  81:15,19
**signed**
  26:7
  43:18
  62:9
  82:5

**significant**
  12:15
  40:6
  42:1
  49:12
**signing**
  77:21
**simply**
  14:7
  25:12
**simultaneously**
  18:13
**single**
  33:17
  86:13
**sir**
  8:2
  93:17
  94:7
  101:14
**sitting**
  74:10
**situation**
  39:3,24
  45:14,15
  47:24
  48:5
  54:18,19
  59:20
  60:1
  63:5
  65:1
  72:16
  74:16
  78:1
  83:21
  84:1,24
  85:7,12

**situations**
  30:18
  34:7
  56:13
**slip**
  91:2
**slow**
  62:7
**small**
  77:6
**society**
  10:11,15
  11:21
**sole**
  25:4
**solely**
  19:8
**someone's**
  77:16
**Something's**
  42:2
**sort**
  9:1
  11:20
  58:5
  63:4
**sought**
  54:4
**source**
  72:4
**sources**
  68:5
  81:10
**speak**
  76:21
**speaking**
  72:4

**speaks**
  73:20
  75:14
**special**
  25:8
  68:18
**specific**
  9:14
  10:21
  21:6
  22:8
  23:3
  35:6
  59:16
  69:18
**specifically**
  23:12
  32:8
  38:13
  39:10
  43:13
  62:15
  67:16
  75:3
  83:11
**specifics**
  18:21
**spoke**
  75:21
  78:9
**spoken**
  52:2
  75:12
**staff**
  10:16
  11:12
  13:23
  24:11,20
  25:5
  30:12,20

31:9,18,
22 32:12
34:6,15
36:7
39:24
53:18,23
54:4,16
55:11,22
65:12,13
82:12,21
95:18,24
96:21,22

**staff's**
81:18

**stairs**
77:15

**stand**
48:16
49:8

**standard**
96:1,6
98:24

**standards**
23:8,10,
14,21,24
24:22
25:14
31:24
32:13
33:13,21
34:22
61:22
64:14
78:5

**standing**
46:15
49:6,17

**stands**
65:4

**start**
20:11

27:12
35:10
45:16
52:15
84:15

**started**
8:14,16

**starting**
27:23
35:7,9
51:8
98:18

**starts**
25:21
26:14
27:8
84:9

**state**
5:16
8:17,20
11:24
16:16
38:24
63:5

**statement**
24:5
43:18

**States**
90:21

**Stateville**
13:6,11
14:11,22
15:15
16:2,5

**stay**
84:23
85:7,11

**steel**
48:21

49:4,5

**step**
10:9
80:6

**stipulate**
5:9,19,
24 6:3,
8,12,21

**stockade**
9:24

**stop**
36:7
69:9
71:9
90:3
94:3

**stopped**
18:10
22:18
66:19

**streamline**
18:1

**stretcher**
41:21,24
46:23
47:11,17
51:16
58:17

**strong**
73:8,14,
23 74:23
75:1
79:1
80:21

**stuck**
57:10

**studied**
24:19

**study**
14:4

**subjected**
78:2

**submission**
6:16

**substance**
10:5
36:2
37:16
67:19
99:18

**substituting**
8:24

**sued**
52:7

**suffering**
77:16

**suffice**
92:9

**sufficient**
61:9
82:9

**sufficiently**
92:15

**suggest**
53:19
54:12

**sum**
36:2
37:15
84:21

**summaries**
87:15

**summarize**
85:17

**summary**
85:18
91:19

**summer**
8:17,19
9:8

**summers**
9:15

**super**
69:18

**superintendent**
11:4,5
12:8,9

**supervise**
14:5

**supervising**
31:11

**supervision**
15:2
53:6,15

**supervisor**
8:15
9:19
12:23
13:4,7,
16 14:21

**supervisors**
32:21

**supervisory**
32:9

**support**
26:21
87:22

**supposed**
45:9

**Supreme**
24:17

**swayed**
65:3

**swear**
6:24
7:4,6

**sworn**
7:12

**symptom**
51:12

**symptomatically**
51:13

**symptoms**
53:20
54:13

**system**
17:22
19:18
34:6
70:15
72:14
77:7
98:15

**systems**
12:16
24:8

————

**T**

**taking**
16:22

talk
13:22
23:7
66:12
74:15
talked
40:3
50:8
76:11
78:22
79:4
talking
15:20
42:9,23
45:12
48:20
49:4,20,
22 62:17
71:8
73:3
83:10
84:2,3
90:17
95:13
99:2
tape
62:20
taught
19:21,24
teach
20:3
teaching
9:2,11
technology
5:10
telephone
99:18
television

62:22
telling
51:14
70:22
tells
46:21
Temple
18:14
20:5
tenure
25:9
31:2
term
16:24
17:20
terminology
31:15
terms
9:10
24:20
42:2
63:21
97:10,14
testified
7:13
42:14,
19,22
43:14
89:9,19
testify
43:17
87:6,16,
22
89:13,23
90:8,12
testifying
87:1
93:16,19

95:12
testimonial
43:19
44:1
testimony
7:9
36:11
37:3
38:15
39:13,18
40:12
43:12,22
44:1,2,5
45:1
47:1,2
64:6
71:21
76:9
91:6
92:1,18
93:10,13
95:7
97:18
98:19
therapy
13:21
thing
39:5
52:24
59:14
77:3
78:23
93:2
100:19
things
8:7
34:19
50:2
55:2
75:12

98:7
thought
11:9
81:1
thoughts
55:1,4
thrust
20:2
thumbnail
19:22
tied
15:21
time
5:6  9:10
11:7
15:1,13
17:9
22:10,11
23:16,20
26:1
33:23
37:18
38:9
39:10,
19,22
40:16
41:8,10
44:6,10
47:1,4,
13 48:9
49:2,10
50:18,19
64:15
65:5
67:8
69:12
71:16
83:4
101:20,
21

times
9:16
15:15
18:18
21:8,10
22:12,
17,18,20
23:4
64:11
69:18
75:11
title
12:11
22:1
today
20:11
26:13
29:3,11
50:1
Today's
5:5
101:19
told
8:4  26:4
41:20,24
46:6,10,
13,15,21
47:10
49:17
51:15
58:15
64:23
90:9
95:6
tomorrow
100:10,
14
tongue
15:21
top
27:20
30:24

34:22
44:24
45:17
84:23
85:7,11
topics
19:21,23
total
22:20
26:18
85:24
totality
78:1
86:10
town
17:10
track
64:7
82:12
train
10:16
trained
24:20
25:7
31:10,23
32:13
33:4,12
training
11:2
25:8
32:18,
19,20
33:6
86:16
95:3
96:19
97:5
transcript
51:24
100:7,24

transcripts
100:4
translated
24:7
69:17
70:16
95:16
transpired
38:24
treatment
32:3
Trebach
6:11
trial
44:2
86:22
88:2
89:10,23
90:3
Trivikram
6:7
94:14
truth
7:7,8
70:23
truthful
34:13
41:2,20
turn
35:5
turning
20:12
56:18
88:8

two-minute
50:12
types
92:13
96:14
typo
29:24
85:3

————

U

unable
38:13
84:5
underlined
53:22
understand
9:9 16:1
32:11
91:17
95:18,19
96:18
98:10,19
understanding
21:12
39:15
55:14
78:11
92:8
understood
21:22
35:4
44:14
53:13,19
54:12
57:22
100:22

undiluted
55:21
unit
9:19
11:6
13:3
14:1,9
16:4
21:13
35:14
37:24
38:1
47:19
48:18
57:3
59:15
63:3
72:8
77:6
United
90:21
University
9:13
18:14,15
20:5,6,7
Unlimited
6:21
unnecessary
93:13
unpack
62:13
unreasonable
93:9
unstable
66:24

upper
34:23
upset
26:9

————

V

vacancy
17:12
vacation
8:24
valid
82:13
verbal
43:2
verify
75:24
version
19:23
video
18:10
20:24
21:1,2,
4,5,7,
15,18,
23,24
22:6,11,
12,14,21
23:1,5
37:23
77:11
videoconference
5:10
videotape
45:2
viewing
22:6
visual
21:11

53:6
vita
89:8
vitae
15:24
52:18
voice
62:6
volunteer
8:16,19
9:2,11,
24 10:2

————

W

wait
80:10
93:8
waited
40:9
walk
11:20
46:14,
15,16,19
47:18,19
walked
14:15
58:15
walking
42:9,23
77:9
Wallenstein
5:12
7:5,11,
24 20:9
29:1
34:1
44:8
51:5
52:18

56:15
64:10
67:17
74:21
76:5,7
78:4
80:5
87:21
91:8
99:8
Wallenstein's
91:15
93:3,10
walls
14:10,21
Wanda
5:24
wanted
44:22
46:6
warden
12:23
13:8,11
14:18,
20,23
15:7,14
17:7,12
18:2,5,
8,9,19,
23 19:3,
5,7,
25:10
warden's
17:20
Washington
18:4,12,
14 20:6
52:8
watch
22:21

watched
  21:9
  22:10,
  12,17,24
  23:1
watching
  21:15,18
  22:17
  62:22
water
  50:13
  88:19
weakness
  43:7
weeks
  16:20
Wessling
  52:6,21
  53:4,8,
  20 54:12
  55:7
  56:2
Wessling
's
  53:13,17
Westlaw
  91:1,2
who'd
  16:8
Williams
on
  89:3,11
witnesses
s
  87:15,16
Wittekind
d
  6:5
  94:5,9,
  12,13,19
  99:7

100:23,
24
Wolf
  10:19
women
  50:6,7
word
  13:8
  38:23
  40:13
  62:3
  70:7
  85:4,8
  90:2
  99:17
words
  35:21
  52:2
  70:14
  72:3,19
  74:1
  78:10
  80:1
work
  9:4,7,
  11,14,23
  10:1,2
  11:24
  29:13
  45:10
  59:2
  68:17
  89:22
  90:4
  97:3
  98:17
worked
  8:8,11
  89:18
  97:15
working
  30:6

32:6
  97:11
  98:5
  99:19
world
  37:17
  85:5
worlds
  97:5
worried
  67:6
worry
  21:1
writ
  25:13
write
  12:12,17
  15:8
  26:23
  76:17
writer
  12:13
written
  62:4,7
  69:24
  70:9
  73:15
wrong
  30:17
  42:2
  46:10
  77:23
wrote
  20:17
  46:1
  60:15
  70:14
  72:18

————————
**Y**
yards
  77:5
year
  15:9
years
  8:8 9:12
  88:10
  89:1,5,
  15,18
yell
  61:10
yelled
  61:2
  74:13
  77:2
Yescare
  6:6
  94:14
  98:17,23