**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JACOB and JAMES JUNG, as Administrators of the Estate of LOUIS JUNG, JR, | : : : | No. 2:24-cv-05618-TJS |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| CITY OF PHILADELPHIA; YesCare Corp.; BLANCHE CARNEY, Former Commissioner of Philadelphia Dept. of Prisons; LALITHA TRIVIKRAM; MAUREEN GAY; MARIESHA APOLLON; BLAIR CABELLOS; GENA FRASIER; WANDA BLOODSAW, | : : : : : : : | |
| | : | |
| Defendants, | : | |
| v. | : | |
| | : | |
| CAREERSTAFF UNLIMITED, LLC, | : | |
| | : | |
| Third Party Defendant, | : | |
| v. | : | |
| | : | |
| TEKACCEL, INC., | : | |
| | : | |
| Fourth Party Defendant. | : | |

**MEMORANDUM OF LAW IN OPPOSITION TO CITY OF PHILADELPHIA
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

/s/ Bret Grote
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
/s/ Rupalee Rashatwar
Staff Attorney
PA ID No. 331085
rupalee@alcenter.org
/s/ Margaret Hu
Staff Attorney
PA ID No. 334438
margo@alcenter.org

/s/ Lolo Salsbury Serrano
Legal Fellow
PA ID No. 338184
lolo@alcenter.org
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

I.    PROCEDURAL HISTORY ........................................................................................... 1

II.   FACTUAL BACKGROUND ........................................................................................ 2

III.  STATEMENT OF QUESTIONS INVOLVED ............................................................ 2

IV.  LEGAL STANDARD ................................................................................................... 3

V.   ARGUMENT ................................................................................................................ 3

   A.    Evidence that Defendants Frasier and Bloodsaw were aware that Mr. Jung was in need of medical care in order to avert a substantial risk of serious harm and failed to take reasonable measures establish disputes of material fact that defeat summary judgment ...................................................................................................................... 3

      i.   A jury could easily find that Defendant Frasier knew of and disregarded a substantial risk of serious harm to Mr. Jung. ............................................................................... 5

      ii.  A jury could easily find that Defendant Bloodsaw knew of and disregarded a substantial risk of serious harm to Mr. Jung. .............................................................. 10

   B.    Evidence that the City of Philadelphia and Defendant Carney maintained and were deliberately indifferent to customs that exposed incarcerated people to substantial risks of serious harm, and that these customs contributed to Mr. Jung suffering hyperglycemia, diabetic ketoacidosis, and death establish disputes of material fact that defeat summary judgment ...................................................................................... 12

      i.   The City of Philadelphia had a custom of failing to audit, monitor, and correct deficiencies in the care provided to diabetic patients, including Louis Jung, Jr. ................. 13

      ii.  The City of Philadelphia had a custom of failing to respond to the emergency medical care needs of incarcerated people within the Philadelphia Department of Prisons .............. 21

   C.    Evidence that the City of Philadelphia failed to provide a reasonable accommodation to ensure Mr. Jung equal access to medical services establish disputes of material fact that defeat summary judgment on Plaintiffs' claims under the Americans with Disabilities Act and Rehabilitation Act ............................................................... 25

   D.    Evidence that the City of Philadelphia failed to supervise its staff to ensure correctional officers performed their duties in identifying and responding to the emergency medical needs of incarcerated people, and failed to supervise its medical contractor as to care for diabetic patients, establish disputes of material fact that defeat summary judgment on Plaintiffs' failure to supervise claim ................................................ 31

   E.    Plaintiffs' Wrongful Death and Survival Claims must remain in the case because Defendants are not entitled to summary judgment on the other federal and state law claims against City Defendants. .............................................................................. 33

VI.  CONCLUSION ...................................................................................... 33

# TABLE OF AUTHORITIES

## CASES

*A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572 (3d Cir. 2004) ...................... 13

*Ancata v. Prison Health Services, Inc.*, 769 F.2d 700 (11th Cir.1985) ......................................... 12

*Baker v. Monroe Township*, 50 F.3d 1186 (3d. Cir. 1995).............................................................. 13

*Barkes v. First Corr. Med., Inc.*, 766 F.3d 307 (3d Cir. 2014),..................................................... 32

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 117 S. Ct. 1382 (1997) 13, 20

*Beck v. City of Pittsburgh*, 89 F.3d 966 (3d. Cir. 1990) ..................................................... 12, 13, 21

*Berg v. Cnty. of Allegheny*, 219 F.3d 261 (3d Cir. 2000) ................................................. 13, 19, 20, 21

*Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585 (6th Cir. 2021)..................................................... 4

*Carter v. City of Philadelphia*, 181 F.3d 339 (3d Cir. 1999)........................................................ 31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................................. 3

*Chambers v. City of Philadelphia*, No. CV 23-0137, 2024 WL 870574 (E.D. Pa. Feb. 29, 2024)
.................................................................................................................................... 12, 21, 32

*Charles v. Orange Cnty.*, 925 F.3d 73 (2d Cir. 2019) ..................................................................... 3

*Chisolm v. McManimon*, 275 F.3d 315 (3d Cir. 2001)................................................................. 26

*Chmiel v. Pennsylvania Dep't of Corr.*, No. CV 18-1691, 2020 WL 1332830 (W.D. Pa. Mar. 23,
2020) ...................................................................................................................................... 27

*City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239 (1983).................................................. 3

*DeFreitas v. Montgomery County Correctional Facility*, 2012 WL 2920219 (E.D.Pa. 2012) .... 30

*Dietz v. Cnty. of Allegheny*, No. CIV.A. 10-1674, 2011 WL 3844177 (W.D. Pa. Aug. 30, 2011)
.................................................................................................................................................. 27

*Est. of Borroto v. CFG Health Sys., LLC*, 751 F. Supp. 3d 443 (D.N.J. 2024) .........................12

*Est. of Roman v. City of Newark*, 914 F.3d 789 (3d Cir. 2019)............................................. 12, 21

*Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976) ................................................................... 4

*Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970 (1994)......................................................... 4, 9

*Forrest v. Parry*, 930 F.3d 93 (3d Cir. 2019) ...................................................................... 12, 32

*Gordon v. Cnty. of Orange*, 888 F.3d 1118 (9th Cir. 2018) ......................................................... 3

*Gray v. Kuhn*, 2024 WL 4719568 (D.N.J. Nov. 8, 2024).......................................................... 30

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003)..................................................... 25, 26

*Hubbard v. Taylor*, 399 F.3d 150 (3d Cir. 2005)........................................................................... 3

*Johnson v. Medlock*, No. CIV.A. 09-234, 2011 WL 311359 (W.D. Pa. Jan. 28, 2011)............. 5, 8

*Johnson v. Stempler*, 373 F. App'x 151 (3d Cir. 2010) ............................................................... 12

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015)............................................................................... 3

*Long v. Annucci*, 2023 WL 8602053 (N.D.N.Y. 2023).............................................................. 30

*Marks v. Colo. Dep't of Corr.*, 976 F.3d 1087 (10th Cir. 2020) ......................................... 25, 26

*Miranda v. Cty. of Lake*, 900 F.3d 335 (7th Cir. 2018) ................................................................ 4

*Montanez v. Price*, 154 F.4th 127 (3d Cir. 2025) ................................................. 25, 26, 27, 31

*Moore v. Luffey*, 767 F. App'x 335 (3d Cir. 2019) ....................................................................... 4

*Moy v. DeParlos*, 2023 WL 3717517 (3d Cir. 2023) .................................................................... 4

*Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003)............................................ 4

*Nunes v. Massachusetts Dept. of Correction*, 766 F.3d 136 (1st Cir. 2014) ............................... 30

*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 118 S. Ct. 1952 (1998).......................... 27

*Pearson v. Prison Health Serv.*, 850 F.3d 526 (3d Cir. 2017)........................................................ 5

*Ponzini v. Monroe Cnty.*, No. 3:11-CV-00413, 2015 WL 5123720 (M.D. Pa. Aug. 31, 2015)... 12

*Prowel v. Wise Bus. Forms*, 579 F.3d 285 (3d Cir.2009)............................................................... 3

*Rouse v. Plantier*, 182 F.3d 192 (3d Cir. 1999) ............................................................................ 7

*Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023) ........................................................... 4, 5, 8

*Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720 (3d Cir. 1989) ............................. 13

*Young v. Beard*, No. CIV.A. 06-160, 2008 WL 2693860 (W.D. Pa. Apr. 4, 2008), *report and recommendation adopted as modified*, No. CIV.A. 06-160, 2008 WL 2693859 (W.D. Pa. June 30, 2008) ........................................................................................................................ 5, 8

*Williams v. Sec'y Pennsylvania Dep't of Corr.,* 117 F.4th 503 (3d Cir. 2024) ............... 27

**RULES**

Fed. R. Civ. P. 56(a) ........................................................................................................ 3

Fed. R. Civ. P. 56(c) ........................................................................................................ 3

**REGULATIONS**

28 C.F.R. § 35.108 ........................................................................................................... 26

28 C.F.R. pt. 35, App. A, 75 Fed. Reg. No. 178 at 56221 .............................................. 26

## I.    PROCEDURAL HISTORY

Plaintiffs Jacob and James Jung brought this case as Administrators of the Estate of Louis Jung, Jr [hereafter "Mr. Jung"], their father, who died of diabetic ketoacidosis while incarcerated in the Curran-Fromhold Correctional Facility (CFCF) within the Philadelphia Department of Prisons. This lawsuit was initiated on October 23, 2024 by the filing of a civil rights action pursuant to 42 U.S.C. § 1983. Dkt. 1. Plaintiffs' claims were based on failures to provide proper medical care and disability accommodations to Mr. Jung.

Constitutional medical care claims were brought under the Fourteenth Amendment to the U.S. Constitution against the City of Philadelphia, YesCare Corporation [hereafter "YesCare"], and against defendants Carney, Trivikram, Gay, and John Does. Pennsylvania state law medical malpractice claims were brought against YesCare, Trivikram, and Gay. Americans with Disabilities Act and Rehabilitation Act claims were brought against the City of Philadelphia. Failure to train or supervise staff in providing medical care or discipline staff who failed to provide proper medical care were brought against the City of Philadelphia and YesCare. Wrongful Death and Survival Action claims were brought against all defendants. Dkt. 1 at ¶¶ 151-181.

The City of Philadelphia defendants filed a motion to dismiss on December 23, 2024. Dkt. 14. The motion was granted in so far as Plaintiffs complaint purported to bring medical malpractice claims against the City of Philadelphia and defendant Carney, but dismissed with prejudice in all other respects. Dkt. 17.

Following initial discovery, Plaintiffs filed a First Amended Complaint. Dkt. 25. The First Amended Complaint removed the Doe defendants and added four additional defendants: Mariesha Apollon, Blair Cabellos, Gena Frasier, and Wanda Bloodsaw. *Id*. at ¶¶ 9-12. All four defendants were sued for violations of the Fourteenth Amendment and under the Wrongful Death and Survival

1

Action counts. *Id*. at ¶¶ 161-164, 182-192. Pennsylvania state law medical malpractice claims were brought against defendants Apollon and Cabellos. *Id*. at ¶¶ 165-168.

Defendant Apollon filed a motion to dismiss on May 1, 2025. Dkt. 35. The Court denied that motion on May 22, 2025. Dkt. 42.

City of Philadelphia Defendants moved for summary judgment on December 5, 2025.

## II.    FACTUAL BACKGROUND

Plaintiffs' hereby incorporate the facts included in their Responsive Concise Statement and Counter Statement of Facts filed along with this brief.

## III.    STATEMENT OF QUESTIONS INVOLVED

1. Whether evidence that Defendants Frasier and Bloodsaw were aware that Mr. Jung was in need of medical care in order to avert a substantial risk of serious harm precludes summary judgment on Plaintiffs' Fourteenth Amendment medical care claims against them at Count I.

2. Whether evidence that the City of Philadelphia and Defendant Carney maintained and were deliberately indifferent to customs that exposed incarcerated people to substantial risks of serious harm, and that these customs contributed to Mr. Jung suffering hyperglycemia, diabetic ketoacidosis, and death, establish disputes of material fact that defeat summary judgment at Count I.

3. Whether evidence that the City of Philadelphia failed to provide a reasonable accommodation to ensure Mr. Jung equal access to medical services precludes summary judgment on Plaintiffs' claims under the Americans with Disabilities Act and Rehabilitation Act at Counts III and IV.

4. Whether evidence that the City of Philadelphia failed to supervise its staff to ensure correctional officers performed their duties in identifying and responding to the emergency medical needs of incarcerated people precludes summary judgment on Plaintiffs' failure to supervise claim at Count V.

5. Whether Plaintiffs' Wrongful Death and Survival Claims must remain in the case because Defendants are not entitled to summary judgment on the other federal and state law claims against City Defendants.

## IV.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir.2009). To defeat summary judgment, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is only "genuine" for purposes of summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## V.    ARGUMENT

### A. Evidence that Defendants Frasier and Bloodsaw were aware that Mr. Jung was in need of medical care in order to avert a substantial risk of serious harm and failed to take reasonable measures establish disputes of material fact that defeat summary judgment.

As a pretrial detainee, Mr. Jung's claims related to the denial of adequate medical treatment fall under the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Hubbard v. Taylor*, 399 F.3d 150, 167 n.23 (3d Cir. 2005) (*citing Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861 (1979)). Supreme Court precedent, the clear weight of sister circuit authority, and several decisions from the Third Circuit indicate that *Kingsley v. Hendrickson* sets as the proper inquiry for a constitutional claim brought by a pretrial detainee whether the defendant's actions were "objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Five circuit courts have held that an objective analysis applies to pretrial detainees' claims of deliberate indifference to serious medical needs. *Charles v. Orange Cnty.*, 925 F.3d 73 (2d Cir. 2019); *Gordon v. Cnty. of Orange*, 888 F.3d 1118 (9th Cir. 2018);

*Miranda v. Cty. of Lake*, 900 F.3d 335 (7th Cir. 2018); *Short v. Hartman*, 87 F.4th 593, 605–06 (4th Cir. 2023); *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 596 (6th Cir. 2021).[1] While this question has never been squarely addressed by the Third Circuit, it has repeatedly acknowledged that *Kingsley* may require reassessment of the deliberate indifference inquiry's subjective prong for cases brought by pretrial detainees. *Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019); *Moy v. DeParlos*, 2023 WL 3717517, at *1 (3d Cir. 2023); *see also Hightower v. City of Philadelphia*, 130 F.4th 352, 356 (3d Cir. 2025) (acknowledging that question of whether subjective prong is required for analysis of certain Fourteenth Amendment pretrial detainee cases is unsettled). The *Kingsley* "objectively unreasonable" standard should apply in this case.

However, record evidence could result in a jury finding Defendants Bloodsaw and Frasier liable under a heightened standard of subjective deliberate indifference. Under this standard, the "evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (applying test from *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976)). The subjective prong of deliberate indifference, adopted from the Eighth Amendment, requires that the defendant officer knows of and disregards a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994).

As the Defendants themselves point out, 'a non-medical prison official' cannot 'be charge[d] with the Eighth Amendment scienter requirement of deliberate indifference' when the

---

[1] These cases reframe the standard for deliberate indifference as "something akin to reckless disregard," *Brawner*, 14 F.4th at 596, *Charles*, 925 F.3d at 33-34, *Miranda*, 900 F.3d at 354-53, *Gordon*, 888 F.3d at 1125; or "civil recklessness," *Short*, 87 F.4th at 611: that the defendant "knew, *or should have known*, that the conditions posed an excessive risk to [the plaintiff's] health or safety." *Charles*, 925 F.3d at 87. *See also Short*, 87 F.4th at 611 ("the plaintiff must show that the defendant should have known of that condition and that risk"); *Gordon*, 888 F.3d at 1124-25 ("the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious").

'prisoner is under the care of medical experts' *and the official does not have 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" Pearson v. Prison Health Serv*., 850 F.3d 526, 543 (3d Cir. 2017) (internal citations omitted; emphasis added). There are well-recognized limits to correctional officers' ability to rely on medical staff when the need for care is subjectively apparent to them from their training or their common sense. Defendants helpfully point to *Short*, 87 F.4th at 613-14, which provides that "if someone were lying on the ground, gasping for air, and clutching their chest, we wouldn't require them to tell the prison official 'I am having a heart attack right now' before concluding that the prison official should have taken action."[2] *Also compare Johnson v. Medlock*, No. CIV.A. 09-234, 2011 WL 311359, at *9 (W.D. Pa. Jan. 28, 2011) (correctional officers not entitled to rely on treating medical staff when the decedent's "screaming, crying out and moaning" was "behavior [that] would have alerted the corrections officers to the fact that [he] needed medical attention") *with Young v. Beard*, No. CIV.A. 06-160, 2008 WL 2693860, at *9 (W.D. Pa. Apr. 4, 2008), *report and recommendation adopted as modified*, No. CIV.A. 06-160, 2008 WL 2693859 (W.D. Pa. June 30, 2008) (correctional officers entitled to rely on medical expertise for determination of "whether a special diet for any particular prisoner is needed or not").

> ### i. A jury could easily find that Defendant Frasier knew of and disregarded a substantial risk of serious harm to Mr. Jung.

There is abundant evidence in the record from which a jury could determine the following: that Defendant Frasier was aware that Mr. Jung was in distress, requesting medical attention, and unable to move on November 5, 2023; that Defendant Frasier knew that Defendant Cabellos

---

[2] *Short* is one of the representative cases cited above wherein a sister circuit adopts the objective *Kingsley* test. We welcome Defendants' receptivity to this line of precedent. This particular passage appears in *Short* under an Eighth Amendment subjective analysis, presented in the alternative to hold that the plaintiff stated a claim under either standard.

provided no medical care to Mr. Jung because she observed their interaction; that Defendant Cabellos told Defendant Frasier to call a stretcher immediately or in the event that Mr. Jung continued complaining of pain; that Defendant Frasier then left Mr. Jung unattended for nine minutes; that Defendant Frasier knew that Mr. Jung was dragged back into his cell without being provided any care; that Defendant Frasier then did not properly check on Mr. Jung for the rest of her shift, including after he did not exit his cell to receive insulin. Evidence of the foregoing readily dispenses with Defendant Frasier's motion for summary judgment.

Contrary to Defendant Frasier's version of putatively undisputed facts, there is conflicting testimony in the record as to whether Defendant Cabellos told Defendant Frasier to call a stretcher. In Defendant Cabellos' signed interview with PDP Investigator Shawn Jay, she contended that she told the correctional officer with her to call a stretcher because Mr. Jung had stated he that he needed help to get up. RCS ¶ 13. In Defendant Cabellos' deposition, she contended that she told the correctional officer with her to call a stretcher "if he continued to complain of pain." *Id.* at ¶ 15. A fact-finder could believe that Defendant Cabellos's signed interview statement, which recognized that Mr. Jung was in need of immediate medical attention, is more credible than her deposition statement, which was provided after she was sued for failing to provide care for Mr. Jung. Whether a defendant has incentive to alter their story so as to attempt to evade liability, in this case by attempting to undermine the notion that she knew Mr. Jung needed care on November 5, 2023, is a textbook credibility determination that cannot be resolved at summary judgment. *See Liberty Lobby*, 477 U.S. at 255, 106 S. Ct. at 2513 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). If the jury credits Defendant Cabellos' earliest account, that she told Defendant Frasier to call a stretcher for emergency aid immediately, then Defendant Fraiser knowingly

disregarded a direct indication from a nurse that emergency medical aid was immediately necessary. This is quintessential deliberate indifference. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) ("We have found 'deliberate indifference' in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it").

If the jury credits the notion either that Defendant Cabellos told Defendant Frasier to call a stretcher only if Mr. Jung continued to complain of pain, or said nothing at all about a stretcher, Defendant Frasier still acted in knowing disregard of a serious medical need. Defendant Frasier does not dispute that "Mr. Jung was asking to see a medical provider." RCS ¶ 11. Defendant Frasier's training prepared her to independently recognize signs of medical emergency applicable to Mr. Jung's crisis on the morning of November 5. Defendant Frasier was trained in PDP policy that specifically notes whether a person is "able to ... walk" is part of an assessment as to medical emergencies. *Id.* at ¶ 55. She knew that Defendant Cabellos conducted no "assessment of ... the person" requesting medical attention and lying on the floor, which she had been trained to know was a "critical" response to "any emergency." *Id.* at ¶ 54. Mr. Jung was lying on the floor in front of her, and remained immobile for nine minutes between the point that she left him at the doorway to his cell and the point that she handed gloves to the incarcerated people who would drag him in. *Id.* at ¶¶ 59, 65-67.[3] Defendant Frasier authorized Mr. Jung's cellmate Anton Walker to move out of his cell, leaving Mr. Jung alone. *Id.* ¶ 60. According to a signed statement given to PDP investigator Lt. Shawn Jay, Anton Walker told Defendant Frasier that he wanted to be moved because his cellmate, Louis Jung, was vomiting and urinating in their shared cell. *Id.* ¶ 61. A jury could easily find that Mr. Jung displayed symptoms – his altered mental status or confusion

---

[3] Gloves are required to be worn under PDP policy by staff and incarcerated workers when coming into contact with blood, bodily fluids, and non-intact skin. PDP Policy 4.E.22, Medical Waste.

consistent with diabetic emergency, the potentially life-threatening nature of his diabetes, vomiting and uncontrolled urination, and above all his status as lying prone and immobile on the floor – that were more consistent with the obvious crisis described in *Short*, 87 F.4th at 613-14, and *Johnson*, 2011 WL 311359, at *9, than with *Young*, 2008 WL 2693860.

There is also record evidence that Defendant Frasier was subjectively aware that Mr. Jung was an insulin-dependent diabetic. At 4:49 PM on November 5, 2023, hours after Mr. Jung was dragged into his cell, Defendant Frasier entered into PDP's electronic logbook, Lock & Track, that Mr. Jung refused insulin. RCS ¶ 74. Defendant Frasier testified that her practice for alerting inmates of insulin on the block was to "yell it out on the pod … depend on if I'm like, behind my desk or where the speaker is, I can say, 'Insulin or Accu-Chek' in progress.' Or I can just yell it, 'Insulin, Accu-Chek in progress.' I'll have the list in front of me of, I'm guessing, who's going to receive the insulin… I don't have to go to every door on the block; I only – I would listen out for who's telling me they want to get it and who wants to come out and get it." *Id.* at ¶ 75.

There is no evidence that Defendant Frasier had any interaction with Mr. Jung at the time of this ostensible "refusal;" rather, video evidence reflected that "at no time did [Defendant Frasier] go to his cell to let him out for Insulin and Accu-check, nor did it appear that [Defendant Frasier] received any indication of his refusal, as [Defendant Frasier was] observed watching TV in the dayroom." RCS ¶ 76. At the time of this "refusal," Defendant Frasier was aware that Mr. Jung had been prone and immobile on the floor earlier in the day; had been dragged into his cell by two other incarcerated people; and had not shown up for his scheduled insulin. Her training prepared her to know that diabetic emergencies were associated with confusion, agitation, and uncontrolled urination, and "may result in loss of consciousness or death." *Id.* at ¶¶ 52-53. Because she knew the risks of diabetic emergencies, because she knew that Mr. Jung had been lying on the floor until

dragged into his cell hours earlier, and because the only available account of this "refusal" reflects a complete lack of individual attention, a jury could easily conclude that Defendant Frasier willfully ignored Mr. Jung's need for medical care – that she knew of, and disregarded, a substantial risk of serious harm. *Farmer*, 511 U.S. at 837.

Defendant Fraiser was on duty as a housing officer until the late evening of November 5, 2023. Her final entry into Lock&Track was marked at approximately 11 PM. RCS ¶ 77. Defendant Frasier's training as a housing officer informed her of duties to maintain "continual observation" and perform headcounts attentive to "flesh and movement." *Id.* at ¶ 56. Defendant Frasier was clearly aware of the life-and-death implications of attentive rounds, as she made an entry into Lock&Track on the morning of November 5, 2023 noting that "all I/P's apprears [sic] alive." *Id.* at ¶ 58. If the jury credits Defendant Cabellos' deposition account of the facts, on which Defendant Frasier relies in her briefing, Defendant Frasier would have been aware that a medical professional told her to call a stretcher for emergency aid if Mr. Jung "continued to complain of pain." *Id.* at ¶ 15. The jury could find that Defendant Frasier made no effort to determine whether Mr. Jung was alive, in pain, in need of insulin, or otherwise in crisis for the entirety of her shift on November 5, 2023 after she abandoned Mr. Jung in the doorway of his cell. A jury could easily find that despite knowing that he was prone, lying on the floor until dragged into his cell in the morning; despite knowing that he required insulin and received none at 4:49 PM; and despite possibly knowing that a nurse told her an emergency stretcher would be necessary if he "continued to complain of pain," Defendant Frasier made no effort to determine whether Mr. Jung was alive or well for the rest of her shift. Defendant Frasier knew of multiple factors that raised a substantial risk of serious harm to Mr. Jung, and disregarded each of them. *Farmer*, 511 U.S. at 837. He was indisputably dead by 7:00 AM the next day. *Id.* at ¶¶ 22-23.

Defendant Frasier's motion for summary judgment must be denied.

> ii. **A jury could easily find that Defendant Bloodsaw knew of and disregarded a substantial risk of serious harm to Mr. Jung.**

Defendant Bloodsaw arrived at Mr. Jung's cell on B1Pod3 nine minutes after Defendant Frasier left him on the ground. RCS ¶ 63. He remained immobile and on the floor for these nine minutes. *Id.* Defendant Bloodsaw then stood by as two incarcerated workers wearing blue gloves picked him up and dragged him back into his cell. *Id.* at ¶ 67. Defendant Bloodsaw secured his cell door and walked off the unit. *Id.* at ¶ 68.

Characterizing that Defendant Bloodsaw "does know that it was not possible that someone told her to call a stretcher on November Fifth and she failed to do so, because her training would have prompted her to act differently than she did on November 5, 2023," RCS ¶ 21, as an undisputed fact is patently absurd. Defendant Bloodsaw is on video overseeing two incarcerated people dragging Mr. Jung into a cell. She has given sworn testimony that this action was "not normal protocol." *Id.* at ¶ 68. She was found to have violated five PDP policies during this incident. *Id.* at ¶ 69. Defendant Bloodsaw was demonstrably willing to deviate from proper procedure as trained, despite actual subjective knowledge that doing so was "not normal protocol," on November 5, 2023.

More fundamentally, the untenable implication that Defendant Bloodsaw could not have been instructed to call a stretcher misses the point. Defendant Bloodsaw's training also prepared her to independently recognize obvious signs of medical crisis. As with Defendant Frasier, Defendant Bloodsaw's training prepared her to "recognize an emergency," that an "altered mental status is an important warning sign of a potentially life-threatening condition," and that "assessment of the scene & the person is critical in any emergency;" that whether a person is "able to speak/walk" is part of an assessment as to medical emergencies; that signs and symptoms of

"diabetic emergencies" include "agitation," being "confused," being "drowsy," and "urination," and the fact that such emergencies "may result in loss of consciousness or death;" and in the difference between the "Disciplinary Process" (in which "any violation of the rules and regulations set forth will be followed up with an incarcerated person misconduct report") and "Medical Services." RCS ¶¶ 52-57. Defendant Bloodsaw oversaw incarcerated workers wearing gloves drag Mr. Jung into his cell; around the same time, Anton Walker was complaining to Defendant Frasier of vomit and urine, asking to be moved. *Id.* at ¶¶ 61, 67. A jury could infer from these facts that Defendant Bloodsaw saw or smelled traces of these bodily fluids, another sign of medical emergency that she had been trained to recognize. Mr. Jung's presentation to Defendant Bloodsaw – prone on the floor in the doorway of his cell, where he had been left unattended for nine minutes prior to her arrival – is more than sufficient to create a dispute of fact, specifically regarding whether Defendant Bloodsaw knew that he was at a substantial risk of serious harm if he did not receive medical attention.

A jury could also find that Defendant Bloodsaw was also informed that Defendant Cabellos said a stretcher should be called. Defendant Bloodsaw claims to remember nothing with respect to her interactions with Defendant Frasier or Mr. Jung on November 5. RCS ¶ 20. A jury may credit Defendant Cabellos' initial account, however, that she told Defendant Frasier to call a stretcher immediately, and the jury could then draw the inference that Defendant Frasier communicated this need to Defendant Bloodsaw and she willfully ignored it. However, this chain of inferences is not necessary. Whether or not Defendant Bloodsaw received any direct communication about stretcher calls, she was subjectively aware of enough information to independently come to the conclusion that failing to call for medical aid created a risk of serious harm.

Defendant Bloodsaw is not entitled to summary judgment.

**B. Evidence that the City of Philadelphia and Defendant Carney maintained and were deliberately indifferent to customs that exposed incarcerated people to substantial risks of serious harm, and that these customs contributed to Mr. Jung suffering hyperglycemia, diabetic ketoacidosis, and death establish disputes of material fact that defeat summary judgment.**

The obligation of the government to provide medical care to those in the custody of its jails is non-delegable. *See Johnson v. Stempler*, 373 F. App'x 151, 154 (3d Cir. 2010) (citing *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 705–06 (11th Cir.1985); *Ponzini v. Monroe Cnty.*, No. 3:11-CV-00413, 2015 WL 5123720, at *10 (M.D. Pa. Aug. 31, 2015); *Est. of Borroto v. CFG Health Sys., LLC*, 751 F. Supp. 3d 443, 473 (D.N.J. 2024) (collecting cases).

A § 1983 claim against a municipality "may proceed in two ways. A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (cleaned up).

Municipal defendants are liable when they show customs or practices that result in injuries to plaintiffs, where policymakers were deliberately indifferent to and did nothing in the face of such knowledge to change it. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 971-72 (3d. Cir. 1990) (custom "may also be established by evidence of knowledge and acquiescence"). An "affirmative link can be drawn between a custom and the alleged constitutional violation by showing that (1) the municipality or its final policymaker(s) knew that similar unlawful conduct had occurred in the past, (2) but failed to take precautions against future violations, and (3) these failures contributed to the plaintiff's injury." *Chambers v. City of Philadelphia*, No. CV 23-0137, 2024 WL 870574, at *4 (E.D. Pa. Feb. 29, 2024) (*citing Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)).

12

Municipal defendants are also liable when they fail to adopt policies or "sufficient procedural or technical safeguards" against errors of constitutional magnitude. *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (gathering Third Circuit cases that apply the failure-to-train framework to "other claims of liability through inaction"). Failure to adopt necessary safeguards is considered deliberate indifference "where the failure has caused a pattern of violations," or where violation of federal rights is a "highly predictable outcome" or "the obvious consequence of the policymakers' choice" not to adopt such procedures. *Id.* (*citing Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 398, 117 S. Ct. 1382, 1385 (1997)).

Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (*citing Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). Individual defendants may also be liable in their supervisory capacity if they, "as the person in charge, had knowledge of and acquiesced in [their] subordinates' violations." *Id.* (*citing Baker v. Monroe Township*, 50 F.3d 1186, 1190-91 (3d. Cir. 1995)).

> i. **The City of Philadelphia had a custom of failing to audit, monitor, and correct deficiencies in the care provided to diabetic patients, including Louis Jung, Jr..**

A jury could find that the City and Defendant Carney knew of and acquiesced in YesCare's custom of insufficient care for diabetic patients at the PDP, *Beck*, 89 F.3d at 971-92, and that the City and Defendant Carney failed to implement sufficient procedural safeguards to audit, monitor, or correct known deficiencies in YesCare's treatment of diabetic patients, *Berg*, 219 F.3d at 276.

There were over sixty hospitalizations for hypoglycemia or hyperglycemia from the PDP between the years 2020 and 2023. RCS ¶ 109. Six of these hospitalizations were Mr. Jung alone. He was hospitalized for diabetic ketoacidosis on December 20, 2021; April 7, 2022; January 8, 2023; January 23, 2023; and March 11, 2023, with a final hospitalization for hyperglycemia on March 19, 2023. *Id.* at ¶ 80.

Mr. Jung's medication administration records contain hundreds of "not documented" entries for insulin and blood sugar checks, and dozens more entries of "no show" or "refusal." RCS ¶ 81; *see also* Ex. 6, Venters Report at 6. Excluding days on which he was hospitalized, Mr. Jung's medication administration record (eMAR) for dates he was under PDP's care from December 16, 2021 through October 31, 2023 contains 424 entries of "not documented," 42 entries of "no show," and 21 entirely blank cells for "Accu-Check" blood sugar checks; and contain 377 entries of "not documented," 57 entries of "no show," and 30 entirely blank cells for insulin administrations (Humulin, Humalog, Novolin, and/or Semglee). RCS ¶ 81.[4]

Mr. Jung's eMAR contains 98 entries of "refused" for Accu-Checks, and 116 entries of "refused" for insulin. RCS ¶ 81. Despite policy requiring each refusal to be documented on a form after a face-to-face encounter, to ensure that patients are counseled on the risks of refusals, his electronic medical records contain only 61 refusal forms documenting refusal of insulin or blood sugar checks. *Id.* at ¶¶ 82-83. None of the refusal forms pertaining to insulin administration contain a signature from Mr. Jung. RCS ¶ 84. Five forms are missing a primary signature by a medical staff witness. *Id.* at ¶ 85. Three contain the handwritten phrase "refusal as per C/O," reflecting that Mr. Jung did not directly communicate with a nurse or other medical staff while ostensibly refusing a critical medication. *Id.* at ¶ 86; *see also* Ex. 4, Roscoe Report at 4. Mr. Jung was recorded as

---

[4] Additionally, Mr. Jung's electronic medication administration records for the months of September 2022 and November 2023 could not be located in the health records provided by either PDP or YesCare.

"refusing" an accu-check and insulin administration on at least one date that he was hospitalized and absent from PDP. *Id.* at ¶ 87.

Within Mr. Jung's case and those of other insulin-dependent diabetics hospitalized after extensive stays at CFCF, medication administration records in the immediate lead-up to hospitalizations for diabetic complications reflect a consistent lack of documentation or non-administration of insulin doses and blood sugar checks.

- Mr. Jung was hospitalized on January 23, 2023 for hyperglycemia. His medication administration record for the three days leading up to his hospitalization only show two documented administrations of insulin, on the mornings of 1/20 and 1/21; the rest of his MAR for blood sugar checks or insulin doses in these three days reflect refusals (with no refusal forms), "not documented," or "no show." RCS ¶ 110; Ex. 14, Venters Report at 6-7.

- Mr. Jung was hospitalized for diabetic ketoacidosis on March 11, 2023. His medication administration record for insulin and blood sugar checks in the week leading up to this hospitalization reflects five "no shows", three "not documented", and five refusals. Only three refusal forms are present, none of them signed by Mr. Jung. RCS ¶ 111; Ex. 14, Venters Report at 6, 8.

- "Patient 1" was hospitalized three times for diabetic complications while under the care of YesCare/Corizon and PDP's CFCF. In the 11-day period leading up to his most recent hospitalization on August 24, 2022, his medication administration record for blood sugar check contained an entry of "not documented" for 19 of 44 checks. His medical records reflect a telephone call about his blood sugar level being at 508 ten days before this hospitalization, but contain no corresponding Nursing Encounter Tool for hyperglycemia. RCS ¶ 112; Ex. 14, Venters Report at 11-12.

- "Patient 3" was hospitalized for diabetic complications on May 25, 2022 while under the care of YesCare/Corizon and PDP's CFCF. In the 11-day period leading up to this hospitalization, his medication administration record contains entries of "not documented" for 13 of 22 blood sugar checks. RCS ¶ 113; Ex. 14, Venters Report at 12-13.

- "Patient 4" was hospitalized for diabetic complications on January 12, 2023 while under the care of YesCare/Corizon and PDP's CFCF. In the 11-day period leading up to this hospitalization, his medication administration record reflects an entry of "not documented" for 8 of 22 blood sugar checks. A week before this hospitalization, his medical records reflect a "stretcher call" for a hypoglycemic episode where the patient was unable to respond to questions. He was given a tube of glucose gel and two sugar packets. His medical records do not reflect any further encounters with medical providers between this episode and his hospitalization. RCS ¶ 114; Ex. 14, Venters Reports at 13.

15

PDP implemented a patchwork of electronic medical record systems wherein documentation was systematically inconsistent and incomplete. PDP's Request for Proposals for Provision of Prison Physical and Behavioral Health Care Services required any "Successful Applicant" to have and use the PDP's prior-established electronic medical record program, eClinicalWorks (eCW). RCS ¶ 88. Corizon, YesCare's predecessor, responded to the RFP while noting that "no other corrections client currently uses eCW." *Id.* at ¶ 89. YesCare/Corizon represented that it would partner with Health Care Systems (HCS) to deploy an Electronic Medication Administration Record (eMAR) system within the PDP and implement "enhanced documentation and access to treatment information for our patients for routine treatments, such as blood glucose checks." *Id.* While YesCare assumed responsibility for integrating documentation systems, "at the end of the day PDP owns the medical record." *Id.* at ¶ 90(a).

PDP owned and operated an electronic medical record that systematically excluded information critical to any insulin-dependent diabetic patient's daily care – their blood glucose levels, their corrective insulin dosages, and all too often, the crucial fact of whether the blood glucose checks or insulin was even administered in the first place. With the exception of a handful of handwritten blood glucose flowsheets, the last of which is dated July of 2022, there is no indication in Mr. Jung's electronic medical record of what his blood sugar was at the time it was checked, or the corrective insulin dosage administered. RCS ¶ 91. The maintenance of several, parallel electronic systems rendered even the fact of whether a blood glucose check was performed at all, let alone the glucose level or the insulin dosage, impossible to track efficiently. Dr. Trivikram, YesCare's 30(b)(6) deponent, testified that the enormous number of "6 – not documented" entries in any diabetic patient's record may or may not be explained by the simultaneity of two incompatible electronic systems: when an insulin dosage or blood sugar check

was not documented within the eMAR, a provider would "have to go back to the individual dates and see if it was administered." *Id.* at ¶ 90(b). YesCare and PDP staff both testified to a patchwork of systems that were known to have glitches and inconsistencies at the time of Mr. Jung's death.[5] When the electronic system *was* fully operational and handwritten sheets were not in use, blood glucose levels and corrective insulin dosages never made their way into the electronic medical record that PDP owned. Dr. Trivikram summarized the state of documentation at PDP as "an imperfect system." *Id.* at ¶ 90(b).

In the years leading to Mr. Jung's death, a cursory review of the electronic medical record of Mr. Jung or other patients hospitalized for diabetic complications would have uncovered this systemic problem. As summarized by Plaintiffs' expert Dr. Venters: "Another systemic failure is the lack of automatic recording of blood glucose values into the medical record of a patient. Any medical exam or test result obtained as part of a patient's care must be included in their medical records. These results are commonly included in flow sheets for vital signs and other basic diagnostic tests that can be reviewed in trends over time… The need for a medical record that includes a patient's diagnoses, diagnostic tests, flow sheets of significant findings and treatments and other basic elements is one of the essential standards of the National Commission on

---

[5] PDP's 30(b)(6) deponent, Sandy Varghese, testified that glucose levels are "documented in the eMAR which is the electronic system. But right now there was an upgrade. And I think the eMAR is not talking to our ECW system or something. We did an upgrade and something is not working right." RCS ¶ 90(a). YesCare's 30(b)(6) deponent, Dr. Lalitha Trivikram, testified that an Accu-Chek may be "documented in a separate area and the nurse did not sign her initials to have done the Accu-Chek." In the event a glucose check was entered into a separate area, she did not know whether it would be "pulled and put in to the chart." *Id.* at ¶ 90(b). YesCare's Director of Nursing, Marsha Jeoboham, testified first that "not documented means that the medication was not administered," but then clarified that under the system operational at PDP administered medication "should be in the MAR," but "not documented" "could possibly mean that the medication administration wasn't charted or it could be that it was just not documented on this specific MAR … if there was an issue with the MAR, then you could document it in eCW … if there was a duplicate, it could be on there as well. I don't know why it would be a duplicate." *Id.* at ¶ 90(c).

Correctional Health Care. In the case of diabetes, tracking blood sugar values together with patient insulin regimen and HbA1C is critical for assessing glycemic control." Ex. 4, Venters Report at 21. "One of the mandated tasks in the YesCare Clinical Pathways document for diabetes was review of prior blood sugars and weekly review of blood glucose logs by a provider. This type of review was nearly impossible given the lack of clarity about whether these results were located and also given how prevalent the problem of accuchecks simply not occurring was. This is exactly the type of systemic problem that County oversight should have detected because it seems to reflect an interaction between how their vendor provided care, how the electronic medical record stored or recorded blood sugar results, and how workflows for nursing and medical staff intersected." *Id.* at 25.

The basic, daily medical treatment of diabetic patients at PDP was not subject to any regular monitoring or auditing. Prior to Mr. Jung's death, YesCare performed no audits of insulin administration, RCS ¶ 103; performed no audits of ostensible "refusals," *Id.* at ¶ 107; and performed no audits of the "red flag" system for provider follow-up after individuals missed "critical medications" such as insulin, *Id.* at ¶ 105. The City was aware that YesCare conducted *some* audits of diabetic care, but never reviewed these audits to see if they tracked basic, necessary information such as insulin administration or blood sugar checks; which, they did not. *Id.* at ¶¶ 40, 103-105. The City never conducted an independent audit of basic daily diabetic care. The City never audited insulin administration independently, and never audited its "red flag" system for provider follow-up after missed doses of "critical medications." *Id.* at ¶¶ 104, 106.

PDP did solicit regular audits of select aspects of its medical care from Western Correctional Consultants, LLC. While the auditor conducted high-level reviews of hospitalizations, tracking whether patients were treated in the emergency room or admitted for

longer-term care, the auditor did not evaluate whether systematic insufficiencies in YesCare's treatment of patients led to the need for hospitalization. RCS ¶ 117. Diabetes care was not an aspect of medical care for which PDP sought review with regularity. *Id.* at ¶ 38. Chronic care for diabetes was, however, included in an audit concluded in June of 2023. *Id.* at ¶ 118. The consultant discussed their findings with Defendant Carney. *Id.* at ¶ 116. After reviewing twelve patient records, the consultant found that "refusals of scheduled care was a prominent factor in several inmate patients maintaining poor diabetic control" and that "refusals were not found in the chart for all missed chronic care visits." *Id.* at ¶ 118. The consultant warned that "refusal of potentially life-saving treatment, such as diabetes care, should be witnessed by a medical provider in a medical setting. This infrequently happens. Many refusals for chronic care visits are not documented in writing at all." *Id.*

Despite this specific warning, the City undertook no additional review of YesCare's diabetic care, no additional review of its refusal processes as applied to diabetic care, and no review of its "red flag" system in the context of diabetes care. By the time that Mr. Jung returned to CFCF on October 27, 2023, the City had long been on notice that its incarcerated patients were being hospitalized for diabetic complications with stunning regularity, and that its electronic medical record system was systematically incomplete. Just four months before Mr. Jung returned, the City's final policymaker for the PDP, former Commissioner Carney, was put on notice of the insufficiency of the "refusal" process in PDP in the context of life-saving diabetic care. A jury could find that the City's failure to audit, monitor, or correct known deficiencies in YesCare's treatment of diabetes constituted a deliberately indifferent failure to adopt necessary safeguards in the face of a pattern of preventable diabetic medical emergencies. *Berg*, 219 F.3d at 276.

Mr. Jung's course of treatment from October 27, 2023 to November 6, 2023 was "highly predictable" given both the City's longstanding "pattern of violations" and the vacuum of appropriate oversight for basic, daily diabetic care. *Berg*, 219 F.3d at 276; *Bryan Cnty.*, 520 U.S. at 398. Mr. Jung's final days reflected a near-constant series of policy breaches and deviations from proper care, all consistent with previously occurring issues that the City systematically failed to monitor or address: multiple failures during the intake screening on 10/28; failure to complete a NET for a blood sugar for 585 on 10/29; failure to document an insulin dosage on 10/30; failure to complete a NET or document regular insulin for a blood sugar of 500 on 10/31; failure to obtain a refusal form or schedule a red flag for missed insulin on the morning of 11/1; failure to complete a NET or administer regular insulin for a blood sugar of 411 on the evening of 11/1; failure to schedule a red flag appointment for an insulin "no show" on 11/3; failure to document insulin on 11/4; failure to schedule a red flag appointment for an insulin "no show" on the morning of 11/5; and failure to obtain a refusal form on the evening of 11/5. RCS ¶¶ 119, 122-123. A jury could find that this course of care was consistent with customs of poor diabetes treatment well-established through prior years at PDP, and that the City acquiesced in these systemic failings.

The final insulin dose that Mr. Jung should have received before he died, on the evening of 11/5, mapped almost precisely onto the specific warning that final policymaker Defendant Carney received in June of 2023. As described above, the jury would be presented with evidence that this "refusal" was supposed to be communicated to medical staff by Defendant Frasier, a correctional staff member, after conducting no face-to-face encounter with Mr. Jung at all. Refusal of "potentially life-saving treatment, such as diabetes care" was not "witnessed by a medical provider in a medical setting," a standard that "infrequently happens" in the PDP. Despite knowing that this style of improper "refusal" was common in the PDP, neither Defendant Carney nor the

City took precautionary steps to monitor or ensure compliance with PDP policy. A jury could easily find that the customs of inadequate treatment, atrocious documentation, and the absence of oversight for daily diabetic care contributed to Mr. Jung's injuries and death. *Chambers*, 2024 WL 870574 at *4; *Est. of Roman*, 914 F.3d at 798.

> ### ii. The City of Philadelphia had a custom of failing to respond to the emergency medical care needs of incarcerated people within the Philadelphia Department of Prisons.

A jury could find that City and its final policymaker for the Department of Prisons, former Commissioner Blanche Carney, knew of and acquiesced in a custom of correctional officers failing to respond to medical emergencies, *Beck*, 89 F.3d at 971-92, and that the City and Commissioner Carney failed to implement sufficient procedural safeguards to correct known deficiencies in correctional officers' identification of and response to medical emergencies resulting in death, *Berg*, 219 F.3d at 276.

In its investigations of cases resulting in death from 2017 through 2023, the PDP Commissioner's Office of Special Investigations found fifteen separate cases in which correctional officers failed to identify or respond appropriately to medical crises in general population. The Office sustained charges against fourteen correctional officers for failing to render emergency aid to individuals in obvious medical crisis, and sustained charges against nineteen correctional officers for failing to make rounds or making rounds incapable of generating effective insights into the wellbeing of incarcerated individuals.

> a. In case SI-17-00235 (PICC 2017), the PDP Commissioner's Office of Special Investigations sustained charges against a Sergeant who "was on [the] unit multiple times throughout his shift, but did not conduct a tour of the unit;" another sergeant was "was on [the] unit, but did not conduct a tour;" and eight additional correctional officers for failing to conduct tours. RCS ¶126(a).
>
> b. In case SI-18-00014 (CFCF 2018), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who "did not notify her

immediate supervisor and did not call for medical assistance upon discovering" the deceased individual "unresponsive inside his cell." RCS ¶ 126(b).

c. In case SI-19-00088 (PICC 2019), the PDP Commissioner's Office of Special Investigations sustained charges against an officer because he "did not notify any supervisor, nor did he generate mental health referrals using Lock and Track (IJMS) for inmates he deemed to be in the state of crisis." RCS ¶ 126(c).

d. In case SI-19-00145 (CFCF 2019), the PDP Commissioner's Office of Special Investigations sustained charges against one officer for his "reluctance to take proper action by notifying the medical staff and his supervisor that" the deceased individual "was unresponsive after he did not respond to … commands to wake up," as well as another officer because he remained at the cell door "for approximately 90 seconds, and then entered the cell and remained in the cell for approximately 15 seconds," and then left the pod without notifying officers or any medical personnel that the deceased individual was unresponsive. RCS ¶ 126(d).

e. In case SI-20-00231 (PICC 2020), the PDP Commissioner's Office of Special Investigations sustained charges against two officers who "failed to tour the unit as per PDP policy," when "video proved that both officers were at the officer's desk when they were notified by an inmate of trouble." RCS ¶ 126(e)

f. In case SI-20-00045 (CFCF 2020), the PDP Commissioner's Office of Special Investigations sustained charges against one officer who arrived at the scene of a medical emergency, "did not check for a pulse, attempt CPR, or render any first-aid" as the deceased individual "was lying faced-down and unresponsive on the ground inside his cell;" another officer who "stood at the entrance" to the deceased individual's cell, "did not enter the cell to check for a pulse, attempt CPR, or render any first-aid;" and a third officer who "did not conduct any tours in any of the buildings throughout the 11:00PM-7:00AM shift." RCS ¶ 126(f).

g. In case SI-20-00149 (DC 2020), the PDP Commissioner's Office of Special Investigations sustained charges against a sergeant who "failed to tour all of her assigned areas and notate her tours in Lock & Track … during the 7AM to 3 PM shift." RCS ¶ 126(g).

h. In case SI-21-00225 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against one officer who "did not perform his 3:00 AM headcount;" of those rounds he did conduct, there was evidence that "many of the cell door windows were obscured, and no corrective action was taken … for a clear view into the cells," and he "did not render any aid (First aid/CPR) to" the deceased individual "for a total of 8 minutes prior to the arrival of medical personnel;" as well as another officer who "failed to render CPR/First Aid" to the deceased individual "for a total of four (4) minutes;" as well as another officer who failed to tour the unit during the shift in which this individual died. RCS ¶ 126(h).

i. In case SI-21-00234 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who "did not conduct proper

tours and headcounts during his shift in accordance with PDP policy and procedures." RCS ¶ 126(i).

j.  In case SI-21-00003 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against two officers after video showed "that an inmate was trying to get the attention of both C/Os" and both "continued on … neither officers appeared to alert anyone of what may have been going on inside with [the deceased individual] who was later discovered unresponsive;" and another officer who "waited approximately two minutes before he attended to" the deceased individual's medical emergency "after being alerted by another inmate." RCS ¶ 126(j).

k.  In case SI-21-00059 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against one officer who "failed to tour the unit as per PDP policy," but "remained behind the officer's desk in a reclined position for most of his shift;" and a Sergeant for permitting the officer to "leave [the pod] unattended to go to his next post … without sending anyone to conduct tours on the unit due to his absence." RCS ¶ 126(k).

l.  In case SI-21-00106 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who "logged 'OKTOUR' in the electronic logbook without conducting physical tours" at three points during the night of the death, "did not conduct any physical tours of the unit," and "video footage shows that [he] remained behind the Officer's desk seated in a reclined position." RCS ¶ 126(l).

m.  In case SI-21-00027 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who "did not conduct her initial tour or initial headcount of the unit upon arrival." RCS ¶ 126(m)

n.  In case SI-22-00105 (CFCF 2022), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who was observed on video "leaving [the] IP … unattended as he walked away from [the] IP … who appeared to be having a medical emergency," and "did not initiate any aid (CPR) during their interactions with [the] IP … during his medical emergency." RCS ¶ 126(n).

o.  In case SI-23-00055 (CFCF 2023), the PDP Commissioner's Office of Special Investigations sustained charges against one officer who was witnessed on video entering the deceased individual's cell and "at no time performing chest compressions;" another officer observed on video "looked into the cell and then walked off the unit, and at no times did she perform chest compressions;" and another officer who "arrived on the unit and stated that he did not see anyone doing, nor did he perform chest compressions (CPR)." RCS ¶ 126(o).

In each of the above cases, correctional officers were tasked with being the front line for identification and response to medical emergencies in general population. With respect to round-related charges, correctional staff failed to observe a lethal emergency in the first instance, either

by failing to make required rounds or by making rounds insufficiently attentive to individuals within their cells. In other cases, correctional staff *did* observe emergencies, but then failed to render necessary emergency aid or call for medical assistance. In all instances, the PDP's reliance on correctional staff as the front line for identifying and responding to medical emergencies broke down. As concluded by Plaintiffs' expert Dr. Venters, "These types of documented failures should have prompted the County to implement auditing of nonfatal medical emergencies to track and improve routing monitoring and emergency responses. This knowledge should have also triggered auditing by the County of the infirmary referral process to ensure that patients who could suffer fatal outcomes when not properly cared for or monitored would be reliably sent for increased monitoring and care in the infirmary." Ex. 4, Venters Report at 25.

Defendant Carney reviewed every one of these reports. RCS ¶ 124. Defendant Carney never ordered refresher trainings for correctional officers on rendering emergency aid. *Id.* at ¶ 127. Defendant Carney also cannot produce evidence that she instructed supervisory staff to address systemic problems with officer rounds such as increasing their presence on the housing units or requiring enhanced monitoring and reporting of round completion by supervisory staff. A jury could easily find that the pattern laid out above of failing to identify or respond to emergencies constitutes a custom, and that Defendant Carney and PDP acquiesced in the pattern of failures.

Despite the demonstrated deficiencies of relying on correctional staff as the front line for medical care, neither Defendant Carney nor PDP ever considered placing patients with greater needs for medical care in the infirmary. RCS ¶ 128. The PDP's medical auditor reviewed infirmary practices to determine whether admission were "proper," "like somebody that needed to be there," but "has not specifically" looked at whether or not certain patients *should* be in the infirmary but are not placed there. *Id.* at ¶ 129. A jury could find that this represents a gross dereliction of

responsibility for ensuring that medically vulnerable, high-risk patients were not knowingly housed in areas that were demonstrated again and again to be more dangerous for individuals at risk of medical emergencies.

Mr. Jung's final day was again a "highly predictable outcome" in light of these "patterns of violations." *Berg*, 219 F.3d at 276. PDP's custom of correctional staff failing to identify or respond appropriately to medical emergencies remained in force. As briefed above, both Defendant Frasier and Defendant Bloodsaw ignored multiple signs of a medical emergency. Defendant Frasier left Mr. Jung on the floor. Defendant Bloodsaw had him dragged back into his cell. Defendant Frasier conducted rounds for the rest of the day without checking on Mr. Jung, and she documented a "refusal" of insulin without engaging with him face-to-face. As had been demonstrated time and again in the PDP, by the time Mr. Jung passed away, correctional staff proved unable or unwilling to effectively respond to medical crises.

Based on the foregoing, the City of Philadelphia and Defendant Carney are not entitled to summary judgment on Plaintiffs' Fourteenth Amendment claim.

### C. Evidence that the City of Philadelphia failed to provide a reasonable accommodation to ensure Mr. Jung equal access to medical services establish disputes of material fact that defeat summary judgment on Plaintiffs' claims under the Americans with Disabilities Act and Rehabilitation Act.

Liability under the Americans with Disabilities Act attaches to a government body "even when it contracts out the operation of their programs, services, or activities to third parties … Congress wanted to give people with disabilities an affirmative right to access *all* covered programs and services no matter *how* or *through whom* the government or federally funded entity elects to deliver them." *Montanez v. Price*, 154 F.4th 127, 149-151 and n.10 (3d Cir. 2025) (italics in original) (*citing, inter alia*, *Marks v. Colo. Dep't of Corr*., 976 F.3d 1087, 1097-98 (10th Cir. 2020) (explaining that the state prison "farm[ing] out operations to others ... would not prevent

liability" under the ADA or RA); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 286-87 (2d Cir. 2003) (holding that Section 504 imposes "supervisory liability" on states accepting federal funds to "guarantee that those it delegates to carry out its programs ... compl[y] with" the RA)); 28 C.F.R. pt. 35, App. A, 75 Fed. Reg. No. 178 at 56221 ("The power to incarcerate citizens rests with the State or local government, not a private entity. . . '[a]ll governmental activities of public entities are covered, even if they are carried out by contractors.'").

The City contends that Mr. Jung's ADA claim fails because "the contracted for services that the City hired YesCare to perform were specifically required to comply with the ADA." City's Brief in Support of Summary Judgment at 14; *see also* RCS ¶ 30. This is incorrect as a matter of law. The City's farming out of its medical services to YesCare does not absolve it of its responsibility to enforce the ADA's requirements. *Marks*, 976 F.3d at 1097-98 (*cited in Montanez*, 154 F.4th at 149 n.10). The language of the City's contract with its medical provider also provides no "guarantee" that the legal requirements of the ADA would be met. *Henrietta D.*, 331 F.3d at 286-87 (*cited in Montanez*, 154 F.4th at 149 n.10). As briefed below, a jury could easily find that they were not met in Mr. Jung's case.

"To state a claim for disability-based discrimination, a plaintiff must show that: (1) he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or other activities for which a public entity is responsible, or was otherwise subjected to discrimination by a public entity; (4) by reason of his disability." *Montanez*, 154 F.4th at 146.

The City does not dispute that Mr. Jung was a qualified individual as a pretrial detainee in custody of the City government, or that his diabetes was a qualifying disability. City's Brief in Support of Summary Judgment at 14; *see also Chisolm v. McManimon*, 275 F.3d 315, 325 (3d Cir.

26

2001) ("Title II of the ADA applies to services, programs and activities provided within correctional institutions" such as city and county jails); 28 C.F.R. § 35.108(d)(2)(iii)(H) (setting forth the principle that "Diabetes substantially limits endocrine functions" as a "predictable assessment" under ADA Title II); *Chmiel v. Pennsylvania Dep't of Corr.*, No. CV 18-1691, 2020 WL 1332830, at *9 (W.D. Pa. Mar. 23, 2020) (unpublished) (finding "diagnosis as a diabetic" to be qualifying disability for ADA claim); *Dietz v. Cnty. of Allegheny*, No. CIV.A. 10-1674, 2011 WL 3844177, at *5 (W.D. Pa. Aug. 30, 2011) (unpublished) (finding claim that plaintiff "suffers from a disability in the form of diabetes, was provided inadequate medical care by Allegheny County, developed severe ketoacidosis and, as a result, was unable to partake in prison programs or activities" to be cognizable against County).

As to the third prong of the ADA analysis, "health care is a quintessential service prisons must provide to prisoners." *Montanez*, 154 F.4th at 147; *see also Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210, 118 S. Ct. 1952, 1955, 141 L. Ed. 2d 215 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')"). "A plaintiff can meet the fourth element of a prima facie case—discrimination 'by reason of his disability'—by showing invidious discrimination or a failure to provide reasonable accommodations." *Montanez*, 154 F.4th at 148. Under the "reasonable accommodations" path to liability, it is well-settled that a "person with a disability may be the victim of discrimination precisely because she did not receive disparate treatment when she needed accommodation." *Williams v. Sec'y Pennsylvania Dep't of Corr.,* 117 F.4th 503, 529 (3d Cir. 2024) (internal citation omitted).

While in general population, Mr. Jung regularly suffered from poorly controlled, elevated glucose levels and hyperglycemia. Based on the findings of plaintiffs' experts, a jury could find that much of the behavior interpreted as "noncompliance" in Mr. Jung's records was itself attributable to symptoms of uncontrolled hyperglycemia. *See* Ex. 3, Williams Report at 6-7 ("Mr. Jung may have missed several Accu Check and insulin administrations because of his declining medical condition" and "incorrect answers … are consistent with someone with impaired cognition in the setting of marked hyperglycemia or DKA") and Ex. 4, Venters Report at 23 ("There is well-established confusion and overlap between refusals of care and patients with uncontrolled diabetes exhibiting behaviors that are actually a product of their disease complications", citing to the NCCHC journal *CorrectCare* for the proposition that "recognizing that the behaviors exhibited are related to the diabetes and not behavioral or noncompliance issues is essential and potentially lifesaving").

A jury could find that medical staff discriminated against Mr. Jung for his symptoms of diabetic hyperglycemia. This occurred very directly, as on May 20, 2023, when a YesCare provider adjusted his glucose checks from the four times per day recommended by Jefferson Hospital to two times per day: "current staffing does not allow for qid evaluations in the setting of this noncompliance." RCS ¶ 100; *see also Id.* ¶ 99, Ex. 24 Jung Medical Records Excerpts at YesCare 1326 (Jefferson Hospital After Visit Summary on March 14, 2023, noting that "you were in the hospital for DKA which is probably related to dosing scheduled of insulin in the prison. Insulin regimen in prison only provides regular insulin sliding scale twice a day in addition to basal insulin. As a result he has been severely hyperglycemic progressing into DKA. Patient's blood glucose needs to be monitored 4 times per day.")

Co-occurrence of mental status changes and "noncompliant" behavior with severe hyperglycemia was clear from Mr. Jung's records prior to this adjustment of his insulin regimen. On January 22, 2023, he was assessed as "refusing" care while lying on a stretcher, reporting nausea and vomiting, with a blood glucose of 466 and ketones in his urine. RCS ¶ 96; *see also* Ex. 4, Venters Report at 7, 22-23. Medical progress notes from January 22 show that Mr. Jung at that time had "multiple red flags for missing medications." RCS ¶¶ 95-96. On January 20, a provider had cancelled an appointment, noting his red flags were "pending," because the "visit [was] created in error" after a nurse reported that "pt is not coming out for any medication or accu check. Pt is complaining of pain and said that's why he isn't coming out." *Id.* at ¶ 95. On January 23, Mr. Jung was found incoherent in his cell, screaming for water, with a blood sugar too high for the finger-stick monitor to report a number. *Id.* at ¶ 97. When asked about missed insulin, he was "able to say 'sleep.'" A YesCare provider described him as "uncooperative" and referred him to the hospital. *Id.* He was diagnosed with diabetic ketoacidosis and acute kidney injury at the emergency room, found to be "confused," and admitted to the hospital "due to the high risk of critical illness or multiorgan failure at initial presentation." *Id.* at ¶ 98. On the afternoon of November 5, 2023, his final dose of insulin before he was found dying in his cell, Mr. Jung was assessed by Defendant Frasier as having "refused" insulin after a prior episode that day of difficulty walking and confusion. *See infra* § V.A.i.

A jury could find that placing Mr. Jung in the infirmary was an eminently reasonable accommodation that would have allowed Mr. Jung to enjoy the benefits of PDP's medical services in a way he was simply unable to in general population. There was available bedspace in the infirmary at all times that Mr. Jung was incarcerated in the PDP. RCS ¶ 102. On at least two occasions, physicians at PDP facilities other than CFCF transferred patients to the infirmary so

that their diabetes could be accommodated with a higher level of monitoring and control. *Id.* at ¶ 101.[6] Transfer of incarcerated patients with complex conditions to the infirmary is a well-established and reasonable principle of correctional medicine.[7] Courts have also recognized that failure to house an incarcerated person in a medical housing unit may violate the ADA, *Gray v. Kuhn*, 2024 WL 4719568, at *7 (D.N.J. Nov. 8, 2024) (alleged failure to house plaintiff in the infirmary resulting denial of access to, inter alia, medical care and/or devices for disabilities states claim under the ADA), and conversely that placement in a medical housing unit within a jail may be sufficient for a governmental entity to satisfy its obligations under the ADA. *Nunes v. Massachusetts Dept. of Correction*, 766 F.3d 136, 146 (1st Cir. 2014) (standing offer to house inmate in the medical unit to accommodate providing him with access to medication satisfied ADA); *DeFreitas v. Montgomery County Correctional Facility*, 2012 WL 2920219, *15 (E.D.Pa. 2012) (recognizing that offering housing in the medical unit was a reasonable accommodation that

---

[6] After recurrent hospitalizations for diabetic complications, including diabetic ketoacidosis and episodes of hypoglycemia, "Patient 2" was transferred to the infirmary, "where she can be observed more closely. Goals of infirmary transfer: 1. Observation of patient's dietary habits … 2. More staff that are available to monitor her." Ex. 4, Venters Report at 11, 13-14; Ex. 26, Patient 2 Infirmary Transfer.
After recurrent hospitalizations for diabetic complications including hyperglycemia with ketonuria, hyperglycemia with vomiting, and hypoglycemia with seizures, "Patient 1" was transferred to the infirmary "for more intensive monitoring of blood sugars and clinical status than will be available here at RCF" and "higher level monitoring." Ex. 4, Venters Report at 11, Ex. 25, Patient 1 Infirmary Transfer at 130. Attempts at four-times-per-day checks of his blood sugar had "proved problematic at CFCF and at RCF because his meals and insulin dosing were separated." Ex. 25. at 120. He was discharged from the infirmary when his treating physician concluded he "has been functioning without difficulty on his current program. He does require glucose checks 4x daily, and that will continue." *Id.* at 109. He was then re-admitted to the infirmary for "higher level of care where someone is aware of his status overnight and is able to perform accuchecks 4 times a day at the scheduled times. This was determined to be best met by the infirmary." *Id.* at 81-82.

[7] "In an infirmary setting, patients can be closely monitored for any late or missed glucose checks or doses of insulin. The NCCHC Standards for Health Services in Jails from 2018 define infirmary level care as "Infirmary-level care is provided to patients with an illness or diagnosis that requires daily monitoring, medication and/or therapy, or assistance with activities of daily living at a level needing skilled nursing intervention." For a patient with insulin dependent diabetes, poor glycemic control and a history of DKA, this level of care is essential. This step of transferring patients with poorly controlled diabetes to a jail infirmary is one that I first became familiar with in the NYC jail system, where this practice was routine." Ex. 4, Venters Report at 5; *see also Id.* at 22-24.

satisfied Defendant's obligations under the ADA); *Long v. Annucci*, 2023 WL 8602053, \*6 (N.D.N.Y. 2023) (placement in the infirmary was reasonable accommodation satisfying the ADA since it provided safe ability to use the toilet and access to medical care).

The City cannot abdicate its duty under the ADA to provide reasonable accommodations for individuals with disabilities, such as Mr. Jung, by pointing their finger at their medical contractor. *Montanez*, 154 F.4th at 149-151. Mr. Jung's diabetes was routinely mismanaged when he was confined in the general population, and conduct consistent with symptoms of his disabilities was improperly and discriminatorily characterized as medical noncompliance, depriving him of access to medical care. Placement in the infirmary would have resulted in his being able to access medical care even – and especially – when his diabetes resulted in symptoms that otherwise adversely impacted his ability to seek care while in general population. A jury could determine that this accommodation, having been made for others within PDP, should have been made for Mr. Jung as well.

As the City has produced no evidence – and cannot – that placing Mr. Jung in the infirmary would have created an undue burden, and there is record evidence that Mr. Jung struggled to maintain access to medical services due to symptoms of his diabetes in general population, summary judgment on the ADA and RA claims must be denied.

> **D. Evidence that the City of Philadelphia failed to supervise its staff to ensure correctional officers performed their duties in identifying and responding to the emergency medical needs of incarcerated people, and failed to supervise its medical contractor as to care for diabetic patients, establish disputes of material fact that defeat summary judgment on Plaintiffs' failure to supervise claim.**

Plaintiffs can prove a municipal failure-to-supervise claim with evidence that demonstrates "a failure or inadequacy amounting to deliberate indifference on the part of the municipality."

*Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999).[8] "This consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.*; *see also Chambers v. City of Philadelphia*, No. CV 23-0137, 2024 WL 870574, at *5 (E.D. Pa. Feb. 29, 2024) (unpublished); *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019).

As described above in Section V.B.ii, the City of Philadelphia's final policymaker with respect to the Department of Prisons, former Commissioner Defendant Carney, personally reviewed all death investigations and was aware of all of their findings. She was aware that correctional officers routinely confronted medical emergencies in general population, and she was aware of an extensive history of employees' mishandling this situation – either by failing to identify emergent needs in the first place, failing to render emergency aid, or failing to call for medical assistance. Wrong choices by PDP correctional staff frequently resulted not only in deprivation of rights, but in loss of life. Defendant Carney did not engage in auditing of emergency response situations to assess whether officers were not making rounds or providing care, and did not establish any mechanism for supervisors to ensure strict compliance of line officers in making rounds. In fact, Defendant Carney steadfastly refused to conduct systemic reviews of policies and practices even in light of the steadily increasing death count linked to staff misconduct. RCS ¶ 26.

The Third Circuit recognizes failure-to-supervise claims with respect to both direct employees and private contractors like correctional health care companies. *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 326–27 (3d Cir. 2014), *overruled on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822, 135 S. Ct. 2042 (2015) ("No reasonable prison administrator could believe

---

[8] Plaintiffs are not proceeding on failure-to-train or failure-to-discipline theories for Count V.

that hiring a private contractor to provide a constitutionally required service would allow them to abdicate their constitutional supervisory duties.") As described above in Section V.B.i, the City of Philadelphia's contractor YesCare confronted many diabetic patients. YesCare/Corizon had an extensive history of patients being hospitalized for blood sugar complications from PDP, and an extensive history of missed insulin doses, failure to document doses, and failure to follow procedures mandated by policy for diabetic patients. The City failed to supervise insulin administration and its "red flag" policy through basic auditing. The City failed to either notice YesCare's wildly incoherent documentation of blood glucose checks and insulin administration, or to equip YesCare with a base electronic medical record system that could store critical information intelligibly. The City of Philadelphia's final policymaker for the Department of Prisons received a specific warning as to YesCare's failure to obtain and document informed refusals for diabetes care in June of 2023, but failed to take any supervisory steps; and Mr. Jung died after a final "refusal" that consisted of nothing more than a correctional officer "yelling out."

Plaintiffs are entitled to go to trial on Count V on a failure-to-supervise theory.

### E. Plaintiffs' Wrongful Death and Survival Claims must remain in the case because Defendants are not entitled to summary judgment on the other federal and state law claims against City Defendants.

Finally, Defendants motion for summary judgment on Plaintiffs' Wrongful Death and Survival Action claims must be denied since judgment on these claims was entirely predicated upon the success of their motion as to Plaintiffs' other claims. Defendants cannot succeed on these other claims, for the reasons articulated in the preceding sections, so accordingly they must be denied summary judgment on Counts VI and VII as well.

## VI.    CONCLUSION

Respectfully submitted,

*/s/ Bret Grote*
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
*/s/ Rupalee Rashatwar*
Staff Attorney
PA ID No. 331085
*/s/ Margaret Hu*
Staff Attorney
PA ID No. 334438
*/s/ Lolo Salsbury Serrano*
Legal Fellow
PA ID No. 338184
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123


*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Bret Grote, Esq., hereby certify that I caused a true and correct copy of the foregoing

Brief in Opposition to City of Philadelphia Defendants' Motion for Summary Judgment to be

electronically filed on December 19, 2025, and thereby served upon all parties entered into the

Court's ECF system.

                                                            /s/ *Bret Grote*
                                                             Bret Grote