**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JACOB and JAMES JUNG, as<br>Administrators of the Estate of LOUIS<br>JUNG, JR, | : <br> : <br> : | No. 2:24-cv-05618-TJS |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| CITY OF PHILADELPHIA; YesCare Corp.;<br>BLANCHE CARNEY, Former<br>Commissioner of Philadelphia Dept. of<br>Prisons; LALITHA TRIVIKRAM;<br>MAUREEN GAY; MARIESHA<br>APOLLON; BLAIR CABELLOS; GENA<br>FRASIER; WANDA BLOODSAW, | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | |
| | : | |
| Defendants, | : | |
| v. | : | |
| | : | |
| CAREERSTAFF UNLIMITED, LLC, | : | |
| | : | |
| Third Party Defendant, | : | |
| v. | : | |
| | : | |
| TEKACCEL, INC., | : | |
| | : | |
| Fourth Party Defendant. | : | |

**PLAINTIFF'S RESPONSIVE CONCISE STATEMENT OF FACTS**
**TO CITY OF PHILADELPHIA DEFENDANTS**

The Plaintiffs, Jacob and James Jung as Administrators of the Estate of Louis Jung, Jr., by and through counsel hereby respond to City of Philadelphia Defendants' Concise Statement of Material Facts. The following numbered paragraphs correspond to the paragraph numbers of the City's Statement. Following the Answer, plaintiff sets forth a Counter Statement of Facts.

*Facts Relating to Mr. Jung's Incarceration and Death:*

1. On October 27, 2023, Louis Jung Jr. was admitted to the Philadelphia Department of

1

Prisons ("PDP"). Exhibit A ("Jung OCP Report"), at BS7.

- **Admit.**

2. Mr. Jung had previously been incarcerated at PDP, as Plaintiffs note in their Complaint, from December 16, 2021, to September 27, 2022, and December 14, 2022, to June 2, 2023. *Id.*; *see also* ECF Doc. No. 25-1 ("Amend. Compl.").

- **Admit**.

3. From June 2, 2023, to October 27, 2023, Mr. Jung was admitted to Norristown State Hospital. Exhibit A at BS10.

- **Admit**.

4. Norristown State Hospital found Mr. Jung to be competent and malingering. *Id.*

- **Admit but dispute as to materiality**. That Norristown State Psychiatric Hospital at any point found Mr. Jung competent and malingering in regard to his psychological competency to stand trial is not relevant to Mr. Jung's claims or any party's defenses.

5. On return from Norristown State Hospital, medical intake notes and orders highlighted that Mr. Jung had type 1 diabetes, arrived at intake with a blood sugar of 542, and a self-report that Mr. Jung had not received insulin for three days upon arrival. Exhibit F ("Jung Intake Medical Records") at BS402.

- **Admit.**

6. Between his return from Norristown State Hospital and his unfortunate death, Mr. Jung refused multiple doses of insulin. Exhibit A at BS10. There is documentation of one refusal for the morning dose on November 1st, and another on the afternoon of November 5th. *Id*.

- **Dispute**. The purported documentation of insulin refusals was deficient under

PDP and YesCare policy, deviated from the standard of care, and was done without any indication that Mr. Jung was counseled by medical staff. On those dates, he was not seen by a medical provider, he did not sign a refusal form, and no refusal form was signed by medical staff. Additionally, the alleged refusals noted in Defendants' Exhibit A were found by YesCare to be deficient in its Patient Safety Report since proper protocol was not followed in documenting and responding to them. Ex. 1, YesCare Patient Safety Report at 5 (noting failure to obtain refusal form for November 1 and 5, 2023, and deeming it a "Problem" that "Nurses failed to obtain a signed refusal or schedule a red flag appointment"). The November 5, 2023 refusal appears to be based on nothing more than Defendant Frasier's notation, which was made after Mr. Jung did not exit his cell to receive insulin when she called out on the tier that it was time for insulin and accu-checks. Defendant Frasier did not speak with Mr. Jung nor did she check on him at all despite her knowing that earlier in that same day he was prone on the floor, requesting medical assistance, and was later dragged into his cell by other incarcerated people without having received any medical care. Under these circumstances, it was improper and inaccurate to characterize his not leaving his cell for insulin as a refusal. Ex 2, Frasier Disciplinary Packet, at Frasier-000006 (finding "at no time did you [Defendant Frasier] go to his cell to let him out for Insulin and Accu-check, nor did it appear that you received any indication of his refusal, as you were observed watching TV in the dayroom (Bottom tier area)"); Ex. 3, Expert Report of Jonathan Williams [hereafter "Williams Report"] at p. 5, 7 (noting that the alleged refusals of November 1

3

and 5 were not properly documented, and opining that "it would be reasonable to assume that Mr. Jung may have missed several Accu Check and insulin administrations because of his declining medical condition. This would include an inability to respond to the verbal medication call-outs performed at the time of insulin administration. As his health declined rapidly on the last day, this would include the inability to call out for help"); Ex. 4, Expert Report of Lori Roscoe [hereafter "Roscoe Report"] at 5-6, 8 ("There is also evidence that nursing staff documented refusals of blood glucose checks and insulin based on the report by the custody officer, rather than having an interaction with their patient. This is unacceptable, as every patient refusing care or medications must be counseled face-to-face and given the ramifications of not accepting the nursing intervention or medication. This is also an opportunity to ensure the patient is alright."); Ex. 5, Expert Report of Arthur Wallenstein [hereafter Wallenstein Report] at p. 9-10 (alleged refusal on November 5, 2023, not based on face-to-face encounter and therefore not accurately categorized as a refusal).

7. Mr. Jung "no showed" for his morning insulin doses on both November 3rd and 5th. *Id.*

- **Dispute as stated**. While medical staff entered a note that Mr. Jung was a "no show" for insulin on November 3 and 5, 2023, this term is vague and misleading. Mr. Jung was suffering from improper medical care resulting in hyperglycemia and diabetic ketoacidosis, and there is no evidence that he heard or was physically capable of exiting his cell in order to receive insulin. Ex. 3, Williams Report at 7 ("As described above, individuals dying from DKA experience excruciating abdominal pain, vomiting, mental status changes, all signs of acidic damage and

multi-organ failure preceding death. Mental status changes would impair the ability to comprehend even basic instructions and stimuli. As such, it would be reasonable to assume that Mr. Jung may have missed several Accu Check and insulin administrations because of his declining medical condition. This would include an inability to respond to the verbal medication call-outs performed at the time of insulin administration. As his health declined rapidly on the last day, this would include the inability to call out for help.").

8. Mr. Jung's insulin status was not recorded in his medical records for the evening doses on October 30th or November 4th. *Id.*

- **Admit.**

9. On November 5, 2023, at approximately 10:57 a.m., Corrections Officer ("CO") Gena Frasier was escorting RN Blair Cabellos for a medical event on the pod that housed Mr. Jung. Exhibit B ("Lock and Track 11/5/23"), at BS30; *see* Exhibit C ("Cabellos Dep."), at 76:2-77:9.

- **Admit.**

10. CO Frasier would accompany a nurse (or, in other words, a civilian employee) while they were on a pod for the nurse's safety. Exhibit D ("Frasier Dep."), at 112:10-21.

- **Admit insofar that this was Defendant Frasier's testimony, dispute that it is material to any claim or defense.**

11. CO Frasier liaised medical attention when she told Nurse Cabellos that Mr. Jung was asking to see a medical provider while Nurse Cabellos was on the pod. Exhibit C at 76:2-77:9.

- **Dispute as stated**. Defendant Frasier contacted a medical staff member, but it

is denied that Nurse Cabellos provided any medical "attention" if that term indicates medical treatment. Defendant Cabellos did not, in fact, provide any medical treatment Ex. 4, Roscoe Report at 14 ("despite Mr. Jung's presentation, LPN Cabellos conducted only a minimal encounter, did not perform a nursing evaluation, and left the unit without arranging for transport to medical or ensuring that another nurse evaluated Mr. Jung. She also did not document the encounter in Mr. Jung's health record."); City Defs' Ex. N (Cabellos Interrogatory Resp.) at 5 (asserting Defendant Cabellos did not engage in a medical encounter).

12. Nurse Cabellos made observations of Mr. Jung but did not constitute said interactions as rising to the level of a medical encounter. Exhibit N ("Cabellos Interrogatory Resp.") at 5.

- **Dispute as stated and in regards to materiality**. The cited Interrogatory Response says nothing about Cabellos making observations of Mr. Jung. It does claim there was no "encounter" in a "medical sense," but does not define medical encounter. Furthermore, Defendant Cabellos's failures to provide any care is not material to Defendant Frasier's request for summary judgment: Defendant Frasier had an obligation to ensure Mr. Jung had access to care after Defendant Cabellos left him remaining on the floor. This remained the case throughout the rest of the day when Mr. Jung still needed to be checked on, specifically by Defendant Frasier when she became aware that he did not exit his cell for Accu-Chek and insulin administration.

13. Nurse Cabellos testified that Mr. Jung verbally complained of leg pain and indicated

that he could not walk. Exhibit C, at 76:2-77:9; *see also* Exhibit A, at BS5.

- **Admit in part.** Defendant Cabellos testified to that effect in the cited deposition transcript, but in her interview with investigating Lt. Shawn Jay she said that Mr. Jung "needed help to get up" after she saw an incarcerated person "on the floor in the doorway of cell 21." Ex. 2, Frasier Disciplinary Packet at Frasier-000026.

14. However, as this conversation was happening, Mr. Jung was standing, then proceeded to walk towards Nurse Cabellos, before he sat himself on the ground and complained of falling. *Id*.

- **Dispute**. In the signed interview statement with Lt. Shawn Jay, Defendant Cabellos agrees that she saw Mr. Jung "on the floor in the doorway of cell 21." Additionally, the security camera footage depicts Defendant Cabellos interacting with Mr. Jung after he is already on the floor in the doorway of the cell, and does not support Defendant Cabellos's testimony that he was standing in the back of the cell at the beginning of their encounter and then walked to the doorway. Ex. 2, Frasier Disciplinary Packet at Frasier-000026; Ex. 29, Security Camera Footage from November 5, 2023.

15. Nurse Cabellos did not determine that Mr. Jung's state required an immediate stretcher call or other immediate medical attention. Exhibit C at 76:2-77:9.

- **Dispute.** Defendant Cabellos stated to Lt. Jay that she told the correctional officer, who was Defendant Frasier, to call a stretcher. Ex. 2, Frasier Disciplinary Packet at Frasier-000026. This statement is also disputed on the basis that Defendant Cabellos did not make any meaningful medical

determination in regard to Mr. Jung because she did not check his vitals, his medical chart, of evaluate his medical condition in any meaningful way. Ex. 4, Roscoe Report at 14; City Defs' Ex. N, Cabellos Interrogatory Resp.") at 5 (asserting Defendant Cabellos did not engage in a medical encounter). This statement is also disputed because Defendant Cabellos testified in her deposition that she told the correctional officer to call a stretcher if he continued to complain of pain. City Defs.' Ex. C (Cabellos Deposition) at 76:2-77:9. There is a genuine dispute as to what Defendant Cabellos stated to the correctional officers on the scene about his medical condition.

16. Nurse Cabellos then left the pod. Exhibit E ("Bloodsaw Dep."), at 96:21-25.

- **Admit.**

17. CO Frasier relied on Nurse Cabellos' medical determination that no medical treatment was needed. Exhibit D at 125:15-126:1; *see also id*. at 54:15-18.

- **Dispute.** Defendant Cabellos stated to Lt. Jay that she told the correctional officer, who was Defendant Frasier, to call a stretcher. Ex. 2, Frasier Disciplinary Packet at Frasier-000026. This statement is also disputed on the basis that Defendant Cabellos did not make any meaningful medical determination in regard to Mr. Jung because she did not examine him in any way, and a jury could find that Defendant Frasier was aware that Defendant Cabellos did not perform a medical examination and that Mr. Jung remained at a substantial risk of serious harm if he was not provided with an evaluation and any appropriate treatment interventions. Ex. 4, Roscoe Report at 14; City Defs' Ex. N, Cabellos Interrogatory Resp.") at 5 (asserting Defendant Cabellos did

not engage in a medical encounter). Finally, even the cited deposition testimony of Defendant Cabellos was that Mr. Jung would need a stretcher if he kept complaining about leg pain; this required Defendant Frasier to check on him later to determine if this is the case, which she failed to do. City Defs.' Ex. C (Cabellos Deposition) at 76:2-77:9; Ex. 5, Wallenstein Report at p. 9-10, 13-14 (finding Defendant Frasier failed to check on Mr. Jung when he did not exit his cell for insulin administration and glucose checks, and that she did not make meaningful rounds and check on him after he was dragged into his cell).

18. As a result of this interaction, CO Frasier requested a supervisor to Cell 21, Mr. Jung's cell, because he was refusing to reenter his cell, not due to a medical emergency. Exhibit D at 118:21-119:24; *see also* Exhibit B, at BS30-31.

- **Dispute**. A jury could find that Defendant Frasier actually has no recollection as to why she called Defendant Bloodsaw, as she is on record claiming she has no recollection of the incident, closer in time to the incident. Ex. 2, Frasier Disciplinary Packet at Frasier-000024 (Q: When Lt. Bloodsaw arrived on the unit what did you inform her in reference to I/P Jung in Cell #21? A: I don't recall if it was something medical or noncompliance if she came over I am assuming I called her.").

19. Lt. Bloodsaw, a supervisor, responded to Cell 21. Exhibit B at BS31.

- **Admit.**

20. Lt. Bloodsaw does not recall interacting with Mr. Jung. Exhibit E at 51:8-52:24.

- **Admit that this is what Lt. Bloodsaw claims, dispute insofar that a fact-finder has to credit it.**

21. Lt. Bloodsaw does know that it was not possible that someone told her to call a stretcher

on November Fifth and she failed to do so, because her training would have prompted her to act differently than she did on November 5, 2023. *Id*. at 69:12-70:18; 107:15-22; 107:23-108:10.

- **Dispute**. This statement requires a credibility determination, and it is possible that correctional staff can fail to follow their training. In fact, the Philadelphia Department of Prisons had a chronic problem with correctional officers failing to make rounds or provide emergency medical care in situations that resulted in the deaths of incarcerated people. Ex. 6, Expert Report of Homer Venters [hereafter "Venters Report"], at 18-19 ("I have reviewed the PDP Special Investigations reports on 58 deaths in the PDP. These reports span approximately 900 pages and many of these cases included substantiated findings regarding failures to render care or aid to a person in distress or adequately monitor a person. Many of these cases included findings that correctional staff failed to properly monitor or respond appropriately to a patient in medical distress outside the infirmary[.]"); Ex. 7, OPC Death Investigations Excerpts.

22. On November 6, 2023, Mr. Jung was found at 6:05 AM breathing but not moving and medical personnel were called to his location. Exhibit A ("Jung OCP Report"), at BS12.

- **Admit.**

23. Emergency medical treatment was given to Mr. Jung, but he unfortunately passed away despite this treatment. *Id*.

- **Admit that Mr. Jung passed away after belated emergency care was attempted.**

24. On March 29, 2024, the Office of Special Investigations ("OSI") concluded an investigation reviewing the circumstances surrounding Mr. Jung's death and completed a report summarizing its findings. *See* Exhibit A.

- **Admit.**

25. These OSI reports are produced for each in-custody death. Exhibit G ("Carney Dep.") at 123:3-17; *and see* Exhibit A.

- **Admit.**

26. These reports summarize the investigation that PDP performed as an audit on both corrections and medical staff's conduct as it relates to those circumstances and makes determinations regarding what these staff members could have, or should have, done differently. *Id*.

- **Admit in part, dispute as characterized**. PDP reports on deaths in custody are not audits of policies and practices implicated by a death, but instead focus on whether individual staff members violated policies. City Defs' Ex. G (Carney Deposition) at 116:6-122:21, 129:15-130:5. Further, the PDP reports do not fully assess medical care's conduct as it pertains to performing its clinical responsibilities, as these mortality reviews are carried out by the contractor, Defendant YesCare Corporation. Ex. 8, Deposition testimony of City of Philadelphia 30(b)(6) Designee Patricia Powers [hereafter "Powers Deposition"], at 67:16-78:5.

27. After completion of Mr. Jung's report, Commissioner Carney would review it. Exhibit G at 123:3-17; 132:8-135:19; 150:2-23.

- **Admit with clarification.** Defendant Carney testified that she reviewed all death reports, so it is the case that she *did* review Mr. Jung's report. City Defs' Ex. G (Carney Deposition) at 123:3-5.

*Innerworkings of the Prison System as it Relates to Inmate Care and Supervision*

28. The City of Philadelphia had procedures in place for disability accommodations. *See*, *e.g.*, Exhibit G, at 88:9-90:10; *and see* Exhibit H at 51:16-53:6.

- **Dispute as to materiality**. The formal existence of policies that permit disability accommodations, including accommodations by placement of an individual with a disability in the infirmary, do not establish that they were utilized in practice; specifically, in regard to Mr. Jung's need for reasonable accommodations to ensure access to medical services and other programs and services in the jail. Dr. Trivikram, a defendant and YesCare's 30(b)(6) deponent testified that infirmary placement would not be considered for diabetic patients such as Mr. Jung, illustrating that the mere existence of a policy that permitted disability accommodations did not mean it was put into practice in this case. City Defs' Ex. L (Trivikram Deposition) at 198:4-14.

29. The City contracted its prison medical services out to YesCare. Exhibit G at 19:24-20:14, 47:21-48:10; Exhibit I, ("Medical Provider Contract") at BS1857-61.

- **Dispute as to materiality**. Plaintiff's claims against the City involve non-delegable duties to provide health care and disability accommodations to the incarcerated population.

30. The contracted-for services that the City hired YesCare to perform were specifically required to comply with the ADA. Exhibit I at BS3136-37.

- **Admit that the contract says this, dispute as to materiality**. Whether YesCare's actions comported with the Americans with Disabilities Act is highly disputed, and contractual terms are not dispositive of the City's liability.

31. Per the agreed upon contract, the medical providers were to provide care consistent with "the certified medical recommendations from that body," here the American Diabetes Association. Exhibit G at 53:4-15; *see*, *e.g.*, Exhibit I at BS002331-34.

- **Admit that the contract says this, dispute as to materiality**. Whether the care provided by YesCare at PDP comported with American Diabetes Association standards in practice is highly disputed, and contractual terms are not dispositive of the City's liability**.**

32. As to training corrections officers, the City presents training at the training academy for newly hired corrections officers, which includes how to respond to general medical emergencies. Exhibit E at 16:6-19:4; Exhibit G at 14:14-15:6; 15:16-16:12, 69:12-71:24.

- **Admit.**

33. The City also provides annual refresher training and training for newly written or updated policies. Exhibit E at 27:13-20, 87:21-89:13; Exhibit G at 15:7-11.

- **Admit.**

34. The corrections staff are trained in how to handle when an inmate refuses medical care. Exhibit E at 40:11-41:23.

- **Admit.**

35. While certain, specific medical training for corrections staff is presented by YesCare employees during roll call, some topics are provided at the direction of PPD. Exhibit J

("Witkowski Dep.") at 17:2-18:18; Exhibit G at 50:18-51:10.

- **Admit.**

36. Finally, the City employees also received a pamphlet at these roll call trainings with symptoms of diabetic emergencies. Exhibit E at 33:20-35:9; *see also* Exhibit K ("Diabetes Training PowerPoint").

- **Admit.**

37. As YesCare's Site Director of Corron-Fromhold Correctional Facility ("CFCF") aptly notes, the Correctional Defendants appropriately relied on the medical evaluation of Nurse Cabellos as it should be a medical determination. Exhibit L ("Trivikram Dep."), at 103:12-24.

- **Dispute.** The cited deposition testimony says nothing about Defendants Frasier, Bloodsaw, or Cabellos, rendering this citation misleading. Plaintiffs also dispute that the statement is "apt" in any way, and further note that the City of Philadelphia accepted a bid by Corizon, later assigned to YesCare, in which the medical provider explicitly stated that it would provide training to "All medical staff and appropriate correctional staff" in a number of areas, including "diabetes." YesCare itself provided training slides to staff describing signs and symptoms of diabetes to correctional staff, and a jury can infer this signaled a recognition that this is important information to convey to staff. Ex. 9, City of Philadelphia Contract with Corizon, at PJUNG002439; City Defs. Ex K. That YesCare's 30(b)(6) deponent disagrees with the Company's own policy and practice of providing training to correctional staff on recognizing signs and symptoms of diabetes is neither apt nor does it reflect an undisputed fact

pertaining to the acts and omissions of Defendants Bloodsaw and Frasier.

38. Twice a year audits from outside Doctors are done on medical care within the prison system. Exhibit H at 25:4-26:4.

- **Admit in part.** Plaintiffs admit that this deposition testimony says this, though only one such audit was produced in discovery.  Ex. 10, Western Correctional Consultants Audit, June 3, 2023.  Plaintiffs only requested audits of diabetes care, however, raising the inference that these biannual audits did not regularly address diabetes, and there is no evidence that they did aside from the singular report produced.

39. These audits can and have included reviews of diabetes care. *Id*. at 32:2-22.

- **Dispute as to materiality**. Only one audit was produced that discussed diabetes care, but the mere discussion of diabetes care in that audit does not establish that this was a reasonable or effective audit of the core components of diabetes care. This does not establish that the City responded to the deficiency regarding improper protocol in purported refusals of diabetes care that was included in that audit. Ex. 10, Western Correctional Consultants Audit, June 3, 2023.

40. The City is aware of corrective action plans for diabetes care. *Id*. at 26:5-23.

- **Dispute as to materiality**. The cited testimony merely states that a 30(b)(6) deponent of the City was aware that they "had corrective action plans" but that she does not "recall the specifics." She also testified that she was not aware of any issues that patients were not receiving insulin as prescribed, signifying the inadequacy of YesCare and the City's oversight. The only corrective action plans related to diabetes produced in discovery post-dated Mr. Jung's death.

41. YesCare supervises new medical providers in the corrections setting. Exhibit L at 39:5-40:7.

- **Dispute**. The Patient Safety Event report in regard to Mr. Jung shows multiple, compound failures to supervise medical staff and ensure they were following policy and protocol. Ex. 1, Patient Safety Report.

42. YesCare employed multiple people to ensure that proper insulin administration was occurring. *Id.* at 104:6-16.

- **Dispute as stated and dispute as to materiality**. YesCare employed multiple people but it did not do so in a way that was effective in ensuring insulin was properly administered. Furthermore, the City contracting with a medical provider who had employees who were ostensibly responsible for diabetes care is not material to the City's liability.

43. The City investigates and produces reports that review each death in the prison system and the discipline the stemmed from any corresponding policy failures by either corrections or medical staff. Exhibit G at 123-3-17; *and see, e.g.*, Exhibit A.

- **Admit, but dispute as to materiality**. The City does investigate deaths in custody for whether individual staff violated policy, but this mere fact does not establish that these reviews were adequate, effective, or reasonable responses to chronic patterns of staff misconduct resulting in serious harm and/or death.

44. Dr. Trivikarm has a standing order to be alerted when someone goes to the hospital for DKA. Exhibit L at 109:5-17.

- **Admit**.

45. As to training for making timely rounds, all Corrections Officers receive training upon

hiring at the training academy regarding how to make rounds. Exhibit E at 16:6-18:19.

- **Admit**.

46. Plaintiffs' expert determined that "correctional staff were adequately trained in the rudimentary basics of supervising the inmate population." Exhibit M ("Wallenstein Report") at 17. However, Plaintiffs' expert does not opine on whether there was a failure to discipline within the Philadelphia Department of Prisons. *See id*.

- **Admit.**

47. Lieutenants and sergeants at PDP were additional layers of supervisors overseeing correctional staff. *See* Exhibit E at 10:23-11:18; 12:2-17.

- **Dispute.** Though the testimony cited indicates that lieutenants and sergeants were supposed to provide supervision over correctional staff, the high rate at which staff were found to have failed to make rounds or provide emergency care in situations resulting in the deaths of incarcerated people creates a dispute of material fact as to whether there was actual supervision happening in practice. Ex. 7, OPC Death Investigation Conclusions; Ex. 6, Venters Report at 18-19 ("I have reviewed the PDP Special Investigations reports on 58 deaths in the PDP. These reports span approximately 900 pages and many of these cases included substantiated findings regarding failures to render care or aid to a person in distress or adequately monitor a person. Many of these cases included findings that correctional staff failed to properly monitor or respond appropriately to a patient in medical distress outside the infirmary[.]"); Ex. 5, Wallenstein Report at 15 (Finding that "Senior agency administration, up to and including the Commissioner appeared to have minimized the importance of

responding to staff behaviors that appear to create a pattern or a culture" that included staff failing to make rounds and failing to contact medical staff or provide first-aid to incarcerated people in need of medical care").

48. Philadelphia Department of Prisons contract with YesCare includes specific information regarding Performance Improvement Plans, which would be communicated on a quarterly basis. Exhibit G at 57:3-19; Exhibit I at BS002258.

- **Admit that the contract says this, dispute as to materiality**. Whether Performance Improvement Plans assessed and properly responded to the relevant medical care issues involved in this case is highly disputed.

49. OSI sustained policy violations against Lt. Bloodsaw, Officer Fraizer, and Nurse Cabellos. *See, e.g.*, Exhibit A.

- **Admit**.

50. After a disciplinary hearing, the allegations against Officer Frasier were found to be not sustained. *See* Exhibit O ("Fraiser disciplinary records").

- **Admit with clarification**. The hearing did not address Defendant Frasier's failure to make personal, face-to-face contact with Mr. Jung when she marked him as allegedly refusing his afternoon insulin and Accu-Chek. This was a part of the narrative in the disciplinary charging documents, but does not seem to have been addressed at all in the proceeding. Ex. 2, Frasier Disciplinary Packet at Frasier-000005-8.

51. In fact, each on-sight [sic] death results in a report and review, which includes any discipline that would stem from the actions that may have led to an inmate's death. Exhibit G at 123-3-17.

- **Dispute as to materiality**. Plaintiffs dispute that these investigations, which did not result in auditing and improving emergency responses, and which did not result in operational changes to protect at risk individuals, were reasonable responses to an extraordinarily high rate of in-custody deaths involving staff misconduct. Ex. 6, Venters Report at 25 ("These types of documented failures should have prompted the County to implement auditing of nonfatal medical emergencies to track and improve routing monitoring and emergency responses. This knowledge should have also triggered auditing by the County of the infirmary referral process to ensure that patients who could suffer fatal outcomes when not properly cared for or monitored would be reliably sent for increased monitoring and care in the infirmary."

**Plaintiffs' Counter-Statement of Facts**

*Mr. Jung's Death*

52. PDP correctional staff are trained to recognize signs and symptoms of diabetic emergencies including "agitation," being "drowsy" or "confused," and "frequent urination." City Defs' Ex. K at Jung-City Production 004400.

53. PDP correctional staff are trained that diabetic emergencies "may result in loss of consciousness or death." *Id.*

54. PDP correctional staff are trained in how to "recognize an emergency," including specific guidance that an "altered mental status is an important warning sign of a potentially life-threatening condition," and that "assessment of the scene & the person is critical in any emergency." Ex. 11, CPR/First Aid Training Excerpts at Jung – City Production004472, 4475, 4468.

55. PDP correctional staff are trained in policy noting specifically that whether a person is "able to talk/walk/breathe" is part of the assessment of medical emergencies. Ex. 12, PDP Policy 4.E.21, PPS Staff roles in Non-Routine and/or Emergency Medical Situations at Jung – City Production002571.

56. Housing officers at PDP are trained that their responsibilities included tours for "safety on the unit by maintaining order, and continual observation," and head counts to "see flesh and movement." Ex. 13, PDP Training Academy - Housing Officer Duties Training Excerpts, Jung – City Production00449, 004499.

57. Housing officers at PDP are trained in the difference between the "Disciplinary Process," in which "any violation of the rules and regulations set forth will be followed up with an incarcerated person misconduct report," and "Medical Services," which include being "alert to I/P's who are too ill to present themselves for medical care and you will assist them obtaining medical care," to "render applicable first aid to I/P in life-threatening situations," and to "recognize the need for an I/P to go to sick call even if the I/P does not request to." Ex. 13, PDP Training Academy - Housing Officer Duties Training Excerpts at Jung – City Production 004506, 4511-4512.

58. At 9:03 AM on November 5, 2023, Defendant Frasier made an entry into Lock & Track reflecting that she "toured area all appears in order I/P's apprears [sic] alive." City Defs' Ex. B (Lock & Track) at Fraiser-000030.

59. Defendants Cabellos and Frasier walked away from Mr. Jung as he lay on the floor, where he remained immobile and unattended for nine minutes. City Defs' Ex. A (Jung Death Investigation) at 10; Ex. 29, Video: B1Pod3, Nov. 5, 2023 at timestamp 9:56-9:57.

60. On the same day, Defendant Frasier made an entry into Lock & Track reflecting that she moved Anton Walker within the unit. City Defs' Ex. B (Lock & Track) at Fraiser-000030; City Defs' Ex. D (Frasier Deposition) at 104:20-105:5.

61. According to a signed statement given to PDP investigator Lt. Shawn Jay, Anton Walker told Defendant Frasier that he wanted to be moved because his cellmate, Louis Jung, was vomiting and urinating in their shared cell. Ex. 2, Frasier Disciplinary Packet at Fraiser-000029 (Anton Walker signed interview).

62. Defendant Frasier then made an entry into Lock & Track requesting assistance from Defendant Bloodsaw, with the written description that Mr. Jung "refused to get up." City Defs' Ex. B (Lock & Track) at Fraiser-000030-31.

63. Defendant Bloodsaw is observed on video arriving nine minutes after Defendants Fraiser and Bloodsaw leave Mr. Jung. She stands over Mr. Jung's body, which remains on the ground. Ex. 29, Video: B1Pod3, Nov. 5, 2023 at timestamp 10:05-10:06; City Defs' Ex. A at City-Jung-000011; Ex. 14, Bloodsaw Disciplinary Packet at Bloodsaw-000148.

64. Defendant Bloodsaw claims not to not recall any part of November 5, 2023, including whether Mr. Jung was awake or alert during their interaction. Ex. 2, Frasier Disciplinary Packet at Fraiser-000027-28 (Bloodsaw Interview); City Defs' Ex. E (Bloodsaw Deposition) at 51:19-54:17, 56:7-11.

65. Defendant Frasier appears on video handing gloves to two incarcerated people. Ex. 29, Video: B1Pod3, Nov. 5, 2023 at timestamp 10:07; Ex. 2, Frasier Disciplinary Packet at Fraiser-000012.

66. PDP policy requires gloves to be worn when touching blood, bodily fluids, or non-intact skin. Ex. 15, PDP Policy 4.E.22, Medical Waste at Jung - City Production002564 (PPS staff), Jung – City Production002566 (trained inmate workers).

67. Defendant Bloodsaw stood over Mr. Jung's body as the two incarcerated people wearing gloves dragged him back into his cell. Ex. 29, Video: B1Pod3, Nov. 5, 2023 at timestamp 10:08; City Defs' Ex. A at City-Jung-000011; Ex. 14, Bloodsaw Disciplinary Packet at Bloodsaw-000148.

68. Defendant Bloodsaw testified that it was "not normal protocol" for an incarcerated person to be taken back into his cell by two other incarcerated people. City Defs' Ex. E, Bloodsaw Deposition at 55:6-11.

69. Defendant Bloodsaw was found to have violated the following PDP policies with respect to this interaction:

   a.  01: Working Knowledge

   b.  03: Efficient Performance

   c.  37: Proper action

   d.  67: IP Welfare

   e.  1.C.11.1: Employee Code of Conduct.

   Ex. 14, Bloodsaw Disciplinary Packet at Bloodsaw-000195.

70. Defendant Bloodsaw closed the door of Mr. Jung's cell after he was dragged back into it. City Defs' Ex. A at City-Jung-000011.

71. Defendant Bloodsaw left the pod after locking Mr. Jung into his cell. Ex. 29, Video: B1Pod3, Nov. 5, 2023 at timestamp 10:10; City Defs' Ex. A at City-Jung-000011, Ex. 14, Bloodsaw Disciplinary Packet at Bloodsaw-000148.

72. Defendant Bloodsaw never called a stretcher for Mr. Jung on November 5, 2023. City Defs'
Ex. A at City-Jung-000011., Ex. 14, Bloodsaw Disciplinary Packet at Bloodsaw-000148.

73. Defendant Bloodsaw did not check on Mr. Jung at any point during the rest of her shift on
November 5, 2023. Ex. 14, Bloodsaw Disciplinary Packet at Bloodsaw-000148.

74. At 4:49 PM, Defendant Frasier made an entry into Lock & Track stating that "I/P Louis
Jung PP #718327 refused insulin." City Defs' Ex. B (Lock & Track) at Fraiser-000033.

75. Defendant Frasier testified that her regular practice for notifying incarcerated people of
insulin is to "yell it out on the pod … depend on if I'm like, behind my desk or where the
speaker is, I can say, 'Insulin or Accu-Chek' in progress.' Or I can just yell it, 'Insulin,
Accu-Chek in progress.' I'll have the list in front of me of, I'm guessing, who's going to
receive the insulin… I don't have to go to every door on the block; I only – I would listen
out for who's telling me they want to get it and who wants to come out and get it." City
Defs' Ex. D (Frasier Deposition) at 108:5-109:13.

76. Shawn Jay, PDP investigator, reviewed video covering this time period.[1] His review
revealed the following: "The video shows that I/P Jung was locked inside of Cell #19 and
at no time exited the cell. In addition, at no time did [Defendant Frasier] go to his cell to
let him out for Insulin and Accu-check, nor did it appear that [Defendant Frasier] received
any indication of his refusal, as [Defendant Frasier was] observed watching TV in the
dayroom." Ex. 2, Frasier Disciplinary Packet at Frasier-000012.

77. Defendant Frasier was on duty until approximately 11PM on November 5, 2023. City Defs'
Ex. B (Lock & Track) at Fraiser-000034.

---

[1] Plaintiffs requested video covering the relevant time periods, a span from about 3:00 PM to 9:00 PM on
November 5, 2023, but the City was no longer in possession of video at the time of discovery.

78. Defendant Frasier never called a stretcher for Mr. Jung on November 5, 2023. City Defs'
Ex. A at City-Jung-000011; Ex. 2, Fraiser Disciplinary Packet at Fraiser-000012.

79. Defendant Frasier did not check on Mr. Jung at any point during the rest of her shift on
November 5, 2023. Defendant Frasier cannot produce any evidence that she did check on
Mr. Jung the rest of her shift on November 5, 2023 after he was dragged back into his cell
by two incarcerated people. Ex. 2, Frasier Disciplinary Packet at Frasier-000030-34; Ex. 5,
Wallenstein Report at 9-15 (Finding 2 and 4).

*Diabetes in the Philadelphia Department of Prisons*

80. Mr. Jung was hospitalized on the following dates for the following reasons while in PDP
custody:

   a. December 20, 2021 – January 5, 2022: diabetic ketoacidosis (DKA);[2]

   b. April 7, 2022 – April 9, 2022: DKA;

   c. January 8, 2023 – January 12, 2023: DKA;

   d. January 23, 2023 – January 29, 2023: DKA;

   e. March 11, 2023 – March 14, 2023: DKA

   f. March 19, 2023 – March 20, 2023 – Hyperglycemia.

Ex. 6, Venters Expert Report; Ex. 16, Hospital Date Record Selections.

81. Excluding days on which he was hospitalized, Mr. Jung's medication administration record
for dates he was under PDP's care from December 16, 2021 through October 31, 2023
shows the following:[3]

---

[2] Mr. Jung then returned to the hospital from January 5, 2022 through January 9, 2022 for complications
of COVID-19 that he contracted while hospitalized.
[3] These numbers exclude November 2023 and September 2022, because no electronic medication
administration record for these months could be located in Mr. Jung's health records provided in
discovery from either PDP or YesCare.

      a. Lines for "Accu-Check" blood sugar checks contain 424 entries of "not documented," 98 entries of "refused," 42 entries of "no show," and 21 entirely blank cells;

      b. Lines for insulin administrations (Humulin, Humalog, Novolin, and/or Semglee) contain 377 entries of "not documented," 116 entries of "refused," 57 entries of "no show," and 30 entirely blank cells.

Ex. 17, Louis Jung Medication Administration Record Summary Exhibit.

82. Refusals of medication must be verified with a face-to-face encounter under YesCare and PDP policy. If the patient agrees to accept insulin, it is to be provided; if the patient refuses, the patient is to be counseled on the risks of refusal of insulin, a refusal form is supposed to be filled out, and the refusal is documented on the patient's Medication Administration Record. Ex. 18, YesCare Policy: Refusal of Medication or Clinical Encounter at 4; Ex. 19, PDP Policy 4.E.13, Inmate Refusal of Health Care Services.

83. Mr. Jung's electronic medical records contains only 61 refusal forms documenting refusal of insulin or blood sugar checks. Ex. 20, Jung Refusal Forms.

84. None of the refusal forms relating to insulin or blood sugar checks are signed by Mr. Jung. *Id.*

85. Five of these forms are missing a primary signature by medical staff. *Id.* at YesCare 0708-09, 0710-11, 0752, 0759, 0825, 0956.

86. Three additional forms contain the handwritten phrase "refusal as per C/O." *Id.* at YesCare 0760, 0815, 1085.

87. Mr. Jung was recorded as "refusing" insulin and a blood sugar check on at least one date that he was hospitalized, and absent from PDP. *Compare* Ex. 17, Louis Jung Medication

Administration Record Summary Exhibit at Jung – City Production001594, 1596 (containing entries of "3 – refused" for Accu-Check and Humulin on 1/24) with Ex. 16, Hospital Date Record Selections at YesCare1371 (After-Visit Summary page listing hospitalization date range from 1/23-1/29/2023).

88. PDP's Request for Proposals for Provision of Prison Physical and Behavioral Health Care Services required any "Successful Applicant" to have and use the PDP's prior-established electronic medical record program, eClinicalWorks (eCW). Ex. 9, City of Philadelphia Contract with Corizon Excerpts at PJUNG001914.

89. Corizon, YesCare's predecessor, responded to the RFP while noting that "no other corrections client currently uses eCW." *Id.* at PJUNG002247. YesCare/Corizon represented that it would partner with Health Care Systems (HCS) to deploy an Electronic Medication Administration Record (eMAR) system within the PDP and implement "enhanced documentation and access to treatment information for our patients for routine treatments, such as blood glucose checks." *Id.* at PJUNG002273, PJUNG002577.

90. Multiple PDP and YesCare staff testified in their depositions to a patchwork of electronic medical documentation systems in which "not documented" in the eMAR may or may not mean not administered, technical issues are known to occur, and blood glucose levels are recorded in a separate, day-by-day format that is not integrated with the electronic health record:

   a. PDP's 30(b)(6) deponent, Sandy Varghese, testified that glucose levels are "documented in the eMAR which is the electronic system. But right now there was an upgrade. And I think the eMAR is not talking to our ECW system or something. We did an upgrade and something is not working right." However, "at the end of the day PDP owns the medical records." City Defs' Ex. H (Varghese Deposition) at 50:1-25.

   b. YesCare's 30(b)(6) deponent, Dr. Lalitha Trivikram, testified that when blood glucose checks or insulin was listed as "not documented" in the MAR, a provider

would "have to go back to the individual dates and see if it was administered." An Accu-Chek may be "documented in a separate area and the nurse did not sign her initials to have done the Accu-Chek." In the event a glucose check was entered into a separate area, she did not know whether it would be "pulled and put in to the chart." She summarized the state of documentation at PDP as "an imperfect system." City Defs' Ex. L at 173:1-19; 175:6-11; 177:17-179:5; 212:12-19.

c.   YesCare's Director of Nursing, Marsha Jeoboham, testified first that "not documented means that the medication was not administered," but then clarified that under the system operational at PDP administered medication "should be in the MAR," but "not documented" "could possibly mean that the medication administration wasn't charted or it could be that it was just not documented on this specific MAR … if there was an issue with the MAR, then you could document it in eCW … if there was a duplicate, it could be on there as well. I don't know why it would be a duplicate." Ex. 21, Jeoboham Deposition at 45:2-5, 47:11-49:10.

91. With the exception of handwritten finger-stick blood glucose (FSBG) flowsheets, the latest of which is dated July of 2022, there is no indication in his electronic health record of blood glucose levels or any corrective insulin dosage administered. Ex. 22, Jung FSBG Flowsheets.

92. Mr. Jung's electronic medication administration record within his electronic medical record contains no blood glucose levels or corrective insulin dosages. Ex. 17, Louis Jung Medication Administration Record Summary Exhibit.

93. YesCare and PDP recognized insulin as a "critical medication" that required medical staff to follow-up with a patient each time a single dose was missed. Ex. 18, YesCare Policy: Refusal of Medication or Clinical Encounter at 4; City Defs.' Ex. H (Varghese Deposition) at 45:5-22.

94. Missing a critical medication such as insulin requires PDP and YesCare staff to implement the "Red Flag" policy. This policy requires nursing staff to schedule a patient "Red Flag Encounter" with a medical provider, so that the patient may be counseled on their medications. The Red Flag appointments are communicated to corrections staff through the PDP's electronic Integrated Jail Management System. These encounters are

documented in the patient's electronic health record. City Defs.' Ex. L, Trivikram Deposition at 77:19-80:13; Ex. 23, PDP Policy 4.E.24.2, Red Flag Medication Compliance System.

95. On January 20, 2023, a YesCare provider cancelled an appointment for Mr. Jung, noting that he had "multiple red flags pending" after a nurse reported that "pt is not coming out for any medication or accu check. Pt is complaining of pain and said that's why he isn't coming out." Ex. 24, Jung Medical Record Excerpts at YesCare 1646-47.

96. On January 22, 2023, Mr. Jung's blood glucose level was recorded at 466 with ketones in his urine. He reported nausea and vomiting. Ex. 24, Jung Medical Record Excerpts at YesCare 1640. YesCare providers wrote that Mr. Jung was refusing services because he "wanted juice and to lay on stretcher instead of getting an IV." He still had multiple red flags pending at the time. *Id.* at YesCare 1642.

97. On January 23, 2023, Mr. Jung was discovered in his cell incoherent and screaming for water, with a blood glucose registering his value as "HI." Ex. 24, Jung Medical Record Excerpts at YesCare 1638. When asked about his missed insulin, he was "able to say 'sleep'. Otherwise IP moaning incoherently." *Id.* at Yescare 1635. He was referred to the ER. *Id.* at YesCare 1636.

98. At the emergency room on January 23, 2023, Mr. Jung was found to be "confused," diagnosed with "severe DKA" (diabetic ketoacidosis), and admitted to the hospital "due to the high risk of critical illness or multi-organ failure." Ex. 24, Jung Medical Record Excerpts at YesCare1404.

99. After another hospitalization for DKA from March 11-March 14, 2023, the hospital provider wrote that Mr. Jung was "in the hospital for DKA which is probably related to

dosing schedule of insulin in the prison. Insulin regimen in prison only provides regular insulin sliding scale twice a day in addition to basal insulin. As a result he has been severely hyperglycemic progressing into DKA. Patient's blood glucose needs to be monitored 4 times per day." Ex. 24, Jung Medical Record Excerpts at YesCare1326.

100.    On May 20, 2023, a YesCare provider modified Mr. Jung's blood sugar checks back to two per day, writing that "current staffing does not allow for qid evaluations in the setting of this noncompliance." Ex. 24, Jung Medical Record Excerpts at YesCare 1482-83.

101.    On at least two occasions, other YesCare providers transferred diabetic patients with poor blood glucose control to the infirmary for a higher level of monitoring and easier access to frequent blood sugar checks. Ex. 25, Patient 1 Infirmary Transfers; Ex. 26, Patient 2 Infirmary Transfers; Ex. 6, Venters Report at 25.

102.    The PDP infirmary has not been full with no vacancies since prior to COVID. City Defs.' Ex. H (Varghese Deposition) at 60:3-5.

103.    YesCare conducted no audits of insulin administration prior to November 2023. Neither YesCare nor the City of Philadelphia can put forth evidence of insulin administration audits prior to November 2023.

104.    The City of Philadelphia conducted no independent audits of insulin administration at PDP prior to November 2023. The City of Philadelphia cannot put forth evidence of independent audits of insulin administration.

105.    YesCare conducted no audits of its red flag policy prior to November 2023. Neither YesCare nor the City of Philadelphia can put forth evidence of red flag policy audits prior to November 2023.

106.     The City of Philadelphia conducted no independent audits of the red flag policy at PDP prior to November 2023. The City of Philadelphia cannot put forth evidence of independent audits of the red flag policy.

107.     YesCare conducted no audits of its refusal policy as applied to diabetes care prior to November 2023. Neither YesCare nor the City of Philadelphia can put forth evidence of refusal policy audits prior to November 2023.

108.     The City of Philadelphia conducted no independent audits of the refusal policy as applied to diabetes care at PDP prior to November 2023. The City of Philadelphia cannot put forth evidence of independent audits of the refusal policy.

109.     There were over sixty hospitalizations for hypoglycemia or hyperglycemia from PDP between 2020 and 2023. Ex. 27, Emergency Room Logs Summary.

110.     Mr. Jung was hospitalized on January 23, 2023 for hyperglycemia. His medication administration record for the three days leading up to his hospitalization only show two documented administrations of insulin, on the mornings of 1/20/23 and 1/21/23; the rest of his MAR for blood sugar checks or insulin doses in these three days reflect refusals (with no refusal forms), "not documented," or "no show." Ex. 6, Venters Report at 6-7.

111.     Mr. Jung was hospitalized for diabetic ketoacidosis on March 11, 2023. His medication administration record for insulin and blood sugar checks in the week leading up to this hospitalization reflects five "no shows", three "not documented", and five refusals. Only three refusal forms are present. Ex. 6, Venters Report at 6, 8.

112.     "Patient 1" was hospitalized three times for diabetic complications while under the care of YesCare/Corizon and PDP's CFCF. In the 11-day period leading up to his most recent hospitalization on August 24, 2022, his medication administration record for blood

sugar check contained an entry of "not documented" for 19 of 44 checks. His medical records reflect a telephone call about his blood sugar level being at 508 ten days before this hospitalization, but contain no corresponding Nursing Encounter Tool for hyperglycemia. Ex. 6, Venters Report at 11-12.

113.    "Patient 3" was hospitalized for diabetic complications on May 25, 2022 while under the care of YesCare/Corizon and PDP's CFCF. In the 11-day period leading up to this hospitalization, his medication administration record contains entries of "not documented" for 13 of 22 blood sugar checks. Ex. 6, Venters Report at 12-13.

114.    "Patient 4" was hospitalized for diabetic complications on January 12, 2023 while under the care of YesCare/Corizon and PDP's CFCF. In the 11-day period leading up to this hospitalization, his medication administration record reflects an entry of "not documented" for 8 of 22 blood sugar checks. A week before this hospitalization, his medical records reflect a "stretcher call" for a hypoglycemic episode where the patient was unable to respond to questions. He was given a tube of glucose gel and two sugar packets. His medical records do not reflect any further encounters with medical providers between this episode and his hospitalization. Ex. 6, Venters Reports at 13.

115.    Defendant Blanche Carney was Commissioner of the Philadelphia Department of Prisons from 2016 through 2024. City Defs' Ex. G (Carney Deposition) at 11:10-12:11, 37:2-5.

116.    Defendant Carney reviewed reports prepared by Western Correctional Consultants, LLC, reviewing the PDP's medical care. City Defs' Ex. G (Carney Deposition) at 37:10-39:14; Ex. 10, Western Correctional Consultants Audit, June 3, 2023, at Jung - City Production002649.

117.     While these outside consultants reviewed hospitalizations from PDP, they did not consider whether individuals had to go to the emergency room because they were not getting the level of care they were supposed to while in PDP custody. City Defs.' Ex. H, Varghese Deposition at 28:13-29:2; *see also* Ex. 10, Western Correctional Consultants Audit, June 3, 2023, at Jung - City Production002651-2653.

118.     A consultant report dated June 3, 2023 reviewed medical charts for twelve patients under the heading "chronic care: diabetes." This consultant report informed the City and Defendant Carney that "refusals of scheduled care was prominent factor in several inmate patients maintaining poor diabetic control;" and that "refusals were not found in the chart for all missed chronic care visits." The report recommended that "refusals of potentially life-saving treatment, such as diabetes care, should be witnessed by a medical provider in a medical setting. This infrequently happens." Ex. 10, Western Correctional Consultants Audit, June 3, 2023, at Jung - City Production002649, 002657-58.

119.     A Patient Safety Report produced by YesCare after Mr. Jung's death noted specifically that the following doses of insulin and blood sugar checks were absent from his record from October 27, 2023-November 6, 2023:

  a.  October 30, 2023, PM administration, reason given: Not Documented;

  b.  November 1, 2023, AM administration, reason given: Refused (no refusal form);

  c.  November 3, 2023, AM administration, reason given: No Show;

  d.  November 4, 2023, PM administration, reason given: Not Documented;

  e.  November 5, 2023, AM administration, reason given: No Show;

  f.  November 5, 2023, PM administration, reason given: Refused (no form).

Ex. 1, Patient Safety Event Report, p. 4.

120.    No "red flag" encounters were scheduled for Mr. Jung at any point between October 28, 2023 and November 6, 2023. Ex. 1, Patient Safety Event Report, p. 4-6; City Def's Ex. A at City-Jung-000010.

121.    Under the policy in force through 2024, when a diabetic patient's glucose level equaled or exceeds 400 in a Finger Stick Blood Glucose (FSBG) check, YesCare nursing staff were required to determine if ketones are present in the patient's urine; complete a 'Nursing Encounter Tool' to document additional symptoms; notify the facility or on-call practitioner for orders and document in the patient's chart; conduct a follow-up FSBG check in approximately two hours; and place the patient on sick call to be seen by the provider for the next day that the provider is on-site. Ex. 28, YesCare Diabetes Clinical Pathway, p. 3-4.

122.    The Patient Safety Report noted that no provider notifications, 'Nursing Encounter Tools,' or blood sugar-rechecks occurred when Mr. Jung had documented hyperglycemic episode at the following times:

    a.   October 28, 2023, during the intake process, for a blood sugar of 542;

    b.   October 29, 2023, PM, for a blood sugar of 585;

    c.   October 31, 2023, PM, for a blood sugar of 500;

    d.   November 1, 2023, PM, for a blood sugar of 411 (at which time no corrective insulin was administered).

Ex. 1, Patient Safety Event Report, p. 3-6.

123.    The Patient Safety Event identified, *inter alia*, the following problems with the care provided to Mr. Jung from October 27, 2023 to November 6, 2023, resulting in the failure to appropriately monitor his glucose, treat his diabetes, and provide him with insulin:

a. "Nurse failed to utilize the Hyper/Hypoglycemia NET during the Intake screening or schedule a follow up (walk in appt)" and "will receive a write up for not completing a NET form for elevated Blood sugar upon examination or scheduling a follow up visit";

b. "Nurse did not utilize CRIC for BS>400 nor notify the provider" and will "receive a write up for failure to administer sliding scale insulin coverage for a BS of 411";

c. "Nurses failed to obtain a signed refusal or schedule a red flag appointment" and will "receive a write up for not receiving a refusal";

d. "Nurses failed to utilize the Hyper/Hypoglycemia NET during med pass (BS >400)" and will "receive a write up for not completing a NET form for elevated Blood sugar upon examination";

e. "Nurses documented a NO SHOW for insulin" and would "receive a write up for not scheduling a red flag appointment";

f. "Nurses failed to document in the EMAR (Not Documented)" and will receive further education on documentation of medication administration;

g. "Provider failed to follow up in real time regarding telephone call about patient with BS of 542 and positive ketones" and "was verbally educated by the SMD [Site Medical Director].

Ex. 1, Patient Safety Event Report at 5-6.

*Deaths in the Philadelphia Department of Prisons*

124.    Defendant Carney was aware of every death in PDP custody and reviewed every death investigation under her tenure. City Defs' Ex. G (Carney Deposition) at 113:3-18, 120:22-123:5.

125.    Former Commissioner Carney does not recall any patterns emerging from the deaths in custody that she reviewed. City Defs' Ex. G (Carney Deposition) at 106:7-10.

126.    Of fifty-six deaths other than Mr. Jung's between May 2016 and June 2023, twenty resulted in the PDP Commissioner's Office of Special Investigations sustaining charges of misconduct against PDP or medical contractor staff. Of these twenty, the following cases

involved findings that correctional officers failed to identify or appropriately respond to the medical emergency that resulted in death:

a. In case SI-17-00235 (PICC 2017), the PDP Commissioner's Office of Special Investigations sustained charges against a Sergeant who "was on [the] unit multiple times throughout his shift, but did not conduct a tour of the unit;" another sergeant was "was on [the] unit, but did not conduct a tour;" and eight additional correctional officers for failing to conduct tours. Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005130-5131

b. In case SI-18-00014 (CFCF 2018), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who "did not notify her immediate supervisor and did not call for medical assistance upon discovering" the deceased individual "unresponsive inside his cell." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005052.

c. In case SI-19-00088 (PICC 2019), the PDP Commissioner's Office of Special Investigations sustained charges against an officer because he "did not notify any supervisor, nor did he generate mental health referrals using Lock and Track (IJMS) for inmates he deemed to be in the state of crisis." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production004974.

d. In case SI-19-00145 (CFCF 2019), the PDP Commissioner's Office of Special Investigations sustained charges against one officer for his "reluctance to take proper action by notifying the medical staff and his supervisor that" the deceased individual "was unresponsive after he did not respond to … commands to wake up," as well as another officer because he remained at the cell door "for approximately 90 seconds, and then entered the cell and remained in the cell for approximately 15 seconds," and then left the pod without notifying officers or any medical personnel that the deceased individual was unresponsive. Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005266.

e. In case SI-20-00231 (PICC 2020), the PDP Commissioner's Office of Special Investigations sustained charges against two officers who "failed to tour the unit as per PDP policy," when "video proved that both officers were at the officer's desk when they were notified by an inmate of trouble." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005357

f. In case SI-20-00045 (CFCF 2020), the PDP Commissioner's Office of Special Investigations sustained charges against one officer who arrived at the scene of a medical emergency, "did not check for a pulse, attempt CPR, or render any first-aid" as the deceased individual "was lying faced-down and unresponsive on the ground inside his cell;" another officer who "stood at the entrance" to the deceased individual's cell, "did not enter the cell to check for a pulse, attempt CPR, or render any first-aid;" and a third officer who "did not conduct any tours in any of the buildings throughout the 11:00PM-7:00AM shift." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005333

g. In case SI-20-00149 (DC 2020), the PDP Commissioner's Office of Special Investigations sustained charges against a sergeant who "failed to tour all of her assigned areas and notate her tours in Lock & Track … during the 7AM to 3 PM shift." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005012

h. In case SI-21-00225 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against one officer who "did not perform his 3:00 AM headcount;" of those rounds he did conduct, there was evidence that "many of the cell door windows were obscured, and no corrective action was taken … for a clear view into the cells," and he "did not render any aid (First aid/CPR) to" the deceased individual "for a total of 8 minutes prior to the arrival of medical personnel;" as well as another officer who "failed to render CPR/First Aid" to the deceased individual "for a total of four (4) minutes;" as well as another officer who failed to tour the unit during the shift in which this individual died. Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production004800.

i. In case SI-21-00234 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who "did not conduct proper tours and headcounts during his shift in accordance with PDP policy and procedures." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005159

j. In case SI-21-00003 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against two officers after video showed "that an inmate was trying to get the attention of both C/Os" and both "continued on … neither officers appeared to alert anyone of what may have been going on inside with [the deceased individual] who was later discovered unresponsive;" and another officer who "waited approximately two minutes before he attended to" the deceased individual's medical emergency "after being alerted by another inmate." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production004740

k. In case SI-21-00059 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against one officer who "failed to tour the unit as per PDP policy," but "remained behind the officer's desk in a reclined position for most of his shift;" and a Sergeant for permitting the officer to "leave [the pod] unattended to go to his next post … without sending anyone to conduct tours on the unit due to his absence." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production004838

l. In case SI-21-00106 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who "logged 'OKTOUR' in the electronic logbook without conducting physical tours" at three points during the night of the death, "did not conduct any physical tours of the unit," and "video footage shows that [he] remained behind the Officer's desk seated in a reclined position." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production004932

m.  In case SI-21-00027 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who "did not conduct her initial tour or initial headcount of the unit upon arrival." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005375

n.  In case SI-22-00105 (CFCF 2022), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who was observed on video "leaving [the] IP … unattended as he walked away from [the] IP … who appeared to be having a medical emergency," and "did not initiate any aid (CPR) during their interactions with [the] IP … during his medical emergency." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005521.

o.  In case SI-23-00055 (CFCF 2023), the PDP Commissioner's Office of Special Investigations sustained charges against one officer who was witnessed on video entering the deceased individual's cell and "at no time performing chest compressions;" another officer observed on video "looked into the cell and then walked off the unit, and at no times did she perform chest compressions;" and another officer who "arrived on the unit and stated that he did not see anyone doing, nor did he perform chest compressions (CPR)." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production004957.

127.    Defendant Carney never ordered refresher trainings for correctional officers on rendering emergency aid. City Defs' Ex. G, Carney Deposition at 144:3-9.

128.    Neither Defendant Carney nor PDP ever considered placing patient with greater needs for medical care in the infirmary. City Defs.' Ex. G, Carney Deposition at 93:8-95:4.

129.    The PDP's medical auditor reviewed infirmary practices to determine whether admissions were "proper," "like somebody that needed to be there," but "has not specifically" looked at whether or not certain patients should be in the infirmary but are not placed there. City Defs.' Ex. H, Varghese Deposition at 58:10-59:21.

130.    In Mr. Jung's case (CFCF 2023), the PDP Commissioner's Office of Special Investigations concluded that "C/O Gena Frasier … failed to render immediate aid to IP Jung as outlined in PDP Policy," "walked away from I/P Jung and left I/P Jung unattended lying on the floor outside of his cell for approximately 9 minutes," and "failed to call for a stretcher or initiate aid to I/P Jung during his medical emergency;" and that Correctional Lieutenant Wanda Bloodsaw "appeared to be trying to communicate with I/P Jung before

two I/P's come to the cell and drag I/P Jung into the cell as Lt. Bloodsaw monitors the

situation the I/Ps exit the cell which is then secured by Lt. Bloodsaw who then exits the

housing area," and Bloodsaw "failed to call for a stretcher or initiate aid to I/P Jung during

his medical emergency."  City Defs' Ex. A at City-Jung-000011.

/s/ Bret Grote
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
/s/ Rupalee Rashatwar
Staff Attorney
PA ID No. 331085
rupalee@alcenter.org
*/s/ Margaret Hu*
Staff Attorney
PA ID No. 334438
margo@alcenter.org
*/s/ Lolo Salsbury Serrano*
Legal Fellow
PA ID No. 338184
lolo@alcenter.org
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123


*Counsel for Plaintiffs*

## **<u>CERTIFICATE OF SERVICE</u>**

I, Bret Grote, Esq., hereby certify that I caused a true and correct copy of the foregoing Responsive Statement of Concise Facts and Counter Statement of Facts to City of Philadelphia Defendants' Statement of Material Facts to be electronically filed on December 19, 2025, and thereby served upon all parties entered into the Court's ECF system.


<u>*/s/ Bret Grote*</u>
Bret Grote
bretgrote@alcenter.org
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123


*Counsel for Plaintiffs*