## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACOB and JAMES JUNG, as Administrators of the Estate of LOUIS JUNG, JR, | : : : | No. 2:24-cv-05618-TJS |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| CITY OF PHILADELPHIA; YesCare Corp.; BLANCHE CARNEY, Former Commissioner of Philadelphia Dept. of Prisons; LALITHA TRIVIKRAM; MAUREEN GAY;  MARIESHA APOLLON; BLAIR CABELLOS; GENA FRASIER; WANDA BLOODSAW, | : : : : : : : | |
| | : | |
| Defendants, | : | |
| v. | : | |
| | : | |
| CAREERSTAFF UNLIMITED, LLC, | : | |
| | : | |
| Third Party Defendant, | : | |
| v. | : | |
| | : | |
| TEKACCEL, INC., | : | |
| | : | |
| Fourth Party Defendant. | : | |

**PLAINTIFF'S RESPONSIVE CONCISE STATEMENT OF FACTS TO DEFENDANT APOLLON**

1.    Plaintiff's decedent, Louis Jung, Jr. (hereinafter, "Mr. Jung"), was born on April 16, 1973, and was diagnosed Type 1 diabetes during adolescence. See ECF No. 27 ¶¶53-54.

- **Admit**.

2.    On December 16, 2021, Mr. Jung, was arrested and incarcerated in the Philadelphia Department of Prisons ("PDP"). *Id.*  ¶58.

- **Admit**.

3.      At all times relevant, Mr. Jung was known to the PDP and to the PDP's medical staff to be

a Type 1 diabetic as far back as 2012. See Exhibit A.

- **Admit in part, dispute in part**. Mr. Jung was routinely misdiagnosed as a Type II diabetic throughout his time at PDP. *See* Ex. 1, Jung Medical Records – Type II Excerpts. On his multiple re-intakes into PDP custody, correct assessment of his diagnosis and insulin regimen depended in part on intake nurses' prompt collection of medical records from the community, prior stays at PDP, and other facilities such as Norristown State Hospital. *See* Ex. 2, YesCare CFCF and Core Process Intake Policies at YesCare 02278 (receiving screening form including current and past illnesses and prescription medications) and YesCare 03216 ("It is critical that the screener be prepared with all pertinent health information prior to contacting the provider"). Additionally, this statement is disputed as vague since "all times relevant" is not defined.

4.      On March 23, 2023, Mr. Jung was sent to Norristown State Hospital for a competency

evaluation to determine whether he could stand trial pursuant to a court order. *Id.* ¶69.

- **Admit in part, dispute in part**. Mr. Jung was sent to Norristown State Hospital on June 2, 2023.    Ex. 3, Jung Medical Records June 2, 2023 – November 6, 2023 at YesCare 1473-74.

5.      Defendant, Mariesha Apollon, R.N. was at all times material hereto a registered nurse. See

Exhibit B, Apollon Dep. 16:3-5.

- **Admit**.

6.      On August 1, 2023 Ms. Apollon began working at the Curran Fromhold Correctional

Facility pursuant to a thirteen-week contract through a medical staffing agency, third party

defendant, Tekkacel. *Id*. at 19:20-24.

- **Admit**.

7.  On October 28, 2023, pursuant to court order, Mr. Jung returned to the PDP, specifically

to the Curran Fromhold Correctional Facility ("CFCF"). ECF 27 ¶70.

- **Dispute**. Mr. Jung was returned to PDP custody on October 27, 2023 at
  approximately 12:55 PM, according to an intake form signed by Mariesha
  Apollon. Ex. 4, Jung Intake Screening Questionnaire by Correctional Officer,
  October 27, 2023. Mr. Jung's medical intake screening took place on October
  28, 2023.

8.  Nurse Apollon was assigned to intake duties at CFCF on October 28, 2023. Exhibit B,

Apollon Dep. 29:5-6.

- **Dispute**. Apollon was both assigned to serve as an intake nurse in addition to
  a medical triage nurse. Apollon Ex. B (Apollon Dep.) at 37:16-38:3. It was
  also her duty to follow up with patients after an initial intake screening when
  warranted. *Id*. at 40:21-41:8.

9.  Ms. Apollon conducted the medical screening of Mr. Jung on October 28, 2023 at intake

from Norristown State Hospital. ECF 27 ¶70.

- **Admit**. Defendant Apollon's intake progress note is electronically signed at
  10:03 AM. Defs' Ex. D (Progress Notes) at YesCare 1471.

10. Part of that medical screening included subjective questions posed to Mr. Jung. See Exhibit

C; & Exhibit B, Apollon Dep. 92: 23-25 & 93:1-6.

- **Admit in part, dispute in part**. The intake questionnaires appear under the

"Subjective" heading of a progress note formatted in SOAP (Subjective, Objective, Assessment, Plan) section. Dispute as to the characterization of the questions as "subjective," and dispute in so far as it implies that the information Defendant Apollon included here accurately reflects her conversation with Mr. Jung.

11.    The intake screening also included an assessment section, where information could be free-typed. See Exhibit D.

- **Admit in part, dispute in part.** Admit that on the intake screening form, Yescare 1470, there is an assessment field that permits information to be "free-typed" but dispute that this is the only section of the screening form that permits information to be "free-typed," as that term is not defined by Defendant Apollon. Also dispute as to materiality, as it is the accuracy or inaccuracy of the information that Defendnat Apollon entered and whether it is appropriate for the relevant standard of care that has a bearing on patient care, and not the mechanism by which she entered it into the patient's medical record.

12.    In part, several of the subjective questions were answered and recorded as follows:

Q. Have you ever been incarcerated before today?

A. No

Q. Do you have diabetes?

A. No

Q. Is the inmate a transfer back into custody from Norristown Hospital?

A. No

See Exhibit C & D.

- **Dispute as stated**. Admit that the intake screening form states the information asserted, but dispute that questions and responses were subjective or that they were answered by the patient before they were recorded and documented. Answers to the intake questionnaire were recorded by Defendant Apollon as laid out in ¶ 12, but are inconsistent with Defendant Apollon's typed characterization of Mr. Jung's subjective account of his condition, which was "states he has type 1 diabetes BS is 542 states he hasn't gotten insulin in 3 days." Whether, how, and when Mr. Jung answered the questions is thus unclear.

13.    As part of her intake screening, Ms. Apollon reviewed Mr. Jung's blood sugar levels. See Exhibit B, Apollon Dep. 102:6-11.

- **Admit**.

14.    At that time, Mr. Jung's blood sugar was 542. See Id.  & Exhibit D.

- **Admit**.

15.    After receiving the blood sugar result, Ms. Apollon communicated with the on-duty provider, co-Defendant Maureen Gay, CRNP. See generally ECF No. 27 ¶¶73, 77.

- **Admit that they communicated**.

16.    Nurse Apollon communicated Mr. Jung's blood sugar levels to CRNP Gay, as well as his vital signs. See generally Id.

- **Dispute**. There is a dispute as to the material fact of what was said between Defendant Apollon and Defendant Gay. Defendant Gay contends that she instructed Defendant Apollon to check Mr. Jung's blood glucose levels within

two hours. Ex. 5, Gay Deposition at 86:16-87:7. Defendant Apollon contends that this instruction was not given. Defs' Ex. B (Apollon Deposition) at 83:1-24, 106:4-23. Defendant Apollon did testify, however, that after Mr. Jung's death Defendant Gay had asked her on a telephone call why she did not call Defendant Gay back to follow up with Mr. Jung. Id. at 105:25-106:7. Defendant Gay testified that Defendant Apollon reported that Mr. Jung was not symptomatic, whereas Apollon did not report or document such information. Ex. 5, Gay Deposition at 98:1-5, 99:7-13. The only documentation of the phone call between Defendant Apollon and Defendant Gay consists of the statement "Please order IP insulin thanks," with response "Please see intake orders written." Defs.' Ex. D (Progress Notes) at YesCare 1466.

17.   As a registered nurse, Ms. Apollon was unable to order insulin for Mr. Jung herself. Exhibit B, Apollon Dep. 114:2-22.

- **Admit**.

18.   Ms. Apollon requested orders from Ms. Gay for insulin to reduce Mr. Jung's blood sugar. *Id.*

- **Admit in part, dispute in part.** Nurse Apollon requested insulin for Mr. Jung, but she failed follow up with Mr. Jung after two hours, as Defendant Gay testified she instructed her to. Ex. 5, Deposition of Gay, p. 87:5-9. There exists a material dispute as to what Defendant Apollon was ordered to do by Defendant Gay on October 28, 2023, and the jury must make the necessary factual finding to determine whether Defendant Apollon failed to abide by the

orders.

19. CRNP Gay gave orders for administration of medication to reduce Mr. Jung's blood sugar, upon receipt of Nurse Apollon's request.   See generally ECF No. 27 ¶¶73, 77 & Exhibit D.

- **Admit in part, dispute in part.** Defendant Gay ordered the provision of insulin, but also testified that she gave orders to Defendant Apollon to again evaluate Mr. Jung after two hours. Ex. 5, Deposition of Gay, p. 87:5-9.

20. Urine testing performed around the time of the medical intake revealed ketones in Mr. Jung's urine.  Exhibit B, Apollon Dep. 92:19-25.

- **Admit.**

21. Ms. Apollon documented that she administered insulin to Mr. Jung and that she advised Mr. Jung to drink plenty of water after receiving the urine ketone and blood sugar results, to flush the ketones. See Mariesha Apollon's Verified Answers to Interrogatories at Exhibit E.

- **Admit in part, dispute as to materiality.** Admit that Apollon administered insulin and told Mr. Jung to drink water. Dispute that insulin administration and instructions to drink water are sufficient for Defendant Apollon to meet the requisite standard of care for treating and assessing a patient presenting with hyperglycemia and potential diabetic ketoacidosis. Def. Ex. K, Expert Opinion of Dr. Williams [hereafter "Williams' Report"].

22. Nurse Apollon had no interaction with Mr. Jung after October 28, 2023. Exhibit B, Apollon Dep. 84:15-17.

- **Dispute as to materiality.** Nurse Apollon's limited interaction with Mr. Jung

at his intake screening on October 28, 2023 was a critical opportunity for medical evaluation and intervention that was entirely missed. On that date, Mr. Jung had a blood glucose level of 542, ketones in his urine, and he showed signs of confusion, suggesting he was developing DKA. Her limited interaction with Mr. Jung was significant, as "Mr. Jung's death was entirely preventable. There were multiple opportunities for medical evaluation" and many interventions on October 28, 2023 were missed, leading to his untimely demise. Def. Ex. K, Williams' report.

23.    From October 29 through November 5, 2023, Mr. Jung's blood sugars and insulin administration were recorded as follows:

**Medication Administration**  

**Insulin order:**
Novolin N 10 units SQ BID
Novolin R 10 units SQ BID
151-200 = 4 units, 201-250 = 6 units, 251-300 = 8 units, 301-400 = 10 units, > 400 = 12 units

| | 10/29 | 10/30 | 10/31 | 11/1 | 11/2 | 11/3 | 11/4 | 11/5 |
|---|---|---|---|---|---|---|---|---|
| AM | BS 385 10 R 10 N | BS 268 8 R 10 N | BS 371 10 R 10 N | Refused (no form) | BS 290 8 R 10 N | No Show | BS 266 8 R 10 N | No Show |
| PM | BS 585 12 R 10 N | Not Doc | BS 500 No CRIC doc 10 N | BS 411 0 R 10 N | BS 245 6 R 10 N | BS 394 10 R 10 N | Not Doc | Refused (no form) |

10/29 PM BS included a note in the EMAR: "Provider notified; urine obtained." No other documentation or lab located.

11/6 AM Patient did not show up for his AM insulin.  The nurse was on his way to obtain a refusal form when the stretcher call was announced at 0604. All resuscitative efforts were attempted, and the patient was pronounced at 0647 after Fire Rescue arrived.

- **Admit in part, dispute in part.** Admit that above chart is produced in Yescare's Patient Safety Review, but dispute that this information was properly recorded or documented in the patient's medical record.

24.    Ms. Apollon was not involved in obtaining any of those blood sugars, or administering any of the insulin documented in Paragraph 23 above. Exhibit B, Apollon Dep. 84:15-17.

8

- **Admit**.

25.  Mr. Jung passed away on November 6, 2023, 9 days after his single interaction with Ms. Apollon, and 894 days after his initial intake into the PDP. ECF 27 ¶97.

- **Admit**.

26.  Plaintiffs are the administrators of the Estate of Louis Jung. ECF 27 ¶1.

- **Admit**.

27.  Plaintiffs' Original Complaint is this matter was filed on or about October 23, 2024. ECF 1.

- **Admit**.

28.  Ms. Apollon was not a named Defendant in the Original Complaint. ECF 27.

- **Admit**.

29.  On or about March 13, 2025, Plaintiffs filed an Amended Complaint, which added new Defendants, including Ms. Apollon. ECF 27.

- **Admit**.

30.  Plaintiffs' Amended Complaint alleges that Mr. Jung died as a result of diabetic ketoacidosis (DKA). ECF 27.

- **Admit**.

31.  Plaintiffs' Amended Complaint contains seven (7) counts with claims as follows: (1) Deliberate Indifference and Objective Indifference to Serious Medical Need, (2) Medical Malpractice, (3) Americans with Disabilities Act, (4) Rehabilitation Act, (5) Failure to Train or Supervise Staff, (6) Wrongful Death Claim pursuant to Pa.C.S.A. §8301, (7) Survival Action pursuant to 20 Pa.C.S.A. §3373 and 42 Pa.C.S.§8302. See generally ECF 27.

- **Admit**.

32. Counts 3 and 4 are brought against the City of Philadelphia alone. Id.

- **Admit**.

33. Count 5 is brought against the City of Philadelphia and YesCare only. *Id.*

- **Admit**.

34. Only Counts 1, 2, 6 and 7 are brought against Ms. Apollon. *Id.*

- **Admit**.

35. Third Party Complaints against CareerStaff Unlimited and Tekaccel have been filed since the Amended Complaint, but do not alter Plaintiffs' allegations against Ms. Apollon. See ECF 60 & ECF 82.

- **Admit**.

36. On or about July 10, 2025, this Honorable Court entered an Order setting deadlines for the submission of Plaintiffs' expert reports, and the completion of discovery. See Exhibit F.

- **Admit**.

37. Specifically, the Order directed that fact discovery be completed no later than September 26, 2025, Plaintiffs' expert reports were due no later than October 24, 2025, contradictory or rebuttal expert reports due not later than November 7, 2025, expert depositions to be conducted no later than November 21, 2025, and dispositive motions due no later than December 5, 2025. *Id.*

- **Admit**.

38. Thereafter, Plaintiffs' counsel sought extension of the above deadlines, which was denied by Order of the Court dated September 18, 2025. See ECF 69 & Exhibit G.

- **Denied**. Plaintiffs' counsel filed a Joint Motion for extension that was agreed

to by all parties after being suggested by defense counsel at a deposition. The motion speaks for itself.

39. However, in the Court's September 18, 2025 Order, this Honorable Court indicated that the parties could agree to continue to discovery provided that other deadlines in the Scheduling Order were unaffected. See Exhibit G.

- **Admit that the Court allowed continuation of discovery deadlines so long as non-discovery deadlines were not affected**.

40. On or about September 19, 2025, a stipulation of counsel was filed with the Court which stated, "PLEASE TAKE NOTICE that, consistent with the footnote in this Court's order of September 18, 2025 that stated 'the parties may agree to continue discovery provided it does not affect any other deadlines in the Scheduling Order,' the parties hereby agree to complete fact discovery by November 19, 2025 and expert discovery by December 3, 2025." See Exhibit H.

- **Admit**.

41. Plaintiffs did not produce expert reports by October 24, 2025. See Email Correspondence at Exhibit I.

- **Dispute as to materiality.** Plaintiffs produced expert reports on December 3, 2025, the stipulated date for the close of expert discovery. The October 24, 2025 deadline in the Scheduling Order was replaced with the stipulated date of December 3, 2025. Plaintiff expert reports could not have possibly been produced by October 24, 2025, as fact discovery was still underway and Defendant Apollon was not even made available for a deposition until two weeks after that date, on November 5, 2025. Apollon's Ex. B, Deposition of

Apollon. Additionally, Defendant Apollon's own legal team cannot agree with each other as to which date they now claim all expert reports were due, with one claiming the deadline for Plaintiff expert reports was October 24, 2025 in this summary judgment filing, and another claiming by email it was November 21, 2025. Ex. 6, Emails regarding expert discovery disclosures, December 10, 2025.

42.     For the first time, Plaintiffs produced expert reports on December 3, 2025, via email timed at 4:00 p.m. *Id.*

- **Admit, but dispute as to materiality.** Admit that Plaintiffs produced the expert reports on the stipulated deadline for the close of expert discovery of December 3, 2025. Additionally, Defendants had notice as to the identities of three of Plaintiffs four experts as early as June 18, 2025, when Plaintiffs' counsel disclosed the names and curriculum vitiates of Lori Roscoe, Dr. Jonathan Williams, and Dr. Homer Venters. A fourth expert in corrections was retained in mid-October, and Plaintiffs disclosed this expert upon receipt of his completed report. Ex. 15, Rule 26(a)(2) Disclosures.

43.     Plaintiffs' expert reports were produced within forty-eight (48) hours of the Motion for Summary Judgment deadline in this matter. *Id.*

- **Admit, but dispute as to materiality.** Admit that the July 10, 2025 Scheduling Order stated that motions for summary judgment were due December 5, 2025 and admit that the deadline for the close of expert discovery that was stipulated to by all parties, including counsel for Defendant Apollon, was December 3, 2025. Dispute that Defendant Apollon or any Defendant

experienced any prejudice by Plaintiffs' adherence to the stipulated date for completion of expert discovery. Defendant Apollon agreed to the stipulated date for completion of expert discovery, made substantive arguments in her summary judgment brief based on the reports, and one week later filed a *Daubert* motion, indicating that Defendant Apollon was capable of processing and responding to the expert reports.

44.    Plaintiffs have produced four (4) expert reports in this matter: Homer Venters, M.D., Lori Roscoe, DNP, Jonathan Williams, M.D. and Art Wallenstein. *Id.*

- **Admit**.

45.    The materials produced via the 4:00 p.m. email on December 3, 2025, total ninety-eight (98) pages. *Id.*

- **Admit in part, dispute in part, and dispute as to materiality.** Plaintiffs met the stipulated filing deadline for the close of expert discovery. Admit that Plaintiffs filed four expert reports, and that all reports included 68 substantive pages of expert opinions. Prior expert history and CVs were also produced. Dispute that there is anything material in the timing or the page numbers involved in Plaintiffs' expert reports.

46.    Dr. Venters is a physician and epidemiologist. See a copy of Dr. Venters Report is at Exhibit J.

- **Admit**.

47.    Dr. Williams is a physician and endocrinologist. See a copy of Dr. Williams' Report at Exhibit K.

- **Admit**.

48.   Nurse Roscoe is an Advanced Practice Registered Nurse and Adult Nurse Practitioner. See a copy of Dr. Roscoe's Report at Exhibit L.

- **Admit**.

49.   Mr. Wallenstein's report indicates that he was asked to review the conduct of the correctional (non-medical) staff members for ensuring access to healthcare. See a copy of Dr. Wallenstein's Report at Exhibit M.

- **Admit**.

### Plaintiffs' Counter-Statement of Facts

50.   Defendant Apollon and Mr. Jung co-signed an "Authorization to Obtain, Use and Disclose Medical Information" that enabled access to "medical/psychiatric treatment records" and "a summary of inpatient/outpatient medical/psychiatric treatments, including medications" on October 28, 2023. Ex. 7, Jung Authorization to Obtain, Use and Disclose Medical Information.

51.   Defendant Apollon testified that she was provided with training when she began at CFCF. This training consisted of both classroom training and on-the-job training with a more experienced preceptor. Defs.' Ex. B (Apollon Deposition) at 43:2-19.

52.   Defendant Apollon testified that she was trained on how to conduct intake, including which forms to fill out and which questions to ask. Defs.' Ex. B (Apollon Deposition) at 44:17-24.

53.   Defendant Apollon testified that she was provided with policies as part of her training, but does not recall which ones. Defs.' Ex. B (Apollon Deposition) at 44:25-45-8.

54.   YesCare's 'Core Process' policy 103-C-SOP, Intake: Urgent/Emergent Care, informs staff performing intake screenings that it "is critical that the screener be prepared with all

pertinent health information prior to contacting the provider. This helps ensure effective communication and the timely delivery of patient care." Ex. 2, YesCare CFCF and Core Process Intake Policies at YesCare 03216.

55.    YesCare's 'Core Process' policy 110-C-SOP, Intake: Medication Verification, requires intake staff to "verify all prescription medication(s)." Ex. 8, YesCare Medication Verification Policy at YesCare 03237.

56.    If a medication container is not available, Step 2 of Core Process 110-C-SOP instructs intake staff to either review a transfer summary from another correctional institution, or obtain a signed Release of Information (ROI); contact outside agencies (which may include "pharmacies, hospitals, doctors offices, clinics, etc.") to request medication verification; and send a copy of the signed ROI to such outside agencies, if required. Ex. 8, YesCare Medication Verification Policy at YesCare 03237-03238.

57.    Step 3 of Core Process 110-C-SOP instructs intake staff to notify the provider, and to "remember to have the following information available when reviewing medication with provider: Name of medication; Dosage; Frequency taken; Date/time of last dose taken; Prescriber name; Reason taken." Ex. 8, YesCare Medication Verification Policy at YesCare 03238.

58.    Dr. Lalitha Trivikram, YesCare's 30(b)(6) deponent, testified that registered nurses conducting intake have access to the electronic health records for patients who have previously been incarcerated at PDP. Ex. 9, Trivikram Deposition at 64:2-8.

59.    Maureen Gay testified that seeking prior medical records was the responsibility of the registered nurse during intake. Ex. 5, Gay Deposition at 32:3-24.

60.    Defendant Apollon contends that she did not have access to electronic medical records

during intake, and had no way to access medical records from another facility. Defs' Ex. B (Apollon Deposition) at 77:10-79-2.

61. Defendant Apollon was aware that "if you do not have documentations of the medical history, it can harm the patient." Defs' Ex. B (Apollon Deposition) at 78:5-6.

62. When Mr. Jung left PDP for Norristown on June 2, 2023, he was prescribed 30 units of Humulin in the morning; 15 units of Humulin in the evening; and sliding scale Humulin ranging from 6 to 18 units, twice a day. Ex. 3, Jung Medical Records June 2, 2023 – November 6, 2023 at YesCare 1473-74.

63. When Mr. Jung left Norristown on October 27, 2023, he was prescribed 30 units of Novolin in the morning; 15 units of Novolin in the evening; and sliding scale Humulin ranging from 3 to 15 units, three times per day. Ex. 10, Jung Norristown Medication Administration Record - October 2023.

64. After reviewing Defendant Apollon's intake notes and speaking with Defendant Apollon on October 28, 2023, Maureen Gay entered an order for Mr. Jung to receive 10 units of Novolin twice daily, and sliding scale Novolin ranging from 2-12 units, twice daily. Ex. 3, Jung Medical Records June 2, 2023 – November 6, 2023 at YesCare 1464-1465.

65. YesCare's clinical pathway for diabetes care provided instructions on "nursing considerations" when a diabetic patient's glucose level equaled or exceeded 400 in a Finger Stick Blood Glucose (FSBG) check. Ex. 11, YesCare Diabetes Clinical Pathway, p. 3.

66. The clinical pathway instructed nursing staff to check urine ketones; if symptomatic, complete a Hyperglycemia/Hypoglycemia NET; notify the facility or on-call practitioner for orders and document in the patient's chart; conduct a follow-up FSBG check in approximately two hours; and place the patient on sick call to be seen by the provider for

the next day that the provider is on-site. Ex. 11, YesCare Diabetes Clinical Pathway, p. 3-4.

67.    YesCare's Nursing Encounter Tool (NET) for Hyperglycemia and Hypoglycemia is a form that provides space for documentation of symptoms, and for documentation of FSBG levels two and four hours after an initial hyperglycemic blood glucose reading. Ex. 12, YesCare Nursing Encounter Tool: Hypoglycemia/Hyperglycemia.

68.    In nursing school, Defendant Apollon received training on care for diabetes and the signs and symptoms of hyperglycemia, including dehydration, blurred vision, and confusion. Defs' Ex. B (Apollon Deposition at 16:22-17:24, 79:3-16.

69.    Defendant Apollon's prior work experience in care for diabetic patients included follow-ups and reassessments, including when patients were assessed to have abnormal blood glucose levels. Defs.' Ex. B (Apollon Deposition) at 16:10-18:8.

70.    Marsha Jeoboham was YesCare's Director of Nursing (DON) from 2022 through October of 2024. DON Jeoboham was Defendant Apollon's clinical leader. Ex. 13, Jeoboham Deposition at 17:6-8, 8:16-17; 89:4-15.

71.    DON Jeoboham testified that new nurses at YesCare were provided with training on diabetes as part of their onboarding process. Ex. 13, Jeoboham Deposition at 52:20-53:23.

72.    DON Jeoboham testified that new nurses at YesCare were trained in Nursing Encounter Tools as part of the onboarding process. Ex. 13, Jeoboham Deposition at 76:4-19.

73.    Defendant Apollon testified that she believed medical staff, including both nurses and doctors, had the ability to follow up with patients after intake at CFCF. Defs.' Ex. B. (Apollon Deposition) at 41:2-8.

74.    The full text that Defendant Apollon entered as Mr. Jung's "assessment" on intake is

"AAOx3 states he has type 1 diabetes BS is 542 states he hasn't gotten insulin in 3 days spoke to provider on remote gave the OK to administered 10 units of NPH and 12 units of Regular insulin gave IP snack. Denies ETOH/BENZO and opiate abuse denies SI/HI. aware of sick call triage and medical triage available 24/7 for emergencies urine present for Ketones encourage to drink plenty of water." Ex. 3, Jung Medical Records June 2, 2023 – November 6, 2023 at YesCare 1470.

75.    Mr. Jung was not seen by any medical provider at PDP for evaluation of his diabetes between his interaction with Defendant Apollon on October 28 and his death on November 6, 2023. Ex. 3, Jung Medical Records June 2, 2023 – November 6, 2023.

76.    The cause of Mr. Jung's death was diabetic ketoacidosis due to lack of insulin. Def. Ex. K, Williams Report at 6-7.

77.    YesCare produced a Patient Safety Event Report after Mr. Jung's death. Ex. 14, Patient Safety Event Report.

78.    The Patient Safety Event Report concluded that "Nurse failed to answer intake questions accurately or obtain an Intermedex which would have identified recent RX and dosages." Ex. 14, Patient Safety Event Report at 5.

79.    The Patient Safety Event Report concluded that the "Nurse failed to utilize the Hyper/Hypoglycemia NET during the intake screening or schedule a follow up (walk in appt)." Ex. 14, Patient Safety Event Report at 5.

80.    The Patient Safety Report concluded that the problems it identified with Mr. Jung's care, including deficiencies in the intake examination, deviated from generally accepted standards and that these deviations reached the patient and resulted in moderate to severe harm or death. Ex. 14, Patient Safety Event Report at 7.

81.    Plaintiffs' expert in correctional nursing, Lori Roscoe, opined the following in regard to

Defendant Apollon:

When RN Apollon conducted Mr. Jung's intake evaluation on October 28th, she encountered conflicting information regarding whether he was diabetic. She documented a blood glucose of 542 mg/dL which is a critically high level that placed Mr. Jung at immediate risk for diabetic ketoacidosis. Although she appropriately contacted the provider and checked for ketones, she did not complete the Hyper/Hypoglycemia Nursing Encounter Tool (NET) nor did she conduct the ongoing reassessment required for a patient in acute metabolic distress. After administering insulin, she did not recheck Mr. Jung's blood glucose or ketones, nor did she continue monitoring him until the level dropped to a safer range, but she should have. A glucose level exceeding 500 mg/dL accompanied by ketonuria represents a medical emergency requiring repeated reassessment, close monitoring, and continued communication with the provider. Often a blood glucose that high warrants transfer to an emergency department for a higher level of care than can be rendered in a correctional facility. RN Apollon's failure to carry out these essential nursing responsibilities deviated significantly from the standard of nursing care.

Defs' Ex. L, Roscoe Report at 11.

82.    Plaintiffs' expert in diabetes care, endocrinologist Dr. Jonathan Williams, opined the

following:

The cause of death is indisputable. Mr. Jung did not receive sufficient insulin, consequently developed DKA, which resulted in suffering and death. As an incarcerated person, he was entirely dependent on attendants at the prison to provide his medical care. The intake record demonstrates that providers were aware of his diagnosis of T1DM and that he took both long-acting and short-acting insulin formulations. He was at high risk for DKA given prior episodes of DKA while in the same prison 3 times the year before. As would be clearly indicated in this individual with T1DM and history of DKA, there were orders to check blood glucose levels and to administer insulin. His prior record at the same prison and also his record at Norristown State Hospital established that he required at least 60 units of insulin per day (Elizabeth Bradley, MD May 20, 2023 progress note and eMAR from Norristown State Hospital October 27, 2023). Mr. Jung had a long history of non-compliance. YesCare policy includes guardrails to manage non-administration of named critical medicines (including insulin), that requires immediate provider action. Clearly, this is meant to avoid known acute complications such as hyper- and hypoglycemia. Unfortunately, the safeguards in place were not followed as outlined, leading to profound under-insulinization.

There is no question that he was developing DKA over this period as it would be entirely expected in the absence of insulin administration since the morning of

October 27, 2023. The NPH insulin he received that morning would've been out of his system by the afternoon that day. From this time forward he would begin to develop DKA. The high suspicion of DKA was evident from intake. His incorrect answers at this time, including stating an initial "no" to history of diabetes and that he had not had "insulin for 3 days" are consistent with someone with impaired cognition in the setting of marked hyperglycemia or DKA. Yet, remarkably, no follow-up interventions were conducted to determine if the insulin provided at that time had corrected either his critically elevated glucose or ketones. Regardless of his appearance at this time, the presence of these two components in an individual with T1DM requires very close follow-up, as indicated in YesCare's policy, which would include a glucose recheck within 2 hours. While increasing oral intake can help lower glucose and reduce ketones, it is a deviation from the standard of care to not order a follow up glucose reading and determine if ketones are starting to clear, as the absence of improvement indicates escalation of care is required. Failing to follow up to check on Mr. Jung's blood glucose level was disregarding a known risk that he would develop DKA.

Defs' Ex. K, Williams Report at 6.

83. Plaintiffs received a Request for Production of Documents from counsel for the City of Philadelphia on December 5, 2025, pertaining to Plaintiffs' corrections expert, and responded in full to that request on December 9, 2025. Ex. 16, Emails regarding City's RPD.

84. Plaintiff produced their corrections expert for a deposition on December 10, 2025. Ex. 17, Cover page for deposition of Arthur Wallenstein.

85. Plaintiffs' counsel are willing to accommodate any further requests for depositions of Plaintiffs' experts and have communicated this to Defendants' counsel. Ex. 6, Emails regarding expert discovery disclosures, December 10, 2025.

/s/ Bret Grote
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
/s/ Rupalee Rashatwar

Staff Attorney
PA ID No. 331085
rupalee@alcenter.org
*/s/ Margaret Hu*
Staff Attorney
PA ID No. 334438
margo@alcenter.org
*/s/ Lolo Salsbury Serrano*
Legal Fellow
PA ID No. 338184
lolo@alcenter.org
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123


*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Bret Grote, Esq., hereby certify that I caused a true and correct copy of the foregoing

Responsive Statement of Concise Facts and Counter Statement of Facts to Defendant Apollon's

Statement of Material Facts to be electronically filed on December 19, 2025, and thereby served

upon all parties entered into the Court's ECF system.

<u>*/s/ Bret Grote*</u>
Bret Grote
bretgrote@alcenter.org
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123

*Counsel for Plaintiffs*