**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JACOB and JAMES JUNG, as Administrators of the Estate of LOUIS JUNG, JR, | : : : | No. 2:24-cv-05618-TJS |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| CITY OF PHILADELPHIA; YesCare Corp.; BLANCHE CARNEY, Former Commissioner of Philadelphia Dept. of Prisons; LALITHA TRIVIKRAM; MAUREEN GAY;  MARIESHA APOLLON; BLAIR CABELLOS; GENA FRASIER; WANDA BLOODSAW, | : : : : : : : : | |
| | : | |
| Defendants, | : | |
| v. | : | |
| | : | |
| CAREERSTAFF UNLIMITED, LLC, | : | |
| | : | |
| Third Party Defendant, | : | |
| v. | : | |
| | : | |
| TEKACCEL, INC., | : | |
| | : | |
| Fourth Party Defendant. | : | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT APOLLON'S MOTION FOR SUMMARY JUDGMENT**

/s/ Bret Grote
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
/s/ Rupalee Rashatwar
Staff Attorney
PA ID No. 331085
rupalee@alcenter.org
/s/ Margaret Hu
Staff Attorney
PA ID No. 334438
margo@alcenter.org

/s/ Lolo Salsbury Serrano
Legal Fellow
PA ID No. 338184
lolo@alcenter.org
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

I.  PROCEDURAL HISTORY .................................................................................... 1

II.  STATEMENT OF FACTS ................................................................................... 2

III.  STATEMENT OF QUESTIONS INVOLVED .................................................... 6

IV.  LEGAL STANDARD ............................................................................................ 7

V.  ARGUMENT .......................................................................................................... 7

A.  Evidence that Defendant Apollon knew of Mr. Jung's hyperglycemia and risk of diabetic ketoacidosis and deviated from the applicable standard of care and YesCare policy for treatment of diabetes establish disputes of material fact that preclude summary judgment on Plaintiffs' Fourteenth Amendment claim against her. ................... 7

B.  Plaintiffs' expert reports opine that Defendant Apollon deviated from the standard of care for Type 1 diabetes and that this deviation made a substantial contribution to Mr. Jung suffering from hyperglycemia, diabetic ketoacidosis, and death. ............................ 14

C.  Plaintiffs' expert reports were timely filed on the stipulated deadline for completion of expert discovery that was permitted by the court and agreed to by all parties, including Defendant Apollon, and this Stipulation effected no prejudice to Defendant Apollon. ....................................................................................................................... 18

i.  Plaintiffs' Expert Reports Were Timely Filed .......................................................... 18

ii.  Even if Plaintiffs' Expert Reports Are Deemed Tardy, Exclusion Is Extreme and Inappropriate 24

VI.  CONCLUSION ...................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Bauder v. Phila., Bethlehem & N.E. R. Co.,* No. 96–7188, 1998 WL 633651 (E.D.Pa. Aug.28, 1998)......25, 28

*Brawner v. Scott Cnty.*, *Tennessee*, 14 F.4th 585 (6th Cir. 2021)................................................................8

*Brown v. Robert Packer Hosp.*, 341 F.R.D. 570 (M.D. Pa. 2022) ...........................................................19, 24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................................7

*Charles v. Orange Cnty.*, 925 F.3d 73 (2d Cir. 2019) ...................................................................................8

*Ciocca v. BJ's Wholesale Club, Inc.*, Civ. No. 04-5605, 2011 WL 3563560 (E.D. Pa. Aug. 12, 2011) ......26

*City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239 (1983)..............................................................7

*Cochran v. Jackson*, No. 14-2165, 2015 WL 3555291 (E.D. Pa. June 8, 2015) ...........................25, 26, 28

*Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976)..................................................................................8

*Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970 (1994)..........................................................................8

*Flickinger v. Toys R Us, Inc.*, No. 3:10-CV-305, 2011 WL 3359646 (M.D. Pa. Aug. 3, 2011)..................19

*Fulton v. Soh*, No. 1:21-CV-01268, 2024 WL 4755444 (M.D. Pa. Nov. 12, 2024)...................................19

*Gibson by Gibson v. Nat'l R.R. Passenger Corp.*, 176 F.R.D. 190 (E.D. Pa. 1997)..............................27, 29

*Gordon v. Cnty. of Orange*, 888 F.3d 1118 (9th Cir. 2018) ........................................................................8

*Hamil v. Bashline*, 481 Pa. 256, 266, 392 A.2d 1280 (Pa. 1978)..............................................................14

*Holbrook v. Woodham*, No. 05-304, 2008 WL 544719 (W.D. Pa. Feb. 28, 2008)......................................28

*Hubbard v. Taylor*, 399 F.3d 150 (3d Cir. 2005) ........................................................................................7

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ...........................................................19, 24

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999)..........................................................................................29

*Jones v. Montefiore Hosp.*, 431 A.2d 920 (Pa. 1981) ...........................................................................14, 17

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015)............................................................................................7

*Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710 (3d Cir. 1997) ......................................................19, 24

*Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894 (3d Cir. 1977) ...........................19, 26

*Miranda v. Cty. of Lake*, 900 F.3d 335 (7th Cir. 2018) ...............................................................................8

*Mitzelfelt v. Kamrin*, 584 A.2d 888 (Pa. 1990)....................................................................................14, 16

*Montgomery v. Mitsubishi Motors Corp.*, 448 F. Supp. 2d 619 (E.D. Pa. 2006)........................................26

*Moore v. Luffey*, 767 F. App'x 335 (3d Cir. 2019).......................................................................................8

*Moy v. DeParlos*, 2023 WL 3717517 (3d Cir. 2023)...................................................................................8

*Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003) .........................................................8

*Nicholas v. Pa. State Univ.*, 227 F.3d 133 (3d Cir. 2000) ........................................................................24

*Nippo Corp./International Bridge Corp. v. Amec Earth & Envtl.,* Civ. No. 09-0956, 2011 WL 1196922
    E.D. Pa. Mar. 30, 2011) ...........................................................................................................................26

*Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017) ...............................................................................9, 13

*Pansini v. Trane Co.*, No. 17-3948, 2019 WL 1299036 (E.D. Pa. Mar. 21, 2019)...............................26, 29

*Pearson v. Prison Health Serv.*, 850 F.3d 526 (3d Cir. 2017)......................................................................9

*Prowel v. Wise Bus. Forms*, 579 F.3d 285 (3d Cir.2009)..............................................................................7

*Rouse v. Plantier*, 182 F.3d 192 (3d Cir. 1999)..........................................................................................9

*Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023) .........................................................................................8

*Soufflas v. Zimmer, Inc.*, 474 F.Supp.2d 737 (E.D. Pa. Feb. 21, 2007).....................................................26

*Stimmler v. Chestnut Hill Hosp.*, 981 A.2d 145 (Pa. 2009)...................................................................14, 16

*West v. Keve*, 571 F.2d 158 (3d Cir. 1978) .................................................................................................9

**RULES**

Fed. R. Civ. P. 26(a)(2) ........................................................................................................20, 22

Fed. R. Civ. P. 56(a) ....................................................................................................................7

## I.     PROCEDURAL HISTORY

Plaintiffs Jacob and James Jung brought this case as Administrators of the Estate of Louis Jung, Jr [hereafter "Mr. Jung"], their father, who died of diabetic ketoacidosis while incarcerated in the Curran-Fromhold Correctional Facility (CFCF) within the Philadelphia Department of Prisons. This lawsuit was initiated on October 23, 2024 by the filing of a civil rights action pursuant to 42 U.S.C. § 1983. Dkt. 1. Plaintiffs' claims were based on failures to provide proper medical care and disability accommodations to Mr. Jung.

Constitutional medical care claims were brought under the Fourteenth Amendment to the U.S. Constitution against the City of Philadelphia, YesCare Corporation [hereafter "YesCare"], and against defendants Carney, Trivikram, Gay, and John Does. Pennsylvania state law medical malpractice claims were brought against YesCare, Trivikram, and Gay. Americans with Disabilities Act and Rehabilitation Act claims were brought against the City of Philadelphia. Failure to train or supervise staff in providing medical care or discipline staff who failed to provide proper medical care were brought against the City of Philadelphia and YesCare. Wrongful Death and Survival Action claims were brought against all defendants. Dkt. 1 at ¶¶ 151-181.

The City of Philadelphia defendants filed a motion to dismiss on December 23, 2024. Dkt. 14. The motion was granted in so far as Plaintiffs complaint purported to bring medical malpractice claims against the City of Philadelphia and defendant Carney, but dismissed with prejudice in all other respects. Dkt. 17.

Following initial discovery, Plaintiffs filed a First Amended Complaint. Dkt. 25. The First Amended Complaint removed the Doe defendants and added four additional defendants: Mariesha Apollon, Blair Cabellos, Gena Frasier, and Wanda Bloodsaw. *Id*. at ¶¶ 9-12. All four defendants were sued for violations of the Fourteenth Amendment and under the Wrongful Death and Survival

Action counts. *Id*. at ¶¶ 161-164, 182-192. Pennsylvania state law medical malpractice claims were brought against defendants Apollon and Cabellos. *Id*. at ¶¶ 165-168.

Defendant Apollon filed a motion to dismiss on May 1, 2025. Dkt. 35. The Court denied that motion on May 22, 2025. Dkt. 42.

Defendant Apollon moved for summary judgment on December 5, 2025.

## II.    STATEMENT OF FACTS

Defendant Mariesha Apollon is a registered nurse who began working at Curran Fromhold Correctional Facility on August 1, 2023. Plaintiffs' Responsive Concise Statement of Facts [hereafter "RCS"] at  ¶¶ 5-6. Defendant Apollon was provided with training when she began work at CFCF, consisting of both classroom training and on-the-job training with a more experienced preceptor. *Id* at ¶ 50. Defendant Apollon was trained on how to conduct intake, including which forms to fill out and which questions to ask. *Id.* at ¶ 52. Defendant Apollon was provided with YesCare policies as part of her training. *Id.* at ¶ 53. Defendant Apollon also received education on diabetes as part of her general nursing training prior to beginning work at CFCF, and had worked with diabetic patients in the past. *Id.* at ¶¶ 68-69. She was aware of the symptoms of hyperglycemia and hypoglycemia, and knew that care for diabetic patients included follow-ups and reassessments, including when patients were assessed to have abnormal blood glucose levels. *Id.*

YesCare's 'Core Process' policy 103-C-SOP, Intake: Urgent/Emergent Care, informs staff performing intake screenings that it "is critical that the screener be prepared with all pertinent health information prior to contacting the provider. This helps ensure effective communication and the timely delivery of patient care." *Id.* at ¶ 54. YesCare's 'Core Process' policy 110-C-SOP, Intake: Medication Verification, requires intake staff to "verify all prescription medication(s)." *Id.* at ¶ 55. If a medication container is not available, Step 2 of Core Process 110-C-SOP instructs

intake staff to either review a transfer summary from another correctional institution, or obtain a signed Release of Information (ROI); contact outside agencies (which may include "pharmacies, hospitals, doctors offices, clinics, etc.") to request medication verification; and send a copy of the signed ROI to such outside agencies, if required. *Id.* at ¶ 56. Step 3 of Core Process 110-C-SOP instructs intake staff to notify the provider, and to "remember to have the following information available when reviewing medication with provider: Name of medication; Dosage; Frequency taken; Date/time of last dose taken; Prescriber name; Reason taken." *Id.* at ¶ 57. Dr. Lalitha Trivikram, YesCare's 30(b)(6) deponent, testified that registered nurses conducting intake have access to the electronic health records for patients who have previously been incarcerated at PDP. *Id.* at ¶ 58. Maureen Gay testified that seeking prior medical records was the responsibility of the registered nurse during intake. *Id.* at ¶ 59.

YesCare's clinical pathway for diabetes care provided instructions on "nursing considerations" when a diabetic patient's glucose level equaled or exceeded 400 in a Finger Stick Blood Glucose (FSBG) check. *Id.* at ¶ 65. The clinical pathway instructed nursing staff to check urine ketones; if symptomatic, complete a Hyperglycemia/Hypoglycemia Nursing Encounter Tool (NET); notify the facility or on-call practitioner for orders and document in the patient's chart; conduct a follow-up FSBG check in approximately two hours; and place the patient on sick call to be seen by the provider for the next day that the provider is on-site. *Id.* at ¶ 66. YesCare's Nursing Encounter Tool (NET) for Hyperglycemia and Hypoglycemia is a form that provides space for documentation of symptoms, and for documentation of FSBG levels two and four hours after an initial hyperglycemic blood glucose reading. *Id.* at ¶ 67.

Louis Jung was born on April 16, 1973, and diagnosed with Type 1 diabetes as an adolescent. *Id.* at ¶ 1. Mr. Jung was incarcerated within the Philadelphia Department of Prisons

[PDP] on December 16, 2021. *Id.* at ¶ 2. On June 2, 2023, Mr. Jung was transferred to Norristown State Psychiatric Hospital. *Id.* at ¶ 4. When Mr. Jung left PDP for Norristown on June 2, 2023, he was prescribed 30 units of Humulin in the morning; 15 units of Humulin in the evening; and sliding scale Humulin ranging from 6 to 18 units, twice a day. *Id.* at ¶ 62. When Mr. Jung left Norristown on October 27, 2023, he was prescribed 30 units of Novolin in the morning; 15 units of Novolin in the evening; and sliding scale Humulin ranging from 3 to 15 units, three times per day. *Id.* at ¶ 63. On October 27, 2023, Mr. Jung was transferred from Norristown State Psychiatric Hospital to PDP custody. *Id.* at ¶ 7.

An initial intake screening form, co-signed by Defendant Apollon, reflected his arrival time at CFCF as 12:55PM on October 27, 2023. *Id*. Defendant Apollon conducted Mr. Jung's medical intake screening on the morning of October 28, 2023. *Id.* at ¶ 9. Defendant Apollon and Mr. Jung co-signed an "Authorization to Obtain, Use and Disclose Medical Information" that enabled access to "medical/psychiatric treatment records" and "a summary of inpatient/outpatient medical/psychiatric treatments, including medications" on October 28, 2023. *Id.* at ¶ 50. Despite receiving this authorization to obtain prior records, there is no indication in the record that Defendant Apollon requested or received Mr. Jung's prior medical records, prescriptions, insulin dosage regimen, or other information from either PDP's internal systems, Norristown State Hospital, local pharmacies, or any other facility. *Id.* at ¶ 78.

As part of the pre-intake medical screening, a medical assistant performed a blood glucose check on the morning of October 28, 2023 that showed Mr. Jung's blood glucose as 542. *Id.* at ¶¶ 13-14. Defendant Apollon reviewed this blood sugar level. *Id.* at ¶ 13. Defendant Apollon also asked Mr. Jung a list of questions from PDP's intake questionnaires, including "Do you have diabetes?" *Id.* at ¶ 12. Defendant Apollon entered an answer of "no" to this question, but typed

4

further down that "states he has type 1 diabetes BS is 542 states he hasn't gotten insulin in 3 days." *Id.*

At some point during the intake process, Defendant Apollon called the on-duty provider, co-defendant Maureen Gay, CRNP. *Id.* at ¶ 15. Defendant Gay contends that she instructed Defendant Apollon to perform a follow-up check of Mr. Jung's blood glucose in two hours. *Id.* at ¶ 16. Defendant Apollon denies that this instruction occurred. *Id.* Defendant Apollon did testify, however, that after Mr. Jung's death Defendant Gay had asked her on a telephone call why she did not call Defendant Gay back to follow up with Mr. Jung. *Id.* The only documented record of their telephone call consists of a "Telephone Encounter" that states "Please order IP insulin thanks." *Id.* Defendant Gay also contends that Defendant Apollon reported that Mr. Jung was not symptomatic. *Id.* Defendant Apollon then typed into the "assessment" portion of Mr. Jung's intake form that she "spoke to provider on remote gave the OK to administered 10 units of NPH and 12 units of Regular insulin gave IP snack… aware of sick call triage and medical triage available 24/7 for emergencies urine present for Ketones encourage to drink plenty of water." *Id.* at ¶ 74.

Defendant Apollon did not fill out a Nursing Encounter Tool for hyperglycemia. *Id.* at ¶ 79. Defendant Apollon did not schedule a follow-up appointment to recheck Mr. Jung's blood glucose. *Id.* Defendant Apollon did testify that she believed medical staff, including both nurses and doctors, had the ability to follow up with patients after intake at CFCF. *Id.* at ¶ 73. After reviewing Defendant Apollon's intake notes and speaking with Defendant Apollon on October 28, 2023, Maureen Gay entered an order for Mr. Jung to receive 10 units of Novolin twice daily, and sliding scale Novolin ranging from 2-12 units, twice daily. *Id.* at ¶ 64.

Mr. Jung was not seen by any medical provider at YesCare for evaluation of his diabetes between his encounter with Defendant Apollon and November 5, 2023. *Id.* at ¶ 75. Mr. Jung's

blood glucose was recorded as ranging between 245 and 585 from October 29, 2023 to November 5, 2023. *Id.* at ¶ 23. He missed at least four and as many as six doses of insulin altogether, including both insulin doses on November 5, 2023. *Id.* He died on the morning of November 6, 2023 of diabetic ketoacidosis.

YesCare produced a Patient Safety Event Report after Mr. Jung's death. *Id.* at ¶ 77. The Patient Safety Event Report identified that the "Nurse failed to answer intake questions accurately or obtain an Intermedex which would have identified recent RX and dosages." *Id.* at ¶ 78. The Patient Safety Event Report also identified that the "Nurse failed to utilize the Hyper/Hypoglycemia NET during the Intake screening or schedule a follow up (walk in appt)." *Id.* at ¶ 79. The Patient Safety Event Report ultimately concluded that the problems it identified with Mr. Jung's care, including deficiencies in the intake examination, deviated from generally accepted standards and that these deviations reached the patient and resulted in moderate to severe harm or death. *Id.* at ¶ 80.

## III.    STATEMENT OF QUESTIONS INVOLVED

1. Whether evidence that Defendant Apollon knew of Mr. Jung's hyperglycemia and risk of diabetic ketoacidosis and deviated from the applicable standard of care and YesCare policy for treatment of diabetes establish disputes of material fact that preclude summary judgment on Plaintiffs' Fourteenth Amendment claim against her.

2. Whether Plaintiffs' expert opinions that Defendant Apollon deviated from the standard of care for Type 1 diabetes and that this deviation made a substantial contribution to Mr. Jung suffering from hyperglycemia, diabetic ketoacidosis, and death preclude summary judgment on Plaintiffs' medical malpractice claim against her.

3. Whether Plaintiffs' expert reports were timely filed on the stipulated deadline for completion of expert discovery that was permitted by the court and agreed to by all parties, including Defendant Apollon, whether this stipulation effected any prejudice to Defendant Apollon, and whether the extreme sanction of excluding Plaintiffs' expert reports is warranted under these circumstances.

## IV.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). To defeat summary judgment, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute is only "genuine" for purposes of summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

## V.    ARGUMENT

### A.    Evidence that Defendant Apollon knew of Mr. Jung's hyperglycemia and risk of diabetic ketoacidosis and deviated from the applicable standard of care and YesCare policy for treatment of diabetes establish disputes of material fact that preclude summary judgment on Plaintiffs' Fourteenth Amendment claim against her.

As a pretrial detainee, Mr. Jung's claims related to the denial of adequate medical treatment fall under the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts Gen. Hosp*., 463 U.S. 239, 244 (1983); *Hubbard v. Taylor*, 399 F.3d 150, 167 n.23 (3d Cir. 2005) (*citing Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861 (1979)). Supreme Court precedent, the clear weight of sister circuit authority, and several decisions from the Third Circuit indicate that *Kingsley v. Hendrickson* sets as the proper inquiry for a constitutional claim brought by a pretrial detainee whether the defendant's actions were "objectively unreasonable." *Kingsley*, 576 U.S. 389 (2015). Five circuit courts have held that an objective analysis applies to pretrial detainees' claims of deliberate indifference to serious medical needs. *Charles v. Orange Cnty*., 925 F.3d 73 (2d Cir.

7

2019); *Gordon v. Cnty. of Orange*, 888 F.3d 1118 (9th Cir. 2018); *Miranda v. Cty. of Lake*, 900 F.3d 335 (7th Cir. 2018); *Short v. Hartman*, 87 F.4th 593, 605–06 (4th Cir. 2023); *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 596 (6th Cir. 2021).[1] While this question has never been squarely addressed by the Third Circuit court, it has repeatedly acknowledged that *Kingsley* may require reassessment of the deliberate indifference inquiry's subjective prong for cases brought by pretrial detainees. *See Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019); *Moy v. DeParlos*, 2023 WL 3717517, at *1 (3d Cir. 2023); *see also Hightower v. City of Philadelphia*, 130 F.4th 352, 356 (3d Cir. 2025) (acknowledging that question of whether subjective prong is required for analysis of certain Fourteenth Amendment pretrial detainee cases is unsettled). The *Kingsley* "objectively unreasonable" standard should apply in this case.

However, record evidence could result in a jury finding Defendant Apollon liable under a heightened standard of subjective deliberate indifference. Under this standard, the "evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (applying test from *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976)). The subjective prong of deliberate indifference, adopted from the Eighth Amendment, requires that the defendant officer knows of and disregards a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994).

---

[1] These cases reframe the standard for deliberate indifference as "something akin to reckless disregard," *Brawner*, 14 F.4th at 596, *Charles*, 925 F.3d at 33-34, *Miranda*, 900 F.3d at 354-53, *Gordon*, 888 F.3d at 1125; or "civil recklessness," *Short*, 87 F.4th at 611: that the defendant "knew, *or should have known*, that the conditions posed an excessive risk to [the plaintiff's] health or safety." *Charles*, 925 F.3d at 87. *See also Short*, 87 F.4th at 611 ("the plaintiff must show that the defendant should have known of that condition and that risk"); *Gordon*, 888 F.3d at 1124-25 ("the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious").

The Third Circuit has a well-developed jurisprudence on "adequacy of care" constitutional claims, as distinguished from complete denials of care. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017). It is well established that "there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements. For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier and less efficacious treatment' of the inmate's condition." *Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017) (*citing West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)). Another quintessential articulation of insufficient care is when a provider "delays necessary medical treatment based on a non-medical reason." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Characterizing this claim as "a checked box in an administrative portion of a form" gravely understates the multiple, compounding inadequacies of the care provided by Defendant Apollon. Initially, there is conflicting testimony in the record as to whether Maureen Gay directly instructed Defendant Apollon to re-check Mr. Jung's insulin within two hours. The credibility determinations necessary to resolve this factual dispute must be made by the factfinder. *See Liberty Lobby*, 477 U.S. at 255, 106 S. Ct. at 2513 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). If the jury credits Maureen Gay's account, then Defendant Apollon knew of and disregarded a direct instruction: one that would've avoided the risk of serious harm posed by hyperglycemia and potential diabetic ketoacidosis. This is quintessential deliberate indifference. See *Rouse*, 182 F.3d at 197 ("We have found 'deliberate indifference' in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it").

Moreover, Defendant Apollon was independently and subjectively aware that reassessment of blood sugar was critical in order to prevent further decline in a hyperglycemic diabetic's condition. Her prior education and work experience as a nurse equipped her with the knowledge that follow-ups and reassessments were the standard of care for diabetic patients. RCS at ¶¶ 68-69. Policies in force at CFCF at the time of Mr. Jung's death listed follow-up blood sugar checks as a required step when a patient's blood sugar was recorded over 400. *Id.* at ¶ 66. Had Defendant Apollon filled out a Hyperglycemia Nursing Encounter Tool, as was also required under YesCare policy, she would have been specifically prompted by spaces on the form to conduct follow-up blood sugar checks within two hours. *Id.* at ¶¶ 66-67. Defendant Apollon failed to either conduct a follow-up blood sugar check, schedule Mr. Jung for a follow-up with other medical staff, or schedule Mr. Jung for a follow-up appointment with a provider at the soonest available time. *Id.* at ¶ 79.

While Defendant Apollon contacted a provider to receive authorization for one insulin dosage, she failed to perform basic due diligence; namely, to equip that provider with critical information necessary to properly evaluate Mr. Jung's condition and advise of the proper course of treatment. Defendant Apollon did not fill out a Nursing Encounter Tool (NET), as was required under YesCare policy. *Id*. This NET would have prompted Defendant Apollon to evaluate Mr. Jung for multiple specific symptoms of diabetic ketoacidosis in addition to his elevated blood glucose level and the presence of ketones in his urine. *Id.* at ¶ 67. Defendant Gay contends that Defendant Apollon verbally represented that Mr. Jung had no other symptoms, *Id.* at ¶ 16. However, this is contradicted by Defendant Apollon's claim that Mr. Jung stated he did not have diabetes, which she determined was untrue during the intake interview. *Id.* at ¶ 12 **.** Mr. Jung's inability to answer basic health questions, all while suffering from a dramatically elevated glucose

level of 542 and with ketones present, is suggestive of the type of confusion and cognitive impairment consistent with diabetic ketoacidosis. *Id.* at ¶ 22. Whether Mr. Jung's answers to intake questions constituted a symptom of his medical condition – a fact that a jury must find – the record reflects that Defendant Apollon, at minimum, failed to document any relevant symptoms on the form that was available to her as standard practice at CFCF. *Id.* at ¶¶ 78-79. By the time Defendant Gay reviewed Mr. Jung's medical records to enter his final medication orders, she had no documented assessment of hyperglycemic symptomology against which to assess his condition.

Defendant Apollon also failed to obtain Mr. Jung's prior medical records or documentation of his active prescriptions. There are multiple indications in the record that this was her responsibility as the intake nurse. YesCare policy provides specific instructions to intake staff as to the steps to take for "medication verification" and to have "information available when reviewing medication with [the] provider." *Id.* at ¶¶ 55-57. YesCare's 30(b)(6) deponent testified that intake nurses have access to patient's prior PDP medical records at intake. *Id.* at ¶ 58. Defendant Gay testified that seeking prior records was the intake nurse's responsibility. *Id.* at ¶ 59. YesCare's review of Mr. Jung's death concluded that the "nurse failed to … obtain an Intermedex which would have identified recent RX and dosages." *Id.* at ¶ 78. Perhaps most conclusively, Defendant Apollon's own signature is on Mr. Jung's "Authorization to Obtain, Use and Disclose Medical Information" form. *Id.* at ¶ 50. And yet Defendant Apollon contended in her deposition that she had no ability to access a patient's prior medical records from PDP or any other facility at intake. *Id.* at ¶ 60. Given this dispute, a jury will have to determine whether Defendant Apollon knew that she should have obtained past records and critical patient information with the authorization that she signed. There is more than sufficient evidence in the record to raise the inference that she did.

The consequences of Defendant Apollon's multiple omissions were severe. Defendant Apollon has testified to knowledge that "if you do not have documentations of the medical history, it can harm the patient." *Id.* at ¶ 61. In the absence of prior medical records, Defendant Gay entered an order for only ten units of insulin, twice daily, with twice-daily sliding scale administrations of two to twelve units. *Id.* at ¶ 64. Had Defendant Apollon obtained prior records using the form that she signed, both Defendants would have known that Mr. Jung's insulin regimen at Norristown consisted of *three or more times as much* daily insulin – 30 units in the morning, 15 in the evening, and 3-15 units three times a day. *Id.* at ¶ 63. Had Defendant Apollon checked Mr. Jung's records from his prior incarceration at PDP, she would have known that this regimen was consistent with his dosage as of June – 30 units in the morning, 15 in the evening, and 6-18 units twice a day. *Id.* at ¶ 64. Defendant Apollon's failure to complete a NET also left the prescribing provider, Defendant Gay, without any documented record of Mr. Jung's possible symptoms of diabetic ketoacidosis beyond his elevated blood glucose and urine ketones. With multiple YesCare policies emphasizing the nurse intake screener's responsibilities to document and inform providers in order to provide prompt care, a jury could easily find that Defendant Apollon's critical omissions were a substantial cause of Mr. Jung's inappropriate prescription and lack of care.

Defendant Apollon knew that Mr. Jung's condition as of October 28, 2023 was objectively serious. She reviewed an objective indication that Mr. Jung had been without insulin for at least 20 hours by the time she conducted her screening – she signed his "Intake Screening Questionnaire by Correctional Officer," which listed an intake time of 12:55PM on October 27, and did not lock her intake note until 10:03AM on October 28. Mr. Jung reported to her that he had not had insulin for three days – a shocking length of time for a Type I diabetic if taken at face value, or an objective indication of his impaired cognition due to his hyperglycemic state. *See* Defs' Ex. K, Williams

12

Report at 6. Any licensed nurse knows that Type I diabetics cannot live without insulin, and that highly elevated blood glucose with ketones is associated with diabetic ketoacidosis and the risk of metabolic decompensation or death. Additionally, Mr. Jung apparently told her that he did not have diabetes, but later indicated that he did, leading to contradictory information being included in his intake records, which is consistent with the type of confusion that Defendant Apollon recognized as a symptom of hyperglycemia. RCS at ¶ 22.

There is sufficient evidence in the record for a jury to conclude that Defendant Apollon was responsible for, and failed to complete, multiple critical steps of care: fully evaluating Mr. Jung's symptoms by completing a NET, obtaining his prior medical records with the form that she signed, checking Mr. Jung's blood glucose after two hours, or scheduling a follow-up for other medical staff to do so. Defendant Apollon made one phone call and administered one dose of insulin. A jury could find that with this phone call, Defendant Apollon either failed to assess Mr. Jung and discern important symptoms that may have prompted a higher level of care (as the documentation reflects) or actively represented that he had no symptoms, despite failing to conduct this evaluation (as Defendant Gay testified). A jury could also find that Defendant Apollon knew she had the authority and responsibility to take each of these steps, but "opt[ed] for 'an easier and less efficacious treatment' of the inmate's condition." *Palakovic*, 854 F.3d at 228. In short, a jury could conclude that Defendant Apollon was deliberately indifferent. Therefore, summary judgment as to this count must be denied.

13

**B. Plaintiffs' expert reports opine that Defendant Apollon deviated from the standard of care for Type 1 diabetes and that this deviation made a substantial contribution to Mr. Jung suffering from hyperglycemia, diabetic ketoacidosis, and death.**

Medical malpractice claims under Pennsylvania law usually require medical expert testimony as to duty, breach, proximate causation, and damages. *Mitzelfelt v. Kamrin*, 584 A.2d 888, 891–92 (Pa. 1990). Expert witnesses "are not required to use 'magic words' when expressing their opinions; rather, the substance of their testimony must be examined to determine whether the expert has met the requisite standard." *Stimmler v. Chestnut Hill Hosp.*, 981 A.2d 145, 155 (Pa. 2009).

Causation in a medical malpractice claim requires proof that a defendant's breaches of duty were the "proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient." *Id.* at 891. A substantial factor "need not" be "the only factor, i. e., 'that cause which ... produces the result.'" *Jones v. Montefiore Hosp.*, 431 A.2d 920, 923 (Pa. 1981). "Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm." *Mitzelfelt*, 584 A.2d at 892. Moreover, "once a plaintiff has established facts from which a jury could reasonably conclude that defendant's actions were a substantial factor in bringing about the harm, the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve the defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence." *Hamil v. Bashline*, 481 Pa. 256, 266, 392 A.2d 1280, 1285 (Pa. 1978).

14

As Defendant Apollon acknowledges, Plaintiffs' expert opined at length in their reports as to her duties as a nurse and her breaches of those duties. Correctional nursing expert Lori Roscoe found as follows:

> When RN Apollon conducted Mr. Jung's intake evaluation on October 28th, she encountered conflicting information regarding whether he was diabetic. She documented a blood glucose of 542 mg/dL which is a critically high level that placed Mr. Jung at immediate risk for diabetic ketoacidosis. Although she appropriately contacted the provider and checked for ketones, she did not complete the Hyper/Hypoglycemia Nursing Encounter Tool (NET) nor did she conduct the ongoing reassessment required for a patient in acute metabolic distress. After administering insulin, she did not recheck Mr. Jung's blood glucose or ketones, nor did she continue monitoring him until the level dropped to a safer range, but she should have. A glucose level exceeding 500 mg/dL accompanied by ketonuria represents a medical emergency requiring repeated reassessment, close monitoring, and continued communication with the provider. Often a blood glucose that high warrants transfer to an emergency department for a higher level of care than can be rendered in a correctional facility. RN Apollon's failure to carry out these essential nursing responsibilities deviated significantly from the standard of nursing care.

RCS at ¶ 48.

And diabetes care expert endocrinologist Dr. Jonathan Williams found the following:

> The cause of death is indisputable. Mr. Jung did not receive sufficient insulin, consequently developed DKA, which resulted in suffering and death. As an incarcerated person, he was entirely dependent on attendants at the prison to provide his medical care. The intake record demonstrates that providers were aware of his diagnosis of T1DM and that he took both long-acting and short-acting insulin formulations. He was at high risk for DKA given prior episodes of DKA while in the same prison 3 times the year before. As would be clearly indicated in this individual with T1DM and history of DKA, there were orders to check blood glucose levels and to administer insulin. His prior record at the same prison and also his record at Norristown State Hospital established that he required at least 60 units of insulin per day (Elizabeth Bradley, MD May 20, 2023 progress note and eMAR from Norristown State Hospital October 27, 2023). Mr. Jung had a long history of non-compliance. YesCare policy includes guardrails to manage non-administration of named critical medicines (including insulin), that requires immediate provider action. Clearly, this is meant to avoid known acute complications such as hyper- and hypoglycemia. Unfortunately, the safeguards in place were not followed as outlined, leading to profound under-insulinization.

There is no question that he was developing DKA over this period as it would be entirely expected in the absence of insulin administration since the morning of October 27, 2023. The NPH insulin he received that morning would've been out of his system by the afternoon that day. From this time forward he would begin to develop DKA. The high suspicion of DKA was evident from intake. His incorrect answers at this time, including stating an initial "no" to history of diabetes and that he had not had "insulin for 3 days" are consistent with someone with impaired cognition in the setting of marked hyperglycemia or DKA. Yet, remarkably, no follow-up interventions were conducted to determine if the insulin provided at that time had corrected either his critically elevated glucose or ketones. Regardless of his appearance at this time, the presence of these two components in an individual with T1DM requires very close follow-up, as indicated in YesCare's policy, which would include a glucose recheck within 2 hours. While increasing oral intake can help lower glucose and reduce ketones, it is a deviation from the standard of care to not order a follow up glucose reading and determine if ketones are starting to clear, as the absence of improvement indicates escalation of care is required. Failing to follow up to check on Mr. Jung's blood glucose level was disregarding a known risk that he would develop DKA.

RCS at ¶ 47.

Defendant Apollon contends that these opinions are insufficiently explicit as to causation. Defendant Apollon further contends that Dr. Williams' position that deaths from diabetic ketoacidosis are rare because diabetic ketoacidosis is easily reversed once treated appropriately is incompatible with a finding of causation. Both contentions are incorrect.

Experts are not required to use "magic words." *Stimmler*, 981 A.2d at 155. The "substance of their testimony" – or, in this case, their reports – is more than sufficient to establish that Defendant Apollon's omission increased the risk of harm to Mr. Jung. With these baselines established, "it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm." *Mitzelfelt*, 584 A.2d at 892.

Defendant Apollon's briefing does not contend with Dr. Williams' finding that Mr. Jung was "developing DKA over this period as it would be entirely expected in the absence of insulin administration since the morning of October 27, 2023." Diabetic ketoacidosis is quickly and easily reversed if treated appropriately; if *not* treated appropriately, Dr. Williams' opinion firmly

establishes that it can develop slowly and painfully, "over this period" of, in Mr. Jung's case, several days. Plaintiffs' position is that there were multiple, compounding breaches of the standard of care in Mr. Jung's final days; that he outright missed multiple doses of insulin; and that both other medical staff and correctional staff violated his rights and breached their duties to him, cumulatively resulting in his death. But under Pennsylvania law, a substantial factor "need not" be "the only factor, i. e., 'that cause which ... produces the result.'" *Jones*., 431 A.2d at 923. Plaintiffs have put forth clear expert testimony as to Defendant Apollon's duty and breach: she did not perform or otherwise secure the necessary follow-up monitoring and care for Mr. Jung's acute metabolic distress. With clear expert testimony that the diabetic ketoacidosis which indisputably killed Mr. Jung was developing over a significant period of time – one that extended back to the time that Defendant Apollon conducted his intake examination – it is for the jury to determine whether or not Defendant Apollon's contribution was a "substantial factor" in his death.

Any requirement that an expert report plainly state "Defendant X caused outcome Y" would be especially inappropriate where, as here, there are disputed questions of fact. It is not Dr. Williams' role, for instance, to resolve the question of whether Defendant Apollon was in fact responsible for obtaining Mr. Jung's prior medical records from PDP or other facilities. As briefed above, a jury could easily resolve this question by finding that she did have such an ability: having held the requisite form in her hands, signed it, and then failed to do anything with it. It *is* Dr. Williams' role to conclude that Mr. Jung's ultimate insulin dosage of 10 units twice daily and 2-12 units twice daily was profoundly inconsistent with his prior dosing regimens; that "his prior records at the same prison and also his record at Norristown State hospital established that he required at least 60 units of insulin per day"; and that insulin administration of "10 Regular/10 NPH" was "under-dosed for both Regular and NPH given prior history." RCS at ¶ 47. Dr. Williams

17

explains multiple times throughout his recitation of the facts that Mr. Jung outright missed multiple insulin doses, but *also* that "*prior dosing was insufficient*," and that Mr. Jung "*did not receive sufficient insulin*, consequently developed DKA, which resulted in suffering and death." *Id.* at 5. Whether the failure to obtain prior records was a cause of Defendant Gay's inappropriate dosage order, and whether Defendant Apollon was responsible for the failure to obtain these records, is a question of competing credibility determinations that a jury must resolve.

Evidence that Defendant Apollon did not obtain Mr. Jung's medical records and that this substantially contributed to his not being prescribed sufficient insulin, evidence that Defendant Apollon did not utilize the NET to determine if Mr. Jung has symptoms indicative of diabetic ketoacidosis and a resultant higher level of care, and evidence that Defendant Apollon did not follow up with Mr. Jung to monitor and treat his hyperglycemia and potential diabetic ketoacidosis provide individual and cumulative bases for fact-finder to determine that her conduct substantially contributed to Mr. Jung suffering from hyperglycemia, diabetic ketoacidosis, and death. These findings are part and parcel of the expert analyses of Roscoe and Williams, and accordingly Defendant Apollon's contention that the experts have not sufficiently opined on causation is without merit.

### C. Plaintiffs' expert reports were timely filed on the stipulated deadline for completion of expert discovery that was permitted by the court and agreed to by all parties, including Defendant Apollon, and this Stipulation caused no prejudice to Defendant Apollon.

#### i.    Plaintiffs' expert reports were timely filed.

Defendant Apollon's argument that Plaintiffs' expert reports should be excluded is meritless. "[T]he exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the

18

proponent of the evidence." *In re Paoli R.R. Yard PCB Litig*., 35 F.3d 717, 791-92 (3d Cir. 1994)

(quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977)).

"[S]triking an expert report is a draconian measure warranted only in extreme cases." *Brown v.

Robert Packer Hosp*., 341 F.R.D. 570, 574–75 (M.D. Pa. 2022). Defendant Apollon can neither

show willful deception or flagrant disregard of a court order, let alone any disregard of a court

order.

　　Here, Defendant relies upon *Fulton*, which itself has a threshold fact that is not present in

the case *sub judice*: an expert report submitted after "expert discovery [was to] be completed."

*Fulton v. Soh*, No. 1:21-CV-01268, 2024 WL 4755444, at *3 (M.D. Pa. Nov. 12, 2024). That

untimely reports are those submitted after the end of "expert discovery" deadlines is an axiomatic

proposition. See also *Konstantopoulos v. Westvaco Corp*., 112 F.3d 710, 721 (3d Cir. 1997)

(excluding expert reports produced when the "cutoff for expert discovery had passed more than a

year earlier"); *Flickinger v. Toys R Us, Inc*., No. 3:10-CV-305, 2011 WL 3359646, at *2 (M.D. Pa.

Aug. 3, 2011) (excluding reports when party "submitted these reports in late June, months after

the expert discovery deadline"). The fatal flaw in Defendant Apollon's argument is that this Court

permitted extension of discovery by stipulation so long as other deadlines remained in place, and

the parties – including Defendant Apollon – then stipulated that fact discovery be completed by

November 19, 2025, and expert discovery be completed by December 3, 2025. Accordingly, the

argument to exclude Plaintiffs' expert reports is nothing more than clutching at straws.

　　Defendant Apollon's argument is predicated upon the inaccurate premise that the reports

were not timely submitted to Defendants, a premise that in turn rests upon material

misrepresentations of the Stipulation, the footnote in this Court's order expressly permitting

continuance of discovery deadlines via stipulation, and the operative case management order.

Review of these misrepresentations *in seriatim* reveals Defendant's argument has an insufficient foundation upon which to stand.

First, all Parties agreed by Stipulation that fact discovery would be completed by November 19 and expert discovery completed by December 3. Such a sequencing allowed for the completion of production of documents, which occurred up until November 19[2], and depositions, which included the completion of Defendant Apollon's deposition on November 5, and others completed on November 12, 14, 17, and 18, prior to the disclosure of expert reports on December 3. That "expert discovery" includes expert reports is evident from Fed. R. Civ. P. 26(a)(2). Defendants now argue that the Stipulation to complete "expert discovery" by December 3 actually contained a *sub silentio* meaning of "expert depositions." This is untenable. If the Parties merely consented to extend the deadline for completing expert depositions then the more specific term would have been used. Similarly, if the Parties agreed to maintain multiple deadlines for expert discovery then those would have also been identified in the Stipulation. To read the Stipulation in the way Defendant Apollon now argues would require substituting "depositions" for "discovery," transforming the meaning and the understanding of the Stipulation drastically. This interpretation would also be illogical as it would have fact and expert discovery overlapping with each other, which is contrary to common practice in the vast majority of federal civil rights litigation, and would have generated gross inefficiencies in the production and supplementation of expert reports. It is telling that Defendant Apollon does not attempt to explain why the Parties would agree to produce expert reports prior to the close of fact discovery, because it would not permit expert review of critical testimony and that is not what the Parties agreed to.

---

[2] Counsel for YesCare provided third-party medical records for twelve individuals to Plaintiffs' counsel on November 19, 2025. This production accommodated YesCare counsel being in trial earlier in November.

Second, Defendants argue that this Court's footnote in its Order of September 18, 2025 denying the Parties' Joint Motion to Extend Discovery required maintaining discrete sequencing and the actual deadlines for expert discovery. This is simply not what the text says. In full, it reads, "Notwithstanding the denial of this motion, the parties may agree to continue discovery provided it does not affect any other deadlines in the Scheduling Order." "Any other deadlines" is counterposed to "continu[ing] discovery," thus meaning that discovery deadlines may be continued as long as other [i.e. non-discovery] deadlines are not affected. Since the parties had just sought to extend the case management order, the Court's meaning here could not be clearer: discovery deadlines may be altered by stipulation, but other deadlines will remain in place. That is precisely what the Stipulation subsequently filed with the Court did. The Court did not require any stipulation entered into by the parties to maintain discrete deadlines for potential rebuttal reports, nor did it mandate a timeframe for depositions. In fact, in the operative case management order the Court provided said that "Expert depositions, *if any*, shall be concluded no later than November 21, 2025." The Court's phrasing recognizes what is clear from Fed. R. Civ. P. 26, namely, that expert depositions are discretionary and the Parties may elect not to conduct them. The Stipulation did not expressly or impliedly incorporate any other discovery deadlines. The Court expressly permitted the parties to stipulate to a continuation of discovery deadlines without any other strictures on how that stipulation was to be structured beyond that it not alter any other deadlines, and that is what the parties did.

Counsel for Apollon themselves are not even in agreement on when they now claim expert reports are due under their interpretation of the stipulation, with one asserting in their motion for summary judgment that they were due on October 24, and another arguing in an email to Plaintiffs' counsel that they should have been produced on November 21. RCS at ¶ 41. This intra-counsel

21

discrepancy only highlights that the Stipulation did not silently incorporate any other expert deadlines, but instead created a singular date upon which all parties were to serve mandatory expert discovery disclosures.

Third, Defendants argue that the operative case management order had a party-specific sequencing of expert reports. This is not true. Defendants falsely assert that, "[t]he scheduling order contemplated a clear sequence: Plaintiffs' reports, defense reports, depositions, then dispositive motions." Defs. Br. at 30. In actual fact, *all* parties had the same deadlines for expert reports and any rebuttal reports:

> Counsel for *each* party shall serve upon counsel for every other party the information referred to in Federal Rule of Civil Procedure 26(a)(2)(B) by expert report or answer to expert interrogatory no later than October 24, 2025. If the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party, counsel shall serve the information on counsel for every other party no later than November 7, 2025. Expert depositions, *if any*, shall be concluded no later than November 21, 2025.

Dkt. 62, Amended Scheduling Order (emphases added). It has always been the case in this litigation that the parties had the same deadline for expert reports. That the Stipulation agreed to by the parties set a singular date for completion of all expert discovery was both permitted by this Court's authorization to continue discovery via stipulation, and consistent with the contemplated sequencing of discovery in this matter that fact discovery be completed prior to expert discovery, and that the parties have contemporaneous deadlines for expert discovery.

In light of the foregoing inaccurate characterizations of the Stipulation, this Court's authorization to extend discovery by Stipulation, and the actual text of the Amended Scheduling Order, it is apparent that Plaintiffs' expert reports were timely submitted upon the date agreed upon via Stipulation by the parties for completing expert discovery required under Fed. R. Civ. 26(a)(2).

There are equitable considerations that support Plaintiffs' position as well. If Defendant Apollon wanted to include time in the stipulated extension for rebuttal reports and depositions then the time to raise that was prior to signing the Stipulation. It also bears emphasizing that the December 3 deadline for completion of expert discovery applied to all parties. Defendants could have produced expert reports by this date or sooner, but none of them chose to do so. Plaintiffs' counsel entered into the Stipulation well aware that it meant foregoing rebuttal reports, and that it would likely not seek any depositions of defendants' experts. These expectations were apparent from the timeline included in the Stipulation in light of the rest of the case scheduling order, and Defendants cannot claim they were surprised by receiving expert disclosures on the deadline for completion of expert discovery, especially since Plaintiffs had already provided the names and CVs of their three medical experts in June prior to any deadline for them to do so, and prior to the Stipulation.[3]

Although Plaintiffs were prepared to forego depositions of any defense experts, counsel for the City of Philadelphia promptly requested to take the deposition of Plaintiffs' corrections expert upon receipt of his report on December 3, and that was scheduled for and took place on December 10. Plaintiffs also replied to written discovery requests regarding their corrections expert in two business days. Plaintiffs then offered to make any of their other experts available for depositions or respond to other discovery requests, but no other defendant has sought depositions or written discovery. Defendant Apollon's counsel have not indicated what, if any, discovery they would want to conduct regarding Plaintiffs' experts, and though one of her counsel has claimed she is too busy until the start of trial in this case to participate in depositions, another of Defendant Apollon's counsel reviewed the discovery produced in regard to Plaintiffs' corrections expert in less than 24

---

[3] Plaintiffs' correction expert was not retained until later, and his report was produced on the deadline for expert discovery.

hours and attended the December 10 deposition. RCS at ¶ 41. Plaintiffs remain willing to work with defendants in the event that they wish to conduct expert depositions prior to trial, but to date no additional depositions or any other expert discovery has been sought.

Plaintiffs' expert reports were timely filed. Defendant Apollon's attempt to impose the "draconian", *Brown,* 341 F.R.D. at 574–75, and "extreme" sanction of excluding them is insupportable as there has not been an untimely submission of any expert report let alone "willful deception" or "flagrant disregard of a court order." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 791-92.

> **ii.    Even if Plaintiffs' expert reports are deemed tardy, exclusion is extreme and inappropriate.**

Even under Defendant Apollon's inaccurate assumption that Plaintiffs tardily submitted expert discovery, Third Circuit jurisprudence weighs in favor of not excluding Plaintiffs' expert reports. Excluding evidence due to a failure to comply with discovery duties is only warranted when the *Nicholas* factors justify such a severe sanction. *See Nicholas v. Pa. State Univ.,* 227 F.3d 133, 148 (3d Cir. 2000). The analysis considers 1) The prejudice or surprise of the party against whom the excluded evidence would have been admitted; 2) The ability of the party to cure that prejudice; 3) The extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and 4) Bad faith or willfulness in failing to comply with a court order or discovery obligation. *Id*. Additionally, courts must examine the importance of the evidence sought to be excluded. *Konstantopoulos,* 112 F.3d at 719. Each one of these factors militates in Plaintiffs' favor.

First, there was no prejudice or surprise to Defendant Apollon. Plaintiffs' disclosed the identities of the medical experts in June 2025, RCS at ¶ 42; their reports were not late, see *supra*. Courts assess prejudice or surprise from untimely expert disclosures along a "spectrum," with the

24

likelihood of prejudice increasing as the disclosure occurs closer to trial. *Cochran v. Jackson*, No. 14-2165, 2015 WL 3555291, at *2 (E.D. Pa. June 8, 2015). Where an expert report is disclosed with sufficient time for a party to prepare cross-examination, courts routinely find minimal prejudice. *Id*. *3-5 (finding minimal prejudice where report was produced seven months late but more than two months before trial and adequate time to depose expert); *Bauder v. Phila., Bethlehem & N.E. R.R. Co.*, No. 96-7188, 1998 WL 633651, at *4–5 (E.D. Pa. Aug. 28, 1998) (no prejudice where Plaintiff had identified expert witness well ahead of production of report and two months before trial was a sufficient amount of time to prepare cross examination). Importantly, the mere fact of lateness does not itself establish prejudice; rather, prejudice turns on whether the delay confers a tactical advantage or meaningfully impairs the opposing party's litigation preparation. *Cochran*, 2015 WL 3555291, at *2.

Here, Defendant Apollon knew that Plaintiffs were intended to use three medical experts in June 2025, and therefore were on notice that expert reports were to be expected after the completion of fact discovery, which was continued by Stipulation to November 19, 2025. That Defendant Apollon was not prejudiced in her summary judgment motion is apparent from her causation argument, which rests on a substantive analysis of the expert reports, demonstrating that she was able to meaningfully assess the reports and prepare a counter. The lack of prejudice was reinforced the following week when Defendant Apollon filed a *Daubert* motion challenging the expert reports, again demonstrating an able capacity to address the reports on their merits. It is also not surprising that counsel were able to respond to the expert reports with substantive arguments, as each of the medical expert reports are based on core facts that have long been known by all parties, the cause of death of Mr. Jung is not in dispute, and the allegations in Plaintiffs' Amended Complaint clearly lay out the factual basis for liability against each Defendant. Not only was it not

a surprise that the experts Plaintiffs identified in June did actually produce expert reports, but their conclusions were also not surprising given Plaintiffs' Amended Complaint and the record in the case they are based upon.

Second, Defendant Apollon has ample opportunity to cure any alleged prejudice, but has opted not to seek any further discovery. Even where some prejudice exists, courts strongly favor curative measures over exclusion, particularly when the prejudice can be remedied through additional discovery. The Third Circuit has repeatedly emphasized that exclusion of critical evidence is an "extreme sanction" that should be imposed only where lesser sanctions are inadequate. *Meyers*, 559 F.2d at 905; Konstantopoulos, 112 F.3d at 719; Quinn v. Consol. Freightways Corp. of Delaware, 283 F.3d 572, 576 (3d Cir. 2002); *Montgomery v. Mitsubishi Motors Corp.*, 448 F. Supp. 2d 619, 633 (E.D. Pa. 2006). Consistent with this principle, courts regularly cure prejudice by permitting depositions of the expert witness at issue. *Cochran*, 2015 WL 3555291, at *3 (allowing deposition of expert to cure prejudice); *Pansini v. Trane Co.*, No. 17-3948, 2019 WL 1299036, at *5–6 (E.D. Pa. Mar. 21, 2019) (granting defendants time to depose expert). This remains the case at the summary judgment stage: exclusion of late expert discovery is disfavored where less drastic sanctions and other remedies exist. See generally *Id.* (allowing consideration of late expert reports at summary judgment stage given critical weight of evidence and curability of prejudice); *Ciocca v. BJ's Wholesale Club, Inc.*, Civ. No. 04-5605, 2011 WL 3563560 (E.D. Pa. Aug. 12, 2011); *Nippo Corp./International Bridge Corp. v. Amec Earth & Envtl.*, Civ. No. 09-0956, 2011 WL 1196922 E.D. Pa. Mar. 30, 2011); *Soufflas v. Zimmer, Inc*., 474 F.Supp.2d 737, 745 (E.D. Pa. Feb. 21, 2007). In contrast, where the prejudice arises from structural unfairness—such as one party receiving substantially more time to prepare expert opinions than the other—courts have found that additional extensions cannot fully cure the

harm. *Gibson by Gibson v. Nat'l R.R. Passenger Corp.*, 176 F.R.D. 190, 194–95 (E.D. Pa. 1997) (finding incurable prejudice where defendants' dilatory conduct resulted in 141 days to prepare expert reports compared to plaintiffs' 77 days).

This factor also turns in Plaintiffs' favor. Although expert discovery was to be completed on December 3, 2025 pursuant to Stipulation, Plaintiffs have remained amenable to responding to Defendant discovery requests pertaining to Plaintiffs' experts. City of Philadelphia's counsel inquired about deposing Plaintiffs' corrections expert on Friday, December 5, and submitted a Request for Production of Documents (RPD) pertaining to that same expert on the same day. Plaintiffs' responded to the RPD with document production in two business days, and produced their corrections expert for a deposition on the third business day from the request. RCS at ¶¶ 83-84. On Monday, December 8, Plaintiffs' counsel asked Defendants' counsel to please advise if they were seeking to depose any of Plaintiffs' other experts so Plaintiffs could facilitate any further depositions. *Id.* at ¶41. In a subsequent email, Plaintiffs' counsel stated "If you or your co-counsel identify what additional discovery, if any, that you still seek prior to trial, Plaintiffs' counsel are still willing to work with you, and to meet and confer about this at any time." While one of Defendant Apollon's lawyers claimed to be too busy in December and January to participate in any further discovery, her other counsel has demonstrated he is able to participate in discovery, as he indicated that he had reviewed documents produced in response to the City's RPD directed toward the corrections expert in less than 24 hours after receiving them, and that same counsel attended the deposition on December 10. RCS at ¶ 41. Counsel for Defendant Apollon have also not identified any further expert discovery they desire. Whether to take an expert's deposition is a strategic question, and many counsel opt not to take expert depositions so as not to provide insight into cross-examination strategies, something implicit in this Court's case management order,

which used the term "if any" to refer to any expert depositions that may be taken. Dkt. 62. Accordingly, Defendant Apollon has had ample opportunity to cure any alleged prejudice, and her counsel have demonstrated an ability to participate in further expert discovery. That option remains open.

Third, the potential for disruption weighs against exclusion where trial is not imminent. Courts permit late expert disclosures where sufficient time remains to incorporate the discovery without impacting trial scheduling or the court's docket. *Cochran*, 2015 WL 3555291, at *3 (no disruption where trial was more than two months away); *Bauder v. Phila., Bethlehem & N.E. R. Co.,* No. 96–7188, 1998 WL 633651, at *4–5 (E.D.Pa. Aug.28, 1998). Thus, disruption is closely tied to timing and procedural posture, with exclusion typically reserved for circumstances where the late disclosure would meaningfully interfere with the court's ability to manage its docket efficiently. As already argued, Defendant Apollon has already demonstrated an ability to assess and meaningfully respond to Plaintiffs' experts in two briefs, and ample time remains for further preparation of cross-examination. There is no need to extend the trial schedule for this issue, and the inclusion of the expert reports will not disrupt the case management schedule.

Fourth, there is no evidence of bad faith, and Defendant pointedly does not argue that there is any bad faith on the part of Plaintiffs' counsel. The presence or absence of bad faith or willfulness is often the most significant factor in determining whether exclusion is appropriate. Courts reserve findings of willfulness for "repeated" or "flagrant" disregard of court orders, not isolated or negligent failures to comply. *Holbrook v. Woodham*, No. 05-304, 2008 WL 544719, at *3 (W.D. Pa. Feb. 28, 2008) (stating that an "egregious" showing of bad faith is necessary for a judicial finding of willfulness). Where a party acts promptly to correct an error and lacks a pattern of violations, courts routinely decline to find bad faith. *Cochran*, 2015 WL 3555291, at *4 (finding

good faith where defendant acted quickly to remedy an "good faith, albeit incorrect" interpretation of the scheduling order); *Pansini*, 2019 WL 1299036, at *6 (no bad faith where delay reflected a "slip-up" rather than a tactical ploy). By contrast, exclusion is warranted where the record demonstrates a conscious disregard of discovery obligations, repeated violations of court orders, or deceptive conduct. *Gibson*, 176 F.R.D. at 195 (finding "flagrant disregard" where defendants repeatedly ignored deadlines and required court intervention); *In re TMI Litig.*, 193 F.3d 613, 722 (3d Cir. 1999) (finding bad faith where plaintiffs repeatedly violated orders and covertly filed untimely reports); *Klatch-Maynard*, 2011 WL 2006424, at *5 (three-and-a-half-year delay without justification constituted willful noncompliance); *SuperMedia*, 2014 WL 5023386, at *10–11 (suspected backdating and withholding of underlying materials). Plaintiffs complied with a Stipulation to continue discovery that was authorized by this Court, so there is no disregard of any court order, let alone a flagrant one or one made in bad faith. Even if the Court were to find that Plaintiffs' expert reports should have been produced sooner on some basis, the fact that Defendant Apollon's counsel cannot even agree among the two of them as to what earlier date Plaintiffs' report was due on, as one asserted in briefing it was October 24, while another asserted in an email it was November 21, further underscores the absence of any bad faith. If they cannot agree on the alternate date that expert reports should have been produced, certainly Plaintiffs' reliance on the date in the Stipulation cannot constitute a willful disregard of a court order.

Finally, the importance of the evidence weighs heavily in favor of the Plaintiffs. This case involves state medical malpractice claims, federal constitutional medical care claims, and Americans with Disabilities Act and Rehabilitation Act Claims against 11 defendants, and the expert reports are critical for each claim. Diabetes care, correctional health care, correctional nursing, and corrections are distinct areas of specialized knowledge that courts and juries routinely

rely on when assessing evidence pertaining to medical care and jail practices and operations. Exclusion is a draconian remedy that is not supported by the facts or the law in this case.

## VI.    CONCLUSION

For the foregoing reasons, Defendant Apollon's motion for summary judgment should be denied in full.


Respectfully submitted,

*/s/ Bret Grote*
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
*/s/ Rupalee Rashatwar*
Staff Attorney
PA ID No. 331085
*/s/ Margaret Hu*
Staff Attorney
PA ID No. 334438
*/s/ Lolo Salsbury Serrano*
Legal Fellow
PA ID No. 338184
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123


*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Bret Grote, Esq., hereby certify that I caused a true and correct copy of the foregoing Brief in Opposition to Defendant Apollon's Motion for Summary Judgment to be electronically filed on December 19, 2025, and thereby served upon all parties entered into the Court's ECF system.

/s/ *Bret Grote*
_____
Bret Grote