**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JACOB and JAMES JUNG, as** | : | |
| **Administrators of the Estate of LOUIS** | : | |
| **JUNG, JR,** | : | |
| | : | |
| **Plaintiffs,** | : | **Civil Action** |
| | : | **No. 2:24-cv-05618** |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## CORRECTION DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSIVE CONCISE STATEMENT OF FACTS TO CITY OF PHILADELPHIA DEFENDANTS

Defendants, City of Philadelphia, Blanche Carney, Gena Fraiser, and Wanda Bloodshaw (hereinafter "Moving Defendants" or "Corrections Defendants"), by and through the undersigned counsel, moves for summary judgment as to all claims against them, and responds to Plaintiff's Counter Statement of Facts, as follows:

*Facts Relating to Mr. Jung's Incarceration and Death:*

1.      No responses necessary.

2.      No responses necessary.

3.      No responses necessary.

4.      No responses necessary.

5.      No responses necessary.

6.      Plaintiffs appear to Admitt that the documents say this but question how the information was placed into the documents. This is not denying a fact, but instead raising an improper credibility argument.

7.      See Response 6.

8.      No responses necessary.

9.      No responses necessary.

10.     No responses necessary, as no new facts are asserted.

11.     There is no dispute as to the fact, only to the definition of medical attention. The sufficiency of Nurse Cabellos' medical attention is not material to this motion.

12.     No responses necessary, as no new facts are asserted.

13.     No responses necessary, Plaintiffs are inserting their own understanding of words that are not inconsistent with each other.

14.     See Response 11 and 13.

15.     See Response 11 and 13.

16.     No responses necessary.

17.     See Response 11 and 13.

18.     No responses necessary, as no new facts are asserted.

19.     No responses necessary.

20.     No responses necessary, as no new facts are asserted.

21.     No responses necessary, as no new facts are asserted.

22.     No responses necessary.

23.     No responses necessary.

24.     No responses necessary.

25.     No responses necessary.

26.     No responses necessary, as no new facts are asserted.

27.     No responses necessary, as no new facts are asserted.

*Innerworkings of the Prison System as it Relates to Inmate Care and Supervision*

2

28.    No responses necessary, as no new facts are asserted.

29.    No responses necessary, as no new facts are asserted.

30.    No responses necessary, as no new facts are asserted.

31.    No responses necessary, as no new facts are asserted.

32.    No responses necessary.

33.    No responses necessary.

34.    No responses necessary.

35.    No responses necessary.

36.    No responses necessary.

37.    No responses necessary, as no new facts are asserted.

38.    No responses necessary, as no new facts are asserted.

39.    No responses necessary, as no new facts are asserted.

40.    No responses necessary, as no new facts are asserted.

41.    No responses necessary, as no new facts are asserted.

42.    No responses necessary, as no new facts are asserted.

43.    No responses necessary, as no new facts are asserted.

44.    No responses necessary, as no new facts are asserted.

45.    No responses necessary, as no new facts are asserted.

46.    No responses necessary, as no new facts are asserted.

47.    No responses necessary, as no new facts are asserted.

48.    No responses necessary, as no new facts are asserted.

49.    No responses necessary, as no new facts are asserted.

50.    There was no policy that Correctional Officers engage in any such interaction. *See* fact 93.

51.     No responses necessary, as no new facts are asserted.

## CORRECTIONS DEFENDANTS' RESPONSES TO PLAINTIFFS' COUNTER-STATEMENT OF FACTS

*Mr. Jung's Death*

52.     PDP correctional staff are trained to recognize signs and symptoms of diabetic emergencies including "agitation," being "drowsy" or "confused," and "frequent urination." City Defs' Ex. K at Jung-City Production 004400.

> **Denied, as stated**. The training slide indicates "Fast breathing/Agitation" as a potential symptom, not simply acting in an agitated manner. Defs' Ex. K at BS4400.
>
> **Admitted, in part**. It is admitted that the Corizon slides indicate being "drowsy" or "confused," or having "frequent urination" as possible symptoms of a diabetic emergency. *Id*.

53.     PDP correctional staff are trained that diabetic emergencies "may result in loss of consciousness or death." *Id.*

> **Admitted.**

54.     PDP correctional staff are trained in how to "recognize an emergency," including specific guidance that an "altered mental status is an important warning sign of a potentially life-threatening condition," and that "assessment of the scene & the person is critical in any emergency." Ex. 11, CPR/First Aid Training Excerpts at Jung – City Production004472, 4475, 4468.

> **Denied, as stated**. The training excerpts presented relate to CPR and/or First Aid skills. *See*, *gen.*, *id*. Further, the training presents a brainstorming exercise regarding "**why** it is important to have an understanding and knowledge of the right procedures of a layperson or responder" as it relates to CPR and First Aid. *Id*. at

BS4475 (emphasis in original). "First Aid" is further defined in PDP policies. Pl. Ex. 12, (PDP Policy 4.E.21) at BS2569. **Admitted, in part**. It is admitted that the referenced lesson plans indicate as a training note to the instructor that "altered mental status is an important warning sign of a potentially life-threatening condition." Pl. Ex. 11 at BS4472.

55.     PDP correctional staff are trained in policy noting specifically that whether a person is "able to talk/walk/breathe" is part of the assessment of medical emergencies. Ex. 12, PDP Policy 4.E.21, PPS Staff roles in Non-Routine and/or Emergency Medical Situations at Jung – City Production002571.

       **Denied as stated**. The quoted portion of the policy relates to information that can be relayed to medical staff during a medical emergency. Rather, the policy specifically notes that "[i]f an individual suffers a major injury or acute illness such as: . . . loss of consciousness. . . Correctional staff should notify the health care services staff . . . to report to the site immediately." *Id*. at BS2570.

56.     Housing officers at PDP are trained that their responsibilities included tours for "safety on the unit by maintaining order, and continual observation," and head counts to "see flesh and movement." Ex. 13, PDP Training Academy - Housing Officer Duties Training Excerpts, Jung – City Production00449, 004499.

       **Denied, as immaterial and, in part, an unclear reference to the record.** Plaintiffs' Exhibit 13 does not include a page bate stamped as 449.

*57.*     Housing officers at PDP are trained in the difference between the "Disciplinary Process," in which "any violation of the rules and regulations set forth will be followed up with an incarcerated person misconduct report," and "Medical Services," which include being

"alert to I/P's who are too ill to present themselves for medical care and you will assist them obtaining medical care," to "render applicable first aid to I/P in life-threatening situations," and to "recognize the need for an I/P to go to sick call even if the I/P does not request to." Ex. 13, PDP Training Academy - Housing Officer Duties Training Excerpts at Jung – City Production 004506, 4511-4512.

> **Denied, as immaterial and, in part, as misleading.** By way of further response, the training also cites that the corrections officer must "not compromise security procedures during the provision of emergency medical services." *Id*. at BS4511. Additionally, a portion of the cited training is discussing when an incarcerated person is refusing to go to a prescheduled sick call appointment with medical providers. This record states that "if you recognize the need for an I/P to go to sick call even if the I/P does not request to, you **can** complete a sick call slip and deposit it in the sick call box." *Id*. at BS4512 (emphasis added). This is not applicable to the instant situation.

58.   At 9:03 AM on November 5, 2023, Defendant Frasier made an entry into Lock & Track reflecting that she "toured area all appears in order I/P's apprears [sic] alive." City Defs' Ex. B (Lock & Track) at Fraiser-000030.

> **Admitted.**

59.   Defendants Cabellos and Frasier walked away from Mr. Jung as he lay on the floor, where he remained immobile and unattended for nine minutes. City Defs' Ex. A (Jung Death Investigation) at 10; Ex. 29, Video: B1Pod3, Nov. 5, 2023 at timestamp 9:56-9:57.

> **Denied, as stated.** While the records speak for themselves, the investigation report indicates that after the two walked away from Mr. Jung, he was "unattended lying

on the floor." Defendants' Exhibit A, at BS11. There is no commentary on Mr. Jung's mobility status in the death report.

60. On the same day, Defendant Frasier made an entry into Lock & Track reflecting that she moved Anton Walker within the unit. City Defs' Ex. B (Lock & Track) at Fraiser-000030; City Defs' Ex. D (Frasier Deposition) at 104:20-105:5.

> **Admitted.** By way of further response, this entry is entered at 11:00 a.m. However, this does not mean that Mr. Walker was moved at that exact moment in time. *See* Defense Exhibit D at 121:19-122:14.

61. According to a signed statement given to PDP investigator Lt. Shawn Jay, Anton Walker told Defendant Frasier that he wanted to be moved because his cellmate, Louis Jung, was vomiting and urinating in their shared cell. Ex. 2, Frasier Disciplinary Packet at Fraiser-000029 (Anton Walker signed interview).

> **Denied** as inadmissible hearsay. Further denied as not material as there is no time frame given for when the vomiting and urinating occurred.

62. Defendant Frasier then made an entry into Lock & Track requesting assistance from Defendant Bloodsaw, with the written description that Mr. Jung "refused to get up." City Defs' Ex. B (Lock & Track) at Fraiser-000030-31.

> **Admitted.** By way of further response, there are two entries to this effect. One is entered at 11:01 a.m. indicated that "Lt. Bloodsaw needed to #21 I/P Jung refuses to get up." *Id*. There is another entry two minutes later at 11:03 a.m., which indicates "I/P Louis Jung PP#718327 laying on floor/refuses to get up." *Id*. at 31.

63. Defendant Bloodsaw is observed on video arriving nine minutes after Defendants Fraiser and Bloodsaw leave Mr. Jung. She stands over Mr. Jung's body, which remains on the

ground. Ex. 29, Video: B1Pod3, Nov. 5, 2023 at timestamp 10:05-10:06; City Defs' Ex. A at City-Jung-000011; Ex. 14, Bloodsaw Disciplinary Packet at Bloodsaw-000148.

> **Admitted.**

64.   Defendant Bloodsaw claims not to not recall any part of November 5, 2023, including whether Mr. Jung was awake or alert during their interaction. Ex. 2, Frasier Disciplinary Packet at Fraiser-000027-28 (Bloodsaw Interview); City Defs' Ex. E (Bloodsaw Deposition) at 51:19-54:17, 56:7-11.

> **Admitted.**

65.   Defendant Frasier appears on video handing gloves to two incarcerated people. Ex. 29, Video: B1Pod3, Nov. 5, 2023 at timestamp 10:07; Ex. 2, Frasier Disciplinary Packet at Frasier-000012.

> **Admitted**, but **Denied** that it is material.

66.   PDP policy requires gloves to be worn when touching blood, bodily fluids, or non-intact skin. Ex. 15, PDP Policy 4.E.22, Medical Waste at Jung - City Production002564 (PPS staff), Jung – City Production002566 (trained inmate workers).

> **Admitted,** but **Denied** that it is material**.**

67.   Defendant Bloodsaw stood over Mr. Jung's body as the two incarcerated people wearing gloves dragged him back into his cell. Ex. 29, Video: B1Pod3, Nov. 5, 2023 at timestamp 10:08; City Defs' Ex. A at City-Jung-000011; Ex. 14, Bloodsaw Disciplinary Packet at Bloodsaw-000148.

> **Admitted** only that Lt. Bloodsaw was standing while the events described occurred. Also **Denied** that it is material.

68.    Defendant Bloodsaw testified that it was "not normal protocol" for an incarcerated person

to be taken back into his cell by two other incarcerated people. City Defs' Ex. E, Bloodsaw

Deposition at 55:6-11.

**Admitted** as to accuracy of the citation but **Denied** that it is material.

69.    Defendant Bloodsaw was found to have violated the following PDP policies with respect

to this interaction:

   a.  01: Working Knowledge
   b.  03: Efficient Performance
   c.  37: Proper action
   d.  67: IP Welfare
   e.  1.C.11.1: Employee Code of Conduct.
Ex. 14, Bloodsaw Disciplinary Packet at Bloodsaw-000195.

**Denied.** The document referenced is titled "schedule of disciplinary hearings" and

the five policies are under columns titled "GO/Policy" and "Description." *Id.*

70.    Defendant Bloodsaw closed the door of Mr. Jung's cell after he was dragged back into it.

City Defs' Ex. A at City-Jung-000011.

**Admitted.**

71.    Defendant Bloodsaw left the pod after locking Mr. Jung into his cell. Ex. 29, Video:

B1Pod3, Nov. 5, 2023 at timestamp 10:10; City Defs' Ex. A at City-Jung-000011, Ex. 14,

Bloodsaw Disciplinary Packet at Bloodsaw-000148.

**Admitted.**

72.    Defendant Bloodsaw never called a stretcher for Mr. Jung on November 5, 2023. City Defs'

Ex. A at City-Jung-000011., Ex. 14, Bloodsaw Disciplinary Packet at Bloodsaw-000148.

**Admitted**

73.    Defendant Bloodsaw did not check on Mr. Jung at any point during the rest of her shift on

November 5, 2023. Ex. 14, Bloodsaw Disciplinary Packet at Bloodsaw-000148.

**Admitted**, but **Denied** that she had any reason or obligation to do so.

74.    At 4:49 PM, Defendant Frasier made an entry into Lock & Track stating that "I/P Louis Jung PP #718327 refused insulin." City Defs' Ex. B (Lock & Track) at Fraiser-000033.

**Admitted.**

75.    Defendant Frasier testified that her regular practice for notifying incarcerated people of insulin is to "yell it out on the pod … depend on if I'm like, behind my desk or where the speaker is, I can say, 'Insulin or Accu-Chek' in progress.' Or I can just yell it, 'Insulin, Accu-Chek in progress.' I'll have the list in front of me of, I'm guessing, who's going to receive the insulin… I don't have to go to every door on the block; I only – I would listen out for who's telling me they want to get it and who wants to come out and get it." City Defs' Ex. D (Frasier Deposition) at 108:5-109:13.

**Admitted.**

76.    Shawn Jay, PDP investigator, reviewed video covering this time period.1 His review revealed the following: "The video shows that I/P Jung was locked inside of Cell #19 and at no time exited the cell. In addition, at no time did [Defendant Frasier] go to his cell to let him out for Insulin and Accu-check, nor did it appear that [Defendant Frasier] received any indication of his refusal, as [Defendant Frasier was] observed watching TV in the dayroom." Ex. 2, Frasier Disciplinary Packet at Frasier-000012.

**Admitted** as to the contents of the testimony. **Denied** that is admissible as an improper opinion and that it is not material.

77.    Defendant Frasier was on duty until approximately 11PM on November 5, 2023. City Defs' Ex. B (Lock & Track) at Fraiser-000034.

**Admitted.**

78.    Defendant Frasier never called a stretcher for Mr. Jung on November 5, 2023. City Defs'

Ex. A at City-Jung-000011; Ex. 2, Fraiser Disciplinary Packet at Fraiser-000012.

**Admitted.**

79.    Defendant Frasier did not check on Mr. Jung at any point during the rest of her shift on

November 5, 2023. Defendant Frasier cannot produce any evidence that she did check on

Mr. Jung the rest of her shift on November 5, 2023 after he was dragged back into his cell

by two incarcerated people. Ex. 2, Frasier Disciplinary Packet at Frasier-000030-34; Ex. 5,

Wallenstein Report at 9-15 (Finding 2 and 4).

**Denied.**

*Diabetes in the Philadelphia Department of Prisons*

80.    Mr. Jung was hospitalized on the following dates for the following reasons while in PDP

custody:

   a.    December 20, 2021 – January 5, 2022: diabetic ketoacidosis (DKA);2
   b.    April 7, 2022 – April 9, 2022: DKA;
   c.    January 8, 2023 – January 12, 2023: DKA;
   d.    January 23, 2023 – January 29, 2023: DKA;
   e.    March 11, 2023 – March 14, 2023: DKA
   f.    March 19, 2023 – March 20, 2023 – Hyperglycemia.
Ex. 6, Venters Expert Report; Ex. 16, Hospital Date Record Selections.

**Admitted**. **Denied** that it is material.

81.    Excluding days on which he was hospitalized, Mr. Jung's medication administration record

for dates he was under PDP's care from December 16, 2021 through October 31, 2023

shows the following:

   a.    Lines for "Accu-Check" blood sugar checks contain 424 entries of "not
         documented," 98 entries of "refused," 42 entries of "no show," and 21 entirely
         blank cells;
   b.    Lines for insulin administrations (Humulin, Humalog, Novolin, and/or
         Semglee) contain 377 entries of "not documented," 116 entries of "refused," 57
         entries of "no show," and 30 entirely blank cells.

Ex. 17, Louis Jung Medication Administration Record Summary Exhibit.

**Admitted**, but **Denied** that it is material.

82.   Refusals of medication must be verified with a face-to-face encounter under YesCare and

PDP policy. If the patient agrees to accept insulin, it is to be provided; if the patient refuses,

the patient is to be counseled on the risks of refusal of insulin, a refusal form is supposed

to be filled out, and the refusal is documented on the patient's Medication Administration

Record. Ex. 18, YesCare Policy: Refusal of Medication or Clinical Encounter at 4; Ex. 19,

PDP Policy 4.E.13, Inmate Refusal of Health Care Services.

**Admitted** that the policy requires medical staff to perform any and all follow-up

actions including any face-to-face counseling after the refusal is made.

83.   Mr. Jung's electronic medical records contain only 61 refusal forms documenting refusal

of insulin or blood sugar checks. Ex. 20, Jung Refusal Forms.

**Admitted**, but **Denied** that it is material.

84.   None of the refusal forms relating to insulin or blood sugar checks are signed by Mr. Jung.

*Id*.

**Admitted**, but **Denied** that it is material.

85.   Five of these forms are missing a primary signature by medical staff. *Id.* at YesCare 0708-

09, 0710-11, 0752, 0759, 0825, 0956.

**Admitted**, but **Denied** that it is material.

86.   Three additional forms contain the handwritten phrase "refusal as per C/O." *Id.* at YesCare

0760, 0815, 1085.

**Admitted**, but **Denied** that it is material.

87.    Mr. Jung was recorded as "refusing" insulin and a blood sugar check on at least one date

that he was hospitalized, and absent from PDP. *Compare* Ex. 17, Louis Jung Medication

Administration Record Summary Exhibit at Jung – City Production001594, 1596

(containing entries of "3 – refused" for Accu-Check and Humulin on 1/24) with Ex. 16,

Hospital Date Record Selections at YesCare1371 (After-Visit Summary page listing

hospitalization date range from 1/23-1/29/2023).

   **Admitted**, but **Denied** that it is material.

88.    PDP's Request for Proposals for Provision of Prison Physical and Behavioral Health Care

Services required any "Successful Applicant" to have and use the PDP's prior-established

electronic medical record program, eClinicalWorks (eCW). Ex. 9, City of Philadelphia

Contract with Corizon Excerpts at PJUNG001914.

   **Admitted**, but **Denied** that it is material.

89.    Corizon, YesCare's predecessor, responded to the RFP while noting that "no other

corrections client currently uses eCW." *Id.* at PJUNG002247. YesCare/Corizon

represented that it would partner with Health Care Systems (HCS) to deploy an Electronic

Medication Administration Record (eMAR) system within the PDP and implement

"enhanced documentation and access to treatment information for our patients for routine

treatments, such as blood glucose checks." *Id.* at PJUNG002273, PJUNG002577.

   **Admitted**, but **Denied** that it is material.

90.    Multiple PDP and YesCare staff testified in their depositions to a patchwork of electronic

medical documentation systems in which "not documented" in the eMAR may or may not

mean not administered, technical issues are known to occur, and blood glucose levels are

recorded in a separate, day-by-day format that is not integrated with the electronic health record:

    a.    PDP's 30(b)(6) deponent, Sandy Varghese, testified that glucose levels are "documented in the eMAR which is the electronic system. But right now there was an upgrade. And I think the eMAR is not talking to our ECW system or something. We did an upgrade and something is not working right." However, "at the end of the day PDP owns the medical records." City Defs' Ex. H (Varghese Deposition) at 50:1-25.

    b.    YesCare's 30(b)(6) deponent, Dr. Lalitha Trivikram, testified that when blood glucose checks or insulin was listed as "not documented" in the MAR, a provider would "have to go back to the individual dates and see if it was administered." An Accu-Chek may be "documented in a separate area and the nurse did not sign her initials to have done the Accu-Chek." In the event a glucose check was entered into a separate area, she did not know whether it would be "pulled and put in to the chart." She summarized the state of documentation at PDP as "an imperfect system." City Defs' Ex. L at 173:1-19; 175:6-11; 177:17-179:5; 212:12-19.

    c.    YesCare's Director of Nursing, Marsha Jeoboham, testified first that "not documented means that the medication was not administered," but then clarified that under the system operational at PDP administered medication "should be in the MAR," but "not documented" "could possibly mean that the medication administration wasn't charted or it could be that it was just not documented on this specific MAR … if there was an issue with the MAR, then you could document it in eCW … if there was a duplicate, it could be on there as well. I don't know why it would be a duplicate." Ex. 21, Jeoboham Deposition at 45:2-5, 47:11-49:10.

    **Admitted** as to the accuracy of the quotation, but **Denied** that it is material.

91.    With the exception of handwritten finger-stick blood glucose (FSBG) flowsheets, the latest of which is dated July of 2022, there is no indication in his electronic health record of blood glucose levels or any corrective insulin dosage administered. Ex. 22, Jung FSBG Flowsheets.

    **Admitted**, but **Denied** that it is material.

92.    Mr. Jung's electronic medication administration record within his electronic medical record contains no blood glucose levels or corrective insulin dosages. Ex. 17, Louis Jung Medication Administration Record Summary Exhibit.

> **Admitted**, but **Denied** that it is material.

93. YesCare and PDP recognized insulin as a "critical medication" **that required medical staff to follow-up with a patient each time a single dose was missed**. Ex. 18, YesCare Policy: Refusal of Medication or Clinical Encounter at 4; City Defs.' Ex. H (Varghese Deposition) at 45:5-22.

> **Admitted. Emphasis added.**

94. Missing a critical medication such as insulin requires PDP and YesCare staff to implement the "Red Flag" policy. This policy requires nursing staff to schedule a patient "Red Flag Encounter" with a medical provider, so that the patient may be counseled on their medications. The Red Flag appointments are communicated to corrections staff through the PDP's electronic Integrated Jail Management System. These encounters are documented in the patient's electronic health record. City Defs.' Ex. L, Trivikram Deposition at 77:19-80:13; Ex. 23, PDP Policy 4.E.24.2, Red Flag Medication Compliance System.

> **Denied** as stated, the Red Flag policy could not be implemented by PDP staff as they were not medical staff. *See* Material fact 93.

95. On January 20, 2023, a YesCare provider cancelled an appointment for Mr. Jung, noting that he had "multiple red flags pending" after a nurse reported that "pt is not coming out for any medication or accu check. Pt is complaining of pain and said that's why he isn't coming out." Ex. 24, Jung Medical Record Excerpts at YesCare 1646-47.

> **Admitted**, but **Denied** that it is material.

96. On January 22, 2023, Mr. Jung's blood glucose level was recorded at 466 with ketones in his urine. He reported nausea and vomiting. Ex. 24, Jung Medical Record Excerpts at

YesCare 1640. YesCare providers wrote that Mr. Jung was refusing services because he "wanted juice and to lay on stretcher instead of getting an IV." He still had multiple red flags pending at the time. *Id.* at YesCare 1642.

  **Admitted**, but **Denied** that it is material.

97. On January 23, 2023, Mr. Jung was discovered in his cell incoherent and screaming for water, with a blood glucose registering his value as "HI." Ex. 24, Jung Medical Record Excerpts at YesCare 1638. When asked about his missed insulin, he was "able to say 'sleep'. Otherwise IP moaning incoherently." *Id.* at Yescare 1635. He was referred to the ER. *Id.* at YesCare 1636.

  **Admitted**, but **Denied** that it is material.

98. At the emergency room on January 23, 2023, Mr. Jung was found to be "confused," diagnosed with "severe DKA" (diabetic ketoacidosis), and admitted to the hospital "due to the high risk of critical illness or multi-organ failure." Ex. 24, Jung Medical Record Excerpts at YesCare1404.

  **Admitted**, but **Denied** that it is material.

99. After another hospitalization for DKA from March 11-March 14, 2023, the hospital provider wrote that Mr. Jung was "in the hospital for DKA which is probably related to dosing schedule of insulin in the prison. Insulin regimen in prison only provides regular insulin sliding scale twice a day in addition to basal insulin. As a result he has been severely hyperglycemic progressing into DKA. Patient's blood glucose needs to be monitored 4 times per day." Ex. 24, Jung Medical Record Excerpts at YesCare1326.

  **Admitted**, but **Denied** that it is material.

100. On May 20, 2023, a YesCare provider modified Mr. Jung's blood sugar checks back to two per day, writing that "current staffing does not allow for qid evaluations in the setting of this noncompliance." Ex. 24, Jung Medical Record Excerpts at YesCare 1482-83.

  **Admitted**, but **Denied** that it is material.

101. On at least two occasions, other YesCare providers transferred diabetic patients with poor blood glucose control to the infirmary for a higher level of monitoring and easier access to frequent blood sugar checks. Ex. 25, Patient 1 Infirmary Transfers; Ex. 26, Patient 2 Infirmary Transfers; Ex. 6, Venters Report at 25.

  **Admitted**, but **Denied** that it is material.

102. The PDP infirmary has not been full with no vacancies since prior to COVID. City Defs.' Ex. H (Varghese Deposition) at 60:3-5.

  **Admitted**, but **Denied** that it is material.

103. YesCare conducted no audits of insulin administration prior to November 2023. Neither YesCare nor the City of Philadelphia can put forth evidence of insulin administration audits prior to November 2023.

  **Denied**. PDP conducted an independent audit of diabetes care inclusive of insulin administration in June of 2023 as part of their routine audits by an independent medical source. *See* material fact 116 citing to a June 2023 audit of diabetes care conducting by auditors hired by the PDP.

104. The City of Philadelphia conducted no independent audits of insulin administration at PDP prior to November 2023. The City of Philadelphia cannot put forth evidence of independent audits of insulin administration.

  **Denied.** See Reponse 103.

105.    YesCare conducted no audits of its red flag policy prior to November 2023. Neither

        YesCare nor the City of Philadelphia can put forth evidence of red flag policy audits prior

        to November 2023.

        **Denied** as stated. No requests were made during discovery to produce any such

        audit. Further **Denied** as not material.

106.    The City of Philadelphia conducted no independent audits of the red flag policy at PDP

        prior to November 2023. The City of Philadelphia cannot put forth evidence of independent

        audits of the red flag policy.

        **Denied**. See Response 105.

107.    YesCare conducted no audits of its refusal policy as applied to diabetes care prior to

        November 2023. Neither YesCare nor the City of Philadelphia can put forth evidence of

        refusal policy audits prior to November 2023.

        **Denied**. See Responses 103 and 105.

108.    The City of Philadelphia conducted no independent audits of the refusal policy as applied

        to diabetes care at PDP prior to November 2023. The City of Philadelphia cannot put forth

        evidence of independent audits of the refusal policy.

        **Denied**. See Responses 103 and 105.

109.    There were over sixty hospitalizations for hypoglycemia or hyperglycemia from PDP

        between 2020 and 2023. Ex. 27, Emergency Room Logs Summary.

        **Admitted**, but **Denied** that it is material.

110.    Mr. Jung was hospitalized on January 23, 2023 for hyperglycemia. His medication

        administration record for the three days leading up to his hospitalization only show two

        documented administrations of insulin, on the mornings of 1/20/23 and 1/21/23; the rest of

18

his MAR for blood sugar checks or insulin doses in these three days reflect refusals (with no refusal forms), "not documented," or "no show." Ex. 6, Venters Report at 6-7.

> **Admitted**, but **Denied** that it is material.

111. Mr. Jung was hospitalized for diabetic ketoacidosis on March 11, 2023. His medication administration record for insulin and blood sugar checks in the week leading up to this hospitalization reflects five "no shows", three "not documented", and five refusals. Only three refusal forms are present. Ex. 6, Venters Report at 6, 8.

> **Admitted**, but **Denied** that it is material.

112. "Patient 1" was hospitalized three times for diabetic complications while under the care of YesCare/Corizon and PDP's CFCF. In the 11-day period leading up to his most recent hospitalization on August 24, 2022, his medication administration record for blood sugar check contained an entry of "not documented" for 19 of 44 checks. His medical records reflect a telephone call about his blood sugar level being at 508 ten days before this hospitalization, but contain no corresponding Nursing Encounter Tool for hyperglycemia. Ex. 6, Venters Report at 11-12.

> **Admitted**, but **Denied** that it is material.

113. "Patient 3" was hospitalized for diabetic complications on May 25, 2022 while under the care of YesCare/Corizon and PDP's CFCF. In the 11-day period leading up to this hospitalization, his medication administration record contains entries of "not documented" for 13 of 22 blood sugar checks. Ex. 6, Venters Report at 12-13.

> **Admitted**, but **Denied** that it is material.

114. "Patient 4" was hospitalized for diabetic complications on January 12, 2023 while under the care of YesCare/Corizon and PDP's CFCF. In the 11-day period leading up to this

hospitalization, his medication administration record reflects an entry of "not documented" for 8 of 22 blood sugar checks. A week before this hospitalization, his medical records reflect a "stretcher call" for a hypoglycemic episode where the patient was unable to respond to questions. He was given a tube of glucose gel and two sugar packets. His medical records do not reflect any further encounters with medical providers between this episode and his hospitalization. Ex. 6, Venters Reports at 13.

      **Admitted**, but **Denied** that it is material.

115.    Defendant Blanche Carney was Commissioner of the Philadelphia Department of Prisons from 2016 through 2024. City Defs' Ex. G (Carney Deposition) at 11:10-12:11, 37:2-5.

      **Admitted.**

116.    Defendant Carney reviewed reports prepared by Western Correctional Consultants, LLC, reviewing the PDP's medical care. City Defs' Ex. G (Carney Deposition) at 37:10-39:14; Ex. 10, Western Correctional Consultants Audit, June 3, 2023, at Jung - City Production002649.

      **Admitted.**

117.    While these outside consultants reviewed hospitalizations from PDP, they did not consider whether individuals had to go to the emergency room because they were not getting the level of care they were supposed to while in PDP custody. City Defs.' Ex. H, Varghese Deposition at 28:13-29:2; *see also* Ex. 10, Western Correctional Consultants Audit, June 3, 2023, at Jung - City Production002651-2653.

      **Admitted**, but **Denied** that it is material.

118.    A consultant report dated June 3, 2023 reviewed medical charts for twelve patients under the heading "chronic care: diabetes." This consultant report informed the City and

Defendant Carney that "refusals of scheduled care was prominent factor in several inmate patients maintaining poor diabetic control;" and that "refusals were not found in the chart for all missed chronic care visits." The report recommended that "refusals of potentially life-saving treatment, such as diabetes care, should be witnessed by a medical provider in a medical setting. This infrequently happens." Ex. 10, Western Correctional Consultants Audit, June 3, 2023, at Jung - City Production002649, 002657-58.

**Admitted**, but **Denied** that it is material.

119. A Patient Safety Report produced by YesCare after Mr. Jung's death noted specifically that the following doses of insulin and blood sugar checks were absent from his record from October 27, 2023-November 6, 2023:

    a. October 30, 2023, PM administration, reason given: Not Documented;
    b. November 1, 2023, AM administration, reason given: Refused (no refusal form);
    c. November 3, 2023, AM administration, reason given: No Show;
    d. November 4, 2023, PM administration, reason given: Not Documented;
    e. November 5, 2023, AM administration, reason given: No Show;
    f. November 5, 2023, PM administration, reason given: Refused (no form).

Ex. 1, Patient Safety Event Report, p. 4.

**Admitted**, but **Denied** that it is material.

120. No "red flag" encounters were scheduled for Mr. Jung at any point between October 28, 2023 and November 6, 2023. Ex. 1, Patient Safety Event Report, p. 4-6; City Def's Ex. A at City-Jung-000010.

**Admitted**, but **Denied** that it is material.

121. Under the policy in force through 2024, when a diabetic patient's glucose level equaled or exceeds 400 in a Finger Stick Blood Glucose (FSBG) check, YesCare nursing staff were required to determine if ketones are present in the patient's urine; complete a 'Nursing Encounter Tool' to document additional symptoms; notify the facility or on-call

21

practitioner for orders and document in the patient's chart; conduct a follow-up FSBG

check in approximately two hours; and place the patient on sick call to be seen by the

provider for the next day that the provider is on-site. Ex. 28, YesCare Diabetes Clinical

Pathway, p. 3-4.

> **Admitted.** This is evidence that it was not Officer Frasier's role or responsibility
>
> to monitor Mr. Jung's treatment.

122. The Patient Safety Report noted that no provider notifications, 'Nursing Encounter Tools,'

or blood sugar-rechecks occurred when Mr. Jung had documented hyperglycemic episode

at the following times:

   a. October 28, 2023, during the intake process, for a blood sugar of 542;
   b. October 29, 2023, PM, for a blood sugar of 585;
   c. October 31, 2023, PM, for a blood sugar of 500;
   d. November 1, 2023, PM, for a blood sugar of 411 (at which time no corrective
      insulin was administered).

   Ex. 1, Patient Safety Event Report, p. 3-6.

> **Admitted**, but **Denied** that it is material.

123. The Patient Safety Event identified, *inter alia*, the following problems with the care

provided to Mr. Jung from October 27, 2023 to November 6, 2023, resulting in the failure

to appropriately monitor his glucose, treat his diabetes, and provide him with insulin:

   a. "Nurse failed to utilize the Hyper/Hypoglycemia NET during the Intake
      screening or schedule a follow up (walk in appt)" and "will receive a write up
      for not completing a NET form for elevated Blood sugar upon examination or
      scheduling a follow up visit";
   b. "Nurse did not utilize CRIC for BS>400 nor notify the provider" and will
      "receive a write up for failure to administer sliding scale insulin coverage for a
      BS of 411";
   c. "Nurses failed to obtain a signed refusal or schedule a red flag appointment"
      and will "receive a write up for not receiving a refusal";
   d. "Nurses failed to utilize the Hyper/Hypoglycemia NET during med pass (BS
      >400)" and will "receive a write up for not completing a NET form for elevated
      Blood sugar upon examination";

    e.  "Nurses documented a NO SHOW for insulin" and would "receive a write up for not scheduling a red flag appointment";

    f.  "Nurses failed to document in the EMAR (Not Documented)" and will receive further education on documentation of medication administration;

    g.  "Provider failed to follow up in real time regarding telephone call about patient with BS of 542 and positive ketones" and "was verbally educated by the SMD [Site Medical Director].

Ex. 1, Patient Safety Event Report at 5-6.

**Admitted**, but **Denied** that it is material as evidence of medical malpractice is not evidence of a constitutional violation.

*Deaths in the Philadelphia Department of Prisons*

124.    Defendant Carney was aware of every death in PDP custody and reviewed every death investigation under her tenure. City Defs' Ex. G (Carney Deposition) at 113:3-18, 120:22-123:5.

**Admitted.**

125.    Former Commissioner Carney does not recall any patterns emerging from the deaths in custody that she reviewed. City Defs' Ex. G (Carney Deposition) at 106:7-10.

**Admitted.** It is denied that there were patterns that caused a constitutional violation in this case as Plaintiffs have no evidence of a constitutional violation.

126.    Of fifty-six deaths other than Mr. Jung's between May 2016 and June 2023, twenty resulted in the PDP Commissioner's Office of Special Investigations sustaining charges of misconduct against PDP or medical contractor staff. Of these twenty, the following cases

    a.  involved findings that correctional officers failed to identify or appropriately respond to the medical emergency that resulted in death: In case SI-17-00235 (PICC 2017), the PDP Commissioner's Office of Special Investigations sustained charges against a Sergeant who "was on [the] unit multiple times throughout his shift, but did not conduct a tour of the unit;" another sergeant was "was on [the] unit, but did not conduct a tour;" and eight additional correctional officers for failing to conduct tours. Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005130-5131

b.  In case SI-18-00014 (CFCF 2018), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who "did not notify her immediate supervisor and did not call for medical assistance upon discovering" the deceased individual "unresponsive inside his cell." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005052.

c.  In case SI-19-00088 (PICC 2019), the PDP Commissioner's Office of Special Investigations sustained charges against an officer because he "did not notify any supervisor, nor did he generate mental health referrals using Lock and Track (IJMS) for inmates he deemed to be in the state of crisis." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production004974.

d.  In case SI-19-00145 (CFCF 2019), the PDP Commissioner's Office of Special Investigations sustained charges against one officer for his "reluctance to take proper action by notifying the medical staff and his supervisor that" the deceased individual "was unresponsive after he did not respond to … commands to wake up," as well as another officer because he remained at the cell door "for approximately 90 seconds, and then entered the cell and remained in the cell for approximately 15 seconds," and then left the pod without notifying officers or any medical personnel that the deceased individual was unresponsive. Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005266.

e.  In case SI-20-00231 (PICC 2020), the PDP Commissioner's Office of Special Investigations sustained charges against two officers who "failed to tour the unit as per PDP policy," when "video proved that both officers were at the officer's desk when they were notified by an inmate of trouble." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005357

f.  In case SI-20-00045 (CFCF 2020), the PDP Commissioner's Office of Special Investigations sustained charges against one officer who arrived at the scene of a medical emergency, "did not check for a pulse, attempt CPR, or render any first-aid" as the deceased individual "was lying faced-down and unresponsive on the ground inside his cell;" another officer who "stood at the entrance" to the deceased individual's cell, "did not enter the cell to check for a pulse, attempt CPR, or render any first-aid;" and a third officer who "did not conduct any tours in any of the buildings throughout the 11:00PM-7:00AM shift." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005333

g.  In case SI-20-00149 (DC 2020), the PDP Commissioner's Office of Special Investigations sustained charges against a sergeant who "failed to tour all of her assigned areas and notate her tours in Lock & Track … during the 7AM to 3 PM shift." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005012

h.  In case SI-21-00225 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against one officer who "did not perform his 3:00 AM headcount;" of those rounds he did conduct, there was evidence that "many of the cell door windows were obscured, and no corrective action was taken … for a clear view into the cells," and he "did not render any aid (First aid/CPR) to" the deceased individual "for a total of 8 minutes prior to the arrival

24

of medical personnel;" as well as another officer who "failed to render CPR/First Aid" to the deceased individual "for a total of four (4) minutes;" as well as another officer who failed to tour the unit during the shift in which this individual died. Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production004800.

i.   In case SI-21-00234 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who "did not conduct proper tours and headcounts during his shift in accordance with PDP policy and procedures." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005159

j.   In case SI-21-00003 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against two officers after video showed "that an inmate was trying to get the attention of both C/Os" and both "continued on … neither officers appeared to alert anyone of what may have been going on inside with [the deceased individual] who was later discovered unresponsive;" and another officer who "waited approximately two minutes before he attended to" the deceased individual's medical emergency "after being alerted by another inmate." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production004740

k.   In case SI-21-00059 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against one officer who "failed to tour the unit as per PDP policy," but "remained behind the officer's desk in a reclined position for most of his shift;" and a Sergeant for permitting the officer to "leave [the pod] unattended to go to his next post … without sending anyone to conduct tours on the unit due to his absence." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production004838

l.   In case SI-21-00106 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who "logged 'OKTOUR' in the electronic logbook without conducting physical tours" at three points during the night of the death, "did not conduct any physical tours of the unit," and "video footage shows that [he] remained behind the Officer's desk seated in a reclined position." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production004932

m.   In case SI-21-00027 (CFCF 2021), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who "did not conduct her initial tour or initial headcount of the unit upon arrival." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005375

n.   In case SI-22-00105 (CFCF 2022), the PDP Commissioner's Office of Special Investigations sustained charges against an officer who was observed on video "leaving [the] IP … unattended as he walked away from [the] IP … who appeared to be having a medical emergency," and "did not initiate any aid (CPR) during their interactions with [the] IP … during his medical emergency." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production005521.

o.   In case SI-23-00055 (CFCF 2023), the PDP Commissioner's Office of Special Investigations sustained charges against one officer who was witnessed on

video entering the deceased individual's cell and "at no time performing chest compressions;" another officer observed on video "looked into the cell and then walked off the unit, and at no times did she perform chest compressions;" and another officer who "arrived on the unit and stated that he did not see anyone doing, nor did he perform chest compressions (CPR)." Ex. 7, OPC Death Investigation Conclusions Excerpts at Jung - City Production004957.

**Denied** as stated. The investigations speak for themselves and Plaintiffs have left out information, including any disciplinary board findings or measures imposed.

127. Defendant Carney never ordered refresher trainings for correctional officers on rendering emergency aid. City Defs' Ex. G, Carney Deposition at 144:3-9.

**Admitted** that this was the testimony, but **Denied** that it is material. It is further denied that they needed to be ordered as they were conducted on a routine basis. *See* material facts 52-55.

128. Neither Defendant Carney nor PDP ever considered placing patient with greater needs for medical care in the infirmary. City Defs.' Ex. G, Carney Deposition at 93:8-95:4.

**Admitted**, but **Denied** that it is material.

129. The PDP's medical auditor reviewed infirmary practices to determine whether admissions were "proper," "like somebody that needed to be there," but "has not specifically" looked at whether or not certain patients should be in the infirmary but are not placed there. City Defs.' Ex. H, Varghese Deposition at 58:10-59:21.

**Admitted**, but **Denied** that it is material.

130. In Mr. Jung's case (CFCF 2023), the PDP Commissioner's Office of Special Investigations concluded that "C/O Gena Frasier … failed to render immediate aid to IP Jung as outlined in PDP Policy," "walked away from I/P Jung and left I/P Jung unattended lying on the floor outside of his cell for approximately 9 minutes," and "failed to call for a stretcher or initiate

aid to I/P Jung during his medical emergency;" and that Correctional Lieutenant Wanda Bloodsaw "appeared to be trying to communicate with I/P Jung before two I/P's come to the cell and drag I/P Jung into the cell as Lt. Bloodsaw monitors the situation the I/Ps exit the cell which is then secured by Lt. Bloodsaw who then exits the housing area," and Bloodsaw "failed to call for a stretcher or initiate aid to I/P Jung during his medical emergency." City Defs' Ex. A at City-Jung-000011.

> **Denied** as inadmissible hearsay and improper lay opinion. It is further denied as not material, especially considering the charges were found to be unsustained and discharged against Officer Frasier.

Date: December 26, 2025                    Respectfully submitted,

_____

**Michael Pestrak**
Senior Attorney
Attorney I.D. No. 208611
**Emily M. Hoff**
Deputy City Solicitor
Attorney I.D. No. 330859
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA  19102
*Attorneys for Defendants City of Philadelphia, Blanche Carney, Gena Fraiser, and Wanda Bloodshaw*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JACOB and JAMES JUNG, as** : <br> **Administrators of the Estate of LOUIS** : <br> **JUNG, JR,** : <br> : <br> **Plaintiffs,** : <br> : <br> **v.** : <br> : <br> **CITY OF PHILADELPHIA, et al.,** : <br> : <br> **Defendants.** : <br> : | **Civil Action** <br> **No. 2:24-cv-05618** |

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, Defendants' Reply to Plaintiff's Responsive Concise Statement of Facts to City of Philadelphia Defendants was filed via the Court's electronic filing system and is available for downloading.


Date: December 26, 2025                Respectfully submitted,


_____
**Michael Pestrak**
Senior Attorney
Attorney I.D. No. 208611
**Emily M. Hoff**
Deputy City Solicitor
Attorney I.D. No. 330859
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA  19102
*Attorneys for Defendants City of Philadelphia, Blanche Carney, Gena Fraiser, and Wanda Bloodshaw*