IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JACOB and JAMES JUNG, as Administrators of the Estate of LOUIS JUNG, JR., | :<br>:<br>:  No. 2:24-cv-05618-TJS<br>: |
| Plaintiff, | : |
| v. | : |
| | :  **JURY TRIAL DEMANDED** |
| CITY OF PHILADELPHIA; YesCare Corp.; BLANCHE CARNEY, Former Commissioner of Philadelphia Dept. of Prisons; LALITHA TRIVIKRAM; MAUREEN GAY;  MARIESHA APOLLON; BLAIR CABELLOS; GENA FRASIER; WANDA BLOODSAW, | :<br>:<br>:<br>:<br>:<br>:<br>: |
| Defendants, | : |
| v. | : |
| CAREERSTAFF UNLIMITED, LLC, | : |
| Third Party Defendant, | : |
| v. | : |
| TEKACCEL, INC., | : |
| Fourth Party Defendant. | : |

**BRIEF IN OPPOSITION TO MARIESHA APOLLON'S
MOTION TO PRECLUDE PLATINIFFS' MEDICAL EXPERT OPINIONS
PURSUANT TO *DAUBERT***

**I.        RELEVANT PROCEDURAL HISTORY**

Plaintiffs Jacob and James Jung brought this case as Administrators of the Estate of Louis Jung, Jr. [hereafter "Mr. Jung"], their father, who died of diabetic ketoacidosis while incarcerated in the Curran-Fromhold Correctional Facility (CFCF) within the Philadelphia Department of Prisons. This lawsuit was initiated on October 23, 2024 by the filing of a civil rights action pursuant to 42 U.S.C. § 1983. Dkt. 1. Plaintiffs' claims were based on failures to provide proper medical

care and disability accommodations to Mr. Jung. Following initial discovery, Plaintiffs filed a First Amended Complaint. Dkt. 25. The First Amended Complaint removed the Doe defendants and added four additional defendants: Mariesha Apollon, Blair Cabellos, Gena Frasier, and Wanda Bloodsaw. *Id*. at ¶¶ 9-12.

On December 3, 2025, the stipulated date for expert discovery, Plaintiffs circulated four expert reports to defense counsel.

Defendant Apollon moved for summary judgment on December 5, arguing in part that Plaintiffs' experts were insufficiently specific as to causation. Dkt. 97, 97-2 at 23-26. Plaintiffs responded with opposition to summary judgment on December 19. Dkt. 119-120. Defendant Apollon moved to preclude plaintiffs' medical expert opinions in a *Daubert* motion on December 12, 2025. Dkt. 110. Plaintiffs now respond.

## II.    QUESTIONS PRESENTED

1. **Whether Plaintiffs' diabetes expert Dr. Williams may offer causation testimony against Nurse Apollon, where multiple experts and record evidence establish her duty as a nurse and breaches of that duty, and his report establishes that Mr. Jung's diabetic ketoacidosis was developing over the course of several days with a lower insulin dose than he required.**

2. **Whether Plaintiffs' correctional nursing expert Lori Roscoe may offer causation testimony against Nurse Apollon, where multiple experts and record evidence establish her duty as a nurse and breaches of that duty, and her report establishes that failures to assess symptoms and conduct follow-up placed Mr. Jung at an ongoing risk of Diabetic Ketoacidosis (DKA) from intake onward.**

3. **Whether Plaintiffs' correctional health expert Dr. Homer Venters may offer causation testimony against Nurse Apollon, where multiple experts and record evidence establish her duty as a nurse and breaches of that duty, and his opinion includes Nurse Apollon's breaches as among the systemic failures that resulted in Mr. Jung's improper treatment and death.**

2

### III.   LEGAL STANDARD

Medical malpractice claims under Pennsylvania law usually require medical expert testimony as to duty, breach, proximate causation, and damages. *Mitzelfelt v. Kamrin*, 584 A.2d 888, 891–92 (Pa. 1990). Expert witnesses "are not required to use 'magic words' when expressing their opinions; rather, the substance of their testimony must be examined to determine whether the expert has met the requisite standard." *Stimmler v. Chestnut Hill Hosp.*, 981 A.2d 145, 155 (Pa. 2009); *see also Klein v. Aronchick,* 85 A.3d 487, 496 (Pa. Super. 2014). Causation in a medical malpractice claim requires proof that a defendant's breaches of duty were the "proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient." *Id.* at 891. A substantial factor "need not" be "the only factor, i.e., 'that cause which ... produces the result.'" *Jones v. Montefiore Hosp.*, 431 A.2d 920, 923 (Pa. 1981). "Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm." *Mitzelfelt*, 584 A.2d at 892.

Federal Rule of Evidence "702, which governs the admissibility of expert testimony, has a liberal policy of admissibility." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997). The "ultimate touchstone" of Rule 702 "is helpfulness to the trier of fact." *In re Paoli R.R. Yard PCB Litig.* [*"Paoli II"*], 35 F.3d 717, 744 (3d Cir. 1994). "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008); *see also Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (referring to these requirements as the "trilogy" of "qualification, reliability and fit"). The

3

reliability requirement "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Paoli II*, 35 F.3d at 742 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590, (1993)). The reliability test is "flexible," and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999). The requirement of "fit" means that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404.

In a medical malpractice case litigated in federal court, courts evaluate the admissibility of expert opinion testimony with reference to both the Federal Rules of Evidence and the applicable state-law standards. For example, in *Wichterman v. City of Philadelphia*, Corizon defendants moved to exclude expert testimony under Rule 702, arguing that the challenged opinion "fails to provide how any action or inaction by Corizon defendants caused Wichterman harm." *Wichterman v. City of Philadelphia*, No. CV 16-5796, 2019 WL 2568340, at *6 (E.D. Pa. June 20, 2019). Incorporating clear Pennsylvania legal precedent that experts "need not use 'magic words'" and "the Court must look at the substance of the expert's testimony," the Court disagreed. *Id.* (internal citations omitted). While the expert in *Wichterman* had not used the term "standard of care," the court looked to his method of reviewing patient records and applicable policies in light of "his professional judgment based on his experience," and concluded that these substantive conclusions sufficed under both Pennsylvania law and Rule 702. *Id.* Similarly, despite the expert in *Wichterman* not using the word "causation," the court accepted his conclusions "based on his experience as a medical doctor working in correctional medicine and on his review of the record."

4

*Id. See also Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 567–68 (M.D. Pa. 2017), *aff'd in part, vacated in part sub nom. Ponzini v. Monroe Cnty.*, 789 F. App'x 313 (3d Cir. 2019).

## IV.   ARGUMENT

Dr. Homer Venters will testify as to systemic deficiencies in YesCare and PDP that impacted Mr. Jung's care, which involves analysis of individual failures, including Defendant Apollon's. Lori Roscoe will testify to duties and breaches of the standard of nursing care and their consequences. Dr. Jonathan Williams, endocrinologist and diabetes expert, will testify as to the progression of diabetes and diabetic ketoacidosis and how Defendants' failures, including those of Defendant Apollon, resulted in Mr. Jung dying from diabetic ketoacidosis. The substance of all three expert reports provides enough helpful, specialized information to assist the jury in reaching a conclusion as to whether Defendant Apollon's breaches of nursing care standards were a substantial factor in the death of Mr. Jung.

As laid out in Plaintiffs' opposition to Defendant Apollon's motion for summary judgment, Defendant Apollon's omissions were significantly greater than presented in her summary judgment briefing or the instant *Daubert* motion. A full recitation of the facts can be found in Plaintiff's responsive concise statement of facts, appendix, and briefing at Dkt. 119-120. Evidence in the record establishes that Defendant Apollon (1) failed to complete a Nursing Encounter Tool for hyperglycemia, and consequently failed to fully assess or document any symptoms other than critically high blood glucose and urine ketones, Dkt. 119 at ¶¶ 66-67, 99, Dkt. 120 at 10-11; (2) failed to obtain an Intermedex or otherwise obtain prior records for Mr. Jung that would have detailed his previous prescriptions, especially his previous insulin dosing regimen, Dkt. 119 at ¶¶ 50-61, 78, Dkt. 120 at 4, 11-12; (3) failed to perform or secure a follow-up blood glucose reading within two hours of his critically high level at intake, potentially disregarding a direct instruction from Defendant Maureen Gay, Dkt. 119 at ¶ 16, Dkt. 120 at 9-10; and (4) failed to place him on a

sick call with a provider the next time a provider was available on-site, Dkt. 119 at ¶¶ 66, 79, Dkt. 120 at 3-5.

Each of Plaintiffs' medical experts offer analysis of failures in care for Mr. Jung's diabetes. Mr. Jung died from diabetic ketoacidosis. Defendant Apollon does not challenge the cause of Mr. Jung's death, but argues that her individual actions regarding his diabetic care were too far removed and attenuated from Mr. Jung's death for Plaintiffs' experts to properly consider them causative. Defendant Apollon also does not take particular issue with the method or process of any of Plaintiffs' experts. Rather, she frames her arguments of insufficient specificity or purported contradictions in their causation opinions as questions of reliability and fit. This is fundamentally a dispute over the weight of their opinions, not their admissibility, and are ill-suited for a *Daubert* motion as opposed to cross-examination at trial.

Each of Plaintiffs' medical experts are well-qualified to give their opinions; each follow a well-established and reliable method in reaching their conclusions; and each give opinions that causally connect Defendant Apollon's failings to Mr. Jung's improperly treated hyperglycemia, high risk of diabetic ketoacidosis, contributing to his trajectory of deficient care that culminated in his death. Plaintiffs' expert testimony will therefore be helpful to the jury in their application of Pennsylvania law.

### A. Dr. Williams' expert opinion as to the length of time over which Mr. Jung was developing DKA and Mr. Jung's under-dosage of insulin will be helpful to the jury in determining whether Defendant Apollon's actions were a substantial factor in the harm to Mr. Jung.

Defendant Apollon argues to limit Dr. Williams' testimony based principally off Dr. Williams' opinion that diabetic ketoacidosis is rarely fatal and easily reversed. She argues that "if DKA is reversible with prompt care, blaming a single re-intake visit nine days earlier without

6

analysis is conjecture." Dkt. 110-2 at 13. This argument rests on a misreading on Dr. Williams' opinion and a misunderstanding of the law.

Dr. Williams provides a clear opinion as to how diabetic ketoacidosis develops, which is through "acid build-up in the blood" when "energy demands are high, yet insulin is deficient, then glucose can no longer meet demand and the body turns to second-line sources of energy, namely stored fat. A consequence of using fat to provide energy is generation of acid components (i.e. ketone bodies)." Defs.' Ex. D, Dkt. 110-7 [hereafter "Williams Report"] at 2. Dr. Williams opined, based on his extensive "education, training, and experience as an internist and endocrinologist," that "[t]here is no question that [Mr. Jung] was developing DKA over this period as it would be entirely expected in the absence of insulin administration since the morning of October 27, 2023. The NPH insulin he received that morning would've been out of his system by the afternoon that day. From this time forward he would begin to develop DKA. The high suspicion of DKA was evident from intake." *Id.* at 6. Dr. Williams provides an opinion as to the specific importance of following up after encountering a patient with hyperglycemia and ketones to "determine if ketones are starting to clear." *Id.* While Dr. Williams is clear that diabetic ketoacidosis can develop quickly and can be reversed quickly, he is equally clear that it can develop as acid builds up in the blood over a longer period of time – in Mr. Jung's case, over the course of several days.

Dr. Williams reviewed Mr. Jung's medical records, including his insulin dosage at Norristown immediately prior to returning to PDP on October 27, 2023 (30 units of Novolin in the morning; 15 units of Novolin in the evening; and sliding scale Humulin ranging from 3 to 15 units, three times per day) and his insulin dosage at PDP prior to leaving for Norristown on June 2, 2023 (30 units of Humulin in the morning; 15 units of Humulin in the evening; and sliding scale Humulin ranging from 6 to 18 units, twice a day). Dr. Williams compared these doses to Mr. Jung's

7

dosage on re-intake into PDP (10 units of Novolin twice daily, and sliding scale Novolin ranging from 2-12 units, twice daily). He concluded that Mr. Jung's "prior record at the same prison and also his record at Norristown State hospital established that he required at least 60 units of insulin per day," and opined throughout his account of Mr. Jung's records that his dosage from October 28 to November 6, 2023 was "under-dosed for both Regular and NPH given prior history," "under-dosed for both insulins," and experienced "insufficient dosing."

Defendant Apollon does not challenge Dr. Williams' extensive qualifications. Dr. Williams' opinion is fairly simple, as it is based on core principles of diabetes progression and his extensive experience in studying and treating diabetes. He followed a standard method of reviewing patient records and evaluating them against a wealth of background knowledge about diabetes and the progression of diabetic ketoacidosis. *See Rowland v. Novartis Pharms. Corp.*, 9 F. Supp. 3d 553, 567 (W.D. Pa. 2014) ("evaluation of a plaintiffs medical records is a reliable method even in the absence of a physical examination" (*citing Paoli,* 35 F.3d at 762)); *Morgan-Mapp v. George W. Hill Corr. Facility*, No. CV 07-2949, 2008 WL 11366456, at *1 n.1 (E.D. Pa. Oct. 3, 2008) ("Dr. Greifinger's report is both reliable and fit because he applies his wealth of experience in correctional medicine to the specific facts of this case. Greifinger reviewed several sets of medical records, GWHCF's policies and procedures, and numerous deposition transcripts in connection with his report. By applying his experience to these materials, Greifinger has satisfied the reliability inquiry for purposes of Rule 702"); *Wichterman*, 2019 WL 2568340 at *6. The causation opinion is simple: Mr. Jung, a Type I diabetic, received insufficient insulin over the period of October 27 to November 6, 2023, in part due to insufficient dosing and in part due to missed doses; acid built up in his blood; he developed diabetic ketoacidosis; and he died as a result.

8

The substance of Dr. Williams' opinion establishes that failing to provide close follow-up for a type 1 diabetic patient with critically elevated glucose and ketones increased the risk of harm to Mr. Jung. A "follow up glucose reading" and a determination of whether "ketones are starting to clear" is critical, "as the absence of improvement indicates escalation of care is required." *Id.* at 6. Failure to perform or schedule a follow-up glucose reading meant that this escalation of care was not taken, or even considered; he was not seen by a provider to evaluate the need for escalation of care, and his prior medical records were never obtained for review and comparison to his Norristown insulin regimen. The substance of this opinion establishes that Defendant Apollon's breaches increased the risk of harm to Mr. Jung, and that Mr. Jung in fact died from the specific harm that this risk raised. Dr. Williams' opinion provides helpful specialized knowledge as to the timespan over which diabetic ketoacidosis can develop; it is a question for the jury to determine whether this is a "substantial factor."

Dr. Williams' opinion also establishes that Mr. Jung was under-dosed on arrival to PDP on October 28, 2023. He opines as to the insufficiency of the dosage in light of prior records that were available to him – but were not reviewed by Defendant Gay in her prescription orders, after the "nurse failed to obtain an Intermedex" or request outside records, including from Norristown. Dkt. 119 at ¶¶ 62-64, 78. If a jury determines that Defendant Apollon failed to review Mr. Jung's medical records, and in doing so failed to provide critical treatment information to Defendant Gay that resulted in her prescribing him insufficient amounts of insulin, then Dr. Williams' analysis will provide helpful, specialized expert testimony. Specifically, Dr. Williams can aid the jury's understanding as to the discrepancy between insulin dosages during Mr. Jung's prior incarceration and at Norristown compared to his reintake on October 28, 2023. Because Defendant Apollon failed to review Mr. Jung's prior PDP records or seek his outside medical and pharmacy records,

9

Dr. Williams' opinion as to the significance of this under-dosage will be helpful for the jury in making their determination as to whether Defendant Apollon's omissions were a "substantial factor" in Mr. Jung's death.

Defendant Apollon's criticisms of Dr. Williams' expert opinion are fit for cross-examination, not expert disqualification. *See In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) ("The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination … if the methodology and reasoning are sufficiently reliable to allow the fact finder to consider the expert's opinion, it is that trier of fact that must assess the expert's conclusions" (internal citations omitted)); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 187 (D.N.J. 2020) ("Where, as here, the causation experts' opinions are based on facts, a reasonable investigation (including documented findings), and traditional technical/mechanical expertise, and the experts provide a reasonable link between the information and procedures they use and the conclusions reached, the *Daubert* requirements are met… To the extent any of the causation experts' analyses are 'shaky but admissible,' Defendants ought to raise these issues on cross-examination before the fact finder." (internal citations omitted)). Dr. Williams is qualified, he follows a standard and reliable method, and his testimony on the nature and progression of diabetic ketoacidosis alongside an account of multiple failures in Mr. Jung's diabetic care is relevant to the case. Any further questions as to the strength of his opinion are for the jury to resolve after direct and cross-examination.

**B. Correctional Nursing Expert Lori Roscoe's expert opinion regarding the consequences and risks of Defendant Apollon's deviations from the standard of nursing care will be helpful to the jury in determining whether these deviations resulted in an ongoing risk of DKA.**

Defendant Apollon also moves to limit Nurse Roscoe's testimony, arguing that Nurse Roscoe's opinion provides only standard of care criticism with no causation opinion. In light of Pennsylvania legal standards governing the substance of expert testimony, a fuller reading of Nurse Roscoe's opinion clearly reflects the consequences and risks of Defendant Apollon's omissions that the jury is entitled to consider.

As quoted in Defendant Apollon's briefing, Nurse Roscoe extensively opines as to the standard of care when a nurse encounters a patient with critically high blood glucose and urine ketones. Nurse Roscoe finds that Defendant Apollon neither completed the Hyper/Hypoglycemia Nursing Encounter Tool, "nor did she conduct the ongoing reassessment required for a patient in acute metabolic distress. A glucose level exceeding 500 mg/dL accompanied by ketonuria represents a medical emergency requiring repeated reassessment, close monitoring, and continued communication with the provider. Often a blood glucose level that high warrants transfer to an emergency department for a higher level of care than can be rendered in a correctional facility. RN Apollon's failure to carry out these essential nursing responsibilities deviated significantly from the standard of nursing care." Defs' Ex. C, Dkt. 110-6 [herafter "Roscoe Report"] at 11. Nurse Roscoe then goes on to further describe "Mr. Jung's ongoing risk of DKA", stemming from failure to assess or document symptoms and conduct necessary follow-up throughout his re-incarceration at PDP, from intake onwards: "Mr. Jung had already demonstrated ketonuria at intake, and his persistent hyperglycemia placed him at high risk for worsening metabolic acidosis." *Id.* at 12-13.

As with Dr. Williams, Nurse Roscoe's expert opinion is based on a standard, reliable method of applying extensive medical knowledge to a thorough review of patient records,

11

depositions, and other evidence in the record. *Rowland*, 9 F. Supp. 3d at 567; *Paoli,* 35 F.3d at 762; *Morgan-Mapp*, 2008 WL 11366456 at *1 n.1; *Wichterman*, 2019 WL 2568340 at *6. Defendant Apollon does not challenge Nurse Roscoe's extensive qualifications in correctional nursing. While Nurse Roscoe does not use the "magic word" of causation, she substantively lays out increased "risk of worsening metabolic acidosis" raised by failures to fully assess symptoms or perform necessary follow-up to Mr. Jung's "ongoing risk of DKA" after he had "already demonstrated ketonuria at intake." *Stimmler*, 981 A.2d at 155. Roscoe's report opines on the importance of reassessment of a patient in acute metabolic distress and how Defendant Apollon failed to do so; how Mr. Jung may have needed to go to an ER on October 28; and how ketonuria and hyperglycemia place a patient at risk for "worsening metabolic acidosis." All of this is sufficient for Roscoe to testify that Apollon's breaches of the standard of care resulted in worsening metabolic distress. This opinion is relevant to the case and will assist the jury in determining whether Defendant Apollon's omissions were a substantial factor in the harm to Mr. Jung. *Schneider*, 320 F.3d at 404; *Stimmler*, 981 A.2d at 155; *Jones*, 431 A.2d at 923.

### C. Correctional Health Care Expert Dr. Homer Venters identifies failures in the intake screening conducted by Defendant Apollon as components of the systemic failures of care that resulted in Mr. Jung's death.

Dr. Venters' report does focus on systemic deficiencies in the care provided to Mr. Jung, and specifically identifies failures that implicate Defendant Apollon. For the same reasons as argued in regard to the preceding experts, his opinion as to the deviations from applicable standards of care during the intake screening provide a sufficient basis to allow him to opine on how Defendant Apollon's conduct contributed to the improper treatment of Mr. Jung's diabetes, resulting in his hyperglycemia and diabetic ketoacidosis going untreated, causing his death.

As with the other experts, Defendant Apollon does not challenge Dr. Venters' extensive qualifications. Dr. Venters has years of experience in both direct care and operating correctional health systems at the level of oversight and system-wide review. Defs' Ex. E, Dkt. 110-8, Report of Dr. Venters at 1-2. Dr. Venters extensively details his methodological approach to reaching system-wide conclusions within his report. *Id.* at 3-4. He also engages in individual analysis and conclusions, following the same reliable, well-accepted method of case-specific medical record, policy, and record evidence review as Dr. Williams and Nurse Roscoe. *Rowland*, 9 F. Supp. 3d at 567; *Paoli,* 35 F.3d at 762; *Morgan-Mapp*, 2008 WL 11366456 at *1 n.1; *Wichterman*, 2019 WL 2568340 at *6. Dr. Venters first opinion addresses "failure to provide basic care for diabetes." This involves both system-wide analysis and a case-specific analysis of individual failures, including Defendant Apollon's, that render his testimony helpful, relevant, and an appropriate fit for the case against her.

Contrary to Defendants' brief that claimed that Dr. Venters only commented on Defendant Apollon in the context of her not being adequately trained, the first paragraph of his first finding states:

> When Mr. Jung arrived in the facility 10/28/23, there was no review of his prior records or insulin regimen to understand that he had been recently hospitalized multiple times with DKA, a potentially fatal complication of diabetes. This is a failure *by the nurse* and the provider, since both had access to his prior records and should have reviewed them for warnings about potentially fatal or serious health problems, including recent hospitalizations for DKA.

Defs' Ex. E, Dkt. 110-8, Report of Dr. Venters at 19 (emphasis added). The failure to review records, a failure of both the nurse and the provider, directly contributed to Mr. Jung not being prescribed sufficient insulin, as discussed *supra* in regard to Dr. Williams' report. Dr. Venters' opinion here will assist the jury in determining why it was important for Defendants Apollon and

13

Gay to review Mr. Jung's records, and how this failure resulted in the inadequate prescription of insulin that directly contributed to his death on November 6, 2023, as explicated by Dr. Williams.

Dr. Venters also opines that "[t]he failure to ensure that Mr. Jung was re-assessed in the hours after his initial intake for his diabetic control is a glaring error that also may reflect a systemic problem." *Id*. at 21. Dr. Venters notes that it was an error for the provider not to reassess Mr. Jung, but Dr. Venters also states that the failure "reflects a lack of adherence to the YesCare Diabetes Clinical Pathway," which was required to be followed by Defendant Apollon as well. *Id*. And he further based his opinions on systemic failures noted in the Patient Safety Report, including its finding that the intake nurse failed to utilize a Hyper/Hypoglycemia Nursing Encounter Tool (NET) to during the intake screening. *Id*. at 19. This is another failure that contributed to the failure to escalate care for Mr. Jung. It is the province of the jury to determine if these deviations from the standard of care collectively amounted to a substantial factor in the harm to Mr. Jung. Dr. Venters has laid out sufficient factual bases demonstrating how Defendant Apollon's conduct in the intake evaluation contributed to the improper treatment of Mr. Jung's diabetes.

## V.    CONCLUSION

Plaintiffs' experts Dr. Jonathan Williams, Nurse Lori Roscoe, and Dr. Homer Venters are highly qualified; follow a reliable method of reviewing patient records and record evidence in light of their substantial medical and nursing knowledge; and their opinions fit the case, providing relevant and specialized knowledge that will assist the jury including on the issue of causation vis-à-vis Defendant Apollon. For the foregoing reasons, Plaintiffs respectfully contend that Defendant Apollon's motion to preclude causation testimony from Plaintiffs' experts Dr. Jonathan Williams and Lori Roscoe should be denied.

Respectfully submitted,

*/s/ Bret Grote*
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
*/s/ Rupalee Rashatwar*
Staff Attorney
PA ID No. 331085
*/s/ Margaret Hu*
Staff Attorney
PA ID No. 334438
*/s/ Lolo Salsbury Serrano*
Legal Fellow
PA ID No. 338184
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123


*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Bret Grote, Esq., hereby certify that I caused a true and correct copy of the foregoing Plaintiff's Brief in Opposition to Defendant Apollon's *Daubert* Motion to be electronically filed on December 26, 2025, and thereby served upon all parties entered into the Court's ECF system.

*/s/ Bret Grote*
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123

*Counsel for Plaintiffs*