IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JACOB and JAMES JUNG, as Administrators of the Estate of LOUIS JUNG, JR, | : <br> : <br> :    No. 2:24-cv-05618-TJS <br> : |
| Plaintiff, | : |
| v. | : |
| | :    **JURY TRIAL DEMANDED** |
| CITY OF PHILADELPHIA; YesCare Corp.; BLANCHE CARNEY, Former Commissioner of Philadelphia Dept. of Prisons; LALITHA TRIVIKRAM; MAUREEN GAY; MARIESHA APOLLON; BLAIR CABELLOS; GENA FRASIER; WANDA BLOODSAW, | : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants, | : |
| v. | : |
| CAREERSTAFF UNLIMITED, LLC, | : |
| Third Party Defendant, | : |
| v. | : |
| TEKACCEL, INC., | : |
| Fourth Party Defendant. | : |

**BRIEF IN OPPOSITION TO CITY DEFENDANTS'
MOTION TO PRECLUDE ARTHUR WALLENSTEIN'S OPINION
PURSUANT TO *DAUBERT***

/s/ Bret Grote
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
/s/ Rupalee Rashatwar
Staff Attorney
PA ID No. 331085
rupalee@alcenter.org
/s/ Margaret Hu
Staff Attorney
PA ID No. 334438
margo@alcenter.org

/s/ Lolo Salsbury Serrano
Legal Fellow
PA ID No. 338184
lolo@alcenter.org
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123

*Counsel for Plaintiffs*

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

1

Plaintiffs Jacob and James Jung brought this case as Administrators of the Estate of Louis Jung, Jr [hereafter "Mr. Jung"], their father, who died of diabetic ketoacidosis while incarcerated in the Curran-Fromhold Correctional Facility (CFCF) within the Philadelphia Department of Prisons. This lawsuit was initiated on October 23, 2024 by the filing of a civil rights action pursuant to 42 U.S.C. § 1983. Dkt. 1. Plaintiffs' claims were based on failures to provide proper medical care and disability accommodations to Mr. Jung. Following initial discovery, Plaintiffs filed a First Amended Complaint. Dkt. 25. The First Amended Complaint removed the Doe defendants and added four additional defendants: Mariesha Apollon, Blair Cabellos, Gena Frasier, and Wanda Bloodsaw. *Id*. at ¶¶ 9-12.

All parties jointly moved for extension of time to complete discovery on September 18, 2025. Dkt. 69. In its order denying the motion, this Court explicitly provided that "[n]otwithstanding the denial of this motion, the parties may agree to continue discovery provided it does not affect any other deadlines in the Scheduling Order." Dkt. 70. On September 19, 2025, all parties stipulated to complete fact discovery by November 19 and expert discovery by December 3, 2025. Dkt. 1. On December 3, Plaintiffs provided a copy of correctional expert Arthur Wallenstein's expert report to all defendants, along with the reports of its three medical experts. Ex. 1, Emails from Plaintiffs' Counsel. On December 5, counsel for City Defendants requested Mr. Wallenstein's availability for a deposition date. Plaintiffs' counsel immediately responded with Mr. Wallenstein's availability. *Id.* Counsel for City Defendants served a notice of deposition and request for documents on December 5, 2025. *Id*. Counsel for Plaintiffs provided responsive documents on December 9, 2025, and Mr. Wallenstein's deposition occurred on December 10, 2025. *Id*.; Defs. Ex. C.

2

City Defendants moved for summary judgment on all counts against Defendants Frasier, Bloodsaw, Carney, and the City of Philadelphia on December 5, 2025. Dkt. 99-100. Plaintiffs filed opposition to the motion on December 19, 2025. Dkt. 116-118. City Defendants moved to exclude correctional expert Arthur Wallenstein's report under Federal Rule of Civil Procedure 26 and Rule of Evidence 702 on December 12, 2025. Dkt. 111. Plaintiffs now respond to this motion.

## II. QUESTIONS PRESENTED

1. **Whether Mr. Wallenstein's expert report should be excluded where it was submitted on the stipulated date for expert discovery, he was subsequently deposed, and Plaintiffs produced all responsive documents requested by Defendants.**

2. **Whether Mr. Wallenstein's expert opinions meet Rule 702's liberal standard for the admissibility of expert testimony where he relies on his extensive professional experience in corrections and the standards of national correctional professional associations in combination with a review of case-specific records to reach his opinions.**

## III. ARGUMENT

    a. **Mr. Wallenstein's expert report should not be excluded because it was timely submitted on the stipulated date for expert discovery, and any potential for prejudice to the City defendants has been cured.**

Fed. R. Civ. P. 26 provides a default rule of disclosing expert opinions 90 days before trial "absent a stipulation or a court order." Fed. R. Civ. P. 26(a)(2)(D). Rule 26 also provides that disclosures of experts' identities and their reports are coextensive – "unless otherwise stipulated or ordered by the court, this disclosure [of "the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705"] must be accompanied by a written report." Fed. R. Civ. P. 26(a)(2)(B).

"[T]he exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994) (quoting

*Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977)). "[S]triking an expert report is a draconian measure warranted only in extreme cases." *Brown v. Robert Packer Hosp.*, 341 F.R.D. 570, 574–75 (M.D. Pa. 2022). Exclusion is only considered in cases where the party proffering expert reports fails to comport with discovery duties as laid out in the Federal Rules and applicable court orders or stipulations, typically after the close of expert discovery. *See Fulton v. Soh*, No. 1:21-CV-01268, 2024 WL 4755444, at *3 (M.D. Pa. Nov. 12, 2024) (excluding report submitted after "expert discovery [was to] be completed"); *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 721 (3d Cir. 1997) (excluding expert reports produced when the "cutoff for expert discovery had passed more than a year earlier"); *Flickinger v. Toys R Us, Inc*., No. 3:10-CV-305, 2011 WL 3359646, at *2 (M.D. Pa. Aug. 3, 2011) (excluding reports when party "submitted these reports in late June, months after the expert discovery deadline").

Plaintiffs submitted Mr. Wallenstein's report on the date for expert discovery that had been stipulated to by all parties, as explicitly contemplated by both the Federal Rules and this Court's order of September 18. Fed. R. Civ. P. 26 explicitly recognizes that the default deadline of disclosure 90 days prior to trial can be modified by court order or stipulation. Rule 26(a)(2)(D). That is precisely what occurred in this case. This court's order of September 18 provided that all discovery deadlines were subject to stipulated change, and the parties' subsequent stipulation establishes a new deadline for expert discovery. There is no requirement in the federal rules that disclosure of an expert's identity precede production of their reports. Fed. R. Civ. P. 26(a)(2)(B) provides that absent a stipulation or court order, disclosure of a report occurs at the same time as the expert's identity. Mr. Wallenstein's report was not produced by ambush; it was produced in accordance with all applicable rules, court orders, and stipulations, on the date for expert discovery.

4

Even under the City Defendants' inaccurate assumption that Plaintiffs untimely submitted Mr. Wallenstein's expert discovery, Third Circuit jurisprudence weighs against exclusion of Plaintiffs' expert reports. Excluding evidence due to a failure to comply with discovery duties is only warranted when the *Nicholas* factors justify such a severe sanction. *See Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000). The analysis considers 1) The prejudice or surprise of the party against whom the excluded evidence would have been admitted; 2) The ability of the party to cure that prejudice; 3) The extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and 4) Bad faith or willfulness in failing to comply with a court order or discovery obligation. *Id*. Additionally, courts must examine the importance of the evidence sought to be excluded. *Konstantopoulos,* 112 F.3d at 719. Each of these factors militates in Plaintiffs' favor.

Plaintiffs do not concede that City Defendants can properly be considered surprised when they received disclosure of an expert's identity and report at the same time, as provided by Fed. R. Civ. P. 26(a)(2)(A-B), on a stipulated date for expert discovery, as explicitly contemplated by both Fed. R. Civ. P. 26(a)(2)(D) and this Court's order of September 18. If there were any conceivable prejudice to Defendants in this stipulated arrangement, however, it has already been cured. Courts regularly cure prejudice by permitting depositions of the expert witness at issue. *Cochran*, 2015 WL 3555291, at *3 (allowing deposition of expert to cure prejudice); *Pansini v. Trane Co.*, No. 17-3948, 2019 WL 1299036, at *5–6 (E.D. Pa. Mar. 21, 2019) (granting defendants time to depose expert). Counsel for City Defendants requested to depose Mr. Wallenstein and served a request for production of documents on receipt of his report. Ex. 1. Counsel for Plaintiffs responded promptly with Mr. Wallenstein's availability, provided responsive documents to City Defendants' request within two business days on December 9, and produced Mr. Wallenstein for a deposition within

5

three business days on December 10. *Id*; Defs. Ex. C. Any additional expert discovery that City Defendants might have expected between production of reports and the stipulated deadline has now occurred. There is no prejudice to Defendants under these circumstances.

Given that Plaintiffs have disclosed their mandatory expert disclosures, including identities and reports, and accommodated City Defendants' requests for discretionary expert discovery, including a deposition and requests for production of documents, there is no potential for disrupting an orderly and efficient trial. The parties did not require a formal extension to collaboratively engage in further discovery, and all requested discovery had been completed as of the filing of City Defendants' *Daubert* motion. There is no need to extend the trial schedule for this issue, and the inclusion of the expert reports will not disrupt the case management schedule.

The City also argues that "this late disclosure, much less than ninety days before trial, prevented moving Defendants from getting an expert of their own." City Defs.' *Daubert* Brief, Dkt. 111 at 6**.** This argument overlooks, however, that the date for production of expert reports ordered by this Court in the Amended Case Management Order had the same date for all parties to submit expert reports and rebuttal reports, and the Stipulation also had a contemporaneous deadline for all parties to submit expert discovery. Dkt. 62, Amended Scheduling Order. Accordingly, Defendants could have produced expert reports in support of their defenses on the same date as Plaintiffs. If Defendants merely want two weeks to produce rebuttal reports, then they could have asked for that.[1]

Finally, Plaintiffs have not acted in bad faith. The presence or absence of bad faith or willfulness is often the most significant factor in determining whether exclusion is appropriate. Courts reserve findings of willfulness for "repeated" or "flagrant" disregard of court orders, not

---

[1] Defendant Apollon, for example, produced an expert report to counsel for all parties in this case on December 22, 2025, and disclosed the intention to produce another expert report on December 23, 2025.

6

isolated or negligent failures to comply. *Holbrook v. Woodham*, No. 05-304, 2008 WL 544719, at *3 (W.D. Pa. Feb. 28, 2008) (stating that an "egregious" showing of bad faith is necessary for a judicial finding of willfulness). Where a party acts promptly to correct an error and lacks a pattern of violations, courts routinely decline to find bad faith. *Cochran*, 2015 WL 3555291, at *4 (finding good faith where defendant acted quickly to remedy a "good faith, albeit incorrect" interpretation of the scheduling order); *Pansini*, 2019 WL 1299036, at *6 (no bad faith where delay reflected a "slip-up" rather than a tactical ploy). By contrast, exclusion is warranted where the record demonstrates a conscious disregard of discovery obligations, repeated violations of court orders, or deceptive conduct. *Gibson*, 176 F.R.D. at 195 (finding "flagrant disregard" where defendants repeatedly ignored deadlines and required court intervention); *In re TMI Litig.*, 193 F.3d 613, 722 (3d Cir. 1999) (finding bad faith where plaintiffs repeatedly violated orders and covertly filed untimely reports); *Klatch-Maynard*, 2011 WL 2006424, at *5 (three-and-a-half-year delay without justification constituted willful noncompliance); *SuperMedia LLC v. Morley*, 2014 WL 5023386, at *10–11 (E.D.Pa. Oct. 8, 2014) (suspected backdating and withholding of underlying materials). Plaintiffs complied with a Stipulation to continue discovery that was authorized by this Court, so there is no disregard of any court order, let alone a flagrant one or one made in bad faith. Plaintiffs promptly accommodated City Defendants' requests for further discovery.

Finally, the importance of the evidence weighs heavily in favor of the Plaintiffs. Corrections is a distinct area of specialized knowledge for which courts and juries routinely rely on expert assistance when assessing evidence pertaining to jail practices and operations. The City Defendants argued in their motion for summary judgment, for example, that Defendant Frasier's conduct on November 5, 2023 was justified because Defendant Cabellos' actions on that day were "not the type of conduct that would prompt a non-medical official to believe that 'prison doctors

7

or their assistants are mistreating (or not treating) a prisoner. Dkt. 99 at p. 11. They also assert that Defendant Bloodsaw had no further obligation as correctional staff to ensure care for Mr. Jung. *Id.* at 11-13. Arguments such as those, among the other issues Mr. Wallenstein's report addresses, are rooted in the specialized understandings, relevant professional standards, and PDP policies that guide correctional operations and how officers are to ensure access to medical care. Mr. Wallenstein provides crucial context and specialized knowledge that will assist the trier of fact in understanding the relevant issues. Exclusion is a draconian remedy that is not supported by the facts or the law in this case.

### b. Mr. Wallenstein's opinions meet the requirements of Rule 702.

Federal Rule of Evidence "702, which governs the admissibility of expert testimony, has a liberal policy of admissibility." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997). The "ultimate touchstone" of Rule 702 "is helpfulness to the trier of fact." *In re Paoli R.R. Yard PCB Litig.* [*"Paoli II"*], 35 F.3d 717, 744 (3d Cir. 1994). "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008); *see also Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (referring to these requirements as the "trilogy" of "qualification, reliability and fit"). The requirement of "fit" means that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404. City Defendants do not contend that Mr. Wallenstein's opinions are a poor fit for the case.

> **i.   Mr. Wallenstein has the requisite qualifications to testify as to correctional practices generally as well as to the role of correctional staff in ensuring access to care.**

"Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts. [The Third Circuit has] eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). Mr. Wallenstein has extensive qualifications in corrections and in the overlap between correctional management and access to medical care. As laid out in Mr. Wallenstein's report, he has over forty-three consecutive years of experience working for governmental agencies with responsibility for inmates in county jails and correctional facilities, including Eastern State Penitentiary; the Philadelphia Prison system; the Stateville Prison Complex in Joliet, Illinois; Bucks County, Pennsylvania; King County, Washington, and Montgomery County, Maryland. Defs. Ex. E, Wallenstein Report at 1-2. Mr. Wallenstein has experience in running facilities accredited by both the National Commission on Correctional Healthcare and the American Correctional Association. *Id.* at 2.

City Defendants move to preclude Mr. Wallenstein's opinion, specifically as to correctional staff's responsibilities to Mr. Jung on the morning of November 5, because Mr. Wallenstein is not a medical professional. They cite to deposition testimony in which Mr. Wallenstein reviews the testimony of Defendant LPN Blair Cabellos, who was present with Officer Frasier while Mr. Jung was on the floor in the doorway of his cell, and object to Mr. Wallenstein's testimony after characterizing it as a conclusion that "Nurse Cabellos should have done more." City Defs' *Daubert* Motion at 9 (*citing* Defs. Ex. C, Wallenstein Deposition at 47:3-49:19). Mr. Wallenstein is clear in his testimony that he is "not making a medical assessment" – rather, his opinion is limited to the obligations of a correctional officer to facilitate proper "access to care." City Defs. Ex. C,

Wallenstein Deposition at 4:7-19. Mr. Wallenstein does not engage in any second-guessing of medical opinions reached after a medical assessment, in either his report or his deposition testimony. To the extent that Mr. Wallenstein was asked to comment on LPN Cabellos' actions, he limited his conclusion to the perspective of a correctional officer: presented with an objective situation in which an incarcerated individual on the floor asked for a nurse, complained of pain or inability to walk, and received no physical assessment from a nursing staff member.[2]

Mr. Wallenstein's extensive correctional experience has equipped him with the training and knowledge to identify situations that trigger correctional officers' obligations to ensure appropriate access to care under applicable national professional standards and the Philadelphia Department of Prisons training materials that he reviewed. PDP policies vest correctional staff with the responsibility to identify and respond to certain medical emergencies, either independently or through established channels that were not followed in Mr. Jung's case. PDP's Access to Care policy provides that security staff will "assist any inmate who needs help to complete and submit an SCR [sick call request]" and "remind inmates identified by PDP or QHCP(s) as needing assistance with their appointments, and of the need to take their medications;" Sick call triaging is performed by a Registered Nurse and "involves licensed practical nurses (LPNs) in screening, but only in a supportive role, and in collaboration with more senior clinicians;" "Health care services must be provided timely by a QHCP [Qualified Health Care Provider] in an adequately equipped, maintained, and secure setting;" and "Inmates must refuse care in the presence of a QHCP." Ex. 3, PDP Policy 4.E.7 Access to Care at 5-7. PDP's Staff Roles in Non-Routine and/or Emergency

---

[2] Non-medical PDP staff also reviewed Defendant Cabellos's conduct in this matter, ultimately resulting in the revocation of her security clearance to work in PDP facilities based on this instance. Ex. 2, Deposition of Xavier Beaufort at 25:22-27:10. If non-medical PDP staff evaluated whether Defendant Cabellos provided any care to Mr. Jung in this instance then certainly Plaintiffs' expert can be permitted to do the same as part of his analysis and opinions on how correctional staff should have responded in the situation.

Medical Situations recognizes that it is PDP staff members' responsibility to "determine (according to training, guidelines, and best judgment) what level of intervention is immediately required prior to the availability of professional medical staff," and that PDP staff are "taught guidelines for deciding when it is appropriate to administer immediate care," and that PDP staff's obligation includes noticing and relaying information including whether an inmate is able to walk. Ex. 4, PDP Policy 4.E.21 PDP Staff roles in Non-Routine and/or Emergency Medical Situations at 3, 5. Each of these policies references and incorporates national standards from the NCCHC and ACA, which informed Mr. Wallenstein's expert opinion. Defs. Ex. E, Wallenstein Report at 3. The existence of any dispute over the distribution of duties between correctional Defendant Frasier and medical Defendant Cabellos only underscores the importance for the jury of expert guidance on national standards informing correctional access to care and staff's obligations in such situations.

> ii. **Mr. Wallenstein's opinions follow a reliable methodology regularly accepted by courts evaluating correctional experts.**

The reliability test is "flexible," and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999). While *Daubert* provides a list of specific factors to consider for scientific testimony, "the *Daubert* factors do not always fit neatly into or easily translate in the context of nonscientific testimony." *Crowley v. Chait*, 322 F. Supp. 2d 530, 536 (D.N.J. 2004) (internal citation omitted). "Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise." Fed. R. Evid. 702 Advisory Committee Notes, 2000 Amendment. In this case on nonscientific professional expert testimony, "[t]he relevant reliability concerns [will] focus upon personal knowledge [and] experience."

*Roberson v. City of Philadelphia*, No. CIV. A. 99-3574, 2001 WL 210294, at *3 (E.D. Pa. Mar. 1, 2001) (*quoting Kumho*, 526 U.S. at 149).

Experts in prison and policing cases are regularly found to follow a reliable method when they review records in a given case and compare them to both professional standards and their own experience in the field. *See Rivera v. Lehigh Cnty.*, No. 13-CV-04748, 2015 WL 12819147, at *2 n.10 (E.D. Pa. Oct. 9, 2015) ("Specifically, I find that reviewing the facts of this case and comparing them with professional standards for Pennsylvania prisons, professional healthcare standards, and relying on [the challenged expert's] experience as a jail administrator is a reliable methodology to provide expert testimony about Prison Administration Policy and Procedure"); *Thomas v. Cumberland Cnty. Corr. Facility*, No. CIV. 09-1323 JBS-JS, 2011 WL 6756897, at *16-19 (D.N.J. Dec. 22, 2011) (recounting correctional expert's decades of correctional experience and membership in professional associations, and denying *Daubert* reliability challenge to expert testimony about training, supervision, and individual officers' actions because "national standards promulgated by the American Correctional Association, the training programs offered by the American Jail Association, and the pre-service training programs offered in other states constitute recognized industry standards or general practices. The Court therefore concludes that [the expert] relies on objective data and standards"); *Roberson*, 2001 WL 210294 at *4 ("Waters reaches his conclusions by applying his significant experience, training and skills to the facts provided to him… While not a formal, testable method, it is the one used by police practices experts and accepted by the courts. In light of Waters' considerable experience, his method is reliable."); *Schieber v. City of Philadelphia*, No. CIV. A. 98-5648, 2000 WL 1843246, at *8 (E.D. Pa. Dec. 13, 2000) (same).

These cases are highly distinguishable from those cited by City defendants. In *Greenwald Caterers*, where the court found there "simply is no methodology," a proposed expert in hotel practices referred "generally to 'industry standards'" without incorporating the guidelines of any professional association, and "varyingly refers to the standard he is using as 'first-class,' 'full service,' 'minimum,' 'Wyndham,' and 'any reasonable hotel quality standard' without any explanation of what these terms mean." *Greenwald Caterers Inc. v. Lancaster Host, LLC*, 699 F. Supp. 3d 382, 397-99 (E.D. Pa. 2023). In *In re Lincoln*, where the court described an expert opinion as improper if it "simply reads and interprets evidence … as any juror might," the court narrowly excluded two opinions put forth by an actuarial expert on this basis, in which the expert asserted that "class policies and their owners are objectively identifiable from [defendant's] business records" and "the class policies all share the same or similar contract provisions." *In re Lincoln Nat'l 2017 COI Rate Litig.*, 620 F. Supp. 3d 268, 281-82 (E.D. Pa. 2022). The court found these opinions entirely "uncoupled from any articulated actuarial analysis" where "it is not clear what, if anything, [the expert's] actuarial expertise adds to the records evidence." *Id.* at 282.

Unlike the proposed experts in *Greenwald Caterers* and *In re Lincoln*, and consistent with correctional or policing experts regularly accepted by courts, Mr. Wallenstein's analysis incorporates the standards of national professional organizations including the National Commission on Correctional Health Care and American Correctional Association, in addition to his extensive professional correctional experience and a thorough review of case evidence and PDP policies in force at the time of Mr. Jung's death. As described above, Mr. Wallenstein's opinion as to Defendants Frasier and Bloodsaw's obligations as a correctional officer when encountering Mr. Jung on November 5 were not based on a medical dispute with an appropriately positioned provider. Rather, his opinion was based firmly in national professional standards and

13

PDP policy that distribute limited but crucial authority to identify and respond to medical events to correctional staff. His opinion as to the appropriate correctional role in such situations is rooted in national standards, *see* Defs. Ex. E at 9 (noting that the NCCHC and standards for adult local detention facilities do not support Defendant Frasier's conduct), extensive experience, and case-specific policy review, and will be helpful to the jury in considering the relative responsibility of correctional and medical staff in such a situation. Mr. Wallenstein's extensive experience and familiarity with national standards will be equally helpful as the jury evaluates Defendant Frasier's obligations as a housing officer throughout the rest of the day on November 5. *Id*. at 9-14. Mr. Wallenstein is intimately familiar with the practice of conducting effective rounds designed to assess and ensure inmate safety. *Id*. at 14 ("Making rounds is a critical element in the scope of work for any correctional officer assigned to a housing unit."). Mr. Wallenstein is qualified to review the video evidence that exists of Defendant Frasier's subsequent rounds on November 5, 2023 and assess whether her level of attention to individuals in their cells was commensurate with national standards and case-specific PDP training.

The City Defendants challenge Mr. Wallenstein's opinion regarding Defendant Frasier's handling of Mr. Jung's ostensible "refusal" based principally on a profound misreading of Defendant Frasier's own deposition testimony. Defendant Frasier did *not* testify that "she heard Mr. Jung refuse," City Defs.' *Daubert* Brief, Dkt. 111 at 10. She testified as to her general practices, and when asked specifically if she did "recall that actual refusal" (Mr. Jung's), stated "I don't recall." City Defs.' Ex. G, Dkt. 111-7, Frasier Deposition at 127:1-12. The City goes on to contend that the "'red flag policy' explains that it is medical staff's, not Officer Frasier's, responsibility to get a signed refusal form." City Defs.' *Daubert* Brief, Dkt. 111 at 11. This ignores the City's access to care policy, which recognizes that correctional staff will often be the front line recipients of

ostensible refusals and advises "security" that they "will … not accept an inmate's refusal of care as a reason for not escorting the inmate to medical," and that "the Correctional Officer will sign his/her name and note that the inmate refused care" in the event that an individual refuses to sign the appropriate form. Ex. 3, PDP Policy 4.E.7 Access to Care at 5-6. Mr. Wallenstein's reference to "hard documentation" is far from a credibility determination – it is a requirement for adherence to institutional protocol in documenting refusals of medical treatment that is rooted in case-specific policy review, national professional standards, and his own extensive experience. Mr. Wallenstein also compares Defendant Frasier's stated general practice of "yelling out" to nationally accepted standards for communicating critical medication distribution. Defs. Ex. C at 10 (noting that yelling has long been replaced as an effective form of communication in correctional institutions and personal interaction with an inmate is necessary to determine if they are refusing care or in distress). The City's claim that Mr. Wallenstein makes an improper credibility finding in regard to Defendant Frasier also misses the mark, as his determination that her notation that Mr. Jung refused medication was "misrepresentation" and that "the record was likely falsified," Defs. Ex. C at 10, stems from the fact that there is no evidence that Defendant Frasier personally spoke to Mr. Jung when she claimed he refused insulin, as a PDP investigation determined she remained at her station "watching television" at that time. Ex. 5, Frasier Disciplinary Packet excerpt, p. 2. The jury is entitled to hear that Defendant Frasier's practice is out of step with national standards – a conclusion that only an experienced correctional expert can provide.

The City Defendants challenge Mr. Wallenstein's opinion as to a pattern of correctional officers failing to provide medical care on the same basis as his other opinions. Mr. Wallenstein reviewed dozens of investigations into deaths in custody by the PDP Commissioner's Office of Special Investigations. Defs. Ex. E ("I reviewed over 900 pages of materials and then summary

15

documentation of the death cases provided through Discovery."). Mr. Wallenstein's comparison of the PDP's own materials regarding the failures of its correctional staff in medical emergencies to national professional standards and his decades of experience at other facilities will be helpful to the jury in determining whether other death investigations constitute a custom.

The City's attacks on Mr. Wallenstein are suited for cross-examination, not a *Daubert* motion. Plaintiffs' burden is to provide an expert opinion that is relevant, reliable, and will assist the trier of fact. Issues of credibility arise after the determination of admissibility, as credibility is for the jury. An expert's alleged shortcomings can be raised properly on cross-examination and go to the credibility, not the admissibility, of his testimony. *Kannankeril v. Terminix Int'l., Inc.*, 128 F.3d 802, 809 (3d Cir. 1997) ("If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility.") See also *Paoli*, 35 F.3d at 741.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully contend that Defendants' motion to preclude the testimony of Mr. Wallenstein should be denied.

Respectfully submitted,

*/s/ Bret Grote*
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
*/s/ Rupalee Rashatwar*
Staff Attorney
PA ID No. 331085
*/s/ Margaret Hu*
Staff Attorney
PA ID No. 334438
*/s/ Lolo Salsbury Serrano*
Legal Fellow
PA ID No. 338184
Abolitionist Law Center

16

990 Spring Garden St., Ste 306
Philadelphia, PA 19123

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Bret Grote, Esq., hereby certify that I caused a true and correct copy of the foregoing Plaintiff's Brief in Opposition to City of Philadelphia Defendants' *Daubert* Motion to be electronically filed on December 26, 2025, and thereby served upon all parties entered into the Court's ECF system.


*/s/ Bret Grote*
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123


*Counsel for Plaintiffs*