# APPENDIX TO

# PLAINTIFFS' STATEMENT OF UNDISPUTED

# MATERIAL FACTS

APPENDIX EXHIBIT LIST

TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

| Exhibit | Document Title | Page Number |
|---------|----------------|-------------|
| 1 | YesCare Clinical Pathway: Diabetes Mellitus | 3 |
| 2 | Deposition of Defendant Lalitha Trivikram, 30(b)(6) designee for YesCare | 10 |
| 3 | Export Report of Dr. Jonathan S. Williams | 35 |
| 4 | American Diabetes Association, Diabetes Management in Detention Facilities (October 2021) | 45 |
| 5 | January 2022 Contract Excerpt | 64 |
| 6 | Deposition of Sandy Varghese, 30(b)(6) designee for PDP | 69 |
| 7 | YesCare Core Process Program: Medication Administration | 73 |
| 8 | Deposition of Marsha Jeoboham | 81 |
| 9 | PDP Red Flag Medication Compliance System | 89 |
| 10 | YesCare Policy: Refusal of Medication or Clinical Encounter | 93 |
| 11 | PDP Inmate Timeline of Louis Jung, Jr. | 99 |
| 12 | Jung Endocrinologist Record, July 20, 2022 | 101 |
| 13 | Jung Psychiatric Evaluation, April 27, 2022 | 103 |
| 14 | Expert Report of Dr. Homer Venters | 108 |
| 15 | Jung Competency Letter | 149 |
| 16 | Jung Intake Screening Questionnaire by Correctional Officer | 151 |
| 17 | Jung Medical Records October 28, 2023 -November 6, 2023 | 154 |
| 18 | Deposition of Defendant Maureen Gay | 174 |
| 19 | Medication Administration Record, October 2023 | 177 |
| 20 | Patient Safety Event Report | 181 |
| 21 | Deposition of Blair Cabellos | 191 |
| 22 | Interview of Blair Cabellos | 204 |
| 23 | YesCare Core Process Program 503-C-SOP: Urgent/Emergent Care | 206 |
| 24 | Expert Report of Lori Roscoe | 212 |
| 25 | YesCare General Health Services Policy & Procedure - Curran-Fromhold Correctional Facility: Communication on Patient's Health Needs | 242 |
| 26 | PDP Report of Investigation, Office of Special Investigations | 245 |

Exhibit 1

YesCare Clinical Pathway: Diabetes Mellitus



# Clinical Pathway: Diabetes Mellitus

The information contained herein has been compiled from established, evidence-based references and nationally recognized authorities. Treatment plans should be individualized based on patient factors including medical and psychiatric histories, comorbidities, medications and patient discussion. This tool is intended for informational purposes and will be one of the many tools you may access in your practice.

## DEFINITION

Diabetes mellitus is a group of metabolic diseases characterized by hyperglycemia resulting from defects in insulin secretion, insulin action, or both.

**Type I** results from absolute insulin deficiency usually caused by autoimmune destruction of pancreatic islet cells.

**Type II** is a disease of uncertain etiology resulting from relative, but not absolute, insulin deficiency with an underlying insulin resistance.

**Pre-Diabetes:** associated with a higher risk for diabetes and cardiovascular disease

- Fasting (no intake for 8 hours) Blood Glucose $\geq$ 100 – 126
- $A_1C \geq 5.7 - 6.4$
- 2 hour postprandial blood glucose 140 - 199 mg/dL

**A1C** (GLYCATED HEMOGLOBIN): reflects the mean glycemia occurring over the preceding two to three

months

## RISK FACTORS

- Physical inactivity
- First-degree relative with diabetes
- High risk ethnic background
- HTN, CAD, CVD, Hyperlipidemia
- Obesity with family history of DM
- Women with baby > 9 lbs at birth or diagnosed with Gestational Diabetes

## CLINICAL PRESENTATION

- Frequent urination
- Excessive thirst
- Extreme hunger
- Unusual weight loss
- Increased fatigue
- Tingling, pain or numbness in
- Blurry vision
- hands and feet

## DIAGNOSTICS/LABS

**Screening**

- BMI $\geq$ 25 at any age, or after age 45.  If normal, repeat every 3 years or more frequently as indicated.
- Urine ketones if blood sugar $\geq$ 300

**Diagnosis**

- Fasting (no intake for 8 hours) Blood Glucose $\geq$ 126
- $A_1C > 6.5$
- Random blood sugar $\geq$ 200 **with symptoms** of diabetes
- Oral Glucose Tolerance Test (OGTT) $\geq$ 200mg/dl

**Follow-up**

- Finger Stick Blood Glucose Monitoring 2 – 3 x/d if on more than 2 injections of insulin
  - Urine ketones if blood sugar $\geq$ 300
- Hemoglobin $A_1C$
  - If $A_1C \leq 8$, recheck every 6 months
  - If $A_1C > 8$, recheck every 3 months

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.

YesCare 3432

 **YesCare** Say Yes To Exceptional Care

# Clinical Pathway: Diabetes Mellitus

## Correlation of A₁C with Average Glucose

| Mean Blood Glucose mg/dl | = Hb A₁C of |
|---|---|
| 126 | 6 |
| 140 | 6.5 |
| 154 | 7 |
| 183 | 8 |
| 212 | 9 |
| 240 | 10 |
| 269 | 11 |
| 298 | 12 |

## MEDICAL MANAGEMENT/TREATMENT

### Comprehensive Evaluation includes but not limited to:

- Prior A₁C and blood sugar results
- Review of symptoms
- Current medications
- Comorbidity status
- Vaccination status
- Foot exam
- Review of risk factors
- Baseline vision screening

### Lifestyle changes for all patients

- Tobacco cessation
- Physical activity goal of 150 min/week
- Consider referral to dietician
- Weight loss counseling to lower BMI to <25

### Treatment of Type II Diabetes

#### Metformin

If not contraindicated, is preferred initial pharmacological treatment for type 2 diabetes. It's been shown to reduce the risk of cardiovascular events and death.

- Include lifestyle modifications
- Slowly titrate to 1000 mg BID to avoid GI effects
- May cause GI side effects
- Renal dosing considerations:
  - o eGFR 45-60 ml/min: Safe to use
  - o eGFR <45 ml/min: Do not initiate new patients or reduce dose in patients already tolerating metformin treatment

#### Glycemic Control Algorithm

1. A₁C ≥ 7-9%: Monotherapy recommended. Metformin is the drug of choice. If metformin is contraindicated or otherwise not tolerated by the patient, another first line medication may be used

---

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.

YesCare 3433



# Clinical Pathway: Diabetes Mellitus

- o  If target A1c is not achieved after 3 months, consider a combination of metformin and another treatment option: sulfonylurea*, thiazolidinedione** or basal insulin
    - o  Insulin should be considered with $A_1C > 8.5$ or who have symptoms of hyperglycemia
- o  Drug choice should be based on patient preferences, disease, and drug characteristics, hypoglycemia risk/management, and patient goals
- o  Check eGFR prior to initiating metformin
2. **$A_1C \geq 9\%$:** initiate dual combination therapy with metformin + other preferred oral agents: sulfonylurea, thiazolidinedione
    - o  If A1c is not achieved after 3 months of dual therapy, a third medication may be added
    - o  Patients not achieving glycemic goals on oral medications, insulin therapy should not be delayed
3. **$A_1C \geq 10$-$12\%$, not symptomatic:** initiate triple oral medication therapy with metformin first-line  **Glycemic control A1c >10-12% (regardless) Metformin  and insulin therapy**
4. **$A_1C \geq 10$-$12\%$, symptomatic:** initiate metformin + basal insulin + mealtime insulin

*Sulfonylureas may cause hypoglycemia and weight gain
**Thiazolidinediones may cause fluid retention and weight gain

## Insulin Dosing

## Corrective Regular Insulin Coverage (CRIC)

- • Requires a provider order
- • Used for prompt glycemic reduction
- • Should not replace the patient's daily basal-bolus insulin dosing
- • Review finger stick logs at least weekly to make necessary adjustment to basal regimens with the goal of eliminating the need for CRIC

| Blood Glucose mg/dl | Standard | Plus* |
|---|---|---|
| 151-200 | 4 units | 6 units |
| 201-250 | 6 units | 8 units |
| 251-300 | 8 units | 12 units |
| 301-400 f/u as below | 10 units | 14 units |
| $\geq$401 call Provider, f/u below | 12 units | 16 units |

. *Plus:  Certain patients may require higher dosages of insulin than is typical of most ("standard") patients.  This may be due to increased insulin resistance and/or a patient's compliance with diet.

## Nursing Considerations using CRIC
**FSBG$\geq$400:**

- • Check urine ketones
- • If symptomatic (nausea, vomiting, increased thirst) complete Hyperglycemia/Hypoglycemia NET
- • Notify facility or on-call practitioner for orders and document in chart.

CS4207 Issued 1/2013                    Revised 08/2022                    Page 3 of 6
© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.



# Clinical Pathway: Diabetes Mellitus

- Follow-up FSBG post-insulin at approximately 2 hours. Testing at less than 90 minutes with repeating insulin can lead to "insulin stacking" and hypoglycemia.
- Place on Sick Call next day practitioner is on-site

**FSBG 300-400:**

- Check urine ketones
- If symptomatic (nausea, vomiting, increased thirst) complete Hyperglycemia/Hypoglycemia NET
- After 3 consecutive FSBG in this range, place on sick call next day practitioner is on-site

### Initiating basal insulin (NPH) in Type II DM:
- Start: 10 U/day or 0.1-0.2 U/kg/day
- Adjust 10-15% or 2-4 U once-twice weekly to reach target FBG
- Hypoglycemia: determine and address cause and potentially decrease dose 4 U or 10-20%

### Adding bolus insulin (Regular) with meals:
- Start: 4 U, 0.1 U/kg, or 10% basal dose with largest meal
- Adjust: 1-2 U or 10-15% once-twice weekly until SMBG target reached
- Hypoglycemia: determine and address cause, decrease corresponding dose 2-4U or 10-20%

### Changing to premixed insulin twice daily (Insulin 70/30):
- Start: divide current total daily insulin dose (NPH + regular) into 2/3 AM, 1/3 PM
- Adjust: 1-2 U or 10-15% once-twice weekly until SMBG target reached
- Hypoglycemia: determine and address cause and decrease corresponding dose by 2-4 U or 10-20%

### Treatment of Type I Diabetes
- Oral antihyperglycemic agents are not indicated in Type I Diabetes
- Refer to community records for continuation of insulin therapy
- Common treatment includes multiple daily injections of prandial and basal insulin
- If initiating insulin therapy for a newly diagnosed patient, consider referral with an endocrinologist.
- Pre mixed insulin should not be used in DM type 1. Basal/ meal time insulin is physiologic. Remember that if you use premixed insulin in the evening, (4-6PM mealtime), there is a risk of hypoglycemia in the early AM hours.

### Treatment of Hyperlipidemia (also refer to dyslipidemia pathway)
- Statin therapy if over 40y/o, with LDL greater than 100 or if 10yr risk of CV disease is >10% (see cvriskcalculator)
- Lipid profile every 3 months if not at goal

### Treatment of Cardiovascular Disease Risk
- 81mg ASA, if no contraindications, with h/o CVD, TIA, PVD, greater than 50y/o or if 10 yr >10% CV risk (see cvriskcalculator)
- Antihypertensive medication with diagnoses of diabetes and hypertension with persistent blood pressure ≥130/80

### Clinical Pearls of Diabetes Medication Management
- Consider discontinuing sulfonylureas after initiating insulin or 5 years after initiation if loss of A₁C control
- Avoid routine sliding scale only insulin regimens

CS4207 Issued 1/2013                    Revised 08/2022                    Page 4 of 6
© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.



# Clinical Pathway: Diabetes Mellitus

## Goals of treatment
- A₁C < 7
- Less stringent goals may be appropriate for diabetic patients with a history of severe hypoglycemia, limited life expectancy, advanced micro or macrovascular complications and extensive comorbid conditions
- Avoid hypoglycemia
- Maintain blood pressure < 140/90

## Treat Symptoms of Hypoglycemia
For BS < 70 mg/dl, give 15 - 20 gm glucose; repeat BS every 15 minutes until BS > 70.

Unconscious patient: use glucagon or IV glucose if available. Patients with one or more episodes of low BS should be referred to provider for evaluation.

## POTENTIAL COMPLICATIONS
- Diabetic ketoacidosis (DKA)
- Cardiovascular disease (CVD)
- Infection/Sepsis
- Nephropathy leading to ESRD
- Retinopathy
- Diabetic neuropathy
- Amputation

Risk reduction should include:
- Glycemic management
- Blood pressure management
- Lipid management
- Medications with cardiovascular and nephrology benefits
- Lifestyle modifications
- Patient education

## FOLLOW-UP

### Chronic Care Visit Evaluation (Initial visit)
- Baseline HgbA1c
- CMP, CBC, TSH, Lipid profile, Liver function tests (All included in YesCare Diagnostic Panel II)
- History (including hospitalizations and medications) and Physical Assessment
- Review of blood glucose logs
- Patient education

### Chronic Care Visit Evaluation (at each visit):
- Weight/BMI
- Review blood glucose log
- Patient education
- CMP at 6 month visit to monitor renal status
- Visual foot inspection
- Consider mental health evaluation for poor adherence to regimen

## Annually
- Calculate BMI
- Labs (if not done in past year)
  - Urinalysis with Microalbumin if not on an ACEI
  - Lipid profile (every 6 months if not at goal)

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.



# Clinical Pathway: Diabetes Mellitus

- EKG
- Evaluate **CVD risk factors cvriskcalculator.com**
- Dilated retinal eye exam by optometrist or ophthalmologist
- Monofilament foot exam (includes monofilament AND any one of: pinprick, vibrational, reflexes, pedal pulses)
- Flu vaccine
- Pneumococcal vaccine per CDC / UpToDate recommendations. Re-vaccination after 5 years if indicated.
- HBV Vaccine series , if less than age 60 (unless contraindicated)
- Optometry exam

**\*Monitor pre-diabetics annually for development of diabetes**

## INDICATIONS FOR SPECIALTY OR ER REFERRAL

- Stage IV kidney failure
- Non-healing ulcer
- Vascular compromise

- Gastroparesis
- Evidence of ischemia / infarction

## UTILIZATION MANAGEMENT CONSIDERATIONS

- Endocrinology/Diabetes specialty referral for newly diagnosed Type 1 Diabetes
- Stage IV kidney failure - include serial labs, GFR, imaging studies, MAR
- Non-healing ulcer – include dimensions of ulcer, pulses, pertinent physical examination, bedside ABI (if available), previous therapies trialed and length of treatment.
- Vascular compromise – include pertinent physical examination, bedside ABI (if available), previous therapies trialed and length of treatment.
- Gastroparesis – include all previous therapies trialed and failed, and length of treatment.
- Evidence of ischemia/ infarction – include pertinent physical examination, bedside ABI (if available), pertinent labs.

## REFERENCES/LINKS

- Centers for Disease Control and Prevention (CDC), Diabetes home page. Available at www.cdc.gov/diabetes
https://www.uptodate.com/contents/clinical-presentation-diagnosis-and-initial-evaluation-of-diabetes-mellitus-in-adults
- Management of Diabetes, Federal Bureaus of Prisons Clinical Guidance, March 2017. Available at: https://www.bop.gov/resources/pdfs/201703_diabetes.pdf
- American Diabetes Association. 2023 Standards of Care in Diabetes. Diabetes Care. January 2023;46(Supp1). Available at: https://diabetesjournals.org/care/article/46/Supplement_1/S41/148039/3-Prevention-or-Delay-of-Type-2-Diabetes-and
- UpToDate

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.

Exhibit 2

Deposition of Defendant Lalitha Trivikram,

30(b)(6) designee for YesCare

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
        No. 2:24-cv-05618-TJS
 3
        ------------------------------------------
 4      JACOB & JAMES JUNG, as Administrators of
        the Estates of LOUIS JUNG, JR.,
 5
 6            Plaintiffs,
 7      -vs-
 8      CITY OF PHILADELPHIA, YESCARE CORP;
        BLANCHE CARNEY, FORMER COMMISSIONER OF THE
 9      PHILADELPHIA DEPARTMENT OF PRISONS; LALITHA
        TRIVIKRAM; MAUREEN GAY; MARIESHA APOLLON;
10      BLAIR CABELLOS; GENA FRASIER; WANDA BLOODSAW,
11            Defendants.
12      ------------------------------------------
13                           -------
                    MONDAY, NOVEMBER 17, 2025
14                           -------
15
16        Videotaped Virtual Oral deposition of
17      DR. LALITHA TRIVIKRAM, was taken on behalf
18      of Plaintiffs, commencing at 10:00 a.m., on
19      the above date, before Lisa J. Brill, a
20      Court Reporter and Notary Public, there
21      being present:
22
23      Job #47414
24
```

Deposition of Dr. Lalitha Trivikram                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1      A.    Yes.

2      Q.    And are you prepared to give a

3   deposition today?

4      A.    Yes.

5      Q.    And do you understand that you're

6   being deposed in both your individual

7   capacity as a defendant in this case and

8   because you've been designated by YesCare

9   to testify to specific topics on behalf of

10  YesCare?

11     A.    Yes.

12     Q.    And the topics you have been

13  designated to testify about on behalf of

14  YesCare were identified in a notice sent

15  by Plaintiffs' counsel.  Have you seen

16  that deposition notice identifying those

17  topics you are asked to testify to?

18     A.    I believe I have.

19     Q.    I'm going to review the topics and

20  make sure that you're prepared to testify

21  to all of those.  So I'm not going to be,

22  you know, testing if you've memorized the

23  notice, but I'll go through those now.

24  Topic 1:  Any audits, reviews,

1    evaluations, investigations, or trainings

2    related to medical care, including, but

3    not limited to, care for persons with

4    diabetes or persons exhibiting symptoms of

5    diabetic ketoacidosis conducted by

6    YesCare, PDP or by outside auditors,

7    evaluators, monitors, experts, or

8    inspectors within PDP facilities between

9    January 1st, 2018 and December 31st, 2023.

10    Are you prepared to testify to that topic?

11        A.    Yes.

12        Q.    Okay, that one was a mouthful.

13    The others are shorter.  Topic 2:

14    Policies and practices for the provision

15    of diabetes treatment within PDP

16    facilities.  You prepare to testify to

17    that?

18        A.    Yes.

19        Q.    Topic 3:  Policies and practices

20    of medication administration,

21    documentation of medication administration

22    and medical records, and documentation and

23    maintenance within PDP facilities?

24        A.    Yes.

1    Q.    Topic 4:    Policies  and  practices

2    of providing emergency medical  care within

3    PDP facilities?

4    A.    Yes.

5    Q.    Topic 5:    Policies and practices

6    pertaining to placement of incarcerated

7    individuals in an infirmary or other

8    medical housing unit within PDP

9    facilities?

10    A.    Yes.

11    Q.    Topic 6:    Policies and practices

12    pertaining to referral or transfer of

13    incarcerated individuals within PDP

14    facilities to an outside medical facility?

15    A.    Yes.

16    Q.    And Topic 7:    Policies and

17    practices pertaining to conducting

18    investigations, reviews, and any type of

19    assessment of the facts and circumstances

20    when an incarcerated person dies while in

21    PDP custody.

22    A.    Yes.

23    Q.    Topic 8:    Policies and practices

24    for imposing disciplinary measures on

1    staff for failures to provide proper care,

2    render aid, or otherwise appropriately

3    respond to situations where incarcerated

4    people are in need of medical care?

5        A.    Yes.

6        Q.    And did you do anything to prepare

7    for today's deposition?

8        A.    I did.

9        Q.    And what was that?  Without

10   telling me about any conversations you had

11   with counsel?

12       A.    I reviewed the chart.

13       Q.    And that would be the chart of Mr.

14   Jung?

15       A.    Yes.

16       Q.    And did you review the entire

17   chart?

18       A.    I did.

19       Q.    Did you do anything else?

20       A.    I reviewed the audits that we did

21   to review the case.

22       Q.    When you say the audits you did to

23   review the case, would those be reviews of

24   Mr. Jung's case in particular?

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    A.    Administered in the same manner

2    meaning?

3    Q.    How is insulin administered?  Are

4    they called at the same time as other

5    medications?  Are they called at different

6    times?  Is it administered in the same

7    place on the housing units?

8    A.    So I believe insulin med pass is a

9    separate med pass where it's actually

10   done.  I think it's in the same place, but

11   again, I'm not 100% sure.

12   Q.    Okay.  I'll come back to the

13   insulin questions.

14        Does YesCare consider certain

15   medications to be critical medications?

16   A.    Yes.

17   Q.    This might be a very long list, so

18   you don't have to be exhausted.  But just

19   what are critical medications?  What does

20   that mean?  And what are some specific

21   examples?

22   A.    Psychotropic medications, insulin,

23   and anticoagulants.  These would be

24   considered critical medications.

1    Q.    What does the term critical mean

2    in this context?

3    A.    It means that if a patient misses

4    one dose, then somebody or a provider

5    should be notified that the patient has

6    missed that dose.

7    Q.    And how are refusals of any

8    medication supposed to be handled within

9    let's say CFCF, but I think it's the same

10    for all of the facilities, so within PDP?

11    A.    If a medication is refused at the

12    time of refusal, the nurse should give

13    some education or counseling to the

14    patient so that they understand why they

15    need to take the medication, what the

16    purpose of the medication is, and what the

17    consequence of not taking the medication

18    is.  If the patient still, after being

19    informed of this, wants to refuse the

20    medication, the patient should sign a

21    refusal form.  However, many patients, if

22    they're willing to refuse their

23    medication, are also willing to refuse to

24    sign the refusal form.  And so, in that

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    circumstance.

2        Q.    What should the refusal form look

3    like?  Who signs it?

4        A.    So if that's the case, then the

5    nurse can sign the refusal form, and she

6    can get a witness to sign the refusal

7    form.

8        Q.    And who could be a witness?  Other

9    medical staff or the correctional staff?

10   Another inmate?  Some of those, not all of

11   those?

12       A.    It should not be another inmate.

13   Preferably it is another nurse, another

14   medical colleague, or an officer who was

15   present to hear the counseling and to hear

16   the patient refuse.

17       Q.    Thank you.  And what is the Red

18   Flag policy?

19       A.    So the Red Flag is our way of

20   identifying patients who have been

21   noncompliant, who are not showing up, or

22   who are refusing their medication.

23       Q.    Okay.  And how does it work?

24       A.    So the nurse, after encountering a

1    patient who refuses the medication.

2    Sorry.   My animals are acting up, too.

3        Q.    They do that.

4        A.    Yes.   When a patient refuses the

5    medication.   If it's a critical

6    medication, after one missed dose the

7    nurse is to schedule a Red Flag encounter

8    for a provider to speak to the patient and

9    counsel them about their refusal or their

10   noncompliance.   If it's a noncritical

11   medication, the Red Flag is created after

12   three missed doses, and our medical staff

13   are made aware of that.

14       Q.    How are medical staff made aware

15   that missing one dose of a critical

16   medication should trigger a Red Flag?

17       A.    So, that is something that's

18   explained to them during their onboarding,

19   because they will be shown that there is a

20   Red Flag encounter.   They'll be told this

21   is what a Red Flag encounter is, and then

22   they will be instructed on how to address

23   a Red Flag encounter.

24       Q.    If the Red Flag encounters are

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1    initiated, is this supposed to be
 2    documented somewhere?
 3         A.   Yes.  It would be an encounter
 4    that is scheduled in the patient's chart.
 5         Q.   So would that be like a
 6    progress -- like within a progress note
 7    there -- well, actually break it down for
 8    me.  Where would it be scheduled and what
 9    would it look like?  What form, and then
10    the follow-up after it happens, how would
11    that be documented?
12         A.   The nurse would schedule an
13    encounter.  And the way our EHR is,
14    there's past, present, and future
15    encounters.  You'll be able to see all of
16    those.  So she would come in and schedule
17    the Red Flag encounter, which we have a
18    provider who is assigned to address the
19    Red Flags pretty much on a daily basis.
20    So that provider, when they come in for
21    the day, will pull up all the scheduled
22    Red Flags, and that's how they will know
23    who needs to be spoken to about medication
24    on compliance.
```

1   Q.   And was this what you just

2   described, was that in place between 2021

3   and 2023?

4   A.   Yes.

5   Q.   And would the Red Flag encounter

6   for a patient then be in that patient's

7   EHR?

8   A.   Yes.

9   Q.   And then after they're seen by the

10  provider, would the provider document that

11  as well?

12  A.   They would document in that Red

13  Flag encounter.

14  Q.   Okay, so would it then become part

15  of the same?

16  A.   No.

17  Q.   This was scheduled and it

18  happened, and here's what happens?

19  A.   Correct.

20  Q.   Okay.  Is there anywhere outside

21  of the Electronic Health Record that a Red

22  Flag encounter would be documented?

23  A.   There might be situation where the

24  refusal was obtained, and that would be

1    whenever they're triggered, everybody in

2    medical staff?  Should everybody know that

3    I should say.

4        A.    So the medical providers will know

5    what to do with the Red Flag.

6        Q.    So I was asking you some questions

7    about insulin administration earlier.

8    What is insulin?

9        A.    It is a hormone used to regulate

10   glucose levels in the body.

11       Q.    And what is diabetes?

12       A.    Diabetes is a condition where

13   there is either resistance to the effects

14   of insulin or a deficiency of insulin

15   production by the body that leads to

16   impaired glucose metabolism.

17       Q.    And what are the possible health

18   consequences of impaired glucose

19   metabolism?

20       A.    Over the long term, impaired

21   glucose metabolism can lead to

22   atherosclerosis, or hardening of the

23   arteries.  It can lead to coronary artery

24   disease, visual loss, peripheral nerve

1    damage, and damage to the motility of the

2    gastrointestinal tract, just to name a

3    few.

4        Q.   And what is Type 1 diabetes?

5        A.   Type 1 diabetes is where the

6    pancreas is not able to make enough

7    insulin, and that leads to impaired

8    glucose metabolism.

9        Q.   And what is Type 2 diabetes?

10       A.   Type 2 diabetes, also known as

11   insulin resistance, is when the body is

12   still able to produce insulin, but the

13   insulin does not work efficiently and

14   effectively.

15       Q.   Between Type 1 and Type 2

16   diabetes, is one generally considered to

17   be more serious or to require a heightened

18   level of monitoring?

19       A.   They're both serious.

20       Q.   Does one involve any greater

21   medical risk than the other?

22       A.   No.  They both can lead to

23   dangerous situations.

24       Q.   How is care for them?  How do you

Deposition of Dr. Lalitha Trivikram                Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    -- let me back up.  You testified earlier

2    that insulin is a critical medication.

3    It's considered a critical medication

4    within PDP by YesCare.  Is that accurate?

5        A.    Yes.

6        Q.    And has that been the case since

7    you began working there back in 2018?

8        A.    Yes.

9        Q.    And what is the role of insulin in

10   treating Type 1 diabetes?

11       A.    Since patients are not able to

12   produce insulin, the exogenous

13   administration of insulin is how we

14   address the deficiency.

15       Q.    And what happens if a Type 1

16   diabetic is not provided exogenous

17   insulin?

18       A.    Then their blood sugar is going to

19   remain high.

20       Q.    Can a Type 1 diabetic live without

21   insulin?

22       A.    They cannot.

23       Q.    And how important is insulin?

24   Well, do all Type 2 diabetics receive

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    insulin as part of their treatment?

2        A.    Not necessarily.

3        Q.    Can you explain when they will,

4    and when they won't?

5        A.    So, Type 2 diabetics start out

6    with resistance to insulin.  Their bodies

7    still produce insulin, but their tissues

8    don't respond to insulin as well, so you

9    might require higher levels of insulin,

10   which eventually taxes the pancreas.  At

11   some point, the pancreas may lose its

12   ability to generate enough insulin.  When

13   they're in the insulin-resistant phase,

14   they can be treated with oral medications.

15   When the pancreas loses the ability to

16   produce enough insulin, we may need to

17   supplement them with insulin.

18       Q.    Thank you.  So the pancreas

19   produces insulin.  What exactly does the

20   pancreas do?

21       A.    In terms of its function in the

22   body.

23       Q.    Its function in the body?

24       A.    It has many functions, but one is

1    glucose was elevated, tat could trigger an

2    ER trip?

3         A.    Unless they were ill in some way.

4    If they're otherwise stable, then the ER

5    isn't necessarily going to do anything

6    differently than we are doing.

7         Q.    Okay.  But if they were -- if they

8    had hyperglycemia and were just not taking

9    or complying with medical orders to take

10   insulin, what would you do then?

11        A.    You would continue to try and work

12   with them to get them to take their

13   insulin.  Noncompliance wouldn't be a

14   reason to send someone to the emergency

15   room.

16        Q.    Okay.  If somebody was

17   noncompliant but medically decompensating,

18   is that a different situation?

19        A.    Yes.

20        Q.    And I had -- are you familiar with

21   the American Diabetes Association?

22        A.    Yes.

23        Q.    And if I were to share with you

24   that they state it's critically important

1  to determine if an individual has Type 1

2  diabetes, because the omission of insulin

3  for as little as 24 hours can result in

4  severe metabolic decompensation, including

5  diabetic ketoacidosis.  Do you agree with

6  that statement?

7      A.    Potentially, yes.

8      Q.    And what does the term metabolic

9  decompensation mean?

10     A.    Basically, that they get ill.

11     Q.    Thank you.  For people with Type 1

12  diabetes, should blood glucose levels be

13  checked three or more times per day?

14     A.    It depends on the patient.

15     Q.    Is there a minimum amount of times

16  per day glucose should be checked for Type

17  1 diabetics?

18     A.    Not necessarily.  Again, it's

19  individual to the patient.

20     Q.    And what is an A1C level?

21     A.    A hemoglobin A1C is the average

22  blood glucose, or average percent of

23  glucose over a three-month period.

24     Q.    And is it important to track the

1    treated by YesCare within PDP facilities?

2        A.    So it depends on the level of

3    blood sugar.  If their sugar is elevated,

4    they might just get an extra dose of

5    insulin.  If their sugar is above a

6    certain level, then we would be checking

7    the urine for ketones, because the concern

8    is that they may be en route to developing

9    diabetic ketoacidosis, and so they will be

10   monitored that way.

11       Q.    And what are ketones?

12       A.    Ketones are the breakdown

13   byproduct of fatty acids -- fatty acid

14   metabolism.

15       Q.    And when ketones are present, is

16   that a good thing or a bad thing?

17       A.    It depends.  If they're in a high

18   enough concentration, then it acidifies

19   the environment to which our internal

20   cellular structures are exposed, and that

21   can be disruptive to their function.

22       Q.    And how does one test for the

23   presence of ketones?

24       A.    A very simplistic way is checking

1    accurate?  Are they taking their

2    medications?  You might confirm that they

3    are noncompliant by reviewing the MAR.

4    For diabetics, you'd be looking to see

5    whether, you know, do we have acute checks

6    to review.  You'd be looking to see what

7    health maintenance the patient needs, what

8    immunizations they need, you know, based

9    on age and medical conditions, and any

10   kind of maintenance that they might

11   require, such as visual exams for patients

12   with hypertension, things like that.

13       Q.   Okay.  I know we've talked about

14   this, but I don't know if I specifically

15   asked this question.  What is

16   hyperglycemia?

17       A.   It's a blood glucose level that is

18   out of the normal range.

19       Q.   And is it out of the normal range

20   in that it's elevated?

21       A.   Yes.

22       Q.   And what is considered

23   hyperglycemic?  What level?

24       A.   So a fasting blood glucose levels

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    Q.   Yeah, we did.  We did.  Thank you.

2    Don't need to go over that ground again.

3         What is diabetic ketoacidosis?

4    A.   So diabetic ketoacidosis is a

5    situation in which the body does not have

6    enough insulin to break down glucose

7    properly.  As a result, the body starts

8    breaking down fats as a fuel source.

9    Byproduct of the breakdown of fats are

10   fatty acids and ketones.  Ketones acidify

11   the blood, acidify the internal

12   environment of the body, and that's where

13   the acidosis part comes in.

14   Q.   And how do you determine if a

15   patient's condition has developed such

16   that DKA is the correct diagnosis?

17   A.   So there's the clinical

18   presentation of hyperglycemia, along with

19   nausea, vomiting, decreased mental status,

20   feeling ill in general.  But then there is

21   also the laboratory testing that I

22   mentioned earlier, where you get blood

23   either from a venous or arterial supply.

24   And you determine acidosis based on that.

1  insulin-dependent diabetic.  How do you

2  determine if one is Type 1 or Type 2?

3     A.    It's a difficult distinction.

4  Sometimes you can do blood work that will

5  look at genetically in their insulin

6  levels and things like that, which I

7  cannot speak to, as I am not an

8  endocrinologist.  But the typical

9  presentation is a Type 1 diabetic, they're

10  usually very young when they're diagnosed,

11  and it is not related to body habitus,

12  obesity and things like that.

13        Type 2 diabetes tends to present

14  later in life, is more associated with

15  being overweight or heavy.  And so in his

16  case, if both diagnoses were listed in his

17  chart, that's where I said I was not clear

18  if he was a Type 1 or Type 2.  But that

19  was a moot point because the issue at hand

20  was that he had hyperglycemia.  And DKA is

21  the condition in Type 1 diabetics that can

22  be life threatening and hyperosmolar

23  hyperglycemic nonketotic syndrome is the

24  equivalent of that in Type 2 diabetics.

1   A.   I believe Linda was there.

2   Q.   Wakowski (ph), The presenter?

3   A.   Yes, yes.  And other than that, I

4   don't recall who was there.

5   Q.   Okay.  And did you have any role

6   in preparing this report?

7   A.   Other than the review that I did

8   as the Site Medical Director, but not

9   specifically.

10   Q.   So, did you review the report

11   before the meeting with corporate?

12   A.   I do not recall if I reviewed it

13   before meeting with corporate.

14   Q.   Okay, and you see this as Cat,

15   for Category 4?  Do you know what that

16   means?

17   A.   It's the level to which the

18   omissions in care impacted the patient.

19   Q.   So, I'll go down to the end.  This

20   is the decision tree of the categories?

21   A.   Yes.

22   Q.   In this one, it's indicating, yes,

23   this was a serious safety event that led

24   to moderate-to-severe harm or death?

Deposition of Dr. Lalitha Trivikram                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1      A.    Yes.

2      Q.    And just take a moment to review

3    that page.

4      A.    Okay.

5      Q.    Do you agree that the information

6    on this page is accurate?

7      A.    I believe so, yes.

8      Q.    Now it says the timeline begins

9    10/28/2023, do you know how it's

10   determined when to review the timeline?

11   So, for instance, we've been talking as

12   far back as December 2021 about Mr. Jung

13   being in PDP.  And there have been other

14   medical incidents in the intervening time

15   period.  Do you know why any of those past

16   instances were not part of this timeline?

17     A.    It was focused on the event and

18   the circumstances leading up to that

19   event.

20     Q.    Is that just how it's done

21   customarily, you focus on the death and

22   the immediate circumstances precipitating

23   it?

24     A.    In terms of the narrative

```
 1    Yes.  I can't recall exactly who I would

 2    have spoken to about Mr. Jung's case.

 3       Q.   Do you recall your conversation --

 4    any conversation, with Linda?

 5       A.   It was probably in the context of

 6    this mortality review that we had to

 7    prepare for.

 8       Q.   In your opinion, was Mr. Jung's

 9    death preventable?

10       A.   Yes, I do think it was

11    preventable.

12       Q.   And how do you think it could have

13    been prevented?

14       A.   It could have been prevented if we

15    were able to identify him and get him his

16    insulin.  I think there were several

17    challenges to doing that and getting his

18    insulin.  But I do think that would have

19    prevented it.

20           MR. GROTE:  If you all will give

21       me one moment so I can have a phone

22       call with my colleagues to see if I

23       have anything further.  It will be a

24       quick one.
```

Exhibit 3

Export Report of Dr. Jonathan S. Williams

December 1, 2025


Mr. Bret Grote, Esq.
Abolitionist Law Center
990 Spring Garden Street, Suite 306
Philadelphia, PA  19123

## Expert Report of Jonathan S. Williams, MD, MMSc.


### Introduction

I, Jonathan S. Williams, MD, MMSc, have been asked to provide my expert opinion in
the matter of Louis Jung, Jr's death during incarceration at Philadelphia Department of
Prisons, Curran-Fromhold Correctional Facility on November 6, 2023.

As way of background, I am an active full-time board-certified practicing endocrinologist
at Brigham and Women's Hospital, with an academic title of Associate Professor of
Medicine at Harvard Medical School, in Boston, MA. I completed my medical training in
Internal Medicine and then in Endocrinology at these institutions. I have an active
endocrine research enterprise in hormonal dysfunction that focuses on adrenal gland
dysfunction, blood pressure homeostasis, insulin resistance and diabetes that
contributes to a wide variety of disease states in humans. I am or have been Principal
Investigator on National Institutes of Health, foundation, and biopharmaceutical
research awards with over 100 original peer-review publications. Relevant to my
interests in human research, I Direct the Cardiometabolic Endocrine Human Genetics
Research Program, I am the Lead Medical Research Officer for the Center for Clinical
Investigations at Brigham and Women's Hospital, Chair of the Institutional Review
Board at Mass General Brigham, and standing member of the National Institutes of
Health, National Institutes of Diabetes, and Digestive and Kidney Disease grant review
study section that funds diabetes research nationally. I formerly sat on the National
Board of the Association for Patient-Oriented Research and the Nominating Committee
of the Association for Clinical and Translational Science and served as Associate Editor
for the journal *Metabolism: Clinical and Experimental*. I have an active leadership and
educator role at Harvard Medical School where I was the past Co-director of the
Masters Program in Clinical and Translational Investigations, The Clinical and
Translational Research Academy, and current Director of the Brigham and Women's
Research in Residency Clinical Investigations Pathway. My clinical and educational
expertise include my role as Attending Physician for the Endocrine Services at Brigham
and Women's Hospital, Dana Farber Cancer Institute, and Boston VA Healthcare
Systems where I train medical students, residents, and fellows from Harvard Medical
School, Boston University School of Medicine, and the Massachusetts College of

Pharmacy and Health Sciences in clinical endocrine practice including management of diabetes and its complications such as diabetic ketoacidosis.

**Materials reviewed**

- Patient Safety Event Committee Report
- Jung Corrective Action Plan
- Medical Records of Louis Jung, Jr.
- FSBG reports
- Jung Red Flag/Potential Red Flag reports
- Jung First Amended Compliant
- Jung PDP Medical Administration Records
- PDP Report into Death of Louis Jung, Jr.
- Jung Refusal Records
- Selected YesCare Policies
- YesCare 1482-1483 Progress Notes of Dr. Bradley May 25, 2023
- Jung Laboratory reports
- Depositions (Mariesha Apollon, Lalitha Trivikram, MD, Gena Frasier, Maureen Gay-Johnson, Blair Cabellos, Shawn Jay, Wanda Bloodsaw)

**Principals of Diabetic Ketoacidosis**

• Diabetic ketoacidosis (DKA) is a condition that arises in the setting of relatively low insulin levels, or absolute zero insulin levels as in Type 1 Diabetes Mellitus (T1DM) in Mr. Jung's case. Insulin is required to convert glucose to energy for metabolic needs. When energy demands are high, yet insulin is deficient, then glucose can no longer meet demand and the body turns to second-line sources of energy, namely stored fat. A consequence of using fat to provide energy is generation of acid components (i.e. ketone bodies). Subsequent acid build-up in the blood impairs and ultimately halts normal physiologic activity leading to multi-organ dysfunction and failure. DKA is rapidly fatal if not reversed. Among the mortal risks are those from cardiac arrythmia due to acute electrolyte and acid-base disorders in the setting of hyperglycemia and DKA.

• <u>Patients with Type 1 DM will develop DKA if they do not receive insulin regularly.</u> Patients like Mr. Jung with Type 1 DM produce no insulin and are thus completely dependent on administration of insulin through external means. In short, if they do not have insulin products in their body, they will quickly develop ketones and then DKA within hours to days. Because they must have insulin in their body at all times to avoid developing DKA, the treatment consists of a continuous supply of insulin. This is given in the form of a long-acting insulin such as glargine or detemir insulin (which can last 18 to 24 hours) to provide a constant insulin level while a patient is fasting or sleeping, as well as short-acting insulin such as aspart, lispro or regular insulin (which can last 2-6 hours) that provides insulin to cover the carbohydrate intake of a meal. Often, patients with Type 1 DM use an insulin pump, which delivers a constant infusion of insulin day and night. *Importantly, if insulin is withheld from a patient with Type 1 DM for a length*

*of time (hours to a day or two) they will begin to generate ketones, typically with hyperglycemia, and rapidly progress to DKA and death.*

- <u>DKA is not a rare presentation</u> in the emergency setting and has been steadily increasing in prevalence. In 2006 a total of 136,510 cases of primary DKA were diagnosed. Most were in patients between the ages of 18 and 44 years (56%) and 45 and 65 years (24%). Patients with a history of DKA are more likely to have another episode of DKA.

- <u>Death caused by DKA is rare because it is avoidable</u>. Although DKA is the most common cause of death in children with Type 1 diabetes (T1DM), the overall mortality in adults is <1%. This is largely due to the development of rapid diagnosis and strictly protocolized treatment programs over the last 20 years.

- <u>Laboratory values provide diagnostic, severity and prognostic information to direct care.</u> Typically, an elevated blood glucose value will accompany a diagnosis of DKA. As such, elevated glucose values are important (*but not required*) in determining the need to explore a diagnosis of DKA. The degree of elevation along with symptoms may influence the decision to check for the presence of ketones towards discovering possible DKA. Accordingly, a <u>normal</u> glucose level in a patient with T1DM who displays signs and symptoms concerning for DKA should invoke testing for ketones. Similar, a markedly elevated glucose level (i.e. >400 mg/dL) in a T1DM without symptoms warrants investigation for DKA by ketone testing.

- <u>The clinical presentation of DKA is important to recognize given the high potential for rapid decompensation and death</u>. Usual early signs and symptoms may include frequent urination, thirst, elevated ketones in the urine, and elevated glucose. As DKA progresses to its later stages, additional signs and symptoms that may develop include fatigue/weakness, abdominal pain, vomiting, and ultimately respiratory and mental status changes (confusion, delirium, obtundation).

- <u>After recognition of DKA, treatment is straightforward and extremely effective at preventing complications and death</u>. This includes; 1) volume resuscitation to correct dehydration and to expedite removal of ketone bodies, 2) correction of electrolytes, 3) reduction in glucose levels with insulin, and 4) identification and treatment of precipitating factors. All these maneuvers address cardiac susceptibility to fatal arrythmia that arises in DKA. Although DKA is fatal if not corrected, it is one of the rare life-threatening conditions wherein someone can be near death, yet discharged from the hospital to normal health in a day or two.

**Case Review**

Mr. Jung was a 50-year-old male transferred from Norristown State Hospital back to Curran-Fromhold Correctional Facility on October 28, 2023. He had a long-standing history of T1DM, which was known to the facility due to prior episodes of DKA. While at Norristown State Hospital, the medical record documents consistent treatment with

3

insulin at least 3 times/day with reasonable glycemic control and very few missed insulin doses or Accu Check glucose readings.

On presentation to the facility intake station, the intake form indicated that he answered "no" to having diabetes, but testimony and the facility records documents that he was known to have T1DM since he was very young.  He stated that he had not had insulin 3 days, although the eMAR from Norristown State Hospital records 2 insulin injections on the morning of October 27, 2023 according to his schedule of NPH 30 units in the morning and 15 units in the afternoon along with regular insulin sliding scale three times/day with meals (ranging 3-15 units). No medical records from Norristown State Hospital were provided or reviewed at the time of intake.

The intake exam reports normal vital signs and appearance with an Accu Check glucose reading critically elevated at 542 mg/dL. Accordingly, the intake nurse Mariesha Apollon contacted the covering off-site provider Maureen Gay to notify her of the value and the presence of ketones on the urine dipstick, obtained per protocol.  Orders provided to the intake nurse were to give 10 units of NPH insulin and 12 units of regular insulin subcutaneously, encourage drinking plenty of fluids, and blood draws for 2 weeks later and a chronic care consult for 1 month later. No additional testing was ordered to determine efficacy of the insulin injection in the setting of critically elevated blood glucose and urine ketones, and Maureen Gay did not otherwise follow up with the patient following this administration of insulin.

Medication orders were placed for NPH 10 units twice per day and regular insulin twice per day on a sliding scale (2-12units), along with Accu Check glucose readings also twice per day.

A Progress Note entered by Maureen Gay on October 28, 2023 at 9:48PM describes the communication with the intake nurse including the diagnosis of T1DM, glucose reading of 542 mg/dL and urine ketones. It remarks on no distress and mucosa moist along with AAOx3. It further states "hasn't gotten insulin in 3 days". Assessment is Type 1 DM, not stated as uncontrolled. Labs are ordered for November 10, 2023, follow-up PRN, disposition-general population.  Three additional notes are recorded by Ms. Gay on October 30, 2023 documenting a rule-out TB results, on October 31, 2023 documenting a COVID-19 vaccination, and on November 6, 2023 that Mr. Jung was deceased.

From October 28 thru November 6, 2023 the medical record documents elevated glucose readings, multiple missed doses of insulin administration and failure to follow related procedures to prevent a critical care situation.

10/29/23:  AM glucose: 385 mg/dL; insulin administration 10 Regular/10 NPH (under-dosed for both Regular and NPH given prior history).

10/29/23:  PM glucose 585 mg/dL (evidence that morning dosing was too insufficient); administered 12 Regular and 10 NPH.  Annotation in eMAR "Provider notified; urine

4

obtained". No documentation of ketone result. No retest of glucose in 2 hours (failing YesCare policy).

10/30/23: AM glucose 268 mg/dL. Administered Regular 8 and 10 NPH (under dosed for both insulins).

10/30/23: PM glucose not recorded. PM insulin not recorded (YesCare policy would require escalation to provider to take action).

10/31/23: AM glucose 371 mg/dL (evidence that prior dosing was insufficient); administered Regular 10 and NPH 10 (insufficient dosing).

10/31/23: PM glucose 500 mg/dL (evidence that prior dosing was insufficient); administered 10 NPH. No documentation of Regular insulin dosing. No testing of ketones. No retesting of glucose in 2 hours.

11/1/23: AM glucose "refused". No documentation of insulin dosing. Nor Red Flag form generated. No notification to provider of missing/refusing critical medication (insulin).

11/1/23: PM glucose 411 mg/dL (evidence that prior dosing/missed dosing was insufficient). Administered 10 NPH. No Regular given. No ketones tested. No re-testing of glucose in 2 hours.

11/2/23: AM glucose 290 mg/dL (evidence that prior dosing was insufficient). Administered Regular 8 and NPH 10 (insufficient dosing).

11/2/23: PM glucose 245 gm/dL (evidence that prior dosing was insufficient). Administered Regular 6 and NPH 10.

11/3/23: AM glucose not obtained. No show for testing and insulin. No Red Flag generated.

11/3/23: PM glucose 394 mg/dL (evidence that prior dosing/missed dosing as insufficient). Administered Regular 10 and NPH 10.

11/4/23; AM glucose 266 mg/dL  (evidence that prior dosing was insufficient). Administered Regular 8 and NPH 10.

11/4/23: PM glucose not obtained. Insulin not documented. No Red Flag generated.

11/5/23: AM glucose not obtained/no show. No insulin recorded. No Red Flag. generated.

11/5/23: PM glucose not obtained/refused. No insulin recorded. No Red Flag generated.

 Consequently, despite reports that Mr. Jung was medically deteriorating by November 5, 2023 (including vomiting and urinating in his cell with a cell mate present) insufficient care was provided. Subsequently, Mr. Jung was found near dead on the morning of November 6, 2023 and expired within 45 minutes.

5

**Opinion**

The cause of death is indisputable. Mr. Jung did not receive sufficient insulin, consequently developed DKA, which resulted in suffering and death. As an incarcerated person, he was entirely dependent on attendants at the prison to provide his medical care. The intake record demonstrates that providers were aware of his diagnosis of T1DM and that he took both long-acting and short-acting insulin formulations. He was at high risk for DKA given prior episodes of DKA while in the same prison 3 times the year before.  As would be clearly indicated in this individual with T1DM and history of DKA, there were orders to check blood glucose levels and to administer insulin. His prior record at the same prison and also his record at Norristown State Hospital established that he required at least 60 units of insulin per day (Elizabeth Bradley, MD May 20, 2023 progress note and eMAR from Norristown State Hospital October 27, 2023). Mr. Jung had a long history of non-compliance. YesCare policy includes guardrails to manage non-administration of named critical medicines (including insulin), that requires immediate provider action. Clearly, this is meant to avoid known acute complications such as hyper- and hypoglycemia.  Unfortunately, the safeguards in place were not followed as outlined, leading to profound under-insulinization.

There is no question that he was developing DKA over this period as it would be entirely expected in the absence of insulin administration since the morning of October 27, 2023. The NPH insulin he received that morning would've been out of his system by the afternoon that day. From this time forward he would begin to develop DKA. The high suspicion of DKA was evident from intake. His incorrect answers at this time, including stating an initial "no" to history of diabetes and that he had not had "insulin for 3 days" are consistent with someone with impaired cognition in the setting of marked hyperglycemia or DKA. Yet, remarkably, no follow-up interventions were conducted to determine if the insulin provided at that time had corrected either his critically elevated glucose or ketones.  Regardless of his appearance at this time, the presence of these two components in an individual with T1DM requires very close follow-up, as indicated in YesCare's policy, which would include a glucose recheck within 2 hours. While increasing oral intake can help lower glucose and reduce ketones, it is a deviation from the standard of care to not order a follow up glucose reading and determine if ketones are starting to clear, as the absence of improvement indicates escalation of care is required.  Failing to follow up to check on Mr. Jung's blood glucose level was disregarding a known risk that he would develop DKA.

The testimony of those involved in his intake care along with the documented lax follow-up indicate a lack of fundamental understanding of T1DM management and the need for individuals to always have insulin in their system. Individuals with T1DM cannot be managed the same way those with T2DM are managed. They are at imminent risk for DKA within hours of insulin leaving the system.

Individuals experiencing DKA do not die silently. Although the available record is scant on actual description of Mr. Jung's condition, his cell mate on November 5, 2023 remarked that he wanted to be transferred to a different cell because Mr. Jung was urinating and vomiting all over the cell. There is testimony from others that he was lifted from the floor to his bed that day. As described above, individuals dying from DKA experience excruciating abdominal pain, vomiting, mental status changes, all signs of acidic damage and multi-organ failure preceding death. Mental status changes would impair the ability to comprehend even basic instructions and stimuli. As such, it would be reasonable to assume that Mr. Jung may have missed several Accu Check and insulin administrations because of his declining medical condition. This would include an inability to respond to the verbal medication call-outs performed at the time of insulin administration. As his health declined rapidly on the last day, this would include the inability to call out for help.

Ultimately, Mr. Jung's death was entirely preventable. There were multiple opportunities for medical evaluation. These are outlined in several outcome documents generated by YesCare and the Philadelphia Department of Prisons from this case. Unfortunately, the policies and procedures created to prevent this outcome were not followed. The recognition of Mr. Jung's signs and symptoms of his progressively grave condition were not appreciated, and his death was entirely predictable in this setting.

These are my opinions based on my education, training, and experience as an internist and endocrinologist, and based on the information provided to me as of the date of this report. I reserve the right to amend this report if new information is made available to me for review.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 1, 2025.


Respectfully,

*Williams*

Jonathan Williams, MD, MMSc
Associate Professor of Medicine
Harvard Medical School
Division of Endocrinology, Diabetes and Hypertension
Brigham and Women's Hospital
Boston, MA  02115

**Five-year Expert Medical Opinion Deposition and Trial History**

*Updated December 2, 2025*

Jonathan Williams, MD, MMSc
184 High Street
Ashland, MA 01721

**Depositions:**

1.  Case: Tonya Forrest v. Richard Bruce Van Eldik, M.D and Endoscopy Center of Ocala (5th Judicial Circuit Marion County, FL)
    Attorney: Olivia T. Kronenberg, Esq (855-292-2111)
    Firm: Paul, Knopf, Bigger (Winter Park, FL)
    Deposition Date: April 5, 2021

2.  Case: William Bawgus v. Downtown Baltimore Family Care, P.A., et al. (Circuit Court for Baltimore, MD)
    Attorney: Robert Joyce, Esq (443-562-2992)
    Firm: Law Office of Barry R. Glazer, L.L.C.
    Deposition Date: January 14, 2022

3.  Case: Dai'Vontay Hudson v. Miami Valley Hospital, et al (Court of Common Pleas, Montgomery County, OH)
    Attorney: Williams S. Jacobsen, Esq
    Firm: Nurenberg Paris
    Deposition Date: August 12, 2022

4.  Case: Stacey Wolking v. Henry Linder, MD and Youngs Apothecary, Inc (United States District Court for the Middle District of Pennsylvania)
    Attorney: Conor Lamb, Esq
    Firm: Kline & Specter, P.C.
    Deposition Date: June 11, 2024

5.  Case: Johnson v Kennedy University Hospital, Inc. (New Jersey)
    Attorney: Thomas M. Walsh, Esq
    Firm: Parker McCay, P.A.
    Deposition Date: July 26, 2024

6.  Bond, Slusser, O'Leary, Corrar, et al. vs. Dupont, 3M, Solvay Specialty Polymers USA, LLC, et al (United States District Court, District of New Jersey)
    Attorney: Stephen Phillips
    Firm: Phillips and Paolicelli, LLP
    Deposition Date: July 1, 2025

**Legal Case Review Guidelines**
(Updated March 1, 2023)

As an Endocrinologist, I am willing to assist attorneys with regard to legal issues involving liability cases, etc.  The fee schedule and policy schedule of depositions is stated below.  If, after careful review of the fee schedule and policy, you wish to arrange for a deposition or review, please notify me.

- **Scheduling:** I must maintain strict control of my time to allow for administrative, teaching, and clinical activities.  I will attempt to schedule depositions in a timely fashion.  Once a date is confirmed with me by the office of the attorney cancellation is possible as presented by the cancellation policy below, but please be mindful that scheduled time for activities (depositions/trial appearances/travel) often requires cancellation of clinic time, which cannot be readily rescheduled or reimbursed

- **Fee Schedule:**

| | |
|---|---|
| Review of records for purpose of assessing liability issues | $2,000 retainer fee with advance payment required to cover initial 4 hours of effort. $500 per hour for further review and discussion |
| Consultation | $500 per hour |
| Depositions | $3,000 minimum for initial 4 hours then $750/hr |
| Preparation for deposition | $500 per hour |
| Court/Panel testimony | $6,000 standing fee per day<br>All travel/lodging expenses paid/reimbursed |
| Travel | $2,000 standing fee per day of travel required beyond deposition/court appearance date if if requires leave before 5:00PM ET prior to appearance date or an additional night's stay after appearance |

- **Payment and cancellation policy for depositions:**
A Deposition retainer of $3,000 must be received 12 working days from the scheduled deposition appointment, and is non-refundable within 12 days of the agreed deposition appointment.
- **Cancellation policy for court testimony:**
A Court testimony retainer of $6,000 must be received 15 working days from the scheduled court appearance and is non-refundable within 15 working days of the agreed court appearance date.

**Your deposit indicates your complete and full understanding of our policy.**

**CHECKS SHOULD BE MADE PAYABLE TO Jonathan Williams, MD**
**SSN:  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**

Exhibit 4

American Diabetes Association, Diabetes Management in

Detention Facilities (October 2021)


Connected for Life

Position Statement

Diabetes Management in Detention Facilities

American Diabetes Association

October 2021

At any given time, the American criminal justice system contains over 2.1 million people in state and federal prisons, local jails, juvenile detention facilities, Indian Country jails, military prisons, immigration detention facilities, and civil commitment centers in the U.S (1). In addition, many more people pass through the corrections system each year. In 2019 alone, over 600,000 people were released from state or federal detention authorities to the community (2). It is estimated that 9% of the incarcerated population has diagnosed diabetes (3), which is slightly lower than the general population rate of 10.5% (4). However, the prevalence of diabetes and its related comorbidities and complications will continue to increase in the detained population as the incarcerated population ages, and the incidence of diabetes in young people continues to increase. Furthermore, the detained population continues to include a disproportionate number of racial minorities (5) who are also disproportionately likely to have diabetes (4).

People with diabetes in detention facilities should receive care that meets national standards as published in the American Diabetes Association (ADA) *Standards of Medical Care in Diabetes*. Detention facilities have unique circumstances that need to be considered so that all standards of care may be achieved (6). Detention facilities should have written policies and procedures for the management of diabetes and for training of medical and security staff in diabetes care practices. These policies must take into consideration issues such as security needs, transfer from one facility to another, and access to medical personnel and equipment when needed so that detainees have timely access to necessary treatment at all appropriate levels of care. These policies should encourage and allow patients to self-manage their diabetes, consistent with security levels. Ultimately, diabetes management is dependent upon having access to needed medical personnel, diagnostic and monitoring, equipment, and appropriate medications. Ongoing and reliable diabetes therapy is important in order to reduce the risk of acute complications including life-threatening hyper- and hypoglycemia (high and low blood sugar), as well as later complications, including cardiovascular events, visual loss, renal failure, and amputation. Early identification and intervention for people with diabetes will reduce medical complications requiring transfer out of the facility, which has important implications for security and cost.

This document provides guidelines for diabetes care in detention facilities. It is not designed to be a general diabetes management manual. More detailed information on the management of diabetes and related disorders can be found in the ADA *Standards of Medical Care in Diabetes* (7). This discussion will focus on those areas where the processes for delivery of care to people with diabetes in detention facilities may differ from those in the community, and specific recommendations are made at the end of each section.

## I. INTAKE MEDICAL ASSESSMENT

### Reception Screening

Reception screening should emphasize patient safety. In particular, rapid identification of all insulin-treated persons with diabetes is essential in order to identify those at highest risk for hypo- and hyperglycemia and diabetic ketoacidosis (DKA). All patients treated with insulin or sulfonylureas should have a capillary blood glucose (CBG) determination within 1–2 hours of arrival. Signs and symptoms of hypo- or hyperglycemia can often be confused with intoxication or withdrawal from drugs or alcohol. Individuals with diabetes exhibiting signs and symptoms consistent with hypoglycemia, particularly altered mental status, agitation, combativeness, and diaphoresis (excessive perspiration/sweating), should have CBG levels measured immediately.

### Intake Screening

Patients with a diagnosis of diabetes should have a complete medical history and physical examination by a qualified health care provider with prescriptive authority in a timely manner. (SOC Table 4.1) If one is not available on site, one should be consulted by those performing reception screening. The purpose of this history and physical examination is to determine the type of diabetes, current therapy, the risk of diabetes-related emergencies, alcohol use, and behavioral health issues, as well as to screen for the presence of diabetes-related complications. It is critically important to determine if an individual has type 1 diabetes because the omission of insulin for as little as 24 hours can result in severe metabolic decompensation, including diabetic ketoacidosis. In addition, people with type 1 diabetes are at higher risk for severe hypoglycemia due to the presence of hypoglycemia unawareness and therefore need more frequent glucose monitoring to detect impending severe hypoglycemia. It should be assumed that any insulin treated patient has type 1 diabetes until there is a thorough evaluation by a qualified health care provider. The evaluation should review the previous treatment and the history of both glycemic control and diabetes complications. It is essential that medication and nutritional goals be continued without interruption upon entry into the detention system, as a hiatus in either medication or appropriate nutrition may lead to either severe hypo- or hyperglycemia that can rapidly progress to irreversible complications, even death.

### Intake Physical Examination and Laboratory

All potential elements of the initial medical evaluation are included in Table 4.17 of the ADA's *Standards of Medical Care in Diabetes* (7). The essential components of the initial history and physical examination are detailed in Fig. 1. Referrals should be made immediately if the patient with diabetes is pregnant.

### Recommendations

• Patients with a diagnosis of diabetes should have a complete medical history and undergo a comprehensive intake physical examination in a timely manner, completed by a qualified health care professional with appropriate experience and training in diabetes care and management. (see SOC table 4.1)
• Particular attention should be paid to neurovascular examinations of skin integrity, sensory function, and pedal pulses.
• Insulin-treated patients treated with insulin or sulfonylureas should have a CBG determination within 1–2 hours of arrival.
• Medications and nutritional goals should be continued without interruption upon entry into the detention setting.

## II. SCREENING FOR DIABETES

Consistent with the *Standards of Care*, all patients should be evaluated for diabetes risk factors at the intake physical and at appropriate times thereafter. Those who are at high risk should be considered for blood glucose screening. If pregnant, a risk assessment for gestational diabetes mellitus (GDM) should be undertaken at the first prenatal visit. For more detailed information on screening for both type 2 and gestational diabetes, see the ADA's *Standards of Medical Care in Diabetes* (7).

## III. MANAGEMENT PLAN

Glycemic control is fundamental to the management of diabetes.

Within 1-2 hrs.

**RECEPTION SCREENING**

•Identify all inmates with diabetes currently using insulin therapy or at high risk for hypoglycemia
• ALL insulin-treated patients: screening CBG and urine ketone test (as clinically indicated)
• Any patient exhibiting signs/symptoms consistent with hypoglycemia: immediate CBG
•Continue usual meal schedule and medication administration

Within 2-24 hrs.

**INTAKE SCREENING**

•Type and duration of diabetes          •Assess alcohol use
•Confirm current therapy                •Identify behavioral health issues
•Presence of complications               such as depression, distress, suicidal ideation
•Family history                         •Assess prior diabetes education
•Pregnancy screen in all female patients
  of childbearing age with diabetes

*All subjects with diabetes should have physician evaluation. If no physician available, physician should be consulted.*

Within 2 hrs. – 2 weeks

**INTAKE PHYSICAL EXAM
LABORATORY - COMPLICATIONS SCREENING**

Complete exam including:          Laboratory studies:
•Height, weight                   •A1C and glucose
•Blood pressure                   •Lipid Profile
•Eye (retinal) exam               •Microalbumia screen (Alb/Cr ratio)
•Cardiac                          •Urine ketones (as clinically indicated)
•Peripheral pulses                •AST/ALT (as clinically indicated)
•Foot and neurologic exam         •Creatinine (as clinically indicated)

Figure 1—Essential components of the initial history and physical examination. Alb/Cr ratio, albumin-to-creatinine ratio; ALT, alanine aminotransferase; AST, aspartate aminotransferase.

A management plan to achieve normal or near normal glycemia with an A1C goal of < 7% should be developed at the time of initial medical evaluation (7). Goals should be individualized (7), and less stringent treatment goals may be appropriate for patients with a history of severe hypoglycemia, patients with limited life expectancies, the elderly, and individuals with certain comorbid conditions (7). This plan should be documented in the patient's record and communicated to all persons involved in his/her care, including security staff.

People with diabetes should receive medical care from a physician-coordinated team. Such teams include, but are not limited to physicians, nurses, registered dietitian nutritionists (RDNs), pharmacists, and mental health professionals with expertise and a special interest in diabetes. Diabetes self-management education is an integral component of care and individuals with diabetes should play an active role in their own treatment. If possible, a patient should be permitted to continue all or parts of their self-management regimen under supervision.

When a detention facility medical program has a chronic care program that includes diabetes, the interval of patient visits should be fixed only when the patient is in good control. When a patient's diabetes control is less than adequate, the interval of visits should be reduced proportionate to the degree of control so as to achieve better control.

It may be helpful to house insulin-treated patients in a common unit, if this is possible, safe, and consistent with providing access to programs at the detention facility that would otherwise be available to them. Use of such a unit should not result in any patient being held in a more restrictive setting than would otherwise be appropriate. Common housing not only can facilitate mealtimes and medication administration, but also provides an opportunity for diabetes self-management education to be reinforced by fellow patients.

## IV. NUTRITION AND FOOD SERVICES

Facilities should institute a heart-healthy diet that is not dominated by refined carbohydrates as the master menu. The diet in the detention setting should, to the extent possible, have consistent carbohydrate content at each meal and means to identify the carbohydrate content of each food selection and meal. Providing carbohydrate content of food selections and/or providing education in assessing carbohydrate content enables patients to meet the requirements of their individual nutritional goals.

Nutrition counseling and menu planning are an integral part of the multidisciplinary approach to diabetes management in detention facilities. A combination of education, interdisciplinary communication, and monitoring food intake aids patients in understanding their medical nutritional needs and can facilitate diabetes control during and after incarceration.

Nutrition counseling for patients with diabetes is considered an essential component of diabetes self- management. People with diabetes should receive individualized nutritional goals as needed to achieve treatment goals, preferably provided by a RDN experienced with nutritional planning for persons with diabetes.

Educating the patient, individually or in a group setting, about how carbohydrates and food choices directly affect diabetes control is the first step in facilitating self-management. This education enables the patient to identify better food selections from those available in the dining hall and commissary. Such an approach is more realistic in a facility where the patient can make food choices. Even if food choice selections are not an option such as in jail, segregation or where there is blind feeding, patients should still have the option to not consume all of the food offered on their tray and to limit their portions.

The use of insulin or oral medications may necessitate snacks in order to avoid hypoglycemia. These snacks with fast-acting carbohydrates must be part of such patients' medical treatment plans, should be prescribed by medical staff, and should be readily accessible to patients. It is critical that access to commissaries not be impeded for patients with diabetes, as a source of rapidly acting carbohydrate must be consumed quickly to prevent a medical emergency such as seizure or coma. Commissaries should also help in nutrition management by offering healthier options and listing the carbohydrate content of foods.

Timing of meals and snacks must be coordinated with medication administration as needed to minimize the risk of hypoglycemia, as discussed more fully in the MEDICATION section of this document. This is particularly important for patients treated with rapid-acting pre-meal insulin, for whom fingerstick glucose testing and insulin dosing should precede the scheduled meal by no more than 15 minutes. Where such timing is not feasible, an alternative plan to mitigate the risk of hypoglycemia should be implemented, in consultation with a qualified health care professional who has appropriate diabetes experience and training. Meal timing should be adjusted as needed to encourage and promote adherence to prescribed insulin. For further information, see the ADA Position Statement *Nutrition Therapy Recommendations for the Management of Adults with Diabetes* (8).

## V. URGENT AND EMERGENCY ISSUES

All patients must have access to prompt treatment for hypo- and hyperglycemia. Facility staff should be trained in the recognition and treatment of hypo- and hyperglycemia, and appropriate staff should be trained to administer glucagon. After such emergency care, patients should be referred for appropriate medical care to minimize the risk of future decompensation.

Institutions should implement a policy requiring staff to notify a physician of all CBG results outside of a specified range, as determined by the treating physician (e.g., < 50 or > 350 mg/dL, < 2.8 or > 19.4 mmol/L).

### Hyperglycemia

Severe hyperglycemia in a person with diabetes may be the result of intercurrent illness, missed or inadequate medication, or corticosteroid therapy. Detention facilities should have systems in place to identify and refer to medical staff all patients with consistently elevated blood glucose, particularly in the setting of intercurrent illness.

The stress of illness in those with diabetes frequently aggravates glycemic control and necessitates more frequent monitoring of blood glucose (e.g., every 4–6 hours for people with type 1 diabetes). Marked hyperglycemia requires temporary adjustment of the treatment program and, if accompanied by ketosis, interaction with the diabetes care team. Adequate fluid and caloric intake must be ensured. Nausea or vomiting accompanied by hyperglycemia may indicate diabetic ketoacidosis (DKA), a life-threatening condition that requires immediate medical care to prevent complications and death. Detention facilities should identify patients with type 1 diabetes who are at risk for DKA, particularly those with a prior history of frequent episodes of DKA. For further information see "Hyperglycemic Crisis in Diabetes" (9). Any patient with insulin-treated diabetes who becomes ill, runs a fever, complains of abdominal pain, nausea, vomiting or other unusual symptoms should be tested for ketonuria or ketonemia, regardless of the blood glucose level. It is important to note that patients with type 2 diabetes who are treated with Sodium Glucose Co-transport Inhibitors (SGLT2i) (*e.g.*, Invokana, Jardiance, Farxiga, Steglatro, or related generic drugs) may develop DKA with normal or minimally elevated glucose levels.

### Hypoglycemia

Hypoglycemia is defined as a blood glucose level < 70 mg/dL (3.9 mmol/L). Individuals with blood glucose levels between 50 and 70 mg/dL may experience hunger, agitation, diaphoresis (excessive perspiration/sweating), and tremulousness. Blood glucose levels below 50 mg/dL can be associated with more severe signs and symptoms, including cognitive change, confusion, combativeness, seizure, or coma.

Severe hypoglycemia is a medical emergency defined as hypoglycemia requiring assistance of a third party and is often associated with mental status changes that may include confusion, incoherence, combativeness, somnolence, lethargy, seizures, or coma. Signs and symptoms of severe hypoglycemia can be confused with intoxication, drug withdrawal, or behavioral "acting out". Individuals with diabetes exhibiting signs and symptoms consistent with hypoglycemia, particularly altered mental status, agitation, and diaphoresis, should have their CBG levels checked immediately.

Security staff who supervise patients at risk for hypoglycemia (i.e., those on insulin, sulfonylureas or glinides) should be educated in the emergency response protocol for recognition and treatment of hypoglycemia. Whenever possible, low blood glucose should be documented by CBG before treatment. Hypoglycemia can generally be self-treated by the patient with oral carbohydrates, such as glucose tablets, fruit juice, or other glucose containing foods, and at-risk patients need to have ready access to these items. Staff members should also have ready access to glucose tablets or equivalent. In general, 15–20 g oral glucose will be adequate to treat hypoglycemic events. CBG and treatment should be repeated at 15-min intervals until blood glucose levels return to normal (>70 mg/dL, 3.9 mmol/L).

Staff should have glucagon for intramuscular injection or intranasal spray, available to treat severe hypoglycemia without requiring transport of the hypoglycemic patient to an outside facility. Any episode of severe hypoglycemia or recurrent episodes of mild to moderate hypoglycemia require reevaluation of the diabetes management plan by the medical staff. In certain cases of unexplained or recurrent severe hypoglycemia, it may be appropriate to admit the patient to the medical unit for observation and stabilization of diabetes management.

Detention facilities should have systems in place to identify the patients at greater risk for hypoglycemia (i.e., those on insulin or sulfonylurea therapy) and to ensure early detection and treatment of hypoglycemia. If possible, patients at greater risk of severe hypoglycemia (e.g., those with a prior episode of severe hypoglycemia) may be housed in units closer to the medical unit in order to minimize delays in treatment.

### Recommendations

- Train facility staff in the recognition, treatment, and appropriate referral for hypo- and hyperglycemia.
- Train appropriate staff to administer glucagon.
- Train staff to recognize symptoms and signs of serious metabolic decompensation, and immediately refer the patient for appropriate medical care.
- Develop and implement a policy requiring staff to notify a physician of all CBG results outside of a specified range, as determined by the treating physician (e.g., < 50 or > 350 mg/dL, < 2.8 or > 19.4 mmol/L).
- Identify patients with type 1 diabetes who are at high risk for DKA.
- Urine ketones should be measured in patients with type 1 diabetes and persistent hyperglycemia (CBG > 300 for 24 hours). Presence of "moderate" or "large" urinary ketones requires urgent medical evaluation and treatment.

## VI. MEDICATION

Medications for diabetes should be initiated and adjusted by health care providers with expertise in diabetes management. Formularies should provide access to usual and customary oral and injectable medications, including insulin, that are necessary to treat diabetes. Procedures must be in place to obtain an individual's diabetes medications immediately upon entry into the facility. Patients at all levels of custody should have access to medication at dosing frequencies that are consistent with their treatment plan and medical direction. If feasible and consistent with security concerns, patients on multiple doses of short-acting oral medications should be placed in a "keep on person" program.

Type 1 diabetes: All patients with type 1 diabetes require daily treatment with insulin. Patients with type 1 diabetes should be treated with a daily injection of long-acting basal insulin plus rapid acting prandial insulin at mealtimes. The dose of pre-meal insulin should be varied based on meal carbohydrate content and blood glucose levels. However, sole reliance on "sliding scale" insulin is inappropriate and can lead to dangerous hypo or hyperglycemia. Telemedicine consultations may be appropriate when treatment by a diabetes specialist (endocrinologist, physician with training/expertise in diabetology, or advanced practice nurse/certified diabetes care & education specialist is needed.

Type 2 diabetes: Selection of medications for treatment of type 2 diabetes should be in accordance with current ADA *Standards of Care* with preferential use of medications with demonstrated cardiovascular disease and/or renal benefits for high-risk patients. In addition, the use of medications with low potential for hypoglycemia (biguanides, DPP4 inhibitors, GLP-1RA and SGLT2i) is recommended due to the limited access to glucose monitoring in many settings. Some patients with type 2 diabetes will require insulin treatment, alone or in combination with other diabetes medications.

Insulin therapy (type 1 and type 2 diabetes): At a minimum, a long-acting basal insulin (e.g., glargine, levemir, degludec) and a rapid-acting prandial insulin (e.g., aspart, lispro, glulisine) should be available on the institution's formulary. The timing of prandial insulin injections is critically important and should be immediately before or after (within 10 minutes) the meal. Basal insulin should be administered at the same time each day. Reliance on insulin "sliding scales" is ineffective and potentially dangerous and is strongly discouraged. Much preferred is periodic review of glucose monitoring results, with pro-active adjustment of standing insulin doses. The safe use of any insulin regimen requires daily glucose monitoring by fingerstick - once daily for patients on basal insulin only, before meals and at bedtime/hours of sleep for those on prandial insulin or insulin pump. If available, the use of a continuous glucose monitor (CGM) is a helpful tool for patients on multiple daily insulin injections.

Insulin treated patients should be permitted to self-inject when consistent with security needs. Medical department nurses should determine whether patients have the necessary skill and responsible behavior to be allowed self-administration and the degree of supervision necessary. When needed, this skill should be a part of patient education. Disposable single use syringe systems should be established.

**Recommendations**

- The sole use of sliding scale insulin is strongly discouraged.
- Formularies should provide access to usual and customary oral and injectable medications, including insulins to treat diabetes and related conditions.
- Patients should have access to continuous subcutaneous insulin infusion (CSII – insulin pump therapy) and CGMs if they were using these modalities before incarceration or deemed eligible for their use, unless there is a specific safety/security risk identified based on an individualized assessment of the patient and circumstances.
- Patients should have access to medication at dosing frequencies that are consistent with their treatment plan and medical direction.
- Detention facilities should implement policies and procedures to diminish the risk of and treat episodes of hypo- and hyperglycemia during off-site travel (e.g., court appearances).

## VII. TECHNOLOGY

Patients who were using CSII or a CGM prior to incarceration should be allowed to continue if they are capable of safely managing the device and have access to necessary supplies and appropriate medical supervision.

Insulin Pumps: Insulin pump therapy should be considered as an option for all adults and youth with type 1 diabetes who are able to safely manage the device.

CSII and CGMs can be effective means of implementing intensive diabetes management with the goal of achieving near-normal levels of blood glucose (10). While the use of these modalities may be difficult in detention facilities, every effort should be made to continue CSII and CGM in people who were using these therapies before incarceration or to institute these therapies in order to achieve blood glucose targets.

## VIII. SPECIALTY REFERRAL

Many detention facilities have physicians providing diabetes care who do not have primary care or diabetes care training. When a physician is unable to assist the patient attain control of their diabetes after repeated clinic visits or when a physician feels unable to manage the patient's diabetes, the detention facility should have a mechanism to refer the patient to a physician with expertise in diabetes either in person or via telemedicine.

## IX. TELE-MEDICINE

Advances in diabetes technology have facilitated patient care and education via telemedicine in the general diabetes population, and more recently, in the detention setting (11, 12). CGM and newer insulin pumps are able to send data directly over the internet. Diabetes health care professionals, including physicians, dietitian nutritionists, educators, podiatrists, and others can fulfill many of the educational and medical needs of the incarcerated population via web-based communication (7). Routine follow-up via tele-medicine has been shown to improve glycemic control and can replace most one-on-one visits for diabetes education and management.

## X. ROUTINE SCREENING FOR AND MANAGEMENT OF DIABETES COMPLICATIONS

All patients with a diagnosis of diabetes should receive routine screening for diabetes-related complications, as detailed in the *Standards of Care* (7). Interval chronic disease clinics for persons with diabetes provide an efficient mechanism to monitor patients for complications of diabetes. In this way, appropriate referrals to consultant specialists, such as optometrists/ophthalmologists, nephrologists, and cardiologists, can be made on an as- needed basis and interval laboratory testing can be done.

The following complications should be considered:

- Foot care: Recommendations for foot care for patients with diabetes and no history of an open foot lesion are described in the *Standards of Care*. An annual comprehensive foot examination is recommended for all patients with diabetes to identify risk factors predictive of ulcers and amputations. Persons with an at-risk (peripheral neuropathy, peripheral vascular disease, foot deformity) should have feet examined at every medical visit. Persons with an insensate foot, an open foot lesion, foot deformity, or a history of such a lesion should be referred for evaluation by an appropriate qualified health care professional (e.g., podiatrist or vascular surgeon). Persons with diabetes and a foot ulcer or impending foot ulcer should be off-loaded (*i.e.*, provided therapeutic shoes designed to provide pressure redistribution). In a detention setting, this means that the patient needs protected housing in an infirmary or similarly protected housing so that the need for them to walk is minimized.

- Persons with a history of amputation are at particular risk for the development of new lesions and further amputation. Special shoes should be provided as recommended by qualified health care professionals to aid healing of foot lesions and to prevent the development of new lesions. Choosing shoes for the at-risk population without active lesions should take into consideration the risk of excessive friction causing blisters, callus, or fresh ulceration. For example, heavy work boots that may be appropriate for the general detention facility population may cause pressure and friction related lesions that can lead to infection and amputation.

- Retinopathy: All patients with type 2 diabetes and those with type 1 for 5 or more years should have annual retinal examinations by a qualified eye care professional, as recommended in the *Standards of Care*. Retinal photography with remote reading by experts has great potential to provide screening services in situations where qualified eye care professionals are not readily available (7). Visual changes that cannot be accounted for by acute changes in glycemic control require prompt evaluation by an eye care professional.

- Nephropathy: An annual spot urine test for determination of microalbumin-to-creatinine ratio should be performed. The use of ACE inhibitors, or angiotensin receptor blockers, or an SGLT2i is recommended for all patients with albuminuria. Blood pressure should be controlled to < 140/80 mmHg.

- Cardiovascular Disease: People with type 2 diabetes are at a particularly high risk for cardiovascular disease (CVD), including coronary artery disease and stroke. CVD risk factor management is of demonstrated benefit in reducing this complication in patients with diabetes.

- Blood pressure should be measured at every routine diabetes visit. HMG-CoA reductase inhibitor (statin) treatment is indicated for most adult patients (age > 40) with diabetes reference *Standards of Care.*

- Use aspirin therapy (75 – 162 mg/day) in all adult patients with diabetes and cardiovascular risk factors or known macrovascular disease and consider for those with multiple CVD risk factors. Consider use of a SGLT2i or GLP1-RA for patients with CVD or multiple cardiovascular risk factors. Consider SGLT2i patients with congestive heart failure. Current national standards for adults with diabetes call for treatment of blood pressure to a level of < 140/80 mmHg.

- In adults not taking statins or other lipid-lowering therapy, it is reasonable to obtain a lipid profile at the time of diabetes diagnosis, at an initial medical evaluation, and every five years thereafter if under the age of 40 years, or more frequently if indicated.

- Obtain a lipid profile at initiation of statins or other lipid-lowering therapy, 4–12 weeks after initiation or a change in dose, and annually thereafter to monitor the response to therapy and inform medication adherence.

## XI. MONITORING/TESTS OF GLYCEMIA

Monitoring capillary blood glucose (CBG) allows caregivers and people with diabetes to evaluate diabetes management regimens. The frequency of monitoring will vary by patients' glycemic control and diabetes regimens. Patients with type 1 diabetes are at risk for hypoglycemia and should have their CBG monitored three or more times daily or have access to CGM technology. Glucose should be monitored prior to meals, at bedtime, prior to exercise, when low blood glucose is suspected, and after treating low blood glucose. Patients with type 2 diabetes on insulin should monitor at least once daily, and more frequently based on their medical plan. Patients treated with oral agents should have CBG monitored with sufficient frequency to facilitate the goals of glycemic control, assuming that there is a program for ongoing medical review of these data to drive changes in medications. Patients whose diabetes is poorly controlled or whose therapy is changing should have more frequent monitoring. Unexplained hyperglycemia in a patient with diabetes may suggest impending illness, DKA or nonketotic hyperglycemic hyperosmolar state; the patient should be evaluated by a health care professional, and testing urine ketones should be performed. (See Urgent and Emergency Issues Section).

A1C is a measure of long-term (two to three months) glycemic control. Perform the A1C test at least two times a year in patients who are meeting treatment goals (and who have stable glycemic

control) and quarterly in patients whose therapy has changed or who are not meeting glycemic goals. Discrepancies between CBG monitoring results and A1C may indicate further need for evaluation.

In the detention setting, policies and procedures need to be developed and implemented regarding CBG monitoring that address the following:
- Infection control, including single use lancing devices
- Education of staff and patients
- Proper choice of meter
- Disposal of testing lancets
- Quality control programs
- Access to health services
- Size adequacy of the blood sample
- Patient performance skills
- Documentation and interpretation of test results
- Availability of test results for the health care provider (13)

**Recommendations**

- In the detention setting, policies and procedures need to be developed and implemented to enable CBG monitoring to occur at the frequency necessitated by the individual patient's glycemic control and diabetes regimen.
- A1C should be checked every three to six months.

## XII. SELF-MANAGEMENT EDUCATION

Self-management education is the cornerstone of treatment for all people with diabetes. The health staff must advocate for patients to participate in self-management as much as possible. Individuals with diabetes who learn self-management skills and make lifestyle changes can more effectively manage their diabetes and avoid or delay complications associated with diabetes. This premise has been demonstrated in the detention setting (14). In the development of a diabetes self-management education program in the detention setting, the unique circumstances of the patient should be considered while still providing, to the greatest extent possible, the elements of the "National Standards for Diabetes Self-Management Education and Support" (14). A staged approach may be used depending on the needs assessment and the length of incarceration. Table 1 sets out the major components of diabetes self-management education. Survival skills should be addressed as soon as possible; other aspects of education may be provided as part of an ongoing education program.

Self-management education should be, where possible, coordinated by a certified diabetes care and education specialist educator who works with the facility to develop policies, procedures, and protocols to ensure that nationally recognized education guidelines are implemented. The educator is also able to identify patients who need diabetes self-management education, including an assessment of the patients' medical, social, and diabetes histories; diabetes knowledge, skills, and behaviors; and readiness to change.

---

**Table 1—Major components of diabetes self-management education**

**Survival skills**
- hypo-/hyperglycemia
- sick day management
- medication
- monitoring
- foot care

**Daily management issues**
- disease process
- nutritional management
- physical activity
- Medications
- Monitoring
- acute complications
- risk reduction
- goal setting/problem solving
- psychosocial adjustment
- preconception care/pregnancy/gestational diabetes management

---

## XIII. STAFF EDUCATION

Policies and procedures should be implemented to ensure that the health care staff has adequate knowledge and skills to direct the management and education of persons with diabetes. The health care staff needs to be involved in the development of the officers' training program. The staff education program should be at a lay level. Training should be offered at least biannually, and the curriculum should cover the following:
- What diabetes is
- Signs and symptoms of diabetes
- Risk factors
- Signs and symptoms of, and emergency response to, hypo- and hyperglycemia
- Glucose monitoring
- Medications
- Exercise
- Nutrition issues including timing of meals and access to snacks
- It is recommended to include diabetes in custodial/security staff education programs.

## XIV. ALCOHOL AND DRUGS

Patients with diabetes who are withdrawing from drugs and alcohol need special consideration. Alcohol, opioids, cocaine, amphetamine, psychostimulants and other drugs of abuse can have complex interactions with glucose regulation (17). This issue particularly affects initial police custody and jails. At an intake facility, proper initial identification and assessment of these patients are critical, and a careful history of chronic or recent exposure to drugs should be obtained. The presence of diabetes may complicate detoxification. Patients in need of complicated detoxification should be referred to a facility equipped to deal with high-risk detoxification. Patients with diabetes should be educated in the risks involved with smoking. All inmates should be advised not to smoke. Assistance in smoking cessation should be provided as practical.

## XV. TRANSFER AND DISCHARGE

Patients in jails may be housed for a short period of time before being transferred or released, because it is not unusual for patients in a prison or other detention system to be transferred within the system several times during their incarceration. One of the many challenges that health care providers face working in the detention system is how to best collect and communicate important health care information in a timely manner when a patient is in initial police custody, is detained for a short period, or is transferred from one facility to another. The importance of this communication is critical when the patient has a chronic illness such as diabetes, as a delayed or missed dose of insulin or meal can have serious consequences.

Transferring a patient with diabetes from one detention facility to another requires a coordinated effort. To facilitate a thorough review of medical information and completion of a transfer summary, it is critical for custody personnel to provide medical staff with sufficient notice before the movement of the patient.

Before the transfer, the health care staff should review the patient's medical record and complete a medical transfer summary that includes the patient's current health care issues. At a minimum, the summary should include the following:
- The patient's diagnosis
- The patient's current medication schedule and dosages
- The date and time of the last medication administration
- Any recent monitoring results (e.g., CBG and a1c)
- Other factors that indicate a need for immediate treatment or management at the receiving facility (e.g., recent episodes of hypoglycemia, history of severe hypoglycemia or frequent DKA, concurrent illnesses, presence of diabetes complications)
- Information on scheduled treatment/ appointments if the receiving facility is responsible for transporting the patient to that appointment
- Name, telephone/fax number, and email if available of a contact person at the transferring facility who can provide additional information, if needed

The medical transfer summary, which acts as a quick medical reference for the receiving facility, should be transferred along with the patient. To supplement the flow of information and to increase the probability that medications are correctly identified at the receiving institution, sending institutions are encouraged to provide each patient with a medication card to be carried by the patient that contains information concerning diagnoses, medication names, dosages, and frequency. Diabetes supplies, including diabetes medication, should accompany the patient.

The sending facility must be mindful of the transfer time in order to provide the patient with medication and food if needed. The transfer summary or medical record should be reviewed by a health care provider upon arrival at the receiving institution.

Planning for patients' discharge from detention settings should include instruction in the long-term complications of diabetes, the necessary lifestyle changes and examinations required to prevent these complications, and, if possible, where patients may obtain regular follow-up medical care. A quarterly meeting to educate patients with upcoming discharges about community resources can be valuable. Inviting community agencies to speak at these meetings and/or provide written materials can help strengthen the community link for patients discharging from detention facilities.

Discharge planning for patients with diabetes should begin at least 1 month before discharge. During this time, applications for appropriate entitlements should be initiated. Any gaps in the patient's knowledge of diabetes care need to be identified and addressed. The detention facility's discharge planning team should provide the patient a list of community resources and assist in securing an appointment for follow-up care with a community provider. A supply of medication adequate to last until the first post release medical appointment should be provided to the patient upon release. The patient should be provided with a written summary of his/her current health care issues, including medications and doses, recent A1C values, etc.

## XVI. BRIEF TRANSFERS

It is essential that the transport of patients from jails, prisons, or other detention settings to off-site appointments, such as medical visits or court appearances, does not cause significant disruption in the timing of insulin and meals. Detention facilities and police "lock-ups" should implement policies and procedures to diminish the risk of hypo- and hyperglycemia by, for example, providing carry-along meals and medication for patients traveling to off- site appointments or changing the insulin regimen for that day. The availability of prefilled insulin "pens" provides an alternative for off-site insulin delivery.

### Recommendations

- For all interinstitutional transfers, complete a medical transfer summary to be transferred with the patient.
- Diabetes supplies and medication should accompany the patient during transfer.
- Begin discharge planning with adequate lead time to ensure continuity of care and facilitate entry into community diabetes care.

## XVII. SHARING OF MEDICAL INFORMATION AND RECORDS

Practical considerations may prohibit obtaining medical records from providers who treated the patient before arrest. Intake facilities should implement policies that 1) define the circumstances under which prior medical records are obtained (e.g., for patients who have an extensive history of treatment for complications); 2) identify person(s) responsible for contacting the prior provider; and 3) establish procedures for tracking requests.

Facilities that use outside medical providers should implement policies and procedures for ensuring that key information (e.g., test results, diagnoses, physicians' orders, appointment dates) is received from the provider and incorporated into the patient's medical chart after each outside appointment. The procedure should include, at a minimum, a means to highlight when key information has not been received and the designation of a person responsible for contacting the outside provider for this information. All medical charts should contain CBG test results in a specified, readily accessible section and should be reviewed on a regular basis.

## XVIII. CHILDREN AND ADOLESCENTS WITH DIABETES

Children and adolescents with diabetes, in particular type 1, present special problems in disease management, even outside the setting of a detention facility. Children and adolescents with diabetes should have initial and follow-up care with physicians who are experienced in their care. Confinement increases the difficulty in managing diabetes in children and adolescents, as it does in adults with diabetes. Detention facility authorities also have different legal obligations for children and adolescents.

### Nutrition and Activity

Growing children and adolescents have greater caloric/nutritional needs than adults. In youth with type 1 diabetes, insulin dosing based on carbohydrate amounts is of particular importance. The provision of adequate calories and nutrients appropriate for children and adolescents is critical to maintaining healthy growth and development. Physical activity should be provided at the same time each day. If increased physical activity occurs, additional CBG monitoring is necessary and additional carbohydrate snacks may be required to avoid or respond to hypoglycemia.

### Medical Management and Follow-up

Children and adolescents who are incarcerated for extended periods should have follow-up visits at least every three months with individuals who are experienced in the care of children and adolescents with diabetes. Thyroid function tests and fasting lipid and microalbumin measurements

should be performed according to recognized standards for children and adolescents (16) in order to monitor for autoimmune thyroid disease and complications and comorbidities of diabetes.

Children and adolescents with diabetes exhibiting unusual behavior should have their CBG checked at that time. Because children and adolescents are reported to have higher rates of nocturnal hypoglycemia (17), consideration should be given regarding the use of episodic overnight blood glucose monitoring in these patients. In particular, this should be considered in children and adolescents who have recently had their overnight insulin dose changed.

## XIX. PREGNANCY

Pregnancy in a woman with diabetes is by definition a high-risk pregnancy. Every effort should be made to ensure that treatment of the pregnant woman with diabetes meets accepted standards (18,19). It should be noted that glycemic standards are more stringent, the details of dietary management are more complex and exacting, insulin is the only antidiabetic agent approved for use in pregnancy, and several medications used in the management of diabetic comorbidities are known to increase the risk for birth defects and must be discontinued in the setting of pregnancy.

## XX. SUMMARY AND KEY POINTS

People with diabetes should receive care that meets national standards. Being incarcerated does not change these standards. Patients must have access to medication, supplies for testing and daily management, and nutrition as needed to manage their disease. In patients who do not meet treatment targets, medical and behavioral plans should be adjusted by health care professionals in collaboration with the detention facility staff. It is critical for detention facilities to identify particularly high-risk patients in need of more intensive evaluation and therapy, including pregnant women, patients with advanced complications, a history of repeated severe hypoglycemia, or recurrent DKA.

In the detention setting environment, there are a number of reasonable accommodations that may be necessary and appropriate for people with diabetes, including modified meal times, special dietary regimen, access to diabetes care supplies, access to food/drink to prevent/treat hypoglycemia, modified schedules/arrangements allowing participation in jobs or other programming, use of assistive devices or other items to accommodate diabetes-related management needs (e.g. insulin pump) and medical complications (e.g. specialized shoes), and more.

A comprehensive, multidisciplinary approach to the care of people with diabetes can be an effective mechanism to improve overall health and delay, and to prevent the acute and chronic complications of this disease.

## ACKNOWLEDGEMENTS

The following members of the American Diabetes Association/National Commission on Correctional Health Care Joint Working Group on Diabetes Guidelines for Correctional Institutions contributed to the revision of this document in 2008: Daniel L. Lorber, MD, FACP, CDE (chair); R. Scott Chavez, MPA, PA-C; Joanne Dorman,  RN, CDE, CCHP-A; Lynda K. Fisher, MD;  Stephanie Guerken,  RD, CDE; Linda B. Haas, CDE, RN; Joan V. Hill,  CDE, RD; David  Kendall,  MD;  Michael Puisis, DO; Kathy Salomone, CDE, MSW, APRN; Ronald M. Shansky, MD, MPH; and Barbara Wakeen, RD, LD.

The following members of the American Diabetes Association/National Commission on Correctional Health Care Joint Working Group on Diabetes Guidelines for Correctional Institutions contributed to the revision of this document in 2020 and 2021: Daniel L. Lorber, MD, FACP, CDE (chair); Michael Puisis, DO; Jill Crandall, MD; Sarah Fech-Baughman, JD; Barbara Wakeen, MA, RDN, LD, CD, CCFP, CCHP; Jo Jo Dantone, MS, RDN, LDN, CDCES, FAND; Robin Hunter-Buskey, DHSc, CPHQ, CCHP, CDE, PA-C, CAPT; Kenneth Moritsugu, MD, MPH, FACPM, FADCES (hon), CCHP; Emily Wang, MD; Marissa Desimone, MD; Ruth Weinstock, MD, PhD; Aaron Fischer, JD; Gabe Eber, JD, MPH; and William Shefelman.

## REFERENCES

1. Maruschak L, & Minton T. Correctional Populations in the United States, 2017-2018. Bureau of Justice Statistics. August 2020.

2. Carson E. A. Prisoners in 2019. Bureau of Justice Statistics. October 2020.

3. Maruschak L, & Berzofsky M. Medical Problems of State and Federal Prisoners and Jail Inmates, 2011–12. Bureau of Justice Statistics. February 2015. Revised, October 2016.

4. Centers for Disease Control and Prevention. National Diabetes Statistics Report, 2020. Atlanta, GA: Centers for Disease Control and Prevention, U.S. Dept of Health and Human Services; 2020.

5. Bureau of Justice Statistics, US Department of Justice. Prison statistics, summary findings (Oct. 2020). Available at: https://bjs.ojp.gov/content/pub/pdf/p19_sum.pdf, accessed Oct. 17, 2021.

6. Puisis M. Challenges of improving quality in the correctional setting. In Clinical Practice in Correctional Medicine. St. Louis, MO, Mosby-Yearbook, 1998, p. 16–18.

7. American Diabetes Association. Standards of medical care in diabetes 2021 (Position Statement). Diabetes Care 37 (Suppl. 1): S14–S80232, 202114.

8.   American Diabetes Association. Nutrition therapy recommendations for the management of adults with diabetes (Position Statement). Diabetes Care 37 (Suppl. 1): S120–S143, 2014.

9.   American Diabetes Association. Hyperglycemic crisis in diabetes (Position Statement). Diabetes Care 27 (Suppl. 1): S94–S102, 2004.

10.   American Diabetes Association. Continuous subcutaneous insulin infusion (Position Statement).  Diabetes Care 27 (Suppl. 1): S110, 2004.

11. Kassar K, Roe C, Desimone M. Use of Telemedicine for Management of Diabetes in Correctional Facilities. Telemedicine and e-Health: vol 23.mo 1:55, 2017.

12. Jameson BC, Zygmont SV, Newman N, Weinstock R. Use of Telemedicine to Improve Glycemic Management in Correctional Institutions: Journal of Correctional Health Care vol 14: 197, 2008.

13. American Diabetes Association. Tests of glycemia in diabetes (Position Statement). Diabetes Care 27 (Suppl. 1): S91–S93, 2004.

14. Haas L, Maryniuk M, Beck J, Cox CE, Duker P, Edwards L, Fisher EB, Hanson L, Kent D, Kolb L, McLaughlin S, Orzeck E, Piette JD, Rhinehart AS, Rothman R, Sklaroff S, Tomky D, Youssef G, on behalf of the 2012 Standards Revision Task Force: National standards for diabetes self-management education and support. Diabetes Care 37 (Suppl. 1): S144–S153, 2014.

15. Dagogo-Jack S. 2016. Diabetes Risks from Prescription and Nonprescription Drugs: Mechanisms and Approaches to Risk Reduction. Alexandria, VA, American Diabetes Association, 2016.

16. International Society for Pediatric and Adolescent Diabetes. Consensus Guidelines 2000: ISPAD Consensus Guidelines for the Management of Type 1 Diabetes Mellitus in Children and Adolescents. Zeist, Netherlands, Medical Forum International, 2000, p. 116, 118.

17. Kaufman FR, Austin J, Neinstein A, Jeng L, Halyorson M, Devoe DJ, Pitukcheewanont P. Nocturnal hypoglycemia detected with the continuous glucose monitoring system in pediatric patients with type 1 diabetes. J Pediatr 141:625–630, 2002.

18. American Diabetes Association. Gestational diabetes mellitus (Position Statement). Diabetes Care 27 (Suppl. 1): S88–S90, 2004.

19. Jovanovic L. Medical Management of Pregnancy Complicated by Diabetes. 4th ed. Alexandria, VA, American Diabetes Association, 2009.

Exhibit 5

January 2022 Contract Excerpt

DocuSign Envelope ID: 7D4D5640-5025-44EA-ACE9-232CED19836F

Contract Number 2220374

November 2021, TS/sml
City of Philadelphia
Department of Prisons

## PROVIDER AGREEMENT
## General Consultant Services

## CONFORMED

**THIS PROVIDER AGREEMENT** is executed on January 4, 2022 , and effective January 1, 2022, between **The City of Philadelphia** (the **"City"**), through its Department of Prisons (the "Department"), and **Corizon Health, Inc. ("Provider")**.

## BACKGROUND

This agreement is for Provider to provide general consultant services to the City in accordance with the provisions of this Provider Agreement, the City of Philadelphia Professional Services Contract General Provisions for General Consultant Services, as revised July 2020

(the "General Provisions"), and all of the other documents and exhibits that constitute the Contract Documents and the Contract as those terms are defined in the General Provisions. A copy of the General Provisions is attached and incorporated in the Contract by reference.

Accordingly, intending to be legally bound, the City and Provider agree as follows:

## ARTICLE I: GENERAL TERMS

**1.1**    **Incorporation of Background.**  The Background is incorporated by reference.

**1.2**    **Definitions.**  Capitalized terms have the meanings assigned to them in the General Provisions.

## ARTICLE II: TERM

**2.1**    **Initial Term.**  The Initial Term of this Contract starts January 1, 2022, and expires December 31, 2022.

**2.2**    **Additional Term(s).**  The City may amend this Contract in its sole discretion in accordance with Section 2.2 (Additional Terms) of the General Provisions. The terms and conditions applicable during the Initial Term shall be applicable during any Additional Term.

DocuSign Envelope ID: 7D4D5640-5025-44EA-ACE9-232CED19836F

## ARTICLE III: SERVICES AND MATERIALS

3.1     **Services and Materials.**  Provider shall perform the Services and provide the Materials as described in the exhibits listed below, which are   attached and incorporated by reference:

        **Exhibit PA-1:**   **Request for Proposal (the "RFP") Contract Opportunity No. 21210428174629**

        **Exhibit PA-2:**   **Corizon Health Inc., Response to RFP Opportunity No. 21210428174629**

## ARTICLE IV: COMPENSATION

4.1     **Compensation.**

     (a)     As compensation for the Services and Materials being provided, the City shall pay Provider in accordance with the following exhibit listed below, which is attached and incorporated by reference, subject to all limitations on the allowability of cost items imposed by the City of Philadelphia Contract Cost Principles and Guidelines:

        **Exhibit PA-3: Compensation Agreement**

        **Exhibit PA-4: Budget and Staffing**

     (b)     Notwithstanding anything in this Contract to the contrary, the Office of the Director of Finance may not certify payments under the Contract that in total exceed $64,272,073.00.

4.2     **Manner of Payment.**

     (a)     Payment shall be made after Provider's timely submission of invoices to the Responsible Official, in the number, form, and content acceptable to the Responsible Official, accompanied by such additional supporting data and documentation as the Responsible Official may require. All payments to Provider are contingent upon satisfactory performance of the terms and conditions of this Contract.  Provider shall submit its final invoice not more than sixty (60) days from completion of the Services and delivery of Materials.

     (b)     All payments to Provider shall be by deposits into Provider's designated bank account by electronic means, unless the City, in its sole discretion, makes payment by check. Provider agrees that the City need not make payment until Provider has completed and submitted to the City the appropriate electronic payment processing enrollment form at https://vendor-

PJUNG001858

DocuSign Envelope ID: 7D4D5640-5025-44EA-ACE9-232CED19836F



Treatment plans are established to ensure the inmate is monitored and evaluated by a primary care provider in accordance with their healthcare needs. Because of this, a chronic care clinical encounter typically includes (but is not limited to) the following:

- An examination of the general condition of the inmate patient, including obtaining a focused patient history
- An examination of specific disease/condition indicators as established by Corizon Health protocol
- Review of any previous laboratory or diagnostic results;
- Initiation or updating of the individualized treatment plan, including further laboratory or diagnostic testing, medications, diets, exercise, housing recommendations (when necessary), treatments, and follow-up care
- Providing verbal and written education on individual health conditions and wellness management

The ITP is regularly reviewed and revised by the entire clinical team. Furthermore, if a patient is enrolled in psychiatric chronic care, psychiatric follow-up is required at least every 90 days for ongoing assessment and treatment of the inmate/patient.

Our behavioral health staff will provide an individualized treatment plan (ITP) for those patients with a co-occurring disorder who are on multiple medications. A key component will be to address the patient's willingness to change and level of insight regarding their addiction. **Motivational Interviewing** techniques will be employed to consistently engage the patient in the care planning process and ensure treatment efforts are targeting the mental and physical health considerations, as well as substance use history and risks. The ITP will assess the appropriateness of the medication, to ensure prescriptions authorized are safe and effective given the patient's overall comorbidities.

Individuals with dual diagnosis are more likely to require the interventions of a multidisciplinary treatment team system, which includes providers from various disciplines that have the capacity and willingness to provide an integrated treatment model to include regular communication and agreed upon goals. We consider security staff important members of multidisciplinary teams, and we will provide training for PDP staff, accordingly, including use of *Correctional Officer Briefings* (COB). Sample *Correctional Officer Briefings* have been provided in **Attachment B**.

**Evidence-Based Care Guidelines**
We develop our care plans and programs with this population in mind, focusing on the medically underserved population that is at high risk for a variety of medical and emotional disorders.

Our Chronic Care Program provides evidence-based care for inmates with chronic diseases that require and/or benefit from regularly scheduled healthcare visits. Our treatment guidelines are adapted from the nationally recognized correctional healthcare sources such as the **National Commission on Correctional Health Care**, and from clinical guidelines endorsed by recognized national organizations, including, but not limited, to those listed below. These guidelines are the foundation for developing the individualized treatment plan based upon the disease and degree of control for each patient.

- American Society of Addiction Medicine (ASAM)
- Centers for Disease Control and Prevention (CDC)

**TAB 5 – PROPOSED SCOPE OF WORK**
**CITY OF PHILADELPHIA – PHILADELPHIA DEPARTMENT OF PRISONS**
PROVISION OF PRISON PHYSICAL AND BEHAVIORAL HEALTH CARE SERVICES
OPPORTUNITY NUMBER 21210428174629 – JULY 19, 2021
PAGE 5.76

PJUNG002332

DocuSign Envelope ID: 7D4D5640-5025-44EA-ACE9-232CED19836F

**CORIZON HEALTH**

- National Institutes of Health (NIH)
- National Patient Safety Foundation (NPSF)
- National Committee for Quality Assurance (NCQA)
- American Diabetes Association
- Utilization Review Accreditation Commission (URAC)
- Agency for Healthcare Research and Quality (AHRQ)
- U.S. Preventive Services Task Force (USPSTF)

Corizon Health uses severity indexing for inmate patients with chronic diseases, subdividing each disease by severity and outlining treatment and pharmacological management based on the severity index. The index defines the frequency of routine visits (i.e., poorly controlled diabetics are seen in the chronic care clinic more frequently than stable diabetics).

The Evidence-Based Care Guidelines utilized by Corizon Health practitioners:

- Asthma
- Diabetes
- Diabetic Ketoacidosis
- Dyslipidemia
- Gestational Diabetes
- HIV/AIDS
- Hypertension
- MRSA
- PTSD
- Schizophrenia
- Women's Health

- Seizure Disorder
- Sickle Cell Disease
- TB/LTBI
- Warfarin Management
- ADHD
- Bipolar Disorder
- Extrapyramidal Symptoms
- Major Depressive Disorder
- Substance Abuse Withdrawal
- Gender Dysphoria

Additionally, each Chronic Illness has the following corresponding tools:

- Nursing Encounter Tools (NETs)
- Mental Health Encounter Tools (METs)
- Patient Information Fact Sheets (PIFs)
- Correctional Officer Briefings (COBS).

These tools are available for staff through the MyCorizon intranet and at the sites to use as a resource or delivery of appropriate care.

Early identification of the patient requiring chronic care case management is critical to allow the treatment team to coordinate care and includes the following key components:

- Using assessment tools that identify individuals who will benefit from preventive care
- Population health management tools identifying those at risk for chronic conditions and care gaps through predictive modeling
- Coordination of care providers (medical, psychiatry, behavioral health, pharmacy, nursing, and case management) through weekly meetings
- A focus on self-management and patient education on treatment plans
- Provision of care in the most appropriate setting within the facilities

**TAB 5 – PROPOSED SCOPE OF WORK**
**CITY OF PHILADELPHIA – PHILADELPHIA DEPARTMENT OF PRISONS**
PROVISION OF PRISON PHYSICAL AND BEHAVIORAL HEALTH CARE SERVICES
OPPORTUNITY NUMBER 21210428174629 – JULY 19, 2021
PAGE 5.77

PJUNG002333

Exhibit 6

Deposition of Sandy Varghese,

30(b)(6) designee for PDP

Deposition of Sandy Varghese                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                      -   -   -

 4   JACOB and JAMES JUNG, as      :
     Administrators of the Estate :
 5   of LOUIS JUNG, JR.,           :
               Plaintiff,          :
 6                                 :
     -vs.-                         :
 7                                 :
     CITY OF PHILADELPHIA, et al.,:
 8          Defendant(s).          :  2:24-cv-05618-TJS

 9                      -   -   -

10             Friday, October 24, 2025

11                      -   -   -

12            Videoconferenced deposition of

13   SANDY VARGHESE, taken pursuant to notice, was

14   held virtually in the Commonwealth of

15   Pennsylvania, commencing at 9:02 a.m., on the

16   above date, before Jared Carey, a Professional

17   Reporter and Notary Public in and for the

18   Commonwealth of Pennsylvania.

19                      -   -   -

20

21

22            EVEREST COURT REPORTING LLC
                 100 N. 18th Street
23                   Suite 2001
            Philadelphia, Pennsylvania 19103
24                  (215) 341-3616

25
```

1      Q.      Did Corizon then change to

2   YesCare?

3      A.      Yes.

4      Q.      Do you remember when YesCare

5   became the contractor?

6      A.      I believe 2021.

7      Q.      But you are not sure, though, are

8   you?

9      A.      No.  It's been the same company.

10  Just a name change.

11     Q.      Right.  I know time is hard to

12  keep track of after COVID.

13     A.      Yes.

14     Q.      How did PDP -- how do you provide

15  oversight of the contract for YesCare?  Walk me

16  through what that looks like.

17     A.      So my duties change from

18  day-to-day.  But overall I can pick a topic that

19  I would like the look at.  And then I will pull

20  a sample from our medical record and conduct

21  chart audits that way.

22              Other things I do is I receive

23  emails throughout the day, a lot from the public

24  defenders with inquiries about somebody's

25  healthcare.  So I look into that to see if the

```
 1          A.      It's based on the American

 2   Diabetes Association.   And we also -- PDP is

 3   accredited by the NCCHC, The National Commission

 4   on Correctional Health Care.   So they do not

 5   have standards specifically to diabetes.   But

 6   they have standards specific to chronic diseases

 7   and how we do certain things.

 8               So our policies and standards are

 9   based on those guidelines.   YesCare has their

10   corporate which puts out guidelines for them to

11   follow.   But their own coordination with the

12   Diabetes Association, NCCHC.

13          Q.      So it is the case that PDP

14   requires its contractor to adhere to NCCHC

15   standards and American Diabetes Association

16   guidelines?

17          A.      Yes.

18          Q.      I think you touched on this but I

19   want to make sure it's clear on the record.   The

20   system of diabetes care you've been describing,

21   how does PDP provide oversight to ensure that

22   it's functioning as it should?

23          A.      I guess I should mention with

24   Dr. Puerini being our medical consultant, he is

25   also somebody that will review their guidelines
```

Exhibit 7

YesCare Core Process Program:

Medication Administration

| CORE PROCESS PROGRAM | | **YesCare**<br>Say Yes To Exceptional Care |
|---|---|---|
| Medication Management | 214-C-SOP | Clinical SOP |
| **Medication Administration** | | |

## PURPOSE

Health staff are responsible to ensure that patients receive the medications prescribed for them. Medications must be made available in a timely, continuous, and clinically appropriate manner. Health staff responsible for medication administration must understand all responsibilities associated with the delivery of medications to patients. The documentation of medications administered is completed at the time of administration. Providers are appropriately notified of medication non-compliance.

## OBJECTIVES

1. Patients receive their medication in an orderly and timely manner.
2. Patients are appropriately identified prior to medication administration.
3. Documentation of medication administration is completed appropriately.
4. Provider notification occurs as outlined in the YesCare policy G.05.01 Refusal of Medication or Clinical Encounter.
5. The pill window area and/or medication cart remains clean, properly functioning, fully stocked, and secure when not in use.
6. Controlled substances are accounted for properly during the medication administration process.

## PROCEDURE

| Medication Administration | | | SMARTies |
|---|---|---|---|
| Step 1 | Receive assignment to administer medications. | | |
| Step 2 | Determine if controlled substances are stored in the pill window area and/or medication cart. | | |
| | *If...* | *Then...* | Refer to 222-C-SOP-Red Book-*Documenting Count* |
| | Controlled substances stored | a. Conduct controlled substance count with the off-going staff.<br>b. **Proceed to Step 3.** | |
| | Controlled substances not stored | **Proceed to Step 3.** | |
| Step 3 | Receive any pertinent patient information from off-going staff. | | Successful sharing of information is essential to the safe administration of medication and prevents adverse events and medication errors. |

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.                YesCare 3254

| Medication Management | 214-C-SOP | Clinical SOP |
|---|---|---|
| **Medication Administration** | | |

| | Medication Administration | SMARTies |
|---|---|---|
| Step 4 | Ensure the pill window area and/or medication cart is neat, clean, and has all items needed prior to medication pass, including, but not limited to:<br>➤ Remove and replace expired medications<br>➤ All needed prescription medication<br>➤ OTC medications<br>➤ Patient personal medications, if applicable<br>➤ Electronic MARs<br>➤ Drinking cups, if applicable<br>➤ Water, if applicable<br>➤ Soufflé cups or other medication container<br>➤ Pill envelopes, if applicable<br>➤ Refusal and sick call request forms, if applicable<br>➤ B/P cuff and stethoscope<br>➤ Medication crushing device<br>➤ Sharps container, if applicable<br>➤ Gloves/hand sanitizer/personal protective equipment (PPE)<br>➤ Trash receptacle<br>➤ Required safety devices per facility policy (e.g., radio, body alarm) | *Refer to 216-C-SOP-Patient Personal Medication Administration*<br>If conducting medication administration at a pill window, ensure:<br>➤ The pill window opens to allow proper visualization of the patient.<br>➤ There are no items within easy reach of a patient.<br>If conducting medication administration from a medication cart, ensure:<br>➤ Heavy items are placed in bottom of the cart.<br>➤ Wheels are in working order.<br>➤ Cart rolls easily.<br>➤ Drawers open and close easily.<br>➤ Locks work properly. |
| Step 5 | Pre-pour medications, if applicable. | *Refer to 215-C-SOP-Pre-Pouring Medication* |

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.                                    YesCare 3255

| Medication Management | 214-C-SOP | Clinical SOP |
|---|---|---|

## Medication Administration

| | Medication Administration | | SMARTies |
|---|---|---|---|
| Step 6 | Initiate medication pass. | | Custody staff should ensure that patients receiving medication present appropriately dressed, with proper identification, and drinking water, if applicable. |
| | | | They should also ensure that the patients form a single file line and keep noise to a minimum while medication is being administered. |
| | *If...* | *Then...* | Access to pill window area is restricted during medication pass. |
| | Pill window | a. Open pill window at designated time. <br> b. **Proceed to Step 7.** | |
| | Medication cart | a. Notify other health staff that you are leaving for medication pass and what units/floors you are assigned. <br> b. Arrive at the location and notify custody staff you are ready to begin the medication pass. <br> c. **Proceed to Step 7.** | Best practice is to notify custody prior to your arrival per facility guidelines. <br> Follow site specific location order to pass medications. <br> Never leave the medication cart unattended. <br> In the case of a medical emergency, lock the cart and ensure it is in a secure location until you return. |

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.

YesCare 3256

| Medication Management | 214-C-SOP | Clinical SOP |
|---|---|---|

## Medication Administration

| Medication Administration | | SMARTies |
|---|---|---|
| **Step 7** | Determine if patient is willing to take medications. | |

| If… | Then… | Refer to *223-C-SOP-Red Book Documenting Administration for controlled substances.* |
|---|---|---|
| Patient agrees to take medications | a. Review the patient's electronic MAR: <br> ➤ Name <br> ➤ ID <br> ➤ DOB <br> ➤ Allergies <br> ➤ Medications to be administered <br><br> b. Verify patient's identity with 2 identifiers. Identification (ID) must be verified using the facility's inmate identification system. <br><br> c. Place the correct medication in the appropriate container. <br><br> d. Administer medications to the patient and directly observe the patient swallow oral medications. <br><br> e. Ensure the patient disposes of all trash (medication container and/or drinking cup) in the trash receptacle. <br><br> f. Document medication administration on the electronic MAR Repeat these steps for all patients receiving medications. <br><br> h. Proceed to Step 8. | Always remember the 8 Rights of Safe Medication Administration: <br> 1. Right medication <br> 2. Right dose <br> 3. Right patient <br> 4. Right route <br> 5. Right time <br> 6. Right documentation <br> 7. Right reason <br> 8. Right response <br><br> If the patient is in a housing area that does not allow them to have their ID (e.g., segregation, suicide observation) the patient must verbalize 2 identifiers (example: name, date of birth, ID number). <br><br> Crush and/or float medication prior to administration per site specific procedure, if applicable. <br><br> Refer to the most current *Do Not Crush* list available on MyYesCare, in the Patient Care Services section, Core Process tab. <br><br> Follow site specific procedure as to who will complete "mouth checks" at time of administration. <br><br> Ensure patients do not grab items from the medication cart or pill window area. <br><br> Medications must be documented at time of administration, or immediately upon return to the medication cart if the cart/electronic MAR is not allowed/accessible on the unit. |

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.

| Medication Management | 214-C-SOP | Clinical SOP |
|---|---|---|

## Medication Administration

| Medication Administration | | SMARTies |
|---|---|---|
| Step 7 (cont'd) | Determine if patient is willing to take medications. | |
| | **If...** / **Then...** | Available YesCare form: |
| | **Patient refuses medication** | a. Complete the refusal form. The form must include the following:<br>&#10095; Name of medication being refused.<br>&#10095; Information on potential risks and complications of not receiving the medication.<br>&#10095; Evidence that the patient has been made aware of any adverse consequences to health that may occur as a result of the refusal.<br>&#10095; Reason for refusal.<br>&#10095; The signature of the patient.<br>&#10095; The signature of a health staff witness.<br>b. Document refusal on the electronic MAR:<br>&#10095; Enter appropriate notation using the drop-down menu.<br>&#10095; Document any additional information in the comments section, if necessary.<br>c. **Proceed to Step 11.** | • Refusal of Clinical Services (CS1601)<br><br>If the patient refuses to sign the refusal form, it is noted on the form by health staff and an additional witness signs the form.<br>The second witness can be another member of the health team or custody staff. |

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.

| Medication Management | 214-C-SOP | Clinical SOP |
|---|---|---|
| **Medication Administration** | | |

| | Medication Administration | | SMARTies |
|---|---|---|---|
| Step 8 | Review electronic MARs and address absences from medication pass. | | |
| | *If...* | *Then...* | |
| | Pill window | a. Notify custody according to facility policy. | |
| | | b. Document the absence on the patient's MAR: | |
| | | ➢ Enter appropriate notation using the drop-down menu. | |
| | | ➢ Document any additional information, if necessary, in the comments section. | |
| | | c. Close the pill window. | |
| | | d. **Proceed to Step 11.** | |
| | Medication cart | a. Initiate a final call for medication pass. | |
| | | b. Repeat Step 7 for each patient that presents to the medication cart. | |
| | | c. Document the absence on the patient's electronic MAR for each patient not presenting to final call: | |
| | | ➢ Enter appropriate notation using the drop-down menu. | |
| | | ➢ Document any additional information in the comments section, if necessary. | |
| | | d. **Proceed to Step .9** | |
| Step 9 | Proceed to the next location and complete Steps 7-8. | | |
| Step 10 | After passing medications to assigned locations, return medication cart to the medical unit. | | |

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.                    YesCare 3259

| Medication Management | 214-C-SOP | Clinical SOP |
|---|---|---|

## Medication Administration

| Medication Administration | | SMARTies |
|---|---|---|
| **Step 11** | Review the electronic MARs to determine that all patients with prescribed medication have received their medication. | |
| | *If...*     *Then...* | |
| | Patients have received their medications.   **Proceed to Step 12.** | |
| | Patients have refused their medication or were absent from medication pass. <br><br> a. Notify provider of a: <br>    ➢ Missed single dose of a critical medication. <br>    ➢ 3rd consecutive missed or refused dose of non-critical chronic care medication. <br>    ➢ Pattern of routinely missed non-critical chronic care medications within the past 14 days. <br> b. **Proceed to Step 12** | *Refer to YesCare policy:* <br> *Refusal of Medication or Clinical Encounter J-G-05.01, P-G-05.01, Y- G-05.01* <br> **Critical medications:** <br> ➢ Antirejection drugs <br> ➢ Anticoagulants <br> ➢ Chemotherapy drugs <br> ➢ Chronic steroid treatment <br> ➢ Hepatitis C medications <br> ➢ HIV medications <br> ➢ Insulin <br> ➢ IV medications (e.g., including those related to hemodialysis) <br> ➢ Long acting injectable antipsychotics |
| **Step 12** | Restock pill window area and/or medication cart for oncoming staff: <br> ➢ Ensure all loose pills are disposed of properly. <br> ➢ MAR books/laptops are placed in the proper location. <br> ➢ Wipe down pill window area and/or medication cart. <br> ➢ Replenish OTC medication supply. <br> ➢ Replace patient specific and/or stock medication, if necessary. <br> ➢ Communicate needs for refill/reorder of patient specific medications per facility guidelines. | *Refer to:232-C-SOP- Medication Disposal* |
| **Step 13** | Conduct controlled substances count with oncoming staff if controlled substances are stored in the pill window area and/or medication cart. | *Refer to 222-C-SOP-Red Book: Documenting Count* |
| **Step 14** | Provide any pertinent patient information to the oncoming staff. | Successful sharing of information is essential to the safe administration of medication and prevents adverse events and medication errors. |

Revised 10/2020, 05/2023, 11/2024     Page **7** of 7

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.    YesCare 3260

Exhibit 8

Deposition of Marsha Jeoboham

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4

   JACOB and JAMES JUNG,     :   CIVIL ACTION
5  as Administrators of      :   NO. 2:24-cv-05618-TJS
   the Estate of LOUIS       :
6  JUNG, JR,                 :
                Plaintiffs   :
7                            :
                             :
8    VS                      :
                             :
9                            :
   CITY OF PHILADELPHIA;     :
10 YESCARE CORP.;            :
   BLANCHE CARNEY,           :
11 Former Commissioner       :
   of Philadelphia Dept.     :
12 Of Prisons; LALITHA       :
   TRIVIKRAM; MAUREEN        :
13 GAY; MARIESHA             :
   APOLLON; BLAIR            :
14 CABELLOS; GENA            :
   FRASIER; WANDA            :
15 BLOODSAW,                 :
                Defendants   :

16

17

18

19

20        DEPOSITION OF:    MARSHA JEOBOHAM

21           BEFORE:    JENNIFER R. RIVERA, RPR
                        NOTARY PUBLIC

22           DATE:     NOVEMBER 18, 2025
                       (10:30 A.M.)

23

24           PLACE:    REMOTE

25

1    manage and care for their diabetes, a nursing staff

2    would then only physically perform the Accu-Chek and

3    insulin themselves when the patient was incapable or

4    did not know how to do so.

5          Would that be correct?

6    A.    Yes.   Um-hmm.

7    Q.    Okay.   Thank you.

8          And this all happens again in, you said,

9    the building triage area, correct?

10   A.    Yes.

11   Q.    Okay.   Thank you.

12         So, did nursing staff decide what time to

13   conduct Accu-Cheks/insulin administration?

14   A.    No.   There was a set time.   So, it would

15   be according to whatever the MARs says.   So, if they

16   had insulin that is due at 4:00 p.m., then you can

17   either administer it an hour before or an hour

18   after, but it's already scheduled in the MAR, what

19   time the patient should be receiving their insulin.

20   Q.    Okay.   And that is generated from, I

21   presume, a provider's assessment, correct?

22   A.    Yes.   Um-hmm.

23   Q.    Okay.   And what was the protocol if a

24   diabetic patient missed an insulin dosage?

25   A.    If they missed an insulin dosage, the

 1    protocol is to see the -- speak with the patient,

 2    ask them, you know, like, why didn't you take the

 3    medication?  It depends sometimes if they just

 4    didn't feel like getting up or whatnot.

 5            So, then if they refused it, then you

 6    would get a refusal form and then get that scanned

 7    into the chart.  And then you would also have to

 8    place a red flag in because it was a critical

 9    medication.

10        Q.    Okay.  I'm going to return to ask some

11    questions about refusals in a minute, so thank you

12    for giving an overview of that at the forefront.

13            So, during your time as DON, are you aware

14    of whether nurses in PDP are trained in responding

15    to emergencies?

16        A.    Yes, they are.

17        Q.    What did that training consist of?

18        A.    I can't remember off of the top of my

19    head, but I know if there's a stretcher call that is

20    called, and if the patient is unresponsive, then you

21    would check for a pulse.  And then if they needed

22    CPR, then you would, you know, initiate CPR.  But if

23    a patient is in a sense, I don't know, like, a

24    walkie-talkie, they're able to verbalize what their

25    issue is, then you would be able to see if they are

1  pause and blow your nose or anything, please let me

2  know.  I'm also getting over some sniffles, so

3  really, I empathize.  So, please let me know if you

4  need a break at all.

5       A.   Okay.  Gotcha.

6       Q.   Yeah.  So, are nurses provided any

7  training on how to handle a situation if a patient

8  refused medical care?

9       A.   Yes.  They are trained on that.

10      Q.   Okay.  And what should a nurse do in that

11 situation?

12      A.   In that situation, the process is if they

13 refuse a critical medication, which could be

14 insulin, it would be any, I think, cancer

15 medications, any anti- -- antiseizure medications.

16 Those are just the top three that I can think off

17 the top of my head.  They would -- sorry, excuse

18 me -- they would ask the patient -- sorry -- the

19 patient would come out and say, "No, I don't want

20 it," or they wouldn't show up at all.

21           And then you would have to go and look for

22 the patient, ask them, "Hey, you didn't come out."

23 Sometimes when you do meet them, they're like, "Oh,

24 I didn't hear that the medication call was called."

25 But if they refuse it, then you would obtain a

Deposition of Marsha Jeoboham                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1   refusal form.  After the refusal form is signed,
 2   they are -- the process is to complete a document
 3   that it was not administered and that they refused,
 4   get the refusal form signed, and then complete a red
 5   flag.
 6       Q.   Okay.
 7            MR. GREGORY:  I think the witness's
 8   answer just had to do with refusal of medication.
 9   Margo, I think -- I thought your question was
10   refusal of medical care.
11            MS. HU:  That's correct.  Although, I
12   think for the intent of my question, I would
13   classify medication under medical care.
14            MR. GREGORY:  Okay.  I just wanted to
15   make sure we weren't talking about two different
16   things.
17            MS. HU:  And I appreciate that.  Thank
18   you.
19            THE WITNESS:  Sorry.
20   BY MS. HU:
21       Q.   No, that's okay.
22            I suppose to clarify, Ms. Jeoboham, is
23   that process described just now specifically when a
24   patient in PDP refused or missed a critical
25   medication is what you mentioned, correct?
```

```
 1        A.    Yes.
 2        Q.    Okay.  And you mentioned a few different
 3   documentations, and then a summary of such refusal,
 4   correct?
 5        A.    I'm sorry.
 6        Q.    Oh, you're totally fine.  Again, technical
 7   difficulties.
 8              You mentioned a few different documents
 9   that then step out of an inmate's refusal; is that
10   correct?
11        A.    Yes.
12        Q.    Okay.  So, you mentioned a signed refusal
13   form?
14        A.    Yes.
15        Q.    And I believe you mentioned that then gets
16   documented -- there's another document that's filled
17   with that signed refusal form; is that correct?
18        A.    It's not with it, but it's, like, in part.
19   That's a part of the process.
20        Q.    Okay.  And where is that documentation
21   logged following the signed refusal form?
22        A.    That would be in the electronic medical
23   record.
24        Q.    Okay.
25        A.    Not the eMAR, the -- yeah, the health
```

1          MR. GREGORY:  ECW is a brand name.

2          MS. HU:  Got it.  Okay.  Okay.  I just

3   want to make sure that when we're using different

4   terminologies we're referring to what's clear, so

5   thank you for that.

6          MR. GREGORY:  And for clarity sake, it's

7   not our system.  It's the City's system.  The City

8   owns the system.  The City bought the system.  The

9   City requires us to use the system.

10          MS. HU:  Okay.  Understood.  Thank you.

11   BY MS. HU:

12      Q.   Okay.  So, back to the subject of refusals

13   of medical care.

14          You walked through what a nurse's

15   responsibility is, which is to get the refusal form

16   signed; is that correct?

17      A.   Correct.

18      Q.   Okay.  Is a nurse's responsibility in that

19   situation any different from that of a medical

20   provider?

21      A.   Yes.  The medical provider would initiate

22   the -- or educate them on the importance of the

23   medication.  The nurse could do it as well, but the

24   documentation in the role of the red flag, it comes

25   from the provider.

Exhibit 9

PDP Red Flag Medication Compliance System

| | PHILADELPHIA DEPARTMENT OF PRISONS <br><br> POLICIES & PROCEDURES | Policy Number <br><br> 4.E.24.2 | Page  1 <br><br> of  3 |
|---|---|---|---|
| **Part: IV - Institutional Services** <br><br> **Section:** E - Health Care | | **Related Pennsylvania Minimum Standards:** <br> Title 37 PA Code 95.226 <br> **NCCHC Standard:** J-D-02 <br> **Related ACA Standards:** 4-ALDF-4C-38, 4-ALDF-4C-39, 4-ALDF-2A-56, 2-CO-4E-01 | |
| **Subject:** Red Flag Medication Compliance System | | **Supersedes:** Policy 4.E.24.2 signed June 23, 2016 | |
| **Approved:** _____ Commissioner | | **Signature Date:** February 28, 2024 | |
| **Effective Date:** March 28, 2024 | | **Scheduled PAD Review:** Annually <br> **Scheduled Commissioner's Review:** February 28, 2028 | |

## Purpose

The purpose of this policy is to update and formalize a Red Flag System that will notify behavioral and physical health care providers and correctional staff of incarcerated people not taking their medications and to develop a system that will both assure that the incarcerated people are given every opportunity to receive their medications and appropriate follow-up, including counseling, when incarcerated people are non-compliant.

## Definitions

*IJMS:* the computer system used to keep track of incarcerated people, e.g., demographic, charge, location etc.

*Nurse:* An individual licensed by the Commonwealth of Pennsylvania to practice nursing (RN or LPN).

*Prescriber*: A Physician, Nurse Practitioner or Physicians' Assistant authorized to prescribe medications under the countersignature of a licensed physician.

*Red Flags:* Instances when an incarcerated person refuses to take or otherwise is not given medication three doses in a row, three days in a row, or in some other pattern of non-compliance such as taking morning medications but refusing evening medications.

*Red Flag Non-Compliance List:* A daily list of incarcerated people who meet Red Flag criteria.

*Against Medical Advice Medication Refusal form* (attachment 4.E.24.1.d): This form is used by physical and mental health care providers when an incarcerated person continues to refuse their medications against the advice of a prescriber.

*Critical Medication:* Defined as blood thinners, medications used to treat seizures, TB, cancer, HIV, Hepatitis C, end stage liver disease, steroids, dialysis/end stage renal disease, organ transplant, antiarrhythmic medications, antipsychotic medication injections, Specialty medications (CHF, MS, Pulmonary HTN)



| PHILADELPHIA DEPARTMENT OF PRISONS<br><br>POLICIES & PROCEDURES | Policy Number<br><br>4.E.24.2 | Page  2<br><br>of   3 |
|---|---|---|
| **Part:** IV - Institutional Services<br><br>**Section:**  E – Health Care | **Subject:** Red Flag Medication Compliance System<br>**Date:** February 28, 2024 | |

**Procedural Overview**
The following will be the order of events that occur when an incarcerated person is called to the medication area to receive their prescribed medications:
  a) The Correctional Officer will announce medication.
  b) The incarcerated people will come to the medication area to take their medications.
  c) The nurse will identify the incarcerated person by checking the armband and cross checking the appropriate medical record for verification, and the incarcerated person will then be offered their medication.

Medication administration falls into two medical categories:
  a) Compliant
  b) Non-compliant.

The Correctional Officer will observe each incarcerated person to be sure medications are taken. They will report to the nurse any instances in which medications are not taken.

**Procedural Overview for Compliance**
When an incarcerated person is compliant in taking their medications and does not express any complaints about the medications (e.g., side effects), the nurse will record the administration in the Electronic Medication Administration Record (eMAR) at the time the incarcerated person receives their medications. The incarcerated person will then return to their housing area.

If the incarcerated person has complaints about their medication (e.g., "It makes me feel sick," "I feel dizzy when I take my medication," "I don't want to take the medication anymore," etc.), but takes their medication, the nurse will record the administration and make an appointment for the incarcerated person to be seen in Provider Sick Call, Chronic Care, or Behavioral Health, as appropriate. The nurse will also note the incarcerated person's complaint in the appointment.

Procedural Overview for Non-Compliance
When an incarcerated person refuses to take or otherwise is not given medication three doses in a row, three days in a row, or in some other pattern of non-compliance such as taking morning medications but refusing evening medications, the nurse will counsel the patients regarding the need to be medication compliant. If the nurse counsels the incarcerated person, and the incarcerated person agrees to take their medication, the nurse will record the administration and delete the name from the non-compliant list. If the incarcerated person continues to refuse despite counseling by the nurse, the incarcerated person will sign the Against Medical Advice Medication Refusal Form. The nurse will activate the Red Flag alert, which only displays in the electronic medical record. The nurse will then schedule a Red Flag visit with the physical and/or behavioral health care prescriber. At that time, the appointment transmits to the IJMS scheduling module so PDP security staff are aware of the appointment.

ATTORNEYS' EYES ONLY

|  | **PHILADELPHIA DEPARTMENT OF PRISONS**<br><br>**POLICIES & PROCEDURES** | **Policy Number**<br><br>4.E.24.2 | **Page** 3<br><br>**of** 3 |
|---|---|---|---|
| **Part:** IV - Institutional Services<br><br>**Section:** E – Health Care | | **Subject:** Red Flag Medication Compliance System<br>**Date:** February 28, 2024 | |

Incarcerated people who miss one dose of a critical medication will be "Red Flagged." If the incarcerated person refused the critical medication, a refusal form must be completed.

A prescriber will counsel the Red Flag patients during Red Flag visits and may adjust, discontinue, or add medications; schedule another Red Flag visit to continue counseling; or discontinue one or more medications.

The prescriber will make a detailed entry of the event in the incarcerated person's medical record. The prescriber will determine if a non-compliant incarcerated person, because of their underlying illness, needs frequent monitoring in the Chronic Care Clinic and/or should be a subject of Treatment Team meetings. A prescriber will notify the Shift Commander if persistent medication non-compliance may pose a threat to the safety and security of the facility.

**Red Flag Medication Summary Report**

Physical and mental health care providers are required to submit a weekly facility Red Flag Medication Summary Report to the Warden. This report will be emailed to the Warden's Office on Monday(s) before 12 p.m. Physical and mental health care providers will submit the following information:

| Red Flag Data |
|---|
| Date, Incarcerated Person's Name, PID, & Housing Unit |
| Number of Red Flag Incarcerated People |
| Number of Red Flag Incarcerated People counseled |
| Number of Red Flag Incarcerated People *not* Counseled |
| Number of Incarcerated People Signing the Release of Responsibility for Medication Refusals form |
| |
| |

The Wardens are required to include a Red Flag Summary as part of the Warden's Weekly Report to the Commissioner. This report consists of the following information:

| Red Flag Incarcerated people |
|---|
| Number of Red Flag Incarcerated People |
| Number of Red Flag Incarcerated People counseled |
| Number of Mental Health Incarcerated People *not* counseled with a vendor Corrective Action Plan |

ATTORNEYS' EYES ONLY          Jung - City Production002551

Exhibit 10

YesCare Policy:

Refusal of Medication or Clinical Encounter

| General Health Services Policy & Procedure | YesCare |
|---|---|
| **Curran-Fromhold Correctional Facility** | |

| Title: Refusal of Medication or Clinical Encounter | Revised: 12/22 |
|---|---|
| | Reviewed: 11/19, 01/20, 05/21 |

| NCCHC: Important | ACA: Mandatory | No: J-G-05.01 |
|---|---|---|

## POLICY:

Patients have a right to refuse medication and clinical encounters. Health staff has the responsibility to educate the patient on their treatment plan and to inform the patient of the potential consequences of refusal.

## PURPOSE:

Provide guidance for health staff on YesCare's approach and expectations regarding patients who exercise their right to refuse medication and clinical encounters during their incarceration. This applies to onsite, offsite, and telehealth encounters.

The goal is to encourage all patients to comply with and adhere to the recommended treatments established through the Nursing Encounter Tools (NETs) and provider's orders. When this is not possible due to patient choice, YesCare staff will provide continuing care while communicating and motivating patients towards adherence with recommended treatment.

| | PROCEDURE STATEMENTS | FACILITY GUIDANCE |
|---|---|---|
| 1 | For **ALL** medication and clinical encounter refusals, the following must occur: <br><br> ➢ Documentation of refusal on an approved form that includes the following: <br><br> • Name of medication or type of clinical encounter being refused (including location of encounter) <br><br> • Information on the specific risks of not complying with the recommendation <br><br> • Signature that the patient has been informed of potential consequences to their health that may occur as a result of the refusal <br><br> • Reason for refusal | Available YesCare form: <br><br> • Refusal of Services (CS1601) <br><br> Meticulous documentation is essential to ensure that the details of refusals are available for all providers <br><br> Education regarding their condition, treatment plan, and potential consequences of refusal should occur at every encounter with the patient and be documented in the health record |

**REFERENCES**

**NCCHC:** Standards for Health Services in Jails 2018, J-G-05
**NCCHC:** Standards for Mental Health Services in Correctional Facilities 2015, MH-I-04 **ACA:** Standards for Adult Local Detention Facilities 4th Edition, 4-ALDF-4D-15
**ACA:** 2016 Standards Supplement – no revisions

| Curran-Fromhold Correctional Facility | | |
|---|---|---|
| Title: Refusal of Medication or Clinical Encounter | | Revised: 12/22<br>Reviewed: 11/19, 01/20, 05/21 |
| NCCHC: Important | ACA: Mandatory | No: J-G-05.01 |

| PROCEDURE STATEMENTS | | FACILITY GUIDANCE |
|---|---|---|
| 1 (cont'd) | • Signature of the patient<br>• Signature of a health staff witness | In the event the patient does not sign the refusal form, it is noted on the form by the health staff and an additional witness signs the form |
| 2 | Sick Call Clinic is a patient driven request, therefore, if the patient declines a visit, documentation of refusal will be obtained and filed in the health record | If the nurse feels this patient's clinical situation requires a provider to assess, then the nurse may refer the patient to the next available provider's clinic |
| 3 | Chronic Care is a provider driven component, therefore, if the patient declines a visit, the following should occur:<br><br>  ➤ Documentation of refusal will be obtained<br><br>  ➤ The patient will be rescheduled for the next available chronic care clinic after the first refusal<br><br>  ➤ If a patient refuses a second time:<br><br>    • Documentation of refusal will be obtained<br><br>    • The provider will be notified for further orders and disposition<br><br>    • The provider will refer the patient to behavioral health for a consultation regarding clinical capacity for health care decision making<br><br>    • Behavioral health will perform clinical capacity evaluation and follow up in thirty (30) days and/or as medically necessary | The patient is not to be discharged from the chronic care clinic as long as they have a chronic diagnosis |

**REFERENCES**

NCCHC: Standards for Health Services in Jails 2018, J-G-05
NCCHC: Standards for Mental Health Services in Correctional Facilities 2015, MH-I-04 ACA: Standards for
Adult Local Detention Facilities 4th Edition, 4-ALDF-4D-15

**ACA:** 2016 Standards Supplement – no revisions

| Curran-Fromhold Correctional Facility | | |
|---|---|---|
| Title: Refusal of Medication or Clinical Encounter | | Revised: 12/22 |
| | | Reviewed: 11/19, 01/20, 05/21 |
| NCCHC: Important | ACA: Mandatory | No: J-G-05.01 |

| | PROCEDURE STATEMENTS | FACILITY GUIDANCE |
|---|---|---|
| 4 | There are two categories of chronic care medications, documentation of refusals will be obtained for both:<br><br>➤ CRITICAL MEDICATIONS<br><br>    • **See Procedure Statement 5**<br><br>➤ NON-CRITICAL MEDICATONS<br><br>    • **See Procedure Statement 8** | All medication refusals will be clearly documented on the Medication Administration Record (MAR)<br><br>The provider will refer the patient to behavioral health for a consultation regarding clinical capacity for health care decision making<br><br>Behavioral health will perform clinical capacity evaluation and follow up in thirty (30) days and as medically necessary |
| 5 | Notify provider for orders and disposition if the patient refuses or misses **one** dose of any of the following **critical medications**:<br><br>➤ Antiarrhythmic<br>➤ Antipsychotics<br>➤ Cancer treatment<br>➤ Chronic steroid treatment<br>➤ Coumadin<br>➤ Dialysis treatment<br>➤ Insulin<br>➤ Organ transplant treatment<br>➤ Plavix<br>➤ Seizure treatment<br>➤ Other medicines as deemed clinically appropriate | Available YesCare form:<br><br>• Refusal of Medication Helpful Reminders (NA9610)<br><br><br><br><br><br><br><br><br><br>Nursing staff will use their clinical judgment and notify providers for any refused medications when they deem it necessary even if the medications are not considered critical |

**REFERENCES**

NCCHC: Standards for Health Services in Jails 2018, J-G-05

© 2018 YesCare

**NCCHC:** Standards for Mental Health Services in Correctional Facilities 2015, MH-I-04  **ACA:** Standards for
Adult Local Detention Facilities 4th Edition, 4-ALDF-4D-15
**ACA:** 2016 Standards Supplement – no revisions

Exhibit 11

PDP Inmate Timeline of Louis Jung, Jr.

Scollon D001448

# PHILADELPHIA DEPARTMENT OF PRISONS
## Inmate Timeline

03/27/2025 09:09

| NAME: JUNG, LOUIS W | PID: 718327 | HOUSING: | CLASSIFY: |
|---|---|---|---|



**DOB:** 04/16/1973

**RACE:** WHITE

**HEIGHT:** 5'10"

**HAIR:** BLACK

**AGE:** 51

**GENDER:** MALE

**WEIGHT:** 165

**EYES:** BROWN

## Booking (1)

| Booking Num:<br>2310416 | Date in:<br>10/27/2023 | Days diff:<br>10 | Overall Status<br>UNSENTENCED | Schedule Release: | Keeper/No Keeper:<br>Keeper |
|---|---|---|---|---|---|
| Case Counts:<br>2 | Verify ID:<br>VERIFIED | | Next Court Date: | | Release Transport:<br>No |

| Sequence Number | Case Type | Court Docket | Bail | Agency Case # | Sent Disp | Clear Reason |
|---|---|---|---|---|---|---|
| 2310416.1 | PTHOLD | MC51CR00226672<br>021 | NO BAIL | 2103056668 | UNSENT | DEATH |
| | 1 F1 18 CC903 CRIMINAL CONSPIRACY | | | | | |
| 2310416.2 | HOLD | CP40CR000275020<br>19 | $0.00 | | HOLD | CONVERSION |

Warrant:
CP40CR00027502019

## Alert Flags (6)

| Event | Flag Name | Date | By |
|---|---|---|---|
| INACTIVATE ALERT | HEAT | 11/06/2023 14:08 | CONVERSION, D000002 |
| CREATE ALERT | MED CLEARED - GP | 10/30/2023 09:40 | CONVERSION, D000002 |
| CREATE ALERT | DEPENDANTS | 10/27/2023 13:15 | CONVERSION, D000002 |
| CREATE ALERT | SMI | 10/27/2023 13:15 | CONVERSION, D000002 |
| CREATE ALERT | SPI | 10/27/2023 13:15 | CONVERSION, D000002 |
| CREATE ALERT | SUD | 10/27/2023 13:15 | CONVERSION, D000002 |

## Inmate Note (5)

| Note Type | Note | Date | By |
|---|---|---|---|
| OTHER EVENT | [LOGNAME]: HOUSING [NOTES]: FIRE RESCUE<br>NEEDED FOR I/P LOUIS JUNG PP#718327 | 11/06/2023 07:39 | CONVERSION, D000002 |
| OTHER EVENT | [LOGNAME]: HOUSING [NOTES]: STRETCHER<br>CALL FOR I/M LOUIS JUNG CELL 21 | 11/06/2023 07:24 | CONVERSION, D000002 |
| OTHER EVENT | [LOGNAME]: HOUSING [NOTES]: STRETCHER<br>CALL FOR LOUIS JUNG CELL 21 | 11/06/2023 07:22 | CONVERSION, D000002 |
| OTHER EVENT | [LOGNAME]: HOUSING [NOTES]: I/P LOUIS<br>JUNG PP#718327 REFUSED INSULIN | 11/05/2023 16:49 | CONVERSION, D000002 |

ATTORNEYS' EYES ONLY

Exhibit 12

Jung Endocrinologist Record,

July 20, 2022

Lubna M Zuberi, MD  7/20/2022 12:26 PM  Signed

### Subjective

Louis Jung is a 49 y.o. male presenting today for: No chief complaint on file.
referred for DM
Also has hypothyroidism

Previously seeing endocrine at Penn

Seen by endocrine in July of 2021, during an acute care admission for DKA
Comorbid of bipolar disorder

He is currently incarcerated , ans is accompanied by 2 police guards


### History of Present Illness

The patient is here for management of type 1 DM
Type 1 Dm diagnosed at age 14 years
DM complicated with peripheral neuropathy
Last A1c: 11.6 ( in 2021)

 no paper work or med list send with pt

Not sure what insulin he is on

A copy of his paperwork was received during his visit , after prison facility was contacted for his records

A review of these records shows that he is currently on NPH 30 units twice daily
R on scale , 4 to 12 units

Previously , during acute care admission in 2021, he was on lantus 20 units hs, lispro 3 units ac

Bg are being monitoried once or twice daily
These sange from 130 to 300's
One of 500

Another Bg was 82


Pt reports that he has gained weight

He denies chest pains, shortness of breath , vision changes or recent infections

Reports feeling hungry all the time

Labs from march 2022

A1c 11.2


RE: Jung, Louis, DOB: ███████                              Page 3

Exhibit 13

Jung Psychiatric Evaluation,

April 27, 2022



PDP - DETENTION CENTER
BEHAVIORAL HEALTH SERVICES WING
8201 STATE RD. PHILADELPHIA, PA 19136-2992
TELEPHONE: 215.685.8656
FAX: 215.685.8681

April 27, 2022

Honorable Sharon Williams-Losier
Philadelphia County Municipal Court
1301 Filbert Street
Philadelphia, PA 19107

**RE: Jung, Louis**
Housed: December 16, 2021

Robbery – Serious Bodily Injury;
Conspiracy; Theft by Unlawful
Taking; Receiving Stolen Property;
Possession of an Instrument of
Crime; Terroristic Threats; Int Poss
Control Substance; Simple Assault
MC-51-CR-0022667-2021

DOB: █████████
**PP#: 718327**

## PSYCHIATRIC EVALUATION

In preparation for a hearing on May 6, 2022, pursuant to your request, I reviewed records and materials and performed a direct psychiatric examination in the above-mentioned matter, solely to assist the court in determining whether the above-mentioned defendant is competent to stand trial. For the reasons that follow, it is my opinion, with reasonable medical certainty, that Mr. Jung is **not competent** to stand trial at this time.

**Sources of Information:**
1. direct psychiatric examination of Mr. Jung on April 22, 2022;
2. review of court commitment documents in this matter;
3. review of eClinicalWorks of the Philadelphia Prisons pertaining to Mr. Jung.

1

**Statement of Non-confidentiality:**
Prior to the interview, Mr. Jung was informed that all information gathered was not confidential and would be used in a report to be submitted to the Court. Mr. Jung was advised that this evaluation was not for the purposes of his treatment and that there was no doctor/patient relationship. Mr. Jung stated that he understood and agreed to proceed with the assessment.

**Identifying Information:**
Mr. Jung is a 49-year-old man who has been incarcerated at the Philadelphia Department of Prisons (PDP) since December 16, 2021, on the charges stated above. He is currently being held on a dual commitment to the Detention Center Forensic Unit and Norristown State Hospital.

**Relevant Background Information:**
Mr. Jung was born and raised in Philadelphia by his parents. He has three sisters and one brother. He described his childhood as "good," and reported no history of physical, sexual, nor emotional abuse. Prior to his incarceration on his current charges, he was living in an abandoned house.

Mr. Jung completed high school and stated that he received a bachelor's degree in "business and human resources." He stated that he repeated "a lot" of grades but could not provide any details. He was in special education classes. He reported no history of suspensions nor expulsions.

Mr. Jung stated that he has never worked. He collects supplemental income from the government for mental health. He has no history of military service.

Mr. Jung has never been in a romantic relationship. He has never married and has no children.

**Drug and Alcohol History:**
Mr. Jung stated that he has never abused alcohol or drugs.

**Psychiatric and Medical History:**
Mr. Jung stated that he is not sure what he has been diagnosed with psychiatrically. He stated that he has been hospitalized over 10 times in his life time with the last admission occurring two days ago by self-report. (This statement was not verified upon review of the records.)

Mr. Jung reported a history of depression but no suicidal thoughts. He reported no manic symptoms. He stated that he hears voices and stated that he was hearing voices during this assessment.

Mr. Jung stated that he does not know if he has any medical issues. *According to eClinicalWorks, he has a history of diabetes, high cholesterol, hypothyroidism, and idiopathy thrombolytic purpura (a clotting disorder of the blood).*

**Course of Psychiatric Pharmacotherapy since Incarceration:**
Mr. Jung was started on Abilify (an antipsychotic medication also used to stabilize moods) shortly after his admission to PDP, as he had been taking this medication in the community. He has continued to take this medication.

**Mental Status Examination:**
Mr. Jung was cooperative with the interview during the psychiatric portion but became uncooperative at the beginning of the competency assessment when he terminated the interview. He made fair eye contact. He appeared older than his stated age. His speech was of normal rate and rhythm. He stated that his mood was "okay" and his affect was congruent with this. His thought process was logical. No delusional thinking was elicited.

Mr. Jung had no suicidal nor homicidal thoughts. He had no current visual hallucinations but stated that he was hearing voices throughout the assessment and appeared to be internally preoccupied. He was not oriented to the month, year, or location of the assessment, thinking that he was in the doctor's office, when actually, he was being interviewed at a table on his jail pod. His concentration was impaired, as evidenced by his responses within the assessment and his responses to formal testing. His insight was impaired into his current legal situation but fair into his history of mental health issues.

**Diagnostic Impression:**
Schizophrenia; Unspecified Cognitive Impairment

**Current Medications:**
Abilify 10 mg once daily (an antipsychotic medication also used to stabilize moods)
Aricept 5 mg once daily (a medication used to treat dementia)
Atorvastatin 20 mg at night (a medication to treat high cholesterol)
Eliquis 5 mg twice daily (a medication to prevent blood clots)
Synthroid 25 mcg once daily (a medication to treat low thyroid hormone levels)
Insulin as needed

**Competency Assessment:**
Mr. Jung stated that he did not understand why he needed to discuss his charges. The purpose of the evaluation was again explained to him. Despite this, he stated that he believed he was in a doctor's office and could not understand why a doctor would ask about his criminal charges. He became upset at this point and terminated the interview by leaving the table.

**Opinion:**
It is my opinion, with reasonable medical certainty, that Mr. Jung is presently unable to understand the nature and object of the court proceedings and is presently unable to participate and assist in his defense. He is currently hearing voices which impair his ability to concentrate within the assessment. These voices prevent him from understanding the court process and affect his ability to assist his attorney. As such, Mr. Jung is **not competent** to stand trial at this time.

Mr. Jung also appears to display some symptoms of cognitive deficit, for which he is taking a medication to treat dementia. It is not clear at this time if his lack of ability to comprehend his situation is due to mental health reasons, which may be treatable, or due to dementia, which is unlikely to change with treatment. He should be recommitted to treatment and likely an increase or change his medications might better manage his psychosis and maximize the probability that he can become competent to proceed.

Thank you for the opportunity to assist in this matter. If I can be of any further assistance, kindly contact me.

Respectfully submitted,

Alexis Beattie, M.D.
Forensic Psychiatrist
abeatte@corizonhealth.com

4

Exhibit 14

Expert Report of Dr. Homer Venters

Review of Care for Louis Jung, Jr., Expert report of Dr. Homer Venters

## Introduction and Qualifications

I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, as well as testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care. I was subsequently promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer of the New York City jails. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, substance use treatment, quality improvement, re-entry and morbidity and mortality reviews, as well as all training and oversight of physicians, nursing, and pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices, including correctional officer responses to patients in distress, assessment after use of force injuries and medical observation and care for people in solitary confinement/segregation settings. My responsibilities during this time also included review and approval of all medical and mental health policies, including those relating to intake health assessments, chronic care and sick call, emergency responses, mental health and substance abuse care, infirmary care, and transfer of patients for higher levels of care.

During this time, I also worked closely with correctional leadership to provide training to correctional staff on the care of patients with serious mental illness, traumatic brain injuries and other common injuries that occur during use of force. I have also provided input on security policies and provided training for security staff relating to how correctional staff should recognize signs of illness and injury among incarcerated people.

In March 2017, I left Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges, and law enforcement staff on forensic evaluation and documentation, analysis of mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

1

Between December 2018 and April 2020, I served as the Senior Health Fellow and President of Community Oriented Correctional Health Services ("COCHS"), a nonprofit organization that promotes evidence-based improvements to correctional practices across the United States. I have also worked as a medical expert in cases involving correctional health since 2017.

During the COVID-19 pandemic, I worked on numerous COVID-19 responses in detention settings. During this time, I have conducted dozens of court-ordered inspections of detention facilities to assess the adequacy of their COVID-19 responses in ICE detention centers, county jails, and state and federal prisons. I was also named as an independent monitor for COVID-19 response for both the Connecticut State Prisons and the Hawaii Department of Corrections, and I was named as COVID-19 inspector by a Federal Court for the Bureau of Prisons facility in Lompoc, California.

I have also been named as Federal Court-appointed monitor for the health services in the Santa Barbara, California County Jail, the Fluvanna Prison for Women in the Virginia Department of Corrections and the Criminal Justice Complex in St. Thomas, United States Virgin Islands and the Cumberland County Jail. I have also been retained by the U.S. Department of Justice and several State Attorney General's offices in their investigations into the adequacy of health services in jail and prison settings.

I have published two books on correctional health, both published by Johns Hopkins University Press; *Life and Death in Rikers Island (2019)* and *Outbreak Behind Bars* (2025).

**Role and Methods**

I have been retained by counsel for the Estate of Mr. Louis Jung, who died while incarcerated in the Philadelphia Department of Prisons (PDP). This review includes an assessment of the adequacy of care that jail health staff provided for Mr. Jung leading up to his death from diabetic ketoacidosis (DKA) in November, 2023, and the adequacy of the oversight of YesCare provided by the Philadelphia Department of Prisons.

In order to formulate my opinions in this case, I have reviewed the following materials.

- Medical records of Mr. Jung in PDP
  - o PDP 00000001-000000025
  - o YesCare 1-2153
- Jung Corrective Action Plan
- Patient Safety Committee Report, 6/23/25
- Insulin Re-Audit September 2024
- PDP Death Reports (City-Jung-000001, CITY014194)
- **Deposition transcripts: Patricia Powers Gay,** Mariesha Apollon, Lalitha Trivikram
- YesCare Clinical Pathway: Diabetes Mellitus

2

- YesCare Audit Charts;
- Third-party medical records for patients 1-4[1]

Part of my role in this case is to determine whether errors or problems in the care provided to Mr. Jung represent systemic deficiencies. The Center for Disease Control (CDC) identifies systemic problems in health care as ones that involve the interplay between policies, procedures, infrastructure, spending decisions and human actions.[2] In jail and prison health systems, systemic barriers or problems in care can include a lack of staffing, ineffective or improper policies, inadequate physical plant and lack of adequate oversight or quality assurance of care. These types of systemic problems in correctional health services can cause harm or risk of harm to numerous patients across time and across multiple staff members. They also increase the likelihood that an individual error will result in harm to a patient.

Part of my approach in this case is to assess whether there is indication of systemic deficiencies indicated in the care provided to Mr. Jung. To address this issue, I have reviewed information beyond his own medical records including the deposition testimony of jail and County staff as well as the medical records of other people who were similarly hospitalized with complications of diabetes.

This is an approach I have utilized in detecting and addressing systemic problems in jail health services many times previously. For example, when leading the correctional health service in NYC, I relied on this methodological approach to review medical records, interview data and policies to identify systemic areas needing improvement in care for transgender patients, preventing assaults on staff and care for patients with traumatic brain injury.[3] In each of these examples, it was necessary to review multiple sources of data to determine how the health services were falling short and/or needed improvement.

This approach is different than the approach sometimes taken in research or academic projects, where the entire sample of patients, or a random sample, is selected to create a statistical model. I have utilized this approach as well, including creating regression models for the association between self-harm and multiple risk factors in a jail and measuring the efficacy of new tuberculosis screening tools in jail settings.[4] But these statistical models were developed after we determined that a systemic problem existed, and after we designed and implemented changes to our system of care.

For example, regarding self-harm, years before our analysis of approximately 250,000 jail admissions and creation of a regression model, we observed a sharp increase in acts of self-harm among our patients. I presented this relatively simple data to our oversight board to show that these increases were driven by the use of solitary confinement or segregation, and were mostly among people with mental illness. This information, along with reports from our patients

---

[1] Patients are anonymized to protect confidentiality. Plaintiffs' counsel have indicated that they will share the identity of each third-party patient with defendants' counsel.
[2] https://www.cdc.gov/polaris/php/thinking-in-systems/identifying-systems-problems.html?CDC_AAref_Val=https://www.cdc.gov/policy/polaris/tis/systems-problems/index.html.
[3] https://pubmed.ncbi.nlm.nih.gov/25913334/ , https://pubmed.ncbi.nlm.nih.gov/26745813/, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.nyc.gov/assets/boc/downloads/pdf/BOCMinutes%20(1.14.14).pdf

[4] https://pubmed.ncbi.nlm.nih.gov/24521238/, https://pubmed.ncbi.nlm.nih.gov/29633660/

themselves, and correctional staff who worked in these settings, led us to completely revamp out approach, and implement new more therapeutic units and care.[5] We has a similar experience with our tuberculosis screening, where we discovered that when utilizing a skin test for TB exposure, many jail patients left after we planted the TB inoculum but before we could read the result, 2-3 days later. In both cases, the statistical analyses were conducted after the systemic problems were identified. The approach I have utilized in this case is one that I have found to be extremely reliable throughout my career in correctional health.

**Diabetes Care in Carceral Facilities**

The treatment of patients with insulin-dependent diabetes is one of the most complicated and difficult missions for any correctional health service. First, patients with this medical problem can die or experience medical emergencies within a short period of time if they do not receive their insulin, and the complication of diabetic ketoacidosis as well as other potentially fatal consequences of extremely high or even low blood sugar can occur quickly, within days or even hours. While there are other medical problems that require regular administration of life-sustaining medications, insulin-dependent diabetes poses unique challenges for correctional health services because of the need for multiple contacts between health staff and the patient each day, as well as the need for coordination of three different tasks, insulin administration, blood glucose monitoring, and meals. When patients are stable in their glycemic control, these tasks can be achieved in a general population settings, but for patients who experience worsening glycemic control, manifested by elevated blood glucose levels, rising Hemoglobin A1C, or swings from elevated to low blood glucose levels, it is imperative that they be transferred to a higher level of care and medical monitoring. For medical emergencies, such as diabetic ketoacidosis (DKA), this must be treated in the hospital setting. But for patients who are not at the level of having a medical emergency but who do have poorly controlled diabetes, the jail infirmary or a dedicated diabetes housing area is the appropriate setting once it has become clear that their disease is not being controlled with the health resources of the general population settings. Jail health staff have numerous sources of information about patients who need a higher level of care, including patients with missed or refused insulin/blood glucose checks, patients with worsening Hemoglobin A1C levels, patients who require hospitalization for diabetic ketoacidosis or other complications of poorly controlled diabetes. The high prevalence of mental health and substance use disorders in jail patient populations means that jail health services routinely encounter patients with serious mental illness and diabetes, and then these patients are known to experience worsening or uncontrolled diabetes, it is essential to increase the level of care and monitoring they receive, most often through transfer to a medical infirmary or a dedicated diabetes housing area.

When a patient is known to experience complications of diabetes, including potentially fatal complications such as DKA, they must be housed in the jail infirmary until their diabetes is well controlled and they must be transferred back to the infirmary when and if their glycemic control worsens. Failing to do this for a patient who is known to be at a risk for DKA significantly increases the likelihood that they will again suffer DKA, require hospitalization, and potentially die. The need for an infirmary level of care for these patients is driven by information that the jail

---

[5] https://pubmed.ncbi.nlm.nih.gov/26848667/

4

health services already has at their disposal, that the patient's diabetes has not been controlled when housed in a general population setting. While this represents a minority of patients with insulin-dependent diabetes, it is essential to identify them and increase their level of care. The 2019 Position Statement of the American Diabetes Association on carceral care for patients with diabetes clearly identifies the need to identify incarcerated patients who are at elevated risk of DKA.[6] In an infirmary setting, patients can be closely monitored for any late or missed glucose checks or doses of insulin. The NCCHC Standards for Health Services in Jails from 2018 define infirmary level care as "Infirmary-level care is provided to patients with an illness or diagnosis that requires daily monitoring, medication and/or therapy, or assistance with activities of daily living at a level needing skilled nursing intervention."[7] For a patient with insulin dependent diabetes, poor glycemic control and a history of DKA, this level of care is essential. This step of transferring patients with poorly controlled diabetes to a jail infirmary is one that I first became familiar with in the NYC jail system, where this practice was routine.

Another basic requirement for patients with complex or poorly controlled chronic care problems is to have an individualized treatment plan that covers all aspects of the patient's care. The NCCHC has a specific and essential standard for patients with "Chronic Disease and other Special Needs" that details the absolute necessity of an individualized treatment plan for patients with complex medical problems.[8] This standard also identifies that the treatment plan must specify "a patient's course of therapy and the roles of qualified health care professionals in carrying it out." This is a key feature of diabetes care in jail settings because multiple nurses and providers may check the patient's glucose, administer insulin or assess the patient via physical examination or review key laboratory results in a single day. Because patients with diabetes can fall into serious illness and medical emergency very quickly, there must be a clear delineation of roles for the many health professionals who have contact with the diabetic patient so that key red flags are not ignored, such as missed doses of insulin or blood sugar checks, or abnormally high or low blood sugar, HbA1C or other test results. The NCCHC specifically mentions several health conditions which merit individualized treatment plans, including developmental disability, mental health problems and diabetes. One of the essential elements of each patient's treatment plan is for providers to clearly document at each contact whether their disease is well or poorly controlled and evidence of complications. This is essential for all of the health team caring for the patient because it makes clear that the patient is stable or when poorly controlled, more susceptible to disease complications and exacerbation.

### Timeline of Medical Events

Mr. Jung was initially detained in the Philadelphia Department of Prisons (PDP) in December 2021. Between his admission to PDP and his death on November 6th, 2023, he had numerous documented instances of poorly controlled blood sugar and serious complications from untreated or poorly treated diabetes. In the period before Mr. Jung's return from Norristown State Hospital on 10/28/23, the following instances are present in his medical records.

---

[6] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://diabetes.org/sites/default/files/2023-10/ADA-position-statement-diabetes-management-detention-settings-2021.pdf.
[7] NCCHC Infirmary Level care, J-F-02 Standards for Health Services in Jails. 2018.
[8] NCCHC Patients with Chronic Disease and Other Special Needs., J-F-01 Standards for Health Services in Jails. 2018.

Hospital transfers (diabetic complications)

| Date | Problem | Records |
|---|---|---|
| 12/20/21-1/5/22 | DKA | Yescare0382 |
| 4/7/22-4/9/22 | DKA | Yescare0617 |
| 1/8/23-1/12/23 | DKA, | Yescare1374 |
| 1/23/23-1/29/23 | Hyoerglycemia, Pneumonia | Yescare1391 |
| 3/11/23-3/14/23 | DKA | Yescare1322 |
| 3/19/23-3/20/23 | Hyperglycemia | Yescare1339 |

I have reviewed the medication administration records (MAR) for Mr. Jung at PDP. These records appear to follow a convention of having nurses enter their initials when a medication or procedure is completed, and entering in various codes for instances when the medication or procedure is not completed. The MAR sheets include definitions for these codes including the following:

Code    Definition

6       Not Documented

3       Refused

1       No Show

I reviewed the MAR sheets for Mr. Jung's blood sugar checks, which were ordered to occur twice daily. In the period from December 2021 through October 2023, I counted numerous instances when the codes for not documented (code 6), refused (code 3) and no show (code 1) were entered into Mr. Jungs records. The MAR document that I reviewed (PDP_MAR-00000000001-0000000000157) incudes 154 pages of MAR records for Mr. Jung from December 2021 through November 2023. These records show hundreds of entries for 'Not Documented', and dozens more for 'Refused' and 'No Show'.

During Mr. JUNG'S hospitalization for DKA on 1/8/23, the hospital physician documented that "he is a poor historian and does not provide reliable information about his glucose monitoring and compliance with insulin regimen". During this admission for DKA, the hospital physician also documented that despite being identified as having DKA, Mr. Jung "Feels thirsty, but has no other complaints and has been in his usual state of health." The discharge medications from this hospitalization include insulin glargine 42 units each night and insulin lispro 18 units three times per day with meals.

Mr. Jung was sent to the hospital on 1/23/23 and admitted with hyperglycemia and pneumonia. In the days prior to his hospital transfer, Mr. Jung's clinical notes and MAR records show the following. (pp 1632-1646)

1/20/23. PA Sarskaya documents that "Pt is not coming out for any medication or accu check . pt is complaining of pain and said that's why he isn't coming out ( per referral )." The assessment and plan for this note are blank.

1/21/23. No follow up or other provider note present.

6

1/22/23. At 8:30 am NP Henderson-Hamwright documents chief complaint of "elevated BG" and "Hyperglycemia with ketones". This note documents that Mr. Jung had glucose elevated to 466, had ketones in his urine and that he wanted to lay on the stretcher and that he was assessed as refusing care; "IP wanted a juice and to lay down on the stretcher…" This note also reports multiple episodes of nausea and vomiting by Mr. Jung. This note also contains two different accounts of how or why Mr. Jung refused intravenous fluids. One part of the note documents that "IV insertion attempted but was unsuccessful. Patient refused further attempts." Another part of this note documents "IP W ANTED JUICE AND TO LAY ON STRETCHER INSTEAD OF GETTING AN IV." This note lacks any assessment or consideration of whether Mr. Jung might be in DKA and experiencing weakness from DKA. This note also documents that Mr. Jung "missed his semglee dose overnight due to being asleep.

There is no provider follow-up note or assessment of Mr. Jung after this 8:30 am encounter with the NP.

1/23/23. A nursing encounter at 10:24 am documents the following for Mr. Jung; "stretcher called to A2P3 at approximately 0910 am, arrived to IP cell IP noted laying in bed disoriented repeatedly screaming for water. IP BS checked reading HI. IP brought down to medical 12 units of Humulin R given SQ, pt continues to be disoriented unable to obtain urine sample, pt seen by triage provider n/o to send pt out VIA 911, for further eval , corrections aw are Dispatch #451 pt oof at 10:00 am awake alert with confusion"

The MAR records for 1/20/23-1/23/23 show insulin administered at 9 am on the 20th and 21st, two refusals on the 21st (both without a refusal form), and 9 instances of "Not Documented' or No Show'. (MAR 121-126)

Mr. Jung experienced two hospitalizations for diabetic ketoacidosis assessment/care in a single week in March 2023. In both of those instances, he had elevated blood glucose levels and positive urine ketone results.

The medical records for Mr. Jung's DKA hospitalization 3/11/23-3/14/23 give specific instructions in the discharge plan for the frequency of care he requires. The physician discharge plan (1326) includes the following assessment and directions;

"Insulin regimen in prison only provides regular insulin sliding scale twice a day in addition to basal insulin. As a result he has been severely hyperglycemic progressing into DKA."

"Patient's blood glucose needs to be monitored 4 times a day. He will need a base dose of mealtime insulin in addition to sliding scale coverage as well as basal insulin."

A physician note on 5/20/23 from Dr. Bradley includes the following; "Patient continues noncompliance. Current staffing does not allow for qid evaluations in the setting of this noncompliance. Insulin orders adjusted accordingly." This note also includes the order "Stop Accu Chek Reading, -, as directed TRT, FOUR TIMES DAILY". There is no documentation about why or how this physician came to the conclusion that Mr. Jung was continuing to be noncompliant.

This physician note also classifies Mr. Jung's diabetes in the following manner: "Diabetes mellitus without mention of complication, type II or unspecified type, uncontrolled".

Mr. Jung's MAR records are reviewed below but for the week before his hospitalization on 3/11/23, Mr. Jung's MAR during 3/4/23-3/10/22 shows 5 refusals, 5 no shows and 3 instances of simply not documented. When I reviewed the 5 instances when refusal was recorded in the MAR, I found that no refusal form was present in 2 of the instances (3/6/23, 4PM insulin and 3/6/23, 4PM accucheck), while the other 3 instances (3/6/23, 3/10/23) include forms but no signature from Mr. Jung and no documentation of his decisional capacity or understanding of the risks and benefits of his refusal.

Between January and March 2023, Mr. Jung had 2 hyperglycemia NETS on 2/9/23 and another telephone encounter for hyperglycemia on 2/10/22. Mr. Jung was seen for an elevated blood glucose of 307 on 2/13/23. The plan for this elevated blood glucose was to monitor Mr. Jung in the medical clinic after he received short acting insulin, but this did not occur. The nursing note documents "IP left triage area although he was informed to stay to be monitored. RN unable to recheck BS." No alternate plan is present for how Mr. Jung will be reassessed on this day.

Mr. Jung's Hemoglobin A1C was documented as 12.7 on 2/25/23. This lab report correlates blood glucose levels with A1C values from 6-12 but stops at 12 as the highest level. The American Diabetes Association's calculator for A1C/blood glucose identified this level (12.7) as representing long term blood glucose levels of 318, more than twice the recommended level of <130.[9]

Mr. Jung had several laboratory tests for Hemoglobin A1C at PDP showing that his values and overall glycemic control worsened dramatically over time.

| Date | Result (normal <6.5) | Blood Glucose Equivalent[10] |
|---|---|---|
| 1/25/22 | 9.3 | 220 |
| 3/14/22 | 11.2 | 275 |
| 2/25/23 | 12.7 | 318 |

No A1C tests are present from March-September 2022 or February-June 2023, times when he was in the care of PDP.

On 6/2/23, a transfer summary is present in Mr. Jung's medical records that indicates that Mr. Jung's insulin regimen includes 30 units of Humulin N in the mornings, 15 units in the evenings and sliding scale coverage with Humulin R with twice daily blood glucose checks.

On October 28, 2023, Mr. Jung was transferred from Norristown Psychiatric Hospital where he had been undergoing competency restoration back to PDP. Mr. Jung's medical records document that he was seen by Nurse Apollon in the morning for a screening encounter. Nurse Apollon contacted Nurse Practitioner Gay during his intake encounter.

A telephone encounter is present in Mr. Jung's medical records from Nurse Apollon to Nurse Practitioner Gay at 10:02 am with the message "Dr Gay Nurse Apollon Please order IP insulin

---

[9] https://professional.diabetes.org/glucose_calc
[10] https://professional.diabetes.org/glucose_calc

thanks". This message has a response time of 9:27 pm with the response "Please see intake orders written."

The receiving screening conducted by Nurse Apollon includes a question "Refer to midlevel practitioner or physician now," which is answered "No".

Nurse Apollon's note, signed at 10:03 AM, starts with "has type 1 diabetes BS is 542 states he hasn't gotten insulin for 3 days".

This encounter lists the chief complaint for Mr. Jung as "SMI SPI SUD," which are references to serious mental illness and substance use disorder, and also includes the following questions/responses:

> "Has inmate been previously diagnosed as SMI" No."

> "Do you have any other medical conditions? No." [occurs after infectious disease questions]

> "Have you been treated/hospitalized within the last year for any medical problems? No."

> "Are you on a diet prescribed by a doctor? No."

> "Have you ever been incarcerated before today? No"

> "Are you currently taking medications for any medical condition? (Including those for HIV/AIDS Diabetes, hypertension, Sickle Cell, Asthma, Epilepsy, hepatitis etc.) No."

This intake encounter also lists the following twice, "Patient's noncompliance with other medical treatment and regimen."

The past medical history in this note does not mention or document any review of Mr. Jung's recent hospitalizations for DKA or his history of recent DKA. This note does not include any documentation of review of Mr. Jung's insulin regimen as ordered after his DKA hospitalization or the regimen he was on prior to being transferred to Norristown for forensic restoration.

There is no review in this encounter of the insulin regimen Mr. Jung was receiving at Norristown or level of glucose control while at that hospital.

The assessment for Nurse Apollon's note includes "urine present for ketones encourage to drink plenty of water."

The assessment lists diabetes "without mention of complication, not stated as uncontrolled", orders Novolin N insulin 10 units twice per day, coverage with Novolin R insulin with a sliding scale, blood glucose checks twice daily and lists an ICD code of 250.01.[11] This encounter sets Mr. Jung's next provider appointment for chronic care (including his diabetes, cholesterol and thyroid issues) for 28 days later. This note also includes lab tests for 14 days later. This encounter note was signed at 9:48 pm.

---

[11] From https://www.aapc.com/codes/icd9-codes/250.01 . The code for type 1 diabetes with elevated blood sugar is E10.65 (used for encounter note 5/8/23) and the code for type 1 diabetes with ketoacidosis is E10.1 and the code for type 1 diabetes with unspecified complications is E10.8.

No re-assessment of Mr. Jung's ketonuria or elevated blood glucose is present later on October 28. No blood glucose result is present.

The intake form does not appear to have any field that documents yes or no for review of prior records. The intake form does not appear to include a list of current or prior health alerts.

On 10/30/28, a "Rule out TB" encounter is present from Medical Assistant Carrullo. This encounter includes a negative PPD reading. There is no documentation in this encounter of any re-assessment of Mr. Jung's ketonuria, elevated blood glucose or diabetes level of control.

A COVID-19 vaccine encounter is present with Nurse Ricks on 10/31/23 which documents Mr. Jung as refusing the vaccine. This encounter documents the medication orders continue for 10 units of Novolin N insulin and blood glucose checks twice per day and coverage with sliding scale Novolin R. There is no documentation in this encounter of any re-assessment of Mr. Jung's ketonuria, elevated blood glucose or diabetes level of control. The Yescare Patient Safety Review after Mr. Jung's death included a snapshot of the insulin and blood glucose checks he received in the time between 10/29/23 and 11/5/23. ((YesCare 3500)

|     | 10/29 | 10/30 | 10/31 | 11/1 | 11/2 | 11/3 | 11/4 | 11/5 |
|-----|-------|-------|-------|------|------|------|------|------|
| AM  | BS 385 10 R 10 N | BS 268 8 R 10 N | BS 371 10 R 10 N | Refused (no form) | BS 290 8 R 10 N | No Show | BS 266 8 R 10 N | No Show |
| PM  | BS 585 12 R 10 N | Not Doc | BS 500 No CRIC doc 10 N | BS 411 0 R 10 N | BS 245 6 R 10 N | BS 394 10 R 10 N | Not Doc | Refused (no form) |

A nursing encounter from Nurse Jeoboham is present in Mr. Jung's medical records dated 11/6/23 at 8:34 am. This encounter records that Mr. Jung was found unresponsive and that CPR was conducted by this nurse and two others but that Mr. Jung was declared dead by outside EMS.

Another encounter note from Nurse Practitioner Henderson-Hamwright describes the same emergency response, and documents that stretcher call was received at 6:04 am. This note states that Mr. Jung was unresponsive, breathing and that the blood sugar reading of the glucometer was "high". The note describes that Mr. Jung was noted to have stopped breathing while being transported to the clinic and that basic lifesaving efforts were initiated without effect. EMS was notified and their staff declared Mr. Jung dead at 6:47 am.

A physician note is also present from the time of Mr. Jung's death, written by Dr. Trivikram.

The discharge orders for medications present at the time of Mr. Jung's death included his cholesterol and thyroid medications and the following insulin regimens:

- Novolin N 10 units twice daily
- Novolin R 2-12 units twice daily

10

- Accu check twice daily

These records indicate that after his initial intake on 10/28/23, there was no subsequent assessment of Mr. Jung by a provider regarding his diabetes until he died on 11/6/23.

The MAR sheets for Mr. Jung's blood glucose checks after his return from Norristown show that the entry #6 (Not Documented) was recorded on the 28th, 30th or half of the 4 days recorded in October. The same code also appears for Mr. Jung's intermediate acting insulin (Novolin N) on these days. There are entries for the regular insulin (Novolin R) administration on October 29th and 30th but no values for the blood glucose reading or the number of units of insulin administered are present in the MAR sheets. There are no corresponding encounters in the medical records to reflect these aspects of care. The autopsy report for Mr. Jung identified his cause of death as diabetic ketoacidosis and the manner of his death as natural.

**Review of Additional Information**

I also requested to review medical records for patients like Mr. Jung, three of whom were sent to the hospital from CFCF, and one from another PDP facility, since 2022 for diabetes related complications at some point after their receiving screening/intake period.[12] I reviewed the medical records of 4 people who met these criteria. These patients exhibited several important similarities to Mr. Jung's case in their profiles of care and diabetes exacerbation.

These patients experienced numerous hospitalizations for worsening diabetes while in PDP.

- Patient 1 appears to have been transferred to the hospital with diabetes complications at least three times, including with hypoglycemia with seizures, hyperglycemia with ketonuria and hyperglycemia with vomiting (pp 240, 462, 516). 11/12/21 on p516, 12/13/21 on p462, 8/24/22 on p240
- Patient 2 appears to have been transferred to the hospital at least three times, including with hypoglycemia, DKA and fall with hypoglycemia (pp 129, 162, 214).2/2/22, 3/4/22
- Patient 3 appears to have been transferred to the hospital once with hyperglycemia and kidney failure (p 114).
- Patient 4 appears to have been transferred to the hospital at least two times past the initial receiving screening/intake period including with hyperglycemia with ketonuria and hypoglycemia (pp 302, 563).

Hospitalizations for Additional Records (after receiving screening/intake period)

| Name | Date/Page |
|---|---|
| Patient 1 | 11/12/21 (p516) |
|  | 12/13/21 (p462) |
|  | 8/24/22 (p240) |
| Patient 2 | 2/4/22 (p214) |
|  | 2/22/22 (p129) |
|  | 3/4/22 (p162) |
| Patient 3 | 5/25/22 (p114) |

[12] I reviewed four sets of records, reviewed above. There were three additional sets of records that fell outside these criteria,                    In addition, among the four people I did review records for, I did not review hospital transfers that occurred in the receiving screening/intake period.

11

| Patient 4 | 7/6/22 (p563) |
| | 1/12/23 (p302) |

I reviewed the MAR leading up to the most recent hospitalization for each of these four patients.

For Patient 1, his MAR shows the following. In the 11 day period before his third and most recent hospitalization with diabetes complications (8/13/22-8/23/22, p967), his accucheck was ordered for four times per day and was listed as 'not documented' 19 of 44 (43%) times it was ordered.

Patient 1's medical records also show that he had been diagnosed with seizure disorder as well as diabetes and had two prior hospitalizations with diabetes complications before August 2022. He had also been identified on 8/12/22 as being high risk based on his profile of insulin medications. (p248) There is a telephone encounter on 8/15/22 for elevated blood glucose to 508, answered by Eujudice Feverier. I did not find a NET encounter for hyperglycemia or actual clinical encounter on this date or any of the next seven days. There is a lab review without any apparent assessment of Patient 1 on 8/19/22, then the next actual progress note occurs on 8/23/22 with Dr. Wilbraham. (p242) It is unclear whether this provider spoke with Patient 1 because the only entry in the subjective section of the note is "BSs" and is it unclear whether the vital signs are new or not. The following day, an ER referral is present that reads "A 28 years old male was brought to medical triage via stretcher while having active seizures activities with hx of type1 diabetes. Blood sugar check 28, 1ml antivan given, glucose gel administered and 911 call initiated. Patient responsive to external stimuli and partially awake at this time. Patient was transported by 911 to Jefferson Torresdale ER" After his hospitalization, Patient 1 was returned to the PDP infirmary for 2 days before returning to a general population setting.

For Patient 3, his MAR shows the following. In the 11 day period before his most recent hospitalization with diabetes complications (5/14/22-5/24/22, p502), his accucheck was ordered for two times and shows that 13 of 22 accuchecks were listed as 'not documented' or 'no show' (59%) of times it was ordered. There is another set of similar appearing accucheck orders for the same time period with 9:00 and 21:00 time rows which is essentially blank across the 9:00 time and shows only 9 of 22 boxes with a staff initial entry, leaving 13 boxes with some other entry. These boxes with a staff initial entry in this second set of accuchecks do not appear to supplement the previous set because the boxes with staff initials in the second set are already marked with a set of initials in the initial set.

CFCF-B1POD1          Medication Administration Record  May 01, 2022 - May 31, 2022

| Medications | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CFCF-B1POD1** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **CFCF-B1POD1** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Accu Chek - Reading as directed | 09:00 | 6 | 6 | OO | 3 | OO | OO | DV | 1 | CF | 1 | 1 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 1 | 6 | 6 | 6 | 6 | | | | | | | |
| | 21:00 | 6 | TP | AK | NA | AN | AK | KF | AK | AN | AK | AK | AN | AK | AK | 6 | 6 | AN | AK | KF | JO | NA | MH | AK | OT | | | | | | | |
| TRT TWICE DAILY for DX(Self-report) U001.00 Rx S142714742 O/D:02/27/22   D/C:05/25/22 Prescriber: GEORGE       , SIGY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Accu Chek - Reading as directed | 09:00 | BC | BC | OO | 3 | OO | OO | DV | 1 | CF | 1 | 1 | OO | OO | OO | 6 | 6 | OO | OO | OO | OO | 1 | OO | OO | 6 | OO | NA | 6 | 1 | 6 | | |
| | 21:00 | 6 | TP | AK | AK | AN | AK | KF | AK | AN | AK | 7 | AN | AK | AK | 6 | 6 | AN | AK | 6 | JO | NA | 6 | LN | OT | 1 | 6 | 6 | 6 | | | |
| TRT TWICE DAILY Rx S145800342 O/D:04/14/22   D/C:05/29/22 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

I also reviewed the hospital records for Patient 3 leading up to his May 2022 hospitalization. The day before his hospitalization, there is a lab review with multiple abnormal results from blood and urine tests indicating anemia, kidney failure or damage. His medical encounter on the day he was sent to the hospital indicates that he was called to the clinic because of a blood glucose reading over 600, but then the provider documents that he also reviewed the lab results at that time and noted the abnormalities. (p120) Review of his medical records shows one blood glucose value of 193 on 5/24/22 at a medical clearance encounter but neither his progress notes nor his MAR show the other blood glucose values that were obtained. I did not see any other accucheck readings in the vital signs summary at the start of his medical records (pp 1-12) or in the MAR sections.

For Patient 4, his MAR shows the following. In the 11 day period before his most recent hospitalization with diabetes complications (1/1/23-1/11/23, p2763), his accucheck was ordered for two times per day and was listed as 'not documented' 8 of 22 times (36%) it was ordered.

I also reviewed the medical records for Patient 4 leading up to his hospitalization on 1/12/23. He was seen for hypoglycemia by PA McKinney on 1/5/23, with a blood glucose of 35. That encounter includes the following;

> "IP known to this provider for frequent hypoglycemic episodes most notably in am (~8-10am); Per triage nurse: "Pt was a stretcher call at 9:20. Pt was awake but not responding to questions. Pt was given 2 sugar packets by LPNs on unit. BG at 9:28 was 30. BP 141/80, HR-79 and pox 97%. Pt was given tube of glucose gel at 9:30 and recheck of BG was 35-pt unable to respond to questions but awake."

There does not appear to be any clinical follow up the next day by a provider, or any of the following days until he is sent to the hospital with blood and ketones in his urine on 1/12/23, 7 days after this episode. I did not see any recording of daily blood glucose results in the vitals section of these medical records or in the MAR and during this period leading up to his hospitalization, I only observed a recorded results on the 5th and 12th of January.(pp 302, 312)

For Patient 2 her MAR shows the following. In the 7 day period before her most recent hospitalization with diabetes complications (2/25/22-3/3/22, pp 440, 465), her accucheck was ordered for two times per day and was listed as administered for all 14 of those times.

13

I also reviewed the medical records for Patient 2 leading up to her hospitalization. The encounter note on 3/4/22, the physician notes that nursing staff reports multiple recent episodes of hypoglycemia and also suggests that the patient was willfully manipulating her blood sugar;

> "I just got a call from MOD 3 nurse saying that this patient's BS was 34 and she was disoriented. She reports that the patent was spitting out the glucose gel they were giving her (intentional or related to her change in MS?) The nurse was frustrated reporting that she has had low BS a couple times in the morning lately." (p 129)

Her medical records include an encounter/NET for hypoglycemia on 3/3/22 but the most recent progress note or NET before that point is 2/24/22 (pp 145, 156). This is the date of this patient's previous transfer for DKA. I did not see any recording of daily blood glucose results in the vitals section of these medical records or in the MAR. This patient was sent to the infirmary upon hospital discharge

I have reviewed the 30 (b) (6) deposition transcript of Major Patricia Powers, one of the custodial leadership at PDP. Major Powers described how the medication administration process proceeds in PDP in general population and locked housing areas, including the officers announcing the presence of nursing staff for medication administration (p25) as well as the blood sugar checks for diabetic patients (p29). Major Powers testified that patients retain the right to not go when called for medications and that these instances trigger an entry by staff into the Red Flag Medication Policy; "So in general I announce medication and inmates choose not to go, they have that right to choose not to go. We do not force them to go. And then place into what we call the Red Flag Medication Policy. And then medical reviews those MARs, the medication administration records." (p31) Major Powers also testified that patients on this Red Flag list are given to security staff who then must bring the patients to medical staff for counseling and/or evaluation; "They place them on a Red Flag Medication Compliance List provided to the security staff. We then have to bring those inmates to medical staff, usually in the medical area where the inmate is counseled on missing, whether it be three straight doses of a life-sustaining or patterns or just refusing certain medications." (p32) Major Powers testified that there were no audits of the functioning of this Red Flag Medication policy and that this was a shared process between medical and security staff. (p34)

I have also reviewed the deposition transcript of Blanche Carney, the former Commissioner of PDP. Commissioner Carney described the Red Flag Medication policy and that when a patient refused three medication doses, refusal forms would be utilized for the refusals and the patient would be assessed by health staff. (p30) She also testified that refusal would be documented in the Lock and Track system, which medical staff had access to, but that a phone call would also be made to health staff about refusal. Commissioner Carney also testified that if a person did not come to the line for medications, but was on the list for medications, medical staff would be notified;

"Q. Did correctional staff have a responsibility to notify medical staff if an inmate was not going to med-line to receive their medication?

A. If they were on the list of individuals scheduled to receive, they would be required to notify that the individual is not coming to the med-line.

Q. And how would they make that notification?

A. That notification is usually made through a phone call, and then there's a documentation on the refusal form." (pp 31,32)

Commissioner Carney also testified that she did not recall specific responses put into place regarding an outside auditor's findings that chronic are refusals were not being documented. (p 42). When asked about how correctional staff respond to a patient not leaving their cell/coming to medication administration, Commissioner Carney responded "Depending on the duties or activities of the day, the officer is going to notify that the person is not showing. And then after they've done whatever duties there are presently completed they can then as part of their tour of the area, walk around, engage the individuals, and notify medical that the person did not report or wasn't sent." (p 46)

I have also reviewed the deposition transcript of Sandy Varghese, a nurse who works as the County Healthcare Coordinator, which she describes in the following manner; "But I oversee the health care contract for the City of Philadelphia." (p 13) She testified that she conducted some audits of care herself and also relied on the outside auditors for their twice per year reports as well as some comments from them in the wake of deaths among PDP patients. (p 21) She also testified that she did not conduct audits regarding diabetes care but that the vendor, YesCare, did some audits relating to diabetes and gave these reports to her although she could not recall the results or findings of these audits. (p 24) When Ms. Varghese was asked about the outside monitors assessing the need for emergency department transfer because of inadequate care in PDP, she responded as follows:

"Q. Did he ever look at whether or not somebody has to go to the emergency room because they are not getting the level of care they were supposed to while in PDP custody?

A. He has not looked at that specifically." (p28)

She also testified that she did recall improper handling of refusals as something that had been raised in quality improvement settings but could not recall the specific times this had occurred. (pp 28, 29)

I have reviewed the deposition transcript of Mariesha Apollon. Ms. Apollon worked in PDP as a nurse at the time Mr. Jung was incarcerated in 2023. Nurse Apollon reported working in both intake and medication administration roles in PDP. She also testified that she received no training on how to utilize the refusal forms at CFCF. (p54) She also testified that at some point, she had reached out to YesCare (a nursing supervisor named Smith) for direction on how to handle medication refusals and was told that there was no specific or additional training for her. (p53)

I have reviewed the deposition transcript of Dr. Lalitha Trivikram who worked at PDP for YesCare and was the site Medical Director at CFCF in late 2023. Dr. Trivikram testified that she reviewed paperwork for hospital returns when it was placed in her inbox but that it did not always occur that this paperwork was placed into her inbox. (p37) She also testified that she reviewed medical records several times for Mr. Jung in relation to hospital returns. (p122) When asked about infirmary placement for patients returning from hospital admissions, she testified as follows:

> "When a patient returns from the emergency room after an inpatient stay, do they come back to CFCF if they left from CFCF; do they go to the Detention Center for the infirmary? Does it depend?

A. They usually end up in the infirmary, and they are in the infirmary until they're seen by the infirmary doctor. On rare occasions, if there is limited space in the infirmary and the patient is returning in very stable condition, they may get transferred back CFCF.

Q. But the normal practice is for the person to go to the infirmary after an inpatient stay?

A. Yes."

When asked about missing glucose measurements from MAR records, Dr. Trivikram testified that those glucose reading might be stored elsewhere besides the MAR part of the patient's records, but when asked whether each patient's electronic health record included their actual blood glucose results, she testified as follows:

"Q. When you pull up a patient's electronic health record, does it have glucose readings in it for a diabetic patient?

A. In ECW, unless it is checked at the time of an encounter, no."

When she was asked further about whether each blood glucose reading was somehow present in a patient's electronic medical record, she testified "I don't know if they pull the Accu-Cheks and put them in the Electronic Health Record. They pull this, the Medication Administration Record, and put that in. I do not know if the Accu-Cheks get put in there as well." (p176)

When asked about the documentation of insulin being "Not documented", she testified that this might mean that the medication was given, but it also might mean that is was not given:

"Q. Okay. If it was not documented, if it was not administered, or the Humulin was not administered, should that have triggered a red flag incident?

A. If it was not administered, then yes. But if it's not documented, that doesn't necessarily mean it was not administered."

When asked how or why insulin could be recorded as not documented in one part of the medical record but also be recorded as given in another view of the patient's medical, she testified "It's an imperfect system."

When asked about increasing or changing the frequency of blood glucose checks and insulin administration for a patient, Dr. Trivikram testified that this was "challenging" and when asked whether the infirmary was a place that this level of care could be accomplished, she testified that "The infirmary, yes, but the infirmary level of care is for patients who require a lot more than just a specific insulin time. They require wound care, they're paraplegic. They need to be turned, they need to be moved. It's for a much higher level of care."

When asked how Mr. Jung's level of care was increased or tailored after his progressive hospitalizations, Dr. Trivikram testified as follows:

"We continued the same things we always did. We continued to try to see him for chronic pain. We continued to try to get him his blood work. We continued to send him to off-site appointments. We continued to try to administer insulin. We continued to do everything we could, but we could not overcome his noncompliance and his persistence in noncompliance with diet, which we did not have any control over, or his walking out of visits with providers, which we could not control. So we provided the same standard of care that we would for every patient

16

every time Mr. Jung returned." (p180) When asked about seeking outside specialty care for Mr. Jung, she testified "We tried to send him out to an endocrinologist; we tried to get a specialist to help us out, but there was literally no one who could help us with the noncompliance." (p181)

When asked specifically about the hospital discharge plan for Mr. Jung in March 2023 that stated he needed an additional dose of mealtime basal insulin and blood sugar checks four times per day, Dr. Trivikram testified as follows;

"Q. It says here the patient's blood glucose needs to be monitored four times per day. He would need a base dose of mealtime insulin in addition to sliding scale, as well as basal insulin. Do you know if Mr. Jung was ever prescribed Accu-Cheks four times a day?

    A. I don't think he was prescribed four times a day. We couldn't get him to comply with twice a day. So I don't know that it was specifically ordered for him four times a day." (p219)

She also stated that checking insulin four times per day would be possible at CFCF "With a compliant patient, we could try to make it work, yes." (p219)

When asked whether Mr. Jung's prior medical records should have been reviewed by the provider on 10/28/23 when he arrived from Norristown with a blood glucose level of 542 and ketones in the urine, Dr. Trivikram testified "Again, they could have looked into the history." (p227). When asked if anything further should have been done for Mr. Jung, Dr. Trivikram testified that a blood sugar check should have been repeated in an hour or two but did not mention any follow up for symptom check or need for further evaluation based on the positive ketones. In addition, she testified that a 14 day period for lab tests was "not unreasonable". (p239)

When asked about how a provider would see a red Flag notification for a patient, Dr. Trivikram testified that "It may have been something that nursing staff informed her of, that the patient had been missing doses of insulin." (p244)

I have reviewed the document "YesCare Clinical Pathways: Diabetes Mellitus". This document does not appear to be a site-specific policy relating to PDP but does include general guidelines for correctional diabetes diagnosis and management. This first element listed under evaluation and management is "Prior A1C and blood sugar results". This document also indicates that for any A1C over 8, the test should be rechecked every three months. The section on the insulin coverage protocol (Corrective Regular Insulin Coverage, CRIC) states that a provider order is required for this medication and that blood glucose logs must be reviewed "at least weekly to make necessary adjustments to basal regiments with the goal of eliminating the need for CRIC."

I have reviewed the PDP Special Investigations report for Mr. Jung. (City-Jung-0001), which found negligence in his death from both correctional and medical staff. This report identifies several problems in the care provided to Mr. Jung including correctional and medical staff not monitoring or rendering aid to Mr. Jung as required as well as failures to call for emergency response equipment and failure in how refusals of care/treatments were handled. This report also identifies numerous refusals of insulin and blood glucose checks that were never entered into the PDP Red Flag system.

I have reviewed the PDP Special Investigations reports on 58 deaths in the PDP. (CITY014194-CITY015338). These reports span approximately 900 pages and many of these cases included substantiated findings regarding failures to render care or aid to a person in distress or adequately monitor a person.

Many of these cases included findings that correctional staff failed to properly monitor or respond appropriately to a patient in medical distress outside the infirmary, including the following deaths:

1. SI-14-10-02 (2014)

2. SI-17-00235 (2017)

3. SI-18-00014 (2018)

4. SI-19-00088 (2019)

5. SI-19-00145 (2019)

6. SI-20-00045 (2020)

7. SI-20-00231 (2020)

8. SI-21-00225 (2021)

9. SI-21-00003 (2021)

10. SI-22-00105 (2022)

11. SI-21-00059 (2021)

12. SI-21-00234 (2021)

13. SI-21-00027 (2021)

14. SI-21-00009 (2021)

15. SI-21-00106 (2021)

16. SI-20-00149 (2020)

Several cases had findings that specifically related to medical staff not adequately responding to a patient in distress or correctional staff not taking required steps for patient refusals or making a health referral for a patient in the Lock and Track system. These included the following;

1. SI-18-00082 (2018)

2. SI-19-00145  (2019)

3. SI-19-00088 (2019)

4. SI-22-00105 (2022)

In addition to these records, I have reviewed the YesCare Patient Safety Event Committee Report from 6/23/25. (YesCare This document identifies several problems with the care for Mr. Jung, including the following;

- Nursing staff not properly document urine test
- Nurse filing to utilize Hyper/Hypoglycemia NET during intake screening or schedule a follow up
- Nursing staff failing to properly document hyperglycemia
- Nurses improperly documenting "No Show" for insulin including no CRIC documented
- Nurses failing to document in the EMAR
- Nurses filing to obtain signed refusals or schedule red flag appointments
- Provider failing to follow up after being notified of a patient with BS 542 and positive ketones

I have also reviewed a document titled "Chart 18 Jung Corrective Action Plan". This document includes 13 "opportunities for improvement" which correlate with the problems identified in the Patient Safety Event Committee Report. Twelve of the 13 items are addressed with a strategy that involves the retraining or signature of acknowledgement of an individual person. One other item was marked as pending at the time the document is written.

I have also reviewed YesCare diabetes audits or quality assurance reports leading up to Mr. Jung's death, from July 2022 through August 2023.(Charts 2,3,4,5,6) these audits do not appear to include two of the most basic and critical parts of diabetes care, whether the patients are having their blood sugar checked as needed, and whether they are receiving insulin as needed. The areas included in these audits relate to long term diabetes control, such as laboratory testing for HbA1C and vaccination status, but there is no review or audit of the areas relevant to every patient in jail with insulin dependent diabetes, blood sugar checks and insulin administration.

I have also reviewed a YesCare document titled "Insulin Re-Audit September 2024". This document presents several areas of needed improvement in diabetes care within the PDP.


**Findings:** Review of the information I have detailed above indicates the following failures in the care provided to Mr. Jung while in PDP.

1. <u>Failure to provide basic care for diabetes.</u>

The care provided to Mr. Jung in the care of PDP was deeply flawed. When Mr. Jung arrived in the facility 10/28/23, there was no review of his prior records or insulin regimen to understand that he had been recently hospitalized multiple times with DKA, a potentially fatal complication of diabetes. This is a failure by the nurse and the provider, since both had access to his prior records and should have reviewed them for warnings about potentially fatal or serious health problems, including recent hospitalizations for DKA. This also reflects a failure of the health service to have a process that makes this type of review mandatory. Given the serious presentation of Mr. Jung, with markedly elevated blood sugar and ketones in his urine, it was also imperative that he be assessed by a provider at the time of his intake, not simply screened by a nurse, to make an assessment of whether he was again slipping back into DKA.

This failure was compounded by the lack of any adequate response to Mr. Jung's extremely elevated blood glucose level of 542 and the presence of ketones in his urine. This combination represents potential DKA and absolutely requires a higher level of assessment that includes measuring the anion gap determining the level of fluid shift/loss and initiating close monitoring of his electrolyte, blood sugar and hydration levels. This is the type of assessment, treatment and monitoring that requires hospital transfer.

Mr. Jung's case exhibits several other failures in his diabetes care before his return from Norristown Hospital on 10/28/23. One of the most glaring failures is the broken system for recording of actual blood glucose values in Mr. Jung's medical records. The testimony of the Site Medical Director, Dr. Trivikram, highlighted that blood glucose might or might not be present in the MAR or the patient's electronic health record. This is extremely damaging to the care of a patient like Mr. Jung because both nurses and providers need to see the blood glucose values alongside the insulin administrations when they are reviewing his health status.

It is also apparent that the Red Flag system and overall refusal practices were deeply flawed in Mr. Jung's case and more generally for PDP patients at this time. Major Powers testified that the Red Flag process that involved both custody and health staff whereby a patient who misses medications or care would be identified by medical staff via their MAR's and then placed on the Red Flag list so that security could take some action. Major Powers testified "They place them on a Red Flag Medication Compliance List provided to the security staff. We then have to bring those inmates to medical staff, usually in the medical area where the inmate is counseled on missing, whether it be three straight doses of a life-sustaining or patterns or just refusing certain medications". There is no evidence in Mr. Jung's medical records that this process was being followed with any consistency and the YesCare Patient Safety Committee meeting regarding Mr. Jung also documents failures in this area. The testimony by Major Powers that there were no audits of the Red Flag system helps to explain why it was not functioning for Mr. Jung. Any system that requires so many steps and multiple types of staff is prone to breakdowns or simply not being performed unless carefully overseen.

Dr. Trivikram testified about another area of ambiguity relating to whether a patient not receiving medication would trigger a Red Flag appointment. She testified that a patient's medical records might indicate their insulin or other medication was recorded as not documented but that "If it was not administered, then yes. But if it's not documented, that doesn't necessarily mean it was not administered." This confusing system appears to reflect the reality that some patients may have their medication recorded as not documented in one part of their medical records but that the medication might be documented elsewhere as administered. Based on my own experience overseeing medication administration, this type confusing system reduced the likelihood that staff will know with certainty that a medication was not given and thus, may simply not create Red Flag appointments or notifications.

My review of the available information indicates that these failures reflect systemic problems with how health care is delivered at PDP, not simply individual errors. The most alarming failure in Mr. Jung's case is that when he was seen with dangerously elevated blood glucose and ketones in his urine, he was not transferred for a higher level of assessment. The systemic nature of this exact problem was identified in an internal YesCare review many months after Mr. Jung's death.

20

The Insulin Adherence Re-Audit from September 2024, had the stated goal of "an audit was conducted to analyze insulin administration adherence in the Philadelphia Department of Prisons." This internal review included data from dozens of diabetic patients across PDP sites and reached the following conclusion; "**Areas In Need Of Improvement:** Treatment of patients with a high blood sugar has not improved."

Based on my review of Mr. Jung's records, there are multiple systemic contributors to these failures. The intake form utilized when Mr. Jung returned to PDP did not have a clear and required field to document review of prior records. This is an important element to include in the initial intake form so that the health staff seeing the patient entering the facility review prior diagnoses, hospitalizations and medication regimens. Mandating this type of review (along with quality assurance to ensure that it occurs) is essential to identification of high risk patients like Mr. Jung.

The failure to ensure that Mr. Jung was re-assessed in the hours after his intake for his diabetic control is a glaring error that also may reflect a systemic problem. Mr. Jung needed hospital evaluation for assessment of potential DKA, but even with that error made by the provider who saw him, it is stunning that there was no automatic encounter generated to be reassessed later on the 28th or early on the 29th when he was seen for a blood glucose over 500 and with a urine test showing ketones in his urine. This failure reflects a lack of adherence to the YesCare Diabetes Clinical Pathway. Based on that document, Mr. Jung's blood glucose should have been rechecked after 2 hours and he should have been seen by the provider the next day.

Another systemic failure is the lack of automatic recording of blood glucose values into the medical record of a patient. Any medical exam or test result obtained as part of a patient's care must be included in their medical records. These results are commonly included in flow sheets for vital signs and other basic diagnostic tests that can be reviewed in trends over time. I did not see any such records in Mr. Jung's medical records. The need for a medical record that includes a patient's diagnoses, diagnostic tests, flow sheets of significant findings and treatments and other basic elements is one of the essential standards of the National Commission on Correctional Health Care.[13] In the case of diabetes, tracking blood sugar values together with patient insulin regimen and HbA1C is critical for assessing glycemic control. Mr. Jung's last HbA1C value was an alarming 12.7 in February 2023. This represents a significant increase from an already elevated level and indicates a rapid worsening of his level of control over prior months. Increasing HbA1C is associated with numerous serious complications including increased risks for cardiovascular disease, kidney disease and death.[14] When he returned to PDP, there was no review or appreciation of that extremely elevated value, but equally problematic, there is no record of the few blood glucose checks that did occur between October 28th and November 6th. These checks are documented as occurring several times, and administration of regular insulin is also documented albeit without documentation in Mr. Jung's medical record of the dose given. Failure to document the blood glucose values and regular insulin administration dosages for Mr. Jung within his electronic health record contributed to the lack of clarity about his worsening level of glycemic control and these appear to reflect systemic problems with how the health

---

[13] NCCHC Standards for Health Services in Jails. 2018. Standard J-A-08, Health Records.
[14] https://pmc.ncbi.nlm.nih.gov/articles/PMC4395238/ and
https://pmc.ncbi.nlm.nih.gov/articles/PMC2766035/.

service operated. Based on review of this information, it is clear that YesCare failed to provide adequate diabetes care for Mr. Jung.

2. Failure to house Mr. Jung in the Jail Infirmary prior to his death

By the time Mr. Jung returned from his inpatient psychiatric stay on 10/28/23, he had already been sent to the emergency department 6 times with DKA and hyperglycemia. His HbA1C has skyrocketed from 9.3 to 11.2 to 12.7. His medical records were full of over 1000 instances of medications (including insulin) and blood glucose checks being not documented, refused, or him being a 'no show'. He was clearly a patient with a serious illness that was not controlled and who had already become so ill as to need hospitalization numerous times. It is hard to conceive of a patient who needed an infirmary setting more than Mr. Jung and the failure to immediately house him in the PDP infirmary reflects a failure of the provider who saw him, but also a failure of YesCare and PDP because of the lack of effective alerts to trigger this automatic transfer.

The consistent opinion of YesCare clinical leaders that Mr. Jung did not need or deserve infirmary level care appears driven by two conflicting opinions, both of which are dangerous and wrong. The first erroneous opinion, reflected by both Dr. Bradley's actions and Dr. Trivikram's actual testimony, is that needing a regimen of insulin and glucose checks four times per day was not sufficient to warrant infirmary level of care. This is exactly what hospital physicians stated was necessary when Mr. Jung returned from his DKA admission in March 2023, his 5th hospital transfer for diabetes complications. His DKA was expressly attributed to the lack of this level of care was expressly called out by in his hospital discharge plan.

The second erroneous opinion expressed by Site Medical Director Dr. Trivikram is that Mr. Jung did not warrant or deserve infirmary level of care because of perceived refusals. When an incarcerated patient is perceived as not following a life-sustaining plan of care in general population, infirmary level assessment/care is exactly what they and the health service need. This is essential to understand the reasons behind their issues with compliance and come to grips with the potential contribution of their own poorly controlled disease, other medications or mental health issues as driving what is perceived as willful noncompliance. It is also essential to utilize the infirmary to maximize the care and monitoring for patients who are known to face serious or fatal outcomes if their disease is not better controlled. Mr. Jung was known to be such a patient after his numerous hospital transfers for DKA.

The note by Dr. Bradley on 3/20/23 marks a clear decision point by YesCare to ignore the direction of hospital physicians that the status quo was not working and that Mr. Jung's DKA was attributable to systemic flaws in their plan of care, not Mr. Jung's so called noncompliance. Dr. Bradley documented the rejection of hospital recommendation for four times daily blood glucose checks stating that this was not possible due to staffing shortages at PDP. This represents a conscious decision that refused a higher level of care for Mr. Jung despite clear communication that this higher level of care was needed to prevent potentially fatal DKA.

The testimony of Dr. Trivikram, who was a Site Medical Director at CFCF, also echoed the same overt decision that a patient who needed a higher level of care to receive insulin and glucose checks would not be an appropriate infirmary patient. She testified that this was "challenging" and when asked whether the infirmary was a place that this level of care could be accomplished,

she testified that "The infirmary, yes, but the infirmary level of care is for patients who require a lot more than just a specific insulin time. They require wound care, they're paraplegic. They need to be turned, they need to be moved. It's for a much higher level of care."

Despite the hospital physician clearly documenting that Mr. Jung had suffered a potentially fatal complication of diabetes, DKA, and that this complication was attributable to the insulin and blood glucose checks occurring only twice daily, Dr. Trivikram repeated the opinion that Mr. Jung's diabetes complications were the product of his own compliance not the lack of a higher level of care.

Even if Mr. Jung's worsening health was driven in part or whole by his noncompliance with medication and glucose checks in the general population setting, transfer to the infirmary was needed so that staff could work with him to understand the source of his issues with compliance and work to provide a higher level of care. My own experience as a physician, Medical Director and Chief Medical Officer of a jail system is that patients who require life-sustaining medications or treatments and who appear to have compliance issues in general population are exactly the type of patients we need to quickly transfer to the infirmary to understand the true issues with their care, maximize the monitoring and treatment we can provide and reduce their risk of death. Three groups of patients who fit this profile and for whom I directed infirmary transfer when there were apparent issues with compliance with life-sustaining care were patients with insulin dependent diabetes, epilepsy and hypertension.

There is well-established confusion and overlap between refusals of care and patients with uncontrolled diabetes exhibiting behaviors that are actually a product of their disease complications. A 2019 review of "High Risk Situations for Diabetes Patients" in CorrectCare (the NCCHC Journal) stated "Recognizing that the behaviors exhibited are related to the diabetes and not behavioral or noncompliance issues is essential and potentially lifesaving."[15]

Concrete examples of this issue are apparent in Mr. Jung's medical records. The series of events between 1/20/23 and 1/23/23 are one example. The medical records from this time show that staff were failing to conduct adequate clinical assessments, continuing to state that Mr. Jung was refusing care, and essentially ignoring his developing medical emergency as a potential contributor to his ability to even understand and engage in his care. During this time, the note by PA Sarskaya on 1/20/23 documents that "Pt is not coming out for any medication or accu check . pt is complaining of pain and said that's why he isn't coming out (per referral )." But this note has a blank assessment and plan and there is no follow up later that day or anytime subsequent about the type of pain causing Mr. Jung to not come out of his cell. He was ultimately diagnosed with DKA and pneumonia several days later and these failure represent extremely substandard care. The next provider encounter two days later by NP Henderson-Hamwright documents that Mr. Jung was experiencing hyperglycemia and ketones in his urine as well as nausea, vomiting and wanting to lay on the stretcher. But this encounter at 8:30 am does not include any assessment of potential DKA and also fails to trigger any follow up by a provider later in the day. These encounters clearly show Mr. Jung experiencing a serious worsening of his health and inability to engage in his own health care. But even on the day he was vomiting with elevated blood glucose and ketones in his urine, his desire to lay on a stretcher and thirst was interpreted as refusal of care. Even in this weakened and dire state, Mr. Jung was not seen again by a

---

[15] High Risk Situations for Patients With Diabetes. Correct Care. Vol. 33, Issue 1, 2019, p11.

provider that day or the following night. When he was finally seen the following morning, his health and mental status had deteriorated to the point that nursing staff documented "pt continues to be disoriented unable to obtain urine sample, pt seen by triage provider n/o to send pt out VIA 911, for further eval".

3.  Failure to conduct basic oversight of the adequacy of care leading up to Mr. Jung's Death

I have identified in the finding above that YesCare failed to provide adequate diabetes care for Mr. Jung . The information I have reviewed also reveals a glaring lack of clinical oversight by the County of the adequacy of care that YesCare was providing.

Testimony by the County's own contract manager, Nurse Varghese, indicates that the County did not conduct any independent audits concerning diabetes care and she could only recall generally that the vendor, YesCare, had performed some sort of audits relating to diabetes but could not recall the details or times they were conducted. She also indicated that the outside physician monitors employed by the County had never looked to see whether lapses in diabetes care led to preventable hospitalizations.

The YesCare diabetes audits leading up to Mr. Jung's death do not appear to include two of the most basic and critical parts of diabetes care, whether the patients are having their blood sugar checked as needed, and whether they are receiving insulin as needed. These are two critical tasks relevant to every patient in jail with insulin dependent diabetes, blood sugar checks and insulin administration. The failure of Yescare to review or audit these aspects of care should have prompted the County to undertake their own audits of these areas.

This failure to effectively monitor YesCare's diabetes care represents a serious deficiency by the County because complications of diabetes are a common source of morbidity and mortality in jail healthcare. In addition, PDP itself had experienced numerous patient hospitalizations for diabetes related illness in the years before Mr. Jung's death. There were more than 60 hospital transfers of patients with apparent diabetes complications among patients within PDP custody between 2020 and the time of Mr. Jung's death in 2023. In addition, review of the YesCare audits relating to diabetes care before Mr. Jung's death (Charts 2,3,4,5,6) showed there was no tracking of insulin administration or blood glucose monitoring for patients.

A central aspect of the Country's oversight failure leading up to Mr. Jung's death is the purported "Red Flag' system that was supposed to capture key refusals or missed care instances so that morbidity and mortality could be prevented. The PDP report on Mr. Jung's death identified numerous instances when Mr. Jung's refusals of insulin and blood glucose checks were never entered into the PDP Red Flag system. Deposition testimony of Major Powers indicates that there was no regular auditing done of this system.

The lack of effective oversight and guidance for how to handle refusals was also apparent in the testimony of Nurse Apollon. She testified that she sought but did not receive additional training on how to approach insulin refusals among diabetic patients.

The failures in the Red Flag system were made worse by the confusing and inoperable approach to recording blood glucose levels in the YesCare electronic medical records. Dr. Trivikram described a system that allowed for some people to have "Not Documented" entered into their

24

MAR when a task was actually completed while others might have entered "Not Documented" when the task was not done. Dr. Trivikram also testified that blood glucose results might or might not be pulled into the patient's MAR or medical records.

One of the mandated tasks in the YesCare Clinical Pathways document for diabetes was review of prior blood sugars and weekly review of blood glucose logs by a provider. This type of review was nearly impossible given the lack of clarity about whether these results were located and also given how prevalent the problem of accuchecks simply not occurring was. This is exactly the type of systemic problem that County oversight should have detected because it seems to reflect an interaction between how their vendor provided care, how the electronic medical record stored or recorded blood sugar results, and how workflows for nursing and medical staff intersected.

My review of the PDP Special Investigations reports for 58 deaths in the PDP. (CITY014194-CITY015338) also showed that there were multiple sustained findings when officers and/or medical staff failed to make rounds or render emergency care. This is relevant to the lead up to Mr. Jung's death because like the failures in the "Red Flag" system, these findings indicate an inability to keep patients safe or monitor their well-being. These types of documented failures should have prompted the County to implement auditing of nonfatal medical emergencies to track and improve routing monitoring and emergency responses. This knowledge should have also triggered auditing by the County of the infirmary referral process to ensure that patients who could suffer fatal outcomes when not properly cared for or monitored would be reliably sent for increased monitoring and care in the infirmary. This is very relevant to Mr. Jung's case because while two of the additional cases I reviewed did show that diabetic patients were sometimes sent to the infirmary for more monitoring and care, this was not done for Mr. Jung.

In addition, the County's outside physician auditors appear to have identified problems with how refusals were handled, without apparent corrective action plans. Taken together, the knowledge that patient deaths (in 16 instances) involved a failure to monitor or render aid, and that flaws existed in handling refusals should have prompted the County to ensure that any patients who were identified as high risk were cared for in an infirmary setting, especially when those patients required care beyond what was available in the general population setting. This knowledge also should have prompted auditing of refusal processing as well as tracking how lapses in diabetes care and other chronic health problems led to hospitalizations. Instead, Dr. Bradley seems to have documented very clearly on 3/20/23 that the systemic problem of not having a way to safely care for Mr. Jung in general population setting would simply result in a lower level of care than he needed.

The NCCHC essential standard on Continuous Quality Improvement clearly identifies that "One essential element of quality improvement is the monitoring of high-risk, high-volume, or problem prone aspects of health care provided to patients.[16] Three of the core areas of care to be monitored in this standard are chronic care, transfers to urgent/emergency care and infirmary care. Review of information in this case indicates that leading up to Mr. Jung's death, the County was simply not monitoring whether their patients with diabetes were receiving adequate blood glucose monitoring, insulin administration, the refusal and Red Flag process. Further, the

---

[16] NCCHC Standards for Health Services in Jails. 2018. Standard J-A-06, Continuous Quality Improvement.

information I have reviewed indicates that the Country was failing to monitor the very basic question of whether failures, lapses or deficiencies in diabetes care were contributing to diabetic complications and hospitalization.

The relevance for reviewing the additional cases of Patients 1-4 is to provide better understanding about whether the deficiencies in Mr. Jung care represented systemic problems with the health service. As I have detailed in my methodology section, a systemic problem is one that does not involve a single person's error in judgment or action but instead represents a feature of how the health service operates, with built in deficiencies in workflow, oversight, training or staffing. Systemic problems can occur across different patients and across time as the built-in deficiencies go unaddressed. Finding a systemic problem in health services is different than conducting a research study to determine the exact prevalence of that problem with fixed confidence intervals. I have taken both approaches numerous times in correctional health settings but the first step is to identify the presence of a systemic problem. In the case of Mr. Jung, his records show multiple gross deficiencies in the care he received leading up to his death and review of these additional four medical records also provides insight to how these problems were systemic, not just one off or unlucky outcomes.

These records show that prior to Mr. Jung's death, there were other patients experiencing life-threatening complications with diabetes who were not being re-checked after their blood sugar was found to be dangerously high or low. These records also show that many of the instances when blood sugar was ordered to occur, it was not done, either with of a 'not documented' code or some other reason. Finally, these records also show that lack of a clear tracking of blood sugar values in the medical records, something that was also present in Mr. Jung's case and which was also identified by the Site Medical Director in her testimony as "imperfect".

These problems reflected deficiencies in how the health system operated, not a failing of one single person. It was the County's responsibility to monitor this critical area of care but by their own admission, they conducted no independent audit of diabetes related care. They also failed to look retrospectively at diabetes-related hospitalizations to assess whether a lack of care contributes to the hospitalization, something that would quickly identify multiple problems with both the care being provided by the vendor, and their internal quality assurance efforts.

It is clear that the County had more than adequate knowledge about key failures in the YesCare approach to patient care before Mr. Jung died. The County's own physician auditors had identified problems with refusal processing for which there was no corrective action plan. The County had failed to conduct independent audits of the diabetes care or whether lapses in care contributed to emergency hospital transfers before Mr. Jung died, despite ample evidence that patients with diabetes (including Mr. Jung) experienced numerous hospitalizations for complications of diabetes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 3, 2025.

Homer Venters MD, MS

**Dr. Homer D. Venters**
hventers@gmail.com

| **Health Administrator** | **Physician** | **Epidemiologist** |
|---|---|---|

*Professional Profile*

- Award winning epidemiologist focused on the intersection of health, criminal justice and human rights.
- Leader in provision and improvement of health services to patients with criminal justice involvement.
- Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

*Professional Experience*

**Medical/Forensic Expert**, 3/2016-present
- Independent correctional health monitor
  - Cumberland County Jail, NJ (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail.
  - Fluvanna Women's Correctional Center, VA (ongoing). Serve as independent, court-appointed health services monitor in a women's prison.
  - Santa Barbara County Jail, CA (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail Complex.
  - VI Department of Corrections (ongoing). Serve as independent, court-appointed monitor of health services in St. Thomas detention facility.
  - HI Department of Corrections (COVID-19 only 9/2021-3/2022).
  - CT Corrections Department (COVID only, 2020).
- U.S. Department of Justice, Civil Rights Investigations medical expert, 2019-present. Work with the USDOJ to investigate correctional health conditions and provide recommendations for addressing.
- State Attorney's General, provide expert consultation and investigation regarding correctional Health (CA, NY, IL).
- Other litigation, see testimony below.
- Conduct analysis of health services and outcomes in detention settings.
- Conduct site inspections and evaluations in detention settings.
- Produce expert reports, testimony regarding detention settings.

**Member, Biden-Harris COVID-19 Health Equity Task Force,** 2/26/21-10/31/21
Work with Task Force members to provide President Biden with interim recommendations to address COVID-19 Health inequities.
  - Work with Task Force and Federal partners to produce final report, recommendations and implementation plan for reducing inequities in COVID-19 and other pandemic responses.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.
- Lead COCHS efforts to provide technical assistance, policy guidance.

- o    Oversee operations and programmatic development of COCHS.
- o    Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
- o    Lead COCHS efforts to expand Health Services in Jails.
- o    Develop strategy for non-profit models of jail diversion/health care.

**Director of Programs,** Physicians for Human Rights, 3/17-11/18.
- o    Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- o    Expand forensic documentation of mass killings and war crimes.
- o    Develop and support sexual violence capacity development with physicians, nurses and judges.
- o    Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.
- o    Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
- o    Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
- o    Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
- o    Reduced overall mortality in the nation's second largest jail system.
- o    Increased operating budget from $140 million to $160 million.
- o    Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.
- o    Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.
- o    Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.
- o    Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
- o    Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.
- o    Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
- o    Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
- o    Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.

o       Developed training program with Montefiore Social internal medicine residency program.
o       Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

*Education and Training*
**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.
**Resident, Social Internal Medicine,** Montefiore Medical Center/Albert    Einstein University7/2004-
5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989.

*Academic Appointments, Licensure*
Adjunct Faculty, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.    New York (2007-present).

*Print articles and public testimony (last 15 years)*
Testimony: United States House of Representatives Subcommittee on Crime, Terrorism, and Homeland
Security, Judiciary Committee 1/21/22.

Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill
8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention
centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  New York State Assembly
Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee
on Correction. NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use
of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

*Peer Reviewed Publications (last 15 years)*

**Venters H.** Preventing Another Fifty Years of Mass Incarceration: How Bioethics Can Help. Hastings Center Report. 2023 April; 53(6).

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

K. Parmar, Jennifer Leigh, Ernest Thomas, Douglass Curry, **Homer Venters**, Andra Gilbert, Tamaryn Nelson, Ed Lester. Confl Health. 2019; 13: 41. Published online 2019 Sep 16.

Messner N, Woods A, Petty A, Parmar PK, Leigh J, Thomas E, Curry D, **Venters H**, Gilbert A, Nelson T, Lester E. Qualitative evidence of crimes against humanity: the August 2017 attacks on the Rohingya in northern Rakhine State, Myanmar. Confl Health. 2019 Sep 16;13:41.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated. *J Health Care Poor Underserved.* 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**. Feasibility of Treating Hepatitis C in a Transient Jail Population.

5

*Open Forum Infect Dis.* 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care.* 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health.* April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, **Venters H.** Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, **Venters H**. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health.* 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health.* 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization.* 2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters** Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved*. 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care*. 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H**. The Triple Aims of Correctional Health:    Patient        safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009.
*Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in
New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

*Honors and Presentations (past 15 years)*
**Invited presentation,** Yale Law School/Liman Colloquium, Death investigation and models of carceral care. Yale Law School, New Haven, CT. 4/9/24.

**Invited presentation,** United Nations Office of Drugs and Crime, Presentation on Custodial Death

Investigation. Malina, Philippines (remote), 3/18/24.

**Invited presentation,** Jail and Prison Health and Human Rights, Oklahoma University School of Health Sciences, 2/13/22.

**Invited presentation,** COVID-19 and Carceral Health, Stanford University Schools of Engineering and Public Health, 2/23/22.

**Invited presentation,** Screening and treatment for sexually transmitted infections in justice. National Academy of Sciences Committee on Law and Justice, remote, September14th, 2020.

**Invited presentation,** Vaccination for COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, August 20th, 2020.

**Invited Presentation,** Documenting Deaths in Custody, National Association for Civilian Oversight of Law Enforcement (NACOLE), remote, August 3rd, 2020.

**Invited Presentation,** Decarceration and Health. Radcliffe Institute/Harvard University. Policy Series. Remote. 6/23/20.

**Invited presentation,** COVID-19 in correctional settings. Briefing for U.S. Senate Staff, sponsored by The Sentencing Project, remote, May 29, 2020

**Invited presentation,** COVID-19 in correctional settings. Briefing for Long Island Voluntary Organizations Active in Disaster , sponsored by The Health & Welfare Council of Long Island, remote, May 29, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, May 12, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Association of Counties, Justice and Public Safety Committee, remote, April 1, 2020.

**Keynote Address,** Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina, postponed.

**TedMed Presentation**, Correctional Health, Boston MA, March 15, 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation,** Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable

care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation,** Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

*Teaching & Other Health & Human Rights Activities*

**United Nations Office of the High Commissioner of Human Rights,** Istanbul Protocol, contributor to 2022 updated protocol.

**Instructor,** Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-2020.

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University,

June 2015, June 2014, April 2019.

**DIGNITY Danish Institute Against Torture,** Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps,** Draconculiasis Eradication, Togo West Africa, June 1990- December 1991.

*Books*
**Venters H.** *Life and Death in Rikers Island.* Johns Hopkins University Press. 2/19.


*Chapters in Books*

**Venters H.** COVID-19 and the Struggle for Health Behind Bars. In *Excessive Punishment.* Columbia University Press, 2024.

**Venters H.** Asylum Evaluation in Detention Settings. In *Asylum Medicine: A Clinician's Guide.* Springer Publishing 2022.

**Venters H.** Mythbusting Solitary Confinement in Jail. In *Solitary Confinement Effects, Practices, and Pathways toward Reform.* Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In *Decarceration.* Ernest Drucker, New Press, 2017.


*Prior Testimony and Deposition*

- Benjamin v. Horn, 75–cv–03073–LAP (S.D.N.Y.). Expert for Defendants 2015.
- Newbrough v. Piedmont Regional Jail Authority, 3:10CV867–HEH (E.D.V.A. 2011). Expert for Plaintiffs.
- Rodgers v. Martin, 2:16-cv-00216 (N.D.T.X.). Expert for Plaintiffs 10/19/2017
- Fikes v. Abernathy, 7:16-cv-00843-LSC (N.D.A.L.). Expert for Plaintiffs 10/30/20017
- Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.N.Y. 2017). Defendant in role as City Employee, 4/10/2018.
- Charleston v. Corizon Health Inc., 2:17-cv-03039-MAK (E.D. P.A.). Expert for Plaintiffs 4/20/2018.
- Atencio v. Board of Cnty. Comm. of Sante Fe Cnty., 1:17-CV-00617 WJ/KK (N.M.). Expert for Plaintiffs 7/23/2018.
- Hammonds v. Dekalb Cnty. , 4:16-cv-01558-KOB (M.D.A.L.). Expert for Plaintiffs 11/30/2018.
- Mathiasen v. Rio Arriba Cnty., 17-CV-1159 JHR/KBM (N.M.). Expert for Plaintiff 2/8/2019.
- Hutchinson v. Bates, 2:17-cv-00185-WKW-SMD (M.D.A.L.). Expert for Plaintiff 3/27/2019.

- Lewis v. East Baton Rouge Parish, 3:16-cv-00352-JWD-RLB (M.D.L.A.). Expert for Plaintiff 6/25/2019, 7/1/2019.
- Belcher v. Lopinto., 2:18-cv-07368-JTM-DPC (E.D.L.A.). Expert for Plaintiffs 12/5/2019.
- Zavala v. City of Baton Rouge, (NO. 3:17-656-JWD-EWD). Expert for Plaintiff. 3/6/2020.
- Imperati v. Semple, 3:18-cv-01847-RNC (C.T.) Expert for Plaintiffs 3/11/2020.
- Camera v. Semple, 3:18-cv-01595 (C.T.). Expert for Plaintiffs 9/23/2020.
- Staten v. Semple, 3:18-cv-01251 (VAB) (C.T.). Expert for Plaintiffs 2020.
- Woodward v. Lopinto, 2:18-cv-04236-MVL-KWR (E.D.L.A) Expert for Plaintiffs 12/1/2020.
- U.S. v. Pratt, 2:19-cr-00213-DWA (W.D.P.A.). Expert for Defendant 4/28/2020 (Video hearing).
- U.S. v. Nelson, 1:19-cr-00021-DSC (W.D.P.A.). Expert for Defendant 5/4/2020 (Video hearing).
- Chunn v. Edge, 1:20-CV-01590-RPK-RLM (E.D.N.Y.) Expert for Plaintiffs 4/30/2020 (Video deposition), 5/12/2020 (Video hearing).
- Martinez-Brooks v. Easter, 3:20-cv-569 (MPS) (C.T.). Expert for Plaintiffs 6/8/2020 (Video deposition), 6/11/2020 (Video hearing).
- Baxley v. Jividen et al. NO. 3:18-cv-01526, 7/1/21 Expert for Plaintiffs (Video Hearing).
- Busby v. Bonner, 2:20-cv-02359-SHL (W.D.T.N.). Expert for Plaintiffs 7/10/2020 (Video hearing).
- Braggs v. Dunn, 2:14-cv-601-MHT (M.D.A.L.). Expert for Plaintiffs 10/19/2020 (Audio testimony).
- Royston v. Christian, 6:19-cv-00274-RAW (E.D.O.K.). Expert for Plaintiffs 3/26/21 (Video deposition).
- Fraihat  v. U.S. Immigration and Customs Enforcement, 5:19-cv-01546-JGB-SHK (C.D.C.A.). Expert for Plaintiffs 2020.
- Torres v. Milusnic, CV 20-04450-CBM-PVC(x) (C.D.C.A). Court appointed expert 5/24/21 (Video deposition).
- Sanchez v. Brown, 20-cv-832-E (N.D.T.X.). Expert for Plaintiffs 5/25/21 (Video deposition).
- Barnett v. Tony, No 0:20-cv-61113-WPD 10/13/21 Expert for plaintiffs (Video hearing).
- Fenty, et al., v. Penzone, et al., No. 2:20-cv-01192. Expert for Plaintiffs 10/21/2021 (Video hearing).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 2/7/22 (Video testimony).
- Thomas Rainey v. County of San Diego, et al., No  CASE NO. No.: 19-cv-01650-H-AGS.. 3/21/22 Expert for Plaintiffs (Video Deposition).
- Frankie Greer v. County of San Diego, et al., No  CASE NO. 19-CV-0378-GPC-DEB. 4/27/22 Expert for Plaintiffs (Video Deposition).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 11/14/22 (Video testimony).
- Derrick Jones et al. v. City of St. Louis, Missouri et al., Case No. 4:21-cv-600. 3/17/23 Expert for Plaintiffs (Video deposition).
- Wilson v. San Diego, CA., Case No. 3:20-cv-0457-BAS-DEB. Expert for plaintiffs 5/8/23 (Video deposition).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 5/30/23 (Video testimony).
- Harris v. Georgia DOC, Case No. 5:18-CV-365-TES. Expert for plaintiffs 6/15/23.
- Serna v. San Diego, CA., Case No. 20-CV-2096-LAB-DDL. Expert for plaintiffs 10/27/23 (Video deposition).

- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 11/17/23 (Video testimony).
- Enyart v. San Bernardino 5:23-cv-00540. Expert for plaintiffs 5/8/23 (Video deposition).
- Carty v. Governor Bryan 3:94-cv-00078 Court appointed monitor. Hearing 4/30/24.

Rate of Compensation for Dr. Venters is $500 per hour, and $250 per hour for travel time plus expenses if needed.

Exhibit 15

Jung Competency Letter


**pennsylvania**
DEPARTMENT OF HUMAN SERVICES
OFFICE OF MENTAL HEALTH AND SUBSTANCE ABUSE SERVICES

October 24, 2023

The Honorable Marsha H. Neifield
Judge, Municipal Court, Philadelphia County
Criminal Justice Center 1301 Filbert Street
Philadelphia, PA 19107

Re:     **Jung, Louis,**  MC-51-CR-0022667-2021

Dear Judge Neifield:

The following is an update regarding the progress in treatment and competency status of Mr. Louis Jung.

**Identifying Information and Reason for Referral:** Mr. Louis Jung is a 50-year-old divorced Caucasian male currently court-ordered for treatment at Norristown State Hospital Regional Forensic Psychiatric Center (RFPC). He was court ordered by for competency evaluation and treatment on May 3, 2023. He was admitted to Norristown State Hospital RFPC on June 2, 2023 and so had been receiving treatment for approximately four months at the time of the assessment.  Current legal charges include robbery, conspiracy, theft, receiving stolen property, possession of an instrument of a crime, terroristic threats, possession of a controlled substance, and simple assault.

**Information Sources:**
- Clinical interview with examinee (October 13, 2023, attempted June 23, 2023)
- Discussion with Norristown State Hospital RFPC treating psychiatrist (October 13, 2023 and June 23, 2023)
- Court Order (May 3, 2023), Philadelphia County.
- Court Summary, via State of Pennsylvania Court of Common Pleas web site
- Preadmission Referral Packet
- Mental Health Evaluation completed by Dr. Francis Ronkowski (March 7, 2023)
- Mental Health Evaluation completed by Dr. Robert Stanton (August 16, 22023)
- Competency Evaluation completed by Dr. Kelly Chamberlain during previous admission to Norristown State Hospital RFPC (November 21, 2023)
- Relevant Norristown State Hospital RFPC medical records

**Update Since Last Evaluation:** It should be noted that other than his self-report, there are no credible indications in the available documentation suggesting that Mr. Jung is experiencing any psychiatric symptoms or memory difficulties. In fact, a review of notes indicates multiple examples of complex negotiating behavior and other functional abilities suggestive of stable cognitive functioning.

Because he left the interview early, I decided to review 100% of the progress notes available in the hospital chart for the time since the last evaluation.

Mr. Jung has demonstrated little or no change in the time since the last evaluation. Clinical notes in the chart describe him as medication compliant but disengaged from treatment. He intermittently attends clinical groups, but when present seldom speaks. He intermittently attends recreational groups, usually

YesCare1253

Exhibit 16

Jung Intake Screening Questionnaire

by Correctional Officer

# PHILADELPHIA DEPARTMENT OF PRISONS

☐ASD  ☑CFCF  ☐DC  ☐HOC  ☐PICC  ☐RCF  OTHER_____

Ca.

.0416

## INTAKE SCREENING QUESTIONNAIRE BY CORRECTIONAL OFFICER

Inmate's Name: ___Jung, Louis___     PID#: __7/8327__
                    (Print Name)

Date of admission: ___10.27.23___   Time of admission: __1255__

| | | YES | NO |
|---|---|---|---|
| 1 | Are you bleeding or coughing up blood? | | |
| 2 | Are you taking insulin or heart medications? | | |
| 3 | Do you have any life threatening medical problems? | | |
| 4 | Are you thinking about harming yourself now? | | |
| 5 | Are you 17 years or younger (Youthful Offender)? | | |
| 6 | Do you have any police-related injury? | | |
| 7 | Do you identify as transgender? | | |
| 8 | The Intake Officer must check the commitment paperwork to answer the following question. Are the charges Murder, Manslaughter, or any type of Sex-related offense, such as Rape, Attempted Rape, Child Molestation, etc.? (DO NOT ASK THE DETAINEE) | | √ |

If "YES" to any question, telephone Medical Intake for an assessment by a medical service provider.

_____
(C/O's Print Name)

_____     Date: _____ .
(C/O's Signature)

___Madrishi Akollin RN___
(Medical Service Provider, Print Name)

_____     Date: 10\28\23
(Medical Service Provider's Signature)

_____     Date: _____
(Inmate's Signature)

86-702

**Distribution:**                                                    Rev. (6/18)

Copy 1- Medical Service Provider    Copy 2- Social Service File    Copy 3- A & D Manager    Copy 4- Inmate

YesCare1246

Philadelphia Department of Prisons
Confidential Intake Screening, Care Access, H & P Consent,
and Non-child Resistant Packaging Acknowledgement

| X | **Confidential Medical Screening** |
|---|---|
|   | By submitting my signature on this form I, LOUIS W JUNG, attest that the information that I have provided to the medical staff in order to complete the confidential medical screening is true and accurate. |
| X | **Access to Care** |
|   | I, LOUIS W JUNG, attest that I have been informed of how to access healthcare services at the Philadelphia Department of Prisons. |
| X | **Non-Child Resistant Packaging** |
|   | I, LOUIS W JUNG, recognize that, If I receive medications upon release, the packaging I receive may not be child resistant. |
| X | **History and Physical Examination** |
|   | I, LOUIS W JUNG , consent to having a History and Physical examination performed by a qualified health care professional and confirm that the information stated is accurate to the best of my knowledge. I am aware that a History and Physical examination is performed upon admission and , then on an annual basis. |
| X | **Telehealth** |
|   | Telehealth is a form of secure video interaction between health care providers and patients. This interaction may include any and/or all of the following: diagnosis, consultation, treatment, transfer of medical data and education using audio (to listen), video (to see) and/or data/electronic communications. I, LOUIS W JUNG, consent to telehealth consultation with a provider with the understanding that I have the option to withdraw this consent at any time. |

**Inmate signature:**

NAME: LOUIS W JUNG INTAKE: 2310416    PID:

**Witness (Interviewer):** Mariesha Apollon

YesCare1247

Exhibit 17

Jung Medical Records

October 28, 2023 – November 6, 2023

# JUNG, LOUIS W

**PID:** 718327 **Intake:** 2310416
**Facility Code:** CFCF **Housing Area:** ,B1POD3,21,3
50 Y old Male, DOB:
, PHILADELPHIA, PA 19148
Provider: ,

Telephone
Encounter

**Answered by**     ,
Date: 11/06/2023
Time: 02:12 PM

**Reason**     Discharge Medication

**Medication**     Stop NovoLIN N Suspension, 100 UNIT/ML, Subcutaneous, 10 unitsa, TWICE DAILY, 90 days
Stop NovoLIN R Solution, 100 UNIT/ML, Injection, 2-12 units, TWICE DAILY PRN, 90 days
Stop Accu Chek Reading, -, TRT, as directed, TWICE DAILY, 90 days
Stop Atorvastatin Calcium Tablet, 20 MG, Orally, 1 tablet, EVERY EVENING, 90 days
Stop Levothyroxine Sodium Tablet, 150 MCG, Orally, 90 Tablet, 1 tablet, DAILY, 90 days

Patient: JUNG, LOUIS W    DOB:            Provider: ,    11/06/2023

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

**Progress Notes**

**PID:** 718327 **Intake:** 2310416
**Facility Code:** CFCF **Housing Area:** ,B1POD3,21,3
**Patient:** JUNG, LOUIS W
**Account Number:** 39662
**DOB:** **Age:** 50 Y **Sex:** Male
**Phone:**
**Address:** , PHILADELPHIA, PA-19148

**Provider:** CMO @CFCF
**Date:** 11/06/2023

## Subjective:

**Chief Complaints:**

**Medical History:** DIABETES , HYPERCHOLESTEROLEMIA, COVID/MRSA PNA 1/2022, Pulmonary embolism and thrombocytopenia, Syphilis treated RPR 1:8 on 1/5/2022 Bicillin given 1-14-22,1-24-22,1-31-22,RPR 1:1 on 12-14-22, Sedative, hypnotic or anxiolytic dependence, unspecified, COVID 1/2023, Patient's noncompliance with other medical treatment and regimen, Patient's noncompliance with other medical treatment and regimen.

**Medications:** NovoLIN N 100 UNIT/ML Suspension 10 unitsa TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock, NovoLIN R 100 UNIT/ML Solution 2- 12 units TWICE DAILY PRN, stop date 01/26/2024, KOP: No, Drug Source: Stock, Notes: 151-200 give 4 units, 201-250 give 6 units, 251-300 give 8 units, 301-400 give 10 units, > or = 401 give 12 units, Accu Chek - Reading as directed TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock, Atorvastatin Calcium 20 MG Tablet 1 tablet EVERY EVENING, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific, Levothyroxine Sodium 150 MCG Tablet 1 tablet DAILY, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific

## Objective:

## Assessment:

**Assessment:**
IP Jung was found unresponsive when I got to him on the stretcher, CPR was performed by myself, along with two other nurses until paramedic arrived and called time of death.

## Plan:

**Provider:** CMO @CFCF
**Patient:** JUNG, LOUIS W **DOB:** **Date:** 11/06/2023

**Electronically signed by Donaldson Jeoboham Med LPN Y on 11/06/2023 at 08:34 AM EST**
**Sign off status: Completed**

**Progress Notes**

**PID:** 718327 **Intake:** 2310416
**Facility Code:** CFCF **Housing Area:** ,B1POD3,21,3
**Patient:** JUNG, LOUIS W
**Account Number:** 39662
**DOB:**      **Age:** 50 Y **Sex:** Male
**Phone:**
**Address:**      , PHILADELPHIA, PA-19148

**Provider:** Shatyra Henderson-Hamwright, NP

**Date:** 11/06/2023

## Subjective:

**Chief Complaints:**

1. Stretcher call.

**HPI:**

()General Examination:

patient is a 50 year old male who was the subject of a stretcher call on B1POD3, re: unresponsive on the floor of his cell.

**ROS:**

nil.

**Medical History:** DIABETES , HYPERCHOLESTEROLEMIA, COVID/MRSA PNA 1/2022, Pulmonary embolism and thrombocytopenia, Syphilis treated RPR 1:8 on 1/5/2022 Bicillin given 1-14-22,1-24-22,1-31-22,RPR 1:1 on 12-14-22, Sedative, hypnotic or anxiolytic dependence, unspecified, COVID 1/2023, Patient's noncompliance with other medical treatment and regimen, Patient's noncompliance with other medical treatment and regimen.

**Medications:** NovoLIN N 100 UNIT/ML Suspension 10 unitsa TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock, NovoLIN R 100 UNIT/ML Solution 2- 12 units TWICE DAILY PRN, stop date 01/26/2024, KOP: No, Drug Source: Stock, Notes: 151-200 give 4 units, 201-250 give 6 units, 251-300 give 8 units, 301-400 give 10 units, > or = 401 give 12 units, Accu Chek - Reading as directed TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock, Atorvastatin Calcium 20 MG Tablet 1 tablet EVERY EVENING, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific, Levothyroxine Sodium 150 MCG Tablet 1 tablet DAILY, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific

**Allergies:** N.K.D.A.

## Objective:

**Vitals:** Time: 0615, Ht 66 in
HR: nil, BP: nil, Resp: 20, O2 Blood Glucose: "High:.

**Examination:**

()General Examination:

At approximately 0604 hours on 11/06/2023, a stretcher call was heard overhead asking for response at B1POD3. Medical staff present at triage collected equipment and responded. When we arrived on the POD, there was a female officer on the top tier who calmly stated that there was a patient on the ground in his cell. All medical staff present climbed the stairs and arrived at the cell at approximately 0610 hours. On the floor, I observed who appeared to be a white male with dark hair dressed in an orange jumpsuit on the floor near the toilet in the supine position. He was in the cell alone. No other incarcerated person was present in the cell. The patient was still breathing at the time and was looking at the ceiling. Upon closer inspection, I recognized the patient as Louis Jung. When I realized who was there, I asked for a blood glucose reading because I knew him to be a brittle diabetic. His blood glucose was obtained by a responding nurse. She obtained a reading of high. In addition to the high blood glucose reading, the patient was also clammy and cold. Patient was minimally responsive to ammonia waved under the nose. We immediately asked for assistance with carrying the patient down the stairs and placing him on the stretcher on the bottom tier.

The patient was placed onto the stretcher at approximately 0619 hours. He was still breathing without assistance at that time. We began moving towards medical triage to administer insulin and further assess the patient. As we passed the elevator at approximately 0622 hours, I noticed that the patient was no longer breathing. We pulled the stretcher onto level ground in the main corridor where CPR was started. Narcan was administered twice with no effect. 14 units of insulin admnistered. 911 was notified immediately by medical staff. At that time, we were unable to obtain a blood pressure from the patient and we were unable to obtain a pulse. The patients head was turned to the left side and an unknown liquid leaked from his mouth. This occurred twice more during CPR. AED and ambu-bag were applied since patients breathing did not seem to be effective. The patient was eventually moved from the stretcher onto the floor for more effective compressions. Approximately 5 to 6 rounds of CPR with only a weak thready pulse detected in between were performed prior to the fire departments arrival at 0646 hours. CPR was stopped by the fire department and the patient was pronounced at 0647 hours.

## Assessment:

**Assessment:**

1. Cardiac arrest - 427.5 (Primary)
2. Hyperglycemia, unspecified - R73.9

## Plan:

**1. Cardiac arrest**
Notes: see "examination"
HSA notified in person.

**2. Hyperglycemia, unspecified**
Notes: see "examination"
HSA notified in person.

**Disposition:**
Notes: fire department arrived, stopped CPR, patient prounounced at "0647" hours. This note was completed by the provider and locked by RN Daniels

**Provider:** Shatyra Henderson-Hamwright, NP
**Patient:** JUNG, LOUIS W  **DOB:**          **Date:** 11/06/2023

**Electronically signed by Kimberly Daniels HSA YesC on 01/04/2024 at 07:57 PM EST**
**Sign off status: Completed**

YesCare 1456

**PID:** 718327 **Intake:** 2310416
**Facility Code:** CFCF **Housing Area:** ,B1POD3,21,3
**Patient:** JUNG, LOUIS W
**Account Number:** 39662
**DOB:** **Age:** 50 Y **Sex:** Male
**Phone:**
**Address:** PHILADELPHIA, PA-19148

**Provider:** Lalitha Trivikram, MD
**Date:** 11/06/2023

## Subjective:

**Chief Complaints:**

- Stretcher Call

**HPI:**

()General Examination:

Additional medical was called to the main corridor. To the right of the door to Medical, medical staff was found in the process of doing CPR on an IP on the stretcher. The triage provider asked me to call 911, so I returned to Triage and call at 6:24 am. I returned to the scene and asked for the patient to be brought to the floor. The board was placed under the patient and he was moved to the floor. I assumed position at the head of the patient to bag ventilate. The AED was already on and engaged. Several rounds of CPR were conducted and only one defibrillation shock was delivered mid code (the other AED analysis before and after did not require shock). Attempts to secure IV access were unsuccessful. Fire Rescue arrived and asked Medical staff to discontinue CPR at 6:47am.

**Medical History:**

- DIABETES
- HYPERCHOLESTEROLEMIA
- COVID/MRSA PNA 1/2022
- Pulmonary embolism and thrombocytopenia
- Syphilis treated RPR 1:8 on 1/5/2022 Bicillin given 1-14-22,1-24-22,1-31-22,RPR 1:1 on 12-14-22
- Sedative, hypnotic or anxiolytic dependence, unspecified
- COVID 1/2023
- Patient's noncompliance with other medical treatment and regimen
- Patient's noncompliance with other medical treatment and regimen

**Medications:**

Taking

- NovoLIN N 100 UNIT/ML Suspension 10 unitsa TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock
- NovoLIN R 100 UNIT/ML Solution 2- 12 units TWICE DAILY PRN, stop date 01/26/2024, KOP: No, Drug Source: Stock, Notes: 151-200 give 4 units, 201-250 give 6 units, 251-300 give 8 units, 301-400 give 10 units, > or = 401 give 12 units
- Accu Chek - Reading as directed TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock
- Atorvastatin Calcium 20 MG Tablet 1 tablet EVERY EVENING, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific
- Levothyroxine Sodium 150 MCG Tablet 1 tablet DAILY, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific

## Objective:

## Assessment:

## Plan:

**Immunizations:**

**Provider:** Lalitha Trivikram, MD
**Patient:** JUNG, LOUIS W **DOB:** **Date:** 11/06/2023

YesCare 1457

**Electronically signed by Lalitha Trivikram MD , MD on 11/06/2023 at 08:25 AM EST**
**Sign off status: Completed**

**Progress Notes**

**PID:** 718327 **Intake:** 2310416
**Facility Code:** CFCF **Housing Area:** ,B1POD3,21,3
**Patient:** JUNG, LOUIS W
**Account Number:** 39662
**DOB:** ▮▮▮▮ **Age:** 50 Y **Sex:** Male
**Phone:**
**Address:** ▮▮▮▮▮▮▮ , PHILADELPHIA, PA-19148

**Provider:** CMO @CFCF
**Date:** 11/06/2023

## Subjective:

**Chief Complaints:**
1. IP unresponsive.

**Medical History:** DIABETES , HYPERCHOLESTEROLEMIA, COVID/MRSA PNA 1/2022, Pulmonary embolism and thrombocytopenia, Syphilis treated RPR 1:8 on 1/5/2022 Bicillin given 1-14-22,1-24-22,1-31-22,RPR 1:1 on 12-14-22, Sedative, hypnotic or anxiolytic dependence, unspecified, COVID 1/2023, Patient's noncompliance with other medical treatment and regimen, Patient's noncompliance with other medical treatment and regimen.

**Medications:** NovoLIN N 100 UNIT/ML Suspension 10 unitsa TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock, NovoLIN R 100 UNIT/ML Solution 2- 12 units TWICE DAILY PRN, stop date 01/26/2024, KOP: No, Drug Source: Stock, Notes: 151-200 give 4 units, 201-250 give 6 units, 251-300 give 8 units, 301-400 give 10 units, > or = 401 give 12 units, Accu Chek - Reading as directed TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock, Atorvastatin Calcium 20 MG Tablet 1 tablet EVERY EVENING, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific, Levothyroxine Sodium 150 MCG Tablet 1 tablet DAILY, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific

## Objective:

## Assessment:

**Assessment:**
Call was made for additional medical staff to the main corridor. Upon my arrival, patient was on a backboard on the stretcher and CPR was in progress. Brown fluid observed around the patients mouth. Report from staff included patient blood glucose read "HI". I gave 1 nasal Narcan (a second nasal Narcan was given by another nurse), assisted with several rounds of chest compressions and breaths via ambu bag. Patient was lowered to the floor and CPR continued. AED administered one shock, with all the other analysis stating "no shock advised." When fire rescue arrived, they stated that we are to cease CPR.

## Plan:

**Disposition:**
Disposition: Deceased

**Provider:** CMO @CFCF
**Patient:** JUNG, LOUIS W **DOB:** ▮▮▮▮ **Date:** 11/06/2023

**Electronically signed by Danielle Mcgettigan QI COR on 11/06/2023 at 07:07 AM EST**
**Sign off status: Completed**

YesCare 1459

**Progress Notes**

**PID:** 718327 **Intake:** 2310416
**Facility Code:** CFCF **Housing Area:** ,B1POD3,21,3
**Patient:** JUNG, LOUIS W
**Account Number:** 39662
**DOB:** ▮▮▮ **Age:** 50 Y **Sex:** Male
**Phone:**
**Address:** ▮▮▮ PHILADELPHIA, PA-19148

**Provider:** Shatyra Henderson-Hamwright, NP
**Date:** 11/06/2023

## Subjective:

**Chief Complaints:**

**Medical History:** DIABETES , HYPERCHOLESTEROLEMIA, COVID/MRSA PNA 1/2022, Pulmonary embolism and thrombocytopenia, Syphilis treated RPR 1:8 on 1/5/2022 Bicillin given 1-14-22,1-24-22,1-31-22,RPR 1:1 on 12-14-22, Sedative, hypnotic or anxiolytic dependence, unspecified, COVID 1/2023, Patient's noncompliance with other medical treatment and regimen, Patient's noncompliance with other medical treatment and regimen.

**Medications:** NovoLIN N 100 UNIT/ML Suspension 10 unitsa TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock, NovoLIN R 100 UNIT/ML Solution 2- 12 units TWICE DAILY PRN, stop date 01/26/2024, KOP: No, Drug Source: Stock, Notes: 151-200 give 4 units, 201-250 give 6 units, 251-300 give 8 units, 301-400 give 10 units, > or = 401 give 12 units, Accu Chek - Reading as directed TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock, Atorvastatin Calcium 20 MG Tablet 1 tablet EVERY EVENING, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific, Levothyroxine Sodium 150 MCG Tablet 1 tablet DAILY, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific

## Objective:

**Vitals:** RR 20 /min, Ht 66 in
BS=High.

## Assessment:

**Assessment:**
A stretcher was called to B1pod3, 21 cell and medical arrived approximately 0610. The patient was found laying on the floor next to the toilet. Patients BS was taken immediately due to his diabetic status. BS read HI. The patient was not responsive to pain stimuli (sternal rub and ammonia). The patients skin was cool and clammy, and the patient was nonverbal at the time of the initial assessment with a respiration of 20. The patient was immediately transported to the stretcher with the assistance of other IP's, due being a noncompliant diabetic. On the way to medical patients status changed and chest was no longer rising with agonal breath, no pulse detected and CPR and oxygen delivered via Ambu bag was immediately initiated at 0622 in the hall outside of medical. Additional medical called at 0622. CPR continued, 14 units of insulin given per provider Henderson at 0624 along with 2 rounds of nasal Narcan. Fire rescue arrived 0646 and 0647 CPR was discontinued per fire rescue order.

## Plan:

**Disposition:**
Disposition: Deceased

**Provider:** Shatyra Henderson-Hamwright, NP
**Patient:** JUNG, LOUIS W **DOB:** ▮▮▮ **Date:** 11/06/2023

**Electronically signed by Tashina Jarvis RN COR on 11/06/2023 at 07:54 AM EST**
**Sign off status: Completed**

**COVID Vaccine Visit**

**PID:** 718327 **Intake:** 2310416
**Facility Code:** CFCF **Housing Area:** ,B1POD3,21,3
**Patient:** JUNG, LOUIS W
**Account Number:** 39662
**DOB:** ▉▉▉ **Age:** 50 Y **Sex:** Male
**Phone:**
**Address:** ▉▉▉ PHILADELPHIA, PA-19148

**Provider:** Corrections Provider
**Date:** 10/31/2023

## Subjective:

**Chief Complaints:**
1. 1st Dose COVID-19 vaccine.

**HPI:**
Coronavirus Vaccine V1:
Coronavirus Vaccine V1
Which dose was offered during this encounter (review Master Problem List to determine dose) *Dose 1*
Do you consent to vaccine? *No (no further action required)*
Reason patient did not consent *Patient refused*

**Medical History:** DIABETES , HYPERCHOLESTEROLEMIA, COVID/MRSA PNA 1/2022, Pulmonary embolism and thrombocytopenia, Syphilis treated RPR 1:8 on 1/5/2022 Bicillin given 1-14-22,1-24-22,1-31-22,RPR 1:1 on 12-14-22, Sedative, hypnotic or anxiolytic dependence, unspecified, COVID 1/2023, Patient's noncompliance with other medical treatment and regimen, Patient's noncompliance with other medical treatment and regimen.

**Medications:** NovoLIN N 100 UNIT/ML Suspension 10 unitsa TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock, NovoLIN R 100 UNIT/ML Solution 2- 12 units TWICE DAILY PRN, stop date 01/26/2024, KOP: No, Drug Source: Stock, Notes: 151-200 give 4 units, 201-250 give 6 units, 251-300 give 8 units, 301-400 give 10 units, > or = 401 give 12 units, Accu Chek - Reading as directed TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock, Atorvastatin Calcium 20 MG Tablet 1 tablet EVERY EVENING, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific, Levothyroxine Sodium 150 MCG Tablet 1 tablet DAILY, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific

## Objective:

## Assessment:

## Plan:

**Immunizations:**
COVID-19,mRNA,50mcg/0.5mL(Moderna bivalent booster) (Not administered - Refused : Patient decision)

**Disposition:**
Notes: pt educated about covid-19 vaccine

**Provider:** Corrections Provider
**Patient:** JUNG, LOUIS W **DOB:** ▉▉▉ **Date:** 10/31/2023

**Electronically signed by Bernice Ricks GHR LPN on 10/31/2023 at 02:42 PM EDT**
**Sign off status: Completed**

**Progress Notes**

**PID:** 718327 **Intake:** 2310416
**Facility Code:** CFCF **Housing Area:** ,B1POD3,21,3
**Patient:** JUNG, LOUIS W
**Account Number:** 39662
**DOB:** **Age:** 50 Y **Sex:** Male
**Phone:**
**Address:** PHILADELPHIA, PA-19148

**Provider:** Corrections Provider

**Date:** 10/30/2023

## Subjective:

**Chief Complaints:**
1. Rule out TB.

**HPI:**
TB Medical Clearance:
    TB Medical Clearance
        Medically Cleared? *Yes*
        Date of medical clearance? *10/30/2023*
        Cleared for food handling? *Yes*
        Medical Screening Date? *10/28/2023*
        Result of PPD? *Negative*
        Follow-up completed? *Yes*
        History and Physical completed? *Yes*
        Blood taken? *Yes*
        Medical record ready? *Yes*
        Medical isolation? *No*
        Medical lock? *No*

**Medical History:** DIABETES , HYPERCHOLESTEROLEMIA, COVID/MRSA PNA 1/2022, Pulmonary embolism and thrombocytopenia, Syphilis treated RPR 1:8 on 1/5/2022 Bicillin given 1-14-22,1-24-22,1-31-22,RPR 1:1 on 12-14-22, Sedative, hypnotic or anxiolytic dependence, unspecified, COVID 1/2023, Patient's noncompliance with other medical treatment and regimen, Patient's noncompliance with other medical treatment and regimen.

**Medications:** NovoLIN N 100 UNIT/ML Suspension 10 unitsa TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock, NovoLIN R 100 UNIT/ML Solution 2- 12 units TWICE DAILY PRN, stop date 01/26/2024, KOP: No, Drug Source: Stock, Notes: 151-200 give 4 units, 201-250 give 6 units, 251-300 give 8 units, 301-400 give 10 units, > or = 401 give 12 units, Accu Chek - Reading as directed TWICE DAILY, stop date 01/26/2024, KOP: No, Drug Source: Stock, Atorvastatin Calcium 20 MG Tablet 1 tablet EVERY EVENING, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific, Levothyroxine Sodium 150 MCG Tablet 1 tablet DAILY, stop date 01/26/2024, KOP: Yes, Drug Source: Patient Specific

## Objective:

**Past Orders:**
Lab:Purified Protein Derivative (PPD)

| Collection Date | 12/16/2021 | 12/14/2022 | 10/28/2023 |
|---|---|---|---|
| Order Date | 12/16/2021 | 12/14/2022 | 10/28/2023 |
| Result: | Negative | Negative | Negative |
| Induration | NR | 0mm | 0MM |
| Notes: | | Gainey,Marquise , Med MA Yes 12/14/2022 01:18:45 PM EST > Tb Was Planted Lfa Borges,Frances , MA YesCare 12/16/2022 11:42:49 AM EST > ppd read | Carrullo,Lisa , MA YesC 10/28/2023 09:34:53 AM EDT > PPD PLANTED LFA Carrullo,Lisa , MA YesC 10/30/2023 09:41:07 AM EDT > PPD CLEARED |

## Assessment:

## Plan:

**Provider:** Corrections Provider
**Patient:** JUNG, LOUIS W **DOB:** **Date:** 10/30/2023

YesCare 1462

**Electronically signed by Lisa Carrullo MA YesC on 10/30/2023 at 10:09 AM EDT**
**Sign off status: Completed**

**Progress Notes**

PID: 718327 **Intake:** 2310416
**Facility Code:** CFCF **Housing Area:** ,B1POD3,TRANSFER,24
**Patient:** JUNG, LOUIS W                                    **Provider:** Maureen Gay, NP
**DOB:**            **Age:** 50 Y **Sex:** Male                **Date:** 10/28/2023
**Phone:**
**Address:**              , PHILADELPHIA, PA-19148

---

## Subjective:

**Chief Complaints:**
1. Intake med orders.

**HPI:**
  ()General Examination:
  Intake orderes requested: has type 1 diabetes BS is 542 states he hasn't gotten insulin in 3 days spoke to provider on remote gave the OK to administered 10 units of NPH and 12 units of Regular insulin gave IP snack. Denies ETOH/ BENZO and opiate abuse denies SI/HI.
  IP ordered levothyroxine 150mcg po daily and atorvastatin 20mg po daily previous jail admission 06/2023. Will renew meds previously ordered. Labs ordered for follow up.

**Medical History:** DIABETES , HYPERCHOLESTEROLEMIA, COVID/MRSA PNA 1/2022, Pulmonary embolism and thrombocytopenia, Syphilis treated RPR 1:8 on 1/5/2022 Bicillin given 1-14-22,1-24-22,1-31-22,RPR 1:1 on 12-14-22, Sedative, hypnotic or anxiolytic dependence, unspecified, COVID 1/2023, Patient's noncompliance with other medical treatment and regimen, Patient's noncompliance with other medical treatment and regimen.

**Allergies:** N.K.D.A.

## Objective:

**Examination:**
  Physical Health Follow up:
    Physical Health Follow up
      Patient needs Chronic Care follow up  *Yes*
      What is the follow up time frame needed for Chronic Care follow up?  *28 days*
      Reason for 28 day follow up appointment  *DM,Other Chronic Diagnosis*
      What is other chronic diagnosis?  *Hyperlipidemia,Hypothyroidism*
      Select the encounter type being completed  *CC Initial*
      Patient needs LAB appointment  *Yes*
      What is the appointment time frame needed for LAB appointment?  *14 days*
      Has the patient been prescribed any medications during this visit?  *Yes*
      Medication ordered (Tramadol, Oxycodone, Oxycontin, Valium, Tylenol 3, Ativan, Phenobarbital, ConZip, Ultram, Xtampza ER, Roxicodone, Oxaydo, Diazepam, Lorazepam, MS Contin, Morphine Sulfate, Chlordiazepoxide, Hydrocodone-Acetaminophen, or Nalbuphine)?  *No*
      Have you wished you were dead or wished you could go to sleep and not wake up since last encounter with healthcare staff? (Answer only if actually seeing the patient)  *No*
      Have you had any actual thoughts of killing yourself since last encounter with healthcare staff? (Answer only if actually seeing the patient)  *No*

## Assessment:

**Assessment:**
1. Mixed hyperlipidemia - E78.2 (Primary)
2. Hypothyroidism, unspecified - E03.9
3. Diabetes mellitus without mention of complication, type I [juvenile type], not stated as uncontrolled - 250.01

## Plan:

**1. Mixed hyperlipidemia**
Start Atorvastatin Calcium Tablet, 20 MG, 1 tablet, Orally, EVERY EVENING, 90 days, Start Date: 10/28/2023, Stop Date: 01/26/2024, KOP: Yes, Drug Source: Patient Specific .
    LAB: *DIAGNOSTIC PROFILE II 2052-9 SST & LAV (Ordered for 11/10/2023)
    LAB: *Hemoglobin A1C 0102-4 LAV-EDTA (Ordered for 11/10/2023)
    LAB: *MICROALBUMIN CREATININE RATIO, RANDOM URINE 0228-7 Cup-Urine (Ordered for 11/10/2023)
Notes: 1. await labs follow up.
**2. Hypothyroidism, unspecified**
Start Levothyroxine Sodium Tablet, 150 MCG, 1 tablet, Orally, DAILY, 90 days, 90 Tablet, Start Date: 10/28/2023, Stop Date: 01/26/2024, KOP: Yes, Drug Source: Patient Specific .
**3. Diabetes mellitus without mention of complication, type I [juvenile type], not stated as uncontrolled**
Start NovoLIN N Suspension, 100 UNIT/ML, 10 unitsa, Subcutaneous, TWICE DAILY, 90 days, Start Date:

YesCare 1464

10/28/2023, Stop Date: 01/26/2024, KOP: No, Drug Source: Stock ; Start NovoLIN R Solution, 100 UNIT/ML, 2-12 units, Injection, TWICE DAILY PRN, 90 days, Start Date: 10/28/2023, Stop Date: 01/26/2024, KOP: No, Drug Source: Stock, Notes: 151-200 give 4 units, 201-250 give 6 units, 251-300 give 8 units, 301-400 give 10 units, > or = 401 give 12 units ; Start Accu Chek Reading, -, as directed, TRT, TWICE DAILY, 90 days, Start Date: 10/28/2023, Stop Date: 01/26/2024, KOP: No, Drug Source: Stock .

**Follow Up:** prn

**Disposition:**
Disposition: General Population
Notes: 1. meds ordered 2. labs/diagnostics ordered 3. Chronic care follow up scheduled.


**Provider:** Maureen Gay, NP
**Patient:** JUNG, LOUIS W   **DOB:**              **Date:** 10/28/2023




**Electronically signed by Maureen Gay FT NP COR, DNP on 10/28/2023 at 09:48 PM EDT**
**Sign off status: Completed**

YesCare 1465

# JUNG, LOUIS W

**PID:** 718327 **Intake:** 2310416
**Facility Code:** CFCF **Housing Area:** ,B1 POD3, TRANSFER, 24
50 Y old Male, DOB:
, PHILADELPHIA, PA 19148
Provider: Gay, Maureen L, FT NP COR

Telephone
Encounter

| | | |
|---|---|---|
| **Answered by** | Apollon, Mariesha | Date: 10/28/2023 |
| | | Time: 10:02 AM |

**Caller**          Mariesha Apollon

**Message**          Dr Gay Nurse Apollon Please order IP insulin thanks

**Action Taken**     Gay, Maureen L, FT NP COR 10/28/2023 09:27:54 PM EDT > Please see intake orders written.

---

Patient: JUNG, LOUIS W  DOB:          Provider: Gay, Maureen L, FT NP COR  10/28/2023

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

**PID:** 718327 **Intake:** 2310416
**Facility Code:** CFCF **Housing Area:** ,RCVG,B16,05
**Patient:** JUNG, LOUIS W
**DOB:** ▇▇▇▇ **Age:** 50 Y **Sex:** Male
**Phone:**
**Address:** ▇▇▇▇▇▇▇, PHILADELPHIA, PA-19148

**Provider:** Maureen Gay, NP
**Date:** 10/28/2023

## Subjective:

**Chief Complaints:**
1. SMI SPI SUD.

**HPI:**
(1) Intake Non-Confidential:
    Non-Confidential Intake Screening
        Date of Intake Screening? *10/28/2023*
        Unwilling/unable to complete intake screening? (If Yes, please complete Intake Refusal smart form) *No*
        Visible Injuries? *No*
        Physical Impairments? *No*
        Head trauma within the last 72 hours? *No*
        Do you use or require physical aids? *No*
        Detainee is apparently under the influence of alcohol or drugs? *No*
        Healthcare professional believes detainee may be a suicide risk? *No*
        General Population? *Yes*
        Single Cell? *No*
        Lower Bunk? *No*
        Lower Tier? *No*
        Lice test performed? *Yes*
        How lice check was done? *Wood Lamp*
        Lice detected? *No*
        Refer to midlevel practitioner or physician now? *No*
        Has inmate been previously diagnosed SMI? *No*
        Is detainee is a minor/juvenile? *No*
        Do you identify as transgender? *No*
        Witness Signature *Mariesha Apollon RN*
    ()Confidential Intake Questionnaire:
        Confidential Intake Questionnaire
        Routine Intake? *Routine*
        Do you have a family physician? *No*
        Appearance *Normal*
        General Visual Observations *Appropriate*
        Respiratory Observations *Normal*
        Skin Observations *TATTOOS*
        Any open sores/wounds/boils? *No*
        Appear sick? *No*
        Restricted mobility? *No*
        Loss of consciousness in the last 72 hours? *No*
        Is inmate experiencing any of the following urgent dental problems? *No urgent dental problem*
        Is inmate experiencing any of the following routine dental problems? *No routine dental problem*
        Oral hygiene status? *Fair*
        Exposure to tuberculosis? *No*
        Has inmate experienced coughing up blood within the past three weeks? *No*
        Has inmate experienced chest pain or pain with breathing or coughing within the past three weeks? *No*
        Has inmate experienced unintentional weight loss within the past three weeks? *No*
        Has inmate experienced loss of appetite within the past three weeks? *No*
        Has inmate experienced fatigue within the past three weeks? *No*
        Has inmate experienced fever within the past three weeks? *No*
        Has inmate experienced night sweats within the past three weeks? *No*
        Has inmate experienced chills within the past three weeks? *No*
        Did inmate answer yes to three or more questions and/or coughing up blood in the past three weeks? *No*
        Born in, travelled to, lived in, taken a cruise to Cancun, Cozumel or any other areas in Mexico or taken a
Caribbean cruise in the last six months. Or since 1997 Cameroon, Central African Republic, Chad, Congo,
Equatorial Guinea, Gabon, Niger or Nigeria. *Yes*
        PPD Implanted? *Yes*
        Location of PPD implant? *Left forearm*
        Have you had chicken pox? *No*
        Do you have diabetes? *No*
        Do you have asthma? *No*
        Do you have hypertension (high blood pressure)? *No*

YesCare 1467

Do you have epilepsy (seizures)? *No*
Do you have sickle cell? *No*
Do you have any communicable, contagious or sexually transmitted diseases? *No*
Do you have HIV and or AIDS? *No*
Rapid HIV test performed? *Yes*
Date of Rapid HIV test *10/28/2023*
Intake Facility *CFCF*
Rapid HIV test results are? *Preliminary negative*
Have you ever gotten a tattoo while in prison? *No*
Have you ever used a needle to give yourself drugs? *No*
Did you receive a blood transfusion before 1992? *No*
Do you have hepatitis? *No*
Do you have any Other Medical Conditions? *No*
Have you been treated/hospitalized within the last year for any medical problem? *No*
Are you on a diet prescribed by a doctor? *No*
Detainee has history of drug abuse? *No*
Detainee has history of alcohol abuse? *No*
Do you use tobacco products? *No*
Is inmate female? *No*
Blood taken? *Yes*
Urine for STDs taken? *Yes*
1) Detainee is apparently under the influence of alcohol or drugs? *No*
2) Detainee lacks support of family or friends in the community? *No*
3) Detainee experienced a significant loss within the last six months? *No*
4) Detainee is very worried about major problems other than legal? *No*
5) Detainee's family or significant other attempted/committed suicide? *No*
6) Detainee is showing signs of mental illness? *No*
7) Detainee has a history of counseling or mental health evaluation/treatment? *No*
8) Detainee has previous suicide attempt more than a month ago? *No*
9) This is the detainee's first incarceration in lockup/jail? *No*
10) Detainee shows signs of depression (crying, sadness, worrying)? *No*
11) Detainee appears over anxious, panicked, afraid, or angry? *No*
12) Detainee acting and/or talking in a strange manner? (cannot focus attention; hearing or seeing things that are not there) *No*
13) Detainee showing signs of withdrawal? *No*
Has inmate answered yes to 8 or more of the above 13 questions? *No*
Arrested for or charged with murder, attempted murder, or unusally sensitive offense (rape, incest, abuse, pedophilia, etc.)? *No*
Detainee expresses signs of extreme embarrassment, shame, or feelings of humiliation as a result of charge/incarceration? *No*
Detainee is thinking about killing themself? *No*
Detainee is expressing feelings of nothing to live for? *No*
Are you thinking of hurting others? *No*
Does patient have a global alert for suicide attempt or self-harm? *No*
1) Do you currently believe that someone can control your mind by putting thoughts into your head or taking thoughts out of your head? *No*
2) Do you currently feel that other people know your thoughts and can read your mind? *No*
3) Have you lost or gained as much as two pounds per week for several weeks without even trying? *No*
4) Have you or your family or friends noticed that you are currently much more active than you usually are? *No*
5) Do you currently feel like you have to talk or move more slowly than you usually do? *No*
6) Have there currently been a few weeks when you felt like you were useless or sinful? *No*
7) Have you ever been in the hospital for emotional or mental problems? *No*
Has inmate answered yes to 2 or more of the above 7 questions? *No*
Is the inmate a transfer back into custody from Norristown Hospital? *No*
  Medications Medical
  Are you currently taking medications prescribed for any medical condition? (Including those for HIV/AIDs, Diabetes, hypertension, Sickle Cell, Asthma, Epilepsy, hepatitis, etc.) *No*
  Is patient currently taking Coumadin (Warfarin)? *No*
  Is patient currently taking other blood thinner? (not aspirin) *No*
  Do you know when you last received tetanus? *No*
  Medications Behavioral Health
  Are you currently taking medications prescribed for emotional or mental health problems? (Including those for depression, bipolar disorder, schizophrenia, PTSD, etc.) *No*
  Withdrawal Medications
  Are you currently taking a prescribed benzo or opiate? (NOT marijuana, crack, cocaine, PCP, or crystal meth) *No*
  Are you currently receiving Methadone treatment? (Please complete Northeast Treatment Center form) *No*
  Are you currently receiving Suboxone treatment? (Please complete Northeast Treatment Center form) *No*
  Are you currently receiving Sublocade treatment? (Please complete Northeast Treatment Center form) *No*

Did the IP accept hydration during screening and been informed to obtain more at pillpass? *Yes*
Shift Intake Completed
What shift was intake completed for patient? *Dayshift (7:00am-2:59pm)*
Work Assignment Clearance
Do you have any other medical condition(s) that may make it dangerous for you to participate in physical activity/exercise? *No*
Do you have epilepsy (seizures)? *No*
Have you ever had an asthma attack requiring immediate medical attention at any time over the last 12 months? *No*
Do you have a physical or mental disability? (Multiple sclerosis, Muscular dystrophy, Cerebral palsy, Paraplegia/Hemiplegia, Spina bifida, Intellectual/Hearing/Visual loss, Down syndrome, Autism, Parkinson, or other) *No*
Any open sores/wounds/boils? *No*
Do you have any communicable, contagious or sexually transmitted diseases? *No*
Have you answered Yes to 2 or more of the above questions? *No*
()Pre-Intake screening:
MA Eligibility
Are you a US Citizen? *Yes*
Are you planning to file Income Taxes? *No*
Do you have unpaid medical bills in last 3 months? *No*
Will you have a job within 30 days of release? *No*
Do you own a vehicle, life insurance policy, or bank account? (If so indicate which) *No*
Have you ever been in foster care at the age of 18 or older (If so indicate county) *No*
Are you collecting income such as Social Security, Disability, Alimony, Cash Assistance? (if so indicate type and frequency) *No*
Pre-Intake Screening
Did you draw the STD Labs? (urine cup & speckle top code L225-2) *No*
Was PPD implanted? *Yes*
Location of PPD implant *Left forearm*
Is the patient diabetic? *Yes*
If Yes, did you complete an accucheck? *Yes*
Is the patient asthmatic? *No*
Is the patient on Coumadin(Warfarin)? *No*
Is the patient taking Dilantin, Tegretol, Depakote, Keppra or Phenobarbital? *No*
Did the patients preliminary HIV test come back positive? *No*
Was the Hepatitis C screening test B125-6 HEP C AB W/RFX RT PCR completed? *No*
Was the patient a hard stick for any of the above labs? *Yes*
If Yes, did you indicate hardstick on the intake encounter to ensure appropriate lab draw follow-up? *No*
Is the patient currently abusing opiates? *No*
Pre-Intake Screening completed by MA *Carrullo*
Coronavirus Screening V1:
Coronavirus Screening V1
In the past 14 days, has the patient had close contact with a person who is under investigation for, or confirmed to have COVID-19 (Coronavirus)? *No*
According to patient's temperature select appropriate range *97.4 to 97.6*
Does the patient have a fever (fever is considered 100.0 F and above)? *No*
Does the patient have any noted lower respiratory symptoms? *No*
Does patient have other symptoms that may represent COVID-19? *No*
Does the patient have a fever, lower respiratory symptoms and/or other symptoms? *No*
Does patient have a positive COVID-19 Result? *No*
Does the patient have poorly controlled HIV (for example CD 4 < 200)? *No*
Has the patient received a organ transplant? *No*
Coronavirus Testing V1:
Coronavirus Testing V1
Was Novel Coronavirus COVID-19 Nasopharynx TH68-0, ID Now COVID-19, BinaxNOW COVID-19 Ag Card, Flow Flex rapid kit, Indicaid Rapid Antigen test, Quick Vue Covid test, or SARS-CoV2 Nasopharynx (City Lab) test ordered? *Novel Coronavirus COVID-19 Nasopharynx TH68-0*
Was Novel Coronavirus COVID-19 Nasopharynx TH68-0 test performed? *Yes*
Date Novel Coronavirus COVID-19 Nasopharynx TH68-0 test performed *10/28/2023*
Facility *CFCF*

**Medical History:** DIABETES , HYPERCHOLESTEROLEMIA, COVID/MRSA PNA 1/2022, Pulmonary embolism and thrombocytopenia, Syphilis treated RPR 1:8 on 1/5/2022 Bicillin given 1-14-22,1-24-22,1-31-22,RPR 1:1 on 12-14-22, Sedative, hypnotic or anxiolytic dependence, unspecified, COVID 1/2023, Patient's noncompliance with other medical treatment and regimen, Patient's noncompliance with other medical treatment and regimen.

**Social History:**
PREA (Intake only):
PREA
Is this inmate disabled? (Deaf, (Unable to speak), Blind, Wheelchair bound or intellectually impaired) *No*
Have you ever been incarcerated before today? *No*

Are you worried that you may be sexually assaulted while in PPS? *No*

## Objective:

**Vitals:** Time: 926, Temp 97.0 F, HR 92 /min, BP 110/82 mm Hg, RR 18 /min, Oxygen sat % 97 %, Wt 179 lbs, Ht 66 in, BMI 28.89 Index, Accucheck 542.

### Examination:

()General Examination:

GENERAL APPEARANCE: in no acute distress, well developed, well nourished.

HEAD: normocephalic, atraumatic.

EYES: pupils equal, round, reactive to light and accommodation.

EARS: normal.

ORAL CAVITY: mucosa moist.

THROAT: clear.

NECK/THYROID: neck supple, full range of motion, no cervical lymphadenopathy.

SKIN: no suspicious lesions, warm and dry.

HEART: no murmurs, regular rate and rhythm, S1, S2 normal.

LUNGS: clear to auscultation bilaterally.

ABDOMEN: normal, bowel sounds present, soft, nontender, nondistended.

EXTREMITIES: no clubbing, cyanosis, or edema.

NEUROLOGIC: nonfocal, motor strength normal upper and lower extremities, sensory exam intact.

## Assessment:

### Assessment:

1. Intake Assessment - IA

AAOx3 states he has type 1 diabetes BS is 542 states he hasn't gotten insulin in 3 days spoke to provider on remote gave the OK to administered 10 units of NPH and 12 units of Regular insulin gave IP snack. Denies ETOH/ BENZO and opiate abuse denies SI/HI. aware of sick call triage and medical triage available 24/7 for emergencies urine present for Ketones encourage to drink plenty of water.

## Plan:

### 1. Intake Assessment

LAB: Rapid HIV test  Preliminary negative

LAB: HEP C AB W/RFX RT PCR B125-6

LAB: Purified Protein Derivative (PPD)

     Carrullo,Lisa , MA YesC 10/28/2023 09:34:53 AM EDT > PPD PLANTED LFA

LAB: Intake Panel L225-2

LAB: Novel Coronavirus COVID-19 Nasopharynx TH68-0

### 2. Others

Action Started- Urgent BH Referral (Intake)

Action Started- BH Community Reentry Referral

### Preventive:

Patient Education Medical/Dental:

  Patient Education

    Patient educated to contact medical if symptoms develop or worsen *Yes*

    Written information provided *Yes*

    The patient demonstrates an understanding of self care, symptoms to report and when to return for

follow up care *Yes*

    Patient informed on how to access dental care? *Yes*

    Oral hygiene and patient dental education form given? *Yes*

### Disposition:

Disposition: Refer to Practitioner for Evaluation or Review of Medication

**Provider:** Maureen Gay, NP

**Patient:** JUNG, LOUIS W  **DOB:** ▓▓▓▓  **Date:** 10/28/2023

YesCare 1470

**Electronically signed by Mariesha Apollon Agency RN on 10/28/2023 at 10:03 AM EDT**
**Sign off status: Completed**

Exhibit 18

Deposition of Defendant Maureen Gay

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO: 24-CV-05618

JACOB AND JAMES JUNG, as              )
Administrators for the Estate         )      DEPOSITION UPON
of LOUIS JUNG, JR.,                    )
                                       )      ORAL EXAMINATION
          Plaintiffs                   )
                                       )            OF
vs.                                    )
                                       )  MAUREEN GAY-JOHNSON
CITY OF PHILADELPHIA, YES CARE         )
CORP., BLANCHE CARNEY, LALITHA         )
TRIVIKRAM, MAUREEN GAY,
MARIESHA APOLLON, BLAIR
CABELLOS, GENA FRASIER AND
WANDA BLOODSAW,

          Defendants

---------------------------------


          TRANSCRIPT OF DEPOSITION, taken by and before
MARGIE A. ROMEO, Professional Reporter and Notary
Public, at the Law Offices of O'Connor, Kimball, LLP,
1500 John F. Kennedy Boulevard, Two Penn Center Plaza,
Philadelphia, PA on Monday, September 8, 2025,
commencing at 2:35 PM.

                              ---

                  MAGNA LEGAL SERVICES
                     7 Penn Center
              1635 Market Street, 9th Floor
                  Philadelphia, PA 19103
                     (866) 624-6221
                    WWW.MagnaLS.COM



Page 7

1   today?

2   A.      Yes.

3   Q.      What did you review?

4   A.      My entry into the patient chart.

5   Q.      And was it just one entry or were there

6   multiple entries?

7   A.      One entry.

8   Q.      And besides that one entry, did you review any

9   other documents?

10  A.      No.

11  Q.      Okay.  Did you do anything else to prepare for

12  today's deposition?

13  A.      No.

14  Q.      Okay.  Where do you currently work?

15  A.      Yes Care.

16  Q.      And how long have you been working there?

17  A.      March of 2022.

18  Q.      And what's your role at Yes Care?

19  A.      Nurse practitioner.

20  Q.      Okay.  Prior to your role at Yes Care in March

21  of '22, can you tell me about your employment history

22  and where you worked before?

23  A.      Corizon, same place.  I started there in 2010.

24  Q.      So my understanding is that Corizon turned



Exhibit 19

Medication Administration Record,

October 2023

## Philadelphia Department of Prisons

**CFCF-B1POD3**          Medication Administration Record  October 01, 2023 - October 31, 2023

| Medications | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

### CFCF-B1POD3

#### CFCF-B1POD3

**Accu Chek - Reading  as directed**

TRT TWICE DAILY
for DX(Diabetes m) 250.01
Rx S181794042 O/D:10/28/23   D/C:01/26/24
Prescriber: Gay                   , Maureen

| Time | ... 28 | 29 | 30 | 31 |
|---|---|---|---|---|
| 07:00 | 6 | DJ | DJ | TB |
| 19:00 | 6 | KW | 6 | TJ |

**Atorvastatin Calcium 20 MG Tablet 1 tablet**

Oral EVERY EVENING
for ABF(Mixed hype) E78.2
Rx S181794062 O/D:10/28/23   D/C:01/26/24
Prescriber: Gay                   , Maureen

| Time | ... 28 | 29 | 30 | 31 |
|---|---|---|---|---|
| 15:00 | 6 | YB | 6 | |

**Levothyroxine Sodium 150 MCG Tablet 1 tablet**

Oral DAILY
for ABF(Hypothyroi) E03.9
Rx S181794092 O/D:10/28/23   D/C:01/26/24
Prescriber: Gay                   , Maureen

| Time | ... 28 | 29 | 30 | 31 |
|---|---|---|---|---|
| 07:00 | 6 | YB | 1 | NA |

**NovoLIN N 100 UNIT/ML   10 unitsa**

Suspension (HUMULIN N)
Subcutaneous TWICE DAILY
for DX(Diabetes m) 250.01
Rx S181794022 O/D:10/28/23   D/C:01/26/24
Prescriber: Gay                   , Maureen

| Time | ... 28 | 29 | 30 | 31 |
|---|---|---|---|---|
| 07:00 | 6 | DJ | DJ | TB |
| 19:00 | 6 | KW | 6 | TJ |

---

DOB [redacted]    Sex:M    Allergies: NK

PCU: CFCF-B1POD3

Diagnosis:Hypothyroidism, unspecified

B1POD3,21,1                   PID #718327

JUNG, LOUIS W

1 - No Show
2 - Not Admin
3 - Refused
4 - KOP
5 - Hold
6 - Not documented
7 - Not Admin/ On Hold

Prior to May 4, 2020 an issue was identified with the medication ordering interface. Users will need to review the eMAR to determine if all orders and administrations are represented on this MAR report.

718327

11/1/23  0:59

YesCare1250

# Philadelphia Department of Prisons

CFCF-B1POD3          Medication Administration Record October 01, 2023 - October 31, 2023

| Medications | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**CFCF-B1POD3**

NovoLIN R 100    2 - 12 units
UNIT/ML Solution (HUMULIN R)
                                                                                            DJ | DJ

Injection TWICE DAILY PRN PRN
for DX(Diabetes m) 250.01
151-200 give 4 units, 201-250 give 6
units, 251-300 give 8 units, 301-400
give 10 units, > or = 401 give 12
units
Rx S181794032 O/D:10/28/23  D/C:01/26/24
Prescriber: Gay          , Maureen

DOB           Sex:M    Allergies: NK

PCU: CFCF-B1POD3

Diagnosis:Hypothyroidism, unspecified

B1POD3,21,1        PID #718327

JUNG, LOUIS W

1 - No Show
2 - Not Admin
3 - Refused
4 - KOP
5 - Hold
6 - Not documented
7 - Not Admin/
On Hold

Prior to May 4, 2020 an issue was identified with the
medication ordering interface. Users will need to
review the eMAR to determine if all orders and
administrations are represented on this MAR report.

718327

•••••••

YesCare1251

# Philadelphia Department of Prisons

CFCF-B1POD3          Medication Administration Record  October 01, 2023 - October 31, 2023

Medications          Time  1  2  3  4  5  6  7  8  9  10  11  12  13  14  15  16  17  18  19  20  21  22  23  24  25  26  27  28  29  30  31

| | |
|---|---|
| BC | Cabellos, Blair |
| CR | Rollins, Chanelle |
| DJ | Jeoboham, Donaldson |
| HS | Scheduler, HCS |
| KW | Wilks-Fraser, Kendai |
| TB | Brown, Terrance |
| TJ | Jarvis, Tashina |
| YB | Bray, Yashawnta |

DOB          Sex:M     Allergies: NK

PCU: CFCF-B1POD3

Diagnosis:Hypothyroidism, unspecified

B1POD3,21,1          PID #718327

JUNG, LOUIS W

1 - No Show
2 - Not Admin
3 - Refused
4 - KOP
5 - Hold
6 - Not documented
7 - Not Admin/
On Hold

Prior to May 4, 2020 an issue was identified with the
medication ordering interface. Users will need to
review the eMAR to determine if all orders and
administrations are represented on this MAR report.

718327

11/1/23  0:59

YesCare1252

Exhibit 20

Patient Safety Event Report



**6/23/2025**

# Patient Safety Event Committee

Curran Fromhold Correctional Facility, Philadelphia Pennsylvania

YesCare 3496

## Patient Safety Work Product (PSWP)



+ This presentation is confidential and protected by legal privilege in accordance with the Federal Patient Safety & Quality Improvement Act of 2005 and applicable State Peer Review Laws

+ YesCare is a contracted participant with the Center for Patient Safety (CPS) Patient Safety Organization (PSO)



YesCare 3497

1

# Patient Safety Event Committee Agenda



| Time | Site | Patient | DOB | Type of Event | Date of Event | CAT | Presenter |
|------|------|---------|-----|---------------|---------------|-----|-----------|
| 0647 | CFCF | Jung, Louis | 4/16/1973 50 y.o. | Mortality | 11/6/2023 | 4 | L. Witkowski |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

YesCare, Corp.  All information and photos are confidential and proprietary.  All rights reserved.

YesCare 3498

2

## Curran Fromhold-- Patient: Jung, Louis 50 y.o.
## Presenter: Lynda Witkowski BSN RN



❖ Narrative Timeline Review

- ❑ Admitted to Facility on 10/28/2023 at 10:03 AM

- ❑ Intake question: Is the patient a transfer back into custody from Norristown hospital? NO*

- ❑ Intake question: "Do you have Diabetes" NO*

- ❑ Intake question: "Are you currently taking medications prescribed for any medical condition? (Including those for HIV/AIDs, Diabetes, Hypertension, Sickle Cell, Asthma, Epilepsy, Hepatitis, etc.)" NO*

- ❑ Freetyped in the intake note "states has Type 1 Diabetes" BS of 542 states "he hasn't gotten insulin in 3 days". Rec'd an order for 10 units of NPH and 12 units of R. Patient was positive for ketones, encouraged to drink plenty of water."*

- ❑ Sent a TE to provider "Please order IP insulin thanks"*

    - ❑ Ordered NPH 10 units BID and CRIC BID

- ❑ Hx of T1DM, medical noncompliance, Hypothyroidism, Hyperlipidemia.

YesCare, Corp. All information and photos are confidential and proprietary. All rights reserved.
YesCare 3499

# Medication Administration



### Insulin order:

Novolin N 10 units SQ BID

Novolin R CRIC SQ BID

151-200 = 4 units, 201-250 = 6 units, 251-300 = 8 units, 301-400 = 10 units, > 400 = 12 units

|  | 10/29 | 10/30 | 10/31 | 11/1 | 11/2 | 11/3 | 11/4 | 11/5 |
|---|---|---|---|---|---|---|---|---|
| **AM** | BS 385 10 R 10 N | BS 268 8 R 10 N | BS 371 10 R 10 N | Refused (no form) | BS 290 8 R 10 N | No Show | BS 266 8 R 10 N | No Show |
| **PM** | BS 585 12 R 10 N | Not Doc | BS 500 No CRIC doc 10 N | BS 411 0 R 10 N | BS 245 6 R 10 N | BS 394 10 R 10 N | Not Doc | Refused (no form) |

10/29 PM BS included a note in the EMAR: "Provider notified; urine obtained." No other documentation or lab located.

11/6 AM Patient did not show up for his AM insulin.  The nurse was on his way to obtain a refusal form when the stretcher call was announced at 0604. All resuscitative efforts were attempted, and the patient was pronounced at 0647 after Fire Rescue arrived.

YesCare 3500

# QIP / Taxonomy Codes
# page 1 of 2



1. Omitted Actions (P1)
   1. Problem: Nurse failed to answer intake questions accurately or obtain an Intermedex which would have identified recent RX and dosages.
   2. Solution: Staff member will complete the YesCare Intake/Receiving Screening module in YesCare University.

2. NET/Usage (PD2)
   1. Problem: Nurse failed to utilize the Hyper/Hypoglycemia NET during the Intake screening or schedule a follow up (walk in appt)
   2. Solution: Staff member will complete YSSO-Documentation and Clinical Communication and YesCare Nursing Encounter Tool (NETS) modules in YesCare University and receive a write up for not completing a NET form for elevated Blood sugar upon examination or scheduling a follow up visit.

3. Situational Awareness (CT1)
   1. Problem: Staff was unaware this IP was a Norristown State Return.
   2. Solution: The Regional Team is developing a plan to identify IPs before they return from NSH to the PDP.

4. Failure to Treat - Nurse (CM4)
   1. Problem: Nurse did not utilize CRIC for BS >400 nor notify the provider.
   2. Solution: Staff member will sign (the recently sent) email acknowledging acceptable documentation in HCS. Staff member will complete Medication management Core Processes Part 1, 2, and 3, YSSO-Documentation and Clinical Communication, and receive a write up for failure to administer sliding scale insulin coverage for a BS of 411.

5. Unformed Skills/Habits (CY1)
   1. Problem: Nurses failed to obtain a signed refusal or schedule a red flag appointment.
   2. Solution: Staff members will sign (the recently sent) email acknowledging acceptable documentation in HCS. Staff members will complete Medication management Core Processes Part 1, 2, and 3 and receive a write up for not receiving a refusal. Staff members will also sign the refusal workflow acknowledging utilizing the signature pad in the HCS and the red flag workflow how to schedule a red flag encounter.

5

YesCare 3601

# QIP / Taxonomy Codes

## Page 2 of 2



1. Inattention (CS1)
   1. Problem:  Nurses failed to utilize the Hyper/Hypoglycemia NET during med pass (BS > 400).
   2. Solution: Staff member will complete YSSO-Documentation and Clinical Communication and YesCare Nursing Encounter Tool (NETS) modules in YesCare University and receive a write up for not completing a NET form for elevated Blood sugar upon examination.

2. Failure to Validate/Verify (CT2)
   1. Problem: Nurses documented a NO SHOW for insulin.
   2. Solution: Staff members will sign (the recently sent) email acknowledging acceptable documentation in HCS. Staff members will complete Medication management Core Processes Part 1, 2, and 3 in YesCare University, and receive a write up for not scheduling a red flag appointment.  Staff members will also sign the refusal workflow acknowledging utilizing the signature pad in the HCS and the red flag workflow on how to schedule a red flag encounter.
   3. Problem: Nurses failed to document in the EMAR (Not documented).
   4. Solution: Staff members will sign (the recently sent) email acknowledging acceptable documentation in HCS. Staff members will complete Medication management Core Processes Part 1, 2, and 3 in YesCare University, YSSO-Documentation and Clinical Communication, and receive an education for not documenting medication administration in HCS.
   5. Problem: Provider failed to follow up in real time regarding telephone call about patient with BS of 542 and positive ketones.
   6. Solution:  Provider was verbally educated by the SMD and will complete YSSO-Documentation and Clinical Communication in YesCare University.

6

# Category Assignment (Decision Tree) Algorithm





| | | |
|---|---|---|
| Was there a deviation from generally accepted performance standards (GAPs)? | **No** → | **Not a Safety Event (Category 1)** |
| ↓ **Yes** | | |
| Did the deviation reach the patient? | **No** → | **Near Miss Safety Event (Category 2)** |
| ↓ **Yes** | | |
| Did the deviation lead to moderate to severe harm or death? | **No** → | **Precursor Safety Event (Category 3)** |
| ↓ **Yes** | | |
| **Serious Safety Event (Category 4)** | | |

YesCare, Corp. All information and photos are confidential and proprietary. All rights reserved.

7

YesCare 3503



**yescarecorp.com**

YesCare 3504

Exhibit 21

Deposition of Blair Cabellos

```
 1        IN THE UNITED STATES DISTRICT COURT

 2   FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3              -   -   -
     JACOB and JAMES       : CIVIL ACTION
 4   JUNG, as              :
     Administrators of     :
 5   the Estate of LOUIS   :
     JUNG, JR.,            :
 6        Plaintiffs,      :
                           :
 7        v.               :
                           :
 8   CITY OF               :
     PHILADELPHIA;         :
 9   YESCARE CORP.;        :
     BLANCHE CARNEY,       :
10   Former Commissioner   :
     of Philadelphia       :
11   Dept of Prisons;      :
     LALITHA TRIVIKRAM;    :
12   MAUREEN GAY;          :
     MARIESHA APOLLON;     :
13   BLAIR CABELLOS;       :
     GENA FRASIER; WANDA   :
14   BLOODSAW,             : NO.
          Defendants.      : 2:24-cv-05618-TJS
15

16              -   -   -

17         September 4, 2025

18              -   -   -

19         Videotaped deposition of
     BLAIR CABELLOS, LPN, taken pursuant to
20   notice, was held at the offices of
     Abolitionist Law Center, 990 Spring
21   Garden Street, Philadelphia, Pennsylvania
     19123, beginning at 10:13 a.m., on the
22   above date, before Kristy L. Liedtka, a
     Professional Court Reporter and Notary
23   Public in and for the Commonwealth of
     Pennsylvania.
24
```

1          A.    August.

2          Q.    And then you started working

3   at YesCare September of 2023?

4          A.    Yes.

5          Q.    Okay.  And where were you

6   placed while working at YesCare?

7          A.    CFCF.

8          Q.    Okay.  Were you at CFCF the

9   whole time you worked at YesCare?

10          A.    No.

11          Q.    Okay.  Where else did you

12   work?

13          A.    RCF.

14          Q.    Okay.  Any other facilities?

15          A.    No.

16          Q.    And how long were you

17   employed at YesCare?

18          A.    From August 2023 to

19   May 2024.

20          Q.    Okay.  And did you hold the

21   same role the whole time there?

22          A.    I went to -- when I went to

23   RCF in January 2024, I went there as a

24   MAT nurse.

1     Q.    As a main nurse?

2     A.    MAT.

3     Q.    A match nurse.

4     A.    Medication assessment --

5 assistant -- assessment -- assessment and

6 treatment nurse.

7     Q.    Okay.  And was that the only

8 role you held at RCF?

9     A.    Yes.

10    Q.    Okay.  So could you repeat

11 for me again which roles you held while

12 working for YesCare?

13    A.    So a regular med pass nurse,

14 which is an LPN, and then when I went to

15 RCF, it was the MAT nurse.

16    Q.    Okay.  When you began

17 working for YesCare slash the

18 Philadelphia Department of Prisons, which

19 moving forward I'll refer to as PDP, what

20 training did you receive?

21    A.    Like as far as orientation?

22    Q.    Correct.

23    A.    Like a shadowing with the

24 nurse.

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1    I mean, I guess worry a lot.

2         Q.    What are the diagnostic

3    criteria for anxiety?

4         A.    I don't know.

5         Q.    What treatments are commonly

6    used for anxiety?

7         A.    Medications, lifestyle

8    changes.

9         Q.    And what is your

10   understanding of bipolar disorder?

11        A.    It's a mental health issue

12   where kind of like a roller coaster of

13   emotion.

14        Q.    What are -- what are the

15   diagnostic criteria, excuse me, for

16   bipolar disorder?

17        A.    I don't know.

18        Q.    What treatments are commonly

19   used for bipolar disorder?

20        A.    The same, the -- either

21   medication or the lifestyle changes or

22   both.

23        Q.    During your nursing

24   education, were you taught about medical

1  documentation?

2          A.    Yes.

3          Q.    What were you taught?

4          A.    To document everything.

5          Q.    What types of information

6  should be documented in a patient's

7  record?

8          A.    The care that you gave.

9          Q.    And how come?  Or what is

10 the importance of doing so?

11         A.    To document the care that

12 you gave.

13         Q.    What kinds of treatment

14 should be noted in such documents?

15         A.    Any.

16         Q.    So every time a nurse or

17 medical practitioner gives care to the

18 patient?

19         A.    Yes.

20         Q.    What kinds of patient

21 behavior should be noted?

22         A.    All types.

23         Q.    And what are the risks of

24 failing to document medical information

1    already, since you mentioned those were

2    additional?

3            A.     In total probably like four.

4            Q.     And that would be for one

5    inmate?

6            A.     No, they would let them all

7    out at the same time.

8            Q.     Understood.  You mentioned

9    being in charge of med pass while at

10   CFCF, correct?

11           A.     I wasn't in charge of it.

12                  ATTORNEY GREGORY:  She --

13           she --

14   BY ATTORNEY HU:

15           Q.     Oh, I'm sorry.  As part of

16   your responsibilities?

17           A.     Yes.

18           Q.     What kinds of medications

19   would you administer?

20           A.     Any medications that were

21   prescribed by the doctor.

22           Q.     Can you walk me through your

23   day on November 5th, 2023?

24           A.     I don't really remember the

```
 1   day.
 2          Q.    Do you recall when you
 3   arrived to work?
 4          A.    When I what?
 5          Q.    When did you arrive to work
 6   on November 5th, 2023?
 7          A.    Like what time?
 8          Q.    Uh-huh.
 9          A.    I'm assuming 7 a.m.
10          Q.    And what housing unit were
11   you assigned to that day?
12          A.    I know it was B Pod.
13          Q.    Does B Pod 3 sound familiar?
14          A.    Yes.
15          Q.    Do you recall other staff
16   you interacted with that day?
17          A.    No.
18          Q.    Do you recall Louis Jung?
19          A.    Now that this is going on I
20   remember the situation, yes.
21          Q.    What do you remember about
22   the situation?
23          A.    Do you want me to start it
24   from the beginning?
```

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1          Q.    Sure.

2          A.    So I had to give medications

3     on the pod because there wasn't enough

4     correctional officers to allow the

5     inmates to all come to me.  So I poured

6     the cups per inmate, poured their

7     medicine in a cup, wrote the -- their

8     room numbers to go onto the pod.  One of

9     the correctional officers, she said she

10    would go there with me.  As I'm

11    distributing the medications to, I can't

12    remember how many inmates, there wasn't a

13    lot, she told me that an inmate wanted to

14    see me.  So I went to the room and the

15    patient said -- he said he didn't feel

16    good.  So I asked him what was wrong.  He

17    told me -- I can't remember if he said

18    his legs or his leg hurt.  So I said, Did

19    you put in a sick call for that?  I can't

20    remember what he said.  And then he told

21    me he couldn't walk, but as he was saying

22    that, he was standing up.  So he told me,

23    look, I can't walk.  So then he proceeds

24    to walk to me.  And then I said, Okay.

```
 1    And then he proceeds to -- he's like,

 2    look, I can't walk and then he proceeds

 3    to gently place himself on the floor.

 4    And then he tells me, see, look, I just

 5    fell.  So I told the correctional officer

 6    that if he continued to complain of pain,

 7    she can call the stretcher call because

 8    there was nothing I could do for him at

 9    the time.

10         Q.    Okay.  I'm going to start

11    from the beginning and ask some follow-up

12    questions, if that's all right.

13              Do you remember the name of

14    the CO who escorted you that day?

15         A.    No.

16         Q.    Does the name Gena Frasier

17    sound familiar?

18         A.    No.

19         Q.    And when you say an inmate

20    was asking to see you, are you referring

21    to Louis Jung?

22         A.    Yes.

23         Q.    And when you first

24    approached his cell, you mentioned
```

1        Q.    Did it look out of the
2   ordinary to you?
3        A.    I can't remember.
4        Q.    And then you say he placed
5   himself on the ground following.
6        A.    Correct.
7        Q.    Okay.  And could you please
8   remind me again what he said about his
9   legs to you?
10       A.    He told me they hurt.
11       Q.    Okay.  Uh-huh.  And where
12   was he lying down when he placed himself
13   on the floor?
14       A.    I can't remember.  It was in
15   the room.
16       Q.    Okay.  Had you encountered
17   Louis Jung prior to this day --
18       A.    No.
19       Q.    -- November 5th.
20             Okay.  Did you know Mr. Jung
21   was diabetic?
22       A.    No.
23       Q.    Did you ever check
24   Mr. Jung's chart that day?

```
 1        A.    No.

 2        Q.    Should you have?

 3        A.    No.

 4        Q.    Were you concerned when he

 5   said his legs hurt?

 6        A.    No.

 7        Q.    Why not?

 8        A.    That was the only symptom he

 9   complained of.  He didn't look -- nothing

10   that -- symptomatically nothing that he

11   was showing or telling me was a concern,

12   which is why I told the correctional

13   officer to call the stretcher call if he

14   continues to complain of pain.

15        Q.    Did you check Mr. Jung's

16   vitals?

17        A.    No.  For leg pain, no.

18        Q.    And why not?

19        A.    You don't check vitals for

20   leg pain.

21        Q.    Did you know about

22   Mr. Jung's mental health conditions?

23        A.    No.

24        Q.    Did you know Mr. Jung had
```

Deposition of Blair Cabellos, LPN                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
1              Q.    Did you speak to any medical

2    staff about Mr. Jung?

3              A.    No.

4              Q.    Did you speak to any

5    correctional staff about Mr. Jung?

6              A.    No.

7              Q.    Did you interact with

8    Mr. Jung after this November 5th

9    incident?

10             A.    No.

11             Q.    Do you recall being

12   interviewed by PDP staff about this

13   matter?

14             A.    Briefly.  Shortly.

15             Q.    Who did you speak with?

16             A.    I don't remember his name.

17             Q.    What did you tell them?

18             A.    The same thing I just told

19   you.

20             Q.    Do you recall what the

21   findings of that PDP inquiry was?

22                   ATTORNEY PESTRAK:

23             Objection.

24                   THE WITNESS:  No.
```

Exhibit 22

Interview of Blair Cabellos



# PHILADELPHIA DEPARTMENT OF PRISONS
## INTERVIEW RECORD



☒ OFFICE OF PROFESSIONAL COMPLIANCE
☐ EQUAL EMPLOYMENT OPPORTUNITY UNIT
☐ OFFICE OF COMMUNITY JUSTICE AND OUTREACH
☐ SPECIAL INVESTIGATIONS UNIT

| Interview of: Blair Cabellos | | PR# | Date: 2/22/2024 | Time: 10:50 am |
|---|---|---|---|---|
| Title: LPN | Assignment/ Shift: RCF 7A-3P | | Case Number: 23-00188 | |
| Interviewed by: Lt Shawn Jay | | Witnessed by: Union Rep:  None Requested | | |

On the above date LPN Cabellos was interviewed and he gave the following statement.

Q. What is your current assignment and shift?

A. RCF 730am – 4pm

Q. How long have you been assigned there?

A. Jan 2 of 2024

Q. Were you assigned to CFCF on November 5, 2023?

A. Yes

**I AM SHOWING YOU A PICTURE OF I/P LOUIS JUNG PP# 718327**

Q. Have you ever had any interaction or treated I/P Jung for any reason; if so what interaction did you have with I/P Jung?

A. I don't recall I/P Jung at all.

**I am showing you a video of B1pod3 CFCF from November 5, 2023**

Q. Is that you in the video?

A. Yes

Q. While walking around with the officer did you see the I/P on the floor in the doorway of cell 21?

A. Yes

Q. At any time during you being on B1pod3 did the I/P in Cell #21 ask you for assistance; if so what did he say to you?

A. He said that  he needed help to get up

Q. Did you assist him in any way while you were on B1pod3 on November 5, 2023; if so how?

A. You did not feel comfortable due to him having a cellmate and we were instructed that we are not to go into any cell unless there is more than one officer.

Q. During the video it appears that you and the officer had a conversation after walking away from Cell#21 before you exit the unit; what was the conversation about?

A. I told the officer to call a stretcher due to the I/P stating that he could not get up.

Q. Is there anything you would like to add?

A. No

I verify that I have read this entire statement, initialed all corrections and signed this statement.  I verify that it is true and correct to the best of my knowledge information and belief.

Signature _____  Date 2/22/24  Time _____  Page _____ of _____

Fraiser-000026

Exhibit 23

YesCare Core Process Program 503-C-SOP:

Urgent/Emergent Care

| CORE PROCESS PROGRAM | | **YesCare** Say Yes To Exceptional Care |
|---|---|---|
| Urgent/Emergent | 503-C-SOP | Clinical SOP |
| Urgent/Emergent Care | | |

## PURPOSE

Health staff must be able to quickly identify potential urgent/emergent health needs for patients in the facility. Health staff must use their clinical knowledge and critical thinking skills to identify current or potential health issues that would require more immediate treatment.

## OBJECTIVES

1. Identify patients that present with urgent/emergent needs.
2. Provide emergency care to patients, as appropriate.
3. Follow the emergency transportation procedure of the facility if emergency services are indicated.
4. Arrange for urgent/emergent care by contacting the provider.
5. Transcribe and implement provider orders received.
6. Document urgent/emergent care provided.

## PROCEDURE

| Urgent/Emergent Care | | SMARTies |
|---|---|---|
| Step 1 | Receive notification of a medical emergency | Medical emergencies may be called different names in different facilities, e.g., man down, code blue, code green.  Know the name for a medical emergency at your facility. |
| | | ***Do Not Wait for an Emergency to Occur*** |
| | | Know the following: |
| | | ➢ Who responds to emergency calls from medical and behavioral health. Verify this information at the start of your shift |
| | | ➢ Who will call 911. Consider having another medical/behavioral health staff member contact emergency medical service (EMS) provider and custody/correctional staff while first responder medical staff/nurse continues emergency procedures |
| | | ➢ The location and contents of the emergency bag, supplies, and equipment |
| | | ➢ Who is responsible for bringing oxygen, AED, backboard, and stretcher? |
| | | ➢ How to transfer to the Emergency Department |
| | | • By ambulance |
| | | • By security vehicle |

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.

YesCare 3388

| Urgent/Emergent | 503-C-SOP | Clinical SOP |
|---|---|---|

## Urgent/Emergent Care

| Urgent/Emergent Care | | | SMARTies |
|---|---|---|---|
| Step 2 | Gather emergency equipment | | Best practice is to have facility required forms pre-assembled into packets for easy use by staff during emergency situations. |
| Step 3 | Respond to the site of the medical emergency | | Know the response time for responding to medical emergencies at your facility. For facilities accredited by ACA, that response time is four minutes. NCCHC does not provide a time frame, but it is a good rule of thumb to use the four minute rule. |
| Step 4 | Enter the location ONLY after being cleared by custody | | DO NOT enter any area until the custody staff has deemed it safe for you to enter. It may be necessary to request custody to restrict inmate movement in the area of the response. |
| Step 5 | Determine if the patient's medical needs are emergent or urgent | | |
| | *If...* | *Then...* | |
| | Emergent | **Refer to Emergent Steps 1 through 9** | |
| | Urgent | **Refer to Urgent Steps 1 through 7** | |
| **Emergent** | | | |
| Step 1 | Initiate emergency care | | YesCare has developed select Emergency Response Tools (ERTs) for use in emergency situations. They are streamlined to include the most vital subjective and objective data and give the health professional in the emergent situation physician-approved intervention to begin until provider guidance can be obtained. The first responder should continue emergency care or life-saving actions until the emergency medical response team arrives on the scene. The first responder continues to support emergency response efforts until advised by the emergency medical response team to stop. |

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.

YesCare 3389

| Urgent/Emergent | 503-C-SOP | Clinical SOP |
|---|---|---|
| **Urgent/Emergent Care** | | |

| Urgent/Emergent Care | | SMARTies |
|---|---|---|
| **Emergent (cont'd)** | | |
| Step 2 | Notify custody staff of need for emergency transport | |
| Step 3 | Notify local Emergency Medical Services (EMS) | The notification process may be completed by a health staff member or by custody staff. Know who contacts 911 in your facility. |
| Step 4 | Complete Emergency Department Referral/EMS transport forms as per facility procedure/contract requirements<br>Provide a copy to:<br>➤ EMS<br>➤ Staff member responsible for CARES entry<br>➤ Health record | Available YesCare form:<br>• Emergency Department Referral (NA5000)<br>All staff **MUST** know where the emergency care/EMS forms are located, and how to properly complete. If you do not know, consult your manager/supervisor. |
| Step 5 | Hand off emergency care to emergency medical service (EMS) team:<br>➤ Assist EMS with preparing the patient for transport<br>➤ Provide EMS with report include pertinent health information and description of emergency event | |
| Step 6 | Notify receiving facility of emergency transport and provide:<br>➤ Pertinent health information<br>➤ Current medication(s)<br>➤ Actions and interventions taken prior to transport<br>➤ Patient's response to actions or interventions | |
| Step 7 | Document findings and interventions including, but not limited to:<br>➤ Emergent care need(s)<br>➤ Times<br>➤ Persons involved<br>➤ Provider notification and orders<br>➤ Specific actions and/or interventions<br>➤ Patient's response to actions or interventions<br>➤ Custody staff notification<br>➤ Name of the facility patient being transported to<br>➤ Any communication with the hospital prior to patient transport<br>➤ Mode of transportation and time of transport<br>➤ Was transport for medical or behavioral health care | Available YesCare form:<br>• Emergency Response Form (NA6291) |

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.

| Urgent/Emergent | 503-C-SOP | Clinical SOP |
|---|---|---|

## Urgent/Emergent Care

| Urgent/Emergent Care | | SMARTies |
|---|---|---|
| **Emergent (cont'd)** | | |
| Step 8 | Document on the shift report that patient is out to the ED | |
| Step 9 | Determine disposition from the ED | |

| | *If…* | *Then…* | It is best practice for site leadership to be notified of inpatient admissions. Know how this is handled at your facility. |
|---|---|---|---|
| | Admitted to inpatient status | a. Communicate the inpatient admission to the UM nurse assigned to your facility<br><br>b. Document admission in the health record | |
| | Returned to the facility | a. Document return to the facility. Include the following:<br>  ➢ Time of return<br>  ➢ Note if documentation was returned with the patient by the ED<br><br>b. Document patient's baseline condition through an objective evaluation to include general appearance, orientation, eyes, mouth, respiratory, lung sounds, and skin condition to include any wounds or incisions<br><br>c. Review documentation received from the ED<br><br>d. Notify the provider of the patient's return<br>  ➢ Review documentation from the ED<br>  ➢ Determine appropriate housing<br>  ➢ Receive and document any provider orders<br><br>e. Implement any orders received<br><br>f. Notify custody to transport to housing | Available YesCare form:<br>• Return from Off-Site (NA7853)<br>Documentation from the ED should always accompany the patient. If no documentation is received, immediately contact the ED. |

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.

| Urgent/Emergent | 503-C-SOP | Clinical SOP |
|---|---|---|

## Urgent/Emergent Care

| Urgent/Emergent Care | | SMARTies |
|---|---|---|
| **Urgent** | | |
| Step 1 | Respond to recognized urgent care need | |
| Step 2 | Choose the Nursing Encounter Tool (NET) or contract approved nursing protocol based on the recognized urgent care need | NETs can be found in the YesCare NETs Manual or on MyYesCare. |
| Step 3 | Complete the NET or contract approved nursing protocol in its entirety | |
| Step 4 | Contact the provider with the following information:<br><br>➢ Description of urgent care need(s)<br>➢ Pertinent health information<br>➢ Subjective and objective findings i.e. vital signs<br>➢ Current medications<br>➢ Specific actions and/or interventions taken, include times<br>➢ Patient's response to actions or interventions | |
| Step 5 | Obtain and implement provider orders | If change in housing disposition ordered, notify and collaborate with custody staff to ensure patient is moved in a timely manner. Contact your manager/supervisor for any challenges or housing placement delays. |
| Step 6 | Provide and document patient education | |
| Step 7 | Ensure the NET or contract approved nursing protocol is in the health record | |

© YesCare, Corp. All information and photos are confidential and proprietary and cannot be otherwise used or disseminated without the prior written consent of YesCare. All Rights Reserved.

YesCare 3392

Exhibit 24

Expert Report of Lori Roscoe



## —C H C—
### CORRECTIONAL HEALTHCARE CONSULTANTS LLC

EXPERT WITNESS REPORT OF LORI E. ROSCOE, DNP, PhD, APRN, ANP-C, CCHP-RN
REGARDING Louis Jung

I have been retained to render opinions regarding the care and treatment of Mr. Louis Jung while detained at the Philadelphia Department of Prisons. My opinions are based on my knowledge, education, training and experience, and the records, videos, and reports I reviewed regarding this matter.

EXPERIENCE AND QUALIFICATIONS:

I am an Advanced Practice Registered Nurse, certified as an Adult Nurse Practitioner. I have a Bachelor's Degree in Education, a Bachelor's Degree in Nursing, a Master's Degree in Public Administration with a healthcare concentration, a Master's Degree in Nursing, a Doctorate Degree in Healthcare Administration, and a Doctor of Nursing Practice degree. I am certified by the National Commission on Correctional Healthcare (NCCHC) as a Correctional Health Professional and a Correctional Health Professional– Registered Nurse. I am currently the principal of Correctional HealthCare Consultants LLC. I began in correctional healthcare in 1995, and have worked in various correctional healthcare roles, including as a correctional facility Health Services Administrator, a Regional Administrator, an Associate Program Director, an Executive Director of Clinical Services, a nurse practitioner, and a registered nurse. I have active registered nurse licensure in California, Kentucky, Florida, Washington, Virginia, and Georgia. In addition, I am licensed as an Autonomous Advanced Practice Registered Nurse (nurse practitioner) in Florida and an Advanced Practice Registered Nurse (nurse practitioner) in California, Kentucky, Virginia, and Georgia.

I have worked for private contractors, such as Correct Care Solutions and CorrectHealth, LLC, and state subcontractors, such as the Medical College of Georgia. In my administrative roles, I was

responsible for policy and procedure development; staff supervision, including RNs, LPNs and ancillary staff; staff education, including RNs, LPNs, ancillary staff, providers and custody staff; Continuous Quality Improvement Programs; and fiscal management. I continue to provide these services, as well as healthcare program transitional, evaluative and consultation services to correctional health programs through Correctional HealthCare Consultants LLC.

I am a member of the American Nurses Association's national expert workgroup that reviewed and revised the *Correctional Nursing: Scope and Standards of Practice,* most recently published in 2021 (third edition). Under the auspices of the American Correctional Nurses Association, I am currently working on the fourth edition, expected to be published in 2026.

I am a member of the National Commission on Correctional Health Care (NCCHC) Multidisciplinary Education Committee, and a member of the American Correctional Association's Nursing Committee and Healthcare Committee. I am a peer reviewer for the Journal of Correctional Health Care. I was an invited expert on the 2024-2025 NCCHC Standards Advisory Task Force that reviewed/edited the 2026 *Standards for Health Services in Jails* and the *Standards for Health Services in Prisons,* published in August 2025.

I am a founding member and President-Elect of the American Correctional Nurses Association. A complete listing of my education, training, and experience is set forth in my Curriculum Vitae, a copy of which is attached to this report as Exhibit A.

COMPENSATION AND PRIOR TESTIMONY:

I have attached to this report as Exhibit B a list of all cases in which I have testified by deposition or at trial in the last four years. I currently receive compensation of $400 per hour for case review and expert report production, with an initial retainer of $5000 for up to 10 hours of work. I receive $650 per hour compensation for deposition and court testimony, with a four-hour daily minimum, and travel time reimbursed at $275 per hour as applicable. Travel expenses are charged per actual cost.

2

DOCUMENTATION REVIEWED:

Please see Exhibit C attached to this report.


SUMMARY

On October 27, 2023, Mr. Jung was discharged from Norristown Hospital and remanded to the Philadelphia Department of Prisons (PDP). On October 28, 2023, Medical Assistant (MA) Carullo completed a pre-intake screening and documented that Mr. Jung was a diabetic. His blood glucose was measured at 542 mg/dL. However, on the Confidential Intake Questionnaire completed that same day, it was documented that Mr. Jung was *not* a diabetic. On the Physical Health Follow-Up form, he was referred for a 28-day chronic care appointment for diabetes management.

Later on October 28, 2023, Registered Nurse (RN) Mariesha Apollon completed Mr. Jung's intake evaluation. She documented that he was not currently taking medication for diabetes, although elsewhere on the form it was indicated that he *was* a diabetic per the pre-intake screening.  A history of non-compliance with other medical treatments was also noted. Vital signs were recorded as: blood pressure 110/82 mmHg, pulse 92 beats per minute, respirations 18 breaths per minute, oxygen saturation 97%, temperature 97.0°F, and blood glucose 542 mg/dL. Mr. Jung reported that he had not received insulin for three days.

RN Apollon contacted a provider, who ordered 10 units of NPH and 12 units of regular insulin; these doses were administered, and Mr. Jung was provided a snack. A urine dip revealed the presence of ketones, and Mr. Jung was encouraged to drink fluids. RN Apollon initiated an urgent behavioral health referral as well as a behavioral health reentry referral. She completed a referral for practitioner evaluation and review of medication.

At approximately 2148 hours on October 28, 2023, Nurse Practitioner (NP) Gay reviewed Mr. Jung's intake screening. She wrote he had previously been admitted to the PDP in June 2023, and she renewed his previously ordered medications (levothyroxine and atorvastatin). She documented his medical history as including diabetes, hypercholesterolemia, COVID-19, MRSA, and a history of

non-compliance with medical treatment. NP Gay reiterated that Mr. Jung's blood glucose was 542 mg/dL upon entry; that he had not received insulin for three days; and that he was administered 10 units of NPH and 12 units of regular insulin earlier that day.

NP Gay's assessment included mixed hyperlipidemia, hypothyroidism, and diabetes mellitus without complications. She ordered Novolin N (NPH) 10 units twice daily for 90 days and Novolin R (regular insulin) on a sliding-scale, to be administered twice daily beginning October 28, 2023. NP Gay's disposition included admission to general population with medications ordered, laboratory tests and diagnostics ordered, and chronic care follow-up scheduled.

This facility uses the term CRIC to refer to *Corrective Regular Insulin Coverage,* which is regular insulin administered to address hyperglycemia identified through blood glucose checks. CRIC is usually ordered on a sliding scale, which means there is a range of dosages ordered, and nursing staff must administer the dose corresponding to the actual blood glucose as measured by a glucometer. Also at this time, Policy and Procedure stated that when an incarcerated person refused their insulin, a refusal form is completed, signed and entered into their health record. In addition, an appointment to speak to a provider (red flag appointment) should be created every time an incarcerated person does not receive their prescribed insulin. This appointment should occur the next day per the Nursing Encounter Tool (NET) for Hyper/Hypoglycemia.

On October 29, 2023, Mr. Jung's morning blood glucose was 385 mg/dL, and he received 10 units of CRIC and 10 units of NPH. His afternoon blood glucose was 585 mg/dL, and he received 12 units of CRIC and 10 units of NPH. There is no indication that a provider was notified or that a urine ketone test was performed. The Nursing Encounter Tool (NET) for Hyper/Hypoglycemia was not used.

On October 30, 2023, Mr. Jung's morning blood glucose was 268 mg/dL, and he was administered 8 units of CRIC and 10 units of NPH. The evening dose section was blank, with no documentation present. No red flag appointment was made. Also on October 30, 2023, Mr. Jung's PPD (Purified Protein Derivative - test for exposure to tuberculosis) was read as 0 mm induration (negative).

On October 31, 2023, Licensed Practical Nurse (LPN) Ricks documented that Mr. Jung was offered a COVID-19 Moderna bivalent booster, which he refused. There is no corresponding signed refusal form in the health record. That morning, Mr. Jung's blood glucose was 371 mg/dL, and he received 10 units of CRIC and 10 units of NPH. His evening blood glucose was 500 mg/dL. No CRIC insulin was administered, although 10 units of NPH is documented as given. There is no corresponding note in the health record explaining why the ordered CRIC was not administered. No Hyper/Hypoglycemia NET was completed; and no provider was notified of Mr. Jung's extremely high blood glucose.

*Because the November 2023 medication administration record (MAR) for Mr. Jung was not part of his health record, the following chronology regarding blood glucose readings and nursing actions are based on the Patient Safety Event Committee presentation by Lynda Witkowski, completed after his death, regarding Mr. Jung's care while detained at the Curran-Fromhold Correctional Facility (CFCF) until his death on November 6, 2023.*

On November 1, 2023, Mr. Jung's morning insulin was refused. There was no signed refusal form in the health record and no red-flag follow-up appointment made. His evening blood glucose was 411 mg/dL, and no CRIC insulin was administered; no urine testing for ketones was conducted; no Hyper/Hypoglycemic NET was initiated, and no provider was notified.

On November 2, 2023, Mr. Jung's morning blood glucose was 290 mg/dL, and he received 8 units of CRIC and 10 units of NPH. His evening blood glucose was 245 mg/dL, and he received 6 units of CRIC and 10 units of NPH.

On November 3, 2023, Mr. Jung was documented as a no-show for the morning blood glucose check and insulin administration. No provider was contacted and no red flag appointment was made. There is no indication that anyone checked on Mr. Jung to ensure his safety. His evening blood glucose was 394 mg/dL, and he received 10 units of CRIC and 10 units of NPH.

On November 4, 2023, Mr. Jung's morning blood glucose was 266 mg/dL, and he received 8 units of regular insulin and 10 units of NPH. It is unknown if Mr. Jung was offered his evening blood glucose test and insulin because his evening blood glucose and insulin administration fields were blank, and there is no documentation in the health record of any nursing interventions at that time.

On November 5, 2023, Mr. Jung was noted to be a no-show for the morning blood glucose check and insulin administration, and again no one checked on Mr. Jung's well-being. No provider was notified and no red flag appointment was made. That evening, Mr. Jung was documented as refusing insulin. There is no signed refusal form, no red flag appointment made and no provider notification.

Video footage from November 5, 2023, at approximately 0955 hours, shows Custody Officer (CO) Gena Frasier and LPN Blair Cabellos in the unit. Per their depositions, CO Frasier informed LPN Cabellos that Mr. Jung wanted to speak with her. When Mr. Jung's cell door was opened, he was visible lying on the floor at/in the doorway. CO Frasier and LPN Cabellos briefly conversed outside the cell, and the nurse left the unit. Mr. Jung remained on the floor in the cell doorway. At approximately 1005 hours, Lieutenant Bloodsaw arrived. Two incarcerated persons were given gloves, went to Mr. Jung's cell, and pulled him further inside the cell. Lt. Bloodsaw closed the door and left the unit. CO Frasier testified in her deposition she believed the nurse did not identify a need for a medical emergency response and she would not override the nurse's medical judgment. LPN Cabellos did not document this encounter in Mr. Jung's health record, but she testified that Mr. Jung asked to see her because of leg pain. She stated that when she went to the cell, he was standing; stated he couldn't walk but did; and then gently went to the floor. She told Mr. Jung to submit a sick call request. She instructed CO Frasier to make a stretcher call if Mr. Jung continued to complain. CO Frasier testified that she was never told to do that. LPN Cabellos stated that she usually did not interact with Mr. Jung because she did not have medications to administer to him, but according to the MAR, Mr. Jung was prescribed levothyroxine as a morning medication, which

6

is the medication administration she was doing. Per the October MAR, Mr. Jung did receive the levothyroxine during some of the morning medication passes.

On November 6, 2023, Mr. Jung was again a no-show for blood glucose measurement and insulin administration. No refusal form was signed, no red flag appointment was made and no provider was notified. No one checked on Mr. Jung to ensure his well-being. The nurse later stated she had intended to return to obtain a signed refusal when the emergency call was made. This refusal represented the fourth time in two days that Mr. Jung, for whatever reason, did not receive his ordered insulin. Thus, his last dose of insulin was on November 4, 2023 in the morning.

At approximately 0604 hours on November 6, 2023, Custody Officer Aaron Hester discovered Mr. Jung unresponsive on the floor during morning meal pass. A medical emergency was initiated. Medical staff, including NP Henderson-Hamright, Dr. Trivikram, and LPN Jeoboham, arrived around 0610 hours. Mr. Jung was breathing but was minimally responsive and staring upward. Because he was known to be a "brittle diabetic," NP Henderson-Hamright requested an immediate blood glucose measurement, which read "HI" on the glucometer, indicating severe hyperglycemia beyond the meter's limit.

She noted that Mr. Jung was cold, clammy, and minimally responsive even to ammonia inhalants. He was placed on a stretcher at approximately 0619 hours for transport to medical for insulin administration and further assessment. En route, he stopped breathing, and CPR was initiated. Naloxone was administered twice with no effect. Fourteen units of insulin were given, and EMS was notified. An AED and ambu-bag ventilation device were applied. Mr. Jung was moved to the floor for more effective compressions. EMS arrived at approximately 0646 hours, and Mr. Jung was pronounced deceased at 0647 hours. The autopsy report indicated that Mr. Jung died from ketoacidosis.

After Mr. Jung's death, the YesCare Patient Safety Event Committee reviewed the death and identified several concerning issues. It noted the discrepancies at intake with identifying Mr. Jung

7

as a diabetic and specifically stating he was not a transfer back from Norristown Hospital as a failure to answer intake questions appropriately. It identified that nurses were not using the NET for Hyper/Hypoglycemia during the Intake screening, and at other times when Mr. Jung's blood sugar was equal to or greater than 400 mg/dL, or per policy, equal to or greater than 300 mg/dL if symptomatic. It noted that nurses did not use the CRIC for blood glucose levels greater than 400mg/dL, nor did they contact a provider. Nurses failed to obtain a signed refusal and schedule patients to be seen by a provider through a red flag appointment. It identified that nurses were leaving the medication administration record blank. Nurses also documented that a patient prescribed insulin was a "no show" but did nothing to verify the patient was okay. It also noted that the provider contacted by the intake nurse failed to follow-up in real time regarding a patient with a blood sugar of 542 mg/dL and positive ketones. Healthcare staff also were not testing their patients with a blood sugar over 400 mg/dL for ketones. Finally, the Patient Safety Event Committee used the decision tree to assign Mr. Jung's death as a category 4, Serious Safety Event.

At this time, YesCare had a policy for refusals, *J-G-05.1 Refusal of Medication or Clinical Encounter*, that stated, in part, that refusals should be documented on an appropriate form - Refusal of Service - with the signature of the patient and the health staff, or if the patient refused to sign, the signature of health staff and a witness. It included that a provider must be notified if the patient refused or missed one dose of a critical medication, including insulin. Also in effect were two processes regarding making red flag urgent appointments: *YesCare Core Process Program 214 C SOP Medication Administration*, which stated that a provider must be notified for any patient missing a single dose of a critical medication. The *Philadelphia Department of Prisons Red Flag Medication Compliance System 4.E.24.2* in part, mandated a weekly report of "Red Flag" patients who were non-compliant with their medications. This included a required summary of all persons who were counseled about their non-compliance. There is no evidence that nursing staff made any red flag appointments for Mr. Jung during his October – November 2023 incarceration, or that he was seen and counseled for his insulin refusals.

To address these deficiencies, YesCare's action plan included retraining the individual nurses who were not practicing according to policy and procedures. Subsequent audits of insulin administration continued to show staff failed to adhere to its policies and procedures and protocols, including notifying a provider when a critical medication was not administered; initiating the Hyper/Hypoglycemia NET for patients with equal to or greater than 400mg/dL blood glucose readings to include urine testing for ketones and notification of a provider. The YesCare audits in January 2024 and August 2024 confirmed that the treatment of patients with high blood sugar greater than or equal to 400mg/dL per the policies, procedures and protocols had not improved. In fact, a repeat audit conducted November 18, 2024 also indicated no improvement in performing a ketone check, notifying a provider and completing the NET when the blood sugar was greater than or equal to 400mg/dL. The Quality Improvement Team's plan was to send the health service administrators the names of nursing staff not performing these interventions and to re-audit in two months.

Review of the records of Mr. Jung's incarceration before he was sent to Norristown Hospital in June of 2023 identifies similar lapses in care and adherence to the policies and procedures; the Clinical Pathway for Diabetes; and the Hyper/Hypoglycemia Nurse Encounter Tool.  Elevated blood glucose levels were not appropriately managed; providers were not always notified per the NET and Clinical Pathway requirements; and red flag appointments and next day appointments were not routinely scheduled when Mr. Jung did not receive his insulin dose.

There is also evidence that nursing staff documented refusals of blood glucose checks and insulin based on the report by the custody officer, rather than having an interaction with their patient. This is unacceptable, as every patient refusing care or medications must be counseled face-to-face and given the ramifications of not accepting the nursing intervention or medication. This is also an opportunity to ensure the patient is alright.

In addition, there were many more refusals documented on the MARs than refusal forms completed and filed in the health record. Informed refusals were not always provided to Mr. Jung, and most

9

refusals were not signed by him acknowledging an understanding of the risks. In correctional healthcare, obtaining an informed refusal is essential because it preserves the patient's autonomy while ensuring they truly understand the treatment/medication, its purpose, the risks of refusing, and any available alternatives. It allows the nurse the opportunity to assess whether the refusal reflects misunderstanding, fear, impaired judgment, or a clinically significant change that requires further evaluation, and it creates a clear record of the education, assessment, and follow-up plan developed by the nurse. When a patient refuses to sign the refusal document, the nurse must still complete the refusal process with documentation of the patient education given to the patient and the patient's response, and then the date and time the patient refused to sign must be documented on the form. In addition, the nurse must obtain the signature of someone who witnessed the patient education given and subsequent refusal to sign the form. This can be either another healthcare staff member or custody staff but must be someone who was there when the patient was educated and refused to acknowledge it through his/her/their signature on the refusal form.

I also noted that Dr. Bradley documented on May 20, 2023 that she was discontinuing the order for glucose checks and CRIC four times a day, and reduced it to twice a day, even though Mr. Jung's diabetes continued uncontrolled. Her justification for this punitive action was "current staffing does not allow for QID evaluations in the setting of non-compliance," and she adjusted his insulin orders accordingly. The actions of Dr. Bradley in this situation are contrary to adequate diabetes care and correctional health care. The American Diabetes Association[1] recommends frequent blood glucose monitoring for Type 1 Diabetics (6-10 per day), and step-down orders should only be given when the patient is improved. Basic correctional healthcare cannot be withheld based on current staffing levels, and the treatment plan should always be based upon the needs and condition of the patient. NCCHC correctional healthcare standards for an adequate healthcare program require that patients are allowed to refuse care and the care decisions made by a provider reflect the patient's medical condition and needs, rather than their refusal behavior. The care provided in the facility must be reflective of the care a patient can receive in the community.

---

[1] https://diabetesjournals.org/care/article/48/Supplement_1/S146/157557/7-Diabetes-Technology-Standards-of-Care-in

Fundamental medical knowledge includes that reducing monitoring frequency in brittle diabetes increases the likelihood of unrecognized hyperglycemia, hypoglycemia, and delayed detection of DKA. Thus, reducing the frequency of blood glucose monitoring to twice daily in a brittle diabetic, based solely on refusals and staffing levels, would fall below accepted standards and pose significant clinical risk.

## DISCUSSION

The care provided to Mr. Jung from his arrival at the Philadelphia Department of Prisons on October 27, 2023, until his death on November 6, 2023, reflects a series of significant and repeated deviations from accepted nursing practice and standards of care, diabetes management standards, and facility policies. These failures occurred at every stage of his incarceration, beginning with his intake evaluation, continuing throughout his daily nursing encounters, and culminating in the inadequate response to his visible clinical deterioration shortly before his death.

When RN Apollon conducted Mr. Jung's intake evaluation on October 28th, she encountered conflicting information regarding whether he was diabetic. She documented a blood glucose of 542 mg/dL which is a critically high level that placed Mr. Jung at immediate risk for diabetic ketoacidosis. Although she appropriately contacted the provider and checked for ketones, she did not complete the Hyper/Hypoglycemia Nursing Encounter Tool (NET) nor did she conduct the ongoing reassessment required for a patient in acute metabolic distress. After administering insulin, she did not recheck Mr. Jung's blood glucose or ketones, nor did she continue monitoring him until the level dropped to a safer range, but she should have. A glucose level exceeding 500 mg/dL accompanied by ketonuria represents a medical emergency requiring repeated reassessment, close monitoring, and continued communication with the provider. Often a blood glucose that high warrants transfer to an emergency department for a higher level of care than can be rendered in a correctional facility. RN Apollon's failure to carry out these essential nursing responsibilities deviated significantly from the standard of nursing care.

The provider, NP Gay, appropriately ordered regular and NPH insulin at intake, but she likewise did not order any follow-up blood glucose checks or reassessments. Established practice for managing severe hyperglycemia includes checking the blood glucose approximately one-two hours after insulin administration, again at four hours, and then continuing monitoring based on clinical response. YesCare's own Hyper/Hypoglycemia NET reflects these requirements. In addition, NP Gay should have explicitly ordered follow-up glucose checks for Mr. Jung to ensure her treatment plan was efficacious.  Without any provider orders directing follow-up assessment, nursing staff lacked clear guidance for monitoring a patient at high risk of rapid decompensation. The failure of NP Gay to ensure that Mr. Jung, her patient with severe hyperglycemia, who was positive for ketones and who reportedly had not had insulin in three days, was properly monitored by nursing staff significantly deviated from the applicable standard of care.

Throughout his incarceration, Mr. Jung repeatedly demonstrated dangerously high blood glucose levels, including readings 500 mg/dL and greater, and ultimately a "HI" reading on the glucometer, indicating extreme hyperglycemia well beyond the meter's measurable range. A glucose level above 300 mg/dL is considered hyperglycemia and necessitates increased monitoring, while levels above 400 mg/dL require immediate action, including provider notification and assessment for diabetic ketoacidosis. However, nursing staff responsible for Mr. Jung's care continued to administer insulin without notifying a provider of his hyperglycemic blood glucose, failed to perform additional ketone testing, and did not use the Hyper/Hypoglycemia NET to guide their clinical actions and decisions. They did not escalate care despite blood glucose levels that clearly indicated a medical emergency, and they failed to make a red flag appointment so Mr. Jung would be evaluated and counseled by a provider the next day. These omissions reflect a clear failure to recognize and respond to life-threatening hyperglycemia and represent a significant deviation from the standard of nursing care.

Mr. Jung's ongoing risk of DKA was further compounded by the lack of monitoring for dehydration, mental status changes, and vital sign abnormalities by the nurses responsible for his glucose checks and medication administration. These signs could be indicative of developing metabolic

crisis. Mr. Jung had already demonstrated ketonuria at intake, and his persistent hyperglycemia placed him at high risk for worsening metabolic acidosis. Nevertheless, there were times, particularly during evening shifts, when no nursing encounter, or even attempt, was documented, and the MAR was blank. The failure of the nurses responsible for Mr. Jung's medication administration and care to monitor their patient and document their nursing interventions deviated significantly from the standard of nursing care.

The nursing response to Mr. Jung's missed or refused insulin doses reflected a systemic disregard for critical medication management. Between October 28, 2023 and November 6, 2023, Mr. Jung missed or refused multiple insulin doses, yet no nurse documented a follow-up assessment, no signed refusals were obtained, and no provider was notified. Facility policy required a provider be informed after even one missed dose of a critical medication such as insulin, and reasonable nursing care requires a "no-show" for essential medication administration must prompt immediate assessment to determine whether the patient is deteriorating clinically. In Mr. Jung's case, these missed doses were particularly dangerous given his already elevated blood glucose levels, yet no red-flag appointments were created, and no efforts were made to evaluate him. These failures deviated significantly from the standards of nursing care and directly increased his risk of developing DKA.

The events of November 5th further demonstrate a concerning lack of clinical judgment and follow-through. According to the testimony of LPN Cabellos, Mr. Jung was not on the floor when she arrived, and he complained of leg pain and inability to walk. She stated he took a few steps before "gently" lowering himself to the floor. Regardless how he reached the floor, once a patient is found lying or seated on the floor and not getting up, an immediate clinical assessment is required to evaluate for possible physical trauma, syncope, dehydration, neurologic compromise, altered mental status, or metabolic instability. Video evidence confirms that Mr. Jung remained on the floor in the cell doorway during and after this interaction.

A reasonable nurse in this situation would have conducted a physical exam and determined whether Mr. Jung needed to be transported to the medical unit for further evaluation and care; or,

13

if he/she/they were responsible for medication administration and could not interrupt their duties, would have called another nurse to evaluate Mr. Jung as soon as possible. At that time, depending on the nurse's findings, a stretcher call would have been made. Finally, a reasonable nurse would document the encounter and outcome in Mr. Jung's health record. However, despite Mr. Jung's presentation, LPN Cabellos conducted only a minimal encounter, did not perform a nursing evaluation, and left the unit without arranging for transport to medical or ensuring that another nurse evaluated Mr. Jung. She also did not document the encounter in Mr. Jung's health record.

There is conflicting testimony regarding LPN Cabellos' instruction to CO Frasier to call a stretcher call if Mr. Jung continued to complain, but as stated above, it was her responsibility to ensure Mr. Jung was monitored by healthcare staff. Mr. Jung ultimately remained on the floor until two incarcerated persons dragged him back inside the cell and the door closed. This represented a serious failure to recognize a potentially emergent medical condition and a missed opportunity to intervene in what was, in retrospect, early clinical deterioration associated with untreated hyperglycemia and impending DKA. The failure of LPN Cabellos to conduct a proper evaluation, escalate care, arrange for timely transport or reassessment by another nurse, and document the encounter in the health record significantly deviated from the standard of nursing care.

On November 6, 2023, the morning nurse did not follow up after yet another missed insulin dose and Mr. Jung was discovered unresponsive by custody staff during meal pass. Although an emergency response was initiated, by that time Mr. Jung had gone more than forty-eight hours without insulin, was showing clear signs of functional decline, and had likely progressed into severe Diabetic Ketoacidosis (DKA). Insulin administered during cardiopulmonary arrest is not a corrective treatment for DKA.

The YesCare Patient Safety Event Committee later identified many of these same failures, including lack of NET completion, insufficient use of CRIC insulin, incomplete documentation, lack of provider notification, and failure to address refusals and no-shows. Importantly, the Committee noted that even after initiating corrective actions, subsequent audits throughout 2024 showed continued non-compliance with critical aspects of diabetic care. This demonstrates that the

deficiencies in Mr. Jung's care were not isolated or attributable to a single nurse; they reflected systemic failures across the nursing service. A targeted retraining approach for individuals was insufficient given the scope of the problem. A facility-wide retraining initiative would have been necessary to address the global breakdown in safe diabetic practice.

My opinions and findings are made to a reasonable degree of nursing, provider and administrative certainty and are based upon my knowledge, education, training and experience, and the records, videos, and reports I reviewed regarding this matter. I hereby reserve the right to amend, supplement, or withdraw my opinion based upon future discovery and depositions of the relative parties that may be provided to me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully Submitted on December 2, 2025.

*Lori E. Roscoe*

Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN

# Curriculum Vitae
## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
404-805-9502

---

### PROFILE

---

An innovative Healthcare Manager, certified as an Advanced Practice Registered Nurse, a Correctional Health Professional, and a Correctional Registered Nurse, with 30 years of experience in Correctional Health Care and 36 years of Registered Nursing experience. An expert on National Commission on Correctional Health Care and American Correctional Association standards, and policy and procedure development and compliance. An educator of both nurses and correctional officers. A seasoned Continuous Quality Improvement professional. An experienced correctional health expert legal witness, including case review, expert report authoring, and deposition/trial testimony.

---

### EDUCATION

---

**Doctor of Nursing Practice**
University of Alabama, 2017

**Master of Science in Nursing, Adult Nurse Practitioner**
South University, 2014

**Doctor of Health Care Administration**
Madison University, 2006

**Master of Public Administration, Health Care concentration**
University of Hartford, 1994

**Bachelor of Science in Nursing**
University of Connecticut, 1989

**Bachelor of Science in Education, Secondary Education and Sociology majors**
Southern Connecticut State University, 1978

---

### AWARDS

---

DAISY Team and Correctional Nurse Leadership Award – November 2025

Margaret Collatt Service Award - 2023 – Academy of Correctional Health Professionals

High Honors - South University - 2014

Award for Academic Excellence – University of Hartford 1994

Woodruff Fellow 1992 – 1994 – University of Hartford

---

## EXPERIENCE

---

**Correctional HealthCare Consultants LLC**

January 2007 – present – Managing Member

**American Correctional Nurses Association** – (2020 – present), Co-Founder and Member of the Correctional Nursing workgroup currently reviewing and editing the *Correctional Nursing: Scope and Standards of Practice, 4th edition,* to be published 2026. President-Elect 2025-2026.

**National Commission on Correctional Health Care Jail and Prison Expert Advisory Task Force for the 2026 Standards** – 2024 – present.

**Independent Content Expert Reviewer** for Doctoral Nursing Student thesis regarding medication administration and Continuity of Care in a Jail setting - Aspen College – 2023-present

**Phoebe Putney Health System – Dougherty County Jail - Georgia** – (2023 – 2024) Healthcare program consultant

**Marion County, KY – Jailer J. Barry Brady** – (2018-present) Healthcare program transitional and ongoing consultation services

**Boone County, KY – Jailer Jason Maydak** – (2018-present) Healthcare program development, transition services and consultation services

**Laurel County, KY – Jailer Jamie Mosley** – (2017-2024; 2025-present) Healthcare Program Evaluation, ongoing program development, and consultation services

**Preceptor for MSN Nurse Practitioner students from Georgia State University – (**2016 – 2017) Semester of Nurse Practitioner experience in a correctional setting

**CorHealth Solutions, LLC – Dr. D. Brent Cherry** – (2016) - Correctional Health Program Development and contract initiation consultation- Somerset, KY

**National Commission on Correctional Health Care Multi-Disciplinary Education Committee** (2019 – present)

**Journal of Correctional Health Care,** peer reviewer (2019 – present)

**University of Connecticut School of Nursing** (2014 - 2016) – Expert Nurse panelist for a research study regarding the Correctional nurse and stress being conducted by Dr. Denise Panosky.

**American Nurses Association –** Member of the Correctional Nursing workgroup responsible for reviewing and editing the *Correctional Nursing: Scope and Standards of Practice* – latest version published November 2020.

**The Correctional Nurse Educator** (2010-present) – Developed and maintain an online educational site where nurses can earn continuing education credits in topics specifically related to correctional nursing. Accredited as a Provider by the California, Florida, Georgia, South Carolina and other Boards of Nursing.

**Medical Association of Georgia** (2007-2017) – Accreditation auditor for the Corrections Division.

**Legal casework** (2007-present) - Multiple cases for both Defendants and Plaintiffs.

**American Correctional Health Services Association –** Executive Director – 2011-2012

**Correct Health, LLC –** DeKalb County Jail (2008-2009) - Operational review, Management staff mentoring, CQI Program expansion and Annual Review, Procedures and Post Order development, nursing staff mentoring and education.

**Comprehensive Nursing Care, Inc.** (2007 - 2009) – Development of successful bid proposal for Medical Nursing Services at Hall County Jail – continued association to develop and execute a complete Nursing orientation program, written procedures for staff, Nursing Assessment Protocols, corresponding Nursing Treatment Notes and Blood Borne Pathogen Exposure Plan, CQI Program and ongoing Staff and Management mentoring.

### The Community Health Center, West Palm Beach, FL

July 2018 – 2023 – Nurse Practitioner

Nurse Practitioner volunteer provider at this Free Clinic – evaluate, diagnose and treat patients presenting to the clinic with a wide range of illnesses and injuries, including chronic illnesses such as diabetes, hypertension, seizure disorder and hyperthyroidism; women's health issues; mental illness; and acute conditions like infections; sprains and minor injuries. Preceptor for Nurse Practitioner, Physician Assistant, Medical and RN students.

### Correct Care Solutions, Nashville, TN

September 2014 – January 2018 – Nurse Practitioner, Georgia

In collaboration with the Medical Director, provision of the full range of medical services for the patients at the facility, including sick call, urgent/emergent and chronic care. Interpretation of lab results and diagnostic studies ordered through the facility.

### CorrectHealth LLC, Atlanta, Georgia

January 2013 – June 2013 – Director of Clinical Support

Responsible for Clinical Services Education, Infection Control, Continuous Quality Improvement, and Accreditation. Daily clinical practice and staff contact. Exclusively responsible for the clinical education of staff at 33 sites, which included working side-by-side with staff, conducting needs assessments and evaluations, and the research of evidence based practices and guidelines to ensure staff were adhering to nationally approved standards of care.

January 2012- January 2013 – Executive Director of Clinical Services

Responsible for all aspects of Clinical Services, including Education, Infection Control, Continuous Quality Improvement, Health Information and Accreditation. Policy and Procedure review and development. Responsible for nursing and ancillary staff. Visited sites and interacted with clients on a regular basis.

July 2009 – December 2011 – Director of Special Projects

Participated in projects with the Georgia Department of Corrections; Project Coordinator and Lead Surveyor for an audit of all healthcare services for the Maricopa County Jail, Phoenix, Arizona; Developed projects and procured funding for the CorrectHealth Community Development Center (non-profit); Project Manager for a Special Study for the Wyoming Department of Corrections regarding healthcare access, medical cost and potential efficiencies; internal operations auditing and staff development. Within CorrectHealth, major responsibility for the clinical education of staff, including nurses, providers and ancillary staff. This included working side-by-side with staff, conducting needs assessments and evaluations, and evidence-based practices and guidelines research to ensure staff adherence to nationally approved standards of care.

**Georgia Correctional Health Care, Georgia Department of Corrections**

    2006 - 2007 – Staff Nurse/PRN - Georgia Diagnostic and Classification Prison

**Correctional Medical Services, St. Louis, Missouri**

    2004 - 2006 - Health Service Administrator - DeKalb County Jail (GA)

    2004 - Utilization Management Nurse (interim) - New Jersey Department of Corrections contract

    2000 - 2002 – Associate Program Director – New Jersey Department of Corrections contract

    1996 - 1998 – Associate Program Director – Massachusetts Department of Corrections contract

    1995 - 1996 - Health Services Administrator - Framingham Women's Prison (MA)

**New Britain Technical Institute, New Britain, CT** 1998 - 1999 – Instructor, LPN program

## PRESENTATIONS/LECTURES/PUBLICATIONS

**The Art of Saying No:  Real Strategies for Real Situations.** Presented at the Fall 2025 NCCHC Conference, Baltimore, MD.  November 4, 2025.

**American Correctional Nurses Association** webinar **Advanced Wound Care Therapy for the Correctional Environment, Moderator**  presented July 29, 2025.

**"How to Achieve Success as a Correctional Nurse Manager"** a series of 5 webinars held February 5th, 12th, 19th, and March 5th and 12th, 2025 for the National Commission on Correctional Healthcare - Lead Nurse Planner and presenter week 3, **Clinical Processes** and week 5, **Capstone** presentation.

**American Correctional Nurses Association** webinar **"Are You Ready to Advance Your Career? Principles of Correctional Nursing Leadership"** a panel discussion held February 6, 2025.

**American College of Correctional Physicians, Case Histories in Correctional Medicine, Webinar Moderator** presented August 21, 2024 .

**A Comprehensive Look at Correctional Healthcare Documentation: The Critical Importance of Medical and Behavioral Healthcare Documentation.** Academy of Correctional Health Professionals, webinar presented August 6, 2024.

**Case Studies in Correctional Nursing:  Practice, Standards and Leadership** presented at the National Commission on Correctional Health Care Spring 2024 Conference April 27-30, 2024 in St. Louis, MO.

**APRN Challenges: Staying Current on Treatment Guidelines** presented at the National Commission on Correctional Health Care Spring 2024 Conference April 27-30, 2024 in St. Louis, MO.

**American Correctional Nurses Association webinar presenter, "What Do the Correctional Nursing: Scope and Standards of Practice Mean to Me?"** Presented February 1, 2024.

**American College of Correctional Physicians, Webinar Moderator, "Compassion and Care--War Stories from the Trenches--Case Histories in Correctional Medicine"** presented November 16, 2023.

**"Bringing High Quality Healthcare to the Incarcerated – Lessons from a Nurse Educator"**  presented at The Western American Correctional Health Services Association conference October 25-27, 2023 in Sacramento, CA.

**The American Correctional Nurses Association, OPEN FORUM: All Things Intake** conducted June 20th, 2023; **Scope of Practice for Correctional Nurses** conducted July 20th, 2023; **Withdrawal** conducted October 19, 2023;   **Systemic Racism**, December 2023; **Recruitment and Retention** January 2024; February 2024; March 2024; April 2024; … March 2025; and ongoing.  ** This is a monthly ACNA activity**
**"Components of a Correctional Healthcare Program"** presented to the Kentucky Jailer's Association during its Educational Conference June 8, 2023, in Covington, Kentucky.

**"The Lived Experiences of Advanced Practice Registered Nurses in Correctional Settings"** presented at the National Commission on Correctional Health Care Spring 2023 Conference in New Orleans, Louisiana.

**"Components of a Correctional Healthcare Program"** presented to the newly elected Jailers at the Kentucky Jailers Association Conference December 9, 2022, in Lexington, Kentucky.

**"APRN Transformational Leadership"** presented at the National Commission on Correctional Health Care Spring 2022 Conference in Atlanta, Georgia.

**"How to Achieve Success as a Correctional Nurse Manager"** a series of 4 webinars for the National Commission on Correctional Healthcare by the Nurse Advisory Council – Lead Nurse Planner and presenter week 3, Clinical Processes, held August 3rd, 10th, 17th and 24th 2021.
Also Presented April 10, 2022, as a Pre-Conference half day session to the Spring National Conference of the National Commission on Correctional Health Care in Atlanta, Georgia.

**"Professional Practice in Our Post-COVID World: A Correctional Nurse Conversation"** presented at the Virginia Department of Correction Nursing Conference Keynote speaker July 13, 2021.

**"Honoring Our Practice in a Post-COVID World: A Correctional Nursing Conversation"** presented at the Wisconsin Department of Correction Health Services Administrators' meeting June 17, 2021.

**"How APRNs Can Add Value to Your Correctional Healthcare Operation"** presented at the National Commission on Correctional Health Care Spring 2021 Virtual Conference.

**"Patient Advocacy for the Correctional Nurse"** and **"Skin Assessment for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in Ft. Lauderdale, FL.  October 2019.

**"Clinical Decision Making in Correctional Nursing"; "Advanced Practice Registered Nurses in Corrections:  Roundtable"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN.  April 2019.

**"Clinical Judgment for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in Las Vegas, NV, October 2018 and in Atlanta, GA, May 2017.

**"A Seizure Disorder Primer for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN, April 2016.

**"A Hypertension Primer for the Correctional Nurse"** and **"The Nurse's Role in Chronic Care Management"** presented at the National Conference of the National Commission on Correctional Health Care in Dallas, TX, October 2015.

**"A Diabetic Primer for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in New Orleans, LA, April 2015.

Guest Expert Panelist, American Association of Legal Nurse Consultants webinar **"Civil Rights Litigation"** held nation-wide on October 30, 2014.

Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN                    November 2025

**"The Nurse's Role in Chronic Care Management"** presented at the National Conference of the National Commission on Correctional Health Care in Atlanta, GA, April 2014.

Guest Expert panelist, Omnisure webinar **"The Unscheduled Encounter: Reducing Liability and Risk",** held nation-wide on December 4, 2013**.**

**"The New ANA Scope and Standards of Practice for Correctional Nurses: Implementation Standard", "The New ANA Scope and Standards of Practice for Correctional Nurses: Communication Standard"** and **"The Essentials of Nursing Leadership: Capstone Presentation"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN, October 2013.

**"Unscheduled Encounters:  Managing the Nursing Curbside Consult"** and **"The New ANA Scope and Standards of Practice for Correctional Nurses: Implementation Standard"** presented at the National Conference of the National Commission on Correctional Health Care in Denver, CO, April 2013.

**"Unscheduled Encounters:   Managing the Nursing Curbside Consult"** presented at the National Conference of the National Commission on Correctional Health Care in Las Vegas, NV, October 2012.

**"Children and Prescription Drug Abuse" –** CHAMPS Instructor School, Georgia Sheriff's Association, June 2012.

**"Con Games: Inmate Manipulation"** presented at the Nursing Forum, American Correctional Health Services Association's National Conference in San Antonio, TX, April 2012.

**"HIV Awareness", "Universal Precautions"** and **"Inmate Medical Services"** at the DeKalb County Sheriff's Office 111th Jail Academy, February 2011 through the 124th Jail Academy, August 2014.

**"Crisis Intervention Training"** co-presenter at the American Correctional Health Services Association Georgia Conference, Savannah, Georgia, November 2009.

**"Nursing Forum: Legal Parameters and Best Practice"** at the American Correctional Health Services Association National Conference, Orlando, Florida, March 2009.

**"Dilemmas in Correctional Nursing"** at the American Correctional Health Services Association National Conference, Reno, NV, June 2007.

---

## PUBLICATIONS

Zucker, D., Reagan, L., Clifton, J., Abdulhamed, A., Roscoe, L., Wright, R., Penix, D., Shelton, D., and Loeb, S. (2022). **NPs caring for people who are incarcerated and negatively impacted by social determinants of health**. *The Nurse Practitioner (47)* 6, 38 - 46.  Wolters Kluwer Health, INC, DOI-10.1097/01.NPR.0000829804.16627.7b

Roscoe, L., Smith, S., and Shelton, D.  (2023). **Translating the Essentials for correctional nursing practice and professional development.** *The Journal of Continuing Education in Nursing, 54(9).* Doi: 10.3928/00220124-20230816-14.

Shelton, D., Roscoe, L., Kaptanovic, T., and Smith, S. (2025). **The correctional nursing workforce crisis:  An innovative solution to meet the challenge.** *Journal of Correctional Health Care,* Doi: 10.1089/jchc.24.09.0079.

---

## LICENSES AND CERTIFICATIONS

---

Advanced Practice Registered Nurse/Nurse Practitioner – Florida (Autonomous Practice APRN9485060), California (NP95006810), Georgia (RN179490), Kentucky (3012955) and Virginia (0024178346).

Certified Adult Nurse Practitioner – American Academy of Nurse Practitioners National Certification Board (A0614010 – expiration June 2029)

Registered Nurse licensure - Florida, Washington, California, Kentucky, Virginia, and Georgia

Certified Correctional Health Professional – Certified Correctional Registered Nurse –

National Commission on Correctional Health Care

Certified Provider of Continuing Education – California Board of Registered Nursing and others

Certified Guest Instructor - Georgia Peace Officer Standards and Training Council

BLS Healthcare Provider

---

## MEMBERSHIPS

---

American Correctional Nurses Association - Founding Member and President-Elect 2025-2026

American Association of Nurse Practitioners - member

American College of Correctional Physicians – member, Virtual Education Committee

American Correctional Association – member, Health Care Committee and Correctional Nursing Committee

American Jail Association - member

Western American Correctional Health Services Association (WACHSA) - member

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
**2021 - 2025**

<u>**Jason Hicks, Chris Hammons**</u>**, Laird, Hammons, Laird, PLLC**
**Oklahoma City, OK**
> Kizzie Simms, individually and as Special Administrator of the Estate of Gregory Neil Davis, Plaintiff, vs. Board Of County Commissioners For Oklahoma County; Board Of Trustees For The Oklahoma County Criminal Justice Authority; Greg Williams, individually, Turn Key Health Clinics, LLc, et al.
> *Plaintiff* **- ongoing litigation**

<u>**Sarah Mansfield, Wesley Clark and Frank Brazil**</u>**, Brazil Clark PLLC**
<u>**Nashville, TN**</u>
> Jason Michael Clark, ex rel Conservator Richard Gary Clark, Plaintiff v Fentress County, Sheriff Michael Reagon, Candy Norman (aka Candy Price), Fast Access Healthcare, Anthony Baird, Nerissa Owens, Defendants
> *Plaintiff* **- settled 2025**

<u>**Marko Duric,**</u>** Sandberg Phoenix**
<u>**St. Louis, MO**</u>
<u>**Shauna Reitz, Loizzi Law Offices, LLC**</u>
<u>**Chicago, IL**</u>
> Amy Hernandez, as Administrator of the Estate of Alex Alvarez, deceased, Plaintiff, v. Vippin Shah, MD, Deena Seed, Amy Frey, Amy Thurman, Pamela Ward and Wexford Health Sources, Inc Defendants.
> *Plaintiff* **- ongoing litigation**

<u>**Paul K. Croley II,**</u>** Law Offices of Croley & Foley**
<u>**Lexington, KY**</u>
> Tammy Webb, as Administratrix of the Estate of Terri Beth Mays, deceased v. Whitley County, KY, Brian Lawson, et al.
> *Plaintiff* **- ongoing litigation**

<u>**Anika Ades**</u>**, MacDonald Hoague & Bayless**
<u>**Seattle, WA**</u>
> Ryan Kelty, Plaintiff, v. Walla Walla County, Rebecca Groom, Nadean Pulfer, et al.
> *Plaintiff* **- settled 2025**

<u>**Derek Franseen**</u>**, Walsh & Franseen**
<u>**Edmond, OK**</u>
> Blake Williams, Plaintiff, v. Heather Hasenmyer, individual
> *Plaintiff* **- ongoing litigation**

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
**2021 - 2025**

**F. Davis Poisson III and Noah Abrams,** Poisson and Bower
**Raleigh, NC**
> Kahleel Truesdale, Plaintiff v. Quality Mobile X-Ray, Wellpath LLC, et al Defendant
> *Plaintiff* - **ongoing litigation**

**Paul K. Croley II,** Law Offices of Croley & Foley
**Lexington, KY**
> Keri Burnette, as Administratrix of the Estate of Aaron K Burnette, deceased v.
> Whitley County
> *Plaintiff* - **ongoing litigation**

**Aurora Randolph,** ALR Civil Rights LLC
**Denver, CO**
> Kisha Birts, Plaintiff, vs. Colorado Department of Corrections, Rita Winn, NP, et al.
> Defendants.
> *Plaintiff* - **ongoing litigation**

**Brian Tanner,** Griffin, Turner, Tanner & Clarkson
**Savannah, GA**
> Patsy Ann Amaro, as mother of Johnny Warren Conley;
> Jake Calvin Conley, as father of Johnny Warren Conley; et al v. Dr. Myra Pope, et al
> *Plaintiff* - **ongoing litigation**

**Anna Holland Edwards,** Holland, Holland Edwards & Grossman, LLC
**Denver, CO**
> Estate of Cristo Jesus Canett, by and through its personal representative Elizabeth
> Naranjo v. Wellpath LLC, Board of County Commissioners of the County of El Paso,
> CO; Sheriff Joseph Roybal, Anthony Lupo, individually; et al.
> *Plaintiff* - **ongoing litigation**

**Anna Holland Edwards,** Holland, Holland Edwards & Grossman, LLC
**Denver, CO**
> Estate of Amy Lynn Cross v. Turn Key Health Clinics LLC, Board of County
> Commissioners, Weld County, et al
> *Plaintiff* - **ongoing litigation**

**Thomas Day,** Eagan Flanagan and Cohen
**Springfield, MA**
> MAURA O'NEILL, as administrator of the Estate of Madelyn E. Linsenmeir,  Plaintiff,
> v. CITY OF SPRINGFIELD, et al. Defendants
> *Defendant Hampton County Sheriff's Office* - Defendant - **settled 2025**

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
### 2021 - 2025

**Jason Hicks, Chris Hammons, Laird, Hammons, Laird, PLLC**
**Oklahoma City, OK**
> Ashley Meyers, et al v.  Board of County Commissioners of Rogers County, et al
> *Plaintiff* - **ongoing litigation**

**William Murray, Jaden Rhea, Bailey & Wyant, PLLC**
**Charleston, WV**
> Joyce Horner as Administratrix of Estate of Noah Morris v. PrimeCare Medical of WV,
> INC and the WV Division of Corrections and Rehabilitation (DCR).
> *Defendant DCR* - **ongoing litigation**

**Todd Schroeder, McKeen and Associates**
**Detroit, MI**
> Timothy Griswold as the personal representative of the estate of John E.  Griswold of
> v. Trinity Health; County of Livingston; et al
> *Plaintiff* - **ongoing litigation**

**Anna Holland Edwards, Erica Grossman, Holland, Holland Edwards & Grossman, LLC**
**Denver, CO**
> Estate of Kelroy Newman, Plantiffs v Board of County Commissioners of the County
> of Montezuma, CO; Sheriff Steven Nowlin; et al
> *Plaintiff* - **ongoing litigation**

**Frederick J. Schlosser, Gates, Wise, Schlosser and Goebel**
**Springfield, IL**
> Smith v. County of Macon, et al.
> *Plaintiff* - ***settled 2025***

**Rachel Fuerst, Henson Fuerst, PA**
**Raleigh, NC**
> Estate of Caveness v. Gray, et al.
> *Plaintiff* - ***settled 2023***

**Mark Krudys, The Krudys Law Firm, PLC**
**Richmond, VA**
> Boley v. Armor Correctional Health Services, Inc., et al.
> *Plaintiff* - ***Trial December 2022***

**John Coletti, Paulson Coletti Trial Attorneys PC**
**Portland, OR**
> Thomsen v. NaphCare, Inc,  et al
> *Plaintiff* - ***settled 2024***

# Legal Cases-Depositions/Trial

Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
**2021 - 2025**

<u>Carolyn Trier,</u> **Trier Law Office, LLC**
**Fort Wayne, IN**
> Rittenhouse v. Wells County et al
> *Plaintiff - **settled 2024***

<u>Michael Crow,</u>  **Beasley, Allen, Crow**
**Montgomery, AL**
> Robert Edward Taylor, v. Eric Starr et al
> *Plaintiff - **settled 2024***

<u>Erik Heipt,</u>  **Budge & Heipt, PLLC**
**Seattle,  WA**
> Mary Margaret Mathis v. Southwestern Correctional LLC et al
> *Plaintiff - **settled 2023***

<u>Amy Miller,</u> **Miller Olsen, PLLCC**
**Seattle,  WA**
> Michael Eugene Searles, v. Washington State Department of Corrections
> *Plaintiff - **settled 2023***

<u>Kevin Young,</u>  **Peterson & Associates, P.C.**
**Kansas City, MO**
> Gary Burke, et al. Plaintiffs vs. Butler County, et al. Defendants
> *Plaintiff - **settled 2023***

<u>Paul Dworak & Jeffery Storms,</u> **Newmark Storms Dworak Law Office;  and**
<u>Jeffrey Montpetit,</u> **Sieben Carey**
**Minneapolis, MN**
> Janessa Novak, Special Administrator vs. Michael McIlvain, Douglas County, MEnD et al
> *Plaintiff - **settled 2023***

<u>Samuel Daheim,</u> **Connolly Law Offices, PLLC**
**Tacoma, WA**
> Daniel Bailey, as Personal Representative of the Estate of Michael Joseph Bailey,
> deceased vs. the City of Kent, Defendant
> *Plaintiff - **settled 2022***

<u>Mark Krudys,</u> **The Krudys Law Firm, PLC**
**Richmond, VA**
> Lucy Mae Hill, Administrator, of the Estate of Lashawn Andrea Hill, deceased vs
> Hallmark Youthcare-Richmond, et al
> *Plaintiff - **settled 2022***

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, PhD, APRN, ANP-C, CCHP-RN
**2021 - 2025**

<u>**Joane Hallinan and Kirstin Eidenbach,**</u>  **Hallinan & Killpack Law Firm**
**Tucson, AZ**
> Armando Banuelos, Margarita Banuelos and Uriel Banuelos vs Corizon Healthcare LLC, Centurion of Arizona LLC, et al, vs Corizon Healthcare LLC, Centurion of Arizona LLC, et al
> *Plaintiff - **ongoing litigation***

<u>**Joane Hallinan and Kirstin Eidenbach,**</u>  **Hallinan & Killpack Law Firm**
**Tucson, AZ**
> Paul Harlan Lupe vs Corizon Healthcare LLC, Centurion of Arizona LLC, Kimberly Branum, et al
> *Plaintiff - **ongoing litigation***

<u>**Dennis Wallin**</u>**, Spence Law Firm NM, LLC**
**Albuquerque, NM**
> Lee Hunt, as the Wrongful Death Personal Representative for the Estate of Gary Sugamosto, deceased, Plaintiff v. The GEO Group, INC; et al
> *Plaintiff - **settled 2022***

<u>**Edwin Budge and Hank Balson,**</u> **Budge & Heipt, PLLC**
**Seattle, WA**
> The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, Individually, Plaintiff v. NaphCare, Inc.; Hannah Gubitz, Individually; and Spokane County, a political subdivision of the State of Washington, Defendants
> *Plaintiff - **trial July 2022***

Exhibit C: Index of Documents Reviewed

YesCare 3251-3495.pdf [Core Process Papers];
Select YesCare Policies.pdf;
Gena Frasier documents for RPD.pdf;
Jung – City RPD.pdf;
3508 PICC MAY Audit.pdf;
3505-3507 Insulin Re-Audit – Sept 2024.pdf;
Chart 1 Accu-Check and Insulin Corrective Action Plan.xlsx;
Chart 4 Diabetes Report Card Audit Rolling July 2022 to October 2022 revised.xlsx;
Chart 3 Diabetes Report Card Audit Rolling 03.2022.xlsx;
Chart 5 Diabetes Report Card Audit Rolling Dec 2022 to March 2023.xlsx;
Chart 7 DM December 2023.xlsx;
Chart 6 DM August 2023.xlsx;
Chart 8 DM April 2024.xlsx;
Chart 9 DM 4.1.24–7.31.24.xlsx;
Chart 10 DM December 2024.xlsx;
Chart 11 DM 12.04.24 03.31.25.xlsx;
Chart 13 HCS and Insulin CAP audit template CFCF.xlsx;
Chart 12 HCS and Insulin CAP audit DC.xlsx;
Chart 15 HCS and Insulin CAP audit template RCF.xlsx;
Chart 14 HCS and Insulin CAP audit template PICC.xlsx;
Chart 16 Lisa DM working audit July 2022 to October 2022.xlsx;
Chart 18 Jung Corrective Action Plan.xlsx;
Chart 17 Lisa DM working audit March 2022 to June 2022.xlsx;
3511-3513 Working Audit March – June 2022 (Redacted).pdf;
3510 DM Aug–Nov 2023 (Redacted).pdf;
23 – YesCare Amended Sup Response to Plntf RPOD 07-30-25.pdf;
3683-3689 CHART 17 – Redacted.pdf;
3514-3515 DM Working Audit July–Oct 2022 (Redacted).pdf;
3516-3682 Diabetes Report Card Dec 2022 – March 2023 (Redacted).pdf;
3699 DM Working Audit Jan–April 2021.pdf;
3692-3696 DM Working Audit Sept.2018–Nov.2020.pdf;
3690-3691 Diabetes Report Card OLD.pdf;
3701-3785 ER & Inpatient Log – 2020.pdf;
3700 DM Working Audit May–July.2023.pdf;
3786-3909 ER & Inpatient Log – 2021.pdf;
3991-4118 ER & Inpatient Log – 2022.pdf;
4119-4346 ER & Inpatient Log – 2023.pdf;
Jung – Fraiser First RPD Responses.pdf;

Exhibit C: Index of Documents Reviewed

Jung – City First RPD Responses (1)A.pdf;

Jung – City First Rogs Responses (1).pdf;

Jung – City First RPD Responses (1).pdf;

Jung – City 1stSuppRPD.pdf;

Jung – Supp RPD Responses.pdf;

Jung – Bloodsaw First RPD Responses.pdf;

Wanda Bloodsaw documents for RPD.pdf;

Jung – Apollon Response to Plaintiff Request for Production of Documents.pdf;

Jung – Apollon Documents Produced 7-31-25.pdf;

Diabetes Clinical Pathway.pdf;

YesCare 1-3250.pdf;

NEW Condensed Complete City Requests for Production of Documents – Discovery – Jung City Production00001-05610.pdf;

City Additional Production – PDP Policies Only – 000003-000028.pdf;

Grote Jung initial retainer;

Grote Jung initial retainer (duplicate entry preserved);

PDP Report into Death of Louis Jung Jr..pdf;

Chart 18 Jung Corrective Action Plan.xlsx (duplicate listing from separate folder section);

3496-3504 A Patient Safety Event Committee Report.pdf;

Select Policies City of Philadelphia.pdf;

2025.02.14 – Jung, Louis – PCP, Nazareth, Norristown Records Bates Stamped.pdf;

04-24-25 YesCare Defs Resp to Plntf Rogs.pdf;

Jung – Fraiser First ROGs Responses.pdf;

Jung – City First Rogs Responses (1).pdf (duplicate entry preserved);

Jung – Supp Rogs Responses.pdf;

Jung – Bloodsaw First Rogs Responses.pdf;

Jung – Apollon Interrogatories to Plaintiff 72225.pdf;

3509 Norristown return process changes.pdf;

Chart 2 DC diabetic audit July 2022 to October 2022.xlsx;

3496-3504 Patient Safety Event Committee Report.pdf (duplicate – different screenshot);

Jung First Amended Complaint.pdf;

Video November 5, 2023 labeled: b13 6a to 3 p 11 5 23;

Video November 6, 2023 labeled: b13 640a to 710a 11 6 23;

List of FSBG and refusals;

Jung insulin and glucose MAR entries,

All red flag and potential red flag;

PDP med admin records; and

Depositions of Gay, Cabellos, Frasier, Bloodsaw, Apollon, Trivikram and Jay.

Exhibit 25

YesCare General Health Services Policy & Procedure –

Curran-Fromhold Correctional Facility:

Communication on Patient's Health Needs

| General Health Services Policy & Procedure | YesCare |
|---|---|
| Curran-Fromhold Correctional Facility | |
| Title: Communication on Patient's Health Needs | Revised: 11/18 |
| | Reviewed: 11/19, 01/20, 05/21, 5/22, 5/23, 5/24 |
| NCCHC: Essential | ACA: Mandatory | No: J-B-07.00 |

## POLICY:

Communication occurs between the correctional administration and treating health staff regarding patients' significant health needs that must be considered in classification decisions in order to preserve the health and safety of that patient, other inmates, or staff.

| | PROCEDURE STATEMENTS | FACILITY GUIDANCE |
|---|---|---|
| 1 | Correctional staff are advised of patients' special health needs that may affect:<br><br>➢ Housing<br>➢ Work assignments<br>➢ Program assignments or selection<br>➢ Disciplinary measures<br>➢ Transport to and from outside appointments<br>➢ Admissions to and transfers from facilities<br>➢ Clothing or appearance<br>➢ Activities of daily living | *Refer to Chronic Care/Special Needs Core Process 301-C-SOP Patient identification and 308-C-SOP Special Needs Treatment Plan* |
| | **SITE SPECIFICS** | |
| | Correctional staff is notified of special health needs via the electronic health record, inmate alert cards, medical equipment receipt forms and direct communication with the Warden's Office. | |
| 2 | Communication of health needs is documented in the health record | |

**REFERENCES**

**NCCHC:** Standards for Health Services in Jails 2018, J-B-07
**NCCHC:** Standards for Mental Health Services in Correctional Facilities 2015, MH-A-08 **ACA:** Standards for Adult Local Detention Facilities 4th Edition, 4-ALDF-4C-40
**ACA:** 2016 Standards Supplement - no revisions

NA-J0008
Issued 10/2012 as J-A-08.00
Revised 8/2018 Reissued as J-B-07.00
YesCare 02212
© 2018 YesCare
Page 1 of 2

| Curran-Fromhold Correctional Facility | | |
|---|---|---|
| Title: Communication on Patient's Health Needs | | Revised: 11/18 |
| | | Reviewed: 11/19, 01/20, 05/21, 5/22, 5/23, 5/24 |
| NCCHC: Essential | ACA: Mandatory | No: J-B-07.00 |

| PROCEDURE STATEMENTS | FACILITY GUIDANCE |
|---|---|
| 3    ACA also requires:<br><br>    ➢  When action is required concerning housing assignments, program assignments, disciplinary measures, and/or transfers to other facilities, a consultation to review the appropriateness of the action occurs as soon as possible, but no later than 72 hours | ACA accredited facilities must have a plan in place to ensure that these referrals occur and are addressed within established time frames |
| SITE SPECIFICS | |
| This facility:<br><br>   ☐  **Is ACA accredited**<br><br>   ☒  **Is not** ACA accredited | |

**REFERENCES**

**NCCHC:** Standards for Health Services in Jails 2018, J-B-07
**NCCHC:** Standards for Mental Health Services in Correctional Facilities 2015, MH-A-08  **ACA:** Standards for Adult Local Detention Facilities 4th Edition, 4-ALDF-4C-40
**ACA:** 2016 Standards Supplement - no revisions

NA-J0008
Issued 10/2012 as J-A-08.00

Revised 8/2018 Reissued as J-
B-07.00 as Care02213

© 2018 YesCare
Page 2 of 2

Exhibit 26

PDP Report of Investigation,

Office of Special Investigations

Report of Investigation

Office of Special Investigations



CONFIDENTIAL

| | |
|---|---|
| **Case Number:** | <u>SI-23-00188</u> |
| **Allegations:** | Death of Louis Jung, PID# 718327, (Age 50) (CFCF) |
| **Cause of Death:** | Diabetic Ketoacidosis |
| **Manner of Death:** | Natural |
| **Completed by:** | Lieutenant Shawn Jay |

|  **Commissioner's Office of** **Special Investigations** | <u>Case # 23-00188</u><br>**Death of Incarcerated Person Louis Jung, PID# 718327**<br>**Cause of Death: Diabetic Ketoacidosis**<br>**Manner of Death: Natural** |
|---|---|
| | |

### ALLEGATION

On November 6, 2023, **Incarcerated Person Louis Jung, PID# 718327,** was found having trouble breathing inside of  Cell #21, on B1 POD 3, at the Curran Fromhold Correctional Facility, while on the stretcher in route to medical he stopped breathing in the Main Corridor where he was pronounced by Philadelphia Fire Department Medic Schroeder at 6:47am. This investigation was initiated to determine if Correctional Staff and medical personnel adhered to the policy standards set forth for the care of Incarcerated Persons by the Philadelphia Department of Prisons.

**Confidential**
ATTORNEYS' EYES ONLY

City-Jung-000002

| | |
|---|---|
| **Commissioner's Office of**<br>**Special Investigations** | **Case # 23-00188**<br><br>Death of Incarcerated Person Louis Jung, PID# 718327<br>Cause of Death: Diabetic Ketoacidosis<br>Manner of Death: Natural |
| | |

## INVESTIGATION SUMMARY

**Correctional Officer Tionya Griffin PR# 269225** stated that on November 5, 2023, she was assigned as the B1 Unit Control Officer on the 7pm-7am shift. She stated that she was assisting C/O Hester on B1pod 3 giving out the morning meal and when C/O Hester arrived to Cell# 21 he stated that he needed a stretcher and a call for a stretcher was made via the telephone on the unit. Medical staff along with Sgt. Bello responded to the area. Medical staff placed I/P Jung on the stretcher with the assistance of other I/P'S and took him off of the unit to medical, I/P Jung was breathing but non responsive to verbal commands when they left the unit.

**Correctional Officer Aarron Hester PR# 295830** stated that on November 5, 2023, he was assigned to B1pod 3 on the 7pm to 7am shift. He stated that B1pod 3was unmanned and himself and C/O Griffin were feeding the morning meal he was feeding the top tier and c/o griffin was feeding the bottom tier. As he reached Cell #21 and opened the door he noticed an I/P lying on the floor of the cell on his mattress appearing to be having difficulty breathing; he called to the I/P and the I/P was not responding to the verbal commands. C/O Hester then ran to the officer's desk and called for a stretcher via telephone. Medical and Sgt. Bello arrived on the unit at which time I/P'S assisted medical in carrying I/P Jung to the stretcher. I/P Jung was breathing but unresponsive to any verbal commands and medical left the unit with I/P Jung on the stretcher.

**Correctional Officer Lakisha James PR# 282411** stated that on November 5, 2023, she was assigned to the Main Corridor Booth on the 7pm to 7am shift. She stated that she saw medical come out B building with an I/P on the stretcher and as they approached the door for medical they stopped in the main corridor and started performing chest compressions (CPR) additional medical staff responded and placed the I/P on the floor and continued chest compressions (CPR) Philadelphia Fire Department Medics arrived and took over care until they pronounced the I/P deceased.

**Correctional Lieutenant Georgia Malloy PR# 220887** stated that on November 5, 2023, she was assigned as the only Lieutenant on the 7pm to 7am shift. She stated that she was on C2 assisting officers with courts and Insulin and Accu check when she heard a stretcher call to B1pod3 she called B1 Unit Control to see what the situation was and was told that Sgt. Bello responded to B1pod3. Lt. Malloy stated that it is not common practice to have a housing area unmanned for any period of time and that on November 5, 2023, she was not informed that B1pod3 was unmanned.

ATTORNEYS EYES ONLY **Confidential**



| | **Commissioner's Office of** | Case # 23-00188 |
| | **Special Investigations** | Death of Incarcerated Person Louis Jung, PID# 718327<br>Cause of Death: Diabetic Ketoacidosis<br>Manner of Death: Natural |

### INVESTIGATION SUMMARY (cont'd)

**Correctional Sergeant Wasiu Bello PR# 270976** stated that on November 5, 2023, he was assigned as the receiving room supervisor on the 7pm to 7am shift. He stated that he heard a call for a stretcher to B1pod3 and responded. When he arrived medical staff was already on the unit attending to the I/P. Medical staff placed him on a stretcher and took him to medical when they got close to medical the I/P stopped breathing and medical requested for additional medical staff which he called via his PDP issued radio. Additional medical staff responded and rendered life saving measures until fire rescue arrived and pronounced the I/P deceased.

**Tashina Jarvis RN** stated "a stretcher was called to B1pod3 and medical arrived at approximately 6:10am. The patient was lying on the floor next to the toilet. The patient's BS (blood sugar) was taken immediately due to his diabetic status. BS read HI. The patient was not responsive to pain stimuli (sternal rub and ammonia). The patient's skin was cool and clammy, and the patient was nonverbal at the time of initial assessment with a respiration of 20. The patient was immediately transported to the stretcher with the assistance of other I/PS, due to being a noncompliant diabetic. On the way to medical patients' status changed and chest was no longer rising with agonal breath, no pulse detected, and CPR and oxygen delivered via Ambu bag was immediately initiated at 06:22 in the hall outside of medical. Additional medical staff called at 06:22."

**Shatyra Henderson-Hamwright FNP-BC** stated "a stretcher was called to B1pod3 at approximately 6:04 hours. When we arrived on the POD, there was a female officer who stated that there was a patient on the ground in his cell. All medical staff arrived at the cell at approximately 6:10hours. On the floor she observed a male in an orange jumpsuit near the toilet in the supine position he was in the cell alone. The patient was breathing and looking at the ceiling at the time. Upon closer inspection she noticed the patient to be I/P Louis Jung PP# 718327, upon realizing who it was she immediately asked for a blood glucose reading due to knowing him to be a brittle diabetic. His blood glucose reading was obtained and read "high" in addition the patient was also clammy and cold. Patient was minimally responsive to ammonia waved under the nose. We immediately asked for assistance with carrying the patient down the stairs and placing him on the stretcher on the bottom tier at approximately 6:19hours as we were taking the stretcher down the hall to medical she noticed that the patient stopped breathing, Chest compressions (CPR) was started Narcan was administered with no effect, and 14 units of insulin were administered. 911 was called notified immediately by medical staff. The patient was moved from the stretcher to the floor for more effective compressions. CPR was continued and was taken over by Philadelphia Fire Department until they pronounced the patient deceased at 6:47 hours."

Confidential



| Commissioner's Office of **Special Investigations** | Case # 23-00188 |
|---|---|
| | **Death of Incarcerated Person Louis Jung, PID# 718327**<br>**Cause of Death: Diabetic Ketoacidosis**<br>**Manner of Death: Natural** |

## INVESTIGATION SUMMARY (cont'd)

**Danielle Mcgettigan LPN** stated that on November 6, 2023, she was in Delta 2 medication room prepping medication when she heard a call for additional medical staff needed to the main corridor. When she arrived, chest compressions (CPR) were already in progress by medical staff and she administered nasal Narcan to no avail. She rotated performing chest compressions (CPR), with medical staff. The patient was lowered from the stretcher to the ground and chest compressions (CPR) was continued until fire rescue arrived and told medical staff to stop chest compressions (CPR) and pronounced the patient deceased.

**Blair Cabellos LPN** stated that on November 5, 2023, she was assigned to CFCF. She admitted that it was her in the video. She stated that she saw the I/P on the floor in the doorway of the cell # 21 while walking around with the officer and that the I/P stated that he could not get up. She stated that she did not assist him due to him having a cell mate and that she was instructed to not to go into any cell unless there is more than one officer. She stated that before she exited the unit she had a conversation with the officer in which she told the officer to call for a stretcher due to the I/P stating that he could not get up.

**Correctional Officer Gena Frasier PR# 285093** stated that on November 5, 2023, she was assigned to B1 pod 3 on the 7am to 7pm shift. She denied knowing I/P Jung and did not recall having any interactions with I/P Jung on November 5, 2023. She was shown video footage form B1 pod 3 from November 5, 2023, and she admitted that it is her in the video. She denied recalling what happened when she arrived at Cell# 21 and why her and the nurse walked away from I/P Jung leaving him lying on the floor unattended however she did state that "if she walked away with the nurse he could not have been on the floor for anything medical and that's if he was on the floor I still don't know 100% if he was on the floor from the video". She denied calling for a stretcher for I/P Jung and stated that due to a nurse being on the unit and at the cell she is guessing that the nurse said that there is no stretcher needed she is the one that makes the medical decisions. She did not recall what she told Lt. Bloodsaw in reference to I/P Jung in Cell#21 when she arrived on the unit, or why she did not go to Cell #21 with Lt. Bloodsaw. She did admit that her Lock & Track username is Frasier_G and that she made the entries in the electronic logbook on November 5, 2023, for B1 pod 3. She denied recalling how I/P Jung informed her that he refused his insulin on November 5, 2023.She denied recalling if I/P Jung signed a refusal form for refusing his insulin on November 5, 2023. She admitted that when insulin and accu check is in progress she alerts the unit by yelling "Insulin and Accu check in progress".



| Commissioner's Office of Special Investigations | **Case # 23-00188**<br><br>Death of Incarcerated Person Louis Jung, PID# 718327<br>Cause of Death: Diabetic Ketoacidosis<br>Manner of Death: Natural |
|---|---|
| | |

## INVESTIGATION SUMMARY (cont'd)

**Correctional Lieutenant Wanda Bloodsaw PR# 253488** stated that on November 5, 2023, she was assigned as the B building Unit Manager on the 7am to 7pm shift at CFCF. She denied knowing I/P Jung and having any interactions with I/P Jung on November 5, 2023. She was shown video of B1pod 3 from November 5, 2023, and she admitted that it was her in the video. When asked about what she witnessed when she arrived at Cell # 21 she denied remembering. She denied remembering if I/P Jung was awake and alert when she arrived at Cell # 21. She denied remembering where I/P Jung was located when she arrived at Cell# 21. She denied remembering if she called for a stretcher at any time for I/P Jung on November 5, 2023. She stated that it is not common practice to have I/P workers drag an I/P who cannot get up back into a cell.

**Confidential**
ATTORNEYS' EYES ONLY

City-Jung-000006



| Commissioner's Office of | Case # 23-00188 |
|---|---|
| **Special Investigations** | Death of Incarcerated Person Louis Jung, PID# 718327<br>Cause of Death: Diabetic Ketoacidosis<br>Manner of Death: Natural |

## ANALYSIS

FROM:     Sandy Varghese, Community Health Nursing Supervisor

SUBJECT:    LOUIS JUNG PPN 718327

IP Jung was a 50-year-old male admitted to the PDP on 10/27/23 at 13:15 on charges of criminal conspiracy and detainer from Luzerne County. The court report dated 10/24/23 listed his charges as robbery, conspiracy, theft, receiving stolen property, possession of an instrument of crime, terroristic threats, possession of a controlled substance and simple assault. He was previously incarcerated at the PDP on:

- 7/12/12 to 7/13/12
- 6/4/14 to 6/10/14
- 5/26/16 to 5/26/16
- 12/16/21 to 9/27/22
- 12/14/22 to 6/2/23
- 10/27/23 to 11/6/23

The following is a summary of the current incarceration.

10/28/23 9:26AM:  Intake screening completed. Answered yes to "Born in, travelled to, lived in, taken a cruise to Cancun, Cozumel or any other areas in Mexico or taken a Caribbean cruise in the last six months, or since 1997 Cameroon, Central African Republic, Chad, Congo, Equatorial Guinea, Gabon, Niger or Nigeria." Answered "no" to diabetes during the Intake with the nurse but answered "yes" to diabetes during the Pre-Intake with the MA. Vitals were temp 97.0, HR 92, BP 110/82, RR 18, oxygen sat 97%, wt. 179 lbs., ht. 66 in., accucheck 542. He stated that he had not had insulin in the last 3 days; the nurse spoke to Provider and administered 10 U NPH and 12 U Regular insulin. Urine was positive for ketones, and he was encouraged to drink plenty of water. Urgent Behavioral Health referral generated. Orders written for Levothyroxine 150mcg daily for Hypothyroidism, Atorvastatin 20mg every evening for mixed hyperlipidemia based on previous admission. Orders were also written for insulin, labs and chronic care. (Labs scheduled for 11/10/23, chronic care for 11/25/23)

11/6/23 RN Jarvis note: "A stretcher was called to B1pod3, 21 cell and medical arrived approximately 0610. The patient was found laying on the floor next to the toilet. Patients BS was taken immediately due to his diabetic status. BS read HI. The patient was not

ATCONFIDENTIAL

Commissioner's Office of
Special Investigations

Case # 23-00188

Death of Incarcerated Person Louis Jung, PID# 718327
Cause of Death: Diabetic Ketoacidosis
Manner of Death: Natural

## ANALYSIS (cont'd)

responsive to pain stimuli (sternal rub and ammonia). The patients skin was cool and clammy, and the patient was nonverbal at the time of the initial assessment with a respiration of 20. The patient was immediately transported to the stretcher with the assistance of other IP's, due being a noncompliant diabetic. On the way to medical patients status changed and chest was no longer rising with agonal breath, no pulse detected and CPR and oxygen delivered via Ambu bag was immediately initiated at 0622 in the hall outside of medical. Additional medical called at 0622. CPR continued, 14 units of insulin given per provider Henderson at 0624 along with 2 rounds of nasal Narcan. Fire rescue arrived 0646 and 0647 CPR was discontinued per fire rescue order."

11/6/23 LPN McGettigan note: "Call was made for additional medical staff to the main corridor. Upon my arrival, patient was on a backboard on the stretcher and CPR was in progress. Brown fluid observed around the patients mouth. Report from staff included patient blood glucose read "HI". I gave 1 nasal Narcan (a second nasal Narcan was given by another nurse), assisted with several rounds of chest compressions and breaths via ambu bag. Patient was lowered to the floor and CPR continued. AED administered one shock, with all the other analysis stating "no shock advised." When fire rescue arrived, they stated that we are to cease CPR."

11/6/23 Dr. Trivikram note: "Additional medical was called to the main corridor. To the right of the door to Medical, medical staff was found in the process of doing CPR on an IP on the stretcher. The triage provider asked me to call 911, so I returned to Triage and call at 6:24 am. I returned to the scene and asked for the patient to be brought to the floor. The board was placed under the patient and he was moved to the floor. I assumed position at the head of the patient to bag ventilate. The AED was already on and engaged. Several rounds of CPR were conducted and only one defibrillation shock was delivered mid code (the other AED analysis before and after did not require shock). Attempts to secure IV access were unsuccessful. Fire Rescue arrived and asked Medical staff to discontinue CPR at 6:47am."

11/6/23 NP Henderson-Hamwright note: "At approximately 0604 hours on 11/06/2023, a stretcher call was heard overhead asking for response at B1POD3. Medical staff present at triage collected equipment and responded. When we arrived on the POD, there was a female officer on the top tier who calmly stated that there was a patient on the ground in his cell. All medical staff present climbed the stairs and arrived at the cell

ATTORNEYS' EYES ONLY
**Confidential**



| Commissioner's Office of Special Investigations | Case # 23-00188 |
|---|---|
| | Death of Incarcerated Person Louis Jung, PID# 718327<br>Cause of Death: Diabetic Ketoacidosis<br>Manner of Death: Natural |
| | |

## ANALYSIS (cont'd)

at approximately 0610 hours. On the floor, I observed who appeared to be a white male with dark hair dressed in an orange jumpsuit on the floor near the toilet in the supine position. He was in the cell alone. No other incarcerated person was present in the cell. The patient was still breathing at the time and was looking at the ceiling. Upon closer inspection, I recognized the patient as Louis Jung. When I realized who was there, I asked for a blood glucose reading because I knew him to be a brittle diabetic. His blood glucose was obtained by a responding nurse. She obtained a reading of high. In addition to the high blood glucose reading, the patient was also clammy and cold. Patient was minimally responsive to ammonia waved under the nose. We immediately asked for assistance with carrying the patient down the stairs and placing him on the stretcher on the bottom tier.

The patient was placed onto the stretcher at approximately 0619 hours. He was still breathing without assistance at that time. We began moving towards medical triage to administer insulin and further assess the patient. As we passed the elevator at approximately 0622 hours, I noticed that the patient was no longer breathing. We pulled the stretcher onto level ground in the main corridor where CPR was started. Narcan was administered twice with no effect. 14 units of insulin administered. 911 was notified immediately by medical staff. At that time, we were unable to obtain a blood pressure from the patient and we were unable to obtain a pulse. The patients head was turned to the left side and an unknown liquid leaked from his mouth. This occurred twice more during CPR. AED and ambu-bag were applied since patients breathing did not seem to be effective. The patient was eventually moved from the stretcher onto the floor for more effective compressions. Approximately 5 to 6 rounds of CPR with only a weak thready pulse detected in between were performed prior to the fire departments arrival at 0646 hours. CPR was stopped by the fire department and the patient was pronounced at 0647 hours."

11/6/23 LP Jeoboham note: "IP Jung was found unresponsive when I got to him on the stretcher, CPR was performed by myself, along with two other nurses until paramedic arrived and called time of death."

Comments:
- He was not seen for the Urgent BH referral. He was a Norristown Return which means an Emergency Referral should have been generated at Intake.



**Commissioner's Office of Special Investigations**

Case # 23-00188

Death of Incarcerated Person Louis Jung, PID# 718327
Cause of Death: Diabetic Ketoacidosis
Manner of Death: Natural

## ANALYSIS (cont'd)

- Admitted to Norristown State Hospital on 6/2/23 and returned to PDP on 10/27/23. We did not receive discharge paperwork from Norristown.
- Norristown evaluation found him to be competent and malingering.
- Review of the MAR showed that he refused AM insulin 11/1/23 and PM insulin 11/5/23. Refusal forms were not found in eCW or HCS. 10/30/23 PM dose and 11/4/23 PM dose was "not documented". He was a "no show" for insulin 11/3/23 AM dose and 11/5/23 AM dose. He was not Red Flagged for any of these missed/refused encounters.
- Preliminary cause of death is Diabetic Ketoacidosis.

Confidential



| **Commissioner's Office of Special Investigations** | **Case # 23-00188**<br><br>Death of Incarcerated Person Louis Jung, PID# 718327<br>Cause of Death: Diabetic Ketoacidosis<br>Manner of Death: Natural |
|---|---|
| | |

## CONCLUSION

A review of Incarcerated Person Louis Jung's PDP file revealed that he was adequately provided with the services afforded to all Incarcerated Persons. However, based on staff interviews, medical reports, and the Medical Examiner's findings, there was negligence on the part of Medical staff; and PDP staff. Therefore, the allegation of Staff Misconduct against PDP/ Medical staff is **Sustained.** C/O Gena Frasier, PR# 285093, failed to render immediate aid to IP Jung as outlined in PDP Policy 4.E.21 (PDP Staff Roles in Non-Routine and/or Medical Emergency Situations). Video footage from November 5, 2023, revealed that C/O Frasier and LPN Cabellos walked away from I/P Jung and left I/P Jung unattended lying on the floor outside of his cell for approximately 9 minutes. Correctional Lieutenant Wanda Bloodsaw, PR# 253488, arrived at the cell and appeared to be trying to communicate with I/P Jung before two I/P's come to the cell and drag I/P Jung into the cell as Lt. Bloodsaw monitors the situation the I/P's exit the cell which is then secured by Lt. Bloodsaw who then exits the housing area. It should be noted that C/O Frasier, Lt. Bloodsaw and LPN Cabellos failed to call for a stretcher or initiate aid to I/P Jung during his medical emergency.



OPC INVESTIGATION CONCLUDED
MAR 29 2024
DIRECTOR
OFFICE OF PROFESSIONAL COMPLIANCE
PHILADELPHIA PRISONS

Confidential