# Exhibit A

1

2        IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3

4
     ------------------------------------------
5    JACOB & JAMES JUNG, as Administrators of
     the Estates of LOUIS JUNG, JR.,
6

7          Plaintiffs,

8    -vs-

9    CITY OF PHILADELPHIA, YESCARE CORP;
     BLANCHE CARNEY, FORMER COMMISSIONER OF
10   PHILADELPHIA DEPARTMENT OF PRISONS; LALITHA
     TRIVIKRAM; MAUREEN GAY; MARIESHA APOLLON;
11   BLAIR CABELLOS; GENA FRASIER; WANDA BLOODSAW,

12         Defendants.

13   ------------------------------------------

14               -------
             THURSDAY, OCTOBER 23, 2025
15               -------

16

17      Videotaped Virtual Oral deposition of

18   BLANCH CARNEY, was taken on behalf of

19   Plaintiffs, commencing at 10:05 a.m., on

20   the above date, before Lisa J. Brill, a

21   Court Reporter and Notary Public, there

22   being present:

23

24

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 3 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1    A P P E A R A N C E S

 2


 3    BY: BRET GROTE, ESQUIRE
      ABOLITIONIST LAW CENTER
 4    990 SPRING GARDEN STREET, SUITE 306
      PHILADELPHIA, PENNSYLVANIA 19123
 5    BRETGROTE@ABOLITIONISTLAWCENTER.ORG
      ATTORNEY FOR THE PLAINTIFFS
 6


 7


 8
      BY:  MICHAEL PESTRAK, ESQUIRE
 9    CITY OF PHILADELPHIA LAW DEPARTMENT
      1515 ARCH STREET, 15TH FLOOR
10    MICHAEL.PESTRAK@PHILA.GOV
      PHILADELPHIA, PENNSYLVANIA 19102
11    ATTORNEY FOR THE DEFENDANTS, BLANCHE
      CARNEY, COMMISSIONER OF THE PHILADELPHIA
12    DEPARTMENT OF PRISONS, CITY OF PHILADELPHIA

13


14


15


16    BY:  JONATHAN KAMINSKY, ESQUIRE
      KIERNAN, TREBACH,LLP
17    TEN PENN CENTER, SUITE 770
      1801 MARKET STREET
18    PHILADELPHIA, PA 19103
      JKAMINSKY@KEIRNANTRABACH.COM
19    ATTORNEY FOR THE DEFENDANT, LALITHA
      MARIESHA APOLLON
20


21


22


23


24
```

1    A  P  P  E  A  R  A  N  C  E  S

2

3

4

5

6    BY: RAY WITTEKIND, ESQUIRE
O'CONNOR KIMBALL, LLP
7    1500 JOHN F. KENNEDY BOULEVARD, SUITE 110,
PHILADELPHIA, PA 19102
8    WITTEKIND@OKLLP.COM
TGREGORY@OKLLP.COM
9    ATTORNEY FOR THE DEFENDANTS, YESCARE CORP.
DR. TRIVIKIM, NURSE GAY, AND BLAIR CABELLOS

10

11

12

13    BY:  SUMMER THOMAS, ESQUIRE
GORDON, REES, SCULLY, MANSUKHANI
14    THREE LOGAN SQUARE
1717 ARCH STREET, SUITE 610
15    PHILADELPHIA, PA 19103
ADOSSINO@GRSM.COM
16    ATTORNEY FOR THE DEFENDANTS, GENA FRASIER,
WANDA BLOODSAW

17

18

19

20

21

22

23

24

Deposition of Blanche Carney                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
1                        I N D E X

2      WITNESS:

3      BLANCHE CARNEY

4

5      EXAMINATION              PAGE

6      MR. GROTE:                 6

7      MR. KAMINSKY:            146

8      MR. WITTEKIND:          149

9

10                    E X H I B I T S

11     NO.        Description                Page

12     Exhibit-1  Provider Agreement          7
                  January 4th, 2022, between
13                Philadelphia and
                  Corizon Health
14

15

16

17

18

19

20

21

22

23

24
```

```
 1            -  -  -
           DEPOSITION SUPPORT INDEX
 2            -  -  -

 3  Direction to Witness Not To Answer
    Page Line
 4
    None
 5

 6

 7  Request for Production of Documents
    Page  Line
 8
    None
 9

10

11

12  Stipulations
    Page  Line
13
    7       1
14

15

16

17  Questions Marked
    Page Line
18
    None
19

20

21

22

23

24
```

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 7 of 75

Deposition of Blanche Carney                        Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 6

- - -

P R O C E E D I N G S

- - -

THE COURT REPORTER:  Let me start at the top of my screen.  Mr. Pestrak, are you going to need the transcript from today?

MR. PESTRAK:  Electronic only. Mini, full.

THE COURT REPORTER:  Ms. Thomas, are you going to need the transcript?

MS. THOMAS:  Yes.  Just an electronic copy.

THE COURT REPORTER:  Mr. Kaminsky?

MR. KAMINSKY:  Yeah, same as everybody as far as electronic copy, full and mini.

THE COURT REPORTER:  Mr. Wittekind?

MR. WITTEKIND:  Yeah, check off electronic full and mini.  It will be to two of us.

Page 7

- - -

(It is hereby stipulated and agreed by and between counsel that reading, signing, sealing, filing and certification are hereby waived; and that all objections, except as to the form of the questions, be reserved until the time of trial.)

- - -

BLANCHE CARNEY, after having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. GROTE:

Q.  All right.  Good morning, Ms. Carney.  My name is Bret Grote.  I'm counsel for the plaintiffs in this matter. The estate of Lewis Jung, Jr. versus the City of Philadelphia.  Can you please state and spell your name for the record?

A.  Blanche Carney, B-L-A-N-C-H-E C-A-R-N-E-Y.

Page 8

Q.  And have you ever given a deposition before?

A.  Yes.

Q.  How many times, if you remember?

A.  About six or seven.

Q.  And were those in your role with the Philadelphia Department of Prisons or related to that role?

A.  Yes.

Q.  So you're going to be familiar with the deposition process, I'm going to go over some basic ground rules, just so we're both on the same page.  You have to speak out loud as I do, so that there's no head nods or no mm-hmms, because the court reporter can't take that down.  We won't talk over each other, so I will let you finish your answers, and if you let me finish your questions, even if you know where the question is going to go and you know the answer, that would just allow the court reporter to get everything down.  If you don't know or remember something, please let me know if there's a document

Page 9

that might refresh your recollection.  And if you answer a question, I'm going to assume that you understood the question. And you can take a break.  If you need a break, just let me know.  With the only caveat being, if I ask a question, please answer the question before we would take a break.  Does all of that sound good to you?

A.  Yeah.

Q.  Are you prepared to give a deposition today?

A.  Yes.

Q.  And did you do anything to prepare for today's deposition?

A.  No.

Q.  And without telling me about any conversations that you've had with your lawyer, have you reviewed any records prior to coming in today?

A.  No.

Q.  Okay.  And are you currently employed in the field of corrections?

A.  Yes.

Page 10

1  Q.  And what is that employment?
2    MR. PESTRAK:  Objection.  And
3  Blanche, if you want to give your
4  title, I think you can answer it
5  that way.  But you don't have to say
6  where you are currently employed.
7  And if we need to make that an
8  issue, Bret, we can do so.  But as I
9  said yesterday, I'm going to
10  instruct not to answer where she is
11  currently employed, but if she wants
12  to give her a title, I'll let her do
13  that.
14    MR. GROTE:  Understood.  We'll
15  certify for the record that you're
16  instructing her not to answer that
17  question.  I was phrasing it in the
18  way I did in order to determine if
19  it was relevant to past experience.
20 BY MR. GROTE:
21  Q.  So with all of that said, what is
22  your current title, Ms. Carney?
23  A.  Associate Director.
24  Q.  And how long have you been in that

Page 11

1  position?
2    MR. PESTRAK:  Same objection.  You
3  can answer if you're comfortable
4  with it, Blanche.
5    THE WITNESS:  Approximately year
6  and a half.
7 BY MR. GROTE:
8  Q.  And prior to that position, where
9  were you employed?
10  A.  The City of Philadelphia
11  Department of Prisons.
12  Q.  And what was your role there?
13  A.  Commissioner.
14  Q.  And how long were you the
15  Commissioner?
16  A.  Eight years.
17  Q.  Before going through the
18  employment history, I'm going to go ask
19  you about your educational history.  Can
20  you let me know any post-high-school
21  education that you have received?
22  A.  A Bachelor's of Science and a
23  Master's of Social Services.
24  Q.  And where did you receive those

Page 12

1  from?
2  A.  Lincoln University and Bryn Mawr
3  Graduate School of Social Work and Social
4  Research.
5  Q.  And what years?
6  A.  1992 and 1997.
7  Q.  And can you walk me from your
8  employment history up -- well, when did
9  you become Commissioner of PDP?
10  A.  If I'm remembering correctly, I
11  believe it was 2016.
12  Q.  And can you walk me through your
13  employment history within the
14  Philadelphia -- well, first, before --
15  when did you start working with the
16  Philadelphia Department of Prisons?
17  A.  1995.
18  Q.  And prior to that, were you ever
19  in any correctional job?
20  A.  No.
21  Q.  Any law enforcement?
22  A.  No.
23  Q.  And can you walk me through your
24  employment from 1995 up to 2016, the

Page 13

1  positions you held, general
2  responsibilities at PDP?
3  A.  Social Work Service Manager,
4  Social Work Supervisor, Human Service
5  Program Administrator, Deputy Commissioner
6  for Restorative and Transitional Services,
7  all of which involved I worked closely
8  with correctional sworn staff and
9  providing direct services to the
10  incarcerated population.
11  Q.  Okay.  And when you became
12  Commissioner, what were your
13  responsibilities as Commissioner?
14  A.  The overall site responsibility
15  for the facilities that make up the
16  Department of Prisons.
17  Q.  And can you elaborate on that a
18  little bit?  I understand that it's quite
19  a comprehensive role, but how many
20  facilities are there, and how would you
21  provide that oversight generally?
22  A.  Well, at the time in which I was
23  Commissioner, we had five major facilities
24  of which there is a rank structure, so I

Page 14

1  have overall site responsibilities.  And
2  those duties are carried out through
3  Deputy Commissioners, which then are
4  carried out through the wardens of each
5  facility.  The wardens of the facilities
6  then have their rank structure, which are
7  deputy wardens.  You have captains,
8  lieutenants, sergeants, down to
9  correctional officers, as well as civilian
10 personnel and contract staff.
11    Q.  Thank you.  And did you have
12 any -- I think this can be an extensive
13 question, so let me know if it'd be easier
14 to break it down.  But I'm just wondering
15 what trainings you received throughout
16 your history within PDP prior to becoming
17 Commissioner.  What training did they
18 provide you for your various roles?
19    A.  There's a training academy that
20 provides training to both sworn and
21 civilian that staff are required to
22 participate and attend throughout their
23 careers at the Department of Prisons.  And
24 that encompasses a range of topics and

Page 15

1  services that are provided in a
2  correctional setting.
3     Q.  And so is it accurate that when
4  you began with PDP, you went through the
5  training academy?
6     A.  Yes.
7     Q.  And how frequently would you have
8  to receive training throughout your
9  employment after that initial time in the
10 academy?
11    A.  It's ongoing, annual training.
12    Q.  Did you receive specific training
13 around the provision of medical care in
14 the jail settings?
15    A.  No.
16    Q.  What about emergency care, you
17 know, responding to emergencies?
18    A.  Staff receive training in the
19 policies, but do not necessarily
20 effectuate the delivery of such
21 medications or emergent care.  So there
22 are policies that are universal for which
23 staff are responsible to have knowledge of
24 how to notify, and then the respective

Page 16

1  parties that are licensed to deliver care
2  or treatment through the contracted
3  services then deliver the services to the
4  incarcerated population.
5     Q.  And so I'm understanding
6  correctly, if there is an emergency and
7  correctional staff, as opposed to medical
8  staff, encounter that, the policy provides
9  guidance for them to seek some in the
10 assistance of appropriate medical staff.
11 Is that accurate?
12    A.  That's accurate.
13    Q.  Did you ever receive any training
14 on any specific medical conditions as a
15 correctional officer, any signs and
16 symptoms to look out for with regard to a
17 specific medical condition?
18       MR. PESTRAK:  I'm just going to
19    object, Bret, because I don't think
20    she was ever a correctional officer.
21       MR. GROTE:  That's a good point.
22 BY MR. GROTE:
23    Q.  Within your employment at PDP, did
24 you ever receive training on any specific

Page 17

1  medical conditions?
2     A.  No.
3     Q.  When you became -- what was your
4  position right before you became
5  commissioner again?
6     A.  Deputy Commissioner.
7     Q.  So as -- how long were you Deputy
8  Commissioner?
9     A.  If I remember correctly, about a
10 year and some months.
11    Q.  How many Deputy Commissioners are
12 there?
13    A.  When I was the Commissioner, there
14 were three.
15    Q.  Do you remember, when you were
16 Deputy Commissioner, how many there were?
17    A.  There were three.
18    Q.  And I know you touched on this
19 before, but as Deputy Commissioner, what
20 were your responsibilities?
21    A.  Overall site responsibility for
22 major division within the Department of
23 Prisons, and through the rank structure
24 the program services and activities were

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 10 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 18

1  then carried out through subordinate human
2  service program administrators, wardens,
3  and down through the chain of command to
4  correctional officers, civilian staff, and
5  contracted staff.
6      Q.  Okay, thank you.
7      As Deputy Commissioner, were there
8  certain facilities you were in charge of
9  that were distinct from the other two
10  Deputy Commissioners?  How were the
11  responsibilities distributed between the
12  deputies?
13      A.  Well, the divisions, the site
14  responsibility was assigned to the Deputy
15  Commissioners, but divisions were located
16  at each of the facilities.
17      Q.  Can you explain to me what you
18  mean by "division"?
19      A.  You can have a division of
20  Restorative and Transitional Services,
21  which is the Social Service Program
22  Division that provides direct service to
23  the population.  You also had a Deputy
24  Commissioner for operations, responsible

Page 19

1  for overall site operations.  And then
2  there was the Deputy Commissioner of court
3  administration, who handled administrative
4  aspects of the Department of Prisons.
5      Q.  And what were the divisions you
6  were responsible for?
7      A.  I was responsible for Restorative
8  and Transitional Services as Deputy.
9      Q.  When you became Commissioner, were
10  you provided any -- did they provide you
11  training or guidance?  What happens when
12  you become Commissioner to prepare you for
13  that job?
14      A.  You're really calling together
15  your experience in the field of
16  corrections.  You bring all of your
17  experience to the position, understanding
18  that you have -- overall have site
19  responsibility for the department.  So all
20  the years that you've gained experience in
21  the department, or in the field of
22  corrections, you bring that to the
23  position.
24      Q.  And as Commissioner, what was your

Page 20

1  relationship to the medical provider?  Did
2  you provide oversight?  Were you in
3  collaboration with them?  What did that
4  look like?
5      A.  As a contracted provider for the
6  Department of Prisons the oversight of
7  that particular contract was through the
8  Chief Medical Officer, and the Chief
9  Medical Officer and I would converse and
10  have ongoing engagement regarding
11  services.  But the overall site
12  responsibility for that contracted
13  provider was through the Chief Medical
14  Officer.
15      Q.  And through 2016 to 2024, who was
16  the Chief Medical Officer, or if there was
17  more than one, who were they?
18      A.  Dr. Bruce Herdman.
19      Q.  The entire time it was Dr.
20  Herdman?
21      A.  Yes.
22      Q.  And do you know what Dr. Herdman's
23  background is professionally?  What is he
24  a doctor in?

Page 21

1      A.  He has a, I believe, an MBA if I
2  recall correctly.
3      Q.  Master's of Business
4  Administration, would that be --
5      A.  Correct.
6      Q.  Do you know what his methods were
7  for providing oversight of the medical
8  contractor?
9      A.  He would hold weekly or daily
10  meetings and have daily engagements with
11  licensed clinical and medical providers.
12  It could be case-related, it could be an
13  overall initiative.  But he maintained
14  contact with the licensed medical
15  provider, direct reports at the
16  facilities, and they also had a rank
17  structure as well.
18      Q.  And would he report to you about
19  his reports from meetings with the
20  provider?
21      A.  On occasion, yes.
22      Q.  And what form would those reports
23  take?  Would they be oral; would they be
24  written?

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 11 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 22

1    A.   Oral.
2    Q.   And were those part of a regular
3  series of meetings you would have, or
4  would it be as a need arose?
5    A.   It would be both.  It depended on
6  the scenario or the case being reviewed.
7  But overall, he maintained and managed
8  site responsibility for the clinical
9  medical services for the Department.
10    Q.   And in the time you were
11  Commissioner of the Philadelphia
12  Department of Prisons, do you know how
13  diabetes care was administered in the
14  prisons?
15    A.   Yes.
16    Q.   And how was that?
17    A.   Well, there would be a clinical
18  assessment by a licensed practitioner.
19  The licensed practitioner would meet with
20  the individual, engage them in a series of
21  questions to obtain information.  At that
22  point based on the clinician's diagnosis
23  medication would be ordered and the
24  individual would receive the medication,

Page 23

1  and that was the normal course of duty for
2  rendering medications.
3    Q.   And if a patient were diabetic,
4  and they -- and they were to receive
5  glucose measurements, where would that
6  happen or how would that happen?
7    A.   They could happen in the medical
8  area or infirmary area, or it could happen
9  in another area designated by the facility
10  to render care.  It depended on the
11  facility's location and where they were
12  going to render confidential services and
13  administer medications.
14    Q.   And would that vary depending on
15  which facility somebody was in perhaps?
16    A.   Yes.
17    Q.   Thank you.  In terms of where it
18  was.
19      MR. PESTRAK:  Did you want her to
20    answer that, Bret, or is that just
21    finishing your question?
22  BY MR. GROTE:
23    Q.   I think, just so we understand and
24  so that we're clear, your answer was that,

Page 24

1  yeah, depending on if they're in CFCF, the
2  Detention Center, PICC, and other factors,
3  whether the medication was administered in
4  one location or the medical services that
5  would vary.  That was not very artful, but
6  do you understand what I mean?
7    A.   Yes.
8    Q.   Were the readings of glucose
9  documented or supposed to be documented?
10    A.   Supposed to be documented in the
11  electronic medical record.
12    Q.   And do you know what was supposed
13  to be documented when they do a glucose
14  check?
15    A.   I don't want to speak or assume
16  so.  I know there's a documentation.  I
17  don't know specifically what.
18    Q.   So you don't know if they're
19  supposed to document the glucose level
20  itself or not?
21      MR. PESTRAK:  Objection.  You can
22    answer again.
23      THE WITNESS:  There is a level or
24    a reading that I am aware of.  I do

Page 25

1    not know the specific medical
2    terminology for that, but that would
3    be from the licensed provider.
4  BY MR. GROTE:
5    Q.   The -- what would be from the
6  provider?  The -- using the correct
7  terminology or?
8    A.   The actual medical provision of
9  services, whether that's inclusive of an
10  assessment terminology to enter into the
11  medical electronic record.
12    Q.   So is it the provider who
13  determines what's supposed to be
14  documented in the medical record?
15    A.   Yes.  By a licensed professional,
16  yes.
17    Q.   Understood.  And this is a similar
18  question, it may get a similar answer:
19  How is insulin administered to diabetic
20  patients?
21    A.   There are two forms of -- I know
22  there's a pill, and then there's one with
23  the syringe.
24    Q.   And would those be provided by the

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 12 of 75

Deposition of Blanche Carney                                Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 26

medical provider?

A. Yes.

Q. And would that be, as you testified before, in an appropriate, confidential medical setting?

A. Yes.

Q. And do you know if that was supposed to be documented as well?

A. I'm not certain of the -- if the location is documented in the electronic medical record.

Q. Do you know if the -- was the fact that it was or was not administered supposed to be documented?

A. Yes.

Q. While you were Commissioner at PDP, was there a process for ensuring that medication administration was occurring as it was supposed to be occurring?

A. Yes.

Q. And what was that process?

A. The process is through the Chief Medical Officer quality-assurance checks to make sure that scheduled medications

Page 27

occur as scheduled. And if an individual refuses medication, there's a process to document their refusal.

Q. So, the quality-assurance checks: Can you tell me a little bit more about that process? How would it be carried out? How frequently? What would they look at?

A. Dr. Herdman would be best to respond to that question, but based on my knowledge, if there were any missed medication periods for the day, Medical would notify Dr. Herdman, and he would engage to determine what the issue or challenge was.

Q. So that would be a daily process in response to a notification from the medical provider?

A. Yes.

Q. Were there any processes that were, in addition to that, say, were there monthly reviews, every three months, some type of audit of medication administration, Dr. Herdman would carry

Page 28

out?

A. Yes. He would do the quality assurance analysis, but I would have to defer to him for the specifics on the frequency and how he arrived at that for those ongoing audits.

Q. Is it fair to say that that was a responsibility that as commissioner you delegated to him to carry out?

A. It wasn't delegated. That was one of his assigned duties, and he was responsible for that. Of course, he would report up, but that was one of his assigned duties. That was not delegated from my assigned duties to monitor on a daily basis those activities.

Q. Thank you for that clarification. I understand. Was -- I mean, was PDP able to identify if there were ever chronic failures in administering insulin within PDP facilities while you were commissioner?

A. No.

Q. And just so I'm understanding my

Page 29

own question better, let me rephrase that. Are you -- is your answer meaning that you never found that there were chronic failures in administering insulin while you were commissioner?

A. I never had any report of any chronic failures.

Q. Did you have any reports of non-chronic or episodic failures, we can say -- call them?

A. No.

Q. Would such reports make it to you or would those be directed to Dr. Herdman?

A. They would be directed to Dr. Herdman and those reports would then if a person refused medications, there's what we have, a red-flag protocol, then that brings into a different response from medical to engage the individual, to provide education, the importance of taking the medication as prescribed, and trying to engage them so that they can become medication-compliant. And those were not brought to my attention. Those

Page 30

were routine care engagements unless
something was life-threatening and it
required that the person you needed a
court order to medicate.  So those are
things that wouldn't be brought to my
attention on a daily basis.

Q.   You mentioned there's a process if
a person refuses medication.  Can you walk
me through what that process was?

A.   The process if they have three
missed doses and they're refusing medical
will engage the patient.  And as I just
testified, there's an engagement by a
licensed provider educating the individual
or the importance of maintaining
medication compliance.

Q.   And is there a form to document
refusals?

A.   Yes.

Q.   Who was supposed to fill that out;
what was the process for that documented
refusal?

A.   I would have to see the form it's
been some time.  I believe the

Page 31

correctional officer would notify medical.
Medical would then be responsible for
getting -- obtaining the signature for
refusal and documenting it in the
electronic medical record.

Q.   Do you know if there was a process
in place if a patient refused to sign the
refusal form?

A.   If that person refused to sign, it
still would have been required to be
documented, their refusal to sign.

Q.   And do you know who would have
signed off that they witnessed that
refusal, what staff?

A.   It could be the correctional
officer or the medical provider.

Q.   Did correctional staff have a
responsibility to notify medical staff if
an inmate was not going to med-line to
receive their medication?

A.   If they were on the list of
individuals scheduled to receive, they
would be required to notify that the
individual is not coming to the med-line.

Page 32

Q.   And how would they make that
notification?

A.   That notification is usually made
through a phone call, and then there's a
documentation on the refusal form.

Q.   Would the phone call to medical be
documented in any way?

A.   I don't believe it's exclusive to
the phone call.  It's the paperwork that
should accompany as well.  So I'm not 100%
certain.

Q.   Understood.  You're familiar with
the Lock and Track system, I assume?

A.   Yes.

Q.   Did medical staff have access to
the Lock and Track system?

A.   Yes.

Q.   Okay.  If something was entered
into the Lock and Track system, would it
still be expected that -- so let's say, if
correctional staff entered into the Lock
and Track system that somebody refused
medication, they would still be expected
to notify medical staff through a phone

Page 33

call like you just discussed?

A.   Yes.

Q.   Do medical staff necessarily
review the Lock and Track, you know, on a
daily basis?

MR. PESTRAK:  Objection.  You can
answer if you know.

BY MR. GROTE:

Q.   If you know.

A.   I'm not sure if it's on a daily
basis.  They do have read-only rights for
portions of Lock and Track.

Q.   Okay.  How -- Can you describe for
the record what Lock and Track is and how
it is used within PDP?

MR. PESTRAK:  How broadly do you
want that question, Bret?

BY MR. GROTE:

Q.   What I'm wondering is kind of
generally what would be documented there
and how frequently staff are reviewing it.
Is it a place to document notes so there's
a record, or is it something that staff
are expected to be reviewing as it's

Page 34

related to, say, the housing unit they're working on as part of their daily job responsibilities?

A.  So Lock and Track is the platform which captures incarcerated individuals' admissions, participation in programs, treatments, any case notes, read-only rights, legal paperwork.  The individuals that have access to Lock and Track are only able to have a read-only access to certain portions of it.  Depending on their work for the day, they may or may not go into Lock and Track.  Their duties and information can be entered for individuals to review if they're going through the case file.  And that information is the overall platform for a person's incarceration history.  The electronic medical record is separate, and only the clinical staff have access to it to enter clinical notes to ensure privacy and protection of medical information.  Need-to-know folks.  There are some read-only rights for individuals just to

Page 35

take a look at certain aspects of the electronic medical record.  That does not give people medical history of an individual.

Q.  Thank you.  When it comes to the refusal forms, was -- every time a patient refused medication, was there supposed to be documented -- documentation of that refusal?

A.  Yes.

Q.  And why is that?

A.  You're tracking to see the individual's compliance.  If it's a one-time occasion you want to engage, the red-flag goes into medications, and that's -- then your -- medical is approaching the individual to educate, engage, see what the challenges are and reason for refusal.

Q.  And you've mentioned the red-flag system a couple times, so can you walk me through that?  And specifically, who determines when a red flag is supposed to be raised?  I don't know what the right term is.  And who's responsible, I guess,

Page 36

for administering the red-flag system?

A.  The red-flag system is triggered when there are three missed doses of medication.  Medical is then looking at we have three missed doses for this individual.  And this is where the engagement starts.  The officer is notifying, as well, daily on those occasions that the person is missing the medications.  Medical is aware and tracking to see, and three missed doses that activates the red flag.  And then you start with the engagement, and trying to gain compliance and obtain the reason for refusal.

Q.  Could a red-flag be initiated if there were less than three missed doses, depending on the medication?

A.  That would be clinically, but the process is set up for three missed doses, to my recollection.

Q.  Thank you.

A.  But certainly, if there's a missed dose, Medical could engage the individual

Page 37

as well.

Q.  Bear with me.  I'm going to use a document here.  And when did you leave PDP again?  It was 2024, correct?

A.  Correct.

MR. GROTE:  I am going to share my screen.  All right, can everybody see this document?

BY MR. GROTE:

Q.  Do you see this document, Ms. Carney, that says Western Correctional Consultants, LLC at the top?

A.  Yes.

MR. GROTE:  And for the record, this is Jung City Production002649.  And this is directed to Ms. Anne Taylor.

BY MR. GROTE:

Q.  You recognize that name, I assume?

A.  Yes.

Q.  And I'm going to give you a moment to review this first page, just so you're familiar with what this document is.  And I'm going to ask some questions about a

Deposition of Blanche Carney

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 38

later passage.  Just let me know when
you've reviewed?
    A.   Okay.  I can't see the last
paragraph because you're -- Okay.
    Q.   This better?
    A.   A little more, please.
    Q.   Good?
    A.   Yes.  Okay.
    Q.   And do you -- where's the name?
And this was signed by -- see at the
bottom here?  Michael T. Puerini.  Do you
remember meeting with Dr. Puerini?
    A.   Yes.
    Q.   And what was Dr. Puerini -- what
was the nature of what they were -- were
they assisting PDP?
    A.   They were auditing PDP.  They were
two contracted, licensed individuals, and
Dr. Puerini is a medical doctor, and he
would come and assess and make
observations and recommendations regarding
the delivery of care at the Department of
Prisons.  And that was done twice a year.
    Q.   Okay, so this is from 2023.  Did

Page 39

he do that twice every year?
    A.   I don't recall if it was twice
every year or if it was annually.
    Q.   Okay.  How -- you might not
remember the exact number of years, but
did he do that for what years when you
were Commissioner?  Every year that you
remember, once or twice?  Some years?
    A.   Some years, but I do not recall
the exact years.
    Q.   Okay, thank you.  And did you
review this report that Dr. Puerini
submitted that we're looking at now?
    A.   Yes.
    Q.   And I want to go down to:
Findings.  You see where it says:
Findings for specific patients?
    A.   Yes.
    Q.   And it says:  Of the 12 patients I
reviewed, three were significantly
non-compliant with the plan of care, two
of which had poorly controlled diabetes.
Some things are in the parentheses.  Then
it says:  Refusals were not found in the

Page 40

chart for all missed chronic care visits.
And then I want to go down to where it
says:  Suggestions.  And one of them is
generally refusals of potentially
life-saving treatment such as diabetes
care should be witnessed by a medical
provider in a medical setting.  This
infrequently happens.  Many refusals for
chronic care visits are not documented in
writing at all.  Do you remember this part
of the report of Dr. Puerini?
    A.   No, not -- until reading it here.
I do not.
    Q.   Understood.  Do you know if that
suggestion was followed up on?
        MR. WITTEKIND:  Objection to the
    form.  You can answer.
        THE WITNESS:  I don't recall.  I'm
    just looking at what he wrote here.
    I'm not recalling it.  But then he's
    saying, further down, something
    totally different so...
BY MR. GROTE:
    Q.   And would you like to say what

Page 41

that is, that you think is totally
different?
    A.   Yeah.  Kudos for managing to see
diabetics regularly on a reasonable
schedule despite the backlogs.  So I don't
know what -- I would have to read this
again in its entirety.
    Q.   Right.  But seeing diabetics on a
regular schedule, wouldn't you -- isn't
that different from documenting refusals?
    A.   Based on the 12 patients that he
pulled from the population, that was what
he found.  That's all I can base it on.
It's based on the 12 that he pulled from
the population size.
    Q.   So whenever Dr. Puerini would
issue a report like this, did you and Dr.
Herdman have a general way of reviewing
and addressing issues in the report?
    A.   Yes, how to address the issues,
how to deliver the care, and he would
implement.  So when we would receive this,
we would be open to suggestions and then
discuss how that the delivery of services

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 42

1  would then get to the population.
2    Q.  And would responses to this
3  report, like you just discussed, be
4  documented in any way?
5    A.  We had oral conversations.  It was
6  easier to go through as we're conversing
7  about how to deliver it.  And then Dr.
8  Herdman would put his plan in place.  And
9  that would also encompass working with the
10  facility wardens, for the wardens to work
11  through their direct reports to get the
12  care to the population.
13    Q.  And so in regard to this top
14  suggestion about where it says many
15  refusals for chronic care visits are not
16  documented in writing at all, and it also
17  talks about -- yeah, when it says that.
18  You don't recall if Dr. Herdman responded
19  to that in any way?
20    A.  I can't say specifically how he
21  responded, but he was responsive to
22  working with the medical providers with
23  any suggestions.  But I can't speak
24  specifically to what he said, how he said

Page 43

1  it, and what plan he actually put in place
2  to deliver it.
3    Q.  Did you have a process for
4  following up with Dr. Herdman after these
5  oral conversations to check on the
6  progress of any response to these reports?
7    A.  Yes, we would have meetings where
8  we would discuss suggestions,
9  implementations, delivery of care.  They
10  were ongoing, and we would converse about
11  it, and he would report that he had spoken
12  with the medical providers, how they were
13  going to deliver care and how they were
14  going to discuss the issues.
15    Q.  And that process, was this always
16  the case when you were Commissioner, what
17  you're describing when you were getting
18  reports from Dr. Puerini, is that the
19  general process you followed?
20    A.  Yes.
21    Q.  And when you were Commissioner in
22  2016, was Corizon the medical provider?
23    A.  Yes.
24    Q.  And were they the medical provider

Page 44

1  until YesCare became the medical provider?
2    A.  Yes.
3    Q.  Do you remember when YesCare
4  became the medical provider?
5    A.  I don't want to guess, but there
6  was a change.  I can't recall the year.
7    Q.  And was Corizon, and then YesCare,
8  were they both responsible for the
9  provision of diabetes care?
10    A.  Yes.
11    Q.  And what role did correctional
12  staff play in administering diabetes care?
13  And by that, I mean I understand that they
14  didn't engage in clinical medical work,
15  but what role would they have played in
16  ensuring patients were notified it was
17  time to go to medication, escorted to
18  medication, or anything else that
19  facilitated access to medical care for
20  diabetes patients?
21    A.  There is generally an announcement
22  made for medication, and then the
23  correctional officer calls out the names
24  of those individuals, and then those

Page 45

1  individuals are either escorted or given a
2  pass to report to medical or the area to
3  receive treatment.
4    Q.  I'm going to stop sharing my
5  screen now.  So when they call out for
6  medication, is that just something they do
7  verbally on the housing unit?
8    A.  They can call out over the
9  intercom system, and then individuals
10  begin to line up.  They all have to call
11  in, and they're going to either be issued
12  a pass or escorted to the area.
13    Q.  And if somebody does not leave
14  their cell when it's time for their
15  medication, was there a protocol the
16  correctional officer was supposed to
17  follow in those circumstances?
18    A.  Depending on the duties or
19  activities of the day, the officer is
20  going to notify that the person is not
21  showing.  And then after they've done
22  whatever duties there are presently
23  completed they can then as part of their
24  tour of the area, walk around, engage the

Page 46

1 individuals, and notify medical that the
2 person did not report or wasn't sent.
3    Q.  So when you say after their kind
4 of current duties, does that mean if
5 they're in the middle of something,
6 that's --
7    A.  If they're in the middle of
8 something, yes, they're going to finish
9 that out and then through the course of
10 their tour, they will address the
11 individuals.
12    Q.  And while you were Commissioner,
13 do you know if correctional staff were
14 trained in recognizing signs and symptoms
15 of diabetes?
16    A.  I'm not 100% recalling the signs.
17 I would have to review the policy for that
18 specific language; I would need to see the
19 policy.
20    Q.  Understood.  Were there are a lot
21 of policies at PDP?
22    A.  Yes.
23    Q.  You didn't memorize them all?
24    A.  No.

Page 47

1    Q.  Bear with me one moment.  All
2 right.  And what I'm going to share now is
3 -- I'm going to share the first page and
4 then ask you a few questions on what is
5 a -- oh, hold on a moment.  All right.
6 And can you see this document?  I'm sorry,
7 I didn't catch that.
8    A.  Yes.
9       MR. GROTE:  Okay.  And this is for
10    counsel.  This has not been
11    produced.  This was obtained through
12    a Right-to-Know request.  I'm going
13    to enter this as an exhibit, and
14    then we can Bates-stamp it and get
15    it to everybody.
16            - - -
17       (Whereupon, Exhibit-1 was marked
18    for identification.)
19            - - -
20 BY MR. GROTE:
21    Q.  And, just reviewing the first
22 page, does this look to you as it is the
23 Provider Agreement executed on January
24 4th, 2022, between Philadelphia and

Page 48

1 Corizon Health?
2    A.  Yes.
3    Q.  And if you recall, when the
4 contract transfer from Corizon to YesCare
5 was it that YesCare became the new entity
6 that had the contract assigned to it, so
7 it was still carrying out the provision of
8 medical services consistent with the terms
9 that Corizon had agreed to?
10    A.  Yes.
11    Q.  And on this page here, is that
12 your signature?
13       MR. GROTE:  And I think you said
14    yes, but I don't know if it's
15    cutting out for others as well.
16    Occasionally a word is missed.
17       THE COURT REPORTER:  Yeah, a
18    couple -- I don't mean to interrupt,
19    but a couple of times I did see you
20    answering.  I just -- I don't know
21    if it's not coming through because
22    you're on an iPhone, or if there's
23    interference on your iPhone.
24    Sometimes that's happening.

Page 49

1       THE WITNESS:  Yes.  Yeah, my
2 answer was yes.
3       MR. KAMINSKY:  I noticed that too.
4 It did seem like a couple of times
5 there might have been a few more
6 words that were not caught.
7       MR. GROTE:  Just saying thanks.
8 Yeah, it's like 98% of it's coming
9 through.
10            - - -
11       (Whereupon, a discussion was held
12    off the record.)
13            - - -
14 BY MR. GROTE:
15    Q.  You see on this page right here,
16 do you agree this is the Request for
17 Proposals?
18    A.  Yes.
19    Q.  And what is a Request for Proposal
20 for the record?
21    A.  That is a formal announcement that
22 is posted on the city's website for
23 solicitation for services.
24    Q.  Thank you.  And I'm going to fast

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 18 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 50

1  forward to this page and the Request for
2  Proposal.  And down here, you see the part
3  I highlighted?
4      A.  Yes.
5      Q.  Now, you agree this says all
6  medical staff and appropriate correctional
7  staff must receive in-service training in
8  at least the following areas.  And do you
9  agree that, right here, it lists diabetes?
10      A.  Yes.
11      Q.  And is it accurate to say that in
12  the Request for Proposal, the city wanted
13  a medical provider who would provide
14  medical staff and appropriate correctional
15  staff with in-service training on
16  diabetes?
17      A.  Yes.
18      Q.  And what is in-service training?
19      A.  In-service training is training
20  that is provided to sworn and civilian
21  staff.  Medical normally provides a
22  training module that is then given to
23  sworn and civilian staff and giving them
24  information about the various conditions

Page 51

1  that are highlighted here.
2      Q.  Thank you.  And was this training
3  to be provided by the medical provider?
4      A.  Yes, it can be provided by the
5  medical provider through roll-call
6  training with the correctional staff, and
7  given to the administrators for sworn
8  staff -- excuse me, for civilian staff, to
9  ensure that the training is delivered to
10  their respective direct reports.
11      Q.  And would medical contract
12  employees of Corizon also be civilian
13  staff?
14      A.  They are civilian,
15  civilian-contracted employees.
16      Q.  Right.  And the distinction here
17  is between civilian and those who are
18  correctional staff; is that accurate?
19      A.  Yes.
20      Q.  And what is roll call training?
21      A.  Roll call training is for sworn
22  staff that receive a number of directives,
23  information for the incoming shift to be
24  aware of any training.  Any information

Page 52

1  that is to be conveyed is done during the
2  roll call training.
3      Q.  And back to this document, where
4  it says:  Appropriate correctional staff,
5  Do you know what the word "appropriate"
6  does in this sentence?  Who are
7  appropriate correctional staff that should
8  receive this type of training?
9      A.  Appropriate correctional staff --
10  all staff should receive that training.
11  But definitely, when you're doing and
12  providing direct service on a post and
13  doing direct engagement with the
14  population.
15      Q.  Does PDP use the term contact
16  staff?
17      A.  No, not during my tenure.
18      Q.  Maybe it's a DOC thing.  But what
19  you just described as those who are
20  providing services, or, I think maybe you
21  said on the housing unit, would officers
22  who interact with the incarcerated
23  population as part of their job
24  responsibilities be included in those

Page 53

1  staff who should be receiving this
2  training?
3      A.  Yes.
4      Q.  Go down to page 43 -- actually, do
5  you know if the medical provider was
6  supposed to provide care consistent with
7  the American Diabetes Association
8  standards?
9          MR. WITTEKIND:  Objection to form.
10          MR. PESTRAK:  You can answer,
11      Blanche.
12          THE WITNESS:  Based on the
13      certified medical recommendations
14      from that body, they should have
15      complied.
16  BY MR. GROTE:
17      Q.  Thank you.  All right, so on this
18  page here, you see the section:  Quality
19  Assurance and Quality Improvement?
20      A.  Yes.
21      Q.  And was that what you were
22  describing before in regard to Dr.
23  Herdman's process for providing oversight
24  of diabetes care?

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 19 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 54

MR. PESTRAK: I heard you a little bit there, Blanche, but if you could just repeat the answer, I'm not sure it came all the way through.

THE WITNESS: Yes.

BY MR. GROTE:

Q. And so it says here: The QA Plan must include clinical guidelines for chronic diseases at a minimum, and then it includes diabetes. So the provider would provide the clinical guidelines for diabetes care; is that accurate?

A. Yes.

Q. Okay. And PIP, which is Performance Improvement Plan, what is the Performance Improvement Plan?

A. The Performance Improvement Plan are areas that require an improvement in the delivery of services.

Q. And so this sentence here, the PIP must provide for monitoring if all significant aspects of health care, including at least the access to care, timeliness of care, timeliness of

Page 55

medication management, appropriateness of care, nursing services, physician services, access to specialty care, access to behavioral health services, pharmacy services, dental services, environmental services, infection control procedures, health care records, sick call services, intake screening and evaluations, chronic disease services, infirmary care, diagnostic services, and adverse patient occurrences, including all deaths. So is that consistent with your understanding of what was to be part of the Performance Improvement Plans?

A. Yes.

Q. Who was responsible for the Performance Improvement Plans?

A. Dr. Herdman, as the Chief Medical Officer, would create the plans, and that would be discussed and expectations set with the medical provider.

Q. And would these be written plans?

A. They could be oral and written plans, yes.

Page 56

Q. What would determine if one was oral or one was written? Was there a method for that?

A. Oral could be to convey information rather quickly --

Q. You just cut out for a bit after that information, very quickly.

A. Yeah, yeah. I'm not sure. I'm trying not to move even with this question. So the oral could be to convey information rather quickly, but the written performance plan would spell out the area that would be addressed, how it would be delivered, and how it would be monitored. So the PIP plan should formalize in writing --

MR. PESTRAK: We lost you in the middle there, Blanche. The PIP plan was to be in writing, and then keep going.

THE WITNESS: It's to formalize in writing the area that's going to be addressed, what's going to be delivered, and how it will be

Page 57

monitored.

BY MR. GROTE:

Q. So would a PIP plan be kind of issue-specific, or would it be something that could incorporate a range of the things that were identified here?

A. It could be both. If it entails that it requires encompassing multiple, but it could be specific to one area.

Q. And do you know if Dr. Herdman had a schedule for how frequently he would be creating a PIP plan? You know, would they be calendared every three months on these issues? Every six months? We do this annually, or was that the case?

A. Based on my recollection, I believe they were quarterly. That's based on my recollection with the meetings he would have with medical.

Q. Understood. Thank you. Would you review PIP plans when they were written?

A. Not necessarily. Dr. Herdman would converse with me, as I stated before. We would talk about what he's

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 20 of 75

Deposition of Blanche Carney                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 58

1  working on, what he's monitoring or
2  managing, and he would provide updates to
3  me.
4      Q.   Thank you.  And did you have a
5  regular list of issues you would discuss
6  with him on updates or would you rely on
7  him to bring relevant things to your
8  attention?
9      A.   Well, standard of care were one of
10  our standing --
11      MR. PESTRAK:  Standard of Care
12  would be a regular --
13      THE WITNESS:  Was one of my
14  regular topics -- they're standing
15  topics that just remain.
16      MR. PESTRAK:  We lost you again,
17  Blanche.
18      THE WITNESS:  Oh, I'm not sure
19  what's happening.
20      MR. PESTRAK:  Do you have a
21  landline you can call into?  We can
22  use it.  You're on the phone, and I
23  think there was a number in the link
24  that I forwarded that you could call

Page 59

1  into for the audio.
2      KAMINSKY:  Can we just take a
3  few-minute break?  Would that be
4  okay while we're working on this
5  anyway.
6      MR. PESTRAK:  Sure.
7                  - - -
8      (Whereupon, a brief recess was
9  taken.)
10                  - - -
11  BY MR. GROTE:
12      Q.   Were there specific issues that
13  you regularly reviewed with Dr. Herdman?
14      A.   There were no specific issues
15  regularly reviewed, but medical services
16  would be a standing agenda item, and that
17  would encompass how services are going,
18  are there any issues?  And that would be
19  our engagement.  So no specific pointing
20  to any specific conditions.  Nothing of
21  that nature.
22      Q.   So you didn't have, like, a set of
23  subtopics, like medication administration,
24  access to care, nursing services, etc.?

Page 60

1  Would it just be this general testimony
2  you just gave?
3      A.   So they would be overarching.  It
4  encompasses all of the areas that you just
5  laid out, and it's giving an update, but
6  not pointing out any one particular issue.
7      Q.   I guess I'm just wondering were
8  you getting an update necessarily on each
9  of those topics, or would you get an
10  update as Dr. Herdman felt there was
11  something to update you about in regard to
12  one of those areas?
13      A.   Yes.  It would be an update from
14  Dr. Herdman regarding one of those areas,
15  yes.
16      Q.   Thank you.  I'm going to go back
17  to the screen share for a couple more
18  questions.  Do you see this document that
19  has Corizon Health at the top?
20      A.   Yes.
21      Q.   And see at the bottom, it says:
22  Tab 5:  Proposed Scope of Work.  Does this
23  look to you like part of Corizon Health's
24  proposal in response to the request for

Page 61

1  proposal?
2      MR. WITTEKIND:  I'm unable to
3  scroll that down.  What page are you
4  on this?  I cannot scroll on my
5  screen.
6      MR. GROTE:  Okay.  Can you see
7  now?  It says Page 5.76 at the
8  bottom?
9      MR. WITTEKIND:  Okay.  All right.
10      MR. GROTE:  Yeah.  For the record,
11  Page 5.76.
12      MR. WITTEKIND:  It was not showing
13  up before.
14      THE WITNESS:  Can you repeat your
15  question, please?
16  BY MR. GROTE:
17      Q.   Certainly.  Looking at the bottom,
18  Tab 5, Proposed Scope of Work, does this
19  appear to you to be a page from Corizon's
20  proposal in response to the City's Request
21  for Proposal we were looking at earlier?
22      A.   Yes.
23      Q.   And the last paragraph here begins
24  with:  Our chronic care program, and it

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 21 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 62

says:  Our treatment guidelines are adapted from nationally recognized correctional healthcare sources, such as the National Commission on Correctional Health Care.

Can you tell us what is the National Commission on Correctional Health Care?

A.  That's a national body that establishes guidelines, recommendations for delivery of healthcare in correctional settings.

Q.  And is that a national -- is that an organization that you would look to as commissioner to follow the standards that they establish?

A.  Yes.

Q.  Bear with me one second.  All right, so the last sentence here:  These guidelines are the foundation for developing the individualized treatment plan based upon the disease and degree of control for each patient.  And then when you go onto the next page, it says:

Page 63

American Diabetes Association.  So is it your understanding that Corizon, in this proposal, was telling the City of Philadelphia we are going to provide care consistent with the standards set out by the National Commission on Correctional Health Care and the American Diabetes Association?

MR. WITTEKIND:  Objection to form.  To the extent you're mischaracterizing the letter, it states guidelines, not standards.

BY MR. GROTE:

Q.  Okay.  Guidelines they were supposed to adhere to for the American Diabetes Association?

A.  Yes.

Q.  Thank you.  And again, would it be Dr. Herdman who is responsible on the side of the City for ensuring the contractor was living up to its obligations under the contract?

A.  Yes.

MR. GROTE:  And now I'm going

Page 64

to -- this is page 562 in the PDF, but page 5.162 at the bottom here, just for the record, so you can correlate that with Bates stamps when we serve these on the other counsel.

BY MR. GROTE:

Q.  You see this paragraph here on diabetes care?

A.  Can you enlarge the screen slightly, please?

Q.  Probably.  How's that?

A.  Much better.  Okay.

Q.  And then, can you see the whole -- I can't exactly see what you see.  Can you see that --

A.  I can see the whole paragraph, yes.

Q.  Okay.  And it begins:  Diabetes care has been significantly improved through the Pharmacist-Directed Diabetes Initiative.  Do you know what the Pharmacist-Directed Diabetes Initiative is?

Page 65

A.  It is a system whereby medical providers can go into a portal or system to see a history of insulin-filled -- no, not insulin-filled; excuse me, prescriptions filled by various pharmacies.  That's my recollection of what it is.

Q.  Okay.  Was that initiative used at PDP while you were commissioner?

A.  I believe medical could go into the portal and review a patient's filled prescription.  I don't know what other information they were able to ascertain from access.

Q.  Okay.  So when you say review prescription, would that be reviewing anything about medication compliance or medication administration, or is it just looking at what the prescriptions were for patients?

A.  Based on my recollection, it was just based on the prescriptions that were filled, and giving the provider some information that the person receives the

Page 66

1 medication at some point. But I don't
2 know about the other question -- areas you
3 just asked about. I'm not sure if that
4 was provided in that portal.
5 Q. Do you know who would know about
6 that?
7 A. I would have to defer to Dr.
8 Herdman to see what additional information
9 can be garnered from this initiative.
10 Q. Thank you. In page 5.183. And
11 this also, you know, Corizon Health at the
12 top. And similar to the Request for
13 Proposal from the City, Corizon here. Do
14 you agree that Corizon is saying all
15 medical staff and appropriate correctional
16 staff must receive in-service training in
17 at least the following areas, and it
18 includes diabetes?
19 A. Yes.
20 Q. And how would the City ensure that
21 that training was happening?
22 A. The City, the Department of
23 Prisons, has a compliance unit that deals
24 with training, the frequencies of

Page 67

1 training. Any training provided and
2 delivered by medical, would be in concert
3 with particular unit, and they would track
4 staff who received the training.
5 Q. Did the City have any way of
6 determining if the training was effective?
7 MR. PESTRAK: Objection to the
8 form, but you can answer.
9 THE WITNESS: The City -- we would
10 do the annual training. I don't
11 believe the City then came in and
12 said, let's assess that training
13 that you're receiving from your
14 medical provider. No.
15 BY MR. GROTE:
16 Q. Were you ever involved in
17 reviewing YesCare's provision of diabetes
18 care?
19 A. I reviewed how they would give or
20 assess, overall the medication. When I
21 say assess the medication, I mean based on
22 the clinical certified practitioner. Any
23 individual who was determined to be
24 diabetic would receive insulin. That's my

Page 68

1 extent.
2 Q. And when you say you would review,
3 how would you do that review? I mean --
4 yeah, how would you do that?
5 A. It wouldn't be a review of any
6 formal reports or individual clients; it
7 was the overall delivery of care. So if
8 someone was diabetic, they would receive
9 insulin based on the clinical provider's
10 assessment.
11 Q. So would there be any documents
12 that you would review in conducting your
13 own review of this?
14 A. No.
15 Q. Would it be reports from Dr.
16 Herdman, oral reports?
17 A. Oral reports if they were brought
18 to my attention. I can't recall reviewing
19 or discussing individuals who were
20 diabetics.
21 Q. Okay, thank you. So I know
22 there'd be a lot of variation to this
23 question depending on the specific
24 circumstances, but generally what happens,

Page 69

1 or what's supposed to happen, if an
2 incarcerated person is experiencing a
3 medical emergency?
4 A. If an individual is experiencing a
5 medical emergency, the officer or the
6 staff member while the emergency is
7 happening is starting the process of
8 notification request, notifying other
9 staff to report to the area. Medical is
10 being notified; they're reporting to the
11 area to render care to the individual.
12 Q. Are correction's staff trained in
13 recognizing medical emergencies?
14 A. Yes, to the extent they're not
15 assessing. But if they are calling out,
16 giving clear commands to the individual,
17 and the individual doesn't appear to
18 respond in a way that indicates they're
19 acknowledging they're being called or
20 engaged, then the officer starts the
21 notification process.
22 Q. Are there other circumstances that
23 might -- so you talked about it -- you're
24 just talking about if an incarcerated

Page 70

1  person is nonresponsive.  Are there other
2  circumstances where a correctional officer
3  is trained to call Medical?
4      A.  If the individual is either
5  nonverbal, non-movement, they're going to
6  notify because they're giving the
7  individual commands and the person isn't
8  either responding verbally, or their body
9  language may be giving something that
10  there's something wrong.
11     Q.  And so if they're non-responsive
12  to commands, how do correction officers
13  determine if this is perhaps a question of
14  somebody being disobedient and not obeying
15  orders versus a potential medical issue?
16     A.  They're not making the distinction
17  for assessment.  It's based on a
18  case-by-case basis.  And if the person
19  is -- it's based on how individuals are
20  responding -- so if they're looking, based
21  on the correctional officer's
22  interpretation, they're then making the
23  call to say this person may be having or
24  experiencing a medical emergency or I need

Page 71

1  security staff for assistance because the
2  person is not following commands.
3      Q.  So if somebody's not following
4  commands, they would call security staff
5  to address that?
6      A.  It's a case-by-case basis.  And
7  let me clarify:  If the officer needs
8  assistance, they're going to call for
9  assistance.  If the person is, you know,
10  -- they're not giving off any medical
11  signs, and again, correctional officers
12  are not certified medical practitioners.
13  But they're looking for visual cues, body
14  cues, and it's dependent on the officer's
15  perception.  At the time they make the
16  call for assistance, they're going to
17  clarify.  I need assistance, medical
18  emergency, or whatever they're observing
19  at the time.  But that's a correctional
20  officer who has a firsthand account of it.
21  So I don't want to put it into a box to
22  say if it's this or that.  I'm just trying
23  to clarify the scenarios.
24     Q.  Right.

Page 72

1      A.  But that help is being called.
2      Q.  In a situation where an
3  incarcerated person is refusing to move
4  into their cell and is lying on the floor,
5  would it be appropriate to have inmate
6  workers move that person into their cell?
7          MR. PESTRAK:  Objection.  You can
8      answer.
9          THE WITNESS:  No.
10  BY MR. GROTE:
11     Q.  Why not?
12         MR. PESTRAK:  Same objection.
13         THE WITNESS:  The officer is
14      responsible for any engagement with
15      an incarcerated individual.
16  BY MR. GROTE:
17     Q.  And why is that?
18     A.  They are employees of the
19  Department of Prisons.
20     Q.  And indeed incarcerated people are
21  not?
22     A.  Yes, correct.
23     Q.  And is it ultimately the
24  responsibility of the Department of

Page 73

1  Prisons to handle security and safety
2  issues within the Department of Prisons?
3      A.  Yes.
4      Q.  Are corrections staff trained to
5  provide life-saving aid like CPR?
6      A.  Yes.
7      Q.  Is that provided in the training
8  academy?
9      A.  Yes.
10     Q.  And are there, you know, refresher
11  trainings on that or how does that work?
12  If somebody gets trained in CPR, do they
13  have to have an annual refresher every two
14  years?  How's that work?
15     A.  It's an annual refresher depending
16  on, I don't recall, if it's two or three
17  years.  But there is a refresher training.
18  Yes.
19     Q.  Is there any other training that
20  they receive in regard to providing any
21  emergency care?
22     A.  Not to my recollection, outside of
23  CPR.
24     Q.  When should staff provide CPR to

Deposition of Blanche Carney                                Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 74

1  somebody?
2      MR. PESTRAK:  Objection.  To the
3  extent she's not a medical
4  personnel, she can answer within her
5  knowledge.
6  BY MR. GROTE:
7      Q.  If they're trained to -- I can
8  rephrase.  If corrections staff are
9  trained to provide CPR, what guidance are
10 they given as to when CPR might be
11 appropriate?
12     A.  They will have to first call for
13 assistance.  And there, I believe, if I
14 remember correctly, it's checking for a
15 pulse.  But the first thing is to call for
16 assistance.  You don't initiate CPR
17 independent of anyone being notified.  So,
18 at the time, the officer -- if the person
19 they can't get a pulse, they may start it,
20 and then medical arrives to take over.
21     Q.  And are the procedures that are in
22 place that are supposed to enable
23 correctional staff to identify potential
24 medical emergencies?  And I can get more

Page 75

1  specific if that would be helpful.  But
2  staffing on the housing units, how many
3  officers are supposed to be there, and is
4  that important for identifying medical
5  emergencies?  I know that's a compound
6  question, so I'll break it down.  How many
7  staff are supposed to be on a regular
8  general population housing unit?
9      A.  It's dependent on the number of
10 individuals incarcerated on that housing
11 unit, which would be one to 64
12 individuals.
13     Q.  And if it were 64 individuals,
14 what would be the complement of staff?
15     A.  One correctional officer.
16     Q.  And is that correctional officer
17 -- one of that correctional officer's
18 responsible for identifying possible
19 medical emergencies that may be occurring
20 with an individual on that unit?
21         MR. PESTRAK:  Objection to form.
22     You can answer.
23         THE WITNESS:  In the course of
24     their duties, they conduct rounds

Page 76

1  and tours on the housing unit, and
2  that is how they are engaging the
3  population or determining if someone
4  needs assistance.
5  BY MR. GROTE:
6      Q.  So, when making rounds, does that
7  involve going around the housing unit and
8  checking on people in their cells?
9      A.  Yes.
10     Q.  And are making rounds important
11 for identifying possible medical
12 emergencies?
13     A.  Not necessarily.  It's the routine
14 duties that they're responsible to
15 perform.  Should they come upon someone
16 who is experiencing a medical emergency,
17 then the activation of notification
18 begins, and then the officer is making
19 whatever observations and calling in
20 medical for assistance.
21     Q.  Right.  Maybe I can rephrase,
22 because I think that could be helpful.
23 Would it be -- so this part of their
24 regular duties to make rounds, they're not

Page 77

1  making rounds simply to identify medical
2  emergencies, but as part of their duties
3  in making rounds, that might be something
4  that they encounter; is that fair?
5      A.  Yes.
6      Q.  And is that one of many reasons
7  why officers are supposed to make regular
8  rounds to identify if there's something
9  they would not observe otherwise?
10     A.  Can you repeat your question?
11     Q.  Certainly.  Why do they -- why do
12 officers make rounds?
13     A.  The officers make rounds for a
14 number of reasons, and that's to make sure
15 that the individuals who are assigned to
16 that unit are -- the number of individuals
17 assigned are counted for and to address
18 any issues that may be presented on the
19 housing unit.
20     Q.  And those could be security
21 issues?
22     A.  Yes.
23     Q.  And they could be health issues?
24     A.  Yes.

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 78

Q. Are there other ways that correctional staff can learn of medical emergencies?

A. Yes. If the officer has completed their rounds, everything appears in order. A fellow incarcerated individual could alert the officer that there is something happening. It may not be called an emergency, but it could be a check on such and such. But another incarcerated individual can do just that.

Q. So officers can observe individuals acting in such a way that they might think there's a medical issue, and they can receive information from other individuals that could alert them to a potential medical issue; is that fair?

A. That's fair.

Q. What if an incarcerated person is refusing to leave their cell, is there guidance that correctional staff have for addressing that situation?

A. Yes.

Q. And what are they supposed to do?

Page 79

A. They can go to the cell. They can engage the individual. The individual will state what the issue is, or maybe not state what the issue is. The officer is documenting in their logbook. And they can also call for a supervisor to come over to assist.

Q. And if they're refusing to come out for medications, is it the process we talked of earlier, they're supposed to notify medical staff?

A. Well, they're notifying medical staff -- based on the list that Medical provides to the housing unit, that's where it generates from. Not the officer generating it to Medical. Medical is providing a list of individuals, and then the officer is notifying Medical that the person is refusing.

Q. Understood. Thank you. Does a corrections officer have the authority to call for a stretcher?

A. Yes, they can. They are notifying, and part of that notification

Page 80

can be, if that's their assessment. Again, it's a case-by-case basis. And we would have to see what the officer's seeing that would say: I need assistance, I need medical, I need a stretcher call. They're going to provide as much information based on their firsthand observation for the response and assistance.

Q. And if a nurse is on the scene and does not call the stretcher, does a correctional officer still have the authority to call a stretcher if they think there might be a medical emergency?

A. We're relying on Medical to make the assessment. The correctional officer isn't a trained clinician. The Medical provider is there and determining and assessing what additional services are needed.

Q. I guess what I'm wondering, though, is if there's a situation where the medical provider doesn't call for a stretcher. If it's a nurse, but the

Page 81

correctional officer is still concerned that the incarcerated person is not doing well, are they empowered to take any further steps?

A. Based on what they're presenting, they could make the call, but it depends on what they're observing. And then they would have to explain the reason for that additional call above the medical-certified practitioner.

Q. Thank you. When an incarcerated person was sent to the hospital when you were Commissioner, would you be notified?

A. Can you clarify hospital?

Q. Yeah. So, I guess, because there's emergent and non-emergency care at the hospital. Let's say if somebody is sent out to the emergency room at the hospital for an emergency situation, would you be notified as the Commissioner about that?

A. Not necessarily. Because you have a warden of each facility that is notified, and based on their assessment,

Page 82

if it escalates and above and it's beyond
and becomes a regular or a routine
transport, then I'm notified, but I'm not
notified of every single transport to the
hospital.  You have your wardens in place.
They're assessing and monitoring the
situation based on the reports that
they're receiving.
   Q.   When would it be escalated to you?
What types of situations would you get
notified about in regard to somebody being
sent to the emergency room?
   A.   If there is someone without a
pulse or severe visible injury.
   Q.   When you were Commissioner, were
hospitalizations from PDP, or say
emergency room trips, were those tracked
in any way by the City of Philadelphia?
   A.   They were tracked by us.  I don't
know the mechanism that the City used to
track, but we tracked all transports.
   Q.   I mean the Philadelphia Department
of Prisons.  So, when you said track them,
I should be more specific.  Were you ever

Page 83

-- so you were documenting all of these,
obviously, right?
   A.   There is documentation of every
trip that goes off campus.
   Q.   And were you ever assessing
emergency room trips to see if there were
issues that kept occurring?
      MR. PESTRAK:  Actually, in the
   form, you can answer.
      THE WITNESS:  No.  It's based on
   the clinical assessment of the
   individual and the need to treat
   above what we could provide on
   campus.
BY MR. GROTE:
   Q.   In your time as Commissioner, did
you ever notice any patterns in regard to
emergency room trips?  And by patterns, I
mean types of medical conditions, types of
injuries, other scenarios that occurred,
you know, more than once?
      MR. PESTRAK:  Objection.  You can
   answer.
BY MR. GROTE:

Page 84

   Q.   And what were some of those
patterns?
      MR. PESTRAK:  Same objection.  You
   can answer.
      THE WITNESS:  If someone's going
   out because of chest pains; if
   someone was in a fight and they were
   assaulted.  Those were the two
   primary.
BY MR. GROTE:
   Q.   Do you know if there are any
protocols in place for the medical
provider to assess a patient's care who is
sent to the emergency room?  Would they
review that patient's care to see if there
had been any deficiencies?
      MR. PESTRAK:  Brad, I'm just going
   to ask for clarification on medical
   provider.  Do you mean the receiving
   facility, or if you mean YesCare?
      MR. GROTE:  I mean YesCare.  I can
   try that again.
BY MR. GROTE:
   Q.   So, if in a scenario where a

Page 85

patient is sent to the emergency room from
the Philadelphia Department of Prisons, do
you know if YesCare took any measures to
review the quality of care, the
appropriateness of care they were
providing to that patient who was sent to
the emergency room?
      MR. WITTEKIND:  Objection to form.
      MR. PESTRAK:  You can answer,
   Blanche.
      THE WITNESS:  Yes.  Dr. Herdman
   would converse with the provider and
   reviewed the files, or the case --
   excuse me, the case.  I don't know
   how often that would occur, but yes,
   I do have knowledge he would discuss
   that with YesCare.
BY MR. GROTE:
   Q.   And when you say you don't know
how often that would occur, does that mean
you're not sure if it happened with every
ER trip?  Is that what you mean?
   A.   I'm not sure if it happened with
every ER trip.  I would have to defer to

Case 2:24-cv-05618-TJS     Document 160-1     Filed 01/09/26     Page 27 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 86

1  Dr. Herdman.
2      Q.   Understood.  And do you know, was
3  there anybody at YesCare that Dr. Herdman
4  liaised with or communicated with more
5  frequently than, you know, others, if you
6  know?
7      A.   I do not recall the title, but
8  there is a hierarchy and rank structure of
9  YesCare.  But I don't recall the actual
10 title, but it was the highest-ranking
11 individual for YesCare.  I do not recall
12 the name or the title.
13     Q.   Was it the medical director?  Does
14 that refresh your recollection?
15         MR. WITTEKIND:  Objection to form.
16         MR. PESTRAK:  You can answer.
17         THE WITNESS:  I can't say for
18     certain.  I would have to defer to
19     Dr. Herman or look at their org
20     chart.
21 BY MR. GROTE:
22     Q.   Okay.  Does the name Dr. Trivikram
23 (ph) sound familiar?
24         MR. WITTEKIND:  Objection to form.

Page 87

1          MR. PESTRAK:  You can answer.
2          THE WITNESS:  Yes.
3  BY MR. GROTE:
4      Q.   Was that the individual who was
5  the highest-ranking at YesCare?
6          MR. WITTEKIND:  Objection.
7          MR. PESTRAK:  You can answer.
8          THE WITNESS:  I do not recall, but
9      have to see documents to support if
10     I'm going to answer that.
11 BY MR. GROTE:
12     Q.   Understood.  Who decides if an
13 incarcerated person was supposed to be
14 placed in the Prison Health Services wing?
15     A.   That is the medical provider.
16     Q.   Does Corrections play any role in
17 those decisions?
18     A.   There are joint decisions and
19 discussions.  Medical makes the medical
20 determination, and the security staff
21 makes sure the security housing is
22 appropriate for that individual as they're
23 receiving care in the medical wing.
24     Q.   Okay.  When you were Commissioner,

Page 88

1  were there times when there was no vacancy
2  in the Prison Health Services wing?  You
3  know, getting at how often was it
4  completely filled if you recall?
5      A.   My recollection is I don't believe
6  there was ever a capacity where we didn't
7  have an opportunity to place someone
8  there, based on my recollection.
9      Q.   Does PDP have a policy on
10 disability accommodations?
11     A.   Can you clarify that question?
12     Q.   Yes.  I have some more specific
13 questions, but the first kind of general
14 one:  When you were Commissioner, did PDP
15 have a policy so that inmates with
16 disabilities were provided accommodations
17 for those disabilities?
18     A.   Yes.
19     Q.   And in general, how were
20 accommodations to be provided?  How were
21 disabilities to be assessed?  Who made
22 those decisions?
23     A.   As part of the intake screening
24 process, disabilities can either be

Page 89

1  presented by the individual and confirmed
2  by the provider.  Any visual or physical,
3  or communicative disabilities are
4  recorded.  An alert is placed in Lock and
5  Track and a card is issued to the
6  individual so that if a person is
7  hearing-impaired, sight impaired, or has a
8  disability, then the officer they can
9  raise the card.  If the person is
10 hearing-impaired and not responding, the
11 officer is alerted in Lock and Track where
12 they can show the card if they're
13 face-to-face with correctional staff.
14     Q.   Thank you.
15     A.   And any other disabilities are
16 determined by medical, such as bunk
17 status, top or bottom, and that's assessed
18 by the medical provider.
19     Q.   You anticipated my next question.
20 So lower tier and lower bunk status are
21 medical decisions, right?
22     A.   Correct.
23     Q.   And do you know if anybody was
24 ever placed -- Could somebody be placed in

Page 90

1  the prison health services wing as part of
2  the disability accommodation policy?
3  Could that be a possible housing
4  accommodation for somebody?
5      A.  Yes.
6      Q.  Do you know the circumstances in
7  which that would be appropriate?
8      A.  Where we have no other facility to
9  accommodate the individual in the existing
10 structure.
11     Q.  When you were commissioner, from
12 COVID until the time that you left, were
13 there challenges with having enough
14 correctional staff during those years?
15        MR. PESTRAK:  Objection.  You can
16     answer.
17        THE WITNESS:  Yes.
18 BY MR. GROTE:
19     Q.  And just broadly speaking, how
20 would you describe those challenges?
21     A.  We were short-staffed, just like
22 the world, who lost a portion of its
23 workforce due to COVID or COVID-related
24 concerns.

Page 91

1      Q.  And did you put in place any
2  policies to ensure that individuals with
3  more serious medical needs would have
4  access to care at times when you were
5  short-staffed with corrections officers at
6  PDP?
7         MR. PESTRAK:  You said "yes," but
8      I don't think it came through.
9      Sorry, Bret.  Just repeat your
10     answer, Blanche.
11        THE WITNESS:  Yes.
12 BY MR. GROTE:
13     Q.  And what were those policies?
14     A.  When we were short-staffed and
15 unable to escort those individuals -- not
16 every individual, but those individuals
17 where we could not provide an escort -- we
18 provided a designated area for medical to
19 come to the area and assess in a
20 confidential manner and provide services.
21     Q.  So, the policy was, if I'm
22 understanding right, to make it easier for
23 medical staff to come to the -- where the
24 patients were, to ensure that the services

Page 92

1  were provided.  Is that accurate?
2      A.  It was to ensure that the services
3  were delivered.  I don't want to put a
4  clarifier of easier on it.  I'm just
5  saying that we were then saying, because
6  we do not have a person to escort, we'll
7  deliver the services in a designated,
8  confidential area.  Medical would report
9  there and render care.
10     Q.  Were there ever challenges with
11 having enough medical staff during those
12 years, 2020, 2024?
13        MR. PESTRAK:  Objection to form.
14     You can answer.
15        THE WITNESS:  I don't believe it
16     was as challenging.  There were some
17     challenges, but not as challenging.
18 BY MR. GROTE:
19     Q.  When you were commissioner between
20 2020 and 2024, did PDP ever seek to admit
21 certain patients who needed more care, you
22 know, a higher level of care, or a higher
23 frequency of care, to the Prison Health
24 Services Wing because of challenges in

Page 93

1  providing that care on the housing units?
2         MR. PESTRAK:  I'm just going to
3      object to form, but you can answer
4      if you understood the question.
5         THE WITNESS:  Repeat that question
6      for me, please.
7  BY MR. GROTE:
8      Q.  Sure.  Due to staffing challenges,
9  did PDP ever consider placing patients
10 with greater needs for medical care in the
11 Prison Health Services Wing to ensure
12 delivery of that care?
13     A.  No.
14     Q.  And why not?
15     A.  Because the infirmary is based on
16 the level of care determined by the
17 medical provider.  Those beds are
18 specifically designated for higher-acute
19 patients care that cannot be provided or
20 rendered in the other facilities.  So
21 simply trying to place someone there to
22 get the basic care, that was not done;
23 that care was delivered at the facilities.
24 Now, if Medical determined this person has

Deposition of Blanche Carney                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 94

1 a higher need, they're an acute or
2 chronic, then that person is transferred
3 into the infirmary.
4     Q.   Okay.  And so it was just always
5 Medical's decision about who went to the
6 infirmary, right?
7     A.   It was in collaboration.  Medical
8 would have to present, make the request,
9 and then security would come alongside,
10 making sure for housing purposes, and then
11 the person was transferred over.
12    Q.   So when you -- so security would
13 have to also approve then; is that true?
14    A.   Approve in terms of making sure
15 that the housing placement there was not
16 where you're putting two individuals that
17 should be separated.  So Medical takes the
18 lead on a clinical necessity for someone
19 to go over, but definitely more security
20 staff for assessing to make sure that it's
21 a smooth transition and not a security
22 matter.
23    Q.   Right.  So PDP and security staff
24 won't interfere with the Medical

Page 95

1 determination, though, right?
2     A.   That is correct, based on their
3 Medical determination and what's
4 presented.
5     Q.   And is intake at CFCF?
6     A.   Repeat your question, please.
7     Q.   The intake to the jail, when
8 somebody's first arriving, is that at
9 CFCF?
10    A.   CFCF for male prisoners.
11    Q.   Yes, for male.  Thank you.  What
12 information do correctional staff in the
13 intake area have access to?  Or let me be
14 more specific.  I think you touched on
15 this in a different question.  So this
16 should be pretty straightforward.  But do
17 they have access to any medical
18 information?
19    A.   If it's available, they would have
20 to maybe confirm with outside sources.
21 They're relying on self-reports from the
22 person they're interviewing or any visual
23 assessments that they make.
24    Q.   They don't have access to the

Page 96

1 patient's medical record, though, do they?
2     A.   They do not.
3     Q.   And is that because of HIPAA?
4     A.   Because of HIPAA.  And they're
5 doing their initial assessments of the
6 individual.
7     Q.   If correction staff thinks
8 somebody might need a higher level of
9 care, emergency care, do they then follow
10 the process you discussed earlier where
11 they notifying medical to make that
12 assessment?
13    A.   Yes.
14    Q.   With the Lock and Track system, is
15 there certain types of information that
16 correctional staff are required to put
17 into Lock and Track?  How do they
18 determine what goes in Lock and Track;
19 What can be omitted from Lock and Track?
20        MR. PESTRAK:  Again, I'm just
21    going to object to the broadness of
22    the question, but you can answer.
23        THE WITNESS:  The platform is
24    designed with preloaded information

Page 97

1 or questions that have to be
2 responded to.  So as the officer is
3 processing a person in the intake,
4 they're answering a series of
5 questions and entering in that
6 information.
7 BY MR. GROTE:
8     Q.   Okay.  You're talking about intake
9 specifically?
10    A.   Yes, based on the question.
11    Q.   Understood.  More generally
12 speaking, you know, when officers make
13 rounds, are they supposed to note that in
14 Lock and Track?
15    A.   Note what specifically?
16    Q.   Just that they made a round?
17    A.   Yes.
18    Q.   What about when they do head
19 counts?
20    A.   Yes.
21    Q.   When they call for medication
22 distribution?
23    A.   I believe they can make that in
24 the log, but I'm not sure if it's a

Page 98

1  mandatory entry based on my recollection.
2     Q.  What about if there's a refusal
3  for somebody to receive medical care?  Is
4  that supposed to be documented in Lock and
5  Track?
6     A.  I believe, based on my
7  recollection, they do enter it in, if.
8  But if the form is -- notes indicating the
9  refusal, is the driver of it.
10    Q.  Understood.  Is there, if you
11  recall, a specific policy document that
12  lays out how officers are supposed to use
13  Lock and Track?
14    A.  I believe there -- if I'm
15  recalling correctly, there is a policy on
16  what is entered there.  I do not recall
17  with certainty, however, but I believe
18  there is some instruction.
19    Q.  Thank you.  When you were
20  commissioner, was there ever any process
21  of auditing Lock and Track to see if
22  officers were entering information as they
23  were supposed to?
24       MR. PESTRAK:  Objection.  You can

Page 99

1  answer.
2       THE WITNESS:  The facility could
3     request the audits to see if staff
4     were entering in.  You had sergeants
5     and lieutenants who would tour the
6     areas, and they, on a daily or
7     weekly basis, would go around.  They
8     would have to be entered into the
9     system, and they could look to
10    determine if individuals were using
11    Lock and Track.
12 BY MR. GROTE:
13    Q.  Okay.  Now, are there policies
14  pertaining to reviewing deaths that happen
15  within PDP custody?
16    A.  There is a death review process.
17  It's a mortality review that's conducted
18  by medical staff, in addition to any
19  investigation that the prison would
20  initiate based on the death in custody.
21    Q.  Okay.  So let's start with the
22  mortality reviews.  When I say mortality
23  review, is that the medical review that
24  you were referring to?

Page 100

1     A.  Yes.
2     Q.  And who conducts those reviews?
3     A.  Dr. Herdman has overall
4  responsibility where he's bringing in and
5  manages the Medical Executive Team, and
6  they're reviewing each individual case.
7     Q.  And what do those reviews consist
8  of?
9     A.  They consist of a series of
10  medical reviews, the treatment provided,
11  and then any issues surrounding the death
12  of an incarcerated individual.
13    Q.  And do these generate written
14  reports?
15    A.  Yes.  The mortality reviews are
16  written reports.
17    Q.  If you recall, what format were
18  those reports in?
19    A.  When you say "format?  Can you
20  specify?
21    Q.  I can give an example.  Well, are
22  you familiar with something called
23  Sentinel Reports?
24    A.  Yes.

Page 101

1     Q.  Are these different from Mortality
2  Reviews?
3     A.  I would have to compare those two.
4  It's been a while.
5     Q.  Okay.  Is the Mortality Review in
6  a spreadsheet format?
7     A.  No.
8     Q.  Okay.  And would you, as
9  Commissioner, review the Mortality
10  Reviews?
11    A.  I would.  As part of the
12  investigations, it's part of the packet,
13  yes.
14    Q.  And for the mortality reviews, who
15  would determine kind of the scope of
16  what's relevant to look at in regard to a
17  particular death?  Would that be Dr.
18  Herdman?  Yeah.  Would that be Dr.
19  Herdman?
20    A.  That would be Dr. Herdman and the
21  medical team.  Yes.
22    Q.  Do you know, you know, for --
23  would there be a specific time frame they
24  would look at in regard to the death?

Deposition of Blanche Carney                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 102

1  Like how far back might they go to assess
2  a patient's care or history in PDP?
3     A.   Based on my recollection, it would
4  be based on the current incarceration
5  period.
6     Q.   What would they be trying to look
7  at in these mortality reviews?  What type
8  of information would they be trying to
9  evaluate?
10       MR. PESTRAK:  Objection.  You can
11    answer if you know.
12       THE WITNESS:  I would have to see
13    the report.  The report lays out
14    what they need to address or answer.
15    I would have to review the mortality
16    report or defer to Dr. Herdman
17    specifically to answer that question
18    for the specifics.
19 BY MR. GROTE:
20    Q.   As Commissioner, were there
21 certain things that you always wanted to
22 look into when there was a death in
23 custody?
24    A.   Yes.

Page 103

1     Q.   And what were those?
2     A.   I would look into tours, last
3  engagement with the individual, and any
4  medical or mental health information, and
5  any security-related information that may
6  have played a part in the incarcerated
7  person's demise.
8     Q.   And why would you look at tours?
9     A.   To see the last time that the
10 correctional officer engaged or toured the
11 area where they were housed.
12    Q.   Would you be looking to see if any
13 policies were violated?
14    A.   Yes.
15    Q.   Would you at times look to see if
16 -- how do I put this -- would you ever
17 look to assess if any of the policies you
18 had in place needed to be changed in light
19 of something that led to a death in
20 custody?
21    A.   Yes.
22    Q.   In what circumstances would you,
23 you know, kind of look to see, does this
24 policy need to be changed, does this need

Page 104

1  to be tweaked?  Was it all the time, or
2  would it be only whenever there was some
3  particular set of facts that would make
4  you take that look?
5        MR. PESTRAK:  Objection.  You can
6     answer.
7        THE WITNESS:  It would be a
8     series.  It's not a one occurrence
9     and then you change an entire
10    policy.  So you're looking for
11    themes and you're looking for an
12    engagement.  So it's not automatic
13    that someone, you know, passes in
14    custody and you just change a policy
15    based on an occurrence.  You're
16    looking for a theme and a pattern.
17 BY MR. GROTE:
18    Q.   And how would you determine if
19 there is a theme or a pattern?
20    A.   In reviewing the investigations,
21 you can glean information, and you're
22 looking to see if there are additional
23 occurrences, or that requires a review for
24 a possible revision.

Page 105

1     Q.   Was there a process at PDP for
2  kind of looking at multiple deaths in
3  custody, in the aggregate, to try to
4  identify patterns?
5        MR. PESTRAK:  Objection.  You can
6     answer.
7        THE WITNESS:  Yes, that's the same
8     process I'm explaining.  So you're
9     looking at the aggregate, but there
10    are differences in every case.  And
11    then you're determining does the
12    policy needs to be changed, or
13    whether this is an isolated incident
14    or an individual case.
15 BY MR. GROTE:
16    Q.   So, when you say looking at the
17 aggregate, what I'm trying to understand
18 is:  Did you have a specific process for
19 doing that, or is it just part of the
20 individual mortality reviews?
21    A.   It's part of the mortality --
22 whatever medical -- if we're gleaning
23 information, we're looking at the totality
24 of the investigation to see, in fact,

Page 106

1  whether there is a pattern here.  Because
2  each individual being treated by medical
3  is different.  So we're not just looking
4  at that; we're looking at the overall
5  circumstance surrounding the death of the
6  individual.
7      Q.   Can you recall any patterns that
8  emerged during your time as Commissioner
9  in regard to in-custody deaths?
10     A.   No.
11     Q.   And are you, just so the record's
12 clear, are you saying no, you don't
13 recall, or no, you don't think that there
14 were any patterns?
15     A.   I don't recall there being any
16 patterns that I reviewed.
17     Q.   Okay.  So do mortality reviews
18 involve -- or could -- I mean, I know it
19 would depend case-by-case.  But could they
20 involve discussions or interviews with
21 medical staff who were involved with
22 patient care for the decedent?
23     A.   They could have, but I don't
24 believe that the staff involved were at

Page 107

1  the mortality review, based on my
2  recollection.
3      Q.   And you said the medical file
4  would be reviewed, though, right?
5      A.   Yes.
6      Q.   Would they review if the decedent
7  had not shown for medical appointments
8  during their time in PDP custody?
9      A.   Yes, that could have been reviewed
10 if it's in the file.
11     Q.   Would mortality reviews assess the
12 reasons for the no-shows?
13     A.   I don't recall that it would
14 assess that.  I'm not sure.  I cannot
15 answer that with certainty.
16     Q.   Do you ever recall if a mortality
17 review would look into systemic issues in
18 regards to somebody missing medical
19 appointments?
20         MR. PESTRAK:  Objection.  You can
21     answer.
22         THE WITNESS:  Again, I don't
23     recall that.
24 BY MR. GROTE:

Page 108

1      Q.   And this might be similar to the
2  last question, or to the last couple
3  questions.  So would mortality reviews
4  track missed medical appointments as part
5  of their process, or was that dependent on
6  the particular case?
7      A.   I would have to defer that to Dr.
8  Herdman to see how he tracked that.
9      Q.   Would mortality reviews ever
10 involve speaking with other incarcerated
11 people?
12     A.   No, that would be part of the
13 investigation, not the mortality review.
14     Q.   In addition to yourself and Dr.
15 Herdman, who else would review mortality
16 reviews?
17     A.   The Deputy Commissioners would
18 review mortality reviews.  Our Director of
19 the Office of Professional Compliance
20 would review as part of the investigation,
21 and we would then solicit a review from
22 our Policy and Audit Division regarding
23 policy and procedure, which makes up the
24 investigation process for the department.

Page 109

1      Q.   Who was the Director of the Office
2  of Professional Compliance when you were
3  Commissioner?
4      A.   Ivan Marshall.
5      Q.   What are quarterly mortality
6  reviews, actually?  Strike that.  I'll
7  come back to that in a moment.  Mortality
8  reviews, do those reports ever make
9  recommendations?
10     A.   I would have to review the form to
11 see if it does make those recommendations.
12     Q.   Okay.  Now, quarterly mortality
13 reviews -- were these something that PDP
14 engaged in?
15     A.   Yes.
16     Q.   And what were the quarterly
17 mortality reviews?
18     A.   The quarterly mortality reviews
19 were cases that would be identified by Dr.
20 Herdman.  We would schedule with myself,
21 deputy commissioners, wardens, and any
22 other designees identified by Dr. Herdman
23 from the medical side and the warden,
24 based on their executive staff side.  And

Deposition of Blanche Carney                            Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 110

we would meet to discuss the cases and to
glean and share information regarding the
individual.  And if there's anything,
again, as I testified, assessing, are
there any issues where we're assessing;
are we seeing any patterns, or what led to
the individual's demise.
    Q.  And so with the quarterly reviews,
you would be -- would you review deaths in
custody that happened within that
three-month period?
    A.  Not necessarily.  It could be from
a previous quarter or it could be the
current quarter, depending on the time of
death.
    Q.  So it'd be some group of deaths in
custody, but it wouldn't necessarily be
only within the three months prior to the
review.  Is that fair?
    A.  That's fair.
    Q.  Was the REMIC monitor ever
involved in quarterly mortality reviews in
any way?
    MR. PESTRAK:  Objection.  You can

Page 111

answer.
    THE WITNESS:  No, they were not
    involved in quarterly mortality
    reviews.
BY MR. GROTE:
    Q.  Did they offer any suggestions on
your mortality review process during the
monitoring of the REMIC case?
    MR. PESTRAK:  Objection.  You can
    answer.
    MR. WITTEKIND:  I'll join.
    THE WITNESS:  With any death that
    occurred during that period, they
    would be involved in the
    after-action review, and we would
    discuss -- the REMIC monitors would
    be present, and they would provide
    whatever recommendations in the
    written report.
BY MR. GROTE:
    Q.  Okay.  What is the after-action
review?
    A.  That is when an in-custody death
has occurred, and it's scheduled.  And

Page 112

you're bringing anyone that may have had
involvement into the meeting to discuss
the individual and any issues or
information that may have led up to the
person's death.
    Q.  And after there's a death in
custody, would there always be one of
these after-action reviews?
    A.  Yes.
    Q.  And bear with me a moment.  Is an
after-action review the same type of
review as a critical incident review?
    A.  Yes.
    Q.  And who would be at those
meetings?
    A.  Medical, Behavioral Health, Dr.
Herdman, deputy commissioners, wardens,
and any staff intimately involved with the
incident.
    Q.  And when you were commissioner,
was that something that was initiated, the
critical incident reviews?
    A.  No, it predates me.
    Q.  Okay.  Was it always in place,

Page 113

then, when you were commissioner?
    A.  Yes.
    Q.  As commissioner, you were aware of
every death that happened in PDP custody,
is that correct?
    A.  Correct.
    Q.  And you would review every
mortality review?
    A.  As part of the investigation, yes.
    Q.  And you would participate in every
after-action review?
    A.  Based on my recollection, I don't
believe I missed any, but if I did, I
don't recall.
    Q.  There -- now you -- I want to go
to a document.  I'm going to share the
screen again.
    A.  All right.
    Q.  And this is the REMIC Monitors
Report filed with the court March 29th,
2024.  You can see from the top the case
number, Document 204 filed 3/09/24.  And
there it says:  Mortality Information.  Do
you see that, Ms. Carney?

Page 114

1  A. Yes.
2  Q. And I'm not going to read the
3  whole paragraph, but if you could read
4  this second paragraph, beginning with
5  September 2022. And then when you get to
6  the bottom, let me know. I'm going to ask
7  you a question or two.
8  A. I'm finished.
9  Q. Okay. Did PDP develop a process
10 for ensuring that all corrective action
11 was implemented and tracked?
12 A. Yes. Prior to this, we still had
13 our reports and our reviews, but based on
14 this we started tracking it formally.
15 Q. Okay. And so how did you do that?
16 A. So this information, I believe,
17 Excel or some type of platform was
18 identified, and our Policy and Audit
19 Division was tasked with monitoring any
20 recommendations and adding it to that
21 form. I don't know if it was a form or
22 just an Excel document.
23 Q. Some documents --
24 A. Where you could track the

Page 115

1  information. Yeah, and it says to
2  formalize the reviews. So we were doing
3  that. We were meeting. We were reviewing
4  the information, and they recommended we
5  formally do that, and we assigned that to
6  our Policy and Audit Division.
7  Q. And so prior to that, you had the
8  individual reviews from each case. You
9  already had those in place, right?
10 A. Yes.
11 Q. But you didn't have a kind of
12 spreadsheet or some similar type of
13 document tracking like you just described?
14 A. Correct.
15 Q. And it also said at the end there,
16 including any disciplinary action taken
17 against individual personnel. So prior to
18 this, were you tracking disciplinary
19 action outside of the individual instances
20 of which was imposed in any way?
21 A. Yes, that's always been tracked
22 through the disciplinary hearings, and
23 that has a record. And we've been
24 tracking that as far back as I can

Page 116

1  remember. The staff who were disciplined,
2  the dispositions. So that information was
3  readily available. And I don't know if
4  they wanted this in a different format,
5  but that's always been tracked.
6  Q. Would that be tracked in a way
7  that would allow you -- Well, would you
8  review that information as Commissioner to
9  try to identify any patterns of staff
10 policy violations?
11 MR. PESTRAK: Objection. You can
12 answer.
13 THE WITNESS: Through that
14 platform where we track all
15 disciplinary issues. The reason is
16 there and you are tracking across.
17 And it comes down to an individual
18 basis. People are individuals,
19 they're not robots. So you may
20 still have staff that are not in
21 compliance with a particular policy,
22 but they may not be following
23 different parts of the policy. So
24 it doesn't say it's the policy. It

Page 117

1  may come down to the individual, but
2  we've been tracking that information
3  and it was tracked up until my
4  retirement.
5  BY MR. GROTE:
6  Q. So how would you -- was it ever --
7  How would you determine if there was an
8  issue with the policy as opposed to the
9  individual if you understand the question?
10 MR. PESTRAK: Objection. You can
11 answer.
12 THE WITNESS: Is it the policy --
13 Yes. Thank you. Is it the policy
14 that needed to be tweaked because it
15 wasn't consistent. So if you had
16 staff just not calling and making
17 the initial call for help, let's
18 assess, is it the individual or the
19 policy?
20 So there are different things
21 you're looking for to see. Is it
22 the policy. But an incident does
23 not require the policy to be
24 changed. Is it the error of the

Page 118

staff person?  But if the policy is
consistent, and more often than not
a majority of the staff are
following the policy, then you're
looking at the Individual.
BY MR. GROTE:
    Q.  Were there ever occasions, as
Commissioner, in which you thought a lot
of staff members were not following
certain policies?
        MR. PESTRAK:  Objection.  You can
answer.
        THE WITNESS:  Not in particular.
    It's just staff, not policies.  But
    no one policy is jumping out at me.
BY MR. GROTE:
    Q.  Right.  And I guess what I'm --
I'm just wondering -- how to phrase this.
Did you ever encounter situations where
you thought the policy was fine, but one
staff member, then another staff member,
then another staff member, right, and so
on, are not doing what they're supposed to
be doing, in those circumstances, would

Page 119

you just seek to treat each instance
through the individual disciplinary
proceeding, or were there other measures
you would take to try to identify why many
staff members were not following a policy
that was sound and should have been
followed?
        MR. PESTRAK:  Objection.  You can
answer.
        THE WITNESS:  We would deal with
    that through the disciplinary
    process.
BY MR. GROTE:
    Q.  Now, what are facility
investigations into deaths in custody?
    A.  Those are investigations conducted
by the facility.  That's the warden for
his designee that have to conduct an
investigation on what occurred in their
facility.
    Q.  And how are they different from
mortality reviews?
    A.  They're doing the overall
investigation with every facet: Security,

Page 120

any person that may have engaged the
individual, program, services, activities.
The mortality review is focusing primarily
on the medical or behavioral health
treatment of the individual.
    Q.  And what is the scope of the
facility investigation?  What are they all
looking at in the facility investigation?
    A.  They're looking for services,
program engagement, any services provided,
any policies violated, the staff who were
involved.  If there are any safety or
security issues that need to be addressed.
    Q.  Did those facility investigations
ever assess if any policies should be
changed?
    A.  If there is, it is presented and a
recommendation or suggestion is made, I
don't recall any, but that's an
opportunity for the facility to assess and
make a recommendation.
    Q.  And how is a facility
investigation -- is it different from an
Office of Professional Compliance

Page 121

investigation?
    A.  It's different, but it becomes
part of the Office of Professional
Compliance investigation.  So they're
providing and assessing what occurred
inside the facility.  The Office of
Professional Compliance is also
determining and assessing what happened
inside and any external impact that may
have resulted.  And so they're
encompassing every scenario that's
presented.  They're not creating it and
assessing.  And that becomes part of the
investigation.  They're also investigating
the staff of the facility that conducted
the investigation or who were involved in
the incident.
    Q.  Does OPC look into every death in
custody or not?
    A.  Yes, they look into every death in
custody.
    Q.  Okay.  And who carries out OPC
investigations?
    A.  That is the Director of the Office

Case 2:24-cv-05618-TJS   Document 160-1   Filed 01/09/26   Page 36 of 75
Deposition of Blanche Carney
Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 122

1  of Professional Compliance, who was then
2  Ivan Marshall.
3     Q.  Okay.  And would he then designate
4  somebody who would carry out the
5  investigation, whom he supervises?
6     A.  It depended on the number of
7  cases, but primarily he was the lead
8  individual responsible.
9     Q.  Okay.  The Office of Professional
10 Compliance, they're looking to see if
11 staff violated policy, correct?
12    A.  Correct.
13       MR. PESTRAK:  Objection to form.
14 BY MR. GROTE:
15    Q.  Does OPC ever assess whether or
16 not certain policies should be changed?
17    A.  Based on my recollection, I don't
18 believe I received any.  But they do look
19 at policy as part of the investigation
20 process to determine whether or not there
21 was a violation.
22    Q.  Understood.  Do you have any
23 recollection of OPC ever recommending that
24 there needs to be more training to staff

Page 123

1  because of their findings?
2     A.  No.  Based on my recollection, no.
3     Q.  Now, OPC reports -- would you read
4  all of those reports as Commissioner?
5     A.  Yes.
6     Q.  And that would include reports
7  where there were sustained findings of
8  misconduct and reports where there were
9  not sustained findings of misconduct?
10    A.  Yes.
11    Q.  And so, when OPC sustains a
12 finding of misconduct, that just means
13 that it's bringing charges against an
14 officer, right?  It doesn't mean that
15 they're fully found to have violated
16 policy yet?
17    A.  Correct.
18    Q.  And can you walk me through the
19 disciplinary process from when charges
20 would be brought through an OPC finding to
21 the end, in a situation where discipline
22 would be imposed?
23    A.  So, at the completion of the
24 investigation by the Office of

Page 124

1  Professional Compliance, the report is
2  then scheduled for a Full Board hearing.
3  The Full Board hearing is chaired by a
4  non-voting Deputy Commissioner, and your
5  panel would be part of the individuals who
6  are present the case would be heard by
7  either a warden or a deputy warden not
8  assigned to the facility being heard.  A
9  security officer is identified, and the
10 hearing is held.  The Office of
11 Professional Compliance presents its case
12 to sustain the charges.  The board hears
13 that, renders a decision, determines which
14 charges are upheld and which are
15 dismissed.  Then There is a range of
16 penalties based on a disciplinary matrix
17 that is rendered; that submission is
18 submitted to the Commissioner as a
19 recommendation.  Upon receiving the
20 report, I review it in its totality.  I
21 can either accept the recommendation,
22 reject the recommendation, or modify the
23 recommendation for discipline.
24    Q.  So as Commissioner, were you the

Page 125

1  only one who was authorized to impose
2  discipline?
3     A.  Yes, unless it was a designee.
4  Now, it depends, for the Office of
5  Professional Compliance, that's that
6  level.  Any investigation conducted at the
7  facility that did not rise to the level of
8  referral for a Full Board hearing would be
9  heard by the warden or the deputy warden
10 designated, would hear the case and render
11 discipline at the facility level.
12    Q.  I'm going to share my screen
13 again.  So I'm going to ask you about some
14 specific reports here.  Can you see this?
15 I can make it bigger?
16    A.  Please enlarge it.  Thank you.
17    Q.  Is that large enough?
18    A.  A little more, please.  Okay.
19    Q.  Okay.  And do you agree that --
20 this is marked Jung City Production004786,
21 and does this look like the COVID page of
22 the Office of Special Investigations'
23 review of the death of Angel Torres
24 Rosado?

Deposition of Blanche Carney

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 126

1  A.  Yes.
2  Q.  Do you recall this case at all?
3  A.  I don't recall the specifics of
4  the case.
5  Q.  Okay.  Do you recall --
6  A.  I would have to review the report.
7  Q.  Understood.  And bear with me
8  while I -- can you take a moment to review
9  the conclusion here and let me know when
10  you're finished.
11  A.  Okay, I'm finished.
12  Q.  Okay.  And just for the record, do
13  you agree that a Corrections Officer was
14  found to have not performed head count and
15  to not have rendered first aid, and there
16  was a sustained finding of staff
17  misconduct?
18  A.  Yes.
19  Q.  And then, in the other paragraph,
20  another staff member was found to have
21  failed to render aid, and another one was
22  found to have not toured the POD as
23  required.  Do you agree it also sustained
24  misconduct findings there?

Page 127

1  A.  Yes.
2  Q.  Does this refresh your
3  recollection about this case at all?
4  A.  No, it does not.
5  Q.  Okay, so you don't recall if
6  discipline was ever imposed against these
7  officers?
8  A.  Based on this report that I'm
9  reading, it is sustaining it.  So I know
10  there was some discipline that was
11  sustained.
12  Q.  But just so we're clear for the
13  record, this report means that charges
14  were brought because it was sustained,
15  right?
16  A.  Correct.
17  Q.  So there would still be a hearing
18  process where they could defend
19  themselves, right?
20  A.  Correct.
21  Q.  Okay.  And so, where it says
22  failing to make a tour for one of the
23  officers, do you agree that that's a
24  serious breach of policy?

Page 128

1  MR. PESTRAK:  Objection.  You can
2  answer.
3  THE WITNESS:  Yes.
4  BY MR. GROTE:
5  Q.  And why is that?
6  A.  Because the tours are to be
7  unpredictable and routine, and assess to
8  make sure, as I testified previously,
9  accountability of the individuals,
10  ensuring those individuals are assigned,
11  and for the office to assess any issues
12  that would require the assistance of
13  additional security, safety security, or
14  medical personnel.
15  Q.  And same with failing to render
16  aid.  Is that also a serious breach of
17  policy?
18  MR. PESTRAK:  Objection.  You can
19  answer.
20  THE WITNESS:  Yes.
21  BY MR. GROTE:
22  Q.  And why is that?
23  A.  Because staff received the
24  training to do just both of those in the

Page 129

1  performance of their duties.
2  Q.  While you were Commissioner, does
3  this refresh your recollection whether
4  there was a pattern of staff failing to
5  make housing tours that was revealed
6  through investigations into deaths in
7  custody?
8  MR. PESTRAK:  Objection.  You can
9  answer.
10  THE WITNESS:  Based on my
11  recollection, there were some cases
12  where staff did not make the
13  required rounds.  Yes.
14  BY MR. GROTE:
15  Q.  Did you ever engage in any more
16  systemic review into why that was
17  happening more than once, or did you deal
18  with these just kind of individual,
19  case-by-case circumstances?
20  MR. PESTRAK:  Objection.  You can
21  answer.
22  THE WITNESS:  Case-by-case,
23  because the majority of the staff
24  were doing their rounds as they were

Page 130

required in the performance of their duties. And those staff who simply failed to perform the rounds, we dealt with them on a case-by-case basis.

BY MR. GROTE:

Q. Was there -- would there ever be a threshold where you would say to yourself or you did say to yourself, was there ever a period that maybe we need to do more? The case-by-case approach isn't preventing this from recurring?

MR. PESTRAK: Objection. You can answer.

THE WITNESS: I did just that. As technology became readily available, and we're looking at that. We didn't just turn a deaf ear and a blind eye. I procured a contract with Guardian. That is a GPS system whereby correctional staff physically go around and there are modules are placed strategically throughout housing areas. Where

Page 131

that GPS, you have to hit the scanner to that GPS, and that tells you that the individual got up from the desk, walked around, and completed their tours. We also put that in place to account for a number of other services provided that wasn't readily available at the time, but when it became available, I procured Guardian. And that GPS system allows us to track, account for, and record cloud-based accounts of engagement and certain work-performance duties to be performed by the correctional officers on the housing unit.

BY MR. GROTE:

Q. When did you procure that service through Guardian?

A. I believe I started engaging -- I signed the contract, based on my recollection, in late 2023, early 2024. But I would need to see the contract to see exactly when that happened.

Page 132

Q. Fair enough. Was it implemented prior to your leaving PDP?

A. I don't believe it was implemented. I believe we were at the stage in which the infrastructure was being installed, based on my recollection.

Q. Thank you. I'll stop sharing now.

Do you remember the case of Lewis Jung, his death?

A. I recollect that this individual was in a housing unit at the Detention Center and he became ill, that an officer called for assistance. A lieutenant reported and a medical provider reported. That's my recollection without seeing the full or reviewing the report again.

Q. So I'm going to share the screen now. This is the Report of Investigation: Office of Special Investigations, Death of Lewis Jung, City Jung000001, and you agree it says his death was caused by diabetic ketoacidosis?

A. Based on what I'm reading, yes.

Q. And I'm going to scroll down to

Page 133

the conclusion and give you a chance to review that. Let me know when you've reviewed it.

A. I'm finished.

Q. Does this refresh your recollection at all?

A. Yes.

Q. And towards the bottom it says: Correctional Lt. Wanda Bloodsaw arrived at the cell and appeared to be trying to communicate with incarcerated person Jung before two incarcerated people come to the cell and drag incarcerated person Jung into the cell as Lt. Bloodsaw monitors the situation. The incarcerated people then exit the cell, which is then secured by Lt. Bloodsaw, who exit the housing area. Does that describe proper protocol?

A. No, it does not.

Q. And what is not proper about that?

A. The arriving to the cell, medical isn't performing any duties. You have two other incarcerated individuals involved, and a stretcher call was not initiated.

Page 134

Q.  And when you say the two other incarcerated individuals were involved, should they have not been involved in the way described here?

A.  That is correct.

Q.  And that's for reasons we discussed earlier, right?  They're not PDP employees?

A.  Correct.

Q.  Do you recall the after-incident review for Mr. Jung's death?

A.  Not off the top of my head, I don't.

Q.  And so you see, this was from November 5th.  If I go back to the first page, it's not on the first page; it's on the second page.  On November 6th, he died.  You were still Commissioner at this time, correct?

A.  Yes.

Q.  And the report was dated March 29th, 2024.  Were you still Commissioner when the OPC investigation concluded?

A.  Yes.

Page 135

Q.  When was your last day, if you remember?

A.  April 4th, 2024.

Q.  Okay.  Do you recall having any conversations about Mr. Jung's case with others at PDP?

A.  I believe I recall not the specifics, but with any death case, I confer and converse with my executive team, so I recall doing that.  That was consistent.  I don't know exactly when, but when any in-death custody occurs, I'm meeting with the executive team and any persons involved with the case.

Q.  Do you recall if there were any instances in Mr. Jung's medical care at PDP where the Red Flag Policy was not followed?

A.  I don't recall.

MR. WITTEKIND:  Objection to form.

BY MR. GROTE:

Q.  Are there ever any notes for the after-incident reviews?

A.  We were not maintaining notes,

Page 136

unless individuals maintained notes.  We brought individuals together, and we would discuss, and people would report.  But we don't have any notes or minutes.

Q.  Why were notes not taken?  Is there a reason for not taking notes?

A.  We wanted to be for staff to articulate their recollection.  The Office of Professional Compliance was already going to get statements obtained and speak to these individuals, and in no way was inferring or implying if someone saying something then you hand that over as part of it.  Everything is independent, and we wanted to give people an opportunity to decompress, express what occurred, and if there were any issues or areas we would address and discuss them.

MR. GROTE:  I'll take a break and confer with colleagues and see how much more I have left.

MR. PESTRAK:  How long do you want to take, Bret?

MR. GROTE:  Five minutes.  It

Page 137

might take more.  Probably not ten.

MR. PESTRAK:  Do you want to come back at 1:00 then.

- - -

(Whereupon, a recess was taken.)

- - -

BY MR. GROTE:

Q.  All set.  Okay, so I'm going to share my screen again.  This is -- wait -- Jung City Production005109, and it refers to an inmate, Jermaine Samicheilli (ph), discovered unresponsive in his cell, and he was pronounced dead on December 17th, 2017.  Do you remember this incident, Commissioner Carney?  Do you remember Mr. Samichielli?

A.  No.  I'm reading it, though.

Q.  Let me know when you have.  I'm going to then take you to another page to see if it refreshes your recollection.

A.  Okay, you can go to the other page.

Q.  Okay.  Here's the conclusion.  And let me know after you've read it, or if

Page 138

1 you need me to scroll down because it
2 finishes on the next page.
3      A.  Okay, you can go to the next page.
4      Q.  And it says on Jung City
5 Production005130 the allegation of staff
6 misconduct against PDP staff, Staff
7 Sergeant C. Hill, Sergeant Gordon, C/O
8 Soell, C/O L. Murphy, C/O H. Rosa, C/O A.
9 Woods, C/O K. Morris, C/O C. Durham, C/O
10 M. Robinson, C/O J. Mathis is sustained.
11 And do you agree that this was sustained
12 because these staff members did not make
13 tours of the housing unit, as they were
14 required to?
15      A.  Yes.  Based on the narrative.
16      Q.  Yes.  And it says disciplinary
17 action was taken by the Facilities
18 Administration by the order of
19 Commissioner Blanche Carney.  Does this
20 refresh your recollection about this
21 instance?
22      A.  No, it does not.  I would have to
23 see the actual investigation.  I'd have to
24 have the full opportunity to review and

Page 139

1 see what discipline was rendered.
2      Q.  Okay.  Is there anything unusual
3 about that many staff members not making
4 housing tours in a particular incident?
5      A.  Without me reviewing it -- there's
6 nothing unusual other than individuals not
7 following the policy.  But I would need
8 time to review this entire investigation
9 to determine why.
10      Q.  Understood.  When you were
11 Commissioner, were you ever concerned that
12 there was a culture amongst corrections
13 staff at PDP of not following protocol?
14          MR. PESTRAK:  Objection.  You can
15      answer.
16          THE WITNESS:  I don't believe it
17      was a culture.  I believe it was
18      individuals simply opting not to
19      follow policy and procedure.  For
20      the most part, this contains several
21      staff members, but it doesn't speak
22      for the totality of the other
23      departmental staff that did their
24      tours and performed their duties.

Page 140

1 BY MR. GROTE;
2      Q.  How would you determine if there
3 was kind of a culture of not following
4 policy?
5          MR. PESTRAK:  Objection.  You can
6      answer.
7          THE WITNESS:  That you would have,
8      more often than not, a majority of
9      your staff simply not doing tours.
10      Based on this incident they've
11      identified the individuals.  But for
12      me to assess, it would have to give
13      me significant indications or
14      incidents where people just simply
15      were flat-out not doing any tours.
16      And I don't want to paint the broad
17      brush with this incident or to
18      minimize it, but that's what I would
19      be looking for.
20 BY MR. GROTE:
21      Q.  If you did think there was an
22 issue among staff culture, right, if they
23 were not following policy, what measures
24 would you have taken to address a more

Page 141

1 widespread issue?
2          MR. PESTRAK:  Objection.  You can
3      answer.
4          THE WITNESS:  Well, I've done just
5      that with the Guardian, with putting
6      additional infrastructure in place,
7      procuring different resources,
8      increasing staffing numbers.  I did
9      a number of things to put measures
10      in place to enhance and increase,
11      and that's how I would handle it.
12      It's not just sitting idly by, but
13      if there are a few bad actors, they
14      certainly don't represent the entire
15      department.  And there were staff on
16      duty throughout my tenure that did
17      their job and performed as per
18      policy.
19 BY MR. GROTE:
20      Q.  You said -- you mentioned the
21 guardian, and we've talked about that.
22 And then you said putting infrastructure
23 in place.  Was there specific
24 infrastructure you had in place?

Page 142

A.   Well, you have additional security measures.  You have scanners that can work to assess and decrease any flow of contraband.  You have your K-9 unit where we procured additional K-9s to aid our security.  So those are the type of measures I'm talking about.

Q.   Are there any measures, though, that you can think of that would specifically go to addressing a staff culture of non-compliance with rules, if you thought that needed to be addressed.  I understand your testimony, but how would you address that?

MR. PESTRAK:  Objection.  You can answer.

THE WITNESS:  You do refresher trainings and during roll calls, you're sharing information with staff, you're reiterating the expectations, and you're providing any additional training.  I know during my tenure I implemented crisis intervention de-escalation

Page 143

training.  So any training that we thought would enhance and supplement, we put that in place and I did just that.

BY MR. GROTE:

Q.   So if there -- if you were -- if you made an assessment that there's been a pattern that I want to address.  I want to make sure staff are really on top of this, we're going to do some refresher trainings and we're going to get this out to everybody.  That's how you would address it?

MR. PESTRAK:  Objection.  You can answer.

THE WITNESS:  That's how I'd address it, with the leadership of the facilities as well.  So it's not just dependent upon me, but it's making sure that they carry out my expectations through training, through refresher trainings, and that there are increased tours by the leadership of those facilities

Page 144

as well.

BY MR. GROTE:

Q.   Did you ever, in your time as Commissioner order refresher trainings for rendering emergency aid?

MR. PESTRAK:  Objection.  You can answer.

THE WITNESS:  Not to my recollection.

BY MR. GROTE:

Q.   Was there ever a time while you were Commissioner that you ordered refresher training on making housing tours?

MR. PESTRAK:  Objection.  You can answer.

THE WITNESS:  Yes, I believe I did several.  And when I say several, through roll call trainings and unit management trainings for the supervisors and the line staff.  And I believe that occurred throughout my tenure.

BY MR. GROTE:

Page 145

Q.   And why did you do that?

MR. PESTRAK:  Objection.  You can answer.

THE WITNESS:  The refresher, we had a significant turnover in staff.  So you're either -- it's a refresher for some, or new to others.  And that was just to reiterate the expectations.  So during that period of time, I had again, as I testified, with a loss of staff.  You have a loss of those staff that are retired and have departed.  So that was making sure that the message was consistently getting to as a refresher or to our newly-hired individuals.  And that's just routine corrections.  It's not a one-and-done.

BY MR. GROTE:

Q.   Understood.  The refreshers on housing tours -- were you ever ordering them in response to a critical incident in the facility?

Page 146

1  A.  Not that I can recall right off
2  the top of my head.
3      MR. GROTE:  No further questions.
4      MR. PESTRAK:  John, do you have
5  any questions?
6      MR. KAMINSKY:  I do, not many.
7           - - -
8           EXAMINATION
9           - - -
10 BY MR. KAMINSKY:
11     Q.  Good afternoon, Ms. Carney.  I'm
12 Mr. Jonathan Kaminsky and I represent
13 Mariesha Apollon in this matter.  And
14 thank you for your time this afternoon and
15 this morning.
16     Earlier today, much earlier today,
17 you had -- a discussion was provided from
18 you about medical providers and medical
19 clinicians.  Do you consider -- is there a
20 difference between medical clinicians to
21 you and a medical provider?
22     A.  No, I use that term
23 interchangeably.
24     Q.  Earlier also, you were discussing

Page 147

1  -- while the discussion was about
2  mortality reports -- you had mentioned a
3  current incarceration period.  What is a
4  current incarceration period to you?
5      A.  So the police identification
6  number does not change.  Once you're
7  issued that, it is with you.
8      The intake number is what changes.
9  So every time you are admitted to custody,
10 you're assigned a unique intake number.
11 And when you're released, then that intake
12 number closes out.  If you're readmitted,
13 that's a current incarceration, and we're
14 using that intake number.
15     Q.  Okay, and so readmitted, meaning
16 that if you were transferred -- if an
17 inmate was transferred out to a mental
18 health facility and then readmitted into
19 the Philadelphia -- into PDP, that's a new
20 number.  Is that what you're saying?
21     A.  No, that's not a new number.  And
22 that's the nuance.  You have to physically
23 leave custody under judicial order, which
24 would end that intake number.  If you were

Page 148

1  transferred to a mental health hospital,
2  that intake number remains active until
3  you are released under judicial order.
4      Q.  Released under judicial order from
5  the --
6      A.  By the court.
7      Q.  No, no, I understand.  But from
8  the mental health facility or from the
9  PDP?
10     A.  From the PDP.
11     Q.  Okay.  And so, as far as the
12 current incarceration period -- I know we
13 were talking about it as far as mortality
14 reports, is that current incarceration
15 period the same as -- does that apply also
16 for correctional staff's participation in
17 an intake?
18     A.  Yes.
19     MR. PESTRAK:  Can you rephrase
20 that?  I'm sorry, I just don't know
21 if I understood.  Can you just
22 rephrase that a little bit?
23     MR. KAMINSKY:  Yeah, the
24 current -- I mean, the witness did

Page 149

1  answer "yes."
2      MR. PESTRAK:  Okay.  If you're
3  okay with the answer, then that's
4  fine.  Okay.
5      MR. KAMINSKY:  I have nothing
6  further.  Thank you.  Thank you
7  again for your time today.
8      MR. PESTRAK:  I have Ms. Thomas
9  next on my screen.  Do you have any
10 questions?
11     MS. THOMAS:  I have no questions.
12 Thank you.
13     MR. PESTRAK:  And that just leaves
14 you, Ray.
15     MR. WITTEKIND:  Well, I -- I just
16 have a couple.
17          - - -
18          EXAMINATION
19          - - -
20 BY MR. WITTEKIND:
21     Q.  Commissioner Carney, my name is
22 Ray Wittekind.  I represent YesCare, Dr.
23 Trivikim, Nurse Gay, and Blair Cabellos.
24 I'm not going to -- I'm going to try not

Deposition of Blanche Carney                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

Page 150

1  to be repetitive of what Bret asked you
2  earlier.  Is it fair to say that, as
3  between you and Dr. Herdman, he was the
4  liaison between the PDP, Corizon, and
5  YesCare?
6     A.  Yes.
7     Q.  Do you recall having any direct
8  communications with anyone at YesCare or
9  Corizon relative to the treatment or the
10  medical care provided to Mr. Jung?
11     A.  Not to my recollection.
12     Q.  And that would include Dr.
13  Trivicam, Nurse Gay, and Blair Gabellos.
14  So you don't recall any discussions with
15  them about what happened to the Plaintiff?
16     A.  If they were present at the
17  meeting, they would have presented
18  whatever was asked of them, or their
19  recollection, and that would have been the
20  extent, but it wouldn't have been calling
21  them directly and soliciting information.
22  But if they were at the meeting, they
23  definitely participated.
24     Q.  During your time as a

Page 151

1  commissioner, did you ever get any -- or
2  strike that -- do you recall any
3  discussions or communications with Dr.
4  Herdman in which he stated that he was
5  concerned over the quality of care that
6  was being provided by Corizon or YesCare?
7     MR. PESTRAK:  Objection.  But you
8  can answer.
9     THE WITNESS:  No, not specifically
10  other than just rendering care, but
11  no specifics.
12     MR. WITTEKIND:  I think that's all
13  I have.
14     MR. PESTRAK:  Bret, I don't have
15  any.  So unless you follow up.
16     MR. GROTE:  I do not.  We are
17  through.  Thank you for your time,
18  Ms. Carney.
19     MR. PESTRAK:  You're free to go.
20  Thank you very much.
21           - - -
22     (Whereupon, a deposition of Blanche
23  Carney was concluded at 1:25 p.m.)
24           - - -

1                               -  -  -

2                    E R R A T A   S H E E T

3                               -  -  -

4

5          PAGE        LINE        CHANGE

6          _____     _____     _____

7          _____     _____     _____

8          _____     _____     _____

9          _____     _____     _____

10         _____     _____     _____

11         _____     _____     _____

12         _____     _____     _____

13         _____     _____     _____

14         _____     _____     _____

15         _____     _____     _____

16         _____     _____     _____

17         _____     _____     _____

18         _____     _____     _____

19         _____     _____     _____

20         _____     _____     _____

21         _____     _____     _____

22         _____     _____     _____

23         _____     _____     _____

24         _____     _____     _____

25         _____     _____     _____

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I,                        , do hereby

 4    certify that I have read the foregoing pages and

 5    that the same is a correct transcription of the

 6    answers given by me to the questions therein

 7    propounded, except for the corrections or

 8    changes in form or substance, if any, noted in

 9    the attached Errata Sheet.

10

11

12

13

14

15    _____   _____
      Date          Signature

16

17

18

19

20

21

22

23

24

25
```

Deposition of Blanche Carney                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1                          C E R T I F I C A T I O N

2

3          I, Lisa J. Brill, a Court and Notary
     Public in and for the Commonwealth of
4    Pennsylvania, do hereby certify the
     foregoing to be a true and accurate
5    transcript of my original stenographic
     notes taken at the time and place
6    hereinbefore set forth.

7

8

     _____
9
     Lisa J. Brill, Court Reporter-Notary Public
10   in and for the Commonwealth of Pennsylvania

11   DATED:_____

12

13

14

15          (The foregoing certification of
     this transcript does not apply to any
16   reproduction of the same by any means,
     unless under the direct control and/or
17   supervision of the certifying shorthand
     reporter.)

18

19

20

21

22

23

24

## WORD INDEX

**< 1 >**
**1**  5:*12*
**1:00**  137:*3*
**1:25**  151:*23*
**10:05**  1:*19*
**100**  32:*10*  46:*16*
**110**  3:*6*
**12**  39:*19*  41:*11*, *14*
**146**  4:*7*
**149**  4:*8*
**1500**  3:*6*
**1515**  2:*9*
**15TH**  2:*9*
**1717**  3:*14*
**17th**  137:*13*
**1801**  2:*17*
**19102**  2:*10*  3:*7*
**19103**  2:*18*  3:*15*
**19123**  2:*4*
**1992**  12:*6*
**1995**  12:*17*, *24*
**1997**  12:*6*

**< 2 >**
**2016**  12:*11*, *24*  20:*15*
  43:*22*
**2017**  137:*14*
**2020**  92:*12*, *20*
**2022**  4:*13*  47:*24*
  114:*5*
**2023**  38:*24*  131:*22*
**2024**  20:*15*  37:*4*
  92:*12*, *20*  113:*21*
  131:*22*  134:*22*  135:*3*
**2025**  1:*14*
**204**  113:*22*
**23**  1:*14*
**29th**  113:*20*  134:*22*

**< 3 >**
**3/09/24**  113:*22*
**306**  2:*4*

**< 4 >**
**43**  53:*4*
**4th**  4:*13*  47:*24*
  135:*3*

**< 5 >**
**5**  60:*22*  61:*18*
**5.162**  64:*2*
**5.183**  66:*10*
**5.76**  61:*7*, *11*
**562**  64:*1*
**5th**  134:*15*

**< 6 >**
**6**  4:*6*
**610**  3:*14*
**64**  75:*11*, *13*
**6th**  134:*17*

**< 7 >**
**7**  4:*8*  5:*12*
**770**  2:*17*

**< 9 >**
**98**  49:*8*
**990**  2:*4*

**< A >**
**a.m**  1:*19*
**able**  28:*18*  34:*10*
  65:*13*
**ABOLITIONIST**  2:*3*
**academy**  14:*19*  15:*5*,
  *10*  73:*8*
**accept**  124:*21*
**access**  32:*15*  34:*9*, *10*,
  *20*  44:*19*  54:*23*  55:*3*
  59:*24*  65:*14*  91:*4*
  95:*13*, *17*, *24*
**accommodate**  90:*9*
**accommodation**  90:*2*,
  *4*
**accommodations**
  88:*10*, *16*, *20*
**accompany**  32:*10*
**account**  71:*20*  131:*6*,
  *11*
**accountability**  128:*9*
**accounts**  131:*12*
**accurate**  15:*3*  16:*11*,
  *12*  50:*11*  51:*18*
  54:*12*  92:*1*  154:*4*
**acknowledging**  69:*19*

**ACKNOWLEDGMEN**
**T**  153:*1*
**acting**  78:*13*
**action**  114:*10*
  115:*16*, *19*  138:*17*
**activates**  36:*12*
**activation**  76:*17*
**active**  148:*2*
**activities**  17:*24*
  28:*16*  45:*19*  120:*2*
**actors**  141:*13*
**actual**  25:*8*  86:*9*
  138:*23*
**acute**  94:*1*
**adapted**  62:*2*
**adding**  114:*20*
**addition**  27:*21*  99:*18*
  108:*14*
**additional**  66:*8*
  80:*19*  81:*9*  104:*22*
  128:*13*  141:*6*  142:*1*,
  *5*, *22*
**address**  41:*20*  46:*10*
  71:*5*  77:*17*  102:*14*
  136:*18*  140:*24*
  142:*14*  143:*8*, *12*, *17*
**addressed**  56:*13*, *23*
  120:*13*  142:*12*
**addressing**  41:*19*
  78:*22*  142:*10*
**adhere**  63:*15*
**administer**  23:*13*
**administered**  22:*13*
  24:*3*  25:*19*  26:*13*
**administering**  28:*20*
  29:*4*  36:*1*  44:*12*
**administration**  19:*3*
  21:*4*  26:*18*  27:*24*
  59:*23*  65:*18*  138:*18*
**administrative**  19:*3*
**Administrator**  13:*5*
**Administrators**  1:*5*
  18:*2*  51:*7*
**admissions**  34:*6*
**admit**  92:*20*
**admitted**  147:*9*
**ADOSSINO@GRSM.**
**COM**  3:*15*
**adverse**  55:*10*

**after-action**  111:*15*,
  *21*  112:*8*, *11*  113:*11*
**after-incident**  134:*10*
  135:*23*
**afternoon**  146:*11*, *14*
**agenda**  59:*16*
**aggregate**  105:*3*, *9*, *17*
**agree**  49:*16*  50:*5*, *9*
  66:*14*  125:*19*  126:*13*,
  *23*  127:*23*  132:*20*
  138:*11*
**agreed**  7:*3*  48:*9*
**Agreement**  4:*8*  47:*23*
**aid**  73:*5*  126:*15*, *21*
  128:*16*  142:*5*  144:*5*
**alert**  78:*7*, *16*  89:*4*
**alerted**  89:*11*
**allegation**  138:*5*
**allow**  8:*21*  116:*7*
**allows**  131:*11*
**alongside**  94:*9*
**American**  53:*7*  63:*1*,
  *7*, *15*
**analysis**  28:*3*
**and/or**  154:*16*
**Angel**  125:*23*
**Anne**  37:*16*
**announcement**  44:*21*
  49:*21*
**annual**  15:*11*  67:*10*
  73:*13*, *15*
**annually**  39:*3*  57:*15*
**Answer**  5:*3*  8:*21*
  9:*2*, *7*  10:*4*, *10*, *16*
  11:*3*  23:*20*, *24*  24:*22*
  25:*18*  29:*2*  33:*7*
  40:*17*  49:*2*  53:*10*
  54:*3*  67:*8*  72:*8*  74:*4*
  75:*22*  83:*9*, *23*  84:*4*
  85:*9*  86:*16*  87:*1*, *7*,
  *10*  90:*16*  91:*10*
  92:*14*  93:*3*  96:*22*
  99:*1*  102:*11*, *14*, *17*
  104:*6*  105:*6*  107:*15*,
  *21*  111:*1*, *10*  116:*12*
  117:*11*  118:*12*  119:*9*
  128:*2*, *19*  129:*9*, *21*
  130:*14*  139:*15*  140:*6*
  141:*3*  142:*16*  143:*15*

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 48 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

144:7, *16*  145:*3*
149:*1, 3*  151:8
**answering**  48:*20*
97:4
**answers**  8:*18*  153:6
**anticipated**  89:*19*
**anybody**  86:*3*  89:*23*
**anyway**  59:*5*
**APOLLON**  1:*10*
2:*19*  146:*13*
**appear**  61:*19*  69:*17*
**appeared**  133:*10*
**appears**  78:*5*
**apply**  148:*15*  154:*15*
**appointments**  107:7,
*19*  108:*4*
**approach**  130:*11*
**approaching**  35:*16*
**appropriate**  16:*10*
26:*4*  50:6, *14*  52:*4, 5,
7, 9*  66:*15*  72:5
74:*11*  87:*22*  90:7
**appropriateness**  55:*1*
85:*5*
**approve**  94:*13, 14*
**Approximately**  11:*5*
**April**  135:*3*
**ARCH**  2:*9*  3:*14*
**area**  23:*8, 9*  45:2, *12,
24*  56:*13, 22*  57:9
69:*9, 11*  91:*18, 19*
92:8  95:*13*  103:*11*
133:*17*
**areas**  50:8  54:*18*
60:*4, 12, 14*  66:2, *17*
99:6  130:*24*  136:*17*
**arose**  22:*4*
**arrived**  28:5  133:9
**arrives**  74:*20*
**arriving**  95:8  133:*21*
**artful**  24:5
**articulate**  136:8
**ascertain**  65:*13*
**asked**  66:*3*  150:*1, 18*
**aspects**  19:*4*  35:*1*
54:*22*
**assaulted**  84:8
**assess**  38:*20*  67:*12,
20, 21*  84:*13*  91:*19*
102:*1*  103:*17*  107:*11,*

*14*  117:*18*  120:*15, 20*
122:*15*  128:7, *11*
140:*12*  142:*3*
**assessed**  88:*21*  89:*17*
**assessing**  69:*15*
80:*19*  82:6  83:5
94:*20*  110:*4, 5*  121:*5,
8, 13*
**assessment**  22:*18*
25:*10*  68:*10*  70:*17*
80:*1, 16*  81:*24*  83:*11*
96:*12*  143:7
**assessments**  95:*23*
96:*5*
**assigned**  18:*14*
28:*11, 14, 15*  48:6
77:*15, 17*  115:5
124:*8*  128:*10*  147:*10*
**assist**  79:7
**assistance**  16:*10*
71:*1, 8, 9, 16, 17*
74:*13, 16*  76:*4, 20*
80:*4, 9*  128:*12*
132:*13*
**assisting**  38:*16*
**Associate**  10:*23*
**Association**  53:7
63:*1, 8, 16*
**assume**  9:*3*  24:*15*
32:*13*  37:*19*
**assurance**  28:*3*  53:*19*
**attached**  153:9
**attend**  14:*22*
**attention**  29:*24*  30:6
58:8  68:*18*
**ATTORNEY**  2:*5, 11,
19*  3:8, *16*
**audio**  59:*1*
**audit**  27:*23*  108:*22*
114:*18*  115:6
**auditing**  38:*17*  98:*21*
**audits**  28:6  99:*3*
**authority**  79:*21*
80:*13*
**authorized**  125:*1*
**automatic**  104:*12*
**available**  95:*19*
116:*3*  130:*16*  131:8,
9

**aware**  24:*24*  36:*10*
51:*24*  113:*3*

**< B >**
**Bachelor's**  11:*22*
**back**  52:*3*  60:*16*
102:*1*  109:7  115:*24*
134:*15*  137:*3*
**background**  20:*23*
**backlogs**  41:5
**bad**  141:*13*
**base**  41:*13*
**based**  22:*22*  27:*10*
41:*11, 14*  53:*12*
57:*16, 17*  62:*22*
65:*21, 22*  67:*21*  68:9
70:*17, 19, 20*  79:*13*
80:7  81:*5, 24*  82:7
83:*10*  88:8  93:*15*
95:*2*  97:*10*  98:*1, 6*
99:*20*  102:*3, 4*
104:*15*  107:*1*  109:*24*
113:*12*  114:*13*
122:*17*  123:*2*  124:*16*
127:8  129:*10*  131:*21*
132:6, *23*  138:*15*
140:*10*
**basic**  8:*12*  93:*22*
**basis**  28:*16*  30:6
33:5, *11*  70:*18*  71:6
80:*2*  99:7  116:*18*
130:*5*
**Bates**  64:*4*
**Bates-stamp**  47:*14*
**Bear**  37:2  47:*1*
62:*18*  112:*10*  126:7
**becoming**  14:*16*
**beds**  93:*17*
**began**  15:*4*
**beginning**  114:*4*
**begins**  61:*23*  64:*19*
76:*18*
**behalf**  1:*18*
**behavioral**  55:*4*
112:*16*  120:*4*
**believe**  12:*11*  21:*1*
30:*24*  32:8  57:*17*
65:*10*  67:*11*  74:*13*
88:5  92:*15*  97:*23*
98:6, *14, 17*  106:*24*

113:*13*  114:*16*
122:*18*  131:*20*  132:*3,
4*  135:7  139:*16, 17*
144:*17, 22*
**best**  27:9
**better**  29:*1*  38:*5*
64:*13*
**beyond**  82:*1*
**bigger**  125:*15*
**bit**  13:*18*  27:5  54:2
56:6  148:*22*
**BLAIR**  1:*11*  3:9
149:*23*  150:*13*
**BLANCH**  1:*18*
**BLANCHE**  1:9  2:*11*
4:*3*  7:*10, 23*  10:*3*
11:*4*  53:*11*  54:2
56:*18*  58:*17*  85:*10*
91:*10*  138:*19*  151:*22*
**B-L-A-N-C-H-E**  7:*23*
**blind**  130:*19*
**BLOODSAW**  1:*11*
3:*16*  133:*9, 14, 17*
**Board**  124:2, *3, 12*
125:8
**body**  53:*14*  62:9
70:8  71:*13*
**bottom**  38:*11*  60:*21*
61:*8, 17*  64:2  89:*17*
114:6  133:8
**BOULEVARD**  3:*6*
**box**  71:*21*
**Brad**  84:*17*
**breach**  127:*24*
128:*16*
**break**  9:*4, 5, 8*  14:*14*
59:*3*  75:6  136:*19*
**BRET**  2:*3*  7:*18*
10:8  16:*19*  23:*20*
33:*17*  91:9  136:*23*
150:*1*  151:*14*
**BRETGROTE@ABO**
**LITIONISTLAWCEN**
**TER.ORG**  2:5
**brief**  59:8
**Brill**  1:*20*  154:*3, 6*
**bring**  19:*16, 22*  58:7
**bringing**  100:*4*
112:*1*  123:*13*

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 49 of 75
Deposition of Blanche Carney
Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**brings** 29:*18*
**broad** 140:*16*
**broadly** 33:*16* 90:*19*
**broadness** 96:*21*
**brought** 29:*24* 30:*5*
68:*17* 123:*20* 127:*14*
136:*2*
**Bruce** 20:*18*
**brush** 140:*17*
**Bryn** 12:*2*
**bunk** 89:*16, 20*
**Business** 21:*3*

**< C >**
**C/O** 138:*7, 8, 9, 10*
**CABELLOS** 1:*11*
3:*9* 149:*23*
**calendared** 57:*13*
**call** 29:*10* 32:*4, 6, 9*
33:*1* 45:*5, 8, 10*
51:*20, 21* 52:*2* 55:*7*
58:*21, 24* 70:*3, 23*
71:*4, 8, 16* 74:*12, 15*
79:*6, 22* 80:*5, 11, 13,*
*23* 81:*6, 9* 97:*21*
117:*17* 133:*24*
144:*19*
**called** 69:*19* 72:*1*
78:*8* 100:*22* 132:*13*
**calling** 19:*14* 69:*15*
76:*19* 117:*16* 150:*20*
**calls** 44:*23* 142:*18*
**campus** 83:*4, 14*
**capacity** 88:*6*
**captains** 14:*7*
**captures** 34:*5*
**card** 89:*5, 9, 12*
**care** 15:*13, 16, 21*
16:*1* 22:*12* 23:*10*
30:*1* 38:*22* 39:*21*
40:*1, 6, 9* 41:*21*
42:*12, 15* 43:*9, 13*
44:*9, 12, 19* 53:*6, 24*
54:*12, 22, 23, 24* 55:*2,*
*3, 7, 9* 58:*9, 11* 59:*24*
61:*24* 62:*5, 8* 63:*4, 7*
64:*9, 20* 67:*18* 68:*7*
69:*11* 73:*21* 81:*16*
84:*13, 15* 85:*4, 5*
87:*23* 91:*4* 92:*9, 21,*

*22, 23* 93:*1, 10, 12, 16,*
*19, 22, 23* 96:*9* 98:*3*
102:*2* 106:*22* 135:*16*
150:*10* 151:*5, 10*
**careers** 14:*23*
**CARNEY** 1:*9, 18*
2:*11* 4:*3* 7:*10, 18, 23*
10:*22* 37:*11* 113:*24*
137:*15* 138:*19*
146:*11* 149:*21*
151:*18, 23*
**C-A-R-N-E-Y** 7:*24*
**carried** 14:*2, 4* 18:*1*
27:*6*
**carries** 121:*22*
**carry** 27:*24* 28:*9*
122:*4* 143:*20*
**carrying** 48:*7*
**case** 22:*6* 34:*7, 16*
43:*16* 57:*15* 85:*13,*
*14* 100:*6* 105:*10, 14*
108:*6* 111:*8* 113:*21*
115:*8* 124:*6, 11*
125:*10* 126:*2, 4*
127:*3* 132:*8* 135:*5, 8,*
*14*
**case-by-case** 70:*18*
71:*6* 80:*2* 106:*19*
129:*19, 22* 130:*4, 11*
**case-related** 21:*12*
**cases** 109:*19* 110:*1*
122:*7* 129:*11*
**catch** 47:*7*
**caught** 49:*6*
**caused** 132:*21*
**caveat** 9:*6*
**cell** 45:*14* 72:*4, 6*
78:*20* 79:*1* 133:*10,*
*13, 14, 16, 21* 137:*12*
**cells** 76:*8*
**CENTER** 2:*3, 17*
24:*2* 132:*12*
**certain** 18:*8* 26:*9*
32:*11* 34:*11* 35:*1*
86:*18* 92:*21* 96:*15*
102:*21* 118:*10*
122:*16* 131:*13*
**certainly** 36:*23*
61:*17* 77:*11* 141:*14*

**certainty** 98:*17*
107:*15*
**certification** 7:*5*
154:*15*
**certified** 53:*13* 67:*22*
71:*12*
**certify** 10:*15* 153:*4*
154:*4*
**certifying** 154:*17*
**CFCF** 24:*1* 95:*5, 9,*
*10*
**chain** 18:*3*
**chaired** 124:*3*
**challenge** 27:*15*
**challenges** 35:*18*
90:*13, 20* 92:*10, 17,*
*24* 93:*8*
**challenging** 92:*16, 17*
**chance** 133:*1*
**change** 44:*6* 104:*9,*
*14* 147:*6* 152:*5*
**changed** 103:*18, 24*
105:*12* 117:*24*
120:*16* 122:*16*
**changes** 147:*8* 153:*8*
**charge** 18:*8*
**charges** 123:*13, 19*
124:*12, 14* 127:*13*
**chart** 40:*1* 86:*20*
**check** 6:*22* 24:*14*
43:*5* 78:*9*
**checking** 74:*14* 76:*8*
**checks** 26:*23* 27:*4*
**chest** 84:*6*
**Chief** 20:*8, 13, 16*
26:*22* 55:*18*
**chronic** 28:*19* 29:*3,*
*7* 40:*1, 9* 42:*15* 54:*9*
55:*8* 61:*24* 94:*2*
**circumstance** 106:*5*
**circumstances** 45:*17*
68:*24* 69:*22* 70:*2*
90:*6* 103:*22* 118:*24*
129:*19*
**CITY** 1:*9* 2:*9, 12*
7:*21* 11:*10* 37:*15*
50:*12* 63:*3, 20* 66:*13,*
*20, 22* 67:*5, 9, 11*
82:*18, 20* 125:*20*

132:*20* 137:*10* 138:*4*
**city's** 49:*22* 61:*20*
**civilian** 14:*9, 21*
18:*4* 50:*20, 23* 51:*8,*
*12, 14, 17*
**civilian-contracted**
51:*15*
**clarification** 28:*17*
84:*18*
**clarifier** 92:*4*
**clarify** 71:*7, 17, 23*
81:*14* 88:*11*
**clear** 23:*24* 69:*16*
106:*12* 127:*12*
**clients** 68:*6*
**clinical** 21:*11* 22:*8,*
*17* 34:*20, 21* 44:*14*
54:*8, 11* 67:*22* 68:*9*
83:*11* 94:*18*
**clinically** 36:*19*
**clinician** 80:*17*
**clinicians** 146:*19, 20*
**clinician's** 22:*22*
**closely** 13:*7*
**closes** 147:*12*
**cloud-based** 131:*12*
**collaboration** 20:*3*
94:*7*
**colleagues** 136:*20*
**come** 38:*20* 76:*15*
79:*6, 8* 91:*19, 23*
94:*9* 109:*7* 117:*1*
133:*12* 137:*2*
**comes** 35:*5* 116:*17*
**comfortable** 11:*3*
**coming** 9:*20* 31:*24*
48:*21* 49:*8*
**command** 18:*3*
**commands** 69:*16*
70:*7, 12* 71:*2, 4*
**commencing** 1:*19*
**Commission** 62:*4, 7*
63:*6*
**COMMISSIONER**
1:*9* 2:*11* 11:*13, 15*
12:*9* 13:*5, 12, 13, 23*
14:*17* 17:*5, 6, 8, 13,*
*16, 19* 18:*7, 24* 19:*2,*
*9, 12, 24* 22:*11* 26:*16*
28:*8, 22* 29:*5* 39:*7*

Deposition of Blanche Carney

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

43:*16*, *21*  46:*12*
62:*15*  65:*9*  81:*13*, *20*
82:*15*  83:*16*  87:*24*
88:*14*  90:*11*  92:*19*
98:*20*  101:*9*  102:*20*
106:*8*  109:*3*  112:*20*
113:*1*, *3*  116:*8*  118:*8*
123:*4*  124:*4*, *18*, *24*
129:*2*  134:*18*, *22*
137:*15*  138:*19*
139:*11*  144:*4*, *12*
149:*21*  151:*1*
**Commissioners**  14:*3*
17:*11*  18:*10*, *15*
108:*17*  109:*21*
112:*17*
**Commonwealth**
154:*3*, *10*
**communicate**  133:*11*
**communicated**  86:*4*
**communications**
150:*8*  151:*3*
**communicative**  89:*3*
**compare**  101:*3*
**complement**  75:*14*
**completed**  45:*23*
78:*4*  131:*5*
**completely**  88:*4*
**completion**  123:*23*
**compliance**  30:*16*
35:*13*  36:*14*  65:*17*
66:*23*  108:*19*  109:*2*
116:*21*  120:*24*  121:*4*,
*7*  122:*1*, *10*  124:*1*, *11*
125:*5*  136:*9*
**complied**  53:*15*
**compound**  75:*5*
**comprehensive**  13:*19*
**concerned**  81:*1*
139:*11*  151:*5*
**concerns**  90:*24*
**concert**  67:*2*
**concluded**  134:*23*
151:*23*
**conclusion**  126:*9*
133:*1*  137:*23*
**condition**  16:*17*
**conditions**  16:*14*
17:*1*  50:*24*  59:*20*
83:*19*

**conduct**  75:*24*
119:*18*
**conducted**  99:*17*
119:*16*  121:*15*  125:*6*
**conducting**  68:*12*
**conducts**  100:*2*
**confer**  135:*9*  136:*20*
**confidential**  23:*12*
26:*5*  91:*20*  92:*8*
**confirm**  95:*20*
**confirmed**  89:*1*
**consider**  93:*9*  146:*19*
**consist**  100:*7*, *9*
**consistent**  48:*8*  53:*6*
55:*12*  63:*5*  117:*15*
118:*2*  135:*11*
**consistently**  145:*15*
**Consultants**  37:*12*
**contact**  21:*14*  52:*15*
**contains**  139:*20*
**contraband**  142:*4*
**contract**  14:*10*  20:*7*
48:*4*, *6*  51:*11*  63:*22*
130:*19*  131:*21*, *23*
**contracted**  16:*2*  18:*5*
20:*5*, *12*  38:*18*
**contractor**  21:*8*
63:*20*
**control**  55:*6*  62:*23*
154:*16*
**controlled**  39:*22*
**conversations**  9:*18*
42:*5*  43:*5*  135:*5*
**converse**  20:*9*  43:*10*
57:*23*  85:*12*  135:*9*
**conversing**  42:*6*
**convey**  56:*4*, *10*
**conveyed**  52:*1*
**copy**  6:*14*, *18*
**Corizon**  4:*14*  43:*22*
44:*7*  48:*1*, *4*, *9*  51:*12*
60:*19*, *23*  63:*2*  66:*11*,
*13*, *14*  150:*4*, *9*  151:*6*
**Corizon's**  61:*19*
**CORP**  1:*9*  3:*8*
**Correct**  21:*5*  25:*6*
37:*4*, *5*  72:*22*  89:*22*
95:*2*  113:*5*, *6*  115:*14*
122:*11*, *12*  123:*17*

127:*16*, *20*  134:*5*, *9*,
*19*  153:*5*
**correction**  70:*12*
96:*7*
**correctional**  12:*19*
13:*8*  14:*9*  15:*2*  16:*7*,
*15*, *20*  18:*4*  31:*1*, *15*,
*17*  32:*21*  37:*11*
44:*11*, *23*  45:*16*
46:*13*  50:*6*, *14*  51:*6*,
*18*  52:*4*, *7*, *9*  62:*3*, *4*,
*7*, *11*  63:*6*  66:*15*
70:*2*, *21*  71:*11*, *19*
74:*23*  75:*15*, *16*, *17*
78:*2*, *21*  80:*12*, *16*
81:*1*  89:*13*  90:*14*
95:*12*  96:*16*  103:*10*
130:*21*  131:*15*  133:*9*
148:*16*
**corrections**  9:*23*
19:*16*, *22*  73:*4*  74:*8*
79:*21*  87:*16*  91:*5*
126:*13*  139:*12*
145:*18*  153:*7*
**correction's**  69:*12*
**corrective**  114:*10*
**correctly**  12:*10*  16:*6*
17:*9*  21:*2*  74:*14*
98:*15*
**correlate**  64:*4*
**counsel**  7:*3*, *19*
47:*10*  64:*6*
**count**  126:*14*
**counted**  77:*17*
**counts**  97:*19*
**couple**  35:*20*  48:*18*,
*19*  49:*4*  60:*17*  108:*2*
149:*16*
**course**  23:*1*  28:*12*
46:*9*  75:*23*
**COURT**  1:*2*, *21*  6:*4*,
*10*, *15*, *20*  8:*15*, *22*
19:*2*  30:*4*  48:*17*
113:*20*  148:*6*  154:*3*,
*6*
**COVID**  90:*12*, *23*
125:*21*
**COVID-related**  90:*23*
**CPR**  73:*5*, *12*, *23*, *24*

74:*9*, *10*, *16*
**create**  55:*19*
**creating**  57:*12*
121:*12*
**crisis**  142:*24*
**critical**  112:*12*, *22*
145:*23*
**cues**  71:*13*, *14*
**culture**  139:*12*, *17*
140:*3*, *22*  142:*11*
**current**  10:*22*  46:*4*
102:*4*  110:*14*  147:*3*,
*4*, *13*  148:*12*, *14*, *24*
**currently**  9:*22*  10:*6*,
*11*
**custody**  99:*15*, *20*
102:*23*  103:*20*
104:*14*  105:*3*  107:*8*
110:*10*, *17*  112:*7*
113:*4*  119:*15*  121:*19*,
*21*  129:*7*  135:*12*
147:*9*, *23*
**cut**  56:*6*
**cutting**  48:*15*

**< D >**
**daily**  21:*9*, *10*  27:*16*
28:*16*  30:*6*  33:*5*, *10*
34:*2*  36:*8*  99:*6*
**date**  1:*20*  153:*15*
**dated**  134:*21*  154:*11*
**day**  27:*12*  34:*12*
45:*19*  135:*1*
**dead**  137:*13*
**deaf**  130:*18*
**deal**  119:*10*  129:*17*
**deals**  66:*23*
**dealt**  130:*4*
**death**  99:*16*, *20*
100:*11*  101:*17*, *24*
102:*22*  103:*19*  106:*5*
110:*15*  111:*12*, *23*
112:*5*, *6*  113:*4*
121:*18*, *20*  125:*23*
132:*9*, *19*, *21*  134:*11*
135:*8*
**deaths**  55:*11*  99:*14*
105:*2*  106:*9*  110:*9*,
*16*  119:*15*  129:*6*

decedent 106:22
107:6

December 137:13

decides 87:12

decision 94:5 124:13

decisions 87:17, 18
88:22 89:21

decompress 136:16

decrease 142:3

de-escalation 142:24

defend 127:18

DEFENDANT 2:19

Defendants 1:12
2:11 3:8, 16

defer 28:4 66:7
85:24 86:18 102:16
108:7

deficiencies 84:16

definitely 52:11
94:19 150:23

degree 62:22

delegated 28:9, 10, 14

deliver 16:1, 3 41:21
42:7 43:2, 13 92:7

delivered 51:9 56:14,
24 67:2 92:3 93:23

delivery 15:20 38:22
41:24 43:9 54:19
62:11 68:7 93:12

demise 103:7 110:7

dental 55:5

departed 145:13

DEPARTMENT 1:10
2:9, 12 8:7 11:11
12:16 13:16 14:23
17:22 19:4, 19, 21
20:6 22:9, 12 38:22
66:22 72:19, 24 73:2
82:22 85:2 108:24
141:15

departmental 139:23

depend 106:19

depended 22:5
23:10 122:6

dependent 71:14
75:9 108:5 143:19

depending 23:14
24:1 34:11 36:18
45:18 68:23 73:15

110:14

depends 81:6 125:4

DEPONENT 153:1

deposition 1:17 5:1
8:2, 11 9:12, 15
151:22

deputies 18:12

Deputy 13:5 14:3, 7
17:6, 7, 11, 16, 19
18:7, 10, 14, 23 19:2,
8 108:17 109:21
112:17 124:4, 7
125:9

describe 33:13 90:20
133:18

described 52:19
115:13 134:4

describing 43:17
53:22

Description 4:8

designate 122:3

designated 23:9
91:18 92:7 93:18
125:10

designed 96:24

designee 119:18
125:3

designees 109:22

desk 131:4

despite 41:5

Detention 24:2
132:11

determination 87:20
95:1, 3

determine 10:18
27:14 56:1 70:13
96:18 99:10 101:15
104:18 117:7 122:20
139:9 140:2

determined 67:23
89:16 93:16, 24

determines 25:13
35:22 124:13

determining 67:6
76:3 80:18 105:11
121:8

develop 114:9

developing 62:21

diabetes 22:13 39:22
40:5 44:9, 12, 20

46:15 50:9, 16 53:7,
24 54:10, 12 63:1, 7,
16 64:9, 19, 21, 23
66:18 67:17

diabetic 23:3 25:19
67:24 68:8 132:21

diabetics 41:4, 8
68:20

diagnosis 22:22

diagnostic 55:10

died 134:18

difference 146:20

differences 105:10

different 29:18
40:22 41:2, 10 95:15
101:1 106:3 116:4,
23 117:20 119:21
120:23 121:2 141:7

direct 13:9 18:22
21:15 42:11 51:10
52:12, 13 150:7
154:16

directed 29:13, 14
37:16

Direction 5:3

directives 51:22

directly 150:21

Director 10:23 86:13
108:18 109:1 121:24

disabilities 88:16, 17,
21, 24 89:3, 15

disability 88:10 89:8
90:2

disciplinary 115:16,
18, 22 116:15 119:2,
11 123:19 124:16
138:16

discipline 123:21
124:23 125:2, 11
127:6, 10 139:1

disciplined 116:1

discovered 137:12

discuss 41:24 43:8,
14 58:5 85:16 110:1
111:16 112:2 136:3,
18

discussed 33:1 42:3
55:20 96:10 134:7

discussing 68:19
146:24

discussion 49:11
146:17 147:1

discussions 87:19
106:20 150:14 151:3

disease 55:9 62:22

diseases 54:9

dismissed 124:15

disobedient 70:14

dispositions 116:2

distinct 18:9

distinction 51:16
70:16

distributed 18:11

distribution 97:22

DISTRICT 1:2

division 17:22 18:18,
19, 22 108:22 114:19
115:6

divisions 18:13, 15
19:5

DOC 52:18

doctor 20:24 38:19

document 8:24
24:19 27:3 30:17
33:22 37:3, 8, 10, 23
47:6 52:3 60:18
98:11 113:16, 22
114:22 115:13

documentation 24:16
32:5 35:8 83:3

documented 24:9, 10,
13 25:14 26:8, 10, 14
30:21 31:11 32:7
33:20 35:8 40:9
42:4, 16 98:4

documenting 31:4
41:10 79:5 83:1

Documents 5:7
68:11 87:9 114:23

doing 52:11, 13 81:2
96:5 105:19 115:2
118:23, 24 119:23
129:24 135:10 140:9,
15

dose 36:24

doses 30:11 36:3, 5,
11, 17, 20

DR 3:9 20:18, 19, 22
27:9, 13, 24 29:13, 14
38:12, 14, 19 39:12

40:*11*  41:*16, 17*  42:7,
*18*  43:*4, 18*  53:22
55:*18*  57:*10, 22*
59:*13*  60:*10, 14*
63:*19*  66:7  68:*15*
85:*11*  86:*1, 3, 19, 22*
100:*3*  101:*17, 18, 20*
102:*16*  108:7, *14*
109:*19, 22*  112:*16*
149:*22*  150:*3, 12*
151:*3*

**drag**  133:*13*
**driver**  98:*9*
**due**  90:*23*  93:*8*
**duly**  7:*11*
**Durham**  138:*9*
**duties**  14:2  28:*11, 14,
15*  34:*13*  45:*18, 22*
46:*4*  75:*24*  76:*14, 24*
77:*2*  129:*1*  130:2
131:*14*  133:22
139:*24*
**duty**  23:*1*  141:*16*

**< E >**
**ear**  130:*18*
**earlier**  61:*21*  79:*10*
*96:10*  134:7  146:*16,
24*  150:2
**early**  131:22
**easier**  14:*13*  42:6
*91:22*  92:4
**EASTERN**  1:2
**educate**  35:*17*
**educating**  30:*14*
**education**  11:*21*
*29:20*
**educational**  11:*19*
**effective**  67:6
**effectuate**  15:*20*
**Eight**  11:*16*
**either**  45:*1, 11*  70:*4,
8*  88:*24*  124:7, *21*
145:6
**elaborate**  13:*17*
**Electronic**  6:8, *14, 18,
23*  24:*11*  25:*11*
*26:10*  31:5  34:*19*
35:2
**emerged**  106:8

**emergencies**  15:*17*
*69:13*  74:*24*  75:5, *19*
*76:12*  77:2  78:*3*
**emergency**  15:*16*
16:*6*  69:*3, 5, 6*  70:*24*
*71:18*  73:*21*  76:*16*
*78:9*  80:*14*  81:*18, 19*
*82:12, 17*  83:6, *18*
*84:14*  85:*1, 7*  96:*9*
144:5
**emergent**  15:*21*
*81:16*
**employed**  9:*23*  10:*6,
11*  11:*9*
**employees**  51:*12, 15*
*72:18*  134:8
**employment**  10:*1*
*11:18*  12:8, *13, 24*
15:*9*  16:*23*
**empowered**  81:*3*
**enable**  74:22
**encompass**  42:*9*
*59:17*
**encompasses**  14:*24*
*60:4*
**encompassing**  57:8
*121:11*
**encounter**  16:*8*  77:*4*
*118:19*
**enforcement**  12:*21*
**engage**  22:*20*  27:*14*
*29:19, 22*  30:*12*
35:*14, 17*  36:*24*
*44:14*  45:*24*  79:2
*129:15*
**engaged**  69:*20*
*103:10*  109:*14*  120:*1*
**engagement**  20:*10*
*30:13*  36:7, *13*  52:*13*
*59:19*  72:*14*  103:*3*
*104:12*  120:*10*
*131:13*
**engagements**  21:*10*
*30:1*
**engaging**  76:2  131:*20*
**enhance**  141:*10*
*143:2*
**enlarge**  64:*10*  125:*16*

**ensure**  34:*21*  51:9
*66:20*  91:2, *24*  92:2
*93:11*
**ensuring**  26:*17*
*44:16*  63:*20*  114:*10*
*128:10*
**entails**  57:7
**enter**  25:*10*  34:*21*
*47:13*  98:7
**entered**  32:*18, 21*
*34:14*  98:*16*  99:8
**entering**  97:5  98:22
*99:4*
**entire**  20:*19*  104:*9*
*139:8*  141:*14*
**entirety**  41:7
**entity**  48:*5*
**entry**  98:*1*
**environmental**  55:5
**episodic**  29:*9*
**ER**  85:22, *24*
**Errata**  153:*9*
**error**  117:*24*
**escalated**  82:*9*
**escalates**  82:*1*
**escort**  91:*15, 17*  92:*6*
**escorted**  44:*17*  45:*1,
12*
**ESQUIRE**  2:*3, 5, 16*
*3:1, 13*
**establish**  62:*16*
**establishes**  62:*10*
**estate**  7:*20*
**Estates**  1:*5*
**evaluate**  102:*9*
**evaluations**  55:8
**everybody**  6:*18*  37:7
*47:15*  143:*12*
**exact**  39:5, *10*
**exactly**  64:*15*  131:*24*
*135:11*
**EXAMINATION**  4:*5*
*7:14*  146:8  149:*18*
**examined**  7:*11*
**example**  100:*21*
**Excel**  114:*17, 22*
**exclusive**  32:8
**excuse**  51:8  65:*4*
*85:14*
**executed**  47:*23*

**Executive**  100:*5*
*109:24*  135:*9, 13*
**exhibit**  47:*13*
**Exhibit-1**  4:*8*  47:*17*
**existing**  90:*9*
**exit**  133:*16, 17*
**expectations**  55:*20*
*142:21*  143:*21*  145:9
**expected**  32:*20, 23*
*33:24*
**experience**  10:*19*
*19:15, 17, 20*
**experiencing**  69:2, *4*
*70:24*  76:*16*
**explain**  18:*17*  81:8
**explaining**  105:8
**express**  136:*16*
**extensive**  14:*12*
**extent**  63:*10*  68:*1*
*69:14*  74:*3*  150:*20*
**external**  121:*9*
**eye**  130:*19*

**< F >**
**facet**  119:*24*
**face-to-face**  89:*13*
**facilitated**  44:*19*
**facilities**  13:*15, 20, 23*
*14:5*  18:8, *16*  21:*16*
*28:21*  93:*20, 23*
*138:17*  143:*18, 24*
**facility**  14:*5*  23:*9, 15*
*42:10*  81:*23*  84:*20*
*90:8*  99:2  119:*14, 17,
20*  120:7, *8, 14, 20, 22*
121:*6, 15*  124:*8*
125:7, *11*  145:*24*
*147:18*  148:8
**facility's**  23:*11*
**fact**  26:*12*  105:*24*
**factors**  24:2
**facts**  104:*3*
**failed**  126:*21*  130:*3*
**failing**  127:22
*128:15*  129:4
**failures**  28:*20*  29:4,
*7, 9*
**fair**  28:7  77:*4*  78:*17,
18*  110:*19, 20*  132:*1*
*150:2*

familiar  8:*10*  32:*12*
  37:*23*  86:*23*  100:*22*
far  6:*18*  102:*1*
  115:*24*  148:*11, 13*
fast  49:*24*
fellow  78:*6*
felt  60:*10*
few-minute  59:*3*
field  9:*23*  19:*15, 21*
fight  84:*7*
file  34:*16*  107:*3, 10*
filed  113:*20, 22*
files  85:*13*
filing  7:*4*
fill  30:*20*
filled  65:*5, 11, 23*
  88:*4*
finding  123:*12, 20*
  126:*16*
Findings  39:*16, 17*
  123:*1, 7, 9*  126:*24*
fine  118:*20*  149:*4*
finish  8:*18, 19*  46:*8*
finished  114:*8*
  126:*10, 11*  133:*4*
finishes  138:*2*
finishing  23:*21*
first  7:*11*  12:*14*
  37:*22*  47:*3, 21*  74:*12,*
  *15*  88:*13*  95:*8*
  126:*15*  134:*15, 16*
firsthand  71:*20*  80:*7*
five  13:*23*  136:*24*
flag  35:*22*  36:*12*
  135:*17*
flat-out  140:*15*
FLOOR  2:*9*  72:*4*
flow  142:*3*
focusing  120:*3*
folks  34:*23*
follow  45:*17*  62:*15*
  96:*9*  139:*19*  151:*15*
followed  40:*15*
  43:*19*  119:*7*  135:*18*
following  43:*4*  50:*8*
  66:*17*  71:*2, 3*  116:*22*
  118:*4, 9*  119:*5*  139:*7,*
  *13*  140:*3, 23*
follows  7:*12*

foregoing  153:*4*
  154:*4, 15*
form  7:*7*  21:*22*
  30:*17, 23*  31:*8*  32:*5*
  40:*17*  53:*9*  63:*9*
  67:*8*  75:*21*  83:*9*
  85:*8*  86:*15, 24*  92:*13*
  93:*3*  98:*8*  109:*10*
  114:*21*  122:*13*
  135:*20*  153:*8*
formal  49:*21*  68:*6*
formalize  56:*16, 21*
  115:*2*
formally  114:*14*
  115:*5*
format  100:*17, 19*
  101:*6*  116:*4*
FORMER  1:*9*
forms  25:*21*  35:*6*
forth  154:*6*
forward  50:*1*
forwarded  58:*24*
found  29:*3*  39:*24*
  41:*13*  123:*15*  126:*14,*
  *20, 22*
foundation  62:*20*
frame  101:*23*
FRASIER  1:*11*  3:*16*
free  151:*19*
frequencies  66:*24*
frequency  28:*5*  92:*23*
frequently  15:*7*  27:*7*
  33:*21*  57:*11*  86:*5*
full  6:*9, 19, 23*  124:*2,*
  *3*  125:*8*  132:*16*
  138:*24*
fully  123:*15*
further  40:*21*  81:*4*
  146:*3*  149:*6*

< G >
Gabellos  150:*13*
gain  36:*14*
gained  19:*20*
GARDEN  2:*4*
garnered  66:*9*
GAY  1:*10*  3:*9*
  149:*23*  150:*13*
GENA  1:*11*  3:*16*

general  13:*1*  41:*18*
  43:*19*  60:*1*  75:*8*
  88:*13, 19*
generally  13:*21*
  33:*20*  40:*4*  44:*21*
  68:*24*  97:*11*
generate  100:*13*
generates  79:*15*
generating  79:*16*
getting  31:*3*  43:*17*
  60:*8*  88:*3*  145:*15*
give  9:*11*  10:*3, 12*
  35:*3*  37:*21*  67:*19*
  100:*21*  133:*1*  136:*15*
  140:*12*
given  8:*1*  45:*1*
  50:*22*  51:*7*  74:*10*
  153:*6*
giving  50:*23*  60:*5*
  65:*23*  69:*16*  70:*6, 9*
  71:*10*
glean  104:*21*  110:*2*
gleaning  105:*22*
glucose  23:*5*  24:*8,*
  *13, 19*
go  8:*12, 20*  11:*18*
  34:*13*  39:*15*  40:*2*
  42:*6*  44:*17*  53:*4*
  60:*16*  62:*24*  65:*2, 10*
  79:*1*  94:*19*  99:*7*
  102:*1*  113:*15*  130:*22*
  134:*15*  137:*21*  138:*3*
  142:*10*  151:*19*
goes  35:*15*  83:*4*
  96:*18*
going  6:*6, 11*  8:*10,*
  *11, 20*  9:*2*  10:*9*
  11:*17, 18*  16:*18*
  23:*12*  31:*19*  34:*15*
  37:*2, 6, 21, 24*  43:*13,*
  *14*  45:*4, 11, 20*  46:*8*
  47:*2, 3, 12*  49:*24*
  56:*20, 22, 23*  59:*17*
  60:*16*  63:*4, 24*  70:*5*
  71:*8, 16*  76:*7*  80:*6*
  84:*5, 17*  87:*10*  93:*2*
  96:*21*  113:*16*  114:*2,*
  *6*  125:*12, 13*  132:*17,*
  *24*  136:*10*  137:*8, 19*
  143:*10, 11*  149:*24*

Good  7:*17*  9:*8*
  16:*21*  38:*7*  146:*11*
GORDON  3:*13*
  138:*7*
GPS  130:*20*  131:*1, 2,*
  *10*
Graduate  12:*3*
greater  93:*10*
GROTE  2:*3*  4:*6*
  7:*16, 18*  10:*14, 20*
  11:*7*  16:*21, 22*  23:*22*
  25:*4*  33:*8, 18*  37:*6, 9,*
  *14, 18*  40:*23*  47:*9, 20*
  48:*13*  49:*7, 14*  53:*16*
  54:*6*  57:*2*  59:*11*
  61:*6, 10, 16*  63:*13, 24*
  64:*7*  67:*15*  72:*10, 16*
  74:*6*  76:*5*  83:*15, 24*
  84:*10, 21, 23*  85:*18*
  86:*21*  87:*3, 11*  90:*18*
  91:*12*  92:*18*  93:*7*
  97:*7*  99:*12*  102:*19*
  104:*17*  105:*15*
  107:*24*  111:*5, 20*
  117:*5*  118:*6, 16*
  119:*13*  122:*14*  128:*4,*
  *21*  129:*14*  130:*6*
  131:*17*  135:*21*
  136:*19, 24*  137:*7*
  140:*1, 20*  141:*19*
  143:*5*  144:*2, 10, 24*
  145:*20*  146:*3*  151:*16*
ground  8:*12*
group  110:*16*
Guardian  130:*20*
  131:*10, 19*  141:*5, 21*
guess  35:*24*  44:*5*
  60:*7*  80:*21*  81:*15*
  118:*17*
guidance  16:*9*  19:*11*
  74:*9*  78:*21*
guidelines  54:*8, 11*
  62:*1, 10, 20*  63:*12, 14*

< H >
half  11:*6*
hand  136:*13*
handle  73:*1*  141:*11*
handled  19:*3*

**happen**  23:*6, 7, 8*
69:*1*  99:*14*
**happened**  85:*21, 23*
110:*10*  113:*4*  121:*8*
131:*24*  150:*15*
**happening**  48:*24*
58:*19*  66:*21*  69:*7*
78:*8*  129:*17*
**happens**  19:*11*  40:*8*
68:*24*
**head**  8:*15*  97:*18*
126:*14*  134:*12*  146:*2*
**Health**  4:*14*  48:*1*
54:*22*  55:*4, 7*  60:*19*
62:*5, 7*  63:*7*  66:*11*
77:*23*  87:*14*  88:*2*
90:*1*  92:*23*  93:*11*
103:*4*  112:*16*  120:*4*
147:*18*  148:*1, 8*
**healthcare**  62:*3, 11*
**Health's**  60:*23*
**hear**  125:*10*
**heard**  54:*1*  124:*6, 8*
125:*9*
**hearing**  124:*2, 3, 10*
125:*8*  127:*17*
**hearing-impaired**
89:*7, 10*
**hearings**  115:*22*
**hears**  124:*12*
**held**  13:*1*  49:*11*
124:*10*
**help**  72:*1*  117:*17*
**helpful**  75:*1*  76:*22*
**Herdman**  20:*18, 20*
27:*9, 13, 24*  29:*13, 15*
41:*18*  42:*8, 18*  43:*4*
55:*18*  57:*10, 22*
59:*13*  60:*10, 14*
63:*19*  66:*8*  68:*16*
85:*11*  86:*1, 3*  100:*3*
101:*18, 19, 20*  102:*16*
108:*8, 15*  109:*20, 22*
112:*17*  150:*3*  151:*4*
**Herdman's**  20:*22*
53:*23*
**hereinbefore**  154:*6*
**Herman**  86:*19*
**hierarchy**  86:*8*

**higher**  92:*22*  94:*1*
96:*8*
**higher-acute**  93:*18*
**highest-ranking**
86:*10*  87:*5*
**highlighted**  50:*3*  51:*1*
**Hill**  138:*7*
**HIPAA**  96:*3, 4*
**history**  11:*18, 19*
12:*8, 13*  14:*16*  34:*18*
35:*3*  65:*3*  102:*2*
**hit**  131:*1*
**hold**  21:*9*  47:*5*
**hospital**  81:*12, 14, 17,*
*19*  82:*5*  148:*1*
**hospitalizations**  82:*16*
**housed**  103:*11*
**housing**  34:*1*  45:*7*
52:*21*  75:*2, 8, 10*
76:*1, 7*  77:*19*  79:*14*
87:*21*  90:*3*  93:*1*
94:*10, 15*  129:*5*
130:*24*  131:*16*
132:*11*  133:*17*
138:*13*  139:*4*  144:*13*
145:*22*
**How's**  64:*12*  73:*14*
**Human**  13:*4*  18:*1*

**< I >**
**identification**  47:*18*
147:*5*
**identified**  57:*6*
109:*19, 22*  114:*18*
124:*9*  140:*11*
**identify**  28:*19*  74:*23*
77:*1, 8*  105:*4*  116:*9*
119:*4*
**identifying**  75:*4, 18*
76:*11*
**idly**  141:*12*
**ill**  132:*12*
**impact**  121:*9*
**impaired**  89:*7*
**implement**  41:*22*
**implementations**  43:*9*
**implemented**  114:*11*
132:*1, 4*  142:*23*
**implying**  136:*12*

**importance**  29:*20*
30:*15*
**important**  75:*4*  76:*10*
**impose**  125:*1*
**imposed**  115:*20*
123:*22*  127:*6*
**improved**  64:*20*
**Improvement**  53:*19*
54:*15, 16, 17, 18*
55:*14, 17*
**incarcerated**  13:*10*
16:*4*  34:*5*  52:*22*
69:*2, 24*  72:*3, 15, 20*
75:*10*  78:*6, 10, 19*
81:*2, 11*  87:*13*
100:*12*  103:*6*  108:*10*
133:*11, 12, 13, 15, 23*
134:*2*
**incarceration**  34:*18*
102:*4*  147:*3, 4, 13*
148:*12, 14*
**incident**  105:*13*
112:*12, 19, 22*  117:*22*
121:*17*  137:*14*  139:*4*
140:*10, 17*  145:*23*
**incidents**  140:*14*
**include**  54:*8*  123:*6*
150:*12*
**included**  52:*24*
**includes**  54:*10*  66:*18*
**including**  54:*23*
55:*11*  115:*16*
**inclusive**  25:*9*
**incoming**  51:*23*
**incorporate**  57:*5*
**increase**  141:*10*
**increased**  143:*23*
**increasing**  141:*8*
**in-custody**  106:*9*
111:*23*
**in-death**  135:*12*
**independent**  74:*17*
136:*14*
**INDEX**  5:*1*
**indicates**  69:*18*
**indicating**  98:*8*
**indications**  140:*13*
**individual**  22:*20, 24*
27:*1*  29:*19*  30:*14*
31:*24*  35:*4, 17*  36:*6,*

*24*  67:*23*  68:*6*  69:*4,*
*11, 16, 17*  70:*4, 7*
72:*15*  75:*20*  78:*6, 11*
79:*2*  83:*12*  86:*11*
87:*4, 22*  89:*1, 6*  90:*9*
91:*16*  96:*6*  100:*6, 12*
103:*3*  105:*14, 20*
106:*2, 6*  110:*3*  112:*3*
115:*8, 17, 19*  116:*17*
117:*1, 9, 18*  118:*5*
119:*2*  120:*2, 5*  122:*8*
129:*18*  131:*3*  132:*10*
**individualized**  62:*21*
**individuals**  31:*22*
34:*5, 8, 15, 24*  38:*18*
44:*24*  45:*1, 9*  46:*1,*
*11*  68:*19*  70:*19*
75:*10, 12, 13*  77:*15,*
*16*  78:*13, 16*  79:*17*
91:*2, 15, 16*  94:*16*
99:*10*  116:*18*  124:*5*
128:*9, 10*  133:*23*
134:*2*  136:*1, 2, 11*
139:*6, 18*  140:*11*
145:*17*
**individual's**  35:*13*
110:*7*
**infection**  55:*6*
**inferring**  136:*12*
**infirmary**  23:*8*  55:*9*
93:*15*  94:*3, 6*
**information**  22:*21*
34:*14, 17, 22*  50:*24*
51:*23, 24*  56:*5, 7, 11*
65:*13, 24*  66:*8*  78:*15*
80:*7*  95:*12, 18*  96:*15,*
*24*  97:*6*  98:*22*  102:*8*
103:*4, 5*  104:*21*
105:*23*  110:*2*  112:*4*
113:*23*  114:*16*  115:*1,*
*4*  116:*2, 8*  117:*2*
142:*19*  150:*21*
**infrastructure**  132:*5*
141:*6, 22, 24*
**infrequently**  40:*8*
**initial**  15:*9*  96:*5*
117:*17*
**initiate**  74:*16*  99:*20*
**initiated**  36:*16*
112:*21*  133:*24*

initiative 21:*13*
64:*22, 23* 65:8 66:9
injuries 83:*20*
injury 82:*14*
inmate 31:*19* 72:5
137:*11* 147:*17*
inmates 88:*15*
in-service 50:7, *15, 18,
19* 66:*16*
inside 121:6, *9*
installed 132:6
instance 119:*1*
138:*21*
instances 115:*19*
135:*16*
instruct 10:*10*
instructing 10:*16*
instruction 98:*18*
insulin 25:*19* 28:*20*
29:*4* 67:*24* 68:9
insulin-filled 65:*3, 4*
intake 55:8 88:*23*
95:5, *7, 13* 97:*3, 8*
147:8, *10, 11, 14, 24*
148:2, *17*
interact 52:*22*
interchangeably
146:*23*
intercom 45:*9*
interfere 94:*24*
interference 48:*23*
interpretation 70:*22*
interrupt 48:*18*
intervention 142:*24*
interviewing 95:*22*
interviews 106:*20*
intimately 112:*18*
investigating 121:*14*
investigation 99:*19*
105:*24* 108:*13, 20, 24*
113:*9* 119:*19, 24*
120:7, *8, 23* 121:*1, 4,
14, 16* 122:5, *19*
123:*24* 125:6 132:*18*
134:*23* 138:*23* 139:*8*
investigations 101:*12*
104:*20* 119:*15, 16*
120:*14* 121:*23*
125:*22* 129:6 132:*19*

involve 76:7 106:*18,
20* 108:*10*
involved 13:7 67:*16*
106:*21, 24* 110:*22*
111:*3, 14* 112:*18*
120:*12* 121:*16*
133:*23* 134:2, *3*
135:*14*
involvement 112:*2*
iPhone 48:*22, 23*
isolated 105:*13*
issue 10:*8* 27:*14*
41:*17* 60:6 70:*15*
78:*14, 17* 79:*3, 4*
117:*8* 140:*22* 141:*1*
issued 45:*11* 89:5
147:7
issues 41:*19, 20*
43:*14* 57:*14* 58:5
59:*12, 14, 18* 73:2
77:*18, 21, 23* 83:7
100:*11* 107:*17* 110:5
112:*3* 116:*15* 120:*13*
128:*11* 136:*17*
issue-specific 57:*4*
it'd 14:*13* 110:*16*
item 59:*16*
its 41:7 63:*21* 90:*22*
124:*11, 20*
Ivan 109:*4* 122:2

< J >
JACOB 1:*5*
jail 15:*14* 95:7
JAMES 1:*5*
January 4:*13* 47:*23*
Jermaine 137:*11*
JKAMINSKY@KEIR

NANTRABACH.COM
2:*18*
job 12:*19* 19:*13*
34:2 52:*23* 141:*17*
JOHN 3:*6* 146:*4*
join 111:*11*
joint 87:*18*
JONATHAN 2:*16*
146:*12*
JR 1:*5* 7:*20*

judicial 147:*23*
148:*3, 4*
jumping 118:*15*
JUNG 1:*5* 7:*20*
37:*15* 125:*20* 132:9,
*20* 133:*11, 13* 137:*10*
138:*4* 150:*10*
Jung000001 132:*20*
Jung's 134:*11* 135:5,
*16*

< K >
K-9 142:*4*
K-9s 142:5
KAMINSKY 2:*16*
4:7 6:*16, 17* 49:*3*
59:2 146:6, *10, 12*
148:*23* 149:5
keep 56:*19*
KENNEDY 3:6
kept 83:7
ketoacidosis 132:*22*
KIERNAN 2:*16*
KIMBALL 3:6
kind 33:*19* 46:*3*
57:*3* 88:*13* 101:*15*
103:*23* 105:2 115:*11*
129:*18* 140:*3*
know 8:*19, 21, 23, 24*
9:5 11:*20* 14:*13*
15:*17* 17:*18* 20:*22*
21:6 22:*12* 24:*12, 16,
17, 18* 25:*1, 21* 26:*7,
12* 31:6, *12* 33:*4, 7, 9*
35:*23* 38:*1* 40:*14*
41:6 46:*13* 48:*14, 20*
52:5 53:5 57:*10, 12*
64:*22* 65:*12* 66:2, *5,
11* 68:*21* 71:9 73:*10*
75:5 82:*20* 83:*21*
84:*11* 85:3, *14, 19*
86:2, *5, 6* 88:*3* 89:*23*
90:6 92:*22* 97:*12*
101:*22* 102:*11*
103:*23* 104:*13*
106:*18* 114:6, *21*
116:*3* 126:9 127:9
133:2 135:*11* 137:*18,
24* 142:*22* 148:*12, 20*

knowledge 15:*23*
27:*11* 74:5 85:*16*
Kudos 41:*3*

< L >
laid 60:5
LALITHA 1:*10* 2:*19*
landline 58:*21*
language 46:*18* 70:9
large 125:*17*
late 131:*22*
LAW 2:*3, 9* 12:*21*
lawyer 9:*19*
lays 98:*12* 102:*13*
lead 94:*18* 122:7
leadership 143:*17, 24*
learn 78:2
leave 37:*3* 45:*13*
78:*20* 147:*23*
leaves 149:*13*
leaving 132:2
led 103:*19* 110:6
112:*4*
left 90:*12* 136:*21*
legal 34:*8*
letter 63:*11*
level 24:*19, 23* 92:*22*
93:*16* 96:8 125:6, *7,
11*
Lewis 7:*20* 132:8, *20*
liaised 86:*4*
liaison 150:*4*
licensed 16:*1* 21:*11,
14* 22:*18, 19* 25:*3, 15*
30:*14* 38:*18*
lieutenant 132:*13*
lieutenants 14:*8* 99:5
life-saving 40:5 73:5
life-threatening 30:2
light 103:*18*
Lincoln 12:2
Line 5:*3, 7, 12, 17*
45:*10* 144:*21* 152:5
link 58:*23*
Lisa 1:*20* 154:*3, 6*
list 31:*21* 58:5
79:*13, 17*
lists 50:*9*

**little** 13:*18* 27:*5* 38:*6* 54:*1* 125:*18* 148:*22*

**living** 63:*21*

**LLC** 37:*12*

**LLP** 3:*6*

**located** 18:*15*

**location** 23:*11* 24:*4* 26:*10*

**Lock** 32:*13, 16, 19, 21* 33:*4, 12, 14* 34:*4, 9, 13* 89:*4, 11* 96:*14, 17, 18, 19* 97:*14* 98:*4, 13, 21* 99:*11*

**log** 97:*24*

**LOGAN** 3:*14*

**logbook** 79:*5*

**long** 10:*24* 11:*14* 17:*7* 136:*22*

**look** 16:*16* 20:*4* 27:*8* 35:*1* 47:*22* 60:*23* 62:*14* 86:*19* 99:*9* 101:*16, 24* 102:*6, 22* 103:*2, 8, 15, 17, 23* 104:*4* 107:*17* 121:*18, 20* 122:*18* 125:*21*

**looking** 36:*4* 39:*13* 40:*19* 61:*17, 21* 65:*19* 70:*20* 71:*13* 103:*12* 104:*10, 11, 16, 22* 105:*2, 9, 16, 23* 106:*3, 4* 117:*21* 118:*5* 120:*8, 9* 122:*10* 130:*17* 140:*19*

**loss** 145:*11, 12*

**lost** 56:*17* 58:*16* 90:*22*

**lot** 46:*20* 68:*22* 118:*8*

**loud** 8:*14*

**LOUIS** 1:*5*

**lower** 89:*20*

**Lt** 133:*9, 14, 17*

**lying** 72:*4*

< M >

**maintained** 21:*13* 22:*7* 136:*1*

**maintaining** 30:*15* 135:*24*

**major** 13:*23* 17:*22*

**majority** 118:*3* 129:*23* 140:*8*

**making** 70:*16, 22* 76:*6, 10, 18* 77:*1, 3* 94:*10, 14* 117:*16* 139:*3* 143:*20* 144:*13* 145:*14*

**male** 95:*10, 11*

**managed** 22:*7*

**management** 55:*1* 144:*20*

**Manager** 13:*3*

**manages** 100:*5*

**managing** 41:*3* 58:*2*

**mandatory** 98:*1*

**manner** 91:*20*

**MANSUKHANI** 3:*13*

**March** 113:*20* 134:*21*

**MARIESHA** 1:*10* 2:*19* 146:*13*

**Marked** 5:*12* 47:*17* 125:*20*

**MARKET** 2:*17*

**Marshall** 109:*4* 122:*2*

**Master's** 11:*23* 21:*3*

**Mathis** 138:*10*

**matrix** 124:*16*

**matter** 7:*19* 94:*22* 146:*13*

**MAUREEN** 1:*10*

**Mawr** 12:*2*

**MBA** 21:*1*

**mean** 18:*18* 24:*6* 28:*18* 44:*13* 46:*4* 48:*18* 67:*21* 68:*3* 82:*22* 83:*19* 84:*19, 20, 21* 85:*20, 22* 106:*18* 123:*14* 148:*24*

**meaning** 29:*2* 147:*15*

**means** 123:*12* 127:*13* 154:*16*

**measurements** 23:*5*

**measures** 85:*3* 119:*3* 140:*23* 141:*9* 142:*2, 7, 8*

**mechanism** 82:*20*

**medical** 15:*13* 16:*7, 10, 14, 17* 17:*1* 20:*1, 8, 9, 13, 16* 21:*7, 11, 14* 22:*9* 23:*7* 24:*4, 11* 25:*1, 8, 11, 14* 26:*1, 5, 11, 23* 27:*12, 18* 29:*19* 30:*11* 31:*1, 2, 5, 16, 18* 32:*6, 15, 24* 33:*3* 34:*19, 22* 35:*2, 3, 16* 36:*4, 10, 24* 38:*19* 40:*6, 7* 42:*22* 43:*12, 22, 24* 44:*1, 4, 14, 19* 45:*2* 46:*1* 48:*8* 50:*6, 13, 14, 21* 51:*3, 5, 11* 53:*5, 13* 55:*18, 21* 57:*19* 59:*15* 65:*1, 10* 66:*15* 67:*2, 14* 69:*3, 5, 9, 13* 70:*3, 15, 24* 71:*10, 12, 17* 74:*3, 20, 24* 75:*4, 19* 76:*11, 16, 20* 77:*1* 78:*2, 14, 17* 79:*11, 12, 13, 16, 18* 80:*5, 14, 15, 17, 23* 83:*19* 84:*12, 18* 86:*13* 87:*15, 19, 23* 89:*16, 18, 21* 91:*3, 18, 23* 92:*8, 11* 93:*10, 17, 24* 94:*7, 17, 24* 95:*3, 17* 96:*1, 11* 98:*3* 99:*18, 23* 100:*5, 10* 101:*21* 103:*4* 105:*22* 106:*2, 21* 107:*3, 7, 18* 108:*4* 109:*23* 112:*16* 120:*4* 128:*14* 132:*14* 133:*21* 135:*16* 146:*18, 20, 21* 150:*10*

**medical-certified** 81:*10*

**Medical's** 94:*5*

**medicate** 30:*4*

**medication** 22:*23, 24* 24:*3* 26:*18* 27:*2, 12, 23* 29:*21* 30:*8, 16* 31:*20* 32:*23* 35:*7* 36:*4, 18* 44:*17, 18, 22*

**measures** 45:*6, 15* 55:*1* 59:*23* 65:*17, 18* 66:*1* 67:*20, 21* 97:*21*

**medication-compliant** 29:*23*

**medications** 15:*21* 23:*2, 13* 26:*24* 29:*16* 35:*15* 36:*10* 79:*9*

**med-line** 31:*19, 24*

**meet** 22:*19* 110:*1*

**meeting** 38:*12* 112:*2* 115:*3* 135:*13* 150:*17, 22*

**meetings** 21:*10, 19* 22:*3* 43:*7* 57:*18* 112:*15*

**member** 69:*6* 118:*21, 22* 126:*20*

**members** 118:*9* 119:*5* 138:*12* 139:*3, 21*

**memorize** 46:*23*

**mental** 103:*4* 147:*17* 148:*1, 8*

**mentioned** 30:*7* 35:*19* 141:*20* 147:*2*

**message** 145:*15*

**method** 56:*3*

**methods** 21:*6*

**MICHAEL** 2:*5* 38:*11*

**MICHAEL.PESTRAK @PHILA.GOV** 2:*10*

**middle** 46:*5, 7* 56:*18*

**Mini** 6:*9, 19, 23*

**minimize** 140:*18*

**minimum** 54:*9*

**minutes** 136:*4, 24*

**mischaracterizing** 63:*11*

**misconduct** 123:*8, 9, 12* 126:*17, 24* 138:*6*

**missed** 27:*11* 30:*11* 36:*3, 5, 11, 17, 20, 23* 40:*1* 48:*16* 108:*4* 113:*13*

**missing** 36:*9* 107:*18*

**mm-hmms** 8:*15*

**modify** 124:*22*

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 57 of 75

Deposition of Blanche Carney
Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

module 50:22
modules 130:23
moment 37:21 47:1,
5 109:7 112:10
126:8
monitor 28:15
110:21
monitored 56:15
57:1
monitoring 54:21
58:1 82:6 111:8
114:19
monitors 111:16
113:19 133:14
monthly 27:22
months 17:10 27:22
57:13, 14 110:18
morning 7:17 146:15
Morris 138:9
mortality 99:17, 22
100:15 101:1, 5, 9, 14
102:7, 15 105:20, 21
106:17 107:1, 11, 16
108:3, 9, 13, 15, 18
109:5, 7, 12, 17, 18
110:22 111:3, 7
113:8, 23 119:22
120:3 147:2 148:13
move 56:9 72:3, 6
multiple 57:8 105:2
Murphy 138:8

< N >
name 7:18, 22 37:19
38:9 86:12, 22
149:21
names 44:23
narrative 138:15
National 62:4, 7, 9,
13 63:6
nationally 62:2
nature 38:15 59:21
necessarily 15:19
33:3 57:22 60:8
76:13 81:22 110:12,
17
necessity 94:18
need 6:6, 11 9:4
10:7 22:4 46:18
70:24 71:17 80:4, 5

83:12 94:1 96:8
102:14 103:24
120:13 130:10
131:23 138:1 139:7
needed 30:3 80:20
92:21 103:18 117:14
142:12
needs 71:7 76:4
91:3 93:10 105:12
122:24
Need-to-know 34:23
never 29:3, 6
new 48:5 145:7
147:19, 21
newly-hired 145:16
nods 8:15
non-chronic 29:9
non-compliance
142:11
non-compliant 39:21
non-emergency 81:16
non-movement 70:5
nonresponsive 70:1
non-responsive 70:11
nonverbal 70:5
non-voting 124:4
normal 23:1
normally 50:21
no-shows 107:12
Notary 1:21 154:3
note 97:13, 15
noted 153:8
notes 33:22 34:7, 21
98:8 135:22, 24
136:1, 4, 5, 6 154:5
notice 83:17
noticed 49:3
notification 27:17
32:2, 3 69:8, 21
76:17 79:24
notified 44:16 69:10
74:17 81:13, 20, 24
82:3, 4, 11
notify 15:24 27:13
31:1, 18, 23 32:24
45:20 46:1 70:6
79:11
notifying 36:8 69:8
79:12, 18, 24 96:11

November 134:15, 17
nuance 147:22
number 39:5 51:22
58:23 75:9 77:14, 16
113:22 122:6 131:7
141:9 147:6, 8, 10, 12,
14, 20, 21, 24 148:2
numbers 141:8
NURSE 3:9 80:10,
24 149:23 150:13
nursing 55:2 59:24

< O >
obeying 70:14
object 16:19 93:3
96:21
Objection 10:2 11:2
24:21 33:6 40:16
53:9 63:9 67:7 72:7,
12 74:2 75:21 83:22
84:3 85:8 86:15, 24
87:6 90:15 92:13
98:24 102:10 104:5
105:5 107:20 110:24
111:9 116:11 117:10
118:11 119:8 122:13
128:1, 18 129:8, 20
130:13 135:20
139:14 140:5 141:2
142:15 143:14 144:6,
15 145:2 151:7
objections 7:6
obligations 63:21
observation 80:8
observations 38:21
76:19
observe 77:9 78:12
observing 71:18 81:7
obtain 22:21 36:14
obtained 47:11
136:10
obtaining 31:3
obviously 83:2
occasion 21:21 35:14
Occasionally 48:16
occasions 36:9 118:7
occur 27:1 85:15, 20
occurred 83:20
111:13, 24 119:19

121:5 136:16 144:22
occurrence 104:8, 15
occurrences 55:11
104:23
occurring 26:18, 19
75:19 83:7
occurs 135:12
O'CONNOR 3:6
OCTOBER 1:14
offer 111:6
Office 108:19 109:1
120:24 121:3, 6, 24
122:9 123:24 124:10
125:4, 22 128:11
132:19 136:8
officer 16:15, 20
20:8, 9, 14, 16 26:23
31:1, 16 36:7 44:23
45:16, 19 55:19 69:5,
20 70:2 71:7, 20
72:13 74:18 75:15,
16 76:18 78:4, 7
79:4, 15, 18, 21 80:12,
16 81:1 89:8, 11
97:2 103:10 123:14
124:9 126:13 132:12
officers 14:9 18:4
52:21 70:12 71:11
75:3 77:7, 12, 13
78:12 91:5 97:12
98:12, 22 127:7, 23
131:16
officer's 70:21 71:14
75:17 80:3
oh 47:5 58:18
Okay 9:22 13:11
18:6 32:18 33:13
38:3, 4, 8, 24 39:4, 11
47:9 54:14 59:4
61:6, 9 63:14 64:13,
19 65:8, 15 68:21
86:22 87:24 94:4
97:8 99:13, 21 101:5,
8 106:17 109:12
111:21 112:24 114:9,
15 121:22 122:3, 9
125:18, 19 126:5, 11,
12 127:5, 21 135:4
137:8, 21, 23 138:3

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

139:2  147:15  148:11
149:2, 3, 4
omitted  96:19
once  39:8  83:21
129:17  147:6
one-and-done  145:19
one-time  35:14
ongoing  15:11  20:10
28:6  43:10
OPC  121:18, 22
122:15, 23  123:3, 11,
20  134:23
open  41:23
operations  18:24
19:1
opportunity  88:7
120:20  136:15
138:24
opposed  16:7  117:8
opting  139:18
Oral  1:17  21:23
22:1  42:5  43:5
55:23  56:2, 4, 10
68:16, 17
order  10:18  30:4
78:5  138:18  144:4
147:23  148:3, 4
ordered  22:23
144:12
ordering  145:22
orders  70:15
org  86:19
organization  62:14
original  154:5
outside  73:22  95:20
115:19
overall  13:14  14:1
17:21  19:1, 18  20:11
21:13  22:7  34:17
67:20  68:7  100:3
106:4  119:23
overarching  60:3
oversight  13:21  20:2,
6  21:7  53:23

< P >
p.m  151:23
PA  2:18  3:7, 15
packet  101:12

PAGE  4:5, 8  5:3, 7,
12, 17  8:13  37:22
47:3, 22  48:11  49:15
50:1  53:4, 18  61:3, 7,
11, 19  62:24  64:1, 2
66:10  125:21  134:16,
17  137:19, 22  138:2,
3  152:5
pages  153:4
pains  84:6
paint  140:16
panel  124:5
paperwork  32:9  34:8
paragraph  38:4
61:23  64:8, 17  114:3,
4  126:19
parentheses  39:23
part  22:2  34:2
40:10  45:23  50:2
52:23  55:13  60:23
76:23  77:2  79:24
88:23  90:1  101:11,
12  103:6  105:19, 21
108:4, 12, 20  113:9
121:3, 13  122:19
124:5  136:13  139:20
participate  14:22
113:10
participated  150:23
participation  34:6
148:16
particular  20:7  60:6
67:3  101:17  104:3
108:6  116:21  118:13
139:4
parties  16:1
parts  116:23
pass  45:2, 12
passage  38:1
passes  104:13
patient  23:3  30:12
31:7  35:6  55:10
62:23  85:1, 6  106:22
patients  25:20  39:17,
19  41:11  44:16, 20
65:20  91:24  92:21
93:9, 19
patient's  65:11
84:13, 15  96:1  102:2

pattern  104:16, 19
106:1  129:4  143:8
patterns  83:17, 18
84:2  105:4  106:7, 14,
16  110:6  116:9
PDF  64:1
PDP  12:9  13:2
14:16  15:4  16:23
26:17  28:18, 21
33:15  37:3  38:16, 17
46:21  52:15  65:9
82:16  88:9, 14  91:6
92:20  93:9  94:23
99:15  102:2  105:1
107:8  109:13  113:4
114:9  132:2  134:7
135:6, 17  138:6
139:13  147:19  148:9,
10  150:4
penalties  124:16
PENN  2:17
PENNSYLVANIA
1:2  2:4, 10  154:4, 10
people  35:3  72:20
76:8  108:11  116:18
133:12, 15  136:3, 15
140:14
perception  71:15
perform  76:15  130:3
Performance  54:15,
16, 17  55:13, 17
56:12  129:1  130:1
performed  126:14
131:15  139:24
141:17
performing  133:22
period  102:5  110:11
111:13  130:10  145:9
147:3, 4  148:12, 15
periods  27:12
person  29:16  30:3, 8
31:9  36:9  45:20
46:2  65:24  69:2
70:1, 7, 18, 23  71:2, 9
72:3, 6  74:18  78:19
79:19  81:2, 12  87:13
89:6, 9  92:6  93:24
94:2, 11  95:22  97:3
118:1  120:1  133:11,
13

personnel  14:10
74:4  115:17  128:14
persons  135:14
person's  34:18  103:7
112:5
pertaining  99:14
PESTRAK  2:5  6:6,
8  10:2  11:2  16:18
23:19  24:21  33:6, 16
53:10  54:1  56:17
58:11, 16, 20  59:6
67:7  72:7, 12  74:2
75:21  83:8, 22  84:3,
17  85:9  86:16  87:1,
7  90:15  91:7  92:13
93:2  96:20  98:24
102:10  104:5  105:5
107:20  110:24  111:9
116:11  117:10
118:11  119:8  122:13
128:1, 18  129:8, 20
130:13  136:22  137:2
139:14  140:5  141:2
142:15  143:14  144:6,
15  145:2  146:4
148:19  149:2, 8, 13
151:7, 14, 19
ph  86:23  137:11
pharmacies  65:6
Pharmacist-Directed
64:21, 23
pharmacy  55:4
PHILADELPHIA
1:9, 10  2:4, 9, 10, 11,
12, 18  3:7, 15  4:13
7:21  8:7  11:10
12:14, 16  22:11
47:24  63:4  82:18, 22
85:2  147:19
phone  32:4, 6, 9, 24
58:22
phrase  118:18
phrasing  10:17
physical  89:2
physically  130:22
147:22
physician  55:2
PICC  24:2
pill  25:22

**PIP** 54:*14, 20* 56:*15, 18* 57:*3, 12, 21*
**place** 31:*7* 33:*22* 42:*8* 43:*1* 74:*22* 82:*5* 84:*12* 88:*7* 91:*1* 93:*21* 103:*18* 112:*24* 115:*9* 131:*6* 141:*6, 10, 23, 24* 143:*3* 154:*5*
**placed** 87:*14* 89:*4, 24* 130:*23*
**placement** 94:*15*
**placing** 93:*9*
**Plaintiff** 150:*15*
**Plaintiffs** 1:*7, 19* 2:*5* 7:*19*
**plan** 39:*21* 42:*8* 43:*1* 54:*7, 15, 16, 17* 56:*12, 15, 18* 57:*3, 12* 62:*22*
**Plans** 55:*14, 17, 19, 22, 24* 57:*21*
**platform** 34:*4, 17* 96:*23* 114:*17* 116:*14*
**play** 44:*12* 87:*16*
**played** 44:*15* 103:*6*
**please** 7:*21* 8:*24* 9:*6* 38:*6* 61:*15* 64:*11* 93:*6* 95:*6* 125:*16, 18*
**POD** 126:*22*
**point** 16:*21* 22:*22* 66:*1*
**pointing** 59:*19* 60:*6*
**police** 147:*5*
**policies** 15:*19, 22* 46:*21* 91:*2, 13* 99:*13* 103:*13, 17* 118:*10, 14* 120:*11, 15* 122:*16*
**policy** 16:*8* 46:*17, 19* 88:*9, 15* 90:*2* 91:*21* 98:*11, 15* 103:*24* 104:*10, 14* 105:*12* 108:*22, 23* 114:*18* 115:*6* 116:*10, 21, 23, 24* 117:*8, 12, 13, 19, 22, 23* 118:*1, 4, 15, 20* 119:*5* 122:*11, 19* 123:*16* 127:*24*

128:*17* 135:*17* 139:*7, 19* 140:*4, 23* 141:*18*
**poorly** 39:*22*
**population** 13:*10* 16:*4* 18:*23* 41:*12, 15* 42:*1, 12* 52:*14, 23* 75:*8* 76:*3*
**portal** 65:*2, 11* 66:*4*
**portion** 90:*22*
**portions** 33:*12* 34:*11*
**position** 11:*1, 8* 17:*4* 19:*17, 23*
**positions** 13:*1*
**possible** 75:*18* 76:*11* 90:*3* 104:*24*
**post** 52:*12*
**posted** 49:*22*
**post-high-school** 11:*20*
**potential** 70:*15* 74:*23* 78:*17*
**potentially** 40:*4*
**practitioner** 22:*18, 19* 67:*22* 81:*10*
**practitioners** 71:*12*
**predates** 112:*23*
**preloaded** 96:*24*
**prepare** 9:*14* 19:*12*
**prepared** 9:*11*
**prescribed** 29:*21*
**prescription** 65:*12, 16*
**prescriptions** 65:*5, 19, 22*
**present** 1:*22* 94:*8* 111:*17* 124:*6* 150:*16*
**presented** 77:*18* 89:*1* 95:*4* 120:*17* 121:*12* 150:*17*
**presenting** 81:*5*
**presently** 45:*22*
**presents** 124:*11*
**pretty** 95:*16*
**preventing** 130:*11*
**previous** 110:*13*
**previously** 128:*8*
**primarily** 120:*3* 122:*7*
**primary** 84:*9*
**prior** 9:*20* 11:*8* 12:*18* 14:*16* 110:*18*

114:*12* 115:*7, 17* 132:*2*
**Prison** 87:*14* 88:*2* 90:*1* 92:*23* 93:*11* 99:*19*
**prisoners** 95:*10*
**PRISONS** 1:*10* 2:*12* 8:*7* 11:*11* 12:*16* 13:*16* 14:*23* 17:*23* 19:*4* 20:*6* 22:*12, 14* 38:*23* 66:*23* 72:*19* 73:*1, 2* 82:*23* 85:*2*
**privacy** 34:*21*
**Probably** 64:*12* 137:*1*
**procedure** 108:*23* 139:*19*
**procedures** 55:*6* 74:*21*
**proceeding** 119:*3*
**process** 8:*11* 26:*17, 21, 22* 27:*2, 6, 16* 30:*7, 9, 10, 21* 31:*6* 36:*20* 43:*3, 15, 19* 53:*23* 69:*7, 21* 79:*9* 88:*24* 96:*10* 98:*20* 99:*16* 105:*1, 8, 18* 108:*5, 24* 111:*7* 114:*9* 119:*12* 122:*20* 123:*19* 127:*18*
**processes** 27:*20*
**processing** 97:*3*
**procure** 131:*18*
**procured** 130:*19* 131:*10* 142:*5*
**procuring** 141:*7*
**produced** 47:*11*
**Production** 5:*7*
**Production002649** 37:*15*
**Production004786** 125:*20*
**Production005109** 137:*10*
**Production005130** 138:*5*
**professional** 25:*15* 108:*19* 109:*2* 120:*24* 121:*3, 7* 122:*1, 9*

124:*1, 11* 125:*5* 136:*9*
**professionally** 20:*23*
**Program** 13:*5* 17:*24* 18:*2, 21* 61:*24* 120:*2, 10*
**programs** 34:*6*
**progress** 43:*6*
**pronounced** 137:*13*
**proper** 133:*18, 20*
**Proposal** 49:*19* 50:*2, 12* 60:*24* 61:*1, 20, 21* 63:*3* 66:*13*
**Proposals** 49:*17*
**Proposed** 60:*22* 61:*18*
**propounded** 153:*7*
**protection** 34:*22*
**protocol** 29:*17* 45:*15* 133:*18* 139:*13*
**protocols** 84:*12*
**provide** 13:*21* 14:*18* 19:*10* 20:*2* 29:*20* 50:*13* 53:*6* 54:*11, 21* 58:*2* 63:*4* 73:*5, 24* 74:*9* 80:*6* 83:*13* 91:*17, 20* 111:*17*
**provided** 15:*1* 19:*10* 25:*24* 50:*20* 51:*3, 4* 66:*4* 67:*1* 73:*7* 88:*16, 20* 91:*18* 92:*1* 93:*19* 100:*10* 120:*10* 131:*7* 146:*17* 150:*10* 151:*6*
**Provider** 4:*8* 20:*1, 5, 13* 21:*15, 20* 25:*3, 6, 12* 26:*1* 27:*18* 30:*14* 31:*16* 40:*7* 43:*22, 24* 44:*1, 4* 47:*23* 50:*13* 51:*3, 5* 53:*5* 54:*10* 55:*21* 65:*23* 67:*14* 80:*18, 23* 84:*13, 19* 85:*12* 87:*15* 89:*2, 18* 93:*17* 132:*14* 146:*21*
**providers** 21:*11* 42:*22* 43:*12* 65:*2* 146:*18*
**provider's** 68:*9*
**provides** 14:*20* 16:*8* 18:*22* 50:*21* 79:*14*

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 60 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

providing 13:9 21:7
52:12, 20 53:23
73:20 79:17 85:6
93:1 121:5 142:21

provision 15:13 25:8
44:9 48:7 67:17

Public 1:21 154:3, 6

Puerini 38:11, 12, 14,
19 39:12 40:11
41:16 43:18

pulled 41:12, 14

pulse 74:15, 19 82:14

purposes 94:10

put 42:8 43:1 71:21
91:1 92:3 96:16
103:16 131:5 141:9
143:3

putting 94:16 141:5,
22

< Q >

QA 54:7

quality 28:2 53:18,
19 85:4 151:5

quality-assurance
26:23 27:4

quarter 110:13, 14

quarterly 57:17
109:5, 12, 16, 18
110:8, 22 111:3

question 8:20 9:2, 3,
6, 7 10:17 14:13
23:21 25:18 27:10
29:1 33:17 56:10
61:15 66:2 68:23
70:13 75:6 77:10
88:11 89:19 93:4, 5
95:6, 15 96:22 97:10
102:17 108:2 114:7
117:9

Questions 5:12 7:7
8:19 22:21 37:24
47:4 60:18 88:13
97:1, 5 108:3 146:3,
5 149:10, 11 153:6

quickly 56:5, 7, 11

quite 13:18

< R >

raise 89:9

raised 35:23

range 14:24 57:5
124:15

rank 13:24 14:6
17:23 21:16 86:8

RAY 3:1 149:14, 22

read 41:6 114:2, 3
123:3 137:24 153:4

readily 116:3 130:16
131:8

reading 7:4 24:24
40:12 127:9 132:23
137:17

readings 24:8

readmitted 147:12,
15, 18

read-only 33:11
34:7, 10, 24

really 19:14 143:9

reason 35:18 36:14
81:8 116:15 136:6

reasonable 41:4

reasons 77:6, 14
107:12 134:6

recall 21:2 39:2, 9
40:18 42:18 44:6
48:3 68:18 73:16
86:7, 9, 11 87:8 88:4
98:11, 16 100:17
106:7, 13, 15 107:13,
16, 23 113:14 120:19
126:2, 3, 5 127:5
134:10 135:4, 7, 10,
15, 19 146:1 150:7,
14 151:2

recalling 40:20
46:16 98:15

receive 11:24 15:8,
12, 18 16:13, 24
22:24 23:4 31:20, 22
41:22 45:3 50:7
51:22 52:8, 10 66:16
67:24 68:8 73:20
78:15 98:3

received 11:21 14:15
67:4 122:18 128:23

receives 65:24

receiving 53:1 67:13
82:8 84:19 87:23
124:19

recess 59:8 137:5

recognize 37:19

recognized 62:2

recognizing 46:14
69:13

recollect 132:10

recollection 9:1
36:21 57:16, 18 65:6,
21 73:22 86:14 88:5,
8 98:1, 7 102:3
107:2 113:12 122:17,
23 123:2 127:3
129:3, 11 131:22
132:6, 15 133:6
136:8 137:20 138:20
144:9 150:11, 19

recommendation
120:18, 21 124:19, 21,
22, 23

recommendations
38:21 53:13 62:10
109:9, 11 111:18
114:20

recommended 115:4

recommending 122:23

record 7:22 10:15
24:11 25:11, 14
26:11 31:5 33:14, 23
34:19 35:2 37:14
49:12, 20 61:10 64:3
96:1 115:23 126:12
127:13 131:12

recorded 89:4

records 9:19 55:7

record's 106:11

recurring 130:12

red 35:22 36:12
135:17

red-flag 29:17 35:15,
19 36:1, 2, 16

REES 3:13

referral 125:8

referring 99:24

refers 137:10

refresh 9:1 86:14
127:2 129:3 133:5
138:20

refresher 73:10, 13,
15, 17 142:17 143:10,
22 144:4, 13 145:4, 6,
16

refreshers 145:21

refreshes 137:20

refusal 27:3 30:22
31:4, 8, 11, 14 32:5
35:6, 9, 18 36:15
98:2, 9

refusals 30:18 39:24
40:4, 8 41:10 42:15

refused 29:16 31:7,
9 32:22 35:7

refuses 27:2 30:8

refusing 30:11 72:3
78:20 79:8, 19

regard 16:16 42:13
53:22 60:11 73:20
82:11 83:17 101:16,
24 106:9

regarding 20:10
38:21 60:14 108:22
110:2

regards 107:18

regular 22:2 41:9
58:5, 12, 14 75:7
76:24 77:7 82:2

regularly 41:4 59:13,
15

reiterate 145:8

reiterating 142:20

reject 124:22

related 8:8 34:1

relationship 20:1

relative 150:9

released 147:11
148:3, 4

relevant 10:19 58:7
101:16

rely 58:6

relying 80:15 95:21

remain 58:15

remains 148:2

remember 8:4, 23
17:9, 15 38:12 39:5,
8 40:10 44:3 74:14
116:1 132:8 135:2
137:14, 15

remembering 12:10

Case 2:24-cv-05618-TJS   Document 160-1   Filed 01/09/26   Page 61 of 75

Deposition of Blanche Carney                                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**REMIC** 110:*21*
111:*8, 16* 113:*19*
**render** 23:*10, 12*
69:*11* 92:*9* 125:*10*
126:*21* 128:*15*
**rendered** 93:*20*
124:*17* 126:*15* 139:*1*
**rendering** 23:*2*
144:*5* 151:*10*
**renders** 124:*13*
**repeat** 54:*3* 61:*14*
77:*10* 91:*9* 93:*5*
95:*6*
**repetitive** 150:*1*
**rephrase** 29:*1* 74:*8*
76:*21* 148:*19, 22*
**report** 21:*18* 28:*13*
29:*6* 39:*12* 40:*11*
41:*17, 19* 42:*3* 43:*11*
45:*2* 46:*2* 69:*9* 92:*8*
102:*13, 16* 111:*19*
113:*20* 124:*1, 20*
126:*6* 127:*8, 13*
132:*16, 18* 134:*21*
136:*3*
**reported** 132:*14*
**Reporter** 1:*21* 6:*4,*
*10, 15, 20* 8:*16, 22*
48:*17* 154:*17*
**Reporter-Notary**
154:*6*
**reporting** 69:*10*
**reports** 21:*15, 19, 22*
29:*8, 12, 15* 42:*11*
43:*6, 18* 51:*10* 68:*6,*
*15, 16, 17* 82:*7*
100:*14, 16, 18, 23*
109:*8* 114:*13* 123:*3,*
*4, 6, 8* 125:*14* 147:*2*
148:*14*
**represent** 141:*14*
146:*12* 149:*22*
**reproduction** 154:*16*
**Request** 5:*7* 47:*12*
49:*16, 19* 50:*1, 12*
60:*24* 61:*20* 66:*12*
69:*8* 94:*8* 99:*3*
**require** 54:*18*
117:*23* 128:*12*

**required** 14:*21* 30:*3*
31:*10, 23* 96:*16*
126:*23* 129:*13* 130:*1*
138:*14*
**requires** 57:*8* 104:*23*
**Research** 12:*4*
**reserved** 7:*8*
**resources** 141:*7*
**respective** 15:*24*
51:*10*
**respond** 27:*10* 69:*18*
**responded** 42:*18, 21*
97:*2*
**responding** 15:*17*
70:*8, 20* 89:*10*
**response** 27:*17*
29:*18* 43:*6* 60:*24*
61:*20* 80:*8* 145:*23*
**responses** 42:*2*
**responsibilities** 13:*2,*
*13* 14:*1* 17:*20* 18:*11*
34:*3* 52:*24*
**responsibility** 13:*14*
17:*21* 18:*14* 19:*19*
20:*12* 22:*8* 28:*8*
31:*18* 72:*24* 100:*4*
**responsible** 15:*23*
18:*24* 19:*6, 7* 28:*12*
31:*2* 35:*24* 44:*8*
55:*16* 63:*19* 72:*14*
75:*18* 76:*14* 122:*8*
**responsive** 42:*21*
**Restorative** 13:*6*
18:*20* 19:*7*
**resulted** 121:*10*
**retired** 145:*13*
**retirement** 117:*4*
**revealed** 129:*5*
**review** 33:*4* 34:*15*
37:*22* 39:*12* 46:*17*
57:*21* 65:*11, 15* 68:*2,*
*3, 5, 12, 13* 84:*15*
85:*4* 99:*16, 17, 23*
101:*5, 9* 102:*15*
104:*23* 107:*1, 6, 17*
108:*13, 15, 18, 20, 21*
109:*10* 110:*9, 19*
111:*7, 15, 22* 112:*11,*
*12* 113:*7, 8, 11* 116:*8*
120:*3* 124:*20* 125:*23*

126:*6, 8* 129:*16*
133:*2* 134:*11* 138:*24*
139:*8*
**reviewed** 9:*19* 22:*6*
38:*2* 39:*20* 59:*13, 15*
67:*19* 85:*13* 106:*16*
107:*4, 9* 133:*3*
**reviewing** 33:*21, 24*
41:*18* 47:*21* 65:*16*
67:*17* 68:*18* 99:*14*
100:*6* 104:*20* 115:*3*
132:*16* 139:*5*
**reviews** 27:*22* 99:*22*
100:*2, 7, 10, 15* 101:*2,*
*10, 14* 102:*7* 105:*20*
106:*17* 107:*11* 108:*3,*
*9, 16, 18* 109:*6, 8, 13,*
*17, 18* 110:*8, 22*
111:*4* 112:*8, 22*
114:*13* 115:*2, 8*
119:*22* 135:*23*
**revision** 104:*24*
**right** 7:*17* 17:*4*
35:*23* 37:*7* 41:*8*
47:*2, 5* 49:*15* 50:*9*
51:*16* 53:*17* 61:*9*
62:*19* 71:*24* 76:*21*
83:*2* 89:*21* 91:*22*
94:*6, 23* 95:*1* 107:*4*
113:*18* 115:*9* 118:*17,*
*22* 123:*14* 127:*15, 19*
134:*7* 140:*22* 146:*1*
**rights** 33:*11* 34:*8, 24*
**Right-to-Know** 47:*12*
**rise** 125:*7*
**Robinson** 138:*10*
**robots** 116:*19*
**role** 8:*6, 8* 11:*12*
13:*19* 44:*11, 15*
87:*16*
**roles** 14:*18*
**roll** 51:*20, 21* 52:*2*
142:*18* 144:*19*
**roll-call** 51:*5*
**room** 81:*18* 82:*12,*
*17* 83:*6, 18* 84:*14*
85:*1, 7*
**Rosa** 138:*8*
**Rosado** 125:*24*
**round** 97:*16*

**rounds** 75:*24* 76:*6,*
*10, 24* 77:*1, 3, 8, 12,*
*13* 78:*5* 97:*13*
129:*13, 24* 130:*3*
**routine** 30:*1* 76:*13*
82:*2* 128:*7* 145:*18*
**rules** 8:*12* 142:*11*

**< S >**
**safety** 73:*1* 120:*12*
128:*13*
**Samicheilli** 137:*11*
**Samichielli** 137:*16*
**saying** 40:*21* 49:*7*
66:*14* 92:*5* 106:*12*
136:*12* 147:*20*
**says** 37:*11* 39:*16, 19,*
*24* 40:*3* 42:*14, 17*
50:*5* 52:*4* 54:*7*
60:*21* 61:*7* 62:*1, 24*
113:*23* 115:*1* 127:*21*
132:*21* 133:*8* 138:*4,*
*16*
**scanner** 131:*2*
**scanners** 142:*2*
**scenario** 22:*6* 84:*24*
121:*11*
**scenarios** 71:*23*
83:*20*
**scene** 80:*10*
**schedule** 41:*5, 9*
57:*11* 109:*20*
**scheduled** 26:*24*
27:*1* 31:*22* 111:*24*
124:*2*
**School** 12:*3*
**Science** 11:*22*
**Scope** 60:*22* 61:*18*
101:*15* 120:*6*
**screen** 6:*5* 37:*7*
45:*5* 60:*17* 61:*5*
64:*10* 113:*17* 125:*12*
132:*17* 137:*9* 149:*9*
**screening** 55:*8* 88:*23*
**scroll** 61:*3, 4* 132:*24*
138:*1*
**SCULLY** 3:*13*
**sealing** 7:*4*
**second** 62:*18* 114:*4*

134:*17*

**section** 53:*18*

**secured** 133:*16*

**security** 71:*1, 4* 73:*1*
77:*20* 87:*20, 21* 94:*9,
12, 19, 21, 23* 119:*24*
120:*13* 124:9 128:*13*
142:*1, 6*

**security-related** 103:*5*

**see** 30:*23* 35:*12, 17*
36:*11* 37:*8, 10* 38:*3,
10* 39:*16* 41:*3* 46:*18*
47:6 48:*19* 49:*15*
50:*2* 53:*18* 60:*18, 21*
61:*6* 64:*8, 14, 15, 16,
17* 65:*3* 66:*8* 80:*3*
83:6 84:*15* 87:9
98:*21* 99:*3* 102:*12*
103:*9, 12, 15, 23*
104:*22* 105:*24* 108:*8*
109:*11* 113:*21, 24*
117:*21* 122:*10*
125:*14* 131:*23, 24*
134:*14* 136:*20*
137:*20* 138:*23* 139:*1*

**seeing** 41:*8* 80:*4*
110:*6* 132:*15*

**seek** 16:*9* 92:*20*
119:*1*

**self-reports** 95:*21*

**sent** 46:*2* 81:*12, 18*
82:*12* 84:*14* 85:*1, 6*

**sentence** 52:6 54:*20*
62:*19*

**Sentinel** 100:*23*

**separate** 34:*19*

**separated** 94:*17*

**September** 114:*5*

**Sergeant** 138:*7*

**sergeants** 14:*8* 99:*4*

**series** 22:*3, 20* 97:*4*
100:9 104:*8*

**serious** 91:*3* 127:*24*
128:*16*

**serve** 64:*5*

**Service** 13:*3, 4* 18:*2,
21, 22* 52:*12* 131:*18*

**Services** 11:*23* 13:*6,
9* 15:*1* 16:*3* 17:*24*
18:*20* 19:*8* 20:*11*

22:9 23:*12* 24:*4*
25:9 41:*24* 48:*8*
49:*23* 52:*20* 54:*19*
55:*2, 3, 4, 5, 6, 7, 9, 10*
59:*15, 17, 24* 80:*19*
87:*14* 88:*2* 90:*1*
91:*20, 24* 92:*2, 7, 24*
93:*11* 120:*2, 9, 10*
131:*7*

**set** 36:*20* 55:*20*
59:*22* 63:*5* 104:*3*
137:*8* 154:*6*

**setting** 15:*2* 26:*5*
40:*7*

**settings** 15:*14* 62:*12*

**seven** 8:*5*

**severe** 82:*14*

**share** 37:*6* 47:*2, 3*
60:*17* 110:*2* 113:*16*
125:*12* 132:*17* 137:*9*

**sharing** 45:*4* 132:*7*
142:*19*

**Sheet** 153:*9*

**shift** 51:*23*

**shorthand** 154:*17*

**short-staffed** 90:*21*
91:*5, 14*

**show** 89:*12*

**showing** 45:*21* 61:*12*

**shown** 107:*7*

**sick** 55:*7*

**side** 63:*19* 109:*23, 24*

**sight** 89:*7*

**sign** 31:*7, 9, 11*

**signature** 31:*3* 48:*12*
153:*15*

**signed** 31:*13* 38:*10*
131:*21*

**significant** 54:*22*
140:*13* 145:*5*

**significantly** 39:*20*
64:*20*

**signing** 7:*4*

**signs** 16:*15* 46:*14,
16* 71:*11*

**similar** 25:*17, 18*
66:*12* 108:*1* 115:*12*

**simply** 77:*1* 93:*21*
130:*2* 139:*18* 140:*9,

*14*

**single** 82:*4*

**site** 13:*14* 14:*1*
17:*21* 18:*13* 19:*1, 18*
20:*11* 22:*8*

**sitting** 141:*12*

**situation** 72:2 78:*22*
80:*22* 81:*19* 82:*7*
123:*21* 133:*15*

**situations** 82:*10*
118:*19*

**six** 8:*5* 57:*14*

**size** 41:*15*

**slightly** 64:*11*

**smooth** 94:*21*

**Social** 11:*23* 12:*3*
13:*3, 4* 18:*21*

**Soell** 138:*8*

**solicit** 108:*21*

**solicitation** 49:*23*

**soliciting** 150:*21*

**somebody** 23:*15*
32:*22* 45:*13* 70:*14*
73:*12* 74:*1* 81:*17*
82:*11* 89:*24* 90:*4*
96:*8* 98:*3* 107:*18*
122:*4*

**somebody's** 71:*3*
95:*8*

**someone's** 84:*5*

**sorry** 47:*6* 91:*9*
148:*20*

**sound** 9:*8* 86:*23*
119:*6*

**sources** 62:*3* 95:*20*

**speak** 8:*14* 24:*15*
42:*23* 136:*10* 139:*21*

**speaking** 90:*19*
97:*12* 108:*10*

**Special** 125:*22*
132:*19*

**specialty** 55:*3*

**specific** 15:*12* 16:*14,
17, 24* 25:*1* 39:*17*
46:*18* 57:9 59:*12, 14,
19, 20* 68:*23* 75:*1*
82:*24* 88:*12* 95:*14*
98:*11* 101:*23* 105:*18*
125:*14* 141:*23*

**specifically** 24:*17*
35:*21* 42:*20, 24*
93:*18* 97:*9, 15*
102:*17* 142:*10* 151:9

**specifics** 28:*4* 102:*18*
126:*3* 135:*8* 151:*11*

**specify** 100:*20*

**spell** 7:*22* 56:*12*

**spoken** 43:*11*

**spreadsheet** 101:*6*
115:*12*

**SPRING** 2:*4*

**SQUARE** 3:*14*

**staff** 13:*8* 14:*10, 21*
15:*18, 23* 16:*7, 8, 10*
18:*4, 5* 31:*14, 17, 18*
32:*15, 21, 24* 33:*3, 21,
23* 34:*20* 44:*12*
46:*13* 50:*6, 7, 14, 15,
21, 23* 51:*6, 8, 13, 18,
22* 52:*4, 7, 9, 10, 16*
53:*1* 66:*15, 16* 67:*4*
69:*6, 9, 12* 71:*1, 4*
73:*4, 24* 74:*8, 23*
75:*7, 14* 78:*2, 21*
79:*11, 13* 87:*20*
89:*13* 90:*14* 91:*23*
92:*11* 94:*20, 23*
95:*12* 96:*7, 16* 99:*3,
18* 106:*21, 24* 109:*24*
112:*18* 116:*1, 9, 20*
117:*16* 118:*1, 3, 9, 14,
21, 22* 119:*5* 120:*11*
121:*15* 122:*11, 24*
126:*16, 20* 128:*23*
129:*4, 12, 23* 130:*2,
21* 136:*7* 138:*5, 6, 12*
139:*3, 13, 21, 23*
140:*9, 22* 141:*15*
142:*10, 20* 143:*9*
144:*21* 145:*5, 10, 11,
12*

**staffing** 75:*2* 93:*8*
141:*8*

**staff's** 148:*16*

**stage** 132:*5*

**stamps** 64:*4*

**standard** 58:*9, 11*

**standards** 53:*8*
62:*15* 63:*5, 12*

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 63 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**standing** 58:*10*, *14*
59:*16*
**start** 6:*4* 12:*15*
36:*13* 74:*19* 99:*21*
**started** 114:*14*
131:*20*
**starting** 69:7
**starts** 36:7 69:*20*
**state** 7:*22* 79:*3, 4*
**stated** 57:*23* 151:*4*
**statements** 136:*10*
**STATES** 1:*2* 63:*12*
**status** 89:*17, 20*
**stenographic** 154:*5*
**steps** 81:*4*
**stipulated** 7:2
**Stipulations** 5:*12*
**stop** 45:*4* 132:7
**straightforward** 95:*16*
**strategically** 130:*23*
**STREET** 2:*4, 9, 17*
3:*14*
**stretcher** 79:*22* 80:*5,*
*11, 13, 24* 133:*24*
**Strike** 109:*6* 151:2
**structure** 13:*24* 14:6
17:*23* 21:*17* 86:8
90:*10*
**submission** 124:*17*
**submitted** 39:*13*
124:*18*
**subordinate** 18:*1*
**substance** 153:*8*
**subtopics** 59:*23*
**suggestion** 40:*15*
42:*14* 120:*18*
**Suggestions** 40:*3*
41:*23* 42:*23* 43:*8*
111:6
**SUITE** 2:*4, 17* 3:*6,*
*14*
**SUMMER** 3:*13*
**supervises** 122:*5*
**supervision** 154:*17*
**Supervisor** 13:*4* 79:*6*
**supervisors** 144:*21*
**supplement** 143:*3*
**SUPPORT** 5:*1* 87:*9*
**supposed** 24:*9, 10, 12,*
*19* 25:*13* 26:*8, 14, 19*

30:*20* 35:*7, 22* 45:*16*
53:6 63:*15* 69:*1*
74:*22* 75:*3, 7* 77:7
78:*24* 79:*10* 87:*13*
97:*13* 98:*4, 12, 23*
118:*23*
**sure** 26:*24* 33:*10*
54:*3* 56:*8* 58:*18*
59:6 66:*3* 77:*14*
85:*21, 23* 87:*21* 93:8
94:*10, 14, 20* 97:*24*
107:*14* 128:*8* 143:*9,*
*20* 145:*14*
**surrounding** 100:*11*
106:*5*
**sustain** 124:*12*
**sustained** 123:*7, 9*
126:*16, 23* 127:*11, 14*
138:*10, 11*
**sustaining** 127:*9*
**sustains** 123:*11*
**sworn** 7:*11* 13:*8*
14:*20* 50:*20, 23* 51:*7,*
*21*
**symptoms** 16:*16*
46:*14*
**syringe** 25:*23*
**system** 32:*13, 16, 19,*
*22* 35:*20* 36:*1, 2*
45:*9* 65:*1, 2* 96:*14*
99:*9* 130:*20* 131:*11*
**systemic** 107:*17*
129:*16*

**< T >**
**Tab** 60:*22* 61:*18*
**take** 8:*16* 9:*4, 7*
21:*23* 35:*1* 59:2
74:*20* 81:*3* 104:*4*
119:*4* 126:*8* 136:*19,*
*23* 137:*1, 19*
**taken** 1:*18* 59:*9*
115:*16* 136:*5* 137:*5*
138:*17* 140:*24* 154:*5*
**takes** 94:*17*
**talk** 8:*17* 57:*24*
**talked** 69:*23* 79:*10*
141:*21*
**talking** 69:*24* 97:8

142:7 148:*13*
**talks** 42:*17*
**tasked** 114:*19*
**Taylor** 37:*17*
**Team** 100:*5* 101:*21*
135:*10, 13*
**technology** 130:*16*
**tell** 27:*5* 62:6
**telling** 9:*17* 63:*3*
**tells** 131:2
**TEN** 2:*17* 137:*1*
**tenure** 52:*17* 141:*16*
142:*23* 144:*23*
**term** 35:*24* 52:*15*
146:*22*
**terminology** 25:2, *7,*
*10*
**terms** 23:*17* 48:8
94:*14*
**testified** 7:*12* 26:*4*
30:*13* 110:*4* 128:*8*
145:*11*
**testimony** 60:*1*
142:*13*
**TGREGORY@OKLL**
**P.COM** 3:*8*
**Thank** 14:*11* 18:6
23:*17* 28:*17* 35:*5*
36:*22* 39:*11* 49:*24*
51:2 53:*17* 57:*20*
58:*4* 60:*16* 63:*18*
66:*10* 68:*21* 79:*20*
81:*11* 89:*14* 95:*11*
98:*19* 117:*13* 125:*16*
132:7 146:*14* 149:*6,*
*12* 151:*17, 20*
**thanks** 49:7
**theme** 104:*16, 19*
**themes** 104:*11*
**thing** 52:*18* 74:*15*
**things** 30:*5* 39:*23*
57:6 58:7 102:*21*
117:*20* 141:*9*
**think** 10:*4* 14:*12*
16:*19* 23:*23* 41:*1*
48:*13* 52:*20* 58:*23*
76:*22* 78:*14* 80:*14*
91:8 95:*14* 106:*13*
140:*21* 142:*9* 151:*12*
**thinks** 96:7

**THOMAS** 3:*13* 6:*10,*
*13* 149:*8, 11*
**thought** 118:*8, 20*
142:*12* 143:2
**THREE** 3:*14* 17:*14,*
*17* 27:*22* 30:*10* 36:*3,*
*5, 11, 17, 20* 39:*20*
57:*13* 73:*16* 110:*18*
**three-month** 110:*11*
**threshold** 130:*8*
**THURSDAY** 1:*14*
**tier** 89:*20*
**time** 7:8 13:*22* 15:*9*
20:*19* 22:*10* 30:*24*
35:6 44:*17* 45:*14*
71:*15, 19* 74:*18*
83:*16* 90:*12* 101:*23*
103:*9* 104:*1* 106:8
107:8 110:*14* 131:*9*
134:*19* 139:8 144:*3,*
*11* 145:*10* 146:*14*
147:*9* 149:7 150:*24*
151:*17* 154:*5*
**timeliness** 54:*24*
**times** 8:*4* 35:*20*
48:*19* 49:*4* 88:*1*
91:*4* 103:*15*
**title** 10:*4, 12, 22*
86:7, *10, 12*
**today** 6:7 9:*12, 20*
146:*16* 149:7
**today's** 9:*15*
**top** 6:*5* 37:*12* 42:*13*
60:*19* 66:*12* 89:*17*
113:*21* 134:*12* 143:*9*
146:2
**topics** 14:*24* 58:*14,*
*15* 60:*9*
**Torres** 125:*23*
**totality** 105:*23*
124:*20* 139:*22*
**totally** 40:*22* 41:*1*
**touched** 17:*18* 95:*14*
**tour** 45:*24* 46:*10*
99:*5* 127:*22*
**toured** 103:*10* 126:*22*
**tours** 76:*1* 103:*2, 8*
128:6 129:*5* 131:*5*
138:*13* 139:*4, 24*

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 64 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

140:9, 15   143:23
144:14   145:22
**Track**   32:13, 16, 19,
22   33:4, 12, 14   34:4,
9, 13   67:3   82:21, 23
89:5, 11   96:14, 17, 18,
19   97:14   98:5, 13, 21
99:11   108:4   114:24
116:14   131:11
**tracked**   82:17, 19, 21
108:8   114:11   115:21
116:5, 6   117:3
**tracking**   35:12
36:11   114:14   115:13,
18, 24   116:16   117:2
**trained**   46:14   69:12
70:3   73:4, 12   74:7, 9
80:17
**training**   14:17, 19, 20
15:5, 8, 11, 12, 18
16:13, 24   19:11   50:7,
15, 18, 19, 22   51:2, 6,
9, 20, 21, 24   52:2, 8,
10   53:2   66:16, 21, 24
67:1, 4, 6, 10, 12   73:7,
17, 19   122:24   128:24
142:22   143:1, 21
144:13
**trainings**   14:15
73:11   142:18   143:10,
22   144:4, 19, 20
**transcript**   6:7, 12
154:5, 15
**transcription**   153:5
**transfer**   48:4
**transferred**   94:2, 11
147:16, 17   148:1
**transition**   94:21
**Transitional**   13:6
18:20   19:8
**transport**   82:3, 4
**transports**   82:21
**treat**   83:12   119:1
**treated**   106:2
**treatment**   16:2   40:5
45:3   62:1, 21   100:10
120:5   150:9
**treatments**   34:7
**TREBACH,LLP**   2:16

**trial**   7:8
**triggered**   36:2
**trip**   83:4   85:22, 24
**trips**   82:17   83:6, 18
**Trivicam**   150:13
**TRIVIKIM**   3:9
149:23
**TRIVIKRAM**   1:10
86:22
**true**   94:13   154:4
**try**   84:22   105:3
116:9   119:4   149:24
**trying**   29:22   36:13
56:9   71:22   93:21
102:6, 8   105:17
133:10
**turn**   130:18
**turnover**   145:5
**tweaked**   104:1
117:14
**twice**   38:23   39:1, 2, 8
**two**   6:24   18:9   25:21
38:18   39:21   73:13,
16   84:8   94:16   101:3
114:7   133:12, 22
134:1
**type**   27:23   52:8
102:7   112:11   114:17
115:12   142:6
**types**   82:10   83:19
96:15

**< U >**
**ultimately**   72:23
**unable**   61:2   91:15
**understand**   13:18
23:23   24:6   28:18
44:13   105:17   117:9
142:13   148:7
**understanding**   16:5
19:17   28:24   55:12
63:2   91:22
**understood**   9:3
10:14   25:17   32:12
40:14   46:20   57:20
79:20   86:2   87:12
93:4   97:11   98:10
122:22   126:7   139:10
145:21   148:21
**unique**   147:10

**unit**   34:1   45:7
52:21   66:23   67:3
75:8, 11, 20   76:1, 7
77:16, 19   79:14
131:16   132:11
138:13   142:4   144:19
**UNITED**   1:2
**units**   75:2   93:1
**universal**   15:22
**University**   12:2
**unpredictable**   128:7
**unresponsive**   137:12
**unusual**   139:2, 6
**update**   60:5, 8, 10, 11,
13
**updates**   58:2, 6
**upheld**   124:14
**use**   37:2   52:15
58:22   98:12   146:22
**usually**   32:3

**< V >**
**vacancy**   88:1
**variation**   68:22
**various**   14:18   50:24
65:5
**vary**   23:14   24:5
**verbally**   45:7   70:8
**versus**   7:20   70:15
**Videotaped**   1:17
**violated**   103:13
120:11   122:11
123:15
**violation**   122:21
**violations**   116:10
**Virtual**   1:17
**visible**   82:14
**visits**   40:1, 9   42:15
**visual**   71:13   89:2
95:22
**vs**   1:8

**< W >**
**wait**   137:9
**waived**   7:5
**walk**   12:7, 12, 23
30:8   35:20   45:24
123:18
**walked**   131:4

**WANDA**   1:11   3:16
133:9
**want**   10:3   23:19
24:15   33:17   35:14
39:15   40:2   44:5
71:21   92:3   113:15
136:22   137:2   140:16
143:8
**wanted**   50:12
102:21   116:4   136:7,
15
**wants**   10:11
**warden**   81:23
109:23   119:17   124:7
125:9
**wardens**   14:4, 5, 7
18:2   42:10   82:5
109:21   112:17
**way**   10:5, 18   32:7
41:18   42:4, 19   54:4
67:5   69:18   78:13
82:18   110:23   115:20
116:6   134:4   136:11
**ways**   78:1
**website**   49:22
**weekly**   21:9   99:7
**well**   12:8, 14   13:22
14:9   18:13   21:17
22:17   26:8   32:10
36:8   37:1   48:15
58:9   79:12   81:3
100:21   116:7   141:4
142:1   143:18   144:1
149:15
**went**   15:4   94:5
**we're**   8:13   23:24
39:13   42:6   59:4
80:15   105:22, 23
106:3, 4   110:5
127:12   130:17
143:10, 11   147:13
**Western**   37:11
**we've**   115:23   117:2
141:21
**widespread**   141:1
**wing**   87:14, 23   88:2
90:1   92:24   93:11
**WITNESS**   4:2   5:3
11:5   24:23   40:18
49:1   53:12   54:5

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 65 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

56:*21*  58:*13, 18*
61:*14*  67:*9*  72:*9, 13*
75:*23*  83:*10*  84:*5*
85:*11*  86:*17*  87:2, *8*
90:*17*  91:*11*  92:*15*
93:*5*  96:*23*  99:*2*
102:*12*  104:*7*  105:*7*
107:*22*  111:2, *12*
116:*13*  117:*12*
118:*13*  119:*10*  128:*3,*
*20*  129:*10, 22*  130:*15*
139:*16*  140:*7*  141:*4*
142:*17*  143:*16*  144:*8,*
*17*  145:*4*  148:*24*
151:*9*
**witnessed**  31:*13*  40:*6*
**WITTEKIND**  3:*1*
4:*8*  6:*21, 22*  40:*16*
53:*9*  61:2, *9, 12*  63:*9*
85:*8*  86:*15, 24*  87:*6*
111:*11*  135:*20*
149:*15, 20, 22*  151:*12*
**WITTEKIND@OKLL**
**P.COM**  3:*7*
**wondering**  14:*14*
33:*19*  60:*7*  80:*21*
118:*18*
**Woods**  138:*9*
**word**  48:*16*  52:*5*
**words**  49:*6*
**Work**  12:*3*  13:*3, 4*
34:*12*  42:*10*  44:*14*
60:*22*  61:*18*  73:*11,*
*14*  142:*2*
**worked**  13:*7*
**workers**  72:*6*
**workforce**  90:*23*
**working**  12:*15*  34:*2*
42:*9, 22*  58:*1*  59:*4*
**work-performance**
131:*14*
**world**  90:*22*
**writing**  40:*10*  42:*16*
56:*16, 19, 22*
**written**  21:*24*  55:*22,*
*23*  56:2, *12*  57:*21*
100:*13, 16*  111:*19*
**wrong**  70:*10*
**wrote**  40:*19*

**< Y >**
**Yeah**  6:*17, 22*  9:*10*
24:*1*  41:*3*  42:*17*
48:*17*  49:*1, 8*  56:*8*
61:*10*  68:*4*  81:*15*
101:*18*  115:*1*  148:*23*
**year**  11:*5*  17:*10*
38:*23*  39:*1, 3, 7*  44:*6*
**years**  11:*16*  12:*5*
19:*20*  39:*5, 6, 8, 9, 10*
73:*14, 17*  90:*14*
92:*12*
**YESCARE**  1:*9*  3:*8*
44:*1, 3, 7*  48:*4, 5*
84:*20, 21*  85:*3, 17*
86:*3, 9, 11*  87:*5*
149:*22*  150:*5, 8*
151:*6*
**YesCare's**  67:*17*
**yesterday**  10:*9*

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 66 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**WORD LIST**

< 1 >
**1** *(1)*
**1:00** *(1)*
**1:25** *(1)*
**10:05** *(1)*
**100** *(2)*
**110** *(1)*
**12** *(3)*
**146** *(1)*
**149** *(1)*
**1500** *(1)*
**1515** *(1)*
**15TH** *(1)*
**1717** *(1)*
**17th** *(1)*
**1801** *(1)*
**19102** *(2)*
**19103** *(2)*
**19123** *(1)*
**1992** *(1)*
**1995** *(1)*
**1997** *(1)*

< 2 >
**2016** *(4)*
**2017** *(1)*
**2020** *(2)*
**2022** *(3)*
**2023** *(2)*
**2024** *(8)*
**2025** *(1)*
**204** *(1)*
**23** *(1)*
**29th** *(2)*

< 3 >
**3/09/24** *(1)*
**306** *(1)*

< 4 >
**43** *(1)*
**4th** *(3)*

< 5 >
**5** *(2)*
**5.162** *(1)*
**5.183** *(1)*

**5.76** *(2)*
**562** *(1)*
**5th** *(1)*

< 6 >
**6** *(1)*
**610** *(1)*
**64** *(2)*
**6th** *(1)*

< 7 >
**7** *(2)*
**770** *(1)*

< 9 >
**98** *(1)*
**990** *(1)*

< A >
**a.m** *(1)*
**able** *(3)*
**ABOLITIONIST** *(1)*
**academy** *(4)*
**accept** *(1)*
**access** *(14)*
**accommodate** *(1)*
**accommodation** *(2)*
**accommodations** *(3)*
**accompany** *(1)*
**account** *(3)*
**accountability** *(1)*
**accounts** *(1)*
**accurate** *(8)*
**acknowledging** *(1)*
**ACKNOWLEDGMENT** *(1)*
**acting** *(1)*
**action** *(4)*
**activates** *(1)*
**activation** *(1)*
**active** *(1)*
**activities** *(4)*
**actors** *(1)*
**actual** *(3)*
**acute** *(1)*
**adapted** *(1)*
**adding** *(1)*
**addition** *(3)*
**additional** *(9)*

**address** *(11)*
**addressed** *(4)*
**addressing** *(3)*
**adhere** *(1)*
**administer** *(1)*
**administered** *(4)*
**administering** *(4)*
**administration** *(7)*
**administrative** *(1)*
**Administrator** *(1)*
**Administrators** *(3)*
**admissions** *(1)*
**admit** *(1)*
**admitted** *(1)*
**ADOSSINO@GRSM.COM** *(1)*
**adverse** *(1)*
**after-action** *(5)*
**after-incident** *(2)*
**afternoon** *(2)*
**agenda** *(1)*
**aggregate** *(3)*
**agree** *(10)*
**agreed** *(2)*
**Agreement** *(2)*
**aid** *(6)*
**alert** *(3)*
**alerted** *(1)*
**allegation** *(1)*
**allow** *(2)*
**allows** *(1)*
**alongside** *(1)*
**American** *(4)*
**analysis** *(1)*
**and/or** *(1)*
**Angel** *(1)*
**Anne** *(1)*
**announcement** *(2)*
**annual** *(4)*
**annually** *(2)*
**Answer** *(65)*
**answering** *(2)*
**answers** *(2)*
**anticipated** *(1)*
**anybody** *(2)*
**anyway** *(1)*
**APOLLON** *(3)*
**appear** *(2)*
**appeared** *(1)*

**appears** *(1)*
**apply** *(2)*
**appointments** *(3)*
**approach** *(1)*
**approaching** *(1)*
**appropriate** *(13)*
**appropriateness** *(2)*
**approve** *(2)*
**Approximately** *(1)*
**April** *(1)*
**ARCH** *(2)*
**area** *(17)*
**areas** *(10)*
**arose** *(1)*
**arrived** *(2)*
**arrives** *(1)*
**arriving** *(2)*
**artful** *(1)*
**articulate** *(1)*
**ascertain** *(1)*
**asked** *(3)*
**aspects** *(3)*
**assaulted** *(1)*
**assess** *(18)*
**assessed** *(2)*
**assessing** *(10)*
**assessment** *(10)*
**assessments** *(2)*
**assigned** *(11)*
**assist** *(1)*
**assistance** *(14)*
**assisting** *(1)*
**Associate** *(1)*
**Association** *(4)*
**assume** *(4)*
**assurance** *(2)*
**attached** *(1)*
**attend** *(1)*
**attention** *(4)*
**ATTORNEY** *(5)*
**audio** *(1)*
**audit** *(4)*
**auditing** *(2)*
**audits** *(2)*
**authority** *(2)*
**authorized** *(1)*
**automatic** *(1)*
**available** *(5)*
**aware** *(4)*

**< B >**
Bachelor's *(1)*
back *(7)*
background *(1)*
backlogs *(1)*
bad *(1)*
base *(1)*
based *(45)*
basic *(2)*
basis *(10)*
Bates *(1)*
Bates-stamp *(1)*
Bear *(1)*
becoming *(1)*
beds *(1)*
began *(1)*
beginning *(1)*
begins *(3)*
behalf *(1)*
behavioral *(3)*
believe *(26)*
best *(1)*
better *(3)*
beyond *(1)*
bigger *(1)*
bit *(5)*
BLAIR *(4)*
BLANCH *(1)*
BLANCHE *(15)*
B-L-A-N-C-H-E *(1)*
blind *(1)*
BLOODSAW *(5)*
Board *(4)*
body *(4)*
bottom *(8)*
BOULEVARD *(1)*
box *(1)*
Brad *(1)*
breach *(2)*
break *(7)*
BRET *(10)*
BRETGROTE@ABO
LITIONISTLAWCEN
TER.ORG *(1)*
brief *(1)*
Brill *(3)*
bring *(3)*
bringing *(3)*

brings *(1)*
broad *(1)*
broadly *(2)*
broadness *(1)*
brought *(6)*
Bruce *(1)*
brush *(1)*
Bryn *(1)*
bunk *(2)*
Business *(1)*

**< C >**
C/O *(8)*
CABELLOS *(3)*
calendared *(1)*
call *(33)*
called *(5)*
calling *(5)*
calls *(2)*
campus *(2)*
capacity *(1)*
captains *(1)*
captures *(1)*
card *(3)*
care *(71)*
careers *(1)*
CARNEY *(16)*
C-A-R-N-E-Y *(1)*
carried *(4)*
carries *(1)*
carry *(4)*
carrying *(1)*
case *(24)*
case-by-case *(8)*
case-related *(1)*
cases *(4)*
catch *(1)*
caught *(1)*
caused *(1)*
caveat *(1)*
cell *(11)*
cells *(1)*
CENTER *(4)*
certain *(12)*
certainly *(4)*
certainty *(2)*
certification *(2)*
certified *(3)*
certify *(3)*

certifying *(1)*
CFCF *(4)*
chain *(1)*
chaired *(1)*
challenge *(1)*
challenges *(7)*
challenging *(2)*
chance *(1)*
change *(5)*
changed *(6)*
changes *(2)*
charge *(1)*
charges *(5)*
chart *(2)*
check *(4)*
checking *(2)*
checks *(2)*
chest *(1)*
Chief *(6)*
chronic *(10)*
circumstance *(1)*
circumstances *(8)*
CITY *(21)*
city's *(2)*
civilian *(9)*
civilian-contracted *(1)*
clarification *(2)*
clarifier *(1)*
clarify *(5)*
clear *(4)*
clients *(1)*
clinical *(12)*
clinically *(1)*
clinician *(1)*
clinicians *(2)*
clinician's *(1)*
closely *(1)*
closes *(1)*
cloud-based *(1)*
collaboration *(1)*
colleagues *(1)*
come *(11)*
comes *(2)*
comfortable *(1)*
coming *(4)*
command *(1)*
commands *(5)*
commencing *(1)*
Commission *(3)*

**COMMISSIONER**
*(65)*
Commissioners *(7)*
Commonwealth *(2)*
communicate *(1)*
communicated *(1)*
communications *(2)*
communicative *(1)*
compare *(1)*
complement *(1)*
completed *(3)*
completely *(1)*
completion *(1)*
compliance *(17)*
complied *(1)*
compound *(1)*
comprehensive *(1)*
concerned *(3)*
concerns *(1)*
concert *(1)*
concluded *(2)*
conclusion *(3)*
condition *(1)*
conditions *(5)*
conduct *(2)*
conducted *(4)*
conducting *(1)*
conducts *(1)*
confer *(2)*
confidential *(4)*
confirm *(1)*
confirmed *(1)*
consider *(2)*
consist *(2)*
consistent *(7)*
consistently *(1)*
Consultants *(1)*
contact *(1)*
contains *(1)*
contraband *(1)*
contract *(9)*
contracted *(5)*
contractor *(2)*
control *(3)*
controlled *(1)*
conversations *(4)*
converse *(5)*
conversing *(1)*
convey *(2)*

Deposition of Blanche Carney

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

conveyed *(1)*
copy *(2)*
**Corizon** *(16)*
**Corizon's** *(1)*
**CORP** *(2)*
**Correct** *(19)*
correction *(2)*
**correctional** *(52)*
**corrections** *(12)*
**correction's** *(1)*
corrective *(1)*
correctly *(6)*
correlate *(1)*
counsel *(4)*
count *(1)*
counted *(1)*
counts *(1)*
couple *(7)*
course *(4)*
**COURT** *(15)*
**COVID** *(3)*
**COVID-related** *(1)*
**CPR** *(7)*
create *(1)*
creating *(2)*
crisis *(1)*
critical *(3)*
cues *(2)*
culture *(5)*
current *(10)*
currently *(3)*
custody *(18)*
cut *(1)*
cutting *(1)*

< D >
daily *(10)*
date *(2)*
dated *(2)*
day *(4)*
dead *(1)*
deaf *(1)*
deal *(2)*
deals *(1)*
dealt *(1)*
death *(22)*
deaths *(8)*
decedent *(2)*
**December** *(1)*

decides *(1)*
decision *(2)*
decisions *(4)*
decompress *(1)*
decrease *(1)*
de-escalation *(1)*
defend *(1)*
**DEFENDANT** *(1)*
Defendants *(4)*
defer *(6)*
deficiencies *(1)*
definitely *(3)*
degree *(1)*
delegated *(3)*
deliver *(7)*
delivered *(6)*
delivery *(8)*
demise *(2)*
dental *(1)*
departed *(1)*
**DEPARTMENT** *(24)*
departmental *(1)*
depend *(1)*
depended *(3)*
dependent *(4)*
depending *(8)*
depends *(2)*
**DEPONENT** *(1)*
deposition *(7)*
deputies *(1)*
**Deputy** *(20)*
describe *(3)*
described *(3)*
describing *(2)*
Description *(1)*
designate *(1)*
designated *(5)*
designed *(1)*
designee *(2)*
designees *(1)*
desk *(1)*
despite *(1)*
**Detention** *(2)*
determination *(3)*
determine *(12)*
determined *(4)*
determines *(3)*
determining *(5)*
develop *(1)*

developing *(1)*
**diabetes** *(22)*
diabetic *(5)*
diabetics *(3)*
diagnosis *(1)*
diagnostic *(1)*
died *(1)*
difference *(1)*
differences *(1)*
different *(14)*
direct *(9)*
directed *(3)*
**Direction** *(1)*
directives *(1)*
directly *(1)*
**Director** *(5)*
disabilities *(6)*
disability *(3)*
disciplinary *(9)*
discipline *(7)*
disciplined *(1)*
discovered *(1)*
discuss *(10)*
discussed *(5)*
discussing *(2)*
discussion *(3)*
discussions *(4)*
disease *(1)*
diseases *(1)*
dismissed *(1)*
disobedient *(1)*
dispositions *(1)*
distinct *(1)*
distinction *(2)*
distributed *(1)*
distribution *(1)*
**DISTRICT** *(2)*
division *(7)*
divisions *(3)*
**DOC** *(1)*
doctor *(2)*
document *(17)*
documentation *(4)*
documented *(17)*
documenting *(4)*
**Documents** *(4)*
doing *(13)*
dose *(1)*
doses *(6)*

**DR** *(49)*
drag *(1)*
driver *(1)*
due *(2)*
duly *(1)*
**Durham** *(1)*
duties *(17)*
duty *(2)*

< E >
ear *(1)*
earlier *(8)*
early *(1)*
easier *(4)*
**EASTERN** *(1)*
educate *(1)*
educating *(1)*
education *(2)*
educational *(1)*
effective *(1)*
effectuate *(1)*
**Eight** *(1)*
either *(8)*
elaborate *(1)*
**Electronic** *(10)*
emerged *(1)*
emergencies *(8)*
emergency *(22)*
emergent *(2)*
employed *(4)*
employees *(4)*
employment *(7)*
empowered *(1)*
enable *(1)*
encompass *(2)*
encompasses *(2)*
encompassing *(2)*
encounter *(3)*
enforcement *(1)*
engage *(12)*
engaged *(4)*
engagement *(11)*
engagements *(2)*
engaging *(2)*
enhance *(2)*
enlarge *(2)*
ensure *(7)*
ensuring *(5)*
entails *(1)*

Deposition of Blanche Carney

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

enter  *(4)*
entered  *(5)*
entering  *(3)*
entire  *(4)*
entirety  *(1)*
entity  *(1)*
entry  *(1)*
environmental  *(1)*
episodic  *(1)*
ER  *(2)*
Errata  *(1)*
error  *(1)*
escalated  *(1)*
escalates  *(1)*
escort  *(3)*
escorted  *(3)*
ESQUIRE  *(5)*
establish  *(1)*
establishes  *(1)*
estate  *(1)*
Estates  *(1)*
evaluate  *(1)*
evaluations  *(1)*
everybody  *(4)*
exact  *(2)*
exactly  *(3)*
EXAMINATION  *(4)*
examined  *(1)*
example  *(1)*
Excel  *(2)*
exclusive  *(1)*
excuse  *(3)*
executed  *(1)*
Executive  *(4)*
exhibit  *(1)*
Exhibit-1  *(2)*
existing  *(1)*
exit  *(2)*
expectations  *(4)*
expected  *(3)*
experience  *(4)*
experiencing  *(4)*
explain  *(2)*
explaining  *(1)*
express  *(1)*
extensive  *(1)*
extent  *(5)*
external  *(1)*
eye  *(1)*

< F >
facet  *(1)*
face-to-face  *(1)*
facilitated  *(1)*
facilities  *(13)*
facility  *(24)*
facility's  *(1)*
fact  *(2)*
factors  *(1)*
facts  *(1)*
failed  *(2)*
failing  *(3)*
failures  *(4)*
fair  *(8)*
familiar  *(5)*
far  *(5)*
fast  *(1)*
fellow  *(1)*
felt  *(1)*
few-minute  *(1)*
field  *(3)*
fight  *(1)*
file  *(3)*
filed  *(2)*
files  *(1)*
filing  *(1)*
fill  *(1)*
filled  *(4)*
finding  *(3)*
Findings  *(6)*
fine  *(2)*
finish  *(3)*
finished  *(4)*
finishes  *(1)*
finishing  *(1)*
first  *(12)*
firsthand  *(2)*
five  *(2)*
flag  *(3)*
flat-out  *(1)*
FLOOR  *(2)*
flow  *(1)*
focusing  *(1)*
folks  *(1)*
follow  *(5)*
followed  *(4)*
following  *(13)*
follows  *(1)*

foregoing  *(3)*
form  *(24)*
formal  *(2)*
formalize  *(3)*
formally  *(2)*
format  *(4)*
FORMER  *(1)*
forms  *(2)*
forth  *(1)*
forward  *(1)*
forwarded  *(1)*
found  *(7)*
foundation  *(1)*
frame  *(1)*
FRASIER  *(2)*
free  *(1)*
frequencies  *(1)*
frequency  *(2)*
frequently  *(5)*
full  *(8)*
fully  *(1)*
further  *(4)*

< G >
Gabellos  *(1)*
gain  *(1)*
gained  *(1)*
GARDEN  *(1)*
garnered  *(1)*
GAY  *(4)*
GENA  *(2)*
general  *(7)*
generally  *(6)*
generate  *(1)*
generates  *(1)*
generating  *(1)*
getting  *(5)*
give  *(10)*
given  *(6)*
giving  *(7)*
glean  *(2)*
gleaning  *(1)*
glucose  *(4)*
go  *(24)*
goes  *(3)*
going  *(58)*
Good  *(5)*
GORDON  *(2)*
GPS  *(4)*

Graduate  *(1)*
greater  *(1)*
GROTE  *(83)*
ground  *(1)*
group  *(1)*
Guardian  *(5)*
guess  *(6)*
guidance  *(4)*
guidelines  *(7)*

< H >
half  *(1)*
hand  *(1)*
handle  *(2)*
handled  *(1)*
happen  *(6)*
happened  *(7)*
happening  *(6)*
happens  *(3)*
head  *(5)*
Health  *(22)*
healthcare  *(2)*
Health's  *(1)*
hear  *(1)*
heard  *(4)*
hearing  *(5)*
hearing-impaired  *(2)*
hearings  *(1)*
hears  *(1)*
held  *(3)*
help  *(2)*
helpful  *(2)*
Herdman  *(35)*
Herdman's  *(2)*
hereinbefore  *(1)*
Herman  *(1)*
hierarchy  *(1)*
higher  *(4)*
higher-acute  *(1)*
highest-ranking  *(1)*
highlighted  *(1)*
Hill  *(1)*
HIPAA  *(2)*
history  *(9)*
hit  *(1)*
hold  *(2)*
hospital  *(6)*
hospitalizations  *(1)*
housed  *(1)*

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 70 of 75

Deposition of Blanche Carney    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

housing  (24)
How's  (2)
Human  (2)

< I >
identification  (2)
identified  (6)
identify  (7)
identifying  (3)
idly  (1)
ill  (1)
impact  (1)
impaired  (1)
implement  (1)
implementations  (1)
implemented  (4)
implying  (1)
importance  (2)
important  (2)
impose  (1)
imposed  (3)
improved  (1)
Improvement  (7)
incarcerated  (25)
incarceration  (7)
incident  (11)
incidents  (1)
include  (3)
included  (1)
includes  (2)
including  (3)
inclusive  (1)
incoming  (1)
incorporate  (1)
increase  (1)
increased  (1)
increasing  (1)
in-custody  (2)
in-death  (1)
independent  (2)
INDEX  (1)
indicates  (1)
indicating  (1)
indications  (1)
individual  (57)
individualized  (1)
individuals  (39)
individual's  (2)
infection  (1)

inferring  (1)
infirmary  (5)
information  (37)
infrastructure  (4)
infrequently  (1)
initial  (3)
initiate  (2)
initiated  (3)
initiative  (5)
injuries  (1)
injury  (1)
inmate  (4)
inmates  (1)
in-service  (5)
inside  (1)
installed  (1)
instance  (2)
instances  (2)
instruct  (1)
instructing  (1)
instruction  (1)
insulin  (5)
insulin-filled  (2)
intake  (14)
interact  (1)
interchangeably  (1)
intercom  (1)
interfere  (1)
interference  (1)
interpretation  (1)
interrupt  (1)
intervention  (1)
interviewing  (1)
interviews  (1)
intimately  (1)
investigating  (1)
investigation  (23)
investigations  (9)
involve  (4)
involved  (14)
involvement  (1)
iPhone  (2)
isolated  (1)
issue  (12)
issued  (3)
issues  (21)
issue-specific  (1)
it'd  (2)
item  (1)

its  (5)
Ivan  (2)

< J >
JACOB  (1)
jail  (2)
JAMES  (1)
January  (2)
Jermaine  (1)
JKAMINSKY@KEIR

NANTRABACH.COM
 (1)
job  (5)
JOHN  (2)
join  (1)
joint  (1)
JONATHAN  (2)
JR  (2)
judicial  (3)
jumping  (1)
JUNG  (12)
Jung000001  (1)
Jung's  (3)

< K >
K-9  (1)
K-9s  (1)
KAMINSKY  (11)
keep  (1)
KENNEDY  (1)
kept  (1)
ketoacidosis  (1)
KIERNAN  (1)
KIMBALL  (1)
kind  (10)
know  (78)
knowledge  (4)
Kudos  (1)

< L >
laid  (1)
LALITHA  (2)
landline  (1)
language  (2)
large  (1)
late  (1)
LAW  (3)
lawyer  (1)

lays  (2)
lead  (2)
leadership  (2)
learn  (1)
leave  (4)
leaves  (1)
leaving  (1)
led  (3)
left  (2)
legal  (1)
letter  (1)
level  (8)
Lewis  (3)
liaised  (1)
liaison  (1)
licensed  (9)
lieutenant  (1)
lieutenants  (1)
life-saving  (2)
life-threatening  (1)
light  (1)
Lincoln  (1)
Line  (7)
link  (1)
Lisa  (3)
list  (4)
lists  (1)
little  (6)
living  (1)
LLC  (1)
LLP  (1)
located  (1)
location  (3)
Lock  (21)
log  (1)
LOGAN  (1)
logbook  (1)
long  (4)
look  (24)
looking  (26)
loss  (2)
lost  (3)
lot  (3)
loud  (1)
LOUIS  (1)
lower  (2)
Lt  (3)
lying  (1)

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 71 of 75

Deposition of Blanche Carney    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**< M >**
maintained *(3)*
maintaining *(2)*
major *(2)*
majority *(3)*
making *(14)*
male *(2)*
managed *(1)*
management *(2)*
Manager *(1)*
manages *(1)*
managing *(2)*
mandatory *(1)*
manner *(1)*
MANSUKHANI *(1)*
March *(2)*
MARIESHA *(3)*
Marked *(3)*
MARKET *(1)*
Marshall *(2)*
Master's *(2)*
Mathis *(1)*
matrix *(1)*
matter *(3)*
MAUREEN *(1)*
Mawr *(1)*
MBA *(1)*
mean *(18)*
meaning *(2)*
means *(3)*
measurements *(1)*
measures *(7)*
mechanism *(1)*
medical *(164)*
medical-certified *(1)*
Medical's *(1)*
medicate *(1)*
medication *(28)*
medication-compliant *(1)*
medications *(8)*
med-line *(2)*
meet *(2)*
meeting *(6)*
meetings *(6)*
member *(5)*
members *(5)*
memorize *(1)*
mental *(4)*

mentioned *(4)*
message *(1)*
method *(1)*
methods *(1)*
MICHAEL *(2)*
MICHAEL.PESTRAK @PHILA.GOV *(1)*
middle *(3)*
Mini *(3)*
minimize *(1)*
minimum *(1)*
minutes *(2)*
mischaracterizing *(1)*
misconduct *(6)*
missed *(12)*
missing *(2)*
mm-hmms *(1)*
modify *(1)*
module *(1)*
modules *(1)*
moment *(6)*
monitor *(2)*
monitored *(2)*
monitoring *(5)*
monitors *(3)*
monthly *(1)*
months *(5)*
morning *(1)*
Morris *(1)*
mortality *(35)*
move *(1)*
multiple *(2)*
Murphy *(1)*

**< N >**
name *(7)*
names *(1)*
narrative *(1)*
National *(5)*
nationally *(1)*
nature *(2)*
necessarily *(8)*
necessity *(1)*
need *(22)*
needed *(6)*
needs *(6)*
Need-to-know *(1)*
never *(2)*
new *(4)*

newly-hired *(1)*
nods *(1)*
non-chronic *(1)*
non-compliance *(1)*
non-compliant *(1)*
non-emergency *(1)*
non-movement *(1)*
nonresponsive *(1)*
non-responsive *(1)*
nonverbal *(1)*
non-voting *(1)*
normal *(1)*
normally *(1)*
no-shows *(1)*
Notary *(57)*
note *(2)*
noted *(1)*
notes *(11)*
notice *(1)*
noticed *(1)*
notification *(7)*
notified *(9)*
notify *(10)*
notifying *(6)*
November *(2)*
nuance *(1)*
number *(19)*
numbers *(1)*
NURSE *(5)*
nursing *(2)*

**< O >**
obeying *(1)*
object *(3)*
Objection *(47)*
objections *(1)*
obligations *(1)*
observation *(1)*
observations *(2)*
observe *(1)*
observing *(2)*
obtain *(2)*
obtained *(2)*
obtaining *(1)*
obviously *(1)*
occasion *(2)*
Occasionally *(1)*
occasions *(2)*
occur *(3)*

occurred *(7)*
occurrence *(2)*
occurrences *(2)*
occurring *(4)*
occurs *(1)*
O'CONNOR *(1)*
OCTOBER *(1)*
offer *(1)*
Office *(14)*
officer *(41)*
officers *(17)*
officer's *(4)*
oh *(2)*
Okay *(57)*
omitted *(1)*
once *(4)*
one-and-done *(1)*
one-time *(1)*
ongoing *(4)*
OPC *(8)*
open *(1)*
operations *(2)*
opportunity *(4)*
opposed *(2)*
opting *(1)*
Oral *(11)*
order *(8)*
ordered *(2)*
ordering *(1)*
orders *(1)*
org *(1)*
organization *(1)*
original *(1)*
outside *(3)*
overall *(14)*
overarching *(1)*
oversight *(5)*

**< P >**
p.m *(1)*
PA *(3)*
packet *(1)*
PAGE *(32)*
pages *(1)*
pains *(1)*
paint *(1)*
panel *(1)*
paperwork *(2)*
paragraph *(7)*

Case 2:24-cv-05618-TJS    Document 160-1    Filed 01/09/26    Page 72 of 75

Deposition of Blanche Carney                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

parentheses *(1)*
part *(28)*
participate *(2)*
participated *(1)*
participation *(2)*
particular *(9)*
parties *(1)*
parts *(1)*
pass *(2)*
passage *(1)*
passes *(1)*
patient *(9)*
patients *(11)*
patient's *(5)*
pattern *(5)*
patterns *(9)*
PDF *(1)*
PDP *(39)*
penalties *(1)*
PENN *(1)*
PENNSYLVANIA *(5)*
people *(10)*
perception *(1)*
perform *(2)*
Performance *(8)*
performed *(4)*
performing *(1)*
period *(9)*
periods *(1)*
person *(35)*
personnel *(4)*
persons *(1)*
person's *(3)*
pertaining *(1)*
PESTRAK *(70)*
ph *(2)*
pharmacies *(1)*
Pharmacist-Directed *(2)*
pharmacy *(1)*
PHILADELPHIA *(23)*
phone *(5)*
phrase *(1)*
phrasing *(1)*
physical *(1)*
physically *(2)*
physician *(1)*
PICC *(1)*

pill *(1)*
PIP *(7)*
place *(20)*
placed *(5)*
placement *(1)*
placing *(1)*
Plaintiff *(1)*
Plaintiffs *(4)*
plan *(13)*
Plans *(6)*
platform *(5)*
play *(2)*
played *(2)*
please *(10)*
POD *(1)*
point *(3)*
pointing *(2)*
police *(1)*
policies *(13)*
policy *(43)*
poorly *(1)*
population *(11)*
portal *(3)*
portion *(1)*
portions *(2)*
position *(5)*
positions *(1)*
possible *(4)*
post *(1)*
posted *(1)*
post-high-school *(1)*
potential *(3)*
potentially *(1)*
practitioner *(4)*
practitioners *(1)*
predates *(1)*
preloaded *(1)*
prepare *(2)*
prepared *(1)*
prescribed *(1)*
prescription *(2)*
prescriptions *(3)*
present *(5)*
presented *(6)*
presenting *(1)*
presently *(1)*
presents *(1)*
pretty *(1)*
preventing *(1)*

previous *(1)*
previously *(1)*
primarily *(2)*
primary *(1)*
prior *(9)*
Prison *(6)*
prisoners *(1)*
PRISONS *(19)*
privacy *(1)*
Probably *(6)*
procedure *(2)*
procedures *(2)*
proceeding *(1)*
process *(35)*
processes *(1)*
processing *(1)*
procure *(1)*
procured *(1)*
procuring *(1)*
produced *(1)*
Production *(1)*
Production002649 *(1)*
Production004786 *(1)*
Production005109 *(1)*
Production005130 *(1)*
professional *(12)*
professionally *(1)*
Program *(7)*
programs *(1)*
progress *(1)*
pronounced *(1)*
proper *(2)*
Proposal *(9)*
Proposals *(1)*
Proposed *(2)*
propounded *(1)*
protection *(1)*
protocol *(4)*
protocols *(1)*
provide *(19)*
provided *(20)*
Provider *(38)*
providers *(5)*
provider's *(1)*
provides *(5)*
providing *(11)*
provision *(5)*
Public *(3)*
Puerini *(8)*

pulled *(2)*
pulse *(3)*
purposes *(1)*
put *(10)*
putting *(3)*

< Q >
QA *(1)*
quality *(5)*
quality-assurance *(2)*
quarter *(2)*
quarterly *(8)*
question *(31)*
Questions *(16)*
quickly *(1)*
quite *(1)*

< R >
raise *(1)*
raised *(1)*
range *(3)*
rank *(5)*
RAY *(3)*
read *(6)*
readily *(3)*
reading *(6)*
readings *(1)*
readmitted *(3)*
read-only *(4)*
really *(2)*
reason *(5)*
reasonable *(1)*
reasons *(4)*
recall *(39)*
recalling *(3)*
receive *(22)*
received *(5)*
receives *(1)*
receiving *(6)*
recess *(2)*
recognize *(1)*
recognized *(1)*
recognizing *(2)*
recollect *(1)*
recollection *(31)*
recommendation *(6)*
recommendations *(7)*
recommended *(1)*
recommending *(1)*

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

record *(21)*
recorded *(1)*
records *(2)*
record's *(1)*
recurring *(1)*
red *(3)*
red-flag *(6)*
REES *(1)*
referral *(1)*
referring *(1)*
refers *(1)*
refresh *(6)*
refresher *(12)*
refreshers *(1)*
refreshes *(1)*
refusal *(13)*
refusals *(6)*
refused *(5)*
refuses *(2)*
refusing *(5)*
regard *(10)*
regarding *(5)*
regards *(1)*
regular *(9)*
regularly *(3)*
reiterate *(1)*
reiterating *(1)*
reject *(1)*
related *(2)*
relationship *(1)*
relative *(1)*
released *(3)*
relevant *(3)*
rely *(1)*
relying *(2)*
remain *(1)*
remains *(1)*
remember *(15)*
remembering *(1)*
REMIC *(4)*
render *(7)*
rendered *(4)*
rendering *(3)*
renders *(1)*
repeat *(6)*
repetitive *(1)*
rephrase *(5)*
report *(27)*
reported *(2)*

Reporter *(9)*
Reporter-Notary *(1)*
reporting *(1)*
reports *(28)*
represent *(3)*
reproduction *(1)*
Request *(12)*
require *(3)*
required *(9)*
requires *(2)*
Research *(1)*
reserved *(1)*
resources *(1)*
respective *(2)*
respond *(2)*
responded *(3)*
responding *(4)*
response *(7)*
responses *(1)*
responsibilities *(7)*
responsibility *(10)*
responsible *(14)*
responsive *(1)*
Restorative *(3)*
resulted *(1)*
retired *(1)*
retirement *(1)*
revealed *(1)*
review *(54)*
reviewed *(12)*
reviewing *(13)*
reviews *(32)*
revision *(1)*
right *(32)*
rights *(3)*
Right-to-Know *(1)*
rise *(1)*
Robinson *(1)*
robots *(1)*
role *(7)*
roles *(1)*
roll *(5)*
roll-call *(1)*
room *(8)*
Rosa *(1)*
Rosado *(1)*
round *(1)*
rounds *(14)*
routine *(5)*

rules *(2)*

< S >
safety *(3)*
Samicheilli *(1)*
Samichielli *(1)*
saying *(8)*
says *(21)*
scanner *(1)*
scanners *(1)*
scenario *(3)*
scenarios *(2)*
scene *(1)*
schedule *(4)*
scheduled *(5)*
School *(1)*
Science *(1)*
Scope *(4)*
screen *(11)*
screening *(2)*
scroll *(4)*
SCULLY *(1)*
sealing *(1)*
second *(3)*
section *(1)*
secured *(1)*
security *(18)*
security-related *(1)*
see *(54)*
seeing *(4)*
seek *(3)*
self-reports *(1)*
sent *(7)*
sentence *(3)*
Sentinel *(1)*
separate *(1)*
separated *(1)*
September *(1)*
Sergeant *(2)*
sergeants *(2)*
series *(5)*
serious *(3)*
serve *(1)*
Service *(7)*
Services *(45)*
set *(7)*
setting *(3)*
settings *(2)*
seven *(1)*

severe *(1)*
share *(9)*
sharing *(3)*
Sheet *(1)*
shift *(1)*
shorthand *(1)*
short-staffed *(3)*
show *(1)*
showing *(2)*
shown *(1)*
sick *(1)*
side *(3)*
sight *(1)*
sign *(3)*
signature *(3)*
signed *(3)*
significant *(3)*
significantly *(2)*
signing *(1)*
signs *(4)*
similar *(5)*
simply *(6)*
single *(1)*
site *(8)*
sitting *(1)*
situation *(7)*
situations *(2)*
six *(2)*
size *(1)*
slightly *(1)*
smooth *(1)*
Social *(6)*
Soell *(1)*
solicit *(1)*
solicitation *(1)*
soliciting *(1)*
somebody *(14)*
somebody's *(2)*
someone's *(1)*
sorry *(3)*
sound *(3)*
sources *(2)*
speak *(5)*
speaking *(3)*
Special *(2)*
specialty *(1)*
specific *(22)*
specifically *(10)*
specifics *(5)*

specify *(1)*
spell *(2)*
spoken *(1)*
spreadsheet *(2)*
SPRING *(1)*
SQUARE *(1)*
staff *(118)*
staffing *(3)*
staff's *(1)*
stage *(1)*
stamps *(1)*
standard *(2)*
standards *(4)*
standing *(3)*
start *(5)*
started *(2)*
starting *(1)*
starts *(2)*
state *(3)*
stated *(2)*
statements *(1)*
STATES *(2)*
status *(2)*
stenographic *(1)*
steps *(1)*
stipulated *(1)*
Stipulations *(1)*
stop *(2)*
straightforward *(1)*
strategically *(1)*
STREET *(4)*
stretcher *(6)*
Strike *(2)*
structure *(6)*
submission *(1)*
submitted *(2)*
subordinate *(1)*
substance *(1)*
subtopics *(1)*
suggestion *(3)*
Suggestions *(5)*
SUITE *(4)*
SUMMER *(1)*
supervises *(1)*
supervision *(1)*
Supervisor *(2)*
supervisors *(1)*
supplement *(1)*
SUPPORT *(2)*

supposed *(27)*
sure *(21)*
surrounding *(2)*
sustain *(1)*
sustained *(8)*
sustaining *(1)*
sustains *(1)*
sworn *(7)*
symptoms *(2)*
syringe *(1)*
system *(14)*
systemic *(2)*

< T >
Tab *(2)*
take *(15)*
taken *(8)*
takes *(1)*
talk *(2)*
talked *(3)*
talking *(4)*
talks *(1)*
tasked *(1)*
Taylor *(1)*
Team *(4)*
technology *(1)*
tell *(2)*
telling *(2)*
tells *(1)*
TEN *(2)*
tenure *(4)*
term *(3)*
terminology *(3)*
terms *(3)*
testified *(6)*
testimony *(2)*
TGREGORY@OKLL
P.COM *(1)*
Thank *(30)*
thanks *(1)*
theme *(2)*
themes *(1)*
thing *(2)*
things *(7)*
think *(17)*
thinks *(1)*
THOMAS *(5)*
thought *(4)*
THREE *(14)*

three-month *(1)*
threshold *(1)*
THURSDAY *(1)*
tier *(1)*
time *(32)*
timeliness *(2)*
times *(7)*
title *(6)*
today *(6)*
today's *(1)*
top *(10)*
topics *(4)*
Torres *(1)*
totality *(3)*
totally *(2)*
touched *(2)*
tour *(4)*
toured *(2)*
tours *(14)*
Track *(28)*
tracked *(9)*
tracking *(8)*
trained *(1)*
training *(46)*
trainings *(8)*
transcript *(4)*
transcription *(1)*
transfer *(1)*
transferred *(5)*
transition *(1)*
Transitional *(3)*
transport *(2)*
transports *(1)*
treat *(2)*
treated *(2)*
treatment *(8)*
treatments *(1)*
TREBACH,LLP *(1)*
trial *(1)*
triggered *(1)*
trip *(3)*
trips *(3)*
Trivicam *(1)*
TRIVIKIM *(2)*
TRIVIKRAM *(2)*
true *(2)*
try *(5)*
trying *(9)*
turn *(1)*

turnover *(1)*
tweaked *(2)*
twice *(4)*
two *(14)*
type *(7)*
types *(4)*

< U >
ultimately *(1)*
unable *(2)*
understand *(9)*
understanding *(6)*
understood *(18)*
unique *(1)*
unit *(18)*
UNITED *(1)*
units *(2)*
universal *(1)*
University *(1)*
unpredictable *(1)*
unresponsive *(1)*
unusual *(2)*
update *(5)*
updates *(2)*
upheld *(1)*
use *(5)*
usually *(1)*

< V >
vacancy *(1)*
variation *(1)*
various *(3)*
vary *(2)*
verbally *(2)*
versus *(2)*
Videotaped *(1)*
violated *(4)*
violation *(1)*
violations *(1)*
Virtual *(1)*
visible *(1)*
visits *(3)*
visual *(3)*
vs *(1)*

< W >
wait *(1)*
waived *(1)*
walk *(7)*

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

**walked**  *(1)*
**WANDA**  *(3)*
**want**  *(16)*
**wanted**  *(5)*
**wants**  *(1)*
**warden**  *(7)*
**wardens**  *(9)*
**way**  *(16)*
**ways**  *(1)*
**website**  *(1)*
**weekly**  *(2)*
**well**  *(22)*
**went**  *(2)*
**we're**  *(16)*
**Western**  *(1)*
**we've**  *(3)*
**widespread**  *(1)*
**wing**  *(6)*
**WITNESS**  *(53)*
**witnessed**  *(2)*
**WITTEKIND**  *(20)*
**WITTEKIND@OKLL
P.COM**  *(1)*
**wondering**  *(5)*
**Woods**  *(1)*
**word**  *(2)*
**words**  *(1)*
**Work**  *(11)*
**worked**  *(1)*
**workers**  *(1)*
**workforce**  *(1)*
**working**  *(6)*
**work-performance**
 *(1)*
**world**  *(1)*
**writing**  *(5)*
**written**  *(9)*
**wrong**  *(1)*
**wrote**  *(1)*

**< Y >**
**Yeah**  *(17)*
**year**  *(7)*
**years**  *(12)*
**YESCARE**  *(19)*
**YesCare's**  *(1)*
**yesterday**  *(1)*