# Exhibit 1
# Email Communication with Counsel for City of Philadelphia



**Bret Grote <bretgrote@alcenter.org>**

## Follow up on previous RPD re: video footage

**Michael Pestrak** <Michael.Pestrak@phila.gov>                           Mon, Oct 20, 2025 at 2:36 PM
To: Bret Grote <bretgrote@alcenter.org>
Cc: Margaret Hu <margo@alcenter.org>, Rupalee Rashatwar <rupalee@alcenter.org>

Good afternoon,

I double checked with PDP and Lt. Jay and all the video he had was provided to me which I passed to you.

Thanks,
Mike

**From:** Bret Grote <bretgrote@alcenter.org>
**Sent:** Friday, October 17, 2025 11:12 AM
**To:** Michael Pestrak <Michael.Pestrak@phila.gov>
**Cc:** Margaret Hu <margo@alcenter.org>; Rupalee Rashatwar <rupalee@alcenter.org>
**Subject:** Follow up on previous RPD re: video footage

**External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

Good morning Mike,

We wanted to follow up on one of our previous requests for production, specifically Plaintiffs' RPD sent on February 20 of this year:

"All video footage of or pertaining to Louis Jung, Jr. in possession of Defendants, including video of events discussed in the Report of Investigation Office of Special Investigations into the death of Louis Jung; video footage from the intake housing unit where Louis Jung, Jr. was held in CFCF between October 27, 2023 and November 6, 2023; video footage depicting any medical care or attempts to provide medical care to Louis Jung, Jr. during his incarceration at PDP."

As you may recall, we have some video footage from 11/5/23 and 11/6/23 that the City shared in initial disclosures, and you represented to us that there was no further footage. However, it is referenced in other discovery (specifically C/O Frasier's charging documents) that there is video footage of the afternoon of 11/5/23,  around the approximately 4:30PM Accuchek/insulin administration. Plaintiffs currently only have 6AM-3PM and 9:30PM-12AM video footage from 11/5/23.

Could you please follow up and inquire whether there is video footage of that missing 11/5/23 period, specifically 3PM-9:30PM?

Thank you,

Bret

# Exhibit 2

# Gena Frasier Employee Violation Report

| **EMPLOYEE VIOLATION REPORT** | PHILADELPHIA DEPARTMENT OF PRISONS |
|---|---|
| *(Prepare in Quadruplicate)* | |

| INSTITUTION OR UNIT | | DATE |
|---|---|---|
| Curran Fromhold Correctional Facility (CFCF) | | 3/11/2024 |

| NAME OF EMPLOYEE | EMPLOYEE NO. | TITLE |
|---|---|---|
| Gena Frasier | 285093 | Correctional Officer |

| NAME OF COMPLAINANT | TITLE |
|---|---|
| Shawn Jay | Correctional Lieutenant (OPC) |

### COMPLAINT
*(State Rule, Order or Regulation violated and give details)*

**C/O G. Frasier, you have violated the following General Orders/Policies and Procedures:**

**G.O. 1** It is essential that each employee has a working knowledge of and complies with the Policies and Procedures which relate to or have a bearing upon his/her duties, responsibilities, and employment in the PDP. Each employee must have a working knowledge of the Pennsylvania State Constitution and its laws, U.S. Constitution and Federal Laws, Philadelphia Home Rule Charter, and Civil Service Regulations that a reasonable person would have.

**G.O. 3** An employee shall be responsible for the efficient performance of his/her assigned duties. Employees will remain alert, aware of, and responsive to their surroundings while on duty in order to ensure the safety and security of the institution as well as the health, safety, or welfare of incarcerated persons, staff, or visitors.

**G.O. 5** All employees shall cooperate in maintaining the security and good order of the institution at all times.

**G.O. 20** Employees whose duties involve the original entry, updating, or modification of information contained on the PDP computer systems are responsible for the timeliness, correctness, and integrity of such data. Employees also are responsible for updating the information on the PDP computer system that was obtained during a period when the automated system was unavailable and was not entered initially in the PDP computer system.

**G.O. 37** Any employee, who fails to take proper action while on duty, fails to assert proper authority, or shows reluctance to carry out rules or orders shall be subject to disciplinary action.

**G.O. 67** It shall be the duty of any employee supervising incarcerated persons to look after the incarcerated persons' welfare and ensure that incarcerated persons obtain proper and sufficient food, clothing, and medical attention.

**Employee Code of Conduct:**

**VI.** Each employee shall exercise reason and good judgment on the job.

**VII.** Each employee shall accept responsibility for the proper performance of his/her duties, in keeping with the Policies and Procedures of the PDP.

*(Use reverse side if additional space is required)*

RECEIVED

MAR 19 2024

Warden's Office
Curran Fromhold
Correctional Facility

*(Complainant's Signature)*

### STATEMENT BY EMPLOYEE

LOCAL 159
E. Lee

My signature indicates that I received this Employee Violation Report. I do not necessarily agree with the charges.

*(Date)* 3/15/24    C/O *(Employee's Signature)*

### ACTION TAKEN

REFERRED DUE TO OPC INVESTIGATION AND NATURE OF CHARGES

| ☐ Case closed at Preliminary Hearing on | ☑ Referred for Formal Disciplinary Action | |
|---|---|---|
| CHAIRMAN'S SIGNATURE | DATE 4-16-24 | RECEIVED IN PERSONNEL OFFICE *(Date)* |

RECEIVED

APR 17 2024

PHILADELPHIA PRISONS
HUMAN RESOURCES DEPARTMENT

Fraiser-000009

On Monday, November 6, 2023, Incarcerated Person Louis Jung, PID# 71[ ].7, was found inside of Cell #21 on B1 Pod 3, having trouble breathing by Correctional Officer Aaron Hester, PR# 295830, who was serving the morning meal on the unit. A stretcher was called, and medical staff arrived and while in route to medical triage with I/P Jung, he stopped breathing and was later pronounced deceased by Philadelphia Fire Department Medic Schroeder at 6:47am. This investigation was initiated to determine if Correctional Staff and Medical personnel adhered to the policy standards set forth for the care of incarcerated persons by the Philadelphia Department of Prisons.

Video footage of this incident was reviewed and revealed that while you, C/O Gena Frasier, PR# 285093, were assigned to B1 Pod 3, on Sunday, November 5, 2023, on the 7am to 7pm shift, at approximately 9:55am you were observed opening Cell #21, while escorting a nurse. I/P Jung appears to be lying on the ground in the doorway of the cell. You and the nurse then walk away and appear to have a discussion. The nurse then leaves the unit and I/P Jung is still observed lying on the floor. At approximately 10:05am, Lieutenant Wanda Bloodsaw, PR# 253488 arrives on the unit and by hand gesture, you appear to point toward the top tier at Cell #21. Lt. Bloodsaw proceeds to walk in that direction as you remain at the officer's desk. You are then observed handing gloves to two I/P's who then appear to go to Cell# 21. Once they arrive at the cell, they drag I/P Jung into the cell and the door is secured by Lt. Bloodsaw, who then walks off the housing unit.

A review of the electronic logbook (Lock & Track) revealed that you made a Medication Event entry at 16:35 for Insulin and Accu-check, in which one of the four (4) I/P's to receive insulin was IP Jung. At 16:49, you entered another logbook event acknowledging that I/P Jung had refused his Insulin and Accu-check. Further video review was conducted of B1 Pod 3 for the relevant time periods related to your logbook entries of the said medication events. The video shows that I/P Jung was locked inside of Cell #19 and at no time exited the cell. In addition, at no time did you go his cell to let him out for Insulin and Accu check, nor did it appear that you received any indication of his refusal, as you were observed watching TV in the dayroom (Bottom tier area).

C/O Frasier, during your OPC interview you stated that you were assigned to B1 Pod 3 on November 5, 2023 during the 7am to 7pm shift. You admitted that it is you in the video on B1 Pod 3, but denied recalling if I/P Jung said anything to you when you and the nurse encountered him on the floor when you opened Cell #21. You denied recalling why you and the nurse walked away from I/P Jung, further stating that it could not have been for medical purposes. You admitted that you did not call for a stretcher due to the nurse being on the unit and that she is the one that makes the medical decisions. You admitted that your Lock and track username is Frasier_G, and that you made the electronic logbook entries for B1 Pod 3 on November 5, 2023. You denied knowing how I/P Jung informed you that he refused insulin. You stated that you typically yell "insulin and accu check in progress" on the unit, and that is how you alert the I/P's who receive it, that it is in progress.

C/O Frasier, General Order #67 states (in part) that "It shall be the duty of any employee supervising incarcerated persons to look after the incarcerated persons' welfare and ensure that incarcerated persons' obtain proper and sufficient food, clothing, and medical attention.

Therefore, due to the above, you are being charged with the aforementioned General Orders, Codes of Conduct and PDP Policies and Procedures.

# Exhibit 3

# Gena Frasier Deposition Excerpts

Case 2:24-cv-05618-TJS    Document 171-1    Filed 01/23/26    Page 7 of 33

Deposition of Gena Frasier                                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1          IN THE UNITED STATES DISTRICT COURT

 2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                       - - -

 4   JACOB and JAMES JUNG,   )  CIVIL DIVISION
     as Administrators of    )
 5   the Estate of LOUIS     )  Case No.:
     JUNG, JR.,              )  2:24-cv-05618-TJS
 6                           )
           Plaintiffs,       )  Deposition of:
 7                           )  GENA FRASIER
           vs.               )
 8                           )  Filed on Behalf of the
     CITY OF PHILADELPHIA;   )    Plaintiff
 9   YESCARE CORP.;          )
     BLANCHE CARNEY,         )  Counsel of Record for
10   Former Commissioner     )    This Party:
     of Philadelphia Dept.   )
11   of Prisons; LALITHA     )  Bret Grote, Esq.
     TRIVIKRAM; MAUREEN      )  Nia Holston, Esq.
12   GAY; MARIESHA           )  Rupalee Rashatwar, Esq.
     APOLLON; BLAIR          )  Margaret Hu, Esq.
13   CABELLOS; GENA          )  ABOLITIONIST LAW CENTER
     FRASIER; WANDA          )  990 Spring Garden St.
14   BLOODSAW,               )  Philadelphia, PA 19123
                             )
15         Defendants.       )

16

17                       - - -

18

19

20

21

22

23

24

25
```

```
1            If I can direct your attention to
2    page 000033 -- that's one you haven't looked at
3    yet -- the fourth entry says, "Other event:
4    Jung, Louis W.," "I/P Louis Jung," PP number,
5    "refused insulin," and you entered that.
6            Do you have any recollection of why
7    you wrote that?
8        A.    I'm sure I put it in because he
9    refused insulin.
10       Q.    But do you recall that actual
11   refusal?
12       A.    I don't recall.
13            But I wouldn't just put anything in
14   Lock & Track that's -- I don't do that.
15       Q.    Do you know how he -- I mean, do you
16   recall -- let's see -- did you notify Medical
17   that he refused insulin?
18       A.    I would be certain that I did.
19       Q.    And how would you have done that?
20       A.    Called back the Unit Management, and
21   let the nurse know he refused his insulin.
22       Q.    Would you have documented that call?
23       A.    Again, if you have the time, you can
24   document it.  You should.  I don't -- here, it
25   looks like I didn't, but it's -- you know, I'm
```

1    sure I was busy and doing the best I can,

2    working by myself.  And if I put that entry in,

3    that he refused it, then he told me he's

4    refusing insulin.

5         Q.    So you're certain he would have told

6    you that?

7         A.    Yes.

8         Q.    Would you have gone to the cell door

9    to speak to him?

10        A.    I wouldn't have to.

11              If I'm on the unit, and I'm yelling,

12   "Insulin," and I'm like, "21 cell" or "17 cell,

13   are you coming out for insulin," if they say,

14   "No," then it's no.  I don't have to physically

15   go to the door and say, "Do you want your

16   insulin?"  If I can hear you through the door,

17   and you tell me "No," then the answer is "No."

18        Q.    What would you have done if he just

19   didn't show up?

20        A.    If he just didn't --

21        Q.    Like, you called, "Insulin," and he

22   just doesn't come.

23        A.    Well, then I would go to the door,

24   and I would say, "Hey, do you want your

25   insulin," and then they'd probably say "yes" or

 1  "no."  But if you're telling me "no," because

 2  I'm yelling, "Insulin," or saying, "Insulin in

 3  progress" -- that's a very common way that we

 4  communicate on the areas; we will yell, if

 5  we're by ourselves, ask the guys do they want

 6  to come out or, you know --

 7      Q.    Right before that refusal, it says

 8  "Medication event."  Was the medication event

 9  -- that says, "Insulin in progress," and then

10  it says, "4."  Does that mean four people?

11      A.    Yes.

12      Q.    Okay.  A little bit below that, it

13  says, "Showers remain in progress."  Does that

14  -- if showers are in progress, does that --

15  would the unit would have been locked down or

16  not?

17      A.    No.  We can run showers one or two

18  or three cells at a time.

19      Q.    Even if there is a lockdown?

20      A.    Yes.

21      Q.    Okay.  Taking you back to page

22  000006, which is the second page of this, I'm

23  going to read this second full paragraph into

24  the record, and then I'll ask you some

25  questions about it.  It says:

1            "A review of the electronic logbook

2    (Lock & Track) revealed that you made a

3    Medication Event entry at 16:35 for insulin and

4    Accu-Chek, in which one of the four (4) I/Ps to

5    receive insulin was I/P Jung.  At 16:49, you

6    entered another logbook event acknowledging

7    that I/P Jung had refused his insulin and

8    Accu-Chek.  Further video review was conducted

9    of B1, Pod 3, for the relevant time periods

10   related to your logbook entries of the said

11   medication events.  The video shows that I/P

12   Jung was locked inside of cell #19 and at no

13   time exited the cell.  In addition, at no time

14   did you go to his cell to let him out for

15   insulin and Accu-Chek, nor did it appear that

16   you received any indication of his refusal, as

17   you were observed watching TV in the dayroom

18   (bottom tier area)."

19            Does this refresh your recollection

20   of that medication event at all?

21                ATTORNEY PESTRAK:  Objection

22   to form.

23            But you can answer.

24                THE WITNESS:  I mean, I

25   remember being, you know, out and about.  I'm

 1    sure I yelled, "Insulin in progress."

 2              That's -- I don't know.

 3    BY ATTORNEY GROTE:

 4         Q.    How -- where is the officer's desk

 5    in relationship to -- it says here "cell #19"?

 6         A.    In here (indicating), it says,

 7    "#21."

 8         Q.    It does.

 9         A.    So was it 19 or 21?

10         Q.    Good question.  It says "21"

11    elsewhere even throughout here.  But

12    regardless, where is the officer's desk in

13    relation to cell 19 or cell 21?

14         A.    So cells 19 and 21 are on the top

15    tier, toward -- I mean, in the beginning of the

16    tier, right on the corner.  It's on the corner.

17    My desk is, obviously, on the bottom level

18    (indicating).  I can't really --

19         Q.    Is it in the middle of the housing

20    unit?

21         A.    No.  Our desk is --

22         Q.    More towards one side?

23         A.    Yes.

24         Q.    And is that side closer to or

25    further from 19 and 21?

# Exhibit 4

# Jung Death Investigation

# Report of Investigation

# Office of Special Investigations



## CONFIDENTIAL

| | |
|---|---|
| **Case Number:** | <u>**SI-23-00188**</u> |
| **Allegations:** | **Death of Louis Jung, PID# 718327, (Age 50) (CFCF)** |
| **Cause of Death:** | **Diabetic Ketoacidosis** |
| **Manner of Death:** | **Natural** |
| **Completed by:** | **Lieutenant Shawn Jay** |

ATTORNEYS' EYES ONLY

|  **Commissioner's Office of Special Investigations** | **Case # 23-00188**<br><br>Death of Incarcerated Person Louis Jung, PID# 718327<br>Cause of Death: Diabetic Ketoacidosis<br>Manner of Death: Natural |
|---|---|
| | |

## ALLEGATION

On November 6, 2023, **Incarcerated Person Louis Jung, PID# 718327,** was found having trouble breathing inside of Cell #21, on B1 POD 3, at the Curran Fromhold Correctional Facility, while on the stretcher in route to medical he stopped breathing in the Main Corridor where he was pronounced by Philadelphia Fire Department Medic Schroeder at 6:47am. This investigation was initiated to determine if Correctional Staff and medical personnel adhered to the policy standards set forth for the care of Incarcerated Persons by the Philadelphia Department of Prisons.

**Confidential**
ATTORNEYS' EYES ONLY

1

City-Jung-000002

|  **Commissioner's Office of Special Investigations** | **Case # 23-00188**<br>Death of Incarcerated Person Louis Jung, PID# 718327<br>Cause of Death: Diabetic Ketoacidosis<br>Manner of Death: Natural |
|---|---|
| | |

## INVESTIGATION SUMMARY

**Correctional Officer Tionya Griffin PR# 269225** stated that on November 5, 2023, she was assigned as the B1 Unit Control Officer on the 7pm-7am shift. She stated that she was assisting C/O Hester on B1pod 3 giving out the morning meal and when C/O Hester arrived to Cell# 21 he stated that he needed a stretcher and a call for a stretcher was made via the telephone on the unit. Medical staff along with Sgt. Bello responded to the area. Medical staff placed I/P Jung on the stretcher with the assistance of other I/P'S and took him off of the unit to medical, I/P Jung was breathing but non responsive to verbal commands when they left the unit.

**Correctional Officer Aarron Hester PR# 295830** stated that on November 5, 2023, he was assigned to B1pod 3 on the 7pm to 7am shift. He stated that B1pod 3 was unmanned and himself and C/O Griffin were feeding the morning meal he was feeding the top tier and c/o griffin was feeding the bottom tier. As he reached Cell #21 and opened the door he noticed an I/P lying on the floor of the cell on his mattress appearing to be having difficulty breathing; he called to the I/P and the I/P was not responding to the verbal commands. C/O Hester then ran to the officer's desk and called for a stretcher via telephone. Medical and Sgt. Bello arrived on the unit at which time I/P'S assisted medical in carrying I/P Jung to the stretcher. I/P Jung was breathing but unresponsive to any verbal commands and medical left the unit with I/P Jung on the stretcher.

**Correctional Officer Lakisha James PR# 282411** stated that on November 5, 2023, she was assigned to the Main Corridor Booth on the 7pm to 7am shift. She stated that she saw medical come out B building with an I/P on the stretcher and as they approached the door for medical they stopped in the main corridor and started performing chest compressions (CPR) additional medical staff responded and placed the I/P on the floor and continued chest compressions (CPR) Philadelphia Fire Department Medics arrived and took over care until they pronounced the I/P deceased.

**Correctional Lieutenant Georgia Malloy PR# 220887** stated that on November 5, 2023, she was assigned as the only Lieutenant on the 7pm to 7am shift. She stated that she was on C2 assisting officers with courts and Insulin and Accu check when she heard a stretcher call to B1pod3 she called B1 Unit Control to see what the situation was and was told that Sgt. Bello responded to B1pod3. Lt. Malloy stated that it is not common practice to have a housing area unmanned for any period of time and that on November 5, 2023, she was not informed that B1pod3 was unmanned.



| | |
|---|---|
| **Commissioner's Office of**<br>**Special Investigations** | **Case # 23-00188**<br><br>**Death of Incarcerated Person Louis Jung, PID# 718327**<br>**Cause of Death: Diabetic Ketoacidosis**<br>**Manner of Death: Natural** |
| | |

## INVESTIGATION SUMMARY (cont'd)

**Correctional Sergeant Wasiu Bello PR# 270976** stated that on November 5, 2023, he was assigned as the receiving room supervisor on the 7pm to 7am shift. He stated that he heard a call for a stretcher to B1pod3 and responded. When he arrived medical staff was already on the unit attending to the I/P. Medical staff placed him on a stretcher and took him to medical when they got close to medical the I/P stopped breathing and medical requested for additional medical staff which he called via his PDP issued radio. Additional medical staff responded and rendered life saving measures until fire rescue arrived and pronounced the I/P deceased.

**Tashina Jarvis RN** stated "a stretcher was called to B1pod3 and medical arrived at approximately 6:10am. The patient was lying on the floor next to the toilet. The patient's BS (blood sugar) was taken immediately due to his diabetic status. BS read HI. The patient was not responsive to pain stimuli (sternal rub and ammonia). The patient's skin was cool and clammy, and the patient was nonverbal at the time of initial assessment with a respiration of 20. The patient was immediately transported to the stretcher with the assistance of other I/PS, due to being a noncompliant diabetic. On the way to medical patients' status changed and chest was no longer rising with agonal breath, no pulse detected, and CPR and oxygen delivered via Ambu bag was immediately initiated at 06:22 in the hall outside of medical. Additional medical staff called at 06:22."

**Shatyra Henderson-Hamwright FNP-BC** stated "a stretcher was called to B1pod3 at approximately 6:04 hours. When we arrived on the POD, there was a female officer who stated that there was a patient on the ground in his cell. All medical staff arrived at the cell at approximately 6:10hours. On the floor she observed a male in an orange jumpsuit near the toilet in the supine position he was in the cell alone. The patient was breathing and looking at the ceiling at the time. Upon closer inspection she noticed the patient to be I/P Louis Jung PP# 718327, upon realizing who it was she immediately asked for a blood glucose reading due to knowing him to be a brittle diabetic. His blood glucose reading was obtained and read "high" in addition the patient was also clammy and cold. Patient was minimally responsive to ammonia waved under the nose. We immediately asked for assistance with carrying the patient down the stairs and placing him on the stretcher on the bottom tier at approximately 6:19hours as we were taking the stretcher down the hall to medical she noticed that the patient stopped breathing, Chest compressions (CPR) was started Narcan was administered with no effect, and 14 units of insulin were administered. 911 was called notified immediately by medical staff. The patient was moved from the stretcher to the floor for more effective compressions. CPR was continued and was taken over by Philadelphia Fire Department until they pronounced the patient deceased at 6:47 hours."

**Confidential**



| Commissioner's Office of **Special Investigations** | Case # 23-00188 |
| --- | --- |
| | Death of Incarcerated Person Louis Jung, PID# 718327<br>Cause of Death: Diabetic Ketoacidosis<br>Manner of Death: Natural |

## INVESTIGATION SUMMARY (cont'd)

**Danielle Mcgettigan LPN** stated that on November 6, 2023, she was in Delta 2 medication room prepping medication when she heard a call for additional medical staff needed to the main corridor. When she arrived, chest compressions (CPR) were already in progress by medical staff and she administered nasal Narcan to no avail. She rotated performing chest compressions (CPR), with medical staff. The patient was lowered from the stretcher to the ground and chest compressions (CPR) was continued until fire rescue arrived and told medical staff to stop chest compressions (CPR) and pronounced the patient deceased.

**Blair Cabellos LPN** stated that on November 5, 2023, she was assigned to CFCF. She admitted that it was her in the video. She stated that she saw the I/P on the floor in the doorway of the cell # 21 while walking around with the officer and that the I/P stated that he could not get up. She stated that she did not assist him due to him having a cell mate and that she was instructed to not to go into any cell unless there is more than one officer. She stated that before she exited the unit she had a conversation with the officer in which she told the officer to call for a stretcher due to the I/P stating that he could not get up.

**Correctional Officer Gena Frasier PR# 285093** stated that on November 5, 2023, she was assigned to B1 pod 3 on the 7am to 7pm shift. She denied knowing I/P Jung and did not recall having any interactions with I/P Jung on November 5, 2023. She was shown video footage form B1 pod 3 from November 5, 2023, and she admitted that it is her in the video. She denied recalling what happened when she arrived at Cell# 21 and why her and the nurse walked away from I/P Jung leaving him lying on the floor unattended however she did state that "if she walked away the nurse he could not have been on the floor for anything medical and that's if he was on the floor I still don't know 100% if he was on the floor from the video". She denied calling for a stretcher for I/P Jung and stated that due to a nurse being on the unit and at the cell she is guessing that the nurse said that there is no stretcher needed she is the one that makes the medical decisions. She did not recall what she told Lt. Bloodsaw in reference to I/P Jung in Cell#21 when she arrived on the unit, or why she did not go to Cell #21 with Lt. Bloodsaw. She did admit that her Lock & Track username is Frasier_G and that she made the entries in the electronic logbook on November 5, 2023, for B1 pod 3. She denied recalling how I/P Jung informed her that he refused his insulin on November 5, 2023.She denied recalling if I/P Jung signed a refusal form for refusing his insulin on November 5, 2023. She admitted that when insulin and accu check is in progress she alerts the unit by yelling "Insulin and Accu check in progress".



| Commissioner's Office of<br>Special Investigations | Case # 23-00188 |
|---|---|
| | **Death of Incarcerated Person Louis Jung, PID# 718327**<br>**Cause of Death: Diabetic Ketoacidosis**<br>**Manner of Death: Natural** |
| | |

## INVESTIGATION SUMMARY (cont'd)

**Correctional Lieutenant Wanda Bloodsaw PR# 253488** stated that on November 5, 2023, she was assigned as the B building Unit Manager on the 7am to 7pm shift at CFCF. She denied knowing I/P Jung and having any interactions with I/P Jung on November 5, 2023. She was shown video of B1pod 3 from November 5, 2023, and she admitted that it was her in the video. When asked about what she witnessed when she arrived at Cell # 21 she denied remembering. She denied remembering if I/P Jung was awake and alert when she arrived at Cell # 21. She denied remembering where I/P Jung was located when she arrived at Cell# 21. She denied remembering if she called for a stretcher at any time for I/P Jung on November 5, 2023. She stated that it is not common practice to have I/P workers drag an I/P who cannot get up back into a cell.

**Confidential**
ATTORNEYS' EYES ONLY

City-Jung-000006



**Commissioner's Office of**

## Special Investigations

Case # 23-00188

**Death of Incarcerated Person Louis Jung, PID# 718327**
**Cause of Death: Diabetic Ketoacidosis**
Manner of Death: Natural

## ANALYSIS

FROM:       Sandy Varghese, Community Health Nursing Supervisor

SUBJECT:    LOUIS JUNG PPN 718327

IP Jung was a 50-year-old male admitted to the PDP on 10/27/23 at 13:15 on charges of criminal conspiracy and detainer from Luzerne County. The court report dated 10/24/23 listed his charges as robbery, conspiracy, theft, receiving stolen property, possession of an instrument of crime, terroristic threats, possession of a controlled substance and simple assault. He was previously incarcerated at the PDP on:

- 7/12/12 to 7/13/12
- 6/4/14 to 6/10/14
- 5/26/16 to 5/26/16
- 12/16/21 to 9/27/22
- 12/14/22 to 6/2/23
- 10/27/23 to 11/6/23

The following is a summary of the current incarceration.

10/28/23 9:26AM: Intake screening completed. Answered yes to "Born in, travelled to, lived in, taken a cruise to Cancun, Cozumel or any other areas in Mexico or taken a Caribbean cruise in the last six months, or since 1997 Cameroon, Central African Republic, Chad, Congo, Equatorial Guinea, Gabon, Niger or Nigeria." Answered "no" to diabetes during the Intake with the nurse but answered "yes" to diabetes during the Pre-Intake with the MA. Vitals were temp 97.0, HR 92, BP 110/82, RR 18, oxygen sat 97%, wt. 179 lbs., ht. 66 in., accucheck 542. He stated that he had not had insulin in the last 3 days; the nurse spoke to Provider and administered 10 U NPH and 12 U Regular insulin. Urine was positive for ketones, and he was encouraged to drink plenty of water. Urgent Behavioral Health referral generated. Orders written for Levothyroxine 150mcg daily for Hypothyroidism, Atorvastatin 20mg every evening for mixed hyperlipidemia based on previous admission. Orders were also written for insulin, labs and chronic care. (Labs scheduled for 11/10/23, chronic care for 11/25/23)

11/6/23 RN Jarvis note: "A stretcher was called to B1pod3, 21 cell and medical arrived approximately 0610. The patient was found laying on the floor next to the toilet. Patients BS was taken immediately due to his diabetic status. BS read HI. The patient was not

City-Jung-000007



**Commissioner's Office of**

**Special Investigations**

**Case # 23-00188**

*Death of Incarcerated Person Louis Jung, PID# 718327*
**Cause of Death: Diabetic Ketoacidosis**
**Manner of Death: Natural**

### ANALYSIS (cont'd)

responsive to pain stimuli (sternal rub and ammonia). The patients skin was cool and clammy, and the patient was nonverbal at the time of the initial assessment with a respiration of 20. The patient was immediately transported to the stretcher with the assistance of other IP's, due being a noncompliant diabetic. On the way to medical patients status changed and chest was no longer rising with agonal breath, no pulse detected and CPR and oxygen delivered via Ambu bag was immediately initiated at 0622 in the hall outside of medical. Additional medical called at 0622. CPR continued, 14 units of insulin given per provider Henderson at 0624 along with 2 rounds of nasal Narcan. Fire rescue arrived 0646 and 0647 CPR was discontinued per fire rescue order."

11/6/23 LPN McGettigan note: "Call was made for additional medical staff to the main corridor. Upon my arrival, patient was on a backboard on the stretcher and CPR was in progress. Brown fluid observed around the patients mouth. Report from staff included patient blood glucose read "HI". I gave 1 nasal Narcan (a second nasal Narcan was given by another nurse), assisted with several rounds of chest compressions and breaths via ambu bag. Patient was lowered to the floor and CPR continued. AED administered one shock, with all the other analysis stating "no shock advised." When fire rescue arrived, they stated that we are to cease CPR."

11/6/23 Dr. Trivikram note: "Additional medical was called to the main corridor. To the right of the door to Medical, medical staff was found in the process of doing CPR on an IP on the stretcher. The triage provider asked me to call 911, so I returned to Triage and call at 6:24 am. I returned to the scene and asked for the patient to be brought to the floor. The board was placed under the patient and he was moved to the floor. I assumed position at the head of the patient to bag ventilate. The AED was already on and engaged. Several rounds of CPR were conducted and only one defibrillation shock was delivered mid code (the other AED analysis before and after did not require shock). Attempts to secure IV access were unsuccessful. Fire Rescue arrived and asked Medical staff to discontinue CPR at 6:47am."

11/6/23 NP Henderson-Hamwright note: "At approximately 0604 hours on 11/06/2023, a stretcher call was heard overhead asking for response at B1POD3. Medical staff present at triage collected equipment and responded. When we arrived on the POD, there was a female officer on the top tier who calmly stated that there was a patient on the ground in his cell. All medical staff present climbed the stairs and arrived at the cell

|  **Commissioner's Office of Special Investigations** | **Case # 23-00188**<br>**Death of Incarcerated Person Louis Jung, PID# 718327**<br>**Cause of Death: Diabetic Ketoacidosis**<br>**Manner of Death: Natural** |
|---|---|
| | |

### ANALYSIS (cont'd)

at approximately 0610 hours. On the floor, I observed who appeared to be a white male with dark hair dressed in an orange jumpsuit on the floor near the toilet in the supine position. He was in the cell alone. No other incarcerated person was present in the cell. The patient was still breathing at the time and was looking at the ceiling. Upon closer inspection, I recognized the patient as Louis Jung. When I realized who was there, I asked for a blood glucose reading because I knew him to be a brittle diabetic. His blood glucose was obtained by a responding nurse. She obtained a reading of high. In addition to the high blood glucose reading, the patient was also clammy and cold. Patient was minimally responsive to ammonia waved under the nose. We immediately asked for assistance with carrying the patient down the stairs and placing him on the stretcher on the bottom tier.

The patient was placed onto the stretcher at approximately 0619 hours. He was still breathing without assistance at that time. We began moving towards medical triage to administer insulin and further assess the patient. As we passed the elevator at approximately 0622 hours, I noticed that the patient was no longer breathing. We pulled the stretcher onto level ground in the main corridor where CPR was started. Narcan was administered twice with no effect. 14 units of insulin admnistered. 911 was notified immediately by medical staff. At that time, we were unable to obtain a blood pressure from the patient and we were unable to obtain a pulse. The patients head was turned to the left side and an unknown liquid leaked from his mouth. This occurred twice more during CPR. AED and ambu-bag were applied since patients breathing did not seem to be effective. The patient was eventually moved from the stretcher onto the floor for more effective compressions. Approximately 5 to 6 rounds of CPR with only a weak thready pulse detected in between were performed prior to the fire departments arrival at 0646 hours. CPR was stopped by the fire department and the patient was pronounced at 0647 hours."

11/6/23 LP Jeoboham note: "IP Jung was found unresponsive when I got to him on the stretcher, CPR was performed by myself, along with two other nurses until paramedic arrived and called time of death."

Comments:
- He was not seen for the Urgent BH referral. He was a Norristown Return which means an Emergency Referral should have been generated at Intake.



| **Commissioner's Office of**<br>**Special Investigations** | <u>Case # 23-00188</u><br><br>**Death of Incarcerated Person Louis Jung, PID# 718327**<br>**Cause of Death: Diabetic Ketoacidosis**<br>**Manner of Death: Natural** |
|---|---|
| | |

## ANALYSIS (cont'd)

- Admitted to Norristown State Hospital on 6/2/23 and returned to PDP on 10/27/23. We did not receive discharge paperwork from Norristown.
- Norristown evaluation found him to be competent and malingering.
- Review of the MAR showed that he refused AM insulin 11/1/23 and PM insulin 11/5/23. Refusal forms were not found in eCW or HCS. 10/30/23 PM dose and 11/4/23 PM dose was "not documented". He was a "no show" for insulin 11/3/23 AM dose and 11/5/23 AM dose. He was not Red Flagged for any of these missed/refused encounters.
- Preliminary cause of death is Diabetic Ketoacidosis.

**Confidential**

|  **Commissioner's Office of Special Investigations** | <u>Case # 23-00188</u><br>**Death of Incarcerated Person Louis Jung, PID# 718327**<br>**Cause of Death: Diabetic Ketoacidosis**<br>**Manner of Death: Natural** |
|---|---|
| | |

## <u>CONCLUSION</u>

A review of Incarcerated Person Louis Jung's PDP file revealed that he was adequately provided with the services afforded to all Incarcerated Persons. However, based on staff interviews, medical reports, and the Medical Examiner's findings, there was negligence on the part of Medical staff; and PDP staff. Therefore, the allegation of Staff Misconduct against PDP/ Medical staff is **Sustained**. C/O Gena Frasier, PR# 285093, failed to render immediate aid to IP Jung as outlined in PDP Policy 4.E.21 (PDP Staff Roles in Non-Routine and/or Medical Emergency Situations). Video footage from November 5, 2023, revealed that C/O Frasier and LPN Cabellos walked away from I/P Jung and left I/P Jung unattended lying on the floor outside of his cell for approximately 9 minutes. Correctional Lieutenant Wanda Bloodsaw, PR# 253488, arrived at the cell and appeared to be trying to communicate with I/P Jung before two I/P's come to the cell and drag I/P Jung into the cell as Lt. Bloodsaw monitors the situation the I/P's exit the cell which is then secured by Lt. Bloodsaw who then exits the housing area. It should be noted that C/O Frasier, Lt. Bloodsaw and LPN Cabellos failed to call for a stretcher or initiate aid to I/P Jung during his medical emergency.

```
┌────────────────────────────────┐
│ OPC INVESTIGATION CONCLUDED    │
│                                │
│        MAR 29 2024             │
│                                │
│           DIRECTOR             │
│ OFFICE OF PROFESSIONAL COMPLIANCE │
│      PHILADELPHIA PRISONS      │
└────────────────────────────────┘
```

**Confidential**<br>ATTORNEYS EYES ONLY

# Exhibit 5

# Shawn Jay Deposition Excerpts

Case 2:24-cv-05618-TJS    Document 171-1    Filed 01/23/26    Page 26 of 33

Deposition of Shawn Jay                    Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                    -   -   -

4   JACOB and JAMES JUNG, as      :
    Administrators of the Estate  :
5   of LOUIS JUNG, JR.,           :
              Plaintiff,          :
6                                 :
    -vs.-                         :
7                                 :
    CITY OF PHILADELPHIA, et al.,:
8             Defendant(s).       : 2:24-cv-05618-TJS

9                    -   -   -

10              Friday, October 10, 2025

11                   -   -   -

12              Videoconferenced deposition of

13   SHAWN JAY, taken pursuant to notice, was held

14   virtually in the Commonwealth of Pennsylvania,

15   commencing at 10:19 a.m., on the above date,

16   before Jared Carey, a Professional Reporter and

17   Notary Public in and for the Commonwealth of

18   Pennsylvania.

19                    -   -   -

20

21

22          EVEREST COURT REPORTING LLC
                100 N. 18th Street
23                  Suite 2001
            Philadelphia, Pennsylvania 19103
24                (215) 341-3616

25

Case 2:24-cv-05618-TJS    Document 171-1    Filed 01/23/26    Page 27 of 33

Deposition of Shawn Jay                          Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

1          A.      I started when I was a sergeant.

2    I have been in this role of the Office of

3    Professional Compliance I believe since the end

4    of 2019.

5          Q.      By your estimate, how many

6    investigations have you conducted for PDP?

7          A.      I don't have an exact number or

8    ballpark.  I know it's been several.

9          Q.      Six years' worth of experience?

10         A.      Yes.

11         Q.      So I know you mentioned briefly

12   earlier -- can you repeat for me what kinds of

13   incidents you investigate for OPC?

14         A.      I do internal affairs incidents,

15   which can be staff misconduct, undue

16   familiarity.  I also do special investigations

17   which are -- and part of that is any

18   incarcerated individuals that happened to be

19   deceased, I investigate those investigations as

20   well.

21         Q.      You mentioned after internal

22   affairs as examples employee misconduct and also

23   undue familiarity.  What is "undue familiarity"?

24         A.      That's potential relationships

25   between staff and incarcerated individuals.

1          Q.      Do you receive all assignments

2    from Captain Ivan Marshall?

3          A.      Yes.

4          Q.      And then is the way you receive

5    or are assigned investigations different if it's

6    a special investigation?

7          A.      No.  It's basically the same as

8    far as the assignment goes, yes.

9          Q.      How is the process different for

10   special investigations?

11         A.      Special investigations in regards

12   to incarcerated persons, death investigations, I

13   actually show up to the -- I would get a phone

14   call stating that there was a death.  And I

15   would show up to the location, whether it's the

16   facility and/or the hospital, depending on where

17   it takes place.

18                 And when I arrive I look at the

19   scene of where it took place.  And then I would

20   notify the Philadelphia Department of Police

21   Officer Involved Shooting Unit who is in charge

22   of doing the in-custody death investigations as

23   well for them.

24                 And when they arrive we exchange

25   information and what we have.  And we go over

1    things.  They conduct interviews of the staff

2    members.  I would conduct interviews of staff

3    members and then gather video or anything that I

4    would need.

5              And then the following day I have

6    to go to the autopsy and view the autopsy.  And

7    then from there while I'm awaiting the final

8    autopsy from the Medical Examiner's Office I

9    conduct my investigation, such as interviews,

10   further interviews, things of that nature, and

11   then come to a conclusion.

12        Q.    Thank you.

13              You mentioned in both these death

14   investigations and also internal affairs that a

15   key part of investigating is interviews; is that

16   correct?

17        A.    Yes.

18        Q.    How do you approach those

19   interviews?  What do they look like?  Do you do

20   them separately?  Walk me through that process.

21        A.    Each interview is done

22   separately.  Basically from the information that

23   I gather from the institutional investigation --

24   because everything is investigated by the

25   institution.  I will get a copy of their

1  investigation.  I look at what they have.  And

2  then I run through and I make up questions and

3  do whatever I have to do and then do the

4  interviews and individually.

5       Q.    Do you decide who to interview?

6  Or is that also assigned to you?

7       A.    No.  I decide who to interview.

8       Q.    How you decide the scope of who

9  is relevant to interview?

10      A.    Based upon -- everything is based

11  upon pretty much policies and procedures on our

12  end to make sure all the policies and procedures

13  and standards were followed during said process.

14      Q.    How do you determine the scope?

15  So, for instance, maybe how far back to ask

16  about what is relevant?

17      A.    When there is a death I try to go

18  back at least as far as the video goes to see

19  the last person -- the last time the decedent

20  was seen on video.  And from there I kind of

21  work my way through it.

22      Q.    Just to make sure we're on the

23  same page:  I think all of these questions I'm

24  asking from here on out about investigation --

25  let's focus on special investigations,

```
 1   specifically death investigations.

 2        A.      Okay.

 3        Q.      So for those sorts of

 4   investigations, you mentioned you also review

 5   documentation.  You review video.  What other

 6   documents or records do you typically review?

 7        A.      Basically it's the institutional

 8   investigation.  Because every time there is an

 9   incarcerated person death, the institution they

10   are housed at does their own separate

11   investigation.

12              So I would look at that.  I would

13   look at the medical records briefly, you know,

14   look at memos from staff and memos from medical

15   and everything and then conduct interviews based

16   on that.

17        Q.      You mentioned that the

18   institution does their own separate

19   investigation.  Is that happening concurrent

20   with your investigation?  Or does it close

21   before yours, if that makes sense?

22        A.      Usually that one closes before

23   mine.

24        Q.      Then do you then receive the

25   documents from that investigation and conduct
```

1    your own investigation?

2          A.    Yes.

3          Q.    Do you ever review Lock & Track

4    records as part of your investigation?

5          A.    Yes.

6          Q.    Other than the methods you

7    mentioned before such as interviewing relevant

8    folks, looking back on video, reviewing

9    documents both on your own and also from this

10   other investigation, do you use any other

11   methods?

12         A.    No.

13         Q.    How long does a typical

14   investigation into a death take?

15         A.    It can be several months due to

16   the fact that I have to wait for the final

17   autopsy report to come out before I can close

18   and complete my investigation.

19         Q.    And is the amount of time it

20   takes up to you?  Or are there set deadlines for

21   that?

22         A.    Normally it's a 90-day period.

23   But we can file for a case extension.  So once

24   we put in for that extension it's kind of -- I

25   will use, for lack of a better term, I will say

Estate of Louis Jung, Jr. v. City of Philadelphia, et al.

```
 1   unlimited.  There is not really a timeframe

 2   after that.

 3               And like I said, in these cases

 4   almost all the time an extension is filed

 5   because I have to wait for the medical

 6   examiner's final report.  And unfortunately in

 7   these cases it does take time to get that.

 8        Q.     How long on average does it take

 9   for that autopsy report to come back?

10        A.     It could take -- I've had it

11   where it's been over a year.  And I've had it

12   where it's been like six months, four to six

13   months, depending on their office.  I am at the

14   mercy of them.

15        Q.     When is your investigation

16   considered finished?

17        A.     The investigation is considered

18   finished once I submit it to my superior for

19   review.  And then he signed off on it.

20        Q.     Once the investigation is

21   finished and the report is signed off, what

22   happens next?

23        A.     If there is any discipline that

24   would be given out to the employees, that

25   discipline is sent over to them.  And they would
```