**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JACOB and JAMES JUNG, as Administrators of the Estate of LOUIS JUNG, JR, | : : : | No. 2:24-cv-05618-TJS |
| Plaintiff, | : : : | |
| v. | : : : | |
| CITY OF PHILADELPHIA, et al., | : : : | |
| Defendants. | : : | |

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' PETITION FOR FEES AND COSTS**

Plaintiffs' Fee Petition provided extensive evidence of detailed record-keeping justifying the attorney fees and costs that counsel are entitled to for achieving outstanding results in complex litigation implicating the most consequential of constitutional rights violations. Defendants' outlandish request to reduce Plaintiffs' fees and costs by 60% is untethered from any mathematical or legal principle and should be rejected out of hand. Plaintiffs' counsel are entitled to the full extent of their requested fees and costs.

I.     **There is no basis for a reduction in fees relating to the degree of Plaintiffs' success.**

Defendants misconstrue case law and misrepresent facts with respect to both the significance of the term "prevailing party" and Plaintiffs' degree of success. First, it is beyond dispute that Plaintiffs prevailed on their municipal liability claim against the City—a substantial undertaking and meaningful victory, particularly given the heightened intent standards governing Fourteenth Amendment claims in the prison context. The City cannot minimize that success here by pointing to Plaintiffs' lack of success against one of three defendants while, in other litigation, arguing that fees should be reduced where plaintiffs fail to establish municipal liability. Indeed, as the City has acknowledged in response briefing in a separate case, "all aspects of municipal

1

liability litigation—particularly discovery—are significantly more onerous than litigating a discrete underlying claim." *Dennis v. City of Philadelphia*, No. 2:18-cv-2689, Def. Resp. Br. at 3 (ECF No. 316). Moreover, as Plaintiffs detailed at length in their opening brief, claims against Officer Frasier and ADA claims dismissed at summary judgment are not properly excludable under operative legal standards. Defendants cherry-pick Plaintiffs' earliest global settlement offer, an opening negotiation position communicated to multiple parties in addition to City Defendants and omit the fact that the jury verdict vastly exceeded the pretrial offers the City put forward themselves. Plaintiffs are the prevailing parties and obtained an exceptional degree of success. Their fees should not be reduced on this basis.

### a. The ADA claims and claims against Officer Frasier share a common core of facts with claims on which Plaintiffs prevailed at trial.

Defendants cite no law to support their arguments that the verdict against Officer Frasier or the dismissal of Plaintiffs' ADA claims affect recoverable fees. As cited in Plaintiff's opening brief in support of their fee petition, the case law does not support Defendants' position. Fees incurred in the prosecution of claims based on a "common core of facts" or "related legal theories" to successful claims are properly recoverable. *Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (1983); *see also City of Riverside v. Rivera*, 477 U.S. 561, 570 (1986); *Dennis v. Jastrzembski,* No. CV 18-2689, 2025 WL 1582452, at *2 (E.D. Pa. June 4, 2025).

Plaintiffs did not prevail on their claim against Defendant Frasier individually. That is why they are not seeking fees from Defendant Frasier. Rather, Plaintiffs have contended and continue to contend that prosecution of the claims against Defendant Frasier involved a common core of facts and related legal theories to the claims against Bloodsaw, Carney, and/or the City, from whom they are seeking fees. Defendant Bloodsaw was only present on the block on the morning of November 5, 2023 because Gena Frasier summoned her. Factual issues relevant to Defendant

Bloodsaw, including precisely what information she knew or what Mr. Jung's physical state was at the time she arrived, follow naturally and immediately from Mr. Jung's interaction with Frasier and Nurse Cabellos and Frasier's subsequent interaction with Bloodsaw. Claims against Defendants Frasier and Bloodsaw shared a common core of facts and a common theory of deliberate indifference.

Defendants adopt a strained reading of the verdict form in isolation to conclude that the jury rejected Plaintiffs' theories against Defendant Carney related to supervision of correctional staff, rather than YesCare. This is directly belied by the instructions read to the jury before they filled out the form. They were instructed that "Plaintiffs may show that Defendant Carney is liable for Defendants Bloodsaw and Frasier's conduct by showing that she, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the conduct." Trial Tr., Day 4, 102:10-14, March 2, 2026. They then received two extensive instructions incorporating "customs" that could be found to result in supervisory liability for Carney – one related to the medical provider, as well as a "custom of correctional staff in failing to respond to medical emergencies…" The jury answered "yes" to the question "Did defendant Blanche Carney establish and maintain a policy, practice, or custom which directly caused the violation of Louis Jung, Jr.'s constitutional right to medical care?" Dkt. 223-1. The jury also answered "yes" to the question "Did defendant City of Philadelphia violate Louis Jung, Jr.'s constitutional right to necessary medical care?" after receiving extensive instructions on failure-to-supervise and custom claims on theories relating to correctional staff as well as YesCare. The jury found egregious misconduct on the part of correctional staff in this case and gave a verdict consistent with Plaintiffs' *Monell* and supervisory theories relating to the conduct of correctional

staff. Developing customs and supervision theories around correctional staffs' failures in emergency response also incorporated a core of facts common to the claim against Frasier.

Defendants admit that Plaintiffs prevailed on a theory relating to the supervision of YesCare. The atrocious diabetes care underlying this constitutional claim shared a common core of facts with the ADA claim. Plaintiffs' complaint alleged the denial of multiple reasonable accommodations specific to Mr. Jung's diabetes care, the denial of which simultaneously established constitutionally deficient care – these included the denial of "insulin administration and regular glucose level checks," Dkt. 27 at 29, ¶ 156, as well as placement in the infirmary, *Id.* at 32, ¶ 174. Denial of insulin administration and glucose checks and the failure to place Mr. Jung in the infirmary constituted a core of facts common to Plaintiffs' constitutional medical care claims, developed extensively at trial through expert testimony. *See* N.T. 2/25/26 at 219-20, 244-45. Plaintiffs pursued factual investigation and expert opinions that served both their ADA theory and their constitutional claims. Dr. Williams' and Dr. Venters' opinions regarding well-recognized misinterpretation of diabetes symptoms, for instance, were elicited at trial in support of constitutional claims as well as cited in Plaintiff's ADA briefing at the summary judgment stage. *Compare* Dkt. 116, Plf.'s Memo. of Law in Opp. To City Motion, at 32 *with* N.T. 2/25/26 at 269-270. Because claims on which Plaintiffs prevailed at trial shared a common core of facts with other claims, attorneys' fees expended in developing the common factual record are recoverable.

### b. Plaintiffs greatly exceeded the settlement offers put forward by City Defendants at trial.

While the Third Circuit has held that otherwise inadmissible settlement negotiations may be considered in fee petition disputes, it found it "important to note that we hold only that settlement negotiations *may* be relevant in measuring success, and, if so, are clearly only one factor to be considered in the award of fees. A court is also free to reject such evidence as not bearing on

success when, for instance, negotiations occur at an early stage before discovery, or are otherwise not a fair measure of what a party is truly seeking in damages." *Lohman v. Duryea Borough*, 574 F.3d 163, 169 (3d Cir. 2009) (emphasis in original).

City Defendants cite to Plaintiffs' initial settlement demand made nearly a year before trial – offered to YesCare Corp., multiple YesCare medical defendants, and Nurse Apollon, as well as the City Defendants ultimately brought to trial– as a benchmark for Plaintiffs' relative success. This is misguided for multiple reasons. This initial demand was levied "at an early stage" before discovery was fully underway. *Lohman*, 574 F.3d at 169. It was a global demand communicated to multiple parties, many of whom settled out of the case before Plaintiffs proceeded to trial against City Defendants. It is no secret that YesCare is in dire financial straits, a condition which became known to Plaintiffs and the public after this initial demand was communicated.[1] This initial, global negotiation position is not a fair measure of Plaintiffs' degree of success against City Defendants.

City Defendants conveniently omit their own settlement positions. Plaintiffs' success at trial greatly exceeded City Defendants' pretrial offers. City Defendants lodged a Rule 68 offer in the amount of $950,000 on March 18, 2025, and lowered their subsequent offers at mediation sessions to only $750,000. Ex. 1, City Rule 68 Offer, March 18, 2025; Ex. 2, Declaration of Bret Grote. Plaintiffs exceeded City Defendants' Rule 68 amount by nearly 60% at trial, and more than doubled their last and most recent mediation settlement offer.

Third Circuit courts regularly decline to reduce attorneys' fees when presented with even larger discrepancies between pretrial negotiations and jury verdicts. *See Mancini v. Northampton*

---

[1] For recent coverage of YesCare's default on settlement payments owed in its prior bankruptcy proceeding, see James Nani, *YesCare Settles With Prison Health Trust to Cure Payment Default*, Bloomberg Law (Feb. 2, 2026), https://news.bloomberglaw.com/bankruptcy-law/yescare-settles-with-prison-health-trust-to-cure-payment-default-1; Akiko Matsuda, *Prison Health Contractor YesCare Loses Bankruptcy Shield After Settlement Default*, Wall Street Journal (March 5, 2026), https://www.wsj.com/articles/prison-health-contractor-yescare-loses-bankruptcy-shield-after-settlement-default-2b72a937.

*Cnty.*, 836 F.3d 308, 320–21 (3d Cir. 2016) (district court properly declined to reduce for limited success even though plaintiff prevailed on only one out of 15 claims and received a jury award that was 5% of damages requested, where claims shared a common core of facts and plaintiff won on the central issue); *Moorehead v. Sch. Dist. For the City of Allentown*, No. 22-Civ.-03959, 2025 WL 1618144, at *4 (E.D. Pa. June 6, 2025) (declining to reduce fee award where plaintiff successfully vindicated his constitutional rights, even though plaintiff rejected $2.5 million settlement offer and received only $131,500 in damages); *Victory v. Berks County*, 452 F. Supp. 3d 185, 207–08 (E.D. Pa. 2020) (rejecting argument fee should be reduced even though plaintiff was awarded $2,800 in damages after making settlement demand of $160,000).

As discussed above, singling out Plaintiffs' early-stage, multiple-defendant, opening negotiation position is inconsistent with *Lohman* and with common sense. This court is not required to consider settlement negotiations at all. To the extent that this Court exercises its discretion to consider such negotiations, the fact that they vastly exceeded all of City Defendants' pretrial offers is far more probative of the degree of Plaintiffs' success at trial.

### c. Plaintiffs obtained a landmark victory that served a public purpose.

From the moment this suit was filed, the Jung family has been clear about the existence of several goals they hoped to achieve through litigation. As they stated on October 23, 2024, "We cannot wrap our heads around letting someone lay there suffering to die. *We want to let everyone know how inhumane this whole situation is*. No one else should have to go through what his three sons, heartbroken mother, brother, sisters, and entire family are going through."[2] Plaintiffs intended in part for their litigation to serve purposes of public education, bringing light to the

---

[2] Louis Jung Family Statement (Oct. 23, 2024), https://abolitionistlawcenter.org/2024/10/23/louis-jung-family-statement/ (emphasis added).

inhumane conditions of the Philadelphia jails, and deterrence, generating enough public accountability to reduce the likelihood that such a torturous death would occur again.

These litigation goals are eminently legitimate in their own right and are also properly considered in subsequent fee petition disputes. A "district court determining the degree of a plaintiff's success should consider not only the difference between the relief sought and achieved, but also the significance of the legal issue decided and whether the litigation served a public purpose." *Jama v. Esmor Corr. Servs., Inc.*, 577 F.3d 169, 176 (3d Cir. 2009) (*citing* Justice O'Connor's concurrence in *Hensley*, 561 U.S. at 121-22). Other circuit courts have expanded on factors relevant to evaluation of a lawsuit's "public purpose," including "whether the judgment vindicates important rights and deters future lawless conduct." *Phelps v. Hamilton,* 120 F.3d 1126, 1132 (10th Cir. 1997). As a rule of thumb, the "more important the right at stake and the more egregious the violation the more likely it is that the victory serves a public purpose." *Cartwright v. Stamper,* 7 F.3d 106, 110 (7th Cir.1993).

The Jung family were successful in achieving this goal. Journalists from the local press were present for every day of the trial. The inhumanity of the situation that resulted in Mr. Jung's death was widely reported in coverage of the verdict.[3] Upon information and belief, it is one of the most prominent wrongful death verdicts against the City of Philadelphia for a death that occurred

---

[3] Emily Rizzo, *Experts Cite 'Systemic' Lapses in Philly Jail Care as Jury Finds City Liable in Diabetes* Death, Kensington Voice (March 5, 2026), https://www.kensingtonvoice.com/experts-cite-systemic-lapses-in-philly-jail-care-as-jury-finds-city-liable-in-diabetes-death/; Abraham Gutman, *A Jury Awarded $1.67 Million to the Sons of a Diabetic Man Who Died in a Philly Jail*, Philadelphia Inquirer (March 3, 2026), https://www.inquirer.com/news/philadelphia/philadelphia-jail-death-diabetes-verdict-20260303.html; Courtenay Harris Bond, *Jury Awards $1.5 Million to Family of Man Who Died of Diabetes Complications in Philly Jail*, Philly Voice (March 3, 2026), https://www.phillyvoice.com/philly-jail-diabetes-death-lawsuit-verdict/; Jack Tomczuk, *Jury Rules Philly Must Pay $1.5 Million to Family of Man Who Died in City Jail*, Metro Philadelphia (March 3, 2026), https://metrophiladelphia.com/stories/jury-philly-15-million-family-dead-inmate,130205.

in one of the City's Jails. It exposed information otherwise not publicly available, and gave the public insight into the conditions at the jails at the time Mr. Jung died.

Plaintiffs brought this case to vindicate legal rights of utmost importance. The constitutional principles ensuring incarcerated people a right to medical care are rooted in "broad and idealistic concepts of dignity, civilized standards, humanity and decency," the "evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (*quoting Jackson v. Bishop*, 404 F.2d 571, 529 (E.D. Ark. 1968); *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). They demonstrated not only that these core concepts of humanity and decency had been violated, but that the City of Philadelphia was at fault. A "determination that the municipality violated plaintiffs' constitutional rights represented a significant legal conclusion serving an important public purpose." *Diaz-Rivera v. Rivera-Rodriguez*, 377 F.3d 119, 125 (1st Cir. 2004) (*quoted in Jama*, 577 F.3d at 176).

As part of the verdict, Plaintiffs achieved not only compensation for their grievous loss, but punitive damages against Defendant Bloodsaw. Punitive damages are reserved for malicious or wanton conduct – the sort of "egregious violation" that courts have recognized as indicative of a public purpose. *Cartwright*, 7 F.3d at 110. As is well-recognized in case law and in the instructions given to the jury, one of the legitimate objections of punitive damages is to deter the defendants and others like the defendants from committing such conduct in the future. Imposing a concrete measure of deterrence against correctional staff in this case was a victory that cannot be understated. Plaintiffs' degree of success was outstanding.

**II.    Plaintiffs' Counsel Used Considerable Billing Judgment, and If Anything, Underbilled.**

Defendants' assertion that Plaintiffs failed to exercise billing judgment is incorrect. The record reflects the opposite: Plaintiffs' counsel exercised substantial restraint and submitted a fee request that is conservative relative to the actual work performed.

The Supreme Court has made clear that fee applicants must exclude "excessive, redundant, or otherwise unnecessary" time. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). Once a fee petitioner demonstrates that its hours and rates are reasonable, the resulting lodestar is presumed to be the reasonable fee. *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001) (quoting *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564 (1986). The burden then shifts to the party opposing the fee petition to challenge with sufficient specificity the reasonableness of the requested fee. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). Courts also recognize that fee petitions often reflect billing judgment already exercised, as counsel routinely write off time before submission. See *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).[4]

That is precisely what occurred here. Plaintiffs' counsel did not bill for all work performed. They excluded categories of time that would be routinely billed in private practice, including work performed by law student interns, time spent by non-legal ALC staff supporting the work on the legal team during jury selection and trial, and other media work related to the case. In large firms,

---

[4] The Court in *Moreno* included the following reminder regarding billing in contingency cases: "It must also be kept in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee. It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker."

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008)

this work is commonly billed—often across multiple timekeepers—but here it was either not billed at all or only partially reflected in counsel's time records.

This restraint is particularly significant given counsel's structure. Plaintiffs were represented by a small nonprofit public interest organization that does not charge its clients. Unlike large firms, Plaintiffs' counsel do not have teams of paralegals or litigation support staff to whom tasks can be delegated. As a result, attorneys necessarily performed this work, which was essential to the conduct of the litigation. It is a case in which counsel, operating with limited resources, exercised billing judgment and underbilled relative to the actual time required to litigate and try a complex civil rights case to verdict. Defendants' argument ignores that reality and provides no basis for a reduction.

### a. Plaintiffs Did Not Overbill for Depositions

Defendants make much of the number of depositions taken in this case and appear to imply, without legal support or reasoned argument, that time expended with respect to deponents not called at trial should not be recovered, because Plaintiffs elected not to call certain deponents as witnesses at trial. They also claim that Plaintiffs overstaffed these depositions. Both arguments fail. Time expended in deposing these individuals was useful and of the type ordinarily necessary to secure the final result obtained.

Courts in the Third Circuit often evaluate the necessity of depositions in the context of taxability under 28 U.S.C. 1920(2) and (4), which requires an assessment of whether depositions were "necessarily obtained for use in the trial." It is well-settled that neither live testimony nor introduction of deposition transcripts are dispositive of even this, higher legal standard. "Rather, the determination of necessity must be made in light of the facts known at the time of the deposition, without regard to intervening developments that later render the deposition unneeded

10

for further use." *Fitchett v. Stroehmann Bakeries*, No.95-284, 1996 WL 47977, at *8-9 (E.D.Pa. Feb. 1, 1996); *see also McLaughlin v. Fisher*, No. CIV.NO.3:00-CV-0521, 2008 WL 4210475, at *3 (M.D. Pa. Sept. 9, 2008). Each of the depositions here contributed either to development of the claims against the City's correctional staff or in developing the factual record related to lapses in YesCare's diabetes care at PDP – a case that formed the core of Plaintiffs' failure-to-supervise YesCare claim, on which Defendants concede Plaintiffs' success. That Plaintiffs made strategic decisions to limit live testimony subsequent to Nurse Apollon and YesCare's settlement did not render any of these depositions less useful at the time they were taken.

Defendants' arguments regarding the number of attorneys present at these depositions fail as well. First, "[i]t is eminently reasonable for multiple attorneys to work on the same assignments." *Minehan v. McDowell*, No. 21 Civ. 5314, 2023 WL 8701296, at *3 (E.D. Pa. Dec. 15, 2023), aff'd, No. 23-2737, 2024 WL 4403873 (3d Cir. Oct. 4, 2024); *Jefferson v. City of Camden*, No. 01 Civ. 4218, 2006 WL 1843178, at *9–10 (D.N.J. June 30, 2006) (rejecting argument that the involvement of multiple counsel on the same tasks demonstrated overstaffing). Defendants also claim that "only one of those attorneys asked questions of the deponent or defended a deponent on the record." Def. Resp. at 5. That is incorrect. Plaintiffs' counsel entered their appearances at many of the depositions and several spoke on the record, reflecting active participation rather than passive attendance.[5] All deponents were considered for their testimony at trial and all were named in both Plaintiffs' and Defendants' Pretrial Memorandum as potential witnesses to be called at trial.

---

[5] For example, at the deposition of Nurse Blair Cabellos, all attorneys who entered their appearances spoke on the record. Cabellos Dep Tr. at 42, 44, 45, 46, 84, 85, passim. At the deposition of Wanda Bloodsaw and Gena Frasier, attorneys Hu, Rashatwar, Grote, and Holston entered their appearances.

More fundamentally, Defendants' argument misstates the governing legal standard. Courts do not impose a numerical limit on the number of attorneys who may attend a deposition. The question is whether counsel were "unreasonably doing the same work." *Rode v. Dellarciprete*, 892 F.2d 1177, 1187 (3d Cir. 1990). Where attorneys perform distinct roles, their participation is not duplicative. Courts addressing this issue in the deposition context have been equally clear. *See Bohen v. City of E. Chicago*, 666 F. Supp. 154, 157 (N.D. Ind. 1987) (rejecting defendants' claim of duplication at depositions, noting that "[u]se of more than one lawyer is common in legal practice. Consultation among lawyers ensures that they do not overlook significant facts or inquiries. … Two lawyers are the minimum in much private litigation"); *Oklahoma Nat. Gas Co. v. Apache Corp.*, 355 F. Supp. 2d 1246, 1259 (N.D. Okla. 2004) ("Defendants seek to reduce ONG's fee request by $10,000 because multiple attorneys attended hearings, depositions and trial. There is no legal basis to limit an attorney fee award to only one attorney. *See, e.g., A.J. v. Kierst*, 56 F.3d 849, 863–65 (8th Cir.1995) (Use of more than one attorney in multiple party litigation recognized as both desirable and common)"); *Kelly v. Wengler*, 7 F. Supp. 3d 1069, 1079 (D. Idaho 2014) (finding multiple attorneys at deposition reasonable in light of "compressed litigation schedule and volume of discovery" in case), *aff'd*, 822 F.3d 1085 (9th Cir. 2016).

The depositions in this case were not routine. They involved complex medical evidence, including insulin administration, glucose monitoring, the progression of diabetic ketoacidosis, constitutional liability issues, including training, supervision, and emergency response practices within the Philadelphia Department of Prisons; and fact-intensive testimony requiring real-time impeachment using medical records, policies, and prior statements. Counsel performed various functions, including conducting the examination on the record, managing and introducing exhibits, tracking testimony against prior records and deposition transcripts, and identifying follow-up lines

12

of questioning in real time. These are concurrent litigation functions that, if performed by a single attorney, would sacrifice efficiency and accuracy. Moreover, attendance at the depositions served a necessary function for future dispositive motions and preparations for trial. Counsel gained insight on the testamentary practices of each witness and used that in developing their strategy at trial and took notes to be shared with the team. If they had not attended the depositions, additional time would have been spent reviewing deposition transcripts, which would not have given the attorneys the full picture of the record.

Finally, this argument must be viewed in light of Plaintiffs' overall billing practices. As discussed above, Plaintiffs' counsel excluded significant categories of time from their petition, including intern work and internal support functions. Against that backdrop, the use of multiple attorneys at key depositions does not reflect overstaffing—it reflects targeted deployment of limited resources at critical stages of the case. There is therefore no basis to reduce Plaintiffs' fee award on this ground.

### III.    Defendants' other arguments for a reduction in fees fail.

Defendants identified a genuine but minor and immaterial error in the spreadsheet attachment to Attorney Hu's declaration. As they note, the written declaration correctly multiplies 455.2 hours by a rate of $280 for a total of $127,456.00. The spreadsheet correctly lists the total hours of 455.2, lists a rate of $280, and contains an erroneous multiplication total due to a typo. The correct total number is included in the written declaration as well as the grand total sheet attached as Exhibit 1, and the correct number of  $127,456.00 is incorporated into the total sums listed in the petition, brief, and proposed order. This is not a reason to reduce fees.

Defendants argue that Attorney Serrano's negligible hours prior to admission to the bar on October 20 should be billed at a law student rate. "When attorney's fees are awarded, the current

13

market rate must be used… [which is] the rate at the time of the fee petition, not the rate at the time the services were performed." *Lanni v. New Jersey*, 259 F.3d 146, 149–50 (3d Cir. 2001); *Oross v. Kutztown Univ.*, No. 21 Civ. 05032 (JLS), 2025 WL 3644245, at *3–4 (E.D. Pa. Dec. 16, 2025) (same). This is not a reason to reduce fees.

A prevailing party is entitled to compensation for time "reasonably expended on the litigation." *Webb v. Board of Educ. of Dyer County*, 471 U.S. 234, 242 (1985) (citing *Hensley*, 461 U.S. 424). Time is reasonably expended "on the litigation" when it is "useful and of a type ordinarily necessary to secure the final result obtained from the litigation." *Penn. v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 561 (1986). Hours incurred prior to the filing of a lawsuit are recoverable if they meet the above test. *Webb*, 471 U.S. at 243 (listing drafting of complaint and development of theory of the case as "obvious examples" of recoverable pre-complaint hours).

Defendants attempt to spin caselaw limiting recovery of fees for clerical "or administrative" tasks into a bar on recovery for "tasks and costs of administration of the estate, which was not a litigation activity." Dkt. 223 at 6 n.7. On the contrary, establishment of an estate was a necessary predicate of filing and litigating a § 1983 lawsuit with survival claims.[6] Time spent establishing the estate was reasonably expended on this litigation. *See Harvey v. Mohammed*, 951 F. Supp. 2d 47, 57–58 (D.D.C. 2013) ("any § 1983 cause of action which had accrued to [the decedent] survived in favor of his legal representative, namely, his estate. The costs of establishing

---

[6] Federal law does not dictate the survival of civil rights actions under § 1983; the law of the state in which the district court sits governs survival of civil rights actions. *Robertson v. Wegmann*, 436 U.S. 584, 589 (1978). "Survival actions under the Pennsylvania Survival Act, 42 Pa.C.S. § 8302, are brought by the administrator of the estate to benefit the decedent's estate." *Rodi v. Williams*, No. CIV.A. 4:12-1379, 2015 WL 1863006, at *1 (M.D. Pa. Apr. 23, 2015) (*citing Kiser v. Schulte*, 648 A.2d 1 (Pa. 1994)). A decedent's estate cannot be a party to any litigation unless a properly appointed personal representative exists. *See Prevish v. Nw. Med. Ctr. Oil City Campus*, 692 A.2d 192, 200 (Pa. Super. Ct. 1997), *aff'd*, 553 Pa. 73, 717 A.2d 1023 (1998).

14

that estate were necessary to the pursuit of the § 1983 action and were thus 'reasonably expended

on the litigation.' The Court will award attorneys' fees for the establishment of the estate.")

## IV.      Conclusion

For the foregoing reasons, this Court should award Plaintiffs' attorney's fees and costs in

full.


DATED: April 6, 2025                              Respectfully submitted,

                                                  */s/ Bret Grote*
                                                  Legal Director
                                                  PA ID No. 317273
                                                  bretgrote@alcenter.org
                                                  */s/ Rupalee Rashatwar*
                                                  Staff Attorney
                                                  PA ID No. 331085
                                                  */s/ Nia Holston*
                                                  Staff Attorney
                                                  PA ID No. 327384
                                                  */s/ Margaret Hu*
                                                  PA ID No. 334438
                                                  */s/ Lolo Salsbury Serrano*
                                                  PA ID No. 338184
                                                  Abolitionist Law Center
                                                  990 Spring Garden St., Ste 306
                                                  Philadelphia, PA 19123

**CERTIFICATE OF SERVICE**

I, Bret Grote, Esq., hereby certify that I caused a true and correct copy of the foregoing Reply Brief in Support of Plaintiffs' Petition for Fees and Costs to be electronically filed on April 6, 2025, and thereby served upon all parties entered into the Court's ECF system.

*/s/ Bret Grote*
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123

*Counsel for Plaintiffs*

16