**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JACOB and JAMES JUNG, as Administrators of the Estate of LOUIS JUNG, JR, | : : : | No. 2:24-cv-05618-TJS |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO CITY OF PHILADELPHIA'S MOTION FOR ENTRY OF JUDGMENT NOTWITHSTANDING THE VERDICT, REMITTITUR, AND/OR A NEW TRIAL.**

City Defendants raise multiple arguments seeking to set aside a jury verdict properly supported by evidence and the law. Alternatively, they seek to minimize their properly imposed liability by passing the buck to YesCare. As with their contractual indemnification theory, none of these arguments are meritorious. The jury's verdict was evidentiarily and legally sound. There is no legal basis for City Defendants to seek contribution from YesCare, and apportionment at trial was properly rejected. Defendants' motion should be denied.

**I.      Judgment Notwithstanding the Verdict Should Be Denied.**

Defendants misread the verdict sheet and jury instructions to conclude that the jury only found *Monell* liability based on failure to supervise YesCare. The jury's verdict was consistent with acceptance of Plaintiff's *Monell* theories and supervisory theories against Carney related to the failures of correctional staff as well. Plaintiffs presented more than enough evidence for the jury to find that the City's deliberate indifference to correctional staff's customary failure to

1

identify or respond to medical emergencies, and the City's or Carney's failure to supervise correctional staff in the same, were a driving force of Mr. Jung's death.

Even if the jury had only accepted Plaintiff's *Monell* and supervisory theories related to the failures of YesCare, both the evidence presented at trial and the law would support their verdict. YesCare's status as a private contractor does not alter the foundational *Monell* or supervisory frameworks - it does not lessen Plaintiffs' burden of proof, but it also does not immunize the City or its supervisory officials. Plaintiffs presented more than enough evidence to conclude that the City's deliberate indifference to YesCare's atrocious treatment of diabetes, and failure to supervise YesCare in the same, was a driving force of Mr. Jung's death.

    a.   The legal standards applicable to Plaintiffs' *Monell* and supervisory theories.

As briefed in opposition to City Defendant's motion for summary judgment, and as laid out in the jury instructions at trial, Plaintiffs pursued *Monell* theories of both custom and failure-to-supervise with underlying patterns related to both correctional staff and YesCare.

A § 1983 claim against a municipality "may proceed in two ways. A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (cleaned up). With respect to their custom claim, Plaintiffs pursued a theory of the City's knowledge and acquiescence in correctional staff's failure to provide access to care, and YesCare's custom of deficient diabetes care. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 971-72 (3d. Cir. 1990); N.T. 3/2/26, 106:12-21. Causation under a custom theory requires a showing that "(1) the municipality or its final policymaker(s) knew that similar unlawful conduct had occurred in the past, (2) but failed to take precautions against future violations, and (3) these failures contributed to the plaintiff's injury." *Chambers v. City of*

*Philadelphia*, No. CV 23-0137, 2024 WL 870574, at *4 (E.D. Pa. Feb. 29, 2024) (*citing Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)).

With respect to their failure-or-adequacy claim, Plaintiffs pursued a theory of failure to supervise and proved the requisite deliberate indifference: a showing that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999); N.T. 3/2/26, 107:11-108:9.

Individual defendants who are policymakers, such as Defendant Carney, are liable under § 1983 if it is shown that such defendants, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (*citing Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). Individual defendants may also be liable in their supervisory capacity if they, "as the person in charge, had knowledge of and acquiesced in [their] subordinates' violations." *Id.* (*citing Baker v. Monroe Township*, 50 F.3d 1186, 1190-91 (3d. Cir. 1995)). "A high-ranking prison official can expose an inmate to danger by failing to correct serious known deficiencies in the provision of medical care to the inmate population. That the official had no specific knowledge of any particular inmate or the failure of subordinate officials to treat that inmate's serious medical condition is irrelevant." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 324 (3d Cir. 2014), *overruled on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015).

3

b. The jury's verdict was consistent with *Monell* theories related to correctional staff, in addition to YesCare, and was supported by evidence at trial.

Defendants adopt a strained reading of the verdict form in isolation to conclude that the jury rejected Plaintiffs' theories against Defendant Carney related to supervision of correctional staff, rather than YesCare alone. They then extrapolate this strained reading to conclude that the jury rejected a *Monell* theory against the City rooted in customs of or failure-to-supervise correctional staff.

This conclusion is directly belied by the instructions read to the jury before they filled out the form. They were instructed that "Plaintiffs may show that Defendant Carney is liable for Defendants Bloodsaw and Frasier's conduct by showing that she, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the conduct." Notes of Testimony (hereafter "N.T.") 3/2/26, 102:10-14. They then received two extensive instructions incorporating "customs" that could be found to result in supervisory liability for Carney – one related to the medical provider, as well as a "custom of correctional staff in failing to respond to medical emergencies…" The jury answered "yes" to the question "Did defendant Blanche Carney establish and maintain a policy, practice, or custom which directly caused the violation of Louis Jung, Jr.'s constitutional right to medical care?" Dkt. 223-1. The jury also answered "yes" to the question "Did defendant City of Philadelphia violate Louis Jung, Jr.'s constitutional right to necessary medical care?" after receiving extensive instructions on failure-to-supervise and custom claims on theories relating to correctional staff, as well as YesCare. The jury found egregious misconduct on the part of correctional staff member Lieutenant Bloodsaw in this case, and gave a verdict consistent with Plaintiffs' *Monell* and supervisory theories relating to the conduct of correctional staff.

4

Plaintiffs presented abundant evidence of the City's and Defendant Carney's acquiescence in customs of, as well as deliberately indifferent failure to supervise, correctional staff. It is undisputed that Defendant Carney was a policymaking official for the City with respect to management and supervision of correctional staff. Defendant Carney was presented with the findings of sixteen investigations of deaths-in-custody at the PDP. For the fifteen cases that sustained disciplinary charges against correctional staff, she agreed with Plaintiffs' characterization of each and every one as either a failure to make rounds or a failure to provide access to care. N.T. 2/25/26, 124-146. Defendant Carney steadfastly maintained that these cases represented individual, "episodic" failings. *Id.* at 117. She testified that she never ordered an inquiry into whether there were systemic issues in staff failing to make rounds that would identify medical emergencies, or failing to ensure access to care when they came upon a medical emergency. *Id.* at 117-18, 145-46. Even excluding those cases implicating only rounds, Defendant Carney had admitted to reviewing seven distinct reports in which staff's failure to provide access to care had resulted in death. She refused to investigate systemic problems; she refused to consider systemic fixes. The jury then found that Mr. Jung's constitutional rights had been violated by an individual correctional staff member – they found Lieutenant Bloodsaw liable for failure to provide Mr. Jung access to necessary medical care, resulting in his death.

The jury had been presented with sufficient evidence to conclude that Defendant Carney knew of and acquiesced in a custom of failures to provide access to care. The jury had been presented with evidence that Carney knew correctional employees would confront medical emergencies such as Mr. Jung's; that there was a history of correctional employees mishandling such emergencies; and that the wrong choice by an employee would frequently cause deprivation of constitutional rights. *Carter*, 181 F.3d at 357. The jury had seen evidence that in seven instances,

5

personally reviewed by Defendant Carney, correctional staff's failure to provide access to care had resulted in deprivation of life itself. The jury had reviewed evidence of similar failure to provide access to care in the past; heard Defendant Carney's testimony that she refused to take precautions against future violations, because she refused to consider these failings systemic; and was entitled to conclude that these failures contributed to Mr. Jung's injury. *Chambers*, 2024 WL 870574 at *4. The jury found that there was an individual failure to provide access to care in Mr. Jung's case, and found that Defendant Carney had maintained a policy, practice, or custom that resulted in the violation of his constitutional rights. YesCare aside, the evidence and law was sufficient to support a *Monell* and supervisory-liability verdict on the correctional-staff theory alone.

      c.   The distinction between employees and contractors is immaterial to *Monell* and supervisory liability.

Even if the jury had only accepted Plaintiff's *Monell* theory related to medical contractor YesCare, both the evidence adduced at trial and the law would support their verdict. Defendants misread both *Est. of Borroto* and *Meyer* and ignore additional authority cited by Plaintiffs to contend that YesCare's status as an independent contractor, rather than an employee, renders the City immune to *Monell* claims linked to YesCare's acts. They assert that Plaintiffs proved only negligence on the part of YesCare, rather than a systematic custom of constitutionally infirm diabetes care of which the City was aware.

The Third Circuit does not recognize a "difference of constitutional import" between employees and private contractors. *Barkes*, 766 F.3d at 326–27 ("No reasonable prison administrator could believe that hiring a private contractor to provide a constitutionally required service would allow them to abdicate their constitutional supervisory duties.") It is in this sense that courts refer to a city or county's duties as "non-delegable." An unconstitutional custom carried out by a private health contractor can result in *Monell* liability for a city under a constitutional

obligation to provide health care to the people it imprisons – provided, of course, that the unconstitutional custom "otherwise satisfies the *Monell* requirements." *Est. of Borroto v. CFG Health Sys.*, LLC, 751 F. Supp. 3d 443, 473 (D.N.J. 2024). *See also Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985); *Ponzini v. Monroe Cnty.*, No. 3:11-CV-00413, 2015 WL 5123720, at *11 (M.D. Pa. Aug. 31, 2015) (describing County's duty as "nondelegable" in that "Monroe County cannot immunize itself from liability for constitutional harm merely by delegating the provision of medical care in its correctional facility to the independent entity PrimeCare Medical, Inc.," and allowing *Monell* claim to survive summary judgment because "[t]here remain material, disputed questions of fact about Monroe County's vigilance in supervising its contract with PrimeCare Medical, Inc.").

Each of these cases rejected arguments by a government defendant that delegation of medical care to a private corporation absolved the government of its constitutional duty to provide medical care, leaving only the corporation subject to suit. The Third Circuit in *Barkes* found that prison administrators could be held liable, provided that facts supporting the stringent standard of personal involvement in failure to supervise were proven. The *Barkes* court recognized that liability based on failure to supervise a private contractor requires the same standards as liability based on failure to supervise employees. The *Ponzini* court found that a county's lack of vigilance in supervising a contract with a private medical company could give rise to liability. A county can be held liable for its own deliberate indifference to a contractor's pattern of failures.

While *Meyer v. Holley* addresses and rejects a species of "nondelegable duty," it assigns a different meaning to the term "nondelegable" and arises in a different legal context. *Meyer* rejected a form of "nontraditional vicarious liability," strict liability for an individual corporate officer of a corporation that was itself subject to *respondeat superior* liability under the Fair Housing Act.

7

*Meyer*'s discussions of § 1981 is limited to a citation to *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 393 (1982), which rejected a conception of "nondelegable duties" equivalent to strict *respondeat superior* responsibility for a contractor's discrimination under § 1981. Neither of these cases addresses the government entity's acquiescence in a contractor's custom, or a government entity's failure to supervise a contractor.

Unlike the strict-liability, *respondeat superior* gloss on nondelegable duties rejected in *Meyer* and *Gen. Bldg.*, Plaintiffs have never claimed that the City of Philadelphia could be held liable based on proof of malfeasance by YesCare and nothing more, in the same way that an employer can be held liable for an employee's tort. Plaintiffs pled, briefed, elicited evidence at trial, and proved to the jury that the City of Philadelphia's relationship to YesCare's violations met all the requirements of *Monell*. Defendants are correct that *Monell* imposes a "demanding requirement" of demonstrating either a failure or inadequacy on the part of the municipality amounting to deliberate indifference, or deliberate indifference to a custom of unconstitutional acts. *Forrest*, 930 F.3d at 105; *Carter*, 181 F.3d at 357. These requirements are precisely what Plaintiffs pled and proved.

More than sufficient evidence of the City's knowledge of and acquiescence in YesCare's customs of unconstitutional diabetes care and deliberately indifferent failure to supervise YesCare were presented at trial for the jury to find *Monell* liability. YesCare's status as a contractor rather than employee does not relax the *Monell* standards. But it also does not immunize the City from liability under *Monell*.

8

II.    **Plaintiffs presented abundant evidence that the City knew of and acquiesced in customs of deficient diabetes care by YesCare and that the City failed to supervise YesCare, along with evidence that these failures led to a violation of Mr. Jung's constitutional rights.**

Plaintiffs presented evidence that Defendant Carney and the PDP did, in fact, take on supervisory responsibilities over YesCare's provision of medical care. Defendant Carney testified that she herself had a responsibility as Commissioner to ensure that there was an effective system of oversight of the medical care within the Philadelphia Department of Prisons, and that this oversight required ensuring that YesCare was adhering to its obligations to provide proper medical care. N.T. 2/25/26, 113. Plaintiffs presented evidence that the PDP had established an office of medical operations which took responsibility for measuring YesCare's compliance with the terms of their contract, including appropriate treatment, quality of care, and timeliness of care. *Id.* at 111. Plaintiffs called as a witness the PDP's medical contract monitor, Sandy Varghese, a full-time employee ostensibly dedicated to providing this oversight. *Id.* at 83-99.

Plaintiffs then presented abundant evidence that the PDP failed to follow through on their oversight responsibilities. Plaintiffs presented evidence that a shocking number of diabetic patients were hospitalized for diabetic complications. N.T. 2/25/26, 187-88 (Dr. Venters' testimony that the PDP's rate of hospitalization for diabetic complications was "a significant amount" and a "serious health problem"). The PDP was notified of each and every hospitalization that occurred from its facilities. *Id.* at 112-13. The PDP audited emergency room transfers to determine if patients should have been sent to the emergency room– but not to determine whether they were receiving an appropriate level of care within the prisons. *Id.* at 88. Ms. Varghese testified that she had not conducted a single independent audit of daily diabetes care – glucose checks or insulin administration – between 2020 and 2023. *Id.* at 86-87. Plaintiffs' expert Dr. Venters walked the jury through what an audit of these hospitalizations would have shown – that hospitalized patients'

medication administration records, which were owned by the City, were regularly plastered with a failure to document or administer insulin doses and blood glucose checks. *Id.* at 190-201. Dr. Venters found that instances of documented critically high or low blood sugar levels were not appropriately addressed with clinical follow-up. *Id.* at 190:17-21; 193:15-22. Dr. Venters described the regularity with which insulin was either not administered or not documented for diabetic patients at PDP as "terrifying." *Id.* at 196:18-21.

These consistent lapses in care were visible from the records of other patients Dr. Venters reviewed, as well as Mr. Jung's own records. *Id.* at 192:10-13; 193:10-13; 197:14-24; 200:18-20. Plaintiffs presented evidence that Mr. Jung was hospitalized from the PDP six times over two years, five of these times for diabetic ketoacidosis, with the same pattern of atrocious documentation, missed doses, and lack of follow-up as other diabetic patients in the PDP. *See id.* at 231:2-10.

Commissioner Carney was directly notified of a serious lapse in diabetes care in the singular audit that touched on diabetes, shortly before Mr. Jung's death. The independent audit conducted in June of 2023 did not track critical, daily diabetes care, such as insulin administration or glucose checks. The auditor did, however, perform a limited review of chronic care clinics for diabetes. He concluded that "refusals of potentially life-saving treatments, such as diabetes care, should be witnessed by a medical provider in a medical setting. This infrequently happens. Many refusals for chronic care visits are not documented in writing at all." N.T. 2/25/26, 149:22-150:3. Defendant Carney reviewed this report when it was produced in June of 2023. *Id.*at 148:13-15, 149:3-5. Carney testified that she ordered a refresher training on refusals in response, but could not recall when, and only "believed" it had been carried out. *Id.* at 152-54. The jury had previously seen training records for Defendants Fraiser and Bloodsaw, also entered into evidence as Plaintiffs'

10

exhibits 11 and 21. These included records through 2025, well after Mr. Jung died; neither contained evidence of a refresher training in refusal of healthcare services after June of 2023. N.T. 3/2/26, 42:8-21. The jury was entitled on this record to disbelieve Carney's claim about the refresher training in its entirety, or to find that her lack of follow-through was woefully insufficient.

The jury heard evidence from Plaintiffs' experts and from Defendant Carney herself about regular failures in administration and documentation of insulin; a pattern of diabetic emergencies occurring with startling regularity; and a pattern of improper "refusals" of diabetic care. These are precisely the extraordinary lapses in medical care that led to Mr. Jung's unconstitutional mistreatment, suffering, and death.

Defendants' claim that Plaintiffs presented evidence only to support medical negligence is farcical. While Drs. Venters and Williams did testify as to lapses in the "standard of care," plaintiffs' experts are not obligated to testify on the ultimate legal issue of "deliberate indifference" in order to support a finding of a constitutional violation. Rather, the evidence adduced at trial established conclusively, time and again in Mr. Jung's final days, that an excessive risk of serious harm to Mr. Jung was obvious and that YesCare or PDP failed to take reasonable measures that would have met the standard of care, followed their own written policies, and saved his life. This is deliberate indifference. *See* N.T. 3/2/26, 100:2-8.

Plaintiffs presented evidence that Mr. Jung's urgent diabetic crisis was obvious from intake, when he presented with a dangerously elevated blood sugar level of 542; remained obvious throughout his final week at PDP, when his blood sugar was critically high on multiple occasions but staff failed to perform follow-up checks or administer corrective insulin; and was obvious on November 5, 2023. 2/26/26 at 81-105. Dr. Williams' testimony established that Mr. Jung lying on the floor was consistent with common symptoms of diabetic ketoacidosis. *Id.* at 105:14-20. Despite

11

the obviousness of his urgent condition from October 28 to November 6, 2023, Mr. Jung was regularly deprived of insulin; medical staff failed to document insulin on multiple occasions; and on his final day he was picked up and locked into his cell, rather than provided with medical attention. *See* Plaintiffs' Trial Exhibits 2, 15. Twice in his final week, Mr. Jung was recorded as "refusing" insulin, but YesCare staff failed to document informed consent or secure him follow-up with a provider. N.T. 2/26/26, 93:9-24. His final dose of insulin before he died, in the P.M. of November 5, 2023, was just such an improper "refusal." *Id.* It was as Defendant Carney had been warned.

Plaintiffs proved that Commissioner Carney, the PDP, and therefore the City of Philadelphia had actual knowledge of YesCare's consistent failures, satisfying the causation inquiry for the customs claim and the knowledge and "history of mishandling" prongs of failure-to-supervise deliberate indifference. *Chambers*, 2024 WL 870574 at *4; *Carter*, 181 F.3d at 357. The City owned the facially-deficient medical records, pockmarked with failures to document or administer insulin. The PDP was notified of each and every hospitalization. But its designated auditor chose not to pursue inquiry into whether hospitalizations were preventable; whether insulin was documented; or whether diabetic patients were receiving insulin at all. Defendant Carney was warned of YesCare's failures – in June of 2023, she received explicit notice that proper documentation of diabetes refusals "infrequently happens." YesCare's proven track record of failing to track or administer insulin, leading patient after patient to be sent to the hospital, was obviously bound to cause further deprivation of constitutional rights. As Plaintiffs' experts established at trial, and as the City knew, diabetes is an extremely serious but easily treated medical condition. Insulin must be administered, or patients will die. Insulin was not administered – not

12

documented, marked "no show," or improperly noted as "refused." And Mr. Jung died a preventable death.

Plaintiffs proved *Monell* and supervisory claims against the City and Defendant Carney for their failure to supervise YesCare and acquiescence in YesCare's customs of deficient care. They proved a constitutional violation in Mr. Jung's case. Judgment notwithstanding the verdict must be denied.

**III.   Because Contribution is Unavailable and Apportionment was Properly Denied, Remittitur or a New Trial is Unwarranted.**

As described in detail above, the City and City Defendants were properly held liable for their own conduct in this case. While certain of these theories were linked to patterns of deficiency in YesCare's treatment of diabetes, the City had an independent constitutional obligation to ensure medical care and it had taken on obligations to supervise YesCare through its contract and in practice. The City was properly held liable. City Defendants now advance multiple arguments for why YesCare should nevertheless pay their bill. None are meritorious. Contribution is not available under either federal or state law. Apportionment was properly denied. Neither remittitur or a new trial are called for.

a.   Contribution is unavailable under § 1988

The vast majority of courts to address the issue have found that there is no federal right to contribution for Section 1983 violations. This is the majority position in Third Circuit district court cases, especially in recent years. *Rocuba v. Mackrell,* 2011 WL 5869787 (M.D. Pa. 2011) (collecting cases rejecting availability of contribution in § 1983 cases); *Loughney v. Correctional Care, Inc.,* 2024 WL 1494178 (M.D. Pa. 2011) (adopting Report & Recommendation dismissing claim for contribution because there is no right to contribution for § 1983 claims); *Bank v. City of Philadelphia,* 991 F.Supp.2d 523, 538 n.26 (E.D. Pa. 2014); *Hay v. Somerset Area Sch. Dist.*, 2017

13

WL 5029057, at *2-*3 (W.D. Pa. Oct. 31, 2017). This is also the overwhelming majority position out of circuit. *See, e.g., Mason v. City of New York*, 949 F. Supp. 1068, 1077 (S.D.N.Y.1996) (collecting cases); *Katka v. Mills*, 422 F. Supp. 2d 1304, 1310 (N.D. Ga. 2006); *Hepburn ex rel. Hepburn v. Athelas Inst., Inc.*, 324 F. Supp. 2d 752, 755 (D. Md. 2004); *Johnson v. Rogers*, 621 F.2d 300, 304 n. 6 (8th Cir.1980); *Allen v. City of Los Angeles*, 92 F.3d 842, 845 n. 1 (9th Cir.1996), *overruled on other grounds sub nom., Acri v. Varian Assocs., Inc.*, 114 F.3d 999 (9th Cir.1997) (en banc).

In the absence of a federal right to contribution, it would also be improper to turn to state law as a source of contribution rights. Section 1988(a) permits courts to adopt state common law "to furnish suitable remedies and punish offenses" in the absence of clear federal law, but only insofar as such state law is "not inconsistent with the Constitution and laws of the United States." 42 U.S.C. § 1988(a). "The policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." *Robertson v. Wegmann*, 436 U.S. 584, 590–91, 98 S.Ct. 1991, 1995 (1978).

"A majority of courts have concluded that § 1988 does not permit borrowing state laws on contribution, because doing so would conflict with the policies underlying § 1983, including deterrence of conduct that violates constitutionally-protected rights." *Bulfin v. Rainwater*, No. 4:20 CV 689 JMB, 2021 WL 2915057, at *4 (E.D. Mo. July 12, 2021) (collecting cases). *See also Mason*, 949 F. Supp. at 1079 ("contribution among joint tortfeasors in Section 1983 cases would conflict impermissibly with the statutory goal of deterrence and is impermissible under the third prong of the Section 1988 test"); *Dobson v. Camden*, 705 F.2d 759, 766 (5th Cir. 1983), *on reh'g*, 725 F.2d 1003 (5th Cir. 1984) ("A rule that removes the burden of damages from the wrongdoer certainly conflicts with the policy of deterrence"); *Hepburn ex rel. Hepburn v. Athelas Inst., Inc.*,

324 F. Supp. 2d 752, 759 (D. Md. 2004) ("Section 1983's twin goals of compensation and deterrence are not furthered by reducing the defendants' costs of violations while placing the risk of an insolvent defendant on the plaintiff;") *Johnson*, 621 F.2d at 304, 304 n.6 (holding that Minnesota law could be properly applied only because it would bar the non-settling joint tortfeasor's ability to claim contribution from a settling tortfeasor).

The one case cited by defendants, *Brown v. Erie County*, does not support borrowing a right to contribution from state law. The court in *Brown* acknowledged the consensus view that there is no federal right to contribution under § 1983, and cited abundant caselaw to support that "[m]ost courts have concluded that § 1988 does not authorize the borrowing of state law to find a right of contribution because doing so would conflict with the policies underlying § 1983." 2023 WL 3026767, *5 (W.D. Pa. 2023) (internal quotation omitted). It acknowledged a single case to the contrary, *Kohn*, in which the Middle District of Pennsylvania concluded that "deterrence is served as long as the violators are aware that they may be liable in damages, even if they may lessen the impact by obtaining contribution from another party." *Kohn v. School Dist. of City of Harrisburg*, 2012 WL 3560822, *6 (M.D. Pa. 2012). The *Brown* opinion went on to note that "this portion of the Court's analysis in *Kohn* is of questionable vitality and contrary to the weight of authority that holds that § 1988 does not permit importing a state law right of contribution to supplement remedies in a § 1983 action." *Id.*

Plaintiffs respectfully submit that this is a case in which incorporation of state law by operation of Section 1988 would be particularly inappropriate. As the City knows, YesCare is in dire financial straits. In February of 2026, shortly before trial, YesCare was attempting to settle claims that they had defaulted on payments owed in their preexisting bankruptcy proceeding.[1] The

---

[1] For recent coverage of YesCare's default on settlement payments owed in its prior bankruptcy proceeding, see James Nani, *YesCare Settles With Prison Health Trust to Cure Payment Default*, Bloomberg Law (Feb.

*Wall Street Journal* reported that this default risked dissolving their bankruptcy shield under Chapter 11, "opening the door again to medical-injury and creditor lawsuits."[2] On April 2, YesCare's predecessor in bankruptcy Corizon sustained a $307.6 million verdict in a jury trial from an individual who had opted out of YesCare/Corizon's earlier bankruptcy settlement.[3] YesCare has continued to incur lawsuits over the course of the *Jung* litigation, even as it loses income from contracts with correctional systems across the country.[4] On April 14, news broke that YesCare has been failing to provide timely payment to its healthcare staff in the Alabama Department of Corrections.[5]

The City of Philadelphia is currently in the process of evaluating competitive bids from prison healthcare companies that could replace YesCare as the provider for PDP in fiscal year

---

[2], 2026), https://news.bloomberglaw.com/bankruptcy-law/yescare-settles-with-prison-health-trust-to-cure-payment-default-1.

[2] Akiko Matsuda, *Prison Health Contractor YesCare Loses Bankruptcy Shield After Settlement Default*, Wall Street Journal (March 5, 2026), https://www.wsj.com/articles/prison-health-contractor-yescare-loses-bankruptcy-shield-after-settlement-default-2b72a937

[3] Erika Erickson, *'I was Treated Like an Animal': Federal Jury Awards $307.6M to Michigan Inmate Denied Surgery Over Cost*, Click on Detroit (Apr. 3, 2026), https://www.clickondetroit.com/news/local/2026/04/03/i-was-treated-like-an-animal-federal-jury-awards-3076m-to-michigan-inmate-denied-surgery-over-cost/; *see also* Order Granting Emergency Motion to Enforce the Injunction Against Interference with Opt-Out Rights, *In re: Tehum Care Services, Inc.,* Case No. 23-90086, ECF No. 2347 (Bankr. S. D. Tex., July 8, 2025).

[4] Greg Johnson, *Wyoming Inmate Sues, Claims Botched Health Care Led to Leg Amputation*, Cowboy State Daily (Feb. 26, 2026) ("At the time [March 2024], YesCare was just months from losing its contract with the Wyoming DOC after 18 years as the agency's health care provider"), https://cowboystatedaily.com/2026/02/26/wyoming-inmate-sues-claims-botched-health-care-led-to-leg-amputation/; Bryan P. Sears, *Board Awards Health Care Contract Over Objection of Losing Bidder: The Vote Wednesday Cuts Ties with YesCare*, Maryland Matters (June 5, 2024) ("YesCare has drawn criticism in Maryland for how it provides services, as well as failing to pay bills from local hospital systems and a Western Maryland volunteer fire company. There are also ongoing concerns about inadequate staffing by YesCare"), https://marylandmatters.org/2024/06/05/board-awards-health-care-contract-over-objection-of-losing-bidder/

[5] *Alabama Corrections Contractor YesCare Issues Paychecks Days Late*, WSFA 12 (Apr. 14, 2026), https://www.wsfa.com/2026/04/14/alabama-corrections-contractor-yescare-issues-paychecks-days-late/; Morgan Hightower, *Company Late Paying Hundreds of Alabama Corrections Healthcare Workers*, WBRC (Apr. 14, 2026), https://www.wbrc.com/2026/04/14/company-late-paying-hundreds-alabama-corrections-healthcare-workers/

16

2027.[6] The one-year Philadelphia contract is worth up to $80 million.[7] It is possible, even likely, that the City of Philadelphia's decision in this procurement process will make the difference between YesCare's continued existence as a company and another round of insolvency and bankruptcy.

This is exactly the situation envision by the court in *Hepburn*, 324 F. Supp. 2d at 759: reducing the City Defendants' cost of their own violations by placing the risk of an insolvent YesCare on the plaintiffs, and thereby failing to serve the goals of either compensation or deterrence. Plaintiffs did settle with YesCare prior to trial, for a sum that greatly understated YesCare's liability exposure in exchange for a modicum of certainty. Given YesCare's track record and current instability, Plaintiffs still face the risk of enforcing their debt from YesCare in bankruptcy court. Shifting the City's liability to YesCare would decrease the chances that Plaintiffs see a penny of either amount. Plaintiffs proved constitutional violations on the part of the City Defendants that should be deterred, a policy underlying § 1983 that would not be served by contribution under any circumstances. The policy of ensuring compensation would be especially threatened by contribution in this particular case. City Defendants should not be allowed to shift their own liability to a financially unstable co-defendant. Contribution must be denied.

     b.   <u>This court properly denied apportionment on the verdict sheet and a new trial is not warranted</u>

YesCare was not party to the case at the time of trial and was properly omitted from the verdict slip. Apportionment at trial rests on the validity of an underlying legal basis for splitting

---

[6] *See* New Contract Opportunity No. 21251027113751, available on eContractPhilly at https://philawx.phila.gov//ECONTRACT/default.aspx; Request for Proposals for Physical and Behavioral Health Services to Inmates of the Philadelphia Department of Prisons available at https://philawx.phila.gov//ECONTRACT/documents/frmPDFWindow.aspx?docid=212510271137510212 511041535321N&ext=pdf .

[7] *Id.*

liability. As described in detail above, a theory of contribution is unavailable to provide a basis for apportioning liability with YesCare in this § 1983 action. As described in Plaintiff's brief in opposition to the City's cross-claim, their contractual indemnification theory fails on the merits as well. Neither the state-law contract claim nor any theory of contribution justified apportionment in this case. *Cf. Schell v. United States*, No. 2:07CV1119, 2010 WL 11693694, at *1 (W.D. Pa. Aug. 31, 2010) (remaining open to possibility of placing settling defendant on verdict slip in medical malpractice action, but only due to application of Pennsylvania law).

The Third Circuit and multiple other circuits have recognized a city can be held jointly and severally liable for all damages awarded in an action, provided that a properly related *Monell* claim is sustained by the jury. *Lesende v. Borrero,* 752 F.3d 324, 337 (3d Cir. 2014) (collecting cases). The court in *Lesende* rejected a City's argument that they had been held improperly liable for acts of another due to lack of apportionment for this reason: "the jury made a separate finding that the City's liability stemmed from its own unconstitutional policy or custom, in accord with Section 1983 and *Monell*. That finding defeats any inference that the lack of an apportionment instruction caused the jury to not consider the City's liability, separate and apart from that of [the individual with respect to whom they sought an apportionment instruction]." *Id.* at 336-37.

The analysis from *Lesende* applies in the instant case; the City was found liable under a *Monell* theory for failure to supervise YesCare. This finding defeats any inference that the City is being improperly charged for YesCare's violations. Moreover, the jury was properly instructed that they could award compensatory damages only for "any injury [] actually sustained *as a result of the defendant or defendants' conduct*" (emphasis added), plainly referring to the defendants before them who were still in the case. N.T. 3/6/26 at 109:7-8. The omission of apportionment from the verdict slip at trial was proper, and the City's awarded liability is its own.

18

### c. **Conclusion**

The jury's verdict was supported by the evidence and the law. The liability assigned to the City Defendants by the jury is theirs to pay. Contribution is unavailable as a matter of federal law, and importing a contribution theory from Pennsylvania law would violate § 1983 policies of compensation and deterrence. Apportionment was properly denied. Neither a new trial, an overturned judgment, or remittitur are due. The City's motion should be denied.

DATED: April 23, 2026                      Respectfully submitted,

*/s/ Bret Grote*
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
*/s/ Rupalee Rashatwar*
Staff Attorney
PA ID No. 331085
*/s/ Nia Holston*
Staff Attorney
PA ID No. 327384
*/s/ Margaret Hu*
PA ID No. 334438
*/s/ Lolo Salsbury Serrano*
PA ID No. 338184
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123

<u>**CERTIFICATE OF SERVICE**</u>

I, Bret Grote, Esq., hereby certify that I caused a true and correct copy of the foregoing

Brief in Opposition to Defendants' Motion for Judgment Notwithstanding the Verdict to be

electronically filed on April 23, 2026, and thereby served upon all parties entered into the Court's

ECF system.


*/s/ Bret Grote*
Legal Director
PA ID No. 317273
bretgrote@alcenter.org
Abolitionist Law Center
990 Spring Garden St., Ste 306
Philadelphia, PA 19123


*Counsel for Plaintiffs*