**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JACOB JUNG and JAMES JUNG, as Administrators of the Estate of Louis Jung, Jr.** | : | **CIVIL ACTION** |
| **v.** | : | |
| **CITY OF PHILADELPHIA, BLANCHE CARNEY, Former Commissioner of Philadelphia Dept. of Prisons, YESCARE CORP., GENA FRASIER, and WANDA BLOODSAW** | : | **NO. 24-5618** |

## MEMORANDUM OPINION

**Savage, J.** **September 24, 2026**

Louis Jung Jr., an insulin-dependent diabetic, died of diabetic ketoacidosis in his prison cell while housed at the Curran Fromhold Correctional Facility ("CFCF"). A jury, finding his death was avoidable, determined the City of Philadelphia and Lieutenant Wanda Bloodsaw had violated his constitutional right to necessary medical care, and Blanche Carney, former Philadelphia Department of Prisons Commissioner, had established and maintained a policy, practice, or custom which caused the violation of that right. It awarded his estate $1,500,000 in compensatory damages against the City, Carney, and Bloodsaw (the "City defendants"), and $170,000 in punitive damages against Bloodsaw. The jury found Correctional Officer Gena Frasier not liable.

The City defendants move for judgment notwithstanding the verdict on the *Monell* claims,[1] arguing the plaintiffs, representatives of Mr. Jung's estate, failed to prove a

[1] A *Monell* claim allows suit of a governmental entity for civil rights violations under limited circumstances. *See Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978).

constitutional violation. The City and Carney contend the evidence did not prove deliberate indifference, a necessary element to establish *Monell* liability. The City defendants also move for remittitur or, in the alternative, a new trial to apportion damages among the City defendants and YesCare Corp., the City's contracted inmate medical care provider.

We conclude there was more than sufficient evidence to support the verdict, and defendants are not entitled to a reduction of the judgment amount or a new trial. Therefore, we will deny the motion.

**Factual Background**

The evidence included video of Correctional Officer Frasier and Lieutenant Bloodsaw's interactions with Mr. Jung leading up to his death on November 6, 2023.[2] The video was compelling. It showed Frasier and a YesCare nurse walking together during a routine morning medicine call at approximately 9:48 a.m.[3] Mr. Jung asked to speak with the nurse.[4] Frasier and the nurse approached Mr. Jung's cell and opened the cell door.[5] Mr. Jung complained of leg pain, stating he could not walk.[6] Shortly after, he is seen lying on the floor in the doorway.[7] After briefly speaking to Mr. Jung, Frasier and the nurse walked away.[8] Frasier called for Bloodsaw, who is shown briefly interacting

---

[2] *See* N.T. 2/24/26 at 57:8–59:1; 59:24–64:1; 73:21–85:11; 91:6–95:6; 172:15–18; 172:21–173:9; 176:1–180:11; 181:5–184:2, ECF No. 225.

[3] *See id.* at 74:3–76:8.

[4] *Id.* at 159:1–22.

[5] *Id.* at 76:16–77:19.

[6] *Id.* at 161:5–12.

[7] *Id.* at 75:19–76:24.

[8] *Id.* at 77:7–14.

with Mr. Jung as he remains on the floor.[9] As Bloodsaw spoke to Mr. Jung, Frasier handed gloves to two inmates.[10] The inmates then proceeded to Mr. Jung's cell and dragged him into the cell as Bloodsaw watched.[11] An inmate is shown carrying a mattress out of the cell.[12] Frasier noted in her log that Mr. Jung refused to get up even though he had insisted he could not walk.[13] Frasier and Bloodsaw did not return, and Mr. Jung did not receive insulin medication.

Later in the day, at 4:35 p.m., there was an insulin call.[14] Frasier recorded in her log Mr. Jung "refused insulin," even though she could not recall speaking to him after the morning incident.[15] This was the second missed opportunity to receive his insulin medication. Despite the fact that Mr. Jung was a known diabetic, no one checked on him until the next day, when he was found unresponsive and later pronounced dead while in transport to the medical clinic.[16]

Relevant to the *Monell* claims, Carney testified that she had oversight of the medical care provided at the Philadelphia Department of Prisons ("PDP"), including CFCF. She acknowledged that, as the final policy maker, she had the authority to enact

---

[9] *Id.* at 80:9–13.

[10] *Id.* at 80:20–25.

[11] *Id.* at 81:4–82:17.

[12] *Id.* at 82:3–5.

[13] Trial Ex. 10 at 2 ("I/P Louis Jung . . . laying on floor/refuses to get up."); N.T. 2/24/26 at 161:5–12, ECF No. 225 ("I asked him to walk towards me. And then he told me he couldn't walk."). Mr. Jung also had a metal rod in his leg which impaired his movement, complicating his diabetes symptoms. *See id.* at 47:16–18.

[14] *Id.* at 89:15–90:23. An insulin call is when a medical professional provides routine insulin for diabetic inmates.

[15] *Id.* at 91:12–23.

[16] Trial Ex. 3 at 8.

and modify policies governing the medical treatment of inmates.[17] It was her responsibility to ensure YesCare, the City's contractor, delivered necessary medical care.[18] She was aware of every inmate's death while she was Commissioner.[19] She reviewed the reports of each investigation into those deaths conducted by the Office of Professional Compliance.[20]

The City's medical contractor monitor, Sandy Varghese, testified that the City did not conduct an independent audit of YesCare's diabetes care between 2020 and the end of 2023.[21] She explained that after Mr. Jung's death, the PDP requested YesCare to prepare a corrective action plan because they found deficiencies in the care provided to Mr. Jung.[22]

Dr. Venters, the plaintiffs' correctional health expert, opined that the PDP did not adequately oversee YesCare and failed to conduct independent audits of the care YesCare was providing.[23] He testified that the City had information regarding refusals of diabetes care, which should have initiated an investigation into the protocols affecting diabetic inmates.[24] Dr. Venters also opined that because the City knew about issues with YesCare, an independent audit should have been performed to identify and correct inadequate treatment of inmates.[25]

---

[17] N.T. 2/25/26 at 101:12–20, ECF No. 226.

[18] *Id.* at 113:12–20.

[19] *Id.* at 114:6–9.

[20] *Id.* at 114:25–115:3.

[21] *Id.* at 87:7–10.

[22] *Id.* at 98:22–99:4.

[23] *Id.* at 172:4–25.

[24] *Id.* at 185:14–25.

[25] *See id.* at 174:16–19, 175:9–18.

After the conclusion of the plaintiffs' case, the defendants moved for a directed verdict, arguing the plaintiffs had only proven the YesCare defendants' negligence caused Mr. Jung's death, not the deliberate indifference of the City and its employees.[26] We denied the motion.[27]

**Analysis**

We can grant a motion for judgment as a matter of law ("JMOL") pursuant to Rule 50(b) only "if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *In re Lemington Home for the Aged Official Comm. of Unsecured Creditors*, 777 F.3d 620, 626 (3d Cir. 2015) (quoting *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001)). In considering the motion, we may not weigh the evidence, judge the credibility of the witnesses, or substitute our version of the facts for the jury's. *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007), *as amended* (Aug. 28, 2007). We assess the evidence in the strongest light favorable to the verdict winner and accord it every fair and reasonable inference. *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1178 (3d Cir. 1976).

*Monell* Liability

To prove a *Monell* claim against a municipality, a plaintiff must prove either that the municipality: (1) had an unconstitutional policy or custom that led to the plaintiff's injuries; or (2) was deliberately indifferent to the inmate's rights. *Hightower v. City of Philadelphia*, 130 F.4th 352, 356 (3d Cir. 2025) (citing *Forrest v. Parry*, 930 F.3d 93, 105–

[26] N.T. 2/26/26 at 144:16–25, ECF No. 227.

[27] *Id.* at 159:4.

06 (3d Cir. 2019)).

Policymakers such as Carney are liable under Section 1983 if they establish and maintain a policy, practice, or custom which directly caused constitutional harm with deliberate indifference to the consequences. *See Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019). In a *Monell* case, "deliberate indifference requires 'proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Hightower*, 130 F.4th at 357 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). This means a plaintiff must prove that a pattern of similar violations put the municipality on notice that its failure to take corrective action amounted to deliberate indifference to inmates' rights. *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). Supervisors are liable if they have knowledge of and acquiesce in their subordinates' violations. *Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016) (citing *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010)).

There was ample evidence to support the jury's findings that the City and Carney were deliberately indifferent to the need to ensure that correctional staff made regular rounds to check on inmates and followed its own "red flag policy," which required staff to follow up on inmates who did not receive their medication.[28] Their failure resulted in denying Mr. Jung lifesaving medical care. Specifically, Carney acknowledged that she knew about cases where correctional staff failed to make rounds, in some cases resulting in inmate deaths.[29] Even though she was aware of this information, Carney never ordered an inquiry into whether there were systemic issues in failing to make rounds.

[28] *Id.* at 98:10–99:12.

[29] N.T. 2/25/26 at 117:17–23, ECF No. 226.

There was sufficient evidence for the jury to reasonably find that the red flag policy was not followed in Mr. Jung's case. The policy required staff to contact the medical provider when an inmate missed or refused a medication dose.[30] This alerted the medical provider to check on the inmate. Dr. Venters noted that this was a sound policy.[31] It required correctional staff and healthcare professionals to communicate clearly, sending and receiving information to each other if an inmate refused medication. However, it was evident that the policy was not routinely followed. And the City knew it.

Carney testified about the City's investigations into inmate deaths that occurred because of the care or lack of care provided by YesCare, and how she had a responsibility to review them.[32] Carney "reviewed every investigation conducted by the office of professional compliance into deaths when [she was] commissioner."[33]

Dr. Venters testified that there were 58 investigations into inmate deaths within the PDP system between 2017 and 2023. Carney was questioned about 16 of the investigations where the Office of Professional Conduct identified problems.[34] Carney described meetings where YesCare's deficiencies were discussed. She knew she had the responsibility to "ensure that there was an effective system of oversight for the medical care within Philadelphia Department of Prisons."[35] Yet, nothing was done.

---

[30] *Id.* at 220:14–19

[31] *Id.* at 181:15–24.

[32] *Id.* at 114:25–115:6.

[33] *Id.* at 114:25–115:3.

[34] *Id.* at 114:25–115:3.

[35] *Id.* at 113:12–15.

Dr. Venters further testified that there was "a failure of the City to conduct basic oversight."[36] He discussed the importance of conducting an independent audit, rather than accepting reports and numbers from the vendor.[37] He stated there should be quarterly audits that include delivery of diabetes care.[38] He also testified there should be "a special level of scrutiny" for patients who were already sick, like Mr. Jung.[39] He opined that the PDP had enough information, based on documented cases of inmates with diabetes, to initiate an audit of diabetes care.[40]

The City blames YesCare. But, it had a non-delegable duty to provide medical care to its prisoners and to avoid life-threatening conditions. "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *West v. Atkins*, 487 U.S. 42, 56 (1988).

The City had a continuing duty to monitor YesCare's delivery of medical treatment to ensure that inmates were provided adequate medical care and treatment. The evidence, viewed in the light most favorable to the plaintiffs, shows the City did not honor that duty. The City was aware of the red flag failures and the number of inmate deaths from lack of adequate care. Yet, it failed to respond appropriately, even though its lack of action created an unreasonable risk of depriving inmates of adequate medical

---

[36] *Id.* at 171:17–20.

[37] *Id.* at 172:7–173:11.

[38] *Id.* at 175:9–176:10.

[39] *Id.* at 182:6–9.

[40] *Id.* at 184:25–185:4.

treatment. According to Dr. Venters, the City knew it needed to conduct independent audits of YesCare's delivery of medical care to its inmates. Carney knew there were issues with correctional officers failing to make rounds and follow the red flag policy. Despite the risk of injury and death, she did not take corrective action. This evidence supports a finding of deliberate indifference.

The City improperly characterizes the evidence as proving only medical malpractice. It showed more than negligence. A finding of medical malpractice does not preclude a finding of failure to deliver adequate medical care that amounts to constitutional deprivation. As we have noted, the evidence supported the jury's verdict that Carney, as policy maker, knew there were systemic failures to deliver adequate medical care, and she did not take steps to correct that failure. This risked injury and death to inmates in the City's custody.

As the defendants point out, the plaintiffs presented expert testimony about YesCare's failure to meet the standard of care for correctional medical care.[41] However, they did so not to prove YesCare's negligence, but to show that if the City had properly supervised YesCare and conducted independent audits, it could have corrected the deficiencies that resulted in a failure to provide adequate medical care to inmates generally and Mr. Jung specifically.

In short, the evidence supported the jury's verdict. The evidence demonstrated that YesCare's care was deficient, and the City defendants knew it was, creating an

---

[41] *See* Defs.' Post-Trial Mot. for Entry of Judgment on the *Monell* Claims, Remittitur of the Verdict, and/or a New Trial, ECF No. 231, 5.

unreasonable risk of injury and death to inmates, and a constitutional deprivation of medical care.

Motion for Remittitur

The plaintiffs also sued three YesCare employees and an intake nurse.[42] The plaintiffs settled their claims with YesCare and the individual YesCare defendants who were contracted to provide medical care.[43] The plaintiffs accepted the intake nurse's Rule 68 offer of judgment for $200,000.[44] YesCare settled shortly before trial for $1,000,000.[45] As part of the settlement, the individual YesCare defendants were also dismissed.[46]

Characterizing its request as one for remittitur, the City moves to amend the judgment to reflect the $1.2 million settlement the plaintiffs reached with the medical defendants. The City is actually requesting contribution. It argues that because the City defendants were joint tortfeasors with the YesCare defendants, they are entitled to a reduction of the judgment by the settlement amount.

Section 1983 does not expressly provide a right to contribution. 42 U.S.C. § 1983. When federal law does not address an issue, federal courts can apply state law, provided it is not inconsistent with the Constitution or federal law. 42 U.S.C. § 1988(a). Thus, we may apply Pennsylvania law of contribution only if it is consistent with federal law. *See* 42 U.S.C. § 1988(a).

---

[42] *See* First Amended Compl., ECF No. 27.

[43] Pls.' Acceptance of Def. Apollon's of Rule 68 Offer, ECF No. 148; Letter dated 2/25/26, ECF No. 207.

[44] Def. Apollon's Rule 68 Offer of Judgment, ECF No. 147; Pls.' Acceptance of Def. Apollon's Rule 68 Offer, ECF No. 148.

[45] Letter dated 2/25/26, ECF No. 207.

[46] Order Dismissing YesCare Defs., ECF No. 204.

Allowing contribution among defendants who have violated one's constitutional right would be inconsistent with federal law. Contribution or a reduction in the judgment would be "deficient in the provisions necessary to furnish suitable remedies and punish offenses against law." *See* 42 U.S.C. § 1988(a). In other words, contribution would permit the City defendants to shift responsibility for their own unconstitutional conduct to others, defeating the goal of Section 1988 to provide "suitable remedies." *See id.*

Whether contribution is available in Section 1983 cases has not been addressed by the Third Circuit. Many district courts have denied contribution. Some have not. The split arises from different interpretations of *Miller v. Apartments & Homes of New Jersey, Inc.*, 646 F.2d 101 (3d Cir. 1981). While evaluating a Section 1982 claim, the *Miller* court held that there was a federal right to contribution. However, this holding has been questioned. The Supreme Court has since decided two cases that substantially limit the power of federal courts to make federal common law, including a federal right to contribution. *See Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630 (1981); *Northwest Airlines, Inc. v. Transp. Union Workers of America et al.*, 451 U.S. 77 (1981). Additionally, *Miller* relied on *Glus v. G.C. Murphy Co.*, 629 F.2d 248 (3d Cir. 1980), which was later overturned by the Supreme Court and remanded in light of *Northwest Airlines*. *See Retail, Wholesale & Dept. Store Union, AFL-CIO v. G.C. Murphy Co.*, 451 U.S. 935 (1981). As a result, the vitality of *Miller* has been questioned by multiple courts in this circuit. *See, e.g.*, *Bank v. City of Philadelphia*, 991 F. Supp. 2d 523, 538 n.26 (E.D. Pa. 2014); *Brown v. Erie Cnty.*, No. 1:20-cv-251, 2023 WL 3026767, at *1, *4 (W.D. Pa. Apr. 3, 2023) *report and recommendation adopted*, No. 1:12-cv-251, 2023 WL 3027431 (W.D. Pa. Apr. 20, 2023).

We agree with the courts that have declined to follow *Miller* and held there is no contribution in Section 1983 cases. *See, e.g.*, *Loughney v. Correctional Care*, No. 3:19-cv-1101, 2023 WL 2692403, at *1, *2 (M.D. Pa. Mar. 29, 2023); *Smart v. Allegheny Cnty.*, No. 2:15-cv-953, 2018 WL 1023090, 4 at *1, *2 (W.D. Pa. May 31, 2018); *Hay v. Somerset Area Sch. Dist.*, No. 3:16-cv-229, 2017 WL 5029057, at *1, *4 (W.D. Pa. Oct. 31, 2017); *Fishman v. De Meo*, 604 F. Supp. 873, 875-77 (E.D. Pa. 1985).

The Supreme Court has repeatedly emphasized that an important purpose of Section 1983 is deterring "future abuses of power." *Bank v. City of Philadelphia*, 991 F. Supp. 2d 523, 533 (E.D. Pa. 2014) (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268 (1981)). Here, the City violated the constitutional rights of a person in its custody, causing his death. The need for deterrence is demanding. The amount of the judgment together with the settlement amount is not excessive.

Denying contribution is especially appropriate in this case. Not only would contribution benefit a wrongdoer, it would also severely reduce the remedy for a violation of the victim's civil rights. The YesCare defendants settled, including a claim for medical malpractice, for one million dollars. YesCare has since filed for bankruptcy. The plaintiffs are unlikely to collect that settlement amount.

Contribution does not advance the goals of Section 1983. Therefore, we will not reduce the judgment against the City defendants.

**Conclusion**

Viewing the evidence in the light most favorable to the plaintiffs, we conclude it supports the jury's verdict. Remittitur or a new trial to allocate damages is not warranted. Therefore, we will deny the City defendants' motion.